JS 44   (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

EDDYSTONE RAIL COMPANY, LLC

**(b)** County of Residence of First Listed Plaintiff   **DELAWARE COUNTY**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attachment

## DEFENDANTS

BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY GAMBOA, FERRELLGAS PARTNERS, L.P., and FERRELLGAS, L.P.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☒ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | Liability / ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 340 Marine / Injury Product | | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 370 Other Fraud | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 371 Truth in Lending | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 360 Other Personal / ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | Injury / Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury - / ☐ 385 Property Damage | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| | Medical Malpractice / Product Liability | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
No U.S. civil statute; claims arise from maritime contract under admiralty jurisdiction - 28 U.S.C. § 1333(1)
Brief description of cause:
Alter ego; fraudulent transfer; breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                        DOCKET NUMBER

DATE
2/2/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 5 Industrial Highway, Eddystone, Pennsylvania 19022

Address of Defendant: (See list attached for defendants' addresses)

Place of Accident, Incident or Transaction: 5 Industrial Highway, Eddystone, Pennsylvania 19022

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☒   No ☐

Does this case involve multidistrict litigation possibilities?    Yes ☐   No ☒

*RELATED CASE, IF ANY:*

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐   No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☒ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Henry E. Hockeimer, Jr._____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 2/2/17 _____   _____   86768
                            Attorney-at-Law         Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 2/2/17 _____   _____   86968
                            Attorney-at-Law         Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Eddystone Rail Company, LLC | : | CIVIL ACTION |
| v. | : | |
| Bridger Logistics, LLC, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
　　 and Human Services denying plaintiff Social Security Benefits.　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
　　 exposure to asbestos.　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
　　 commonly referred to as complex and that need special or intense management by
　　 the court. (See reverse side of this form for a detailed explanation of special
　　 management cases.)　　　　( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　(X)

| | | |
|---|---|---|
| 2/2/17 | _(signature)_ | Eddystone Rail Company |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 864-8204 | (215) 864-8999 | hockeimerh@ballardspahr.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EDDYSTONE RAIL COMPANY, LLC** ) | Civil Action No. _____ |
| ) | |
| **Plaintiff,** ) | **DEMAND FOR JURY TRIAL** |
| **vs.** ) | |
| ) | |
| **BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY** ) | |
| **GAMBOA, FERRELLGAS PARTNERS, L.P., and** ) | |
| **FERRELLGAS, L.P.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## COMPLAINT

COMES NOW Plaintiff Eddystone Rail Company, LLC, by and through its undersigned

counsel, and alleges upon personal knowledge as to its own acts and as to all other matters

upon information and belief, as follows:

## NATURE OF THIS ACTION

1.      This is an action for money damages and avoidance of transfers arising from a

maritime contract.

2.      Defendants are managers and officers of Bridger Transfer Services, LLC ("BTS")

and the corporate parents of BTS, who held out BTS as a bona fide entity and thereby profited

from BTS' activities.  In February 2013, Plaintiff Eddystone Rail Company ("Eddystone") entered

into an agreement with BTS under which Eddystone agreed to construct and operate a facility

in Eddystone, Pennsylvania to transfer crude oil from railcars to river barges.  BTS agreed to

bring a minimum of 64,750 barrels a day of crude oil to Eddystone's facility every month from

the facility's completion until June 2019.  In reliance on these promises, Eddystone invested

over $170 million to build a rail-to-barge transloading facility.

3.       BTS' parent, Defendant Bridger Logistics, LLC, Bridger Logistics' parents Ferrellgas

Partners, L.P. and Ferrellgas, L.P. (collectively, "FGP"), and BTS' key officers, Defendants Julio

Rios and Jeremy Gamboa, used Eddystone's transloading capacity to conclude and perform

under a contract to deliver crude oil to a Philadelphia area refinery.  Defendants obtained a

matching agreement with a refinery in Trainer, Pennsylvania to deliver at least 65,000 barrels

per day of crude oil from North Dakota through June 2019.  A shipper was also involved in the

arrangements, purchasing the crude in North Dakota and selling it to the Trainer refinery after

Bridger Logistics delivered it.  Bridger Logistics and its affiliates would have crude oil loaded into

railcars in North Dakota rail loading facilities, ship it by train to Eddystone's facility at

Eddystone, and transload it to barges on the Delaware River alongside Eddystone's facility,

which would carry the crude oil to refineries downriver.  Because North Dakota wellhead prices

were substantially lower than the "Brent benchmark" crude otherwise available to Delaware

River refineries, shippers could make a profit even after accounting for the cost of

transportation.  This allowed providers of crude oil transportation like Bridger Logistics and

their control persons to profit.

4.       Eddystone lived up to its agreement with BTS.  From March 2013 to April 2014,

Eddystone built the promised transloading facility.  From May 2014 through January 2016,

Eddystone transloaded every trainload of crude oil that BTS and the Defendants brought to Eddystone.

5.     BTS made the transloading capacity it obtained from Eddystone available to Bridger Logistics on a long-term, exclusive basis so that Bridger Logistics could deliver North Dakota crude to the Trainer refinery.  Bridger Logistics provided funds to BTS so that BTS could make its payments under its agreement with Eddystone that gave rise to that capacity.  If an arm's length relationship existed, no company in BTS' position would have agreed to provide such capacity without an obligation from Bridger Logistics that would cover BTS' costs, including its long-term commitment to Eddystone, and give it an opportunity for profit.

6.     Petroleum prices changed, making North Dakota crude, given its higher transport cost to market, more expensive relative to Brent-priced crude oil.  This change in relative crude oil prices made continued supply from North Dakota unattractive to the Trainer, PA refinery that Bridger Logistics was supplying.  More importantly, the change in price resulted in huge monthly losses to the shipper that had contracted to purchase oil for the Trainer refinery.  This rendered the shipper unable to purchase crude oil for the refinery and pay the minimum volume amounts it owed Bridger Logistics for long.  If the shipper defaulted, Bridger Logistics would still have to pay its obligations to BTS for the reserved capacity of the Eddystone terminal, but would have to find a new destination for the crude oil.

7.     Instead, Defendants tried to solve their problem by improperly using their control of BTS without regard to the obligations to Eddystone.  In January 2016, Bridger Logistics made modifications to its agreements with the shipper and the refinery that allowed them to unwind the crude oil supply arrangements.  No unaffiliated company in BTS' position

3

would have allowed Bridger Logistics to abrogate its obligation to fund BTS' contract payments to Eddystone, for such an abrogation effectively transferred to FGP and Bridger Logistics the almost $140 million present value of BTS' right to receive payments from Bridger Logistics, for no consideration whatever.  Yet that is exactly what Defendants did, improperly using their control of BTS to render it insolvent and unable to pay its creditors.   Defendants also transferred all of BTS' other assets to other FGP entities, leaving it stripped of resources.  Then, for good measure, Bridger Logistics sold the corporate entity BTS for $10 to a newly formed subsidiary of the shipper.  As noted, by February 2016, the shipper was unable to meet its obligations, so it lacked the ability to make BTS' payments in any event.  The now-defunct BTS immediately defaulted on its payments to Eddystone.

8.     But BTS was in fact not the independent bona fide entity that Defendants held out.  Contrary to Defendants' holding out of BTS, it was an entirely captive instrument of Defendants, without operational or financial independence.  By dominating BTS as their alter ego, Defendants are liable for the debts BTS owes to ERC.

9.     And even if BTS were not the alter ego of Bridger Logistics, Defendants' improper use of their control of BTS to have it transfer away BTS' assets to other FGP entities and abrogate implied rights to payment from Bridger Logistics for no consideration whatever constitutes a fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. C.S. §§ 5101 *et seq.*  Bridger Logistics had an obligation to continue to fund the long-term agreement by which Bridger Logistics had acquired years of virtually exclusive access to Eddystone's transloading facility.  Defendants' improper use of their control of BTS to have it allow its implied contract with Bridger Logistics to be abrogated without

payment of reasonably equivalent value resulted in a transfer of value to Defendants – all of them BTS insiders – of almost $140 million.  As a direct result, BTS became insolvent and unable to meet its payment obligations to creditor Eddystone.  Accordingly, Eddystone is entitled to equitable avoidance of the transfer and/or damages compensating Eddystone for the value of the intentional or constructive transfer, together with punitive damages for an intentional fraudulent transfer.

10.     Finally, when a company enters the zone of insolvency, the fiduciary duties of its controlling persons shift from the company's equity owners to its creditors.  Such a company must be managed so as to maximize the return to creditors. Instead, Defendants negligently or intentionally appropriated BTS' assets for their own benefit without providing equivalent value in return and drove BTS into insolvency.  By using their management and controlling powers over BTS to render BTS unable to pay its creditors Defendants violated their fiduciary duties of care and/or loyalty to Eddystone.   Accordingly, Defendants are liable for the economic injury they caused to Eddystone.

## THE PARTIES

11.     Plaintiff Eddystone Rail Company, LLC is a Delaware entity, with its principal place of business in Eddystone, Pennsylvania.

12.     Defendant Bridger Logistics, LLC ("Bridger Logistics") is a Louisiana limited liability company, with its corporate headquarters in the State of Texas.

13.     Defendant Ferrellgas Partners, L.P. is a Delaware limited partnership, with its corporate headquarters in the State of Kansas.

14.     Defendant Ferrellgas, L.P. is a Delaware limited partnership, with its corporate headquarters in the State of Missouri.

15.     Defendant Julio E. Rios II is a resident of the State of Louisiana or Texas.

16.     Defendant Jeremy H. Gamboa is a resident of the State of Texas.

## JURISDICTION

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) (maritime jurisdiction).  Eddystone seeks to enforce payment of a debt arising under a maritime contract.  The maritime contract in question concerns Eddystone's providing the service of transloading crude oil from railcars delivered to Eddystone's facility to vessels at the facility's dock for subsequent shipment downriver.  This Court also has jurisdiction under 28 U.S.C. § 1367(a) (supplemental jurisdiction).

18.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

## FACTUAL ALLEGATIONS

19.     Rios and Gamboa, along with non-defendant James Ballengee, owned and operated a crude oil trading and logistics business.  They created a series of nominally different companies with the name "Bridger" to carry on this business, but treated them all as part of an undifferentiated whole.  The Bridger entities operated without inter-company contracts and were all headed by the very same people and shared employees.  These entities included, among others, Bridger, LLC, Bridger Marketing, Bridger Logistics and its subsidiaries Bridger Rail Shipping, LLC, Bridger Marine, LLC, and BTS (collectively, the "Bridger Group").  The Bridger

Group, holding itself out as Bridger Logistics, provided logistics services for the transport of crude oil from wellhead to end markets in North America.  Bridger Logistics was the sole "member" of BTS, which in the context of a limited liability company means that Bridger Logistics owned all of BTS' equity and controlled all of BTS' decision-making.  Through the Bridger Marketing entity, the Bridger Group purchased and took title to crude shipments until delivery to the purchaser.

20.     In early 2013, shipping crude oil out of North Dakota by rail represented a profitable business opportunity for firms like Bridger Marketing and Bridger Logistics.  Shippers like Bridger Marketing could buy crude oil from the oil production area in North Dakota at a discounted price and later resell it to refineries on the East Coast at a profit.  In February 2013, the prevailing prices for North Dakota crude were more than $20.00 per barrel less than the price for Brent, the primary benchmark price for crude oil on the East Coast.  After covering the expenses of transporting crude oil by rail from North Dakota to the East Coast, shippers could keep as profit a significant part of the $20+ North Dakota/Brent price differential or "spread." Similarly, crude oil logistics firms like Bridger Logistics could earn profits by agreeing to provide these shippers with arrangements to transport crude oil from the wellhead in North Dakota to East Coast refineries.

21.     In order to take advantage of this opportunity, Bridger Logistics needed access to a transloading facility to transfer the crude oil it brought in on rail cars to barges for shipment to oil refineries on the Delaware River.  Thus, Defendants Rios, Gamboa, and Bridger Logistics entered into negotiations with Eddystone to induce Eddystone to commit to building a facility that would give Bridger Logistics exclusive transloading capacity to refineries on the Delaware

River.  To that end, on February 13, 2013, Rios executed the Eddystone Rail Facilities Services Agreement ("RSA") between BTS and Eddystone.

22.     Under the RSA, BTS promised to transload a total of 118,168,750 barrels of crude oil at the Eddystone facility over a period of five years and two months from the date construction was completed.  Every month, BTS was to bring into the transloading facility the equivalent of at least 64,750 barrels per day.  Eddystone would charge BTS $2.25 for each barrel transloaded and, if BTS failed to deliver the monthly minimum volume commitment ("MVC"), BTS would make a deficiency payment of $1.75 for each barrel by which the month's delivered volume fell short of the MVC.

23.     In reliance on the promise to make these payments and on Defendants' holding out of BTS as a bona fide company, Eddystone spent over $170 million in constructing a rail-to-barge crude oil transloading facility for BTS at Eddystone, Pennsylvania which ultimately employed about 50 people.  Eddystone completed and began operating the Eddystone facility on April 17, 2014.  BTS then became obligated to transload its MVC quantity of crude oil or make its deficiency payments.

24.     The RSA allowed Bridger Logistics to obtain its desired business opportunity.  Touting Bridger Logistics' exclusive access to the Eddystone facility's transloading capacity, the Bridger Group was able to sign a deal in June 2014 to acquire and deliver North Dakota crude to Monroe Energy LLC ("Monroe").  Monroe is the owner/operator of a refinery in Trainer, Pennsylvania which refines crude oil into refined products, including jet fuel for Monroe's parent company, Delta Airlines.

25.     The June 2014 Crude Oil Supply Agreement (the "COSA") between Monroe and Bridger Marketing provided and paid for both Bridger Marketing's and Bridger Logistics' services as an undifferentiated package.  The COSA was closely calibrated to BTS' transloading capacity available under the RSA.  Bridger Marketing agreed to acquire and deliver to the Trainer refinery and Monroe agreed to accept and pay for 1.95 million barrels per month through June 2019—roughly equaling BTS' minimum volume commitment to Eddystone under the RSA.  Under the June 2014 COSA, Monroe did not differentiate between payment for Bridger Marketing's services and Bridger Logistics' logistics transportation services.

26.     Bridger Marketing's role was only to acquire, through third-party financing, the crude oil to be sold to Monroe.  Bridger Logistics and its subsidiaries arranged for the transportation of the crude oil shipments from North Dakota to the Eddystone facility by rail, where it was transferred from railcars to barges at Eddystone's dock and then transported down the Delaware River to the refinery at Trainer, Pennsylvania.

27.     Defendants held out to Eddystone that BTS was an independent, bona fide company with substantial operations in addition to the RSA.  Defendants represented that, as of December 31, 2014, BTS had total assets of $98.1 million, including shareholders' (members') equity of $37.9 million, including crude oil truck injection units, construction in progress, and receivables.  These numbers did not include any value for the RSA contract.

28.     Until May 2015, there were no written contracts between Bridger Marketing, Bridger Logistics, and BTS as to how to split the payments from Monroe.  Rios and Gamboa used the Monroe payments as if all Bridger affiliates were one entity.

29.     The course of dealing among the Bridger entities shows that they either operated with one another without regard to corporate entities or through a series of implied contracts.

30.     Defendants were operating BTS without regard to its separate company identity from Bridger Logistics, so Bridger Logistics is fully liable for BTS' debts to Eddystone.  Although the Bridger Group consisted of several separate entities, it was run as a single integrated organization.  Bridger, LLC served as sole member and manager of Bridger Marketing and Bridger Logistics.  Bridger, LLC also served as sole manager of BTS, which had Bridger Logistics as its sole member.

31.     Bridger, LLC employed all the principals and executives who dealt with Eddystone under the RSA, on behalf of BTS.  Julio Rios was Bridger, LLC's President and CEO, and Jeremy Gamboa was its Executive Vice President and Chief Operating Officer.  The rail operations bringing trains into the Eddystone facility were managed by Dion Nicely, Jon Kolniak, and Taylor Phifer, who held the titles of Vice President, Rail and Marine (and earlier Chief of Staff), Manager Rail Operations, and Rail Logistics Coordinator at Bridger, LLC, respectively.  BTS had no personnel of its own.

32.     To accomplish the transport of crude oil to Monroe, Rios and Gamboa had Bridger Group entities enter into contracts with third parties to secure the necessary assets, including BTS' contract with Eddystone.  BTS had no source of cash flow other than the funds it received from Bridger Logistics.  Bridger Logistics provided BTS the funds needed to satisfy its obligations to Eddystone under the RSA by which the Bridger Group had secured access to the Eddystone transloading facility.  Over the nineteen months in which crude oil was shipped to

Monroe and Monroe made its COSA payments, Bridger Logistics paid BTS all of the amounts necessary for BTS to make all of the RSA payments due to Eddystone.

33.     If BTS was not the alter ego of Bridger Logistics, it was operating through a series of implied contracts with Bridger Logistics, which Bridger Logistics abrogated without compensation to BTS.  A parent is obligated to pay its subsidiary for the fair value of services that it receives and, from the start, Bridger Logistics and BTS formed an implied contract for a series of such exchanges.  Bridger Logistics used BTS' transloading services to service Monroe and to fulfill its obligations under its contracts with Bridger Marketing and Monroe.

34.     In providing this service, BTS was a subcontractor of Bridger Logistics, which was providing a packaged product to Monroe and Marketing.  To obtain the transloading capacity to satisfy Bridger Logistics' needs, BTS entered into a five-year minimum volume commitment with Eddystone.  No unrelated third-party subcontractor would have entered into a five-year obligation like the RSA with Eddystone and then provided the transloading services to a third party on a monthly basis at its monthly cost, ignoring the long-term obligation it had incurred. Instead, an arm's length third party would have required an agreement from its prime contractor that it would cover the subcontractor's costs. Thus, the subsidiary BTS committed to provide services to the parent Bridger Logistics in exchange for the parent's implied commitment to make payments to fund the subsidiary's costs.  Bridger Logistics and BTS continuously reaffirmed their implied contract through their course of dealing.  Bridger Logistics and its affiliates transferred to BTS all the funds necessary to make all payments due to Eddystone from May 2014 until February 2016, and during that time BTS consistently made those payments to maintain access to Eddystone's facility for Bridger Logistics.  Through the

consistent transfers and payments over an uninterrupted period of nineteen months, Bridger

Logistics evidenced its obligation to BTS to fund the RSA for its entire term.

36.     In May and June 2015, Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively

"FGP") negotiated with Rios and Gamboa to acquire Bridger Logistics.  Because FGP was only

acquiring Bridger Logistics, it was necessary to divide the Monroe payments between those

being provided for Bridger Marketing's services and those being provided for Bridger Logistics'

services.

36.     Thus, in May 2015, the June 2014 COSA with Monroe was replaced with three

new agreements among Monroe, Bridger Marketing and Bridger Logistics.  First, Marketing

entered into an amended COSA with Monroe whereby Monroe paid separately for Marketing's

services.  Second, Bridger Logistics entered into a new Transportation and Logistics Services

Agreement with Monroe to provide transportation logistics from North Dakota by rail,

transloaded at the Eddystone facility to barges and down the Delaware River to Trainer.  Finally,

the two Bridger entities, Marketing and Logistics, entered into a new Transportation and

Logistics Agreement whereby Logistics agreed to provide logistics services to Marketing.

37.     On June 24, 2015, Bridger, LLC sold Bridger Logistics to FGP.  Rios and Gamboa

personally realized at least $27.1 million and $13.6 million from the sale of Bridger Logistics.

Bridger, LLC retained Bridger Marketing.

38.     As part of the deal, Rios and Gamboa transferred to Ballengee their interests in

Bridger, LLC and joined FGP as its management team for Bridger Logistics.  Ballengee, now sole

owner of Bridger, LLC and its remaining subsidiary Bridger Marketing, renamed them "Jamex,

LLC" and "Jamex Marketing."

39.     To perform under the new arrangement, Bridger Logistics continued to require BTS' access to the Eddystone facility.  The volume capacity at Eddystone's transloading facility matched the volume requirement of the new Transportation and Logistics Agreement with Monroe, so BTS continued to commit the capacity it had secured at Eddystone's facility to Bridger Logistics' needs so that Bridger Logistics could fulfill its obligations under the Transportation and Logistics Agreement with Monroe.  Bridger Logistics continued to fund BTS so that it could make payments to Eddystone under the RSA.

40.     Indeed, FGP publicly represented that access to the ERC transloading capacity was an asset of Bridger Logistics.  In a June 1, 2015 presentation titled "Bridger Acquisition Overview" FGP asserted that Bridger Logistics' "Newbuild, high-quality asset base includes . . . rail . . . unloading terminals . . . to transport a minimum of 65 MBbls/d."  The FGP Form 8-K announcing the purchase of Bridger Logistics observed that "Bridger Logistics' business included . . . rail . . . unloading terminals . . . to transport a minimum of 65 MBbls/d."  FGP's 10-K for the period ending July 31, 2015 states that Bridger Logistics "owns and/or controls" the ERC volume capacity.

41.     FGP also represented that the ERC transloading capacity was "available" to Bridger Logistics in both the Form 8-K announcing the purchase of Bridger Logistics and in FGP's consolidated financial statements.

42.     Subsequent to its separation from Bridger Logistics, Jamex Marketing continued in the business of acquiring crude oil for end users elsewhere, including its amended COSA with Monroe.

43.     But oil prices were changing, eventually making the amended COSA and Jamex Marketing's Transportation and Logistics Agreement with Bridger Logistics quite unprofitable for Jamex Marketing.  The amended COSA pricing was based, in part, on Brent benchmark prices.  Bridger Marketing would profit so long as North Dakota prices remained substantially below Brent.  But the difference between North Dakota crude oil prices and Brent narrowed dramatically to the point where the spread was too narrow for Bridger Marketing to earn any profit through its performance under the COSA.

44.     As the North Dakota–Brent price differential narrowed even further, Jamex Marketing began incurring multi-million dollar losses almost every month.   By the fall of 2015, Jamex Marketing was seeking to negotiate with Monroe and Bridger Logistics to terminate its obligations.

45.     Monroe was receptive to Jamex Marketing's suggestions.  The spread between North Dakota and Brent prices had narrowed to the point where Monroe would be substantially advantaged if it were able to acquire West African crude instead of North Dakota crude under the amended COSA.

46.     Bridger Logistics, FGP, Rios, and Gamboa were also receptive to Jamex Marketing's suggestions.  Although Bridger Logistics and FGP were deriving rich profits from its Transportation and Logistics Agreements with Monroe and Jamex Marketing, it was clear that Jamex Marketing was losing money at such a rapid clip that Jamex Marketing would run out of cash to acquire crude oil for Monroe or to pay its Transportation and Logistics Agreement obligations to Bridger Logistics.  This would end revenue from the Transportation and Logistics Agreement from Monroe well before the June 2019 end of its term, leaving Bridger Logistics

and BTS with the obligations for the matching transloading capacity at the Eddystone facility secured under the RSA.  Accordingly, the Defendants developed a plan to wind down the exposure to Jamex Marketing, strip BTS of its assets, but without providing for payment of Bridger Logistics' obligation to BTS and its creditor Eddystone.

47.     On January 13, 2016, in a set of letter agreements, Bridger Logistics, Jamex Marketing, and Monroe suspended their arrangement for the sale and delivery of crude oil. Jamex Marketing and Monroe agreed to suspend performance under the amended COSA for at least three months, starting February 1, 2016.  This suspension never ended: after extending the suspension, the parties ultimately terminated the amended COSA.

48.     The January letter agreements also provided for the transfer of BTS and its RSA to a newly formed subsidiary of Jamex Marketing.  That transfer was effective on February 1, the very date on which the amended COSA suspension made the Eddystone facility useless both to Bridger Logistics and Jamex Marketing.  Prior to the transfer of BTS to Jamex Marketing, the Defendants transferred all of BTS' real estate, equipment, receivables, and other assets to other FGP entities and allowed BTS to effectively relinquish its right to payment of the RSA obligations from Bridger Logistics, so that BTS' only "asset" was the RSA with ERC.  Indeed, the Defendants prohibited BTS from engaging in any business other than performing under the RSA, which BTS lacked the ability to perform.

49.     Jamex Marketing paid $10 for the now valueless BTS, which twelve months earlier had $98.1 million in assets.  Jamex Marketing, of course, had no use for the stripped BTS and lacked the resources to service BTS' remaining RSA obligations.

50.     Beginning February 1, 2016, BTS (later renamed Jamex Transfer Services) never delivered another train to Eddystone.  Several weeks after Bridger Logistics stopped providing funding, BTS belatedly notified Eddystone of its change in ownership.  BTS refused to make any more payments under the RSA, claiming the RSA was void ab initio.  BTS even falsely claimed that the reason for the termination of the amended COSA and the cessation of shipments to Monroe was that Eddystone refused to consent to a financing arrangement.   Abruptly cut off from the business on which Eddystone had relied, Eddystone had to suspend operations.  Eddystone is still trying to find business to resume operations at the facility.

51.     In response, Eddystone filed a demand for arbitration with the Society of Maritime Arbitrators on April 19, 2016.  Eddystone sought an award for unpaid invoices that had accrued to date and for future minimum volume payments in light of BTS' anticipatory breach of contract.  On January 5, 2017, Eddystone entered into a settlement agreement with Jamex Marketing and James Ballengee, whereby Bridger Transfer Services—now re-named Jamex Transfer Services—consented to an arbitration award.

## **COUNT ONE**
### **(Alter Ego)**

52.     Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 above.

53.     FGP, Bridger Logistics, Rios, and Gamboa completely dominated BTS in all aspects of its business, directing and controlling its day-to-day operations and treating it like a mere department instead of respecting it as an independent legal entity.  BTS was merely the alter ego of Bridger Logistics in several respects.

54.     First, BTS was not capitalized with sufficient resources for its business, providing transloading services for Bridger Logistics.  That required BTS to undertake a substantial minimum volume commitment payment obligation—for the benefit of Bridger Logistics—for which it did not have adequate resources of its own.

55.     Second, if Bridger Logistics did not have an implied contractual obligation to fund the RSA payments BTS was required to make, BTS' making available all of its transloading capacity to Bridger Logistics was not an arm's length transaction for fair value.

56.     Third, BTS did not maintain separate financial records or accounts from Bridger Logistics and Defendants treated and represented to others that BTS' assets were Bridger Logistics' own.

57.     Fourth, Bridger Logistics did not deal with BTS at arm's length.  If there was no implied contract between BTS and Bridger Logistics, Defendants directed BTS to take on the RSA obligations for no compensation to provide Bridger Logistics access to the Eddystone facility, and transferred money to BTS *ad hoc* as its conduit to pay Eddystone.  Defendants treated BTS' assets as Bridger Logistics' own, and represented as much to the wider marketplace by maintaining that Bridger Logistics had exclusive access to a transloading facility in the Philadelphia area and that BTS' capacity was Bridger Logistics'.

58.     Fifth, BTS never paid dividends.  Rios and Gamboa never allowed BTS to earn a profit as a separate entity, but treated it merely as a conduit entity.  Beginning with BTS' first payment to Eddystone, Bridger Logistics transferred funds to BTS just to cover expenses it incurred in the normal course of business.

59.     BTS was thus a façade for the operations of its 100% equity owner, Bridger Logistics.

60.     Considering Defendants' improper use of the company form, the Court should disregard BTS' status as a separate entity.  Bridger Logistics derived substantial benefits from BTS' access to the transloading facility, benefits in addition to its actual use of the facility.   The Court should therefore disregard BTS' status as a separate entity to avoid the injustice of Defendants reaping these economic benefits without paying the associated costs.

61.     In light of the alter ego relationship between BTS and Bridger Logistics, Eddystone is entitled to an order from this Court piercing the corporate veil of BTS and holding Bridger Logistics liable for the debts BTS owed to Eddystone.

**COUNT TWO**
**(Intentional Fraudulent Transfer – 12 Pa. C.S. § 5104(a))**

62.     Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 61 above.

63.     Defendants caused BTS to allow its implied contract with Bridger Logistics to be abrogated without reasonably adequate consideration, thereby transferring to Defendants approximately $140 million of value.  Defendants Rios, Gamboa, Bridger Logistics and FGP therefore engaged in an intentional fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act.

64.     In February 2016, Bridger Logistics unilaterally terminated its implied obligation to BTS.  Through their control of BTS, transferees Rios, Gamboa, Bridger Logistics, and FGP caused BTS to allow its implied contract with Bridger Logistics to be abrogated, transferring about $140 million of value to Defendants without providing BTS reasonably equivalent value.

18

Bridger Logistics then transferred BTS to a subsidiary of Jamex Marketing, an entity it knew or should have known to have insufficient resources to pay the RSA payments in any event.

65.     BTS' right to receive payments from Bridger Logistics was a highly valuable interest in property.  And Defendants, in unilaterally terminating Bridger Logistics' payment commitment, caused BTS to transfer away this property to Defendants for no consideration.

66.     Defendants Rios, Gamboa, Bridger Logistics, and FGP caused BTS to transfer away its property with the intent to hinder, delay, or defraud Eddystone, BTS' principal creditor. The transfer was marked by the following badges of fraud:

    a.  First, the transfer of value was to insiders of the transferor BTS.  Bridger Logistics and BTS were parent and subsidiary at the time.  FGP was Bridger Logistics' 100% parent, and Rios and Gamboa were the officers and controlling persons of BTS as well as Bridger Logistics.  The value was transferred from BTS for the benefit of the insider Defendants.

    b.  Second, Defendant transferees planned clandestinely to transfer away the value of BTS' implied contract.  Defendants never disclosed their shut-off of funding or their plan to terminate shipments until well after the fact.  Nor was the sale of BTS disclosed until after it had occurred and BTS had defaulted on the RSA.

    c.  Third, there was no business purpose for the transfer of BTS, which was merely an effort to hinder Eddystone's collection of its debts.  Defendant transferees knew or should have known that Monroe would not be calling for North Dakota crude much longer, so the transfer was made just prior to a

termination of deficiency payments that they were obligated to pay to BTS.
Indeed, the entire transaction was to hinder Eddystone, for Jamex Marketing
had no business reason to acquire BTS.  Defendants did not even transfer all
documents to BTS' new owners, making it more difficult for Eddystone to
obtain discovery in its arbitration against BTS.

d.  Fourth, the transfer of the value of Bridger Logistics' implied obligation by
causing BTS to allow termination of that contract constituted a transfer of
substantially all of BTS' assets to transferee Defendants.  The implied right to
payment from Bridger Logistics was BTS' only real asset.

e.  Fifth, in return for this essential asset, BTS did not receive equivalent value—
indeed, it received no value whatsoever.  Transferees Rios, Gamboa, Bridger
Logistics, and FGP thus caused BTS to deplete its assets with no corresponding
benefit to BTS.

f.  Sixth, as a result of the transfer to transferees, BTS immediately became
insolvent and defaulted on the RSA.

67.    In light of Defendants' intentional fraudulent transfer, Eddystone is entitled to an
order from the Court avoiding the transaction and requiring Defendants to transfer to BTS the
assets necessary to satisfy obligations owed to Eddystone, damages in the amount of the value
of the transfer, punitive damages, and all other relief described below.

## COUNT THREE

### (Constructive Fraudulent Transfer – 12 Pa. C.S. § 5105)

68.     Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 67 above.

69.     By causing BTS to allow its implied contract with Bridger Logistics to be abrogated without any compensation to BTS, Defendants transferred value to Rios, Gamboa, Bridger Logistics, and FGP without "reasonably equivalent value."

70.     BTS became insolvent as a result of the transfer.

71.     Accordingly, the transfer was a constructive fraudulent transfer under 12 Pa. C.S. § 5105.

72.     In light of Defendants' constructive fraudulent transfer, Eddystone is entitled to an order from the Court avoiding the transaction and requiring Defendants to return the assets to BTS to the extent necessary to satisfy obligations owed to Eddystone damages in the amount of the value of the transfer, and all relief described below.

## COUNT FOUR

### (Breach of Fiduciary Duties of Care and Loyalty to Creditors)

73.     Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 72 above.

74.     From the time that BTS was in the zone of insolvency, the parties to whom Defendants, BTS' controlling persons, including its officers, owed fiduciary duties of care and loyalty to BTS' creditors, including Eddystone.   In the zone of insolvency, BTS' controlling

persons owed creditors a duty to manage BTS in a manner calculated to maximize creditors' recovery of BTS' debts to creditors.

75.     Defendants negligently or otherwise improperly caused BTS to transfer its assets.  Defendants did so knowing that such transfer was for inadequate consideration, was made while BTS was in the zone of insolvency, and would harm BTS' creditors, or they negligently failed to determine the circumstances surrounding the transfer, including its effect on BTS' solvency, the need for adequate consideration, and their duties to BTS' creditors.

76.     If there was an implied contract between Bridger Logistics and BTS, Defendants violated their fiduciary duties of care and/or loyalty to Eddystone by causing BTS to allow the abrogation of that implied contract without any consideration to BTS.

77.     If there was no implied contract between Bridger Logistics and BTS, BTS was insolvent from the moment that it entered into the RSA with Eddystone, as it would have had insufficient resources to make payments under the contract.  In that event, Defendants breached their fiduciary duties of care and/or loyalty to BTS' creditors by failing to secure an arm's length contract that would pay BTS for its services. Defendants thus managed BTS in a way directly contrary to the interests of Eddystone and BTS itself.  They negligently or intentionally allowed BTS' assets, property, and liabilities to be used for the benefit of themselves and their affiliates.  Defendants thus owe Eddystone damages sufficient to compensate it for the injuries caused by their breach of duty and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Eddystone respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

1.      An award of all payments BTS owes to Eddystone under the RSA.

2.      An award against Defendants of all amounts awarded by the SMA arbitration panel in the arbitration between Eddystone and BTS.

3.      All expectation damages available to a party injured by breach of contract at common law and by statute and such other and further relief as this Court deems just and proper.

4.      An order avoiding all direct or indirect transfers from BTS to Defendant transferees and requiring Defendant transferees to undo those transfers.

5.      Damages in the amount of the value of the transfers described in the previous paragraphs.

6.      An award of compensatory damages against Defendants for the economic injury they caused Eddystone through breach of their fiduciary duty in the amount of the foregone minimum volume payments owed under the RSA.

7.      An award of punitive damages against Defendant transferees for their intentional fraudulent transfer and their willful breach of fiduciary duty.

**<u>JURY DEMAND</u>**

Plaintiff Eddystone Rail Company, LLC hereby demands a trial by jury as to all counts so triable.

Dated: February 2, 2017

By: _____

Henry E. Hockeimer, Jr. (I.D. No. 86768)
hockeimerh@ballardspahr.com
Terence M. Grugan (I.D. No. 307211)
grugant@ballardspahr.com

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

Filiberto Agusti (*pro hac vice* application pending)
fagusti@steptoe.com
Jeffrey Theodore (*pro hac vice* application pending)
jtheodore@steptoe.com
Timothy Work (*pro hac vice* application pending)
twork@steptoe.com
Nicholas Petts (*pro hac vice* application pending)
npetts@steptoe.com

**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

*Counsel for Eddystone Rail Company, LLC*