**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:17-cv-00495-RK |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | **Oral Argument Requested** |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., AND
FERRELLGAS, L.P.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ...................................................................3
    A.    The Rail Services Agreement is a Contract between ERC and BTS, Only ...........3
    B.    The Alleged Implied Contract between BTS and Logistics ................................6
    C.    The Sale of Logistics to the FG Defendants and Subsequent Change in Oil Prices ....................................................................................................6
    D.    The Sale of BTS to JTH and the Guarantee by Jamex.....................................7
    E.    JTS Allegedly Breached the RSA and ERC Commenced an Arbitration .............8

ARGUMENT.................................................................................... 8
    I.    ERC FAILS TO SATISFY APPLICABLE PLEADING BURDENS................................................................................8
    II.    ERC FAILS TO STATE A VALID ALTER EGO CLAIM (Count One) ....................................................................................10
        A.    Alter Ego Liability is Limited to Exceptional Circumstances....................................................................10
        B.    Logistics Cannot Be Liable as a Purported Alter Ego of BTS Because the Liability at Issue Accrued after BTS was Sold to Jamex............................................................13
        C.    ERC Fails to Allege Any Plausible Basis to Pierce the Corporate Veil of BTS.................................................15
            i.    No Fraud is Alleged.......................................15
            ii.    Insufficient Allegations of Domination ...........15
            iii.    ERC Fails to Allege Injustice or Unfairness Where It Knowingly Contracted with BTS and Chose Not to Obtain Parent Guarantees ...........17
        D.    ERC's Alter Ego Claim is a Thinly Veiled Attempt to Write into the RSA More Security and Collateral than ERC Bargained For ....................................................19
    III.    ERC FAILS TO STATE ANY FRAUDULENT TRANSFER CLAIM (Counts Two and Three).............................................20
        A.    The "Implied Contract" Allegation on Which Counts Two and Three Depend is Premised on  False Assumptions and Turns Corporate Law on its Head .................................21
        B.    ERC Does Not Plausibly Allege the Existence of a Transfer........23
    IV.    ERC FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY (Count Four)..........................................24
        A.    ERC Fails to State a Direct or Derivative Claim for Breach of Fiduciary Duty....................................................24
            i.    Louisiana Bars Direct Claims by Creditors against Members of an LLC ......................................25
            ii.    ERC Lacks Standing to Pursue a Derivative Claim for Breach .....................................................26

iii.     Even if ERC Had Standing, It Fails to Allege an
Actionable Breach ............................................................27

V.     ERC ASSERTS NO CLAIMS AGAINST THE FG
DEFENDANTS....................................................................................28

CONCLUSION ...........................................................................................................29

**<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                                          **Page(s)**

*Abraham v. Lake Forest, Inc.*,
    377 So. 2d 465 (La. Ct. App. 1979) ................................................................*passim*

*Accurso v. Infra-Red Servs., Inc.*,
    23 F. Supp. 3d 494, 509 (E.D. Pa. 2014) ........................................... 10,  16, 17

*Advanced Tel. Sys. Inc. v. Com-Net Prof. Mobile Radio, LLC*,
    846 A.2d 1264 (Pa. Super. Ct. 2004) ................................................ 12, 16

*Appe & Appe, Inc. v. Appe & David Appe LLC*,
    No. 2010-15082, 2012 WL 3143589 (La. Dist. Ct. June 14, 2012) ...................... 12

*Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.*,
    622 F. Supp. 2d 46 (S.D.N.Y. 2009) ................................................ 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................... 8, 9

*Barnco Intern. v. Arkla, Inc.*,
    28-157 (La. App. 2 Cir. 11/15/96); 684 So. 2d 986 ................................... 12, 15

*Bedford Affiliates v. Sills*,
    156 F.3d 416 (2d Cir. 1998) *overruled on other grounds* ............................ 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................... 8

*Bottom Line Equip., L.L.C. v. BZ Equip., L.L.C.*,
    10-830 (La. App. 5 Cir. 1/25/11); 60 So. 3d 632 ................................... 11

*Bouriez v. Carnegie Mellon Univ.*,
    Civ. A. No. 02-2104, 2005 WL 3006831 (W.D. Pa. Nov. 9, 2005) ...................... 17

*Broussard v. Tipton*,
    2013-1268 (La. App. 1 Cir. 4/24/14); 2014 WL 3559371 ............................. 27

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ..................................................... 6, 19

*Catania v. Zurich Am. Ins. Co.*,
    Civ. A. No. 13-1278, 2014 WL 12599599 (W.D. Pa. June 16, 2014) ..................... 9, 24

*Charming Charlie, Inc. v. Perkins Rowe Assocs., L.L.C.*,
    2011-2254 (La. App. 1 Cir. 7/10/12), 97 So. 3d 595 ................................. 16

*Chengelis v. Cenco Instruments Corp.*,
   386 F. Supp. 862 (W.D. Pa. 1975) .......................................................................... 11, 12, 17

*CMC GH Sisak D.O.O. v. PTC Grp. Holdings Corp*,
   Civ. A. No. 15-1357, 2016 WL 5025750 (W.D. Pa. Sept. 20, 2016) ............................. 11, 15

*CML V, LLC v. Bax*,
   28 A.3d 1037 (Del. 2011) ..................................................................................................27

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ...........................................................................................................22

*Craig v. Lake Asbestos of Quebec, Ltd.*,
   843 F.2d 145 (3d Cir. 1988) ........................................................................................ 13, 14

*Dennis' Nat. Mini-Meals, Inc. v. 91 Fifth Ave. Corp.*,
   172 A.D.2d 331 (N.Y. 1st Dep't 1991) ..................................................................................7

*Destiny Servs., LLC v. Cost Containment Servs., L.L.C*
   2010-1895 (La.App. 1 Cir. 9/20/11) 2011 WL 4375318 .....................................................27

*Double-Eight Oil & Gas, L.L.C. v. Caruthers Producing Co.*,
   44-199 (La. App. 2 Cir. 5/20/09); 13 So. 3d 754 .................................................................26

*Floyd v. Lykes Bros. S.S. Co.*,
   844 F.2d 1044 (3d Cir. 1988) .............................................................................................10

*Glod v. Baker*,
   2002-988 (La. App. 3 Cir. 8/6/03); 851 So. 2d 1255 ..........................................................27

*Hirsch v. Schiff Benefits Grp., LLC*,
   Civ. A. No. 10-2574, 2011 WL 1166127 (E.D. Pa. Mar. 28, 2011) ....................................21

*Hosp. Consultants, LLC v. Angeron*,
   2009-1738 (La. App. 4 Cir. 6/9/10); 41 So.3d 1236 ............................................................27

*Huard v. Shreveport Pirates, Inc.*,
   147 F.3d 406 (5th Cir. 1998) ........................................................................................ 10, 12

*JA Apparel Corp. v. Abboud*,
   682 F. Supp. 2d 294 (S.D.N.Y. 2010) .................................................................................19

*Kidd v. Symbion, Inc.*,
   Civ. A. No. 10-3361, 2011 WL 4020814 (E.D. La. Sept. 9, 2011) ......................................29

*Larkin v. Geico Gen. Ins. Co.*,
   Civ. A. No. 14-1802, 2015 WL 667515 (E.D. Pa. Feb. 13, 2015).......................................3, 9

*Lone Star Indus., Inc. v. Besser Co.*,
  Civ. A. No. 11-1481, 2013 WL 1655983 (E.D. Pa. Apr. 17, 2013) ......................................21

*Lum v. Bank of Am.*,
  361 F.3d 217 (3d Cir. 2004) .....................................................................................................9

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*,
  Civ. A. No. 16-1111, 2016 WL 6962542 (S.D.N.Y. Nov. 28, 2016) ....................................7

*McDonough Marine Serv., a Div. of Marmac Corp. v. Doucet*,
  95-2087 (La. App. 1 Cir. 6/28/96); 694 So. 2d 305 ............................................................25

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
  930 A.2d 92 (Del. 2007) ........................................................................................................26

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp. (NYSEG)*,
  766 F.3d 212 (2d Cir. 2014) ..................................................................................................13

*Nassau Chapter, Civil Serv. Emp. Ass'n v. Bd. of Ed., Union Free Sch. Dist. No.
  3, Town of Hempstead*,
  310 N.Y.S.2d 381 (N.Y. App. Div. 1970) .............................................................................19

*Nicholson Mgmt. & Consultants, Inc. v. Bergman*,
  96-0557 (La. App. 4 Cir. 9/25/96); 681 So. 2d 471 ............................................................25

*Nicolaides v. Bank of Am. Corp.*,
  No. 10-1762, 2012 WL 2864468 (E.D. Pa. July 12, 2012) ....................................................9

*Pearson v. Component Technology Corp.*,
  247 F.3d 471 (3d Cir. 2001) ..................................................................................................11

*In re Pocius*,
  556 B.R. 658 (Bankr. E.D. Pa. 2016) ....................................................................................29

*Port of S. La. v. Tri-Par. Indus., Inc.*,
  Civ. A. No. 11-3065, 2013 WL 2394859 (E.D. La. May 28, 2013) .....................................10

*Prasad v. Bullard*,
  10–291 (La. App. 5 Cir. 10/12/10); 51 So. 3d 35 ................................................................11

*In re Provenza*,
  316 B.R. (Bankr. E.D. La 2003) ............................................................................................28

*Realco Serv., Inc. v. Holt*,
  513 F. Supp. 435 (E.D. Pa. 1980) ............................................................................. 16, 17, 18

*Riggins v. Dixie Shoring Co., Inc.*,
  590 So. 2d 1164 (La. 1991) .......................................................................................... 11, 15

*Riggins v. Dixie Shoring Co., Inc.*,
    592 So. 2d 1282 (La. 1992) ...................................................................... 11, 12, 17

*In re Rite Way Elec., Inc.*,
    510 B.R. 471 (Bankr. E.D. Pa. 2014) ............................................................ 9, 20

*Sands v. McCormick*,
    502 F.3d 263 (3d Cir. 2007) ................................................................................ 4

*Scofield, Inc. v. Daigle, Ltd.*,
    2008-798 (La. App. 3 Cir. 12/10/08); 999 So. 2d 311 ...................................... 26

*Sharkey's Reef, Ltd. v. Polit*,
    96-499 (La. App. 5 Cir. 1/15/97); 688 So. 2d 67 .............................................. 26

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007), *as amended* (Oct. 12, 2007) ............................... 22

*Terrebonne Concrete, LLC v. CEC Enters., LLC*,
    2011-0072 (La. App. 1 Cir. 8/17/11); 76 So. 3d 502 ........................................ 25

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
    Civ. A. No. 08-1498, 2014 WL 1766083 (W.D. Pa. May 2, 2014) ........................ 10,  16, 17

*Unimobil 84, Inc. v. Spurney*,
    797 F.2d 214 (5th Cir. 1986) ............................................................................ 25

*Wrist Worldwide Trading GMBH v. MV Auto Banner*,
    Civ. A. No. 10-2326, 2011 WL 1321794 (D.N.J. Mar. 30, 2011) ......................... 10

*Young v. Adolph*,
    2002-67 (La. App. 5 Cir. 5/15/02); 821 So. 2d 101 ......................................... 25

**Statutes**

La. Code Civ. Proc. Art. 611 ................................................................................... 26

La. R.S. § 12:1301, 12:1302(A)(13), 12:1314, 12:1315(A)(1), 12:1320,
    12:1320(B), 12:1320(C) ............................................................... 16, 24, 25, 26, 28

12 Pa. C.S. § 5101, 5104(a), 5105, 5107, 5108(b) ............................................... 20, 29

Fed. R. Civ. P. 8, 9(b), 12(b)(6) .......................................................... 9, 10, 20, 24, 28

**Other Authorities**

Fletcher, *Cyclopedia of the Law of Corporations* § 41.85 (2016) ............................... 12

Defendants Bridger Logistics, LLC ("Logistics"),[1] Ferrellgas Partners, L.P. ("FGP"), and Ferrellgas, L.P. ("FG" and, together with FGP, the "FG Defendants" and, collectively with FGP and Logistics, the "BL/FG Defendants") respectfully submit this memorandum of law in support of their motion to dismiss (the "Motion") with prejudice the Complaint filed by Plaintiff Eddystone Rail Company, LLC ("ERC").

## PRELIMINARY STATEMENT

Plaintiff ERC is a sophisticated party, a subsidiary within the extensive Enbridge group of companies.  In February 2013, when the price of crude oil promised high profits, ERC entered into the agreement now at issue (as described below, the "RSA") with a single counterparty, non-party Bridger Transfer Services, LLC ("BTS" and, as later renamed under new ownership, Jamex Transfer Services, LLC ("JTS")).  ERC contracted for the *right to request* certain financial assurances, forms of collateral, and limited guarantees in the event that questions arose in the future as to BTS's financial stability, but did not obtain any up front parent or affiliate guarantees, any security, or other means by which it could eliminate the credit risk involved in entering a five year contract with BTS.  ERC accepted the risk that commodity market conditions might change—and the impact of such change on its sole counterparty—presumably satisfied with the opportunities for high profits and the other terms of the contract.  Nor did ERC obtain any provision in the RSA that precluded Logistics from selling BTS if it so chose, another risk knowingly accepted by ERC.  Approximately three years later, those risks came to pass, petroleum prices changed, Logistics sold BTS to non-party Jamex Transfer Holdings, LLC ("JTH," which in turn renamed BTS JTS), and JTS (under new ownership) allegedly breached the RSA  and refused to make deficiency payments allegedly due to ERC.  ERC now seeks to

---

[1] Capitalized terms not defined herein have the meaning given in the complaint (the "Complaint" or "Compl.").

1

pierce the corporate veil of JTS's *former* parent—its *pre-breach* parent—and effectively to obtain the parent guarantee it failed to bargain for in 2013.

ERC concedes that BTS made all payments as due under the agreement through and until the sale of BTS to JTH.  As part of that sale, Logistics provided more than $4 million to the buyer to ensure it paid all of the known outstanding amounts that were due to ERC through the effective date of sale.  And more importantly, JTH expressly acknowledged that it would be liable for all post-closing obligations to ERC and the buyer's parent, Jamex Marketing LLC, guaranteed such obligations.

After the sale, JTS allegedly defaulted on the RSA, despite the promises to assume and guarantee the liability.  On April 19, 2016 (more than two months after Logistics's ownership of BTS ended), ERC commenced an arbitration against JTS (formerly BTS) (the "Arbitration"). On January 5, 2017, ERC allegedly reached a settlement with JTS, Jamex Marketing, and James Ballengee—*i.e.*, the entities that breached the agreement and promised to guarantee performance and a member of the buyer group—which apparently provided for an award against JTS only (the "Award").  ERC now seeks to impose that liability on the BL/FG Defendants.

On these facts, ERC claims it can pierce the veil of JTS to obtain redress from its former owner, Logistics, for a breach that allegedly occurred under its new owner's control.  ERC also asserts Pennsylvania state-law fraudulent transfer claims, premised on a purported *implied* obligation for Logistics to infuse enough money into BTS to cover all BTS's future obligations to ERC, and, lastly, a claim for breach of fiduciary duty.  ERC's Complaint is a patent attempt to get more than it bargained for; its claims have no basis in the law and are contradicted by the

contracts the Complaint relies on.  ERC's attempt to impose liability on the BL/FG Defendants should not be countenanced and the Complaint should be dismissed, with prejudice.[2]

## STATEMENT OF FACTS[3]

### A.  The Rail Services Agreement is a Contract between ERC and BTS, Only

In February 2013, ERC entered into the Eddystone Rail Facilities Agreement (the "RSA")[4] with BTS, pursuant to which ERC agreed to construct/improve and thereafter to operate a rail and barge facility in Eddystone, Pennsylvania, that would transload crude oil.  *See* Compl. ¶ 2; RSA at 1.  BTS, in turn, agreed to utilize the facility for a period of five years and two months by transloading a minimum volume of crude oil through the facility every month (for which it would pay $2.25 per barrel), or, if it sent less than the minimum volume, to make a "deficiency payment."  Compl. ¶¶ 2, 22; RSA at 5 & §§ 2.1, 4.  In early 2013, the price of crude oil promised high profits for such services and, assuming oil continued to flow, BTS would pay ERC more $4 million per month. Compl. ¶¶ 3, 20; RSA at 5.

ERC and BTS are the only parties to the RSA; none of the BL/FG Defendants is a party.  *See* RSA at 1.  At the time that the RSA was entered, BTS was a subsidiary of Logistics, but had no affiliation with the FG Defendants.  *See* Compl. ¶¶ 19, 30, 31.  The FG Defendants acquired

---

[2] ERC should not be permitted to amend its Complaint because it would be futile. As further set forth in the motion to strike filed concurrently herewith, ERC has already had access to extensive discovery in connection with the Arbitration which it evidently used (improperly) to draft its Complaint.

[3] The BL/FG Defendants accept the Complaint's well-pled allegations as true for this Motion only.

[4] Relevant excerpts of the RSA are attached as Exhibit A to the *Declaration of David M. Zensky in Support of Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P.'s Motion to Dismiss Plaintiff's Complaint* filed concurrently herewith (the "Zensky MTD Decl."). The Court may consider the RSA on this Motion because it is integral to the Complaint and ERC explicitly relied upon it in the Complaint. *See Larkin v. Geico Gen. Ins. Co.*, Civ. A. No. 14-1802, 2015 WL 667515, at *4 (E.D. Pa. Feb. 13, 2015); *see also, e.g.*, Compl. ¶¶ 2, 17, 21, 22.

Logistics and its subsidiaries, including BTS, two years later. *Id.* ¶ 37. Through February 2016, BTS made all payments due to ERC under the RSA. *Id.* ¶¶ 32, 34; SDNY Petition at 3.[5]

In February 2016, the membership interests in BTS were sold back to an affiliate of the original owner of Logistics, and the new owner breached the agreement. Compl. ¶¶ 48–50.

The RSA is a complex commercial contract, and ERC is a sophisticated party. As disclosed in this litigation and reflected in the RSA, ERC is part of the Enbridge company with widespread projects.[6] Indeed, the Complaint alleges that ERC invested more than $170 million in the ERC facility alone. *See* Compl. ¶ 2. Altogether, the RSA is almost 40 pages long, with intricate terms governing, *inter alia*, the volumes of crude oil to be handled, standards for the facility, rules for the terminal, scheduling of transloading services, the rights and remedies for the parties, etc. *See* RSA *generally*. Many of the terms favor ERC, such as a right to early termination if its ground lease was terminated, a limitation on BTS's remedies if ERC was unable to transload all or part of its crude oil in any month, indemnification, and the right in ERC's sole discretion to refuse to load BTS's crude oil or to move BTS's crude oil at BTS's cost. *E.g.* RSA §§ 2.3, 4.4, 13.2 & Ex. A § 12.

Payment assurance and the credit risk associated with contracting solely with BTS, was front and center at the time BTS and ERC entered the RSA. The RSA does not contain any representation or warranty as to BTS's (or ERC's) capitalization. Neither does it contain a

---

[5] *See Verified Petition to Enforce Subpoena Issued to Ferrelgas Partners, L.P. in SMA Arbitration*, No. 16-mc-00295-P1 [ECF No. 1] (S.D.N.Y. Aug. 10, 2016) (the "<u>SDNY Petition</u>") at 3 (ERC asserting that "Prior to February 1, 2016, JTS [BTS] had made all such volume deficiency payments when due."). Relevant excerpts of the SDNY Petition are attached as Exhibit B to the Zensky MTD Decl. The Court may consider the SDNY Petition on this Motion because it is a matter of public record. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (judicial proceedings, including order and transcripts, constitute public records).

[6] *See ERC's Disclosure Statement Form* [ECF No. 2] (disclosing as ERC's parents and owners of 10% or more of its stock: Enbridge, Inc., Enbridge Energy Management, L.L.C., and Enbridge Energy Partners, L.P.); *see also e.g.*, RSA § 15.8 (notice to ERC requires notice to Enbridge Rail (Philadelphia) LLC); *id.* at 3(referencing Enbridge's North Dakota rail facility and pipeline station); *id.* at 3 (defining Enbridge); *id.* at Ex. A at 1 (referencing other rail facilities owned by Enbridge).

covenant to maintain a particular net worth or liquidity.  Further, as noted above, ERC obtained no parent or affiliate guarantee, or any form of collateral to secure its ability to receive future payments from BTS under the RSA.  Instead, the parties negotiated certain other contractual provisions addressing the possibility that BTS might not "have the ability to pay" its obligations under the RSA, or if its credit rating fell below a certain threshold.  *See* RSA §§ 11.1–11.2.  Specifically, BTS agreed, upon ERC's request, to provide ERC with information about its ability to pay its obligations under the RSA.  *Id.* § 11.1.  *If* (1) BTS failed to provide the information upon request, (2) ERC determined that BTS "may not have the ability to pay" based on the information, or (3) BTS's credit ratings fell below a certain threshold, *then* ERC could then demand a letter of credit, a guaranty from an entity other than BTS (*e.g.*, Logistics), or "such other enforceable collateral security."  *Id.* § 11.1(a)–(c).  The RSA further provided that if BTS failed to deliver such financial assurances, ERC could refuse to receive BTS's crude oil at the facility.  *Id.* § 11.1.[7]

It is thus undeniable that (1) ERC knew that BTS alone was its sole counterparty and understood its relationship to its parents and affiliates, and (2) the parties negotiated and considered the question of BTS's financial ability to make all future payments allegedly due to ERC and memorialized those terms in the RSA.  It is also undeniable that ERC recognizes that it lacks any direct rights against the BL/FG Defendants under the RSA, as it is not alleging any breach of contract claim against them; instead ERC is effectively seeking to obtain from the Court the parent guarantee it did not contract for in the RSA.

---

[7] The parties agreed that the RSA expressed their entire agreement and superseded any other agreements or negotiations.  *Id.* § 15.4.

**B.  The Alleged Implied Contract between BTS and Logistics**

The ERC facility was completed in April 2014.  Compl. ¶ 23.  BTS made deliveries of crude oil to ERC from May 2014 through January 2016.  *Id.* ¶ 4.  The crude oil was for ultimate sale to Monroe, the owner/operator of a refinery for Delta Airlines in Pennsylvania.  *Id.* ¶¶ 24–25.  Bridger Marketing acquired the crude oil, and Logistics and its subsidiaries (including BTS) arranged for the transportation of shipments to the ERC facility and from the facility to the refinery.  *Id.* ¶ 26. *Logistics paid BTS all of the amounts necessary for it to make its payments to ERC under the RSA through January 2016. Id.* ¶¶ 32, 34; SDNY Petition at 3.

**C.  The Sale of Logistics to the FG Defendants and Subsequent Change in Oil Prices**

In June 2015, two years after the RSA was entered, the FG Defendants purchased Logistics, which in turn owned BTS and other subsidiaries.  *Id.* ¶ 37.  The Complaint alleges that after the sale of Logistics to the FG Defendants, BTS continued to utilize the ERC facility and make payments due to ERC under the RSA.  *Id.* ¶ 39.  The Complaint contains no allegations whatsoever of the FG Defendants' involvement (if any) in supervising or contracting with BTS.

The price of oil subsequently began to change and it ceased being profitable to ship crude oil from North Dakota to the East Coast.  *Id.* ¶¶ 6, 43, 44.  In January 2016, the parties to the contract with Monroe agreed to suspend performance temporarily, starting February 1, 2016.  *Id.* ¶ 47.  At that point, it was clearly contemplated that the flow of crude oil and use of the ERC facility might resume.  *See* Purchase and Sale Agreement (the "BTS PSA")[8] §§ 2.3(d)–(f) (waiver of non-compete to allow continued use of the ERC facility by JTS).

---

[8] Relevant excerpts of the BTS PSA are attached as Exhibit C to the Zensky MTD Decl.  The Court may consider the BTS PSA on this Motion because the Complaint relies upon the agreement and certain of its terms.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (affirming district court consideration of document attached to defendant's 12(b)(6) motion and relied on in complaint); *see also, e.g.*, Compl. ¶¶ 7, 48, 49.

### D.  The Sale of BTS to JTH and the Guarantee by Jamex

Effective February 1, 2016, Logistics sold its membership interests in BTS to JTH, pursuant to the BTS PSA.  The RSA contains no change-in-control or similar clause that prevented Logistics from selling ownership of BTS or required ERC's consent.[9]  After the sale, BTS was renamed JTS.  The consideration included not only the $10 referenced in the Complaint, but also *inter alia,* a release agreement and limited waiver of a non-compete agreement.  *See* BTS PSA § 2.3.

The BTS PSA allocated responsibility for all obligations to ERC under the RSA.  ***First***, Logistics (the seller) provided $4.48 million to JTH, to be paid to ERC, for all the known outstanding amounts due pursuant to the RSA through the effective date of sale.  *See* BTS PSA § 2.3(c).  ***Second***, Logistics also voluntarily accepted, as a "retained liability," any liability to ERC under the RSA that arose after the closing of the BTS PSA but related to the pre-closing period.  *Id.* at 5.  Thus, rather than an effort to avoid payments to ERC, the BTS PSA reflects that Logistics agreed to make those payments due to ERC for the period during which Logistics owned BTS.  ***Third***, JTH (the buyer) promised Logistics that it expressly assumed all Liabilities (as broadly defined in the BTS PSA) under the RSA for periods on and after the closing.  *Id.* §

---

[9] The RSA contains an anti-assignment provision, *see* RSA § 8, but no change-in-control provision.  New York law, which governs the RSA, *id.* § 15.2, distinguishes assignment from change-in-control, and provides that a limitation on the former does not bar a change-in-control of an entity effectuated by the purchase or transfer of shares in the entity.  *See Dennis' Nat. Mini-Meals, Inc. v. 91 Fifth Ave. Corp.*, 172 A.D.2d 331, 334 (N.Y. 1st Dep't 1991) (a corporate entity's "transfer of all of its stock to a third party does not constitute a breach of a nonassignment provision" of an agreement to which it is a party).  Moreover, a court will not read a change of control provision into a contract where a sophisticated party could have negotiated for such a provision but failed to do so.  *See MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, Civ. A. No. 16-1111, 2016 WL 6962542, at *4 (S.D.N.Y. Nov. 28, 2016) ("The parties that negotiated Section 13(e) did not use any language that would require consent based on an upstream change of control.  Courts routinely refuse to find a change of control provision in contracts that do not use the phrase 'change of control.").

2.1(b).  BTS (renamed JTS) remained liable as well, of course.[10]  ***And finally***, JTH's parent, Jamex Marketing, guaranteed JTH's obligations, including those to ERC.  *See id.* Ex. B § 4.

### E.  JTS Allegedly Breached the RSA and ERC Commenced an Arbitration

BTS was current on all payments to ERC and not in breach of the RSA at the time its membership interests were sold to JTH.  Compl. ¶¶ 32, 34, 48; SDNY Petition at 3.  After the sale, however—and despite the express assumption of liability to ERC under the RSA and Jamex's guarantee of that liability—the Complaint alleges that JTS stopped delivering crude oil to ERC and refused to make any more payments under the RSA, claiming that the RSA was void ab initio.  Compl. ¶ 50.  ERC commenced the Arbitration seeking unpaid amounts and future payments in light of JTS's "anticipatory breach."  *Id.* ¶ 51.  ERC ultimately entered into the settlement agreement with JTS, Jamex Marketing (JTS's parent), and James Ballengee (part of Jamex buyer group), whereby JTS consented to the Award.  *Id.* ¶ 51; BTS PSA at 2 & Ex. B at 1.[11]  Nor does ERC allege that the Award has not been, or will not be, paid.[12]

## ARGUMENT

### I.  ERC FAILS TO SATISFY APPLICABLE PLEADING BURDENS

To survive a motion to dismiss, ERC must plead sufficient factual allegations, taken as true, to state a claim to relief that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[10] The BTS PSA definition of "Affiliates" provided that BTS was an Affiliate of Logistics prior to closing (but not afterwards), and would be an affiliate of JTH after closing (but not before).  *See* BTS PSA at 1.

[11] JTS had numerous defenses to ERC's claims in the Arbitration; however the merits of ERC's breach of contract claim against JTS are not at issue on this motion, and the BL/FG Defendants assume, *arguendo,* that JTS owes some amount of money to ERC for breaching the RSA after the sale.  Whatever that amount might be (if anything), ERC cannot collect under any legal theory from JTS's former parent.

[12] Although ERC does not allege the amount of the Award, the BL/FG Defendants understand from ERC's filings in a concurrent SDNY action seeking to confirm the Award, that it is for essentially the full amount ERC conceivably could have sought.  The settlement appears to be a collusive attempt between ERC on the one hand and JTS,  Jamex Marketing, and James Ballengee on the other, to shield these parties from any liability (despite voluntarily acquiring JTS) and create leverage for ERC to pursue instead the defendants in this action by consenting to an unwarranted, albeit enormous, arbitration award.

544, 570 (2007).  A claim is plausible if a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009).  While the Court must accept well-pled allegations as true at this stage, the Court is not required to accept legal conclusions couched as factual allegations or conclusory allegations that are contradicted by documents underlying the Complaint.  *See Id.*; *Catania v. Zurich Am. Ins. Co.*, Civ. A. No. 13-1278, 2014 WL 12599599, at *1 (W.D. Pa. June 16, 2014) (claim dismissed where allegations contradicted by contract); *Nicolaides v. Bank of Am. Corp.*, No. 10-1762, 2012 WL 2864468, at *4 (E.D. Pa. July 12, 2012) (similar).

In determining plausibility, the court conducts a three-part inquiry: (1) "outline the elements a plaintiff must plead"; (2) identify allegations that are not "entitled to the assumption of truth" (*e.g.* conclusions); and (3) "look for well-pled factual allegations, assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief." *Larkin*, 2015 WL 667515, at *3 (internal citations and formatting omitted).

ERC's claims sounding in fraud must also meet the heightened pleading standard of Rule 9(b), which provides that "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).  This requires ERC to include specificity as to the "circumstances constituting fraud" such as the "who, what, when, where, and how." *In re Rite Way Elec., Inc.*, 510 B.R. 471, 477 (Bankr. E.D. Pa. 2014).  Thus, Rule 9(b) applies to ERC's Count Two fraudulent transfer claim and any allegations of fraud in support of its remaining claims. *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).

## II.     ERC FAILS TO STATE A VALID ALTER EGO CLAIM (Count One)

### A.   Alter Ego Liability is Limited to Exceptional Circumstances

As ERC apparently asserts its alter ego claim under admiralty jurisdiction, federal common law applies, as supplemented by state law where maritime law is silent or where a local matter is at issue, absent conflict. *Wrist Worldwide Trading GMBH v. MV Auto Banner*, Civ. A. No. 10-2326, 2011 WL 1321794, at *6 n.6 (D.N.J. Mar. 30, 2011) (dismissing alter ego claim under admiralty jurisdiction under Rule 12(b)(6)); *Floyd v. Lykes Bros. S.S. Co.*, 844 F.2d 1044, 1047 (3d Cir. 1988) (borrowing state law concepts).  Thus Louisiana[13] and Pennsylvania state law, among others, may supplement the analysis. *Port of S. La. v. Tri-Par. Indus., Inc.*, Civ. A. No. 11-3065, 2013 WL 2394859, at *3 (E.D. La. May 28, 2013) (in admiralty case, noting that Louisiana state and federal alter ego tests are essentially the same and courts apply state and federal cases interchangeably); *Trinity Indus., Inc. v. Greenlease Holding Co.*, Civ. A. No. 08-1498, 2014 WL 1766083, at *12 n.7 (W.D. Pa. May 2, 2014) (applying federal common law to both federal and Pennsylvania state-law claims since the "veil piercing principles are similar").

It is a fundamental tenet of corporate and commercial law that courts presume the legitimacy of the corporate form and will pierce the veil only when "exceptional circumstances warrant such an exceptional remedy."  *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 509 (E.D. Pa. 2014) (dismissing claims under Rule 12(b)(6) standard, noting alter ego standard is a "stringent one"); *see also Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.*, 622 F. Supp. 2d 46, 53 (S.D.N.Y. 2009) (granting motion to dismiss under Rule 12(b)(6)).  Respect for the corporate form "encourages business and industry."  *Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406, 409 (5th Cir. 1998).  The alter ego principles are equally applicable to corporate parents "and hence,

---

[13] BTS is a Louisiana LLC.  *See* RSA at 1.

10

mere ownership of a subsidiary does not justify the imposition of liability on the parent." *Pearson v. Component Technology Corp.*, 247 F.3d 471, 484 (3d Cir. 2001).

Piercing the corporate veil is "a drastic remedy and must of course be construed very narrowly and exercised reluctantly and cautiously." *Riggins v. Dixie Shoring Co., Inc.*, 592 So. 2d 1282, 1283 (La. 1992) (concurrence in denial of rehearing); *see also Pearson*, 247 F.3d at 485 (noting that the alter ego test is "notoriously difficult for plaintiffs to meet.").

Courts in the Third Circuit require the plaintiff seeking to pierce the corporate veil to "present an element of injustice or fundamental unfairness." *CMC GH Sisak D.O.O. v. PTC Grp. Holdings Corp*, Civ. A. No. 15-1357, 2016 WL 5025750, at *2 (W.D. Pa. Sept. 20, 2016); *see also Chengelis v. Cenco Instruments Corp.*, 386 F. Supp. 862, 865 (W.D. Pa. 1975) ("Absent the element of fraud or injustice akin to fraud, we cannot disregard the corporate structure").  In addressing alter ego claims, the courts consider eight non-exclusive factors: (1) a subsidiary's gross undercapitalization for its purpose; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the subsidiary; (5) siphoning of funds of the corporation by the dominant stockholder; (6) nonfunctioning of other officers or directors; (7) absence of corporate records; and (8) whether the corporation is merely a façade for the operations of the dominant stockholder or stockholders. *Id.*

Likewise, in Louisiana, "[b]efore the corporate entity is disregarded on the basis it is simply the alter ego of the member, proof of fraud or deceit is usually required. The corporate entity may also be disregarded when the individualities of the corporation and member cease to exist." *Bottom Line Equip., L.L.C. v. BZ Equip., L.L.C.*, 10-830 (La. App. 5 Cir. 1/25/11); 60 So. 3d 632, 636 (*quoting Prasad v. Bullard*, 10–291 (La. App. 5 Cir. 10/12/10); 51 So. 3d 35, 40); *see also Riggins v. Dixie Shoring Co., Inc*., 590 So. 2d 1164, 1168 (La. 1991) ("it usually

11

involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation."); *see also Advanced Tel. Sys. Inc. v. Com-Net Prof. Mobile Radio, LLC*, 846 A.2d 1264, 1279 (Pa. Super Ct. 2004) ("although the evidence shows . . . lack of formalities, the law nevertheless requires that this lack of formalities led to some misuse of the corporate form" (Pennsylvania law)).  Even if a plaintiff can demonstrate a few of the alter ego factors, a court may reject veil piercing in light of the "totality of the circumstances."  *Abraham v. Lake Forest, Inc.*, 377 So. 2d 465, 468 (La. Ct. App. 1979); *accord Barnco Intern. v. Arkla, Inc.*, 28-157 (La. App. 2 Cir. 11/15/96); 684 So. 2d 986, 992. For example, LLCs are not required to hold meetings, keep minutes or act through formal resolutions, and thus an assessment of formalities does not support the extraordinary remedy of piercing the corporate veil.  *Appe & Appe, Inc. v. Appe & David Appe LLC*, No. 2010-15082, 2012 WL 3143589 (La. Dist. Ct. June 14, 2012).

Finally, more stringent standards apply to alter ego claims based in contract because

> the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity and is expected to suffer the consequences of the limited liability associated with the corporate business form. Generally, ***one who has contracted with a selected party and received the promise bargained for should not be allowed to look to another merely because he or she is disappointed in the selected party's performance***; thus, under contract law, the disappointed party generally may not hold the other liable without additional compelling facts. . . . . Accordingly, absent very compelling equitable considerations, ***courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established***.

Fletcher, *Cyclopedia of the Law of Corporations*, § 41.85 (2016); *see also Huard*, 147 F.3d at 409 (an alter ego plaintiff with respect to a contract claim "faces an additional hurdle to this already difficult task"); *Riggins*, 592 So. 2d at 1285 (similar); *Chengelis*, 386 F. Supp. at 865 (similar); *Lake Forest*, 377 So. 2d at 469 (similar).  This heightened standard has particular

resonance in the case because, as noted, this case arises out of a complex, long-term commercial contract—with more than $100 million expected to change hands—between two sophisticated parties (each a subsidiary of a larger group of companies), and Plaintiff ERC elected to contract with BTS alone without any parent or affiliate guarantee.

**B. Logistics Cannot Be Liable as a Purported Alter Ego of BTS Because the Liability at Issue Accrued after BTS was Sold to Jamex**

ERC attempts to allege that Logistics dominated BTS (while it owned BTS), but does not and cannot allege that Logistics[14] controlled BTS "in respect to the transition attacked." *Craig v. Lake Asbestos of Quebec, Ltd*., 843 F.2d 145, 150 (3d Cir. 1988). It is axiomatic that a plaintiff asserting an alter ego claim must show that the individual shareholder or corporate parent controlled the subsidiary at the time of the alleged breach or tort. *Id.* (parent must exercise "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp. (NYSEG)*, 766 F.3d 212, 228 (2d Cir. 2014) ("As a general matter, under veil-piercing theory, a parent can only be liable for a wrong committed by the subsidiary under the influence of the parent."); *Bedford Affiliates v. Sills*, 156 F.3d 416, 431 (2d Cir. 1998) *overruled on other grounds* (vacating veil piercing judgment for lack of evidence alleged domination caused loss at issue).

ERC has failed to meet this basic prerequisite. ERC seeks to hold "Logistics liable for the debts BTS owed" to ERC. Compl. ¶ 61. Those debts are for amounts allegedly due to ERC after JTS ceased using the ERC facility to transload the crude oil, starting in February 2016 and running through the end of the RSA term. *Id.* ¶ 51. *But ERC does not allege that Logistics controlled—let alone dominated—BTS at the time any unpaid debts to ERC accrued.* To the

---

[14] Count One does not assert an alter ego claim against either FG Defendant. Compl. ¶ 61.

contrary, ERC concedes that effective February 1, 2016, Logistics sold its entire ownership of BTS and further concedes that all payments under the RSA were made as due to ERC throughout the time Logistics owned BTS. *Id.* ¶¶ 32, 34; SDNY Petition at 3. And ERC concedes that any breach under the RSA occurred under the watch of a "newly formed subsidiary of Jamex Marketing." Compl. ¶¶ 48, 50.

Accepting the allegations of the Complaint and the documents properly before the Court, the only plausible inference is that the BL/FG Defendants sought to ensure that BTS *fulfilled* its obligations to ERC. In addition to allocating funds under the BTS PSA for all payments to ERC when crude was shipped, Logistics agreed to ensure ERC was paid for any deficiency payments arising prior to the sale of BTS. BTS PSA § 2.3(c) & at 8. Then, upon the sale of BTS, Logistics obtained the express written agreement of the buyer that it would be responsible for future amounts due to ERC, and obtained a guarantee of such performance from Jamex Marketing itself, the buyer's ultimate parent. *Id.* § 2.1(b) & Ex. B § 4. While the flow of crude oil was temporarily suspended at that point, the BTS PSA established that BTS *could* resume using the ERC facility to transload oil and earn fees sufficient to make the payment due to ERC. *E.g.*, BTS PSA §§ 2.3(d)–(f). The decision to permanently cease performance under and assert grounds for rescission of the RSA (and then arbitrate and settle such issues) was made by JTS and its new owners after the BL/FG Defendants' alleged control over BTS had ended.

As such, it is undeniable that Logistics did not control BTS with "respect to" any unpaid debts to ERC. *Craig*, 843 F.2d at 150. Allegations as to how Logistics managed BTS or funded its obligations are legally meaningless, as ERC fails to state a plausible claim for relief.

**C.  ERC Fails to Allege Any Plausible Basis to Pierce the Corporate Veil of BTS**

Even if Logistics still owned JTS, such that the alleged domination and breach harming ERC were temporally connected, ERC has still failed to allege facts that would justify piercing the veil of JTS/BTS based on the totality of the circumstances.  *Barnco*, 684 So.2d at 992.

### i.  *No Fraud is Alleged*

ERC does not allege that any of the BL/FG Defendants lied or fraudulently misrepresented BTS to ERC.  While the Complaint alleges that BTS was held out as a bona fide company in 2013, and includes alleged representations as to BTS's assets (but not liabilities) in 2014 (long after the RSA was entered), *see* Compl. ¶¶ 23, 27, ERC notably does not allege that such representations were false when made, nor does ERC allege it was ever misled or confused as to what entity was obligated to make payments to it under the RSA, or that its ability to obtain security or guarantees from Logistics or other BTS affiliates was not wholly conditional.  Accordingly, ERC's bears a heavy burden on its alter ego claim.  *Riggins*, 590 So. 2d at 1168.[15]

### ii.  *Insufficient Allegations of Domination*

ERC alleges that BTS was "an entirely captive instrument of Defendants, without operational or financial independence" and that the "Bridger entities" (which included BTS and Logistics before they were acquired by the FG Defendants), "operated without inter-company contracts and were all headed by the very same people and shared employees."  Compl. ¶¶ 8, 19, 28, 30–32.  ERC ignores that, as an LLC, BTS was not required to hold meetings, keep minutes, or act through formal resolutions, and thus those factors are inapplicable to an LLC alter ego

---

[15] Even with specific allegations of fraud (which ERC lacks), courts have rejected claims like ERC's.  In *CMC GH Sisak D.O.O.*, the court rejected as insufficient to support an alter ego claim, allegations that the parent of a wholly owned subsidiary, "lied to [plaintiff] and induced [it] to do business with [the subsidiary] under certain terms and conditions that [the parent] knew [the subsidiary] could not and would not fulfill," and that the parent promised that it "would assume primary responsibility for, and/or would guarantee" the subsidiary's liability although it knew the subsidiary could not pay the liability in issue.  2016 WL 5025750, at *2.  ERC makes no such claim.

analysis.  *See* LSA-RS 12:1301, *et seq.*; *see also Advanced Tel. Sys. Inc.*, 846 A.2d at 1272 (regarding alter ego claim and noting that LLCs have few corporate formalities).  Likewise, allegations of shared management and employees are insufficient.  *See Accurso*, 23 F. Supp. 3d at 510 (allegations, including that individual "wore many hats," were "not enough").

Likewise, although it offers the conclusory and unsupported allegation that BTS was undercapitalized "if there was no implied contract" with Logistics, *see* Compl. ¶¶ 54, 77, ERC does not allege that BTS was undercapitalized upon formation.  *Trinity Indus., Inc.*, 2014 WL 1766083, at *13 ("The general rule is gross undercapitalization is to be analyzed according to the subsidiary's initial capitalization . . . [and whether the] resources are reasonable in relation to the nature of the business of the corporation and the risks attendant to such businesses." (citations omitted)).  Courts have refused to pierce the veil even where the subsidiary's total capital was greatly outweighed by its debts.  *See Lake Forest*, 377 So. 2d at 468 (noting subsidiary with $1,000 in capital stock that purchased property for $790,000 was under-capitalized "in a sense," yet declining to pierce the subsidiary's veil); *Realco Serv., Inc. v. Holt*, 513 F. Supp. 435, 441–42 (E.D. Pa. 1980) (noting that if subsidiary's capitalization was only $50, it was "clearly low," but not necessarily undercapitalized).  Here, conversely, the Complaint alleges that BTS had total assets of $98.1 million, including $37.9 million in shareholders' equity, in December 2014 (long after the RSA was entered).  Compl. ¶¶ 27, 49.  Nor does ERC allege intermingling of funds; to the contrary, ERC alleges that Logistics provided funds in exchange for its use of BTS' services to transload crude oil.  Compl. ¶¶ 6, 32, 34, 39, 57.

In sum, ERC's conclusion that "Defendants were operating BTS without regard to its separate company identity," Compl. ¶ 30, 56, amounts to a "bare assertion" unsupported by sufficient specific facts.  *Charming Charlie, Inc. v. Perkins Rowe Assocs., L.L.C.*, 2011-2254 (La.

App. 1 Cir. 7/10/12), 97 So. 3d 595, 599; *accord Accurso*, 23 F. Supp. 3d at 510 (alter ego averments must be supported by sufficient factual allegations).

### iii. *ERC Fails to Allege Injustice or Unfairness Where It Knowingly Contracted with BTS and Chose Not to Obtain Parent Guarantees*

Even if ERC had plausibly alleged (which it has not) that Logistics "dominated" BTS to the degree required by the cases (*i.e.*, where the two corporations become indistinguishable), ERC's alter ego claim is fatally flawed because the facts contained in the Complaint do not present the required "element of injustice or unfairness." *Trinity Indus.*, 2014 WL 1766083 at *12; *see also Chengelis*, 386 F. Supp. at 865 (alter ego claim meritless, irrespective of domination, where "there is no proof that the corporate form of the subsidiary was used by the defendant to perpetrate a fraud or promote an injustice akin to fraud."). The reason is simple: ERC is a sophisticated party that knowingly contracted with a subsidiary as its sole counterparty and did not contract for a guarantee from that subsidiary's parent.

A party that "knowingly limits its contractual relationship to one of two or more related corporate enterprises cannot successfully attack the validity of the entity with which it dealt without proof of misrepresentation or other unusual circumstances justifying the application of an estoppel." *Bouriez v. Carnegie Mellon Univ.*, Civ. A. No. 02-2104, 2005 WL 3006831, at *19 (W.D. Pa. Nov. 9, 2005); *accord Chengelis*, 386 F. Supp. at 865 (denying alter ego claim where "plaintiffs executed a contract which bound only the subsidiary and not the parent corporation notwithstanding plaintiffs' knowledge of the interrelation of the two."); *Riggins*, 592 So. 2d at 1285 ("absent very compelling equitable considerations, *courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established*.") (emphasis added); *Realco Services, Inc. v. Holt*, 513 F. Supp. 435, 442 (E.D. Pa. 1980) (sophisticated commercial entities that know risks of trade not entitled to pierce veil in contract case).

*Lake Forest* is particularly instructive. In that case, even though the plaintiff had alleged facts establishing "a number of factors" that ordinarily support piercing the corporate veil, the court looked to the "totality of the facts" and determined that the alter ego claim must fail, reasoning:

> the plaintiff ***made a business judgment which, at the time he accepted the note, seemed to be quite prudent***. He had gotten appraisals on this property which indicated that it had a great potential and he was apparently convinced that [the subsidiary] could capitalize on the project. Needless to say, [the subsidiary] was equally optimistic because it and its parent corporations invested considerable sums in the purchase of the property. ***When plaintiff took the note he was obviously speculating on the success of the project itself and was not relying on the credit of the parent corporation***. He was apparently satisfied to take the risk considering the fact that he stood to make a relatively quick profit on the option which he had purchased just six months previously.

*Id.* at 469 (emphasis added). The court concluded that "equitable features" and the "relative position of the parties" foreclosed application of the alter ego theory. *Id.*

Likewise, a court will not find an element of unfairness merely because a plaintiff finds itself on the wrong side of an economic downturn. In *Realco*, the subsidiary defendant defaulted on its lease to the plaintiff for, among other reasons, an "inability to weather financial disaster." *See Realco*, 513 F. Supp. at 441. The plaintiff had not received a guarantee, so it attempted to pierce the subsidiary's veil to hold the shareholders liable in the amount of the default. *Id.* at 439. The court declined to pierce the veil, noting "it is difficult to see how any injustice will occur" given the plaintiff's status as "sophisticated commercial entities that know the risks of their trade[,] how to avoid loss, [and] the importance of credit information." *Id.* at 442.

As in *Lake Forest* and *Realco*, ERC is a sophisticated party that knowingly negotiated and contracted with BTS, without obtaining a guarantee or other form of security from its parents, and subsequently was faced with a change in the markets. ERC does not allege that it

was misled as to BTS's corporate structure or capitalization; to the contrary, the RSA expressly addressed the issue of BTS's potential inability to pay ERC, and ERC chose to accept the limited and contingent protections of the contract. *See* RSA § 11.1. Indeed, when ERC was asked to consent to certain liens on the crude to permit new financing for the oil sales to Monroe, ERC refused, insisting that *ERC's "agreements are with Bridger Transfer Services, LLC only."*[16] In such a context, ERC's feeble allegations concerning Logistics's management of BTS fall well short of stating a claim for the extraordinary remedy of piercing the veil.

### D.  ERC's Alter Ego Claim is a Thinly Veiled Attempt to Write into the RSA More Security and Collateral than ERC Bargained For

In the RSA, ERC contracted for limited "financial assurances" from BTS and others (including Logistics) under certain circumstances. *See* RSA § 11.1 ERC, could have, but chose not to, seek a blanket guarantee from Logistics. But a blanket guarantee is precisely what ERC now seeks to obtain, *post hac*, through its alter ego claim against Logistics.

Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accordance with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing." *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 302 (S.D.N.Y. 2010) (citations omitted). Where the contract was negotiated by sophisticated parties at arm's length, courts applying New York law must be particularly reluctant to insert into negotiated contracts provisions or obligations that the contracting parties could have included on their own. *See Id.*; *see also Nassau Chapter, Civil Serv. Emp. Ass'n v. Bd. of Ed., Union Free Sch. Dist. No. 3, Town of Hempstead*, 310 N.Y.S.2d

---

[16] *See* Nov. 2015 Email, attached as Exhibit D to Zensky MTD Decl. (emphasis added). The Court can consider the email on this Motion because ERC's refusal to consent to the financing arrangement is referenced in the Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *see also* Compl. ¶ 50.

381, 383 (N.Y. App. Div. 1970) ("It is not for the Court to enlarge the contract by inserting provisions which the parties could have negotiated and agreed upon but did not.").

The provisions of the RSA are clear: ERC was entitled to receive financial information upon request and, if it determined that BTS may not be able to pay its obligations, to receive a letter of credit, a guaranty "from a third party reasonably acceptable to [ERC]" (*e.g.* Logistics), or other collateral.  RSA §§ 11.1(a)–(c).  The fact and understanding that both ERC and BTS are part of larger corporate structures, with affiliates, is stitched into the fabric of the RSA.  *E.g.* RSA at 3 & §§ 1.1, 9, 15.8 & Ex. A §§ 10(d), 12(d), 13(a)(i).

ERC, a sophisticated party, did not negotiate or pay for a guarantee or other form of security from Logistics.  The court should recognize and dismiss ERC's alter ego claim for what it is—an attempt to circumvent and supplement the express provisions of the RSA.

### III.    ERC FAILS TO STATE ANY FRAUDULENT TRANSFER CLAIM (Counts Two and Three)

Under Pennsylvania's Uniform Fraudulent Transfer Act, 12 Pa. C.S. § 5101, *et seq.* ("PUFTA"), a transfer is intentionally fraudulent if it is made "with actual intent to hinder, delay or defraud any creditor of the debtor" and constructively fraudulent if it is made for less than reasonably equivalent value at a time when the debtor was insolvent, or the debtor became insolvent as a result of the transfer.  *Id.* §§ 5104(a), 5105.  As noted, Rule 9(b) requires ERC to plead with specificity the "circumstances constituting fraud," including the "who, what, when, where, and how."  *In re Rite Way Elec., Inc.*, 510 B.R. at 477.

ERC seeks to leave the sale to JTH in place and attacks, as a fraudulent "transfer" only the alleged "abrogation" of a supposed "implied contract" between BTS/JTS and its former parent, Logistics.  Compl. ¶¶ 63–65, 69, 76.  ERC's claims suffer from a multitude of flaws,

including, foundationally, the utter implausibility of the purported "implied contract" or its supposed abrogation.[17]

### A. The "Implied Contract" Allegation on Which Counts Two and Three Depend is Premised on  False Assumptions and Turns Corporate Law on its Head

ERC alleges that an implied contract arose whereby Logistics impliedly promised to provide BTS with enough funds to make all future payments due to ERC, whether for actual transloading or for deficiency payments, and that BTS's release of such an alleged implied agreement was a fraudulent transfer.  Compl. ¶¶ 63–65, 69.  The alleged "abrogation" was a "transfer" according to ERC because it allowed Logistics to retain $140 million in funding it otherwise supposedly was impliedly obligated to give BTS for BTS to give to its counterparty, ERC, for three years' worth of deficiency payments.  *Id.* ¶ 7.  If the allegations respecting the purported implied contract fail (as they must), there can be no fraudulent conveyance.

"A complaint alleging the existence of an implied contract must do more than assert generally and without factual context that the defendants agreed to provide their 'best efforts.' It must actually allege a fact pattern which might show that there was a meeting of the minds and that there were mutual undertakings."  *Hirsch v. Schiff Benefits Grp., LLC*, Civ. A. No. 10-2574, 2011 WL 1166127, at *3 (E.D. Pa. Mar. 28, 2011) (citation omitted) (where complaint shed almost no light on interactions, the question of whether an implied contract may have existed was "a matter of pure speculation"); *see also  Lone Star Indus., Inc. v. Besser Co.*, Civ. A. No. 11-1481, 2013 WL 1655983, at *4 (E.D. Pa. Apr. 17, 2013) (rejecting allegation of implied contract between parent and subsidiary, asserted by creditor of subsidiary, noting that the creditor is "ultimately responsible for knowing what company it was contracting with" and to the extent

---

[17] ERC also fails plausibly to allege the presence of sufficient badges of fraud, insolvency, or lack of reasonably equivalent value.  For the sake of brevity, the BL/FG Defendants confine their arguments on this Motion to the fundamental defects that require dismissal of both fraudulent transfer Counts Two and Three.

there was any confusion as to the relationship between the two companies, "the burden was on [the creditor] to clarify its confusion before entering into the contract.").

In constructing the purported implied contract, ERC sets up a false choice, arguing that *either* (1) BTS is the alter ego of Logistics, *or* (2) BTS was operating through "implied contracts" with Logistics, premised on ERC's speculation as to what unrelated parties dealing at arms' length would have agreed to. Compl. ¶¶ 33, 53–55, 57. Under ERC's paradigm, the alleged "implied contracts" date back to the signing of the RSA, when ERC asserts that Logistics impliedly promised BTS that it would always fund its payments to ERC—whether BTS and ERC's services were being used or not. *Id.* ¶¶ 32–34. ERC's argument hinges on its assertion that "a parent is obligated to pay its subsidiary for the fair value of its services" and that "no unrelated third-party subcontractor would have entered into" the RSA and provided its services at cost, "ignoring the long-term obligation it had incurred." *Id.*

ERC's assumption that a parent and wholly owned subsidiary conducting business are *either* alter egos *or* dealing at arms' length, is legally and factually insupportable. As the Third Circuit has recognized, "the only interest of a wholly owned subsidiary is in serving its parent" and "[t]hat doing so [serving its parent] may not always involve maximizing the subsidiary's economic value is of little concern." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 367 (3d Cir. 2007), *as amended* (Oct. 12, 2007) (discussing Delaware law) (citations omitted). Similarly, the Supreme Court has held that a parent corporation and its wholly owned subsidiary cannot conspire together because they are presumed to act as a single economic actor and it takes two to conspire. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 777 (1984). Thus it is not accurate that BTS's signing a five-year contract with ERC that would potentially benefit Logistics necessarily means that BTS must have benefited from an implied promise from

Logistics to fund every cost for the life of the agreement.  Compl. ¶¶ 32, 34.  Indeed, if ERC truly believed such an "implied contract" existed, there would have been no need for it to seek the "financial assurances" under Section 11.1 of the RSA.[18]  Furthermore, the contention that no third-party would enter a commitment like the RSA "without requir[ing] an agreement from its prime contractor that it would cover the subcontractor's costs," Compl. ¶ 34, is belied by ERC's own actions; ERC itself, indisputably at arms' length from BTS, signed a contract with a 5-year commitment *without requiring an agreement from Logistics that it would cover BTS's costs*.

Finally, even if the Court were to entertain the notion of an implied contract, the course of dealing ERC alleges shows only that Logistics paid BTS *while it was shipping crude oil through BTS and ERC.  Id.* ¶ 50 (performance stopped after February 1, 2016); ¶¶ 32, 34 (funds paid until February 2016); ¶ 48 (sale effective February 1, 2016); *see also id.* ¶ 33 ("A parent is obligated to pay its subsidiary for the fair value of *services that it receives*") (emphasis added).  At most, this can support the inference—and the BL/FG Defendants do not concede that it does—that Logistics impliedly agreed to pay BTS enough to cover its costs under the RSA when Logistics actually utilized or planned to continue utilizing BTS to transload oil via the ERC facility.  It is <u>not</u> a basis for implying a meeting of the minds for Logistics to pay all BTS's deficiency costs through the end of the contract period, when it had ceased using the facility.

### B.  ERC Does Not Plausibly Allege the Existence of a Transfer

The fraudulent transfer claims are not plausible for the additional reason that the BTS PSA explicitly contradicts the allegation that the purported implied contract to cover all future payments—even if sufficiently pled—was abrogated or terminated.  *Id.* ¶¶ 48, 64.

---

[18] The paradigm ERC proposes would render the alter ego doctrine obsolete.  Rather than remaining an "extraordinary remedy" available only where complete domination and injustice can be shown, ERC's paradigm would require setting aside the corporate form *whenever* a parent and subsidiary did business together and the subsidiary eventually experienced financial difficulty.

The BTS PSA clearly shows that Logistics ensured that all of BTS's pre-sale liabilities were paid and retained, and that all of the post-sale liabilities were assumed by the purchaser— and even ensured that the new parent provided a guarantee. BTS PSA at 5, §§ 2.1(b), 2.3(c) & Ex. B § 4. Thus, even if an "implied contract" requiring future payments existed—which it did not—the BTS PSA contradicts any allegation that it was abrogated. Counts Two and Three fail because the "transfer" is not plausible. *Catania*, 2014 WL 12599599, at *2 (dismissing breach of contract claim under Rule 12(b)(6) where allegations were contradicted by terms of contract, "prevent[ing] Plaintiff from stating a plausible claim.").[19]

## IV.   ERC FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY (Count Four)

The fiduciary duties owed to a limited liability company ("LLC") by its members and manager-members are set forth in, and exclusively governed by, Louisiana's comprehensive statutory law of limited liability companies. *See* L.S.A.-R.S. § 12:1301, *et seq.*[20] Pursuant to this statutory law, members and  manager stand in a fiduciary relationship with the LLC itself. L.S.A.-R.S. § 12:1314.[21]   As set forth below, ERC has failed to state a claim under Louisiana law for either direct or derivative claims of breach of fiduciary duties.

### A.  ERC Fails to State a Direct or Derivative Claim for Breach of Fiduciary Duty

ERC fails to state clearly whether it is attempting to plead a fiduciary duty claim on a direct or derivative basis. Either way, Count Four is legally insufficient and must be dismissed.

---

[19] ERC's demand for punitive damages in connection with Counts Two and Four is barred. *See* RSA § 9.

[20] *See also* L.S.A.-R.S. § 12:1320(A ("The liability of members, managers, employees, or agents, as such, of a [LLC] organized and existing under [Louisiana law] shall at all times be determined solely and exclusively by the provisions of this Chapter." (emphasis added)).

[21] L.S.A.-R.S. § 12: 1315(A)(1) further provides that an LLC may eliminate or limit monetary damages for breaches of all statutory fiduciary duties imposed on members in the LLC's articles of organization or operating agreement. The BL/FG Defendants reserve their rights to make all available arguments pursuant to any such clause in the formational documents of Logistics and BTS.

The Complaint alleges that the BL/FG Defendants "violated their fiduciary duties of care and/or loyalty *to Eddystone*," as BTS's creditor.  *E.g.*, Compl. ¶¶ 10, 74–77.  Although ERC alleges there was an implied contract between Logistics and BTS for Logistics to fund BTS's payments to ERC under the RSA, ERC does not allege that *BTS* was harmed by Logistics's purported abrogation, but rather that *ERC* was harmed.  *Id.*  Further, ERC does not state that it is proceeding derivatively on behalf of BTS, and has not joined BTS as a party.  Finally, it seeks no recovery for BTS or its members, but rather only for itself.  *Id.* ¶ 77; *id.* at "Prayer for Relief." ERC thus appears to be attempting to assert a direct claim based on its status as an alleged creditor of BTS.  As set forth *infra*, Louisiana does not permit such a claim.

### i. *Louisiana Bars Direct Claims by Creditors against Members of an LLC*

It is well-established that Louisiana does not give a creditor a direct cause of action against the principals of a corporate entity for breach of fiduciary duties.  *See Terrebonne Concrete, LLC v. CEC Enters.*, *LLC*, 2011-0072 (La. App. 1 Cir. 8/17/11); 76 So. 3d 502, 510 (members of an LLC do not owe fiduciary duties to "persons or entities that contract with the corporation"); *McDonough Marine Serv., a Div. of Marmac Corp. v. Doucet*, 95-2087 (La. App. 1 Cir. 6/28/96); 694 So. 2d 305, 312 (same).  This principle is especially applicable where, as here, ERC has made no specific allegations of fraudulent conduct by the BL/FG Defendants.  *See also Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (similar); *Young v. Adolph*, 2002-67 (La. App. 5 Cir. 5/15/02); 821 So. 2d 101, 106 (similar); *Nicholson Mgmt. & Consultants, Inc. v. Bergman*, 96-0557 (La. App. 4 Cir. 9/25/96); 681 So. 2d 471, 477 (similar).

This body of law applies with equal or greater force to LLCs.  Louisiana courts have readily held that L.S.A.-R.S. § 12:1320 insulates a member of a limited liability company from personal liability for a debt or obligation of the limited liability company to a third party.  *E.g. Double-Eight Oil & Gas, L.L.C. v. Caruthers Producing Co.*, 44-199 (La. App. 2 Cir. 5/20/09);

13 So. 3d 754, 758 (creditor's attempt to amend a judgment against an LLC to include its members barred by L.S.A.-R.S. § 12:1320). Accordingly, to the extent ERC purports to assert a direct claim for breach of fiduciary duties against the BL/FG Defendants, the claim must be dismissed.[22]

### ii.  *ERC Lacks Standing to Pursue a Derivative Claim for Breach*

Instead, because legally enforceable duties run solely to the LLC itself, the appropriate vehicle for an LLC to recover from a fiduciary that allegedly breached its duties would be a <u>derivative</u> action. *E.g., Sharkey's Reef, Ltd. v. Polit*, 96-499 (La. App. 5 Cir. 1/15/97); 688 So. 2d 67, 68 (affirming dismissal, noting "shareholder or creditor is not the proper party plaintiff to bring an action on behalf of a corporation. That right falls to the proper corporate representative, a court appointed liquidator or receiver, or, in the case where the corporation refuses to bring the action, a shareholder in a shareholder's derivative suit."); *see also Scofield, Inc. v. Daigle, Ltd.*, 2008-798 (La. App. 3 Cir. 12/10/08); 999 So. 2d 311, 315 (member of LLC asserts a direct, as opposed to derivative, claim if it suffers a direct loss caused by breach of fiduciary duty).

If ERC is attempting to plead a <u>derivative</u> action for breach of fiduciary duties, it has failed to state a claim. Under Louisiana statutory law, only a "member" of an LLC has standing to bring a derivative action on behalf of the company or its members. *See* La. Code Civ. Proc. Art. 611. A "member" of an LLC is statutorily defined under Louisiana law as "a person with a membership interest in a limited liability company with the rights and obligations specified under this Chapter [22]." L.S.A.-R.S. § 12: 1301(A)(13). Louisiana courts have repeatedly rejected alleged derivative claims where the plaintiff asserting the derivative claim cannot establish that it is a member of the LLC. *See, e.g.*, *Broussard v. Tipton*, 2013-1268 (La. App. 1

---

[22] This is supported by Delaware law. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99–103 (Del. 2007) (no direct fiduciaries duties to creditors when company is insolvent or "in the zone of insolvency").

Cir. 4/24/14); 2014 WL 3559371, at *5 (affirming dismissal where evidence presented by plaintiff-member-managers did not establish that defendant was a "member" of the LLC within the definition of the Louisiana LLC statute, and thus defendant owed no fiduciary duties); *Hosp. Consultants, LLC v. Angeron*, 2009-1738 (La. App. 4 Cir. 6/9/10); 41 So.3d 1236, 1241 (because plaintiffs were not members of LLC at the time of the alleged breach, they lacked standing to pursue a derivative action or breach of fiduciary duty claims against manager of LLC); *Glod v. Baker*, 2002-988 (La. App. 3 Cir. 8/6/03); 851 So. 2d 1255, 1271 (third parties "were not shareholders or members [of the LLC], and having no proprietary interest in the LLCs, they had and have no standing to bring a derivative action on behalf of them" against managing member of LLC).[23]

Here, ERC does not allege that it is a "member" or "manager" of BTS within the meaning of Louisiana statutory law. Thus, ERC does not have standing under Louisiana law to bring a derivative claim for breach of fiduciary duties against any of the BL/FG Defendants.[24]

### *iii.* ___Even if ERC Had Standing, It Fails to Allege an Actionable Breach___

Finally, independent of ERC's lack of standing to pursue either derivative or direct claims against Logistics as BTS's former member/manager, ERC's allegation that the BL/FG Defendants breached their fiduciary duties by behaving merely "negligently," *e.g.* Compl. ¶¶ 75, 77, is legally insufficient to state a claim. The statutory standard for breach of fiduciary duties

---

[23] This result is supported by a decision of the Delaware Supreme Court interpreting substantially similar statutory language concerning limited liability companies. *See CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011), as corrected (Sept. 6, 2011) (the Delaware LLC statute "is unambiguous and limits derivative standing in LLCs exclusively to *members* or assignees. . . . The statutory language is clear, unequivocal, and *operates to deny derivative standing to creditors who are not members* or assignees of membership interests." (emphases added)).

[24] Even if Louisiana law permitted ERC to assert derivative claims for breach of fiduciary duties—which it does not—ERC has failed to satisfy any of the necessary derivative lawsuit protocols such as indicating that it is suing individually and on behalf of BTS, joining BTS to the lawsuit or alleging that BTS was harmed (rather than ERC). A plaintiff suing derivatively may not recover damages suffered by the plaintiffs personally, rather than the LLC—the only form of damages ERC seeks. *See Destiny Servs., L.L.C. v. Cost Containment Servs., L.L.C.,* 2010-1895, 2011 WL 4375318 (La.App. 1 Cir. 9/20/11), at *8–9 (vacating award of personally-incurred losses to plaintiff-members suing derivatively on behalf of LLC).

under Louisiana LLC law is *gross* negligence.  *See* LSA-R.S. 12:1314(B) (a member or manager shall discharge his fiduciary duties to the LLC in good faith and "[s]hall not be personally liable to the limited liability company or the members thereof for monetary damages unless the member or manager acted in a *grossly negligent manner* . . . or engaged in conduct which demonstrates a *greater disregard of the duty of care than gross negligence* . . . .") (emphases added); *see also In re Provenza*, 316 B.R. at 232 (Bankr. E.D. La 2003) ("In determining whether a member of a member–managed LLC or a manager–managed LLC has breached a fiduciary duty to the LLC and its members, the courts employ, at minimum, a gross negligence standard and the business judgment rule.").   ERC's breach of fiduciary duty claims predicated on negligent conduct are inactionable and must be dismissed.

## V.   ERC ASSERTS NO CLAIMS AGAINST THE FG DEFENDANTS

The Complaint is devoid of allegations against either of the FG Defendants and does not even assert a count against them.  Apart from generalized allegations against "Defendants"— which span time periods before the FG Defendants even purchased Logistics—the Complaint essentially alleges only that in 2015 the FG Defendants became the owners of Logistics, hired two former personnel, and made statements about Logistics's access to transload oil at the ERC facility.  Compl. ¶¶ 35, 37–38, 40–41.[25]

In addition, Count One does not assert an alter ego claim against either FG defendant, and alleges no facts about the corporate veil of the FG Defendants. Compl. ¶ 61.  The FG Defendants are not proper defendants under Counts Two and Three because they are not alleged to be party to the "implied contract" with BTS or transferees of the supposed abrogation (or

---

[25] The allegations that the FG Defendants received the "value" of the alleged abrogated implied contract, "dominated" BTS, or "caused BTS to allow its implied contract" to be abrogated, are simply conclusory, legal conclusions that lack any specificity or factual bases and fail to satisfy Rules 8 or 9(b).  Compl. ¶¶ 7, 53, 64, 66, 69.

when or how they received any value). *See In re Pocius*, 556 B.R. 658 (Bankr. E.D. Pa. 2016) (under bankruptcy code, finding owner of LLC that was initial recipient of fraudulent transfer was neither a subsequent transferee nor the entity for whose benefit the transfer was made); *see also* 12 Pa. C.S. §§ 5107, 5108(b) (recovery of value limited to initial transferee or subsequent transferee).   Lastly, Count Four fails to assert any claim for breach of fiduciary duties against either FG Defendant because ERC has not pled that either is a "member" or "manager" of BTS. *See* Compl. ¶¶ 19, 30.   Even a plaintiff that has standing cannot pursue a claim for breach of fiduciary duties against the ultimate corporate parent of, and indirect investor in, an LLC, because there is no fiduciary relationship with the ultimate corporate parent.   *See Kidd v. Symbion, Inc.*, Civ. A. No. 10-3361, 2011 WL 4020814, at *9 (E.D. La. Sept. 9, 2011).

## CONCLUSION

For the foregoing reasons, this action should be dismissed in its entirety as to the BL/FG Defendants.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Dated: March 16, 2017

Respectfully submitted,

*/s/ Jeffery A. Dailey*

Jeffery A. Dailey (I.D. No. 85993)
Caroline A. Gardner (I.D. No. 318815)
AKIN GUMP STRAUSS HAUER &
FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, PA 19103
T: 215-965-1200
F: 215-965-1210
jdailey@akingump.com
cgardner@akingump.com

David M. Zensky (*pro hac vice*)
Katherine P. Porter (*pro hac vice*)
Kelly A. Eno (*pro hac vice*)
AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002
dzensky@akingump.com
kporter@akingump.com
keno@akingump.com
*Attorneys for Bridger Logistics, LLC*
*Ferrellgas Partners, L.P., and Ferrellgas L.P.*

30