# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17–cv–00495 |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## PLAINTIFF EDDYSTONE RAIL COMPANY'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    Rios and Gamboa Induce Eddystone to Build a Transloading Facility on the Delaware River ...........................................................................................3

    B.    BTS Was a Sham, Captive Entity of the Defendants..............................................5

    C.    Ferrellgas Purchases Bridger Logistics....................................................................6

    D.    The Monroe Deal Turns Bad, and Bridger Logistics Unwinds its Contracts with Jamex Marketing and Monroe .........................................................7

    E.    Defendants Loot BTS and Transfer it to a Newly-Formed, Insolvent Entity to Evade their Obligations to BTS and to Eddystone ................................8

    F.    BTS Immediately Defaults on its RSA Obligations ..............................................11

STANDARD ON A MOTION TO DISMISS ......................................................................11

ARGUMENT ........................................................................................................................12

I.    THE DEFENDANTS ARE ALTER EGOS OF BRIDGER TRANSFER SERVICES........................................................................................................................12

    A.    Cases Overwhelmingly Support Imposition of Alter Ego Liability on the Facts Alleged Here.................................................................................................12

    B.    It Would Be Unjust to Allow Defendants to Reap the Benefits of the RSA while Using BTS to Shield Themselves from the Liabilities ...............................18

    C.    Selling BTS to an Insolvent, Special Purpose Entity Does Not Absolve Defendants of their Alter Ego Liability .................................................................20

    D.    Nothing Exempts Ferrellgas, Rios, and Gamboa, who Dominated BTS for their own Benefit, from Alter Ego Liability .........................................................23

II.    DEFENDANTS ARE LIABLE FOR FRAUDULENT TRANSFER BECAUSE THEY STRIPPED AN INSOLVENT DEBTOR OF ITS ASSETS IN ORDER TO DEPRIVE EDDYSTONE OF PAYMENTS DUE UNDER THE RSA ....................25

    A.    Eddystone Has Alleged Fraudulent Transfers under PUFTA...............................25

    B.    The Arguments Bridger Logistics Makes in its Motion to Dismiss Only Confirm the Existence of a Fraudulent Transfer........................................................27

        1.    The Transfer of Balance Sheet Assets ......................................................27

        2.    The Abrogation of Bridger Logistics' Obligation to BTS ........................27

    C.    Ferrellgas, Rios, and Gamboa Are Liable for Directing the Fraudulent Transfers ................................................................................................................32

III.    DEFENDANTS BREACHED THE FIDUCIARY DUTIES MANAGERS AND MEMBERS OWE TO CREDITORS OF AN INSOLVENT COMPANY ......................35

IV.   THIS COURT HAS PERSONAL JURISDICTION OVER RIOS AND GAMBOA ............................................................................................................40

    A.   Rios and Gamboa Have Far More than the Minimum Contacts with Pennsylvania Needed for Personal Jurisdiction ......................................................41

    B.   Rios and Gamboa Are Subject to Personal Jurisdiction as Alter Egos of BTS ............................................................................................................................43

    C.   Rios and Gamboa Cannot Hide Behind the Fiduciary Shield Doctrine ................43

        1.   The Fiduciary Shield Doctrine Has No Application in Pennsylvania ...............................................................................................43

        2.   Even if Recognized in Pennsylvania, the Fiduciary Shield Doctrine Would Not Apply to Eddystone's Allegations ...........................................44

CONCLUSION ...............................................................................................................................46

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*3 Point Holdings, L.L.C. v. Gulf South Solutions, L.L.C.*,
No. CIV.A. 06-10902, 2008 WL 695379 (E.D. La. Mar. 13, 2008) ...............................36, 38

*Abraham v. Lake Forest*,
377 So. 2d 465 (La. Ct. App. 1979)......................................................................16, 17, 20, 38

*Accurso v. Infra-Red Services*,
23 F. Supp. 3d 494 (E.D. Pa. 2014) ....................................................................................16

*Advanced Telephone Systems v. Com-Net Professional Mobile Radio*,
846 A.2d 1264 (Pa. Super. Ct. 2004)..................................................................................16

*American Contract Bridge League v. Nationwide Mutual Fire Insurance Co.*,
752 F.2d 71 (3d Cir. 1985)..................................................................................................36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................11

*Atlantic Pier Associates v. Boardakan Restaurant Partners*,
647 F. Supp. 2d 474 (E.D. Pa. 2009) ..................................................................................36

*Barnco International v. Arkla*,
684 So. 2d 986 (La. Ct. App. 1996).....................................................................................16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................................11

*Bouriez v. Carnegie Mellon University*,
No. CIV.A. 02-2104, 2005 WL 3006831 (W.D. Pa. Nov. 9, 2005) .......................................20

*Bragg v. Linden Research*,
487 F. Supp. 2d 593 (E.D. Pa. 2007) .............................................................................45, 46

*Brocious Trucking v. BFL*,
No. CIV.A. 09-741, 2010 WL 569559 (W.D. Pa. Feb. 11, 2010) ...........................................44

*Brown v. Presbyterian Ministers Fund*,
484 F.2d 998 (3d Cir. 1973)................................................................................................36

*Buckley v. Abuzir*,
8 N.E.3d 1166 (Ill. App. Ct. 2014) .................................................................................24, 25

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)............................................................................................................41

*Carteret Savings Bank v. Shushan*,
    954 F.2d 141 (3d Cir. 1992) ........................................................................42

*Citizens National Bank of Texas v. NXS Construction*,
    387 S.W.3d 74 (Tex. App. 2012) ...............................................................33

*CMC GH Sisak D.O.O. v. PTC Group Holdings Corp.*,
    Civ. No. 15-1357, 2016 WL 5025750 (W.D. Pa. Sept. 20, 2016) .............16

*Collet v. American National Stores*,
    708 S.W.2d 273 (Mo. Ct. App. 1986) ........................................................22

*Craig v. Lake Asbestos of Quebec*,
    843 F.2d 145 (3d Cir. 1988) ..............................................................21, 22

*D&S Screen Fund II v. Ferrari*,
    174 F. Supp. 2d 343 (E.D. Pa. 2001) .........................................................42

*Dent Manufacturing v. Zafir*,
    No. CIV. A. 94-2532, 1995 WL 605501 (E.D. Pa. Oct. 12, 1995) ............42

*Engle v. Matrix Golf & Hospitality Philadelphia*,
    Civ. No. 08-5831, 2009 WL 880680 (E.D. Pa. Mar. 31, 2009) ....... passim

*Esse v. Empire Energy III*,
    333 S.W.3d 166 (Tex. App. 2010) .............................................................33

*Fairfield Development, Inc. v. Georgetown Woods Senior Apartments Limited Partnership*,
    768 N.E.2d 463 (Ind. Ct. App. 2002) ........................................................24

*FDIC v. Sea Pines Co.*,
    692 F.2d 973 (4th Cir. 1982) .....................................................................37

*First United Bank & Trust v. PNC Financial Services Group*,
    667 F. Supp. 2d 443 (M.D. Pa. 2009) ........................................................17

*Firstar Bank v. Faul*,
    No. 00 C 4061, 2001 WL 1636430 (N.D. Ill. Dec. 20, 2001) ..................34

*FlagHouse v. ProSource Devevelopment*,
    528 F. App'x 186 (3d Cir. 2013) ...............................................................43

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ......................................................................11

*Friedman v. Israel Labour Party*,
    957 F. Supp. 701 (E.D. Pa. 1997) .............................................................12

*Hammersmith v. TIG Insurance Co.*,
  480 F.3d 220 (3d Cir. 2007) .................................................................36

*Hillman Lumber Products v. Webster Manufacturing*,
  No. CIV.A. 06-1204, 2007 WL 1266124 (W.D. La. Apr. 27, 2007) ......................................37

*Hipple v. Hipple*,
  No. CV 12-1256, 2016 WL 320216 (E.D. Pa. Jan. 27, 2016) .................................35

*Hudson v. Radnor Valley Country Club*,
  No. CIV. A. 95-4777, 1996 WL 172054 (E.D. Pa. Apr. 11, 1996) .........................28

*Hystro Products v. MNP Corp.*,
  18 F.3d 1384 (7th Cir. 1994) ................................................................14

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997).................................................................30

*In re Covenant Partners, L.P.*,
  No. AP 16-226, 2017 WL 838637 (Bankr. E.D. Pa. Mar. 2, 2017)..................................39, 40

*In re Jamuna Real Estate, LLC*,
  416 B.R. 412 (Bankr. E.D. Pa. 2009) .......................................................36

*In re McCook Metals, LLC*,
  319 B.R. 570 (N.D. Ill. 2005) ...............................................................33

*In re Ozark Restaurant Equipment Co.*,
  61 B.R. 750 (W.D. Ark. 1986)................................................................37

*In re Saba Enterprises*,
  421 B.R. 626 (Bankr. S.D.N.Y. 2009) .......................................................33

*In re Teleglobe Communications Corp.*,
  493 F.3d 345 (3d Cir. 2007).................................................................30

*Inter-Tel Technologies v. Linn Station Properties*,
  360 S.W.3d 152 (Ky. 2012) ...........................................................15, 19, 23

*Kontonotas v. Hygrosol Pharmaceuticals Corp.*,
  Civ. No. 07-4989, 2009 WL 3245421 (E.D. Pa. Oct. 5, 2009).........................................42, 44

*Lally v. Catskill Airways*,
  198 A.D.2d 643 (N.Y. App. Div. 1993) .....................................................25

*Leone v. Cataldo*,
  574 F. Supp. 2d 471 (E.D. Pa. 2008) ......................................................42

*Markowitz v. Northeast Land Co.*,
　906 F.2d 100 (3d Cir. 1990)...........................................................................11

*McCrone v. Acme Markets*,
　561 F. App'x 169 (3d Cir. 2014) ...................................................................27

*McDonough Marine Service v. Doucet*,
　694 So. 2d 305 (La. Ct. App. 1996).............................................................38

*Michael S. Rulle Family Dynasty Trust v. AGL Life Assurance Co.*,
　No. CIV.A.10-231, 2010 WL 3522135 (E.D. Pa. Sept. 8, 2010) .........................36

*Mobil Oil Corp. v. Advanced Environmental Recycling Technologies*,
　833 F. Supp. 437 (D. Del. 1993)...................................................................43

*N.Y. State Electric & Gas Corp. v. FirstEnergy Corp. (NYSEG)*,
　766 F.3d 212 (2d Cir. 2014)..........................................................................22

*National Precast Crypt Co. v. Dy-Core of Pennsylvania*,
　785 F. Supp. 1186 (W.D. Pa. 1992)........................................................44, 45

*O'Connor v. Sandy Lane Hotel Co.*,
　496 F.3d 312 (3d Cir. 2007)..........................................................................41

*Pro Tanks Leasing v. Midwest Propane & Refined Fuels*,
　988 F. Supp. 2d 772 (W.D. Ky. 2013) .....................................................18, 23

*QVC v. OurHouseWorks*,
　649 F. App'x 223 (3d Cir. 2016) ...................................................................19

*Rapp v. Walt Disney Co.*,
　No. CIV. A. 98-3478, 1998 WL 564491 (E.D. Pa. Sept. 3, 1998) .........................14

*Realco Services v. Holt*,
　513 F. Supp. 435 (E.D. Pa. 1980) ....................................................16, 17, 19, 20

*Rowan v. Vail Holdings, Inc.*,
　31 F. Supp. 2d 889 (D. Colo. 1998)..............................................................28

*Rowen Petroleum Properties v. Hollywood Tanning Systems*,
　Civ. No. 08-4764, 2011 WL 6755838 (D.N.J. Dec. 23, 2011)..............................32

*Shapira v. United Medical Service*,
　205 N.E.2d 293 (N.Y. 1965)..........................................................................28

*Simeone ex rel. Estate Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*,
　360 F. Supp. 2d 665 (E.D. Pa. 2005) .......................................................13, 14

*Spiro v. Allied Building Products Corp.*,
   No. CIV.A. 13-1561, 2013 WL 5270772 (E.D. Pa. Sept. 17, 2013) .......................................12

*Square D Co. v. Scott Electric Co.*,
   No. CIV.A. 06-00459, 2008 WL 4877990 (W.D. Pa. Nov. 12, 2008) ...................................44

*Sugartown Worldwide LLC v. Shanks*,
   129 F. Supp. 3d 201, 205 (E.D. Pa. 2015) ...............................................................................43

*Sugartown Worldwide LLC v. Shanks*,
   No. CIV.A. 14-5063, 2015 WL 1312572 (E.D. Pa. Mar. 24, 2015).......................................36

*Sunbeam Corp. v. Liberty Mutual Insurance Co.*,
   781 A.2d 1189 (Pa. 2001) ........................................................................................................30

*Systems Industries v. Han*,
   No. CIV. A. 84-5457, 1987 WL 9144 (E.D. Pa. Apr. 7, 1987) ..............................................45

*Terrebonne Concrete, LLC v. CEC Enterprises, LLC*,
   76 So. 3d 502, 510 (La. Ct. App. 2011)...................................................................................38

*Thorpe v. Weiss*,
   44 Pa. D. & C.3d 117 (Pa. Com. Pl. 1986) .............................................................................28

*TJS Brokerage & Co. v. Mahoney*,
   940 F. Supp. 784 (E.D. Pa. 1996) ...........................................................................................44

*Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill*,
   561 F.3d 377 (5th Cir. 2009) ...................................................................................................38

*Travelers Casualty & Surety Co. v. Irex Corp.*,
   No. 02-CV-2142, 2002 WL 32351176 (E.D. Pa. May 31, 2002)...........................................36

*Trinity Industries v. Greenlease Holding Co.*,
   No. CIV.A. 08-1498, 2014 WL 1766083 (W.D. Pa. May 2, 2014).......................................18

*Trustees of National Elevator Industry Pension, Health Benefit & Education Funds v.
   Lutyk*,
   332 F.3d 188 (3d Cir. 2003).....................................................................................................19

*United Rubber, Cork, Linoleum & Plastic Workers of America, AFL-CIO v. Great
   American Industries, Inc.*,
   479 F. Supp. 216 (S.D.N.Y. 1979)...........................................................................................23

*Universal Steel Buildings Corp. v. Shore Corp. One*,
   No. CIV.A. 09-0656, 2010 WL 1142039 (W.D. Pa. Mar. 24, 2010) .....................................44

*Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.*,
    75 F.3d 147 (3d Cir. 1996)..................................................................41

*Vital Pharmaceuticals v. USA Sports, LLC*,
    No. 3:11-CV-975, 2012 WL 760561 (M.D. Pa. Mar. 8, 2012) ................35

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*,
    919 F.2d 206 (3d Cir. 1990)............................................................34, 37

*Wachovia Securities v. Banco Panamericano*,
    674 F.3d 743 (7th Cir. 2012) ...............................................................17

*West Contracting Corp. v. Bechtel Corp.*,
    885 F.2d 1196 (4th Cir. 1989) ..............................................................43

*Westlake Plastic Co. v. O'Donnell*,
    182 F.R.D. 165 (E.D. Pa. 1998)...........................................................38

*Wicks v. Milzoco Builders*,
    470 A.2d 86 (Pa. 1983)........................................................................34

*Wieboldt Stores v. Schottenstein*,
    131 B.R. 655 (N.D. Ill. 1991) ..............................................................34

*World–Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980).............................................................................40

*Young v. Adolph*,
    821 So. 2d 101 (La. Ct. App. 2002) .....................................................37

**ACTS**

12 Pa. Stat. § 5101(b)......................................................................................45

12 Pa. Stat. § 5104(a)(1) ...........................................................................26-27

12 Pa. Stat. § 5108(b)......................................................................................33

42 Pa. Stat. § 5322(b)................................................................................41, 44

La. Rev. Stat. Ann. § 12:1320.....................................................................45, 38

**RULES**

Fed. R. Civ. P. 8..............................................................................................39

Fed. R. Civ. P. 12(b)(6)....................................................................................43

Fed. R. Civ. P. 12(b)(2)....................................................................................12

**BOOKS AND ARTICLES**

Restatement (Second) of Contracts § 202(5) ..................................................................30

### INTRODUCTION

Plaintiff Eddystone Rail Company ("Eddystone") seeks to recover from the owners and controlling persons of Bridger Transfer Services ("BTS"), who used BTS as a sham entity to fleece Eddystone out of more than $140 million that Eddystone spent to build a transloading facility on the banks of the Delaware River.  Defendant Bridger Logistics and its principals, Defendants Julio Rios and Jeremy Gamboa, developed a business plan to deliver North Dakota crude oil by railcar to Eddystone, Pennsylvania, transload it to river barges, and deliver it to a refinery in Trainer, Pennsylvania.  To accomplish this, they induced Eddystone to spend over $170 million to construct a transloading facility that was essential to their plan in return for a contractual commitment that they would transload a minimum volume of crude oil at Eddystone's facility over five years.  Eddystone entered into an agreement to build the facility with BTS, which Defendants held out as a bona fide independent entity with substantial business.

In fact, BTS was a sham – a shell entity with no employees and no independent revenue dominated entirely by Defendants.  BTS made the transloading capacity it obtained from Eddystone – at substantial cost and in return for a five-year minimum volume commitment – exclusively available to Bridger Logistics without obtaining any written contract or opportunity for profit in return.  Despite securing and providing the critical transloading capacity at great expense, BTS did not share in any of the profits Bridger Logistics earned from its refinery client.

Bridger Logistics directly paid the amounts due under Eddystone's contract with BTS – including deficiency payments in months when the minimum volume commitment was not met – for as long as it needed Eddystone's transloading capacity.  But as soon as the economics of Bridger Logistics' shipping arrangement began to fail, Bridger Logistics, Rios and Gamboa, and Bridger Logistics' new parent, Ferrellgas, came up with a scheme to saddle Eddystone with the cost of the transloading facility that they had induced Eddystone to build.

First, Defendants stripped BTS of all of the assets on its balance sheet and transferred them to Ferrellgas entities.  Then, they abrogated the arrangement by which Bridger Logistics had paid amounts BTS owed under the Eddystone contract.  And, to put distance between them and BTS before the inevitable default on its obligations to Eddystone, they sold BTS to Jamex Transfer Holdings ("JTH"), a newly formed shell company.  Under the sale agreement, this asset- and revenue-less new company "assum[ed]" the obligation to fund minimum volume commitment payments in the future.

Defendants appear to believe that they can escape liability by paying the portion of their obligation to Eddystone that came due before BTS was sold – and then inducing Jamex Transfer Holdings to purport to agree to cover the remainder.  But the law does not allow an obligor to evade an ongoing financial obligation by transferring it to an insolvent entity and asserting that it was paid up as of the time of the transfer.

Of course, as Defendants knew, JTH had no ability to fund minimum volume commitment payments.  Stripped of its assets and cut off from its source of funding, BTS promptly defaulted on its obligations to Eddystone.  And Defendants' machinations do not shield them from liability.  First, their manipulation of a shell entity as an instrumentality for the purpose of obtaining the fruits of the Eddystone contract without bearing any of its burdens makes them liable as alter egos of BTS.  Second, Defendants' decision to strip BTS of its assets, abrogate the course of dealing by which Bridger Logistics paid BTS' minimum volume commitment charges, and then purport to transfer that obligation to an insolvent entity gives rise to fraudulent transfer liability.  Finally, because BTS was well within the zone of insolvency, with obligations to Eddystone far in excess of its actual assets or cash flow, Defendants owed fiduciary duties to manage BTS in the interests of its creditor, Eddystone.  Instead, they used

their control over BTS to exploit it for their own benefit and to the detriment of Eddystone, in violation of their fiduciary duties.

## BACKGROUND

### A.   Rios and Gamboa Induce Eddystone to Build a Transloading Facility on the Delaware River

In early 2013, the wellhead price of crude oil in North Dakota was over $20 per barrel lower than the "Brent" world benchmark crude oil price that prevails around Philadelphia. Compl. ¶ 20.  Defendants Julio Rios and Jeremy Gamboa, who ran a crude oil logistics business under the name "Bridger," saw an opportunity to capitalize on the price differential:  they would bring North Dakota crude to Philadelphia-area refineries by railcar.  Compl. ¶¶ 3, 21.

Their target customer was Monroe Energy LLC, the owner/operator of a refinery in Trainer, Pennsylvania.  Compl. ¶¶ 3, 24.  But the Monroe refinery was built to receive petroleum from overseas on marine vessels.  Thus, Rios and Gamboa needed a facility to "transload" the crude oil from railcars to marine vessels that could supply the Monroe refinery.  Compl. ¶¶ 3, 21.

Rios and Gamboa negotiated with Plaintiff Eddystone Rail Company – a joint venture of local Philadelphia investors (organized as Canopy Prospecting) and Enbridge, a crude oil transportation infrastructure company – to build a rail-to-barge transloading facility for this purpose.  Compl. ¶ 21.  Rios and Gamboa had extensive, in-person, telephonic, and email communications with Eddystone and Monroe personnel in Pennsylvania regarding the terms of their arrangement to ship crude oil through the state.  These included multiple visits to Monroe and to the transloading facility that Eddystone built and operated.  Theodore Decl. Exs. 1-11.

In February 2013, Rios and Gamboa caused a Bridger entity named Bridger Transfer Services ("BTS") to enter into a Rail Facilities Services Agreement (the "RSA") with Eddystone. The RSA was executed by Rios.  Under the RSA, Eddystone would build a transloading facility

in Eddystone, Pennsylvania.  Compl. ¶¶ 2, 21–23.  Railcars full of crude oil would arrive at the facility, where the crude would be transloaded from the railcars onto waiting barges.  Compl. ¶¶ 2, 3, 21, 22.  The barges would then take the crude eight miles downriver to the Monroe refinery at Trainer.  Compl. ¶ 3.

In return, Rios and Gamboa agreed that, for five years, BTS would deliver approximately 65,000 barrels of crude oil per day to Eddystone for transloading and would pay $2.25 per barrel. Compl. ¶¶ 2, 3, 21, 22.  Under the RSA, if there was a failure to deliver this 65,000 barrel "minimum volume commitment," Eddystone was entitled to $1.75 per barrel of deficiency. Compl. ¶ 22.

This "take or pay" minimum volume commitment was critical.  Eddystone ultimately invested over $170 million in a facility that was unprecedented in the Philadelphia area.  Compl. ¶¶ 2, 23.  Unless Eddystone knew that it had someone to take or pay for the facility's capacity for its first five years, it was far too risky to build.  Compl. ¶ 23.

Rios and Gamboa held out BTS as a real entity with substantial assets and business activities.  For example, in financial statements that Rios and Gamboa delivered to Eddystone, BTS was represented to have almost $100 million of assets.  Compl. ¶¶ 27, 49.  These assets included, but were not limited to, dozens of fuel injection facilities, real estate, and accounts receivable.  Compl. ¶ 27.  Indeed, the balance sheet showed that BTS had almost $40 million in net worth as of December 31, 2014.  *Id.*

With the RSA in hand and what appeared to be a real entity on the other side of the transaction, Eddystone proceeded to construct the transloading facility from March 2013 until mid-April 2014.  Compl. ¶ 4.  Rios and Gamboa travelled to Pennsylvania multiple times to assess the facility and market BTS' capacity there to potential investors and business partners.

Theodore Decl. Exs. 1-11.  On May 1, 2014, BTS began delivery of crude to the facility, which transloaded the crude oil cargoes to barges for delivery downstream.  Compl. ¶ 4.  Eddystone proceeded to transload every trainload of crude oil that BTS delivered to the facility until BTS abruptly terminated its operations on February 1, 2016.  *Id.*

Rios and Gamboa used this transloading capacity so that another of their companies, Bridger Marketing, could negotiate and secure a matching five-year Crude Oil Supply Agreement with Monroe, the refinery owner/operator in Pennsylvania.  Under the Crude Oil Supply Agreement, the parties would take advantage of the North Dakota-Brent price difference. Compl. ¶¶ 20, 21, 24, 25.  Bridger Marketing obtained financing to purchase and sell crude oil volumes to Monroe, while BTS' direct parent company, Bridger Logistics, was responsible for transporting the crude from North Dakota to Monroe.  Because the price difference between the Brent benchmark and North Dakota crude was higher than the cost of transporting the crude from North Dakota to Philadelphia, the Bridger operation could get paid while Monroe still received crude at a price below the Brent benchmark.  Compl. ¶ 20.

### B.       BTS Was a Sham, Captive Entity of the Defendants

In fact, BTS was not a real, standalone entity but a shell that Rios and Gamboa were using in an effort to obtain the RSA's benefits while depriving Eddystone of a counterparty with the wherewithal to backstop its contractual obligations.  Rios and Gamboa ran their crude oil logistics business through a web of limited liability companies under the "Bridger" name. Within that web, BTS existed only for the benefit of Defendant Bridger Logistics, its 100% equity owner.  Compl. ¶ 19.  When BTS entered into the RSA, it was wholly controlled by Bridger Logistics, Rios, and Gamboa.  Compl. ¶¶ 30–32, 54–58.  BTS had no independent officers or directors.  Compl. ¶¶ 31, 66.a.  BTS had no employees of its own.  Compl. ¶ 31. Instead, employees of other Bridger entities performed work on BTS' behalf as necessary.  *Id.*

Rather than conduct its own operations or enter into its own contracts, BTS simply made all of its transloading capacity available to Bridger Logistics without any written contract.  Under the Crude Oil Supply Agreement – and, later, an Amended and Restated Crude Oil Supply Agreement and a Transportation Logistics Agreement – Monroe paid Bridger Logistics, not BTS, for delivery of crude to Monroe's refinery.  Compl. ¶¶ 25, 32.  Rios and Gamboa did not have BTS benefit from the Crude Oil Supply Agreement, despite BTS' central importance.  Instead, Rios and Gamboa sent Monroe's payments under the Crude Oil Supply Agreement to other Bridger entities.  Compl. ¶¶ 32, 34, 58.  Thus, BTS did not have any source of revenue other than from Bridger Logistics and its other 100% owned subsidiaries.  Compl. ¶ 32.

In other words, BTS made exclusively available to Bridger Logistics all of the Eddystone facility's transloading capacity that BTS owned under the RSA.  Without this capacity, Bridger Logistics could not have performed and earned payments from Monroe.  Compl. ¶¶ 3, 21, 24, 25, 34.  But Bridger Logistics had no written contract whereby it paid BTS for this capacity.  Compl. ¶¶ 28, 33, 34.  Bridger Logistics and other Bridger Logistics subsidiaries simply paid all amounts due under the RSA – including minimum volume commitment deficiency charges – to Eddystone directly, with no compensation to BTS.  Compl. ¶¶ 5, 58.  In fact, Defendant Ferrellgas Partners (which later bought Bridger Logistics) did not even acknowledge BTS' existence in its SEC filings, which asserted that Logistics owned all of the transloading capacity.  Compl. ¶¶ 40, 41.  In short, all of the Defendants' efforts were to enrich Bridger Logistics, with no benefit to BTS.

### C.   Ferrellgas Purchases Bridger Logistics

In June 2015, Rios and Gamboa sold Bridger Logistics and its subsidiaries to Defendant Ferrellgas in a transaction where they became significant equity owners of Ferrellgas.  As a result of the sale, Rios and Gamboa together realized more than $40 million and obtained

substantial ownership positions in Ferrellgas.  Rios and Gamboa also were named Executive

Vice Presidents at Ferrellgas responsible for running Bridger Logistics and its subsidiaries.

Compl. ¶¶ 37, 38.

Ferrellgas did not acquire Bridger Group's oil trading operation – previously run under

the name "Bridger Marketing."  The ownership of Bridger Marketing was transferred to James

Ballengee – Rios and Gamboa's business partner in the pre-Ferrellgas Bridger Group –who

renamed it "Jamex Marketing."  Compl. ¶ 38.  Jamex Marketing entered into an Amended and

Restated Crude Oil Supply Agreement with Monroe that separated the amounts Monroe owed

Marketing from the amounts Monroe owed Logistics for the crude oil transportation.  Compl. ¶¶

35, 36.  Bridger Logistics entered into "Transportation and Logistics Agreements" with each of

Monroe and Jamex Marketing that provided a "take or pay" minimum volume commitment to

cover Bridger Logistics' exposure to Eddystone and others in the supply chain.  Compl. ¶ 36.

But nothing changed for BTS.  BTS continued to make its capacity available to Bridger

Logistics for no consideration.  Compl. ¶¶ 39–41.  And Bridger Logistics continued to cover

BTS' obligations to Eddystone – including minimum volume commitment deficiency payments

in months in which BTS did not deliver its minimum monthly commitment.  Compl. ¶ 39.

### D.    The Monroe Deal Turns Bad, and Bridger Logistics Unwinds its Contracts with Jamex Marketing and Monroe

Over the two years since the RSA was signed, the petroleum markets changed.  Due to

market developments that increased the relative price of North Dakota crude, the difference

between North Dakota crude prices and the East Coast Brent benchmark price greatly decreased.

Compl. ¶ 43.  Under the Amended Crude Oil Supply Agreement pricing formula, the

disappearance of this price differential made the price of Bakken crude higher than Brent after

accounting for the cost of shipping to Monroe and made the whole arrangement a huge losing

proposition for Jamex Marketing.  Compl. ¶¶ 43, 44.  Jamex Marketing experienced large

monthly losses, which put the entire arrangement – including Bridger Logistics' transportation

and logistics contracts – at risk of collapse.  Compl. ¶¶ 45, 46.  If Jamex Marketing failed,

Bridger Logistics would have no one to fund the minimum volume guarantee on which it and

Ferrellgas relied.

Bridger Logistics, under the control and direction of Rios, Gamboa, and Ferrellgas,

developed a scheme to end its exposure to Jamex Marketing's failure while extricating itself

from the RSA obligations to Eddystone.  Bridger Logistics secretly entered into an agreement to

wind down its minimum volume commitment deal with Monroe and Jamex Marketing.  The new

arrangement would end crude deliveries on February 1, 2016, wind down Bridger Logistics'

Transportation and Logistics Agreements, and give Bridger Logistics a stream of payments in

return.  Compl. ¶¶ 46–50.  This released Bridger Logistics from its operational need to maintain

its North Dakota-to-Philadelphia logistics network – the infrastructure lynchpin of which was the

$170 million Eddystone facility – in order to perform obligations to Monroe.  Bridger Logistics

and Jamex Marketing gave no public notice of this deal, hiding it from Eddystone.  Compl.

¶¶ 50, 66.b.

>>>>    **E.    Defendants Loot BTS and Transfer it to a Newly-Formed, Insolvent Entity to Evade their Obligations to BTS and to Eddystone**

At or about the same time that Bridger Logistics – directed by Ferrellgas, Rios and

Gamboa – unwound the Monroe deal, they transferred all of BTS' balance sheet assets to other

Ferrellgas entities, stripping BTS of value.  Compl. ¶¶ 48, 49.  As of December 31, 2014,

auditors had confirmed that BTS had $98 million in assets.  Compl. ¶¶ 27, 49.  A year later,

Bridger Logistics represented that BTS "has no assets other than the Eddystone Agreement [i.e.,

the RSA]" and certain other contracts.  Purchase and Sale Agreement ("PSA") § 4.11 (Zensky

Decl. Ex. C; Dkt. No. 35-5).  Defendants had stripped BTS bare of assets.  *Id.*; Compl. ¶¶ 7, 48.

Defendants also eliminated Bridger Logistics' ongoing, implied agreement to fund BTS'

obligations under the RSA.  BTS had provided its transloading capacity so that Bridger Logistics

could make good on its agreement to provide crude to Monroe.  Thus, as BTS' parent and the

true beneficiary of the RSA, Bridger Logistics was obliged to compensate BTS for the fair value

of its services.  Had BTS been independent, it never would have taken on the RSA's five-year

minimum volume guarantee and then made the capacity exclusively available to Bridger

Logistics without a matching financial guarantee.  Compl. ¶¶ 5, 33, 34.  And, indeed, until

February 1, 2016, Bridger Logistics did cover all amounts due under the RSA – including both

payment for amounts actually transloaded and for deficiency charges in those months when it did

not bring the minimum volume of crude to the Facility.  Compl. ¶¶ 32, 34.

On February 1, 2016, Defendants caused Bridger Logistics to unilaterally abrogate this

agreement to cover amounts due under the RSA, including the $140 million in minimum volume

payments still remaining.  Compl. ¶¶ 7, 9, 49, 63, 64.

Finally, after stripping BTS of all value, as part of Defendants' deal to wind down the

shipping arrangement with Jamex Marketing, Bridger Logistics sold BTS for $10 to Jamex

Transfer Holdings ("JTH"), an insolvent subsidiary of Jamex Marketing newly formed for this

sole purpose.  Compl. ¶¶ 49, 50.

As part of the sale, Bridger Logistics "retained liability . . . to make those payments due

to Eddystone" under the RSA for periods prior to February 1, 2017 but purported to transfer to

JTH its obligation to cover "[l]iabilities under the Eddystone Agreement [i.e., the RSA] . . . for

periods on and after the Closing Date."  PSA § 2.1(b); BL MTD at 7.[1]  In other words, Defendants acknowledged that Bridger Logistics had an obligation to cover liabilities under the RSA but attempted to transfer those liabilities to an insolvent entity they knew could not pay. Bridger Logistics agreed to "retain[]" liabilities under the RSA for months prior to February 2016 but purported to have JTH "assum[e]" those liabilities for future months.  PSA § 2.1(b); *see also* BL MTD at 7 ("[T]he BTS PSA reflects that Logistics agreed to make those payments due to [Eddystone]" but "JTH (the buyer) promised Logistics that it expressly assumed all Liabilities … under the RSA for periods on and after the closing.").

The sale of BTS to Jamex Transfer Holdings was thus nothing more than a sham transaction to make it more difficult for Eddystone to seek legal recourse from the Defendants who had stripped BTS.  JTH had no assets other than BTS stock, and neither JTH nor Jamex Marketing had any use for BTS.  Compl. ¶ 49.  Subsequent to February 1, neither Bridger Logistics nor Jamex Marketing would ever have contracts with railroads to bring crude to Eddystone and, with the unwinding of the Monroe deal, had no need to barge crude from the transloading facility to Monroe.  Compl. ¶ 50.  Indeed, Jamex Marketing had no logistics business at all, so it was not capable of making arrangements to do so.  Compl. ¶¶ 48, 49.

The "assignment" to JTH of Bridger Logistics' obligation to fund amounts due under the RSA was in substance an abandonment of Logistics' obligation to BTS, to which an independent BTS – and certainly its creditors – never would have consented.  Compl. ¶¶ 33, 34.  Defendants' January 2016 maneuvers stripped BTS of all of the assets on BTS' balance sheet and transferred to a shell company Bridger Logistics' obligation to pay BTS' expenses, leaving BTS with

---

[1] This brief refers to the memorandum in support of the Bridger Logistics and Ferrellgas motion to dismiss (Dkt. No. 35-1) as the "BL MTD."  It refers to the memorandum in support of the motion to dismiss filed by Julio Rios and Jeremy Gamboa as the "RG MTD."

nothing to pay Eddystone over $140 million in minimum volume commitment payments remaining under the RSA.

###    F.    BTS Immediately Defaults on its RSA Obligations

After the sale BTS immediately defaulted on its obligations to Eddystone.  Compl. ¶ 50. None of Bridger Logistics, Jamex Marketing, nor BTS delivered another barrel of crude to Eddystone nor made minimum volume commitment payments under the RSA.  *Id*.

Jamex Marketing falsely claimed that Eddystone – which had flawlessly transloaded every cargo of crude oil brought to the Facility for twenty months – had breached the RSA to such an extent that BTS could no longer conduct business.  *Id*.  It falsely claimed that the end of the Monroe deal was caused by Jamex Marketing's inability to obtain financing, which it attributed to Eddystone.  *Id*.

Compelled by the RSA to proceed against BTS in arbitration, Eddystone obtained an arbitral award against BTS.  However, BTS is unable to pay.  Compl. ¶ 51.  In the present suit, Eddystone turns to the parties that dominated, manipulated, and stripped BTS in an effort to evade debts to Eddystone under the RSA.

### STANDARD ON A MOTION TO DISMISS

On a motion to dismiss this Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them."  *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).  A Complaint need merely state a claim for relief that is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff may rely not only on the allegations of the complaint but also on "affidavits or competent evidence that show sufficient contacts with the forum state." *Spiro v. Allied Building Products Corp.*, No. CIV.A. 13-1561, 2013 WL 5270772, at *2 (E.D. Pa. Sept. 17, 2013). "Factual discrepancies created by affidavits are generally resolved in favor of the non-moving party." *Friedman v. Israel Labour Party*, 957 F. Supp. 701, 706 (E.D. Pa. 1997).

## ARGUMENT

## I.      THE DEFENDANTS ARE ALTER EGOS OF BRIDGER TRANSFER SERVICES

### A.      Cases Overwhelmingly Support Imposition of Alter Ego Liability on the Facts Alleged Here

As Eddystone has alleged, BTS never had an independent existence separate from that of Defendants, who exercised complete control and used BTS as a mere instrumentality.  BTS had no employees of its own; everything it did was planned and implemented by Rios, Gamboa, and other employees of FGP and Bridger Logistics.  Seeking to obtain the benefits of the RSA for themselves without incurring any of its obligations, Defendants held out BTS as a genuine entity with substantial assets and operations but instead operated it as a shell – with no separate employees, offices, or management – whose sole purpose was to incur substantial, long-term payment obligations to Eddystone for transloading capacity that was then made exclusively available to Bridger Logistics without any written contract or opportunity for return to BTS. Apart from payment by Bridger Logistics of amounts due under the RSA – an unwritten obligation Bridger Logistics abandoned as soon as it became inconvenient – BTS had no reliable revenue stream commensurate with the value of its obligations to Eddystone or of the transloading capacity obtained in the RSA.  Rather, Defendants appropriated BTS' assets for

themselves as they saw fit, ultimately taking them all once BTS was no longer of any use.  *See* Compl. ¶¶ 3, 22, 31, 33, 40, 41, 53, 55, 57, 77.

These facts more than justify veil piercing.  Where, as here, "the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent," it is appropriate to disregard the corporate form and hold those responsible liable for the company's debts.  *Simeone ex rel. Estate Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005); *accord Engle v. Matrix Golf & Hospitality Philadelphia*, Civ. No. 08-5831, 2009 WL 880680, at *3–4 (E.D. Pa. Mar. 31, 2009).  Thus, the court in *Bombardier* found an alter ego relationship between a Canadian parent and its wholly owned Austrian subsidiary Rotax where "[t]he Bombardier corporate office, rather than Rotax's own management team, made major business decisions for Rotax," the parent company "always controlled the outcome of . . . deals" between parent and sub, and the parent abused that control to "use Rotax as a corporate shell to facilitate" business deals with third parties that served the parent's purposes but that the parent preferred not to enter into directly.  360 F. Supp. 2d at 676–78.

That is exactly what has happened here, where BTS does not even have its own separate management team, employees, or business.  Bridger Logistics' senior officers, Rios and Gamboa, made all major business decisions for BTS; indeed, BTS had no employees of its own to make any independent decisions at all or even to conduct day-to-day operations.  Compl. ¶¶ 3, 8, 31.  Defendants used their power over BTS to cause it to enter into a business deal with Eddystone designed not to benefit BTS in any way but solely to facilitate Bridger Logistics' transportation arrangement with Monroe – and then caused BTS to deliver the fruits of the RSA to Bridger Logistics on terms to which no independent, arm's-length party would have agreed.

Compl. ¶¶ 34, 53, 55.  Just as "[p]hrases blurring the two companies together appeared repeatedly in Bombardier's annual reports," "Bombardier specifically attributed design and manufacturing of Rotax engines to itself," and Bombardier held "itself and Rotax out to the public as a single entity," 360 F. Supp. 2d. at 676–78, Defendants submitted SEC filings in which they represented that Bridger Logistics had rights to Eddystone's transloading capacity without any mention of BTS.  Compl. ¶¶ 40, 41, 57, 77.

Indeed, the facts of this case go far beyond the circumstances that justified veil piercing in *Bombardier*.  Not only is Defendants' control of BTS far more total and comprehensive, but Bridger Logistics and BTS commingled funds, engaged in *ad hoc* and contractually unjustified cash transfers, and entered into transactions without formal documentation or contracts and from which BTS had no possibility of profit – for example, by permitting Bridger Logistics to use BTS' transloading capacity as its own.  Compl. ¶¶ 31, 53, 55, 57, 77.  Eddystone has, of course, alleged that under these circumstances Bridger Logistics had an implied obligation to cover BTS' costs at a minimum.  But, in their Motion to Dismiss, Ferrellgas and Bridger Logistics actually argue that rather than provide BTS with a reliable revenue stream, Bridger Logistics simply provided the funds to cover Eddystone's payments as they came due, with no obligation for BTS' contingent liability.  BL MTD at 32; *see also* Compl. ¶¶ 32–34, 53–57.  As this Court has explained, "[e]vidence that a parent corporation pays expenses for its subsidiary tends to show the existence of an 'alter-ego relationship.'"  *Rapp v. Walt Disney Co.*, No. CIV. A. 98-3478, 1998 WL 564491, at *3 (E.D. Pa. Sept. 3, 1998) (Kelly, J.); *see also Hystro Products v. MNP Corp.*, 18 F.3d 1384 (7th Cir. 1994) (allowing alter ego claim where plaintiff alleged parent dominated subsidiary's operations, exercised control over its finances, and had the debtor request funds from the parent for all its expenditures).

In particular, veil piercing is appropriate where, as here, a corporate parent covers a subsidiary's payments on an agreement from which the parent derives all of the benefit. *See Inter-Tel Technologies v. Linn Station Properties*, 360 S.W.3d 152 (Ky. 2012) (treating grandparent and subsidiary as alter egos where the grandparent made rent payments on the subsidiary's lease and the grandparent and parent derived all use and benefit from the leased premises).

Bridger Logistics and BTS are similar to the LLCs at issue in *Engle v. Matrix Golf & Hospitality Philadelphia*, Civ. No. 08-5831, 2009 WL 880680 (E.D. Pa. Mar. 31, 2009) (Kelly, J.), in which this Court held that the plaintiff had adequately pled his alter ego claims against the defendants who orchestrated the corporate arrangement.  There, the plaintiff sought to collect on unpaid loans to a debtor LLC and asserted alter ego claims against its affiliate LLCs, which supplied the debtor LLC with its sole source of funds, and the officers who managed the debtor. This Court held that the plaintiff had adequately pled his alter ego claim through factual allegations showing that, "while the Matrix Defendants are structured as many different entities, they are, in fact, intermingled and all controlled by the same source."  *Id.* at *4.

Eddystone has made even stronger allegations.  Eddystone alleges that Defendants "created a series of nominally different companies with the name 'Bridger' to carry on this business, but treated them all as part of an undifferentiated whole," with completely overlapping personnel.  Compl. ¶ 19.  The Defendants structured BTS as a captive entity within its corporate group, which, like Matrix Philadelphia, had "no source of cash flow other than the funds it received from Bridger Logistics."  Compl. ¶ 32.  Indeed, the *Matrix* defendants actually paid Matrix Philadelphia a fee for providing them management services, whereas Eddystone has alleged that Bridger Logistics merely covered BTS' expenses, with no profit at all for BTS.  *Id.*

Defendants rely on easily distinguishable cases, many of which make clear that an alter ego claim would be amply supported by circumstances such as those alleged here. *Barnco International v. Arkla*, 684 So. 2d 986, 992 (La. Ct. App. 1996), involved a subsidiary that conducted a profitable, independent business on its own, maintained exact records of cash moves among its affiliates, earned interest whenever its money was used by other entities, and entered contracts without seeking parental endorsement. Similarly, the court in *CMC GH Sisak D.O.O. v. PTC Group Holdings Corp.*, Civ. No. 15-1357, 2016 WL 5025750, at *3 (W.D. Pa. Sept. 20, 2016), dismissed an alter ego claim based on allegations of ownership *alone* and contrasted the case with one alleging "siphoning of funds." BTS, of course, had no independent management and was never permitted to earn a profit from its assets. Compl. ¶¶ 31, 58. Instead, its owners siphoned all of its assets. Compl. ¶¶ 63–65.

*Advanced Telephone Systems v. Com-Net Professional Mobile Radio*, 846 A.2d 1264, 1282 (Pa. Super. Ct. 2004), rejected an alter ego claim where the misuse of the corporate form was not "between [the plaintiff] and the LLC, but rather, between the LLC and a third party" so that the plaintiff "could not demonstrate that it was prejudiced." There was no claim, as here, that the LLC had been falsely held out as a legitimate operation or that the plaintiff had lost $140 million as a result of the subterfuge. Likewise, *Accurso v. Infra-Red Services*, 23 F. Supp. 3d 494, 510 (E.D. Pa. 2014), declined to pierce the veil because the plaintiff did not allege intermingling of funds or other indicia of alter ego status beyond mere sharing of addresses. Nonetheless, the Court granted leave to amend so that the plaintiff could allege that the defendant was a mere "pass-through entity" with no genuine business of its own. *Id*.

Finally, Defendants cite two cases for the proposition that undercapitalization is not enough. *See Abraham v. Lake Forest*, 377 So. 2d 465 (La. Ct. App. 1979); *Realco Services v.*

*Holt*, 513 F. Supp. 435 (E.D. Pa. 1980).  Of course, undercapitalization is one of only many factors that support veil piercing here.  By contrast, in *Realco*, 513 F. Supp. at 442, the owners, in every other way, had respected the company as a separate entity and had not used their control to accomplish an inequitable purpose.  *Id.* at 442.  And in *Lake Forest*, undercapitalization was not enough because it was standard practice in the industry.  *Id.* at 469.[2]

In sum, Eddystone has alleged far more than enough facts to sustain an alter ego claim. Eddystone has alleged that Bridger Logistics, as its sole member, exercised total control over BTS, that Rios and Gamboa made all corporate decisions for both entities, that BTS had no employees and relied on those of Bridger Logistics, that Defendants commingled the two entities' funds, and that Bridger Logistics used BTS' assets without compensating BTS and treated BTS' assets as its own.  *See* Compl. ¶¶ 30–34, 40, 41, 57, 58, 77; *First United Bank & Trust v. PNC Financial Services Group*, 667 F. Supp. 2d 443, 447 (M.D. Pa. 2009) (alter ego claim adequately pled where plaintiff–creditor alleged corporate parent owned all of debtor's stock, controlled debtor's management, and caused its own employees to perform services interchangeably for debtor).  Eddystone has further alleged that BTS served simply as a sham to be exploited for the operations of its parents and then stripped of assets and discarded when convenient.  *See* Compl. ¶¶ 48, 49, 54, 59; *Wachovia Securities v. Banco Panamericano*, 674 F.3d 743, 752 (7th Cir. 2012) (upholding alter ego ruling where, "[w]ithout adequate capitalization," the entity was "a mere liability shield, rather than an independent entity capable

---

[2] The debtor entity in *Lake Forest*, despite having only $1,000 of paid-in capital, was undercapitalized only "in a sense" because it also owned a capital asset worth as much as the liabilities it had incurred to purchase it.  377 So.2d at 468.

of carrying on its own business").[3]  As the foregoing cases make clear, these facts justify

piercing the corporate veil.

**B.     It Would Be Unjust to Allow Defendants to Reap the Benefits of the RSA while Using BTS to Shield Themselves from the Liabilities**

Seeking to shield themselves from alter ego liability, Defendants argue that veil piercing

is foreclosed because Eddystone failed to obtain a written parent guarantee, without which it

cannot meet the "unfairness or injustice" prong of an alter ego claim.  BL MTD at 17–20.

Defendants cite no authority for the proposition that failure to obtain a guarantee – even in the

presence of overwhelming alter ego facts – precludes veil-piercing.  And Eddystone has alleged

ample unfairness to justify the alter ego remedy.  Eddystone has averred – and financial

statements that Bridger Logistics delivered to Eddystone unquestionably show – that Defendants

held BTS out as a genuine, independent entity with real operations and a substantial balance

sheet, when in reality it was a shell that Defendants interposed as a liability shield between

themselves and Eddystone in an effort to enjoy the fruits of the RSA without bearing its burdens.

Compl. ¶¶ 8, 27, 30, 32, 60.

---

[3] Defendants incorrectly assert that the alter ego analysis considers only the initial equity invested at formation in determining adequacy of capitalization.  In fact, courts will consider "capital transfers to the controlling shareholder" that occur after the company has begun operating as a going concern if the transfers significantly affect its continued ability to carry on its business.  *Pro Tanks Leasing v. Midwest Propane & Refined Fuels*, 988 F. Supp. 2d 772, 787 (W.D. Ky. 2013) (finding undercapitalization where seller of propane business transferred the sales proceeds to its corporate grandparent).  Bridger Logistics relies on *Trinity Industries v. Greenlease Holding Co*., No. CIV.A. 08-1498, 2014 WL 1766083, at *13 (W.D. Pa. May 2, 2014), for the notion that only a subsidiary's initial capitalization matters to the veil-piercing inquiry.  But the case completely contradicts Defendants' theory because it holds that piercing is warranted based on siphoning of assets if the parent has knowledge of the subsidiary's liabilities at the time of siphoning.  *See id*. at *13–14 (declining to pierce the veil only because, at the time of the transfer away of assets, the parent had no knowledge of the sub's latent environmental liabilities).  Defendants were well aware of BTS' liabilities here. Compl. ¶¶ 7, 34, 39 48, 54, 58, 66, 75.

This is the essence of the sort of injustice that justifies disregarding the corporate form. Where "a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities," or a parent corporation has engaged in "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation," piercing is appropriate. *QVC v. OurHouseWorks*, 649 F. App'x 223, 227 (3d Cir. 2016). In *Inter-Tel*, for example, the court pierced the corporate veil to avoid injustice where a corporate parent and grandparent had caused their assetless shell subsidiary to lease space for their business operations and incur monthly rent obligations that it was unable to pay on its own. 360 S.W.3d at 156, 167–68. The court explained that the lease liability fell solely on the subsidiary, yet all of its assets were "squirreled" into the grandparent company "beyond a legitimate creditor's reach absent application of the piercing doctrine." *Id.* at 168. Here, the Defendants used BTS to take unfair advantage of Eddystone in exactly the same way. The Defendants heaped on BTS five years' worth of payment obligations under the RSA while giving Bridger Logistics exclusive control over Eddystone's transloading capacity and the resulting Monroe revenue stream, thereby keeping those funds out of Eddystone's reach once Defendants no longer had use for the RSA. Further, in the months preceding Defendants' abandonment of BTS, they "squirreled" BTS' balance sheet assets out of it, leaving it an empty, assetless shell.[4]

Defendants are unable to cite a single case that involves any such injustice. *Realco*, on which Bridger Logistics heavily relies, is not remotely similar on its facts. *Realco* involved a

---

[4] Defendants argue that Eddystone has not alleged fraud as part of its alter ego claims. BL MTD at 15. But, as they acknowledge, fraud is not a prerequisite to alter ego liability. *See Trustees of National Elevator Industry Pension, Health Benefit & Education Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (The Third Circuit "does not require proof of actual fraud as a prerequisite for piercing the corporate veil."). And, while Eddystone has not brought a fraud count, the Complaint establishes that Defendant's holding out of BTS as a bona fide company was false. Compl. ¶¶ 8, 27, 53-54,

genuine subsidiary corporation with multiple offices, independent "officers . . . active in running the company," "payroll in New York alone [] list[ing] about 25 employees," and no suggestion of siphoning of value. 513 F. Supp. at 442. The company's failings were limited to "sloppy management and casual observance of formalities." *Id.* Conversely, *Bouriez v. Carnegie Mellon University*, No. CIV.A. 02-2104, 2005 WL 3006831, at *19 (W.D. Pa. Nov. 9, 2005), is not even an alter ego case. The plaintiff did "not claim that it was an unknowing victim of the corporate structure . . . or the limitations imposed by the contractual relationships between the parties" and "has not attempted to pierce the corporate veil under the alter ego theory between GRT and GTC." *Id.* at *19. And in *Lake Forest*, the plaintiff lender was well aware of the corporate and financial structure of the defendant, which operated as an independent real estate investment vehicle, all of whose transactions were properly accounted for. While the debtor's real estate investment failed, it did not allow its assets to be exploited for the benefit of its parents, and the economics of the plaintiff's loan were clear up front.

None of these cases suggest that a failure to obtain a guarantee dooms an alter ego action. Nor does such a proposition make sense. If a contractual parent guarantee were required, the alter ego doctrine would be moot. For this reason, parent guarantees are uniformly *absent* where the veil is pierced. The wrong is that the plaintiff has been lured into dealing with a sham company, used by its parent as a tool to avoid liability. It is hardly surprising that, in such cases, the parent should decline to give a guarantee after the victim has been snared.

### C.     Selling BTS to an Insolvent, Special Purpose Entity Does Not Absolve Defendants of their Alter Ego Liability

Next, Bridger Logistics argues that, even if its behavior was unjust, it cannot be an alter ego because the liability for which Eddystone seeks to hold it responsible accrued after it sold BTS to Jamex Transfer Holdings, an assetless entity specially formed to cut BTS off from any

source of funding and shield other Bridger and Jamex entities from its debts.  BL MTD at 13-14.

In other words, Bridger Logistics is arguing that it was free to use BTS as a sham corporation

and strip it of assets to leave it a judgment-proof shell, so long as it transferred BTS away to

another shell before the payments it sought to avoid came due.  Bridger Logistics' theory is

wrong as a matter of both fact and law.

First, the liability at issue accrued well before Bridger Logistics sought to evade it by

transferring BTS to Jamex Transfer Holdings.  That liability accrued in February 2013, when the

RSA was signed and when BTS agreed to make minimum volume commitment payments for

five years in order to induce Eddystone to build a transloading facility.  Compl. ¶¶ 22, 23.

Moreover, the wrong for which Eddystone now seeks redress occurred when Bridger Logistics

stripped BTS of assets and effectively abrogated its obligation to fund BTS, actions that made

default inevitable.  This all occurred before the worthless shell of BTS was sold to the worthless

shell that is Jamex Transfer Holdings for $10.  Compl. ¶¶ 48–50.

Second, there is no authority for Defendants' proposition as a matter of law.  On the

contrary, such a principle would give fraudsters a license to defraud creditors with impunity.

Under Bridger's view of the law, a party that uses a sham entity to induce a counterparty to enter

into a $170 million obligation can strip the entity of assets and then avoid all liability by

transferring the sham entity – just before it defaults – to a paper entity completely incapable of

satisfying the commitment.

Unsurprisingly, the case Defendants cite for this proposition holds nothing of the sort.

*Craig v. Lake Asbestos of Quebec*, 843 F.2d 145 (3d Cir. 1988), was not an instance in which a

former parent company escaped alter ego liability by selling off its subsidiary right before it

repudiated its payment obligations.  In fact, the defendant still owned the subsidiary at the time

of the suit.  *Id.* at 147.  The court held the parent not liable on an alter ego theory because, unlike the Defendants in this case, it had never exercised improper control over the subsidiary.  *Id.* at 152 ("[T]here is no evidence that Charter's intrusion into Cape's affairs is even 'constant' or day-to-day.").

By contrast, cases that are actually on point reject such a principle.  In *Collet v. American National Stores*, 708 S.W.2d 273 (Mo. Ct. App. 1986), the defendant had dominated its subsidiary as its alter ego from its formation, through control over its operating funds, overlapping personnel, and undercapitalization that left the subsidiary consistently insolvent. Once it became clear the subsidiary had no value as a going concern, the parent sold it to a corporate insider for $1, and a year later it collapsed.  *Id.* at 280–81.  When a creditor sought to recover, the court found that the former parent had exercised improper control over the subsidiary, causing its insolvency and inability to pay.  *Id.* at 287.  The court rejected the defendant's argument that it did not control the debtor at the time of its breach because the sale was not an arm's-length transaction and the company had no value.  *Id.* at 286.

Defendants here have attempted exactly the same maneuver the *Collett* court found impermissible.  They kept BTS dependent on affiliates for cash flow unable to meet its payment obligations on its own.  Then, once BTS had outlived its usefulness, they stripped its remaining assets and sold the worthless shell to a related party for token consideration.  But, as the *Collett* court made clear, such a sham sale does not cut off alter ego liability.  Rather, as the court in the Defendants' own case makes clear, "the use of control to commit a wrong is a key component to veil piercing."  *N.Y. State Electric & Gas Corp. v. FirstEnergy Corp. (NYSEG)*, 766 F.3d 212, 228 (2d Cir. 2014).  That is exactly what happened here.

### D.   Nothing Exempts Ferrellgas, Rios, and Gamboa, who Dominated BTS for their own Benefit, from Alter Ego Liability

Ferrellgas, Rios, and Gamboa deny that they are alter egos.  But the Complaint alleges that those three defendants dominated BTS as their alter ego and therefore should be held personally liable for its debts.  Compl. ¶¶ 19, 31, 37–42, 46–48, 53–61.  After Ferrellgas acquired Bridger Logistics and BTS, Ferrellgas continued Bridger Logistics' practices of dominating BTS and exploiting its assets, with Rios and Gamboa, both appointed Executive Vice Presidents of Ferrellgas, continuing as the key personnel.  Compl. ¶¶ 36, 37, 39–42.  Indeed, it was Ferrellgas that publicly held out BTS' transloading capacity at Eddystone's facility as an asset of Bridger Logistics.  Compl. ¶¶ 40, 41.  And Ferrellgas was the beneficiary of the stripping of BTS' balance sheet assets and the abrogation of the Bridger Logistics obligation to BTS.  Compl. ¶¶ 36, 37, 39–42, 46–48.

In cases where the subsidiary serves as the "mere instrumentality" of its parent and its grandparent companies, alter ego liability attaches to both.  *See Inter-Tel*, 360 S.W.3d at 156 (holding grandparent and parent liable where the grandparent exercised ultimate authority over the sub); *Pro Tanks Leasing*, 988 F. Supp. 2d at 790-94 (holding both parent and grandparent liable on alter ego theory based on unity of control).

*United Rubber, Cork, Linoleum & Plastic Workers of America, AFL-CIO v. Great American Industries, Inc.*, 479 F. Supp. 216, 242 (S.D.N.Y. 1979), held both corporate parent and grandparent liable on an alter ego theory where, as here, they acted together through shared and overlapping executive officers to extract the subsidiary's assets for their joint benefit.  Where "the[] executive officers, as well as the overlapping directors, did not act independently and in the interest of the sub" but "instead . . . acted solely for the benefit of the grandparent and parent," it is appropriate to hold both liable for the subsidiary's debts.  *Id*. at 243.  Ferrellgas, just

as much as Bridger Logistics, acting through their shared officers Rios and Gamboa, caused BTS to operate for the benefit of its parent and grandparent, Bridger Logistics and Ferrellgas.  Compl. ¶¶ 46–48.

Similarly, the law holds Rios and Gamboa – the controlling persons and substantial equity owners of both Bridger Logistics and, later, Ferrellgas – liable as alter egos because they dominated BTS and ran it as a sham corporation to wrongfully abuse creditors for the interests of its equity owners.  Courts consistently hold such principals personally liable for their company's debts on an alter ego theory.  *See Buckley v. Abuzir*, 8 N.E.3d 1166 (Ill. App. Ct. 2014) (collecting cases from over 17 jurisdictions recognizing that even non-shareholding principals may be liable under an alter ego theory); *Matrix*, 2009 WL 880680, at *4 (upholding alter ego allegations against officers and shareholders).

For example, Rios and Gamboa's conduct is more than on par with the principal in *Fairfield Development, Inc. v. Georgetown Woods Senior Apartments Limited Partnership*, 768 N.E.2d 463 (Ind. Ct. App. 2002), where the Court imposed alter ego liability on a principal who, though not an officer or owner, had nevertheless acted as chief executive, made all decisions, and negotiated directly with all business partners in a case where the debtor entity had never been operated independent of its affiliates, commingled funds, and freely shared assets.  *Id*. at 473. Here, Rios and Gamboa presided over the commingling of funds and loose sharing of assets among different Bridger entities.  Compl. ¶ 32.  They made all the executive decisions for BTS, and were the principal figures who dealt with Eddystone on behalf of BTS.  Compl. ¶¶ 3, 19, 21. As the *Fairfield* decision makes clear, Rios and Gamboa cannot escape alter ego liability by arguing that they held no membership interest in BTS or official title as officers of the company.

*See also Buckley*, 8 N.E.3d at 1171 (principal who was neither officer nor a shareholder held liable because he was the solely governing and dominating personality of the corporation).

Not only did Rios and Gamboa orchestrate Ferrellgas and Bridger Logistics' domination of BTS, they also benefitted from it personally as substantial owners of Bridger Logistics and Ferrellgas.  In this respect, Rios and Gamboa's conduct closely resembles that of the principal defendant in *Lally v. Catskill Airways*, 198 A.D.2d 643 (N.Y. App. Div. 1993).  When a corporation defaulted on a loan, the creditor sued its manager, who had transferred its assets to another corporation of which he was a part owner, allegedly in satisfaction of a debt.  *Id.* at 644.  The court refused to dismiss the alter ego claim against the manager because, while he held no interest in the debtor corporation, a jury could find that he had unilaterally directed the transfer of its assets to a company in which he did hold an interest, for his personal benefit.  *Id.* at 645.  Here, Eddystone has alleged that Rios and Gamboa both exercised control over BTS' assets like the defendant in *Lally* and for a similar personal benefit.  As BTS principals, they directed an asset transfer valued at over $140 million to Bridger Logistics and Ferrellgas, entities in which they held substantial ownership stakes.  Compl. ¶ 37, 46, 63, 64.  Accordingly, Eddystone has also stated alter ego claims against Rios and Gamboa in their individual capacities.

## II.   DEFENDANTS ARE LIABLE FOR FRAUDULENT TRANSFER BECAUSE THEY STRIPPED AN INSOLVENT DEBTOR OF ITS ASSETS IN ORDER TO DEPRIVE EDDYSTONE OF PAYMENTS DUE UNDER THE RSA

### A.   Eddystone Has Alleged Fraudulent Transfers under PUFTA

As the Complaint describes, Defendants committed fraudulent transfers as to BTS' creditor Eddystone by transferring away all of BTS' assets to themselves and abrogating Bridger Logistics' obligations to BTS.  They then sold BTS to a newly formed shell entity, Jamex Transfer Holdings.  Compl. ¶¶ 46–49, 63–67; PSA § 4.11.

First, Defendants used their control over BTS to transfer away all of the $98 million in assets that BTS had on its balance sheet at the end of 2014.  As evidenced by BTS' complete lack of value when it was sold to Jamex Transfer Holdings for $10 in February 2016, these transfers were made for no equivalent value, let alone the reasonably equivalent value required by fraudulent transfer laws.  Compl. ¶¶ 27, 48; PSA § 4.11.  Second, Bridger Logistics incurred an implied obligation to fund BTS' obligations under the RSA when BTS made all of the RSA's transloading capacity available exclusively to Bridger Logistics in return for payment of its obligations under the RSA.  Bridger Logistics then terminated that obligation for no reasonably equivalent value.  Compl. ¶¶ 5, 9, 33, 34, 63, 64.

These transfers are fraudulent under 12 Pa. Stat. § 5104(a)(1) because they were made with actual intent to hinder, delay or defraud Eddystone, they were not made for reasonably equivalent value, and BTS' debts exceeded its assets.  This Court has held that a plaintiff adequately pleads a claim for intentional fraudulent transfer when it "presents enough facts to put the defendant on notice of the precise misconduct at issue" and "alleges facts sufficient to allow the defendant to identify the transaction being alleged as fraudulent."  *Matrix*, 2009 WL 880680, at *4.

*Matrix* approved a fraudulent transfer claim under similar circumstances.  "[V]iewing the Amended Complaint as a whole, [the plaintiff] set[] out in detail the circumstances surrounding this transaction" because he alleged that debtor's only source of cash was its affiliate Matrix CBH, and the defendants "caused Matrix CBH to transfer property and assets to Fairways at Cedarbrook" while "knowing that Matrix CBH did not have the necessary funds to make this transfer and still pay its dues to Matrix Philadelphia."  *Id.* at *2, *4.  Here, Eddystone has alleged that "BTS had no source of cash flow other than the funds it received from Bridger Logistics"

and "that Bridger Logistics terminated its obligations to BTS and transferred it to an entity, Jamex Transfer Holdings, which lacked sufficient resources to fund BTS' payments to Eddystone.  Compl. ¶¶ 32, 48, 49.

**B.     The Arguments Bridger Logistics Makes in its Motion to Dismiss Only Confirm the Existence of a Fraudulent Transfer**

**1.     The Transfer of Balance Sheet Assets**

Defendants simply have nothing to say about the transfer of BTS' balance sheet assets. They completely ignore the removal of $98 million in assets, including almost $40 million in net worth, from BTS' balance sheet in only 12 months, after which Bridger Logistics sold the valueless shell of BTS to Jamex Transfer Holdings for $10.  Compl. ¶¶ 27, 48, 49; PSA § 4.11. The motions to dismiss should be denied for this reason alone.

**2.     The Abrogation of Bridger Logistics' Obligation to BTS**

As for Bridger Logistics' abrogation of its implied payment obligation to BTS, Defendants do not deny that they actually intended to hinder, delay or defraud Eddystone.  12 Pa. Stat. § 5104(a)(1).  Nor do they claim that BTS received anything of value in return for the loss of its right to continued payment of its RSA obligations.  Instead, Defendants argue – as a matter of fact before any discovery – that there was no implied contract and that the Purchase and Sale Agreement they secretly concocted in January 2016 contradicts the existence of a transfer.  But a motion to dismiss must assume the truth of the Complaint's allegations, the Complaint plainly alleges the existence of an implied contract and all of its elements, and the Purchase and Sale Agreement actually confirms the allegations of Eddystone's Complaint.

First, the existence of an implied contract is a question of fact, not a matter to be resolved on a motion to dismiss.  Whether actions by parties "were sufficient to create implied contractual terms is a question of fact."  *McCrone v. Acme Markets*, 561 F. App'x 169, 173 (3d Cir. 2014);

*see also Thorpe v. Weiss*, 44 Pa. D. & C.3d 117, 120 (Pa. Com. Pl. 1986) (finding allegations sufficient to make out an "implied contract in fact"); *Shapira v. United Medical Service*, 205 N.E.2d 293, 298 (N.Y. 1965) ("[T]he existence of an implied contract is a question of fact.").

Second, the facts alleged in the Complaint establish the existence of an implied contract between BTS and Bridger Logistics to cover all amounts due under the RSA.  Through January 2016, Logistics provided BTS funds with which to pay not only fees for transloading of actual volumes but all minimum volume commitment payments due under the RSA.  Thus, even when Bridger Logistics did not need to transload volumes at Eddystone, it still paid BTS to cover the deficiency charges under the RSA.  Because "[a]n implied-in-fact contract may . . . arise from a course of dealing, including the receipt of and payment for services over a period of time," the course of dealing by which Bridger Logistics covered BTS' RSA obligations is evidence of an implied contract.  *Hudson v. Radnor Valley Country Club*, No. CIV. A. 95-4777, 1996 WL 172054, at *2 (E.D. Pa. Apr. 11, 1996).

Courts have implied contracts between a parent and a 100% wholly-owned subsidiary in similar circumstances.  The court in *Rowan v. Vail Holdings, Inc.*, 31 F. Supp. 2d 889 (D. Colo. 1998), found an implicit contract between a World Cup ski racing corporation and its North American services subsidiary where, as here, the sub had provided services to the parent in exchange for the parent's payments of the subsidiary's costs.  The Court found that the facts evidenced a "mutuality of obligation—i.e., in exchange for [the subsidiary's] arrangement of glide testing in North America, [the parent] would arrange for glide testing in Europe [which] would benefit North American skiers, the customers of [the subsidiary] . . . .  [The subsidiary] was provided funds out of [the parent's] budget for this arrangement."  *Id.* at 907.  Here, BTS

was paid and relied on funds out of Bridger Logistics' budget, its only compensation for arranging transloading services pursuant to the RSA.

Indeed, Bridger Logistics implicitly concedes that it had an obligation to cover BTS' payments under the RSA when it argues that it had the power to allocate away this obligation in the Purchase and Sale Agreement by which it transferred BTS to Jamex Transfer Holdings. Notwithstanding the fact that BTS was not a party to the Purchase and Sale Agreement, Bridger Logistics asserts that the "PSA allocated responsibility for all obligations to [Eddystone] under the RSA," with Logistics "retain[ing] liability . . . related to the pre-closing period" and Jamex Transfer Holdings "promis[ing] Logistics that it expressly assumed all Liabilities . . . under the RSA for periods on and after the closing."  BL MTD at 7.  And the Purchase and Sale Agreement itself makes clear that Bridger Logistics is purporting to transfer to JTH "Liabilities under the Eddystone Agreement . . . for periods on and after the Closing Date."  PSA § 2.1(b).

That Bridger Logistics was itself purporting – in an agreement to which BTS is not a party – to "retain[] liability" for pre-closing amounts due under the RSA while transferring liability for post-closing amounts to JTH, is an *acknowledgement* that Bridger Logistics had incurred an obligation to cover the payments due under the RSA and then sought to transfer it away.  But Bridger Logistics cannot escape this ongoing liability by transferring it to an insolvent entity simply because it had paid off the portions that already had come due.  In light of the complete inability of JTH to make the future payments, the purported transfer to JTH itself was nothing but a sham orchestrated to hinder and delay Eddystone's efforts to collect its debts. *See* below at 31-32.

Logistics also argues that there was no implied contract because it may deal with its subsidiary in a non-arm's-length manner without being an alter ego.  *See* BL MTD at 22.  The

only case Logistics cites for this novel proposition not only has nothing to do with implied

contracts but makes clear in the very sentence after Bridger's quoted passage that this principle

does not apply if the subsidiary is insolvent.  As the Third Circuit noted:  "If the subsidiary is not

wholly owned, however, in the interest of protecting minority shareholders we revert to requiring

that whoever controls the subsidiary seek to maximize its economic value with requisite care and

loyalty.  *Similarly, if the subsidiary is insolvent, we require the same in the interest of protecting*

*the subsidiary's creditors*."  *In re Teleglobe Communications Corp*., 493 F.3d 345, 367 (3d Cir.

2007) (emphasis added).  That well-established principle, of course, is what Eddystone is

vindicating here.  And, as explained above, Logistics' exploitation of BTS, as part of which it

treated BTS' assets as its own without providing arm's-length fair value, strongly supports alter

ego liability.  *See* above at 12-22.

Logistics further asserts as a factual matter that – inconsistent with Eddystone's

allegations – any implied contract was to pay only during the period that it was shipping crude.

BL MTD at 23.  This kind of factual assertion about the terms of the implied contract raises a

factual question that cannot be resolved on a motion to dismiss and should be ignored because it

is inconsistent with the allegations of the Complaint.  *See In re Burlington Coat Factory*

*Securities Litigation*, 114 F.3d 1410, 1424–25 (3d Cir. 1997).

Moreover, a contract must be implied consistent with prevailing commercial terms.

"Wherever reasonable, the manifestations of intention of the parties to a promise or agreement

are interpreted as consistent with each other and with any relevant course of performance, course

of dealing, or usage of trade."  *Sunbeam Corp. v. Liberty Mutual Insurance Co.*, 781 A.2d 1189,

1193 (Pa. 2001) (quoting Restatement (Second) of Contracts § 202(5)).  As the Complaint

alleges, no third party would have entered into a five-year commitment with Eddystone, then

committed the capacity obtained thereby exclusively to another without assurance of coverage for the term of the deal.  Compl. ¶¶ 9, 34.  For example, Bridger Logistics, in its deal with Jamex Marketing in the Transportation Logistics Agreement, obtained minimum volume commitment coverage for the entire term of the RSA.  An implied contract to cover only transloading at cost would not have covered Eddystone's actual costs to secure the capacity made available to Logistics, which included the minimum volume commitment and deficiency obligation.  No arm's-length negotiator would have agreed to a five-year minimum volume commitment to secure capacity and then sold it on an as-needed basis at monthly cost with no markup.  Thus, any implied contract necessarily endured for the term of the RSA.  Compl. ¶¶ 9, 34.

Bridger Logistics' factual assertion about an implied contract for transloading alone is also inconsistent with the facts.  It paid not only transloading charges but minimum volume commitment charges as well.  Compl. ¶ 32.  The deals with Monroe and Jamex Marketing covered the same five-year term.  And Bridger Logistics' own PSA expressly contemplated that Jamex Transfer Holdings would take on from Logistics its post-sale payment obligations, including deficiency charges – reflecting that Bridger Logistics had incurred them in the first place.  All these facts indicate that Logistics had accepted an obligation to take on the minimum volume commitment deficiency charges due under the contract.  There are no facts that support Defendants' contrary contention.

Finally, Bridger Logistics argues that the abrogation of its implied obligation to BTS was not a fraudulent transfer because it transferred to Jamex Transfer Holdings the obligation to cover future deficiency charges under the RSA.  BL MTD at 23–24.  Defendants appear to believe that they can escape liability because they had paid those amounts due to Eddystone as of February 1, 2016 and because Jamex Transfer Holdings purported to accept the obligation to

cover future amounts.  Instead, this argument only confirms that Bridger Logistics had a payment obligation to BTS, broke it, and tried to paper over the breach with a sham transfer to JTH – an assetless, newly formed entity created for the sole purpose of holding the equity of the asset-stripped BTS.

Bridger Logistics cannot escape its ongoing obligations to BTS by purporting to transfer them to an insolvent third-party that had no business purpose whatever for owning BTS and no ability to cover BTS' obligations under the RSA.  Indeed, that is exactly what the fraudulent transfer laws are designed to prevent.  *See Rowen Petroleum Properties v. Hollywood Tanning Systems*, Civ. No. 08-4764, 2011 WL 6755838, at *12 (D.N.J. Dec. 23, 2011) (court held that assignment of a contractual payment obligation to a shell company was probative of a fraudulent transfer, intended to leave the plaintiff "holding the bag").  The supposed sale of BTS for $10 and the transfer of the future payment obligation to an insolvent entity was nothing more than an elaborate artifice designed to allow Bridger Logistics to escape its implicit contractual obligations and further complicate Eddystone's ability to recover sums owed under the RSA.

### C.    Ferrellgas, Rios, and Gamboa Are Liable for Directing the Fraudulent Transfers

Ferrellgas, Rios, and Gamboa try to avoid fraudulent transfer liability for abrogating Bridger Logistics' implied contract with BTS on the ground that they were not the entity that owed the obligation.  Ferrellgas argues that it cannot be liable for fraudulent transfer because it was not a party to the implied contract and thus not the transferee of any benefit when the contract was abrogated.  BL MTD at 28 n.25.  Similarly, Rios and Gamboa argue that they cannot be held liable because they were not the transferees.  RG MTD at 16.  Neither argument has merit.  Fraudulent transfer liability extends beyond the transferee to those who directed and benefitted from the transfers.

Under PUFTA a plaintiff can recover the value of the assets not only from the transferee but from any "person for whose benefit the transfer was made."  12 Pa. Stat. § 5108(b).  Thus, an entity is liable for fraudulent transfer where it controls and directs a fraudulent transfer to its subsidiaries in order to increase the value of its business.  In *Esse v. Empire Energy III*, 333 S.W.3d 166 (Tex. App. 2010), before their joint venture partner could collect expenses owed for a failed oil drilling project, two owners transferred their company's remaining assets to a new entity they formed.  The court held both owners liable as the parties for whose benefit the fraudulent transfer was made.  They had assented to the transfer, and because they were the controlling shareholders of both transferor and transferee, "their actions resulted in more than just an incidental or indirect benefit to them."  *Id.* at 181; *see also Matrix*, 2009 WL 880680, at *4 (holding owners and control persons can be liable for directing a fraudulent transfer).

That is exactly what Ferrellgas did here, when it used its control over both Logistics and BTS to transfer BTS' assets to Bridger Logistics, the Ferrellgas subsidiary that was a non-party to the RSA.  Courts regularly hold the responsible parent company liable in such a circumstance. *See, e.g, In re Saba Enterprises*, 421 B.R. 626, 653 (Bankr. S.D.N.Y. 2009) (holding a defendant liable for fraudulent transfer where it "siphoned off" "valuable assets of the Debtor" to "its ultimate parent, or a sister affiliate"); *Citizens National Bank of Texas v. NXS Construction*, 387 S.W.3d 74, 85 (Tex. App. 2012) (holding parent liable where it approved the transfer of assets to its wholly owned subsidiary in order to increase the value of its business); *In re McCook Metals, LLC*, 319 B.R. 570, 592 (N.D. Ill. 2005) (holding CEO and controlling shareholder liable where he transferred the right to acquire an aluminum smelter from one company to another for less than equivalent value because he received a benefit in the form of his share of the assets' value).

Similarly, Rios and Gamboa directed the transfers from their executive positions at Ferrellgas, Bridger Logistics, and BTS and benefitted as substantial Ferrellgas shareholders. Compl. ¶¶ 37, 38, 46, 63, 64.  The Third Circuit has made clear that officers such as Rios and Gamboa can be held liable.  *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 217 (3d Cir. 1990), held owners and officers liable for fraudulent transfer where they participated in the fraudulent transfer of the debtor's assets to another of their companies because "The Pennsylvania Supreme Court has also held that liability will attach to a corporate officer who participates in the wrongful acts of the corporation."  As the Pennsylvania Supreme Court explained, "Pennsylvania law recognizes the participation theory as a basis of liability.  The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor."  *Wicks v. Milzoco Builders*, 470 A.2d 86, 90 (Pa. 1983).

Through their substantial ownership stakes in Ferrellgas and Bridger Logistics, Rios and Gamboa were also "persons for whose benefit the transfer" was made.  *Wieboldt Stores v. Schottenstein*, 131 B.R. 655, 666 (N.D. Ill. 1991) (holding two brothers liable for a fraudulent transfer even though they did not personally receive the funds because, through a series of companies, they owned 15% of the corporation that was sold).  They are liable for fraudulent transfer even though they were not personally the transferees.  *See Firstar Bank v. Faul*, No. 00 C 4061, 2001 WL 1636430, at *6–7 (N.D. Ill. Dec. 20, 2001) (denying motion to dismiss of president and significant shareholder who allegedly made fraudulent transfer intended to frustrate creditors and benefit himself via his shareholdings).

III.   **DEFENDANTS BREACHED THE FIDUCIARY DUTIES MANAGERS AND MEMBERS OWE TO CREDITORS OF AN INSOLVENT COMPANY**

As the Complaint alleges, once BTS entered the zone of insolvency, its officers, members, and controlling persons had a fiduciary duty to maximize the company's assets for the benefit of its creditor, Eddystone.  Compl. ¶¶ 7–10; 74–77.  This is the law in both Pennsylvania and Louisiana.  And Defendants breached these fiduciary duties when they used their powers over BTS to enrich themselves and their businesses at BTS' expense.  In arguing to the contrary, Defendants simply ignore the zone of insolvency, the factual situation that gives rise to the duty.

As this Court has noted, "a debtor owes a fiduciary duty to its creditors when the debtor becomes insolvent or is close to becoming insolvent."  *Matrix*, 2009 WL 880680, at *6.  "[O]nce a corporation becomes insolvent[,] the creditors' investment is at risk, and the directors should manage the corporation in their interests as well as that of the shareholders."  *Id*.  Thus, in *Engle*, this Court found a limited liability company and its members owed a fiduciary duty to the company's creditors.  *See also Hipple v. Hipple*, No. CV 12-1256, 2016 WL 320216, at *12 (E.D. Pa. Jan. 27, 2016) ("When a corporation is insolvent, the fiduciary duty of the controlling shareholders arises in favor of corporate creditors.  Under Pennsylvania law, corporate officers and directors have a fiduciary duty to creditors when a corporation . . . is insolvent."); *Vital Pharmaceuticals v. USA Sports, LLC*, No. 3:11-CV-975, 2012 WL 760561, at *9 (M.D. Pa. Mar. 8, 2012) (holding in the LLC context that "Pennsylvania common law imposes a fiduciary duty upon corporate officers in favor of creditors, as well as to the corporation, when the corporation is insolvent.").

This rule extends to all forms of corporate organization.  "Cases interpreting Pennsylvania law hold that a controlling shareholder is a fiduciary of the corporation as are corporate officers; cases further hold that a fiduciary relationship develops between a controlling

shareholder and creditors of the corporation, as it does between officers of the corporation and

creditors of the corporation, at the point the corporation becomes insolvent." *Travelers Casualty*

*& Surety Co. v. Irex Corp.*, No. 02-CV-2142, 2002 WL 32351176, at *3 (E.D. Pa. May 31,

2002); *see also Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3d Cir. 1973) ("As

an officer, director, and principal stockholder of an insolvent corporation, . . . [defendant] was

duty bound to act with absolute fidelity to both creditors and stockholders."); *Sugartown*

*Worldwide LLC v. Shanks*, No. CIV.A. 14-5063, 2015 WL 1312572, at *12 (E.D. Pa. Mar. 24,

2015) (holding that "when [a limited partnership] becomes insolvent," its "officers, directors,

and controlling shareholders . . . owe a fiduciary duty to the corporation's creditors"); *In re*

*Jamuna Real Estate, LLC*, 416 B.R. 412, 435–36 (Bankr. E.D. Pa. 2009) (LLC context).

Defendants assert that Louisiana applies a contrary rule, but Louisiana courts also

recognize that controlling persons of a limited liability company within the zone of insolvency

owe a fiduciary duty to its creditors.[5] *See 3 Point Holdings, L.L.C. v. Gulf South Solutions,*

---

[5] Citing several Louisiana statutory provisions, Defendants assert that Louisiana law applies. BL MTD at 24. However, "[a] district court's choice-of-law decision is governed by the choice-of-law rules of the forum state." *American Contract Bridge League v. Nationwide Mutual Fire Insurance Co*., 752 F.2d 71, 74 (3d Cir. 1985). The first prong of Pennsylvania's choice of law analysis is to determine whether "there is [a] difference between the laws of the forum state and those of the foreign jurisdiction[;] [if not,] the court may . . . presume the law of the forum state controls." *Atlantic Pier Associates v. Boardakan Restaurant Partners*, 647 F. Supp. 2d 474, 487 (E.D. Pa. 2009).

Were there a conflict, Pennsylvania law would control because Pennsylvania has a much "greater interest in the application of its law." *Hammersmith v. TIG Insurance Co*., 480 F.3d 220, 231 (3d Cir. 2007). Pennsylvania is Plaintiff's home, the locus of the transloading business at issue in this litigation, and the target of Defendant's scheme to victimize Eddystone. By contrast, there is no connection with Louisiana other than that it is BTS' place of incorporation. *See Michael S. Rulle Family Dynasty Trust v. AGL Life Assurance Co*., No. CIV.A.10-231, 2010 WL 3522135, at *2 (E.D. Pa. Sept. 8, 2010) (noting that "relevant factors to consider include the place of injury, the location where the injury-causing conduct occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship between the parties is centered.").

*L.L.C.*, No. CIV.A. 06-10902, 2008 WL 695379, at *2 (E.D. La. Mar. 13, 2008) ("Officers and

directors who are aware that the entity is within the 'zone of insolvency' have expanded

fiduciary duties which include the creditors, not just the equity holders."); *cf. Young v. Adolph*,

821 So. 2d 101, 106 (La. Ct. App. 2002) ("[O]ur courts have recognized a fiduciary duty by a

corporation towards creditors of that corporation"); *Hillman Lumber Products v. Webster*

*Manufacturing*, No. CIV.A. 06-1204, 2007 WL 1266124, at *6 (W.D. La. Apr. 27, 2007)

("Louisiana courts have also recognized a fiduciary duty by a corporation towards its

creditors.").

    Nor can there be any question that Defendants violated their fiduciary duties here.  When

Ferrellgas, Bridger Logistics, Rios, and Gamboa decided that they no longer needed BTS'

transloading capacity, they stripped BTS of all of its balance sheet assets and allowed the

abrogation of Bridger Logistics' implied contract with BTS.  This enriched Defendants and left

BTS completely insolvent and incapable of making any payments on the RSA obligations.[6]

Under analogous circumstances, courts routinely find that control persons have violated their

fiduciary duties to creditors.  *See Voest-Alpine*, 919 F.2d at 217 n.25 (officers "breached their

fiduciary duty owing to . . . creditors when they participated in the fraudulent conveyance . . .

assets . . . for less than full consideration"); *In re Ozark Restaurant Equipment Co.*, 61 B.R. 750,

752 (W.D. Ark. 1986) (finding breach of fiduciary duty where debtor's principals used it merely

as a vehicle to purchase goods at a discount for immediate resale to the debtor's affiliates); *FDIC*

*v. Sea Pines Co.*, 692 F.2d 973, 977–78 (4th Cir. 1982) (holding fiduciaries liability to creditors

---

[6] Indeed, if Defendants are correct to deny that Bridger Logistics had an implied agreement to fund all BTS obligation under the RSA for its full five-year term, it would have been insolvent from the day the RSA was entered.  BTS' control persons would have committed it to more than $100 million in long-term obligations without any revenue stream with which to service them as they came due.

where they "manipulated the assets, property and liabilities" of the firm for the sole benefit of its parent entity); *Westlake Plastic Co. v. O'Donnell*, 182 F.R.D. 165, 171 (E.D. Pa. 1998) (self-dealing is a breach of fiduciary duty per 15 Pa. C.S.A. § 512).

Defendants suggest that creditors may not bring claims against the principals of a corporate entity, but their arguments ignore the critical fact of insolvency.  *See* BL MTD at 25. And their cases stand for nothing more than the ordinary rule that there is no fiduciary duty to creditors *prior to actions that render an entity insolvent*.  S*ee Terrebonne Concrete, LLC v. CEC Enterprises, LLC*, 76 So. 3d 502, 510 (La. Ct. App. 2011); *McDonough Marine Service v. Doucet*, 694 So. 2d 305, 312 (La. Ct. App. 1996).  Here, insolvency is not even in dispute.

Similarly, Bridger Logistics' argument, BL MTD at 25–27, that only a member has standing to bring a fiduciary duty claim against officers or members of a limited liability has no support in the context of insolvency.  As the Fifth Circuit has explained, once an entity reaches the zone of insolvency, creditors step into the place of shareholders and gain standing to bring a claim for breach of fiduciary duty.  *See Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill*, 561 F.3d 377, 385 (5th Cir. 2009) (insolvency determines whether creditors have the power to bring derivative claims).

Nor does L.S.A.-R.S. § 12:1320 protect Defendants against a claim for breach of fiduciary duty.  That provision establishes that members are not liable for the debts of a Limited Liability Corporation ("LLC"), but "Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of . . . any breach of professional duty or other negligent or wrongful act by such person."  *See 3 Point Holdings*, 2008 WL 695379, at *2 (applying fiduciary duty to members of an LLC); *Lake Forest*, 377 So. 2d at 471 (finding

breach of fiduciary duty where insolvent LLC's "decision through its directors and officers . . . was altogether in its own interest and in total disregard of the rights and interests of [the] only other creditor"). While BTS' members and managers are not directly liable for its debts, Eddystone can recover for their breach of their fiduciary duties.

Unable to dispute that BTS was insolvent or that they acted against the interests of its sole creditor, Defendants attempt to read Eddystone's fiduciary duty claims out of the complaint by asserting that they are predicated solely on negligence. BL MTD at 27–28. This is contradicted by the unambiguous language of the Complaint, which alleges not only that Defendants breached their duties of loyalty but that they did so intentionally. *See* Compl. ¶¶ 76, 77 (alleging breach of "fiduciary duties of care and loyalty" and that Defendants acted "intentionally"); *id.* ¶ 46 ("[T]he Defendants developed a plan to wind down the exposure to Jamex Marketing, strip BTS of its assets, but without providing for payment of Bridger Logistics' obligation to BTS and its creditor Eddystone."); *id.* ¶¶ 63–67 (alleging intentional fraudulent transfer). Eddystone clearly alleges that Defendants' conduct was intentional and in violation of Defendants' obligations of loyalty to creditors as part of a scheme to deprive BTS of assets with which to repay its creditors.[7]

Finally, Ferrellgas argues that it was not a manager or member of BTS and thus cannot be liable for breach of fiduciary duty. BL MTD at 29. But Ferrellgas is liable as the controlling entity of BTS' sole member. Control persons of a fiduciary are liable when they cause that fiduciary to breach its duties. *See In re Covenant Partners, L.P.*, No. AP 16-226, 2017 WL 838637, at *3 (Bankr. E.D. Pa. Mar. 2, 2017). There, the control persons of a limited

---

[7] The fact that Eddystone also pleaded negligent misconduct in no way renders insufficient its allegations as to intentional acts. *See* Fed. R. Civ. P. 8 (a "pleading is not made insufficient by the insufficiency of one or more of the alternative statements").

partnership's general partner were held liable for the general partner's breach of its fiduciary duties because the breach resulted from their exercise of control, just as Ferrellgas – a principal beneficiary of Bridger Logistics' fiduciary breaches – caused Bridger Logistics to breach its fiduciary duties to BTS.  The court held that, "[a]s the individuals who control the general partner of the limited partnership which is the general partner of the Debtor, [Defendants] owed fiduciary duties to the Debtor's limited partners."  *Id.*  Similarly, Ferrellgas, which controls the managing member of BTS, owes fiduciary duties to its creditors.

## IV.    THIS COURT HAS PERSONAL JURISDICTION OVER RIOS AND GAMBOA

Despite Rios and Gamboa's extensive efforts to contract for the use of a facility fewer than 20 miles from the courthouse where this Court presides, their numerous dealings with Pennsylvania-based companies, and their many meetings in Pennsylvania related to this project, they argue that this Court lacks personal jurisdiction over them.  Their argument is without merit.

As discussed above and set forth in detail by Eddystone's Complaint, this litigation arises from the plan Rios and Gamboa masterminded – and from which they greatly profited – to transport crude oil into Pennsylvania, transload it at Eddystone's Pennsylvania facility, and sell it to a refinery in Trainer, Pennsylvania.  Compl. ¶¶ 19, 21–26.  Rios and Gamboa negotiated to obtain the use of this Pennsylvania transloading facility, and Rios signed the agreement.  They then orchestrated a series of transactions to prevent their Pennsylvania counter-party from recovering the amounts it was due under that agreement.  Their extensive business dealings in Pennsylvania and with Pennsylvania companies, meetings in Pennsylvania, and communications with Pennsylvania residents regarding a Pennsylvania business deal make it clear that they should "reasonably anticipate being haled into court" in the forum state.  *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

### A.   Rios and Gamboa Have Far More than the Minimum Contacts with Pennsylvania Needed for Personal Jurisdiction

Pennsylvania's long-arm statute permits courts to exercise personal jurisdiction to the maximum extent permitted under the United States Constitution.  42 Pa. Cons. Stat. § 5322(b); *see Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 150 (3d Cir. 1996).  Thus, to establish personal jurisdiction over Rios and Gamboa, Eddystone need only establish a *prima facie* case that they have "'purposefully directed [their] activities'" at the forum, that the litigation "'arise[s] out of or relate[s] to'" at least one of those activities, and that jurisdiction "'comport[s] with fair play and substantial justice.'"  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Both Rios and Gamboa easily meet this test because they: (1) developed and carried out a plan to transport oil into Pennsylvania, transload it at the Pennsylvania transloading facility at issue in this litigation, and deliver it to a refinery in Trainer, Pennsylvania, Compl. ¶ 3; (2) negotiated and executed a series of contracts with Eddystone and Monroe in Pennsylvania to accomplish this, Compl. ¶¶ 2, 21–25, 36; (3) executed a series of transactions to impede a Pennsylvania creditor from collecting its lawful debts, Compl. ¶¶ 7–10, 48–50; (4) repeatedly visited and toured the Eddystone facility and Monroe refinery in Pennsylvania and had extensive telephonic and email communications with Eddystone personnel, Canopy personnel, and Monroe personnel in Pennsylvania to manage their business shipping crude oil through the state, negotiate with railroads and other counter-parties, market the capacity Bridger controlled at the Facility, and, ultimately, structure the transactions designed to prevent Eddystone from recovering the sums due under the RSA.  Theodore Decl. Exs. 1-11.

Rios and Gamboa have thus availed themselves of the Pennsylvania forum far in excess of other defendants whose contacts with the state were sufficient to establish personal jurisdiction.  *See Leone v. Cataldo*, 574 F. Supp. 2d 471, 479 (E.D. Pa. 2008) (New York resident subject to Pennsylvania jurisdiction over New Jersey restaurant because business negotiations were conducted in Pennsylvania); *Kontonotas v. Hygrosol Pharmaceuticals Corp.*, Civ. No. 07-4989, 2009 WL 3245421, at *3 & n.1 (E.D. Pa. Oct. 5, 2009) (denying motion to dismiss for lack of jurisdiction over individual defendant because he was one of two officers of the corporation and traveled to the state); *Dent Manufacturing v. Zafir*, No. CIV. A. 94-2532, 1995 WL 605501, at *13 (E.D. Pa. Oct. 12, 1995) (finding personal jurisdiction because president of corporate plaintiff "stated in his affidavit that he had business meetings with both [defendants] in Pennsylvania over a substantial period of time").  In *Carteret Savings Bank v. Shushan*, 954 F.2d 141, 149–50 (3d Cir. 1992), the Third Circuit held that telephone calls and correspondence sent into New Jersey from Louisiana by the representative of a Louisiana real estate developer, coupled with a meeting in New Jersey to facilitate the closing of a loan, were sufficient.  Rios and Gamboa's contacts with Pennsylvania are far more extensive.

Rios and Gamboa's contacts also far exceed those in the case on which they rely, *D&S Screen Fund II v. Ferrari*, 174 F. Supp. 2d 343, 347–48 (E.D. Pa. 2001).  There, "the only contacts which [the defendant] has had with Pennsylvania consist[ed] of several telephone conversations and facsimile transmissions with [plaintiff's] representatives."  RG MTD at 15.  Here, Rios and Gamboa devised and managed an entire oil shipping operation in the state.  While they attempt to minimize their contacts with the jurisdiction, they do not even dispute that exercising personal jurisdiction would comport with fair play and substantial justice.

**B.** **Rios and Gamboa Are Subject to Personal Jurisdiction as Alter Egos of BTS**

Even apart from their personal contact with the forum state, Rios and Gamboa are subject to personal jurisdiction because they are alter egos of BTS.  The "jurisdictional analysis over an alleged alter ego is a less onerous standard than [the one] appl[ied] under Fed. R. Civ. P. 12(b)(6) for piercing the corporate veil for liability purposes."  *Sugartown Worldwide LLC v. Shanks*, 129 F. Supp. 3d 201, 205 (E.D. Pa. 2015) (exercising personal jurisdiction).  As described above, the Court should pierce BTS' corporate veil for purposes of liability; for the same reasons, Rios and Gamboa meet the less demanding alter ego test for exercising personal jurisdiction.

**C.** **Rios and Gamboa Cannot Hide Behind the Fiduciary Shield Doctrine**

**1.** **The Fiduciary Shield Doctrine Has No Application in Pennsylvania**

Rios and Gamboa try to escape the consequences of their extensive contacts with Pennsylvania by invoking the fiduciary shield doctrine.  RG MTD at 5–10.  This argument is unavailing for several reasons, the first being that the doctrine is not applicable in Pennsylvania.

"[T]he fiduciary shield rule is solely a matter of statutory construction under state law and is not required under the due process clause."  *West Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1200 (4th Cir. 1989).  Accordingly, the Third Circuit has explained that where state "law provides for personal jurisdiction to the fullest extent allowed by the Due Process Clause, and because the Supreme Court has held that it does not violate due process to find personal jurisdiction based solely on contacts made in an employee's official capacity, there is no basis for the fiduciary shield doctrine to apply."  *FlagHouse v. ProSource Deveevelopment*, 528 F. App'x 186, 189 n.4 (3d Cir. 2013).[8]  Because Pennsylvania extends personal jurisdiction to the

---

[8] *Accord Mobil Oil Corp. v. Advanced Environmental Recycling Technologies*, 833 F. Supp. 437, 442 (D. Del. 1993) (declining to apply fiduciary shield doctrine because "in order for the Court to recognize the fiduciary shield doctrine as a valid principle under Delaware's long-arm statute, the Court must construe the statute as being more restrictive than federal due process

full extent of the Due Process Clause, 42 Pa. Stat. § 5322(b), the fiduciary shield doctrine does not apply.

For this reason, "the fiduciary shield doctrine has never been used by Pennsylvania state courts." *Kontonotas*, 2009 WL 3245421, at *3 & n.1; *see also Brocious Trucking v. BFL*, No. CIV.A. 09-741, 2010 WL 569559, at *1 (W.D. Pa. Feb. 11, 2010) ("Although Wallace attempts to invoke the 'fiduciary shield' doctrine, under which individuals acting solely within corporate capacities are excused from personal jurisdiction, Pennsylvania federal courts have raised questions regarding the applicability and scope of that doctrine.") (collecting federal cases). None of the federal cases Rios and Gamboa cite grapple with this fatal defect.[9]

### 2. Even if Recognized in Pennsylvania, the Fiduciary Shield Doctrine Would Not Apply to Eddystone's Allegations

Even those states that do recognize the fiduciary shield doctrine would not apply it to the causes of action Eddystone brings here. Eddystone's alter ego claim is itself a basis on which to establish jurisdiction over an officer defendant. *See National Precast Crypt Co. v. Dy-Core of Pennsylvania*, 785 F. Supp. 1186, 1192 (W.D. Pa. 1992); *TJS Brokerage & Co. v. Mahoney*, 940 F. Supp. 784, 789 (E.D. Pa. 1996). As a result, an alleged alter ego "is not protected from jurisdiction by the corporate shield doctrine." *Universal Steel Buildings Corp. v. Shore Corp. One*, No. CIV.A. 09-0656, 2010 WL 1142039, at *5 (W.D. Pa. Mar. 24, 2010) (alleged alter ego "may be found personally liable for the tortious conduct of the corporation, and therefore is not

---

requires," which "would run counter to the expansive interpretation that Delaware courts have consistently applied to Delaware's long-arm statute").

[9] Indeed, Rios and Gamboa's attempt to "set[] forth the fiduciary shield doctrine as though it is well-settled law, [when] it is not" reflects "a lack of candor" given the dubiety "as to whether the fiduciary shield doctrine is even applicable in the Commonwealth of Pennsylvania." *Square D Co. v. Scott Electric Co.*, No. CIV.A. 06-00459, 2008 WL 4877990, at *2 (W.D. Pa. Nov. 12, 2008).

protected from jurisdiction by the corporate shield doctrine"); *see also Systems Industries v. Han*, No. CIV. A. 84-5457, 1987 WL 9144, at *2 (E.D. Pa. Apr. 7, 1987).

Likewise, the fiduciary shield doctrine is no defense in the context of Eddystone's fraudulent transfer and fiduciary duty claims because it does not apply if "the corporate officer is charged with violating a statutory scheme that provides for personal, as well as corporate liability." *National Precast Crypt Co.*, 785 F. Supp. at 1191. PUFTA provides for personal officer liability. *See* 12 Pa. Stat. § 5101(b); above at 32-34. And Louisiana's LLC statute expressly provides for manager liability on the basis of breach of a duty or other wrongful acts. La. Rev. Stat. Ann. § 12:1320.

Nor is the fiduciary shield doctrine an absolute bar to the exercise of personal jurisdiction, regardless of the particular cause of action at issue. The doctrine does not protect a corporate employee who commits a tort, where "[1] the defendant had a major role in the corporate structure, [2] the quality of his contacts with the state were significant, and [3] his participation in the tortious conduct alleged was extensive." *Bragg v. Linden Research*, 487 F. Supp. 2d 593, 603 (E.D. Pa. 2007).

Here, the Complaint establishes that Rios and Gamboa were the top executives at BTS and Bridger Logistics and the highest-ranking executives at Ferrellgas with responsibility over this matter. They sought to exercise complete personal control over the transloading business at Eddystone and the relationship with Monroe. Theodore Dec. ¶ 12 & Ex. 11. Both engaged in extensive negotiations with Eddystone in Pennsylvania, made repeated trips to the state, marketed the facility, and directed their efforts into Pennsylvania. Theodore Decl. Exs. 1-11. Their participation in the fraudulent transfer and breach of fiduciary duty was extensive:  it was, at least in part, their idea, and they carried it out using their corporate authority. This is more

than sufficient to establish jurisdiction notwithstanding the fiduciary shield doctrine.[10]  *See*

*Bragg*, 487 F. Supp. 2d at 603 (finding jurisdiction where CEO directed representations into

Pennsylvania as part of a national publicity campaign).

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Dated: April 13, 2017                                  Respectfully submitted,

                                                      /s/ Filiberto Agusti
                                                      Filiberto Agusti (*pro hac vice*)
                                                      Jeffrey M. Theodore (*pro hac vice*)
                                                      Timothy Work (*pro hac vice*)
                                                      Nicholas Petts (*pro hac vice*)
                                                      STEPTOE & JOHNSON LLP
                                                      1330 Connecticut Avenue, NW
                                                      Washington, DC 20036
                                                      Telephone: (202) 429-3000
                                                      Facsimile: (202) 429-3902
                                                      fagusti@steptoe.com
                                                      jtheodore@steptoe.com
                                                      twork@steptoe.com
                                                      npetts@steptoe.com

                                                      Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                      Terence M. Grugan (I.D. No. 307211)
                                                      BALLARD SPAHR LLP
                                                      1735 Market Street, 51st Floor
                                                      Philadelphia, PA 19103-7599
                                                      Telephone: (215) 665-8500
                                                      Facsimile: (215) 864-8999
                                                      hockeimerh@ballardspahr.com
                                                      grugant@ballardspahr.com

                                                      *Counsel for Eddystone Rail Company, LLC*

---

[10] Rios and Gamboa argue that they do not satisfy the second prong of the test because "the only connection that Rios and Gamboa have to Pennsylvania is their employment as officers of the Bridger Parties."  RG MTD at 8.  This is obviously circular.  The test is designed to determine if the quality of their contacts and significance of their corporate role justifies jurisdiction notwithstanding their status as employees.  Simply asserting that they were employed by the Bridger Parties elides the legal question before the Court.

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via the Court's ECF system on April 13, 2017, thereby

serving all counsel of record.

/s/ Jeffrey M. Theodore
Jeffrey M. Theodore