# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 17–cv–00495 |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY GAMBOA, FERRELLGAS PARTNERS, L.P., and FERRELLGAS L.P. | ) | |
| Defendants. | ) | |

**PLAINTIFF EDDYSTONE RAIL COMPANY'S LLC'S SUR-REPLY
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

I. THE BL/FG REPLY ESTABLISHES NO LEGAL BASIS FOR DISMISSING
EDDYSTONE'S CLAIMS..........................................................................................2

    A. Eddystone Has a Valid Alter Ego Claim .................................................2

    B. Eddystone Has a Valid Fraudulent Transfer Claim .................................7

        1. The Transfer of Balance Sheet Assets ......................................7

        2. The Transfer of the Implied Obligation from Bridger Logistics .................8

    C. Eddystone Has a Valid Fiduciary Duty Claim.........................................12

II. RIOS AND GAMBOA CANNOT EVADE PERSONAL JURISDICTION ...................16

    A. The Fiduciary Shield Doctrine Does Not Apply.....................................16

    B. Prior to Discovery, Plaintiffs May Rely on Allegations to Establish
Personal Jurisdiction ...............................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3 Point Holdings, L.L.C. v. Gulf South Solutions, L.L.C.*,
  No. CIV.A. 06-10902, 2008 WL 695379 (E.D. La. Mar. 13, 2008) ................................13, 14

*Abraham v. Lake Forest*,
  377 So. 2d 465 (La. Ct. App. 1979).................................................................................5, 14

*Alphonse v. Arch Bay Holdings, L.L.C.*,
  548 F. App'x 979 (5th Cir. 2013) ...........................................................................................12

*In re Auto. Refinishing Paint Antitrust Litig.*,
  358 F.3d 288 (3d Cir. 2004)....................................................................................................17

*Blue Whale v. Grand China Shipping Dev.*,
  722 F.3d 488 (2d Cir. 2013)......................................................................................................2

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
  851 F. Supp. 2d 504 (S.D.N.Y. 2012)...................................................................................2, 3

*Diamond Shamrock Expl. Co. v. Hodel*,
  853 F.2d 1159 (5th Cir. 1988) .................................................................................................9

*Earthgrains Baking Cos. v. Sycamore Family Bakery*,
  No. 2:09CV523DAK, 2015 WL 5009376 (D. Utah Aug. 21, 2015).......................................12

*Engle v. Matrix Golf & Hosp. Philadelphia, LLC*,
  No. CIV.A. 08-5831, 2009 WL 880680 (E.D. Pa. Mar. 31, 2009)...........................................8

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983).................................................................................................................12

*FlagHouse v. ProSource Development*,
  528 F. App'x 186 (3d Cir. 2013) ............................................................................................15

*Floyd v. Lykes Bros. S.S. Co.*,
  844 F.2d 1044 (3d Cir. 1988).....................................................................................................2

*Germain v. Wisniewski*,
  No. 15-1279, 2016 WL 4158994 (W.D. Pa. Aug. 5, 2016).......................................................7

*Hecht v. Malvern Preparatory Sch.*,
  716 F. Supp. 2d 395 (E.D. Pa. 2010) ...................................................................................7, 8

*Hillman Lumber Prods. v. Webster Mfg.*,
  No. CIV.A. 06-1204, 2007 WL 1266124 (W.D. La. Apr. 27, 2007).......................................14

*Hooper v. Maruka Mach. Corp. of Am.*,
  525 So. 2d 1113 (La. Ct. App. 1988)......................................................................................13

*Hudson v. Radnor Valley Country Club*,
  No. CIV. A. 95-4777, 1996 WL 172054 (E.D. Pa. Apr. 11, 1996) ...........................................9

*Lastertel N. Am. v. Innova*,
  No. 3:12-CV-354, 2016 WL 1729558 (S.D. Ohio Feb. 10, 2016) ...........................................13

*Lauritzen v. Larsen*,
  345 U.S. 571 (1953)..................................................................................................................2

*In re Lobell*,
  390 B.R. 206 (Bankr. M.D. La. 2008) ...............................................................................13, 14

*Lopez v. TDI Services*,
  631 So. 2d 679 (La. Ct. App. 1994).......................................................................................13

*Maleski by Taylor v. DP Realty Trust*,
  653 A.2d 54 (Pa. Commw. Ct. 1994) ....................................................................................15

*McDonough Marine Service v. Doucet*,
  694 So. 2d 305 (La. Ct. App. 1996)......................................................................................14

*N. Tankers (Cyprus) Ltd. v. Backstrom*,
  967 F. Supp. 1391 (D. Conn. 1997)........................................................................................5

*QVC v. OurHouseWorks*,
  649 F. App'x 223 (3d Cir. 2016) .............................................................................................4

*Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*,
  855 F.2d 406 (7th Cir. 1988) ..................................................................................................4

*Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*,
  462 F.3d 666 (6th Cir. 2006) ..................................................................................................4

*Statia Terminals N.V. v. Huber, Inc.*,
  No. CIV.A. 95-1633, 1998 WL 560358 (E.D. La. Aug. 31, 1998) ...........................................9

*Tech. Dev. Co. v. Onischenko*,
  No. CIV.A. 05-4282 MLC, 2011 WL 6779552 (D.N.J. Dec. 23, 2011) ..................................12

*Telecom International America v. AT&T*,
  280 F.3d 175 (2d Cir. 2001)....................................................................................................4

*In re Teleglobe Communications Corp.*,
    493 F.3d 345 (3d Cir. 2007)...................................................................................10

*Toys "R" Us v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003)...................................................................................18

*Unimobil 84 v. Spurney*,
    797 F.2d 214 (5th Cir. 1986) ..................................................................................14

*Young v. Adolph*,
    821 So. 2d 101 (La. Ct. App. 2002)........................................................................14

**Statutes**

15 Pa. C.S. §§ 401, 402...................................................................................................13

15 Pa. C.S. § 402(a).........................................................................................................13

15 Pa. C.S. § 4145............................................................................................................13

**Other Authorities**

Fed. R. Civ. P. 9.......................................................................................................5, 7, 8

Fed. R. Civ. P. 12(b)(2)...................................................................................................17

## INTRODUCTION

In their reply brief, Defendants depart from the arguments in their motions to dismiss and make a host of new ones in a last ditch attempt to avoid discovery into their scheme to deprive Plaintiff Eddystone Rail Company ("Eddystone") of the amounts due under its Rail Facilities Services Agreement ("RSA") with Bridger Transfer Services ("BTS").

The Bridger Parties introduce a series of novel – and inconsistent – choice of law arguments.  They assert that federal common law precludes citation to state law cases on Eddystone's alter ego claim while at the same time arguing that Eddystone's fiduciary duty claim should be decided by Louisiana law under Pennsylvania choice of law rules.  Meanwhile, the Bridger Parties introduce a new explanation of their fraudulent transfer arguments based on the *Twombly*/*Iqbal* plausibility standard.

These new arguments have no more merit than those in Defendants' Motion. Eddystone's Complaint states claims under any applicable law, and the implied contract underlying Eddystone's fraudulent transfer claims is not only plausible but consistent with the Bridger Parties' own previous description of the Purchase and Sale Agreement by which it sold BTS for $10 to a subsidiary of its former sibling company, Jamex Marketing.

Rios and Gamboa fail to address the core flaw in the fiduciary shield argument that is the underpinning of their personal jurisdiction motion to dismiss.  Rios and Gamboa do not dispute that the fiduciary shield doctrine has no application to the minimum contacts analysis under the Due Process Clause and acknowledge that Pennsylvania's long-arm statute extends to the full reaches of due process.  Yet, they never explain how the fiduciary shield doctrine could possibly apply in Pennsylvania in light of these legal realities.

I.      **THE BL/FG REPLY ESTABLISHES NO LEGAL BASIS FOR DISMISSING EDDYSTONE'S CLAIMS**

    A.      **Eddystone Has a Valid Alter Ego Claim**

On reply, the Bridger Parties appears to walk away from all of the alter ego arguments in their motion to dismiss. *Compare* Mot. at 10–20 *with* Reply at 11–14. Instead, citing *Floyd v. Lykes Bros. S.S. Co.*, 844 F.2d 1044, 1047 (3d Cir. 1988), they assert that "federal common law" applies to the alter ego claim and complain that Eddystone has relied too heavily on non-maritime alter ego cases. Reply at 11. That is odd given that, in their opening brief, the Bridger Parties cited *Floyd* for the proposition that it is appropriate to "borrow[] state law concepts," asserted that "state and federal alter ego tests are essentially the same" so that "courts apply state and federal cases interchangeably," and proceeded to cite a host of non-maritime state law cases. Mot. at 10. Eddystone cited not only federal, Pennsylvania, and Louisiana cases, but the most factually on-point alter ego cases from a wide variety of courts because "veil piercing principles are similar" and "Louisiana and Pennsylvania state law, *among others*," are relevant. *Id.* (emphasis added).[1]

In any event, the facts of this case fit comfortably within those of maritime decisions that have pierced the corporate veil. In maritime cases, piercing is appropriate where the entity is "so dominated" that it "primarily transacted another entity's business rather than its own corporate business." *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012) (citations, quotation marks, and alteration marks omitted). That is exactly what occurred here, where Defendants completely dominated BTS and used it to

---

[1] In fact, "admiralty jurisdiction and federal maritime law need not go hand-in-hand" and "federal common law" does not "*automatically* govern[] the alter-ego claim" in a maritime case. *Blue Whale v. Grand China Shipping Dev.*, 722 F.3d 488, 496–97 (2d Cir. 2013) (emphasis in original). If necessary, courts should apply the maritime conflicts of law test from *Lauritzen v. Larsen*, 345 U.S. 571 (1953), but there does not appear to be any relevant conflict here.

accomplish their scheme to transport crude oil to the Trainer Refinery while depriving BTS of any of the profits from the business, all of which went to Defendants.  Compl. ¶¶ 19, 28, 30, 31, 39, 40, 53, 56, 57, 58; *see also* Compl. ¶ 32 ("To accomplish the transport of crude oil to Monroe, Rios and Gamboa had Bridger Group entities enter into contracts with third parties to secure the necessary assets, including BTS' contract with Eddystone.  BTS had no source of cash flow other than the funds it received from Bridger Logistics. . . . Bridger Logistics paid BTS all of the amounts necessary for BTS to make all of the RSA payments due to Eddystone."), ¶ 48 ("Prior to the transfer of BTS to Jamex Marketing, the Defendants transferred all of BTS' real estate, equipment, receivables, and other assets to other FGP entities . . . .").

Thus, in *Clipper Wonsild*, the Southern District of New York upheld a maritime alter ego claim under circumstances analogous to those here.  Fulcrum, the defendant, had formed Biodiesel, which entered into a contract with the plaintiff, to help it take advantage of opportunities for marketing and selling biodiesel fuels.  After Biodiesel breached the contract, the plaintiffs obtained an arbitration award against and then sought to impose alter ego liability on Fulcrum.  Though "the overlap between employees and personnel of Fulcrum, NBF, and Biodiesel is not overwhelming at first glance," veil piercing was proper because an employee of Fulcrum was president of Biodiesel, one of the limited partners of Fulcrum made all decisions behind the scenes, including negotiation of the contract with the plaintiff that was at issue, and Fulcrum provided the operating funds for Biodiesel.  *Clipper Wonsild*, 851 F. Supp. 2d at 509–11.  That is exactly what occurred here, where Rios and Gamboa completely controlled BTS from their positions at Bridger Logistics and then Ferrellgas, Compl. ¶¶ 19, 28, 38, 46–48; Rios and Gamboa negotiated and signed the RSA, Compl. ¶ 21; BTS had no independent discretion over business decisions, Compl. ¶¶ 19, 48; and Bridger Logistics provided funding for BTS as

needed for its own business purposes while keeping the profits from the Monroe contract for itself, Compl. ¶¶ 32, 39, 58.

The Bridger Parties claim that "multiple Circuit Courts have found that it is 'inconceivable'" that a creditor might be permitted to pierce the corporate veil of a parent company from which it "failed to obtain a parent guaranty." Reply at 11. But if that were the case, there would be no alter ego doctrine – a parent guaranty would render veil piercing superfluous. All three of the cases Bridger cites are off point. For example, in *Telecom International America v. AT&T*, 280 F.3d 175, 200 (2d Cir. 2001), AT&T expressly agreed to limit its remedies to specific investments, and "there [was] no evidence that the disclosure to AT&T of TIA's financial condition was anything but full and fair." That is not the case here, where Defendants held BTS out as a genuine operating entity with $98 million in assets when in fact it was a mere shell.[2] Compl. ¶¶ 19, 27, 28, 30, 32, 39, 40, 48.

By contrast, the Bridger Parties make no effort to distinguish the dozens of cases in Eddystone's brief in which courts found alter ego liability on similar facts, other than to claim

----

[2] The Bridger Parties also rely on *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666 (6th Cir. 2006). Reply at 12. There, the Court upheld dismissal of an alter ego claim because the complaint did not satisfy the Delaware law requirement of alleging "fraud or injustice . . . in the defendants' use of the corporate form." 462 F.3d at 674. But the requisite "unfairness or injustice" under Pennsylvania law is plainly set out in Eddystone's Complaint. Opp. at 18–19 & n.4. Defendants caused BTS's "liabilities and its inability to pay for them," and "squirreled assets into a liability-free corporation while heaping liabilities upon an asset-free corporation." *QVC v. OurHouseWorks*, 649 F. App'x 223, 227 (3d Cir. 2016).

*Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406 (7th Cir. 1988), is likewise inapposite. Reply at 12. In that case, a creditor accused a bank of being the debtor trucking company's alter ego. The Seventh Circuit upheld dismissal because, for one thing, the defendant bank was a creditor, not a shareholder. 855 F.2d at 413. Second, although Defendants offer *Secon* for the principle that an alter ego relationship requires "something more than control," the plaintiff in that case could not even demonstrate this much. *Id.* at 415. In contrast, Eddystone has demonstrated both Defendants' control over BTS, Opp. at 5–6, as well as "something else" – Defendants' abuse of the corporate form to dodge the liabilities they piled upon BTS. *Id.* at 18.

that there has been no injustice or unfairness in this case.  Reply at 12–14.[3]  Eddystone's

Complaint certainly does so allege, but injustice or unfairness is not needed for an alter ego

claim in the federal maritime context.  State "law may well require a showing of fraud or

inequity, but . . . federal maritime law has no such requirement."  *N. Tankers (Cyprus) Ltd. v.*

*Backstrom*, 967 F. Supp. 1391, 1401 (D. Conn. 1997).  After performing an extensive evaluation

of Second Circuit maritime alter ego case law, the *Backstrom* court found that a maritime

"plaintiff must either prove (1) control and domination or (2) fraud or some other inequity" and

"conclude[d] that plaintiff has sufficiently proven domination to permit the piercing of all the

real estate and most shipping defendants' corporate veils."  *Id*. at 1408.

  In any event, there is clearly injustice here.  While ERC "understood" that BTS was its

counter-party, Reply at 13, Defendants falsely held BTS out as a genuine operating company

with extensive assets and a real business.  Compl. ¶¶ 8, 27.  In fact it was a façade for the

operations of Bridger Logistics but received no profits from the business with Monroe for which

its assets, including the RSA, were deployed.  Compl. ¶¶ 30–32, 58.  As described in

Eddsytone's Opposition, this is more than enough to satisfy the injustice prong.  Opp. at 14–19.[4]

---

[3] In their reply, for the first time, the Bridger Parties make a free-standing Rule 9(b) argument that does not appear to be tethered to any of Eddystone's claims.  Reply at 2–3. Bizarrely, the impetus for this seems to be the statement in Eddystone's Opposition that it has not brought a freestanding misrepresentation claim and has not taken on the burden of basing its alter ego claim on fraud.  Opp. at 19 n.4.  The Bridger Parties characterize this as "sleight of hand," but it is no such thing.  Eddystone is not obligated to take on an unnecessary burden of pleading fraud.

Nor are the Bridger Parties correct to claim that Eddystone has complete information available to it.  In particular, Eddystone has minimal insight into the Bridger Group's internal finances.  While Eddystone strongly suspects that it was provided false financials showing that BTS had assets of $98 million, Compl. ¶ 27, it cannot prove this until it takes discovery.

[4] As in their opening brief, the Bridger Parties rely heavily on *Lake Forest* but make no effort to respond to the ways in which it is plainly distinguishable, which are described in Eddystone's Opposition.  Opp. at 20.

Finally, the Bridger Parties claim that Eddystone should have pursued Jamex Marketing, which they claim has guaranteed BTS's obligations under the RSA.  Reply at 14.  That seriously misstates the contracts at issue.  Jamex Marketing did not guarantee BTS's obligations to Eddystone under the RSA.  Instead, the Bridger Parties have asserted that Jamex Marketing guaranteed the obligations that Jamex Transfer Holdings – the newly-formed, asset-less entity that purchased BTS as part of the Defendants' scheme to defraud Eddsytone during the windup of the Monroe arrangement, Compl. ¶¶ 48, 49 – owed to Bridger Logistics under the BTS Purchase and Sale Agreement.  Dkt. 35-5 (PSA § 2.1 & Ex. B § 4(a)).  Because the Jamex Guaranty runs in favor of Bridger Logistics, not Eddystone, it has to do with Bridger Logistics's rights against Jamex; it is not an additional reason to deprive Eddystone of the amounts it is owed.  And in any event, these Bridger allegations about transactions to which Eddystone was not a party are inappropriate on a motion to dismiss, as they are outside the four corners of the Complaint and Eddystone has had no opportunity to conduct discovery.

Nor can Bridger Logistics dismiss its involvement as "pre-breach" and point the finger at Jamex Marketing.  Reply at 14.  Throughout its operational life, BTS made the transloading capacity it purchased at great expense (and with a five-year volume commitment) from Eddystone exclusively available to Bridger Logistics for Bridger Logistics's own purposes.  Compl. ¶¶ 24, 32, 39–41, 57.  Bridger Logistics used that capacity to run its own profitable business, paying no compensation to BTS, and then, when the economics changed, sought to insulate itself from liability for the remaining amounts due under the RSA by offloading BTS onto a newly-formed subsidiary of its former sibling, Jamex Marketing, and halting the payments that allowed BTS to meet its obligations under the RSA.  Compl. ¶¶ 32, 39, 46–49.  It is clear that if a controlling entity manipulates its alter ego so that the latter has insufficient assets to

satisfy its obligations, it is liable under an alter ego theory.  As Eddystone noted in its

Opposition, there is no law that suggests a party can avoid liability by transferring the company

to an asset-less party just before the default resulting from its manipulation occurs.  *See* Opp. at

19–22 (citing cases).[5]

### B.       Eddystone Has a Valid Fraudulent Transfer Claim

#### 1.       The Transfer of Balance Sheet Assets

After failing to address the fraudulent transfer of almost $100 million of balance sheet

assets in its initial motion, the Bridger Parties now insist that the Complaint alleged these merely

as "badges of fraud."  Reply at 4.  But the Complaint clearly alleges that these assets were

"transferred . . . to other FGP entities."  Compl. ¶ 48.[6]

The Bridger Parties also allege that Eddystone has failed to satisfy Rule 9(b) as to these

transfers.  In the fraudulent transfer context, Rule 9 requires that the Complaint "sets forth the

date, time, and place of the transfers."  *Hecht v. Malvern Preparatory Sch.*, 716 F. Supp. 2d 395,

400 (E.D. Pa. 2010).[7]  Here, Eddystone has explained that $98 million in assets listed on the

---

[5] Incredibly, having themselves colluded with Jamex Marketing to cut BTS off from its sources of fund, strip it of its assets, and layer it as part of a series of shell entities in order to evade the amounts due to Eddystone under the RSA, the Bridger Parties now accuse Eddystone of colluding with Jamex Marketing to settle its arbitration with BTS.  This accusation is more baseless hyperbole.  While the Bridger Parties no doubt would have preferred that the insolvent BTS run interference for them in stymieing Eddystone's attempts to collect the amounts due under the RSA, neither Eddystone nor BTS was under any obligation to continue to spend money in arbitration against a bankrupt shell that had the funds neither to arbitrate nor to pay a judgment.  Accordingly, BTS and Eddystone settled, and Eddystone now turns to Bridger Logistics to satisfy the amounts due under the RSA.

[6] If the Court requires, Eddystone can file an Amended Complaint that specifies more clearly that all of the transfers are at issue in Counts 2 and 3 as well as clarifying any of the other details that the Bridger Parties claim are found only in the Opposition.

[7] Rule 9 does not apply to the constructive fraud claim.  *See Germain v. Wisniewski*, No. 15-1279, 2016 WL 4158994, at *3 (W.D. Pa. Aug. 5, 2016) ("[M]ost Courts in the Circuit

December 31, 2014 BTS audited financials were transferred to other FGP entities prior to February 1, 2016.  Compl. ¶¶ 47, 48.  While the exact details are unknown to Eddystone, they are available to Defendants, who know exactly what happened to the specific assets identified in the Complaint and in the Bridger Group's own financial statements.

In this circumstance the allegations "are sufficient to satisfy the pleading requirements of Rule 9(b)."  *Engle v. Matrix Golf & Hosp. Philadelphia, LLC*, No. CIV.A. 08-5831, 2009 WL 880680, at *4 (E.D. Pa. Mar. 31, 2009).  Eddystone has identified the "the circumstances surrounding this transaction," particularly the removal of BTS's assets prior to its sale to JTH for $10 during the windup of the Monroe transaction.  Compl. ¶¶ 48, 49, 63.  This suffices to "put the Defendants on notice as to the precise conduct in question" and provide "sufficient identification of the circumstances constituting fraud so that [the Bridger Parties] can prepare an adequate answer to the allegations."  *Id*.; *Hecht*, 716 F. Supp. 2d at 400.

## 2.    The Transfer of the Implied Obligation from Bridger Logistics

Again abandoning the arguments in their Motion to Dismiss, the Bridger Parties' Reply makes a series of novel and inaccurate arguments regarding the abrogation of the implied agreement by which Bridger Logistics agreed to cover BTS's obligations under the RSA in return for obtaining the transloading capacity secured by that contract.

First, confronted with the law that the existence of an implied agreement is a question of fact, the Bridger Parties make a new *Twombly*/*Iqbal* plausibility argument.  Reply at 4–5 & n.11.  They argue that it is implausible that Bridger Logistics would have agreed to pay BTS for any

---

recognize that constructive fraudulent transfer claims are not analyzed under the heightened Rule 9(b) pleading standard.").

period other than the time during which it was utilizing BTS to transload oil.[8]  This is a remarkable argument, for there is nothing implausible about a party who gets exclusive access to capacity making a corresponding promise to take or pay for that capacity; Eddystone has alleged and will prove at trial that this is the ordinary expectation in the industry.[9]  On the contrary, it is implausible that BTS would have made transloading capacity – for which BTS had made a five-year minimum volume commitment – exclusively available to Bridger Logistics on a spot basis at Bridger's option with no mark-up and with no long-term commitment.  That would mean BTS was taking 100% of the risk of Bridger Logistics not needing the capacity – and doing so without any compensation – an absurd business and logical proposition.

The Bridger Parties cite language from *Hudson v. Radnor Valley Country Club*, No. CIV. A. 95-4777, 1996 WL 172054, at *2 (E.D. Pa. Apr. 11, 1996), to the effect that implied contracts "ordinarily" cannot be "assumed" to have a specific time period, but – perhaps not anticipating a surreply – excise the language contemplating that there may be a "showing to the contrary."  Here, the five-year term of the RSA, Compl. ¶ 22, establishes with precision the obligation that BTS was required to undertake to obtain the transloading capacity – and thus the term of the

---

[8] The Bridger Parties also deny that the Complaint alleged that Bridger Logistics provided BTS with the funds to pay amounts due under the RSA.  Reply at 5.  On the contrary, Paragraph 32 of the Complaint alleges that "BTS had no source of cash flow other than the funds it received from Bridger Logistics.  Bridger Logistics provided BTS the funds needed to satisfy its obligations to Eddystone under the RSA by which the Bridger Group had secured access to the Eddystone transloading facility.  Over the nineteen months in which crude oil was shipped to Monroe and Monroe made its COSA payments, Bridger Logistics paid BTS all of the amounts necessary for BTS to make all of the RSA payments due to Eddystone."  *See also* Compl. ¶ 39.

[9] *See, e.g.*, *Diamond Shamrock Expl. Co. v. Hodel*, 853 F.2d 1159, 1161 (5th Cir. 1988) (exclusive access to gas sales from a particular lease provided on take-or-pay basis); *Statia Terminals N.V. v. Huber, Inc.*, No. CIV.A. 95-1633, 1998 WL 560358, at *1 n.5 (E.D. La. Aug. 31, 1998) (exclusive access to single-point mooring system provided on take-or-pay basis).

obligation by which it would be provided to Bridger Logistics.[10]   Bridger Logistics and

Ferrellgas publicly represented that Bridger Logistics "owns and/or controls" the transloading

capacity at Eddystone, that it was an "asset" of Bridger Logistics, and that it was "available" to

Bridger Logistics.  Compl. ¶¶ 40-41.  These assertions could not be true if there were no time

period attached to the arrangement by which Bridger Logistics obtained the Eddystone

transloading capacity from BTS.

        Nor can the Bridger Parties so easily escape the implications of their own agreement to

sell BTS to Jamex Transfer Holdings.  As the Bridger Parties noted in their opening brief, the

"BTS PSA" – between Bridger Logistics and Jamex Transfer Holdings – "allocated

responsibility for all obligations to ERC under the RSA."  Mot. at 7.  Bridger Logistics could not

have purported to allocate responsibility for those obligations had it not undertaken them itself.

Indeed, Bridger Logistics alleges that it undertook to "provide[] $4.48 million to JTH, to be paid

to ERC, for all the known outstanding amounts due pursuant to the RSA through the effective

date of sale" and accepted as a "*retained* liability" all amounts due under the RSA pre-closing.

Mot. at 7 (quoting PSA § 1.1) (emphasis added).  Bridger further alleges that JTH "promised

*Logistics*" that it "assumed" all future liabilities "under the RSA."  Mot. at 7 (quoting PSA § 2.1)

(emphasis added).  Bridger Logistics could not have "retained" a liability it did not have, nor

_____

        [10] The Bridger Parties also reprise their citation to *In re Teleglobe Communications
Corp.*, 493 F.3d 345, 367 (3d Cir. 2007), for the proposition that a subsidiary's interest is in
serving its parent and misquote Eddystone's Opposition to suggest that Eddystone agrees that
*Teleglobe* stands for this proposition.  As explained in Eddystone's Opposition, however,
*Teleglobe* makes clear that this principle does not apply where there are minority shareholders or
the subsidiary is insolvent, in which case "whoever controls the subsidiary [must] seek to
maximize its economic value with requisite care and loyalty."  In addition, *Teleglobe* has nothing
to do with the pleading of implied contracts.  Opp. at 30.  The Bridger Parties simply ignore
these key points.

would JTH otherwise have properly promised Bridger Logistics that it would assume the liabilities under the RSA.

Departing even further from the allegations of the Complaint, however, the Bridger Parties now attempt to dispense with the PSA's language about "assumption" and "retention" by Bridger Logistics of "liabilities under the Eddystone Agreement [RSA]" and claim that this "does not in any way constitute a transfer of an obligation by Logistics."  Reply at 6.  On the contrary, the language to which Bridger Logistics agreed in the PSA indicates that Bridger Logistics itself understood that it had an obligation to fund payments under the RSA and sought to escape that obligation by transferring it to JTH.

Finally, the Bridger Parties assert that the Complaint contains no allegations that JTH, the newly-formed subsidiary of Jamex Marketing to which BTS was sold, was insolvent or that BTS was stripped of assets prior to the sale.  Reply at 7.  This new assertion is wrong.  The Complaint clearly alleges that "Jamex Marketing, of course, had no use for the stripped BTS and lacked the resources to service BTS' remaining RSA obligations."  Compl. ¶ 49; *see also id*. ¶ 48 (describing the transfer of all of BTS's assets).  Bridger Logistics cannot evade its implied obligations to BTS and thereby to its creditor Eddystone by purporting to transfer them to a shell company.[11]

---

[11] The Bridger Parties accuse Eddystone of implying that JTH was owned by Bridger Logistics.  Reply at 7.  In fact, the Opposition makes quite clear that JTH was a subsidiary of Jamex Marketing.  Opp. at 9, 10, 11, 32.  As Eddystone has explained, the entire point of the sale was to attempt to cut off BTS from Bridger Logistics.

### C.      Eddystone Has a Valid Fiduciary Duty Claim

Eddystone has valid direct fiduciary duty claims against Defendants because the control

persons of insolvent LLCs owe fiduciary duties to their creditors.  Opp. at 35–36.[12]  In their

Reply, the Bridger Parties do not deny that Eddystone has a valid breach of fiduciary duty claim

under Pennsylvania law.  Reply at 8.  Instead, they invoke the "internal affairs doctrine," which

also made no appearance in their opening brief, to argue that Louisiana law controls.  This is not

correct.  While "the law of the state of incorporation normally determines issues relating to the

internal affairs of a corporation, . . . [d]ifferent conflicts principles apply, however, where the

rights of third parties external to the corporation are at issue."  *First Nat'l City Bank v. Banco*

*Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983).[13]  Indeed, "[t]he internal affairs

of an LLC are limited only to matters peculiar to the relationships among or between the

corporation and its current officers, directors, and shareholders."  *Earthgrains Baking Cos. v.*

*Sycamore Family Bakery*, No. 2:09CV523DAK, 2015 WL 5009376, at *1 (D. Utah Aug. 21,

2015) (citations omitted).  Thus, "claims . . . asserted by third party creditors against an LLC fall

outside the internal affairs doctrine."  *Id.*; *see also Alphonse v. Arch Bay Holdings, L.L.C.*, 548 F.

App'x 979, 986 (5th Cir. 2013) ("[T]he internal-affairs doctrine does not apply to disputes that

include people or entities that are not part of the LLC.").

---

[12] Eddystone's Complaint and Opposition both make clear that Defendants owed duties directly to Eddystone as a creditor, not just to BTS.  *See* Compl. ¶ 74 ("Defendants . . . owed fiduciary duties of care and loyalty to BTS' creditors, including Eddystone."); ¶ 76 ("Defendants violated their fiduciary duties of care and/or loyalty to Eddystone."); Opp. at 35 ("[O]nce BTS entered the zone of insolvency, its officers, members, and controlling persons had a fiduciary duty to maximize the company's assets for the benefit of its creditor, Eddystone."); *id.* at 36 ("[C]ontrolling persons of a limited liability company within the zone of insolvency owe a fiduciary duty to its creditors.").

[13] While the Bridger Parties invoke federal common and maritime law for choice of law purposes in the context of Eddystone's alter ego claim, they notably fail to do so in the context of Eddystone's fiduciary duty claim.

For this reason, the District of New Jersey has held the internal affairs doctrine inapplicable to a similar breach of fiduciary duty claim premised on the alleged misappropriation of corporate assets because the claims "involve dealings with third parties" rather than the "organic structure" of the entity. *Tech. Dev. Co. v. Onischenko*, No. CIV.A. 05-4282 MLC, 2011 WL 6779552, at *11 (D.N.J. Dec. 23, 2011). As the Court explained, cases have "distinguish[ed]" fiduciary duty claims "'brought by creditors not by officers, directors, or shareholders'" as "therefore not subject to the internal affairs doctrine." *Id.* (quoting *Palladin Partners v. Gaon*, No. 05–3305, 2006 WL 2460650, at *17 (D.N.J. Aug.22, 2006)); *accord Lastertel N. Am. v. Innova*, No. 3:12-CV-354, 2016 WL 1729558, at *1 (S.D. Ohio Feb. 10, 2016).[14]

But if Louisiana law applied, it would not bar a fiduciary duty claim under these facts. Louisiana "jurisprudence has historically recognized that corporate principals have a fiduciary relationship not only to the corporate entity but also to its creditors." *Hooper v. Maruka Mach. Corp. of Am.*, 525 So. 2d 1113, 1117 (La. Ct. App. 1988). "The officers and directors of a corporation owe a fiduciary duty not only to the corporate entity, but to the corporation's creditors." *Lopez v. TDI Services*, 631 So. 2d 679, 688 (La. Ct. App. 1994). Thus, the Louisiana

---

[14] It is also not clear that the "internal affairs doctrine" applies to limited liability companies (as opposed to corporations). The Pennsylvania statute adopting the internal affairs doctrine, 15 Pa. C.S. § 4145, appears in "Part II. Corporations" of the Pennsylvania business code and applies only to "corporations" by its express terms. By contrast, Part III of the Pennsylvania business code, dealing with limited liability companies, contains no such provision. The Bridger Parties cite 15 Pa. C.S. § 402(a) for the proposition that the "same" rule "applie[s] to foreign limited liability companies." Reply at 8. But that Section appears in the chapter of the business code governing unincorporated foreign associations and applies only to such associations. *See* 15 Pa. C.S. §§ 401, 402. There is no such provision for limited liability companies. And the Bridger Parties do not cite a single case in which the Pennsylvania internal affairs doctrine has been applied to a limited liability company.

Court of Appeals has held that a trial court "erred as a matter of law in finding that" a corporate officer "owed no fiduciary duty" to a creditor.  *Id.*

This applies equally to limited liability companies.  *See 3 Point Holdings, L.L.C. v. Gulf South Solutions, L.L.C.*, No. CIV.A. 06-10902, 2008 WL 695379, at *2 (E.D. La. Mar. 13, 2008).  The Bridger Parties argue that this Court should ignore *3 Point*, an on-point district court decision from Louisiana, because it supposedly was "criticize[d] . . . as badly reasoned" by a bankruptcy judge.  Reply at 9 (quoting *In re Lobell*, 390 B.R. 206, 216 (Bankr. M.D. La. 2008)).  However, *Lobell* did not involve a claim for breach of fiduciary duty by the control persons of an insolvent entity.  It determined whether a debt was non-dischargeable in bankruptcy and therefore "respectfully decline[d] to follow *3 Point* on this record" because the "*3 Point* case was not a bankruptcy case."  *Id.* at 216 & n.49.

Retreating from their position in their opening brief, the Bridger Parties now argue that fraud is the touchstone of a creditor breach of fiduciary duty claim under Louisiana law.  *Compare* Dkt. 35-1 at 25 *with* Reply at 8–9.[15]  But the Louisiana Court of Appeals has applied the fiduciary duty to creditors principle "even though there was no proof of fraud."  *Abraham v. Lake Forest*, 377 So. 2d 465, 471 (La. Ct. App. 1979).  And neither of the Bridger Parties' citations addresses the fiduciary duties of corporate principals in the context of the zone of insolvency; it is that context that triggers a fiduciary duty to creditors.  *Hillman Lumber Prods. v. Webster Mfg.*, No. CIV.A. 06-1204, 2007 WL 1266124, at *6 (W.D. La. Apr. 27, 2007), and *Young v. Adolph*, 821 So. 2d 101, 106 (La. Ct. App. 2002), require fraud if corporate principals

---

[15] To the extent that the Court believes that pleading fraud is an essential part of a fiduciary duty claim and that the fraudulent transfer allegations do not suffice, Eddystone respectfully requests the opportunity to replead to allege fraud.

are to be held derivatively liable for a corporation's breach of its *own* fiduciary duty to creditors, not for the principals' breaches of their own fiduciary duties.[16]

## II.     THE COMPLAINT PROPERLY PLEADS CLAIMS AGAINST FERRELLGAS

The Bridger Parties assert that the Complaint does not plead alter ego, fraudulent transfer, or fiduciary duty claims against Ferrellgas.  Reply at 14-15.  But the Complaint alleges that "FGP" (Ferrellgas) "dominated BTS in all aspects of its business" upon purchasing BTS.  Compl. ¶ 53.  Rios and Gamboa exercised the same control over BTS in new positions as officers of Ferrellgas.  Compl. ¶ 38.  And Defendants make no attempt to distinguish or respond to Eddystone's cases holding both parent and grandparent entities liable as alter egos where they used shared executive officers to extract the subsidiary's assets for their joint benefit.  Opp. at 23-24 (citing cases).  That is exactly what Eddystone has alleged.  Compl. ¶¶ 7, 38, 46, 48.

Second, the Bridger Parties contend that Ferrellgas cannot be liable for fraudulent transfer because it was not the transferee.  But, as Eddystone explained in its Opposition, a defendant may be liable for fraudulent transfer where used its control to "siphon[] off" "valuable assets of the Debtor" to "its ultimate parent, or a sister affiliate."  *In re Saba Enterprises*, 421 B.R. 626, 653 (Bankr. S.D.N.Y. 2009); Opp. at 33 (citing additional cases).  Ferrellgas has done that here, "transferr[ing] all of BTS' other assets to other FGP entities, leaving it stripped of resources."  Compl. ¶ 7; *see also* Compl. ¶ 48 ("the Defendants transferred all of BTS' real estate, equipment, receivables, and other assets to other FGP entities").  Rather than address

---

[16] The Bridger Parties cite two older cases to argue that insolvency is not relevant to the analysis.  But neither contains any analysis of the relevance of insolvency.  *McDonough Marine Service v. Doucet*, 694 So. 2d 305, 312 (La. Ct. App. 1996), summarily holds that corporate officers do not owe fiduciary duties "to persons or entities which contract with the corporation," without any analysis of the rules applying to creditors in the context of insolvency.  *See also Unimobil 84 v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (no consideration of the impact on insolvency on duties to creditors).  More recent cases make clear that insolvency is key.

Eddystone's on-point cases, the Bridger Parties cite *Holber v. Pocius (In re Pocius)*, 556 B.R. 658, 672 (E.D. Pa. 2016), for the proposition that "alleging ownership of Logistics, and thereby BTS, is not enough to allege status as a transfer beneficiary."  Reply at 15.  But mere ownership is not what Eddystone has alleged:  it is Ferrellgas's use of control to transfer assets to its affiliates that gives rise to liability.  *See* Opp. at 33; Compl. ¶¶ 7, 48.

Finally, the Bridger Parties argue that Ferrellgas cannot be liable for breach of fiduciary duty because is not a member or manager of BTS.  But, as Eddystone pointed out in its Opposition, fiduciary duty liability extends to those who use their control over a fiduciary to cause a breach.  *See* Opp. at 39-40.  *Kidd v. Symbion, Inc*., No. 10-3361, 2011 WL 4020814, at *9 (E.D. La. Sept. 9, 2011), on which the Bridger Parties rely, focuses on a different, alter ego theory of establishing fiduciary duty liability.  And Ferrellgas is liable on this basis as well, in light of Eddystone's valid alter ego claim.

## III.   RIOS AND GAMBOA CANNOT EVADE PERSONAL JURISDICTION

### A.   The Fiduciary Shield Doctrine Does Not Apply

Rios and Gamboa ignore the key reason that they cannot invoke the fiduciary shield doctrine:  it is a principle of statutory construction, not due process, and Pennsylvania's long-arm statute extends to the furthest reaches of the Due Process Clause.  As a result, the fiduciary shield doctrine simply does not apply.  Eddystone explained this in its Opposition.  Opp. at 43–44. Rios and Gamboa offer no response.

Rios and Gamboa do attempt to distinguish *FlagHouse v. ProSource Development*, 528 F. App'x 186, 189 n.4 (3d Cir. 2013), which held the fiduciary shield doctrine inapplicable in New Jersey for this very reason, on the ground that it involved New Jersey law.  RG Reply at 5. But *FlagHouse* held the fiduciary shield doctrine inapplicable because New Jersey's long-arm

statute extends to the limits of the Due Process Clause.  As Rios and Gamboa acknowledge, the same is true in Pennsylvania.

Rios and Gamboa next cite a Pennsylvania Commonwealth Court case for the proposition that this "in no way undermines the application of the fiduciary shield doctrine."  RG Reply at 5. But that case, *Maleski by Taylor v. DP Realty Trust*, 653 A.2d 54, 62 (Pa. Commw. Ct. 1994), did not endorse application of the fiduciary shield doctrine.  Instead, it noted that "a line" of federal cases had applied the doctrine.  Rather than "squarely address[] this situation," *Maleski* found that the doctrine could not be satisfied because "the federal courts have recognized an exception to this rule when a corporate officer has been personally involved in a corporation's tortious conduct, and on that basis, has rested jurisdiction."  *Id.*

And even if the fiduciary shield doctrine did apply, it would not avail Rios and Gamboa for this reason, too.  As explained in Eddystone's Opposition and in the Complaint, Rios and Gamboa were personally responsible for the tortious misconduct at issue in this litigation.  Opp. at 45–46; Compl. ¶¶ 19, 21, 28, 32, 35, 37, 38, 46, 53, 58, 63, 64, 66.  Using their authority as CEO and COO of Bridger Logistics, and then as the Ferrellgas Executive Vice Presidents responsible for Bridger Logistics's business, Rios and Gamboa directed the entire scheme.  *Id.*

Rios and Gamboa next assert that they cannot be subject to personal jurisdiction on this ground because they received no benefit from the fraudulent transfers.  RG Reply at 6–7.  This both ignores the breach of fiduciary duty claim and conflates personal jurisdiction with the merits.  Rios and Gamboa acknowledge that Eddystone has alleged that they did benefit from the fraudulent transfers as shareholders of Bridger Logistics and Ferrellags.  RG Reply at 6–7.  They cite declarations in which they claim that they were no longer shareholders of Ferrellgas or Bridger Logistics at the time of the sale of BTS to Jamex Transfer Holdings and thus can have

received no benefit from the transfers.  RG Reply at 7.  But Rios and Gamboa cannot overcome

Eddystone's fraudulent transfer allegations by filing declarations denying them before Eddystone

has had a chance to take discovery.  Moreover, even if Rios and Gamboa were shorn of their

Ferrellgas stakes by January 2016, they had already realized the benefit from the scheme, which

included the use of BTS as a shell, when they sold the business to Ferrellgas in June 2015 and

personally realized more than $40 million in proceeds.  Compl. ¶ 37.

Rios and Gamboa also argue that their contacts with Pennsylvania to negotiate the RSA,

investigate the Eddystone transloading facility, supervise operations, and manage the transport

and sale of crude oil to Monroe preceded the asset transfer and have "no relevance to the claims

in this case."  RG Reply at 10.  That is absurd.  The claims in this case arise out of the breach of

the obligations in the RSA, which occurred when the economics of Rios and Gamboa's crude oil

business soured and they came up with a scheme to avoid the obligations that they had

negotiated with Eddystone *in Pennsylvania*.  Dkt. 39-1 ¶¶ 4–12.  The asset transfer was only the

culmination of Rios and Gamboa's years-long scheme to make use of Eddystone's transloading

capacity for their own purposes while evading the obligations in the RSA.  Compl. ¶¶ 21, 32, 48–

50.  As noted in the Opposition, Pennsylvania courts have found jurisdiction over parties with a

much lower level of involvement with Pennsylvania.

Moreover, while Rios and Gamboa repeatedly refer to the time period of the "evidence

submitted by Eddystone," RG Reply at 11, they make no affirmative denial that they had

contacts with Pennsylvania during the 2016 time period in which they wound up their crude oil

operation in the state and made plans to sell BTS to Jamex Transfer Holdings.  Rios and

Gamboa's counterparty was the Monroe Energy refinery in Trainer, Pennsylvania.  Compl.

¶¶ 24, 25.  The contract that they negotiated to suspend in 2016 was a contract to deliver crude

oil to that Pennsylvania refinery.  Compl. ¶¶ 24, 36, 47.  BTS, the entity that they cut off from

funding and transferred, was transloading crude oil in Pennsylvania and the RSA obligations that

Rios and Gamboa were thereby evading were to a transloading facility in Eddystone,

Pennsylvania.  Compl. ¶¶ 22, 23.

> **B.** **Prior to Discovery, Plaintiffs May Rely on Allegations to Establish Personal Jurisdiction**

In their Reply, Rios and Gamboa alternately accuse Eddystone of attempting to

supplement its Opposition with material outside the Complaint and claim that Eddystone may

not rely on the pleadings to oppose a Rule 12(b)(2) motion.  In particular, Rios and Gamboa

argue that Eddystone must submit proof of its alter ego claims before it may rely on them to

establish personal jurisdiction.

The law is just the opposite.  "Prior to discovery, a plaintiff may defeat a motion to

dismiss based on legally sufficient allegations of jurisdiction."  *In re Auto. Refinishing Paint

Antitrust Litig.*, 358 F.3d 288, 292 n.3 (3d Cir. 2004) (quoting *In re Magnetic Audiotape

Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir.2003)).  Indeed, "it is well established that in deciding

a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations

as true, and is to construe disputed facts in favor of the plaintiff."  *Toys "R" Us v. Step Two, S.A.*,

318 F.3d 446, 457 (3d Cir. 2003) (citing with approval multiple district court decisions denying a

motion to dismiss for lack of personal jurisdiction because the defendant was entitled to proceed

to jurisdictional discovery based on the allegations in the complaint.).

While Rios and Gamboa may re-raise their personal jurisdiction arguments at summary

judgment and require an evidentiary showing, "factual allegations that suggest with reasonable

particularity the possible existence of the requisite contacts between the party and the forum

state" require that "the plaintiff's right to conduct jurisdictional discovery should be sustained."

*Id*. at 456.

Dated: June 7, 2017                                    Respectfully submitted,

                                                       /s/ Henry E. Hockeimer
                                                       Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                       Terence M. Grugan (I.D. No. 307211)
                                                       BALLARD SPAHR LLP
                                                       1735 Market Street, 51st Floor
                                                       Philadelphia, PA 19103-7599
                                                       Telephone: (215) 665-8500
                                                       Facsimile: (215) 864-8999
                                                       hockeimerh@ballardspahr.com
                                                       grugant@ballardspahr.com

                                                       Filiberto Agusti (*pro hac vice*)
                                                       Jeffrey M. Theodore (*pro hac vice*)
                                                       Timothy Work (*pro hac vice*)
                                                       Nicholas Petts (*pro hac vice*)
                                                       STEPTOE & JOHNSON LLP
                                                       1330 Connecticut Avenue, NW
                                                       Washington, DC 20036
                                                       Telephone: (202) 429-3000
                                                       Facsimile: (202) 429-3902
                                                       fagusti@steptoe.com
                                                       jtheodore@steptoe.com
                                                       twork@steptoe.com
                                                       npetts@steptoe.com

                                                       *Counsel for Eddystone Rail Company, LLC*

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via the Court's ECF system on June 7, 2017, thereby serving all counsel of record.

/s/ Terence M. Grugan
Terence M. Grugan