| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Complaint ¶ 3 (noted Motion to Strike ("MTS") at 7) | "BTS' parent, Defendant Bridger Logistics, LLC, Bridger Logistics' parents Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively, "FGP"), and BTS' key officers, Defendants Julio Rios and Jeremy Gamboa, used Eddystone's transloading capacity to conclude and perform under a contract to deliver crude oil to a Philadelphia area refinery." | The corporate relationships between Ferrellgas Partners, L.P., Ferrellgas, L.P. (together with Ferrellgas Partners, L.P., "Ferrellgas"), Bridger Logistics, and BTS and the positions held by Rios and Gamboa are described in SEC and Delaware and Louisiana Secretary of State filings, which are public documents. |
| Complaint ¶ 3 | "Defendants obtained a matching agreement with a refinery in Trainer, Pennsylvania to deliver at least 65,000 barrels per day of crude oil from North Dakota through June 2019." | • The Crude Oil Supply Agreement between Monroe Energy, LLC and Bridger Marketing, LLC, dated July 2, 2014 ("COSA"), produced by Jamex in the arbitration. <br> • The Amended Crude Oil Supply Agreement between Monroe Energy, LLC and Bridger Marketing, LLC, dated May 26, 2015, ("Amended COSA"), produced by Jamex in the arbitration. <br> • The Transportation and Logistics Agreement between Monroe Energy, LLC and Bridger Logistics, LLC, dated May 26, 2015 ("Monroe TLA"), produced by Jamex in the arbitration. |
| Complaint ¶ 3 | "A shipper was also involved in the arrangements, purchasing the crude in North Dakota and selling it to the Trainer refinery after Bridger Logistics delivered it." | • COSA <br> • Amended COSA <br> • Knowledge available to Eddystone personnel as a result of Eddystone's involvement in the Monroe supply chain. |
| Complaint ¶ 3 | "Bridger Logistics and its affiliates would have crude oil loaded into railcars in North Dakota rail loading facilities, ship it by train to Eddystone's facility at Eddystone, and transload it to barges on the Delaware River alongside Eddystone's facility, which would carry the crude oil to refineries downriver." | Day-to-day operational communications Eddystone had with Bridger, the barge operator, and the railroads necessary to accomplish Eddystone's own role transloading oil from rail cars coming in from North Dakota to Delaware River barges for shipment to the Monroe refinery down river at Trainer. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Complaint ¶ 3 | "Because North Dakota wellhead prices were substantially lower than the "Brent benchmark" crude otherwise available to Delaware River refineries, shippers could make a profit even after accounting for the cost of transportation.  This allowed providers of crude oil transportation like Bridger Logistics and their control persons to profit." | The historical benchmark market prices for North Dakota crude and Brent are publicly available on the internet on a variety of services.  The decline in the difference between those prices is publicly available as well as its effect on crude by rail shipments to East Coast locations.<br><br>Eddystone's parents include a pipeline company involved in several aspects of the crude by rail business. |
| Compl. ¶ 5. (noted MTS at 7) | "BTS made the transloading capacity it obtained from Eddystone available to Bridger Logistics on a long-term, exclusive basis so that Bridger Logistics could deliver North Dakota crude to the Trainer refinery." | Eddystone knows that the transloading capacity was made exclusively available to Bridger Logistics on a long-term basis because:<br>• Ferrellgas's SEC filings indicating that Bridger Logistics "owns and/or controls" and has "available" to it the Eddystone transloading capacity. *See* Ferrellgas Partners, L.P., Form 8-K, June 1, 2015 & Form 10-K, July 31, 2015.<br>• The operational personnel at Eddystone know from their monitoring of rail and barge operations that, during the entire operational history of Eddystone, every barrel of crude oil transloaded pursuant to the capacity BTS purchased in the RSA was bound for Monroe.  The COSA, Amended COSA, and Monroe TLA showed that Bridger Logistics, not BTS, received the payment from Monroe for those arrangements. |
| Compl. ¶ 5. | "Bridger Logistics provided funds to BTS so that BTS could make its payments under its agreement with Eddystone that gave rise to that capacity.  If an arm's length relationship existed, no company in BTS' position would have agreed to provide such capacity without an obligation from Bridger Logistics that would cover BTS' costs, including its long-term commitment to Eddystone, and give it an opportunity for profit." | • The COSA, Amended COSA, and Monroe TLA show that no payment went from Monroe to BTS, instead going to Bridger Logistics.<br>• By January 2016, BTS had no assets (other than the RSA itself) from which to make payments due under the RSA.<br>• The conclusion that Bridger Logistics paid all RSA payments is further supported by the fact that |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| | | Eddystone received many payments due under the RSA directly from Bridger Logistics and its affiliates. |
| Compl. ¶ 7 (noted MTS at 7) | "Instead, Defendants tried to solve their problem by improperly using their control of BTS without regard to the obligations to Eddystone.  In January 2016, Bridger Logistics made modifications to its agreements with the shipper and the refinery that allowed them to unwind the crude oil supply arrangements." | Eddystone knows of the changes to and suspension of the crude oil supply arrangement with Monroe in January 2016 because Jamex produced in the arbitration copies of the three letter agreements dated January 13, 2016 ("January Letter Agreements") by which this occurred:<br>• In the first letter agreement, Monroe Energy and Jamex Marketing agreed to suspend their obligations under their Amended COSA.<br>• In the second letter agreement, Monroe Energy and Bridger Logistics suspended their obligations under the Monroe TLA.<br>• In the third letter agreement, Jamex Marketing and Bridger Logistics agreed to a reduced schedule of payments in exchange for suspending the shipments of crude oil to Monroe.<br>In addition, the collapse of the shipping arrangement was publicly reported in the press and in FGP's SEC filings. |
| Compl. ¶ 7 | "No unaffiliated company in BTS' position would have allowed Bridger Logistics to abrogate its obligation to fund BTS' contract payments to Eddystone, for such an abrogation effectively transferred to FGP and Bridger Logistics the almost $140 million present value of BTS' right to receive payments from Bridger Logistics, for no consideration whatever.  Yet that is exactly what Defendants did, improperly using their control of BTS to render it insolvent and unable to pay its creditors." | Eddystone knows that Bridger Logistics stopped funding BTS from:<br>• The terms of the Purchase and Sale Agreement, between Bridger Logistics and Jamex Transfer Holdings, dated February 22, 2016, effective February 1, 2016 ("PSA"), produced by Jamex in the arbitration and attached by Bridger Logistics to its motion to dismiss papers.<br>• The fact that BTS lacked funds with which to make payments under the RSA.<br>Further details regarding the basis for the implied contract allegations are described below. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 7 | "Defendants also transferred all of BTS' other assets to other FGP entities, leaving it stripped of resources." | Eddystone knows that Defendants stripped BTS of its assets, leaving it insolvent, because:<br>• BTS had $98 million of assets listed in December 31, 2014 audited financials provided to Eddystone by Bridger in spring 2015 as part of the business relationship between the Parties.<br>• Eddystone discovered in the arbitration that, by 2016, BTS had no assets.<br>• BTS was sold to Jamex Transfer Holdings in February 2016 for $10 according to the PSA, which listed BTS's assets as only the RSA. |
| Compl. ¶ 7 | "Then, for good measure, Bridger Logistics sold the corporate entity BTS for $10 to a newly formed subsidiary of the shipper." | Eddystone knows that Bridger Logistics sold BTS to Jamex Transfer Holdings, a subsidiary of Jamex Marketing for $10 because this is detailed in the PSA. |
| Compl. ¶ 7 | "As noted, by February 2016, the shipper was unable to meet its obligations, so it lacked the ability to make BTS' payments in any event.  The now-defunct BTS immediately defaulted on its payments to Eddystone." | Eddystone knows that Jamex Marketing could not meet its own obligations because:<br>• Ferrellgas's SEC filings disclosed that Jamex Marketing's inability to fulfill its obligations under the COSA was a source of risk for Bridger Logistics.<br>• Jamex Marketing disclosed information about its finances as part of settlement negotiations in the arbitration. |
| Comp. ¶ 8 (noted MTS at 7) | "But BTS was in fact not the independent bona fide entity that Defendants held out.  Contrary to Defendants' holding out of BTS, it was an entirely captive instrument of Defendants, without operational or financial independence.  By dominating BTS as their alter ego, Defendants are liable for the debts BTS owes to ERC." | • As described above and below (regarding paragraphs 5 and 34), BTS made its contracted transloading capacity available for the exclusive use of Bridger Logistics without any written contract or arms-length compensation or contractual interest in the Monroe relationship for which the transloading capacity was used.<br>• Louisiana Secretary of State filings show that Rios and Gamboa were the officers of all relevant Bridger |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| | | entities, including Bridger Logistics and BTS.<br>• During the operational history of the Parties' performance under RSA, Rios, Gamboa, and other Bridger Logistics and Ferrellgas personnel made all decisions for BTS, and BTS had no independent personnel, officers, or existence.<br>• The COSA, Amended COSA, Monroe TLA, and January Letter Agreements reflect that this control was used to the detriment of BTS and its primary creditor, Eddystone. |
| Compl. ¶ 9 (noted MTS at 7) | "And even if BTS were not the alter ego of Bridger Logistics, Defendants' improper use of their control of BTS to have it transfer away BTS' assets to other FGP entities and abrogate implied rights to payment from Bridger Logistics for no consideration whatever constitutes a fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act ('PUFTA'), 12 Pa. C.S. §§ 5101 *et seq.*" | Regarding the transfer of balance sheet assets:<br>• The December 31, 2014 Bridger financial statements that Julio Rios emailed to Eddystone in early 2015 attributed over $98 million in assets to BTS. These financials did not include the RSA as an asset. Consolidated Financial Statements for Bridger, LLC, April 15, 2015.<br>• The PSA for the sale of BTS stated that, by January 2016, BTS had no assets but the Rail Services Agreement with Eddystone. Therefore, the $98 million in assets must have been transferred to other entities in the intervening eleven months, as alleged in the Complaint. Eddystone is entitled to discovery on what Ferrellgas internally did with BTS's assets in the intervening nine months. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 9. | "Bridger Logistics had an obligation to continue to fund the long-term agreement by which Bridger Logistics had acquired years of virtually exclusive access to Eddystone's transloading facility." | Eddystone knows the facts on which the implied contract is based because:<br>• BTS provided its transloading capacity exclusively to Bridger Logistics (see above at p. 2, paragraph 5 discussion)<br>• Bridger Logistics had all of the Monroe cash flow under the Monroe TLA and often made the RSA payments itself (see above at p.3, paragraph 5 discussion)<br>• Bridger Logistics acknowledged the existence of an obligation to fund payments under the RSA when it purported to transfer that obligation to Jamex Transfer Holdings pursuant to the PSA. |
| Compl. ¶ 9. | "Defendants' improper use of their control of BTS to have it allow its implied contract with Bridger Logistics to be abrogated without payment of reasonably equivalent value resulted in a transfer of value to Defendants – all of them BTS insiders – of almost $140 million." | Eddystone knows that the implied contract was abrogated from the fact that BTS was sold to Jamex Transfer Holdings in the PSA and was deprived of the funds with which to make its remaining RSA payments.<br><br>The membership relationships and officer positions by which Defendants controlled BTS are available from public SEC and Louisiana Secretary of State filings and apparent to Eddystone during the course of the Parties' business dealings. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 9 | "As a direct result, BTS became insolvent and unable to meet its payment obligations to creditor Eddystone. Accordingly, Eddystone is entitled to equitable avoidance of the transfer and/or damages compensating Eddystone for the value of the intentional or constructive transfer, together with punitive damages for an intentional fraudulent transfer." | Eddystone knows that BTS became insolvent by January 2016 because the PSA states that it had no assets but the RSA and because the RSA still required payment of over $140 million in minimum volume commitment payments.  Thus, at least as of that time, BTS was unable to pay its obligations when they came due. |
| Compl. ¶ 19 (noted MTS at 7) | "Rios and Gamboa, along with non-defendant James Ballengee, owned and operated a crude oil trading and logistics business.  They created a series of nominally different companies with the name 'Bridger' to carry on this business, but treated them all as part of an undifferentiated whole." | See below at pp. 20–21, discussing paragraphs 56–59. |
| Compl. ¶ 19 | "The Bridger entities operated without inter-company contracts and were all headed by the very same people and shared employees." | • BTS did not produce any such contracts in the arbitration though they would have been responsive to Eddystone's document requests and explained that there were no contracts between BTS and other Bridger affiliates.<br>• The membership relationships and officer positions by which Defendants controlled BTS are available from public SEC and Delaware and Louisiana Secretary of State filings and, along with the sharing of employees, were apparent to Eddystone during the course of the Parties' business dealings. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 19 | "These entities included, among others, Bridger, LLC, Bridger Marketing, Bridger Logistics and its subsidiaries Bridger Rail Shipping, LLC, Bridger Marine, LLC, and BTS (collectively, the 'Bridger Group')." | The corporate relationships between Ferrellgas, Bridger Logistics, and BTS and the positions held by Rios and Gamboa are described in SEC and Delaware and Louisiana Secretary of State filings, which are public documents. |
| Compl. ¶ 19 | "The Bridger Group, holding itself out as Bridger Logistics, provided logistics services for the transport of crude oil from wellhead to end markets in North America." | This allegation reflects Bridger Group's public statements and marketing. |
| Compl. ¶ 19 | "Bridger Logistics was the sole 'member' of BTS, which in the context of a limited liability company, means that Bridger Logistics owned all of BTS' equity and controlled all of BTS' decision-making." | The corporate relationship between Bridger Logistics and BTS is described in Louisiana Secretary of State filings, which are public documents. |
| Compl. ¶ 19 | "Through the Bridger Marketing entity, the Bridger Group purchased and took title to crude shipments until delivery to the purchaser." | • COSA<br>• Amended COSA |
| Compl. ¶ 25 (noted MTS at 7) | "The June 2014 Crude Oil Supply Agreement (the "COSA") between Monroe and Bridger Marketing provided and paid for both Bridger Marketing's and Bridger Logistics' services as an undifferentiated package." | • COSA |
| Compl. ¶ 25 | "The COSA was closely calibrated to BTS' transloading capacity available under the RSA. Bridger Marketing agreed to acquire and deliver to the Trainer refinery and Monroe agreed to accept and pay for 1.95 million barrels per month through June 2019—roughly equaling BTS' minimum volume commitment to Eddystone under the RSA." | Eddystone knows this by comparing COSA § 2.1(b) with the definition of "Volume Commitment" in RSA § 1.1. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 25 | "Under the June 2014 COSA, Monroe did not differentiate between payment for Bridger Marketing's services and Bridger Logistics' logistics transportation services." | • COSA |
| Compl. ¶ 28 (noted MTS at 7) | "Until May 2015, there were no written contracts between Bridger Marketing, Bridger Logistics, and BTS as to how to split the payments from Monroe." | • See discussion above at p.7, paragraph 19<br>• Ferrellgas's own SEC filings acknowledge "material weaknesses" in Bridger Logistics's internal financial controls. Ferrellgas Partners, L.P., Form 8-K, June 1, 2015 ("June 1, 2015 SEC filing"). |
| Compl. ¶ 28 | "Rios and Gamboa used the Monroe payments as if all Bridger affiliates were one entity." | • Under the Monroe TLA, Bridger Logistics had the Monroe cash flow and often made the payments due under the RSA itself (see above at p.3, paragraph 5 discussion).<br><br>• Ferrellgas's own SEC filings acknowledge "material weaknesses" in Bridger Logistics's internal financial controls.  See June 1, 2015 SEC filing. |
| Compl. ¶ 29 (noted MTS at 7) | "The course of dealing among the Bridger entities shows that they either operated with one another without regard to corporate entities or through a series of implied contracts." | • As described above, BTS had no written agreements with its affiliates, the only customers at the Eddystone facility.<br>• Under the Monroe TLA, Bridger Logistics had the Monroe cash flow and often made the payments due under the RSA itself (see above at p.3, paragraph 5 discussion).<br>• Ferrellgas's own SEC filings acknowledge "material weaknesses" in Bridger Logistics's internal financial controls.  June 1, 2015 SEC filing. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 30 (noted MTS at 7) | "Defendants were operating BTS without regard to its separate company identity from Bridger Logistics, so Bridger Logistics is fully liable for BTS' debts to Eddystone.  Although the Bridger Group consisted of several separate entities, it was run as a single integrated organization." | Eddystone knows that the entities were operated as a single organization without regard to their separate identities from:<br>• As discussed above at 7, the entities performed functions for one another and shared employees without written contracts among them setting forth the affiliates' separate obligations and rights.<br>• As discussed above at 2, Bridger Logistics took exclusive use of BTS' transloading capacity without contract and without compensating BTS or otherwise observing the obligation to deal with subsidiaries as bona fide separate entities.<br>• As described above at 6, Ferrellgas and its affiliates stripped BTS of assets between January 1, 2015 and January 16, 2016 without giving BTS reasonably equivalent value as a separate entity.<br>• During the Parties' course of dealing, Bridger Group entities shared officers and employees – with all significant decisions made by Rios.<br>• Eddystone personnel observed that Bridger Group officers and employees treated all Bridger entities as a unified whole and that this control was exercised with no attention to BTS's separate existence and interests. |
| Compl. ¶ 30 | "Bridger, LLC served as sole member and manager of Bridger Marketing and Bridger Logistics.  Bridger, LLC also served as sole manager of BTS, which had Bridger Logistics as its sole member." | The corporate relationships between Bridger, LLC, Bridger Marketing, Bridger Logistics, and BTS are reflected in their LLC filings, which are available from the relevant Secretary of State websites. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 32 (noted MTS at 7) | "To accomplish the transport of crude oil to Monroe, Rios and Gamboa had Bridger Group entities enter into contracts with third parties to secure the necessary assets, including BTS' contract with Eddystone." | • Rios negotiated and signed the RSA on behalf of BTS.<br>• Rios and Gamboa caused another Bridger Group entity to enter into the charter party agreement for the barge used to transport crude from Eddystone to Monroe.<br>• Rios caused Bridger Group entities to enter into leases for fuel injection stations and truck to train loading stations, some with Eddystone's parent, Enbridge. |
| Compl. ¶ 32 | "BTS had no source of cash flow other than the funds it received from Bridger Logistics.  Bridger Logistics provided BTS the funds needed to satisfy its obligations to Eddystone under the RSA by which the Bridger Group had secured access to the Eddystone transloading facility.  Over the nineteen months in which crude oil was shipped to Monroe and Monroe made its COSA payments, Bridger Logistics paid BTS all of the amounts necessary for BTS to make all of the RSA payments due to Eddystone." | • Under the Monroe TLA, Bridger Logistics had all Monroe cash flow and often made the payments due to Eddystone under the RSA itself (see above at pp. 2-3, paragraph 5 discussion).<br>• BTS's lack of assets and cash flow is reflected in the PSA, which states that by 2016 BTS's only asset was the RSA.<br>• BTS stopped having funds to pay amounts due under the RSA once Bridger Logistics transferred it to JTH and disavowed its payment obligations. |
| Compl. ¶ 34 (noted MTS at 7) | "In providing this service, BTS was a subcontractor of Bridger Logistics, which was providing a packaged product to Monroe and Marketing." | In the COSA, Amended COSA, and TLAs, Bridger agreed to provide full North Dakota to Monroe transportation services. Because Bridger Logistics used transloading capacity owned by BTS for this purpose, that makes BTS effectively a subcontractor of Bridger Logistics, though Bridger Logistics did not evidence that relationship with written contracts.<br><br>Eddystone also knows from its operational role in the supply chain that the transloading capacity it sold to BTS in the RSA was used for this purpose of transporting crude from North Dakota origin-trains to the Monroe refinery in Trainer and from Ferrellgas's SEC filings that the Eddystone transloading capacity was made "available" to Bridger Logistics. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 34 | "To obtain the transloading capacity to satisfy Bridger Logistics' needs, BTS entered into a five-year minimum volume commitment with Eddystone." | • RSA |
| Compl. ¶ 34 | "No unrelated third-party subcontractor would have entered into a five-year obligation like the RSA with Eddystone and then provided the transloading services to a third party on a monthly basis at its monthly cost, ignoring the long-term obligation it had incurred.  Instead, an arm's length third party would have required an agreement from its prime contractor that it would cover the subcontractor's costs." | This is based on industry practice with which Eddystone and its consultants are familiar. |
| Compl. ¶ 34 | "Thus, the subsidiary BTS committed to provide services to the parent Bridger Logistics in exchange for the parent's implied commitment to make payments to fund the subsidiary's costs.  Bridger Logistics and BTS continuously reaffirmed their implied contract through their course of dealing.  Bridger Logistics and its affiliates transferred to BTS all the funds necessary to make all payments due to Eddystone from May 2014 until February 2016, and during that time BTS consistently made those payments to maintain access to Eddystone's facility for Bridger Logistics.  Through the consistent transfers and payments over an uninterrupted period of nineteen months, Bridger Logistics evidenced its obligation to BTS to fund the RSA for its entire term." | • As described at paragraph 32 at p. 11–12 above, Bridger Logistics continued to cover both transloading and deficiency payments due under the RSA.<br>• As described at paragraph 5 at p. 2 above, BTS continued to make its transloading capacity available to Bridger Logistics. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 35 (noted MTS at 7) | "In May and June 2015, Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively "FGP") negotiated with Rios and Gamboa to acquire Bridger Logistics." | • Eddystone knows that Rios and Gamboa were CEO and COO of Bridger as set forth in Delaware and Louisiana Secretary of State filings and, based on its own business dealings with Bridger, that they were responsible for all Bridger Group decision-making.<br>• As part of the effort to sell Bridger Logistics to Ferrellgas, Rios took Ferrellgas on a tour of the Eddystone in which he marketed Eddystone transloading capacity and expansion opportunities.  See Dkt. 39-12.<br>• On October 23, 2015, Ferrellgas publicly disclosed its issuance of 1,104,737 common units to Rios Holdings, Inc. and 552,368 units to Gamboa Enterprises, LLC. See Ferrellgas Partners, L.P., Form S-3/A, October 23, 2015 ("October 23, 2015 SEC filing").  Ferrellgas issued these units to Rios and Gamboa in connection with its purchase of Bridger Logistics in June 2015.  *Id.* at 45. |
|  | "Because FGP was only acquiring Bridger Logistics, it was necessary to divide the Monroe payments between those being provided for Bridger Marketing's services and those being provided for Bridger Logistics' services." | • Amended COSA<br>• Monroe TLA |
| Compl. ¶ 36 (noted MTS at 7) | "Thus, in May 2015, the June 2014 COSA with Monroe was replaced with three new agreements among Monroe, Bridger Marketing and Bridger Logistics." | • COSA<br>• Amended COSA<br>• Monroe TLA<br>• The Transportation and Logistics Agreement between Bridger Marketing, LLC and Bridger Logistics, LLC, dated June 24, 2015 ("Marketing TLA"), produced by Jamex in the arbitration. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 36 | "First, Marketing entered into an amended COSA with Monroe whereby Monroe paid separately for Marketing's services." | • Amended COSA |
| Compl. ¶ 36 | "Second, Bridger Logistics entered into a new Transportation and Logistics Services Agreement with Monroe to provide transportation logistics from North Dakota by rail, transloaded at the Eddystone facility to barges and down the Delaware River to Trainer." | • Monroe TLA |
| Compl. ¶ 36 | "Finally, the two Bridger entities, Marketing and Logistics, entered into a new Transportation and Logistics Agreement whereby Logistics agreed to provide logistics services to Marketing." | • Marketing TLA |
| Compl. ¶ 37 (noted MTS at 7) | "On June 24, 2015, Bridger, LLC sold Bridger Logistics to FGP." | • Ferrellgas Partners, L.P., Form 8-K, June 24, 2015. |
| Compl. ¶ 37 | "Rios and Gamboa personally realized at least $27.1 million and $13.6 million from the sale of Bridger Logistics." | • Ferrellgas, in its October 23, 2015 SEC filing referred to its issuance of 1,104,737 common units to Rios Holdings, Inc. and 552,368 units to Gamboa Enterprises, LLC.<br>• At the market price for Ferrellgas units at the time of the sale of Bridger Logistics, Rios and Gamboa received the amounts alleged in the complaint.<br>• Eddystone has not alleged the amount Rios and Gamboa received in cash from the transaction, which Ferrellgas did not disclose. |
| Compl. ¶ 37 | "Bridger, LLC retained Bridger Marketing." | • June 1, 2015 SEC filing, EX-2.1<br>• Louisiana Secretary of State filings |
| Compl. ¶ 38 (noted MTS at 7) | "As part of the deal, Rios and Gamboa transferred to Ballengee their interests in Bridger, LLC and joined FGP as its management team for Bridger Logistics." | • Ferrellgas publicly disclosed its issuance of common units to Rios and Gamboa as consideration for Bridger LLC's sale of Bridger Logistics to Ferrellgas.  October 23, 2015 SEC filing |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| | | <ul><li>After the sale, Ferrellgas reported in its Form 10-K, September 29, 2015 that Jamex LLC (f/k/a Bridger LLC), a related entity, was owned entirely by James Ballengee.</li><li>Therefore, the two other original owners of Bridger, LLC, Rios and Gamboa, transferred their interests in Bridger, LLC to Ballengee in connection with the sale of Bridger Logistics to Ferrellgas.</li><li>After the sale, Ferrellgas's corporate website reflected that Rios and Gamboa each held the title of Executive Vice President of Ferrellgas Partners.</li><li>Eddystone observed in the course of the Parties' business relationship that Rios and Gamboa continued to manage Bridger Logistics.</li></ul> |
| Compl. ¶ 38 | "Ballengee, now sole owner of Bridger, LLC and its remaining subsidiary Bridger Marketing, renamed them 'Jamex, LLC' and 'Jamex Marketing.'" | <ul><li>Delaware and Louisiana Secretary of State filings.</li></ul> |
| Compl. ¶ 43 (noted MTS at 7) | "But oil prices were changing, eventually making the amended COSA and Jamex Marketing's Transportation and Logistics Agreement with Bridger Logistics quite unprofitable for Jamex Marketing." | <ul><li>Amended COSA</li><li>TLAs</li><li>Oil prices to which this paragraph refers are publicly available.</li></ul> |
| Compl. ¶ 43 | "The amended COSA pricing was based, in part, on Brent benchmark prices." | <ul><li>Amended COSA § 4.1.</li></ul> |
| Compl. ¶ 43 | "Bridger Marketing would profit so long as North Dakota prices remained substantially below Brent." | These economics were calculated based on the economic terms of the Amended COSA and publicly available information about crude oil prices. |
| Compl. ¶ 43 | "But the difference between North Dakota crude oil prices and Brent narrowed dramatically to the point where the spread was too narrow for Bridger Marketing to earn any profit through its performance under the COSA." | These economics were calculated based on the economic terms of the Amended COSA and publicly available information about crude oil prices. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 44 (noted MTS at 7) | "As the North Dakota–Brent price differential narrowed even further, Jamex Marketing began incurring multi-million dollar losses almost every month." | These losses were calculated based on the economic terms of the Amended COSA and publicly available information about crude oil prices. |
| Compl. ¶ 44 | "By the fall of 2015, Jamex Marketing was seeking to negotiate with Monroe and Bridger Logistics to terminate its obligations." | Eddystone knows that by the fall of 2015 Jamex Marketing was seeking to terminate its obligations to Monroe and Bridger Logistics based on its economic incentives described above and the ultimate termination of the deal.  This was confirmed by emails Jamex produced in the arbitration. |
| Compl. ¶ 45 (noted MTS at 7) | "Monroe was receptive to Jamex Marketing's suggestions. The spread between North Dakota and Brent prices had narrowed to the point where Monroe would be substantially advantaged if it were able to acquire West African crude instead of North Dakota crude under the amended COSA." | The financial incentives of Monroe can be determined from the economic terms of the COSA and TLAs, produced by Jamex Marketing in the arbitration, and historical crude oil prices. |
| Compl. ¶ 46 (noted MTS at 7) | "Bridger Logistics, FGP, Rios, and Gamboa were also receptive to Jamex Marketing's suggestions.  Although Bridger Logistics and FGP were deriving rich profits from its Transportation and Logistics Agreements with Monroe and Jamex Marketing, it was clear that Jamex Marketing was losing money at such a rapid clip that Jamex Marketing would run out of cash to acquire crude oil for Monroe or to pay its Transportation and Logistics Agreement obligations to Bridger Logistics.  This would end revenue from the Transportation and Logistics Agreement from Monroe well before the June 2019 end of its term, leaving Bridger Logistics and BTS with the obligations for the matching transloading capacity at the Eddystone facility secured under the RSA." | The financial incentives of Defendants were determined from the economic terms of the COSA, Amended COSA, and TLAs as well as observations about potential business risks in Ferrellgas SEC filings. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 46 | "Accordingly, the Defendants developed a plan to wind down the exposure to Jamex Marketing, strip BTS of its assets, but without providing for payment of Bridger Logistics's obligation to BTS and its creditor Eddystone." | See below re paragraphs 47-49. |
| Compl. ¶ 47 (noted MTS at 7) | "On January 13, 2016, in a set of letter agreements, Bridger Logistics, Jamex Marketing, and Monroe suspended their arrangement for the sale and delivery of crude oil." | The January Letter Agreements, as described at paragraph 7 at p. 3 above. |
| Compl. ¶ 47 | "Jamex Marketing and Monroe agreed to suspend performance under the amended COSA for at least three months, starting February 1, 2016." | The January Letter Agreements, as described at paragraph 7 at p. 3 above. |
| Compl. ¶ 47 | "This suspension never ended: after extending the suspension, the parties ultimately terminated the amended COSA." | The termination of the relationship is reflected in public SEC filings, which include a copy of the Termination Agreement. |
| Compl. ¶ 48 (noted MTS at 7) | "The January letter agreements also provided for the transfer of BTS and its RSA to a newly formed subsidiary of Jamex Marketing." | The January Letter Agreements, as described at paragraph 7 at p. 3 above. |
| Compl. ¶ 48 | "That transfer was effective on February 1, the very date on which the amended COSA suspension made the Eddystone facility useless both to Bridger Logistics and Jamex Marketing." | • PSA |
| Compl. ¶ 48 | "Prior to the transfer of BTS to Jamex Marketing, the Defendants transferred all of BTS' real estate, equipment, receivables, and other assets to other FGP entities and allowed BTS to effectively relinquish its right to payment of the RSA obligations from Bridger Logistics, so that BTS' only "asset" was the RSA with ERC." | • BTS financial statements prepared in early 2015 and supplied to Eddystone during the course of the Parties' business relationship attributed over $98 million in assets to BTS.  Consolidated Financial Statements for Bridger, LLC, April 15, 2015, at 20.<br>• However, the agreement for the sale of BTS stated that, by February 2016, BTS had no assets but the Rail Services Agreement with Eddystone.  PSA §§ 2.3(a), |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| | | 4.11.<br>• Therefore, the $98 million in assets must have been transferred to other entities in the intervening eleven months, as alleged in the Complaint. |
| Compl. ¶ 48 | "Indeed, the Defendants prohibited BTS from engaging in any business other than performing under the RSA, which BTS lacked the ability to perform." | This is reflected in the fact that BTS had no assets other than the RSA by January 2016. |
| Compl. ¶ 49 (noted MTS at 7) | "Jamex Marketing paid $10 for the now valueless BTS, which twelve months earlier had $98.1 million in assets." | • PSA |
| Compl. ¶ 49 | "Jamex Marketing, of course, had no use for the stripped BTS and lacked the resources to service BTS' remaining RSA obligations." | Eddystone knows Jamex Marketing had no use for the stripped BTS because:<br>• BTS' only remaining asset was the RSA.<br>• Per the relevant agreements, Jamex Marketing was responsible for buying and selling crude, not transporting it, during the life of the deal.<br>• Per their January 13, 2016 letter agreement, Jamex Marketing would not be selling Monroe any additional crude oil to be transported through the Eddystone facility. |
| Compl. ¶ 53 (noted MTS at 7) | "FGP, Bridger Logistics, Rios, and Gamboa completely dominated BTS in all aspects of its business, directing and controlling its day-to-day operations and treating it like a mere department instead of respecting it as an independent legal entity." | See above at p. 2, paragraph 5 discussion; p.3, paragraph 5 discussion; p.4, paragraph 7 discussion; p.12, paragraph 30 discussion; p. 13, paragraph 32 discussion. |
| Compl. ¶ 53 | "BTS was merely the alter ego of Bridger Logistics in several respects." | See below at pp. 20–21, discussing paragraphs 56–59, as well as Complaint paragraphs 54–55, which Defendants do not challenge. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 56 (noted MTS at 7) | "Third, BTS did not maintain separate financial records or accounts from Bridger Logistics and Defendants treated and represented to others that BTS' assets were Bridger Logistics' own." | • BTS did not produce such contracts in the arbitration though they would have been responsive to Eddystone's document requests and explained that there were no contracts between BTS and other Bridger affiliates. Without contracts setting forth BTS' rights, there could not have been a proper accounting of its assets.<br>• Bridger Logistics had the Monroe cash flow and often made the payments under the RSA itself (see above at p.3, paragraph 5 discussion), further indicating that proper financial separation was not maintained.<br>• Ferrellgas's own SEC filings acknowledge "material weaknesses" in Bridger Logistics's internal financial controls.  June 1, 2015 SEC filing.<br>• BTS had no pre-2016 financial information to produce in the arbitration and represented that its financial information remained under the control of Bridger Logistics after the sale.<br>• Defendants represented that BTS' assets were Bridger Logistics' own in their public SEC filings and presentations described at paragraphs 40 and 41 of the complaint. |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| Compl. ¶ 57 (noted MTS at 7) | "Fourth, Bridger Logistics did not deal with BTS at arm's length.  If there was no implied contract between BTS and Bridger Logistics, Defendants directed BTS to take on the RSA obligations for no compensation to provide Bridger Logistics access to the Eddystone facility, and transferred money to BTS *ad hoc* as its conduit to pay Eddystone.  Defendants treated BTS' assets as Bridger Logistics' own, and represented as much to the wider marketplace by maintaining that Bridger Logistics had exclusive access to a transloading facility in the Philadelphia area and that BTS' capacity was Bridger Logistics'." | See above at p. 2, paragraph 5 discussion; p. 3, paragraph 5 discussion; p. 11, paragraph 32 discussion; p. 12, paragraph 34 discussion. |
| Compl. ¶ 58 (noted MTS at 7) | "Fifth, BTS never paid dividends.  Rios and Gamboa never allowed BTS to earn a profit as a separate entity, but treated it merely as a conduit entity.  Beginning with BTS' first payment to Eddystone, Bridger Logistics transferred funds to BTS just to cover expenses it incurred in the normal course of business." | • COSA, Amended COSA, and TLAs show that only Bridger Logistics and Jamex Marketing (not BTS) earned any return under the Monroe contracts<br>• Bridger Logistics made payments due under the RSA itself (see above at p.3, paragraph 5 discussion).<br>• By January 2016, BTS had no assets other than the RSA.<br>• All of the allegations noted at pages 2–3, and 11–12, above. |
| Compl. ¶59 (noted MTS at 7) | "BTS was thus a façade for the operations of its 100% equity owner, Bridger Logistics." | See above at pp. 20–22, discussing paragraphs 53, 56–59. |
| Compl. ¶63 (noted MTS at 7) | "Defendants caused BTS to allow its implied contract with Bridger Logistics to be abrogated without reasonably adequate consideration, thereby transferring to Defendants approximately $140 million of value.  Defendants Rios, Gamboa, Bridger Logistics and FGP therefore engaged in an intentional fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act." | See above at p. 7, paragraph 9 discussion. |
| Compl. ¶ 66(c) | "Defendants did not even transfer all documents to BTS' | On July 29, 2016, BTS responded to discovery requests |

| Complaint Paragraph Challenged | Allegation from Complaint Paragraph | Source |
|---|---|---|
| (noted MTS at 7) | new owners." | propounded during the arbitration by stating that "all email servers, file management systems, and other document repositories relating to operations prior to that purchase date remained in the possession of Bridger Logistics, LLC or its affiliates."  JTS's Objections and Responses to Claimant's First Request for Production, July 29, 2016. |