IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 17-0495 |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY GAMBOA, FERRELLGAS PARTNERS, L.P., and FERRELLGAS, L.P., | : | |
| Defendants. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                                             **JULY 19, 2017**

      Presently before this Court are the Motion to Dismiss filed by Defendants, Julio Rios ("Rios") and Jeremy Gamboa ("Gamboa"), the Motion to Dismiss filed by Bridger Logistics, LLC ("Bridger Logistics"), Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively, "Ferrellgas"), the Response in Opposition to Defendants' Motions to Dismiss filed by Plaintiff, Eddystone Rail Company, LLC ("Eddystone"), and all of the Replies and Sur-Replies thereto. For the reasons set forth below, Defendants' Motions are denied.[1]

## I. FACTS[2]

      Eddystone seeks to recover from the owners and controlling persons of Bridger Transfer Services, LLC ("BTS"), who allegedly used BTS as a sham entity to defraud Eddystone out of more than $140 million that it spent to build a transloading facility on the banks of the Delaware

---

[1]Rios and Gamboa joined in the other Defendants' Motion to Dismiss. (Doc. No. 34.)

[2]For purposes of expediency, we have used the Introduction from Eddystone's Response in Opposition to Defendants' Motion to Dismiss as the factual background. (See Pl.'s Response Opp'n Defs.' Mot. to Dismiss.)

River.  Bridger Logistics and its principals, Rios and Gamboa, developed a business plan to deliver North Dakota crude oil by railcar to Eddystone, Pennsylvania, transload it to river barges, and deliver it to a refinery in Trainer, Pennsylvania.[3]  To accomplish this, Eddystone alleges that they induced it to spend over $170 million to construct a transloading facility that was essential to their plan in return for a contractual commitment that they would transload a minimum volume of crude oil at Eddystone's facility over five years.  Eddystone entered into a Rail Facilities Services Agreement ("RSA" or "Eddystone Contract") to build the facility with BTS, which Rios and Gamboa held out as a bona fide independent entity with substantial business.

Eddystone alleges that BTS was a sham - a shell entity with no employees and no independent revenue dominated entirely by Rios and Gamboa.  According to Eddystone, BTS made the transloading capacity it obtained from Eddystone (at a substantial cost and in return for a five-year minimum volume commitment) exclusively available to Bridger Logistics without obtaining any written contract or opportunity for profit in return.  Despite securing and providing the critical transloading capacity at great expense, Eddystone alleges that BTS did not share in any of the profits Bridger Logistics earned from its refinery client.  It further asserts that Bridger Logistics directly paid the amounts due under the Eddystone Contract with BTS, including deficiency payments in months when the minimum volume commitment was not met, for as long as it needed Eddystone's transloading capacity.  Eddystone states that, as soon as the economics of Bridger Logistics' shipping arrangement began to fail, Bridger Logistics, Rios, Gamboa, and Bridger Logistics' new parent, Ferrellgas,[4] came up with a scheme to saddle Eddystone with the cost of the transloading facility that they had induced Eddystone to build.

---

[3]The refinery in Trainer, Pennsylvania, is owned and operated by Monroe Energy LLC ("Monroe").  (Compl. ¶ 24.)

[4]The Complaint states that Ferrellgas Partners, L.P. and Ferrellgas, L.P. are the parents of Bridger Logistics. (Compl. ¶ 3.)

Eddystone states that Defendants stripped BTS of all of the assets on its balance sheet and transferred them to Ferrellgas entities. Then, according to Eddystone, they abrogated the arrangement by which Bridger Logistics had paid amounts BTS owed under the Eddystone Contract. Eddystone further alleges that, in order to put distance between them and BTS before the inevitable default on its obligations to Eddystone, they sold BTS to Jamex Transfer Holdings ("JTH"), a newly formed shell company. Under the sale agreement, Eddystone asserts that this asset-less and revenue-less new company assumed the obligation to fund minimum volume commitment payments in the future. Eddystone further asserts that Defendants knew that JTH had no ability to fund minimum volume commitment payments. Stripped of its assets and cut off from its source of funding, Eddystone states that BTS promptly defaulted on its obligations to it.

Eddystone filed its Complaint on February 2, 2017.[5] The Complaint includes the following counts: Count I - Alter Ego; Count II - Intentional Fraudulent Transfer (12 Pa. C.S. § 5104(a)); Count III - Constructive Fraudulent Transfer (12 Pa. C.S. § 5105); and Count IV - Breach of Fiduciary Duties of Care and Loyalty to Creditors. (See Compl.) It alleges that Defendants' supposed manipulation of a shell entity as an instrumentality for the purpose of obtaining the fruits of the Eddystone Contract without bearing any of its burdens makes them liable as alter egos of BTS. Moreover, it claims that Defendants' alleged decision to strip BTS of its assets, abrogate the course of dealing by which Bridger Logistics paid the minimum volume commitment charges of BTS, and then purport to transfer that obligation to an insolvent entity gives rise to fraudulent transfer liability. Furthermore, it alleges that, because BTS was

---

[5] "Under the United States Constitution, the federal judicial power encompasses 'all Cases of admiralty and maritime Jurisdiction.'" Hargus v. Ferocious & Impetuous, LLC, 840 F.3d 133, 136 (3d Cir. 2016) (quoting U.S. Const. art. III, § 2, cl. 1.). "Congress codified that jurisdiction at 28 U.S.C. § 1333(1), which provides that federal district courts have original jurisdiction over '[a]ny civil case of admiralty or maritime jurisdiction.'" Id. (quoting 28 U.S.C. § 1333(1)).

purportedly well within the zone of insolvency with obligations to Eddystone far in excess of its actual assets or cash flow, Defendants owed fiduciary duties to manage BTS in the interests of its creditor, Eddystone. Instead, Defendants supposedly used their control over BTS to exploit it for their own benefit, and to the detriment of Eddystone, in violation of their fiduciary duties.

Rios and Gamboa deny Eddystone's allegations, and move to dismiss Eddystone's Complaint on several grounds, which include a failure to state a claim and lack of personal jurisdiction. Regarding personal jurisdiction, Defendants assert that they both are residents of Texas who have not paid taxes in Pennsylvania, own no real or personal property in Pennsylvania, and maintain no bank accounts or licenses in Pennsylvania. (Defs.' Mot. to Dismiss at 8) (citing Ex. A (Declaration of Julio Rios) ("Rios Decl.") ¶ 2; Ex. B (Declaration of Jeremy Gamboa) ("Gamboa Decl.") ¶ 2.)[6] They also argue that they are shielded by the fiduciary shield doctrine because Eddystone's claims are asserted against them solely in their corporate roles, and their only contacts with Pennsylvania were in their corporate capacities. (See id.)

For the reasons set forth below, the Motion to Dismiss by Rios and Gamboa based upon a lack of personal jurisdiction is denied. Likewise, Rios and Gamboa's Motion to Dismiss based

---

[6]Rios and Gamboa move for dismissal based on Federal Rule of Civil Procedure 12(b)(2). (Defs.' Mot. to Dismiss at 5.) Once a defendant raises a jurisdictional defense, the plaintiff "must prove by affidavits or other competent evidence that jurisdiction is proper." Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009) (citation omitted). Where, as here, the district court does not hold an evidentiary hearing, "a plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004). However, the plaintiff may not rely on the pleadings alone and "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Patterson by Patterson v. F.B.I., 893 F.2d 595, 604 (3d Cir. 1990). In this case, Eddystone has submitted a sworn declaration of Jeffrey M. Theodore, Esq. ("Theodore Decl."), an attorney representing Eddystone who reviewed emails between Rios, Gamboa and Eddystone personnel, attesting to the facts that form the basis of the jurisdictional analysis below. (See Pl.'s Response Opp'n Defs.' Mot. to Dismiss; Theodore Decl.) As a result, Eddystone has provided sufficient evidence to overcome Defendants' Motion.

upon a failure to state a claim, as well as the Motion to Dismiss for failure to state a claim filed by Bridger Logistics and Ferrellgas, are denied as meritless at this stage of the litigation.

## II. DISCUSSION

### A. Motion to Dismiss For Lack of Personal Jurisdiction

#### 1. Specific Jurisdiction

"Federal courts . . . may exercise personal jurisdiction over nonresident defendants to the extent provided by the law of the state in which the federal court sits." Penco Prods., Inc. v. WEC Mfg., LLC, 974 F. Supp. 2d 740, 746 (E.D. Pa. 2013) (citation omitted). "Pennsylvania's Long-Arm Statute allows personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the Fourteenth Amendment." Id. (citing 42 Pa. Cons. Stat. Ann. § 5322(b); Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992)). "Under this standard, nonresident defendants are required to have minimum contacts with Pennsylvania so as not to offend traditional notions of fair play and substantial justice." Id. (citing Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). "There are two types of personal jurisdiction: general and specific."[7] Id. (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 & n.9 (1984)).

Regarding specific jurisdiction, the United States Court of Appeals for the Third Circuit ("Third Circuit") has provided a clear summary of this jurisdictional analysis, noting:

> [t]he inquiry as to whether specific jurisdiction exists has three parts. First, the defendant must have "purposefully directed [its] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with fair play and substantial justice."

---

[7] The parties only argue about specific jurisdiction; therefore, we limit our analysis to specific jurisdiction.

O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) (internal citations omitted).

Eddystone has made a prima facie showing of specific jurisdiction over Rios and Gamboa for each claim.[8]  First, it is clear that Rios and Gamboa both purposefully directed their activities at Pennsylvania.  As set forth by Eddystone, "Rios and Gamboa devised and managed an entire shipping operation in the state."  (Pl.'s Response Opp'n Defs.' Mot. to Dismiss at 42.)  Eddystone goes on to argue that both Rios and Gamboa:

> (1) developed and carried out a plan to transport oil into Pennsylvania, transload it at the Pennsylvania transloading facility at issue in this litigation, and deliver it to a refinery in Trainer, Pennsylvania, Compl. ¶ 3; (2) negotiated and executed a series of contracts with Eddystone and Monroe in Pennsylvania to accomplish this, Compl. ¶¶ 2, 21–25, 36; (3) executed a series of transactions to [allegedly] impede a Pennsylvania creditor from collecting its lawful debts, Compl. ¶¶ 7–10, 48–50; (4) repeatedly visited and toured the Eddystone facility and Monroe refinery in Pennsylvania and had extensive telephonic and email communications with Eddystone personnel, [Canopy Prospecting, Inc.] personnel, and Monroe personnel in Pennsylvania to manage their business shipping crude oil through the state, negotiate with railroads and other counter-parties, market the capacity Bridger controlled at the Facility, and, ultimately, [allegedly] structure the transactions designed to prevent Eddystone from recovering the sums due under the RSA.[9]

---

[8] "Though specific jurisdiction must ordinarily be analyzed claim-by-claim, it is not 'necessary to do so in all multiple claim cases.'"  Phila. Prof'l Collections, LLC v. Young, No. 10-724, 2010 WL 5257651, at *4 n.59 (E.D. Pa. Dec. 22, 2010) (quoting Remick v. Manfredy, 238 F.3d 248, 255-56 (3d Cir. 2001)).  Here, Eddystone's claims for Alter Ego, Intentional Fraudulent Transfer (12 Pa. C. S. § 5104(a)), Constructive Fraudulent Transfer (12 Pa. C.S. § 5105), and Breach of Fiduciary Duties of Care and Loyalty to Creditors all factually overlap since each claim is based upon the Eddystone Contract and the alleged orchestration of a series of transactions to prevent Eddystone from recovering the amounts it was supposedly due under that agreement.  Consequently, it is unnecessary to conduct a separate jurisdictional inquiry as to each claim.  Id. (citing O'Connor, 496 F.3d at 318 n.3 (loss of consortium claim factually overlaps with, and is derivative of, negligence claim and does not require separate analysis); CDV Mgmt., LP v. Integrated Airline Servs., No. 04-4173, 2005 WL 230630, at *1, *4-5 (E.D. Pa. Jan. 31, 2005) (analyzing specific jurisdiction for breach and unjust enrichment claims together)).  Nevertheless, we conclude that there is specific jurisdiction over both Rios and Gamboa regarding each individual claim because their contacts show that they purposely directed their activities towards Pennsylvania, each claim arises out of those activities, and exercising personal jurisdiction comports with the notions of fair play and substantial justice.  See O'Connor, 496 F.3d at 317.

[9] Eddystone also points out the following:

6

(Id. at 41; Theodore Decl.; Exs. 1-11.)  Specifically, the Theodore Declaration, which includes exhibits of various relevant emails, states that "Rios and Gamboa directed dozens or hundreds of email exchanges as well as telephone calls to Eddystone personnel in Pennsylvania, and made several in-person visits to the state."  (Id. ¶ 2.)  According to Theodore, "[t]hese emails reflect that Rios and Gamboa travelled to Pennsylvania repeatedly in order to meet with Eddystone, give tours of the facility, and direct the operations of Bridger Transfer Services and its affiliates." (Id. ¶ 3.)  Significantly, neither Rios nor Gamboa contest the veracity of the claims made in the Theodore Declaration or its exhibits.  In light of the aforementioned, we conclude that the first prong is met because Rios and Gamboa purposefully directed their activities at Pennsylvania.  Second, regarding the "arise out of or relate to" prong, there is no doubt that Eddystone's claims all arise out of those activities and transactions in Pennsylvania.

Third, the extension of personal jurisdiction comports with fair play and substantial justice because Rios and Gamboa's alleged actions represent a concerted effort to engage Eddystone in Pennsylvania and to induce it to take specific actions that they knew would cause harm in its home state.[10]  In determining whether exercising jurisdiction over Rios and Gamboa

---

> [Defendants] make no affirmative denial that they had contacts with Pennsylvania during the 2016 time period in which they wound up their crude oil operation in the state and made plans to sell BTS to Jamex Transfer Holdings.  Rios and Gamboa's counterparty was the Monroe Energy refinery in Trainer, Pennsylvania.  Compl. ¶¶ 24, 25.  The contract that they negotiated to suspend in 2016 was a contract to deliver crude oil to that Pennsylvania refinery.  Compl. ¶¶ 24, 36, 47.  BTS, the entity that they [allegedly] cut off from funding and transferred, was transloading crude oil in Pennsylvania and the RSA obligations that Rios and Gamboa were thereby [allegedly] evading were to a transloading facility in Eddystone, Pennsylvania.  Compl. ¶¶ 22, 23.

(Pl.'s Surreply at 18-19.)

[10]Rios and Gamboa do not present any substantive argument pertaining to the "fair play and substantial justice" prong.  (Defs.' Mot. to Dismiss at 15.) ("Because Rios and Gamboa do not have sufficient minimum contacts to warrant exercising personal jurisdiction over them in this court under the first two elements of the specific jurisdiction test, no fair-play inquiry is necessary.")  In their Reply, they argue that "[f]ar from not disputing that the exercise of jurisdiction would comport with fair play and substantial justice, any exercise of jurisdiction would

comports with traditional notions of fair play and substantial justice, the following four factors are generally addressed: "'the burden on the defendant; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'" Miller Yacht Sales, Inc., 384 F.3d at 97 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). "Pennsylvania has a strong interest in deterring actors from committing torts within its territory." FFR SE, LLC v. Sanborn, No. 14-5439, 2015 WL 3970923, at *6 (E.D. Pa. June 30, 2015) (citing Sullick v. United Pet Grp., Inc., No. 14-2950, 2015 WL 3643988, at *8 (E.D. Pa. June 12, 2015)). We acknowledge that it will be a burden for Rios and Gamboa, who are from Texas, to litigate in Pennsylvania; however, "allowing [them] to reap the benefit of conducting business in Pennsylvania 'while leaving an injured plaintiff remediless is fundamentally unjust.'" Id. (citing Merced v. Gemstar Grp., Inc., No. 10-3054, 2011 WL 5865964, at *5 (E.D. Pa. Nov. 22, 2011)).

Rios and Gamboa could reasonably foresee that their contacts with Eddystone in Pennsylvania would cause its injuries there; therefore, they could reasonably foresee being haled into a Pennsylvania court. See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987) ("The nature of these contacts must be such that the defendant should be reasonably able to anticipate being haled into court in the forum state."). Their contacts with Pennsylvania were instrumental in both the formation of the Eddystone Contract (which created a continuing relationship with Eddystone within Pennsylvania for more than five years) and the alleged scheme to get out of the agreement, both of which form the foundation of this case. Each claim involved in this litigation arises from the activities of Rios and Gamboa in

---

constitute such a violation of fair play and substantial justice that the Court can resolve the jurisdictional issue before even reaching this second level of inquiry." (Defs.' Am. Reply at 13.)

Pennsylvania, and the exercise of jurisdiction in this case comports with fair play and substantial justice. While Rios and Gamboa may face some inconvenience since their home state is Texas, we find that Eddystone's interest in obtaining the most efficient resolution of its controversies, as well as Pennsylvania's interest in adjudicating this dispute, favor Pennsylvania as a reasonable forum. See O'Connor, 496 F.3d at 324-25 ("[W]hen minimum contacts exist, due process demands no more than a reasonable forum."). As such, Rios and Gamboa have not presented any evidence to support a showing of unfairness, and they have failed to meet their burden of presenting a compelling case that jurisdiction is unreasonable. Therefore, we hold that jurisdiction in Pennsylvania "comport[s] with fair play and substantial justice." See id. at 496 F.3d at 317; Burger King, 471 U.S. at 476.

We conclude that Rios and Gamboa have significant minimum contacts with Pennsylvania to support personal jurisdiction. They purposely directed their activities towards Pennsylvania, Eddystone's claims arise out of those activities, and exercising personal jurisdiction comports with the notions of fair play and substantial justice. Consequently, we find that we have personal jurisdiction over Rios and Gamboa regarding all of the claims in this matter.

### 2. *Fiduciary Shield Doctrine*

Rios and Gamboa additionally argue that jurisdiction over them is improper because of the "fiduciary shield doctrine," which sets forth "[a]s a general rule, individuals performing acts in a state in their corporate capacity are not subject to personal jurisdiction of the courts of that state of those acts."[11] D & S Screen Fund II, A v. Ferrari, 174 F. Supp. 2d 343, 347 (E.D. Pa.

---

[11]"The fiduciary shield doctrine is not established law in [the] Third Circuit. . . ." Schley v. Microsoft Corp., No. 08-3589, 2008 WL 5075266, at *11-12 (D.N.J. Nov. 24, 2008), amended, No. 08-3589, 2009 WL 197568 (D.N.J. Jan. 23, 2009); compare Cerciello v. Canale, 563 F. App'x 924, 927-28 (3d Cir. 2014) ("This so-called 'corporate shield' doctrine sometimes protects defendants who are thus sued in their individual capacities for what are

2001) (citation omitted).  "Where, however, the corporate officer engages in tortious conduct in his or her corporate capacity in the forum state, personal liability may attach." Id. (citations omitted); see also Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc., 885 F. Supp. 2d 767, 785 (E.D. Pa. 2012) (finding personal jurisdiction over chief executive officer for alleged participation in torts).  "Accordingly, courts have refused to permit a corporate officer to invoke the shield when the officer was involved in tortious conduct for which he or she could be held personally liable." Id. (citation omitted).  "Using a case-by-case approach to determine whether corporate contacts should be considered for personal jurisdiction over an officer, courts analyze the following factors: (1) the officer's role in the corporate structure; (2) the quality of the officer's contacts; and (3) the nature and extent of the officer's participation in the alleged tortious conduct." Id. (citations omitted).

With respect to the roles of Rios and Gamboa in the corporate structure, at the time of the alleged conduct, both Defendants held senior level positons.  "Gamboa was employed at Ferrellgas, Inc. - the General Partner of Ferrellgas, L.P. - initially as a Senior Vice-President, then later as an Executive Vice-President, and was also employed as the Chief Operating Officer of Bridger Logistics. . . .  Rios was employed by Ferrellgas, Inc. as an Executive Vice President, and by Bridger Logistics as President and Chief Executive Officer."  (Defs.' Mot. to Dismiss at 8) (citing Gamboa Decl. ¶ 3; Rios Decl. ¶ 3.)

Regarding the quality of Rios and Gamboa's contacts with Pennsylvania, the Complaint sets forth that Rios and Gamboa were the top executives at BTS and Bridger Logistics and high-

---

corporate acts."), with FlagHouse, Inc. v. ProSource Dev., Inc., 528 F. App'x 186, 189 n.4 (3d Cir. 2013) ("Because New Jersey law provides for personal jurisdiction to the fullest extent allowed by the Due Process Clause, and because the Supreme Court has held that it does not violate due process to find personal jurisdiction based solely on contacts made in an employee's official capacity, there is no basis for the fiduciary shield doctrine to apply in this case and no need to undertake the participation theory analysis engaged in by the District Court.").  However, even in courts where the fiduciary shield doctrine has been applied, it would not necessarily bar the extension of jurisdiction over Rios and Gamboa because of the tort exception, which applies in our case.

ranking executives at Ferrellgas with responsibility over this matter.  (Compl. ¶¶ 31-77.) According to the Theodore Declaration, Rios and Gamboa sought to exercise complete personal control over the transloading business at Eddystone and the relationship with Monroe.  (Pl.'s Response Opp'n Defs.' Mot. to Dismiss at 45; Theodore Decl. ¶ 12; Ex. 11.)  As pointed out by Eddystone, "[b]oth engaged in extensive negotiations with Eddystone in Pennsylvania, made repeated trips to the state, marketed the facility, and directed their efforts into Pennsylvania." (Id.) (citing Theodore Decl.; Exs. 1-11.)  We find these contacts are sufficient to weigh in favor of the exercise of personal jurisdiction by this Court.

As for the third factor, Rios and Gamboa argue that their contacts with Pennsylvania pertaining to the creation of the RSA, and the management of the relationship therefrom, preceded the asset transfer and have no relevance to the claims in this case.  (Defs.' Am. Reply at 10-12.)  However, as Eddystone correctly points out, "[t]he claims in this case arise out of the breach of the obligations in the RSA, which [allegedly] occurred when the economics of Rios and Gamboa's crude oil business soured and they came up with a scheme to avoid the obligations that they had negotiated with Eddystone *in Pennsylvania*."  (Pl.'s Surreply at 18.) (citing Pl.'s Response Opp'n Defs.' Mot. to Dismiss at ¶¶ 4-12.)  It further points out that "[t]he asset transfer was [allegedly] only the culmination of Rios and Gamboa's years-long scheme to make use of Eddystone's transloading capacity for their own purposes while evading the obligations in the RSA."  (Id.) (citing Compl. ¶¶ 21, 32, 48-50.)  According to Eddystone, "[u]sing their authority as CEO and COO of Bridger Logistics, and then as the Ferrellgas Executive Vice Presidents responsible for Bridger Logistics' business, Rios and Gamboa [allegedly] directed the entire scheme."  (Pl.'s Surreply at 17.) (citing Pl.'s Response Opp'n Defs.' Mot. to Dismiss at 45-46; Compl. ¶¶ 19, 21, 28, 32, 35, 37, 38, 46, 53, 58, 63, 64, 66.)

It is clear that both Rios and Gamboa had quality contacts with Pennsylvania, and directly participated in or directed the tortious conduct alleged in the Complaint. We reject the corporate shield defense; therefore, Rios and Gamboa are subject to this Court's personal jurisdiction in their individual capacities for their personal participation in the tortious conduct charged.

B. <u>Motions to Dismiss For Failure to State A Claim</u>

Regarding the dismissal of Eddystone's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), we have thoroughly examined all of the arguments presented by the parties, including, *inter alia*, the piercing of the corporate veil argument.[12] After carefully considering all of the arguments, and accepting all of the factual allegations in the Complaint as true, we conclude that the Complaint clearly and adequately alleges claims against each Defendant for Alter Ego, Intentional Fraudulent Transfer (12 Pa. C. S. § 5104(a)), Constructive Fraudulent Transfer (12 Pa. C. S. § 5105), and Breach of Fiduciary Duties of Care and Loyalty to Creditors. Finding that the Complaint clearly alleges colorable claims after drawing all reasonable inferences from the Complaint in favor of Eddystone, we deny Defendants' Motions to Dismiss at this stage of the litigation.

---

[12]Pursuant to Federal Rule of Civil Procedure 12(b)(6), the defendant bears the burden of demonstrating that the plaintiff has failed to set forth a claim from which relief may be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).

## III. CONCLUSION

We have specific jurisdiction over Rios and Gamboa; therefore, their Motion to Dismiss for lack of personal jurisdiction is denied.  After careful consideration of the Motions to Dismiss based upon a failure to state a claim filed by Rios and Gamboa, as well as Bridger Logistics and Ferrellgas, we find that Eddystone's Complaint clearly and adequately alleges colorable claims against each Defendant for Alter Ego, Intentional Fraudulent Transfer (12 Pa. C. S. § 5104(a)), Constructive Fraudulent Transfer (12 Pa. C.S. § 5105), and Breach of Fiduciary Duties of Care and Loyalty to Creditors.  As such, Defendants' Motions to Dismiss are denied.

An appropriate Order follows.