**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:17-cv-00495-RK |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANTS FERRELLGAS PARTNERS, L.P. AND FERRELLGAS, L.P.'S ANSWER**
**AND DEFENSES TO COMPLAINT AND COUNTERCLAIMS**

Jeffery A. Dailey (I.D. No. 85993)
AKIN GUMP STRAUSS HAUER &
FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, PA 19103

David M. Zensky (*pro hac vice*)
Katherine P. Porter (*pro hac vice*)
Kelly A. Eno (*pro hac vice*)
AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park
New York, New York 10036

*Counsel for Defendants Ferrellgas Partners, L.P., and Ferrellgas, L.P.*

Defendants Ferrellgas Partners, L.P. ("FGP") and Ferrellgas, L.P. ("FG") (collectively, "Ferrellgas" or the "FG Defendants"), by and through their undersigned counsel, hereby answer the numbered paragraphs of the Complaint of Plaintiff Eddystone Rail Company, LLC ("ERC" or "Plaintiff"), as set forth below.[1]

## INTRODUCTORY STATEMENT

The Complaint contravenes the Federal Rules of Civil Procedure by improperly combining factual allegations with legal conclusions and argument.  Many of the Complaint's allegations are overly broad, vague, conclusory and/or contain terms that are undefined or susceptible to different meanings.  Accordingly, by way of general response, all allegations in the Complaint are denied unless expressly and specifically admitted.  Any factual allegation admitted below is only admitted as to the specific facts and not as to any conclusions, characterizations, implications, rhetoric or speculation contained in the allegation or the Complaint as a whole.  For ease of reference, section headings and sub-headings from the Complaint have been copied into this Answer.  No response to these headings is required, but to the extent a response is required, the FG Defendants deny them.

Unless otherwise noted, the FG Defendants deny knowledge or information sufficient to form a belief as to the truth of any allegation relating to any other entity, including but not limited to Bridger, LLC and the Bridger Group.  The Complaint contains numerous allegations relating to alleged conduct of non-specific "Defendants."  Unless otherwise noted, the FG Defendants deny knowledge or information sufficient to form a belief as to the truth of any allegation relating to any other Defendant in the litigation.

The FG Defendants respectfully submit that the Complaint contains numerous purported

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the *Memorandum of Law in Support of Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Motion to Dismiss Plaintiff's Complaint*.  [ECF No. 35-1.]

allegations that lack any specific time frame or contain generalized descriptions of purported

conduct of the FG Defendants, Bridger Logistics, LLC ("Logistics"), Bridger Transfer Services,

LLC ("BTS") and other entities over a number of years, during which time periods such entities

had varying corporate structures and relationships.  Unless otherwise noted, the FG Defendants

deny knowledge or information sufficient to form a belief as to the truth of any allegation

pertaining to (i) Logistics' and BTS's alleged conduct prior to June 24, 2015 and (ii) BTS's

alleged conduct after BTS was sold to Jamex Transfer Holdings, LLC ("JTH") in February 2016

and the FG Defendants ceased owning any indirect equity ownership interests or partnership

interests, and exercised no control over, BTS.

      The FG Defendants further respectfully submit that the Complaint contains numerous

purported allegations that constitute legal conclusions.  The FG Defendants are not required to

respond to legal conclusions in their Answer, but to the extent a response is required, the FG

Defendants deny such allegations, unless otherwise stated.

      The Complaint contains multiple references to purported descriptions and/or summaries

of, and purported quotations from, various documents, including contracts and SEC filings.  In

appropriate cases, the FG Defendants respectfully refer the Court to the relevant documents for a

description of their contents without admitting the truth, completeness, or accuracy thereof, the

admissibility of those documents, or whether Plaintiff was permitted to use such documents in

drafting its Complaint.  Where defined terms are used in the Complaint, they are sometimes

repeated in the Answer for ease of reference, except where otherwise defined herein.

      This Answer is based on the present knowledge of and information available to

employees of the FG Defendants.  The FG Defendants reserve their right to amend this Answer,

including to assert any additional defenses or affirmative defenses, based on information or facts obtained through discovery or other means during the pendency of this case.

The comments and objections in this Introductory Statement are incorporated into each numbered paragraph of this Answer.

## SPECIFIC RESPONSES

### NATURE OF THIS ACTION

1.      The FG Defendants admit that Plaintiff purports to bring this action, but deny the remaining allegations contained in Paragraph 1.

2.      The FG Defendants admit that they either held indirect equity interests or partnership interests in BTS for approximately seven (7) months, beginning in June 2015 and ending in February 2016, but deny the remaining allegations contained in the first sentence of Paragraph 2.  The FG Defendants respectfully refer the Court to the Eddystone Rail Facilities Services Agreement (the "RSA") referenced in the second and third sentences of Paragraph 2 for an accurate recitation of the terms of that contract; to the extent an additional response is required, the FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second and third sentences of Paragraph 2, and therefore deny such allegations.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the fourth sentence of Paragraph 2 and therefore deny such allegations.

3.      The FG Defendants admit that they held either indirect equity interests or partnership interests in BTS for approximately seven (7) months, beginning in June 2015 and ending in February 2016, and that they held equity interests and/or partnership interests, or had a managerial role, in Logistics from June 24, 2015 to the present, and admit that, between June 24, 2015 and February 1, 2016, Logistics was an equity owner of BTS and that BTS delivered oil to

4

ERC to be transloaded at the facility in Eddystone, Pennsylvania, but deny the remaining allegations contained in the first sentence of Paragraph 3.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second, third and fourth sentences of Paragraph 3 and therefore deny such allegations.  Upon information and belief, the FG Defendants admit that North Dakota wellhead prices were lower than the "Brent benchmark" crude at certain times, which allowed for profits, but deny the remaining allegations contained in the fifth and sixth sentences of Paragraph 3.

4.      The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 4 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, the FG Defendants deny the allegations contained in Paragraph 4 for the time period of June 24, 2015 to January 2016.

5.      The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of Paragraph 5 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that BTS provided its transloading capacity at Eddystone's facility to, *inter alia*, Logistics, and admit that Logistics was able to deliver some crude to a refinery in Trainer, Pennsylvania, but deny the remaining allegations contained in the first sentence of Paragraph 5.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of Paragraph 5 for the time period prior to June 24, 2015 and therefore deny such allegations for that time period; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants

admit that at certain times prior to February 2016, Logistics compensated BTS for the services it provided to Logistics and that BTS made or directed payments to be made to ERC under the RSA, but deny the remaining allegations contained in the second sentence of Paragraph 5.  The third sentence of Paragraph 5 states a legal conclusion to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the third sentence of Paragraph 5.

6.      The FG Defendants admit that petroleum prices changed at various times in 2015 and 2016, but deny the remaining allegations contained in the first sentence of Paragraph 6.  The FG Defendants deny the allegations contained in the second and fifth sentences of Paragraph 6.  Upon information and belief, the FG Defendants deny the allegations contained in the third and fourth sentences of Paragraph 6.

7.      Upon information and belief, the FG Defendants admit that in January 2016, Logistics entered and/or consented to certain agreements that modified certain prior arrangements for a short period of time and respectfully refer the Court to the January 13, 2016 letter agreements for an accurate recitation of the contents of those documents, and admit that BTS was sold to JTH effective February 1, 2016, but deny the remaining allegations contained in Paragraph 7.

8.      Paragraph 8 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 8.

9.      Paragraph 9 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 9.

10.      Paragraph 10 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 10.

## THE PARTIES

11.     Upon information and belief, the FG Defendants admit the allegations contained in Paragraph 11.

12.     Upon information and belief, the FG Defendants admit the allegations contained in Paragraph 12.

13.     The FG Defendants admit the allegations contained in Paragraph 13.

14.     The FG Defendants admit the allegations contained in Paragraph 14.

15.     The FG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore deny such allegations.

16.     The FG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and therefore deny such allegations.

## JURISDICTION

17.     Paragraph 17 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 17.

18.     Paragraph 18 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 18.

## FACTUAL ALLEGATIONS

19.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first, second, third and fifth sentences of Paragraph 19, and therefore deny such allegations.  Upon information and belief, the FG Defendants admit that Bridger, LLC had various subsidiaries, but lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in the fourth sentence of Paragraph 19 and therefore deny such allegations.  The FG Defendants lack

knowledge or information sufficient to form a belief about the truth of the allegations contained in the sixth sentence of Paragraph 19 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that at certain times prior to February 1, 2016, Logistics was an equity owner of BTS, but deny the remaining allegations contained in the sixth sentence of Paragraph 19.  The seventh sentence of Paragraph 19 states a legal conclusion to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the seventh sentence of Paragraph 19.

20.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 20 and therefore deny such allegations.

21.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first and second sentences of Paragraph 21, and therefore deny such allegations.  Upon information and belief, the FG Defendants admit that BTS executed the RSA in February 2013 but deny the remaining allegations contained in the third sentence of Paragraph 21.

22.     The FG Defendants respectfully refer the Court to the RSA cited in Paragraph 22 for an accurate recitation of the terms of that contract; to the extent an additional response is required, the FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 22, and therefore deny such allegations.

23.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of Paragraph 23 and therefore deny such allegations.  Upon information and belief, the FG Defendants deny the allegations

contained in the second sentence of Paragraph 23.  The third sentence of Paragraph 23 states a legal conclusion to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the third sentence of Paragraph 23.

24.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of Paragraph 24 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants deny the allegations contained in the first sentence of Paragraph 24. Upon information and belief, the FG Defendants admit that Bridger Marketing, LLC signed a deal in June 2014 to acquire and deliver crude to Monroe Energy, LLC, but lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in the second sentence of Paragraph 24 and therefore deny such allegations.  Upon information and belief, the FG Defendants admit the allegations contained in the third sentence of Paragraph 24.

25.     The FG Defendants respectfully refer the Court to the 2014 Crude Oil Supply Agreement (the "COSA") by and between Bridger Marketing, LLC and Monroe Energy, LLC, dated July 1, 2014, for an accurate recitation of the terms of that contract.  To the extent an additional response is required, the FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 25 and therefore deny such allegations.

26.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of Paragraph 26 and therefore deny such allegations.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of Paragraph 26 for the

time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that Logistics and certain of its subsidiaries arranged for the transportation of crude oil shipments from, among other places, North Dakota, to, among other facilities, the Eddystone facility, by rail and barges, as well as by other means, and transported them down the Delaware River, among other places, but deny the remaining allegations contained in the second sentence of Paragraph 26.

27.     The first sentence of Paragraph 27 states legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the first sentence of Paragraph 27.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second and third sentences of Paragraph 27 and therefore deny such allegations.

28.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 28 and therefore deny such allegations.

29.     Paragraph 29 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 29.

30.     The first and second sentences of Paragraph 30 state legal conclusions to which no response is required; to the extent a response is required, upon information and belief, the FG Defendants deny the allegations contained in the first and second sentences of Paragraph 30. The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the third sentence of Paragraph 30 and therefore deny such allegations.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the fourth sentence of Paragraph 30 for the time periods

prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that at certain times prior to February 1, 2016, Logistics was an equity owner of BTS, but deny the remaining allegations contained in the fourth sentence of Paragraph 30.

31.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first, second and third sentences of Paragraph 31 and therefore deny such allegations.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the fourth sentence of Paragraph 31 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants deny the allegations contained in the fourth sentence of Paragraph 31.

32.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of Paragraph 32 and therefore deny such allegations.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second, third and fourth sentences of Paragraph 32 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that at certain times prior to February 2016, Logistics compensated BTS for the services it provided to Logistics and that BTS made or directed payments to be made to ERC under the RSA, but deny the remaining allegations contained in the second, third and fourth sentences of Paragraph 32.

33.     The first and second sentences of Paragraph 33 state legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the first and second sentences of Paragraph 33.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the third sentence of Paragraph 33 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that Logistics used BTS's services to deliver oil to the Eddystone facility, but deny the remaining allegations contained in the third sentence of Paragraph 33.

34.     The first sentence of Paragraph 34 states legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the first sentence of Paragraph 34.  The FG Defendants respectfully refer the Court to the RSA referenced in the second sentence of Paragraph 34 for an accurate recitation of the terms of that contract; to the extent an additional response is required, the FG Defendants deny the remaining allegations contained in the second sentence of Paragraph 34.  Upon information and belief, for the period prior to June 24, 2015, the FG Defendants deny the allegations contained in the third, fourth, fifth, sixth and eighth sentences of Paragraph 34; for the period from June 24, 2015 to February 1, 2016, the FG Defendants deny the allegations contained in the third, fourth, fifth, sixth and eighth sentences of Paragraph 34.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the seventh sentence of Paragraph 34 for the time periods prior to June 24, 2015 and therefore deny such allegations for those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit that at certain times prior to February

2016, Logistics compensated BTS for the services it provided to Logistics and that BTS made or directed payments to be made to ERC under the RSA, but deny the remaining allegations contained in the seventh sentence of Paragraph 34.

35.     The FG Defendants admit that in May and June 2015, FGP negotiated to acquire Logistics, but deny the remaining allegations contained in the first sentence of Paragraph 35. Upon information and belief, the FG Defendants admit that, after June 24, 2015, Monroe made separate payments for marketing services and logistics services, but otherwise deny the allegations contained in the second sentence of Paragraph 35.

36.     The FG Defendants respectfully refer the Court to the Amended COSA, the Transportation and Logistics Services Agreement by and between Logistics and Monroe Energy, LLC, dated May 26, 2015 (the "TLSA"), and the Transportation and Logistics Agreement by and between Bridger Marketing, LLC and Logistics, dated June 24, 2015 (the "TLA"), referenced in Paragraph 36 for an accurate recitation of the terms of those contracts.  To the extent an additional response is required, the FG Defendants deny the remaining allegations contained in Paragraph 36.

37.     The FG Defendants admit the allegations contained in the first and third sentences of Paragraph 37.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of Paragraph 37, and therefore deny such allegations.

38.     The FG Defendants admit that Rios and Gamboa joined FGP as part of the management team for Logistics but deny the remaining allegations contained in the first sentence of Paragraph 38.  Upon information and belief, the FG Defendants admit the allegations contained in the second sentence of Paragraph 38.

39.     Upon information and belief, the FG Defendants admit that between the time the COSA was amended and February 2016, Logistics utilized BTS's access to the Eddystone facility, and admit that Logistics compensated BTS for the services it provided to Logistics and that BTS made or directed payments to be made to ERC under the RSA, but deny the remaining allegations in Paragraph 39.

40.     The FG Defendants respectfully refer the Court to the June 1, 2015 presentation, FGP Form 8-K and FGP Form 10-K quoted and referenced in Paragraph 40 for an accurate quotation of their contents.  To the extent an additional response is required, the FG Defendants deny the remaining allegations contained in Paragraph 40.

41.     The FG Defendants respectfully refer the Court to the Form 8-K and FGP's consolidated financial statements cited in Paragraph 41 for an accurate quotation of their contents.  To the extent an additional response is required, the FG Defendants deny the remaining allegations contained in Paragraph 41.

42.     Upon information and belief, the FG Defendants admit that, for a certain period, Jamex Marketing, LLC continued in the business of acquiring and/or shipping crude oil for end users elsewhere, including its amended COSA with Monroe, until it became unable to do so due to ERC's material breaches of the RSA and bad faith conduct, but deny the remaining allegations contained in Paragraph 42.

43.     Upon information and belief, the FG Defendants admit the allegations contained in the first, second and fourth sentences of Paragraph 43.  Upon information and belief, the FG Defendants deny the allegations contained in the third sentence of Paragraph 43.

44.     Upon information and belief, the FG Defendants admit that Jamex Marketing, LLC began incurring losses, but denies the remaining allegations contained in the first sentence

of Paragraph 44.  Upon information and belief, the FG Defendants admit that by approximately the fall of 2015, Jamex Marketing, LLC informed Logistics that it wanted to negotiate certain terms of its contracts, but deny the remaining allegations in the second sentence of Paragraph 44.

45.     The FG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 and therefore deny such allegations.

46.     The FG Defendants deny the allegations contained in the first and fourth sentences of Paragraph 46 as they pertain to the FG Defendants; the FG Defendants deny, upon information and belief, the remaining allegations contained in the first and fourth sentences of Paragraph 46.  The FG Defendants deny the allegations contained in the second and third sentences of Paragraph 46.

47.     The FG Defendants respectfully refer the Court to the January 13, 2016 letter agreements referenced in the first sentence of Paragraph 47 for an accurate recitation of the contents of those documents; to the extent an additional response is required, the FG Defendants deny the allegations contained in the first sentence of Paragraph 47.  Upon information and belief, the FG Defendants admit the allegations contained in the second sentence of Paragraph 47.  The FG Defendants deny the allegations contained in the third sentence of Paragraph 47.

48.     The FG Defendants respectfully refer the Court to the January 13, 2016 letter agreements referenced in the first and second sentences of Paragraph 48 for an accurate recitation of the contents of those documents; to the extent an additional response is required, the FG Defendants deny the allegations contained in the first and second sentences of Paragraph 48.  The FG Defendants deny the allegations contained in the third and fourth sentences of Paragraph 48.

49.     The FG Defendants deny the allegations contained in the first sentence of Paragraph 49.  Upon information and belief, the FG Defendants deny the allegations contained in the second sentence of Paragraph 49.

50.     Upon information and belief, the FG Defendants admit the allegations contained in the first sentence of Paragraph 50.  Upon information and belief, the FG Defendants deny the allegations contained in the second sentence of Paragraph 50.  The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the third, fourth and fifth sentences of Paragraph 50 and therefore deny such allegations.

51.     Upon information and belief, the FG Defendants admit that ERC filed a demand for arbitration with the Society of Maritime arbitrators on April 19, 2016, but deny the remaining allegations contained in the first sentence of Paragraph 51.  Upon information and belief, the FG Defendants admit that ERC purported to seek an award for unpaid invoices that had accrued to date and for future minimum volume payments in light of BTS' alleged anticipatory breach of contract, but deny the remaining allegations contained in the second sentence of Paragraph 51. Upon information and belief, the FG Defendants admit that on January 5, 2017, ERC entered a settlement agreement with Jamex Marketing, LLC and James Ballengee whereby Jamex Transfer Services ("JTS") consented to an arbitration award, but deny the remaining allegations contained in the third sentence of Paragraph 51.

## COUNT ONE
### (Alter Ego)

52.     The FG Defendants repeat, re-allege and incorporate by reference every admission, denial and answer made in response to Paragraphs 1 through 51 above with the same force and effect as if fully set forth herein.

53.     Paragraph 53 states legal conclusions to which no response is required; to the extent a response is required, for the period prior to June 24, 2015, upon information and belief, the FG Defendants deny the allegations contained in Paragraph 53; for the period of June 24, 2015 to February 2016, the FG Defendants deny the allegations contained in Paragraph 53.

54.     Upon information and belief, for the time period of June 24, 2015 to February 1, 2016, the FG Defendants admit that BTS lacked adequate on-call liquid capital immediately to pay all possible deficiency payments under the full term of the RSA, but deny the remaining allegations contained in Paragraph 54; for the time period prior to June 24, 2015, upon information and belief, the FG Defendants deny the allegations contained in Paragraph 54.

55.     The FG Defendants deny the allegations contained in Paragraph 55.

56.     Upon information and belief, the FG Defendants deny the allegations contained in Paragraph 56.

57.     The first and second sentences of Paragraph 57 states legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the first and second sentences of Paragraph 57.  The FG Defendants deny the allegations contained in the third sentence of Paragraph 57.

58.     The FG Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of Paragraph 58 for the time periods prior to June 24, 2015 or after February 1, 2016 and therefore deny such allegations for

those time periods; upon information and belief, for the period of June 24, 2015 to February 1, 2016, the FG Defendants admit the allegations contained in the first sentence of Paragraph 58. Upon information and belief, the FG Defendants deny the allegations contained in the second and third sentences of Paragraph 58.

59.     Paragraph 59 states a legal conclusion to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 59.

60.     Paragraph 60 states a legal conclusion to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 60.

61.     Paragraph 61 states a legal conclusion to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 61.

**COUNT TWO**
**(Intentional Fraudulent Transfer – 12 Pa. C.S. § 5104(a))**

62.     The FG Defendants repeat, re-allege and incorporate by reference every admission, denial and answer made in response to Paragraphs 1 through 61 above with the same force and effect as if fully set forth herein.

63.     Paragraph 63 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 63.

64.     The first and second sentences of Paragraph 64 states legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the first and second sentences of Paragraph 64.  The FG Defendants admit that a subsidiary of Jamex Marketing acquired BTS in February 2016, but deny the remaining allegations contained in the third sentence of Paragraph 64.

65.     Paragraph 65 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 65.

66.     Paragraph 66 states legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 66.

    a.  The first and fourth sentences of Paragraph 66(a) state legal conclusions to which no response is required; to the extent a response is required, the FG Defendants deny the allegations contained in the first and fourth sentences of Paragraph 66(a). The FG Defendants admit that at certain times prior to February 1, 2016, Logistics was an equity owner of BTS, but deny the remaining allegations contained in the second sentence of Paragraph 66(a).  The FG Defendants admit that the FG Defendants have held an equity and/or partnership interest and/or managerial role in Logistics from the period of June 24, 2015 to the present, and admit that Rios and Gamboa were officers of Logistics between June 24, 2015 and November 28, 2016, but deny the remaining allegations contained in the third sentence of Paragraph 66(a).

    b.  The FG Defendants deny the allegations contained in Paragraph 66(b).

    c.  Upon information and belief, the FG Defendants admit that certain documents were not transferred to BTS's new owners, but deny the remaining allegations contained in Paragraph 66(c).

    d.  Paragraph 66(d) states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 66(d).

    e.  Paragraph 66(e) states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 66(e).

     f.   Paragraph 66(f) states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 66(f).

67.    Paragraph 67 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 67.

### COUNT THREE
### (Constructive Fraudulent Transfer – 12 Pa. C.S. § 5105)

68.    The FG Defendants repeat, re-allege and incorporate by reference every admission, denial and answer made in response to Paragraphs 1 through 67 above with the same force and effect as if fully set forth herein.

69.    Paragraph 69 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 69.

70.    Paragraph 70 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 70.

71.    Paragraph 71 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 71.

72.    Paragraph 72 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 72.

### COUNT FOUR
### (Breach of Fiduciary Duties of Care and Loyalty to Creditors)

73.    The FG Defendants repeat, re-allege and incorporate by reference every admission, denial and answer made in response to Paragraphs 1 through 72 above with the same force and effect as if fully set forth herein.

74.     Paragraph 74 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 74.

75.     Paragraph 75 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 75.

76.     Paragraph 76 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 76.

77.     Paragraph 77 states legal conclusions to which no response is required.  To the extent a response is required, the FG Defendants deny the allegations contained in Paragraph 77.

**PRAYER FOR RELIEF**

The FG Defendants deny that ERC is entitled to the relief requested in the first through seventh sentences in the Prayer for Relief, or any relief whatsoever.

**JURY DEMAND**

The FG Defendants admit that the Plaintiff purports to demand a jury trial as to all counts so triable, but deny that Plaintiff has the right to a jury trial because it asserts its claims under admiralty jurisdiction.

**DEFENSES**

Without admitting any wrongful conduct on the part of the FG Defendants and without conceding that the FG Defendants have the burden of proof on any of the following defenses, the FG Defendants assert the following defenses to the Complaint and reserve the right to add, alter, and/or amend their defenses as the course of discovery so requires.

Contract-based defenses pertaining to the RSA are wholly conditional upon, operational to the effect, and seek to impose liability on ERC only to the extent of, a finding of liability against the FG Defendants for damages due to ERC on any theory.

**First Defense**
**(Lack of Original Subject Matter Jurisdiction)**

The Plaintiff's claims are barred, in whole or in part, for a lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) because Plaintiff's claims do not concern maritime or admiralty law or an alleged breach of a maritime contract.

**Second Defense**
**(Lack of Supplemental Subject Matter Jurisdiction)**

The Plaintiff's claims are barred, in whole or in part, for a lack of supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) because they are not closely related to any claims within the original jurisdiction of this Court.  Plaintiff's claims for breach of fiduciary duties are further barred, in whole or in part, for a lack of supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(2) because Plaintiff's claims raise a complex issue of Louisiana state law.

**Third Defense**
**(Failure to State a Claim)**

The Plaintiff's claims for relief are barred, in whole or in part, because they fail to state a claim against the FG Defendants upon which relief may be granted.

**Fourth Defense**
**(No Causation)**

The Plaintiff's claims for relief are barred, in whole or in part, because the FG Defendants did not directly or proximately cause or contribute to any alleged damages, loss, or injury sustained by the Plaintiff, which harm allegedly occurred after Logistics had sold BTS to new owners.

**Fifth Defense**
**(No Liability)**

The Plaintiff's claims for relief are barred, in whole or in part, because the FG

Defendants did not control or have any equity or partnership interests in BTS at the time the RSA

was either entered or allegedly breached, and thus if Plaintiff suffered from any cognizable losses

or damages in connection with that breach, those losses or damages were not caused by the FG

Defendants.  Further, the FG Defendants are not liable for the alleged torts or conduct of BTS or

JTS.

**Sixth Defense**
**(Estoppel)**

The Plaintiff's claims are barred, in whole or in part, by estoppel because ERC and its

members and/or managers operated or operate in a manner similar to that alleged in the

Complaint.

**Seventh Defense**
**(No Fiduciary Duties Owed)**

The Plaintiff's claims for breach of fiduciary duties are barred, in whole or in part,

because the FG Defendants owe no fiduciary duties to BTS or to Plaintiff under applicable law.

**Eighth Defense**
**(No Standing to Bring Breach of Fiduciary Duty Claims)**

The Plaintiff's claims for breach of fiduciary duties are barred, in whole or in part,

because the Plaintiff does not have standing to assert such claims against the FG Defendants

under applicable law.

**Ninth Defense**
**(No Fraud)**

The Plaintiff's claims are barred, in whole or in part, because there was no fraud or

misrepresentation in connection with ERC's decision to enter the RSA.

**Tenth Defense**
**(Reasonably Equivalent Value)**

The Plaintiff's claims are barred, in whole or in part, because reasonably equivalent value was exchanged in good faith in or in connection with the Purchase and Sale Agreement by and between Logistics and JTH, and the Release and Guarantee Agreement between Logistics and Jamex Marketing, LLC, including but not limited to consents to waive non-compete agreements, the assignment of leases, modification of rights to deficiency payments under existing contracts relating to other aspects of shipping crude oil through the Eddystone facility, release by Jamex Marketing, LLC of valuable claims against Logistics related to inventory disputes concerning ERC or the Eddystone Facility, and costs of resolving other disputes over deficiency payments.

**Eleventh Defense**
**(Failure to Plead with Particularity)**

The Plaintiff's claims are barred, in whole or in part, because (i) the fraudulent transfer allegations have not been pled with particularity and (ii) the Plaintiff has not alleged that the FG Defendants are the transferees of any allegedly fraudulent transfer.  Further, Plaintiff's claims have failed to identify with particularity any specific fraudulent action of the FG Defendants.

**Twelfth Defense**
**(No Assets Fraudulently Transferred)**

The Plaintiff's claims are barred, in whole or in part, because any assets transferred from BTS were subject to valid liens and were not available for execution, satisfaction or collection by unsecured creditors such as ERC.

**Thirteenth Defense**
**(Duplicative Recovery)**

Any recovery or judgment against the FG Defendants must be reduced, diminished, and/or barred to the extent the Plaintiff seeks, has sought or recovered overlapping or duplicative recovery to the various claims against the FG Defendants or others, including through the

24

amount paid to Plaintiff pursuant to the Settlement Agreement settling the arbitration entitled

*Eddystone Rail Company, LLC v. Jamex Transfer Services, LLC*.  Further, to the extent that ERC

was sold or that the Eddystone facility was sold, leased, rented or otherwise contracted for use, in

whole or in part, any recovery or judgment against Logistics must be reduced by the amount of

such sale.

**Fourteenth Defense**
**(No Implied Contract)**

The Plaintiff's claims are barred, in whole or in part, because there was no "implied

contract" between BTS and Logistics for obligations owed to ERC under the RSA.

**Fifteenth Defense**
**(Proportionate Responsibility)**

Any recovery or judgment against the FG Defendants must be reduced, diminished

and/or barred to the percentage of responsibility, if any, assessed pursuant to the principles of

recoupment, proportionate responsibility, comparative fault, any settlement credit, and/or any

other applicable law or doctrine.

**Sixteenth Defense**
**(Assumption of Risk)**

The Plaintiff's claims are barred, in whole or in part, due, *inter alia*, to its knowing

assumption of the risk, upon entering the RSA with BTS, which expressly acknowledged such

risks, that BTS "may not have the ability to pay all" of its costs under the RSA or may have a

low credit rating, and its failure to obtain any up front parent or affiliate guarantees, collateral,

security or other means by which it could secure its ability to receive future payments from or on

behalf of BTS under the RSA and eliminate the credit risk involved in entering a five year and

two month contract with BTS, or the risk that commodity market conditions might change.  ERC

25

also failed to obtain any change-of-control or similar provision in the RSA that precluded

Logistics from selling BTS.

### Seventeenth Defense
### (Breach of Contract)

The Plaintiff's claims are barred, in whole or in part, because Plaintiff materially

breached the RSA.  To the extent liability is or may be imposed against the FG Defendants, it

must be reduced, diminished and/or barred in light of Plaintiffs' fraudulent misrepresentations

concerning and material breaches of the RSA that rendered the Eddystone facility largely

unusable, including but not limited to:  (i) the immense delays in the opening of the Eddystone

facility, (ii) the large granite pinnacle in the Delaware River that rendered the loading depth at

the Eddystone facility to 27 feet instead of the 34 feet represented by ERC, reachable only during

high tide, (iii) the four-hour loading window imposed by local transportation authorities, (iv) the

poor engineering of the Eddystone facility, including the "elbow" in the Eddystone facility's

piping, which slowed pumping processes to 10,000bph ("barrels per hour") from the 20,000bph

represented by ERC and unreasonably delayed the loading and unloading of trains, (v) the

insufficient fire suppression system in the Eddystone facility, (vi) the lack of industry-standard

custody transfer meters and (vii) ERC's bad faith rejection of an industry-standard financing

acknowledgement agreement, which ERC knew was necessary for BTS to be able to transship

crude oil through the Eddystone facility.

### Eighteenth Defense
### (Rescission)

The Plaintiff's claims are barred, in whole or in part, because ERC's conduct entitled

BTS to rescission of the RSA.  To the extent liability is or may be imposed against the FG

Defendants, it must be reduced, diminished and/or barred under the doctrine of rescission due to

ERC's conduct including, but not limited to:  (i) ERC's fraudulent misrepresentations concerning

the capacity of the Eddystone Facility, (ii) mistake, impracticability or frustration of purpose due to the numerous fundamental defects in the Eddystone facility, (iii) ERC's refusal to agree to an industry-standard financing agreement, which ERC knew was necessary for BTS and its customer(s) to be able to transship crude oil through the Eddystone facility.

**Nineteenth Defense**
**(Laches)**

The Plaintiff's claims for relief are barred, in whole or in part, by the doctrine of laches.

**Twentieth Defense**
**(Unclean Hands)**

The Plaintiff's claims for relief are barred, in whole or in part, by the doctrine of unclean hands and *in pari delicto*, to the extent that the Plaintiff has been guilty of inequitable conduct with respect to the matters alleged in the Complaint, and such actions bar the Plaintiff's recovery, including but not limited to (i) ERC entered into a collusive, sham settlement with JTS of its arbitration claims against JTS and (ii) ERC and its parents operated or operate in a manner similar to that alleged in the Complaint.

**Twenty-first Defense**
**(Ratification)**

To the extent liability is or may be imposed against the FG Defendants, the Plaintiff's claims are barred, in whole or in part, through the doctrines of waiver, ratification, knowledge, consent, acquiescence, estoppel and/or laches, by Plaintiff's continued reaffirmation of the terms of the RSA, including but not limited to Section 11 of the RSA, long after it knew, or should have known, how BTS operated or was financed, and/or how payments were being made under the RSA.

**Twenty-second Defense**
**(No Attorneys' Fees)**

The FG Defendants deny that the Plaintiff is entitled to attorneys' fees or costs under applicable law and, to the extent a judgment is issued against the FG Defendants premised on BTS's or JTS's breach of the RSA and the FG Defendants being the alter ego of either, such damages are barred by the terms of the RSA.

**Twenty-third Defense**
**(No Punitive Damages)**

Plaintiff is not entitled to punitive damages under the RSA and applicable law.

**Twenty-fourth Defense**
**(No Pre-Judgment Interest)**

The FG Defendants deny that the Plaintiff is entitled to pre-judgment interest.

**Twenty-fifth Defense**
**(Unjust Enrichment)**

The Plaintiff's claims are barred, in whole or in part, because any recovery by the Plaintiff against the FG Defendants would constitute unjust enrichment.

**Twenty-sixth Defense**
**(Speculative Damages)**

The Plaintiff's claims are barred, in whole or in part, because the losses or damages alleged are speculative, uncertain or otherwise not cognizable.

**Twenty-seventh Defense**
**(Failure to Mitigate)**

Any damage, loss or liability sustained by the Plaintiff (which the FG Defendant deny) must be reduced, diminished and/or barred in proportion to the Plaintiff's failure to mitigate, reduce, or otherwise avoid any alleged damages.

**Twenty-eighth Defense**
**(Preclusion of Claims)**

Any claims based on amounts allegedly owed to Plaintiff by BTS or JTS are barred

because ERC failed to seek to join the FG Defendants in the arbitration proceeding where the

existence and amount of damages owed by BTS or JTS, if any, was supposed to be established.

**Twenty-ninth Defense**
**(Exclusive Remedy)**

The Plaintiff's claims are barred, in whole or in part, because its election of contract-

based remedies under the RSA, including under Section 11, excludes an award of other, extra-

contractual equitable remedies.

## ADDITIONAL DEFENSES

By designating the aforementioned defenses, the FG Defendants do not in any way waive

or limit any defenses which are or may be raised by their denials and averments.  These defenses

are pled in the alternative, and are raised to preserve the rights of the FG Defendants to assert

such defenses, and are without prejudice to the FG Defendants' ability to raise other and further

defenses.  The FG Defendants expressly reserve all rights to re-evaluate their defenses and/or

assert additional defenses upon discovery and review of additional documents and information,

upon the development of other pertinent facts, and/or during pretrial proceedings in this action.

## COUNTERCLAIMS OF FERRELLGAS PARTNERS, L.P. AND FERRELLGAS, L.P.

If this Court finds Ferrellgas Partners, L.P. and/or Ferrellgas, L.P. (collectively, the "FG

Defendants"), liable under any theory for damages due to Eddystone Rail Company, LLC

("ERC") the FG Defendants hereby assert the following Counterclaims against ERC.

The following Counterclaims are wholly conditional upon, operational to the effect, and

seek to impose liability on ERC only to the extent of, a finding of liability against the FG

Defendants for damages due to ERC on any theory:

## PARTIES

1.      Defendant-counterclaim plaintiff FGP is a Delaware limited partnership, with its corporate headquarters in the state of Kansas.

2.      Defendant-counterclaim plaintiff FG is a Delaware limited partnership, with its corporate headquarters in the state of Missouri.

3.      Plaintiff-counterclaim defendant ERC is a limited liability company organized under the laws of Delaware with its principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

4.      To the extent there is subject matter jurisdiction over Plaintiff's claims, which the FG Defendants do not concede, there is also supplemental subject matter jurisdiction over the FG Defendants' Counterclaim under 28 U.S.C. § 1367(a) because the counterclaims are so related to the Plaintiff's claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.      To the extent venue is proper over Plaintiff's claims, which the FG Defendants do not concede, venue is similarly proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## BACKGROUND

### (a) THE FACILITY PROMISED BY ERC

6.      Upon information and belief,[2] in or about early 2012, ERC's precursor agents and affiliates began developing plans to convert a coal power plant with existing rail and marine docking infrastructure owned by Exelon Generation Company, LLC, into a facility that would transload crude oil shipped by rail onto barges for delivery to Philadelphia-area refineries.  Upon

---

[2] The FG defendants assert the allegations pertaining to the time period prior to June 24, 2015 upon information and belief and specifically incorporate by reference throughout these Counterclaims that all allegations pre-dating June 24, 2015 are upon information and belief, even if not expressly noted.

information and belief, after purportedly conducting due diligence on the project, ERC began

advertising to potential users that it was constructing a state-of-the-art, high speed crude oil

unloading facility with a barge loading terminal and distribution pipeline facilities.

7.      Upon information and belief, the facility was advertised as being capable of

transloading up to 80,000bpd ("barrels per day") with a planned pipeline distribution element

that would double its capacity to 160,000bpd.  Upon information and belief, ERC initially

claimed its "state-of-the-art" facility would be complete and ready for operations in "Fall 2013,"

at which time the facility would specifically be able to receive, unload, and depart a full unit

train of 80,000 barrels within 12 hours, as well as handle cargo barges of up to 34 feet of draft.

Upon information and belief, ERC further claimed that the second phase—with increased

capacity and a pipeline distribution element—would be operational by the summer of 2014.

### (b) THE RSA

8.      Upon information and belief, in or around February 2013, Bridger Transfer

Services, LLC ("BTS"), a former subsidiary of Logistics, entered a contract with ERC called the

Eddystone Rail Facilities Services Agreement (the "RSA").

9.      By its terms, the RSA is governed by New York law, without regard to New York

principles of conflicts of laws.

10.     Pursuant to the RSA, ERC agreed to improve upon and thereafter to operate a rail

and barge transloading facility in Eddystone, Pennsylvania (the "Facility"), that would transload

crude oil on the Delaware River.  BTS, in turn, and subject to ERC's proper compliance with the

RSA, agreed to utilize the Facility for a period of five years and two months by transloading a

minimum volume of crude oil through the facility every month (for which it would pay $2.25 per

barrel), or, if it sent less than the minimum volume, to make a "deficiency payment" to ERC.

11.     Upon information and belief, BTS was materially induced to enter the RSA by the statements, inducements, and promises made by ERC and/or its agents and affiliates concerning the transloading capacity of the facility to be improved upon by ERC.  For instance, upon information and belief, ERC represented, among other things, that the pipes in the Facility were capable of handling 20,000bph ("barrels per hour") of oil.

12.     Indeed, the terms of the RSA expressly confirmed a number of pre-contractual promises made by ERC to BTS, including that:

    a.  The facility was "estimated" to become fully operational on December 1, 2013;

    b.  All transfers of crude oil would "be performed solely by custody transfer meter and not by hand innage and/or ullage measurements of shore tanks and/or barges";

    c.  BTS's trains and barges could arrive at the facility within plus-or-minus 4 hours of the beginning of each assigned window (*i.e.*, an 8-hour period for arrival); and

    d.  BTS could bring "two (2) or more" trains into the Facility for unloading at a time, as needed.

**(c) DELAYS AND PROBLEMS BESET THE OPENING OF THE FACILITY**

13.     After the signing of the RSA, upon information and belief, ERC repeatedly represented, including in the RSA itself, that the Facility would be completed, and fully functional, by December 1, 2013.

14.     Upon information and belief, the Facility was not functional by December 1, 2013.  Instead, in or around fall 2013, ERC informed BTS that the Facility would not be operational until February 2014.  ERC also informed BTS that the mean low water ("MLW") of the Delaware River channel (the "Channel") to the Facility was only 31 feet of draft (*i.e.*, barges having up to 31 feet of draft), not the advertised 34 feet.

15.     Upon information and belief, in preparation for the promised opening of the Facility, in December 2013, BTS chartered a barge called the *Petrochem Producer*, which had approximately 28 feet of loaded draft.  ERC repeatedly reassured BTS that the *Petrochem Producer* had measurements that would be functional because the Channel was capable of accommodating 28 feet of loaded draft.

16.     Upon information and belief, on or around February 6, 2014, however, ERC informed BTS that it had discovered a "granite pinnacle" (the "Granite Pinnacle") and other obstacles that limited the MLW depth of the Channel to merely 27 feet in key places, rather than the 34 feet that ERC had previously represented to BTS.

17.     Upon information and belief, after informing BTS of this fundamental problem with the Facility, ERC repeatedly represented to BTS that ERC would remove the Granite Pinnacle, thus increasing the depth of the Channel and permitting the *Petrochem Producer* to operate in the Channel.

18.     Upon information and belief, in or around February 2014, ERC informed BTS for the first time that its ability to bring trains loaded with crude oil into the Facility would *also* be severely limited by a constraint imposed by the Southeastern Philadelphia Transportation Authority ("SEPTA") that did not allow freight trains to arrive or depart from the Facility except during a 4-hour window from midnight to 4:00 a.m. (the "Four-Hour Window").  ERC knew, or should have known, about this restriction and the negative impact it would have on BTS's ability to access the Facility, prior to inducing BTS to enter the RSA.

19.     Upon information and belief, the Facility again failed to meet its new operational date of February 2014, and on February 28, 2014, ERC informed BTS that the Facility would be operational on April 14, 2014.

20.     Upon information and belief, the Facility was not operational on April 14, 2014, and did not become operational until May 3, 2014.  The first barge loading did not ultimately occur until May 20, 2014.

21.     Nonetheless, upon information and belief, ERC still charged BTS deficiency amounts for April and May 2014, which BTS paid under protest.

### (d) THE DISMAL CONDITIONS OF THE FACILITY MATERIALLY BREACHED THE RSA

22.     Upon information and belief, when the Facility finally became capable of transloading oil, after months of delay, it suffered from a number of fatal defects that materially breached the representations that ERC had made to BTS and inhibited or precluded performance by BTS.

23.     Upon information and belief, it soon became apparent that the Granite Pinnacle permitted the *Petrochem Producer* to operate only during high tide, denying BTS the promised 8-hour arrival window guaranteed by the RSA and rendering the Facility practicably impossible for BTS to use.

24.     Further, upon information and belief, the Four-Hour Window adversely affected the arrival and departure times of trains, denying BTS the promised ability to arrive, unload and depart within 12 hours as originally guaranteed by ERC.

25.     Upon information and belief, the Facility was also extremely poorly engineered and contained design flaws, including an unnecessary corner or "elbow" (the "Elbow") in the Facility's piping, which acted like a kink in a hose and unreasonably slowed the required pumping of oil.  The Elbow severely reduced pumping capacity, slowing the loading and unloading of trains to a crawl and negatively impacting BTS's daily operations.  The Elbow resulted in the Facility pumping only 10,000bph, just *half* of the 20,000bph capacity represented

by ERC.

26.     Upon information and belief, the problems caused by the Granite Pinnacle, Four-Hour Window and Elbow compounded on themselves, breaching all of the promises and representations made by ERC and depriving BTS of the benefit of its bargain under the RSA.

27.     Upon information and belief, the Facility also lacked the custody transfer meters for gauging the amount of crude oil transloaded as promised under the terms of the RSA and had an insufficient fire suppression system, in violation of applicable laws.  Without an industry-standard custody transfer meter (despite ERC's promises that it would install one and the requirement in the RSA to measure transloaded crude oil with one), crude oil had to be measured manually by a human inspector, resulting in great cost and delay and a number of inaccuracies in the loss/gain volumes of crude oil that moved through the facility.

28.     Upon information and belief, in the face of the Granite Pinnacle, the Four-Hour Window and the Elbow, BTS was forced to conform its shipping schedule to the nearly-impossible limitations caused by ERC's misrepresentations and failures to disclose the defects with the Facility.  If even one of the Facility's numerous defects was in play, BTS's day-to-day operations could be set back for a full day or longer.

29.     For instance, upon information and belief,  if one of BTS's trains missed the Four-Hour Window, *or* arrived during the Four-Hour Window when it occurred during low tide, *or* the train was permitted access but could not unload fast enough due to the Elbow, BTS could not access the Facility as promised (or at all)—this resulted in bottlenecks where staff, barges, incoming trains and the customer-refinery were all forced to wait, idle, until the Facility finally became functional again.

30.     Upon information and belief, despite BTS's best efforts to accommodate

extraordinarily difficult circumstances at the Facility, these fundamental defects with the Facility ultimately forced BTS to incur deficiency charges and delay-related costs, including with third party funders and barge operators.  This situation also deprived BTS of the use of its accrued deficiency credits.

31.     On June 24, 2015, FG and FGP acquired equity and/or partner interests in Bridger Logistics, which was at certain times prior to February 1, 2016 an equity owner of BTS.

32.     Upon information and belief, BTS made a number of complaints to ERC, including through the issuance of demand letters through counsel, to put it on notice of the defects in the Facility and failure of the Facility to live up to ERC's representations, but ERC failed to correct the numerous fundamental defects in the Facility.

### (e)  ERC'S BAD FAITH FAILURE TO COOPERATE WITH PROPOSED FINANCING ACKNOWLEDGEMENT

33.     As ERC well knew, the crude oil shipper with whom BTS worked, Jamex Marketing, LLC ("JML"), required financing agreements that provided JML with the working capital that permitted it to buy and sell crude oil for transshipment by BTS through the Facility.

34.     The industry standard required ERC and its member or manager Enbridge entities to enter into an acknowledgement of the financer's rights in the crude oil being transshipped.

35.     Upon information and belief, ERC and its member or manager Enbridge entities signed such an acknowledgement with Merrill Lynch Commodities, Inc. (which had entered into an Intermediation Agreement with JML in or around April 2014) on June 18, 2014 that was set to terminate in early December 2015.

36.     Upon information and belief, anticipating the impending expiration of its Intermediation Agreement, in November 2015, JML sought another financial agreement that would enable BTS to acquire oil to transship through the Facility.

37.     Upon information and belief, in or around December 2015, JML was able to secure financing required for it to continue its performance under the RSA, from Carlyle Commodity Management, L.L.C. ("Carlyle").  Consistent with the industry standard, Carlyle required that ERC and its members or managers enter into an acknowledgment of Carlyle's rights in the crude oil being shipped.

38.     Upon information and belief, ERC, and its members or managers, refused in bad faith to cooperate with or sign the standard industry acknowledgement.  ERC knew that its bad faith refusal to agree to the acknowledgement would result in BTS not being able to acquire oil to transload at the Facility.

39.     Upon information and belief, after Carlyle declined to provide financing due to ERC's refusal to sign an industry-standard acknowledgement, BTS was no longer able to transship sufficient oil to meet the volume commitment for that month (or any month since then).

**(f)  BTS PERFORMED ALL OBLIGATIONS UNDER THE RSA**

40.     BTS satisfied all of its obligations under the RSA, including making all applicable deficiency payments, while Logistics was an equity owner in BTS.  At certain times prior to February 2016, Logistics compensated BTS for the services it provided to Logistics, and BTS made or directed payments to be made to ERC under the RSA.

41.     On or around February 22, 2016, effective February 1, 2016, Logistics entered a purchase and sale agreement, the "BTS PSA," with third party Jamex Transfer Holdings, LLC, pursuant to which, inter alia, Logistics sold all ownership interests in BTS to JTH for fair and adequate consideration.

42.     Upon information and belief, in or around February 2016, after the sale of BTS, JTH renamed BTS "Jamex Transfer Services, LLC" ("JTS").

43.     Upon information and belief, after  February 1, 2016  (i.e., the effective date of

the BTS PSA) JTS did not deliver any crude to the Facility and did not make any deficiency payments allegedly due to ERC for the period beginning on and after such date.

**(g) THE ARBITRATION.**

44.    Upon information and belief, on or around April 19, 2016, ERC commenced an arbitration against JTS before the Society of Maritime Arbitrators (the "Arbitration").

45.    ERC did not name Logistics or the FG Defendants as a party to the Arbitration.

46.    Upon information and belief, JTS and ERC reached a collusive settlement, without any hearing on JTS's numerous viable defenses and counterclaims, or any reduction in the judgment to reflect the defenses or counterclaims, that resolved the arbitration.

If this Court finds Logistics liable under any theory for damages due to ERC, the FG Defendants allege as follows:

## COUNTERCLAIM I – FRAUDULENT INDUCEMENT

47.    The FG Defendants incorporate by reference the allegations contained in the above paragraphs of these Counterclaims as if fully set forth herein.

48.    BTS justifiably relied upon the misrepresentations and omissions of ERC and thereby expended considerable sums of money securing barges and trains, arranging (and rearranging and rescheduling) the arrival and departure of trains and barges at the Facility, and suffered costs, expenses, and lost opportunities related to delays caused by the misrepresentations concerning construction, the failure of the Facility to be a "state of the art" facility as represented, and due to the undisclosed and misrepresented restrictions concerning the Four-Hour Window, the Granite Pinnacle, the lack of custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality.

49.    ERC made these misrepresentations and/or omissions when it knew or should

have known of the Four-Hour Window and the Granite Pinnacle but failed to disclose them to BTS.

50.     BTS justifiably relied on ERC's misrepresentations and/or omissions to enter into the RSA, including BTS's misrepresentations of the truth concerning the Four-Hour Window and the Granite Pinnacle.

51.     BTS expended considerable sums preparing to perform and performing under the RSA at the subpar Facility, including securing the necessary financing to acquire crude oil to ship through the Facility, and securing barges and trains.

52.     After the RSA was entered, ERC further fraudulently induced BTS not to rescind the RSA by promising to remedy the numerous defects with the Facility, including by removing the Granite Pinnacle, installing the required custody transfer meters and improving the insufficient fire suppression system.

53.     The FG Defendants, directly and indirectly, have sustained damages in the amount of at least $20,000,000.00 due to the fraudulent conduct of ERC in connection with the RSA.

## COUNTERCLAIM II – NEGLIGENT MISREPRESENTATION

54.     The FG Defendants incorporate by reference the allegations contained in the above Paragraphs of these Counterclaims as if fully set forth herein.

55.     ERC had a duty to speak with care when communicating about the ability of customers to bring in and depart trains and barges from the Facility.

56.     As the developer of the facility, ERC and/or its agents and affiliates had unique or special expertise about the railway conditions, the dock and channel limitations, and other operational aspects of the facility, and provided information regarding the same to BTS knowing

that BTS would use that information to enter into the RSA and arrange for trains and barges.

57.     ERC misrepresented the quality of the Facility due to the Four-Hour Window, the Granite Pinnacle, the Elbow, the lack of custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality.

58.     The information was supplied in a negligent and/or reckless manner that caused BTS to suffer damages due to delays lost opportunities, and deficiency charges.

59.     The FG Defendants, directly and indirectly, have sustained damages in the amount of at least $20,000,000.00 due to ERC's negligent misrepresentations.

## COUNTERCLAIM III – BREACH OF CONTRACT

60.     The FG Defendants incorporate by reference the allegations contained in the above Paragraphs of these Counterclaims as if fully set forth herein.

61.     The RSA was a valid and enforceable contract entered into by ERC and BTS.

62.     BTS fully performed its obligations under the RSA.

63.     The Four-Hour Window, the Granite Pinnacle, the Elbow and the lack of custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality, materially breached the terms of the RSA and caused BTS, and the FG Defendants by extension, to incur deficiency charges and forfeit deficiency credits in the amount of $11,604.519.12 from April 2014 to December 2015.

64.     The Four-Hour Window, the Granite Pinnacle, the Elbow and the lack of custody transfer meters and insufficient fire suppression system, amongst other issues with the Facility's construction quality, also caused BTS, and the FG Defendants by extension, to incur costs, expenses, damages and lost opportunities, and to forfeit deficiency credits.

## COUNTERCLAIM IV – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

65.     The FG Defendants incorporate by reference the allegations contained in the above Paragraphs of these Counterclaims as if fully set forth herein.

66.     ERC knew that an industry-standard financing acknowledgement was necessary for BTS to be able to continue to ship crude oil through the Facility.

67.     ERC had an obligation under New York law to act in good faith and not refuse an industry-standard financing acknowledgement.

68.     Nonetheless, ERC refused to sign the industry-standard financing acknowledgement procured in November 2015.

69.     ERC breached its duty of good faith and fair dealing by intentionally and/or arbitrarily rejecting an industry-standard financing acknowledgement in November 2015, entitling BTS to rescission.

## COUNTERCLAIM V – RESCISSION

70.     The FG Defendants incorporate by reference the allegations contained in the above Paragraphs of this Counterclaim as if fully set forth herein.

71.     ERC made material misrepresentations of fact that induced BTS to enter the RSA concerning the Granite Pinnacle, the Four-Hour Window and the Elbow that entitle BTS to rescission of the RSA.

72.     The existence of the Granite Pinnacle, the Four-Hour Window and the Elbow constitute frustration of the purpose of the RSA, entitling BTS to rescission of the RSA.

73.     The existence of the Granite Pinnacle, the Four-Hour Window and the Elbow constitute a mistake of fact, entitling BTS to rescission of the RSA.

74.     The existence of the Granite Pinnacle, the Four-Hour Window and the Elbow

make the RSA impracticable, entitling BTS to rescission of the RSA.

75.     ERC's failure to install custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality, make the RSA impracticable, entitling BTS to rescission of the RSA.

76.     ERC's intentional and/or arbitrary rejection of an industry-standard financing acknowledgement in November 2015, which it knew was necessary for BTS to be able to continue to ship crude oil through the Facility, entitles BTS to rescission.

## **CONCLUSION**

**WHEREFORE**, the FG Defendants respectfully seek judgment in their favor and against ERC as follows:

A.  That the Plaintiff take nothing by virtue of the Complaint;

B.  That the Plaintiff's claims against the FG Defendants are dismissed with prejudice;

C.  That the FG Defendants be awarded all attorneys' fees and costs;

D.  That judgment be entered in the FG Defendants' favor on their counterclaims;

E.  That the FG Defendants be awarded damages in the amount of at least $32,604,519.12;

F.  That the RSA be rescinded;

G.  That the FG Defendants be awarded pre-and post-judgment interest at the maximum rate permitted by law; and

H.  For such other and further relief as this Court may deem just and proper.

Dated:  August 10, 2017

Respectfully submitted,

/s/      *Jeffery A. Dailey*

Jeffery A. Dailey (I.D. No. 85993)
AKIN GUMP STRAUSS HAUER &
FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, PA 19103
T: 215-965-1200
F: 215-965-1210
jdailey@akingump.com

David M. Zensky (*pro hac vice*)
Katherine P. Porter (*pro hac vice*)
Kelly A. Eno (*pro hac vice*)
AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002
dzensky@akingump.com
kporter@akingump.com
keno@akingump.com

*Counsel for Defendants Ferrellgas Partners, L.P., and Ferrellgas, L.P.*

**CERTIFICATE OF SERVICE**

I, Jeffrey A. Dailey, hereby certify that I caused Defendants Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Answer and Defenses to Complaint and Counterclaims and Defendant Bridger Logistics' Answer and Defenses to Complaint and Counterclaims to be filed and served to all counsel of record via the Court's ECF System on August 10, 2017.

Dated:  August 10, 2017

/s/      *Jeffery A. Dailey*