# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered on February 22, 2016 by and between BRIDGER LOGISTICS, LLC, a Louisiana limited liability company with principal offices at 2009 Chenault Drive, Suite 100, Carrollton, Texas 75006 ("Seller") and JAMEX TRANSFER HOLDINGS, LLC, a Texas limited liability company with principal offices at 2009 Chenault Drive, Suite 110, Carrollton, Texas 75006 ("Buyer"). Buyer and Seller may be referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS

WHEREAS, Seller owns all right, title and interest in and to one hundred percent (100%) of the issued and outstanding limited liability company membership interests in, to, and of BRIDGER TRANSFER SERVICES, LLC, a Louisiana limited liability company (the "Company" and all of such membership interests in the Company, the "Membership Interests"); and

WHEREAS, pursuant to the terms and conditions of this Agreement, Seller desires to sell, transfer, convey, and assign to Buyer, and Buyer desires to acquire and assume the Membership Interests.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual representations, warranties, agreements, and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Definitions.  Capitalized terms used in this Agreement but not defined elsewhere in the body of this Agreement have the meaning set forth in this Section.

"Accounting Firm" means the Dallas office of KPMG, or such other accounting firm as the Parties may mutually agree.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, whether civil, criminal, administrative, regulatory or otherwise, and whether at law or in equity.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under common Control with such Person. The Company shall be deemed to be (a) an Affiliate of Seller but not Buyer with respect to the period of time prior to Closing and (b) an Affiliate of Buyer but not Seller with respect to the period of time subsequent to Closing.

1

"Agreement" has the meaning ascribed to such term in the preamble to this Agreement.

"Akin" has the meaning ascribed to such term in Section 10.14.

"Assigned Contracts" has the meaning ascribed to such term in Section 6.4.

"Bridger Marks" has the meaning ascribed to such term in Section 2.2.

"Bridger Swan Ranch" has the meaning ascribed to such term in Section 6.4.

"Bridger Terminals" has the meaning ascribed to such term in Section 6.4.

"Business" means the business of the Company as described in the Ferrellgas PSA.

"Buyer" has the meaning ascribed to such term in the preamble to this Agreement.

"Buyer Indemnitees" has the meaning ascribed to such term in Section 8.1.

"Buyer Group" means James H. Ballengee, an individual, Ballengee Interests, LLC, a Louisiana limited liability company, JBAH Holdings, LLC, a Texas limited liability company, Jamex, LLC, a Delaware limited liability company, Buyer, and Jamex Marketing, LLC, a Louisiana limited liability company.

"Cap" has the meaning ascribed to such term in Section 8.7(b).

"Closing" has the meaning ascribed to such term in Section 2.1(a).

"Closing Date" has the meaning ascribed to such term in Section 2.1(a).

"Company" has the meaning ascribed to such term in the recitals.

"Contract" means any legally binding oral or written, without limitation, agreement, commitment, obligation, lease, license, or contract.

"Control," "Controlling," "Controlled By" or "under common Control" means, with respect to any Person, the possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of the management, policies, or day-to-day business of such Person through the ownership of voting securities, by Contract, or otherwise.

"Direct Claim" has the meaning ascribed to such term in Section 8.3(c).

"Eddystone Agreement" means that certain Eddystone Rail Facilities Services Agreement dated February 14, 2013, by and between Bridger Transfer Services, LLC, as Customer, and Eddystone Rail Company, LLC, as Owner.

"Ferrellgas PSA" means that certain Purchase and Sale Agreement dated May 27, 2015, by and between Ferrellgas Partners, LP, as Purchaser, and Bridger, LLC, as Seller.

2

"Fraud" means, with respect to any Party, actual fraud involving a knowing or intentional misrepresentation of a fact with respect to the making by the applicable Party of any representation and warranty contained herein in ARTICLE 3, ARTICLE 4, and ARTICLE 5 with the intention that the other Party rely thereon to its detriment.

"Fundamental Representations" has the meaning ascribed to such term in Section 7.1.

"Indemnified Party" has the meaning ascribed to such term in Section 8.3.

"Indemnifying Party" has the meaning ascribed to such term in Section 8.3.

"Jamex TLA" means that certain Transportation and Logistics Agreement dated June 24, 2015, by and between Bridger Marketing, LLC, as Marketing, and Bridger Logistics, LLC, as Carrier, and any and all amendments, modifications, ratifications, and extensions thereof.

"Knowledge of Seller" means the actual knowledge of Julio Rios, Jeremy Gamboa, Todd Soiefer and Les Patterson, in each case after independent due inquiry by such individual.

"Later Discovered Property" has the meaning ascribed to such term in Section 6.3.

"Law" means any order, constitution, law, ordinance, regulation, statute or treaty of any governmental authority having jurisdiction over the subject matter thereof, any principle of common law, or any interpretation thereof by any governmental authority having jurisdiction over the subject matter thereof.

"Liabilities" or "Liability" means any duties, responsibilities, commitments, expenses, obligations, or liability (including indebtedness) in all cases of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Lien" means, with respect to any particular asset or all assets taken as a whole, in each case as the context requires, any encumbrance, charge, claim, equitable interest, convertible interest, lien (statutory or otherwise), option, warrant, pledge, condition, security interest, purchase right (including rights of first refusal or rights of first offer), mortgage, easement, encroachment, right of first refusal, conditional or installment sale agreements or other title acquisition or retention agreements, arrangements, or understandings, or any other similar restriction, limitation, or encumbrance, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.  Notwithstanding anything herein to the contrary, restrictions imposed upon securities under applicable state or federal securities laws shall be deemed not to be Liens hereunder.

"Loss" or "Losses" means losses, damages, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

3

"Material Adverse Effect" means any circumstance, change or effect, that is materially adverse to the business, operations (including results of operation), assets, Liabilities or condition (financial or otherwise) of the Business, excluding any circumstance, change or effect resulting or arising from (a) any change in general economic conditions in the industries or markets in which the Company operates or will operate, including any change in markets for commodities or supplies, transported, used or to be used in connection with the Business; (b) any change in general regulatory, social or political conditions, including any acts of war, sabotage or terrorist activities; (c) the implementation of, failure to implement, revocation, or alteration in any manner of, a market for Persons engaged in the Business by any governmental authority, irrespective of the form that such market may take; (d) any change in the financial, banking, credit, securities or capital markets (including any suspension of trading in, or limitation on prices for, securities on any stock exchange or any changes in interest rates) or any change in the general national or regional economic or financial conditions; (e) any change in any Law not contemplated prior to the date hereof; (f) any actions to be taken pursuant to or in accordance with this Agreement; and (g) the announcement of the execution of this Agreement or the transactions contemplated hereby; except in the case of the foregoing clauses (a), (b), (c), (d) and (e), to the extent that such matters have a disproportionally material adverse effect on the Business.

"Material Contract" or "Material Contracts" means any Contract or group of related Contracts (i) for the lease of real property, equipment or fixtures, (ii) that involves performance of services or delivery of goods or materials by the Company, or the receipt or purchase of good or services by the Company, (iii) concerning an investment or interest in a limited liability company, partnership, corporation, trust, joint venture, or similar arrangement; (iv) pursuant to which a Liability is created, incurred, assumed, or guaranteed any for borrowed money or any capitalized lease, or under which it has imposed an encumbrance on any assets of any type or character; (v) concerning confidentiality or purporting to limit the right of the Company to engage or compete in any line of business, save and except for this Agreement and the Ferrellgas PSA; (vi) any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other similar agreement for the benefit of its current or former directors, officers, and employees; (vii) concerning collective bargaining; (viii) concerning the employment of any individual on a full-time, part-time, consulting, or other basis or providing severance benefits; (ix) the performance of which involves actual cash payment or exchange of good or services with an approximate value in excess of One Thousand and No/100s Dollars ($1,000.00).

"Membership Interest Assignment" means the assignment of the Membership Interests in substantially the form attached hereto as Exhibit "A."

"Membership Interests" has the meaning provided to such term in the Recitals.

"Organizational Documents" means, with respect to any Person (a) that is a corporation, the articles and certificate of incorporation and bylaws thereof, or any comparable governing instruments, together with any other governing agreements or instruments of such corporation or the shareholders thereof, each as amended, (b) that is a limited

4

liability company, the certificate of formation and the operating agreement, limited liability company agreement or regulations of the limited liability company, or any comparable governing instruments, each as amended, (c) that is a partnership, the partnership agreement of the partnership and, if applicable, in the case of limited partnerships, the certificate of formation of the partnership and the Organizational Documents of such partnership's general partner, or any comparable governing instruments, each as amended and (d) that is any other Person, the organizational, constituent and/or governing documents and/or instruments of such Person.

"Party" and "Parties" have the meanings set forth in the preamble.

"Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union, or other entity or governmental authority.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning the day after the Closing Date.

"Pre-Closing Taxes" means Taxes of the Company for any Pre-Closing Tax Period (not including any sales or transfer Tax or similar Tax imposed as a result of the transactions contemplated by this Agreement) and any penalties and interest with respect to such Taxes.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Release Agreement" has the meaning ascribed to such term in Section 2.3(b).

"Representatives" means, as to any Person, its Affiliates and its and their respective governing persons, officers, employees, legal counsel, accountants, financial advisers, investors, lenders, consultants, and other agents.

"Retained Liabilities" means any asset, Contract (including the Eddystone Agreement and the other Contracts set forth on Schedule 4.4), Liability (including any Pre-Closing Tax liability), or obligation of any nature whatsoever of Seller, the Company, or their respective Affiliates, including as set forth on Schedules 3.5 and 4.6 hereof, to the extent relating to any period before the Closing, including any Liability or obligation that arises after the Closing with respect to any matter that occurred or accrued, or relates to the period, before the Closing. In addition, and notwithstanding the foregoing, it is agreed that the Assigned Contracts, and all Liabilities thereunder, are Retained Liabilities regardless of whether any such Liabilities thereunder arose prior to or on, or arises after, the Closing Date.

"Seller" has the meaning ascribed to such term in the preamble to this Agreement.

5

"Seller Indemnitees" has the meaning ascribed to such term in Section 8.2.

"Straddle Period" has the meaning ascribed to such term in Section 9.2.

"Tax" or collectively, "Taxes," means any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions thereto, and any Liability in respect of the foregoing payable by reason of contract, assumption, transferee liability, or operation of law.

"Tax Authority" means any governmental authority or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"Tax Returns" means any report, return, election, document, estimated Tax filing, declaration or other filing provided to any Tax Authority or jurisdiction with respect to Taxes, including any amendments thereto.

"Terminal Logistics Services Agreement" means that certain Terminal Logistics Services Agreement by and between Company and Seller, dated effective as of February 1, 2016.

"Third Party Claim" has the meaning ascribed to such term in Section 8.3(a).

"Transaction Documents" means, collectively, this Agreement, the Exhibits and Schedules attached hereto, the Terminal Logistics Services Agreement, the Membership Interest Assignment, the Release Agreement, and all documents executed and delivered by any of the Parties in connection with any of the foregoing or the transactions described therein.

"Transfer Taxes" has the meaning ascribed to such term in Section 6.1.

1.2     Construction.

(a)     Each article, section, exhibit, annex and schedule reference are to those various Articles, Sections, Exhibits, Annexes and Schedules to this Agreement, respectively, unless otherwise stated. All Articles, Sections, Exhibits, Annexes and Schedules are attached hereto and made a part of this Agreement for all purposes.

(b)     Each Party agrees that it is represented by counsel during the negotiation and execution of this Agreement and ancillary and related documents and instruments, and that it has executed the same upon the advice of counsel. Each Party and its counsel have worked together in the preparation of this Agreement and such ancillary and related documents and instruments. All drafts related to the preparation of a final and definitive agreement of the Parties are hereby deemed by the Parties to be the work product of both Parties, and shall not be construed against a Party by reason or drafting history, preparation or negotiation.

6

(c)     Unless context requires otherwise, (i) proper nouns shall have the meaning ascribed to them in Section 1.1 of this Agreement, or as otherwise stated, unless no such meaning is ascribed, (ii) terms defined in the singular and plural have corresponding meanings regardless of use, (iii) masculine, feminine and gender-neutral terms shall have the same meanings, unless otherwise stated, (iv) references to days are to calendar days, unless otherwise stated, (v) reference to any document, agreement or instrument shall be deemed to include all amendments, modifications, ratifications and extensions thereof unless otherwise stated.

(d)     All references to price and currency herein are to United States Dollars (USD).

(e)     The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. Unless expressly provided to the contrary herein, the word "or" is not exclusive. The words "day" or "days" shall mean calendar day. The words "will" and "will not" are expressions of command and not merely expressions of future intent or expectation. When used in this Agreement, the word "either" shall be deemed to mean "one or the other", not "both."

## ARTICLE 2
## PURCHASE AND SALE

2.1     Closing; Transfer of Membership Interests.

(a)     The transactions contemplated by this Agreement will be consummated (the "Closing") at 10:00 a.m., Dallas, Texas time, at the offices of Seller, located at 2009 Chenault Drive, Suite 100, Carrollton, Texas 75006, on the date hereof or such other time as the Parties may agree. The date on which the Closing occurs is referred to herein as the "Closing Date"; provided that the Closing shall be effective solely for accounting purposes (including with respect to accruals incurred in the ordinary course of business under the Eddystone Agreement) as of  12:00 a.m., Dallas, Texas time, on February 1, 2016.  All proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing will be deemed to have been taken and executed simultaneously, and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed, and delivered.

(b)     At the Closing, Seller shall sell, assign, transfer, convey, deliver, and set over to Buyer the Membership Interests free and clear of any and all Liens.  The purchase and sale of the Membership Interests, and Buyer's consequent ownership of the Company, excludes the Retained Liabilities.  The transfer of the Membership Interests contemplated by the immediately preceding sentence shall be effectuated at Closing pursuant to the Membership Interest Assignment attached hereto as Exhibit "A."  At the Closing, Buyer will accept such assignment and transfer of the Membership Interests from Seller on the

terms and conditions set forth herein, including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth on <u>Schedule 4.4</u> for periods on and after the Closing Date.

(c)     At the Closing, the Parties shall execute, and deliver to the other, this Agreement and the other Transaction Documents (other than the Membership Interest Assignment, which is to be delivered as set forth in subsection (b) of this <u>Section 2.1</u>).

2.2     <u>Reservation of Bridger Marks.</u>  Notwithstanding anything contained herein to the contrary, Seller expressly reserves, and does not transfer or assign any right, title, or interest in or to the "Bridger" name or mark, including, without limiting the generality of the foregoing, the "Bridger" name and logo and any and all variations or derivations of such name and logo, and related or similar trade names, trademarks, service marks, or logos to which any Affiliate of Seller holds rights (the "<u>Bridger Marks</u>"). Immediately after Closing, Buyer will (a) cause the Company to change its name in respect of the rights of Seller in and to the Bridger Marks (*i.e.*, such new name shall not include "Bridger" or any term similar thereto) and (b) deliver, or permit the Seller to cause to be delivered, the Notice of Change in Name attached hereto as <u>Exhibit "C"</u>.

2.3     <u>Consideration.</u>

(a)     <u>Payment of Funds.</u>  At the Closing, as consideration for the transactions contemplated by <u>Section 2.1(b)</u>, and elsewhere herein, Buyer will tender and pay or cause to be tendered and paid the sum of Ten and No/100s Dollars ($10.00) to Seller at a bank of Seller's designation.

(b)     <u>Execution of Release.</u>  At the Closing, as consideration for the transactions contemplated by <u>Section 2.1(b)</u> and elsewhere herein, Seller shall execute and deliver the Release Agreement attached hereto as <u>Exhibit "B."</u>

(c)     <u>Payment of Invoices.</u>  As consideration for the transactions contemplated by <u>Section 2.1(b)</u> and elsewhere herein, subsequent to Closing, Seller hereby covenants and agrees to tender and pay to Buyer, for the benefit of the Company, Four Million Four Hundred Forty Seven Thousand Six Hundred Seventy Seven Dollars and 96/100 ($4,447,677.96) in satisfaction of all charges and sums actually due under invoices issued in the ordinary course of business pursuant to the Eddystone Agreement that are incurred during the period for the month of January 2016, as such sums and charges become due and payable on or about February 20, 2016 (in accordance with the terms of the Eddystone Agreement); <u>provided</u>, <u>however</u>, any penalties, fees, costs, expenses, Losses, or other obligations or liabilities under the Eddystone Contract that arise on or after the Closing Date due to the aforestated amount not having been paid by Seller to Buyer pursuant to the terms of this <u>Section 2.3(c)</u> shall be the sole responsibility of Seller, and shall be a Retained Liability.  For the purposes of clarity, the obligation of Seller under this <u>Section 2.3(c)</u> relates solely and exclusively to charges and sums incurred in the ordinary course of business pursuant to the terms of the Eddystone Agreement.

(d)     <u>Limited Waiver of Jamex TLA Non-compete.</u>  As consideration for the transactions contemplated by <u>Section 2.1(b)</u> and elsewhere herein, Seller hereby consents

to Buyer Group and each of such group's respective Affiliates utilizing the Company as a provider of all those certain transportation and logistics services as and to the extent expressly described in the Eddystone Agreement, and Seller does hereby waive Section 2(c) of the Jamex TLA solely with respect to the Eddystone Agreement and solely to the extent necessary to give effect to the foregoing consent in this <u>Section 2.3(d)</u>, such consent being subject to Seller's written consent to any assignment, amendment, modification, extension or ratification of the Eddystone Agreement, in each case, as contemplated by <u>Section 2.3(f)</u> hereof. Notwithstanding anything contained in this <u>Section 2.3(d)</u> to the contrary, (i) Seller's consent provided for in the first sentence of this <u>Section 2.3(d)</u> is expressly limited to the term of the Eddystone Agreement (*i.e.*, such consent shall be deemed automatically revoked upon the earlier expiration or termination of the Eddystone Agreement), (ii) subject to the immediately preceding clause (i), Seller reserves all rights contemplated by the Jamex TLA, and (iii) save and except for the previous sentence, Seller does not consent to Buyer Group or any of such group's respective Affiliates utilizing any other providers of transportation and logistics services for any crude petroleum pursuant to Section 2(a) of the Jamex TLA or otherwise.

(e)  <u>Limited Waiver of Ferrellgas PSA Non-compete.</u>  As consideration for the transactions contemplated by <u>Section 2.1(b)</u> and elsewhere herein, Ferrellgas Partners, LP (the beneficial and pecuniary owner an undivided ninety-nine percent (99%) interest in Seller) hereby consents to Buyer Group and each of such group's respective Affiliates owning, acquiring, managing, operating, controlling, or participating in the ownership, management, operation, and control of Company solely to the extent in connection with its performance of its or Buyer's obligations under the Eddystone Agreement, and Seller does hereby agree to waive Section 6.10(a) of the Ferrellgas PSA and Section 1 of the Non-Competition Letter Agreement from James Ballengee to Ferrellgas Partners, LP dated May 29, 2015 solely with respect to Company's or Buyer's performance of the Eddystone Agreement and solely to the extent required to give effect to the foregoing consent in this <u>Section 2.3(e)</u>, such consent being subject to Seller's written consent to any assignment, amendment, modification, extension or ratification of the Eddystone Agreement, in each case, as contemplated by <u>Section 2.3(f)</u> hereof. Notwithstanding anything contained in this <u>Section 2.3(e)</u> to the contrary, (i) subject to the limited waiver by Ferrellgas Partners, LP of Section 6.10(a) of the Ferrellgas PSA and Section 1 of the Non-Competition Letter Agreement from James Ballengee to Ferrellgas Partners, LP dated May 29, 2015 expressly provided for in this <u>Section 2.3(e)</u>, Ferrellgas Partners, LP reserves all rights pursuant to the Ferrellgas PSA and nothing herein shall be construed to derogate from any such rights, and (ii) save and except for the previous sentence, Ferrellgas Partners, LP does not consent to Buyer Group owning, acquiring, managing, operating, controlling or participating in the ownership, management, operation, or control of any business that competes with the Business other than solely as a result of the Company's or Buyer's performance of the Eddystone Agreement.

(f)  <u>No Amendment of Eddystone Agreement.</u>  As consideration for the transactions contemplated by <u>Section 2.1(b)</u> and elsewhere herein, and notwithstanding anything contained in this <u>Section 2.3</u> to the contrary, Buyer shall not, and shall not permit the Company to, amend, modify, extend, or ratify the Eddystone Agreement without the express, prior written consent of Seller, which consent may be granted or denied in the

9

sole and absolute discretion of Seller, if such amendment, modification, extension, or ratification would, as written, directly or indirectly have the likely effect of expanding the nature or scope of the waivers granted in Sections 2.3(d) or (e). For avoidance of doubt, Seller acknowledges and agrees that Buyer may, without the requirement of any further consent of Seller, amend, modify, extend, or ratify the Eddystone Agreement if such amendment, modification, extension, or ratification, as written, would not be reasonably expected to expand the nature or scope of the waivers granted in Sections 2.3(d) and (e). For the purposes of clarity and notwithstanding anything herein to the contrary, the Parties agree that the waivers contemplated in Sections 2.3(d) and (e) are intended to be, and shall be construed to be, applicable with respect to the scope and nature of activities set forth in terms of the Eddystone Agreement as in effect immediately prior to Closing. In furtherance of the foregoing, the Parties agree that the waivers contemplated by Sections 2.3(d) and (e) shall apply (and shall be deemed to apply) to the terms of the Terminal Logistics Services Agreement to the extent such waivers are necessary to enable the Company to perform its obligations under the Terminal Logistics Services Agreement without causing a violation by Buyer Group of the restrictive covenants contemplated by Section 2.3(d) or (e).

2.4     Transaction Expenses.    Each Party to this Agreement and the Transaction Documents shall bear its own fees, costs, and expenses of any financial advisors, consultants, attorneys, or other Representatives engaged by such Party or its Representatives and payable by such Party in connection with the structuring, negotiation, or consummation of the transactions contemplated by this Agreement or any of the other Transaction Documents, which, in each case, are unpaid as of the Closing.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer on and as of the Closing that, except as otherwise stated herein or on the Schedules, the following are true, correct, and complete:

3.1     Organization.    Seller is a limited liability company duly organized pursuant to the Laws of the State of Louisiana. Seller is in good standing pursuant to the Laws of the State of Louisiana, and has all requisite organizational power and authority to conduct its business as presently conducted by it. Seller is in good standing in all other jurisdictions in which the ownership of its assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by the Transaction Documents to which Seller is a party, or to impair Seller's ability to perform its obligations under the Transaction Documents to which Seller is a party.

3.2     Authorization.    Seller has all requisite power and authority to execute and deliver each of the Transaction Documents to which it is a party and to consummate and perform the transactions contemplated hereby and thereby. The execution and delivery of the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite limited liability company action on the part of Seller. The Transaction Documents to which Seller is a party have

3.8    Brokers' Fees.  No broker, investment banker, financial advisor, or other Person is entitled to any broker's, finder's, financial advisor's, or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangement made by or on behalf of Seller.

**ARTICLE 4**
**REPRESENTATIONS RELATING TO THE COMPANY**

Seller, for and on behalf of the Company, hereby represents and warrants to Buyer on and as of the Closing, except as otherwise stated herein or on the Schedules, that the following are true, correct, and complete:

4.1    Organization.    The Company is a limited liability company duly organized pursuant to the Laws of the State of Louisiana.  The Company is in good standing pursuant to the Laws of the State of Louisiana, and has all requisite organizational power and authority to conduct its business as presently conducted by it.  The Company is in good standing in all other jurisdictions in which the ownership of its assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified would have a Material Adverse Effect.

4.2    Authorization.    Company has all requisite power and authority to execute and deliver each of the Transaction Documents to which it is a party and to consummate and perform the transactions contemplated hereby and thereby.  The execution and delivery of the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite limited liability company action on the part of Company.  The Transaction Documents to which Company is a party have been duly and validly executed and delivered by Company, and, assuming the due authorization, execution, and delivery by the other parties thereto, each Transaction Document to which Company is a party constitutes a valid and binding obligation of Company, enforceable against Seller in accordance with its terms.

4.3    Membership Interests.    Seller is the sole member of the Company, and the Membership Interests represent one hundred percent (100%) of the issued and outstanding limited liability company Membership Interests in and to the Company. All of the Membership Interests are duly authorized, validly issued, fully paid, and owned by Seller and free and clear of all Liens other than statutory Liens. The Membership Interests were issued in compliance with all applicable Laws.

4.4    Contracts.    Except as set forth on Schedule 4.4, the Company is not a party to, bound by, or obligated to enter into, any Contract, whether a Material Contract or otherwise.

4.5    Banking Relationships.    Exhibit "D" sets forth the names, account numbers, and location of all banks and financial institutions in which the Company has accounts.  The Company has no lines of credit, and is not a party to, bound by, or obligated under any line of credit of Seller or any of Seller's other Affiliates.

4.6    Liabilities.    To the knowledge of Seller, except as disclosed in Schedule 4.6, the Company is not subject to any Liabilities or other obligations of any nature whatsoever,

13

including in connection with any breach of any Contract, environmental Law, or otherwise, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise, other than Liabilities or obligations under the Contracts listed on <u>Schedule 4.4</u>.  The Company has no accounts payable or accounts receivable.  Other than Pre-Closing Taxes for which Seller is responsible hereunder or with respect to amounts payable pursuant to the express terms of the Eddystone Agreement or the other Contracts set forth on <u>Schedule 4.4</u>, no third Person has any right or interest of any nature in or to the income (gross or net) or profits or losses of the Company.

4.7     <u>Subsidiaries</u>.  The Company does not own, or have any ownership interest in any other Person.  There are no outstanding rights, options, warrants, calls, preemptive rights, convertible or exchangeable securities, subscriptions, or other agreements pursuant to which the Company is, or may be, obligated, to sell, issue, or acquire any ownership interest of any Person.

4.8     <u>Compliance with Laws</u>.

(a)     The Company has, since January 1, 2012, materially complied, and is now materially complying, with all Laws applicable to it or its business, properties, or assets, and since such date no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against the Company alleging any failure to so comply.

(b)     All material permits required for the Company to conduct its business have been obtained by it and are valid and in full force and effect.  All fees and charges with respect to such permits as of the Closing Date have been paid in full.  To the knowledge of Seller, except as disclosed on <u>Schedule 4.6</u>, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse, or limitation of any permit.

4.9     <u>Employees</u>.  The Company has no employees and, since January 1, 2012, has never had any employees.

4.10     <u>Taxes</u>.

(a)     Since January 1, 2012, all Tax Returns required to be filed on or before the Closing Date by the Company have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all material respects.  All Taxes due and owing by the Company (whether or not shown on any Tax Return) have been, or, subject to <u>Section 9.2</u>, will be if due after the Closing Date, timely paid.

(b)     The Company has withheld and paid each Tax required by Law to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, member, or other Person, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)     To the knowledge of Seller, no claim has been made by any taxing authority in any jurisdiction where the Company does not file Tax Returns that it is, or may be, subject to Tax by that jurisdiction.

14

4.11    Assets.  The Company has no assets other than the Eddystone Agreement and the other Contracts set forth on Schedule 4.4, and owns 100% of all right, title, and interest in and to the Eddystone Agreement and the other Contracts set forth on Schedule 4.4 (excluding the rights and interests of the counterparty to such agreements).  No Person other than the Company has, has had, has the right to, or has any claim against, all or any portion of the Company's right, title, or interest in, to, or under such agreements. The Company has no interest of any nature in any real property, except as lessee under the leases contemplated by the Transportation Logistics Services Agreement, which leases are also set forth on Schedule 4.4.  The Company does not own, license, or lease any intellectual property of any nature.

4.12    Powers of Attorney.  The Company has no outstanding powers of attorney.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller on and as of the Closing that the following are true, correct, and complete:

5.1    Organization.  Buyer is a limited liability company duly organized pursuant to the Laws of the State of Texas. Buyer is in good standing pursuant to the Laws of the State of Texas, and has all requisite organizational power and authority to conduct its business as presently conducted by it. Buyer is in good standing in all other jurisdictions in which the ownership of its assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by the Transaction Documents to which Buyer is a party, or to impair Buyer's ability to perform its obligations under the Transaction Documents to which Buyer is a party.

5.2    Authorization.  Buyer has all requisite power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate and perform the transactions contemplated hereby and thereby. The execution and delivery of the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite action on the part of Buyer. The Transaction Documents to which Buyer is a party have been duly and validly executed and delivered by Buyer, and, assuming the due authorization, execution and delivery by the other parties thereto, each Transaction Document to which Buyer is a party constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3    Independent Evaluation.  Buyer is sophisticated in the evaluation, purchase, development, ownership, and operation of businesses and assets similar to the Business and assets of the Company. In making its decision to enter into this Agreement and consummate the transactions contemplated herein, Buyer has conducted its own independent investigation and evaluation of the Company, the Business and the assets thereof, and has received advice from competent advisors, lawyers, and accountants. In respect of this Agreement and the transactions contemplated hereby, except for the representations and warranties herein or in any other Transaction Document, Buyer has not relied on any comments, statements, reports, projects, or other documents or materials provided by or for Seller or its agents.

207605883 v17
7597706.10/SP/15556/1209/021916

5.4     Investment Representation.   Buyer is purchasing the Membership Interests for its own account with the present intention of holding the Membership Interests for investment purposes and not with a view to or for sale in connection with any public distribution of the Membership Interests in violation of any federal, state or foreign securities Law. Buyer is an "accredited investor" as that term is defined in Rule 501 of Regulation D. Buyer has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Membership Interests. Buyer acknowledges that the Membership Interests have not been registered under any federal, state, or foreign securities Law, and that the Membership Interests may not be sold, transferred, offered for sale, pledged, hypothecated, or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation, or other disposition is registered under applicable federal, state, or foreign securities Law, or pursuant to an exemption from registration under any federal, state or foreign securities Law. Buyer has undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery, and performance of this Agreement and the purchase of the Member Interests. Buyer acknowledges and agrees that the Business is subject to substantial risks and uncertainties associated with the Business, including, without limitation (i) risks that customer concentration may expose the Business to material risks if any contract related to the Business is terminated or a counterparty fails to performs its obligations thereunder, (ii) risks that financing and leasing for the Business may not be available on commercially acceptable term, (iii) risks that commodity and energy prices may adversely affect the Business, (iv) risks of increased competition for services in the Business, (v) risks of decreasing demand for services in the Business, (vi) risks related to compliance with Law or (vii) risks that the operations of the Business may not be profitable.

5.5     Ownership of Buyer.   The sole member, and the owner of 100% of the membership interests in Buyer, is Jamex Marketing, LLC, a Louisiana limited liability company.

5.6     Brokers' Fees.   No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangement made by or on behalf of Buyer.

## ARTICLE 6
## COVENANTS OF BOTH PARTIES

6.1     Tax Matters.   Buyer shall pay and otherwise be liable for any sales, use, transfer, recording, registration, value added (to the extent not creditable), stock documentary and real property transfer Tax or similar Taxes, and any and all filing fees and expenses that may be imposed, assessed against, or incurred by any of the Parties as a result of carrying out the terms of this Agreement ("Transfer Taxes").

6.2     Media and Announcements.   Notwithstanding anything contained in this Agreement to the contrary, Buyer and Seller shall not, and each of Buyer and Seller shall cause each of their respective Affiliates not to, make any announcement concerning the transactions contemplated herein or in any Transaction Document, in each case, after Closing, unless (a) the other Party has agreed in writing to permit such public announcement to be made, which permission shall not be unreasonably withheld, conditioned, or delayed, or (b) such public

17

Terminals that have not theretofore been assigned to Bridger Terminals.  If and so long after the Closing as any such assignment shall not have been made, Buyer shall, and shall cause the Company to, (i) to the extent that such action shall not result in violation of an applicable Assigned Contract (as shall be determined in good faith solely by Buyer), transfer (promptly following receipt thereof) to (A) Bridger Terminals all pecuniary rights in respect of the Assigned Contracts, and (ii) to the extent that the provisions of clause (i) above are not sufficient to transfer all of the benefits (including the economic benefit) of such Contract (other than legal title), take such actions (which, without limitation, may include entering into subcontracting arrangements with Bridger Terminals, as applicable, if such subcontracts are not prohibited by the applicable Contract or by applicable Law) as are commercially reasonable to provide all of the benefits (or the equivalent thereof, including the economic benefit) of such Contract (other than legal title) to Bridger Terminals.  From and after Closing, Buyer shall cause the Company not to take any action that would result in the termination, amendment, or modification of an Assigned Contract prior to the assignment thereof to Bridger Terminals.  For avoidance of doubt, all obligations of any nature under each of the Assigned Contracts are the sole and exclusive responsibility of Seller as Retained Liabilities for all periods whether prior to, on, or after the Closing Date, including as to all ordinary course costs and expenses with respect to each such Assigned Contract until assigned to Bridger Terminals, all of which shall be paid by Seller when and as due, whether paid to Buyer directly or otherwise.  Bridger Terminals is not intended by the Parties to be, and shall not be deemed to be, third party beneficiaries of this <u>Section 6.4</u> or otherwise under this Agreement.

**ARTICLE 7**
**SURVIVAL**

7.1    <u>Survival.</u>  Except for the Fundamental Representations, the other representations and warranties of the Parties contained in <u>ARTICLE 3</u>, <u>ARTICLE 4</u> and <u>ARTICLE 5</u>, shall survive the Closing for a period of 18 months.  Each of the representations and warranties of Seller made in <u>Sections 3.1</u> (Organization), <u>3.2</u> (Authorization), <u>3.3</u> (Ownership of the Membership Interests), and <u>3.6</u> (Brokers Fees), and those made by the Company in <u>Sections 4.1</u> (Organization), <u>4.2</u> (Authorization), and <u>4.3</u> (Membership Interests) (collectively, the "<u>Fundamental Representations</u>") shall survive indefinitely.  Representations and warranties in <u>Section 4.10</u> (Taxes), and the right to seek indemnity under <u>Section 8.1(c)</u> and <u>Section 8.1(d)</u> shall survive the Closing for a period equal to the statute of limitations applicable to the underlying subject matter of such representations and warranties.  All covenants and agreements made or contemplated herein, including <u>Section 6.4</u>, will survive the Closing indefinitely or for the period explicitly set forth therein.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period will not thereafter be barred by the expiration of the relevant representation or warranty, and such claims will survive until finally resolved.

**ARTICLE 8**
**INDEMNIFICATION**

8.1    <u>Indemnification By Seller</u>.  Subject to the other terms and conditions of this <u>ARTICLE 8</u>, Seller will indemnify each of Buyer and its Affiliates (including the Company) and

19

their respective Representatives (collectively, the "Buyer Indemnitees") against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees or any of them to the extent based upon, arising out of, with respect to, or by reason of:

(a)     any failure (regardless of the magnitude of such) of any representation or warranty of Seller contained in ARTICLE 3 or ARTICLE 4 of this Agreement or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement to be true, correct, and complete as of the Closing (except for representations and warranties, if any, that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation (including as described or contemplated in Section 6.4) to be performed by Seller or any of its Affiliates pursuant to this Agreement;

(c)     the Retained Liabilities; or

(d)     (i) Taxes of the Company or relating to the business of the Company for all Pre-Closing Tax Periods; (ii) Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company (or any predecessor of the Company) is or was a member on or prior to the Closing by reason of a liability under Treasury Regulation Section 1.1502-6 or any comparable provisions of foreign, state or local Law; or (iii) Taxes of any Person imposed on the Company arising under the principles of transferee or successor liability or by contract, relating to an event or transaction occurring before the Closing.

8.2     Indemnification By Buyer.  Subject to the other terms and conditions of this ARTICLE 8, Buyer will indemnify each of Seller and its Affiliates and their respective Representatives (collectively, the "Seller Indemnitees") against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees to the extent based upon, arising out of, with respect to or by reason of:

(a)     any failure (regardless of the magnitude of such) of any representation or warranty of Buyer contained in ARTICLE 5 of this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement to be true, correct and complete as of the Closing (except for representations and warranties, if any, that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date); or

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement.

8.3     Indemnification Procedures.  The party making a claim under this ARTICLE 8 is referred to as the "Indemnified Party," and the party against whom such claim is asserted under this ARTICLE 8 is referred to as the "Indemnifying Party."

(a)     <u>Third Party Claims</u>.  If an Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "<u>Third Party Claim</u>") against such Indemnified Party with respect to which the Indemnifying Party is alleged to be obligated to provide indemnification under this Agreement, the Indemnified Party will give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice will not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party will describe the Third Party Claim in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably estimable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party will cooperate in good faith in such defense; <u>provided</u>, <u>however</u>, that if the Indemnifying Party is Seller, such Indemnifying Party will not have the right to defend or direct the defense of any such Third Party Claim that (i) is asserted against Buyer or the Company directly by or on behalf of any Person that is a party to, or such asserted is otherwise made in connection with, the Eddystone Agreement, or (ii) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to <u>Section 8.3(b)</u>, it will have the right to take such action as it deems necessary to avoid, dispute, defend, appeal, or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party will have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel will be at the expense of the Indemnified Party, <u>provided</u>, that if in the reasonable opinion of counsel to the Indemnified Party: (x) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (y) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party will be liable for the reasonable fees and expenses of counsel to the Indemnified Party. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to <u>Section 8.3(b)</u>, pay, compromise, and defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

21

(b)      Settlement of Third Party Claims.  Notwithstanding any other provision of this Agreement, the Indemnifying Party will not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 8.3(b).  If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 8.3(a), it will not agree to any settlement without the written consent of the Indemnifying Party (which consent will not be unreasonably withheld, conditioned, or delayed).

(c)      Direct Claims.  Any Action by an Indemnified Party on account of a Loss that does not result from a Third Party Claim (a "Direct Claim") will be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice will not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party will describe the Direct Claim in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably estimable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim except that Seller will reimburse Buyer for any Taxes of the Company that are the responsibility of Seller within ten (10) days after payment of such Taxes by Buyer or the Company. The Indemnified Party will allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party will assist the Indemnifying Party's investigation by giving such information and assistance as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) day period such party will be deemed to have rejected such claim, in which case the Indemnified Party will be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

(d)      Cooperation.  Upon a reasonable request by the Indemnifying Party, each Indemnified Party seeking indemnification hereunder in respect of any Direct Claim hereby agrees to consult with the Indemnifying Party and act reasonably to take actions

reasonably requested by the Indemnifying Party in order to attempt to reduce the amount of Losses in respect of such Direct Claim. Any costs or expenses associated with taking such actions will be included as Losses hereunder.

8.4     Disregard of Materiality.    For purposes of this ARTICLE 8, any failure, inaccuracy in, or breach of any representation or warranty will be determined without regard to any materiality, Material Adverse Effect, or similar qualification contained in or otherwise applicable to such representation or warranty.

8.5     Effect of Investigation.    The representations, warranties, and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, will not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was, or might be inaccurate as of the Closing Date.

8.6     Payments.    Once the amount of a Loss is agreed to in writing by the Indemnifying Party or finally adjudicated by a court of competent jurisdiction to be payable pursuant to this ARTICLE 8, the Indemnifying Party will satisfy its obligations within fifteen (15) days of such final, non-appealable, adjudication by wire transfer of immediately available funds. The Parties agree that should an Indemnifying Party not make full payment of any such obligations within such fifteen (15) day period, any amount payable will accrue interest from and including the date of agreement of the Indemnifying Party or the final, non-appealable, adjudication to and including the date such payment has been made at a rate per annum equal to twelve percent (12%). Such interest will be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

8.7     Limitation on Losses.

(a)     Except for Losses with respect to claims for any breach of any Fundamental Representation or the representations and warranties in Section 4.10 (Taxes), the Buyer Indemnitees will not be entitled to recover under Section 8.1(a) until the total amount of Losses that Buyer Indemnitees would recover under Section 8.1(a), but for this Section 8.7(a), exceeds $50,000 (the "Deductible"). Once the total amount of Losses that the Buyer Indemnitees would recover under Section 8.1(a) (except for Losses with respect to claims for any breach of any Fundamental Representation or the representations and warranties in Section 4.10), but for this Section 8.7(a), exceeds the Deductible, the Buyer Indemnitees will be entitled to recover only the amount of such Losses in excess of the Deductible.  The Deductible will not apply to or otherwise affect the ability of the Buyer Indemnitees to make claims or recover Losses under Section 8.1(a) with respect to claims for any breach of any Fundamental Representation or the representations and warranties in Section 4.10, and the amount of any Losses for which Buyer is entitled to recover under Section 8.1(a) for any breach of any Fundamental Representation or the representations and warranties in Section 4.10 shall not be included in determining whether the Losses that Buyer Indemnitees would recover under Section 8.1(a) with respect to any matters other than breach of any Fundamental Representation or the

23

(b)    To Buyer:

c/o Jamex Transfer Holdings, LLC
2009 Chenault Drive, Suite 110
Carrollton, Texas 75006
Attn: Grant Adams
Email gadams@jamexmarketing.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 10.1</u>.

10.2    <u>Headings.</u>    Article and Section headings in this Agreement are for convenience only and are not to be construed so as to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

10.3    <u>Binding Agreement; Assignment.</u>    This Agreement is binding upon and will inure to the sole benefit of the Parties hereto and their respective successors and permitted assigns. Neither Party may assign or transfer this Agreement or the rights and obligations contained herein, in whole or in part, without the prior written consent of the other Party hereto. Any purported assignment in violation of the foregoing shall be null and void.

10.4    <u>Waiver.</u>    No waiver of any right under this Agreement shall be effective unless evidenced in writing and executed by the Person from whom the waiver is sought. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent another act or omission, which would have originally constituted a violation, from having the effect of an original violation.

10.5    <u>No Third Party Beneficiaries.</u>    Except as otherwise expressly set forth herein, nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement.

10.6    <u>Expenses.</u>    The Parties acknowledge and agree that, except as may be otherwise expressly provided herein, each Party shall bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of legal counsel, financial advisers and accountants.

10.7    <u>Counterparts.</u>    This Agreement may be executed and delivered in multiple counterparts, including multiple signature pages, in any format, whether electronic, hard copy, or facsimile copy, each of which will be deemed an original, and all of which, taken together, shall be construed to be one and the same agreement.

10.8    <u>Entire Agreement.</u>    This Agreement, the other Transaction Documents, and the other agreements contemplated herein constitute the entire agreement of the Parties with respect to the matters expressly provided for herein, and supersede all prior agreements, understandings,

27

negotiations, and discussions, whether oral or written, of the Parties pertaining to such subject matter.

10.9   Amendments.  This Agreement may not be amended or modified in whole or in part without a duly authorized subsequent writing referencing this Agreement, executed by each Party.

10.10   Severability.  The invalidity or unenforceability of any term or provision of this Agreement in any situation or jurisdiction shall not affect the validity or enforceability of the other terms or provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction and the remaining terms and provisions shall remain in full force and effect, and this Agreement, with respect to such invalid or unenforceable provision, shall be reformed, construed and enforced in the applicable jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid or unenforceable provision.

10.11   Limitation on Damages.   IN NO EVENT SHALL LOSSES INCLUDE, NOR SHALL ANY INDEMNIFYING PARTY BE LIABLE TO ANY INDEMNIFIED PARTY FOR, (A) ANY EXEMPLARY OR PUNITIVE DAMAGES, OR (B) ANY LOSSES THAT ARE NOT, AS OF THE DATE OF THIS AGREEMENT, THE PROBABLE AND FORESEEABLE RESULT OF (I) AN INACCURACY OR BREACH BY A PARTY OF ANY OF ITS REPRESENTATIONS OR WARRANTIES UNDER THIS AGREEMENT OR (II) THE OTHER MATTERS GIVING RISE TO A CLAIM FOR INDEMNIFICATION UNDER THIS AGREEMENT, EXCEPT, IN ANY CASE, TO THE EXTENT THAT ANY SUCH LOSSES OR DAMAGES ARE REQUIRED TO BE PAID TO A THIRD PARTY PURSUANT TO A THIRD-PARTY CLAIM. The limitation on damages contemplated by the immediately preceding sentence shall not apply in the instance of any intentional violation of any covenant of any Parties herein.

10.12   Governing Law and Venue; Waiver of Jury Trial.   This Agreement shall be governed by the laws of the State of Texas without regard to its rules or principles regarding conflicts of laws. The Parties stipulate and agree, and hereby waive any claim or objection, that venue for any dispute hereunder shall be in a court of competent jurisdiction situated in Dallas County, Texas. **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

10.13   Disclaimer.   **EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES MADE BY SELLER OR BUYER IN THIS AGREEMENT OR ANOTHER TRANSACTION DOCUMENT, EACH PARTY ACKNOWLEDGES THAT (a) IT IS NOT RELYING UPON, AND HAS NOT RELIED UPON, ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY AND (b) NO PARTY HAS MADE ANY REPRESENTATION OR WARRANTY RELATED TO THE TRANSACTIONS CONTEMPLATED HEREBY, THE MEMBERSHIP INTERESTS, THE COMPANY, OR THE ASSETS OR LIABILITIES OF THE COMPANY, OTHER THAN THE EXPRESS AND SPECIFIC**

Person can show that such information: (a) is generally available to and known by the public through no fault of such Person, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by such Person, any of its Affiliates or their respective Representatives from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller, on the one hand, or Buyer, on the other hand or any of their respective Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, including in connection with litigation, such Person will promptly notify the other Parties hereto in writing and will disclose only that portion of such information that Seller is advised by its counsel in writing is legally required to be disclosed, provided that such Person will use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurances that confidential treatment will be accorded such information. Notwithstanding the foregoing, nothing herein shall be constructed to prevent or impede any party from exercising its rights or fulfilling its obligations hereunder or derogate from the obligations of Buyer under Section 2.2.

10.16   Equitable Relief.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached.  It is accordingly agreed that each of the Parties shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court identified in Section 10.12 (in each case, without the requirement of posting bond or other form of security).

[*Signature Pages Follow*]

207605883 v17
7597706.10/SP/15556/1209/021916

IN WITNESS WHEREOF, this Purchase and Sale Agreement has been duly executed and delivered by the duly authorized officer of each Party effective as of the date first written above.

**SELLER**:

BRIDGER LOGISTICS, LLC, a Louisiana limited liability company

By: _____
Name:  Julio E. Rios, II
Title:   President & Chief Executive Officer

**BUYER**:

JAMEX TRANSFER HOLDINGS, LLC, a Texas limited liability company

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, this Purchase and Sale Agreement has been duly executed and delivered by the duly authorized officer of each Party effective as of the date first written above.

**SELLER:**

BRIDGER LOGISTICS, LLC, a Louisiana limited liability company

By: _____
Name: Julio E. Rios, II
Title:   President & Chief Executive Officer

**BUYER:**

JAMEX TRANSFER HOLDINGS, LLC, a Texas limited liability company

By: _____

Name: _____James Ballengee_____

Title: _____Manager_____

SCHEDULE 4.4

CONTRACTS

1.      The Eddystone Agreement.

2.      Assignment and Assumption Agreement dated effective January 31, 2016 at 11:59 p.m. CST from Bridger Transfer Services, LLC, as assignor, to Bridger Terminals, LLC, as assignee.

3.      Assignment and Assumption Agreement dated effective January 31, 2016 at 11:59 p.m. CST from Bridger Transfer Services, LLC, as assignor, to Bridger Swan Ranch, LLC, as assignee.

4.      General Warranty Deed dated effective January 31, 2016 at 11:59 p.m. MST from Bridger Transfer Services, LLC, as grantor, to Bridger Swan Ranch, LLC, as grantee, recorded in the Official Records of the County Clerk, Laramie County, Wyoming.

5.      Truck Station Lease Agreement—Berthold Station dated December 1, 2010, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

6.      Truck Station Lease Agreement—Stanley Station (Lot 3A) dated December 1, 2010, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

7.      Truck Station Lease Agreement—Stanley Station (Lot 3B) dated December 1, 2010, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

8.      Truck Station Lease Agreement—Beaver Lodge Station dated September 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

9.      Truck Station Lease Agreement—Reserve Station dated October 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

10.     Truck Station Lease Agreement—Alexander Station dated November 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and

any and all amendments, modifications, extensions and ratifications thereof.

11.     Truck Station Lease Agreement—Trenton Station dated November 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

12.     Truck Station Lease Agreement—Gerona Station dated November 22, 2012, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

13.     Truck Station Lease Agreement—Little Muddy Station dated November 22, 2012, by and between Enbridge Pipelines (North Dakota), LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

14.     Connection Agreement dated March 17, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering crude pipeline connections to the Cline Shale System in Sterling and Irion Counties, Texas.

15.     License Agreement dated March 17, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering the Barnhart WTI Station in Irion County, Texas.

16.     Connection Agreement dated April 15, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering crude pipeline connections to the Centurion System in Scurry County, Texas.

17.     License Agreement dated April 15, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering the Bridger Transfer Services WTI Station in Scurry County, Texas.

18.     License Agreement dated December 7, 2011 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering the Midland Sweet Station in Midland County, Texas.

19.     Truck Station Connection Agreement dated December 7, 2011, by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering crude pipeline connections to the Centurion System in Midland County, Texas.