# EXHIBIT B

*Execution Version*

# RELEASE AND GUARANTEE AGREEMENT

**THIS RELEASE AND GUARANTEE AGREEMENT** (this "*Agreement*"), dated as of February 22, 2016, is made by and between Jamex Marketing, LLC ("*Jamex*") and Bridger Logistics, LLC ("*Bridger*").  Jamex and Bridger are herein referred to from time to time as the "*Parties*" and each, individually, as a "*Party*".

## RECITALS

WHEREAS, the Parties entered into that certain letter agreement dated as of January 13, 2016 (the "*Letter Agreement*");

WHEREAS, among other transactions, the Letter Agreement contemplates that Bridger shall sell, transfer, convey and assign to Jamex, and that Jamex shall purchase and receive from Bridger, the equity interests held by Bridger in Bridger Transfer Services, LLC ("*BTS*", and the definitive agreement pursuant to which the equity interests in BTS held by Bridger will be transferred to Jamex, the "*BTS Transfer Document*");

WHEREAS, in connection with the transactions contemplated by the BTS Document (which is hereby acknowledged and agreed to be that certain Purchase and Sale Agreement by and between Bridger and Jamex Transfer Holdings, LLC ("*Buyer*") dated as of even date herewith), Buyer, a newly formed, wholly owned subsidiary of Jamex will, after the consummation of the transactions contemplated by the BTS Transfer Document, be the record holder of 100% of the issued and outstanding equity interests of BTS;

WHEREAS, as a material inducement to enter into the BTS Transfer Document, Jamex agrees to cause Buyer to fulfill its obligations under the BTS Transfer Document and to guarantee payment of any amounts payable thereunder by Buyer in favor of Bridger;

WHEREAS, contemporaneously with the execution of this Agreement and the BTS Transfer Document, Jamex is receiving good and valuable consideration in exchange for Jamex's relinquishment of certain Claims (as defined herein) contemplated herein; and

WHEREAS, Jamex acknowledges that Bridger is relying on this Agreement in connection with Bridger's execution and delivery of the BTS Transfer Document.

NOW THEREFORE, in consideration for the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

## AGREEMENT

1. <u>Release by Jamex</u>. Effective as of consummation of the transfer of the equity interests in BTS to Buyer pursuant to the BTS Transfer Document (the "*Closing*"):

(a) Subject to <u>Section 1(d)</u> below, Jamex does hereby finally, unconditionally, irrevocably, and absolutely release, acquit, remise, and forever discharge Bridger and each of its past, present, and future shareholders, directors, officers, partners, managers, members,

1

Affiliates, employees, counsel, agents, representatives, and contractors and each of their respective successors and assigns (individually, a "*Releasee*" and, collectively, the "*Releasees*") from any and all accounts, agreements (including, but not limited to, any rights to indemnification, reimbursement, or compensation from any Releasee, whether pursuant to any contract, law, arrangement, commitment, undertaking or otherwise, and whether written or oral and whether or not relating to claims pending on, or asserted after, the Closing), avoidance actions, bills, bonds, causes, causes of action, charges, claims, complaints, contracts, controversies, costs, counterclaims, damages, debts, demands, equitable proceedings, executions, expenses, legal proceedings, liabilities, losses, matters, objections, obligations, orders, proceedings, reckonings, remedies, rights, setoffs, suits, and sums of money, of any kind, whether any of the foregoing exist at common law, exist by statute, or otherwise, and whether known or unknown, whether matured or unmatured, whether absolute or contingent, whether direct or derivative, whether suspected or unsuspected, and whether liquidated or unliquidated, in each case to the extent, but only to the extent, such arises directly or indirectly out of the sale of BTS to Buyer (each, a "*Claim*," and collectively, the "*Claims*"), including, but not limited to, any claims for breach of contract, breach of any special relationship, breach of duty of care, breach of duty of loyalty, breach of fiduciary duty, concealment, conflicts of interest, conspiracy, control, course of conduct or dealing, debt recharacterization, deceit, deceptive trade practices, deepening insolvency, defamation, disclosure, duress, economic duress, equitable subordination, fraud, fraudulent conveyance, fraudulent transfer, gross negligence, insolvency law violations, interference with contractual and business relationships, misrepresentation, misuse of insider information, negligence, breach of obligation of fair dealing, breach of obligation of good faith and fair dealing, breach of obligation of good faith, preference, secrecy, securities and antitrust laws violations, substantive consolidation, tying arrangements, unconscionability, usury, violations of statutes and regulations of governmental entities, instrumentalities and agencies, wrongful recoupment or setoff, or any tort, whether common law, statutory, or in equity, and including as a result of, or in relation to, any negligence of any Releasee; provided, however, that the releases herein made by Jamex shall not in any manner derogate from or be deemed to derogate from (i) the representations, warranties, covenants, and agreements made by Bridger to Buyer under the BTS Transfer Document and the other Transaction Documents (as such term is defined in the BTS Transfer Document), or (ii) the rights and remedies of Buyer or any Buyer Indemnitee under the BTS Transfer Document and the other Transaction Documents, as applicable.

(b) Except as otherwise provided for herein, Jamex, or Jamex on behalf of Buyer, hereby irrevocably waives and covenants and agrees to forbear and refrain from, directly or indirectly, asserting any Claim, or commencing, instituting, or causing to be commenced or instituted, any legal, arbitral, or equitable proceeding of any kind (whether actual, asserted or prospective) against any Releasee based upon any matter released pursuant to this Agreement.

(c) Without in any way limiting any of the rights and remedies otherwise available to any Releasee, Jamex shall indemnify and hold harmless each Releasee from and against all liabilities, claims, damages, and expenses (including reasonable attorneys' fees), whether or not involving third-party claims, arising directly or indirectly from or in connection with the assertion by or on behalf of Jamex of any Claim.

(d) The Parties agree that the Claims expressly set forth on Schedule 1 (and only to the extent set forth on Schedule 1) are not Claims that are being released pursuant to this Agreement and Section 1(a) specifically.

2. Severability.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal,, or unenforceable in any respect in any jurisdiction under any applicable law, such invalidity, illegality, or unenforceability shall not affect the validity, legality, or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed, and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal, or unenforceable provision.

3. Successors and Assigns; Third Party Beneficiaries.  The obligations of any Party under this Agreement may not be assigned without the prior written consent of the other Party, and any purported assignment in violation of the foregoing shall be void *ab initio*.  Subject to the immediately preceding sentence, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement is intended or shall be construed to confer upon any Person other than the Parties, the Releasees, and their respective successors and permitted assigns any right, remedy, or claim under or by reason of this Agreement.

4. Guarantee.

(a) Effective as of the date hereof, Jamex hereby absolutely, unconditionally, and irrevocably guarantees each and every representation, warranty, covenant, agreement and other obligation of Buyer, and the full and timely payment and prompt and complete performance of Buyer's obligations and liabilities, under the provisions of BTS Transfer Document (collectively, the "***Guaranteed Obligations***").  Jamex acknowledges that it is making the guarantee contemplated in this Section 4 (the "***Guarantee***") to induce Bridger to enter into the BTS Transfer Document.

(b) The Guarantee is an absolute, unconditional, and continuing guarantee of the full and timely payment and performance of the Guaranteed Obligations, and not of collection.  Should Buyer default in the payment of any of its payment obligations under the BTS Transfer Document, the corresponding Guaranteed Obligations hereunder shall become immediately due and payable by Jamex to Bridger.  Claims hereunder may be made on one or more occasions.  In the event that any payment to Bridger in respect of any Guaranteed Obligation is rescinded and/or returned to Jamex for any reason whatsoever, Jamex shall remain liable hereunder with respect to the Guaranteed Obligation as if such payment had not been made.

(c) For the purposes of clarity, to the fullest extent permitted by law, the continuing validity and enforceability of the Guarantee will not be affected by (i) any amendment or restatement of, supplement to, or modification or waiver of or consent to any departure from the BTS Transfer Document or the documents entered into in connection therewith that may be agreed to by Buyer, (ii) any release or discharge of any obligation of Buyer contained in the BTS Transfer Document resulting from any change in the existence,

3

structure, or ownership of Buyer, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting Buyer, (iii) the addition, substitution, or release of any Person primarily or secondarily liable for any Guaranteed Obligation, (iv) any other act or omission that may or might in any manner or to any extent vary the risk of Jamex or otherwise operate as a discharge of Jamex as a matter of law or equity, (v) the existence of any claim, set-off, or other right that Jamex may have at any time against Buyer or Bridger, whether in connection with the Guaranteed Obligations or otherwise, or (vi) the adequacy of any other means Bridger may have of obtaining the payment of the Guaranteed Obligations.

(d) Jamex hereby waives, to the fullest extent permitted by law, for the benefit of Bridger (i) any right to require Bridger, as a condition of payment or performance hereunder by Jamex, to proceed against Buyer or any other Person primarily or secondarily liable for any Guaranteed Obligation or pursue any other remedy whatsoever, (ii) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate Jamex or sureties, and (iii) promptness, diligence, notice of the acceptance of the Guarantee and of any Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor, and protest, notice of the incurrence of any Guaranteed Obligation and all other notices of any kind, all defenses which may be available by virtue of any valuation, stay, moratorium law, or other similar law now or hereafter in effect, any right to require the marshaling of assets of Buyer or any other Person interested in the transactions contemplated by the BTS Transfer Document, and all suretyship defenses generally (other than actual fraud by Bridger). Notwithstanding any waiver of defenses contemplated by the Guarantee, Jamex shall have the right to avail itself of any and all rights of Buyer to the extent expressly set forth in the BTS Transfer Document.

(e) Without limiting in any way the Guarantee, Jamex covenants and agrees to take all actions to cause and enable Buyer to comply with its obligations under the BTS Transfer Document that require action on the part of Buyer or any of its Affiliates to enable Buyer to comply with its obligations under the BTS Transfer Document.

(f) The Guaranteed Obligations, and each of them, shall conclusively be deemed to have been created, contracted, or incurred in reliance upon the Guarantee, and all dealings between Buyer or Jamex, on the one hand, and Bridger, on the other hand, in connection with the Guaranteed Obligations shall likewise be conclusively presumed to have been had or consummated in reliance upon the Guarantee.

5. <u>Representations and Warranties</u>.

(a) Jamex is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization.

(b) Jamex has the limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Jamex of this Agreement and the consummation by Jamex of the transactions contemplated hereunder have been duly authorized by all necessary action on the part of Jamex. Jamex is the legal and beneficial owner of all of the issued and outstanding equity securities of Buyer.

4

(c)  This Agreement has been duly executed and delivered by Jamex and constitutes a legal, valid, and binding agreement of Jamex, enforceable against Jamex in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

(d)  The execution, delivery, and performance of this Agreement by Jamex does not and will not (i) conflict with or violate its organizational documents, (ii) violate any applicable law, or (iii) result in any breach or violation of or constitute a default (with or without notice or lapse of time, or both) under or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, or other instrument or obligation to which Jamex is a party or by which Jamex or its properties are bound.

6. <u>No Subrogation</u>. Jamex hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Buyer or any other Person liable with respect to any of the Guaranteed Obligations that arise from the existence, payment, performance, or enforcement of Jamex's Guaranteed Obligations under or in respect of the Guarantee or any other agreement in connection therewith, including any right of subrogation, reimbursement, exoneration, contribution, or indemnification and any right to participate in any claim or remedy of Bridger against Buyer or such other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from Buyer or such other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the payment obligations contained in the Guaranteed Obligations and all other amounts payable under the Guarantee shall have been fully satisfied.  If any amount shall be paid to Jamex in violation of the immediately preceding sentence at any time prior to the payment in full in cash of the payment obligations contained in the Guaranteed Obligations, such amount shall be received and held in trust for the benefit of Bridger, shall be segregated from other property and funds of Jamex and shall forthwith be paid or delivered to Bridger in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the payment obligations contained in the Guaranteed Obligations, in accordance with the terms of the BTS Transfer Document, whether matured or unmatured, or to be held as collateral for the payment obligations contained in the Guaranteed Obligations thereafter arising.

7. <u>Satisfaction of Certain Obligations under Letter Agreement</u>.  Jamex and Bridger agree that their respective execution and delivery of this Agreement and the BTS Transfer Document fully satisfies and constitutes complete and timely performance of their respective obligations set forth in Section VI of the Letter Agreement.  Notwithstanding the previous sentence, each of Jamex and Bridger remains obligated to perform their respective obligations and undertakings as set forth elsewhere in the Letter Agreement.

8. <u>Governing Law; Venue; Waiver of Jury Trial</u>.

(a) This Agreement will be governed by, and construed in accordance with, the laws of the State of Texas, regardless of the laws that might otherwise govern under principles of

5

207580039 v11
7622325.5/SP/40962/0101/020916

conflict of laws thereof.  For any dispute arising hereunder, each Party hereby irrevocably submits to the jurisdiction of any state or federal court located within Dallas County in the State of Texas and irrevocably and unconditionally waives any objection to the laying of venue of any legal proceeding arising out a dispute concerning this Agreement, and agrees not to plead or claim in any such court that any such proceeding brought in any such court has been brought in an inconvenient forum or that such Party is not subject to personal jurisdiction in such court.

(b) TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

9. <u>Specific Performance</u>.  Jamex acknowledges and agrees that the Releasees would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, Jamex agrees that each of the Releasees shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof, without the requirement of posting bond or other form of security, in any action instituted in any court of the United States or any state thereof having, in accordance with the terms of this Agreement, jurisdiction over Jamex and any of the Releasees, and the matter, in addition to any other remedy to which it may be entitled, at law or in equity.

10. <u>Entire Agreement</u>.  This Agreement, the Letter Agreement, and the agreements contemplated herein and therein constitute the entire agreement between the Parties with respect to the Guaranteed Obligations, and supersede all prior agreements, understandings, representations, or warranties, written or oral, with respect to the Guaranteed Obligations by or between the Parties.

11. <u>Further Actions</u>.  Each Party shall execute and deliver such documents and take such other actions as may reasonably be requested by the other Party in order to carry out the provisions of this Agreement.

12. <u>Knowing and Voluntary Waiver</u>. Jamex, by its free and voluntary act of signing below, (a) acknowledges that it has been given appropriate time to consider whether to agree to the terms contained herein, (b) acknowledges that it has been advised to consult with an attorney and has consulted with an attorney prior to executing this Release, (c) acknowledges that it understands that this Agreement specifically releases and waives rights and Claims that it may have, and (d) agrees to all of the terms of this Agreement and intends to be legally bound

thereby. The Parties hereto acknowledge and agree that each Party has reviewed and negotiated the terms and provisions of this Agreement and has contributed to its preparation (with advice of counsel). Accordingly, the rule of construction to the effect that ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement. Rather, the terms of this Agreement shall be construed fairly as to all Parties and not in favor of or against any Party based on the fact that such Party may have drafted such terms or provisions.

13. <u>Interpretation</u>. The Recitals are incorporated into this Agreement for all purposes. This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by each of the Parties. Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) words using the singular or plural number also include the plural or singular number, respectively; and (c) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement. References to a Person are also to its successors and/or permitted assigns, if any. Unless specifically provided for herein, the term "or" shall not be deemed to be exclusive. The headings contained in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement. As used herein, "***Affiliate***" means, with respect to any, individual, entity or other person (a "***Person***"), any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

14. <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the Parties and delivered to the other Parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission shall be deemed the same as delivery of an original. At the request of any Party, the other Parties shall confirm facsimile or pdf transmission by signing a duplicate original document.

**[The remainder of this page is intentionally left blank.]**

207580039 v11
7622325.5/SP/40962/0101/020916

IN WITNESS WHEREOF, the undersigned have executed and delivered this Release and Guarantee Agreement as of the date first written above.

JAMEX MARKETING, LLC

By: _____
Name: _James Ballangee_____
Title: _Manager_____

BRIDGER LOGISTICS, LLC

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the undersigned have executed and delivered this Release and Guarantee Agreement as of the date first written above.

JAMEX MARKETING, LLC

By: _____
Name: _____
Title: _____

BRIDGER LOGISTICS, LLC

By: _*/s/ Julio E. Rios*_____
Name:  Julio E. Rios, II
Title: President and Chief Executive Officer

Schedule 1

The obligations between Jamex and a Releasee (each, a "*Jamex-Releasee Agreement*") to the extent arising out of any transaction, relationship or contract other than the BTS Transfer Document and the sale of BTS from Bridger to Jamex or its designee; provided, however, for the purposes of clarity, that Section 1(a) of this Agreement shall apply with respect to any Claim with respect to any failure or alleged failure by any Releasee to perform in accordance with the terms of a Jamex-Releasee Agreement prior to Closing.

Payment in February 2016 to BTS with respect to barrels of crude oil throughput through the Eddystone Rail Facilities (as such terms is defined in the Transportation and Logistics Services Agreement dated May 26, 2015, by and between Bridger Logistics, LLC and Monroe Energy, LLC, without giving effect to the amendment thereof on January 13, 2016) in January of 2016. Such payment per barrel of crude oil contemplated the immediately preceding sentence is equal to $2.25 per barrel so throughput in January of 2016.