## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17–cv–00495 |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF EDDYSTONE RAIL COMPANY'S LLC'S MOTION TO COMPEL**

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

## INTRODUCTION

Plaintiff Eddystone Rail Company, LLC, ("Eddystone") brings this motion in response to Defendants' refusal to produce key documents that are essential to understanding the alter ego relationships and fraudulent transfers at the core of this case.  As the Court is aware, Eddystone contends that, to hinder its ability to collect on its rights under its Rail Facilities Services Agreement ("RSA") with Bridger Transfer Services ("BTS"), the Defendants – who owned and controlled BTS – stripped BTS of its cash flow and other assets and transferred them to other entities owned by Defendants.

Defendants Bridger Logistics, Ferrellgas Partners, L.P., and Ferrellgas L.P. (together, "Ferrellgas") agreed to produce a complete set of accounting books and records for BTS and its immediate parent Bridger Logistics, expressly including "general ledgers" and associated accounting information, as part of a mutual and reciprocal program of early discovery.  The early discovery agreement was designed to provide each party with prompt access to important documents, streamline discovery, and help clarify the issues in this litigation.  But Ferrellgas ultimately did not produce the general ledgers and is now refusing to comply with its agreement.  These key accounting records are the complete record of BTS and Bridger Logistics's transactions and will provide evidence of the asset transfers and inter-affiliate relationships that are at the heart of Eddystone's claims.  Review of the BTS and Bridger Logistics general ledgers, including associated subsidiary ledgers, adjusting journals, and transaction detail, is essential for Eddystone to develop its case and proceed through discovery in an efficient manner – as Ferrellgas recognized when it agreed to produce these accounting ledgers up front.

Meanwhile, Defendants Rios and Gamboa – former executives of Ferrellgas, Bridger Logistics, and BTS – refuse "at this time" to produce documents dated before December 31, 2014 or after March 1, 2016.  But it was during 2014 that performance under the RSA

commenced and BTS and other Bridger entities established the course of dealing by which Defendants used BTS as a mere instrument for their own profit and created the implied contractual relationship alleged in the Complaint. Many other key events underlying this litigation – from the holding out of BTS as a bona fide independent entity to the negotiation of the RSA – all took place long before December 31, 2014. And the final wrapping up of Defendants' relationship with Monroe Energy, LLC (the customer for the oil transloaded under the Eddystone relationship) and the assignment of termination payments to Bridger Logistics rather than BTS did not occur until September 2016. Defendants themselves seek documents dating from January 1, 2012 to present in their own discovery requests. Rios and Gamboa should not be permitted to refuse unilaterally to produce relevant documents outside the December 31, 2014 to March 1, 2016 time period.

Finally, Defendants are unable to produce complete sets of Bridger bank records for the period before the Ferrellgas acquisition of Bridger Logistics. Therefore, Eddystone has requested bank account records of Defendants and other Bridger entities from Business First Bank, where the various Bridger entities, Rios, and Gamboa maintain their accounts, and from The Independent Bankers Bank, the bank that handled their wire transactions. Those banks have requested that Eddystone obtain Defendants' consent to the disclosure of the bank records. However, Defendants are unwilling to provide that consent without imposing draconian restrictions that would deprive the records of much of their value. Confidentiality is not a problem as this Court's July 31, 2017 protective order enables the parties to safeguard sensitive information, and Eddystone has offered to agree to reasonable redactions of personal expenditures. The bank records are highly relevant to alter ego and fraudulent transfer claims, and this Court should order Defendants to consent to their production.

## LEGAL STANDARD

"[T]he discovery rules are meant to be construed quite liberally so as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence." *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, No. 4:15-CV-00539, 2017 WL 2021514, at *3 (M.D. Pa. May 12, 2017) (citation omitted).

"Fed. R. Civ. P. 26(b)(1) defines the scope of discovery as 'any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . .'" *First Niagara Risk Mgmt., Inc. v. Folino*, 317 F.R.D. 23, 25 (E.D. Pa. 2016). The proportionality requirement "requires courts to consider the following factors when defining the scope of discovery: (1) the importance of the issues at stake, (2) the amount in controversy, (3) the parties' relative access to information, (4) the parties' resources, (5) the importance of discovery in resolving the issues, and (6) whether the burden or expense of discovery outweighs its likely benefits." *Id.* at 28.

"A party moving to compel discovery pursuant to Fed. R. Civ. P. 37 bears the initial burden of proving the relevance of the material requested." *First Niagara*, 317 F.R.D. at 25. "If the moving party meets this burden, the party resisting discovery can establish a lack of relevance by showing that the material requested does not fall within the broad scope of relevance defined by Rule 26 or is of such little relevance that the potential harm occasioned by discovery outweighs the ordinary presumption favoring its disclosure." *Id.*

ARGUMENT

I.    **THE COURT SHOULD ORDER FERRELLGAS TO PRODUCE THE BTS AND BRIDGER LOGISTICS GENERAL LEDGERS AND ACCOUNTING RECORDS, AS IT AGREED TO DO**

    **A.    Ferrellgas Agreed to Provide Accounting Records and General Ledgers, But Now Refuses to Live up to Its Commitment**

The Parties agreed to a joint initial exchange of the most highly relevant documents. The Parties each agreed to produce seven categories of key documents that would permit further discovery to proceed in a more informed and efficient manner. Theodore Decl. Ex. 1. As one of those categories, Ferrellgas agreed to produce:

> The accounting records of Bridger Logistics and BTS for the period January 1, 2012 to March 1, 2016, including balance sheets, **general ledgers** and adjusting journals, cash flow statements, statements of changes in equity, statements of income and retained earnings, and fixed asset schedules.

Theodore Decl. Ex. 1 at 2 (emphasis added).

In reliance on this agreement, Eddystone produced documents on August 11, 2017. Unfortunately, Ferrellgas did not comply with the Parties' initial discovery agreement. Rather than produce the set of accounting records described in Eddystone's request, Ferrellgas produced a mass of 12,000 documents. Those included many stray financial and accounting-related documents but not the general ledger or any complete or coherent set of accounting records describing the transactions of BTS or Bridger Logistics in an organized fashion. While this production has revealed substantial unlawful transfers, it is impossible to obtain a full, organized picture of BTS's transactions from what Ferrellgas has produced.

Eddystone raised the absence of a general ledger in an August 30 email to counsel for Ferrellgas and additional follow-up emails. Theodore Decl. Exs. 2-4. In a September 6 meet and confer telephone call, counsel for Ferrellgas stated that Bridger Logistics and BTS simply may not have kept general ledgers in the normal course of business. Theodore Decl. ¶ 5.

- 5 -

However, documents recently obtained via subpoena from Bridger's auditor KPMG

make clear that ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████ Moreover, it is implausible that a publicly traded company such as

Ferrellgas would not maintain a general ledger for the transactions of Bridger Logistics and BTS,

major subsidiaries with a business that Ferrellgas valued at almost $1 billion.  There is no way to

prepare financials or perform audits without a general ledger.  And, of course, Ferrellgas has

continued to disclose audited financial statements since the Bridger Logistics/BTS acquisition.

After Eddystone sent a follow-up letter making these points, Ferrellgas conceded that

general ledgers do exist after all.  Theodore Decl. Exs. 10-11.  But rather than agree to comply

with the Parties' early discovery agreement and fill the holes in its initial production, Ferrellgas

has now revoked its agreement to supply a general ledger, offering a series of excuses for

continuing not to honor its discovery agreement.  The Court should reject these arguments and

order Ferrellgas to turn over this critical discovery.

### B.    General Ledgers Are Critical Accounting Documents that Courts Regularly Order Produced in Alter Ego and Fraudulent Transfer Litigation

Of the accounting records that Ferrellgas agreed to produce in early discovery, the most

important are the general ledgers for Bridger Logistics and BTS, including subsidiary ledgers,

journals, and full transaction details.

A general ledger is "the main accounting record of a company or organization."  *See*

https://en.oxforddictionaries.com/definition/general_ledger.  It is "the principal and controlling

ledger of a business enterprise containing individual or controlling accounts for all assets,

liabilities, net worth items, revenue, and expenses." *See* https://www.merriam-webster.com/dictionary/general%20ledger. Any business of even moderate size must have an accounting system to evidence and keep track of revenue, expenses, assets, liabilities, inflows and outflows. Whenever a business transaction is executed it must be recorded in the company's books and records. A general ledger is the accumulation of those transactions – the collection and complete record of accounting data and transactions for the enterprise. Hermanson, Edwards & Maher, *Accounting Principles: A Business Perspective, First Global Text Edition, Financial Accounting* (8[th] ed.) ("A ledger (general ledger) is the complete collection of all accounts of a company."). Companies today maintain their general ledgers, along with the underlying ledgers and journals, in electronic systems that have the capability to export transaction data and account details to Excel spreadsheets as needed.

These records are essential to Eddystone's fraudulent transfer and alter ego claims. First, the general ledgers (including subsidiary ledgers, journals, and transaction detail) will reflect the complete picture of asset transfers by which Ferrellgas stripped BTS of assets before selling it to Jamex Transfer Holdings for $10 in February 2016. Evidence produced so far shows Defendants engaged in a brazen series of fraudulent transfers to other Ferrellgas entities ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



But not all intra-corporate family transfers are so neatly memorialized in transaction documents.  As the complete record of BTS and Bridger Logistics's transactions, the general ledger is likely to reveal additional such transfers.

Second, the general ledger and its associated accounting records will reflect the transfers and intercompany accounting by which Defendants deprived BTS of the cash flow from the Monroe relationship to which it was entitled.  BTS was owed such payments in return for providing crude injection, rail loading, and transloading services, and it needed these sums to obtain the funds to cover its payments under the RSA.  The accounting records evidence the course of dealing by which Defendants implicitly agreed to pay BTS amounts sufficient to cover the RSA's obligations – including deficiency payments – in return for having the transloading capacity available to them and then how Defendants abrogated that agreement by transferring the revenue to Bridger Logistics or other Ferrellgas entities.

Finally, these accounting records, if maintained properly, should capture all intercompany transactions involving Bridger Logistics and BTS and are thus the best evidence of the intercompany relationships and transfers.  They should provide a firm basis on which Eddystone – and ultimately the factfinder – can assess key details of the alter ego relationship between BTS and its affiliates.  Access to the Bridger Logistics and BTS general ledgers and related accounting records is needed so that Eddystone can understand how BTS and Bridger

Logistics accounted for the services that BTS provided to Bridger Logistics and/or other Ferrellgas companies, what payments BTS received, and what transfers BTS made to or from its affiliates.

For these reasons, courts regularly hold that general ledgers are highly relevant to alter ego and fraudulent transfer claims. *See Whitney v. Wurtz*, No. C04-05232 PVT, 2006 WL 3201035, at *1-*2 (N.D. Cal. Nov. 6, 2006) ("general ledger" was "relevant to show . . . show comingling of funds"); *Pielet Bros. Scrap Iron & Metal P'ship v. Reynolds Metal Co.*, No. 90 C 3807, 1994 WL 649105, at *3 (N.D. Ill. Nov. 15, 1994) (finding general ledgers "clearly relevant to determining whether assets were commingled and whether one entity was treating the assets of another as its own"); *He v. Rom*, No. 15-CV-1869, 2016 WL 5682012 (N.D. Ohio Oct. 3, 2016) (ordering defendants to produce balance sheets, general ledger reports, general ledger detail reports, income statements and tax returns in case where plaintiffs asserted breach of fiduciary duty and veil-piercing claims); *Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, No. 00 CIV. 2798 DLC, 2002 WL 31885795, at *11 (S.D.N.Y. Dec. 27, 2002) (intercompany transfers documented in general ledger support veil-piercing theory); *Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 278 (W.D. Mich. 2017) (same).

### C.   Ferrellgas's Excuses for Not Producing the General Ledgers are Without Merit

Ferrellgas itself has publicly acknowledged that Bridger "has and continues to experience material weaknesses in its internal controls over financial reporting" but now refuses to produce the general ledger that would lay bare those "weaknesses." Ferrellgas Partners, L.P., Form 8-K, June 1, 2015. First, Ferrellgas now asserts that Eddystone did not "define 'general ledger' in connection with the preliminary exchange." Theodore Decl. Ex. 11 at 1. Of course, Ferrellgas did not raise any such objection at the time of the Parties' agreement. That is because "general

ledger" is a universally understood accounting term, as reflected by the citations above. Indeed, the term even has its own Wikipedia entry, which explains that a "general ledger" "contains all the accounts for recording transactions relating to a company's assets, liabilities, owners' equity, revenue, and expenses" and "works as a central repository for accounting data." Black's Law Dictionary defines a company's "ledger" or "general ledger" as "A book or series of books used for recording financial transactions in the form of debits and credits; esp., a book in which a business or bank records how much money it receives and spends." *See* Black's Law Dictionary (10th ed. 2014) (definition of "ledger" and "general ledger"). And Bridger's auditor KPMG clearly understood the concept when it referred to Bridger's General Ledger repeatedly in its workpapers. Eddystone's request for "the accounting records of Bridger Logistics and BTS . . . , including . . . general ledgers and adjusting journals" is quite clear. "General ledger" is a well-understood term; Ferrellgas agreed to produce those documents as part of a mutual exchange of early discovery; and that agreement should be enforced.

Next, Ferrellgas argues that it should be excused from producing general ledgers because it produced 12,000 documents as part of initial discovery, among which can be found a hodge-podge of stray financial records, some of which even "incorporate 'general ledger' information." Theodore Decl. Ex. 11 at 2. But a disorganized mass of documents is not a general ledger, which is a complete *organized* record of BTS's transactions that will efficiently guide Eddystone and the jury through Defendants' activities. That is why auditors like KPMG rely on the general ledger and not random masses of documents. The assortment of disjointed financial documents in Ferrellgas's initial production is no substitute for a general ledger. As one judge observed when faced with a similar tactic, "a general ledger, unlike the other bits and pieces of financial documents defendants have produced, shows how, in the ordinary course of business, the

defendants characterized and accounted for intercompany transaction, if they accounted for it at all; a general ledger shows how defendants characterized and accounted for revenue; and, a general ledger shows transfers of . . . assets. . . . This type of information is clearly relevant to [] veil-piercing claims and is not similarly disclosed through check registers, cash disbursement journals, and bank account statements." *S. New England Tel. Co. v. Glob. NAPs, Inc.,* 251 F.R.D. 82, 91 (D. Conn. 2008), *aff'd,* 624 F.3d 123 (2d Cir. 2010). Indeed, that is exactly the agreement the Parties made. Rather than a document dump, Eddystone requested and Ferrellgas agreed to produce the general ledgers.

Turning to the general ledgers themselves, and dropping its claim that Bridger Transfer Services and Bridger Logistics general ledgers do not exist, Ferrellgas now asserts that they are protected from discovery because they are not maintained on a "standalone basis." Instead, "the raw data" is "collected and maintained by [Ferrellgas] in their current accounting software systems along with the data of many other affiliates." Theodore Decl. Ex. 11 at 2. But Ferrellgas is not entitled to withhold "accounting records of Bridger Logistics and BTS" that it expressly agreed to produce, Theodore Decl. Ex. 1 at __, simply because they are maintained in a joint accounting system. This is no basis to refuse to withhold critical documents that were part of the Parties' initial discovery agreement. Rule 34 plainly defines this accounting data as "electronically stored information" and "data or data compilations" as subject material subject to production because "it is stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." F.R.C.P. 34(a)(1)(A). Ferrellgas can easily export the BTS and Bridger Logistics ledger entries into a spreadsheet and should be ordered to do so.

Finally, Ferrellgas argues that general ledger entries for BTS and Bridger Logistics prior to the Ferrellgas acquisition are stored on archived computer systems. Theodore Decl. Ex. 11 at 2. But Ferrellgas expressly agreed to produce BTS and Bridger Logistics accounting information for that period as part of initial discovery and has now had more than four months to obtain it. The accounting books and records of BTS are critical alter ego and fraudulent transfer evidence in this litigation. *See Springel v. Prosser*, No. CIVIL ACTION 08-146, 2012 WL 2149737, at *6 (D.V.I. June 12, 2012), *aff'd sub nom. In re Innovative Commc'n Corp.*, 567 F. App'x 109 (3d Cir. 2014) (general ledger reflected fraudulent transfers); *Auto. Fin. Corp. v. Joliet Motors, Inc.*, 761 F. Supp. 2d 789, 793 (N.D. Ill. 2011) (defendant's failure to keep general ledger supported plaintiff's veil-piercing claim); *Aldmyr Sys., Inc. v. Friedman*, 215 F. Supp. 3d 440, 467 (D. Md. 2016), *aff'd*, 679 F. App'x 254 (4th Cir. 2017) (same). Ferrellgas cannot evade production because it resides on systems from 2015, a mere two years ago.

## II.   RIOS AND GAMBOA SHOULD NOT BE PERMITTED TO LIMIT DISCOVERY TO 2015

While Ferrellgas refuses to produce critical accounting records, Defendants Rios and Gamboa seek to exclude vast swathes of relevant discovery by restricting the time period for their production to December 31, 2014 to March 1, 2016 – notwithstanding that the time period called for in Defendants' own requests is January 1, 2012 to present. Theodore Decl. Exs. 17, 18 at 12.[1] Rios and Gamboa should be compelled to produce discovery from the full relevant timeframe, as enunciated by Defendants themselves.

---

[1] While Rios and Gamboa have not served their own discovery, they appear to be coordinating their defense with and piggy-backing on discovery served by Ferrellgas, which is paying their legal bills in this case.

Rios and Gamboa's date restriction would prevent Eddystone from taking discovery into critical facts. First, the 2012-2013 time period is crucial because that is when Defendants held out BTS as a bona fide, independent entity and induced Eddystone to enter the RSA while at the same time arranging their shipping arrangement with Monroe in the name of other entities that would owe no obligation to Eddystone under the RSA. In fact, Defendants themselves seek discovery from Eddystone relating to these negotiations, including "all documents concerning any negotiations, drafting, or approval concerning the RSA," "all documents concerning . . . analysis by ERC . . . concerning BTS, BL, any member of the Bridger Group," and so forth. Theodore Decl. Ex. 18 at Requests 6, 7.

Not only are these negotiations relevant themselves, but Eddystone is entitled to explore BTS's alter ego status at this key time period (and even back to BTS's 2011 formation). *See Painters Joint Comm. v. J.L. Wallco, Inc.*, No. 2:10-CV-1385 JCM PAL, 2011 WL 5854714, at *2 (D. Nev. Nov. 21, 2011) (permitting discovery as to alter ego claims from the time of the alter ego's corporate formation); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 (D. Del. 1985) (permitting discovery stretching back to the very beginning of an alleged restraint-of-trade scheme); *Schenley Indus., Inc. v. N.J. Wine & Spirit Wholesalers Ass'n*, 272 F. Supp. 872, 887 (D.N.J. 1967) ("The asserted history of the conspiracy … provides the temporal boundary for the discovery." (citation omitted)). This would cover the periods when evidence of "failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud" may have been created. *See Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). At a minimum, evidence of transactions during earlier years will "help piece together the . . . picture." *Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1367-68 (2d Cir. 1991).

Rios and Gamboa's December 31, 2014 cutoff date would also exclude the entire period of development of the Eddystone facility in 2013 and early 2014 and the first eight months of transloading under the RSA from May to December 2014. Accounting of revenues, intracompany transfers, and the arms-length relationship or lack thereof between BTS and its affiliates during that period is highly relevant to Eddystone's alter ego and fraudulent transfer claims. Moreover, the ongoing course of conduct and accounting of Monroe reviews during this period – by which Defendants acknowledged BTS's entitlement to a portion of the Monroe revenue stream – is evidence of the implied contract, subsequent abrogation of which and diversion of the revenues elsewhere is at the heart of the stripping of BTS and of Eddystone's fraudulent transfer claim.

The 2013-2014 period is also essential to Defendants' counterclaims and defenses predicated on supposed flaws with the Eddystone Facility, the so-called SEPTA rail window, and alleged obstructions in the Delaware River channel leading to Eddystone dock. *See* Dkt. Nos. 67 at 27-38 & 71-1. This was the time in which Defendants made arrangements with rail carriers, chartered a tanker with an excessively deep draft, and established the crude oil shipping operations that they now claim were obstructed by alleged design flaws in the Facility. Documents from this period go directly to the defenses and counterclaims arising out of Bridger's rail and barge operations. Notably, Defendants have requested a host of documents from this period regarding "obstacles in the channel", "limitations or constraints on access" to the Facility, and so on. Theodore Decl. Ex. 18 at Requests 43, 44.

Finally, cutting off production on March 1, 2016 prevents discovery of the ultimate wrapping up of Defendants' crude oil shipping arrangement with Monroe. Those agreements

incorporated ongoing payments to Bridger Logistics that by rights should have been obtained by

BTS and are relevant to the alter ego and fraudulent transfer claims at issue.

Rios and Gamboa should not be able to evade production of critical documents by

arbitrarily restricting the date range in a manner that contradicts Defendants' own discovery

requests. Although Ferrellgas is likely to provide the bulk of discovery in this case, counsel for

Rios and Gamboa have acknowledged that they conducted business through their personal email

accounts and retained possession of documents after leaving Ferrellgas last Fall.

## III.    DEFENDANTS SHOULD BE COMPELLED TO CONSENT TO THE PRODUCTION OF BANK RECORDS IN RESPONSE TO EDDYSTONE'S SUBPOENAS

Eddystone is also entitled to bank records for BTS and its affiliates with which it may

have done business and into whose accounts Defendants may have deposited revenues to which

BTS was entitled. Ferrellgas agreed to produce bank records as part of the initial discovery

agreement in this case. See Theodore Decl. Ex. 1. However, it produced records for only five of

the more than two hundred bank accounts that Bridger entities maintained. And for those five

accounts, Ferrellgas was able to produce only incomplete records. For one BTS operating

account, Ferrellgas produced statements for June 2013 and October 2014 to May 2015, but

nothing before June 2013, nothing else before October 2014, and nothing between May 2015 and

the sale of BTS to Jamex in January 2016. For another BTS operating account, Ferrellgas

produced nothing prior to October 2014 and nothing for July and November 2015. The

productions of statements for Bridger Logistics accounts – into which records show that BTS

invoicees were often instructed to deposit payments – are similarly limited.

Because Defendants have been able to produce only partial sets of historical bank

records, Eddystone subpoenaed the banks directly. Theodore Decl. Exs 21 & 22. Those banks,

Business First Bank and The Independent Bankers Bank, have requested that Eddystone obtain Defendants' consent to the production of their bank records and those of their affiliates, citing Louisiana and Texas bank privacy laws.

Eddystone requested that consent in emails dated September 5, September 12, and September 15, as well as on meet and confer telephone calls with counsel for Defendants' on September 6 and September 15. Theodore Decl. ¶ 18 & Exs. 4, 19, 20. Rios and Gamboa have refused to consent to production of any bank records other than statements for the period of November 2015 to March 2016 with almost all content redacted. Theodore Decl. ¶ 18. Ferrellgas has indicated that it will consent to production of Bridger Logistics's records and has stated that it will consider whether to consent to produce statements of a handful of other BTS affiliates but has refused to consent to a full production. Theodore Decl. ¶ 19.

Bank account information is essential to evaluate Eddystone's fraudulent transfer and alter ego claims. The account records will reflect Bridger's internal cash management and commingling of funds, including whether Eddystone or another Bridger entity actually received payments due to Eddystone under its contracts with third parties. Invoices indicate that in many instances BTS invoicees were instructed to make payments into accounts of Bridger Logistics or other Bridger entities rather than BTS. For this reason, courts have found "there is no question that bank records" are relevant to alter ego claims. *Lester v. Wow Car Co.*, No. 2:11-CV-00850, 2013 WL 6018537, at *4 (S.D. Ohio Nov. 13, 2013), *aff'd*, No. 2:11-CV-00850, 2014 WL 457542 (S.D. Ohio Feb. 4, 2014) (citing *Trans Pacific Ins. Co. v. Trans–Pacific Ins. Co.*, No. 90–2531, 1991 WL 152302 (E.D. Pa. Aug.2, 1991) (bank documents were relevant because "may provide further evidence of the alter-ego status")); *see also AJY Int'l, Inc. v. Paldo Co.*, No. 17-CV-00744-VC (LB), 2017 WL 3588241, at *3 (N.D. Cal. Aug. 19, 2017) (compelling

defendant to produce tax returns, bank statements, and balance sheets because such records were relevant to plaintiff's alter ego allegations); *Whitney v. Wurtz*, No. C04-05232 PVT, 2006 WL 3201035, at *1 (N.D. Cal. Nov. 6, 2006) ("checkbook register and bank statements and cancelled checks . . . are relevant to show alter ego liability").

The bank records may also confirm Eddystone's fraudulent transfer allegations by showing whether BTS received Monroe revenues generated largely by BTS's transportation services. The initial history of payments to BTS is evidence of BTS's entitlement to the Monroe proceeds and of an implied contract with its affiliates by which it was entitled to payment for its provision of transloading and other services essential to the sale and transportation of crude oil to Monroe. The diversion of that revenue to Bridger Logistics is evidence of the fraudulent transfers that are the gravamen of this action.

There is no good reason for Defendants to refuse to consent to the production of bank records of BTS affiliates, and they should be ordered to do so.

## CERTIFICATION OF COUNSEL

Undersigned counsel certifies that the Parties, after reasonable effort, are unable to resolve the discovery disputes identified in this motion.

## CONCLUSION

For the foregoing reason, Ferrellgas should be compelled to produce the general ledgers of BTS and Bridger Logistics for the period January 1, 2012 to March 1, 2016, including all subsidiary ledgers, adjusting journals, and transaction detail. Defendants should be ordered to produce documents for the full time frame of this case, not limited to the period December 31, 2014 to March 1, 2016. And Defendants should be ordered to consent to the production of all Bridger bank records maintained by Business First Bank and The Independent Bankers' Bank.

Dated: September 19, 2017                  Respectfully submitted,


/s/ Jeffrey M. Theodore
Henry E. Hockeimer, Jr. (I.D. No. 86768)
Terence M. Grugan (I.D. No. 307211)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com
grugant@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Jeffrey M. Theodore (*pro hac vice*)
Andrew J. Sloniewsky (*pro hac vice*)
Timothy Work (*pro hac vice*)
Nicholas Petts (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com
jtheodore@steptoe.com
twork@steptoe.com
npetts@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via the Court's ECF system on September 19, 2017, thereby serving all counsel of record.

/s/ Jeffrey M. Theodore
Jeffrey M. Theodore