## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:17-cv-00495-RK |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

### PLAINTIFF'S MOTION TO DISMISS AMENDED COUNTERCLAIMS
### AND TO STRIKE AFFIRMATIVE DEFENSES

Plaintiff Eddystone Rail Company, LLC ("Eddystone") hereby moves to dismiss with prejudice the Amended Counterclaims filed by Defendants Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P. (together with Ferrellgas Partners, L.P., "Ferrellgas"), to strike their Seventeenth, Eighteenth, and Twentieth Affirmative Defenses, and to strike the Eighteenth Affirmative Defense of Defendants Julio Rios and Jeremy Gamboa pursuant to Federal Rules of Civil Procedure 8, 9(b), 12(b)(6), and 12(f).   In support of this motion, Eddystone relies upon and incorporates by reference the attached Memorandum of Law in Support of Plaintiff's Motion to Dismiss Amended Counterclaims and to Strike Affirmative Defenses, and Declaration of Jeffrey M. Theodore and supporting exhibits.

WHEREFORE, Eddystone requests that this Court dismiss with prejudice Bridger Logistics's and Ferrellgas's Amended Counterclaims, strike their Seventeenth, Eighteenth, and Twentieth Affirmative Defenses, strike Rios and Gamboa's Eighteenth Affirmative Defense, and enter an Order in the form attached hereto.

Dated: October 12, 2017

Respectfully submitted,

/s/ Jeffrey M. Theodore
Henry E. Hockeimer, Jr. (I.D. No. 86768)
Terence M. Grugan (I.D. No. 307211)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com
grugant@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Jeffrey M. Theodore (*pro hac vice*)
Andrew Sloniewsky (*pro hac vice*)
Timothy Work (*pro hac vice*)
Nicholas Petts (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com
jtheodore@steptoe.com
asloniewsky@steptoe.com
twork@steptoe.com
npetts@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I, Jeffrey M. Theodore, hereby certify that I caused Plaintiff's Motion to Dismiss Amended Counterclaims and to Strike Affirmative Defenses and supporting documents to be filed and served to all counsel of record via the Court's ECF system on October 12, 2017.

Dated: October 12, 2017                                    /s/ Jeffrey M. Theodore

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17–cv–00495 |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF EDDYSTONE RAIL COMPANY'S LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS AMENDED COUNTERCLAIMS AND TO STRIKE AFFIRMATIVE DEFENSES

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ................................................................................................................3

    A.    The RSA ..............................................................................................................3

    B.    Eddystone's Supposed Representations about and Performance under the RSA ..............................................................................................................6

    C.    Eddystone's Failure to Agree to the Carlyle Acknowledgement Agreement ..........8

    D.    Bridger Logistics and Ferrellgas Unwind the Monroe Relationship and Sell BTS, Causing it to Default on Its Obligations Under the RSA ......................10

    E.    Eddystone Arbitrates against and Settles its Claims against Jamex ......................11

LEGAL STANDARD...........................................................................................................12

ARGUMENT ......................................................................................................................13

I.    THE TORTIOUS INTERFERENCE COUNTERCLAIM FAILS BECAUSE THE ARBITRATION SETTLEMENT HAD NO IMPACT ON DEFENDANTS' RIGHTS AGAINST JAMEX MARKETING ..................................................................13

    A.    Bridger Logistics and Ferrellgas Cannot Object to the Settlement Because They Still Have Their Claim for Indemnification against Jamex ...........................13

    B.    There is No Plausible Interference or Intent to Interfere with Bridger Logistics's and Ferrellgas's Rights .........................................................................15

II.    BRIDGER LOGISTICS'S AND FERRELLGAS'S COUNTERCLAIMS II-VII ARE CLAIMS OF BTS THAT BRIDGER LOGISTICS AND FERRELLGAS CANNOT ASSERT .........................................................................................................16

III.    THE BULK OF THE COUNTERCLAIMS MUST BE DISMISSED BECAUSE THE UNDERLYING ALLEGATIONS CONTRADICT THE RSA ...............................19

    A.    The Plain Language of the RSA Undermines Each of Ferrellgas's Allegations .............................................................................................................20

        1.    The Operational Date..............................................................................20

        2.    Transloading 80,000 Barrels within 12 hours............................................20

        3.    The "Granite Pinnacle" .............................................................................21

        4.    The SEPTA "Four Hour Window" ............................................................22

        5.    The 10,000 Barrel Per Hour Loading Rate ................................................23

    B.    The Contrary Terms of the RSA Defeat the Counterclaims for Fraud and Breach of Contract ...........................................................................................23

        1.    Bridger Logistics and Ferrellgas Cannot Premise Fraud Claims on Alleged Misrepresentations that Contradict the Terms of the Written Agreement, Particularly in Light of Its Integration Clause ..........23

        2.     Claims for Breach of Contract or of the Duty of Good Faith and
              Fair Dealing Cannot Contradict the Contract Terms .................................26

  C.    Defendants' Request for Rescission and Related Affirmative Defenses
       Must Also Be Dismissed...........................................................................29

CONCLUSION....................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2470 Cadillac Resources v. DHL Express (USA),*
    84 A.D.3d 697 (N.Y. App. Div. 2011) ...................................................................17

*Agretti v. ANR Freight Sys., Inc.,*
    982 F.2d 242 (7th Cir. 1992) .......................................................................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................................12

*Bank of New York v. Sasson,*
    786 F. Supp. 349 (S.D.N.Y. 1992) .............................................................................27

*Batoff v. Charbonneau,*
    130 F. Supp. 3d 957 (E.D. Pa. 2015) .........................................................................12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................................16

*Blue Mountain Mushroom Co. v. Monterey Mushroom,*
    246 F. Supp. 2d 394 (E.D. Pa. 2002) .........................................................................24

*Bravia Capital Partners v. Fike,*
    No. 09 CIV. 6375 JFK, 2010 WL 3359470 (S.D.N.Y. Aug. 25, 2010) ....................16

*Brokerage Concepts v. U.S. Healthcare,*
    140 F.3d 494 (3d Cir. 1998) .......................................................................................13

*Bross Utilities Service Corp. v. Aboubshait,*
    618 F. Supp. 1442 (S.D.N.Y. 1985) ...........................................................................18

*Buck v. Hampton Township School District,*
    452 F.3d 256 (3d Cir. 2006) .......................................................................................12

*Citibank, N.A. v. Plapinger,*
    66 N.Y.2d 90, 485 N.E.2d 974, 495 N.Y.S.2d 309 (N.Y. 1985) .......................25, 26

*Colonial Funding Network, Inc. for TVT Capital v. Epazz,*
    No. 16 CIV. 5948 (LLS), 2017 WL 1944125 (S.D.N.Y. May 9, 2017) ...................32

*D.S. America (East) v. Chromagrafx Imaging Systems,*
    873 F. Supp. 786 (E.D.N.Y. 1995) ............................................................................30

*Da Silva v. Musso,*
    53 N.Y.2d 543, 428 N.E.2d 382 (N.Y. 1981) ........................................................31

*Deom v. Walgreen Co.,*
    591 F. App'x 313 (6th Cir. 2014) ........................................................16

*Diesel Systems v. Yip Shing Diesel Engineering Co.,*
    861 F. Supp. 179 (E.D.N.Y. 1994) ........................................................17, 18

*Dunkin' Donuts Franchised Restaurants v. Claudia I,*
    998 F. Supp. 2d 383 (E.D. Pa. 2014) ........................................................23

*Flannery v. Mid Penn Bank,*
    No. 1:CV-08-0685, 2008 WL 5113437 (M.D. Pa. Dec. 3, 2008)........................16

*Forest Serv. Employees For Envtl. Ethics v. U.S. Forest Serv.,*
    No. CIV.A.08-323ERIE, 2009 WL 1324154 (W.D. Pa. May 12, 2009)................14

*In re Gabapentin Patent Litigation,*
    648 F. Supp. 2d 641 (D.N.J. 2009) ........................................................29

*Gagan v. United Consumers Club,*
    No. 2:10-CV-26-JD-PRC, 2011 WL 7462197 (N.D. Ind. Dec. 15, 2011) ...............31

*Gander Mountain Co. v. Islip U-Slip,*
    923 F. Supp. 2d 351 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014) ..............31

*Garrett v. Music Publishing Co. of America,*
    740 F. Supp. 2d 457 (S.D.N.Y. 2010) ........................................................27

*General Bank v. Mark II Imports,*
    293 A.D.2d 328, 741 N.Y.S.2d 201 (N.Y. App. Div. 2002) ..............................25

*Gerdau Ameristeel US Inc. v. Ameron Int'l Corp.,*
    No. 13 CIV. 07169 LGS, 2014 WL 3639176 (S.D.N.Y. July 22, 2014)................28

*GlobeTec Construction v. Custom Screening & Crushing,*
    77 So.3d 802 (Fla. App. 2011)........................................................19

*Gosmile v. Levine,*
    81 A.D.3d 77 (N.Y. App. Div. 2010) ........................................................19

*Hedges v. United States,*
    404 F.3d 744 (3d Cir. 2005)........................................................12

*J2 Cloud Services v. Fax87.com,*
    No. 13-05353 DDP, 2017 WL 1737951 (C.D. Cal. Apr. 28, 2017) ........................30

*Lama Holding Co. v. Smith Barney,*
    668 N.E.2d 1370 (N.Y. 1996) ............................................................................23

*Marine Midland Bank, N.A. v. Cafferty,*
    174 A.D.2d 932, 571 N.Y.S.2d 628 (N.Y. App. Div. 1991) ..........................24

*Marine Midland Bank, N.A. v. CES/Compu-Tech,*
    147 A.D.2d 396 (N.Y. App. Div. 1989) ...........................................................25

*MBIA Insurance Corp. v. Countrywide Home Loans,*
    105 A.D.3d 412, 963 N.Y.S.2d 21 (N.Y. App. Div. 2013) ...........................31

*McClease v. R.R. Donnelley & Sons Co.,*
    226 F. Supp. 2d 695 (E.D. Pa. 2002) ...............................................................15

*Nova Telecom, Inc. v. Long Distance Mgmt. Sys., Inc.,*
    No. CIV. A. 00-2113, 2000 WL 1593994 (E.D. Pa. Oct. 26, 2000).............15

*O'Grady v. BlueCrest Capital Management,*
    111 F. Supp. 3d 494 (S.D.N.Y. 2015)...............................................................26

*Pension Ben. Guar. Corp. v. White Consol. Indus.,*
    998 F.2d 1192 (3d Cir. 1993).............................................................................12

*Quad/Graphics Inc. v. Fass,*
    724 F.2d 1230 (7th Cir. 1983) ...........................................................................15

*In re Sch. Asbestos Litig.,*
    921 F.2d 1330 (3d Cir. 1990).............................................................................14

*Shein v. Myers,*
    394 Pa. Super. 549, 576 A.2d 985 (Pa. Super. 1990) ...................................15

*Sheth v. New York Life Insurance Co.,*
    273 A.D.2d 72, 709 N.Y.S.2d 74 (N.Y. App. Div. 2000) ............................24

*Skillgames v. Brody,*
    1 A.D.3d 247, 767 N.Y.S.2d 418 (N.Y. App. Div 2003) ............................23

*Slater Trust Co. v. Gardiner,*
    183 F. 268 (C.C.S.D.N.Y. 1910) ......................................................................32

*Taylor v. Pathmark,*
    No. CIV.A. 11-7702, 2013 WL 943359 (E.D. Pa. Mar. 12, 2013)..............17

*Triton Partners v. Prudential Securities,*
    301 A.D.2d 411, 752 N.Y.S.2d 870 (N.Y. App. Div. 2003) ........................24

*Tullett Prebon v. BGC Partners*,
  No. CIV.A.09-5365 (SRC), 2010 WL 2545178 (D.N.J. June 18, 2010), *aff'd*,
  427 F. App'x 236 (3d Cir. 2011) .........................................................................................17

*Wayland Investment Fund v. Millenium Seacarriers*,
  111 F. Supp. 2d 450 (S.D.N.Y. 2000).................................................................................26

*Yale University v. Konowaloff*,
  No. 3:09CV466 AWT, 2010 WL 3925262 (D. Conn. Sept. 29, 2010) ...................................30

**Other Authorities**

Fed. R. Civ. P. 12(b)(6).........................................................................................3, 29, 30

Fed. R. Civ. P. 12(f).................................................................................................29, 30

Fed. R. Civ. P. 15...........................................................................................................30

Restatement (Second) of Contracts §§ 261, 265 & cmt. (a) .......................................31

# INTRODUCTION

This litigation arises out of the efforts of Ferrellgas Partners, L.P., Ferrellgas, L.P., and Bridger Logistics, LLC (together, "Ferrellgas" or "Defendants") to avoid paying Eddystone Rail Company, LLC ("Eddystone") for the transloading capacity that they used to transport crude oil to their client Monroe Energy, LLC.  By using Eddystone's contractual counterparty Bridger Transfer Services, LLC ("BTS") as a sham entity, Defendants sought to secure the benefits of BTS's transloading capacity agreement with Eddystone – the Eddystone Rail Facilities Services Agreement ("RSA") – while evading the RSA's corresponding obligations to Eddystone.  When market conditions made the RSA expendable, Defendants stripped BTS of its cash flow and assets and, to make it more difficult for Eddystone to pursue an action against them, sold BTS and the RSA – BTS's only remaining "asset" – to a specially-formed subsidiary of their former affiliate Jamex Marketing, LLC.  Defendants knew that BTS's new parent lacked the resources to cover the remaining obligations under the RSA and had no business with which to earn revenue.

Having sold BTS and the RSA in an effort to evade Eddystone, Defendants now assert that Eddystone somehow tortiously interfered with the sales agreement by settling with BTS and its new parents so that it could proceed against Defendants, the entities who stripped and manipulated BTS.  But the arbitration settlement has no effect on Defendants' rights under the BTS sale agreement, which they have asserted as cross-claims in this litigation.  And there is no basis on which to suggest that a party to an arbitration such as Eddystone cannot settle with its adversary because the adversary has a contract with a third party.  Such a principle has no precedent and is at war with judicial policy that favors amicable settlement of disputes.  Eddystone had no obligation to continue to arbitrate against BTS and Jamex Marketing to conclusion before suing Ferrellgas.

In addition, having sold BTS, Defendants seek to sue Eddystone on claims that would accrue only to BTS under the RSA, as if the RSA were still their asset. Counterclaims 2-6 relate to supposed deficiencies of the Eddystone Rail Facilities that are the subject of the RSA. But Ferrellgas does not own the RSA and cannot assert BTS's claims, if any, regarding the transloading capacity it purchased in the RSA. Only BTS has the right to those claims, not Bridger Logistics or Ferrellgas. Nor can Bridger Logistics and Ferrellgas attempt to benefit from the fact that they should be treated as BTS's alter egos for purposes of Eddystone's Complaint: it is well settled that parents cannot pierce their own subsidiary's corporate veil in order to assert on their own behalf legal claims that accrue to the subsidiary. Ferrellgas does not own the facility deficiency claims, and they should be dismissed.

Finally, even if BTS did not own the "facility deficiency" counterclaims, the great bulk still would have to be dismissed because they consist of makeweight allegations that are inconsistent with the *express terms* of the RSA. Eddystone would be able to show on summary judgment that the Counterclaim allegations are false and that Defendants are simply attempting to manufacture non-existent problems in a smoothly functioning facility as a tactical litigation counterpoint. But Eddystone should not bear the expense of discovery on claims that are insufficient as a matter of law and should be dismissed.

The facility deficiency counterclaims are uniformly contradicted by the provisions of the RSA, which contains a broad integration clause crafted precisely to foreclose claims based on allegations inconsistent with its terms. Eddystone should not have to litigate the date on which the facility became operable when the RSA expressly states that it contains only an estimated date and that there will be no cause of action for a delay. Eddystone should not have to litigate the assertion that it promised 20,000 barrels per hour pumping capacity when the RSA

unambiguously requires only 7,000.  Eddystone should not have to litigate ostensible problems created by a longstanding Philadelphia commuter rail restriction outside the facility when the RSA makes clear that bringing trains to the facility is the exclusive responsibility of BTS.  It is settled law that claims contrary to the express provisions of a contract are to be dismissed under Rule 12(b)(6).

The supposed quality issues with the Facility and the supposed misrepresentations made by Eddystone are all inconsistent with the plain language of BTS's agreement with Eddystone.  As a result, neither BTS nor its former parents can maintain claims for intentional or negligent misrepresentation, breach of contract, or breach of the duty of good faith and fair dealing.[1] Bridger Logistics' and Ferrellgas's seventeenth, eighteenth, and twentieth affirmative defenses and request for rescission are based on the same allegations and are equally insufficient as a matter of law, as is the more summary version that Julio Rios and Jeremy Gamboa have asserted as their eighteenth affirmative defense.  They should be stricken for the same reasons the Counterclaims are dismissed.

## BACKGROUND

### A.    The RSA

In February 2013, Plaintiff Eddystone entered into a Rail Facilities Services Agreement (the "RSA") with BTS, a former subsidiary of Counterclaim Plaintiffs Bridger Logistics and Ferrellgas.

---

[1] The sole exception is the new claim – made for the first time in the Amended Counterclaims – that *after entry of the RSA* Eddystone fraudulently or negligently induced BTS to charter an oil tanker called the Petrochem Producer by misrepresenting or failing to disclose what it knew about the depth of the channel leading to the Facility.  This claim is false, but for purposes of this motion its sole deficiency is that Ferrellgas has no right to bring it.

In the RSA, Eddystone agreed "to construct and/or improve a new rail and barge facility located in Eddystone, Delaware County, Pennsylvania that will unload Crude Petroleum . . . from unit trains and load such Crude Petroleum into barges." Theodore Decl. Ex. 1 (RSA, February 13, 2013) at 1. BTS, "to induce [Eddystone] to construct, improve and operate the Eddystone Rail Facilities" "commit[ted] to utilize the Eddystone Rail Facilities for a specified minimum volume of Crude Petroleum over the term provided for in this Agreement." *Id.*[2] The Parties contemplated that BTS would bring railcars full of crude oil to the Eddystone facility (the "Facility"), where the crude would be transloaded from the railcars onto barges. The barges would then take the crude eight miles downriver to the Monroe Energy refinery at Trainer, Pennsylvania.

The Parties understood that Eddystone was constructing a new type of facility in an area where one had never been built before. They therefore wrote into the RSA that "Each of the Parties acknowledges and agrees that there are a number of contingencies that may affect the actual Operational Date." RSA § 2.2. The Parties "estimated that the Operational Date will occur on December 1, 2013," but in light of the "contingencies" that might "affect" that date, agreed that "neither Party will have any right or remedy against the other Party if the Operational Date occurs earlier or later than the estimated Operational Date." *Id.*

Eddystone agreed that, once the Facility was operable, it would "provide Transloading Services for [BTS's] Volume Commitment in accordance with this Agreement, the Terms and Conditions, and the Terminal Rules." RSA § 3.1. That Volume Commitment was 64,750 barrels

---

[2] The facts relied on in Eddystone's motion to dismiss are taken from the RSA, the Counterclaims filed by Bridger Logistics and Ferrellgas, and from documents referenced by and incorporated into the Counterclaims. Eddystone accepts the allegations of the Counterclaims as true for purposes of this motion only, except insofar as they contradict the terms of the RSA and the other documents incorporated therein.

a day (not the 80,000 alleged in the Counterclaims).  *Compare* RSA § 1.1 (definition of "Volume

Commitment") *with* Ferrellgas Counterclaims ("FGP CC") ¶ 9.[3]  Eddystone agreed to load

BTS's barge at a rate of "7,000 barrels per hour" (not the 20,000 bph alleged in the

Counterclaims).  *Compare* RSA Terms and Conditions ("T&C") § 9(b) *with* FGP CC ¶¶ 23, 30.

Eddystone's acceptance of volumes in excess of the Volume Commitment would be at "the sole

discretion of [Eddystone]."  RSA § 4.3.

Because BTS's objective was to transfer oil from North Dakota to Philadelphia and then

on to area refineries, and Eddystone's was to construct and operate a Facility capable of

transloading trains as they arrived at the Facility, the Parties assigned to BTS the sole

responsibility to manage the movements of its trains and barges.  BTS was to "cause Trains to be

delivered to the Eddystone Rail Facilities . . . and Barges to be delivered to the Eddystone Rail

Facilities."  T&C § 2(d).  The RSA expressly called for Eddystone to assign BTS train unloading

windows and barge unloading windows during which times BTS's trains and barges would have

access to the facility.  T&C § 2(c).  BTS was "solely responsible for aligning Trains and Barges

with its Assigned Train Unloading Windows and Assigned Barge Loading Windows."  T&C

§ 2(d).[4]

Because working with rail carriers and barge operators and bringing trains and barges to

the Facility was unambiguously BTS's responsibility, the RSA did not contain any

representations or requirements regarding trackage restrictions imposed by railroads outside of

---

[3] For the sake of simplicity, Eddystone cites the paragraph numbers in the Ferrellgas
version of the Counterclaims.  The Bridger Logistics Counterclaims contain identical allegations
at slightly different paragraph numbers.

[4] In fact, Eddystone assigned train and barge loading windows to match BTS's train and
barge schedules.  Thus, as a practical matter, BTS had round-the-clock train and barge windows
at the Facility.

the Eddystone facility or the depth of the Delaware River channel leading to the Eddystone

facility.  Instead, it provided that BTS would contract and negotiate with rail carriers and barge

operators.  T&C §§ 6, 8.

The Parties also agreed to a detailed integration clause: "This Agreement, the Terms and

Conditions and any Terminal Rules issued by Owner express the entire agreement of the Parties

with respect to the subject matter hereof and thereof, and all prior or contemporaneous

agreements or negotiations with respect to the subject matter hereof are hereby superseded, and

may be amended only by written agreement of the Parties."  RSA § 15.4.

**B.      Eddystone's Supposed Representations about and Performance under the RSA**

Notwithstanding the express language of the RSA, Ferrellgas alleges that Eddystone

made a series of extra-contractual misrepresentations and omissions to BTS about the Facility.  It

claims that the Facility did not live up to these promises but does not dispute that Eddystone

transloaded every train that BTS delivered to the Facility.

First, the Counterclaims allege that Eddystone had represented that



The RSA does not specify any minimum depth, places all responsibility for getting river

craft into the facility on BTS, and represents the "entire agreement of the Parties with respect to

the subject matter hereof" (i.e., the Eddystone Rail Facilities).

███████████████████████████████████████████████

███████████████████████████

Second, Ferrellgas alleges that Eddystone failed to disclose that a "constraint imposed by the Southeastern Pennsylvania Transportation Authority" ("SEPTA") restricted BTS's trains to a four hour window between midnight and 4 AM when leaving and departing the Facility.  FGP CC ¶ 51.  This refers to a longstanding SEPTA-imposed limitation on the times during which freight trains can move across a piece of trackage on SEPTA's service to Philadelphia International Airport.  The SEPTA trackage at issue is near the airport upstream of the Facility and was part of the route that BTS and its contracted rail carrier, Norfolk Southern, chose to have their trains traverse on their way to the Facility – despite the availability of other routes that did not require use of the airport trackage.

Third, Ferrellgas alleges that Eddystone represented that the Facility would pump crude oil into BTS's barges at a rate of 20,000 barrels per hour but that the Facility as constructed could only pump at a rate of 10,000 barrels per hour.  FGP CC ¶ 65.  Ferrellgas also asserts that Eddystone failed to install custody transfer meters and an adequate fire suppression system.  FGP CC ¶¶ 69–70, 170.  Ferrellgas contends that, together, these inconsistencies between Eddystone's

---

[5] Contrary to the allegations in the Counterclaims, the *Petrochem Producer* was not a "barge" and Eddystone did not misrepresent either the berths at its Facility or the channel leading to them (two separate matters conflated by Defendants).  In an attempt to save money while still transporting the same volume of crude, Bridger hired a single ocean going tanker rather than the two smaller river barges that would have been appropriate for the Delaware River and that the Parties had contemplated Bridger would use.  *See* T&C § 9(a) ("*Each Barge* will be loaded, at Owner's option, at either berth 1 or berth 2." (emphasis added)).  Eddystone repeatedly warned Bridger that the *Petrochem Producer* was not suitable for the Delaware River or the Eddystone facility, but Bridger hired it anyway.  In fact, the *Petrochem Producer* was substantially larger than ███████████████████ size that Eddystone told Bridger it could accommodate, FGP CC ¶ 36, and was too big to fit at either of Eddystone's berths.  To accommodate its customer, Eddystone managed to develop a procedure by which the *Producer* could moor at Eddystone through the use of both berths simultaneously and then depart with the tide.

representations and the Facility as built interfered with its efforts to move crude oil through the Facility, prevented it from making use of deficiency credits, and made compliance with the RSA "impracticable." FGP CC ¶¶ 181–82. Yet, the Counterclaims do not dispute that BTS continued to bring crude oil to the Facility or that Eddystone transloaded every train of oil that BTS brought to the Facility under the terms of the RSA.

      **C.**    **Eddystone's Failure to Agree to the Carlyle Acknowledgement Agreement**

Instead, Ferrellgas alleges that what actually prevented BTS's compliance with the terms of the RSA was Eddystone's supposed refusal to facilitate a third-party financing agreement between Carlyle Commodity Management, L.L.C, and Jamex Marketing, LLC (formerly Bridger Marketing, LLC), the former Bridger Logistics sibling company that was also the crude oil shipper with which BTS worked. FGP CC ¶¶ 86–100.

Specifically, Ferrellgas alleges that Bridger/Jamex Marketing required third-party financing in order to buy and sell the crude oil that BTS shipped through the Facility. FGP CC ¶ 86. ███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████

Eddystone's consent was needed to implement this financing arrangement for the crude oil that BTS would ship through the Facility. The RSA entitled Eddystone to a "lien on all of [the] Crude Petroleum received by Owner for Transloading Services." T&C § 12(a). █████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



Eddystone responded that it did not wish to enter into such an agreement, a view Ferrellgas

found unsurprising at the time. *See* below at 29 n.11.  Now, however, Ferrellgas alleges that

Eddystone's refusal to subordinate its contractual "lien on all of [BTS's] Crude Petroleum received by [Eddystone] for Transloading Services," RSA § 12(a)█████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

**D.      Bridger Logistics and Ferrellgas Unwind the Monroe Relationship and Sell BTS, Causing it to Default on Its Obligations Under the RSA**

In mid-January 2016, Bridger Logistics, Jamex Marketing, and Monroe agreed to stop the shipment of crude oil to Monroe via the Facility and entered into a series of agreements unwinding their deal, effective February 1, 2016███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████

At the same time, Ferrellgas and Bridger Logistics sold BTS to Jamex Transfer Holdings, LLC, a newly-formed subsidiary of Jamex Marketing (together, "Jamex"), for $10. *See* Dkt. 35-5 (Purchase and Sale Agreement "PSA"); FGP CC ¶ 103. ███████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

On February 1, 2016, the date of the transfer to Jamex, BTS immediately ceased all

payments to Eddystone under the RSA and did not deliver a single barrel of crude oil to the

Eddystone facility.  FGP CC ¶ 115.  Neither Jamex nor Bridger Logistics nor Ferrellgas made

good on the RSA payments.

**E.      Eddystone Arbitrates against and Settles its Claims against Jamex**

On April 19, 2016, Eddystone proceeded against BTS – now owned by Jamex – in

arbitration, as required by the RSA.  FGP CC ¶ 117.  BTS asserted counterclaims similar to those

that Bridger Logistics and Ferrellgas now assert.  FGP CC ¶ 118.

However, it soon became clear that neither BTS nor its new Jamex parents had the

wherewithal to cover the amounts due under the RSA.  Rather than spend millions arbitrating

against entities that could not pay, Eddystone entered into settlement negotiations.  ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

### LEGAL STANDARD

To survive a motion to dismiss, a pleading of counterclaims must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is proper where a complaint does not "state a claim as a matter of law." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005); *see also Batoff v. Charbonneau*, 130 F. Supp. 3d 957, 968 (E.D. Pa. 2015) (dismissing contract and fraud claims that "fail as a matter of law").

While a counterclaim plaintiff's allegations are generally accepted as true, a court "may consider documents . . . incorporated by reference or integral to the claim." *Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006) (quotation marks and citations omitted). Thus, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993) ("When a complaint relies on a document, . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.").

ARGUMENT

**I.     THE TORTIOUS INTERFERENCE COUNTERCLAIM FAILS BECAUSE THE ARBITRATION SETTLEMENT HAD NO IMPACT ON DEFENDANTS' RIGHTS AGAINST JAMEX MARKETING**

In the Amended Counterclaims, Ferrellgas alleges for the first time that Eddystone's arbitration settlement with the Jamex entities constitutes tortious interference with the BTS Purchase and Sale Agreement. Supposedly, the settlement was intended to deprive Ferrellgas of "bargained-for contractual rights under the BTS PSA" to indemnification from Jamex for any failure to pay amounts due under the RSA. FGP CC ¶ 150.

This interference claim is completely without merit as a matter of law. The arbitration settlement does not have any impact on Ferrellgas' indemnification rights against Jamex under the PSA – indeed, Ferrellgas has filed cross-claims asserting those very same rights in this litigation. And Eddystone is free to dispose of its claims against Jamex as it sees fit. Ferrellgas cannot use its bargain by which BTS was sold to Jamex – cooked up with the express purpose of evading debts to Eddystone – to force Eddystone into a pointless and expensive arbitration with an insolvent Jamex while the real party in interest skates free. Ferrellgas and Jamex Marketing are free to resolve their PSA claims among themselves, but the PSA does not bind Eddystone and cannot be used to stymie Eddystone in its effort to recover amounts that are due under the RSA.

**A.     Bridger Logistics and Ferrellgas Cannot Object to the Settlement Because They Still Have Their Claim for Indemnification against Jamex**

In Pennsylvania, a tortious interference claim requires that the defendant have acted intentionally to deprive the plaintiff of its contractual rights without justification. *See Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 530 (3d Cir. 1998) (requiring (1) "the existence of a contractual . . . relation;" (2) "purposeful action on the part of the defendant, specifically

- 13 -

intended to harm the existing relation;" (3) the "absence of a privilege or justification on the part

of the defendant;" and (4) the occasioning of actual legal damage as a result of the defendants'

conduct."). Moreover, to challenge a co-defendant's settlement as improper, a non-settling party

must show "some cognizable prejudice to a legal relationship between it and the settling parties."

*In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir. 1990). But the settlement has caused

Ferrellgas no cognizable prejudice, no legal harm, nor any deprivation of their contractual rights

because they can still assert – indeed, have already asserted – their claims for indemnification

against Jamex.

      Courts interpret the concept of prejudice narrowly. "Legal prejudice" will result only if

the settlement "attempts to thwart a specific legal right of the nonsettling party." *Forest Serv.*

*Employees For Envtl. Ethics v. U.S. Forest Serv.*, No. CIV.A.08-323ERIE, 2009 WL 1324154, at

*3 (W.D. Pa. May 12, 2009). In particular, "a settlement which does not prevent the later

assertion of a non-settling party's claims, although it may force a second lawsuit against the

dismissed parties, does not cause plain legal prejudice to the non-settling party." *In re Sch.*

*Asbestos Litig.*, 921 F.2d at 1333; *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir.

1992).

      That is exactly the case here. Ferrellgas can still pursue its indemnification claims

against Jamex, if any, and has done so in this action through a third-party complaint seeking

exactly that relief. There is no language in the arbitration settlement that Jamex can rely on to

defeat the cross-claims for indemnification. Ferrellgas has suffered no legal prejudice from the

settlement and therefore has no basis to challenge it as improper.

      As the Seventh Circuit explained, "Some disadvantage to the remaining defendants is

bound to occur and may, in fact, be the motivation behind the settlement. But just as a court has

no justification for interfering in the plaintiff's initial choice of the parties it will sue . . . the court

should not intercede in the plaintiff's decision to settle with certain parties, unless a remaining

party can demonstrate plain legal prejudice." *Quad/Graphics Inc. v. Fass*, 724 F.2d 1230, 1233

(7th Cir. 1983).

### B.     There is No Plausible Interference or Intent to Interfere with Bridger Logistics's and Ferrellgas's Rights

In any event, Ferrellgas cannot allege tortious interference because the settlement is not

the cause of Jamex's supposed failure to perform.  Under Pennsylvania tortious interference law,

a defendant must intentionally cause a third party to not perform its contract with the claimant to

be liable. *Nova Telecom, Inc. v. Long Distance Mgmt. Sys., Inc.*, No. CIV. A. 00-2113, 2000 WL

1593994, at *9 (E.D. Pa. Oct. 26, 2000) (citing *Maier v. Maretti*, 448 Pa.Super. 276, 671 A.2d

701, 707 (Pa.Super.1996)); *Shein v. Myers*, 394 Pa. Super. 549, 576 A.2d 985, 988 (Pa. Super.

1990) (tortious interference claim requires intentional action that results in interference of the

performance of a contract with another).  The interference must "intentional[ly] . . . caus[e] the

third party not to perform." *McClease v. R.R. Donnelley & Sons Co.*, 226 F. Supp. 2d 695, 703

(E.D. Pa. 2002).  But there is no plausible allegation that Eddystone caused Jamex not to honor

its indemnification obligations to Ferrellgas, much less that it intended to do so.

First, there can be no claim for tortious interference because Eddystone could not

possibly have caused a breach of Jamex's supposed indemnification obligations.  Jamex

Marketing was refusing to make payments under the RSA and not indemnifying Bridger

Logistics and Ferrellgas long before the arbitration settlement. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Thus, there is no possible avenue of causation by which the

settlement could have deprived Bridger Logistics and Ferrellgas of their indemnification payments. *See Flannery v. Mid Penn Bank*, No. 1:CV-08-0685, 2008 WL 5113437, at *9 (M.D. Pa. Dec. 3, 2008) (no tortious interference where the defendant "did not cause [the third party] to do anything").

Moreover, the Counterclaims offer no plausible grounds on which to allege that it was Eddystone's intention to interfere with Ferrellgas and Bridger Logistics's indemnification rights. While Ferrellgas offers conclusory assertions that it was Eddystone's "intention" and "purpose" to interfere with Bridger Logistics's rights, FGP CC ¶¶ 149–150, this "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Courts have consistently dismissed complaints based on bare allegations of intent where the actual "financial incentives make an inference of bad faith" not "colorable." *Bravia Capital Partners v. Fike*, No. 09 CIV. 6375 JFK, 2010 WL 3359470, at *5 (S.D.N.Y. Aug. 25, 2010). Here, any amounts that Jamex might pay to indemnify Bridger Logistics and Ferrellgas would only increase the amount of money available to satisfy an eventual judgment in this action. As a result, it is in Eddystone's own interest for Jamex to honor its contractual indemnification obligations. And where the defendant's "economic interests" make a claim of intent "facially implausible," the complaint should be dismissed for failure to state a claim. *Deom v. Walgreen Co.*, 591 F. App'x 313, 320 (6th Cir. 2014).

## II.     COUNTERCLAIMS II-VII ARE CLAIMS OF BTS THAT BRIDGER LOGISTICS AND FERRELLGAS CANNOT ASSERT

The remaining Counterclaims should be dismissed for a simple reason: Bridger Logistics and Ferrellgas do not own claims based on the RSA and cannot assert them. The Counterclaims are based entirely on the supposed misconduct of Eddystone toward BTS in respect of the RSA. Bridger Logistics and Ferrellgas are not parties to the RSA, and they gave up control of BTS

- 16 -

when they sold it to Jamex Marketing. They lack standing to assert BTS's claims and, as a matter of law, their status as alter egos does not give rise to a different result.

As Ferrellgas itself alleges, the RSA was between BTS and Eddystone. FGP CC ¶ 16. Ferrellgas does not claim that it or Bridger Logistics are parties to the RSA nor do they assert that they have any rights under the RSA. Notably, every single one of the allegations in the counterclaims speaks of Eddystone's obligations, duties, or representations to BTS or of BTS's rights and injuries. The Counterclaims allege that "BTS justifiably relied," that "BTS expended considerable sums," that "BTS [was not] able to continue to transload crude oil through the Facility," that "BTS could not access the Facility as promised," and that "BTS . . . incur[red] deficiency charges and delay-related costs." FGP CC ¶¶ 72–73, 100, 155. Bridger Logistics and Ferrellgas cannot bring a claim for alleged deficiency charges or forfeited deficiency credits allegedly due to BTS under the provisions of the RSA.

It is elementary that one who is not a party to a contract cannot bring an action under that contract. *See, e.g.*, *2470 Cadillac Resources v. DHL Express (USA)*, 84 A.D.3d 697, 698 (N.Y. App. Div. 2011) (dismissing plaintiffs' claim for breach of contract where plaintiffs were not parties to the agreement sued on).[6] And there is no exception to this fundamental rule for corporate affiliates. *See Tullett Prebon v. BGC Partners*, No. CIV.A.09-5365 (SRC), 2010 WL 2545178, at *4 (D.N.J. June 18, 2010), *aff'd*, 427 F. App'x 236 (3d Cir. 2011) (finding lack of standing where parent alleged that defendants harmed it by violating subsidiary's rights); *Diesel Systems v. Yip Shing Diesel Engineering Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994)

---

[6] While the RSA is governed by New York law, *see* RSA § 15.2, the same rule applies under Pennsylvania law. *See Taylor v. Pathmark*, No. CIV.A. 11-7702, 2013 WL 943359, at *8 (E.D. Pa. Mar. 12, 2013) (plaintiff could not bring a breach of contract claim where it was not a party to the agreement at issue).

(dismissing plaintiff's claims for tortious interference with contract to which sister company, and not plaintiff, was a party).

Nor does the alter ego context suspend this rule. It is black letter law that a corporate parent may not pierce its own subsidiary's corporate veil to assert its claims. *Diesel Systems*, 861 F. Supp. at 181 ("A corporation may not pierce the veil of another corporation that it set up for its own benefit in order to advance the claims of that corporation."). "[T]he courts will not allow a parent to pierce the corporate veil it created for its own benefit, so as to assert the claims of its subsidiary." *Bross Utilities Service Corp. v. Aboubshait*, 618 F. Supp. 1442, 1444 (S.D.N.Y. 1985). Thus, *Diesel Systems* dismissed a claim for tortious interference with a contract to which only the plaintiff's sister company was a party. The plaintiff was a "legal stranger to the contract and business relations that were allegedly interfered with," a fact the plaintiff could not overcome by piercing the veil of its sister company. 861 F. Supp. at 181. Likewise, in *Bross* the plaintiff had directed its subsidiary to contract with the defendant but still could not assert the subsidiary's breach of contract claims, regardless of the fact that it had assisted with contract performance and claimed the subsidiary was "merely a shell corporation created for tax purposes." 618 F. Supp. at 1445 ("A parent corporation cannot create a subsidiary corporation and then ignore the separate corporate existence of that subsidiary whenever it would be advantageous to the parent."). There simply is no legal basis for Ferrellgas to bring BTS's contract claims.

Similarly, Ferrellgas cannot assert claims for fraudulent or negligent inducement to enter into the RSA because the RSA is a contract into which Ferrellgas *never entered*. It is a fundamental element of the cause of action for inducement to enter into a contract by fraud or negligent misrepresentation that the party bringing the action actually have been induced to enter

- 18 -

into the contract. *Gosmile v. Levine*, 81 A.D.3d 77, 81 (N.Y. App. Div. 2010) ("To state a claim

for fraudulent inducement, there must be a knowing misrepresentation of material present fact,

which is intended to deceive another party and *induce that party to act on it*, resulting in injury")

(emphasis added). Thus, *GlobeTec Construction v. Custom Screening & Crushing*, 77 So.3d 802

(Fla. App. 2011), ordered a suit for fraudulent inducement dismissed where the plaintiff was not

a party to the contract formed. As a matter of law, Ferrellgas has no right to assert

Counterclaims II-VI, which must be dismissed.

### III.   THE BULK OF THE COUNTERCLAIMS MUST BE DISMISSED BECAUSE THE UNDERLYING ALLEGATIONS CONTRADICT THE RSA

Even if BTS had sought to bring the claims that Ferrellgas asserts in the Counterclaims,

dismissal of most would be appropriate because the allegations are squarely at odds with the

terms of the RSA. Particularly where a contract contains an integration clause, contracting

parties cannot rely on representations that contradict the contract language to which they agreed.

The RSA's contrary language therefore defeats an essential element of a misrepresentation

claim. Nor can parties assert claims for breach of contract or of the duty of good faith and fair

dealing where the express contract language is to the contrary. As a result, Counterclaims II-VI

and the corresponding affirmative defenses fail as a matter of law. The sole exceptions are the

fraud and negligent misrepresentation counterclaims and only to the extent they allege that

Eddystone caused BTS to charter an overly large oil tanker called the *Petrochem Producer* by

misrepresenting or failing to disclose what it knew about the depth of the channel leading to the

Facility approximately a year after entry of the RSA. FGP CC ¶¶ 31–50.[7]

---

[7] Of course, these claims still must be dismissed for the reasons given in Header II, above.

A.      **The Plain Language of the RSA Undermines Each of Ferrellgas's Allegations**

      1.      **The Operational Date**

Ferrellgas claims that BTS relied on a misrepresentation that the "facility would be complete and ready for operations in 'Fall 2013.'" FGP CC ¶ 9.  On the contrary, the RSA says explicitly that the Parties "estimated" an Operational Date of "December 1, 2013" but "acknowledge[d] and agree[d] that there are a number of contingencies that may affect the actual Operational Date" and that "neither Party will have any right or remedy against the other Party if the Operational Date occurs earlier or later than the estimated Operational Date." RSA § 2.2.  The RSA language reflects that the parties understood that building Eddystone was a complicated endeavor that had not previously been attempted in the area and expressly agreed that there could be no certainty as to when it would be complete.

Nor did Eddystone promise that a "second phase—with increased capacity and a pipeline distribution element—would be operational by the summer of 2014." FGP CC ¶ 9.  Instead, the RSA states that "one or more subsequent phases . . . *may* include connection(s) to *future* pipeline distribution system(s) . . . but such subsequent phase will include *only* such *connection(s)* and *not* any such future Pipeline Distribution Systems." RSA at 1 (emphasis added).  The plain language reflects that Eddystone did not agree to build new pipeline distribution systems; rather, it stated that *if* such systems were built, it *might* then decide to build a connection between the Facility and those systems.  Any such subsequent development phase would have been the subject of a separate contract guaranteeing the additional volumes needed to support such an investment.

      2.      **Transloading 80,000 Barrels within 12 hours**

Next, the Counterclaims allege a misrepresentation that "the facility would specifically be able to receive, unload, and depart a full unit train of 80,000 barrels within 12 hours." FGP CC ¶ 9.  In fact, the RSA provides that a "train unloading window," which is defined as the "period

of time . . . that is reserved . . . for a Train . . . to arrive at the Eddystone Rail Facilities, be unloaded, and depart" will be "twenty (20) hours."  RSA § 1.1 (definition of "train unloading window").  The RSA thus expressly contradicts Counterclaimants' allegation of a twelve-hour turnaround.

Moreover, Eddystone agreed to transload 64,750 barrels a day, not 80,000.  *See* RSA § 3.1 (matching Eddystone's transloading obligation to BTS's "Volume Commitment"); RSA § 1.1 (defining "Volume Commitment" to be 64,750 barrels a day); RSA § 4.3 (making acceptance of volumes in excess of the Volume Commitment would be at "the sole discretion of the Owner").[8]  Here, too, the counterclaims require rewriting the RSA.

### 3.    The "Granite Pinnacle"

The Counterclaims allege that Eddystone misrepresented that the depth of the Delaware River Channel leading to Eddystone's dock would be 31 or 34 feet.  But the RSA, which is by its terms the "entire agreement" regarding the requirements of the Eddystone Facility contains an extensive description of those requirements, includes no such minimum depth requirement, and places responsibility for bringing barges into the facility entirely on BTS.  The RSA requires BTS to nominate barges and entitles Eddystone to reject any barge if its characteristics – including "draft" – fail to satisfy "all of Owner's Barge Acceptance Criteria, in Owner's *sole discretion*."  T&C § 7(b), (c) (emphasis added).

Moreover, the RSA places any difficulties caused by the so-called "granite pinnacle" or any other obstructions in the Delaware River channel squarely within BTS's area of responsibility.  BTS was to enter charter agreements with barge operators, *see* T&C § 8, and to

---

[8] In fact, Eddystone regularly unloaded 80,000 barrels a day, turned BTS's trains around in well under 20 hours, and even transloaded three trains in a two-day period during which BTS brought the requisite trains to the Facility.

"cause . . . Barges to be delivered to the Eddystone Rail Facilities." BTS was "solely responsible for aligning . . . Barges with its . . . Assigned Barge Loading Windows, all in accordance with the schedule established from time to time by Owner or Operator." T&C § 2(d). Thus, it was BTS's obligation to hire a barge that could navigate the Delaware River channel and arrive at Eddystone's dock as warranted. BTS's decision to hire an oceangoing tanker with a deep draft may have caused it scheduling difficulties, but any such difficulty cannot be laid at Eddystone's feet under the express terms of the RSA.[9]

### 4.   The SEPTA "Four Hour Window"

Ferrellgas also alleges that a SEPTA-imposed restriction on the times during which freight trains could traverse the SEPTA airport line upstream of the Facility "adversely affected the arrival and departure times of trains, denying BTS the promised ability to arrive, unload and depart within 12 hours as advertised by ERC." FGP CC ¶ 61. Of course, the RSA calls for twenty-hour, not twelve-hour, turnaround times. RSA § 1.1 (definition of "Train Unloading Window").[10]

And, here too, the RSA makes it BTS's responsibility to negotiate with the railroads and to bring trains to the Facility. BTS was to "cause . . . Trains to be delivered to the Eddystone Rail Facilities" and was *solely responsible for aligning Trains . . . with its Assigned Train Unloading Windows.*" T&C § 2(d) (emphasis added). Under the RSA, Eddystone was to build and operate a transloading facility. BTS, not Eddystone, was responsible for dealing with train scheduling issues on the way to the Facility. There are dozens of trackage constraints between

---

[9] In fact, the *Petrochem Producer* went in and out of the Facility hundreds of times without incident.

[10] Were this allegation to survive dismissal, Eddystone would show that the SEPTA window is a routine rail traffic restriction that did not pose any obstacle to BTS's train deliveries throughout performance.

North Dakota and Eddystone, and Eddystone is no more responsible for the SEPTA window that it is for similar windows in Chicago, Cleveland, Altoona, or anywhere else along the route. The allegation is a red herring brought for tactical advantage. The RSA allocates responsibility for managing scheduling problems on the route to the facility to BTS, not to Eddystone.

### 5.      The 10,000 Barrel Per Hour Loading Rate

Ferrellgas alleges that Eddystone misrepresented the rate at which the Facility would load the Producer and that an "elbow" in the piping "resulted in the Facility pumping only 10,000bph ("barrels per hour"), just half of the 20,000 bph capacity represented by ERC." FGP CC ¶ 65. But the RSA expressly provides for a "minimum loading rate of 7,000 barrels per hour." *See* T&C § 9(b). According to the Counterclaims, Eddystone loaded BTS's barge at 10,000 bph – 3,000 bph *faster* than the RSA required.

### B.      The Contrary Terms of the RSA Defeat the Counterclaims for Fraud and Breach of Contract

#### 1.      Bridger Logistics and Ferrellgas Cannot Premise Fraud Claims on Alleged Misrepresentations that Contradict the Terms of the Written Agreement, Particularly in Light of Its Integration Clause

"Reasonable" or "justifiable" reliance is an essential element of a fraud claim. A "fraudulent inducement claim requires [the plaintiff] to allege and prove that it reasonably relied on a material misrepresentation." *Skillgames v. Brody*, 1 A.D.3d 247, 250, 767 N.Y.S.2d 418, 421 (N.Y. App. Div 2003); *see also Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1373 (N.Y. 1996) ("to recover damages for fraud, the plaintiff must prove . . . justifiable reliance of the other party on the misrepresentation"); *Dunkin' Donuts Franchised Restaurants v. Claudia I*, 998 F. Supp. 2d 383, 389 (E.D. Pa. 2014) ("A plaintiff claiming fraud in the inducement under Pennsylvania law must establish . . . justifiable reliance on the misrepresentation").

And there can be no reasonable reliance on an alleged misrepresentation that is at odds with the text of the contract at issue. *See Sheth v. New York Life Insurance Co.*, 273 A.D.2d 72, 74, 709 N.Y.S.2d 74, 75 (N.Y. App. Div. 2000) ("The purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for fraudulent and/or negligent misrepresentation since they . . . are contradicted by the written agreement between the parties."); *Blue Mountain Mushroom Co. v. Monterey Mushroom*, 246 F. Supp. 2d 394, 406 (E.D. Pa. 2002) (Plaintiff could "not justifiably rely on Defendant's alleged misrepresentations which contradict the written agreement.").

For example, in *Triton Partners v. Prudential Securities*, 301 A.D.2d 411, 411, 752 N.Y.S.2d 870, 870 (N.Y. App. Div. 2003), a "defendant's [supposed false] promise to proceed with [a] transaction" could not have fraudulently induced entry into an engagement letter where the engagement letter itself permitted termination of the transaction without cause. Even taking the alleged misrepresentation as true, the contrary terms of the contract defeated "plaintiff's claim of reasonable reliance." Indeed, "where the person claiming to have been defrauded has by specific contract provisions agreed to terms which are contrary to the oral promises allegedly relied upon, he himself would be guilty of deliberately misrepresenting his own true intentions" and cannot rely on the supposed extrinsic representations. *Marine Midland Bank, N.A. v. Cafferty*, 174 A.D.2d 932, 933, 571 N.Y.S.2d 628, 630-31 (N.Y. App. Div. 1991).

Here, Ferrellgas's fraudulent inducement allegations are contrary to the plain words of the RSA. By its plain language, the RSA does not require any minimum channel depth; it places on BTS the responsibility to work with the railroads to bring trains to the facility; and it permits a 10,000 barrel per hour loading rate. BTS could not reasonably have relied on alleged contrary representations that it failed to incorporate into the terms of the RSA.

Even if the extracontractual counterclaims were not directly contradicted by the RSA, they would be prohibited by the strong integration clause to which the Parties agreed in the RSA – a provision that is itself a basis to dismiss fraud claims based on supposed extra-contractual representations. Where a contracting party agrees that it will not rely on oral representations extrinsic to a contract, it cannot bring a fraudulent inducement claim predicated on just such representations. *See Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95, 485 N.E.2d 974, 977, 495 N.Y.S.2d 309, 312 (N.Y. 1985).

Section 15.4 of the RSA provides that:

> This Agreement, the Terms and Conditions and any Terminal Rules issued by Owner express the entire agreement of the Parties with respect to the subject matter hereof and thereof, and all prior or contemporaneous agreements or negotiations with respect to the subject matter hereof are hereby superseded, and may be amended only by written agreement of the Parties. Notwithstanding the foregoing, the Terms and Conditions and Terminal Rules are subject to amendment, supplement and/or restatement by Owner from time to time in accordance with Section 6 hereof.

Applying the rule announced in *Plapinger*, New York courts have dismissed fraudulent inducement and misrepresentation claims based on integration clauses almost identical to the RSA's. For example, in *Marine Midland Bank, N.A. v. CES/Compu-Tech*, 147 A.D.2d 396, 396-98 (N.Y. App. Div. 1989), the First Department dismissed a fraudulent inducement claim based on a contract term that read, "'[t]his Agreement and the other documents delivered pursuant to, and referred to in, this Agreement set forth the entire understanding of the parties hereto with respect to the subject matter thereof and may be modified only by a written instrument duly executed by [the parties].'" Similarly, in *General Bank v. Mark II Imports*, 293 A.D.2d 328, 328-29, 741 N.Y.S.2d 201, 202 (N.Y. App. Div. 2002), a contract provision providing the "Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or

amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment" was sufficient to bar reliance on extrinsic representations.

The language of the integration clauses at issue in the New York cases discussed above is almost identical to that of the RSA. As the New York Court of Appeals put it in *Plapinger*, to allow a fraud claim in these circumstances would "in effect condone [Plaintiff's] own fraud in deliberately misrepresenting [its] true intention" regarding reliance on oral statements. 66 N.Y.2d at 95, 485 N.E.2d at 977, 495 N.Y.S.2d at 312 (citation and quotation marks omitted).

Accordingly, the inducement by fraud counterclaims should be dismissed due to their inconsistency with the RSA's terms and the RSA's integration clause.

### 2. Claims for Breach of Contract or of the Duty of Good Faith and Fair Dealing Cannot Contradict the Contract Terms

The contrary terms of the RSA also defeat the contract and "good faith and fair dealing" counterclaims. Contract interpretation is a matter of law, and courts routinely dismiss breach of contract claims that contradict the contract terms. For example, in *O'Grady v. BlueCrest Capital Management*, 111 F. Supp. 3d 494, 500–01 (S.D.N.Y. 2015), a hedge fund manager sued for breach of contract when he was terminated without receiving his annual bonus. Since his employment agreement made clear that all bonuses would be paid in the firm's absolute discretion, the court granted the firm's 12(b)(6) motion, explaining that "the plain terms of the Agreement foreclose[d] his breach of contract claim." *See also Wayland Investment Fund v. Millenium Seacarriers*, 111 F. Supp. 2d 450, 457 (S.D.N.Y. 2000) (dismissing claim for breach of promissory notes that relied on an interpretation of the notes that was at odds with their plain terms). Thus, Ferrellgas cannot make out a breach of contract claim based on allegations that run afoul of the contract language.

These considerations also dispose of the good faith and fair dealing counterclaim. Despite having claimed that the other deficiencies of the Facility made transloading crude oil in accordance with the terms of the RSA "impracticable," Ferrellgas alleges that what actually deprived BTS of oil to transload at the Facility was ███████████████████ ████████████████████████████████████████████████████ ████████████████████  But Eddystone's refusal to agree to an "acknowledgement" that its ████████████████████████████████████████████████████ ████████████████████  cannot be a violation of the implied duty of good faith and fair dealing because that duty "does not impose an affirmative duty to assist a contracting party in performing its obligations under the contract." *Garrett v. Music Publishing Co. of America*, 740 F. Supp. 2d 457, 459, 463 (S.D.N.Y. 2010) (refusing to require that a defendant grant its counterparty an extension or help it to procure necessary assignments of interest).

Eddystone was under no obligation to consent to ██████████████████████ ████████████████████████  because that would undermine its own contractual right in the RSA to a "lien on all of Customer's Crude Petroleum received by Owner for Transloading Services." T&C § 12(a).  The duty of good faith "does not require the promisor to take actions contrary to his own economic interest." *Bank of New York v. Sasson*, 786 F. Supp. 349, 354 (S.D.N.Y. 1992).  Eddystone negotiated lien rights to the oil passing through its facility, and Ferrellgas cannot use the duty of good faith to undermine those express terms of the RSA. Therefore, as a matter of law, ████████████████████████████████████ ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████





### C.   Defendants' Request for Rescission and Related Affirmative Defenses Must Also Be Dismissed

The Court should also strike the Seventeenth, Eighteenth, and Twentieth Affirmative

Defenses from Bridger Logistics's and Ferrellgas's Answers and the Eighteenth Affirmative

Defense asserted by Julio Rios and Jeremy Gamboa.  These defenses, based on breach of

contract, fraud, and rescission, advance the same legal theories as Defendants' Counterclaims,

and therefore similarly fail as a matter of law.  The same is true of the request for rescission as an

alternative form of relief on the Bridger Logistics and Ferrellgas Counterclaims.

Under Rule 12(f), the Court may strike an affirmative defense "if it cannot succeed under

any circumstances" and is insufficient as a matter of law.  *In re Gabapentin Patent Litigation*,

648 F. Supp. 2d 641, 647–48 (D.N.J. 2009).  An affirmative defense challenged under Rule 12(f)

as legally insufficient "is governed by the same standards as a motion to dismiss filed pursuant to

Fed. R. Civ. P. 12(b)(6)."  *Id.*  Consequently, where courts have dismissed a counterclaim as

_____

*See*

Theodore Decl. Ex. 4.

legally insufficient under Rule 12(b)(6) they also strike affirmative defenses based on the same legal grounds. *See, e.g., D.S. America (East) v. Chromagrafx Imaging Systems*, 873 F. Supp. 786, 797–98 (E.D.N.Y. 1995) (where court had dismissed counterclaim for breach of contract under Rule 12(b)(6), dismissing affirmative defense as legally insufficient under Rule 12(f) to the extent based on same theory).

In their Seventeenth, Eighteenth, and Twentieth Affirmative Defenses, Ferrellgas and Bridger Logistics recycle the exact same allegations and legal theories it asserts in the Counterclaims. They again make allegations about a delay in construction, the "granite pinnacle," the four-hour SEPTA "window," the 10,000 bph loading rate, the fire suppression system, the lack of a custody transfer meter, and Eddystone's inability to subordinate its interests to a new third-party financier for Bridger Logistics' benefit. Dkt. 67 at 23-25; Dkt. 68 at 26-27; Dkt. 78 at 26-27; Dkt. 79 at 23-25.[12] And they again argue breach of contract and fraudulent inducement while seeking rescission as a remedy. *Id.*

The Seventeenth, Eighteenth, Twentieth Affirmative Defenses raise no arguments not already advanced in Bridger Logistics's and Ferrellgas's Counterclaims.[13] Like their corresponding Counterclaims, these Affirmative Defenses are legally insufficient because they

---

[12] The Court should also strike all of the revisions to Bridger Logistics's and Ferrellgas's answers and affirmative defenses submitted as part of their Amended Answer and Counterclaims, Dkts. 76 & 77. Unlike the counterclaims, the answer and affirmative defenses are not pleadings as to which a responsive pleading is required. "A single filing which contains both an Answer and a Counterclaim constitutes two separate pleadings, and only the latter is a pleading 'to which a responsive pleading is required' for purposes of Rule 15." *J2 Cloud Services v. Fax87.com*, No. 13-05353 DDP (AJWX), 2017 WL 1737951, at *2 (C.D. Cal. Apr. 28, 2017). As a result, Rule 15 does not permit amendment as a matter of right more than twenty-days after filing. Bridger Logistics and Ferrellgas must seek leave of the Court to amend their answer and affirmative defenses. *See id.*; *Yale University v. Konowaloff*, No. 3:09CV466 AWT, 2010 WL 3925262, at *2 (D. Conn. Sept. 29, 2010).

[13] Rios and Gamboa's Eighteenth Affirmative Defense is simply a more summary version of the defenses advanced by Bridger Logistics and Ferrellgas. *See* Dkt. 66 at 19.

run afoul of Eddystone's entitlement to settlement its claims against Jamex, because only BTS can assert them, and because on the merits they are foreclosed by the plain terms of the RSA. Accordingly, just as the Counterclaims fail as a matter of law and should be dismissed, the Affirmative Defenses based on the same legal grounds should be stricken. *See Gagan v. United Consumers Club*, No. 2:10-CV-26-JD-PRC, 2011 WL 7462197, at *6 (N.D. Ind. Dec. 15, 2011) ("[A]ffirmative defenses 17 and 25 rest on the same legal ground as the counterclaims— counterclaims that the Court has recommended that the District Court dismiss as legally insufficient.  Accordingly, the affirmative defenses are redundant of the legally-insufficient counterclaims and are hereby stricken.").

Inconsistency with the RSA language also defeats rescission, a doctrine that is barred where the underlying allegations run afoul of the contrary terms of the parties' written deal. Ferrellgas cannot claim mistake where they have received "neither more nor less than that for which they bargained." *Da Silva v. Musso*, 53 N.Y.2d 543, 552, 428 N.E.2d 382, 387 (N.Y. 1981).  And their allegations of frustration of purpose and impracticability cannot survive where "non-occurrence of the event" of which they complain was not "a basic assumption on which the contract was made." *Gander Mountain Co. v. Islip U-Slip*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014); Restatement (Second) of Contracts §§ 261, 265 & cmt. (a).  Having agreed to contradictory contract language, Ferrellgas cannot now contend that at 34-foot channel depth, absence of trackage restrictions on the rail route from North Dakota to the Facility, and 20,000 barrel pumping rate were 'basic assumptions" on which the RSA was made.

Finally, the request for rescission is improper because the RSA transaction cannot be undone.  Rescission is a "very rarely used equitable tool," *MBIA Insurance Corp. v. Countrywide*

- 31 -

*Home Loans*, 105 A.D.3d 412, 413, 963 N.Y.S.2d 21, 22 (N.Y. App. Div. 2013), that "is not available where, like here, the transaction cannot be undone without prejudicing the other party." *Colonial Funding Network, Inc. for TVT Capital v. Epazz*, No. 16 CIV. 5948 (LLS), 2017 WL 1944125, at *7 (S.D.N.Y. May 9, 2017). It is a cardinal rule that "relief is . . . always limited to a restoration of the parties to the status quo." *Slater Trust Co. v. Gardiner*, 183 F. 268, 273 (C.C.S.D.N.Y. 1910). Because that is impossible in light of Eddystone's substantial investment based on the RSA to create a transloading facility, rescission is not an available remedy.

## CONCLUSION

For these reasons, the Court should grant Eddystone's motion and dismiss all Amended Counterclaims, strike the Seventeenth, Eighteenth, and Twentieth Affirmative Defenses asserted by Bridger Logistics and Ferrellgas, and strike the Eighteenth Affirmative Defense asserted by Julio Rios and Jeremy Gamboa.

Dated: October 12, 2017

Respectfully submitted,

/s/ Jeffrey M. Theodore
Henry E. Hockeimer, Jr. (I.D. No. 86768)
Terence M. Grugan (I.D. No. 307211)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com
grugant@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Jeffrey M. Theodore (*pro hac vice*)
Andrew J. Sloniewsky (*pro hac vice*)
Timothy Work (*pro hac vice*)
Nicholas Petts (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com
jtheodore@steptoe.com
twork@steptoe.com
npetts@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via the Court's ECF system on October 12, 2017, thereby serving all counsel of record.

/s/ Jeffrey M. Theodore
Jeffrey M. Theodore