**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
|  | ) | No. 2:17-cv-00495-RK |
| JULIO RIOS and JEREMY GAMBOA, | ) | |
| Defendants, | ) | |
|  | ) | |
| BRIDGER LOGISTICS, LLC, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P., | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| v. | ) | |
|  | ) | |
| JAMEX MARKETING, LLC (f/k/a BRIDGER | ) | |
| MARKETING, LLC), JAMEX TRANSFER | ) | |
| HOLDINGS, LLC, JAMEX, LLC (f/k/a | ) | |
| BRIDGER, LLC), JAMEX TRANSFER | ) | |
| SERVICES, LLC (f/k/a BRIDGER TRANSFER | ) | |
| SERVICES, LLC), JAMES BALLENGEE and | ) | |
| JOHN DOES 1-10, | ) | |
| Third-Party Defendants. | ) | |
|  | ) | |

**DEFENDANTS / THIRD-PARTY PLAINTIFFS BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P., and FERRELLGAS L.P.'S RESPONSE IN
OPPOSITION TO PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S
MOTION TO COMPEL**

AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, Pennsylvania 19103
T: (215) 965-1200
F: (215) 965-1210

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002

I.      INTRODUCTION

The Court should deny Plaintiff Eddystone Rail Company's LLC's Motion to Compel [ECF No. 73] ("Motion to Compel" or "Mot."),[1] which is not, and never was, necessary or ripe. First, the BL/FG Defendants never refused to produce electronically stored general ledger data of Logistics or BTS and, in fact, are in the process of making such production.  Second, the BL/FG Defendants were in the process of discussing reasonable limitations on the excessively broad scope of the bank subpoenas for which ERC sought the BL/FG Defendants' consents, when ERC filed the motion and, in fact, have since reached such agreement.  Although these two issues are now resolved, ERC refuses to withdraw the motion against the BL/FG Defendants in its entirety, or even to extend the response deadline.  Absent a dispute requiring this Court's intervention, ERC is using the motion solely as a vehicle to try to prejudice the Court's view of the case and the parties.  Indeed, the Motion appears to be a pretext for ERC to sell its view of the merits and present the BL/FG Defendants as uncooperative in discovery; it is replete with misstatements in these respects.  Accordingly, the BL/FG Defendants file this opposition in order to apprise the Court of the status of the two issues, correct certain factual mischaracterizations, make clear that they have been reasonable and cooperative throughout the discovery process, and highlight certain critical facts already unearthed in discovery which will help paint this litigation, and ERC's efforts to use discovery unreasonably to make it as expensive as possible, in a proper light.

---

[1] Capitalized terms not defined herein have the meaning given in the *Memorandum of Law in Support of Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P.'s Motion to Dismiss Plaintiff's Complaint* [ECF No. 35].

1

## II. RELEVANT BACKGROUND

Early in the litigation, the parties agreed to a staggered discovery process. *See* Report of Rule 26(f) Meeting [ECF No. 49] ("Discovery Report") § III.[2] Each party agreed to produce a first wave of documents responsive to seven initial requests (the "Preliminary Exchange"), with a second wave of full discovery to commence after the then-pending motions to dismiss were decided. *Id.*; *see also* Porter Decl.¶2, Ex. A.  The Preliminary Exchange was designed to target accessible documents that would be easy to locate and review and inexpensive to produce. *See* Porter Decl. ¶2 & Ex.A ("[P]arties responding to the preliminary requests need only make a reasonable effort to produce responsive documents.").

In fact, many of the documents are not easily accessible. ERC requested documents from January 2012 through March 2016. The Ferrellgas defendants, however, acquired Logistics only in June 2015. Many of the documents from the pre-acquisition period are housed on difficult-to-access, archived computer systems. Knapp Decl.¶6.[3] Nevertheless, the BL/FG Defendants expended significant time and resources in order to locate as many documents as possible for the Preliminary Exchange production. Knapp Decl. ¶¶2, 6, 8. The BL/FG Defendants have also engaged a third-party vendor to locate additional documents.[4] Knapp Decl. ¶6.

The BL/FG Defendants complied with the Preliminary Exchange agreement and, by the agreed date of August 11, 2017, produced more than 12,200 documents spanning more than 45,400 pages, which included more than 100 accounting and financial records, including (i) more than two dozen documents which included "general ledger" data, explicitly titled as such, (ii) tax

---

[2] *See also* Declaration of Jeffrey M. Theodore in Support of Plaintiff's Eddystone Rail Company's Motion to Compel [ECF No. 73] ("Th. Decl.") Ex. 1; Declaration of Katherine Porter in Support of the Defendants / Third-Party Plaintiffs Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Response in Opposition to Plaintiff Eddystone Rail Company, LLC's Motion to Compel, filed concurrently herewith ("Porter Decl.") ¶ 2.

[3] Declaration of Patrick Knapp in Support of the Defendants / Third-Party Plaintiffs Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Response in Opposition to Plaintiff Eddystone Rail Company, LLC's Motion to Compel, filed concurrently herewith ("Knapp Decl.").

[4] The BL/FG Defendants reserve the right to seek cost-sharing with ERC for this expense.

records; (iii) bank account statements and reconciliation schedules; (iv) financial statements, accounting records and schedules consisting of segment and/or subsidiary details showing (a) revenue, (b) earnings before interest, tax, depreciation and amortization charges ("EBITDA"), (c) balance sheet, (d) income statement, (e) account receivable schedules, (f) account payable schedules, (g) fixed asset schedules with additions, dispositions and adjustments, (h) prepaid schedules, (i) debt schedules, (j) intercompany balances, (k) professional services schedules, etcetera; (v) consolidated management reports respecting midstream operations financial performance; (vi) budgets and forecasts; (vii) audited financial statements; and (viii) loan documents, including notes, letters of credit, guarantees, security agreements and loan releases. Porter Decl. ¶3. Notably, of the seven Preliminary Exchange categories of production, ERC's Motion to Compel concerns only one of those categories, and only one item of the many items listed in that category. Yet the motion wrongly seeks to portray the BL/FG Defendants as difficult or recalcitrant litigants.

After the motions to dismiss were denied in July 2017, the time for second wave, full discovery between the parties commenced. The parties exchanged document requests and responses and objections and met and conferred on multiple issues, by writing and by phone. Porter Decl. ¶5. Each party had raised multiple concerns regarding the other party's positions in discovery. The matters addressed in ERC's Motion to Compel are a subset among the many discovery-related matters that were — and still are — under discussion between the parties and which the BL/FG Defendants were working in good faith to resolve consensually.[5] Porter Decl. ¶5.

---

[5] The Federal Rules of Civil Procedure, the Local Rules of the Eastern District of Pennsylvania, and the Discovery Report in this case all require the parties to attempt to resolve a discovery dispute before bringing it to the attention of the Court. Fed. R. Civ. P. 37(a); E.D. Pa. Loc. R. 26.1(f); Discovery Report § VI.

**III.   THERE IS NO DISPUTE FOR THE COURT TO RESOLVE**

ERC's Motion to Compel seeks two categories of information from the BL/FG Defendants: (1) "general ledger" electronically stored information ("ESI") from defendant Logistics and BTS for the period of January 1, 2012 to March 1, 2016 (Mot. 5–12), and (2) consent to the production of bank records for various current or former affiliates of BTS based upon subpoenas issued to Business First Bank and The Independent Bankers Bank (the "Bank Subpoenas") (Mot. 15–17).  The BL/FG Defendants (1) have *never refused* to produce responsive ESI accounting data and, to the contrary, are actively working to produce it, and (2) have *never refused* to provide relevant consents for the Bank Subpoenas and, to the contrary, have already provided the revised consents ERC requested.  In short, ERC's Motion to Compel does not raise (and never has raised) any live issue or dispute requiring relief from the Court.

*(a)   General Ledger ESI Data*

ERC's Motion to Compel focuses on the generation and export of ESI accounting data, pertaining to "general ledger" type information for BTS and Logistics, which is stored in electronic software systems.  But the BL/FG Defendants have *already* agreed to generate exports of that ESI data as a part of full discovery, which is already underway.  Knapp Decl. ¶¶3, 10. Indeed, the BL/FG Defendants repeatedly told ERC—both before and after ERC filed its Motion to Compel—that they would export ESI data as a part of full discovery.  Porter Decl. ¶¶11, 16, Ex. F.

The Preliminary Exchange was designed to target accessible documents, not ESI in software systems.  This is consistent with the terms of the Preliminary Exchange (as originally described by ERC's counsel), as well as the Federal Rules of Civil Procedure, which define and discuss "documents" and "ESI" as different types of discoverable material.  *See* Porter Decl. ¶2, Ex.A (per ERC's own counsel, in the Preliminary Exchange, parties "need only make a

4

reasonable effort to produce responsive documents"); Fed. R. Civ. P. 26 (addressing specific issues with requests for ESI); Fed. R. Civ. P. 34 (distinguishing between documents and ESI); *see also* Committee Note to Rule 34(a) (2006) (observing that "it has become increasingly difficult to say that all forms of electronically stored information, many dynamic in nature, fit within the traditional concept of a 'document'" and that, as here, "[e]lectronically stored information may exist in dynamic databases and other forms far different from fixed expression on paper.").[6]

The only dispute on this front — if there was any — was simply whether such ESI data, which the BL/FG Defendants collect and maintain in software systems but do not create in document form, in their usual course of business, Knapp Decl. ¶9, should have been produced as a part of the Preliminary Exchange, or now. Whether ESI data was encompassed by first wave or second wave discovery (which is already underway) is an academic point, and certainly not a live dispute that the parties should burden the Court with deciding.

### (b)     *Consent to Production of Bank Records*

Despite ERC's drastically overbroad requests, the BL/FG Defendants have never refused to consent to the release of the requested records, but only sought to discuss the appropriate scope of the Bank Subpoenas.[7]

---

[6] *Nat'l Jewish Health v. WebMD Health Servs. Grp., Inc.*, 305 F.R.D. 247, 253 (D. Colo. 2014) (quoting with approval commentary that, as contemplated by amended Rule 34, "ESI is not a subset of documents; it is a new category in addition to documents" and that "the distinction was drawn primarily to recognize the difficulty in fitting different forms of ESI, like dynamic databases that constantly change, within the traditional concept of document.").

[7] The subpoena to Business First Bank, for instance, requests documents and communication pertaining to (among other things) all accounts or subaccounts "opened, maintained, accessed, used, controlled, held, or beneficially owned by any Bridger Party," which is defined to include "Julio Rios, James Ballengee, Jeremy Gamboa, Bridger LLC, Bridger Logistics, LLC, Bridger Marketing, LLC, Bridger Transportation, LLC, Bridger Leasing, LLC, Bridger Transfer Services, LLC, Bridger Lake, LLC, Bridger Rail Shipping, LLC, Bridger Marine, LLC, and Bridger Midstream, LLC, and any of their employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, successors, predecessors, and parents." Porter Decl. Ex. E. Further, the subpoena demands documents and communications from July 1, 2011 and the present. *Id.* This is despite the fact that ERC has sought to pierce only one corporate veil: between BTS and Logistics.

It was reasonable and appropriate for the BL/FG Defendants to question the scope of the Bank Subpoenas. Upon information and belief, the subpoena to Business First Bank alone, as worded, seeks records for more than 250 bank accounts spanning more than six years. *See* Porter Decl. ¶7, Ex. E. The vast majority of the account holders for such accounts are strangers to this litigation; they are neither parties, parents of parties, nor even recipients of the (lawful) transfers about which ERC complains in its Motion to Compel. Furthermore, for all of these entities (regardless of their role), ERC has requested all documents "during any time between July 1, 2011 and the present." *See* Porter Decl. Ex. E at 5. This date range spans years when ERC and BTS had *no* business relationship whatsoever— (i) it commences *more than one and a half years* before ERC and BTS entered into the RSA (in early 2013), (ii) it commences nearly *three years* before the ERC facility became operational and any payment became due (in May 2014), (iii) it commences *nearly five years* before the first payment under the RSA is alleged to have been missed (after February 2016), and (iii) continues *more than a year and a half* after BTS was sold by the BL/FG Defendants (effective February 1, 2016).[8]

The BL/FG Defendants recognize and agree that ERC is entitled to discovery fairly related its alter ego claim and other claims. But discovery must be <u>proportional</u> to the needs of the case and "<u>should not serve as a fishing expedition</u>." Fed. R. Civ. P. 26(b)(1); *Lafate v. Vanguard Grp., Inc.*, No. 13-CV-5555, 2014 WL 4384510, at *5, *8 (E.D. Pa. Sept. 5, 2014) (emphasis added) (quoting *Upshaw v. Janssen Research & Dev., LLC*, No. 11-7574, 2014 WL 1244047, at *3 (E.D. Pa. Mar. 26, 2014)). Moreover, courts in this district have explicitly

---

[8] Furthermore, ERC has failed to articulate why so many entities' records (or years of records) are relevant or proportional. ERC contends that it requires a bank records to establish "whether BTS received Monroe revenues generated largely by BTS's transportation services." Mot. 17. Yet ERC has already received Jamex's consent to review JTS's bank records (which includes all the records pertaining to BTS prior to the sale to Jamex), which will permit ERC to review all of BTS/JTS's transactions, including any transactions with Monroe and any transactions with any of BTS/JTS's affiliates.

rejected the sort of affiliate-related fishing expedition that ERC is pursuing. *See Trans Pacific Insurance Co. v. Trans-Pacific Insurance Co.*, No. 90-2531, 1991 WL 152302, at *1 (E.D. Pa. Aug. 2, 1991) (where alter-ego plaintiff sought bank records for defendants' affiliates, the court granted the defendants' motion for a protective order as to non-defendant entities, holding that "the requested bank documents *regarding the defendant companies* are relevant to plaintiff's case" but that the "documents regarding the *other corporations* [] are beyond the scope of the case") (emphasis added).[9]

Indeed, with seemingly limitless resources, ERC appears to be pursuing an aggressive, sweeping discovery campaign that is driving up the costs of litigation, including by issuing expansive discovery requests and numerous subpoenas seeking enormous amounts of documents, and sending numerous letters and emails demanding fast responses. ERC is a subsidiary of Enbridge, a multi-national, $67 billion market capitalization enterprise. The BL/FG Defendants have just a fraction of ERC's resources and personnel. Knapp Decl. ¶8. It is well known that discovery may be abused as a strategic tool to increase the costs of litigation and strong arm a settlement. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007) ("[T]he

---

[9] ERC appears to take the position that it is entitled to obtain unlimited discovery regarding the bank records of not only the BL/FG Defendants, but also countless affiliates, as a matter of right simply because it has asserted an alter ego theory of liability between two entities: BTS and Logistics. ERC relies upon several cases to try to support this position. None is relevant on this point. In *Lester v. Wow Car Co.*, the court observed that bank records may contain information relating to plaintiff's alter ego claims, but the defendants did not challenge plaintiff's discovery requests on the bases of relevancy or proportionality, as here. No. 2:11-CV-00850, 2013 WL 6018537, at *4 (S.D. Ohio Nov. 13, 2013), *aff'd*, No. 2:11-CV-00850, 2014 WL 457542 (S.D. Ohio Feb. 4, 2014). Rather, the *Lester* defendants sought to quash the subpoena as premature in light of the pending motion to dismiss the alter ego claims. *Id.* at *4-5. Similarly, in *AJY Int'l, Inc. v. Paldo Co.*, the AJY plaintiff did not challenge the breadth and proportionality of the discovery, as do the BL/FG Defendants here, and instead merely argued that the bank documents had no relevance whatsoever to the alter ego allegations. No. 17-CV-00744-VC (LB), 2017 WL 3588241, at *2-3 (N.D. Cal. Aug. 19, 2017). Finally, *Whitney v. Wurtz* involved a motion for a continuance of scheduled summary judgment hearings based on the need for additional discovery, not a motion to compel. No. C04-05232 PVT, 2006 WL 3201035, at *1 (N.D. Cal. Nov. 6, 2006). The *Whitney* court observed that the information that plaintiffs had requested, but not yet received, which included general ledgers and bank statements relating to the defendant, were relevant to potential alter ego liability; however, the court did not compel the production of such documents, or consider the relevance or proportionality of non-defendant records. *Id.* And, again, the BL/FG Defendants have agreed to virtually unbridled discovery of BTS and Logistics.

threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching [summary judgment] proceedings.").

Accordingly, the parties began to discuss the scope of the request for consents to production of records pursuant to the Bank Subpoenas—and each of ERC and the BL/FG Defendants made a proposal *to each other* about initial consents. On Friday, September 15, 2017, the BL/FG Defendants' counsel spoke with ERC's counsel in the early evening and (i) indicated that they *would* provide consent for Logistics and certain other non-defendant Bridger entities, (ii) requested an explanation as to the relevance and proportionality of the scope of the subpoena, and (iii) proposed that the parties agree to seek/provide consents for certain entities' bank records immediately, *without prejudice* to ERC's right to request consents for additional entities in the future if ERC found additional areas of inquiry. Porter Decl. ¶¶6, 8. During that same call, counsel to ERC asked whether the BL/FG Defendants would consent to the production of accounts held by a subset of eight entities. Porter Decl. ¶8.[10] Because this conversation occurred on a Friday evening, the parties agreed to speak early the following week to continue the discussions. Porter Decl. ¶9.

ERC never contacted the BL/FG Defendants. Porter Decl. ¶10. Instead, before either party had responded to the other's proposal, ERC filed the Motion to Compel. ERC waited just one business day after the proposals had been exchanged.[11] Porter Decl. ¶10.

After the Motion to Compel was filed, the BL/FG Defendants continued to seek reasonable agreement with ERC. On October 5, 2017 ERC proposed a new list of 12 entities for which ERC requested consents from the BL/FG Defendants pertaining to the Bank Subpoenas.

---

[10] ERC omits reference in its Motion to Compel and Declaration to the fact that ERC had made a proposal to resolve the issue pertaining to bank records without court intervention.

[11] The BL/FG Defendants disagree with (and do not understand the basis for) ERC's certification that "the Parties, after reasonable effort, are unable to resolve the discovery disputes identified in this motion." Mot. 17.

8

Porter Decl. ¶13, Ex. G.  The BL/FG Defendants provided consent by email on October 11, 2017 for the nine entities for which the BL/FG Defendants had the requisite authority (the other three are Jamex entities for which Jamex has already consented).  Porter Decl. ¶15, Ex. G.  On October 12, the due date for the BL/FG Defendants' opposition, ERC stated that it would withdraw only Section III of the Motion to Compel, and only on the condition that it received the executed consent, despite the written email agreement between the parties.  Porter Decl. ¶ 17, Ex. G.

### IV.   THE MOTION TO COMPEL APPEARS TO BE PRINCIPALLY AN ATTEMPT TO PREJUDICE THE COURT

The true purpose of ERC's Motion to Compel appears to be try to prejudice the Court by falsely presenting the BL/FG Defendants as obstructionist and by presenting the Court with a "sneak peek" of ERC's view of the merits.

#### *(a)   The Description of the BL/FG Defendants as Non-Compliant Is False*

ERC's assertions that the BL/FG Defendants have been "refusing to comply" (Mot. 2), or have "revoked" or "refused to honor" the Preliminary Exchange (Mot. 6) are bald untruths.  The statement that the BL/FG Defendants purported to withhold information or "assert that [it was] protected from discovery" on the basis that it was ESI (Mot. 11) is patently false, and ERC's lack of candor on this point is remarkable.[12]  The BL/FG Defendants clearly conveyed to ERC that no known or easily accessible documents were withheld in the Preliminary Exchange, that the Preliminary Exchange was intended to encompass accessible, existing documents, and further

---

[12] ERC deceptively omits mentioning in the Motion to Compel or supporting Declaration that the BL/FG Defendants' letter of September 13, 2017 affirmatively stated that the BL/FG Defendants would produce ESI in connection with the general ledgers, stating: "the raw electronic data currently stored in the BL/FG Defendants' accounting systems may be requested by, and responsive to, certain of the requests in the Plaintiff's First Set of Requests for Production. *We will, of course, work with you to produce the responsive data, consistent with our responses and objections to such requests*." Th. Decl. Ex. 11 at 3 (emphasis added).  The BL/FG Defendants' agreement to produce the very ESI that ERC sought by its motion is buried in more than 150 pages of exhibits and was not brought to the Court's attention.  *Id.*

that ESI relating to general ledgers <u>would</u> be produced in discovery (which was underway). Porter Decl. ¶16.

ERC's statement that the BL/FG Defendants said that no general ledgers existed, and then "conceded" they existed when confronted with evidence (Mot. 6) is also false.[13]  First, the BL/FG Defendants never denied that such general ledger information existed in any form, but stated that reports were not currently generated in the normal course of business and that no accessible documents were withheld.  Second, they made clear to ERC that to the extent such information did exist, additional documents with such information were not accessible to the BL/FG Defendants or not in the possession, custody or control of the BL/FG Defendants at all, and that any other data was maintained only in a software system (and thus not part of the Preliminary Exchange, but would be produced in discovery).  Porter Decl. ¶16.

Likewise, the BL/FG Defendants never argued that general ledgers of BTS or Logistics were not relevant. Mot. 9.  To the contrary, the BL/FG Defendants agreed to produce such documents, to the extent they existed, in the Preliminary Exchange and to produce such documents and ESI data in full discovery.  Porter Decl. ¶¶2, 3, 16, Ex. A; *see also supra* n. 13.

### (b)   *The BL/FG Defendants Dispute ERC's Version of the Facts*

The Motion to Compel repeatedly asserts that ERC has found documents that have "revealed substantial unlawful transfers" and other such assertions. *E.g.* Mot. 5, 7.  The BL/FG Defendants insist that discovery motion practice is not the appropriate time or place for a party to try to preview its view of the case, and respond here as necessary in order to show that ERC's

---

[13] ERC's identification of KPMG documents that refer to general ledgers (Mot. 6) is not contradictory to the BL/FG Defendants' position, as previously explained to ERC.  The KPMG documents pertain to the period *prior* to the acquisition of Logistics by Ferrellgas in June 2015. ERC's reference to such material as pertaining to "Ferrellgas" (Mot. 6) is highly misleading chronologically.  Documents from this period, if any presently exist, are either not in the custody, possession or control of the BL/FG Defendants or are stored on archived computer systems that the BL/FG Defendants are working diligently to access.  Knapp Decl. ¶¶ 5–7.

10

assertions (which at this stage are *not* allegations afforded any presumption of truth) should not simply be accepted.

As will be shown at summary judgment and/or trial, there was nothing improper whatsoever about the transfers ERC claims are unlawful.  For instance, the BL/FG Defendants will show that BTS was sold effective February 1, 2016, at which time it was solvent and fully paid to ERC and that its new owner (a) specifically promised to take over, perform or resolve the contract, and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  *E.g*., Porter Decl. Exs. V, W.  Furthermore, as will be shown, the BTS assets were subject to liens securing substantial debt, such that there was no unencumbered asset value available to pay amounts allegedly due to ERC, and that they were transferred with knowledge of the buyer.

Similarly, ERC completely distorts the background to its entrance into the RSA with BTS—ERC's sole counterparty.  The Motion to Dismiss repeats the fallacy that ERC was induced into building the facility by the BL/FG Defendants.  Mot. 13.   *E.g*., Porter Decl. Ex.H.  It was ERC, in fact, that induced BTS to enter the contract, based on these empty promises.

More importantly, ERC did not, and could not possibly have, relied on BTS's — or any of the BL/FG Defendants'— financial capabilities in deciding to enter the RSA. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

11

███████████████████████████████████ Porter Decl. Exs. I, J, K, L, M, N, O, P, Q, R, S, T. And ERC thereafter repeatedly acknowledged the separate corporate existence of BTS, and reaffirmed (from its perspective) the binding nature of the RSA as a complete statement of its rights and obligations. As such there is no basis to impose BTS' alleged liabilities on any other person or entity as a supposed alter ego.[14]

The RSA was not the first commercial arrangement between an Enbridge and Bridger entity. In the Spring of 2012, eight months before the RSA was entered into, Enbridge Storage (North Dakota) LLC entered into an oil storage agreement with Bridger Storage LLC, and Enbridge Rail (North Dakota) LP entered into a rail loading agreement with BTS. Knapp Decl. Exs. A, C. Enbridge requested, and obtained, a modest parent guarantee from Logistics in respect of the oil storage ████████████████ ($1 million and ███████ respectively). Knapp Decl. Exs. B, D. These prior engagements are critical because it was Enbridge itself that was simultaneously asking BTS to contract with ERC for use of the facility, conducted diligence on Logistics and BTS, and negotiated the RSA.[15]

As part of these earlier agreements Logistics supplied Enbridge with substantial financial due diligence about Logistics, BTS and other Bridger entities. ████████████████████
████████████████████████████████████ Porter Decl. Ex. J. ██████
████████████████████████████████████████████████████████████
████████████████████████████ Porter Decl. Ex. L. ██████████

---

[14] *See* Memorandum of Law in Support of Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P.'S Motion To Dismiss Plaintiff's Complaint [ECF No. 35] 10-20; Defendant / Third-Party Plaintiff Bridger Logistics, LLC's First Amended Answer and Defenses to Complaint and Counterclaims [ECF No. 76] 20, 23, 24, 25 (affirmative defenses 3, 4, 5, 6, 9, 16, 20, 21); *see also* Defendants / Third-Party Plaintiffs Ferrellgas Partners, L.P. and Ferrellgas, L.P.'S First Amended Answer and Defenses to Complaint and Counterclaims [ECF No. 77].

[15] By way of further background for the Court, these other contracts had terms through 2016 and 2023. Knapp Decl. Exs. A, B. As with the RSA, the relevant Bridger counterparty made all payments allegedly due to Enbridge under these agreements at all times.

██████████████████████████████████████████████

██████████████████████████████████████ Porter Decl. Ex. K. To put the numbers in perspective, the RSA (entered about 6 months after Enbridge received these financials) allegedly obligated BTS to make payments totaling between $41 million and $69 million per year for more than 5 years. ████████████████████████████

████████████████████████ Porter Decl. Exs. O, P. ██████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ Porter Decl. Exs. I, M, N, Q, R, S, T.[16] ██████████████████████████

████

████████████████████████████████████████████████

Porter Decl. Ex. T. ████████████████████████

████████████████████████████████

████████████████████████████████

---

[16] Indeed, the quantum of financial information Plaintiff had received about Logistics and BTS before and after entering the RSA in raises a red flag as to their supposed need for voluminous discovery going back to 2013.

[17] The Court should note the casual interchangeable use of Enbridge and ERC, the very sort of thing ERC asserts allows it to pierce BTS' corporate veil. *E.g.*, Cplt. ¶ 40.

When Enbridge caused ERC to enter the RSA with BTS, in addition to studying its finances, it knew that neither BTS nor Logistics itself had a contract to sell Bakken crude to any customer in the Northeast that would enable BTS to use the ERC facility.  ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████  Porter Decl. Ex.U.

Thus, at the time the RSA was entered — with BTS as the sole party obligated to make payments — Enbridge and ERC were fully aware that BTS could never make any of deficiency payments under the RSA that ERC now seeks from BTS' former parent if the flow of Bakken crude ceased (or indeed, if it never started).   Likewise ERC has conceded its awareness that it had no other source of payment at the time it entered the agreement, and that that was a mistake on its part.

## V.    CONCLUSION

For the foregoing reasons, the BL/FG Defendants respectfully request that ERC's Motion to Compel be denied as to the BL/FG Defendants.  The Court need not have been burdened with these purported discovery disputes in the first instance.  The BL/FG Defendants have already (and always) agreed to provide ESI data and the parties have already reached a resolution regarding the question of consent to production of certain bank records.

Dated: October 12, 2017

Respectfully submitted,

 /s/ *Jeffery A. Dailey*
Jeffery A. Dailey (I.D. No. 85993)
Ellen L. Pierce (I.D. No. 318579)
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, Pennsylvania 19103
T: (215) 965-1200
F: (215) 965-1210
jdailey@akingump.com
epierce@akingump.com

David M. Zensky (*pro hac vice*)
Katherine P. Porter (*pro hac vice*)
Kelly A. Eno (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002
dzensky@akingump.com
kporter@akingump.com
keno@akingump.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.*

## **CERTIFICATE OF SERVICE**

     I, Jeffery A. Dailey, hereby certify that I caused Defendants / Third-Party Plaintiffs, Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Response in Opposition to Plaintiff Eddystone Rail Company, LLC's Motion to Compel to be filed and served on all counsel of record via the Court's ECF system on October 12, 2017.

                                              */s/ Jeffery A. Dailey*
                                              Jeffery A. Dailey

Dated: October 12, 2017