**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC<br><br>　　　　Plaintiff,<br>　　vs.<br><br>BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY GAMBOA, FERRELLGAS PARTNERS, L.P., and FERRELLGAS L.P.<br><br>　　　　Defendants. | Civil Action No. 17–CV–00495 |

### PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Fed. R. Civ. P. 26(d)(2), Plaintiff Eddystone Rail Company, LLC ("Eddystone") requests that Defendants Bridger Logistics, LLC, Julio Rios, Jeremy Gamboa, Ferrellgas Partners, L.P., and Ferrellgas, L.P. produce the following documents within thirty (30) days of the date of the parties' Rule 26(f) conference, pursuant to Fed. R. Civ. P. 34(b)(2)(A).

### DEFINITIONS

1. The "Amended COSA" means the Amended and Restated Crude Oil Supply Agreement dated May 26, 2015, between Jamex Marketing and Monroe.

2. "Affiliate" means any entity effectively controlling or controlled by another or associated with others under common ownership or control.

3. "Bridger Group" means prior to July 1, 2015, Julio Rios, James Ballengee, Jeremy Gamboa, Bridger LLC, Bridger Logistics, LLC, Bridger Marketing, LLC, Bridger Transportation, LLC, Bridger Leasing, LLC, Bridger Transfer Services, LLC, Bridger Lake, LLC, Bridger Rail Shipping, LLC,

Bridger Marine, LLC, and Bridger Midstream, LLC and any of their employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, and parents; after July 1, 2015, "Bridger Group" means all of the foregoing entities other than Bridger, LLC and Bridger Marketing, LLC.

4. "Bridger Logistics" means Defendant Bridger Logistics, LLC, and any of its present and former employees, officers, representatives, agents, attorneys, subsidiaries, affiliates, and parents.

5. "BTS" or "JTS" means Bridger Transfer Services, LLC, now known as Jamex Transfer Services, LLC, and its present and former employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, and parents.

6. The "BTS Purchase and Sale Agreement" means the Purchase and Sale Agreement dated February 22, 2016, by which Bridger Logistics sold BTS to Jamex Transfer Holdings and all associate agreements, including the BTS Assignment Agreement and the Release and Guarantee Agreement dated February 22, 2016.

7. The "BTS Assignment Agreement" means the Assignment of Membership Interest dated February 1, 2016.

8. "Carlyle" means Carlyle Global Market Strategies Commodities Funding 2015-1, Ltd and Carlyle Commodity Management, LLC.

9. The "Carlyle Agreement" means the draft control agreement between BTS, Carlyle, and Eddystone, proposed in connection with financing Carlyle offered to Jamex Marketing.

10. "Communication" means any transmission of information including facts, ideas, inquiries, solicitations, requests, complaints, proposals, or otherwise by any means and in any form, whether orally, electronically, telephonically, in writing, in person, or otherwise.

11. "Concerning" or "relating to" mean embodying, discussing, referring to, relating to, pertaining to, describing, evidencing, comprising, containing, constituting, concerning supporting, reflecting, connected with, involving, identifying, or regarding.

12. The "COSA" means the Crude Oil Supply Agreement between Jamex Marketing and Monroe publicly announced on July 21, 2014.

13. "Document" means any information or means of recording information – including writings, drawings, graphs, charts, photographs, sound recordings, images, files, and other data or data compilations – stored physically, electronically, or in any other medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

14. The "Facility" means the Eddystone rail-to-barge crude oil transloading facility, located in Eddystone, Pennsylvania.

15. "Ferrellgas" means Defendants Ferrellgas Partners, L.P. and Ferrellgas, L.P. and any of their present and former employees, officers, representatives, agents, attorneys, subsidiaries, affiliates, and parents.

16. "Gamboa" means Defendant Jeremy Gamboa.

17. "Jamex LLC" or "Bridger LLC" means Jamex, LLC, f/k/a, Bridger, LLC, and any of its present and former employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, and parents.

18. "Jamex Marketing" means Jamex Marketing, LLC, f/k/a Bridger Marketing, LLC, f/k/a Bridger Trading, LLC and any of its present and former employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, and parents.

19. The "Jamex TLA" means the Transportation and Logistics Services Agreement dated June 24, 2015, between Jamex Marketing and Bridger Logistics.

20. "Jamex Transfer Holdings" means Jamex Transfer Holdings, LLC, the wholly owned subsidiary of Jamex Marketing that purchased BTS from Bridger Logistics.

21. The "January Letter Agreements" means the set of letter agreements, dated January 13, 2016 and January 25, 2016, among Bridger Logistics, Jamex Marketing, and Monroe regarding the suspension of future sales and shipments of crude oil by Jamex Marketing and Bridger Logistics to Monroe.

22. The "Logistics APA" means the Asset Purchase Agreement by which Bridger, LLC, sold Bridger Logistics to Ferrellgas on May 29, 2015.

23. "Merrill" means Merrill Lynch Commodities, Inc.

24. The "Merrill Financing Agreement" means the Intermediation Agreement dated April 3, 2014, between BTS and Merrill.

25. "Monroe" means Monroe Energy, LLC, and any of its present and former employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, and parents.

26. The "Monroe Refinery" means the crude oil refinery operated by Monroe in Trainer, Pennsylvania.

27.   The "Monroe TLA" means the Transportation and Logistics Services Agreement dated May 26, 2015, between Logistics and Monroe.

28.   "Person" means any natural person, corporation, company, partnership, sole proprietorship, or other business or legally-recognized entity.

29.   "Rios" means Defendant Julio E. Rios.

30.   The "RSA" means the Eddystone Rail Facilities Services Agreement dated February 13, 2013 between Eddystone and BTS.

31.   "You" or "your" means Defendants Bridger Logistics, LLC, Julio Rios, Jeremy Gamboa, Ferrellgas Partners, L.P., and Ferrellgas, L.P. and their present and former employees, officers, representatives, agents, attorneys, members, subsidiaries, affiliates, and parents.

## INSTRUCTIONS

1.   Deem the singular to include the plural and the plural to include the singular.

2.   Construe the words "all," "any," "each," and "every" to encompass "all," "any," "each," and/or "every" thing as necessary to make the document requests inclusive not exclusive and to bring within their scope all information that would otherwise be construed to be outside their scope.

3.   Construe the words "and" and "or" conjunctively or disjunctively as necessary to make the document requests inclusive not exclusive.

4.   Furnish all responsive information and documents either in your possession, custody, or control or available to you, your present and former representatives, employees, agents, attorneys, members, members, subsidiaries, parents, or affiliates.

5

5. Unless otherwise specified, the time period of these requests is from 2012 to the present.

6. Furnish all responsive documents with unique, sequential identifying page numbers and indicate in your response to each document request the unique page numbers of those documents that are responsive to it.

7. State in detail the basis of any objection to any request, and respond fully to any request to the extent it is unobjected to in whole or in part.

8. Supplement and update your response: at any time you discover that your initial response was not entirely correct when made or is no longer entirely correct; at any time a failure to supplement would constitute a knowing or negligent concealment; or at any time you locate additional information or documents that are responsive to these requests.

9. Produce all documents in their original form.

10. When furnishing documents stored physically, produce them with the original filing structure intact, including but not limited to the labeling of files in which they are contained, the manner of stapling or binding, and the order of documents within a file.

11. When producing documents or information stored electronically, provide them in their native format and context with all contextual and metadata.

12. If any responsive document is not available to you or in your possession, custody, or control, identify each such document and state the disposition of such document, including the date of such disposition, the location of the document, and the person or persons presently in possession of the document.

13. If you seek to withhold any document on the basis of any claim of privilege, provide a privilege log that identifies for each document with sufficient specificity to permit the Court and counsel for Eddystone to determine the validity of the claimed privilege: the date, the number of pages, the nature and title of the document, a description of the subject matter of the document, the name, employer, and position of each author, sender, addressee, and recipient of the document (or participant in or witness to a communication), the precise nature of the privilege claimed, the facts on which the claim of privilege is based, and the document request(s) to which the document is responsive.

**DOCUMENT REQUESTS**

1. All documents on which you will rely in this litigation.

2. All documents or communications concerning the RSA, any obligations or amounts owed thereunder, Eddystone, or the Facility.

3. All employment agreements and other documents reflecting the terms of employment for all employees of Bridger Logistics and/or of BTS and for all employees of Ferrellgas who had responsibility for business activities of Bridger Logistics or BTS, including but not limited to Julio Rios, Executive Vice President, Jeremy Gamboa, Executive Vice President, Alan Heitmann, Executive Vice President, Chief Financial Officer and Treasurer, Joseph Natale, Heike Wallace, Dion Nicely, Jon Kolniak, Kelly Wilkins, Troy Lee, Tye Graham, Dan Giannini, David Stark, Wade Dollins, Callie Mendenhall, Les Patterson, Vispi Jilla, Linda Carabajal, and Taylor Phifer.

4. Sufficient documents to identify all persons who were BTS employees, agents, or in any way acted on behalf of BTS from January 1, 2012 through March 1, 2016.

5. With respect to persons who were agents or otherwise acted on behalf of BTS but who were not BTS employees, all documents identifying the employer or employment status of each such person and the source of such person's compensation from January 1, 2012 through March 1, 2016.

6. All documents identifying the members, equity owners, control persons, and any governing body of BTS, of Bridger Logistics, and of each other entity in the Bridger Group from June 1, 2011 through March 1, 2016.

7. All documents reflecting the appointment of officers or managers of BTS, of Bridger Logistics, and of each other entity in the Bridger Group from June 1, 2011 through March 1, 2016.

8. All meeting minutes or notes of meetings among the members, managers, officers, or other control persons or governing entity of BTS, Bridger Logistics, and each other entity in the Bridger Group from June 1, 2011 through March 1, 2016.

9. All limited liability company agreements, operating agreements, or other such governing documents for BTS, Bridger Logistics, and each other entity in the Bridger Group from June 1, 2011 through March 1, 2016, including all amendments thereto.

10. All Ferrellgas Board of Directors Meeting Minutes for the period December 1, 2014 through December 31, 2016 that relate in any way to BTS, Bridger Logistics, the Bridger Group, Eddystone, the RSA, Jamex, LLC, Jamex Marketing, Jamex Transfer Holdings, or Monroe.

11. All records and documents for any bank account that held, accumulated, acted as a cash management account, or in any way was a depository, repository, or vehicle for cash or money of BTS, of Bridger Logistics, of any entity in the Bridger Group, or of any Ferrellgas

entity that transferred cash or other assets to or received cash or assets from Bridger Logistics or BTS.

12. All records and documents for all open or closed bank, financial, investment, brokerage, institutional, or other accounts holding assets or deposits (or reflecting debts) of BTS, of Bridger Logistics, of any entity in the Bridger Group, or of any Ferrellgas entity that transferred cash or other assets to or received cash or assets from Bridger Logistics or BTS.

13. All records of any brokerage or other account through which BTS, Bridger Logistics, or any other Bridger Group entity held futures contracts, options contracts, or other derivative instruments related to the purchase, sale, or transportation of crude oil.

14. All accounting books and records (in their native form, including electronic format, as generated and maintained in the normal course of business) of BTS, of Bridger Logistics, of all other entities in the Bridger Group, and of any Ferrellgas entity that transferred cash or other assets to or received cash or assets from Bridger Logistics or BTS for 2013, 2014, 2015 and 2016, including but not limited to the following:

    a. All books of original entries

    b. Detailed General Ledger

    c. All detailed subsidiary ledgers

    d. All detailed journal entries or other detailed sources of entries that resulted in a posting to the General Ledger

    e. Opening and closing balances

    f. Debit and credit memos

9

      g.   Metadata reflecting the software on which the accounting files were maintained in the normal course of business and the electronic format of the files.

15. All audited and unaudited balance sheets, income statements, consolidating schedules, cash flow statements, profit and loss statements, statements of changes in equity, statements of retained earnings, and other financial statements or accounting reports, along with drafts, trial balances, and internal accounting workpapers, of BTS, of Bridger Logistics, of all other entities in the Bridger Group, and of any Ferrellgas entity that transferred cash or other assets to or received cash or assets from Bridger Logistics or BTS for 2013, 2014, 2015 and 2016

16. Ferrellgas's General Ledger, journal entries, detailed entries, subsidiary ledgers, and original entries for 2014, 2015 and 2016 for transactions or postings related to an entity in the Bridger Group or an asset that at any time was owned or in the custody of an entity in the Bridger Group.

17. All documents and communications relating to the income taxes (federal, state, or local) owed or paid by BTS, Bridger Logistics, and all other entities in the Bridger Group for the years 2013, 2014, 2015 and 2016, including all tax returns filed with the Internal Revenue Service and all equivalent state or local authorities, all documents reflecting taxable income, all supporting schedules, all forms, and all other tax documents.

18. For each entity in the Bridger Group, for the periods 2013, 2014, 2015 and 2016, a fixed asset listing, including description of the asset, date of acquisition, cost and depreciated value.

19. For Ferrellgas, for the periods 2013, 2014, 2015 and 2016, a fixed asset listing of any asset owned at any time by a Bridger Group entity, including description of the asset, acquisition date, cost and depreciated value.

20. All documents provided to and all communications with any lender relating to proposed or requested financing, existing or new, of any investment in a Bridger Group entity or their assets or any other interests therein.

21. All documents and communications concerning or relating to any transfer of assets or things of value from any Bridger Group entity to Ferrellgas, including any agreement governing the transfer, any documents reflecting consideration for the transfer, and any negotiations regarding the transfer.

22. All records and documents of BTS, Bridger Logistics, or any other entity in the Bridger Group that were provided to independent auditors in 2013, 2014, 2015, and 2016, as part of the financial statement audit process.

23. Any adjusting entries proposed by the independent auditors for the financial statements or records of BTS, Bridger Logistics, or any other entity in the Bridger Group in 2013, 2014, 2015 and 2016, whether or not posted.

24. All communications between BTS, Bridger Logistics, or any other entity in the Bridger Group and its independent auditors for the years 2013, 2014, 2015 and 2016.

25. All communications relating to the June 2, 2015 disclosure to the SEC that "Bridger Logistics has and continues to experience material weaknesses in its internal controls over financial reporting," and all drafts of the disclosure documents.

26. All underlying records and documents supporting each of the BTS current asset account balances at December 31, 2014, as shown in the consolidating balance sheet of the 2014 Bridger, LLC and Subsidiaries financial statements, including all documents reflecting accounts receivable debtors, entities who owed such accounts receivable, the consideration BTS provided in respect of such accounts receivable, and other current assets.

27. All underlying records and documents supporting each of the BTS property and equipment balances at December 31, 2014, as shown in the consolidating balance sheet of the 2014 Bridger, LLC and Subsidiaries financial statements, including all documents reflecting BTS' ownership of, control over, or interest in such property and equipment, including all pipeline injection stations, land, rail cars, and vehicles.

28. All documents and communications relating to the decline in BTS' total assets or any portion of the total assets from $98,120,418 or any portion thereof as of December 31, 2014 to "no assets or liabilities other than its obligations under the Eddystone contract," on January 13, 2016, including all emails, invoices, agreements, assignments, wire confirmations, receipts, conveyances, mortgages, encumbrances, licenses, leases, surrendered or gifted (or granting of any option or documents entering into any contractual obligations to do any of the foregoing) and other documents evidencing or relating to transfers of assets to or from BTS from or to other entities, including without limitation, related parties.

29. All documents reflecting any BTS dividends, distributions (in cash or in kind), redemptions, purchases, repayments, return or reduction of capital or other payments to members of BTS or other direct or indirect BTS owners from December 31, 2012 through March 1, 2016.

30.     All documents, communications, and agreements concerning any BTS payment or transfer of assets or of any thing of value to Bridger, LLC, Bridger Logistics, Ferrellgas, any other Bridger Group entity, and/or any other entity in which Bridger, LLC, Bridger Logistics and/or Ferrellgas directly or indirectly owns an interest from December 31, 2012 through March 1, 2016.

31.     All documents reflecting compensation, remuneration, incentive payment, value transfer, or granting of any benefit to Messrs. Rios, Gamboa from December 31, 2012 through March 1, 2016, including bonuses, success fees, management fees, service fees, brokers fees, finders fees, commissions, or other charges or fees, from December 31, 2012 through March 1, 2016.

32.     All documents reflecting compensation, remuneration, incentive payment or value transfer or granting or any benefit to Messrs. Rios, Gamboa, or any entity in which Ferrellgas Partners, LP owns an interest, including bonuses, success fees, management fees, service fees or other charges or fees, brokers fees, finders fees, commissions from June 25, 2015 through February 1, 2016.

33.     All documents reflecting a BTS waiver, release or deferral of an obligation or an amount owed from December 31, 2012 through March 1, 2016.

34.     All express agreements between and/or among Bridger Group entities and BTS, including in the form of executed documents, letter agreements, emails, and/or other exchanges of correspondence.

35.     All documents or communications which, in the Defendants' view, gave rise to an implied or express contract or agreement between BTS and any other Bridger Group entity.

36. All documents and communications reflecting or relating to the exchange of consideration between any Bridger Group entities and BTS.

37. All documents and communications regarding the decision to have BTS, rather than Bridger Logistics, contract with Eddystone for access to the Facility.

38. All documents concerning the terms on which BTS provided transloading capacity to Bridger Logistics, Ferrellgas, and/or any other entity in the Bridger Group.

39. All documents, communications, and agreements that reflect a commercial relationship between BTS and any other parties, including any Bridger Group entities.

40. All documents and communications relating to capital contributions made to BTS or repaid by BTS after its formation on June 1, 2011 through March 1, 2016.

41. All documents relating to the ownership or control of all property, plant, and equipment used by BTS or used in the shipping of crude oil through the Facility each month, including but not limited to copies of all purchase or lease agreements for the rail cars that delivered crude oil to the Facility.

42. All documents relating to the premises from which Bridger Logistics, BTS, and each other entity of the Bridger Group conducted business, including but not limited to all commercial lease agreements.

43. All documents and communications concerning BTS's sources of revenue/sales/income from business operations, including any business conducted in addition to BTS's business at the Facility.

44. All documents concerning BTS's source(s) of revenue or funding from January 1, 2012 to March 1, 2016, including all documents reflecting the source(s) of funds for each

monthly payment made by BTS under the RSA, all documents concerning payments by Monroe and/or Jamex Marketing or Jamex, LLC, to any Bridger Group entity, and all documents concerning payments to BTS by any Bridger Group entity or by Jamex Marketing or Jamex, LLC.

45. All documents concerning the terms of any arrangement, agreement, or business relationship between BTS and Bridger Logistics or any other Bridger Group entity, including any obligations owed to BTS by any Bridger Group entity.

46. For all expenses BTS incurred in its business, including on lease agreements it signed with third parties, all records reflecting payments made from bank accounts not held in BTS' own name.

47. All documents and communications among BTS, any Bridger Group entity, Ferrellgas, and all third parties regarding Eddystone's rail unloading terminal and the roughly 65,000 barrels per day transloading capacity owned/controlled through the RSA.

48. All documents, reports, or studies that any Bridger Group entity prepared concerning the merits of supplying crude oil to Delaware River refineries via the Eddystone facility, including any documents provided to Monroe.

49. All documents concerning BTS's obligation to provide financial assurances to Eddystone under the RSA, including all documents concerning any effort to provide such financial assurances whether a letter of credit or any other form of financial assurances.

50. All documents and communications concerning efforts or proposals by any Bridger Group entity to use the Eddystone facility to supply crude oil to any refinery other than Monroe or to supply crude oil to any refinery on the East Coast other than through the Eddystone facility.

51. All documents and communications concerning any possible purchase of the Facility from Eddystone by Bridger Logistics, Jamex Marketing, or their affiliates during the period January 1, 2013 to March 1, 2016, including all any applications, communications, or discussions that in any way relate to actual or potential financing or a credit facility, including all documents provided to a lender.

52. All documents and communications relating to or concerning the sale, supply, or shipment of crude oil to Monroe and/or via the facility, the Crude Oil Supply Agreement, the Amended and Restated Crude Oil Supply Agreement, the Monroe TLA, Jamex TLA, the Logistics APA, and all related or associated agreements, including but not limited to copies of the agreements, documents relating to performance thereunder, and potential or actual termination or modification of the agreements.

53. All documents concerning the financing of purchases or shipment of crude oil to be delivered to Monroe or transloaded at the Facility, including all documents or communications relating to financing by Carlyle or Merrill, the Carlyle Agreement, or the Merrill Financing Agreement.

54. All documents and communications relating to or concerning the January Letter Agreements, any amendments thereto, the cessation of crude oil shipments to Monroe and/or via the Facility, and the potential or actual termination or modification of the Crude Oil Supply Agreement, the Amended and Restated Crude Oil Supply Agreement, the Monroe TLA, Jamex TLA, and all related or associated agreements.

55. All documents and communications concerning or relating to the BTS Purchase and Sale Agreement, the BTS Assignment Agreement, and all associated or related agreements, including copies thereof.

56. All documents and communications concerning the negotiation and sale of BTS to Jamex Transfer Holdings, including but not limited to all agreements related to the sale and all communications regarding the decision to sell BTS, the terms of the sale, the impact on obligations to BTS, and the impact on obligations to Eddystone under the RSA.

57. All documents and communications regarding assets exchanged or payments made between or among Ferrellgas, Bridger Logistics, the Bridger Group, Jamex, LLC, and Jamex Marketing from May 1, 2015 through present.

58. All documents and communications regarding payments any Bridger Group entity received from Jamex Marketing from May 1, 2015 through present.

59. All documents and communications regarding Ferrellgas' decision, on October 18, 2016, to relieve Messrs. Rios and Gamboa of their management responsibilities at Bridger Logistics.

60. All documents relating to the internal review of Bridger Logistics' operations that Ferrellgas announced in connection with its October 18, 2016 decision to remove Messrs. Rios and Gamboa from their management positions at any Bridger Group entity, including all preliminary and final reports produced in the course of the review.

| | |
|---|---|
| Dated: March 13, 2017 | /s/ Jeffrey M. Theodore |
| | Filiberto Agusti (*pro hac vice*) |
| | fagusti@steptoe.com |
| | Jeffrey M. Theodore (*pro hac vice*) |
| | jtheodore@steptoe.com |
| | Timothy Work (*pro hac vice*) |
| | twork@steptoe.com |
| | Nicholas Petts (*pro hac vice*) |
| | npetts@steptoe.com |
| | **STEPTOE & JOHNSON LLP** |
| | 1330 Connecticut Avenue, NW |
| | Washington, DC 20036 |
| | Telephone: (202) 429-3000 |
| | Facsimile: (202) 429-3902 |
| | |
| | Henry E. Hockeimer, Jr. (I.D. No. 86768) |
| | hockeimerh@ballardspahr.com |
| | Terence M. Grugan (I.D. No. 307211) |
| | grugant@ballardspahr.com |
| | **BALLARD SPAHR LLP** |
| | 1735 Market Street, 51st Floor |
| | Philadelphia, PA 19103-7599 |
| | Telephone: (215) 665-8500 |
| | Facsimile: (215) 864-8999 |
| | |
| | *Counsel for Eddystone Rail Company, LLC* |

**EXHIBIT B**