**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | |
| Plaintiff, | |
| v. | |
| JULIO RIOS and JEREMY GAMBOA, | Civil Action No. 2:17-cv-00495 |
| Defendants, | |
| BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., and FERRELLGAS L.P., | |
| Defendants/Third-Party Plaintiffs, | |
| v. | |
| JAMEX MARKETING, LLC (f/k/a BRIDGER MARKETING, LLC), JAMEX TRANSFER HOLDINGS, LLC, JAMEX, LLC (f/k/a BRIDGER, LLC), JAMEX TRANSFER SERVICES, LLC (f/k/a BRIDGER TRANSFER SERVICES, LLC), JAMES BALLENGEE and JOHN DOES 1–10, | |
| Third-Party Defendants. | |

**MEMORANDUM OF LAW AND EXHIBITS IN SUPPORT OF**
**THE JAMEX ENTITIES' MOTION TO DISMISS THIRD-PARTY COMPLAINT**

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ............................................................................1

II.  STATEMENT OF FACTS ..................................................................................2

    A.   The Eddystone Contract was Solely a BTS Obligation. ..........................2

    B.   Ferrellgas Acquired Bridger Logistics (including BTS) in June 2015; the
Third-Party Defendants had no Involvement in the Alleged Bad Acts. .................3

    C.   In February 2016, Jamex Transfer Holdings Agreed to Accept Assignment
of BTS's Ownership Interests and Fully Complied with that Obligation...............3

    D.   In an Arm's-Length Negotiation with Eddystone, the Jamex Entities
Entered into a Settlement that Resulted in BTS Being Held Liable for its
Contractual Obligations. ........................................................................5

    E.   Bridger-Ferrellgas now Sues on Nonexistent Indemnity Obligations. ...................6

III. ARGUMENT ..................................................................................................6

    A.   The Claims Should be Dismissed for Forum Non Conveniens. .............................7

        1.   Forum Non Conveniens is Highly Deferential to Forum Selection
Clauses. ...................................................................................7

        2.   The Forum Selection Clauses are Valid and Enforceable. .........................8

        3.   All Public Interest Factors Weigh in Favor of Dismissal. ........................11

        4.   "Ancillary Venue" is Inapplicable. ................................................13

    B.   This is no Personal Jurisdiction over Jamex LLC and Jamex Transfer
Holdings. ......................................................................................14

        1.   The Third-Party Complaint Fails to Allege "with Reasonable
Particularity" Facts Showing Minimum Contacts with
Pennsylvania. ............................................................................15

            a.   There is no General Jurisdiction Alleged or Existing...................15

            b.   The Allegations for Specific Jurisdiction are Insufficient. ............16

                (i.)   Neither Entity "Purposefully Directed" any
Activities at Pennsylvania.................................................17

                (ii.)   The Third-Party Claims do not "Arise out of"
Contacts with Pennsylvania. .............................................19

                (iii.)   Jurisdiction Cannot be Imputed Through Ownership
of Companies Having Contacts with Pennsylvania. ..........20

        2.   Exercising Personal Jurisdiction Would be "Unreasonable."...................22

    C.   The Third-Party Complaint Fails to State a Claim on all Counts. .........................23

i

1.      Count I:  Bridger-Ferrellgas Fails to State a Claim for Breach of
the PSA. ....................................................................................24

    a.      The PSA Obligated Jamex Transfer Holdings to Accept an
Assignment of Only the BTS Membership Interests, Not
Directly Assume the Eddystone Agreement. .................................25

    b.      There is no Promise in the PSA that the Eddystone Contract
Would be "Performed" by Anyone...............................................28

    c.      There is no Indemnification in the PSA for Bridger-
Ferrellgas's own Conduct. ..........................................................29

2.      Counts II-III:  The Breach of Guarantee and Tortious Interference
Claims Necessarily Fail Along with the Claim for Breach of the
PSA (Count I). ..........................................................................32

3.      Count IV:  Bridger-Ferrellgas Fails to State a Claim for
Contribution. ............................................................................33

IV.   CONCLUSION..................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*AAMCO Transmissions, Inc. v. Romano*,
   42 F. Supp. 3d 700, 713 (E.D. Pa. 2014) ............................................................11

*Accelerated Christian Educ., Inc. v. Oracle Corp.*,
   925 S.W.2d 66 (Tex. App.—Dallas 1996, no writ) .................................................9

*Am. Licorice Co. v. Total Sweeteners, Inc.*,
   2014 WL 892409 (N.D. Cal. Mar. 4, 2014).............................................................14

*Arnold v. Garlock Inc.*,
   288 F.3d 234 (5th Cir. 2002) ..................................................................................33

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
   480 U.S. 102 (1987)................................................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................6

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court*,
   134 S. Ct. 568 (2013)................................................................................7, 8, 10, 12

*Bank v. City of Philadelphia*,
   991 F. Supp. 2d 523 (E.D. Pa. 2014) .....................................................................34

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................6

*Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*,
   413 F. Supp. 2d 410 (E.D. Pa. 2005) .....................................................................17

*Blackwell v. Marina Assocs.*,
   2006 WL 573793 (E.D. Pa. Mar. 9, 2006)..............................................................15

*Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*,
   2016 WL 6213035 (E.D. Pa. Oct. 24, 2016)....................................................31, 34

*Bork v. Mills*,
   329 A.2d 247 (Pa. 1974) .........................................................................................16

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)...........................................................................................15, 17

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)..............................................................................23, 34

*Burry v. Cach LLC*,
    2015 WL 328182 (E.D. Pa. Jan. 22, 2015) ..........................................................................19

*CBI NA-CON, Inc. v. UOP Inc.*,
    961 S.W.2d 336 (Tex. App.—Houston [1st Dist.] 1997, pet. denied)....................................33

*In re Chocolate Confectionary Antitrust Litig.*,
    641 F. Supp. 2d 367 (M.D. Pa. 2009) ...................................................................................16

*Cintron Beverage Grp., LLP v. Aoun*,
    2011 WL 3156584 (E.D. Pa. July 26, 2011) .........................................................................19

*Coker v. Coker*,
    650 S.W.2d 391 (Tex. 1983)...........................................................................................24, 26

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) ...........................................................................................................15

*In re Davenport*,
    522 S.W.3d 452 (Tex. 2017)..................................................................................................25

*Derman v. Wilair Servs., Inc.*,
    404 Pa. Super. 136, 590 A.2d 317 ........................................................................................16

*Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*,
    294 S.W.3d 164 (Tex. 2009)..................................................................................................24

*Eagle Traffic Control, Inc. v. James Julian, Inc.*,
    933 F. Supp. 1251 (E.D. Pa. 1996) .......................................................................................17

*Eisaman Contract Assocs., Inc. v. Smith Sys. Mfg., Co.*,
    2017 WL 2378123 (W.D. Pa. June 1, 2017).....................................................................12, 33

*Element Fin. Corp. v. ComQi, Inc.*,
    52 F. Supp. 3d 739, 747 (E.D. Pa. 2014) ..............................................................................18

*EQT Prod. Co. v. Terra Services, LLC*,
    179 F. Supp. 3d 486, 493 (W.D. Pa. 2016)............................................................................33

*Escude Cruz v. Ortho Pharm. Corp.*,
    619 F.2d 902 (1st Cir. 1980).................................................................................................20

*In re Fisher*,
    433 S.W.3d 523 (Tex. 2014)...................................................................................................9

*Foulke v. Dugan*,
    212 F.R.D. 265 (E.D. Pa. 2002).............................................................................................33

*Gen. Elec. Co. v. Deutz AG,*
    270 F.3d 144 (3d Cir. 2001) ...............................................................................17

*Global Quality Foods, Inc. v. Van Hoekelen Greenhouses, Inc.,*
    2016 WL 4259126 (N.D. Cal. Aug. 12, 2016) ....................................................14

*Greenwood v. Tillamook Country Smoker, Inc.,*
    857 S.W.2d 654 (Tex. App.—Houston [1st Dist.] 1993, no writ)............................9

*Helicopteros Nacionales de Colom., S.A. v. Hall,*
    466 U.S. 408 (1984)...........................................................................15, 16, 22

*Heritage Res., Inc. v. NationsBank,*
    939 S.W.2d 118 (Tex. 1996).............................................................................24

*High River Ltd. P'ship v. Mylan Labs., Inc.,*
    353 F. Supp. 2d 487 (M.D. Pa. 2005) ..............................................................13

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement et al.,*
    326 U.S. 310 (1945)..........................................................................................22

*It's Intoxicating, Inc. v. Maritim Hotelgesellschft, mbH,*
    2012 WL 3686784 (M.D. Pa. Aug. 27, 2012) ....................................................18

*Jon Feingersh Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.,*
    2014 WL 716723 (E.D. Pa. Feb. 25, 2014) .......................................................10

*Junge v. Wheeling Island Gaming, Inc.,*
    2010 WL 4537052 (W.D. Pa. Nov. 2, 2010) ......................................................19

*Kachur v. Yugo Am., Inc.,*
    632 A.2d 1297 (Pa. 1993).................................................................................17

*Kehm Oil Co. v. Texaco, Inc.,*
    537 F.3d 290 (3d Cir. 2008)..............................................................................20

*Kilts Contracting, Inc. v. Anadarko Petroleum Corp.,*
    2014 WL 11510240 (D. Wyo. Dec. 4, 2014).....................................................12

*Kisano Trade & Invest Ltd. v. Lemster,*
    737 F.3d 869 (3d Cir. 2013)..............................................................................11

*Koresko v. Crosswhite,*
    2006 WL 263623 (E.D. Pa. Feb. 1, 2006) ........................................................14

*Longport Ocean Plaza Condo., Inc. v. Robert Cato & Assocs., Inc.,*
    2002 WL 2013925 (E.D. Pa. Aug. 29, 2002) ....................................................33

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
   818 F. Supp. 2d 597 (E.D.N.Y. 2011), *aff'd sub nom.*, 714 F.3d 714 (2d Cir. 2013) .............10

*Mathias v. Caterpillar, Inc.*,
   203 F. Supp. 3d 570, 575 (E.D. Pa. 2016) ...........................................................7, 8

*N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp.*,
   515 F. App'x 176 (3d Cir. 2013) ........................................................20

*Nat'l Specialty Ins. Co. v. Tunkhannock Auto Mart, Inc.*,
   2017 WL 661475 (M.D. Pa. Feb. 17, 2017) ...........................................34

*Negron v. Ryder Student Transp.*,
   1996 WL 99745 (E.D. Pa. Mar. 6, 1996).................................................33

*Papasan v. Allain*,
   478 U.S. 265 (1986)..........................................................................21

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001)...............................................................21

*Phoenix Network Technologies (Europe) Ltd. v. Neon Sys., Inc.*,
   177 S.W.3d 605, 615 (Tex. App.—Houston [1st Dist.] 2005) ..................9

*Pinkus v. Sirius XM Radio Inc.*,
   2017 WL 2243104 (N.D. Ill. May 23, 2017) ........................................14

*Radmore v. Aegis Commc'ns Grp., Inc.*,
   2008 WL 5129895 (E.D. Pa. Dec. 4, 2008), *aff'd*, 346 F. App'x 835 (3d Cir. 2009) .......20, 21

*Ramsay v. Tex. Trading Co.*,
   254 S.W.3d 620 (Tex. App.—Texarkana 2008, pet. denied) ...................9

*Rathblott v. Peoplestrategy, Inc.*,
   2016 WL 861348 (E.D. Pa. Mar. 7, 2016), *aff'd*, 685 F. App'x 107 (3d Cir. 2017)..............24

*Retail Brand All., Inc. v. Rockvale Outlet Ctr., LP*,
   2007 WL 403885 (E.D. Pa. Jan. 31, 2007) ..........................................24

*Robrinzine v Big Lots Stores, Inc.*,
   2016 WL 3459733 (N.D. Ill. June 24, 2016) ........................................14

*Rotondo Weinreich Enters., Inc. v. Rock City Mech.*,
   2005 WL 119571, at *6 (E.D. Pa. Jan. 19, 2005) ...................................18

*Rush v. Savchuk*,
   444 U.S. 320 (1980)..........................................................................20

*Saudi v. Acomarit Mars. Servs., S.A.*,
    114 F. App'x 449 (3d Cir. 2004) ..........................................................19

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014).............................................................9, 23

*Scott v. NG U.S. 1, Inc.*,
    881 N.E.2d 1125 (Mass. 2008) ...........................................................31

*Selas Fluid Processing Corp. v. Spilman*,
    2006 WL 890818 (E.D. Pa. Apr. 3, 2006) ............................................19

*Sheet Metal Workers' Int'l Ass'n Local Union No. 19 v. Main Line Mech., Inc.*,
    2013 WL 867123 (E.D. Pa. Mar. 7, 2013) ............................................21

*Sherk v. Countrywide Home Loans, Inc.*,
    2009 WL 2412750 (E.D. Pa. Aug. 5, 2009) ..........................................23

*Silvis v. Ambit Energy, L.P.*,
    90 F. Supp. 3d 393, 397 (E.D. Pa. 2015) .............................................14

*Skinner v. Flymo, Inc.*,
    351 Pa. Super. 234, 505 A.2d 616 (1986)............................................16

*Stiles v. Bankers Healthcare Group, Inc.*,
    637 F. App'x 556 (11th Cir. 2016) ......................................................10

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*,
    75 F.3d 147 (3d Cir. 1996)....................................................15, 16, 18

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ........................................................................16

*West v. Triple B Servs., LLP*
    264 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2008, no pet.)..........24

*World-Wide Volkswagen v. Woodson*,
    444 U.S. 286 (1980)..............................................................................17

**Statutes, Rules**

42 PA. CONS. STAT. § 8324 ........................................................................................33

TEX. CIV. PRAC. & REM. CODE, ch. 33 ......................................................................33

FED. R. CIV. P. 12(b)(2) ...................................................................................1, 14, 15

FED. R. CIV. P. 12(b)(6) ................................................................................... *passim*

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) ..............................................................30

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2009) ...............................28

Jamex LLC, Jamex Marketing LLC, Jamex Transfer Holdings LLC, and Jamex Transfer Services LLC (f/k/a Bridger Transfer Services LLC) (collectively, the "Jamex Entities")[1] file this memorandum of law in support of their Motion to Dismiss the Third-Party Complaint of Bridger Logistics LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P. (collectively "Bridger-Ferrellgas") [Dkt. No. 69/70] pursuant to Rules 12(b)(2), 12(b)(6), and *forum non conveniens*.  James Ballengee, an individual third-party defendant, joins Part III.A and Part III.C.  Together the Jamex Entities and Mr. Ballengee are referred to herein as the "Third-Party Defendants."

## I.      PRELIMINARY STATEMENT

The foundation of this entire third-party action is based on an inherently implausible notion: that Jamex Transfer Holdings—the purchaser of a company alleged by Bridger-Ferrellgas to have "minimal assets" (i.e., BTS/JTS[2]) that was sold for the price of $10—would promise to itself assume and *perform* BTS's own $100+ million deficiency obligation to Plaintiff Eddystone Rail Company LLC ("Eddystone") through 2019.  Such an allegation is not only farfetched as a commonsense matter, but insupportable as a matter of law under the plain language of the Purchase and Sale Agreement upon which Count I is based (the "PSA," attached as **Exhibit B**).  The notion goes further afield when extended to the derivative Count II claim on the Guarantee given by Jamex Marketing (attached as **Exhibit C**), as well as the allegation that James Ballengee tortiously interfered and caused a breach of the PSA/Guarantee (Count III).

In addition, there are no allegations sufficient to sustain the "contingent" claim for contribution alleged in Count IV of the Third-Party Complaint since a conclusory assertion of

---

[1] Attached as **Exhibit G** is a demonstrative organizational chart to help graphically illustrate the entity relationships and sale transactions addressed in this brief and referred to in the Third-Party Complaint.  The relevant organizational relationship of the Jamex Entities is depicted therein.  [*See* Ex. G at 3.]

[2] **For clarity, Jamex Transfer Services LLC (f/k/a Bridger Transfer Services LLC) is referred to as "BTS" when it was owned by Bridger-Ferrellgas *prior* to the sale on February 22, 2016, and as "JTS" once it afterwards became owned by Jamex Transfer Holdings and was renamed with the Jamex brand.**

alter ego fails to state facts showing that any Third-Party Defendant was involved in the actions taken by Bridger-Ferrellgas before it sold BTS. All the conduct alleged by Eddystone for the claims in its suit against Bridger-Ferrellgas was *prior* to the February 2016 sale, which, regardless of how damages are said to result, is a "Retained Liability" of Bridger Logistics under the PSA. The Third-Party Complaint should be dismissed for failure to state a claim.

Before the analysis even gets that far, however, this entire third-party action can (and should) be dismissed on *forum non conveniens* grounds. A mandatory venue clause in the PSA states that any disputes between the contracting parties—all of which are headquartered in Dallas County, Texas—"shall be" litigated in Dallas County. [*See* Ex. B § 10.12.] Given Ferrellgas's "consent" to the PSA, a further waiver of objection to Dallas County in the Guarantee, and the overlapping factual basis of the other third-party claims asserted (not to mention the lack of interest Pennsylvania has in an indemnity dispute between non-Pennsylvania companies), this entire third-party matter should be dismissed so it can be heard in Dallas County instead.

In addition, Bridger-Ferrellgas fails to allege sufficient facts to exercise personal jurisdiction over, at a minimum, Jamex LLC and Jamex Transfer Holdings as "direct and indirect owners." Neither company was engaged in the underlying oil and gas business in Pennsylvania and neither has contacts with Pennsylvania sufficient to establish general or specific jurisdiction. Counts I and IV against them should be dismissed for lack of personal jurisdiction.

## II.   STATEMENT OF FACTS[3]

### A.   The Eddystone Contract was Solely a BTS Obligation.

As alleged in the Third-Party Complaint (cited as "TPC" hereinafter), Eddystone and BTS entered into a Rail Facilities Services Agreement in 2013 (the "Eddystone Agreement,"

---

[3] These "facts" are largely derived from the allegations of Bridger-Ferrellgas. By making this motion the Third-Party Defendants do not adopt the allegations of the Third-Party Complaint and reserve all rights to deny the inaccuracies alleged by Bridger-Ferrellgas in accordance with the Federal Rules of Civil Procedure.

attached as **Exhibit E**) that required BTS to deliver a minimum of 64,750 barrels of oil per day for transloading at a price of $2.25 per barrel.  [TPC ¶¶ 18-19; Ex. E at 5-7.]  If less than 64,750 barrels per day were delivered over a monthly basis, then BTS (and BTS alone) was obligated to pay Eddystone a deficiency charge of $1.75 for each barrel below the minimum.  [TPC ¶ 19; Ex. E at 3, 7.]  As a result, the contract represented an approximate $3.5 million minimum monthly payment to Eddystone for the five-year term regardless of whether services were provided.

**B.      Ferrellgas Acquired Bridger Logistics (including BTS) in June 2015; the Third-Party Defendants had no Involvement in the Alleged Bad Acts.**

The Third-Party Complaint admits that the Jamex entities which existed at the time Ferrellgas acquired Bridger Logistics—Jamex LLC (f/k/a Bridger LLC) and Jamex Marketing (f/k/a Bridger Marketing)—were, after June 24, 2015, completely separate from Bridger Logistics [*see* TPC ¶¶ 24-25; *see also* Ex. G at 2-3], and thus not involved in any of the alleged stripping of assets or abrogating of implied contracts that Eddystone alleges Bridger Logistics carried out in January 2016 before it sold BTS to the newly-formed Jamex Transfer Holdings. [*See* Dkt. No. 1 "Eddystone Compl." ¶¶ 7, 46-49.]  Indeed, Bridger-Ferrellgas admits it was the sole owner of BTS for the seven-month period prior to February 2016.  [*See* TPC ¶¶ 5, 25.]

**C.      In February 2016, Jamex Transfer Holdings Agreed to Accept Assignment of BTS's Ownership Interests and Fully Complied with that Obligation.**

On February 22, 2016, Bridger Logistics and Jamex Transfer Holdings (with Ferrellgas's "consent") entered into the PSA that serves as the basis for this entire indemnity dispute.  [*See* Ex. B at 1, signature pages.]  The agreement provided for Bridger Logistics to transfer all ownership interests it held in BTS to Jamex Transfer Holdings for $10 [*see* Ex. B § 2.3(a)] and other nonmonetary consideration, including approximately $4.4 million related to throughput barrels BTS already owed to Eddystone as of February 20, 2016.  [*See id.* § 2.3(c).]  The core provision of the PSA at issue is Section 2.1(b), which states in full:

> At the Closing, Seller shall sell, assign, transfer, convey, deliver, and set over to Buyer the Membership Interests free and clear of any and all Liens.  The purchase and sale of the Membership Interests, and Buyer's consequent ownership of the Company, excludes the Retained Liabilities.   The transfer of the Membership Interests contemplated by the immediately preceding sentence shall be effectuated at Closing pursuant to the Membership Interest Assignment attached hereto as Exhibit "A."   At the Closing, Buyer will accept such assignment and transfer of the Membership Interests from Seller on the terms and conditions set forth herein, including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth on Schedule 4.4 for periods on and after the Closing Date.

[*See* Ex. B § 2.1 (b).]  This provision is discussed in detail at pages 25-27 below.

The "Retained Liabilities" excluded from the transfer included any "obligation of any nature whatsoever of [BTS and others] … to the extent relating to any period before the Closing, including any Liability or obligation that arises after the Closing with respect to any matter that occurred or accrued, or relates to the period, before the Closing."  [Ex. B at 5.]  In addition, the form of "Membership Interest Assignment" document was attached as an exhibit to the PSA and provided the entire transfer to Jamex Transfer Holdings was only ownership interests:

> Assignor does hereby BARGAIN, SELL, ASSIGN, TRANSFER, CONVEY, SET OVER, and DELIVER to Assignee all of Assignor's 100% right, title, and interest in and to the Membership Interests.[4]  Assignee hereby ACCEPTS the Membership Interests, free and clear of all liens and encumbrances (including security interests) other than restrictions imposed on sales of securities under applicable laws.

[Ex. B at internal exhibit A § 1.]  The Membership Interest Assignment did not assign the Eddystone Agreement and no reference was made anywhere in the entire PSA to BTS assigning its obligations under the Eddystone Agreement to anyone.

In conjunction with the PSA, on February 22, 2016, Jamex Marketing entered into a Guarantee for the performance of Jamex Transfer Holdings' obligations under the PSA.  [*See* Ex. C at 1.]  Section 4(a) of the Guarantee is most relevant and states in full:

---

[4] The "Membership Interests" were defined as "all of the right, title, and interest in and to one hundred percent (100%) of the limited liability company membership interests in and to BRIDGER TRANSFER SERVICES, LLC, a Louisiana limited liability company."  [Ex. B at 1, 4.]

> Effective as of the date hereof, Jamex hereby absolutely, unconditionally, and irrevocably guarantees each and every representation, warranty, covenant, agreement and other obligation of Buyer, and the full and timely payment and prompt and complete performance of Buyer's obligations and liabilities, under the provisions of BTS Transfer Document (collectively, the "Guaranteed Obligations"). Jamex acknowledges that it is making the guarantee contemplated in this Section 4 (the "Guarantee") to induce Bridger to enter into the BTS Transfer Document.

[Ex. C § 4(a) (emphasis removed).] In effect, it was a guarantee that Jamex Transfer Holdings would do whatever it was required to do under the PSA. As a result, any claim against Jamex Marketing on the Guarantee is wholly dependent on the terms of the PSA.

Jamex Transfer Holdings fully performed its obligation to accept assignment of the BTS membership interests by executing the Membership Interest Assignment (executed version attached as **Exhibit D**), which, as affirmatively alleged in the Third-Party Complaint, resulted in BTS being "sold" and renamed as JTS. [*See* TPC ¶¶ 6, 28, 40; *see also* Ex. G at 3.]

## D.    In an Arm's-Length Negotiation with Eddystone, the Jamex Entities Entered into a Settlement that Resulted in BTS Being Held Liable for its Contractual Obligations.

After the sale, JTS did not deliver oil to Eddystone. [TPC ¶ 41.] In fact, oil shipments had stopped three weeks before execution of the PSA [*see* Ex. B at 1 (executed February 22, 2016)] while BTS was still under Bridger-Ferrellgas's control, as effectively acknowledged in the Third-Party Complaint. [*See* TPC ¶ 41 (noting facility not used after February 1, 2016).]

Accordingly, on April 19, 2016, Eddystone initiated an arbitration against the renamed JTS with the Society of Maritime Arbitrators ("SMA"), as required by the Eddystone Agreement, seeking deficiency payments through 2019 totaling approximately $144 million. [*See* TPC ¶¶ 43-44.] The arbitration was litigated through 2016 until January 5, 2017, when, after a month of arm's-length negotiation, the Third-Party Defendants entered into a settlement with Eddystone. [*Id.* ¶¶ 48-51.] Under the terms of the settlement JTS agreed not to oppose entry of a final award against it for a discounted present value of $139,050,406.77. [*Id.* ¶ 46]

For additional consideration paid to Eddystone, all Third-Party Defendants other than JTS were released from any and all follow-on claims.  [*Id.* ¶¶ 50-52.]

On January 24, 2017, the SMA panel issued a final award holding JTS (and solely JTS) liable for its obligations under the Eddystone Agreement.  [*Id.* ¶ 56.]  Bridger-Ferrellgas now alleges the settlement and final award was "collusive."  [*Id.* ¶¶ 46, 51, 64.]  However, such characterization of an arm's length-negotiation undertaken for legitimate business reasons and providing real value to the Jamex entities is conclusory and not entitled to any weight.[5]

**E.    Bridger-Ferrellgas now Sues on Nonexistent Indemnity Obligations.**

On February 2, 2017, Eddystone filed its Complaint initiating this action seeking to recover damages resulting from conduct done *by* Bridger-Ferrellgas *prior to* the sale of BTS. [TPC ¶¶ 59–63.]  In response, Bridger-Ferrellgas seeks to drag in the Third-Party Defendants with dubious allegations that Jamex Transfer Holdings promised to "assume" and "perform" the Eddystone Agreement [*see id.* ¶¶ 6, 39, 41, 42, 70, 77], that James Ballengee tortiously interfered with that nonexistent obligation [*see id.* ¶¶ 95-104], and that a bevy of identified and unidentified entities should be held jointly responsible for Bridger-Ferrellgas's actions during a time when it was admittedly the sole owner of BTS.  [*See id.* ¶¶ 24-25.]  The claims are baseless and should be dismissed.

## III.    ARGUMENT

The foundation for this entire third-party indemnity action is based on the terms of the PSA (and, as such, the Guarantee and tortious interference are derivative), which can be dismissed as a matter of law under Rule 12(b)(6).  However, given that *forum non conveniens* and personal jurisdiction are threshold matters they are addressed first in the discussion below at

---

[5] Conclusory allegations of law, inferences unsupported by facts, or a formulaic recitation of the elements in a complaint will not defeat a motion under Federal Rule of Civil Procedure 12(b)(6).  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

Part III.A (forum non conveniens) and Part III.B (personal jurisdiction), with the arguments for failure to state a claim following thereafter in Part III.C.

## A.    THE CLAIMS SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*.

The doctrine of *forum non conveniens* requires dismissal of the claims against all Third-Party Defendants because the PSA designates Dallas County, Texas, as the mandatory forum for all disputes and there is otherwise no diversity[6] to support transfer to a federal court in Texas.

### 1.    *Forum Non Conveniens* is Highly Deferential to Forum Selection Clauses.

The Supreme Court has directed federal courts to decide *forum non conveniens* motions in a way that closely mirrors the analysis for a 28 U.S.C. § 1404(a) motion to transfer.  *See Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court*, 134 S. Ct. 568, 581–83 & n.8 (2013).  "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum."  *Id*.  Because forum selection clauses are "bargained for by the parties, a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases."  *Id.*

Based on *Atlantic Marine*, this Court conducts a two-part analysis when analyzing a forum selection clause.  *See Mathias v. Caterpillar, Inc.*, 203 F. Supp. 3d 570, 575 (E.D. Pa. 2016).  First, it is necessary to determine whether the forum selection clause is valid and enforceable.  *Id.*  Such clauses are deemed "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances," or obtained by "fraud, undue influence, or overweening bargaining power."  *Id.* (citing *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir.1991)).  If valid, there is no need to consider "private interest" factors in a traditional *forum non conveniens* analysis because "the plaintiff's

---

[6] Bridger Logistics is alleged to be headquartered in Texas [TPC ¶ 9], as are all the Third-Party Defendants.  [*Id.* ¶¶ 12-16.]

choice of forum merits no weight." *Id.*  Rather, the privilege of a plaintiff to choose the forum is "effectively exercised" during contract negotiations. *Atl. Marine*, 134 S. Ct. at 581–82.  Second, a court must consider whether "extraordinary circumstances" militate against enforcing the forum selection clause. *Mathias*, 203 F. Supp. 3d at 575 (citing *Atl. Marine*, 134 S. Ct. at 581). In determining whether extraordinary circumstances exist a court can consider "arguments about public-interest factors only," *id.*, including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* (citing *Atl. Marine*, 134 S. Ct. at 581 n.6).  The public interest factors must "overwhelmingly disfavor" transfer to avoid a forum selection clause.  *Id.* (citing *Atl. Marine*, 134 S. Ct. at 583).

For purposes of the above analysis, "the party defying the forum-selection clause … bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine*, 134 S. Ct. at 581.  Bridger-Ferrellgas cannot meet that burden here because: (1) they already exercised the privilege to choose the proper forum when agreeing to mandatory venue in Dallas County, Texas, as part of the PSA; and (2) Bridger Logistics further agreed to a similar forum selection clause as part of the Guarantee (which is entirely derivative of the PSA).  Moreover, the private and public interest factors in a full *forum non conveniens* analysis as to the remaining tortious interference and contribution claims also support dismissal. Finally, the plea for "ancillary venue" in the Third-Party Complaint is inapplicable in the face of a valid and enforceable forum selection clause.  Therefore, this Court should dismiss all claims so they may be heard together in the agreed convenient forum of Dallas County, Texas.

### 2.       The Forum Selection Clauses are Valid and Enforceable.

Bridger-Ferrellgas seeks to enforce the PSA and Guarantee, and makes no allegation the forum selection clauses are not enforceable.  In the circumstances of this third-party matter they

require this entire dispute to be heard in Dallas County, Texas, where: (1) the named parties (i.e., Bridger Logistics, Jamex Transfer Holdings, and Jamex Marketing) are all headquartered [*see* TPC ¶¶ 9, 12, 13], (ii) the officers who executed the contracts—i.e., James Ballengee for  the Jamex entities and Julio Rios for Bridger Logistics and Ferrellgas—all reside [*see* TPC ¶ 16; Dkt. No. 66[7] at 4 (¶ 15) (Rios is a Texas resident)], and (iii) where the courts deciding the matter would be "at home" applying the law.  [*See* TPC ¶¶ 27 n.1, 35 n.2 (alleging Texas law governs).]

In regard to the PSA specifically, Bridger Logistics (with Ferrellgas "consenting") executed a contract which states that the "parties stipulate and agree, and hereby waive any claim or objection, that venue for any dispute hereunder ***shall be*** in a court of competent jurisdiction situated in Dallas County, Texas."  [Ex. B § 10.12 (emphasis added).]  Such language creates mandatory venue.  For example, in *Phoenix Network Technologies (Europe) Ltd. v. Neon Sys., Inc.*, the contract there stated "… venue for resolution of any disputes arising out of this Agreement ***shall be*** the United Kingdom," which was determined to be mandatory.  177 S.W.3d 605, 615 (Tex. App.—Houston [1st Dist.] 2005), no pet. (emphasis added).  That court further cited cases finding language that disputes "*be*" litigated in a particular forum were mandatory as well.  *Id.*[8]  As a result, the foundational claim for Counts I-III in the Third-Party Complaint is

---

[7] In ruling on a motion to dismiss, a district court can consider "matters of public record."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[8] *See also, e.g.*, *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) (holding forum selection clause mandatory where it provided "each of the parties irrevocably submits to the non-exclusive jurisdiction of each such court in any such proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the proceeding may be heard and determined in any such court and agrees not to bring any proceeding arising out of or relating to this Agreement in any other court."); *Ramsay v. Tex. Trading Co.*, 254 S.W.3d 620, 626 (Tex. App.—Texarkana 2008, pet. denied) (mandatory where clause provided that "[a]ll actions or proceedings arising ... from this agreement or any transaction covered hereby, shall be governed by the law of Illinois and may, at the discretion and election of [ADM], be litigated in a court whose situs is within Illinois"); *Accelerated Christian Educ., Inc. v. Oracle Corp.*, 925 S.W.2d 66, 69, 70–71 (Tex. App.—Dallas 1996, no writ) (mandatory when providing: "[I]f [plaintiff] brings the action, it shall be instituted in one of the courts specified in subparagraph (a) above"); *Greenwood v. Tillamook Country Smoker, Inc.*, 857 S.W.2d 654, 655, 656–57 (Tex. App.—Houston [1st Dist.] 1993, no writ) (mandatory when providing: "[A]ny legal action concerning this Agreement shall be brought in a court of competent jurisdiction in the State of Oregon").

subject to mandatory venue in Dallas County.  No private interest factors need be considered.
*Atl. Marine*, 134 S. Ct. at 581–82.

Bridger Logistics made a similar agreement in the Guarantee naming Dallas County,
Texas, as a convenient forum for disputes, stating in most relevant part:

> For any dispute arising hereunder, each party hereby irrevocably submits to the
> jurisdiction of any state or federal court located within Dallas County in the State
> of Texas and *irrevocably and unconditionally* **_waives_** *any objection to the laying
> of venue* of any legal proceeding arising out of a dispute concerning this
> Agreement, and agrees not to plead or claim in any such court that any such
> proceeding brought in any such court has been brought in an inconvenient forums
> or that such Party is not subject to personal jurisdiction in such court.

[Ex. C § 8(a) (emphasis added).]  The language of the Guarantee's venue clause is different from
the PSA.  However, the result is the same because the claims on the Guarantee (as well as for
tortious interference) are reliant on the existence of a claim under the PSA.

Indeed, if Bridger-Ferrellgas has no claim on the PSA, then it has no claim for Counts I-
III at all.  Such a derivative nature of claims—combined with Bridger-Ferrellgas's agreement in
the PSA and Guarantee to "waive" any objection to venue in Dallas County—demands that all
claims be heard together in the PSA's contractually-agreed forum. *See, e.g.*, *Stiles v. Bankers
Healthcare Group, Inc.*, 637 F. App'x 556, 562 (11th Cir. 2016) (wife's claims based on same
general facts as husband who was bound to forum selection clause were "derivative" for
mandatory venue purposes); *see also Magi XXI, Inc. v. Stato della Citta del Vaticano*, 818 F.
Supp. 2d 597, 607 (E.D.N.Y. 2011), *aff'd sub nom.*, 714 F.3d 714 (2d Cir. 2013) (nonsignatory's
claims subject to mandatory venue).  For efficiency reasons and factual overlap, the "contingent"
contribution claim in Count IV of the Third-Party Complaint should also be deemed derivative
and subject to mandatory venue in Dallas. *See, e.g.*, *Jon Feingersh Photography, Inc. v.
Houghton Mifflin Harcourt Pub. Co.*, 2014 WL 716723, at *3 (E.D. Pa. Feb. 25, 2014) (finding

10

claims—some subject to a mandatory venue and others not—should be transferred for efficiency purposes when majority of matter related to claims subject to mandatory venue).

Even if the Guarantee and other claims are not considered "derivative" of the PSA claim, the private interest factors under a full *forum non conveniens* analysis are met. *See Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013) (factors "include the ease of access to sources of proof; ability to compel witness attendance if necessary; means to view relevant premises and objects; and any other potential obstacle impeding an otherwise easy, cost-effective, and expeditious trial"). In fact, Bridger-Ferrellgas's unambiguous waiver of objection to Dallas County already renders any opposition on "private interest" grounds untenable. *See AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 713 (E.D. Pa. 2014) (noting "the Supreme Court has explained that the existence of a forum selection clause *of any kind* significantly undercuts any argument that the preselected forum is inconvenient for the parties or their witnesses") (emphasis added). Further, there is no legitimate argument Dallas County is not convenient given: (i) the named contract parties are all headquartered in Dallas County, (ii) all relevant Jamex witnesses reside in or are subject to legal process there [*see* Decl. of J. Ballengee, attached as **Exhibit A**, ¶ 14]; (iii) Ferrellgas is a large publicly-traded enterprise that can litigate anywhere,[9] and (iv) the employees of Bridger Logistics involved with the contract reside in Texas.[10] Bridger-Ferrellgas cannot legitimately contend Dallas County is inconvenient.

### 3.     All Public Interest Factors Weigh in Favor of Dismissal.

In a *forum non conveniens* analysis, the Supreme Court provides that, when there is a valid forum selection clause, not only do the private interest factors take a backseat but the

---

[9] This is a matter of public knowledge and judicial notice. The shares of Ferrellgas Partners, L.P., are listed on the New York Stock Exchange and publicly-traded under the symbol "FGP."

[10] To the extent Ferrellgas has witnesses separate and apart from Bridger Logistics, those witnesses may be based in Kansas or Missouri, but not Pennsylvania. [*See, e.g.*, Dkt. No. 77 at 7 (Ferrellgas headquarters in Kansas)].

public interest factors "will rarely defeat" a dismissal since forum selection clauses "should control except in unusual cases." *Atl. Marine*, 134 S. Ct. at 582. Again, the public interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 581 n.6. Importantly, Bridger-Ferrellgas has the burden to show those factors "overwhelmingly disfavor" dismissal. *Id.* at 583.

None of the public interest factors here are overwhelming and nothing indicates this is one of the "unusual cases" contemplated by *Atlantic Marine*. There are no administrative difficulties that arise by dismissing this case in favor of a Dallas County court. A court there can produce a judgment just as enforceable as one in Pennsylvania (indeed, more easily enforceable given all the defendants reside in Texas), there is no special court congestion in Dallas County [*see* Decl. of R. Guy, attached as **Exhibit H**, ¶ 3], and a Texas court is best positioned to decide the matters of Texas law that will control the outcome.[11] Overall, Texas has a superior interest in determining an indemnity dispute between Texas companies over contracts negotiated, entered into, and performed in Texas.[12] Pennsylvania, on the other hand, has an interest in the dispute between Eddystone—a Pennsylvania resident regarding Pennsylvania business—and Bridger-Ferrellgas. JTS has already arbitrated with Eddystone in New York and, as an entity that Bridger-Ferrellgas acknowledges "has no assets" [*see* TPC ¶ 47] (and effectively admits had no assets when it sold the entity in February 2016),[13] JTS made the reasonable business decision to

---

[11] *See also Eisaman Contract Assocs., Inc. v. Smith Sys. Mfg., Co.*, 2017 WL 2378123, at *5 (W.D. Pa. June 1, 2017) (noting district courts in the Third Circuit "have not placed great importance" on the court congestion factor and that a Texas court is better suited to decide Texas law).

[12] *See, e.g., Kilts Contracting, Inc. v. Anadarko Petroleum Corp.*, 2014 WL 11510240, at *6 (D. Wyo. Dec. 4, 2014) (finding little local interest in an indemnity suit in similar circumstances, even though underlying suit clearly involved heavy local interest due to an environmental spill that occurred in Wyoming).

[13] *See* TPC ¶ 27 (alleging that "[a]t the time of the sale of BTS to JTH, BTS had *minimal assets*, a fact which was disclosed to JTH and the other Third-Party Defendants").

consent to an arbitration award rather than incur the substantial costs of litigation when it was already clear it would not be able to pay those costs or an award.[14]   This indemnity dispute between Texas companies is a sideshow to the main dispute involving Pennsylvania and keeping it here despite the forum selection clauses threatens to distract from that matter.

Bridger-Ferrellgas is thus not able to meet its burden of showing the public interest factors "overwhelmingly disfavor" this third-party matter occurring in Dallas County, Texas, where the parties contractually agreed to "irrevocably and unconditionally waive[] any objection" to venue.  [Ex. C § 8(a); Ex. B § 10.12.]  This entire matter should be dismissed.

### 4.   "Ancillary Venue" is Inapplicable.

The sole allegation as to venue in the Third-Party Complaint is for "ancillary venue" [*see* TPC ¶ 8], which is misplaced. Ancillary venue (also called pendent venue) is an analogue to supplemental jurisdiction designed to allow courts to hear claims arising out of the same operative facts that otherwise do not independently satisfy venue requirements—i.e., when venue is wrong under the federal statute.  *See High River Ltd. P'ship v. Mylan Labs., Inc.*, 353 F. Supp. 2d 487, 493 (M.D. Pa. 2005).  But a dismissal for *forum non conveniens* is not based on such an argument, only that the mandatory forum selection clause in the PSA, waiver in the Guarantee, and private/public interest factors warrants dismissing this entire third-party matter so it can be heard in Dallas County, Texas.  Further, the indemnity claims at issue do not arise out of the same operative facts alleged by Eddystone against Bridger-Ferrellgas in the main action—i.e., the pre-sale fraudulent transfer and breach of fiduciary duty—in anything more than a superficial background way and it is dubious to suggest the contribution allegations are intertwined when

---

[14] There are additional facts surrounding JTS's decision to stop arbitrating that are very unfavorable to Ferrellgas (which, of course, are not mentioned in the Third-Party Complaint), that can be set forth at the appropriate time and in the appropriate forum, but that forum should be Texas.

Bridger-Ferrellgas admits it was the sole owner of BTS for the seven months prior to the sale when the supposed stripping of assets and abrogating of implied contracts allegedly occurred.

Courts that have recently considered forum selection clauses in connection with assertions of "ancillary venue" in third-party actions have routinely found the doctrine inapplicable. *See Global Quality Foods, Inc. v. Van Hoekelen Greenhouses, Inc.*, 2016 WL 4259126, at *5 (N.D. Cal. Aug. 12, 2016);[15] *Robrinzine v Big Lots Stores, Inc.*, 2016 WL 3459733 (N.D. Ill. June 24, 2016); *see also Pinkus v. Sirius XM Radio Inc.*, 2017 WL 2243104, at *4 (N.D. Ill. May 23, 2017). Such a result is supportive of and consistent with the well-established policy that "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Silvis v. Ambit Energy, L.P.*, 90 F. Supp. 3d 393, 397 (E.D. Pa. 2015) (alterations in original) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988)). Accordingly, the "ancillary venue" allegation fails to have any effect or importance.

## B. THIS IS NO PERSONAL JURISDICTION OVER JAMEX LLC AND JAMEX TRANSFER HOLDINGS.

If the Court does not dismiss all claims for *forum non conveniens*, then, pursuant to Rule 12(b)(2), the Court should still at a minimum dismiss the claims against Jamex LLC (Count IV) and Jamex Transfer Holdings (Count I) due to a lack of personal jurisdiction.

Bridger-Ferrellgas bears "the burden of proving, either by sworn affidavits or other competent evidence, sufficient contacts with the forum state to establish personal jurisdiction." *See Koresko v. Crosswhite*, 2006 WL 263623, at *2 (E.D. Pa. Feb. 1, 2006) (citing *N. Penn Gas Co. v. Corning Nat. Gas Corp.*, 897 F.2d 687, 689 (3d Cir. 1990). As it stands, the Third-Party

---

[15] It appears the notion of ancillary jurisdiction post-*Atlantic Marine* stems from a single Northern District of California case, *Am. Licorice Co. v. Total Sweeteners, Inc.*, 2014 WL 892409 (N.D. Cal. Mar. 4, 2014). Yet, that case has no persuasive value as the court there acknowledged its prioritization of the interests was not based on direct legal authority, *id.* at *6, and all courts since have rejected the premise, including two that directly rejected *American Licorice* by name. *See Pinkus*, 2017 WL 2243104, at *4; *Global*, 2016 WL 4259126, at *5.

Complaint does not even make *allegations* to support the exercise of jurisdiction over Jamex LLC and Jamex Transfer Holdings.  Both should be dismissed under Rule 12(b)(2).

**1.      The Third-Party Complaint Fails to Allege "with Reasonable Particularity" Facts Showing Minimum Contacts with Pennsylvania.**

The due process limits on the exercise of personal jurisdiction is defined by a two-prong test.  First, the defendant must have purposefully established "minimum contacts" with the forum and, second, if minimum contacts are shown, the court must determine whether personal jurisdiction is consistent with notions of "fair play and substantial justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-76 (1985).  Determining minimum contacts requires "an examination of the relationship among the forum, the defendant and the litigation."  *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 150 (3d Cir. 1996).  Minimum contacts may exist if the particular cause sued upon arose from the defendant's activities in the forum state (specific jurisdiction) or the defendant has "continuous and systematic" contacts with the forum state (general jurisdiction).  *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414, 416 (1984).

Here, Bridger-Ferrellgas has not alleged, and cannot establish, the requisite minimum contacts with Pennsylvania in regard to Jamex LLC or Jamex Transfer Holdings, and requiring them to defend this action in Pennsylvania is not consistent with fair play and substantial justice.

**a.      *There is no General Jurisdiction Alleged or Existing.***

According to the Supreme Court, general jurisdiction requires affiliations with the forum to be so continuous and systematic as to render the person essentially "at home" in the state.  *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).  Consequently, the "threshold showing for establishing general jurisdiction is very high, and requires a showing of extensive and pervasive facts demonstrating connections with the forum state."  *Blackwell v. Marina Assocs.*, 2006 WL

573793, at *3 (E.D. Pa. Mar. 9, 2006); *see also In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 383 (M.D. Pa. 2009) ("The defendant must maintain perpetual, abiding ties with the forum.  Sporadic, ephemeral, or deciduous contacts do not suffice.").

Here, Bridger-Ferrellgas does not allege general jurisdiction as to Jamex LLC or Jamex Transfer Holdings, [*see* TPC ¶¶ 4–7], and there is no basis on which to make such a claim.  As stated in the attached Declaration of James H. Ballengee (Exhibit A), Jamex LLC and Jamex Transfer Holdings are not incorporated in Pennsylvania, not registered to do business there, have not consented to jurisdiction there, and do not carry on or maintain any type of business activities in Pennsylvania.  [*See* Ex. A ¶ 7.]  Courts have consistently held that negligible contacts—even those more substantial than here—fail to establish general jurisdiction.[16]  Because Jamex LLC and Jamex Transfer Holdings have no contacts to Pennsylvania, there is no general jurisdiction.

### b.    The Allegations for Specific Jurisdiction are Insufficient.

A defendant may be subject to specific jurisdiction only "when the cause of action arises from the defendant's forum related activities."  *Vetrotex*, 75 F.3d at 151; *see also Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (cause of action must "arise out of contacts that the defendant *himself* creates with the forum state") (emphasis in original).  In addition, "a plaintiff must show the defendant has minimum contacts with the state such that the defendant should reasonably anticipate being haled into court there."  *Vetrotex*, 75 F.3d at 151.  Thus, "[s]pecific

---

[16] *See, e.g.*, *Helicopteros*, 466 U.S. at 416-18 (foreign corporation sent officers to forum for negotiating session, accepted checks from forum bank, purchased equipment from forum, and sent personnel to forum to be trained); *Bork v. Mills*, 329 A.2d 247, 249 (Pa. 1974) (lack of allegations that defendant's business activities were "continuous and substantial" results in general jurisdiction); *Derman v. Wilair Servs., Inc.*, 404 Pa. Super. 136, 590 A.2d 317, 324 (corporation did small amount of business with Pennsylvania residents, but not incorporated in Pennsylvania, did not advertise in Pennsylvania, maintained no office in Pennsylvania, and paid no taxes in Pennsylvania); *Skinner v. Flymo, Inc.*, 351 Pa. Super. 234, 239, 505 A.2d 616, 619 (1986) (not incorporated in Pennsylvania, incurred no tax liability there, did not advertise or maintain offices there, and no officers or employers in Pennsylvania).

jurisdiction is established when a non-resident defendant has 'purposefully directed'[17] his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001).

Bridger-Ferrellgas alleges only one basis for specific jurisdiction over Jamex Transfer Holdings: that, by entering into the PSA, it promised "to perform and make payments as contractually obligated to [Eddystone] in the state of Pennsylvania." [TPC ¶ 6.] The allegation against Jamex LLC states only that it was an "indirect owner" of BTS, and that BTS itself was obligated to perform the Eddystone Agreement in Pennsylvania. [*Id.* ¶ 5.] As noted previously, the allegation as to Jamex Transfer Holdings is contradicted by the plain terms of the PSA. Further, the "owner" argument is not sufficient to show purposeful availment.

### (i.) Neither Entity "Purposefully Directed" any Activities at Pennsylvania.

As noted in Mr. Ballengee's Declaration attached hereto, neither of the entities at issue have any business or contacts with Pennsylvania. [*See* Ex. A ¶ 7.] The only indirect connection would be, as alleged by Bridger-Ferrellgas, the contract between Eddystone and BTS/JTS— currently a subsidiary of Jamex Transfer Holdings. [*See* Ex. G at 3.] However, a transfer of the ownership interests of a company that has contacts with Pennsylvania is not sufficient to establish specific jurisdiction over the purchaser. *See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 413 F. Supp. 2d 410, 413–14 (E.D. Pa. 2005) (contract

---

[17] This is also known as purposeful availment and requires more than a mere foreseeability of causing injury in another state. *Burger King*, 471 U.S. at 474. Purposeful availment is designed "to ensure that jurisdiction would not be based on 'random,' 'fortuitous' or 'attenuated' contacts, or on the 'unilateral activity of another party or a third person.'" *Kachur v. Yugo Am., Inc.*, 632 A.2d 1297, 1300 (Pa. 1993). Instead, the Constitution requires an "affirmative act" by which "the defendant purposefully avails itself of the privilege of conducting activities within the forum state." *Eagle Traffic Control, Inc. v. James Julian, Inc.*, 933 F. Supp. 1251, 1255 (E.D. Pa. 1996). This requirement helps safeguard the "orderly administration of the laws" by providing "a degree of predictably to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980).

affecting terms and conditions of employment of Pennsylvania residents insufficient); *see also* *Vetrotex*, 75 F.3d at 148 (entering into contract with Pennsylvania-based company insufficient).

Moreover, the totality of circumstances around the PSA weighs against, rather than for, specific jurisdiction.  None of the parties to the contract are incorporated or headquartered in Pennsylvania [TPC ¶¶ 9, 13], Texas law governs [*id.* ¶ 27 n.1], and it was negotiated, executed, and performed (i.e., the transfer by way of the Membership Interests Assignment) in Texas.  [*See* Ex. A ¶ 11; *see also* Ex. D.]  Those circumstances are even less than other cases in which jurisdiction has been denied.  *See, e.g.*, *Element Fin. Corp. v. ComQi, Inc.*, 52 F. Supp. 3d 739, 747 (E.D. Pa. 2014) (no jurisdiction when "no extended or protracted contract negotiations or post-contract discussion, no visits to Pennsylvania, no performance of the contract in Pennsylvania, and no manifest intent by the parties to enter into a long-term business relationship—or even to conduct business beyond the provision of media players and services the agreement contemplated in Pennsylvania"); *Rotondo Weinreich Enters., Inc. v. Rock City Mech.,* Inc., 2005 WL 119571, at *6 (E.D. Pa. Jan. 19, 2005) (holding no jurisdiction when contract to be performed outside state and no choice-of-law designating forum); *see also It's Intoxicating, Inc. v. Maritim Hotelgesellschft, mbH*, 2012 WL 3686784, at *5 (M.D. Pa. Aug. 27, 2012) (dismissing when plaintiff failed "to provide any information as to the nature and character of the negotiations, the parties' course of dealings, or the terms of the contract").

There is no allegation of jurisdiction over Jamex LLC in relation to the PSA.  Even if there were, however, those would be even more remote as Jamex LLC is not a party to the PSA and not a direct parent of Jamex Transfer Holdings (nor JTS) [*see* TPC ¶ 5; *see also* Ex. G at 3], meaning Jamex LLC had no role in negotiating the PSA, Guarantee, or Eddystone Agreement,

and did not cause any contracting party to enter into those agreements.   [*See* Ex. A ¶ 9.]
Therefore, Bridger-Ferrellgas fails to establish purposeful availment.

### (ii.)   *The Third-Party Claims do not "Arise out of" Contacts with Pennsylvania.*

Even if there were purposeful availment in general, the Third Circuit requires the analysis to further "zero in on" whether the claims actually "arise from" the purposeful availment.   *See Burry v. Cach LLC*, 2015 WL 328182, at *5 (E.D. Pa. Jan. 22, 2015).   Though the Third Circuit has not settled on a specific rule to test "relatedness," it has advised that the inquiry should begin with a "but-for" causation test.   *Id.*   The inquiry does not end there, however, because "specific jurisdiction requires a closer and more direct causal connection than that provided by the 'but-for test.'"   *Id.*   As such, courts in the Third Circuit routinely dismiss claims that do not arise out of a defendant's contacts with the relevant forum.[18]

Bridger-Ferrellgas's only claim against Jamex Transfer Holding is for breach of contractual indemnification (Count I) and, as to Jamex LLC, for contribution (Count IV).   These alleged claims, however, do not arise out of the jurisdictional contacts alleged in the Third-Party Complaint.   As to Jamex Transfer Holdings, the Third-Party Complaint does not allege the PSA was negotiated, executed, or performed in Pennsylvania.   As to Jamex LLC, there is no allegation of a single contact within Pennsylvania that the contribution claim could have arisen out of.   The only allegation is a "contingent" one that, if Bridger-Ferrellgas is found to be an "alter ego" of BTS, then Jamex LLC should be as well.   [TPC ¶ 107.]   Bridger-Ferrellgas fails to

---

[18] *See, e.g.*, *Saudi v. Acomarit Mars. Servs.*, S.A., 114 F. App'x 449, 453 (3d Cir. 2004) (holding "Saudi's alleged injury did not arise from any activities Acomarit 'purposefully directed' at Pennsylvania"); *Cintron Beverage Grp., LLP v. Aoun*, 2011 WL 3156584, at *4 (E.D. Pa. July 26, 2011) (finding "the claim in the present case arose in Michigan where GFDI failed to remit payment to Cintron in Pennsylvania.   Thus, the present litigation did not arise out of the activities GFDI directed toward Pennsylvania."); *Junge v. Wheeling Island Gaming, Inc.*, 2010 WL 4537052, at *1 (W.D. Pa. Nov. 2, 2010) (declining jurisdiction because it was clear from complaint that plaintiff's injuries "did not arise out of" defendant's alleged contacts with Pennsylvania); *Selas Fluid Processing Corp. v. Spilman*, 2006 WL 890818, at *3 (E.D. Pa. Apr. 3, 2006) (same).

allege specific facts showing how the entire lack of individual contacts between Jamex LLC and Pennsylvania resulted in the claim asserted.  Such a conclusory allegation fails to meet the standards of pleading and, thus, fails to establish specific jurisdiction.

> (iii.) <u>Jurisdiction Cannot be Imputed Through Ownership of Companies Having Contacts with Pennsylvania.</u>

As noted before, the primary allegation Bridger-Ferrellgas makes for jurisdiction over Jamex LLC and Jamex Transfer Holdings is as an indirect and direct owner of JTS.  [TPC ¶ 5.] That is not adequate because each defendant's contacts with the forum state must be assessed individually.  *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980) ("The requirements of *International Shoe*, however, must be met as to *each defendant* over whom a state court exercises jurisdiction." (emphasis added)).  "[T]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary," *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) (cited approvingly by *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 301 (3d Cir. 2008)).

The only exception is for when the parent "controls" the subsidiary such that the subsidiary is an alter ego of the parent.  *Id.* at 300; *see also  Radmore v. Aegis Commc'ns Grp., Inc.*, 2008 WL 5129895 at *3 (E.D. Pa. Dec. 4, 2008), *aff'd*, 346 F. App'x 835 (3d Cir. 2009) ("To warrant imputing the subsidiary's contacts for jurisdiction, the parent must control the business operations and affairs of the subsidiary, effectively making it the parent's alter ego.").  To meet that standard, however, there must be more than "mere majority or complete stock control."  Instead, the parent must exercise "complete domination" not over just the "finances" of a company, "but of policy and business practice[s]" such that the subsidiary had "no separate mind, will or existence of its own."  *N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp.*, 515 F. App'x 176, 180 (3d Cir. 2013).  Further, there is an "extremely high burden" when it

comes to establishing parent liability.  *See, e.g.*, *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001) (observing burden of proving alter ego under the traditional test "is notoriously difficult for plaintiffs to meet"); *Sheet Metal Workers' Int'l Ass'n Local Union No. 19 v. Main Line Mech., Inc.*, 2013 WL 867123, at *4 (E.D. Pa. Mar. 7, 2013) ("The traditional corporate alter ego test places an extremely high burden on plaintiffs attempting to pierce the corporate veil.").  The standard requires, at a minimum, specific allegations as to each company concerning things such as "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder."  *Pearson*, 247 F.3d at 484–85.

Here, Bridger-Ferrellgas makes a single "contingent" allegation in the entire Third-Party Complaint that "[i]f a judgment is issued against any or all of the Third-Party Plaintiffs on the grounds that they are the alter ego of BTS … Jamex LLC … should also be adjudged" an alter ego.  [TPC ¶ 107.]  Such a contingent, conclusory allegation is not sufficient.  As the Supreme Court has held, courts are "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  The allegation of alter ego (made only against Jamex LLC) is divorced from any factual basis.  There are no facts demonstrating alter ego.  As a result there is no jurisdiction over any entity on that basis.  *See, e.g.*, *Radmore*, 2008 WL 5129895 at *3 (rejecting attempt to impute to parent the jurisdictional contacts of its wholly-owned subsidiaries because plaintiff "failed to provide any evidentiary basis for concluding that [parent entity] is the alter ego of [children entities]" and plaintiff had "not pleaded or established any of the indicia of an alter ego relationship").  Bridger-Ferrellgas has

entirely failed to allege—nor can it establish—jurisdiction over either Jamex LLC or Jamex Transfer Holdings on the basis of any other entity's contacts with Pennsylvania.

### 2. Exercising Personal Jurisdiction Would be "Unreasonable."

Separate and apart from Bridger-Ferrellgas's failure to establish minimum contacts, exercising personal jurisdiction over Jamex LLC and Jamex Transfer Holdings would "offend the traditional notions of fair play and substantial justice," and therefore be unreasonable. *See Helicopteros*, 466 U.S. at 414. The case of *International Shoe* and its progeny require courts to examine the reasonableness of exercising personal jurisdiction in each particular case. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement et al.,* 326 U.S. 310, 316 (1945). In doing so, the Court should consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the efficient resolution of controversies between the states; and (5) the shared interests of the states in furthering fundamental, substantive social policies. *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987).

As discussed in connection with the *forum non conveniens* analysis, Pennsylvania has little interest in an indemnity dispute between Texas companies involving a Texas contract that was negotiated, executed, and performed in Texas. This is a distraction to the dispute between Eddystone and Bridger-Ferrellgas, especially considering the highly dubious nature of the core indemnity claim (i.e., that Jamex Transfer Holdings would purchase a company that had no assets and agree to directly "assume" that company's $100+ million payment obligation through 2019 and, what's more, promise to "perform" it after BTS had already stopped performing three weeks prior). The lack of interest Pennsylvania has in the matter, when weighed against the burden that would be placed on Jamex LLC and Jamex Transfer Holdings in having to litigate outside of Texas (where Bridger-Ferrellgas waived any objections to venue) and the public

policy reasons for declining to stretch Pennsylvania's long-arm jurisdiction halfway across the United States, dictate that the exercise of personal jurisdiction would be unreasonable and not comport with the "traditional notions of fair play and substantial justice."

For all the reasons discussed in this Part III.B, this Court should decline to exercise personal jurisdiction over, at a minimum, Jamex LLC and Jamex Transfer Holdings and dismiss all claims against them (i.e., Count I and Count IV).

## C.   THE THIRD-PARTY COMPLAINT FAILS TO STATE A CLAIM ON ALL COUNTS.

In addition to *forum non conveniens* and lack of personal jurisdiction, the causes of action against the Third-Party Defendants should each be dismissed under Rule 12(b)(6) because the allegations of the Third-Party Complaint fail to state a claim for: (1) breach of the PSA by Jamex Transfer Holdings (or, derivatively, breach of the Guarantee and tortious interference); and (2) the "contingent" contribution claim.  All claims (Counts I-IV) should be dismissed.

In considering a motion to dismiss for failure to state a claim, "all well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiffs."  *Sherk v. Countrywide Home Loans, Inc.*, 2009 WL 2412750, at *4 (E.D. Pa. Aug. 5, 2009) (citation omitted).  However, it is only "well-pleaded" allegations of fact—not vague generalities or legal conclusions—that are accepted.  *Id.*  The well-pleaded facts must establish a "plausible basis for relief under the law, indicating more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at *5 (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

A court ruling on motion to dismiss can "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Schmidt*, 770 F.3d at 249.  However, any "document integral to or explicitly relied upon in the complaint" can be attached to a motion to dismiss and considered as well.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

    **1.**    <u>Count I</u>:  **Bridger-Ferrellgas Fails to State a Claim for Breach of the PSA.**

As acknowledged in the Third-Party Complaint, both the PSA and Guarantee are governed by Texas law.  [TPC ¶¶ 27 n.1, 35 n.2.]  Thus, to state a claim for breach, Bridger-Ferrellgas must plead a plausible factual basis to show: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained as a result of the breach.  *West v. Triple B Servs.*, *LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.).  Bridger-Ferrellgas fails as to the third and fourth elements because the allegation that Jamex Transfer Holdings was required to directly "assume" or "perform" the obligations of the Eddystone Agreement is contradicted by the plain language of the PSA, and Eddystone affirms it seeks to establish liability based on pre-sale conduct.

On a motion to dismiss this Court can rule on a contract if the language is unambiguous.  *See Rathblott v. Peoplestrategy, Inc.*, 2016 WL 861348 (E.D. Pa. Mar. 7, 2016), *aff'd*, 685 F. App'x 107 (3d Cir. 2017); *see also Retail Brand All., Inc. v. Rockvale Outlet Ctr.*, *LP*, 2007 WL 403885, at *2 (E.D. Pa. Jan. 31, 2007).  Under Texas law, "[w]hether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered."  *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  A "contract is ambiguous when its meaning is uncertain or doubtful or is reasonably susceptible to more than one interpretation."  *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  However, if "a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous," *Coker*, 650 S.W.2d at 393.  Further, a "contract is not ambiguous simply because the parties disagree over its meaning."  *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).  Rather, terms are given "their plain, ordinary, and generally accepted meaning," and, if necessary, a court can look "to dictionaries to discern the meaning of a commonly used term that the contract

does not define." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017).   If the contract is not

ambiguous, then it must be "enforced as written." *Id.*

When read as a whole and in light of its plain language, the PSA unambiguously

contradicts the allegations made by Bridger-Ferrellgas in the Third-Party Complaint.

> ### a.   The PSA Obligated Jamex Transfer Holdings to Accept an Assignment of Only the BTS Membership Interests, Not Directly Assume the Eddystone Agreement.

As noted before, Section 2.1(b) of the PSA is the core provision upon which this entire

third-party indemnity action is based.   The language is laid out in full in the statement of facts

and attached [*see* Ex. B § 2.1(b)], which can be fairly summarized as:

- At Closing, Bridger Logistics would assign the ownership interests of BTS to Jamex Transfer Holdings free and clear of all liens.

- Jamex Transfer Holdings' "consequent ownership" of BTS would not include any Retained Liabilities (which carved out any Liabilities, including those of BTS under the Eddystone Agreement, related to events *prior* to Closing).

- The transfer of BTS's Membership Interests would happen by way of the Member Interest Assignment document.

- At Closing, Jamex Transfer Holdings would accept the membership interests of BTS "… on the terms and conditions set forth herein, including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth on Schedule 4.4 for periods on and *after* the Closing Date."

Such a clause is standard in any purchase and sale transaction, and simply provides for the

transfer of ownership interests in a company while further demarcating what liabilities of the

sold company (i.e., pre- and post-Closing) would fall on which side for *indemnification*

purposes.   Bridger-Ferrellgas now contends, however (apparently based on an unreasonable

reading of the quoted language in the fourth bullet above), that there was an agreement for Jamex

Transfer Holdings to itself *directly* assume the obligation and liabilities of the Eddystone

Agreement.   [*See* TPC ¶¶ 6, 29, 32, 34, 39, 41-42, 45-46, 70, 77-78, 79.]   That is neither

plausible nor true as a matter of contractual interpretation.

The allegation that direct liability was being assumed is particularly irrational when "looking at the [PSA] as a whole in light of the circumstances present when the [PSA] was entered." *See Coker*, 650 S.W.2d at 394. First, Bridger-Ferrellgas alleges that Jamex Transfer Holdings was fully aware the company being sold (i.e., BTS) had "minimal assets" while it was simultaneously burdened by a contract requiring BTS to pay at least $3.5 million per month to Eddystone until 2019 regardless of services provided. That represented well over $100+ million in pure liability. It is implausible to even suggest Jamex Transfer Holdings would agree to pay $10 in order to *directly* assume such a huge debt, particularly when the only actual assignment referred to over and over in the PSA was for the "membership interests" of BTS.[19] Such a contention is not supportable other than through an unreasonable twisting of Section 2.1(b).

In reality, a *direct* assumption by Jamex Transfer Holdings of liability for the Eddystone Agreement is not provided for anywhere in the "terms and conditions set forth [t]herein" of the PSA, other than for purposes of demarcating pre- and post-Closing indemnification responsibilities. [*See* Ex. B §§ 8.1, 8.2.] That is the only reasonable reading of the language in the last sentence of Section 2.1(b). The contract as a whole further confirms no direct assumption of the Eddystone Agreement was ever contemplated because the actual Membership Interests Assignment document attached to the PSA (and executed by the parties) provided for a direct assignment to Jamex Transfer Holdings of *only* the BTS membership interests. [*See* Ex. D § 1.] The Eddystone Agreement is not mentioned anywhere in that document. Further, no such

---

[19] The PSA refers extensively to an assignment of "Membership Interests" only. [*See* Ex. B at 1, 4; §§ 2.1, 3.3, 4.3, 5.4, 5.5, 7.1, 10.13.] Indeed, the very first page of Recitals declares:

> WHEREAS, Seller owns all right, title and interest in and to one hundred percent (100%) of the issued and outstanding limited liability company membership interests in, to, and of BRIDGER TRANSFER SERVICES, LLC, a Louisiana limited liability company (the "Company" and all of such membership interests in the Company, the "Membership Interests"); and

> WHEREAS, pursuant to the terms and conditions of this Agreement, Seller desires to sell, transfer, convey, and assign to Buyer, and Buyer desires to acquire and assume the Membership Interests.

direct assumption could even conceivably occur by way of an assignment between *Bridger Logistics* and Jamex Transfer Holdings.[20]  For such liability to be directly assigned to Jamex Transfer Holdings there would need to be an agreement between *BTS* and Jamex Transfer Holdings; not to mention it clearly would have required Eddystone's consent [*see* Ex. E § 8 (consent-to-assign clause in Eddystone Agreement)] and Bridger-Ferrellgas warranted that no consent of any third person was needed for the transactions contemplated by the PSA.[21]  As a result, no direct assignment of such liability was provided for (although, of note, there are assignments of other contracts expressly spelled out, demonstrating the parties knew how to contract for an assignment if they had so intended)[22] nor did any assignment of the Eddystone Agreement occur.  The allegation of a direct assumption of liability is insupportable.

Rather, the plain language of the PSA provides the only assignment that Jamex Transfer Holdings was obligated to accept was for the BTS membership interests.  The Third-Party Complaint confirms that obligation was fully performed by alleging: (1) BTS was "sold" and renamed JTS, [TPC ¶ 40]; (2) the renamed "JTS" engaged in arbitration with Eddystone, [*id.* ¶ 48]; and (3) "JTS"—not anyone else—became subject to a final award for its own liability on the Eddystone Agreement.  [*Id.* ¶¶ 46, 56.]  The Third-Party Complaint accordingly fails to state a claim based on the allegation that Jamex Transfer Holdings breached a nonexistent obligation to directly assume the liabilities of the Eddystone Agreement.

---

[20] Indeed, there was no representation made by Bridger Logistics in the PSA that it owned the Eddystone Agreement in any way such that it could directly assign the contract to Jamex Transfer Holdings.  [*See* Ex. B § 3.3.]

[21] *See* Ex. B § 3.4 (Bridger Logistics warranting the PSA would not breach any contract and that "[n]o consent of any Person is required to be obtained by Seller or the Company in order to sell the Membership Interests to Buyer and consummate the transactions hereunder contemplated"); *see also id.* § 3.6 (similarly warranting that Bridger Logistics did not even need to give "*notice*" to anyone to consummate the PSA transactions).

[22] The only reference to assignment of any specific contract is found in Section 6.4 of the PSA, which obligates Jamex Transfer Holdings to cause BTS to assign certain contracts (but not the Eddystone Agreement) to Bridger Terminals LLC.  [Ex. B § 6.4.]  The parties thus knew how to cause a direct assignment of BTS's contracts and so clearly were not intending to directly assign the Eddystone Agreement to Jamex Transfer Holdings.

**b.**   **There is no Promise in the PSA that the Eddystone Contract Would be "Performed" by Anyone.**

Bridger-Ferrellgas further contradicts the plain terms of the PSA by alleging Jamex Transform Holdings made a promise to "perform" the Eddystone Agreement.  [*See* TPC ¶¶ 6, 39, 41, 42, 70, 77.]  Even if the last sentence of Section 2.1(b) of the PSA could be interpreted as an agreement for Jamex Transfer Holdings to directly "assume" the liabilities of the Eddystone Agreement (which it cannot for the reasons discussed above), that is still far from a promising to "perform" the Eddystone Agreement.  Agreeing to accept assignment of ownership interests in a company—or even directly assuming the liabilities of a contract that company is a party to—is fundamentally different from agreeing to perform a contract.  One can *assume* liabilities for a contract without needing to *perform* any of its terms,[23] and there is no provision of the PSA in which Jamex Transfer Holdings agreed to "perform" the Eddystone Agreement (or that anyone would).  [*See generally* Ex. B.]  The obligation simply does not appear in the document.

Bridger-Ferrellgas has previously suggested, and may attempt to argue in response, that the language of Section 2.3(e) of the PSA—i.e., a limited waiver of a noncompete right belonging to Ferrellgas—constitutes confirmation that Jamex Transfer Holdings agreed to perform the Eddystone Agreement since that language refers to "performance of [BTS's] or [Jamex Transfer Holdings'] obligations under the Eddystone Agreement."  [*See* Ex. B § 2.3(e).]  However, such a reading is not reasonable because it has no such legal effect.  Section 2.3(e) is a promise *by Ferrellgas* to the Buyer Group[24] to waive a noncompete right held by way of an extrinsic contract. [*See id.*]  There was no promise made by any Jamex entity in that provision.

---

[23] A comparison of dictionary definitions illustrates the plain and ordinary meaning of the two terms is quite different.  *Assume* means "to take to or upon oneself: UNDERTAKE (responsibility)," whereas *perform* means "to adhere to the terms of: FULFILL," "CARRY OUT."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2009) at 75, 920.  An assumption of duties and obligations connotes, at best, responsibility for nonperformance.

[24] "Buyer Group" is defined to mean James H. Ballengee, Ballengee Interests, LLC, JBAH Holdings, LLC, Jamex, LLC, Jamex Transfer Holdings, LLC, and Jamex Marketing, LLC.  [Ex. B at 2.]  It excludes BTS altogether.

[*See id.*]   Additionally, Ferrellgas's waiver was given "solely to the extent" of performance of the Eddystone Agreement.   [*Id.*]   Thus, the waiver does not even contemplate performance would necessarily occur; only that a waiver of the noncompete would be given *if* performance occurred and, then, only to the extent of such performance.[25]

As a result, the waiver given by Ferrellgas in Section 2.3(e) did not create a promise from Jamex Transfer Holdings to Bridger Logistics that the Eddystone Agreement would be performed.   Bridger-Ferrellgas's allegations of breach based on a lack of "performance" fail.

### c.   There is no Indemnification in the PSA for Bridger-Ferrellgas's own Conduct.

Under the plain terms of the PSA, the transfer of BTS's membership interests to Jamex Transfer Holdings excluded all "Retained Liabilities," which Bridger Logistics agreed to be responsible for by way of indemnification.   [*See* Ex. B §§ 2.1(b); 8.1(c).]   The Retained Liabilities were defined to include any "obligation of any nature whatsoever [of BTS or others] … relating to any period before the Closing, *including any Liability*[26] or obligation *that arises after* the Closing with respect to any matter that *occurred* … or relates to the period, *before the Closing*."   [Ex. B at 5 (emphasis added).]   The Closing is defined as the date of execution: February 22, 2016.[27]   As such, any conduct of BTS occurring prior to February 22, 2016, as well as Bridger-Ferrellgas's own conduct *at any time*, is not subject to indemnification under the PSA.

---

[25] *See also* Dkt. No. 35-1 at page 13 of 37 (i.e., page 6 of Bridger-Ferrellgas's brief) (acknowledging the limited waiver was because "use of the ERC facility *might* resume") (emphasis added).

[26] "Liability" is defined to mean "any duties, responsibilities, commitments, expenses, obligations, or liability (including indebtedness) in all cases of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due."   [Ex B. at 3.]

[27] Bridger-Ferrellgas appears to allege the "Closing Date" is February 1, 2016.   [TPC ¶¶ 26, 29.]   That is contrary to the PSA.   February 1, 2016, was the effective date for "accounting purposes only."   [Ex. B § 2.1(a).]   For all other matters then—such as Retained Liabilities—the "Closing" (and "Closing Date") is defined as the "the date hereof" [*id.*], which is listed in the header as February 22, 2016, the date the parties consummated the PSA.   [*See id.* at 1.]

Nevertheless, the Third-Party Complaint now seeks indemnification for Bridger-Ferrellgas's own pre-Closing conduct as alleged by the Eddystone Complaint filed in this action. [*See, e.g.*, TPC ¶¶ 59-72.]   The means by which Bridger-Ferrellgas attempts to do that is mischaracterizing the Eddystone Complaint as seeking "damages for JTS's alleged breach of the [Eddystone Agreement] for the period after February 1, 2016."   [*Id.* ¶ 60.]   But Bridger-Ferrellgas confuses *damages* and *liability* in a way that is inconsistent with both the Eddystone Complaint and the PSA.   The Complaint filed by Eddystone is a matter of public record that this Court can consider on a motion to dismiss and, plainly, there is no cause of action asserted in that document against Bridger-Ferrellgas for breach of the Eddystone Agreement (nor could there be since BTS/JTS is the only party to the contract).[28]   There is no indemnification on that basis. Rather, the Eddystone Complaint alleges counts solely for: (i) fraudulent transfer (intentional and constructive), (ii) breach of fiduciary duty, and (iii) alter ego.   [*See* Eddystone Compl. ¶¶ 52-77.] None of those claims are indemnifiable either.

First, the claim for fraudulent transfer is inherently a pre-Closing matter that does not involve the conduct of JTS.   A fraudulent transfer occurs when one moves assets out of an entity to hinder its creditors,[29] which is what Eddystone alleges Bridger Logistics did to BTS *before* it sold the company to Jamex Transfer Holdings.   [*See, e.g.*, *id.* ¶¶ 48-49 ("stripping" of assets prior to sale).]   In fact, that timing and nature of the conduct alleged—i.e., pre-Closing by Bridger-Ferrellgas (not BTS/JTS)—is precisely what Eddystone argued (and prevailed on) in

---

[28] *See also* Dkt. No. 35-1 at page 12 of 37 (i.e., page 5 of Bridger-Ferrellgas's brief) (acknowledging Eddystone is not seeking to hold Bridger-Ferrellgas liable for breach of the Eddystone Agreement).

[29] A fraudulent conveyance is defined as a "transfer of an interest in property for little or no consideration, made for the purpose of hindering or delaying a creditor by putting the property beyond the creditor's reach; a transaction by which the owner of real or personal property seeks to place the property beyond the reach of creditors."   *Fraudulent Conveyance*, BLACK'S LAW DICTIONARY (10th ed. 2014).

response to Bridger-Ferrellgas's motion to dismiss at the outset of this action.[30]  The fraudulent transfer claims are thus not indemnifiable because they, in Eddystone's own words (and Bridger-Ferrellgas's as well),[31] allege liability for conduct "that occurred … before the Closing."

Second, the breach of fiduciary duty alleged by Eddystone is similarly directed solely at Bridger-Ferrellgas's actions prior to Closing.  [*See, e.g.*, Eddystone Compl. ¶¶ 10, 66, 70, 75 (alleging asset transfers in breach of duties to creditors while BTS was in "zone of insolvency" prior to sale).]  Therefore, the result again is no indemnification.

Finally, the alter ego allegation is even simpler to deal with because it is not a cause of action; merely a theory of liability.[32]  Nonetheless, the conduct alleged for alter ego liability— i.e., domination of BTS's operations and finances, lack of capitalization, no written contracts, commingling funds, no dividends, disregard of corporate formalities [*see* Eddystone Compl. ¶¶ 8, 28, 52-61]—is, again, alleged to have been carried out by Bridger Logistics (or its principals) prior to the sale.  Further, as Bridger-Ferrellgas argued in its own motion to dismiss, a person is subject to the alter ego only for conduct occurring while it was an owner.  [*See* Dkt. No. 35-1 at page 20 of 37 (i.e., page 13 of the brief) (citing *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 226-30 (2d Cir. 2014) and *Bedford Affiliates v. Sills*, 156 F.3d 416, 431 (2d. Cir. 1998)).][33]  Bridger-Ferrellgas affirmatively alleges it held no ownership

---

[30] *See* Dkt. No. 39 at page 31 of 57 (i.e., page 21 of Eddystone's brief) (emphasizing that all "the wrong for which Eddystone now seeks redress occurred when Bridger Logistics stripped BTS of assets and effectively abrogated its obligation to fund BTS, actions that made default inevitable. ***This all occurred before*** the worthless shell of BTS was sold to the worthless shell that is Jamex Transfer Holdings for $10") (emphasis added).

[31] *See* Dkt. No. 35-1 at page 27 of 37 (i.e., page 20 of Bridger-Ferrellgas's brief) (stating Eddystone's fraudulent transfer claims seek to "leave the sale to JTH in place" and attack only the alleged abrogation of implied contracts).

[32] *See Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, 2016 WL 6213035, at *2 (E.D. Pa. Oct. 24, 2016) (quoting BLACK'S LAW DICTIONARY (10th ed. 2014): "Alter Ego, is not a cause of action. Rather, it is a theory of liability that permits a court to pierce the corporate veil and impose liability on a corporation's owners or on a subservient corporation").

[33] *See also Scott v. NG U.S. 1, Inc.*, 881 N.E.2d 1125, 1134 (Mass. 2008) (citing additional sources for the point).

interest in BTS after the sale.  [*See* TPC ¶ 28.]  As a result, any alter ego alleged by Eddystone legally applies only to pre-Closing conduct which is, again, a Retained Liability.

Of course, Bridger-Ferrellgas likely intends to rely on the way Eddystone describes its "damages" to argue for indemnification.  [*See* TPC ¶ 60.]  However, the fact that Eddystone refers to the amount of the arbitration award against JTS when discussing its damages does not change the analysis because the fulcrum upon which Retained Liabilities turns is when the *conduct occurred*, not when or how damages are alleged to later "arise" from that conduct. Bridger-Ferrellgas unambiguously agreed to *retain* all responsibility for "any Liability … that *arises after* the Closing with respect to any matter that *occurred* … *before the Closing*," [Ex. B at 5 (emphasis added)], and Bridger-Ferrellgas is responsible for its own conduct no matter when that occurred.  It is Eddystone's burden to prove damages resulted from the alleged pre-Closing bad acts and Bridger-Ferrellgas's sole responsibility to defend its own conduct.  Attempting to shift that burden to the Third-Party Defendants by a twisted and unreasonable reading of the PSA is not appropriate and should result in an outright dismissal of the baseless claims.

In sum, there is no claim stated for breach of the PSA's indemnification obligations because Jamex Transfer Holdings was not obligated to assume or perform the Eddystone Agreement, and Eddystone seeks to establish liability based on Bridger-Ferrellgas's pre-Closing conduct (i.e., a Retained Liability).  The claim for breach of the PSA fails as a matter of law.

## 2.   Counts II-III: The Breach of Guarantee and Tortious Interference Claims Necessarily Fail Along with the Claim for Breach of the PSA (Count I).

As laid out previously, the Guarantee provided by Jamex Marketing is tied solely to Jamex Transfer Holdings' performance of the PSA.  [*See* Ex. C § 4(a).]  As such, if no breach of the PSA exists, then there is no breach of the Guarantee.  Count II should be dismissed.  The same applies to Count III for tortious interference against James Ballengee individually.  The

allegation is that he interfered with and caused a breach of the PSA and Guarantee.  [TPC ¶¶ 100-04.]  If there is no breach of the PSA properly alleged, then there is no breach of the Guarantee and no claim stated for tortious interference.  Count III should also be dismissed.

### 3.     Count IV:  Bridger-Ferrellgas Fails to State a Claim for Contribution.

The claim for contribution against Jamex LLC, JTS, and James Ballengee consists entirely of conclusory allegations that fail to meet Rule 12(b)(6) pleading standards.

A claim for contribution in Pennsylvania[34] is governed by 42 PA. CONS. STAT. § 8324, which applies only to "joint tortfeasors."  Under that statute an allegation that one person is jointly liable for a plaintiff's injury by way of *contract* breach is plainly insufficient; there must be plausible allegations that both parties jointly committed a *tort* causing injury to the plaintiff. *See Longport Ocean Plaza Condo., Inc. v. Robert Cato & Assocs., Inc.*, 2002 WL 2013925, at *2 (E.D. Pa. Aug. 29, 2002); *see also EQT Prod. Co. v. Terra Services, LLC*, 179 F. Supp. 3d 486, 493 (W.D. Pa. 2016) ("Accordingly, contribution is not available for breach of contract claims.").  Further, the allegations must establish joint tortious acts harmed the plaintiff in the same way given that contribution is not available when "the acts of the original wrongdoer [and the joint tortfeasor] are severable as to time, neither having the opportunity to guard against the other's acts, and each breaching a different duty owed to the injured plaintiff."  *Foulke v. Dugan*, 212 F.R.D. 265, 270 (E.D. Pa. 2002) (editing in original); *see also Negron v. Ryder Student Transp.*, 1996 WL 99745, at *2 (E.D. Pa. Mar. 6, 1996).  Finally, because contribution is

---

[34] To the extent Texas law applies to the contribution claim, the standard has similar requirements and may be even stricter. For example, in Texas the proportionate liability statute also applies only to limited matters that do not include breach of contract, *see CBI NA-CON, Inc. v. UOP Inc.*, 961 S.W.2d 336, 339, 341 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) ("A breach of contract claim is not a basis for contribution under chapter 33 of the Texas Civil Practice and Remedies Code"), but in Texas there must also be an actual judgment against the first tortfeasor who seeks contribution. *See Arnold v. Garlock Inc.*, 288 F.3d 234, 237 (5th Cir. 2002) (noting that, in Texas, the "essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability").  Third-Party Defendants reserve the right to assert that Texas law applies to the contribution claim but, at this stage, it matters not whether Pennsylvania or Texas law applies as the result is the same given the deficient allegations.

available only among persons who acted jointly, a party who fails to plead that it is itself liable in

tort fails to state a claim for contribution.  *See Nat'l Specialty Ins. Co. v. Tunkhannock Auto

Mart, Inc.*, 2017 WL 661475, at \*4-\*5 (M.D. Pa. Feb. 17, 2017) (dismissing complaint because

plaintiffs did not allege they were liable to injured party); *see also Bank v. City of Philadelphia*,

991 F. Supp. 2d 523, 538 (E.D. Pa. 2014) (dismissing crossclaim because, "[n]owhere in its

crossclaim does Century Motors allege that it and the Foster Defendants are joint tortfeasors").

There is no allegation in the Third-Party Complaint that Jamex LLC, Mr. Ballengee, or

JTS jointly engaged with Bridger-Ferrellgas in joint tortious acts against Eddystone in regard to

the pre-Closing fraudulent transfer claim (which is statutory; not tortious) or the fiduciary

breaches asserted in the Eddystone Complaint.  Quite the contrary, Bridger-Ferrellgas alleges it

was the *sole* owner of BTS for the seven months prior to the sale from June 2015 to February

2016 [*see* TPC ¶¶ 5, 25], the precise time during which Eddystone alleges assets were transferred

and implied contracts were abrogated.  Bridger-Ferrellgas cannot now, in good faith, allege facts

of a joint tortious action occurring in that timeframe.[35]  Neither does Bridger-Ferrellgas allege it

is liable to Eddystone for a tort that any Third-Party Defendant is alleged to have participated in.

Rather, the sole basis Bridger-Ferrellgas asserts for contribution is a conclusory alter ego

allegation.  [TPC ¶¶ 107-108.]  Again, however, alter ego is not a cause of action (nor a tort) that

itself results in damages; it is merely a theory of liability.  *See Boardakan Rest. LLC*, 2016 WL

6213035, at \*2.  In any case there are no allegations of fact sufficient to establish alter ego status

---

[35] Nor could Bridger-Ferrellgas maintain an allegation for contribution prior to June 24, 2015, since, in connection with Ferrellgas's purchase, Ferrellgas required Bridger Logistics to, on behalf of itself and all past, present, and future "Affiliates," to release Jamex LLC (including all of its subsidiaries, owners, and employees) from all claims relating to the purchase of Bridger Logistics (and BTS), "including, but not limited to, any rights to indemnification, reimbursement, or compensation from any Seller Party Releasee … whether or not relating to claims pending on, or asserted after [June 24, 2015]."  [*See* Release Agreement, attached as **Exhibit F**, ¶ 2(a).]  The Third-Party Complaint identifies and relies upon the May 29, 2015, sale agreement between Jamex LLC and Ferrellgas.  [*See, e.g.*, TPC ¶ 24.]  As a result, the release executed in connection with that sale (and attached as an exhibit to the sale document) can be considered if the Court finds it necessary.  *See In re Burlington*, 114 F.3d at 1426.

as to Jamex LLC, Mr. Ballengee, or JTS (which is an odd assertion to make anyway—i.e., that JTS is an alter ego of *itself*).   Further, the last throwaway paragraph in the Third-Party Complaint—that JTS should be ordered to contribute to or "indemnify" any judgment against Bridger-Ferrellgas [*see* TPC ¶ 109]—has no well-pled factual basis to establish a claim.  There is no legal relationship between post-sale JTS and Bridger-Ferrellgas upon which to base indemnity, and no allegations JTS engaged in a tort in concert with Bridger-Ferrellgas after the company was sold in February 2016.  JTS's own liability to Eddystone arising from the SMA arbitration in New York is severable from the allegations against Bridger-Ferrellgas both in time (i.e., *pre-* versus *post-*Closing conduct) and alleged duties (*tort/statutory* for Bridger-Ferrellgas versus *contractual* as to JTS).  As such, Count IV asserted against Jamex LLC, James Ballengee, and JTS should be dismissed for failure to legally state a claim under Rule 12(b)(6).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Jamex Entities (with James Ballengee joining in items 1, 3, and 4 below) respectfully request that the Court:

1.   Dismiss this entire third-party action under the doctrine of *forum non conveniens*;

2.   Dismiss all claims against Jamex LLC (Count IV) and all claims against Jamex Transfer Holdings LLC (Count I) for lack of personal jurisdiction;

3.   Dismiss Counts I-IV with prejudice and without leave to amend for failure to state a claim as a matter of law; and

4.   Grant all other relief the Third-Party Defendants are entitled at law or in equity.

The Jamex Entities further request that the Court hear oral argument on this motion.

Dated:  October 30, 2017

Respectfully submitted,

*/s/ Allison Brown*

Allison Brown
Pennsylvania State Bar No. 202227
WEIL, GOTSHAL & MANGES LLP
17 Hulfish Street, Suite 201
Princeton, New Jersey 08542
Telephone: 609-986-1104
Telecopier: 609-986-1199
allison.brown@weil.com

-and-

T. Ray Guy
Texas State Bar No. 08648500
(*pro hac vice to be submitted*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201-6950
Telephone: 214-746-7700
Telecopier: 214-746-7777
ray.guy@weil.com

*Attorneys for James H. Ballengee, Jamex LLC,
Jamex Marketing LLC, Jamex Transfer
Holdings LLC, and Jamex Transfer Services
LLC*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 7.1(d), I hereby certify that on October 30, 2017, I electronically

transmitted the foregoing document using the ECF system for filing and transmittal of a Notice

of Electronic Filing to those parties registered for ECF in this case.


*/s/ Allison Brown*
Allison Brown