**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC,<br>　　　　　　Plaintiff,<br>　v.<br><br>JULIO RIOS and JEREMY GAMBOA,<br>　　　　　Defendants,<br><br>BRIDGER LOGISTICS, LLC, FERRELLGAS<br>PARTNERS, L.P., and FERRELLGAS, L.P.,<br>　　　　　Defendants/Third-Party Plaintiffs,<br>　v.<br><br>JAMEX MARKETING, LLC (f/k/a BRIDGER<br>MARKETING, LLC), JAMEX TRANSFER<br>HOLDINGS, LLC, JAMEX, LLC (f/k/a<br>BRIDGER, LLC), JAMEX TRANSFER<br>SERVICES, LLC (f/k/a BRIDGER TRANSFER<br>SERVICES, LLC), JAMES BALLENGEE and<br>JOHN DOES 1-10,<br>　　　　　Third-Party Defendants. | No. 2:17-cv-00495-RK<br><br>**Oral Argument Requested** |

**DEFENDANTS / THIRD-PARTY PLAINTIFFS BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P., and FERRELLGAS L.P.'S OPPOSITION TO
PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S
MOTION TO DISMISS AMENDED COUNTERCLAIMS AND TO STRIKE
AFFIRMATIVE DEFENSES**

AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, Pennsylvania 19103
T: (215) 965-1200
F: (215) 965-1210

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ...........................................................................1

II.    BACKGROUND...............................................................................................2

III.   LEGAL STANDARD ........................................................................................6

IV.    ARGUMENT ....................................................................................................7

   A.   COUNTERCLAIMS II THROUGH VI ARE ENTIRELY CONDITIONAL ON
      ERC SETTING ASIDE THE CORPORATE VEIL ...........................................7

   B.   THE PLAIN LANGUAGE OF THE RSA, AND ERC AND ITS PARENTS'
      EXPLICIT STATEMENTS, SUPPORT BL/FG COUNTERCLAIMS ...................10

     1.   ERC's Motion Willfully Distorts the RSA and Ignores ERC's Own Admissions as
        Pled in the Counterclaims—the Plain Language of Both Amply Support the
        Counterclaims ...........................................................................................11

       (a)   The Custody Transfer Meters ...............................................................11

       (b)   The Delayed Operational Date .............................................................11

       (c)   The Promised Transloading Capacity....................................................13

       (d)   The Concealed Granite Pinnacle ..........................................................14

       (e)   The Impossible Four-Hour Window ......................................................15

       (f)   The Promised 20,000 Barrel Per Hour Loading Rate ..........................17

     2.   The Allegations Support the Breach of Contract Counterclaims ..........................18

     3.   Nothing in the RSA Prevents the Fraud Claims......................................................19

     4.   Bad Faith Refusal to Consent to Carlyle Financing ...............................................23

     5.   BL/FG are Entitled to Rescission of the RSA .........................................................28

   C.   BL/FG STATE A CLAIM FOR TORTIOUS INTERFERENCE BASED ON ERC'S
      COLLUSIVE SETTLEMENT SCHEME ..........................................................30

     1.   Legal Prejudice Is Not an Element of Tortious Interference, But is Present Here
        in Any Event ............................................................................................................32

     2.   BL/FG Adequately Allege Intent to Interfere and Interference .............................34

   D.   THERE IS NO BASIS TO STRIKE THE AFFIRMATIVE DEFENSES................35

V.     CONCLUSION................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2470 Cadillac Res., Inc. v. DHL Exp. (USA), Inc.*,
  923 N.Y.S.2d 530 (N.Y. App. Div. 2011) ...................................................................8

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144 (2002)................................................................................... 23, 25

*Aero Media LLC v. World Healing Ctr. Church, Inc.*,
  No. 12 CIV. 5196 (LLS), 2013 WL 2896856 (S.D.N.Y. June 11, 2013) ............................22

*Aetna, Inc. v. Health Diagnostic Lab. Inc.*,
  No. CV 15–1868, 2015 WL 9460072 (E.D. Pa. Dec. 28, 2015) (Kelly, J.) ......... 31, 32, 34, 35

*Agretti v. ANR Freight Sys., Inc.*,
  982 F.2d 242 (7th Cir. 1992) ...................................................................... 32, 33

*Alpha Capital Anstalt v. Oxysure Sys., Inc.*,
  252 F. Supp. 3d 332, 340–341 (S.D.N.Y. May 8, 2017)........................................ 18, 22, 28

*Bank of New York v. Sasson*,
  786 F. Supp. 349 (S.D.N.Y. 1992)................................................................................28

*Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*,
  246 F. Supp. 2d 394 (E.D. Pa. 2002)..................................................................21

*Bravia Capital Partners, Inc. v. Fike*,
  No. 09 CIV. 6375 JFK, 2010 WL 3359470 (S.D.N.Y. Aug. 25, 2010)................................35

*Brokerage Concepts v. U.S. Healthcare*,
  140 F.3d 494 (3d Cir. 1998) .......................................................................31

*Bross Utilities Serv. Corp. v. Aboubshait*,
  618 F. Supp. 1442 (S.D.N.Y. 1985)........................................................................9

*Brown & Brown, Inc. v. Cola*,
  No. 10-3898, 2010 WL 5258067 (E.D. Pa. Dec. 22, 2010) .............................................6, 18

*Burton v. Iyogi, Inc.*,
  Civ. No. 13-6926, 2015 WL 4385665 (S.D.N.Y. Mar. 16, 2015) ........................................19

*Cipollone v. Liggett Group, Inc.*,
  789 F.2d 181 (3d Cir. 1986) ................................................................................36

*Colonial Funding Network, Inc. for TVT Capital v. Epazz*,
  No. 16 Civ. 5948 (LLS), 2017 U.S. Dist. LEXIS 70747 (S.D.N.Y. May 9,
  2017)............................................................................................................................29

*Conopco Inc. v. Wells Enterp., Inc.*,
  No. 14 CIV. 2223 (NRB), 2015 WL 2330115 (S.D.N.Y. May 14, 2015) ..............................8

*Da Silva v. Musso*,
  428 N.E.2d 382 (N.Y. 1981)..........................................................................................28

*Dalton v. Educ. Testing Serv.*,
  87 NY2d 384 (1995).......................................................................................................23

*DeLa Cruz v. Piccari Press*,
  521 F. Supp. 2d 424 (E.D. Pa. 2007)..............................................................................36

*Deom v. Walgreen Co.*,
  591 F. App'x 313 (6th Cir. 2014) ...................................................................................35

*Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*,
  861 F. Supp. 179 (E.D.N.Y. 1994)....................................................................................9

*Forest Serv. Employees For Envtl. Ethics v. U.S. Forest Serv.*,
  Civ. A. No. 08-323, 2009 WL 1324154 (W.D. Pa. May 12, 2009)......................................32

*Frankini v. Landmark Constr. of Yonkers, Inc.*,
  937 N.Y.S.2d 80 (2d Dep't 2012) ............................................................................24, 28

*Gander Mountain Co. v. Islip U-Slip*,
  923 F. Supp. 2d 351 (N.D.N.Y. 2013) ............................................................................28

*Garrett v. Music Publishing Co. of America*,
  740 F. Supp. 2d 457 (S.D.N.Y. 2010).............................................................................28

*GlobeTec Const., LLC v. Custom Screening & Crushing, Inc.*,
  77 So.3d 802 (Fla. Dist. Ct. App. 2011)..........................................................................10

*Gosmile, Inc. v. Levine*,
  915 N.Y.S.2d 521 (N.Y. App. Div. 2010) .......................................................................10

*Green v. Beer*,
  No. 06 CIV. 4156 (KMW) (JCF), 2009 WL 911015 (S.D.N.Y. Mar. 31, 2009) ..................22

*Kernaghan v. BCI Commc'ns, Inc.*,
  802 F. Supp. 2d 590 (E.D. Pa. 2011)..............................................................................33

*Laduzinski v. Alvarez & Marsal Taxand LLC*,
  16 N.Y.S.3d 229 (N.Y. App. Div. 2015)..........................................................................22

*M & T Mortg. Corp. v. Miller*,
   323 F. Supp. 2d 405 (E.D.N.Y. 2004) ..................................................................21

*Magi Commc'ns, Inc. v. Jac-Lu Assocs.*,
   410 N.Y.S.2d 297 (N.Y. App. Div. 1978) ............................................................22

*Marine Midland Bank, N.A. v. Cafferty*,
   571 N.Y.S.2d 628 (N.Y. App. Div. 1991) ......................................................20, 22

*Marine Midland Bank, N.A. v. CES/Compu-Tech, Inc.*,
   537 N.Y.S.2d 818 (N.Y. App. Div. 1989) ............................................................22

*Matthius v. Platinum Estates, Inc.*,
   74 A.D.3d 908 (2d Dep't 2010) ............................................................................18

*MBIA Insurance Corp. v. Countrywide Home Loans*,
   963 N.Y.S.2d 21 (N.Y. App. Div. 2013) ..............................................................29

*Mercer Capital, Ltd. v. U.S. Dry Cleaning Corp.*,
   No. 08 CIV. 05763 (LTS) (JCF), 2009 WL 2163598 (S.D.N.Y. July 21, 2009) ..................19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*,
   798 N.Y.S.2d 14 (N.Y. App. Div. 2005) ..............................................................21

*Mfrs. Hanover Tr. Co. v. Yanakas*,
   7 F.3d 310 (2d. Cir. 1993) ............................................................................21, 22

*O'Grady v. BlueCrest Capital Management*,
   111 F. Supp. 3d 494, 503 (S.D.N.Y. 2015) ......................................................18, 27

*Olin Corp. v. OneBeacon Am. Ins. Co.*,
   864 F.3d 130 (2d Cir. 2017) ................................................................................19

*Quad/Graphics, Inc. v. Fass*,
   724 F.2d 1230 (7th Cir. 1983) ............................................................................32

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*,
   109 F. Supp. 3d 587, 605 (S.D.N.Y. 2015) ..........................................................23

*In re Sch. Asbestos Litig.*,
   921 F.2d 1330 (3d Cir. 1990) ..............................................................................32

*Sheth v. New York Life Ins. Co.*,
   709 N.Y.S.2d 74 (N.Y. App. Div. 2000) ..............................................................20

*Slater Trust Co. v. Gardiner*,
   183 F. 268 (C.C.S.D.N.Y. 1910) ..........................................................................29

*Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher*,
    747 N.Y.S.2d 441 (N.Y. App. Div. 2002) ............................................................29

*Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*,
    522 N.Y.S.2d 292 (3d Dep't 1987) ...................................................................24

*Tempo Shain Corp. v. Bertek, Inc.*,
    120 F.3d 16 (2d Cir. 1997) ..............................................................................21

*Triton Partners LLC v. Prudential Sec. Inc.*,
    752 N.Y.S.2d 870 (N.Y. App. Div. 2003) ..........................................................21

*Tullett Prebon, PLC v. BGC Partners, Inc.*,
    No. 09-5365 (SRC), 2010 WL 2545178 (D.N.J. June 18, 2010), *aff'd on other
    grounds*, 427 F. App'x 236 (3d Cir. 2011) .........................................................9

*Valley Stream Foreign Cars, Inc. v. Am. Honda Motor Co.*,
    209 F. Supp. 3d 547, 555 (E.D.N.Y. 2016) ........................................... 23, 24, 25

*Wayland Investment Fund v. Millennium Seacarriers*,
    111 F. Supp. 2d 450 (S.D.N.Y. 2000) ........................................................ 18, 27

## Statutes

Fed. R. Civ. P. 8 ..................................................................................................34

Fed. R. Civ. P. 8(d)(2) ...........................................................................................8

Fed. R. Civ. P. 12(b)(6) ..........................................................................................6

4 Moore's Federal Practice ...................................................................................34

Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P. ("BL/FG")[1]
respectfully submit this opposition to ERC's Motion to Dismiss Amended Counterclaims and
Strike Affirmative Defenses [ECF No. 83] (the "Motion" or "Mot.").

## I.    PRELIMINARY STATEMENT

ERC now apparently agrees with BL/FG, that BTS was a separate legal entity whose
legal existence must be respected.  ERC argues that BTS, and BTS alone, is responsible for
alleged unpaid debts (if any) under the RSA, and, therefore, that BTS, and BTS alone, has power
to assert claims (if any) arising under the RSA.  However, to the extent that ERC wants to have it
both ways—and to assert that BTS's corporate form must be set aside for *ERC's* alter ego
claims, but must simultaneously be upheld for the counterclaims involving liability on the same
contract—*that* duplicity has no support in the law.  BL/FG counterclaims II – VI are wholly
conditional on ERC setting aside BTS's corporate veil; ERC ignores that important distinction.
Unless ERC drops its alter ego claim (or this Court rejects it), ERC's arguments based on
standing under the RSA must be rejected as well.

On the substance, ERC ignores the wealth of specific allegations in the counterclaims
regarding ERC's multiple misrepresentations regarding access to and capacity of its facility,
terms of the RSA, and damages, among other things.  ERC promised a "state of the art" facility,
with 80,000 bpd transloading capacity, and free access, among other things.  Instead, it delivered
a sub-par facility that could be accessed only in the middle of the night, from which barges could
leave only at high-tide, with many significant constraints and deficiencies.  Trying to avoid the

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the *Defendants / Third-Party Plaintiffs Ferrellgas Partners, L.P. and Ferrellgas, L.P.'s First Amended Answer and Defenses to Complaint and Counterclaims* [ECF No. 77] ("FG CC").  For ease of reference, BL/FG cite only to the FG CC, but this opposition is intended to address equally ERC's Motion with respect to *Defendant / Third-Party Plaintiff Bridger Logistics's Amended Answer and Defenses to Complaint and Counterclaims* [ECF No. 76].

consequences of its own clear statements and misrepresentations, ERC instead tries to rewrite the story; the Motion routinely and improperly seeks to introduce new facts outside the pleadings.

Further, ERC tries to distort the RSA.  The plain terms of the RSA either support, or do not address (and therefore do not preclude), the subjects of the counterclaims.  ERC's arguments that the contract "undermines" some (but not all) of the multiple misrepresentations depend on re-writing and re-purposing irrelevant provisions.  The law does not countenance such an attempt.  Likewise, the law is clear that the boilerplate "entire agreement" clause in the RSA does not bar fraud claims.

Finally, in response to the tortious interference claims, ERC once again cites the wrong law.  ERC ignores this Court's on point precedent and attempts to introduce the inapplicable concept of "legal prejudice" to defend its collusive settlement.

## II.     BACKGROUND

In early 2012, ERC and its parent entities, Enbridge and Canopy, agreed to develop a facility to transload crude oil from rail onto barges for delivery to local refineries.  FG CC ¶ 6.  They marketed the facility as "state of the art" and "high speed," capable of receiving, unloading, and departing a full unit train of 80,000 barrels within 12 hours and handling cargo barges of up to 34 feet of draft.  *Id.* ¶¶ 8–9, 13.  They advertised an operational date in fall 2013, with a second phase to begin in summer 2014 that would double the facility's capacity to 160,000 barrels per day ("bpd").  *Id.* ¶¶ 8–9, 13.  They marketed the facility to BTS, among many other potential customers.  At the time, Enbridge was already very familiar with BTS's position within its corporate family—*i.e.*, an LLC, wholly owned and controlled by defendant Logistics—and limited resources due to its existing mid-stream oil contracts with the Bridger companies and having reviewed their recent financials.  *Id.* ¶ 12.

BTS entered into the RSA with ERC in February 2013 based upon, *inter alia*, these representations about the facility's capabilities.  *Id.* ¶ 16.  At that time, ERC, Enbridge, and Canopy knew that BTS had no existing customer for crude oil to flow through the facility.  The RSA included a minimum volume commitment by BTS of 64,750 bpd, but expressly provided BTS the right to transload oil above and beyond the minimum volume, entitled BTS to accrue valuable deficiency credits and utilize them to transload excess volumes, and entitled BTS to shorten the duration of the contract for volumes transloaded in excess as well.  *Id.* ¶¶ 18–20; *see also* Porter Decl. Ex. D (the "RSA") §§ 1.1, 4.2, 4.3.  The ability to transload excess volumes was crucial to the economics of the RSA for BTS.  FG CC ¶ 82.

The facility, however, became operational far behind schedule.  After the RSA was signed, ERC repeatedly promised BTS that the facility would become operational, but missed those deadlines over and over again.  *Id.* ¶¶ 28–29, 55.  The facility ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████.  *Id.* ¶ 56.  The facility's expected operational date, December 2013, was at a critical time because the market for Bakken crude oil was strong and BL/FG missed months of the ability to bring crude to the East Coast and moved the RSA's end date further back in time.

Once it opened, access to the facility was outrageously constrained in all directions and the facility lacked the many capabilities that ERC and its parents had repeatedly and expressly promised.  To induce BTS to enter the RSA, ERC had promised an accessible facility to which trains could arrive at different times on different days, but when the facility finally became operational in mid-2014, trains could only arrive during a Four-Hour Window *in the middle of the night*, between midnight and 4:00 a.m.  *Id.* ¶¶ 14, 31, 51–52.  ERC ████████████████

███████████████████████████████████████████████

███████████████████████████████. *Id.* ¶¶ 14, 51, 53. ████████████

███████████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 53, 77(a).

On top of that, ██████████████████ ████ █████████████████
*Id.* ¶¶ 46, 59.  To induce BTS to enter the RSA, ERC had promised a facility that barges laden
with crude could depart from, with 34 feet of draft.  *Id.* ¶¶ 9, 13, 23.  But in fact, a Granite
Pinnacle (*i.e.*, an underwater obstacle) ██████████████████████. *Id.* ¶ 46.
Like the Four-Hour Window, ████████████████████████████████. *Id.*
¶ 46. ██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶¶ 32–44.  Based upon
ERC's assurances, the *Petrochem Producer*, one of the only available barges, was chartered in
December 2013.  *Id.* ¶¶ 32, 43, 45.  ██████████████████████████████
█████████████████████████████████. *Id.* ¶ 46.

ERC had also promised a "high speed" facility, capable of loading 20,000 barrels per
hour ("bph"), but after the RSA was signed, █████████████████████████████
███████████████████████████████████████████████
███████████████████████████████. *Id.* ¶ 30; *see infra* Sec. IV(B)(1)(f).

The RSA sets minimum transloading volumes, but does not constrain volumes for excess
loading or for the facility's bpd transloading capacity, which are entirely separate volumes.  *See*
RSA.  Nor does the RSA specify the facility's bph loading capacity or the channel draft.  *Id.* The

RSA does not limit train access to the Four-Hour Window; to the contrary, the Four-Hour Window directly conflicts with provisions in the RSA.  FG CC ¶ 52.

ERC promised to install (and the RSA required) custody transfer meters, an industry-standard method of accounting for the crude oil flowing through a pipe from one destination to another.  *Id.* ¶ 69.  ███████████████████████  ██████  ██████████████████████. *Id.* ¶ 77(c).  This breach alone caused concrete damages.  *Id.* ¶¶ 69, 70.

Due to ERC's breaches and misrepresentations, BTS was unable to realize the benefit of its bargain.  *Id.* ¶¶ 58–61, 65.  ████████████████████████████████████ ██████████████████████.  *Id.* ¶ 81.  Under the RSA, BTS properly reserved all its rights and claims.  *See* RSA § 15.7.  BTS nonetheless complied with all of its obligations and made all payments due to ERC under the RSA until it was sold to JTH.  FG CC ¶¶ 101–02.

Effective February 1, 2016, Logistics sold BTS to JTH, pursuant to the BTS PSA.  *Id.* ¶ 103.  In exchange, JTH, owned by Jamex, the party responsible for selling crude to Monroe and making take or pay payments to Logistics and BTS, expressly assumed all obligations to perform under the RSA and agreed to indemnify Logistics and its affiliates for the breach of any obligations required to be performed by JTH under the BTS PSA, including its assumption of liabilities under the RSA.  *Id.* ¶¶ 104–05.  Jamex (formerly the owner of Logistics) was already familiar with the RSA and the facility's defects, and Logistics understood that Jamex planned to consensually or through arms-length negotiations resolve all issues regarding the RSA.  Further, BL/FG knew Jamex had the financial resources to reach such a solution.  *Id.* ¶ 113.  Logistics also entered into a release and guarantee agreement with JML, whereby JML unconditionally

guaranteed JTH's performance of all obligations due to Logistics and its affiliates. *Id.* ¶¶ 109–10. BTS was then renamed Jamex Transfer Services, LLC ("JTS"). *Id.* ¶ 114.

The new owners of JTS, however, caused JTS to cease making payments under the RSA in the absence of any deal to do so. *Id.* ¶ 115. ERC then commenced arbitration proceedings against JTS. *Id.* ¶ 117. Consistent with its assumption and indemnification obligations, the new owner of JTS caused JTS to defend against the arbitration claims without even trying to implead Logistics or claim that Logistics would have any form of responsibility under the RSA. But before the arbitrators could address JTS's defenses or counterclaims, ERC and JTS entered into a collusive settlement whereby ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████. *Id.* ¶ 120–28. This collusive settlement was designed to lock in the maximum potential liability and then foist it all upon BL/FG, despite and in breach of JTH and JML's indemnification obligations to Logistics. *Id.* ¶¶ 121–24, 130–31. The Final Award now forms the basis for the damages asserted in ERC's Complaint.[2] *Id.* ¶ 127.

## III.    LEGAL STANDARD

ERC bears the burden of demonstrating that the counterclaims fail to set forth a claim from which relief may be granted. Fed. R. Civ. P. 12(b)(6); *see also* Memorandum [ECF No. 59] ("Memo") at 12 n.12. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Memo at 12 n.12 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court must accept as true the factual allegations set forth in the pleading, and draw all reasonable inferences in favor of the non-movant. *E.g.*, *Brown & Brown, Inc. v. Cola*, No. 10-3898, 2010 WL 5258067, at *10 (E.D.

---

[2] Complaint [ECF No. 1.].

Pa. Dec. 22, 2010) (denying motion to dismiss counterclaims based on "inherently factual arguments" because "the Court must take all allegations in the [c]ounterclaims as true").

As ERC acknowledges (and pretends to follow), the court's determination must be based solely on the pleading at issue, and any documents incorporated therein.  Mot. 4 n.2.  But ERC's Motion brazenly flouts this rule.  On nearly every point, ERC disputes the counterclaims' factual allegations,[3] tries to inject entirely new factual allegations,[4] and/or cites documents not referenced in the counterclaims.[5]  ERC's new assertions may not be accepted as true or considered on its Motion.  To the contrary, if anything, ERC's improper approach shows that its arguments are too factual to be resolved on a motion to dismiss.

## IV.    ARGUMENT

### A.    COUNTERCLAIMS II THROUGH VI ARE ENTIRELY CONDITIONAL ON _ERC_ SETTING ASIDE THE CORPORATE VEIL

Counterclaims II through VI arise under the RSA, to which only ERC and BTS are parties.  BL/FG explicitly and clearly assert these counterclaims _only conditionally_ and _only to the extent_ that, at the culmination of this litigation, _ERC_ prevails on _its_ alter ego claim to set aside BTS's corporate veil and obtains a determination that BTS and Bridger Logistics are one and the same.  FG CC at 30, 69.  The Federal Rules expressly allow alternative, hypothetical, and

---

[3] _E.g._, Mot. 2 ("Eddystone would be able to show on summary judgment that the Counterclaim allegations are false . . ."); _see also compare_ FG CC ¶¶ 51, 59 (trains could only arrive between midnight and 4:00 AM; barge access only at high-tide), and ¶ 71 ("BTS was forced to conform its shipping schedule to the nearly-impossible limitations caused by ERC's misrepresentations and failures to disclose the defects with the Facility.") _with_ Mot. 5 n.4 ("In fact, Eddystone assigned train and barge loading windows to match BTS's train and barge schedules.  Thus, as a practical matter, BTS had round-the-clock train and barge windows at the Facility."); _see also compare_ FG CC ¶ 77(a) (████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████") _with_ Mot. 22 (asserting ERC was not responsible for SEPTA window).

[4] _E.g._, Mot. 7 n.5 ("Contrary to the allegations in the Counterclaims. . ." ERC goes on to assert new, contrary "facts"); _id._ 7 (ERC's new assertions that SEPTA window was "longstanding" and other routes were available); _id._ 15 (ERC's new assertions that Jamex was not indemnifying Bridger); _id._ 20 (". . . building Eddystone was a complicated endeavor that had not previously been attempted."); _id._ 22 n.10 (SEPTA window restricting access to the middle of the night was a "routine rail traffic restriction that did not pose any obstacle").

[5] _E.g._, Mot. 29 n.11 (seeking to introduce entirely new assertions based on purported document <u>not</u> referenced or incorporated in counterclaims).

contingent claims.  Fed. R. Civ. P. 8(d)(2); *Conopco Inc. v. Wells Enterp., Inc.*, No. 14 CIV. 2223 (NRB), 2015 WL 2330115, at *7 (S.D.N.Y. May 14, 2015) (defendant was free to assert a counterclaim that was contingent upon the outcome of plaintiff's claim).  Yet, ERC utterly ignores the contingent nature of these claims.

To be clear, BL/FG emphatically disagree with ERC's alter ego claim seeking to lift BTS's corporate veil.  *E.g.*, BL/FG MTD 10–20.[6]  BTS was properly created as a legally valid and separate entity that ERC voluntarily chose to contract with, as its sole counterparty, following months of doing business with Logistics and BTS and following substantial due diligence.  As such, BL/FG are fighting to enforce BTS's corporate separateness.  *Id.*  Ironically, in seeking dismissal of these counterclaims, ERC is trumpeting the separate corporate existence of BTS.  Nevertheless, if *ERC* is successful in *its* alter ego claim and if *ERC* sets aside BTS's corporate form (to impose liability for alleged breach of the RSA), then ERC cannot simultaneously rely on BTS's corporate form in order to foreclose any inquiry into ERC's fraud and breach of the very same agreement.  ERC has cited no authority that would countenance such a result.

First, ERC contends that the counterclaims must be dismissed for lack of standing because "one who is not a party to a contract cannot bring an action under that contract" and "there is no exception to this fundamental rule for corporate affiliates."  Mot. 17–18.  These arguments are completely beside the point.  Unlike the cases ERC relies on, BL/FG do not purport to bring any claim as intended third-party beneficiaries under the RSA[7] and do not seek

---

[6] Memorandum of Law in Support of Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P.'S Motion To Dismiss Plaintiff's Complaint [ECF No. 35-1] ("BL/FG MTD").

[7] *Cf. 2470 Cadillac Res., Inc. v. DHL Exp. (USA), Inc*., 923 N.Y.S.2d 530, 531 (N.Y. App. Div. 2011) (dismissing plaintiffs' contract claims because plaintiffs were merely incidental third-party beneficiaries of contract without standing to sue for breach of contract).

to assert BTS's rights as their own by virtue of the former corporate affiliation.[8]  ERC ignores

the fact that these counterclaims are pled *only* to the extent that *ERC* successfully pierces BTS's

corporate veil to impose liability upon them.  *If*  ERC prevails on its alter ego claim (which

BL/FG dispute), the Court will have determined that BTS and BL/FG are alter egos and, thus,

one and the same entity for purposes of the commercial arrangements reflected by the RSA.  In

that case, counterclaims II through VI would assert BL/FG's own rights, as the alleged alter egos

of BTS, rather than the rights of a third party beneficiary or corporate affiliate.  On the other

hand, *if* ERC drops, or the court dismisses, ERC's alter ego claim, *then* BL/FG counterclaims II

through VI would also have to be dismissed.

Next, ERC argues that "a corporate parent may not pierce its own subsidiary's corporate

veil to assert its claims."  Mot. 18.  This position, however, once again ignores the fact that

BL/FG *do not seek* to pierce BTS's corporate veil; to the contrary, they argue *against* piercing

BTS's corporate veil.  The counterclaims are alleged only on the condition that *ERC* is

successful in stripping away BTS's corporate veil through *ERC's* alter ego claim.  The cases

cited by ERC simply do not involve this scenario.[9]

---

[8] *Cf. Tullett Prebon, PLC v. BGC Partners, Inc.*, No. 09-5365 (SRC), 2010 WL 2545178, at *4 n.5 (D.N.J. June 18, 2010) (noting that "[n]o party to [the] suit has argued that the facts of the case warrant disregarding the corporate form" and dismissing plaintiff corporation's claims that were based upon injuries suffered by plaintiff's subsidiaries, rather than plaintiff), *aff'd on other grounds*, 427 F. App'x 236 (3d Cir. 2011) (affirming dismissal, but overturning standing ruling); *Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F. Supp. 179, 180–81 (E.D.N.Y. 1994) (where plaintiff's complaint obfuscated corporate formalities, plaintiff could not assert claims under contract to which only its sister corporation was a party, noting that the court refused to pierce the corporate veil at plaintiff's request, because plaintiff could not "pierce the veil of another corporation that it set up for its own benefit in order to advance the claims of that corporation.").  In fact, the court's discussion in both of these cases show that if the courts *had* agreed to pierce the corporate veil, standing would have been proper.

[9] *E.g.*, *Diesel*, 861 F. Supp. at 181 (rejecting plaintiff's effort to pierce its sister corporation's veil and noting that by forming the sister corporation, plaintiff "became bound by the disadvantages as well as the advantages of separate corporation"); *Bross Utilities Serv. Corp. v. Aboubshait*, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985) (rejecting parent corporations' attempt to assert claims based upon breach of agreement between defendants and plaintiffs' subsidiary, reasoning that "[a] parent corporation cannot create a subsidiary corporation and then ignore the separate corporate existence of that subsidiary whenever it would be advantageous to the parent.").

Finally, ERC argues that BL/FG cannot assert fraudulent inducement or negligent misrepresentation counterclaims because they are not parties to the RSA.  Mot. 18–19.  This argument once again ignores that fact that the counterclaims are wholly contingent upon ERC convincing this Court that BTS and BL/FG are one and the same for purposes of this litigation.  ERC's arguments and cases are not on point.[10]

ERC has cited *no* authority supporting that it may strip away BTS's corporate shield for some purposes, but not others.  Indeed, ERC wants to have it both ways.  ERC's own cases recognize standing would be proper if the corporate form was set aside.  In its Complaint, ERC asked this Court to set aside BTS's corporate form to impose liability based on a purported breach of the RSA, and at the same time ERC seeks to prevent defendants from asserting BTS's legitimate counterclaims and defenses.  ERC's position is legally unsupportable; it cannot pick and choose when the corporate form should be upheld or set aside.

### B.   THE PLAIN LANGUAGE OF THE RSA, AND ERC AND ITS PARENTS' EXPLICIT STATEMENTS, SUPPORT BL/FG COUNTERCLAIMS

ERC next argues that "most"—but not all—of the counterclaims are "at odds" with the terms of the RSA or the claims are barred by an "entire agreement" clause in the RSA.  Mot. 19.  ERC further argues that the "sole exception" is the allegation that ERC caused BTS to engage a barge[11] by misrepresenting and failing to disclose what it knew about the depth of the channel.  *Id.*  This is not the sole exception: BL/FG allege multiple misrepresentations and failures to

---

[10] *GlobeTec Const., LLC v. Custom Screening & Crushing, Inc.*, 77 So.3d 802, 803 (Fla. Dist. Ct. App. 2011) (refusing to enforce arbitration agreement and dismissing plaintiff's fraudulent inducement claim, where contract in question was between affiliates of plaintiff and defendant only, but neither plaintiff nor defendant was a party to the contract); *Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524 (N.Y. App. Div. 2010) (reversing order dismissing complaint and holding that plaintiff's fraudulent inducement claim was not duplicative of breach of contract claim where alleged misrepresentation was "a misrepresentation of then present facts that was collateral to the contract," "not merely an insincere promise of future performance.").

[11] ERC's description of the barge as an "overly large oil tanker" or an "oceangoing tanker" is yet another example of ERC introducing new allegations in its Motion.  Mot. 19, 22.  The BL/FG alleged that the barge was a barge, that it was a reasonable size for a barge, and ██████████████████████████.  *E.g.*, FG CC ¶¶ 35, 37.

disclose, including about the SEPTA window, which ERC's ███████████████

███████████████████████████████████████████████████████████████████████

███████ *E.g.*, FG CC ¶ 53.  For the reasons set forth below, ERC's arguments have no basis in

the RSA or the law, and once again willfully misinterpret BL/FG's counterclaims.

> **1.      *ERC's Motion Willfully Distorts the RSA and Ignores ERC's Own Admissions as Pled in the Counterclaims—the Plain Language of Both Amply Support the Counterclaims***

> (a)      The Custody Transfer Meters

ERC completely ignores the multiple allegations regarding the custody transfer meters.[12]

ERC does not dispute that custody transfer meters were required by the RSA, that they were

promised by ERC, that ERC failed to install them, that ERC repeatedly lied about when they

would be installed, that BTS suffered concrete financial harm as a result, or that the claims are

legally sufficient.  FG CC ¶¶ 69–70, 77(c), 155, 157 163–165, 170–171, 182.

ERC merely notes that BTS continued to bring crude oil to the facility despite the

missing equipment.  Mot. 8.  The RSA, however, specifically says "[t]he failure of either Party to

pursue any remedy resulting from a breach of this Agreement by the other Party shall not be

construed as a waiver of that breach or of any subsequent or other breach of this Agreement."

RSA § 15.7.  Because ERC does not dispute the specific allegations of breach, damages, and

rescission flowing from the lack of custody transfer meters, the motion to dismiss the

counterclaims must be dismissed on that point alone.

> (b)      The Delayed Operational Date

ERC argues that the delayed operational date does not support the counterclaims because

the RSA "estimated" the operational date and anticipated possible contingencies could impact it.

---

[12] The BL/FG allegations support the fraudulent inducement, negligent misrepresentation, breach of contract and rescission claims.  FG CC ¶¶ 155, 157, 159, 163–165, 170–171, 182.

Mot. 20.  ERC completely ignores that BL/FG allege the delayed operational date in support of their *fraudulent inducement claims*, not their breach of contract claim, and thus the language of the RSA does not bar the claims.[13]  *Compare* FG CC ¶ 155 (citing "delays caused by the misrepresentations concerning construction") *with id.* ¶ 170 (not citing construction delays); *see infra* Sec. IV(B)(3).  Further, ERC does not dispute (nor could it) the fact that the facility was originally promised to be operational in the fall of 2013 and that ERC continued to promise that the facility would quickly become operational after the RSA was signed, or that BTS was harmed.  *Id.* ¶¶ 9, 28, 29, 55, 56.  ERC's continued representations (even after the RSA) about the operational date fraudulently induced BTS's reliance, and ERC cannot hide behind the contract now to insulate its misrepresentations.  ███████████████████████

████████████████████████████████████  ███  ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

     Likewise, ERC argues that the promised second phase of the facility was included merely as a "maybe" in the RSA, but concedes that the RSA anticipates the second phase.[14]  Mot. 20.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████  Further, nothing in the RSA contradicts the allegations about

---

[13] The BL/FG allegations support the fraudulent inducement, negligent misrepresentation and rescission claims.  FG CC ¶¶ 26, 55–57, 103, 155, 157, 163.

[14] *E.g.*, Mot. 20; RSA 1 ("One or more subsequent phases . . ."), § 15.10(e) ("second or subsequent phase"); T&C § 1(c) ("the initial phase").

ERC's promises about the phase two capacity.  BTS reasonably relied upon, and was materially

induced into the RSA by, promises of a more technologically advanced phase two.[15]

(c)     The Promised Transloading Capacity

BL/FG allege that ERC repeatedly promised that the facility would have the capacity to

transload 80,000bpd.  FG CC ¶¶ 9, 13, 20, 23, 31.[16]  ERC does not dispute (nor could it) that it

made those multiple, and specific, representations and promises.  Instead, ERC argues that under

the terms of the RSA, it ultimately only "agreed to transload 64,750 barrels a day."  Mot. 21.

This argument improperly distorts the RSA and tries to ignore ERC's own representations on the

topic, as specifically pled in the counterclaims.  Under the plain terms of the RSA, the 64,750bpd

figure represented the *bare minimum* that ERC was contractually required to transload and does

not address overall transloading *capacity*.[17]  The RSA plainly recognizes the difference between

minimum commitments and capacity, and expressly anticipates that ERC would, at BTS's,

request transload *more* than the minimum commitment.  *E.g.*, RSA § 1.1 (definition of

"Transloaded Volumes," broader than definition of "Volume Commitment"); §§ 4.2–4.3

(outlining use of deficiency credits for amounts transloaded above Volume Commitment).  The

deficiency credit provision of the RSA further refers to the "capacity" of the facility, a term for a

different concept which is *not* defined in the RSA.  *Id.* § 4.3.  Importantly, to use any of its

accumulated deficiency credits effectively, BTS would have to be able to transload oil in excess

of the minimum volume set at 64,750 bpd.  FG CC ¶ 20.  ERC's new misreading of the RSA

---

[15] ERC's mere statement that Eddystone did not promise BTS a second phase (Mot. 20) directly conflicts with the BL/FG counterclaims (FG CC ¶¶ 9, 13, 19), which are entitled to deference at this stage.  It is also plainly untrue.  *See* Porter Decl. Ex. B.

[16] The BL/FG allegations support the fraudulent inducement, negligent misrepresentation, breach of contract and rescission claims.  FG CC ¶¶ 155, 157, 159, 162–163, 170–171, 182.

[17] *See* RSA § 1.1 (definition of "Volume Commitment"); § 3.1 ("Owner shall provide Transloading Services for Customer's Volume Commitment . . . .").

13

(which conflicts with its contemporaneous statements) would obliterate entirely or render illusory the important deficiency credit provisions, among other provisions of the RSA.

On multiple occasions, ERC promised—both prior to and after entry into the RSA—that the facility would be *capable* of transloading 80,000bpd; such capacity is a measurement separate, distinct from, and necessarily more than the minimum volume commitment.  FG CC ¶¶ 9, 13, 20, 23, 31.[18]  ERC's misrepresentations caused direct and concrete harm.  The misrepresented transloading capacity fraudulently induced BTS to enter the RSA and continue performance, breached BTS's bargained-for contractual right to collect and utilize the deficiency credits expressly provided for in the RSA, and entitle BTS to rescind the RSA.  *Id.* ¶¶ 155, 157, 159, 162, 163, 170, 171, 182.  ERC cannot escape its misrepresentations and breaches, and the resulting harm, by pointing to an inapposite term in the RSA.

(d)     The Concealed Granite Pinnacle

ERC concedes that the requirements for barge draft were not specifically covered by the RSA.  Mot. 21–22.[19]  Thus, it is plain that BTS did not agree to any terms that contradict ERC's many representations about barge access with 34 feet of draft.  BL/FG have set forth in their counterclaims an extensive summary, with a multitude of specific details, of ███████████ ██████████████████████████████████████████████████ ████████████████████████ as well as ERC's failure to timely inform BTS of this issue ████████ ████████████████████████ FG CC ¶¶ 23, 32, 34–50, 68, 77(b). [20]

---

[18] Notably, ERC (while seeking to introduce "facts") concedes that it was expected to transload 80,000bpd, further demonstrating the BL/FG's reasonable expectations of and reliance on this representation.  Mot. 21 n.8.

[19] Indeed, ERC appears to acknowledge its marked weakness on this point, by singling it out as an exception.  Mot. 19.

[20] The BL/FG allegations support the fraudulent inducement, negligent misrepresentation, breach of contract and rescission claims.  FG CC ¶¶ 155–157, 159, 163–165, 170–171, 178–181.

The RSA also completely contradicts ERC's argument that the "granite pinnacle" was "within BTS's area of responsibility." Mot. 21. ERC tries to support this argument by saying that "it was BTS's obligation to hire a barge that could navigate the Delaware River channel and arrive at Eddystone's dock." *Id.* 21–22. But the RSA specifically gave *ERC* responsibility for constructing the docking area and approach and for approving or rejecting barges that failed to satisfy certain criteria, *including draft*. RSA at 1, T&C § 7(b), (c), (d). Consistent with the RSA, the counterclaims assert that *ERC* (not BL/FG) had authority to approve or reject barges *for draft* and that ERC actually gave approval for the barge. FG CC ¶¶ 27, 42–45, 80.

Finally, the argument is defeated by BL/FG allegations that



Mot. 7 n.5.

(e)      The Impossible Four-Hour Window

BL/FG allege with detailed specificity that (1) the SEPTA Four-Hour Window severely constrained access to the facility, FG CC ¶ 52; (2) that ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛t, *id.* ¶ 53; (3) that addressing the Four-Hour Window was "ERC's responsibility," *id.* ¶ 53; (4) that ERC ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, *id.* ¶¶ 54, *id.* ¶ 77(a); and (5) that ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

---

[21] ERC's implication that the *Petrochem Producer* was somehow inappropriate for the Facility is an alleged fact that conflicts with the BL/FG counterclaims, which require deference on a motion to dismiss. ERC's argument is further contradicted by its other improper new assertion that the *Petrochem Producer* "went in and out of the Facility hundreds of time without incident." Mot. 22 n.9.

15

███████████████████████," *id.* ¶ 77(a)(v).[22]  ERC does not dispute these allegations.

Rather, ERC's arguments simply hope the Court will ignore the well-pled counterclaims, which

must be accepted as true and viewed in the light favorable to BL/FG.[23]

Instead, ERC simply tries to argue that the Four-Hour Window was BTS's responsibility

because the RSA contemplates that BTS was to cause the trains to be delivered to the facility and

align the trains with the assigned unloading window.  Mot. 22.  This argument has no merit.

First, it is incompatible with multiple provisions in the RSA which, among other things,

promised an *8 hour* window for train arrivals.   FG CC ¶ 52 ("The Four-Hour Window . . .

directly conflicted with provisions in the RSA . . .").[24]  Second, it ███████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████. *Id.* ¶ 77(a)(iii) (███████████████████

███████████████████████████████████████████████."); *see also id.*

¶¶ 53, 77(a)(ii), (iv).[25]

Finally, the promised 12-hour window is not contradicted by the 20-hour maximum

window provided for in the RSA because, once again, it relates to "capacity," which is

referenced but not defined in the deficiency credit provisions of the RSA.[26]  Regardless of

---

[22] The BL/FG allegations support the fraudulent inducement, negligent misrepresentation, breach of contract and rescission claims.  FG CC ¶¶ 155–157, 159, 163–165, 170–171, 178–181.

[23] ERC also improperly introduces facts outside of the BL/FG counterclaims, which the Court should decline to consider on a motion to dismiss.  *E.g.*, Mot. 22 n.10.

[24] The RSA allows trains to be delivered in an *8 hour* window, of "not earlier than four (4) hours before, or later than four (4) hours after, the start of its Assigned Train Unloading Window" RSA T&C § 2(d).  The RSA also contemplates that the schedule could be requested and would change from month to month.  T&C § 2(c).

[25] Indeed, if ERC's position is that its own facility was practically inaccessible by train due to the Four-Hour Window but that it was nonetheless BTS's responsibility to align all such trains, and that it openly claimed responsibility but secretly disclaimed it, this supports rescission of the RSA.  *Id.* ¶¶ 177–83.

[26] Moreover, BL/FG have adequately alleged that ERC promised BTS a 12-hour loading and unloading window prior to and after entry into the RSA for the purposes of the fraudulent inducement and negligent misrepresentation claims.  *E.g.*, FG CC ¶¶ 9, 13, 23, 31, 61, 154–166; *see also* Sec. IV(D)(2).  ERC's mere denial of these promises is improper on a motion to dismiss and should be rejected.  At the very least, ERC's arguments raise issues of material fact that cannot be decided now.

whether it is 12- or 20-hours, BL/FG specifically allege that ERC failed numerous times to unload one train in a day which caused the train to miss the exit window and delayed other trains from entering the facility, causing the trains to back up and damages.  *Id.* ¶ 62.

(f)     The Promised 20,000 Barrel Per Hour Loading Rate

ERC also made misrepresentations that the facility would have 20,000bph pumping capacity.[27]  *Id.* ¶¶ 23, 30, 65, 80.  BL/FG adequately pled that ERC ████████████████████
████████████████████████████████  *Id.* ¶ 30.  Indeed, ████████████████████████
████████ ██████████ █████████ ███████████████████ ██████████████████ ███ ████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

Once again, ERC does not engage the numerous specific allegations on point.  Instead, ERC only tries to argue that the issue is contradicted by an irrelevant provision of the RSA.  Mot. 23.  ERC points to the provision of the RSA governing loading time for barges and cherry-picks such language completely out of context.  The sentence *actually* reads that "*the time allowed* to Owner for loading of a Barge with Petroleum *will be based on* a minimum loading rate of 7,000bph . . ."  RSA T&C § 9(b) (emphasis added).  The purpose of this provision was *not* to set the pumping capacity for the facility; rather, it was to prevent barges from lingering at the loading dock by taking a long time to load.  This is incontrovertible when one reads the full sentence, rather than the fragment ERC quotes.  This is also alleged in the counterclaims, which ERC fails to address.  FG CC ¶ 21 ("the RSA also includes provisions designed to prevent barges from squatting at the dock, forcing barges to leave the facility and make room for other customers' barges; the time allowed for barge loading was based on a pumping capacity

---

[27] The BL/FG allegations support the fraudulent inducement, negligent misrepresentation, breach of contract and rescission claims.  FG CC ¶¶ 155–157, 159, 163–165, 170–171, 178–181.

significantly slower than the facility's advertised capacity in order to establish maximum load times even for slow-pumping capacity barges or delays outside ERC's control.").

### 2. *The Allegations Support the Breach of Contract Counterclaims*

As set forth above, each of ERC's arguments about how the RSA purportedly contradicts some of the breach of contract counterclaims is a red-herring.  Mot. 26.[28]  The RSA supports many of the topics cited in support of the breach of contract counterclaims under any reasonable interpretation.[29]  Indeed, ERC has no response whatsoever for the explicit breach of the contract with respect to the custody transfer meter.  The RSA is silent on the remaining topics, and ERC's attempt to cite to irrelevant provisions, on different topics, fails.[30]

Furthermore, integration clauses do not preclude consideration of subject matter that is not specifically addressed by a contract.  *E.g.*, *Matthius v. Platinum Estates, Inc.*, 74 A.D.3d 908, 910 (2d Dep't 2010) (where contract did not address indemnification, integration clause did not bar plaintiff from presenting evidence to provide the existence of separate agreement regarding indemnification); *accord Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 340–341 (S.D.N.Y. May 8, 2017) (denying motion to dismiss); *Brown & Brown*, 2010 WL 5258067, at *9 (denying motion to dismiss counterclaims).

---

[28] The decisions cited by ERC on this point are inapposite.  Mot. 26.  The provisions at issue in *O'Grady v. BlueCrest Capital Management*, 111 F. Supp. 3d 494, 503 (S.D.N.Y. 2015) provided, in the specific context of employment, that the employer had absolute discretion over the employee's bonus and that the employee would not be eligible for a bonus if he was terminated (which he was); thus he was not contractually entitled to a bonus per express contract terms.  Here, the RSA does not expressly speak to the issues raised by BL/FG's counterclaims and ERC does not even allege that BL/FG (or the subsidiary, BTS) ever breached the RSA.  In *Wayland Investment Fund v. Millennium Seacarriers*, 111 F. Supp. 2d 450, 457 (S.D.N.Y. 2000), the contract also expressly contradicted the relevant issue.  But here, the issues raised by BL/FG are either supported by the RSA or not directly addressed by the RSA and ERC points only to loosely tangentially-related terms for their arguments, if any at all.

[29] For instance, the RSA expressly requires custody transfer meters (RSA § 12.4, T&C § 3(b)) and contemplates an 8-hour window for train arrival times (+/- 4 hours) that would have to be set, different times could be requested, and the times could change (*id.* T&C § 2(a), (c), (d)), not just four hours in the middle of the night.

[30] For instance, the RSA does not set the facility's bpd transloading capacity (which is explicitly distinct from the minimum transloading volumes ERC cites); nor does it set the facility's bph loading capacity (which is explicitly distinct from the term limiting how much time the barges may spend at the docks ERC cites); and nor does it set the channel draft (which is explicitly distinct from the obligation to bring barges that *ERC* could reject for draft issues, which ERC cites).

BL/FG have asserted a straightforward breach of contract counterclaim.  The lack of required custody transfer meters and resulting damages is undisputed.  The inability of BTS to utilize its deficiency credits due to the Granite Pinnacle and Four-Hour Window (and the facility's other defects, such as the slow transloading and pumping capacity) breached BTS's bargained-for contractual right to such credits and entitle BTS to rescind the RSA, and ERC's new interpretation (asserted now for the purposes of this litigation, and incompatible with former promises) would render illusory its deficiency credit provisions, among others.  *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 148–49 (2d Cir. 2017) ("Any interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.") (internal quotation and citations omitted).

### 3.    *Nothing in the RSA Prevents the Fraud Claims*

To establish a claim for fraudulent inducement, the party must demonstrate: (1) a misrepresentation or omission of an existing material fact; (2) made with knowledge of its falsity; and (3) with an intent to defraud; (4) that induces reasonable reliance; and (5) damages the party.  *Burton v. Iyogi, Inc.*, Civ. No. 13-6926, 2015 WL 4385665, at *6 (S.D.N.Y. Mar. 16, 2015) (denying motion to dismiss).[31]  ERC does not argue that the first, second, third, or fifth elements are adequately pled.  ERC raises only two arguments against the fraud claims.  Both fail.

*First*, ERC claims that BL/FG cannot establish reasonable reliance upon some—but not all—of the alleged misrepresentations by ERC because those alleged misrepresentations are

---

[31] A negligent misrepresentation claim requires showing (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.  *Mercer Capital, Ltd. v. U.S. Dry Cleaning Corp.*, No. 08 CIV. 05763 (LTS) (JCF), 2009 WL 2163598, at *6 (S.D.N.Y. July 21, 2009) (denying motion to dismiss counterclaims).  ERC challenges only the fifth element. For the reasons set forth herein, this argument fails.

contradicted by the express terms of the RSA.  Mot. 24.[32]  As discussed *supra*, the RSA simply

does not contradict the counterclaims: (1) the RSA explicitly requires custody transfer meters,

which ERC concedes were not installed, and sets an *eight*-hour window for train arrivals; and (2)

the RSA does not establish the depth for barges (as ERC concedes) or establish transloading or

pumping capacity.  Simply put, ERC can point to nothing in the RSA that shows that BTS agreed

to a 5-year contract to use a mediocre facility that could be accessed only during four hours in

the middle of the night, from which barges could only leave at high-tide, with slow pumping

capacity.  Moreover, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ ██████ ██████████████████.[33]  Finally, to the extent that ERC is

trying to cabin the fraud claims to the misrepresentations regarding the channel depth, that

attempt fails; BL/FG fraud-based counterclaims relate to the operational delays, the facility's

promised "state of the art" functionality, the custody transfer meters, the transloading capacity,

the pumping capacity, and accessibility by train, as well as the Granite Pinnacle.  FG CC ¶¶ 8–9,

13, 23, 28–31, 34–47, 51–53, 55–56, 77.  ERC's arguments based on the RSA are untenable, and

the cases they cite are not on point.[34]

---

[32] ERC argues that "the RSA does not require any minimum channel depth; it places on BTS the responsibility to work with the railroads to bring trains to the facility; and it permits a 10,000 barrel per hour loading rate."  Mot. 24.  Thus, ERC concedes that the RSA cannot contradict ERC's misrepresentations regarding channel depth.  As discussed above, BTS's responsibility to "bring trains to the facility" is separate and distinct from ERC's responsibility to provide an *8*-hour window for train arrivals and representations about free access to the facility.  *See* Sec. IV(B)(1)(e).  Finally, ERC utterly misreads the reference to 10,000 bph (which set the clock for barge loading, not pumping capacity) and its current arguments are contradicted by its contemporaneous acknowledgment that the 10,000 bph pumping capacity was a breach.  *See* Sec. IV(B)(1)(f).

[33] *E.g.*, FG CC ¶¶ 31 (post-RSA statements re: 80,000 bpd transloading capacity, and 12-hour turn-around); 34–47 (post-RSA statements re: channel draft); 51–53 (post-RSA statements re: free access to facility); 28–29, 55–56 (post-RSA statements re: the operational date); 75, 77 (post-RSA promises to remedy facility's deficiencies, including the Four-Hour Window, Granite Pinnacle, and custody transfer meters).

[34] The cases cited by ERC involved claims expressly contradicted by terms that the parties actually agreed to or mere puffery—that is not the case here.  *See Marine Midland Bank, N.A. v. Cafferty*, 571 N.Y.S.2d 628 (N.Y. App. Div. 1991) (defendant himself had proposed an amendment to the agreement that specifically contradicted the alleged misrepresentations, recognizing that general merger clauses do not bar fraud claims); *Sheth v. New York Life*

**Second**, ERC argues that, even if the allegations in the Amended Counterclaims are not directly contradicted by the RSA's terms, BL/FG fraud claims are barred by the "strong integration clause" in the RSA.  Mot. 25.  But it is well-established under New York law that the existence of a general integration or merger clause, like the RSA's integration clause, *does not* foreclose a fraudulent inducement claim.  "Put simply, a claim for fraud in the inducement cannot be defeated through the use of a merger clause."  *M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004) (denying motion to dismiss); *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d. Cir. 1993) ("Thus, even when the contract contains 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made,' a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud.").[35]  As fraud vitiates a contract, a "merger clause cannot preclude such a showing [of fraud or misrepresentations] since the effectiveness of the clause itself depends on its being part of a valid agreement."  *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997).

Only a specific provision, that disclaims "the existence of or reliance upon *specified representations*," will bar a fraudulent inducement claim based upon those alleged representations.  *Mfrs. Hanover Tr. Co.*, 7 F.3d at 315 (emphasis added).  The provision "must contain *explicit disclaimers* of the *particular representations* that form the basis of the fraud-in-the inducement claim."  *Id.* at 316 (emphasis added).  In other words, "the touchstone is

---

*Ins. Co.*, 709 N.Y.S.2d 74, 75 (N.Y. App. Div. 2000) (alleged misrepresentations were conclusory and mere puffery); *Triton Partners LLC v. Prudential Sec. Inc.*, 752 N.Y.S.2d 870 (N.Y. App. Div. 2003) (no reasonable reliance on purported promise to proceed with a transaction where relevant engagement letter permitted termination without cause); *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394 (E.D. Pa. 2002) (on summary judgment, finding that written contract contradicted alleged misrepresentation).

[35] A general clause will likewise not bar the admission of parol evidence to establish a claim for fraudulent inducement.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*, 798 N.Y.S.2d 14, 16 (N.Y. App. Div. 2005).

specificity" and "where specificity has been lacking, dismissal of the fraud claim has been ruled

inappropriate." *Id.* The cases upon which ERC relies involve specific, heavily negotiated

provisions and are inapplicable here.[36]

The RSA "entire agreement" clause upon which ERC relies, Mot. 25, is a standard,

boilerplate clause. It reads:

> The integration or merger clause in the RSA provides as follows: "This
> Agreement, the Terms and Conditions and any Terminal Rules issued by Owner
> express the entire agreement of the Parties with respect to the subject matter
> hereof and thereof, and all prior or contemporaneous agreements or negotiations
> with respect to the subject matter hereof are hereby superseded, and may be
> amended only by written agreement of the Parties. Notwithstanding the
> foregoing, the Terms and Conditions and Terminal Rules are subject to
> amendment, supplement and/or restatement by Owner from time to time in
> accordance with Section 6 hereof."

RSA § 15.4. Courts routinely reject precisely this type of clause as too general to bar a fraud

claim. *E.g.*, *Alpha Capital Anstalt*, 252 F. Supp. 3d at 342 (considering clause nearly identical to

that in RSA and finding that "[g]eneral disclaimers such as this one are not enough to bar a

fraud in the inducement claim from proceeding.").[37]

---

[36] *Citibank, N.A., v. Plapinger* reaffirmed the well-established principle that a general merger clause is
ineffective to preclude a fraudulent inducement claim, but found on summary judgment that the clause before it was
not a "generalized boilerplate exclusion," but rather the product of "extended negotiations between sophisticated
business people." 485 N.E.2d 974, 976-77. ERC describes the provision in *Marine Midland* as "almost identical" to
the RSA, but leaves out that fact that the court was addressing two contract provisions—an integration clause and a
waiver provision in the term note—that the court considered *together*, to find that "the language of the disclaimer in
the assignment agreement and note is sufficiently specific to foreclose the defense of fraudulent inducement as a
matter of law." *Marine Midland Bank, N.A. v. CES/Compu-Tech, Inc.*, 537 N.Y.S.2d 818, 819-820, 396–97 (N.Y.
App. Div. 1989). *General Bank v. Mark II Imports, Inc.* involved an integration clause that was more specific than
the RSA's and also contained provisions that indicated the clause was the product of thorough negotiations. 741
N.Y.S.2d 201, 202 (N.Y. App. Div. 2002).

[37] *See also Laduzinski v. Alvarez & Marsal Taxand LLC*, 16 N.Y.S.3d 229, 233 (N.Y. App. Div. 2015)
(denying motion to dismiss and considering clause nearly identical to that in RSA and finding the "boilerplate
language [to be] too general to bar plaintiff's claim"); *Magi Commc'ns, Inc. v. Jac-Lu Assocs.*, 410 N.Y.S.2d 297,
299 (N.Y. App. Div. 1978) (same); *see also Aero Media LLC v. World Healing Ctr. Church, Inc.*, No. 12 CIV. 5196
(LLS), 2013 WL 2896856, at *5 (S.D.N.Y. June 11, 2013) ("because fraudulent inducement is remedied with
rescission of the entire contract including its merger clause, New York courts routinely permit fraudulent
inducement claims to go forward although the written contract contains a merger clause.") (denying motion to
dismiss counterclaims); *Green v. Beer*, No. 06 CIV. 4156 (KMW) (JCF), 2009 WL 911015, at *8 (S.D.N.Y. Mar.
31, 2009) ("Defendants cannot invoke [entire agreement] provisions to preclude Plaintiffs from asserting their

Notably, however, the RSA *also* includes a different, specific clause, specifically disclaiming representations with respect to the quality or grade of petroleum (which is not an issue here).  In contrast to the general "entire agreement" clause, the other specific clause reads:

> OWNER MAKES NO WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OR REPRESENTATION WITH RESPECT TO THE GRADE OR QUALITY OF CRUDE PETROLEUM FOR WHICH TRANSLOADING SERVICES ARE PROVIDED UNDER THE AGREEMENT.

*See* RSA T&C § 1(g).  This demonstrates further that where ERC intended to disclaim specific reliance, ERC knew how to do so.  Under well-established law, the boilerplate "entire agreement" provision in the RSA does not bar BL/FG fraudulent inducement, negligent misrepresentation, or rescission claims.

### 4.    *Bad Faith Refusal to Consent to Carlyle Financing*

Under New York law, all contracts imply a broad covenant of good faith and fair dealing in the course of performance.  *E.g.*, *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153–54 (2002); *Dalton v. Educ. Testing Serv.*, 87 NY2d 384, 389 (1995).  This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" and encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."  *Jennifer Realty Co.*, 98 N.Y.2d at 153 (internal quotation marks and citation omitted).  The implied covenant may require a party to take "affirmative steps to cooperate in achieving the contract's objective," *Valley Stream Foreign Cars, Inc. v. Am. Honda Motor Co.*, 209 F. Supp. 3d 547, 555 (E.D.N.Y. 2016) (applying New York law), or to "tak[e] positive action" to cause the occurrence of a condition precedent, *Royal*

---

reliance on alleged misrepresentations that preceded, and led Plaintiffs to sign, the Agreements.") (denying motion to dismiss).

*Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 605 (S.D.N.Y. 2015)

(applying New York law). A party's frustration of the purpose of the agreement can constitute a

violation of the implied covenant that excuses its counterparty's performance. *See, e.g.*,

*Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 522 N.Y.S.2d 292, 293 (3d Dep't

1987). Finally, a party may breach the implied covenant without violating the express terms of

the contract. *See Frankini v. Landmark Constr. of Yonkers, Inc.*, 937 N.Y.S.2d 80, 80 (2d Dep't

2012). Whether conduct violates the duty is "ordinarily a question of fact to be determined by

the" fact finder. *Valley Stream*, 209 F. Supp. 3d at 554.

Here, in counterclaim V, BL/FG allege that ERC knew that an industry-standard

financing acknowledgement was necessary for BTS to be able to continue to ship crude oil

through the facility, but nevertheless, in breach of its obligations, refused to sign the industry-

standard financing acknowledgement procured in November 2015. FG CC ¶¶ 173–176. ERC

breached the implied covenant of good faith and fair dealing when it ███████████   ██████

███████   ████████████████████████████████████████████████████████

████████████████████████████████████████████████   *Id.* ¶¶ 90–

100, 173–176. As ERC was well aware, BTS's continued transloading of oil under the RSA was

*only* possible through a larger series of marketing and logistics arrangements that included

financing that would acknowledge certain of the financer's rights in the crude oil. *Id.*

Nonetheless, ERC made clear that, ██████████████████   ████████████████

████████████████████████████   █████   ██████████████████████

██████████   *Id.* ¶ 96.

Under New York law, ERC was bound to cooperate in good faith with BTS to achieve

the RSA's objective, which was to transload crude oil through the facility and to take positive

actions to ensure that all conditions precedent to BTS's performance under the RSA were satisfied. *See Valley Stream*, 209 F. Supp. 3d at 555 (defendant's refusal to enforce policy against wholesaling breached implied covenant, even where the policy was not contractually mandated); *Jennifer Realty Co.*, 98 N.Y.2d at 153 (breach caused, *inter alia*, difficulty obtaining financing and impaired resale, which undermined contract's objective); *Royal Park Investments SA/NV*, 109 F. Supp. 3d at 605 (party's ability but failure to fulfill contractual requirement breached implied covenant). Seeing an opportunity to demand deficiency payments from BTS under the RSA without the costs of operation (and also to rent or sell the facility for additional cash), ERC refused in bad faith to agree to the acknowledgment.

When determining whether a party has breached its duty of good faith and fair dealing, "a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." *Valley Stream*, 209 F. Supp. 3d at 554 (citation omitted). Here, the course of dealing supports BL/FG's claims. ERC was aware of the industry standard financing required to acquire oil to transload through the facility because, as ERC admits, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ ██████ ██████ *Id.* ¶ 96.[38]

---

[38] ERC responded: "███████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████. *Id.* ¶¶ 95–97.

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████. FG CC ¶ 93.  For instance, ERC's  minimal "lien rights"

under the RSA are only applicable in the event that BTS defaults under the RSA—and in that

event, a lien is available only as to the particular oil in the facility at that time, *i.e.*, as collateral

or security, to ERC to enforce the RSA and/or recover damages against BTS.  RSA T&C

§ 12(a)–(b). █████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

Porter Decl. Ex. F § 5.2.  Indeed, whether one agreement was "better" than another agreement

must take into account multiple factors and is quintessentially a fact dispute, not properly

decided on a motion to dismiss.[39]

Furthermore, ████████████████████████████████

█████████████████████████████████████  ████████  ██

████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████. *Id.*

Nonetheless, ERC intentionally withheld its cooperation, breaching the implied covenant of good

faith and fair dealing.

---

[39] ERC's conflicting version of the facts should be ignored as inconsistent with the BL/FG counterclaims, which are entitled to deference on a motion to dismiss.  Further, ████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
At most, ERC's contrary arguments create disputed issues of fact not properly decided on a motion to dismiss.  They do not provide a legal basis for dismissal at this stage.

ERC's argument that it ██████████████████████████████████
████████████████████████ Mot. 27.  Surely it was in ERC's economic interest to keep the crude oil flowing through the facility and to continue receiving timely payments from BTS of $2.25 per barrel.  If ERC is implying that it was in its economic interest to preclude BTS from performing under the RSA and collect payments from BTS to the extent of its limited resources, while also renting or selling its facility to others, that bad faith behavior is a breach of the implied covenant.

The decisions cited by ERC do not counsel a different result.  In *O'Grady v. BlueCrest Capital Management*, 111 F. Supp. 3d 494, 504-05 (S.D.N.Y. 2015), the court dismissed the plaintiff's breach of implied covenant claim as duplicative of his breach of contract claim where the claims were premised on the same facts, which is not the case here.  The contract at issue in *O'Grady* further referred to the defendant's discretion over the plaintiff's bonus, which the court held contradicted the plaintiff's breach of contract claim for failure to pay a bonus, but there is no such discretionary provision in the RSA regarding financing.  *Id.* at 501-02.  The *O'Grady* court also acknowledged that the defendant could have breached the implied covenant by "stymi[eing]" the condition precedent by failing to provide the plaintiff a release, thus frustrating the purpose of the contract, but held that the plaintiff had not pleaded sufficient facts pertaining to the release.  *Id.* at 503.  Here, that is precisely what BL/FG have alleged.   *Wayland Investment Fund v. Millennium Seacarriers*, 111 F. Supp. 2d 450, 457 (S.D.N.Y. 2000) is wholly inapposite because, there the court held that it was more appropriate for the plaintiff to pursue its mutual mistake claim as a cause of action for reformation rather than breach of contract (not the issue here).

ERC misleadingly quotes *Bank of New York v. Sasson*, 786 F. Supp. 349, 354 (S.D.N.Y. 1992) by removing the first half of the quoted sentence. The full quote is: "Moreover, *so long as the promisee is allowed to reap the benefits of the contract*, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest such as extending, or even negotiating the possible extension of, a risky loan." *Id.* (emphasis added). Further, in *Sasson*, the defendant failed to allege interference with the benefits promised under the contract. *Id.* at 353. ERC, however, was well aware that declining to negotiate and enter an industry-standard financing arrangement would deprive BTS from the benefits of the RSA.[40]

### 5.  *BL/FG are Entitled to Rescission of the RSA*

It is black letter law that "fraudulent inducement is remedied with rescission of the entire contract." *Alpha Capital Anstalt*, 252 F. Supp. 3d at 341 (citation omitted). ERC nevertheless argues rescission is improper because BL/FG "cannot claim mistake where they have received 'neither more nor less than that for which they bargained.'" Mot. 31.[41]  But rescission of the RSA is based upon ERC's lies and misrepresentations, such that BTS did not receive what it bargained for (not even close). FG CC ¶ 178; *see also id.* ¶ 75, 81; Porter Decl. Ex. C (████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[40] *Garrett v. Music Publishing Co. of America*, 740 F. Supp. 2d 457, 459, 463 (S.D.N.Y. 2010), which held that because the defendant did not breach the contract he could not have breached the implied covenant does not accurately reflect New York law in that respect. *See Frankini*, 937 N.Y.S.2d at 80.  And the plaintiff in *Garrett* premised its breach of the implied covenant claims on the defendant's conduct during negotiations, rather than an existing contract, which is not the case here.  *Garrett*, 740 F. Supp. 2d at 459.

[41] ERC's citation to *Da Silva v. Musso*, 428 N.E.2d 382, 387 (N.Y. 1981) is not on point. In that case, there was "no fraud" and the party sought rescission due to his own mistake, and received "neither more nor less" than what was bargained for.   In *Gander Mountain Co. v. Islip U-Slip*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013), likewise, there was no well-pled claim for fraudulent inducement and the plaintiff was aware of the flood risk and allocated risk with respect to property damage in the lease agreement.  Here, fraudulent inducement is well pled and the deficiencies and misrepresented aspects of the facility were not truthfully or timely disclosed.

█████████████████████████████████████.")  As discussed, ERC

fraudulently concealed the mistakes of fact, and the RSA does not contain contradictory

language.

ERC also claims that BL/FG "allegations of frustration of purpose and impracticability

cannot survive where 'non-occurrence of the event' of which they complain was not 'a basic

assumption on which the contract was made.'"  Mot. 31.  This argument is unavailing, as the

ability to access the facility, and the promised capacity of the facility to allow BTS to accrue and

use deficiency credits, were fundamental to the economics of the RSA—indeed, they *are* the

basic assumptions of the RSA.  FG CC ¶¶ 181–82.[42]

Finally, ERC asserts that the RSA cannot be undone because ERC invested in building

the facility.  Mot. 31–32.  But the rule against rescission where the parties cannot be returned to

the status quo "will not be strictly enforced where the party against whom rescission is sought is

a wrongdoer who is exploiting its change of position to shield its wrong doing."  *Sokolow,*

*Dunaud, Mercadier & Carreras LLP v. Lacher*, 747 N.Y.S.2d 441, 446 (N.Y. App. Div. 2002)

(rejecting argument that rescission was unavailable because it would not return parties to status

quo, where party fraudulently induced counterparty to enter contract).  ERC's cases do not

involve fraudulent inducement,[43] or involve a plaintiff that, unlike BTS, "voluntarily gave up" its

right to seek rescission and never even requested it.[44]  Here, ERC fraudulently induced BTS to

---

[42] ERC does not address the relief for rescission based upon ERC's intentional and/or arbitrary rejection of an industry-standard financing acknowledgement.  FG CC ¶ 183.

[43] *Slater Trust Co. v. Gardiner*, 183 F. 268, 273 (C.C.S.D.N.Y. 1910) addressed a mutual mistake, where the defendant was "innocent of conscious mistake," not a party's lies to fraudulently induce its counterparty. *Colonial Funding Network, Inc. for TVT Capital v. Epazz*, No. 16 Civ. 5948 (LLS), 2017 U.S. Dist. LEXIS 70747, at * 15 (S.D.N.Y. May 9, 2017) involved a defendant's unilateral mistake in carelessly reading the document.

[44] *MBIA Insurance Corp. v. Countrywide Home Loans*, 963 N.Y.S.2d 21, 22 (N.Y. App. Div. 2013) (plaintiff "contracted away" and "voluntarily gave up" its right to seek rescission and "never actually requested" rescission).

enter the RSA and the RSA specifically provides that waiting to assert a claim does not waive a party's rights.  RSA § 15.7.

More importantly, however, rescinding the contract *will* return the parties to the status quo: ERC will have the facility that it planned, built, and marketed on its own initiative, and can continue to find customers, as it always did and always intended to do.  *See* Porter Decl. Ex. E

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████   ████████████████

████████████████████   *See* FG CC ¶ 6.  And BTS never had exclusive access to the facility. From the beginning, ERC had other customers.  Indeed, BTS was never intended to be the sole actual or potential customer and the RSA itself is limited to approximately five years.  RSA § 2.1.  In sum, rescission is an appropriate remedy here.  ERC cites no case law to the contrary.

### C.   BL/FG STATE A CLAIM FOR TORTIOUS INTERFERENCE BASED ON ERC'S COLLUSIVE SETTLEMENT SCHEME

Effective February 1, 2016, Logistics sold BTS to JTH, JTH expressly assumed all obligations to perform under the RSA and agreed to indemnify Logistics and its affiliates for its assumption of liabilities under the RSA, among other things, and JML unconditionally guaranteed JTH's performance of all obligations due to Logistics and its affiliates.  FG CC ¶¶ 103–05, 109–10.  The new owners of JTS, however, caused JTS to cease making payments under the RSA and ERC then commenced arbitration proceedings against JTS.  *Id.* ¶¶ 115, 117. Before the arbitrators could address JTS's defenses or counterclaims, ERC and JTS entered into a collusive settlement designed to lock in the maximum potential liability and then foist it all upon BL/FG, despite and in breach of JTH and JML's indemnification obligations to Logistics. *Id.* ¶¶ 121–28, 130–31.

In counterclaim I, BL/FG allege that ERC tortiously interfered with the BTS PSA and the Guarantee—binding contracts that Bridger Logistics entered into with JTH and JML that obligated those Jamex parties to indemnify BL/FG—by scheming up and entering into the collusive settlement.  FG CC ¶¶ 144–53; *see* Third Party Complaint.[45]  As an initial matter, ERC quotes *Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 530 (3d Cir. 1998), for the elements of intentional interference with contractual relations under Pennsylvania law, Mot. 14, but fails to address this Court's prior holding that *Brokerage Concepts* is limited to tortious interference claims between business competitors.  *Aetna, Inc. v. Health Diagnostic Lab. Inc.*, No. CV 15–1868, 2015 WL 9460072, at *5 (E.D. Pa. Dec. 28, 2015) (Kelly, J.) (denying motion to dismiss).  Rather, this Court has held that the elements of an ordinary claim for tortious interference under Pennsylvania law are:  (1) an existing contractual relationship; (2) the defendant's purposeful or intentional interference with the performance of that contract by inducing a breach or otherwise causing the third party not to perform; (3) the defendant's lack of privilege to interfere; and (4) pecuniary loss resulting from the breach of contract.  *Id.*

Here, ERC does not dispute that the first, third, or fourth elements are pled.[46]  Of the second element, ERC does not dispute that the Jamex parties breached and/or failed to perform the indemnification provisions of the agreements.  *See* FG CC ¶¶ 140–141, 143, 150.  In fact, ERC's only arguments are the counterclaim does not allege sufficiently that:  (1) ERC's collusive settlement caused "cognizable prejudice" to BL/FG, *see* Mot. 14, and (2) ERC's intent

---

[45] Third-Party of Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P. [ECF. No. 69].

[46] ERC does not dispute that the first, third, or fourth elements are pled under either *Brokerage Concepts* or *Aetna's* formulation.  ERC does not dispute that the BTS PSA and the Guarantee were existing contractual relationships between BL/FG and various Jamex entities of which ERC was aware (*see* FG CC ¶¶ 145–149) or that ERC was not privileged to interfere in the BL/FG contracts with Jamex (*see id.* ¶ 152).  ERC also does not contest that BL/FG have adequately pled damages.  *See* FG CC ¶¶ 142, 153, 73(E).

or that ERC caused the breach of Jamex's indemnification obligations, *see* Mot. 15.  Each of these arguments fails.

> ### 1. *Legal Prejudice Is Not an Element of Tortious Interference, But is Present Here in Any Event*

First, "legal prejudice" is not an element of a tortious interference claim.  *None* of the decisions cited by ERC regarding "legal prejudice" are in the context of tortious interference. Mot. 14–15.  Instead, the decisions cited by ERC stand for the unremarkable—and irrelevant— propositions that a non-settling defendant generally does not have standing to formally object to, move to invalidate, or appeal a settlement of its co-defendants in the same action unless it has suffered an injury-in-fact or some form of legal prejudice, *see Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir. 1990); *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1233 (7th Cir. 1983), and that proposed intervenors who cannot establish that their legal rights are prejudiced cannot intervene in an action to which they are strangers to prevent settlement and dismissal.  *See Forest Serv. Employees For Envtl. Ethics v. U.S. Forest Serv.*,  Civ. A. No. 08-323 Erie, 2009 WL 1324154, at *3 (W.D. Pa. May 12, 2009).  These cases are entirely inapposite.  In citing these cases, ERC conflates the inapplicable "legal prejudice" concept with the actual requirement of damages (which element has been amply pled and which ERC does not dispute).[47]  BL/FG and Jamex parties were not co-defendants in the arbitration.  While BL/FG's Answer disputes the applicability in this case of the Award on various grounds, the tortious interference counterclaim does not seek to appeal, object to, or unwind the arbitration settlement.  Instead, the counterclaim asserts that ERC tortiously interfered with and induced the Jamex parties to enter into an

---

[47] As this Court knows, however, a plaintiff is merely required to establish the occasioning of actual damage as a result of defendant's conduct.  *See Aetna, Inc.*, 2015 WL 9460072, at *5 (tortious interference claim requires "pecuniary loss resulting from the breach of contract.").  The BL/FG counterclaims contain multiple allegations regarding damages, which ERC does not challenge in its Motion.  *See* FG CC ¶¶ 142, 153; *id.*at 73(e).

agreement that violated its contractual indemnification obligations to BL/FG under the BTS PSA and the Guarantee.  FG CC ¶¶ 120–24, 126–28, 130–33, 142, 144–53.

Even if "prejudice" was an element of a tortious interference claim—which it is not—BL/FG allegations show significant prejudice here.  According to ERC's own cited decisions legal prejudice "includes any interference with a party's contract rights or a party's ability to seek contribution or indemnification" or strips away a "legal claim or cause of action . . . or the right to present relevant evidence at trial."  *Agretti*, 982 F.2d at 247 (citations ommitted).  BL/FG have alleged that ERC designed a collusive settlement scheme in order to foist the largest possible liability on BL/FG (based on its belief as to available resources) ███████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████.  FG CC ¶¶ 120–24, 126–27, 130, 132. Indeed, in this very same Motion, ERC doubles down on this collusive scheme by seeking to prevent this Court from even considering the counterclaims and the multiple reasons that the underlying contract, the RSA, should be rescinded or the claimed ERC damages reduced, at the same time it asserts that BL/FG are responsible for and bound by a contract they were not party to.  Mot. 16–32.  Furthermore, there is no policy reason to encourage *collusive* settlements.

Finally, to the extent that ERC is arguing that BL/FG are somehow barred from asserting both a breach of contract claim against Jamex and a tortious interference claim against ERC (*see* Mot. 14), this is wrong.  ERC cites no support for this proposition.  Nor could they.  A plaintiff is not prohibited from pursuing both claims simultaneously.  *See, e.g.*, *Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 597 (E.D. Pa. 2011) (sustaining claim for tortious

interference in action asserting both tortious interference and breach of contract); *see also* Fed. R. Civ. P. 8; 4 Moore's Federal Practice (Civil) § 18.02 (2017) (pleading in the alternative).[48]

## 2.   *BL/FG Adequately Allege Intent to Interfere and Interference*

ERC misapplies the law and goes outside BL/FG counterclaims in attempting to argue that it did not interfere in Jamex's performance of the BTS PSA and the Guarantee.  Mot. 15–16. As this Court has observed:  "Plaintiff . . . needs only to prove that a third person . . . induced a third party not to perform a contract."  *Aetna, Inc.*, 2015 WL 9460072, at *6 (denying motion to dismiss).

BL/FG have alleged ERC's intent in specific detail in their counterclaims, which ERC simply ignores in its Motion.  BL/FG have alleged that ██████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████
████████████████.  *See* FG CC ¶¶ 124–33, 144–53.  BL/FG have therefore plausibly alleged that ERC improperly intended to induce the Jamex parties to breach the indemnification obligations, and set up a scheme designed to foist all liability on BL/FG.[49]

This Court has also previously rejected ERC's argument that the autonomy of the party who was tortiously induced to breach its contract can break the chain of causation and relieve the

---

[48] ERC also misconstrues the BL/FG breach of contract claim against Jamex.  ERC argues that the BL/FG have not been deprived of their indemnification rights against Jamex because the BL/FG have asserted breach of contract claims against Jamex to enforce those indemnification rights.  Mot. 14.  But that claim has not yet been vindicated and BL/FG have incurred many costs in defending this action, which never would have been brought if Jamex had complied with its contribution duties, and many costs seeking to enforce Jamex's indemnification obligations.  Those damages, among others, are recoverable against ERC due to its tortious interference.

[49] Unable to defeat the BL/FG allegations, ERC introduces multiple facts that are outside the BL/FG counterclaims and should not be considered by this Court on this motion to dismiss.  *E.g.* Mot. 15.

defendant of liability for tortious interference.  *See Aetna*, 2015 WL 9460072, at *6 (in denying a motion to dismiss, holding that breaching parties' independent decisions to take the actions breaching the contract did not break the chain of causation where the plaintiff alleged that the defendant improperly induced the breaching parties to breach their contracts).

ERC also argues that it could not have tortiously interfered with BL/FG contracts because it is in ERC's interest for Jamex to indemnify BL/FG.  Mot. 16.  This is outside the pleadings and wrong.  BL/FG have plausibly pled that ERC constructed the scheme in order to foist the full amount of potential liability on BL/FG, whom they (incorrectly) view as "deep pockets."  *See* FG CC ¶¶ 121, 126.  It is nonsensical to propose that ERC settled with the Jamex parties for utterly inadequate consideration in order to commence a new and expensive litigation against BL/FG, in order to actually collect indirectly from the original Jamex parties.  Further, neither of the decisions cited by ERC on this point involves a claim for tortious interference.  *See Bravia Capital Partners, Inc. v. Fike*, No. 09 CIV. 6375 JFK, 2010 WL 3359470, at *5 (S.D.N.Y. Aug. 25, 2010) (no breach of the implied duty of good faith and fair dealing where financial incentives rendered inferences of bad faith "even less colorable"); *Deom v. Walgreen Co.*, 591 F. App'x 313, 320 (6th Cir. 2014) (similar).

### D.   THERE IS NO BASIS TO STRIKE THE AFFIRMATIVE DEFENSES

ERC moves to strike portions of BL/FG Seventeenth, Eighteenth, and Twentieth Affirmative Defenses because they are based on similar legal grounds as the counterclaims ERC moves against.[50]  Mot. 29–30.  ERC has withdrawn footnote 12 of its Motion, and thus BL/FG do not address those issues here.[51]  ERC's remaining arguments fail for the reasons set forth above.  In addition, ERC has not established that it is entitled to such relief.

---

[50] ERC's arguments do not apply to sections (i), (ii), and (v) of the Twentieth Affirmative Defense.
[51] If the Court requests briefing on those issues, the BL/FG are happy to provide a supplemental brief.

Courts rarely grant motions to strike, which are disfavored. *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428–29 (E.D. Pa. 2007). A successful motion to strike must illustrate that the affirmative defenses "have no possible relation to the controversy and may cause prejudice to one of the parties, or . . . confuse the issues," *id.*, and will be granted only where the insufficiency of the defense is clearly apparent. *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181, 188 (3d Cir. 1986).

ERC cannot show the insufficiency of the defenses and has not argued prejudice.[52] Further, the affirmative defenses are clearly related to the controversy. The motion to strike should be denied for the reasons set forth above. Moreover, even if the counterclaims were dismissed, the question of the appropriate amount of damages would still need to be established by ERC on its claims, and consideration of the affirmative defenses is necessary in order to come to the right and just result.

## V.   CONCLUSION

For the foregoing reasons, BL/FG request that the Motion be denied in its entirety.

---

[52] For instance, given that this Court has yet to decide ERC's alter ego claim, the question of the BL/FG standing to assert affirmative defenses Seventeenth, Eighteenth, and Twentieth (iii)–(iv) is not "clearly apparent" from the pleadings.

Dated: November 6, 2017

Respectfully submitted,

  /s/ *Jeffery A. Dailey*
Jeffery A. Dailey (I.D. No. 85993)
Ellen L. Pierce (I.D. No. 318579)
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, Pennsylvania 19103
T: (215) 965-1200
F: (215) 965-1210
jdailey@akingump.com
epierce@akingump.com

David M. Zensky (*pro hac vice*)
Katherine P. Porter (*pro hac vice*)
Kelly A. Eno (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002
dzensky@akingump.com
kporter@akingump.com
keno@akingump.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas
Partners, L.P., and Ferrellgas L.P.*

37

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffery A. Dailey, hereby certify that I caused Defendants / Third-Party Plaintiffs

Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Opposition to Plaintiff

Eddystone Rail Company, LLC's Motion to Dismiss Amended Counterclaims and to Strike

Affirmative Defenses to be filed and served on all counsel of record via the Court's ECF system

on November 6, 2017.

*/s/ Jeffery A. Dailey*
Jeffery A. Dailey

Dated:  November 6, 2017