# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC,<br>        Plaintiff,<br>  v.<br><br>JULIO RIOS and JEREMY GAMBOA,<br>        Defendants,<br><br>BRIDGER LOGISTICS, LLC, FERRELLGAS<br>PARTNERS, L.P., and FERRELLGAS, L.P.,<br>        Defendants/Third-Party Plaintiffs,<br>  v.<br><br>JAMEX MARKETING, LLC (f/k/a BRIDGER<br>MARKETING, LLC), JAMEX TRANSFER<br>HOLDINGS, LLC, JAMEX, LLC (f/k/a<br>BRIDGER, LLC), JAMEX TRANSFER<br>SERVICES, LLC (f/k/a BRIDGER TRANSFER<br>SERVICES, LLC), JAMES BALLENGEE and<br>JOHN DOES 1-10,<br>        Third-Party Defendants. | No. 2:17-cv-00495-RK<br><br>**Oral Argument Requested** |

## DEFENDANTS/THIRD PARTY PLAINTIFFS BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., and FERRELLGAS L.P.'S CONSOLIDATED OPPOSITION TO THIRD PARTY DEFENDANTS' MOTIONS TO DISMISS THE THIRD PARTY COMPLAINT

AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, Pennsylvania 19103
T: (215) 965-1200
F: (215) 965-1210

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................1

FACTUAL BACKGROUND ...................................................................................5
- I.   BTS Enters into the RSA ........................................................................5
- II.  JTH and JML Assume Obligations Under the BTS PSA and Guarantee................7
- III. JTS Breaches the RSA, and JTH Fails to Assume Liability Thereunder................9
- IV.  ERC Brings an Arbitration Against JTS, and Ballengee Crafts a Collusive Settlement with ERC................................................................9
- V.   ERC's Lawsuit Against the Third Party Plaintiffs ................................11

ARGUMENT ..........................................................................................................12
- I.   Forum Non Conveniens Does Not Mandate Dismissal ................................12
  - A.   Enforcement of the BTS PSA's Mandatory Forum Selection Clause is Unreasonable ................................................................14
  - B.   Count II for Breach of the Guarantee Is Not Subject to the Forum Selection Clause in the BTS PSA and May Be Heard in This District................................................................17
    - 1.   The Guarantee Contains a Permissive Forum Selection Clause................................................................17
    - 2.   Count II (Breach of Guarantee) Is Not Derivative of Count I (Breach of BTS PSA) ................................................18
  - C.   Counts III and IV for Tortious Interference and Contribution Are Not Dependent on or Derivative of the Breach of the BTS PSA Claim................................................................20
  - D.   The Private Interest Factors Weigh Against Dismissal ....................21
- II.  This Court Has Personal Jurisdiction Over Jamex LLC, JTH, and Ballengee................................................................24
  - A.   JTH, Ballengee, and Jamex LLC Have Sufficient Minimum Contacts with Pennsylvania to Support Personal Jurisdiction.............25
    - 1.   Ballengee Had Extensive Suit-Related Contacts with Pennsylvania ................................................................27
    - 2.   JTH Had Extensive Suit-Related Contacts with Pennsylvania ................................................................30
    - 3.   Jamex LLC Had Extensive Suit-Related Contacts with Pennsylvania ................................................................31
    - 4.   The Alter Ego Allegations in the ERC Complaint Support Personal Jurisdiction over Jamex LLC and Ballengee ................32
    - 5.   The Collusive Settlement Supports Personal Jurisdiction over JTH, Ballengee, and Jamex LLC ................................33
  - B.   Exercising Personal Jurisdiction over JTH, Jamex LLC, and Ballengee is Reasonable and Consistent with Notions of Fair Play and Substantial Justice ................................................................34
- III. The Third Party Defendants' Rule 12(b)(6) Arguments Are Meritless................35
  - A.   JTH Assumed Post-Sale Liabilities under the RSA....................35

B.    The BTS PSA Contemplates Performance of Obligations under the
       RSA....................................................................................................38
C.    JTH and JML Must Indemnify the Third Party Plaintiffs for ERC's
       Claims Stemming from JTS's Breach of the RSA....................................40
D.    The Third Party Complaint States a Tortious Interference Claim
       Against Ballengee ...............................................................................43
E.    The Third Party Plaintiffs Have Stated a Claim against the Third
       Party Defendants for Contribution.........................................................46

       1.    The Contingent Contribution Claim Meets Rule 8 Pleading
              Standards...................................................................................48
       2.    The Contingent Contribution Claim Relates to Joint
              Tortious Conduct .......................................................................49

CONCLUSION.......................................................................................................51

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Unione Mediterranea Di Sicurta*,
    364 F.3d 646 (5th Cir. 2004) ...............................................21

*Aegis Sec. Ins. Co. v. Kingsway Fin. Servs., Inc.*,
    No. 1:16-CV-1555, 2017 WL 4015659 (M.D. Pa. May 2, 2017)...........................38

*In re Agresti*,
    Civ. A. No. 14-00126, 2014 WL 3408691 (Tex. App. May 29, 2014) ...................17

*Aluminum Co. of Am. v. Beazer E., Inc.*,
    124 F.3d 551 (3d Cir. 1997)...................................................36, 37, 38

*Apollo Prop. Partners, LLC v. Diamond Houston I, L.P.*,
    Civ. A. No. 14-07-00528, 2008 WL 3017549 (Tex. App. Aug. 5, 2008) ..............18

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
    134 S. Ct. 568 (2013).......................................................14, 16, 23

*Atl. Pier Assocs., LLC v. Boardakan Rest. Partners L.P.*,
    Civ. A. No. 08-4564, 2010 WL 3069607 (E.D. Pa. Aug. 2, 2010).......................32

*B., Inc. v. Miller Brewing Co.*,
    663 F.2d 545 (5th Cir. 1981) .................................................43

*Bancroft Life & Cas. ICC, Ltd. v. FFD Res. III, LLC*,
    Civ. A. No. 11-2382, 2012 WL 5032111 (S.D. Tex. Oct. 17, 2012)....................19

*Bank v. City of Phila.*,
    991 F. Supp. 2d 523 (E.D. Pa. 2014) .........................................48

*Bhd. of Locomotive En'gs & Trainmen v. United Transp. Union*,
    413 F. Supp. 2d 410 (E.D. Pa. 2005) .........................................26

*Bodor v. Horsham Clinic, Inc.*,
    Civ. A. No. 94-7210, 1995 WL 424906 (E.D. Pa. July 19, 1995).......................16

*Buck v. Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006)...................................................5

*Buckeye Pennsauken Terminal LLC v. Dominique Trading Corp.*,
    150 F. Supp. 3d 501, 506 (E.D. Pa. 2015) ....................................14

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ................................................................................ *passim*

*Calder v. Jones*,
  465 U.S. 783 (1984) ................................................................................27, 28

*Carlile Bankshares, Inc. v. Armstrong*,
  Nos. 02-14-00014-CV, 02-14-00018-CV, 2014 WL 3891658 (Tex. App. Aug.
  7, 2014) ..................................................................................................20

*Chahadeh v. Jacinto Med. Grp., P.A.*,
  519 S.W.3d 242 (Tex. App. 2017) ..........................................................18, 19

*Chengelis v. Cenco Instruments Corp.*,
  386 F. Supp. 862 (W.D. Pa. 1975) ..........................................................49

*City of New Orleans v. Mun. Admin. Servs., Inc.*,
  376 F.3d 501 (5th Cir. 2004) ..................................................................17

*Cooper v. Nationwide Mut. Ins. Co.*,
  No. CIV.A. 02-2138, 2002 WL 31478874 (E.D. Pa. Nov. 7, 2002) ................49

*In re Davenport*,
  522 S.W.3d 452 (Tex. 2017) ..................................................................37

*De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*,
  Civ. A. No. 00-2355, 2000 WL 1593978 (E.D. Pa. Oct. 25, 2000) ................16

*Eastcott v. McGraw-Hill Glob. Educ. Holdings, LLC*,
  Civ. A. No. 16-904, 2016 WL 3959076 (E.D. Pa. July 22, 2016) ..................16

*Eddystone Rail Co., LLC v. Bridger Logistics, LLC*,
  Civ. A. No. 17-0495, 2017 WL 3072250 (E.D. Pa. July 19, 2017) ............... *passim*

*Element Fin. Corp. v. ComQi, Inc.*,
  52 F. Supp. 3d 739, 747 (E.D. Pa. 2014) ................................................26

*Ferring B.V. v. Mylan Pharm. Inc.*,
  Civ. A. No. 13-5909, 2014 WL 4105987 (E.D. Pa. Aug. 21, 2014) (Kelly, J.) ....................22

*First United Pentacostal Church of Beaumont v. Parker*,
  514 S.W.3d 214 (Tex. 2017) ..................................................................43

*Flora v. Cty. of Luzerne*,
  776 F.3d 169 (3d Cir. 2015) ..................................................................41

*Fuentes v. AMC Entm't Holdings, Inc.*,
  Civ. A. No. 09-CV-5804, 2010 WL 1375555 (E.D. Pa. Apr. 5, 2010) ................23

*Garcia v. Cummings*,
  2009 WL 136785 (M.D. Pa. Jan. 20, 2009)..................................................................50

*Gen. Elec. Co. v. Deutz AG*,
  270 F.3d 144 (3d Cir. 2001)...........................................................................31, 35

*Gullion v. JLG Serviceplus, Inc.*,
  Civ. A. No. 06-1015, 2007 WL 294174 (S.D. Tex. Jan. 29, 2007) ...................19, 21

*Harsh v. Petroll*,
  887 A.2d at 218...........................................................................................50

*Holland v. Consol. Rail Corp.*,
  Civ. A. No. 98-CV-2694, 1998 WL 414722 (E.D. Pa. July 22, 1998)..................24

*Holloway v. Skinner*,
  898 S.W.2d 793 (Tex. 1995)........................................................................44, 45

*Int'l Shoe v. Washington*,
  326 U.S. 310, 320 (1945)..............................................................................24

*It's Intoxicating, Inc. v. Maritim Hotelgesellschft, mbH*,
  Civ. A. No. 3:11-2379, 2012 WL 3686784 (M.D. Pa. Aug. 27, 2012) ...............27

*Jon Feingersh Photography, Inc. v. Pearson Educ., Inc.*,
  978 F. Supp. 2d 463 (E.D. Pa. 2013) .............................................................16, 35

*Jumara v. State Farm Ins. Co.*,
  55 F.3d 873 (3d Cir. 1995)...........................................................................21

*Junge v. Wheeling Island Gaming, Inc.*,
  Civ. A. No. 10-1033, 2010 WL 4537052 (W.D. Pa. Nov. 2, 2010) ...................27

*Kaplan v. First Options of Chicago, Inc.*,
  19 F.3d 1503 (3d Cir. 1994).........................................................................49

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)....................................................................................24

*Kingston v. Helm*,
  82 S.W.3d 755 (Tex. Ct. App. 2002) .............................................................44

*Kontonotas v. Hygrosol Pharm. Corp.*,
  Civ. A. No. 07-4989, 2009 WL 3245421 (E.D. Pa. Oct. 5, 2009).....................29

*Leone v. Cataldo*,
  574 F. Supp. 2d 471 (E.D. Pa. 2008) .............................................................29

*Lexxus Intern. Inc. v. Loghry*,
  512 F. Supp. 2d 647 (N.D. Tex. 2007) .................................................................43

*Lin v. Rohm & Haas Co.*,
  865 F. Supp. 2d 649 (E.D. Pa. 2012) ...................................................................46

*Magi XXI, Inc. v. Stato Della Citta Del Vaticano*,
  818 F. Supp. 2d 597 (E.D.N.Y. 2011) ..................................................................19

*McG ee v. Int'l Life Ins. Co*,
  355 U.S. 220, 223 (1957)......................................................................................35

*Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*,
  960 F.2d 1217 (3d Cir. 1992)..........................................................................25, 31

*Metcalfe v. Renaissance Marine, Inc.*,
  566 F.3d 324 (3d Cir. 2009)..................................................................................25

*Nat'l Specialty Ins. Co. v. Tunkhannock Auto Mart, Inc.*,
  No. 3:16-CV-00268, 2017 WL 661475 (M.D. Pa. Feb. 17, 2017) .........................48

*North Texas Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*,
  107 F. Supp. 3d 620, 636 (N.D. Tex. 2015) .........................................................43

*Nova Ribbon Prod., Inc. v. Lincoln Ribbon, Inc.*,
  Civ. A. No. 89-4340, 1992 WL 392614 (E.D. Pa. Dec. 14, 1992) ...................16, 35

*O'Connor v. Sandy Lane Hotel Co., Ltd.*,
  496 F.3d 312 (3d Cir. 2007)........................................................................24, 25, 34

*Operadora Maritima de Graneles v. Gamesa Wind U.S., LLC*,
  989 F. Supp. 2d 445, 449 (E.D. Pa. 2013) ...........................................................49

*Osborne v. Norfolk S. Corp.*,
  Civ. A. No. 11-2258, 2011 WL 3047944 (E.D. Pa. July 25, 2011) (Kelly, J.).......22

*Pennenvironment & Sierra Club v. PPG Indus., Inc.*,
  No. 12-342, 2016 WL 3197961 (W.D. Pa. June 9, 2016) ..........................47, 50, 51

*Phila. Elec. Co. v. Hercules, Inc.*,
  762 F.2d 303 (3d Cir. 1985)..................................................................................37

*Powell Indus., Inc. v. Allen*,
  985 S.W.2d 455 (Tex. 1998)..................................................................................43

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.*,
  Civ. A. No. 12-1922, 2014 WL 1725041 (E.D. Pa. Apr. 30, 2014) .................41, 48

*Rotondo Weinreich Enters., Inc. v. Rock City Mech., Inc.*,
   Civ. A. No. 04-5285, 2005 WL 119571 (E.D. Pa. Jan. 19, 2005) ...........................................27

*RSR Corp. v. Siegmund*,
   309 S.W.3d 686 (Tex. App. 2010) ...................................................................................20, 21

*Saudi v. Acomarit Mars. Servs., S.A.*,
   114 F. App'x 449 (3d Cir. 2004) .............................................................................................27

*Sharpe v. AmeriPlan Corp.*,
   769 F.3d 909 (5th Cir. 2014) ...................................................................................................20

*Silvis v. Ambit Energy, L.P.*,
   90 F. Supp. 3d 393, 397 (E.D. Pa. 2015) ................................................................................14

*SKF USA Inc. v. Okkerse*,
   992 F. Supp. 2d 432 (E.D. Pa. 2014) ......................................................................................15

*State Farm Fire and Cas. Co. v. Gandy*,
   925 S.W.2d 696 (Tex. 1996).....................................................................................................45

*Steinmetz v. McGraw-Hill Glob. Educ. Holdings, LLC*,
   220 F. Supp. 3d 596, 600 (E.D. Pa. 2016) ..............................................................................21

*Stiles v. Bankers Healthcare Grp., Inc.*,
   637 F. App'x 556 (11th Cir. 2016) ..........................................................................................19

*Surgical Laser Techs., Inc. v. C.R. Bard, Inc.*,
   921 F. Supp. 281 (E.D. Pa. 1996) ...........................................................................................29

*Target Glob. Logistics Servs., Co. v. KVG, LLC*,
   Civ. A. No. 15-4960, 2017 WL 1355371 (E.D. Pa. Apr. 12, 2017) ........................................15

*Toys "R" Us, Inc. v. Step Two, S.A.*,
   318 F.3d 446 (3d Cir. 2003)......................................................................................................25

*Tulpehocken Spring Water, Inc. v. Obrist Americas, Inc.*,
   No. 4:09-CV-2189, 2010 WL 5093101 (M.D. Pa. Dec. 8, 2010)...........................................48

*United States v. Sunoco, Inc.*,
   501 F. Supp. 2d 656 (E.D. Pa. 2007) ......................................................................................50

*Universal Metals & Machinery, Inc. v. Bohart*,
   539 S.W.2d 874 (Tex. 1976).....................................................................................................18

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*,
   75 F.3d 147 (3d Cir. 1996)........................................................................................................26

*Vizant Techs., LLC v. Whitchurch*,
　97 F. Supp. 3d 618, 629 (E.D. Pa. 2015) ........................................................27, 28

*Walden v. Fiore*,
　134 S. Ct. 1115 (2014) ..............................................................................................27

*In re Wilmer Cutler Pickering Hale & Dorr LLP*,
　Civ. A. No. 05-08-01395, 2008 WL 5413097 (Tex. App. Dec. 31, 2008) ............20

*Your Town Yellow Pages, L.L.C. v. Liberty Press, L.L.C.*,
　Civ. A. No. 09-0605-D, 2009 WL 3645094 (N.D. Tex. Nov. 2, 2009)..................20

**Statutes**

28 U.S.C. § 1391(b)(2) ...................................................................................................23

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) ...................................................................38, 39

Fed. R. Civ. P. 8 .............................................................................................................48

Fed. R. Civ. P. 10 .....................................................................................................48, 49

Fed. R. Civ. P. 12(b)(3)..................................................................................................23

Fed. R. Civ. P. 12(b)(6)............................................................................................12, 35

Bridger Logistics, LLC ("Bridger Logistics"), Ferrellgas Partners, L.P. ("FGP"), and Ferrellgas, L.P. ("FG," and together with Bridger Logistics and FGP, the "Third Party Plaintiffs") respectfully submit this consolidated opposition to (1) the Motion to Dismiss the Third Party Complaint  submitted by Jamex LLC, Jamex Marketing, LLC ("JML"), Jamex Transfer Holdings, LLC ("JTH"), and Jamex Transfer Services, LLC ("JTS") [ECF No. 97, ("Jamex MTD")], and (2) the Motion to Dismiss the Third Party Complaint submitted by James Ballengee [ECF No. 99, ("Ballengee MTD")] (Ballengee, Jamex LLC, JML, JTH, and JTS, collectively, the "Third Party Defendants").  For the reasons set forth herein, the Third Party Defendants' Motions to Dismiss should be denied in their entirety.[1]

## PRELIMINARY STATEMENT

**Jurisdiction and Venue:**  The claims brought by the Third Party Plaintiffs against the Third Party Defendants (the "Third Party Claims"), which sound in contract, tort, and contribution, arise from the exact same facts as the first party claims ("ERC Claims" or "ERC Action") brought by Eddystone Rail Company, LLC ("ERC")[2] already before this Court:  the negotiation, performance, and alleged breach of a Rail Facilities Services Agreement ("RSA") governing the transloading of crude oil at a Pennsylvania facility ("Facility") and destined for transport to a Pennsylvania refinery, and the collusive settlement between ERC and █████ ████████████████████████████████████████████████████████████████ ████████████████████  Together, the ERC Claims and Third Party Claims present a single question:  was the RSA breached, and if so, which parties bear responsibility for the alleged breach?  ERC alleges that responsibility lies with the Third Party Plaintiffs.  The Third Party

---

[1] The two motions submitted by the Third Party Defendants span 58 pages and numerous arguments.  For efficiency, the Third Party Plaintiffs address all of the Third Party Defendants' arguments in one place.

[2] Capitalized terms not defined herein have the meaning ascribed to them in the Third Party Complaint.

Plaintiffs allege that ERC is entitled to no recovery, and that any liability to ERC lies with the Third Party Defendants.  The ERC Claims and Third Party Claims are two halves of a unified case.  The Third Party Defendants' (and ERC's) attempt to present this Court with only half the story is part of a collusive scheme cooked up between ERC ███████████████████████ █████████████████████████████████████.

Yet the Third Party Defendants, on the basis of *forum non conveniens*, ask this Court to keep half of this case in Pennsylvania, while sending the other half across the country to Texas. This Court should not reward the ████████████████ collusive conduct.  Instead, judicial efficiency, the convenience of the parties and witnesses, and Pennsylvania's significant interest in this Pennsylvania-centric litigation strongly weigh in favor of retaining the entirety of this case before this Court.  Any other outcome would needlessly burden the parties and the courts and risk conflicting decisions and obligations.

Certain of the Third Party Defendants also move to dismiss the Third Party Claims for lack of personal jurisdiction.  But each of the Third Party Defendants has extensive suit-related contacts with this forum and is subject to personal jurisdiction here.  The Third Party Defendants concede that JTS (formerly Bridger Transfer Services, LLC ("BTS"))—which negotiated and executed the RSA, performed under the RSA in Pennsylvania for several years, and allegedly breached the RSA in and after February 2016, allegedly causing harm to ERC in Pennsylvania—is subject to personal jurisdiction in this state.  And they concede that JML—which negotiated, executed, and performed its obligations under a crude oil supply agreement ("COSA") for the sale of crude oil to a Pennsylvania refinery—is also subject to personal jurisdiction here.  Yet the Third Party Defendants still insist that JTH, Ballengee, and Jamex LLC, which had similar and often identical contacts with Pennsylvania, fall outside this Court's jurisdiction.  They are wrong.

JTH expressly assumed all of JTS's obligations under the RSA, including obligations relating to the transloading of crude oil through ERC's Facility in Pennsylvania and the duty to make payments to ERC, if any, in Pennsylvania, and is subject to personal jurisdiction in Pennsylvania just like JTS.  Indeed, ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

Jamex LLC likewise has substantial suit-related contacts with Pennsylvania, including signing the COSA for shipment of crude oil through the Facility to a Pennsylvania customer and

████████████████████████████████████████████████████

██████████████████████████████ This Court has also held that personal jurisdiction exists as to defendants Julio Rios and Jeremy Gamboa—two individuals who were acting on behalf of Jamex LLC and related entities.  *See Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, Civ. A. No. 17-0495, 2017 WL 3072250 (E.D. Pa. July 19, 2017).  If personal jurisdiction exists over these individuals, then personal jurisdiction also exists over Jamex LLC.

Ballengee, likewise, had similar contacts with Pennsylvania to Rios and Gamboa, his former business partners.  And Rios and Gamboa made arguments similar to those made by Ballengee now in support of dismissal for lack of personal jurisdiction; this Court rejected those arguments once and should do the same here.  ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

And, ████████████████████████ entered into a collusive settlement with ERC █

████████████████████████████████████████████████████████████

██████████████████████, which ERC predictably filed in Pennsylvania.  That fact alone shows it was reasonably foreseeable that the Third Party Defendants would be haled into court here and are already contractually obligated to participate in this litigation.

**Legal Sufficiency of Pleadings:**  The Third Party Defendants also move to dismiss the Third Party Claims for failure to state a claim, but their arguments are baseless.  First, with respect to Count I for breach of the BTS PSA and Count II for breach of the Guarantee against JTH and JML, respectively, the Third Party Defendants dispute that the BTS PSA required JTH to assume obligations under the RSA.  This flatly contradicts the unambiguous language of the BTS PSA, which specifically mandates JTH's "assumption of Liabilities under the Eddystone Agreement [RSA]," including all "duties, responsibilities, commitments . . . [and] obligations." This is open to just one interpretation:  JTH "assum[ed]" all "duties" under the RSA, including the duty to make the payments to ERC that ERC is now seeking to recover from the Third Party Plaintiffs.  JTH's failure to fulfill those assumed duties, or to obtain a legal determination that no performance was due, was a breach of the BTS PSA for which JTH was required to indemnify the Third Party Plaintiffs.

With respect to Count III for tortious interference, Ballengee argues his wrongful conduct should be excused because it also benefitted certain other companies he controlled, in addition to himself.  But that does not change the fact that ████████████████████████████ ██████████████████████.  And as such, they suffice to state a claim for tortious interference.  Ballengee's arguments supporting dismissal of this claim, moreover, are inappropriately factual and cannot be decided on a motion to dismiss.

With respect to Count IV for contribution, the Third Party Defendants claim there is no allegation of joint tortious conduct, but that is incorrect:  ERC's alter ego claim, which forms the

basis of Count IV, incorporates tort elements of fraud.  And contribution is a wholly appropriate means to apportion liability among prior and subsequent parent entities of a subsidiary (here, JTS) that is alleged to have caused the plaintiff's injury.

The Third Party Defendants also make the factual argument that ERC's claims against the Third Party Plaintiffs arose *before* the closing date of the BTS PSA, and therefore the Third Party Defendants are not responsible for any breach of the RSA.  The Third Party Defendants are mistaken:  ERC seeks damages arising out of JTS's breach of the RSA, which ERC alleges occurred *after* the sale of BTS to JTH, when the deficiency payments allegedly due for February 2016 would have come due.

For these reasons, and for the additional reasons set forth herein, the Third Party Defendants' motion to dismiss the Third Party Claims should be rejected in its entirety.

## FACTUAL BACKGROUND[3]

### I.      BTS Enters into the RSA

The Third Party Claims arise out of an alleged breach of the RSA between ERC and BTS (subsequently renamed, and at the time of the breach, JTS), which occurred after Bridger Logistics sold BTS to Third Party Defendant JTH.[4]

In or around February 2013, BTS entered into the RSA with ERC.  At that time, BTS and Bridger Logistics were owned and controlled by Jamex, LLC (f/k/a Bridger, LLC).  Third Party Complaint ("TPC") ¶ 18; Ex. C.[5]  Under the RSA, ERC agreed to improve upon and thereafter

---

[3] Unless otherwise specified, these facts are drawn from the Third Party Plaintiffs' allegations in the Third Party Complaint, which must be accepted as true for the purposes of this motion to dismiss, and documents incorporated into the Third Party Complaint, of which this Court may take judicial notice.  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

[4] For clarity, Jamex Transfer Services LLC (f/k/a Bridger Transfer Services LLC) is referred to as "BTS" when it was owned by Bridger Logistics prior to its sale to JTH on February 1, 2016, and as "JTS" after the sale.

[5] References to "Ex." refer to exhibits attached to the Declaration of John C. Murphy ("Murphy Decl."), filed herewith.

operate a Facility in Eddystone, Pennsylvania, that would transfer crude oil from incoming rail cars to outgoing barges, for shipment down Pennsylvania waters. TPC ¶ 19. BTS, in turn, agreed to use the Facility for a period of five years and two months, by delivering for transloading a minimum volume of crude oil through the Facility every month, for which it would pay $2.25 per barrel. TPC ¶ 19. If BTS delivered less than the minimum volume in a given month, it was required to make a "deficiency payment" to ERC of $1.75 for every barrel less than the minimum volume. TPC ¶ 19. Pursuant to a crude oil supply agreement ("COSA") later executed by Jamex LLC on behalf of Jamex Marketing LLC ("JML," f/k/a Bridger Marketing LLC), crude oil procured by JML in North Dakota was transloaded at the Facility and sold to a refinery in Pennsylvania operated by Monroe Energy LLC ("Monroe"). ERC Compl. ¶¶ 24, 25; Ex. E. The COSA was amended on May 26, 2015. Ex. F.

As of November 20, 2013, Jamex, LLC owned all of the ownership equity interests in Bridger Logistics. TPC ¶ 22. Through a purchase and sale agreement dated May 29, 2015, Jamex, LLC sold Bridger Logistics and certain of its subsidiaries, including BTS, to Ferrellgas Partners, L.P. ("FGP"), effective June 24, 2015. TPC ¶ 23. For the next approximately seven months, through the end of January 2016, Bridger Logistics owned BTS, and BTS met all of its obligations under the RSA, including payment of all transloading fees and deficiency charges. TPC ¶ 24. During that period, JML continued to sell crude oil to Monroe and to use Bridger Logistics (including BTS) to transport the oil from North Dakota to Pennsylvania. TPC ¶ 24; ERC Compl. ¶¶ 26, 32, 36, 42. Then, effective February 1, 2016 (for purposes relevant to the claims at issue), Bridger Logistics sold BTS to JTH, a subsidiary of Jamex, LLC, essentially selling it back to its former owner. TPC ¶¶ 26, 27.

## II.     JTH and JML Assume Obligations Under the BTS PSA and Guarantee

Effective February 1, 2016 (for relevant purposes), Bridger Logistics and JTH entered into an agreement for the sale of BTS (the "BTS PSA") for good and valuable consideration. TPC ¶¶ 26, 27, 34; Ex. A.  The BTS PSA was signed by Ballengee, the manager of JTH.  TPC ¶ 33.  Through the BTS PSA, Bridger Logistics sold all ownership interests in BTS to JTH.  TPC ¶ 27.  Following the sale, BTS was renamed JTS.

As part of the deal, JTH assumed all liabilities to ERC under the RSA arising on and after February 1, 2016, through the remainder of the term of the RSA.  TPC ¶ 29.  Section 2.1(b) of the BTS PSA states in relevant part:

> At the Closing, Buyer [JTH] will accept such assignment and transfer of the Membership Interests from Seller [Bridger Logistics] on the terms and conditions set forth herein, *including the assumption of Liabilities under the Eddystone Agreement* [*i.e.*, the RSA] and the Contracts set forth on Schedule 4.4 for the periods on and after the Closing Date.

Ex. A § 2.1(b) (emphasis added).  "Liabilities" is elsewhere defined broadly as:

> any duties, responsibilities, commitments, expenses, obligations, or liability (including indebtedness) in all cases of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

Ex. A at 3.  Although the BTS PSA was executed on February 22, 2016, the Closing was effective "for accounting purposes (*including with respect to accruals incurred in the ordinary course of business under the Eddystone Agreement [RSA]*) as of 12:00 a.m., Dallas, Texas time, on February 1, 2016."  Ex. A § 2.1(a) (emphasis added). ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

Thus, Third Party Defendant JTH agreed to assume all duties, responsibilities, and obligations under the RSA—including all accruals due to ERC in the ordinary course of business on or after February 1, 2016, such as transloading fees and deficiency payments, which had accrued in the ordinary course and had always been paid as due during the life of the RSA prior to the sale. TPC ¶ 29. These deficiency payments, accruing on or after February 1, 2016, are exactly what ERC is suing for in the first party action. *See* ERC Compl. Prayer for Relief (seeking "[a]n award of all payments BTS owes to Eddystone under the RSA").

Bridger Logistics, for its part under the PSA, continued to be responsible for all "Retained Liabilities," defined in relevant part as any contract, obligation, or liability, including the Eddystone Agreement, "relating to any period before the Closing," *i.e.*, before February 1, 2016.[6] Ex. A at 5. JTH also agreed to indemnify Bridger Logistics and its "Affiliates"—*e.g.*, FG and FGP—for "any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by [JTH] pursuant to [the BTS PSA]." TPC ¶ 32; Ex. A § 8.2(b).

The BTS PSA further provided that Bridger Logistics would make a payment of $4.4 million to JTH in satisfaction of all fees accrued under the RSA during January 2016 (*i.e.*, pre-sale), which would then become due and owed to ERC after the February 1 Closing. TPC ¶ 30; Ex. A § 2.3(c). Bridger Logistics made this $4.4 million payment to JTH as promised, but JTH never paid that amount to ERC. TPC ¶¶ 31, 42.

On the same day as the execution of the BTS PSA, Bridger Logistics and Third Party Defendant JML entered into a Release and Guarantee Agreement ("Guarantee"), in which JML unconditionally guaranteed all obligations of JTH under the BTS PSA, including JTH's obligations under the RSA. TPC ¶ 35. Specifically, the Guarantee states in relevant part:

---

[6] "Retained Liabilities" also includes certain pre- and post-Closing Liabilities under certain Assigned Contracts not pertinent here.

> Jamex [JML] hereby absolutely, unconditionally, and irrevocably guarantees each and every obligation of Buyer [JTH], and the full and timely payment and prompt and complete performance of Buyer's obligations and liabilities, under the provisions of the [BTS PSA] (collectively, the "Guaranteed Obligations"). . . . The Guarantee is an absolute, unconditional, and continuing guarantee of the full and timely payment and performance of the Guaranteed Obligations, and not of collection.  Should [JTH] default in the payment of any of its payment obligations under the [BTS PSA], the corresponding Guaranteed Obligations hereunder shall become immediately due and payable by [JML] to Bridger [Logistics].

Ex. B § 4.1(a)-(b).  The Guarantee was signed by Ballengee as manager of JML.  TPC ¶ 38.

### III.    JTS Breaches the RSA, and JTH Fails to Assume Liability Thereunder

During the seven months in which Bridger Logistics (and indirectly, FG and FGP) owned BTS, between June 24, 2015 and February 1, 2016, BTS met all of its obligations under the RSA, including payment of all transloading fees and deficiency charges.  TPC ¶ 25.  BTS's performance during this time is conceded by ERC in the first party action.  ERC Compl. ¶ 34.  *After the sale of BTS to JTH*, however, ERC alleges that JTS (f/k/a BTS) immediately ceased performance of the RSA.  TPC ¶ 41; ERC Compl. ¶ 50.  After the sale, neither JTS nor JTH made any payments to ERC under the RSA.  TPC ¶ 41; ERC Compl. ¶ 50.  Similarly, although Bridger Logistics paid $4.4 million to JTH in fulfillment of all amounts owed by BTS to ERC for the month of January 2016 and expected that JTH would pay that amount to ERC, neither JTS nor JTH ever made that payment.  TPC ¶ 42.  Indeed, JTS and JTH, which had assumed all obligations under the RSA, each failed to perform any obligation alleged to be due under the RSA after February 1, 2016.  TPC ¶¶ 41, 42.

### IV.    ERC Brings an Arbitration Against JTS, and Ballengee Crafts a Collusive Settlement with ERC

Following JTS's alleged breach of the RSA, ERC commenced an arbitration ("Arbitration") against JTS before the Society of Maritime Arbitrators in New York.  TPC ¶ 43.  In the Arbitration, ERC sought payment of all alleged deficiency payments accruing from the

date of JTS's alleged breach—plus all future deficiency payments through the remainder of the term of the RSA, totaling approximately $144 million.  TPC ¶ 44. ██████████████████

████████████████████████████████████████████████████████

██████, entering into a collusive settlement ("Settlement") with ERC ████████████████

████████████████████████████████

Under the Settlement, JTS consented to the entry of a final arbitration award ("Final Award") of $139 million—████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ TPC ¶ 46.  JTS made no effort to present any defenses to liability and made no effort to minimize the amount of the final award.  TPC ¶¶ 48, 49, 51.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ TPC ¶ 51.

The Final Award, submitted by the parties to the Arbitration at ERC's behest and signed by Ballengee, reflects this collusive capitulation and states (without a proper adjudication) that JTS "materially breached and anticipatorily repudiated the [RSA]," that JTS "is liable to [ERC] for general damages resulting therefrom," that the "defenses and counterclaims asserted by JTS in the arbitration are without merit," and that JTS owes $139 million to ERC.  TPC ¶ 56.  Ex. H.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

_____

[7] ████████████████████████████████████████████████████

██████████████ TPC ¶ 51.  ERC then brought an action in the Southern District of New York ("SDNY") to confirm the award against JTS, in order to actually collect that amount not from JTS, but from the Third Party Plaintiffs.  TPC ¶ 57.  The Third Party Plaintiffs have been forced to move to intervene in that proceeding to protect their rights and prevent ERC from obtaining a federal court judgment arising from the collusive Settlement.  TPC ¶¶ 57, 58.

### V.     ERC's Lawsuit Against the Third Party Plaintiffs

Just before seeking confirmation of the Final Award in SDNY, ERC filed the present lawsuit in the Eastern District of Pennsylvania, to which these Third Party Claims relate, seeking the same $139 million awarded in the Arbitration and consented to by JTS in the collusive Settlement, or alternatively, all monies allegedly due and owing to ERC under the RSA from and after February 2016.  ERC Compl. ¶¶ 7, 9, 63, 64, Prayer for Relief ¶¶ 1, 2.  On a variety of legal theories, the ERC Complaint seeks to recover damages arising from JTS's alleged breach of the RSA after the Closing Date of the BTS PSA, and after JTH and JML expressly assumed liability, indemnification, and guarantee obligations for payments under the RSA.  TPC ¶ 61.  The ERC Complaint alleges that the Third Party Plaintiffs were alter egos of BTS and are liable for JTS's alleged breaches of the RSA.  ERC Compl. ¶¶ 52-61.  Those alleged breaches, however, occurred *after Bridger Logistics sold BTS to JTH*, at which time none of the Third Party Plaintiffs had any direct or indirect interest in BTS.  TPC ¶¶ 61, 62; ERC Compl. ¶ 50.  Instead, the alleged breaches occurred after ownership of JTH (and any resulting alter ego liability) was transferred to the Third Party Plaintiffs.  TPC ¶¶ 26, 27.

Notwithstanding the ERC Complaint and ERC's efforts to confirm the Final Award, JTH and JML have refused to honor their express contractual indemnification and guarantee obligations owed to the Third Party Plaintiffs.

11

The time frame for discovery in the underlying action demanded by ERC extends into 2011, four years before FGP acquired Bridger Logistics and BTS, during which time Jamex LLC and Ballengee owned and controlled the Bridger (Jamex) entities. *Plaintiff Eddystone Rail Company LLC's Motion to Compel* at 5, 15–17 [ECF No. 73]. Likewise, nearly all of the purported "alter ego" behavior identified by ERC occurred when BTS was owned and controlled by Ballengee and the Jamex entities, not by the Third Party Plaintiffs. ERC Compl. ¶¶ 19, 21, 27–36, 50–51; TPC ¶¶ 5–6, 18, 21–22, 27–28, 61–62, 107–108.

## ARGUMENT

Although the Third Party Claims and the ERC Claims arise from the same facts and represent two halves of the same controversy, the Third Party Defendants argue that half of this controversy should be tried in Texas, and half should be tried in Pennsylvania. This would be massively inefficient and unreasonable. Neither *forum non conveniens* nor personal jurisdiction provide any legal basis to dismiss the Third Party Claims from this Court.

The Third Party Defendants also argue that the Third Party Claims should be dismissed under Rule 12(b)(6) for failure to state a claim. These arguments, too, should be rejected. The plain language of the BTS PSA and Guarantee establish JTH's and JML's liability for breach of contract. The Third Party Defendants' arguments to the contrary twist the plain meaning of these contracts beyond all recognition and are unsupported by fact or law and are utterly implausible. And the Third Party Defendants' proffered reasons for dismissal of the tortious interference and contribution claims are inappropriately factual and similarly misguided.

## I.   *Forum Non Conveniens* **Does Not Mandate Dismissal**

The Third Party Defendants urge the Court to dismiss the entire Third Party Complaint on *forum non conveniens* grounds, based on a forum selection clause in the BTS PSA, which is

applicable to just one of the four Third Party Claims and just one of the four Third Party

Defendants.  This is a gross overreach.  As a preliminary matter, enforcement of the forum

selection clause in the BTS PSA is unreasonable in light of the unique circumstances presented

in this case, including the ████████████████████████████

████████████████████████, which precipitated this Pennsylvania litigation

against the Third Party Plaintiffs.  The inextricable relationship between the Third Party Claims

and the ERC Claims currently pending before this Court likewise compels that all related claims

should be heard here before a single court.

Even if the Court decides to enforce the BTS PSA's forum selection clause, only one of

the Third Party Plaintiffs' four claims (Count I for breach of the BTS PSA) arises under the BTS

PSA.  Similarly, only one of the Third Party Defendants (JTH) is a party to the BTS PSA.  None

of the other claims against any of the other Third Party Defendants (Count II for breach of the

Guarantee, Count III for tortious interference, and Count IV for contribution, against Jamex

LLC, JML, JTH, and Ballengee) are impacted at all by the forum selection clause in the BTS

PSA.

Finally, it is critically important for both the Third Party Claims and the ERC Claims to

be adjudicated by one court.  Each of the Third Party Claims arises from the same facts and

circumstances as the ERC Action already pending here.  The ERC Action, together with the

Counterclaims and Third Party Claims, form a single litigation designed to resolve a number of

identical issues.  The overriding public and private interests dictate that these interlocking claims

be heard together for the efficient resolution of the entire controversy.  Policy and equity also

militate against enabling the ██████████████████████████

████████████████████████, contrary to the express terms of their contractual

indemnification and guarantee obligations, while forcing the Third Party Plaintiffs to litigate the same case in two different forums.

### A. Enforcement of the BTS PSA's Mandatory Forum Selection Clause is Unreasonable

The Third Party Plaintiffs do not dispute that the BTS PSA contains a mandatory forum selection clause. This, however, does not end the inquiry. The forum selection clause may be disregarded where, as here, enforcement of the provision would be unreasonable because "extraordinary circumstances unrelated to the convenience of the parties," based on an assessment of public interest factors,[8] clearly disfavor dismissal or transfer. *Atl. Marine*, 134 S. Ct. at 579, 581–82; *Silvis v. Ambit Energy, L.P.*, 90 F. Supp. 3d 393, 397 (E.D. Pa. 2015) (declining to enforce mandatory forum selection clause due to exceptional circumstances, including Pennsylvania's strong interest in the case).

The Third Party Defendants did not initiate this litigation in Pennsylvania. They did not "flout[] [their] contractual obligations [by] fil[ing] suit in a different forum" than was required by the forum selection clause. *Atl. Marine*, 134 S. Ct. at 582. Instead, the Third Party Plaintiffs filed these Third Party Claims in Pennsylvania because they were sued here by ERC, as a direct result of ██████████████████████████████████████████████

██████████████████████████████████████████████

██████, the Third Party Defendants ask this Court to transfer the Third Party Claims—which arise from the exact same facts as the ERC Claims and in fairness should be heard together with them—to another court across the country. This is fundamentally inequitable, and a unique and

---

[8] The public interest factors include administrative difficulties stemming from increasingly overburdened courts, practical considerations that could make the trial easy, expeditious, or inexpensive, the local interest in deciding local controversies at home, the familiarity of the trial judge with the applicable state law in diversity cases, and the public policies of the fora. *Atl. Marine*, 134 S. Ct. at 581 n.6; *Silvis*, 90 F. Supp. 3d at 397 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995)); *Buckeye Pennsauken Terminal LLC v. Dominique Trading Corp.*, 150 F. Supp. 3d 501, 506 (E.D. Pa. 2015).

compelling basis to override JTH's request to enforce the forum selection clause in the BTS PSA.

The Third Party Defendants attempt to downplay the Third Party Claims as a "distraction" or "sideshow," Jamex MTD at 13, 22, in justifying transfer of these claims to Texas, but they are wrong.  The ERC Claims and the Third Party Claims are part of a single dispute, rooted in Pennsylvania.  The Third Party Action and the ERC Action seek to resolve the same issues:  the responsibility for any alleged breach of the RSA, the impact and enforceability of the collusive Settlement, and whether BTS operated as a mere alter ego of its parent entities, and if so, during what time.

Pennsylvania—not Texas—also has a far stronger interest in deciding this controversy. Each of the Third Party Claims arises in full or in part from the same Pennsylvania-based facts as the ERC Action.  The Third Party Claims, like the ERC Claims, arise from longstanding business relationships in Pennsylvania, in connection with the transport of crude oil by train to the transloading Facility in Pennsylvania and then along Pennsylvania waters for ultimate delivery to a customer in Pennsylvania.  This dispute is by no means a local Texas controversy.  *See SKF USA Inc. v. Okkerse*, 992 F. Supp. 2d 432, 441 (E.D. Pa. 2014) (noting that "Pennsylvania has an interest in protecting companies that conduct business within its borders.").

The public interest is further served by keeping all related proceedings consolidated before a single court that is already familiar with the litigation.  Dismissal of any part of the Third Party Complaint on *forum non conveniens* grounds would undermine principles of judicial efficiency and would further burden an already overburdened judiciary.  *See Target Glob. Logistics Servs., Co. v. KVG, LLC*, Civ. A. No. 15-4960, 2017 WL 1355371, at *5 (E.D. Pa. Apr. 12, 2017) (denying motion to dismiss for *forum non conveniens* so that the Eastern District of

Pennsylvania could retain jurisdiction over all related claims, including first party claims and

related counterclaims); *Eastcott v. McGraw-Hill Glob. Educ. Holdings, LLC*, Civ. A. No. 16-904,

2016 WL 3959076, at *3 (E.D. Pa. July 22, 2016) (declining to enforce forum selection clause

that covered only "a fraction of the claims in this case" and noting that "[j]udicial economy

heavily favors litigating all claims together."); *Jon Feingersh Photography, Inc. v. Pearson*

*Educ., Inc.*, 978 F. Supp. 2d 463, 467–68 (E.D. Pa. 2013) (declining to enforce certain forum

selection clauses that covered only some, but not all of the claims in the action, to avoid

piecemeal litigation).[9]  Parallel proceedings in different venues would also create a risk of

inconsistent rulings and discovery obligations upon the parties.  *See Bodor v. Horsham Clinic,*

*Inc.*, Civ. A. No. 94-7210, 1995 WL 424906, at *10 (E.D. Pa. July 19, 1995).

Finally, the Third Party Defendants argue that "a Texas court is best positioned to decide

the matters of Texas law that will control the outcome" of the Third Party Complaint.  Jamex

MTD at 12.  This argument, however, ignores the fact that the tortious interference and

contribution claims are governed by Pennsylvania law, not Texas law.  In any event, federal

courts routinely apply the law of other states with no difficulty, and this factor should carry no

weight.[10]  This Court is perfectly well-equipped to apply Texas contract law to the claims under

the BTS PSA and Guarantee.  For all of these reasons, enforcement of the BTS PSA's forum

selection clause is unreasonable under the circumstances, and dismissal of the Third Party

Claims on *forum non conveniens* grounds should be rejected.

---

[9] *See also Nova Ribbon Prod., Inc. v. Lincoln Ribbon, Inc.*, Civ. A. No. 89-4340, 1992 WL 392614, at *2–3 (E.D. Pa. Dec. 14, 1992) ("I would cheerfully send this case to be tried on the banks of the East River, and not on the Delaware, if redundant litigation would not result. . . . [I]t is unreasonable and a waste of this court's and both parties' resources to have identical evidence and witnesses presented in two forums.").

[10] *See, e.g., Atl. Marine*, 134 S. Ct. at 584 ("[F]ederal judges routinely apply the law of a State other than the State in which they sit.  We are not aware of any exceptionally arcane features of Texas contract law that are likely to defy comprehension by a federal judge sitting in [another state]."); *De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*, Civ. A. No. 00-2355, 2000 WL 1593978, at *2 (E.D. Pa. Oct. 25, 2000) (denying motion to transfer and noting that "federal judges routinely apply the law of various jurisdictions and basic contract law principles do not vary widely among the states.").

**B.  Count II for Breach of the Guarantee Is Not Subject to the Forum Selection Clause in the BTS PSA and May Be Heard in This District**

Even if the Court enforces the forum selection clause in the BTS PSA in connection with Count I for breach of the BTS PSA, that clause does not support dismissal of the remaining Third Party Claims.  While the BTS PSA contains a mandatory forum selection clause, the Guarantee contains a distinct *permissive* forum selection clause that allows for claims under the Guarantee to be heard in this District.  The Third Party Defendants do not dispute this.  Instead, they argue that a claim for breach of the Guarantee is "derivative of" Count I for breach of the BTS PSA. That is incorrect as a matter of law.

### 1.   *The Guarantee Contains a Permissive Forum Selection Clause*

For a forum selection clause to be considered mandatory, it must "clearly demonstrate the parties' intent to make that jurisdiction exclusive."  *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004).[11]  A permissive forum selection clause, in contrast, "authorizes venue in a designated forum but does not prohibit litigation elsewhere."  *In re Agresti*, Civ. A. No. 14-00126, 2014 WL 3408691, at *5 (Tex. App. May 29, 2014).  The Guarantee's forum selection clause does *not* mandate Texas as the *exclusive* jurisdiction for claims arising thereunder.  Instead, it states simply that the parties would submit to jurisdiction in Texas if either party commenced a case there:

> For any dispute that might arise hereunder, each Party hereby irrevocably submits to the jurisdiction of any state or federal court located within Dallas County in the State of Texas and irrevocably and unconditionally waives any objection to the laying of venue of any legal proceeding arising out [of] a dispute concerning this Agreement, and agrees not to plead or claim in any such court that any such proceeding brought in any such court has been brought in an inconvenient forum or that such Party is not subject to personal jurisdiction in such court.

Ex. B § 8(a).

---

[11] Questions of contract interpretation are governed by Texas law.  Ex. A § 10.12; Ex. B  § 8(a).

Notably, whereas the BTS PSA states that venue "shall be" in Dallas County, Texas, similar mandatory language is absent from the Guarantee. Courts routinely hold that clauses similar to that found in the Guarantee are permissive, not mandatory. *See, e.g.*, *Apollo Prop. Partners, LLC v. Diamond Houston I, L.P.*, Civ. A. No. 14-07-00528, 2008 WL 3017549, at *2 (Tex. App. Aug. 5, 2008) (holding that forum selection clause similar to that contained in the BTS PSA was permissive, not mandatory). The same result follows here: Count II for breach of the Guarantee against Third Party Defendant JML may be heard in this District and should not be dismissed.

### 2. *Count II (Breach of Guarantee) Is Not Derivative of Count I (Breach of BTS PSA)*

Notwithstanding the clearly permissive language in the Guarantee, the Third Party Defendants argue that Count II for breach of the Guarantee must be heard in Texas because it is "derivative of" the existence of a claim under the BTS PSA. Jamex MTD at 10. This is incorrect. A claim for breach of a guarantee stands on its own and does not depend on the existence of a claim for breach of the underlying contract.

A claim or demand against the principal debtor is *not* an element of a claim for breach of a guarantee. *See Chahadeh v. Jacinto Med. Grp., P.A.*, 519 S.W.3d 242, 249 (Tex. App. 2017). To the contrary, "no demand upon the principal debtor is necessary . . . , and the [b]reach of the principal's contract to pay the sum promised *ipso facto* imposes upon the guarantor a complete liability." *Universal Metals & Machinery, Inc. v. Bohart*, 539 S.W.2d 874, 878 (Tex. 1976); *see also Chahadeh*, 519 S.W.3d at 247 ("[A] guarantor of payment is primarily liable and waives any

requirement that the holder of the note take action against the maker as a condition precedent to his liability on the guaranty.").[12]

JML's liability under the Guarantee "is a separately enforceable obligation," *Chahadeh*, 519 S.W.3d at 248, and is not dependent on the Third Party Plaintiffs' underlying claim against JTH under the BTS PSA. Thus, while the Third Party Plaintiffs must allege and ultimately establish the facts upon which JML's liability under the Guarantee is based—*i.e.*, JTH's breach of the BTS PSA—the Third Party Plaintiffs are *not* required to actually pursue or establish a claim against JTH for breach of the BTS PSA before pursuing a claim against JML under the Guarantee. The plain language of the Guarantee itself confirms this:

> Should [JTH] default in the payment of any of its payment obligations under the [BTS PSA], the corresponding Guaranteed Obligations hereunder shall become immediately due and payable by [JML] to Bridger [Logistics].

Ex. B § 4(b). The Third Party Plaintiffs may therefore proceed against JML under the Guarantee regardless of whether JTH is a party to the same litigation and, indeed, regardless of whether JTH is even sued at all.

There is also no basis to read the BTS PSA's mandatory forum selection clause into the Guarantee, as the Third Party Defendants suggest.[13] Instead, the opposite is true: the Guarantee's forum selection clause is deliberately different from the BTS PSA's and indicates

---

[12] The cases upon which the Third Party Defendants rely in claiming that the claims under the Guarantee are "derivative" are inapposite. In those cases, the court found that a forum selection clause bound a non-signatory because the non-signatory had no independent basis for its claims other than the contract containing the clause. Here, however, the Guarantee provides an independent contractual basis for Count II, and is pled as such. None of the cases cited by the Third Party Defendants involved a separate contract with an independent and distinct forum selection clause such as that contained in the Guarantee. *See Stiles v. Bankers Healthcare Grp., Inc.*, 637 F. App'x 556, 557–58 (11th Cir. 2016) (wife's claims were governed by the forum selection clause in husband's loan agreement where claims were "predicated on" and had no independent basis other than husband's contract); *Magi XXI, Inc. v. Stato Della Citta Del Vaticano*, 818 F. Supp. 2d 597, 605–06 (E.D.N.Y. 2011) (non-signatory could enforce forum selection clause where claims against it were "completely derivative of" signatory's interests and conduct under contract).

[13] *Bancroft Life & Cas. ICC, Ltd. v. FFD Res. III, LLC*, Civ. A. No. 11-2382, 2012 WL 5032111, at *2 (S.D. Tex. Oct. 17, 2012) (declining to extend forum selection clause in one contract to actions brought under a separate contract); *Gullion v. JLG Serviceplus, Inc.*, Civ. A. No. 06-1015, 2007 WL 294174, at *7 (S.D. Tex. Jan. 29, 2007) (same).

that the parties *did not* intend for all disputes under the Guarantee to be heard exclusively in Texas.[14]  In any event, the BTS PSA's forum selection clause applies only to claims for breach of the BTS PSA itself—it does not cover claims under the Guarantee.  Ex. A § 10.12 ("venue for *any dispute hereunder* shall be in . . . Dallas County, Texas) (emphasis added).[15]  As a result, even if the Court dismisses Count I for breach of the BTS PSA based on the forum selection clause therein—and as discussed above, it should not—the Court need not and, indeed, should not dismiss the Guarantee claim from this District.

### C.  Counts III and IV for Tortious Interference and Contribution Are Not Dependent on or Derivative of the Breach of the BTS PSA Claim

The tortious interference claim against Ballengee (Count III) and the contribution claim against Jamex LLC, JTS, and Ballengee (Count IV) are likewise not subject to the BTS PSA's forum selection clause.  Ballengee, Jamex LLC, and JTS are not parties to the BTS PSA.  The BTS PSA's forum selection clause, therefore, is not a basis to dismiss any claim against these Third Party Defendants.[16]  Moreover, because the BTS PSA's forum selection clause applies only to claims for breach of that agreement, it does not govern the location of the Third Party

---

[14] *See, e.g., Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 916–17 (5th Cir. 2014) ("The language in Guarisco's agreement demonstrates that AmeriPlan knew how to draft a narrow forum selection clause, and its decision in later Sales Director Agreements to add far more extensive language establishing a full dispute resolution process must be given effect as creating something beyond that."); *In re Wilmer Cutler Pickering Hale & Dorr LLP*, Civ. A. No. 05-08-01395, 2008 WL 5413097, at *4 (Tex. App. Dec. 31, 2008) ("When parties use different language in different parts of a contract, we may ordinarily assume that they intended different things.").

[15] *Your Town Yellow Pages, L.L.C. v. Liberty Press, L.L.C.*, Civ. A. No. 09-0605-D, 2009 WL 3645094, at *4 (N.D. Tex. Nov. 2, 2009) ("[F]orum selection clause, by specifying that it applies to 'any dispute arising herefrom,' governs only claims arising under [contract] itself"); *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 700–02 (Tex. App. 2010) (forum-selection clause governing "[a]ll disputes hereunder" applies only if parties "are suing on rights or obligations that are created by" the contract).

[16] *Carlile Bankshares, Inc. v. Armstrong*, Nos. 02-14-00014-CV, 02-14-00018-CV, 2014 WL 3891658, at *7 (Tex. App. Aug. 7, 2014) (declining to enforce forum selection clause against non-signatories).

Plaintiffs' separate claims for tortious interference and contribution.[17]   Accordingly, those claims

may be properly heard in this District.

### D.  The Private Interest Factors Weigh Against Dismissal

The Third Party Defendants argue that "[e]ven if the Guarantee and other claims are not

'derivative' of the BTS PSA claim, the private interest factors under a full *forum non conveniens*

analysis are met."  Jamex MTD at 11.  To the contrary, a full assessment of the private interest

factors weighs heavily against dismissal of these claims.  The Third Party Defendants bear the

burden on this issue.  *Jumara*, 55 F.3d at 879.  And the Third Party Plaintiffs' choice of forum on

these counts is entitled to substantial weight and "should not be lightly disturbed."  *Steinmetz v.*

*McGraw-Hill Glob. Educ. Holdings, LLC*, 220 F. Supp. 3d 596, 600 (E.D. Pa. 2016) (citing

*Jumara*, 55 F.3d at 879).  There is no reason to disturb the Third Party Plaintiffs' utterly logical

decision to bring these claims in the Eastern District of Pennsylvania, ███████████████████

███████████████████████████████.

The facts underlying each Third Party Claim are based in this District.  The contribution

claim is unquestionably centered in Pennsylvania as it is contingent upon the outcome of ERC's

Claims in the ERC Action pending before this Court.  ERC seeks to hold the Third Party

Plaintiffs liable in a Pennsylvania court for damages allegedly incurred in Pennsylvania caused

by an alleged breach of a contract to be performed in Pennsylvania.  ERC Compl. ¶¶ 7, 50, 63.

The Third Party Plaintiffs now seek contribution from the Third Party Defendants to the extent

the Third Party Plaintiffs are found liable in the ERC Action.  TPC ¶¶ 106–08.  Similarly,

through Counts I-III, the Third Party Plaintiffs seek, through contract and tort theories, to hold

---

[17] *See Gullion*, 2007 WL 294174, at *7 (forum selection clause covering "action[s] commenced hereunder" was "not intended to govern disputes" based upon rights distinct from contract at issue); *RSR Corp.*, 309 S.W.3d at 700–02 (forum selection clause did not apply to claims premised upon rights and obligations other than contract in question); *see also Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652–53 (5th Cir. 2004) (insurer's contribution claim against co-insurer not covered by forum selection clause in co-insurer's contract with insured).

the Third Party Defendants responsible for whatever damages may be awarded to ERC. TPC

¶¶ 73–104. Indeed, it was the collusive Settlement between ERC ███████████

████████ that directly led to the initiation of these Pennsylvania proceedings.

The Third Party Defendants contend that the convenience of the parties and witnesses

supports dismissal of the Third Party Claims. To the contrary, it is inevitable that the Third Party

Defendants will be involved in this litigation in Pennsylvania regardless of whether the Third

Party Claims are reasserted in Texas. Ballengee and other Jamex personnel are integral

witnesses and have been named in every single one of the parties' initial disclosures in the first-

party action. Murphy Decl. ¶ 24. The Third Party Defendants, moreover, have not identified a

single witness who would actually be unwilling or unavailable to testify in this District.[18] If any

part of the Third Party Claims is dismissed here and commenced in Texas, the existence of

parallel proceedings would be decidedly *inconvenient* to all parties and witnesses (who would

each have to litigate and appear in both actions)—as well as to the two Courts hearing the same

facts and deciding overlapping issues of liability.[19]

The Third Party Defendants are perfectly capable of litigating and conducting other

business in Pennsylvania when it suits them. The Third Party Defendants have long conducted

business in Pennsylvania. ██████████████████████████████████

Among other things, JTS (f/k/a BTS) performed its obligations in Pennsylvania under the RSA

for years, when it was owned and controlled by Jamex LLC. ERC Compl. ¶ 34; TPC ¶¶ 41–42.

---

[18] *See Ferring B.V. v. Mylan Pharm. Inc.*, Civ. A. No. 13-5909, 2014 WL 4105987, at *4 (E.D. Pa. Aug. 21, 2014) (Kelly, J.) (denying motion to transfer where defendant did "not identif[y] a single witness who would be available in [transferee forum], but unavailable in the Eastern District of Pennsylvania"); *Osborne v. Norfolk S. Corp.*, Civ. A. No. 11-2258, 2011 WL 3047944, at *3 (E.D. Pa. July 25, 2011) (Kelly, J.) (noting that defendant bears "the burden of identifying witnesses who would be unavailable at trial" and that "[t]he consideration here is not simply whether the forum is inconvenient for the witnesses, but whether the witnesses would be 'unavailable' for trial.").

[19] Duplicative and piecemeal litigation of claims arising from the same facts is disfavored, and the prospect of such an outcome weighs heavily against dismissal. *See supra* Argument, Section I.A.

Then, JTH expressly assumed JTS's obligations owed under the RSA in Pennsylvania.  Ex. A §

2.1(b); TPC ¶ 29.  And JML guaranteed those same Pennsylvania obligations in the Guarantee.[20]

Ex. B § 4; TPC ¶¶ 35–36.

This Court, moreover, has already determined it is appropriate for this District to hear

claims against Rios and Gamboa (Ballengee's former business partners and former officers of the

Jamex entities), based upon their business contacts with Pennsylvania.  *See Eddystone,* 2017 WL

3072250, at *3–5.  This District is an equally appropriate forum to adjudicate claims against the

Jamex entities that Rios and Gamboa represented in connection with those Pennsylvania

contacts.

Any documents or other sources of proof relevant to this dispute can be equally produced

and accessed in Texas or Pennsylvania.[21]  Indeed, many, if not most, of the documents relevant to

the Third Party Claims have already been requested in the ERC Action, and many of the

witnesses relevant to the Third Party Claims will be deposed in the ERC Action.[22]  Given the

substantial factual overlap between the Third Party Claims and the ERC Action, this efficiency

weighs against dismissal.[23]

---

[20] JTS, moreover, a Texas-based firm with substantial operational overlap with JTH and JML, arbitrated a dispute with ERC in New York, which is even further from Texas than Pennsylvania.

[21] *See Fuentes v. AMC Entm't Holdings, Inc.*, Civ. A. No. 09-CV-5804, 2010 WL 1375555, at *3 (E.D. Pa. Apr. 5, 2010) (denying motion to transfer and finding this factor neutral because any relevant documents "could likely be electronically reproduced with minimal effort").

[22] Surely, if the actions are split, the witnesses deposed in one action may need to be deposed again in the other action, further burdening the witnesses and creating fodder for more discovery disputes.

[23] The Third Party Defendants make observations about venue in connection with their *forum non conveniens* argument, which are unavailing.  *See* Jamex MTD at 13; *see also Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 577–78 (2013) ("Whether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b) . . . .") *id.* at 579 ("[A] forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3).").  Notably, however, the Third Party Defendants do not move to dismiss the Third Party Complaint on the grounds that venue is improper under the federal venue statute and thus dismissal is not sought or proper on that basis.  And indeed, venue is unquestionably proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the [Third-party Claims] occurred" in this District, and under § 1391(b)(3), because the Third Party Defendants concede that JTS and JML are subject to personal jurisdiction here.  Venue is also proper under doctrine of ancillary venue, which permits courts "to hear

## II.       This Court Has Personal Jurisdiction Over Jamex LLC, JTH, and Ballengee

In addition to venue, Jamex LLC, JTH, and Ballengee challenge personal jurisdiction (while JTS and JML concede that personal jurisdiction exists over them).  Those defendants, however, have extensive suit-related contacts with this forum.[24]

In determining whether sufficient minimum contacts exist to justify the exercise of personal jurisdiction, a court must assess whether a defendant's contacts with the forum state are such that it "should reasonably anticipate being haled into court there."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  This analysis focuses on "the relationship among the defendant, the forum, and the litigation."  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984).  The Third Circuit applies a three-part test for specific jurisdiction.  *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).  First, the plaintiff must establish that the defendant "purposefully directed [its] activities" at the forum state.  *Id.*  Second, the litigation must "arise out of or relate to" the defendant's activity within the forum state.  *Id.*

After the plaintiff establishes the first two parts of the test, the defendant then bears the burden of demonstrating that the exercise of jurisdiction is unreasonable and does not "comport with 'fair play and substantial justice.'"  *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 320 (1945)).  "The existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  *O'Connor*, 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477).

---

claims as to which venue is technically lacking if those claims share a common nucleus of operative facts with claims as to which venue is proper."  *Holland v. Consol. Rail Corp.*, Civ. A. No. 98-CV-2694, 1998 WL 414722, at *2 (E.D. Pa. July 22, 1998).

[24] The Third Party Plaintiffs do not rely on general jurisdiction.

Once a defendant raises a jurisdictional defense, the plaintiff "must prov[e] by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).  When the district court does not hold an evidentiary hearing, "the plaintiff[s] need only establish a prima facie case of personal jurisdiction and the plaintiff[s][are] entitled to have [their] allegations taken as true and all factual disputes drawn in [their] favor." *O'Connor*, 496 F.3d at 316.  To meet this burden, the plaintiff must establish "with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).[25]

### A. JTH, Ballengee, and Jamex LLC Have Sufficient Minimum Contacts with Pennsylvania to Support Personal Jurisdiction

JTH, Ballengee, and Jamex LLC challenge personal jurisdiction in this District, but they each have extensive suit-related contacts with Pennsylvania and should have reasonably anticipated being "haled into court" here. *Burger King*, 471 U.S. at 476.  The core facts of the Third Party Complaint relate to (1) the performance and breach of the RSA, a contract between BTS and a Pennsylvania-based entity for the transloading of oil in Pennsylvania for ultimate shipment to a Pennsylvania refinery, and (2) the performance and breach of the BTS PSA and Guarantee, which required the assumption of obligations of the RSA.  Recognizing this, JTS and JML do not even attempt to challenge personal jurisdiction.

As set forth in detail below, *infra* Argument, Sections I.A.1–3, JTH, ████████

████████████████████████████████████████████████

---

[25] If the Court finds that the Third Party Plaintiffs have not yet met their burden of establishing personal jurisdiction at this juncture, the Third Party Plaintiffs respectfully request jurisdictional discovery regarding the Third Party Defendants in order to do so.  *Metcalfe*, 566 F.3d at 336; *accord Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues. . . . [and] if the plaintiff's claim is not clearly frivolous [as to the basis for personal jurisdiction], the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden.")

 ERC

Compl. ¶¶ 7, 9, p. 23 ¶ 2. ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ Their

argument that this Court lacks jurisdiction over them now is the height of hypocrisy.

Unsurprisingly, the Third Party Defendants cite to no case law with remotely similar facts in which personal jurisdiction was found wanting.  Instead, the cases relied upon by the Third Party Defendants involve defendants with far fewer contacts in Pennsylvania, who did not assume or interfere with liabilities or obligations to perform in Pennsylvania, and who only passively interacted with the forum.  *See, e.g.*, *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151–53 (3d Cir. 1996) (no personal jurisdiction where defendant never visited Pennsylvania, "no product was shipped from, through, or to Pennsylvania," and defendant's "only contacts" with Pennsylvania were "some telephone calls and letters"); *Element Fin. Corp. v. ComQi, Inc.*, 52 F. Supp. 3d 739, 747 (E.D. Pa. 2014) (no personal jurisdiction where there were "no extended or protracted contract negotiations or post-contract discussion, no visits to Pennsylvania, no performance of the contract in Pennsylvania, and no manifest intent by the parties to enter into a long-term business relationship."); *Bhd. of Locomotive En'gs & Trainmen v. United Transp. Union*, 413 F. Supp. 2d 410, 417–18 (E.D. Pa. 2005) (no minimum contacts where "none of the negotiations nor the execution of the [contract] occurred within

Pennsylvania" and only forum-related contact was that [contract] affected residents of states across the country, including Pennsylvania).[26]

### 1.   Ballengee Has Extensive Suit-Related Contacts with Pennsylvania

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████   This Court has already considered and decided the issue of personal jurisdiction in connection with a similar motion filed by Ballengee's former business partners, Rios and Gamboa, and held that personal jurisdiction was adequately alleged. *Eddystone*, 2017 WL 3072250, at \*3–5.  Upholding personal jurisdiction against Rios and Gamboa, this Court found that their "contacts with Pennsylvania were instrumental in both the formation of the [RSA] (which created a continuing relationship with [ERC] within Pennsylvania for [many] years) and the alleged scheme to get out of the agreement, both of which form the foundation of this case."  *Id.* at \*5; *id.* at \*3 n.8, 4.  The personal jurisdiction analysis with respect to Ballengee and the claim for contribution against him is the same.[27]

---

[26] The remaining cases relied upon by the Third Party Defendants are equally inapplicable.  *See, e.g.*, *Walden v. Fiore*, 134 S. Ct. 1115, 1124 (2014) (no minimum contacts with Nevada where *all* underlying facts took place in Georgia and plaintiff's residence was only connection to Nevada); *Saudi v. Acomarit Mars. Servs., S.A.*, 114 F. App'x 449, 453 (3d Cir. 2004) (no minimum contacts where claims "relate only to an accident which occurred in the Gulf of Mexico, not in Pennsylvania or its territorial waters"); *It's Intoxicating, Inc. v. Maritim Hotelgesellschft, mbH*, Civ. A. No. 3:11-2379, 2012 WL 3686784, at \*5 (M.D. Pa. Aug. 27, 2012) (plaintiff did not establish personal jurisdiction over defendant where it failed to "provide any information as to the nature and character of the [parties'] negotiations, the parties' course of dealings, or the terms of the contract."); *Junge v. Wheeling Island Gaming, Inc.*, Civ. A. No. 10-1033, 2010 WL 4537052, at \*4 (W.D. Pa. Nov. 2, 2010) (no personal jurisdiction in Pennsylvania over Pennsylvania plaintiff's slip-and-fall claim against casino operator where injury occurred at casino in West Virginia); *Rotondo Weinreich Enters., Inc. v. Rock City Mech., Inc.*, Civ. A. No. 04-5285, 2005 WL 119571, at \*4–5 (E.D. Pa. Jan. 19, 2005) (no personal jurisdiction where "parties did not intend to establish a common venture extending over a substantial period of time" and contract was for one-time project complete in under one year).

[27] Ballengee urges the Court to consider the *Calder* effects test set forth by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).  Ballengee MTD at 13–14.  This test, however, "need only be invoked when a district court finds that a defendant lacks sufficient minimum contacts under the traditional [specific personal jurisdiction] test," which is not the case here.  *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 629 (E.D. Pa. 2015).  In any event, Ballengee expressly aimed his tortious conduct at Pennsylvania.  By entering into the collusive Settlement and tortiously interfering with the BTS PSA and Guarantee, ████████████████████████████████ ███████████████████████████████████████  TPC ¶¶ 46, 50–54.  This is sufficient to establish

Ballengee was equally instrumental—if not more so—in the formation and implementation of the Pennsylvania-based business relationship at the core of these claims.  Just as this Court found that Rios and Gamboa's contacts with the forum were sufficient to establish personal jurisdiction over them, Ballengee's similar contacts subject him to personal jurisdiction here as well.  *See Eddystone*, 2017 WL 3072250, at *3–5.  ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ██████████████████

██████████████████████████████████████████████ Given

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

that he expressly aimed his conduct at Pennsylvania.  *See Vizant*, 97 F. Supp. 3d at 634 (finding personal jurisdiction over defendants under traditional and *Calder* effects tests where defendants "'expressly aimed' their allegedly tortious conduct at this forum by taking steps to interfere with the prospective and existing business relationships of a Pennsylvania-based business and its Pennsylvania-based CEO.").

[29] Ballengee submitted a declaration in support of his Motion to Dismiss, in which he claims that he has no significant contacts with Pennsylvania.  Declaration of James H. Ballengee in Support of Motion to Dismiss [ECF No. 99-2].  ██████████████████████████████████████████  Given Ballengee's apparent willingness to shift stories and say whatever he thinks will suit him in the moment, his credibility is clearly questionable, and his declaration should be afforded no weight prior to his deposition.

 *See,*

*e.g.*, *Leone v. Cataldo*, 574 F. Supp. 2d 471, 479 (E.D. Pa. 2008) (individual defendant subject to

personal jurisdiction in Pennsylvania where he visited counterparty once in Pennsylvania and

negotiated with Pennsylvania counterparty by telephone repeatedly); *Kontonotas v. Hygrosol*

*Pharm. Corp.*, Civ. A. No. 07-4989, 2009 WL 3245421, at *3 (E.D. Pa. Oct. 5, 2009) (fifty-

percent owner of company subject to personal jurisdiction in Pennsylvania based on travel to the

state).[30]

 To the extent that Ballengee argues these contacts cannot support a finding of minimum

contacts because he acted in his corporate, rather than personal, capacity, this Court has already

considered and rejected the same argument made by his business associates, Defendants Rios

and Gamboa, based on similar facts.  *Eddystone*, 2017 WL 3072250, at *5–6.

---

[30] Ballengee relies heavily upon *Surgical Laser Techs., Inc. v. C.R. Bard, Inc.*, 921 F. Supp. 281 (E.D. Pa. 1996), which he claims is "directly on point."  Ballengee MTD at 11.  In declining to exercise personal jurisdiction over an out-of-state defendant on the plaintiff's tortious interference claim, the court found that the defendant had "not directed any activity at Pennsylvania: no negotiation, no bargain, no benefit, no breach, no betrayal."  *Surgical Laser*, 921 F. Supp. at 284–85. ██████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ .

### 2. JTH Has Extensive Suit-Related Contacts with Pennsylvania

Just as Ballengee has sufficient suit-related minimum contacts to establish personal

jurisdiction over him in Pennsylvania, so too do the entities he owns and controls.  The Supreme

Court has explained that "with respect to interstate contractual obligations . . . , parties who reach

out beyond one state and create continuing relationships and obligations with citizens of another

state are subject to regulation and sanctions in the other State for the consequences of their

activities."  *Burger King*, 471 U.S. at 473.  JTH did exactly that.

JTH purposefully directed its activities at Pennsylvania by entering into the BTS PSA to

purchase JTS, an entity with operations in Pennsylvania, and expressly assuming JTS's

obligations under the RSA, *i.e.*, the transloading of crude oil through ERC's Pennsylvania

Facility.  TPC ¶ 29; Ex. A § 2.3(b) ("At the Closing, [JTH] will accept such assignment and

transfer of the Membership Interests from [Bridger Logistics] on the terms and conditions set

forth herein, *including the assumption of Liabilities under the Eddystone Agreement [RSA]* and

the Contracts set forth on Schedule 4.4 for periods on and after the Closing Date.") (emphasis

added); ████████████████████████████████████████

████████████████████████████████████  The BTS PSA also

provided that Bridger Logistics would pay JTH $4.4 million, which JTH in turn was to pay to

ERC in Pennsylvania, in satisfaction of all payments due under the RSA through February 1,

2016.  Ex. A § 2.1(c).

After the BTS PSA was executed, JTH allegedly caused JTS to breach the RSA,

defaulting on the alleged obligations owed to ERC in Pennsylvania, which it had assumed, and

purportedly causing harm to ERC in Pennsylvania.  TPC ¶ 41; ERC Compl. ¶ 50.  In addition,

JTH failed to pay to ERC the $4.4 million (paid by Bridger Logistics under the BTS PSA and

earmarked for ERC), causing further harm to ERC in Pennsylvania.  TPC ¶ 42.  And, most significantly, JTH declined to indemnify the Third Party Plaintiffs for the damages they have been sued for and losses they are incurring in Pennsylvania as a result of JTH's alleged breach. These contacts are more than sufficient to establish personal jurisdiction over JTH with respect to the claim it is sued on.[31]

### 3. Jamex LLC Has Extensive Suit-Related Contacts with Pennsylvania

Jamex LLC claims this Court lacks personal jurisdiction over it in respect to the claim for contribution because "[t]here is no allegation of jurisdiction over Jamex LLC in relation to the BTS PSA."  Jamex MTD at 18.  This argument misses the point.

First, the contribution claim is not based at all on the BTS PSA:  it is based on the allegations in the ERC Complaint against the Third Party Plaintiffs, which arise out of the negotiation, operation, and alleged breach of the RSA in Pennsylvania, and the ownership and control of BTS in relation to the RSA.  TPC ¶¶ 61, 106–08. This Court has already found such allegations sufficient for personal jurisdiction in this matter.  *Eddystone*, 2017 WL 3072250, at *3–5.

And second, Jamex LLC has its own extensive suit-related contacts with Pennsylvania. For example, Jamex LLC (f/k/a Bridger LLC) negotiated, executed, and performed the COSA and the Amended COSA, as the manager of Bridger Marketing, LLC (renamed JML).  Exs. E, F. Jamex LLC additionally signed a series of letter agreements in January 2016 further amending and supplementing the COSA.  Ex. G.  These contracts related to the sale of crude oil by JML to

---

[31]  *Burger King*, 471 U.S. at 476 (personal jurisdiction in Florida exists over contract claim against Michigan defendants where parties' agreement contemplated "continuing and wide-reaching contacts" between defendants and Florida plaintiff, and defendants failed "to make the contractually required payments in" Florida); *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 151 (3d Cir. 2001) (personal jurisdiction over foreign company exists where company deliberately assumed long-term obligations in the forum); *Mellon Bank*, 960 F.2d at 1223–24 (out-of-state defendants subject to personal jurisdiction in Pennsylvania where, "before, during, and after the dates" the relevant contracts were executed, defendants owed payments under contract in Pennsylvania, and parties had continuing relationship and obligations).

the Monroe refinery in Pennsylvania—the same oil that was transloaded from Pennsylvania

trains to Pennsylvania barges at ERC's Facility pursuant to the RSA—and figure prominently in

the ERC Action as well.  *See* ERC Compl. ¶ 25 (alleging that the COSA and RSA were

interconnected and "closely calibrated" to each other).  ████████████████████

████████████████████████████████████████████████

████████████████████████████

### 4. *The Alter Ego Allegations in the ERC Complaint Support Personal Jurisdiction over Jamex LLC and Ballengee*

The alter ego allegations in the ERC Complaint also suffice to establish personal

jurisdiction over Jamex LLC and Ballengee with respect to the contribution claim.  As Jamex

LLC and Ballengee recognize in their briefs, personal jurisdiction can be imputed through the

ownership of a company having contacts with Pennsylvania where the defendant is the

company's alter ego.  Jamex MTD at 20–21; Ballengee MTD at 15–16; *see also Atl. Pier*

*Assocs., LLC v. Boardakan Rest. Partners L.P.*, Civ. A. No. 08-4564, 2010 WL 3069607, at *3

(E.D. Pa. Aug. 2, 2010).

ERC alleges that Third Party Plaintiff Bridger Logistics is the alter ego of BTS, and the

Third Party Plaintiffs' contribution claim against Jamex LLC and Ballengee is expressly

conditioned upon those allegations.  ERC Compl. ¶¶ 53–61; TPC ¶ 107.  On an alter ego theory,

ERC seeks to hold the Third Party Plaintiffs liable for BTS's alleged breach of the RSA, which

occurred under the ownership of JTH, Jamex LLC, and Ballengee.  ERC Compl. ¶¶ 53–61.  *The*

*allegations supporting ERC's alter ego claim date back to the formation of BTS, when BTS was*

*under the control of Ballengee and Jamex LLC, and long before the Third Party Plaintiffs*

*entered the scene*.  ERC Compl. ¶¶ 5, 19, 27–32.  Jamex LLC and Ballengee also indirectly

owned BTS at the time that the RSA was negotiated and entered into, and for the majority of its

32

performance.  Thus, if any entities should be held liable as an alter ego of BTS, it should be the Third Party Defendants, not the Third Party Plaintiffs.  For this purpose, the Third Party Complaint incorporates ERC's alter ego allegations, and this Court has already held, over the Third Party Plaintiffs' objection, that those allegations suffice to plead alter ego liability and personal jurisdiction at this stage.  *Eddystone*, 2017 WL 3072250, at *6.

**5.  *The Collusive Settlement Supports Personal Jurisdiction over ███,
Ballengee,* ███████████**

The collusive Settlement, ████████████████████████████████████████, further supports the exercise of personal jurisdiction over ████ Ballengee, ████████████ in connection with the subject matter of the Settlement in Pennsylvania.  ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

███████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

██████████████████████████████

████████████████████████████████████████

██████████████████████████████████



—it was reasonably foreseeable, if not certain, that ████████████, and Ballengee would be "haled into court" in Pennsylvania.

**B. Exercising Personal Jurisdiction over JTH, Jamex LLC, and Ballengee is Reasonable and Consistent with Notions of Fair Play and Substantial Justice**

"The existence of minimum contacts makes jurisdiction presumptively constitutional." *O'Connor*, 496 F.3d at 324. The burden is on the Third Party Defendants to overcome this presumption of constitutionality, and they cannot do so. *See O'Connor*, 496 F.3d at 324. In analyzing this issue, the court may consider: (1) "the burden on the defendant;" (2) "the interest of the forum state in adjudicating the dispute;" (3) "the plaintiff's interest in obtaining convenient and effective relief;" (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies;" and (5) the "shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 476. Applying these factors, the exercise of personal jurisdiction over JTH, Jamex LLC, and Ballengee is plainly reasonable.

The Third Party Defendants contend it would be burdensome to force Jamex LLC, JTH, and Ballengee to litigate this dispute in Pennsylvania. These concerns are grossly exaggerated. ████████████████████████████████████. The Third Party Defendants' course of conduct also shows they have ample resources to transact and litigate outside of Texas. Indeed, each of the Third Party Defendants transacted extensively in Pennsylvania over the course of many years, including through the negotiation, execution, and

alleged breach of the RSA, which led to the breach of the BTS PSA.[32]  Moreover, "because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

Pennsylvania has a strong interest in adjudicating this dispute.  The RSA, a contract negotiated and performed in Pennsylvania, is at the center of all of the parties' claims.  And the Third Party Plaintiffs' interest in obtaining convenient and effective relief coincides with the judiciary's interest in obtaining the most efficient resolution of controversies.  The Third Party Claims are integrally related to the ERC Claims:  they arise out of the same facts and seek to apportion responsibility for the same liability.  This Court, moreover, is already familiar with the underlying facts of the parties' dispute.  Duplicative, piecemeal litigation would result if this Court declined to exercise personal jurisdiction over any of the Third Party Defendants and required those claims to be litigated elsewhere.  Such inefficiency is strongly disfavored and serves only to unnecessarily burden the parties and the courts.[33]

## III.   The Third Party Defendants' Rule 12(b)(6) Arguments Are Meritless

### A.  JTH Assumed Post-Sale Liabilities Under the RSA

The BTS PSA unambiguously required JTH to assume liability for JTS's obligations under the RSA.  Section 2.1 of the BTS PSA unequivocally states:  JTH "will accept such assignment and transfer of Membership Interests from [Bridger Logistics] on the terms and

---

[32] *See Gen. Elec.*, 270 F.3d at 152 (personal jurisdiction in Pennsylvania over German company is reasonable where company "actively over[saw] the performance of the contract in [Pennsylvania] for five years with no apparent difficulties in communication or travel.").

[33] *See, e.g., Pearson Educ.*, 978 F. Supp. 2d at 467–68 (piecemeal litigation of related claims "leads to [] wastefulness of time, energy and money"); *Nova Ribbon*, 1992 WL 392614, at *2–3 ("[I]t is unreasonable and a waste of this court's and both parties' resources to have identical evidence and witnesses presented in two forums.").

conditions set forth herein, *including the assumption of Liabilities under the Eddystone Agreement* [RSA] . . . for periods on and after the Closing Date." Ex. A § 2.1(b) (emphasis added). "Liabilities" is broadly defined as: "*duties, responsibilities, commitments, expenses, obligations*, or liability (including indebtedness) in all cases of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due." *Id.* at 3 (emphasis added). This language is crystal clear and open to just one interpretation: JTH was required to assume liability for the "obligations" of the RSA—including any failures to make minimum deliveries of crude oil to the Eddystone Facility, and to ensure deficiency payments for all deliveries not made. *See, e.g.*, *Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 566 (3d Cir. 1997) (language in contract at issue providing for assumption "of all of the liabilities and obligations" of the liquidating company was "clear and unambiguous").[34]

The Third Party Defendants' arguments to the contrary effectively re-write the text of Section 2.1(b) and twist the meaning of these words beyond all recognition. First, the Third Party Defendants argue that JTH could not have assumed obligations under the RSA because there was no formal assignment of the RSA to JTH. This argument is pure misdirection: the Third Party Plaintiffs do not allege an assignment of the RSA—they allege, instead, that JTH *assumed* liabilities thereunder per the plain language of the BTS PSA. BTS/JTS was required to perform its obligations under the RSA, if any, both before and after the execution of the BTS PSA. Through the BTS PSA, JTH simply promised that JTH, too, would assume those same obligations if JTS failed to perform them. There was no assignment—at all times, JTS remained contractually obligated to perform the RSA. Parties regularly assume contractual liabilities and

---

[34] ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

obligations in corporate transactions using the language of assumption found in the BTS PSA. *See, e.g.*, *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 309 (3d Cir. 1985) (express assumption of all pertinent liabilities, including performance of agreements, without assignment).

The Third Party Defendants next argue that the language regarding JTH's express "assumption of Liabilities under the Eddystone Agreement" is mere boilerplate relating to JTH's indemnification obligations. This argument is completely unsupported by fact or law, and contrary to the Jamex entities' contemporaneous understanding, as evidenced by the Jilla Email. Section 2.1(b) makes no reference to indemnification at all—instead, JTH's indemnification obligations are set forth in an entirely different section of the BTS PSA (Section 8.2). JTH, moreover, cites no case or other authority holding that such language is mere boilerplate and should not be enforced according to its plain meaning. Instead, it is a basic tenet of contract interpretation that courts "must read contractual provisions so none of the terms of the agreement are rendered meaningless or superfluous." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017).

The Third Circuit, interpreting a similar provision, squarely rejected the Third Party Defendants' argument that unambiguous language relating to the "assumption of liabilities" was intended merely to clarify the parties' indemnification obligations. In *Aluminum Company*, the Third Circuit interpreted a contractual provision that read:

> [Beazer], for itself, its successors and assigns, fully intending to become legally bound therefore, *does hereby assume all of the liabilities and obligations* of [ALT] of whatsoever nature, and does hereby agree to indemnify and hold harmless [ALT], its officers and directors, from and against all liability, loss, cost and damage . . . .

124 F.3d at 566. Beazer, seeking to avoid liability, argued that the assumption of liabilities related only to the indemnification obligations referenced later in the provision. The Third Circuit easily rejected this argument, reasoning: "Although the provision goes on to additionally

provide indemnification for liabilities arising out of liquidation, the compound nature of the provision in no way detracts from the clarity of the assumption of liabilities language." *Aluminum Co. of Am.*, 124 F.3d at 566.  The result is the same here.

The Third Party Defendants also cannot circumvent the plain language of Section 2.1(b) by summarily arguing that the plain reading of the terms negotiated by the parties is "implausible."  The Third Party Defendants argue that the Third Party Plaintiffs' interpretation of Section 2.1(b) is "implausible" because it resulted in an unprofitable business relationship for JTH.[35]  But on a motion to dismiss, arguments as to alleged implausibility are insufficient as a matter of law to overcome the plain meaning of unambiguous contract language.[36]

## B.  The BTS PSA Contemplates Performance of Obligations Under the RSA

The Third Party Defendants appear to argue that because the word "perform" is not used in the RSA, JTH had no duty to ensure performance under the RSA by JTS or assume such obligations itself.  This is nonsensical and incompatible with the contract.  The obligation to ensure performance under the RSA is plainly required by JTH's assumption of any and all "Liabilities"—a term that explicitly is defined to include "duties," "responsibilities," "commitments," and "obligations" "in all cases of any kind or nature."  A "duty" is "[a] legal obligation that is owed or due to another . . . which one is bound to *do*"—*i.e.*, to perform. *Black's Law Dictionary* (10th ed. 2014) (emphasis added).  An "obligation," likewise, is "a duty

---

[35] Third Party Plaintiffs have adequately alleged that there was good and legally sufficient consideration to support the BTS PSA.  TPC ¶¶ 34–35, 37. ████████████████████████████████████
████████████████████████████████████████████████████████████████

[36] *See, e.g., Aegis Sec. Ins. Co. v. Kingsway Fin. Servs., Inc.*, No. 1:16-CV-1555, 2017 WL 4015659, at *5 (M.D. Pa. May 2, 2017) (rejecting defendant's argument that plaintiff's reading of plain language of contract was "implausible" based on defendant's purported explanation of the parties' mutual intent and noting that consideration of such arguments was inappropriate on a motion to dismiss).

*to do* or not do something." *Id.*  These words are not passive.  JTH assumed obligations and duties under the RSA; its myopic arguments based on the word "performance" are plainly wrong.

In addition, Bridger Logistics waived non-compete rights with respect to the Third Party Defendants and their affiliates, in clear contemplation of JTS's and/or JTH's performance of the RSA.  Section 2.3(e), for example, specifically references "*Buyer's* [JTH's] performance under the Eddystone Agreement" or the "performance of . . . *Buyer's* [JTH's] obligations under the Eddystone Agreement" no less than three times.  Ex. A § 2.3(e) (emphases added).  The Third Party Defendants argue that the non-compete contains no actual promise by JTH to carry on performance under the RSA, and that the non-compete does not imply an obligation to perform.  But if the parties did not contemplate JTH's *performance* under the RSA, then there would have been no need for the waiver of the non-compete to run to *JTH*, as opposed to JTS.  The very existence of the non-compete indicates that the parties contemplated that JTH would ensure, or handle itself, actual *performance* of all obligations under the RSA.

Even if JTH had not assumed obligations to ensure performance of obligations under the RSA—and it unquestionably did—it would still be required to indemnify the Third Party Defendants for JTS's non-performance.  JTH was obligated to "assume"—*i.e.*, to take on for itself—all "Liabilities," including "indebtedness," under the RSA.  *Black's Law Dictionary* (10th ed. 2014).  And JTH was also required to indemnify Bridger Logistics for "any breach of non-fulfillment of any covenant, agreement or obligation to be performed by [JTH] pursuant to [the BTS PSA]."  Ex. A § 8.2(b).  JML further guaranteed this.  Ex. B.  To the extent JTS owed deficiency payments or other monies to ERC, that was unquestionably a "Liability" that JTH agreed to assume.  The "Liabilities" under the RSA, if any, will be determined by the

proceedings in this action.  JTH and/or JML should be required to pay all such Liabilities,

because they assumed them under the BTS PSA and Guarantee.

### C.  JTH and JML Must Indemnify the Third Party Plaintiffs for ERC's Claims Stemming from JTS's Breach of the RSA

The Third Party Defendants next argue that the indemnification claim should be

dismissed because ERC does not assert a claim for breach of the RSA against the Third Party

Plaintiffs.  Jamex MTD at 30.  This is a gross distortion of the substance of the ERC Complaint.

Although the ERC Complaint does not contain a claim labeled as a "breach of contract," ERC

expressly seeks damages arising from the alleged breach of the RSA.  ERC Compl. ¶¶ 50–51; *id.*

at 23.  Specifically, ERC alleges that after BTS was sold to JTH, "BTS refused to make any more

payments under the RSA, claiming the RSA was void ab initio" and that "[i]n response, [ERC]

filed a demand for arbitration . . . [based on] BTS's *anticipatory breach of contract*."  *Id.* ¶¶ 50–

51 (emphasis added).  By way of its first party Complaint, ERC now seeks to hold the Third

Party Plaintiffs liable for damages resulting from this alleged breach.  *Id.* ¶¶ 50–51; *id.* at 23.

Indeed, ERC and the Third Party Plaintiffs are actively litigating the very questions of whether

BTS/JTS breached the RSA, whether there were defenses justifying such a breach, whether it

was entitled to rescind the RSA, and the amount of any damages, in the ERC Action.[37]  Hundreds

of pages of briefing now pending before the Court address the issue of whether the Third Party

Plaintiffs can assert such claims and defenses on behalf of BTS.  [ECF Nos. 83, 110, 113.]

The Third Party Defendants also argue that they are not required to indemnify the Third

Party Plaintiffs because—so they claim—the conduct for which ERC seeks damages occurred

---

[37] ERC has alleged that after the sale of BTS to JTH, JTS stopped making payments under the RSA, in breach of its terms, causing ERC to incur damages.  ERC Compl. ¶¶ 50–51.  Third Party Plaintiffs have responded with counterclaims alleging, among other things, that the state of the Facility breached the RSA and that ERC breached the implied covenant of good faith and fair dealing by refusing to agree to an industry-standard financing agreement, causing damages to the BTS (and, derivatively, Third Party Plaintiffs) and entitling it to rescind the RSA.  FG Counterclaims ¶¶ 167–183 [ECF No. 77].  ERC has filed a motion to dismiss these counterclaims, which is pending before the Court, and briefing on this motion raises these crucial issues.  [ECF No. 83.]

before the Closing.  Resolution of factual disputes like this is inappropriate on a motion to

dismiss.  Jamex MTD 31–32; *see Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 n.8 (3d Cir. 2015)

(district court properly rejected defendants' efforts to introduce additional factual background

into briefing on motion to dismiss).  Instead, this Court must accept as true all factual allegations

in the Third Party Complaint and draw all inferences from the facts alleged in the light most

favorable to the Third Party Plaintiffs.  *Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, Civ. A. No.

12-1922, 2014 WL 1725041, at *2 (E.D. Pa. Apr. 30, 2014).  Under that standard (and indeed,

under any standard) the Third Party Plaintiffs have adequately pled that the breach occurred after

the effective date of the transfer and that JTH and JML were required to indemnify them for

ERC's claims relating to the alleged breach of the RSA.

The Third Party Defendants' improper factual argument is also incorrect.  The closing

date of the BTS PSA for amounts accrued under the RSA is February 1, 2016.  Ex. A § 2.1(a).

Although the execution and exchange of transaction documents took place on February 22, 2016,

the BTS PSA is clear that for accounting purposes, including accruals under the RSA for which

JTH was required to indemnify the Third Party Plaintiffs, liabilities under the RSA are

apportioned as of *February 1, 2016.  Id.*[38]  The difference between February 1 and February 22 is

also immaterial because BTS never breached under FGP ownership— Bridger Logistics paid the

amounts due in February for January charges, and no anticipatory breach for future months

occurred under the Third Party Plaintiffs' ownership—it occurred, if ever, under Third Party

Defendants' ownership.  Thus, any alleged breach of the RSA, for which ERC now seeks

---

[38] This plain language interpretation of the BTS PSA is also supported by the $4.4 million payment made
by Bridger Logistics to JTH for payment of deficiency payments owed for January, when Bridger Logistics'
apportioned liability under the RSA ended.  *See supra*, Argument, Section II.A.2., *see also* TPC ¶¶ 30–31, 42.

damages, occurred after that date.[39]  ERC Compl. ¶¶ 50–51, *id.* at 23.  Indeed, the entire

Arbitration occurred under the understanding that JTS—not BTS—breached the RSA.  No party

to the Arbitration sought to include any of the Third Party Plaintiffs as real parties in interest in

the Arbitration or argued that any breach of the RSA was caused by BTS before the sale.

The Third Party Defendants also suggest that the relevant "conduct" causing harm to

ERC was the Third Party Plaintiffs' alleged pre-Closing "domination" of BTS underlying the

asserted alter ego liability.  *But such domination, if it occurred, caused no harm to ERC because,*

*as ERC admits, it was fully paid on the RSA prior to the sale of BTS.  Id.* ¶ 34.  Both the ERC

Complaint and the Third Party Complaint are replete with allegations that all required payments

had been made to ERC under the RSA as of the sale to JTH (*i.e.*, for volumes owed through

January 2016) and that the RSA was not breached until JTH purchased BTS and assumed the

obligations under the RSA.  *Id.* ¶¶ 34, 50–51, *id.* at 23; TPC ¶¶ 25, 31, 41–42.  Instead, ERC

alleges it was first harmed by BTS's breach of the RSA in and after February 2016—the very

thing JTH and JML promised the Third Party Plaintiffs they would not do.  ERC Compl. ¶¶ 50–

51, *id.* at 23.  And that breach, as well as ERC's Claims for breach of fiduciary duties and

fraudulent transfer premised on that breach, occurred squarely under JTH's ownership.  *Id.*

---

[39] Even if February 22, 2016 is the correct date for accounting purposes, which Third Party Plaintiffs do not concede, deficiency payments for February 2016 would not have come due under the terms of the RSA until March 20, 2016, and thus any failure to make those payments would still have been JTH's responsibility.  See Ex. C (RSA) § 5.3 ("Payment shall be made on the 20th of the Month immediately following the Month for which Charges are payable or ten (10) days after invoicing whichever is later.").  A breach of the RSA, if there was one, started under JTH's ownership of JTS and reflects February accruals due in March 2016.

Further, even if BTS somehow breached the RSA while under the ownership of the Third Party Plaintiffs (and it did not), the Third Party Plaintiffs could only be liable, at most, for failing to make payments to ERC that accrued before the sale—*i.e.*, before February 1, 2016 (or at worst, February 22, 2016).  Having then sold BTS to JTH, any further anticipatory breach of the RSA, and any further resulting damages, would have arisen under JTH's ownership.  Damages are an essential element of each of ERC's claims, and the overwhelming majority—if not all—of specific damages alleged by ERC did not accrue on any of its claims against the Third Party Plaintiffs until JTS breached the RSA under JTH's ownership.

ERC's claims for breach of fiduciary duty and fraudulent transfer thus did not accrue until BTS was under the control of the Third Party Defendants, after the closing of the BTS PSA. Damages is an essential element of a claim for breach of fiduciary duty, *First United Pentacostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017), and ERC incurred no damages at all until *after* BTS was sold to JTH, and JTS allegedly breached the RSA. The same is true for ERC's fraudulent transfer claim:  regardless of when any transfer occurred, damages to ERC did not accrue until *after* the closing of the BTS PSA and subsequent alleged breach of the RSA.

### D. The Third Party Complaint States a Tortious Interference Claim Against Ballengee

Ballengee argues that the tortious interference claim should be dismissed because his actions benefitted entities other than himself.  But "where it has been alleged that the agent has been acting in furtherance of personal objectives, the existence of the agent's privilege turns upon a *question of substantive fact*" and is not amenable to a disposition on a motion to dismiss.[40]  *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 554 (5th Cir. 1981) (emphasis added). As a result, courts will deny a motion to dismiss where a complaint sets forth the elements of a claim for tortious interference and alleges that the defendant acted in furtherance of his personal interests, even if that defendant was a corporate agent.  *See, e.g.*, *Lexxus Intern. Inc. v. Loghry*, 512 F. Supp. 2d 647, 670 (N.D. Tex. 2007); *North Texas Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*, 107 F. Supp. 3d 620, 636 (N.D. Tex. 2015).

---

[40] The Third Party Defendants' assertion that this cause of action should be dismissed because the Complaint does not allege that Jamex parties complained about Ballengee's actions is also unavailing.  Again, this is an inappropriate factual argument at the pleadings stage.  The opinion cited for this proposition arose in connection with a motion for summary judgment, *i.e.* after discovery had taken place, not a motion to dismiss, where Third Party Plaintiffs have not had the benefit of discovery into the communications and deliberations of the Jamex entities.  *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455 (Tex. 1998).  The Third Party Plaintiffs have stated a prima facie case of tortious interference with contract, and have alleged at length ██████████████

Here, the Third Party Plaintiffs allege that Ballengee tortiously interfered with JTH's and JML's express obligations under the BTS PSA and Guarantee to assume liabilities under the RSA after February 1, 2016 and to indemnify Third Party Plaintiffs for all such liabilities.[41]  Ex. A §§ 2.1(b), 8.2(b).  In violation of the express provisions of the BTS PSA and Guarantee, JTS neither performed its transloading obligations under the RSA nor made any required deficiency payments, if any, to ERC.  TPC ¶¶ 27–39, 41–42.  When ERC initiated the Arbitration against JTS, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶¶ 45–56.  The Third Party Defendants' attempt to inject contrary and irrelevant factual arguments is inappropriate at this stage of the proceedings.

In arguing for dismissal of the tortious interference claim, Ballengee relies heavily on *Holloway v. Skinner*, 898 S.W.2d 793 (Tex. 1995).  That reliance is misplaced.  In *Holloway*, the court observed that "an officer or director [of a corporation] may not be held liable in damages for inducing the corporation to violate a contractual obligation, provided that the officer or director *acts in good faith* and believes that what he does is for the best interest of the corporation."  898 S.W.2d 793 (Tex. 1995) (emphasis added); *see also Kingston v. Helm*, 82 S.W.3d 755, 763 (Tex. Ct. App. 2002).  Ballengee's collusive Settlement, which compelled breaches of the BTS PSA and Guarantee, falls well outside the boundaries of good faith.

---

[41] *See supra*, Argument, Section III.C.

As an initial matter, JTH and JML failed to perform (or to cause JTS to perform) the obligations under the RSA, in direct violation of JTH's assumption of those liabilities in the BTS PSA.  Ex. A § 2.1(b).  ████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████.  The effect of this bad faith maneuver was the breach of JTH's assumption of liabilities under the RSA in the BTS PSA and Guarantee and ERC's pursuit of claims against the Third Party Plaintiffs.  *Id.*  Such a settlement, ████████████████████████

████████████████████████████████████████

██████ can be accurately characterized as a "sham" that "perpetrates a fraud."  *See State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 712-13 (Tex. 1996).

Ballengee claims that the Settlement "benefited not only [Ballengee] himself, but also Jamex Marketing and Jamex Transfer Holdings, as well as other corporate entities . . . ." Ballengee MTD at 20.  That is of no significance.  As Ballengee himself acknowledges, when a corporate act is alleged as the basis of a tortious interference claim, "the plaintiff must show that the defendant acted in a fashion so *contrary to the corporation's best interests* that his actions could only have been motivated personal interests."  *Holloway*, 898 S.W.2d at 796 (emphasis added).  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████  Ballengee also relies on the familiar rule that a party cannot interfere with its own contract.  *Id.*  But JTS, unlike other entities controlled by Ballengee, was not a party to the BTS PSA or Guarantee.  This rule, too, does not bar the tortious interference claim.

Ballengee, in essence, argues █████████████████████████████████████████████ ███████████████████████████████████.  Yet none of the cases cited by Ballengee arose in the context of a corporate agent who controlled multiple companies, and who, like Ballengee, ███████████████████████████████ ████████████  This presents complex factual questions that cannot be resolved on a motion to dismiss, relating to ████████████████████████████████████ *Lin v. Rohm & Haas Co.*, 865 F. Supp. 2d 649, 670 (E.D. Pa. 2012).  The motion to dismiss this cause of action should be denied, and Third Party Plaintiffs should be afforded the opportunity to conduct discovery into these issues.

### E.  The Third Party Plaintiffs Have Stated a Claim Against the Third Party Defendants for Contribution

The Third Party Plaintiffs' claim for contribution against Jamex LLC and Ballengee is based on the allegations and claims in the ERC Complaint, and the Third Party Defendants have incorporated those allegations on a contingent basis.  TPC ¶¶ 59–64.  This Court has already held that ERC's complaint "clearly and adequately alleges claims against each Defendant for Alter Ego."  *Eddystone*, 2017 WL 3072250, at *6.  The result should be no different for the Third Party Plaintiffs' contribution claim premised on the ERC Complaint for periods during which Jamex LLC and Ballengee owned and/or controlled BTS.  TPC ¶¶ 59–64; ERC Compl. ¶¶ 2–3, 5, 7–10, 19–36, 50–51.

Contribution here is available based on the Ballengee's and Jamex LLC's prior or subsequent ownership of an entity—BTS/JTS—that allegedly caused injury to ERC.  *See, e.g.*, *Pennenvironment & Sierra Club v. PPG Indus., Inc.*, No. 12-342, 2016 WL 3197961, at *10 (W.D. Pa. June 9, 2016).  The ERC Complaint relates to actions purportedly taken by BTS between early 2013 and February 2016 (though ERC has demanded extensive discovery dating back to 2011) and seeks to hold the Third Party Plaintiffs liable for BTS's conduct in part based on the Third Party Plaintiffs' direct or indirect ownership of BTS.[42]  ERC Compl. ¶¶ 2–3, 5, 7–10, 19–36, 50–51.  But before June 24, 2015, Jamex LLC and Ballengee owned and controlled both Bridger Logistics and BTS, and after the sale to JTH, *none of the Third Party Plaintiffs controlled BTS*, either directly or indirectly.  Instead, at those times, BTS was owned and/or controlled by Jamex LLC and Ballengee, not the Third Party Plaintiffs.[43]  TPC ¶¶ 60–62.  The ERC Complaint is replete with allegations describing actions purportedly taken by BTS when BTS was owned and/or controlled by Jamex LLC and Ballengee.  ERC Compl. ¶¶ 2–3, 5, 7–10, 19–36, 50–51.  If the Third Party Plaintiffs are held liable to ERC, then Jamex LLC and Ballengee should be held liable to the Third Party Plaintiffs for contribution for all damages that

---

[42] In footnote 35 of the Jamex MTD, the Third Party Defendants suggest, incorrectly, that any contribution claim for the period before June 24, 2015 was released, citing Exhibit F to the Jamex MTD.  First, any consideration of the document relied on is premature, as it is extrinsic to the complaint and mentioned only to mark the date Bridger Logistics was sold to Ferrellgas.  *See* TPC ¶ 24.  As such it can only be raised by way of an affirmative defense and dealt with at summary judgment or trial.  Second, even if the Court chose to consider the cited release now, it plainly extends only to claims arising out of or relating to the 2015 purchase agreement itself, not potential third party claims arising out of the manner in which the Third Party Defendants operated Bridger Logistics and its subsidiaries before the sale.  Indeed, the release omits the far broader language found in the release extended to Bridger Logistics and Ferrellgas in the very same document (in paragraph 1(a)), which releases all claims with respect to the business being sold.  Finally, in a passage from the document omitted by the Third Party Defendants, the release carves out claims "relating to matters to the extent occurring following the closing" and, as noted earlier, the Third Party Plaintiffs' contribution claim did not accrue or arise until the Third Party Plaintiffs were sued by ERC in 2017.

[43] ERC also moved this Court demanding documents from time periods prior to 2012, arguing that they were vital to ERC's claims in the ERC Action.  *Plaintiff Eddystone Rail Company LLC's Motion to Compel* at 13 [ECF No. 73] ("[ERC] is entitled to explore BTS's alter ego status . . . even back to BTS's 2011 formation.").

occurred while BTS was under the control of one or more of the Third Party Defendants.  TPC ¶¶ 60–62; ERC Compl. ¶¶ 2–3, 5, 7–10, 19–36, 50–51.

### 1.   The Contingent Contribution Claim Meets Rule 8 Pleading Standards

The Third Party Defendants' argument that the contribution claim fails Rule 8(a) pleading standards is meritless.  Jamex MTD 34.  Rule 8 requires a plaintiff to provide a "short and plain statement of the claim showing that the pleader is entitled to relief . . . and a demand for the relief sought."  Fed. R. Civ. P. 8(a).  Under Rule 8(a), a party may plead "statements of a claim or defense alternatively or hypothetically" and "may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(2), (3).

It is well-established that a third party plaintiff sufficiently states a contingent claim for contribution by asserting that *if* it is held liable to the plaintiff, then the third party defendant is also liable to the third party plaintiff.[44]  This is exactly what the Third Party Plaintiffs have done.  No more is required.

By incorporating by reference the allegations in the ERC Complaint, the Third Party Complaint provides additional detail regarding the nature of its contribution claim.  TPC ¶¶ 4, 7, 59–64, 107–08.  Rule 10 provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."  Fed. R. Civ. P. 10(c).  To satisfy Rule 10, a party must only incorporate the pleading "with a degree of clarity which enables the responding party to ascertain the nature and extent of the incorporation" of the

---

[44] *See Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. CIV.A. 12-1922, 2014 WL 1725041, at *5 (E.D. Pa. Apr. 30, 2014) (third party plaintiffs "simply bringing a contribution claim in case they are found guilty by a jury" sufficiently stated claim for contribution) (denying motion to dismiss); *Tulpehocken Spring Water, Inc. v. Obrist Americas, Inc.*, No. 4:09-CV-2189, 2010 WL 5093101, at *5 (M.D. Pa. Dec. 8, 2010) (denying motion to dismiss where plaintiff adequately pled contingent contribution claim if plaintiff was found to be liable).  The decisions cited by the Third Party Defendants on this point are inapposite because the third party plaintiffs in those instances were not pleading contribution as a contingent claim in the alternative and thus did not, as here, assert any contingent liability.  *See Nat'l Specialty Ins. Co. v. Tunkhannock Auto Mart, Inc.*, No. 3:16-CV-00268, 2017 WL 661475, at *5 (M.D. Pa. Feb. 17, 2017); *Bank v. City of Phila.*, 991 F. Supp. 2d 523, 538, 538 n.26 (E.D. Pa. 2014).

referenced complaint. *Cooper v. Nationwide Mut. Ins. Co.*, No. CIV.A. 02-2138, 2002 WL 31478874, at *5 (E.D. Pa. Nov. 7, 2002); *see also Operadora Maritima de Graneles v. Gamesa Wind U.S., LLC*, 989 F. Supp. 2d 445, 449 (E.D. Pa. 2013)  (brief description of actions taken by third party plaintiffs to constitute joint tortfeasor status and references to underlying plaintiff's complaint sufficient to state claim for contribution).  This standard is more than met here.

The Third Party Complaint, in numerous paragraphs, explicitly references the ERC Complaint and the basis of the Third Party Plaintiffs' alleged liability, for which the Third Party Plaintiffs now seek contribution.  *E.g.*, TPC ¶¶ 59-64, 107, 108.[45]  There can be no dispute that the Third Party Plaintiffs have clearly incorporated into their Complaint all allegations in ERC's Complaint (albeit contingently), and that the Third Party Defendants are on notice of the nature of these claims.  Indeed, the Third Party Defendants cite to the ERC Complaint in their motion. Jamex MTD at 30.

### 2.   The Contingent Contribution Claim Relates to Joint Tortious Conduct

The Third Party Defendants assert that the Third Party Plaintiffs have made no allegations of joint tortious conduct to support a contribution claim, but that is incorrect.  ERC's alter ego claim incorporates classic tort elements of fraud.  ERC Compl. ¶¶ 52–77.  *See, e.g.*, *Chengelis v. Cenco Instruments Corp.*, 386 F. Supp. 862, 865 (W.D. Pa. 1975) ("Absent the element of fraud or injustice akin to fraud, we cannot disregard the corporate structure"); *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994) ("[A]lter ego is akin to and has elements of fraud").

---

[45] The Third Party Complaint also references ERC's Complaint in its entirety by reference to its e-filed docket number, which is publicly available on the docket in the present action.  TPC ¶¶ 4, 7, 59.  And the Third Party Plaintiffs gave further written notice to the Third Party Defendants of the substance of ERC's claims before the Third Party Complaint was even filed.  TPC ¶¶ 66, 67.

ERC's alter ego allegations also amount to "joint" conduct, as that term is defined in the tort context.  Parties may act *sequentially*—rather than simultaneously—and still be considered "joint" tortfeasors.  *See, e.g.*, *Pennenvironment*, 2016 WL 3197961, at *10.  Thus, a contribution claim may be premised, as here, on the prior or subsequent ownership of the entity that allegedly produced plaintiff's injury.  *See, e.g.*, *id.* (third party plaintiff sued for environmental violations in connection with ownership of polluted site stated claim for contribution against third party defendant that previously owned and allegedly polluted landfill); *see also Garcia v. Cummings*, 2009 WL 136785, at *3 (M.D. Pa. Jan. 20, 2009) (contribution applicable where defendants' independent actions combined to cause plaintiff's indivisible harm); *Harsh v. Petroll*, 887 A.2d at 218 (same); *United States v. Sunoco, Inc.*, 501 F. Supp. 2d 656, 662 (E.D. Pa. 2007) ("[T]hat the violations occurred sequentially rather than simultaneously does not bar joint tortfeasor status where the acts combined as substantial factors to form one physical injury.").

As set forth in the Third Party Complaint, the ERC Complaint identifies periods of time during which Jamex LLC and Ballengee owned and/or controlled BTS and specific actions taken during those periods that are pled in support of its allegations against the Third Party Plaintiffs.  ERC Compl. ¶¶ 2–3, 5, 7–10, 19–36, 50–51; TPC ¶¶ 59-64, 107, 108.  Indeed, the time frame for discovery sought in the underlying action extends into 2011, *four years* before FGP acquired Bridger Logistics and BTS, at a time when Jamex LLC and Ballengee owned and controlled both entities.  *Plaintiff Eddystone Rail Company LLC's Motion to Compel* at 5, 15–17 [ECF No. 73].

Here, nearly all of the purported "alter ego" behavior identified by ERC occurred during Ballengee's or Jamex, LLC's control and/or ownership.[46]  ERC Compl. ¶¶ 19, 21, 27–36, 50–51;

---

[46] To the extent the Third Party Defendants argue that these claims did not arise during their ownership of BTS, those arguments are both premature and inaccurate.  Although the Third Party Plaintiffs preserve these arguments and reserve their rights to continue to raise them in this litigation, the Court did not accept similar

TPC ¶¶ 5–6, 18, 21–22, 27–28, 61–62, 107–08.  This Court, moreover, has allowed discovery into BTS's and Bridger Logistics' accounting files dating back to January 1, 2012 and their bank account records from July 1, 2011 to the present, covering periods of time in which BTS was owned and/or controlled by Ballengee and Jamex LLC.  *Plaintiff Eddystone Rail Company LLC's Motion to Compel* at 5, 15–17 [ECF No. 73].

Contribution is a flexible equitable remedy that apportions the plaintiff's loss among all parties who are jointly liable for a tortious injury, irrespective of the underlying causes of such liability.  *Pennenvironment*, 2016 WL 3197961, at *10 (third party plaintiff stated claim for contribution even though lawsuits did not technically assert "tort" causes of action).  If the Third Party Plaintiffs are ultimately held liable for harm to ERC as the alter egos of BTS under any theory, Jamex LLC and Ballengee should be required to contribute to such judgment based on their proportionate share of liability arising from periods in which they—not the Third Party Plaintiffs—controlled BTS.  ERC Compl. ¶¶ 2–3, 5, 7–10, 19–36, 50–51; TPC ¶¶ 59-64, 107, 108.

## CONCLUSION

For the foregoing reasons, the Third Party Plaintiffs request that the Jamex MTD and the Ballengee MTD be denied in their entirety.  The Third Party Plaintiffs believe they have more than adequately stated facts supporting plausible claims against the Third Party Defendants and to establish personal jurisdiction and venue regarding each claim.  If the Court believes that more facts are necessary, the Third Party Plaintiffs respectfully request that the Court grant them leave to re-plead.

---

arguments made by the Third Party Plaintiffs in connection with their motion to dismiss the ERC Complaint.  [ECF Nos. 59, 60.]

Dated: November 28, 2017

Respectfully submitted,


 /s/ *Jeffery A. Dailey*

Jeffery A. Dailey (I.D. No. 85993)
Ellen L. Pierce (I.D. No. 318579)
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square, Suite 4100
2001 Market Street
Philadelphia, Pennsylvania 19103
T: (215) 965-1200
F: (215) 965-1210
jdailey@akingump.com
epierce@akingump.com

David M. Zensky (*pro hac vice*)
Katherine P. Porter (*pro hac vice*)
John C. Murphy (*pro hac vice* pending)
Kelly A. Eno (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
T: (212) 872-1000
F: (212) 872-1002
dzensky@akingump.com
kporter@akingump.com
keno@akingump.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas
Partners, L.P., and Ferrellgas L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffery A. Dailey, hereby certify that I caused Defendants / Third Party Plaintiffs

Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas L.P.'s Consolidated Opposition

to Third Party Defendants' Motion to Dismiss the Third Party Complaint to be filed and served

on all counsel of record via the Court's ECF system on November 28, 2017.

<em>/s/ Jeffery A. Dailey</em>
Jeffery A. Dailey

Dated:  November 28, 2017