## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC,

       Plaintiff,

   v.

JULIO RIOS and JEREMY GAMBOA,

       Defendants,

BRIDGER LOGISTICS, LLC, FERRELLGAS
PARTNERS, L.P., and FERRELLGAS L.P.,

       Defendants/Third-Party Plaintiffs,

   v.

JAMEX MARKETING, LLC (f/k/a BRIDGER
MARKETING, LLC), JAMEX TRANSFER
HOLDINGS, LLC, JAMEX, LLC (f/k/a
BRIDGER, LLC), JAMEX TRANSFER
SERVICES, LLC (f/k/a BRIDGER TRANSFER
SERVICES, LLC), JAMES BALLENGEE and
JOHN DOES 1–10,

       Third-Party Defendants.

Civil Action No. 2:17-cv-00495

## THE JAMEX ENTITIES' REPLY IN SUPPORT OF
## THEIR MOTION TO DISMISS THIRD-PARTY COMPLAINT

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT .........................................................................................1

II.   REPLY ARGUMENT ...................................................................................................2

    A.   Forum Non Conveniens Remains Appropriate.......................................................2

    B.   Bridger-Ferrellgas's Submissions on Personal Jurisdiction Show No More
        Than Mere Ownership by Jamex LLC and Jamex Transfer Holdings. ...................5

    C.   Dismissal is Still Required Based on Failure to State a Claim. .............................9

        1.   Counts I-III:  Bridger-Ferrellgas Does Not Dispute it is
            Responsible for its Own Conduct. ..............................................................9

        2.   Count IV:  There is No Joint Tortious Cause of Action Alleged by
            Bridger-Ferrellgas; the Alter Ego Theory Fails of its Own Accord. .........14

III.   CONCLUSION............................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAMCO Transmissions, Inc. v. Romano*,
   42 F. Supp. 3d 700, 713 (E.D. Pa. 2014) .............................................................................3

*ALA, Inc. v. CCAIR, Inc.*,
   29 F.3d 855 (3d Cir. 1994).....................................................................................................7

*Aluminum Co. of Am. v. Beazer E., Inc.*,
   124 F.3d 551 (3d Cir. 1997)..................................................................................................12

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court*,
   134 S. Ct. 568 (2013) .............................................................................................................3

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006)....................................................................................................6

*Burry v. Cach LLC*,
   2015 WL 328182 (E.D. Pa. Jan. 22, 2015) ............................................................................5

*D.R. by M.R. v. E. Brunswick Bd. of Educ.*,
   109 F.3d 896 (3d Cir. 1997)..................................................................................................13

*Eddystone Rail Company, LLC v. Ferrellgas Partners, L.P.*,
   No. 16-misc-00295-P1 (S.D.N.Y. filed on Aug. 10, 2016) .....................................................7

*Jiffy Lube Intern., Inc. v. Jiffy Lube of Penn.*,
   848 F. Supp. 569 (E.D. Pa. 1994) .........................................................................................14

*Kilts Contracting, Inc. v. Anadarko Petroleum Corp.*,
   2014 WL 11510240 (D. Wyo. Dec. 4, 2014)...........................................................................5

*LeFevre v. State*,
   176 Misc. 2d 666, 673 N.Y.S.2d 855 (Ct. Cl. 1998) ............................................................13

*Painter v. Prison Health Services, Inc.*,
   2009 WL 1664357 (W.D. Pa. June 12, 2009).........................................................................7

*Parilla v. IAP Worldwide Serv., VI, Inc.*,
   368 F.3d 269 (3d Cir. 2004)....................................................................................................6

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993)..................................................................................................7

*Philadelphia Elec. Co. v. Hercules, Inc.*,
  762 F.2d 303 (3d Cir. 1985)..................................................................................................12

*Sourovelis v. City of Philadelphia*,
  246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) ...........................................................................7

*Starrett v. Coe*,
  2017 WL 3431920 (M.D. Pa. June 20, 2017) *report and recommendation adopted*,
  2017 WL 3412273 (Aug. 9, 2017)...........................................................................................13

**Other Authorities**

5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE
  § 1363 (3d ed. 2004).................................................................................................................7

Judicial Profile, Hon. Sam R. Cummings, THE FEDERAL LAWYER .................................................4

The Jamex Entities[1]—along with Mr. Ballengee joining where applicable—file this reply in support of their Motion to Dismiss the Third-Party Complaint.  References to the Jamex Entities' opening memorandum of law [Dkt. No. 97-1] will be to "Brief" (or "Br.") and references to Bridger-Ferrellgas's opposition [Dkt. No. 115] will be to "Opposition" (or "Opp.").

## I.   PRELIMINARY STATEMENT

Short on substance, Bridger-Ferrellgas in its Opposition resorts to a tactic that is the hallmark of weak arguments: the overuse of accusatory adjectives and hyperbole.  In the Opposition there are twenty-two (22) references to the Jamex Entities' settlement with Eddystone as "collusive"[2] and eight repetitions of the mantra that it "foisted" or "imposed" or "forced" liability onto Bridger-Ferrellgas.  None have legal meaning or relevance to the analysis here.  The settlement was the product of arm's-length negotiation after the entity with contractual liability (JTS) could no longer afford to defend itself, and the document plainly does not "impose" liability on anyone else.  Rather, Eddystone simply followed through on its pre-existing threats—of which Bridger-Ferrellgas was repeatedly informed—to pursue tort claims, including fraudulent transfer, against Bridger-Ferrellgas for its own pre-sale conduct. The Jamex Entities cannot be faulted for negotiating and securing releases where possible in return for paying $450,000 in cash and relinquishing oil worth another $2 million.  Bridger-Ferrellgas is simply the target of same voracious adversary that earlier focused its sights on Jamex.

Another recurring misplaced theme of the Opposition is that Bridger-Ferrellgas is somehow the innocent victim of others' conduct.  But as Eddystone has made clear in this proceeding, it asserts tort claims of fraudulent transfer and breach of duties owed to creditors for

---

[1] All capitalized terms not defined herein are defined in the Brief.

[2] [*See* Opp. at 1, 2 (twice), 4, 9, 10 (twice), 11, 13 (twice), 14, 15, 21, 22, 26, 27, 33 (twice), 34, 44, 45.]

actions carried out when Bridger-Ferrellgas alone was in sole ownership and control of pre-sale

BTS.  Eddystone, in its own words opposing a motion to dismiss, unequivocally declared:

> [T]he wrong for which Eddystone now seeks redress occurred when ***Bridger Logistics*** stripped BTS of assets and effectively abrogated its obligation to fund BTS, actions that made default inevitable. This all occurred ***before*** the worthless shell of BTS was sold to the worthless shell that is Jamex Transfer Holdings for $10.

[*See* Dkt. No. 39 (Eddystone's Resp. to MTD) at page 31 of 57 (*i.e.*, page 21 of brief) (emphasis

added).]  There is no basis asserted in the Third-Party Complaint, nor one that could possibly be

asserted, under which Jamex is required to indemnify Bridger-Ferrellgas for its *own conduct*.

That irrefutable reality should result in a dismissal with prejudice of the entire third-party action.

Of course, the Court must rule that way only if it first determines Bridger-Ferrellgas has

shown convincing reasons why the acknowledged mandatory venue in the PSA (and concededly

derivative nature of Guarantee/tortious interference) should not result in a *forum non conveniens*

dismissal to Texas, and that personal jurisdiction exists over Jamex LLC and Jamex Transfer

Holdings.  For the reasons discussed herein, the Opposition's arguments fail on all grounds and

provide additional reasons to dismiss this entire third-party proceeding.

## II.   REPLY ARGUMENT

The Third-Party Defendants continue to rely on all points raised in the opening Brief.

This Reply is submitted merely to highlight certain concessions made by Bridger-Ferrellgas as to

*forum non conveniens* and personal jurisdiction, while further addressing glaring fallacies in the

Opposition.  For consistency, the primary arguments are presented in the same order as the Brief.

### A.   *FORUM NON CONVENIENS* REMAINS APPROPRIATE.

Bridger-Ferrellgas makes two critical concessions as to *forum non conveniens*: (1) Count

I, for breach of the PSA, is subject to mandatory venue in Dallas County [*see* Opp. at 14]; and

(2) Count II, the claim on the Guarantee, requires Bridger-Ferrellgas to "ultimately establish …

breach of the [] PSA."  [Opp. at 19.]  Simple logic dictates that Count III as well, the claim that Mr. Ballengee tortiously interfered to cause a breach of the PSA/Guarantee, likewise requires proof the PSA was breached.  [TPC ¶¶ 95-104.]  As a result, three out of the four third-party claims either must be heard, or are derivative of what must be heard, in Dallas County.

The only question, therefore, is whether the existence of Bridger-Ferrellgas's Count IV contribution claim (found on a single conclusory alter ego allegation) alters the practical conclusion that the entire third-party action should be heard in Dallas.  As set out in the Brief, Count IV should be dismissed for failing to state a claim, but, even if not, the balance of factors in the *forum non conveniens* analysis still weighs in favor of Dallas.  It is unnecessary to repeat all the detailed reasons why [*see* Br. at 10-13], but is worth reiterating that, given the existence of mandatory venue as to one count and Bridger-Ferrellgas's waiver of objection to Dallas for others,[3] Bridger-Ferrellgas had the burden of demonstrating the public interest factors "overwhelmingly disfavor" a dismissal.  *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court*, 134 S. Ct. 568, 581, 583 (2013).  Yet, the Opposition barely addresses those factors, relying instead on assertions that the "same facts" apply to the main and third-party claims and a supposed possibility of inconsistent rulings.  [Opp. at 15-16.]  Those contentions are overstated.

First, a comparison of the main and third-party complaints shows the facts at issue are not the same.  The Third-Party Complaint is heavily focused on the February 2016 PSA and Guarantee and subsequent settlement—which, again, Bridger-Ferrellgas seems unable to avoid pairing with the adjective "collusive"—in January 2017 [Dkt. Nos. 69/70], whereas Eddystone's claims and the vast majority of Bridger-Ferrellgas's defensive allegations involve the time period

---

[3] *See AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 713 (E.D. Pa. 2014) (noting "the Supreme Court has explained that the existence of a forum selection clause *of any kind* [i.e., mandatory or permissive] significantly undercuts any argument that the preselected forum is inconvenient for the parties or their witnesses") (emphasis added).

*prior to* February 2016. [*See generally* Dkt. Nos. 1, 76, 77.]  It is particularly relevant as well that the claims at issue will be governed by different law (Pennsylvania for Eddystone claims; Texas for third-party claims) and different triers of fact in large parts.  [*See* Eddystone Compl. at 23 (jury demand); Dkt. No. 97-3 (Ex. B) at § 10.12 (waiving jury trial); Dkt. No. 97-4 (Ex. C) at § 8 (same).]  The only third-party claim that might theoretically be argued to overlap with Eddystone's suit then, is the contribution claim.  As demonstrated in the Brief, however, that claim is unfounded and should be dismissed since the doctrine of contribution applies only among *joint tortfeasors*, which Bridger-Ferrellgas does not (and cannot) properly assert. [*See* Br. at 33-35.]  Even then, any factual overlap is superficial since, as admitted in the Third-Party Complaint, Bridger-Ferrellgas alone ran BTS from June 2015 to February 2016 when it was allegedly stripped of assets and a fraudulent transfer occurred.  [TPC ¶¶ 5, 25.]  Retaining the third-party action in this Court, therefore, would most likely multiply the relevant fact issues, bringing into play post-closing facts not at all relevant to the main action.

For much the same reasons, it is hard to imagine inconsistent rulings resulting from a dismissal of the third-party claims.  Counts I-III are not tied to Eddystone's suit whatsoever.  The unsupportable Count IV—even in the unlikely event it survived a Rule 12(b)(6) motion—cannot result in an inconsistent ruling either because a contribution claim simply determines the percentage split (if any) between joint tortfeasors; not the amount of liability owed to the plaintiff.  The concern of inconsistent rulings is feigned and entitled to no credence.

Bridger-Ferrellgas also makes, but offers no support for, the usual response that transfer of the third-party claims would "undermine principles of judicial efficiency and would further burden an already overburdened judiciary."  [Opp. at 15.]  To the contrary, judges in northern Texas are on record lamenting the dearth of jury trials in their courts, *see, e.g.,* Judicial Profile,

4

Hon. Sam R. Cummings, THE FEDERAL LAWYER Sept. 2016, at 22 ("When Judge Cummings first became a judge, he was trying five or six civil jury cases a month, compared to today where he averages three or four jury trials a year."), and the Jamex Entities offered undisputed evidence that there is no special congestion in the Dallas courts.  [*See* Dkt. No. 97-9 at ¶ 3.]

The fact is that, when Jamex Transfer Holdings purchased BTS/JTS from Bridger-Ferrellgas, the parties jointly agreed on mandatory venue in Dallas for any resulting disputes. Pennsylvania has no interest in an indemnification dispute that, contrary to Bridger-Ferrellgas's contentions, does not involve the operations of the rail terminal in south Philadelphia and rather involves only a stock purchase agreement between Texas companies, in Texas, governed by Texas law, and for which the parties agreed all disputes would be heard in Dallas.  The principles of *forum non conveniens* support a dismissal of this entire third-party action to Texas.  *See, e.g.*, *Kilts Contracting, Inc. v. Anadarko Petroleum Corp.*, 2014 WL 11510240, at *6 (D. Wyo. Dec. 4, 2014) (dismissing third-party claims in Wyoming in favor of Texas in similar situation).

**B.     BRIDGER-FERRELLGAS'S SUBMISSIONS ON PERSONAL JURISDICTION SHOW NO MORE THAN MERE OWNERSHIP BY JAMEX LLC AND JAMEX TRANSFER HOLDINGS.**

The Opposition concedes a lack of general jurisdiction over Jamex LLC and Jamex Transfer Holdings.  [Opp. at 24 n.24.]   Accordingly, the inquiry focuses only on *specific* jurisdiction and whether the third-party claims "arise from" purposeful availment of Pennsylvania in relation to the claims asserted.  *See Burry v. Cach LLC*, 2015 WL 328182, at *5 (E.D. Pa. Jan. 22, 2015).  In that regard, the emails and other documents Bridger-Ferrellgas submitted do not establish that Jamex LLC or Jamex Transfer Holdings purposefully directed their *own* activities at Pennsylvania.  Rather, as anticipated, the Opposition simply attempts to establish jurisdiction over them based on their ownership of other Jamex Entities [*see* Opp. at 30-31 (Jamex Transfer Holdings' ownership of JTS); 31-32 (Jamex LLC executed agreements as a

"manager" of Jamex Marketing)], or by trying to couch the third-party contract claims as arising out of the January 2017 settlement with Eddystone.  [*See* Opp. at 33-34.]  All plainly fail.

First, as to the ownership issue, both parties agree jurisdiction is not proper on that basis without first showing alter ego. [*See* Br. at 20-21; Opp. at 32.]  Of course, there is nothing but a single conclusory (and contingent) alter ego allegation in the Third-Party Complaint itself.  [TPC ¶ 107.]  Bridger-Ferrellgas recognizes that and so claims now it "incorporated by reference" the Eddystone Complaint.  [*See* Opp. at 48-49.]  That is an odd position for Bridger-Ferrellgas to take since a party's own factual allegations are deemed judicial admissions,[4] but, either way, there are no allegations in the Eddystone Complaint that Jamex LLC or Jamex Transfer Holdings is an alter ego of anyone.  To the contrary, Eddystone alleges only that *__Bridger Logistics__* was an alter ego of pre-sale BTS.  [*See* Eddystone Compl. ¶¶ 52-61.][5]  Accordingly, the Third-Party Complaint still fails to allege sufficient facts to show alter ego over any Jamex Entity, on its own or by way of adopting the factual allegations of the Eddystone Complaint as Bridger-Ferrellgas's own judicial admissions.  [*See* Br. at 20-21 (citing requirements for alter ego).]

The Opposition next tries basing jurisdiction on the January 2017 settlement, which involved a New York arbitration governed by New York law, and specifies New York as the venue for resolution of any disputes.  [*See* Dkt. 115-5 (Ex. D) ¶ 16.]  That is not sufficient for

---

[4] The law treats factual allegations of a party as judicial admissions.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n. 20 (3d Cir. 2006) ("Judicial admissions are concessions in pleadings or briefs that bind the party who makes them."); *see also Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) (similar).  As a result, if Bridger-Ferrellgas is really going to claim it incorporates the Eddystone Complaint by reference, the result would be that Bridger-Ferrellgas is judicially admitting all the facts needed to prove Eddystone's claims.  If Bridger-Ferrellgas wishes to shoot itself in the head that way, it certainly is entitled to do so.  Such a suicidal act does not establish jurisdiction though, because nothing in the Eddystone Complaint alleges claims against the Jamex Entities.

[5] The concluding paragraph states: "In light of the alter ego relationship between BTS and Bridger Logistics, Eddystone is entitled to an order from this Court piercing the corporate veil of BTS and holding Bridger Logistics liable for the debts BTS owed to Eddystone." [Eddystone Compl. ¶ 61.]  Eddystone thus does not allege any Jamex Entity is an alter ego of BTS.  Indeed, it would never try to since that would be a violation of Eddystone's covenant not to sue in the settlement.  [*See* Dkt. 115-5 (Ex. D) ¶ 9.]

Bridger-Ferrellgas to establish specific jurisdiction over the Jamex Entities, however, because the third-party claims are based on a purported breach of the PSA (and derivative Guarantee); not a breach of the settlement.  The PSA is a contract between Texas companies with a mandatory venue of Dallas, making Texas the only place where one could reasonably expect to be sued.  Nevertheless, the Opposition suggests it was "reasonably foreseeable" to the Jamex Entities that Bridger-Ferrellgas would be sued in Pennsylvania as a result of the settlement.  To be clear, there is no such allegation in the Third-Party Complaint, but the contention would not be consistent with the undisputed documents and public record anyway,[6] which show, at best, only an expectation that Eddystone might sue in New York.  New York is where Eddystone previously filed suit against Ferrellgas, in August 2016,[7] and New York is where the action to confirm the arbitration award was filed and remains pending.[8]  Nothing in the settlement agreement or otherwise suggested Eddystone would file a suit in Pennsylvania.

The same fallacy exists in regard to the Opposition's contention that Jamex Transfer Holdings in particular should have expected to be sued in Pennsylvania on the contract claims

---

[6] See ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control."); Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (court can consider "undisputedly authentic" documents relied on by the complaint); Sourovelis v. City of Philadelphia, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) (noting "the Court need not accept as true allegations that are directly contradicted by indisputably authentic documents on which the complaint relies, or matters of public record."); Painter v. Prison Health Services, Inc., 2009 WL 1664357, at *2 (W.D. Pa. June 12, 2009) ("Nevertheless, under the 12(b)(6) standard, a 'court need not ... accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.' … Nor must the Court accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. … Nor must the court accept legal conclusions set forth as factual allegations.") (citations omitted); see also 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1363, at 120-21 (3d ed. 2004) ("The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading.") (citations omitted).

[7] See Eddystone Rail Company, LLC v. Ferrellgas Partners, L.P., No. 16-misc-00295-P1 (S.D.N.Y. filed on Aug. 10, 2016).

[8] [See Dkt. 115-5 (Ex. D) ¶ 1 (stating proceeding to confirm arbitration award would be filed in New York state or federal court); TPC ¶ 57 (confirming suit was filed in New York).]

because it "directly assumed" the liabilities of the Eddystone Agreement through the PSA's terms. As set out below, the Jamex Entities absolutely disagree with the contention of a direct assumption, but even if that were correct, it would be of no consequence because whatever obligations existed under the Eddystone Agreement were owed to Eddystone, not Bridger-Ferrellgas. As a result, a direct assumption of liability by Jamex Transfer Holdings would be relevant to a jurisdiction analysis only if Eddystone were suing Jamex Transfer Holdings (which still would give rise only to an expectation of arbitration in New York, as required by the Eddystone Agreement);[9] it is not relevant when Bridger-Ferrellgas is suing for indemnification under a PSA that points in every single way to Texas.

In sum, Bridger-Ferrellgas's Opposition: (i) fails to overcome the evidence submitted with the Brief demonstrating Jamex LLC and Jamex Transfer Holdings did not direct any of their own activities, *on their own behalf*, at Pennsylvania; (ii) does not show any sufficient alter ego allegations against the Jamex Entities to support jurisdiction for a contribution claim; and (iii) cannot sidestep the fact that the third-party contract claims alleged arise solely out of Texas contracts between Texas companies specifying a forum of Dallas County, Texas. For those reasons and the additional unreasonableness factors discussed in the Brief [*see* Br. at 22-23], this Court should dismiss the claims against Jamex LLC and Jamex Transfer Holdings due to a lack of personal jurisdiction.

---

[9] Further, the JTS obligation under the Eddystone Agreement does not necessarily point to Pennsylvania in regard to a supposed assumption of liability by Jamex Transfer Holdings because the contract did not mandate action in Pennsylvania. Although BTS/JTS transloaded oil through the Eddystone terminal for more than a year, it was not required to do so; it could have satisfied all obligations simply by paying $1.75 per barrel for the minimum volume commitment, and the contract plainly does not require payment to occur in Pennsylvania. [*See* Dkt. No. 115-4 (Ex. C) §§ 4.1, 4.2.]

C.    **DISMISSAL IS STILL REQUIRED BASED ON FAILURE TO STATE A CLAIM.**

1.    Counts I-III:  Bridger-Ferrellgas Does Not Dispute it is Responsible for its Own Conduct.

The Brief identified three reasons that Count I (breach of the PSA) fails as a matter of law: (i) no direct assumption of the Eddystone Agreement, (ii) no promise the Eddystone Agreement would be performed for any length of time, and (iii) no indemnification for Bridger-Ferrellgas's own conduct.  Any one of those reasons results in a dismissal of Count I (and, thus, the derivative Counts II-III as well).  However, Bridger-Ferrellgas so glaringly failed to dispute the third reason identified above that it becomes immediately dispositive and, as such, is addressed first herein so the Court can skip the rest of this section if it agrees.

In particular, it is undisputed the PSA does not indemnify Bridger-Ferrellgas for its _own_ Liabilities.  No such Liabilities were transferred.[10]  Only the Liabilities of BTS/JTS were split between Bridger Logistics and Jamex Transfer Holdings along a demarcation line of February 22, 2016 (and only for indemnification purposes).  Placed in that proper context, it matters none what damages are asserted or when the Opposition says they first "accrued," because there is simply _no_ indemnification possible for _Bridger-Ferrellgas's own conduct_.  None whatsoever. The Opposition does not suggest anything to the contrary or even address the point at all because it is irrefutable.  On that basis, Counts I-III should be dismissed with prejudice.

What the Opposition instead tries to do, unsuccessfully, is portray Eddystone's claims as alleging a post-closing breach of contract by JTS.  That is plainly not what the Eddystone Complaint states,[11] nor could it since the post-closing contract breach by JTS was the subject of a

---

[10] [_See_ Dkt. No. 97-3 (Ex. B) § 2.1(b); _see also id._ at 5 (definition of Retained Liabilities).]

[11] The Opposition suggests there is a "factual dispute" because Bridger-Ferrellgas alleges, contrary to Eddystone itself (and despite incorporating Eddystone's Complaint), that the breach for which Eddystone sues did not occur until after BTS's sale.  [_See_ Opp. at 41.]  Courts do not accept allegations that are contradicted by the public record and authentic documents, [see, _supra_, note 6 herein], and the question

separate arbitration. Rather, Eddystone now alleges that Bridger-Ferrellgas committed actionable torts in the period prior to BTS's sale. [*See* Dkt. No. 39 at page 31 of 57 (Eddystone declaring "the wrong for which Eddystone now seeks redress occurred when Bridger Logistics stripped BTS of assets and effectively abrogated its obligation to fund BTS, actions that made default inevitable. This all *occurred before* the worthless shell of BTS was sold …").] By instead focusing on when damages "accrued [*see* Opp. at 43], all Bridger-Ferrellgas does is argue there are no damages proximately caused by its own pre-closing conduct. It may ultimately be established that there is no such proximate cause, but the claim is still not indemnifiable because, again, the PSA does not cover Bridger-Ferrellgas's own conduct. To put it simply, there are two entirely different sets of conduct at issue: (i) alleged torts by Bridger-Ferrellgas prior to closing (as asserted in the Eddystone Complaint now) and (ii) breach of contract by JTS after closing (which was the subject of arbitration). The damages resulting, if any, matter none because there is no indemnification for any losses of any kind based on Bridger-Ferrellgas's own conduct. The fact that Eddystone seeks a maximum amount of damages referenced by the agreed arbitration award—$139 million—is meaningless; in its suit Eddystone still has to prove damages (in any amount) proximately resulted from the pre-closing conduct of Bridger-Ferrellgas. Whatever legal costs or ultimate liability Bridger-Ferrellgas incurs for allegations as to its own conduct are indisputably not indemnifiable under the PSA.[12] If Eddystone fails to trace damages to Bridger-Ferrellgas's conduct, then that will be Eddystone's problem. If, on the other hand, Eddystone

---

for indemnification is not what Bridger-Ferrellgas alleges, but what Eddystone alleges. The record reflects that Eddystone, in its own words, sues for conduct that "all occurred before the worthless shell of BTS was sold." Eddystone is the master of its own claims. Bridger-Ferrellgas cannot change them by its own contradictory allegation, as that would needlessly increase meritless litigation.

[12] Nor can there be a contribution claim in this regard, because the two sets of conduct articulated above are not "joint torts": one is contract, which, as a matter of law, is not a basis for contribution in Pennsylvania. [*See* Br. at 33-34 (citing cases and law).]

can prove damages proximately resulted from Bridger-Ferrellgas's own conduct, then that is Bridger-Ferrellgas's problem.  Either way, there is no third-party indemnification.  The damages "accrual" argument is irrelevant.

Nevertheless, for the sake of argument, even if the claims now asserted against Bridger-Ferrellgas for its *own* conduct were subject to indemnification under the PSA's terms (and they patently are not), the date of damages "accrual" argument also fails under the plain language. The Retained Liabilities carved out of the transfer in Section 2.1(b)[13] of the PSA make it very clear that "**any matter that occurred ... or relates to the period before the Closing**" falls on Bridger Logistics' side of the line even if the resulting "Liability … arises after the Closing."  As emphasized in the Opposition, the term "Liability" is defined to include any expense whatsoever that results from the pre-closing occurring, whether "accrued *or unaccrued*."  [Opp. at 7, 36 (citing definition).]  It is therefore only when the "matter … occurred"—i.e., the <u>*conduct*</u>—that determines what is a Retained Liability, not when a cause of action is argued to "accrue."

Accordingly, no matter the framework in which Eddystone's allegations against Bridger-Ferrellgas are viewed—as beyond the PSA (like they properly should be) or under the PSA's terms—there is no indemnification because it is only who did the conduct and when it occurred that matters.  That disposes of Counts I-III since, as effectively acknowledged in the Opposition, all three counts require Bridger-Ferrellgas to "establish … breach of the [] PSA."  [Opp. at 19.] Should the Court prefer to read further, however, the remainder of this sub-section addresses the arguments made in the Opposition on the other two points: direct liability and performance.

In regard to the Opposition's argument that the PSA required a direct assumption and performance of the Eddystone Agreement by Jamex Transfer Holdings, it must be noted that

---

[13] Which, again, merely splits up responsibility for the Liabilities of BTS/JTS, not anyone else.

Bridger-Ferrellgas misleads by use of the *Beazer* and *Hercules* cases. [*See* Opp. at 36-37.] Both cases involved a company that *directly acquired* certain assets (in each case, land) from the actual owner of the assets; and so the only question was whether liability followed the direct asset transfer.[14] For those decisions to be relevant here, there would need to be a direct transfer of assets from *BTS/JTS*—the party directly owning the Eddystone Agreement—to Jamex Transfer Holdings. As noted in the Brief, however, no such direct transfer was contemplated by the PSA and none occurred. [*See* Br. at 26-27.] The Opposition concedes that reality. [Opp. at 36 ("There was no assignment—at all times, JTS remained contractually obligated to perform the RSA.").] The *Beazer/Hercules* cases are thus inapplicable and no "superfluous" result occurs in reading the last sentence of Section 2.1(b) of the PSA the only way it can be read: that the assumption language was for purposes of demarcating indemnification responsibilities.[15]

Indeed, it is puzzling why Bridger-Ferrellgas even insists there was a direct assumption of JTS's liability other than for the sake of argument because, if it is true, then Bridger Logistics itself correspondingly agreed to assume and become directly responsible to Eddystone for the pre-closing Liabilities of BTS. That would be another strange position to take since it would mean that Bridger Logistics concedes it is *directly* liable for any asset transfers done by BTS prior to closing, effectively eliminating the need for Eddystone to show alter ego. Incredibly,

---

[14] *See Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 555 (3d Cir. 1997) ("Under the terms of the liquidation agreement, Beazer received immediate transfer and *assignment* of all of ALT's rights, titles, *property, and assets*.") (emphasis added); *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 307 (3d Cir. 1985) (transfer of assets directly from company holding the liability, PICCO, to the company held liable under the terms of transfer agreement, Hercules)

[15] The Opposition's reliance on the "Jilla Email" is specious. [*See* Opp. at 7.] That email, drafted by a non-lawyer (a "Treasurer") more than a month prior to the PSA was finalized is clearly parol evidence excluded by the PSA's merger clause. [*See* Dkt. No. 69-1 (Ex. A to TPC) at § 10.8.] Further, the email plainly states that "Jamex *or a designated entity of Jamex* will assume payment obligations under the Eddystone contract …." [Dkt. No. 115-8 (Ex. U) (emphasis added).] JTS is a designated entity of Jamex.

however, that seems to be the Opposition's position.  [*See* Opp. at 8 ("Bridger Logistics, for its part under the PSA, continued to be responsible for all 'Retained Liabilities,' … including the Eddystone Agreement, 'relating to any period before the Closing.'").]  If Bridger-Ferrellgas wishes to impair its defenses by concession in such a way, that is certainly its prerogative. But it is not what the PSA actually provides as to Jamex Transfer Holdings and, regardless, the PSA still does not provide indemnification to Bridger-Ferrellgas for its own pre-closing conduct.

In any case, the requirement of dismissal would be the same even if Bridger-Ferrellgas were correct in arguing that Jamex Transfer Holdings directly assumed the duties and obligations of its subsidiary, JTS.  If that is so—and, again, the Jamex Entities do not concede the point— then what Jamex Transfer Holdings assumed was JTS's payment obligation *to Eddystone*, since Eddystone is the one to whom the "Liabilities under the Eddystone Agreement" [*see* Dkt. No. 97-3 (Ex. B) § 2.1(b)] were owed; not Bridger-Ferrellgas.  As such, even if by virtue of the PSA there is a basis to say Jamex Transfer Holdings took on direct liability to Eddystone for JTS's payment obligation (i.e., the $139 million conceded in the arbitration award), there is still nothing in the PSA that precluded Jamex Transfer Holdings from settling its liability to Eddystone by paying $450,000 in cash and relinquishing over $2 million worth of oil.[16]  Bridger-Ferrellgas's suggestion it could prevent Jamex Transfer Holdings from settling its own liability with Eddystone is not supported by the contract, case law, or public policy.[17]

---

[16] [*See* Dkt. No. 115-5 (Ex. D) §§ 1-2.]

[17] It is the public policy of New York and Pennsylvania—and all jurisdictions and courts—to encourage the settlement of disputes.  *See, e.g.*, *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997) ("Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts."); *Starrett v. Coe*, 2017 WL 3431920, at *3 (M.D. Pa. June 20, 2017), *report and recommendation adopted*, 2017 WL 3412273 (Aug. 9, 2017) ("There is a strong, prevailing public policy in Pennsylvania to encourage voluntary settlements.") (citing *Nationwide Ins. Co. v. Schneider*, 960 A.2d 442, 449 (Pa. 2008)); *LeFevre v. State*, 176 Misc. 2d 666, 672, 673 N.Y.S.2d 855, 859 (Ct. Cl. 1998) ("First and foremost, public policy has long been to encourage and facilitate settlements.").

In reality, Bridger-Ferrellgas alone is responsible for its own pre-closing conduct (which is the sole subject of Eddystone's Complaint) and the language of the PSA cannot be stretched to include an obligation for the Jamex Entities to indemnify Bridger-Ferrellgas for that conduct. Counts I-III should be dismissed with prejudice for failure to state a claim as a matter of law.

2.      **Count IV**:  There is No Joint Tortious Cause of Action Alleged by Bridger-Ferrellgas; the Alter Ego Theory Fails of its Own Accord.

The Opposition does not dispute the Jamex Entities' point that the Third-Party Complaint fails to allege a joint tort *cause of action*.  Rather, Bridger-Ferrellgas tries to hold on to its contribution claim by characterizing the single conclusory alter ego allegation as itself being sufficient.  [*See* Opp. at 49-50.]  But the law conclusively establishes alter ego is not a cause of action [*see* Br. at 31 n.32] and, further, contrary to the Opposition's suggestion, the theory can be established without proving any independent fraud cause of action at all.[18]  Indeed, the Opposition does not cite a single Pennsylvania case in which alter ego has ever been ruled a sufficient basis for a contribution claim.  The reason is simple: alter ego is not a cause of action.  Even if a parent company acts in such a way as to clearly be an alter ego of its subsidiary, if there is no breach or actionable wrong by the subsidiary whose veil is pierced, then there is no cause of action to apply to the parent company.  Alter ego is merely a way to extend liability to an owner for wrongs committed by the subsidiary.  Alleging alter ego without alleging an actual underlying breach is meaningless.  In order to state a valid claim for contribution then, a pleading must allege an actual join tort cause of action.  The Third-Party Complaint fails to do so.

Furthermore, given the admissions in the Opposition, any attempt to amend the Third-Party Complaint to state a cognizable claim for a joint tort would be futile.  Bridger-Ferrellgas

---

[18] *See, e.g.*, *Jiffy Lube Intern., Inc. v. Jiffy Lube of Penn.*, 848 F. Supp. 569, 580 (E.D. Pa. 1994) (facts necessary to pierce corporate veil are: "(a) insufficient capitalization; (b) intermingling of funds; (c) other officers and directors were not functioning; (d) failure to observe corporate formalities; (e) failure to pay dividends; (f) the fact that the corporation is a facade for the operations of the dominant shareholder.").

admits it was the sole owner of BTS from June 2015 to February 2016 when BTS was allegedly stripped of assets and the subject of a fraudulent transfer, and the post-sale breach by JTS is contractual in nature.  [*See* Br. at 33 (citing law that contribution not available for contract claims).]  Further, any claim for pre-sale "alter ego" extending back to the formation of BTS (2012 or further) was fully released as part of the sale in June 2015 when Ferrellgas purchased Bridger Logistics.  [*See* Br. at 34 n. 35; Dkt. No. 97-7 (Ex. F) at § 2.]

The Third-Party Complaint accordingly fails to allege a cause of action for contribution and no re-pleading could cure that deficiency.  Count IV should be dismissed with prejudice.

## III.    <u>CONCLUSION</u>

For the foregoing reasons and those provided in the Brief, the Jamex Entities respectfully request that the Court grant their motion to dismiss.

Dated:  December 26, 2017

Respectfully submitted,

*/s/ T. Ray Guy*

Allison Brown
Pennsylvania State Bar No. 202227
WEIL, GOTSHAL & MANGES LLP
17 Hulfish Street, Suite 201
Princeton, New Jersey 08542
Telephone: 609-986-1104
Telecopier: 609-986-1199
allison.brown@weil.com

-and-

T. Ray Guy
Texas State Bar No. 08648500
(*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201-6950
Telephone: 214-746-7700
Telecopier: 214-746-7777
ray.guy@weil.com

*Attorneys for James H. Ballengee, Jamex LLC,*
*Jamex Marketing LLC, Jamex Transfer*
*Holdings LLC, and Jamex Transfer Services*
*LLC*

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Local Rule 7.1(d), I hereby certify that on December 26, 2017, the foregoing document was electronically submitted using the ECF system for filing and transmittal of a Notice of Electronic Filing to those parties registered for ECF in this case.

<u>*/s/ Jason E. Wright*</u>
Jason E. Wright