IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC | ) Civil Action |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) No. _____2:17-cv-00495-RK |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY GAMBOA, FERRELLGAS PARTNERS, L.P., and FERRELLGAS, L.P.,FERRELLGAS, L.P., BRIDGER ADMINISTRATIVE SERVICES II, LLC, BRIDGER MARINE, LLC, BRIDGER RAIL SHIPPING, LLC, BRIDGER REAL PROPERTY, LLC, BRIDGER STORAGE, LLC, BRIDGER SWAN RANCH, LLC, BRIDGER TERMINALS, LLC, BRIDGER TRANSPORTATION, LLC, BRIDGER ENERGY, LLC, BRIDGER LEASING, LLC, BRIDGER LAKE, LLC, J.J. LIBERTY, LLC, J.J. ADDISON PARTNERS, LLC | ) DEMAND FOR JURY TRIAL ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

FIRST AMENDED COMPLAINT

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

2

**Formatted:** Font: Times New Roman, 12 pt

COMES NOW Plaintiff Eddystone Rail Company, LLC, by and through its undersigned counsel, and alleges ~~upon personal knowledge as to its own acts and as to all other matters upon information and belief,~~ as follows:

### NATURE OF THIS ACTION

1.    This is an action for money damages and avoidance of transfers arising from a maritime contract.

2.    Defendants are managers and officers of Bridger Transfer Services, LLC ("BTS~~")~~ ~~and"),~~ the corporate parents of BTS, and other affiliates of BTS, who held out BTS as a bona fide entity and thereby profited from BTS' activities.

~~2.~~3.    In February 2013, Plaintiff Eddystone Rail Company ("Eddystone") entered into an agreement with BTS under which Eddystone agreed to construct and operate a facility in Eddystone, Pennsylvania to transfer crude oil from railcars to river barges.  BTS agreed to bring a minimum of 64,750 barrels a day of crude oil to Eddystone's facility every month from the facility's completion until June 2019.  In reliance on these promises, Eddystone invested over $170 million to build a rail-to-barge transloading facility.

~~3.~~4.    BTS' parent, Defendant Bridger Logistics, LLC, Bridger Logistics' parents Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively, "FGP"), and BTS' key officers, Defendants Julio Rios and Jeremy Gamboa, used Eddystone's transloading capacity to conclude and perform under a contract to deliver crude oil to a Philadelphia area refinery.  Defendants obtained a matching agreement with a refinery in Trainer, Pennsylvania to deliver at least 65,000 barrels per day of crude oil from North Dakota through June 2019.  A shipper was also involved in the arrangements, purchasing the crude in North Dakota and selling it to the Trainer refinery

after Bridger Logistics delivered it.  Bridger Logistics and its affiliates would have crude oil loaded into railcars in North Dakota rail loading facilities, ship it by train to Eddystone's facility at Eddystone, and transload it to barges on the Delaware River alongside Eddystone's facility, which would carry the crude oil to refineries downriver.  Because North Dakota wellhead prices were substantially lower than the "Brent benchmark" crude otherwise available to Delaware River refineries, shippers could make a profit even after accounting for the cost of transportation. This allowed providers of crude oil transportation like Bridger Logistics and their control persons to profit.

4.5.    Eddystone lived up to its agreement with BTS.  From March 2013 to April 2014, Eddystone built the promised transloading facility.  From May 2014 through January 2016, Eddystone transloaded every trainload of crude oil that BTS and the Defendants brought to Eddystone.

5.6.    BTS made the transloading capacity it obtained from Eddystone available to Bridger Logistics on a long-term, exclusive basis so that Bridger Logistics could deliver North Dakota crude to the Trainer refinery.  Bridger Logistics provided funds to BTS so that BTS could make its payments under its agreement with Eddystone that gave rise to that capacity.  If an arm's length relationship existed, no company in BTS' position would have agreed to provide such capacity without an obligation from Bridger Logistics that would cover BTS' costs, including its long-term commitment to Eddystone, and give it an opportunity for profit.

6.7.    Petroleum prices changed, making North Dakota crude, given its higher transport cost to market, more expensive relative to Brent-priced crude oil.  This change in relative crude oil prices made continued supply from North Dakota unattractive to the Trainer, PA refinery that Bridger Logistics was supplying.  More importantly, the change in price resulted in huge

**Formatted:** Font: Times New Roman, 12 pt

monthly losses to the shipper that had contracted to purchase oil for the Trainer refinery.  This rendered the shipper unable to purchase crude oil for the refinery and pay the minimum volume amounts it owed Bridger Logistics for long.  If the shipper defaulted, Bridger Logistics would still have to pay its obligations to BTS for the reserved capacity of the Eddystone terminal, but would have to find a new destination for the crude oil.

7.8.    Instead, Defendants tried to solve their problem by improperly using their control of BTS without regard to the obligations to Eddystone.  In January 2016, Bridger Logistics made modifications to its agreements with the shipper and the refinery that allowed them to unwind the crude oil supply arrangements.  No unaffiliated company in BTS' position would have allowed Bridger Logistics to abrogate its obligation to fund BTS' contract payments to Eddystone, for such an abrogation effectively transferred to FGP and Bridger Logistics the almost $140 million present value of BTS' right to receive payments from Bridger Logistics, for no consideration whatever.  Yet that is exactly what Defendants did, improperly using their control of BTS to render it insolvent and unable to pay its creditors.   Defendants also transferred all of BTS' other assets to other FGP entities, leaving it stripped of resources.  Then, for good measure, Bridger Logistics sold the corporate entity BTS for $10 to a newly formed subsidiary of the shipper.  As noted, by February 2016, the shipper was unable to meet its obligations, so it lacked the ability to make BTS' payments in any event.  The now-defunct BTS immediately defaulted on its payments to Eddystone.

8.9.    But BTS was in fact not the independent bona fide entity that Defendants held out.  Contrary to Defendants' holding out of BTS, it was an entirely captive instrument of Defendants, without operational or financial independence.  By dominating BTS as their alter ego, Defendants are liable for the debts BTS owes to ERC.

**Formatted:** Font: Times New Roman, 12 pt

9.10.   And even if BTS were not the alter ego of Bridger Logistics, Defendants' improper use of their control of BTS to have it transfer away BTS' assets to other FGP entities and abrogate implied rights to payment from Bridger Logistics for no consideration whatever constitutes a fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. C.S. §§ 5101 *et seq.* Bridger Logistics had an obligation to continue to fund the long-term agreement by which Bridger Logistics had acquired years of virtually exclusive access to Eddystone's transloading facility. Defendants' improper use of their control of BTS to have it allow its implied contract with Bridger Logistics to be abrogated without payment of reasonably equivalent value resulted in a transfer of value to Defendants – all of them BTS insiders – of almost $140 million. As a direct result, BTS became insolvent and unable to meet its payment obligations to creditor Eddystone. Accordingly, Eddystone is entitled to equitable avoidance of the transfer and/or damages compensating Eddystone for the value of the intentional or constructive transfer, together with punitive damages for an intentional fraudulent transfer.

10.11.   Finally, when a company enters the zone of insolvency, the fiduciary duties of its controlling persons shift from the company's equity owners to its creditors. Such a company must be managed so as to maximize the return to creditors. Instead, Defendants negligently or intentionally appropriated BTS' assets for their own benefit without providing equivalent value in return and drove BTS into insolvency. By using their management and controlling powers over BTS to render BTS unable to pay its creditors Defendants violated their fiduciary duties of care and/or loyalty to Eddystone. Accordingly, Defendants are liable for the economic injury they caused to Eddystone.

**THE PARTIES**

6

11.12.  Plaintiff Eddystone Rail Company, LLC is a Delaware entity, with its principal

place of business in Eddystone, Pennsylvania.

12.13.  Defendant Bridger Logistics, LLC ("Bridger Logistics") is a Louisiana limited

liability company, with its corporate headquarters in the State of Texas.

13.14.  Defendant Ferrellgas Partners, L.P. is a Delaware limited partnership, with its

corporate headquarters in the State of Kansas.

14.15.  Defendant Ferrellgas, L.P. is a Delaware limited partnership, with its corporate

headquarters in the State of Missouri.

15.16.  Defendant Julio E. Rios II is a resident of the State of Louisiana or Texas.

16.17.  Defendant Jeremy H. Gamboa is a resident of the State of Texas.

18.     Bridger Administrative Services II, LLC, is a Delaware limited liability company,

with its corporate headquarters in the State of Kansas.

19.     Bridger Marine, LLC, is a Delaware limited liability company, with its corporate

headquarters in the State of Kansas.

20.     Bridger Rail Shipping, LLC, is a Louisiana limited liability company, with its

corporate headquarters in the State of Texas.

21.     Bridger Real Property, LLC, is a Delaware limited liability company, with its

corporate headquarters in the State of Kansas.

22.     Bridger Storage, LLC, is a Louisiana limited liability company, with its corporate

headquarters in the State of Texas.

23.     Bridger Swan Ranch, LLC, is a Delaware limited liability company, with its

corporate headquarters in the State of Kansas.

24.     Bridger Terminals, LLC, is a Delaware limited liability company, with its corporate headquarters in the State of Kansas.

25.     Bridger Transportation, LLC, is a Louisiana limited liability company, with its corporate headquarters in the State of Texas.

26.     Bridger Leasing, LLC, is a Louisiana limited liability company, with its corporate headquarters in the State of Texas.

27.     Bridger Energy, LLC, is a Delaware limited liability company.

28.     Bridger Lake, LLC, is a Delaware limited liability company, with its corporate headquarters in the State of Kansas.

29.     J.J. Liberty, LLC, is a Texas limited liability company, with its corporate headquarters in the State of Missouri.

30.     J.J. Addison Partners, LLC, is a Texas limited liability company, with its corporate headquarters in the State of Missouri.

## JURISDICTION

17.31.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) (maritime jurisdiction).  Eddystone seeks to enforce payment of a debt arising under a maritime contract.  The maritime contract in question concerns Eddystone's providing the service of transloading crude oil from railcars delivered to Eddystone's facility to vessels at the facility's dock for subsequent shipment downriver.  This Court also has jurisdiction under 28 U.S.C. § 1367(a) (supplemental jurisdiction).

18.32.  Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

## FACTUAL ALLEGATIONS

33.     Rios and Gamboa, along with non-defendant James Ballengee, owned and operated a crude oil trading and logistics business.  They created a series of nominally different companies with the name "Bridger" to carry on this business, but treated them all as part of an undifferentiated whole.  The Bridger entities operated without inter-company contracts and were all headed by the very same people and shared employees.  These entities included, among others, Bridger, LLC, Bridger Marketing, Bridger Logistics and its subsidiaries Bridger Administrative Services II, LLC, Bridger Marine, LLC, Bridger Rail Shipping, LLC, Bridger Marine, LLC, Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Energy, LLC, Bridger Leasing, LLC, Bridger Lake, LLC, Bridger Administration, Bridger Management, J.J. Liberty, LLC, J.J. Addison Partners, LLC (the "Additional Fraudulent Transfer Recipient Subsidiaries"), and BTS (collectively, the "Bridger Group").  The Bridger Group, holding itself out as Bridger Logistics, provided logistics services for the transport of crude oil from wellhead to end markets in North America.

19.34.  Bridger Logistics was the sole "member" of BTS, which in the context of a limited liability company means that Bridger Logistics owned all of BTS' equity and controlled all of BTS' decision-making.  Through the Bridger Marketing entity, the Bridger Group purchased and took title to crude shipments until delivery to the purchaser. Bridger Logistics was also the sole "member" of Bridger Administrative Services II, LLC, Bridger Marine, LLC, Bridger Rail Shipping, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Energy, LLC, Bridger Leasing, LLC, Bridger Lake, LLC, and Bridger Real Property, LLC; through their sole member Bridger Real

Property, Bridger Logistics owned and controlled J.J. Liberty, LLC, and J.J. Addison Partners, LLC.

Formatted: Font: Times New Roman

20.35. In early 2013, shipping crude oil out of North Dakota by rail represented a profitable business opportunity for firms like Bridger Marketing and Bridger Logistics. Shippers like Bridger Marketing could buy crude oil from the oil production area in North Dakota at a discounted price and later resell it to refineries on the East Coast at a profit. In February 2013, the prevailing prices for North Dakota crude were more than $20.00 per barrel less than the price for Brent, the primary benchmark price for crude oil on the East Coast. After covering the expenses of transporting crude oil by rail from North Dakota to the East Coast, shippers could keep as profit a significant part of the $20+ North Dakota/Brent price differential or "spread." Similarly, crude oil logistics firms like Bridger Logistics could earn profits by agreeing to provide these shippers with arrangements to transport crude oil from the wellhead in North Dakota to East Coast refineries.

21.36. In order to take advantage of this opportunity, Bridger Logistics needed access to a transloading facility to transfer the crude oil it brought in on rail cars to barges for shipment to oil refineries on the Delaware River. Thus, Defendants Rios, Gamboa, and Bridger Logistics entered into negotiations with Eddystone to induce Eddystone to commit to building a facility that would give Bridger Logistics exclusive transloading capacity to refineries on the Delaware River. To that end, on February 13, 2013, Rios executed the Eddystone Rail Facilities Services Agreement ("RSA") between BTS and Eddystone.

22.37. Under the RSA, BTS promised to transload a total of 118,168,750 barrels of crude oil at the Eddystone facility over a period of five years and two months from the date construction was completed. Every month, BTS was to bring into the transloading facility the

Formatted: Font: Times New Roman, 12 pt

equivalent of at least 64,750 barrels per day.  Eddystone would charge BTS $2.25 for each barrel

transloaded and, if BTS failed to deliver the monthly minimum volume commitment ("MVC"),

BTS would make a deficiency payment of $1.75 for each barrel by which the month's delivered

volume fell short of the MVC.

~~23.~~38.  In reliance on the promise to make these payments and on Defendants' holding

out of BTS as a bona fide company, Eddystone spent over $170 million in constructing a rail-to-

barge crude oil transloading facility for BTS at Eddystone, Pennsylvania which ultimately

employed about 50 people.  Eddystone completed and began operating the Eddystone facility on

April 17, 2014.  BTS then became obligated to transload its MVC quantity of crude oil or make

its deficiency payments.

~~24.~~39.  The RSA allowed Bridger Logistics to obtain its desired business opportunity.

Touting Bridger Logistics' exclusive access to the Eddystone facility's transloading capacity, the

Bridger Group was able to sign a deal ~~in June 2014~~ to acquire and deliver North Dakota crude to

Monroe Energy LLC ("Monroe").  Monroe is the owner/operator of a refinery in Trainer,

Pennsylvania which refines crude oil into refined products, including jet fuel for Monroe's parent

company, Delta Airlines.

~~25.~~40.  The ~~June~~July 2014 Crude Oil Supply Agreement (the "COSA") between Monroe

and  Bridger Marketing provided and paid for both Bridger Marketing's and Bridger Logistics'

services as an undifferentiated package.  The COSA was closely calibrated to BTS' transloading

capacity available under the RSA.  Bridger Marketing agreed to acquire and deliver to the

Trainer refinery and Monroe agreed to accept and pay for 1.95 million barrels per month through

June 2019—roughly equaling BTS' minimum volume commitment to Eddystone under the RSA.

> Formatted: Font: Times New Roman

> Formatted: Font: Times New Roman

> Formatted: Font: Times New Roman, 12 pt

Under the June ~~2014~~July COSA, Monroe did not differentiate between payment for Bridger

Marketing's services and Bridger Logistics' logistics transportation services.

~~26.~~41.   Bridger Marketing's role was ~~only~~ to acquire, through third-party financing, the

crude oil to be sold to Monroe.  Bridger Logistics and its subsidiaries arranged for the

transportation of the crude oil shipments from North Dakota to the Eddystone facility by rail,

where it was transferred from railcars to barges at Eddystone's dock and then transported down

the Delaware River to the refinery at Trainer, Pennsylvania.

~~27.~~42.   Defendants held out to Eddystone that BTS was an independent, bona fide

company with substantial operations in addition to the RSA.  Defendants represented that, as of

December 31, 2014, BTS had total assets of $98.1 million, including shareholders' (members')

equity of $37.9 million, including crude oil truck injection units, construction in progress, and

receivables.  These numbers did not include any value for the RSA contract.

~~28.~~43.   Until May 2015, there were no written contracts between Bridger Marketing,

Bridger Logistics, and BTS or any of the Additional Fraudulent Transfer Recipient Subsidiaries

as to how to split the payments from Monroe.  Rios and Gamboa used the Monroe payments as if

all Bridger affiliates were one entity.

~~29.~~44.   The course of dealing among the Bridger entities shows that they either operated

with one another without regard to corporate entities or through a series of implied contracts.

~~30.~~45.   Defendants were operating BTS without regard to its separate company identity

from Bridger Logistics, so Bridger Logistics is fully liable for BTS' debts to Eddystone.

Although the Bridger Group consisted of several separate entities, it was run as a single

integrated organization.  Bridger, LLC served as sole member and manager of Bridger Marketing

and Bridger Logistics.  Bridger, LLC also served as sole manager of BTS, which had Bridger

Logistics as its sole member.

~~31.~~46.  Bridger, LLC employed all the principals and executives who dealt with

Eddystone under the RSA, on behalf of BTS.  Julio Rios was Bridger, LLC's President and CEO,

and Jeremy Gamboa was its Executive Vice President and Chief Operating Officer.  The rail

operations bringing trains into the Eddystone facility were managed by Dion Nicely, Jon

Kolniak, and Taylor Phifer, who held the titles of Vice President, Rail and Marine (and earlier

Chief of Staff), Manager Rail Operations, and Rail Logistics Coordinator at Bridger, LLC,

respectively.  BTS had no personnel of its own.

~~32.~~47.  To accomplish the transport of crude oil to Monroe, Rios and Gamboa had

Bridger Group entities enter into contracts with third parties to secure the necessary assets,

including BTS' contract with Eddystone.  ~~BTS had no source of cash flow other than the funds it~~

~~received from~~ Bridger Logistics.  ~~Bridger Logistics~~ affiliates provided BTS the funds needed to

satisfy its obligations to Eddystone under the RSA by which the Bridger Group had secured

access to the Eddystone transloading facility.  ~~Over the nineteen months in which crude oil was~~

~~shipped to Monroe and Monroe made its COSA payments~~Until May 2015, Bridger Logistics

affiliates received payments from Monroe under the COSA and paid BTS ~~all of the~~ amounts

~~necessary for~~sufficient to allow BTS to make all of the RSA payments due to Eddystone.

~~33.~~48.  If BTS was not the alter ego of Bridger Logistics, it was operating through a

series of implied contracts with Bridger Logistics, which Bridger Logistics later abrogated

without compensation to BTS.  A parent is obligated to pay its subsidiary for the fair value of

services that it receives and, from the start, Bridger Logistics and BTS formed an implied

contract for a series of such exchanges.  Bridger Logistics used BTS' transloading services to

service Monroe and to fulfill its obligations ~~under its contracts with~~to Bridger Marketing and

Monroe.

~~34.~~49.  In providing this service, BTS was a subcontractor of Bridger Logistics, which

was providing a packaged product to Monroe and Marketing.  To obtain the transloading

capacity to satisfy Bridger Logistics' needs, BTS entered into a five-year minimum volume

commitment with Eddystone.  No unrelated third-party subcontractor would have entered into a

five-year obligation like the RSA with Eddystone and then provided the transloading services to

a third party on a monthly basis at its monthly cost, ignoring the long-term obligation it had

incurred.  Instead, an arm's length third party would have required an agreement from its prime

contractor that it would cover the subcontractor's costs. Thus, the subsidiary BTS committed to

provide services to the parent Bridger Logistics in exchange for the parent's implied

commitment to make payments to fund the subsidiary's costs.  Bridger Logistics and BTS

continuously reaffirmed their implied contract through their course of dealing.  Bridger Logistics

~~and its~~ affiliates credited to BTS a substantial portion of the Monroe revenue stream and

transferred ~~to BTS all the~~ those funds ~~necessary~~to BTS' bank accounts from May 2014 through

late May 2015.  These transfers allowed BTS to make all payments due to Eddystone~~from May~~

~~2014 until February 2016, and during~~.  During that time, BTS consistently made those payments

to maintain access to Eddystone's facility for Bridger Logistics~~.~~ and its affiliates.  Through the

consistent transfers and payments over an uninterrupted period of ~~nineteen~~twelve months,

Bridger Logistics evidenced its obligation to BTS to fund the RSA for its entire term.

~~35.~~50.  In May and June 2015, Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively

"FGP") negotiated with Rios and Gamboa to acquire Bridger Logistics.  Because FGP was only

acquiring Bridger Logistics, it was necessary to divide the Monroe payments between those

14

being provided for Bridger Marketing's services and those being provided for Bridger Logistics' services.

~~36.~~51.  Thus, in May 2015, the ~~June~~July 2014 COSA with Monroe was replaced with

Formatted: Font: Times New Roman

three new agreements among Monroe, Bridger Marketing and Bridger Logistics.  First, Marketing entered into an amended COSA with Monroe whereby Monroe paid separately for Marketing's services.  Second, Bridger Logistics entered into a new Transportation and Logistics Services Agreement with Monroe to provide transportation logistics from North Dakota by rail, transloaded at the Eddystone facility to barges and down the Delaware River to Trainer.  Finally, the two Bridger entities, Marketing and Logistics, entered into a new Transportation and Logistics Agreement whereby Logistics agreed to provide logistics services to Marketing.

~~37.~~52.  On June 24, 2015, Bridger, LLC sold Bridger Logistics to FGP.  Rios and Gamboa personally realized at least $27.1 million and $13.6 million from the sale of Bridger Logistics.  Bridger, LLC retained Bridger Marketing.

~~38.~~53.  As part of the deal, Rios and Gamboa transferred to Ballengee their interests in Bridger, LLC and joined FGP as its management team for Bridger Logistics.  Ballengee, now sole owner of Bridger, LLC and its remaining subsidiary Bridger Marketing, renamed them "Jamex, LLC" and "Jamex Marketing."

54.    To perform under the new arrangement, Bridger Logistics continued to require BTS' access to the Eddystone facility.  The volume capacity at Eddystone's transloading facility matched the volume requirement of the new Transportation and Logistics Agreement with Monroe, so BTS continued to commit the capacity it had secured at Eddystone's facility to Bridger Logistics' needs so that Bridger Logistics could fulfill its obligations under the Transportation and Logistics Agreement with Monroe.

Formatted: Font: Times New Roman, 12 pt

55.     Beginning in May 2015, however, Defendants Rios, Gamboa, Bridger Logistics continued to fund, and FGP stripped BTS so that it could make of assets, of its former payments to for the Eddystone and other transshipment capacity, and of its cash flows from other contracts.

56.     In June 2015, Defendants Rios, Gamboa, Bridger Logistics, and FGP caused BTS to forgive millions of dollars in accounts receivable that it was owed by other Bridger Logistics and FGP affiliates, including the Additional Fraudulent Transfer Recipient Subsidiaries.

39.57.   From May 2015 onward, Defendants Rios, Gamboa, Bridger Logistics, and FGP re-directed the portions of the Monroe revenue stream that had gone to BTS – as well as much of BTS's non-Monroe related revenue – to other Bridger Logistics and FGP affiliates, particularly Bridger Rail Shipping.  From this point forward, BTS was paid nothing for its transloading capacity under the RSA or for many of the other services it provided that allowed Bridger Logistics, FGP, and Rail Shipping to transport oil to Monroe and fulfill its obligations under its transportation and logistics agreements with Jamex and Monroe.  As long as they needed the capacity to service Monroe and the transportation and logistics agreements, Bridger Logistics, Bridger Rail Shipping, and their non-BTS affiliates continued to fund payments to Eddystone under the RSA by paying Eddystone directly.

40.58.   Indeed, FGP publicly represented that access to the ERC transloading capacity was an asset of Bridger Logistics.  In a June 1, 2015 presentation titled "Bridger Acquisition Overview" FGP asserted that Bridger Logistics' "Newbuild, high-quality asset base includes . . . rail . . . unloading terminals . . . to transport a minimum of 65 MBbls/d."  The FGP Form 8-K announcing the purchase of Bridger Logistics observed that "Bridger Logistics' business included . . . rail . . . unloading terminals . . . to transport a minimum of 65 MBbls/d."  FGP's 10-

K for the period ending July 31, 2015 states that Bridger Logistics "owns and/or controls" the ERC volume capacity.

41.59.  FGP also represented that the ERC transloading capacity was "available" to Bridger Logistics in both the Form 8-K announcing the purchase of Bridger Logistics and in FGP's consolidated financial statements.

42.60.  Subsequent to its separation from Bridger Logistics, Jamex Marketing continued in the business of acquiring crude oil for end users elsewhere, including its amended COSA with Monroe.

43.61.  But oil prices were changing, eventually making the amended COSA and Jamex Marketing's Transportation and Logistics Agreement with Bridger Logistics quite unprofitable for Jamex Marketing.  The amended COSA pricing was based, in part, on Brent benchmark prices.  Bridger Marketing would profit so long as North Dakota prices remained substantially below Brent.  But the difference between North Dakota crude oil prices and Brent narrowed dramatically to the point where the spread was too narrow for Bridger Marketing to earn any profit through its performance under the COSA.

44.62.  As the North Dakota–Brent price differential narrowed even further, Jamex Marketing began incurring multi-million dollar losses almost every month.  By the fall of 2015, Jamex Marketing was seeking to negotiate with Monroe and Bridger Logistics to terminate its obligations.

45.63.  Monroe was receptive to Jamex Marketing's suggestions.  The spread between North Dakota and Brent prices had narrowed to the point where Monroe would be substantially advantaged if it were able to acquire West African crude instead of North Dakota crude under the amended COSA.

46.64.  Bridger Logistics, FGP, Rios, and Gamboa were also receptive to Jamex Marketing's suggestions.  Although Bridger Logistics and FGP were deriving rich profits from its Transportation and Logistics Agreements with Monroe and Jamex Marketing, it was clear that Jamex Marketing was losing money at such a rapid clip that Jamex Marketing would run out of cash to acquire crude oil for Monroe or to pay its Transportation and Logistics Agreement obligations to Bridger Logistics.  This would end revenue from the Transportation and Logistics Agreement from Monroe well before the June 2019 end of its term, leaving Bridger Logistics and BTS with the obligations for the matching transloading capacity at the Eddystone facility secured under the RSA.  Accordingly, the Defendants developed a plan to wind down the exposure to Jamex Marketing, strip BTS of its assets, but without providing for payment of Bridger Logistics' obligation obligations to BTS and its creditor Eddystone.

65.     Between late May 2015 and January 2016, Defendants Rios, Gamboa, Bridger Logistics, and FGP stripped BTS of assets, including cash flows, and caused BTS to operate as little more than a liability shield for other FGP entities.  First, the Monroe revenues that had previously been credited to BTS were redirected to other FGP entities, including Bridger Logistics and Bridger Rail Shipping – and ultimately passed up to FGP.  Bridger Logistics and Bridger Rail Shipping began making payments directly to Eddystone on the RSA.

66.     Second, throughout this period BTS engaged in a series of intercompany transactions by which it transferred substantial assets to Defendants Bridger Logistics, Bridger Administrative Services II, LLC, Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Transportation, LLC, Bridger Energy, LLC, Bridger Leasing, LLC, Bridger Lake, LLC, Bridger Administration, Bridger Management, J.J. Liberty, LLC, and J.J. Addison Partners, LLC.  Reflecting the management of Bridger as a single business without regard for individual

18

corporate distinctions, millions of dollars of these transfers were recorded as to "Bridger Group," "Bridger Administration," and "Bridger Management," which are not legally defined entities. These transfers were not made for reasonably equivalent value. Often they were for intercompany "accounts receivable" that were themselves written off or that BTS otherwise did not recover.

67.     Third, BTS also transferred away all of its real and personal property and valuable commercial contracts to other FGP subsidiaries. For example, in January 2016, BTS transferred to Bridger Swan Ranch, LLC, a newly-formed FGP subsidiary, the Swan Ranch transloading facility with all of its transshipment infrastructure, including crude injection stations, a crude oil transmission pipeline, and associated fixtures, valued at $18.5–20 million. BTS also transferred to Bridger Swan Ranch, LLC, the associated throughput agreement with Shell that had $23.68 million remaining in fixed fees. BTS received no consideration. BTS granted Bridger Real Property, LLC, title to 15 acres of land in Laramie County, Wyoming for $10, though the land was valued by the county tax assessor at $950,000. BTS transferred tens of millions of dollars' worth of assets to Bridger Terminals, LLC, including land, injection stations, throughput agreements, and equipment, fixtures, and personal property for $10. BTS also allowed a blanket lien to be granted on its assets to secure loans made to FGP.

68.     Fourth, in January 2016, Defendants Rios, Gamboa, Bridger Logistics, and FGP caused BTS to forgive millions of dollars in accounts receivable that it was owed by other Bridger Logistics and FGP affiliates, including the Additional Fraudulent Transfer Recipient Subsidiaries.

69.     Through this process BTS was left without any valuable assets and ongoing businesses so that it served as a mere tool of Defendants through which they hoped to evade the

**Formatted:** Font: Times New Roman, 12 pt

RSA obligations without cost to the Defendants.  BTS's revenue and profits were re-directed to Bridger Logistics, Bridger Rail Shipping, the other Additional Fraudulent Transfer Recipient Subsidiaries, and ultimately passed up to FGP.

47.70.  On January 13, 2016, in a set of letter agreements, Bridger Logistics, Jamex Marketing, and Monroe suspended their arrangement for the sale and delivery of crude oil. Jamex Marketing and Monroe agreed to suspend performance under the amended COSA for at least three months, starting February 1, 2016.  This suspension never ended: after extending the suspension, the parties ultimately terminated the amended COSA.

71.     Under the letter agreements suspending and ultimately terminating the Monroe shipping arrangement, Bridger Logistics received and continues to receive substantial payments in lieu of the minimum volume obligations that appeared in its transportation and logistics agreements with both Monroe and Jamex Marketing, which it has passed up to FGP.  Those transportation and logistics agreements and their minimum volume obligations matched, were obtained using, and were serviced via BTS's contractual transloading capacity at Eddystone under the RSA.  But once it ceased shipments of crude oil to Monroe, Bridger Logistics and FGP retained the payments attributable to those minimum volume obligations for themselves rather than honoring Bridger Logistics' implied contract with BTS.

48.72.  The January letter agreements also provided for the transfer of BTS and its RSA to a newly formed subsidiary of Jamex Marketing.  That transfer was effective on February 1, the very date on which the amended COSA suspension made the Eddystone facility useless both to Bridger Logistics and Jamex Marketing.  Prior to the transfer of BTS to Jamex Marketing, the Defendants transferred all of BTS' remaining real estate, equipment, receivables, and other assets to other FGP entities and allowed BTS to effectively relinquish its right to payment of the

RSA obligations from Bridger Logistics, so that BTS' only "asset" was the RSA with ERC. Indeed, the Defendants prohibited BTS from engaging in any business other than performing under the RSA, which BTS lacked the ability to perform.

49.73.  Jamex Marketing paid $10 for the now valueless BTS, which twelve months earlier had $98.1 million in assets.  Jamex Marketing, of course, had no use for the stripped BTS and lacked the resources to service BTS' remaining RSA obligations.

50.74.   Beginning February 1, 2016, BTS (later renamed Jamex Transfer Services) never delivered another train to Eddystone.  Several weeks after Bridger Logistics stopped providing funding, BTS belatedly notified Eddystone of its change in ownership.  BTS refused to make any more payments under the RSA, claiming the RSA was void ab initio.  BTS even falsely claimed that the reason for the termination of the amended COSA and the cessation of shipments to Monroe was that Eddystone refused to consent to a financing arrangement.   Abruptly cut off from the business on which Eddystone had relied, Eddystone had to suspend operations. Eddystone is still trying to find business to resume operations at the facility.

51.75.  In response, Eddystone filed a demand for arbitration with the Society of Maritime Arbitrators on April 19, 2016.  Eddystone sought an award for unpaid invoices that had accrued to date and for future minimum volume payments in light of BTS' anticipatory breach of contract.  On January 5, 2017, Eddystone entered into a settlement agreement with Jamex Marketing and James Ballengee, whereby Bridger Transfer Services—now re-named Jamex Transfer Services—consented to an arbitration award.

**COUNT ONE**

**(Alter Ego – against FGP, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping)**

52.76.  Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 5175 above.

21

53.77.  Defendants FGP, Bridger Logistics, Rios, and Gamboa completely dominated BTS in all aspects of its business, directing and controlling its day-to-day operations and treating it like a mere department instead of respecting it as an independent legal entity.  BTS was merely the alter ego of FGP, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping in several respects.

54.78.  First, after Defendants stripped BTS, BTS was not capitalized with sufficient resources for its business, providing transloading services for Bridger Logistics.Defendants,  That required BTS to undertake a substantial minimum volume commitment payment obligation—for the benefit of FGP, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping—for which it did not have adequate resources of its own.

55.79.  Second, if Bridger Logistics did not have an implied contractual obligation to fund the RSA payments BTS was required to make, BTS' making available all of its transloading capacity to Bridger Logistics and Bridger Rail Shipping (and by extension the other Defendants) was not an arm's length transaction for fair value.

56.80.  Third, BTS did not maintain separate financial records or accounts from Bridger Logistics Defendants, and Defendants treated transferred, commingled, managed, and represented to others that BTS' used BTS's assets wereand funds for the benefit of its affiliates, including Bridger Logistics, FGP, and Bridger Logistics' own.Rail Shipping.

81.      Fourth, Defendants treated and represented to others that BTS' assets were Bridger Logistics Logistics' and FGP's own.

57.82.  Fifth, Defendants did not deal with BTS at arm's length.  If there was no implied contract between BTS and Bridger Logistics, Defendants directed BTS to take on the RSA obligations for no compensation to provide Bridger Logistics and the other Defendants access to

22

the Eddystone facility, and transferred money to BTS *ad hoc* as its conduit to pay Eddystone.

Defendants treated BTS' assets as Bridger Logistics' own, and represented as much to the wider

marketplace by maintaining that Bridger Logistics had exclusive access to a transloading facility

in the Philadelphia area and that BTS' capacity was Bridger Logistics'.

~~58.~~83.   ~~Fifth~~Sixth, BTS never paid dividends.  FGP, Rios, and Gamboa ~~never allowed~~did not allow BTS to earn a profit as a separate entity, but treated it merely as a conduit entity. Beginning with BTS' first payment to Eddystone, Bridger Logistics affiliates transferred funds to BTS just to cover expenses it incurred in the normal course of business.

~~59.~~84.   BTS was thus a façade for the operations of its 100% equity owner, Bridger Logistics, Bridger Logistics' control persons Rios, Gamboa, and FGP, and Bridger Rail Shipping.

~~60.~~85.   Considering Defendants' improper use of the company form both before and after the sale of Bridger Logistics to FGP, the Court should disregard BTS' status as a separate entity. Bridger Logistics, FGP, Rios, Gamboa, and Bridger Rail Shipping derived substantial benefits from BTS' access to the transloading facility, benefits in addition to its actual use of the facility. The Court should therefore disregard BTS' status as a separate entity to avoid the injustice of Defendants reaping these economic benefits without paying the associated costs.

~~61.~~86.   In light of the alter ego relationship between BTS and Bridger Logistics, FGP, Rios, Gamboa, and Bridger Rail Shipping, Eddystone is entitled to an order from this Court piercing the corporate veil of BTS and holding ~~Bridger Logistics~~each Defendant liable for the debts BTS ~~owed~~owes to Eddystone.

**COUNT TWO**

**(Intentional Fraudulent Transfer – 12 Pa. C.S. § 5104(a~~)~~)) – against all Defendants)**

23

62.87.  Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 6186 above.

Formatted: Font: Times New Roman

88.     Prior to, in preparation for, and after the sale of Bridger Logistics to FGP, Defendants Rios, Gamboa, Bridger Logistics, and FGP caused BTS to transfer, without reasonably adequate consideration in exchange, all of its cash, accounts receivable, real and personal property, valuable commercial agreements, and other assets, to Bridger Logistics, Bridger Administrative Services II, LLC, Bridger Marine, LLC, Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Energy, LLC, Bridger Leasing, LLC, Bridger Lake, LLC, Bridger Administration, Bridger Management, J.J. Liberty, LLC, and J.J. Addison Partners, LLC.

63.89.  Defendants caused BTS to allow its implied contract with Bridger Logistics to be abrogated without reasonably adequate consideration, thereby transferring to Defendants approximately $140 million of value.  Defendants Rios, Gamboa, Bridger Logistics, FGP, and FGPBridger Rail Shipping therefore engaged in an intentional fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

64.90.  InBy or before February 2016, Bridger Logistics unilaterally terminated its implied obligation to BTS.  Through their control of BTS, transferees Rios, Gamboa, Bridger Logistics, Bridger Rail Shipping, and FGP caused BTS to allow its implied contract with Bridger Logistics to be abrogated, transferring about $140 million of value to Defendants without providing BTS reasonably equivalent value.  Bridger Logistics then transferred BTS to a subsidiary of Jamex Marketing, an entity it knew or should have known to have insufficient resources to pay the RSA payments in any event.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman, 12 pt

24

65.91.  BTS' right to receive payments from Bridger Logistics was a highly valuable interest in property.  And Defendants, in unilaterally terminating Bridger Logistics' payment commitment, caused BTS to transfer away this property to Defendants for no consideration.

66.92.  Defendants Rios, Gamboa, Bridger Logistics, and FGP caused BTS to transfer away its property with the intent to hinder, delay, or defraud Eddystone, BTS' principal creditor. The transfer was marked by the following badges of fraud:

    a.  First, the transfer of value was to insiders of the transferor BTS.  Bridger Logistics and BTS were parent and subsidiary at the time.  FGP was Bridger Logistics' 100% parent, and.  The Additional Fraudulent Transfer Recipient Subsidiaries were affiliates of BTS and subsidiaries of FGP and Bridger Logistics.  Rios and Gamboa were the officers and controlling persons of BTS as well as Bridger Logistics and FGP.  The value was transferred from BTS for the benefit of the insider Defendants.

    b.  Second, Defendant transferees planned clandestinely to transfer away the value of BTS' implied contract and other assets.  Defendants never disclosed their shut-off of funding or their plan to terminate shipments until well after the fact. Nor was the sale of BTS disclosed until after it had occurred and BTS had defaulted on the RSA.

    c.  Third, there was no business purpose for the transfer of BTS, which was merely an effort to hinder Eddystone's collection of its debts.   Defendant transferees knew or should have known that Monroe would not be calling for North Dakota crude much longer, so the transfer was made just prior to a termination of deficiency payments that they were obligated to pay to BTS.

Indeed, the entire transaction was to hinder Eddystone, for Jamex Marketing had no business reason to acquire BTS.  Defendants did not even transfer all documents to BTS' new owners, making it more difficult for Eddystone to obtain discovery in its arbitration against BTS.

    d.  Fourth, the transfer of the value of Bridger Logistics' implied obligation by causing BTS to allow termination of that contract and the transfer of BTS's other assets constituted a transfer of substantially all of BTS' assets to transferee Defendants.  The implied right to payment from Bridger Logistics was BTS'These were BTS's only real assetassets.

    e.  Fifth, in return for thisits essential assetassets, BTS did not receive equivalent value—indeed, it received no value whatsoever.  Transferees Rios, Gamboa, Bridger Logistics, and FGPFGP, and the Additional Fraudulent Transfer Recipient Defendants thus caused BTS to deplete its assets with no corresponding benefit to BTS.

    f.  Sixth, as a result of the transfer to transferees, BTS immediately became insolvent and defaulted on the RSA.

67.93.  In light of Defendants' intentional fraudulent transfer, Eddystone is entitled to an order from the Court avoiding the transaction and requiring Defendants to transfer to BTS the assets necessary to satisfy obligations owed to Eddystone, damages in the amount of the value of the transfer, punitive damages, and all other relief described below.

**COUNT THREE**

**(Constructive Fraudulent Transfer – 12 Pa. C.S. § 5105 – against All Defendants)**

68.94.  Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 6793 above.

69.95.  By causing BTS to allow its implied contract with Bridger Logistics to be abrogated without any compensation to BTS and by transferring away BTS's other assets to Bridger Logistics and the Additional Fraudulent Transfer Recipient Subsidiaries without reasonably adequate consideration in exchange, Defendants Rios, Gamboa, Bridger Logistics, and FGP transferred value to Rios, Gamboa, Bridger Logistics, FGP, and FGPthe Additional Fraudulent Transfer Recipient Subsidiaries without BTS' receiving "reasonably equivalent value."

70.96.  BTS became insolvent as a result of the transfertransfers.

71.97.  Accordingly, the transfer wastransfers were a constructive fraudulent transfertransfers under 12 Pa. C.S. § 5105.

72.98.  In light of Defendants' constructive fraudulent transfertransfers, Eddystone is entitled to an order from the Court avoiding the transaction and requiring Defendants to return the assets to BTS to the extent necessary to satisfy obligations owed to Eddystone, damages in the amount of the value of the transfer, and all relief described below.

**COUNT FOUR**

**(Breach of Fiduciary Duties of Care and Loyalty to Creditors – against FGP, Bridger Logistics, Rios, and Gamboa)**

73.99.  Eddystone re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 7298 above.

74.100.     From the time that BTS was in the zone of insolvency, the parties to whom Defendants Bridger Logistics, FGP, Rios, and Gamboa, BTS' controlling persons, including its officers, owed fiduciary duties of care and loyalty to BTS' creditors, including Eddystone. – In the zone of insolvency, BTS' controlling persons owed creditors a duty to manage BTS in a manner calculated to maximize creditors' recovery of BTS' debts to creditors.

75.101.     Defendants Bridger Logistics, FGP, Rios, and Gamboa negligently or otherwise improperly caused BTS to transfer its assets.  Defendants Bridger Logistics, FGP, Rios, and Gamboa did so knowing that such transfer was for inadequate consideration, was made while BTS was in the zone of insolvency, and would harm BTS' creditors, or they negligently failed to determine the circumstances surrounding the transfer, including its effect on BTS' solvency, the need for adequate consideration, and their duties to BTS' creditors.

76.102.     If there was an implied contract between Bridger Logistics and BTS, Defendants Bridger Logistics, FGP, Rios, and Gamboa violated their fiduciary duties of care and/or loyalty to Eddystone by causing BTS to allow the abrogation of that implied contract without any consideration to BTS and otherwise transferring BTS' assets to Defendants beginning in May 2015.

77.103.     If there was no implied contract between Bridger Logistics and BTS, BTS was insolvent from the moment that it entered into the RSA with Eddystone, as it would have had insufficient resources to make payments under the contract.  In that event, Defendants Bridger Logistics, FGP, Rios, and Gamboa breached their fiduciary duties of care and/or loyalty to BTS' creditors byon an ongoing basis from April 2014 through present by making BTS' transloading capacity available to its affiliates while failing to secure an arm's length contract that would pay BTS for its services and also as a result of the fraudulent transfers and other

conduct to BTS' disadvantage described in this Complaint, Defendants Bridger Logistics, FGP, Rios, and Gamboa thus managed BTS in a way directly contrary to the interests of Eddystone and BTS itself.  They negligently or intentionally allowed BTS' assets, property, and liabilities to be used for the benefit of themselves and their affiliates.  Defendants Bridger Logistics, FGP, Rios, and Gamboa thus owe Eddystone damages sufficient to compensate it for the injuries caused by their breach of duty and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Eddystone respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

1. An award of all payments BTS owes to Eddystone under the RSA.

2. An award against Defendants of all amounts awarded by the SMA arbitration panel in the arbitration between Eddystone and BTS.

3. All expectation damages available to a party injured by breach of contract at common law and by statute and such other and further relief as this Court deems just and proper.

4. An order avoiding all direct or indirect transfers from BTS to Defendant transferees and requiring Defendant transferees to undo those transfers.

5. Damages in the amount of the value of the transfers described in the previous paragraphs.

6. An award of compensatory damages against Defendants for the economic injury they caused Eddystone through breach of their fiduciary duty in the amount of the foregone minimum volume payments owed under the RSA.

7. An award of punitive damages against Defendant transfereesDefendants for their intentional fraudulent transfer and their willful breach of fiduciary duty.

29

8.   Pre- and post-judgment interest, including under NY CPLR 5001 & 5004.

**JURY DEMAND**

Plaintiff Eddystone Rail Company, LLC hereby demands a trial by jury as to all counts so triable.

Dated: February 2, 2017July ___, 2018                      By: _____

Henry E. Hockeimer, Jr. (I.D. No. 86768)
hockeimerh@ballardspahr.com
Terence M. Grugan (I.D. No. 307211)
grugant@ballardspahr.com

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

Filiberto Agusti (*pro hac vice* application pending)
fagusti@steptoe.com
Jeffrey Theodore (*pro hac vice* application pending)
jtheodore@steptoe.com
Timothy WorkAndrew Sloniewsky (*pro hac vice* application pending)
tworkasloniewsky@steptoe.com
Nicholas Petts (*pro hac vice* application pending)
npetts@steptoe.com

**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

*Counsel for Eddystone Rail Company, LLC*

30