**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17–cv–00495 |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| ―――――――――――――――― | ) | |

**PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S MOTION TO COMPEL**

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

## INTRODUCTION

Plaintiff Eddystone Rail Company, LLC ("Eddystone") respectfully requests the Court's intervention in two discovery disputes that the Parties have been unable to resolve after extensive discussions, including at least two telephonic conferences and a long-running exchange of emails.

First, Eddystone requests the opportunity to inspect and obtain full production of Ferrellgas's accounting records.  As the Court recognized when it ordered production of these materials almost a year ago, Ferrellgas's accounting records are the best evidence of the asset transfers and inter-affiliate relationships that are at the heart of Eddystone's claims.  However, as detailed in the attached declaration by Eddystone's forensic accountants, the accounting records that Ferrellgas has produced are not complete.  Not only is the scope of the timeframe and transactions covered incomplete (and inconsistent with Ferrellgas's prior agreements), but the records that have actually been produced are missing key information that is essential to understand BTS's transactions, including the identities of the counter-parties, customer or payee names, descriptions of the purpose of the transactions and so forth.  This information is essential to understand the propriety of BTS's payments to its affiliates and whether Defendants siphoned off revenue to which BTS was properly entitled.  Ferrellgas has objected that producing the detailed backup documentation would be overly burdensome.  Accordingly, Eddystone requests the opportunity to inspect Ferrellgas's systems and identify the records to be produced – all subject to confidentiality order in this case.

Second, Eddystone asks the Court to overrule Ferrellgas's objections to producing documents regarding the transfers of assets from BTS to its affiliates and Defendants' financing arrangements.  Regarding the first, Ferrellgas has taken the position in discovery correspondence that its obligations are satisfied by its production of accounting records.  But Eddystone is

entitled to additional materials such as agreements, term sheets, communications and so forth. Eddystone needs these materials as they will provide critical context and detail to understand what Ferrellgas was doing and *why it was doing it* – an important element of an intentional fraudulent transfer claim.  Regarding the financing arrangements, Ferrellgas has agreed to produce only documents memorializing or reflecting financing arrangements in which BTS assets were used to secure loans.  But this improperly prevents Eddystone from tracing the diffusion of BTS's value throughout the Ferrellgas and Bridger Logistics groups – for example, Ferrellgas's proposal would exclude situations in which BTS assets were transferred to a Bridger Logistics subsidiary, liquidated or converted into other forms of value and then the resulting assets or value used to secure loans or pay off creditors elsewhere in the organization.  That would improperly crimp Eddystone's effort to follow the diffusion of the value contained in BTS that was fraudulent transferred.  Accordingly, the Court should overrule Ferrellgas's objections.

Eddystone respectfully brings these two issues to the Court's attention as they have been the subject of extensive meet and confer discussions and are now ripe for consideration. Eddystone notes that Ferrellgas waited until the August 13 document production deadline to produce 1.75 million pages – then eighty-five percent of its production – and then waited two weeks past the deadline to produce another 230,000 pages.  Ferrellgas has not yet served its privilege log.  Eddystone is still in the process of reviewing the production.  Eddystone will attempt to resolve any further issues without motion practice if possible, but may need to seek the Court's assistance again.

## ARGUMENT

**I.   THE COURT SHOULD ORDER AN INSPECTION OF FERRELLGAS'S ACCOUNTING RECORDS AND THE FULL PRODUCTION OF THE REQUESTED RECORDS**

Ferrellgas continues to withhold from Eddystone critical accounting records, including substantial portions of the Ferrellgas general ledger, meaningful sub-ledgers, and all accounting backup documents.  Ferrellgas claims that production of this material would be overly burdensome.  However, Ferrellgas has also refused to permit Eddystone's forensic accountants to conduct an inspection of the Ferrellgas accounting system to review the information that they need.  The Court should allow Eddystone to inspect Ferrellgas's accounting records and order a full production of Ferrellgas's accounting records.

This litigation concerns Ferrellgas's decision to strip BTS of assets and divert its revenue streams to other Ferrellgas entities to prevent Eddystone from recovering the more than $140 million due on Eddystone's contract with BTS.  Discovery so far has shown that this occurred via sophisticated accounting manipulations of Ferrellgas's books and records, whereby payments earned by BTS were instead credited to sham accounts not belonging to any actual legal entity with the actual cash deposited in other entities' bank accounts.  Ferrellgas papered these transactions with a complex web of intercompany accounts receivable and payables that ended in BTS receiving no consideration.

The full details of the accounting transactions cannot be determined from the general ledger alone, however, because it lacks so much of the transaction detail customarily found in a properly maintained general ledger.  *See* Declaration of M. Cardell ¶¶ 3-4, September 7, 2018. Revenue entries frequently do not indicate how the entity to which revenue is credited earned the revenue, or record "transfer revenue" or "revenue correction" without indicating the reason why. The intercompany accounts receivable and accounts payable transactions do not make clear why

an affiliate owed BTS money in each instance.  *Id*. ¶ 3.  To learn these and other critical details, Eddystone requires the sub-ledgers and documents supporting these entries.  *Id*. ¶ 4.  This is all material the Court has previously ordered Ferrellgas to produce.  *See* Dkt. 107 at 2 (ordering production of "all subsidiary ledgers, adjusting journals, and transaction detail").

Unfortunately, the supposed subsidiary ledger files Ferrellgas has produced are of little use.  Like BTS's general ledger, these files lack the customary transaction detail found in a properly maintained sub-ledger, including invoice numbers, customer names, dates, and so forth. Cardell Decl. ¶ 6.  To make matters worse, the files have no journal entry IDs to tie them in any way to the general ledger entries.  *Id*.  In fact, it is not even clear from the sub-ledgers to which entity each of the supposed sub-ledgers relates.  *Id*.  Being able to inspect the accounting files *in situ* in the context of the Bridger and Ferrellgas accounting systems rather than as excel spreadsheets exported from those accounting systems will likely help Eddystone's forensic accountants understand the accounting records.  *Id*. ¶ 7.  But Ferrellgas has refused this request.

As a result of these deficiencies, it is also essential that Eddystone's forensic accountants be able to see the backup documentation for all transactions at issue so that they can confirm exactly what has occurred.  Yet, after long-running negotiations, Ferrellgas has refused to produce the backup documentation that Eddystone has requested.  *See* Petts Declaration Ex. 3 (Email string between Counsel for Eddystone and Counsel for Ferrellgas, April 25, 2018 through August 3, 2018).  Eddystone initially requested production of all backup materials.  After Ferrellgas rejected that request, Eddystone agreed to Ferrellgas's request to specify particular entries at issue but warned Ferrellgas that the set of entries would be voluminous given the enormous number of intercompany transactions in which BTS was engaged.  *See* Petts Decl. Ex. 3 at 17, 30.  Eddystone subsequently requested backup documentation for roughly 27,000

general ledger entries.  The large number of entries is a result both of the fact that there are an enormous number of transactions between BTS and its affiliates but also because, in many case, transactions in the general ledger are composed of many smaller entries.  Cardell Decl. ¶¶ 8-9. Ferrellgas has refused this request as unduly burdensome, but also refuses to allow Eddystone to make its own inspection of the accounting systems.

Ferrellgas's accounting system should be the most complete record of the asset transfers and transactions by which Defendants used BTS for their own purposes, deprived it of revenue to which it was entitled, and stripped it of assets.  As the accumulation of all of the transactions of a company, the accounting records should disclose the complete picture of how Defendants abused BTS.  But the detail contained in the accounting records that have been produced so far is not complete.  For example, it is possible to see that Ferrellgas caused BTS to forgive well over $20 million in accounts receivable owed by its affiliates but not always possible to identify why or how those accounts receivable were originally incurred.  At it is possible to see that beginning in the summer of 2015, Ferrellgas diverted to other affiliates tens of millions of dollars in revenue that had been previously flowing to BTS but not always possible to identify the customer relationships or specific work in respect of which that revenue has been earned.  The lack of this critical detail interferes with Eddystone's ability to build a full picture of BTS's assets and revenue streams as they were shifted to other Ferrellgas entities and is why Eddystone seeks full inspection and production.

Ferrellgas cannot have it both ways.  It cannot refuse to produce the documents on grounds of burden while also refusing to allow Eddystone's own accountants to do the work themselves.  There is nothing unusual in such an inspection:  every day public companies allow their independent auditors to examine their backup documentation when reviewing their

- 6 -

financial statements before publication.  Ferrellgas cannot refuse to produce the requested

documents on grounds of burden and at the same time deny Eddystone access to inspect the

documents for itself.

Finally, an inspection is necessary because Ferrellgas continues to hold back critical

portions of its own general ledger and has now reneged on production agreements made nine

months ago.  While Ferrellgas has produced general and subsidiary ledgers for many of the

Bridger Logistics subsidiaries at issue (though they are inadequate for the reasons described

above), it has produced at most very limited portions of its own general ledger.

Without claiming to have made a full production, Ferrellgas has told Eddystone that

BLFG_EDPA0045640 "contains Ferrellgas accounting data."  Petts Decl. Ex. 3 at 1.  However,

this file appears to contain entries only from July 2015 through March 2016.  There is no

indication within the file that would identify it as Ferrellgas's general ledger or establish which

Ferrellgas entities' accounting entries are included in the file (i.e., Ferrellgas Partners, L.P.,

Ferrellgas, L.P., etc.).  In addition, the entries do not consistently indicate the counter-party for

each transaction (e.g., BTS, Bridger Rail Shipping, Bridger Logistics, Bridger Terminals, etc.).

Cardell Decl. ¶ 5.

This is not only inconsistent with an appropriate scope of production in this case but is

substantially less than what Ferrellgas itself agreed to produce after extensive negotiations

between Eddystone and Ferrellgas's prior counsel.  In particular, Ferrellgas agreed to produce

from the Ferrellgas general ledger all "transactions related to any of the Identified Bridger

Entities from between May 1, 2015 to December 31, 2016."  Petts Decl. Ex. 2 at 5 (Letter from

K. Porter to J. Theodore, Dec. 1, 2017).  But new counsel appears to have receded from this

agreement.  Cardell Decl. ¶ 5.

The failure to produce the agreed-upon portions of the Ferrellgas general ledger is particularly significant as Ferrellgas appears to be liquidating the assets of Bridger Logistics subsidiaries and using the money to pay off its own debts to its lenders.  Last month, Ferrellgas announced that on July 31, weeks after Eddystone shared with Ferrellgas counsel its amended complaint naming additional Bridger Logistics subsidiaries as fraudulent transferees, Bridger Logistics had sold assets of those subsidiaries worth $92 million, the proceeds of which would be used to pay down FGP's secured debt.  Petts Decl. Ex. 4 at 6 (Ferrellgas Partners, L.P., Form 8-K, Aug. 6, 2018).  The sale included all of the remaining crude oil terminal assets, the Swan Ranch Facility, Bridger Terminals, Bridger Environmental, and all assets associated with Bridger Transportation.  Previously, Ferrellgas appears to have sold $51 million in rail cars owned by Bridger Rail Shipping and applied the proceeds to pay down Ferrellgas's secured debt.  Petts Decl. Ex. 5 at 12 (Ferrellgas Partners, L.P., Form 10-Q, June 7, 2018).  By moving this money from Bridger Logistics subsidiaries that received transfers from BTS to Ferrellgas itself, Ferrellgas may be seeking to prevent Eddystone from recovering out of those assets even if it is successful against Bridger Logistics in this litigation.  But without access to Ferrellgas's general ledger, Eddystone remains substantially in the dark as to what is going on.

## II. THE COURT SHOULD ORDER COMPLETE PRODUCTION OF DOCUMENTS RESPONSIVE TO EDDYSTONE REQUESTS 20 AND 21 REGARDING ASSETS TRANSFERS AND SECURED LOANS

Eddystone requests 20 and 21 seek documents concerning financing or investments in Bridger Group entities as well as "all documents and communications concerning or relating to any transfer of assets or things of value from any Bridger Group entity to Ferrellgas, including any agreement governing the transfer, any documents reflecting consideration for the transfer, and any negotiations regarding the transfer."  Petts Decl. Ex. 1 at 32, 34 (Ferrellgas's First

Supplemental Responses and Objections to Plaintiff's First Set of Requests for Production,

August 1, 2018).  These requests are all the more important in light of the recent revelation that

Ferrellgas has pledged the assets of its Bridger subsidiaries to secure its loans and liquidated

those assets to reduce the Ferrellgas loan balance.  That effectively transfers value out of Bridger

subsidiaries, including those that received fraudulent transfers from BTS, and moves it to

Ferrellgas.

In earlier negotiations, prior Ferrellgas counsel agreed to produce the bulk of this

information, including "documents and communications relating to any transfer of assets or

things of value from BTS to Ferrellgas or another Bridger Group entity," "documents sufficient

to identify any transfer of assets or things of value from any of the other Identified Bridger

Entities to any Ferrellgas or Bridger Group Entity," "documents and communications relating to

. . . financing for BTS and/or BTS's assets," and "documents sufficient to identify financing for

the remaining Identified Bridger entities and their assets."  Petts Decl. Ex. 2 at 5-6.

Now, however, Ferrellgas counsel has retreated from that position.  After extended

negotiations on the issue, Ferrellgas asserts blithely that it has "confirmed" that its existing

ledger production is sufficient to address Request 21 for documents concerning transfers.  Petts

Decl. Ex. 3 at 3.  This is a red herring, evades the actual request at issue, and is a complete

departure from the Parties ongoing negotiations.  Eddystone is entitled not only to ledger entries,

which are the subject of other requests, but to other documentation concerning the transfers, such

as agreements, terms, emails and so forth.  The additional information provides context and

additional detail, such as precise terms, Ferrellgas's reasoning and intentions, larger descriptions

of what Ferrellgas was intending to accomplish, and Ferrellgas employees understanding of the

relationship between BTS and its affiliates – all highly relevant to Eddystone's alter ego and

intentional fraudulent transfer claim.  Ferrellgas's attempt to make the issue go away at this late date by pointing to its (inadequate) ledger productions has nothing to do with this discovery dispute.

As to Request 20, Ferrellgas now proposes to produce "documents memorializing or reflecting lending arrangements . . . in which BTS assets were used to secure the loan" are sufficient to address Request 20.[1]  Petts Decl. Ex. 3 at 3.  Not only is this a major contraction of its prior positions, but it is inconsistent with the allegations and conduct in this case.  Eddystone is attempting to trace the flow of the value contained in BTS from BTS to Bridger Logistics subsidiaries such as Bridger Terminals, Bridger Rail Shipping, and Bridger Transportation, and on from there.  The balkanized production proposal Ferrellgas now proposes by would interfere with Eddystone's ability to do that.  Eddystone is entitled to a full set of documents, not documents limited to the first stage at which the assets at issue remained in BTS.  The Court should overrule Ferrellgas's positions and order production as requested.

## CONCLUSION

For the foregoing reasons, Eddystone respectfully requests that the Court grant its motion.

---

[1] Ferrellgas email setting out this proposal also misstates Eddystone's positions during the Parties' discovery calls.

Dated: September 7, 2018                Respectfully submitted,


                                     /s/ Jeffrey M. Theodore
                                     Henry E. Hockeimer, Jr. (I.D. No. 86768)
Terence M. Grugan (I.D. No. 307211)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com
grugant@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Jeffrey M. Theodore (*pro hac vice*)
Andrew J. Sloniewsky (*pro hac vice*)
Timothy Work (*pro hac vice*)
Nicholas Petts (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com
jtheodore@steptoe.com
twork@steptoe.com
npetts@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via the Court's ECF system on September 7, 2018, thereby serving all counsel of record.

/s/ Jeffrey M. Theodore
Jeffrey M. Theodore