# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **EDDYSTONE RAIL COMPANY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 17–cv–00495** |
| | ) | |
| **BRIDGER LOGISTICS, LLC, JULIO RIOS,** | ) | |
| **JEREMY GAMBOA, FERRELLGAS** | ) | |
| **PARTNERS, L.P., FERRELLGAS L.P.,** | ) | |
| **BRIDGER ADMINISTRATIVE SERVICES** | ) | |
| **II, LLC, BRIDGER MARINE, LLC,** | ) | |
| **BRIDGER RAIL SHIPPING, LLC,** | ) | |
| **BRIDGER REAL PROPERTY, LLC,** | ) | |
| **BRIDGER STORAGE, LLC, BRIDGER** | ) | |
| **SWAN RANCH, LLC, BRIDGER** | ) | |
| **TERMINALS, LLC, BRIDGER** | ) | |
| **TRANSPORTATION, LLC, BRIDGER** | ) | |
| **ENERGY, LLC, BRIDGER LEASING, LLC,** | ) | |
| **BRIDGER LAKE, LLC, J.J. LIBERTY, LLC,** | ) | |
| **J.J. ADDISON PARTNERS, LLC,** | ) | |
| | ) | |
| **Defendants.** | | |

## PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S REPLY
## IN SUPPORT OF ITS MOTION TO COMPEL

There is absolutely no merit to the central claim in Ferrellgas's opposition brief – that Eddystone failed to meet and confer regarding the discovery that is the subject of this motion to compel.  Ferrellgas *admits* that Eddystone asked at least three times – the actual number is six – for the accounting inspection that is the principal relief requested in this motion, only to be told that Ferrellgas "is not willing to let ERC's experts have access to its accounting system" even subject to the protective order in this case and that "Ferrellgas simply cannot allow outsiders to go traipsing around in its accounting records."  Davis Decl. ¶ 3.  Meanwhile, Eddystone spent more than a year negotiating the scope of its requests for documents regarding asset transfers and financing, only for Ferrellgas to renege on agreements memorialized in discovery letters written months earlier.

Even then, Eddystone gave Ferrellgas "a heads up" that it saw no further hope of negotiated resolution and "plan[ned] to move to compel regarding" each of these issues "on which we think the Parties' disputes are crystallized and ripe."  Theodore Decl. Ex. 1.  After Ferrellgas did not respond and did not express any further willingness to compromise, Eddystone filed this motion.  Under any possible interpretation of the rules, Eddystone more than satisfied the requirements of a good faith effort to resolve these matters through negotiation.

Ferrellgas's response on the merits of Eddystone's discovery requests is no more persuasive.  Regarding Eddystone's request for an inspection of accounting records, Ferrellgas simply ignores the deficiencies in the accounting documents it has produced that make an inspection necessary.  And Ferrellgas does not dispute that an inspection of the accounting files in their native context is likely to reveal important information that was lost during the export process.  Instead, Ferrellgas relies on vague generalities about the cost of an inspection.  But unsubstantiated claims of expense are no basis on which to oppose a motion to compel,

particularly where Ferrellgas has nothing to say about the concrete deficiencies in its accounting production identified by Eddystone's forensic accountants.

Finally, Ferrellgas does not dispute the relevance or importance of Eddystone's requests for documents regarding asset transfers and financing. These are highly important documents, and Ferrellgas should be required to produce them. The Court should grant Eddystone's motion to compel.

## I.     Eddystone's Inspection Motion is Ripe

### A.     Eddystone Repeatedly Met and Conferred Regarding an Inspection of Ferrellgas's Accounting Records, and Ferrellgas Flatly Refused to Agree

Eddystone filed this motion only after Ferrellgas made clear, repeatedly, that it would not consider an inspection under any circumstances. Ferrellgas acknowledges that Eddystone made at least three written requests for an inspection. Davis Decl. 3.f-h. Each time, Eddystone explained the deficiencies in Ferrellgas's accounting production that made an inspection necessary. And each time, Ferrellgas flatly refused the request without so much as addressing Eddystone's concerns. On July 13, 2018, Ferrellgas declared that, "Ferrellgas, a public company, is not willing to let ERC's experts have access to its accounting system." And on August 1, 2018, Ferrellgas doubled down: "as a public company, Ferrellgas simply cannot allow outsiders to go traipsing around in its accounting records." After Eddystone told Ferrellgas that it saw no further hope of resolving the matter through negotiations intended to file a motion to compel on this issue, Ferrellgas made no response and never informed Eddystone that it thought a further meet and confer would be productive. On this record, it is preposterous to suggest that Eddystone failed to exhaust its meet and confer obligations.

After first raising the issue on a meet-and-confer call, Eddystone followed up in a June 27, 2018 email requesting an inspection of Ferrellgas's accounting system. Dkt. 183-5 at 15.

Eddystone described deficiencies in the sub-ledgers that Ferrellgas had produced and explained that an inspection was necessary as a result. *Id*. Eddystone raised the issue again in a follow-up email two weeks later. *Id*. at 13. Rather than address the deficiencies in the subledgers, Ferrellgas responded that "the subledgers are what they are" and flatly refused to allow Eddystone any access to its accounting systems: "Ferrellgas, a public company, is not willing to let ERC's experts have access to its accounting systems." Dkt. 183-5 at 11. Eddystone's response again raised the question of an inspection and proposed that allowing one would resolve the Parties' ongoing discussions regarding production of backup documents as well. *Id*. at 9.

The Parties held a telephonic meet-and-confer on these issues on July 30, during which Eddystone explained that the deficiencies in the sub-ledgers meant that it needed either the backup documents or an inspection. *Id*. at 4. Ferrellgas promised to provide Eddystone its "final position" by Wednesday, August 1. *Id*. In an email of that date, Ferrellgas told Eddystone that "as a public company, Ferrellgas simply cannot allow outsiders to go traipsing around in its accounting records." *Id*. at 2.

At this point, Ferrellgas accuses Eddystone of "abandon[ing] meet-and-confer discussions in midstream" and asserts that Eddystone never got back to Ferrellgas after promising to do so while waiting a month to file its motion to compel. Opp. at 7, 8. That is incorrect. The Parties had further email correspondence on several of the other open issues referred to in the email chain. *See, e.g.*, Theodore Decl. Ex. 1 at 1-2; Ex. 2; Ex. 3 at 1-2 (email communications between counsel for Eddystone and Ferrellgas). But Eddystone was not required to continue to meet and confer regarding an inspection once it became clear that "a meet-and-confer session would have been futile." *Metrokane, Inc. v. Built NY, Inc.*, No. 06CIV14447, 2008 WL 4185865, at *3 (S.D.N.Y. Sept. 3, 2008). Where litigants encounter a

discovery dispute, the movant asks opposing counsel to reconsider its position, and oppose counsel flatly refuses, the movant is "justified in concluding that it would be futile and a waste of time and resources to 'meet and confer' further" on the matter before seeking relief from the court. *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 CIV. 8833, 1998 WL 2829, *3 (S.D.N.Y. Jan. 6, 1998).  After Ferrellgas flatly denied Eddystone's repeated inspection requests and refused to reconsider, Eddystone was under no further obligation to meet and confer to no end.

In the meantime, Eddystone evaluated the state of discovery and chose to proceed on these issues.  *Before filing its motion to compel*, Eddystone gave Ferrellgas a multi-day "heads up [that] we plan to move to compel regarding points 2, 4, and 5, in the below on which we think the Parties' disputes are crystallized and ripe."  Theodore Decl. Ex. 1 at 1.  Point two was the accounting documents / inspection / backup documents matter at hand.  *Id*. at 3.  Ferrellgas made no response to that email and did not dispute that the matter was ripe for decision by this Court. Ferrellgas's accusation that Eddystone "did not respond at all" fails to bring to the Court's attention the Parties subsequent email correspondence, including Eddystone's final email.[1]

---

[1] Rather than focus on the relief that Eddystone is actually seeking in this motion and that Ferrellgas refused to provide, Ferrellgas spends much of its brief focusing on Eddystone's request that it produce 27,000 backup documents.  Ferrellgas argues that Eddystone's motion is unripe because the Parties had not completed their meet and confer on that issue.  But Eddystone does not seek to compel Ferrellgas to produce the backup documents.  Rather, Eddystone seeks to inspect Ferrellgas's accounting system so that it can better understand Ferrellgas's records.  It is Eddystone's hope that an inspection will help resolve the backup documents dispute, including by allowing it to better understand the journal entries and identify a smaller universe of backup documents to request.  Indeed, during meet and confer efforts, and as described in its initial motion, Eddystone proposed that an inspection could hopefully resolve the backup document issues as well as the issues with the sub-ledgers.  Currently, however, Ferrellgas has refused to allow an inspection, has refused to produce the full set of backup documents Eddystone has identified, and has refused to resolve the deficiencies of the accounting documents that have been produced.  This combination is untenable.

**B.      Eddystone's Clear and Repeated Inspection Requests Satisfy Rule 34**

Ferrellgas's next tactic is to argue that the Court should disregard Eddystone's requests

for an inspection because they appeared in emails and telephonic meet-and-confer calls rather

than in formal document requests.  This objection would accomplish nothing more than to delay

production.  And Rule 34 contains no requirement that a party draft its document requests in

fully captioned pdf files and attach them to an email rather than make them in the body of the

email itself.  Eddystone's inspection requests were clear – and Ferrellgas clearly understood and

flatly rejected them.  That satisfies Rule 34.[2]

Email is a perfectly acceptable format for a discovery request.  "[I]nformal requests for

production—as contained in . . . emails, as well as Plaintiffs' Proposed Order of Court—are

sufficient to form the basis of a motion to compel." *Trask v. Olin Corp.*, 298 F.R.D. 244, 260

(W.D. Pa. 2014).  To conclude otherwise would "exalt form over substance" in a manner that is

inconsistent with the purpose of the Federal Rules.  *Employers Ins. Co. of Wausau v. Nationwide*

*Mut. Fire Ins. Co.*, No. CV 2005-0620, 2006 WL 1120632, at *2 (E.D.N.Y. Apr. 26, 2006)

(granting motion to compel compliance with informal written request for production of

documents).  Unsurprisingly, Ferrellgas does not cite a single case that has imposed its

requirement of a non-email inspection request.  Opp. at 5-6.

The critical issue is not the formatting but whether Eddystone's inspection request clearly

informed Ferrellgas of the discovery sought.  For example, *Trask* found that "the request for

---

[2] Ferrellgas's assertion that "Eddystone did not request an inspection of the BL/FG
Defendants' accounting systems," Opp. at 5, is false.  Eddystone made three separate written
requests for inspection in the months before it filed its motion to compel, which Ferrellgas
acknowledged at the time, and which it acknowledges in its papers before the Court.  *See* Davis
Decl. ¶ 3.d, e, g.  Ferrellgas really objects that the requests "never became concrete" because
Eddystone made them through email messages and not through a document attached to the email
with a caption above the request and a signature line below.  Opp. at 6.

production was adequately communicated" because the defendant knew what documents had

been requested "based upon [the parties'] email correspondence."  298 F.R.D. at 261.  And in

*Dixon v. Cappellini*, 88 F.R.D. 1 (M.D. Pa. 1980), where defendant made oral request for

documents at the plaintiff's deposition, and "correspondence between counsel indicate[d] that

further discussion of the request went on between the parties" before plaintiff's counsel finally

refused the request, the court found the request properly made and ultimately granted the motion

to compel.  *Id.* at 4; *see also Swope v. Nat'l Presto Indus., Inc.*, No. CIV. A. 89-2731, 1990 WL

149203, at *2 (E.D. Pa. Oct. 3, 1990) ("An oral request for documents made at a party's

deposition may be sufficiently formal for purposes of Rule 37(a) if the material requested is

described with reasonable particularity such that both parties were aware of what document is

involved.").

　　　Here, Ferrellgas freely acknowledges that it understood Eddystone's emails to be seeking

an inspection of its accounting system and expressly refused to allow access.  Of course,

Eddystone would have been happy to serve a formal request if that would have resolved

Ferrellgas's concerns, but Ferrellgas never identified Eddystone's formatting as a reason that it

was unwilling to permit an inspection.  Instead, Ferrellgas stated that it "is not willing to let

ERC's experts have access to its accounting systems."  Dkt. 183-5 at 11.

　　　In making this blanket refusal to permit inspection, Ferrellgas also did not raise any of the

"important issues" that it now claims the parties should have had "occasion to discuss."  Opp. at

6.  That the Parties did not discuss the length of time in which Eddystone would "have access to

the accounting systems," "live" vs. "read-only copies," "cost," "download[ing],"and so forth,

Opp. at 6-7, is a function not of the format in which Eddystone made its request but of

Ferrellgas's decision to refuse to agree to an inspection under *any* set of conditions.  Having

failed to raise these concerns "during the months that the parties have been negotiating," Ferrellgas cannot raise them in opposition to a motion to compel.  *Fleisher v. Phoenix Life Ins. Co.*, No. 11 CIV. 8405, 2012 WL 6732905, at *2 (S.D.N.Y. Dec. 27, 2012).

In the alternative to its claim that Eddystone did not request an inspection at all, Ferrellgas argues that Eddystone did not adequately communicate its inspection request in discovery because Eddystone sought only "limited" records and never requested the "free-for-all demanded in the Motion to Compel."  Opp. at 6.  On that view, Ferrellgas's decision to offer up a blanket refusal rather than to negotiate the details would be all the more perplexing.  And Ferrellgas's own emails show that it never saw the inspection request as so "limited."  Ferrellgas told Eddystone that it "disagree[d] with your suggestion" that it must "allow ERC *unfettered* access to the Bridger/Ferrellgas Entities' accounting records for purposes of 'inspection.'"  *Id*. at 2 (emphasis added).  Having rejected the exact relief that it accuses Eddystone of seeking in its motion, Ferrellgas cannot accuse Eddystone of failing to exhaust its obligation to meet and confer.

## II.    An Inspection of Accounting Records Is Proper on the Merits

The Court should also grant Eddystone's motion on the merits because an inspection of Ferrellgas's accounting system is warranted.  Ferrellgas has nothing to say – and during the Parties' discussions has never had anything to say – about the deficiencies in the accounting records that it has produced.  Ferrellgas also has nothing to say about the fact, explained by Plaintiffs' forensic accountants, that the records may be more understandable *in situ*.  Eddystone does not, in fact, seek a "free-for-all."  Rather it seeks the opportunity to review Ferrellgas's accounting records under the supervision of whatever personnel Ferrellgas deems appropriate and is happy to work out the details with Ferrellgas, with the Court's assistance if necessary.

Given the significance of the evidence and the amount at stake in this litigation, that relief is appropriate.

Ferrellgas's opposition simply ignores the pervasive problems with the accounting files it has produced.  As explained in Eddystone's opening brief and the declaration of Meghan Cardell, critical transaction details are missing, including journal entry IDs.  Cardell Decl. ¶¶ 3, 6; Dkt. 183 at 4-5.  There is a likelihood that many of these deficiencies are a result of the export process by which the entries were exported from their native accounting system environment to excel files.  Cardell Decl. ¶ 7.  Ferrellgas does not address any of these defects or dispute that seeing the records *in situ* will cure or clarify the deficiencies.  Cardell Repy Decl. ¶¶ 5-8.

As a result, this is not a situation where benefits of an inspection will be "meager" or "negligible," because the information sought is "already available . . . in a somewhat different format" or can be "obtained by alternate means."  Opp. at 13-14.  The information sought is not already available, as Eddystone explained at length in its motion and the supporting declaration of its forensic accounting expert.  Without denying the deficiencies, Ferrellgas has stated only that "the sub-ledgers are what they are" and has refused to answer an interrogatory asking it to provide the missing information for the sub-ledger files.  Dkt. 183-5 at 11; Theodore Decl. Ex. 4 at 13-15.[3]  As a result, only by inspecting the sub-ledgers in the context of the native accounting system and software can Eddystone fully analyze the accounting records that are central to this case.

Rather than address the substantive defects in the records, Ferrellgas asserts that the problem "appears stem from differences in nomenclature."  Opp. at 12.  But that is not the case.

---

[3] In its interrogatory response, Ferrellgas provided only a set of company codes, which Eddystone had already deduced and which do not supply the information missing from the accounting production.  Cardell Reply Decl. ¶ 8.

Whatever the accounting entries are called, the versions that have been exported to excel files are missing substantive information, including links to other entries and journal entry IDs.  This is not a question of nomenclature.  Cardell Decl. ¶ 6; Cardell Reply Decl. ¶¶ 7-8.

Ferrellgas objects that it would be an imposition to have "to assign employees to assist and supervise the inspectors at all times to ensure the integrity of the company's records.  Such efforts would be costly and time-consuming."  Opp. at 13-14.  But inspections of sensitive information are entirely routine in civil litigation, including of far more sensitive materials such as Google's source code.  *See, e.g., Performance Pricing, Inc. v. Google Inc.*, 2009 WL 2832353 at *3 (E.D. Tex. Aug. 31, 2009); *In re Google Litig.*, 2011 WL 286173 at *4 n.9 (N.D. Cal. Jan. 27, 2011).

Next, Ferrellgas asserts that "assign[ing] employees to assist and supervise the inspectors . . . would be costly and time-consuming."  Opp. at 14.  But Ferrellgas provides no specifics to support its claim of expense.  And a party resisting discovery "cannot invoke the defense of oppressiveness or unfair burden without detailing the nature and extent thereof.  Simply decrying the expense to plaintiff will not satisfy this obligation."  *Porter v. Nationscredit Consumer Disc. Co.*, No. CIV.A. 03-3768, 2004 WL 1753255, at *1 (E.D. Pa. July 8, 2004), *aff'd sub nom. Porter v. Nationacredit Consumer Disc. Co.*, 285 F. App'x 871 (3d Cir. 2008).  Absent any sort of details or estimates backed by supporting declarations and calculations, Ferrellgas's generalized complaints about "cost," are not grounds to oppose a motion to compel.

Nor would an inspection pose any material risk to Ferrellgas's financial reporting.  Ferrellgas's claims that "Eddystone's request for onsite access to the accounting systems introduces the potential that data could be lost, altered, or corrupted," which could disrupt its financial reporting to the SEC and public investors.  Opp. at 13.  But this risk is easily avoided

by providing Eddystone's accountants with only read-only access to the accounting system.  As described in the accompanying declaration of Meghan Cardell, this sort of access control is a common feature of accounting software, including the PeopleSoft system that Ferrellgas uses for its current reporting and the legacy Great Plains system that has been used by certain Bridger entities.  Cardell Reply Decl. ¶¶ 3-4; http://goo.gl/LHxcki (Oracle website providing detailed instructions by which to grant individual users "full access," "read only access," or "no access" to all or part of the PeopleSoft accounting system that Ferrellgas currently uses).

Finally, Ferrellgas's lengthy discussion of its burden in producing backup documentation, *see* Opp. at 14-16, is not responsive to the real issues raised in Eddystone's motion to compel.  Given Ferrellgas's claims about the burden of producing the backup documents (the specifics of which Ferrellgas did not provide until more than six months into the Parties' discussions of this issue), Eddystone's motion does not seek to compel production of the backup documentation but seeks an inspection, which it hopes will not only resolve the problems with the journal entries that have been produced but also narrow or resolve the backup documents issue.  *See, e.g.*, Dkt. 183-8 (Proposed Order).  If the records were properly maintained, Eddystone hopes to be able to use the information it gleans to modify its request for backup documentation in a way that satisfies both Parties.

## III.     The Court Should Compel Compliance with Requests 20 and 21

### A.     Eddystone Fully Met and Conferred on Requests 20 and 21 and Filed this Motion after Ferrellgas Receded from its Prior Agreements

As acknowledged in Ferrellgas's opposition, the Parties have been meeting and conferring over Requests 20 and 21 for over a year.  Opp. at 8.  Request 20 asks for documents regarding financing of Bridger entities, which is important because it can result in encumbrances on the assets at issue in this litigation.  Request 21 asks for documents regarding transfers of

assets, the core question at issue on Eddystone's fraudulent transfer claims. Eddystone made substantial progress on these disputes during negotiations with Ferrellgas's prior counsel. After Ferrellgas substituted counsel, Eddystone had hoped to obtain a final resolution of these issues and negotiated with new Ferrellgas's new counsel Bryan Cave for additional months – only for Bryan Cave to stake out a position less generous than what Ferrellgas's prior counsel had previously agree to *and attempt to attribute it to Eddystone*. At that point, Eddystone informed Ferrellgas that it saw continued discussion as an exercise in futility and moved to compel.

From the beginning, a point of contention between Eddystone and Ferrellgas was whether these requests would apply to financing and assets of Bridger entities other than BTS. By late 2017, Eddystone and Ferrellgas had created a list of "Identified Bridger Entities" to which many of Eddystone's requests would apply. *See, e.g.,* Dkt. 183-4 at 5-6 (letter from K. Porter referring to the "Identified Bridger Entities"). Eddystone's position at the time was that Requests 20 and 21 should apply to the Identified Bridger Entities in full, while Ferrellgas's was that those requests should apply to BTS on an "all documents" relevant to the transactions basis and to the Identified Bridger Entities on a more limited "sufficient to identify" the transactions basis. Those positions were memorialized in amendments that Eddystone made to its requests for production and a letter from Akin moving toward Eddystone's amended position. Theodore Decl. Ex. 5 at 12-13 (Plaintiff's Revised First Set of Requests for Production, Oct. 10, 2017); Dkt. 183-4 at 5-6.

Thereafter, Eddystone continued to discuss Requests 20 and 21, culminating in a meet and confer on July 30. Eddystone's position, as memorialized in its email of that date, was use of the Identified Bridger Entities for Request 20 and use of a smaller list of entities for Request 21. Dkt. 183-5 at 4. On the call, Eddystone asked for and Ferrellgas agreed to provide its final

position by August 1.  On that date, Ferrellgas sent an email purporting to accept what it characterized as an Eddystone offer to limit Request 20 to instances "in which BTS assets were used to secure the loan."  Ferrellgas also asserted that Request 21 was fully resolved via Ferrellgas's production of accounting records.  *Id*. at 3.

There was no merit to either of these claims.  Ferrellgas's response withdrew agreements it had made months earlier in negotiations regarding both Requests 20 and 21, in which it agreed to produce at least some records for all of the Identified Bridger Entities.  *See* Dkt. 183-4 at 5-6. And limiting Request 21 to accounting records would have rendered that request moot in light of Eddystone's Requests 12-16, in which Eddystone described the accounting records it sought. Eddystone pointed this out in its opening brief.  Dkt. 183 at 9.  Yet, in its opposition, Ferrellgas continues to insist that Eddystone "agreed to limit [Request 20] to situations in which assets of [BTS] were to be used as collateral."  Opp. at 8.  Of course, Eddystone agreed to no such thing. It is simply implausible that Eddystone would agree to a compromise more restrictive than what Ferrellgas had already agreed to in writing seven months before.

Contrary to Ferrellgas's assertions that Eddystone "did not respond at all," Opp. at 9, in subsequent emails, Eddystone told Ferrellgas that the email "limit[ed] some of your agreements to produce dramatically in ways that we have not contemplated and that were not consistent with our discussions" and that it was "mov[ing] to compel regarding points 2, 4, and 5 in the below," the latter two of which corresponded to Requests 20 and 21.  Theodore Decl. Ex. 1 at 1-2. Ferrellgas's own emails in the continued chain acknowledged that Requests 20 and 21 were among those that "remain in dispute."  *Id*. at 2.

In light of this correspondence and faced with Ferrellgas's retreat from its own prior agreements, Eddystone was more than justified in moving to compel.  A party is not required to

continue negotiating once its opponent abandons existing agreements to produce. *See HT S.R.L. v. Velasco*, 125 F. Supp. 3d 211, 228 (D.D.C. 2015) (opposing party's "change in position is unfair" and justifies granting the motion to compel); *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 356 (N.D. Ill. 2005) (party was justified in concluding that further negotiations would be futile and opponent reneged on prior promise to allow certain discovery and refused to produce). Having negotiated for over a year, Eddystone was entitled to move to compel.

### B.    Requests 20 and 21 Are Substantively Proper

Turning to the merits, Ferrellgas offers no explanation as to why the scope of Requests 20 and 21 is improper. As Eddystone explained in its opening brief, Request 21 seeks documents regarding asset transfers – a core issue in this case. And Request 20 seeks documents regarding financing – a process by which value maybe transferred from one Ferrellgas entity whose assets are encumbered to serve as security to another entity that receives the loan proceeds.

These documents are needed not only for transfers from BTS or loans secured with BTS assets but for all of the Identified Bridger Entities as a result of the multi-step process by which value moved from BTS to different Bridger Logistics subsidiaries on up the chain to Ferrellgas. As explained in Eddystone's opening brief, Ferrellgas has been liquidating assets of the transferee entities in order to reduce its own debt. Ferrellgas's opposition does not address these developments or offer any explanation as to why Eddystone should not be permitted to understand the full picture.

Instead, Ferrellgas continues to assert that it has complied with these requests because Eddystone supposedly agreed to narrow these requests to BTS assets. Opp. at 16. But Ferrellgas can cite no document in which Eddystone agreed to such a limitation – only its own internal emails and declarations. And Eddystone agreed to no such thing – as reflected in the

correspondence written by Eddystone's, rather than Ferrellgas's, lawyers.  Dkt. 183-5 at 4.

There is no reason that Eddystone would have agreed to a scope of production narrower than

what Ferrellgas had already committed itself to back in December 2017.  Absent any substantive

objection to Eddystone's requests, the Court should order full production of documents

responsive to the Amended Requests 20 and 21.[4]

Dated: October 2, 2018                                  Respectfully submitted,


                                                        /s/ Jeffrey Theodore
                                                        Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                        Terence M. Grugan (I.D. No. 307211)
                                                        BALLARD SPAHR LLP
                                                        1735 Market Street, 51st Floor
                                                        Philadelphia, PA 19103-7599
                                                        Telephone: (215) 665-8500
                                                        Facsimile: (215) 864-8999
                                                        hockeimerh@ballardspahr.com
                                                        grugant@ballardspahr.com

                                                        Filiberto Agusti (*pro hac vice*)
                                                        Jeffrey M. Theodore (*pro hac vice*)
                                                        Andrew J. Sloniewsky (*pro hac vice*)
                                                        Nicholas Petts (*pro hac vice*)
                                                        STEPTOE & JOHNSON LLP
                                                        1330 Connecticut Avenue, NW
                                                        Washington, DC 20036
                                                        Telephone: (202) 429-3000
                                                        Facsimile: (202) 429-3902
                                                        fagusti@steptoe.com
                                                        jtheodore@steptoe.com
                                                        asloniewsky@steptoe.com
                                                        npetts@steptoe.com

                                                        *Counsel for Eddystone Rail Company, LLC*

---

[4] The amended requests for production rather than the original requests should have been attached to Eddystone's original motion.  Eddystone apologizes to the Court and to Ferrellgas for that oversight.

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via the Court's ECF system on October 2, 2018, thereby

serving all counsel of record.

/s/ Jeffrey M. Theodore
Jeffrey M. Theodore