Exhibit 1

**Petts, Nick**

| | |
|---|---|
| **From:** | Theodore, Jeffrey |
| **Sent:** | Wednesday, September 05, 2018 6:53 PM |
| **To:** | Davis, Tim; Kramer, Jake; Sloniewsky, Andrew |
| **Cc:** | Petts, Nick; Eddystone Team |
| **Subject:** | RE: Eddystone discovery issues |

Tim,

To give you a heads up, we plan to move to compel regarding points 2, 4, and 5, in the below on which we think the Parties' disputes are crystallized and ripe.

I appreciate your assurance that the terms of the Parties' prior agreements control over the language of the RFP responses.

On the other points, what is the status of the tank car capacity docs in point 6. Also, is there any update on the assessment in the burden of the Jamex settlement docs (point 3)?

We are also available to discuss your letter of August 23 and FGP's responses to our third set of RFPs. Did FGP draft additional search terms to respond to our third set of RFPs? Let us know a time that works.

Thanks,

Jeff

---

**From:** Davis, Tim [mailto:tim.davis@bclplaw.com]
**Sent:** Tuesday, August 07, 2018 8:36 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jeff,

Attached are the redlines you request.  It might be helpful if you gave more specifics regarding your concerns, and we'll happily take a look and respond.  But in the meantime, we had no intention of limiting or altering the various agreements reached by the parties through their meet-and-confer correspondence and discussions.  We did not, however, endeavor to capture and reflect those various meet-and-confer agreements in the amended RFP responses, except with respect to one specific point: our agreement to produce documents that hit on certain search terms run against certain custodians and other ESI sources.  As discussed at length in the below email chain, we agreed to amend our response to certain RFPs that were "in dispute" (as identified in your May 17, 2018 email, first set nos. 16, 20, 21, 57-58, second set nos. 8, 32, 35, 51, 59-61), as we understood you wanted a more formal commitment from us with respect to what we agreed

1

to do in the way of search terms, and that this would allay your concerns with respect to at least some of the RFPs "in dispute" (specifically, as reflected in your July 20 email, only 16, 20, 21 (set one), and 8, 32, 35, and 59 (set two) would remain in dispute following our amendment).  (Note that we did not amend our response to RFP no. 59 in set two, regarding Rios and Gamboa arbitration documents, as the parties had separately resolved that RFP).

We never agreed to undertake the painstaking and make-work exercise of formally amending our RFP responses to reflect all of the parties' various other meet-and-confer agreements, and the fact that our amended RFP responses do not reflect such agreements is not meant to be, and is not, a reflection that we are in any way limiting or altering those agreements.  Please let us know if you'd like to discuss further.

Sincerely,

--Tim



TIMOTHY J. DAVIS
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
tim.davis@bclplaw.com
T: +1 816 374 3241

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Monday, August 06, 2018 5:12 PM
**To:** Davis, Tim; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Tim,

We are attempting to understand your changes to your RFP responses, which appear to limit some of your agreements to produce dramatically in ways that we have not contemplated and that were not consistent with our discussions. Can you please provide a redline of both sets of responses against your prior responses?

Thanks,

Jeff

**From:** Davis, Tim [mailto:tim.davis@bclplaw.com]
**Sent:** Wednesday, August 01, 2018 5:27 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Dear Jeff,

Here are responses to each of your points:

**(1) Search terms for Akin internal emails**.  Thank you for sending the search terms, which reduced the volume to approximately 5,700 internal, Akin-to-Akin emails (after de-duplication).  Reserving all rights, we are working with Akin to assess the burden of logging these materials and will revert as soon as we have more information.

**(2) Accounting backup documents**.  We would like to find a compromise on this issue that both sides can live with, but we don't believe it will be possible if ERC continues to insist on the production of backup materials for 28,000 ledger entries.  For each of the approximately 28,000 entries identified by Eddystone, someone in Ferrellgas's accounting department would need to (a) identify the company and accounting period involved; (b) locate documentation in a vendor file, a customer file, or some other document supporting an accrual, an adjustment, or another type of entry; (c) make a copy, scan, or duplicate of the documentation; and (d) index the copy in some fashion that would allow a reviewer to identify what it is and what entry it relates to.  We estimate that an individual could research and collect the backup for approximately 4 transactions per hour, meaning ERC's request for backup for 28,000 entries will require approximately 7,000 hours of work (which, even if we had 5 people working 10 hour days 7 days a week, would still take nearly 5 months of non-stop work to complete).  We are willing to discuss the possibility of ERC paying contractors to complete the work, which realistically could take six months or more.  Beyond that, however, our position remains that the request is overbroad and imposes an undue burden, and we cannot agree to produce the requested backup material unless and until ERC comes forward with a reasonable and targeted request.

Also, we disagree with your suggestion that the Bridger/Ferrellgas Entities must either (a) suffer the massive burden that ERC seeks to impose, or (b) allow ERC unfettered access to the Bridger/Ferrellgas Entities' accounting records for purposes of "inspection."  Indeed, the accounting backup documentation is not all maintained in a central system or location, and thus any ERC inspection would be extraordinarily intrusive and necessarily reliant on the participation of Bridger/Ferrellgas personnel.  In that sense, ERC's "inspection" proposal won't actually materially lessen the burden, and in fact may even increase the burden given the added disruption that is likely to result from an adversarial inspection conducted by outsiders.  In addition, as a public company, Ferrellgas simply cannot allow outsiders to go traipsing around in its accounting records.

**(3) Jamex settlement related communications**.  In our July 25, 2018 correspondence to you, we explained why each of your grounds for seeking these communications lacks merit.  You did not respond to our points on the call, and you haven't done so in your email below.

Further, your July 9 email was not a proper or valid document request.  Your July 9 email recognized as much when you asked us if we would agree to provide the requested documents in response to your email, "or whether [ERC] need[s] to serve formal document requests."  Moreover, as you know, Rule 11 requires that "[e]very . . . paper" served pursuant to the Rules "must be signed by at least one attorney of record in the attorney's name," and the "paper must state the signer's address, e-mail address, and telephone number."  Among other reasons, these form requirements are in place to ensure that parties understand and are on notice as to when a party intends to take formal action that will have legal effect in a litigation.  Your July 9 email did not comply with these requirements. Moreover, even assuming, hypothetically, that your July 9 email could constitute a formal document request, then our 30-day period for responding has not expired, and we hereby object to the deficient and improper form of your request (in addition to the lack of relevance and undue burden associated with gathering these documents).

As to your suggestion that ERC's prior requests encompass the communications you now seek, this position is belied by your July 9 informal request for these documents, which, again, recognized that if we did not voluntarily agree to produce these documents on an informal basis, ERC would "need to serve formal document requests."

In any event, we are assessing the burden associated with gathering and reviewing these documents, and we will get back to you as soon as we are able.  In the meantime, given that this issue developed so late in the discovery period (through no fault of either side), we propose the parties agree that this issue need not be resolved by August 13, and that both parties reserve all rights to deal with this issue within a reasonable time following August 13.

**(4)  First set of requests nos. 16 and 21**:  Thank you for your agreement to narrow the scope of these requests as set forth in your email below.  While we continue to dispute that the breadth of your request is appropriate, we have confirmed that the accounting data we've produced includes all intercompany transactions between Ferrellgas and the specific entities and reporting units that you identify in your email ("Bridger Transfer Services, Bridger Logistics, Bridger Rail Shipping, Bridger Rail Services, Bridger Management, Bridger Marine, Bridger Pipeline, or Bridger Pipeline Services").  As a point of clarity, please note that "Bridger Rail Services," "Bridger Pipeline" or "Bridger Pipeline Services," and "Bridger Management" are not legal entities, but are internal reporting units that were tracked for internal purposes.

**(5)  First set of requests no. 20**:  This request seeks "documents provided to and all communications with any lender relating to proposed or requested financing, existing or new, of any investment in a Bridger Group entity or their assets or any other interests therein."  During our call, you agreed to limit this request to documents memorializing or reflecting lending arrangements in which BTS assets were used to secure the loan.  We continue to dispute that the breadth of this request is appropriate, but to avoid a discovery dispute, we will search for documents memorializing or reflecting lending arrangements undertaken by any of the entities you identify <u>and</u> in which BTS assets were used to secure the loan.

**(6)  Second set requests 32 and 35 (tank car specifications and cost of transporting crude from ND to ERC)**:  As to request 32, we agree to produce documents sufficient to identify the capacity of the tank cars used to transport the crude oil from North Dakota to the Eddystone facility.  Documents containing this information will be included in a supplemental production that we are now in the midst of preparing, and we will identify the documents by Bates range once we make our production.  As to request no. 35, the accounting records we already produced reflect the cost of shipping crude, including the primary costs such as throughput charges (costs associated with loading oil through various terminals in ND) and amounts paid to railroads to haul our rail cars.

**(7)  Amendment of RFP responses to reflect production in accordance with search terms**:  see attached.

**(8)  Status of productions**:  We are working on finalizing a supplemental production that we should have ready by week's end, including the native files that Jamex produced to us for privilege review.  We will likely have another supplemental production closer to August 13.

Sincerely,

--Tim



TIMOTHY J. DAVIS
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
tim.davis@bclplaw.com
T: +1 816 374 3241

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Monday, July 30, 2018 6:55 PM
**To:** Kramer, Jake; Davis, Tim; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jake,

Thanks for speaking with us today. This follows up on our conversation and the current standing of disagreements and contains the information you asked us to provide.

1.  Akin internal emails. We would propose the following list of search terms that we think are very unlikely to hit on other clients:

Bridger
"BTS" OR "Bridger Transfer Services"
"Bridger Terminals"
"Swan Ranch"
Monroe
Ballengee
Jamex
"Jamex Marketing"
"Jamex Transfer Holdings" OR "JTH"
"Jamex Transfer Services" OR "JTS"
Enbridge OR Eddystone OR "ERC"
"RSA" OR "Rail Services Agreement"

2. Accounting backup documents. As we expressed on the phone, these are key documents. If they are too burdensome to produce, we are happy to inspect. But we need one or the other. You agreed to get back to us on this with your final position by Wednesday.

3. Jamex settlement related communications. These are highly relevant for the three reasons we discussed on the phone. These would already be covered by (among others) First Set of Requests 54, 57, and 58, and Second Set of Requests 5. In addition, my July 9 email is proper as a document request under the rules. Notably, you made a substantive response and did not claim any deficiency in form.

4. As a compromise regarding First Set of Requests 16 and 21, we would propose to replace "an entity in the Bridger Group"/"any Bridger Group entity" with "Bridger Transfer Services, Bridger Logistics, Bridger Rail Shipping, Bridger Rail Services, Bridger Management, Bridger Marine, Bridger Pipeline, or Bridger Pipeline Services." Please let us know whether this is acceptable.

5. As a compromise regarding First Set of Request 20, we proposed using the list of "Identified Bridger Entities," which is:

Bridger Administrative Services II, LLC
Bridger Logistics, LLC
Bridger Marine, LLC
Bridger Rail Shipping, LLC
Bridger Real Property, LLC
Bridger Storage, LLC
Bridger Swan Ranch, LLC
Bridger Terminals, LLC
Bridger Transportation, LLC (including its predecessors, Southern Energy Transp. LLC, Southern Energy Transp., Inc.)
Jamex Marketing, LLC (including its predecessors Bridger Marketing, LLC and Bridger Trading, LLC)
Jamex Transfer Services LLC (including its predecessor Bridger Transfer Services, LLC)
Jamex, LLC (including its predecessor Bridger LLC)
Bridger Management
J.J. Liberty, LLC
J.J. Addison Partners, LLC
Bridger Group
Bridger Administration
Bridger Lake
Bridger Leasing

6. Second Requests 32 and 35 (tank car specifications and cost of transporting crude from ND to ERC). You are considering this and will endeavor to get back to us by August 1.

7. Amendment of RFP responses to reflect production in accordance with search terms. You indicated that this would be done by August 1.

8. Status of your productions. Finally, please advise regarding the status of your production. We have not received any documents from you since June 4, and we still have not received the pre-acquisition Jamex documents. We had understood that you would be making rolling productions so that we would not receive the bulk of your documents in one fell swoop near the end of the discovery period.

Thanks,

Jeff

---

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Monday, July 30, 2018 6:46 AM
**To:** Theodore, Jeffrey; Davis, Tim; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jeff,

I'm not sure what you mean by "agreeable in concept."  As stated in our prior emails over the course of the last month, we are willing to explore ways to reduce burden here, including by relaying terms to Akin in order to assess the burden of reviewing and logging inter-attorney emails hitting on those terms.  We cannot agree to more than that at this time, but we will run the searches if you send the terms.

Understandably, Akin is not going to produce any of their internal emails to BCLP without first conducting a privilege review, as Akin is bound by the attorney-client privilege owed to all of its clients, many of whom were reportedly caught up in the 25,000+ emails collected using your prior terms.  Again, we continue to question this exercise as Akin's internal emails concerning the transactions now at issue were exchanged in the rendition of providing legal advice and counsel to their client, and would therefore be privileged.

We look forward to tomorrow's call and are happy to discuss the above as well as names of entities and individuals you'd like us to relay to Akin.

  JACOB A. KRAMER
Partner
BRYAN CAVE LEIGHTON PAISNER LLP - Washington, D.C. USA
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

---

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Monday, July 30, 2018 12:33 AM

**To:** Davis, Tim; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Tim,

We look forward to speaking tomorrow. Re the Akin internal search terms, we were waiting for your response as to whether that was agreeable in concept. We are happy to negotiate something agreeable re particular terms, but are thinking something very simple along the lines of names of entities and few key folks.

Jeff

---

**From:** Davis, Tim [mailto:tim.davis@bclplaw.com]
**Sent:** Thursday, July 26, 2018 3:14 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Thanks, I'll send around a dial-in.



TIMOTHY J. DAVIS
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
tim.davis@bclplaw.com
T: +1 816 374 3241

---

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Thursday, July 26, 2018 5:13 PM
**To:** Davis, Tim; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

That works. Thanks.

---

**From:** Davis, Tim [mailto:tim.davis@bclplaw.com]
**Sent:** Thursday, July 26, 2018 1:56 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jeff,

How about 2 pm CT on Monday?



**TIMOTHY J. DAVIS**
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
tim.davis@bclplaw.com
T: +1 816 374 3241

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Wednesday, July 25, 2018 5:46 PM
**To:** Davis, Tim; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Tim,

Friday doesn't work on our end. How about Thursday or Monday?

Jeff

**From:** Davis, Tim [mailto:tim.davis@bclplaw.com]
**Sent:** Wednesday, July 25, 2018 2:04 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jeff,

We write in response to your email of July 20, 2018 (below).

**(1)  Documents pertaining to Jamex settlement**:  If we understand your email correctly, you are contending that the communications and other documents pertaining to the Bridger/Ferrellgas Entities' settlement with Jamex are purportedly relevant for three reasons.

(a) *Because the settlement "modifies the already complex financial relationships between Jamex and FGP whereby FGP is paid under the MVC provisions of the TLAs, which were obtained via its access to the Eddystone transloading capacity."*  We do not necessarily endorse your description of the settlement (or the facts at large), but even assuming your statement to be accurate, we still don't understand how this renders any and all communications and documents pertaining to the settlement as relevant and discoverable.  Indeed, if the "modifie[d]" relationship is what is purportedly relevant, you have the document that controls and sets forth the modification—the settlement agreement, which is fully integrated.  The documents and other communications surrounding the settlement cannot and do not alter or modify what is in the settlement agreement itself.

(b) *Because the settlement purportedly bears on Jamex's solvency.*  If ERC is interested in Jamex's solvency, the most direct and efficient way for ERC to explore that issue is by subpoenaing documents from Jamex.  There is no need to put the Bridger/Ferrellgas Entities through the burden of processing, reviewing, and producing (or logging) the communications and other documents regarding the settlement, which would have only indirect, if any, bearing on Jamex's solvency.

(c) *Because the settlement purportedly bears on the credibility of Jamex personnel as witnesses in this matter*.  If the fact of settlement purportedly bears upon the credibility of Jamex personnel, you already have the document that establishes the fact of settlement and conclusively sets forth the terms of such settlement.  We don't understand what the communications and other documents pertaining to the settlement (which, again, cannot and do not override the terms of the settlement agreement itself) would add to your credibility argument over and above the terms of the settlement itself.

We don't mean to be difficult, but as we're sure you can appreciate, we are already grappling with various document-discovery issues that, as you know, must be wrapped up by August 13, 2018.  So, we are being vigilant to keep the scope of discovery fixed on only those materials that are relevant.  We are happy to discuss this further and explore the possibility of some sort of compromise.

**(2)  Accounting backup**.  Thank you for the further explanation as to why ERC supposedly needs the backup, but we do not believe that all 28,000 entries feature the characteristics you cite.  And even if they did, we continue to disagree that all 28,000 entries for which you seek backup could possibly be relevant to this dispute.  We renew our request that you please submit a targeted and reasonably narrow list of ledger entries for which you seek backup materials.  If and when we receive that, we will respond.

**(3)  Akin documents.**

(a) *Third Party Communications*:  Akin has pulled the third-party emails corresponding with your proposed list of domains and is reviewing the communications for privilege and production. Accordingly, we believe this dispute is now resolved.

(b) *Internal Communications*: Our e-discovery vendor has advised that we should be able to de-dupe the Akin-to-Bridger/Ferrellgas emails. Akin is in the process of providing us with those communications. After the data has been received, we will let you know if we encounter any technological roadblocks. Absent such roadblocks, we believe this dispute is also now resolved.

Regarding Akin's internal emails, your email ignores the attorney-client privilege and incorrectly suggests that the attorney work product doctrine provides the sole grounds for withholding inter-attorney communications.  As you know, our client previously retained Akin not only as litigation counsel, but also to provide legal advice concerning the transactions now at issue. Accordingly, internal Akin emails concerning such transactions were exchanged to facilitate the rendition of legal advice, and we cannot conceive of a situation where such emails would not be privileged.  Reviewing and generating a log for clearly privileged communications would serve only to impose a significant burden on our client while providing no benefit to ERC.  Further, this is quite different from the communications that we've asked you to log, which would involve ERC (and Enbridge and Canopy) <u>business people</u>, and not attorney-to-attorney communications.

In an effort to avoid motion practice, however, we previously agreed to your request that we relay to Akin narrower search terms to run across the 25,939 documents in order to assess a reduced burden.  We have yet to receive any proposed terms

**(4)  Remaining RFP issues**.  We will get you our amended RFP responses as soon as possible, likely within a week.  In the meantime, we are happy to discuss the remaining requests you identify.  How about sometime on Friday afternoon (July 27)?

Sincerely,

--Tim



TIMOTHY J. DAVIS
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA

tim.davis@bclplaw.com
T: +1 816 374 3241

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Friday, July 20, 2018 4:34 PM
**To:** Davis, Tim; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jake and Tim,

We disagree that the settlement of Jamex and FGP's dispute has no bearing on our litigation against FGP. The settlement further modifies the already complex financial relationships between Jamex and FGP whereby FGP is paid under the MVC provisions of the TLAs, which were obtained via its access to the Eddystone transloading capacity. The terms of the settlement clearly are related to Jamex's solvency, which is an important point relating to FGP's claim that the Jamex-Eddystone settlement was collusive and unfairly left Jamex off the hook. And because the FGP claims against Jamex were dismissed without prejudice and Jamex personnel will be witnesses, the settlement's partial effect on Jamex's interest in this litigation is relevant to Jamex's testimony, including its credibility. Therefore, we continue to request the production of all non-privileged documents and communications relating to the settlement, just as we produced the same for the ERC-Jamex settlement.

We need the backup documents given the lack of detail in the general ledger entries. For many entries there is no description or only an ambiguous description of the expense or transfer, leaving the purpose of the transaction unknown. For example, there are many entries where the description is to transfer revenue or revenue correction. Many other entries do not indicate a customer name but only mention a state or location. The invoices are necessary to understand why the revenue or expense was recorded and for which customer. Without the underlying support behind those transactions, we are unable to determine what is actually happening. Similarly, there are many intercompany accounts receivable/payable transactions with little to no descriptions. It is necessary to see the underlying documentation which supports these intercompany transactions to understand their purpose and justification. Further complicating matters, for many small lines in the GL, the other side of the journal entry is much larger. Therefore, we need all of the smaller line entries to understand the full journal entry on the other side.

The bottom line is that the backup materials are highly relevant and essential given the poor quality of the general ledger and subledger entries. If FGP does not want the burden of producing them, we are happy to perform an inspection. But you can't have it both ways – you can't refuse to produce on burden grounds while depriving us of the opportunity to look at them ourselves.

Regarding Akin, thank you for agreeing to get back to us on the third party communications. Is there any update on the de-duping? Re the internal Akin emails, the purpose of searching them is that they are relevant communications during the heart of the critical period in this case. They may or may not be protected AWP, but FGP needs to log them if it wants to assert such a claim so that we may assess and challenge it. You have made the same point in your recent letter, in which you told us that "At the very least, ERC is required to search for, gather, and log any and all such allegedly privileged documents so that we can assess the claim of privilege."

We appreciate your willingness to amend your responses to say that you will produce via search terms. Subject to the details of the amendment and the adequacy thereof, we think would leave requests 16, 20, 21 (set one), and 8, 32, 35, and 59 (set two) as ones for us to discuss. Please let us know when you are available.

Thanks,

Jeff

**From:** Davis, Tim [mailto:tim.davis@bclplaw.com]
**Sent:** Friday, July 13, 2018 2:21 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Dear Jeff,

We write in response to your two emails of July 9 (one set forth below, pertaining to various ongoing discovery issues, and a separate email pertaining to the Jamex native files and the resolution of the claims between Jamex and the Bridger/Ferrellgas entities, attached):

**(1) Jamex native files**:  Jamex provided us with more than 45,000 native files that needed to be reviewed for purposes of identifying any material covered by privileges belonging to the Bridger entities.  As you can surely appreciate, reviewing for privilege does not always go swiftly, and we have been working to review these documents alongside the hundreds of thousands of additional documents that hit on ERC's search terms and that have otherwise been collected in response to ERC's document requests.  Nevertheless, our review is nearly finished.  We expect to wrap up this process soon and get you the documents within the next two weeks.

**(2) Resolution of claims between Jamex and the Bridger/Ferrellgas entities**:  We are seeking consent from Jamex to disclose the settlement agreement without a formal discovery request.  If and when we are able to disclose the agreement without a formal request, we think it will be evident to you from the settlement agreement itself that the terms of the settlement and the discussions related to the settlement have absolutely no bearing on the issues between ERC and the Bridger/Ferrellgas entities.  We will follow up once we find out Jamex's position.

**(3) Last remaining email search string**:  Thank you for proposing a compromise on the last remaining email search string under discussion; we will run the modified search as you suggest in your July 9, 2018 email:  North Dakota" w/ 50 (rail* OR transport* OR deliver* OR ship* OR train OR route OR crude OR oil OR bakken) w/ 50 (Eddystone OR "ERC" OR Philadelphia OR Philly OR Delaware OR Pennsylvania).

**(4) Akin emails**:

    **(a) Third Party Communications**: While our initial assessment is that limiting the collection/review by your proposed list of domains should be manageable, we need to discuss the domains with Akin and will get back to you. One carve out, however, is that three of the proposed domains (Bridgergroup.com, Ferrellgas.com, and Ferrellcapinc.com) are Bridger or Ferrellgas entities addressed in subsection (b).

    **(b)  Internal Communications**: We will follow up with our e-discovery vendor and Akin concerning de-duping the Akin-to-Bridger/Ferrellgas emails; however, we are uncertain whether the software will recognize the emails as duplicates because they come from different servers. We also note that our privilege log without these emails – which, again, are already subject to review given their overlap with the collection from the Bridger/Ferrellgas custodians – will likewise consist of tens of thousands of entries, which is one reason for our objections to reviewing duplicative emails.

    Regarding the internal Akin emails, if you propose narrower search terms, we will request that Akin run the terms across the 25,939 Akin-to-Akin communications to assess the burden of review.  We cannot, however, comprehend a scenario in which internal Akin emails about anything remotely germane to this

case would not be privileged.  Can you?  The point of a privilege log is to allow the opposing party to assess the claim of privilege, but we can't see how any such assessment could possibly serve any purpose.  Thus, we continue to question what end is served by requiring a log for clearly privileged Akin-to-Akin emails, other than imposing burden on the Bridger/Ferrellgas entities.

**(5) Accounting subledgers**:  Our accounting experts have confirmed that the Ferrellgas and Bridger subledgers for the relevant time periods are included within the bates range we mentioned previously.  We cannot help that perhaps the subledgers are not in the form, or do not contain the content, that you had expected.  The subledgers are what they are.

**(6) Accounting backup materials**:  Regardless of whether it is 10%, 1%, or any other percent of the total ledger entries, it is not reasonable to request that we locate, process, review, and produce the back-up materials for nearly 28,000 ledger entries.  This is especially so in light of the fact that you've offered no explanation as to why the back-up material will purportedly provide any greater insight into the issues you raise above and beyond the information conveyed by the ledger entries themselves.  We are of course willing to continue discussing this issue, but until we receive a more cogent explanation of the need for this material and a more targeted and reasonable scope of requested material, we are not sure there is much to discuss.  Ferrellgas, a public company, is not willing to let ERC's experts have access to its accounting systems.

**(7) Amendment of RFP responses**:  In the hopes of putting this issue to rest, we are willing to consider amending our responses to disputed RFP responses (subject to the condition described below) to reflect that we will respond by producing ESI that hits on the agreed search terms.  Before we do this, however, we would like to know your position on which RFPs would remain "in dispute" following such an amendment.  By our count and for the reasons stated in our prior email, remaining disputes would be limited to first request nos. 16 and 21, and second request nos. 8, 32, 35, and 59 (as previously stated, we are already in ongoing discussions regarding the production of accounting documents in response to first request no. 16 and second request no. 8).  Please confirm.

Following your review of the foregoing, please let us know if you think a call would be productive.  If so, we will propose some times to discuss by phone.  Thank you.

Sincerely,

--Tim



TIMOTHY J. DAVIS
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
tim.davis@bclplaw.com
T: +1 816 374 3241

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Monday, July 09, 2018 12:50 PM
**To:** Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jake,

Here are our responses. Regarding search terms, it seems like we are very close, with only one search string outstanding (and even that only for part of the time period), which is:

"North Dakota" AND (rail* OR transport* OR deliver* OR ship* OR train OR route OR crude OR oil OR bakken) AND (Eddystone OR "ERC" OR Philadelphia OR Philly OR Delaware OR Pennsylvania)

We understand that SEPTA window has been separately searched for. Our point is that Bridger was responsible for rail logistics and was researching the route, so we want emails showing this was Bridger's area of responsibility, their due diligence, etc. whether or not SEPTA is mentioned. In addition, there is the mitigation issue, which you do not address. We do not think a mitigation argument is very strong given the economic situation, and if FGP (and Rios and Gamboa) were to drop it, it could simplify this issue. That said, we would like to resolve this in a way that works for both sides. Would the hit counts be reasonable if we applied /50 limiters in place of the ANDs for the time periods that we are debating? What about other modifications to get what we're looking for but keep it workable?

Regarding Akin, below is our list of relevant domains. In terms of Akin to FGP emails, given the preservation issues, we think they should be de-duped, reviewed, and logged. In comparison to our privilege log, which is likely to be tens of thousands of entries, we're not talking about a huge number of emails. De-duping should eliminate your concern re overlap. Regarding the internal Akin emails, what if we were to propose a narrower set of search terms?

Weil.com
Strasburger.com
Jamexmarketing.com
Steptoe.com
Bridgergroup.com
Ferrellgas.com
Evercore.com
Sutherland.com
Harterlaw.com
simmonsco-intl.com
lynnllp.com
credit-suisse.com
willkie.com
sprucelaw.com
Enbridge.com
Riverstonellc.com
Ballardspahr.com
Baml.com
Bankofamerica.com
Blackrock.com
Us.gt.com
Us.pwc.com
Kpmg.com
Blankrome.com
Sprucelaw.com
Mjlf.com
Canopy.com
Monroe-energy.com
Hollyfrontier.com
Shell.com
Ferrellcapinc.com
Lw.com
Delta.com

Regarding the accounting documents, the bates range you refer to do not appear to be subledgers in any meaningful sense. As I mentioned in my previous email, they do not specify the account to which they relate or even the entity at

issue and are not tied to specific journal entry IDs from the GL. Is that all Bridger/FGP has in terms of subledgers? As I asked in my previous email, would it be possible for our accountants to perform an inspection so that they can better understand how these documents relate?

Regarding the back-up documents, as we stated many times, the requested entries were going to be voluminous. There should be no surprise at the volume. In any event, I believe that we have (so far) identified fewer than 10% of the total entries. And all of the identified entries are quite proper. Employee expenses are highly relevant to determining whose employees were doing work on behalf of BTS and whether BTS was being improperly billed for work done on behalf of other entities. We ask that you reconsider your unwillingness to produce the requested backup. Alternatively, we would request that you make your systems available to our accountants for inspection and review.

We disagree with your analysis in Point 4 in your email below for the reasons we have already explained in prior emails. Your RFP responses should be amended to be consistent with what you now say will be accomplished via search terms.

We propose a call this week to discuss these issues, the RFP responses identified in our emails below, your responses to our third set of requests for production, and any outstanding discovery issues you may have. Please let us know when works for you.

Thanks,

Jeff

---

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Tuesday, July 03, 2018 9:53 AM
**To:** Theodore, Jeffrey; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues


Jeff:

Here is our response to your email below:

1. <u>Search Terms.</u>  Attached is a version of the document you sent that includes our responses on each of the remaining search strings at issue.  As you see, we agree to most of the proposed changes.  We do not, however, agree to that there is a need for further searches to identify documents related to our clients' knowledge of the SEPTA window.  We have searched specifically for such documents, and any document that mentions SEPTA should already have been captured.

2. <u>Accounting Documents.</u>

    a. <u>Sub-Ledgers.</u>  The sub-ledgers are included in the production with the Bates range BLFG_EDPA0045645- BLFG_EDPA0047279.  The attached spreadsheet (46441) is one example.

b. <u>Back-up Documentation.</u>  You have requested back-up documentation for 27,555 individual ledger entries.  This is not a targeted request of the kind we discussed, and the request appears calculated to impose burden.  Some of these entries are for $1.  There are hundreds, if not thousands, of individual entries that are for less than $50.  Moreover, the individual entries each already include a description of the expense or transfer.  A huge number of the entries are labelled as Travel-Meals, Travel-Lodging, or Travel-Mileage.  Others are identified as Postage or Drug Testing.  Surely, postage and meal receipts have nothing to do with the litigation.  Overall, this request is not much different from the initial request to produce all back-up information in the system.  Until we received more targeted requests, we do not intend to respond.

3. <u>Akin Documents.</u>

   a. <u>Third Party Communications.</u> We were able to ascertain hit counts for each of the domain names, which we've added to the attached excel document. Let us know once you've identified the third parties you believe are connected to this case.

   b. <u>Internal Communications.</u> Regarding the 2,693 Akin-to-Bridger/Ferrellgas emails, our position remains that these documents are privileged and that requiring Bridger/Ferrellgas to review and log the emails would be unreasonably burdensome, cumulative, and duplicative as we are already reviewing and logging the Akin-to Bridger/Ferrellgas emails collected from the Bridger/Ferrellgas custodians. Reviewing and logging the same set of privileged emails collected from the Akin custodians would impose a significant burden without any corresponding benefit.  Regarding the internal Akin communications, what do you propose to further reduce the 25,939 documents?

4. <u>Document Requests.</u>

   a. To answer your question, you identified the following <u>RFPs that remain in dispute</u>:  "The requests at issue are for which you have stated that you may or will not produce in full are Eddystone Requests Nos. 16, 20, 21, 57-58; Second Set of Eddystone Requests Nos. 8, 32, 35, 51, 59-61."

   b. In the same email, you identified the following <u>RFPs for which you believe that search terms are insufficient</u>:  "Regarding the first set of document requests, our understanding based on discussions with Akin was that search terms are insufficient for all or parts of Requests 1-30, 34, 35, 38, 39, 41, and 45.  Regarding the second set of document requests, our sense is that Requests 1, 3, 4, 5, 8, 15, 20, 27, 30, 32, 34, 35, 40, 43, 52, 53, and 59 particularly are not amenable to search terms in whole or in part."

   c. Comparing these two lists and following our discussions on search terms and review standards, we conclude that search terms are sufficient for all of the RFPs that remain in dispute, except for RFPs 16, 20, and 21, as well as Second RFPs 8, 32, 35, and 59.  As to RFP 16 and Second RFP 8, we are engaged in ongoing negotiations on the production of accounting materials.  As to RFP 20, we already agreed to provide responsive documents in the attached email.  Thus, we conclude that the only RFPs that require additional negotiation are RFP 21 and Second RFPs 32, 35, and 59.



JACOB A. KRAMER
Partner
BRYAN CAVE LEIGHTON PAISNER LLP - Washington, D.C. USA
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Wednesday, June 27, 2018 4:11 PM
**To:** Kramer, Jake; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jake,

I have attached our further responses on the search terms. In addition, I have attached the first tranche of GL entries for which we request the backup documents.

Regarding the subledgers, we have been unable to identify any sub-ledgers in the January productions. Can you point us to the documents that you believe are subledgers? There are some accounting type documents (00046423, for example), but those do not appear related to any specific account. For example, they do not identify the entity at issue, are not tied to journal entry IDs, and do not appear to be organized as subledgers. We think it likely to be helpful for our accounting experts to perform an inspection of the accounting systems at issue (or of a read-only copy). Is that something to which your side is amenable?

Regarding Akin, we agree that there is no need to review emails that are most likely related to other cases. Based on our internal analysis, this may be something of a long tail issue. Would it be possible to provide us with the hit counts for each of the domain names? We are working on evaluating the 500+ domains you sent us and will revert shortly.

We disagree that internal communications need not be reviewed or logged. We have not requested that any attorney emails during the litigation be logged. But the emails that we are discussing involve the structuring of the transactions at the heart of this case. Akin was responsible for that, and this material should not be insulated from discovery because Akin is a law firm. The emails are highly relevant, and Defendants must establish a basis for withholding them. That said, we agree that it may make sense to cut down the number of emails. The 2,693 between Akin and Bridger/Ferrellgas are almost certainly relevant. But we are amenable to reducing the 25,939 that are internal to Akin.

Regarding Point 4 in your email, we appreciate your willingness to discuss, but how did you conclude that RFPs 21, 32, 35, and 59 are the only ones in dispute? We identified Requests Nos. 16, 20, 21, 57-58; Second Set of Eddystone Requests Nos. 8, 32, 35, 51, 59-61.

Jeff

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Friday, June 22, 2018 11:07 AM
**To:** Theodore, Jeffrey; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jeff:

As promised, attached is our response on search terms.

Thanks,
Jake



JACOB A. KRAMER
Partner
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

**From:** Kramer, Jake
**Sent:** Tuesday, June 19, 2018 5:21 PM
**To:** Theodore, Jeffrey; Sloniewsky, Andrew
**Cc:** Petts, Nick; Eddystone Team
**Subject:** RE: Eddystone discovery issues

Jeff:

Here are responses to the issues you raise:

1. <u>Search Terms.</u>  We are reviewing your proposed modifications and will respond.  Please keep in mind, however, that a great deal of document review occurred during the month since we last heard from you on this topic.

2. <u>Accounting Documents.</u>  The sub-ledgers were included in productions on January 4 and 18, 2018.  Our June 4, 2018 production included audit-related materials, tax returns, and closing books that contain a significant amount of financial data (including financial statements attached to the purchase agreement itself).  Otherwise, we will stand by for the list of entries for which you seek backup, and we will assess and respond in due course, reserving all rights to object based on undue burden or any other basis.

3. <u>Akin Documents.</u>  As agreed, Akin ran the search terms you provided (for Andy Lehman and John Goodgame during the periods from April 1, 2015 - July 1, 2015 and Oct 15, 2015 - March 15, 2016), and the search yielded 49,265 unique documents (emails and attachments).  Here is our proposal for next steps:

   a. <u>Third Party Communications.</u>  Of the 49,265 total, 20,633 are emails (and related attachments) that include third parties (i.e., parties other than Akin, Bridger, and Ferrellgas).  Because your search terms were so broad, the overwhelming majority of those third parties are Akin clients with no connection to this litigation.  Understandably, Akin will not provide such emails to BCLP without first conducting a privilege review.  Reviewing all 20,633 documents would impose a significant burden and provide little, if any, benefit. To avoid undue burden, we extracted all of the third-party domain names included in the 20,633 documents to generate the attached list, which we have designated as "Confidential" under the 7/31/17 Stipulated Protective Order.  We propose that you review the list and identify the third parties that you have reason to believe are connected to this case (e.g., jamexmarketing.com).  If we can settle on an agreed list that yields a manageable number of results, we can proceed to the review stage.  Please advise if you agree with this approach.

   b. <u>Internal Communications.</u>  Of the 49,265 unique documents, 25,939 are internal emails between and among Akin attorneys, and 2,693 are emails between Akin attorneys and Bridger/Ferrellgas.  Again, because of the broad search terms, many of these results have no connection to this litigation.  While we are open to further discussion, our position remains that internal communications related to the events at issue in this litigation are all privileged (or protected by the work product doctrine), and it would be unduly burdensome to review tens of

thousands of emails in order to identify and log those emails that do relate to the dispute between our clients.

4. <u>Document Requests.</u>  Returning to the discussion below, are we correct that your position is that search terms are sufficient with respect to all of the RFPs that remain in dispute, except for First RFP 21 (transfers from Bridger entities) and Second RFPs 32 (rail car specifications), 35 (costs to ship crude by rail), and 59 (Rios and Gamboa arbitration)?  We remain open to discussing these requests.

Thanks,
Jake



JACOB A. KRAMER
Partner
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

---

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Friday, June 15, 2018 3:07 PM
**To:** Kramer, Jake; Hartley, Sarah; Sloniewsky, Andrew; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick; Davis, Tim
**Subject:** RE: Eddystone discovery issues

Jake,

Attached please find our reactions to FGP's proposed search term modifications.

Thanks very much for your recent production, which we are reviewing. Are the additional accounting documents that you intended to produce among the spreadsheets in that production or are those coming separately? Can you give us a summary of the additional accounting documents that were produced? Have we now received all of the subledgers? Regarding back-up materials, we will provide you with a list of entries for which we want the backup documents. As we have indicated previously, the number of entries will be substantial but we are provisionally deferring to your preference to do back-up documents on an individual entry basis conditioned on the approach proving to be workable.

Thank you for running the Akin terms. Do you have the results?

We will move to compel on the inadequate discovery responses.

Jeff

---

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Wednesday, May 23, 2018 1:27 PM
**To:** Theodore, Jeffrey; Hartley, Sarah; Sloniewsky, Andrew; Ragsdale Olszeski, Ali

**Cc:** Petts, Nick; Davis, Tim
**Subject:** RE: Eddystone discovery issues


Jeff:

Our responses are embedded below.

Thanks,
Jake




JACOB A. KRAMER
Partner
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

---

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Thursday, May 17, 2018 4:32 PM
**To:** Kramer, Jake; Hartley, Sarah; Sloniewsky, Andrew; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jake,

My email was an accurate account of our group call from last week. As I mentioned during our subsequent one-on-one talk, the personal accusations, including that I "misrepresent[ed]" our discussion, are neither correct nor conducive to a productive discussion. My email was accurate, and my hope is that we can have a civil and professional interaction. Turning to the substance of the issues:

1.  Search terms. Thank you for sending your revised search terms. We are reviewing and will get back to you as soon as possible. As we review, we had two questions about the 467,000 document number mentioned in Sarah's email. First, does that number consist of the sum of the hit counts for each of the individual terms or is it the hit count for all of the terms run together? I.e., does it count documents that are responsive to multiple search terms once each or once per term? Second, is that 467,000 number pre- or post-deduping across custodians?

BCLP Response:  467,000 unique documents are responsive to the narrowed search terms only, after de-duplication.  Many more documents hit on the other search terms we have not proposed narrowing.

1A. Productions. Do you have any update on the status of the accounting documents, as reflected in point 3 of your May 3 email? Also, when will we receive a production of documents responsive to the sets of search strings that you have begun reviewing already?

BCLP Response:  We have identified additional accounting documents and plan to produce them by the end of next week.  We do not, however, intend to produce all of the back-up materials.  Please let us know if you have specific requests for particular back-up materials.  As for your second question, we expect to begin producing emails responsive to search terms in the next two weeks.

2. Akin. We sent you a list of proposed search terms for Akin custodians. You asserted that the terms PSA, Purchase and Sale Agreement, and Purchase Agreement were overbroad and asked us to replace them. We considered those to be very important search terms because they are the name of the agreement that was being negotiated to distance Ferrellgas from BTS. Given the need to target different aspects of the negotiations that we are interested in without using the name of the agreement, we had to use a larger number of replacement terms. We think that the new terms

are completely proper on the merits, but are happy to discuss any substantive objection that you may have. Because we think that they are substantively appropriate, we would appreciate it if you would run the hit counts on all of the terms and then we can discuss further on that basis if the hit counts are too high.

BCLP Response:  We asked you to narrow the search terms to reduce the burden associated with three rather generic terms (e.g., "purchase agreement"), not to expand the burden by adding a number of additional terms.  We will revert to the original list you proposed to obtain hit counts for Andy Lehman and John Goodgame during the periods from April 1, 2015 - July 1, 2015 and Oct 15, 2015 - March 15, 2016.

3. Lost emails/Natale. We appreciate your searching for Natale back-up materials. When did he leave Bridger? The assertion that we "changed []our position to seek even more" after you agreed to search for Natale is not accurate. We have made clear ever since you disclosed the lost email issue to us – and stated expressly on the phone call – that this issue is larger than Natale. That is reflected in all of the emails that we have sent on this subject as well, including ones in this chain. While Natale is the most significant of the custodians whose emails are missing entirely, we have made clear consistently – and make clear again – that the partial or complete loss of other custodians' emails is a serious problem that threatens to prejudice Eddystone. The measures needed to deal with this are not limited to Natale and we have never suggested that they were.

BCLP Response:  Our understanding is that Natale left Bridger at some point during the period from 2/18/14 - 3/28/14, before the acquisition.  We do not have personnel records that allow us to fix a precise date, although such records may be available from Jamex or Insperity (an outsourcing PEO).  We have searched for back-up images of laptops used by all of the custodians for whom we do not have documents, and we have not been able to locate any such back-ups.

4. Thank you for the information regarding Iron Mountain.

BCLP Response:  You're welcome.

5. Confidentiality. Rather than get into a finger-pointing match about why, we can agree that we did not make it to the confidentiality issue before the call ended. We are happy to discuss it on future calls. Nonetheless, so that we can understand the position taken in Sarah's email better, we would appreciate a response to the questions in my email below. What confidential information does FGP plan to withhold and on what basis? And why is the withholding of documents containing confidential information appropriate given the confidentiality order entered in this case?  Did the arbitration panel enter a confidentiality order in the Ferrellgas/Rios/Gamboa arbitration?

BCLP Response:  We are happy to discuss the confidentiality issue on our next call.  Until then, the materials at issue relate to the employment arbitration involving Rios and Gamboa, and they have not consented to disclosure in this litigation.  We understand their position to be that the AAA arbitration proceeding was confidential, and none of the materials are relevant in any event.  We may want to include their counsel in this discussion.

6. Document request responses. To the extent that you do not want to engage in negotiations over your responses to document requests because the process is disconnected from discussion over search terms, the easy solution is to amend your responses to the requests to say that you will produce responsive, non-privileged documents in accordance after a reasonable search. Saying in formal responses that you won't produce certain documents but then asking us to hold off obtaining relief for those same documents on the expectation that they will be captured by broader search terms does not give us the necessary comfort.

By contrast, there is no need for us to make further amendments to our responses to your requests because we have already amended them to tell you exactly what we have committed to produce after good faith discussions of the sort that you now disclaim in the context of our requests to you. Thus, your proposed "reciprocal commitment" is not reciprocal at all. You should negotiate the responses and expressly agree to produce (as we did ours) or be prepared to have us protect our litigation position against the uncertainty that you have created.

The requests at issue are for which you have stated that you may or will not produce in full are Eddystone Requests Nos. 16, 20, 21, 57-58; Second Set of Eddystone Requests Nos. 8, 32, 35, 51, 59-61. For some of these, Eddystone laid out a proposed compromise position in Andrew's April 25, 2018 emails.  We simply to know whether or not you will make a reasonable search for all reasonably available, non-privileged documents responsive to these 12 requests. Getting a straight answer to this question does not require the parties to engage in "interminable" discussions.  Please let us know your answer. In addition, there are five requests (First Set of Eddystone Request No. 29, Second Set of Eddystone Requests Nos. 30, 33-34, 40) for which Andrew asked in his 4/25/2018 emails that Ferrellgas provide clarity regarding its responses. Please provide us with this clarification.

You ask us to identify document requests for which application of search terms would be insufficient. We cannot provide an absolute answer to this question as we do not know what document repositories Ferrellgas possesses, i.e., we are unsure what responsive documents exist that are not associated with particular custodians  The burden of meeting Ferrellgas's discovery obligations rests principally with Ferrellgas, which has the obligation to make a reasonable search that will capture responsive documents and has much superior knowledge regarding its documents.  That said, in an effort to advance this process, we would expect that search terms would not be sufficient for (and to the extent that) requests that call for specific documents, such as agreements or financial records or specifications. Regarding the first set of document requests, our understanding based on discussions with Akin was that search terms are insufficient for all or parts of Requests 1-30, 34, 35, 38, 39, 41, and 45. Regarding the second set of document requests, our sense is that Requests 1, 3, 4, 5, 8, 15, 20, 27, 30, 32, 34, 35, 40, 43, 52, 53, and 59 particularly are not amenable to search terms in whole or in part.

BCLP Response:  Again, your email does not contain an accurate account of our conversation or our position.  We have provided our responses and objections to ERC's discovery requests, and we have modified them after extensive negotiations.  We maintain the objections currently stated in our responses.  We have not suggested that you rely on the results of search terms and refrain from taking whatever action you deem appropriate to challenge our objections to RFPs.

We did, however, ask you to be practical.  In particular, the parties' agreement to produce documents that hit on an agreed set of search terms will result in the production of documents that we have not expressly agreed to produce (and that you have not expressly agreed to produce).  We neither amend our objections nor waive them by producing documents in response to the agreed-upon search terms, but we did try to explore the possibility of a compromise that takes account of these practical considerations.  To move that discussion along, I asked you to review the RFPs that remain in dispute (not all of the RFPs) and tell us which of the RFPs that remain in dispute you think are not covered by the search terms.  Cross-referencing the RFP lists in the final two paragraphs of your email, your position appears to be that search terms are sufficient with respect to all of the RFPs that remain in dispute, except for First RFP 21 (transfers from Bridger entities) and Second RFPs 32 (rail car specifications), 35 (costs to ship crude by rail), and 59 (Rios and Gamboa arbitration).  You have our position on each of these RFPs (including in response to item 5 above), but we are open to discussing further.

Jeff

---

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Wednesday, May 09, 2018 3:06 PM
**To:** Theodore, Jeffrey; Hartley, Sarah; Sloniewsky, Andrew; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jeff:

As in your recent submission to Judge Kelly, your May 4 email (below) misrepresents much of what was said in the call last week and appears calculated to create an inaccurate record of our conversation for future submission to the court.  If this pattern persists, we will arrange for court reporters to participate in future calls.

While we are on the subject, I would like to renew the request for civility in the discovery process.  The snickering and condescending remarks we heard from your team during the recent call are unprofessional and wildly inappropriate, and such conduct will not be tolerated in the future.

Turning to the substance, here are some particular reactions:

1.  Search Terms.  We agreed that the parties would aim to exchange search term proposals this week.  We will proceed with that objective, but the parties did not agree to exchange by May 11.  Like us, you were unwilling to commit to a date when we spoke.

2.  Akin emails.  When we resolved the issue regarding your revised search terms, we will proceed to assess the burden of reviewing Akin emails.  To recap, we agreed to search using all of the terms you proposed, minus three that are extremely general.  During our call, we suggested that you might tailor those general terms by pairing them with specific terms.  Instead, you replied by adding a number of new terms to the agreed list.  At this point, we are inclined to use the original set to which we agreed, minus the three general terms we suggested removing.

3.  Natale Files.  We agreed to search for Natale back-up materials, which may or may not exist, because you stated that his files are important for purposes of our counterclaims.  After we agreed to do so, you changed your position to seek even more.  We will search for Natale.  Notably, despite your questions and concerns, he left Bridger long before the start of this litigation.

4.  Iron Mountain.  We have obtained more information about the Iron Mountain files:
     a.  There are no Ferrellgas documents stored at the Iron Mountain facility.
     b.  The Bridger entities moved offices multiple times throughout the years.  Until August 2017, the Bridger entities stored hard copy documents in various Bridger offices and at a different off-site storage facility.
     c.  In August 2017, Bridger Logistics moved offices again.  At the same time, they consolidated the documents that were stored in the various Bridger offices and the off-site facility and transferred them all to Iron Mountain.
     d.  There may be some very old documents stored at the Iron Mountain facility, as well as some documents created within the last 5-6 years.
     e.  Importantly, all documents that someone at Bridger felt were important (or would need to be referenced again) were scanned into the Bridger system.  Such are therefore likely to be included in Bridger's electronic files, including its legacy email system and fileshare, both of which we are searching.

5.  Confidentiality Orders.  You did not raise any issues about confidentiality orders during our call.  You initiated the call but did not have a clear agenda, which resulted in a somewhat meandering discussion that lasted longer than the 60 minutes we blocked out.  As a practical matter, it would be more efficient (and respectful of time) if the party who initiates the call will take responsibility to circulate a concise topical agenda.  We can discuss this issue during our next call.

6.  Objections to Document Requests.  Your final point, in which you accuse us of a taking a "wink and nod" approach to responding to document requests, grossly mischaracterizes both our discussion and our position.  As we stated, the interminable back-and-forth negotiations initiated by your team are inefficient and disconnected from the actual discovery process.  Both parties have agreed to use search

terms to search the email files of a set of custodians.  And the parties further agreed that documents that hit on search terms are presumptively responsive and will be produced, unless we reach a good faith conclusion that no party would regard the document as relevant (i.e., junk emails), or there is an applicable privilege.  This agreement has been in place for some time.  The search terms are expansive and capture documents that are responsive to requests to which the parties have otherwise objected.  Our approach has been to honor the parties' agreement on responsiveness, notwithstanding such objections, and you stated that Steptoe has proceeded in this fashion as well.  After this exchange, you asked us to amend our responses to document requests to reflect this approach.  In response, we proposed that both parties amend their discovery responses in such fashion, rather than continuing to engage in the interminable back-and-forth negotiations about objections.  You refused to make a reciprocal commitment, which resulted in an impasse.  To help move the discussion forward, please let us know if there are particular document requests to which we have objected and for which you think email searches will be insufficient.

Thanks,
Jake



**JACOB A. KRAMER**
Partner
jacob.kramer@bclplaw.com
T: +1 202 508 6153   M: +1 202 550 8547

---

**From:** Kramer, Jake
**Sent:** Wednesday, May 09, 2018 2:42 PM
**To:** 'Theodore, Jeffrey'; Hartley, Sarah; Sloniewsky, Andrew; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jeff:

Could you please explain how the elimination of three general terms we flagged resulted in all of the new terms you suggest?  At first blush, it seems that you are taking advantage of this process to expand the list of terms to which we have already agreed, not to craft more targeted replacements for the terms we asked you to reconsider.

Thanks,
Jake



**JACOB A. KRAMER**
Partner
jacob.kramer@bclplaw.com
T: +1 202 508 6153   M: +1 202 550 8547

---

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Wednesday, May 09, 2018 2:15 PM
**To:** Hartley, Sarah; Sloniewsky, Andrew; Kramer, Jake; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jake,

Here are our proposed modifications to the Akin search terms per our discussion last week.

Thanks,

Jeff

---

**From:** Theodore, Jeffrey
**Sent:** Friday, May 04, 2018 4:06 PM
**To:** Hartley, Sarah; Sloniewsky, Andrew; Kramer, Jake; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jake,

Thanks for your summary of our call yesterday. Here are our reactions as well as some additional issues that we see arising from our discussion and the emails we have exchanged. I have pasted your email from yesterday into the prior email chain just so that everything is in one place.

We agree with your point 1, below, that the Parties will circulate proposed modifications of search terms by Friday May 11th. You also stated that you are reviewing search strings that have returned fewer than 20,000 documents and that you will get your first production out in the next couple of weeks. As you know, we would very much like to start reviewing FGP's documents, and we hope to see a substantial production by May 17.

Regarding FGP's second set of document requests served last week, we will review those and respond appropriately, including as to whether additional search strings are appropriate.

We appreciate your efforts on the accounting documents. Please let us know your position as soon as you are able.

Regarding Akin, we agree to Goodgame and Lehman as test custodians. Regarding time frame, we would propose Oct 15, 2015 to March 15, 2016 and April 1, 2015 to July 1, 2015. By Monday, we will propose replacement search terms for PSA, Purchase and Sale Agreement, or purchase agreement as you suggested on the call.

We appreciate your efforts to determine whether Natale's laptop was imaged. As we stated on the call, while Natale is the most important custodian of those whose emails are missing, our concerns go beyond him and we continue to have questions and concerns about whether emails of other custodians have been lost as well (in part or in whole).

We are reviewing the Iron Mountain index. It would be helpful to have some additional context as to when/why the boxes were put into storage and what they contain. You told us on the call that you do not have any such information beyond what is contained in the index and that you have been unable to locate anyone at FGP who has such information. Please let us know if that changes.

Sarah's email from Wednesday stated, "We will not produce documents that are the subject of confidentiality agreements." We think that this is not appropriate. A protective order has been entered in this case that protects confidential information; in any event, such a vague and blanket refusal is inappropriate. What confidential information does FGP plan to withhold and on what basis?

Finally, we cannot agree to your proposal regarding your responses to Eddystone's Second Set of Document Requests. You have responded that you will not produce many categories of highly relevant documents, stated that you will not negotiate or discuss those positions, and stated that this is ok because we may get many of the documents if they hit on agreed search terms. We are entitled to a clear answer as to whether FGP will produce the requested documents, which are highly relevant. Your "wink and nod" approach by which you say that you will not produce categories documents in your formal discovery responses but then informally tell us not to worry because they are covered by the search terms does not work. We need to have confidence and agreement as to the proper scope of discovery. Indeed, because you know FGP's documents better than we do, we are to some degree relying on you to construct terms that reflect the production agreement; the lack of agreement therefore makes us unwilling to rely on search terms. Moreover, certain categories of documents are not susceptible to search terms, such as the record of the proceedings between FGP and Rios and Gamboa.

Ultimately, your proposal avoids taking clear positions and allows FGP to stand on its objections, notwithstanding your telephonic suggestions that the documents may be produced. Your proposed language that "any document containing such search terms is presumptively responsive and will be produced unless it is clearly irrelevant" gives us no confidence as your formal discovery responses suggest that you consider many of our requests irrelevant. We do not understand why FGP cannot engage in discussions as to whether it will or won't produce the documents falling within the various categories set forth in our document requests and take straightforward positions as to whether it will or will not produce. If you truly do intend to produce responsive documents via search terms, FGP can just say that it will produce according to the "proposed plan" regarding search terms rather than saying "no" and then telling us on the side that search terms should suffice.

Your position is also inconsistent with your approach to discovery on Eddystone. You argue that discussion of our second set of document requests (which have been outstanding for months) is not necessary and reject the importance of providing accurate responses to our requests in light of the search term negotiations. But you have just served on us an entirely new set of document requests, to which you expect us to respond. That makes no sense if, as you now assert, the only thing that matters is search terms. And of course, we have given clear responses as to what categories of documents we would and would not produce in our formal responses to your earlier written discovery and engaged in extensive discussions of those responses. As a result, if FGP wants, it can move to compel documents that Eddystone has clearly indicated in its discovery responses it will not provide. While Eddystone has produced more documents than strictly required by its responses to FGP's requests, FGP should not assume that because of this Eddystone is making full production of materials falling into document categories to which it objected.

If FGP does not modify its written objections to our document requests, we will understand that FGP does not feel obligated to produce those materials and we will act as needed to protect our litigation position.

Jeff

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Thursday, May 03, 2018 2:49 PM
**To:** Theodore, Jeffrey; Sloniewsky, Andrew
**Cc:** Hartley, Sarah; Ragsdale Olszeski, Ali
**Subject:** Eddystone - List of Action Items for Discovery

Jeff:

Thank you for taking the time to discuss various issues today.  Here is a summary of the action items for each side:

1.  Both parties will aim to circulate modified search term proposals by May 11, 2018.

2.  Both parties agreed to review BL/FG's second set of discovery requests in connection with Eddystone's search terms and consider whether Eddystone needs to add additional search terms.

3.  We agreed to evaluate the issues surrounding the accounting records and will let you know as soon as we are in a position to further discuss your requests.  Specifically, we are assessing your requests (1) to expand the time period through the close of discovery, (2) for subsidiary ledgers, and (3) for back-up documents.

4.  We did not agree to collect, review, log or produce any internal Akin emails.  We did, however, agree to evaluate the burden of your requests for such materials.  Specifically, we proposed (a) to search the files of Andy Lehman and John Goodgame (we agreed that those custodians would suffice), (b) applying a date range of November 1, 2015 – March 1, 2016, and (c) using the search terms you provided previously (but not PSA, Purchase and Sale Agreement, or purchase agreement).  Please let us know your position on the date range and search terms so that we may proceed with this effort.

5.  We agreed to try to determine whether Joe Natale's laptop was imaged.

6.  You are reviewing the Iron Mountain index and will let us know if you believe any additional steps are required.

7.  To cut off extended negotiations about objections to document requests, you asked us to add language to our formal responses indicating that we would produce emails that are identified using agreed custodians and search terms.  We discussed that the parties have agreed to a presumption of responsiveness over such documents and to produce any such documents that are not clearly irrelevant.  To resolve this issue and reflect this agreement, we propose that both parties agree to amend their formal responses to contain the following language:

> The parties have agreed to search the email files of certain custodians using certain search terms, which may be modified in consultation with one another, and they have further agreed that any document containing such search terms is presumptively responsive and will be produced unless it is clearly irrelevant.  As a result, each party may produce documents that are responsive to document requests to which they have objected.  The parties' agreement to proceed in this manner is not intended to waive any of their specific objections to document requests.

---

**From:** Hartley, Sarah [mailto:sarah.hartley@bclplaw.com]
**Sent:** Wednesday, May 02, 2018 3:06 PM
**To:** Sloniewsky, Andrew; Theodore, Jeffrey; Kramer, Jake; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

My apologies.  See attached.



**SARAH HARTLEY**
Partner
sarah.hartley@bclplaw.com
T: +1 303 866 0363

---

**From:** Sloniewsky, Andrew [mailto:ASloniewsky@steptoe.com]
**Sent:** Wednesday, May 02, 2018 1:03 PM
**To:** Hartley, Sarah; Theodore, Jeffrey; Kramer, Jake; Ragsdale Olszeski, Ali
**Cc:** Petts, Nick
**Subject:** RE: Eddystone discovery issues

Sarah:

Could you send us a copy of the Iron Mountain file index?  It was not included with your email.

Andrew

---

**From:** Hartley, Sarah [mailto:sarah.hartley@bclplaw.com]
**Sent:** Wednesday, May 02, 2018 2:55 PM
**To:** Theodore, Jeffrey; Kramer, Jake; Ragsdale Olszeski, Ali
**Cc:** Sloniewsky, Andrew; Petts, Nick
**Subject:** RE: Eddystone discovery issues


Jeff and Andrew,

We write in response to your various emails as to which you requested a meet and confer call, to be held tomorrow.

(1)  We do not intend to engage in further RFP-by-RFP discussions regarding our objections and asserted limitations on what we will produce.  We do not believe continued back-and-forth regarding the nuances of our objections is productive.  We have agreed to search an exceedingly large universe of documents and custodians for potentially relevant documents, and we believe that the scope of the review to which we have agreed is abundantly reasonable.  With that in mind, we have provided you our responses and objections, and, except for the few limited exceptions noted below, we refer you to our written responses for the scope of what we agreed to produce.  To be clear, we do not accept your abbreviated characterizations of our detailed responses.

(2)  We have obtained a copy of the Iron Mountain file index, and a copy is attached.

(3)  Your email asked a litany of questions challenging our representations regarding the existence or non-existence of certain files from the legacy Bridger email system. Counsel has undertaken good faith investigation of the available data in this case, and your inquisition is inappropriate.  Regardless, we will address key issues for the sake of transparency.

  a.  To be clear, there are no issues with missing custodians from the Ferrellgas email system--only the legacy Bridger system that has been maintained solely for purposes of this litigation.

  b.  When we talk about the Bridger legacy email system, we are referring to the email system used by Bridger before the Ferrellgas acquisition.  Our understanding is that Bridger utilized a cloud-

27

based service provider with both enterprise and user level data limitations. This means that if a particular user hit data limits, the user may have deleted emails to create space. The same applies on the enterprise level. We do not have files or records that indicate who performed what deletions or why, but we have confirmed that the scope of the data archived from the Bridger email system excludes the custodians we listed in our April 2, 2018 email to you (Doug Swatzell, Grant Adams (who was never a Bridger employee), Josh Taton, Laura Marroquin, Micah Knox, Randy Morgan and Sonia Ramirez) and our April 12, 2018 email (Andrew (Tye) Graham or Giuseppe (Joe) Natale). There was no "back-up" of the Bridger emails once they were deleted in the ordinary course of business. The universe of custodians and emails has been static since the system was deactivated for use around March 2016.

c.   As we have represented previously, we have engaged in a thorough search of the Bridger emails that were preserved on the legacy system, and only certain custodians' files exist. We have confirmed that the archived Bridger emails do not contain files for the custodians we previously informed you we did not have emails for.

d.   To address your questions relating to the transition of any information from the Bridger email system to the Ferrellgas system, it was not automatic that a Bridger employee's emails were transitioned into the Ferrellgas email system, but employees could opt to retain access to their Bridger emails from before the Ferrellgas acquisition. To the extent any employee did so, all of the pre-acquisition emails are on the Ferrellgas system and already have been collected for review.

e.   Individuals may have sought to avoid the system data limitations by archiving emails locally on their laptops. We are not aware that this happened for any particular individuals. In the ordinary course of business, when an employee has left Bridger, Bridger repurposed his/her laptop for use by other employees. We understand that certain laptops may have been imaged before being repurposed, but we have yet to find that an image of the laptop belonging to any of the missing custodians was preserved. We will follow up if we determine that any such images were made and preserved.

(4) With respect to "AEI reader" data or train location data, our client has confirmed that it does not have such data. Bridger did not receive train location data from the railroads. Instead, Bridger was able to log into a customer portal on the railroad's website, through which they could view real-time data on train locations, but it did not receive reports as a matter of course. Bridger did not maintain internal records showing daily train locations, but we understand daily emails with certain limited information on train locations may have been circulated, which we will search for in our document review. Beyond that, we do not have access to any train location data.

(5) For the accounting data, we believe that everything you have requested and which we agreed to provide has been produced. We are engaging in a comprehensive review of productions made by Akin to confirm this is the case. We do not agree to the extensive back-up demanded by ERC, as explained in our response to your Second RFP #8.

(6) We have been working with our vendors in an iterative manner to identify ways in which we can revise search terms to narrow them to ensure we capture relevant documents without the undue burden we have described in previous communications and to the court. We are working hard to have a proposed set of alternative searches that meaningfully narrows the universe of the review, and will revert once we have that. In the meantime, rest assured that document review is already on-going.

(7) As a general matter, we already have agreed on search terms, although as we have indicated above and previously, they need to be narrowed to make the burden of collection/review/production reasonably proportionate to the needs of the case. Search terms already have been crafted to address ERC's Second Set of RFPs. We therefore do not agree to add additional search strings to our review, unless they are narrowly crafted to replace others that yielded excessive hits.

(8)  For our response to your Second RFP #3, please identify for us what third party productions responsive to subpoenas you have received so that we can provide to you any others that we have received.

(9)  We will not produce documents that are the subject of confidentiality agreements.

We look forward to talking tomorrow.

Sarah



**SARAH HARTLEY**
Partner
sarah.hartley@bclplaw.com
T: +1 303 866 0363

---

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Tuesday, May 01, 2018 12:47 PM
**To:** Kramer, Jake; Hartley, Sarah; Ragsdale Olszeski, Ali
**Cc:** Sloniewsky, Andrew; Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jake,

Let's plan on noon on Thursday.

Thanks,

Jeff

---

**From:** Kramer, Jake [mailto:jake.kramer@bclplaw.com]
**Sent:** Tuesday, May 01, 2018 10:45 AM
**To:** Theodore, Jeffrey; Hartley, Sarah; Ragsdale Olszeski, Ali
**Cc:** Sloniewsky, Andrew; Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jeff:

We could talk on Thursday from 12-1 pm, 2-3 pm, or beginning at 4:30 pm Eastern.

Please let us know a time that works on your end.

Thanks,
Jake



**JACOB A. KRAMER**
Partner
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

**From:** Theodore, Jeffrey [mailto:jtheodore@steptoe.com]
**Sent:** Friday, April 27, 2018 4:18 PM
**To:** Kramer, Jake; Hartley, Sarah; Ragsdale Olszeski, Ali
**Cc:** Sloniewsky, Andrew; Petts, Nick
**Subject:** RE: Eddystone discovery issues

Jake, Sarah,

Following up on this, are you available to chat early next week?

Thanks,

Jeff

---

**From:** Theodore, Jeffrey
**Sent:** Wednesday, April 25, 2018 3:03 PM
**To:** Kramer, Jake; Hartley, Sarah; Ragsdale Olszeski, Ali
**Cc:** Sloniewsky, Andrew; Petts, Nick
**Subject:** Eddystone discovery issues

Jake and Sarah,

I write regarding various outstanding discovery issues between the Parties. For ease of reference, I have combined these issues into one email. I think it probably makes sense to have a call to discuss many of these. Please let us know a time that works best for you.

1. We are very concerned about the absence of emails for certain BL/FG custodians, including Joe Natale, as described in your email of April 12. Natale was the point person for interactions between Eddystone and Bridger during 2013 and 2014 and was centrally involved in all of the issues regarding rail scheduling, barges, etc. that are at the core of the counterclaims. His emails are key evidence. We have a couple of questions about this:

When you say the "the BL legacy email system," what exactly are you referring to?

Other than Natale and Graham, who else's emails are missing?

What time period does this problem relate to? Only pre-FGP acquisition? Or post-acquisition as well?

Is this an issue for the FGP email system?

Post-acquisition did all Bridger personnel use the FGP email system? Is that true even if they continued to use Bridger email addresses post June 2015?

When you say "freed up space by deleting emails or archiving locally on laptops," do you mean freed up space on the email server?

Was there any backup of the BL legacy email server at any point?

When an email was sent or received by Bridger personnel prior to the Ferrellgas acquisition, was it automatically saved on the user's laptop?

What happened to the laptops on which excess emails were archived?

Why are all of Natale's emails (and those of other custodians) gone as opposed to only those that exceeded the data limits on the server?

When was the BL legacy email system deactivated?

What happened to the BL legacy email system after it was deactivated?

Were emails on the BL legacy email system migrated to the FG email system for active users? Or only email stored on laptops?

2. We also are surprised about the lack of train location data. Based on conversations with our witnesses at the Facility, this information was being provided to Bridger by the railroads on a regular basis. You state in your response that you do not have "AEI reader" data (quotes in the original). Perhaps this train location data was stored under a different name? This data is of extremely high relevance regarding the counterclaims and the allegations of delay. We request that you make every effort to find it.

3. Prior to your appearance in the case, prior counsel had produced accounting data. However, we have not received all of the data, particularly subledgers for intercompany ARs, APs, and payments between the different Bridger and Ferrellgas entities. There are a lot of intercompany transactions and the top-level general ledger detail is insufficient to determine what many of them were in respect of. We therefore reiterate our request for all of the accounting data, particularly subledgers for ARs, APs, and payments.

4. We are in receipt of your letter requesting that we reconsider our refusal to include Monaco, Schuldhaus, and Varsanyi as custodians. We are somewhat surprised that you would be proposing such an expansion of our discovery burden at the same time that you are seeking to renegotiate your search terms and custodians down. Our document numbers are already in the range of the numbers that you have said require you to reduce your terms, so we are surprised that you would seek to negotiate our burden up and yours down.

In any event, we have reviewed the documents you identify in your letter, and we do not think that they warrant addition of these custodians. The documents that you have identified, while having to do with Eddystone, are not really relevant to the disputes at issue in the case. None of the documents cited in your letter relates to the fraudulent transfer, alter ego, or fiduciary duty issues that are the gravamen of Eddystone's claims or to the SEPTA window, granite pinnacle, loading rate, custody transfer meter, Jamex indemnification, and Carlyle issues that are the basis for the counterclaims. In addition, the documents show that Monaco, Schuldhaus, and Varsanyi had only the most attenuated involvement with Eddystone. For example, Monaco's alleged concerns about cost overruns or Schuldhaus's requested attendance at a stray meeting regarding Eddystone do not rise to the level of involvement that would set them apart from perhaps dozens or hundreds of personnel or justify their inclusion as a custodian. Finally, the documents you identify consistently went to between three and six named custodians (not counting Monaco, Schuldhaus, and Varsanyi). That suggests that anything even tangentially relevant will be captured by searches of the existing set of custodians and that addition of these custodians would be cumulative and unnecessarily burdensome.

That said, we are happy to discuss why exactly you feel that these custodians are necessary in the context of our larger discussion of custodians and search terms and see if we can work something out that works for both parties.

5. We understand that you want to renegotiate certain search terms and custodians for FGP documents. As previously indicated, we are amenable to reasonable adjustments. I believe that you were planning to provide us a chart of search terms and hit counts by custodian to help with that process? Is that something that is likely to be available soon?

6. You asked us for a proposed list of search terms for Akin custodians. (We understand your caveat that there was no agreement on this point and that this was for discussion purposes only.) Here is what we have come up with:

ERC
Eddystone
Enbridge
Canopy
RSA
"Rail Services Agreement"
PSA
"Purchase and Sale Agreement"
"purchase agreement"
BTS
"Bridger Transfer Services"
Ballengee
jballengee
Jilla
vjilla
gadams
adams
Monroe
delta
hunter
Warmann
burnett
graeme
jamex
jamexmarketing
"swan ranch"
"bridger terminals"
Brenner
Strasburger

We look forward to hearing from you on all of these points and having a chance to discuss.

Jeff

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.