UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-cv-00495 |
| | ) | |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., FERRELLGAS L.P., | ) | |
| BRIDGER ADMINISTRATIVE SERVICES II, | ) | |
| LLC, BRIDGER MARINE, LLC, BRIDGER | ) | |
| RAIL SHIPPING, LLC, BRIDGER REAL | ) | |
| PROPERTY, LLC, BRIDGER STORAGE, LLC, | ) | |
| BRIDGER SWAN RANCH, LLC, BRIDGER | ) | |
| TERMINALS, LLC, BRIDGER | ) | |
| TRANSPORTATION, LLC, BRIDGER | ) | |
| ENERGY, LLC, BRIDGER LEASING, LLC, | ) | |
| BRIDGER LAKE, LLC, J.J. LIBERTY, LLC, | ) | |
| J.J. ADDISON PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | | |

_____

**PLAINTIFF EDDYSTONE RAIL COMPANY'S
MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS
UNDER THE CRIME-FRAUD EXCEPTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................3

     A.    Bridger Transfer Services's Assets before the Ferrellgas Acquisition ..................3

     B.    Ferrellgas Acquires Bridger Logistics and Begins Stripping BTS of its Assets and Revenue ..............................................................................................5

     C.    Ferrellgas Abandons the RSA and Strips the Remaining Value Out of BTS .........8

     D.    This Litigation and Defendants' Assertion of Privilege .......................................11

LEGAL STANDARD...........................................................................................................15

ARGUMENT ......................................................................................................................17

I.    The Court Should Order Production under the Crime-Fraud Exception ..........................17

     A.    There Are Strong Grounds to Conclude that Defendants Engaged in Intentional Fraudulent Transfers ..........................................................................17

     B.    The Defendants Misused the Advice of Outside and In-House Counsel to Further the Fraudulent Transfers ........................................................................22

     C.    If the Court Considers It Necessary, an In Camera Review Will Confirm the Applicability of the Crime Fraud Exception....................................................24

II.    Ferrellgas Has Not Adequately Established any Basis on which to Withhold the Documents at Issue as Privileged ......................................................................................26

CONCLUSION....................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Chapman Lumber Co., Inc.*,
No. 05-00408, 2007 WL 2316528 (Bankr. N.D. Iowa Aug. 8, 2007) ...................................18

*Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*,
No. CIV.A. 09-2751, 2011 WL 6088611 (E.D. Pa. Dec. 7, 2011) .........................................18

*CSX Transp. Inc. v. Admiral Ins. Co*.,
No. 93-132-CIV-J-10, 1995 WL 855421 (M.D. Fla. July 20, 1995)......................................26

*In re DiLoreto*,
No. 9834641F, 2002 WL 34573858 (Bankr. E.D. Pa. May 3, 2002) ....................................16

*Fed. Trade Comm'n v. Innovative Designs, Inc*.,
No. CV 16-1669, 2017 WL 4310236 (W.D. Pa. Sept. 28, 2017) ..........................................27

*Fragin v. First Fund Holdings LLC*,
2016 WL 4256984 (Sup. Ct. N.Y. Cty. Aug. 11, 2016) ...................................................20, 21

*Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*,
No. 1:04-CV-00007-LMB, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004)......................16, 22

*In re Grand Jury*,
705 F.3d 133 (3d. Cir. 2012).....................................................................................15, 16, 17

*In re Grand Jury Matter #3*,
847 F.3d 157 (3d Cir. 2017)...................................................................................................23

*In re Grand Jury Proceedings*,
604 F.2d 798 (3d Cir. 1979).......................................................................................15, 16, 26

*Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n*.,
914 F. Supp 1172 (E.D. Pa. 1996) .........................................................................................28

*McGrath v. Cosco, Inc*.,
No. 98–CV–1502, 1999 WL 269920 (E.D. Pa Apr. 21, 1999)..............................................28

*Estate of Page v. Slagh*,
No. 1:06-CV-245, 2007 WL 1385957 (W.D. Mich. May 8, 2007)........................................20

*Schaeffer v. Tracey*,
No. 215CV08836MCASCM, 2017 WL 465913 (D.N.J. Feb. 2, 2017) ..................................28

*In re Sigma-Tech Sales, Inc.,*
    570 B.R. 408 (Bankr. S.D. Fla. 2017) ...................................................................21

*U.S. Fire Ins. Co. v. Bunge N. Am., Inc.,*
    No. 05CV2192JWL-DJW, 2008 WL 2548129 (D. Kan. June 23, 2008) ..............................27

*United States v. Hallinan,*
    290 F. Supp. 3d 355 (E.D. Pa. 2017) ...........................................................24, 25

*In re Universal Serv. Fund Tel. Billing Practices Litig.,*
    232 F.R.D. 669 (D. Kan. 2005).....................................................................28

*Transcon. Refrigerated Lines, Inc. ex rel. Young v. New Prime, Inc.,*
    No. 1:13-CV-2163, 2014 WL 2471936 (M.D. Pa. June 3, 2014).....................................16, 24

**Statutes**

12 Pa. C.S. § 5104(a)(1)........................................................................18

12 Pa. C.S. § 5104(b)(1) .......................................................................20

12 Pa. C.S. § 5104(b)(2) .......................................................................21

12 Pa. C.S. § 5104(b)(3) .......................................................................21

12 Pa. C.S. § 5104(b)(5) .......................................................................19

12 Pa. C.S. § 5104(b)(8) .......................................................................19

## INTRODUCTION

Plaintiff Eddystone Rail Company, LLC ("Eddystone") moves under the crime-fraud exception to compel full disclosure of certain documents that Defendants have withheld based on the attorney-client privilege and the work-product protection.

Defendants caused Eddystone's counterparty BTS to transfer away all of its assets for no consideration with the intent to commit fraudulent transfers and evade BTS's debts to Eddystone. Defendants sought to retain the assets that BTS owned while avoiding payment of amounts due Eddystone. The scope and sophistication of the fraudulent transfers was extraordinary. The Defendants therefore required and heavily relied on the assistance of counsel, both inside the company and at an outside law firm.

Beginning June 2015 the Defendants steered to other subsidiaries of Bridger Logistics well over ██████████ dollars in revenue that BTS earned by providing logistics services – all for the ultimate benefit of Bridger Logistics, its ultimate 100% owner Ferrellgas, and the other Defendants. Defendants hid much of the income in a fake accounting entity, including a stream of revenue BTS had formerly used to cover its monthly payments to Eddystone. The Defendants then directed Bridger Logistics and companies it owned to make BTS's payments to Eddystone until the time came to abandon the Eddystone contract.

In February 2016, when the Defendants stopped shipping crude through the Eddystone facility, Defendants finished the job. The day before BTS's last train left Eddystone, the Defendants stripped BTS of its remaining assets, transferring many millions of dollars in ongoing businesses and their property, physical plant, and equipment to Bridger Logistics subsidiaries that Defendants also controlled.

To execute these fraudulent transfers, the Defendants used the services of both in-house counsel and outside counsel.  Between May and July 2015, in-house counsel helped create a fictitious new legal structure that justified the diversion of revenue from BTS to the fake accounting entity.  In January 2016, attorneys at Ferrellgas's outside law firm drafted the key agreements whereby Defendants covertly divested BTS of its remaining assets without alerting its largest creditor, Eddystone.

It is established law that where the evidence provides a reasonable basis to suspect that an attorney's services have been used to effect a fraudulent transfer, the attorney communications are not protected by privilege or work product protection.  The evidence here far exceeds this standard.  Under the circumstances of this case, where the accounting and transaction records are perfectly clear that a fraudulent transfer was effected and that counsel was used for that purpose, the attorney-client privilege and the work-product privilege are no longer defensible.  The Defendants' communications with their attorneys regarding BTS's asset transfers, along with their attorneys' work product, are highly relevant to the element of intent in Eddystone's claims for intentional fraudulent transfer.

Faced with a clear case of fraudulent transfer, Defendants are using grossly overbroad assertions of privilege for which they have given the thinnest or no cognizable justification to avoid disclosure of guilty emails.  The Court should reject this gambit.

Having misused their attorneys' services to further their fraud, the Defendants cannot use privilege to bury the evidence.  Accordingly, the Court should pierce the privilege and compel the Defendants to produce the documents and communications identified by Eddystone.

## BACKGROUND

### A.      Bridger Transfer Services's Assets before the Ferrellgas Acquisition

In February 2013, Bridger Transfer Services (BTS) signed a Rail Services Agreement (RSA) to purchase transloading capacity from Eddystone Rail Company (Eddystone) at a facility to be built in Eddystone, Pennsylvania.  Dkt. 35-3 at 7 (Rail Facilities Services Agreement, February 13, 2013).  BTS agreed that for five years it would transload 64,750 barrels of crude per day at the Eddystone facility and pay $2.25 per barrel.  *Id.* at 5-6.  If BTS failed to meet this "minimum volume commitment" (MVC), BTS agreed to pay $1.75 per barrel of deficiency.  *Id.* at 3, 7.  In return, Eddystone agreed to build and operate the transloading facility.

From 2012 through 2016, BTS was a subsidiary of Bridger Logistics LLC, a crude oil logistics holding company that owned a number of logistics-focused subsidiaries.  Ferrellgas acquired Bridger Logistics and all of its subsidiaries on June 24, 2015.  During the 2012 time period through Ferrellgas's June 2015 acquisition of Bridger Logistics, BTS was Bridger Logistics's primary operating entity.  ███████████████████████

███████████████████████████

██████████████████████████████

████████████████████████████████

███████████████████████████

██████████████████

While Eddystone awaits further information from Ferrellgas's accounting records, the documents produced to date demonstrate that BTS's business consisted of several categories.  BTS owned capacity at crude oil rail loading terminals in Berthold, New Town, and Van Hook North Dakota as well as its rail to barge transloading capacity at Eddystone. Petts Decl. Exs. 3-5.  BTS provided this capacity to its affiliates so that they could deliver crude oil to their client

Monroe and other customers, and BTS was paid in return.  Petts Decl. Exs. 6-7.  The accounting

records produced in discovery to date show that revenue attributable to BTS's loading and

transloading capacity was known ███████████████████  Cardell Decl. ¶ 4.  Each month,

until the Ferrellgas acquisition, BTS recorded ██████████████████████.  *Id.*

BTS used that revenue to make payments to Eddystone and other vendors.  *Id.*

BTS also owned or controlled substantial capacity at pipeline injection stations, by which

crude oil was brought by trucks to be injected into pipeline systems.  BTS charged fees for the

use of those injection stations.  The most significant of these was the Swan Ranch facility in

Cheyenne, Wyoming.  BTS had a contract with Shell Trading worth █████████████ to

move crude oil from trucks into a nearby pipeline system.  Petts Decl. Ex. 8.

In addition to its rail throughput and station throughput revenue, BTS also earned

pipeline management revenue and storage fees revenue.  In its storage business, BTS earned fees

by renting capacity for storing crude oil.  In its pipeline management business, BTS earned fees

from its affiliates for scheduling the movements of their crude barrels along a pipeline gathering

network. █████████████████████████████████

████████████████████████████████████████

███████████████████████████ █

While BTS had substantial non-affiliated customers, much of its business, including

supplying loading and transloading capacity to the Monroe supply chain, was conducted with

affiliates.  For many of the instances in which BTS provided services to its affiliates, BTS would

book an account receivable from the affiliate rather than receive payment in cash.  As a result, at

---

[1] BTS may have had additional sources of revenue.  Defects in the produced accounting records have prevented Eddystone's forensic accountants from detailing the complete picture of BTS's business.

the time of the Ferrellgas acquisition in June 2015, ████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

█████████████ .

**B.      Ferrellgas Acquires Bridger Logistics and Begins Stripping BTS of its Assets and Revenue**

On June 24, 2015, Ferrellgas acquired BTS's parent, Bridger Logistics, from Bridger, LLC, which was renamed Jamex, LLC.  This transaction split the logistics and the marketing sides of Bridger's pre-acquisition business.  Where previously there had been one contract with Monroe to supply and deliver crude oil, on May 16, 2015, in anticipation of the Ferrellgas acquisition, Bridger Logistics, Bridger Marketing, and Monroe entered into three separate agreements.  Monroe and Marketing entered into an Amended Crude Oil Supply Agreement in which Monroe paid Marketing only for the crude itself.  Petts Decl. Ex. 9.  At the same time, Bridger Logistics entered into a Transportation and Logistics Agreement ("TLA") with Monroe whereby it agreed to transport the crude from North Dakota to the Monroe Refinery at Trainer, PA, and a similar agreement with Marketing, newly renamed Jamex Marketing.  Petts Decl. Exs. 10-11.  As a result of these transactions, Bridger Logistics obtained the contractual right to payment of transportation fees from Monroe, which had previously been in the Monroe contract with Marketing.  But BTS retained the five-year right to rail transloading capacity at Eddystone and the concomitant five-year monthly payment obligation under the RSA.

Upon taking control of Bridger Logistics and obtaining the logistics portions of the Monroe revenue stream, Ferrellgas continued to recognize that a substantial portion of the Monroe payments were ████████████████████ attributable to the BTS loading and transloading capacity at New Town, Van Hook, Berthold, and Eddystone.  But Ferrellgas stopped paying BTS for that capacity.  Instead, Ferrellgas internally transferred these loading and

transloading assets and the associated portion of the Monroe revenue stream to other Bridger

Logistics subsidiaries and stripped BTS of the payments for the services BTS was still providing.

     To divert revenue from BTS to other Ferrellgas subsidiaries, ███████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████. But no such entity ever actually

existed; it was a fictional account on Ferrellgas's books.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

     In correspondence with counsel for Eddystone during the arbitration, Ferrellgas's prior

counsel represented ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ At the same time,

BTS remained the obligor on the five-year stream of minimum volume payments due to

Eddystone under the RSA.

  Immediately upon the acquisition, Ferrellgas also stripped BTS of the majority of its

other assets and income streams.  Upon acquiring Bridger Logistics, Ferrellgas promptly caused

BTS and its affiliates to eliminate all of their intercompany accounts payable and receivable,

resulting in a ████████████████████████ Cardell Decl. ¶¶ 9,10.  Ferrellgas also diverted

BTS's pipeline, storage, and other rail throughput revenue to other Bridger entities, just as it had

diverted the Monroe-related revenue. █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████

After Ferrellgas's initial round of stripping, all that remained in BTS was the pipeline injection stations and associated revenue.  This revenue allowed the many employees still working at BTS projects to be paid.  ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

### C.   Ferrellgas Abandons the RSA and Strips the Remaining Value Out of BTS

By December 2015, Ferrellgas concluded that it was convenient for it to stop shipping crude through Eddystone.  Because it is much more expensive to ship crude by rail than by ocean tanker, obtaining crude from North Dakota is only cheaper for Philadelphia refineries if the price of crude in North Dakota is much cheaper than the "Brent" benchmark price of North Atlantic crude.  But beginning with the fall 2014 crash in world crude prices, the difference between North Dakota "Bakken" and Brent narrowed substantially.  The formula in the Amended Crude Oil Supply Agreement resulted in higher costs to Monroe and large losses to Jamex Marketing.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

If Ferrellgas terminated its deals with Monroe and Jamex Marketing, BTS would no longer be able to meet its 64,750 barrel per day commitment to Eddystone and would be obligated to pay $1.75 for each barrel it did not deliver.

███████████████████████████████████████████████████

On January 31, 2016, Ferrellgas completed the transfer of BTS's remaining assets to other Ferrellgas subsidiaries.

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

        ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

        Defendants gave Eddystone no notice that they had stripped BTS of all of its assets.  On

February 1, 2016, the last BTS train left Eddystone.  ████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████.

        █████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████

### D.     This Litigation and Defendants' Assertion of Privilege

Once BTS defaulted on its MVC obligations, Eddystone brought an arbitration against BTS.  However, it became clear that BTS was insolvent, and rather than continue to arbitrate against a bankrupt entity, Eddystone settled with BTS and the parties to whom it had been transferred.  Eddystone then filed this suit against Ferrellgas, Rios, and Gamboa, who accomplished the fraudulent transfers that left BTS with no assets.

The Court ordered that document discovery be completed on or before August 13, 2018. Dkt. 157.  On August 13, Ferrellgas produced 1.75 million pages, which at the time amounted to more than 85% of its production in the case.  Since then, Ferrellgas has produced another 300,000 pages on August 15, August 24, September 14, September 17, September 26, and October 1.  Rios and Gamboa have produced 30,000 pages since the August 13 document completion deadline with the most recent production on October 2.

Rios and Gamboa produced their privilege log on August 24, but subsequently acknowledged that "our review team did not redact partially privileged documents, but instead marked any such documents as completely privileged and included them on the privilege log as such." Petts Decl. Ex. 32.  Rios and Gamboa promised "to correct this . . . [and] produce any partially privileged documents in redacted form along with a revised privilege log," and "anticipate[d] that this review and production will be complete by September 28th." *Id*.  To date, no such production or updated privilege log has been forthcoming.

Instead, on September 28, 2018, Rios and Gamboa sent a letter clawing back hundreds of allegedly privileged documents that they had previously produced.  As of yet, Rios and Gamboa have not produced a privilege log for any of the clawed back documents nor corrected their existing privilege log as promised.

Ferrellgas did not produce its privilege log until September 21, more than five weeks after the document production deadline.  That log disclosed that Ferrellgas had withheld tens of thousands of documents from production on the basis of privilege, but the entries did not provide any meaningful descriptions of the material withheld or of the basis for claiming privilege.  Rather than explain why each document contains protected legal advice and the subject matter thereof, the log simply reproduced the sender, recipients, and email subject line – and then, in the column marked "privilege description," simply stated "attorney-client."  The log was also missing such basic features as a unique document identifier for each withheld document.

On October 11, 2018, after Eddystone complained about the deficiencies in the first privilege log, Ferrellgas served a revised privilege log, which is attached as Exhibit 31 to the Petts Declaration accompanying this motion.  The new log assigned each privilege document a unique number.  It also expanded the privilege descriptions, albeit not in a way that provides any additional information.  Where, previously the log stated "attorney-client," the revised log uses the phrase "Attorney-client privileged communication/document providing and/or discussing legal advice."  The revised log repeats this exact language almost 55,000 times.  As a result, the revision does not provide any actual new information about the subject matter of the withheld documents or the basis for claiming privilege.

It is unclear exactly what many of the withheld documents relate to because the descriptions, which are limited to the original email subject lines, are so ambiguous. ███

██████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

[REDACTED]

Combined with a privilege description "Attorney-client privileged communication/document providing and/or discussing legal advice," Eddystone cannot ascertain the subject matter of these communications.  It is impossible to know what these documents relate to or why they are privileged, as a result of Ferrellgas's failure to provide proper descriptions.

Nonetheless, it is clear that hundreds or thousands of withheld documents with dates in the relevant time period [REDACTED]

[REDACTED] As with the rest of its privilege log, for the vast majority if not all of these documents, Ferrellgas has failed to explain why they are privileged.  Often, Ferrellgas claims documents as privileged simply because attorneys are listed in the "cc" line, *with no further description of the basis for the privilege*.

For example, Ferrellgas has withheld a series of emails with the [REDACTED]

████████████████████████████████████████████████ Counsel is
copied, but Ferrellgas has provided no explanation to support a claim that ████████████
█████████████████ ontain or seek legal advice.  Instead, Ferrellgas made a bare assertion
of "Attorney-client" in the "privilege description" column of its original log and now updates
that to read "Attorney-client privileged communication/document providing and/or discussing
legal advice" – the exact same description that it has used for every single email on its log sent
by lawyers.

     Ferrellgas has also withheld emails ████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████
█████████████████ Nor has Ferrellgas redacted the privileged portions and
produced the remainder.  As a result, Ferrellgas is depriving Eddystone of these highly relevant
and probative emails without any explanation of the basis on which they are claimed to be
privileged or of the supposed legal advice contained therein.

     Eddystone, Ferrellgas, and Rios and Gamboa met and conferred regarding privilege
issues on October 5, 2018.  During that meet and confer, Ferrellgas stated that it disagreed that
the crime-fraud exception applied and stated that there was no hope of resolving that issue via
further discussions.  Ferrellgas also insisted that its privilege log descriptions were adequate.
Therefore, and given the press of time before depositions, Eddystone must now bring this
motion.

**LEGAL STANDARD**

The attorney-client privilege is not absolute.  It is "designed to encourage clients to make full disclosure of facts to counsel so that he may properly, competently, and ethically carry out his representation," with the "ultimate aim" of "promot[ing] the proper administration of justice." *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979).  "That end, however, would be frustrated if the client used the lawyer's services to further a continuing or future crime or tort.  Thus, when the lawyer is consulted, not with respect to past wrongdoing but to future illegal activities, the privilege is no longer defensible and the crime-fraud exception comes into play." *Id.*

The same exception applies to the protections afforded by the attorney work product privilege when the client uses the attorney's work product to further a fraud.  *Id.* at 803.  "The work product privilege is a qualified one that can be overcome by a showing of good cause," and "the crime-fraud exception comes within 'good cause' to deny applicability of the work product doctrine.  *Id.*

Two elements govern application of the crime-fraud exception to the attorney-client privilege and the work product privilege.  A party seeking to pierce the privilege must show "there is a 'reasonable basis' to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud." *In re Grand Jury*, 705 F.3d 133, 155 (3d. Cir. 2012).

The client's fraudulent intent controls; it is no defense to the crime-fraud exception to claim that counsel was innocent.  *See In re Grand Jury Proceedings*, 604 F.2d at 802.  Thus, "it is not necessary that the "lawyer[] [be] complicit[] in the wrongful transaction: The attorney may

be innocent, and still the guilty client must let the truth come out." *In re DiLoreto*, No. 9834641F, 2002 WL 34573858, at *15 (Bankr. E.D. Pa. May 3, 2002) (quoting *U.S. v. Ballard*, 779 F.2d 287, 292–93 (5th Cir. 1986) (internal citation and quotation omitted)).  Once "the client uses the work product to further a fraud, the relationship has broken down, and the lawyer's services have been 'misused,'" with fatal consequences for the attorney-client privilege.  *In re Grand Jury*, 705 F.3d at 166.

The crime-fraud exception applies not only to criminal cases and common law fraud but also to fraudulent transfers.  "[W]hen a client uses the [] services of an attorney to hide assets from creditors . . . that attorney may testify about the hidden assets because the crime-fraud exception to the privilege applies." *In re DiLoreto*, 2002 WL 34573858 *15.  For any "communication, or document reflecting a communication, [that] pertains to the furtherance of an allegedly fraudulent transfer, each is subject to the crime-fraud exception." *Transcon. Refrigerated Lines, Inc. ex rel. Young v. New Prime, Inc.*, No. 1:13-CV-2163, 2014 WL 2471936, at *13 (M.D. Pa. June 3, 2014); *see also Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*, No. 1:04-CV-00007-LMB, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004) (affirming bankruptcy court's order compelling disclosure of attorney-client communications regarding a fraudulent transfer).

The standard of proof for a fraudulent transfer that will pierce privilege is lower than it is for establishing liability at trial.  A party moving to compel full disclosure need not conclusively establish the fraudulent transfers by a preponderance of the evidence; it need only make a "prima facie showing." *In re Grand Jury*, 705 F.3d at 153-54 (movant "is not required to introduce evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred").  To make a prima facie showing sufficient to pierce

privilege, the movant must present evidence showing a "reasonable basis to suspect" a fraudulent

transfer and the use of counsel in furtherance of that fraudulent transfer.  *Id.* at 152-154.

## ARGUMENT

The Court should order production of Defendants' purportedly privileged documents and

work product under the crime-fraud exception.  All the evidence, from BTS's accounting records

to the asset-transfer agreements to Defendants' internal email communications, shows that

Defendants engaged in carefully planned and implemented intentional fraudulent transfers of

substantially all of BTS's assets between June 2015 and February 2016.  The evidence further

shows that Defendants misused the services of their attorneys to paper, structure, and execute

this fraud on Eddystone.  As a result, the Defendants cannot use the attorney-client privilege or

the work product privilege to shield from disclosure the documents and communications related

to these intentional fraudulent transfers.  The Court should order production any additional

withheld documents relating to the restructuring of BTS, the transferring or redirecting of its

assets or revenue streams, the sale of BTS to Jamex, and the cessation of the Monroe shipping

arrangement.

## I.    The Court Should Order Production under the Crime-Fraud Exception

### A.    There Are Strong Grounds to Conclude that Defendants Engaged in Intentional Fraudulent Transfers

The first element of the crime-fraud exception is met because there is a basis for a

reasonable suspicion that the Defendants engaged in intentional fraudulent transfers.  Indeed,

there is overwhelming evidence that, between June 2015 and February 2016, Defendants caused

BTS to transfer away substantially all its assets for no value with the express purpose of evading

the obligations to Eddystone in the RSA.  The transfers are clearly reflected in Ferrellgas

business records and transaction documents, and all of the surrounding circumstances, as well as

the Defendants' own words, reveal an "actual intent to hinder, delay or defraud [a] creditor of the debtor," specifically Eddystone.  PUFTA, 12 Pa. C.S. § 5104(a)(1).

"To determine whether the transfer was made with actual intent to defraud, a court considers the non-exclusive list of factors contained in the UFTA, which are commonly referred to as 'badges of fraud.'"  *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. CIV.A. 09-2751, 2011 WL 6088611, at *7 (E.D. Pa. Dec. 7, 2011).  Those badges overwhelmingly show intent to defraud here.  The evidence shows that (1) BTS received zero value for the transfers of many millions of dollars in assets; (2) the transfers were of substantially all BTS's assets; (3) the transfers rendered BTS insolvent; (4) the transfers were to insiders, subsidiaries in which the parties controlling the transfers had an interest; (5) the transfers allowed Defendants to retain control over the transferred assets; (6) the transfers were concealed from Eddystone; and (7) the transfers were made in anticipation of litigation once BTS defaulted on the RSA.  *See In re Chapman Lumber Co., Inc.*, No. 05-00408, 2007 WL 2316528, at *3 (Bankr. N.D. Iowa Aug. 8, 2007) ("The convergence of several badges of fraud may support an inference of fraud, which grows in strength as the badges increase in number.").  Taken together, these badges of fraud make a case for intentional fraudulent transfer far more than strong enough to satisfy the "reasonable case" necessary for the crime-fraud exception.  And that conclusion is confirmed by Defendants' contemporaneous statements in their own emails.

***The Transfers Were for No Equivalent Value***.  First, BTS received nothing of value in exchange for the June 2015 through January 2016 transfer of all of its assets.  When Ferrellgas acquired Bridger Logistics on June 24, 2015 it wrote off BTS's net positive accounts receivable from other entities for no compensation.  *Supra* at 7.  Then, as BTS continued to provide the loading and transloading capacity in support of the Monroe arrangement, it redirected the

associated revenue to Bridger Rail Services.  *Supra* at 6-7.  And Ferrellgas re-directed BTS's

remaining pipeline management and storage revenue streams to other Ferrellgas subsidiaries.

*Supra* at 7.  BTS received nothing at all in return for forgoing its rail throughput and other

revenues and allowing its affiliates to reap the benefit ████████████ that BTS had

rightfully earned.  Thus, the record shows the first badge of fraud in that "the value of the

consideration received by the debtor," BTS, was not "reasonably equivalent to the value of the

asset transferred."  PUFTA, 12 Pa. C.S. § 5104(b)(8).

On January 31, 2016, Defendants caused BTS to gift its remaining assets to other Bridger

entities that the Defendants owned and/or controlled.  These assets included all the property,

plant, and equipment, and customer contracts, associated with its station throughput business.

*Supra* at 9-10.  ████████████████████████████████

████████████████████████████████████

████████     *See* PUFTA, 12 Pa. C.S. § 5104(b)(8).

**The Transfers Depleted All of BTS's Assets**.  As a second badge of fraud, the January

2016 transfers, together with the June 2015 transfers, stripped BTS completely.  When Ferrellgas

sold BTS to Jamex on February 22, 2016████, the parties stipulated that BTS had no assets

other than the RSA, which was really an obligation, and a few other contracts on which BTS still

owed money.  *Supra* at 9-10.  Thus, these transfers were "of substantially all the debtor's assets,"

a second badge of fraud.  PUFTA, 12 Pa. C.S. § 5104(b)(5).

**The Transfers Rendered BTS Insolvent**.  A third badge of fraud is that "the debtor was

insolvent or became insolvent shortly after the transfer was made."  PUFTA § 5104(b)(9).  When

the Defendants stripped BTS of its rail throughput revenue in June 2015, BTS remained

obligated under the RSA.  But without its rail throughput revenue, it lacked the cash flow to

cover its payments to Eddystone.  So the Defendants directed BTS's affiliates to step in and make those payments on BTS's behalf so long as the transloading capacity was useful.  When Ferrellgas sold BTS in February 2016 it still owed Eddystone $140 million in periodic payments over the next three years and four months.  With no assets and now separated from the affiliates that had been receiving its former revenue streams, the insolvent BTS quickly defaulted under the RSA and repudiated its remaining payment obligations to Eddystone.  *See Fragin v. First Fund Holdings LLC*, 2016 WL 4256984 (Sup. Ct. N.Y. Cty. Aug. 11, 2016) (finding crime-fraud exception applicable where defendants caused debtor to transfer all its assets for far less than equivalent value and rendered it unable to pay its debts); *Estate of Page v. Slagh*, No. 1:06-CV-245, 2007 WL 1385957, at *2 (W.D. Mich. May 8, 2007) (applying the crime-fraud exception because "the timing and effect of the [allegedly fraudulent] transfers at issue in this case raise a reasonable suspicion that the transfers were undertaken in violation of the [Michigan fraudulent transfer statute]").

**Insider Defendants Retained Control of the Assets**.  Defendants structured the June 2015 to January 2016 asset transfers to retain control over BTS's valuable assets.  The transfer in each instance "was to an insider": Bridger Rail Services, Bridger Rail Shipping, Bridger Real Property, Bridger Terminals, Bridger Swan Ranch, and the other transferees were all affiliates of BTS that Ferrellgas and Bridger Logistics wholly owned.  PUFTA, 12 Pa. C.S. § 5104(b)(1).  In this way, the Defendants "retained possession or control of the property transferred after the transfer."  PUFTA, 12 Pa. C.S. § 5104(b)(2).

The facts closely mirror *Fragin*, where the defendants caused the debtor, which they controlled, to transfer its assets to an affiliate they also controlled, and the defendants had the same attorneys "advise both sides of the transaction."  *Fragin*, 2016 WL 4256984 at *3.  The

*Fragin* court concluded, "The close relationship between the transacting parties and the fact that [the defendants] were left in control of the property after the transfer satisfies two of the 'badges of fraud.'"  *Id.*  Likewise, the Defendants here stood on both sides of the June 2015 and January 2016 transfers, retaining control over the assets transferred by merely shifting them from one pocket to another.  Indeed, as in *Fragin*, the Defendants employed the same outside attorneys to draft and finalize for both transferor and transferee the agreements by which the assets were transferred, with Defendant Rios himself signing for each side.  *Supra* at 9-10.  These circumstances evidence two additional badges of fraud: transfers to insiders and retention of control.

***Defendants Concealed the Transfers***.  In a sixth badge of fraud, the Defendants actively concealed these transfers from BTS's principal creditor, Eddystone.  PUFTA, 12 Pa. C.S. § 5104(b)(3).  The June 2015 shifting of revenue from BTS to a fake accounting entity while leaving BTS as the counter-party on the RSA was designed precisely to hide income from BTS's creditors.  *See supra* at 6-7.  It is no different from *In re Sigma-Tech Sales, Inc.,* 570 B.R. 408 (Bankr. S.D. Fla. 2017), where the court found the defendant had actively concealed the debtor's assets when he "shifted the Debtor's assets and business into Gold Star, Disc–O–Tech, and Triple Play, and used these companies to hide income."  *Id.* at 416.  The Defendants also carefully concealed the early 2016 asset transfers from Eddystone as well – never telling BTS's largest creditor that they were stripping all of BTS's assets.  Thus, "this was not a case of mere failure to inform.  There were affirmative efforts to make sure that [Eddystone and Enbridge] did not find out."  *Galaxy*, 2004 WL 3661433 at *3.

While the circumstances of the transfers are more than sufficient for a factfinder to infer fraudulent intent, Ferrellgas's internal emails confirm it.  ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ The more

than one hundred privilege log entries between December 2015 and January 2016 with subject

lines containing ████████████████ demonstrate that the purpose of the restructuring was

to evade BTS's debt to Eddystone.  *See* Petts. Decl. Ex. 31.  Meanwhile, Bridger's lawyers

confirmed that there was no business purpose to the transactions.  ████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████

All of this evidence gives rise to far more than a reasonable suspicion that Defendant's

purpose was to deprive BTS of its assets in order to prevent Eddystone from recovering the

minimum volume payments due under the RSA.

> **B.    The Defendants Misused the Advice of Outside and In-House Counsel to Further the Fraudulent Transfers**

The Defendants did not act alone in fraudulently transferring BTS's assets to other

Bridger Logistics subsidiaries between June 2015 and February 2016.  Ferrellgas used in-house

counsel and retained outside restructuring counsel to structure, paper, and carry out the

fraudulent transfers.  Where the evidence shows not only intentional fraudulent transfers but also

the misuse of attorney-client communications or attorney work product in furtherance of those

fraudulent transfers, it is appropriate to pierce the privilege.  *In re Grand Jury Matter #3*, 847

F.3d 157, 166 (3d Cir. 2017).  Here, Defendants did not merely contemplate the fraudulent

transfers and later abandon their plans.  They actually committed the fraudulent transfers with transaction documents drafted by counsel.

In June 2015, the Defendants misused attorney-client communications with in-house counsel at Bridger Logistics to strip BTS of its revenue streams.  It appears from Rios and Gamboa's privilege log that ███████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████.  This is evident from the many entries on Rios and Gamboa's privilege log in which the General Counsel appears to have provided legal advice about ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████   ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████

████████

Similarly, there is conclusive evidence that the Defendants used outside counsel's assistance to accomplish the fixed asset transfers on January 31, 2016.  Ferrellgas used outside counsel to draft BTS's two Assignment and Assumption Agreements with Bridger Swan Ranch and Bridger Terminals, ████████████████████████████████████████████████

██████████████████████████████████████

Thus, there is far more than sufficient evidence to sustain a "reasonable suspicion" of fraudulent transfer required for termination of the attorney client privilege.  The evidence shows both intentional fraudulent transfers and that the assistance of counsel was misused in furtherance of those fraudulent transfers.  The Court should conclude that "the exception applies to destroy [the Defendants'] attorney-client privilege with respect to all documents privileged to [them] in whole or in part, and compel full disclosure of all documents requested by [Eddystone]."  *Transcon. Refrigerated Lines, Inc. ex rel. Young v. New Prime, Inc.*, No. 1:13-CV-2163, 2014 WL 2471936, at *13 (M.D. Pa. June 3, 2014).

### C.    If the Court Considers It Necessary, an In Camera Review Will Confirm the Applicability of the Crime Fraud Exception

There is no need for in camera review in this case because, as described above, there is more than sufficient "evidence which, if believed by the fact finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met."  *United States v. Hallinan*, 290 F. Supp. 3d 355, 364 (E.D. Pa. 2017).  That is sufficient to obtain the ultimate relief of piercing the privilege.  However, a lower standard applies to obtain an in camera review, which requires only "'a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the

- 24 -

crime-fraud exception applies." *Id.* at 365.  The evidence here meets the higher standard for piercing the privilege.  But if the Court is so inclined it should review key documents from Ferrellgas and Rios and Gamboa's privilege logs to confirm the applicability of the crime-fraud exception.

Eddystone has been stymied in its ability to identify documents for in camera review by Rios and Gamboa's failure to serve a privilege log identifying the documents that they have clawed back as well as Ferrellgas's deficient descriptions on its privilege log.  If the Court believes that in camera review is necessary, it should request that Defendants submit for review the documents from their logs that relate to the restructuring of BTS, the transferring or redirecting of its assets or revenue streams, the sale of BTS to Jamex, and the cessation of the Monroe shipping arrangement, including but not limited to ████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

\*   \*   \*

Ultimately, no in camera review in necessary because Eddystone has made its "prima facie showing that there is 'some foundation in fact' for the applicability of the crime fraud exception."  *United States v. Hallinan*, 290 F. Supp. 3d 355, 364 (E.D. Pa. 2017).  In its analysis of the Defendants' business records and email communications, Eddystone has presented evidence that forms a "reasonable basis to suspect" that the Defendants stripped substantially all BTS's assets with an intent to defraud BTS, and that it misused the advice of counsel in furthering those intentional fraudulent transfers.  Under the circumstances, preserving the Defendants' privilege would only "obstruct[] the search for truth" in this matter.  *In re Grand*

*Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979).  Because there is more than enough

evidence to support the crime-fraud exception, the Court should pierce the privilege behind

which the Defendants seek to hide additional evidence of their fraudulent conduct.

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

## II.   Ferrellgas Has Not Adequately Established any Basis on which to Withhold the Documents at Issue as Privileged

Even apart from the crime-fraud exception, Ferrellgas should be ordered to produce the

documents at issue because its privilege log is utterly inadequate to justify withholding them.  To

withhold a document as privileged, Ferrellgas must "describe the nature of the documents,

communications, or tangible things not produced or disclosed—and do so in a manner that,

without revealing information itself privileged or protected, will enable other parties to assess the

claim."  Rule 26(b)(5)(A)(ii).  That Ferrellgas's log entirely fails to do.

As described above, Ferrellgas's log contains no description of the subject matter or basis

for asserting that the documents it has withheld are privileged other than to recite the subject line

of each email and state "Attorney-client privileged communication/document providing and/or

discussing legal advice."  "Conclusory statements such as these do not sufficiently establish the

elements of the attorney-client and work product privileges."  *CSX Transp. Inc. v. Admiral Ins.

Co.*, No. 93-132-CIV-J-10, 1995 WL 855421, at *3 (M.D. Fla. July 20, 1995).  Before

withholding documents on the basis of privilege, Ferrellgas must explain the subject matter of

the communication and the reason that the document is privileged – i.e., that it transmits legal

advice, facts essential to the rendering of legal advice, or the like.  Ferrellgas's log utterly fails to do so and "does not provide sufficient information to enable the Court to determine whether each element of the asserted privilege is satisfied."  *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, No. 05CV2192JWL-DJW, 2008 WL 2548129, at *6 (D. Kan. June 23, 2008).

Moreover, Ferrellgas appears to have listed a host of documents as privileged simply because attorneys are copied, with no further explanation.  But the presence of attorneys in the "cc" line does not make a document privileged.  "A party cannot avail itself of the protection of attorney-client privilege simply because a communication was routed through or copied to counsel."  *Fed. Trade Comm'n v. Innovative Designs, Inc.*, No. CV 16-1669, 2017 WL 4310236, at *7 (W.D. Pa. Sept. 28, 2017).  Ferrellgas's fails to explain why ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████.  And that failure fatally undermines its claim of privilege.

Similarly, Ferrellgas's privilege assertions over documents for which it identifies no attorney whatsoever in the sender or recipient fields are completely inadequate.  In each of those instances, Ferrellgas's log asserts that the withheld email or document "includ[es] attorney-client attachment" or "attorney-client communication" without specifying what that communication is or why it is privileged.  *See, e.g.*, Petts Decl. Ex. 31 at 3076, 3079 (entries 40012-13 and 39977).  As a result, the claim of privilege is inadequate for the same reasons as the rest of Ferrellgas's log.  But worse, Ferrellgas has almost entirely failed to distinguish among the parts of the email chains that are privileged and those that are not, in the vast majority of cases simply deciding to withhold the entire chain rather than redact the privileged communication from the document.

The Court should treat Ferrellgas's failure to properly support its claims of privilege as a waiver. *See Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n*., 914 F. Supp. 1172, 1179 (E.D. Pa. 1996) ("failure to assert a privilege properly may amount to waiver of that privilege."); *McGrath v. Cosco, Inc*., No. 98–CV–1502, 1999 WL 269920, at *2 (E.D. Pa Apr. 21, 1999) (finding a waiver of privilege where Defendant has not "described the nature of the withheld information, and thus has precluded the Court from assessing the validity of the claim"); *Schaeffer v. Tracey*, No. 215CV08836MCASCM, 2017 WL 465913, at *3 (D.N.J. Feb. 2, 2017) ("The production of an inadequate privilege log or none at all, is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver to the privilege."); *In re Universal Serv. Fund Tel. Billing Practices Litig*., 232 F.R.D. 669, 671 (D. Kan. 2005) ("The law is well-settled that, if a party fails to make the required showing, by not producing a privilege log or by providing an inadequate one, the court may deem the privilege waived.").

There is no longer time for Ferrellgas to submit yet another revised and adequate privilege log.  Ferrellgas chose to wait six weeks after the document completion deadline to submit its privilege log, along with a substantial rolling production of late-produced documents. Three weeks later, it then submitted a revised privilege log in an attempt to paper over the deficiencies in the first.  The Parties are rapidly proceeding into deposition discovery, and Eddystone needs the documents to examine witnesses and build its case.  Had Ferrellgas complied with its discovery obligations in a timely manner, there likely would have been time for another do over.  But there is not now, and Eddystone should not be prejudiced by Ferrellgas's dilatory behavior.  Having failed to adequately support its claims of privilege, Ferrellgas should be ordered to turn over the documents at issue.

**CONCLUSION**

For these reasons, Eddystone asks the Court to find the crime-fraud exception applicable and Ferrellgas's privilege descriptions inadequate and compel full disclosure of any withheld documents relating to the restructuring of BTS, the transferring or redirecting of its assets or revenue streams, the sale of BTS to Jamex, and the cessation of the Monroe shipping arrangement.

Dated:  October 12, 2018                              Respectfully submitted,

                                                    /s/ Jeffrey Theodore
                                                    Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                    Terence M. Grugan (I.D. No. 307211)
                                                    BALLARD SPAHR LLP
                                                    1735 Market Street, 51st Floor
                                                    Philadelphia, PA 19103-7599
                                                    Telephone: (215) 665-8500
                                                    Facsimile: (215) 863-8999
                                                    hockeimerh@ballardspahr.com
                                                    grugant@ballardspahr.com

                                                    Filiberto Agusti (*pro hac vice*)
                                                    Jeffrey M. Theodore (*pro hac vice*)
                                                    Andrew J. Sloniewsky (*pro hac vice*)
                                                    Nicholas Petts (*pro hac vice*)
                                                    STEPTOE & JOHNSON, LLP
                                                    1330 Connecticut Avenue, NW
                                                    Washington, DC 20036
                                                    Telephone: (202) 429-3000
                                                    Facsimile: (202) 429-3902
                                                    fagusti@steptoe.com
                                                    jtheodore@steptoe.com
                                                    asloniewsky@steptoe.com
                                                    npetts@steptoe.com

                                                    *Counsel for Eddystone Rail Company, LLC*

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via the Court's ECF system on October 12, 2018, thereby serving all counsel of record.

/s/ Jeffrey M. Theodore
Jeffrey M. Theodore