# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC,
        Plaintiff/Counter-defendant,

    v.

BRIDGER LOGISTICS, LLC, *et al.*,
        Defendants,

BRIDGER LOGISTICS, LLC, *et al.*,
        Defendants/Counterclaimants.

:
:
:
:
:
: No. 2:17-cv-00495-RK
:
:
:
:
:
:
:

---

# BL/FG DEFENDANTS' OPPOSITION TO PLAINTIFF'S
# MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS
# UNDER THE CRIME-FRAUD EXCEPTION

## <u>TABLE OF CONTENTS</u>

BACKGROUND ..................................................................................................5

I.   ERC CONSTRUCTED A SUBPAR FACILITY THAT RAN NEARLY ███
     ███████████████, AND ERC NOW SEEKS TO RECOVER ITS COST
     OVERRUNS THROUGH THIS LITIGATION. ................................................5

II.  FERRELLGAS DID NOT "STRIP" BTS OF ANY ASSETS OR REVENUE
     STREAMS WHEN IT ACQUIRED BRIDGER LOGISTICS IN JUNE 2015..................14

     A.   Ferrellgas Implemented Cost-Center Accounting Principles That Better
          Reflected The Performance Of Bridger Logistics' Business Segments;
          Ferrellgas Did Not Shift Any BTS Revenue To Other Entities................14

     B.   Accounts Receivable Were Eliminated for Appropriate Reasons. ..........17

III. THE JANUARY 2016 TRANSACTIONS WERE A RESULT OF ERC'S
     DECISION TO CUT OFF JAMEX MARKETING'S FINANCING; JAMEX AND
     BRIDGER LOGISTICS THEREAFTER TRIED TO MAKE THE BEST OF A
     TOUGH SITUATION, NOT TO "DEFRAUD" ERC............................................19

     A.   BTS Performed Under The RSA And Sought To Continue Doing So. ..................19

     B.   Bridger Logistics Did Not Defraud ERC By Selling BTS To Jamex. ....................21

     C.   Ferrellgas Transferred Assets From BTS To Remain Compliant With Its
          Loan Covenants, Not To Harm ERC. ............................................23

     D.   BTS Did Not Consult With Counsel To Further Any Purported "Fraud.".............27

IV.  THERE IS NOTHING NEFARIOUS OR FRAUDULENT ABOUT THE BL/FG
     DEFENDANTS' CONDUCT IN 2015 AND EARLY 2016. ..................................27

V.   ENBRIDGE AND CANOPY TRANSFERRED AWAY ERC'S ASSETS DESPITE
     THE BL/FG DEFENDANTS' PENDING COUNTERCLAIMS. ..........................29

GENERAL LEGAL STANDARDS................................................................30

ARGUMENT ....................................................................................33

I.   EDDYSTONE HAS NOT CARRIED ITS BURDEN TO INVOKE THE CRIME-
     FRAUD EXCEPTION................................................................33

     A.   Eddystone Has Not Shown A Reasonable Basis To Find Actual Fraud.................33

          1.   "Fraudulent Transfers" Do Not Necessarily Involve Fraud. ......................33

          2.   There Is No Evidence Of Actual Fraud......................................36

        3.     The Alleged "Badges of Fraud" Do Not Show Actual Fraud. ....................39

    B.    Eddystone Has Not Shown A Reasonable Basis To Find That Attorneys Participated In Any Fraud.................................................................................41

II.    THERE IS NO BASIS FOR *IN CAMERA* REVIEW. ............................................43

III.    ANY ORDER APPLYING THE CRIME-FRAUD EXCEPTION SHOULD BE SUBJECT TO APPELLATE REVIEW.......................................................................45

IV.    THE BL/FG DEFENDANTS HAVE NOT WAIVED PRIVILEGE. ...................................45

## TABLE OF AUTHORITIES

**Cases:**                                                                                     **Page(s)**

*Armstrong World Indus., Inc. v. Robert Levin Carpet Co.*,
   No. Civ. A. 98-CV-5884, 1999 WL 387329 (E.D. Pa. May 20, 1999) ......................... 41

*Barba v. Shire US, Inc.*,
   Case No. 13-21158-CIV, 2015 WL 7015324 (S.D. Fla. Nov. 12, 2015) ...................... 32

*Bucci v. Wachovia Bank, N.A.*,
   591 F. Supp. 2d 773 (E.D. Pa. 2008) ................................................................. 40

*Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*,
   No. Civil Action 09-2751, 2011 WL 6088611 (E.D. Pa. Dec. 7, 2011) ....................... 39

*CSX Transp., Inc. v. Admiral Ins. Co.*,
   No. 93-132-CIV-J-10, 1995 WL 855421 (M.D. Fla. July 20, 1995) ............................ 49

*First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*,
   902 F. Supp. 1356 (D. Kan. 1995),
   *rev'd on other grounds,* 101 F.3d 645 (10th Cir. 1996) .................................... 49

*Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*,
   No. 1:04-CV-00007-LMB, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004) .................... 36

*Haines v. Liggett Grp. Inc.*,
   975 F.2d 81 (3d Cir. 1992) ............................................................... *passim*

*Hipple v. Hipple*,
   No. 12-1256, 2016 WL 320216 (E.D. Pa. Jan. 27, 2016) ............................... 24

*Husky Int'l Elecs., Inc. v. Ritz*,
   136 S.Ct. 1581 (2016) ................................................................. 34

*In re Blatstein*,
   226 B.R. 140 (E.D. Pa. 1998),
   *aff'd in part and rev'd in part on other grounds,* 192 F.3d 88 (3d cir. 1999) ............... 24

*In re Chevron Corp.*,
   633 f.3d 153 (3d Cir. 2011) ......................................................... 31, 41

*In re DiLoreto Bankruptcy*,
   No. 9834641F, 2002 WL 34573858 (Bankr. E.D. Pa. May 3, 2002) ...................... 35

*In re Grand Jury Investigation*,
   599 F2d 1224 (3d Cir. 1979)......................................................... 31

*In re Grand Jury Matter #3*,
   847 F.3d 157 (3d Cir. 2017) ........................................... 31, 32, 33
                                                         41, 45

*In re Grand Jury Proceedings*,
   604 F.2d 798 (3d Cir. 1979) ......................................................... 31

iv

**Page(s)**

*In re Grand Jury Subpoena ABC Co.*,
    696 F. App'x 66 (3d Cir. 2017) .................................................................... 32, 36, 40

*In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund
(Retirement Accounts) II, L.P. Secs. Litig.*,
    848 F. Supp 527 (D. Del. 1994) ......................................................................... 43

*In re Sunrise Sec. Litig.*,
    124 F.R.D. 99 (E.D. Pa. 1989) ............................................................................ 44

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
    232 F.R.D. 669 (D. Kan. 2005)............................................................................ 48

*Jarzyna v. Home Props., LP*,
    114 F. Supp. 3d 243 (E.D. Pa. 2015) .................................................................. 44

*Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*,
    914 F. Supp. 1172 (E.D. Pa. 1996) ..................................................................... 48

*McGrath v. Cosco, Inc.*,
    No. CIV. A. 98-CV-1502, 1999 WL 269920 (E.D. Pa. Apr. 21, 1999) ........................ 48

*Protica, Inc. v. iSatori Techs., LLC*,
    Civil Action No. 2011-cv-01105, 2012 WL 1071223 (E.D. Pa. Mar. 20, 2012) .......... 40

*Schaeffer v. Tracey*,
    Civil Action No. 2:15-CV-8836-MCA-SCM,
    2017 WL 465913 (D.N.J. Feb. 2, 2017) ............................................................. 48

*Transcontinental Refridgerated Lines, Inc. v. New Prime, Inc.*,
    Civil No. 1:13-CV-2163, 2014 WL 2471936 (M.D. Pa. June 3, 2014) ........................ 35

*United Bank v. Buckingham*,
    301 F. Supp. 3d 547 (D. Md. 2018) ............................................................... *passim*

*United States, ex. rel. Gohil v. Sanofi U.S. Servs., Inc.*
    Case 2:02-cv-02964-AB (E.D. Pa. filed Oct. 23, 2018) ............................................ 44

*United States Fire Ins. Co. v. Bunge N.A., Inc.*,
    No. 05-CV-2192-JWL-DJW, 2008 WL 2548129 (D. Kan. June 23, 2008).................... 49

*WebXchange Inc. v. Dell Inc.*,
    264 F.R.D. 123 (D. Del. 2010) ............................................................................ 43

*White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*,
    586 F. Supp. 2d 1250 (D. Kan. 2008) ................................................................. 49

**Statutes, Rules and Regulations:**                                                          **Page (s)**

Fed. R. Civ. P. 26 ............................................................................................   45

Fed. R. Civ. P. 37 ............................................................................................   47

Fed. R. Civ. P. 53 ............................................................................................   44

E.D. Pa. R. 26.1 ...............................................................................................   47

12 Pa. C.S. § 5101 ......................................................................................   24, 33

12 Pa. C.S. § 5104 ...........................................................................................   39

**Other Authorities:**

9C Charles Alan Wright & Arthur R. Miller,
*Federal Practice & Procedure* § 2602.1 (3d ed. 2018) ......................................   44

Kenneth C. Kettering, *The Uniform Voidable Transactions Act*
*or, the 2014 Amendments to the Uniform Fraudulent Transfer Act,*
70 THE BUSINESS LAWYER 777 (2015) ........................................................   33

The Sedona Conference, *The Sedona Principles, Third Edition:*
 *Best Practices, Recommendations & Principles for Addressing*
*Electronic Document Production,* 19 Sedona Conf. J. 1 (2018)  ........................   47

12240071

**<u>INTRODUCTION</u>**

The Motion to Compel Production of Withheld Documents Under the Crime-Fraud Exception (the "Motion" or "Motion to Compel") filed by Plaintiff Eddystone Rail Company, LLC ("ERC" or "Eddystone") is built on a one-sided factual narrative rife with inaccuracies and distortions. Defendants Bridger Logistics, LLC, Ferrellgas L.P., and Ferrellgas Partners, L.P. (collectively, the "BL/FG Defendants") submit this opposition brief to provide the Court with context, set the record straight, and debunk ERC's false narrative. ERC's Motion does not begin to establish a factual or legal basis to disregard the attorney-client privilege and compel disclosure of confidential communications between the BL/FG Defendants and their counsel.

The Eddystone Rail Facility (the "Facility") is a transloading facility that was, for a period of time, jointly owned by Enbridge Rail (Philadelphia), LLC ("Enbridge") and Canopy Prospecting, Inc. ("Canopy"), through Plaintiff Eddystone (a special purpose limited liability company). ERC planned to build out a facility in Eddystone, Pennsylvania to entice customers to ship crude oil from North Dakota by rail to the Facility, where the crude would be "transloaded" to barges for delivery to Philadelphia-area customers. ERC advertised a "████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████. In reliance on these and other representations, Bridger Transfer Services, LLC ("BTS") entered into a Rail Services Agreement (the "RSA") with ERC.

At the time, BTS was a subsidiary of Bridger Logistics, LLC ("Bridger Logistics"), and Bridger Logistics was a subsidiary of Bridger, LLC. BTS operated as a "midstream" transporter of crude purchased by Bridger Marketing, LLC (another subsidiary of Bridger, LLC). In this case, BTS was to transport crude to a refinery owned by Monroe Energy, a subsidiary of Delta Air Lines, where it would be turned into jet fuel.

1

ERC contracted directly and exclusively with BTS—not with Bridger Logistics, Bridger, LLC, or any other entity.  ERC did not negotiate for or obtain a parent guaranty.  This was a non-issue during the time that Bridger Logistics owned BTS, because BTS made every payment owed to ERC, despite enormous operational problems with the Facility.

Indeed, Enbridge and Canopy were in over their heads when they developed the Facility. The project was massively over budget and delayed, and their Facility was plagued by operational problems, many of which were caused by ERC cost-cutting.  ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████.  The issues were so severe that BTS attempted to purchase the Facility to improve operations and conduct its business.

Meanwhile, Bridger, LLC decided to sell its logistics business (Bridger Logistics) to Ferrellgas Partners, L.P. ("Ferrellgas" or "FGP"), while retaining its marketing business (Bridger Marketing).  That transaction closed on June 24, 2015, whereupon Bridger, LLC became Jamex, LLC ("Jamex"), and Bridger Marketing became Jamex Marketing, LLC ("Jamex Marketing").

In its Motion, Eddystone tries to characterize various accounting decisions made in connection with the acquisition as "fraudulent transfers."  This is pure hyperbole.  For example, ERC says (at 5-7) that the BL/FG Defendants "divert[ed] revenue from BTS to other Ferrellgas subsidiaries" through a "fictional" or "fake" accounting entity.  In truth, FGP used internal accounting company codes and cost centers to facilitate segment reporting to management.  No monies were taken from BTS nor "hidden" from creditors.  Rather, management reports and financial statements were prepared on a semi-consolidated basis to facilitate efficient and effective management of the business.

2

ERC also says (at 7-8) that the BL/FG Defendants "stripped BTS of the majority of its other assets" by causing "BTS and its affiliates to eliminate all of their intercompany accounts payable and receivable."  This is a gross oversimplification of a complex but entirely appropriate series of transactions that had nothing to do with ERC.  In truth, the purchase agreement between Ferrellgas and Bridger, LLC required the parties to reconcile and pay certain of the accounts between the Bridger Logistics group of companies (acquired by Ferrellgas) and the Jamex Marketing group of companies (not acquired by Ferrellgas), and to eliminate certain other accounts.  Thus, certain accounts receivable between the Bridger Logistics companies and the Jamex Marketing companies were settled and paid.  The remaining intercompany accounts within the Bridger Logistics family of companies were eliminated following a third-party analysis of the value of the assets acquired by Ferrellgas, in a manner consistent with generally accepted accounting principles ("GAAP") and customary business combination practices.

ERC also argues that "[b]y December 2015, Ferrellgas concluded that it was convenient for it to stop shipping crude through Eddystone."  In truth, it was Jamex and Monroe that ended the arrangement, leaving BTS without any crude to ship through the Eddystone Rail Facility.  As a result, Bridger Logistics began looking at options to address the unused asset—*i.e.*, BTS's contractual right to transload through the Eddystone Rail Facility—including (1) suing ERC as a result of the deficiencies at the facility, (2) selling BTS to a party that might have the need for or desire to obtain the Eddystone transloading capacity, or (3) a potential BTS bankruptcy. Ultimately, Bridger Logistics decided to sell BTS to Jamex, which was interested in obtaining the transloading contract rights in the RSA between BTS and Eddystone.

In the process, Bridger Logistics consulted with counsel.  This is the very sort of attorney-client consultation the privilege is designed to promote and protect.  As this Court knows, thousands upon thousands of lawyers—many in the very city where this Court resides—

3

rise every day and provide advice on restructuring and bankruptcy issues. There is nothing nefarious or fraudulent about seeking or receiving such advice.

ERC argues (at 8-10) that Bridger Logistics "stripped BTS of all of its assets" before selling the company. In truth, such assets could not be used to satisfy any obligations to Eddystone. From the moment that Ferrellgas completed its acquisition of Bridger Logistics in June 2015, virtually all of the BTS assets unrelated to Eddystone were already designated as collateral for Ferrellgas credit facilities. While the liens might not have been imposed until January 2016 (due to an oversight by the bank), Ferrellgas's loan agreements made clear that BTS's assets—subject to lien or not—could not be transferred to Jamex (or any other third party), because they were set aside as security for a ████████ credit facility.

As explained further below, ERC's Motion to Compel is meritless and should be denied. ERC has altogether failed to demonstrate a reasonable basis for this Court to invade the sanctity of the attorney-client privilege as to any communication, let alone the thousands of attorney-client communications listed on Defendants' privilege logs during the relevant time periods (from May to July 2015 and December 2015 to February 2016). There are mundane reasons for all of the legitimate accounting decisions and transactions ERC attempts to sensationalize, and ERC cannot carry its heavy burden to invoke the crime-fraud exception simply by relying on "fraudulent transfer" allegations (including the so-called "badges of fraud"). Even if ERC could show actual fraud (and it cannot), it barely even attempts to establish a reasonable basis to conclude that counsel representing the BL/FG Defendants acted in furtherance of any fraud.

4

## BACKGROUND

I.    **ERC CONSTRUCTED A SUBPAR FACILITY THAT RAN NEARLY** ████
████████████████████**, AND ERC NOW SEEKS TO RECOVER ITS COST
OVERRUNS THROUGH THIS LITIGATION.**

In early 2012, ERC's parent entities (Enbridge and Canopy) began developing and
marketing a plan to convert a coal-fired power plant in Eddystone, Pennsylvania with existing
rail and marine infrastructure into the Facility, which could load crude oil shipped by rail from
North Dakota onto barges for delivery to East Coast refineries—a process known as
"transloading." ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ (11/7/18 Declaration of
Alicia Ragsdale Olszeski, Ex. A hereto ("Olszeski Decl."), Ex. 1, Nov. 26, 2012 Johnson email
& press release, Eddystone 0034339; Ex. 2, May 15, 2012 Wilkins email,
ERCEDPA00173151.)[1] ████████████████████████████████████
████████████████████████████████." (Ex. 2, May 5,
2012 Wilkins email, ERCEDPA00173151.)
████████████████████████████████████. (Ex. 3,
Ballengee Decl. ¶ 6.) ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████ (*See, e.g.*, Ex. 4, Sept. 1, 2011 Beaver Lodge

---

[1]    All numbered exhibits cited herein are attached to the Olszeski Decl.

Lease, BLFG_EDPA1848500; Ex. 5, Nov. 1, 2011 Trenton Lease, ERCEDPA00002225; Ex. 6, May 5, 2012 Berthold Rail Agreement, ERCEDPA00131622; Ex. 7, July 2012 Berthold Rail Phase I Agreement, ERCEDPA00411916.)  The Berthold facility was a starting point for crude to be shipped from the Bakken region to the Facility, and then on to East Coast refineries.

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████.  (Ex. 3, Ballengee Decl. ¶ 8; Ex. 8, Feb. 3, 2013 Wilkins email and attachment, ERC01609-30; Ex. 1, Nov. 26, 2012, Johnson email and press release, Eddystone 0034339.) ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████ (Ex. 8, Feb. 3, 2013 Wilkins email, ERC01609-30.)

Relying on ERC's representations, BTS entered into the RSA with plaintiff ERC on March 8, 2013.  (Ex. 9, RSA at 18.) ████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████ (*Id.* §§ 1.1, 2.1, 4.) ████████████████████████████████████

█████████████████████████████████████████████████████ (*Id.* §§ 1.1, 4.2.)

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████ (*Id.*) ███████████████████████████████████████████████

████████████████████████████; otherwise, ERC's promises with respect to the use of deficiency credits would be empty.

6

███████████████████████████████████████████████

███████████████████. (*See id.* at 1.)  RSA terms confirm ERC's representations about

the Facility's capabilities. ███████████████████████████████████

(*Id.* § 2.2.) ████████████████████████████████████

███████████████████████████████ (*Id.* RSA Terms &

Conditions ("T&C") § 2(d).) ████████████████████████

████████████████████████ (*See Id.* RSA T&C § 2(d).) █████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ (*Id.* RSA T&C §§

2(b), 2(f), 3(b).)  This was crucial to achieve the represented speed and efficiency of the Facility

and would be expected for a supposedly "state of the art" Facility.

       After BTS signed the RSA, however, it became apparent that ERC utterly failed to

deliver on its promises.  ERC had gone over its original budget for the project by a wide margin

and, as a result of cost-cutting, developed a Facility that did not live up to its many promises:

       **First**, ██████████████████████████████████

██████████████████████████████████████

████████████████████ (Ex. 3, Ballengee Decl. ¶¶ 13 & 15.) █████████

██████████████████████████████████████

████████████████████████████

       **Second**, rail access restrictions made it impossible for the Facility to receive and

transload crude in the manner promised by ERC and set forth in the RSA. ████████████

██████████████████████████████████████

██████████████████████████████████████



██████. (Ex. 3, Ballengee Decl. ¶ 14; Ex. 10, Natale Decl. ¶¶ 25-26.) ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████. (*See* Ex. 9, RSA T&C §§ 2(b), 2(d), 2(f); Ex. 10, Natale Decl. ¶¶ 25-26;

Ex. 11, Nicely Decl. ¶¶ 27-31.)

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████. (*See* Ex. 11,

Nicely Decl. ¶ 32 ("[A] delay of merely 4-hours occurring anywhere in the 1,500-mile

movement as few as 6 days a month resulted in volume lost that was impossible to make up.")

███████████████████████████████████████████████

████████████████████████████████. (Ex. 3, Ballengee

Decl. ¶¶ 14, 27; Ex. 11, Nicely Decl. ¶¶ 31-32.) ████████████████

█████████████████████████. (Ex. 3, Ballengee Decl. ¶ 25.)

**<u>Third</u>**, ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████ (Ex. 8, Feb. 3, 2013 Wilkins email and attachment, ERC01609.) ████

███████████████████████████████████████████████.

(*See* Ex. 10, Natale Decl. ¶ 15; Ex. 12, Sept. 18, 2013 Turnbull email, Eddystone 0055352.)

███████████████████████████████████████████████

███████████████████████████████████████████████

12240071

██████████████████████████████████. (Ex. 10, Natale Decl. ¶ 15; Ex. 11, Nicely Decl. ¶¶

9-10.) ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ (Ex. 13, Dec. 12, 2013 ERC emails & attachments re: dredging progress,

ERCEDPA00137429; Ex. 14, Dec. 20, 2013 ERC emails re: BTS guidance, dredging and

blasting, Eddystone 0028780; Ex. 15, Jan. 28, 2014 ERC emails re: rock sampling, chisel barge

and blasting, Eddystone 0040325.)

████████████████████████████████████████████

██████. (Ex. 10, Natale Decl. ¶¶ 18-21; Ex. 11, Nicely Decl. ¶¶ 10-14.) ████████████

████████████████████████████████████████████████

████████████████████████. (Ex. 10, Natale Decl. ¶¶ 14-20; Ex. 11, Nicely Decl. ¶¶ 8-12.)

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. (Ex. 11, Nicely Decl. ¶¶ 15-17, 37.)

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. (*See* Ex.

11, Nicely Decl. ¶ 15.) ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. (Ex. 10, Natale Decl. ¶ 21; Ex. 11, Nicely ¶¶ 13,

20.) ████████████████ (Ex. 10, Natale Decl. ¶¶ 21, 23; Ex. 11, Nicely Decl. ¶¶ 13, 20-21.)

**Fourth**, ████████████████████████████████████████



(Ex. 11, Nicely Decl. ¶ 32.)

(*Id.* ¶¶ 15-17, 32.)

(*Id.* ¶¶ 44-48.)

(*Id.* ¶ 46.)

. (*See* Ex. 16, Sept. 17, 2013 Turnbull email, ERCEDPA00062329; Ex. 12, Sept. 18, 2013 Turnbull email; Ex. 17, Sept. 25, 2013 Turnbull email and attachment, ERCEDPA00261298).

. (Ex. 18, Jilla Decl. ¶ 28.)

. (Ex. 3, Ballengee Decl. ¶¶ 28-30; Ex. 11, Nicely Decl. ¶ 49.)

. (Ex. 3, Ballengee Decl. ¶¶ 28-30.)

. (*Id.* ¶¶ 16, 29-31.)

██████████████████████████████████████████████████████████

████████████████████████ (*Id.* ¶¶ 28-29.) ████████████████████████

████████████████████████████████████████ (*Id.* ¶ 30.) ████████████

████████████████████████████████████████████████████. (*Id.* ¶ 31;

Ex. 11, Nicely Decl. ¶ 49.)

        █████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████. (*See* Ex. 19, June 17-30, 2105 BTS-ERC emails,

ERCEDPA00541634.) ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████. (*Id.*) None of the three aforementioned

triggers ever occurred, and ERC never attempted to exercise its sole remedy.

        Instead, a more pressing issue arose before the parties were able to resolve the Facility

defects, BTS's request to amend the RSA, or ERC's request for financial assurances. ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████. (Ex. 3, Ballengee Decl. ¶ 35.)

        █████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ (*See* Ex. 20, June 18, 2014 Acknowledgment,

MLC00001351; Ex. 3, Ballengee Decl. ¶ 35; Ex. 18, Jilla Decl. ¶ 12.) 

. (Ex. 3, Ballengee Decl. ¶ 33; Ex. 18, Jilla Decl. ¶¶ 14-15.)

(Ex. 3, Ballengee Decl.

¶ 35; Ex. 18, Jilla Decl. ¶ 16.)

.

(Ex. 18, Jilla Decl. ¶ 17.)

. (Ex. 3, Ballengee Decl. ¶¶ 36-37; Ex. 18, Jilla Decl. ¶¶ 19-20.)

. (Ex. 3, Ballengee Decl. ¶ 36; Ex. 18, Jilla Decl. ¶ 25.)

. (Ex. 3, Ballengee Decl. ¶ 36; Ex. 18, Jilla Decl. ¶ 25.)

. (Ex. 3, Ballengee Decl. ¶ 36; Ex. 18, Jilla Decl. ¶

12

27; Ex. 2, May 15, 2012 Wilkins email, ERCEDPA00173151.)



█████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████. (Ex. 18, Jilla Decl. ¶ 26; Ex. 3, Ballengee Decl. ¶ 37.) █████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████. (*See* Ex. 18, Jilla Decl. ¶ 26; Ex. 3, Ballengee Decl. ¶ 37.)

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████. (*See* Ex. 21, Sept. 3, 2015 Email attaching BOD

memo, ERCEDPA00236809.)   ERC commenced arbitration and strong-armed JTS into a

collusive and pretextual settlement agreement, in which the parties agreed to a nearly $140

million final award against JTS (despite disclaiming any liability) and released from liability the

other Jamex affiliates and their principals in exchange for a modest payment, an unspecified

amount of crude, and an agreement to cooperate in ERC's subsequent legal actions.   ERC then

commenced part two of its scheme to recover the massive construction overruns by filing the

present action, using the stipulated $140 million award as the basis for its "damage" claim.

The foregoing context is essential to understand the transactions that ERC alleges were

"fraudulent transfers."   As explained further below, ERC's allegations are baseless.

12240071

## II.   FERRELLGAS DID NOT "STRIP" BTS OF ANY ASSETS OR REVENUE STREAMS WHEN IT ACQUIRED BRIDGER LOGISTICS IN JUNE 2015.

### A.   Ferrellgas Implemented Cost-Center Accounting Principles That Better Reflected The Performance Of Bridger Logistics' Business Segments; Ferrellgas Did Not Shift Any BTS Revenue To Other Entities.

Bridger Logistics was founded in 2010, and, from the outset, it was in the business of moving petroleum.   When Ferrellgas purchased Bridger Logistics in June 2015, Bridger Logistics offered a full complement of services associated with storing, transporting, and marketing crude oil—often referred to as "midstream" services.   Through its affiliates, Bridger Logistics moved petroleum from the wellhead to the refinery via multiple modes of transport, including truck, rail, pipeline, and barge.   (Ex. 22, Ferrellgas Annual Meeting Power-Point, RG_EDPA0053505-17.)

At the time Ferrellgas acquired Bridger Logistics in June 2015, Bridger Logistics was comprised of four principal business sectors:   (1) Truck Transportation, (2) Pipeline Terminals, (3) Pipelines, and (4) Rail.   (Ex. 23, Bridger Management Report, BLFG_EDPA1880337.) Rather than providing a breakdown of costs, expenses, and financial performance on a subsidiary-by-subsidiary basis, the management reports that Bridger Logistics' executives used to run the business were broken down by sector.   Each sector reported on financial performance across multiple subsidiaries; in some instances, a subsidiary would contribute to multiple sectors.

As part of its due diligence before acquiring Bridger Logistics, Ferrellgas retained consultants to assess the company's business model, including Grant Thornton, LLP ("GT") for accounting due diligence.   (Ex. B, 11/5/18 Declaration of Todd Soiefer ("Soiefer Decl.") ¶¶ 4-8.) GT produced a financial, tax, and human resources due diligence report dated May 21, 2015, also known as a Quality of Earnings Analysis ("QEA").   █████████████████

██████████████████████████████████████████████



(Ex. 24, QEA, BLFG_EDPA0299525.)

(*Id.* (emphasis added).)

(*Id.*, BLFG_EDPA0299528.)

(*Id.*)

When Ferrellgas acquired Bridger Logistics, it did not redistribute revenues away from BTS to other Bridger entities, as ERC contends.

. (Ex. 25, Bridger Management Report, BLFG_EDPA0183830.)

Certain entities, including BTS, did not limit their activities to a single sector (*e.g.*, BTS conducted activity in the Pipeline Terminals, Pipelines, and Rail Services sectors). Consequently, under the updated, post-acquisition accounting framework, costs and revenues for those entities could not be attributed to a single sector in Ferrellgas's accounting system. The converse was also true: multiple entities would often contribute to a single business sector. To account for these realities, Bridger Logistics and Ferrellgas created new company codes and cost

15

12240071

centers in their accounting systems, known as "Bridger Rail Services" and "Bridger Pipeline Services."  (Ex. C, 11/6/18 Declaration of Michael Farmer ("Farmer Decl.") ¶ 8.)

Contrary to ERC's sensational allegations, neither Bridger Rail Services nor Bridger Pipeline Services was a "fake" or "fictional accounting entity," nor did the choice to use cost centers in accounting deprive BTS of any revenue that it would have otherwise recognized.  (Ex. D, 11/5/18 Declaration of William Ruisinger ("Ruisinger Decl.") ¶ 6; Ex. E, 11/7/18 Declaration of Gary Polkowitz ("Polkowitz Decl.") ¶¶ 24-26.)  The recording of activity in a cost center does not affect the financial condition or financial results of the entity in which that activity originates. (Ex. E, Polkowitz Decl. ¶ 26.)  The use of cost centers also does not affect the consolidated financial reporting of a company like Ferrellgas.  (*Id.*)  Ferrellgas's public financial statements reflect the assets, liabilities, revenue, and expenses of the parent company and its subsidiaries in the aggregate, as is customary for public companies and for many private companies as well. (*Id.*)  Financial activity recorded in a cost center such as Bridger Rail Services was combined with activity recorded in BTS and other affiliates to generate consolidated accounting information for Bridger Logistics and then Ferrellgas.  (*Id.*)

Moreover, it is not as if Bridger Logistics attributed only revenue to the newly-created cost centers.  Rather, when Bridger Logistics shifted to cost-center accounting, it booked costs in the same manner that it booked revenues, a fact that ERC ignores.  While ERC is quick to note that certain *revenue streams* previously recorded in BTS before the Ferrellgas acquisition were recorded in Bridger Rail Services and Bridger Pipeline Services post-acquisition, Eddystone fails to mention that *corresponding expenses* previously recorded in BTS were also recorded in Bridger Rail Services and Bridger Pipeline Services after the acquisition.  (*Id.* ¶ 28.)  For example, from January 2015 through May 2015, expenses related to Costs of Goods Sold ("COGS") for BTS averaged more than $██████ per month.  (*Id.*)  From July 2015 through

16

December 2015, no COGS expenses were recorded in BTS, but more than $███████ in COGS expenses were recorded in the Bridger Rail Services cost center.  (*Id.*)  Operating expenses also were recorded in Bridger Rail Services and Bridger Pipeline Services after the Ferrellgas Acquisition.  (*Id.*)

In addition, certain revenues previously recorded under BTS were shifted to Bridger Storage following the Ferrellgas acquisition.  This shift corrected a longstanding error in the Bridger Logistics accounting system, through which Bridger Storage's revenues were incorrectly recorded under BTS, despite the fact that Bridger Storage was the contracting party.  (Ex. F, 11/7/18 Declaration of Julio Rios ("Rios Decl.") ¶ 4; Ex. E, Polkowitz Decl. ¶¶ 29-30.)  Notably, as with the cost-center accounting, COGS associated with those revenues were also shifted to Bridger Storage after the acquisition.  (*Id.* ¶ 30.)

Bottom line, no assets were transferred and no revenue streams were stripped from BTS as a result of accounting changes after Ferrellgas acquired Bridger Logistics.  Instead, Ferrellgas aligned Bridger Logistics' accounting system to match Bridger Logistics' business model and performance reporting.  The form of accounting a company chooses to employ does not change the actual substance of that company's business or the transactions that occur.

### B.    Accounts Receivable Were Eliminated for Appropriate Reasons.

Eddystone's narrative about how accounts receivable were treated at the time of the acquisition is likewise misleading and illogical, and it ignores how transactions of this nature are handled.  The separation of Bridger Logistics and its subsidiaries from Bridger, LLC meant that the two groups had to resolve their intercompany relationships.  This resolution was reflected in the acquisition agreement between Ferrellgas and Bridger, LLC and a June 24, 2015 Amendment and Supplement to the agreement.  (Ex. 26, Amendment and Supplement to the Purchase and Sale Agreement, BLFG_EDPA2248693-703; Ex. E, Polkowitz Decl. ¶ 16.)  The parties agreed

17

that certain accounts between the two groups of companies would be eliminated to permit a clean break, but other accounts were reconciled, resulting in an obligation by the Bridger Marketing group to the Bridger Logistics group in the amount of $██████ for services provided through closing.  (Ex. E, Polkowitz Decl. ¶ 16.)  Bridger Logistics invoiced Jamex for this amount and Jamex paid on behalf of Bridger, LLC.  (*Id.* ¶¶ 16-17.)

Of the approximately $██████ in BTS-intercompany accounts receivable that Eddystone identifies in its Motion, $██████ is made up of accounts receivable from companies that Ferrellgas did not acquire.  (Ex. E, Polkowitz Decl. ¶ 12-15.)  The approximately $██████ in intercompany accounts payable that were on BTS's books as of June 23, 2015 included $██████ payable to companies that Ferrellgas did not acquire.  (*Id.*)  Once these receivables and payables are removed from the equation, as of June 23, 2015, BTS was due approximately $██████ in intercompany accounts receivable, and it owed approximately $██████ in intercompany accounts payable.  (*Id.* ¶ 15.)

These remaining intercompany payables and receivables were eliminated as part of Ferrellgas's accounting for the acquisition of the Bridger Logistics group of companies.  (Ex. D, Ruisinger Decl. ¶¶ 3-5; Ex. E, Polkowitz Decl. ¶ 18-22.)  Ferrellgas obtained a report from a valuation firm to establish the value of the assets it acquired, and the firm did not attribute any value to intercompany accounts.  (Ex. D, Rusinger Decl. ¶¶ 3-5.)  Ferrellgas's decision to reduce these intercompany accounts to zero was appropriate under GAAP and customary business combination practices.  (Ex. E, Polkowitz Decl. ¶¶ 18-22.)   In other words, these eliminations were carried out as a matter of standard accounting procedure, not to harm BTS or its creditors.

12240071

III. **THE JANUARY 2016 TRANSACTIONS WERE A RESULT OF ERC'S DECISION TO CUT OFF JAMEX MARKETING'S FINANCING; JAMEX AND BRIDGER LOGISTICS THEREAFTER TRIED TO MAKE THE BEST OF A TOUGH SITUATION, NOT TO "DEFRAUD" ERC.**

A. **BTS Performed Under The RSA And Sought To Continue Doing So.**

ERC argues (at 8) that "[b]y December 2015, Ferrellgas concluded that it was convenient for it to stop shipping crude through Eddystone" and thus terminated all of the agreements associated with such shipment and abandoned the RSA. This could not be further from the truth.

As an initial matter, BTS always performed under the RSA, despite ERC's shortcomings. (Ex. B, Soiefer Decl. ¶ 38; Ex. F, Rios Decl. ¶ 2.) Moreover, contrary to ERC's baseless allegation that FGP decided that it would be "convenient for it to stop shipping crude through Eddystone," Ferrellgas, Bridger Logistics, and BTS very much wanted BTS to continue to facilitate the shipment of crude through the Facility; indeed, the RSA was considered a valuable asset when Ferrellgas acquired Bridger Logistics and BTS six months earlier. (Ex. B, Soiefer Decl. ¶ 12; Ex. F, Rios Decl. ¶ 5.) But market conditions that initially made the project work had changed. ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

Nevertheless, Jamex Marketing, Ferrellgas, Bridger Logistics, and BTS made every effort to find a solution that would have allowed all parties to continue to perform under the various agreements, including the RSA. (Ex. B, Soiefer Decl. ¶ 20.) ███████████████████████ ████████████████████████████████████████████████. (Ex. 27, Nov. 12, 2015 Soiefer email, BLFG_EDPA1737035-36.)

████████████████████████████████████████████████████████

████████████████████████.  (Ex. 3, Ballengee Decl. ¶ 31.)  ERC dealt a fatal blow to every

potential solution that Ferrellgas, Bridger Logistics, BTS or Jamex proposed:

- ████████████████████████████████████████████████████
  ███████████████ (Ex. 55, Nov. 6, 2015 Hampton email, BLFG_EDPA2254897; Ex. 18, Jilla
  Decl. ¶ 16.)  ███████████████████████████████████████████
  █████████████ (Ex. 28, Nov. 23, 2015 Boaz email, BTSEDDYSTONE0007199; Ex. 3,
  Ballengee Decl. ¶ 35.)

- As explained above, Bridger, LLC and then Bridger Logistics attempted to buy
  Enbridge's and Canopy's interest in the Facility on more than one occasion.  (Ex. F, Rios
  Decl. ¶ 3; Ex. B, Soiefer Decl. ¶ 22.)█████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ████████████████████████████████████████ (Ex. B, Soiefer Decl.
  ¶ 23; Ex. 29, Oct. 13, 2015 Soiefer email, BLFG_EDPA0976161; Ex. 30, Sept. 8, 2015
  Enbridge BOD notice, ERCEDPA 00450954; Ex. 31, Sept. 9, 2018 Enbridge BOD
  notice, ERCEDPA00236838.)

- Bridger Logistics and BTS attempted to negotiate a rate reduction from ERC, which
  would in turn have allowed Bridger Logistics and BTS to negotiate lower rates with
  Jamex so that Jamex could continue to perform.  ERC again refused.  (Ex. B, Soiefer
  Decl. ¶ 23.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████.  (Ex. 28, Nov. 23, 2015 Boaz email, BTSEDDYSTONE0007199; Ex. 32, COSA

Side Letter Agreement, RG_EDPA0024365;  Ex. 33, Certain Arrangements Agreement,

BLFG_EDPA0044147; Ex. 34, Amendment to Monroe TLA, JTS-SMA_0010730.)  The owner

of Jamex Marketing, explained as much in a declaration submitted in the JTS arbitration:



12240071



(Ex. 3, Ballengee Decl. ¶¶ 35-36.)

**B.     Bridger Logistics Did Not Defraud ERC By Selling BTS To Jamex.**

ERC claims (at 10) that "[o]n February 22, 2016, Bridger Logistics sold the corporate shell that remained of BTS to a newly-formed, assetless subsidiary of Jamex Marketing for $10" as part of a scheme to defraud ERC.  This allegation is incorrect.

As explained above, as a result of the temporary cessation agreements, there was no longer any crude for BTS to transload through the Facility for delivery to Monroe.  (Ex. B, Soiefer Decl. ¶¶ 28-29.)  While this ended BTS's only potential use for ERC's transloading capacity, it did not mean that another actor could not find a use for that same capacity.  The RSA, in the right hands, was a significant asset, providing unique logistical access to East Coast oil refineries situated on the Delaware River.  (Ex. F, Rios Decl. ¶ 5.)  At the time of the transfer, Bridger Logistics and Ferrellgas believed that Jamex had the capability to use the RSA to its full

21

potential.  (Ex. B, Soiefer Decl. ¶¶ 33-34.)

Moreover, Jamex sought privity of contract with ERC to break through ERC's roadblock to financing that would allow Jamex to continue sourcing crude and transloading it through the Facility, as Ballengee explained in his declaration in the JTS arbitration:



(Ex. 3, Ballengee Decl. ¶ 37 (emphasis added).)

In other words, as a result of ERC's decision to cut off Jamex's financing options, the RSA was a valuable asset to Jamex and of nominal value to Bridger Logistics and BTS by January 2016.  (Ex. B, Soiefer Decl. ¶ 34; Ex. 35, Purchase and Sale Agreement with Jamex Transfer Holdings, BLFG_EDPA0005496 (███████████████████████).)

████████████████████████████████████████████████████████

████████████████.  (Ex. 36, Feb. 25, 2016 Ballengee email and letter, ERCEDPA00179204.)  Bridger Logistics would have benefitted greatly had Jamex been able to reach an agreement with ERC and obtain financing to continue sourcing crude, as it sought to do.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████.  (Ex. 3, Ballengee Decl. ¶ 37; Ex. B, Soiefer Decl. ¶¶ 12, 16-18, 20 (explaining that Bridger Logistics' contract with Monroe was a valuable asset and Jamex's role as the marketing company sourcing the crude for Monroe was essential).)

In fact, Monroe is currently receiving oil through the Facility.  (Ex. 37, Philadelphia-Area Crude Rail Terminal Reawakened By Discounted Crude, September 25, 2018, available at

https://www.reuters.com/article/us-usa-crude-rail/philadelphia-area-crude-rail-terminal-reawakened-by-discounted-crude-idUSKCN1M50GF ("The 90,000 barrel-per-day-rail terminal in Eddystone, Pennsylvania, has been getting routine deliveries of Bakken crude for the past month . . . . Monroe Energy, a subsidiary of Delta Air Lines Inc, is using the terminal to help supply its 185,000 bpd refinery in Trainer, Pennsylvania.").)[2]

Moreover, Bridger Logistics took measures to ensure that the BTS would not have a material impact on ERC. As it negotiated with ERC, 

(Ex. B, Soiefer Decl. ¶ 15.)

(Ex. 33, Certain Arrangements Agreement, BLFG_EDPA0044147.)

### C.   Ferrellgas Transferred Assets From BTS To Remain Compliant With Its Loan Covenants, Not To Harm ERC.

As stated in the Motion, some of BTS's assets were transferred to other Bridger Logistics affiliates in January 2016. ERC is wrong, however, when it alleges that those transfers were fraudulent transfers intended to "strip" BTS of its assets so that BTS would be unable to pay ERC. To the contrary, the assets were transferred to adhere to preexisting loan covenants.

Ferrellgas's loan agreement provided Ferrellgas's lender with a right to place a lien on

---

[2]  . (Ex. B, Soiefer Decl. ¶ 41; Ex. 39, Non-Compete, BLFG_EDPA1699929-32; Ex. 35, Purchase and Sale Agreement with Jamex Transfer Holdings ( ).)

12240071

BTS's assets, and it prohibited Ferrellgas from transferring BTS's assets to the Jamex group or any other third party.  This is significant from a factual perspective, because an unsecured creditor such as ERC could not legitimately complain about the transfer of a secured creditor's collateral, because collateral already pledged to a secured creditor presents no avenue of recovery for an unsecured creditor like ERC.

The law reflects this reality by making clear that the transfer of encumbered property cannot qualify as "fraudulent."  Specifically, under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), a "transfer" is a disposition of an "asset or an interest in an asset," and an asset *does not include* "property to the extent it is encumbered by a valid lien."  12 Pa. C.S. § 5101(b); *Hipple v. Hipple*, No. 12-1256, 2016 WL 320216 (E.D. Pa. Jan. 27, 2016) (rejecting PUFTA claim because assets transferred were encumbered by valid lien); *In re Blatstein*, 226 B.R. 140, 150 (E.D. Pa. 1998), *aff'd in part and rev'd in part on other grounds*, 192 F.3d 88 (3d Cir. 1999); *see also* Bar Association Comment to 12 Pa. C.S. § 5101 ("The laws protecting valid liens against impairment by levying creditors, exemption statutes, and the rules restricting levyability of interest in entireties property are limitations on the rights and remedies of unsecured creditors, and it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of 'asset' for purposes of this chapter.").[3]

Here, the facts surrounding Ferrellgas's loan obligations and the resulting liens on BTS's assets make clear that no fraudulent transfer could have occurred.  ██████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████.  (Ex. 40, Am. No. 2 to

---

[3]     Eddystone asserts its claims under the PUFTA, but the BL/FG Defendants reserve the right to assert that the law of a different jurisdiction applies.  The Pennsylvania legislature replaced PUFTA with the Pennsylvania Uniform Voidable Transactions Act effective February 20, 2018.  Statutory citations here are to the pre-amendment versions, which would apply here.

Credit Agreement, Sch. 2.01, BLFG_EDPA2056460.) ███████████████████

██████████████████████. (Ex. 41, Security Agreement BLFG_EDPA2056411.) ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ (Ex.  42,  Credit  Agreement

BLFG_EDPA2056722 § 6.12(b).) ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████. (Ex. 43, Credit Agreement

§§ 7.04, 7.05(d), 7.05(k) each as restated in Amendment No. 3, BLFG_EDPA2056535.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████. (Ex. 44, Guaranty Supplement, BLFG_EDPA0045922.) █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 45, June 24, 2015

Heitmann letter, BLFG_EDPA2324391-96.)  But it appears that the bank either did not receive

or did not correctly process the Guaranty Supplement, and neither party addressed the required

Grantor Accession Agreement at the time.

        This documentation issue resurfaced and was ultimately rectified in early 2016, when

Ferrellgas approached its lenders about an expansion of the credit available under the Credit

Agreement. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

25

████████████. (Ex. 46, Jan. 14, 2016 Guaranty Supplement, BLFG_EDPA2056483.) ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ (Ex. 47, Grantor Accession Agreement,  BLFG_EDPA0045976.) ████████████████████████

████████████████████████████████████████████████

███████████████ (Ex. 47, Grantor Accession Agreement, BLFG_EDPA0045984.)  The next day, January 15, 2016, Bank of America filed a Uniform Commercial Code financing statement in Louisiana, where BTS was organized.  (Ex. 48, UCC Search Results, BLFG_EDPA2056979.)[4]

Contrary to ERC's contention (at 9) that "Ferrellgas entered into a new security agreement with its lender" in January 2016 to make BTS judgment proof, ████████████

████████████████████████████████████████████████

██████████████████████████. (Ex. 42, Credit Agreement BLFG_ EDPA2056722; Ex. 56, FGP Form 8-K, filed November 4, 2009, available at http://www.ferrellgas.com/our-company/investor-information/sec-filings/.) ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████. Thus, BTS's assets never presented an avenue of recovery for ERC, and the transfer of those assets was not "fraudulent."

In its brief, ERC ignores that the liens perfected in January 2016 were required by contract and should have been perfected months earlier pursuant to the requirements of Ferrellgas's longstanding $██████ credit facility.

---

[4] ████████████████████████████████████████████████

████████████████████████████████████████████████

### D.     BTS Did Not Consult With Counsel To Further Any Purported "Fraud."

When Jamex negotiated the temporary cessation agreements, BTS realized that it would no longer have any crude to ship through the Facility, unless and until Jamex was able to negotiate a solution with ERC.  (Ex. B, Soiefer Decl. ¶ 28; Ex. 3, Ballengee Decl. ¶ 37.)  Bridger Logistics and BTS thus began looking at options to address what would become of its unused asset—BTS's right to transload crude through the Facility.   BTS considered suing ERC to address the deficiencies at the Facility.   (Ex. B, Soiefer Decl. ¶ 30.)   Bridger Logistics and Ferrellgas also considered whether BTS could be put into bankruptcy.  (*Id.* ¶ 31.)  Rather than pursue these options, Bridger Logistics decided to explore selling BTS.   (*Id.* ¶ 32.)  Ferrellgas, Bridger Logistics, and BTS consulted with counsel about their options, as any prudent company would.  (*Id.* ¶ 36.)

Ferrellgas did not, as ERC claims (at 9), retain outside counsel "to draft the paperwork by which to divest BTS of its remaining assets so that they would not be available to satisfy BTS's obligations to Eddystone under the RSA . . . under the false pretense of maintaining Bank of America's collateral before BTS's sale to a third party."  As explained above, BTS assets were not available to satisfy any debts to ERC under the RSA, ████████████████████████████ ████████████████████████████████████████████████████████████.  (*Id.* ¶ 35; Ex. 42, Credit Agreement BLFG_EDPA2056722 § 6.12(b).)

## IV.    THERE IS NOTHING NEFARIOUS OR FRAUDULENT ABOUT THE BL/FG DEFENDANTS' CONDUCT IN 2015 AND EARLY 2016.

As explained in the attached declaration of Professor Edward B. Rock, there is nothing out of the ordinary—let alone "fraudulent" or even "improper"—about the BL/FG Defendants' conduct in connection with the June 2015 acquisition of Bridger Logistics or the January 2016 sale of BTS to the Jamex company group.  Professor Rock is the Martin Lipton Professor of Law

at New York University Law School, where he also serves as Director of the Institute for Corporate Governance and Finance.  (Ex. G, 11/2/18 Declaration of Professor Edward B. Rock (Rock Decl.) ¶¶ 1-2.)  Previously, he was a professor at the University of Pennsylvania law school since 1989, where for approximately 15 years he served as the Saul A. Fox Distinguished Professor of Business Law and as a Professor of Business Economics and Public Policy at the Wharton School.  (*Id.* ¶ 3.)  He is a Fellow of the American College of Governance Counsel and a Member of the American Law Institute.  (*Id.* ¶ 4.)

As Professor Rock explains, the very activities that ERC holds up as "fraudulent" are activities that are frequently undertaken for sound business reasons, and there is no particular reason to infer that such activities are motivated by any "fraudulent" intent.  (*Id.* ¶¶ 10-11, 14-18.)  Specifically, Professor Rock notes that each of the following activities is often justified by prudent business reasons and is undertaken in the normal course of business activity:   (1) reconciliation and settlement of accounts between affiliate entities, (2) recording of revenues and expenses using cost centers to permit management to better understand business operations, (3) execution of a guaranty and grant of a security interest by a company in connection with a credit facility that provides financing and liquidity to a corporate family, and (4) discussing restructuring and bankruptcy options for a company experiencing financial stresses.  (*Id.* ¶ 11.)  These are the very same business activities that ERC speculates are "fraudulent."

Moreover, although PUFTA indicates that a court *may* consider various attributes of a transaction to determine whether a transferor made a transfer with actual intent to hinder, delay, or defraud a creditor, there is no particular reason to draw that conclusion (and especially not the specific conclusion that the transferor's intent was to *defraud*) based on these attributes.  As Professor Rock explains, these attributes are often completely disassociated from any intent to hinder or delay—let alone "defraud"—a creditor.  (*Id.* ¶ 21.)

28

For instance, whenever a subsidiary pays out a dividend to a parent company, there will be a transfer in which the transferor does not receive equivalent value.  (*Id.* ¶ 15.)  As another example, in consolidating two subsidiaries or a subsidiary into a parent company, it is often the case that all of a company's assets will be transferred.  (*Id.* ¶ 16.)  Similarly, transfers made to an affiliate (or an "insider") are often done in the ordinary course to realign operational or business units.  (*Id.* ¶ 17.)  The fact that a transfer is not disclosed to third parties could be motivated by any number of legitimate reasons, including, for example, the fact that a transaction might not be material in any way to the third-party in question.  (*Id.* ¶ 18.)  Lastly, consultation with counsel about any such transfers is likewise not indicative of any intent to "defraud" or hinder any creditors—when a group of companies encounters financial distress, it is commonplace for the company group to seek counsel regarding how to restructure its operations.  (*Id.* ¶ 19.)

In short, there is no basis for the central premise of ERC's motion—*i.e.*, that Ferrellgas's and Bridger Logistics' accounting activities, asset transfers, and consultation with counsel "must" have been done to carry out some purported "fraud."

## V.     ENBRIDGE AND CANOPY TRANSFERRED AWAY ERC'S ASSETS DESPITE THE BL/FG DEFENDANTS' PENDING COUNTERCLAIMS.

In addition to the foregoing, ERC's own conduct belies its misleading "fraudulent transfer" narrative.  During the pendency of this case, in which the BL/FG Defendants assert significant counterclaims against ERC, ███████████████████████████████ ███████████████████████████████.  In the process, it appears that Enbridge and Canopy stripped ERC of its assets, reducing it to a judgment-proof shell.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Ex. 49, May 4, 2017 Email from M. Keith to H. Tomte, ERCEDPA00526313; Ex. 50, Apr. 13, 2017 Email from V. Paradis to P. Schuldhaus, ERCEDPA 00520121.)

████████████████████████████████████████████████. (Ex. 51, Oct. 19, 2019 Redemption and Asset Transfer Agreement, ERCEDPA00529409.) ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████" (Ex. 52, Aug. 28, 2017 Email from G. Jones to V. Paradis and M. Keith, ERCEDPA00529798.)

Notwithstanding Eddystone's (*i.e.*, Enbridge and Canopy's) efforts to kill the RSA and instead pursue litigation to recover its cost-overruns from developing the Eddystone Facility, the Facility is once again being used to transload Bakken crude to the Monroe refinery:

> The 90,000 barrel-per-day-rail terminal in Eddystone, Pennsylvania, has been getting routine deliveries of Bakken crude for the past month, the first significant deliveries since the site went dark in January 2016. Monroe Energy, a subsidiary of Delta Air Lines Inc, is using the terminal to help supply its 185,000 bpd refinery in Trainer, Pennsylvania.

(Ex. 37, *Philadelphia-area crude rail terminal reawakened by discounted crude*.)  Monroe's present use of the facility shows that ERC could have significantly mitigated the alleged damages it now seeks to recover through litigation.

## GENERAL LEGAL STANDARDS

Against that factual backdrop, there is no legal basis to apply the crime-fraud exception in this case.  "The attorney-client privilege . . . is the oldest confidential communications privilege known to the common law." *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 89-90 (3d Cir.

1992) (reversing district court's finding that the crime-fraud exception applied). The privilege is "worthy of maximum legal protection," and documents that fall within the scope of the privilege should be "zealously protected." *Id.* at 90 (citation omitted). The purpose of the privilege is "to encourage clients to make a full disclosure to their attorneys," as well as "to encourage full and frank communication between attorneys and their clients and thereby [to] promote broader public interests in the observance of law and administration of justice." *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

The work-product privilege is a complement to the attorney-client privilege and preserves the confidentiality of legal communications prepared in anticipation of litigation. *In re Grand Jury Matter #3*, 847 F.3d 157, 165 (3d Cir. 2017) (declining to apply crime-fraud exception). This privilege "promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Id.* (citation omitted). The Third Circuit has "accorded an attorney's work product almost absolute protection from discovery." *Haines*, 975 F.3d at 94 (reversing district court's ruling that the crime-fraud exception applied to work product). As Eddystone's own case explains, work-product protection "is distinct from and broader than the attorney-client privilege." *In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir. 1979); *see also In re Grand Jury Investigation*, 599 F.2d 1224, 1231 (3d Cir. 1979) (explaining that opinion work product is "the most sacrosanct of all forms of work product" and discoverable only in a "rare situation").

"A party seeking to invoke the crime-fraud exception to the attorney-client privilege bears the burden of demonstrating that the exception is applicable." *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011) (movant failed to adduce evidence sufficient to trigger exception). In particular, the moving party must establish that there is a reasonable basis for two factual findings: (1) the privilege holder committed a crime or fraud, *and* (2) the attorney-client

31

communication was used in furtherance of such crime or fraud.  *Id.*

Importantly, the movant has the burden to "present evidence which, if believed by the fact-finder, would be sufficient to support a finding that [both of] the elements of the crime-fraud exception were met." *Haines*, 975 F.2d at 95-96.  "The 'reasonable basis' standard is intended to be reasonably demanding; neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *In re Grand Jury Subpoena ABC Co.*, 696 F. App'x 66, 70 (3d Cir. 2017) (finding movant failed to carry its burden) (citation omitted).

Where no crime is alleged (as in this case), the first element requires a showing of actual fraud.  As explained further below, even if a movant can muster evidence of "fraudulent transactions" voidable under a state statute, such evidence is not legally sufficient to satisfy the first element; instead, the movant must come forward with additional evidence of "wrongful intent," *i.e.*, "deception, dishonesty, misrepresentation, falsification, or forgery." *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 552-57 (D. Md. 2018).  "Such an intricate and case-determinative matter requires a thorough adversarial process beyond the discovery context to be adequately adjudicated." *Barba v. Shire US, Inc.*, Case No. 13-21158-CIV, 2015 WL 7015324, at *3 (S.D. Fla. Nov. 12, 2015) (denying crime-fraud motion where opposition "contain[ed] substantial argument and analysis" regarding alleged fraudulent acts).

And even if a movant can show actual fraud, it must also show that the communications at issue were made by an attorney *in furtherance of such fraud*.  "[E]vidence of a crime or fraud, no matter how compelling, does not by itself satisfy both elements of the crime-fraud exception." *In re Grand Jury Matter #3*, 847 F.3d at 166 (citation omitted).  To satisfy the second element, the movant must establish a reasonable basis to find "communications from the *lawyer* to the client" were conveyed "by the *lawyer* for the purpose of giving advice for the commission of a fraud or crime." *Haines*, 975 F.2d at 90.  "The use-in-furtherance requirement"

of the second element "provides a key safeguard against intrusion into the attorney-client relationship." *In re Grand Jury Matter # 3*, 847 F.3d at 165.

Similarly, to obtain *in camera* review, Eddystone must come forward with a "factual basis" sufficient to "support a good faith belief by a reasonable person that the materials may reveal evidence of a crime or fraud." *Haines*, 975 F.2d at 96.

## ARGUMENT

## I.      EDDYSTONE HAS NOT CARRIED ITS BURDEN TO INVOKE THE CRIME-FRAUD EXCEPTION.

### A.      Eddystone Has Not Shown A Reasonable Basis To Find Actual Fraud.

#### 1.      "Fraudulent Transfers" Do Not Necessarily Involve Fraud.

As stated above, Eddystone cannot simply allege "fraudulent transfers" to eviscerate the attorney-client privilege. Fraudulent transfer claims do not necessarily involve fraud at all— "fraudulent transfers" are transactions voidable under state statutes enacted to protect creditors. Indeed, the statutory framework that governs Eddystone's claims—the Pennsylvania Uniform Fraudulent Transfer Act, or PUFTA—was recently renamed the Pennsylvania Uniform Voidable Transactions Act to draw this very distinction. *See* 12 Pa. C.S. § 5101(a) ("This chapter, that was formerly cited as the Pennsylvania Uniform Fraudulent Transfer Act, shall be known and may be cited as the Pennsylvania Uniform Voidable Transactions Act."). The legislature renamed the statute "to replace the long-used but misleading word 'fraudulent' with terminology that will not mislead." Kenneth C. Kettering, *The Uniform Voidable Transactions Act; or, the 2014 Amendments to the Uniform Fraudulent Transfer Act*, 70 THE BUSINESS LAWYER 777, 803 (2015). "The heart of the matter is that fraud, in the modern sense of the word, is not, and never

has been, a necessary element of a claim for relief under the act." *Id.*[5]

Consequently, it is not sufficient for Eddystone to make a prima facie showing of a fraudulent transfer voidable under the PUFTA, as Eddystone contends (at 16). Instead, Eddystone must make a prima facie showing of actual fraud, which requires evidence of "deception, dishonesty, misrepresentation, falsification, or forgery." *United Bank*, 301 F. Supp. 3d at 554-55 (finding crime-fraud exception inapplicable to state-law fraudulent transfer claims because the moving party failed to present evidence of "wrongful intent," *i.e.*, "deception, dishonesty, misrepresentation, falsification, or forgery").[6] As explained above and in the next section, Eddystone's Motion does not even come close to meeting this standard.

In *United Bank*, creditor United Bank brought state-law fraudulent transfer claims against the guardian of a debtor-estate, alleging that the guardian manipulated insurance policies to remove the value from the estate and thereby avoid the reach of the estate's creditors. *Id.* at 550. United Bank sought discovery from the defendants' attorney, who advised defendant on the transactions at issue. *Id.* United Bank ultimately filed a motion to compel the discovery under the crime-fraud exception. *Id.* at 550-51. The magistrate judge denied the motion, finding that United Bank did not establish a prima facie case of fraud. *Id.* In so ruling, he distinguished "between transactions that might be invalid under state law and transactions that include conduct of lying or misleading such that they are rendered sufficiently fraudulent to trigger the crime-fraud exception." *Id.* In short, the magistrate judge required evidence of actual fraud.

---

[5]     These amendments conform Pennsylvania's statutory framework to the Uniform Law Commission's model statute, which was updated in 2014.

[6]     As the court in *United Bank* explained, the requirement that a movant demonstrate wrongful intent is in line with the Supreme Court's decision in *Husky International Electronics, Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016), in which the Court interpreted "actual fraud" (as the term is used in § 523(a) of the Bankruptcy Code) to mean fraud committed with "wrongful intent." *United Bank*, 301 F. Supp. 3d at 553-55.

United Bank objected to this ruling, citing various "badges of fraud," including the debtor's insolvency and enormous debt; the close relationship of the transferor and the transferee; the pendency or threat of litigation; and the transfer of the entirety of the debtor's estate. *Id.* at 556. The district court overruled United Bank's objections and sustained the magistrate's reasoning and conclusion. *Id.* at 557. The court explained that, "[a]s it is true that not all fruits are apples, so also is it true that not all conveyances deemed fraudulent by statute trigger the [crime-fraud] exception." *Id.* at 554. The court reasoned that a fraudulent transfer, even if done intentionally, does not suffice to pierce the attorney-client privilege unless the transfer was carried out with "deception, dishonesty, misrepresentation, falsification, or forgery." *Id.* at 554-55. The court found United Bank had not made the requisite prima facie showing of wrongful intent, despite its reliance on various "badges of fraud." *Id.* at 557.

Accordingly, Eddystone understates its burden when it argues (at 16) that "[t]he crime-fraud exception applies not only to criminal cases and common law fraud but also to fraudulent transfers." Eddystone supports this sweeping assertion with citations to three unpublished bankruptcy opinions, all of which fail to support Eddystone's position and are inapplicable here.

First, Eddystone relies on *In re DiLoreto Bankruptcy*, No. 9834641F, 2002 WL 34573858 (Bankr. E.D. Pa. May 3, 2002), but that case *does not actually involve allegations of fraudulent transfer*, and the court ultimately found that the crime-fraud exception *did not apply*. *Id.* at *17. Rather, the bankruptcy court in *DiLoreto* considered whether the debtor's attorney must testify in an adversary proceeding arising from the debtor's intentional failure to schedule assets in a bankruptcy filing—a failure that, if true, was a federal crime. *Id.* at *14.

Similarly, in *Transcontinental Refrigerated Lines, Inc. v. New Prime, Inc.*, No. 1:13-CV-2163, 2014 WL 2471936 (M.D. Pa. June 3, 2014), the plaintiff asserted a number of *common law fraud* and statutory fraud claims arising from transfers intended to defraud creditors in

bankruptcy.  *Id.* at *10.  The decision to apply the crime-fraud exception in *Transcontinental* is consistent with the holding in *United Bank*, because the movant asserted common-law fraud and came forward with evidence that "would permit a reasonable trier of fact to find that [the party asserting the privilege] did commit a fraud."  *Id.* at *12 n.17.  In contrast, Eddystone does not assert common law fraud claims in this action, nor does it contend that Defendants engaged in actual fraud in connection with the transactions it challenges.

Eddystone's reliance on *Galaxy CSI, LLC v. Galaxy Computer Services, Inc.*, No. 1:04-CV-00007-LMB, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004), is similarly unavailing.  This court in *Galaxy* limited its analysis and holding to cases arising "in the bankruptcy context" and claims brought "in a bankruptcy case."  *Id.* at *2.  This is not a bankruptcy case, and Eddystone does not assert any claims subject to the Bankruptcy Code.[7]

The three unpublished opinions upon which Eddystone builds its argument are distinguishable as bankruptcy cases, and all involved actual fraud.  As explained in *United Bank*, Eddystone misses the mark in its Motion to Compel by relying entirely on PUFTA standards, including "badges of fraud."  For the reasons explained below, Eddystone's motion should be denied because Eddystone does not (and cannot) make a prima facie showing of actual fraud.

### 2.        There Is No Evidence Of Actual Fraud.

Eddystone offers no evidence of actual fraud by the BL/FG Defendants.  As stated above, a request to apply the crime-fraud exception "must have some foundation in fact."  *In re Grand Jury Subpoena ABC Co.*, 696 F. App'x at 70-71 (citation and quotations omitted).  Thus, "[a]

---

[7]       Even if the reasoning in *Galaxy CSI* did apply here (and it does not), the court in *Galaxy CSI* found that the defendants engaged in something more than just statutory fraudulent transfers. *Id.* at *2 (explaining that applying crime-fraud exception requires a "*prima facie* showing of crime or fraud" demonstrated by evidence of collusion to conceal transfers, which the Court distinguished from a "mere failure to inform").

general, unsubstantiated allegation is not sufficient to overcome the protection afforded by the attorney-client or work-product privileges," and Eddystone "may not rely on bare assertions in its brief as 'evidence' to apply the crime-fraud exception." *Id.* (citation and quotations omitted).

**May to July 2015.**   There is nothing described in Eddystone's recitation of the facts surrounding the Ferrellgas acquisition of Bridger Logistics (at 3-8) that remotely resembles actual fraud, and there are mundane explanations for all of the supposedly nefarious conduct:

- ERC hints (at 5) that there is some impropriety in the fact that, as part of the June 2015 Ferrellgas acquisition, "Bridger Logistics obtained the contractual right to payment of transportation fees from Monroe."  The creation of separate agreements with Monroe was necessary, however, because Bridger Marketing and Bridger Logistics would no longer be affiliated after the Ferrellgas Acquisition.  Eddystone does not suggest that these separate agreements adversely affected any of the parties, much less defrauded anyone.

- ERC argues (at 6) that to "divert revenue from BTS to other Ferrellgas subsidiaries, Ferrellgas adopted a fictitious new internal accounting structure" and assigned BTS's "rail loading and unloading" contracts to this new "fictitious entity."  ERC also contends (at 7) that this "fictitious" accounting structure was used to "[take] over $███████ in rail throughput revenue that should have gone to BTS."  In truth, as explained above, BTS revenue was not diverted to any other company, nor were any of BTS's contracts assigned elsewhere.  Rather, Ferrellgas and Bridger Logistics modified their internal accounting systems so that the various aspects of BTS's operations—both revenue and associated expenses—would be captured and reported internally in alignment with operational business segments.  The recording of financial activity in the Bridger Rail Services and Bridger Pipeline Services cost centers was solely for internal accounting purposes, had no adverse effect on BTS or its creditors, and was not, in fact, indicative of any cash flowing out of BTS or any other asset transfers.

- ERC argues (at 7) that revenues recorded "in the Bridger Rail Services account were ultimately credited to another Bridger Logistics subsidiary called Bridger Rail Shipping."  This is not true.  Activity in those two accounts—both rail-related—was presented on a consolidated basis for purposes of internal reporting and analysis of the overall rail business segment.  That presentation had no legal or economic effect, and it did not harm BTS or its creditors in any way.

- ERC suggests impropriety (at 7) because "storage fees and other revenues that BTS had earned prior to the acquisition were transferred to Bridger Storage."  There was nothing improper about this.  As explained above, a small amount of storage-related revenue and expenses that were mistakenly recorded on the books of BTS before the acquisition were recorded in Bridger Storage after the acquisition.  That decision was made after Ferrellgas determined that the activity should have been in Bridger Storage all along, not as a result of any effort to disadvantage BTS or its creditors.

- ERC argues (at 7) that upon "acquiring Bridger Logistics, Ferrellgas promptly caused BTS and its affiliates to eliminate all of their intercompany accounts payable and receivable, resulting in a net loss to BTS of $██████." But as explained above, the elimination of intercompany obligations among BTS and its affiliates, after the resolution and payment of amounts owed by and to its former affiliates, was appropriate under GAAP and customary business combination practices and was not an effort to harm or defraud anyone.

**December 2015 to February 2016.**  Nor does Eddystone describe any actual fraud in its one-sided account of the transactions that occurred in late 2015 and early 2016 (at 8-10).  Again, there are mundane explanations for all of the conduct Eddystone describes:

- ERC argues (at 8) that "Ferrellgas concluded that it was convenient for it to stop shipping crude through Eddystone."  As explained above, BTS stopped transshipments of oil through the Eddystone Facility because there was no oil to deliver. ████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████. Likewise, Monroe no longer desired to purchase Bakken crude.

- ERC suggests (at 9) that Ferrellgas utilized counsel to "divest BTS of its remaining assets so that they would not be available to satisfy BTS's obligations to Eddystone under the RSA."  In truth, as explained above, Ferrellgas personnel consulted with counsel about a "restructuring" and the possibility of a BTS bankruptcy, and nearly all of the BTS assets were already pledged as collateral in connection with the Bank of America credit facility.

- ERC asserts (at 9) that Ferrellgas's efforts to comply with its loan obligations and avoid default on its $██████ credit facility was a "false pretense."  ERC is wrong.  As explained above, BTS assets were pledged as collateral for a pre-existing Credit Agreement at the same time that Ferrellgas acquired Bridger Logistics.

  o BTS (like all of the other Bridger companies acquired by Ferrellgas) was required to grant security interests in its assets in favor of Bank of America under an agreement that dated back to 2009, and it signed on as a credit facility guarantor in June 2015.

  o ERC asserts (at 9) that BTS "received no benefit from the loans to Ferrellgas."  But that is far from the point.  As of the end of June 2015, Bank of America should have had a lien on all of the Bridger companies' assets, for which Ferrellgas had paid more than $██████; because of an oversight, the bank had no lien until January 2016.

  o The question facing Ferrellgas, BTS, and their affiliates was whether to grant the security interest that should have been granted months earlier or default under the credit facility.  There was no "false pretense" to defraud BTS.

- Contrary to ERC's argument (at 9-10), there was no impropriety in the transfers of BTS's terminal facilities and associated assets to Bridger Terminals and Bridger Swan Ranch.

38

- o   The transfers of these assets did not harm ERC, practically or legally.  Because of the bank's liens, Eddystone had no ability to collect from these assets, and PUFTA provides expressly that the transfer of an encumbered asset is not "fraudulent."

- o   The real estate underlying the Swan Ranch terminal, while unencumbered, had no intrinsic value.  Swan Ranch produced income from the tangible personal property located on the land, which was encumbered by the bank's lien.

- o   The "guaranteed future payments" cited by ERC were also encumbered by the bank's security interest in accounts receivable and general intangibles.

- ERC also suggests (at 10) impropriety because the BL/FG Defendants purportedly "gave [ERC] no notice" about the January 2016 transactions involving BTS.  As explained in the next section, the BL/FG Defendants had no obligation of any kind to give notice.

In short, Eddystone has not demonstrated that any fraud occurred.

### 3.   The Alleged "Badges of Fraud" Do Not Show Actual Fraud.

Eddystone's alleged "badges of fraud" (at 18) are insufficient to carry its heavy burden to invade the sanctity of the attorney-client privilege under the crime-fraud exception.[8]

Eddystone relies on *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. 09-2751, 2011 WL 6088611 (E.D. Pa. Dec. 7, 2011), to argue that the "badges of fraud" listed in PUFTA, 12 Pa. C. S. § 5104, can be used to "determine whether the transfer was made with actual intent to defraud."  *Id.* at *1-2, 7.  There is no discussion of the crime-fraud exception in that opinion.  Rather, this Court made passing mention of the PUFTA factors in granting an unopposed motion for summary judgment voiding transfers made by a former employee, who embezzled money from the plaintiff through unauthorized transfers to his personal account (held jointly with his wife), used the money to make lavish purchases, and then pled guilty to theft and agreed to pay restitution.  *Id.* at *7.  *Clinton Plumbing* hardly supports a conclusion that the

---

[8]     The term "badges of fraud" is a misnomer.  PUFTA provides that a court may consider certain factors in "determining actual intent under subsection (a)(1)"—*i.e.*, "actual intent to hinder, delay or defraud any creditor."  12 Pa. C.S. § 5104(a)(1).  In other words, the statutory badges may indicate that a transfer is voidable, but they do not show that it is voidable *because of fraudulent intent* in particular.

presence of PUFTA "badges of fraud" suffices to make the type of showing required to pierce the attorney-client privilege under the crime-fraud exception.

As explained above, the BL/FG Defendants did not make any transfers to defraud Eddystone. The closest Eddystone comes to asserting actual fraud is its contention (at 21) that "Defendants actively concealed these transfers from BTS's principal creditor, Eddystone." But Eddystone's argument does not come close to showing fraud, for at least two reasons.

**First**, Eddystone offers no evidence that Defendants made any effort to conceal anything. As to the period from May 2015 through July 2015, Eddystone argues (at 21) that "[t]he June 2015 shifting of revenue from BTS to a fake accounting entity . . . was designed precisely to hide income from BTS's creditors." As explained above, however, the "fake accounting entity" to which Eddystone refers did not result in any "shifting" of revenue away from BTS. Rather, some of BTS's income—along with the related expenses—was recorded in a manner that permitted management to better understand segments of the Bridger companies' adjacent businesses. But the income and expenses remained BTS's all along. Eddystone does not even *suggest* that it or any other creditor received a financial statement that included less than all of BTS's assets, liabilities, income, or expenses.

As to the later period, Eddystone makes a conclusory assertion (at 21) that "the Defendants also carefully concealed the early 2016 asset transfers from Eddystone as well – never telling BTS's largest creditor that they were stripping all of BTS's assets." Eddystone offers no supporting evidence, and "assertions in its brief fail to provide an adequate factual basis to apply the crime-fraud exception." *In re Grand Jury Subpoena ABC Co.*, 696 F. App'x at 71.

**Second**, the BL/FG Defendants had no contractual or common-law obligation to inform Eddystone of their actions during either period. Without a duty to disclose, a failure to inform does not constitute fraud. *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 787 (E.D. Pa.

40

12240071

2008) (dismissing fraud claim because, under Pennsylvania law, "silence in the absence of a duty to speak cannot suffice" to prove fraud) (citation and quotations omitted); *Protica, Inc. v. iSatori Techs., LLC*, No. 2011-cv-01105, 2012 WL 1071223 at *5 (E.D. Pa. Mar. 20, 2012) (dismissing fraud claim based on failure to disclose because, to constitute actionable fraud, "the party charged must have a duty to speak or disclose," and "a 'normal business relationship between sophisticated commercial entities . . . does not form the basis" of a special relationship necessary to establish a duty to disclose) (citation and quotations omitted) (ellipses in original).

Moreover, in the course of negotiations over the RSA, Eddystone could have attempted to negotiate an obligation on the contracting party to keep Eddystone apprised of future restructuring efforts.  But Eddystone failed to do so.  *See, e.g.*, *Armstrong World Indus., Inc. v. Robert Levin Carpet Co.*, No. 98-CV-5884, 1999 WL 387329, at *5-6 (E.D. Pa. May 20, 1999) (dismissing fraud claim based on allegations that a party failed to disclose its plans to terminate distributorship rights because if the moving party's "understanding that it would be a[] distributor for the foreseeable future was a material factor in . . . [its decisions] . . . it should have insisted that this understanding be set forth in the parties' integrated distribution agreements").

**B.   Eddystone Has Not Shown A Reasonable Basis To Find That Attorneys Participated In Any Fraud.**

Even if it could show a reasonable basis to find actual fraud (and it cannot), ERC has altogether failed to carry its burden to show that attorneys furthered a fraud.  As stated above, "evidence of a crime or fraud, no matter how compelling, does not by itself satisfy both elements of the crime-fraud exception . . . because to establish the second element of the exception the party seeking to circumvent the privilege . . . bears the burden of making a prima facie showing that there were communications between the client and attorney *in furtherance of that fraud*."  *In re Chevron*, 633 F.3d at 166-67 (emphasis added).  This requirement is "a key safeguard against

41

intrusion into the attorney-client relationship." *In re Grand Jury Matter # 3*, 847 F.3d at 165.

Thus, Eddystone must establish a reasonable basis to find that "communications from the *lawyer* to the client" were conveyed "by the *lawyer* for the purpose of giving advice for the commission of a fraud or crime." *Haines*, 975 F.2d at 90. The "seal is broken" only "when the lawyer's communication is meant to facilitate future wrongdoing by the client," *i.e.*, giving "advice that is illicit because it gives direction for the commission of future fraud or crime." *Id.*

**May to July 2015.** Eddystone has failed to carry its burden to show attorney participation in any fraud for the period of time surrounding the acquisition of Bridger Logistics. Eddystone argues (at 23) that "in-house counsel at Bridger Logistics" provided "extensive legal advice" in connection with the supposedly "fake new legal structure" that "existed only on Ferrellgas' accounting books to hide income from BTS's creditors." As explained above, however, the new accounting treatment of BTS's operations did not adversely affect BTS or its creditors. Eddystone makes no effort at all to show that counsel had any involvement in the decision to apply accounting principles to eliminate certain intercompany receivables.

**December 2015 to February 2016.** Eddystone also fails to carry its burden with respect to the later period. Eddystone argues (at 24) that "Ferrellgas used outside counsel to draft BTS's two Assignment and Assumption Agreements with Bridger Swan Ranch and Bridger Terminals" as part of an effort to restructure the company. As explained above, however, these transfers were necessary to avoid defaulting under Ferrellgas's loan covenants, which gave Ferrellgas's bank a security interest in the assets of Ferrellgas subsidiaries, and prohibited Ferrellgas subsidiaries from transferring property to third parties (except under certain conditions and with the bank's written consent). Even if ERC were correct, the only emails that might be disclosed are those sent by outside counsel in connection with such agreements. *Haines*, 975 F.2d at 90 (crime-fraud exception applies only to "communications from the *lawyer* to the client" conveyed

"by the *lawyer* for the purpose of giving advice for the commission of a fraud or crime").

The BL/FG Defendants have produced a revised version of their privilege log that contains detailed descriptions of the subjects of all communications during the periods from May to July 2015 and December 2015 to February 2016. (Ex. 53, Oct. 24, 2018 Email from J. Kramer and enclosed privilege log.) As shown in the privilege log, there are relatively few communications that fall into the categories described in Eddystone's motion. Even if Eddystone had carried its burden to establish the applicability of the crime-fraud exception (and it has not), these are the only communications that might be disclosed.

## II.     THERE IS NO BASIS FOR *IN CAMERA* REVIEW.

For all of the reasons stated above, Eddystone also has not satisfied the standard to justify *in camera* review of Defendants' privileged communications, because it has not come forward with a "factual basis" sufficient to "support a good faith belief by a reasonable person that the materials may reveal evidence of a crime or fraud." *Haines*, 975 F.2d at 96.

Again, there are mundane explanations for the conduct Eddystone portrays as nefarious, Eddystone's Motion contains no evidence of actual fraud, and its unsubstantiated allegations of fraud do not suffice. *WebXchange Inc. v. Dell Inc.*, 264 F.R.D. 123, 129 (D. Del. 2010) (declining to order *in camera* review or apply the crime-fraud exception because the moving party's "arguments amount to little more than a restatement of their inequitable conduct allegations, which are insufficient for a prima facie showing of fraud"); *In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Secs. Litig.*, 848 F. Supp. 527, 566 (D. Del. 1994) (finding the crime-fraud exception inapplicable and *in camera* review unnecessary; movant "*alleged* sufficient facts to warrant the application of the crime-fraud exception," but "mere allegations are not sufficient" without the requisite factual basis).

In addition, Eddystone fails to justify the scope of the *in camera* review it requests. As

stated above, Eddystone has identified only two narrow categories of attorney communications that it claims were in furtherance of a fraud:  (1) communications from Bridger's in-house counsel regarding Bridger Rail Services and Bridger Pipeline Services during the period from May to June 2015; and (2) communications from outside counsel concerning the Assignment and Assumption Agreements with Bridger Swan Ranch and Bridger Terminals in January 2016.

As a result, Eddystone states no basis at all to justify its sweeping request (at 25) for *in camera* review of all communications that "relate to the restructuring of BTS, the transferring or redirecting of its assets or revenue streams, the sale of BTS to Jamex, and the cessation of the Monroe shipping arrangement."  At most, any *in camera* review should be limited to the two discrete categories of emails that Eddystone contends were made in furtherance of fraud.  Such emails comprise only a small fraction of the approximately 14,500 emails listed in the BL/FG Defendants' privilege log during the relevant periods.

If the Court were inclined to embark on an *in camera* review of voluminous emails, however, the BL/FG Defendants respectfully suggest that it appoint a special master to handle the task and make recommendations concerning the application of the crime-fraud exception, pursuant to Fed. R. Civ. P. 53(a)(1)(C).  "Although discovery disputes usually should not require the supervision of a master, the appointment of a master may be necessary at times to resolve protracted disagreements between counsel and to alleviate the burdens on the district judge."  9C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2602.1 (3d ed. 2018).

As this Court has observed, Special Master "[r]eferrals sometimes have been found to be useful in handling certain discovery problems (for example, claims of privilege and protective orders)."  *In re Sunrise Sec. Litig.*, 124 F.R.D. 99, 100 (E.D. Pa. 1989) (quoting Manual for Complex Litigation, Second, § 20.14).  *See also* Order Appointing Special Master, *United States, ex. rel. Gohil v. Sanofi U.S. Servs., Inc.*, No. 2:02-cv-02964-AB (E.D. Pa. filed Oct. 23, 2018)

12240071

(Dkt. 274); *Jarzyna v. Home Props., LP*, 114 F. Supp. 3d 243, 251 (E.D. Pa. 2015) (appointing special master "[i]n light of myriad discovery disputes among the parties").

## III.  ANY ORDER APPLYING THE CRIME-FRAUD EXCEPTION SHOULD BE SUBJECT TO APPELLATE REVIEW.

If the Court grants Eddystone's motion and orders disclosure of privileged communications under the crime-fraud exception, with or without *in camera* review, the BL/FG Defendants respectfully ask that they be afforded an opportunity to seek relief from the United States Court of Appeals for the Third Circuit prior to any disclosure.  *See, e.g.*, *Haines*, 975 F.3d at 89-91 (granting writ of mandamus and reversing order to disclose privileged communications under the crime-fraud exception); *In re Grand Jury Matter #3*, 847 F.3d at 162-67 (allowing interlocutory appeal and reversing order applying crime-fraud exception).  "Because of the sensitivity surrounding the attorney-client privilege, care must be taken that, following any determination that an exception applies, the matters covered by the exception be kept under seal or appropriate court-imposed privacy procedures until all avenues of appeal are exhausted." *Haines*, 975 F.3d at 97.

## IV.  THE BL/FG DEFENDANTS HAVE NOT WAIVED PRIVILEGE.

Finally, there is no merit to Eddystone's argument (at 26-28) that the BL/FG Defendants' privilege log is "utterly inadequate," let alone Eddystone's contention that the level of detail in the BL/FG Defendants' privilege log is so deficient as to justify a "waiver" of the privilege.  To the contrary, the BL/FG Defendants' privilege log "describe[s] the nature of the documents, communications, or tangible things not produce do disclosed" in a manner that "will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A)(ii).

At the outset, it is again important to provide some context.  Eddystone complains (at 11) that Ferrellgas produced 1.75 million pages of documents on August 13, the court-imposed

deadline for document productions.  The parties in this case used agreed search terms to identify responsive materials from among a vast universe of emails and other electronic documents.  The parties further agreed that any documents that contained such search terms would be deemed responsive and produced, except for documents that all parties would deem to be irrelevant (*e.g.*, "spam" emails).  Eddystone's search terms returned an enormous volume of documents, and the BL/FG Defendants reviewed and produced more than two million pages of documents during a relatively short period of time prior to the August 13 deadline.

Eddystone also complains (at 12) that Ferrellgas "did not produce its privilege log until September 21, more than five weeks after the document production deadline."  In the first instance, there is nothing in the Court's scheduling order (Dkt. 157) requiring that privilege logs be served by August 13.  Indeed, Eddystone served its own privilege log *after* August 13.  (Ex. 54, Aug. 23, 2018 Email from A. Sloniewsky.)

Moreover, as a result of the extraordinary volume of documents they reviewed and produced pursuant to the parties' agreements, the BL/FG Defendants' privilege log contains approximately 65,000 entries.  It was no small task to prepare, and it could not be prepared until *after* the BL/FG Defendants had reviewed documents for production on August 13.[9]

After the BL/FG Defendants served their privilege log on September 21, Eddystone waited two weeks to meet and confer about any purported deficiencies.  During the October 5 meet and confer call, Eddystone asked for a new version of the log that contained document numbers identifying each entry, and it also took issue with the sufficiency of subject-matter

---

[9]      As the BL/FG Defendants were preparing their privilege log, they identified some documents that were not privileged and promptly produced them (and made Eddystone aware that this was the reason for some additional productions after August 13).  Eddystone complains about such productions as well (at 11), but it fails to note that it also produced a substantial number of documents after the August 13 deadline, including productions on September 25, October 15, October 19, and October 24.

descriptions in the privilege log.  Counsel for the BL/FG Defendants agreed to provide an updated privilege log with document identifiers (which they served on October 11) and explained that their log already (1) identified the date, sender, recipients, subject line, and privilege asserted as to all 65,000 entries, (2) identified all attorneys listed as senders or recipients of communications on the log (using an asterisk), and (3) contained detailed descriptions of the subject of any email that was not sent or received by an attorney.

Such information should suffice under the circumstances.  *See* The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 81 (2018) ("Traditionally, parties have complied with [Rule 26(b)(5)(B)] by producing a privilege log with separate entries for each document, containing objective information about the document (such as author, addressee, and Bates number) as well as a field that describes the basis for the privilege claim. Even if there are relatively few privileged documents, preparing and reviewing a privilege log can be extremely time-consuming.  Often, the privilege log is of marginal utility.  The immense volume of ESI now subject to discovery exacerbates the problem.").

Nevertheless, counsel for the BL/FG Defendants asked Eddystone to identify the entries that it deemed to be insufficient so that the BL/FG Defendants could assess and respond. Eddystone made no further effort to confer before filing its Motion a week later on October 12, ignoring the requirements of Fed. R. Civ. P. 37(a)(1) and Local Rule 26.1(f).[10]

---

[10]    Rule 37(a) requires that a party moving to compel discovery submit to the Court "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1).  Local Rule 26.1(f) states that "[n]o motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute."  E.D. Pa. R. 26.1(f).

In the Motion, Eddystone challenges (at 11-14) the sufficiency of privilege log entries for unspecified "hundreds or thousands of documents with dates in the relevant time period" and argues (at 26-28) that "[t]here is no longer time for Ferrellgas to submit yet another revised and adequate privilege log."  Upon receiving Eddystone's Motion, however, the BL/FG Defendants undertook a herculean task to review and revise approximately 14,500 privilege log entries for communications during the "relevant time period" from May to July 2015 and December 2015 to February 2016.  The BL/FG Defendants served the revised log 11 days later on October 23.[11]

Accordingly, there should be no further issue related to the sufficiency of privilege log descriptions for the communications at issue in Eddystone's Motion to Compel.  The new descriptions are more than sufficient, and the Court need not entertain Eddystone's argument that the BL/FG Defendants "waived" the privilege through their initial privilege log.

If the Court is inclined to consider this argument, however, the authorities cited in ERC's brief (at 28) do not begin to support a finding of waiver as to the many thousands of documents listed on the BL/FG Defendants' privilege log.  *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 914 F. Supp. 1172, 1173, 1178-79 (E.D. Pa. 1996) (*declining to find waiver* of attorney-client privilege even after non-movant disobeyed "three court orders" compelling discovery and "fail[ed] to provide a privilege log"); *McGrath v. Cosco, Inc.*, No. 98-CV-1502, 1999 WL 269920, at *1-2 (E.D. Pa. Apr. 21, 1999) (overruling privilege objection to *interrogatory* and ordering non-movant to respond because it "neither made its claim of privilege expressly nor described the nature of the withheld information"); *Schaeffer v. Tracey*, No. 2:15-CV-08836-MCA-SCM, 2017 WL 465913, at *3-4 (D.N.J. Feb. 2, 2017) (overruling objections to disclosure based on *law enforcement privilege*, which was not properly supported in privilege

---

[11]     Despite arguing that "[t]here is no longer time for Ferrellgas to submit yet another revised and adequate privilege log[,]" Eddystone served a revised privilege log on October 26, 2018.

log and also found to be inapplicable on the merits); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 670-72 (D. Kan. 2005) (*declining to find waiver* of attorney-client privilege and ordering production of a relatively small number of emails only after ordering non-movant to submit a privilege log and then conducting an *in camera* review).[12]

Moreover, waiver is unavailable in these circumstances. "[W]aiver of a privilege is a serious sanction most suitable for cases of unjustified delay, inexcusable conduct, and bad faith." *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 902 F. Supp. 1356, 1361 (D. Kan. 1995) (reversing magistrate's ruling ordering production of privileged documents) *rev'd on other grounds*, 101 F.3d 645 (10th Cir. 1996). Without a showing that the non-movant failed to comply with Rule 26(b)(5) in *bad faith*, "automatically finding a waiver of the privilege would be unduly harsh." *Id.* at 1362 (quoting 8 Federal Practice & Procedure § 2016.1). "Minor procedural violations, good faith attempts at compliance and other such mitigating circumstances bear against finding waiver." *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 586 F. Supp. 2d 1250, 1266 (D. Kan. 2008) (finding no waiver).

Here, the BL/FG Defendants produced a detailed privilege log with 65,000 entries, (1) identifying the date, sender, recipients, and subject line for each entry, (2) identifying attorneys who participated in communications listed in the log, and (3) providing detailed descriptions of any entries not sent or received by counsel. Eddystone complained that the subject-matter descriptions were insufficient on October 5, and the undersigned asked for more specificity.

---

[12]    *See also CSX Transp., Inc. v. Admiral Ins. Co.*, No. 93-132-CIV-J-10, 1995 WL 855421, at *1-5 (M.D. Fla. July 20, 1995) (finding subject-matter descriptions in supplemental privilege log insufficient and giving non-movant an opportunity to revise such descriptions in lieu of a "draconian" finding of waiver); *United States Fire Ins. Co. v. Bunge N. A., Inc.*, No. 05-CV-2192-JWL-DJW, 2008 WL 2548129, at *1-8 (D. Kan. June 23, 2008) (finding that movant satisfied obligation to meet and confer under Fed. R. Civ. P. 37(a)(1) and local rules, ordering production of four pages, and giving non-movant an opportunity to supplement descriptions of other documents).

Rather than respond, Eddystone identified its concerns with more particularity in a Motion to Compel filed a week later, prompting the BL/FG Defendants to undertake an enormous and costly effort to provide more detailed descriptions for approximately 14,500 entries on the log and to serve a revised log just 11 days later.  Bottom line, there is no basis to find waiver under the circumstances, and Eddystone is not entitled to the remedy it seeks.

## CONCLUSION

For all the foregoing reasons, this Court should deny Plaintiff Eddystone Rail Company's Motion to Compel Production of Withheld Documents Under the Crime-Fraud Exception.

Dated:  November 7, 2018

Respectfully submitted,

By: /s/   *Lawrence G. Scarborough*
Lawrence G. Scarborough (Admitted *Pro Hac Vice*)

Richard L. Scheff (I.D. No. 35213)
Michael C. Witsch (I.D. No. 313884)
ARMSTRONG TEASDALE, LLP
1500 Market Street
12th Floor, East Tower
Philadelphia, PA 19102
Telephone:  (215) 246-3469
Facsimile:  (215) 569-8228
rlscheff@armstrongteasdale.com
mwitsch@armstrongteasdale.com

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
Bieta Andemariam (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 541-2000
Facsimile:  (212) 541-4630
lgscarborough@bclplaw.com
bieta.andemariam@bclplaw.com

50

Jacob A.  Kramer (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW
Washington, D.C. 20004
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200
jake.kramer@bclplaw.com
rachel.beck@bclplaw.com

Brian C. Walsh (Admitted *Pro Hac Vice*)
Alicia Ragsdale Olszeski (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
211 North Broadway, Suite 3600
St.  Louis, Missouri 63102
Telephone:  (314) 259-2000
Facsimile:  (314) 259-2020
brian.walsh@bclplaw.com
ali.olszeski@bclplaw.com

Sarah L. Hartley (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
sarah.hartley@bclplaw.com

*Attorney for Bridger Logistics, LLC, Ferrellgas
Partners, L.P., Ferrellgas L.P., Bridger Rail
Shipping, LLC, Bridger Real Property, LLC,
Bridger Storage, LLC, Bridger Swan Ranch, LLC,
Bridger Terminals, LLC, Bridger Transportation,
LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC,
Bridger Admin Services II LLC, Bridger Energy,
LLC, Bridger Lake, LLC, Bridger Leasing, LLC,
Bridger Marine, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Witsch, hereby certify that on November 7, 2018, a true and correct copy of the foregoing *BL/FG Defendants' Opposition to Plaintiff Eddystone Rail Company's Motion to Compel Production of Withheld Documents Under the Crime-Fraud Exception* was filed electronically via the Court's ECF filing system. This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

 /s/ *Michael Witsch*                     
Michael Witsch

12240071