# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : |
|       Plaintiff/Counter-defendant, | : |
| | : |
|  v. | :   No. 2:17-cv-00495-RK |
| | : |
| BRIDGER LOGISTICS, LLC, *et al.*, | : |
|       Defendants, | : |
| | : |
| BRIDGER LOGISTICS, LLC, *et al.*, | : |
|       Defendants/Counterclaimants. | : |

**DECLARATION OF ALICIA RAGSDALE OLSZESKI IN SUPPORT OF**
**BL/FG DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS**
**UNDER THE CRIME-FRAUD EXCEPTION**

    I, Alicia Ragsdale Olszeski, pursuant to 28 U.S.C. § 1746, hereby state and declare as follows:

    1.     I am an attorney at the law firm of Bryan Cave Leighton Paisner LLP, counsel of record for Bridger Logistics, LLC, Ferrellgas Partners, L.P., Ferrellgas L.P., Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC, Bridger Administrative Services II, LLC, Bridger Energy, LLC, Bridger Lake, LLC, Bridger Leasing, LLC and Bridger Marine, LLC in the above-captioned action.

    2.     I am over the age of 18 and competent to testify as to the matters set forth herein.

    3.     Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of an email from E. Johnson to G. Heisler, with attached press release, dated November 26, 2012.

    4.     Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of an email from K. Wilkins to S. Wuori, dated May 15, 2012.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the Witness Statement of James H. Ballengee, dated December 23, 2016.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the Beaver Lodge Lease, dated September 2, 2011.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the Truck Station Lease Agreement for Trenton Station, dated November 2, 2011.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the Berthold Rail Agreement, dated May 5, 2012.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the Berthold Rail Phase I Loading Agreement, dated July 2012.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of an email from K. Wilkins to J. Rios, *et al.*, dated February 3, 2013.

11.      Attached hereto as **Exhibit 9** is a true and correct copy of the Eddystone Rail Facilities Services Agreement, dated March 8, 2013.

12.      Attached hereto as **Exhibit 10** is a true and correct copy of the Witness Statement of Giuseppe "Joe" Natale, dated December 23, 2016.

13.      Attached hereto as **Exhibit 11** is a true and correct copy of the Witness Statement of Dion Nicely, dated December 23, 2016.

14.      Attached hereto as **Exhibit 12** is a true and correct copy of an email from S. Turnbull to B. Shamla, *et al.*, dated September 18, 2013.

15.      Attached hereto as **Exhibit 13** is a true and correct copy of an email from T. Hess to J. Mazzarella, *et al.*, dated December 12, 2013.

16.      Attached hereto as **Exhibit 14** is a true and correct copy of an email from T. Hess to G. Blaszkowski, *et al.*, dated December 20, 2013.

17.     Attached hereto as **<u>Exhibit 15</u>** is a true and correct copy of an email from R. Downs to T. Hess, *et al.*, dated January 28, 2014.

18.     Attached hereto as **<u>Exhibit 16</u>** is a true and correct copy of an email from K. Wilkins to S. Turnbull, dated September 17, 2013.

19.     Attached hereto as **<u>Exhibit 17</u>** is a true and correct copy of an email from S. Turnbull to B. Shamla, *et al.*, dated September 25, 2013.

20.     Attached hereto as **<u>Exhibit 18</u>** is a true and correct copy of the Witness Statement of Vispi N. Jilla, dated December 23, 2016.

21.     Attached hereto as **<u>Exhibit 19</u>** is a true and correct copy of an email from J. Rios to B. Boaz, *et al.*, dated June 30, 2015.

22.     Attached hereto as **<u>Exhibit 20</u>** is a true and correct copy of the Acknowledgment among Eddystone Rail Company, LLC, Bridger Transfer Services, LLC, and Merrill Lynch Commodities, Inc., dated June 18, 2014.

23.     Attached hereto as **<u>Exhibit 21</u>** is a true and correct copy of an email from V. Paradis to B. Brown, *et al.*, with attachment, dated September 3, 2015.

24.     Attached hereto as **<u>Exhibit 22</u>** is a true and correct copy of the Ferrellgas 2015 Annual Meeting Presentation.

25.     Attached hereto as **<u>Exhibit 23</u>** is a true and correct copy of an excerpt of the June 2015 Bridger Management Report.

26.     Attached hereto as **<u>Exhibit 24</u>** is a true and correct copy of the Grant Thornton Financial, Tax and Human Resource Due Diligence Report related to Ferrellgas Partners, L.P.'s proposed acquisition of Bridger Logistics, LLC, also known as the Quality of Earnings Analysis, dated May 21, 2015.

27.     Attached hereto as **Exhibit 25** is a true and correct copy of an excerpt of the September 2015 Bridger Management Report.

28.     Attached hereto as **Exhibit 26** is a true and correct copy of the Amendment and Supplement to the Purchase and Sale Agreement, dated June 24, 2015.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of an email from T. Soiefer to V. Jilla, *et al.*, dated November 12, 2015.

30.     Attached hereto as **Exhibit 28** is a true and correct copy of an email from B. Boaz to P. Knapp, dated November 23, 2015.

31.     Attached hereto as **Exhibit 29** is a true and correct copy of an email from T. Soiefer to V. Paradis, *et al.*, dated October 13, 2015.

32.     Attached hereto as **Exhibit 30** is a true and correct copy of an Enbridge Board of Directors Notice, dated September 8, 2015.

33.     Attached hereto as **Exhibit 31** is a true and correct copy of an Enbridge Board of Directors Notice, dated September 9, 2015.

34.     Attached hereto as **Exhibit 32** is a true and correct copy of the Amendment to the Crude Oil Supply Agreement, also known as the COSA Side Letter Agreement, dated January 13, 2016.

35.     Attached hereto as **Exhibit 33** is a true and correct copy of the Certain Arrangements Agreement, dated January 13, 2016.

36.     Attached hereto as **Exhibit 34** is a true and correct copy of the Amendment to the Transportation and Logistics Services Agreement, dated January 13, 2016.

37.     Attached hereto as **Exhibit 35** is a true and correct copy of the Purchase and Sale Agreement between Bridger Logistics, LLC and Jamex Transfer Holdings, LLC, dated February 22, 2016.

4

38.     Attached hereto as **Exhibit 36** is a true and correct copy of an email from J. Ballengee to J. Galloway, *et al.*, with attachment, dated February 25, 2016.

39.     Attached hereto as **Exhibit 37** is a true and correct copy of a Jarrett Renshaw and Devika Krishna Kumar article, *Philadelphia-Area Crude Rail Terminal Reawakened by Discounted Crude*, dated September 25, 2018, available at https://www.reuters.com/article/us-usa-crude-rail/philadelphia-area-crude-rail-terminal-reawakened-by-discounted-crude-idUSKCN1M50GF.[1]

40.     Attached hereto as **Exhibit 39** is a true and correct copy of the J. Ballengee Non-Competition Agreement, dated May 29, 2015.

41.     Attached hereto as **Exhibit 40** is a true and correct copy of Amendment No. 2 to Credit Agreement, dated October 21, 2013.

42.     Attached hereto as **Exhibit 41** is a true and correct copy of the Security Agreement, dated November 2, 2009.

43.     Attached hereto as **Exhibit 42** is a true and correct copy of the Credit Agreement, dated November 2, 2009.

44.     Attached hereto as **Exhibit 43** is a true and correct copy of Amendment No. 3 to Credit Agreement, dated June 6, 2014.

45.     Attached hereto as **Exhibit 44** is a true and correct copy of the Guaranty Supplement, dated June 24, 2015.

46.     Attached hereto as **Exhibit 45** is a true and correct copy of a letter from A. Heitmann to P. Baker, dated June 24, 2015.

47.     Attached hereto as **Exhibit 46** is a true and correct copy of the Guaranty Supplement, dated January 14, 2016.

---

[1]     **Exhibit 38** has been intentionally omitted.

5

48.     Attached hereto as **Exhibit 47** is a true and correct copy of the Guaranty Accession Agreement, dated January 24, 2016.

49.     Attached hereto as **Exhibit 48** is a true and correct copy of UCC Lien Report, dated June 12, 2018.

50.     Attached hereto as **Exhibit 49** is a true and correct copy of an email from M. Keith to H. Tomte, dated May 4, 2017.

51.     Attached hereto as **Exhibit 50** is a true and correct copy of an email from V. Paradis to P. Schuldhaus, dated April 13, 2017.

52.     Attached hereto as **Exhibit 51** is a true and correct copy of the Redemption and Asset Transfer Agreement, dated October 19, 2017.

53.     Attached hereto as **Exhibit 52** is a true and correct copy of an email from G. Jones to M. Keith, *et al.*, dated December 27, 2017.

54.     Attached hereto as **Exhibit 53** is a true and correct copy of an email from J. Kramer to J. Theodore, *et al.*, with attached privilege log, dated October 24, 2018.

55.     Attached hereto as **Exhibit 54** is a true and correct copy of an email from A. Sloniewski to J. Kramer, *et al.*, dated August 23, 2018.

56.     Attached hereto as **Exhibit 55** is a true and correct copy of an email from T. Hampton to G. Adams, dated November 6, 2015.

57.     Attached hereto as **Exhibit 56** is a true and correct copy of an excerpt from the United States Securities and Exchange Commission Form 8-K filed by Ferrellgas Partners, L.P. on or around November 4, 2009, available at http://www.ferrellgas.com/our-company/investor-information/sec-filings/.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2018, in St. Louis, Missouri.

*/s/ Alicia Ragsdale Olszeski*
Alicia Ragsdale Olszeski

# EXHIBITS 1-3, 5 – 36, 39 – 52, 55 FILED UNDER SEAL

# EXHIBIT 4

*E/N/R ORIGINAL*

# TRUCK STATION LEASE AGREEMENT

# BEAVER LODGE STATION

THIS TRUCK STATION LEASE AGREEMENT ("LEASE AGREEMENT"), made effective this 1st day of September 2011 (the "EFFECTIVE DATE") by and between ENBRIDGE PIPELINES (NORTH DAKOTA) LLC, a Delaware limited liability company with offices at 2505 16th Street SW, Minot, North Dakota 58701 (hereinafter referred to as "Lessor") and BRIDGER TRANSFER SERVICES LLC, a Louisiana limited liability corporation with offices at 800 Spring Street, Suite 205, Shreveport, Louisiana, 71101 (hereinafter referred to as "Lessee").

## WITNESSETH THAT:

WHEREAS, Lessor owns land located in the County of Mountrail, State of North Dakota, and more particularly described as the plot of land containing approximately one (1.0) acre and designated as Lot 12 on the plot plan attached hereto as Exhibit A and incorporated herein by reference (the "Leased Premises"), which Leased Premises is included in the lease lots established on lands owned by Lessor as indicated on Exhibit A (Lessor's land, inclusive of all lease lots, hereinafter referred to as the "Property"); and

WHEREAS, Lessee desires to use the Leased Premises to construct, maintain, operate, protect, repair and replace storage tanks, piping and other facilities on the Leased Premises for the receipt of crude oil by truck and to temporarily store same prior to delivery to Lessor for transportation on Lessor's pipeline transportation system.

NOW, THEREFORE, in consideration of the mutual promises herein the Parties hereto agree as follows:

1.   LEASED PREMISES

1.1    Lessor hereby leases to Lessee and Lessee leases from Lessor the Leased Premises on the terms and conditions contained in this Lease Agreement.

1.2    Lessee is leasing the Leased Premises as is, where is and with all faults.

2.   PURPOSE

2.1    The Leased Premises shall be used solely for the following purposes:

(a)    To construct, maintain, operate, protect, repair and replace in-kind crude oil storage tanks, pipes, dikes and appurtenances necessary for receiving and storing crude oil that is subsequently delivered by pipeline to Lessor for further transportation on Lessor's pipeline transportation system; and

(b)    Such additional facilities and modifications as are necessary to utilize the Leased Premises for crude oil unloading with only temporary parking (less than 48 hours) for automobiles and trucks.

2.2    All personal property, materials, structures and fixtures placed by Lessee on the Leased Premises (hereinafter collectively referred to as the "Facilities") shall be

1

BLFG_EDPA1848500

compatible with the piping, tanks, structures and equipment owned and operated by Lessor on the Property and/or lands adjacent to the Leased Premises in order that crude oil stored in Lessee's Facilities can be readily transferred to Lessor's pipeline transportation system.

2.3    Lessee shall consult in advance with Lessor before placing or erecting any property or structure on the Leased Premises.  All Facilities installed by Lessee shall be in accordance with the Truck Station Lease Automatic Custody Transfer Unit (LACT) Specifications referenced in Exhibit B attached hereto, incorporated herein by reference and as may be amended for time to time. Prior to construction, Lessee shall obtain Lessor's written approval to construct Lessee's Facilities and Lessor's approval of the constructed Facilities shall be required prior to commencing operation.  Lessee shall also be required to provide Lessor with as-built drawings and other technical and/or operational information as required by Lessor to provide Lessor's approval of the constructed facilities and compatibility for use in the operation of Lessor's pipeline transportation system.

3.    MAINTENANCE AND IMPROVEMENT OF ROADWAYS AND FACILITIES

3.1    Lessor shall, at Lessor's expense, maintain all access roads on the Property that provide access to the Leased Premises so that the roadways are suitable for use by the vehicles used by Lessee in accordance with this Lease Agreement; it being understood and agreed that said access roadways will also be used by Lessor and others to whom Lessor grants access rights to the Property.  Lessor reserves the right of ingress and egress on the access road through the Leased Premises.

3.2    Lessee shall, at its sole risk and expense, maintain its Facilities in good condition and free from crude oil release, debris or any other condition that creates a hazardous or nuisance condition on the Property or is a violation of any applicable regulation or law. Lessee further agrees to immediately and completely mitigate any crude oil release or violations of applicable regulations or laws, and to comply with Lessor's reasonable requirements in this regard.  Lessee shall assume full responsibility for maintaining the environmental integrity of the Leased Premises during the Term of this Lease Agreement.

3.3    Lessee further agrees that in the event that Lessor determines that major maintenance or non-routine capital improvements are required to ensure that roadways on the Property are suitable for use by Lessee or others, or to increase the capacity or the efficiency of the Property that will benefit Lessor, either directly or indirectly, Lessee shall pay its proportionate share of said major maintenance and/or non-routine capital improvements to Lessor.  Lessee waives any and all claims to any property ownership rights that may be construed by payment of its share of said improvements and Lessor agrees to pay all property taxes that may result from the same.  Lessor shall give Lessee reasonable notice and detail regarding the major maintenance and/or non-routine capital improvements along with an estimate of Lessee's proportionate share of the costs, and Lessee shall have the opportunity to meet and confer with Lessor for the purpose of resolving any differences they may have regarding the nature of the improvements or Lessee's proportionate share of costs associated with the improvements.  Lessee will provide Lessor its written acceptance to pay its share of the costs within sixty (60) days upon receipt of notice from Lessor.   Lessor shall design and construct the improvements, and Lessee shall make its Facilities, personnel and Leased Premises

2

BLFG_EDPA1848501

accessible to Lessor as may be required for the purposes of constructing and maintaining the improvements, provided that Lessor provides Lessee reasonable notice of intent to access. Lessor will issue to Lessee an invoice for recovery of Lessee's share of said major maintenance and/or capital improvements and Lessee agrees that it shall pay said invoice within 30 days of issuance. If Lessee does not provide written confirmation to Lessor of Lessee's agreement to pay Lessee's share of the costs or Lessee does not pay the invoice, Lessor may provide Lessee written notice of termination of this Agreement. Lessee shall have thirty (30) days prior to termination to meet the requirements of this paragraph. Following termination, Lessee shall comply with all applicable requirements of this Agreement, including those of Section 9.

4.    ACCEPTANCE OF CRUDE OIL BY LESSOR

4.1   Lessor shall accept crude oil tendered for transportation by Lessee on the same terms and in accordance with all of Lessor's applicable then-current and effective published tariffs, and Lessee agrees to pay all applicable tariffs and fees referenced in those tariffs, subject to FERC regulations.

Lessee agrees that all of the crude oil it receives onto the Leased Premises will only be delivered to Lessor's North Dakota pipeline system.

4.3   Lessee agrees to deliver through the Leased Premises a minimum volume of 30,000 barrels of oil each calendar month into Lessor's North Dakota pipeline system. Failure to deliver a minimum of 30,000 barrels of oil each calendar month for a consecutive period of three (3) months shall be an event of termination.

5.    ENVIRONMENTAL ASSESSMENT

Lessor and Lessee shall agree upon and document the condition of the Leased Premises at the time of execution of this agreement. At its sole discretion and cost, Lessor may complete a baseline environmental assessment ("EA") of the Leased Premises to document existing environmental conditions prior to Lessee coming upon the Leased Premises. If an EA is completed, Lessor will provide the EA to Lessee and, as a condition of this Agreement, Lessee will acknowledge in writing Lessee's acceptance of the conclusions of the EA and Lessee's commitment to maintain the conditions described in the EA during the Term of this Agreement. If Lessor provides Lessee with an EA for the Leased Premises, Lessee shall have the option to conduct its own baseline environmental assessment of the Leased Premises at Lessee's sole expense. If Lessee obtains an EA, the Parties shall confer and agree in writing on the environmental conditions applicable to the Leased Premises. Should the Parties fail to reach agreement on the applicable environmental conditions, Lessor's EA shall be deemed accurate and exclusively applicable to the Leased Premises.

6.    TERM AND EXTENSION OF TERM

Subject to the further provisions hereof, this Lease Agreement shall be for a term of up to three (3) consecutive one (1) year periods commencing on the Effective Date and ending on May 31st of the subsequent calendar year (the "Term"). This Lease Agreement shall be automatically extended for successive additional terms of one (1) year each commencing on June 1st, unless either party gives written termination notice to the other party at least thirty (30) days prior to the expiration date of the original term or any extended term. Following termination, Lessee shall have ninety (90) days to meet the requirements of Section 9 of this Agreement.

3

BLFG_EDPA1848502

7.    RENT

7.1    Lessee shall pay Lessor as rent hereunder the sum of Fifty Thousand Dollars ($50,000.00) per annum in advance.  The rent for the initial Term shall be paid in full upon the execution hereof, and the rent for each additional term to be paid at or prior to June 1st of each year.

7.2    Lessor reserves the right to adjust the annual rent paid by Lessee for the Leased Premises for any subsequent one-year renewal term.  If it elects to adjust the annual rent, Lessor will advise Lessee of the new annual rent due in writing at least ninety (90) days prior to the date of adjustment.  Lessee shall have sixty (60) days from the date of Lessor's notice to provide Lessor its written acceptance of the new annual rent.  Lessee's failure to deliver written acceptance of the new annual rent within sixty (60) days shall be deemed Lessee's notice to Lessor of its intention to terminate the Lease Agreement effective with the end of the current annual term, whereupon the provisions of Sections 9 and 13 hereof will apply.

8.    COMPLIANCE WITH GOVERNMENTAL AND ENVIRONMENTAL REQUIREMENTS

Lessee's Facilities and operations on the Leased Premises shall comply with all applicable federal, state and other governmental requirements, including but not limited to statutes, rules and regulations pertaining to safety, health and environmental protection, and Lessee shall be obligated to obtain any and all applicable permits, licenses, or other certifying documents for the installation and operation of its Facilities at the Leased Premises.  Lessee shall provide copies of any and all applicable permits, licenses, or other certifying documents to Lessor upon receipt.  Further, prior to operation of the Facilities, Lessee shall provide Lessor with Lessee's Spill Prevention and Countermeasure Contingency Plan ("SPCC Plan") for the Leased Premises.  Lessee shall also provide Lessor with a copy of any leak notifications required to be filed with any government entity, including reports and correspondence exchanged between Lessee and any government entity, as such documents relate to the Leased Premises.  As failure to observe and comply with any such requirements may jeopardize or affect Lessor's operations, Lessor hereby reserves and shall have the right to terminate this Lease Agreement at any time for Lessee's failure to comply with this paragraph.  Except in cases of emergency (in which instance Lessor shall provide notice as soon as is reasonably practical), Lessor shall give notice in writing to Lessee of the details of any noncompliance with this paragraph and if Lessee shall fail to correct or otherwise remedy the noncompliance within thirty (30) days after having received Lessor's written notification thereof, this Lease Agreement shall terminate and the procedures described in Sections 9 and 13 hereof shall apply.

9.    TAXES

9.1    Lessor shall pay all real property taxes levied against the Leased Premises as a result of Lessor's ownership of the Property; provided, however, that Lessee shall reimburse Lessor for any such taxes or increased taxes that are the direct result of Lessee's use of and operations on the Leased Premises.

9.2    Lessee shall pay: i) any sales, use or occupation tax applicable to Lessee's Facilities or interest in the Leased Premises; ii) any license or permit fee resulting from

4

BLFG_EDPA1848503

the existence or operation of Lessee's Facilities on the Leased Premises; and iii) any personal property taxes assessed on personal property and fixtures of Lessee that are placed on the Leased Premises by Lessee to the extent that such taxes are payable due to Lessee's use of or operations on the Leased Premises during the Term of this Lease Agreement.

10.   REMOVAL OF LESSEE'S PROPERTY

10.1  All Facilities placed upon the Leased Premises by Lessee shall be and remain the property of Lessee during the term of this Lease Agreement.

10.2  Within ninety (90) days of  termination of this Lease Agreement Lessee shall: i) promptly remove the Facilities from the Leased Premises; and ii) restore and reclaim the Leased Premises to its prior condition at its sole cost, usual wear and tear and damage by the elements excepted.    The restoration and reclamation of the Leased Premises shall not be determined to be completed until so stated in writing by Lessor.

10.3  At the sole expense of Lessee (including actual attorney's fees and court costs to recover a judgment for such services), Lessor shall have the right to remove Lessee's Facilities and restore and reclaim the Leased Premises following the expiration of ninety (90) days from termination of this Lease Agreement.

10.4 Lessor will hold the removed Facilities in storage for Lessee's benefit for ninety (90) days from removal of the Facilities. Following the ninety (90) days, Lessor has the right to sell or lease the Facilities that were removed and to retain the proceeds of any sale or lease for its benefit.

10.5   Notwithstanding the foregoing, Lessor reserves the right to waive Lessee's obligation to remove the Facilities and may do so by notifying Lessee in writing. Lessee's obligations to mitigate any environmental liability as specified herein shall survive any termination of this Lease Agreement.

11.   MAINTENANCE AND USE

11.1    Lessee shall not permit litter or other unsightly accumulations on the Leased Premises and at Lessee's sole expense shall keep the Leased Premises in a neat and orderly condition, including painting and weed and dust control.

11.2    At Lessee's sole expense, Lessee shall comply with all governmental laws, ordinances and regulations applicable to Lessee's use and operation of the Leased Premises, and shall promptly comply with all governmental orders and directives for correction, prevention and abatement of nuisances or prohibited acts on the Leased Premises or connected therewith or related thereto.

12.   RESTRICTION ON ASSIGNMENT

Lessee shall not sublet or assign the Leased Premises or the Lease Agreement, in whole or in part, without first receiving the express written consent of Lessor, which consent may be withheld by Lessor in its sole discretion.

5

BLFG_EDPA1848504

13.  <u>DEFAULT</u>

If Lessee fails to pay the rent as herein provided or defaults in the performance or observance of any of the terms, covenants and stipulations hereof, and such failure or default shall continue for thirty (30) days after written notice thereof by Lessor to Lessee, then and in such event Lessor may at its election terminate this Lease Agreement and all the rights of Lessee hereunder.

14.  <u>SURRENDER OF PREMISES AT TERMINATION</u>

14.1    At the expiration or termination of this Lease Agreement, regardless of the manner in which it occurs, Lessee shall surrender the Leased Premises to Lessor peaceably and in as good condition as when received by Lessee, usual wear and tear and damage by the elements excepted.

14.2    Any environmental contamination or other nonconforming condition arising from Lessee's operations on the Leased Premises shall be remediated by Lessee according to the requirements of applicable State or Federal Law.  Should Lessee fail to fully and completely remediate any environmental contamination or other nonconforming condition arising from Lessee's operations on the Leased Premises, Lessor shall have the right to cure such or otherwise redress Lessee's failure to do so at the sole expense of Lessee, including actual attorney's fees and court costs necessary to recover a judgment for such services.

15.  <u>LESSOR'S RIGHT OF ENTRY</u>

Lessor reserves and shall have the right to enter the Leased Premises for the purpose of making inspections, repairs and improvements, surveying the same, and for any other reasonable purpose, so long as such activities do not materially interfere with the rights and privileges herein granted to Lessee.

16.  <u>INDEMNIFICATION AND DUTY TO DEFEND</u>

**LESSEE AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS, LESSOR, ITS PARENT AND AFFILIATED COMPANIES, PARTNERS, SUCCESSORS, ASSIGNS, REPRESENTATIVES, OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND EMPLOYEES (COLLECTIVELY "LESSOR"), FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, FINES, PENALTIES, ASSESSMENTS, CAUSES OF ACTION, SUITS AND LIABILITIES OF EVERY KIND, INCLUDING ALL EXPENSES OF LITIGATION, COURT COSTS, EXPERTS AND ATTORNEY'S FEES, ARISING OUT OF INVESTIGATION, LITIGATION, ENFORCEMENT OR SETTLEMENT OF ANY DEMANDS, CLAIMS, PROCEEDINGS, SUITS OR SIMILAR ACTION FOR INJURY TO ANY PERSON OR PROPERTY OR DEATH OF ANY PERSON (INCLUDING WITHOUT LIMITATION, CLAIMS FOR POLLUTION AND ENVIRONMENTAL DAMAGE ON OR ABOUT THE LEASED PREMISES), ANY CIVIL OR CRIMINAL**

6

**FINES OR PENALTIES, STRICT LIABILITY OR VIOLATION OF ANY STATUTE, RULE OR REGULATION DIRECTLY ARISING OR ALLEGED TO ARISE OUT OF (1) LESSEE'S PERFORMANCE OF THIS AGREEMENT, USE OF THE LEASED PREMISES OR ANY WORK PERFORMED UNDER THIS AGREEMENT BY LESSEE OR ITS AGENTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, VENDORS OR THEIR AGENTS OR EMPLOYEES; AND (2) ANY VIOLATION OR NONCOMPLIANCE WITH, OR ANY FAILURE OF THE PROPOSED FACILITIES TO BE CONSTRUCTED IN ACCORDANCE WITH, ANY APPLICABLE LAW OR THE CONDITIONS OF ANY APPLICABLE PERMIT OR REGULATORY REQUIREMENT, WITHOUT LIMITATION, WHEN SUCH VIOLATION IS A RESULT OF THE NEGLIGENT OR INTENTIONAL ACTIONS OR OMISSIONS OF LESSEE, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, OR VENDORS OR THEIR AGENTS OR EMPLOYEES, EXCEPT TO THE EXTENT CAUSED BY THE WILLFUL MISCONDUCT OF LESSOR.**

17.   <u>INSURANCE OF LESSEE</u>

17.1   Lessee shall place and maintain throughout the Term of this Agreement:

(a)   Workers Compensation coverage as is required by the applicable jurisdiction and Employer's Liability Insurance covering each employee to the extent of Two Million Dollars ($2,000,000);

(b)   Automobile Liability Insurance covering bodily injury and property damage arising from the operation of owned, non-owned, leased, or rented vehicles, with inclusive limits of not less than Two Million Dollars ($2,000,000) for any one occurrence;

(c)   Commercial General Liability insurance covering bodily injury, death, property damage and sudden and accidental pollution liability in the amount of Ten Million Dollars ($10,000,000). With respect to any coverage maintained on a "claims made" basis, the retroactive date must precede the commencement date of this Lease Agreement, and Lessee shall continue to renew the "claims made" policy or provide for extended coverage for a period of two (2) years following termination of this Lease Agreement;

Property insurance in respect of all risks of direct physical loss or damage to Lessee's work, equipment, furniture and other moveable property  in an amount not less than the maximum foreseeable loss as determined by a loss control professional.

17.2   <u>Additional Named Insured</u>

All liability policies carried by Lessee shall name Lessor as an additional insured with respect to liability arising out of the operations of Lessee, and provide for cross-liability and severability of interests.  To the extent possible, all policies maintained by Lessee shall waive subrogation rights to Lessor with respect to liability arising out of the operations of the Lessee.

BLFG_EDPA1848506

17.3     Policy Terms and Conditions

The policies described herein shall provide ninety (90) days' notice of material change or alteration and such policies shall state that insurers will endeavour to provide ninety (90) days' notice of policy cancellation in accordance with policy provisions.  The insurance coverages required herein must be placed with terms, conditions and limits as set forth above and with insurance companies duly licensed for such purpose and rated Best's A- by A.M. Best Insurance Guide and Key Ratings, such ratings to be maintained throughout the required term of the policy and under forms of policies reasonably satisfactory to Lessor. Prior to commencing operations, Lessee will provide Lessor with Certificates of Insurance evidencing all required coverage, and at all times thereafter, if requested, Lessee shall furnish certificates of insurance evidencing all required coverages.

18.   SECURITY

Lessor has adopted a security threat level indication system similar to that of the United States Department of Homeland Security.   Threat levels include red, orange, yellow and green. Lessee's activities on the Leased Premises may proceed as normal under threat levels yellow and green.  However, should Lessor adopt a threat level orange, the Lessee will be required to undergo additional security measures that may impede its ability to access, maintain, repair, operate, and/or otherwise use its Facilities at the Leased Premises.   Should Lessor adopt a threat level red, the Lessee shall immediately remove all personnel from the Leased Premises and shall direct its employees, agents, representatives, contractors, and subcontractors, including any other person Lessee has reason to believe may access the Leased Premises, to not enter the Leased Premises until such time as the threat level is reduced, by Lessor, to a level lower than red. Lessor agrees to communicate changes in the security threat levels, as soon as reasonably practicable, to Lessee.

19.   SUCCESSORS

The terms, conditions and covenants contained herein shall apply to, inure to the benefit of and be binding upon the Parties hereto and their respective successors in interest and legal representatives to the extent permitted herein.

20.   GOVERNING LAW

This agreement shall be governed by and construed in accordance with the laws of the State of North Dakota and the federal laws applicable therein, and the Parties hereto submit to the jurisdiction of the courts of the State of North Dakota for the interpretation and enforcement hereof.

21.   NOTICES

All notices required or permitted to be given hereunder or in connection herewith shall be in writing and given by mailing in the U.S. Mail, as certified or registered mail, postage prepaid and addressed to the respective Party as follows:

BLFG_EDPA1848507

Lessor:     Enbridge Pipelines (North Dakota) LLC
            2505 16th Street SW, Suite 200
            Minot, North Dakota 58701


Lessee:     Bridger Transfer Services LLC
            800 Spring Street, Suite 205
            Shreveport, Louisiana 71101

or to such other address as the Parties may hereafter designate by giving written notice as provided herein. Every notice mailed as aforesaid shall be conclusively deemed to have been received by the Party to whom addressed on the third business day following the deposit thereof in the U.S. Mail, regardless of when or whether such notice is actually received by the addressee.

22.   ENTIRE AGREEMENT, AMENDMENT

This Lease Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and cancels and supersedes any prior understanding and agreements of any nature whatsoever between the Parties with respect hereto. There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the Parties other than as expressly set forth in this Lease Agreement. No amendment, supplement, modification, waiver, termination of this Lease Agreement or consent or approval by any Party hereunder shall be binding unless executed in writing by the Parties.

        IN WITNESS WHEREOF, this Lease Agreement has been executed by the Parties hereto as of the Effective Date.

**LESSOR: ENBRIDGE PIPELINES (NORTH DAKOTA) LLC**

Sign: _____

Print: _MIKE MOELLER_____

Title: _G. M._____

Date: _10/4/11_____

**LESSEE: BRIDGER TRANSFER SERVICES LLC**

Sign: _____

Print: _Julio E. Rios, II_____

Title: _Manager/COO_____

Date: _9/30/11_____

9

BLFG_EDPA1848508

EXHIBIT "A"

BEAVER LODGE STATION

BRIDGER TRANSFER SERVICES

LOT 12

BLFG_EDPA1848509



Enbridge Pipelines (North Dakota) LLC

Lease Automatic Custody Transfer Unit

(LACT) Specification

Truck Unloading Facility

REV 3 November 8, 2010

BLFG_EDPA1848510

# SPECIFICATION

# TABLE OF CONTENTS

1.  SCOPE ........................................................................................................2
  1.1.  Intent .....................................................................................................2
  1.2.  Responsibility .......................................................................................2
2.  RELATED STANDARDS ..............................................................................2
  2.1.  API Manual of Petroleum Measurement Standards ..............................2
  2.2.  NFPA 70 ...............................................................................................2
  2.3.  API RP 500 ...........................................................................................2
3.  LACT DESIGN .............................................................................................2
  3.1.  Mechanical ...........................................................................................3
    3.1.1.  General .........................................................................................3
    3.1.2.  Unit Components ...........................................................................3
    3.1.3.  Accessories ..................................................................................5
  3.2.  Electrical ...............................................................................................5
    3.2.1.  General .........................................................................................5
    3.2.2.  Control Panel Design ....................................................................6
    3.2.3.  Control Panel Function .................................................................6
    3.2.4.  Enbridge Signal Interface .............................................................7
  3.3.  Civil ......................................................................................................7
    3.3.1.  General .........................................................................................7
    3.3.2.  Tankage ........................................................................................7
    3.3.3.  Secondary Containment ...............................................................7
      3.3.3.1.  Customer Owned Property ....................................................7
      3.3.3.2.  Enbridge Leased Property .....................................................7
    3.3.4.  Permits to Construct .....................................................................8
4.  REVISIONS ..................................................................................................8
  4.1.  REV 1 November 17, 2009 ....................................................................8
  4.2.  REV 2 April 8, 2010 ..............................................................................8
  4.3.  REV 3 November 8, 2010 ......................................................................9
List of Appendices ...............................................................................................9
  Appendix A – Truck Unloading LACT Unit P&ID ............................................9
  Appendix B – LACT Enviro/Drain Box Detail ..................................................9

i

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC – LACT SPECIFICATION -- TRUCK UNLOADING   

# 1.    SCOPE

## 1.1.    Intent

This standard provides the basis for the design of a Lease Automatic Custody Transfer (LACT) Unit specific to Enbridge Pipelines (North Dakota) LLC. This specification shall address LACT unit design specific to truck unloading facilities.

LACT unit design for the following facility types shall be addressed in other specifications:
* pipeline connected facilities (either direct feed or from tankage)

## 1.2.    Responsibility

The customer shall provide Enbridge with drawings (plot plan, skid/building layout, electrical details, piping details, etc.) for review prior to installation. Compliance with this and other related industry standards shall be the responsibility of the customer.

# 2.    RELATED STANDARDS

The most recent edition shall apply.

## 2.1.    API Manual of Petroleum Measurement Standards

Chapter 6 – Metering Assemblies- Section 1 – Lease Automatic Custody Transfer (LACT) Systems

## 2.2.    NFPA 70

National Electric Code

## 2.3.    API RP 500

Recommended Practice for Classification of Locations for Electrical Installations at Petroleum Facilities.

# 3.    LACT DESIGN

The LACT design includes determining the following:

* Flow Rate
* Design Pressure
* Viscosity
* Pour Point
* * Temperature
* * API Gravity
* * Vapor Pressure vs. Temperature Plot
* * Sulfur Content

    * Refer to the Tariff – Rules and Regulations for exact crude specifications.

BLFG_EDPA1848512

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC – LACT SPECIFICATION – TRUCK UNLOADING 

### 3.1.    Mechanical

#### 3.1.1.  General

- The LACT unit should be housed in a heated building (minimum 16' x 20') with adequate room for personnel to safely perform necessary duties and in the case of an emergency have more than one means of exit.

#### 3.1.2.  Unit Components

The LACT unit shall be completely assembled on a skid.  The components in flow order shall be as follows (see Appendix A - Typical Truck Unloading LACT Unit P&ID):

1. **Charge Pump -** Centrifugal pump (gear pumps are not allowed) and TEFC motor completely mounted in a common base, coupling, and coupling guard.  Pump shall deliver design rate with 2 feet of suction head and a discharge pressure of 30 psig at the suction of the delivery pump.

2. **Strainer -** with mesh basket and differential pressure gauge

3. **Air eliminator** – shall be sized based on flow rate with soft seated gas valve, having a minimum vent line of ½" with discharge to the divert line.  Install with valves to allow isolation to confirm integrity of air eliminator.

4. **Static Mixer** – with design considerations for viscosity, flow rate and pressure drop

5. **B.S.& W. fail safe monitor -** with 0-1% range, 30 second time delay and an inline plastic coated probe.  The probe shall be mounted in a vertical run.  There shall be a ¼" sample cock located below the probe. The sample cock shall be available to Enbridge personnel for purposes of obtaining a running sample to confirm quality of oil and accuracy of B.S.&W. monitor.

6. **Sampler** – with adjustable capability, electric mixing pump and five gallon (minimum) sample container (capturing a minimum of 1 gallon to a maximum of 80% of container volume for each ticketing period). Sample container, other than piston type, shall be plastic coated, shall give a visual indication of the sample quantity, shall be equipped to hold an internal pressure (minimum 15 psi), shall be equipped with a pressure indicator, and shall be equipped with a quick opening cover to be able to clean container.

   Sampler Probe - probe horizontally inserted in middle 3rd of vertical pipe run with inlet facing direction of flow, probe to be located after static mixer.

7. **Three-way diverting valve** - (capable of being sealed), hydraulic actuator, positioned by B.S. & W. monitor. Normally closed to the meter when no actuation energy applied.

BLFG_EDPA1848513

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC -- LACT SPECIFICATION – TRUCK UNLOADING 

8. **Positive displacement meter** –

   a. Meter shall be Smith, 100% 5 to 1 gallon gearing. To allow proving by Enbridge, flow rate shall be a minimum of 70 BPH and maximum of 450 BPH.

   Meter shall be sized by customer to operate between 60-80% of meter's continuous maximum rate.

   b. Meter stack equipped with:

   - Pulse Transmitter - Model E Pulse Transmitter - single-pole, double-throw (SPDT) heavy-duty, mercury wetted form "C" contact, 1 pulse/bbl. Pulse transmitter is to pace the temperature averager and Enbridge PLC input – meter count.
   - Right angle drive for meter proving
   - Counter – 200A Series – accumulative, nine-digit, <u>non-reset type,</u> integral switch pulser to drive meter fail and sampler

9. A standard **temperature averager** capable of taking 1 temperature reading per barrel with temperature alarm/shutdown range of 0°F to 120°F.

10. **Proving loop** with double block and bleed valve:

    - See Appendix B for LACT – Enviro (Environmental)/Drain Box Typical
    - Proving connection valves shall have a companion threaded flange, and a 3" Ever-Tite quick coupling with female ends, cam locks and dust caps.
    - Proving connections shall be available outside of building accessible by Enbridge prover.
      - o Install Enviro/Drain box with
        - clearance to operate prover hose valves
        - expanded metal catch screen
        - locate bleed valves immediately upstream of the connection valves inside the Enviro/Drain box
    - Grounding Stud available for prover truck hook-up
    - Provide and maintain access to prover connections (e.g. snow removal, rut removal, etc)

11. **Back pressure regulator.** Regulator shall be installed on downstream side of proving loop. Range to be determined by operating conditions. Regulator setting will be determined by Enbridge measurement personnel. LACT units with multiple meters shall have back pressure regulators on each meter to balance flow.

12. **Delivery Pump** – Positive Displacement pump (screw, progressive cavity, piston or gear) and motor completely mounted on a common base, coupling, and coupling guard. If the pump is a piston type pump pulsation dampeners are required. Pump shall deliver design flow rate +/- 10% over an operating pressure range of 0-110 psig. An overpressure pressure protection system shall be installed to ensure the discharge pressure does not exceed 250 psig.

BLFG_EDPA1848514

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC -- LACT SPECIFICATION – TRUCK UNLOADING 

13. **Check valve** installed at tie in per Enbridge approval. Check valve shall be flanged to Enbridge receipt valve. Demarcation (custody transfer) shall be on the inlet of the Enbridge receipt valve.

14. Install **CP isolation kit** between customer check valve and Enbridge block valve per Enbridge approval.

### 3.1.3.  Accessories

The unit shall be equipped with the following accessories:

1. A re-calibratable pressure gauge of suitable operating range shall be installed immediately upstream of the back pressure regulator.

2. Thermowell located immediately downstream of meter, inner third of pipe.

3. <u>Provision shall be made for locking with pipe line seals, the control panel and it's components, sampler, valves, prover loop, back pressure valve, etc.</u>

4. The delivery tank shall be a single commingled tank. Enbridge shall have the ability to seal customer tank valves to ensure delivery from one tank only.

5. The delivery tank shall have a HIHI level alarm that activates a 110db audible horn and beacon in the truck unload area to warn the truck operator of potential tank overflow. A local acknowledge pushbutton shall silence the horn. The beacon shall continue until HIHI level clears.

   - HIHI Level  = Overflow Volume – (Maximum Flow Rate x Worst Case Shutdown Time)
     - o  Overflow Volume = maximum tank design volume

## 3.2.  Electrical

### 3.2.1.  General

1. All electrical equipment shall be installed per NEC and State Electrical Regulations.

2. Power supply will be 480 volt, 3 phase, customer's responsibility.

3. A fused main disconnect switch with door interlock shall be provided.  Power supply to control circuits shall be separately fused.

4. Motor control circuit shall include three overload relays and a hand-off-auto selector switch.

5. All non-latching relays shall be plug-in type with dust covers and with contacts rated by manufacturer at 10 amps minimum at 120 volt AC.  Coils shall be rated for continuous duty in 104° F ambient.

BLFG_EDPA1848515

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC – LACT SPECIFICATION – TRUCK UNLOADING 

6.   If pulse transmitter contacts are rated less than 10A, interposing relays are required between contacts and controlled devices.

7.   Name plates – All items of electrical equipment and wiring shall be systematically identified on manufacturer's wiring diagram.  Stenciled name plates using diagram designations shall be mounted adjacent to each component in control panel. Terminal blocks shall be identified in the same manner.  Each conductor entering control panel shall be permanently identified by color code or marker and this identification shall be the same as shown on the wiring diagram.

### 3.2.2.  Control Panel Design

1.   The control panel shall be a NEMA 3R enclosure, located outside of LACT building.

2.   Control panel shall be protected with lightning arrestors mounted on outside of panel.

3.   Control panel external wiring connections shall be on barrier type terminals blocks within the enclosure.

### 3.2.3.  Control Panel Function

The control panel shall be capable of performing the following functions:

1.   LACT unit shall start in divert mode on intermediate level and then divert shall close to ship merchantable oil. Stop charge and delivery pump on low delivery tank level and hold until tank returns to intermediate level.  Provide manual override pushbutton to start pumps between levels.

2.   Divert crude (bypassing low flow circuit) when B.S. & W. content exceeds set point or power failure occurs.

3.   Provide meter failure or low flow detection circuit using meter pulse transmitter from top of meter head to shut-in system if rate drops below a pre-set minimum. Meter fail shall function in either hand or auto (float control) mode. This must be a lockout function with manual reset button. The detection circuit must lockout delivery if the meter pulse contacts stop in either the open or closed position. Provision shall be made to remove power from timer (if used) so that timer can be manually reset without damage.

4.   Provide signal to sampler to give sample proportional to flow.

5.   Provide lights on panel to indicate power supply on, good oil, bad oil diversion, low flow rate and delivery tank levels.

6.   All components (except fluid level control) shall perform same functions on hand or automatic.

BLFG_EDPA1848516

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC -- LACT SPECIFICATION -- TRUCK UNLOADING 

### 3.2.4. Enbridge Signal Interface

1. Minimum hardwired signal requirements include:
   - LACT Status (to Enbridge)
   - LACT Enable / Disable (from Enbridge)
   - Meter Pulse (1 pulse per barrel)
   - Other signals deemed necessary by Enbridge for operations.

   Interface relays shall be used to isolate customer and Enbridge control signals.

2. For LACT units located remote to Enbridge facilities: Spread Spectrum Ethernet radios shall be used for signal interface.

## 3.3. Civil

### 3.3.1. General

- Site shall have proper elevation and drainage.
- Sites with fenced locations shall have 12'-14' rolling gate for vehicle clearance.

### 3.3.2. Tankage

- Truck delivery connections shall be installed inside a drain/Getty box.
- Trucks shall not deliver fluid direct to the meter, a delivery tank will be required between truck connection and LACT charge pump. Line from truck delivery connection to delivery tank shall be below grade.
- Delivery tank shall be sized for adequate retention when located on Enbridge leased property.
- Recommend second storage tank to divert off-spec product into.
- Crude blending shall not be permitted downstream of customer delivery tank.
- Recommend flame arrestors be installed on all tanks.
- Windsock shall be installed on highest tank at the facility.

### 3.3.3. Secondary Containment

#### 3.3.3.1. Customer Owned Property

The customer shall follow latest SPCC (Spill Prevention Control and Countermeasures Plan) guidelines set out by the EPA for secondary containment.

#### 3.3.3.2. Enbridge Leased Property

Customer tanks located on Enbridge leased property shall follow specific secondary containment below per Enbridge standards in addition to any EPA requirements:

- Containment volume for a tank lot shall be:

REV 3 November 8, 2010          Page **7**

BLFG_EDPA1848517



- o   For lots containing a single tank: 110% of the hydrocarbon design volume
- o   For lots containing multiple tanks: the sum of 110% of the hydrocarbon design volume for the largest tank and stormwater storage volume

- Berm design shall be an appropriate containment structure with:

  - o   3:1 side slopes
  - o   Impermeable lining inside berm containment bottom
  - o   Containment may also be constructed in wall form from concrete, steel, or another suitable material
  - o   Berm angles may not exceed 2:1 side slopes unless approved by a Geotechnical Engineer

- Tank lots and berms shall have a maximum permeability of $1.0 \times 10\text{-}6$ cm/s ($1.6 \times 10\text{-}8$ gpm)
- If a berm is constructed around the LACT building it shall provide adequate working space and means of ingress/egress for Enbridge proving/gauging activities.

### 3.3.4.  Permits to Construct

- Customer shall obtain necessary air permits to construct storage tanks on Enbridge leased property or adjacent property per local, state, federal requirements.
- Customer shall determine if storm water permitting is required to construct per local, state, and federal requirements.
- Customer shall obtain all other necessary local, state and federal permits to construct

## 4.    REVISIONS

### 4.1.    REV 1 November 17, 2009

- Removed Ticket Management System and associated instrumentation, removed UPT (Universal Pulse Transmitter) on Smith Meter, added Smith Meter Model E Pulse Transmitter and 200 Series counter specification.

### 4.2.    REV 2 April 8, 2010

- Added charge pump min discharge pressure, added delivery pump, added HIHI tank level audible alarm and beacon, removed Appendix B – LACT Isolation and Control Relay Box Drawing. Other miscellaneous changes.

BLFG_EDPA1848518

ENBRIDGE PIPELINES (NORTH DAKOTA) LLC – LACT SPECIFICATION – TRUCK UNLOADING 

**4.3.    REV 3 November 8, 2010**

- updated Appendix A - P&ID and LACT component flow (3.1.2)
- added Static Mixer (3.1.2.5)
- further defined sample container and added sampler probe installation clarification (3.1.2.6)
- added operating range to PD meter (3.1.2.8.a)
- further defined E Pulse Transmitter and 200A series pulser operation/control (3.1.2.8.b)
- further defined Delivery pump requirements (3.1.2.12)
- added definition for single delivery tank (3.1.3.4)
- added Appendix B – LACT Enviro/Drain Box Typical

**List of Appendices**

**Appendix A – Truck Unloading LACT Unit P&ID**

**Appendix B – LACT Enviro/Drain Box Detail**

BLFG_EDPA1848519



## Appendix A - Typical Truck Unloading LACT Unit P&ID

BLFG_EDPA1848520



BLFG_EDPA1848521



**Appendix B – Typical - LACT Enviro/Drain Box Detail**



**BILL OF MATERIAL**

| # | QTY | DESCRIPTION |
|---|-----|-------------|
| 1 | 1 | Metal Enclosure |
| 2 | 2 | Lift Bracket & Lid Support |
| 3 | 1 | 2" Suction |
| 4 | 2 | 3" Ball Valve w/ Handle & Seal Lock |
| 5 | 2 | 1/2" Bleeder Ball Valve & Plug |
| 6 | 2 | 3" Ever-Tite Cam Locking Quick Coupling w/ Female End & Dust Cap |
| 7 | 1 | Screen |

PLAN VIEW

FRONT ELEVATION

SIDE ELEVATION

TYPICAL
LACT Enviro./ Drain
Box Detail

ENBRIDGE PIPELINES (North Dakota) LLC

B-725

BLFG_EDPA1848523

# EXHIBIT 37



Midterm Elections | Imprisoned In Myanmar | Sectors Up Close | Breakingviews | Investing | Futu

COMMODITIES

SEPTEMBER 25, 2018 / 1:14 AM / A MONTH AGO

# Philadelphia-area crude rail terminal reawakened by discounted crude

Jarrett Renshaw, Devika Krishna Kumar



NEW YORK (Reuters) - A rail terminal outside of Philadelphia has begun taking deliveries of Bakken crude after going dormant for nearly three years, according to shipping data and a source familiar with operations, as refiners snatch up discounted North American crude barrels.

The 90,000 barrel-per-day-rail terminal in Eddystone, Pennsylvania, has been getting routine deliveries of Bakken crude for the past month, the first significant deliveries since the site went dark in January 2016. Monroe Energy, a subsidiary of Delta Air Lines Inc, is using the terminal to help supply its 185,000 bpd refinery in Trainer, Pennsylvania.

The return of crude deliveries at Eddystone highlights the growing pains confronting U.S. producers who are facing bottlenecks as booming production outpaces pipeline growth. It also shows how U.S. refiners are trying to seize on the bottlenecks, doing whatever they can to access the distressed crude.

The Eddystone rail terminal was one of several facilities built on the U.S. East Coast in the early part of this decade to take advantage of discounted crude out of North Dakota. But

business at this terminal and others slumped as the discount vanished and cheap imports came into favor.

North Dakota oil production hit a record 1.3 million barrels per day in July, outpacing pipeline capacity, forcing producers to discount crude and making it attractive for coastal buyers.

The Dakota Access Pipeline, the key artery out of North Dakota, was nearly 100 percent full in August, according to energy industry intelligence service Genscape. Flows on the line, which runs from North Dakota to Illinois, are averaging just over 500,000 bpd, and further expansion is expected.

U.S. crude's discount to global benchmark Brent rose to more than $10 a barrel this month, the widest in three months and near the biggest discount in over three years.

That spread is key for East Coast refiners, since the Bakken grade is priced off U.S. crude while import grades are typically priced off Brent. But other factors such as full pipelines have also contributed to the pickup in crude by rail, traders said.

Rail volumes from North Dakota to the East Coast hit nearly 75,000 bpd in June, according to the latest federal data, up from near zero volumes in August and September of last year. At the height of the boom, more than 450,000 bpd ran from the Bakken to the East Coast.

The activity could persist as long as the discounts for Bakken crude remain, according to traders and analysts. Brent crude's premium to Bakken has been between $10 and $11 for November, traders said. It is expected to average around $7 a barrel in 2019, according to Morgan Stanley.

Delta Air Lines used the Eddystone terminal to supply the refinery from 2013 until the contract collapsed in 2016. It is unclear whether the new deliveries are part of a new supply contract or represent spot purchases.

The terminal is owned by Canopy Prospecting, which bought out its partner, Enbridge Inc, last year. Jack Galloway, one of the partners at Canopy, declined comment when reached by phone on Friday.

Monroe Energy did not respond to comment for this story.

Reporting by Jarrett Renshaw and Devika Krishna Kumar in New York; Editing by Matthew Lewis

*Our Standards:*   *The Thomson Reuters Trust Principles.*

---

Apps     Newsletters     Advertise with Us     Advertising Guidelines     Cookies     Terms of Use     Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

# EXHIBIT 53

| **From:** | Kramer, Jake |
| --- | --- |
| **Sent:** | Wednesday, October 24, 2018 12:28 PM |
| **To:** | Theodore, Jeffrey; Eddystone Team; mailto:mwitsch@armstrongteasdale.com; mailto:rlscheff@armstrongteasdale.com; jnegovan@griesinglaw.com; Adrian Garcia; Christian Orozco; Ewelina Johnson; Greg Brassfield; Jeremy Fielding; Jon Kelley; Kent Krabill |
| **Cc:** | Agusti, Fil; Sloniewsky, Andrew; Petts, Nick; grugant@ballardspahr.com; Henry Hank E. Hockeimer Jr. (hockeimerh@ballardspahr.com) (hockeimerh@ballardspahr.com) |
| **Subject:** | Revised Privilege Log |
| **Attachments:** | USA01-#12252122-v2-FGBL_2nd_Revised_Priv_Log_10_23_18.xlsx |

Counsel:

Attached is a revised version of the BL/FG Defendants' privilege log.  When we had our first meet and confer about privilege issues on October 5, we explained our approach to preparing the privilege log and asked Eddystone to identify descriptions in our log that it deemed to be insufficient.  There was no follow-up on that request before Eddystone filed its motion to compel under the crime-fraud exception on October 12, which challenges privilege log entries related to communications during the periods from May to July 2015 and December 2015 to February 2016.  The attached revised privileged log contains even more detailed descriptions of the subject matter of all communications during those periods, totaling approximately 14,500 entries.

During the process of preparing these additional descriptions, we identified a relatively small number of communications that are not privileged (approximately 200 documents).  Those will be produced shortly.

Thanks,
Jake



**JACOB A. KRAMER**
Partner
BRYAN CAVE LEIGHTON PAISNER LLP - Washington, D.C. USA
jacob.kramer@bclplaw.com
T: +1 202 508 6153  M: +1 202 550 8547

# The BL/FG Defendants' Second Revised Privilege Log Will Be Submitted Electronically in Its Native Format, Under Seal

# EXHIBIT 54

| **From:** | Sloniewsky, Andrew <ASloniewsky@steptoe.com> |
|---|---|
| **Sent:** | Thursday, August 23, 2018 5:55 PM |
| **To:** | Kramer, Jake; Jon Kelley; Kent Krabill; Jeremy Fielding; Julie Negovan; rscheff@mmwr.com; mwitsch@mmwr.com; Eddystone Team; Hartley, Sarah |
| **Cc:** | hockeimerh@ballardspahr.com; grugant@ballardspahr.com; Agusti, Fil; Petts, Nick; Theodore, Jeffrey; Arad-Neeman, Daniele; Eberstadt, Rick; Pierce, Jerome |
| **Subject:** | Eddystone - Privilege Log |
| **Attachments:** | 12124862_2.xlsx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Counsel:

Attached in Excel format please find our privilege log in this matter.  A few points:

(1) This log does not include documents responsive to the July 2018 subpoena that Ferrellgas served on Enbridge.  We are still collecting and reviewing documents responsive to that subpoena, and will update this log upon completing that process.

(2) For email chains, the "To", "From", and "CC" columns in the attached provide information regarding the most recent email in each chain.  Attorney names in those columns are denoted with an asterisk.  The column titled "Privilege Description" identifies the bases upon which the subject document, or portions thereof, are being withheld.  The individuals mentioned in the "Privilege Description" column are attorneys.

Let me know if you have any questions.  We look forward to receiving Ferrellgas' and Rios/Gamboa's logs.

Regards,

Andrew

**Andrew J. Sloniewsky**
Of Counsel
ASloniewsky@steptoe.com

## Steptoe

+1 202 429 6759 direct     Steptoe & Johnson LLP
+1 202 261 0621 fax        1330 Connecticut Avenue, NW
                           Washington, DC 20036
                           www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

# EXHIBIT 56

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported): **November 4, 2009 (November 2, 2009)**

# Ferrellgas Partners, L.P.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-11331** | **43-1698480** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **7500 College Blvd., Suite 1000, Overland Park, Kansas** | **66210** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **913-661-1500**

**Not Applicable**
Former name or former address, if changed since last report

# Ferrellgas Partners Finance Corp.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **333-06693** | **43-1742520** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **7500 College Blvd., Suite 1000, Overland Park, Kansas** | **66210** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **913-661-1500**

**n/a**
Former name or former address, if changed since last report

# Ferrellgas, L.P.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **000-50182** | **43-1698481** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **7500 College Blvd., Suite 1000, Overland Park, Kansas** | **66210** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **913-661-1500**

**n/a**
Former name or former address, if changed since last report

# Ferrellgas Finance Corp.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **000-50183** | **14-1866671** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **7500 College Blvd., Suite 1000, Overland Park, Kansas** | **66210** |

(Address of principal executive offices)                                   (Zip Code)

Registrant's telephone number, including area code: **913-661-1500**

**n/a**
Former name or former address, if changed since last report

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a -12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d -2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e -4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

The information included in Item 2.03 of this Current Report on Form 8-K is incorporated by reference into this Item 1.01 of this Current Report on Form 8-K.

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

On November 2, 2009, our operating partnership, Ferrellgas, L.P., entered into a secured working capital credit facility which provides the Company borrowing capacity of up to $400.0 million. This facility replaces the Company's former senior unsecured credit facility due 2010. This new facility will mature on November 2, 2012. Borrowings under this new facility are available for working capital needs, capital expenditures and other general partnership purposes, including the refinancing of existing indebtedness.

The new secured working capital credit facility contains various affirmative and negative covenants and default provisions, as well as requirements with respect to the maintenance of specified financial ratios and limitations on the making of loans and investments. All borrowings under the facility bear interest, at the operating partnership's option, at a rate equal to either:

- for Base Rate Loans or Swing Line Loans, the Base Rate, which is defined as the higher of i) the federal funds rate plus 0.50%, ii) Bank of America's prime rate; or iii) the Eurodollar Rate plus 1%; plus a margin varying from 2.50% to 3.25%; or
- for Eurodollar Rate Loans, the Eurodollar Rate, which is defined as the LIBOR Rate plus a margin varying from 3.50% to 4.25%.

The descriptions set forth above in this Item 2.03 are qualified in their entirety by the operating partnership's new bank credit facility, a copy of which is filed as an exhibit to this report and is incorporated by reference herein.

**Item 9.01 Financial Statements and Exhibits.**

Exhibit 10.1 - Credit Agreement dated as of November 2, 2009, among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto.

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Ferrellgas Partners, L.P.

*November 4, 2009*                    By:     /s/ J. Ryan VanWinkle
                                              *Name: J. Ryan VanWinkle*
                                              *Title: Senior Vice President and Chief Financial Officer;*
                                              *Treasurer (Principal Financial and Accounting Officer) of*
                                              *Ferrellgas, Inc., the general partner*

Ferrellgas Partners Finance Corp.

*November 4, 2009*                    By:     /s/ J. Ryan VanWinkle
                                              *Name: J. Ryan VanWinkle*
                                              *Title: Chief Financial Officer and Sole Director*

Ferrellgas, L.P.

*November 4, 2009*                    By:     /s/ J. Ryan VanWinkle
                                              *Name: J. Ryan VanWinkle*
                                              *Title: Senior Vice President and Chief Financial Officer;*
                                              *Treasurer (Principal Financial and Accounting Officer) of*
                                              *Ferrellgas, Inc., the general partner*

Ferrellgas Finance Corp.

*November 4, 2009*                    By:     /s/ J. Ryan VanWinkle
                                              *Name: J. Ryan VanWinkle*
                                              *Title: Chief Financial Officer and Sole Director*

Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Credit Agreement dated as of November 2, 2009, among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto. |

4