# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDDYSTONE RAIL COMPANY, LLC** | ) | |
| | ) | |
| | ) | **Civil Action No. 17-cv-00495** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **PUBLIC VERSION** |
| | ) | |
| **BRIDGER LOGISTICS, LLC, JULIO RIOS,** | ) | |
| **JEREMY GAMBOA, FERRELLGAS** | ) | |
| **PARTNERS, L.P., FERRELLGAS L.P.,** | ) | |
| **BRIDGER ADMINISTRATIVE SERVICES** | ) | |
| **II, LLC, BRIDGER MARINE, LLC,** | ) | |
| **BRIDGER RAIL SHIPPING, LLC,** | ) | |
| **BRIDGER REAL PROPERTY, LLC,** | ) | |
| **BRIDGER STORAGE, LLC, BRIDGER** | ) | |
| **SWAN RANCH, LLC, BRIDGER** | ) | |
| **TERMINALS, LLC, BRIDGER** | ) | |
| **TRANSPORTATION, LLC, BRIDGER** | ) | |
| **ENERGY, LLC, BRIDGER LEASING, LLC,** | ) | |
| **BRIDGER LAKE, LLC, J.J. LIBERTY, LLC,** | ) | |
| **J.J. ADDISON PARTNERS, LLC,** | ) | |
| | | |
| **Defendants.** | | |

---

## EDDYSTONE RAIL COMPANY'S REPLY IN SUPPORT OF
## ITS MOTION TO COMPEL UNDER THE CRIME-FRAUD EXCEPTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................4

I.    Prima Facie Evidence for a Reasonable Basis to Suspect an Intentional Fraudulent
Transfer Satisfies the Crime-Fraud Exception..........................................................4

II.   Eddystone Has Carried its Burden for the Crime-Fraud Exception. ...........................6

    A.   Eddystone Has Made a *Prima Facie* Showing that in June 2015 Defendants
Intentionally Diverted ▇▇▇▇▇ in Revenue from BTS for No Consideration. .........7

       1.   Ferrellgas admits that the money BTS earned from the Monroe deal did not go
to BTS. ................................................................................................................7

       2.   Ferrellgas's "cost center" explanation is undermined by the documentary
evidence, and fails to disprove that the improper accounting harmed BTS. ..........8

       3.   Ferrellgas's explanation of Ferrellgas's consolidated reporting confuses
accounting with financial reporting and BTS with Ferrellgas .............................11

       4.   Ferrellgas's declarations do not support its account of the diverted revenue.......12

    B.   Eddystone Has Made a *Prima Facie* Showing that in January 2016 Defendants
Stripped BTS of its Remaining Assets for No Consideration. ....................................14

       1.   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ........................................................................15

       2.   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ......16

       3.   Ferrellgas did not sell BTS to Jamex for a legitimate business reason.................18

       4.   Ferrellgas did not assign Jamex the payment obligations under the RSA............20

       5.   Ferrellgas did not expect Jamex to cover BTS's payments under the RSA. .........21

       6.   The truth is that Ferrellgas sold BTS to Jamex for $10.00 in order to distance
itself from its fraudulent misconduct. ..................................................................22

    C.   Eddystone has Made a *Prima Facie* Showing that Defendants Used Legal Counsel
in Furtherance of its Fraudulent Transfers. ...............................................................23

       1.   Defendants used in-house counsel in furtherance of the intentional fraudulent
transfers in June 2015. ........................................................................................24

       2.   Defendants used in-house and outside counsel in furtherance of the intentional
fraudulent transfers in January 2016....................................................................25

III.  Ferrellgas Cannot Seek an Interlocutory Appeal. ....................................................26

IV.  Ferrellgas's New Privilege Log Remains Incomplete. .............................................27

CONCLUSION...................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cendant Corp. v. Shelton*,
   246 F.R.D. 401 (D. Conn. 2007)...............................................................4

*DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer*,
   869 F.3d 839 (9th Cir. 2017) ...................................................................5

*In re Enron Corp.*,
   349 B.R. 115 (Bankr. S.D.N.Y. 2006)....................................................23, 24, 26

*In re Grand Jury*,
   705 F.3d 133 (3d Cir. 2012)....................................................................6

*Husky Int'l Elecs., Inc. v. Ritz*,
   136 S. Ct. 1581 (2016)...........................................................................5

*In re Jacobs*,
   2006 WL 4451566 (Bankr. D. Idaho Feb. 10, 2006)...............................16

*In re Jolly's Inc.*,
   188 B.R. 832 (Bankr. D. Minn. 1995) .....................................................15

*Kaye v. Lone Star Fund V (U.S.), L.P.*,
   453 B.R. 645 (N.D. Tex. 2011)................................................................15

*In re Marquis Prod., Inc.*,
   150 B.R. 487 (Bankr. D. Me. 1993).........................................................15

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
   180 F. Supp. 3d 273 (S.D.N.Y. 2016)......................................................4

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2009)...............................................................................26

*Oasis Research, LLC v. Carbonite, Inc.*,
   2015 WL 5317600 (E.D. Tex. Sept. 11, 2015).......................................27

*Estate of Page v. Slagh*,
   2007 WL 1385957 (W.D. Mich. May 8, 2007) .......................................17

*S.E.C. v. Yorkville Advisors LLC*,
   No. 12 Civ. 7728(GBD)(HBP), 2015 WL 855796 (S.D.N.Y. Feb. 27, 2015)........................28

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    319 F.R.D. 100 (S.D.N.Y. 2017) ....................................................................25, 26

*In re TOUSA, Inc.*,
    680 F.3d 1298 (11th Cir. 2012) ...............................................................................15

*United Bank v. Buckingham*,
    301 F. Supp. 3d 547 (D. Md. 2018) ..........................................................................5

*United States v. Barrier Indus., Inc.*,
    No. 95 CIV. 9114, 1997 WL 16668 (S.D.N.Y. Jan. 17, 1997).................................4

*In re Vereen*,
    No. 96-78369-W, 1999 WL 33485642 (Bankr. D.S.C. Sept. 7, 1999).....................4

*In re Warner*,
    88 B.R. 199 (Bank. M.D. Fla. 1988)..........................................................................4

*In re Wes Dor, Inc.*,
    996 F.2d 237 (10th Cir. 1993) ..................................................................................15

**Statutes**

Pennsylvania Uniform Fraudulent Transfer Act..........................................................14

**INTRODUCTION**

Defendants Ferrellgas Partners, L.P., Ferrellgas, L.P., and Bridger Logistics, LLC (collectively, "Ferrellgas") have no answer to the material facts Eddystone has laid out in support of its crime-fraud motion.  Ferrellgas does not deny that, starting in June 2015, it caused Bridger Rail Services and Bridger Pipeline Services to book ███████████████████████████ ██████████████████████████████████ that Bridger Transfer Services ("BTS") had rightfully earned.  Ferrellgas does not deny that in January 2016 it caused BTS to transfer its remaining assets to affiliates for no consideration before selling the empty corporate shell to Jamex for $10.  And Ferrellgas does not deny that it used the assistance of counsel, both in-house and outside, to further these assets transfers.

Instead, Ferrellgas attempts to provide "context" for its misconduct.  But Ferrellgas's "mundane" explanations for the asset transfers are riddled with inconsistencies and misleading statements.  Each of Ferrellgas's explanations is demonstrably false.

Ferrellgas claims that recording BTS's revenue to Bridger Rail Services and Bridger Pipeline Services was merely ████████████████████████████████ But Ferrellgas does not deny that BTS never received or was credited with the actual money – or that all of the money instead went to Bridger Rail Shipping and then to Bridger Logistics and Ferrellgas.  ██████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

1

████████████████████████ Debtors cannot accomplish in two steps – ███████████████████████

████████████████████ – what the fraudulent transfer laws bar them from accomplishing in one.

████████████████████████████████████████████████████████

████████████████████████████████████████ Ferrellgas sold $50

million in other "encumbered" Bridger assets to a third party earlier this year.

Finally, Ferrellgas claims Jamex had a strong business need to buy BTS and its sole asset, the Rail Facilities Services Agreement ("RSA"), so that Jamex could negotiate with Eddystone and resume transloading shipments to its customer Monroe.  Of course, Ferrellgas does not explain why Jamex did not feel the need to acquire any of the other supply chain assets needed to deliver crude to Monroe, such as the loading facilities, rail cars, and barge charter.  That is because there was no intention of resuming shipments via Eddystone.  Just weeks before purchasing BTS, Jamex and Monroe had agreed they would go around—not through— Eddystone if shipments ever resumed.  Ferrellgas already knew this at the time of the sale—it was a party to the agreement.

Ferrellgas attempts to gloss over these deficiencies by creating the appearance of factual disputes.  Ferrellgas seeks to snow over the Court with its fifty-page brief and seven sworn declarations—much of which is completely irrelevant here—in order to create the appearance of a genuine issue of material fact regarding their intent to defraud Eddystone.  But this is a discovery dispute, not a summary judgment motion.  Eddystone need only show that there are facts to support its fraudulent transfer claims from which a jury could find in its favor, not show that it should prevail on summary judgment.

Indeed, Ferrellgas bases the opposition to Eddystone's Motion to Compel on a heightened standard for which there is absolutely no legal authority.  Ferrellgas incorrectly

claims that Eddystone must show a reasonable basis for a finding of fact of actual fraud to satisfy the crime-fraud exception.  To obtain the requested discovery, however, Eddystone need only put forward prima facie evidence of a reasonable basis to *suspect* that Defendants engaged in intentional fraudulent transfers with the assistance of counsel.  Eddystone has more than met this standard.  If a finding of fraud were required, the crime-fraud exception would be superfluous: one could not use the exception to conduct discovery until one had already proved one's case through other evidence.

Ferrellgas's lengthy discussion of its counterclaims is a red herring calculated to distract attention from the issues before the Court.  *See, e.g.*, Opp. at 5-13.  The claims are makeweight, and Eddystone will disprove each one at the appropriate time, summary judgment.  But even if Ferrellgas's counterclaims against Eddystone were meritorious, it did not justify looting BTS to deny Eddystone's ability to recover on its own claims.  If Ferrellgas truly believed in the counterclaims, it could have had BTS assert them in defense to a collection action.  The counterclaims are completely irrelevant to the crime-fraud motion; Ferrellgas raises them here only to confuse the issue.

After Eddystone filed its Motion to Compel, Ferrellgas served a third, still inadequate privilege log.  Ferrellgas failed to correct all the entries that lack sufficient information for Eddystone to understand the basis for Ferrellgas's privilege claims.  Instead, Ferrellgas fixed only those entries for documents dated around the time of its fraudulent transfers.  Eddystone reserves all rights to seek attorney's fees and costs.

Ultimately, Eddystone has presented a case that far exceeds prima facie evidence of the June 2015 intentional fraudulent transfers and the January 2016 intentional fraudulent transfers,

as well as evidence of the use of counsel in furtherance of those frauds.  Accordingly, the Court should grant Eddystone Motion to Compel Production under the Crime-Fraud Exception.

## ARGUMENT

**I.      Prima Facie Evidence for a Reasonable Basis to Suspect an Intentional Fraudulent Transfer Satisfies the Crime-Fraud Exception.**

Ferrellgas misstates the standard for the crime-fraud exception.  Ferrellgas claims it requires a showing of "actual fraud," which Ferrellgas contends is something above and beyond an intentional fraudulent transfer.  Opp. at 34.  But intentional fraudulent transfer *is* "actual fraud," which is why cases universally hold that attorney communications in furtherance of intentional fraudulent transfers satisfy the crime-fraud exception.  Ferrellgas also claims the evidence must be sufficient to form a reasonable basis for a "factual finding" of actual fraud.  Opp. at 31.  But the Third Circuit has held that for the crime-fraud exception a movant need not show that it is more likely than not that a fraud occurred; it need only establish a "reasonable basis to suspect" fraud.  There is no basis in law for Ferrellgas's heightened standard.

It is well-established law that a *prima facie* showing of an intentional fraudulent transfer satisfies the crime-fraud exception.  In addition to the wealth of case law cited in in the motion, there is also *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 180 F. Supp. 3d 273, 282 (S.D.N.Y. 2016) (applying crime-fraud exception in a fraudulent transfer case); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 407 (D. Conn. 2007) (same); *In re Vereen*, No. 96-78369-W, 1999 WL 33485642, at *2 (Bankr. D.S.C. Sept. 7, 1999) (same); *United States v. Barrier Indus., Inc.*, No. 95 CIV. 9114, 1997 WL 16668, at *3 (S.D.N.Y. Jan. 17, 1997) (same); *In re Warner*, 88 B.R. 199, 201–03 (Bank. M.D. Fla. 1988) (same).   Ferrellgas tries to distinguish Eddystone's supporting case law by arguing some were decided in bankruptcy court.  Opp. at 35.  The notion that a different rule should apply for the crime-fraud exception in federal

4

bankruptcy court than in federal district court is illogical.  The universal rule is that intentional fraudulent transfers provide a basis for the crime-fraud exception.

Ferrellgas offers no authority for requiring more than a *prima facie* showing of intentional fraudulent transfer or of requiring Ferrellgas's plus factor of "actual fraud." Ferrellgas cites just one district court case for its standard—*United Bank v. Buckingham*, 301 F. Supp. 3d 547 (D. Md. 2018).  But *United Bank* does not support the standard Ferrellgas argues for.  In fact, the *United Bank* court reaffirmed that a movant need only make a *prima facie* showing of an intentional fraudulent transfer.  The court simply found that the movant had not, under the circumstances, carried its burden.  *Id.* at 557 ("Under the circumstances presented here, [Magistrate] Judge Sullivan was well within reason to find that United Bank failed to make a *prima facie* showing of wrongful intent in relation to the conveyances at issue in this case."). Thus it is not the case that "a fraudulent transfer, even if done intentionally, does not suffice to pierce the attorney-client privilege unless the transfer was carried out with 'deception, dishonesty, misrepresentation, falsification, or forgery."  Opp. at 35.  An intentional fraudulent transfer does indeed suffice.

In any event, all cases of intentional fraudulent transfer amount to actual fraud. Ferrellgas's one case, *United Bank*, discussed at length the Supreme Court's recent decision in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016).  At issue in *Husky* was the meaning of "actual fraud" in the Bankruptcy Code.  The Court observed that, "from the beginning of English bankruptcy practice, courts and legislatures have used the term 'fraud' to describe a debtor's transfer of assets that, like Ritz' scheme, impairs a creditor's ability to collect the debt."  *Id.* at 1587.  Accordingly, the Supreme Court held that "actual fraud" "encompass[es] fraudulent conveyance schemes, even when those schemes do not involve a false representation."  *Id.* at

5

1590; *see also DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer*, 869 F.3d 839, 843–44 (9th Cir. 2017) ("[T]he bankruptcy court correctly found that the Meyers engaged in fraudulent transfers and, therefore, actual fraud, to DZ Bank's detriment."). Thus, intentional fraudulent transfer is in itself actual fraud, and hence a basis for the crime-fraud exception.

Ferrellgas is also wrong about the standard of proof for a crime-fraud motion. Ferrellgas claims that to satisfy both elements, "the moving party must establish that there is a reasonable basis for two factual findings." Opp. at 31. To the contrary, the Third Circuit has held that "the party opposing the privilege is not required . . . even to show that it is more likely than not that the crime or fraud occurred." *In re Grand Jury*, 705 F.3d 133, 153–54 (3d Cir. 2012). In *In re Grand Jury*, the Third Circuit directly addressed and clarified "The question of what proof we require to overcome evidentiary privileges." *Id.* That proof, the Third Circuit held, is evidence to form "a reasonable basis to suspect" that a fraud occurred and that the attorney-client communications or attorney work product was used in furtherance. *Id.*

Whether under the governing standard or Ferrellgas's heightened standard, Eddystone has offered more than sufficient proof to establish the crime-fraud exception to attorney-client privilege.

## II.   Eddystone Has Carried its Burden for the Crime-Fraud Exception.

Ferrellgas does not deny any of the material facts in Eddystone's motion. Ferrellgas does not deny the transfer of revenue streams from BTS, *for no consideration,* to Bridger Rail Services and Bridger Pipeline Services in June 2015. Ferrellgas does not deny the transfer of BTS's remaining fixed assets and customer contracts, *for no consideration*, to affiliates in January 2016. Instead, Ferrellgas repeatedly seeks to provide "context." But Ferrellgas's "context"—much of which is false—does nothing to explain away the facts, which clearly show

6

an intent to defraud Eddystone by stripping its counterparty of all assets to pay RSA obligations to Eddystone.

**A.    Eddystone Has Made a _Prima Facie_ Showing that in June 2015 Defendants Intentionally Diverted ███████████████ from BTS for No Consideration.**

Ferrellgas does not deny that it diverted valuable lines of revenue that BTS was legally entitled to and that it had previously booked, to Bridger Rail Services and Bridger Pipeline. Instead, it claims this was merely an internal accounting mechanism that did not harm BTS.  But Ferrellgas does not dispute that none of the money attributable to the provision of transloading and other services went to BTS.  Ferrellgas's explanation shows only that the accounting did not harm BTS's owners—Defendants Bridger Logistics and Ferrellgas.

**1.    Ferrellgas admits that the money BTS earned from the Monroe deal did not go to BTS.**

Ferrellgas does not dispute that the money BTS earned for providing logistical services in support of the Monroe deal never went to BTS after June 2015. ███████████

███████████████████████████████████

██████████████████████████████████

█████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████████████  _See_ Polkowitz Decl. ¶ 28 ("Ms. Cardell correctly reports that certain revenue streams that were recorded in BTS before the Ferrellgas Acquisition were recorded in Bridger Rail Services and Bridger Pipeline Services after the Ferrellgas Acquisition.").

Far from denying the transfers, Ferrellgas argues that the costs were transferred as well. *See* Polkowitz Decl. ¶ 28 ("Expenses that were recorded in BTS before the Ferrellgas Acquisition also were recorded in Bridger Rail Services and Bridger Pipeline Services afterwards.").  That simply goes to the net amount that Defendants denied BTS.  Second Cardell Decl. ¶¶ 7–10. ████████████████████████████████████████████

████████████████████  Second Cardell Decl. ¶¶ 11–12. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

### 2.     Ferrellgas's "cost center" explanation is undermined by the documentary evidence, and fails to disprove that the improper accounting harmed BTS.

Ferrellgas tries to explain away the diverted revenue by claiming that Bridger Rail Services and Bridger Pipeline Services were harmless "cost centers" used to improve financial reporting.  Opp. at 16, 37. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

The documentary evidence disproves Ferrellgas's claim that in June 2015 it intended Bridger Rail Services and Bridger Pipeline Services to be harmless "cost centers" —company codes with no existence outside Ferrellgas's accounting system. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Petts Decl. Ex. 7 at 1 & Ex. 12 at 1. ███

████████████████████████████████████████████

████████████████████████████████████████████████████

8

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ Opp. at 37 ("nor were

any of BTS's contracts assigned elsewhere").  Ferrellgas also admits that Bridger Rail Services

and Bridger Pipeline Services were never ███████. *See* Polkowitz Decl. ¶ 24 ("My

understanding is that Bridger Rail Services and Bridger Pipeline Services were not corporate

entities."). ████████████████████████████████████

████████████████████████████████████████

     Furthermore, Ferrellgas's claim that Bridger Rail Services and Bridger Pipeline Services

were "cost centers" does not mean diverting BTS's revenue to them did not harm BTS and its

creditors.  Nowhere in his declaration does Ferrellgas's accounting expert, Gary Polkowitz,

claim that BTS actually received any of the revenues at issue – revenues that Ferrellgas itself

attributed to the transloading capacity at Eddystone for which BTS had entered into a five-year

minimum volume commitment.  Nor does Mr. Polkowitz deny that recording BTS's revenue at

"cost centers" Bridger Rail Services and Bridger Pipeline Services after June 2015 injured BTS.

Polkowitz states only that, as a general matter, "The recording of activity in a profit center or

cost center does not affect the financial condition or financial results of the entity in which that

activity originates."  Polkowitz Decl. ¶ 26.  The statement is intentionally ambiguous.  "The

entity in which that activity originates" could refer to BTS, which actually performed the rail

throughput and pipeline management activity, or it could refer to Bridger Logistics, which by

virtue of owning BTS and the other Bridger subsidiaries is also "the entity in which that activity

originates."

Here Polkowitz appears to mean that recording BTS's revenue in Bridger Rail Services and Bridger Pipeline Services did not affect the financial condition or financial results *of Bridger Logistics*.  Second Cardell Decl. ¶¶ 5-6.  That is true but beside the point.  Whether the Defendants recorded BTS's revenue at BTS or outside BTS's accounting books at "cost centers" under Bridger Logistics's control makes no difference to Bridger Logistics, which reports the results of all its subsidiaries on a consolidated basis.  But the diversion of revenue clearly denied BTS all the money it earned servicing the Monroe deal, to the detriment of both BTS and its creditors.  *There is no dispute that the money was never credited to BTS or placed in its accounts*.  In other words, if Bridger Rail Services and Bridger Pipeline Services really were cost centers (and the documentary evidence reflects that they were not), then they were only cost centers for Bridger Logistics—not cost centers within BTS.  Recording BTS's revenue to Bridger Rail Services and Bridger Pipeline Services, even if they were "cost centers" for Bridger Logistics, harmed BTS.  Second Cardell Decl. ¶¶ 5-6.

Finally, Ferrellgas claims without support tha  when it implemented the "cost center" accounting that diverted revenue from BTS.  Opp. at 15.  Ferrellgas quotes

The term "operating reports" generally refers to informal reports generated for internal use only, in making business decisions and financial forecasts.  Second Cardell Decl. ¶ 16–18

Second Cardell Decl. ¶ 17.

███████████████████████████████████████████

███████████████████████████████████ Second

Cardell Decl. ¶ 18.  Indeed, the phrase "cost center accounting" appears nowhere in its report. █

███████████████████████████████████████████

████████████████████████████ The distinction between accounting

and reports based on accurate accounting books is one Ferrellgas blurs in its other explanations

of its improper accounting.

> ### 3.    Ferrellgas's explanation of Ferrellgas's consolidated reporting confuses accounting with financial reporting and BTS with Ferrellgas

Ferrellgas next claims that the improper accounting was immaterial because Ferrellgas

reports its financial results on a consolidated basis.  Opp. at 2.  This excuse confuses accounting

with financial reporting and, more importantly, fails to distinguish between the financial

condition of BTS and the financial condition of Ferrellgas.

Regardless of how Ferrellgas presents information in its financial statements, the

manipulation of BTS's accounting books harmed BTS.  Ferrellgas claims:

> The use of profit centers and cost centers also does not affect the consolidated
> financial reporting of a company like Ferrellgas.  Ferrellgas's public financial
> statements reflect the assets, liabilities, revenue, and expenses of the parent
> company and its subsidiaries in the aggregate.

Polkowitz Decl. ¶ 26.  But the harm to BTS was accomplished when Ferrellgas diverted revenue

from BTS's accounting books to the fake accounting entities under Bridger Logistics's exclusive

control.  Second Cardell Decl. ¶¶ 13-14.  How Ferrellgas chooses to report its company-wide

financial results is irrelevant to the fair treatment of BTS.  *Id.*  Ferrellgas's financial reporting

concerns only how it *communicates* its accounting data.  But the First Amended Complaint does

not allege material misstatements in Ferrellgas's public financial statements; this is not a suit for

securities fraud. ██████████████████████████████████

██████████████████████████

████

Ferrellgas's talk of consolidated financial reporting implies only that the improper accounting had no effect *on the owners* of BTS.  To be sure, when a corporate parent secretly moves assets from one subsidiary to another while denying the first reasonably equivalent value in exchange, the fraudulent transfer has no effect on the parent that owns both entities.  But it certainly harms the subsidiary losing the assets—and it harms that subsidiary's creditors. Fraudulent transfer law protects creditors by prohibiting corporate parents from abusing their control over their subsidiaries in just this way.

> **4.    Ferrellgas's declarations do not support its account of the diverted revenue.**

Ferrellgas tries to bolster its misleading explanation of the diverted revenue with declarations from Ferrellgas employees, including senior accountants.  A review of these declarations reveals that not one Ferrellgas employee with direct knowledge of the diverted revenue was willing to swear under oath to the story Ferrellgas tries to tell in its brief, let alone swear that the improper recording of revenue to Bridger Rails Services and Bridger Pipeline Services caused BTS no harm.

The two declarations of Ferrellgas senior accountants that address the issue offer no credible evidence to support Ferrellgas's story.  Ferrellgas has put forward a senior accountant at Ferrellgas to plead ignorance and say he is "not aware" of any intent to harm BTS.  *See* Ruisinger Decl. ¶ 6.  Of course, this narrowly circumscribed, self-serving statement cannot defeat a crime-fraud motion in the face of documentary evidence in emails and accounting records to the contrary.  In any event, Ruisinger insists that he was only "involved to a limited

degree." *Id.* As a result, his statement that he was "not aware" of an intent to harm BTS has no probative value.

The other accountant who submitted a declaration, Michael Farmer, can offer only hearsay: "It is my understanding that management directed the accounting department" to divert revenue from BTS as part of cost center accounting. *See* Farmer Decl. ¶ 9. ███████████ ████████████████████████████████████████ *see* Petts Decl. Ex. 14 at 2, he had no involvement in the initial decision to divert revenue and therefore has no firsthand knowledge about what management actually told the accounting department between June and July 2015. Importantly, however, even Farmer remains silent about whether the "cost center" accounting he attests to harmed BTS.

Against this conclusory affidavit, the documentary evidence is overwhelming. A fictitious new legal structure, showing the assignment of BTS's rail contracts, was submitted to Ferrellgas executives for approval. Second Petts Decl. Ex. 35 ████████████████████ ██████████████████. And in a June 18, 2015 email, Bridger CFO Patrick Kelly told a Ferrellgas employee about "the latest legal structure" that he and Bridger's chief accountant Vispi Jilla had "discussed with Julio and Jeremy this afternoon." Second Petts Decl. Ex. 36.

In his declaration, Bridger Logistics' President and Chief Executive Officer does not deny the creation of a fictitious new legal structure designed to mislead its accountants, nor was he willing to attest to Ferrellgas's alternative explanation of the diverted revenue. Instead, he offers a thin 5-paragraph declaration attesting to uncontroversial facts such as that "The RSA provided unique logistical access to East Coast oil refineries situated on the Delaware." Rios Decl. ¶ 5. Rios's silence speaks volumes.

13

The other glaring omission in Ferrellgas's declarations is any statement from ███████ █████, the Ferrellgas employee who personally directed its accountants to divert the revenue. Apparently, ██████ would not swear under oath that the diversions were merely a harmless internal accounting mechanism because that is flatly contradicted by her own contemporaneous emails █████ could not possibly back up Ferrellgas's claim that Bridger Rail Services and Bridger Pipeline Services were legitimate internal reporting units with no legal existence when in her July 6, 2015 email ██████████████████████████████████ Petts Decl. Ex. 7 at 1.  From Rios, to Gamboa, ███████████████████ no one directly involved in the June 2015 diversion of BTS's revenue streams was willing to attest to Ferrellgas's explanation of its actions.

Ultimately, what matters is that there is no dispute that BTS never received the money. Ferrellgas never claims it did, much less points to accounting records to that effect.  Whatever the internal accounting purposes at stake, the bottom line is not in dispute: the money was diverted away from BTS to Rail Shipping.  Rail Shipping got the rail throughput revenue, paid Eddystone with a portion of it, and kept the majority as profit.

**B.     Eddystone Has Made a *Prima Facie* Showing that in January 2016 Defendants Stripped BTS of its Remaining Assets for No Consideration.**

Ferrellgas does not dispute that Ferrellgas caused BTS to transfer away all of its remaining assets in January 2016, before it sold BTS for $10 to Jamex.  Ferrellgas responds that it sold BTS with its RSA to Jamex because Jamex had a stronger business need for it.  Ferrellgas then explains that, before the sale, it had to transfer all of BTS's assets to its affiliates because ██████████████████████████████████████████████ Here, too, Rios's silence is deafening.  In his declaration the Bridger Logistics President & CEO says absolutely nothing in

14

support of Ferrellgas's account of the January 2016 asset transfers that he oversaw.  The reason
is that none of it is true.

### 1.    No lien encumbered BTS's assets.

Ferrellgas claims that "BTS's assets never presented an avenue of recovery for ERC"
because they were encumbered by a lien and therefore not subject to the Pennsylvania Uniform
Fraudulent Transfer Act.  Opp. at 26, 38.  But PUFTA exempts such transfers only if the assets
are "encumbered by a *valid* lien."  *See* PUFTA § 5101(b).  The purported lien on BTS's assets
was invalid and itself a fraudulent transfer.  *See* PUFTA § 5101(a) (defining "transfer" subject to
PUFTA to include "creation of a lien or other encumbrance.").

When a corporate parent takes out a loan it cannot cause its subsidiary to guarantee and
secure, for no consideration, the parent's debt to its lender.  The same fraudulent transfer rules
apply.  "[A] transferor receives less than reasonably equivalent value when it transfers property
in exchange for consideration that passes to a third party . . . even when the third party is the
parent company of the debtor."  *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 667 (N.D.
Tex. 2011).  Thus, in *In re Jolly's Inc.*, 188 B.R. 832 (Bankr. D. Minn. 1995), where a subsidiary
granted a blanket lien on its assets to a third party that had extended credit to the subsidiary's
corporate parent, the court held that the encumbered subsidiary had not received reasonably
equivalent value.  *Id.* at 845-46.  And if by granting the lien and securing the parent's debt the
subsidiary becomes insolvent, the lien constitutes a fraudulent transfer.  In *In re TOUSA, Inc.*,
680 F.3d 1298, 1303 (11th Cir. 2012), for example, the court avoided as fraudulent transfers
upstream guaranties and liens that subsidiaries granted to secure loans made to their corporate
parent because assuming the parent's obligation rendered the subsidiaries balance-sheet
insolvent.  *See also In re Marquis Prod., Inc.*, 150 B.R. 487, 495 (Bankr. D. Me. 1993) (avoiding
mortgage that insolvent subsidiary granted to secure $300,000 line of credit its parent obtained

from third party); *In re Wes Dor, Inc.*, 996 F.2d 237 (10th Cir. 1993) (avoiding as fraudulent transfer blanket lien subsidiary granted to secure loan to parent).

Here, the blanket lien that Ferrellgas caused BTS to grant to Ferrellgas's banks constituted another fraudulent transfer.  Ferrellgas readily admits that BTS received no value from granting its lien in favor of Ferrellgas's lenders.  Opp. at 38 ("ERC asserts (at 9) that BTS 'received no benefit from the loans to Ferrellgas.' But that is far from the point.").  And assuming liability for FGP's bank debt rendered BTS balance-sheet insolvent: Ferrellgas caused BTS, a company with ███████████ in assets and a long-term obligation to Eddystone, to guaranty and secure a $311.6 million debt Ferrellgas had outstanding under its loan facility. Second Petts Decl. Ex. 37 at 15.  Thus, the lien that Ferrellgas claims encumbered BTS's assets was itself a fraudulent transfer.  And since the lien was invalid, BTS's assets were certainly available to satisfy its debt to Eddystone.

### 2. No loan covenants prevented Ferrellgas from selling BTS with all its assets.

The next "mundane" explanation Ferrellgas offers is that "Ferrellgas transferred assets from BTS to remain compliant with its loan covenants."  Opp. at 23.  According to Ferrellgas, the loan covenants "prohibited Ferrellgas from transferring BTS's assets to the Jamex group or any other third party."  Opp. at 23-24.  First, the application of these loan covenants to BTS is a fraudulent transfer for the reasons above.  Second, the lien, even if valid, did not prevent Ferrellgas from selling BTS's assets to Jamex.

Ferrellgas's loan documents clearly permitted Ferrellgas and Bridger Logistics to sell BTS and all its assets to Jamex in an arms' length transaction.  The Security Agreement Ferrellgas relies on to claim BTS's assets were fully encumbered in favor of Ferrellgas's lenders granted a security interest in a long list of tangible and intangible property—including "proceeds

of the foregoing."  Olszeski Decl. Ex. 41 at 5 (Security Agreement § 2.1(p)); Petts Decl. Ex. 19 at 1 (Grantor Accession Agreement).  Thus, Ferrellgas's lenders would have retained their collateral in a sale of BTS's assets to Jamex because their security interest would have attached to the sale proceeds.  *See, e.g.*, *In re Jacobs*, 2006 WL 4451566, at *6 (Bankr. D. Idaho Feb. 10, 2006) ("Plaintiff held an enforceable security interest in the Ford securing the balance due on its purchase price.  When Defendant sold the Ford, Plaintiff's interest attached to the sale proceeds.").  Hence, so long as Bridger Logistics complied with certain conditions regarding the sale proceeds specified in Section 7.05(h), the Credit Agreement permitted Bridger Logistics to sell BTS to Jamex at full fair market value.  Olszeski Decl. Ex. 42 at 84.  Ferrellgas's recent liquidation of its Bridger assets confirms this reading of the loan documents.  The same loan documents that Ferrellgas claims would not permit it to sell BTS's assets to Jamex permitted Ferrellgas to sell over $47 million in Bridger assets to another third party, on February 21, 2018. Second Petts Decl. Ex. 38 at 8 (Ferrellgas Form 8-K, February 20, 2018).

There is therefore no merit to Ferrellgas's argument that it had to strip BTS of all its assets before selling it to Jamex for $10.00.  Ferrellgas's loan covenants permitted the sale of BTS with all its assets to Jamex in an arms' length transaction.  This is all the more true because the loan covenants did not even apply to BTS—the blanket lien the Defendants imposed on BTS was invalid and yet another fraudulent transfer.

As Eddystone noted in its motion, Ferrellgas attempted to encumber BTS's assets solely as a pretext for stripping them from BTS.  Ferrellgas's motive is plain from the timing.  *See Estate of Page v. Slagh*, 2007 WL 1385957, at *2 (W.D. Mich. May 8, 2007) (applying the crime-fraud exception because "the timing and effect of the transfers at issue in this case raise a reasonable suspicion that the transfers were undertaken in violation of the [UFTA]").  On

17

January 13, 2016, Ferrellgas secured Jamex's commitment to buy BTS for $10.00.  On January

14, 2016, Ferrellgas encumbered all BTS's assets with a blanket lien in favor of Ferrellgas's

lenders.  And on January 31, 2016, Ferrellgas bailed out all BTS's remaining assets, before

selling it to Jamex three weeks later.  The last-minute blanket lien Ferrellgas tried to impose on

BTS's assets was indeed a false pretense to justify the fraudulent transfers.  The lien was invalid

and the assets were always available to satisfy BTS's payment obligations to Eddystone.  But it

was Ferrellgas's intent to deny Eddystone any recovery.

> **3.      Ferrellgas did not sell BTS to Jamex for a legitimate business reason.**

Next, Ferrellgas claims it sold an empty BTS with the RSA to Jamex because "the RSA

was a valuable asset to Jamex."  Opp. at 28.  "Had Jamex and ERC resolved their disputes,"

Ferrellgas claims, "Jamex could have resumed transloading crude through the facility pursuant to

the RSA."  Opp. at 22.  This is fiction.

Jamex had no use for BTS and the RSA because it had just ended all crude sales to

Monroe.  On January 13, 2016, the day Jamex agreed to buy BTS and the RSA from Bridger

Logistics, Jamex and Monroe simultaneously agreed to suspend all sales and shipments of crude

indefinitely.  *See* Second Petts Decl. Ex. 39 at 3 ("Jamex . . . shall purchase and accept from

Bridger, all of the equity interest in Bridger Transfer Services, LLC.") & Ex. 40 at 1 ("Supplier

shall not be required to sell and deliver to the Refiner . . . and Refiner shall not be required to

purchase and accept . . . any volumes of Crude Oil").  There was no crude for Jamex to

throughput at Eddystone when it paid $10.00 for BTS and the RSA in February 2016.

Even if shipments to Monroe had resumed (they never did), Jamex had every intention of

going around—not through—Eddystone.  Again, on January 13, 2016, the same day Jamex

agreed to buy BTS and its access to Eddystone, Jamex provided Monroe a deep discount on all

barrels that did *not* ship through Eddystone.  Specifically, the parties agreed that the contract

price for all barrels "delivered . . . other than via the Eddystone Rail Company, LLC's Crude

petroleum transloading facilities located in Eddystone, Pennsylvania will be reduced by $0.50

per Barrel."  Second Petts Decl. Ex. 40 at 2 & Ex. 41at 1 (Jan. 25 Letter Agreement) (amending

the COSA to permanently incorporate the $0.50 discount in the January 13 Letter Agreement).

Jamex wanted to avoid Eddystone so much it was willing to give Monroe a discount worth $10

million per year in exchange for permission to deliver its crude shipments another way.

 Ferrellgas knew Jamex never intended to use Eddystone when it sold Jamex BTS and the

RSA, because Bridger Logistics had joined the new contractual arrangement.  Bridger Logistics

was the exclusive shipper of all crude Jamex sold Monroe, transporting it from North Dakota to

the refinery gate in Trainer, Pennsylvania.  Again, on January 13, 2016, the same day Jamex

promised to buy BTS from Bridger Logistics, Bridger Logistics amended its Transportation and

Logistics Agreement with Monroe (the "Monroe TLA"), in the event that Jamex's shipments to

Monroe ever resumed.  The parties struck out from the Monroe TLA every instance of the term

"Eddystone."  Second Petts Decl. Ex. 42 at 1-2 ("The definition of 'Eddystone Rail Facilities' is

hereby deleted in its entirety from Exhibit B of the TLA.").  If shipments ever resumed, Jamex

and Monroe's shipper would go around—not through—Eddystone.  Clearly, on January 13, 2016

Jamex and Monroe and Bridger Logistics resolved to never again use the Eddystone facility.

 Not only is Ferrellgas's explanation contrary to the evidence, it is also illogical.  If Jamex

resumed selling domestic crude to Monroe, Bridger Logistics would resume its role as the

parties' exclusive shipper under the Monroe TLA, for which the parties paid Bridger Logistics a

fixed fee that covered the entire route from the oil fields in North Dakota to the gate at Trainer.

It makes no sense to suggest that Jamex would pay for logistics services at Eddystone on top of

that arrangement.  If it was Jamex's intent to take over the role of shipper from Bridger

Logistics, Jamex would have purchased BTS with its complementary assets—███████████████ █████████████████████████████████████, which formed the complete logistics chain to Monroe.  As shown above, Ferrellgas could have easily sold Jamex the whole business.  Jamex buying BTS so it could negotiate the logistics simply makes no sense.

### 4. Ferrellgas did not assign Jamex the payment obligations under the RSA

Ferrellgas claims there was no fraudulent transfer because Jamex assumed all payment obligations to Eddystone under the RSA when it purchased BTS.  Opp. at 21-22.  This is not true as a practical matter or as a matter of contract interpretation, as Jamex itself has explained.

Jamex itself has strongly denied Ferrellgas's allegation that Jamex agreed to directly assume the RSA's remaining payment obligations, which totaled $140 million when Jamex bought BTS in February 2016.  Jamex Motion to Dismiss Cross-Claims, October 30, 2017, Dkt. 97 at 25.   Jamex has rightly rejected as "inherently implausible" the notion "that Jamex Transfer Holdings—the purchaser of a company alleged by Bridger- Ferrellgas to have 'minimal assets' (i.e., BTS/JTS) that was sold for the price of $10—would promise to itself assume and perform BTS's own $100+ million deficiency obligation to Plaintiff Eddystone Rail Company LLC ("Eddystone") through 2019." *Id.* at 1.  A review of the February 22, 2016 Purchase and Sale Agreement for BTS (the "PSA") confirms that Jamex acquired only Bridger Logistics's equity interest in BTS.  Petts Decl. Ex. 28 § 2.1(b); Dkt. 97 at 29.  As Jamex correctly notes of the payment obligations under the RSA, for "such liability to be directly assigned to Jamex Transfer Holdings there would need to be an agreement between BTS and Jamex Transfer Holdings; not to mention it clearly would have required Eddystone's consent."  Dkt. 97 at 27.  Of course, Ferrellgas never would have allowed BTS to seek such consent from Eddystone; doing so would

have disclosed the sale of BTS to Jamex for $10.00 and exposed the fraudulent transfers out of BTS.

**5.    Ferrellgas did not expect Jamex to cover BTS's payments under the RSA.**

Lastly, Ferrellgas seems to claim that it reasonably believed BTS's sale to Jamex "would not have a material impact on ERC" because Jamex "appeared to be in a financial position" to cover BTS's payments.  Opp. at 23.  Ferrellgas points to a ████████████████████ to Jamex in June 2015—which Ferrellgas then notes Jamex had lost half of by the time it bought BTS.  Ferrellgas knew that Jamex was in ████████████ when it secured Jamex's commitment to buy BTS for $10.00.  Ferrellgas did not expect Jamex to cover BTS's payments to Eddystone, not least because Jamex still owed tens of millions of dollars in payments directly to Ferrellgas.

████████████████████ in June 2015 had nothing to do with BTS or its payment obligations under the RSA.  When Ferrellgas bought Bridger Logistics, the ██████████████████████████████████ —to the newly named Jamex Marketing so that it could continue to sell crude to Monroe under the COSA, and so Monroe would continue to pay Bridger Logistics for shipping under the Monroe TLA.  Petts Second Decl. Ex. 43 Side Letter Agreement § 4 at 2.  ████████ ████████████████████ ██████████████████████ ████████ Without a restructuring of the COSA and Monroe TLA, Ferrellgas worried in December 2015, ██████████████████ ████████ Petts Second Decl. Ex. 44 at 1 (December 8, 2015 email from J. Gamboa to J. Rios).

Ferrellgas knew Jamex ███████████████████ when in January 2016 it secured Jamex's commitment to buy BTS.  Ferrellgas points to the January 13, 2016 letter agreement in which "Jamex represented and warranted that it had tens of millions of dollars of liquidity and $124 million in assets." Opp. at 23.  The reason for that representation was that Jamex was agreeing to pay Bridger Logistics several million dollars a month for Bridger Logistics' consent to the suspension of shipments.  Second Petts Decl. Ex. 39 January Letter Agreement § II at 1-2.  But Ferrellgas knew Jamex would have a hard time making even these payments.  A week before they signed the agreement, Jamex told Ferrellgas it would not have "sufficient liquidity to make these TLA payments to Bridger Logistics" unless Ferrellgas lifted the contractual restrictions on Jamex's sale of its Ferrellgas stock, which Ferrellgas was loath to do.  Petts Second Decl. Ex. 45 at 1 (██████████████████ January 5, 2016).  As Ferrellgas had good reason to think Jamex might default on its payment obligations to Bridger Logistics (which it soon did), Ferrellgas had no reason to think Jamex would voluntarily cover BTS's payments to Eddystone.

In short, Ferrellgas knew full well that Jamex ███████████████ when it sold BTS to Jamex for $10.00.  Ferrellgas was under no illusions that Jamex would ever cover BTS's payments to Eddystone on top of the millions Jamex had to pay Ferrellgas.

### 6.     The truth is that Ferrellgas sold BTS to Jamex for $10.00 in order to distance itself from its fraudulent misconduct.

The real reason for the sale was to allow Bridger Logistics and Ferrellgas to distance themselves from BTS after they fraudulently transferred all BTS's assets to its affiliates.  And they induced Jamex to buy the empty BTS by exercising their substantial leverage over Jamex.

As Ferrellgas explains in its opposition, Jamex wanted to suspend shipments because market conditions had soured █████████████████████████ See Opp. at 19–20.  But Jamex and Monroe's exclusive shipper Bridger Logistics had an expensive

22

take-or-pay contract—the Monroe TLA—that guaranteed Bridger Logistics ████████████ ████ whether or not it moved shipments for them.  Second Petts Decl. Ex. 46 § 6.4 at 4.  And that payment obligation would fall entirely on Jamex if shipments ended.  Second Petts Decl. Ex. 47 § 23, at 12-13.[1]  So Jamex required Bridger Logistics's consent to suspend the entire contractual arrangement.  Bridger Logistics did consent, but one of its conditions was the disposition of BTS.

It is abundantly clear that the sole purpose of selling BTS to Jamex was to allow Ferrellgas and Bridger Logistics to distance themselves from BTS and the evidence of their fraudulent conduct.  While Ferrellgas sold BTS to Jamex for $10.00, Ferrellgas never assigned to Jamex the $140 million in payment obligations remaining under the RSA.  Jamex never would have accepted such an assignment, since it clearly had no intention of ever transloading at Eddystone again.  Dkt. 97 at 1, 25–27.  And Ferrellgas knew Jamex █████████████████ ██████████ to cover BTS's payment obligations under the RSA.

### C. Eddystone has Made a *Prima Facie* Showing that Defendants Used Legal Counsel in Furtherance of its Fraudulent Transfers.

In its opposition Ferrellgas stakes everything on persuading the Court that the June 2015 and January 2016 asset transfers were something other than they are—intentional fraudulent transfers.  Ferrellgas does not deny the assistance of counsel in the asset transfers in June 2015 or January 2016, which satisfies the second element of the crime-fraud exception.  Whether or not counsel considered BTS's asset transfers appropriate is irrelevant, because the crime-fraud



exception does not require that counsel share its client's wrongful intent.   *In re Enron Corp.*,

349 B.R. 115, 128 (Bankr. S.D.N.Y. 2006) (applying crime-fraud without requiring evidence of

counsel's intent because "the intent, knowledge or culpability of counsel is not the dispositive

factor").

> **1.    Defendants used in-house counsel in furtherance of the intentional fraudulent transfers in June 2015.**

Between June and July 2015 ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████  Ferrellgas does not deny what is evident

from many privilege log entries during this period: ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████  *See* Opp. at 42.

████████████████████████████████████  satisfy the

second element of the crime-fraud exception because they "reasonably relate to the subject

matter of the violation."  *Enron*, 349 B.R. at 128.  Direct evidence that in-house counsel at

Bridger Logistics acted with wrongful intent is not necessary.  In *Enron*, where business

executives had "had conversations with in-house counsel" regarding a business transaction

challenged as fraudulent, the court required no further evidence to find the second element of

crime-fraud met with respect to privileged communications surrounding the transaction.  *Id.* at

128.  Similarly, ████████████████████████████████████████████

██████████████████████████████████████████████████ aise a reasonable suspicion

that Ferrellgas used legal counsel to further its fraud in June 2015.

        **2.     Defendants used in-house and outside counsel in furtherance of the intentional fraudulent transfers in January 2016.**

Nor does Ferrellgas deny outside counsel assisted Ferrellgas in its stripping of BTS's

remaining assets in January 2016.  The non-privileged emails show that outside counsel drafted

the agreements by which BTS assigned its fixed assets and customer contracts to its affiliates for

no consideration, on January 31, 2016.  Petts Decl. Ex. 20 at 1.  In *Sec. Inv'r Prot. Corp. v.

Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 109 (S.D.N.Y. 2017), the court found the

crime-fraud exception applied where the defendant had used outside counsel to draft documents

to transfer ownership of assets out of reach of the creditors.  *Madoff*, 319 F.R.D. at 109 ("[T]he

Trustee need not establish that Guston & Guston had any knowledge of either Madoff's scheme

or the bookkeeping legerdemain that led to the transfer of the funds that the Defendants used to

purchase the house.").  In using outside counsel to structure and paper BTS's asset transfers to its

affiliates for no consideration, Ferrellgas employed the services of counsel in furtherance of its

fraud in January 2016.

Ferrellgas also used in-house counsel in furtherance of its January 2016 fraudulent

transfers. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

      █████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

Thus, as in *Madoff* and *Enron*, Ferrellgas used legal counsel in connection with the transactions by which it defrauded Eddystone.  Having put forward *prima facie* evidence of a series of intentional fraudulent transfers between June 2015 and January 2016, and having identified with specificity the use of legal counsel in furthering those frauds, Eddystone has carried its burden of establishing that the crime-fraud exception applies.

## III.   Ferrellgas Cannot Seek an Interlocutory Appeal.

Ferrellgas requests leave to file an interlocutory appeal if the Court orders disclosure under the crime-fraud exception.  If the Court grants Eddystone's crime-motion motion, the Court should deny Ferrellgas's request for interlocutory review, as it is contrary to law.

Pre-trial discovery orders regarding privilege are not subject to appeal until after a final judgment has been rendered.  In *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009), the Supreme Court held, "we have generally denied review of pretrial discovery orders," and rejected the argument that "rulings implicating the attorney-client privilege differ in kind from

26

run-of-the-mill discovery" for this purpose. *Id.* at 108. The Court explained that "Appellate courts can remedy the improper disclosure of privileged material . . . by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109. Following *Mohawk*, lower courts have held refused to allow interlocutory appeals of orders compelling the disclosure of documents under the crime-fraud exception, as appellate courts lack jurisdiction to hear them. *See, e.g., Oasis Research, LLC v. Carbonite, Inc.*, 2015 WL 5317600, at *5-6 (E.D. Tex. Sept. 11, 2015) (granting crime-fraud motion and refusing to stay order of disclosure pending appellate review). Therefore, the Court should deny Ferrellgas's request for an interlocutory appeal if it finds that the crime-fraud exception applies.

## IV.   Ferrellgas's New Privilege Log Remains Incomplete.

After Eddystone filed its Motion to Compel, Ferrellgas served a third, half-baked privilege log on Eddystone. Eddystone reserves all rights.

Ferrellgas's privilege log is still defective and completely inadequate. Over half the entries—38,355—bear one identical, completely generic document description: "Attorney-client privileged communication/document providing and/or discussing legal advice." This description imparts no information as to the subject matter of the document or the basis for Ferrellgas's claim of attorney-client privilege. In addition, it contains hundreds of entries for documents dated after the June 2015 Ferrellgas acquisition of Bridger Logistics addressed to, from, or copying Jamex personnel that Ferrellgas has claimed as privileged. These documents clearly fall outside the scope of attorney-client privilege and have been improperly withheld.

Ferrellgas has selectively altered its privilege log only to the extent necessary to defend against Eddystone's crime-fraud motion. Ferrellgas revised only those entries on its privilege log that fall within during the time periods Eddystone identified as relevant to its fraudulent

transfer claims.  Ferrellgas added detail to its descriptions between May 1, 2015 and August 1, 2015, and again between December 1, 2015 and March 1, 2016.  See Olszeski Decl. Ex. 53 at 1 (October 24, 2018 email from J. Kramer to J. Theodore).  Outside of these periods, Ferrellgas made no effort to correct its privilege log.

Since Ferrellgas delayed production of its third privilege log, which remains inadequate, until after Eddystone filed its Motion to Compel, Eddystone reserves its right to seek attorney's fees and costs.  *See S.E.C. v. Yorkville Advisors LLC*, No. 12 Civ. 7728(GBD)(HBP), 2015 WL 855796, at *1-2, 19 (S.D.N.Y. Feb. 27, 2015) (awarding fees and costs where plaintiff submitted revised privilege log in response to motion to compel and excuse for delay was "totally inadequate").  Eddystone also reserves its right with respect to the other deficiencies in Ferrellgas's privilege log.  If after meeting and conferring Ferrellgas is still unwilling to produce a complete privilege log, Eddystone will again move to compel.

*** 

Eddystone has carried its burden: it has put forward more than enough evidence to form a reasonable basis to suspect that between June 2015 and January 2016 Defendants engaged in intentional fraudulent transfers, and to suspect that Defendants used the assistance of in-house and outside counsel in furtherance of those frauds.  Eddystone having made its *prima facie* case that the crime-fraud exception applies, the burden shifts to Ferrellgas to rebut it.

In its opposition, Ferrellgas has failed to discharge its burden of persuasion.  "In order to carry its burden of persuasion, the party seeking to invoke the privilege has to show by a preponderance of the evidence that the *prima facie* showing that the crime/fraud exception applies should not be accepted."  *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1307 (S.D. Fla. 2000) (holding that crime-fraud exception applied where plaintiffs made *prima facie*

28

case and defendant's explanations were unpersuasive).  Specifically, Ferrellgas must provide "a reasonable explanation of its conduct" that is "sufficient to rebut the evidence" Eddystone has offered.  *Id.*  Ferrellgas has failed in this.  Each of Ferrellgas's explanations is lacking in support, inconsistent with the documentary evidence that Eddystone has put forward, and inherently implausible.

Ferrellgas offers no reasonable explanation for the diversion of ███████████████ from BTS to Bridger Rail Services and Bridger Pipeline Services starting in June 2015. Ferrellgas tries to explain its improper accounting by claiming that Bridger Rail Services and Bridger Pipeline Services were "cost centers" with no legal existence outside its accounting system.  But Ferrellgas's "cost center" accounting story is undermined by Eddystone's evidence that, at the time, Ferrellgas falsely told its accountants that Bridger Rail Services and Bridger Pipeline Services were in fact new legal entities, and that BTS had assigned its revenue-generating contracts to Bridger Rail Services.  Ferrellgas has no explanation at all for the falsehoods it told its accountants that led them to divert revenue away from BTS to Bridger Rail Services and Bridger Pipeline Services.  Ferrellgas claims that it implemented "cost center" accounting on the recommendation of an outside consultant.  But nowhere in its report does the consultant mention "cost center accounting" or recommend that Defendants alter their accounting at all.  In the end, Ferrellgas does not deny that the money BTS earned under the Monroe deal did not go to BTS after June 2015, and it offers no reasonable explanation for its improper accounting.

Nor does Ferrellgas provide a reasonable explanation for the stripping of BTS's remaining assets in January 2016.  Ferrellgas tries to explain that BTS's assets were unavailable to satisfy its debt to Eddystone because they were encumbered by a lien in favor of Ferrellgas's

29

lenders.  But the evidence shows the lien on BTS's assets was invalid, another fraudulent transfer as BTS received no value in exchange for granting the lien.  Ferrellgas tries to explain that its loan covenants prevented it from selling BTS with its "encumbered" assets to Jamex.  But the evidence shows that those same loan documents permitted Ferrellgas to liquidate $50 million worth of other "encumbered" Bridger assets earlier this year.  Ferrellgas tries to explain that it sold an empty BTS with the RSA to Jamex so that it could resolve the disputes with Eddystone and resume transloading.  But the evidence shows that at the time of the sale Jamex and Monroe and Ferrellgas had agreed to never again transload crude at Eddystone.  Ferrellgas tries to explain that when it sold BTS to Jamex it also assigned the payment obligations under the RSA to Jamex so that the sale would have no material impact on Eddystone.  But the deal documents show there was no assignment; indeed, it is simply implausible that Jamex would have paid $10.00 for an asset-less BTS for which it had no use and assume a $140 million obligation under the RSA. Finally, Ferrellgas tries to explain that it reasonably believed Jamex had the finances to voluntarily cover BTS's payments to Eddystone.  But the emails and agreements show that Ferrellgas knew Jamex was in financial distress when it purchased BTS, and that any funds Jamex had available would go to paying the millions it continued to owe Ferrellgas.  In the end, Eddystone has put forward uncontroverted evidence that Ferrellgas stripped all assets from BTS to deny Eddystone any recovery under the RSA, and that it then sold BTS to Jamex for $10.00 merely to distance itself from its misconduct.

As the *Gutter* court held, "[the defendant] may very well have explanations for all of the foregoing; but thus far it has failed to carry its burden with the explanations provided.  It will have other opportunities to present its evidence where the standard is different."  *Gutter*, 124 F. Supp. 2d at 1304.

30

## CONCLUSION

For these reasons, the Court should find that the crime-fraud exception applies and grant

Eddystone's Motion to Compel Production.

Dated:  November 16, 2018                         Respectfully submitted,

                                                  /s/ *Nicholas Petts*
                                                  Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                  Terence M. Grugan (I.D. No. 307211)
                                                  BALLARD SPAHR LLP
                                                  1735 Market Street, 51st Floor
                                                  Philadelphia, PA 19103-7599
                                                  Telephone: (215) 665-8500
                                                  Facsimile: (215) 863-8999
                                                  hockeimerh@ballardspahr.com
                                                  grugant@ballardspahr.com

                                                  Filiberto Agusti (*pro hac vice*)
                                                  Jennifer Quinn-Barabanov (*pro hac vice*)
                                                  Steven Barber (*pro hac vice*)
                                                  Andrew J. Sloniewsky (*pro hac vice*)
                                                  Nicholas Petts (*pro hac vice*)
                                                  STEPTOE & JOHNSON, LLP
                                                  1330 Connecticut Avenue, NW
                                                  Washington, DC 20036
                                                  Telephone: (202) 429-3000
                                                  Facsimile: (202) 429-3902
                                                  fagusti@steptoe.com
                                                  jquinnba@steptoe.com
                                                  sbarber@steptoe.com
                                                  asloniewsky@steptoe.com
                                                  npetts@steptoe.com

                                                  *Counsel for Eddystone Rail Company, LLC*

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via the Court's ECF system on November 16, 2018,

thereby serving all counsel of record.

*/s/ Nicholas Petts*

Nicholas Petts