# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC,
          Plaintiff/Counter-defendant,

    v.

BRIDGER LOGISTICS, LLC, *et al.*,
          Defendants/Counterclaimants.

: 
: 
: 
: 
: 
: No. 2:17-cv-00495-RK
: 
: 
: 
: 
: 
: 

## BL/FG DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS <u>UNDER THE CRIME-FRAUD EXCEPTION</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................. iii

INTRODUCTION ........................................................................................ 1

ARGUMENT .............................................................................................. 3

I.    ERC MISSTATES LEGAL STANDARDS TO AVOID ITS BURDEN ...................................................................................... 3

    A.    ERC Has The Burden To Establish The Crime-Fraud Exception ..................................................................... 3

    B.    A *Prima Facie* Showing Of Fraudulent Transfer Does Not Automatically Trigger The Crime-Fraud Exception ................................. 5

II.    ERC HAS NOT ESTABLISHED A REASONABLE BASIS TO BELIEVE THAT DEFENDANTS COMMITTED FRAUD .............................. 8

    A.    BL/FG Defendants Did Not Divert BTS Revenue To Other Companies ........................................................... 10

    B.    ERC'S New Argument That The Lien On BTS Assets Constitutes A Fraudulent Transfer Is Baseless And Inconsistent With PUFTA ......................................... 14

    C.    There Were Legitimate Business Reasons For Selling BTS To Jamex ............................................................ 15

        1.    Jamex And Monroe Agreed To A Temporary Suspension Of Crude Deliveries Through The Facility, Not A Permanent Cessation ............................... 16

        2.    There Is No Evidence That Jamex And Monroe Intended To Excise ERC From The Logistics Chain If Shipments Resumed, Let Alone That BL/FG Defendants Were Aware Of Such An Intent ............................... 19

        3.    The Payment Obligations Under The RSA Remained With BTS ............................................................ 19

        4.    Ferrellgas Believed That Jamex Could Perform BTS's On-Going Obligations Under The RSA ........................... 21

i

**Page**

III.    ERC HAS NOT CARRIED ITS BURDEN TO SHOW THAT
        ATTORNEYS FURTHERED AN INTENTIONAL FRAUD ............................    22

IV.    ANY ORDER APPLYING THE CRIME-FRAUD EXCEPTION
        SHOULD BE SUBJECT TO APPELLATE REVIEW ........................................    24

CONCLUSION ............................................................................................................    27

CERTIFICATE OF SERVICE ............................................................................    29

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Birla v. New Jersey Bd. of Nursing*,
  549 Fed. Appx. 76 (3d Cir. 2013) ..................................................................   2

*Cendant Corp. v. Shelton*,
  246 F.R.D. 401 (D. Conn. 2007) ....................................................................   8

*Coleman v. Sterling*,
  No. 09-CV-1594 W (BGS), 2012 WL 12952831 (S.D. Cal. Feb. 21, 2012) ..................   25

*Galaxy CSI, LLC v. Galaxy Comp Servs. Inc.*,
  No. 1:04-CV-0007-LMB, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004) ......................   7

*Gucciardi v. Bonide Prods., Inc.*,
  28 F. Supp. 3d 383 (E.D. Pa. 2014) ...............................................................   3

*Gutter v. E.I. Dupont De Nemours*,
  124 F. Supp. 2d 1291 (S.D. Fla. 2000) ...........................................................   4

*Haines v. Liggett Grp Inc.*,
  975 F.2d 81 (3d Cir. 1992) ...............................................................*passim*

*Henriquez-Disla v. Allstate Prop. & Cas. In. Co.*,
  No. 13-284, 2014 WL 3887750 (E.D. Pa. Aug. 7, 2014) ...........................................   25

*Husky Int'l Elecs., Inc. v. Ritz*,
  136 S. Ct. 1581 (2016) .................................................................   6

*In re Chevron Corp.*,
  633 F.3d 153 (3d Cir. 2011) ..........................................................   4

*In re DiLoreto*,
  Bankruptcy No. 98-34641F, 2002 WL 34573858 (Bankr. E.D. Pa. May 3, 2002) ........   7

*In re Enron Corp.*,
  349 B.R. 115 (Bankr. S.D.N.Y. 2006) ..........................................................   23, 24

*In re Grand Jury*,
  705 F.3d 133 (3d Cir. 2012) ..........................................................   26

*In re Grand Jury Subpoena ABC Co.*,
  696 F. App'x 66 (3d Cir. 2017) ....................................................   4

**Page(s)**

*In re MTBE Products Liability Litigation*,
180 F. Supp. 3d 273 (S.D.N.Y. 2016) ........................................................... 7, 8

*In re Surrick*,
338 F.3d 224 (3d Cir. 2003),
*aff'd, Surrick v. Killion*, 449 F.3d 520 (3d Cir. 2006) .................................... 2

*In re Vereen*,
Nos. 96-78369-W, 98-80262-W, 1999 WL 33485642 (D.S.C. Jan. 17, 1999) .............. 8

*In re Warner*,
87 B.R. 199 (M.D. Fla. 1988) ........................................................ 8

*Jersey Cent. Power & Light Co. v. Township of Lacey*,
772 F.2d 1103 (3d Cir. 1985) ........................................................ 20

*Mellon Bank, N.A. v. Metro Communications, Inc.*,
945 F.2d 635 (3d Cir. 1991) ........................................................ 15

*Mohawk Industries, Inc. v. Carpenter*,
558 U.S. 100 (2009) ......................................................... *passim*

*Myers v. Autozoners, LLC*,
No. 16-1312, 2017 WL 6316586 (W.D. Pa. Dec. 11, 2017) ........................................ 20

*Oasis Research, LLC v. Carbonite, Inc.*,
Nos. 4:10-CV-435, 4:12-CV-525, 4:12-CV-526, 2015 WL 5317600
(E.D. Tex. Sept. 11, 2015) ........................................................ 25

*Peoples-Pittsburgh Trust Co. v. Holy Family Polish Nat'l Catholic Church*,
19 A.2d 360 (Pa. 1941) ........................................................ 14

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities*,
319 F.R.D. 100 (Bankr. S.D.N.Y. 2017) ........................................................ 23

*Transcontinental Refrigerated Lines, Inc. v. New Prime, Inc.*,
No. 1:13-CV-2163, 2014 WL 2471936 (M.D. Pa. June 3, 2014) ................................ 7

*United Bank v. Buckingham*,
301 F. Supp. 3d 547 (D. Md. 2018) ......................................................... *passim*

*United States v. Barrier Industries, Inc.*,
No. 95 Civ. 9114 (BSJ), 1997 WL 16668 (S.D.N.Y. 1997) ........................................ 8

**Page(s)**

**Statutes, Rules and Regulations:**

12 Pa. C.S. § 5104(a)(1) ................................................................................... 9

12 Pa. C.S. § 5104(a)(2) ................................................................................... 14

12 Pa. C.S. § 5105 ............................................................................................ 14


**Other Authorities:**

Kenneth C. Kettering, *The Uniform Voidable Transactions Act; or the 2014*
  *Amendments to the Uniform Fraudulent Transfer Act,*
  70 The Business Lawyer 777 (2015) ............................................................... 5

## <u>INTRODUCTION</u>

Defendants Bridger Logistics, LLC, Ferrellgas L.P., and Ferrellgas Partners, L.P. (collectively, the "BL/FG Defendants") respectfully submit this sur-reply to respond to the November 16, 2018 reply brief (the "Reply") filed by Plaintiff Eddystone Rail Company, LLC ("ERC" or "Eddystone") in support of its Motion to Compel Production of Withheld Documents Under the Crime-Fraud Exception (the "Motion" or "Motion to Compel").[1]

ERC's Reply further demonstrates its inability to satisfy the burden required to invoke the crime-fraud exception and invade the sanctity of the attorney-client privilege. ERC uses its 31-page Reply (which is two pages longer than its opening brief) to retreat from some of its main arguments, make new arguments, cite new legal authority, and submit new declarations. It should be evident that ERC's Motion is built on a one-sided narrative rife with speculation and hyperbole, as ERC attempts to sensationalize mundane corporate decisions that it does not fully understand, in part because it has not yet taken any depositions. For the reasons stated in the BL/FG Defendants' Opposition and in this brief, the Motion is meritless and should be denied.

**<u>First</u>**, ERC seeks to invoke the crime-fraud exception without actually showing fraud, inventing a lenient standard that requires only suspicions and "a *prima facie* showing of an intentional fraudulent transfer" to pierce the privilege. (Reply at 4-6.) As explained below, however, ERC's evidence must withstand rebuttal, and ERC must show actual fraud.

**<u>Second</u>**, ERC has not carried its burden to show that accounting decisions related to the acquisition of Bridger Logistics in June 2015 amount to intentional fraudulent transfers. In its Reply (at 7-13), ERC abandons entirely its argument that the elimination of intercompany accounts receivable as part of the acquisition (consistent with GAAP) was somehow a fraudulent

---

[1]   For convenience, the BL/FG Defendants utilize the same abbreviations and defined terms used in their opposition brief (Dkt. 266) (the "Opposition").

transfer.  Instead, ERC relies solely on the fact that Ferrellgas used internal accounting company codes and cost centers to account for and report BTS revenues following the acquisition.  This myopic view—as if every BL/FG accounting activity were an effort to harm ERC—overlooks that there is not a shred of evidence that these mundane accounting decisions had anything at all to do with ERC, let alone that such decisions were intended to defraud ERC.  Indeed, these decisions were made at a time when the BL/FG Defendants were transloading crude through the Facility, long before Jamex and Monroe decided to suspend Bakken crude shipments to Monroe.

**Third**, ERC has not carried its burden to show a reasonable basis to believe that BTS assets were fraudulently transferred to other Bridger Logistics subsidiaries in January 2016. (Reply at 14-18.)  In their Opposition, the BL/FG Defendants established that such assets were encumbered as security for a longstanding $██████ Ferrellgas credit facility, in support of a guaranty executed by BTS immediately following the acquisition of Bridger Logistics.  ERC does not dispute that encumbered assets cannot be fraudulently transferred under PUFTA.

Instead, ERC concocts a brand-new theory in its Reply, arguing for the first time that BTS's execution of a guaranty in mid-2015 and grant of a security interest in January 2016 *was itself a fraudulent transfer*.[2]  As explained below, ERC's new theory fails as a matter of law as to the grant of the security interest, and ERC has presented no evidence that might somehow permit ERC to void the BTS guaranty.  And again, there is not a shred of evidence that efforts to comply with Ferrellgas loan covenants had anything at all to do with ERC, let alone that the

---

[2]     This is one of several improper new arguments in ERC's Reply.  *In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003) (party waived an argument because of his "failure to identify or argue [the] issue in his opening brief"), *aff'd, Surrick v. Killion*, 449 F.3d 520 (3d Cir. 2006); *Birla v. NewJersey Bd. of Nursing*, 549 Fed. Appx. 76, 79 (3d Cir. 2013) (courts do not consider arguments raised for the first time in reply); *Gucciardi v. Bonide Prods., Inc.*, 28 F. Supp. 3d 383, 393 (E.D. Pa. 2014) (declining to consider new arguments raised in a reply brief and stating, "[a]lthough reply briefs may be used to respond to points made in the opposing party's papers, it generally cannot be used to expand the issues presented for adjudication beyond those raised in the moving papers.") (quotations and citations omitted).

BL/FG Defendants intended to defraud ERC.

ERC also ignores 

(Reply at 18-23.)   ERC offers no evidence to support its speculation that Jamex purchased BTS for any reason other than as stated

Bottom line, ERC's suspicions and speculation do not suffice.  ERC may be emboldened by a series of motions decided in its favor in this case, but the ever-changing theories and arguments supporting this Motion misunderstand and misrepresent the facts and do not come close to the type of showing required to meet ERC's burden under the crime-fraud exception.[3]

<u>**ARGUMENT**</u>

## I.   ERC MISSTATES LEGAL STANDARDS TO AVOID ITS BURDEN.

### A.   ERC Has The Burden To Establish The Crime-Fraud Exception.

The attorney-client privilege is "worthy of maximum legal protection" and is to be "zealously protected."  *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 89-90 (3d Cir. 1992) (reversing decision to apply crime-fraud exception).  As a result, the "party seeking to invoke the crime-fraud exception to the attorney-client privilege bears the burden of demonstrating that the exception is applicable."  *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011).

To meet its burden in this case, ERC must "present evidence which, if believed by the

---

[3]    As detailed below, ERC abandons or significantly modifies several key allegations underlying its First Amended Complaint that the Court accepted as true in denying Defendants' motion to dismiss.  (*See* Dkt. 269.)  ERC no longer argues Ferrellgas improperly deprived BTS of 2015 accounts receivable or that reclassifying storage revenue was fraudulent; and, recognizing that transferring assets encumbered by a lien cannot be fraudulent, ERC modifies its theory surrounding the 2016 transfers in an effort to void the valid lien on the BTS assets.

fact-finder, would be sufficient to support a finding that [both of] the elements of the crime-fraud exception were met." *Haines*, 975 F.2d at 95-96.   In particular, ERC must establish a "reasonable basis" to believe that (1) the BL/FG Defendants committed a fraud *and* (2) the attorney-client communications at issue were used in furtherance of such a fraud. *In re Chevron*, 633 F.3d at 166.   "The 'reasonable basis' standard is intended to be reasonably demanding; neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *In re Grand Jury Subpoena ABC Co.*, 696 F. App'x 66, 70 (3d Cir. 2017) (citations omitted).

In the final pages of its Reply (at 28-30), ERC makes an incorrect and improper new argument that, "having made its *prima facie* case that the crime-fraud exception applies, the burden shifts to Ferrellgas to rebut it" by taking on a "burden of persuasion" that requires a "preponderance of the evidence."  Tellingly, ERC cites (at 28) only to an out-of-circuit case from Florida to support this new burden-shifting framework, which is simply not the law in the Third Circuit. *See Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1307 (S.D. Fla. 2000).

Rather, as the Third Circuit explained in *Haines*, the burden remains with the movant, and the non-movant has an absolute right to put forward rebuttal evidence:

> The importance of the privilege, as we have discussed, as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege. We are concerned that the privilege be given adequate protection, and this can be assured only when the district court undertakes a thorough consideration of the issue, with the assistance of counsel on both sides of the dispute. *See Matter of Feldberg*, 862 F.2d at 626 (after prima facie showing that exception applies, party asserting privilege should have opportunity to rebut; "[i]f the court finds the explanation satisfactory, the privilege remains.").

> We therefore must agree with petitioners' contention that where a fact finder undertakes to weigh evidence in a proceeding seeking an exception to the privilege, the party invoking the privilege has the absolute right to be heard by testimony and argument.

*Haines*, 975 F.2d at 97.

4

Here, even if ERC had made a *prima facie* showing of fraud in its opening brief, the BL/FG Defendants have rebutted ERC's speculative arguments with a mountain of evidence, including numerous declarations from fact witnesses and experts alike, explaining the mundane reasons for BL/FG Defendants' decisions and demonstrating that ERC's "suspicions" of fraud are speculative and unfounded. "[I]f the court finds the explanation satisfactory, the privilege remains." *Id.* (citation omitted). Indeed, ERC's decision to abandon a number of the original arguments its Motion speaks volumes concerning its inability to discharge its burden.

**B.    A *Prima Facie* Showing Of Fraudulent Transfer Does Not Automatically Trigger The Crime-Fraud Exception.**

Unable to meet its burden, ERC attempts to lower the bar for itself, arguing that it need only make "a *prima facie* showing of an intentional fraudulent transfer," and "all cases of intentional fraudulent transfer amount to actual fraud." (Reply at 4-6.) ERC is wrong, and this Court should not permit ERC to excuse itself from showing actual fraud.

ERC has no response to the fact that a "fraudulent transfer" voidable under PUFTA does not necessarily involve fraud at all, and the legislature recently renamed PUFTA the "Pennsylvania Uniform Voidable Transactions Act" to avoid the "misleading" use of the term "fraudulent." Kenneth C. Kettering, *The Uniform Voidable Transactions Act; or the 2014 Amendments to the Uniform Fraudulent Transfer Act*, 70 The Business Lawyer 777, 803 (2015) ("The heart of the matter is that fraud, in the modern sense of the word, is not, and never has been, a necessary element of a claim for relief under the act").

The court in *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 554 (D. Md. 2018), drew the same distinction: "As it is true that not all fruits are apples, so also it is true that not all conveyances deemed fraudulent by statute trigger the [crime-fraud] exception." In *United Bank*, the court declined to apply the crime-fraud exception because the movant presented no evidence

of "wrongful intent," *i.e.*, "deception, dishonesty, misrepresentation, falsification, or forgery." *Id.*

(citations omitted).  Thus, the court required evidence of actual fraud to trigger the crime-fraud

exception, not merely evidence of intentional fraudulent transfers voidable under a state statute.

ERC misrepresents that holding in its Reply when it argues that "the *United Bank* court

reaffirmed that a movant need only make a *prima facie* showing of an intentional fraudulent

transfer." (Reply at 5.)  To the contrary, the court rejected ERC's position:

> United Bank argues that because it is alleging that the fraudulent conveyances at
> issue in this case were done *intentionally*, that should be enough to pierce the
> attorney-client privilege. . . . United Bank argues that by requiring a showing of
> "deception, dishonesty, misrepresentation, falsification, or forgery," Judge
> Sullivan inappropriately imposed an additional burden.

*United Bank*, 301 F. Supp. 3d at 554.  Instead, it held that "[a] conveyance deemed fraudulent by

statute does not *necessarily* trigger the exception," and "[f]or an alleged conveyance deemed

fraudulent under the statute to trigger application of the exception, the allegations must present

sufficient evidence of 'deception, dishonesty, misrepresentation, falsification, or forgery.'" *Id.*

As the court in *United Bank* explained, this rule follows directly from the Supreme

Court's decision in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016):

> United Bank is correct that the Supreme Court in *Husky* held that "actual fraud"
> can include fraudulent conveyance schemes, even those that do not involve a false
> representation.  But, nowhere did the Court say that *all* fraudulent conveyances
> constitute actual fraud.  The Court explained that "actual fraud" by definition
> requires "wrongful intent," and therefore by logic can only encompass
> conveyances deemed fraudulent by statute that are done with wrongful intent.  By
> the Court's own distinction, "implied" fraud or fraud "in law" are insufficient to
> trigger an exception without a showing of actual fraud.

*United Bank*, 301 F. Supp. 3d at 554.  In other words, there is a "fundamental difference between

a transaction done with wrongful intent, and thus actual fraud, and a transaction done without

wrongful intent, and thus only implied fraud, despite both transactions constituting 'fraudulent

conveyances.'" *Id.* at 555.  Accordingly, ERC is wrong when it argues that any "intentional

fraudulent transfer is in itself actual fraud." (Reply at 5-6.) Indeed, even if ERC were to show so-called "badges of fraud other than 'deception, dishonesty, misrepresentation, falsification, or forgery,'" such a showing "is not dispositive." *United Bank*, 301 F. Supp. 3d at 557.

Lacking any evidence of actual fraud, ERC relies entirely on its attempt to make a *prima facie* showing that a transaction is voidable under PUFTA. But as set forth in the Opposition (at 35-36), all of the cases upon which ERC originally relied either declined to apply the crime-fraud exception or found evidence of actual fraud. *See In re DiLoreto,* Bankruptcy No. 98-34641F, 2002 WL 34573858 (Bankr. E.D. Pa. May 3, 2002) (declining to apply crime-fraud exception in a case that did not involve fraudulent transfer claims); *Transcontinental Refrigerated Lines, Inc. v. New Prime, Inc.*, No. 1:13-CV-2163, 2014 WL 2471936, at *12 n.17 (M.D. Pa. June 3, 2014) (finding that non-movant "did commit a fraud"); *Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-0007-LMB, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004) (evidence of collusion to conceal transfers).

Abandoning its original authorities, ERC cites a number of new cases for the first time in its Reply, arguing (at 4) that "it is well-established that a *prima facie* showing of an intentional fraudulent transfer satisfies the crime-fraud exception." As the foregoing discussion shows, however, the rule that ERC advances certainly is not "well established." The new cases ERC cites do not undermine the rule stated in *United Bank*, and they are all factually distinguishable:

- In *In re MTBE Products Liability Litigation*, 180 F. Supp. 3d 273, 283 (S.D.N.Y. 2016), the court found "factual support" for allegations that defendant engaged in "a fraudulent scheme" to avoid debts by stripping a company of assets and putting it into bankruptcy. Unlike here, the defendant failed to "provide any explanation for the structure of the transaction" and the communications at issue constituted "advice on how to prevent others from learning of that fraud by controlling who holds the attorney-client privilege."

*Id.*  In stark contrast, the BL/FG Defendants have explained the mundane reasons for their actions.[4]

- In *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405-06 (D. Conn. 2007), the court applied the crime-fraud exception only after finding that the defendant *committed accounting fraud* and then attempted to shield his assets by transferring them away after his fraud had been uncovered.  Thus, the court found common-law fraud.

- In *In re Vereen*, Nos. 96-78369-W, 98-80262-W, 1999 WL 33485642, at *2 (D.S.C. Jan. 17, 1999), the court found that a bankruptcy trustee who sought access to privileged information had the authority to waive privilege, and the debtor had implicitly waived privilege by invoking an advice of counsel defense.  The crime-fraud exception was a third, alternative basis for the disclosure order, and the court's limited analysis of its applicability appears to be *dicta*.

- In *United States v. Barrier Industries, Inc.*, No. 95 Civ. 9114 (BSJ), 1997 WL 16668, at *1-3 (S.D.N.Y. 1997), the defendant owned and operated a company sued by the EPA to recover the cost of removing hazardous waste, and he transferred his only valuable asset to his estranged wife in a divorce settlement (after the two had lived apart for almost 30 years) to avoid liability to the EPA.  After an *in camera* review, the court ruled that the crime-fraud exception applied only to two letters.

The handful of out-of-jurisdiction authorities cited by ERC are factually different from this case and do not demonstrate a "well-established" rule that a *prima facie* showing of intentional fraudulent transfers automatically triggers the crime-fraud exception.  For the reasons stated above and, importantly, in *United Bank*, more is required to invade the attorney-client privilege.   In any event, ERC has not come forward with a reasonable evidentiary basis for intentional fraudulent transfers or actual fraud, let alone that counsel furthered any fraud.

## II.   ERC HAS NOT ESTABLISHED A REASONABLE BASIS TO BELIEVE THAT DEFENDANTS COMMITTED FRAUD.

ERC has retreated from a number of the factually baseless arguments contained in its Motion, and its remaining arguments do not supply a reasonable basis to believe that the BL/FG Defendants engaged in intentional fraudulent transfers, let alone actual fraud.  At this point,

---

[4]      Along similar lines, the bankruptcy court in *In re Warner*, 87 B.R. 199, 201 (M.D. Fla. 1988), applied the crime-fraud exception to communications about asset transfers after the debtor "declined to discuss the circumstances surrounding" the transfers.

ERC's Motion is based on accounting decisions made after the Ferrellgas acquisition of Bridger Logistics and a skeletal argument, made for the first time in the Reply, that the encumbered assets transferred by BTS were not validly encumbered.

In its Reply, ERC makes no effort to show that the actions of BTS were accompanied by any "deception, dishonesty, misrepresentation, falsification, or forgery."  Nor does it dispute that the BL/FG Defendants had no duty to inform ERC of their decisions.  (*See* Opposition at 40-41.) ERC also makes no effort to dispute the declaration from Professor Rock, which makes clear that there was nothing nefarious about the BL/FG Defendants' conduct.  (*Id.* at 27-29 & Ex. G.)

Moreover, ERC has no evidence that the decisions to have the Bridger Logistics subsidiaries (including BTS) change the manner in which they recorded revenues and execute documents to comply with the Ferrellgas credit facility were made "with actual intent to hinder, delay, or defraud" ERC, as is required to establish an intentional fraudulent transfer under PUFTA.  12 Pa. C.S. § 5104(a)(1).  As explained in the Opposition (at 14-26), such decisions had nothing at all to do with ERC, and there is not a shred of evidence that they were intended to avoid debts to ERC.  Indeed, in June 2015, Bakken crude was being transloaded through the Facility for delivery to Monroe.  As ERC states in its Motion (at 8), it was not until December 2015 that ████████████████████████████████████████

Beyond that, there is no factual basis for ERC's contention that BL/FG Defendants "diverted" BTS revenue to other Bridger Logistics subsidiaries.  Nor is there a legal or factual basis for the brand-new argument that Defendants somehow carried out an intentional fraudulent transfer when Bridger Logistics and its subsidiaries (including BTS) became guarantors of the Ferrellgas credit facility and gave Bank of America a security interest in their assets.

### A.    BL/FG Defendants Did Not Divert BTS Revenue To Other Companies.

As discussed above, ERC has completely abandoned its argument that Ferrellgas deprived BTS of $16.5 million in accounts receivable in June 2015.  (*See* Motion at 7.)  ERC also has abandoned its argument that the reclassification of storage revenue to Bridger Storage LLC was fraudulent.  (*Id.*)  ERC's remaining argument is just as flawed and half-formed.

Now, ERC's principal argument is that Ferrellgas caused BTS revenue to be diverted to other subsidiaries.  But ERC never actually settles on a recipient of this alleged transfer, arguing at various times that it was Bridger Rail Shipping (at 14), ███████████ (Declaration of Meghan E. Cardell in Support of Plaintiff's Motion to Compel, dated Nov. 16, 2018 ("Cardell Decl."), ¶ 9), ████████ (*id.* ¶¶ 9-10).  That confusion is only one example of the utter lack of substance in ERC's argument.  No amount of repetition about "fake" entities or supposed "lying" to accountants can disguise the fundamental lack of proof of a fraud.

ERC's accounting argument goes off the tracks right out of the station:  "Ferrellgas does not deny the transfer of revenue streams from BTS, *for no consideration*, to Bridger Rail Services and Bridger Pipeline Services in June 2015."  (Reply at 6.)  But of course Ferrellgas denies that.  As Ferrellgas stated clearly in its Opposition (at 17), "no assets were transferred and no revenue streams were stripped from BTS as a result of accounting changes after Ferrellgas acquired Bridger Logistics."  The reason is simple:  Bridger Rail Services and Bridger Pipeline Services *are not companies*, as ERC implicitly acknowledges when it repeatedly refers to them as "fake."  They are company codes or cost centers—tracking mechanisms for various aspects of BTS's business—with no legal significance or standing.  Neither revenue nor anything else could have been transferred to Bridger Rail Services or Bridger Pipeline Services, and no "consideration" was owed to BTS in return.

That should be the end of the inquiry.  But ERC and its expert advance a number of

speculative propositions in an apparent effort to sow confusion.  None makes sense, and none demonstrates any intent to defraud.

First, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████ (Cardell Decl. ¶ 6.) ████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████ (*Id.*) ████████████

████████████████████████████████

Second, ERC asserts repeatedly that Ferrellgas ████████████ (Reply at 8; *see also id.* at 1, 9, 14, 24, 29.) ████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████ (*Id.*, Ex. 12.)  But all parties agree that the companies were *not* created and the contracts were *not* assigned. ████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████ (*Id.*, Ex. 7 at JTS-SMA_0010943.) ████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████ ERC explains none of this.[5]

---

[5]    ERC takes a second helping of this applesauce by characterizing ████ as "the Ferrellgas employee who personally directed its accountants to divert the revenue" and then complaining

Third, ERC derides as "intentionally ambiguous" the statement of Ferrellgas' accounting expert that the use of a cost center "does not affect the financial condition or financial results of the entity in which that activity originates." (Reply at 9.) The entire premise of ERC's Motion is that the relevant activity originated in BTS, and Ferrellgas largely agrees.[6] But ERC complains that revenue was supposedly "diverted" or "transferred" from BTS to another company as a result of accounting decisions. Polkowitz's declaration met that assertion head-on: That is not how things work. (Second Declaration of Gary Polkowitz, Ex. A hereto ("Second Polkowitz Decl."), ¶¶ 5, 6 and 8.) Moreover, Polkowitz is an expert witness. ERC simply ignores a sworn statement by Ferrellgas' controller that he is unaware of "any adverse impact that the establishment or use of these company codes and cost centers would have had on Bridger Transfer Services, LLC, its creditors, or anyone associated with it." (Opposition, Ex. D., Ruisinger Decl. ¶ 6.) There is no ambiguity in this statement.

Fourth, ERC complains that BL/FG Defendants' discussion of consolidated financial reporting is either irrelevant or misleading. (Reply at 11-12.) That also is wrong. ERC first singles out page 2 of the Opposition, but that is not a discussion of consolidated financial reporting at all. The BL/FG Defendants stated (at 2) that "management reports and financial statements were prepared *on a semi-consolidated basis* to facilitate efficient and effective management of the business" (emphasis added). That is not an irrelevant point; it explains that

---

that ████ did not submit a declaration in support of Ferrellgas' Opposition. (Reply at 14.) As ERC points out elsewhere, this is "not a summary judgment motion." (*Id.* at 2.) Nevertheless, the BL/FG Defendants rebutted ERC's accounting arguments with declarations from the individuals who served as the controller (Ruisinger) and assistant controller (Farmer) of Ferrellgas during the relevant period, and another from an accounting expert. If ERC wants to explore its wild theory that ████ was the mastermind of a fraudulent plot, ERC should take ████ deposition.

[6]     As discussed in greater detail in the Opposition, certain storage-related activity was moved from BTS to Bridger Storage, LLC, where it should have been all along, and ERC has abandoned its complaints about this decision.

Ferrellgas and Bridger Logistics had legitimate, non-fraudulent reasons for organizing their accounting records in the way that they did, *i.e.*, to permit management to understand segments of the business that involved multiple companies.  And the more general discussions of financial reporting are important also, for they show that the internal organization of the enterprise's records was not visible in the consolidated financial reports available to ERC or other outsiders, who could not possibly have been misled in any respect.

Fifth, ERC speculates about where "the money" earned by BTS went and argues that "the money" was not "placed in [BTS's] accounts."  (Reply at 1, 7, 10, 14.)  But ERC's argument in the Motion is about accounting for revenue, not about "money," which is not an accounting concept in any event.  (Second Polkowitz Decl. ¶ 9.)  As explained in the Opposition and above, the use of Bridger Rail Services and Bridger Pipeline Services did not deprive BTS of any revenue.

To the extent that ERC now wishes to complain about the flow of *cash* or the workings of particular *bank accounts*, it has utterly failed to meet its burden of proof.  It is neither fair nor appropriate to expect Ferrellgas to trace the cash associated with payments for services provided by BTS, for several reasons:  (1) ERC has the burden of proof, both on the Motion and on the merits of this case; (2) the argument was raised for the first time in the Reply and is not appropriately before the Court; (3) no fact witness could possibly have sufficient knowledge to address the issue authoritatively; and (4) it would be essentially impossible for Ferrellgas to spend the hundreds or thousands of expert man-hours necessary to complete that task in connection with a sur-reply.  In short, if ERC has an issue with the flow of cash or the use of bank accounts, it should amend its complaint, take discovery, and present evidence and argument on those points at summary judgment or trial.

**B.     ERC's New Argument That The Lien On BTS Assets Constitutes A Fraudulent Transfer Is Baseless And Inconsistent With PUFTA.**

ERC does not and cannot dispute that the transfer of an asset that is encumbered by a valid lien is not a fraudulent transfer.  As explained in the Opposition (at 23-26), that conclusion is dictated by the plain language of PUFTA and scuttles ERC's argument that the BL/FG Defendants "stripped" BTS of encumbered assets in January 2016.  In its Reply (at 15), ERC advances a new argument, with no supporting evidence, that the security interest granted by BTS in favor of Bank of America was not valid in the first place.

Importantly, ERC appears to be suggesting that Bank of America's security interest could be avoided as a *constructive fraudulent transfer*—not the type of intentional fraudulent transfer that ERC claims is sufficient to invoke the crime-fraud exception.  (Reply at 4-6.)

Moreover, a constructive fraudulent transfer theory would require ERC to demonstrate, among other things, that BTS granted the security interest "without receiving a reasonably equivalent value in exchange."  12 Pa. C.S. §§ 5104(a)(2), 5105.  But PUFTA provides expressly that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred *or an antecedent debt is secured or satisfied*…."  *Id.* § 5103(a) (emphasis added).  This has been the law in Pennsylvania since long before PUFTA was enacted.  *See Peoples-Pittsburgh Trust Co. v. Holy Family Polish Nat'l Catholic Church*, 19 A.2d 360, 361 (Pa. 1941) (rejecting argument that mortgage was fraudulent under 1921 Uniform Fraudulent Conveyance Act and citing common-law precedent from 1884).  And the principle plainly applies here, for there is no dispute that BTS guaranteed the Bank of America obligations in June 2015 and granted a security interest to the bank in January 2016.  The straightforward language of the statute thus defeats ERC's late-arriving argument.

At times, ERC's point seems to be that BTS's *guaranty* of the bank debt in mid-2015 was

*ipso facto* a fraudulent transfer.  This proposition also is squarely inconsistent with controlling precedent.  In *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991), the Third Circuit reversed a bankruptcy court's decision that a company's incurrence of an obligation to a bank in connection with an acquisition was a fraudulent transfer.  As in the Reply, the plaintiff pursued this fact-intensive argument as though it were a question of law.  The Third Circuit criticized the plaintiff and the trial court on several grounds, including their failure to recognize that access to credit has value, the lack of expert testimony, and the court's failure to consider guarantees provided by affiliated entities, which lessened the financial burden on the guarantor involved in the case.  The court summarized its grounds for reversal as follows:

> Although the ability to obtain credit is the lifeblood of the commercial world and governmental operational survival, and the synergistic strength expected from the merger here, no doubt had value, the [plaintiff] introduced no evidence to support its burden of showing that Metro received less than reasonably equivalent value in exchange for its guaranty and security interest.  The [plaintiff] acted on the blind assumption that they had no value and the bankruptcy court agreed.

*Id.* at 648.  ERC's three-paragraph argument that Bank of America did not have a valid security interest in BTS's assets suffers from all of these flaws and more.

### C.    There Were Legitimate Business Reasons For Selling BTS To Jamex.

With much invective and hyperbole, but a paucity of evidence, ERC argues in its Reply (at 18-23) that Ferrellgas' explanation of the legitimate business reasons for the sale of BTS to Jamex is "fiction," and instead, "Jamex had no use for BTS and the RSA because it had just ended all crude sales to Monroe," it never intended to resume delivery of crude and conspired to bypass the Facility when deliveries to Monroe resumed.  (Reply at 18.)  ERC is wrong.

No amount of argument and conjecture can overcome the evidence that: ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████



In addition to other evidence, ERC's speculation is rebutted by the unambiguous declaration of Todd Soiefer, who states that Bridger Logistics and Ferrellgas believed the RSA could be a useful asset to Jamex, and the sale of BTS to Jamex was intended to facilitate Jamex's use of the RSA and the Eddystone Facility.  (Opposition, Ex. B., Soiefer Decl. ¶¶ 32-34, 39.)  It is also rebutted by the ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ (Opposition, Ex. A., Ex. 3 ████████████████

      **1.**    **Jamex And Monroe Agreed To A Temporary Suspension Of Crude Deliveries Through The Facility, Not A Permanent Cessation.**

Contrary to ERC's argument in its Reply (at 18-20), the parties did not agree to terminate Jamex's obligation to deliver Bakken crude to Monroe.  Absent the ability to predict with certainty how and when crude markets would improve from the narrowed spreads causing losses in late 2015 and early 2016, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ (*See* Second Declaration of Nicholas Petts in Support of Plaintiff Eddystone Rail Company's Reply in Support of its Crime-Fraud Exception Motion ("Second Petts Decl."), Ex. 42████████████████████████████████████████████ ██████ ████████████████████████████████████████████████████████████ ████████████████████ (Second Declaration of Alicia Ragsdale Olszeski, Ex. B hereto ("Second

Olszeski Decl."), Ex. 57, [7]

(Ex. 58,

ERC's assertion that Jamex could have no use for BTS or the RSA is further contradicted by

(Second Petts Decl., Ex. 42        ), and the fact that

(*See* Ex. 59,        .

Simply put, the evidence contradicts ERC's argument that the right to ship crude through the Eddystone Facility to Monroe had no value to Jamex.  Indeed, since at least September 24, 2018 (i.e., *during the term of the RSA*), crude is again being shipped through the Eddystone Facility for delivery to Monroe.  (*See* Opposition, Ex. A, Ex. 37.)

Nor is there any merit to ERC's related argument that Jamex could not have intended to ship crude in the future, because it did not acquire BTS's upstream assets.  (Reply at 2, 19-20.)



(Opposition, Ex. A, Ex. 3,

---

[7]        Exhibits 57-66 cited herein are attached to the Second Olszeski Decl.



(Ex. 60

(*See* Ex. 61

Simply put, the evidence again contradicts ERC's speculation in its Reply (at 19) that Jamex would need to "take over the role of shipper from Bridger."  Indeed, as explained in the Opposition (at 20-22) and in the

(Opposition, Ex. A, Ex. 3,

(Opposition, Ex. A., Ex. 36,

Nor is there any basis for ERC's speculation that,

(Second Petts Decl., Ex. 46 at 8, ¶ 6)

███████████████████████████████████████████████████████████

      **2.**      **There Is No Evidence That Jamex And Monroe Intended To Excise ERC From The Logistics Chain If Shipments Resumed, Let Alone That BL/FG Defendants Were Aware Of Such An Intent.**

There also is no basis for ERC's argument (at 18-19) that Jamex planned to "go around"

the Eddystone Facility if it ever did resume shipments of crude, let alone that Ferrellgas knew of

such intent when it sold BTS. █████████████████████████████████

██████████████████████████████████████████████████████████

(Second Petts Decl., Ex. 42███████)█████████████████████████████

██████████████████████████████████████████████████████████

(Ex. 62, ██████████████████████████████████

█████████████████████    Accordingly, ERC's contention (at 19) that Ferrellgas

"knew Jamex never intended to use Eddystone when it sold Jamex BTS" is unsupported and

demonstrably false.

      **3.**      **The Payment Obligations Under The RSA Remained With BTS.**

██████████████████████████████████████████████████

███████████████████████████(*See* Ex. 63, ████████████████

█████████████████████████████████████████████████████

████████████; Ex. 64, ████████████████████████████████

████████████████████  ███████████████████████████

█████████████████████████████

Nevertheless, ERC now makes the startlingly contradictory argument (at 20) that Jamex had no obligation to make payments to ERC once JTH acquired the membership interests of BTS/JTS.  The only "evidence" upon which ERC relies are arguments in a legal brief filed by Jamex in support of a motion to dismiss third party claims in this action, which was denied by the Court.  (Reply at 20 (citing "Jamex Motion to Dismiss Cross-Claims, October 30, 2017, Dkt. 97"); Dkt. 155, Order Denying Jamex's Motion to Dismiss Cross-Claims, dated April 12, 2018.) Of course, legal arguments are not evidence.  *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985) ("Legal memoranda and oral argument are not evidence"); *Myers v. AutoZoners, LLC*, No. 16-1312, 2017 WL 6316586, at *8 (W.D. Pa. Dec. 11, 2017) ("[A]ttorneys' unsworn statements in their legal memoranda . . . plainly are not evidence.").



Notwithstanding Jamex's arguments in support of its motion to dismiss

(Opposition, Ex. A., Ex. 35,

Indeed,

(Ex. 65

The former CFO of Bridger Logistics

Under the terms of the sale of BTS from Bridger Logistics to Jamex Transfer Holdings,



(Opposition, Ex. B., Soiefer Decl. ¶¶ 2, 40, 42.)  Moreover, ███████████████████

███████████████████████████████  (*See* Ex. 66, ██████████████████

███████████████████████

### 4. Ferrellgas Believed That Jamex Could Perform BTS's On-Going Obligations Under The RSA.

ERC also argues in its Reply (at 21-22) that Ferrellgas "did not expect" that Jamex would

"voluntarily cover BTS's payments" to ERC, but, instead, expected Jamex to go bankrupt within

12-18 months.   ERC concedes—as it must—that the email it quotes ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Moreover,  ERC  again  ignores  the  declaration  of  Todd  Soiefer,  which  states

unambiguously that, ████████████████████████████████████

███████████████████████████████████████  (Opposition, Ex.

B., Soiefer Decl. ¶ 40.) ████████████████████████████████

██████████████████████████████████████████  (*Id.*,

¶¶ 40-41.)  Indeed. ██████████████████████████████████

██████████████████████  *Id.*, Ex. A, Ex. 33), ██████████████████

███████████████████████████████████  (*Id.*, Ex. B.,

Soiefer Decl. ¶¶ 40-41).

## III.   ERC HAS NOT CARRIED ITS BURDEN TO SHOW THAT ATTORNEYS FURTHERED AN INTENTIONAL FRAUD.

Notwithstanding its burden to establish the applicability of the crime-fraud exception, ERC argues in its Reply (at 23) that "Ferrellgas does not deny the assistance of counsel in the asset transfers in June 2015 or January 2016, which satisfies the second element of the crime-fraud exception."  As the BL/FG Defendants stated quite clearly in their Opposition (at 41-42), however, "ERC has altogether failed to carry its burden to show that attorneys furthered a fraud."

As to the entire relevant time period, ERC has not identified the particular entries on the BL/FG Defendants' revised privilege log that it claims are communications in furtherance of intentional fraudulent transfers, leaving the BL/FG Defendants and the Court to guess.

As to the period from May to July 2015, there is no merit to ERC's argument that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Reply at 24.)  As explained above, the BL/FG Defendants did not create "fake" entities.  As a result, there is no evidence that █████████████████████████████████████████████████████████████

As stated above, ERC modifies its argument regarding the transfer of BTS assets during December 2015 and January 2016 in its Reply (at 15-18), asserting now that fraudulent transfers occurred when Bridger Logistics and its subsidiaries (including BTS) became guarantors under the Ferrellgas credit agreement with Bank of America in mid-2015 and later granted a security interest in their assets to comply with the agreement.  Even if the Court is inclined to accept this meritless new argument made for the first time in the Reply, ERC comes forward with no evidence that attorneys were involved, let alone that attorneys furthered any fraud.

22

In addition, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ It is well-established that the "seal is broken" only "when the lawyer's communication is meant to facilitate *future wrongdoing* by the client" and "gives direction for the commission of *future fraud or crime*." *Haines*, 975 F.2d at 90 (emphasis added). As explained above, neither the grant of a security interest nor the transfer of encumbered assets could qualify as a fraudulent transfer (even with appropriate evidence of wrongful intent) unless ERC also could eliminate the guaranty. As a result, ERC has not demonstrated that any communications with counsel during December 2015 and January 2016 furthered a fraud, ████████████████████████████████████████████████████████████████ ████████████████ (*See also* Opposition, Ex. B., Soiefer Decl. ¶ 36.)[8]

Of course, ERC cannot overcome its burden with pointed citations (at 24-25) to cases involving famous frauds, such as *In re Enron Corp.*, 349 B.R. 115 (Bankr. S.D.N.Y. 2006), and *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 319 F.R.D. 100 (Bankr. S.D.N.Y. 2017). Putting aside that these citations appear for the first time in the Reply, the facts here bear no resemblance to the facts in the *Madoff* and *Enron* cases.

In *Enron*, the court applied the crime-fraud exception to communications with in-house counsel concerning a fraudulent effort to obtain a surety bond for a loan transaction, which is unlawful, by duping the surety into believing that that the loan was actually a capacity service agreement. In particular, the movant came forward with evidence that Enron's counsel were involved in actual fraud by showing that (1) Enron "understood that the transaction was a loan and not a capacity service agreement," (2) Enron "knew about the Appleton Rule prohibiting [the

---

[8]   Notably, these are the same privileged communications Steptoe attorneys reviewed after recognizing that the documents had been inadvertently produced, prompting both this Motion and the pending motion to disqualify the Steptoe team.

surety] from issuing a bond to guaranty payment of a loan," (3) the surety "did not know about the true nature of the transaction," and (4) Enron employees "had conversations with in-house counsel regarding the Appleton Rule and the transaction at issue." *Enron*, 349 B.R. at 128. Thus, there was evidence implicating Enron's counsel in actual future fraud.

In *Madoff*, 319 F.R.D. at 107-09, a discovery arbitrator examined whether defendant used counsel to help her "shield the proceeds" she received from the Madoff "Ponzi scheme" by purchasing a house titled in the name of her life partner. After conducting an *in camera* review, the arbitrator found that defendant (1) decided to remove her own name from the title after learning "that the Madoff Ponzi scheme was about to fall apart," (2) transferred "more money to [counsel] than was necessary to purchase the house," (3) provided a pretextual explanation for her decision, (4) "spearhead[ed] the effort to ensure that 'her name' did not appear on the title" just "a few months before Madoff's Ponzi scheme was exposed," (5) transferred large sums of money out of her accounts with Madoff (including to buy the house) in the months before the Ponzi scheme fell apart, and (6) obtained advice from counsel about how to structure the transaction to "further[] the unlawful goal of making it more difficult for [victims of the Ponzi scheme] to trace the funds used to purchase the house and secure their return." *Id.* at 108-09.

In stark contrast, there is no evidence in this case demonstrating that counsel furthered any future fraud. At most, ERC has shown that in-house counsel gave advice about ████████

████████████████████████████████████████████████████

## IV. ANY ORDER APPLYING THE CRIME-FRAUD EXCEPTION SHOULD BE SUBJECT TO APPELLATE REVIEW.

Resolution of this issue is important to the future contours of these proceedings. That is why BL/FG Defendants surface early review in the event of an adverse ruling. On that subject,

ERC misstates (at 26) the Supreme Court's holding in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), when it argues that "[p]re-trial discovery orders regarding privilege are not subject to appeal until after a final judgment has been rendered." In *Mohawk*, the Court determined only whether a party could immediately appeal a discovery order under the collateral order doctrine under, pursuant to 28 U.S.C. § 1291. The Court held that the "collateral order doctrine does not extend to disclosure orders adverse to the attorney-client privilege," but it did not bar other paths to appellate review, several of which remain available. *Id.* at 114.

First, as the Court made clear in *Mohawk* itself, "a party may ask the district court to certify, and the court of appeals to accept, an interlocutory appeal pursuant to 28 U.S.C. § 1292(b)." *Id.* at 110. *See also Henriquez-Disla v. Allstate Prop. & Cas. Ins. Co.*, No. 13-284, 2014 WL 3887750, at *5 (E.D. Pa. Aug. 7, 2014) (citing *Mohawk* and stating "that interlocutory appeal pursuant to section 1292(b) is available for 'a particularly injurious or novel privilege ruling'").

Indeed, *Mohawk* teaches that "[t]he preconditions for § 1292(b) review . . . are most likely to be satisfied when a privilege ruling involves a new legal question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases." *Id.* at 110-11; *see also Henriquez-Disla*, 2014 WL 3887750, at *5 (analyzing *Mohawk* and certifying § 1292(b) interlocutory appeal involving "applicability of the attorney client privilege"); *Coleman v. Sterling*, No. 09-CV-1594, 2012 WL 12952831, at *4 (S.D. Cal. Feb. 21, 2012) (certifying § 1292(b) interlocutory appeal and finding substantial ground for difference of opinion regarding, *inter alia*, the "scope of the crime-fraud exception").[9]

---

[9]     ERC cites (at 27) *Oasis Research, LLC v. Carbonite, Inc.*, Nos. 4:10-CV-435, 4:12-CV-525, 4:12-CV-526, 2015 WL 5317600, at *5-6 (E.D. Tex. Sept. 11, 2015), for the proposition that district courts have denied interlocutory appeals following *Mohawk*. ERC's argument is directly refuted by *Henriquez-Disla* and *Coleman*.

Here, the briefs demonstrate disagreement about the burden ERC must meet to invoke the crime-fraud exception, with ERC arguing that it need only make a prima facie showing of a fraudulent transfer to trigger the exception and advocating for a burden-shifting framework never endorsed by the Third Circuit and based entirely on an out-of-circuit case from Florida.

Second, *Mohawk* does not foreclose the BL/FG Defendants from filing a petition for a writ of mandamus to challenge an order to disclose privileged materials.  *See Mohawk*, 558 U.S. at 111 ("a party may petition the court of appeals for a writ of mandamus" in connection with discovery order adverse to privilege); *Haines*, 975 F.2d at 93 (granting mandamus petition and reversing decision to apply crime-fraud exception).

Third, as stated in *Mohawk*, the BL/FG Defendants or their counsel might decline to turn over the documents at issue, resulting in a contempt order that is immediately appealable to the Third Circuit.  *Mohawk*, 558 U.S. at 101 (after a contempt order has been entered against a "noncomplying party," that party may "appeal directly from that ruling"); *see also In re Grand Jury*, 705 F.3d 133, 143 (3d Cir. 2012) ("The contempt route to an immediately appealable final decision is a firmly established feature of federal appellate procedure.").

And finally, the Third Circuit has made very clear that any disclosure of privileged communications should occur only after "all avenues of appeal are exhausted":

> Because of the sensitivity surrounding the attorney-client privilege, care must be taken that, following any determination that an exception applies, the matters covered by the exception be kept under seal or appropriate court-imposed privacy procedures until all avenues of appeal are exhausted.  Regrettably this protection was not extended by the district court in these proceedings.  Matters deemed to be excepted were spread forth in its opinion and released to the general public.  In the present posture of this case, by virtue of our decision today, an unfortunate situation exists that matters still under the cloak of privilege have already been divulged.  *We should not again encounter a casualty of this sort.*

*Haines*, 975 F.2d at 97 (emphasis added).  Accordingly, the BL/FG Defendants respectfully ask that they be given an opportunity to seek appellate review before the disclosure of any privileged

communications pursuant to the crime-fraud exception.

## CONCLUSION

For all the foregoing reasons, this Court should deny Plaintiff Eddystone Rail Company's

Motion to Compel Production of Withheld Documents Under the Crime-Fraud Exception.

Dated:  November 30, 2018

Respectfully submitted,

By: /s/   *Lawrence G. Scarborough*
Lawrence G. Scarborough (Admitted *Pro Hac Vice*)

Richard L. Scheff (I.D. No. 35213)
Michael C. Witsch (I.D. No. 313884)
ARMSTRONG TEASDALE, LLP
1500 Market Street
12th Floor, East Tower
Philadelphia, PA 19102
Telephone:  (215) 246-3469
Facsimile:  (215) 569-8228
rlscheff@armstrongteasdale.com
mwitsch@armstrongteasdale.com

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
Bieta Andemariam (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 541-2000
Facsimile:  (212) 541-4630
lgscarborough@bclplaw.com
bieta.andemariam@bclplaw.com

Jacob A.  Kramer (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW
Washington, D.C. 20004
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200
jake.kramer@bclplaw.com
rachel.beck@bclplaw.com

Brian C. Walsh (Admitted *Pro Hac Vice*)
Alicia Ragsdale Olszeski (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
211 North Broadway, Suite 3600
St.  Louis, Missouri 63102
Telephone:  (314) 259-2000
Facsimile:  (314) 259-2020
brian.walsh@bclplaw.com
ali.olszeski@bclplaw.com

Sarah L. Hartley (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
sarah.hartley@bclplaw.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas
Partners, L.P., Ferrellgas L.P., Bridger Rail
Shipping, LLC, Bridger Real Property, LLC,
Bridger Storage, LLC, Bridger Swan Ranch, LLC,
Bridger Terminals, LLC, Bridger Transportation,
LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC,
Bridger Admin Services II LLC, Bridger Energy,
LLC, Bridger Lake, LLC, Bridger Leasing, LLC,
Bridger Marine, LLC*

## CERTIFICATE OF SERVICE

I, Michael Witsch, hereby certify that on November 30, 2018, a true and correct copy of the foregoing *BL/FG Defendants' Sur-Reply in Opposition to Plaintiff Eddystone Rail Company's Motion to Compel Production of Withheld Documents Under the Crime-Fraud Exception* was filed electronically via the Court's ECF filing system.  This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

  /s/ *Michael Witsch*
Michael Witsch