UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC )
)
           Plaintiff, )   Civil Action No. 17-cv-00495
)
           v. )
)
BRIDGER LOGISTICS, LLC, JULIO )   THIS DOCUMENT CONTAINS
RIOS, JEREMY GAMBOA, )   CONFIDENTIAL INFORMATION
FERRELLGAS PARTNERS, L.P., )   THAT IS SUBJECT TO THE
FERRELLGAS L.P., BRIDGER )   COURT'S PROTECTIVE ORDER IN
ADMINISTRATIVE SERVICES II, )   THIS ACTION AND IS HEREBY
LLC, BRIDGER MARINE, LLC, )   FILED UNDER SEAL
BRIDGER RAIL SHIPPING, LLC, )
BRIDGER REAL PROPERTY, LLC, )
BRIDGER STORAGE, LLC, BRIDGER )
SWAN RANCH, LLC, BRIDGER )
TERMINALS, LLC, BRIDGER )
TRANSPORTATION, LLC, BRIDGER )
ENERGY, LLC, BRIDGER LEASING, )
LLC, BRIDGER LAKE, LLC, J.J. )
LIBERTY, LLC, J.J. ADDISON )
PARTNERS, LLC, )
)
           Defendants. )

DECLARATION OF E. NORMAN VEASEY

My name is E. Norman Veasey and I hereby declare:

1.  I am over the age of 18 and competent to testify on the matters set forth in this Declaration.

2.  I have personal knowledge of the matters in this Declaration.

3.  If I should be asked to testify under oath as to these matters, I would be competent and willing to do so.

4.      I am a member in good standing of the Bar of the Supreme Court of Delaware and I have been a member thereof since January 10, 1958. I am also a member of the Bar of the United States District Court for the District of Delaware, the United States Court of Appeals for the Third Circuit, the United States Court of Appeals for the Federal Circuit, and the United States Supreme Court.

5.      Upon becoming a member of the Delaware Bar in 1958, I became an associate, and later a partner and managing partner, of the Wilmington, Delaware, firm of Richards, Layton & Finger (RLF), which firm later became Richards, Layton & Finger, P.A., of which I was a Director until 1992, including three years as President (1985-1988).

6.      During my 34-year career at RLF I was actively engaged as a corporate counselor and litigator, representing the firm's clients in a number of complex matters, including mergers and acquisitions, corporate litigation, and general litigation practice. In 1979, I was honored to be inducted into the American College of Trial Lawyers (ACTL), of which I have been a Fellow continuously (although when I was Chief Justice I was necessarily designated a "Judicial Fellow"). I now serve on the Alternate Dispute Committee and the Complex Litigation Committee of the ACTL.

7.      I served RLF and its clients until April 1992, when I resigned to become the Chief Justice of the Supreme Court of Delaware. I served my twelve-year term as Chief Justice until May of 2004.

8.      As Chief Justice, I served as the administrative head of all the courts of the Delaware Judiciary (Del. Const. art IV, section 13). Along with my judicial colleagues on the Delaware Supreme Court and the Court on the Judiciary, I decided many cases, and regulated the ethics of the Delaware Bar and Bench.

9.      While I was Chief Justice and during the years 1992 through 1995, I served as an officer, and ultimately the Chair, of the Section of Business Law (SBL) of the American Bar Association (ABA).

10.      Another major ABA responsibility was offered to me (and I accepted) shortly after I had served my terms as an officer of the SBL of the ABA.  In 1997, I was asked by the President of the ABA on his behalf and on behalf of the Immediate Past President and the President-Elect of the ABA to serve as Chair of the then-newly-created ABA Commission to Evaluate the Model Rules of Professional Conduct (Ethics 2000).  I was honored to Chair the Ethics 2000 Commission for the five years from 1997 to 2002.  I can best describe the detailed work of the Commission in revising the ABA Model Rules of Professional Responsibility by referring to a comprehensive Delaware Law Review article that I authored in 2002.  A copy of that article is attached hereto as Exhibit A.

11.      After I retired as Delaware Chief Justice, from June of 2004 until the end of 2013 I was a Senior Partner of the international law firm, Weil, Gotshal & Manges LLP (WGM).  In that role I had offices in Wilmington and New York City.

12.      From January of 2014 until the present I have been Special Counsel of the Wilmington firm Gordon, Fournaris & Mammarella, PA (GFM).  Attached as Exhibit B is a copy of my curriculum vitae, which appears in the current website of GFM.

13.      Other honors I have received in connection with ethics and professionalism include the following:  Lewis F. Powell, Jr., Award for Professionalism and Ethics from the American Inns of Court Foundation in 1996; Annual Ethics Award from the American Corporate Counsel Association (ACCA) in 2002; Daniel L. Herrmann Professional Conduct Award in 2005; and the Michael Franck Professional Responsibility Award in 2005.  I have also served as

a member of the ABA Standing Committee on Ethics & Professional Responsibility (SCEPR). In addition, I was President of the Delaware State Bar Association in 1982-83; received the Order of the First State in 2004, the highest state award, presented by the Governor of Delaware; I was named Corporate Governance Lawyer of the Year in 2009-2012; and I was President of the Conference of Chief Justices and Chair of the National Center for State Courts (1999-2000).

14.     Beginning during my term as Chief Justice and continuing in various years up to the present, I have taught as an adjunct professor at the law schools of the following universities: University of Virginia, SMU University, New York University, University of Pennsylvania, Wake Forest University, and Ohio State University.  The name of my course is "The Real World of Ethical Corporate Lawyering."  A copy of my current syllabus (with an ethics component relevant to the issues in this matter) for the upcoming teaching of my course in February 2019 at Wake Forest University School of Law is attached as Exhibit C.

15.     I have been asked by the firm of Steptoe & Johnson to review certain documents filed in this matter, including the Motion to Disqualify Plaintiff's Counsel, various briefs, and declarations relating thereto.

16.     The issue I have been asked to address relates to the principles governing the duties of a lawyer who receives ("the Receiving Lawyer") in the course of discovery documents produced by the Receiving Lawyer's adversary ("the Producing Lawyer"), which documents are claimed by the Producing Lawyer to have been inadvertently produced and to contain material that is allegedly subject to a claim of attorney-client privilege.

17.     The precise question implicated in the issue presented to me is what, if anything, the Receiving Lawyer and the Producing Lawyer must do as a matter of professional responsibility and procedural requirements in federal court?

18.     The responsibility of the Receiving Lawyer, imposed by the ABA Model Rules of Professional Conduct (Model Rules) as adopted by the Pennsylvania Supreme Court, is to notify the Producing Lawyer.

19.     The ethics rule that is to be considered in this matter is Rule 4.4(b), which is substantially similar to Pennsylvania Rule 4.4(b), and which provides:

> (b) A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender.

20.     In my opinion, the notification provided in this rule is the extent of mandatory responsibilities that are imposed by the applicable Rules of Professional Conduct on the Receiving Lawyer.

21.     Neither Rule 4.4(b) nor the Comments thereto ordains what the Receiving Lawyer must or must not do, beyond notification. The Comments to Rule 4.4(b) note:

> Cmt [2] … Whether the lawyer is required to take additional steps, such as returning the document or deleting electronically stored information, is a matter of law beyond the scope of these Rules, as is the question of whether the privileged status of a document or electronically stored information has been waived. …

> Cmt [3] Some lawyers may choose to return a document or delete electronically stored information unread, for example, when the lawyer learns before receiving it that it was inadvertently sent. Where a lawyer is not required by applicable law to do so, the decision to voluntarily return such a document or delete electronically stored information is a matter of professional judgment ordinarily reserved to the lawyer. See Rules 1.2 and 1.4.

22.     ABA Formal Opinion 05-437 of October 2005 reinforces this analysis. It provides, in part, as follows:

> Rule 4.4(b) thus only obligates the receiving lawyer to notify the sender of the inadvertent transmission promptly. The rule does not require the receiving lawyer either to refrain from examining the materials or to abide by the instructions of the sending lawyer.

23.     I recall personally the debate within the Ethics 2000 Commission and in public hearings conducted by our Commission on the question whether or not under Model Rule 4.4(b) there should be an ethical component to the Receiving Lawyer's duties, beyond mere notification.  We decided that there should not be, and that "other law" would control those duties.

24.     So, the "bottom line" of the Commission's decision in connection with Model Rule 4.4(b) is that the Rule should provide only that the Receiving Lawyer must notify the Producing Lawyer.  That is also the current Pennsylvania rule.

25.     Our conclusion that this issue would be covered by other law or resolved in proceedings unrelated to ethics enforcement, has since been supported and reaffirmed by various ethics opinions, including the most recent ABA Formal Opinion on the subject, Opinion 06-440, dated May 13, 2006.  It is attached hereto as Exhibit D.

26.     In its "bottom line," ABA Formal Opinion 06-440 confirms, as of 2006, what our Ethics 2000 Commission decided as of 2002, as noted at page 18 of my Delaware Law Review article.  Here is what is said there:

> A new provision in Rule 4.4 ("Respect for Rights of Third Persons"), among other things, deals with the currently controversial issue of the "errant fax."  It provides that a lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that it was inadvertently sent, must promptly notify the sender.  Beyond this, however, the rule does not attempt to dictate a lawyer's possible obligations under other law in connection with examining and using confidential documents that come into the lawyer's possession through the inadvertent or wrongful act of another.

27.     Here is what is said in ABA Formal Opinion 06-440, as it withdrew certain earlier ABA Formal Opinions on the subject, including Formal Opinions 92-368 and 94-382:

> In Formal Opinions 92-368 and 94-382, the Committee was influenced by principles involving the protection of confidentiality, the inviolability of the

attorney-client privilege, the law governing bailments and misspent property and general considerations of common sense, reciprocity, and professional courtesy. Application of other law is beyond the scope of the Rules, as noted expressly in comments to Rule 4.4(b) and in Scope [15]. Scope [16] notes that the Rules do not exhaust the moral and ethical considerations that should inform a lawyer. Certainly, the considerations that influenced the Committee in Formal Opinion 92-368, which carried over to Formal Opinion 94-382, are part of the broader perspective that may guide a lawyer's conduct in the situations addressed in those opinions. They are not, however, an appropriate basis for a formal opinion of this Committee, for which we look to the Rules themselves.

As was noted in Formal Opinion 05-437, Rule 4.4(b) requires only that a lawyer who receives a document relating to the representation of the lawyer's client and who knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender. The Rule does not require refraining from reviewing the materials or abiding by instructions of the sender. …

*　　　*　　　*

Accordingly, because the advice presented in Formal Opinion 94-382 is not supported by the Rules, the opinion is withdrawn in its entirety.

28.　　The "other law" in this case includes Fed.R.Civ.P. 26(b)(5)(B) and the 502 stipulation referred to in the papers filed with the Court. The stipulation is relevant but mostly similar to and declaratory of the federal rule. It provides, in part:

> Nothing in this Stipulation shall prevent a Receiving Party from challenging the privilege or protection asserted by the Producing Party, or limit the right of a Receiving Party to petition the Court for an in camera review of the Protected Information.

There are other considerations that may apply. For example, the Receiving Lawyer may consider matters involving her own professional judgment in connection with her duties in representing her client and in her responsibilities to the Court.

29.　　Rule 26(b)(5)(B) which is applicable to the responsibilities of both the Producing Lawyer and the Receiving Lawyer in federal court provides:

> 26(b)(5)(B) *Information Produced.* If information produced in discovery is subject to a claim of privilege or of protection as trial-pre-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use

or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

30.     The operative principles embodied in the foregoing rule are that when a Producing Lawyer claims that the inadvertently-produced documents are privileged that lawyer may notify the Receiving Lawyer "of the claim and the basis for it." The Receiving Lawyer, in turn, must "promptly return, sequester, or destroy the specified information and any copies it has; *must not use or disclose* the information until the claim is resolved; ...; and may promptly present the information to the court under seal for a determination of the claim. ..." (Emphasis added)

31.     The operative term in the federal rule is that the Receiving Lawyer may not "use or disclose" the information until the privilege claim is resolved by the Court. In my opinion the verb "use" for purposes of federal rule must mean some action in the nature of actively deploying the document, such as in a deposition, pleading or court proceeding other than one merely seeking a ruling of the court on the Producing Lawyer's privilege claim. The common, dictionary definition of the verb "use" which should be considered here is to "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result; employs; she used her key to open the front door ...." (New Oxford American Dictionary, at page 1907 (3rd ed. 2010).

32.     Accordingly, when the Receiving Lawyer reads the documents for the sole purpose of informing that lawyer whether or not to concur with or challenge the Producing Lawyer's unilateral claim of privilege, that review is not "use" within the meaning of the rule unless the Receiving Lawyer takes a further step and actively deploys the documents, as in a

deposition, pleading, or active court proceeding, for example.  This is true whether or not the Producing Lawyer has stated a basis for the claim of privilege.  In fact, how can the Receiving Lawyer challenge the privilege assertion of the Producing Lawyer, as contemplated by the 502 stipulation, without any review of the produced documents?

33.    I have read the Declaration submitted in this case by my learned friend, Lawrence J. Fox, Esquire, and I am constrained respectfully to disagree with some of the statements in his Declaration.

34.    For example, my friend says in paragraphs 20 through 24 that (a) "Steptoe and Johnson goes too far in its assertion of *domain [sic]* over these documents" by reviewing them to assess the Producing Party's claim of privilege; (b) that this demonstrates "pure *disdain* for the present civilized order that has been established to avoid the *rules of the jungle*, treating the rules as *merely hortatory* and not applying to the law firm;" (c) "the clear result of this approach is to give Steptoe access to *every* attorney-client privileged document;" (d) "… such a process results in the *wholesale* disclosure of privileged information, thereby *destroying* that which must be protected;" (e) "How can any information be *flushed* from the reviewing lawyer's mind once it has been read?;" (f) "*Any review* of these documents for privilege necessarily exposes the contents of these documents to the adverse lawyers, *securing entitlement* to them when questions still remain and should remain until the court decides whether Steptoe has established *entitlement* to the errant documentation;" and (g) "The Steptoe solution results not in the preservation of the privilege but in its *destruction.*" (Emphasis added).

35.    With all due respect, I suggest that my friend not only overstates the situation with his rhetoric but also he begs the very question to be decided at this juncture: namely, does

the federal rule prohibit a lawyer from simply reading the documents for the sole purpose of determining the validity of the Producing Lawyer's unilateral and untested claim of privilege?

36.     Moreover, my friend makes the untenable argument that once the Receiving Lawyer reads a document solely to decide whether or not to concur or challenge the Producing Lawyer's unilateral claim of privilege, the Receiving Lawyer is forever contaminated and immobilized by indelible information that cannot be "flushed" from her brain.  This *ipse dixit* assertion cannot logically be the touchstone of the practical application or principled interpretation of the federal rule's prohibition of "use."  The upshot of my friend's suggestion is that the Receiving Lawyer must *always* accept uncritically the Producing Lawyer's unilateral claim of privilege.  This cannot be correct.

37.     If simply reviewing the documents to inform the Receiving Lawyer of the validity of the Producing Lawyer's privilege claim were held to be a prohibited "use" under the federal rule, the outcome would be nonsensical from a practical point of view as it would mean that the Receiving Lawyer must set aside her client's interests the instant she receives a document cloaked in the Producing Lawyer's unilateral privilege claim.

38.     Therefore, it is my opinion that the guiding principle that should be applicable in this kind of case is that there is no ethical or procedural rule prohibiting the Receiving Lawyer from reviewing the documents for the limited purpose of informing that lawyer on the sole question, which is whether or not the Producing Lawyer's unilateral claim of privilege is valid.

I declare under penalty of perjury that the statements herein are true and correct.

December 13, 2018

E. Norman Veasey

# EXHIBIT A

WESTLAW       EXHIBIT A

**5 Del. L. Rev. 1**

ETHICS 2000: THOUGHTS AND COMMENTS ON KEY ISSUES OF PROFESSIONAL RESPONSIBILITY IN THE TWENTY-FIRST CENT...
5 DELREV 1    E. Norman Veasey    Delaware Law Review    *(Approx. 15 pages)*

E. Norman Veasey[a1]

Copyright © 2002 by Delaware Law Review: E. Norman Veasey

# ETHICS 2000: THOUGHTS AND COMMENTS ON KEY ISSUES OF PROFESSIONAL RESPONSIBILITY IN THE TWENTY-FIRST CENTURY

Delaware is one of forty-two states with some version of the Model Rules of Professional Conduct. The Model Rules were approved by the House of Delegates of the American Bar Association in 1983 after a long debate on the work of the Kutak Commission. About thirty amendments to the original version of the Model Rules were adopted by the ABA House after 1983. The Delaware Supreme Court will soon be considering whether—and to what extent—to adopt a new set of Delaware Lawyers' Rules of Professional Conduct, as a result of recent ABA activity to modernize the Model Rules.

## An Overview of Ethics 2000

In 1997 the ABA Board of Governors—inspired by the then ABA President (Jerry Shestak), his predecessor as President (Lee Cooper) and his successor (Phil Anderson)—created a commission to overhaul the Model Rules. Known as the Commission on Evaluation of the Rules of Professional Conduct (nicknamed "Ethics 2000"), the thirteen-member Commission was appointed by President Shestak, began work on that overhaul in mid-1997 and released its Report for comment in November 2000.

After a period of vetting, the November 2000 Report was revised and replaced with the Commission's formal Report 401 that was submitted to the House for action. The debate on Report 401 began at the ABA Annual Meeting in Chicago in August 2001. Thereafter, a further revised Report 401 was submitted to the House and was debated at the ABA Mid-Year Meeting in Philadelphia in February 2002. After debate, the adoption of a few amendments to Report 401, and the deferral of action on Rules 5.5 and 8.5 relating to multijurisdictional practice, the new set of Model Rules was adopted by the House at the Philadelphia meeting.

I have had the honor to chair the Commission throughout this nearly five-year process. The other twelve members of this diverse Commission also have stayed with the *2 Commission throughout. Four judges, five practitioners, two ethics professors and two "clients" (a corporate general counsel and a nonlawyer public citizen) constitute the Commission. In addition to the thirteen voting members of the Commission, there were two non-voting liaison members from the ABA Board of Governors. The Commission had three brilliant academic Reporters and an outstanding ABA staff.

**SELECTED TOPICS**

Attorney and Client

Discipline
Multiple Violations of Attorney Disciplinary Rules

Secondary Sources

Bringing of frivolous civil claim or action as ground for discipline of attorney

85 A.L.R.4th 544 (Originally published in 1991)

...This annotation collects and discusses the state and federal cases ruling on disciplinary actions brought on the ground of attorney misconduct in bringing allegedly frivolous or unwarranted civil claim...

Disciplinary action against attorney for aiding or assisting another person in unauthorized practice of law

41 A.L.R.4th 361 (Originally published in 1985)

...This annotation collects and discusses the cases in which courts have considered whether disciplinary action should be taken against an attorney who has allegedly aided or assisted another person in th...

Negligence, inattention, or professional incompetence of attorney in handling client's affairs in criminal matters as ground for disciplinary action--modern cases

69 A.L.R.4th 410 (Originally published in 1989)

...This annotation collects and analyzes the modern cases in which the courts have discussed or determined what constitutes an attorney's negligence, inattention, or professional incompetence in the handl...

See More Secondary Sources

Briefs

Petition for Writ of Certiorari

2000 WL 34001023
George E. KERSEY, Petitioner, v. Daniel C. CRANE and Terence M. Troyer, Respondents.
Supreme Court of the United States
Dec. 04, 2000

...Petitioner respectfully requests that a writ of certiorari issue to review the judgment of the Supreme Judicial Court, Commonwealth of Massachusetts in its case No. SJC-08137. A decision by the Supreme...

Petition for a Writ of Certiorari

2000 WL 34000442
J. L. WILSON, Petitioner, v. James NEAL, Director of the Arkansas Supreme Court Committee on Professional Conduct, Respondent.
Supreme Court of the United States
Sep. 27, 2000

...Petitioner, J. L. Wilson, respectfully petitions this Court to issue a writ of certiorari to review the final judgment of the Supreme Court of the State of Arkansas (that was entered in this case on Ma...

Brief in Opposition

2001 WL 34117169
J. L. WILSON, Petitioner, v. James NEAL, Director of the Arkansas Supreme Court

The members of the entire "team" are as follows:

Committee on Professional Conduct.
Respondent,
Supreme Court of the United States
Feb. 05, 2001

...The petition and argument includes a lengthy, unnecessary and sometimes inaccurate review of the history of this disciplinary action which requires a response to the facts alleged. 1.Criminal Proceedin...

See More Briefs

## Commission Members:

E. Norman Veasey (Chair)

Lawrence J. Fox

Albert C. Harvey

Geoffrey C. Hazard, Jr.

Patrick E. Higgenbotham

W. Loeber Landau

Margaret C. Love

Susan R. Martyn

David T. McLaughlin

Richard E. Mulroy

Lucian T. Pera

Henry Ramsey, Jr.

Laurie D. Zelon

## Liaisons from the Board of Governors:

James Lee

Seth Rosner

## Reporters:

Nancy J. Moore (Chief Reporter)

Carl A. Pierce

Thomas D. Morgan (1998-1999)

## Staff of the ABA Center for Professional Responsibility:

Jeanne P. Gray (Director)

Charlotte K. Stretch (Counsel)

Susan M. Campbell (Paralegal).

*3 This is an extraordinary group, most of whom are more knowledgeable than I about the scholarship of professional ethics.

Lack of uniformity in state ethics rules was a primary motivation for the 1997 Board of Governors' decision to revisit the Model Rules. There are many significant differences among the state versions, and this problem had been exacerbated by the thirty or so ABA House-adopted amendments to the Model Rules since 1983. Some states had elected to retain some version of the 1969 Model Code of Professional Responsibility rather than to adopt the Model Rule approach, and California remained committed to an entirely separate system of lawyer regulation. Delaware itself, I must confess, was guilty of inertia in some respects by not having institutionalized a process of modernization. We now have a Permanent Advisory Committee on the Delaware Lawyers' Rules of Professional Conduct under Supreme Court Rule 96. That

Committee, chaired by Dennis L. Schrader, Esquire, will be recommending to the Court a new set of Rules in light of the Ethics 2000 Report and the House action. In addition, the Committee will keep the Court up to date with continuing recommendations.

It was not only the patchwork pattern of state regulation that motivated the ABA leaders to commission the Ethics 2000 process in 1997. There were also new issues and questions raised by the influence that technological developments were having on the delivery of legal services. The explosive dynamics of modern law practice and the anticipated developments in the legal profession in the future provided urgency and a substantive dimension to the project. These developments were underscored by the comprehensive work underway in 1997 and now completed on the American Law Institute's Restatement of the Law Governing Lawyers.

There was also a strong countervailing sense that there is much to be valued in the concepts and articulation of the existing Model Rules. The Commission concluded early on that the valuable aspects of the Rules and familiarity with its language should not be lost or put at risk in our revision effort. As a result, the Commission set about to be comprehensive, but at the same time to recommend change only where necessary. In balancing the need to preserve the good with the need for improvement, we were mindful of Thomas Jefferson's words of about 185 years ago, in a letter concerning the Virginia Constitution, that "moderate imperfections had better be borne with; because, when once known, we accommodate ourselves to them, and find practical means of correcting their ill effects." We also were mindful of the wisdom of the medical profession's Hippocratic Oath, "first, do not harm," and the barnyard logic that "if it ain't broke, don't fix it."

*4 In this brief and necessarily superficial article, I will be able only to scratch the surface of the numerous changes and proposals arising out of this recent ABA activity. For a more comprehensive exposition and analysis, I refer the reader to the website of the ABA Center for Professional Responsibility[1] and an upcoming, comprehensive article by my fellow Commissioner, Margaret Colgate Love, Esquire, entitled "The Revised ABA Model Rules of Professional Conduct—Summary of the Work of 'Ethics 2000,'" scheduled for publication in the *Georgetown Journal of Legal Ethics*, Spring 2002.

## Drafting Goals

Our goal was to develop a set of Model Rules that will be comprehensible and responsible in the eyes of the public while providing clear guidance to the practitioner. We wanted to preserve all that is valuable and enduring about the existing Model Rules, while at the same time correcting errors, seeking the professional high ground, adapting the Rules to the realities of modern law practice, recognizing the limits of professional disciplinary enforcement and fostering public trust and confidence. We decided to retain the basic architecture of the Model Rules. We also retained the principle that the primary function of the Rules is to establish a disciplinary structure.

Our objective was also to resist the temptation to preach aspirationally about "best practices" or professionalism concepts. Valuable as the profession might find such guidance, sermonizing about best practices would not have—and should not be misperceived as having—a regulatory dimension. There are other vehicles for accomplishing that noble objective. For example, concepts of professionalism are being addressed in the implementation of the National Action Plan on Professionalism and Lawyers' Conduct of the Conferences of Chief Justices. The details of the 1999 Action Plan and the 2001 implementation plan may be accessed on the website of the National Center for State Courts.[2]

Although we tried to keep our changes to a minimum, the Commission ended up making a fairly large number of changes in the Model Rules and Comments. Some

are relatively innocuous and nonsubstantive, in the nature of editorial or stylistic changes. Others are substantive, but not particularly controversial. A few are both substantive and controversial. Again, I urge the reader to examine the text of the Rules, Comments and *5 Reporters' observations that are available on the website of the ABA Center for Professional Responsibility.

## Process

Our process was open throughout. At regular intervals over this period, we had over fifty days of meetings, all of which were open, and at least ten public hearings. There were a large number of interested observers at most of our meetings and hearings. Many of these observers were members of our Advisory Council of 250-plus persons. Their comments and suggestions were very helpful and influential in shaping the Report. Our public discussion drafts, minutes and the Commission's meetings and the three formal Reports have been regularly available on our website throughout the process for the world to see and comment upon. As a consequence, we received an enormous number of excellent comments and suggestions.

We believe our product is a balanced blend of traditional precepts and forward-looking provisions that are responsive to modern developments. Although our process was thorough, painstaking, open, scholarly, objective and collegial, some of our recommendations have not been without internal and external controversy. That is not surprising. One would not reasonably expect every vote in the Commission's deliberations to have been unanimous. Most of our decisions on individual Rules and Comments within the Commission were by unanimous vote or simply by consensus. Some resulted in divided votes. A few of those were by the narrowest of margins. In a collegial process this is expected and healthy. As Walter Lippmann, the great American writer and editor, said, "Where all think alike, no one thinks very much."

The Commission's recommendations were fully debated in the House at the ABA meetings in August 2001 and February 2002. With a few amendments, the House finally approved nearly all of our proposals. As noted, our proposals on Rules 5.5 and 8.5 bearing upon multijurisdictional practice were omitted from House consideration. There is a separate ABA Commission on Multijurisdictional Practice that will report to the House in August 2002 for consideration of its version of Rules 5.5 and 8.5, compared with the Ethics 2000 recommendations on those rules.

What follows is a brief description of some of the most significant recommendations proposed by the Ethics 2000 Commission (including our version of Rules 5.5 and 8.5). I will also discuss the three areas where the House adopted amendments that differed from our recommendation. But first, an overview of some "hot topics" that I call the "Six Cs."

## *6 Hot Topics—The "Six Cs"

The new Model Rules are bristling with interesting issues and improvements. It would take a very long article to do justice to all that the Ethics 2000 Commission and the House accomplished. Our Report 401 was about 280 pages of very dense writing. In this little piece I can give only some highlights of the things I think are most interesting. I am certain that I have skipped over provisions that others believe to be significant. For example, in his article in the February 11, 2002 issue of the *New Jersey Lawyer*, Robert G. Seidenstein, Esquire, expressed the view that the revised Model Rule 1.17 permitting sale of an "area" of law practice was significant. I agree, but this is one provision (and there are a number of others) that I do not have room to cover in this article. (I should note that Delaware does not now have a rule relating to the sale of a law practice, but maybe we should.)

The "hot topics" that interest me the most are those I call the "Six Cs": Competence, Communication, Confidentiality, Conflicts, Corporate Clients and Candor.

First, Competence. Ethics 2000 did not change Model Rule 1.1, which requires a lawyer to have and use the requisite legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. This is the cornerstone of our profession. If a lawyer is not competent to handle a matter it should be declined or referred to one who is. This latter concept is also reflected in Rule 1.5 relating to referral fees.

Second, Communication. Ethics 2000 has placed significant emphasis on communication and writing requirements. Disciplinary problems are often the viruses and bacteria that grow in the petrie dish of noncommunication or miscommunication. Modernized concepts of "informed consent" and "confirmed in writing" are articulated in new Rule 1.4 and a new Rule 1.0 defining key terminology. These concepts of the importance of communication and a writing appear throughout the new rules.

Third, Confidentiality. This is *the* hot topic in terms of the controversy it has engendered. There are a number of provisions where issues of confidentiality arise. The central provision, of course, is Model Rule 1.6. The Commission proposed some significant changes to the Model Rules in this area. We believe those changes comport with the reality of today's environment. In one respect—discretionary disclosure of client confidences in connection with financial frauds or crimes—the House regrettably rejected our proposal. There is much to discuss in the whole area of confidentiality, and this article can only "tee up" some issues.

*7 Fourth, Conflicts. These are among the most troublesome issues that lawyers face every day. They are fact-specific and highly nuanced. The Ethics 2000 Report and the House action are replete with conflicts issues and their "first cousin," imputation. We have conflict issues and imputational issues in several Model Rules, including Rule 1.7 (current clients), Rule 1.8 (specific conflict rules), Rule 1.9 (former clients), Rule 1.10 (imputation of conflicts), Rule 1.11 (conflicts involving former and current government lawyers), an entirely new concept in Rule 1.18 (prospective clients) and others.

Fifth, Corporate Clients. Many ethics problems arise in the context of the corporation or other organization. First, the lawyer must be clear about who is the lawyer's client: the corporation, an affiliate of the corporation or an officer of the corporation.

In the confidentiality/fraud area, what is the lawyer for the corporation to do when the lawyer learns that a senior corporate officer is involved in fraud? Rule 1.13 (organization as client) gives a roadmap directing the lawyer how to remedy the problem and possibly to go "up the chain of command." Rule 4.2 (contact with represented persons) has a new Comment [7] spelling out the persons in a corporation or other organization that the adverse lawyer may or may not contact.

Sixth, Candor. Lawyers must be truthful (Rule 4.1) and must be candid to a tribunal (Rule 3.3). This latter rule has specific requirements for correcting false evidence and articulates new, special rules applicable in criminal defense when the accused insists on testifying to facts the lawyer knows or reasonably should know are false.

The issues presented by the "Six Cs" are among the most interesting and vexing. They provided lively discussion within the Ethics 2000 Commission and generated spirited debate in the House. These provisions and others probably will be the subject of many interesting exchanges in Delaware. I will now turn to some major policy issues, many of which are touched on in the discussion of the Six Cs.

## Communication with Clients and Informed Consent

One recurring theme in the new Model Rules is an insistence on clear communication between lawyer and client. The lawyer's obligation to consult with the client is emphasized in Rule 1.4 ("Communication"), and given effect in certain rules requiring that client consent must be "informed." As defined in a new Terminology Rule 1.0(e):

12/11/2018 ETHICS 2000: THOUGHTS AND COMMENTS ON KEY ISSUES OF PROFESSIONAL RESPONSIBILITY IN THE TWENTY-FIRST CE...

Case 2:17-cv-00495-JD   Document 281-1   Filed 12/14/18   Page 17 of 44

"informed consent" means agreement by a person "after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

*8 The client's consent must be confirmed in writing in many cases. The term "confirmed in writing" is defined in new Rule 1.0(b). Ordinarily, the requirement of a writing may be satisfied by a letter from the lawyer to the client memorializing the client's oral consent. If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, the lawyer must obtain or transmit it within a reasonable time thereafter. Three rules, however, require a client to sign a consent. They are Rule 1.5(c) on contingent fees, Rule 1.8(a) on business transactions with clients, and Rule 1.8(g) on aggregate settlements.

## Fees

New Rule 1.5(a) essentially provides that it is a disciplinary offense for a lawyer to charge an unreasonable fee. Moreover, costs and disbursements must be reasonable under the circumstances.

As to the matter of the division of fees between a referring lawyer and the lawyer to whom a matter has been referred, new Rule 1.5(e) requires that the client agree (confirmed in writing) to the division, including each lawyer's share. This rule also requires that the division be in proportion to the services performed or that each lawyer assume joint responsibility for the representation. Joint responsibility entails legal responsibility, including financial and ethical responsibility as if the lawyers were associated in a partnership. The Comment notes that the referring lawyer must refer the client to a competent lawyer (cross-referencing Rule 1.1). This is key to professional responsibility in this connection.

The Commission had proposed in Rule 1.5(b) to require a lawyer to communicate in writing the scope of the representation and the fee and expense arrangements, except where the lawyer will charge a "regularly represented" client at the same basis or rate. This is one of the three areas where the House amended our proposal. The House-adopted amendment inserted the word "preferably" before the words "in writing," thus returning to the current Model Rule (and Delaware's) precatory formulation.

## Confidentiality

There has always been a tension between the goal of keeping inviolate the client's confidences and the need to provide the lawyer with the ability to deal with situations where the lawyer reasonably believes it necessary to make some disclosure to protect third *9 parties or the legal system from substantial harm. The Commission's proposals would broaden, in carefully circumscribed situations, the grounds for discretionary disclosure of client information.

As approved by the House, new Rule 1.6(b)(1) provides the lawyer with discretion to reveal a client confidence if the lawyer reasonably believes it "necessary to prevent reasonably certain death or substantial bodily harm." The result of this new rule is to change "imminent" to "reasonably certain" and to eliminate the requirement that a client's crime be the cause of the problem. Disclosure is permissible whether or not the act in question is a crime or is the act of the lawyer's client. An example given in Comment [6] hypothesizes an accidental discharge into a town's water supply of toxic waste that has a substantial risk of becoming life-threatening over time, not necessarily imminently.

The most provocative debate in the House was over the Commission's proposed 1.6(b)(2), a very limited provision that would permit, but not require, the disclosure of information to the extent the lawyer reasonably believes necessary to prevent client crimes or frauds that are reasonably certain to cause substantial economic injury, and

in furtherance of which the lawyer's services have been used. The Commission's proposed 1.6(b)(2) was rejected by an amendment that passed the House. As a consequence of that vote, the Commission withdrew its companion proposal in 1.6(b)(3) to permit rectification of the economic harm.

Today, forty-one jurisdictions (although not Delaware, oddly enough) permit disclosure to prevent the client from committing a crime that would result in substantial financial injury. Notably the Commission's proposal centers on the client whose fraud or crime involves the use of the lawyer's services—a limitation that now exists in only two of the forty-one states. As a result of the House action, however, there is no provision in Model Rule 1.6 permitting disclosure of a client's financial crime under any circumstances. The following is an analysis, prepared by the Commission's Reporters, showing the Commission's proposed Rule 1.6(b)(2) and (3) compared with current state ethics rules:

## Ethics 2000 Proposed Rule 1.6(b)(2)

A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary ... to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property *10 of another and in furtherance of which the client has used or is using the lawyer's services.

## Current State Ethics Rules

Forty-one jurisdictions (80.3%) either permit or require disclosure to prevent a client from perpetrating a fraud that constitutes a crime.

· Of these 41 jurisdictions, 37 permit disclosure and 4 require disclosure;

· Of these 41 jurisdictions, 11 also permit or require disclosure to prevent a non-criminal fraud likely to result in substantial injury to the financial interests or property of another. Of these 11 jurisdictions, 9 permit and 2 require disclosure;

· Of these 41 jurisdictions, 28 permit or require disclosure without regard to the magnitude of loss to the affected persons. For the most part, these are the jurisdictions that permit disclosure to prevent any crimes but not non-criminal frauds. The other 13 only permit disclosure if the crime or fraud is likely to result in substantial injury to the financial interests or property of another;

· Of these 41 jurisdictions, only two limit disclosure to situations in which the client has used or is using the lawyer's services.

## Ethics 2000 Proposed Rule 1.6(b)(3)

A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary ... to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services.

## *11 Current State Ethics Rules

Eighteen jurisdictions (35%) permit or require disclosure to rectify substantial financial loss resulting from a client's prior commission of a crime or fraud in which the client used the lawyer's services. Of these 18 jurisdictions, 16 permit and 2 require disclosure.

My fellow Commissioner, and superguru of ethics, Geoff Hazard, in a March 11, 2002 article entitled "Removing Gag Rules for Lawyers?" in the *American Lawyers Media* points the way to other avenues that lawyers may take to disassociate themselves from a client's crime. First, Rule 1.2 prohibits the lawyer from being involved in planning such a crime, so the attorney-client privilege and ethical constraints relating to confidentiality may not be applicable. Second, Comments to Rules 1.2, 1.6 and 4.1 permit a "noisy withdrawal" if the client seeks to perpetrate a fraud. Comment [14] to Rule 1.6, for example, states:

> If the lawyer's services will be used by the client in materially furthering a course of criminal or fraudulent conduct, the lawyer must withdraw, as stated in Rule 1.16(a)(1). After withdrawal the lawyer is required to refrain from making disclosure of the client's confidences, except as otherwise permitted by Rule 1.6. Neither this Rule nor Rule 1.8(b) nor Rule 1.16(d) prevents the lawyer from giving notice of the fact of withdrawal, and the lawyer may also withdraw or disaffirm any opinion, document, affirmation, or the like. Where the client is an organization, the lawyer may be in doubt whether contemplated conduct will actually be carried out by the organization. Where necessary to guide conduct in connection with this Rule, the lawyer may make inquiry within the organization as indicated in Rule 1.13(b).

Third, Rule 1.13 requires the lawyer for the corporation to employ intra-corporate remedies to stop a fraud by a corporate officer or employee. Those remedies in Rule 1.13 contemplate going up the chain of command all the way to the board of directors, if necessary. At the board level it is likely the fraud would be stopped by directors who would not want to jeopardize their careers and reputations by allowing a corporate employee or officer to perpetrate a fraud injuring the corporation or innocent third parties. *12 Thus, many potential frauds in these situations can be prevented without a permissive disclosure such as the Ethics 2000 recommendation.

Notwithstanding these other ways to deal with client fraud, in light of the public expectations of lawyers' responsibilities in today's environment, and the rules in forty-one jurisdictions, the House vote rejecting the Commission's proposed Rule 1.6(b)(2) is indeed anomalous. In my view, it is necessary that the lawyer have a clear path under Rule 1.6 to make a permissive disclosure as a last resort if all else fails. The Commission's proposed Rule 1.6(b)(2) makes it quite clear that this last resort of permissive (not mandatory) disclosure comes only if the lawyer "reasonably believes" that the disclosure is "necessary ... to prevent" the client's crime or fraud. The forthcoming Delaware discussions on this topic should be very interesting.

## Conflicts of Interest

### (a) *Current Clients*

The Commission retained in Rule 1.7 (retitled "Conflict of Interest: Current Clients") the basic substantive concepts relating to conflicts affecting current clients, but completely reorganized and clarified the rule. We also expanded the Comment to give guidance in a number of complex areas. The revised rule clearly defines what constitutes a current conflict of interest and distinguishes situations in which the lawyer may be "directly adverse" to a client from those in which the lawyer's representation of the client may be "materially limited."

Client consent to a conflict must be "informed," and must be confirmed in writing. The revised rule provides that lawyers in the same firm may not represent opposing parties in the same litigation even if both clients consent. (The term "firm" is defined broadly in Rule 1.0(c)). The Comment to Rule 1.7 also gives detailed guidance on such unsettled conflict issues as positional conflicts, conflicts in representation of multiple clients, class action conflicts, corporate family conflicts, close family relationships, and prospective waivers. One issue is when is a lawyer who represents

a corporation precluded from taking a position adverse to an affiliate of the corporation. There is a specific Comment to Rule 1.7 that provides:

> [34] A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. See Rule 1.13(1). Thus, the lawyer for an organization is not barred from *13 accepting representation adverse to an affiliate in an unrelated matter, unless the circumstances are such that the affiliate should also be considered a client of the lawyer, there is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates, or the lawyer's obligations to either the organizational client or the new client are likely to limit materially the lawyer's representation of the other client.

This Comment may be controversial in Delaware.

A lawyer's obligation to withdraw when a conflict arises after a representation has begun is detailed in several contexts, such as changes in corporate and other organizational affiliation, or the addition or realignment of parties in litigation. If more than one client is involved, a lawyer may be required to terminate both representations, and client consent may not be sufficient to permit the lawyer to continue any participation in the matter.

## (b) Other Conflicts Issues — Former Clients, Government Lawyers, Transactions with Clients, Prospective Clients

No substantive change is proposed in the text of Rule 1.9 on "Duties to Former Clients," though new commentary clarifies several unsettled issues. For example, a lawyer who has represented multiple clients in a matter may not subsequently represent one client against the others in the same or a substantially related matter, without the consent of all affected clients. The Comment also spells out that matters will be deemed "substantially related" for purposes of the rule "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information" obtained in the prior representation would materially advance the client's position in the current matter.

Rule 1.8 covers specific rules on conflicts of interest with current clients. The new rule reformulates and clarifies the rules governing a lawyer's transactions with clients. As amended, paragraph (a) of Rule 1.8 relating to business transactions with clients requires the following: (i) the transaction is fair to the client; (ii) the lawyer advises the client in writing of the desirability of seeking independent legal counsel on a business transaction; and (iii) the client gives informed consent in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in it, including whether the lawyer is representing the client's interests in the transaction. A new Comment explains the risks associated with a lawyer's dual role as legal advisor and participant in a transaction, *14 clarifying that in some cases Rule 1.7 would preclude the lawyer from even seeking the client's consent to the transaction. A new Rule 1.8(j) prohibits sexual relations between a lawyer and client, unless a consensual sexual relationship existed at the time the client-lawyer relationship commenced.

A new Rule 1.18 dealing with a lawyer's duties to a prospective client imposes on the lawyer a duty of confidentiality to a person who discusses the possibility of forming a client-lawyer relationship. In addition, a lawyer will not be permitted, without consent, to represent any clients against such a prospective client in the matter about which the lawyer was consulted (or one substantially related to it), if the lawyer received information during the consultation that could be "significantly harmful" to the prospective client in the matter. Other lawyers in the firm will be permitted to undertake such a representation, however, if consent, confirmed in writing, is

Case 2:17-cv-00495-JD  Document 281-1  Filed 12/14/18  Page 21 of 44

obtained or if the personally disqualified lawyer had taken reasonable steps to avoid taking in unnecessary confidential information and is screened with notice given to the prospective client.

## Imputation of Conflicts — Screening

Conflicts that burden one lawyer are generally imputed by Rule 1.10 to all lawyers associated in a "firm," a term that may include lawyers sharing office space as well as corporate and government law offices. Under amended Rule 1.10, however, a lawyer's "personal interest conflicts" ordinarily would not be imputed.

Ethics 2000 had proposed that lawyers moving laterally between firms could avoid imputational conflicts by screening in some cases. This is the third of the Ethics 2000 proposals that was amended in the House, however. The Rule as adopted by the House would not permit nonconsensual screening of laterals to avoid the imputation rules. I assume that there will be considerable interest in Delaware in the imputation and screening concepts. The issue of screening or bifurcation of firms takes on additional significance in Delaware because of special considerations having to do with the imputation of conflicts in the Public Defender's Office. This is a topic the Permanent Advisory Committee is pursuing on an accelerated timetable.

Other situations in which the rules will permit unconsented screening are those involving former government lawyers in Rule 1.11, judges and third-party neutrals in Rule 1.12, and, as noted, lawyers who interview prospective clients in Rule 1.18. The conflicts of current government lawyers and a firm's non-lawyer personnel are ordinarily not imputed, though in both cases personally disqualified individuals "ordinarily" should *15 be screened. The elements of an effective screen are set forth in a new Rule 1.0(k) on Terminology.

## Law Firm Management

Revisions to Rules 5.1 ("Responsibilities of Partners, Managers and Supervisory Lawyers") and Rule 5.3 ("Responsibilities Regarding Nonlawyer Assistants") make clear that the responsibilities imposed by these provisions apply not only to "partners" in a law firm, but also to all lawyers with "managerial authority" in a firm. These responsible lawyers must make reasonable efforts to establish internal policies and procedures designed to assure that all lawyers in a firm conform to the Rules, including reasonable procedures designed to detect and resolve conflicts of interest, to account for client funds, and to ensure proper supervision of inexperienced lawyers and nonlawyer personnel.

## Pro Bono Service

The Commission discussed at length whether to amend Model Rule 6.1 ("Voluntary Pro Bono Publico Service"), which sets forth an aspirational standard of fifty hours annually. This standard was the result of a 1993 amendment to the Model Rules. (Delaware has retained the pre-1993 version of this model rule, which has only a generalized aspirational statement, without specific standards or goals.)

Some members of the Commission and others wanted to make mandatory a lawyer's obligation to perform a specified number of hours of pro bono service or to take other specific steps to comply with the requirement. The Commission voted to recommend that pro bono service remain voluntary and continued the current Model Rule's aspirational standard of fifty hours annually. The vote in the Commission was as close as it gets (7-6). After I obtained some informal input from the Chief Justices and State Bar Presidents (most of whom opposed a mandatory regime), I voted for the voluntary model rather than the mandatory model, thus breaking the 6-6 tie vote. My view was and is that it is an insult to lawyers to mandate pro bono service and that Delaware lawyers willingly volunteer their services without being forced to do so by a

12/11/2018    ETHICS 2000: THOUGHTS AND COMMENTS ON KEY ISSUES OF PROFESSIONAL RESPONSIBILITY IN THE TWENTY-FIRST CE...

Case 2:17-cv-00495-JD   Document 281-1   Filed 12/14/18   Page 22 of 44

disciplinary rule. The House agreed with the voluntary model without any debate on the subject.

In order to emphasize that pro bono publico service is a time-honored ethical obligation of all members of the legal profession, however, the Commission voted to add to the black letter rule a provision like that originally in the Comment stating that "Every lawyer has a professional responsibility to provide legal services to those unable to pay." *16 New commentary exhorts law firms to act reasonably to enable and encourage all lawyers in the firm to provide pro bono legal services called for by the rule. I am realistic enough to understand firm pressures on associates and firm members to produce substantial billable hours. But I am optimistic—at least in Delaware—that we have many individual lawyers and firms that volunteer substantial time providing legal services to those unable to pay.

## Limited Legal Service Programs

A new Rule 6.5 ("NonProfit and Court-Annexed Limited Legal Services Programs"), which already has been adopted by the Delaware Supreme Court, addresses the ethical obligations of lawyers by providing "short-term limited legal services" to persons of limited means under the auspices of a nonprofit or court-annexed legal services program (such as legal advice hotlines, advice-only clinics, or pro se counseling programs). In these programs a client-lawyer relationship is established, but the imputation rules are applicable only in cases when the lawyer knows that there is a disqualifying conflict. As a result, firms should not be disqualified when their lawyers volunteer to provide this assistance and should not be discouraged from permitting their lawyers to volunteer for legal service programs.

## Third Party Neutrals

A new Rule 2.4 ("Lawyer Serving as Third-Party Neutral") will require a lawyer serving as a neutral to make clear to the disputing parties the nature of the lawyer's neutral role in the matter. Former Rule 2.2 ("Intermediary"), which had generated some uncertainty, has been deleted in its entirety. Amendments to Rule 1.12 ("Former Judge, Arbitrator, Mediator or Other Third Party-Neutral") extend its conflict of interest provisions to all third-party neutrals. This means that former mediators, like former judges and arbitrators, may not represent a client in any matter in which they participated personally and substantially while a mediator, but others in the former neutral's firm may do so if the former neutral is screened.

## Obligations to the Tribunal

Rule 3.3 ("Candor Toward the Tribunal") has been revised and reorganized to clarify a lawyer's obligations with respect to testimony given and actions taken by the *17 client and other witnesses. (The term "tribunal" is defined in new Rule 1.0(m) to include binding arbitration and all entities acting in an adjudicative capacity.) The Comment to Rule 3.3 was reorganized and expanded to address some recurring situations not directly addressed in the Rule.

In some particulars, the lawyer's obligations to the tribunal have been strengthened. For example, the rule now makes clear that the lawyer must not allow the introduction of false evidence and must take remedial steps, including—if necessary—disclosure to the tribunal, where the lawyer comes to know that material evidence offered by the client or a witness called by the lawyer is false—regardless of the client's wishes. As under the existing rule, the lawyer's obligations to the tribunal may require the lawyer to reveal information otherwise protected by Rule 1.6. The lawyer's obligation in existing Rule 3.3 to avoid assisting client crime or fraud is replaced by a broader obligation to ensure the integrity of the adjudicative process. The lawyer must take remedial measures whenever the lawyer comes to know that any person is engaging

12/11/2018    ETHICS 2000: THOUGHTS AND COMMENTS ON KEY ISSUES OF PROFESSIONAL RESPONSIBILITY IN THE TWENTY-FIRST CE...

Case 2:17-cv-00495-JD   Document 281-1   Filed 12/14/18   Page 23 of 44

or has engaged in criminal or fraudulent conduct related to the proceeding, such as jury tampering or document destruction.

If the lawyer represents a defendant in a criminal prosecution, however, new Rule 3.3 has strengthened the lawyer's obligation to the client. For the first time the rule text addresses the special obligations of a criminal defense lawyer, requiring that such a lawyer does not have the same discretion as other lawyers regarding the client's own testimony. Although a criminal defense lawyer is subject to the general rule prohibiting the offering of testimony the lawyer *knows* to be false, the lawyer may not refuse to allow a defendant to testify if the lawyer does not actually *know*, but only *reasonably believes* the testimony will be false. The Comment also makes clear that if a court insists that a defendant in a criminal case be permitted to testify, the lawyer commits no ethical violation in allowing the client to do so even if the lawyer knows the client intends to lie.

## Obligations to Third Parties

Rule 4.1 ("Truthfulness in Statements to Others") is unchanged, but the Comment clarifies the duty imposed by paragraph (b) (a lawyer shall not knowingly "fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6"). This duty is a specific application of the lawyer's general duty not to assist a client in fraudulent or criminal conduct set forth in Rule 1.2(d), and is most frequently invoked when a client's wrongdoing involves dishonesty or misrepresentation to a third party. New comments to Rule 4.1 *18 and Rule 1.2 explain the relationship between the lawyer's duty to third parties under Rules 1.2(d), Rule 4.1, Rule 1.16, and the lawyer's duty of confidentiality to the client under Rule 1.6.

A new provision in Rule 4.4 ("Respect for Rights of Third Persons"), among other things, deals with the currently controversial issue of the "errant fax." It provides that a lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that it was inadvertently sent, must promptly notify the sender. Beyond this, however, the rule does not attempt to dictate a lawyer's possible obligations under other law in connection with examining and using confidential documents that come into the lawyer's possession through the inadvertent or wrongful act of another.

## Communication with Represented and Unrepresented Persons

The Commission spent a great deal of time and energy considering possible amendments to Rule 4.2 ("Communication with Person Represented by Counsel"), to meet concerns raised by the United States Department of Justice. In the end, the Commission decided to propose the addition of only the words "or a court order" to the black letter of the rule. The new rule now prohibits a lawyer from communicating with the client of another lawyer unless the communication has been consented to or unless authorized by law "or a court order." A new Comment provides that a court order may be sought either to clarify the application and scope of the rule, or "in exceptional circumstances," to authorize a communication that would otherwise be prohibited by the rule. After vigorous debate in the House, the Commission's proposal was adopted.

A revised Comment explains that communications "authorized by law" may include, for example, those made (a) by a lawyer "on behalf of a client who is exercising a constitutional or other legal right to communicate with the government," and (b) in the course of "investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings." In this latter regard, the revised Comment attempts to clarify the relationship between Rule 4.2 and constitutional limits on government lawyers' investigative activities: "The fact that a communication does not violate a

Case 2:17-cv-00495-JD   Document 281-1   Filed 12/14/18   Page 24 of 44

state or federal constitutional right is insufficient to establish that the communication is permissible under this rule."

*19 Another new Comment makes clear that the no-contact rule does not preclude a lawyer from advising a represented person who is seeking a second opinion, as long as the lawyer is not otherwise representing a client in the matter. It also confirms that a lawyer may not make a communication prohibited by the Rule through the acts of another—though parties to a matter may communicate directly with each other, and the lawyer may advise the client that such party-to-party communication is permitted. The Comment states that the "no-contact rule" applies even when the represented person "initiates or consents to" the communication, and that a lawyer must immediately terminate communications if the lawyer learns that the person is one with whom communication is not permitted. Finally, Comment [3] makes clear the distinction between constitutional rights and Rules of Professional Responsibility in this area:

> When communicating with the accused is a criminal matter, a government lawyer must comply with this rule in addition to honoring the constitutional rights of the accused. The fact that a communication does not violate a state or federal constitutional right is insufficient to establish that the communication is permissible under this Rule.

With respect to the applicability of the no-contact rule in the organizational context, the test has been modified so that communication is now prohibited with "a constituent" of the organization who "supervises, directs, or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." The new Comment deleted the problematic reference in the old Comment to persons whose "statement may constitute an admission on the part of the organization." The Comment also clarifies that the Rule does not bar communications with former constituents.

New Rule 4.3 ("Dealing with Unrepresented Person") restores a provision from the old Model Code of Professional Responsibility prohibiting a lawyer from giving legal advice, other than the advice to seek counsel, to an unrepresented person whose interests "are or have a reasonable possibility of being in conflict" with those of the lawyer's client. A new Comment provides guidance on what constitutes impermissible advice-giving and alludes to the particular problems that may arise when a lawyer for an organization deals with an unrepresented constituent. A proposed amendment that the Commission opposed, which would have required the lawyer to give the unrepresented client a *Miranda*-type warning, was defeated by the House.

## *20 Multidisciplinary Practice

Not long ago there was considerable interest in having the profession explore the opportunities for unions between the legal profession and other professions, notably accountants. The argument was made that this kind of multidisciplinary practice would benefit clients by permitting "one-stop shopping." The focus had been on possible amendments to Rule 5.4 that prohibits fee-splitting and firm governance-sharing with non-lawyers. These efforts were stopped in their tracks by the ABA House of Delegates Resolution 10F at the Annual Meeting in the Summer of 2000. That resolution, focusing on "core values" of the profession, effectively prevented further House consideration of amendments to Rule 5.4, leaving open further consideration of "strategic alliances" under the auspices of the Standing Committee on Ethics and Professional Responsibility. That issue is still unresolved, but Ethics 2000 recommended and the House approved no change in the Rule 5.4 prohibition against sharing fees, governance or ownership with non-lawyers.

12/11/2018    ETHICS 2000: THOUGHTS AND COMMENTS ON KEY ISSUES OF PROFESSIONAL RESPONSIBILITY IN THE TWENTY-FIRST CE...

Case 2:17-cv-00495-JD   Document 281-1   Filed 12/14/18   Page 25 of 44

**Multijurisdictional Practice**

There is a separate ABA Commission on Multijurisdictional Practice that will report this Spring to the ABA House of Delegates, and this report will be considered at the August 2002 Annual Meeting in Washington, D.C. This issue focuses on what a lawyer admitted in state A may or may not do in state B where the lawyer is not admitted. Ethics 2000 had recommended in Rule 5.5 four "safe harbors" from concerns about such a lawyer being engaged in unauthorized practice. Moreover, the Commission recommended a choice of law regime in 8.5 permitting either state A or state B to discipline the lawyer. The safe harbors proposed by Ethics 2000 in its recommended Rule 5.5 are:

> · Pro hac vice admission (and preparation therefor);

> · In-house counsel;

> · The lawyer's activities in a matter in state B that are "reasonably related" to those in state A where the lawyer is admitted to practice;

> · The lawyer in state A is associated in state B with a lawyer admitted there.

Based upon preliminary reports, the ABA Commission on Multijurisdictional Practice will recommend a somewhat different Rule 5.5 in its final report. Ethics 2000 *21 may continue to adhere to its version of Rule 5.5. We will just have to wait for the Commission's final proposal and see what happens at the ABA Annual Meeting in Washington in August 2002.

## Where Do We Go From Here in Delaware?

Turning to Delaware, we have a mechanism in place to move forward with the consideration of a new set of the "Delaware Lawyers' Rules of Professional Conduct." As noted, a new Permanent Committee of the Supreme Court under Rule 96 is considering the new ABA Model Rules as approved by the House and the Ethics 2000 Report 401. That Committee will be recommending new rules to the Delaware Supreme Court.

The Committee is already at work. The members of the Committee are:

Dennis L. Schrader (Chair)

Crystal L. Carey

Mark F. Dunkle

Anne Churchill Foster

Mary M. Johnston

John W. Paradee

Harvey Bernard Rubenstein

Calvin L. Scott, Jr.

Bruce M. Stargatt

Benjamin Strauss

W. Jeffrey Whittle.

Gayle Lafferty, Supreme Court Chief Staff Attorney, will be the staff liaison from the Supreme Court, and I will be the liaison Justice to the Committee.

The Court looks forward to the Committee's recommendations, and I am certain that the Committee would welcome comments and suggestions for its consideration.

## Conclusion

The collegial and open process of the Ethics 2000 Commission was a very intellectually stimulating experience. We appreciate the expeditious and thoughtful consideration by the House, the civil tone of the debate and the approval of the overwhelming majority of our recommendations.

*22 Of course, no provision of the new Model Rules will be applicable to any lawyer in any state until the supreme court of the state in which the lawyer is admitted has adopted its own new Rules of Professional Responsibility. I have urged each chief justice to guide his or her supreme court in giving the new Model Rules careful and expeditious consideration, including the appointment of study committees. I look forward to the recommendation of the Advisory Committee to the Delaware Supreme Court.

April, 2002.

### Footnotes

| | |
|---|---|
| a1 | Chief Justice of Delaware and Chair of the Ethics 2000 Commission. |
| 1 | http://www.abanet.org/cpr/ethics2k.html |
| 2 | http://www.ncsc.dni.us/ccj/natlplan.html |

5 DELREV 1

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw. © 2018 Thomson Reuters.   Privacy Statement   Accessibility   Supplier Terms   Contact Us   1-800-REF-ATTY (1-800-733-2889)   Improve Westlaw          THOMSON REUTERS

# EXHIBIT  B



EXHIBIT B

| Home | Contact Us

## GF&M  GORDON, FOURNARIS & MAMMARELLA, P.A.

ATTORNEYS | PUBLICATIONS / PRESENTATIONS | NEWS / PRESS | ABOUT | AREAS OF PRACTICE | DFL BLOG

Home » Attorneys » E. Norman Veasey

# Chief Justice E. Norman Veasey



SPECIAL COUNSEL
GORDON, FOURNARIS & MAMMARELLA, P.A.

P: (302) 652-2900 | F: (302) 652-1142

Email: e.normanveasey@gfmlaw.com

Download vCard

E. NORMAN VEASEY joined the Wilmington law firm of Gordon, Fournaris & Mammarella, P.A. in January 2014. He is the former Chief Justice of the Delaware Supreme Court, having served a 12-year term through May 2004. After his retirement from the Supreme Court, he was a Senior Partner at Weil, Gotshal & Manges LLP, until the end of 2013.

At GFM, he serves as an arbitrator, mediator, special master, counsellor, as well as providing other services in complex corporate, contract, and commercial transactions and litigation. Chief Justice Veasey is listed on the National Roster of

Arbitrators and Mediators of the American Arbitration Association (AAA) and as a distinguished neutral of the Institute for Conflict Prevention and Resolution (CPR). In 2015 he was selected as the Delaware member of the newly-created AAA Master Mediator Panel for the Northeast in large, complex, commercial cases.

During his tenure as Chief Justice, and thereafter, the United States Chamber of Commerce ranked Delaware's courts first in the nation for their fair, reasonable, and efficient litigation environment. Chief Justice Veasey has been credited with leading nationwide programs to restore professionalism to the practice of law and to adopt best practices in the running of America's courts. In 2004, his final year of service in the Delaware Supreme Court, he was awarded the Order of the First State by the Governor of Delaware, the highest honor for meritorious service the State's governor can grant.

As Senior Partner at Weil, he served as a strategic adviser to the firm's roster of prominent global clients on a wide range of issues related to mergers & acquisitions, restructuring, and litigation. He also advised on corporate governance issues involving the responsibilities of corporate directors in complex financial transactions and crisis management.

He was President of the Conference of Chief Justices, Chair of the board of the National Center for State Courts, Chair of the Section of Business Law of the American Bar Association (ABA), Chair of the ABA Special Commission on Evaluation of the Rules of Professional Conduct (Ethics 2000), Chair of the Committee on Corporate Laws of the ABA Section of Business Law, and President of the Delaware State Bar Association.

During 1992-93, Chief Justice Veasey was the editor of Volume 48 of The Business Lawyer, the scholarly legal journal published by the Section of Business Law of the ABA. He is co-author, with Weil's Christine Di Guglielmo, of a book,

published by Oxford University Press, on the challenges of modern-day corporate general counsel. The book is entitled, *E. Norman Veasey & Christine T. Di Guglielmo, Indispensable Counsel: The Chief Legal Officer in the New Reality* (2012). The Wall Street Journal called it "a field manual to aid [chief legal officers] with their new tasks." (March 9, 2012)

He is a Fellow of the American College of Trial Lawyers (a member of the Alternative Dispute Resolution Committee); a Fellow and honorary founding Chair of the American College of Governance Counsel; included in Best Lawyers in America; a director of the Institute for Law and Economics at the University of Pennsylvania; a member of the American Law Institute; a member of the International Advisory Board of the Centre for Corporate Law and Securities Regulation; a frequent panelist and lecturer on the corporation law, corporate governance, ethics, and professionalism; and has been appointed as an Adviser to a project of the American Law Institute on principles of the law, compliance, enforcement, and risk management for corporations, nonprofits, and other organizations.

He has served as an Adjunct Professor at the University of Pennsylvania Law School, where he taught a course entitled, "The Real World of Ethical Corporate Lawyering," a subject on which he has lectured at other law schools, including Cornell Law School. He also served in previous years as an Adjunct Professor teaching this course at New York University School of Law, the University of Virginia School of Law, Wake Forest University School of Law, Dedman School of Law of Southern Methodist University, and the Moritz School of Law of Ohio State University. He is a lecturer on corporate governance at the Tuck School of Business of Dartmouth College, and appears often as a writer and speaker on various topics including alternate dispute resolution, corporate governance, and professional responsibility.

He is a graduate of Dartmouth College (A.B. 1954) and the University of Pennsylvania Law School (LLB 1957). He has been awarded honorary degrees of Doctor of Laws from the University of Delaware and Widener University.

**Other Honors** include Josiah Marvel Cup presented by the Delaware Chamber of Commerce, January, 2014, for outstanding service to the state, community, and society; Common Cause of Delaware Public Service Achievement award, November 2014; named "Corporate Governance Lawyer of the Year" in 2009-2012; Michael Franck Professional Responsibility Award; Daniel L. Herrmann Professional Conduct Award; Order of the First State-2004; Annual Ethics Award from ACCA-2002; Paul C. Reardon Award from the National Center for State Courts-2002; St. Thomas More Society Award; Alumni of Merit Award from the University of Pennsylvania; Lewis F. Powell, Jr., Award for Professionalism and Ethics from the American Inns of Court Foundation-1996; Class of 1954 Award from Dartmouth College.

From 1957 until he took office as Chief Justice in 1992, he practiced law with the Wilmington, Delaware, law firm of Richards, Layton & Finger, where he concentrated on business law, corporate transactions, litigation, and counselling. He served at various times as managing partner and the chief executive officer of the firm. During 1961-63, he was Deputy Attorney General and Chief Deputy Attorney of the State of Delaware, and from 2011 to 2014 he served the State of Delaware as Independent Counsel and Special Deputy Attorney General to investigate campaign funding law violations.Chief Justice Veasey and his wife, Suzanne, live in Wilmington, Delaware. They have four grown children and eleven grandchildren.

AREAS OF PRACTICE

Corporate and Commercial Counseling, Alternative Dispute Resolution (ADR) including mediation, arbitration, special master, and moot court practice in preparing lawyers for trials and appeals.

BAR ASSOCIATIONS

Delaware State Bar Association

EDUCATION

University of Pennsylvania Law School, Juris Doctor 1957
Dartmouth College, Bachelor of Arts, 1954

PUBLICATIONS

E. Norman Veasey: Is the Promise of Arbitration Illusory? (October, 2015, )

Chief Justice Veasey: Putting His Experience To Work (May, 2014, The Metropolitan Corporate Counsel)



Printer-friendly version

Gordon, Fournaris & Mammarella, P.A.
1925 Lovering Ave
Wilmington, DE 19806

🐦 Twitter @GFandMLaw

P: (302) 652-2900
F: (302) 652-1142

©2018 Gordon, Fournaris & Mammarella, P.A.
Law/Attorney Website Design and CMS, 4x3 LLC

# EXHIBIT  C

.

EXHIBIT C

Revised
December 2018

## THE REAL WORLD OF ETHICAL CORPORATE LAWYERING

Wake Forest University
School of Law
Spring 2019
February 11-22, 2019

E. Norman Veasey
Gordon, Fournaris & Mammarella, P.A.
Chief Justice (Ret.) Delaware Supreme Court

## SYLLABUS

This advanced and sophisticated course is designed to explore in depth the challenges and pitfalls facing modern corporate transactional lawyers and litigators. It analyzes recent cases applying Delaware's dynamic corporate jurisprudence, particularly as it impacts public companies. In addition, the course will explore the ethical challenges facing lawyers practicing in this area, including the pernicious problem of cybercrime, which increasingly threatens the theft and exploitation of confidential client information. Emphasis will be placed on the skills, integrity, independence, and courage expected of in-house and outside lawyers representing corporate clients.

This is a one-credit course involving extensive reading and robust class participation. Students will be expected to have a working command of the basic principles illustrated by excerpts from the cases and other materials that will be assigned. Those cases and other materials are listed in the following pages of this syllabus.

Conducted in a seminar style, the course will focus primarily on basic as well as advanced principles of Delaware corporate law in the context of real-world ethical practice. In addition, we shall cover certain relevant Model Rules of Professional

{GFM-01133719.DOC-2}© Copyright 2018 E. Norman Veasey – All rights reserved.
US_ACTIVE\44407605\1\99980.0151

Conduct, SEC Professional Responsibility Rules, the lawyer-client privilege, the work product doctrine, and corporate investigations.

The course is broken down into six separate units, covering the better part of 80 minutes per day for 10 days.  Students will get the most out of the course by thorough preparation, engaging with the issues, and actively participating in class discussions. Although there will be a final take-home exam, thorough preparation and contribution in class—or lack thereof—may count positively or negatively toward the student's final grade.

A student's previous completion of law school courses that include corporation law and professional responsibility is very desirable, but is not a rigid prerequisite.

{GFM-01133719.DOC-2}© Copyright 2018 E. Norman Veasey – All rights reserved.

US_ACTIVE\44407605\1\99980.0151

**Unit I.**    **What are the Basic and Advanced Applications of the Principles of Corporate Fiduciary Duties in Various Corporate Transactional And Litigation Settings?**

We begin with an analysis of the fiduciary duties of corporate officers and directors of Delaware corporations. Relevant excerpts from the following materials will be provided to illustrate some salient principles of Delaware law in the corporate area. This Unit is the primary focus of the course and will probably occupy at least four and one-half days.

**Basic Reading.** We shall focus first on excerpts from the following cases as examples of traditional corporate jurisprudence and practice:

- *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del. 1993). **As an example of a litigator's lack of professionalism, note also the Addendum, 637 A.2d at 51.** We shall discuss this issue in depth in Unit II.
- *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)
- *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)
- *In re Oracle Corp. Derivative Litigation*, 824 A.2d 917 (Del. Ch. 2003)
- *Beam v. Stewart*, 845 A.2d 1040 (Del. 2004)
- *In Re Walt Disney Company Derivative Litigation*, 906 A.2d 27 (Del. 2006)
- *Stone v. Ritter*, 911 A.2d 362 (Del. 2006)
- *In Re Citigroup Inc. Shareholder Litigation*, 964 A.2d 106 (Del. Ch. 2009)

**Advanced Reading.** We shall then focus on excerpts from the following cases and authorities as illustrating principles of Delaware's dynamic corporate jurisprudence and practice:

- Leo E. Strine, Jr., *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporation Law*, 50 Wake Forest L. Rev. 761 (2015)
- *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618 (Del. Ch. 2013)
- *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014)
- *In Re Rural Metro Corp.*, 88 A.3d 54 (Del. Ch. 2014)
- *RBC Capital Market, LLC v. Jervis*, 129 A.3d 816 (Del. 2015)
- *In re Cornerstone Therapeutics Inc. Stockholder Litigation*, 115 A.3d 1173 (Del. 2015)
- *Corwin v. KKR Financial Holdings*, 125 A.3d 304 (Del. 2015)
- Delaware General Corporation Law (DGCL), Section 251(h)
- *Singh v. Attenborough*, 137 A.3d 151 (Del. 2016)

- *In re Volcano Corporation Stockholder Litigation*, 143 A.3d 727 (Del. Ch. 2016), *aff'd*, No. 372, 2016 (Del. Feb. 9, 2017)
- *In re EZCORP Inc. Consulting Agreement Derivative Litigation*, 2016 WL 301245 (Del. Ch. Jan. 25, 2016)
- *In re Solera Holdings, Inc. Stockholder Litigation*, 2017 WL 57839 (Del. Ch. Jan. 5, 2017)
- *In re Saba Software, Inc. Stockholder Litigation*, 2017 WL 1201108 (Del. Ch. Mar. 31, 2017)
- *Flood v. Synutra International, Inc.*, 2018 WL 4869248 (Del. Oct. 9, 2018)
- *In re PLX Technology Inc. Stockholders Litigation*, C.A. No. 9880 VCL (Del. Ch. Oct. 16, 2018) (slip op.)

## Unit II.   How Does Professional Responsibility Apply to the Practice of the Corporate Lawyer?

This Unit is a key to successful lawyering, particularly in Delaware corporate litigation. See the Addendum to *Paramount v. QVC*, 637 A.2d at 51, referred to in Unit I.  We shall probably devote more than one full day to discussion of the issues in Unit II.

**Reading:**

- E. NORMAN VEASEY & CHRISTINE T. DI GUGLIELMO, INDISPENSABLE COUNSEL: THE CHIEF LEGAL OFFICER IN THE NEW REALITY (Oxford 2012) (Excerpts from Chapters 4, 5, and 7, will be provided)
- Rules 1.1, 1.4, 1.6, 1.7, 1.9, 1.10, 1.13, 1.15, 2.1, 3.3, 4.2, 4.4, 5.1-5.3, and 8.4 of the Model Rules of Professional Conduct
- Rules 501 and 502, Federal Rules of Evidence; Rule 26(b)(5)(B), Federal Rules of Civil Procedure

{GFM-01133719.DOC-2}© Copyright 2018 E. Norman Veasey – All rights reserved.   4
US_ACTIVE:\44407605\1\99980.0151

**Unit III    The Challenge in the Digital Age of Keeping Client Information Confidential and Protected**

Modern corporate practice, including its litigation component, is difficult and challenging enough without the lurking presence of cyber criminals.  In this Unit we shall discuss for at least a full day the lawyer's ethical duties in the proper exercise of defensive mechanisms to protect client information from theft and exploitation by cyber criminals.

**Reading**

- The ABA Cybersecurity Handbook, Second Edition (2018).  Copies of excerpts from the following articles will be provided:
    o Lucy Thomson, *Understanding Cybersecurity Risks*, Chapter 2, pp. 11-43
    o Peter Geraghty and Lucian T. Pera, *Lawyers' Obligations to Provide Data Security Arising from Ethics Rules and Other Law*, Chapter 6, pp. 115-143
- A PowerPoint presentation will be shown and discussed.  Hard copies will be provided.

**Unit IV.    What Information in the Corporate Lawyer's Files is Protected from Discovery or Investigation?**

As we will have been discussing in Unit III, modern corporate practice now requires a knowledge of the schemes of circling cyber criminals and of the protective steps that must be taken to thwart them.  Of equal importance is the fact that there have always been litigants, regulators, and investigators who will be seeking ways to get their hands on the lawyer's valuable documents.  What is protected from production, and how does the lawyer ensure that protection?  This Unit will take about a full day.

**Reading:**

- STEPHEN GILLERS, REGULATION OF LAWYERS PROBLEMS OF LAW AND ETHICS (Wolters Kluwer) (2012), pp. 32-33
- Jessica R. Kunz, *Attorney-Client Privilege and Work-Product Doctrine: Corporate Applications,* The Bureau of National Affairs, Inc. 2015 (Corporate Practice Series, ISSN 2372-465x; No. 22-5th) (Excerpts)
- United States Department of Justice, Offices of the United States Attorneys, *United States Attorneys' Manual* (USAM) 2018 ((Excerpts)
- American College of Trial Lawyers, *Recommended Practices for Companies and Their Counsel in Conducting Internal Investigations,* 46 Am. Crim. L. Rev. 73 (2009) http://www.acc.com/chapters/charlotte/upload/Conducting-Internal-Investigations.pdf (Excerpts)

{GFM-01133719.DOC-2}© Copyright 2018 E. Norman Veasey – All rights reserved.          5
US_ACTIVE:\44407605\1\99980.0151

**Unit V.**     **What Does the Real World Application of Some of the Foregoing Look Like?**

Next comes "movie day." In Unit V we shall view and discuss for about a full day the following somewhat-dated (but still relevant) dramatizations of various professional responsibility situations in corporate settings: Association of Corporate Counsel DVDs entitled (a) Corporate Professional Responsibility and (b) Ethical Issues for Corporate Counsel.

The showing of the DVDs may be interrupted at various points for discussion. See excerpts from the readings below, which will guide our discussions.

**Reading:**

- Association of Corporate Counsel, Corporate Professional Responsibility: Presentation Guide material/Analysis (2005), http://www.acc.com/vl/public/ProgramMaterial/loader.cfm?csModule=security/getfile&pageid=20360&page=legalresources/resource.cfm&qstring=show=20360&title=Corporate%20Professional%20Responsibility%3A%20Presentation%20Guide%20and%20Legal%20Authorities

- Association of Corporate Counsel, "Ethical Issues for Corporate Counsel;" Problem Discussion Material/Analysis (2008)

{GFM-01133719.DOC-2}© Copyright 2018 E. Norman Veasey – All rights reserved.     6
US_ACTIVE:\44407605\1\99980.0151

**Unit VI.   How Does the Lawyer Properly Guide the Corporate Client and Stay Out of Trouble Herself?**

In the early part of the Twenty-first Century there were a number of ugly scandals, like Enron and WorldCom.  Out of those scandals and others the Sarbanes-Oxley Act of 2002 and implementing SEC Rules emerged.  But Congress and the SEC might not have needed to get into the act if the lawyers for the corporations had properly done their professional jobs.  In this final Unit we shall reflect for most of one day on the question: Where were the lawyers?  What have corporate lawyers learned from this sorry history?

**Reading:**

- SEC "Final Rule: Implementation of Standards of Professional Conduct for Attorneys" January 30, 2003, Part 205 (Implementing Section 307 of the Sarbanes-Oxley Act)
- New York City Bar, Report of the Task Force on the Lawyer's Role in Corporate Governance (Nov. 2006), 62 BUS. LAW. 427 (2007) Appendix D "Nine Scandals: Where Were The Lawyers?" Appendix D1-D29 (Excerpts)
- E. Norman Veasey and Christine T. Di Guglielmo, "General Counsel Buffeted by Compliance Demands and Client Pressures May Face Personal Peril," 68 BUS. LAW 57 (2012) (Excerpts)
- Lawrence A. Cunningham, "Sharing Accounting's Burden: Business Lawyers in Enron's Dark Shadows," 57 BUS. LAW. 1421 (2002) (Excerpts)

# EXHIBIT  D

EXHIBIT D

# AMERICAN BAR ASSOCIATION
STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY

Formal Opinion 06-440                                    May 13, 2006
Unsolicited Receipt of Privileged or Confidential Materials:
Withdrawal of Formal Opinion 94-382 (July 5, 1994)

*The Committee has considered recent changes to Model Rule of Professional Conduct 4.4(b) and its comments in relation to its earlier Formal Opinion 94-382 dealing with the subject of a lawyer's unsolicited receipt of privileged or confidential materials. Under the same reasoning that led the Committee recently to withdraw Formal Opinion 92-368, on which Formal Opinion 94-382 was based, and which dealt with a subject the Committee then considered analogous, the Committee here withdraws Formal Opinion 94-382.*

Formal Opinion 94-382[1] addresses the obligations under the Model Rules of Professional Conduct[2] of a lawyer who is offered or is provided, by a person not authorized to offer them, materials of an adverse party that the lawyer knows to be, or that on their face appear to be, subject to the attorney-client privilege of the adverse party or otherwise confidential within the meaning of Rule 1.6. Notwithstanding several state ethics opinions having considered the subject and having reached a different conclusion,[3] and acknowledging that the unauthorized sending of documents was not inadvertence, the Committee nevertheless reasoned that because the materials in question would not have been sent intentionally by the lawyer or the adverse party, their unauthorized disclosure by others was "no more intended and no more consensual than when disclosure occurs because of an error in transmission."[4]

The opinion found no basis in the Rules for requiring the lawyer to return the materials to their rightful owner or even to forbid their use. However, it

---

1. ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 94-382 (July 5, 1994) (Unsolicited Receipt of Privileged or Confidential Materials), in FORMAL AND INFORMAL ETHICS OPINIONS 1983-1998 at 233 (ABA 2000).

2. This opinion is based on the Model Rules of Professional Conduct as amended by the ABA House of Delegates through August 2003. The laws, court rules, regulations, rules of professional conduct and opinions promulgated in the individual jurisdictions are controlling.

3. FORMAL AND INFORMAL ETHICS OPINIONS 1983-1998 at 236.

4. *Id.* at 235.

AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY. 321 N. Clark Street, Chicago, Illinois 60610-4714 Telephone (312)988-5300 CHAIR: William B. Dunn, Detroit, MI ⏌ Elizabeth Alston, Mandeville, LA ⏌ T. Maxfield Bahner, Chattanooga, TN ⏌ Amie L. Clifford, Columbia, SC ⏌ Timothy J. Dacey, III. Boston, MA ⏌ James A. Kawachika, Honolulu, HI ⏌ Steven C. Krane, New York, NY ⏌ John P. Ratnaswamy. Chicago, IL ⏌ Irma Russell, Memphis, TN ⏌ Thomas Spahn. McLean, VA ⏌ CENTER FOR PROFESSIONAL RESPONSIBILITY: George A. Kuhlman, Ethics Counsel; Eileen B. Libby, Associate Ethics Counsel

© 2006 by the American Bar Association. All rights reserved.

applied the same requirements identified in (now withdrawn) Formal Opinion 92-368,[5] stating:

> [A] lawyer receiving such privileged or confidential materials satisfies her professional responsibilities by (a) refraining from reviewing materials which are probably privileged or confidential, any further than is necessary to determine how appropriately to proceed; (b) notifying the adverse party or the party's lawyer that the receiving lawyer possess such documents; (c) following the instructions of the adverse party's lawyer; or (d), in the case of a dispute, refraining from using the materials until a definitive resolution of the proper disposition of the materials is obtained from a court.[6]

In Formal Opinions 92-368 and 94-382, the Committee was influenced by principles involving the protection of confidentiality, the inviolability of the attorney-client privilege, the law governing bailments and missent property, and general considerations of common sense, reciprocity, and professional courtesy. Application of other law is beyond the scope of the Rules, as noted expressly in comments to Rule 4.4(b) and in Scope [15]. Scope [16] notes that the Rules do not exhaust the moral and ethical considerations that should inform a lawyer. Certainly, the considerations that influenced the Committee in Formal Opinion 92-368, which carried over to Formal Opinion 94-382, are part of the broader perspective that may guide a lawyer's conduct in the situations addressed in those opinions. They are not, however, an appropriate basis for a formal opinion of this Committee, for which we look to the Rules themselves.

As was noted in Formal Opinion 05-437, Rule 4.4(b) requires only that a lawyer who receives a document relating to the representation of the lawyer's client and who knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender. The Rule does not require refraining from reviewing the materials or abiding by instructions of the sender. Thus, even assuming that the materials sent *intentionally* but without authorization could be deemed "inadvertently sent" so that the subject is one addressed by Rule 4.4(b)', the instructions of Formal Opinion 94-382 are not supported by the Rule.

It further is our opinion that if the providing of the materials is not the result of the sender's inadvertence, Rule 4.4(b) does not apply to the factual situation addressed in Formal Opinion 94-382. A lawyer receiving materials under such circumstances is therefore not required to notify another party or that party's lawyer of receipt as a matter of compliance with the Model Rules. Whether a lawyer may be required to take any action in such an event is a

---

5. *See generally* ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 05-437 (October 1, 2005) (Inadvertent Disclosure of Confidential Materials: Withdrawal of Formal Opinion 92-368 (November 10, 1992)).

6. FORMAL AND INFORMAL ETHICS OPINIONS 1983-1998 at 237 - 38.

7. The Committee does not so assume.

matter of law beyond the scope of Rule 4.4(b).[8]

Accordingly, because the advice presented in Formal Opinion 94-382 is not supported by the Rules, the opinion is withdrawn in its entirety.

---

8. If the sender of privileged or confidential material has engaged in tortious or criminal conduct, a lawyer who receives and uses the materials may be subject to sanction by a court. *See e.g.,* Maldonado v. New Jersey, 225 F.R.D. 120 (D.N.J. 2004) (plaintiff's counsel disqualified after retaining and using privileged letter that had allegedly appeared without explanation in plaintiff's workplace mailbox); and other liabilities, *see e.g.,* RESTATEMENT (SECOND) OF AGENCY: INTENTIONALLY CAUSING OR ASSISTING AGENT TO VIOLATE DUTY § 312, cmt. c (1958). These issues are matters of substantive law, at least in the first instance. To the extent the lawyer would be engaged in criminal conduct, Rule 8.4(b) may be implicated. Other factual circumstances present may implicate Rule 8.4(c) (conduct involving dishonesty), but those circumstances are not the subject of either Formal Opinion 94-382 or this opinion.