## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : |
|       Plaintiff/Counter-defendant, | : |
| | : |
|  v. | : |
| | :   No. 2:17-cv-00495-RK |
| JULIO RIOS, JEREMY GAMBOA, | : |
| BRIDGER LOGISTICS, LLC, | : |
| FERRELLGAS PARTNERS, L.P., | :   **Oral Argument Requested** |
| FERRELLGAS, L.P., *et al.*, | : |
|       Defendants, | : |
| | : |
| BRIDGER LOGISTICS, LLC, | : |
| FERRELLGAS PARTNERS, L.P., and | : |
| FERRELLGAS, L.P., | : |
|       Defendants/Counterclaimants. | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |

## MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(1)

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................ 1

BACKGROUND ......................................................................................... 2

      A.     The Eddystone Rail Services Agreement .................................................. 2

      B.     Allegations In The Amended Complaint ................................................. 5

ARGUMENT .............................................................................................. 6

I.      THE RAIL SERVICES AGREEMENT DOES NOT SUPPORT ADMIRALTY JURISDICTION .............................................................. 8

II.     EVEN IF THE RAIL SERVICES AGREEMENT WERE A MARITIME CONTRACT, NONE OF ERC'S CLAIMS ARISE UNDER THE CONTRACT ...................................................................... 14

CONCLUSION ........................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Abiona v. PNC Bank, N.A.*,
No. CIV. A. 98-1994, 1998 WL 426552 (E.D. Pa. July 29, 1998) ............................. 6

*Atlantic Mut. Ins . Co. v. Balfour Maclaine Int'l, Ltd.*,
968 F.2d 196 (2d Cir. 1992) ................................................................................. 13

*Atlanta Shipping Corp. v. Chemical Bank*,
818 F.2d 240 (2d Cir. 1987) ...................................................................... 14, 15, 16

*Berkshire Fashions, Inc. v. M.V. Hakusan II*,
954 F.2d 874 (3d Cir. 1992) ..................................................................................... 7

*Blanning v. Tisch*,
378 F. Supp. 1058 (E.D. Pa. 1974) ........................................................................... 9

*Brown v. Philadelphia Hous. Auth.*,
350 F.3d 338 (3d Cir. 2003) ..................................................................................... 6

*Capron v. Van Noorden*,
6 U.S. (2 Cranch) 126 (1804) ................................................................................... 6

*Colgate Palmolive Co. v. S/S Dart Canada*,
724 F.2d 313 (2d Cir. 1983) ................................................................................... 12

*D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd.*,
756 F.3d 151 (2d Cir. 2014) ................................................................................... 14

*Dawes-Lloyd v. Publish Am., LLP*,
Civil Action No. 09-2387, 2010 WL 3431663 (E.D. Pa. Aug. 31, 2010) .................. 6

*Derby Res. AG v. Ultramar Panama, P.R.*,
Nos. 86 CIV. 9600 (JMW), 87 CIV. 1739 (JMW),
1988 WL 78316 (S.D.N.Y. July 19, 1988) ............................................................. 10, 11

*Eastern Transp. Co. v. United States*,
272 U.S. 675 (1927) ................................................................................................. 7

12240559.18

**Page(s)**

*The Eclipse*,
   135 U.S. 599 (1890).................................................................................................... 15

*Eddystone Rail Co. LLC v. Jamex Transfer Servs., LLC*,
Case No. 1:17-cv-01266-WHP (S.D.N.Y. Jan. 11, 2019) ............................................. 4

*Euclid Energy Ltd. v. SIA Ventall Terminals*,
   598 F. Supp. 2d 454 (S.D.N.Y. 2009) ....................................................................... 10

*Executive Jet Aviation, Inc. v. City of Cleveland*,
   409 U.S. 249 (1972) ..................................................................................................... 8

*Exxon Corp. v. Central Gulf Lines, Inc.*,
   500 U.S. 603 (1991) ............................................................................................... 7, 13

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
   807 F.3d 572 (4th Cir. 2015) ..................................................................................... 14

*Holt Cargo Sys., Inc. v. Delaware River Port Auth.*,
   No. CIV. A. 94-7778, 1996 WL 195390 (E.D. Pa. Apr. 19, 1996) ........................... 7, 10

*In re World Imports Ltd.*,
   820 F.3d 576 (3d Cir. 2016) ......................................................................................... 7

*Intercontinental Contractors, Inc. v. Canadian Maritime Carriers, Ltd.*,
   Civ. A. No. 86-2503, 1986 A.M.C. 2161,
   1986 WL 5338 (E.D. Pa. May 6, 1986) ..................................................................... 10

*Jones v. Berwick Bay Oil Co.*,
   697 F. Supp. 260 (E.D. La. 1988) .............................................................................. 13

*Kennedy v. H&M Landing, Inc.*,
   529 F.2d 987 (9th Cir. 1976) .................................................................................. 9, 10

*Kontrick v. Ryan*,
   540 U.S. 443 (2004) ..................................................................................................... 6

*Larkin v. Geico Gen. Ins. Co.*,
   Civ. A. No. 14-1802, 2015 WL 667515 (E.D. Pa. Feb. 13, 2015) .............................. 2

*Lee v. Thompson*, 15 F. Cas. 233 (C.C.D. La. 1878) (No. 8,202) ................................... 14

*Lozman v. City of Riviera Beach*,
   568 U.S. 115 (2013) ..................................................................................................... 7

Page(s)

*Marubeni Int'l Petroleum (Singapore) Pte Ltd. v.*
*Prestige Marine Services Pte Ltd.*,
  591 F. Supp. 2d 386 (S.D.N.Y.  2009) .......................................................... 13

*Norfolk S. Ry. Co. v. Kirby*,
  543 U.S. 14 (2004) ...................................................................................... 7, 8, 9, 10

*Peacock v. Thomas*,
  516 U.S. 349 (1996) ...................................................................................... 17

*Pennsylvania Prot. & Advocacy, Inc. v. Houston*,
  136 F. Supp. 2d 353 (E.D. Pa. 2001) ........................................................... 6

*Reliance Lumber Co. v. Rothschild*,
  127 F. 745 (E.D. Pa. 1904) .......................................................................... 10

*Roco Carriers, Ltd. v. M/V Nurnberg Express*,
  899 F.2d 1292 (2d Cir. 1990) ....................................................................... 12

*Shernoff v. Morgan Marina, Inc.*,
  Civil Action No. 09-1353, 2009 WL 901881 (D.N.J. Mar. 31, 2009) ......................... 14

*Sisson v. Ruby*,
  497 U.S. 358 (1990) ...................................................................................... 7, 14

*Steamship Overdale Co. v. Turner*,
  206 F. 339 (E.D. Pa. 1913) ........................................................................... 10, 13

*St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.*,
  863 F. Supp. 1013 (E.D. Mo. 1994) .............................................................. 12

*Swift & Co. Packers v. Compania Columbiana del Caribe, S.A.*,
  339 U.S. 684 (1950) ...................................................................................... 7, 15-17

*The Jefferson*,
  61 U.S. (20 How.) 393 (1857) ....................................................................... 7

*Tradhol Internacional, S.A. v. Colony Sugar Mills Ltd.*,
  354 F. App'x 463 (2d Cir. 2009) ................................................................... 13

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) ........................................................................................ 14

12240559.18

**Page(s)**

*Weinstein v. Eastern Airlines, Inc.*,
  316 F.2d 758 (3d Cir. 1963) ........................................................................   8

**Statutes, Rules and Regulations:**

28 U.S.C. § 1333 ...........................................................................................   5, 7

28 U.S.C. § 1367 ...........................................................................................   5

Fed. R. Civ. P. 12 ..........................................................................................   1, 6

12 Pa. C.S. § 5105 .........................................................................................   5

**Other Authorities:**

1 Steven R. Friedell, *Benedict on Admiralty* § 182 (7th rev. ed. 2012) .........................   7

v

## INTRODUCTION

All Defendants jointly and respectfully submit this memorandum in support of their Motion to Dismiss Plaintiff Eddystone Rail Company, LLC's First Amended Complaint for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) (the "Motion").

This case presents no federal question, and Plaintiff Eddystone Rail Company, LLC ("ERC") cannot hope to demonstrate that it is of diverse citizenship from the 18 Defendants—particularly not the publicly-traded Ferrellgas Partners, L.P.   Instead, in an attempt to manufacture federal jurisdiction, ERC asserts that this is an admiralty case in which it "seeks to enforce the payment of a debt arising under a maritime contract," *i.e.*, the Eddystone Rail Facilities Services Agreement (the "Rail Services Agreement" or "RSA").   (Dkt. 182, First Amended Complaint ("FAC") ¶¶ 31, 36-37.)   As explained below, however, the Rail Services Agreement is not a maritime contract because its connection with maritime commerce is tangential at best.   But even if it were, the more fundamental problem is that *ERC has not asserted any claims arising under the Rail Services Agreement*, and it has not even named the counterparty to the agreement as a defendant here.   Instead, ERC seeks to impose secondary liability on non-parties to the contract by means of alter-ego and fraudulent-transfer claims.   It also asserts state-law claims for breach of fiduciary duty—which have nothing to do with the Rail Services Agreement or maritime commerce—against several of the Defendants.

As a general matter, if a plaintiff properly invokes admiralty jurisdiction by asserting a claim based on a maritime contract or a maritime tort, the court also may adjudicate alter-ego and fraudulent-transfer claims against other defendants.   But this is not such a case.   ERC pursued its contractual claim against its counterparty, Bridger Transfer Services, LLC ("BTS"), before an arbitration tribunal in New York, and BTS is not a party to this litigation.   And even if the Rail Services Agreement were a maritime contract, ERC could not invoke the Court's

admiralty jurisdiction to pursue secondary relief against others.  Accordingly, this Court lacks subject-matter jurisdiction.

The Federal Rules of Civil Procedure and more than 200 years of case law make clear that a litigant may challenge subject-matter jurisdiction at any stage of the proceeding, and an action must be dismissed if federal jurisdiction is lacking.   Neither the Court nor the parties can have any confidence that a judgment in this case will stand unless the Court has jurisdiction to enter that judgment in the first place.  ERC bears the legal burden and duty as plaintiff to file suit in a court with the power to render a valid judgment.  ERC has demonstrably failed to do so.

## BACKGROUND

### A.     The Eddystone Rail Services Agreement.

On February 14, 2013, ERC and BTS entered into the Rail Services Agreement, in which ERC agreed to complete a rail unloading facility in Eddystone, Pennsylvania (the "Eddystone Rail Facilities"), for the discrete task of transloading crude petroleum that BTS delivered by rail. (*See* FAC ¶ 3; RSA at 1.) [1]  BTS, in turn, agreed to utilize the Eddystone Rail Facilities for a period of five years and two months by transloading a minimum volume of crude petroleum every month (for which it would pay $2.25 per barrel), or to make a "deficiency payment" if it sent less than the minimum volume.  (FAC ¶¶ 3, 36, 37; RSA at 5 & §§ 2.1, 4.)

ERC and BTS are the only parties to the RSA; none of the Defendants is a party.  (*See* RSA at 1.)  At the time that it executed the agreement, BTS was a wholly-owned subsidiary of Defendant Bridger Logistics, LLC ("Bridger Logistics"), and neither entity had any affiliation with Defendants Ferrellgas Partners, L.P. or Ferrellgas, L.P. (the "Ferrellgas Defendants").

---

[1]     The Rail Services Agreement is attached as Exhibit A.  The Court may consider the agreement in connection with this Motion because it is integral to ERC's jurisdictional allegations and the merits of the First Amended Complaint.  *See Larkin v. Geico Gen. Ins. Co.*, Civ. A. No. 14-1802, 2015 WL 667515, at *4 (E.D. Pa. Feb. 13, 2015).  ERC explicitly relied upon the contract in the Complaint.  S*ee, e.g.*, FAC ¶¶ 3, 31, 36, 37.

2

Bridger Logistics was, in turn, a wholly-owned subsidiary of non-party Bridger, LLC.  ERC did not negotiate for or obtain a guaranty from Bridger Logistics or any other entity.

BTS operated as a "midstream" transporter of crude oil purchased by Bridger Marketing, LLC (also a non-party and another subsidiary of Bridger, LLC) and needed assistance in transporting the petroleum to the refinery of Monroe Energy ("Monroe") in Trainer, Pennsylvania.  Under the Rail Services Agreement, BTS was to deliver crude oil by rail from North Dakota to the Eddystone Rail Facilities.  ERC would then unload the crude from the trains, store the oil at the Eddystone Rail Facilities, and then transload the crude for delivery to Philadelphia-area refineries, either by barges chartered by BTS or through pipeline distribution systems.  Once it loaded the crude petroleum onto barges at its dock or into pipelines, ERC was not involved in further transportation of the crude.

Although the Rail Services Agreement makes mention of barges, its substance makes clear that the primary objective of the agreement was not the shipment of crude by water:

- The crux of ERC's obligations under the Rail Services Agreement was to provide "Transloading Services," which are defined in Section 1 as "receipt of Trains loaded with a customer's Crude Petroleum at the Eddystone Rail Facilities, unloading of such Crude Petroleum from such Trains, loading of such Crude Petroleum into Barges and/or, if applicable, delivery of such Crude Petroleum into Pipeline Distribution Systems, and all incidental storage and other services provided by [ERC] to perform or facilitate such services."

- The language above expressly contemplates that crude could be transloaded into pipelines rather than barges.

- While the Rail Services Agreement includes a requirement to load "Crude Petroleum into Barges," it is also a contract to remove crude petroleum from trains and store petroleum on land.

- The Rail Services Agreement contains extensive terms dictating the quality of the crude petroleum to be transported to the Eddystone Rail Facilities (*see* Section 1 of RSA's Exhibit A, Terms and Conditions for the Use of the Eddystone Rail Facilities) and the mechanism for delivery of the crude by rail from North Dakota to the Eddystone Rail Facilities (*see* Sections 5 and 6 of Terms and Conditions).

- The RSA does not refer to or relate to any particular vessel or voyage.

3

- BTS could have satisfied its obligations under the Rail Services Agreement by making deficiency payments, even if it never used the Eddystone Rail Facilities at all.

- ERC did not own or operate any of the barges that transported crude from the Eddystone Rail Facilities to Monroe; in fact, the definition of "Barge Operator" excludes ERC.

In 2016, the Jamex group of companies acquired BTS, renaming it Jamex Transfer Services ("JTS"). Shortly following this acquisition, ERC commenced an arbitration proceeding against JTS seeking unpaid amounts and future payments in light of JTS's "anticipatory breach" of the Rail Services Agreement. (FAC ¶ 75.) ERC and JTS eventually entered into a collusive and pretextual settlement agreement, in which the parties stipulated to an award against JTS of nearly $140 million, without resolving the merits of the claims. ERC released from liability the other Jamex affiliates and their principals in exchange for a modest payment, transfer of ownership of an unspecified amount of crude, and an agreement to cooperate in ERC's subsequent legal actions. ERC then commenced this action in February 2017, using the stipulated $140 million award against non-party JTS as a basis for its allegation that it seeks to enforce the payment of a debt under the Rail Services Agreement.

The arbitration award has not been confirmed. ERC filed a petition to confirm the award in the Southern District of New York, and the parties originally named as Defendants in this case moved to intervene. Judge Pauley denied Defendants' motion to intervene, but he stayed the action pending the outcome of this litigation. (*See* Dkt. 71, *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, Case No. 1:17-cv-01266-WHP, at 8 (S.D.N.Y. Jan. 11, 2019) ("[A]s a practical matter, it is troubling to this Court that an Arbitration Award obtained through a settlement between Eddystone and Jamex—an entity with no assets—could summarily be converted into a $139 million judgment. And even more concerning is that this judgment could then be used against a party that never had an opportunity to challenge the process by which the Arbitration Award was obtained.")).

4

B.      **Allegations In The Amended Complaint.**

ERC asserts four claims: (1) alter ego against the Ferrellgas Defendants, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping; (2) intentional fraudulent transfer under 12 Pa. C.S. § 5104(a) against all Defendants; (3) constructive fraudulent transfer under 12 Pa. C.S. § 5105 against all Defendants; and (4) breach of fiduciary duties to creditors against the Ferrellgas Defendants, Bridger Logistics, Rios, and Gamboa.  (FAC ¶¶ 76-103.)

ERC alleges that the Court has subject-matter jurisdiction under 28 U.S.C. § 1333(1), because ERC "seeks to enforce payment of a debt arising under a maritime contract."   (FAC ¶ 31.)   ERC refers to the Rail Services Agreement (*see id.* ¶¶ 36-37) and alleges that "[t]he maritime contract in question concerns [ERC]'s providing the service of transloading crude oil from railcars delivered to [ERC]'s facility to vessels at the facility's dock for subsequent shipment downriver" (*id.* ¶ 31).   Beyond the cursory mention of vessels and "subsequent shipment downriver," ERC fails to allege on what basis the Rail Services Agreement is a maritime contract sufficient to support admiralty jurisdiction.   None of ERC's claims are themselves maritime in nature.[2]

---

[2]      ERC also asserts that the Court has supplemental jurisdiction.  (FAC ¶ 31.)   But supplemental jurisdiction is relevant only in a "civil action of which the district courts have original jurisdiction."  28 U.S.C. § 1367(a).

**ARGUMENT**

A federal court must have subject-matter jurisdiction to enter a valid, enforceable judgment.  The Court must dismiss this action if it determines that it lacks subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  "A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."  *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).  *See also Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126, 127 (1804) (permitting plaintiff to assert lack of subject-matter jurisdiction on appeal following entry of judgment for defendant); *Brown v. Philadelphia Hous. Auth.*, 350 F.3d 338, 346-47 (3d Cir. 2003) (permitting defendant to assert lack of subject-matter jurisdiction in reply brief on appeal, 29 years after entry of consent decree).

Although "the court must accept as true all well-pleaded allegations" upon a facial challenge to subject-matter jurisdiction, "[t]his presumption of truthfulness does not require the Court to credit 'bald assertions,' 'unsupported conclusions,' 'unwarranted inferences,' or 'legal conclusions masquerading as factual conclusions.'"  *Dawes-Lloyd v. Publish Am., LLP*, Civil Action No. 09-2387, 2010 WL 3431663, at *2 (E.D. Pa. Aug. 31, 2010) (citations omitted), *aff'd*, 441 F. App'x 956 (3d Cir. 2011).  Moreover, the Court need not "presume that the plaintiff can prove facts it has not alleged." *Id.* (citation omitted).

"Regardless of whether the challenge is facial or factual, the plaintiff still bears the burden of persuasion.  Plaintiff is the one seeking to invoke the jurisdiction of this court, and it must demonstrate that the case is within [the Court's] competence." *Pennsylvania Prot. & Advocacy, Inc. v. Houston*, 136 F. Supp. 2d 353, 359 (E.D. Pa. 2001) (citations omitted).  *See also Abiona v. PNC Bank, N.A.*, No. CIV. A. 98-1994, 1998 WL 426552, at *5 (E.D. Pa. July 29,

1998) ("Once Defendants have challenged this Court's subject matter jurisdiction, it is Plaintiff's burden to show that subject matter jurisdiction exists.").

Admiralty and maritime jurisdiction is governed by 28 U.S.C. § 1333. "The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Sisson v. Ruby*, 497 U.S. 358, 367 (1990) (quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982)); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25 (2004) (same). As a result, admiralty jurisdiction must be grounded in a maritime contract or a maritime tort.[3]

As to maritime contracts, "the trend in modern admiralty case law . . . is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991). A contract "made on land, to be performed on land," is not a maritime contract, even if it is a contract to build a ship. *The Jefferson*, 61 U.S. (20 How.) 393, 402 (1857). By contrast, an agreement is a maritime contract if it "relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment," 1 Steven R. Friedell, Benedict on Admiralty § 182 (7th ed. rev. 2012), or if its "primary objective is to accomplish the transportation of goods by sea," *Norfolk Southern*, 543 U.S. at 24.[4]  *See also Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 (3d Cir. 1992) (contract "concerns the operation of a ship or its navigation or management"); *Weinstein v. Eastern Airlines, Inc.*, 316 F.2d 758, 766 (3d Cir. 1963) (contract

---

[3]     ERC makes no allegations that the Court has subject-matter jurisdiction based on a maritime tort, which "must occur on navigable waters and be caused by a vessel." *Holt Cargo Systems, Inc. v. Delaware River Port Auth.*, No. CIV. A. 94-7778, 1996 WL 195390, at *6 (E.D. Pa. Apr. 19, 1996).

[4]     Benedict on Admiralty has been published since 1850 and is cited regularly by the Supreme Court and the Third Circuit. *See, e.g., Lozman v. City of Riviera Beach*, 568 U.S. 115, 125 (2013); *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 693 (1950); *Eastern Transp. Co. v. United States*, 272 U.S. 675, 691 (1927); *In re World Imports Ltd.*, 820 F.3d 576, 583 (3d Cir. 2016).

must be "directly and in essence, an obligation maritime in its nature, for the performance of maritime service or transactions") (quotations and citations omitted).[5]

If a contract involves both maritime and non-maritime aspects, the jurisdictional question is "whether the principal objective of a contract is maritime commerce." *Norfolk Southern*, 543 U.S. at 25. Thus, a through bill of lading for transportation of goods from Australia to Alabama is a maritime contract, even though it contemplates "a 'fringe' portion" of rail transportation from Savannah to Huntsville. *Id.* By contrast, if the maritime "components are insubstantial, then the bill is not a maritime contract." *Id.* at 27.[6]

## I. THE RAIL SERVICES AGREEMENT DOES NOT SUPPORT ADMIRALTY JURISDICTION.

As stated above, ERC alleges that this Court may exercise maritime jurisdiction based on the Rail Services Agreement, because ERC "seeks to enforce payment of a debt arising under a maritime contract," which "concerns Eddystone's providing the service of transloading crude oil from railcars delivered to Eddystone's facility to vessels at the facility's dock for subsequent shipment downriver." (FAC ¶ 31.) But "[c]alling a contract a maritime contract does not make it one." *Kennedy v. H&M Landing, Inc.*, 529 F.2d 987, 988 (9th Cir. 1976). The Rail Services Agreement cannot be the font of admiralty jurisdiction in this case for three related reasons.

---

[5]     The Supreme Court disapproved of *Weinstein* on other grounds in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 266 (1972).

[6]     The Third Circuit has not determined whether *Norfolk Southern*, which arose in the context of a single transaction with discrete land and sea components, applies to contracts requiring repeated performance and less-distinct lines between what is land-based and what is maritime. Under the Third Circuit's earlier precedents, admiralty jurisdiction arises "only when the subject matter of the contract is 'purely' or 'wholly' maritime in nature." *Berkshire Fashions*, 954 F.2d at 880. Exceptions for situations in which the maritime and non-maritime components "can be severed" or in which the non-maritime aspects are "'merely incidental'" do not apply here. *Id.* (citation omitted). For the reasons discussed below, it is the *maritime* components of the RSA that are incidental, and if the RSA were severed into maritime and non-maritime components, the instant dispute would arise under the non-maritime portion.

First, the principal objective of the contract is evident from its name:  "Rail Facilities Services Agreement."  ERC constructed a facility that would permit BTS and other shippers of crude petroleum to offload their cargo from railcars after a 1,500-mile journey from the Bakken oilfields in North Dakota.  (FAC ¶ 4.)  The agreement contemplated that the crude might be loaded onto river-going barges, stored on land, or transported by pipeline.  (*See, e.g.,* RSA at 1 & §§ 4.2, 7.2, 7.3, 12.2, 12.4.)  The contract did not require either party to provide, charter, or operate any vessel.  Indeed, it was conceivable that BTS might not deliver any crude to the Eddystone Rail Facilities, particularly if market prices were unfavorable or if Bridger Marketing did not have a customer that wished to purchase crude; in that event, BTS was obligated to make deficiency payments instead.  (FAC ¶ 37; RSA, § 4.1.)  The Rail Services Agreement thus does not "require[] substantial carriage of goods by sea" or otherwise have maritime commerce as its principal objective.  *Norfolk Southern*, 543 U.S. at 27.

Moreover, to the extent that the complaint mentions actual maritime transport, it is clear that it was a minimal component of the overall transaction.  ERC alleges that the purpose of the facility was to enable delivery of crude oil from North Dakota to refineries on the Delaware River, chiefly a refinery located in Trainer, Pennsylvania.  That refinery is about four and one-half miles from the Eddystone Rail Facilities—a minor additional distance after a rail journey across half the continent.[7]   The Court in *Norfolk Southern* said that "[g]eography … is useful … in a limited sense:  If a bill [of lading]'s *sea* components are insubstantial, then the bill is not a maritime contract."  543 U.S. at 27.  Accordingly, even if ERC had actually been the shipper responsible for delivering crude oil from North Dakota to Trainer, its transportation contract

---

[7]    The Court may take judicial notice of the distance between two locations.  *See, e.g., Blanning v. Tisch*, 378 F. Supp. 1058, 1060 (E.D. Pa. 1974).

2cee6ccdfb57e1e6

would not have been a maritime contract.  The Rail Services Agreement, under which ERC provided no transportation at all, has even less of a maritime purpose.

Second, any connection between the Rail Services Agreement and maritime commerce is general and abstract in nature.  It is not sufficient that "the services to be performed under the contract have reference to a ship or to its business, a ship is the object of such services, or it has reference to navigable waters."  1 Benedict on Admiralty § 182.  Rather, there must be "a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping."  *Id.  See, e.g., Kennedy*, 529 F.2d at 989 (exclusive franchise to sell bait in a harbor is not a maritime contract); *Euclid Energy Ltd. v. SIA Ventall Terminals*, 598 F. Supp. 2d 454, 455-56 (S.D.N.Y. 2009) (lease-and-services agreement for facility where gasoline is upgraded and loaded onto ships for export by sea is not a maritime contract); *Holt Cargo Sys.*, 1996 WL 195390, at *6 (lease of a marine terminal is not a maritime contract); *Derby Res.s AG v. Ultramar Panama, P.R.*, Nos. 86 CIV 9600 (JMW), 87 CIV 1739 (JMW), 1988 WL 78316, at *5 (S.D.N.Y July 19, 1988) (contract governing the operation of a marine terminal is not a maritime contract); *Intercontinental Contractors, Inc. v. Canadian Maritime Carriers, Ltd.*, Civ. A. No. 86-2503,1986 A.M.C. 2161, 2162, 1986 WL 5338, at *2 (E.D. Pa. May 6, 1986) (lease of equipment used to unload vessels is not a maritime contract); *Steamship Overdale Co. v. Turner*, 206 F. 339, 341 (E.D. Pa. 1913) (requirements contract for supply of coal to owner of steamship line is not a maritime contract); *Reliance Lumber Co. v. Rothschild*, 127 F. 745, 748-49 (E.D. Pa. 1904) (marine insurance policy is a maritime contract, but agreement to procure such a policy is not a maritime contract).

10

In *Derby*, for example, a plaintiff that purchased crude oil to be loaded on a vessel at a marine terminal in the Shetland Islands sued the terminal operator, alleging that the quantity and quality of the oil was insufficient.  Plaintiff argued unsuccessfully that the contract governing the operations of the terminal was a maritime contract.  1988 WL 78316, at *1.  The operator's contractual duties included "supervision of the receipt of crude oil delivered from incoming pipelines and treatment of the oil in accordance with quality requirements; allocation of berth days, services and storage to ships in accordance with other provisions of the [contract]"; "maintenance of the Terminal and the keeping of maintenance records"; "disposal of ballast water and other tankship effluents"; "preparation of customs declarations on behalf of Pipeline participants"; and issuing quantity and quality certificates, in connection with loading of a ship, that contain information such as "which tanker which will carry the oil described in the [certificate], the oil's destination, the type of oil, such as Ninian crude, the number of barrels and the amount of the cargo that is not actual crude oil, but only unsalable bottom sediment and water."  *Id.* at *2.  The court concluded that this was not a maritime contract but was "in effect, a services contract, and the nature and subject matter of the contract relate to admiralty tangentially at most."  *Id.* at *4.  The court explained that "[m]ost of those [contract] duties have nothing whatever to do with maritime commerce, but are merely duties that, performed well, enable the Pipeline Operators to more easily engage in maritime commerce.  Other duties, such as disposal of tankship effluents, are most properly characterized as contracts preliminary to maritime contracts, which do not fall under this Court's admiralty jurisdiction."  *Id.*

Perhaps ERC believes—though the complaint does not say—that a contract to provide transloading services must be maritime to the extent the goods are loaded onto ships.  But that notion would be a substantial expansion of admiralty jurisdiction.  Courts have repeatedly held that even when a company is in the business of receiving cargo on land and loading it onto ships,

12240559.18

the land-based portion of the work is non-maritime.  For example, in *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313 (2d Cir. 1983)*,* the defendant operated a terminal facility that received goods, stored them, and then loaded them onto ships.  A claim regarding the loss of cargo during storage was not within the court's admiralty jurisdiction.  724 F.2d 313, 315 (2d Cir. 1983).  *See also Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292, 1295 (2d Cir. 1990) ("[I]nasmuch   as any claim … arose while the cargo was on land, [the claim] is … not within admiralty jurisdiction."); *St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.*, 863 F. Supp. 1013, 1018 (E.D. Mo. 1994) (no admiralty jurisdiction because "[t]he alleged damage to plaintiff's property occurred on land, at the terminal facility operated by defendant … [and] [a]ny breach of contract … must have occurred on land").  At a minimum, then, a dispute relating to ERC's services in removing oil from railcars is not a matter for admiralty jurisdiction.

Third, when a concrete dispute developed between the parties to the Rail Services Agreement, that dispute had nothing to do with maritime commerce.  ERC pursued its arbitration claim against BTS because BTS *did not use the facility* to transload oil from rail cars and did not pay the deficiency charges that were owed in circumstances in which BTS transloaded less than the specified amounts of oil per month.  ERC pursued a claim for money damages that was based solely on deficiency charges that had accrued at the time of the arbitration and that would accrue through the remaining life of the contract.  (*See* FAC ¶¶ 74-75.)

Thus, the "nature of the transaction" underlying this case is purely financial; it has nothing to do with barges or maritime commerce in any respect.  *Exxon*, 500 U.S. at 611.  *See also Tradhol Internacional, S.A. v. Colony Sugar Mills Ltd.*, 354 F. App'x 463, 465 (2d Cir. 2009) (no admiralty jurisdiction because contract clauses about "prepayments and damages for any delays in loading and lost profits" are not "merely incidental"); *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 968 F.2d 196, 200 (2d Cir. 1992) (no admiralty jurisdiction because

12

dispute about claim under marine insurance policy for coffee that disappeared from warehouse and was never designated for transportation by ship is "so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction").

While a contract that is not inherently maritime in nature may give rise to a maritime dispute that triggers admiralty jurisdiction, there is no such maritime dispute in this case.  *See Steamship Overdale*, 206 F. at 34 (if "coal had been supplied to the Overdale, the contract would apply as to the coal delivered to the navigation or commerce of the particular vessel, and admiralty would have jurisdiction."); *Exxon*, 500 U.S. at 612 (Exxon's claim for nonpayment for a delivery of fuel to a vessel in Saudi Arabia under a requirements contract was within admiralty jurisdiction); *Jones v. Berwick Bay Oil Co.*, 697 F. Supp. 260,  267 (E.D. La. 1988) (only after fuel is supplied to a particular vessel under a blanket contract "is there a sufficient nexus to the operation of a ship or to transportation by sea to invoke admiralty jurisdiction and create a maritime obligation"); *Marubeni Int'l Petroleum (Singapore) Pte Ltd. v. Prestige Marine Services Pte Ltd.*, 591 F. Supp. 2d 386, 388 (S.D.N.Y. 2009) (distinguishing between contracts expressly providing that fuel would be used to power a party's vessels and contracts "to supply fuel to indeterminate vessels in the future").  Here again, the dispute is purely financial.

For these reasons, the Rail Services Agreement is not a fundamentally maritime contract, and it did not ripen into a maritime transaction that triggered the dispute between its parties. This Court's involvement in this dispute is neither necessary nor helpful in protecting maritime commerce.  *See Sisson*, 497 U.S. at 367.  The agreement thus cannot be the foundation of the Court's jurisdiction in this case.  Accordingly, the Court must dismiss this action for lack of subject-matter jurisdiction.

12240559.18

## II.     EVEN IF THE RAIL SERVICES AGREEMENT WERE A MARITIME CONTRACT, NONE OF ERC'S CLAIMS ARISE UNDER THE CONTRACT.

Even if the Rail Services Agreement were a maritime contract, the Court could not exercise subject-matter jurisdiction over a mere subsidiary claim.[8]  "Ordinarily, federal admiralty jurisdiction is strictly limited to claims traditionally raised in admiralty." *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir. 1987).   Courts are loath to extend admiralty jurisdiction beyond traditional admiralty claims; however, courts have extended jurisdiction to include certain types of subsidiary, equitable claims when resolution of those claims is necessary for an admiralty court to enforce its own judgments. *Id*. (examining *Lee v. Thompson*, 15 F. Cas. 233 (C.C.D. La. 1878) (No. 8,202)).[9]  For example, courts may extend admiralty jurisdiction to encompass fraudulent transfer claims when the alleged fraudulent transfers are aimed at frustrating or evading an admiralty judgment.   *Id*.   The existence of a maritime contract somewhere in the background, however, is not a sufficient basis to justify the exercise of admiralty jurisdiction over non-contractual claims against non-contracting parties.[10]

Two leading cases make the point unmistakably clear.   In *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684 (1950), the Supreme Court endorsed the proposition that an admiralty court has jurisdiction to enforce its own judgments and extended

---

[8]     Admiralty courts have referred to ancillary claims related to primary admiralty claims as subsidiary claims.

[9]     A limited exception extending admiralty jurisdiction is inapplicable here.   Under Supreme Court precedents dating to the 1790s, a district court's admiralty jurisdiction "extends to claims to enforce foreign admiralty judgments." *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 582 (4th Cir. 2015); *see also D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd.*, 756 F.3d 151, 156 (2d Cir. 2014).   ERC does not have a foreign admiralty judgment against anyone.

[10]     Certain of Defendants' defenses and conditional counterclaims arise from ERC's deficient performance under the Rail Services Agreement.   But it is black-letter law that subject-matter jurisdiction must be determined on the basis of the plaintiff's well-pleaded complaint, not on a defense or a counterclaim.   *See, e.g., Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009); *Shernoff v. Morgan Marina, Inc.*, Civil Action No. 09-1353, 2009 WL 901881, at *2 (D.N.J. Mar. 31, 2009) (applying principle to attempt to invoke admiralty jurisdiction).

14

admiralty jurisdiction to claims of alter ego and fraudulent transfer aimed at frustrating an admiralty court's authority to attach property to secure a maritime claim.  *Id.* at 694-95.  In extending admiralty jurisdiction to these claims, the Supreme Court warned against further expansion.  *Id*. at 695 ("But because power exists, its use is not inexorable.").

The Court in *Swift* also emphasized that the specific circumstances of the case merited jurisdiction.  *Id.*  In that action, the libellant filed an admiralty suit against a shipping company and attempted to attach the company's ship as security.  *Id*. at 685-87.  When the libellant discovered that the shipping company had transferred the ship to an alleged alter ego, the libellant filed a supplement libel against the alter ego in the same admiralty proceedings seeking attachment of the ship.  *Id.*  Moreover, the principal issue in the case was "a claim arising upon a contract of affreightment supplemented by charges of negligence in the nondelivery of a sea cargo—matters obviously within admiralty jurisdiction."  *Id.* at 691.  By contrast, the Court stated that "a court of admiralty will not enforce an independent equitable claim merely because it pertains to maritime property."  *Id.* at 690 (citing *The Eclipse*, 135 U.S. 599, 608 (1890)).  And in particular, the Court concluded that the district court's dismissal of the case for lack of jurisdiction would have been appropriate "if the libellants, as creditors of [the debtor], had gone into admiralty by way of a creditor's bill to set aside a pretended sale of [the vessel] as a fraudulent transfer."  *Id.* at 690-91.

The Second Circuit was presented with the latter fact pattern in *Atlanta Shipping*.  The plaintiff shipping company and its customer entered into what was unquestionably a maritime contract, under which plaintiff would "carry 560 mobile homes from the United States to Saudi Arabia in four voyages in exchange for $1.54 million per voyage to be paid in installments." *Atlanta Shipping*, 818 F.2d at 243.  After the customer failed to pay, plaintiff obtained and confirmed an arbitration award against the customer.  Plaintiff then filed suit in federal district

15

court against the customer's bank to recover for a "maritime debt," alleging that payments to the bank were fraudulent transfers. *Id.* The Second Circuit "reject[ed] [plaintiff]'s broad assertion that an admiralty court may set aside a fraudulent transfer even if it is not exercising admiralty jurisdiction over traditional admiralty claims." *Id.* at 248. The Court explained that admiralty jurisdiction is limited to traditional admiralty claims and subsidiary claims related to the enforcement of an admiralty court's judgment, and it held that a plaintiff "may invoke admiralty jurisdiction over subsidiary claims in equity only after it has initiated a primary action properly within the jurisdiction of an admiralty court." *Id.* However, "[h]aving never invoked the jurisdiction of an admiralty court over any primary admiralty claim, [plaintiff] cannot now invoke admiralty jurisdiction against a third party over the derivative claim of an alleged fraudulent transfer." *Id.*

Both *Swift* and *Atlanta Shipping* make clear that a court can exercise admiralty jurisdiction over a "subsidiary or derivative issue" ***only*** if the court first has jurisdiction of "issues wholly within admiralty jurisdiction." *Swift*, 339 U.S. at 691, 692. Further, those claims must be specifically aimed at frustrating or evading an admiralty judgment. *Atlanta Shipping*, 818 F.2d at 248. ERC does not allege claims subject to admiralty jurisdiction.

<u>First</u>, ERC has not presented this Court with any issues "wholly within admiralty jurisdiction." As the Supreme Court stated, "[i]n a subsequent lawsuit involving claims with no independent basis for jurisdiction, a federal court lacks threshold jurisdictional power that exists when ancillary claims are asserted in the same proceeding as claims conferring federal jurisdiction." *Peacock v. Thomas*, 516 U.S. 349, 355 (1996) (citation omitted). Even if the Rail Services Agreement were a maritime contract, ERC pursued its contractual rights and remedies against BTS in an arbitration proceeding in New York—not in an admiralty suit. ERC cannot now come to this Court in admiralty to pursue secondary claims or collection remedies against

16

third parties.  Those claims arise solely under state law, and they have no nexus to the sea or to maritime commerce.  Such an "independent equitable claim [that] merely … pertains to maritime property" cannot serve as the foundation for a suit in admiralty.  *Swift*, 339 U.S. at 690.

Second, ERC's subsidiary claims are not subject to the limited expansion of admiralty jurisdiction for claims necessary to enforce an admiralty court's judgment.  Not only do the alleged fraudulent transfers predate any court proceedings against any party, the transfers predate any alleged breach of contract.  An argument that these historic alleged fraudulent transfers were an attempt to evade or frustrate a potential admiralty judgment in the future is wholly speculative and cannot serve as the basis for the expansion of admiralty jurisdiction.

In short, the existence of a maritime contract may permit the parties to resolve their contractual disputes in a court of admiralty, but it does not give a contracting party a free pass to federal court to pursue *subsidiary claims against other parties*.  Because this suit involves no claims within this Court's admiralty jurisdiction, it must be dismissed.

## CONCLUSION

For all of these reasons, the Court must dismiss ERC's First Amended Complaint for lack of subject-matter jurisdiction.  A proposed order is filed herewith.

Dated: January 25, 2019

Respectfully submitted,

By:___/s/ Lawrence G. Scarborough_____
    Lawrence G. Scarborough (Admitted *Pro Hac Vice*)

    Richard L. Scheff (I.D. No. 35213)
    Michael C. Witsch (I.D. No. 313884)
    ARMSTRONG TEASDALE, LLP
    1500 Market Street
    12th Floor, East Tower
    Philadelphia, PA 19102
    Telephone:  (215) 246-3469
    Facsimile:  (215) 569-8228
    rlscheff@armstrongteasdale.com
    mwitsch@armstrongteasdale.com

    Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
    BRYAN CAVE LEIGHTON PAISNER LLP
    1290 Avenue of the Americas
    New York, New York 10104
    Telephone:  (212) 541-2000
    Facsimile:  (212) 541-4630
    lgscarborough@bclplaw.com

    Jacob A.  Kramer (Admitted *Pro Hac Vice*)
    BRYAN CAVE LEIGHTON PAISNER LLP
    1155 F Street, NW
    Washington, D.C. 20004
    Telephone:  (202) 508-6000
    Facsimile:  (202) 508-6200
    jake.kramer@bclplaw.com
    Brian C. Walsh (Admitted *Pro Hac Vice*)
    Alicia Ragsdale Olszeski (Admitted *Pro Hac Vice*)
    BRYAN CAVE LEIGHTON PAISNER LLP
    211 North Broadway, Suite 3600
    St.  Louis, Missouri 63102
    Telephone:  (314) 259-2000
    Facsimile:  (314) 259-2020
    brian.walsh@bclplaw.com
    ali.olszeski@bclplaw.com
    Sarah L. Hartley (Admitted *Pro Hac Vice*)
    BRYAN CAVE LEIGHTON PAISNER LLP
    1700 Lincoln Street, Suite 4100
    Denver, Colorado 80203
    Telephone:  (303) 861-7000
    Facsimile:  (303) 866-0200
    sarah.hartley@bclplaw.com

18

*Attorneys for Bridger Logistics, LLC, Ferrellgas Partners, L.P., Ferrellgas L.P., Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC, Bridger Admin Services II LLC, Bridger Energy, LLC, Bridger Lake, LLC, Bridger Leasing, LLC, Bridger Marine, LLC*

    /s/ Julie Negovan
Julie Negovan, Esquire (1651)
1622 Spruce Street
Philadelphia, PA 19103
Telephone:  (267) 546-0623
jn@sprucelaw.com

Jeremy A. Fielding
Kent D. Krabill
Jonathan D. Kelley
Christian A. Orozco
LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
jfielding@lynnllp.com
kkrabill@lynnllp.com
jkelley@lynnllp.com
corozco@lynnllp.com

*Attorneys for Defendants Julio Rios and Jeremy Gamboa*

12240559.18

## CERTIFICATE OF SERVICE

I, Michael C. Witsch, hereby certify that on January 25, 2019, a true and correct copy of the foregoing *Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)* was filed electronically via the Court's ECF filing system. This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

 /s/ Michael C. Witsch            

Michael C. Witsch

12240559.18