# EXHIBIT A

## EDDYSTONE RAIL FACILITIES SERVICES AGREEMENT

THIS EDDYSTONE RAIL FACILITIES SERVICES AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 2013 (the "Effective Date") by and between **BRIDGER TRANSFER SERVICES, LLC**, a Louisiana limited liability company having offices at 800 Spring Street, Suite 205, Shreveport, LA 71101 ("Customer"), and **EDDYSTONE RAIL COMPANY, LLC**, a Delaware limited liability company having offices at 1100 Louisiana, Suite 3300, Houston, Texas 77002 ("Owner"). Customer and Owner are sometimes collectively referred to in this Agreement as the "Parties" or individually referred to as a "Party."

### WITNESSETH:

**WHEREAS**, Owner proposes to construct and/or improve a new rail and barge facility located in Eddystone, Delaware County, Pennsylvania that will unload Crude Petroleum (as defined below) from unit trains and load such Crude Petroleum into barges and, potentially, pipelines, including track, rail unloading equipment (up to and including the fitting for the unloading arm), custody transfer meters, pumps, shore tanks and other incidental storage and pipeline facilities, barge loading equipment, marine facilities, and other ancillary facilities (all of the foregoing, collectively, the "Eddystone Rail Facilities"). One or more subsequent phases of the Eddystone Rail Facilities may include connection(s) to future pipeline distribution system(s) from the Eddystone Rail Facilities into Philadelphia area refineries and terminals ("Pipeline Distribution Systems"), but such subsequent phase will include only such connection(s) and not any such future Pipeline Distribution Systems; and

**WHEREAS**, to induce Owner to construct, improve and operate the Eddystone Rail Facilities, Customer desires to commit to utilize the Eddystone Rail Facilities for a specified minimum volume of Crude Petroleum over the term provided for in this Agreement, subject to and upon the terms and conditions set forth in this Agreement;

**NOW THEREFORE**, in consideration of the mutual agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

1. **Definitions.**

1.1 <u>Defined Terms</u> Capitalized terms used in this Agreement and not defined elsewhere in this Agreement shall have the meanings given such terms as set forth below:

"Affiliate" means with respect to a Party, any other Person directly or indirectly controlling, controlled by, or under common control with such Party. For purposes of this definition the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another entity whether through the ownership of voting securities, by contract or otherwise. Each of the members of Owner shall be deemed to be Affiliates of Owner.

"Applicable Laws" means all maritime and other laws, statutes, directives, codes, ordinances, rules, regulations, municipal by-laws, judicial, arbitral, administrative,

ministerial, departmental or regulatory judgments, orders, decisions, rulings or awards, consent orders, consent decrees and policies of any Governmental Authority which is applicable to a Person, its property or a transaction.

"Assigned Barge Loading Window" means a Barge Loading Window for Customer's Barges that is assigned by Owner in accordance with the provisions of item 2 (c) (or any successor item) of the Terms and Conditions. "Assigned Barge Loading Window" may also include a Replacement Barge Loading Window to the extent provided in item 10(c) (or any successor item) of the Terms and Conditions.

"Assigned Train Unloading Window" means a Train Unloading Window for Customer's Trains that is assigned by Owner in accordance with the provisions of item 2 (c) (or any successor item) of the Terms and Conditions. "Assigned Train Unloading Window" may also include a Replacement Train Unloading Window to the extent provided in item 10(c) (or any successor item) of the Terms and Conditions.

"Barge" means a barge into which Customer's Crude Petroleum will be loaded at the Eddystone Rail Facilities. Barges are subject to the requirements of the Terms and Conditions and the Terminal Rules.

"Barge Loading Window" means the period of time that is reserved by Owner for a Barge scheduled by Customer to arrive at the Eddystone Rail Facilities, be loaded with Customer's Crude Petroleum, and depart, as set forth in the Terms and Conditions.

"Barge Operator" means the owner, operator or charterer, as applicable, of a Barge, but shall not include Customer or Owner.

"Barrel" means forty-two (42) United States gallons at sixty degrees (60°) Fahrenheit and equilibrium vapor pressure of the liquid.

"Berthold Rail Facility" means Enbridge Rail (North Dakota) LP's unit-train Crude Petroleum rail unloading facility located near Enbridge Pipelines (North Dakota) LLC's Berthold Station.

"bpd" means Barrels per day.

"Business Day" means any day other than Saturday, Sunday, and any other day when banks are closed for business in Pennsylvania.

"Charges" means, collectively, the Transloaded Volume Charge and the Deficiency Volume Charge.

"Conrail" means Consolidated Rail Corporation or its successors.

"Crude Petroleum" means the direct virgin liquid product of oil or gas wells.

"Crude Rail Car" means a rail car suitable for shipping Crude Petroleum on a Rail Carrier and other United States rail carriers.

"CSX" means CSX Transportation or its successor.

"Debt" means senior unsecured debt.

"Deficiency Volume Charge" means $1.75 per Barrel, subject to adjustment in accordance with Section 5 hereof.

"Dollar" or "$" means United States dollars.

"Enbridge" means Enbridge Energy, Limited Partnership and/or any of its Affiliates.

"Exelon" means Exelon Generation Company, LLC and its successors and assigns.

"Force Majeure" means any occurrence beyond the reasonable control of the affected Party, including (1) compliance with acts, orders, regulations, or requests of any Governmental Authority or any Person purporting to act therefor; (2) insurrections, wars, rebellion, riots, strikes, or labor difficulties; (3) action of the elements that is not reasonably preventable or accidental disruption; (4) breakdown of production, loading, unloading, storage, transportation or marine facilities that is not reasonably preventable; (5) accident to machinery, equipment or pipeline (not attributable to improper maintenance or operator negligence); (6) the relocation of all or any portion of the Eddystone Rail Facilities pursuant to the Lease; and (7) any other cause, whether or not of the same class or kind, reasonably beyond the control of a Party excepting that the lack of funds or insufficiency of Crude Petroleum supply shall not constitute an event of Force Majeure. It is understood and agreed that the settlement of strikes or differences with workers shall be entirely within the discretion of the Party affected by the Force Majeure event.

"Governmental Authority" means any government, any governmental, administrative or regulatory entity, authority, commission, board, agency, instrumentality, bureau or political subdivision and any court, tribunal or judicial or arbitral body (whether national, federal, state or local or, in the case of an arbitral body, whether governmental, public or private).

"Lease" means that certain Lease Agreement, dated as of September 19, 2012, by and between Exelon and Eddystone Rail Transportation LLC with respect to the facilities upon which some or all of the Eddystone Rail Facilities are or will be located, as amended, supplemented or restated from time to time.

"Month" means the period commencing at 7:00 a.m. MST on the first day of a calendar month and ending at 7:00 a.m. MST on the first day of the next calendar month, except that the first Month of the Term shall mean the period commencing at 7:00 a.m. MST on the Operational Date and ending at 7:00 a.m. MST on the first day of the next calendar month.

"Monthly Volume Commitment" for any Month means the product of (a) the

Volume Commitment and (b) the number of days in such Month.

"MST" means Mountain Standard Time.

"NS" means Norfolk Southern Corporation or its successors.

"Operator" means the operator engaged by Owner from time to time to operate the Eddystone Rail Facilities and perform some or all of the Transloading Services. Owner shall, without limitation, have the right to perform any or all of Transloading Services (directly or through an Affiliate) and/or to replace the Operator from time to time.

"Owner Approvals" means all governmental and regulatory authorizations, orders, certificates, licenses, permits and approvals, required or, in the sole discretion of Owner, desirable in connection with the Eddystone Rail Facilities or the construction, improvement, ownership or operation thereof.

"PA Time" means the local time in Philadelphia, Pennsylvania.

"Person" means an individual, partnership, limited liability company, corporation, trust, estate, unincorporated association, nominee, joint venture, or other entity.

"Rail Carrier" means CSX, Conrail, NS and/or any other rail carrier whose trains are hauled or otherwise delivered into the Eddystone Rail Facilities.

"Replacement Barge Loading Window" means an alternate Barge Loading Window that is assigned to Customer by Owner or Operator in accordance with the provisions of item 10(c) (or any successor item) of the Terms and Conditions.

"Replacement Train Unloading Window" means an alternate Train Unloading Window that is assigned to Customer by Owner or Operator in accordance with the provisions of item 10(c) (or any successor item) of the Terms and Conditions.

"Terminal Rules" means the terminal rules and regulations issued by Owner from time to time, as amended, supplemented and restated from time to time by Owner in accordance with Section 6.2 hereof.

"Terms and Conditions" means Owner's terms and conditions for the Transloading Services, as amended, supplemented and restated from time to time by Owner in accordance with Section 6.1 hereof.

"Total Volume Commitments" means Customer's aggregate Volume Commitment over the Term in the amount of 118,168,750 Barrels.

"Train" means a unit-train by which Customer's Crude Petroleum will be delivered to the Eddystone Rail Facilities for Transloading Service. Trains are subject to the requirements of the Terms and Conditions and the Terminal Rules.

4

"Train Unloading Window" means the period of time, initially twenty (20) hours (subject to revision from time to time by Owner with Customer's written consent, such consent not to be unreasonably withheld), that is reserved by Owner for a Train scheduled by Customer to arrive at the Eddystone Rail Facilities, be unloaded, and depart.

"Transloaded Volume Charge" shall mean $2.25 per Barrel, subject to adjustment in accordance with Section 5 hereof.

"Transloaded Volumes" means volumes of Customer's Crude Petroleum for which Transloading Services are provided. The delivery ticket provided by Owner at the custody transfer meters into the Barges and/or, if applicable, the Pipeline Distribution Systems shall provide the conclusive measurement of the volume of such Crude Petroleum that is binding on both Parties (and will not be superseded or replaced by any separate measurement provided by the unloading or loading arm of the Eddystone Rail Facilities or any survey or independent survey).

"Transloading Services" mean receipt of Trains loaded with a customer's Crude Petroleum at the Eddystone Rail Facilities, unloading of such Crude Petroleum from such Trains, loading of such Crude Petroleum into Barges and/or, if applicable, delivery of such Crude Petroleum into Pipeline Distribution Systems, and all incidental storage and other services provided by Owner to perform or facilitate such services.

"Volume Commitment" means seven (7) Trains per week with a minimum capacity of 65,000 Barrels per Train which is approximately the equivalent of Nine Thousand Two Hundred and Fifty Barrels per day (9,250 bpd) per Train, subject to phase-in as follows:

| Commencing | Number of Trains | Approximate Equivalent Number of bpd |
|---|---|---|
| Operational Date | Two | 18,500 |
| One month after Operational Date | Four* | 37,000* |
| Two months after Operational Date | Seven* | 64,750* |

* Inclusive of earlier number of trains and bpds

"Year" means, as the context requires:

(a)     a calendar year beginning at 7:00 a.m. MST on January 1 and ending at 7:00 a.m. MST on the next following January 1;

(b)     the period beginning at 7:00 a.m. MST on the Operational Date and ending at 7:00 MST on the next following January 1; or

(c)     the period beginning at 7:00 a.m. MST on January 1 of the calendar year in which the Term ends and ending on the last day of the Term.

1.2    Other Defined Terms.   Each of the following terms is defined in the Section set forth opposite such term:

| Defined Term | Section Cross-Reference |
| --- | --- |
| Adjustment Date | 5.1 |
| Agreement | Preamble |
| CPI | 5.1 |
| Credit | 4.2 |
| Customer | Preamble |
| Customer Costs | 11.1 |
| Dispute | 15.3 |
| Eddystone Rail Facilities | Recitals |
| Effective Date | Preamble |
| Import and Export Laws | 14.2 |
| Operational Date | 2.2 |
| Owner | Preamble |
| Minimum Rating | 11.1 |
| Party or Parties | Preamble |
| Special Damages | 9 |
| Term | 2.1 |

## 2.    **Effectiveness and Term.**

2.1    Term.   This Agreement shall take effect and become binding on the Parties on the Effective Date. All of the obligations and liabilities under this Agreement shall continue for a period of five (5) years two (2) months from the Operational Date or for any shorter period pursuant to Sections 2.3 or 4.3 hereof (the "Term").

2.2    Operational Date.   The Parties agree that the "Operational Date" for purposes of this Agreement will be the date when the Eddystone Rail Facilities are ready to accept Trains containing Customer's Crude Petroleum for Transloading Services, as specified in a written notice given by Owner to Customer at least forty-five (45) days prior to the Operational Date. As of the Effective Date, it is estimated that the Operational Date will occur on December 1, 2013. Each of the Parties acknowledges and agrees that there are a number of contingencies that may affect the actual Operational Date. Accordingly, neither Party will have any right or remedy against the other Party if the Operational Date occurs earlier or later than the estimated Operational Date.

2.3    Early Termination.    Owner shall have the right to terminate this Agreement by written notice to Customer in the event that the Lease is terminated for any reason prior to the expiration of the Term.  Notwithstanding anything in the foregoing, provided Customer is not in breach of this Agreement beyond any applicable cure periods, Owner agrees not to (a) agree to the early termination of the Lease, except as provided for in the Lease or for cause, and (b) commit any breach of the Lease that results in the termination of the Lease.

**3.     Transloading Services.**

3.1     Provision of Transloading Services.  Subject to satisfaction of the condition precedent set forth in Section 3.3 hereof, and provided Customer is not in breach of this Agreement beyond any applicable cure periods, commencing on the Operational Date, Owner shall provide Transloading Services for Customer's Volume Commitment, in accordance with this Agreement, the Terms and Conditions and the Terminal Rules. Customer agrees that any or all of Owner's rights and obligations under this Agreement, the Terms and Conditions or the Terminal Rules may be performed by an Operator. Owner will provide Transloading Services for Crude Petroleum that satisfies item 1(a) (or any successor item) of the Terms and Conditions and no other commodity under this Agreement. Customer acknowledges that Crude Petroleum may be delivered into an active shore tank at the Eddystone Rail Facilities at the same time as Crude Petroleum is pumped from such active shore tank into the same or another customer's barge.

3.2     Risk. Crude Petroleum shall be pumped into a Barge at the expense of Owner, but the risk of Owner and Operator shall cease at the Barge's permanent hose connections where delivery of the Crude Petroleum shall be taken by the Customer, Barge Operator or Customer's consignee.

3.3     Condition Precedent to Transloading Services. It shall be a condition precedent to Owner's obligations under Section 3.1 hereof (but not to Customer's obligations under Section 4.1 hereof) that Customer shall  (a) have entered into a Transportation Master Contract with one or more Rail Carriers for the rail services to be provided by such Rail Carrier(s) in connection with the Transloaded Volumes as contemplated by this Agreement, the Terms and Conditions and/or the Terminal Rules, and (b) own or have entered into a charter party for the Barges, or entered into an agreement with a third party who owns or has entered into a charter party for Barges required to load and remove the Transloaded Volumes as contemplated by this Agreement, the Terms and Conditions and/or the Terminal Rules, and Customer shall have provided to Owner reasonable evidence of such ownership, contract or charter party, together with a copy of the charter party.

**4.     Customer Commitment.**

4.1     Monthly Payment Commitment.     Subject to Sections 4.2 and 7.2 hereof, Customer agrees that, each Month from the Operational Date through the end of the Term, it shall pay to Owner an amount equal to the sum of (a) the product of (i) Customer's Transloaded Volumes for such Month, and (ii) the Loaded Volume Charge, and (b) the product of (i) the amount, if any, by which the Monthly Volume Commitment for such Month exceeds Customer's Transloaded Volume for such Month, and (ii) the Deficiency Volume Charge.

4.2     Credits. If, in any Month, the Transloaded Volumes total less than Customer's Monthly Volume Commitment for such Month, Customer shall pay the Deficiency Volume Charge with respect to the shortfall in accordance with Section 4.1(b), but Customer shall receive a one Barrel credit (a "Credit") for each Barrel for which it paid the Deficiency

Volume Charge. Customer may apply Credits towards the Transloaded Volume Charge payable by Customer for Transloaded Volumes in excess of Customer's Monthly Volume Commitment during the six (6) Months following the expiration of the applicable Month during which the deficiency occurred, subject to there being sufficient available capacity in the Eddystone Rail Facilities as determined in the sole discretion of Owner. Customer shall pay to Owner the per-Barrel amount by which the Transloaded Volume Charge exceeds the Deficiency Volume Charge at the time a Credit is applied. All Credits will expire on the earlier of (a) the expiration of such six (6) Month period, or (b) termination of this Agreement whether or not such Credits were applied (even if there was insufficient available capacity to accommodate any such excess volumes). For purposes of this Section 4.2, the Transloaded Volumes (not exceeding Customer's Monthly Volume Commitment) will be deemed to occur in the Month of a Shipper's Assigned Barge Loading Window to the extent Transloaded Volumes are loaded into Barges or, if applicable, delivered into a Pipeline Distribution System during a Replacement Barge Loading Window that occurs in the immediately following Month.

4.3    Excess Transloaded Volumes.    Customer acknowledges and agrees that acceptance by Owner of volumes in excess of Customer's Monthly Volume Commitment will be subject to availability of capacity in the Eddystone Rail Facilities, as determined in the sole discretion of Owner.   Commencing with the third (3rd) month following the Operational Date, if Owner is able to accept Transloaded Volumes that exceed Customer's Monthly Volume Commitment for such Month, then, except to the extent Customer applied Credits to such excess volumes in accordance with Section 4.2), Customer shall be entitled to credit the excess Transloaded Volumes towards its Total Volume Commitment and the Term set forth in Section 2.1 shall be shortened by one (1) day for every Sixty Four Thousand Seven Hundred Fifty (64,750) Barrels of such excess Transloaded Volumes.

4.4    Limited Capacity.    If, in any Month, Owner is unable to accept all or part of Customer's Monthly Volume Commitment for any reason other than an event of Force Majeure described in Section 7.1 or Customer's breach of this Agreement, the Terms and Conditions and/or the Terminal Rules, the obligations of Customer under Section 4.1(b) hereof shall be excused to the extent of the Monthly Volume Commitment not accepted by Owner as Customer's sole remedy in connection with such inability.

## 5.    **Charges.**

5.1    Adjustment of Charges. Effective as of each anniversary of the Operational Date (the "Adjustment Date") starting with the first anniversary of the Operational Date, the then-current Transloaded Volume Charge and the then-current Deficiency Volume Charge shall each be adjusted by any increase in the United States Department of Labor, Consumer Price Index (All Urban Consumers Philadelphia-Wilmington-Atlantic City, All Items 1982-84=100) (the "CPI") over the CPI for the same month of the immediately preceding year. If the CPI is not available, a successor or substitute index shall be selected by Owner to make the adjustment provided for in this Section 5.1. If no successor or substitute index is available, a reliable governmental or other non-partisan publication, determined solely by Owner, evaluating the information theretofore used in

determining the CPI, shall be selected by Owner to make the adjustment provided for in this Section 5.1. In no event, however, shall the provisions of this Section be construed to lower the then-current Transloaded Volume Charge or the then- current Deficiency Volume Charge hereunder from the immediately preceding year.

5.2 <u>Regulation Changes</u>. In addition to any adjustment pursuant to Section 5.1, in the event that any Governmental Authority promulgates, issues or changes any rules, regulations or other mandates that require Owner to take actions that increase the capital and operating expenses of the Terminal, Owner will determine the per Barrel cost of such mandated increased capital and operating expenses and adjust the Charges so that Customer will bear its proportionate part thereof.

5.3 <u>Invoice</u>. Owner will invoice Customer each Month for all Charges payable by Customer in accordance with Section 4, as adjusted by Sections 5.1 and 5.2 hereof, demurrage, storage and other charges, and other amounts payable by Customer under this Agreement, the Terms and Conditions and/or the Terminal Rules for the immediately preceding Month. Payment shall be made on the 20th of the Month immediately following the Month for which Charges are payable or ten (10) days after invoicing whichever is later. If the payment due date falls on a Sunday or Monday banking holiday, payment will be effected on the following Business Day. If the payment due date falls on a Saturday or a banking holiday other than a Monday, then payment will be effected on the preceding Business Day. If timely payment is not made, in addition to Owner's other rights and remedies provided for in the Terms and Conditions or Terminal Rules or available under Applicable Law, Owner shall have the right to assess a late fee at an annual interest rate equivalent to one hundred twenty-five percent (125%) of the prime rate of interest charged by Citibank N.A. of New York, New York (or its successor) on ninety (90) day loans to substantial and responsible commercial borrowers as of the due date.

**6.   <u>Terms and Conditions; Terminal Rules</u>.**

6.1 <u>Terms and Conditions</u>. The Terms and Conditions are included in and part of this Agreement and Customer shall comply with and be bound by the Terms and Conditions. The initial Terms and Conditions are attached hereto as <u>Exhibit A</u>, but may be amended, supplemented or restated by Owner from time to time. Owner shall give at least forty-five (45) days' prior written notice to Customer prior to any such amendments or supplements becoming effective. Without limitation, the Terms and Conditions may be revised as reasonably deemed necessary or appropriate by Owner in connection with any connection between the Eddystone Rail Facilities and any Pipeline Distribution System.

6.2 <u>Terminal Rules</u>. Customer shall also be subject to the Terminal Rules issued by Owner, as such Terminal Rules may be amended, supplemented and restated from time to time by Owner, and Customer shall comply with and be bound by any and all such Terminal Rules. Owner shall give at least forty-five (45) days' prior written notice to Customer of any new, amended, supplemented or restated rules. Customer acknowledges that the Terminal Rules may expand on or supplement provisions addressed in this Agreement or the Terms and Conditions. Without limitation, the Terminal Rules may be revised as

9

reasonably deemed necessary or appropriate by Owner in connection with any connection between the Eddystone Rail Facilities and any Pipeline Distribution System.

**7.    Force Majeure.**

7.1    Impact of Owner Force Majeure.    If Owner is unable to provide any or all Transloading Services to Customer due to an event of Force Majeure, such failure will not be deemed to be a breach of Owner's obligations insofar as they are affected by such event of Force Majeure, for the duration of the inability to provide such Transloading Services due to the event of Force Majeure. Operator shall promptly notify Customer in writing of any Force Majeure event that prevents Operator from providing Transloading Services and will provide a non- binding, written estimate of the anticipated duration of the Force Majeure event.

7.2    Impact of Owner Force Majeure on Monthly Deficiency Payments. If and to the extent that an event of Force Majeure prevents Owner from providing Transloading Services to Customer for a period exceeding ninety (90) continuous days, then, commencing on the ninety-first (91st) consecutive day and continuing until the event of Force Majeure ceases, the obligations of Customer under Section 4.1 hereof shall be suspended in proportion to the interruption in Transloading Services. This Section 7.2 shall not apply to the extent that the applicable event of Force Majeure results from the failure of Customer, a Rail Carrier, a barge owner or operator or another Person to deliver trains or barges to, or remove trains or barges from, the Eddystone Rail Facilities or, if applicable, a Pipeline Distribution System being unable to accept receipt of Crude Petroleum or deliver such Crude Petroleum to a refinery or terminal.

7.3    Termination Based on Owner Force Majeure.

(a)    If, as a result of an event of Force Majeure, Owner shall have provided no Transloading Services to customers for a period exceeding ninety (90) continuous days, and, as of such ninetieth (90th) continuous day, (i) Owner shall not have commenced and be diligently pursuing the cure of the event of Force Majeure, and/or (ii) such event of Force Majeure is not capable of being cured within an additional ninety (90) days, either Party shall be entitled to terminate this Agreement by written notice to the other Party given at any time after the expiration of such ninety (90) continuous day period, but prior to the cessation of the applicable event of Force Majeure or until Section 7.3(b) shall apply.

(b)    If, as a result of an event of Force Majeure, Owner shall have provide no Transloading Services to customers for a period exceeding one hundred and eighty (180) continuous days, either Party shall be entitled to terminate this Agreement by written notice to the other Party given at any time after the expiration of such one hundred and eighty (180) continuous day period, but prior to the cessation of the applicable event of Force Majeure.

(c)    This Section 7.3 shall not apply to the extent that the applicable event of Force Majeure results from the failure of Customer, a Rail Carrier, a barge owner or operator or another Person to deliver trains or barges to, or remove trains or barges from, the Eddystone Rail

Facilities or, if applicable, a Pipeline Distribution System being unable to accept receipt of Crude Petroleum or deliver such Crude Petroleum to a refinery or terminal.

7.4    <u>Customer Rights and Obligations</u>. It is expressly agreed that, except as expressly provided in Sections 4.4, 7.2 and 7.3, no cause or event whatsoever, including an event of Force Majeure affecting the performance of Customer's obligations hereunder will permit or provide a basis for Customer to terminate this Agreement or excuse or suspend Customer's obligation to perform its obligations under this Agreement, including its obligations under Section 4.1 hereof, the Terms and Conditions and/or the Terminal Rules.

8.    <u>**Assignments**</u>. Customer shall not be entitled to assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed. Without limitation, Owner shall be deemed reasonable in refusing its consent to a proposed assignment if the proposed assignee or transferee is not financially capable of performing Customer's obligations under this Agreement (and an assignee or transferee shall, without limitation, be deemed not financially capable of performing Customer's obligations hereunder if such assignee or transferee does not satisfy the requirements of Section 11 hereof).

9.    <u>**LIMITATIONS ON LIABILITY**</u>. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, EXCEPT TO THE EXTENT OF THE TRANSLOADED VOLUME CHARGE AND DEFICIENCY VOLUME CHARGE AND EXCEPT TO THE EXTENT INCORPORATED IN THE TERMS AND CONDITIONS, TERMINAL RULES AND INDEMNIFICATION FOR CLAIMS OF THIRD PARTIES UNDER SECTION 13 HEREOF, NEITHER PARTY SHALL BE LIABLE OR RESPONSIBLE TO THE OTHER PARTY HERETO OR SUCH OTHER PARTY'S AFFILIATES FOR ANY CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES, OR FOR LOSS OF PROFITS OR REVENUES (COLLECTIVELY REFERRED TO AS "<u>SPECIAL DAMAGES</u>") INCURRED BY SUCH PARTY OR ITS AFFILIATES THAT ARISE OUT OF OR RELATE TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIM ARISES UNDER OR RESULTS FROM CONTRACT, TORT OR STRICT LIABILITY; PROVIDED THAT THE FOREGOING LIMITATION IS NOT INTENDED AND SHALL NOT AFFECT SPECIAL DAMAGES IMPOSED IN FAVOR OF PERSONS THAT ARE NOT PARTIES TO THIS AGREEMENT.**

10.    <u>**Representations and Warranties**</u>. Each Party to this Agreement represents and warrants to the other Party that it is an entity duly incorporated or organized and validly existing and in good standing under the laws of the state of its incorporation or organization and that it has all requisite corporate or limited liability company power and authority to enter into this Agreement and to carry out the terms and provisions hereof.

11.    <u>**Financial Assurances**</u>.

11.1    <u>Initial Financial Assurances</u>. At Owner's request, Customer shall from time to time provide information to Owner that will enable Owner to determine Customer's ability to

11

pay the Charges and all other amounts that may reasonably become payable by Customer under this Agreement, the Terms and Conditions and/or the Terminal Rules (collectively, the "Customer Costs"). If (A) Customer fails to provide the requested information to Owner within five (5) days of Owner's written request, (B) Owner's review of the requested information reveals that Customer may not have the ability to pay all Customer Costs, or (C) at any time on or after the Effective Date, Customer has a Debt credit rating that is less than BBB- from Standard & Poor's or Baa3 from Moody's (the "Minimum Rating") or Customer's Debt is not credit rated by Standard & Poor's and Moody's, then, in each case, Owner shall not be obligated to receive Crude Petroleum for Transloading Services unless and until Customer delivers one or more of the following financial assurances:

(a)     a letter of credit in favor of Owner in an amount sufficient to ensure payment of all Customer Costs payable during the forthcoming twelve (12) months (or, prior to the Operational Date, during the twelve (12) months commencing on the Operational Date), in a form, substance and from an institution reasonably acceptable to Owner, provided that such letter of credit shall, without limitation, allow Owner to demand full or partial payment thereunder in the event (i) of a breach by Customer of this Agreement, the Terms and Conditions or  the Terminal Rules, (ii)  Owner experiences losses or is entitled to damages in connection with or arising out of the Agreement, the Terms and Conditions or the Terminal Rules or the termination or rejection of the Agreement, or (iii) Customer does not deliver to Owner a new letter of credit or extension satisfying the requirements of this clause at least forty-five days (45) prior to the expiration of such letter of credit;

(b)     a guaranty in an amount sufficient to ensure payment of all Customer Costs, in form and substance reasonably acceptable to Owner, and which is from a third party reasonably acceptable to Owner (i) that has a Debt rating from Standard & Poor's and Moody's that is not less than the Minimum Rating or (ii) whose Debt is not credit rated by Standard & Poor's or Moody's, but that otherwise satisfies Owner that it has the ability to satisfy all of its obligations under such guaranty (and if clause (ii) applies, at Owner's request, Customer shall cause such guarantor to provide to Owner from time to time such financial information as will enable Owner to determine guarantor's ability to satisfy all of its obligations under such guaranty); or

(c)     such other enforceable collateral security as shall be reasonably acceptable to Owner, in form and substance acceptable to Owner.

11.2    Additional Financial Assurances. If Owner reasonably determines that:

(a)     Customer's or, if applicable, its guarantor's Debt credit rating from Standard & Poor's and/or Moody's falls below the Minimum Rating;

(b)     any financial assurances previously provided by Customer no longer provides adequate security for the applicable Customer Costs under Section 11.1 hereof; or

(c)     it is otherwise reasonably necessary to obtain additional financial assurances from Customer;

then, Customer shall provide additional financial assurances from an issuer, if applicable, in an amount, and on terms and conditions, reasonably acceptable to Owner within three (3) business days of Owner's written request.

11.3    <u>Use of Financial Assurances</u>. Financial assurances may be applied by Owner, in its discretion, against any amounts owed by Customer in connection with this Agreement, the Terms and Conditions or the Terminal Rules or any damages to which Owner is entitled in connection with this Agreement or the breach thereof. The use, application or retention of the financial assurances, or any portion thereof, by Owner shall not prevent Owner from exercising any other right or remedy provided by this Agreement, the Terms and Conditions or the Terminal Rules or which Owner may otherwise have at law, in equity or by statute or regulation and shall not operate as a limitation on any recovery to which Owner may otherwise be entitled.

11.4    <u>Ongoing Payment Obligations</u>. Notwithstanding that any financial assurances shall have been provided under Sections 11.1 or 11.2, Customer shall continue to make ongoing payments under this Agreement, the Terms and Conditions and the Terminal Rules, as and when such payments are due and payable under the terms hereof and thereof, including the payments described in Section 4.1, as adjusted in accordance with Section 5.

## 12.    **Liability of Owner.**

12.1    Except where caused by the gross negligence or intentional misconduct of Owner or as set forth in Section 12.3, Owner shall not be liable to Customer for any delay, damage, loss or consequential loss resulting from any cause while Owner is in possession or control of Customer's Crude Petroleum, including the acts or omissions of any Operator, the breakdown, unavailability, or insufficient available capacity of the Eddystone Rail Facilities, and delays resulting from the failure of other customers to schedule arrivals and departures of Trains and Barges in accordance with Owner's schedule.

12.2    Except as set forth in Section 12.3, if damage or loss to Crude Petroleum results from any cause other than the gross negligence or intentional misconduct of Owner while Owner is in possession or control of such Crude Petroleum in any Month, or if there is any gain in the volume of Crude Petroleum in Owner's possession in any Month, then Owner shall apportion the cost of such damage or loss or such gain on a pro rata basis among all customers. Each customer's share of such cost or gain shall be determined by Owner based on the proportion of the volume of such customer's Crude Petroleum delivered into Barges and/or, if applicable, Pipeline Distribution Systems by Owner during such Month to the total volume of Crude Petroleum received by Owner from all customers at the Eddystone Rail Facilities and delivered into Barges and/or, if applicable, Pipeline Distribution Systems by Owner during such Month. Owner will be obligated to deliver only that portion of the Crude Petroleum remaining after such deduction.

12.3   If Crude Petroleum is lost or destroyed while in the custody of Owner due to the negligence or intentional misconduct of Owner, Owner, shall, as full compensation therefor, either obtain and deliver to Customer thereof other Crude Petroleum that satisfies the Philly Light Crude specification provided for in the Terms and Conditions, in the same quantity as that which was lost, or compensate Customer for such loss in money at the dated Brent crude price for that given Month less $2.00/bbl.

12.4   All loss or gain pursuant to this Section 12 shall be determined based on the deliveries of Crude Petroleum from the Eddystone Rail Facilities measured via custody transfer meters into Barges and/or, if applicable, Pipeline Distribution Systems from the Eddystone Rail Facilities in the applicable Month.

**13.    Indemnification by Customer.**

13.1   Customer shall indemnify and save Owner harmless from and against any and all damages, losses, liabilities, claims, suits, personal injuries, property damage (including full or partial loss of use of property) costs and expenses of every type (including reasonable attorneys' fees), arising out of or relating to: (a) any breach of warranty or representation of Customer with respect to any Crude Petroleum received from Customer for Transloading Services; (b) the arrival, departure or presence of Crude Rail Cars, Trains, and/or Barges at the Eddystone Rail Facilities, the condition of Crude Rail Cars, Trains, and/or Barges, and/or delays in the arrival or departure of Trains and/or Barges; (c) the unloading of Customer's Crude Petroleum from Trains, the loading of Customer's Crude Petroleum into Barges and/or, if applicable, the delivery of Customer's Crude Petroleum into Pipeline Distribution Systems, except to the extent caused by the gross negligence or intentional misconduct of Owner or Operator; (d) damage to or destruction of real property or personal property, personal injury or death caused by Customer, a Rail Carrier, a Barge Operator or their respective agents or employees; (e) any discharges, spills, or leaks of Crude Petroleum from (i) Trains and/or Barges destined for or departing or in transit from the Eddystone Rail Facilities or (ii) Crude Rail Cars, Trains and/or Barges while at the Eddystone Rail Facilities to the extent such Crude Rail Cars, Trains and/or Barges are not under the control of Owner or Operator; (f) any accidents or other incidents involving Trains and/or Barges, whether destined for, at or departing or in transit from the Eddystone Rail Facilities; and (g) any demurrage or other damages for delay, storage or other charges and other amounts payable to any Rail Carrier, any other rail carrier, any Barge Operator, or any other third party in connection with the Trains and/or Barges, including the arrival, departure, storage or condition of Trains and/or Barges.

13.2   It is the intention of the Parties that all risks, incidents, liabilities and claims ordinarily and generally insurable in the trade shall be insured against under the policies of insurance provided in the Terms and Conditions or the Terminal Rules to be maintained by Customer, the Rail Carriers and/or the Barge Operators. However, it is expressly agreed that Customer shall be fully responsible for all losses and liabilities arising out of the operations of the Trains and the Barges (except where specifically provided to the contrary in this Agreement), and, consequently, Customer shall protect, defend, indemnify and hold Owner harmless from and against all claims, demands, suits, causes

of action, losses and liabilities, of every kind and character, without limit, as respects all personal injury, death, property damage, deductibles, and uninsured repairs, in any way incident to, in connection with, or arising out of the performance of Transloading Services regardless of fault and of who asserts such claims, demands, suits, causes of action, losses or liabilities, except as specifically provided to the contrary in this Agreement. In the event of a conflict between this Section 13.2 and Section 13.1 of this Agreement, this Section 13.2 shall govern.

13.3   In the event any suit or action shall be brought against Owner on account of any matter for which Owner is entitled to indemnification in accordance with Sections 13.1 or 13.2, Owner shall notify Customer in writing of the suit or action (provided that any failure to provide such notice shall not limit Owner's right to indemnification except to the extent that Customer shall have been materially prejudiced thereby) and provide reasonable cooperation (at Customer's expense) and authority to defend the action or suit. Notwithstanding the foregoing, Customer shall not be entitled to settle any suit or action without Owner's consent unless such settlement contains a full release of Owner without any liability for any monetary damages or any type of equitable relief.

13.4   This Section 13 shall survive the expiration or earlier termination of this Agreement.

**14.**   **Compliance with Laws**.

14.1   Both Parties shall, in carrying out the terms and provisions hereof, abide by all present and future Applicable Laws

14.2   Customer shall comply with all Applicable Laws concerning export and imports, economic sanctions, trade embargoes, and similar matters ("Import and Export Laws") with respect to Crude Petroleum for which Transloading Services are provided under this Agreement. For the avoidance of doubt, it is agreed that Owner is neither the importer nor the exporter of any Crude Petroleum for which any Transloading Services are provided under this Agreement.

14.3   Customer shall indemnify, hold harmless and reimburse Owner for any and all duties, taxes, penalties, fines, interest, costs and/or other amounts incurred by or which become payable by Owner as a result of Customer's failure to comply with its obligations under Section 14.2

**15.**   **Miscellaneous**.

15.1   Severability.  If any part of this Agreement is found invalid by a court of competent jurisdiction or is in conflict with any valid and Applicable Laws, the Parties shall negotiate in good faith to appropriately amend this Agreement so that the revised Agreement validly accomplishes as nearly as possible the terms and conditions that existed under this Agreement upon the date of execution or most recent amendment.

15.2   Governing Law. This Agreement shall be governed and construed according to the laws of the State of New York, without regard to principles of conflict of laws that, if applied, might require the application of the laws of another jurisdiction.

15.3 <u>No Third Party Rights</u>.     It is expressly understood that the provisions of this Agreement do not impart enforceable rights in anyone who is not a Party or a successor or permitted assign of a Party hereto.

15.4 <u>Entire Agreement</u>. This Agreement, the Terms and Conditions and any Terminal Rules issued by Owner express the entire agreement of the Parties with respect to the subject matter hereof and thereof, and all prior or contemporaneous agreements or negotiations with respect to the subject matter hereof are hereby superseded, and may be amended only by written agreement of the Parties. Notwithstanding the foregoing, the Terms and Conditions and Terminal Rules are subject to amendment, supplement and/or restatement by Owner from time to time in accordance with Section 6 hereof

15.5 <u>Independent Contractor Status</u>. Should either Party perform work for the other pursuant to this Agreement, it shall perform such work as an independent contractor and shall not be deemed to be an agent or employee of the other.

15.6 <u>Headings</u>. The headings in this Agreement are for the purpose of reference only and shall not limit or define the meaning hereof.

15.7 <u>Waiver</u>. The failure of either Party to pursue any remedy resulting from a breach of this Agreement by the other Party shall not be construed as a waiver of that breach or of any subsequent or other breach of this Agreement.

15.8 <u>Notices</u>. All notices and communications given by a Party to the other Party shall be in writing and shall be delivered either personally, by prepaid registered post, by prepaid courier service or by facsimile or other telecommunications which produces a written copy of the notice or communication addressed as follows:

    If to Owner:

    Eddystone Rail Company, LLC
    1100 Louisiana, Suite 3300
    Houston, Texas 77002
    Attn:_____, General Manager
    Fax:   _____

    Copies to:

| | |
|---|---|
| Enbridge Rail (Philadelphia) LLC | Canopy Prospecting, Inc. |
| 1100 Louisiana Suite 3300 | 4975 West Chester Pike Suite 200 |
| Houston, Texas 77002 | Edgemont, Pennsylvania 19028 |
| Attn:__, General Manager | Attn: Jack Galloway, President |
| Fax: __ | Fax: (610) 353-5310 |

    If to Customer:

Bridger Transfer Services, LLC
Spring Plaza
800 Spring Street, Suite 205
Shreveport, Louisiana 71101
Fax No.: (318) 429-7103

A Party may change its address for notices and communications by notice to the other Party in the manner provided for in this Section 15.8.

15.9    <u>Time of the Essence</u>.   Time shall be of the essence of all of the Parties' respective obligations and rights hereunder.

15.10   <u>Construction</u>.

    (a)    Unless otherwise expressly specified herein, (i) defined terms in the singular shall also include the plural and vice versa, (ii) the words "hereof," "herein," "hereunder" and other similar words refer to this Agreement as a whole, (iii) Section and Exhibits references in this Agreement are to Sections of or Exhibits to this Agreement, and (iv) words of any gender (masculine, feminine, neuter) mean and include correlative words of the other genders.

    (b)    The captions in this Agreement, the Terms and Conditions and the Terminal Rules are for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement, the Terms and Conditions or the Terminal Rules.

    (c)    Unless the context otherwise requires, when used in this Agreement, the Terms and Conditions or the Terminal Rules, the term "including" means "including without limitation."

    (d)    No presumption will operate in favor of or against either Party as a result of any responsibility that either Party may have had for drafting this Agreement.

    (e)    Notwithstanding anything in this Agreement or the Terms and Conditions to the contrary, references to one or more "Pipeline Distribution Systems" shall apply and be effective only if and when the connection between the Eddystone Rail Facilities and such Pipeline Distribution Systems is in- service as part of a second or subsequent phase of the Eddystone Rail Facilities.

**IN WITNESS WHEREOF**, this Agreement is executed on the dates set forth below the respective execution lines, but effective as of the Effective Date.

<u>**Customer**</u>

**BRIDGER TRANSFER SERVICES, LLC**

By:
Name:
Title:
Date:

<u>**Owner:**</u>

**EDDYSTONE RAIL COMPANY, LLC**

By:
Name: Kevin Hatfield
Title: President
Date: 3/08/2013

By:
Name: John K. Galloway
Title: VICE PRESIDENT
Date: 8/5/13

Feb 14, 2013
3/14/13
3/14/13

18

## Exhibit A
### Terms and Conditions for the Use of the Eddystone Rail Facilities

This Exhibit A is attached to and made a part of that certain Eddystone Rail Facilities Services Agreement dated as of _____, 2013 (the "Agreement"), by and between **BRIDGER TRANSFER SERVICES, LLC** ("Customer") and **EDDYSTONE RAIL COMPANY, LLC** ("Owner"). Capitalized terms used but not defined in this Exhibit A shall have the meanings ascribed to them in the Agreement.

The following terms and conditions have been formulated for, and Owner and Customer shall cooperate to achieve, the efficient and safe use of the Eddystone Rail Facilities. Any violation of these terms and conditions by Customer shall constitute a breach by Customer under the Agreement.

## 1. CRUDE QUALITY, SEGREGATION AND CHANGES IN QUALITY

(a)     Customer shall not deliver to the Eddystone Rail Facilities for Transloading Services any product other than Crude Petroleum that complies with the Philly Light Crude specification. The "Philly Light Crude" specification shall mean Crude Petroleum that (a) has an API gravity between 35 and 45 degrees, (b) has a sulfur content of 0.20% or less, (c) has a sediment and water content of 1% or less, and (d) is not contaminated by chemicals foreign to virgin crude oil, such as chlorinated and/or oxygenated hydrocarbons and lead.

(b)     If Crude Petroleum is delivered to the Eddystone Rail Facilities by Trains that:

(i)     originate at the Berthold Rail Facility, Crude Petroleum will be accepted by Owner "as-is, where is", subject to the deemed warranties referenced in items 1(f) and 14(a) below.

(ii)     originate from a rail facility that is owned by Enbridge, other than the Berthold Rail Facility, which is mutually agreed to in writing by both Parties, such Crude Petroleum must satisfy the crude specification for Philly Light Crude set forth in item 1(a) above, and Customer shall provide the deemed warranties referenced in items 1(f) and 14(a) below.

(iii)     originate from a source other the rail facilities referenced in items 1(b)(i) or (ii) above, then, prior to such delivery, Customer shall sample and pre-test the quality of the Crude Petroleum transported by each such Train for compliance with the crude specification for Philly Light Crude set forth in item 1(a) above and provide Owner with a crude quality analysis report for such Crude Petroleum prior to its delivery to the Eddystone Rail Facilities as well as the deemed warranties referenced in items 1(f) and 14(a) below.

(c)     No segregation or batch delivery services will be provided in the initial phase of the Eddystone Rail Facilities, but segregation or batching may, in Owner's discretion, be provided as part of a second or subsequent phase of the Eddystone Rail Facilities, for which a supplemental charge may be payable.

1

(d)     Owner will provide Customer with the sulfur content and other quality specifications of the Crude Petroleum loaded as Transloaded Volumes into Customer's Barges at the Eddystone Rail Facilities and will periodically report the sulfur content and other quality specifications of the common stock of Crude Petroleum delivered into the Eddystone Rail Facilities by customers over specified periods of time.

(e)     Crude Petroleum will be received by Owner for Transloading Services on the condition that it may be subject to such changes in gravity or quality while in the custody of Owner as may result from the Transloading Services, including changes resulting from the mixing of Customer's Crude Petroleum with other Crude Petroleum in the Eddystone Rail Facilities. Owner will be under no obligation to load into Barges the identical Crude Petroleum received from Customer at the Eddystone Rail Facilities or for any variations in quality while in its custody and will only be obligated to load out of the common stock of Crude Petroleum in its possession (which may result in the loading of a different or lesser grade of Crude Petroleum from that received from Customer). There will be no quality bank, no financial consideration nor any monetary adjustments to the Charges by Customer to Owner if Customer's Crude Petroleum delivered into the Eddystone Rail Facilities from Trains differs from the Crude Petroleum loaded by Owner or Operator into Barges.

(f)     Each request for Transloading Services by Customer shall be deemed to include a warranty in favor of Owner that the Crude Petroleum identified in the request satisfies the Philly Light Crude specification set forth in item 1(a) of these terms and conditions.

(g)     OWNER MAKES NO WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OR REPRESENTATION WITH RESPECT TO THE GRADE OR QUALITY OF CRUDE PETROLEUM FOR WHICH TRANSLOADING SERVICES ARE PROVIDED UNDER THE AGREEMENT.

2.     **SCHEDULING OF TRANSLOADING SERVICES, TRAINS AND BARGES**

(a)     Customer shall submit requests for Transloading Services to Operator, in the form and in accordance with the schedule prescribed by Owner. The initial form of such requests will be provided to Customer prior to the Operational Date.

(b)     If only one (1) Train and one (1) Barge will be unloaded or loaded for a batch of Transloaded Volumes, the Barge Loading Window will be not less than eight (8) hours (as such period may be revised from time to time by Owner with Customer's written consent, such consent not to be unreasonably withheld). If two (2) or more Trains and/or Barges will be unloaded or loaded for a batch of Transloaded Volumes, the Barge Loading Window will be the period reasonably specified in Owner's schedule based on the volume to be loaded (based generally on the loading rate provided for in these terms and conditions).

(c)     Owner or Operator will provide to Customer, on a monthly basis, a provisional schedule of Customer's Assigned Train Unloading Window(s) and Assigned Barge Loading Window(s) for the immediately following month. Each such Assigned Train Unloading Window and Assigned Barge Loading Window is subject to change by Owner or Operator until ten (10) days prior to the start of such Assigned Train Unloading Window (the "Schedule Lockdown

2

Date"); provided that, since the loading of Barges is dependent on delivery and unloading of the Train, the Assigned Barge Loading Window may be adjusted as appropriate by Owner pursuant to the coordination of schedules in accordance with item 2(d) below. Customer may request changes to its Assigned Train Unloading Window and/or Assigned Barge Loading Window for the immediately following month at any time prior to the Schedule Lockdown Date, and Owner or Operator shall endeavor to accommodate any such request to the extent it can do so consistent with the efficient scheduling of the Eddystone Rail Facilities and the needs of its other customers. The Assigned Barge Loading Windows and Assigned Train Unloading Windows may be on different days or at different times each week.

(d)     Customer shall be solely responsible for aligning Trains and Barges with its Assigned Train Unloading Windows and Assigned Barge Loading Windows, all in accordance with the schedule established from time to time by Owner or Operator, said schedule being coordinated each Business Day with the applicable Rail Carriers, the applicable Barge Operators, Customer and Owner or Operator. Unless otherwise agreed by Owner, Customer shall cause (i) Trains to be delivered to the Eddystone Rail Facilities not earlier than four (4) hours before, or later than four (4) hours after, the start of its Assigned Train Unloading Window (the "Permitted Train Arrival Period"), and (ii) Barges to be delivered to the Eddystone Rail Facilities not earlier than four (4) hours before, or later than four (4) hours after, the start of its Assigned Barge Loading Window (the "Permitted Barge Arrival Period").

(e)     Trains will not be accepted into the Eddystone Rail Facilities for the commencement of Transloading Services until evidence satisfactory to Owner or Operator has been furnished that Customer has made the necessary arrangements for Barges to be delivered to the Eddystone Rail Facilities to be loaded with such Crude Petroleum in accordance with the schedule established from time to time by Owner.

(f)     If only one (1) Train and one (1) Barge will be unloaded or loaded for a batch of Transloaded Volumes, the Assigned Barge Loading Window will generally start on or around the end of the Assigned Train Unloading Window. If two (2) or more Trains and/or Barges will be unloaded or loaded for a batch of Transloaded Volumes, the Trains must be delivered consecutively and the Assigned Barge Loading Window will start as specified in Owner's schedule.

(g)     Unless otherwise agreed by Owner, if a Train is delivered prior to the Permitted Train Arrival Period, or a Barge is delivered prior to the Permitted Barge Arrival Period, then, such Train or Barge may be rejected by Owner until the start of the Permitted Train Arrival Period or Permitted Barge Arrival Period, as applicable, and, in the interim, Customer shall not allow such Train or Barge to interfere with the operations of the Eddystone Rail Facilities or the delivery or removal of trains or barges thereto or therefrom. In accordance with these Terms and Conditions, Customer shall be responsible for any and all demurrage, storage and other charges resulting or arising out of any rejection for early delivery.

(h)     If the Eddystone Rail Facilities are unable to accept a Train or Barge during a Permitted Train Arrival Period or Permitted Barge Arrival Period, as applicable, because of delays in another train or barge leaving the Eddystone Rail Facilities, Customer shall hold (or cause to be held) its Train or Barge in a lawful location that causes no interference with the

operations of the Eddystone Rail Facilities or the delivery or removal of trains or barges thereto or therefrom and, provided Customer delivers such Train or Barge promptly following notice that the Eddystone Rail Facilities can accept such Train or Barge, Customer shall be deemed to have satisfied its obligations under item 2(d) above.

(i)     Owner will notify Customer promptly after it starts unloading a Train. If Customer does not own or operate a Barge, Customer shall notify the Barge Operator: (i) immediately upon the delivery of a Train by a Rail Carrier into the Eddystone Rail Facilities and (ii) immediately upon receiving notice from Owner or Operator that Customer's Trains have been unloaded. Customer shall provide evidence to Owner or Operator that both notifications to the Barge Operators have occurred.

(j)     Customer shall update Owner of the estimated arrival time of each Barge at the Eddystone Rail Facilities five (5), two (2) and one (1) days prior to actual arrival of such Barge at the Eddystone Rail Facilities. Any change by more than eight (8) hours of the estimated arrival of a Barge must be communicated to Owner as soon as possible but in any case within twenty-four (24) hours after Customer first becomes aware of such change, unless such change occur less than two (2) days prior to such estimated arrival time, in which event such change must be communicated to Owner within eight (8) hours after Customer first becomes aware of such change.

## 3.     EVIDENCE OF RECEIPT AND DELIVERIES

(a)     Crude Petroleum received from Customer at the Eddystone Rail Facilities and loaded into Customer's Barges will be evidenced by a ticket, showing the quantity received and loaded, offload date, railcar number, transloader number, weight in kilograms, temperature, density, sulphur, bottom solids and water, railcar waybill number, seal numbers, net Barrels, gross Barrels and any data essential to the determination of quantity. Unless otherwise agreed by Owner and Customer, such tickets shall be signed by a representative of Owner or Operator, and shall constitute final evidence of the Crude Petroleum received by Owner and the Crude Petroleum loaded into Barges for Customer.

(b)     Customer acknowledges that, since Crude Petroleum may be unloaded from Trains into the store tank(s) at the Eddystone Rail Facilities at the same time as Crude Petroleum from such shore tank(s) is being loaded into barges, such shore tanks may not remain in a static condition for loading into barges. Accordingly, as specified in the definition of Transloaded Volumes, all custodial cargo transfer operations at the Eddystone Rail Facilities will be performed solely by custody transfer meter and not by hand innage and/or ullage measurements of shore tanks and/or barges.

## 4.     WORKING STOCK

Each Customer shall supply its quantity of Crude Petroleum required as working stock for the operation of the Eddystone Rail Facilities as determined from time to time by Owner.

## 5.     RAILCARS; TRAINS

(a)     Customer shall be responsible for providing Crude Rail Cars for delivery of Crude

Petroleum to the Eddystone Rail Facilities and will ensure that such Crude Rail Cars comply with all applicable DOT (49 CFR) and AAR (Rules and Regulations) standards as well as all applicable common carrier rail transportation tariffs. Unless otherwise agreed by Owner or Operator, each Train must have a minimum of 100 Crude Rail Cars. In addition, Customer shall ensure that two buffer cars (front and back) in each Train have been provided (so that the minimum cars for each Train is 102 cars). Customer may use Trains with up to 118 Crude Rail Cars (and two buffer cars for a maximum of 120 cars) at no additional expense. Customer may not deliver to the Eddystone Rail Facilities Trains with more than 118 Crude Rail Cars (and two buffer cars) without the prior written approval of Owner or Operator. If such consent is given, Customer shall pay any additional charges agreed with Owner or Operator.

(b)     Customer shall be responsible for collecting and aggregating loaded Crude Rail Cars up to the required number set forth in item 5(a) above at Customer's offsite location and moving the completed, loaded Train to the Eddystone Rail Facilities in accordance with item 2 above.

(c)     Customer shall be responsible for ensuring compliance of Trains with the safety, odor recovery, dimension and/or other standards and criteria established by Owner and/or applicable Rail Carriers. Without limiting the foregoing, Owner shall have the right to reject any Train that does not meet such standards and criteria, in which event such rejected Train(s) shall not be eligible to arrive or be at the Eddystone Rail Facilities or to be unloaded at the Eddystone Rail Facilities.

(d)     Customer shall ensure that all Crude Rail Cars in each Train comply with all requirements of the applicable Rail Carrier(s) for transportation from time to time, including the Rail Carriers' respective requirement that rail car lengths be no greater than sixty feet (60') and no less than fifty-eight feet (58') and that such Crude Rail Cars will have a minimum capacity of six hundred and fifty barrels (650 bbls).

(e)     Customer shall ensure that each Crude Rail Car within each Train is equipped with the following:

(i)     Top Air Inlet Connection (for Vapor Recovery): 2" Ball Valve attached to Rail Car with 2" Male Cam x 2" MPT fitting with 2" Dust Cap (Female) attached to Ball Valve.

(ii)     Bottom Outlet Arrangement (for Crude Unloading): 4" Bottom Outlet Cap and Nozzle Thread per AAR Manual of Standards and Practices Specifications for Tank Cars, Appendix E, Figure E18.

Crude Rail Cars not equipped with a Top Air Inlet Connection and Bottom Outlet Arrangement for unloading of Crude Petroleum in accordance with clauses (i) and (ii) will not be unloaded by Owner or Operator.

## 6.     TRANSPORTATION CONTRACTS WITH RAIL CARRIERS

(a)     Customer shall pay all freight charges directly to its Rail Carrier(s) and any other rail carriers used by Customer in conjunction with the Agreement.

5

(b)     Customer shall be responsible for complying with the tariffs, books, rules, policies and guides of its Rail Carrier(s) (and any other applicable rail carrier) and for all freight, demurrage, other damages for delay and storage charges and other fees, charges and amounts payable to its Rail Carrier(s) (and any other applicable rail carrier) in connection with the Trains, including the arrival, departure, storage and condition of Trains. Under no circumstances will Owner be liable to the Rail Carriers or any other rail carriers for any such fees, demurrage, damages, and/or other charges or amounts.

## 7.     BARGES

(a)     Barge Condition. Each Barge upon tendering for each voyage commencing at the Eddystone Rail Facilities shall, as far as due diligence can make her so, be tight, staunch, strong, seaworthy, and in every way clean, fit and safe for the loading, carriage and discharge of Crude Petroleum.

(b)     Barge Nomination. Customer shall nominate to Owner in writing each Barge to be loaded with Crude Petroleum at the Eddystone Rail Facilities under the Agreement and these Terms and Conditions (a "Barge Nomination"). The Barge Nomination shall include the following information: barge number; tonnage; loading drafts; name of Barge Operator; estimated time of arrival; and any other information required under Owner's barge acceptance criteria ("Barge Acceptance Criteria") are satisfied. The Barge Nomination shall not be effective unless it is received by Owner prior to the Schedule Lockdown Date. Customer shall be liable for all costs resulting in delays in loading Crude Petroleum due to its failure to supply the required information on time.

Any Barge Nomination received by Owner after 16:00 hours PA Time shall be treated as received at 09:00 hours the following Business Day.

Any changes to the Barge Nomination, including the substitution of a nominated Barge pursuant to item 7(c), shall be deemed a new Barge Nomination and shall be notified to Owner no later than the latest time that a Barge Nomination must be received in accordance with this item 7(b), unless Owner agrees otherwise in writing.

(c)     Substitution of Barges. Upon written notice to Owner given prior to the Schedule Lockdown Date, Customer may substitute another Barge for the Barge named in a Barge Nomination, provided that the size of the Barge and the quantity of Crude Petroleum to be loaded are not materially different from the Barge size and load quantity previously notified, and Owner notifies Customer that the substitute Barge satisfies all of Owner's Barge Acceptance Criteria, in Owner's sole discretion. The Assigned Barge Loading Window for the substituted Barge will apply to the substitute Barge, unless otherwise agreed by Owner in writing.

(d)     Rejection of Barges. Within two (2) Business Days after receipt of a Barge Nomination, Owner shall be entitled to reject such Barge Nomination or request additional time to decide whether to accept or reject such Barge Nomination, such request not to be unreasonably conditioned, delayed or refused by Customer. Customer shall not specify in its Barge Nominations any Barge which does not meet, or will no longer meet, Owner's Barge Acceptance Criteria.  Owner may, without any penalty or liability, reject any Barge Nomination:

(i)     upon the request of any Governmental Authority;

(ii)    which violates, or would if effected, violate any Applicable Laws;

(iii)   if one or more of Owner's Barge Acceptance Criteria are not satisfied in Owner's sole discretion; or

(iv)   if the Barge Operator is not acceptable to Owner.

If Owner rejects a Barge Nomination and Customer does not deliver a Barge Nomination for a replacement Barge that is approved by Owner on or before the Schedule Lockdown Date, then, subject to item 10(c) below, Owner shall have no obligation to accept any replacement Barge or any Train that would have delivered to the Eddystone Rail Facilities the Crude Petroleum that would have been loaded on such Barge, but Charges will continue to be payable under Section 4.1 of the Agreement.

(e)     Condition of Barges. Customer represents and warrants that each Barge that is identified by Customer under these terms and conditions (i) shall be vetted by Customer as being good to go, (ii) will, at all times during the currency of its charter (or, for any Barge owned by Customer, at all times during which such Barge is destined for, at, or departing or in transit from the Eddystone Rail Facilities and is carrying or is intended to receive Crude Petroleum for Customer), be in full compliance with all Applicable Laws and any applicable directives, of the country of vessel registry and any locale to which the Barge may be directed or may proceed in connection with such charter, related to vessel navigation, manning, operations, safety, design, construction, maintenance, equipment, size and capacity, and pollution prevention, including MARPOL 1973/1978; SOLAS 1974/1978/1981/1983; Load Line 1966/1971/1973/1979; 72 COLREGS, STCW 1995, ISM Code 1994, U.S. Port and Tanker Safety Act, U.S. Federal Water Pollution Control Act, U.S. Oil Pollution Act of 1990, and such Barge's classification society rules, with all applicable amendments, and (iii) will, at all times during the currency of its charter (or, for any Barge owned by Customer, at all times during which such Barge is destined for, at, or departing or in transit from the Eddystone Rail Facilities and is carrying or is intended to receive Crude Petroleum for Customer), have on board, all certificates, records and other documentation required by Applicable Laws. The delivery of a Barge to the Eddystone Rail Facilities shall constitute a deemed warranty by Customer that there are no latent defects in the Barge and that such Barge is capable of being loaded with Crude Petroleum using the equipment normally employed by the Eddystone Rail Facilities for loading barges. In no event shall Owner or Operator be responsible for the seaworthiness, maintenance, repair or service of Barges delivered to the Eddystone Rail Facilities, such responsibility being that of Customer. Notwithstanding the foregoing, should any Barge develop any leaks, cracks or other conditions which, in the sole judgment of Owner or Operator, may result in damage to the Barge and/or its cargo, Customer agrees to take or cause to be taken whatever steps are necessary to protect the Barge and/or its cargo. In no event shall Owner or Operator have any responsibility for inspecting any Barge or any liability if loss or damage to a Barge occurs as a result of the failure by Owner or Operator to reject a Barge that has leaks, cracks or similar conditions, whether or not such conditions are visible.

(f)     The master of a Barge shall be solely responsible for determining whether the depth of water (at any tide or river stage) is sufficient for the Barge, neither Owner nor Operator having any responsibility therefor. Neither Owner nor Operator shall be deemed to warrant either (i) the safety of public channels, fairways, approaches thereto, anchorages or other publicly-maintained areas either inside or outside the port area where any Barge may operate, or (ii) the safety of any of the docks or midstream facilities of the berths of the Eddystone Rail Facilities, including the Eddystone Rail Facilities' mooring buoys.

## 8.     CONTRACTS WITH BARGE OPERATORS

(a)     Customer shall pay all charges directly to the Barge Operator(s) used by Customer in conjunction with the Agreement.

(b)     Customer shall be responsible for complying with the rules, policies and guides of its Barge Operator(s) and for all, demurrage charges or other damages for delay or loss of despatch time and/or other fees, charges and amounts payable with respect to the Barges scheduled by Customer including the arrival, departure, storage and condition of such Barges. Under no circumstances will Owner be liable to the Barge Operators for any such fees, demurrage, damages and other charges or amounts.

## 9.     BERTHS; VESSEL LOAD PROCEDURES

(a)     Each Barge will be loaded, at Owner's option, at either berth 1 or berth 2 of the Eddystone Rail Facilities.

(b)     Unless otherwise agreed, the time allowed to Owner for the loading of a Barge with Crude Petroleum will be based on a minimum loading rate of 7,000 barrels per hour, via Owner's pumps, operating continuously until completion of loading, all weekends and public holidays included (unless loading at the Eddystone Rail Facilities at any time or on any day is prohibited by Applicable Laws).

(c)     Owner shall not be responsible for any dispatch or detention whatsoever.

(d)     Each Barge shall vacate its berth at the Eddystone Rail Facilities as soon as the loading hoses have been disconnected and the Barge shall further vacate the berth if and when ordered to do so by Owner.

(e)     Owner shall have the right to shift each Barge from one of Owner's berths to the other and vice versa. All costs, including damages for delay, shall be for Owner's account if such shifting is for Owner's purposes and otherwise shall be for Customer's account. Owner's payment to Customer in the amount of One Thousand Dollars ($1,000.00) will be considered as payment "in full" by Owner for any shifting for Owner's account. Owner will have no other obligations to Customer for shifting Customer's Barge from one berth to the other.

(f)     All vapor recovery/destruction fuel costs ("Vapor Fuel Costs") incurred by Owner or Operator in connection with the Transloading Services for Customer's Transloaded Volume shall, at Owner's option, be for the account of Customer. If measured separately, Customer shall

8

pay the amount of such Vapor Fuel Costs upon receipt of an invoice therefor. If measured for the common stock, Customer shall pay its share of such Vapor Fuel Costs based on the proportion of the volume of Customer's Crude Petroleum delivered into Barges and/or, if applicable, Pipeline Distribution Systems by Owner during a Month to the total volume of Crude Petroleum received by Owner from all customers at the Eddystone Rail Facilities and delivered into Barges and/or, if applicable, Pipeline Distribution Systems by Owner during such Month, upon receipt of an invoice therefor.

(g)     All costs associated with the Barge's call at the Eddystone Rail Facilities, including tugs, pilots, line handlers, booming, stevedores, wharfage and/or dockage (but excluding vapor recovery costs, which are addressed in items 9(f)) shall be for the account of Customer.

## 10.     LATE ARRIVAL, LOADING OR DEPARTURE; DEMURRAGE

(a)     If a Train scheduled by Customer is received at the Eddystone Rail Facilities from a Rail Carrier within the Permitted Train Arrival Period and Owner or Operator fails to complete the unloading of such Train by the end of Customer's Assigned Train Unloading Window, other than as a result of Customer's breach or failure to comply with any of the provisions of the Agreement, these terms and conditions or the Terminal Rules, Owner will pay Customer as liquidated damages and not as a penalty, the amount of Seventy-five Dollars ($75.00) per car per hour, as Owner's sole liability in connection with the delay.

(b)     If a Barge scheduled by Customer is received by Operator within the Permitted Barge Arrival Period and Operator fails to complete the loading of such Barge by the end of Customer's Assigned Barge Loading Window, other than as a result of Customer's breach or failure to comply with any of the provisions of the Agreement, these terms and conditions or the Terminal Rules, Owner will pay Customer as liquidated damages and not as a penalty, the amount of Two Hundred Fifty Dollars ($250.00) per hour, as Owner's sole liability in connection with the delay.

(c)     If (i) a Train is not scheduled by Customer to arrive at the Eddystone Rail Facilities, or does not, for any reason other than Owner's fault or a delay described in item 2(h) above, arrive at the Eddystone Rail Facilities during the Permitted Train Arrival Period, (ii) Customer fails to deliver to Owner or Operator evidence that Customer has made the necessary arrangements for Barges to be delivered to the Eddystone Rail Facilities during the Permitted Barge Arrival Period, (iii) Owner rejects a Barge Nomination and Customer does not deliver a Barge Nomination for a replacement Barge that is approved by Owner on or before the Schedule Lockdown Date, or (iv) Customer is otherwise in breach of the Agreement or these Terms and Conditions, then, in each case, (A) Owner will be entitled to allocate Customer's Assigned Train Unloading Window and Assigned Barge Loading Window to another customer, (B) Owner may assign to Customer a Replacement Train Unloading Window and a Replacement Barge Loading Window (in which event such Replacement Train Unloading Window shall be deemed to be an Assigned Train Unloading Window and such Replacement Barge Loading Window shall be deemed to be an Assigned Barge Loading Window, in each case, for purposes of other items of this Exhibit A where the context so admits), but Owner does not guaranty that a Replacement Train Unloading Window and Replacement Barge Loading Window will be available to satisfy

Customer's Volume Commitment for such Month or that such Replacement Train Unloading Window and Replacement Barge Loading Window will be acceptable to Customer (and the Charges will be payable under Section 4.1 of the Agreement even if a Replacement Train Unloading Window and/or Replacement Barge Loading Window is not assigned to Customer or any such Replacement Train Unloading Window and/or Replacement Barge Loading Window is not acceptable to Customer), and (C) if a Replacement Train Unloading Window and Replacement Barge Loading Window are provided by Owner in accordance with clause (B) above, Customer shall pay an overtime charge of fifty cents ($.50) per Barrel, in addition to the Charge, for all Barrels unloaded during such Replacement Train Unloading Window or loaded during such Replacement Barge Loading Window, in either case, using double-shifts, overnight shifts or other extra services.

(d)     Unless agreed by Owner, if a Barge scheduled by Customer does not arrive at the Eddystone Rail Facilities during the Permitted Barge Arrival Period for any reason other than Owner's fault or a delay described in item 2(h) above, Owner shall have the right, at Owner's sole discretion, without penalty or liability to Owner, to (i) move some or all of the Crude Petroleum that should have been loaded into the delayed Barge (the "Delayed Crude Petroleum") to one or more storage locations (which may be outside the Eddystone Rail Facilities), and Customer shall reimburse Owner for all costs incurred in connection with moving, caring for, storing and maintaining the Delayed Crude Petroleum, and moving the Delayed Crude Petroleum back to the Eddystone Rail Facilities, (ii) through an agent, sell some or all of the Delayed Crude Petroleum by auction or private sale (and Owner or its members or their respective Affiliates may be a purchaser of some or all of the Delayed Crude Petroleum), and Owner may, out of the proceeds of sale, pay itself all expenses of sale, moving, caring for, storing and maintaining the Crude Petroleum, and the balance shall be held for whomsoever may be lawfully entitled thereto, (iii) reject any further deliveries of Crude Petroleum from Customer until the Delayed Crude Petroleum has been removed by Customer and Customer has provided assurance adequate to Owner that there will be no future delays in the arrival of Barges; provided that the Charges will continue to be payable under Section 4.1 of the Agreement with respect to any period during which such rejection continues, and/or (iv) exercise any other right or remedy available under Applicable Laws to minimize interference with the operations of the Eddystone Rail Facilities resulting from the delays in the arrival of the Barge.

(e)     If a Train scheduled by Customer has not departed from the Eddystone Rail Facilities within four (4) hours after the end of Customer's Assigned Train Unloading Window, Customer shall pay to Owner, as liquidated damages and not as a penalty, the amount of Two Hundred and Fifty Dollars ($250.00) per car for the first twenty (20) hours (or part thereof) of delay in the departure of the unloaded Train (commencing four (4) hours after the end of Customer's Assigned Train Unloading Window). If the delay exceeds twenty-four (24) hours from the end of Customer's Assigned Train Unloading Window (i.e., exceeds the four-hour grace period plus the first twenty (20) hours), liquidated damages will accrue in the amount of Five Hundred Dollars ($500.00) per car for each subsequent period of twenty (20) hours (or part thereof) until the departure of the unloaded Train. The liquidated damages shall be payable regardless of whether such delay is within Customer's control or any other event outside Customer's control (other than failure of Owner or Operator to unload the Train).

(f)     If a Barge scheduled by Customer has not departed within four (4) hours after the

end of Customer's Assigned Barge Loading Window, Customer shall pay to Owner, as liquidated damages and not as a penalty, the amount of Two Thousand Five Hundred Dollars ($2,500.00) per hour for the first twenty (20) hours (or part thereof) of delay in the departure of the Barge (commencing four (4) hours after the end of the Assigned Barge Loading Window). If the delay exceeds twenty-four (24) hours from the end of the Assigned Barge Loading Window (i.e., exceeds the four-hour grace period plus the first twenty (20) hours), liquidated damages will accrue in the amount of Ten Thousand Dollars ($10,000.00) per hour for each subsequent period of twenty (20) hours (or part thereof) until the departure of the Barge. The liquidated damages shall be payable regardless of whether such delay is within Customer's control or any other event outside Customer's control (other than failure of Owner to timely complete loading of Customer's Crude Petroleum in accordance with these terms and conditions).

11. **DISCHARGES FROM BARGES**

(a)     In the event of any discharges, spills, or leaks of Crude Petroleum from Barges departing or in transit from the Eddystone Rail Facilities, Customer shall, and shall cause its representatives and insurers, to immediately:

(i)     make all notifications to Governmental Authorities required by Applicable Laws;

(ii)     notify Owner or Operator of the discharge, spill, or leak and provide all information related thereto requested by Owner or Operator;

(iii)     take all steps required by any Governmental Authority, Owner or Operator to eliminate the cause and/or source of the discharge, spill, or leak and clean up such discharge, spill, or leak;

(iv)     take all steps required by Applicable Laws to restore the environment;

(v)     take all steps to mitigate damages and liabilities of Customer, Owner, Operator and other Persons;

(vi)     pay or reimburse all fines, damages and losses of Customer, Owner, Operator, and all costs and expenses of cleanup;

(vii)     pay or reimburse all monies and funds required to be paid to applicable Governmental Authorities;

(viii)     Consult with Owner and Operator and keep Owner and Operator informed of all steps taken and contemplated to comply with provisions of this paragraph; and

(ix)     Cooperate with Owner in issuing statements to Governmental Authorities and media representatives and not make any public statement regarding such discharge, spill, or leak without the prior written approval of Owner.

(b)     Whether or not Customer has complied with the provisions of item 11, Owner

11

may, but shall not be required to, take over and manage all prevention, cleanup and restoration activities for any such discharge, spill, or leak Barges departing or in transit from the Eddystone Rail Facilities, without limiting Customer's obligations under item 11, and with full reservation to Owner of all rights against the Barge, Barge Operator, Customer or their respective insurers for reimbursement of costs, expenses and reasonable attorneys' fees. In the event Owner takes over and manages such prevention, cleanup and restoration efforts, such action shall not be deemed a waiver, or constitute an estoppel by Owner or an admission of fault or responsibility on the part of Owner or Operator. Owner may, but is not required to, utilize its own and contracted personnel, vessels and equipment in such prevention, cleanup and restoration efforts, and may, at its discretion, allocate such resources as it, in its sole discretion, deems appropriate.

## 12. REMEDIES

(a)     Owner shall have all remedies available to it at law, in equity or under maritime law to enforce the Agreement, these terms and conditions and the Terminal Rules, including canceling a Barge Nomination or ordering a Barge from its berth at the Eddystone Rail Facilities. Owner shall also have all remedies available at law, in equity or under maritime law to secure the payment of all charges payable under the Agreement and these terms and conditions, including demurrage and other charges and/or collect liquidated damages, including a maritime lien against the Barge and a lien on all of Customer's Crude Petroleum received by Owner for Transloading Services. Without limiting the generality of the foregoing, at Owner's sole discretion, until all charges and/or liquidated damages have been paid, Owner shall have the right, without penalty or liability to Customer, to (i) refuse to load Customer's Crude Petroleum, and/or (ii) move some or all of Customer's Crude Petroleum to one or more different storage locations, and Customer shall reimburse Owner for all costs incurred in connection with such removal, storage and/or movement back to the Eddystone Rail Facilities after the charges have been paid in full. The general lien provided herein shall be in addition to any lien or security interest otherwise provided by Applicable Laws or contract.

(b)     If any charges payable under the Agreement, these terms and conditions or the Terminal Rules remain unpaid for at least five (5) days after written notice is mailed to Customer of Owner's intention to enforce its lien, in addition to Owner's rights under item 12(a), Owner shall be entitled to (i) sell Customer's Crude Petroleum by auction or private sale (and Owner or its members of their respective Affiliates may be a purchaser of some or all of such Crude Petroleum), and Owner shall be entitled to pay itself all charges, expense of notice, advertisement, sale, and other expense of caring for, moving, maintaining and selling the Crude Petroleum out of the proceeds of said sale, and the balance shall be held for whomsoever may be lawfully entitled thereto, (ii) reject any further deliveries of Crude Petroleum from Customer until the overdue charges have been paid in full; provided that the Charges will continue to be payable under Section 4.1(b) of the Agreement with respect to any period during which such rejection continues, and/or (iii) require prepayment of future charges.

## 13. INSURANCE

(a)     Rail Carrier Insurance. Subject to item 13(c) below, Customer shall cause its Rail Carrier(s) to maintain, at all times during which a Train is destined for, at, or departing or in transit from the Eddystone Rail Facilities, which is carrying or is intended to deliver Crude

Petroleum for Customer:

    (i)    <u>Worker's Compensation</u> insurance covering the insured party's employees for all compensation and other benefits required of such entity by the Workers' Compensation or other statutory insurance laws and requirements in all applicable state(s), with endorsements waiving all rights of subrogation against Exelon, Owner, Owner's Affiliates and Operator (collectively, "<u>Owner Parties</u>"). For states where Workers' Compensation is provided exclusively by the state's designed workers compensation program or compulsory state fund (also known as monopolistic state fund), upon Owner's request, Customer shall deliver or cause to be delivered to Owner a certificate of good standing evidencing compliance with all such requirements by Customer or Rail Carrier, as applicable.

    (ii)    <u>Commercial General Liability Insurance</u>, covering any and all damages, costs and expenses resulting from or arising in connection with bodily injury (including death to any person), and/or loss, damage or destruction of property and providing bodily injury and property damage liability coverage with a combined single limit of not less than Twenty-five Million Dollars ($25,000,000) per occurrence and in the aggregate. Such insurance shall:

        1)    Not contain any limitation for "bodily injury" on any Train used to deliver Crude Petroleum to the Eddystone Rail Facilities or any exclusion relating to operations on or near railroad property;

        2)    Include contractual liability, fire fight protection, and, if reasonably required, XCU coverage for excavation operations;

        3)    Cover Blanket Contractual Liability and Broad Form Property Damage;

        4)    Include appropriate territorial limits extension to cover all areas of operation; and

        5)    Include a cross liability / severability of interest clause;

    (iii)    <u>Personal Property Insurance Coverage</u> extended to cover, regardless of negligence, the market value of the Crude Petroleum carried by a Train destined for or at the Eddystone Rail Facilities;

    (iv)    <u>Contractor's Pollution Coverage</u> in an amount of not less than $10,000,000 per occurrence, covering any and all damages, costs and expenses resulting from or arising in connection with bodily injury, property damage including physical injury to or destruction of tangible property destroyed, or (not including the resulting loss of use thereof) cleanup costs. Coverage shall apply to sudden and non-sudden pollution conditions including discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants and

13

pollutants into or upon land, the atmosphere or any water course or body of water, which results in bodily injury, property damage or remediation expense and if coverage is purchased on a "claims made" basis, such coverage shall be maintained in force for a minimum of (3) three years after expiration of the Agreement; and

(v)     Any other insurance which the owner of a train may be required by Applicable Laws to maintain in connection with the operations described in the Agreement or these Terms and Conditions.

Subject to item 13(c), if Rail Carrier does not provide the insurance required by this item 13(a), Owner shall be entitled, in its sole discretion, to refuse to allow a Train to enter the Eddystone Rail Facilities.

(b)     <u>Barge Operator Insurance</u>. Subject to item 13(c) below, Customer shall maintain (for any Barge that Customer owns) or cause its Barge Operator to maintain (for any Barge that Customer does not own), at all times during which a Barge is destined for, at, or departing or in transit from the Eddystone Rail Facilities, which is carrying or is intended to receive Crude Petroleum for Customer:

(i)     <u>Commercial General Liability Insurance</u>, with minimum limits of at least Twenty-five Million Dollars ($25,000,000.00) each occurrence and Twenty-five Million Dollars ($25,000,000.00) aggregate per policy, covering damages resulting from bodily injury (including, without limitation, death) and property damage (including loss of use or occupancy). The commercial general liability policy shall also include Sudden and Accidental Pollution Liability Coverage, and shall be endorsed to:

1)     Cover Blanket Contractual Liability and Broad Form Property Damage;

2)     Include appropriate territorial limits extension to cover all areas of operation; and

3)     Include a cross liability / severability of interest clause.

(ii)     <u>Worker's Compensation and/or Occupational Disease coverage insurance</u>, covering the insured party's employees for all compensation and other benefits required of such entity by the Workers' Compensation or other statutory insurance laws and requirements in all applicable state(s), including Alternate Employers Endorsement that will pay claims for un- seaworthiness and claims occurring under the U.S. Longshore Harbor Worker's Compensation Act (USL&H), the Jones Act, the Outer Continental Shelf Lands Act, the Death on High Seas Act, the Admiralty Extension Act, and the general maritime laws of the United States, including claims for transportation, wages, maintenance, and cure, with endorsements waiving all rights of subrogation against the Owner Parties and with all appropriate extensions to cover locations where the Barges will be located or travel. For states where Workers' Compensation is provided exclusively by the state's designed workers compensation program or compulsory state fund (also known as monopolistic state fund), upon

14

Owner's request, Customer shall deliver or cause to be delivered to Owner a certificate of good standing evidencing compliance with all such requirements by Customer or Barge Operator, as applicable.

 (iii) <u>Maritime Employer's Liability,</u> which covers all employees with limits of not less than Ten Million Dollars ($10,000,000) each accident / Ten Million Dollars ($10,000,000) disease- each employee / and Ten Million Dollars ($10,000,000) policy limit that will pay for claims for un-seaworthiness and claims occurring under the general maritime laws of the United States, with such insurance being endorsed to cover locations where the Barges will be located or travel.

 (iv) <u>Hull & Machinery Insurance,</u> covering each Barge, with a policy limit equal to the greater of the Barge's mortgage value or actual cash value, and with navigational limits adequate for the use of the Barge as contemplated by to the Agreement or these terms and conditions. Where the Barge engages in towing operations, this insurance shall include full Tower's Liability with the Sistership Clause un-amended. All Hull & Machinery Insurance shall be endorsed to:

  1) Name Owner Parties as additional insureds, without limiting coverage liability "as owner" of the Barge and to delete any "as owner" clause any other language purporting to limit coverage to liability of an insured "as owner" of the Barge;

  2) Delete any language limiting coverage for Owner Parties in the event of the applicability of any limitation of liability statute; and

  3) Provide an "In Rem" endorsement whereby claims "in rem" shall be treated as claims against Customer.

 (v) <u>Charterer's Legal Liability Insurance,</u> providing coverage for liabilities arising out of the use of any chartered Barge, with a minimum limit of Ten Million Dollars ($10,000,000) for any claim, with such insurance being endorsed to waive all rights of subrogation against Owner Parties.

 (vi) <u>Protection and Indemnity ("P & I") Insurance,</u> covering all owned, operated, or chartered Barges, with coverage being kept at all times current with International P&I Club rules, with a minimum limit of Ten Million Dollars ($10,000,000) per occurrence.

 (vii) <u>Pollution Liability Insurance,</u> including cleanup and third party liabilities and to treat "in rem" actions against Barges as actions against Customer, with a minimum policy limit of One Billion Dollars ($1,000,000,000) each occurrence.

 (viii) <u>Commercial Excess, Umbrella, or Bumbershoot Liability Insurance.</u> This policy shall be written on a "Following Form" basis and shall be accepted to cover deficiencies in all above required liability insurance policies so that no gap in coverage whatsoever occurs and coverage hereunder shall be at least as broad as each underlying insurance policy described herein.

15

Subject to item 12(c), if Customer or Barge Operator, as applicable, does not provide the insurance required by this item 12(b), Owner shall be entitled, in its sole discretion, to refuse to allow a Barge to enter the Eddystone Rail Facilities.

(c)     Customer Provided Coverage Customer may satisfy item 13(a) and/or 13(b) by providing the required insurance coverage through Customer's own insurance company(ies) provided that such insurance otherwise satisfies all of the terms and requirements of this item 13.

(d)     Insurance Policy Requirements. All liability policies shall name Owner Parties as additional insureds and waive all rights of subrogation against Owner Parties.

(e)     Premiums.  Customer, Rail Carrier or Barge Operator, as applicable, shall be responsible for all premiums, surcharges, supplemental calls, penalty payments, deductibles, self-insured retentions, and all other costs for all insurance referenced in items 13(a) and 13(b) above.

(f)     Compliance with Applicable Law.  If it is judicially determined that the monetary limits of the insurance required herein do not conform with Applicable Laws, such insurance shall automatically be amended to conform to the minimum monetary limits and other provisions of such Applicable Laws and charged back to Customer.

(g)     Insurance Certificates; Policies.  Upon execution of the Agreement, and on an annual basis thereafter until the Agreement is terminated, Contractor shall cause all of its insurance providers to deliver to Owner a certificate of insurance, on the standard Acord form (or other standard form regularly accepted in the industry) certifying that all insurance policies required under this Section 12 have been issued and at the time of certificate issuance such policies are valid and effective, with all required endorsements evidenced on such certificate. Such certificates shall provide for the insurance company to notify Owner at least thirty (30) days prior to any cancellation or material amendment of the applicable insurance policy. If Customer fails to provide Owner with such certificate of insurance, Owner may, but shall not be obligated to, obtain and maintain the required insurance with reputable insurers on behalf of Customer and the cost thereof shall be payable by Customer to Owner on demand and Owner may elect to deduct the cost from any amount which is or may become payable to Contractor. Additionally, upon Owner's or its representative's request, Customer agrees to furnish to Owner copies of any insurance policy required hereunder,  including documentation evidencing all required endorsements thereto.

(h)     Indemnities to be Supported by Insurance.  To the fullest extent required by certain Applicable Laws and not prohibited by other Applicable Laws, Customer agrees to obtain and maintain, for the benefit  of the Owner Parties, as indemnitees, types and amounts of insurance coverage at least equal to the insurance requirements set forth in items 13(a) and 13(b), in each case to cover the entire scope of the release, indemnity, defense, and hold harmless obligations assumed in Section 13 of the Agreement. All insurance required under item 13(a) are in support of Customer's respective release, indemnity, defense, and hold harmless obligations is in addition to, and independent of, any other insurance requirements contained in the Agreement or these terms and conditions. Except as required by law, the amount of any insurance provided to support Customer indemnity obligation shall not limit such indemnity obligation. Except as

16

required by Applicable Laws, compliance with the obligations under this item 13 shall in no way limit or replace the indemnity and other obligations of Customer contained elsewhere in the Agreement or these terms and conditions.

## 14.  TITLE AND LEGALITY OF SHIPMENT

(a)  A request for Transloading Services for Crude Petroleum shall be deemed a warranty of title by Customer, but acceptance shall not be deemed a representation by Owner as to title. Owner may, in the absence of adequate security, decline to receive for Transloading Services any Crude Petroleum which is in litigation, or as to which a dispute over title may exist or which is encumbered by any lien of which Owner has notice.

## 15.  ADVERSE CLAIMS AGAINST CRUDE PETROLEUM

(a)  Customer shall not request Transloading Services for, or deliver to Owner, Crude Petroleum which is involved in litigation, the ownership of which may be in dispute or which is encumbered by a lien or charge of any kind unless Customer provides written notification to Owner of such litigation, dispute, lien or charge not less than twenty (20) days before such request is made to Owner.

(b)  Owner shall not be obligated to accept Crude Petroleum that is involved in litigation, the ownership of which may be in dispute or which is encumbered by a lien or charge of any kind.

(c)  Customer shall advise Owner in writing if, at any time while Customer's Crude Petroleum is in the possession of Owner, such Crude Petroleum becomes involved in litigation, the ownership of such Crude Petroleum becomes in dispute or such Crude Petroleum becomes encumbered by a lien or charge of any kind.

(d)  Customer shall, upon demand from Owner, provide a bond or other form of indemnity satisfactory to Owner protecting Owner against any liability or loss that may arise as a result of Customer's Crude Petroleum that is involved in litigation, the ownership of which may be in dispute, or which is encumbered by a lien or charge of any kind. If Customer fails to provide such bond or other form of indemnity acceptable to Owner, Owner will not be obligated to accept Customer's Crude Petroleum for Transloading Services.

## 16.  CLAIMS, SUITS, AND TIME FOR FILING

(a)  If a dispute, controversy or claim ("Dispute") arises out of or relating to the Agreement, these terms and conditions, the Terminal Rules or the Transloading Services, the aggrieved Party may provide written notification of the Dispute to the other Party. A meeting shall be held promptly between the Parties, attended by representatives of the Parties with decision-making authority regarding the Dispute, to attempt in good faith to negotiate a resolution of the Dispute. If, within twenty-one (21) days after such meeting, the Parties have not succeeded in negotiating a resolution of the Dispute, either Party may commence arbitration proceedings in connection with the Dispute pursuant to item 16(b). Notwithstanding anything in the foregoing to the contrary, the negotiation required under this item 16(a) shall not apply to a Dispute arising out of or relating to the amount of, any failure to pay, or any delay in paying,

Charges, or the exercise of any rights or remedies in connection therewith.

(b)    If any Dispute is not resolved pursuant to item 16(a), either Party may refer the Dispute to three (3) persons at New York, one to be appointed by each of the Parties, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, the Agreement and these terms and conditions may be made a rule of the court. The proceedings shall be conducted in accordance with the Rules of the Society of Maritime Arbitrators, Inc. ("SMA"). Notwithstanding anything contained herein to the contrary, should the sum claimed by a Party not exceed Fifty Thousand Dollars ($50,000), the Dispute is to be governed by the "Shortened Arbitration Procedure" of the SMA of New York, as defined in the Society's current Rules for such procedure. The following provisions shall apply to the arbitration of any Dispute:

(i)    The arbitrators are not empowered to award damages of the type waived in Section 9 of the Agreement.

(ii)    The fees and expenses of the arbitrators and, if applicable, the costs of the facilities required for the arbitration shall be paid equally by the Parties, unless the award specifies a different division of such costs and expenses.

(iii)    Each Party shall be responsible for its own expenses, including attorneys' fees.

(iv)    Arbitration under the applicable procedures pursuant to item 16(b) shall be the exclusive remedy for all Disputes that are not resolved in accordance with item 16(a).

(v)    The Parties shall, and shall direct the arbitrators to, keep the nature, terms and outcome of any negotiation or arbitration under this item 16 confidential, except as required by the applicable rules of the SMA or as otherwise agreed by the Parties.

(vi)    The arbitrators shall have no authority, power or right to alter, change, amend, modify, supplement or subtract from the terms of the Agreement, these terms and conditions or the Terminal Rules.

(vii)    Notwithstanding anything herein to the contrary, prior to the appointment of arbitrators under item 16(b), either Party may seek temporary injunctive relief in a court of law with jurisdiction over the Parties to maintain the status quo or prevent irreparable harm. Without prejudice to such provisional remedies as may be available under the jurisdiction of a court, the arbitrator(s) shall have full authority to grant provisional remedies or order the Parties to request that a court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any Party to respect the orders of the arbitrator(s) to that effect.

(c)    Customer shall not be entitled to make any claim for delay, damage, injury or loss resulting from the Transloading Services unless Customer gives written notice of such claim to Owner within thirty (30) days of the Transloading Services that are the subject of the claim.

(d)    To the extent permitted by Applicable Laws, Customer may not commence

arbitration in connection with any claim against Owner more than sixty (60) days from the date that written notice is given by Owner to Customer that Owner has disallowed such claim or any part of such claim.

(e)     If Customer fails to comply with the provisions of paragraphs (c) or (d) of this item 16, then Customer waives all rights it has to bring an action against Owner with respect to such claim.