# Exhibit A

1

H4DJEDDC                    Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   EDDYSTONE RAIL COMPANY, LLC,

 4                  Plaintiff,

 5          v.                          17 Civ. 01266 WHP

 6   JAMEX TRANSFER SERVICES, LLC,

 7                  Defendant.

 8   ------------------------------x

 9

10

11
                                        April 13, 2017
12                                      11:05 a.m.

13

14

15   Before:

16              HON. WILLIAM H. PAULEY III,

17                                      District Judge

18

19

20

21

22

23

24

25

H4DJEDDC                        Conference

1              (In open court)

2              (Case called)

3              THE COURT:  Good morning, everyone.  Please be seated.

4              So, Mr. Agusti, briefly do you want to describe the

5      nature of the proceeding here.

6              MR. AGUSTI:  Yes, your Honor.

7              Your Honor, we are represent Eddystone Rail Company,

8      and essentially at the beginning of this case there is a

9      contract that Eddystone entered into.  Eddystone is a facility

10     on the banks of the Delaware River about a few miles from

11     Philadelphia, and essentially what this facility does, it

12     trans-loads crude oil from railcars to barges, and the barges

13     would then take the oil, this crude oil, to refineries

14     downstream Trainer, Pennsylvania.

15             The contract that it had was with a entity called

16     Bridger Transfer Services.  Bridger Transfer Services has

17     entered into a take-or-pay contract with Eddystone, under which

18     it would either deliver 65,000 barrels of crude oil a day or it

19     would pay for not doing so.  Our client, Eddystone Rail

20     Company, relied on the existence of this contract in order to

21     build the facility, which ended up costing it about $170

22     million.

23             In February 1st of 2016, the company Bridger Transfer

24     Services was transferred by the proposed intervenors to a shell

25     company called Jamex Transfer Holdings, and immediately

H4DJEDDC                    Conference

1    thereafter Jamex Transfer Holdings defaulted on the contract

2    and no more railcars ever came to the facility.  What happened

3    then was that, of course, under the terms of the rail contract,

4    Eddystone was obligated to proceed with an arbitration in front

5    of the Society of Marine Arbitrators.  That arbitration began,

6    we initiated it on April 19th of 2016.

7            The first hearing on that arbitration was on June

8    29th, a couple of months later.  It is important to note

9    actually for the purposes of the motion for intervention that

10   at that hearing on the record, counsel for transfer services

11   noted that he had been in communication with the proposed

12   intervenors in order to try to obtain documents for the

13   arbitration, and they had discussed the arbitration.  And so

14   certainly we have on record that as of June 29th, the proposed

15   intervenors were aware just weeks actually after the initiation

16   of the arbitration the proposed intervenors had knowledge of

17   the fact the arbitration was proceeding.

18           It is clear from the public record that on July 13th

19   Eddystone, we, served a subpoena that was issued by the

20   arbitrable panel on Ferrellgas, the proposed intervenors.  At

21   the time Messrs. Rios and Gamboa, who are separately

22   represented here, were the principal employees running Bridger

23   Logistics, a relevant subsidiary of Ferrellgas.

24           On July 13th, we served a subpoena.  The reason it is

25   a matter of public record is because Ferrellgas initially

4

H4DJEDDC                    Conference

1   resisted the subpoena, and so we had to initiate a proceeding

2   in the Southern District of New York to enforce the subpoena.

3   The arbitration, by its terms, was conducted here in New York

4   in front of Judge Caproni, and so it is clear on the record

5   that from that time in July the current proposed intervenors

6   had knowledge of the arbitration.

7           What happened then is that we had disputes.

8           Ultimately the proceeding, the document proceeding was

9   resolved among the parties.  Judge Caproni entered a stipulated

10  order, and discovery proceeded throughout the fall.  Indeed,

11  the final documents were provided to us by the proposed

12  intervenors in early January.

13          Your Honor, what happened was that ultimately in this

14  arbitration, as in many cases, there was a settlement reached

15  by the parties, by the party then, the transferee of Bridger

16  Transfer Services, you recall that on February 1, 2016, Bridger

17  Transfer Services had been transferred, or at least the

18  Philadelphia, as we allege in the Philadelphia action.

19          At that point it was a shell entity.  It had no

20  assets, and part of the reason why we needed to get documents

21  was because the operational documents for this entity had

22  remained with the proposed intervenors.  So, in any event, the

23  parties reached a settlement.  Pursuant to the rules of the

24  Society of Maritime Arbitrators, there was a settlement award

25  that was entered on January 24.  On February 2 we began our

H4DJEDDC                    Conference

1   action against the proposed intervenors, the action in

2   Philadelphia, the Eastern District of Pennsylvania.  The action

3   basically has three basic theories:

4           One of them is that the entity was an alter ego of the

5   proposed intervenors;

6           The second theory is that they stripped Bridger

7   Transfer Services of its assets just prior to the February 1,

8   2016 transfer.  There are audited financial statements

9   indicating that Bridger Transfer Services had assets of close

10  to $100 million as of December 31, 2013.  On January 13, 2016,

11  the proposed intervenors, in a transactional document,

12  indicated that by that point Bridger Transfer Services had no

13  assets, and that is, of course, all in the Philadelphia

14  lawsuit;

15          Finally, the final theory has to do with a breach of

16  the fiduciary duty that directors and officers of an insolvent

17  entity owe its creditors, and, of course, the primary creditor

18  of Transfer Services was Eddystone.

19          Your Honor, that action is February 2, began February

20  2 in Philadelphia.  The proposed intervenors, defendants in

21  that case, have filed a motion to dismiss.  It turns out that

22  today we will be filing our opposition to their motion, and the

23  case expects to proceed in Philadelphia.

24          Meanwhile, a little after we filed the lawsuit against

25  the proposed intervenors in Pennsylvania, we filed this

H4DJEDDC                    Conference

1    petition to confirm the award that had been entered by the

2    arbitrable panel on January 24th.  The concept here is just

3    simply to have a final judgment reflecting the arbitrable

4    award.  In the ordinary process, that is contemplated by the

5    Federal Arbitration Act.  Of course, as the court knows, the

6    proposed intervenors have filed a letter requesting briefing on

7    the motion to intervene.

8            Our view, your Honor, is that it's quite clear that

9    they are not entitled to intervene for the following reasons:

10           Section 10 of the Federal Arbitration Act makes clear

11   that a party can only seek to vacate an arbitrable award if it

12   was a party to the arbitration.  Similarly, Section 11 of the

13   Federal Arbitration Act says that you have to be a party to the

14   arbitration to seek a modification of that award.

15           So it is clear from the words of the statute that only

16   parties to the arbitration are supposed to get involved in this

17   proceeding, which is nothing more than a petition to confirm

18   the award.  That has been upheld by the cases cited in our

19   letter; Dundas, Katir, Meshkin all enforce that rule.

20           The proposed intervenors have pointed to a case called

21   Associated Contracting Plumbers, in which the Second Circuit

22   created a limited exception to that rule, in a situation where

23   the proposed intervenor did not know of the intervention and

24   the proposed intervenor or the arbitrable award, and the court

25   judgment directly and immediately affects the proposed

7

H4DJEDDC                    Conference

1    intervenor.  We think that neither of those conditions are

2    satisfied here.

3           I just want to go very, very quickly on the

4    Contracting Plumbers case because I think it is important here,

5    your Honor.  Basically that was a case in which an

6    international union that included pipe fitters and plumbers had

7    established, had a right under the Constitution, the contract

8    among the unions, to establish work jurisdiction among the

9    unions.  It decided that it was for some particular jobs here

10   in New York City, it was going to grant jurisdiction to the

11   pipe fitters union.

12          The plumbers union were not happy with that result,

13   and without telling the international union, an arbitration was

14   initiated between the employer association, the contractors

15   that hire plumbers, and the plumbers union.  There were two

16   different proceedings, but they were essentially for the same

17   purpose, and at that proceeding, the result of that proceeding

18   was that the arbitrator, without any knowledge really of the

19   issues that involved the international union, entered an award

20   actually in favor of the plumbers association, which said that

21   the work that enjoined actually or that said that the local

22   plumbers unions should do the work.

23          They then went to the district court here in the

24   Southern District of New York and got the award confirmed and

25   got permanent injunctions entered enjoining the local unions to

8

H4DJEDDC                       Conference

1    go ahead and do the work.  So, in other words, the permanent

2    injunctions from the confirmed award directly took away the

3    right of the international union to assign work immediately.

4    There was nothing contingent about it, it was a direct assault

5    on the international union because the international union had

6    already awarded that to someone else.

7            Now, under those circumstances, Judge Lumbard found

8    that, in fact, you could have someone directly affected in that

9    way like the international union that hadn't known about the

10   existence of the arbitration an opportunity to vacate the

11   award.  Your Honor, that's quite different than the situation

12   we have here.

13           First of all, as I have said in explaining the facts,

14   the proposed intervenors here had knowledge of our arbitration

15   going back to weeks after the beginning of the arbitration.

16   Since they had not consented to the arbitration, we really

17   weren't in a position to include them in the arbitration, but

18   essentially they were in a situation where they were perfectly

19   aware that this was going on.

20           THE COURT:  But what occurred in the arbitration other

21   than an agreement by Jamex to settle?

22           Was there a hearing?

23           MR. AGUSTI:  Yes, sir, on June 29th there was a

24   hearing at which we, in which we actually presented our case,

25   our case in chief.  Basically then there was a recess for the

9

H4DJEDDC                    Conference

1        folks at Jamex to prepare their defense and, indeed, for

2        document discovery to occur.  That was in the context that we

3        went through document discovery.  And so then there was a

4        settlement before the final hearing, where Jamex would have

5        presented its defense, and an award, an award was entered.

6               So the point is, your Honor, that the proposed

7        intervenors had knowledge that the arbitration was going on,

8        and naturally most arbitrations, like most disputes, end up in

9        settlements, so they knew we were suing an entity that had no

10       assets, so obviously we weren't looking for a recovery against

11       that entity, but rather we were seeking to establish our

12       contractual right to be compensated for what was a clear breach

13       of our contract, and yet they didn't intervene.

14              Just to be clear, your Honor, essentially what

15       happened in that arbitration is that the parties engaged in the

16       initial hearing, it was a full hearing with witnesses and

17       cross-examination, and then there was a recess that was

18       actually extended because of the difficulty in getting

19       documents from third parties.  But then as it happens in most

20       cases, there was a settlement of it.

21              THE COURT:  But does it happen in most cases that

22       there is $139 million settlement with an entity that has no

23       assets?  Is that typical?

24              MR. AGUSTI:  Your Honor, it is certainly allowed by

25       the rules.  I can't say how often entities enter into awards

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H4DJEDDC                      Conference

1   and for what amount, but it certainly would be normal for the

2   purpose of the arbitration, your Honor.  The answer is I don't

3   know, your Honor.

4           THE COURT:  Right.  It is not really an arbitration

5   award.  It is a capitulation, isn't it, signed off on by an

6   arbitrator?  There was no factual finding by the arbitrators?

7           When I first read your complaint, I thought that there

8   was a full blown arbitration and a true adversary proceeding

9   that resulted in $139 million award, but now I'm hearing that

10  the $139 million award was really a settlement with an entity

11  that was essentially defunct.

12          MR. AGUSTI:  Your Honor, it was a settlement with that

13  entity and with, of course, it's the entities that controlled

14  that entity, just to be very clear, but that is absolutely

15  right.  To the extent that there is a problem in that, to the

16  extent that that creates a reason why the court in the next

17  case --

18          THE COURT:  You might be right about that, it might be

19  an issue that the proposed intervenors here are free to raise

20  in the Pennsylvania action, but let me hear from Mr. Zensky

21  about that in the first instance.

22          MR. AGUSTI:  Your Honor, I did want to say something

23  about the contingency of the interest, but I am happy to sit

24  down now.

25          THE COURT:  Okay.  Thanks.

H4DJEDDC                    Conference

1            MR. ZENSKY:  I have a few slides which I have provided

2     to Mr. Agusti when we arrived.  May I approach the Bench?

3            THE COURT:  Okay.  Sure.

4            (Pause)

5            THE COURT:  Mr. Zensky, do you have a copy for the

6     Court Reporter?

7            MR. ZENSKY:  We do, your Honor.

8            (Pause)

9            MR. ZENSKY:  Good morning, your Honor.

10           I largely agree with Mr. Agusti's recitation of the

11    chronology of events.  Apart from his description of the merits

12    of the Pennsylvania case, that is not before the court and I am

13    not going to respond to that part of his comments.

14           His point that we were aware of the arbitration is

15    irrelevant, as I will make clear to your Honor in a moment.

16    Let me take you through the slides so you know who the parties

17    are and understand how it is and why it is we are seeking

18    intervention here.

19           One of our clients, look at Slide 1, your Honor, this

20    shows the corporate alignment as of February 2013.  Our client

21    Ferrellgas didn't have any ownership interest in any of the

22    entities that were involved in the arbitration or in the

23    dispute that Mr. Agusti described.  You can see that there was

24    a corporate family called Bridger, LLC and Bridger Logistics

25    owned a number of subsidiaries, including an entity called

H4DJEDDC                    Conference

1    Bridger Transfer Services, and that is the entity that Mr.

2    Agusti described to you that contracted with his client,

3    Eddystone, to trans-load the oil on a take-or-pay agreement in

4    Pennsylvania, and that agreement is referred to as the rail

5    services agreement, and that is what the RSA refers to, your

6    Honor.

7         If you flip to the next slide, in June of 2015 our

8    client Ferrellgas acquired Bridger Logistics from the Bridger

9    family of companies along with its subsidiaries.  So you can

10   see that Bridger Logistics moved from the right side of the

11   chart to the left side, and in buying Bridger Logistics, we

12   also acquired the subsidiaries of Bridger Logistics, which

13   included the entity that had contracted with Eddystone, and you

14   can see that now on the left side of the page.

15        In order to avoid confusion between the now separate

16   companies, the Bridger people and the entities that were not

17   sold renamed themselves Jamex, and that is an acronym for the

18   owner of those entities, James Balangi.  So you see Jamex and

19   Jamex Marketing are still on the right side.

20        Then we get to February 1, a transaction which Mr.

21   Agusti briefed you on, your Honor.  As a result of a number of

22   disputes and discussions that were ongoing between our client

23   and the Jamex Group, part of the resolution of that, we sold

24   Bridger Transfer Services back to the Jamex family of

25   companies, subject to the contract that we're here about today,

H4DJEDDC                    Conference

1    and you can see that Bridger Transfer Services along with the

2    contract with Eddystone gets transferred to Jamex Transfer

3    Holdings and is renamed Jamex Transfer Services, again subject

4    to the terms of the contract with Eddystone.  There are a

5    variety of gives and gets as part of that sale, and that was

6    consummated effective February 21, 2016.

7           The next slide is critical to understand why we would

8    have no incentive to try to intervene in the arbitration

9    proceeding despite being aware of it.  Leaving aside under the

10   Society of Maritime Arbitration rules there is no such thing as

11   intervention, it is not subject to federal rules and there was

12   no controversy between us and their client, and that is because

13   when we sold Bridger Transfer Services to Jamex on February 1,

14   we were fully paid up under the contract.

15          There was no dispute between my group of companies and

16   the Eddystone people that we had paid all the debts that came

17   due as of that day, and you don't have to take my word for it,

18   you can take Mr. Agusti's word for it because it is right in

19   the pleadings he had filed in this Court and in the

20   Pennsylvania court.

21          Under Paragraph 12 of the motion to compel, which you

22   heard Mr. Agusti talk about, Eddystone alleged that prior to

23   February 1, Jamex Transfer Services, which was then known as

24   Bridger Transfer Services, had made all such volume deficiency

25   payments when due, but immediately after Bridger Logistics sold

14

H4DJEDDC                    Conference

1    JTS to Jamex Marketing, Bridger Logistics stopped bringing

2    trains in and out of the trans-loading facility and ceased all

3    performance under the RSA

4            Mr. Agusti told you that, frankly.  He said after the

5    sale, JTS defaulted on the take-or-pay agreement.  If that

6    allegation in this courtroom or this courthouse was not enough,

7    in the Pennsylvania case they made the same allegation that

8    Bridger Logistics and its affiliates made that BTS was funded

9    adequately all the way up until the sale, to make all payments

10   due to his client, and that was the case.

11           On top of that, your Honor, when we sold Bridger

12   Transfer Services to THE Jamex family, in the contract of sale

13   Jamex explicitly assumed responsibility for the take-or-pay

14   agreement going forward, and we got a guarantee from a parent

15   that that would be the case.  So we were fully paid up and we

16   got an explicit contractual promise from the buyer dealing with

17   Mr. Agusti's client and making those take-or-pay payments,

18   performing under that contract was going to be the buyer's

19   responsibility.

20           Given that lay of the land, when you turn to the next

21   slide, you can see that the arbitration proceeded following the

22   default.  The arbitration was solely between the

23   counter-parties to that restructuring rail services agreement.

24   They're the only parties that are in that contract, the only

25   party responsible to make payments to ERC is Jamex Transfer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H4DJEDDC                    Conference

1    Services.  They went into arbitration.  Under what possible

2    reason would we have to intervene into their arbitration about

3    a default that occurred after we sold the company and when we

4    were fully paid up as of the time of the sale?

5            Yes, we were aware of the arbitration.  They

6    subpoenaed us to produce documents, but they never sent us a

7    letter that said and be forewarned if we get a judgment in that

8    arbitration, we are coming after you to pay for it.

9            I don't know on what theory and we don't think they

10   have a valid theory in Pennsylvania, but the existence of the

11   arbitration is a complete red herring, doesn't distinguish the

12   Association of Contracting Partners case, which I will discuss

13   in a moment.

14           THE COURT:  Is Jamex currently in bankruptcy?

15           MR. ZENSKY:  No, none of the Jamex entities are in

16   bankruptcy, which is part of the smell factor about the

17   settlement.  They haven't sued any Jamex entity to try to

18   collect on their $139 million judgment.

19           THE COURT:  Why hasn't Jamex counsel appeared in this

20   action?

21           MR. ZENSKY:  A good question, which proves right away

22   one of the elements of intervention, there is no one here to

23   represent our interests.  That is because Jamex settled with

24   them and capitulated, as your Honor put it, and we don't know

25   what sort of releases up the parent chain they got.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H4DJEDDC                    Conference

```
 1          For all we know, Mr. Agusti's client may have made a
 2    payment to Jamex to get them to capitulate and enter this dummy
 3    settlement so that they could get a confirmation in this Court
 4    and wave it around to try to chase my client for a breach of
 5    contract that occurred after we sold the business.
 6          We don't know that, but we need to be here to protect
 7    our interests and make sure that a settlement -- and using that
 8    word loosely -- that is not the product of an adjudication, not
 9    the product of adversary process is not used improperly in any
10    other proceeding or court in this country, whether in the
11    Pennsylvania case or potential bankruptcy of one of the Jamex
12    entities.  We can't predict what is going to happen.
13          I am finishing up on Slide 5.  As you heard Mr. Agusti
14    say, they had an initial hearing.  There was no adjudication of
15    any kind rendered.  His petition in this case does not refer to
16    any decision of the arbitrators.  It just said they had a
17    hearing, there were more hearings scheduled, and then all of a
18    sudden they settled.
19          Just to put that piece to rest, we had no reason to
20    know we should intervene.  We would not have been allowed to
21    intervene, as far as I can tell, and he didn't cite any rule to
22    you that suggesting we could.  When you turn to the contracting
23    Partners case, you see that is not part of the holding at all,
24    your Honor.
25          If you turn to the next slide, the rules are very
```

H4DJEDDC                    Conference

1      clear that govern our motion to intervene the requested motion,

2      your Honor.  Federal Rule 81 says that the federal rules apply

3      in proceedings under the Federal Arbitration Act, which

4      includes the proceeding we're here on today, their motion to

5      confirm, or their action to confirm.

6              There is no exception.  It doesn't say the

7      intervention rules don't apply, but everything else does.  It

8      says the federal rules apply to the extent applicable and

9      invoked by any party in a proceeding under 9 USA 1, et seq.

10             Of course, we have 24 (a)(2), which grants

11     intervention as of right, and 24 (b)(1)(B) which is permissive

12     intervention, and we satisfy both tests and we'll certainly

13     satisfy them if your Honor permits us to make the motion.

14     Intervention as of right involves four elements.  Timely

15     motion.  We sent our letter to your Honor 10 days after we

16     became aware of their petition to confirm, that is, Mr. Agusti

17     did not say we slept on our rights once they moved to confirm

18     the arbitration.

19             We have to claim an interest related to the property

20     or transaction that is the subject of this action.  In their

21     Pennsylvania case they cite to the arbitration award as a basis

22     for establishing the liability that they now want to collect

23     derivatively against us, so obviously we claim an interest in

24     this action.

25             THE COURT:  Can't your clients contest and defend

H4DJEDDC                    Conference

1      against Eddystone's claim that your clients are responsible for

2      paying the judgment, assuming this Court confirms it in the

3      Pennsylvania action?

4           MR. ZENSKY:  We certainly can defend against the

5      argument there is a basis to pierce the corporate veil, whether

6      there was a breach of fiduciary duty, et cetera, and if your

7      Honor denies intervention or grants it, but nonetheless allows

8      the judgment, we would argue it cannot be res judicata against

9      our clients as a non-party to the arbitration.

10           I can't predict how the Pennsylvania court will rule

11     on that.  They're going to argue in whatever court in this

12     country they try to pursue us or other parties in, that if you

13     give them a judgment, that that is final, binding and

14     dispositive on the question of whether JTS was indebted to

15     Eddystone under a take-or-pay agreement.  Remember, JTS had

16     defenses they asserted that they interfered with the

17     performance of the contract in a number of ways and defaulted

18     themselves.  They just capitulated and never pressed those

19     defenses in the hearing.  We owned this company for a time and

20     I believe those defenses had substantial merit, but for

21     whatever reason they're a defunct company and they gave up.

22           They will also argue that the 139 million is

23     dispositive of how much JTS was indebted to Eddystone.  That is

24     not present value.  That is the next three years of payments

25     that they were seeking under the contract, just rubber stamp.

H4DJEDDC                    Conference

1    That is what Jamex apparently did, that they're not here to

2    tell us otherwise.  They say okay, you can have a judgment,

3    just don't enforce it against us, right, because they were

4    planning to come after us, the former owner for this.

5          Your Honor, can I predict with certainty whether the

6    judge in Pennsylvania will or won't accept their argument on

7    res judicata?  No, I can't.  If the standard of intervention

8    was that I had to prove to you that the outcome of this action

9    would necessarily impair our rights, I would not be able to

10   satisfy that standard, but the rule doesn't require me to

11   establish that.

12         If you go back to the text of 24 (a)(2), we only have

13   to establish that we are situated such that disposing of this

14   action may as a practical matter impair or impede our ability

15   to protect our interests.  If I wasn't here today seeking

16   intervention, when we got to Pennsylvania you can bet your last

17   dollar Mr. Agusti would get up and say Mr. Zensky, where were

18   you in New York?  You should have been there to seek to oppose

19   the confirmation of the judgment.  You were aware of it and now

20   that judgment is final and binding, you can't contest how much

21   Jamex Transfer Service owes to Eddystone.

22         I hope that is responsive to your Honor's question.

23         Let me turn to the cases and I will sit down.

24         THE COURT:  No.  Yes.  Look, I am not sure how I come

25   out on this application, and as a consequence of that, I am

H4DJEDDC                    Conference

1   going to fix a briefing schedule on the proposed intervenor's

2   motion.

3           MR. ZENSKY:  I will hold my argument until the day we

4   come back unless your Honor wants a brief response on the case

5   law discussion?

6           THE COURT:  If you want to give me very brief

7   responsible now, that is fine.  I will take it, recognizing

8   that I think next week the Supreme Court is hearing argument in

9   an appeal involving intervention and what the contours of

10  intervention are, and I understand from afar, from down in the

11  trenches that the case may be of some consequence in the

12  future.

13          MR. ZENSKY:  Understood, your Honor.  I think it is

14  more fun down in the trenches.

15          In any event, just briefly, the Katir and Dundas case

16  Mr. Agusti cited are cases where there was no pending motion to

17  confirm or vacate between the parties to the arbitration.  A

18  third party shows up and files the petition with the court

19  initiating a proceeding and asking for vacatur of a

20  confirmation award.  That is not what happened here, your

21  Honor.

22          Mr. Agusti started this proceeding, and we sought

23  intervention in an otherwise validly commenced petition under

24  the Federal Arbitration Act.  Those cases that he cited have no

25  bearing.  If he had not filed, perhaps we would not have the

H4DJEDDC                    Conference

1    right to have done anything, but then again he wouldn't have

2    been able to convert his settlement into a judgment without

3    filing for confirmation.  So we have that.

4           The Association of Contracting Plumbers is squarely on

5    point.  The Second Circuit affirmed that non-parties to an

6    arbitration were not only permitted to intervene into the

7    proceeding, but having intervened, had all the rights of a

8    party, including the right of a party under 9 U.S.C. Section 10

9    to oppose confirmation of the award, and they successfully

10   argued, the intervenors won the case by establishing the

11   arbitration that went on between the other two parties was

12   outside the scope of the arbitration clause.

13          The Second Circuit cannot be clearer in saying that,

14   reading from the decision, your Honor, under Headnote 1:

15          "Section 10 of the arbitration act allows the court to

16   vacate an arbitration award" --

17          THE COURT:  Slowly, please.

18          MR. ZENSKY:  -- "upon the application of any party to

19   the arbitration if certain conditions are found to exist,

20   citing the Federal Arbitration Act.

21          "The threshold question here is whether under Section

22   10 a District Court may entertain the motion of a non-party to

23   sets aside an arbitration award.  There is little question that

24   the UA" -- you heard Mr. Agusti talk about Local 6638 and MCA

25   -- "have a substantial interest in the arbitration and

H4DJEDDC                    Conference

1    consequently may intervene as of right under Rule 24 (a).

2              Once the right to intervene is established, the

3    intervenor status is equivalent to that of a party.  So having

4    intervened, we are permitted to raise a defense under the

5    Federal Arbitration Act, which is exactly what we will be doing

6    if your Honor grants the application to intervene, and that

7    would be that the settlement, the alleged settlement award was

8    procured by undue means, fraud or corruption, which is an

9    explicit ground under the Federal Arbitration Act to deny

10   confirmation of an award.  That is what we'll address in our

11   motion to intervene.  Of course, we won't be able to address

12   the merits.  This is just the intervention itself at this

13   point.

14             THE COURT:  When do you want to file your motion?

15             MR. ZENSKY:  I have spoken briefly to Mr. Agusti

16   before we came in.  I was hoping we could do it sometime the

17   first week of May, so we have to respond to the briefs he

18   indicated his client is filing today.

19             THE COURT:  Do you want to file it May 5?

20             MR. ZENSKY:  5 or 6, if that is suitable for your

21   Honor?

22             THE COURT:  The 6th is a Saturday.

23             MR. ZENSKY:  I am sorry.  The following Monday or

24   Tuesday?

25             THE COURT:  May 9.

H4DJEDDC                    Conference

1           MR. ZENSKY:  Thank your Honor.

2           THE COURT:  Tuesday, May 9.

3           Mr. Agusti, how much time do you want to oppose the

4    motion?

5           MR. AGUSTI:  Your Honor, the other case is quite busy.

6    If I could have the court's indulgence for three weeks to

7    respond, we would appreciate it.

8           THE COURT:  You've got it, except I'll make it three

9    weeks and a couple of days because otherwise someone in your

10   office will be working on Memorial Day Weekend.

11          MR. AGUSTI:  Thank your Honor.

12          THE COURT:  File your opposition by June 2.  Can you

13   get me a reply by June 12?

14          MR. ZENSKY:  Yes, we can, your Honor.  Thank you.

15          THE COURT:  All right.  I'll set that down for an oral

16   argument.

17          MR. ZENSKY:  I am out of the country June 29th to July

18   9, your Honor.  My daughter is graduating high school, so it is

19   a family celebration trip.

20          THE COURT:  Bastille Day, July 14.

21          MR. ZENSKY:  Fine, your Honor.

22          THE COURT:  Now, Mr. Agusti, if you're coming from

23   Washington, what is the most convenient time?  Later in the

24   morning?

25          MR. AGUSTI:  Your Honor, later in the morning is fine,

H4DJEDDC                    Conference

 1    but I am quite flexible.

 2              THE COURT:  We'll set it for 12:00 noon.

 3              MR. AGUSTI:  Your Honor may I be heard for a quick

 4    moment on an issue?

 5              THE COURT:  Sure.

 6              MR. AGUSTI:  Your Honor, I did want to clarify just

 7    two things factually that came up during the discussion just to

 8    make sure that there is not any bad perception about Weil

 9    Gotshal's counsel to the Jamex parties.

10              Essentially they had understood that they were going

11    to be participating in today's hearing but apparently neglected

12    to enter an appearance, and for that reason it was suggested

13    they could not appear today, but they did wish to appear today,

14    your Honor.  I just wanted to be clear it is not they're not

15    here for disinterest.

16              THE COURT:  All right.  The action was filed on

17    February 17th.  There has been no appearance, but someone from

18    Weil called my law clerk this morning to ask whether -- they

19    had an interest, but could they participate by telephone?

20              Without any appearance --

21              MR. AGUSTI:  I want to be clear --

22              THE COURT:  -- I told my clerk to tell them that is

23    not the way proceedings work.

24              MR. AGUSTI:  Yes, your Honor.

25              THE COURT:  And they were a subway ride away.

H4DJEDDC                    Conference

```
 1            MR. AGUSTI:  Yes, your Honor.  I am not defending
 2     them.  I am making sure the record is clear that they --
 3            THE COURT:  Maybe someday they will file a notice of
 4     appearance.  I don't know, but --
 5            MR. AGUSTI:  Maybe very soon your Honor.  Your Honor,
 6     the other thing --
 7            THE COURT:  -- if they were sufficiently concerned,
 8     the firm is big enough, they'd have somebody down here, most
 9     importantly the person who is responsible for the case, unless
10     they're out of the country.
11            There isn't any reason why they shouldn't be here to
12     address the court especially when there are letters filed in
13     the case suggesting that it was a collusive settlement, so I am
14     sure there will be other pages to be turned in this case.
15            MR. AGUSTI:  Your Honor, I just wanted to be --
16            THE COURT:  Because you did, I felt that I had to
17     fully disclose as well that I declined their invitation to
18     allow them to participate by telephone.
19            MR. AGUSTI:  Thank you, your Honor.
20            THE COURT:  Because I am part of the old school, okay?
21            If they had made the request a few days earlier and
22     everyone was on board, I may very well likely have granted it,
23     but not this sort of midnight application from someone who
24     purports to have an interest but can't file an appearance on
25     ECF --
```

H4DJEDDC                    Conference

1            MR. AGUSTI:  Yes, your Honor.

2            THE COURT:  -- in a $139 million case.  I'll see you

3     all on July 14th.

4            Before we adjourn, Mr. Kelley, do you want to weigh in

5     on this matter?  I am sorry.

6            MR. KELLEY:  Thank you, your Honor.  I do, but just

7     very briefly.  I just want to echo what Mr. Zensky said.  I

8     represent Julio Rios and Mr. Gamboa.  I believe they're

9     identically situated with regard to the Bridger parties, and

10    they were officers of the Bridger parties, and are now

11    defendants in the Pennsylvania action.

12           So we would ask we just join the arguments made by Mr.

13    Zensky on behalf of the Bridger parties, and we are looking

14    forward to coordinating with Akin with regard to briefing and

15    discovery and things like that to ensure there is no possible

16    delay.

17           THE COURT:  Do these deadlines that I fixed, are they

18    going to --

19           MR. KELLEY:  Yes, your Honor, they work for us.

20           THE COURT:  I presume that there can be one

21    consolidated motion for intervention?

22           MR. ZENSKY:  Absolutely, that is what Mr. Kelley was

23    getting at.

24           THE COURT:  One set of papers.

25           MR. KELLEY:  Exactly, yes.

27

H4DJEDDC                          Conference

 1              THE COURT:  We are ending on a happy note then, all

 2     right.

 3              Have a great Holiday.

 4              (Court adjourned)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25