# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC, <br><br> *Plaintiff/Counter-Defendant*, <br><br> vs. <br><br> JULIO RIOS, JEREMY GAMBOA, BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., FERRELLGAS, L.P., BRIDGER REAL STORAGE, LLC, BRIDGER SWAN RANCH, LLC, BRIDGER TERMINALS, LLC, J. J. LIBERTY, LLC, BRIDGER ADMINISTRATIVE SERVICES II, LLC, BRIDGER ENERGY, LLC, BRIDGER LAKE, LLC, BRIDGER LEASING, LLC, and BRIDGER MARINE, LLC, <br><br> *Defendants*, <br><br> BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., and FERRELLGAS, L.P., <br><br> *Defendants/Counterclaimants*. | § § § § § § § § § § § § § § § § § § § § § § § <br><br> Civil Action No. 2:17-cv-00495-RK |

**DEFENDANTS JULIO RIOS AND
JEREMY GAMBOA' NOTICE OF DEPOSITION OF
THE CORPORATE REPRESENTATIVE OF CANOPY PROSPECTING, INC.**

Defendants Julio Rios and Jeremy Gamboa will take the deposition of the Corporate Representative of Canopy Prospecting, Inc. on **February 8, 2019** at **9:00 a.m. ET**. The deposition will take place at the offices of Magna Legal Services located at 1635 Market St, Philadelphia, Pennsylvania, 19103, and will continue from day to day until completed.

In accordance with Federal Rule of Civil Procedure 30(b)(6), Canopy is directed to designate a person or persons to testify on its behalf about the topics identified in Exhibit A to this Notice.

The deposition will be taken before a Certified Shorthand Reporter, Notary Public, or other officer duly authorized to administer oaths and may be videotaped.

Dated:  February 19, 2019

Respectfully submitted:

/s/ Jonathan D. Kelley
Jeremy A. Fielding (*pro hac vice*)
jfielding@lynnllp.com
Kent D. Krabill (*pro hac vice*)
kkrabill@lynnllp.com
Jonathan D. Kelley (*pro hac vice*)
jkelley@lynnllp.com
Christian A. Orozco (*pro hac vice*)
corozco@lynnllp.com
LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

Julie Negovan, Esquire (1651)
jnegovan@griesinglaw.com
GRIESING LAW, LLC
1717 Arch Street, Suite 3630
Philadelphia, Pennsylvania 19103

**ATTORNEYS FOR DEFENDANTS JULIO RIOS AND JEREMY GAMBOA**

**CERTIFICATE OF SERVICE**

      I, Jonathan Kelley, hereby certify that I served the foregoing on all counsel of record via electronic mail on February 19, 2019 as follows:

Filiberto Agusti
fagusti@steptoe.com
Nicholas Petts
npetts@steptoe.com
Timothy Work
twork@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, DC 20036

Henry Hockeimer, Jr.
hockeimerh@ballardspahr.com
Terence Grugan
grugant@ballardspahr.com
BALLARD SPAHR LLP
1735 Market St. 51st Floor  Philadelphia, PA 19103

*Attorneys for Plaintiff Eddystone Rail Company, LLC*

                                                      */s/ Jonathan D. Kelley*
                                                      Jonathan D. Kelley

**EXHIBIT A**
**CORPORATE REPRESENTATIVE TOPICS**

### I. DEFINITIONS

The following terms have the following meanings, unless the context requires otherwise:

1. "Communications" means all transmittals of information in the form of facts, ideas, inquiries, or otherwise through oral or written expressions, statements, or utterances of any nature, including, but not limited to, correspondence, conversations, agreements, or other understandings between or among two or more persons, and made by or to anyone.

2. "Person" means any natural person, legal or governmental entity, association or business.

3. "Relating" means concerning, referring, describing, evidencing, or constituting, either directly or indirectly.

4. "Bridger" means Bridger LLC, Bridger Logistics, LLC, Bridger Marketing, LLC, f/k/a, Bridger Trading, LLC, Bridger Transportation, LLC, Bridger Leasing, LLC, Bridger Transfer Services, LLC, Bridger Lake, LLC, Bridger Rail Shipping, LLC, Bridger Marine, LLC, and Bridger Midstream, LLC, and include their respective directors and officers, affiliates, parents, subsidiaries, agents, assigns, legal representatives, non-legal representatives, attorneys, employees, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on its behalf.

5. "Canopy," "you," or "your" means Canopy Prospecting, Inc., and include its respective directors and officers, affiliates, parents, subsidiaries, agents, assigns, legal representatives, non-legal representatives, attorneys, employees, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on its behalf.

6. "Carlyle Tripartite Agreement" means the intermediation agreement involving Carlyle Commodity Management L.L.C., or one of its affiliates.

7. "Delta" means Delta Air Lines, Inc., and any of its partners, principals, employees, officers, directors, members, managers, representatives, agents, advisors, attorneys, subsidiaries, Affiliates, and parents.

8. "ERC" means Eddystone Rail Company, LLC, also sometimes referred to as "Eddystone."

9. ███████████████████████████████████ and any of its partners, principals, employees, officers, directors, members, managers, representatives, agents, advisors, attorneys, subsidiaries, Affiliates, and parents.

10. "Enbridge" means Enbridge (U.S.), Inc., and includes its respective directors and officers, affiliates, parents, subsidiaries, agents, assigns, legal representatives, non-legal representatives,

attorneys, employees, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on its behalf.

11. "Exelon" means Exelon Corporation and includes its respective directors and officers, agents, affiliates, parents, subsidiaries, assigns, legal representatives, non-legal representatives, attorneys, employees, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on its behalf.

12. "Facility" means the rail and barge facility located in Eddystone, Pennsylvania that was subject of the RSA.

13. "FAC" means ERC's First Amended Complaint filed in the above-captioned cause.

14. "Individual Defendants" means Defendants Julio Rios and Jeremy Gamboa.

15. "Intermediation Agreement" means the agreement between Merrill Lynch Commodities, Inc. and Jamex Marketing, LLC or Bridger Marketing, LLC.

16. "Joint Venture" means the agreement between Canopy and Enbridge to operate the Facility together.

17. "Loan" means the Pledge Agreement between Canopy and Enbridge dated May 2, 2014.

18. "MLC Acknowledgment" means the agreement between Merrill Lynch Commodities, Inc. and Jamex Marketing, LLC or Bridger Marketing, LLC.

19. "Monroe" means Monroe Energy, LLC, and includes its respective directors and officers, agents, affiliates, parents, subsidiaries, assigns, legal representatives, non-legal representatives, attorneys, employees, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on its behalf, including for the sake of clarity, Delta.

20. "MOU" means the Memorandum of Understanding signed between Canopy and Enbridge before the Joint Venture.

21. "RSA" means the Eddystone Rail Facilities Services Agreement dated February 13, 2013 between Plaintiff Eddystone Rail Company, LLC and Bridger Transfer Services, LLC.

22. "SEPTA" means Southeastern Pennsylvania Transportation Authority.

23. "SEPTA Window" means the period of time allotted by SEPTA to permit unit trains bound to and from the Facility.

24. All other terms not explicitly defined herein are to be construed in accordance with their plain and ordinary meanings in the English language and the context in which those terms are used.

25. The connectives "and" and "or" should be construed either conjunctively or disjunctively as necessary to bring within the scope of the topic all matters that might otherwise be construed to be outside its scope.

## II. CORPORATE REPRESENTATIVE TOPICS

1. ~~Canopy's experience in crude oil transportation.~~

1. Canopy's document collection efforts and document production in connection with this Lawsuit. [Commented [A1]: Galloway at 448]

2. Communications with any experts or consultants hired by Canopy or ERC to investigate any operational problems or obstacles encountered at the Facility, and any subsequent communication of those issues to Bridger. [Commented [A2]: Johnson at 69] [Commented [A3]: Johnson at 139]

3. Communication to Bridger regarding the SEPTA window and the granite pinnacle. [Commented [A4R3]: Galloway at 217-18, 364-65, 408] [Commented [A5]: Johnson at 142]

4. The value of any loan forgiven by Enbridge as a condition or term of the sale of the Facility to Canopy in 2018. [Commented [A6R5]: Galloway at 305-07] [Commented [A7]: Johnson at 250]

5. Any potential claims Canopy believed it had against Enbridge related to the Facility, its construction or operation. [Commented [A8]: Johnson at 287, 288, 325-6, 330]

6. Any communication with the Jamex Entities or James Ballengee, including the March 2016 meeting in Dallas, Texas. [Commented [A9]: Johnson at 207/208]

~~3.~~7. Any conversations related to seeking or obtaining financial assurances from Bridger and/or Individual Defendants, including, but not limited to any letter of credit, surety bond, escrow accounts, casualty insurance or other type of financial assurances. [Commented [A10]: Galloway at 387, 514]

4. ~~Any marketing of the Facility to Monroe from 2012 through the present, including the Facility's expected unloading and loading capabilities, rail access to the Facility, the Facility's daily transloading capacity, and barge access to the facility.~~

~~5.~~8. Any marketing of the Facility to Bridger from 2012 through the present, including any representations made to Bridger regarding the Facility's expected unloading and loading capabilities, rail access to the Facility, the Facility's daily transloading capacity, tank storage capacity at the Facility, and barge access to the Facility. [Commented [A11]: Johnson at 62]

~~6.~~9. Your negotiations, the scope of the relationship, and division of labor and input with Enbridge with respect to the Facility and any related pipelines or other planned projects. This includes the MOU, the Joint Venture, and the Loan. [Commented [A12]: Galloway at 38, 411, 47, 107-08, 174-75]

7. ~~Communications with Exelon regarding any lease, and its amendments, or subsequent negotiations.~~

8. ~~Your negotiations and communications from 2012 through 2013 with current and prospective customers regarding the Facility, use of the Facility, and terms of contracting with respect to the Facility.~~

9. ~~Your negotiations and communications from 2016 through present with current and prospective customers, Including ▆▆▆▆ regarding the Facility, use of the Facility, and terms of contracting with respect to the Facility.~~

~~10.     Your responsibilities and duties with respect to the Facility and/or ERC.~~

~~11.~~10.     Any litigation threats, assessments, and pending lawsuits related to the Facility. [Commented [A13]: Galloway at 56, 59, 387, 458-59, 463, 484]

~~12.~~11.     ~~Your decision and rationale to become involved with the Facility, including, but not limited to the Facility's purchase and any exercise of the right of first refusal.~~

~~13.~~12.     Any interest in purchasing Enbridge's share of the Joint Venture. [Commented [A14]: Galloway at 87-89, 464-65]

13.     Any efforts to locate and secure customers for the Facility after JTS defaulted under the RSA. [Commented [A15]: Galloway at 345-47]

~~14.     Contracts with current customers, contractors, and employees that work at or use the Facility.~~

~~15.~~14.     Any diligence conducted by Canopy or ERC into ~~T~~the Facility's operational capabilities and functionality. [Commented [A16]: Johnson at 72] [Commented [A17R16]: Galloway at 364]

~~16.~~15.     The development and construction of the Facility including, but not limited to, the budget and completion date. [Commented [A18]: Galloway at 127, 310, 313, 322-23]

~~17.     Discussions with any party, including but not limited to Bridger, Monroe or Delta regarding the purchase of the Facility or any interest in the Facility from 2012 to the present, including the creation of a joint venture with Canopy to purchase the Facility or an interest in the Facility.~~

~~18.     Discussions with Monroe or Delta regarding any joint venture or cooperation to build and/or operate a pipeline from the Facility to Monroe's Trainer refinery from 2012 to the present.~~

~~19.     Any discussions with Monroe or Delta regarding concerns about operations or throughput at the Facility, including concerns about Bridger, Enbridge, and/or Jamex.~~

~~20.~~16.     The justification for the consideration Canopy gave Enbridge for its 75% interest in ERC. [Commented [A19]: Galloway at 484]

~~21.~~17.     The material facts alleged in the FAC including, but not limited to, the following:

   a. The alleged implied contract that Eddystone identifies in the FAC, including ERC's reliance on such contract, the terms of such contract, the termination of such contract, and the manner in which ERC became aware of the alleged implied contract;

   b. The basis for and meaning of ERC's allegations that Defendants caused BTS to allow an implied contract with Bridger Logistics to be abrogated without compensation;

   c. The basis for and meaning of ERC's allegations that Defendants treated and represented to others that BTS' assets were Bridger Logistics' and Ferrellgas' own assets, including the specific representations allegedly made;

   d. The basis for and meaning of ERC's allegations that Defendants improperly caused BTS to forgive accounts receivable;

e. The basis for and meaning of ERC's allegations that the lien on BTS assets in 2015 and 2016 was in anyway improper.

f. The basis for and meaning of ERC's allegations that Defendants owed and violated fiduciary duties of care and loyalty allegedly owed to BTS' creditors, including ERC, at any time from 2013 to the present.

22.18. The reasons ERC did not exercise its remedy under the RSA to cease accepting BTS' crude when the financial assurances requested from BTS were not forthcoming from 2013 through 2016.

23. ~~Discussions about ERC's refusal to execute the Carlyle Tripartite Agreement, including the rationale for that refusal.~~

24. ~~Discussions about Bridger Logistics' interest in acquiring the Facility and/or Canopy's or Enbridge's interest in ERC.~~

25. ~~Any hedges made by ERC, Enbridge, and/or Canopy to offset risk related to any change in market conditions that could impact the use of the Facility.~~

26. ~~Knowledge and understanding about the acquisition of Bridger Logistics by Ferrellgas.~~

19. Any representations made by the Individual Defendants to Canopy related to Bridger, BTS, or the financial capability of any Bridger entity.  [Commented [A20]: Johnson at 335-37, 348]

27. ~~Any benefit the Individual Defendants received from the alleged fraudulent transfers in this case.~~

28. ~~Knowledge of the SEPTA Window or other issues with rail access to the Facility.~~

29. ~~Negotiations and discussions with SEPTA about the SEPTA Window.~~

30. ~~Knowledge of and discussions relating to the granite pinnacle and access channel depth at the Facility, including any discussion of actual or potential efforts to remove the granite pinnacle.~~

31. ~~Knowledge of the Intermediation Agreement and MLC Acknowledgement, including how those agreements facilitated financing of crude oil BTS shipped to the Facility.~~

32. ~~The January 5, 2017 settlement agreement between ERC, Jamex Marketing, and James Ballengee, including negotiation of the terms of the agreement and the agreed judgment.~~

33.20. The October 19, 2017 Redemption and Asset Transfer Agreement by and among Canopy, ERC, the Canopy Principals, and Enbridge (U.S.) Inc., including the negotiation of the terms of the agreement.