# Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 2:17-CV-00495-RK

- - -

EDDYSTONE RAIL COMPANY, LLC,                    :

   Plaintiff/Counter-Defendant,          :

   - vs -                                         :

JULIO RIOS, JEREMY GAMBOA,              :
BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P.,              :
FERRELLGAS, L.P., et al.,
                                        :
   Defendants,
                                        :
BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P., and          :
FERRELLGAS, L.P.,
   Defendants/Counterclaimants.         :

- - -

VIDEOTAPED DEPOSITION UPON ORAL
EXAMINATION OF
JOHN R. GALLOWAY, ESQUIRE
Philadelphia, Pennsylvania
January 15, 2019
- - -
REPORTED BY:  EDWARD J. RUGGERI, RPR, CCR
- - -
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Videotaped Deposition of

JOHN R. GALLOWAY, ESQUIRE, taken pursuant

to notice, was held at STRADLEY, RONON,

STEVENS & YOUNG, LLP, One Commerce Square,

2005 Market Street, Suite 2600,

Philadelphia, Pennsylvania, commencing at

9:27 a.m. on the above date, before

Edward J. Ruggeri, Registered Professional

Reporter, Certified Court Reporter and

Notary Public.

- - -



Page 3

```
 1   A P P E A R A N C E S:
 2
 3
 4   STEPTOE & JOHNSON, LLP
     BY:  FILIBERTO AGUSTI, ESQUIRE
 5     1330 Connecticut Avenue, NW
       Washington, DC 20036
 6     202.429.6428
       fagusti@steptoe.com
 7         Counsel for the Plaintiff
 8
 9   BRYAN, CAVE, LEIGHTON & PAISNER, LLP
     BY:  JACOB A. KRAMER, ESQUIRE
10         RACHEL A. BECK, ESQUIRE
       1155 F Street NW
11     Washington, DC 20004
       202.508.6153
12     jacob.kramer@bclplaw.com
       rachel.beck@bclplaw.com
13         Counsel for the Defendants,
           Bridger Logistics, LLC, Ferrellgas
14         Partners, L.P., and Ferrellgas, L.P.,
           et al.
15
16
     LYNN, PINKER, COX & HURST
17   BY:  JEREMY FIELDING, ESQUIRE
           JON D. KELLEY, ESQUIRE
18     2100 Ross Avenue
       Suite 2700
19     Dallas, TX 75201
       214.981.3800
20     jfielding@lynnllp.com
       jkelley@lynnllp.com
21         Counsel for the Defendants,
           Julio Rios and Jeremy Gamboa
22
23
24
```



Page 4

```
 1   A P P E A R A N C E S:

 2

 3

 4   STRADLEY, RONON, STEVENS & YOUNG, LLP
     BY:   ANDREW S. LEVINE, ESQUIRE
 5         ADRIEL J. GARCIA, ESQUIRE
       One Commerce Square
 6     2005 Market Street
       Suite 2600
 7     Philadelphia, PA 19103
       215.564.8073
 8     alevine@stradley.com
       agarcia@stradley.com
 9         Counsel for the Canopy Prospecting,
           Inc.

10

11

12

13

14

15   A L S O   P R E S E N T:

16

17   Chris McGlincey, Esquire
     Jason Fifield, Videographer

19

20

21

22

23

24
```



Page 5

```
 1              I N D E X

 2

 3

 4     WITNESS:                        PAGE

 5

 6     JOHN R. GALLOWAY, ESQUIRE

 7

 8     By:  Mr. Kramer.....................11

 9     By:  Mr. Fielding..................358

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



Page 6

1                    E X H I B I T S

2

3

4      NUMBER   DESCRIPTION                     PAGE

5

6      425      ERCEDPA00189802 - 00189808......39

7      426      ERCEDPA00514969 - 00515018......49

8      427      ERCEDPA00488594 - 00488606......62

9      428      Eddystone 0034339 - 0034341....115

10     429      Eddystone 0032378 - 0032400....124

11     430      ERCEDPA00020828 - 00020864.....157

12     431      ERCEDPA00182137................178

13     432      ERCEDPA00400664................184

14     433      ERCEDPA00263621 - 00263626.....204

15     434      ERCEDPA00437997 - 00438000.....220

16     435      Eddystone 0042450..............225

17     436      Eddystone 0061939 - 0061940....227

18     437      Eddystone 0035717 - 0035719....235

19     438      ERCEDPA00388108................244

20     439      Eddystone 0036397 - 0036436....248

21     440      ERCEDPA00555781 - 00555782.....258

22     441      ERCEDPA00513748 - 00513755.....262

23     442      ERCEDPA00050210 - 00050218.....280

24     443      ERCEDPA00137429 - 00137432.....287



```
 1                    E X H I B I T S

 2

 3

 4     NUMBER   DESCRIPTION                     PAGE

 5

 6     444      Eddystone 0028780 - 0028783....293

 7     445      ERCEDPA00026110 - 00026131.....312

 8     446      ERCEDPA00029300 - 00029302.....319

 9     447      ERCEDPA00560767 - 00560768.....323

10     448      ERCEDPA00529860 - 00529862.....337

11     449      CANTP028198 - 028199...........347

12     450      Eddystone 0025051 - 0025052....409

13     451      Eddystone 0050966 - 0050967....423

14     452      CANTP018837....................394

15     453      CANTP003011....................431

16     454      CANTP016864 - 016871...........440

17     455      ERCEDPA00518754 - 00518757.....464

18     456      ERCEDPA00518767 - 00518773.....471

19     457      ERCEDPA00520121 - 00520125.....481

20     458      EX001439 - 001440..............496

21

22

23

24
```



Page 8

```
 1              DEPOSITION SUPPORT INDEX

 2

 3

 4    Direction To Witness Not To Answer

 5    Page    Line

 6      60       24

 7      62        6

 8      70       11

 9      71        8

10      73       16

11      76       19

12      79       15

13      80        5

14    Request For Production Of Documents

15    Page    Line

16

17    Stipulations

18    Page    Line

19

20    Attorneys' Eyes Only

21    Page(s)

22    195 - 199

23    350 - 357

24    370 - 515
```



```
 1                    - - -

 2           THE VIDEOGRAPHER:  We are now

 3      on the record.  This begins videotape

 4      No. 1 in the deposition of Jack

 5      Galloway in the matter of Eddystone

 6      Rail Company, LLC, versus Julio Rios,

 7      et al., in the U.S. District Court

 8      for the Eastern District of

 9      Pennsylvania, Docket No.

10      2:17-cv-00495-RK.

11           Today is Tuesday, January 15,

12      2019.  The time is 9:27 a.m.  This

13      deposition is being taken at

14      Obermayer Rebmann in Philadelphia --

15      I'm sorry -- at Ronon in Philadelphia

16      at the request of Bryan Cave.

17           I'm the videographer, Jason

18      Fifield, of Magna Legal Services and

19      the court reporter is Edward Ruggeri

20      of Magna Legal Services.  Will

21      counsel and all parties present

22      please state their appearances and

23      whom they represent.

24           MR. LEVINE:  First of all,
```



```
1        Andrew Levine, Stradley, Ronon,

2        Stevens & Young, where the deposition

3        is being held, for Jack Galloway.

4             THE VIDEOGRAPHER:  Apologies.

5             MR. LEVINE:  Not a problem.

6             MR. AGUSTI:  This is Fil

7        Agusti, Steptoe & Johnson, for the

8        plaintiff, Eddystone Rail Company.

9             MR. KRAMER:  Okay.  Jake

10       Kramer, Bryan, Cave, Leighton &

11       Paisner, for Defendants Ferrellgas

12       and Bridger and the related entities.

13            MS. BECK:  Rachel Beck of

14       Bryan, Cave, Leighton & Paisner on

15       behalf of the corporate defendants.

16            MR. FIELDING:  Jeremy Fielding

17       and Jon Kelly on behalf of the

18       individual defendants, Julio and

19       Jeremy.

20            THE VIDEOGRAPHER:  Will the

21       court reporter please swear in the

22       witness.

23                 - - -

24            JOHN R. GALLOWAY, ESQUIRE,
```



```
 1        after having been duly sworn by

 2        Edward J. Ruggeri, a Notary Public

 3        within and for the State of

 4        Pennsylvania, was examined and

 5        testified as follows:

 6                   - - -

 7                   EXAMINATION

 8                   - - -

 9   BY MR. KRAMER:

10        Q.    Okay.

11              Mr. Galloway, good morning.  We

12   met off the record.  Again, my name is

13   Jake Kramer.  I'm here on behalf of

14   Ferrellgas and Bridger and we thank you

15   for coming.  As I'm sure you've been told,

16   the process here is merely to ask

17   questions and obtain information and we

18   appreciate your corporation.

19              Have you been deposed before?

20        A.    Yes.

21        Q.    Roughly how many times?

22        A.    Two or three times.

23        Q.    Two or three.  Okay.

24              So you've done this before but
```



Page 38

1   assigned Johnson the job of going out and

2   finding those -- those producers or

3   transshippers of crude oil that would like

4   to have an east coast facility involved in

5   crude by rail.  At that point, there was

6   no crude by rail in the -- what I would

7   call the Philadelphia refining

8   marketplace.

9        Q.    Did Canopy approach Enbridge

10  about the opportunity or the reverse?

11       A.    I don't -- I don't have that

12  information.  You'd have to ask Johnson

13  that.

14       Q.    Did there come a time when

15  Enbridge and Canopy entered into a

16  Memorandum of Understanding?

17       A.    Yes.

18       Q.    And what was the purpose of

19  that Memorandum of Understanding?

20       A.    Well, from the vantage point of

21  an executive, my -- the purpose was to

22  narrow the view of one company, that is

23  our company, and perhaps its potential

24  associate there to sort of narrow within



Page 47

```
 1    -- you know, that was Canopy's thought

 2    that that would be the most efficient way

 3    of conducting this.

 4        Q.    Okay.

 5              Did the Eddystone facility ever

 6    connect by pipeline to any refineries?

 7        A.    No.

 8        Q.    When Enbridge and Canopy

 9    entered into this joint venture, did they

10    form an LLC?

11        A.    Boy, I'd have to -- I don't

12    recall.  We'll have to look at the

13    documents on --

14        Q.    Okay.

15        A.    -- the formation of Eddystone

16    Rail.

17        Q.    Are you familiar with Eddystone

18    Rail Company, LLC?

19        A.    Yes.

20        Q.    All right.

21              Is that the entity that in

22    which Canopy ultimately owned a 25 percent

23    interest?

24        A.    Yes, to the best of my
```



Page 87

1      Q.    Did Canopy purchase all of the

2   assets from the LLC?

3      A.    I made it a commitment for

4   Canopy's participation is that we are not

5   discussing what Canopy or Canopy's SPE are

6   doing, you know.  We're in business.

7   We're a private business.  We have -- we

8   really don't have anything to do with the

9   litigation having to do with Eddystone

10  Rail other than being responsive to what

11  part we may have played when we had an

12  ownership in that.

13     Q.    Okay.  I don't think you

14  answered my question.  Let's start with

15  yes or no.

16           Did Canopy purchase all of the

17  assets from the Eddystone Rail Company,

18  LLC?

19     A.    I don't know because I've never

20  examined the books of Eddystone Rail that

21  were held by the administrative part.

22     Q.    Okay.

23           Are you aware of any assets at

24  Eddystone Rail Company, LLC, that were



Page 88

```
 1   held by the company during the time you
 2   were an owner but not purchased by Canopy?
 3        A.     I don't know.
 4        Q.     You're not aware of any?
 5             MR. AGUSTI:  Objection, asked
 6        and answered.
 7             THE WITNESS:  My answer will
 8        have to be I don't know.
 9   BY MR. KRAMER:
10        Q.     Okay.
11             Did Canopy purchase some of the
12   assets from Eddystone Rail Company, LLC?
13             THE WITNESS:  Andy, I'm going
14        to have to seek your advice on this.
15        I'm -- you know, we drew the line in
16        the sand that we're dealing with
17        this.
18             MR. AGUSTI:  No.  There's only
19        one witness being deposed here and
20        that's you, Mr. Galloway, and you --
21        when a question is pending, you
22        should answer the question to the
23        best of your ability.  If you don't
24        know, just say that you don't know.
```



Page 89

1          THE WITNESS:  Would you repeat

2     the question, please?

3               - - -

4          (At this time, the court

5     reporter read back from the record as

6     was requested.)

7               - - -

8          THE WITNESS:  Yes.

9  BY MR. KRAMER:

10     Q.    What assets did Canopy

11 purchase?

12     A.    Assets in connection with a

13 rail terminal at Eddystone.

14     Q.    Canopy -- okay.

15          Did Eddystone Rail Company at

16 the time Canopy was a 25 percent owner

17 have any other assets?

18     A.    I don't know.

19     Q.    Are you aware of the LLC

20 holding any other assets during the time

21 that Canopy was a 25 percent owner?

22          MR. LEVINE:  Which LLC?

23          MR. KRAMER:  Eddystone Rail

24     Company, LLC.



Page 127

```
 1                    Have you seen any marketing
 2     materials related to the facility?
 3          A.    I've seen some but -- you know,
 4     I've seen several and...
 5          Q.    Did you participate in any --
 6     in developing any such marketing material
 7     materials?
 8          A.    I did -- no.  I didn't draw
 9     them or participate in them, no, or
10     prepare them.
11          Q.    Did you --
12          A.    I might have seen them but I
13     just -- you know, that's --
14          Q.    Okay.
15          A.    That wouldn't be a tool I would
16     be using.
17          Q.    Do you know if the facility was
18     marketed as a state of the art, high speed
19     facility?
20          A.    I don't know that.
21          Q.    You don't know that?
22          A.    No.
23          Q.    Okay.
24                    MR. AGUSTI:  Asked and
```



Page 174

1        Q.      Where did that conversation

2    take place?

3        A.      Probably at Eddystone.

4        Q.      At Eddystone at the facility?

5        A.      Well, that's where these

6    meetings, either a technical meeting or a

7    management meeting, would take place.

8        Q.      Okay.  All right.

9               Did you review any documents

10   that refreshed your recollection about

11   such an agreement?

12       A.      About which agreement?  On this

13   agreement between the customer and the

14   operating --

15       Q.      Uh-huh.

16       A.      I don't recall reviewing those

17   documents.

18       Q.      Okay.

19               Have you ever seen a written

20   agreement of that kind?

21       A.      I don't recall seeing it.

22       Q.      Do you know whether the

23   agreement was to be temporary or permanent

24   in nature?



Page 175

1      A.      I can't recall seeing it.   I

2   don't know whether it would be temporary

3   or permanent.

4      Q.      Okay.

5            So your understanding is that

6   Bridger agreed for the duration of its use

7   of the facility that custody transfer

8   meters were not necessary?

9      A.      My understanding was that the

10  measurement and the verification of

11  quality of the product was going to be

12  undertaken by a human organization such as

13  inspector or some other competitive

14  organization, that that's what they do,

15  and I do know that that's the general

16  practice in the port of Philadelphia.

17     Q.      What do you mean -- how do you

18  know it's the general practice in

19  Philadelphia?

20     A.      Because I represented the

21  refineries in the past, and if there were

22  disputes about delivery of product, they

23  would be resolved as a result of these

24  inspector-type organizations that would



Page 305



```
18              Did you have any communications
19    with Bridger about the depth of the
20    channel after dredging?
21         A.    I don't recall.
22         Q.    All right.
23              Do you recall that the depth of
24    the channel after dredging was 27'8"?
```



Page 306

1          A.     I don't recall.

2          Q.     Do you recall the depth of the

3    channel after dredging being different

4    from the depth of the channel -- the

5    planned depth of the channel?

6          A.     Don't recall.



Page 307

2       A.      I don't recall this memo, no.

3       Q.      All right.

4               Do you recall generally after

5       the dredging had taken place a

6       recommendation from Turnbull that

7       Eddystone ascertain the cost of removing

8       the pinnacle?

9       A.      I can't recall the specifics

10      there.

11      Q.      Okay.

12              You indicated earlier that you

13      agreed with Manny Zare that there was

14      nothing more to do and no more money to

15      spend.

16              Did you ever change your mind

17      about that?

18      A.      No.

19      Q.      Why not?

20      A.      I didn't have occasion to

21      change my mind.  As far as I was

22      concerned, there were trains unloading

23      every day and barges moving in and out on

24      a very regular basis.



```
 1                  THE WITNESS:   Shape of the

 2         vessel.

 3    BY MR. KRAMER:

 4         Q.    Let's go with the Petrochem

 5    Producer.

 6                 Do you know what the capacity

 7    of that barge was?

 8         A.    I understand that moved at

 9    140,000 barrels.   That's all I know.

10         Q.    All right.

11                 Do you know if that barge was

12    able to traverse the channel at full

13    capacity at the Eddystone facility?

14         A.    I don't know that.

15         Q.    Do you know if it had to be

16    light-loaded?

17         A.    I don't know that.

18         Q.    Did Canopy ever hire a

19    consultant to evaluate barge access to the

20    facility?

21         A.    I don't recall.

22         Q.    Do you know someone named

23    Captain John Dudley?

24         A.    We did hire Dudley as a
```



Page 313

```
 1              Mr. Galloway, this is an e-mail

 2    from tankerisk@charter.net to you and Erik

 3    Johnson copying a number of others dated

 4    February 7, 2014.

 5         A.    Yep.

 6         Q.    Do you see that?

 7         A.    I do.

 ▮         ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮   ▮▮▮▮▮

10         A.    Yes.

 ▮         ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮   ▮▮▮▮▮

13         A.    Yes.

 ▮         ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮   ▮▮▮▮▮▮▮▮▮▮

16         A.    Yes.

 ▮         ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮   ▮▮▮▮▮▮▮

19         A.    I don't know.

20         Q.    All right.

 ▮               ▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮   ▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮

23         A.    Right.

24         Q.    And it says "during the
```



Page 322

```
 1    2014?

 2         A.    I don't recall and I've never

 3    seen this e-mail before.

 4         Q.    Okay.
```

▮    ███████████████████████████████

▮  █████████████████████████████

▮  ████████████████████████████████████

▮  ██████████████████████████████████

▮  ███████████████████████████████

▮  ████████████████████████████████

▮  ████████████████████████████████

▮  ███████████████████████

▮  ███████████████████████████████████

▮  ████████████████████████  █████████

▮  ██████████████████████████

```
16              Is that a true statement, that
```

▮  ██████████████████████████████████████

▮  ███████████████████?

```
19              MR. AGUSTI:   Objection, lack of

20         foundation.

21              THE WITNESS:   I don't know.

22    BY MR. KRAMER:
```

▮       █    ███████████████████████████████

▮  ███████████████████████████████



Page 323

██  ████████████

2        A.      I don't know what his

3   commission was.

4        Q.     Okay.

5                    - - -

6               (At this time, a document was

7   marked for identification as

8   Exhibit-447.)

9                    - - -

██  ████████████

██      ██    █████████████████

██  ███████████   ██████████████

██  ██████████████████████████

██  ████████████████████████████

██  ██████████████████████████

██          ████████████

██      ██    ████

██      ██   ███████████████████

██  ███████████████████████████

██  ████████████████████

██  ███████████████████████

██  █████████████████████████

██  ████████████████████████

██  ████████   ███████████████



Page 347

1   suggestions?

2        A.     I don't recall.

3        Q.     Did Enbridge suggest any

4   business opportunities to Canopy?

5        A.     I don't recall.

6               - - -

7               (At this time, a document was

8        marked for identification as

9        Exhibit-449.)

10              - - -

11              MR. KRAMER:  Exhibit-459 -- or

12       448?

13              MR. FIELDING:  449 should be --

14              MR. KRAMER:  449.

15              MR. FIELDING:  That is the

16       previous one, so it's 449.

17              MR. KRAMER:  Okay.

18   BY MR. KRAMER:

19       Q.     449 is numbered CANTP28198

20   through 99 and there's an attachment, and

21   this is e-mail from Erik Johnson to you

22   and Tom Fridel dated April 2017.

23              Do you see that?

24       A.     Yes.



Page 364

1    rail consultants had input into, was it

2    those rail consultants you just identified

3    for me now, Mr. Scanlan?

4            MR. AGUSTI:   Objection,

5        ambiguous.

6    BY MR. FIELDING:

7        Q.    Or do you know?

8        A.    I don't know which document

9    we're talking about from Mr. Kramer.

10       Q.    Okay.

11            How many consultants did Canopy

12   retain in connection with its work on the

13   Eddystone facility, do you know?

14       A.    I don't recall.

15       Q.    Do you know the names of any of

16   those consultants?

17       A.    I've given you one name,

18   Scanlan.

19       Q.    Okay.

20            Other than -- other than that

21   -- Mr. Scanlan; is that right?

22       A.    That's right.

23       Q.    Other than Mr. Scanlan, any

24   other names you recall?



1   that would provide Eddystone for a full --

2   the full term of financial assurances it

3   only negotiated a 12-month LOC?  Do you

4   know why?

5          A.    No.  I don't know why.

6          Q.    In fact, in letters you sent

7   later and your lawyer sent later you

8   accused Enbridge of making a mistake when

9   it did that, didn't you, sir?

10         A.    I don't recall the lawyer's

11  letters to that effect, but --

12         Q.    You don't recall telling

13  Enbridge and your lawyer telling Enbridge

14  that you believed the mistake that had

15  been made at the very beginning was to

16  fail to receive financial assurances that

17  protected you for the term of the

18  contract?

19         A.    Specifically I don't remember

20  that letter, no.

21         Q.    Okay.

22         A.    I can go back and review the

23  letter and obviously I'll be refreshed on

24  it.



Page 408

1          testimony.

2               THE WITNESS:  I'll stay with my

3          answer.  Canopy had the right to

4          approve any public statements and we

5          wanted to --

6               MR. FIELDING:  Objection,

7          nonresponsive.  That's not my

8          question.

9     BY MR. FIELDING:

10         Q.   My question is other than the

11    -- other than what's set forth in

12    Exhibit-452, you're not aware of any other

13    time that Canopy and Enbridge decided to

14    withhold information from Bridger because

15    it would upset their expectations, are

16    you?

17         A.   I can't recall.

18         Q.   Okay.  All right.  Let's see.

19              Now, the ongoing issues -- the

20    immediate issues you had with the work

21    that Enbridge was doing was twofold,

22    wasn't it?  One were -- one was that you

23    were having cost overruns --

24    Exhibit-450 --



Page 447

```
 1    signature at the end of a plain and simple

 2    letter, it would be a lot simpler.

 3         Q.    Here's my -- here's my question

 4    for you.

 5              This is a document that you

 6    yourself reviewed and sent to Mr. Johnson,

 7    right?

 8         A.    I'm not sure of that.

 9         Q.    Okay.

10         A.    Until I can see a signature, I

11    don't know that I sent this document.  All

12    right.

13         Q.    Hold on.  We know you sent it.

14         A.    No, I don't.  All I know is

15    that -- I know that there's a cover and an

16    almost blank page that says Galloway to

17    Johnson, "correct paper."

18         Q.    Right.  And you attached it,

19    sir.

20              This is an e-mail from you

21    where you attached this document and sent

22    it to Mr. Johnson, right?

23         A.    I don't know.

24         Q.    Okay.
```



Page 448

```
 1              You don't know --
 2        A.    I don't know.
 3        Q.    -- that this is an e-mail from
 4   you to Mr. Johnson --
 5        A.    No.
 6        Q.    -- with an attachment?
 7        A.    All I know is the front page.
 8   That's the only thing I know is the front
 9   page which is 90 percent blank.
10        Q.    And you're disputing that you
11   actually attached this e-mail and sent it
12   to Mr. Johnson?
13        A.    Until it's -- until it's
14   presented in a more legible form, yes.
15        Q.    So this is a fabrication?  You
16   see --
17        A.    I don't know if it's a
18   fabrication.
19              MR. AGUSTI:  Objection.
20   BY MR. FIELDING:
21        Q.    This is produced by you.
22              MR. AGUSTI:  Misrepresents the
23        --
24   BY MR. FIELDING:
```



Page 449

1          Q.    You can see --

2               MR. AGUSTI:  Misrepresents the

3          witness's testimony.

4               MR. FIELDING:  Well, I just

5          want to understand what he's saying.

6     BY MR. FIELDING:

7          Q.    This -- it's got your Bates

8     label on the bottom of it, sir.  This was

9     produced by you and your lawyers.

10               Are you suggesting your lawyers

11     produced a document and attached an e-mail

12     that is -- doesn't go with the document?

13          A.    I would not suggest that.

14          Q.    Okay.  Good.  I wouldn't

15     either.  I wouldn't either.  I'm sure that

16     they've produced this thing accurately.

17               Here's my question to go back

18     to that same sentence.  This letter says,

19     quote, Canopy's perception is that you --

20     Enbridge -- are attempting to use it as a

21     scapegoat for the failures by your own

22     company's ability to appropriately scope,

23     estimate, and construct a relatively basic

24     facility."



Page 450

```
1               Do you see that?

2       A.      That's in the second paragraph?

3       Q.      Yes.

4               What is a scapegoat, Mr.

5  Galloway?

6       A.      It's not a word I generally

7  use.

8       Q.      What is it though?

9       A.      Well, a scape --

10      Q.      When you use it, what do you --

11 when you use it, what do you mean?

12      A.      I don't use that word, but we

13 could look it up in a dictionary.  I don't

14 -- I don't use the word "scapegoat."

15      Q.      When you use that word, what

16 does it mean?

17      A.      To put blame on someone else --

18      Q.      Right.

19      A.      -- for your own error.

20      Q.      For your own problems, right.

21              So Canopy is saying, "Enbridge,

22 we think you're trying to blame us for

23 problems you created," right?

24      A.      I don't know that that's what
```



Page 451

1    I'm saying.  That's why I think in order

2    for us to understand this document, why

3    don't we see the finished letter that --

4         Q.    Sir.

5         A.    -- that went from -- you say

6    from Galloway to Elliott.

7         Q.    Sir, I don't know why you

8    haven't produced this.  It's not my

9    document.  I didn't produce it.  You guys

10   produced it to me.

11        A.    No.  You just produced this for

12   me.

13        Q.    No.  No, sir.

14              MR. LEVINE:  No.

15              MR. FIELDING:  No.  No, sir.

16              MR. LEVINE:  It was a draft.

17              THE WITNESS:  Okay.

18              MR. LEVINE:  We don't know what

19        the implications of the cover sheet

20        are.  You may simply have been saying

21        "I hope this is the correct one," but

22        there's no indicia that you actually

23        drafted it.

24              MR. FIELDING:  This didn't come



Page 452

1          from us.

2               MR. AGUSTI:  There's no --

3               MR. FIELDING:  Your lawyer can

4          confirm it.

5               MR. AGUSTI:  There's no

6          evidence that's been presented here

7          that you actually sent it.

8   BY MR. FIELDING:

9          Q.    Well, I don't care whether you

10  actually sent it.

11              You're writing it down and

12  thinking it, aren't you, sir?

13         A.    When I have five pages of

14  cross-outs --

15         Q.    Okay.

16         A.    -- that don't mean anything, I

17  can't accept this as my document.

18         Q.    Let me ask you this.

19              It says, quote, Canopy has

20  repeatedly demanded, most recently in

21  writing on November 7th, within the terms

22  of the operating agreement --

23         A.    Where are you writing --

24  reading from now?



Page 453

1       Q.      The very next sentence in the

2   second paragraph that I just read.

3       A.      Okay.

4       Q.      "Canopy has repeatedly

5   demanded, most recently in writing on

6   November 7th, within the terms of the

7   operating agreement and other related

8   documents access to the documentation to

9   demonstrate the legitimacy and cause of

10  Enbridge's cost overruns but has been

11  uniformly met with nonresponse and, in

12  fact, with bad faith refusal to provide

13  management committee with essential

14  information."

15              Do you see that?

16      A.      I see it.

17      Q.      Is that a true statement of

18  what had happened?

19      A.      I will say they're powerful

20  words but they don't sound like me.

21      Q.      Do they sound like Mr. Johnson?

22      A.      No.

23      Q.      Well, who wrote this?

24      A.      I don't know.



Page 484

14          Do you see that?

15     A.    I do.

16     Q.    Do you recall Enbridge making

17 all of those offers or threats to you in

18 that particular period of time?

19     A.    I don't recall them making all

20 of those offers and threats to us, no.

21     Q.    Do you recall one of the things

22 Enbridge -- Enbridge used or one of the

23 pieces of leverage they tried to use in

24 their negotiations was the threat that



Page 514

1    have or not?  It's simple.

2              Yes or no; did they get them or

3    not, sir?

4         A.    I think the record will reflect

5    what's going on here.  Why are we in this

6    litigation?  Why was there a litigation in

7    the arbitration?

8         Q.    Sir, did Enbridge get the

9    financial assurances that you believe they

10   should have got or not?  Yes or no?  Why

11   won't you answer that question?  Yes or

12   no?  Did they or not?

13        A.    I don't know.

14        Q.    That's the best answer you can

15   give to my question and to this jury?

16        A.    That's the only answer I can

17   give you.

18              MR. FIELDING:  Pass the

19         witness.  No further questions.  I

20         think we're out of our time.

21              Are we out of time?

22              MR. AGUSTI:  We are well out of

23         time.

24              MR. FIELDING:  Okay.  Thank



Page 516

1            C E R T I F I C A T I O N

2

3

4                        I, Edward J. Ruggeri,

5    Registered Professional Reporter,

6    Certified Court Reporter and Notary

7    Public, do hereby certify that the

8    foregoing is a true and accurate

9    transcript of the stenographic notes taken

10   by me in the aforementioned matter.

11

12                     - - -

13

14

15

16

17

18

19

20

21

22

23        _____

24            Edward J. Ruggeri, RPR, CCR

