# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC,

        Plaintiff,

    vs.

BRIDGER LOGISTICS, LLC, JULIO RIOS,
JEREMY GAMBOA, FERRELLGAS
PARTNERS, L.P., FERRELLGAS, L.P.,
BRIDGER ADMINISTRATIVE SERVICES
II, LLC, BRIDGER MARINE, LLC,
BRIDGER RAIL SHIPPING, LLC,
BRIDGER REAL PROPERTY, LLC,
BRIDGER STORAGE, LLC, BRIDGER
SWAN RANCH, LLC, BRIDGER
TERMINALS, LLC, BRIDGER
TRANSPORTATION, LLC, BRIDGER
ENERGY, LLC, BRIDGER LEASING, LLC,
BRIDGER LAKE, LLC, J.J. LIBERTY, LLC,
J.J. ADDISON PARTNERS, LLC,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 17-cv-00495

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, D.C.  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

Dated:  February 22, 2019

*Attorneys for Eddystone Rail Company, LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

    A.    The 2013 Rail Services Agreement between Eddystone and BTS ........................ 2

    B.    Eddystone's Performance and BTS's Breach ..................................................... 3

    C.    Maritime Arbitration of the Claim against BTS ................................................. 4

    D.    Eddystone's Allegations against Defendants ..................................................... 5

LEGAL STANDARD ........................................................................................... 6

ARGUMENT ....................................................................................................... 7

I.       THE RAIL SERVICES AGREEMENT IS A MARITIME CONTRACT ...................... 7

    A.    Courts Look to a Contract's "Primary Objective" to Determine if it Constitutes a "Maritime Contract" ..................................................................................... 7

    B.    The Primary Objective of the Rail Services Agreement Is the Maritime Service of Loading Oil onto Vessels for Transport on Navigable Waterways in Maritime Commerce ................................................................................... 10

    C.    Defendants Fail to Establish that the Rail Services Agreement Is Non-Maritime ..................................................................................... 13

        1.    The References to a Potential Future Connection to a Pipeline System Do Not Take this Dispute Outside of Maritime Law ............................... 13

        2.    The Fact that Aspects of the Contract May Be Performed on Land Does Not Defeat Maritime Jurisdiction ....................................................... 15

        3.    Defendants' Decision to Transport Crude Oil from North Dakota Does Not Render the Transloading Services Non-Maritime ............................ 16

        4.    This Case Does Not Involve a Contract with Only an Attenuated Connection to Maritime Commerce ....................................................... 17

        5.    The Fact that Eddystone Has Alleged that BTS Failed to Make Payments Does Not Take this Case Outside of Maritime Jurisdiction ..... 19

II.    THE COURT'S JURISDICTION OVER DISPUTES ARISING UNDER A MARITIME CONTRACT INCLUDES THE POWER TO AWARD THE EQUITABLE RELIEF SOUGHT BY EDDYSTONE ................................................ 20

    A.    Courts Sitting in Admiralty May Award Relief Through Equitable Principles .... 21

    B.    A Court May Exercise Maritime Jurisdiction over Claims for Equitable Remedies that Are Grounded in a Maritime Contract ........................................ 23

    C.    Given that the Court Is Sitting in Admiralty, It May Exercise Jurisdiction over Eddystone's Subsidiary Claims for Equitable Relief ................................. 26

III.    THE REMAINING CLAIMS ARE SUBJECT TO SUPPLEMENTAL JURISDICTION ........................................................................................................ 27

CONCLUSION ..................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pres. Lines, Ltd. v. Green Transfer & Storage, Inc.*,
    568 F. Supp. 58 (D. Or. 1983) .................................................................................12

*American Stevedores, Inc. v. Porello*,
    330 U.S. 446 (1947)..................................................................................................11

*Atlanta Shipping Corp. v. Chem. Bank*,
    818 F.2d 240 (2d Cir. 1987).........................................................................23, 25, 26

*Atlantic Transport Co. of West Virginia v. Imbrovek*,
    234 U.S. 52 (1914)....................................................................................................10

*Baltimore Line Handling Co. v. Brophy*,
    771 F. Supp. 2d 531 (D. Md. 2011) .........................................................................11

*Berkshire Fashions, Inc. v. M.V. Hakusan II*,
    954 F.2d 874 (3d Cir. 1992).....................................................................................18

*Blue Whale Corp. v. Grand China Shipping Dev. Co.*,
    722 F.3d 488 (2d Cir. 2013).....................................................................................25

*Brown v. Astro Holdings, Inc.*,
    385 F. Supp. 2d 519 (E.D. Pa. 2005) .......................................................................23

*Carefree Cartage, Inc. v. Husky Terminal & Stevedoring, Inc.*,
    No. C07-5294 RBL, 2007 WL 4358316 (W.D. Wash. Dec. 7, 2007)......................11

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
    851 F. Supp. 2d 504 (S.D.N.Y. 2012)......................................................................24

*Colgate Palmolive Co. v. S/S Dart Canada*,
    724 F.2d 313 (2d Cir. 1983).....................................................................................15

*Cooper v. Loper*,
    923 F.2d 1045 (3d Cir. 1991)...................................................................................11

*Derby Resources AG v. Ultramar Panama, P.R.*,
    Nos. 86 CIV. 9600 (JMW), 87 CIV. 1739 (JMW), 1988 WL 78316 (S.D.N.Y.
    July 19, 1988).........................................................................................................17

*Euclid Energy Ltd. v. SIA Ventall Terminals*,
  598 F. Supp. 2d 454 (S.D.N.Y. 2009)......................................................................17

*Exxon Corp. v. Cent. Gulf Lines, Inc.*,
  500 U.S. 603 (1991).....................................................................................8, 9, 10, 11

*Favazza v. Path Media Holdings, LLC*,
  No. 4:12-cv-1561 TCM, 2014 WL 1846109, at *8 (E.D. Mo. May 8, 2014) ........................28

*Fertilizantes Fosfatadox Mexicanos, S.A. v. Chen*,
  No. 91 CIV. 2048 (MJL), 1992 WL 204394 (S.D.N.Y. 1992)..............................................27

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
  807 F.3d 572 (4th Cir. 2015) ...............................................................................23

*Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*,
  413 F.3d 307 (2d Cir. 2005)...........................................................................18, 20

*Frederick Mut. Ins. Co. v. Target Corp.*,
  301 F. Supp. 3d 515 (E.D. Pa. 2018) .......................................................................7

*Holt Cargo Sys., Inc. v. Del. River Port Auth.*,
  No. Civ. A. 94-7778, 1996 WL 195390 (E.D. Pa. Apr. 19, 1996) ........................................18

*Hoogovens Estel Verkoopkantoor, B.V. of Ijmulden v. Ceres Terminals, Inc.*,
  No. 80 Civ. 6383 (DBB), 1983 WL 604 (S.D.N.Y. Apr. 26, 1983) ......................................16

*Ingersoll Mill. Mach. Co. v. M/V Bodena*,
  829 F.2d 293 (2d Cir. 1987).............................................................................13

*Intercontinental Contractors, Inc. v. Canadian Maritime Carriers, Ltd.*,
  Civ. A. No. 86-2503, 1986 WL 5338 (E.D. Pa. May 6, 1986) ...............................................18

*Jones v. Berwick Bay Oil Co.*,
  697 F. Supp. 260 (E.D. La. 1988) .............................................................................18

*Jordan v. Staffing Plus, Inc.*,
  315 F. Supp. 3d 844 (E.D. Pa. 2018) .....................................................................6

*Kennedy v. H & M Landing, Inc.*,
  529 F.2d 987 (9th Cir. 1976) (per curiam)..............................................................18

*Kossick v. United Fruit Co.*,
  365 U.S. 731 (1961).....................................................................................8, 10, 25

*Marubeni Int'l Petroleum (Singapore) Pte Ltd. v. Prestige Marine Servs. Pte Ltd.*,
   591 F. Supp. 2d 386 (S.D.N.Y. 2009) .......................................................................................18

*Minturn v. Maynard*,
   58 U.S. 477 (1855) ......................................................................................................................8

*Moore-McCormack Lines, Inc. v. Int'l Terminal Op. Co.*,
   619 F. Supp. 1406 (S.D.N.Y. 1985) ...........................................................................12, 16, 19

*Nat'l Marine Serv. v. C.J. Thibodeaux & Co.*,
   380 F. Supp. 1076 (S.D. Tex. 1973) ........................................................................................25

*New Orleans Stevedoring Co. v. United States*,
   439 F.2d 89 (5th Cir. 1971) .................................................................................................11, 19

*Norfolk Southern Railway Co. v. Kirby*,
   543 U.S. 14 (2004) ............................................................................................................ *passim*

*Orient Overseas Container Line v. John T. Clark & Sons of Boston, Inc.*,
   229 F. Supp. 2d 4 (D. Mass. 2002) ..........................................................................................28

*Peacock v. Thomas*,
   516 U.S. 349 (1996) ..................................................................................................................23

*In re Petition of Frescati Shipping Co.*,
   Nos. 05-cv-305 (JHS), 08-cv-2898 (JHS), 2016 WL 4035994 (E.D. Pa. July
   25, 2016) .............................................................................................................................21, 22

*Plains All Am. Pipeline L.P. v. Cook*,
   866 F.3d 534 (3d Cir. 2017) .......................................................................................................6

*Ragan v. Tri-Cty. Excavating, Inc.*,
   62 F.3d 501 (3d Cir. 1995) .......................................................................................................28

*Roco Carriers, Ltd. v. M/V Nurnberg Express*,
   899 F.2d 1292 (2d Cir. 1990) ...................................................................................................15

*Sinclair v. Soniform*,
   935 F.2d 599 (3d Cir. 1991) .....................................................................................................27

*St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.*,
   863 F. Supp 1013 (E.D. Mo. 1994) ..........................................................................................15

*Steamship Overdale Co. v. Turner*,
   206 F. 339 (E.D. Pa. 1913) ................................................................................................12, 18

*In re The Strathnairn*,
190 F. 673 (W.D. Wash. 1911) ................................................................12

*Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*,
339 U.S. 684 (1950) ...............................................................22, 23, 24, 26

*Tradhol Internacional, S.A. v. Colony Sugar Mills Ltd.*,
354 F. App'x 463 (2d Cir. 2009) .............................................................20

*Vanderklok v. United States*,
142 F. Supp. 3d 356 (E.D. Pa. 2015) .........................................................7

*Vitol S.A. v. Primerose Shipping Co. Ltd*,
708 F.3d 527 (4th Cir. 2013) ..................................................................22

**Statutes**

28 U.S.C. § 1331 ..........................................................................................23

28 U.S.C. § 1333 ..........................................................................5, 6, 7, 23

28 U.S.C. § 1367(a) ...............................................................................27, 29

**Other Authorities**

1 Benedict on Admiralty § 184 ...............................................................8, 12

Federal Rule of Civil Procedure 12(b)(1) .............................................6, 29

U.S. Const. art. III, § 2 ...............................................................................7

# INTRODUCTION

After two years of litigation, Defendants have challenged the jurisdiction of this Court. As might be expected, there is no merit to their motion.

Jurisdiction over this action is governed by the simple principle that a contract that calls for a party to load or unload cargo from a marine vessel is a contract for maritime services that gives rise to maritime jurisdiction.  This case involves exactly such a contract:  Plaintiff Eddystone Rail Company, LLC ("Eddystone") agreed to load crude oil that was delivered to its facility onto barges for transport to refineries located elsewhere on the Delaware River. Defendants do not dispute that this contract involved loading of cargo onto vessels so that it could be transported in maritime commerce.  And although Defendants point to other features of the contract, such as its reference to possible future connections to a pipeline system and the possibility of temporary storage of oil on the site, they cannot dispute that the primary objective of the contract, both on paper and in practice, was to load oil onto barges—not the use of pipelines, and not temporary storage of oil.

The nature of the relief sought in this action, moreover, has no effect on this Court's jurisdiction.  Eddystone has expressly invoked admiralty jurisdiction over a maritime contract, both here (in a claim for relief from BTS's alter egos) and in the arbitration and resulting federal court action to confirm an arbitral award against BTS's successor.  Given that a dispute under a maritime contract has been raised in admiralty, the fact that Eddystone requests relief grounded in equitable principles has no bearing on the jurisdictional inquiry.  Further, the Court may exercise supplemental jurisdiction over other claims, including Eddystone's claim for breach of fiduciary duty, because all four counts in the First Amended Complaint arise out of a common

nucleus of operative fact: the stripping of assets from BTS and fraudulent transfer to other companies in the Bridger family, leaving BTS unable to perform on the contract.

## BACKGROUND

### A.    The 2013 Rail Services Agreement between Eddystone and BTS

This is an action to enforce the terms of a maritime contract against the alter egos of the nominal contracting party.  In 2013, Eddystone and Bridger Transfer Services, LLC ("BTS") entered into a Rail Services Agreement ("RSA") under which Eddystone agreed to construct and operate a facility on the Delaware River in Eddystone, Pennsylvania (the "Transloading Facility") for the purpose of "transloading" (transferring) shipments of crude oil from train cars to barges that would carry the oil down the river to Philadelphia-area refineries.  *See* Rail Facilities Services Agreement of February 13, 2013 (hereinafter, "RSA"), Doc. No. 283-1, ¶ 3.1. The agreement was negotiated on behalf of BTS by BTS's parent, Defendant Bridger Logistics, LLC ("Bridger Logistics"), and two corporate officers of Bridger Logistics (Defendants Julio Rios and Jeremy Gamboa).  *See* Eddystone's First Amended Complaint ("FAC"), Doc. No. 182, ¶¶ 4, 36, 46.

The RSA incorporated a set of Terms and Conditions, which were attached to the agreement as Exhibit A.  *See* RSA, Doc. No. 283-1.  Under the Terms and Conditions, BTS agreed to contract with barge operators directly, and arrange for barges to arrive at the Transloading Facility during certain pre-determined windows so that the barges could be loaded by Eddystone with shipments of crude oil that had arrived by rail.  *See id.*, Ex. A at 6-8, §§ 7-8. The parties also agreed to procedures for berthing and loading oil onto barges and for responding to discharges, spills, or leaks of transloaded oil from barges.  *Id.*, Ex. A at 8-9, 11-12, §§ 9, 11.

Further, the parties to the agreement recognized its maritime nature, electing *ex ante* to submit their disputes to the Society of Maritime Arbitrators for resolution.  *Id.*, Ex. A at 18, § 16(b).

In order to induce Eddystone to commit millions of dollars to building and providing transloading services at the Transloading Facility, these Defendants agreed that BTS would pay Eddystone $2.25 per transloaded barrel and committed BTS to transloading at least 64,750 barrels of crude per day at the Transloading Facility for a period of five years.  FAC ¶ 3; RSA at 4-5, 6 at ¶ 2, 7 at ¶ 4.1.  If BTS failed to meet this "minimum volume commitment" ("MVC"), BTS was obligated to pay $1.75 per barrel as a deficiency payment.  RSA at 3.  The RSA applies no charges for the temporary storage of crude or for the use of the Transloading Facility by the trains that delivered the crude petroleum.  All charges were focused on the key service provided: the transloading of crude petroleum onto barges.

### B.    Eddystone's Performance and BTS's Breach

Eddystone commenced its building of the Transloading Facility in March 2013 and completed construction in April 2014.  FAC ¶ 5.  Once construction was complete, Bridger Logistics took advantage of Eddystone's transloading services as part of its performance of a contract to deliver crude oil that was sourced in North Dakota to a refinery in Trainer, Pennsylvania.  FAC ¶ 4.  From May 2014 through January 2016, Eddystone transloaded every trainload of crude oil that BTS and the Defendants brought to the Transloading Facility onto barges for shipment to the refinery in Trainer.  FAC ¶ 5.

The economics of Bridger's transaction depended on the difference between the price of crude at the North Dakota wellhead and the international Brent benchmark exceeding the cost of transporting the petroleum from North Dakota to the refinery.  In late 2014, as world petroleum prices fell substantially, the Brent-North Dakota "spread" declined dramatically.  In 2015,

however, the price of North Dakota crude oil began to fall.  As the spread disappeared, Defendants Ferrellgas (which acquired Bridger Logistics and its subsidiaries in mid-2015), Bridger Logistics, Rios, and Gamboa decided that they could no longer profit from shipping oil from North Dakota to Pennsylvania.  FAC ¶ 52.  In January 2016, Defendants terminated their agreement with the refinery in Trainer, and, therefore, had no need to continue to direct shipments of crude oil through Eddystone's Transloading Facility.

In the months leading up to the termination of their agreement with the refinery, Defendants stripped BTS of the majority of its other assets and income streams and diverted BTS's revenue to other Bridger entities.  FAC ¶¶ 55, 65.  By January 2016, BTS's only "asset" was the RSA with Eddystone.  FAC ¶ 72.  BTS was sold to a newly formed shell company for $10 on February 1, 2016.  FAC ¶ 73.  On the same date, BTS stopped making payments under the RSA and delivered its last shipment of crude to the Transloading Facility.  FAC ¶ 74.

### C.      Maritime Arbitration of the Claim against BTS

In April 2016, Eddystone demanded that BTS submit to arbitration before the Society of Maritime Arbitrators in New York, as contemplated by the dispute resolution provision in the RSA.  FAC ¶ 75.  Eddystone sought an award for amounts due on unpaid invoices and future minimum volume payments in light of BTS's anticipatory breach of the contract.  Through discovery, Eddystone came to understand that, although Defendants had held out BTS as an independent, bona fide company with substantial operations, they had in fact operated BTS without regard for its separate corporate identity and had stripped it of everything of value to leave Eddystone without recourse when BTS breached the RSA.  It also became clear that BTS had insufficient assets to pay any judgment that was levied against it.

Rather than spend millions arbitrating against entities that could not pay, Eddystone and BTS's new corporate parent agreed to settle their dispute, and BTS's parent consented to the entry of an award of approximately $140 million against BTS by the arbitration panel.  In the same month in which it filed the instant lawsuit, Eddystone filed a separate action to confirm its arbitral award against BTS (which had been renamed "Jamex Transfer Services, LLC") in the U.S. District Court for the Southern District of New York.  *See* Pet. to Confirm Arb. Award (Feb. 17, 2017), *Eddystone Rail Co. v. Jamex Transfer Servs., LLC*, No. 1:17-cv-01266-WHP (S.D.N.Y.), ECF No. 1 (attached hereto as **Exhibit 1**).  Given that the award arose out of a dispute regarding BTS's obligations under a maritime contract, Eddystone alleged that the court's jurisdiction was founded in admiralty under 28 U.S.C. § 1333(1).  *Id.* ¶ 3.  The Defendants in this action requested but were denied leave to intervene in order to argue that the award should not be confirmed.  In January 2019, however, the court agreed to stay the action pending this Court's "determination with respect to alter ego liability."  *See* Mem. Op. & Order at 9 (Jan. 11, 2019), *Eddystone Rail Co. v. Jamex Transfer Servs., LLC*, No. 1:17-cv-01266-WHP (S.D.N.Y.), ECF No. 71 (attached hereto as **Exhibit 2**).

D.     **Eddystone's Allegations against Defendants**

On February 2, 2017, Eddystone filed an initial complaint in the U.S. District Court for the Eastern District of Pennsylvania against Bridger Logistics (the corporate parent of BTS); Ferrellgas Partners, L.P., and Ferrellgas, L.P. (collectively, "Ferrellgas"), which acquired Bridger Logistics in 2015; and Julio Rios and Jeremy Gamboa, both of whom were corporate officers involved in the negotiation and performance of the RSA between Eddystone and BTS.  *See* Complaint, Doc. No. 1.  Eddystone alleged that the court had jurisdiction in admiralty under 28

U.S.C. § 1333 because Eddystone sought to "enforce payment of a debt arising under a maritime contract." *Id.* ¶ 17.

After taking discovery, Eddystone was granted leave to amend its initial complaint to assert claims against additional subsidiaries of Ferrellgas. *See* Doc. Nos. 178, 181. Eddystone's First Amended Complaint, like its initial pleading, alleges that the case falls within the Court's exclusive admiralty jurisdiction under 28 U.S.C. § 1333 because Eddystone seeks to enforce a maritime contract. FAC ¶ 31. Count One of the First Amended Complaint alleges that the original defendants (Ferrellgas, Bridger Logistics, Rios, and Gamboa) plus a new defendant, Bridger Rail Shipping, were liable for BTS's debts and contractual damages on the RSA because they were alter egos of BTS. Counts Two and Three allege claims for fraudulent conveyance against the original set of defendants as well as the newly added Bridger subsidiaries that received the assets that were stripped from BTS. Finally, Count Four seeks damages arising out of the original defendants' breach of fiduciary duties to BTS's creditors, including Eddystone. In its prayer for relief, Eddystone seeks, among other things, an "award of all payments that BTS owes to Eddystone under the RSA," and "[a]ll expectation damages available to a party injured by breach of contract." FAC Prayer for Relief Nos. 1 and 3.

## **LEGAL STANDARD**

In resolving a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a court "review[s] only whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." *Jordan v. Staffing Plus, Inc.*, 315 F. Supp. 3d 844, 846 (E.D. Pa. 2018) (quoting *Licata v. U.S. Postal Serv.*, 33 F.3d 259, 260 (3d Cir. 1994)). A reviewing court should accept the truth of the allegations in the complaint and "draw all reasonable inferences in favor of the plaintiff." *Plains*

6

*All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538 (3d Cir. 2017).  The court may also consider "documents referenced in or attached to the complaint" and matters of public record as part of this inquiry.  *Vanderklok v. United States*, 142 F. Supp. 3d 356, 359 (E.D. Pa. 2015).  As plaintiff, Eddystone bears the burden of persuading the court that it has jurisdiction in admiralty over the subject matter of this action.  *See Frederick Mut. Ins. Co. v. Target Corp.*, 301 F. Supp. 3d 515, 518 (E.D. Pa. 2018).

## ARGUMENT

## I.     THE RAIL SERVICES AGREEMENT IS A MARITIME CONTRACT

Eddystone's First Amended Complaint alleges that Defendants, as alter egos of BTS, are liable for the breach of BTS's obligations under a maritime contract for the transloading of crude oil from railcars onto barges for shipment to refining facilities located elsewhere on a navigable waterway.  Eddystone seeks to impose liability and collect damages on this basis.  Because these allegations are grounded in a maritime contract (the RSA), Eddystone's First Amended Complaint establishes the basis for maritime jurisdiction.

### A.     Courts Look to a Contract's "Primary Objective" to Determine if it Constitutes a "Maritime Contract"

Federal courts have original jurisdiction over matters that arise in admiralty or maritime jurisdiction.  *See* U.S. Const. art. III, § 2 (extending federal judicial power "to all Cases of admiralty and maritime Jurisdiction"); 28 U.S.C. § 1333(1) (giving federal district courts "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction").  As a general matter, courts have interpreted this grant as authorizing the exercise of federal jurisdiction over cases involving a "maritime tort" or "maritime contract," and they apply different standards depending on which basis is alleged.  "In general, a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea

or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water."  1 Benedict on Admiralty § 182 (2018 update).

The determination of whether a contract is sufficiently maritime is "conceptual rather than spatial."  *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961).  That is, maritime jurisdiction depends on a contract's subject matter, rather than where it is executed or performed. In applying that "conceptual" approach, the Supreme Court has repeatedly overruled rigid doctrines that excluded certain categories of contracts (frequently those with some land-based elements) from the federal courts.  First, in *Kossick v. United States*, 365 U.S. 731 (1961), the Court held that the federal courts had admiralty jurisdiction over a case involving a sailor who allegedly agreed to forego his "maritime right to maintenance and cure" and to instead seek treatment in a public hospital after receiving certain assurances from his employer.  *Id.* at 738. The Court held that the U.S. Court of Appeals for the Second Circuit had applied "too narrow of a view" of the scope of maritime jurisdiction in holding that the contract at issue was "merely a promise to pay money, on land, if the former seamen should suffer injury . . . , on land, in the course of medical treatment."  *Id.* at 736.  For the Court, the maritime nature of the obligation controlled whether there was a maritime contract, regardless of whether the contract would be performed on land or on the water.

In 1991, the Supreme Court overruled long-standing precedent in *Minturn v. Maynard*, 58 U.S. 477 (1855), to the extent that it established a per se rule that excluded claims grounded in contracts between an agent and a buyer from the courts of admiralty.  *See Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608-12 (1991).  The Court explained that, instead of

8

applying this per se rule, "lower courts should look to the subject matter of the . . . contract and determine whether the services performed under the contract are maritime in nature." *Id.* at 612.

Finally, in its most recent case to address the doctrine, *Norfolk Southern Railway Co. v. Kirby*, the Court recognized that a contract may qualify as maritime even if part of the agreement is to be performed on land, and even where the claims to be litigated in federal court arise from the performance of the land-based aspects of the contract. 543 U.S. 14, 27 (2004). *Kirby* involved an agreement (bill of lading) to transport goods from Australia to Huntsville, Alabama. Although the goods were transported by ship from Australia to a port in Savannah, Georgia without incident, they were damaged on the last leg of the journey inland to Huntsville when the train on which they were being transported derailed. In holding that the case arose in maritime jurisdiction, despite the fact that part of the contract was to be performed entirely on land, the Supreme Court noted that "[m]aritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations." *Id.* at 25. The Court noted that it was adopting a more expansive view of maritime jurisdiction than the approach taken by many lower courts, identifying, in particular, a line of cases in which lower courts declined to exercise jurisdiction over contracts with land-based elements unless those elements were deemed "incidental" to the performance of the contract. *Id.* at 26. The Supreme Court held that, to the extent the decisions that focused on whether land-based elements were "incidental" rest "solely on geography," they were "inconsistent with the conceptual approach our precedent requires." *Id.* at 27. Rather than focusing on the nature of the land-based components, the Court directed courts to focus on whether a bill of lading "requires substantial carriage of goods by sea," and to reject jurisdiction only if the bill's "*sea* components are insubstantial." *Id.* (emphasis in original).

Several guiding principles have emerged from the Supreme Court's maritime jurisprudence.  First, whether a contract qualifies as "maritime" "'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'"  *Kirby*, 543 U.S. at 24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)); *see also Exxon Corp.*, 500 U.S. at 612.  Second, as long as the "primary" or "principal" objective of the contract is "maritime commerce," a federal court may exercise maritime jurisdiction even if the contract also includes non-maritime elements.  *Kirby*, 543 U.S. at 24-25.  Finally, in view of the inherent difficulties in drawing clear boundaries in this area of the law, the Supreme Court has recognized that federal precedent plays a key role in delineating the boundaries of maritime jurisdiction "insofar as they exclude or include certain common types of contract."  *Kossick*, 365 U.S. at 734.

**B.      The Primary Objective of the Rail Services Agreement Is the Maritime Service of Loading Oil onto Vessels for Transport on Navigable Waterways in Maritime Commerce**

These principles, applied here, establish this Court's jurisdiction.  First, the nature of the contract is to facilitate maritime commerce, through the shipment of oil by barge down the Delaware River.  That is also the primary objective of the contract.  And a substantial body of precedent holds that a contract for the loading of vessels to facilitate the transport of cargo in maritime commerce is a maritime service that gives rise to maritime jurisdiction.

There is a broad, long-standing, and unchallenged consensus among federal courts that loading and unloading ships (which was historically the work of "stevedores" or "longshoremen") is a maritime service, and that contracts for the loading and unloading of ships are maritime contracts because they involve this service.   The Supreme Court of the United States has recognized this principle repeatedly.  In *Atlantic Transport Co. of West Virginia v.*

10

*Imbrovek*, for example, the Court held that a stevedore[1] who was injured while loading cargo onto a ship was performing a "maritime service," noting that there was "no doubt that the service in loading and stowing a ship's cargo" is of a maritime nature.  234 U.S. 52, 61 (1914). Similarly, in *American Stevedores, Inc. v. Porello*, it held that there was maritime jurisdiction over an action by the United States to implead the employer of an injured longshoreman because a "stevedoring contract is maritime" and the claim for indemnity arose out of such a contract. 330 U.S. 446, 456 (1947).

The consensus is reflected in numerous opinions by lower federal courts, including the Third Circuit.  *See Cooper v. Loper*, 923 F.2d 1045, 1048 (3d Cir. 1991) (holding that there was maritime jurisdiction over a claim for indemnity arising out of a stevedoring contract between a shipowner and dockowner); *New Orleans Stevedoring Co. v. United States*, 439 F.2d 89, 90, 92 (5th Cir. 1971) (affirming lower court's decision that a multi-year contract for the "'unloading and loading of cars, barges, or trucks to and from piers, docks, and wharves' at New Orleans" was a maritime contract that gave rise to maritime jurisdiction); *Baltimore Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 538 (D. Md. 2011) (recognizing that the services provided under a "stevedoring contract" are "direct, nautical services to vessels that have been found to support maritime contract jurisdiction"); *Carefree Cartage, Inc. v. Husky Terminal & Stevedoring, Inc.*, No. C07-5294 RBL, 2007 WL 4358316, at *3 (W.D. Wash. Dec. 7, 2007) (exercising maritime jurisdiction over contract "for unloading containers from the ship, stowing them, and then

---

[1] Although many cases describe the services and contracts using the historical term for the laborers who provided these services (*e.g.*, "stevedoring contract"), nothing in the case law suggests that federal jurisdiction exists only where a contract specifically refers to "stevedores" or "longshoremen."  Indeed, such a narrow reading would be inconsistent with the Supreme Court's direction to consider the "nature" of the services provided in the contract.  *See Kirby*, 543 U.S. at 24; *Exxon*, 500 U.S. at 612.

11

releasing them to outbound carriers" and noting that "[w]ithout performance of those duties, goods could not be shipped across the ocean to inland destinations"); *Moore-McCormack Lines, Inc. v. Int'l Terminal Op. Co.*, 619 F. Supp. 1406, 1409 (S.D.N.Y. 1985) ("It is undisputed that stevedoring is a maritime activity and that such contracts are maritime contracts."); *Am. Pres. Lines, Ltd. v. Green Transfer & Storage, Inc.*, 568 F. Supp. 58, 60 (D. Or. 1983) ("Loading and unloading of cargo from a ship have traditionally been considered maritime services."); *Steamship Overdale Co. v. Turner*, 206 F. 339, 341 (E.D. Pa. 1913) (recognizing that a "breach of contract to load a cargo on a vessel" would provide grounds to exercise maritime jurisdiction); *In re The Strathnairn*, 190 F. 673 (W.D. Wash. 1911) ("[There] can now be no doubt that contracts for the rendition of stevedoring services are maritime contracts."); *see generally* 1 Benedict on Admiralty § 184 n.20 (2018 update) (collecting cases).

Here, the primary objective of the Rail Services Agreement is for Eddystone to transfer (e.g., "transload") crude oil from railcars onto barges for transport down the Delaware River. The contract's Terms and Conditions are largely devoted to the maritime aspects of the contract, including the procurement of barges, berthing of barges, the processes that would be used to transload oil onto barges, and responding to leaks from barges.  *See* RSA, Ex. A at 6-9, 11-12, §§ 7-9, 11.  Although the contract envisions that oil would arrive at the Transloading Facility on railcars, and also references the possibility of storage of oil before it is loaded to barges, there is no separate price charged for either of those activities, as they are incidental to the RSA's primary purpose of loading crude oil onto marine vessels.  None of these activities constituted the "primary objective" of the agreement.  Rather, the primary objective of the contract (on paper

and in practice) was always to facilitate the transport of crude oil by barge to destinations on the

Delaware River.[2]

### C.   Defendants Fail to Establish that the Rail Services Agreement Is Non-Maritime

Defendants' brief studiously avoids any mention of the precedent establishing that

contracts for loading and unloading goods from vessels are maritime contracts, most likely

because Defendants recognize that this principle is beyond dispute.  Rather than engage with this

case law, Defendants attempt to play up other qualities of the agreement in order to argue that

other lines of maritime cases should control the outcome—specifically, cases involving

transportation of goods on land, damage to goods while in storage, and contracts that courts

deemed to be only tangentially related to maritime commerce.  For the reasons discussed below,

Defendants fail to establish that the Court lacks jurisdiction over a contract to provide the core

maritime service of loading goods onto a vessel for transport in maritime commerce.

### 1.   The References to a Potential Future Connection to a Pipeline System Do Not Take this Dispute Outside of Maritime Law

Defendants appear to take the position that, because the Rail Services Agreement

contemplated that the Transloading Facility might one day be connected to a pipeline system that

would run to a refinery, the contract was insufficiently maritime.  (Defs. Mem. at 9.)  They are

incorrect.  The parties to the agreement contemplated that "[o]ne or more subsequent phases of

---

[2] Although Defendants initially argue that "calling a contract a maritime contract does not make it one" (Defs. Mem. at 8), they change their tune just sentences later, and contend that Rail Services Agreement's principal (e.g., *non-maritime*) objective is "evident from its name" (Defs. Mem. at 9).  In fact, the title of a contract does not determine whether it falls on one side of the line or the other.  To determine a contract's "principal objective," a court must look at the obligations it creates—not its title.  *See Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 302 (2d Cir. 1987) ("[T]he focus of our inquiry must be not on the name assigned to the contract, but rather on the nature of the services to be performed.").

the Eddystone Rail Facilities may include connection[s] to future pipeline distribution system(s) .
. . ." RSA at 1.   But there were no binding agreements between the parties as to this possibility.
The possibility of connecting to a pipeline system was certainly not the "primary" or "principal"
objective of the contract, and, in fact, it never became a reality.   At the time that the agreement
was executed, and at all times since, the sole option for transporting oil downriver from the
Transloading Facility has been to load it onto barges.   To this day, the Facility is not connected
to a pipeline system.   Further, it is clear from the language of the agreement that transport by
pipeline was at most something to be explored in the future rather than part of the parties'
existing contractual relationship.   The RSA did not obligate either party to take any affirmative
steps in furtherance of establishing such a connection between a pipeline system and the
Transloading Facility or establish a timeline for exploring or developing such a connection.   The
RSA's current Terms and Conditions have no provisions relating to the transport of oil through a
pipeline system, in contrast to the detailed provisions regarding transport by barge, which
include provisions for scheduling arrival and departure times, docking, loading oil, and
accidents.   *See* RSA, Ex. A at §§ 7-9, 11-12.   Further, the parties appear to have contemplated
developing a new set of Terms and Conditions in the event that it became possible to connect to
a pipeline system from the Transloading Facility.   RSA at 9, ¶ 6.1.[3]   By no means was the mere
*possibility* of connecting to a pipeline system at some point in the future the "primary objective"
of the contract.

---

[3] In addition, the RSA provides that "references to one or more 'Pipeline Distribution Systems'
*shall apply and be effective only if and when the connection between the Eddystone Rail
Facilities and such Pipeline Distribution Systems is in-service as part of a second or subsequent
phase* of the Eddystone Rail Facilities."   RSA at 17, ¶ 15.10(e) (emphasis added).

### 2. The Fact that Aspects of the Contract May Be Performed on Land Does Not Defeat Maritime Jurisdiction

Defendants contend that, because the services to be provided under the RSA include the receipt of oil that arrives at the Transloading Facility by train and may include "incidental storage" at the facility, the contract is non-maritime.  (Defs. Mem. at 9, 11-12.)  They base both arguments on cases in which courts held that they lacked jurisdiction over claims based on damage to goods that were held in storage after being offloaded from a ship.

None of the cases cited by the Defendants establishes that the contract at issue here is non-maritime.  Two are completely inapplicable, as they involve the separate question of jurisdiction over a maritime tort, which is a "spatial" rather than "conceptual" inquiry as to which the non-maritime location of the harm can be dispositive.[4]  Defendants cite only one case in which a court analyzed a claim for damage to goods under the standard for jurisdiction over maritime contracts.  In *St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.*, the court acknowledged the undisputed rule that "a contract to load or unload cargo" from a vessel is "maritime in nature," but held that, because the cargo at issue was damaged after being unloaded and stored on land, the case arose outside of the court's admiralty jurisdiction.  863 F. Supp. 1013, 1017-18 (E.D. Mo. 1994).  To the extent that this approach remains sound after *Kirby* (which cautioned lower courts against applying a "spatial" analysis when assessing jurisdiction over maritime contracts), it is difficult to see how it applies here, given that the dispute at issue

---

[4] *See Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292 (2d Cir. 1990) (holding that state law rather than federal common law applied to the plaintiff's pendent claim for conversion against a warehousing and trucking company to the extent that the claim arose "while the cargo was on land"); *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir. 1983) (noting a previous holding that "an action against a terminal for negligent loss of cargo is not within federal maritime jurisdiction").

centers on the breach of a contract under which Eddystone was to perform the core maritime service of loading cargo onto barges, and not any issue relating to storage (much less to any particular cargo that was damaged in storage).

In any event, courts regularly hold that a contract for stevedoring services is subject to maritime jurisdiction even if it contemplates temporary land-based storage. *See, e.g.*, *Moore-McCormack Lines*, 619 F. Supp. at 1408-09 (holding that a contract was maritime where it provided for incidental storage, and retained that character regardless of whether goods were damaged prior to loading or after unloading); *Hoogovens Estel Verkoopkantoor, B.V. of Ijmulden v. Ceres Terminals, Inc.*, No. 80 Civ. 6383 (DBB), 1983 WL 604, at *3 (S.D.N.Y. Apr. 26, 1983) (holding that "acting as stevedore" is a "maritime service" subject to maritime jurisdiction, and, because storage was "incidental to the unloading," claims arising out of damage that occurred while the goods were in storage after being unloaded also arose under maritime jurisdiction).

### 3.   Defendants' Decision to Transport Crude Oil from North Dakota Does Not Render the Transloading Services Non-Maritime

Defendants argue that, because the crude oil originated in North Dakota, the contract is not maritime. More specifically, Defendants highlight the fact that oil traveled over "half the continent" to reach the Transloading Facility by rail, and then only a few miles by barge after leaving the facility. (Defs. Mem. at 9-10.) Defendants appear to suggest that this might be enough to take the case outside of maritime jurisdiction. This is incorrect under *Kirby*, 543 U.S. at 27, and the references to the distances travelled are a red herring. The question is the nature of *this* contract, not the distance traveled under a series of contracts. This case involves a contract to receive oil from trains at a facility located on the Delaware River and load it onto barges for transportation on the river; Eddystone did not contract with BTS or any Defendant in this action

16

to provide for the transportation of oil to or from the Transloading Facility.  (Indeed, the RSA expressly provides that BTS will be responsible for transporting oil by rail to the Facility and transporting it by barge away from the Facility.  *See* RSA at 7, ¶ 3.3.[5])  Eddystone is unaware of any instance in which a court has looked to how far cargo traveled by land *before* reaching the site for loading and unloading or how far it will travel *after* it is loaded in order to determine whether there is maritime jurisdiction over a stevedoring contract.

### 4.    This Case Does Not Involve a Contract with Only an Attenuated Connection to Maritime Commerce

The Defendants rely on a variety of cases involving different types of contracts to argue that the RSA is non-maritime.  None of these cases involve contracts that had the primary objective of loading or unloading cargo from vessels for transportation in maritime commerce. Instead, Defendants cite cases that involve, among other things:

- A lease-and-services contract for a terminal adjoining a waterway that gave the lessee the right to dock at the terminal but involved no loading and unloading services;[6]

- A contract that imposed a variety of obligations on the operator of a terminal (including treatment of oil and issuing of certificates of quantity and quality), most of which the court found to relate to admiralty "tangentially at most";[7]

---

[5] Given that the RSA requires BTS to procure barges to pick up transloaded oil at the Facility for transportation downriver, it is unclear why Defendants assert that the RSA "did not require either party to provide, charter, or operate any vessel."  (Defs. Mem. at 9.)

[6] *See Euclid Energy Ltd. v. SIA Ventall Terminals*, 598 F. Supp. 2d 454, 455-57 (S.D.N.Y. 2009).

[7] *See Derby Resources AG v. Ultramar Panama, P.R.*, Nos. 86 CIV. 9600 (JMW), 87 CIV. 1739 (JMW), 1988 WL 78316, at *2-*5 (S.D.N.Y. July 19, 1988).

- Various leases of property or equipment that could be used in maritime commerce;[8] and

- Various contracts for the sale of supplies to be used in maritime commerce.[9]

Many of these cases pre-date *Kirby*, and, therefore, may no longer be good law to the extent that their holding rests on whether land-based components are "incidental" to the contract.  As the Second Circuit has observed,  *Kirby*'s criticism of the "incidental" exception "calls for reconsideration of our precedent."  *See Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 314-15 (2d Cir. 2005).[10]  Regardless, Defendants' cases are inapplicable for

---

[8] *See Holt Cargo Sys., Inc. v. Del. River Port Auth.*, No. Civ. A. 94-7778, 1996 WL 195390, at *6 (E.D. Pa. Apr. 19, 1996) (lease of terminal was non-maritime, based on "incidental" exception criticized by *Kirby*); *Intercontinental Contractors, Inc. v. Canadian Maritime Carriers, Ltd.*, Civ. A. No. 86-2503, 1986 WL 5338 (E.D. Pa. May 6, 1986) (lease of equipment to unload grain was not a maritime transaction because the agreement did not itself reference any maritime services or transactions).

[9] *Kennedy v. H & M Landing, Inc.*, 529 F.2d 987, 988 (9th Cir. 1976) (per curiam) (contract to provide bait to a sport-fishing business has "[nothing] to do with . . . maritime commerce); *Marubeni Int'l Petroleum (Singapore) Pte Ltd. v. Prestige Marine Servs. Pte Ltd.*, 591 F. Supp. 2d 386, 387 (S.D.N.Y. 2009) (contract to sell fuel based on needs of fleet of ships); *Jones v. Berwick Bay Oil Co.*, 697 F. Supp. 260, 265-66 (E.D. La. 1988) (same); *Steamship Overdale*, 206 F. 339 (contract to provide coal based on needs of ship was not maritime).

[10] Although the Third Circuit has not specifically revisited its previous holdings in which it relied on the exception for "incidental" land-based activities, it would appear that a similar reconsideration is in order.  For example, *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874 (3d Cir. 1992), like *Kirby*, involved a bill of lading for the shipment of goods internationally. The Third Circuit held that, as a general principle, "a contract for partial sea and partial land transport[] would not give rise to admiralty jurisdiction."  *Id.* at 881.  The court based its reasoning on the standard that the Supreme Court expressly rejected in *Kirby*—*i.e.*, it held that a contract must either be "wholly" maritime, or, if there are non-maritime aspects, those aspects must be "severable" or "incidental."  *Id.* at 880.  After *Kirby*, this is no longer the test—the Supreme Court held, in no uncertain terms, that federal maritime jurisdiction extends to contracts that involve "non-incidental" land components as long as they also involve "substantial . . . sea components."  *Kirby*, 543 U.S. at 27.  As a result, there is no merit to Defendants' suggestion that the standard applied in *Berkshire Fashions* continues to determine the scope of maritime jurisdiction in the Third Circuit.  (Defs. Mem. at 8 n.6.)

18

the simple reason that none involve contracts with the primary objective of loading or unloading cargo from ships, and none cast doubt on the continuing viability of precedent holding that loading and unloading is a maritime service.

### 5.     The Fact that Eddystone Has Alleged that BTS Failed to Make Payments Does Not Take this Case Outside of Maritime Jurisdiction

Finally, Defendants appear to take the position that, because Eddystone seeks damages that are grounded, at least in part, on the provision of the RSA that required BTS to make deficiency payments if it failed to deliver sufficient oil to the Facility to be transloaded, this somehow takes the case outside of the court's maritime jurisdiction. This has no bearing on the jurisdictional analysis. A court does not lose maritime jurisdiction over a case involving a contract for stevedoring services merely because the party seeks monetary damages for its breach or because the contract in question provides for some form of liquidated damages. In *New Orleans Stevedoring Co. v. United States*, for instance, the Fifth Circuit held that the Court of Claims had maritime jurisdiction over an action brought by the New Orleans Stevedoring Company against the United States to recover "overhead costs incurred as a result of a decline in the volume of shipping below that which the Government had estimated" in negotiating multi-year agreements for the company to provide loading and unloading services to the government on an ongoing basis. 439 F.2d at 90, 92.

In any event, the focus of the jurisdictional inquiry must be on the "primary objective" of the contract—not the manner in which it was allegedly breached or the nature of the damages sought. *See Kirby*, 543 U.S. at 24-25; *see also Moore-McCormack Lines*, 619 F. Supp. at 1409 (holding that, because a contract for stevedoring services was maritime, it was "essentially irrelevant" whether the losses occurred after goods had been loaded or unloaded from a ship,

because "the jurisdictional inquiry begins and ends with the subject matter of the contract").[11]

Here, the inquiry begins and ends with the fact that the primary objective of the contract is for

Eddystone to perform the maritime service of loading cargo onto vessels for transport in

maritime commerce.  The RSA is a maritime contract.

## II.    THE COURT'S JURISDICTION OVER DISPUTES ARISING UNDER A MARITIME CONTRACT INCLUDES THE POWER TO AWARD THE EQUITABLE RELIEF SOUGHT BY EDDYSTONE

Defendants argue that, even if the RSA is a maritime contract, the Court lacks jurisdiction

because Eddystone seeks equitable remedies, including relief against BTS's alter egos and the

recovery of fraudulently transferred assets that could be used to pay an eventual judgment.  But

even the cases that Defendants cite in support of their arguments hold that, once a maritime

contract is made subject to admiralty jurisdiction, a court sitting in admiralty may exercise power

over claims for equitable remedies relating to that contract.

Eddystone has done far more than allege the "existence of a maritime contract

somewhere in the background" (Defs. Mem. at 14)—it has obtained an arbitral award from the

---

[11] This issue is not controlled by *Tradhol Internacional, S.A. v. Colony Sugar Mills Ltd.*, 354 F. App'x 463, 465 (2d Cir. 2009), which Defendants cite on page 12 of their memorandum.  As an initial matter, *Tradhol* was issued as a "summary order," indicating that each member of the panel believed that no "jurisprudential purpose" would be served by issuing a precedential opinion.  *See* 2d Cir. Internal Operating Proc. 32.1.1.  Further, *Tradhol* appears to have involved a contract that covered both the sale of goods and the loading of goods onto ships.  The issue before the Second Circuit was whether the presence of a "demurrage" clause (*e.g.*, a maritime liquidated damages clause designed to compensate the owner of the goods for any lost profits due to delays in loading) created jurisdiction over both the maritime (loading) and non-maritime (sales) aspects of the contract.  The court held that, because the non-maritime provisions were not "merely incidental," it lacked maritime jurisdiction.  As discussed elsewhere in this memorandum, the Second Circuit has held that this "incidental" exception is no longer viable post-*Kirby*.  *See Folksamerica*, 413 F.3d at 314-15.  In any event, this case does not involve a contract in which the primary objective of a contract involved both maritime elements (loading) "mixed" with non-maritime components (*e.g.*, refining of oil prior to loading).

Society of Maritime Arbitrators based on BTS's breach of that maritime contract, invoked

maritime jurisdiction in a federal action to enforce the arbitration award, and alleged in this

action that Defendants are liable for BTS's debts under the maritime contract as BTS's alter

egos.  *See Petition* ¶ 3 (**Exhibit 1**) (invoking admiralty jurisdiction over petition to confirm

arbitral award); FAC ¶ 31 (invoking maritime jurisdiction on grounds that Eddystone "seeks to

enforce payment of a debt arising under a maritime contract"); *id.* ¶¶ 76-86 (alleging basis for

alter ego liability, including the fact that Defendants "derived substantial benefits" from the

RSA); *id.* Prayer for Relief Nos. 1 and 3 (seeking damages arising from the breach of the RSA).

Eddystone's express claims that BTS and Defendants are liable for damages on a maritime

contract are more than sufficient to confer maritime jurisdiction over this dispute.  Further,

because Eddystone has established the basis to exercise jurisdiction over a dispute arising out of

a maritime contract, this Court may exercise admiralty jurisdiction over Eddystone's claims to

reverse fraudulent transfers in order to protect any future admiralty judgment.

### A.     Courts Sitting in Admiralty May Award Relief Through Equitable Principles

Defendants' insistence on a rigid division between "traditional" and "equitable" claims

(Defs. Mem. at 14) again places them on the wrong side of admiralty history.  As Judge Slomsky

observed in a recent opinion, at one time, it was thought that admiralty courts did not have the

characteristic powers of a court of equity.  *In re Petition of Frescati Shipping Co.*, Nos. 05-cv-

305 (JHS), 08-cv-2898 (JHS), 2016 WL 4035994, at *71 (E.D. Pa. July 25, 2016) (vacated in

part on other grounds).  "Over time, however, courts have retreated from the traditional rule

against equity [and] are now inclined to grant equitable relief in admiralty disputes."  *Id.*  Judge

Slomsky quoted a First Circuit opinion, which described the modern approach as follows:

21

> District courts sitting in admiralty, which now operate under virtually the same
> procedures as they do otherwise, should be able to provide the kind or degree of
> remedy that will properly and fully redress an injury within their jurisdiction, in
> keeping with the same principles as they would apply in other comparable cases.
> Where equitable relief is otherwise proper under usual principles, it will not be
> denied on the ground that the court is sitting in admiralty.

*Id.* (quoting *Pino v. Protection Maritime Ins. Co.*, 599 F.2d 10, 16 (1st Cir. 1979)).

Consistent with Judge Slomsky's observation, it is now well-settled that a maritime

court's jurisdiction over an admiralty dispute allows it to hear claims that draw on equitable

principles (*e.g.*, claims against alter egos). *See, e.g.*, *Vitol S.A. v. Primerose Shipping Co. Ltd*,

708 F.3d 527, 538 (4th Cir. 2013) (internal citation omitted) ("It is well established that an

admiralty court can review questions of . . . alter ego.").

Indeed, the Supreme Court recognized this inherent authority in *Swift & Co. Packers v.

Compania Colombiana del Caribe, S.A.*, 339 U.S. 684 (1950), which Defendants discuss at

length in their brief.  In *Swift*, owners of cargo that was lost at sea filed an admiralty suit against

the ship owner for breach of a maritime contract and negligence.  The plaintiffs also attached the

defendant's ship as security.  However, the plaintiffs soon discovered that the original defendant

had transferred the ship to an alter ego, so the plaintiffs filed a supplementary libel in which they

sought again to attach the ship, either as an asset that had been fraudulently transferred or as an

asset held by an alter ego of the ship owner.

The Supreme Court confirmed that both of these equitable remedies were available in

admiralty.  It explained that "jurisdiction of a court of admiralty to determine of the question of

alter ego is undoubted."  *Id.* at 689 n.4.  Further, the Court affirmed that a court may exercise

jurisdiction over a claim of attachment arising out of a fraudulent transfer in order to protect an

eventual maritime judgment, noting that a contrary rule that precluded such relief would "hobble

22

a legal system that has been so responsible to the practicalities of maritime commerce and so inventive in adopting its jurisdiction to the needs of that commerce." *Id.* at 691.  The Second Circuit, similarly, recognized that, as a general principle, equitable relief is available once a case is properly before an admiralty court.  *See Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987) (discussed in Defs. Mem. at 15-16).

### B.   A Court May Exercise Maritime Jurisdiction over Claims for Equitable Remedies that Are Grounded in a Maritime Contract

In their eagerness to frame Eddystone's claims as "subsidiary" or "ancillary" claims (Defs. Mem. at 14, 16), Defendants ignore the allegations in Eddystone's complaint that invoke the RSA as a basis for liability and damages.[12]  In taking this position, Defendants fail to acknowledge that Eddystone has asserted what amounts to a "contractual claim" (albeit against BTS's alter egos) in Count One of its First Amended Complaint.  (*See* Defs. Mem. at 14.)  There can be no question that the RSA, a maritime contract, lies at the heart of Eddystone's alter ego claim, as Eddystone alleges that Defendants participated in its negotiation, availed themselves of its benefits, and engineered its breach, and seeks damages in the form of expected profits and unpaid debts under the contract.  *Cf. Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519, 524-26 (E.D. Pa. 2005) (holding that a claim for alter ego liability under ERISA raised a "claim for direct liability" that provided an "independent basis for jurisdiction").  These allegations suffice to establish maritime jurisdiction on the basis of a maritime contract.  The fact that Eddystone

---

[12] In addition, *Peacock v. Thomas*, 516 U.S. 349, 355 (1996), cited on page 16 of Defendants' brief, involves the separate question of jurisdiction under the ERISA statute.  The U.S. Court of Appeals for the Fourth Circuit has cautioned against applying *Peacock* in the admiralty arena without giving due regard to the "substantial[]" differences between determining federal-question jurisdiction under 28 U.S.C. § 1331 and admiralty jurisdiction under 28 U.S.C. § 1333. *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 581-82 (4th Cir. 2015).  In any event, because this case does not involve an "ancillary" proceeding, *Peacock* is inapplicable.

23

pursued claims on the same contract against BTS in arbitration prior to bringing this action does

not transform a substantive claim for liability against BTS's alter egos under the contract into a

"secondary claim[] or collection remed[y]," as Defendants suggest.  (Defs. Mem. at 16.)  Count

One is a substantive claim for direct liability—not an action to pursue a "collection remedy"—

and it forms an independent basis for jurisdiction.

Defendants cite no case that suggests that jurisdiction under a maritime contract is

limited to cases in which a party asserts a "traditional" breach of contract claim (*i.e.*, a claim

directly against its counterparty).  The law does not require it, in any event.  Although maritime

complaints frequently assert claims for relief against contract signatories *and* the alter egos of

contract signatories in the same action, there is no jurisdictional requirement that a plaintiff

assert a claim against a contract signatory as part of the action before a court may hear claims for

contractual liability and damages against an alter ego.

To the contrary, admiralty courts have held that jurisdiction over a maritime contract

includes the power to determine whether a party is an alter ego to a contract signatory.  *See Swift*,

339 U.S. at 689 n.4 ("The jurisdiction of a court of admiralty to determine the question of alter

ego is undoubted."); *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F.

Supp. 2d 504, 507-08 (S.D.N.Y. 2012) (holding that, where the contract at the "heart of the

dispute" is a maritime contract, the fact that a party asserts claims against an alter ego "does

nothing to undermine that fact or vitiate the Court's jurisdiction," and noting that "[a]later ego

theories of liability are prima facie admiralty claims so long as the underlying claim arose in

admiralty").  Further, courts have recognized that their admiralty jurisdiction permits the exercise

of jurisdiction over claims against alter egos premised on the alter egos' liability on an

underlying maritime contract.  "So long as the underlying obligation arises out of a maritime

contract, admiralty is not deprived of jurisdiction merely because an equitable remedy is utilized." *Nat'l Marine Serv. v. C.J. Thibodeaux & Co.*, 380 F. Supp. 1076, 1080 (S.D. Tex. 1973) (denying motion to dismiss claim against an non-party signatory's alter ego for lack of subject matter jurisdiction in action arising out of a contract for repair of the vessel); *Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 493 (2d Cir. 2013) (exercising jurisdiction over an action for pre-judgment attachment against an alter ego on the basis of a breach of a maritime contract that was the subject of an arbitration pending in London).

In any event, even if the Court were to hold that a party must allege a maritime claim against a contract signatory before an admiralty court may exercise jurisdiction over other claims relating to a maritime contract, Eddystone has satisfied that requirement by pursuing relief against BTS (now JTS) in separate proceedings in New York. Eddystone had, in fact, already obtained an arbitral award against the signatory to the RSA (BTS) when it initiated this action. Although Defendants characterize this proceeding as "an arbitration proceeding in New York— not an admiralty suit" (Defs. Mem. at 16), the arbitration was, in fact, heard by a *maritime* body (the Society of Maritime Arbitrators), and, of course, involved a demand for relief under a maritime contract. Further, Defendants omit the fact that Eddystone expressly invoked admiralty as the basis for the U.S. District Court in the Southern District of New York to exercise jurisdiction over its petition to confirm the award. *See* **Exhibit 1**. These are not, as Defendants suggest, run-of-the-mill state-law contract proceedings—they have the "genuinely salty flavor" of a maritime dispute. *Kossick*, 365 U.S. at 742.

Eddystone's direct invocation of maritime jurisdiction over claims arising directly from a maritime contract, both in this action and in the proceedings in New York, serves to take this case outside of the framework applied by the Second Circuit in *Atlanta Shipping Corporation v.*

*Chemical Bank*, 818 F.2d 240 (2d Cir. 1987), which is discussed on pages 15-16 of the

Defendants' brief.  There, a shipping corporation sued its customers' bank, asserting equitable

claims that the bank had benefited from fraudulent transfers.  Unlike the *Swift* plaintiff, which

had filed an admiralty claim for loss of goods at sea, the *Atlanta Shipping* corporation had not

invoked admiralty court jurisdiction in a claim against its customers.  Thus, the issue before the

Second Circuit was "whether admiralty jurisdiction is available to consider an equitable claim to

set aside a transfer to a creditor allegedly made to frustrate payment of a maritime debt where

admiralty jurisdiction was not invoked with respect to the underlying debt."  *Id.* at 243.  The

Second Circuit recognized that it could exercise jurisdiction without an underlying maritime

judgment, provided that jurisdiction of an admiralty court was first properly invoked.  *Id.* at 248

("A libellant may invoke admiralty jurisdiction over subsidiary claims in equity only after it has

initiated a primary action properly within the jurisdiction of an admiralty court.").

Unlike the litigant in *Atlanta Shipping*, Eddystone has invoked maritime jurisdiction with

respect to the underlying debt owed by BTS, and, in doing so, has "initiated a primary action

properly within the jurisdiction of an admiralty court."  *Id.*  As a result, *Atlanta Shipping* has no

application to this dispute.

### C.   Given that the Court Is Sitting in Admiralty, It May Exercise Jurisdiction over Eddystone's Subsidiary Claims for Equitable Relief

By virtue of the admiralty proceeding in the Southern District of New York, this Court

may also exercise maritime jurisdiction over Eddystone's subsidiary claims for equitable relief

from fraudulent transfers, to protect an eventual admiralty judgment.  As *Swift & Co. Packers*

illustrates and *Atlanta Shipping* confirms, an admiralty court may exercise jurisdiction to address

a fraudulent transfer occurring before judgment.  *See Swift*, 339 U.S. at 691; *Atlanta Shipping*,

26

818 F.2d at 248 ("[A]dmiralty jurisdiction is available in some circumstances to challenge transfers that occurred prior to judgment.").  Here, the First Amended Complaint alleges that Defendants systematically transferred assets from BTS so that it would have no assets with which to pay its principal creditor in the inevitable suit for breach of contract.   Awarding relief on Eddystone's claims to reverse fraudulent conveyances will help to ensure that Eddystone can collect on any judgment that is entered in the maritime proceeding in the Southern District of New York.

## III.   THE REMAINING CLAIMS ARE SUBJECT TO SUPPLEMENTAL JURISDICTION

In the alternative, because this Court has maritime jurisdiction over alter ego claims alleged in the First Amended Complaint, it may exercise supplemental jurisdiction over the remaining claims that "form part of the same case or controversy."  *See* 28 U.S.C. § 1367(a). The Third Circuit has recognized that courts exercising jurisdiction in admiralty may exercise supplemental jurisdiction over non-maritime claims that "derive from a common nucleus of operative fact" and that plaintiffs would expect to try in a single proceeding with their maritime claims.  *Sinclair v. Soniform*, 935 F.2d 599 (3d Cir. 1991) (exercising maritime jurisdiction over claims against the crew of a vessel used to transport passengers to dive sites, and supplemental jurisdiction over state-law claims against a manufacturer of scuba-diving equipment, where both claims arose out of the same injuries).  This principle has been applied in admiralty with respect to alter ego and fraudulent transfer claims.  *Fertilizantes Fosfatadox Mexicanos, S.A. v. Chen*, No. 91 CIV. 2048 (MJL), 1992 WL 204394 at *4 (S.D.N.Y. 1992) (asserting jurisdiction over additional defendants because "[t]he claims against the remaining defendants  are inextricably intertwined with the claims of fraudulent transfer against [the parties to the charter contracts]");

*see also Orient Overseas Container Line v. John T. Clark & Sons of Boston, Inc*., 229 F. Supp. 2d 4, 14 (D. Mass. 2002) ("Although not cognizable in admiralty, this court may exercise supplemental jurisdiction over the indemnity and contribution claims . . . .").

Here, Eddystone's fraudulent transfer claims (Counts Two and Three) derive from the same nucleus of operative facts as the alter ego claims (Count One) over which the Court clearly has maritime jurisdiction.  Alter ego liability may attach "whenever one in control of a corporation uses that control, or uses the corporate assets, to further [the controller's] own personal interests."  *Ragan v. Tri-Cty. Excavating, Inc.*, 62 F.3d 501, 508 (3d Cir. 1995) (quoting *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978)).  Thus, when one in control of a company strips that company's assets for no consideration, the same set of facts supports both a claim for fraudulent transfer and a claim for alter ego.  For example, in *Favazza v. Path Media Holdings, LLC*, No. 4:12-cv-1561 TCM, 2014 WL 1846109, at *8 (E.D. Mo. May 8, 2014), where the defendant caused the plaintiff's debtor to transfer all of its assets for no consideration to other entities under the defendant's control, the defendant was found liable on both fraudulent transfer and alter ego grounds.  *Id.* at *8-*10 (holding that "[t]he discussion in the section above [Count II: Piercing the Corporate Veil] clearly and convincingly shows transfer of the two companies' assets were 'made with an intent to hinder, delay, or defraud creditors,'" in violation of the UFTA) (citation omitted).  Here, Eddystone alleges that the Defendants transferred to themselves substantial revenue that BTS earned starting in June 2015, and then BTS's remaining fixed assets and customer contracts in January 2016, all for no consideration.  FAC ¶¶ 65-69.  As in *Favazza*, Defendants' stripping of BTS's assets amounts to not only a gross violation of fraudulent transfer law, but also the improper treatment of BTS as their alter ego.  Thus, the facts supporting

28

Eddystone's fraudulent transfer claims constitute many (though not all) of the same facts that support its alter ego claim.

Thus, this Court has supplemental jurisdiction over the two fraudulent transfer claims (Claims Two and Three).   Under the statute, this Court may also hear claims against additional parties when they arise from the same nucleus of operative fact.  *See* 28 U.S.C. § 1367(a) ("Such supplemental jurisdiction shall include claims that involve the joinder . . . of additional parties.").

For the same reason, Eddystone's claim for breach of fiduciary duty against certain defendants (Count Four) arises from the same nucleus of operative facts as its alter-ego and fraudulent transfer claims, as all three claims involve the stripping of assets from BTS and transfer to other subsidiaries within the Bridger family of companies.  As a result, it is properly within the jurisdiction of this Court.  *See* FAC ¶ 31.

## CONCLUSION

For the reasons stated above, Eddystone respectfully requests that the Court deny the *Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Subject-Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)* (Doc. No. 283).

Dated: February 22, 2019                            Respectfully submitted,

                                                    /s/ *Filiberto Agusti*
                                                    Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                    Terence M. Grugan (I.D. No. 307211)
                                                    BALLARD SPAHR LLP
                                                    1735 Market Street, 51st Floor
                                                    Philadelphia, PA 19103-7599
                                                    Telephone: (215) 665-8500
                                                    Facsimile: (215) 864-8999
                                                    hockeimerh@ballardspahr.com
                                                    grugant@ballardspahr.com

                                                    Filiberto Agusti (*pro hac vice*)
                                                    Andrew J. Sloniewsky (*pro hac vice*)
                                                    Nicholas Petts (*pro hac vice*)
                                                    STEPTOE & JOHNSON LLP
                                                    1330 Connecticut Avenue, NW
                                                    Washington, DC 20036
                                                    Telephone: (202) 429-3000
                                                    Facsimile: (202) 429-3902
                                                    fagusti@steptoe.com
                                                    asloniewsky@steptoe.com
                                                    npetts@steptoe.com

                                                    *Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2019, I filed the foregoing

electronically through the CM/ECF system, which sent electronic notice of this filing to all

counsel of record.


　　　　　　　　　　　　　　　　　 /s/ *Filiberto Agusti*　　　　　　
　　　　　　　　　　　　　　　　　Filiberto Agusti