**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : |
| Plaintiff/Counter-defendant, | : |
| | : |
| v. | : |
| | : No. 2:17-cv-00495-RK |
| | : |
| JULIO RIOS, JEREMY GAMBOA, | : |
| BRIDGER LOGISTICS, LLC, | : |
| FERRELLGAS PARTNERS, L.P., | : **Oral Argument Requested** |
| FERRELLGAS, L.P., *et al.*, | : |
| Defendants, | : |
| | : |
| BRIDGER LOGISTICS, LLC, | : |
| FERRELLGAS PARTNERS, L.P., and | : |
| FERRELLGAS, L.P., | : |
| Defendants/Counterclaimants. | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S**
**FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER**
**JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(1)**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION ...................................................................... 1

RESPONSE TO ERC'S BACKGROUND SECTION .................................. 2

ARGUMENT ........................................................................... 3

I.      PLAINTIFF HAS NOT MET ITS BURDEN TO ESTABLISH THAT
        THE RAIL SERVICES AGREEMENT IS A MARITIME
        CONTRACT ................................................................... 3

        A.      The Rail Services Agreement Is Not A Stevedoring Contract ................... 3

        B.      The Current Dispute Is Not About Stevedoring Or Any Other
                Maritime Function ..................................................... 6

II.     EVEN IF THE RAIL SERVICES AGREEMENT WERE A
        MARITIME CONTRACT, ERC CANNOT PURSUE NON-
        CONTRACTUAL CLAIMS AGAINST NON-CONTRACTING
        PARTIES IN A COURT OF ADMIRALTY .................................... 7

        A.      ERC's Separate Arbitration And Confirmation Proceeding In
                New York Cannot Establish Admiralty Jurisdiction Here .................... 9

        B.      Assertion Of An Alter-Ego Claim Does Not Transform This
                Litigation Into An Action In Admiralty .................................. 11

CONCLUSION ......................................................................... 16

CERTIFICATE OF SERVICE .......................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Argo Trade S.A. v. Petkim Petrochemicals Trading FZE*,
  No. 09 Civ. 171, 2009 WL 383343 (S.D.N.Y. Jan. 14, 2009) .................................... 6

*Atlanta Shipping Corp. v. Chemical Bank*,
  818 F.2d 240 (2d Cir. 1987) ...................................................................... *passim*

*Blue Whale Corp. v. Grand China Shipping Dev. Co.*,
  722 F.3d 488 (2d Cir. 2013) ...................................................... 14, 15

*Brown v. Astro Holdings, Inc.*,
  385 F. Supp. 2d 519 (E.D. Pa. 2005) ........................................... 11

*Brown v. Philadelphia Hous. Auth.*,
  350 F.3d 338 (3d Cir. 2003) ........................................................ 8

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
  851 F. Supp. 2d 504 (S.D.N.Y. 2012) ........................................ 14

*Derby Res. AG v. Ultramar Panama, P.R.*,
  Nos. 86 CIV. 9600 (JMW), 87 CIV. 1739 (JMW),
  1988 WL 78316 (S.D.N.Y. July 19, 1988) ................................ 6

*Dunsink Trading, Ltd. v. Pittsburg Fin., Inc.*,
  No. 09-cv-320 (GBD), 2009 U.S. Dist. LEXIS 71609 (S.D.N.Y. Aug. 5, 2009) ........ 13

*Ellis v. Allsteel Constr. Inc.*,
  389 F. 3d 1031 (10th Cir. 2004) ................................................ 12

*Exxon Corp. v. Central Gulf Lines, Inc.*,
  500 U.S. 603 (1991) .................................................................... 7

*Euclid Energy Ltd. v. SIA Ventall Terminals*,
  598 F. Supp. 2d 454 (S.D.N.Y. 2009) ....................................... 6

*Fertilizantes Fosfatados Mexicanos, S.A. v. Chen*,
  No. 91 Civ. 2048 (MJL), 1992 WL 204394 (S.D.N.Y. Aug. 11, 1992) ..................... 14

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
  807 F.3d 572 (4th Cir. 2015) ...................................................... 15

ii

**Page(s)**

*Futura Development of Puerto Rico, Inc.*
   *v. Estado Libre Asociado de Puerto Rico,*
   144 F.3d 7 (1st Cir. 1998) .......................................................... 12, 13

*Groden v. N&D Transp. Co.,*
   866 F.3d 22 (1st Cir. 2017) ......................................................... 12

*H.C. Cook Co. v. Beecher,*
   217 U.S. 497 (1910) ................................................................... 10

*In re Petition of Frescati Shipping Co.,*
   No. 05-cv-305 (JHS), 2016 WL 4035994 (E.D. Pa. July 25, 2016),
   *aff'd in part, rev'd in part,* 886 F. 3d 291 (3d Cir. 2018) ............................ 14

*International Ass'n of Heat & Frost Insulators & Asbestos Workers*
   *v. A. Gallo Contractors, Inc.,*
   Civil Action No. 07-2870, 2008 WL 942595 (E.D. Pa. Apr. 8, 2008) ....................... 11

*International Ass'n of Heat & Frost Insulators & Asbestos Workers*
   *v. A. Gallo Contractors, Inc.,*
   Civil Action No. 07-2870, 2008 WL 1971320 (E.D. Pa. May 7, 2008) ..................... 12

*Miners, Inc. v. Alpine Equip. Corp.,*
   722 A.2d 691 (Pa. 1998) ............................................................. 12

*National Marine Serv., Inc. v. C.J. Thibodeaux & Co.,*
   380 F. Supp. 1076 (S.D. Tex. 1973),
   *aff'd,* 501 F.2d 940 (5th Cir. 1974) ................................................. 14, 15

*Norfolk S. Ry Co. v. Kirby,*
   543 U.S. 14 (2004) ................................................................... 5

*Peacock v. Thomas,*
   516 U.S. 349 (1996) ................................................................. *passim*

*Romita v. Anchor Tank Lines, LLC,*
   No. 11 Civ. 9641 (DAB), 2013 WL 432903 (S.D.N.Y. Feb. 1, 2013) ....................... 12

*Steamship Overdale Co. v. Turner,*
   206 F. 339 (E.D. Pa. 1913) .......................................................... 6

*St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.,*
   863 F. Supp. 1013 (E.D. Mo. 1994) ................................................... 6

12532961.12

**Page(s)**

*Swift & Co. Packers v. Compania Columbiana del Caribe, S.A.*,
   339 U.S. 684 (1950) ............................................................................................ *passim*

*Tradhol Internacional, S.A. v. Colony Sugar Mills Ltd.*,
   354 F. App'x 463 (2d Cir. 2009) ................................................................. 6

*Vaughn v. Atkinson*,
   369 U.S. 527 (1962) ........................................................................................ 7

*Vitol, S.A. v. Primerose Shipping Co.*,
   708 F.3d 527 (4th Cir. 2013) ..................................................................... 15

*Zamora v. Bodden*,
   395 F. App'x 118 (5th Cir. 2010) ............................................................. 13

**Other Authorities:**

1 Steven R. Friedell, *Benedict on Admiralty* § 182 (7th ed. Rev. 2012) ........................ 1

iv

## <u>INTRODUCTION</u>

The parties are in agreement that *Benedict on Admiralty* correctly defines a maritime contract as one "relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment." 1 Steven R. Friedell, *Benedict on Admiralty* § 182 (7th ed. rev. 2012) (cited in  Motion to Dismiss Plaintiff's first Amended Complaint for Lack of Subject-Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) (1/25/19) ("Motion"), Dkt. 283 at 7 and Memorandum of Law in Opposition to Motion to Dismiss (2/22/19) ("Opposition" or "ERC Opp."), Dkt. 294 at 1-2).  But ERC makes no real effort to apply this standard to the Rail Services Agreement, which does not relate to any ship, or navigation, or sea transport, or maritime employment, and merely contemplates that there may be maritime commerce if oil transloaded from railcars is placed onto a barge.  ERC strains to argue that the Rail Services Agreement is merely a stevedoring contract for the loading of crude oil onto barges.  But in fact, the primary objective of the agreement is *railcar unloading and storage*; the Rail Services Agreement contemplates that the crude could leave the facility by pipeline instead; the parties could have performed fully without the involvement of any vessels (or any crude, for that matter); and this dispute is purely financial.

Even if the Rail Services Agreement were a maritime contract, that conclusion would not permit the Court to exercise admiralty jurisdiction in this dispute.  This is not a suit on the Rail Services Agreement, and ERC's contracting counterparty is not a defendant here.  Admiralty jurisdiction does not permit a plaintiff to sue whomever it chooses in whatever federal court might seem convenient merely because the plaintiff is a party to a maritime contract having some factual connection to the immediate dispute.  The case should be dismissed.

## RESPONSE TO ERC'S BACKGROUND SECTION

Except for its discussion of the Rail Services Agreement itself, the lengthy "Background" section of ERC's opposition brief has no bearing on this Court's subject-matter jurisdiction. Nevertheless, to avoid any impression that ERC's presentation is accurate, we respond in summary fashion to several incorrect statements and incomplete assertions in ERC's opposition by presenting the following, accurate summary:

- BTS was the only Bridger entity that was a party to the Rail Services Agreement. ERC did not obtain a guaranty from any BTS affiliates.

- ERC asserts (at 3, 12) that it did not charge separately for unloading railcars or storing crude.  That is accurate, but it also did not charge separately for loading barges or pipelines.

- Defendants did not terminate an agreement to supply crude to the Trainer refinery, as ERC suggests (at 4).   Jamex Marketing—*not* an affiliate of Defendants, and *not* a party to this litigation—and Trainer's operator made the decision to suspend the purchase and sale of crude based on market conditions, leaving nothing for BTS to deliver.

- Substantially all of the BTS assets were encumbered by liens in favor of Bank of America, meaning that those assets were not available to ERC for the satisfaction of its contractual claim.

- ERC pursued an arbitration claim *only* against BTS, now known as Jamex Transfer Services, and the parties resolved that proceeding with a pretextual settlement and a collusive award of approximately $140 million, which ERC hopes to collect from the different Defendants in this case on ERC's theories of alter ego and fraudulent transfer.  Judge Pauley, in the Southern District of New

York, denied Defendants' motion for leave to intervene in ERC's suit to confirm the award. But he described ERC's strategy as "troubling" and "concerning," and he stayed the proceeding without confirming the award.

## ARGUMENT

## I.   PLAINTIFF HAS NOT MET ITS BURDEN TO ESTABLISH THAT THE RAIL SERVICES AGREEMENT IS A MARITIME CONTRACT.

Neither the Complaint nor ERC's Opposition satisfies ERC's acknowledged burden to show that the case is within this Court's jurisdiction, because both fall short of establishing that the Rail Services Agreement is a maritime contract. While ERC initially embraces the appropriate standard to determine whether an agreement is a maritime contract—namely, whether the "primary" or "principal" objective of the contract is "maritime commerce"—ERC reaches the conclusion that the Rail Services Agreement is a mere stevedoring contract by ignoring the context of the agreement and bulk of the parties' contractual obligations. ERC also incorrectly argues (at 9) that the Rail Services Agreement "requires substantial carriage of goods by sea"; in fact, the parties could have performed fully without ever involving maritime transport at all.

### A.   The Rail Services Agreement Is Not A Stevedoring Contract.

Defendants acknowledge that stevedoring contracts generally are considered maritime contracts. And ERC devotes much of its Opposition to its argument that the Rail Services Agreement is a stevedoring contract, but it carefully avoids describing the very limited role it plays in actually loading oil onto barges.[1] ERC's lengthy discussion of the history and nature of stevedoring and the involvement of longshoremen is essentially irrelevant, because the loading

---

[1]     The evidence will show that when crude was loaded onto a barge at the Eddystone Rail Facilities, the barge's crew was responsible for setting up the equipment, and ERC's employee simply "turned a valve or pressed the button." (Attached as Exhibit A, Dion Nicely Depo. (2/26/19) at 275:9.)

of cargo onto a barge is not the primary objective of the Rail Services Agreement.  Rather, the

primary objective of the Agreement is to build and operate a facility for offloading crude oil

from railcars arriving from North Dakota.[2]

BTS signed an agreement requiring ERC "to construct, improve and operate the

Eddystone Rail Facilities."  (Motion, Ex. A, ("RSA") at 1.)  ERC alleges the following:

> Plaintiff Eddystone Rail Company ("Eddystone") entered into an agreement with
> BTS under which *Eddystone agreed to construct and operate a facility* in
> Eddystone, Pennsylvania to transfer crude oil from railcars to river barges.  BTS
> agreed to bring a minimum of 64,750 barrels a day of crude oil to Eddystone's
> facility every month from the facility's completion until June 2019.

(Dkt. 182, First Amended Complaint (9/7/18) ("FAC") ¶ 3) (emphasis added).  In ERC's own

words, the primary objective of the contract was the construction and operation of a facility, not

the loading or unloading of crude oil on barges.

The Rail Services Agreement contemplated that crude oil *could* be loaded onto barges

supplied by BTS, but nothing in the agreement required that oil leave the Eddystone Rail

Facilities by barge.  The Agreement provides that offloaded cargo could be loaded onto a barge,

---

[2]     ERC goes beyond the record to assert that barge loading must be the principal purpose of
the agreement, because there is no pipeline connection "[t]o this day."  (ERC Opp. at 14.)  As the
evidence will show, one of ERC's former principals, Jack Galloway, testified that unloading
crude from rail cars was the primary purpose of constructing and operating the Eddystone Rail
Facilities:

> Q.     All right. . . . [W]as the principal  purpose of the facility to offload crude
> from rail cars and then transport it either by barge or pipeline?
>
> A.     The answer to that is yes. It would -- you know, the purpose of the facility
> was to unload rail cars where you could park a long train -- a mile-and-a-quarter
> long train and move that -- quickly unload those rail cars, return the cars -- the
> train to service, and then, of course, you had to move the oil along to its
> destination.  So -- and if a barge was the most appropriate step, that was -- that
> was where it went -- would go and -- or if a pipeline became available --
> obviously you have to lay pipeline.  You have to get permits for the pipeline.
> That may become the option.

(Attached as Exhibit B, John Galloway Depo. (1/15/19) at 102:21 – 103:17.)

stored, or loaded into a pipeline for further transit.  And BTS also had the option not to use the facilities at all, in which case it was required to make an alternative payment to ERC.[3]

ERC does not cite any case that would categorize an agreement comparable to the Rail Services Agreement as a stevedoring contract.  As noted by ERC, "[t]he determination of whether a contract is sufficiently maritime is conceptual . . . ."  (ERC Opp. at 8.)  ERC cites a list of stevedoring cases that are based on contracts very different conceptually from the Rail Services Agreement.  (ERC Opp. at 11-12.)  Not one of the contracts in those cases involves the construction of a facility or the movement of oil by rail.  Instead, they involve straightforward contracts for the loading and unloading of goods onto vessels.

The Rail Services Agreement is not a traditional stevedoring contract because its first stated objective is construction of a facility.  (*See* RSA at 1.)  The Rail Services Agreement goes on to dictate the quality of the oil being shipped, the timing of trains, and the insurance that must be obtained; none of these terms even touches on maritime commerce.  (*See id.*, Ex. A at §§ 1, 5, 6, 10, 13.  Instead, these terms show that the primary objective of the contract was to govern the logistics of the process for transloading crude from rail to an alternative mode of transportation, which, under the agreement, could be a barge or a pipeline. (*See id.* at 1.)

As a result, the portions of the Rail Services Agreement that do concern barge transport are not of such a nature that it can be said that the "primary objective is to accomplish the transportation of goods by sea."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004).  Consequently, the more pertinent authorities are those concluding that jurisdiction is lacking in suits for breach of contracts with a mix of maritime and non-maritime components.  *See Euclid*

---

[3]     ERC's assertion that the Rail Services Agreement "requires BTS to procure barges to pick up transloaded oil" is not correct.  (ERC Opp. at 17 n.5.)  BTS was not *required* to deliver oil to the Eddystone Rail Facilities at all, let alone to transport oil by barge, because BTS had the option to pay deficiency charges if it opted not to transload any oil through the facilities.

*Energy Ltd. v. SIA Ventall Terminals*, 598 F. Supp. 2d 454, 455-56 (S.D.N.Y. 2009) (upgrading of gasoline and loading onto ships for export); *Derby Res. AG v. Ultramar Panama, P.R.*, Nos. 86 CIV. 9600 (JMW), 87 CIV. 1739 (JMW), 1988 WL 78316, at *2 (S.D.N.Y. July 19, 1988) (receipt of crude oil from pipelines, allocation of berths, disposal of ballast water and other effluents, preparation of customs declarations, measuring quality and quantity of cargo loaded); *Tradhol Internacional, S.A. v. Colony Sugar Mills Ltd.*, 354 F. App'x 463, 465 (2d Cir. 2009) (sale and loading of ethyl alcohol, including provisions for demurrage and dead freight); *St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.*, 863 F. Supp. 1013, 1017-18 (E.D. Mo. 1994) (unloading of goods from barge and storage on land).[4]

### B.   The Current Dispute Is Not About Stevedoring Or Any Other Maritime Function.

ERC brought this case because it built a $170 million facility that Jamex Transfer Service ("JTS") stopped using, and ERC was not able to collect deficiency payments from JTS.  (*See* FAC ¶¶ 3, 74-75.)  The dispute is purely financial and results from a cessation of all commerce rather than from ongoing or mishandled maritime commerce.  Because ERC's claim is based on a lack of commerce instead of actual maritime commerce, there is no maritime jurisdiction here. *See Argo Trade S.A. v. Petkim Petrochemicals Trading FZE*, No. 09 Civ. 171, 2009 WL 383343 at *2 (S.D.N.Y. Jan. 14, 2009) (claim that defendant breached contract by failing to provide letter of credit required before oil was to be loaded onto tanker did not allege "breach of any maritime obligation"); *Steamship Overdale Co. v. Turner*, 206 F. 339, 341 (E.D. Pa. 1913)

---

[4]   ERC attempts to distinguish *St. Louis Cold Drawn* on the basis that the dispute in this case arises from "the core maritime service of loading cargo onto barges, and not any issue relating to storage."  (ERC Opp. at 16.)  But, in fact, this dispute does not arise from either one. ERC commenced arbitration proceedings against JTS because it stopped using the Eddystone Rail Facilities altogether.

(claim that supplier breached requirements contract by failing to supply coal to vessel did not implicate admiralty jurisdiction).

Stated differently, the "nature of the transaction" in this case is financial rather than maritime. *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991). That transaction cannot serve as the basis for admiralty jurisdiction in this Court.

## II.   EVEN IF THE RAIL SERVICES AGREEMENT WERE A MARITIME CONTRACT, ERC CANNOT PURSUE NON-CONTRACTUAL CLAIMS AGAINST NON-CONTRACTING PARTIES IN A COURT OF ADMIRALTY.

But even if ERC were right about the primary objective of the Rail Services Agreement, much more is necessary before it can sue Defendants in admiralty on claims that do not arise under that contract. Three fundamental misdirections or misconceptions underlie ERC's efforts to establish admiralty jurisdiction in this Court.

*First*, ERC argues at length (at 21-23) that a court of admiralty may award equitable relief. Of course it may; that point is not controversial. *See Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962). But the plaintiff must first invoke admiralty jurisdiction by advancing a cause of action sounding in admiralty, for "a court of admiralty will not enforce an independent equitable claim merely because it pertains to maritime property." *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 690 (1950). The relevant question is not whether the Court may grant equitable relief; it is whether the Court may grant any relief at all, which at a minimum requires the Court to have subject-matter jurisdiction.[5] To again be perfectly clear, ERC has not sued *any* party in this action for breach of the Rail Services Agreement.

*Second*, ERC takes issue (at 21-23) with Defendants' labeling of certain claims as "traditional," "equitable," "subsidiary," and "ancillary." But these are terms used by the courts

---

[5]    ERC does not (and cannot) argue that this case is within the Court's federal-question or diversity jurisdiction.

in cases defining the scope of admiralty jurisdiction and federal enforcement jurisdiction. *See*, *e.g.*, *Swift*, 339 U.S. at 691 (referring to fraudulent-transfer claim as a "subsidiary or derivative issue in a litigation clearly maritime"); *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir. 1987) (referring to "traditional admiralty claims" and "equitable claims subsidiary to that litigation" and "the derivative claim of an alleged fraudulent transfer"); *Peacock v. Thomas*, 516 U.S. 349, 355 (1996) (referring to claims that are not themselves sufficient to invoke federal jurisdiction as "ancillary claims"). The fundamental point remains the same—a plaintiff must assert a maritime claim before discussions of particular remedies become pertinent.

*Third*, ERC spends two pages (at 27-29) discussing supplemental jurisdiction . But Defendants' motion does not challenge the exercise of supplemental jurisdiction.[6] The appropriate exercise of supplemental jurisdiction in this case is irrelevant if the Court lacks subject-matter jurisdiction over the case in the first instance.

When the distractions above are stripped away, the essential jurisdictional question remains: Even if the Rail Services Agreement is a maritime contract, how can the Court exercise admiralty jurisdiction in this lawsuit, which involves no claim for breach of that contract and no claim against its counterparty? Indeed, none of the parties to this case were parties to the arbitration proceeding in New York. ERC advances two arguments in response, neither of which it outlines cleanly in its opposition papers. First, ERC suggests (at 1, 21, 25-27) that it is sufficient that it has advanced a contractual claim against JTS in New York. Second, ERC argues (at 23-25) that the invocation of the alter-ego doctrine transforms a non-contractual

---

[6]     Defendants do not concede that supplemental jurisdiction is appropriate here, but it would be immaterial if they did, for parties cannot waive objections to subject-matter jurisdiction. *See Brown v. Philadelphia Hous. Auth.*, 350 F.3d 338, 346 (3d Cir. 2003).

dispute between non-contracting parties into a contractual dispute between contracting parties. For the reasons that follow, neither of these arguments has merit.

A.   **ERC's Separate Arbitration And Confirmation Proceeding In New York Cannot Establish Admiralty Jurisdiction Here.**

ERC's attempt to anchor this Court's jurisdiction in proceedings in the Southern District of New York is squarely inconsistent with *Atlanta Shipping* and *Swift*. *Atlanta Shipping*, in particular, involved the same series of events that led to this litigation—an arbitration against the party to the maritime contract, followed by confirmation of the award in the Southern District of New York, followed by a fraudulent-transfer lawsuit against a *different defendant that was not a party to the contract*. *See Atlanta Shipping*, 818 F.2d at 244. Even though the second suit was also filed in the Southern District of New York, the Second Circuit appropriately rejected the plaintiff's argument that "the fact of a related maritime dispute is sufficient to confer admiralty jurisdiction over its independent action to assert equitable claims." *Id.* at 248. Rather, the court held, a plaintiff "must have invoked the admiralty court's jurisdiction over litigation properly before it in order to permit the court to consider equitable claims subsidiary to that litigation." *Id.* No maritime claim is properly before this Court.

*Swift*, by contrast, demonstrates when a court may address alter-ego and fraudulent-transfer claims against non-contracting parties. In that case, the libellants "went into admiralty on a claim arising upon a contract of affreightment supplemented by charges of negligence in the nondelivery of a sea cargo – matters obviously within admiralty jurisdiction." *Swift*, 339 U.S. at 691. They later amended their libel to join a new respondent, against which they asserted claims of alter ego and fraudulent transfer. *Id.* at 686. Because these claims were "subsidiary to issues wholly within admiralty jurisdiction," the court had the power to entertain them. *Id.* at 692. But

the Court made clear that a court of admiralty could not entertain "an independent equitable claim," such as a creditor's bill to set aside the fraudulent transfer. *Id.* at 690.

ERC asserts (at 24) that Defendants have cited "no case that suggests that jurisdiction under a maritime contract is limited to cases in which a party asserts a 'traditional' breach of contract claim (*i.e.*, a claim directly against its counterparty)." This is a curious argument, for Defendants cited *Swift* and *Atlanta Shipping* and discussed them at length in their motion. These cases not only *suggest* that admiralty jurisdiction is so limited; they *establish* that it is so limited.[7] ERC attempts to distinguish *Atlanta Shipping* (at 26) by citing a snippet of the opinion referring to "*an* admiralty court" and arguing that advancing a claim in *any* admiralty court will do. But the immediately preceding sentence of the opinion makes clear that the plaintiff must have "invoked *the* admiralty court's jurisdiction over litigation properly before *it* in order to permit *the* court to consider equitable claims." *Atlanta Shipping*, 818 F.2d at 248 (emphasis added). Neither *Atlanta Shipping* nor any other authority cited by ERC supports its position that a plaintiff may travel about the country suing additional defendants in federal courts merely because the plaintiff once asserted a related maritime claim against its counterparty in some federal court. *See Peacock*, 516 U.S. at 355 ("claims alleged to be factually interdependent with and, hence, ancillary to claims brought in an earlier federal lawsuit will not support federal jurisdiction over a subsequent lawsuit"); *H.C. Cook Co. v. Beecher*, 217 U.S. 497, 498 (1910) (holding that federal court lacked jurisdiction over plaintiff's suit attempting "to make the defendants answerable for the judgment already obtained" by plaintiff in patent litigation).

---

[7] As noted in the motion, the longstanding exception for proceedings to enforce a foreign admiralty judgment has no application here. (Motion at 14 n.9.)

**B.      Assertion Of An Alter-Ego Claim Does Not Transform This Litigation Into An Action In Admiralty.**

ERC's other attempt to steer a course around *Peacock*, *Atlanta Shipping*, and similar authorities involves considerable creativity but is entirely meritless.   Though not explained clearly in the opposition papers, the argument appears to go like this:

(1)      Bridger Logistics (for example) is the alter ego of BTS;

(2)      Because BTS and Bridger Logistics are one and the same for legal purposes, Bridger Logistics is a party to the Rail Services Agreement, a maritime contract;

(3)      Bridger Logistics is liable for breach of the contract; and

(4)      Thus, ERC is asserting "what amounts to a 'contractual claim' (albeit against BTS's alter egos)" on a maritime contract. (ERC Opp. at 23.).  Q.E.D.

This argument is not only too clever by half; but ERC also supports it with only a single ERISA case that does not withstand scrutiny, and with no admiralty cases at all.

In *Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519 (E.D. Pa. 2005), Judge McLaughlin adopted a jurisdictional theory in an ERISA case that resembles ERC's argument here.  Raising a jurisdictional question sua sponte, she concluded that a pension plan's attempt to assert a claim for withdrawal liability against affiliates of a bankrupt employer on veil-piercing grounds—precisely what the plaintiff in *Peacock* attempted—did not present a federal question, but the plan's similar alter-ego claim did.  *See id.* at 525.

Judge O'Neill, however, rejected the *Brown* rationale in *International Association of Heat & Frost Insulators & Asbestos Workers v. A. Gallo Contractors, Inc.*, Civil Action No. 07-2870, 2008 WL 942595 (E.D. Pa. Apr. 8, 2008), holding that an alter-ego ERISA claim does not invoke federal jurisdiction unless the purported alter ego itself "played a direct role in the underlying ERISA violation" such that it is directly liable (not merely as an alter ego).  *Id.* at *4.

11

Judge O'Neill adhered to his decision on a motion for reconsideration, emphasizing that "plaintiffs' mere assertion of an alter ego claim does not establish that Gallo is directly liable for the ERISA violation of Tempco." *International Ass'n of Heat & Frost Insulators & Asbestos Workers v. A. Gallo Contractors, Inc.*, Civil Action No. 07-2870, 2008 WL 1971320, at *4 (E.D. Pa. May 7, 2008).[8]

Judge O'Neill's analysis is consistent with well-reasoned ERISA opinions from throughout the United States. *See, e.g., Groden v. N&D Transp. Co.*, 866 F.3d 22, 30-31 (1st Cir. 2017) (allegations that purported alter ego was *directly* liable as an "employer" under ERISA were sufficient to invoke federal-question jurisdiction, while absence of similar allegations about another defendant meant that that claim did not present a federal question under *Peacock*); *Ellis v. Allsteel Constr. Inc.*, 389 F.3d 1031, 1035 (10th Cir. 2004) (rejecting distinction between veil-piercing and alter-ego claims for jurisdictional purposes and observing that Supreme Court granted certiorari in *Peacock* to resolve circuit split involving both types of claims); *Romita v. Anchor Tank Lines, LLC*, No. 11 Civ. 9641 (DAB), 2013 WL 432903, at *3 (S.D.N.Y. Feb. 1, 2013) (applying *Peacock* to dismiss successor liability claim under ERISA).[9]

ERC's theory fares no better outside the ERISA context. For example, *Futura Development of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7 (1st Cir. 1998), involved the fact pattern present here—a federal suit for breach of contract followed by a

---

[8]     In Pennsylvania, alter ego is merely a theory of piercing the corporate veil. *See Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. 1998). There is no basis for suggesting that one label permits a plaintiff to access federal court but the other does not.

[9]     ERC has not alleged that Bridger Logistics or any of the other purported alter egos of BTS are *directly* liable for breaching the Rail Services Agreement. While an allegation that a company that does not formally employ certain workers should nevertheless be considered their "employer" under ERISA's regulatory regime is at least plausible, a suggestion that a company that is not a party to a contract is directly responsible for breaching it is not. Instead, ERC's alter-ego allegations relate to such typical matters as the financial and contractual relationships between BTS and its affiliates, the capitalization of BTS, and the lack of dividends paid by BTS (FAC ¶¶ 77-86.)

second federal suit with no independent jurisdictional basis seeking to impose liability on an alleged alter ego of the original defendant.  *See id.* at 8-9.  The First Circuit was not persuaded by the plaintiff's efforts to distinguish *Peacock*, holding that it is irrelevant whether the alleged alter ego's improper actions occur before or after the initial judgment is rendered and rejecting the plaintiff's argument that its alter-ego theory means that the defendant in the second action "is not really a 'new' defendant."  *Id.* at 11.  Rather, the court said, alter-ego and veil-piercing claims "involve a substantive theory for imposing liability upon entities that would, on first blush, not be thought liable for a tort or on a contract."  *Id.* at 12.  The court declined "to treat the corporate form of [defendant] as a complete nullity – to look through its legal identity to the party standing behind it – and to do so under the guise of making a factual determination necessary to determine our subject matter jurisdiction over this case."  *Id.*

The same analysis applies in admiralty.  The Fifth Circuit, for example, refused to permit a plaintiff to pursue an alter-ego claim against a non-diverse defendant to collect on a prior admiralty judgment.  *See Zamora v. Bodden*, 395 F. App'x. 118, 119 (5th Cir. 2010).  Citing *Peacock*, the court rejected the proposition that "this collection action can derive its federal jurisdiction from the earlier lawsuit."  *Id.*  The Southern District of New York reached the same conclusion in *Dunsink Trading, Ltd. v. Pittsburg Financial Inc.*, No. 09 cv 320 (GBD), 2009 U.S. Dist. LEXIS 71609 (S.D.N.Y. Aug. 5, 2009), stating that "[n]o ancillary jurisdiction may be exercised where, as here, a federal judgment creditor brings a new action against newly named parties seeking to shift liability for an existing judgment under an alter ego theory of liability." *Id.* at *9.  The court went on to say that "[a]dmiralty jurisdiction cannot be invoked solely in an attempt to establish alter ego liability in a second confirmation proceeding after confirmation of an arbitral award against the named party has already taken place."  *Id.* at *10.

ERC does not really argue otherwise.  Instead, it retreats to a safe berth, pressing

uncontroversial propositions such as "jurisdiction over a maritime contract includes the power to determine whether a party is an alter ego." (ERC Opp. at 24.)  Because ERC does not sue Defendants for breach of a maritime contract, this point is not helpful.  But in the interest of completeness, we address here each of the admiralty cases cited in Part II of ERC's opposition brief:

- In *Frescati*, the court held that equitable defenses are available in admiralty.  *See In re Petition of Frescati Shipping Co.*, No. 05-cv-305 (JHS), 2016 WL 4035994, at *71 (E.D. Pa. July 25, 2016), *aff'd in part, rev'd in part*, 886 F.3d 291 (3d Cir. 2018).

- Several cases are consistent with *Swift*, permitting an admiralty court to resolve alter-ego or fraudulent-transfer claims *alongside traditional maritime claims*.  *See Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 506, 508 (S.D.N.Y. 2012); *Fertilizantes Fosfatados Mexicanos, S.A. v. Chen*, No. 91 Civ. 2048 (MJL), 1992 WL 204394, at *3-4 (S.D.N.Y. Aug. 11, 1992).

- Several cases involved no dispute about subject-matter jurisdiction.  *See Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 491,  494 (2d Cir. 2013) (stating several times that neither party disputes jurisdiction); *National Marine Serv., Inc. v. C.J. Thibodeaux & Co.*, 380 F. Supp. 1076, 1079-80 (S.D. Tex. 1973) (addressing res judicata, choice of federal or state law, and merits of

alter-ego claim; no discussion of jurisdiction), *aff'd*, 501 F.2d 940 (5th Cir. 1974).[10]

- Several cases also involved foreign admiralty judgments or foreign arbitrations, which are subject to different jurisdictional rules. *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 533 (4th Cir. 2013) (Rule B attachment of vessel after foreign judgment); *Blue Whale*, 722 F.3d at 491 (Rule B attachment of vessel while London arbitration was pending); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 581-82 (4th Cir. 2015) (Rule B attachment of vessel by one plaintiff with foreign judgment and one with foreign arbitral award).[11]

ERC's alchemical alter-ego theory of jurisdiction presents a host of other problems, including preclusion (how can the plaintiff sue the same party twice for the same breach of contract?) and manipulation of other jurisdictional statutes (can a plaintiff eliminate the diversity-destroying citizenship of a party by alleging it to be an alter ego of a company incorporated elsewhere?). But the more fundamental issue is that ERC's convoluted theory of jurisdiction is plainly inconsistent with *Peacock*, *Swift*, *Atlanta Shipping*, other authorities, and common sense. This is not a suit for breach of a maritime contract against a party to the contract, and an allegation of alter ego does not make it such.

---

[10]   ERC wrongly states (at 25) that the *National Marine* opinion involves the denial of a motion to dismiss for lack of jurisdiction. In fact, it is a decision awarding judgment to the plaintiff on the merits, apparently after a trial.

[11]   ERC argues (at 23 n.12) that the Fourth Circuit in *Flame* identified substantial differences between federal-question jurisdiction and admiralty jurisdiction, such that *Peacock* may not apply fully in admiralty. But the only differences identified in *Flame* were the longstanding rule allowing enforcement of foreign admiralty judgments and the court's power to grant attachments. *See* 807 F.3d at 582. Neither is relevant in this domestic dispute involving *in personam* liability.

## **CONCLUSION**

For these reasons and those stated in Defendants' motion, the Court should dismiss ERC's First Amended Complaint for lack of subject-matter jurisdiction.

 Dated:  March 11, 2019

Respectfully submitted,


By:___/s/_____
        Lawrence G. Scarborough (Admitted *Pro Hac Vice*)

        Richard L. Scheff (I.D. No. 35213)
        Michael C. Witsch (I.D. No. 313884)
        ARMSTRONG TEASDALE, LLP
        1500 Market Street
        12th Floor, East Tower
        Philadelphia, PA 19102
        Telephone:  (215) 246-3469
        Facsimile:  (215) 569-8228
        rlscheff@armstrongteasdale.com
        mwitsch@armstrongteasdale.com

        Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
        BRYAN CAVE LEIGHTON PAISNER LLP
        1290 Avenue of the Americas
        New York, New York 10104
        Telephone:  (212) 541-2000
        Facsimile:  (212) 541-4630
        lgscarborough@bclplaw.com

        Jacob A.  Kramer (Admitted *Pro Hac Vice*)
        BRYAN CAVE LEIGHTON PAISNER LLP
        1155 F Street, NW
        Washington, D.C. 20004
        Telephone:  (202) 508-6000
        Facsimile:  (202) 508-6200
        jake.kramer@bclplaw.com

Brian C. Walsh (Admitted *Pro Hac Vice*)
Alicia Ragsdale Olszeski (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
211 North Broadway, Suite 3600
St.  Louis, Missouri 63102
Telephone:  (314) 259-2000
Facsimile:  (314) 259-2020
brian.walsh@bclplaw.com
ali.olszeski@bclplaw.com

Sarah L. Hartley (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
sarah.hartley@bclplaw.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas
Partners, L.P., Ferrellgas L.P., Bridger Rail
Shipping, LLC, Bridger Real Property, LLC,
Bridger Storage, LLC, Bridger Swan Ranch, LLC,
Bridger Terminals, LLC, Bridger Transportation,
LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC,
Bridger Admin Services II LLC, Bridger Energy,
LLC, Bridger Lake, LLC, Bridger Leasing, LLC,
Bridger Marine, LLC*


_____/s/_____
Julie Negovan, Esquire (1651)
1622 Spruce Street
Philadelphia, PA 19103
Telephone:  (267) 546-0623
jn@sprucelaw.com

Jeremy A. Fielding
Kent D. Krabill
Jonathan D. Kelley
Christian A. Orozco
LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
jfielding@lynnllp.com
kkrabill@lynnllp.com

17

jkelley@lynnllp.com
corozco@lynnllp.com

*Attorneys for Defendants Julio Rios and
Jeremy Gamboa*

18

## CERTIFICATE OF SERVICE

I, Michael Witsch, hereby certify that on March 11, 2019, a true and correct copy of the foregoing *Reply in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)* was filed electronically via the Court's ECF filing system.  This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

/s/ Michael Witsch
Michael Witsch

12532961.12