**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 17-cv-00495 |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., FERRELLGAS, L.P., | ) | |
| BRIDGER ADMINISTRATIVE SERVICES | ) | |
| II, LLC, BRIDGER MARINE, LLC, | ) | |
| BRIDGER RAIL SHIPPING, LLC, | ) | |
| BRIDGER REAL PROPERTY, LLC, | ) | |
| BRIDGER STORAGE, LLC, BRIDGER | ) | |
| SWAN RANCH, LLC, BRIDGER | ) | |
| TERMINALS, LLC, BRIDGER | ) | |
| TRANSPORTATION, LLC, BRIDGER | ) | |
| ENERGY, LLC, BRIDGER LEASING, LLC, | ) | |
| BRIDGER LAKE, LLC, J.J. LIBERTY, LLC, | ) | |
| J.J. ADDISON PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EDDYSTONE RAIL COMPANY, LLC'S SUR-REPLY IN OPPOSITION TO
DEFENDANTS' JANUARY 25, 2019 MOTION TO DISMISS (Doc. No. 283)**

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, D.C.  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

Dated:  March 18, 2019                    *Attorneys for Eddystone Rail Company, LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.      THE RAIL SERVICES AGREEMENT IS A MARITIME CONTRACT ...................... 2

      A.     Defendants Effectively Concede that Contracts for Loading Cargo onto
              Ships Are Maritime ............................................................................................. 2

      B.     The Rail Service Agreement's Primary Objective Is Transloading Oil onto
              Barges for Shipment to Refineries on the Delaware River ................................... 3

      C.     Maritime Jurisdiction Encompasses Suits for Money Damages Arising
              Out of the Breach of a Maritime Contract ............................................................ 6

II.     THE COURT HAS JURISDICTION OVER COUNT ONE BECAUSE IT SEEKS
        TO HOLD DEFENDANTS LIABLE FOR BREACH OF A MARITIME
        CONTRACT UNDER A THEORY OF ALTER EGO LIABILITY ............................... 7

      A.     Defendants Fail to Appreciate that Eddystone Predicates its Claim for
              Alter Ego Liability on the Breach of a Maritime Contract ................................... 7

      B.     Defendants' Narrow View of Veil Piercing Ignores the Reality that Plaintiffs
              Can (and Often Do) Assert Claims for Contractual Liability and Damages
              Against Non-Signatory Alter Egos ....................................................................... 9

      C.     Defendants Have Not Established that a Plaintiff Must Sue Its Contractual
              Counterparty in the Same Action Before it Can Proceed on Claims Against
              an Alter Ego on the Same Contract ..................................................................... 12

      D.     Eddystone's Claim for Liability on an Alter Ego Theory Is Not a Lawsuit to
              Enforce a Judgment Against a Third Party ........................................................... 15

III.    BECAUSE THE COURT HAS JURISDICTION OVER A CLAIM FOR BREACH
        OF A MARITIME CONTRACT UNDER AN ALTER EGO THEORY, THE
        COURT MAY PROPERLY EXERCISE SUPPLEMENTAL JURISDICTION
        OVER ANY RELATED CLAIMS ......................................................................... 17

IV.    IN THE ALTERNATIVE, THE COURT MAY EXERCISE JURISDICTION
        OVER CLAIMS ASSERTED IN AID OF AN EVENTUAL MARITIME
        JUDGMENT THAT MAY BE AWARDED IN NEW YORK ..................................... 18

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pres. Lines, Ltd. v. Green Transfer & Storage, Inc.*,
   568 F. Supp. 58 (D. Or. 1983) .................................................. 3

*Ariate Compania Naviera, S.A. v. Commonwealth Tankship Owners, Ltd.*,
   310 F. Supp. 416 (S.D.N.Y. 1970) .............................. 10, 12, 13

*Atl. Transp. Co. of W. Va. v. Imbrovek*,
   234 U.S. 52 (1914)............................................................... 3

*Atlanta Shipping Corp. v. Chem. Bank*,
   631 F. Supp. 335 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987) .................................. 14

*Atlanta Shipping Corp. v. Chem. Bank*,
   818 F.2d 240 (2d Cir. 1987)......................................... 14, 18

*Bennett v. Itochu Int'l, Inc.*,
   682 F. Supp. 2d 469 (E.D. Pa. 2010) ................................... 11

*C.F. Trust, Inc. v. First Flight Ltd. P'ship*,
   306 F.3d 126 (4th Cir. 2002) .............................................. 15

*Carefree Cartage, Inc. v. Husky Terminal & Stevedoring, Inc.*,
   No. C07-5294 RBL, 2007 WL 4358316 (W.D. Wash. Dec. 7, 2007)........................................ 3

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
   851 F. Supp. 2d 504 (S.D.N.Y. 2012)..................................... 9

*Dunsink Trading, Ltd. v. Pitsburg Fin. Inc.*,
   No. 1:09 CV 320 GBD, 2009 U.S. Dist. LEXIS 71609 (S.D.N.Y. Aug. 5, 2009) (mem.) ...... 16

*Engle v. Matrix Golf & Hosp. Phila., LLC*,
   No. Civ. A. 08-5831, 2009 WL 880680 (E.D. Pa. Mar. 31, 2009).......................................... 11

*Epperson v. Entm't Express, Inc.*,
   242 F.3d 100 (2d Cir. 2001).............................................. 19

*Fertilizantes Fosfatados Mexicanos, S.A. v. C.Y. Chen*,
   No. 91 Civ. 2048 (MJL), 1992 WL 204394 (S.D.N.Y. Aug. 11, 1992) ................................... 18

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
807 F.3d 572 (4th Cir. 2015) ........................................................ 16

*Great E. Shipping Co. v. Binani Cement Ltd.*,
655 F. Supp. 2d 395 (S.D.N.Y. 2009) ........................................... 6

*Ingersoll Mill. Mach. Co. v. M/V Bodena*,
829 F.2d 293 (2d Cir. 1987) ......................................................... 2

*Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*,
689 F. Supp. 1340 (S.D.N.Y. 1988) ......................................... 9, 10

*Nat'l Mar. Servs., Inc. v. Straub*,
776 F.3d 783 (11th Cir. 2015) .................................................... 19

*New Orleans Stevedoring Co. v. United States*,
439 F.2d 89 (5th Cir. 1971) ...................................................... 3, 6

*Norfolk S. Ry. Co. v. Kirby*,
543 U.S. 14 (2004) .................................................................... 2, 4

*Peacock v. Thomas*,
516 U.S. 349 (1995) ............................................................... 15, 19

*S.S. Overdale Co. v. Turner*,
206 F. 339 (E.D. Pa. 1913) .......................................................... 3

*Sabine Towing & Transp. Co. v. Merit Ventures, Inc.*,
575 F. Supp. 1442 (E.D. Tex. 1983) ....................................... 10, 12

*Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*,
339 U.S. 684 (1950) .............................................................. 14, 18

*Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*,
475 F. Supp. 2d 275 (S.D.N.Y. 2006) ..................................... 10, 11

*Zamora v. Bodden*,
395 F. App'x 118 (5th Cir. 2010) (per curiam) ........................... 16

**Statutes**

28 U.S.C. §1367(a) ........................................................................ 17

## INTRODUCTION

The Court's jurisdiction over this case is governed by a few simple propositions.

First, the Rail Services Agreement ("RSA") is a maritime contract. It facilitates maritime commerce by setting out an agreement for the loading of barges at a facility to be constructed by Eddystone for that purpose. Contrary to the reply brief, it is not a construction contract or a building loan agreement. It charges by the barrel for the service of transloading crude oil from trains to barges. The barges would then transport the oil over navigable waters. Functionally, the RSA serves the same purpose as a stevedoring contract—loading cargo into vessels—though it employs modern technology in lieu of the muscles of individual workers.

Second, this case deals with a breach of the RSA. Contrary to the reply brief, Eddystone *does* allege a breach of that maritime contract and does intend to prove it at trial. The First Amended Complaint specifically asserts that BTS defaulted on its obligations and asks that Defendants, as alter egos, be held liable for that default. The power of an admiralty court to determine alter ego liability is undisputed in the case law. That is what this Court has been asked to do here.

Third, because this Court has jurisdiction to determine alter ego liability, it has supplemental jurisdiction to decide whether any fraudulent transfers should be voided. Defendants have not contested that Eddystone's allegations of alter ego and fraudulent transfer liability stem from the same nucleus of fact. Nor have they contested that Eddystone's claim for breach of fiduciary duty involves the same facts.

Fourth, Defendants concede that, if the RSA is a maritime contract, then the ongoing proceedings to confirm an arbitral award in the Southern District of New York arise under that court's maritime jurisdiction. It is well established that a federal court may preside over efforts

to force disgorgement of fraudulent transfers, such as those alleged here, in aid of separate maritime proceedings.

Defendants offer no meaningful challenge to any of these propositions, and instead argue that this case should be governed by a series of inapplicable legal doctrines relating to "mixed" contracts and post-judgment actions for alter ego liability that lack an independent jurisdictional basis. These arguments misconstrue legal doctrine, mischaracterize Eddystone's allegations and the terms of the RSA, and generally fail to respond to the facts as they actually exist.

Defendants would prefer not to discuss the facts of this case because the facts do not honor their clients. But it is time to put aside the various procedural obstacles and grapple with the substance of the case. Defendants' motion should be denied.

## ARGUMENT

## I.     THE RAIL SERVICES AGREEMENT IS A MARITIME CONTRACT

### A.     Defendants Effectively Concede that Contracts for Loading Cargo onto Ships Are Maritime

Defendants now "acknowledge that stevedoring contracts generally are considered maritime contracts." Reply at 3. Defendants argue, however, that this precedent is "essentially irrelevant," apparently because, in their view, the RSA is not a "stevedoring" contract. (*Id.*) As in their initial memorandum, Defendants place far too much weight on the title or label given to a contract and far too little weight on its subject matter. To determine if a contract is maritime, a court must look to the "nature and character of the contract"—not what it is called. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004) (citation omitted); *see also Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 302 (2d Cir. 1987) ("[T]he focus of our inquiry must be not on the name assigned to the contract, but rather on the nature of the services to be performed.").

2

As Eddystone explained in its opposition brief, there is broad agreement among courts that loading and unloading goods from ships is a maritime service, regardless of what it is called or how the loading/unloading is accomplished.  *See* Opp. at 10-12.  Eddystone has cited ample support for the proposition that contracts for the loading and unloading of vessels are maritime contracts.  *See, e.g.*, *New Orleans Stevedoring Co. v. United States*, 439 F.2d 89, 90 (5th Cir. 1971) (exercising maritime jurisdiction over a contract for the "'*unloading and loading* of cars, barges, or trucks to and from piers, docks, and wharves'") (emphasis added); *Carefree Cartage, Inc. v. Husky Terminal & Stevedoring, Inc.*, No. C07-5294 RBL, 2007 WL 4358316, at *3 (W.D. Wash. Dec. 7, 2007) (exercising maritime jurisdiction over a contract "for *unloading* containers from the ship, stowing them, and then releasing them to outbound carriers") (emphasis added); *Am. Pres. Lines, Ltd. v. Green Transfer & Storage, Inc.*, 568 F. Supp. 58, 60 (D. Or. 1983) ("*Loading and unloading* of cargo from a ship have traditionally been considered maritime services.") (emphasis added); *S.S. Overdale Co. v. Turner*, 206 F. 339, 341 (E.D. Pa. 1913) (recognizing that a "breach of contract to *load a cargo on a vessel*" would provide grounds to exercise maritime jurisdiction) (emphasis added).  Thus, a stevedore is "engaged in the performance of maritime service" because "the service in loading and stowing a ship's cargo is of this character."  *Atl. Transp. Co. of W. Va. v. Imbrovek*, 234 U.S. 52, 61 (1914).

B.     **The Rail Service Agreement's Primary Objective Is Transloading Oil onto Barges for Shipment to Refineries on the Delaware River**

Defendants acknowledge that a contract's primary objective determines whether it is maritime.  Reply at 3.  Here, the text of the agreement and the parties' course of dealing thereunder demonstrate that the primary objective of the RSA is to take crude oil from railcars and load it onto barges for transport in maritime commerce to facilities elsewhere on the

Delaware River.  This is a core maritime service, regardless of what it is called.  Nor does evidence that the loading involved little physical exertion and was performed with the assistance of a barge's crew (*see* Reply at 3 & n.1) in any way undermine the fact that the "nature" of the contract is an agreement for the service of loading oil onto vessels for transport in maritime commerce.  One of the virtues of the "conceptual" approach to identifying maritime contracts is that it allows the doctrine to evolve along with advances in technology.  *See Kirby*, 543 U.S. at 25-26 (observing that the concept of what is a maritime contract must evolve along with technological change).

Nevertheless, Defendants posit, inexplicably, that the primary objective of the RSA is to "build and operate a facility for offloading crude oil from railcars arriving from North Dakota." Reply at 4.  Although offloading was, of course, a component of the services to be provided at the facility, it was by no means the primary objective of the contract.  The primary objective was to transfer crude oil from trains to the barges that would take it to its final destination elsewhere on the Delaware River.  Further, the fact that Eddystone had to first construct a facility in order to be in a position to perform these services in no way alters the primary objective of the contract, which was for Eddystone to provide transloading services at the facility, and for BTS to avail itself of those services for a fixed period of time.  Significantly, BTS was charged for the transloading, not for the building.

Defendants' contention that the primary objective of the contract was building a facility for offloading oil is further belied by the terms of the contract, the paragraph of Eddystone's First Amended Complaint that they cite, and even the witness testimony on which they rely.  The RSA describes the project as "construct[ing] and/or improv[ing] a new rail and barge facility located in Eddystone, Delaware County, Pennsylvania that will unload Crude Petroleum . . .

4

from unit trains and load such Crude Petroleum into barges and, potentially, pipelines." RSA at 1, Doc. No. 283-1. Once the facility was completed, Eddystone agreed to provide "Transloading Services," which entailed unloading from trains and loading it onto barges (the only available transportation option to this day). RSA at 5. These provisions are consistent with Eddystone's allegation that it agreed to "construct and operate a facility . . . *to transfer crude oil from railcars to river barges*." FAC, Doc. No. 182, ¶ 3 (cited in Reply at 4) (emphasis added). They are also consistent with Jack Galloway's testimony that, "of course, you had to move the oil along to its destination" once it reached the facility. Reply Ex. B, Galloway Dep. Tr. 103:10-11. Finally, the RSA's incorporated Terms and Conditions include numerous provisions relating to barges, revealing the centrality of maritime transport to the agreement between Eddystone and BTS. *See* RSA, Ex. A, §§ 2, 7-11. There were no comparable terms and conditions for pipelines. Indeed, there was no agreement in the RSA that a pipeline would be built.

Defendants also return to the same arguments that Eddystone has already refuted in its opposition brief—*i.e.*, that because the RSA contemplated a possible future connection to a pipeline, allowed for incidental storage at the facility, and permitted BTS to pay a fee if it failed to meet its transloading quota, its "primary objective" cannot be the maritime service of loading and unloading. Reply at 3-5. But Defendants do not dispute that no connection to a pipeline was ever established, and that transport by barge remains the sole means of transport from the facility to refineries downriver. Defendants also do not dispute that the RSA contemplated at most "incidental" storage, nor do they try to show that storage (as opposed to transloading oil onto barges for maritime transport) was the primary purpose of the contract. Indeed, the RSA has no separate charge for storage, which was incidental to transloading; the charges are instead based on the primary objective of the RSA, which was transloading oil onto barges for transportation in

5

maritime commerce.  Finally, the argument that BTS "had the option not to use the facilities at

all" (Reply at 5) hardly establishes the contract's primary objective.  It would not have been an

objective of BTS to opt to pay what are essentially liquidated damages for failing to meet an

agreed-to quota while receiving no transloading services in return.  In short, these provisions are

incidental to the contract; they do not alter its primary objective, which was for Eddystone to

transload oil onto barges for shipment on the Delaware River.

### C.    Maritime Jurisdiction Encompasses Suits for Money Damages Arising Out of the Breach of a Maritime Contract

Finally, there is no merit to the Defendants' suggestion that, because Eddystone seeks

damages for BTS's effective repudiation of the RSA, this court lacks jurisdiction over the

dispute.  A court's jurisdiction over maritime contracts is not limited to disputes that arise out of

"ongoing or mishandled" maritime commerce.  Reply at 6.  Rather, jurisdiction over maritime

contracts extends to suits for breach for non-performance or deficient performance of such

contracts, such as that alleged here.  *See, e.g.*, *New Orleans Stevedoring*, 439 F.2d at 90, 92

(holding that there was maritime jurisdiction over a suit to recover overhead from the

government under a contract to provide loading and unloading services where the government

had allegedly failed to to use the company's loading and unloading services as much as it had

estimated); *Great E. Shipping Co. v. Binani Cement Ltd.*, 655 F. Supp. 2d 395, 398-99 (S.D.N.Y.

2009) (holding that an agreement to indemnify a shipper in the event that there were issues with

delivery of cargo under a charter party qualified as a maritime contract because it facilitated

maritime commerce).[1]  The fact that BTS stopped providing oil for transloading and stopped

---

[1] In any event, the cases that Defendants cite for this proposition are inapplicable, as they involve
claims for damages arising out of the breach of agreements for the sale of goods that were found
to be non-maritime.

making deficiency payments, forcing Eddystone to seek damages, does not remove this suit from maritime jurisdiction.

In sum, Eddystone has asserted claims arising out of the breach of a contract whose primary objective was to facilitate the transfer of oil from trains to barges for shipment in maritime commerce.  The RSA is a maritime contract that is subject to this Court's maritime jurisdiction.

## II.     THE COURT HAS JURISDICTION OVER COUNT ONE BECAUSE IT SEEKS TO HOLD DEFENDANTS LIABLE FOR BREACH OF A MARITIME CONTRACT UNDER A THEORY OF ALTER EGO LIABILITY

### A.     Defendants Fail to Appreciate that Eddystone Predicates its Claim for Alter Ego Liability on the Breach of a Maritime Contract

Defendants argue that even if the RSA is a maritime contract, Eddystone has not claimed a breach of that contract.  *See* Reply at 1 ("This is not a suit on the Rail Services Agreement. . . ."); *id.* at 7 ("To again be perfectly clear, ERC has not sued *any* party in this action for breach of the Rail Services Agreement."); *id.* at 8 ("Even if the Rail Services Agreement is a maritime contract, how can the Court exercise admiralty jurisdiction in this lawsuit, which involves no claim for breach of that contract . . . ."); *id.* at 14 ("ERC does not sue Defendants for breach of a maritime contract . . . .").

Defendants are wrong: Plaintiff Eddystone *has* predicated this lawsuit on a breach of the Rail Services Agreement, and this Court has already found that Eddystone's claims all arise from that breach.

The first paragraph of Eddystone's First Amended Complaint explains that "[t]his is an action for *money damages* and avoidance of transfers *arising from a maritime contract*."  FAC, Doc. No. 182, ¶ 1 (emphasis added).  The FAC describes how the Defendants negotiated the RSA with Eddystone on behalf of BTS (FAC ¶ 36), and then denuded BTS of its assets, so that

7

"the shipper was unable to meet its obligations" under the RSA, leading the "now-defunct BTS [to] immediately default[] on its payments to Eddystone." FAC ¶ 8. Count One of the FAC demands that, in light of the alter ego relationship between BTS and the various Defendants, Eddystone is entitled to an order "holding each Defendant liable for the debts BTS owes to Eddystone"—which would include the debts on the RSA contract. FAC ¶ 86. The Prayer for Relief in the FAC makes this explicit, by requesting "[a]n award of all payments BTS owes to Eddystone *under the RSA*" and "[a]ll expectation damages available to a party *injured by breach of contract*." FAC at 28 (emphasis added).

Further, this Court has agreed with Eddystone that the claims asserted against BTS's alter egos "arise out of the breach of the obligations in the RSA." *See* Memorandum on Order Denying Motion to Dismiss at 11 (July 19, 2017), Doc. No. 59 ("[A]s Eddystone correctly points out, 'the claims in this case *arise out of the breach of the obligations in the RSA*, which [allegedly] occurred when the economics of Rios and Gamboa's crude oil business soured and they came up with a scheme to avoid the obligations that they had negotiated with Eddystone *in Pennsylvania*.' (Pl.'s Surreply at 18.).") (first alteration and emphasis added; second alteration and emphasis in original).

Defendants virtually ignore the fact that Eddystone has alleged BTS's breach of the RSA as an element of its claim for damages from these Defendants. To be sure, Eddystone has not asserted that the Defendants themselves are *parties* to the RSA. Eddystone has instead alleged that certain Defendants can be held liable for the damages arising from BTS's breach of the RSA by virtue of the fact that they are BTS's alter egos and, in that capacity, engineered BTS's breach of the agreement. In order to prevail on that claim, Eddystone will have to establish both that BTS breached its maritime contract with Eddystone, *and* that certain Defendants are liable for

8

that breach as alter egos of BTS.  Because the breach of a maritime contract is an integral part of Eddystone's case, there is admiralty jurisdiction.

In fact, Defendants find "uncontroversial" the proposition that "jurisdiction over a maritime contract includes the power to determine whether a party is an alter ego."  Reply at 14, quoting Opp. at 24.  But that proposition is determinative here.  This Court has jurisdiction over the maritime contract whose breach has been alleged, and that jurisdiction includes the power to determine whether other parties may be held responsible under an alter ego theory.  Because the "underlying claim" (breach by BTS) "arose in admiralty," the alter ego claims fall squarely within maritime jurisdiction.  *See, e.g.*, *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 508 (S.D.N.Y. 2012) (quoting *Pink Goose (Cayman) Ltd. v. Sunway Traders LLC*, No. 08-cv-2351(HB), 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008)) ("[A]lter-ego theories of liability are prima facie admiralty claims so long as the underlying claim arose in admiralty.").

### B.   Defendants' Narrow View of Veil Piercing Ignores the Reality that Plaintiffs Can (and Often Do) Assert Claims for Contractual Liability and Damages Against Non-Signatory Alter Egos

Notwithstanding Defendants' efforts to paint Eddystone's jurisdictional arguments as "alchemic" and "too clever by half" (Reply at 11 and 15), Eddystone is in fact asking for a simple, uncontroversial application of the alter ego theory to hold a non-contracting party liable for contractual damages.  Federal courts sitting in admiralty routinely exercise jurisdiction over such claims.  In *Maritime Ventures International, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F. Supp. 1340 (S.D.N.Y. 1988), for instance, the Southern District of New York held that a plaintiff had stated a claim in admiralty against an alter ego for liability on a "charter party" (i.e., a contract to hire a vessel).  The court explained that:

9

> In the present case, plaintiff has alleged that Douglas is liable *on the Senhorita contract* due to his domination of Caribbean.  Since a contract for the hire of a vessel is within the Court's admiralty jurisdiction, . . . plaintiff's allegations provide a basis for the exercise of subject matter jurisdiction [in admiralty] against Douglas.

*Id.* at 1347-48 (emphasis added) (internal citations omitted).  It also rejected a similar argument

made by other alter-ego defendants who sought to vacate attachments:

> . . . Matthew and de Paulo assert that the claims against them do not fall within the Court's admiralty jurisdiction, and therefore that there is no basis for a maritime attachment.  As discussed above, however, the *main claim against de Paulo and Matthew is for demurrage due under a contract of charter party, and it is well established that this is an admiralty claim*. . . .

> . . . Here, . . . liability is sought against Matthew and de Paulo as alter egos of Caribbean.  In contrast to an agent for a disclosed principal, who has no primary liability on the principal's contract, a person who has so dominated a corporation as to become a *corporate alter ego can be held liable on the corporation's contracts.*

*Id.* at 1356 (emphasis added) (internal citations omitted).

Other courts sitting in admiralty have similarly exercised jurisdiction over claims to hold

non-signatories liable for breach of maritime contracts based on theories of alter-ego liability.

*See, e.g.*, *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 276-

77, 281-83 (S.D.N.Y. 2006) (claim for breach of charter party asserted against alleged alter ego

entity); *Sabine Towing & Transp. Co. v. Merit Ventures, Inc.*, 575 F. Supp. 1442, 1443-45 (E.D.

Tex. 1983) (claim for breach of charter agreement asserted against parent company of

contracting subsidiary under a theory of alter ego liability); *Ariate Compania Naviera, S.A. v.

Commonwealth Tankship Owners, Ltd.*, 310 F. Supp. 416, 417-20 (S.D.N.Y. 1970) (claim for

breach of charter party asserted against two non-signatory entities and two individuals under theories of alter ego liability).[2]

This principle is, of course, not limited to maritime cases. This Court reached the same conclusion based on Pennsylvania state law in a diversity case.[3] In *Engle v. Matrix Golf & Hospitality Philadelphia, LLC*, No. Civ. A. 08-5831, 2009 WL 880680 (E.D. Pa. Mar. 31, 2009), this Court rejected the defendants' argument that the "only viable claim" was a direct breach-of-contract action against a signatory to that contract. *Id.* at \*3. The Court held that the plaintiff had put forward sufficient allegations that other defendants were liable under an "alter ego" theory to survive a motion to dismiss. *Id.* at \*3-\*4. Other courts in this district have recognized this principle as well. *See, e.g.*, *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 478 (E.D. Pa. 2010) ("Plaintiffs have adequately established that Itochu could be liable for [its subsidiary's] breach of the MedSurg Distribution Agreement under an alter ego theory.").

As these authorities demonstrate, Eddystone can invoke an alter ego theory to hold Defendants liable for BTS's breach of contract.

---

[2] Defendants are incorrect that Eddystone supported its arguments solely by citing Judge McLaughlin's opinion regarding alter-ego liability under ERISA in *Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519 (E.D. Pa. 2005). *See* Reply at 11. *Brown* was not the only case on which Eddystone relied for its argument: it also cited numerous maritime decisions for the proposition that courts sitting in admiralty can determine the identity of alter egos of contractual signatories. *See* Opp. at 24-25.

[3] Given that Eddystone's alter ego claim seeks to impose liability under a maritime agreement, federal common law—as opposed to Pennsylvania state law—may govern the determination of liability. *See, e.g.*, *Wajilam Exports*, 475 F. Supp. 2d at 282 (quoting *Status Int'l S.A. v. M & D Mar. Ltd.*, 994 F. Supp. 182, 186 (S.D.N.Y. 1998)) ("Federal courts sitting in admiralty apply federal common law when examining corporate identity."). However, the Pennsylvania law cases are illustrative of how these legal principles interact.

11

**C.  Defendants Have Not Established that a Plaintiff Must Sue Its Contractual Counterparty in the Same Action Before it Can Proceed on Claims Against an Alter Ego on the Same Contract**

The fact that Eddystone is proceeding *solely* against alter egos in this action, and has not asserted a claim in this Court against BTS as its contractual counterparty, does not change the analysis.  Defendants once again fail to cite any authority for the proposition that a party *must* sue its contractual counterparty in the same action (or at all) in order to proceed against alter egos for liability on the contract.

An examination of the case law reveals no such limitation.  Instead, maritime courts have allowed plaintiffs to proceed against alleged alter egos, and have held alter egos liable for contractual damages, even where the contracting party is not part of the case.  In *Sabine Towing & Transportation Co. v. Merit Ventures, Inc.*, 575 F. Supp. 1442 (E.D. Tex. 1983), for instance, a plaintiff elected to sue the parent of its insolvent contractual counterparty for alter-ego liability on a maritime contract.  *Id.* at 1443, 1445.  The court assumed jurisdiction, noting that "[i]t is well established that this court, as a court of admiralty jurisdiction, has the power to pierce the corporate veil of the defendant corporation."  *Id.* at 1446 (citing *Swift & Co. Packers v. Compania Columbiana Del Caribe S.A.*, 339 U.S. 684 (1950)).  Ultimately, the court decided that it was appropriate to pierce the corporate veil and award contractual damages against the non-signatory alter ego under the charter agreement.  *Id.* at 1449.

Similarly, in *Ariate Compania Naviera, S.A. v. Commonwealth Tankship Owners, Ltd.*, 310 F. Supp. 416 (S.D.N.Y. 1970), the plaintiff sought to recover for breach of a "charter party"

against four non-signatories.[4]  The court held, first, that the non-party contract signatory had

breached the charter party at issue.  *Id.* at 417.  It then addressed the non-signatory defendants'

argument that the court lacked admiralty jurisdiction over the claims against them.  The court

rejected this argument, noting that "[t]he cause of action was . . . essentially one for breach of a

maritime contract," as the plaintiff "would have no cause of action at all were it not for the fact

that the charter party was breached."  *Id.* at 418.  Ultimately, the court imposed liability for

contractual damages against one of the non-signatories.  *Id.* at 420 ("Lincoln, for one, appears to

have been nothing more than the alter ego of Philpotts, and the court therefore finds that justice

requires here that the Lincoln corporate veil be pierced and that Philpotts be held *personally*

*liable for breach of the charter party*.") (emphasis added).

Of course, in many cases in which a plaintiff alleges a breach of a maritime contract, the

plaintiff will pursue contractual claims against its signatory in the same action as the signatory's

alter egos.  But this was not a feasible option here.  Eddystone was required to resolve disputes

with its counterparty, BTS, through arbitration before the Society of Maritime Arbitrators in

New York.  *See* RSA, Ex. A, § 16(b), Doc. No. 283-1.  It was only through discovery taken in

connection with the arbitration that Eddystone obtained the evidence that BTS had been stripped

of assets and other evidence supporting the assertion of alter ego liability in this action.  Because

there was no reason to continue to incur the expense of arbitrating against an empty entity with

no assets, Eddystone entered into a settlement with BTS's alleged successor in December 2016.

Due to this settlement, moreover, Eddystone could not reasonably make BTS's successor a

---

[4] Although the contracting party was initially named as a defendant, it was no longer part of the
case when the court addressed whether it had jurisdiction over the claims against the non-
signatories.  *Id.* at 419.

defendant in this action, which Eddystone filed in February 2017.  Nor did the action to confirm the arbitral award provide a viable avenue to obtain a ruling on alter ego.  Thus, Eddystone took the logical course:  it sued Defendants, and not the empty signatory BTS, in this Court, and offered to prove a breach of contract and alter ego in this Court.

In making the argument that Eddystone was required to sue its counterparty in this action, Defendants return to two cases discussed previously in the briefs—*Swift* and *Atlanta Shipping*— and claim that those cases "*establish*" that Eddystone cannot proceed against Defendants on an alter ego theory.  Reply at 10.  This couldn't possibly be true.  *Swift* was a fraudulent transfer case in which the Court reaffirmed the power of an admiralty court to grant relief based on theories of alter ego liability.  *See Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 689 n.4 (1950) ("The jurisdiction of a court of admiralty to determine the question of alter ego is undoubted.").  The Court found the alter ego doctrine inapplicable on the facts, and therefore had no opportunity to address its jurisdiction over a claim for contractual damages against an alter ego.  *See id.*

Similarly, the sole issue before the Second Circuit in *Atlanta Shipping* was whether an action to reverse a fraudulent transfer arose in admiralty.  The court held that, because the plaintiff had not invoked admiralty in conjunction with its prior judgment, it could not do so in connection with the enforcement of that judgment.  *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 243, 248 (2d Cir. 1987).  The underlying district court opinion (which the Second Circuit affirmed) observed that the plaintiff had *not* alleged a theory of alter ego liability, and even went so far as to suggest that such an allegation could have changed the outcome.  *See Atlanta Shipping Corp. v. Chem. Bank*, 631 F. Supp. 335, 341 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987).

Because neither plaintiff alleged a cognizable theory of alter ego liability in the first instance, neither *Swift* nor *Atlanta Shipping* had occasion to address the extent to which a party must assert a claim against its contractual counterparty in the same case (or at all) in order to invoke the court's admiralty jurisdiction over a claim to hold an alter ego liable on a maritime contract. These cases, in other words, have no bearing on this court's jurisdiction over Eddystone's claims for contractual damages against BTS's alter egos. Instead, this case is controlled by the abundant case law cited above, which establishes that a plaintiff may invoke admiralty jurisdiction when it seeks to hold an alter ego liable for a signatory's breach of a maritime contract.

### D.      Eddystone's Claim for Liability on an Alter Ego Theory Is Not a Lawsuit to Enforce a Judgment Against a Third Party

Finally, because Eddystone has alleged and will prove a breach of a maritime contract, this case is not controlled by *Peacock v. Thomas*, 516 U.S. 349 (1995), or its progeny. In *Peacock*, the Court held that federal-question jurisdiction under 28 U.S.C. § 1331 over an initial action for breach of fiduciary duty under the ERISA statute did not extend to a subsequent lawsuit brought against an officer of the judgment debtor to pierce the corporate veil and make that officer liable on the judgment. *Id.* at 358-59.

By its own terms, *Peacock* applies only where there is no independent basis for the federal court to exercise jurisdiction over a claim. *See id.* at 355 ("In a subsequent lawsuit involving claims with no independent basis for jurisdiction, a federal court lacks the threshold jurisdictional power that exists when ancillary claims are asserted in the same proceeding as the claims conferring federal jurisdiction."); *see also C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306

15

F.3d 126, 133 (4th Cir. 2002) ("*Peacock* does not prohibit a federal court from taking jurisdiction over a[n] . . . alter ego claim where an *independent* basis for jurisdiction exists.").

*Peacock* is plainly inapplicable to this action, because Eddystone has asserted an independent basis for this court to exercise jurisdiction: *the breach of a maritime contract*. Eddystone is not seeking to "piggyback" on a prior proceeding that arose in admiralty; it is asserting a claim that is cognizable in admiralty in the first instance. *See, e.g.*, *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 581-82 (4th Cir. 2015) (finding *Peacock* inapplicable to an action against an alter ego where the court's admiralty jurisdiction provided an independent basis to exercise jurisdiction).

Eddystone identifies only two cases in which a court applied *Peacock* in an admiralty dispute: a brief, unpublished, *per curiam* opinion by the Fifth Circuit, and a federal district court's unpublished memorandum decision. *See* Reply at 13. Both of these courts emphasized the fact that the claims were asserted in a new action to enforce a prior judgment entered in an admiralty dispute against an alter ego of the judgment debtor. *See Zamora v. Bodden*, 395 F. App'x 118 (5th Cir. 2010) (per curiam) ("[Plaintiff] believes that the court in this collection action can derive its federal jurisdiction from the earlier lawsuit. "); *Dunsink Trading, Ltd. v. Pitsburg Fin. Inc.*, No. 1:09 CV 320 GBD, 2009 U.S. Dist. LEXIS 71609, at *9 (S.D.N.Y. Aug. 5, 2009) (mem.) ("No ancillary jurisdiction may be exercised where, as here, a federal judgment creditor brings a new action against newly named parties seeking to shift liability for an existing judgment under an alter ego liability."). Here, in contrast, Eddystone did not bring this suit to enforce a prior judgment—and, indeed, there is no prior federal judgment that it *could* enforce. As a result, even the cases that have applied *Peacock* in the context of an admiralty dispute fail to support Defendants' motion to dismiss.

16

In sum, this case is controlled by ample precedent establishing maritime jurisdiction over efforts to enforce maritime contracts against alter egos in the first instance. *Peacock* presents no bar to this court continuing to exercise jurisdiction over Eddystone's First Amended Complaint.

## III. BECAUSE THE COURT HAS JURISDICTION OVER A CLAIM FOR BREACH OF A MARITIME CONTRACT UNDER AN ALTER EGO THEORY, THE COURT MAY PROPERLY EXERCISE SUPPLEMENTAL JURISDICTION OVER ANY RELATED CLAIMS

In its Opposition (p. 27), Eddystone explained that, if this Court has maritime jurisdiction over one claim, it has supplemental jurisdiction over any other claims that "form part of the same case or controversy." *See* 28 U.S.C. §1367(a). Eddystone presented case law showing that claims formed part of the same controversy if they derived from a common nucleus of operative fact, and then explained that its claims for fraudulent transfer and breach of fiduciary duty all arise from the same nucleus of operative fact as the alter ego claims. *See* Opp. at 27-28. Defendants do not challenge the legal and factual bases that Eddystone offered for exercising supplemental jurisdiction over the remaining claims, and they appear to concede that, to the extent that this court has jurisdiction over at least one claim in admiralty, it may exercise supplemental jurisdiction over the remaining claims asserted in the First Amended Complaint. *See* Reply at 8 & n.6.

As a result, once the Court determines that Eddystone has invoked maritime jurisdiction by pursuing a claim for damages on a maritime contract on an alter ego theory, as alleged in Count One, the Court may also assert supplemental jurisdiction over the fraudulent transfer counts (Counts Two and Three) and breach of fiduciary duty count (Count Four). This Court can therefore resolve this Motion based on the combination of alter ego doctrine (Count One) and supplemental jurisdiction (Counts Two through Four). In fact, exercising supplemental

17

jurisdiction here would be consistent with the Court's prior conclusion that all of the claims in this case arise out of the breach of obligations under the RSA.  *See* Memorandum on Order Denying Motion to Dismiss at 11 (July 19, 2017), Doc. No. 59.

## IV.   IN THE ALTERNATIVE, THE COURT MAY EXERCISE JURISDICTION OVER CLAIMS ASSERTED IN AID OF AN EVENTUAL MARITIME JUDGMENT THAT MAY BE AWARDED IN NEW YORK

As noted above, the fact that Eddystone has alleged a claim for substantive liability on a maritime contract against BTS's alter egos establishes maritime jurisdiction over this action, and allows this Court to exercise supplemental jurisdiction over any remaining claims.  In any event, the pending New York action to confirm the arbitral award against BTS's successor provides an alternative basis to exercise maritime jurisdiction.  Because the RSA is a maritime contract, the action pending in the Southern District of New York arises in admiralty.[5]  In the event that Eddystone is able to obtain a judgment in that proceeding, its efforts to reverse fraudulent conveyances in this action will help to ensure that it can collect on that judgment.  *See Swift*, 339 U.S. at 691 (recognizing jurisdiction in admiralty to address a fraudulent transfer in order to protect an eventual judgment on a maritime claim); *see also Fertilizantes Fosfatados Mexicanos, S.A. v. C.Y. Chen*, No. 91 Civ. 2048 (MJL), 1992 WL 204394, at *3 (S.D.N.Y. Aug. 11, 1992) (exercising jurisdiction over claim to order the disgorgement of fraudulently transferred assets

---

[5] Because Eddystone has expressly invoked maritime jurisdiction in its petition to confirm the arbitral award now pending in the Southern District of New York, *Atlanta Shipping* poses no obstacle to awarding the relief sought in Counts Two or Three.  The issue in *Atlanta Shipping* was that the plaintiff asserted maritime jurisdiction for the first time in an action to disgorge a fraudulent conveyance from a third party.  *Atlanta Shipping*, 818 F.2d at 243, 258.  Here, in contrast, Eddystone has expressly invoked maritime jurisdiction over its action against BTS's successor.  *See* Petition to Confirm Arbitral Award at ¶ 3, Opp. Ex. 1, Doc. No. 294-1.

from a third party as an "integral part of the [admiralty] action initiated before [a different district court judge] and a necessary vehicle for protection of the integrity of the prior judgment").

A federal court's power to adjudicate claims regarding fraudulent transfers in aid of a separate maritime judgment or proceeding remains intact even after *Peacock*.  As the Second Circuit has observed, "*Peacock* does not hold that fraudulent conveyance claims brought in a subsequent action require an independent jurisdictional basis."  *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 105-06 (2d Cir. 2001) (collecting cases).  *Epperson* noted that *Peacock* expressly distinguished efforts to void fraudulent transfers from efforts to impose liability on a judgment on an alter ego of the judgment debtor.  *Id.*  In line with this analysis, courts have held that *Peacock* imposes no obstacle to exercising ancillary jurisdiction over claims to disgorge a fraudulently transferred asset to aid a judgment obtained in a separate maritime proceeding.  *See Nat'l Mar. Servs., Inc. v. Straub*, 776 F.3d 783, 787 (11th Cir. 2015) ("In contrast with *Peacock*, the district court had ancillary jurisdiction over this supplementary proceeding because National Maritime sought to disgorge Straub of a fraudulently transferred asset, not to impose liability for a judgment on a third party."); *see also Epperson*, 242 F.3d at 106-07 .

Putting aside their arguments relating to the nature of the RSA, Defendants' sole argument against exercising maritime jurisdiction *in this action* to protect an eventual maritime judgment in New York appears to be that Eddystone filed this action in the Eastern District of Pennsylvania rather than the Southern District of New York.  *See* Reply at 10.  But, as noted above, it is beyond dispute that a party may bring a separate action to protect or collect on a maritime judgment, and there is nothing in these cases that suggests that the authority to do so is limited to the court that issued the judgment in the first place.  Indeed, Defendants acknowledge the "longstanding" practice of exercising jurisdiction over actions brought in aid of "foreign

19

admiralty judgment[s]" (Reply at 10 n.7, 15), which are, by definition, brought in a different forum than that which presided over the "original" maritime action.

This Court, therefore, may exercise jurisdiction over the fraudulent transfer claims in aid of the proceedings in New York, regardless of whether there is an independent basis for admiralty jurisdiction over the First Amended Complaint.  Defendants' arguments to the contrary have no merit.

## <u>CONCLUSION</u>

For the reasons stated above, as well as those previously stated in its opposition brief (Doc. No. 294), Eddystone respectfully requests that the Court deny the *Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Subject-Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)* (Doc. No. 283).

Dated: March 18, 2019

Respectfully submitted,

/s/ *Filiberto Agusti*
Henry E. Hockeimer, Jr. (I.D. No. 86768)
Terence M. Grugan (I.D. No. 307211)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com
grugant@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Steven J. Barber (*pro hac vice*)
Jennifer Quinn-Barabanov (*pro hac vice*)
Andrew J. Sloniewsky (*pro hac vice*)
Nicholas Petts (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com
sbarber@steptoe.com
jquinnba@steptoe.com
asloniewsky@steptoe.com
npetts@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March, 2019, I filed the foregoing electronically

through the CM/ECF system, which sent electronic notice of this filing to all counsel of record.

/s/ *Filiberto Agusti*
Filiberto Agusti

21