**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDDYSTONE RAIL COMPANY, LLC, <br><br>  Plaintiff/Counter-Defendant, <br><br> v. <br><br> JULIO RIOS, JEREMY GAMBOA, BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., FERRELLGAS, L.P., BRIDGER RAIL SHIPPING, LLC, BRIDGER REAL PROPERTY, LLC, BRIDGER STORAGE, LLC, BRIDGER SWAN RANCH, LLC, BRIDGER TERMINALS, LLC, BRIDGER TRANSPORTATION, LLC, J.J. ADDISON PARTNERS, LLC, J.J. LIBERTY, LLC, BRIDGER ADMINISTRATIVE SERVICES II, LLC, BRIDGER ENERGY, LLC, BRIDGER LAKE, LLC, BRIDGER LEASING, LLC, and BRIDGER MARINE, LLC, <br><br>  Defendants, <br><br> BRIDGER LOGISTICS, LLC, FERRELLGAS PARTNERS, L.P., and FERRELLGAS, L.P., <br><br>  Defendants/Counterclaimants. | CIVIL ACTION <br><br> No. 17-495 |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                                                **MARCH 26, 2019**

Presently before this Court is the Motion to Dismiss Plaintiff's First Amended Complaint

for Lack of Subject-Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) filed by all of the

Defendants, Plaintiff Eddystone Rail Company, LLC's ("Eddystone") Opposition to Defendants'

Motion to Dismiss, Defendants' Reply and Eddystone's Sur-Reply. For the reasons set forth below, the Motion to Dismiss will be denied.

## I.     BACKGROUND

Since the parties and the Court are all familiar with the facts of this matter, we will not state the underlying facts at length. In February 2013, Bridger Transfer Services, LLC ("BTS") entered into a Rail Services Agreement ("RSA") with Eddystone under which Eddystone agreed to construct and operate a facility on the Delaware River in Eddystone, Pennsylvania (the "Transloading Facility") for the purpose of transloading (transferring) crude oil from railcars to barges that would carry the oil down the river to Philadelphia-area refineries.[1] The RSA was negotiated on behalf of BTS by BTS's parent, Defendant Bridger Logistics, LLC ("Bridger Logistics"), and two corporate officers of Bridger Logistics, Defendants Julio Rios ("Rios") and Jeremy Gamboa ("Gamboa"). Pursuant to the RSA, BTS committed to purchase a minimum volume of rail-to-barge crude oil transloading capacity over the course of five years. BTS made that capacity available to its affiliates so that they could supply Bakken crude oil to the Monroe Refinery in Trainer, Pennsylvania ("Monroe Refinery").[2] From March 2013 to April 2014, Eddystone built the Transloading Facility. From May 2014 through January 2016, Eddystone transloaded every trainload of crude oil onto barges that BTS and Defendants brought to Eddystone.

---

[1] "'Transloading' is a term of art in the bulk transportation industry." N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 242 n.1 (3d Cir. 2007). "It means '[t]ransferring bulk shipments from the vehicle/container of one mode to that of another at a terminal interchange point.'" Id. (quoting U.S. DOT, Fed. Highway Admin., Freight Prof'l Dev. Prog., Freight Glossary, available at http://ops.fhwa.dot.gov/freight/FPD/glossary/index.htm). In the context of this case, transloading refers to transferring crude oil from railcars (which carried it from North Dakota) to a barge (for carriage to refineries on the Delaware River).

[2] "BTS operated as a 'midstream' transporter of crude oil purchased by Bridger Marketing, LLC (. . . a non-party and another subsidiary of Bridger, LLC) and needed assistance in transporting the petroleum to the refinery of Monroe Energy ('Monroe') in Trainer, Pennsylvania." (Defs.' Mot. to Dismiss at 3.)

In June 2015, BTS's parent, Bridger Logistics, was purchased by Defendants Ferrellgas Partners, L.P. and Ferrellgas, L.P. (collectively, "Ferrellgas"). At that time, BTS owed to Eddystone a remaining minimum volume obligation of approximately $150 million. Eddystone alleges that Ferrellgas promptly caused Eddystone to abandon more than $10 million of net accounts receivables with its affiliates, the Defendants in this litigation. In addition, Ferrellgas allegedly began crediting the revenue associated with BTS's transloading capacity to its affiliate Defendant Bridger Rail Shipping, LLC ("Bridger Rail Shipping") and causing Bridger Rail Shipping to cover the RSA payments as they came due, while leaving the long-term obligation in BTS. According to Eddystone, as it became clear that a halt to shipping was imminent, Ferrellgas caused BTS to transfer the remainder of its assets to the affiliates who are now Defendants in this litigation. Eddystone asserts that BTS then defaulted on the RSA. Eddystone alleges that Jamex Marketing paid $10.00 for the now valueless BTS, which twelve months earlier had $98.1 million in assets, and renamed BTS as Jamex Transfer Services, LLC ("JTS").

On April 19, 2016, pursuant to the RSA's dispute resolution provision, Eddystone initiated an arbitration against the newly-purchased and renamed JTS before the Society of Maritime Arbitrators ("SMA") in New York. The arbitration was litigated through 2016 until January 5, 2017, when, after a month of negotiations, a settlement was reached. Under the terms of the settlement, JTS agreed not to oppose entry of an Arbitration Award against it for a discounted present value of $139,050,406.77.[3] For additional consideration paid to Eddystone, other third-parties were released from any and all follow-on claims.

On January 24, 2017, the SMA panel issued its Arbitration Award holding JTS liable for its obligations under the RSA. On February 17, 2017, Eddystone filed its Petition to Confirm the

---

[3] Defendants allege that the settlement and Final Award were collusive.

Arbitration Award in the amount of $139,050,406.77 against JTS in the United States District Court for the Southern District of New York (17-cv-1266-WHP). (Pl.'s Opp'n, Ex. 1 (Pet. to Confirm Arb. Award (Feb. 17, 2017), *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, No. 17-cv-1266-WHP (S.D.N.Y.).) Given that the award arose out of a dispute regarding BTS's obligations under a maritime contract, Eddystone alleged that the court's jurisdiction was founded in admiralty under 28 U.S.C. § 1333(1).[4] (*Id.*, Ex. 1 ¶ 3.) The Defendants in this action requested, but were denied, leave to intervene in order to argue that the Arbitration Award should not be confirmed. In January 2019, however, the court agreed to stay the action pending our determination regarding alter ego liability. (*Id.*, Ex. 2 (Mem. Op. & Order at 9 (Jan. 11, 2019), *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, No. 17-cv-1266-WHP (S.D.N.Y.).)

On February 2, 2017, Eddystone filed this lawsuit, and filed its First Amended Complaint ("FAC") on September 7, 2018. (Doc. Nos. 1, 183.) Regarding subject-matter jurisdiction, Eddystone alleged:

> This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1333(1) (maritime jurisdiction). Eddystone seeks to enforce payment of a debt arising under a maritime contract. The maritime contract in question concerns Eddystone's providing the service of transloading crude oil from railcars delivered to Eddystone's facility to vessels at the facility's dock for subsequent shipment downriver. This Court also has jurisdiction under 28 U.S.C. § 1367(a) (supplemental jurisdiction).

FAC ¶ 31. Eddystone asserts claims for alter ego based on a breach of the RSA, intentional and constructive fraudulent transfer under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S. §§ 5104(a), 5105, and breach of fiduciary duties of care and loyalty to creditors. (*See id.*

---

[4] The United States Constitution extends the federal judicial power to "all Cases of admiralty and maritime jurisdiction." U.S. Const., Art. III, § 2, cl. 1. By statute, Congress has empowered federal district courts to hear "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1).

4

¶¶ 76-103.)

Defendants, Bridger Logistics and Ferrellgas (collectively, "BL/FG Defendants") asserted various defenses, as well as the following amended counterclaims against Eddystone: Counterclaim I – Tortious Interference with Contract; Counterclaim II – Fraudulent Inducement; Counterclaim III – Negligent Misrepresentation; Counterclaim IV – Breach of Contract; Counterclaim V – Breach of Implied Covenant of Good Faith and Fair Dealing; and Counterclaim VI – Rescission. Most of the BL/FG Defendants' defenses, as well as Counterclaims II -VI are premised entirely upon the RSA.[5]

There has been extensive motion practice in this case since its inception. Discovery, which is on-going, is a massive endeavor and involves a production of approximately 3 million pages. Defendants filed their Motion to Dismiss for Lack of Subject-Matter Jurisdiction on January 25, 2019, and Eddystone's Opposition was filed on February 22, 2019. (*See* Doc. Nos. 283, 294.) Defendants filed their Reply on March 11, 2019. (Doc. No. 301.) Eddystone filed its Sur-Reply on March 18, 2019. (Doc. No. 304.)

## II. LEGAL STANDARD

A party may challenge a court's subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'" *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (footnote omitted) (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). A motion filed under Rule 12(b)(1) may take two forms: (1) a facial attack, where the party contesting subject-matter jurisdiction attacks the face of the complaint; or (2) a factual attack, where the existence of subject-matter jurisdiction is attacked as a matter of fact. *See id.* n.3. "A

---

[5] Counterclaims II-VI are conditional on Eddystone setting aside the corporate veil.

facial attack concerns an alleged pleading deficiency[,] whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (internal quotation marks and alterations omitted); *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

When a party files a Rule 12(b)(1) motion that mounts a facial attack to subject-matter jurisdiction, a court may consider only "the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted). In reviewing a factual attack, on the other hand, a court "may consider evidence outside the pleadings," *id.*, but there is "no presumptive truthfulness attache[d] to plaintiff's allegations," *Mortensen*, 549 F.2d at 891. "When subject-matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (citing *Mortensen*, 549 F.2d at 891).

### III.  DISCUSSION

#### A.  Maritime Contract Law

Defendants initially move to dismiss Eddystone's First Amended Complaint for lack of subject-matter jurisdiction on the ground that maritime jurisdiction under 28 U.S.C. § 1333 does not exist because the RSA is not a maritime contract.[6] (Defs.' Mot. to Dismiss at 8-13.) Admiralty jurisdiction extends to a contract dispute if the contract at issue is a maritime contract. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23–24 (2004) (finding intermodal transportation contracts to be maritime contracts "because their primary objective is to accomplish the

---

[6] Admiralty is the sole jurisdictional basis because the parties are not diverse, and Eddystone's claims do not arise under the laws of the United States.

transportation of goods by sea"); *see also* 14A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3675 at 660 (noting the "fragmented and somewhat discordant historical development of maritime contract law" prior to *Kirby*). "[W]hether a contract is a maritime one . . . 'depends upon the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'"[7]  *Kirby*, 543 U.S. at 23-24 (ellipsis omitted) (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)).  Specifically, the United States Supreme Court has instructed that the inquiry is "conceptual" rather than "spatial":

> We have recognized that "[t]he boundaries of admiralty jurisdiction over contracts — as opposed to torts or crimes — being conceptual rather than spatial, have always been difficult to draw."  To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case.  Nor can we simply look to the place of the contract's formation or performance.  Instead, the answer "depends upon . . . the nature and character of the contract," and the true criterion is whether it has "reference to maritime service or maritime transactions."

*Id.* at 23 (citations omitted).  Whether a contract lies within admiralty jurisdiction depends on "whether the principal objective of a contract is maritime commerce."  *Id.* at 25; *see also Exxon*

---

[7] In their Motion, Defendants rely upon the standard set forth in *Kirby*, but argue that the United States Court of Appeals for the Third Circuit ("Third Circuit") "has not determined whether [*Kirby*], which arose in the context of a single transaction with discrete land and sea components, applies to contracts requiring repeated performance and less-distinct lines between what is land-based and what is maritime." (Defs.' Mot. to Dismiss at 8 n.6.) (citing *Berkshire Fashions, Inc. v. The M.V. Hakusan II*, 954 F.2d 874, 880 (3d Cir. 1992)) (stating that admiralty jurisdiction applies to a "mixed" contract (i.e, one with maritime and non-maritime obligations) when the maritime and non-maritime portions can be separately enforced without prejudice to either party and if the non-maritime aspects are "merely incidental" in what would otherwise be a wholly maritime contract).  Defendants' Reply also relies upon the standard set forth in *Kirby*. (Defs.' Reply at 3.)  We find that *Kirby* applies to our case. Nevertheless, to the extent that an argument can be made that pre-*Kirby* precedents apply here, we conclude that the maritime components of the RSA are not merely incidental, as Defendants argue.  We also conclude that the maritime and non-maritime obligations in the RSA cannot be severed without prejudice to the parties because the RSA only charges one fee per transloaded barrel.  It does not charge separately for unloading railcars or loading barges.

*Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991) (stating that the purpose of the grant of admiralty jurisdiction is to protect maritime commerce); *Hargus v. Ferocious & Impetuous, LLC*, 840 F.3d 133, 136 (3d Cir. 2016) ("The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce."). "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract's interpretation."[8] *Id.* at 22-23 (citation omitted).

It appears that determining whether a contract is maritime or non-maritime would be quite simple; however, it is not simple due to the fact that there is no "clean line[ ]" of delineation "between maritime and nonmaritime contracts." *Kirby*, 543 U.S. at 23 ("The boundaries of admiralty jurisdiction over contracts . . . have always been difficult to draw."); *see also Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) (stating "[t]he boundaries of admiralty jurisdiction over contracts - as opposed to torts or crimes - being conceptual rather than spatial, have always been difficult to draw"); *d'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd.*, 886 F.3d 216, 218 (2d Cir. 2018) ("The question is clear, but the law is murky.").

**B. Analysis**

Eddystone's First Amended Complaint alleges that certain Defendants, as alter egos of BTS, are liable for the breach of BTS's obligations under a maritime contract (the RSA) for the transloading of crude oil from railcars onto barges for shipment to refining facilities located elsewhere on a navigable waterway, the Delaware River. Eddystone seeks to impose liability and collect damages on this basis. Asserting that these allegations are grounded in a maritime

---

[8] In determining whether a dispute is inherently local, the court looks to whether "[a] maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law." *Kirby*, 543 U.S. at 27. Here, the parties have neither identified any state or local interest at stake relating to the interpretation of the RSA nor any state or local interests implicated by the RSA as to beckon interpretation by state law. Also, we conclude that it does not appear that the interpretation of the RSA so implicates local interests as to be considered an inherently local dispute.

contract (the RSA), Eddystone argues that its First Amended Complaint establishes the basis for maritime jurisdiction.

Defendants argue that the RSA is a non-maritime contract because its primary objective was to permit BTS and other shippers of crude oil petroleum to offload their cargo from railcars after a 1,500-mile journey from the Bakken oilfields in North Dakota.[9] (Defs.' Mot. to Dismiss at 9) (citing FAC ¶ 4). Defendants argue that the RSA contemplated that crude oil might be loaded onto river-going barges, stored on land, or transported by pipeline. (*Id.*) (citing Rail Facilities Services Agreement of February 13, 2013 (hereinafter, "RSA") at 1 & §§ 4.2, 7.2, 12.2, 12.4). Furthermore, Defendants assert that, to the extent that Eddystone's Amended Complaint mentions actual maritime transport, it is clear that it was a minimal component of the overall transaction. (*Id.*) They also argue that any connection between the RSA and maritime commerce is general and abstract in nature and the dispute under the RSA is purely financial and "had nothing to do with maritime commerce." (*Id.* at 10, 12.)

To be clear, the primary objective of the RSA is to transload oil from railcars onto barges. Necessarily, the nature of the RSA is to facilitate maritime commerce through the shipment of oil

---

[9] Defendants focus on the use of railcars travelling for 1,500 miles to deliver the crude oil from North Dakota to the Transloading Facility in Pennsylvania. (Defs.' Mot. to Dismiss at 9-10.) They also point out that the Delaware River refinery chiefly relied upon by Eddystone is located about four and one-half miles from the Transloading Facility in Trainer, Pennsylvania, which is "a minor additional distance after a rail journey across half the continent." (*Id.* at 9.) Eddystone responded, and we agree, that it is unaware of any instance in which a court has looked at how far cargo travelled *before* reaching the site for loading and unloading or how far it will travel *after* it is loaded in order to determine whether there is maritime jurisdiction over a stevedoring contract. (Pl.'s Opp'n at 17) (emphasis in original). Eddystone correctly states that "[t]his case involves a contract to receive oil from trains at a facility located on the Delaware River and load it onto barges for transportation on the river; [it] did not contract with BTS or any Defendant . . . to provide the transportation of oil to or from the Transloading Facility." (*Id.* at 16-17) (citing RSA at 7 ¶ 3.3) (stating that "the RSA expressly provides that BTS will be responsible for transporting oil by rail to the Facility and transporting it by barge away from the Facility"). The RSA calls for some performance on land; the construction of the Transloading Facility and the unloading of railcars. However, under a conceptual approach as applied to our specific case, this fact does not alter the essentially maritime nature of the RSA. We also note that "[m]aritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations." *Kirby*, 543 U.S. at 25. We disagree with Defendants that the maritime transport was a minimal component of the overall transaction, and find that it was the principal objective of the RSA.

by barge down the Delaware River.  As previously explained, the RSA required Eddystone to construct and operate the Transloading Facility, on the banks of the Delaware River, for the purpose of transloading shipments of crude oil from train cars to barges that would carry the oil down the Delaware River to Philadelphia-area refineries.  *See* RSA at 1.  The RSA includes "Section 3.3. <u>Condition Precedent to Transloading Services</u>," in which BTS shall (1) have entered into a Transportation Master Contract with one or more Rail Carriers for the rail services and (2) own or have entered into a charter party for barges, or entered into an agreement with a third-party who owns or has entered into a charter party for barges required to load and remove the Transloaded Volumes as contemplated by the RSA.[10]  *See id.* ¶ 3.3.  Regarding the barges, BTS shall have provided to Eddystone reasonable evidence of such ownership, contract or charter party, together with a copy of the charter party.  *See id.*  Also, Eddystone was given authority for approving or rejecting barges that failed to satisfy certain criteria.  *See id.* at 1, Ex. A (Terms & Conditions ("T&C")), § 7(b), (c), (d).

Under the RSA's Terms and Conditions, BTS agreed to contract with barge operators directly, and arrange for barges to arrive at the Transloading Facility during certain pre-determined windows so that the barges could be loaded by Eddystone with shipments of crude oil that had arrived by rail, which was also arranged by BTS.  *See id.*, T&C at 5-8, §§ 6-8.  The parties also agreed to procedures for berthing and loading oil onto barges and for responding to discharges, spills, or leaks of transloaded oil from barges.  *See id.*, T&C at 8-9, 11-12, §§ 9, 11.  Further, the parties to the RSA recognized its maritime nature stating that "[Eddystone] shall have all remedies available to it at law, in equity or under maritime law to enforce the Agreement, these terms and conditions . . . ." *Id.*, T&C at 12, § 12.  Likewise, by electing *ex*

---

[10] Defendants previously stated that "[b]ased upon [Eddystone's] assurances, the *Petrochem Producer*, one of the only available barges, was chartered in December 2013."  (Doc. No. 111 at 4) (citations omitted).

*ante* to submit their disputes to the Society of Maritime Arbitrators for resolution. *See id.*, T&C at 18, § 16(b).

In order to induce Eddystone to commit millions of dollars to building and providing transloading services at the Transloading Facility, Defendants agreed that BTS would pay Eddystone $2.25 per transloaded barrel and committed BTS to transloading at least 64,750 barrels of crude per day at the Transloading Facility for a period of five years.[11]  FAC ¶ 3; RSA at 1, 4-5, 6 at ¶ 2, 7 at ¶ 4.1. If BTS failed to meet this "minimum volume commitment," BTS was obligated to pay $1.75 per barrel as a deficiency payment.[12]  RSA at 3. The RSA applies no charges for the temporary storage of crude; thereby, treating such storage as incidental.[13]  Also, the RSA did not apply charges for the use of the Transloading Facility by the trains that

---

[11] Eddystone invested over $170 million to build the Transloading Facility. FAC ¶ 3.

[12] Defendants argue that "BTS was not *required* to deliver oil to Eddystone Rail Facilities at all, let alone to transport oil by barge, because BTS had the option to pay deficiency charges if it opted not to transload any oil through the facilities." (Defs.' Reply at 5 n.3) (emphasis in original).

[13] We find that the temporary storage component of the RSA was incidental to merely facilitate the activity of loading barges, especially in light of the fact that there was no charge for it. *See* RSA. We reject Defendants' argument that the storage component played any more substantial role in the RSA. Likewise, we reject Defendants' argument that the RSA's references to a potential future connection to a pipeline system take this dispute outside of maritime law. The parties to the RSA contemplated that "[o]ne or more subsequent phases of the Eddystone Rail Facilities may include connection[s] to future pipeline distribution system(s) from the Eddystone Rail Facilities into Philadelphia area refineries and terminals . . . ." *Id.* at 1. In addition, the RSA provides that "references to one or more 'Pipeline Distribution Systems' shall apply and be effective only if and when the connection between the Eddystone Rail Facilities and such Pipeline Distribution Systems is in-service as part of a second or subsequent phase of the Eddystone Rail Facilities." *Id.* at 17, ¶ 15.10(e). There were no binding agreements between the parties as to the possibility of connecting to a pipeline system, and the possibility was not the "primary" or "principal" objective of the contract, and, in fact, it never became a reality. (*See* Pl.'s Opp'n at 14.) Notably, at the time that the RSA was executed, and at all times since, the sole option for transporting oil downriver from the Transloading Facility has been to load it onto barges. (*Id.*) According to Eddystone, the Transloading Facility is currently not connected to a pipeline system. (*Id.*) Additionally, we agree with Eddystone that the RSA's language clearly shows that transport by pipeline was, at most, something to be explored in the future rather than part of the parties' existing contractual relationship. The RSA neither obligated either party to take any affirmative steps in furtherance of establishing such a connection between a pipeline system and the Transloading Facility nor establish a timeline for exploring or developing such a connection. The RSA's Terms and Conditions have no provisions relating to the transport of oil through a pipeline system, which is in contrast to the detailed provisions regarding transport by barge, including provisions for scheduling arrival and departure times, docking, loading oil, and accidents. *See* RSA, T&C at §§ 7-9, 11-12. Further, the parties appear to have contemplated developing a new set of Terms and Conditions in the event that it became possible to connect to a pipeline system from the Transloading Facility, but the future possibility of such a connection was not the primary objective of the RSA. (*Id.*) (citing RSA at 9, ¶ 6.1).

delivered the crude petroleum or the barges. *See id.* In the RSA, all charges were focused on the key service provided of the transloading of crude petroleum onto barges. *See id.*

According to Eddystone, Defendants Bridger Logistics, Ferrellgas, Rios, and Gamboa, took advantage of Eddystone's transloading services as part of its performance of a contract to deliver crude oil that was sourced in North Dakota to the Monroe Refinery. FAC ¶ 4. From May 2014 through January 2016, Eddystone transloaded every trainload of crude oil that BTS and the Defendants brought to the Transloading Facility onto barges for shipment to Monroe Refinery. *Id.* ¶¶ 5-6. Eddystone alleges that, once the price of North Dakota oil began to fall, Defendants decided that they could no longer profit from shipping oil from North Dakota to Pennsylvania, and they terminated their agreement with the Monroe Refinery.[14] (Pl.'s Opp'n at 4.) Consequently, they no longer needed to continue direct shipments of crude oil through Eddystone's Transloading Facility. (*Id.*)

Under the specific facts of our case, we find that the RSA's direct connection with the traditional maritime activity of loading a barge makes it akin to a stevedoring contract. The definition of stevedore is "to handle (cargo) as a stevedore" and "to load or unload the cargo of (a ship) in port." *The Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/stevedore (March 25, 2019); *see also Ne. Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 254 n.4 (1977) ("A stevedore or stevedore contractor is responsible for loading or unloading a ship in port by contract with a shipowner, agent, or charter operator.") (citation omitted). While the RSA involved the construction of the Transloading Facility and the unloading of oil from railcars, which are land-based, the primary objective of the agreement was

---

[14] Defendants state that they "did not terminate an agreement to supply crude to the Trainer refinery . . . . Jamex Marketing – not an affiliate of Defendants, and not a party to this litigation – and Trainer's operator made the decision to suspend the purchase of crude based on market conditions, leaving nothing for BTS to deliver." (Defs.' Reply at 2.)

12

to transload the oil onto barges for the express purpose of the barges travelling down river to deliver the oil to refineries on the Delaware River for a five-year period.[15] The RSA's loading component of oil onto barges is not only maritime, but it the objective of the agreement.

"A 'stevedoring contract is a maritime contract' and a federal district court has jurisdiction over a claim for breach of such a contract under Section 1333." *Cooper v. Loper*, 923 F.2d 1045, 1048 (3d Cir. 1991) (quoting A *& G Stevedores v. Elleman Lines,* 369 U.S. 355, 359 (1962)). While we are acutely aware that the RSA is not a stevedoring contract *per se*, we conclude that it is analogous enough to tip the RSA into a maritime contract. Additionally, pursuant to the RSA, Eddystone actually transloaded every trainload of crude oil that BTS and the Defendants brought to the Transloading Facility onto barges for shipment to the Monroe Refinery for a period from May 2014 through January 2016. *See* FAC ¶ 5. The RSA does not merely reference barges, but it includes a direct and substantial link to the loading of crude oil onto a barge that was specifically chartered for the purposes of the RSA. *See Atl. Transp. Co. of W. Va. v. Imbrovek*, 234 U.S. 52, 61 (1914) (tort case) ("The libellant was injured on a ship, lying in navigable waters, and while he was engaged in the performance of a maritime service. We entertain no doubt that the service in loading and stowing a ship's cargo is of this character."); *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 947 (3d Cir. 1990) (tort case) (stating that "loading and unloading vessels is historically a task of the ship's crew"); *Moser v. Texas Trailer Corp.,* 623 F.2d 1006, 1009 (5th Cir. 1980) (tort case) (stating that "the loading of

---

[15] Defendants assert that "the primary objective of the Agreement is to build and operate a facility for offloading crude oil from railcars arriving from North Dakota." (Defs.' Reply at 4.) Eddystone acknowledges that offloading was a component of the services, but explains that "the primary objective was to transfer crude oil from trains to barges that would take it to its final destination elsewhere on the Delaware River." (Pl.'s Sur-Reply at 4.) It also points out that the fact that it had to first construct the facility in order to be in a position to perform its transloading services does not alter the primary objective of it providing transloading services, which BTS availed itself of for a fixed time period. (*Id.*) Also, it notes that "BTS was charged for the transloading, not for the building." (*Id.*)

cargo [is] a traditional maritime activity. The vehicle involved was a barge, whose function was transportation across navigable waters, a traditional role of watercraft"); *Lightering LLC v. Teichman Grp., LLC*, 328 F. Supp. 3d 625, 642 (S.D. Tex. 2018) (contract case) ("The court concludes that in this Agreement, neither wharfage nor equipment storage is a maritime commerce activity, but vessel loading and unloading is. The only part of the Agreement that involves 'work from a vessel' is the equipment loading and unloading."), *appeal dismissed sub nom. Lightering, L.L.C. v. T & T Offshore, Inc.*, No. 18-20574, 2019 WL 718972 (5th Cir. Jan. 24, 2019); *Fed. Marine Terminals, Inc. v. Dimond Rigging Co., LLC*, No. 13-1329, 2014 WL 4809427, at *3 (N.D. Ohio Sept. 26, 2014) (contract case) ("The physical loading of a vessel is governed by maritime law."); *Orgulf Trans. Co. v. Hill's Marine Enters.,* 188 F. Supp. 2d 1056, 1061 (S.D. Ill. 2002) (contract and tort case) ("[A]ssuming that contracts existed between the parties for either the unloading or loading of the barges, those contracts were in reference to maritime services. It is appropriate for this Court to assert admiralty jurisdiction over disputes arising from such contracts.").

The RSA's connection with the traditional maritime activity of transloading (loading) oil (i.e, cargo) onto a barge over the course of a guaranteed five-year period is not only a maritime activity, but effectuates maritime commerce by transloading the oil onto barges to travel down river to refineries. *See Barrios v. Centaur, LLC*, 345 F. Supp. 3d 742, 748 (E.D. La. 2018) (noting that the loading and unloading of vessels is "a traditional maritime commerce activity"). Not only does Eddystone's First Amended Complaint specifically invoke the Court's admiralty jurisdiction, but the underlying contract in this case, the RSA, also clearly implicates admiralty jurisdiction. Since the RSA is maritime in nature, we conclude that admiralty jurisdiction is properly invoked.

Alternatively, even if the RSA is a maritime contract, Defendants argue that we lack jurisdiction because none of Eddystone's claims arise under the RSA; instead, it seeks equitable remedies, including relief against BTS's alter egos and the recovery of fraudulently transferred assets that could be used to pay an eventual judgment. (Defs.' Mot. to Dismiss at 14-17.) They contend that the Court cannot exercise subject-matter jurisdiction over a mere subsidiary claim because Courts are loath to extend admiralty jurisdiction beyond traditional admiralty claims. (*See id.*) They assert that "[t]he existence of a maritime contract somewhere in the background . . . is not a sufficient basis to justify the existence of admiralty jurisdiction over non-contractual claims against non-contracting parties." (*Id.* at 14.)

Eddystone points out that it has done far more than merely allege the existence of a maritime contract somewhere in the background by stating:

> it has obtained an arbital award from the Society of Maritime Arbitrators based on BTS's breach of that maritime contract, invoked maritime jurisdiction in a federal action to enforce the arbitration award, and alleged in this action that Defendants are liable for BTS's debts under the maritime contract as BTS's alter egos. *See Petition* ¶ 3 (Exhibit 1) (invoking admiralty jurisdiction over petition to confirm arbitral award); FAC ¶ 31 (invoking maritime jurisdiction on grounds that Eddystone "seeks to enforce payment of a debt arising under a maritime contract"); *id.* ¶¶ 76-86 (alleging basis for alter ego liability, including the fact that Defendants "derived substantial benefits" from the RSA); *id.* Prayer for Relief Nos. 1 and 3 (seeking damages arising from the breach of the RSA).

(Pl.'s Opp'n at 20-21.) It also argues that its "express claims that BTS and Defendants are liable for damages on a maritime contract are more than sufficient to confer maritime jurisdiction over this dispute." (*Id.* at 21.) It further states that, "because Eddystone has established the basis to exercise jurisdiction over a dispute arising out of a maritime contract, this Court may exercise

15

admiralty jurisdiction over Eddystone's claims to reverse fraudulent transfers in order to protect any future admiralty judgment." (*Id.*)

Regarding Count I - Alter Ego, it is clear that Eddystone asserts that certain Defendants; namely, BL/FG Defendants, Rios, Gamboa, and Bridger Rail Shipping, can be held liable for the damages arising from BTS's breach of the RSA by virtue of the fact that they are BTS's alter egos and, in that capacity, engineered BTS's breach of the RSA. Eddystone has predicated this lawsuit on a breach of the RSA since it will need to establish that BTS breached its maritime contract with Eddystone, and that the aforementioned Defendants are liable for that breach as alter egos of BTS. The RSA lies at the heart of Eddystone's Alter Ego claim, which is essentially a "contractual claim," albeit against BTS's alter egos.

Under the unique set of facts before us, Eddystone explains that it was unfeasible to pursue contractual claims against BTS as signatory to the RSA and BTS's alter egos in the same action. (Pl.'s Sur-Reply at 13.) It explains:

> Eddystone was required to resolve disputes with its counterparty, BTS, through arbitration before the Society of Maritime Arbitrators in New York. *See* RSA, Ex. A, § 16(b), Doc. No. 283-1. It was only through discovery taken in connection with the arbitration that Eddystone obtained the evidence that BTS had been stripped of assets and other evidence supporting the assertion of alter ego liability in this action. Because there was no reason to continue to incur the expense of arbitrating against an empty entity with no assets, Eddystone entered into a settlement with BTS's alleged successor in December 2016. Due to this settlement, moreover, Eddystone could not reasonably make BTS's successor a defendant in this action, which Eddystone filed in February 2017. Nor did the action to confirm the arbitral award provide a viable avenue to obtain a ruling on alter ego. Thus, Eddystone took the logical course: it sued Defendants, and not the empty signatory BTS, in this Court, and offered to prove a breach of contract and alter ego in this Court.

(*Id.* at 13-14.) In further support of the fact that Eddystone's Alter Ego claim is premised on a breach of contract, we point out that certain of Defendants' defenses and BL/FG Defendants' conditional counterclaims arise from Eddystone's performance under the RSA. For instance, BL/FG Defendants' Counterclaims II-VI against Eddystone for fraudulent inducement, negligent representation, breach of contract, breach of implied covenant of good faith and fair dealing, and rescission, are premised entirely upon the RSA.

There is no doubt that the alleged breach of the RSA is at the center of Eddystone's Alter Ego claim since it alleges that certain Defendants engineered BTS's breach of the RSA and seeks damages that clearly arose as a result of the breach. Eddystone's inability to assert a breach of contract claim under the facts before us does not automatically foreclose its quasi-contractual claim from admiralty jurisdiction. In fact, we find that admiralty jurisdiction exists over Eddystone's quasi-contractual claim for alter ego premised on a breach of contract because it directly arises out of a maritime contract, the RSA.

"Admiralty courts have jurisdiction over quasi-contractual claims that 'arise out of maritime contracts or other inherently maritime transactions.'" *See Barna Conshipping, S.L. v. 2,000 Metric Tons, More or Less, of Abandoned Steel*, 410 F. App'x 716, 722-23 (4th Cir. 2011) (citing *Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.*, 553 F.2d 830, 835 (2d Cir. 1977); *Archawski v. Hanioti*, 350 U.S. 532, 536 (1956) ("Rights which admiralty recognizes as serving the ends of justice are often indistinguishable from ordinary quasi-contractual rights created to prevent unjust enrichment. How far the concept of quasi-contracts may be applied in admiralty it is unnecessary to decide. It is sufficient this day to hold that admiralty has jurisdiction . . . provided that the unjust enrichment arose as a result of the breach of a maritime contract.")). "[S]o long as the claim asserted arises out of a maritime

contract, the admiralty court has jurisdiction over it." *Archawski*, 350 U.S. at 535; *see also Barna*, 410 F. App'x at 722 ("We think it clear, however, that admiralty jurisdiction can exist over Barna's quasi-contract claims notwithstanding the absence of admiralty jurisdiction over Barna's other claims."); *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 705 (5th Cir. 1961) ("Neither resort to equitable principles in adjudicating performance or non-performance [of a maritime contract], nor the arithmetical process of treating evidentiary items in the determination of the amount of such decree, destroys in any way the admiralty jurisdiction."); *Sword Line v. United States*, 230 F.2d 75, 77 (2d Cir. 1956) ("We think it sounder, and more in accordance with the nature of admiralty, to rest upon the inherent maritime character of the underlying transaction, rather than upon an attempt to force this claim into the mold of a breach of contract."); *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 508 (S.D.N.Y. 2012) ("The fact that Plaintiffs asserted claims against Fulcrum as an alter ego of Biodiesel does nothing to undermine [the fact that the charter party at the heart of the dispute was a maritime contract] or vitiate the Court's maritime jurisdiction in this action.") (citing cases); *Santova Logistics, Ltd. v. Castello 1935, Inc.*, No. 6:12-0007, 2012 WL 4408733, at *3-4 (W.D. Va. June 19, 2012) ("[E]ven if Plaintiff and Defendant are not both parties to one of the earlier bills of lading . . . Plaintiff's Complaint can still be brought before this Court under a quasi-contract theory, since the alleged damages quite clearly arose as a result of the breach of contract of at least one of these maritime contracts."); *AAB Elec. Indus., Inc. v. Control Masters, Inc.*, 1980 A.M.C. 1795, 1808 (E.D. La. Mar. 20, 1980) ("Breach of an underlying maritime contract is not a condition precedent to the exercise of admiralty jurisdiction in a quasi-contract case."); *Nat'l Marine Serv., Inc. v. C. J. Thibodeaux & Co.*, 380 F. Supp. 1076, 1080 (S.D. Tex. 1973) ("So long as the underlying obligation arises out of a maritime contract, admiralty is not

deprived of jurisdiction merely because an equitable remedy is utilized."), *aff'd,* 501 F.2d 940 (5th Cir. 1974).

Thus, pursuant to the facts before us, we find that we have maritime jurisdiction over Eddystone's Amended Complaint under the quasi-contract theory of its Alter Ego claim. By seeking alter ego liability on certain Defendants for their engineering and direct involvement in BTS's alleged breach of the RSA, it is clear that Eddystone's Alter Ego claim clearly arose as a result of the breach of the RSA. Since Eddystone's additional claims of fraudulent transfers and breach of fiduciary duties arise out of the same common nucleus of operative fact as its Alter Ego claim, we may exercise supplemental jurisdiction over those claims. *See Sinclair v. Soniform, Inc.*, 935 F.2d 599, 603 (3d Cir. 1991) (determining that the court had admiralty jurisdiction and extending supplemental jurisdiction over related claims pursuant to 28 U.S.C. § 1367(a)).

## IV. **CONCLUSION**

We find that the RSA is a maritime contract. Since the RSA is maritime in nature, we conclude that admiralty jurisdiction is properly invoked. Consequently, this Court has admiralty jurisdiction over Eddystone's First Amended Complaint. The Court exercises admiralty jurisdiction on a quasi-contract basis due to the fact that Eddystone brings an Alter-Ego claim based on an alleged breach of the RSA and alleges damages that arose as a result of that breach. Also, supplemental jurisdiction over Eddystone's remaining claims is proper. Both the nature of the RSA and the nature of the dispute squarely implicate the Court's admiralty jurisdiction; therefore, federal subject- matter jurisdiction exists here under 28 U.S.C. § 1333(1). Consequently, Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction is denied.

An appropriate Order follows.