

April 3, 2019

Lawrence G. Scarborough
Direct: 602/364-7137
Fax: 602/716-8137
lgscarborough@bclplaw.com

Publicly-filed, Redacted Version

Hon. Robert F. Kelly
Senior United States District Judge
United States District Court for the Eastern
District of Pennsylvania
James A. Byrne U.S. Courthouse
Room 11613
601 Market Street
Philadelphia, PA 19106

Re:   Case 2:17-cv-00495-RK, Eddystone Rail Company, LLC v. Bridger Logistics, LLC et al. - Supplemental Submission Regarding Eddystone's Crime-Fraud Motion

Dear Judge Kelly,

On behalf of the BL/FG Defendants and in advance of the oral argument scheduled to occur on April 10, 2019 on the pending Crime-Fraud Motion (Dkt. 218) (the "Motion") filed by Plaintiff Eddystone Rail Company, LLC ("ERC"), we write to supplement the record with deposition testimony, documentary evidence, and other information relevant to the Motion that has come to light in discovery since the BL/FG Defendants submitted their sur-reply on November 30, 2018.

The evidence and information falls generally into three categories: **(1)** additional evidence refuting ERC's contention that the February 2016 sale of BTS to the Jamex entities had no legitimate purpose, and was intended only to "defraud" ERC; **(2)** additional evidence refuting ERC's contention that Ferrellgas's January 2016 granting of a security interest and lien to its lender (Bank of America, or "BOA") was "pretextual" and intended only to "defraud" ERC; and **(3)** ERC's contention that a party seeking to compel documents withheld as privileged must identify with specificity the materials they seek, rather than moving to compel broad categories documents (as ERC has done in its Motion).

I.   Additional Evidence Relating to the February 2016 Sale of BTS to Jamex.

One of the key allegations underlying ERC's Motion is its suggestion that the BL/FG Defendants sold BTS to Jamex in February 2016, not for any "legitimate business reason," but allegedly "to allow Bridger Logistics and Ferrellgas to distance themselves from BTS after they fraudulently transferred all BTS's assets to its affiliates." (Dkt. 273, Reply at 18–23.) ERC

Hon. Robert F. Kelly
April 3, 2019
Page 2



further alleges that when Jamex and Monroe agreed to REDACTED, they did not intend to REDACTED, and Jamex did not believe it took on the obligation to pay ERC under the RSA when it acquired BTS. (*Id.* at 18–20, 30.) In particular, ERC argues that "Ferrellgas knew Jamex never intended to use Eddystone when it sold Jamex BTS and the RSA." (*Id.* at 19.)

In both their opposition (Dkt. 268) and sur-reply (Dkt. 277) to the Motion, the BL/FG Defendants pointed out that ERC's contention was refuted by the plain terms of the relevant agreements, the sworn declaration of Jamex's principal, James Ballengee, and the sworn declaration of Bridger Logistics's former CFO, Todd Soiefer, among other evidence. (Dkt. 268, Opposition at 21–23; Dkt. 277, Sur-Reply at 15–21.) In particular, the evidence shows that Jamex and Monroe hoped to REDACTED, and Jamex's purpose for acquiring BTS (and the RSA) was to REDACTED, including to REDACTED.

In recent months, both Ballengee and Monroe's corporate representative have testified at depositions, and their testimony confirms that Jamex's purchase of BTS was intended to facilitate the REDACTED. Ballengee's testimony also confirms that Jamex knowingly assumed BTS's payment obligations under the RSA.

In his January 9, 2019 deposition, Ballengee testified as follows:

- REDACTED (**Exhibit A**, Ballengee Tr. at 211:21–22 & 212:3–4.)

- REDACTED (*Id.* at 230:18–231:12.)

- REDACTED (*Id.* at 232:5–13.) REDACTED (*Id.* at 145:25–146:5.)

- REDACTED (*Id.* at 231:23–232:4.)

Hon. Robert F. Kelly  
April 3, 2019  
Page 3



- REDACTED

  (*Id.* at 259:9–15.)

- REDACTED

  (*Id.* at 233:16–22.) REDACTED

  (*Id.* at 232:5-20; 233:16-234:3.) REDACTED

  (*Id.* at 199:22–200:1.) REDACTED

  (*Id.* at 253:14–17; 253:20–254:5.)

Similarly, Monroe's corporate representative provided the following testimony at a February 12, 2019 deposition, acknowledging that the REDACTED:

- REDACTED

  (**Exhibit B**, Monroe Tr. at 96:5–99:13.) REDACTED

  (*Id.* at 118:13–20.)

- REDACTED

  (*Id.* at 143:5–144:5.) REDACTED

  (*Id.* at 147:5–22.) REDACTED

  (*Id.* at 149:15–150:11.)

- REDACTED

  (*Id.* at 150:21–151:15.) REDACTED

  (*Id.* at 151:22–152:4, 155:21–24.)

- REDACTED

  (*Id.*, at 223:11–15.)



- REDACTED

(*Id.* at 162:3–9, 172:2–176:20.)

- REDACTED

(*Id.* at 184:21–185:19.)

All of this deposition testimony further undermines ERC's argument that the February 2016 sale of BTS to Jamex and the related transactions were illegitimate and undertaken only to "distance" the BL/FG Defendants from liability in an alleged attempt to defraud ERC.

**II.    New Evidence Regarding the Grant of a Security Interest to Ferrellgas's Lender.**

Another of the contentions underlying ERC's Motion is its suggestion that the BL/FG Defendants were not restrained by BOA's security interest from transferring any of BTS's assets to Jamex along with BTS.  ERC argues that BOA's security interest in BTS assets was a "false pretense" (Dkt. 218, Motion at 9), put in place "solely as a pretext for stripping" BTS of its assets before the sale to Jamex (Dkt. 273, Reply at 17).  ERC supports this argument with conjecture derived from the purportedly suspicious timing of events surrounding the paperwork relating to BOA's security interest.  Specifically, in connection with a contemplated January 2016 transaction REDACTED.  ERC speculates that there is "fraud" because this paperwork-remediation occurred not long before Jamex acquired BTS:  "The last-minute blanket lien Ferrellgas tried to impose on BTS's assets was indeed a false pretense to justify the fraudulent transfers."  (Dkt. 273, Reply at 18.)

ERC asked for and the BL/FG Defendants recently produced additional documents concerning their outside counsel's communications with BOA, which show the following:

- REDACTED

. (**Exhibit C**, Closing Checklist.)



- REDACTED (**Exhibit D,** Email "RE: Ferrellgas Accordion – Certificates and Resolutions.") REDACTED

- REDACTED (**Exhibit E**, Jan. 8, 2016 Email re "Bridger Guaranty Supplement.")

These documents further undermine ERC's speculation that the paperwork and the lien were anything other than a legitimate requirement imposed by the BL/FG Defendants' lender.

### III. ERC's Opposition to Rios and Gamboa's Motion to Compel.

In its Motion, ERC does not identify with specificity the documents on the BL/FG Defendants' privilege log that ERC believes are subject to the crime-fraud exception, let alone explain why each such document is supposedly subject to the exception. Rather, ERC moves to "compel full disclosure of any withheld documents relating to the restructuring of BTS, the transferring or redirecting of its assets or revenue streams, the sale of BTS to Jamex, and the cessation of the Monroe shipping arrangement." (Dkt. 218, Motion at 29; *see also id.* at 17, 26.)

On February 27, 2019, Defendants Julio Rios and Jeremy Gamboa filed a motion to compel ERC to produce certain documents listed on its privilege log. (Dkt. 297.) In an opposition filed on March 5, 2019 (Dkt. 300 at 6), ERC argues that Rios and Gamboa's motion should be denied because they failed to "identify the specific documents at issue in pre-filing discussions with Eddystone," and it is improper for them to "simply make an indiscriminate demand covering 'hundreds' of documents on Eddystone's log." In its sur-reply (Dkt. 305 at 4), ERC argues again that Rios and Gamboa "have not specified particular entries in the privilege log that they currently believe are problematic," instead challenging "entire categories of documents." ERC goes on to argue that "courts have repeatedly insisted that, under circumstances such as these, challenges to privilege logs should be made on a document-by-document basis." (*Id.*) For all of these reasons, ERC argues that Rios and Gamboa's motion to compel should be denied.

ERC apparently attempts to preempt criticism by hinting that its Motion is somehow different, distinguishing a hypothetical instance "in which the Court is being asked to decide a discrete

Hon. Robert F. Kelly
April 3, 2019
Page 6



question that automatically applies across a category of documents (e.g., whether waiver of privilege occurred, thereby potentially disqualifying an entire category of documents based on that bright line determination)." (*Id.*)  ERC offers no authority for such a distinction, and no "bright line determination" can be made to resolve ERC's Motion under the crime-fraud exception.  Indeed, it is not apparent why the issue presented by Rios and Gamboa's motion (whether withheld documents relate to non-legal business advice or were improperly withheld under a common-interest privilege) would require the movant to identify privilege log entries with specificity, when the issue raised by ERC's own motion (whether an attorney communication was used to further an alleged fraud) would not require specific identification.

ERC concludes its sur-reply argument by advocating for a "rule [that] protects Eddystone (and potentially, the Court) from the massive burden and cost associated with re-reviewing thousands of documents to rebut Rios/Gamboa's speculative, categorical assertions." (*Id.* at 5.)  Yet ERC's pending Motion implicates many more thousands of privilege log entries, and the burden it seeks to impose on the BL/FG Defendants (and potentially, the Court) is far greater than the burden it claims is too great in opposition to Rios and Gamboa's motion to compel.

We appreciate the Court's consideration of these supplemental materials and look forward to the opportunity to be heard at the oral argument on April 10, 2019.

Very truly yours,

/s/ *Lawrence G. Scarborough*


Lawrence G. Scarborough


cc:     All counsel of record (*via e-filing and email*)