Filiberto Agusti
202 429 6428 direct
202 261 7512 fax
fagusti@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com



April 5, 2019

<u>BY HAND</u>

Hon. Robert F. Kelly
United States District Judge
United States District Court for the Eastern
District of Pennsylvania
James A. Byrne U.S. Courthouse
Room 11613
601 Market Street
Philadelphia, PA 19106

Re: Case 2:17-cv-00495, *Eddystone Rail Company, LLC v. Bridger Logistics, LLC et al.* – Response to Submission Regarding Eddystone's Crime-Fraud Motion

Dear Judge Kelly,

On behalf of the Plaintiff, Eddystone Rail Company, LLC ("Eddystone"), we write to respond to the supplemental submission Defendants made on April 3, 2019. Defendants' submission is another effort to confuse the issues and divert the Court's attention away from the core inquiry: Whether there is "a reasonable basis to suspect" that Defendants engaged in intentional fraudulent transfers of BTS's assets between June 2015 and January 2016. *In re Grand Jury*, 705 F.3d 152–54 (3d. Cir. 2012). When the wheat is separated from the chaff, it is clear that Eddystone has met its burden.

## I. Introduction

Defendants' supplemental submission raises a number of points that all miss the mark. Defendants' selective citations to the depositions of James Ballengee and Monroe's corporate representative, ███████, are misleading and incomplete. More importantly, regardless of whether Defendants had a legitimate reason to sell BTS, Defendants, under the PUFTA, had no right to strip BTS of its assets prior to the sale. Defendants' other citations, to exchanges with Ferrellgas's lender, are no more helpful. That Ferrellgas's lender may have requested a lien on BTS's assets does not render the transfer valid. The fact remains that the loan was entirely for the benefit of Ferrellgas; BTS received no reasonably equivalent value for the lien and guaranty

Judge Kelly
April 5, 2019
Page 2

it gave to secure Ferrellgas's credit facility. It is settled that the grant of such an upstream guaranty by a subsidiary is voidable as a fraudulent transfer.

Defendants misunderstand Eddystone's position on document-by-document privilege determinations. In Rios and Gamboa's motion to compel, there was no dispute regarding the governing legal standards. The only question was whether particular documents were privileged. Yet Rios and Gamboa failed to identify the specific documents they claimed were privileged, choosing instead to speculate that entire categories were not privileged. In contrast, the parties hotly contest the legal standard governing the crime-fraud exception and whether the record evidence supports a piercing of the privilege. Once the Court rules on these threshold questions, Defendants will have ample guidance for identifying the specific documents that need to be produced.

## II. Regardless of the Reason for the Sale of BTS, Defendants had No Right to Strip BTS of its Assets Prior to the Sale

Defendants cite excerpts from the deposition testimony of James Ballengee and the corporate representative of Monroe in an effort to "refute" ERC's contention that the February 2016 sale of BTS to Jamex Transfer Holdings ("JTH") had no legitimate purpose. In fact, however, these witnesses repeatedly testified in support of Eddystone's position.

Ballengee testified as follows:





The Monroe corporate representative testified as follows:

As these excerpts demonstrate, the testimony of Ballengee and Hunter was quite different than Defendants suggest. But ultimately, regardless of the sale's purpose, as Eddystone has previously noted, Defendants had no right to effect a fraudulent transfer by stripping BTS's assets beforehand. *In re Sigma-Tech Sales, Inc.*, 570 B.R. 408, 416 (Bankr. S.D. Fla. 2017) (finding intentional fraudulent transfer where company's owner "stripped the Debtor of its value, transferred such value to other companies he and Mrs. Luboff controlled," and "[t]he Debtor and its creditors received no benefit from the transfers"); *see also Collet v. Am. Nat. Stores, Inc.*, 708 S.W.2d 273, 281–85 (Mo. Ct. App. 1986) (defendant held liable as alter ego upon finding of "the stripping of assets from the subservient corporation," notwithstanding subsequent sale of the shell to a third party for $1.00). The harm was done when Defendants caused BTS to transfer away all its remaining assets for no consideration in January 2016. What Defendants later did with the shell of BTS cannot justify those fraudulent transfers.

Judge Kelly
April 5, 2019
Page 4

### III. Regardless of ▇▇▇▇▇▇▇ Loan Requirements, BTS did not Receive Reasonably Equivalent Value in Exchange for the Guaranty and Lien

Defendants again try to support their claim that BTS's assets were encumbered by a valid lien by pointing to communications with Ferrellgas's lender ▇▇▇▇▇▇▇. Ferrellgas contends that ▇▇▇▇▇▇▇ requested a lien on all the Bridger entities' assets as part of an increase in Ferrellgas's credit facility in January 2016. *See* Ferrellgas Letter at 4–5. Thus, Ferrellgas declares, the lien was "a legitimate requirement imposed by the BL/FG Defendants' lender." Ferrellgas Letter at 5.

However, even if ▇▇▇▇▇▇▇ requested the lien, that request did not render the lien valid. The loan was entirely for the benefit of Ferrellgas; by having BTS grant a lien to ▇▇▇▇▇▇▇ on BTS assets, Ferrellgas effectively used BTS assets – otherwise available to pay BTS' own creditors – to pay down Ferrellgas' own debt. BTS still did not receive reasonably equivalent value in exchange – it received no loan proceeds at all. Indeed, all the evidence is that since the day on which Ferrellgas caused BTS to guarantee its debt, Ferrellgas did not even credit to BTS the revenues earned from BTS's own contracts. *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 667 (N.D. Tex. 2011) ("[A] transferor receives less than reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party . . . This is true even when the third party is the parent company of the debtor.").

Nor does ▇▇▇▇▇▇▇ request disprove the element of fraudulent intent. "Under the [UFTA], the transferee's intent is irrelevant to the statutory finding of an intentional fraudulent transfer, which is based instead solely on the transferor's intent." *Nat'l Council on Comp. Ins., Inc. v. Caro & Graifman, P.C.*, No. CIV 300-CV-1925 AHN, 2008 WL 450413, at *21 (D. Conn. Feb. 15, 2008). Here, Ferrellgas readily agreed to cause BTS to transfer to ▇▇▇▇▇▇▇ a blanket lien on BTS assets, for no reasonably equivalent value to BTS, at the same time that Ferrellgas planned to strip those same assets from BTS. The effect of the transfer, of course, was to shift their value from BTS creditor to BTS equity owner, Ferrellgas. Ferrellgas still used the lien as a tool to effect its fraudulent purpose of stripping BTS of assets.

Indeed, Defendants misunderstand basic fraudulent transfer law when they insist that the upstream guaranty and lien immunize the stripping of BTS's assets. Since they cannot dispute that BTS received no new value for the blanket lien, Defendants instead point to BTS's June 2015 guaranty of Ferrellgas's credit facility and argue that the facility was an antecedent debt. Dkt. 276 at 14. But the rule that a transferor may grant a lien to secure an antecedent debt without receiving fresh consideration applies only where the transferor received value for that antecedent debt in the first instance. *In re Solomon*, 299 B.R. 626, 637 (B.A.P. 10th Cir. 2003). In *Solomon*, where a subsidiary had guaranteed its parent's loan and later granted a lien to secure that guaranty, the court rejected the antecedent debt defense of the lien because the subsidiary had never received any loan proceeds or other benefits in exchange. *Id.* at 638.



Judge Kelly
April 5, 2019
Page 5

As noted, there is no evidence that BTS received any loan proceeds or other benefits in exchange for the guaranty and lien it executed in support of Ferrellgas's credit facility.  So BTS's lien did not in fact secure a valid antecedent debt.  To the contrary, the antecedent debt was itself a fraudulent transfer, as BTS received no reasonably equivalent value for its June 2015 guaranty either.  With no valid lien encumbering BTS's assets, the transfers to its affiliates remain clear fraudulent transfers.

**IV.    In Contrast to Rios and Gamboa's Motion to Compel, the Crime-Fraud Motion Requires a Ruling on the Governing Legal Standard and Whether the Privilege Should Pierced**

Defendants suggest that Eddystone's motion should be denied, because Eddystone has not identified the specific documents that should be produced.  They assert that Eddystone's motion to compel categories of documents (i.e., documents related to the restructuring of BTS, the transferring or redirecting of its assets or revenue streams, the sale of BTS to Jamex, and the cessation of the Monroe shipping arrangements) is inconsistent with the position Eddystone took in opposition to Rios and Gamboa's Motion to Compel Production of Nonprivileged Documents on Plaintiff's Privilege Log ("RS motion") (Dkt. 297).

Defendants are comparing apples to oranges.  The RS motion sought to compel production of documents that allegedly reflected (a) business communications in which no legal advice was sought or provided, or (b) communications between adversaries that had no common interest.  The parties did not dispute the applicable legal standards (e.g., a communication must reflect or seek legal advice from an attorney).  See Dkt 299 at 1, 5.  The only question was whether the documents withheld met the standard (e.g., whether particular documents reflected only business communications rather than legal advice).  The only way to answer that question was to analyze the specifics of each document.  See Dkt. 305 at 2, 4-5, 10.

Eddystone argued that the RS motion was improper, because Rios and Gamboa did not specify or explain why particular documents on Eddystone's privilege log did not meet the legal standard.  Instead, Rios and Gamboa speculated that entire categories of documents (e.g., all business communications in which an attorney was a cc recipient) could not have involved a request or provision of legal advice.  Dkt. 305 at 2, 4.  Enbridge submitted declarations to prove that these categorical assertions were false.  See Dkt. 305, Declaration of Andrew Sloniewsky.  However, Eddystone did not take the position that a movant must always specify each and every document that is the subject of a motion to compel.  Instead, Eddystone noted that there could be circumstances in which a Court is "asked to decide a discrete question that automatically applies across a category of documents (e.g., whether waiver of privilege occurred . . . .)"  Dkt. 305 at 4.

The present motion involves such circumstances.  In contrast to the RS motion, the parties contest the applicable legal standard (e.g., whether "actual fraud" must be shown in addition to a reason to suspect intentional fraudulent transfers).  They also contest whether the record evidences  a reason to suspect intentional fraudulent transfers.  Thus, resolution of Eddystone's

Judge Kelly
April 5, 2019
Page 6

motion does not simply turn on an analysis of particular documents. Rather, Court must determine the applicable legal standard and whether the evidence supports a piercing of the privilege.

Eddystone believes that the Court's rulings on these threshold issues will resolve Eddystone's motion. If the status of certain documents cannot be ascertained without a document-by-document review, Eddystone acknowledges that in camera review may be appropriate. But there can be little doubt that the Court's ruling on the applicable legal standard and whether the privilege should be pierced will provide ample guidance to defendants in determining which withheld documents should be produced under the exception.

**V.      Conclusion**

In the final analysis, Defendants' supplemental submission does nothing to rebut the case Eddystone has made for application of the crime-fraud exception. We appreciate the Court's consideration of all the materials both sides have submitted, and look forward to the opportunity to be heard at the oral argument on April 10, 2019.

                                                          Respectfully,

                                                          */s/ Fil Agusti*
                                                          Filiberto Agusti