**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00495-JD |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P. | ) | |
| | ) | |
| Defendants/Counterclaimants | ) | |
| | ) | |

**JOINT STATUS REPORT**

Pursuant to the Court's January 17, 2020 Order (Dkt. 356), Plaintiff Eddystone Rail Company, LLC ("Eddystone") and Defendants Bridger Logistics, LLC ("Bridger Logistics") and certain subsidiaries thereof ("Additional Entity Defendants"), Ferrellgas Partners, L.P., Ferrellgas, L.P. (together, "Ferrellgas" or the "BL/FG Defendants"), Julio Rios, and Jeremy Gamboa hereby notify the Court of their liaison counsel and respectfully submit the following Joint Status Report. Plaintiff and Defendants write separately below to provide their statements of the case, and they join in the remainder of the status report, except where disagreement is indicated.

**I.      Liaison Counsel**

Pursuant to the Court's January 17, 2020 Order, the undersigned hereby identify the following individuals to serve as liaison counsel in this matter for their respective clients.

1

**A.      Plaintiff Eddystone**

Steven J. Barber
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
sbarber@steptoe.com

**B.      BL/FG Defendants**

Jacob A. Kramer
Bryan Cave Leighton Paisner, LLP
1155 F Street, NW, Suite 700
Washington, DC 20004
(202) 508-6153
jake.kramer@bclplaw.com

**C.      Defendants Rios and Gamboa**

Jeremy Fielding
Kirkland & Ellis LLP
1601 Elm St.
Dallas, TX 75201
(214) 972-1754
jeremy.fielding@kirkland.com

**D.      Jamex Marketing**

The Court's January 21, 2020 Order also requested liaison counsel for Jamex Marketing, LLC and the Jamex related third-party defendants.  The claims and counterclaims involving these defendants were dismissed by stipulation in June 2018.  Dkt. 175.  The current contact information for their counsel is as follows:

T. Ray Guy
Frost Brown Todd, LLC
100 Crescent Court, Suite 350
Dallas, TX 75201
(214) 545-5933
rguy@fbtlaw.com

## II.     Plaintiff's Statement of the Case

### A.     Case Summary

This case arises from a contract in which Plaintiff Eddystone agreed to construct and operate a facility to "transload" crude oil from railcars to Delaware river barges.  Am. Compl. (Dkt. 182).  In return non-party Bridger Transfer Services, LLC ("BTS") agreed to become a customer at the facility and pay Eddystone a certain minimum monthly amount for five years. Dkt. 182 at 2. ███████████████████████████████████ ███████████████████████ ███████████████████. Dkt. 182 at 2.  Eddystone alleges that less than two years into the deal, the Defendants – the former managers, affiliates, and parent companies of BTS – secretively and intentionally stripped all of BTS's businesses and assets so that BTS could not meet its payment obligations and was judgment-proof.  Dkt. 182 at 4. █████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████

Eddystone brought this action against Defendants on February 2, 2017 pursuant to 28 U.S. Code § 1331(1) (maritime jurisdiction).  Dkt. 1, Amended at Dkt. 182.  Eddystone's Amended Complaint alleges four counts: Alter Ego, Intentional Fraudulent Transfer, Constructive Fraudulent Transfer, and Breach of Fiduciary Duties of Care and Loyalty to Creditors.  Eddystone seeks the $140 million it is allegedly owed under the contract, pre-judgment interest on that amount and other damages.

Defendants have denied the allegations and filed Counterclaims against Eddystone, alleging that it had violated the contract by failing to disclose defects and improperly managing

3

the transloading facility.   Dkts. 67, 68, Amended at Dkts. 76–78.   ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████   Defendants' Amended Counterclaims allege six counts

related to these allegations: Tortious Interference with Contract, Fraudulent Inducement,

Negligent Misrepresentation, Breach of Contract, Breach of the Implied Covenant of Good Faith

and Fair Dealing, and Rescission.  Dkts. 76–78.  Eddystone has denied these allegations.  Dkts.

133, 134.

The Parties are in the midst of extensive discovery which has included the production of

957,867 documents and the completed depositions of eleven witnesses, nine by the Defendants

and two by the Plaintiff.  The Court has previously denied six motions to dismiss, resolved seven

significant contested discovery motions, and entered several other substantive rulings in a variety

of issue areas.

Plaintiff's depositions have been stalled pending Court resolution of an ongoing

discovery dispute.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████   Dkt. 217.   Because questioning of Defendant

representatives could not be completed until production of all documents, the parties agreed to

postpone those depositions until after resolution of the crime-fraud dispute and production.  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

4

████████████████████████████████████

████████████████████████████████ The parties have agreed that the additional depositions should await resolution of this dispute. Defendants Rios and Gamboa have also filed a pending Motion to Dismiss Plaintiff's Breach of Fiduciary Duty claims for lack of standing. Dkt. 343; *see also* Dkts. 346, 355. Plaintiff contends the Court already rejected the arguments presented in this motion when it denied Rios and Gamboa's motion to dismiss for failure to state a claim almost three years ago. *See infra* at § V.A.

## B. Background Facts

Eddystone entered into a Rail Facilities Services Agreement ("RSA") in February 2013 with non-defendant BTS under which Eddystone agreed to construct and operate a facility in Eddystone, Pennsylvania to transfer crude oil from railcars to river barges. Dkt. 35-3 at 7 (February 13, 2013). BTS agreed to bring, each month, an average of 64,750 barrels a day of crude oil to Eddystone's facility for five years after the facility's completion. BTS was to pay $2.25 for every barrel transloaded and $1.75 for every barrel below the monthly threshold ("minimum volume commitment" or "MVC"). *Id.* at 5–6. In return, Eddystone built the facility at a cost of about $170 million.

When the parties signed the RSA in February 2013, BTS was part of a crude oil trading and logistics business owned and operated by Defendants Julio E. Rios II ("Rios") and Jeremy H. Gamboa ("Gamboa") along with non-defendant James Ballengee. Together these three created and ran several companies sharing the name "Bridger" in their titles (collectively the "Bridger Group") to carry on this business, including Defendant Bridger Logistics – the parent

company both to BTS and to several subsidiaries known as the "Additional Entity Defendants."[1] The Bridger Group provided both oil marketing and logistics services for the transport of crude oil from wellhead to end markets in North America.

The first BTS train arrived at the riverside transloading facility in Eddystone, PA on May 5, 2014.  From that date until February 2016, BTS continuously delivered crude to Eddystone, and Eddystone transloaded the crude onto barges on the Delaware River.  These barges would sail downstream and deliver the crude to the Monroe Energy refinery in Trainer, Pennsylvania, pursuant to a Crude Oil Supply Agreement ("COSA") between a BTS oil marketing affiliate, Bridger Marketing LLC, and Monroe Energy – an agreement that matched the flow terms and duration term as provided in the RSA.  *See* Dkt. 217-9 (COSA, May 26, 2015).



---

[1]     The Additional Entity Defendants consist of: Bridger Administrative Services, II, LLC, Bridger Marine, LLC, Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Leasing, LLC, Bridger Energy, LLC, Bridger Lake, LLC, J.J. Liberty, LLC, and J.J. Addison Partners, LLC.  Dkt. 190 at 1.

6

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

After BTS stopped making payments, Eddystone commenced arbitration against BTS in April 2016 seeking an award for unpaid invoices and for future minimum volume payments. Eddystone entered into a settlement agreement with the new direct and indirect owners of BTS (Jamex Transfer Holdings LLC, Jamex Marketing and Ballengee) in January 2017 under which BTS consented to an arbitration award.  Eddystone then filed the instant lawsuit in February 2017 against the prior owners and principals of BTS (Ferrellgas, Bridger Logistics, Rios, and Gamboa) and other subsidiaries of Bridger Logistics (the Additional Entity Defendants).

C.    **Plaintiff's Claims**

Eddystone alleges that the Defendants deliberately stripped BTS of its assets and rendered the company judgment-proof in order to evade the RSA's minimum volume commitment.  The BTS contract with Eddystone had become unprofitable due to a change in world petroleum prices.  BTS had signed the RSA and Bridger Marketing had signed its matching agreement with Monroe, when the "Brent" price – the benchmark for North Atlantic crude most frequently used in the U.S. Northeast – substantially exceeded the price of Bakken crude.  In such circumstances, the cost of transporting Bakken crude by rail from North Dakota was less than the difference between Brent and Bakken prices, such that Bakken crude was cheaper in Philadelphia than North Atlantic or West African crude.  Bridger Marketing thus agreed to deliver Bakken crude to Monroe under a formula that gave Monroe a discount from Brent on half the crude delivered and applied a cost plus basis on the other half.

7

But after the late 2014 crash in world crude prices, the price differential between Bakken North Dakota crude and the Brent price greatly narrowed.  As a result, the continued rail delivery of Bakken crude to Philadelphia became uneconomic throughout 2015 and was projected to remain so throughout 2016.  Dkt. 182, at ¶¶ 4, 7-8.  Consequently, the transport of crude from North Dakota had become unsustainable for the Defendants, as it was creating both ruinous monthly losses for Jamex Marketing and prices well over Brent for Monroe.  Those parties were now motivated to get out of a deal that brought North Dakota crude into Philadelphia – except that Ferrellgas and Bridger Logistics, who directly or indirectly owned the BTS businesses and assets, would be stuck with paying the minimum volume commitment to Eddystone for over three remaining years of the RSA.

[REDACTED]

Eddystone's Amended Complaint includes four counts against the Defendants. The first count is for Alter Ego, filed against Ferrellgas, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping. It asserts that these Defendants operated the Bridger entities as a single business and exercised such total control over BTS that they should be viewed as its alter egos. The second count is for Intentional Fraudulent Transfer, filed against all Defendants, and alleging that Defendants intentionally transferred BTS's revenues and assets away from BTS to render the company insolvent and unable to pay its contractual obligation to Eddystone. The third count is for Constructive Fraudulent Transfer, filed against all Defendants, and alleging that

Defendants transferred away BTS's assets to other companies without reasonably adequate consideration, and that BTS became insolvent as a result. The fourth count is for Breach of Fiduciary Duties of Care and Loyalty to Creditors, filed against Ferrellgas, Bridger Logistics, Rios, and Gamboa. This claim asserts that when BTS entered the zone of insolvency, these four Defendants owed creditors a duty to manage BTS in a manner calculated to maximize creditors' recovery of BTS's debts, and that these Defendants breached this duty by negligently or otherwise improperly causing BTS to transfer its assets despite knowing that BTS did so for inadequate consideration, in violation of obligations to creditor Eddystone.

## III.   BL/FG Defendants' Statement of the Case

### A.   The Eddystone Facility and the Rail Services Agreement

In early 2012, ERC (and its parent entities) began developing plans to invest ▇▇▇▇▇▇ to convert a power plant with rail and marine access into a facility to "transload" crude oil shipped by rail from North Dakota onto barges for delivery to East Coast refineries. Dkt. 266-1, Exs. 1-2. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

In March 2013, BTS and ERC entered the Rail Services Agreement (the "RSA"), with BTS agreeing to transload 64,750 bpd for five years, or to make deficiency payments if it transloaded fewer barrels in a given month. Dkt. 266-1, Ex. 9 at 5. When it made deficiency payments, BTS would receive "credits" toward transloading future barrels exceeding the 64,750 bpd target, but the credits expired after six months. *Id*. at 7-8. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



---

[2]    The BL/FG Defendants' counterclaims are conditioned on an alter ego finding, because there is no claim for breach of the RSA; ERC instead seeks to recover damages from the BL/FG Defendants as alter egos, based on a presumed breach by BTS after it was sold.

[REDACTED]

### B.   Ferrellgas Acquisition of Bridger Logistics

On June 24, 2015, Ferrellgas acquired Bridger Logistics and its subsidiaries (including BTS) for more than $800 million, and [REDACTED]

[REDACTED]

---

3 [REDACTED]

### C.     Jamex Acquisition of BTS

To be clear, Jamex Marketing ("Jamex") (f/k/a Bridger Marketing, before Ferrellgas acquired Bridger Logistics) purchased oil in North Dakota and sold it to Monroe in Pennsylvania; Jamex paid Bridger Logistics to transport the oil from North Dakota, and its subsidiary, BTS, entered into the RSA to transload oil from rail to barge at ERC's facility.

The oil market deteriorated in late 2015 (months after the acquisition), due to falling prices and a narrowing "spread" between the price of domestic and foreign crude.  As a result, Jamex was suffering sizable losses every month on its contracts with Monroe (the oil purchaser) and Bridger Logistics (the oil transporter).  Jamex (Bridger Logistics' customer) determined that these unexpected losses—coupled with facility defects—called into question the advisability of Jamex continuing to purchase North Dakota crude to supply Monroe.

Confronted by deteriorating marketplace realities, Jamex (and the BL/FG Defendants) tried to find a solution that would have allowed all parties to continue to perform under the various agreements, including the RSA.  Dkt. 266-2 (Soiefer Decl. ¶ 20).  ERC, however, refused to participate in finding a solution.  Dkt. 266-1, Ex. 3 (Ballengee Decl. ¶ 31).

13



601576754.6

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

The BL/FG Defendants were not parties to the arbitration, but they sought to intervene in ERC's action to confirm the award.  The court in that action denied the motion to intervene but stayed confirmation, describing ERC's strategy as "troubling" and "concerning." *Eddystone Rail Co., LLC v. Jamex Transfer Serv.*, LLC, 2019 WL 181308, at *4 (S.D.N.Y. Jan. 11, 2019).

**D.     BTS Asset Transfers**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

6   ███████████████████████████████████████████
███████████████████████████████████████████



████████████████████████████████████████████████████

████████████████████████████████████

### E.    EDPA Litigation

On February 2, 2017, ERC initiated this litigation against Ferrellgas, Bridger Logistics, Julio Rios, and Jeremy Gamboa. Dkt. 1.[8] ERC used the pretextual $140 million arbitration award as the basis for its damages claim, asserting theories of alter ego, intentional and constructive fraudulent transfer, and breach of fiduciary duties of care and loyalty to creditors. *Id.* at 16-21. The BL/FG Defendants denied liability and filed conditional Counterclaims based on the facility deficiencies detailed above, alleging fraudulent inducement, negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing (and also seeking rescission). Dkt. 67 at 35-38. ERC's Complaint and the BL/FG Defendants' Counterclaims both survived motions to dismiss. Dkt. 59; Dkt. 125.[9]

On September 7, 2018, ERC amended its Complaint to add 13 new corporate defendants, claiming each received assets fraudulently transferred from BTS. Dkt. 182 & 194-206.

On January 1, 2019, the BL/FG Defendants moved to dismiss for lack of subject matter jurisdiction. Dkt. 283. The Court denied the motion, reasoning that ERC's effort to impose alter

---

[7] ██████████████████████████████████████████████████

████████████████████████████████████████████

[8]    ERC demanded a jury trial (Dkt. 1), but it withdrew its demand (Dkt. 320) after the BL/FG Defendants consented (Dkt. 319). Thereafter, the Court ordered a bench trial. Dkt. 328.

[9]    The BL/FG Defendants also asserted third party claims against Jamex and its owner, who asserted counterclaims as well.  These claims were all dismissed by stipulation. Dkt. 175.

ego liability invoked a "quasi-contractual" form of admiralty jurisdiction. Dkt. 308 at 17. The Court's theory is novel and was not asserted by ERC or briefed by the parties. *Id.*[10]

The BL/FG Defendants later petitioned for a writ of mandamus, which the Third Circuit denied without issuing an opinion. The jurisdictional issue will cast a shadow on this case until it is resolved by the Third Circuit in a direct appeal or revisited by this Court, because "[a] litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).  If the Court's *sua sponte* theory is in error, this litigation may be void *ab initio*.

The parties have engaged in extensive discovery, including producing vast amounts of electronically-stored information ("ESI") responsive to agreed search terms. ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████

███████████████████████████████████████

█████████████████████████ The parties have deposed several witnesses, but the

---

[10]    Lacking diversity, ERC invoked admiralty jurisdiction to "enforce payment of a debt arising under a maritime contract." Dkt. 182 ¶ 31. But ERC does not assert breach of a maritime contract (no Defendant is a party to the RSA), and courts caution that admiralty jurisdiction does not extend to freestanding alter ego or fraudulent transfer claims. *See Swift & Co. Packers v. Compania Columbiana del Caribe, S.A.*, 339 U.S. 684, 690 (1950) ("[A] court of admiralty will not enforce an independent equitable claim merely because it pertains to maritime property."); *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir. 1987) (finding no admiralty jurisdiction over fraudulent transfer claims asserted to collect on arbitration award and rejecting argument that "a related maritime dispute is sufficient to confer admiralty jurisdiction over its independent action to assert equitable claims").

depositions of eight fact witnesses and two corporate representatives are stayed pending final resolution of the Crime Fraud-Motion. Expert discovery is similarly suspended.

F.      **The Crime-Fraud Dispute**

ERC's October 2018 Crime-Fraud Motion has been the focal point of this case for more than a year, and it has served as a roadblock to the completion of discovery and a resolution on the merits.

601576754.6



## IV.     Defendants Rios and Gamboa's Statement of the Case

In its Amended Complaint, Plaintiff alleges four causes of action against Defendants Rios
and Gamboa: 1) alter ego, 2) intentional fraudulent transfer, 3) constructive fraudulent transfer,

and 4) breach of fiduciary duty.  Dkt. 182.  While each of these claims are also alleged against the BL/FG defendants, Rios and Gamboa possess defenses that are independently and uniquely exculpatory.  For purposes of clarity, Rios and Gamboa briefly describe each of these defenses as they relate to Plaintiff's claims, below:

A.      Alter Ego

Plaintiff alleges that BTS was used as the alter ego of Rios and Gamboa.  But Rios and Gamboa were neither officers, directors, members, nor owners of BTS, and as such, neither possessed the authority to affect any of the transactions Eddystone complains of, let alone exercise the kind of exclusive control that alter ego liability requires.  Indeed, the allegation that Rios and Gamboa were the "alter egos" of the wholly-owned subsidiary (BTS) of a publicly-traded master limited partnership with thousands of individual unitholders (Ferrellgas) is preposterous on its face.

At the time of the alleged fraudulent transactions, BTS was a manager-managed LLC, managed by Bridger Logistics.   Neither Rios nor Gamboa were owners, officers, or directors at BTS; BTS was wholly owned by Bridger Logistics and had no officers or directors.  Rios and Gamboa were executives of Bridger Logistics, but lacked certain discretionary authority because Bridger Logistics was wholly owned and member-managed by Ferrellgas, which subjugated Rios and Gamboa's authority to that of its own.[11]  Accordingly, all material actions Rios or Gamboa took on behalf of Bridger Logistics were subject to the consent, approval, and direction of Ferrellgas, a publicly traded master limited partnership with literally thousands of unitholders

---

[11]    Under relevant Louisiana law, member and manager-managed LLC's do not have officers or directors but are solely and exclusively managed by their manager/member.

(none of which included Rios or Gamboa).[12]  As such, neither Rios nor Gamboa possessed the authority or ability—factually or legally—to control or direct the actions of BTS as alleged "alter egos."

And this lack of ownership and control stretches back to Bridger's beginning. █████



### B.    Intentional and Constructive Fraudulent Transfer

Plaintiff alleges that Rios and Gamboa received $140 million in "value" as "transferees" of certain assets of BTS to other subsidiaries of Ferrellgas.  But neither Rios nor Gamboa were the recipients of any of these assets.  Nor did they benefit in any way from these complained-of transfers—all of which were made to Ferrellgas subsidiaries.  Neither Rios nor Gamboa had an ownership interest in any of the subsidiaries to which these asset transfers were made.

---

[12] 

Accordingly, whatever the value of these (encumbered) assets, precisely none of it would have flowed to Gamboa nor Rios.

Pressed in discovery to identify the benefit Rios or Gamboa received from the alleged fraudulent transfers, Eddystone eventually identified two theories: 1) as minority unit holders in Ferrellgas, Rios and Gamboa received indirect benefits from the transfers to Ferrellgas subsidiaries in the form of increased Ferrellgas unit value; and/or 2) Rios and Gamboa received incentive payments as a result of the transfers.  But neither of these claims are true.

First, neither Rios nor Gamboa are unit holders in Ferrellgas.[13]  Moreover, Ferrellgas units *declined* in value following the alleged asset transfers, plummeting from $23/share at the time of the transfer to approximately $0.36/share today.   Second, neither Rios nor Gamboa received *any* incentive payments during their time at Ferrellgas—let alone an incentive payment resulting from the alleged fraudulent transfer.

Eddystone's remedy for avoiding a fraudulent transfer is to recover value from the direct recipient of the assets wrongly transferred.  *See* 12 Pa. Stat. and Cons. Stat. § 5107 (stating that avoidance of the transfer or the attachment of a lien against the transferred property are the available remedies—not a judgment against the transferor, which would leave a transferee with a windfall).  Rios and Gamboa received no such assets and no such benefit.  Thus, whatever the underlying merits of Eddystone's fraudulent transfer claim, it cannot recover from Rios or Gamboa.

## C.    Breach of Fiduciary Duty

Eddystone's breach of fiduciary duty claims against Rios and Gamboa are factually and legally deficient for the following reasons.

---

[13]     *See* footnote 12, *supra*.

*First*, BTS is a member-managed Louisiana LLC, and under Louisiana law, **only** such member-managers owe fiduciary duties to shareholders.[14]   Neither Rios nor Gamboa was a member-manager of BTS.  Accordingly, neither owes BTS fiduciary duties.

*Second*, because Rios and Gamboa were not member-managers of Bridger Logistics, they did not owe a fiduciary duty to Bridger Logistics, let alone to one of Bridger Logistics's subsidiaries or its creditors.

*Third*, setting aside the fact that Rios and Gamboa did not owe a fiduciary duty to BTS or its creditors, Eddystone lacks standing to bring a direct action against Rios and Gamboa.  Claims brought by creditors for breach of fiduciary duty must be brought derivatively on behalf of all creditors.  Eddystone did not bring its claims against Rios or Gamboa derivatively, and so they must be dismissed.  This fact forms the basis for the motion to dismiss Rios and Gamboa filed on October 25, 2019, which is currently pending before the Court.  Dkt. 343.

*Fourth*, as discussed in Section IV.A, above, neither Rios nor Gamboa possessed the requisite authority to effectuate the transfers.   Without the authority to effectuate the transactions, neither can be held liable for them.

*Fifth*, before Rios and Gamboa took any steps to assist Ferrellgas or its legal counsel with the transfer of BTS's assets or the sale of BTS, they sought and received assurances by Ferrellgas and its legal counsel that any BTS assets that would be transferred as part of the sale to Jamex were subject to a valid and existing lien.  Indeed, their superiors at Ferrellgas and its legal advisors informed them that selling BTS without first transferring these encumbered assets

---

[14]      L.S.A.-R.S. § 12:1314 (pursuant to which, a "manager, if management is vested in one or more managers . . . [s]hall be deemed to stand in a fiduciary relationship with the limited liability company and its members and shall discharge his duties in good faith, with the diligence, care, judgment and skill which an ordinary prudent person in a like position would exercise under similar circumstances").  Rios and Gamboa were not managers of BTS or Bridger Logistics and therefore owed no fiduciary duty to either company or their creditors under Louisiana law.

601576754.6

to another subsidiary under Ferrellgas's control would violate Ferrellgas's existing credit agreement. Because BTS's assets were subject to a lien—and had been since before the RSA was entered into—Rios and Gamboa understood that transferring the assets out of BTS would have no material effect on BTS's other unsecured creditors, because the unsecured creditors would not be able to recover from BTS's encumbered assets in any event. Had Ferrellgas and its legal advisors not provided Rios and Gamboa with these assurances, neither would have effectuated the asset transfers, as directed. These actions thus reflect sound business judgment and are thus protected from Plaintiff's fiduciary duty claim by the business judgment rule.

*Sixth*, neither Rios nor Gamboa were involved in any accounting changes Ferrellgas and its outside consultants made after its purchase about which Eddystone complains. All accounting decisions and functions were performed by Ferrellgas. Rios and Gamboa were not consulted in these decisions, nor did they become aware of the changes in accounting about which Eddystone complains until after this suit was filed. Thus, neither can be held liable for any purported breach of fiduciary duty in connection with accounting decisions made solely and exclusively by Ferrellgas.

## V.    Motions Practice (Joint)

### A.    Motions to Dismiss and Strike the Pleadings

On March 16, 2017, Defendants Ferrellgas and Bridger Logistics filed a Motion to Dismiss the original Complaint for failure to state a claim. Dkt. 35. Rios and Gamboa joined in that motion and also filed a Motion to Dismiss the original Complaint for lack of personal jurisdiction and failure to state a claim on the same day. Dkt. 34. On July 19, 2017, the Court denied these Motions to Dismiss "as meritless at this stage of the litigation." Dkts. 59 at 5, 60.

Defendants Bridger Logistics and Ferrellgas filed a Motion to Strike allegations in the Complaint on March 16, 2017.  Dkt. 36.  Following briefing and a telephonic hearing before Judge Kelly, Defendants withdrew the Motion to Strike on June 27, 2017.  Dkt. 57.

Eddystone filed Motions to Dismiss the Counterclaims on August 13 and October 12, 2017.  Dkts. 71, 83.  On February 6, 2018, the Court denied Eddystone's Motion to Dismiss the Amended Counterclaims without prejudice, allowing Eddystone to renew its arguments at the summary judgment stage of proceedings.  Dkt. 125.

The Additional Entity Defendants moved to Dismiss Eddystone's Amended Complaint for lack of Personal Jurisdiction on October 5, 2018, and Rios and Gamboa moved to Dismiss Eddystone's Breach of Fiduciary Duty claim for failure to state a claim on the same day.  Dkt. 190, 207.  The Court denied these motions on November 13, 2018 and November 20, 2018 respectively. Dkts. 269–270, 275.

On January 25, 2019, Defendants all filed a joint Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction, arguing that the Court lacks admiralty jurisdiction.  Dkt. 283.  The Court denied this motion on March 26, 2019.  Dkts. 308, 309.

The Defendants again challenged the Court's subject matter jurisdiction in their later Third Circuit mandamus petition, arguing that the court did not have admiralty jurisdiction in this case.  July 18, 2019 Petition for Writ of Mandamus.  The Third Circuit denied Defendants' petition on Sept. 27, 2019.  3rd Cir. Order (Sept. 27, 2019), Case 19-2678.

Rios and Gamboa have now filed a Motion to Dismiss the Breach of Fiduciary Duty claim in the Amended Complaint for Lack of Standing, filing this motion on October 25, 2019. Dkt. 343.  The Court has not yet ruled on this Motion to Dismiss.

Additional Rulings

Bridger Logistics and Ferrellgas filed a Third Party Complaint against the Jamex Entities and James Ballengee on August 23, 2017.  Dkt. 70.  Ultimately the Jamex entities reached a stipulation with Bridger Logistics and Ferrellgas to dismiss their respective claims and counterclaims against each other on June 26, 2018.  Dkts. 174, 175.

On November 5, 2018, Defendants Bridger Logistics and Ferrellgas filed a Motion to Disqualify Plaintiff's Attorneys.  Dkt. 264.  The Court denied this motion on February 14, 2019.  Dkt. 291.

On April 12, 2019, the Court ordered the parties to inform the Court whether they consented to a jury trial, holding that, absent consent of all parties, there was no right to a jury trial under admiralty jurisdiction.  Dkt. 319.  Plaintiff withdrew its jury demand five days later and requested that the case proceed as a bench trial.  Dkts. 320, 322, 323.  On the same day, Defendants consented to trial by jury.  Dkts. 319, 321.  On May 1, 2019, the Court ordered that the case proceed as a bench trial.  Dkt. 328.

B.    **Discovery Motions**

Eddystone filed a Motion to Compel Production of Defendants' accounting documents on September 23, 2017.  Dkt. 73.  The Court granted that motion on November 6, 2017.  Dkt. 107. On September 7, 2018, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████  ██████████████████████████████ ████████████████████

On October 17, 2017, Defendants Rios and Gamboa moved for a protective order seeking relief from an obligation to respond to Eddystone's written discovery requests, and seeking to

quash a subpoena to Business First Bank. Dkt. 92.  The Court denied this motion on November 6, 2017.  Dkt. 106.

On September 26, 2018, Defendant Rios filed a Motion to Compel Interrogatory Responses from Eddystone.  Dkt. 188.  The Court denied this motion on October 11, 2019.  Dkt. 216.

On February 4, 2019, Canopy Prospecting, Inc. ("Canopy") filed a motion to quash the Rule 30(b)(6) Notice of Deposition it received from Defendants Rios and Gamboa.  Dkt. 285. The Court denied this motion on February 25, 2019.  Dkt. 295.

Defendants Rios and Gamboa filed a Motion to Compel Eddystone to produce certain documents on February 27, 2019.  Dkt. 297.  The Court denied this motion on April 30, 2019. Dkt. 327.

After Defendants asserted attorney-client privilege with respect to a number of their communications, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████

## VI.   Status of Discovery

### A.   Discovery Completed to Date (Joint)

To date, the Plaintiff, Defendants, and Third Parties have substantially completed document discovery (957,867 documents produced to date), with the sole exception being any

---

[15]   These documents are identified in Exhibit B to Eddystone's motion.  Dkt. 349-3.

remaining documents implicated by the Crime Fraud Order. The Parties have conducted 11 combined depositions (2 by Plaintiffs and 9 by Defendants) and seven combined rounds of interrogatory responses. The Parties have produced and revised several rounds of privilege logs.

**B.   Discovery Remaining (Joint)**

All Parties plan to resume discovery upon the Court's ruling on Eddystone's Motion to Enforce the Crime Fraud Order. Dkt. 349. Document discovery closed on August 13, 2018 (Dkt. 157), and the Parties agree that they have substantially completed their productions, pending the Court's ruling on whether Ferrellgas must produce additional crime-fraud documents. The Parties will combine to conduct 10 more fact depositions (8 individuals and 2 corporate representatives). Plaintiff and Defendants also plan to conduct expert discovery.

**C.   Discovery Schedule (Competing proposals)**

On May 18, 2017, the Parties submitted a joint discovery plan. Dkt. 49. The Parties agreed to a stipulation pursuant to Federal Rule of Evidence 502(d) on July 31, 2017 (Dkt. 62), and the Court set forth a Stipulated Protective Order on the same day (Dkt. 63).

The Court entered a scheduling order on April 13, 2018, which contained deadlines for the close of fact discovery, expert discovery, and other pretrial matters. Dkt. 157. However, on October 19, 2018, the Court ordered fact discovery to "close four weeks after the Court's decision on Plaintiff's Motion to Compel Production of Documents under the Crime Fraud Exception" and suspended "[a]ll other existing deadlines set forth in the [April 13] scheduling order" until "reestablished upon further order of the Court." Dkt. 238. All previous deadlines set by the April 13 order have passed, and presently there is no scheduling order.

The Parties have conferred and are unable to agree on a schedule for future proceedings. The Parties separately propose the following discovery schedules:

|  | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| Disclosure of Experts in Support of Claims and Counterclaims | 4 weeks after resolution of Motion to Enforce[16] | 4 weeks after resolution of Motion to Enforce |
| Completion of Fact Depositions | 6 weeks after resolution of Motion to Enforce | 10 weeks after resolution of Motion to Enforce |
| Expert Reports in Support of Claims and Counterclaims Due | 2 weeks after completion of fact depositions | 4 weeks after completion of fact depositions |
| Expert Reports in Opposition to Claims and Counterclaims Due | 4 weeks after expert reports in support of claims and counterclaims due | 4 weeks after expert reports in support of claims and counterclaims due |
| Rebuttal Expert Reports Due | 2 weeks after expert reports in opposition to claims and counterclaims due | 4 weeks after expert reports in opposition to claims and counterclaims due |
| Completion of Expert Discovery | 3 weeks after rebuttal reports are served | 5 weeks after rebuttal reports are served |
| Potential Mediation / Settlement Negotiation | Conducted within 2 weeks of completion of expert discovery | Conducted within 2 weeks of completion of expert discovery |
| Summary Judgment Motions Due | 2 weeks after mediation / settlement negotiations end | 4 weeks after mediation / settlement negotiations end |
| Final Pretrial Filings Due | 4 weeks after court ruling on motions for summary judgment | 6 weeks after court ruling on motions for summary judgment |
| Trial | 6 weeks after court ruling on motions for summary judgment | 10 weeks after court ruling on motions for summary judgment |

## VII.    Pending Motions

There are two pending motions before the Court.  First, Plaintiff filed a Motion to

Enforce the Court's June 28, 2019 Order granting Plaintiff's Motion to Compel.  Dkt. 349; *see*

*also* Dkts. 217, 333, 335–337, 340, 342, 344, 353.  Second, Defendants Rios and Gamboa have

---

[16]    If the Court grants the motion, the resolution date would be the date on which the Defendants produce the documents; if the Court denies the motion, the resolution date would be the date the motion is denied.

31

filed a Motion to Dismiss the Breach of Fiduciary claims for lack of standing.  Dkts. 343 & 349;
*see also* Dkts. 346, 355.

Dated:  February 18, 2020                      Respectfully submitted,

                                               /s/ Filiberto Agusti
                                               Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                               BALLARD SPAHR LLP
                                               1735 Market Street, 51st Floor
                                               Philadelphia, PA 19103-7599
                                               Telephone: (215) 665-8500
                                               Facsimile: (215) 864-8999
                                               hockeimerh@ballardspahr.com
                                               grugant@ballardspahr.com

                                               Filiberto Agusti (*pro hac vice*)
                                               Steven Barber (pro hac vice)
                                               Andrew J. Sloniewsky (*pro hac vice*)
                                               STEPTOE & JOHNSON LLP
                                               1330 Connecticut Avenue, NW
                                               Washington, DC 20036
                                               Telephone: (202) 429-3000
                                               Facsimile: (202) 429-3902
                                               fagusti@steptoe.com

                                               *Counsel for Eddystone Rail Company, LLC*


                                                /s/  Lawrence G. Scarborough
                                               Lawrence G. Scarborough (Admitted *Pro Hac Vice*)

                                               Richard L. Scheff (I.D. No. 35213)
                                               Michael C. Witsch (I.D. No. 313884)
                                               ARMSTRONG TEASDALE LLP
                                               One Commerce Square
                                               2005 Market Street, 29th Floor
                                               Philadelphia, PA 19103
                                               Telephone:  (267) 780-2000
                                               Facsimile:  (215) 405-9070
                                               rlscheff@atllp.com
                                               mwitsch@atllp.com

32

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
Bieta Andemariam (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 541-2000
Facsimile:  (212) 541-4630
lgscarborough@bclplaw.com
bieta.andemariam@bclplaw.com

Jacob A.  Kramer (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW
Washington, D.C. 20004
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200
jake.kramer@bclplaw.com
rachel.beck@bclplaw.com

Brian C. Walsh (Admitted *Pro Hac Vice*)
Alicia Ragsdale Olszeski (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
211 North Broadway, Suite 3600
St.  Louis, Missouri 63102
Telephone:  (314) 259-2000
Facsimile:  (314) 259-2020
brian.walsh@bclplaw.com
ali.olszeski@bclplaw.com

Sarah L. Hartley (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
sarah.hartley@bclplaw.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas Partners, L.P., Ferrellgas L.P., Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC, Bridger Admin Services II LLC, Bridger Energy, LLC,  Bridger  Lake,  LLC,  Bridger  Leasing,  LLC, Bridger Marine, LLC*

*/s/ Jeremy A. Fielding*
Jeremy A. Fielding, PC (pro hac vice)
jeremy.fielding@kirkland.com
Jonathan D. Kelley (pro hac vice)
jon.kelley@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street, 27th Floor
Dallas, Texas 75201
Telephone:  (214) 972-1755
Facsimile: (214) 972-1771

Julie Negovan,
jnegovan@griesinglaw.com
GRIESING LAW, LLC
1717 Arch Street, Suite 3630
Philadelphia, Pennsylvania 19103

*Attorneys for Defendants Julio Rios and
Jeremy Gamboa*

601576754.6

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via the Court's ECF system on February 18, 2020, thereby serving all counsel of record.

/s/ Filiberto Agusti
Filiberto Agusti