```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

EDDYSTONE RAIL COMPANY,    : CIVIL NO. 17-495
LLC,                       :
              Plaintiff    :
                           :
                           :
       v.                  :
                           :
                           :
                           :
BRIDGER LOGISTICS, LLC,    : Philadelphia, Pennsylvania
et al,                     : February 25, 2020
              Defendant    : 1:46 p.m.

                          - - -

           TRANSCRIPT OF STATUS HEARING
       BEFORE THE HONORABLE JAN E. DUBOIS
          UNITED STATES DISTRICT JUDGE

                          - - -

APPEARANCES:

For the Plaintiff:   FILIBERTO AGUSTI, ESQUIRE
                     Steptoe & Johnson, LLP
                     1330 Connecticut Avenue NW
                     Washington, DC 20036


For the Defendant:   LAWRENCE G. SCARBOROUGH, ESQUIRE
Bridger Logistics,   JACOB A. KRAMER, ESQUIRE
LLC                  Bryan Cave Leighton Paisner, LLP
                     1290 Avenue of the Americas
                     New York, NY 10104

For the Defendant:   JEREMY FIELDING, ESQUIRE
Julio Rios           JONATHAN D. KELLEY, ESQUIRE
Jeremy Gamboa        Lynn Pinker Cox & Hurst, LLP
                     2100 Ross Avenue
                     Suite 2700
                     Dallas, TX 75201
```

TK Transcribers
9 Dogwood Avenue
Glassboro, NJ 08028
609-440-2177

2

Audio Operator:        Michael Cosgrove

Transcribed By:        Michael T. Keating

- - -

        Proceedings recorded by electronic sound recording; transcript produced by computer-aided transcription service.

- - -

1        (The following was heard in open court at

2   1:46 p.m.)

3        THE COURT:  -- Logistics, LLC and a number

4   of others, many others, civil action number 17-495.

5   We scheduled a status conference for today.  I assume

6   you're all ready for it.  I won't ask you to sound

7   off one by one.

8        We all miss Judge Kelly.  I miss him more

9   now than I did before this file was transferred to

10  me.  This is not exactly the type of case a judge

11  dreams about getting in mid-cycle.  I note that there

12  were over 300 docket entries, and there's a lot of

13  love between the two sides in the case.  And my goal

14  today is to try to streamline it and to try to cut

15  through a lot of the what I perceive to be litigation

16  tactics -- I suspect litigation tactics because

17  judging -- or recalling what I did when I was

18  practicing, I did a lot of what you're doing in this

19  case.  And it makes a lot of work for the Judge, and

20  I'm going to try to avoid that.

21        I've got a full calendar, and just tail-

22  ending two MDLs, and I have another one that's very

23  active.  So I'm not looking for a lot of paper, and

24  I'm particularly not looking for a lot of in-camera

25  reviews of hundreds of documents or more.  So I want

4

1    you to be thinking about the way we can accomplish

2    that goal.

3            First of all, there are two pending

4    motions, and I'll talk about them.  Thank you.  And I

5    think the discovery motion might take a little more

6    time than the motion to dismiss.  And we'll adopt a

7    schedule, and I'll hear what you have to say.

8            I administer cases like this largely by

9    telephone.  I decided it was appropriate on this

10   occasion, the first time we will be getting together,

11   to have everyone in the courtroom.  As I look around,

12   I think I recognize all of two of you, and there are

13   more than a dozen in the courtroom.  And at least I

14   think I recognize two of you.  Henry Hockheimer?

15           MR. HOCKHEIMER:  Good afternoon, Your

16   Honor.  Nice to see you again.

17           THE COURT:  Good to see you again.  You

18   haven't told your colleagues about the last case in

19   which we were together, have you?

20           MR. HOCKHEIMER:  Just bits and pieces,

21   Judge.  No, it was a great case.  It was a lot of

22   fun.

23           THE COURT:  Yes.  It involved something

24   that we were able to resolve very easily, and it was

25   in large part -- and I'm not patting you on the back

5

1   because I'm not so sure you've done in this case what

2   you did in that case, but we came up with a way to

3   settle on a global basis a rather sensitive issue

4   involving what I consider to be inadvertent

5   eavesdropping by a school district on students in an

6   ill-advised effort to track down computers.  And --

7   but we resolved the whole thing.  We set up a program

8   and all of the cases were resolved.  I'd like to do

9   something like that here.

10           So we're going to talk about the pending

11   motions, the discovery issues.  We're going to adopt

12   a schedule.  And we're also going to talk about

13   settlement.  I've looked through the file.  I haven't

14   read everything, of course.  I don't see any

15   reference to settlement.  I don't know whether there

16   have been any settlement discussions.  But Mr.

17   Hockheimer can tell you I have a super magistrate

18   judge paired with me.  He was with me in my law firm

19   in the 1980s.  He became an AUSA, did very well, then

20   became magistrate judge, then chief.  And now,

21   unfortunately, although he's considerably younger

22   than I, he's retiring, and he'll retire the end of

23   June.  But until then, he's available for settlement

24   conferencing, and we're going to address how that

25   should be handled.  I require an investment of the

6

1     parties in any settlement discussions.  I don't order

2     settlement conferences.  I let the parties tell me

3     whether they agree that settlement conferencing -- it

4     certainly wouldn't be one conference in this case.  I

5     let the parties tell me that settlement conferencing

6     might be of assistance in resolving the case.  And

7     before we adjourn, we're going to address that issue.

8     We'll add it to the schedule.

9            I'm going to tell you something about the

10    schedule now.  You've given me a lot of dates in

11    terms of how much time you need, ten weeks, 12 weeks,

12    16 weeks.  I want to know start to finish on your

13    schedule, and I think your schedule is triggered by

14    my rulings on the discovery motion.  So you can --

15    and the motion to dismiss.  But let me take a quick

16    look.

17           Well, it's just the -- it's the start, the

18    first item on the -- your schedule, "Disclosure of

19    experts," four weeks after resolution of the motion

20    to enforce.  I want someone to figure out how much

21    time that will take start to finish.  And then we'll

22    plug in how long I think it will take to address the

23    discovery issues.  I need to know more about them

24    before I can decide how much time that will take.

25           All right.  Let's start with an easy issue.

7

1    The file reflects the liaison counsel, but I saw no

2    order designating liaison counsel.  Was there one?

3    If you don't know, we'll issue a new one.

4            MR. HOCKHEIMER:  I don't believe so, Judge.

5            THE COURT:  From the file as we have it, I

6    gather liaison counsel for Eddystone is Steven

7    Barber?

8            MR. AGUSTI:  Your Honor --

9            THE COURT:  Two Steven Barbers?

10           MR. AGUSTI:  No, Your Honor, this is Fil

11   Agusti.  I would be the lead counsel for Eddystone,

12   Your Honor.

13           THE COURT:  Fine.  Fine.  And Mr.

14   Hockheimer, is sitting in the number 1 seat because

15   he's local counsel, is that --

16           MR. HOCKHEIMER:  That's right, Judge.  I

17   tried to sit way over there, but they put me here so

18   I'm here.

19           THE COURT:  I find him to be little more --

20   little more -- a lot more than local counsel.

21           MR. HOCKHEIMER:  Thank you, Judge.

22           THE COURT:  Good.  Well, I'm going to issue

23   an order appointing liaison counsel, and it's just

24   really for purposes of communicating with you all.  I

25   don't want to have to track down a lot of others,

8

1  just the person who will be able to feed whatever I

2  say to all others.

3          For the BLFG defendants, Jacob Kramer,

4  Bryan Cave.

5          MR. KRAMER:  That's me, Your Honor.

6          THE COURT:  Welcome --

7          MR. KRAMER:  Good morning.

8          THE COURT:  -- Mr. Kramer.

9          MR. KRAMER:  Good afternoon.

10          THE COURT:  And welcome to you too, Mr.

11  Barber.

12          MR. BARBER:  Thank you, Your Honor.

13          THE COURT:  For Defendants Rios and Gamboa,

14  Jeremy Fielding.

15          MR. FIELDING:  Yes, here, Your Honor.

16          THE COURT:  Mr. Fielding.

17          MR. FIELDING:  Yes, Your Honor.

18          THE COURT:  And for Third-Party Defendant

19  Jamex, which I think is out of the case -- is anyone

20  here representing Jamex?

21          SPEAKER:  No.

22          THE COURT:  We ought to take them off the

23  docket.  They're still on the docket, and we'll do

24  that.  I also want to recognize Mr. Scheff certainly.

25          MR. SCHEFF:  Good afternoon, Your Honor.

9

1      How are you?

2             THE COURT:  Yes, I'm fine.  My recollection

3      is that Mr. Scheff and I -- we didn't clerk at the

4      same time because I'm a good deal older, but you did

5      clerk for one of my colleagues.

6             MR. SCHEFF:  That's correct, Your Honor,

7      Judge Derr (sp).

8             THE COURT:  Yes.  And we all -- we all miss

9      Judge --

10            MR. SCHEFF:  We do.

11            THE COURT:  -- Derr.

12            MR. SCHEFF:  Thank you.

13            THE COURT:  All right.  Well, we'll take

14     the Jamex defendants off the docket.  No liaison

15     counsel needed.

16            As far as the motion to dismiss is

17     concerned -- we'll talk about the two motions -- I

18     think there is enough on the record for me to decide

19     the motion.  I don't have the date of -- yes, I do.

20     It was filed October 25th.  So it isn't -- it isn't

21     that old, and I gather Judge Kelly was rather busy at

22     the end of his term.  I don't know when he shared

23     with you his retirement, but he didn't share it with

24     us until I would say sometime in October.  It was

25     late.  But in any event, I think the motion to

10

1  dismiss is fully briefed and ripe for decision.  Any

2  disagreement?

3          MR. SCHEFF:  None from us, Your Honor.  We

4  filed the motion.

5          THE COURT:  I wish I could say the same

6  thing about the discovery, but -- and one solution

7  would be for me to read all the documents that are

8  out there, but hundreds -- and I don't know how

9  many -- there are hundreds of documents.  I don't

10  know how many pages in each document.  That is not

11  something I intend to do.

12          MR. AGUSTI:  Your Honor, we're happy to

13  address it when you would like for us to.

14          THE COURT:  Do you have a shortcut to

15  resolving it in --

16          MR. AGUSTI:  Your Honor, we've --

17          THE COURT:  -- an appropriate way?

18          MR. AGUSTI:  -- proposed (indiscernible).

19  I'm happy to share it with Your Honor right now if I

20  may.

21          THE COURT:  That's exactly what I want to

22  hear.

23          MR. AGUSTI:  Yes, Your Honor.

24          (Pause in proceedings.)

25          MR. AGUSTI:  Your Honor, as the plaintiffs

1  in this case --

2          THE COURT:  I think you ought to identify

3  yourself for the record.

4          MR. AGUSTI:  Yes, Your Honor.  I'm Fil

5  Agusti.  May it please the Court?  I represent

6  Eddystone, the plaintiff in this case.  Your Honor,

7  we are plaintiffs and we filed this case that we've

8  just had our third year anniversary and we're not

9  still finished with fact discovery.  And so we're

10  quite anxious to shortcut things and to -- and to get

11  to a solution.  And, naturally, we understand that a

12  solution does not involve Your Honor reviewing 95,000

13  documents.  So, basically, the --

14          THE COURT:  Well, we've lost five.  I

15  thought there were -- somewhere you came up with the

16  figure of -- no corroboration or no detail, but you

17  came up with a figure of 100,000.  Thank you --

18          MR. AGUSTI:  Yes, Your Honor.

19          THE COURT:  -- for relieving me --

20          MR. AGUSTI:  And let me -- let me just --

21          THE COURT:  Thank you for relieving me of

22  that task, which I was never going to undertake.

23          MR. AGUSTI:  Your Honor, let me just take

24  it from the top.  So, Your Honor, this --

25  essentially, we've had -- the reason why we're still

1  in discovery is because we've had a lot of delays

2  by -- because of the difficulty in trying to get the

3  documents in this case.  Believe it or not, Your

4  Honor, document discovery in this case ended on

5  August 13, 2018, but we've had to have two sets of

6  motions to compel.

7          First, Your Honor, you may recall from the

8  joint report that there --

9          THE COURT:  The redacted report?

10         MR. AGUSTI:  Pardon me?

11         THE COURT:  I thought the redacted report

12  was very interesting, and we had to come back to you

13  for an unredacted report.

14         MR. AGUSTI:  I --

15         THE COURT:  You saw -- did you see the

16  redacted report?

17         MR. AGUSTI:  Your Honor, I really focused

18  more on the -- on the full, unredacted report, but --

19         THE COURT:  The redacted report was very

20  interesting.  It told me absolutely nothing.

21         MR. AGUSTI:  Your Honor, I apologize if --

22         THE COURT:  No, that's all right.

23         MR. AGUSTI:  It's -- a lot of things are

24  redacted.  Your Honor, just to be clear from our

25  side, we do not have any concern with the record

1   being fully on public display.  We do have an

2   agreement with the other side.  They have been

3   redacting large parts of the record and, you know,

4   we're happy to accommodate it so long as our case

5   moves forward.  But, Your Honor, just to be clear, we

6   don't have any -- we -- as far as we're concerned, if

7   there was no redaction go, we would be very happy.

8   In any event --

9          THE COURT:  That's because none of your

10   confidential documents are out there, or maybe none

11   of your confidential information is.

12          MR. AGUSTI:  None of our confidential

13   information is at issue, Your Honor.

14          THE COURT:  Right.

15          MR. AGUSTI:  So --

16          THE COURT:  You may continue.

17          MR. AGUSTI:  So in any event -- so this

18   issue that we've got, this problem that we all have

19   on the -- on the documents, just to put it in context

20   on chronology, we received the privilege log six

21   weeks after the discovery cutoff date.  The first --

22   the first version of it, which is about September

23   26th, 2018, we promptly filed our crime fraud motion.

24   There were then a couple of modifications of that

25   privilege log in October.  There was a very long and

14

1    very exhaustively briefed motion on crime fraud,

2    there was a long hearing on it, Your Honor, with just

3    about everybody here present.  After the -- after the

4    hearing, Judge Kelly decided to look at some 840

5    documents, sampling, and he ruled on June 28th that

6    we should have the documents.

7              THE COURT:  Well, not all of the documents

8    that were reviewed.

9              MR. AGUSTI:  Yeah, four cat -- yeah, four

10   categories of privileged documents, Your Honor,

11   that's correct.  And so --

12             THE COURT:  But the sample for ex parte

13   review, as I understand it, was based on 40 specific

14   subject lines.

15             MR. AGUSTI:  Yes, sir, that's right.

16   That's right.  And the sample that he looked at was

17   altogether --

18             THE COURT:  840.

19             MR. AGUSTI:  -- 840, and he took that as a

20   sampling to determine what the -- whether the --

21   whether the crime fraud exception had been satisfied

22   in a more general way.  And he satisfied himself of

23   that, and on June 28th, he issued an order ordering

24   production of those documents.  That order was --

25             THE COURT:  Not all of the documents.

15

1          MR. AGUSTI:  Pardon me, Your Honor?

2          THE COURT:  Not all of those documents.  He

3     ordered production of documents that fell into four

4     categories.

5          MR. AGUSTI:  Yes, sir, into four

6     categories.  Correct.  Correct.  The categories were

7     documents that have to do with the so-called

8     restructuring of BTS, documents that have to do with

9     the transfer of assets and revenue streams from BTS,

10    Bridger Transfer Services, to other Ferrellgas

11    subsidiaries in an attempt to avoid -- to strip the

12    company.  He ordered all documents that relate to

13    the -- to the cessation of the contract with the

14    refinery downstream to which the facility was

15    shipping the petroleum.

16         THE COURT:  You're talking --

17         MR. AGUSTI:  And so -- and so there were

18    four categories of documents that were -- that he

19    ordered be produced of the attorney-client privilege

20    documents.  So that's the baseline.

21         The other side appealed that order to the

22    Third Circuit.  That appeal took three months, and

23    about September 27th of 2019, we had an order denying

24    the appeal from the Third Circuit.  We promptly asked

25    that the documents be produced, and of the 100,000

16

1    documents, about a little under 5,000 documents were,

2    in fact, produced by the other side.  But as we've

3    talked about a little bit in our -- in our motion to

4    enforce, and as I can describe today if Your Honor

5    likes, it's relatively clear that there are documents

6    out there that have not been produced.

7          The problem that we're up against is that

8    we haven't seen any of these documents and the

9    descriptions are incredibly vague.  So, for example,

10   there are 6,000 documents that are described in

11   exactly the same word -- words.  They say something

12   to the -- to the -- attorney-client communication,

13   privileged, that's the entire entry on the privilege

14   log.  Clearly, we have no idea what the document

15   says.

16         There are other variations.  For example,

17   there are hundreds, I think probably thousands, but

18   we haven't counted them, that say attorney

19   consultation.  There are hundreds of documents where

20   the description of the document simply says ray (ph).

21   And so we -- sitting on the outside, while for a lot

22   of reasons, we suspect that there are documents that

23   haven't been delivered.  For example, in -- as Your

24   Honor probably knows from looking at our joint status

25   report, the accounting records that we finally

17

1    obtained after going through two sets of motions to

2    compel show clearly that money, that revenue, was

3    diverted from BTS on contracts that BTS owned.  And

4    remember, Your Honor, just to --

5                THE COURT:  Excuse me a minute.

6                MR. AGUSTI:  Yes, Your Honor?

7                THE COURT:  I, unfortunately, have in front

8    of me the copy of the joint status -- there are pages

9    that go on like this.  I don't know whether you

10   started -- Nick, I don't have the -- the status

11   report.

12               (Pause in proceedings.)

13               MR. SCHEFF:  Your Honor, I have an

14   unredacted one if you --

15               THE COURT:  I -- no, I have it.  It's here.

16   Thanks, Mr. Scheff.  It's here in the -- in the

17   papers that -- it was here.

18               (Pause in proceedings.)

19               MR. AGUSTI:  Your Honor, I'm happy just to

20   summarize --

21               THE COURT:  I have it.

22               MR. AGUSTI:  -- the key facts.  Okay, Your

23   Honor.

24               THE COURT:  Okay.

25               MR. AGUSTI:  So --

18

1          THE COURT:  Go ahead.

2          MR. AGUSTI:  So, Your Honor, basically --

3          THE COURT:  Direct me to a page.

4          MR. AGUSTI:  I don't have a page reference,

5    Your Honor.  I was just talking generally about

6    the -- about the case, so I do not have a page

7    reference to what I'm about to say.

8          THE COURT:  All right.  Well, then say it.

9          MR. AGUSTI:  If I may.  So, Your Honor --

10   so the -- so our -- so we found that there were

11   basically two waves of stripping BTS.  As Your Honor

12   knows, basically, the case revolves around a contract

13   between our client and Bridger Transfer Services.  As

14   of May 2015, Bridger Transfer Services was a very

15   substantial organization.  The defendants,

16   Ferrellgas, paid $800 million -- over $800 million

17   for the Bridger Group of companies.  Bridger Transfer

18   Services provided over 50 percent of the operating

19   revenues of Bridger Group.  It also provided over 40

20   percent of the profits for Bridger Group.  So it's a

21   substantial company that had a contract with us.

22   So -- but they had a problem and that problem was I

23   guess the Eddystone contract.  And that's because the

24   Eddystone contract was really a risk that they had

25   taken, was based upon the differential between the

1   price of crude petroleum in North Dakota and the

2   price of crude petroleum in the North Atlantic, which

3   is called Brent.

4        What had happened is that those -- there

5   had been a change in that and it turned the contract

6   into a loser.  And so they decided that the way to

7   get out of a loser was basically to strip BTS of all

8   of its assets.  And by seven months, six months

9   later, January '16, January of 2016, the BTS, our

10  counterparty, had been stripped from a company that

11  provided 50 percent of the operating revenues of a

12  group for which it had paid $800 million into a

13  company that had zero assets and that they sold off

14  for ten dollars to a third party in order to make it

15  harder for us to bring a fraudulent transfer action.

16        So that's essentially the background.  Now,

17  the stripping occurred in two stages.

18        THE COURT:  The change that you've just

19  described, is that the change in the oil market

20  generally?  I don't follow Brent crude prices, but

21  the oil market tumbled.  I don't remember exactly

22  when.

23        MR. AGUSTI:  Yes, Your Honor.  Actually,

24  it's -- the key thing is it diff -- there was a --

25  the key difference isn't so much the overall crude

20

1   market, although our expert -- our experts will

2   explain that that has something to do with it, but

3   it's really the differential between the price that

4   you pay in Philadelphia --

5           THE COURT:  And the price in North Dakota?

6           MR. AGUSTI:  -- for Brent -- pardon me?

7           THE COURT:  And the price in North Dakota?

8           MR. AGUSTI:  Yes, sir.  And when this

9   contract started the price in North Dakota was a lot

10  cheaper.  And so when -- it was so much cheaper that

11  it made sense to stick it in a rail car in North

12  Dakota and ship it all the way down here, take it to

13  our transloading facility, and put it into a Delaware

14  River barge and take it down to a refinery eight

15  miles downstream, the Monroe Refinery.  And so -- and

16  the alternative to that for the Monroe Refinery is to

17  buy petroleum from the -- that's priced at North

18  Atlantic prices, and those are called Brent.  That's

19  the benchmark price.  And it turned out back then,

20  when they started doing this, that there was a huge

21  gap and it more than paid for the -- it cost a lot

22  more money to rail petroleum across the country than

23  it does to put it on a boat in West Africa and float

24  it to Philadelphia.

25          So, basically, the deal depended upon that

1  differential.  What happened over time was that their

2  bet didn't pay off and the differential eroded to the

3  point where it was almost equal.  And a lot of that

4  had --

5          THE COURT:  Because of --

6          MR. AGUSTI:  -- to do, Your Honor, with --

7          THE COURT:  Because of the increased cost

8  of extracting the North Dakota oil?

9          MR. AGUSTI:  No.  No, Your Honor.  I -- why

10  oil prices change is something that's, unfortunately,

11  way beyond my (indiscernible), or maybe I would be an

12  oil trader.  But what happened was that the price of

13  oil -- of oil in North Dakota, basically, it dropped,

14  but it didn't -- but, basically, it didn't drop as

15  much as the oil that was coming across from West

16  Africa as a result of the events in -- with Saudi

17  Arabia in the fall of -- beginning in the fall of

18  2014 but continuing.

19          So, Your Honor, what happened as an

20  economic matter was that what had been a good deal

21  based upon this differential between what was then

22  cheap North Dakota oil and expensive Brent oil didn't

23  make sense anymore.  The prices had -- you know, had

24  basically coalesced so that there was a very small

25  differential in price and you had this massively

22

1   higher cost of transporting it on rails all the way

2   to Philadelphia.  So that's the fundamental problem,

3   the real-world problem that went on with them that

4   caused them to think that this was a bad contract

5   they wanted to get rid of.  But as part of entering

6   into the deal, we built this facility in Eddystone,

7   just south of Philadelphia, and it cost a lot of

8   money to do that, and we wouldn't have done that if

9   we didn't have a commitment from BTS to go ahead and

10  take petroleum for us -- from us for five years.

11          So our deal was look, it's a -- it's a

12  classic take-or-pay contract, the kind that you find

13  in the oil industry all the time.  Basically, look,

14  what BTS said is we'll deliver to you 65,000 barrels

15  of petroleum per day, or to the extent that we don't,

16  we will pay you a minimum volume payment, right?  And

17  what that does is it gives us some -- it gives us,

18  the people who are spending all this money to build

19  the facility, some assurance that we're going to get

20  our money back for building this facility.  And that

21  was the -- that was the gamble that they had taken

22  and that was what BTS -- or what the owners of BTS,

23  better said, because they dealt with BTS as if it was

24  a play thing.  What they said, well, we have a smart

25  idea for getting out of this contract.  We'll just

1    strip BTS so that it's judgment proof and then we'll

2    default on the contract.

3            So that's exactly what they did.  Beginning

4    in July 1, 2015, they -- which was the very first day

5    that -- remember I said that Ferrellgas bought this

6    company for about $800 -- or group of companies for

7    about $800 million beginning -- that was effective on

8    July 1, 2015.  From that day, the money starts going

9    not to BTS -- this is on contracts where clearly BTS

10   is the contract party.  The revenues from those

11   contracts start going out to other companies, and in

12   some cases, to companies that don't even exist.  And

13   in order -- there's a small amount that's left over.

14   After all, BTS did have a payroll.  But prim -- but

15   the overwhelming majority of its $104 million in

16   annual revenues that they had in 2014 are suddenly

17   going someplace else.

18           Ultimately, by January 2016, February 2016,

19   they go ahead and they make an arrangement with this

20   refinery downstream, completely unknown to us, and

21   they then just literally take the contracts, take all

22   the assets that BTS has, and they transfer those

23   assets to other companies.  And then one fine day,

24   February 1, is the last train that BTS delivered

25   to -- and I should say they also sell the corporate

24

1  shell because at that point, this substantial company

2  of mid-2015 was zero.  They take that company and

3  they sell it for ten dollars to a third party, a

4  third party under some, you know, corporate structure

5  where the company is actually owned by another

6  assetless company, et cetera.

7          So in any event, Your Honor, on February 1,

8  they stop delivering crude.  And from that day

9  forward, they don't make any minimum volume payments.

10  They just flat out default.  And what we did next is

11  we brought in arbitration.  We -- obviously, we

12  didn't know that this had happened.  We brought in

13  arbitration.  During the course of the arbitration,

14  we learned what had happened.  We settled with the

15  new owners of BTS, and then we brought this action --

16          THE COURT:  The new owners being Jamex?

17          MR. AGUSTI:  Yes, sir.  Yes, Your Honor.

18  The series of -- James Ballengee and the Jamex

19  companies.  And then beginning in -- and then

20  beginning in February of 2017, we brought this

21  lawsuit.  So we're a little bit past the third year

22  anniversary.

23          So we conducted discovery, we -- as I said

24  earlier, we had document production that was under

25  the -- Judge Kelly's initial order ended on August

1   2018.  We had some difficulties getting the

2   accounting records.  We finally got the accounting

3   records.  And then, of course, we had the crime fraud

4   motion, the crime fraud motion that we filed just

5   within a couple of weeks after receiving the first

6   version of their privilege log, and was finally

7   resolved through the Third Circuit September 27,

8   2019.

9          So the problem that we have right now, Your

10  Honor, is the problem there are some documents that

11  we can tell are probably relevant.  And so we've

12  asked in the motion to enforce that someone, Your

13  Honor or magistrate, take a look at those documents.

14  But then that leaves a -- and that's a very limited

15  number of documents.  But that leaves --

16          THE COURT:  You're talking now about the

17  documents in the ex parte submission that weren't

18  ordered produced.  841 documents were produced.

19          MR. AGUSTI:  Yes, sir, and we've asked for

20  those.

21          THE COURT:  724 of those documents -- I'm

22  sorry, were produced for in-camera review.  724 of

23  those documents were, according to Judge Kelly,

24  within his description of the categories that were

25  subject to the crime fraud exception --

1          MR. AGUSTI:  Yes, sir, Your Honor.

2          THE COURT:  -- the four subjects.  So

3    you're talking about production of what?

4          MR. AGUSTI:  So -- Your Honor, so we're

5    talking -- we've filed a motion to enforce.  That,

6    basically -- there are -- looking at the privilege

7    logs, we have tried to discern a narrower set of

8    documents that we think also fall within Judge

9    Kelly's categories.  And so we've asked --

10          THE COURT:  Of the documents --

11          MR. AGUSTI:  -- for production.

12          THE COURT:  -- that were produced for the

13    in-camera review?

14          MR. AGUSTI:  Yes, Your Honor, that they be

15    produced for in-camera review.  Those are a narrower

16    set of documents.  And then --

17          THE COURT:  You're talking about the

18    difference between 724 and 841, 117 documents?

19          MR. AGUSTI:  No, no, Your Honor, I don't

20    know off the top of my head how many additional

21    documents we're seeking.  I'll ask my colleague and

22    I'll be sure and get you the answer later on, but it

23    is -- it's a number of documents in the hundreds of

24    documents --

25          THE COURT:  And how --

27

1          MR. AGUSTI:  -- that --

2          THE COURT:  And how many pages is in the

3   average document?

4          MR. AGUSTI:  Your Honor, I can --

5          THE COURT:  Are they one-page doc --

6          MR. AGUSTI:  I can give you the answers to

7   those questions, but I honestly do not have them

8   right now.  But the -- but the second -- the larger

9   problem -- and we think that those are a number of

10  documents that Your Honor or a magistrate could

11  review and make calls as to whether they fall in or

12  not.  But that, Your Honor, leaves us with a massive

13  number of documents on which they've taken -- they've

14  asserted privilege that we don't have any idea what

15  they are.  There are -- there are -- Your Honor, just

16  to give you an example, there are 6,000 documents

17  that have exactly the same description, something

18  along the lines of attorney-client confidential

19  communication.  We have no idea what that document

20  says.  The other descriptions are "Consultation with

21  attorney."  We have no idea what that document

22  relates to.  You're talking about thousands of those

23  documents.

24          So, Your Honor, from where we are right

25  now, we can tell because there's gaps in the

28

1    evidence.  For example, there's -- I'll give you

2    another example.  In a document that was produced was

3    a -- are some emails involving one in-house counsel

4    in January 2016 that talks about playing in the -- in

5    the UFTA sandbox.  UFTA, of course, is an acronym for

6    the Uniform Fraudulent Transfer Act, one of the model

7    transfer acts throughout the United States.  The

8    other one is UFCA, the Uniform Fraudulent Conveyance

9    Act.  He refers to that one too and refers in a

10   couple of emails about facing UFCA risks.  But it is

11   clear from the context of the emails that this --

12   he's referring to prior discussions that they've had.

13   And yet we don't have a single document of these

14   many, many thousands of documents that address this.

15   So we feel certain that there are gaps.  So here's

16   what -- the solution that we have posed to the other

17   side as a way of cutting through all this without

18   having -- the impossible without having to have the

19   Court do it or a magistrate look at that many

20   documents.

21         What we would do is do what we do with any

22   of the massive numbers of documents that are produced

23   in modern cases.  Basically, we would put together

24   some computer keywords or keyword strings, which is

25   the way we normally deal with millions of documents

29

1   that we get in discovery, and see whether we can get

2   a reasonable body of documents.  If the strings are

3   sufficiently specific, we can get -- we can hit

4   documents that will be relevant.  And, thereby, we

5   will be able to reduce this 95,000 -- this body of

6   95,000 documents to a smaller body of documents

7   that -- you know, that a court or the magistrate can

8   take a look at and say right away whether this is

9   something that falls in the category or not.

10  Surely -- for example, surely if this in-house lawyer

11  was talking in mid-January about referring to prior

12  discussions about the UFTA and the UFCA, there are

13  documents, emails, referring -- containing those

14  prior discussions.  We would put in a keyword term,

15  theoretically, where we just refer to UFTA or

16  fraudulent transfer, and documents should come up

17  that are rel -- clearly relevant to the category --

18  to, actually, a couple of the categories that Judge

19  Kelly referred to.

20          So the way we would go at dealing with

21  this, Your Honor, is first of all, as to the

22  documents that we think, you know, from looking at

23  this very, very hard, these additional I believe few

24  hundred documents that we have looked at the

25  privilege log and, based on the timing and, you know,

1    the modest description, we think are relevant, what

2    we would do, we would ask the Court to -- or

3    magistrate to take a look at these hundreds of

4    documents, and then the next -- and then we would

5    propose to the other -- what we have proposed to the

6    other side is that we have a keyword search of these

7    documents, like we do any large body of documents, in

8    order to try to get just those documents that are

9    relevant and that are a sufficiently small group of

10   documents that a -- you know, a magistrate or Your

11   Honor could go through them and make a determination

12   of what falls within Judge Kelly's -- Judge Kelly's

13   order.  So that's what -- how --

14          THE COURT:  Well, are you still talking

15   about documents that fall within the crime fraud

16   exception?

17          MR. AGUSTI:  Yes, sir.  Yes, sir.  Yes,

18   sir.  All of these documents are documents on which

19   they have taken the attorney-client privilege.

20   There's -- they took the attorney-client -- they've

21   asserted the attorney-client privilege on about

22   100,000 documents, and as I said, you know, it's --

23   we think -- obviously, this is in violation of their

24   obligations, but we think the descriptions are -- do

25   not give -- permit us to make any assessment of

31

1     whether the documents are, in fact, privileged or not

2     because, you know, how can you -- if you've got a

3     document which says that it's regarding an attorney

4     consultation, well, what about?  And with that kind

5     of a -- with that kind of a description, it's

6     impossible to tell -- for us to tell, who are not

7     looking at the documents, whether they relate to our

8     case or not.

9              I would say, you know, Your Honor, to start

10    with I mean it's not like we are going into a mass of

11    documents that are completely irrelevant to the case.

12    For the defendants to have placed those on a

13    privilege log, they had to make, you know, an initial

14    determination that the documents were relevant to our

15    lawsuit.  They may not be relevant to the -- to the

16    categories that Judge Kelly described in his -- in

17    his June 28th order, but they certainly are relevant

18    to this case.  And we suspect that there, you know,

19    will be a fair number of documents that we have not

20    had an opportunity to deal with that -- or that we've

21    not had an opportunity to review that we'll have

22    available to us at that point.  And, Your Honor, as

23    you --

24             THE COURT:  And you believe this proposal

25    will bypass the need for the defendants to take

1   another look -- and I'm being kind -- based on your

2   argument, take another look at their privilege logs

3   and redo them?  You're not -- you're not asking for

4   that?

5           MR. AGUSTI:  Your Honor, the reason I'm not

6   asking for that is because we've already tried that a

7   few times and it's not really worked out all that

8   well.  And so I think that we really would like to

9   have, you know, something neutral like a keyword

10  string, fish out these documents.  I mean obviously

11  any time that they want to look at more documents and

12  produce more documents, we would be very pleased to

13  have them.  But they have opposed our motions so far.

14  And this, of course, is the key thing that at this

15  point is holding up the end of dis -- of fact

16  discovery.

17          All of -- one thing we do agree on, Your

18  Honor, is that we've got about nine depositions left.

19          THE COURT:  How many have you taken?

20          MR. AGUSTI:  We've taken 11, Your Honor.

21  The 11 that we've taken are primarily theirs of us

22  because we don't have the same issues.  So they have

23  I think one deposition left of a corporate

24  representative, and we have eight depositions of

25  theirs.  And the -- basically, the depositions are

33

1    being held up pending the production of these

2    documents because obviously a lot of these documents

3    are going to relate directly to the testimony a lot

4    of these people -- if the logs tell us nothing, they

5    tell us that a lot of these people are often involved

6    in some of these attorney consultations.

7             So, Your Honor, we would -- that -- once we

8    have those documents, then there's -- then I think if

9    you look at page 31 of at least the unredacted status

10   report, you'll see the competing proposals -- the

11   competing proposed schedules there.  We all agree

12   that we need to have a resolution and a production of

13   the attorney-client -- what I call I guess the crime

14   fraud documents.  And once that happens, then, Your

15   Honor, the way that you will see a table that shows

16   the parties' two --

17            THE COURT:  I --

18            MR. AGUSTI:  -- proposals --

19            THE COURT:  I have it.

20            MR. AGUSTI:  -- for how much time we should

21   take from that trigger point, the trigger point being

22   the point at which those documents are produced, the

23   time that we would take to take depositions.  I think

24   you'll find that consistently our time is narrower

25   than their time and -- is shorter is a better way of

34

1  saying it I guess.  Fact discovery, we think we've

2  got nine depositions.  We don't see any reason why we

3  can't do it in six weeks.  They want ten.  Expert

4  discovery, start to finish we say 11 weeks, they say

5  17.  And you'll see, Your Honor, on and on.  But,

6  basically, we have -- we're plaintiffs, we've been at

7  it for three years, we think it's long past time for

8  us to get going, we very, very, very much want to get

9  going.  And so we -- you have before you the two

10  positions on where we would take the schedule once

11  these crime fraud documents are produced to us.

12         THE COURT:  Where is the proposed agreement

13  in terms of -- I'm talking about the proposed

14  agreement regarding the computer searches for these

15  additional --

16         MR. AGUSTI:  There is --

17         THE COURT:  -- records.

18         MR. AGUSTI:  There is no proposed

19  agreement, Your Honor.

20         THE COURT:  Oh, I thought you had proposed

21  a --

22         MR. AGUSTI:  We have proposed to them in a

23  meet and confer letter that we approach this --

24  approach it this way, and we have not yet received a

25  response to that proposal, Your Honor, but that's --

35

1          THE COURT:  All right.

2          MR. AGUSTI:  -- but that's how we propose

3    to resolve it.

4          THE COURT:  Fine.  Thank you.

5          MR. AGUSTI:  Anything further, Your Honor?

6          THE COURT:  Not now, but there will be.

7          MR. AGUSTI:  I won't go away.

8          THE COURT:  No, I know you won't.

9          MR. AGUSTI:  Thank you, Your Honor.

10         THE COURT:  Who wants to respond?

11         MR. KRAMER:  Hello again, Your Honor.  Jake

12   Kramer for the Bridger and Eddystone defendants.  Mr.

13   Scarborough is our lead counsel in the case, but I'm

14   going to talk about the crime fraud issues, and then

15   I'll turn it back to him to deal with the schedule if

16   that's all right with you.

17         THE COURT:  All right.

18         MR. KRAMER:  Okay.  So we heard a lot there

19   from Mr. Agusti and there's a lot to unpack.  I'm

20   going to do it as efficiently as possible.  And I

21   thought what I would do is start with some background

22   and finish with where we are on ideas to move the

23   case forward because we have some too.

24         The first thing that you heard a lot is

25   that there are 100,000 documents at issue here on our

1    privilege log, and look, this is a collection action,

2    and Eddystone has been very aggressive in trying to

3    collect the debt from our clients.

4          THE COURT:  Well, you're playing hide and

5    seek.  They're seeking and you're not coughing up.

6          MR. KRAMER:  That's certainly the

7    allegation, that we're playing hide and seek, Your

8    Honor, but we have done nothing but try to comply

9    with this order.  We've produced 4,533 privileged

10   communications and we did it within three weeks of

11   the appeal --

12         THE COURT:  That's commendable.

13         MR. KRAMER:  -- terminating.

14         THE COURT:  That's commendable unless there

15   are an additional 10,000 documents that should have

16   been produced.

17         MR. KRAMER:  That's absolutely right, Your

18   Honor.

19         THE COURT:  Look, you're talking to someone

20   who's been involved in discovery disputes both as a

21   lawyer and as a Judge for years and years and years,

22   so telling me you produced 4,000 doesn't tell me very

23   much unless the universe is 4,000.  They say the

24   universe is much, much greater.

25         MR. KRAMER:  Uh-huh.  Okay.  Well --

37

1          THE COURT:  We're going to have to come up

2     with a way to test the defense position --

3          MR. KRAMER:  There's --

4          THE COURT:  -- that they've produced

5     everything.

6          MR. KRAMER:  There's no question about

7     that, Your Honor, because we're at loggerheads about

8     whether we've complied with the order or whether we

9     haven't complied with the order.  When you think --

10          THE COURT:  Well, you -- and you've got --

11     you've got to come up with something that's realistic

12     or --

13          MR. KRAMER:  Uh-huh.

14          THE COURT:  -- else you're going to be

15     stuck with an order that -- well, if I err, I'm

16     certainly going to err in favor of disclosure under

17     facts of this --

18          MR. KRAMER:  Well, that's what we've tried

19     to do in our review of the documents as well, Your

20     Honor.  And we suggested an in-camera review to

21     resolve this situation.  The proposals that we

22     received were give us all the documents that haven't

23     yet been turned over.  We'll take a look at them,

24     decide what falls within the order --

25          THE COURT:  Well, that's not --

1          MR. KRAMER:  -- and --

2          THE COURT:  -- going to work either --

3          MR. KRAMER:  Right.

4          THE COURT:  -- because the documents that

5    were produced, as I read the motion papers, Judge

6    Kelly's initial universe was more broad than the

7    documents that he ordered produced.  So saying

8    that -- produced the rest of the 841 documents

9    doesn't work.  But there is another issue, the issue

10   that was raised by plaintiff's letter where they want

11   lots more documents.  But what's wrong with the

12   plaintiff's proposition, the one that was advanced at

13   the end of that --

14          MR. KRAMER:  Well --

15          THE COURT:  -- background presentation?

16          MR. KRAMER:  -- we just received that the

17   other day and we've started to look at it.  The

18   letter we received was a little different than the

19   proposal we just heard, and I think the proposal we

20   just heard is more workable.  The letter we received

21   said essentially you are cherry-picking the documents

22   that you're producing, intentionally withholding

23   documents that you've been ordered to produce, which

24   we reject as categorically false.  And we've offered

25   to hand these documents over for an in-camera review

1    to test that proposition repeatedly.

2           THE COURT:  Yes, but --

3           MR. KRAMER:  But --

4           THE COURT:  -- that's a goal not to be

5    desired.  I'm not interested in reviewing a lot of

6    documents.

7           MR. KRAMER:  Understood, and --

8           THE COURT:  Right.

9           MR. KRAMER:  -- therein lies --

10          THE COURT:  My plate is pretty full.  I

11   certainly have time to handle all of the cases on my

12   docket, but I'm not looking for lots of documents to

13   review in camera.

14          MR. KRAMER:  Understood, Your Honor.  So

15   the proposal we received, to answer your question --

16   and then let's talk about the scope of documents to

17   be reviewed.  The proposal we received was run these

18   searches, produce the documents immediately, and the

19   situation will be resolved.  What we just heard is

20   run these searches, we'll give them to a special

21   master and -- or a magistrate or Your Honor,

22   whomever, and a third party, a neutral -- someone who

23   is not advocating for their client will make the

24   decision about whether the documents fall within the

25   scope of the order.  That's a lot more realistic.

1          I do think -- we've started to take a look

2     at the keywords.  We just received this the other

3     day.  We started to take a look at the keywords and

4     there are -- there are thousands of documents that

5     come out.  Now, mind you, these are -- these are all

6     documents that we have reviewed repeatedly and

7     concluded that they do not fall within the four

8     categories that Judge Kelly identified.  So, again,

9     we're happy to turn them over if we can get the

10    number down to a reasonable place that's palatable

11    from the Court's perspective and test that

12    proposition.

13          Operationally, Your Honor, the problem here

14    is that this motion came at us with a list of four

15    categories.  You read the categories.  You referred

16    to them earlier.

17          THE COURT:  Well, not -- I referred to them

18    generally, not --

19          MR. KRAMER:  Generally, yes.

20          THE COURT:  -- the --

21          MR. KRAMER:  The --

22          THE COURT:  -- the restructuring of a

23    subsidiary, BTS; the transfer of a subsidiary, BTS's

24    assets and revenue streams, and they should be rather

25    easy to identify --

41

1          MR. KRAMER:  Uh-huh.

2          THE COURT:  -- I think.  Three, the sale of

3   a subsidiary, BTS; and four, and this is not self-

4   explanatory, the cessation of a related shipping

5   arrangement.  That's the shipping -- the North

6   Dakotan shipping arrangement?

7          MR. KRAMER:  That's the arrangement through

8   which Jamex purchased oil in North Dakota, our

9   clients transported the oil to Philadelphia, it was

10  transloaded through the Eddystone facility from

11  railcars to barges, and then ultimately was delivered

12  to the Monroe Refinery, which is the Delta Airlines

13  refinery on the river here.  So the cessation of that

14  arrangement is what prompted the default on the

15  contract --

16         THE COURT:  I did not ask --

17         MR. KRAMER:  -- by BTS.

18         THE COURT:  -- Mr. Barber, the Delta

19  refinery is closed now, is it not?

20         MR. KRAMER:  I don't know, Your Honor.  I

21  think -- actually, the last I heard there was still

22  crude moving up the river in that direction, but I

23  don't know if it's happened more recently.

24         THE COURT:  What about the structure that

25  was built by Eddystone?

42

1          MR. KRAMER:  The Eddystone structure is

2     still in place.  It's been -- as we understand it,

3     ownership has transferred to one of the joint

4     venturers in the Eddystone project and it is still

5     operational.

6          THE COURT:  Is it operating?

7          MR. KRAMER:  Well, we don't -- we don't

8     have an -- we don't have an up-to-date view on that,

9     Your Honor.  Mr. Agusti probably knows the answer.

10    My understanding is last we checked, yes, it was

11    operating.

12         THE COURT:  All right, you may continue.

13         MR. KRAMER:  Thank you.  So how many

14    documents are we dealing with?  It's not 100,000.

15    There -- by way of background here, we do have a long

16    privilege log.  There are approximately 65,000

17    entries.  And the reason -- we actually -- we took

18    over this case.  Before we did, an agreement was made

19    among counsel that any document that hit -- again,

20    here we are on the computer keywords -- any document

21    that hits on a keyword would be deemed responsive

22    unless it clearly was not, a spam email, something

23    just that no reasonable person could look at and

24    determine falls within the ambit of this case.

25         The keywords were negotiated among the

43

1    parties, and the results were voluminous.  And any

2    document that hit on a keyword that we had negotiated

3    with the other side ended up on our privilege log.

4    So there's a lot of materials on there, and it takes

5    a lot of time to put a privilege log like that

6    together, and there are 65,000 entries.  How many

7    entries really matter for purposes of this motion,

8    the crime fraud motion?  We're really talking about a

9    universe of something like 25,000.  So we're down all

10   the way already 75 percent from where we started.  Of

11   those, which we've reviewed repeatedly to find the

12   documents that fall within these four categories and

13   to hand them over, we -- we've already produced, as I

14   said, 4,553.  So the numbers -- the numbers change

15   when we put them in perspective as to the

16   proportions.

17          As to the descriptions in our privilege

18   log, we've been taken to task for that repeatedly,

19   and I think it's worth a little more background for

20   the Court.  What we did in our privilege log, it was

21   voluminous -- and you see this happen sometimes in

22   cases like this -- we put the date, we put the

23   sender, we put the recipient, we put the subject line

24   of the email, we identified all the attorneys who are

25   listed as senders or recipients to show that the

44

1   documents were going back and forth among attorneys.

2   And to the extent there wasn't an attorney listed, we

3   ident -- we provided a more fulsome description so

4   that the other side can understand what happened.

5        The crime fraud motion was filed after we

6   received that.  It focused principally on a period

7   from in the middle of 2015 and at the end of 2015 and

8   the start of 2016.  So we voluntarily, after

9   receiving that motion, updated all of those

10  descriptions and we provided it to the other side,

11  and what we did is instead of using more generic

12  descriptions of the documents, we provided particular

13  descriptions document by document for 14,500 entries.

14       Right after we did that, the other side

15  protested, as they did earlier today, and said no,

16  you need to update the entire privilege log.  We

17  talked about that, tried to come to some reasonable

18  resolution and understanding, and what we got was a

19  compromise proposal from Eddystone.  And what it

20  says, and I can read, "Eddy" -- we've submitted it.

21  It's an exhibit to our opposition brief.  "Eddystone

22  will accept a further amended privilege log in which

23  Ferrellgas has fixed all entries from September 1,

24  2014, through April 30, 2015, as a compromise."

25       So we did that.  We updated another 10,000

45

1 privilege log entries. But the target keeps moving,

2 and once this motion was decided and we started

3 producing documents, the compromise has gone away.

4 And despite having accepted the agreement, we're

5 asked to update more privilege log descriptions and

6 taken to task for not doing it. So I think that's

7 important just to put that particular issue in

8 perspective.

9         The bottom line, Your Honor, we're dealing

10 with, like I said, two different periods of time. In

11 the middle of 2015, Ferrellgas acquired Bridger

12 Logistics. And the theory on the other side is that

13 immediately upon acquiring that company, Ferrellgas

14 and Bridger Logistics began diverting revenue from

15 BTS, the subsidiary. And the theory you just heard

16 espoused was Ferrellgas and Bridger Logistics did

17 this because the oil market was changing and it was

18 clear that this midstream logistics business bringing

19 oil from North Dakota to Philadelphia to the -- to

20 the refinery would not be profitable. That was the

21 business that drove the deal.

22         So the disconnect here is the question why

23 would our clients spend $800 million to acquire

24 Bridger Logistics and immediately set about moving

25 and diverting revenue from a subsidiary because they

1    had just purchased a company whose principal line of

2    business, whose main contract, as Mr. Agusti said,

3    who -- which generated 40 to 50 percent of the

4    revenues and profits for the company, was failing?

5    It makes no sense.

6            In truth, the spread -- the spread between

7    the price of domestic oil in North Dakota and foreign

8    oil in Philadelphia narrowed after the acquisition.

9    The allegation is, nevertheless, that we invested

10   $800 million to buy a failing contract and a failing

11   company and immediately set about to loot it.  It's

12   not -- I'm not here to argue the merits, and Judge

13   Kelly didn't decide the merits in his opinion about

14   whether this particular conduct constitutes a fraud.

15   But if the plaintiffs haven't found the documents

16   that they're looking for and that has prompted them

17   to come to the Court and come to us and ask for more

18   documents, it's because they don't exist.  There was

19   no fake entity to which revenue was diverted.  There

20   was a realignment of the accounting structure

21   recommended by accountants, and none of that caused

22   BTS to lose revenue.  And how could it if the entity

23   to which the revenue was diverted was never actually

24   formed?  So then we move forward in time.

25            THE COURT:  Well, what happened?  I'm just

47

1    looking at a chart.  Ferrellgas purchased Bridger

2    Logistics in June of 2015.

3              MR. KRAMER:  That's right, June 24th.

4              THE COURT:  And -- for all these millions

5    of dollars.

6              MR. KRAMER:  Uh-huh.

7              THE COURT:  What happened between June of

8    2015 and February of 2016 when Jamex acquired BTS for

9    ten dollars?

10             MR. KRAMER:  A couple of things happened.

11   During that period, the spread narrowed and it became

12   economically unattractive for Monroe to buy oil from

13   North Dakota and for Jamex to sell oil from North

14   Dakota because it also had to cover the

15   transportation costs.

16             THE COURT:  When did that start, that --

17             MR. KRAMER:  That started after the

18   acquisition.  And we put a -- we put a graph into our

19   opposition to the brief to show the spread narrowing

20   in around November of 2015.  And there was another

21   important event happening at around the same time,

22   which is Jamex had liquidity issues and was unable to

23   obtain intermediation financing, which is something

24   provided by a lender, originally Merrill Lynch.  Then

25   they were able to arrange financing from Carlyle.

1   It's complicated and I don't pretend to fully

2   understand it, but the basic principle is the lender

3   uses its balance sheet to purchase the oil, it holds

4   title to the oil until it's delivered, whereupon it's

5   paid off, and it's a way for a company like Jamex,

6   which is in the oil marketing business, to use the

7   balance sheet of a more sophisticated bank to

8   purchase and sell the oil.  It's a credit sleeve.

9           THE COURT:  You asked a question, a

10  rhetorical question, why would Ferrellgas pay $800-

11  plus millions of dollars for BTS and then proceed to

12  disburse its assets, but I think you've just answered

13  it.  The downturn in the oil -- well, it's not

14  exactly a downturn, but the narrowing of the prices

15  as between North Dakotan oil and North Atlantic oil

16  for crude --

17          MR. KRAMER:  I --

18          THE COURT:  -- occurred I gather without

19  any advance warning or not much advance warning,

20  occurred after the purchase for $800 million, which

21  makes that purchase not such a good idea.

22          MR. KRAMER:  Great question, Your Honor,

23  and I understand why you ask.  To be clear, I'm

24  talking about two different time --

25          THE COURT:  Well, you asked the question,

49

1    why --

2            MR. KRAMER:  I know.

3            THE COURT:  -- would they, and I think I've

4    just come up with at least an answer.  You, of

5    course, will have an explanation for why they did

6    that.

7            MR. KRAMER:  Well, my question was -- may

8    have been posed inartfully, but it was a little

9    different.  Why would they do it immediately?  Why

10   would they do it immediately upon purchasing the

11   company --

12           THE COURT:  Yes, you did say immediately.

13           MR. KRAMER:  -- in the middle of 2015?

14           THE COURT:  Well, it turns out it's a few

15   months.  I don't know whether that's immediately in

16   terms of selling companies.  I guess a few months is

17   pretty immediate, but I leave that to you.  That's

18   not an issue --

19           MR. KRAMER:  Well --

20           THE COURT:  -- on which we'll decide the

21   case.

22           MR. KRAMER:  That's right.  And I'm

23   responding to an allegation that it began essentially

24   on day 2, which isn't the case at all and --

25           THE COURT:  Well, it began a few months

1    later.

2            MR. KRAMER:  Well, here's what happened a

3    few months later.  Jamex, the buyer and seller of the

4    oil, and Monroe, the purchase of the oil, didn't want

5    to be in the business of North Dakota crude anymore

6    because of that price change.

7            THE COURT:  Was it just that or was there a

8    decline in the quality of the North Dakotan crude?

9            MR. KRAMER:  No, I don't think it had

10   anything to do with quality.  It's light, sweet

11   crude, which is fungible with crude from other places

12   in the world.  It was -- it was principally the gap

13   between the cost to buy it and the price at which it

14   could be sold needed to accommodate the price of

15   transportation so there was margin left over.  When

16   it shrinks the margin goes away and it doesn't make

17   sense from Jamex, the seller's, perspective.  And

18   because of the decline in foreign crude prices, it

19   doesn't make sense from Monroe, the oil buyer's,

20   perspective.

21           So our clients are in the shipping

22   business.  We move the oil from North Dakota to

23   Philadelphia.  Jamex and Monroe decided that they

24   were going to put their arrangement on pause.  They

25   consulted with our clients about it.  And,

51

1    ultimately, there was a cessation in oil delivery.

2    Does that prompt our clients to, as you say, transfer

3    the revenue, transfer the assets out of BTS?  Not

4    quite.

5           What also happens is Jamex, back to the

6    intermediation financing, hasn't been able to replace

7    its financing from Merrill Lynch, and it goes and it

8    talks to The Carlyle Group, and they're willing to do

9    it.  And that's a way that Jamex could have kept the

10   oil moving before this -- before this cessation was

11   agreed.  And Jamex was willing to do that because it

12   still made economic sense even with the price

13   differences.  But they needed Eddystone to consent to

14   the intermediation financing agreement, and Eddystone

15   wouldn't do that.  And the reason that they gave was

16   look, we don't have a direct relationship with Jamex,

17   we have a direct relationship with BTS; we're not in

18   privity with you, we're not going to negotiate with

19   you to put this consent in place.

20          The other thing is there were problems with

21   the facility.  Because of the SEPTA schedule, trains

22   could only come in between midnight and 4:00 a.m. and

23   they could only leave between midnight and 4:00 a.m.,

24   which made it very difficult to hit the volumes that

25   everybody anticipated hitting at the outset.  And on

1   top of that, in addition to some other problems, on

2   the way out of the facility, there's a big, granite

3   pinnacle in the channel, which effectively meant that

4   the barge could only sail at high slack tide if it

5   was loaded with oil, which is a very narrow window.

6   So you had a very narrow window coming into the

7   facility and a very narrow window coming out of the

8   facility.

9        So what Jamex wanted to do after it found

10  itself unable to obtain the financing it needed to

11  continue selling the oil was get into a situation

12  where it could negotiate with Eddystone, as it was

13  able to negotiate with Monroe and as it was able to

14  negotiate with my clients, and come up with a

15  solution for the problem for everyone.  So Jamex

16  approached us, Jamex asked to buy the subsidiary,

17  BTS, and Ferrellgas looked into it.

18        Here, we hit the second period that's been

19  flagged in the crime fraud motion when BTS is sold to

20  Jamex and the assets are moved out of Jamex and --

21  excuse me, out of BTS and into other Ferrellgas

22  subsidiaries.  Why does that happen?  It doesn't look

23  great, but there's a -- there's an explanation.

24  Ferrellgas has this line of credit it's -- upon which

25  it relies for operating capital.  Every subsidiary of

53

1    Ferrellgas is a guarantor on the line of credit.

2    It's part of the loan covenants.  And it's been in

3    place since 2009.  And the loan covenants prevent

4    subsidiaries from disposing of assets except under

5    certain conditions, and one of the conditions is they

6    can be transferred to other subsidiaries.  So there's

7    a lien on these assets, which is a defense to a

8    fraudulent transfer claim.

9            The subsidiaries -- excuse me, BTS was able

10   to move the assets to other subsidiaries.  The

11   natural conclusion is if these assets are liened up

12   already in favor of the bank, they're not available

13   to serve as recourse for any -- for Eddystone in any

14   event if it were to sue on the contract as an

15   unsecured creditor, so it should have no economic

16   effect.

17           Now, again, not here to argue the merits of

18   the fraudulent transfer claim, and Judge Kelly didn't

19   decide the merits.  He didn't really address this

20   defense, which is a really important part of the case

21   when he issued his crime fraud decision.  But that's

22   what was going on at the time, those assets were

23   moved out of BTS.

24           THE COURT:  Are you saying all of the

25   assets moved out of BTS were fully liened?

54

1          MR. KRAMER:  That's correct, Your Honor.

2     They were.  There was a -- there was a lien in favor

3     of Bank of America, which was the lender for

4     Ferrellgas.  Now, there were some paperwork issues

5     related to the lien.  The security statement was --

6     the UCC statement was perfected in advance of the

7     transaction.  It was a little late.  There were some

8     mistakes on the bank side.  But when the other side

9     says hey, we've looked at these documents that you've

10    produced, as they did in their most recent letter,

11    and we don't see the documents that we think should

12    be there, this is an explanation.  This is why,

13    because the documents that Mr. Agusti mentioned --

14          THE COURT:  Did you share this information

15    with the plaintiff's side?

16          MR. KRAMER:  Yes, it's featured prominently

17    in our defense of the case, including the crime fraud

18    motion, and it was one of the things --

19          THE COURT:  Have you provided proof of the

20    lien?

21          MR. KRAMER:  Yes, Your Honor.

22          THE COURT:  Is there any question as to

23    lien priority?

24          MR. KRAMER:  I don't believe so, Your

25    Honor.  The -- stepping back, you know -- and this is

1    one of the reasons that Eddystone is in the situation

2    that it's in now, trying to collect not from its

3    counterparty in the contract, but from others in a

4    rather aggressively-postured collection action, there

5    was no parental guarantee or security in the contract

6    it entered into with BTS, so it had no security

7    interest in any of these assets at all.

8              THE COURT:  By "parental guarantee," you

9    mean BTS's parent?

10             MR. KRAMER:  That's right.  There was no

11   collateral pledged as part of the contract, there was

12   no performance bond, there was no security at all.

13   So there's no question that the bank is ahead of

14   Eddystone as a creditor.  And indeed if it were to

15   sue, it would have to obtain a judgment before -- and

16   even then it would be an unsecured creditor with a

17   judgment behind the bank.  So that's a big part of

18   the case.  And --

19             THE COURT:  Are you telling me this is all

20   discovery in aid of execution?

21             MR. KRAMER:  That's right, Your Honor.

22   That's right.  Well, execution --

23             THE COURT:  No, that can't --

24             MR. KRAMER:  -- on what?

25             THE COURT:  That can't be right --

1          MR. KRAMER:  It's not --

2          THE COURT:  -- because there is a lot of

3    law out there that says no.

4          MR. KRAMER:  It's over -- it's an

5    oversimplification on my part to answer that --

6          THE COURT:  Oversimplification.  But my

7    question -- but as you articulated the issue, it

8    occurred to me that we might be dealing with that.

9          MR. KRAMER:  Well, and it begs the question

10   execution on what?  So --

11         THE COURT:  There would have to be a

12   judgment.

13         MR. KRAMER:  Right.  So what's the judgment

14   in this case?  What happened is -- remember I said

15   Jamex wanted to buy BTS so it would be in a position

16   to negotiate with Eddystone?  That's exactly what

17   Jamex did after it acquired the company, went to sit

18   down with Eddystone and negotiate.  That was not met

19   with a warm reception.  To the contrary, Eddystone

20   immediately initiated an arbitration against Jamex

21   before the Society of Maritime Arbitrators, and that

22   proceeding ended abruptly before Jamex was able to

23   put on its defense with the settlement.  And the

24   settlement was Jamex stipulated to an arbitration

25   award in the amount of the unpaid deficiency payments

1   under the contract, the take-or-pay aspect remaining

2   on the contract, which is about $140 million, and

3   that award was entered by the arbitration tribunal.

4           At the same time, however, the settlement

5   agreement tells a different story.  In the settlement

6   agreement, Jamex expressly denies liability, JTS

7   expressly --

8           THE COURT:  Which is --

9           MR. KRAMER:  -- denies liability --

10          THE COURT:  In settlement agreements,

11  that's --

12          MR. KRAMER:  That's right.

13          THE COURT:  -- that's typical.

14          MR. KRAMER:  That's right, but not if you

15  have a stipulated judgment for $140 million in

16  liability.  I'm positive that that is atypical.  On

17  one hand, we have an agreement saying we've done

18  nothing wrong; on the other hand, they've stipulated

19  to an award for $140 million.  Why did they do that?

20          THE COURT:  Well, isn't that an argument

21  that you could make every time there's a settlement

22  and the denial of liability?  I don't want to make

23  reference to that aiding bank that just paid a lot of

24  money --

25          MR. KRAMER:  Uh-huh.

58

1          THE COURT:  -- to settle claims.  I'm not

2     talking about the $3 billion fine, but --

3          MR. KRAMER:  Right.

4          THE COURT:  -- they said the same thing.

5     So it's typical.

6          MR. KRAMER:  But did they stipulate to a

7     judgment for that settlement amount?  Because that's

8     what Jamex did, they stipulated to an arbitration

9     award finding them liable for $140 million while at

10    the same --

11         THE COURT:  Some judges might that -- might

12    find that to be a distinction without a difference.

13    I haven't looked into it.

14         MR. KRAMER:  Okay.

15         THE COURT:  But that doesn't -- that

16    argument doesn't impress me because it -- in real

17    life, in settlements, when companies decide to pay

18    millions and millions of dollars at settlement and

19    deny liability, you can make the same argument, the

20    payout is the same.  They have to satisfy the

21    judgment --

22         MR. KRAMER:  That's right.  We --

23         THE COURT:  -- and they have to pay the

24    money.

25         MR. KRAMER:  We -- yes, but let's follow it

59

1   through.  What happened --

2          THE COURT:  But what about the release?

3   Was there a release?

4          MR. KRAMER:  There -- yes, there was a

5   release of claims and a covenant not to sue I believe

6   the principals of Jamex, the people who bought JTS.

7   Some money was exchanged, some oil was exchanged that

8   was sitting in the Eddystone facility, and --

9          THE COURT:  Did BTS secure a release in its

10  favor?

11         MR. KRAMER:  No, BTS stipulated to a

12  judgment against it for $140 million.

13         SPEAKER:  JTS.

14         MR. KRAMER:  Excuse me.  Yes, the name had

15  been changed at that point to Jamex Transfer

16  Services, but JTS, BT -- formerly BTS, stipulated to

17  a finding of liability for $140 million while at the

18  same time entering into a settlement agreement

19  disclaiming liability, which is where I see the

20  disconnect.  And when Eddystone took this award to

21  Judge Pauley in the Southern District of New York to

22  have it confirmed, we moved to intervene.  And while

23  the motion to intervene was denied, what the judge

24  said was I find this troubling and I'm going to put

25  it on hold, I'm not going to confirm the award.

60

1      THE COURT:  What did Judge Pauley do?  He

2   happens to be one of the judges in the SDNY who I

3   know fairly well.

4      MR. KRAMER:  He --

5      THE COURT:  What did he do?

6      MR. KRAMER:  He stayed the motion to

7   confirm until this case is resolved.

8      THE COURT:  Until --

9      MR. KRAMER:  Yes.

10      THE COURT:  He's waiting for me?

11      MR. KRAMER:  That's right.  That's right.

12   And this case -- of course -- it's a tangled web we

13   weave, Your Honor, and this tang -- this case arises

14   from an effort to enforce the stipulated arbitration

15   award which hasn't been confirmed.

16      THE COURT:  But back to the release.

17   Companies that pay money typically get a release in

18   return for payment of money, or the entry of

19   judgment.

20      MR. KRAMER:  Uh-huh.

21      THE COURT:  And what I'm getting at, was

22   there a general release?

23      MR. KRAMER:  Not in favor of JTS.  There

24   was a release in favor of the people who owned the

25   company and purchased it from Bridger and Ferrellgas,

61

1    but JTS was not released.  To the contrary, it
2    stipulated that it was liable for the full amount
3    sought by Eddystone.
4           THE COURT:  Release of all -- I'm talking
5    about not a release -- well, I guess I'm talking
6    about a release of that claim, the claims that were
7    asserted in that arb -- that arbitration.  And have
8    you looked at the documents that were associated with
9    that?
10          MR. KRAMER:  I have, Your Honor.  I
11   believe we've submitted them, and we could do it
12   again, but --
13          THE COURT:  Oh, do you --
14          MR. KRAMER:  I don't know if they're in
15   your binder.  I guess they're not.
16          THE COURT:  My binder.  The Court would
17   tilt if we piled all of the documents --
18          MR. KRAMER:  No doubt.
19          THE COURT:  -- on --
20          MR. KRAMER:  No doubt.
21          THE COURT:  -- in the binder, right?  I'm
22   reminded of a huge patent case which I did.  It's the
23   last time I did it.  I ordered paper copies of
24   exhibits.  My courtroom looked like a warehouse.  It
25   was -- it was just awful.  I don't have a desire to

62

1   look, but it occurs -- occurred to me that -- and you

2   folks have spent much more time than I -- that's a --

3   that's a gross understatement -- in analyzing these

4   issues, but it was one of the things that occurred to

5   me and I had no answer, and you've given me your

6   answer.

7           MR. KRAMER:  That's right, Your Honor, if

8   you put the --

9           THE COURT:  And you don't think there's any

10  solace on any side that could be found in these

11  documents that were executed in connection with the

12  settlement to which you've just referred?

13          MR. KRAMER:  No, I don't, Your Honor,

14  because the settlement was very intentionally

15  constructed to allow this lawsuit to proceed next,

16  which is why we find ourselves here after that

17  proceeding was resolved.

18          THE COURT:  How was that done?

19          MR. KRAMER:  What?

20          THE COURT:  How was that done?

21          MR. KRAMER:  Well, you -- I believe you had

22  the same lawyers involved, and the way it was done is

23  that all of the parties -- the arbitration -- we were

24  not a party to the arbitration.  The plaintiff in the

25  arbitration was Eddystone; the defendants in the

63

1    arbitration included JTS and its parent and the

2    principal who owned the family of companies, James

3    Ballengee.  When a settlement agreement was reached

4    the deal was Ballengee and his companies would pay a

5    certain amount of money, I believe it was a few

6    hundred thousand dollars, they would turn over title

7    to some oil that was sitting in the Eddystone

8    facility, and they would stipulate to a $140 million

9    judgment against JTS, against the subsidiary, and in

10   exchange, they would all be released except for JTS,

11   allowing the other side to use that arbitration --

12   that stipulated arbitration award as a springboard to

13   sue Ferrellgas, Bridger, Mr. Rios, Mr. Gamboa under

14   alter ego and fraudulent transfer theories, the

15   collection action.

16           So the -- circling all the way back around,

17   is this -- is this discovery in aid of execution?

18   No, it's an effort to collect on a debt that was

19   established through this stipulated arbitration

20   award, using that very intentionally to bring us into

21   this proceeding, and it's --

22           THE COURT:  Isn't that a stipulation in aid

23   of execution, an arbitration award reduced to

24   judgment?

25           MR. KRAMER:  It hasn't been confirmed and

1    reduced to judgment.

2            THE COURT:  Oh, because Judge Pauley is

3    holding his case in abeyance until I rule.

4            MR. KRAMER:  That's right.  He's -- I

5    believe the case is stayed until there's been a

6    finding on the alter ego allegations in this case

7    that will allow Judge Pauley to determine whether

8    he's able to confirm the award, although I don't

9    purport to know what's going on in his head.

10           THE COURT:  All right.

11           MR. KRAMER:  But we've gone far afield, so

12   if I may -- I don't want to take too much of the

13   Court's time -- bring it back to the crime fraud

14   dispute and how we can move forward in an orderly

15   fashion?

16           THE COURT:  I'm going to order that you

17   meet and confer to continue this discussion and come

18   up with something that works that isn't front-loaded

19   with lots of ex parte reviews --

20           MR. KRAMER:  Okay.

21           THE COURT:  -- because if we get into too

22   much of that, I'm thinking -- well, it just depends

23   on volume.

24           MR. KRAMER:  Uh-huh.

25           THE COURT:  And I don't do this very often,

65

1    but we might need a discovery master.

2         MR. KRAMER:  That's right, and that's

3    something that's been suggested.  You know, if you go

4    back and you read the motion to enforce the crime

5    fraud order that was filed by the other side that

6    we're talking about right now, what it asks for is

7    two things: an in-camera review of the 117 documents

8    from the sample that Judge Kelly reviewed that were

9    not produced, as well as an in-camera review of

10   around 700 documents from a list that the other side

11   created that also were not produced.  So we're

12   talking about less than 1,000 documents.

13        THE COURT:  But how many pages, on average,

14   are these documents?  I've conducted ex parte reviews

15   where one document is 150 pages.

16        MR. KRAMER:  Uh-huh.

17        THE COURT:  And you're smiling.  Is there a

18   little of that lurking in the background here?

19        MR. KRAMER:  I'm smiling because that's the

20   very question Judge Kelly asked before he transferred

21   the case.

22        THE COURT:  To me?

23        MR. KRAMER:  I don't -- I don't have the

24   precise number in front of me, but I believe it is in

25   the roughly 10,000 to 15,000 page range.  So the

1    documents I guess, on average, are four to five pages

2    long.  But here we are.  That's a good place to

3    start, Your Honor.  These are the documents from the

4    in-camera sample.  And remember, Judge Kelly said in

5    his order that he found a majority, the vast

6    majority, of the documents he reviewed to be

7    responsive and to fall within the four categories,

8    not all of them.  And he said it again in his

9    submission to the Third Circuit.

10               THE COURT:  But his sample was much more

11   broad.

12               MR. KRAMER:  His sample was only 840

13   documents.

14               THE COURT:  Well, more broad in description

15   of what was to be included in the sample.  I think

16   there were 40 subject matters.

17               MR. KRAMER:  That's right.  There were --

18   he identified subject lines, and we gathered all of

19   the emails that had the subject lines --

20               THE COURT:  Subject lines.

21               MR. KRAMER:  -- submitted them, and it

22   totaled 141 documents -- or 841 documents.

23               THE COURT:  And of that number, he directed

24   production of 720-something?

25               MR. KRAMER:  No.

1          THE COURT:  You came up with that?

2          MR. KRAMER:  That's what we produced --

3          THE COURT:  Yes.

4          MR. KRAMER:  -- after we -- see, that's the

5    problem, Your Honor.  We have categories.  We don't

6    have an order -- when this motion was styled, the

7    request was order these four categories of documents

8    subject to the crime fraud exception.  There was no

9    list of documents until after we finished in the

10   Third Circuit.  And Judge Kelly did this in-camera

11   review and he adopted the four categories, but at no

12   time has anyone specified what documents fall into

13   those categories.  So the only thing we can do is

14   what we all do as attorneys when we're trying to

15   comply with a court order whether -- or when we're in

16   discovery.  And what we did was we took the

17   categories, we went through the documents very

18   carefully with a bias towards disclosure, and we

19   looked for any that fell in those categories, and we

20   produced them.  We're not trusted by the other side

21   to make those determinations.  That's a problem of

22   their own making, but here we are.

23          THE COURT:  Well, that can be said in any

24   case.  Frequent --

25          MR. KRAMER:  sure.

68

```
 1            THE COURT:  Frequently, it is.  But,
 2   fortunately, must more frequently, it is not.  And
 3   judges don't oversee this discovery by the ex parte
 4   review process --
 5            MR. KRAMER:  That's right.
 6            THE COURT:  -- very frequently.
 7            MR. KRAMER:  I understand, Your Honor.
 8            THE COURT:  And I want to try -- I want to
 9   try to avoid it.
10            MR. KRAMER:  The only except -- the only
11   pushback I have on that concept -- and I don't
12   disagree at all, but it is very common in the crime
13   fraud context.
14            THE COURT:  Exactly, and we recognize that.
15            MR. KRAMER:  It just sort of wasn't done
16   all the way here, and as a result, we have
17   disagreements.  The parties are at loggerheads and we
18   need someone to arbitrate those disagreements.  And,
19   again, we've offered repeatedly to submit these for
20   in-camera review, but what we can't do -- because,
21   you know, not only are we representing our clients
22   here, but this is the attorney-client privilege.
23   It's not to be taken lightly.  We can't just fork
24   over the documents and waive it all.  I mean there --
25   these are not documents that fall within the four
```

1  categories.

2        THE COURT:  As I'm sitting here hearing

3  you, I'm having a devilish thought, appointing Judge

4  Kelly discovery master in this case.

5        MR. KRAMER:  I may have prompted that

6  devilish thought --

7        THE COURT:  He will --

8        MR. KRAMER:  -- with my prior comment.

9        THE COURT:  I'll tell him you did.  But he

10  will -- he will not love me for that.  And he'll

11  undoubtedly say no.  And I'm being -- that was said

12  completely in jest.  It's -- we've been at it for

13  quite a while, although I find this well,

14  presentation, both sides -- and I'm not through.

15  I'll certainly give other -- the other parties a

16  chance to speak.  But I'm finding it very helpful and

17  a little entertaining.  And the latter thought I

18  never thought I'd say, I'd utter in this case.  You

19  may continue, sir.

20        MR. KRAMER:  Glad to be helpful and

21  entertaining, Your Honor.  And I'll wrap it up

22  because I can take a hint.  The path forward here I

23  think everyone agrees is to find the third party

24  neutral, whether it's a magistrate or a master, to

25  take a look at some subset of these documents.  What

70

1    I hear the Court say is we should confer about that

2    subset.  We can do that.  My suggestion is the place

3    to start here, if we're going to start, is exactly

4    what plaintiffs requested in their motion, which is

5    they look at the documents from the in-camera sample

6    that Judge Kelly reviewed but that we did not

7    produce, about 117 documents, and then look at the

8    documents on their list that we did not produce,

9    which is the 782 documents I referenced earlier.

10          If there are -- if there are to be keyword

11   searches -- again, first time hearing this today and

12   we'll confirm more -- that results in an in-camera

13   review, I think we can make some progress there with

14   the other side, but the letter we received just said

15   hey, these documents almost certainly fall within the

16   order; produce them right away.  There was no -- I'm

17   glad we're moving towards a compromise position.

18          THE COURT:  Well, we are, but as you

19   articulate your position, it seems to me you've got

20   nothing to lose by overproducing, based on what

21   you've told me.

22          MR. KRAMER:  That's right, Your Honor, and

23   I think we did overproduce when we selected the

24   documents that fell within the four categories.

25          THE COURT:  Well, that's a typical

1  response, but I'm talking about from this point

2  forward.  And -- but I can't order that.

3          MR. KRAMER:  That's --

4          THE COURT:  I can tell you that I'm

5  concerned that -- I don't know whether you told me

6  that all of the assets were liened, but if they were,

7  are we tilting at windmills?  I don't --

8          MR. KRAMER:  Yes, we absolutely are, Your

9  Honor.

10         THE COURT:  That's a typical answer from a

11  defense lawyer whose company -- whose company is

12  charged with owing some money.

13         MR. KRAMER:  Well, look, I don't mean to

14  minimize the complexity of the issue because it's

15  not, you know -- it's not as simple as we've

16  discussed today, but it's a big issue in the case and

17  it's one that hasn't drawn a lot of attention and

18  it's one that deserves attention.  Unless the Court

19  has further questions, I will --

20         THE COURT:  No.  No, I do not.

21         MR. KRAMER:  -- go back to my seat and let

22  Mr. Scarborough speak about the schedule.

23         THE COURT:  Right.  We're going to let --

24         MR. AGUSTI:  Your Honor, before Mr.

25  Scarborough speaks -- and I don't want to interrupt.

72

1    I just wanted to respond just very briefly to Mr.

2    Kramer's remarks.

3              THE COURT:  Well, Mr. Scarborough, I don't

4    need to hear about the schedule right now.  What I

5    need to hear about is anyone else's view on what

6    we've discussed so far.

7              MR. SCARBOROUGH:  Because Mr. Agusti had

8    addressed you on the schedule, I was going to come in

9    from behind.  I'm happy to wait until it's time.

10             THE COURT:  Oh, abs -- certainly before I

11   adopt a schedule, I'm going to hear from all sides.

12             MR. KELLEY:  If I could just be briefly

13   heard on behalf of my clients, Your Honor, Mr. Rios

14   and Mr. Gamboa?

15             THE COURT:  Yes.

16             MR. KELLEY:  So, obviously, on this crime

17   fraud issue, we're not directly involved in the sense

18   that they aren't our privileged documents, we don't

19   hold the privilege, and we defer to them on that

20   issue.  The only thing that I would say because

21   there's been a discussion of the merits -- and I

22   think it's important for you, Your Honor, at the

23   beginning of this to kind of appreciate and

24   understand the distinction that my clients operate.

25   My clients were two executives not at the BTS level,

1  but at a level above the BTS level of the company.

2  They weren't officers and directors of that.  And

3  they were involved as executives in this transaction,

4  not in an authoritative way because they didn't have

5  the authority to do that.  It was a member-managed

6  LLC and they were acting at the direction and

7  instruction of their bosses, the CFO of the company,

8  the CEO of the company, et cetera, and somehow we

9  got -- my clients got swept up into all of this.

10         The one point that I would make, Your

11  Honor, broadly, that I think in terms of like the

12  best way to look at this case -- and you've really

13  kind of -- when you asked Mr. Kramer the question --

14  I understand you're simplifying things a little

15  bit about this being a collection action, but that's

16  really what this is.  And what's fascinating, and you

17  hear Mr. Agusti talk about how this contract became

18  uneconomical for BTS.

19         The reality is, Your Honor is that BTS was

20  a midstream energy company.  They just -- they move

21  the oil from one place to another.  And in that

22  sense, they're in exactly the same position that

23  Eddystone was in.  Eddystone is just -- they own a

24  facility that moves oil from trains to barges.  And

25  companies that are in the business of moving the oil,

74

1    they don't buy it, they're not exposed directly to

2    market risk.  So when the spread collapses, Your

3    Honor, or when it becomes uneconomic to move, they

4    have these long-term contracts that they rely upon,

5    and BTS was no different.  BTS had a long-term take-

6    or-pay contact with Jamex, a third party, in which

7    Jamex promised that no matter what happened, whether

8    the contract was economical or not, Jamex was going

9    to keep on paying every single month.  That's the

10   same kind of contract that BTS had with Eddystone

11   that's at issue in this case.

12           Here's what -- here's why this is

13   significant, Your Honor, is what this means is that

14   when you contract with a counterparty and you're a

15   midstream energy company, you recognize that you have

16   indirect exposure to their customers' credit risk.

17   And so whenever these contracts are negotiated, one

18   of the most important aspects of the contract are the

19   financial assurances that you're going to be provided

20   beyond the entity itself.  So what happens if that

21   entity no longer -- if its customers default and its

22   customers can't pay, which is what happened here?

23   What's going to happen?

24           So those are hotly negotiated.  And you can

25   do everything from a parent guarantee that says we'll

1    guarantee everything, and so you can go right to the

2    top, or you can just -- you can have limited

3    financial assurances that are just given by the

4    special purpose entity itself.  Here, Your Honor,

5    when this contract was negotiated, Eddystone did a

6    terrible job of negotiating financial assurances.

7    They didn't get a parent guarantee.  In fact, the

8    guarantees they got were very limited and small, and

9    the teeth they had to enforce them were also de

10   minimis.

11          What this case is really about is an effort

12   by Eddystone, who failed to negotiate good financial

13   assurances up front and obtain a parent guarantee, to

14   get one through the back door by way of a fraudulent

15   transfer claim.  And it's -- what's striking, Your

16   Honor, is there's an email from their own joint

17   venture partner that says that, who's diagnosing what

18   happened here and says the reason this happened to

19   Eddystone is because Eddystone failed to negotiate

20   financial assurances from the counterparty at the

21   beginning.  So I think that's an important point to

22   make.

23          THE COURT:  They're after the money and

24   they claim the money was conveyed fraudulently.

25          MR. KELLEY:  Precisely, if they're right

76

 1   about that.  And that leads me to my second point,

 2   Your Honor.  And you're exactly right, it doesn't

 3   give a party the right to transfer away assets, which

 4   didn't happen here.  But what it does mean is that

 5   when you contract with an entity and you know that

 6   you don't have a parent guarantee, you understand

 7   that that exposes you to risk associated with that

 8   entity.

 9          Let me deal with the issue of the liens

10   because it's everything that Mr. Kramer has talked

11   about, but with respect to my client, it's even worse

12   than that.  The idea here, Your Honor, is there's a

13   thought experiment that you could do and say if

14   instead of transferring these assets that were liened

15   up, let's just say BTS didn't sell and they just said

16   we're going to default and we're going to go into

17   bankruptcy.  The point is Eddystone would have been

18   in no worse position in that circumstance than they

19   are in the circumstance where the company was sold

20   and the assets were transferred, because if BTS just

21   said I'm not going to pay, and the creditors showed

22   up -- Eddystone showed up in bankruptcy and they said

23   we need to execute on this $140 million judgment that

24   we've got against BTS, then the bankruptcy judge is

25   going to say you got a problem, you've got Bank of

77

1    America with a priority lien in front of you.

2           That's all that happened.  But it's even

3    worse, Your Honor, for my client because unlike BTS,

4    my client is not a transferee.  We didn't receive any

5    of these assets, and to this day, Your Honor, when we

6    talk about weird kind of things that haven't been

7    focused on, none of these assets that they're

8    complaining about ended up in my client's bank

9    account, on my client's balance sheet.  They're just

10   guys that are in mid-level, executive positions in

11   this big, sprawling Ferrellgas entity.

12          THE COURT:  Didn't Judge Kelly rule on

13   this?

14          MR. KELLEY:  He has not ruled on this

15   issue.

16          THE COURT:  Well, no, he ruled.  There was

17   a motion to dismiss filed on behalf of your client.

18          MR. KELLEY:  There was -- on grounds that

19   had to do with whether there were fiduciary duties

20   that apply.  Whether -- it basically turned on

21   whether Delaware law applies or -- excuse me, whether

22   Pennsylvania law or Louisiana law applied.  And it

23   was a pleading -- it was a pleading on the -- or a

24   motion on the pleadings, a motion to dismiss.  This

25   is a summary judgment point that will get briefed to

78

1   the Court at some point.  But the problem, from my

2   client's perspective with the whole fraudulent

3   transfer claim --

4           THE COURT:  Well, I don't know what he -- I

5   haven't read the complaint in detail.

6           MR. KELLEY:  Yes, Your Honor.

7           THE COURT:  I do know that Judge Kelly

8   ruled --

9           MR. KELLEY:  He did.

10          THE COURT:  -- and I don't remember whether

11  it was a 12(b)(1) or 12(b) -- 12(b)(1)?

12          MR. KELLEY:  (6).

13          THE COURT:  (6).

14          MR. KELLEY:  Yeah.

15          THE COURT:  12(b) --

16          MR. KELLEY:  There was a 12(b)(6) filed at

17  the outset of the case where we pointed out -- we had

18  some jurisdictional issues, personal jurisdiction

19  issues that he overruled and denied that motion.  And

20  then we had some claims that had to do with the fact

21  that we -- he -- they have a breach of fiduciary duty

22  claim, and one of our arguments was as a matter of

23  law --

24          THE COURT:  So you moved to dismiss part of

25  the complaint?

79

1              MR. KELLEY:  Yeah, we moved to dismiss the

2     breach of fiduciary duty claims.  Yes.  And he

3     denied -- he denied that on the basis -- on the basis

4     that we moved on in that 12(b)(6) motion.  We've

5     subsequently moved on this 12(b)(1) motion where we

6     pointed out that under this recent case decided by

7     one of the sister -- your sister courts here, that a

8     plaintiff has to bring a claim derivatively --

9              THE COURT:  But Judge Baylson disagrees.

10             MR. KELLEY:  What's that?

11             THE COURT:  Judge Baylson disagrees.  You

12    said "sister court."  You mean one of my fellow

13    judges?

14             MR. KELLEY:  Yes, it's the -- Your Honor,

15    which case -- it's the -- it's the case -- it's the

16    recent case that was -- it was a 2019 case.  It's the

17    Artesanias Hacienda Real S.A. case.

18             THE COURT:  That's on appeal now, isn't it?

19             MR. KELLEY:  Yeah, I believe it -- I don't

20    know, actually.  I believe it's -- I believe it's on

21    appeal.  But it was a situation where --

22             THE COURT:  That's what I said.

23             MR. KELLEY:  Yeah -- where the court found

24    that a claim for breach of fiduciary duty in a

25    context like this where you're bringing a claim

80

1   against officers and directors and you're saying I'm

2   claim -- I'm saying you breached your fiduciary duty

3   on behalf of the company, it's a derivative claim.

4   It would be the same if you brought it on behalf of

5   shareholders.

6           THE COURT:  Other -- but you said one of my

7   sister judges.

8           MR. KELLEY:  In the Eastern District of

9   Pennsylvania.

10          THE COURT:  Yes.

11          MR. KELLEY:  Yeah.

12          THE COURT:  Another judge ruled the other

13  way.

14          MR. KELLEY:  Which judge was that?

15          THE COURT:  Judge Baylson.

16          MR. KELLEY:  In which case, Your Honor?

17          THE COURT:  It will take me a second.

18          MR. KELLEY:  I know that there is something

19  in their briefing about the -- about the Bruno case,

20  which they claim went the other direction, Your

21  Honor, but of course we -- as we point out in our

22  reply brief, we fundamentally disagree with their

23  reading of that case, the -- I don't know if you're

24  talking --

25          THE COURT:  Baylson's --

81

1          MR. KELLEY:  -- about the In re Bruno case.

2          THE COURT:  Baylson's opinion was Impala,

3    but we're not -- we don't have to go there.

4          MR. KELLEY:  Yeah, in any case -- yes, Your

5    Honor.  And I don't mean to get off on that rabbit

6    trail.  My point was --

7          THE COURT:  Because you're -- you pointed

8    to a case that, at least in this district, there is

9    conflicting law.

10          MR. KELLEY:  The most recent opinion from a

11    court in this district is the Artesanias case from

12    last year, 2019, and that's where they these --

13          THE COURT:  Nick, who decided that case?

14    Do we know?

15          MR. KELLEY:  Yeah, 2019.  It was decided

16    August of 2019.

17          THE COURT:  Yes, that was decided by Judge

18    Smith --

19          MR. KELLEY:  Okay.

20          THE COURT:  -- in Eastern --

21          MR. KELLEY:  That makes sense.  That sounds

22    right.  But just so you can appreciate again how my

23    client is situated differently, the -- in addition to

24    having this lien standing in front of them, the other

25    problem they have, with respect to my client, is we

1   didn't benefit from this.  We didn't get -- the

2   assets weren't transferred to us, they didn't end up

3   in our bank account, they didn't end up on our

4   balance sheet.  The best that they have been able to

5   say is that well, you owned shares, you were one of

6   thousands of unit holders in publicly-traded

7   Ferrellgas.  And so some theory is that you

8   benefitted in some way there even though -- the

9   problem is the stock price fell precipitously

10  following this.

11          So I bring all that up so the Court has an

12  appreciation I think of how we're situated

13  differently.  We share many of the same defenses with

14  the Ferrellgas lawyers in terms of the merits of the

15  case, and we share their opinions on the crime fraud

16  issues to the extent it matters though, it's not our

17  privilege.  But we have a number of additional

18  defenses that are unique to our clients because they

19  were individuals who were not involved in these

20  decisions -- well, were involved in them, but only in

21  the extent that they were acting at the instruction

22  and direction of their -- of their -- people that

23  they worked for, their bosses, and didn't benefit.

24          THE COURT:  Aren't you getting into a

25  summary judgment argument now?

83

1          MR. KELLEY:  No --

2          THE COURT:  I don't --

3          MR. KELLEY:  You will.  You will, Your

4    Honor.

5          THE COURT:  I don't --

6          MR. KELLEY:  And I just wanted to point --

7          THE COURT:  Oh, I thought that's what I was

8    hearing now.

9          MR. KELLEY:  I just wanted to point that

10   out to Your Honor so you had an appreciation for the

11   kind of ground rule -- the context and background.

12         THE COURT:  What I'm struggling with now is

13   getting this case on track.

14         MR. KELLEY:  Yes, Your Honor.

15         THE COURT:  And what you want -- what you

16   want to happen is to get it on track --

17         MR. KELLEY:  Yes.

18         THE COURT:  -- absent your clients.

19         MR. KELLEY:  We would love --

20         THE COURT:  I think that's -- well, I know

21   you would love that and that's why you presented it

22   to me.

23         MR. KELLEY:  We would love to have

24   discovery completed quickly so we can file this

25   motion for summary judgment and my client can go back

84

1   to their normal lives, Your Honor.  That's our

2   position.

3            THE COURT:  Well, that certainly is a goal

4   to be desired for everyone --

5            MR. KELLEY:  Yes, Your Honor.

6            THE COURT:  -- including all of the

7   lawyers.

8            MR. KELLEY:  Yes, Your Honor.  Thank you,

9   Your Honor.  That's all I ask.  That's all I have.

10           MR. AGUSTI:  Your Honor, I just wanted to

11  respond briefly, primarily to what Mr. Kramer said --

12           THE COURT:  Well, before you do, I want you

13  to move -- we're going to set a schedule for the meet

14  and confer and getting back to me, and --

15           MR. AGUSTI:  Yes, sir.

16           THE COURT:  -- I want you to move on that

17  quickly.  It sounds like we have the seeds -- and

18  I'll use that term -- of an agreement, and that's,

19  well, a substantial accomplishment.

20           MR. AGUSTI:  Your Honor, absolutely.  Just

21  to be clear -- and the reason I'm doing this is to be

22  clear -- our letter actually -- not only does our

23  letter suggest that if the documents are voluminous,

24  that we consider a special master to handle the

25  issue, but we also were quite specific that we never

85

1    suggested that the documents that came up on the

2    keywords should be turned over to us willy nilly.

3          THE COURT:  All right.  Well --

4          MR. AGUSTI:  We suggested that it be turned

5    over to a magistrate or special master.

6          THE COURT:  Okay.

7          MR. AGUSTI:  If there's any thought that we

8    disagree on that, then I wanted to make sure that

9    that's laid to rest.

10          On the lien issue, Your Honor, I just want

11    to be clear that there's something that hasn't been

12    mentioned here, which is that the bank filed its lien

13    the day after these gentlemen had entered into an

14    agreement to distribute all of the assets of BTS to

15    other entities.  There's well-established law in this

16    circuit that an upstream guarantee, which is what

17    this would be -- it would have been a lien securing

18    an upstream guarantee -- is only good if the entity

19    that's giving the guarantee is -- benefits or

20    receives a benefit from that -- from that guarantee.

21          By definition, if an -- if an entity is

22    torn completely apart after the lien is filed -- or

23    before the lien is filed, that guarantee is

24    fraudulent transfer itself, the lien is a fraudulent

25    transfer.  In fact -- and I wanted to be very clear

1    that while we are -- want more documents because,

2    Your Honor, we're entitled to more documents, those

3    4,500 documents include very good documents,

4    including --

5            THE COURT:  The numbers keep changing.

6    I've got a lot of numbers on my yellow pad.

7            MR. AGUSTI:  Yes, Your Honor.

8            THE COURT:  I thought we were -- we were

9    down to 25,000, at least someone said.  That's right,

10   it was you, 25,000 documents.

11           MR. AGUSTI:  No.  Yeah, let me tell you

12   about the --

13           THE COURT:  You're going to -- you're going

14   to narrow that list.

15           MR. AGUSTI:  We're going to narrow it.

16   Your Honor, there are 65,000 entries in their log, so

17   that's actually 65,000 documents.  I said 100,000.

18   Those are the number of pages that we understand are

19   involved.  So it's about 65,000 documents.  I would

20   stand corrected if that's wrong, but it's 100,000

21   pages.  And hope would be that -- and I think that

22   it's a good hope -- that through cooperation with

23   counsel perhaps, we could get it to a narrower group

24   of documents that if Your Honor is not excited about

25   going through all of them, perhaps we can have the

 1   magistrate or a special master review the documents.

 2          So I do think we do have largely an

 3   agreement here, but we may need some assistance, Your

 4   Honor, in determining, for example, the keywords.  We

 5   hope we can do this all agreeably, but if not, then

 6   we would probably want to try to get back to you on

 7   that.

 8          Finally, Your Honor, I would say since

 9   there was an argument on the motion made here on the

10   Artesanias Hacienda case, Your Honor, that case was

11   nothing like what Mr. Fielding said.  That case is a

12   bankruptcy case, and it says that in a bankruptcy

13   case, a bankruptcy trustee brings a fiduciary duty

14   claim on behalf of the estate, as is usually the case

15   for a bankruptcy estate creditor.  So I think --

16          THE COURT:  It's a derivative suit --

17          MR. AGUSTI:  It -- well --

18          THE COURT:  -- under your -- under

19   Artesanias.

20          MR. AGUSTI:  In Artesanias, it doesn't talk

21   about a derivative suit.  It's actually talking about

22   the --

23          THE COURT:  And there's another reason why

24   Artesanias is not squarely on point.

25          MR. AGUSTI:  Yes, Your Honor.

88

1          THE COURT:  It addresses an issue that,

2    quite frankly, I haven't had any contact with before,

3    but it's called deepening insolvency.  I'm certain

4    everyone in the room knows what that means.  I didn't

5    when I first -- when I first read it.  It's a unique

6    scenario.  And deepening insolvency claims are

7    handled differently than --

8          MR. AGUSTI:  Yes, Your Honor.

9          THE COURT:  -- routine claims.

10          MR. AGUSTI:  So, Your Honor, I -- that's

11    all -- that's all I had to say.

12          THE COURT:  Well, what we're going to do on

13    this issue, before I hear from Mr. Scarborough and

14    whoever will speak for the plaintiffs on the

15    schedule, we're going to come up with a framework.

16    We're not going to go into scheduling right at this

17    minute.  We're going to come up with a framework for

18    the way in which the discovery issue should be

19    presented.  I'm going to order a meet and confer, and

20    I think it might be better -- and I draft almost all

21    of my orders, but I think it might be better if you

22    meet and confer and send me an agreed upon.  That's

23    really a directive.  I don't want any horsing around.

24    I want an agreement on a form of order and a

25    procedure to be followed that makes sense in the

1    context of this case.  And I think with what we've

2    accomplished today -- and we really accomplished a

3    lot more.  I haven't ruled on much of anything, but I

4    think we've set the stage for moving the case

5    forward.  You know how I'm going to handle the case.

6    You've gotten some idea of that today.

7         What we'll do, we're not going to convene

8    everybody.  I know your law firms, but what I don't

9    know is how close to Philadelphia you are.  I suspect

10   not many of you are local, local.  Is that a correct

11   statement?

12        MR. SCARBOROUGH:  That's fair, but we're

13   not far away.

14        MR. AGUSTI:  Your Honor, I'm just in

15   Washington, D.C., close as the Acela.

16        THE COURT:  Okay, thank you.

17        MR. KELLEY:  We can get here when you need

18   us to, Your Honor.

19        THE COURT:  Well, then when I deal with

20   everyone else by telephone, you can train up if you

21   would like.  No, we'll deal by telephone.  And what

22   I'll do is identify the agenda in advance and give

23   you an opportunity to add to the agenda and then

24   schedule -- and maybe we'll do it today, as a matter

25   of fact, but we'll schedule with liaison counsel, and

1    liaison counsel can bring anyone else into the --

2    into the telephone conference, and we'll record the

3    telephone conferences.  It's the way I handle MDLs

4    and it works.  I think I was one of the first judges

5    to start doing that in the early 2000s, late 1990s,

6    and it has caught on because most of my colleagues

7    all over the country are doing it now instead of

8    dragging everybody here.  My mentor, as an MDL judge,

9    had a contrary view.  He wanted everyone in the

10   courtroom and would do that monthly, and I don't

11   think that works.

12           The first thing we're going to schedule is

13   the submission of a joint report, meet and confer, to

14   address all discovery issues and submit a proposed

15   order, including identification -- I don't know

16   whether I'm going here.  I might go with a magistrate

17   judge -- identification of a special master for

18   discovery on which you agree.  I'm going to leave to

19   you the way in which the payment should be handled,

20   but certainly the parties will pay for the special

21   master if we go that route.  The alternative would be

22   using a magistrate judge.

23           All right.  How much time do you need to do

24   that?

25           MR. AGUSTI:  Your Honor, ten days would be

1    fine for us.

2            MR. SCARBOROUGH:  Likewise.

3            THE COURT:  Really?  Is that enough time?

4            MR. SCARBOROUGH:  Well, we --

5            THE COURT:  I don't --

6            MR. SCARBOROUGH:  -- were whispering two

7    weeks, but Mr. Agusti said ten days.  As you'll hear

8    from me in a minute, we're not looking to delay this

9    unwarrantedly, so if Me. Agusti thinks we can have a

10   proposal and a response in ten days, we'll work very

11   hard to meet it.

12           THE COURT:  Okay.  Does that -- what is

13   that, next Friday (indiscernible)?  Not here.

14   Someone with a calendar?  I guess I have to get my

15   own calendar.

16           (Pause in proceedings.)

17           MR. SCARBOROUGH:  6th.  March 6th, Your

18   Honor.

19           THE COURT:  Okay.  Is that -- that's --

20   it's a Friday.  Okay.  March 6th.  If more time is

21   needed, then simply drop me an email and you'll have

22   it.  I think we're really moving in the right

23   direction on resolving the discovery disputes.  And

24   maybe there aren't as many discovery disputes as

25   there were at the beginning of this conference.  It

92

seems to me some of the issues have been addressed,

and I think you might have a different perspective on

them.  I'm still a little concerned about the lien

Mr. Agusti came up with, an issue -- I'm not a

commercial transactions -- well, certainly not a

commercial transactions judge.  I almost was a

commercial transactions lawyer, but I did not go with

that law firm.

The bottom line, I want you to try to reach

agreement that works, something that is feasible.

And keep in mind that if you've got nothing to lose

from the defense, it's better to disclose subject to

whatever protections you need.  If the documents say

what you say they say, then -- don't rely on

principle, with an L-E, to cause me to have to figure

out how to -- how to, well, get through this

discovery issue.

All right.  Now, Mr. Scarborough, do you

think we ought to go ahead and schedule now and leave

it the way it is -- the way the schedule reads now,

beginning four weeks after I rule?

MR. SCARBOROUGH:  Well, we had -- our time

periods -- well, first, let me back up.  I'm Larry

Scarborough.  I represent Bridger and Ferrellgas.

And because Mr. Agusti and his team have one schedule

1   and ours is longer, I wanted to start by saying if

2   you add all theirs up, I think we're now all

3   coalescing around the notion that the trigger point

4   is the resolution of the scope of the crime fraud

5   production.

6           THE COURT:  Well, that's where you start --

7           MR. SCARBOROUGH:  That's right.

8           THE COURT:  -- but their --

9           MR. SCARBOROUGH:  And that's where I wanted

10   to pick up.

11           THE COURT:  Plaintiffs are I think at --

12           MR. SCARBOROUGH:  They're at --

13           THE COURT:  No, you're at -- you're at 30-

14   some odd months and they're at 50.

15           MR. SCARBOROUGH:  I did my --

16           THE COURT:  Who is going --

17           MR. SCARBOROUGH:  I did my homework while

18   the rest of the crew was arguing.  So if you follow

19   the schedule from the plaintiffs, it's 35 weeks --

20           THE COURT:  For them, and 52 --

21           MR. SCARBOROUGH:  -- from the trigger

22   point, 53 weeks --

23           THE COURT:  Okay.

24           MR. SCARBOROUGH:  -- from us.  So to

25   recommunicate the point I just made, we're not

1    looking to overly delay this.  My overarching view is

2    that our schedule is more practical from a -- just a

3    stepping through a very large case with a big record.

4    But I came to the podium to talk about one particular

5    date for Your Honor and that's the first one, whether

6    the fact witness depositions can be completed in six

7    weeks or ten.  That's the one for which I want to

8    advocate for, ten, and here's the reason why.

9             We're all agreed that there are nine

10   depositions.  There are names attached to those

11   depositions.  Two of them are 30(b)(6) depositions,

12   one for each side.  The parties have relative control

13   over the deponents and the scheduling.  That leaves

14   seven.  Two of them are the individual defendants,

15   Mr. Rios and Mr. Gamboa, over whom -- for whom Mr.

16   Fielding can speak.  That leaves five.  Those are

17   four ex-Ferrellgas employees and one Akin Gump

18   partner in connection with obviously the crime fraud

19   proceedings.  We know who those people are.  The

20   lists were exchanged before.  We keep in touch with

21   those individuals, but they have other jobs.  They

22   have moved on with their lives and have other

23   commitments.  So when it comes to scheduling them,

24   we're not going to be able to say, even if counsel

25   were to agree, date X is the date.  The employers of

95

1    those individuals are going to have something to say

2    about it.

3              So based on the fact that we all know we've

4    taken 11 of the depositions, and looking how long

5    that took --

6              THE COURT:  How long was the average

7    deposition?

8              MR. SCARBOROUGH:  The average deposition

9    went all day, consistent with the -- consistent with

10   the federal rules, and I think some may have gone

11   longer.  I can't recall.  Maybe it's because Mr.

12   Ballengee has been deposed several times, so there's

13   a lot of transcript on him.

14             In any event, we just think -- and I know

15   that Your Honor would tell us, and I've heard this

16   before, that the schedules of the three sets of

17   lawyers involved don't matter, but the reality is

18   when we take those sets, plus the ex-employees, our

19   position is, from a practical position, ten weeks

20   seems more doable than six.  And that's really all I

21   have to say about the schedule.  The other dates are

22   the ones that we contend are more reasonable, but of

23   course that's all up to the Court.  And I'll end

24   there unless you have questions.

25             THE COURT:  No, I don't, although I think

1    what we'll do when I'm finished hearing from all of

2    you on the schedule, we'll go over the schedule line

3    by line because, for example, fact depositions will

4    last either six weeks or ten weeks or something in

5    between.

6              MR. SCARBOROUGH:  The -- and that's what I

7    just --

8              THE COURT:  I know.

9              MR. SCARBOROUGH:  -- addressed.

10             THE COURT:  I understand.  The very next

11   item on the list, expert reports, two weeks after

12   completion of fact depositions for plaintiff, four

13   weeks after completion of fact depositions for

14   defendants.  That tells me you don't intend to use

15   the -- all of the fact depositions for your expert

16   witness reports.

17             MR. SCARBOROUGH:  We do, which is why we

18   advocated for four.  We just think getting the

19   transcript together and putting it in and then

20   getting to the reports is not something that can be

21   accomplished in two weeks, but that's just me.

22             THE COURT:  Well, that's something I spend

23   a lot of time with as a lawyer.  And I get proposals

24   from lawyers where the fact depositions end and the

25   expert witness discovery begins same day.  By

1   "begins," I mean the person with the burden of proof

2   submits an expert witness report, same day.  That

3   never worked in real life for me.  And in real life,

4   when I questioned the lawyers who make that type of

5   suggestion, they say we had never thought of that.

6   That's the answer.  But I think about it because it's

7   something I did over and over and over again.

8          MR. SCARBOROUGH:  And so --

9          THE COURT:  So we're going to go over this

10  list.  I gather that you're pretty much in agreement

11  for the defense, although I'll hear from anyone

12  else -- the defense are pretty much in agreement with

13  the plaintiff's proposal except for the completion of

14  fact depositions?  You want ten weeks, they want six

15  weeks?

16          MR. SCARBOROUGH:  And we think for the very

17  reason Your Honor has stated, that some of these

18  other times need to be elongated to allow for the

19  record to be solidified so it can be used in a

20  meaningful fashion to present to Your Honor --

21          THE COURT:  You didn't say this.

22          MR. SCARBOROUGH:  -- the arguments in the

23  case.

24          THE COURT:  You didn't say that.  I was the

25  one who said that.

1          MR. SCARBOROUGH:  You did, but that was my

2   point on six versus ten, and I --

3          THE COURT:  Oh, for that?

4          MR. SCARBOROUGH:  Yeah.

5          THE COURT:  But that was just -- this is

6   after resolution of the motion to enforce.  And

7   perhaps there's -- well, certainly --

8          MR. SCARBOROUGH:  And, Your Honor --

9          THE COURT:  -- certainly that would give --

10  that's a time when the experts would have to, well,

11  begin to review the documents that were produced.

12         MR. SCARBOROUGH:  And what I said was I was

13  agreeing with Your Honor that we would like to use

14  all the fact witness depositions, which is why we

15  proposed four weeks instead of two as the kickoff

16  time for even expert reports.  But Mr. Agusti or

17  whomever on his side can address the reason for two.

18  I'm happy to do this any way -- any way you want.

19         THE COURT:  All right.  Thank you very

20  much, Mr. Scarborough.

21         MR. SCARBOROUGH:  Thank you.

22         THE COURT:  Let me hear from the rest of

23  the defendants.  They might defer to Mr. Scarborough.

24         MR. KELLEY:  We defer entirely to him on

25  this.  We share -- we share his concerns and

99

1     (indiscernible).

2              THE COURT:  Mr. Scheff?

3              MR. SCHEFF:  Your Honor, this is a non-

4     discovery request.  It's a personal request.  I have

5     a family matter in New York.  I have a child in a car

6     outside this courthouse, and so if I can be excused

7     from the proceeding, I would appreciate that.

8              THE COURT:  Absolutely.

9              MR. SCHEFF:  Thank you.

10             THE COURT:  You may be excused, Mr. --

11             (Pause in proceedings.)

12             MR. AGUSTI:  Yes, Your Honor, I'm just

13    going to address the two things that Mr. Scarborough

14    addressed.  Certainly, Your Honor, we do have --

15    there are a number of witnesses that are not

16    controlled by the parties, but, basically, we are

17    going to have six weeks to do this, and unless

18    there's a particular preference for one witness

19    coming after another, which we are basically not --

20    we don't think it's necessary to delay depositions to

21    do that, we ought to be able to approach once we know

22    what the -- what the starting date is, we ought to be

23    able to approach these folks and give them a choice

24    of any day within six weeks, and they ought to be

25    able to find a date within six weeks.  It's

100

1  relatively -- there might be an extraordinary

2  circumstance that I can't think of right now, Your

3  Honor.  And I'm sure that if something like that

4  happens, we would accommodate it.  But, Your Honor, I

5  think that six -- that giving witnesses a choice of

6  any of -- any day within six weeks is perfectly

7  adequate to take care of the schedules of

8  individuals.

9          As for the expert -- the initial expert

10  reports being only two weeks as opposed to four

11  weeks, Your Honor, we would anticipate -- we also do

12  intend to use the -- very much intend to use the fact

13  depositions as part of what's in the expert reports,

14  but we would expect that this would be a process that

15  would be ongoing, even as the fact depositions are

16  going, that we would be in consultation with experts

17  so that they could incorporate the testimony in their

18  reports.  And so that the final two weeks, the way we

19  view it -- and, again, we don't want to be

20  unreasonable -- but we view it is that we would --

21  there would be an incorporation and putting --

22  finalizing really the expert reports during that two-

23  week period.  So that's what we would say on that.

24  You know, we are over three years now in this case

25  and we are quite anxious to move forward.

1          THE COURT:  And that's what we're going to

2  do.

3          MR. AGUSTI:  Yeah.  And so, Your Honor --

4          THE COURT:  Well --

5          MR. AGUSTI:  -- that's all I really had to

6  say on those -- on those two points.

7          THE COURT:  Fine.  Well, we're going to go

8  over the schedule now.  Thank you.

9          MR. AGUSTI:  Thank you, Your Honor.

10         THE COURT:  I think if we're to adopt a

11  schedule now, it has to be framed in the same way as

12  the proposed schedules, defendants' and plaintiff's.

13  In other words, it has to be keyed to the resolution

14  of the motion to enforce.  Those documents I think,

15  if there are to be any additional documents produced,

16  must be produced before we go through the rest of the

17  schedule.

18         Maybe I've taken more depositions than you

19  have, Mr. Agusti.  I stopped counting, but it was

20  somewhere around 2,500 or 3,000.  It was an

21  incredible number.  And I always had difficulty

22  scheduling depositions, notwithstanding how

23  reasonable your presentation was.  But I think we'll

24  allow ten weeks for the completion of fact

25  depositions.

102

1              As far as the next item, expert reports, I

2      think we'll compromise and give the defense one less

3      week and the plaintiffs one additional week, three

4      weeks, and the same for the rebuttal reports, the

5      responsive reports, three weeks.

6              (Pause in proceedings.)

7              THE COURT:  And three weeks for rebuttal

8      reports as well.

9              You're allowing five weeks to complete

10     expert witness depositions.  Is that enough time?

11     Too much time?  That's the defense.  Plaintiff says

12     three weeks.

13             MR. SCARBOROUGH:  Defendants said five

14     weeks, plaintiff said three.  Five weeks, to us,

15     makes more sense given the number of experts we're

16     likely to see on both sides.

17             THE COURT:  How many experts do you think

18     you're going to see?

19             MR. SCARBOROUGH:  Speaking for us, it's a

20     handful, like on the order of five, let's say, maybe

21     plus or minus one.

22             THE COURT:  Is that for all the defendants?

23             MR. SCARBOROUGH:  Only for the Bridger and

24     Ferrellgas defendants I'm speaking of.

25             MR. KELLEY:  We anticipate having maybe

1    two, Your Honor.

2            MR. AGUSTI:  Your Honor, we anticipate

3    about five.

4            THE COURT:  Five.  That's 12.  Three weeks

5    to take 12 depositions.  You'll have to have

6    deposition tracks.  Is that what you want to do?

7            MR. AGUSTI:  That's certainly what we

8    anticipated doing, Your Honor, but if Your Honor

9    wants to --

10           THE COURT:  I don't know how many tracks --

11   you don't have enough lawyers to require a number of

12   tracks.

13           MR. AGUSTI:  Oh, Your Honor, the people in

14   this room are a small subset of the people working on

15   these cases.

16           THE COURT:  Just keep in mind that it's all

17   of you and there's one of us and a law clerk, a very

18   able law clerk.

19           MR. AGUSTI:  Yes, Your Honor.  Your Honor,

20   if Your Honor feels we need more time for --

21           THE COURT:  Yes, I do.

22           MR. AGUSTI:  -- depositions, of course.

23           THE COURT:  Only because my experience

24   tells me if you want to take 12 depositions -- and in

25   this case, 12 experts, we're going to have pretty

1   close to 12 depositions -- you need more time.  And

2   I'm not sure the defense time is sufficient, but

3   we'll start there, five weeks.

4           Let's talk about settlement.  What I

5   generally do with regard to settlement is I pick a

6   settlement report date, and it doesn't necessarily

7   have to come after all of the work that we've

8   addressed that would go into the schedule before this

9   item on the -- on the schedule.  I agree with you

10  that it's a good idea to explore settlement before

11  summary judgment motions have to be prepared and

12  ruled on.  And I generally require the parties to

13  meet and confer and come up with an answer to the

14  question whether they believe a settlement

15  conference -- or settlement conferencing -- in this

16  case, it would not be one conference -- before a

17  magistrate judge or some other form of ADR, private

18  mediation, for example, might be of assistance in

19  resolving the case.  And if yes, you tell me what the

20  parties agree and when you would be ready to proceed.

21  Does that work better than providing for before --

22  well, certainly I want it before summary judgment.

23  But does that -- it gives you more flexibility.

24          (Pause in proceedings.)

25          MR. SCARBOROUGH:  We're happy to have more

105

1    flexibility.  We would be very interested in

2    (indiscernible) --

3             THE COURT:  I mean you might decide --

4    well, have you had any settlement discussions?

5             MR. SCARBOROUGH:  There have been

6    conversations between Mr. Agusti and myself --

7             MR. AGUSTI:  That's right.

8             MR. SCARBOROUGH:  -- yes.

9             MR. AGUSTI:  That's right, Your Honor, but

10   I -- as Mr. Scarborough says, I think that we would

11   want to have some flexibility as well.

12            THE COURT:  Well, then we won't put it off.

13   I haven't counted the number of weeks, but -- well,

14   has anyone counted the number of weeks I've allowed

15   and when it takes us?  End of summer?

16            MR. KELLEY:  I've got 25, Your Honor,

17   through the completion of expert discovery.

18            THE COURT:  So that's six months.  That's

19   going to take us to August.  Well, my superstar

20   magistrate judge retires June 30th.  I'm just putting

21   that out there.  If I were to ask you to pick a

22   settlement report date, and it would be a date for

23   writing a very short letter, not docketed, so you

24   don't have to do any redacting, the bottom line, it

25   would read, "Has case settled?"  You would tell me

106

1  case settled or not.  If not, you would tell me we

2  agree -- or our clients agree that settlement

3  conferencing before your magistrate judge or private

4  mediation or any other form of ADR -- I chaired the

5  court's ADR Committee until we decided we would fold

6  it into the Civil Rules Committee.  But any other

7  form of ADR might work, summary jury trial, things of

8  that sort.  I'm open to whatever you might suggest.

9           MR. AGUSTI:  Your Honor --

10          THE COURT:  Leave that flexible and have

11  you try to pick a date today with the understanding

12  that if you want to initiate this process sooner, you

13  can.  If the date we pick today is too soon -- and it

14  might be -- tell me and you'll get a later date.  The

15  purpose of this provision is to cause you all to

16  think about settlement at an appropriate time when

17  you think it's appropriate, nudged a little by the

18  Court.

19          MR. AGUSTI:  Your Honor, we would love to

20  take advantage of your superstar magistrate, and if

21  June 1 is a date that works, we would be happy to

22  have June 1 be the date.

23          THE COURT:  Well, I think maybe you ought

24  to -- and you can powwow now if you -- if you can

25  agree on a date now.  Otherwise, I can pick a date at

1   random.  And, again, it's very flexible.  If the date

2   works, great.  If it doesn't, if it's too late, you

3   can advance it.  If it's too soon, you can tell me,

4   Judge, we need more time --

5           MR. SCARBOROUGH:  So counsel --

6           THE COURT:  -- and you'll get it.

7           MR. SCARBOROUGH:  Counsel has thrown out

8   June 1st.  I'm onboarding your statement, Your Honor,

9   that it might well take -- and I agree with this --

10  more than one session, so I'm won --

11          THE COURT:  Oh, I'm sure.

12          MR. SCARBOROUGH:  -- I'm sure -- I'm

13  wondering whether June 1 is kind of pushing to be

14  late.

15          THE COURT:  It's pushing my magistrate

16  judge, who is not going to appreciate what I'm doing

17  to her now, not going to appreciate that.

18          MR. SCARBOROUGH:  So maybe May 1 sounds

19  like a better date, but if you prefer to have us meet

20  and confer, we're very likely to come up with

21  something in there, but I would just push it back 30

22  days.

23          THE COURT:  May 1 will give us really about

24  70 days.  Hopefully, you'll have more documents by

25  then.

108

1          MR. AGUSTI:  Your Honor --

2          THE COURT:  And I don't --

3          MR. AGUSTI:  Your Honor, our principal

4    problem, of course, is that we would like to have the

5    documents before we have the settlement conference.

6          THE COURT:  You're right.  And I said,

7    hopefully, you will have more documents by then.  If

8    the date we pick -- first of all, selfishly, I'd like

9    to get for this magistrate judge a going-away

10   present, and this would be a fitting present.  He is

11   really very, very good.  But May 1st is better than

12   June 1st because I think there will absolutely be a

13   need for more than one conference.  But, again, to

14   raise your comfort level, if the date we pick today

15   is too soon, just tell me and you get it.  It's

16   automatic.  It's your call.  And if it's too late,

17   that would please me.  You can just advance it.  Just

18   write to me and tell me to initiate the process.  The

19   process I initiate by issuing an order referring the

20   case to the magistrate judge for settlement

21   conferencing.  I generally provide for vacating the

22   schedule, and that would be your call.  In other

23   words, while you're embarked in settlement

24   conferencing, I will vacate or will consider vacating

25   the schedule.  If the case doesn't settle, you report

109

1    to me within seven days and submit a proposed

2    schedule for further proceedings at that point.

3    Hopefully, the case would settle.  But we'll pick a

4    May 1st or -- let me just check the calendar and make

5    sure that's a weekday.

6           (Pause in proceedings.)

7           THE COURT:  It's a Friday.  Good.  May 1st,

8    settlement report date.

9           (Pause in proceedings.)

10           THE COURT:  Do you want to go forward and

11   schedule summary judgment?  We're not going to -- I

12   don't think I want to schedule beyond summary

13   judgment today, but do you want to schedule the

14   filing of summary judgment motions?  Plaintiffs

15   first.

16           MR. AGUSTI:  It makes sense to us.

17           THE COURT:  I'm sorry, plaintiffs not

18   first.

19           MR. AGUSTI:  It makes sense to us, Your

20   Honor.

21           THE COURT:  Plaintiffs not first.  It makes

22   sense not to file them.  Defense?

23           MR. SCARBOROUGH:  Agreed.

24           THE COURT:  Defer -- oh, I'm sorry, go

25   forward with it today?

110

1              MR. SCARBOROUGH:  I think I agree with Mr.

2    Agusti, who just said maybe we don't schedule summary

3    judgment --

4              THE COURT:  All right.

5              MR. SCARBOROUGH:  -- until after we see

6    where we are on settlement.

7              THE COURT:  All right.  Well, I'll go ahead

8    and do the schedule --

9              MR. AGUSTI:  Your Honor, I --

10             THE COURT:  -- based on what we've done so

11   far.  And you'll remember the key issue that is

12   triggering everything, and that is the discovery --

13             MR. AGUSTI:  Yes, Your Honor.

14             THE COURT:  -- proposal.

15             MR. AGUSTI:  And if I may?  I actually --

16   maybe I was misunder -- I stopped in mid-sentence

17   because I didn't want to interrupt Your Honor.  I

18   actually thought that it did make sense to have the

19   beginning of summary judgment scheduled because it

20   would provide an incentive for the parties to

21   actually -- well, first of all, we would like very

22   much to have it on the schedule so that we don't have

23   any further delay.  And also, frankly, Your Honor, if

24   there's a day of reckoning coming, sometimes it helps

25   settlement discussions somewhat.  So we would

1    appreciate I think to have a date on which summary

2    judgment begins.

3            THE COURT:  Well, I don't like to schedule

4    things where there might not be a need to go forward.

5    And in a case like this, I would never schedule

6    beyond summary judgment.  And here, on the proposed

7    schedule, you asked me to schedule final pretrial

8    filings, and there -- I haven't decided on the form

9    of plan on pretrial order I'll require.  I might,

10   notwithstanding the complexity of the case, require

11   nothing more than a short form pretrial memoranda.

12   But after summary judgment, if we go that route, and

13   assuming it's -- well, if it's granted, the case is

14   over.  If not, we're talking about marking and

15   exchanging exhibits (indiscernible).  Although there

16   might be lots of exhibits in this case, I'll not

17   order paper copies of exhibits.  Filing of pretrial

18   memos, and then I generally have a final pretrial

19   conference.  And we would have to pick a trial date.

20           How long do you think it will take to try

21   the case, Mr. Agusti?

22           MR. AGUSTI:  Your Honor, we were talking

23   about that this morning.  We think it will take three

24   to four weeks.

25           THE COURT:  Is that the plaintiff's case or

112

1   the whole case?

2       MR. AGUSTI:  The whole case, Your Honor, is

3   what we thought.

4       MR. SCARBOROUGH:  I think it's somewhat

5   longer than that from my perspective.  A couple of

6   additional weeks is -- based on experience in doing

7   these things, this feels more like a six-week trial

8   even though it is presently set out to the bench.

9       (Pause in proceedings.)

10      THE COURT:  I'm focused on the summary

11  judgment.

12      (Pause in proceedings.)

13      THE COURT:  Well, the plaintiffs propose

14  that summary judgment motions be filed within two

15  weeks after the end of any mediation or settlement

16  negotiations.  And defendants are talking about four

17  weeks.  I think we'll wait until we get there.  I

18  don't think I'm going to schedule beyond the

19  settlement conferencing.  If I change my mind -- and

20  I haven't really thought about this -- I'll either

21  order the summary judgment motions -- and I now

22  appreciate, Mr. Agusti, you were talking about their

23  work, not your work, will be filed -- can you do it

24  in three weeks if I decide to include that in the

25  order, Mr. Scarborough?

1          MR. SCARBOROUGH:  We certainly will.  And I

2     did misunderstand Mr. Agusti across the aisle, so I

3     apologize for that.

4          THE COURT:  Well, no, what he wanted, I

5     thought I misunderstood him as well.  But now he

6     wants you to prepare the motions for summary judgment

7     in advance, which is a rather strange request from

8     the plaintiff's side.

9          MR. SCARBOROUGH:  And that's why we had

10    four weeks.  I mean we were -- again, we were trying

11    to step through a schedule at some pace.  At the same

12    time, we're enamored with the -- with the break here

13    at the latest for settlement.  So we would like not

14    to have to produce all our summary judgment work to

15    only have two weeks or three weeks afterwards --

16         THE COURT:  Well, he would like you to have

17    one week or a few days.

18         MR. SCARBOROUGH:  We -- I understand that.

19    We stick with our position that we would prefer four

20    weeks if that's --

21         THE COURT:  All right.

22         MR. SCARBOROUGH:  -- all right with the

23    Court.

24         THE COURT:  Well, I will rule.  If I do

25    include that in the order, I'll give the defense four

114

1   weeks.  All right.  Is there anything else that we

2   have to do?  Nick, have I forgotten anything?

3           (Pause in proceedings.)

4           THE COURT:  Anything else, counsel?

5           MR. AGUSTI:  Nothing from us, Your Honor.

6           MR. SCARBOROUGH:  Nothing from us.

7           MR. KELLEY:  Nothing from us, Your Honor.

8   Thank you.

9           THE COURT:  So it is or is not discovery in

10  aid of execution?  We'll end on that note?

11          MR. KRAMER:  I think we can agree that we

12  have oversimplified, but we weren't far off, Your

13  Honor.

14          THE COURT:  If you had asked me before this

15  conference whether I would enjoy it, I would have

16  told you heck no.  But that turned out not to be the

17  case.  I found it challenging, interesting, and

18  hopefully we can keep the case on track now.  Thank

19  you all.

20          ALL:  Thank you, Your Honor.

21          THE COURT:  Have a good day.

22          ALL:  You too.

23          (Proceedings adjourned, 4:04 p.m.)

24

25                        *  *  *

1

2

3

4

5

6                    CERTIFICATION

7

8        I, Michael Keating, do hereby certify that

9    the foregoing is a true and correct transcript from the

10   electronic sound recordings of the proceedings in the

11   above-captioned matter.

12

13

14

     2/27/20

15   _____          _____

16   Date                     Michael Keating

17

18

19

20

21

22

23

24

25