**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | No. 17-cv-00495 |
| v. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P. | ) | |
| | ) | |
| Defendants/Counterclaimants | ) | |

**PLAINTIFF EDDYSTONE RAIL COMPANY LLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT ON AMENDED COUNTERCLAIMS**

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................5

    A.    Eddystone and BTS Negotiate and Enter Into the RSA. .......................................5

    B.    FG's Complaints About Purported Facility Defects and Eddystone's Performance Under the RSA. ..................................................................................7

    C.    Jamex's Failed Attempt to Obtain Third Party Financing. ....................................9

    D.    Eddystone's Arbitration and Settlement with Jamex..........................................12

LEGAL STANDARD.........................................................................................................12

ARGUMENT ...................................................................................................................13

I.      COUNTERCLAIMS II-VI FAIL AS A MATTER OF LAW BECAUSE FG LACKS STANDING TO ASSERT THEM..............................................................................13

    A.    FG Was Not A Party to the RSA. ........................................................................13

    B.    Finding FG Liable as the Alter Ego of BTS Would Not Cure FG's Standing Deficiency. ...........................................................................................................14

II.    EVEN IF FG HAD STANDING, THE RSA'S PLAIN LANGUAGE PRECLUDES ITS BREACH OF CONTRACT COUNTERCLAIM.......................................................16

III.   EVEN IF FG HAD STANDING, ITS FRAUDULENT INDUCEMENT AND NEGLIGENT MISREPRESENTATION COUNTERCLAIMS STILL FAIL. ...............20

    A.    The Misrepresentation-Based Counterclaims Are Duplicative of FG's  Breach of Contract Claim...............................................................................................21

    B.    The Misrepresentation-Based Counterclaims Fail Because Reasonable Reliance Cannot be Established as a Matter of Law in the Face of the RSA. .......27

    C.    The Undisputed Evidence Belies FG's Claims of Fraudulent Misrepresentation and Reliance............................................................................29

    D.    There Is No "Special Relationship" To Support the Negligent Misrepresentation Counterclaim...................................................................................................34

IV.   EVEN IF FG HAD STANDING, THERE IS NO ADMISSIBLE EVIDENCE THAT ALLEGED FACILITY DEFECTS CAUSED THE HARM ALLLEGED IN COUNTS II-IV. ....................................................................................................35

V.    EVEN IF FG HAD STANDING, ITS BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING COUNTERCLAIM STILL FAILS...................37

VI.   FG'S TORTIOUS INTERFERENCE COUNTERCLAIM FAILS AS A MATTER OF LAW. ........................................................................................................40

VII.  FG IS NOT ENTITLED TO THE "EXTRAORDINARY" EQUITABLE REMEDY OF RESCISSION. ...............................................................................................42

CONCLUSION...............................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Pages**

*2470 Cadillac Resources* v. *DHL Express (USA)*,
   923 N.Y.S.2d 530 (App. Div. 2011) ............................................................................... 13

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
   910 F. Supp. 2d 543 (S.D.N.Y. 2012) ........................................................................... 34

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ........................................................................................... 36

*Amusement Indus., Inc. v. Stern*,
   786 F. Supp. 2d 758 (S.D.N.Y. 2011) ........................................................................... 35

*ATACS Corp. v. Trans World Commc'ns, Inc.*,
   155 F.3d 659 (3d Cir. 1998) ........................................................................................... 36

*Baker-Rhett v. Aspiro AB*,
   324 F. Supp. 3d 407 (S.D.N.Y. 2018) ........................................................................... 20

*Bank of New York v. Sasson*,
   786 F. Supp. 349 (S.D.N.Y. 1992) ................................................................................. 39

*Barnett v. Countrywide Bank, FSB*,
   60 F. Supp. 3d 379 (E.D.N.Y. 2014) ............................................................................. 42

*Bd. of Managers of 147 Waverly Place Condo. v. KMG Waverly, LLC*,
   10 N.Y.S.3d 537 (App Div. 2015) ................................................................................. 29

*BNP Paribas Mort. Corp. v. Bank of Am., N.A.*,
   949 F. Supp. 2d 486 (S.D.N.Y. 2013) ........................................................................... 35

*Bombardier Cap., Inc. v. Naske Air GmbH*,
   No. 02-cv-10176, 2003 WL 22137989 (S.D.N.Y. Sept. 17, 2003) ........................................... 31

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
   98 F.3d 13 (2d Cir. 1996) ............................................................................................... 22

*Brooks v. Outboard Marine Corp.*,
   234 F.3d 89 (2d Cir. 2000)............................................................................................. 36

*Bross Utilities Service Corp. v. Aboubshait*,
   618 F. Supp. 1442 (S.D.N.Y. 1985)............................................................................... 14

*Caraballo v. United States*,
   830 F.2d 19 (2d Cir. 1987).............................................................................................. 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................... 12

*Ciocca v. Heidrick & Struggles, Inc.*,
    No. 17-cv-5222, 2020 WL 1550748 (E.D. Pa. Apr. 1, 2020)....................... 36

*Citibank, N.A. v. Plapinger*,
    495 N.Y.S.2d 309 (1985)............................................................................... 27

*Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*,
    70 N.Y.2d 382 (1987) ..................................................................................... 21

*Congress Fin. Corp. v. John Morrell & Co.*,
    790 F. Supp. 459 (S.D.N.Y. 1992)................................................................. 31

*Consol. Edison, Inc. v. Ne. Utilities*,
    249 F. Supp. 2d 387 (S.D.N.Y. 2003)............................................................ 28

*Corr. U.S.A. v. McNany*,
    892 F. Supp. 2d 626 (M.D. Pa. 2012) ........................................................... 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)........................................................................................ 12

*Denny v. Breawick, LLC*,
    137 N.E.3d 578 (Ohio Ct. App. 2019)........................................................... 16

*Diesel Systems v. Yip Shing Diesel Eng'ing Co.*,
    861 F. Supp. 179 (E.D.N.Y. 1994) .......................................................... 13, 14

*Doe v. Abington Friends Sch.*,
    480 F.3d 252 (3d Cir. 2007)........................................................................... 13

*Dujardin v. Liberty Media Corp.*,
    359 F. Supp. 2d 337 (S.D.N.Y. 2005)............................................................ 19

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    165 F. Supp. 2d 615 (S.D.N.Y. 2001)............................................................ 27

*Empire Outlet Builders LLC v. Constr. Res. Corp. of New York*,
    97 N.Y.S.3d 68 (2019) ................................................................................... 43

*EQT Infrastructure Ltd. v. Smith*,
    861 F. Supp. 2d 220 (S.D.N.Y. 2012)...................................................... 22, 23

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y.2012)....................................................... 22, 35

*Flannery v. Mid Penn Bank*,
    No. 08-cv-0685, 2008 WL 5113437 (M.D. Pa. Dec. 3, 2008) ................................. 42

*Gander Mountain Co.* v. *Islip U-Slip*,
    923 F. Supp. 2d 351 (N.D.N.Y. 2013), *aff'd,* 561 F. App'x 48 (2d Cir. 2014) ...................... 43

*Garrett v. Music Publ'g Co. of Am.*,
    740 F. Supp. 2d 457 (S.D.N.Y. 2010) .................................................................. 37

*Gianelli v. RE/MAX of New York, Inc.*,
    41 N.Y.S.3d 273 (App. Div. 2016) ..................................................................... 16

*Hangzhou Silk Imp. & Exp. Corp. v. P.C.B. Int'l Indus., Inc.*,
    No. 00-cv-6344, 2002 WL 2031591 (S.D.N.Y. Sept. 5, 2002) ................................. 44

*John Paul Mitchell Sys. v. Quality King Distrib., Inc.*,
    No. 99-cv-9905, 2001 WL 910405 (S.D.N.Y. August 13, 2001) ............................... 22

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
    10 F. Supp. 3d 504 (S.D.N.Y. 2014) .................................................................. 21

*LMEG Wireless, LLC v. Farro*,
    140 N.Y.S.3d 593 (App Div. 2021) ..................................................................... 16

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011) ..................................................................................... 34

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    928 N.Y.S.2d 229 (App. Div. 2011) .................................................................... 35

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    963 N.Y.S.2d 21 (2013) ................................................................................... 43

*MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*,
    927 N.Y.S.2d 517 (Sup. Ct. 2011) .............................................................. 25, 28

*McClease v. R.R. Donnelley & Sons Co.*,
    226 F. Supp. 2d 695 (E.D. Pa. 2002) ................................................................. 41

*Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Investments*,
    951 F.2d 1399 (3d Cir. 1991) ........................................................................... 27

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,*
    500 F.3d 171 (2d Cir. 2007) ............................................................. 29, 20, 33, 34

*Morrissey v. Gen. Motors Corp.*,
    21 F. App'x 70 (2d Cir. 2001) .......................................................................... 28

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004) ........................................................................ 35, 39

*Netto v. Rastegar*,
   No. 12-cv-4580, 2012 WL 4336167 (S.D.N.Y. Sept. 20, 2012) ................... 21, 24, 25

*Nova Telecom, Inc. v. Long Distance Mgmt. Sys., Inc.*,
   No. 00-cv-2113, 2000 WL1593994 (E.D. Pa. Oct. 26, 2000) ........................... 41

*Obremski v. Image Bank, Inc.*,
   816 N.Y.S.2d 448 (2006) ............................................................................... 20

*Osan Ltd. v. Accenture LLP*,
   454 F. Supp. 2d 46 (E.D.N.Y. 2006) ............................................................... 26

*Osmond v. Litton Loan Servicing, LLC*,
   No. 10-cv-0011, 2011 WL 1988403 (D. Utah May 20, 2011) ........................ 37

*Pantusco v. Wiley*,
   616 S.E.2d 901 (Ga. Ct. App. 2005) ............................................................... 15

*Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*,
   51 F. Supp. 3d 379 (S.D.N.Y. 2014) ............................................................... 34

*Perry v. H & R Block E. Enterprises, Inc.*,
   No. 04-cv-6108, 2007 WL 954129 (E.D. Pa. Mar. 27, 2007) ......................... 42

*PetEdge, Inc. v. Garg*,
   234 F. Supp. 3d 477 (S.D.N.Y. 2017) ............................................................. 21, 23

*Primedia Enthusiast Publ'n, Inc. v. Ashton Int'l Media, Inc.*,
   No. 02-cv-9997, 2003 WL 22220375 (S.D.N.Y. Sept. 25, 2003) .................... 25, 28

*Pyskaty v. Wide World of Cars, LLC*,
   856 F.3d 216 (2d Cir. 2017) ........................................................................... 43

*Safeco Ins. Co. of Am. v. S & T Bank*,
   No. 07-cv-1086, 2010 WL 786257 (W.D. Pa. Mar. 3, 2010) .......................... 36

*Scott v. Harris*,
   550 U.S. 372 (2007) ....................................................................................... 12

*Shein v. Myers*,
   576 A.2d 985 (Pa. Super. Ct. 1990) ............................................................... 41

*Sheth v. N.Y. Life Ins. Co.*,
   709 N.Y.S.2d 74 (App. Div. 2000) .................................................................. 28

*Slater Tr. Co. v. Gardiner*,
　183 F. 268 (C.C.S.D.N.Y.) (1910) ................................................................ 44

*Smith v. City of Allentown*,
　589 F.3d 684 (3d Cir. 2009) ...................................................................... 12

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
　374 F.3d 158 (2d Cir. 2004) ...................................................................... 37

*Sugar Creek Stores, Inc. v. Pitts*,
　604 N.Y.S.2d 407 (1993) ........................................................................... 44

*Synthes, Inc. v. Emerge Med., Inc.*,
　25 F. Supp. 3d 617 (E.D. Pa. 2014) .......................................................... 41

*Taylor v. Pathmark Inc.*,
　Civil Action No. 11-7702, 2013 WL 943359 (E.D. Pa. Mar. 12, 2013) ................ 13

*Teachers Ins. & Annuity Ass'n of America v. Wometco Enterprises*,
　833 F. Supp. 344 (S.D.N.Y.1993) .............................................................. 37

*Teen-Ed, Inc. v. Kimball Int'l, Inc.*,
　620 F.2d 399 (3d Cir. 1980) ...................................................................... 36

*Transnational Mgmt. Sys. II, LLC v. Carcione*,
　No. 14-cv-2151, 2016 WL 7077040 (S.D.N.Y. Dec. 5, 2016) ............................ 19

*Tullett Prebon v. BGC Partners*,
　No. 09-cv-5365, 2010 WL 2545178 (D.N.J. June 18, 2010), *aff'd*, 427 F. App'x 236
　(3d Cir. 2011) ......................................................................................... 13

*Twenty-Nine Palms Enterprises Corp. v. Bardos*,
　149 Cal. Rptr. 3d 52 (Ct. App. 2012) ........................................................ 15

*United States v. Diebold, Inc.*,
　369 U.S. 654 (1962) ................................................................................. 12

*United States v. Fulton*,
　837 F.3d 281 (3d Cir. 2016) ...................................................................... 35

*Wakeman v. Wheeler & Wilson Mfg. Co.*,
　101 N.Y. 205 (1886) ................................................................................. 39

*Wall v. CSX Transp., Inc.*,
　471 F.3d 410 (2d Cir. 2006) ...................................................................... 20

*Wilder v. World of Boxing LLC*,
　310 F. Supp. 3d 426 (S.D.N.Y. 2018) ........................................................ 39

*Zola v. Gordon*,
  685 F. Supp. 354 (S.D.N.Y. 1988)............................................................................. 42

*Zoom Elec., Inc. v. Int'l Bhd. of Elec. Workers, Loc. 595*,
  989 F. Supp. 2d 912 (N.D. Cal. 2013) .............................................................. 14, 16

**Other Authorities**

Restatement (Second) of Contracts §§ 261, 265 & cmt. (a) ......................................... 49

Uniform Commercial Code § 7-307 (2003).......................................................... 10, 43

Eddystone Rail Company LLC ("Eddystone") respectfully submits this memorandum of law in support of its motion for summary judgment on the Amended Counterclaims of Ferrellgas Partners, L.P., Ferrellgas, L.P., and Bridger Logistics, LLC (together, "FG").

## PRELIMINARY STATEMENT

Eddystone spent approximately $172 million building a facility on the Delaware River to "transload" crude oil from railcars to river barges (the "Facility") in reliance on the promise that Bridger Transfer Services, LLC ("BTS") would deliver 118,168,750 barrels of Bakken crude oil for transloading over the following five years.  While the Facility completed in April 2014 was indisputably capable of fulfilling all of Eddystone's contractual obligations to BTS, BTS often failed to meet its monthly volume commitment, resulting in millions of dollars in deficiency charges under the parties' contract.  As will be demonstrated in Eddystone's forthcoming Motion for Summary Judgment on its affirmative claims, when the business of supplying Bakken crude to Philadelphia became unprofitable, beginning in about June 2015, BTS's owner, FG, began to evade the obligation of delivering crude to Eddystone by stripping BTS of its assets, rendering it a judgment-proof shell and, ultimately, selling its empty husk.  The BTS shell unilaterally stopped performing on February 1, 2016, less than two years after the Facility became operational.  When Eddystone brought suit against it to recover the deficiency payments owed, FG reverted to what the evidence shows was its go-to strategy:  Pressed to fulfill financial commitments, FG seeks to distract attention from its clear misdeeds through baseless claims about the Facility's alleged deficiencies.  Eddystone brings this Motion for Summary Judgment to bring this charade to its appropriate conclusion:  Dismissal of all counterclaims.

FG seeks to rescind the Rail Facility Services Agreement ("RSA"), asserting counterclaims for breach of contract, fraudulent inducement and negligent misrepresentation based on purported Facility "defects."  FG also claims that Eddystone breached the implied duty of good faith and fair

dealing by failing to agree to a potential financier's agreement that would have subordinated Eddystone's own rights under the RSA and at law, and tortiously interfered with FG's right to indemnification from the new owners of BTS (Jamex Transfer Holdings LLC, Jamex Marketing and James Ballengee) by entering into an arbitration settlement.

There are no genuine issues of material fact that preclude summary judgment as to any of these claims.  As a threshold matter, FG admits it lacks standing to assert all but its tortious interference claims.  FG boldly (and incorrectly) argues that if the corporate veil is pierced to impose liability on it, it should be allowed to step into BTS's shoes for all purposes.  FG's argument that the Court's exercise of its equitable powers should lead to this result, permitting FG to assert claims that don't belong to it—based on its abuse of the corporate form to escape liability to Eddystone—is both ironic and meritless.  Corporate veil piercing is meant solely to impose liability on those who abuse the corporate form—like FG here—not to allow abusers to take further advantage of their own abuses.  Because FG was not a party to the contract and cannot step into BTS's shoes to assert its claims, Eddystone can properly be granted summary judgment on all but the tortious interference claim on this basis alone, even before a resolution of Eddystone's affirmative claims.

Even if FG had standing, summary judgment is still proper as to all of its claims.  FG's breach of contract, fraudulent inducement and negligent misrepresentation claims all hinge on alleged representations made outside of the parties' contract and ignore the contract's integration clause disclaiming reliance on such representations.  The RSA reduced to writing the obligations of Eddystone and BTS and it directly contradicts FG's claim that terms of the agreement were breached.  The only term FG can point to concerns installing custody transfer meters, which Eddystone and BTS subsequently agreed to forego in writing.  Worse still, the alleged "defects"

concern areas within BTS's control and responsibility, as laid out in the RSA, and/or are issues on which liability is expressly prohibited in the RSA's express limitations on liability.

FG's claims based on alleged misrepresentations concerning the yet-to-be-constructed Facility that allegedly induced BTS to enter into and remain in the contract fail based on the undisputed facts. Notwithstanding the economic magnitude of the RSA and that BTS was represented by counsel, FG would have the Court believe BTS relied on alleged representations that were purportedly crucial to BTS's ability to perform under the contract but that BTS failed to include in the contract, or which are directly contradicted by or exceed the contract's actual terms. The evidence shows that BTS did not so rely. But even if it had, such reliance is impermissible and irrelevant as a matter of law in the face of an integrated contract.

FG's claims based on allegedly fraudulent omissions fare no better. FG's damages claim depends heavily on its allegations that Eddystone "knew of and failed to disclose" (1) the "SEPTA window," a Southeastern Pennsylvania Transportation Authority restriction on its airport commuter line track more than six miles outside the Facility that limited crude oil train movements to 12:00 a.m. to 4:00 a.m. daily (purportedly making false Eddystone's statements that the Facility would be accessible 24/7), and (2) the pinnacle, a rock ledge at the bottom of the Delaware River channel into the Facility, that reduced channel depth and thus allegedly limited the movements of the Petrochem Producer, the ocean tanker BTS belatedly chartered to transport crude oil in the Delaware River from the Facility (that BTS alleges it would not have chartered if it had known of the pinnacle).

As to the SEPTA window, the undisputed evidence shows, *inter alia*, that (i) BTS—not Eddystone—was responsible for routing trains into and out of the Facility, (ii) the Facility has two gates, one of which did not require traversing the SEPTA segment, and was available to BTS 24/7,

and (iii) Eddystone tried to assist in reducing any burden that the SEPTA window posed, as it said it would, despite having no obligation to do so.  FG's assertions regarding the pinnacle likewise are demonstrably false.  The undisputed evidence shows that *before* BTS chartered the Petrochem Producer, Eddystone disclosed the pinnacle and informed BTS that, despite dredging, some high spots of rock ledge might be impossible to remove.  The precise channel depth with the pinnacle was known to BTS before it chartered an oversized ocean tanker rather than a river barge.  The counterclaims are nothing more than a pretext to shift attention away from FG and its fraudulent conduct.

Not only does the undisputed evidence doom FG's fraudulent inducement and negligent misrepresentation claims, they also fail as a matter of law because they are (1) essentially contract claims masquerading as claims of fraud, which are not cognizable in New York, (2) the "reasonable reliance" element of both claims cannot be met because reliance on representations that are inconsistent with the plain language of an integrated contract is unjustified as a matter of law, and (3) there was no "special relationship" between BTS and Eddystone—sophisticated entities that negotiated the RSA at arm's-length—as is required to establish negligent misrepresentation.

FG's claims for breach of the implied duty of good faith and fair dealing and for tortious interference with contract are also meritless.  Eddystone had no legal obligation to sign a "Tripartite Agreement" related to a third-party financing agreement—the only basis for FG's breach of duty claim—and certainly not when it would have subordinated Eddystone's lien rights in the crude oil.  FG's allegation that Eddystone settled its arbitration claims with Jamex to intentionally interfere with FG's right to indemnification from Jamex not only lacks any

4

evidentiary support, but is borderline frivolous.  The arbitration settlement had no impact on FG's indemnification rights, as FG's assertion of them in this very litigation demonstrates.

## BACKGROUND

### A.      Eddystone and BTS Negotiate and Enter Into the RSA.

This dispute arises from the RSA between Eddystone and BTS.  ERC-394, RSA, ERCEDPA00020828-64; SOF ¶ 31.  From at least May 2012 through February 2013, BTS, a company engaged in the logistics business, and the parties that ultimately formed Eddystone,[1] sophisticated parties represented by counsel, engaged in arm's-length negotiations regarding the conversion of a coal unloading facility on the Delaware River into one capable of transloading crude oil from railcars to river barges.  SOF ¶¶ 5, 13, 28-29, 32.  Eddystone negotiated with several other parties that expressed interest in the Facility.  SOF ¶ 28.  World Fuel Services Corp., in particular, engaged in significant negotiations with Eddystone for use of the Facility.  *Id*.

Eddystone ultimately chose BTS over the Facility's other suitors and, in February 2013, BTS and Eddystone entered into the RSA, a maritime contract governing the construction and operation of the Facility to transport crude oil delivered by railcar to barges.  SOF ¶ 30.  Eddystone built the Facility at a construction cost of approximately $172 million only after obtaining a contractually guaranteed customer, BTS, via the RSA.  SOF ¶¶ 34-35.  The only parties to the RSA are BTS and Eddystone.  SOF ¶ 33.

Under the RSA, BTS agreed to bring to the Facility each month an average minimum volume of 64,750 barrels of crude oil per day (about 1.95 million barrels of crude oil per month) (the "Monthly Volume Commitment" or "MVC") from the Facility's operational completion until a date five years and two months after that date.  SOF ¶¶ 39-40.  If BTS failed to meet the MVC,

---

[1] Eddystone was formed in December 2012.  SOF ¶ 1.

the RSA required BTS to make a deficiency payment of $1.75 for each barrel by which the month's delivered volume fell short of the MVC.  SOF ¶ 42.  Eddystone agreed that, once the Facility became operational, it would "provide Transloading Services for [BTS's] Volume Commitment [defined as 'seven (7) Trains per week with a minimum capacity of 65,000 barrels per Train'] in Accordance with this Agreement, the Terms and Conditions, and the Terminal Rules."  ERC-394, RSA, ERCEDPA00020828-64, at -32 (§ 1.1, defining "Volume Commitment), *id.* at -34 (§ 3.1); SOF ¶¶ 39, 43.  The RSA clearly delineated the respective responsibilities of Eddystone and BTS—Eddystone would build the Facility and transload oil there, while BTS would transport the oil to and from the Facility.  SOF ¶¶ 37, 43, 46.  The RSA places sole responsibility for getting the trains and barges to and from the Facility grounds on BTS.  SOF ¶ 46; ERC-394, RSA, ERCEDPA00020828-64, at -34, § 3.3 ("It shall be a condition precedent . . . that [BTS] shall (a) have entered into a Transportation Master Contract with one or more Rail Carriers. . ., and (b) own or have entered into a charter party for the Barges. . ."); *id.* at -48, T&C § 2(d) ("[BTS] shall be solely responsible for aligning Trains and Barges with its Assigned Train Unloading Windows and Assigned Barge Loading Windows" and "[BTS] shall cause (i) Trains to be delivered to the Eddystone Rail Facilities. . . and (ii) Barges to be delivered to the Eddystone Rail Facilities. . .").

Consistent with BTS's general transportation responsibilities, it and its affiliates entered into numerous contracts relating to transportation to and from the Facility, including (i) contracts with rail loading facilities in North Dakota, (ii) contracts with several rail carriers, (iii) purchases and leases of railcars, and (iv) charter party agreements leasing vessels.  SOF ¶ 46.  BTS scheduled loading at North Dakota terminals; determined train routing into and out of the Facility (in collaboration with the rail carriers); determined the size of BTS's rail car fleet, as well as the number and identity of the vessels used to transport oil to the Monroe Energy LLC refinery in

Trainer, Pennsylvania (BTS's ultimate customer) ("Monroe"); and scheduled unloading at Monroe. *Id*. Eddystone was not a party to any of those agreements and, indeed, did not even have copies of them.

The RSA also included an "estimated" Operational Date of December 1, 2013, but recognizing that Eddystone was constructing a new type of facility on the site of a decades-old coal facility and construction uncertainties existed, the parties agreed in the RSA that "[e]ach of the Parties acknowledges and agrees that there are a number of contingencies that may affect the actual Operational Date," and expressly provided that "neither Party will have any right or remedy against the other Party if the Operational Date occurs earlier or later than the estimated Operational Date." SOF ¶ 38. The parties also agreed to include a detailed integration clause and allow amendment only by written agreement: "This Agreement, the Terms and Conditions and any Terminal Rules issued by Owner express the entire agreement of the Parties with respect to the subject matter hereof and thereof, and all prior or contemporaneous agreements or negotiations with respect to the subject matter hereof are hereby superseded, and may be amended only by written agreement of the Parties." ERC-394, RSA, ERCEDPA00020828-64, at -43; SOF ¶ 51.

**B.     FG's Complaints About Purported Facility Defects and Eddystone's Performance Under the RSA.**

The Facility became operational on April 17, 2014. SOF ¶ 52. From that time through January 2016, Eddystone transloaded every trainload of crude oil that BTS brought to the Facility. SOF ¶ 54. After February 1, 2016, however, BTS did not bring any trains to the Facility for the remainder of the RSA term, SOF ¶ 59; ERC-2000, Ballengee Dep. 172:14-16, and thus defaulted on its subsequent MVC obligations when it failed to pay the resulting deficiency payments, SOF ¶¶ 60-61; ERC-394, RSA, ERCEDPA00020828-64, at -33.

Notwithstanding Eddystone's contractual compliance and the express language of the RSA, FG alleges that purported defects concerning the Facility and its operations were the real source of BTS's failure to meet MVC and "deprived BTS of its bargain under the RSA," Dkt. 78, 9/22/2017 Counterclaims of Ferrellgas Partners, L.P. and Ferrellgas, L.P. ("FG CC")[2] ¶ 66, and asserts claims against Eddystone for fraudulent inducement, negligent misrepresentation, and breach of the RSA. The purported Facility defects include the following:

> _Operational Date_: FG complains that the Facility's operational date occurred in April 2014 rather than the estimated date of December 1, 2013, set forth in the RSA, or subsequent predictions of the Operational Date. ERC-1122, Second Supplemental and Amended Responses to Interrogatories at 12-13.

> _SEPTA Window_: FG complains that the Facility was only accessible during a four-hour window each day because SEPTA only allowed unit trains to pass on a particular portion of rail (located miles outside the Facility) between midnight and 4:00 a.m., and that Eddystone failed to disclose this limitation and represented it was working to resolve this limitation but was ultimately unsuccessful in mitigating it. _Id._ 37-38. Note, the SEPTA window cannot properly be characterized as a "Facility defect" at all, because (a) it applies to a track segment more than six miles outside the Facility, ERC-2006, Heller Dep. 47:8–17; ERC-1101, Heller Expert Report at 17-18, and (b) Eddystone did not impose it. SOF ¶ 76.[3]

> _20,000 BPH Loading Rate_: FG complains Eddystone represented (before the RSA was executed) that the Facility would be capable of loading barges at a rate of 20,000 bph and then ultimately was not. ERC-1122, Second Supplemental and Amended Responses to Interrogatories at 43-44.

> _80,000 BPD Transloading_: FG complains Eddystone represented the Facility would be capable of unloading 80,000 barrels from a train in a day (in some instances the alleged

---

[2] The counterclaims in Docket 78 and Docket 79 are identical, although the paragraph numbers differ. Citations will be to the paragraph numbers in Docket 78.

[3] Without in any way conceding this point, for simplicity, we include the SEPTA window among the alleged "Facility defects" as alleged in the Counterclaims.

representation was that a train could be unloaded in 12 hours).
*Id.* 44-45.

*Pinnacle*:  FG complains Eddystone represented that the river
channel leading to the Facility would have a depth of 31' or 34'
and failed to disclose a granite pinnacle that limited the depth to
27'8" and misrepresented that it would be removed.  *Id.* at 41-42.

*Custody Transfer Meters*:  FG complains that Eddystone delayed
installation of custody transfer meters for 18 months while
representing it would install them.  *Id.* at 15-17.

*Fire Suppression System*:  FG complains that the Facility had an
insufficient fire suppression system.  Dkt. 78, FG CC ¶ 155.

FG claims that the cumulative impact of the alleged Facility defects was "fatal" and "inhibited or precluded" BTS from satisfying its MVC.  *Id.* ¶ 58.  It is undisputed, however, that BTS satisfied its MVC in five of the twenty-two months of operations, demonstrating that the Facility had the capacity to transload that amount despite the purported defects.  SOF ¶ 56.  FG's expert, James N. Heller, concedes that the Facility had the capacity to transload the MVC.  SOF ¶ 58; Heller Dep. 74:6-8, 18-24.

Although Eddystone does not need to rely on any opinions from its rail expert, William Rennicke, in support of this motion, it is noteworthy for context that he has offered the opinion, based on, among other things, the internal rail models, documents and witness testimony of BTS and its affiliated entities, that the root cause of BTS's MVC shortfalls was that BTS had an inadequate number of trains and rail cars to transport oil from North Dakota to the Facility.  ERC-1105, Rennicke Expert Report at 7-8.

## C.    Jamex's Failed Attempt to Obtain Third Party Financing.

Bridger Marketing, the Bridger, LLC subsidiary that was the crude oil marketer responsible for the purchase and sale of crude oil, used third-party financing in order to buy and sell the crude oil shipped through the Facility.  Dkt. 78, FG CC ¶ 86; SOF ¶¶ 6-7.  In April 2014, at the outset of

Facility operations, Bridger Marketing obtained intermediation financing from Merrill Lynch Commodities, Inc. ("Merrill").  SOF ¶¶ 114-15.  Because Eddystone would be in possession of the crude that was effectively Merrill's collateral, Merrill sought Eddystone's agreement to seize crude for Merrill in the event of a Bridger Marketing default.  SOF ¶¶ 115-16.  On June 18, 2014, Eddystone, Merrill, and BTS executed an Acknowledgement in which Eddystone agreed to comply with Merrill's instructions regarding the crude, provided that Merrill acknowledged Eddystone's prior security interest in any crude in Eddystone's possession to satisfy any obligations to Eddystone.  SOF ¶ 116.  Eddystone's prior security interest was reflected in the RSA, which entitled Eddystone to a "lien on all of [the] Crude Petroleum received by Owner for Transloading Services."  ERC-394, RSA, ERCEDPA00020828-64, at -57, T&C § 12(a); SOF ¶ 49; *see* U.C.C. § 7-307 (2003) ("A carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law").

In June 2015, the corporate parent of Bridger Marketing and Bridger Logistics sold Logistics to Ferrellgas.  SOF ¶ 8.  Logistics owned 100% of BTS, making BTS an indirect Ferrellgas subsidiary.  SOF ¶ 10.  At the same time, Bridger Marketing continued its crude marketing business and was renamed Jamex Marketing, LLC ("Jamex").  SOF ¶ 9.  Merrill immediately began winding-down the financing commitment, which completely ended in November 2015.  SOF ¶ 117.

To replace Merrill, Jamex negotiated with Carlyle Commodity Management, LLC ("Carlyle") for a new intermediation financing agreement.  SOF ¶ 118; ERC-1030, 11/16/15

Knapp Email and Attachment, BLFG_EDPA0201411-22.  While conducting due diligence on the proposed financing, Carlyle asked Jamex to have its terminal operators execute its analogue of the Merrill Acknowledgement, the "Tripartite Agreement."  SOF ¶ 118; ERC-1030, 11/16/15 Knapp Email and Attachment, BLFG_EDPA0201411-22, at -11.  But unlike the Merrill document, the Tripartite Agreement would have subordinated to Carlyle Eddystone's lien rights to the crude. SOF ¶¶ 116, 120.  And, in the event of default, Carlyle had no obligation to pay outstanding transloading charges that BTS owed to Eddystone.  SOF ¶ 120.  Instead, if Carlyle wished to remove crude from the Eddystone Facility, it was required to pay ERC "storage fees"—the sleeves off its vest, since *no storage fees were due* under the RSA.  *Id.*  Eddystone declined to execute the proposed Tripartite Agreement.  SOF ¶ 121.  Mr. Knapp placed a follow-up call to Mr. Boaz, at Eddystone, approximately one week later.  SOF ¶ 122.  Following that, *there was no further communication from Mr. Knapp or anyone else at BTS* to Eddystone regarding the Tripartite Agreement.  *Id.*  As in *The Hound of the Baskervilles*, BTS's contemporaneous failure to bark at the rejection of what it now contends is a key agreement reveals much.  Notably, just days before Eddystone's response, on November 16, Monroe had proposed unacceptable terms to Jamex for continued Bakken shipments.  SOF ¶ 123.[4]

Jamex was not able to secure financing from Carlyle, but *not* because Eddystone declined to execute the Tripartite Agreement.  According to a member of Carlyle's Investment Committee, the proposed deal with Jamex was "unacceptable under Investment Committee criteria" and Carlyle did not consider the deal after November 2015.  SOF ¶ 123; ERC-2016, 1/25/21 Declaration of David E. Johnson at ¶¶ 13-15, and Exhibit 5.

---

[4] *See* ERC-367, 11/19/15 Ballengee Email, JTS-SMA_0010284-87 (Ballengee stating, after learning of Monroe's terms for a deal: "Let's just kill all talks and get the attorneys involved. F[!@#] them").

### D. Eddystone's Arbitration and Settlement with Jamex.

On April 19, 2016, following BTS's failure to make payments to Eddystone under the RSA, Eddystone initiated an arbitration against Jamex Transfer Services, LLC—by then the name of BTS. SOF ¶¶ 125-27. Eddystone and Jamex entered into a settlement in December 2016, and the settlement was finalized on January 5, 2017. SOF ¶ 128; ERC-2000, Ballengee Dep. 223:1-7; ERC-423, 1/5/17 Confidential Release and Settlement Agreement, ERCEDPA00516596-614.

## LEGAL STANDARD

A party may successfully seek summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Testimony (such as from an expert witness who is properly excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)) "that would be inadmissible at trial may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). It is not sufficient for the non-moving party "merely [to] deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

12

## ARGUMENT

## I.   COUNTERCLAIMS II-VI FAIL AS A MATTER OF LAW BECAUSE FG LACKS STANDING TO ASSERT THEM.

Counterclaims II-VI fail as a matter of law for a simple reason:  FG lacks standing to assert them.  These claims are based entirely on Eddystone's alleged breach of a contract with, and alleged misrepresentations to, BTS.  It is undisputed that FG was not a party to the RSA, SOF ¶ 33, and that it gave up control of BTS when BTS was sold to Jamex Transfer Holdings, LLC on February 22, 2016.  SOF ¶¶ 59, 125.  Finding FG liable on an alter ego theory would not cure FG's standing to assert claims belonging solely to BTS.

### A.   FG Was Not A Party to the RSA.

It is elementary that one who is not a party to a contract cannot bring an action under that contract.  *See, e.g.*, *2470 Cadillac Resources* v. *DHL Express (USA)*, 923 N.Y.S.2d 530, 531 (App. Div. 2011) (dismissing breach of contract claim because "plaintiffs ha[d] no standing to assert their breach of contract claim as third party beneficiaries").[5]  And there is no exception to this fundamental rule for corporate affiliates.  *See Tullett Prebon v. BGC Partners*, No. 09-cv-5365, 2010 WL 2545178, at *4 (D.N.J. June 18, 2010), *aff'd*, 427 F. App'x 236 (3d Cir. 2011) (finding lack of standing where parent alleged that defendants harmed it by violating subsidiary's rights); *Diesel Systems v. Yip Shing Diesel Eng'ing Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994) (dismissing plaintiff's claims for tortious interference with contract to which sister company, and not plaintiff, was a party).

---

[5] While New York law governs the RSA, *see* ERC-394, RSA, ERCEDPA00020828-64, at -42 § 15.2, the same rule applies under Pennsylvania law.  *See Taylor v. Pathmark Inc.*, Civil Action No. 11-7702, 2013 WL 943359, at *8 (E.D. Pa. Mar. 12, 2013) (plaintiff could not bring a breach of contract claim where it was not a party to the agreement at issue).

FG admits that the RSA was between BTS and Eddystone.  Dkt. 78, FG CC at ¶ 16; SOF ¶ 33.  FG was not a party to the RSA nor does it assert that it has any rights under the RSA; indeed, FG acknowledges that Counterclaims II-VI are contingent on the Court finding it liable as the alter ego of BTS.  *Id*. at 27; SOF ¶ 65; *see also* Dkt. 111, 11/7/2017 Response by Bridger Logistics, LLC, Ferrellgas Partners, L.P. and Ferrellgas, L.P. in Opposition to Plaintiff Eddystone Rail Company LLC's Motion to Dismiss Amended Counterclaims and to Strike Affirmative Defenses ("Opp. to MTD") at 7.

**B.      Finding FG Liable as the Alter Ego of BTS Would Not Cure FG's Standing Deficiency.**

Recognizing that it lacks standing to assert Counterclaims II-VI on its own behalf, FG argues that if the Court pierces the corporate veil to its disadvantage—*e.g.*, by finding that it is the alter ego of BTS for purposes of Eddystone's claims—then the Court should also pierce the corporate veil to FG's *advantage* and allow it to assert claims only BTS holds.  Dkt. 111, Opp. to MTD at 1.  Not so.  Piercing the corporate veil is an equitable doctrine.  "[C]ourts will not allow a parent to pierce the corporate veil it created for its own benefit, so as to assert the claims of its subsidiary." *Bross Utilities Service Corp. v. Aboushait*, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985) (emphasis omitted); *Diesel Systems*, 861 F. Supp. at 181 ("A corporation may not pierce the veil of another corporation that it set up for its own benefit in order to advance the claims of that corporation.").

This bar against asserting a subsidiary's claims applies even if the corporate veil is being pierced to find the abuser of the corporate form liable, as Eddystone has requested here.  *Zoom Elec., Inc. v. Int'l Bhd. of Elec. Workers, Loc. 595*, 989 F. Supp. 2d 912, 931 (N.D. Cal. 2013) *aff'd sub nom. Zoom Elec., Inc. v. Horak*, 617 F. App'x 677 (9th Cir. 2015) (rejecting argument that "because the Court pierced [an entity's] corporate veil to find [its alter ego] individually liable

for the judgments against [the entity], the Court should pierce the veil for all purposes").  The decision and reasoning in *Pantusco v. Wiley*, 616 S.E.2d 901 (Ga. Ct. App. 2005) is particularly instructive.  There, employees sued a shareholder (piercing the corporate veil) and the shareholder was not permitted to assert the corporation's counterclaims against the employees.  Just like FG here, the shareholder "maintain[ed] that, because a jury might find that he was the corporation's alter ego, he should have the right to assert directly the corporation's claims." *Id.* at 902.  But the court rejected this argument, stating the "general rule" that "a party cannot invoke the aid of equitable principles when he does not come into court with clean hands.  [Defendant] seeks to assert his counterclaim based upon his alleged abuse of the corporate form, a proposition we reject." *Id.* at 903; *see also Twenty-Nine Palms Enterprises Corp. v. Bardos*, 149 Cal. Rptr. 3d 52, 66 (Ct. App. 2012) (rejecting defendant's attempt to pierce the corporate veil it benefitted from because "[o]ne who comes into equity must come with clean hands.").

Here, FG comes to the Court with unclean hands.  FG asserts its counterclaims "*only conditionally* and *only to the extent* that, at the culmination of this litigation, [*Eddystone*] prevails on *its* alter ego claim to set aside BTS's corporate veil[.]" Dkt. 111, Opp. to MTD at 13 (emphasis in original); *see also* Dkt. 78, FG CC at 30; SOF ¶ 65.  In other words, FG admits its Counterclaims II-VI are contingent on the Court finding that FG abused the corporate form.  If the Court reaches this conclusion, FG would necessarily have unclean hands and could not seek to pierce the corporate veil to bring its counterclaims.  This is so even where, as in *Pantusco*, the veil is pierced to impose liability on it.  *Pantusco*, 616 S.E.2d at 903 (abuser of the corporate form does not have clean hands and "cannot invoke the aid of equitable principles" such as piercing the corporate veil)*; see also Twenty-Nine Palms*, 149 Cal. Rptr. 3d at 66 ("One who comes into equity must come with clean hands.").

FG's contention that the Court must pierce the corporate veil for FG's benefit if it pierces the corporate veil to impose liability on it is simply incorrect, *see Zoom Elec.*, 989 F. Supp. 2d at 931–32, and inconsistent with the principle behind piercing the corporate veil—*i.e.*, to *impose liability* on those who disregarded the corporate form, not to allow *them* to impose liability on *others*. *See, e.g., Denny v. Breawick, LLC*, 137 N.E.3d 578, 584 (Ohio Ct. App. 2019) ("Piercing the corporate veil is [t]he judicial act of *imposing personal liability* on otherwise immune corporate officers, directors, or shareholders for the corporation's wrongful acts.") (emphasis added) (internal quotation marks omitted).

Because FG lacks standing to assert Counterclaims II-VI against Eddystone regardless of the Court's resolution of Eddystone's claims against FG, summary judgment is warranted.

## II.    EVEN IF FG HAD STANDING, THE RSA'S PLAIN LANGUAGE PRECLUDES ITS BREACH OF CONTRACT COUNTERCLAIM.

Even if FG had standing to assert a breach of contract claim against Eddystone—which it does not—its counterclaims fly in the face of the RSA's express terms and thus fail as a matter of law.

FG cannot establish, as it must, that Eddystone breached any terms of the RSA. *See LMEG Wireless, LLC v. Farro*, 140 N.Y.S.3d 593, 596 (App Div. 2021) ("A plaintiff must also identify the provisions of the contract that were breached.") (citations omitted); *Gianelli v. RE/MAX of New York, Inc.*, 41 N.Y.S.3d 273, 274 (App. Div. 2016) ("A breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached."). The RSA provides a clear demarcation of responsibility, assigning to Eddystone the obligation of and risks associated with building the Facility and transloading oil in the Facility, and to BTS the obligation of and risks associated with transporting crude oil to and from the Facility. SOF ¶¶ 37, 39-40, 43, 46; *see also* ERC-394, RSA, ERCEDPA00020828-64, at -28

16

("Owner proposes to construct and/or improve a new rail and barge facility . . . that will unload

Crude Petroleum . . . and load such Crude Petroleum . . ."); *id.* at ERCEDPA00020848, T&C §

2(d) (making BTS "solely responsible" for aligning train and barge arrivals with arrival windows

and for causing trains and barges to be delivered to the Facility).   In fact, the RSA directly

contradicts all but one of FG's breach claims, and even assigns several of the relevant obligations

to *BTS*, as detailed below:

| Alleged Defect | FG's Claim | RSA |
|---|---|---|
| SEPTA Window | –   Trains could "arrive, unload and depart within 12 hours…"  Dkt. 78, FG CC ¶ 61. | –   Refers only to a twenty-hour turnaround time, not twelve.  ERC-394, RSA, ERCEDPA00020828-64, at -32, § 1.1 (definition of "Train Unloading Window");<br><br>–   Assigns responsibility to BTS to "cause. . . Trains to be delivered to the Eddystone Rail Facilities";<br><br>–   Makes BTS "solely responsible for aligning Trains . . . with its Assigned Train Unloading Windows."<br><br>*See* ERC-394, RSA, ERCEDPA00020828-64, at -48, T&C § 2(d). |
| Pinnacle | –   Facility was required to have a channel depth of 31 or 34 feet. Dkt. 78, FG CC ¶ 46. | –   Does not provide for a minimum channel depth;<br><br>–   Assigns responsibility to BTS to "cause . . . Barges to be delivered to the Eddystone Rail Facilities";<br><br>–   Makes BTS "solely responsible for aligning . . . Barges with its . . . Assigned Barge Loading Windows[.]"<br><br>*See* ERC-394, RSA, ERCEDPA00020828-64, at -48, T&C § 2(d). |

17

| | | |
|---|---|---|
| Barrels Per Hour Loading Rate | – Facility was required to have 20,000 barrels per hour ("bph") capacity. Dkt. 78, FG CC at ¶¶ 23, 65. | – Does not include a 20,000 bph rate;<br><br>– Train unloading time is "based on a minimum loading rate of 7,000 barrels per hour." ERC-394, RSA, ERCEDPA00020828-64, at -53, T&C 9(b). |
| Barrels Per Day Transloading Capacity | – Facility was required to "be able to transload 80,000 [barrels per day] bpd." Dkt. 78, FG CC at ¶¶ 23, 31. | – Transloading commitment is 64,750 bpd;  ERC-394, RSA, ERCEDPA00020828-64, at -34, § 3.1 (matching Eddystone's transloading obligation to BTS's "Volume Commitment"); *id.* at -32, § 1.1 (defining "Volume Commitment" to be 64,750 barrels a day);<br><br>– States that "acceptance of volumes in excess of the Volume Commitment" of 64,750 bpd are at "the sole discretion of the Owner." *Id.* at -45, § 4.3. |
| Fire Suppression System | – The Facility had an "insufficient fire suppression system." Dkt. 78, FG CC at ¶ 167. | – There is no provision concerning a fire suppression system.<br><br>*See generally* ERC-394, RSA, ERCEDPA00020828-64. |

The remaining alleged breach relates to an obligation to install custody transfer meters at the Facility.  Dkt. 78, FG CC ¶¶ 167-68.  While the RSA originally required the use of custody transfer meters at the Facility for cargo transfer operations, SOF ¶¶ 48, 108, the parties subsequently agreed in writing to use third-party inspectors instead, SOF ¶¶ 48, 109-10; *see* ERC-145, 10/17/13 Turnbull Email, BLFG_EDPA0394838-40, at -41 ("This practice obviously does not meet the language of the agreement between [Eddystone] & Bridger (specifying CT meter solely), and would require your approval to do so."); *id.* at -38 (BTS providing clear approval).

Unable to identify any provisions in the parties' actual agreement that were breached, FG repeatedly points to purported "advertise[ments]" and "represent[ations]" *outside* the contract. *See, e.g.,* Dkt. 78, FG CC at ¶¶ 9, 61, 65.  But extrinsic evidence is inadmissible to alter the terms

of an unambiguous contract.  *See Transnational Mgmt. Sys. II, LLC v. Carcione*, No. 14-cv-2151, 2016 WL 7077040, at *4 (S.D.N.Y. Dec. 5, 2016) ("To the extent that plaintiff is alleging that there was a contract separate from the Purchase Agreement, or an oral agreement that altered its terms, that argument easily can be dispensed with as improper extrinsic evidence given the unambiguous terms of the Purchase Agreement.").  This is especially true where, as here, the contract in question contains an integration clause unambiguously stating that the "Agreement, Terms and Conditions and any Terminal Rules issued by Owner express *the entire agreement* of the Parties with respect to the subject matter hereof and thereof, and all prior or contemporaneous agreements or negotiations with respect to the subject matter hereof are hereby superseded[.]"  SOF ¶ 51; ERC-394, RSA, ERCEDPA00020828-64, -43, § 15.4 (emphasis added); *see also Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 357 (S.D.N.Y. 2005) (finding consideration of purported promises outside the agreement "in connection with Plaintiff's breach of contract claim would contradict the integration clause providing that the [agreements] contain the entire agreement between the parties.").  The "subject matter" of the RSA was, of course, Eddystone's "construct[ion], improve[ment], and operat[ion]" of the Facility and BTS's "commit[ment] to utilize" the Facility.  ERC-394, RSA, ERCEDPA00020828-64, at -28 (first two "Whereas" clauses); SOF ¶ 37.

Finally, not only does the RSA allocate risk and responsibility for issues *outside* the Facility to BTS, it expressly prohibits BTS from suing Eddystone for purported delays *at* the Facility.  SOF ¶ 47.  Section 12.1 of the RSA, "Liability of Owner," expressly states:

> "Except where caused by the *gross negligence or intentional misconduct* of Owner or as set forth in Section 12.3 . . . [Eddystone] shall not be liable to [BTS] for any delay, damage, loss or consequential loss resulting from any cause while Owner is in possession or control of Customer's Crude Petroleum, including the acts or omissions of any Operator, the breakdown, unavailability, or insufficient available capacity of the Eddystone Rail Facilities, and delays resulting from the

19

> failure of other customers to schedule arrivals and departures of Trains and
> Barges in accordance with Owner's schedule."

ERC-394, RSA, ERCEDPA00020828-64, at -40, § 12.1 ("Liability of Owner"); SOF ¶ 47.  Such

provisions limiting liability are routinely enforced, *see Obremski v. Image Bank, Inc.*, 816

N.Y.S.2d 448, 449–50 (2006).

This provision alone mandates summary judgment against FG's contract claims.  FG's

breach claims are all that the purported Facility "defects" resulted in delays at the Facility that

impeded BTS's ability to achieve MVC.  Expert Heller's entire testimony seeks to quantify that

delay.  And FG's Counterclaims do not allege—nor is there any evidence to support—a claim that

Eddystone's gross negligence or intentional misconduct caused any delays at the Facility.  RSA

Section 12.1 precludes FG's claims related to these purported defects.

*****

For the foregoing reasons, Eddystone is entitled to summary judgment on FG's breach of

contract claim.

## III.   EVEN IF FG HAD STANDING, ITS FRAUDULENT INDUCEMENT AND NEGLIGENT MISREPRESENTATION COUNTERCLAIMS STILL FAIL.

FG also repackages the same alleged Facility defects as tort claims, claiming that

Eddystone's pre-contractual statements fraudulently induced BTS to enter into the RSA and ERC's

post-contractual statements induced BTS not to rescind the RSA.  FG claims that if these purported

misstatements were not fraudulent, they were made negligently.  These claims are deficient as a

matter of law and undisputed fact.

FG's fraudulent inducement claim requires them to show (i) Eddystone made a "material

false representation," (ii) "intended to defraud [BTS]," (iii) that BTS "reasonably relied upon,"

and (iv) "suffered damage as a result." *Baker-Rhett v. Aspiro AB,* 324 F. Supp. 3d 407, 418–19

(S.D.N.Y. 2018) (citing *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006)).  A

20

negligent misrepresentation claim requires FG to show that Eddystone (1) "negligently provided incorrect information" that, (2) BTS "reasonably relied upon," and (3) that "the parties stood in some special relationship imposing a duty of care on [Eddystone] to render accurate information." *LBBW Luxemburg S.A.* v. *Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014).

## A.   The Misrepresentation-Based Counterclaims Are Duplicative of FG's Breach of Contract Claim.

The crux of FG's misrepresentation-based counterclaims is that purported Facility defects prevented BTS from realizing the benefits of its bargain under the RSA and BTS sustained damages "due to the fraudulent conduct of [Eddystone] *in connection with the RSA*." Dkt. 78, FG CC ¶ 157 (emphasis added).[6]  But New York law "does not recognize claims that are essentially contract claims masquerading as claims of fraud." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 491–92 (S.D.N.Y. 2017) (citation omitted); *see also Netto v. Rastegar*, No. 12-cv-4580, 2012 WL 4336167, at *5 (S.D.N.Y. Sept. 20, 2012) (fraudulent inducement "may not be used as a means of restating what is, in substance, a claim for breach of contract"); *Clark-Fitzpatrick, Inc.* v. *Long Is. R.R. Co.*, 70 N.Y.2d 382, 389 (1987) (dismissing negligence claims based on the "well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").

So frequently do parties seek to repackage contract claims as fraud that the Second Circuit has developed a test to establish a claim of fraud relating to a contract: a party "must either (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages

---

[6] *See also id.* ¶ 56 (delays resulting from the alleged defects "depriv[ed] BTS of its contractually bargained-for right to obtain an utilize deficiency credits"); *id.* ¶ 66 ("the problems caused by the Granite Pinnacle, Four Hour Window and Elbow . . . depriv[ed] BTS of the benefit of its bargain under the RSA.").

that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc*., 98 F.3d 13, 20 (2d Cir. 1996) (internal citations omitted). FG's misrepresentation-based claims fail on all counts.

 ***Separate Legal Duty***—It is undisputed that BTS and Eddystone were sophisticated parties who negotiated at arm's-length a multimillion-dollar contract (the RSA). SOF ¶¶ 13, 32. It is well-established that such a relationship does not give rise to a legal duty separate from the contract. *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012) ("[C]ourts regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'").

 ***Misrepresentation Extraneous to the Contract***—For a representation to be "extraneous" to the contract, it must (1) misrepresent a present fact as opposed to a promise of what will be done in the future; and (2) not be addressed by the contract. *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) ("The general rule is that 'a promissory statement of what will be done in the future . . . gives rise only to a breach of contract cause of action and a misrepresentation of a present fact . . . gives rise to a separate cause of action for fraudulent inducement.'"); *see also John Paul Mitchell Sys. v. Quality King Distrib., Inc.*, No. 99-cv-9905, 2001 WL 910405, at *5 (S.D.N.Y. August 13, 2001) (finding pre-contractual representations not extraneous where "they were entirely consistent with the express terms of the agreement" and post-contractual statements not actionable "because intentionally false statements to conceal a breach of contract do not give rise to an action for fraud).

 Virtually every one of the alleged misrepresentations was made *about* the Facility's operations, *before* the Facility was operational. *See, e.g.,* ERC-1122, Second Supplemental and Amended Responses to Interrogatories at 12-13 (operational date representations necessarily

pre-operational); *id.* at 37, 44-45 (Facility *will be able to* turn trains in 12 hours, unload 80,000 bpd); *id.* 41-42 (Facility *will have* 31' or 34' channel depth).   The exceptions—alleged misrepresentations concerning installation of custody transfer meters and attempts to resolve the SEPTA window—even if not pre-operational, were still promises of what will be done in the future.  *Id.* at 16-17; *id.* at 37-38.  Because these are promises "of what will be done" rather than present fact, they "give[] rise only to a breach of contract cause of action," not to misrepresentation-based claims.  *EQT Infrastructure Ltd.*, 861 F. Supp. 2d at 233.

Further, BTS and Eddystone's agreement about the Facility and their respective rights and obligations was negotiated and reduced to writing in the RSA—an 18-page contract, concerning Eddystone's "construct[ion], improve[ment], and operat[ion]" of the Facility and BTS's "commit[ment] to utilize" the Facility, with over 50 defined terms and many appendices, including a 17-page appendix outlining the terms and conditions for the use of the Facility.  SOF ¶¶ 36-37. Each of the alleged misrepresentations concerns Eddystone's "construct[ion], improve[ment], and operat[ion]" of the Facility and/or BTS's "utiliz[ation]" of the Facility, *see* Dkt. 78, FG CC ¶¶ 28, 30-31, 34, 155,164 (alleging fraud related to the Facility operational date, Facility transloading capabilities and other factors related to BTS's ability to utilize the Facility), and the contract therefore addressed them and they are not "extraneous" to it, *see* Section II, *supra* (including chart comparing FG's allegations with corresponding RSA terms).   Indeed, that FG's claims are "contract claims masquerading as claims of fraud," *PetEdge, Inc.*, 234 F. Supp. 3d at 491–92, is clear from even a cursory review of the counterclaims, in which virtually all the bases of FG's purported misrepresentation claims align perfectly with its breach of contract claims:

23

| FG CC ¶ 170 –Bases for Breach of Contract Claim | FG CC ¶ 155 – Bases for Fraudulent Inducement Claim | FG CC ¶ 164 – Bases for Negligent Misrepresentation Claim |
|---|---|---|
| "The Four-Hour Window, the Granite Pinnacle, the Elbow and the lack of custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality, materially breached the terms of the RSA." | "[D]elays caused by the misrepresentations concerning construction, the failure of the Facility to be a "state of the art" facility as represented, and due to the undisclosed and misrepresented restrictions concerning the Four-Hour Window, the Granite Pinnacle, the lack of custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality." | "[Eddystone] misrepresented the quality of the Facility due to the Four-Hour Window, the Granite Pinnacle, the Elbow, the lack of custody transfer meters and the insufficient fire suppression system, amongst other issues with the Facility's construction quality." |

FG cannot circumvent this conclusion by claiming the RSA is silent on the specific defects it alleges and are thus extraneous to the contract.  As shown in Section II, *supra*, the alleged defects are all refuted by the contract's terms.  In fact, for several of the alleged defects, BTS affirmatively *took on responsibility* for the precise details of performance that FG now claims were violated. For example, the SEPTA window is a restriction on the movement of trains on their way to and from the Facility, *see supra* at pp. 3-4, SOF ¶ 76, and BTS agreed to be responsible for causing trains to get to and from the Facility.  SOF ¶ 46; *see* Section II, *supra* (discussing RSA's allocation of risks on train and barge arrival and departure and chart showing the subject of each alleged defect is addressed and responsibility allocated in the RSA).  FG cannot contort its flawed breach of contract claim into one for misrepresentation because it is now dissatisfied with the assignment of obligations and allocation of risk to which BTS agreed in the RSA.  *See Netto*, 2012 WL 4336167 at *5 ("Fraudulent inducement is not intended to function as a blanket insurance policy

for anything that can go wrong in a contractual relationship, and it 'may not be used as a means of restating what is, in substance, a claim for breach of contract.'").

Even if the RSA *were* silent as to certain alleged defects, when a party is sophisticated and is "on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection," courts will determine that the party "willingly assumed the business risk that the facts may not be as represented." *MBIA Ins. Corp.* v. *Credit Suisse Sec. (USA) LLC*, 927 N.Y.S.2d 517, 532–33 (Sup. Ct. 2011); *see also Primedia Enthusiast Publ'n, Inc. v. Ashton Int'l Media, Inc.,* No. 02-cv-9997, 2003 WL 22220375, at *6 (S.D.N.Y. Sept. 25, 2003) ("[C]ourts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms length[] and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement.").

Nor can FG argue its claims are "extraneous" to the RSA because the purported misrepresentations allegedly induced it to continue performance.   "[A] claim in fraudulent inducement does not ordinarily lie where a plaintiff alleges that he was induced to continue performing his obligations under an existing contract–*i.e.*, where the essence of the claim is that the plaintiff was induced not to breach his own contractual obligations." *Netto*, 2012 WL 4336167 at *6.   That is precisely what FG alleges here.   Dkt. 78, FG CC ¶ 156 ("[Eddystone] further fraudulently induced BTS not to rescind the RSA by promising to remedy the numerous defects with the Facility").

In short, the RSA addresses all of the alleged misrepresentations and/or they are promises of future conduct, not representations of present fact.  FG's misrepresentation claims are thus not "extraneous" to the contract.

***Special Damages Unrecoverable as Contract Damages***—FG seeks substantially the same damages under its fraud and misrepresentation claims as it does its breach of contract claims. *Compare* Dkt. 78, FG CC ¶ 155 ("suffered costs, expenses, and lost opportunities" from fraudulent inducement); *id.* ¶¶ 162–63 ("suffer[ed] damages due to delays[,] lost opportunities, and deficiency charges" from negligent misrepresentation) *with id.* ¶¶ 170-71 ("incur[red] deficiency charges and forfeit[ed] deficiency credits" and "incur[red] costs, expenses, damages and lost opportunities, and [] forfeit[ed] deficiency credits" from the breach of contract).  This indisputable fact is conclusive evidence that damages from these alleged torts "are [not] a special consequence of the alleged fraud and, thus, can[not] be separated from contract damages that could" be—and in fact are— "claimed."  *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 55–56 (E.D.N.Y. 2006).  That there are no special damages unrecoverable as contract damages is especially true here, where the RSA explicitly prohibits *any* finding of special damages "aris[ing] out of or relat[ing] to this agreement, regardless of whether such claim arises under or results from contract, tort or strict liability."  ERC-394, RSA, ERCEDPA00020828-64 at -38, § 9 ("Limitations on Liability"); SOF ¶ 50.

Because FG's fraud and misrepresentation claims are duplicative of its breach of contract claims, Eddystone is entitled to summary judgment on each as a matter of law.

**B.      The Misrepresentation-Based Counterclaims Fail Because Reasonable Reliance Cannot be Established as a Matter of Law in the Face of the RSA.[7]**

One cannot "reasonably rely" on a "misrepresentation" that is inconsistent with the terms of a contract.  Because FG's supposed fraudulent inducement and negligent misrepresentation claims conflict in different ways with the RSA terms, FG cannot establish reasonable reliance as a matter of law.

*First*, the RSA's integration clause stated unequivocally that the RSA constituted "the entire agreement of the Parties," and "all prior or contemporaneous agreements or negotiations with respect to the subject matter are hereby superseded."  ERC-394, RSA, ERCEDPA00020828-64, at -43, § 15.4; SOF ¶ 51.  When a contracting party agrees that it will not rely on oral representations extrinsic to a contract by incorporating an integration clause, it cannot bring a fraudulent inducement claim predicated on just such representations.  *See Citibank, N.A. v. Plapinger*, 495 N.Y.S.2d 309, 312 (1985).[8]  This is especially true where the parties are sophisticated.  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 622–23 (S.D.N.Y. 2001) ("In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration.").

The "subject matter" of the RSA was the construction and use of the Facility, SOF ¶ 37.  Each alleged pre-contractual misrepresentation concerns the construction and use of the Facility and therefore falls within the scope of the contract and its integration clause.  Further, as noted above, BTS and Eddystone were sophisticated, experienced parties who negotiated at arm's length a multimillion-dollar contract.  SOF ¶¶ 13, 32.  BTS's reliance on any statements concerning the

---

[7] While Eddystone does not seek summary judgment on the element of intent, it vigorously disputes that it intended to defraud BTS.

[8] The same rule applies in Pennsylvania.  *See Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Investments*, 951 F.2d 1399, 1411 (3d Cir. 1991).

Facility that pre-date February 2013, when the RSA was signed and became effective, and which were not integrated into the contract, is unreasonable as a matter of law. *See MBIA Ins. Corp.*, 927 N.Y.S.2d at 532–33 (sophisticated party assumes the business risk that facts are not as represented if it fails to "insert[] appropriate language in the agreement for [its] protection"); *Primedia Enthusiast Publ'n, Inc.*, 2003 WL 22220375 at *6.

The outcome would be the same taking into account FG's anticipated (and incorrect) argument that the integration clause lacks specificity. *See Primedia Enthusiast Publ'n Inc.*, 2003 WL 22220375 at *6 ("Notwithstanding the lack of an explicit disclaimer of representations . . . courts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated . . ."); *Consol. Edison, Inc. v. Ne. Utilities*, 249 F. Supp. 2d 387, 402 (S.D.N.Y. 2003) (holding that non-specific merger and disclaimer language defeats a claim of reasonable reliance on oral representations where a sophisticated party failed to include any "specific representation and warranty" in the agreement).

*Second*, as a matter of law, a litigant may not rely on purported representations that are at odds with the text of the contract at issue. *See Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App. Div. 2000) ("The purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for fraudulent and/or negligent misrepresentation since they . . . are contradicted by the written agreement between the parties."); *Morrissey v. Gen. Motors Corp.*, 21 F. App'x 70, 73 (2d Cir. 2001) ("reliance on [defendant's] alleged oral promises, which directly contradict the terms of that letter . . . was unreasonable as a matter of law"). As explained above, virtually all of FG's claimed misrepresentations contradict the RSA's very terms. *See* Section II, *supra* (chart showing alleged representations contradict RSA provisions).

28

*Third*, statements and predictions about Eddystone's future intentions or plans cannot give rise to a fraud claim. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement."). FG repeatedly cites numerous Eddystone statements in a February 2013 presentation, including that it was "building a state of the art, high speed crude oil unloading facility and transloading terminal"—which it was and did. *See, e.g.*, Dkt. 78, FG CC ¶¶ 13, 23; ERC-1122, Second Supplemental and Amended Responses to Interrogatories at 37, 41, 44, 45, 46. FG's complaint that the Facility did not live up to its expectations does not sound in fraud. *See Bd. of Managers of 147 Waverly Place Condo.* v. *KMG Waverly, LLC,* 10 N.Y.S.3d 537, 537 (App Div. 2015) (dismissing fraudulent inducement claim where "the renovation [of a building] was in its early stages at those points, the statements in the description were predictions of future events and, therefore, cannot sustain an action for fraud").

After discarding the purported misrepresentations that (1) are precontractual and rendered superfluous by the RSA allocation of risk and its integration clause; (2) cannot be relied upon as a matter of law because they contradict the terms of the RSA; and/or (3) are statements about the future and thus not amenable to fraud claims, there is simply nothing left of FG's misrepresentation-based claims.

## C.   The Undisputed Evidence Belies FG's Claims of Fraudulent Misrepresentation and Reliance.

FG's misrepresentation-based claims are not only precluded as a matter of law, but belied by the undisputed record. Focusing on each topic of alleged post-contractual misrepresentations (since *none* of the purported pre-contractual representations can be relied on as a matter of law in

light of the integrated contract) demonstrates the absence of any disputed factual issue regarding material misstatements or omissions, or detrimental reliance.

*Operational Date*—The RSA *expressly* provides an "estimated" Operational Date of December 1, 2013 and that "neither Party will have any right or remedy against the other Party if the Operational Date occurs earlier or later than the estimated Operational Date." SOF ¶¶ 38, 66. Eddystone provided a revised "targeted" Operational Date of February 28, 2014 and BTS not only knew it was an estimate, but BTS also conducted its own assessment and concluded it would be "the first part of April" at "the *earliest*" SOF ¶¶ 67-70. It would be farcical to say BTS reasonably relied on Eddystone's cautiously qualified estimate and ignored its own. Eddystone provided another revised estimate of "about March 31." SOF ¶ 71. Eddystone ultimately provided an "official notice" of an Operational Date of April 14, 2014, which was further revised by three days in an April 7, 2014 "10-day lockdown letter." SOF ¶¶ 72, 73. ***None*** of these statements is actionable as a misrepresentation because they are at most "promissory statement[s] of what will be done in the future," actionable only as breach of contract, and not "misrepresentation[s] of a present fact," as required for FG's misrepresentation claims. *See Allegheny Energy, Inc.,* 500 F.3d at 184; *see* Section III.A, *supra.* Of course, FG does not allege this as part of its breach of contract because the RSA explicitly bars a breach claim premised on the Facility's Operational Date. SOF ¶ 38.

*SEPTA Window*—Not only does the RSA foreclose FG's claim that Eddystone misrepresented that the Facility would be able to operate twenty-four hours a day and seven days a week, *see* Section III.A (at p. 23), *supra,* it fails because it was a true statement. First, there is no dispute that the Facility could and did operate around the clock. SOF ¶ 53. Second, the Facility had two gates: (1) a North/West Gate that crossed a small portion of a SEPTA track subject to the

SEPTA window, and (2) a South/East gate, constructed by Eddystone as a new access and exit for the Facility that was accessible via a different, "Amtrak route," *not* subject to the SEPTA window. SOF ¶¶ 77-78; ERC-2006, Heller Dep. at 51:8-15.   There is no evidence that Eddystone ever restricted access to either gate to certain times of day.   SOF ¶ 81.   Trains could and did use the South/East gate to enter or exit the Facility on multiple occasions.   SOF ¶ 80.   Eddystone did not decide which gate trains would use to go in or out of the Facility; Norfolk Southern, the rail carrier, and/or BTS or its affiliated entities did.   SOF ¶ 79.   Trains were unloaded and barges loaded continuously throughout the day.   SOF ¶ 53.   In short, the Facility was able to operate and did operate twenty-four hours a day, seven days a week, as predicted.   Perhaps the best evidence that the SEPTA window claim is a baseless claim "made for litigation" is that during the twenty-two months of the Facility's operation, Norfolk Southern and BTS generally chose to go over the SEPTA track over an available alternative.   SOF ¶ 80.

FG's claim that Eddystone knew of and failed to disclose the SEPTA window also cannot succeed as a matter of law.   "Under New York law, in order for an omission to be fraudulent, the party accused of fraud must have had a duty to speak." *Bombardier Cap., Inc. v. Naske Air GmbH*, No. 02-cv-10176, 2003 WL 22137989, at *3 (S.D.N.Y. Sept. 17, 2003).   Eddystone disputes that it withheld material information from BTS.   But, in any event, it had no duty to speak.   Such a duty arises "(1) where there is a fiduciary relationship between the parties, or (2) where one party possesses superior knowledge, not readily available to the other, and knows that the other party is acting on the basis of mistaken knowledge." *Congress Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 472 (S.D.N.Y. 1992).

There was no event or circumstance that triggered a fiduciary relationship between BTS and Eddystone.   Nor did Eddystone possess "superior knowledge" that was not readily available

to BTS.  The SEPTA Window was located six-miles *outside* of the Facility and an independent third party controlled it.  SOF ¶ 76.  Moreover, the RSA expressly stated that it was BTS's obligation to "cause . . . Trains to be delivered to the Eddystone Rail Facilities" and that BTS was "solely responsible for aligning Trains . . . with its Assigned Train Unloading Windows."  SOF ¶ 46.  Exploring any potential issues getting the trains to the Facility was BTS's responsibility, not Eddystone's.

FG's claim that it relied upon and was damaged by Eddystone representatives' alleged fraudulent assurances that they would make efforts to convince SEPTA and/or local officials to resolve the SEPTA window are ludicrous.  The record demonstrates that Eddystone and its representatives *did* engage in outreach regarding the SEPTA window—even though they had no obligation to do so—making it a true statement and not subject to claims of fraud.  SOF ¶¶ 46, 79, 82.  Even if BTS relied on these *truthful* assurances and was deterred from taking action itself, there is no evidence BTS would have been any more successful in mitigating the SEPTA window, which had been in force over the commuter line since the early 1980s.  SOF ¶ 76.  Without evidence BTS would have actually succeeded in eliminating the SEPTA window, the claim that BTS's supposed reliance on these alleged misrepresentations caused it harm is nothing more than pure, unfounded speculation.

***20,000 BPH Loading Rate—***FG does not allege a single post contractual representation that the Facility could load at a rate above the RSA-imposed minimum transload rate of 7,000 bph.  SOF ¶¶ 45, 103.  Not only did the Facility consistently surpass this rate, FG concedes the Facility could load at a rate of 10,000 bph, which it, in fact, did.  SOF ¶ 102.

***80,000 BPD Transloading—***FG alleges Eddystone made representations that the Facility could unload a train of 80,000 barrels in a day.  But this statement is indisputably true.  SOF ¶ 106.

Indeed, with an average train of just shy of 80,000 barrels, the Facility unloaded hundreds of trains in under a day. SOF ¶¶ 106-07. And while FG claims that Eddystone failed to meet its pre-operational estimate that a train could be unloaded in approximately 12 hours, FG fails to explain whether or why these estimates were misstatements of present fact or why reliance is permissible when they were not included in the integrated RSA and were, at most, "promissory statement[s] of what will be done in the future," actionable only as breach of contract, and not "misrepresentation[s] of a present fact," as required for a misrepresentation claim. *See Allegheny Energy, Inc.,* 500 F.3d at 184; *see* Section III.A, *supra*.

*Pinnacle*—FG claims that it relied on alleged Eddystone misrepresentations about the channel depth when it chartered the Petrochem Producer on January 9, 2014, but the undisputed facts demonstrate the opposite. Eddystone provided BTS with prompt notice of the pinnacle and the achieved channel depth of approximately 27'8" after dredging on December 19, 2013, *before* BTS or its affiliated entities chartered the Petrochem Producer. SOF ¶¶ 96-98. On December 19, 2013, just hours after the dredging contractor informed Eddystone that hard dredging had not been able to remove the pinnacle, Eddystone's Facility Manager emailed BTS that dredging was complete, but "we MAY have some high spots of ledge rock that cannot be removed." ERC-151, 12/19/13 Turnbull Email ERCEDPA00028867-71; SOF ¶ 96. BTS was aware of the pinnacle, the achieved channel depth of approximately 27'8", and that the inability to achieve the 31' target depth could impact the amount of cargo that the Petrochem Producer could carry *before* entering into the charter party agreement (a maritime lease) for the Petrochem Producer on January 9, 2014. SOF ¶ 97; ERC-152, 12/23/13 Natale Email, BLFG_EDPA0063716-20 ("Draft issue- Single pinnacle mid-channel (~27'8" max. draft vs. >=31' planned)."). FG's allegation that Eddystone "finally informed" BTS of the pinnacle and the fact that 31' depth had not been achieved on

February 6, 2014 [after the Petrochem Producer had been chartered] is unequivocally proven false by contemporaneous emails. *See* Dkt. 78, FG CC ¶ 46. Since BTS knew about the channel depth with the pinnacle and that it might not be possible to remove the pinnacle *before* it leased the Petrochem Producer—the only action it allegedly took in reliance on purported prior and contradictory representations—it was unreasonable to rely on those prior statements as a matter of law and FG's claims of misrepresentations related to the pinnacle fail. *See Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F. Supp. 3d 379, 397 (S.D.N.Y. 2014) (finding a failure to "plausibly plead reasonable reliance . . . especially in light of the fact that [defendant] possessed contradictory information" to the allegedly relied on representation).

  ***Custody Transfer Meters***—As discussed *supra* at Section II, Eddystone proposed eliminating the custody transfer meter requirement in the RSA and BTS accepted that proposal. SOF ¶¶ 108-10. The purported representations after that point regarding scheduling installation are again, at most, "promissory statement[s] of what will be done in the future" and not actionable as fraud. *Allegheny Energy, Inc.,* 500 F.3d at 184.

  **D.** **There Is No "Special Relationship" To Support the Negligent Misrepresentation Counterclaim.**

  To survive summary judgment on a negligent misrepresentation claim, a party must establish "the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011)). Here, it is undisputed that BTS and Eddystone were sophisticated, experienced players who engaged in an arm's length business transaction in negotiating and entering into the RSA. SOF ¶ 13, 32. There is no evidence of an event that would have created any duty from Eddystone to BTS. Courts have repeatedly rejected that the requisite "special

relationship" arises in such circumstances. *See BNP Paribas Mort. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 511 (S.D.N.Y. 2013) ("[C]ourts have not found 'unique or specialized knowledge' or relationships of special 'confidence or trust' where all parties are 'highly sophisticated players . . . .'") (quoting *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 230 (App. Div. 2011)); *Fed. Hous. Fin. Agency*, 858 F. Supp. 2d at 334 ("[A]n arm's-length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'"); *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011) ("[A]n arm's length business arrangement between sophisticated and experienced parties [is] a circumstance insufficient to create a 'special relationship.'").   Without this "special relationship," BTS's negligent misrepresentation claim necessarily fails.

## IV.   EVEN IF FG HAD STANDING, THERE IS NO ADMISSIBLE EVIDENCE THAT ALLEGED FACILITY DEFECTS CAUSED THE HARM ALLLEGED IN COUNTS II-IV.

Although FG claims that the alleged Facility defects were "fatal" and "inhibited or precluded" BTS from satisfying its MVC, FG lacks any admissible evidence to establish proximate causation, a necessary element of all of its breach of contract, fraudulent inducement and negligent misrepresentation claims.  Dkt. 78, FG CC ¶ 58; *Caraballo v. United States*, 830 F.2d 19, 22 (2d Cir. 1987) (in New York, "[p]roximate or legal cause is defined as that 'which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred.'"); *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d at 777.  The claimed impact of the alleged defects, *i.e.*, how much crude oil could have been transloaded at the facility in a "but for" world in which the alleged defects did not exist, is a hypothetical question that only an expert may address. The Third Circuit prohibits lay witnesses from testifying about hypothetical questions.  *See United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016) ("In layman's terms, Rule 701 means that a

witness is only permitted to give her opinion or interpretation of an event when she has some personal knowledge of that incident."); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 404 (3d Cir. 1980) ("Testifying as a layman, Zeitz would be more restricted than if he were proffering opinion evidence as an expert.  The essential difference, however, is that a qualified expert may answer hypothetical questions.") (internal citation omitted); *Ciocca v. Heidrick & Struggles, Inc.*, No. 17-cv-5222, 2020 WL 1550748, at *8 n.1 (E.D. Pa. Apr. 1, 2020) (collecting cases).

FG designated James Heller as its only expert on the operational impact of the alleged defects.  SOF ¶ 58.  If the Court grants Eddystone's Motion to Exclude Heller, FG lacks *any* admissible evidence that the alleged Facility defects harmed BTS by reducing Facility throughput and if so, how much.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 271 (2d Cir. 2002) (summary judgment granted "because of plaintiffs' failure to present any admissible evidence in support of their theory of causation."); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (finding "summary judgment was properly granted" where the plaintiff's expert was excluded and the plaintiff therefore "has no evidence in the record to support his [design defect] theory").

Similarly, FG has no admissible evidence of damages related to reduced throughput or MVC shortfalls if the Court grants Eddystone's Motion to Exclude the testimony of FG's only damages expert, Glenn George.  *Safeco Ins. Co. of Am. v. S & T Bank*, No. 07-cv-1086, 2010 WL 786257, at *4, *7 (W.D. Pa. Mar. 3, 2010) ("a plaintiff must provide a factfinder evidence from which damages may be calculated with . . . 'reasonable certainty . . . [that] is not too speculative, vague or contingent upon some unknown factor.'") (citing *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998) (internal quotation marks omitted)).

Without admissible evidence that the alleged Facility defects caused harm or damages, FG has failed to establish essential elements of its breach of contract, fraudulent inducement, and negligent misrepresentation claims. Consequently, Counts II-IV should be dismissed.

## V.    EVEN IF FG HAD STANDING, ITS BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING COUNTERCLAIM STILL FAILS.

According to FG, Eddystone's refusal to consent to the Tripartite Agreement—an "acknowledgement of [a third-party financer's] rights to the crude oil being shipped"—constitutes a breach of the implied duty of good faith and fair dealing. Dkt. 78, FG CC ¶¶ 90, 171-73. It does not.

*First*, Eddystone was under no obligation to consent to the Tripartite Agreement, regardless of the reasonableness of the request or whether it would impact Eddystone. *See Teachers Ins. & Annuity Ass'n of America v. Wometco Enterprises*, 833 F. Supp. 344, 349 (S.D.N.Y. 1993) ("[I]n the absence of explicit contractual language stating that a party may not unreasonably withhold consent, parties may withhold consent for any reason or no reason, and [] no implied obligation to act in good faith exists to limit that choice."); *Osmond v. Litton Loan Servicing, LLC*, No. 10-cv-0011, 2011 WL 1988403, at *2 (D. Utah May 20, 2011) ("The implied covenant of good faith and fair dealing does not imply that a party is bound to forego its rights, even if another party is disadvantaged by this action."). The RSA says nothing about financing to BTS's customer, SOF ¶ 49; *see generally* ERC-394, RSA, ERCEDPA00020828-64, and certainly "sets no express restrictions" on Eddystone's right to withhold consent. *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004). Thus Eddystone was not prohibited from withholding consent (whether reasonable or not). And Eddystone had no affirmative duty to assist BTS in performing its obligations by acknowledging the financing agreement. *See Garrett v. Music Publ'g Co. of Am.*, 740 F. Supp. 2d 457, 459, 463 (S.D.N.Y. 2010) (granting summary

judgment on implied duty claim where the defendant "was simply under no obligation to give [plaintiff] an extension or to help him procure the Assignments."). This renders irrelevant FG's factual assertions that the proposed Tripartite Agreement was ostensibly "industry standard" and that it was "consistent in all material respects" to a prior financing agreement with Merrill. Dkt. 78, FG CC ¶¶ 91, 93. Even if true, Eddystone *still* had no duty to agree.

*Second*, the undisputed facts, in any event, show that the Tripartite Agreement subordinated Eddystone's lien rights to crude in its Facility at the time of breach. SOF ¶¶ 113, 119-21. The RSA granted Eddystone a general "lien on all of Customer's Crude Petroleum received by Owner for Transloading Services." ERC-394, RSA, ERCEDPA00020828-64, at -57, T&C § 12(a); SOF ¶ 113. In addition, Pennsylvania law gives a carrier, such as Eddystone, a statutory lien on goods in its possession to pay outstanding fees. U.C.C. § 7-307 (2003). The control agreement with Merrill Lynch included Merrill's acknowledgment that it was junior to Eddystone's lien rights. SOF ¶ 116; ERC-258, Merrill Acknowledgement, MLC00001351-59 at § 1 (*Subject to the rights of the Facility under the [RSA]*, the Facility agrees . . . the Merrill Crude is and shall remain the personal property of Merrill so long as the same is in possession of the Facility") (emphasis added); *id*. § 4(b) ("Nothing in this Acknowledgement replaces or supersedes any rights of the Facility . . . in the [RSA], regardless of whether such rights or obligations are related to Merrill Crude . . ."). By contrast, the Tripartite Agreement subordinated Eddystone's lien rights. SOF ¶¶ 120-21. The Agreement required Eddystone to acknowledge Carlyle's ownership of the crude oil at the Facility without any explicit statement that it was "subject to the rights of the Facility under the [RSA]" or did not "replace[] or supersede[]" Eddystone's rights "in the [RSA]". *See* ERC-1030, 11/16/15 Knapp Email and Attachment, BLFG_EDPA0201411-22, at -14, -15 §§ 2, 5.2; SOF ¶¶ 120-21. Nor was Carlyle required to pay any transloading fees owed by BTS at the time of breach. *Id.*

Instead, Carlyle was only required to pay outstanding "storage fees" before removing crude from the Facility – an illusory obligation, because BTS was not even required to pay storage fees under the RSA.   SOF ¶¶ 120-21; ERC-1030, 11/16/15 Knapp Email and Attachment, BLFG_EDPA0201411-22, at -15 § 5.2 ("Carlyle shall be entitled *(but not obligated)*, within a reasonable time after its receipt of notice of [Bridger] Default, to fulfill such obligations on behalf of Bridger or remove any Crude Oil it owns from the Terminal.   Prior to Carlyle's removal of Crude Oil from the Terminal, Carlyle shall, at the request of Terminal Company, pay or cause to be paid any **outstanding storage fees** associated with such Crude Oil that are due and owing to Terminal Company under to the Terminal Agreement") (emphasis added).   Eddystone's signing of the Tripartite Agreement thus would have required Eddystone voluntarily, and without consideration, to subordinate its lien rights under the RSA.   The duty of good faith and fair dealing did not obligate Eddystone to act against its own economic interest.   *See Bank of New York v. Sasson*, 786 F. Supp. 349, 354 (S.D.N.Y. 1992) (The duty of good faith "does not require the promisor to take actions contrary to his own economic interest.").   This is all the truer in a situation where, as here, Eddystone had the right to refuse the request even if it were reasonable (which it was not).

Finally, even if Eddystone had an obligation to consent to the Tripartite Agreement—which it did not—based on the undisputed facts, FG cannot establish that a breach of the implied duty was the proximate cause of its alleged damages, as is required.   *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 448 (S.D.N.Y. 2018) (breach of the implied covenant requires proof of proximate cause).   Damages that are "so remote as not to be directly traceable to the breach, or [that] may be the result of other intervening causes, . . . cannot be allowed." *Nat'l Mkt. Share, Inc.*, 392 F.3d at 526 (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)).

39

FG claims that the third party, Carlyle, refused to provide financing "due to [Eddystone's] refusal to sign" the acknowledgement and "[i]f [Eddystone] had agreed to [the financing agreement] . . . BTS would have been able to continue to transload crude oil through the Facility pursuant to the RSA." Dkt. 78, FG CC ¶ 100.  The undisputed evidence, however, shows that Carlyle would *not* have closed on the proposed financing with Jamex *regardless of Eddystone's actions*.  David Johnson, an Advisor in Global Credit at Carlyle and member of Carlyle's Investment Committee, submitted a sworn declaration stating that "if Carlyle entered into the deal with Jamex, Carlyle— as Jamex's proposed assignee—would suffer a loss of at least $9-$11 million every month that it was doing business with Jamex" and this "rendered the proposed deal with Jamex unacceptable under Investment Committee criteria."  ERC-2016, 1/25/21 Declaration of David E. Johnson at ¶ 13; *id.* Exhibit 5; SOF ¶ 124.  In addition, Mr. Johnson states that "In February 2016, Carlyle made the strategic decision to wind down its commodities structured transaction business and ceased entering into commodities structured transactions with new counterparties, like the one proposed with Jamex.  Accordingly, the Investment Committee did not consider the Jamex deal after November 2015."  ERC-2016, 1/25/21 Declaration of David E. Johnson at ¶ 15; SOF ¶ 124. Thus, there is no genuine issue of fact; FG cannot establish—as it must—that Eddystone's failure to acknowledge the Tripartite Agreement was the reason Carlyle declined to provide financing to Jamex, which in turn, was the cause of damage to FG.  Eddystone is therefore entitled to summary judgment.

## VI.   FG'S TORTIOUS INTERFERENCE COUNTERCLAIM FAILS AS A MATTER OF LAW.

FG brings a claim for tortious interference on the basis that Eddystone's settlement with Jamex intentionally deprived FG of "bargained-for contractual rights under the BTS PSA" to

indemnification from Jamex for any failure to pay amounts due under the RSA.  Dkt. 78, FG CC ¶ 150.  The undisputed facts contradict these baseless, borderline frivolous, allegations.

*First*, as a preliminary matter, FG's claim of tortious interference with contract fails on the simple basis that Eddystone has not interfered with any of FG's legal rights under its contract with Jamex.  FG continued to have whatever indemnity rights its contract with Jamex provided, totally unaffected by Eddystone's agreement with Jamex, and FG has always been free to assert those rights.  In fact, FG asserted an indemnification claim against Jamex *in this very litigation*.  Dkt. 70 (Third Party Complaint against Jamex); SOF ¶ 131.  That Eddystone's agreement with Jamex and suit against FG may cause FG to seek to *enforce* its indemnity rights—as it has in fact done—does not prove or even suggest interference with those rights, nor does Jamex's settlement with Eddystone conflict at all with its alleged duty to indemnify FG in the event of a judgment against it.

*Second*, there is no evidence that Eddystone "intentional[ly] . . . caus[ed]" Jamex not to perform under its contract with FG, as is required.  *McClease v. R.R. Donnelley & Sons Co*., 226 F. Supp. 2d 695, 703 (E.D. Pa. 2002); *Nova Telecom, Inc. v. Long Distance Mgmt. Sys., Inc.*, No. 00-cv-2113, 2000 WL1593994, at *9 (E.D. Pa. Oct. 26, 2000); *Shein v. Myers*, 576 A.2d 985, 988 (Pa. Super. Ct. 1990) (tortious interference claim requires intentional action that results in interference of the performance of a contract with another).  The record is devoid of any evidence that Eddystone intended to interfere with FG's indemnification rights—or was even aware of any such rights—when it entered into the settlement to end its dispute with Jamex.  SOF ¶ 130; *See Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 731 (E.D. Pa. 2014) (granting summary judgment where plaintiff "failed to identify any evidence that . . . [defendant] had an intent to harm [plaintiff] by interfering with that contractual relationship"); *Corr. U.S.A. v. McNany*, 892 F. Supp.

2d 626, 644 (M.D. Pa. 2012) (tortious interference claim falls where there is no evidence defendant "acted with the 'specific purpose' of harming [plaintiff] or that the interference and harm were ever carried out intentionally").

Nor can the arbitration settlement have caused a breach of Jamex's supposed indemnification obligations to FG because Jamex was refusing to make payments under the RSA *long before* the arbitration settlement.   SOF ¶¶ 126-29; *compare* Dkt. 78, FG CC ¶ 115 (crude delivery, and payments, ceased on February 1, 2016) *with id.* at ¶ 127 (settlement was entered on January 5, 2017).   Where Jamex was *already* not paying, FG cannot plausibly claim the arbitration settlement caused Jamex not to pay; there is simply no possible avenue of causation by which the settlement could have deprived FG of its indemnification payments.   *See Flannery v. Mid Penn Bank*, No. 08-cv-0685, 2008 WL 5113437, at *9 (M.D. Pa. Dec. 3, 2008) (no tortious interference where the defendant "did not cause [the third party] to do anything"); *Perry v. H & R Block E. Enterprises, Inc.*, No. 04-cv-6108, 2007 WL 954129, at *10 (E.D. Pa. Mar. 27, 2007) (tortious interference claim fails where "plaintiff has failed to submit any evidence that she has suffered any pecuniary losses as a result of such action").

Accordingly, summary judgment is warranted on Counterclaim I for tortious interference.

## VII.   FG IS NOT ENTITLED TO THE "EXTRAORDINARY" EQUITABLE REMEDY OF RESCISSION.

Rescission is an equitable remedy, "not a cause of action."   *Zola v. Gordon*, 685 F. Supp. 354, 374 (S.D.N.Y. 1988).   Because FG cannot establish *any* of its counterclaims for the reasons stated above, its "claim" for rescission also fails.   *See Barnett* v. *Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 394 (E.D.N.Y. 2014) (where rescission claim rests on other causes of action, failure

on the "other claims is also the 'death knell' of the[] rescission claim").[9]  But even if FG could survive summary judgment on one of its counterclaims, it still would not be entitled, as a matter of law, to the extraordinary equitable remedy of rescission, which is "very rarely used."  *MBIA Ins. Corp. v. Countrywide Home Loans, Inc*., 963 N.Y.S.2d 21, 22 (2013).

*First*, none of the alleged Facility defects can be characterized as a "basic assumption on which the contract was made," where the RSA contained language that contradict FG's claims or BTS failed to negotiate and reduce to writing purported material terms concerning the Facility. *Gander Mountain Co.* v. *Islip U-Slip*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013), *aff'd,* 561 F. App'x 48 (2d Cir. 2014); Restatement (Second) of Contracts §§ 261, 265 & cmt. (a).  *See* Sections II, III.B, *supra*; SOF ¶¶ 43-46, 83, 108-11.  This is particularly true given the RSA's integration clause, which rendered most alleged misrepresentations inoperative.  SOF ¶ 51.  The basic assumption surrounding the RSA—that there would be a facility capable of transloading seven trains a week to awaiting barges—was unquestionably met.  SOF ¶¶ 39, 55.  As noted, the supposed defects did not prevent BTS from achieving the MVC in many months.  SOF ¶ 56.  Because the alleged defects are not "basic assumption[s]" of the contract, even if FG's claims had merit (they do not), damages would be an adequate remedy and rescission would therefore not be available. *See Empire Outlet Builders LLC v. Constr. Res. Corp. of New York*, 97 N.Y.S.3d 68, 69 (2019) ("[t]he equitable remedy of rescission is not available where there is an adequate legal remedy, and plaintiff does not explain why damages—a legal remedy—would be insufficient.").

*Second*, FG's request for rescission comes too late.  Rescission is only available if the "status quo may be substantially restored" through rescission.  *See Pyskaty v. Wide World of Cars,*

---

[9] As discussed *supra* at Section I, FG makes it rescission claim contingent on the Court piercing the corporate veil for FG's abuse of the corporate form, which would necessarily be a finding FG has unclean hands and is not entitled to equitable remedies like rescission.

*LLC*, 856 F.3d 216, 227 (2d Cir. 2017); *Slater Tr. Co. v. Gardiner*, 183 F. 268, 273 (C.C.S.D.N.Y.) (1910) ("[R]elief is . . . always limited to a restoration of the parties to the status quo.").  As is plain from the face of the RSA, Eddystone built the Facility only *after* obtaining a contractually guaranteed customer via the RSA, SOF ¶ 34, and can therefore not be "substantially restored" to its pre-RSA status quo.  Put simply, the Facility built on the promise of a guaranteed customer cannot be un-built.  This fact *alone* eliminates rescission as a possible remedy.

FG's request is also too late because BTS accepted benefits under the contract *after* discovering the claimed fraud.  *Hangzhou Silk Imp. & Exp. Corp.* v. *P.C.B. Int'l Indus., Inc.*, 2002 WL 2031591, at *4 (S.D.N.Y. Sept. 5, 2002) ("[A]cceptance of benefits under a contract subsequent to discovery of fraud constitutes affirmation of the contract . . . ."); *see also Sugar Creek Stores, Inc.* v. *Pitts*, 604 N.Y.S.2d 407, 408–09 (1993).  Here, FG claims that BTS became aware of the alleged Facility defects as soon as transloading began in May 2014.  Dkt. 78, FG CC ¶¶ 56, 59, 76; SOF ¶ 132.  Indeed, BTS wrote a letter in December 2014 identifying alleged defects and claiming a right to rescind the contract.  SOF ¶ 133.  Even if BTS had the right to rescind at that time (it did not), any such right would have been indisputably extinguished by BTS's continued performance and "acceptance of benefits under [the] contract."  *Hangzhou Silk Imp.*, 2002 WL 2031591 at *4.  And BTS did indeed continue to perform and accept the benefits of the contract.  For more than a year after the December 2014 letter, BTS continued to bring trains into the Facility for Eddystone to transload—which Eddystone did.  Dkt. 78, FG CC ¶ 115; SOF ¶¶ 54, 56, 58, 105-07, 134.  In that same time period, when BTS fell short of its MVC commitment, it paid deficiency charges owed under the RSA.  SOF ¶¶ 57, 135.  Having chosen to continue to operate under the RSA and accept the benefits of use of the Facility, FG cannot now try to rescind the contract.

## CONCLUSION

For the foregoing reasons, Eddystone is entitled to summary judgment on all of the counterclaims asserted.


Dated: September 28, 2021                    Respectfully submitted,

                                             */s/ Filiberto Augusti*
                                             Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                             Terence M. Grugan (I.D. No. 307211)
                                             BALLARD SPAHR LLP
                                             1735 Market Street, 51st Floor
                                             Philadelphia, PA 19103-7599
                                             Telephone: (215) 665-8500
                                             Facsimile: (215) 864-8999
                                             hockeimerh@ballardspahr.com
                                             grugant@ballardspahr.com

                                             Jennifer Quinn-Barabanov (pro hac vice)
                                             Filiberto Agusti (pro hac vice)
                                             Steven J. Barber (pro hac vice)
                                             Andrew J. Sloniewsky (pro hac vice)
                                             STEPTOE & JOHNSON LLP
                                             1330 Connecticut Avenue, NW
                                             Washington, DC 20036
                                             Telephone: (202) 429-3000
                                             Facsimile: (202) 429-3902
                                             jquinnbarabanov@steptoe.com
                                             fagusti@steptoe.com
                                             sbarber@steptoe.com
                                             asloniewsky@steptoe.com

                                             *Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via the Court's ECF system on September 28, 2021,

thereby serving all counsel of record.

Dated September 28, 2021                           /s/ *Andrew J. Sloniewsky*
                                                   Andrew J. Sloniewsky