**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : | |
| Plaintiff/Counter-defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| BRIDGER LOGISTICS, LLC, *et al.*, | : | No. 2:17-cv-00495-JDW |
| Defendants, | : | |
| | : | |
| BRIDGER LOGISTICS, LLC, *et al.*, | : | |
| Defendants/Counterclaimants. | : | |
| | : | |
| | : | |
| | : | |

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR
LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT ON ALL COUNTS
<u>OF PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

TABLE OF ABBREVIATIONS .................................................................. xvi

I.    INTRODUCTION ........................................................................... 1

II.   STANDARD OF REVIEW ............................................................... 1

III.  ARGUMENT .................................................................................. 2

    A.    The Court Lacks Subject Matter Jurisdiction ......................................... 2

        1.    An Alter Ego Remedy Is Not An Admiralty Case ....................... 3

        2.    Because There Is No Underlying Admiralty Case, The
             Court Lacks Enforcement Jurisdiction ....................................... 7

    B.    ERC's Alter Ego "Claim" Fails (Count I) ............................................. 7

        1.    Federal Common Law and State Law Applies ............................ 8

        2.    Alter Ego Is Not a Legally Cognizable Claim ............................ 9

        3.    The Settlement Agreement Does Not Support ERC's
             Claimed Damages ........................................................................ 11

        4.    ERC Cannot Show That BTS Was The Alter Ego Of FGP
             Or FG .......................................................................................... 13

    C.    There Is No Gap-Filling Implied Contract ............................................ 17

        1.    Texas Law Applies ..................................................................... 17

        2.    Any Implied Agreement Is Unenforceable Under The
             Statute of Frauds ........................................................................ 20

        3.    There Was No Implied Contract ................................................ 21

        4.    BL Did Not Assume an Implied Contract .................................. 25

    D.    ERC's Fraudulent-Transfer Claims Fail (Counts II & III) ..................... 26

        1.    The 2016 Assignments Were Subject To A Valid Lien ............... 27

i

**Page**

a.     BOA's Lien Was Valid ...................................................... 28

      i.     BOA Gave Value In Exchange For A Blanket Lien On BTS's Assets ............................ 29

      ii.     BTS Had A Right To The Assets, And BOA Perfected The Lien ...................................... 31

b.     Any Attempt To Invalidate The Lien Would Fail ............ 32

2.     The 2015 Accounting Activities Were Not Fraudulent Transfers ...................................................................... 35

    a.     The 2015 Accounting Activities Were Not Intentional Fraudulent Transfers ......................................... 36

    b.     The Write-Offs Were Not Constructive Fraudulent Transfers ...................................................................... 39

    c.     The Cost Center Recording Was Not A Transfer At All ...................................................................................... 40

    d.     ERC Suffered No Harm From The 2015 Accounting Activities Because All Of BTS's Assets Were Subject To A Valid Lien ............................ 40

3.     Summary Judgment Should Be Granted On The Real Estate Transfer ............................................................... 41

E.     ERC's Breach Of Fiduciary Duty Claim Fails (Count IV) ..................... 42

1.     Count IV Fails Under Louisiana Law ......................................... 42

    a.     Louisiana Law Applies ................................................ 42

    b.     ERC's Fiduciary Duty Claim Fails Under Louisiana Law ............................................................... 44

2.     The Fiduciary Duty Claim Also Fails Under Pennsylvania Law ...................................................................... 45

3.     ERC's "Zone of Insolvency" Claim Fails Under Either State's Law ............................................................................ 48

4.     FG And FGP Are Not BTS Fiduciaries ....................................... 49

# TABLE OF AUTHORITIES

**Cases:**                                                                                                     **Page(s)**

*3 Point Holdings, L.L.C. v. Gulf S. Sols., L.L.C.*,
   2008 WL 695379 (E.D. La. Mar. 13, 2008) ............................................................ 45

*AAB Ele. Indus., Inc. v. Control Masters, Inc.*,
   1980 A.M.C. 1795 (E.D. La. Mar. 20, 1980) ......................................................... 6

*Amavizca v. Nutra Mfg., LLC*,
   2021 WL 945242 (C.D. Cal. Mar. 9, 2021) ........................................................... 12

*Am. Fed. Bank v. W. Central Ag Servs.*,
   2021 WL 1193948 (D. Minn. Mar. 30, 2021) ....................................................... 28

*A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*,
   560 F. Supp. 705 (E.D. Pa. 1983) ......................................................... 29, 40

*Archawski v. Hanioti*,
   350 U.S. 532 (1956) ......................................................................................... 5

*Atlanta Shipping Corp., Inc. v. Chem. Bank*,
   818 F.2d 240 (2d Cir. 1987) .............................................................................. 4, 6

*Banjo Buddies, Inc. v. Renosky*,
   399 F.3d 168 (3d Cir. 2005) .............................................................................. 42

*Barna Conshipping, S.L. v. 2,000 Metric Tons, More or Less,*
   *of Abandoned Steel*,
   10 F. App'x 716 (4th Cir. 2011) ...................................................................... 5

*Bear Ranch, LLC v. HeartBrand Beef, Inc.*,
   2014 WL 1052515 (S.D. Tex. Mar. 18, 2014) ................................................... 18-19

*Blue Whale Corp. v. Grand China Ship. Dev. Co., Ltd.*,
   722 F.3d 488 (2d Cir. 2013) .............................................................................. 8

*Budget Rent-A-Car Sys., Inc. v. Chappell*,
   407 F.3d 166 (3d Cir. 2005) .............................................................................. 18, 19

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   40 F.3d 622 (3d Cir. 1994) .............................................................................. 8

*Cao v. Glob. Motorcars of Houston, LLC*,
   2014 WL 1338309 (Tex. App. Apr. 3, 2014) .................................................... 22

**Page(s)**

*Carucci v. Regency Fin. Grp., LLC*,
2016 WL 3909570 (N.J. App. July 20, 2016) ........................................................... 42

*Celotex Corp v. Catrett*,
477 U.S. 317 (986) ................................................................................................... 2

*Ceres Terminals, Inc. v. Indus. Comm'n of Illinois*,
53 F.3d 183 (7th Cir. 1995) ..................................................................................... 3

*Charles Schwab & Co. v. WS Wealth Mgmt., LLC*,
2016 WL 7033699 (E.D. Va. Dec. 2, 2016) ............................................................. 47

*Chin v. Chrysler LLC*,
538 F.3d 272 (3d Cir. 2008) .................................................................................... 17

*Clientron Corp. v. Devon IT, Inc.*,
894 F.3d 568 (3d Cir. 2018) .................................................................................... 4

*Clipper Wonsild Tankers Holding AS v. Biodiesel Ventres LLC*,
851 F. Supp. 2d 504 (S.D.N.Y. 2012) ...................................................................... 5

*CML V, LLC v. Bax*,
6 A.3d 238 (Del. Ch., 2010) .............................................................................. 46, 47

*Collins v. Allied Pharm. Mgmt., Inc.*,
871 S.W.2d 929 (Tex. App. 1994) ........................................................................... 21

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
194 A.3d 1010 (Pa. 2018) ....................................................................................... 3

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987) ................................................................................................... 43

*Culbreth v. Amosa (Pty) Ltd.*,
898 F.2d 13 (3d Cir. 1990) ...................................................................................... 9

*Curlett v. Madison Indus. Servs. Team, Ltd.*,
863 F. Supp. 2d 357 (D. Del. 2012) ........................................................................ 15

*Daughtry v. Jenny G. LLC*,
703 Fed. App'x 883 (11th Cir. 2017) ....................................................................... 8

*Dominion Dev. Grp., LLC v. Beverlein*,
774 F. App'x 757 (3d Cir. 2019) ............................................................................. 7

**Page(s)**

*Eclipse Liquidity, Inc. v. Geden Holdings Ltd.,*
2020 WL 3574540 (E.D. Pa. July 1, 2020) ............................................ 4

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,*
124 F.3d 252 (1st Cir. 1997) .................................................. 27, 32

*Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.,*
346 F.3d 552 (5th Cir. 2003) ............................................... 6

*E-Learning LLC v. AT&T Corp.,*
517 S.W.3d 849 (Tex. App. 2017) ......................................... 24, 25

*Epperson v. Enter. Express, Inc.,*
338 F. Supp. 2d 328 (D. Conn. 2004) .................................... 28

*Farone v. Bag'n Baggage, Ltd.,*
165 S.W.3d 795 (Tex. App. 2005) ......................................... 21

*Fednav, Ltd. v. Isoramar, S.A.,*
925 F.2d 599 (2d Cir. 1991) ............................................... 6

*Fidelity Bond & Mortg. Co. v. Brand,*
371 B.R. 708 (E.D. Pa. 2007) ............................................. 32

*Finkelman v. Nat'l Football League,*
810 F.3d 187 (3d Cir. 2016) .............................................. 2

*Fletcher v. Atex, Inc.,*
68 F.3d 1451 (2d Cir. 1995) ............................................... 17

*Floyd v. Lykes Bros. S.S. Co.,*
844 F.2d 1044 (3d Cir. 1988) ............................................. 8

*Fluorine On Call, Ltd. v. Fluorogas Ltd.,*
380 F.3d 849 (5th Cir. 2004) ............................................. 11

*Gallagher v. Med. Rsch. Consultants, LLP,*
2004 WL 2223312 (E.D. Pa. Oct. 1, 2004) ........................... 18, 19, 20

*Garden State Tanning, Inc. v. Mitchell Mfg. Grp., Inc.,*
55 F. Supp. 2d 337 (E.D. Pa. 1999) .................................... 39-40

*Garza v. Citigroup Inc.,*
724 F. App'x 95 (3d Cir. 2018) ........................................... 49

**Page(s)**

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ........................................................................... 10

*Golden Horn Shipping Co., Ltd. v. Volans Shipping Co., Ltd.*,
  2017 WL 3535002 (S.D.N.Y. Aug. 16, 2017) ....................................... 43

*Gully v. First Nat'l Bank*,
  299 U.S. 109 (1936) ........................................................................... 3

*Hadjipateras v. Pacifica, S.A.*,
  290 F.2d 697 (5th Cir. 1961) .............................................................. 5

*Hanaway v. Parkesburg Grp., LP*,
  168 A.3d 146 (Pa. 2017) .................................................................... 47

*Harris Fiberglass Materials, Inc. v. Vought Aircraft Indus., Inc.*,
  2007 WL 3317655 (Tex. App. Nov. 9, 2007) ....................................... 22, 23

*Harrison v. Williams Dental Grp., P.C.*,
  140 S.W.3d 912 (Tex. App. 2004) ...................................................... 23

*Hasso v. Hapke*,
  227 Cal. App. 4th 107 (Cal. App. 2014) .............................................. 27

*Heaney v. Riddle*,
  23 A.2d 456 (Pa. 1942) ...................................................................... 46, 48

*Hipple v. Hipple*,
  2016 WL 320216 (E.D. Pa. Jan. 27, 2016) .......................................... 27, 34, 48

*Huard v. Shreveport Pirates, Inc.*,
  147 F.3d 406 (5th Cir. 1998) .............................................................. 16

*Image Masters, Inc. v. Chase Home Fin.*,
  489 B.R. 375 (E.D. Pa. 2013) ............................................................. 39

*In re 1701 Com., LLC*,
  511 B.R. 812 (N.D. Tex. 2014) ........................................................... 32

*In re Blatstein*,
  226 B.R. 140 (E.D. Pa. 1998) ............................................................. 30

*In re Equip. Lessors of Pa., Inc.*,
  No. CIV. A. 98-4752, 1999 WL 391390 (E.D. Pa. May 26, 1999) ........... 3

**Page(s)**

*In re Gulf Fleet Holdings, Inc.*,
   491 B.R. 747 (Bankr. W.D. La. 2013) ................................. 14

*In re Hillsborough Holdings Corp.*,
   166 B.R. 461 (Bankr. M.D. Fla. 1994) ................................ 17

*In re Intelligent Direct Mktg.*,
   518 B.R. 579 (E.D. Cal. 2014) .................................. 41-42

*In re Laramie Assocs., Ltd.*,
   1997 WL 587288 (E.D. Pa. Sept. 8, 1997) ........................... 39

*In re Lobell*,
   390 B.R. 206 (Bankr. M.D. La. 2008) ............................. 45, 48

*In re Moll Indus., Inc.*,
   454 B.R. 574 (Bankr. D. Del. 2011) ................................ 14

*In re Pinto Trucking Svc., Inc.*,
   93 B.R. 379 (Bankr. E.D. Pa. 1988) ................................ 37

*In re Reliable Mfg. Corp.*,
   703 F.2d 996 (7th Cir. 1983) ................................. 30-31

*In re SMTC Mfg.*,
   421 B.R. 251 (Bankr. W.D. Tex 2009) ............................... 42

*In re Terminal Moving & Storage Co., Inc.*,
   631 F.2d 547 (8th Cir. 1980) ..................................... 31

*In re Total Containment, Inc.*,
   2008 WL 682455 (Bankr. E.D. Pa. Mar. 5, 2008) .................... 46

*In re Tronox Inc.*,
   855 F.3d 84 (2d Cir. 2017) ....................................... 14

*In re Valley Bldg. & Const. Corp.*,
   435 B.R. 276 (E.D. Pa. 2010) ............................... 32, 38-39

*In re Vivaro*,
   524 B.R. 536 (Bankr. S.D.N.Y. 2015) ....................... 33, 34-35

*In re Watt & Shand*,
   452 Pa. 287 (1973) .............................................. 41

**Page(s)**

*Inoff v. Craftex Mills, Inc.,*
  2007 WL 4355385 (E.D. Pa. Dec. 11, 2007) ........................................ 19

*ITP, Inc. v. OCI Co.,*
  865 F. Supp. 2d 672 (E.D. Pa. 2012) ................................................. 9

*Jordan v. Sony BMG Music. Ent., Inc.,*
  637 F. Supp. 2d 442 (S.D. Tex. 2008) .............................................. 23

*JTREO, Inc. v. Hightower & Assocs., Inc.,*
  2020 WL 3468148 (Tex. App. June 18, 2020) .................................... 22

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,*
  529 F.3d 371 (7th Cir. 2008) ........................................................... 17

*Kidd v. Symbion, Inc.,*
  2011 WL 4020814 (E.D. La. Sept. 9, 2011) ....................................... 50

*Klein v. Weidner,*
  729 F.3d 280 (3d Cir. 2013) ............................................................ 28

*Kligman v. IRS,*
  272 F. App'x 166 (3d Cir. 2008) ...................................................... 2

*Knapp v. Schaeffler Grp. USA Inc.,*
  2021 WL 2482410 (W.D. Mo. June 17, 2021) .................................... 12

*La. World Exposition v. Fed. Ins. Co.,*
  858 F.2d 233 (5th Cir. 1988) ........................................................... 45

*Liberty Mut. Ins. Co. v. Horizon Bus Co.,*
  2011 WL 1131098 (E.D.N.Y. Feb. 22, 2011) ..................................... 42

*Lusk v. Foxmeyer Health Corp.,*
  129 F.3d 773 (5th Cir. 1997) ........................................................... 15

*Mantle v. N. Star Energy & Constr. LLC,*
  437 P.3d 758 (Wyo. 2019) .............................................................. 47

*Martin v. Wilks,*
  490 U.S. 755 (1989) ....................................................................... 10

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,*
  739 F. Supp. 2d 100 (D. Conn. 2010) .............................................. 49

**Page(s)**

*Mathes Brierre Architects v. Karlton/ISG Enter., LLC*,
   311 So. 3d 532 (La. App. 4th Cir. 2020) ............................................... 9

*Mathews v. Lancaster Gen., Hosp.*,
   87 F.3d 624 (3d Cir. 1996) .............................................................. 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..................................................................... 2

*Matter of Foxcroft Square Co.*,
   184 B.R. 671 (E.D. Pa. 1995) ......................................................... 38

*McDonough Marine Serv. v. Doucet*,
   694 So. 2d 305 (La. Ct. App. 1996) ................................................. 45

*Mehrtash v. Mehrtash*,
   112 Cal. Rptr. 2d 802 (Ct. App. 2001) ............................................ 29

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991) ...................................................... 34, 38

*Melmark, Inc. v. Schutt by and through Schutt*,
   206 A.3d 1096 (Pa. 2019) ............................................................. 43

*Melville v. Am. Home Assur. Co.*,
   584 F.2d 1306 (3d Cir. 1978) ......................................................... 18

*Meyer v. Bayles*,
   2012 WL 2522896 (W.D. La. May 31, 2012) ..................................... 9

*MGR, Inc. v. Geico Cas. Co.*,
   2019 WL 573968 (Tex. App. Feb. 13, 2019) ................................... 24

*Montana-Dakota Util. Co. v. N.W. Pub. Serv. Co.*,
   341 U.S. 246 (1951) ..................................................................... 3

*Mullins v. TestAmerica, Inc.*,
   564 F.3d 386 (5th Cir. 2009) ..................................................... 27, 29

*Nat'l Marine Servs., Inc. v. C.J. Thibodeaux & Co.*,
   380 F. Supp. 1076 (S.D. Tex. 1973) ................................................. 5

*Neeley v. Bankers Tr. Co. of Tex.*,
   757 F.2d 621 (5th Cir. 1985) ......................................................... 25

ix

**Page(s)**

*Nelson v. Adams USA, Inc.*,
  529 U.S. 460 (2000) ................................................................................................. 10

*N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*,
  930 A.2d 92 (Del. 2007) ..................................................................... 46, 48, 49

*Oetting v. Heffler Radetich & Saitta LLP*,
  2017 WL 3453342 (E.D. Pa. Aug. 11, 2017) ............................................... 43

*Pac. Gulf Ship Co. v. Vigorous Ship. & Trading S.A.*,
  992 F.3d 893 (9th Cir. 2021) ................................................................................. 8

*Peacock v. Thomas*,
  516 U.S. 349 (1996) ........................................................................................ 3, 5, 9

*Pearson v. Component Tech. Corp.*,
  247 F.3d 471 (3d. Cir. 2001) ................................................................. 13, 14, 16

*Peoples-Pittsburgh Tr. Co. v. Holy Family Polish Nat'l Catholic Church*,
  19 A.2d 360 (Pa. 1941) ........................................................................................ 34

*Peters v. Lifeline Sys. Co.*,
  2009 WL 3335098 (E.D. Mo. Oct. 15, 2009) ............................................... 12

*Plotkin v. Joekel*,
  304 S.W.3d 455 (Tex. App. 2009) .................................................................... 22

*Quadrant Structured Prods. Co. v. Vertin*,
  115 A.3d 535 (Del. Ch. 2015) ............................................................................ 49

*RBATHTDSR, LLC v. Project 64, LLC*,
  2020 WL 2748027 (D. Del. May 27, 2020) ...................................................... 9

*Richards v. Jefferson Cnty., Ala.*,
  517 U.S. 793 (1996) ............................................................................................... 10

*Robar Dev. Corp. v. Minutello*,
  408 A.2d 851 (Pa. Super. Ct. 1979) ......................................................... 46, 48

*Royce v. Michael R. Needle, P.C.*,
  381 F. Supp. 3d 968 (N.D. Ill. 2019) ............................................................. 31

*RSL Commc'ns PLC v. Bildirici*,
  649 F. Supp. 2d 184 (S.D.N.Y. 2009) ............................................................. 49

**Page(s)**

*Rupp v. Moffo*,
   358 P.3d 1060 (Utah 2015) .................................................   28

*Sanford v. Waugh & Co.*,
   328 S.W.3d 836 (Tenn. 2010) .............................................   49

*Santova Logistics, Ltd. v. Castello 1935, Inc.*,
   2012 WL 4408733 (W.D. Va. June 19, 2012) .....................   5, 6

*Scallop Imaging, LLC v. Vision Techs., Inc.*,
   2021 WL 3561213 (D. Mass. Aug. 12, 2021) .......................   16

*Sexual Minorities Uganda v. Lively*,
   899 F.3d 24 (1st Cir. 2018) ................................................   7

*Sheetz v. Spagnol*,
   302 A.2d 379 (Pa. Super. 1973) .........................................   16

*Simmons v. Luba Workers' Comp.*,
   206 So. 3d 397 (La. Ct. App. 2016) ....................................   8

*Smith v. Marshview Fitness, LLC*,
   212 A.3d 767 (Conn. App. 2019) .......................................   27

*Spring Street Partners-IV, L.P. v. Lam*,
   730 F.3d 427 (5th Cir. 2013) .............................................   3

*Swift & Co. Packers v. Compania Colombiana del Caribe SA*,
   339 U.S. 684 (1950) ..........................................................   4

*Sword Line v. United States*,
   230 F.2d 75 (2d Cir. 1956) ................................................   5

*T.O. Stanley Boot Co. v. Bank of El Paso*,
   847 S.W.2d 218 (Tex. 1992) ..............................................   24

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
   903 F.3d 333 (3d. Cir. 2018) .............................................   13, 14

*United States v. Best Foods*,
   54 U.S. 51 (1998) ..............................................................   4, 15, 49

*United States v. Exec. Health Res., Inc.*,
   196 F. Supp. 3d 477 (E.D. Pa. 2016) .................................   13

**Page(s)**

*Univ. Atl. Sys., Inc. v. Honeywell Int'l, Inc.*,
 388 F.Supp.3d 417 (E.D. Pa. 2019) ........................................................... 21

*Univ. Com. Consulting, Inc. v. Pitcairn Enter., Inc.*,
 2005 WL 2077269 (E.D. Pa. Aug. 26, 2005) ........................................ 32-33

*U.S.I. Prop. Corp. v. M.D. Constr. Co.*,
 230 F.3d 489 (1st Cir. 2000) ..................................................................... 7

*Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*,
 752 A.2d 1175 (Del. Ch. 1999) .................................................................. 9

*Weinstein v. Colborne Foodbotics, LLC*,
 302 P.3d 263 (Colo. 2013) ....................................................................... 47

*Zamora v. Bodden*,
 395 F. App'x 118 (5th Cir. 2010) ............................................................... 4

*Zurich Am. Ins. Co. v. MB Fin. Bank, N.A.*,
 2020 WL 4913178 (Ill. App. Aug. 19, 2020) ........................................... 28


**<u>Statutes and Rules</u>:**

**Louisiana:**

La.R.S. § 10:9-203(b) ...................................................................................... 29

La.R.S. § 10:1-204 ......................................................................................... 30

La.R.S. § 12-1311 .......................................................................................... 42

La.R.S. § 12:1314 .......................................................................................... 45

La.R.S. § 12:1314(A)(1) .................................................................................. 44

La.R.S. § 12:1320(A) ..................................................................................... 44

La.R.S. § 12:1320(C) ................................................................................ 44, 48

La.R.S. § 12:1366 .......................................................................................... 44

Page(s)

**Pennsylvania:**

1 Pa.C.S. § 1927 ........................................................... 28

12 Pa.C.S. § 5101(b) ..................................................... 26, 29, 40

12 Pa.C.S. § 5103 ......................................................... 28, 34

12 Pa.C.S. § 5103(a) ...................................................... 38

12 Pa.C.S. § 5104(a) ...................................................... 26, 36

12 Pa. C.S. § 5104(b) ..................................................... 37

12 Pa.C.S. § 5104(b)(1) ................................................... 37

12 Pa.C.S. § 5104(b)(3) ................................................... 38

12 Pa.C.S. § 5104(b)(5) ................................................... 38

12 Pa.C.S. § 5104(b)(8) ................................................... 38

12 Pa.C.S. § 5104(b)(9) ................................................... 38

12 Pa.C.S. § 5105 ......................................................... 26

12 Pa.C.S. § 5105(b)(4) ................................................... 38

12 Pa.C.S. § 5108(b)(1) ................................................... 41

12 Pa.C.S. § 5110 ......................................................... 26

12 Pa.C.S. § 5101(b)(1) ................................................... 27

13 Pa.C.S. § 1204 ......................................................... 29, 30

13 Pa.C.S. § 9102(a) ...................................................... 35

13 Pa.C.S. § 9317(a)(2) ................................................... 29

13 Pa.C.S. § 9203(b) ...................................................... 29

15 Pa.C.S. § 402(a)(2) .................................................... 43, 44

**Page(s)**

15 Pa.C.S. § 8141 ................................................... 29

15 Pa.C.S. § 8812(a) ............................................. 44

15 Pa.C.S. § 8814 ................................................. 44

15 Pa.C.S. § 8831 ................................................. 46

15 Pa.C.S. § 8832 ................................................. 46

15 Pa.C.S. § 8833 ................................................. 46

15 Pa.C.S. § 8834 ................................................. 46

15 Pa.C.S. § 8834(a) ............................................. 46, 48

15 Pa.C.S. § 8835 ................................................. 46

15 Pa.C.S. § 8841 ................................................. 45

15 Pa.C.S. § 8842 ................................................. 45

15 Pa.C.S. § 8843 ................................................. 45

15 Pa.C.S. § 8844 ................................................. 45

15 Pa.C.S. § 8845 ................................................. 45

15 Pa.C.S.§ 8846 ................................................. 45

15 Pa.C.S. § 8847 ................................................. 42

15 Pa.C.S. § 8848 ................................................. 45

15 Pa.C.S. § 8849.1 .............................................. 45

15 Pa.C.S. § 8850 ................................................. 45

33 Pa.C.S. § 1 ...................................................... 18

33 Pa.C.S. § 3 ...................................................... 20

42 Pa.C.S. § 8141 ................................................. 29

**Page(s)**

**Texas:**

Tex. Bus. & Com. Code. § 1.303(b) ......................................................... 23

Tex. Bus. & Com. Code § 24.002 ......................................................... 26

Tex. Bus. & Com. Code § 26.01(a) ......................................................... 18, 20

Tex. Bus. & Com. Code § 26.01(b)(2) ......................................................... 20

Tex. Bus. & Com. Code § 26.01(b)(5) ......................................................... 20

Tex. Bus. & Com. Code § 26.01(b)(6) ......................................................... 18, 20

**Delaware:**

6 Del. C. § 18-1001 ......................................................... 47

6 Del. C. § 18-1002 ......................................................... 47

**Federal:**

Fed. R. Civ. P. 56(a) ......................................................... 1

**Other Authorities:**

18 C.J.S. Corporations § 38 (2021) ......................................................... 3

*Restatement (Second) of Conflict of Law* § 6 (1971) ................................. 44

*Restatement (Second) of Conflict of Law* § 188(2) (1971) ......................... 19

U.C.C. § 9-203(b) ......................................................... 29

## Table of Abbreviations

2015 Accounting Activities ........................................ "Cost Center Recording" and "Write-Offs"

2016 Assignments ................................Assignment of BTS assets to its affiliates in January 2016

Acquisition............................................. Ferrellgas purchase of BL and subsidiaries in June 2015

Alter Ego Defendants ................................................................................. FGP, FG, BL, and BR

BL...................................................................................................Bridger Logistics, LLC

BM .......................................................................................................Bridger Marketing, LLC

BOA ........................................................................... Bank of America and a consortium of lenders

BR .................................................................................................. Bridger Rail Shipping, LLC

BTS .....................................................................................Bridger Transfer Services, LLC

COSA ............................................................................... Crude Oil Supply Agreement

Cost Center Recording .................................Post-"Acquisition" creation of two new cost centers

Defendants ...................................FGP, FG, BL, BR, and all other BL subsidiaries sued by ERC

ERC .....................................................................................Eddystone Rail Company, LLC

FAC ................................................................................. Dkt. 182, First Amended Complaint

Ferrellgas ...................................................................................................... FG and FGP

FG..............................................................................................Ferrellgas, L.P.

FGP .............................................................................. Ferrellgas Partners, L.P.

Jamex...........................................................................Jamex, LLC, JTH, and JTS

JTH..............................................................................Jamex Transfer Holdings, LLC

JTS ..............................................................................Jamex Transfer Services, LLC

LLC ................................................................... Limited liability company

PSA ............................................................. Purchase and Sale Agreement for the "Acquisition"

PUFTA .............................................................Pennsylvania Uniform Fraudulent Transfer Act

RSA ................................................................. 2013 Rail Facilities Services Agreement

SDNY Case ...................................................*ERC v. BOA*, Case No. 1:19-cv-09584 (S.D.N.Y.)

SUMF ............................................................. Statement of Undisputed Material Facts

Write-Offs ........................................................ BTS accounts receivable written off in mid-2015

Defendants respectfully ask the Court to dismiss this case for lack of subject matter jurisdiction or, in the alternative, to enter summary judgment in their favor on all four counts in ERC's First Amended Complaint.

## I.   INTRODUCTION.

This dispute centers on the RSA between ERC and non-party BTS for the use of a facility in Eddystone, Pennsylvania designed to transload crude oil from rail cars onto barges on the Delaware River.  BL and BTS provided logistical services to support a July 2014 COSA in which non-party BM (a former affiliate of BL) agreed to supply Bakken crude from North Dakota to the Trainer Refinery in Delaware County, Pennsylvania.  (SUMF-¶16.)  FG purchased BL and BTS in the Acquisition, but it did not acquire BM.  (SUMF-¶10, 15, 18.)  Instead, BM was spun off and re-named Jamex Marketing.  (SUMF-¶18.)  In early 2016, JTH (an affiliate of Jamex Marketing) acquired BTS and changed the name to JTS.  (SUMF-¶142.)  JTS subsequently ceased making payments to ERC under the RSA, and ERC initiated arbitration against Jamex.  (SUMF-¶149.)

As explained below, this is a collection action in which ERC attempts to enforce against Defendants a stipulated arbitration award arising from its settlement with Jamex.  Defendants challenge subject matter jurisdiction, which was previously upheld on the basis of admiralty jurisdiction arising from ERC's alter ego count.  In the alternative, Defendants move for summary judgment on each of ERC's four counts: (1) alter ego; (2) intentional fraudulent transfer; (3) constructive fraudulent transfer; and (4) breach of fiduciary duty, including with respect to the alleged "implied contract" theory ERC advances in an attempt to fill various evidentiary voids.

## II.   STANDARD OF REVIEW.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the movant "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The rule "mandates the entry of summary judgment … against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the nonmoving party bears the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3d Cir. 1996). When the non-moving party fails to establish a "genuine issue" for trial, the movant is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.   ARGUMENT.

### A.   The Court Lacks Subject Matter Jurisdiction.

A federal court's "obligation to assure itself that it has subject matter jurisdiction over a claim is antecedent to [its] power to reach the merits of that claim." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016). Defendants moved at the pleading stage to dismiss for lack of jurisdiction. In response, ERC argued that it seeks to recover on a maritime contract through its alter ego count. (Dkt. 308, Opinion at 16.) The Court held that it had "maritime jurisdiction over Eddystone's Amended Complaint under the quasi-contract theory of its Alter Ego claim." (*Id.* at 19.) It also held that, "[s]ince Eddystone's additional claims of fraudulent transfers and breach of fiduciary duties arise out of the same common nucleus of operative fact as its Alter Ego claim, we may exercise supplemental jurisdiction over those claims." (*Id.*)

It is now apparent from the undisputed facts that ERC asserts state-law causes of action that cannot support admiralty jurisdiction. ERC has the burden to establish jurisdiction. *Kligman v. IRS*, 272 F. App'x 166, 168 (3d Cir. 2008) (affirming dismissal for lack of jurisdiction). Thus, Defendants renew their motion, this time on the basis of a factual record demonstrating a lack of jurisdiction. If the Court agrees, there is a pending (but stayed) action in the Court of Common

Pleas for Delaware County, Pennsylvania  (No. CV-2019-646), which does have jurisdiction.

### 1.     An Alter Ego Remedy Is Not An Admiralty Case.

For a "case [to] arise[] 'under the Constitution or laws of the United States'" "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Gully v. First Nat'l Bank,* 299 U.S. 109, 113 (1936) (affirming lack of jurisdiction); *Ceres Terminals, Inc. v. Indus. Comm'n of Illinois*, 53 F.3d 183, 186 (7th Cir. 1995) (rejecting admiralty jurisdiction).

ERC attempts to create jurisdiction not through an admiralty <u>case</u>, but through an equitable <u>remedy</u> available in an admiralty case (i.e., alter ego).  But a court of admiralty cannot award the relief ERC seeks unless it has jurisdiction over the matter in the first instance.  *See Montana-Dakota Util. Co. v. N.W. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951) ("The Judicial Code, in vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions.").

Veil-piercing (or alter ego) is <u>not</u> an independent cause of action.  *See, e.g.*, *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (veil-piercing "does not state a cause of action under ERISA and cannot independently support federal jurisdiction"); 18 C.J.S. Corporations § 38 (2021) ("[W]ithout an underlying cause of action creating corporate liability, evidence of an abuse of the corporate form is immaterial"); *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1035 (Pa. 2018) ("A request to pierce the corporate veil is not an independent cause of action, but rather is a means of imposing liability established in an underlying cause of action"); *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013) (under Texas law, asserting veil piercing or corporate disregard is "purely remedial" and extends "what is otherwise only a corporate liability"); *see also In re Equip. Lessors of Pa., Inc.*, No. CIV. A. 98-4752, 1999 WL 391390, at *2 (E.D. Pa. May 26, 1999) ("veil piercing" and "alter ego" are

interchangeable terms).

Instead, veil piercing is "an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation." *Clientron Corp. v. Devon IT, Inc*., 894 F.3d 568, 576 (3d Cir. 2018) (quoting *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999)).  As such, it imposes derivative liability. *Id*. at 579; *see also United States v. Bestfoods*, 524 U.S. 51, 68 (1998) (questions about "relationship between" a parent and a subsidiary go to "indirect liability")

Because ERC does not assert a maritime cause of action as a basis for veil-piercing, it has failed in its burden to establish a basis for subject matter jurisdiction.  *See Zamora v. Bodden*, 395 F. App'x 118 (5th Cir. 2010) (affirming dismissal of an attempt to "collect an award on an alter-ego theory rendered in a prior admiralty case"); *Peacock*, 516 U.S. at 354.  A court of admiralty will "not enforce an independent equitable claim merely because it pertains to maritime property." *Swift & Co. Packers v. Compania Colombiana del Caribe SA*, 339 U.S. 684, 865-66 (1950).  The Second Circuit said it succinctly:  "Having never invoked the jurisdiction of an admiralty court over any primary admiralty claim, Atlanta cannot now invoke admiralty jurisdiction against a third party over the derivative claim of an alleged fraudulent transfer." *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987).  Similarly, this Court recently rejected the "maritime" characterization of a suit to hold an alleged successor liable for a judgment based on the purchase of a boat.  *Eclipse Liquidity, Inc. v. Geden Holdings Ltd*., 2020 WL 3574540, *4 (E.D. Pa. July 1, 2020).

Here, Defendants were strangers to the contract from the beginning; ERC considered but did <u>not include</u> in the RSA a parent guaranty requirement.  (SUMF-¶30.)  In its prior Opinion, the Court recognized there was no privity between ERC and Defendants—and no claim for breach of

the RSA.  (Dkt. 308, Opinion at 17-18.)  Adopting an approach not briefed by either party, however, the Court referred to "quasi-contract" in conjunction with alter ego and, in the process, conflated a quasi-contract claim in admiralty with an alter ego remedy available only when admiralty jurisdiction has otherwise been established.  (*Id.*)

That explains why the majority of the cases the Court cited find admiralty jurisdiction over quasi-contract <u>claims</u> relating to an <u>admiralty wrong</u>.  *See Archawski v. Hanioti*, 350 U.S. 532, 533-34 (1956) (quasi-contract claim related to shipowner's retention of money paid for passage not provided); *Barna Conshipping, S.L. v. 2,000 Metric Tons, More or Less, of Abandoned Steel*, 410 F. App'x 716, 719 (4th Cir. 2011) (quasi-contract claim in a dispute over damaged cargo delivered via ship); *Sword Line v. United States*, 230 F.2d 75, 77 (2d Cir. 1956) (quasi-contract claim regarding repayment of overcharges for charter hire); *Santova Logistics, Ltd v. Castello 1935, Inc.*, 2012 WL 4408733, at *4 (W.D. Va. June 19, 2012) (quasi-contract claim regarding payment under bill of lading for shipment of goods); *Nat'l Marine Servs., Inc. v. C.J. Thibodeaux & Co.*, 380 F. Supp. 1076, 1079 (S.D. Tex. 1973) (pre-*Peacock* decision holding party for whose benefit ship repairs were made responsible for repair costs).

The other cases relied upon by the Court find jurisdiction only when there is an underlying maritime jurisdictional basis, and not otherwise.  *See Hadjipateras v. Pacifica, S.*A., 290 F.2d 697, 705 (5th Cir. 1961) (finding jurisdiction over a claim for unpaid funds, because admiralty jurisdiction exists "when [an] accounting is necessary to the complete adjudgment of rights <u>over which admiralty has independent jurisdiction.</u>") (emphasis added); *Clipper Wonsild Tankers Holding AS v. Biodiesel Ventres LLC*, 851 F. Supp. 2d 504, 505 (S.D.N.Y. 2012) (addressing enforcement of confirmed arbitration award involving claims under Rule B of the Supplemental Admiralty and Maritime Claim Rules against dissolved entity, without considering *Peacock*

jurisdictional issues).[1]

      Unlike the cases upon which the Court relied, there is no underlying admiralty claim here. Instead, ERC seeks to recover from the former owner of JTS and its corporate parents, based on a stipulated arbitration award with JTS that has not been confirmed.  (SUMF-¶150-51, 155.)

      Moreover, the deficiency fees ERC seeks to recover are not a maritime debt.  There is nothing maritime about ERC's claim for more than $140 million in unpaid deficiency fees for <u>not using a facility</u>.  (*See* SUMF-¶25-26, 157.)  *Atlanta Shipping*, 818 F.2d at 248 ("Atlanta is not pursuing a 'derivative issue in a litigation clearly maritime' nor is equitable relief sought 'in the course of admiralty's exercise of its jurisdiction over a matter exclusively maritime.'"); *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc*., 346 F.3d 552, 566 (5th Cir. 2003) (bond to reimburse deposits for a cruise that does not occur is "not maritime in nature:" it "does not relate to the carriage of passengers; it merely makes good on the owners' financial obligations by reimbursing the passengers if the cruise is not performed."); *Fednav, Ltd. v. Isoramar*, S.A., 925 F.2d 599, 602 (2d Cir. 1991) (contribution agreement is not maritime because an agreement to satisfy an obligation from a maritime contract or tort is not an admiralty claim; nor is breach of a settlement; and where the defendant was not a party to a settlement, the agreement is "collateral" and "cannot serve as the basis for initiating an independent action in admiralty for specific performance."); *Santova*, 2012 WL 4408733, at *3 ("A contract of indemnity, even where it be for default in the performance of a maritime service, is not essentially maritime in character since it cannot, by definition, 'relate to a ship in its use as such.'").

      ERC tried but failed to obtain a parent guaranty for the RSA.  (SUMF-¶30, 34.)  Even had

---

[1]     One of the cited cases found no admiralty jurisdiction because the conduct occurred on land. *AAB Ele. Indus., Inc. v. Control Masters, Inc*., 1980 A.M.C. 1795 (E.D. La. Mar. 20, 1980).

such an agreement existed, an action upon that agreement would not have been maritime. ERC's decision to forego the protections offered by such a guaranty cannot manufacture admiralty jurisdiction over its attempt to impose the same obligation in the absence of any contract.

>        2.    **Because There Is No Underlying Admiralty Case, The Court Lacks Enforcement Jurisdiction.**

Because there is no underlying maritime claim, the Court lacks jurisdiction to craft an equitable remedy. Subject matter jurisdiction is "circumscribed by Article III and congressional action" and cannot be enlarged through equitable doctrines. *Sexual Minorities Uganda v. Lively*, 899 F.3d 24, 34 (1st Cir. 2018). To be sure, courts retain a certain "residual federal jurisdiction over postjudgment enforcement proceedings flowing from their original jurisdiction over the action" and that "[a]ncillary enforcement jurisdiction" "traditionally has an equitable and discretionary character." *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 496 (1st Cir. 2000) (no enforcement jurisdiction over alter ego claim). But in such cases, there must be continuity, such that postjudgment proceedings "collect an existing judgment" rather than "raise an independent controversy with a new party, attempting to shift liability." *Id.* at 498-99. When the purpose is the latter, as here, there must be an independent ground for federal jurisdiction. *Id.*

That limitation applies generally, even if a party is seeking to enforce a settlement agreement, unless the terms of the settlement are expressly incorporated in the dismissal order or there is an independent basis for jurisdiction. *Dominion Dev. Grp., LLC v. Beverlein*, 774 F. App'x 757, 759 (3d Cir. 2019) (no jurisdiction where dismissal order did not incorporate settlement). Here, there is no such order and no independent basis for jurisdiction.

>  **B.    ERC's Alter Ego "Claim" Fails (Count I).**

ERC brings a "claim" for "Alter Ego" liability, seeking to "pierc[e] the corporate veil of BTS and hold[] each [Alter Ego] Defendant ... liable for the debts BTS owes to Eddystone." (Dkt.

182, FAC ¶86; SUMF-¶156.)

### 1. Federal Common Law And State Law Applies.

While Defendants dispute jurisdiction, they assume admiralty jurisdiction for purposes of the substantive arguments on summary judgment. The Third Circuit has not decided the issue, but other federal courts sitting in admiralty have applied federal common law to evaluate alter ego theories. *See, e.g.*, *Blue Whale Corp. v. Grand China Ship. Dev. Co., Ltd.*, 722 F.3d 488, 497 (2d Cir. 2013) ("When the choice is between state law and federal common law, the federal interest in maintaining uniformity in the quintessentially federal realm of admiralty supersedes any competing interest in applying state law"); *Pac. Gulf Ship. Co. v. Vigorous Ship. & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) ("Sitting in admiralty, we apply the federal common law in examining corporate identity."); *Daughtry v. Jenny G. LLC*, 703 Fed. App'x 883, 886 (11th Cir. 2017) (unpublished) ("To determine whether to disregard the corporate form in an admiralty case, we apply federal common law.").

Even applying federal common law, the Court may borrow from state law. *Floyd v. Lykes Bros. S.S. Co.*, 844 F.2d 1044, 1047 (3d Cir. 1988) ("State law may supplement maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with maritime law."); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 40 F.3d 622, 627 (3d Cir. 1994) ("Whether a state law may provide a rule of decision in an admiralty case depends on whether the state rule 'conflicts' with the substantive principles of federal admiralty law.").

In this case, there are no material conflicts between the laws of Louisiana (the state of formation for BTS and BL), Delaware (the state of formation of FG), or Pennsylvania (the location of the ERC terminal). (SUMF-¶4, 6, 15, 19, 167); *see, e.g,*, *Simmons v. Luba Workers' Comp.*, 206 So. 3d 397, 402 (La. Ct. App. 2016) (The veil is pierced when "the shareholder fails to properly conduct the corporation's business as a separate entity, and the shareholder and the corporation

become indistinguishable such that, in reality, the corporation is the alter ego of its shareholder."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (To pierce the corporate veil, the parent must have "exclusive domination and control" such that the controlled entity "no longer ha[s] legal or independent significance of [its] own" and is essentially a "sham and exist[s] for no other reason than as a vehicle for fraud."); *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 14 (3d Cir. 1990) (In Pennsylvania, veil piercing requires a showing that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham.").

### 2.    Alter Ego is Not a Legally Cognizable Claim.

As explained above, alter ego is not an independent cause of action, "but rather is a means of imposing liability on an underlying cause of action." *Peacock*, 516 U.S. at 354; *see also ITP, Inc. v. OCI Co.*, 865 F. Supp. 2d 672, 684 (E.D. Pa. 2012) ("[A]n attempt to pierce the corporate veil is not itself a cause of action, but rather a means of imposing liability on an underlying cause of action, such as a tort or breach of contract."); *Mathes Brierre Architects v. Karlton/ISG Enter., LLC*, 311 So. 3d 532, 542 (La. App. 4th Cir. 2020) (same).

Here, ERC seeks to impose liability on the Alter Ego Defendants for breach of the RSA, principally the failure to pay deficiency fees from early 2016 to the RSA's expiration.  (FAC-¶86, Prayer for Relief ¶¶1, 2; SUMF-¶156.)  Yet ERC has not brought a claim for breach of the RSA in this case.  As a result, there is no underlying claim on which to base liability.  *See Peacock*, 516 U.S. at 354 (no jurisdiction over alter ego "claim" because there was no underlying cause of action); *RBATHTDSR, LLC v. Project 64 LLC*, 2020 WL 2748027, at *6 (D. Del. May 27, 2020) (dismissing alter ego claim premised on a tort claim that was not asserted); *Meyer v. Bayles*, 2012 WL 2522896, at *4 (W.D. La. May 31, 2012) ("[I]f a complaint attempts only to state a veil-piercing claim, and not an underlying cause of action, it must be dismissed.").

Rather than asserting an underlying breach of contract claim, ERC seeks to collect from the Alter Ego Defendants on the basis of the settlement agreement between ERC and Jamex. (FAC-¶¶75, 86).)  That settlement agreement expressly disclaims liability as to JTS.  (SUMF-¶151.)  Critically, the settlement agreement was the result of an arbitration ERC brought against Jamex, in which the Alter Ego Defendants did not participate.  (SUMF-¶149-50.)

It is a "violat[ion of] the Due Process Clause of the Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented."  *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 794 (1996) (citing *Hansberry v. Lee*, 311 U.S. 32, 37 (1940)) (state court's decision to bind litigants to an earlier adjudication in which they did not participate deprived them of due process); *Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").  "The fundamental requisite of due process of law is the opportunity to be heard ... in a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).  Accordingly, a party cannot be held liable for a judgment where it had no opportunity to be heard.  *See, e.g.*, *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 460–61 (2000) (party added post-judgment was denied due process where it had no opportunity to contest liability).

Here, it is undisputed that the Alter Ego Defendants were not parties to the arbitration or the settlement agreement.  (*See* SUMF-¶149-50.)  Nor were the Alter Ego Defendants' interests "adequately represented" by JTS in the arbitration proceeding such that due process has been satisfied.  *See Martin*, 490 U.S. at 762 (prior suit did not bar subsequent suit on same topic by different parties because their interests were not adequately represented).  Indeed, there was no ongoing relationship between JTS and the Alter Ego Defendants at the time of the arbitration.

(SUMF-¶142-43.)  Moreover, the settlement agreement states that JTS agreed to settle due to a lack of "resources remaining to continuing litigating the Arbitration or satisfy any award in favor of ERC."  (SUMF-¶152.)  Finally, while the parties to the arbitration stipulated to an award of $139,050,406.77 against JTS, it required payment of only $450,000 by the "Jamex Parties" (excluding JTS).  (SUMF-¶153.)  Although all Jamex entities disclaimed liability, the ERC release does not include JTS.  (SUMF-¶151, 154.)  As James Ballengee (Jamex's owner) described it:

> [F]or half a million dollars to get out and to get releases [] for myself and everybody up and down the chain, I felt like that was a huge win, even though I felt like that we had—you know, our claims had merit. I just didn't have the million dollars to spend to defend it.

(SUMF-¶152.)  In short, the arbitration settlement was aimed at securing releases for all of the Jamex entities except JTS—the entity through which ERC purports to assign liability to the Alter Ego Defendants.  The Court should reject any attempt by ERC to impose liability on the Alter Ego Defendants based on the arbitration outcome.

### 3. The Settlement Agreement Does Not Support ERC's Claimed Damages.

Even if the alter ego "claim" were proper, ERC cannot establish the underlying liability for any of its claimed damages.  ERC asserts four sets of unpaid amounts under the RSA: (1) $44,399.67 charged to ERC on December 15, 2015 by Norfolk Southern for moving locomotives in and out of the ERC facility; (2) $493,134.38 for deficiency charges incurred in January 2016; (3) $3,338,639.50 for deficiency charges incurred in February 2016; and (4) $143,816,593.05 for the "entire remaining amount of deficiency charges" for the term of the RSA.  (SUMF-¶157.)

As to the alleged deficiency payments from February 2016 to the end of the RSA's term (items 3 and 4)—the principal damages ERC seeks—there can be no alter ego liability where a parent entity does not assert control over a subsidiary at the time of the alleged misconduct.  *E.g.*, *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861–62 (5th Cir. 2004) ("It is illogical,

for example, to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred."); *Knapp v. Schaeffler Grp. USA Inc.*, 2021 WL 2482410, at *2 (W.D. Mo. June 17, 2021) ("Unless the 'parent corporation' had 'complete[ ] control [of] its subsidiary at the time the complained of conduct occurred,' a court cannot hold the parent liable for the alleged acts of the subsidiary.").

Here, it is undisputed that Defendants had no relationship with JTS after February 1, 2016. (SUMF-¶143.)  Indeed, when Jamex acquired BTS in an effort to negotiate with ERC, it also acquired the RSA, including all obligations to make deficiency payments incurred after February 1, 2016.  (SUMF-¶144-45.)  There is no basis to hold the Alter Ego Defendants responsible for payments owed by JTS <u>after</u> it was sold to Jamex.  *E.g.*, *Peters v. Lifeline Sys. Co.*, 2009 WL 3335098, at *1 (E.D. Mo. Oct. 15, 2009) (because plaintiff "bec[ame] the parent of [defendant] only four days after the accident in this matter it is not plausible that [plaintiff] exerted the type of control at the time the complained of conduct occurred needed to pierce the corporate veil"); *Amavizca v. Nutra Mfg., LLC*, 2021 WL 945242, at *4 (C.D. Cal. Mar. 9, 2021) (plaintiff "fail[ed] to raise a triable issue of fact as to whether [parent company] acted as [subsidiary company's] alter ego with respect to the conduct that caused Plaintiff's alleged injury").

The alleged deficiency payments from January 2016 (item 2), and any alleged charges by Norfolk Southern in December 2015 (item 1), were undisputedly incurred prior to the sale of BTS and retained by BL.  (*See* SUMF-¶146.)  To prevail, ERC would need to assert a breach of contract claim against BL, the entity that retained such liabilities.  ERC failed to do so.  Even if the arbitration settlement could create liability for the Alter Ego Defendants (it cannot), Jamex had no authority to settle claims arising prior to its purchase of JTS.  Thus, there is no basis to hold any

12

of the Alter Ego Defendants liable to ERC for pre-sale breaches of the RSA.[2]

### 4.    ERC Cannot Show That BTS Was The Alter Ego Of FGP Or FG.

ERC also lacks clear and convincing evidence to pierce the BTS corporate veil to reach the top two levels of the Ferrellgas corporate structure: (1) FG, the sole parent of BL, and (2) FGP, the controlling parent of FG.  (SUMF-¶4, 13.)  "[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (affirming determination not to pierce veil).  To succeed on an alter ego theory, a plaintiff "must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such."  *Id.* at 485.  Courts examine multiple factors to determine whether to pierce the veil: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [subsidiary] corporation, siphoning of funds from the [subsidiary] corporation by the stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a façade for the operations of the dominant stockholder."  *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018) (quoting *Pearson*, 247 F.3d at 484-85) (finding no basis to pierce veil).  "Additionally, the situation 'must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness.'"  *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 515 (E.D. Pa. 2016) (quoting *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981)) (dismissing claims against corporate parents for failure to establish basis for veil-piercing).  No single factor is dispositive; the court looks to the totality of the circumstances.

---

[2]     Pursuant to the agreement for the sale of BTS to Jamex, BL provided $4,447,677.96 to Jamex "in satisfaction of all charges and sums actually due under invoices issued in the ordinary course of business pursuant to the Eddystone Agreement" incurred in January 2016.  (SUMF-¶147.)  Payment was due in February 2016, after the acquisition, and Jamex's owner made a decision to pay ERC the transloading charges for January 2016, but not the deficiency fees. (SUMF-¶148.)

*See Trinity*, 903 F.3d at 365.  Ultimately, the test is "an inquiry into whether the [controlled] corporation is little more than a legal fiction.  Such a burden is notoriously difficult for plaintiffs to meet."  *Pearson*, 247 F.3d at 485.  Indeed, the plaintiff must meet its burden by clear and convincing evidence.  *Trinity*, 903 F.3d at 365.[3]

Moreover, numerous courts have found that, where alter ego theories are directed at multiple levels of corporate organization, alter ego liability must be established for each relationship at each level.  *See, e.g.*, *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 790 & n.10 (Bankr. W.D. La. 2013) ("Under Delaware law, if a plaintiff seeks to establish liability for all members of a corporate group, it must 'establish alter ego liability with respect to each one of the entities.'"); *In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017) (two additional levels of veil piercing needed to reach former parent and ultimate parent).  At a minimum, ERC must come forward with veil-piercing evidence as to FG and FGP.  *See In re Moll Indus., Inc.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011) (requiring veil-piercing evidence as to each defendant).

Here, there is little to no evidence regarding FGP and FG.  ERC has no evidence that FGP ever acted as the alter ego of its subsidiary FG (or BTS), nor is there any material evidence that FG acted as an alter ego of its subsidiary BL (or BTS).  There is no evidence that FG or BL, at any relevant time, was undercapitalized, failed to observe corporate formalities, unreasonably failed to pay dividends, was insolvent, had funds siphoned from it by its parent, had nonfunctioning officers and directors, failed to keep adequate corporate records, or was merely "a façade for the operations of" its parent company.  *See Trinity*, 903 F.3d at 365.  To the contrary, the evidence demonstrates that Rios and Gamboa served as BL officers (SUMF-¶11-12) and BL entered into written contracts

---

[3]     ERC also cannot establish that either BL or BR was an alter ego of BTS.  But in recognition of the limitations of summary judgment, particularly given a totality of the circumstances test, Defendants do not move for summary judgment on that basis with respect to BL or BR.

with third parties, including Jamex Marketing and Monroe, which entitled it to payment for the logistics services provided (SUMF-¶59-61).

The basis for ERC's alter ego claim against FGP and FG consists of generalized statements regarding "Ferrellgas" or "Defendants," and assertions that Rios, Gamboa, and other Ferrellgas employees were involved in decisions relating to BTS. (*See* SUMF-¶158.) Such facts, even if proven, are insufficient to meet the high burden required to disregard the corporate form. *Bestfoods*, 524 U.S. at 69 (quoting *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988)) (court erred in its "automatic attribution of the actions of dual officers and directors to the corporate parent").  "[I]t cannot be enough to establish liability ... that dual officers and directors made policy decisions and supervised activities." *Id.* at 69-70; *see also Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997) (describing "well established principle that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership" and requiring plaintiffs to establish that the dual officers were "acting in their capacity as officers of [the subsidiary]"). "[C]lose relationships, even to the point where the subsidiary's management is run by the parent's employees, are not sufficient to hold the parent liable for the subsidiary's actions unless the 'subsidiary is in fact a mere instrumentality or alter ego of its parent.'" *Curlett v. Madison Indus. Servs. Team, Ltd.*, 863 F. Supp. 2d 357, 363 (D. Del. 2012) (dismissing alter ego claim).

Here, ERC has failed to elicit evidence that any of the actions complained of were undertaken by Rios or Gamboa in their capacity as officers or employees of FGP or FG, rather than in their capacity as officers of BL.  In fact, neither Rios nor Gamboa were employed by FG or FGP—their employment contracts were with non-party Ferrellgas, Inc., and they held corporate positions at that company and BL.  (SUMF-¶11-12.)  Nor has ERC elicited evidence that any of

the other individuals they identify were employed by FGP or FG or were acting in their capacity as FGP or FG employees.  For example, of those employed by any Alter Ego Defendant, Todd Soiefer was an employee of both BL and Ferrellgas, Inc., Steve Wambold was employed by Ferrellgas, Inc., Trent Hampton was employed by Ferrellgas, Inc., and Patrick Knapp was an employee of both Ferrellgas, Inc. and BL.  (SUMF-¶159.)  Even if these individuals assisted in managing BTS or made decisions on behalf of BTS, ERC has failed to adduce any evidence that the actions of any identified individual were such that BTS "had no separate existence" from FGP or FG or that FGP, FG, and BTS all "functioned as a single entity."  *Pearson*, 247 F.3d at 485.

Importantly, it is undisputed that ERC knew, when entering into the RSA, that BTS was a separate entity and that other related Bridger entities would not guarantee BTS's obligations. (SUMF-¶45.)  ERC did not demand a parent guaranty as part of the RSA, even though its parent company (Enbridge) had previously required such a guaranty in another contract with BTS. (SUMF-¶21, 30, 34-36.)  An alter ego theory cannot be used to rewrite the RSA to create a parent guaranty that ERC never obtained.  *See Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406, 409 (5th Cir. 1998) ("More stringent standards [for veil-piercing] are justified with respect to contract claims because the plaintiff's claim depends on the existence of a contract in which he chose to rely solely on the obligation of the corporation without any additional guarantees from its shareholders"); *Sheetz v. Spagnol*, 302 A.2d 379, 381 (Pa. Super. 1973) ("The lower court has in this case, through its improper disregard of the corporate existence, rewritten an explicit contract so as to impose personal liability where none has been contracted."); *Scallop Imaging, LLC v. Vision Techs., Inc.*, 2021 WL 3561213, at *9 (D. Mass. Aug. 12, 2021) ("Scallop did not bargain for a contractual guaranty from Vision, and the Court declines to grant it one 'ex post facto' through veil piercing.").

To the extent ERC relies on BTS's cash management system or Cost Center Recording (i.e., Bridger Rail Services and Bridger Pipeline Services), "[c]ourts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 380 (7th Cir. 2008) (same); *see also In re Hillsborough Holdings Corp.*, 166 B.R. 461, 471 (Bankr. M.D. Fla. 1994) ("It has been widely recognized in the corporate world that there is nothing inherently wrong in a parent managing all the cash generated by the subsidiaries through a cash management system."). To the extent ERC relies on the 2016 Assignments, such assets were subject to a valid lien in favor of BOA, as explained below.

### C. There Is No Gap-Filling Implied Contract.

ERC seeks to use an "implied contract" obligating BL to satisfy BTS's obligations to ERC as a means to fill evidentiary gaps (including the absence of a parent guaranty) and collect from BL deficiency fees that accrued after BTS was sold to Jamex on February 1, 2016. (FAC-¶¶10, 44, 48, 49, 71.) Specifically, ERC alleges that BTS "abrogated" an "implied contract," resulting in fraudulent transfers (Counts II and III) and a breach of fiduciary duty (Count IV). (*Id.* ¶¶89-90, 92, 95, 102.) To the extent ERC's claims rely on the alleged existence of an implied contract, Defendants are entitled to summary judgment.

#### 1. Texas Law Applies.

Where, as here, a court exercises supplemental jurisdiction over state-law claims, it applies the substantive law of the forum state, including its choice-of-law rules. *See Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Pennsylvania employs a "hybrid" choice-of-law analysis that "combines the approaches of both Restatement II (contacts establishing significant relationships) and 'interest analysis'

(qualitative appraisal of the relevant States' policies with respect to the controversy)." *Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978). The first step is to evaluate the interests of the implicated states and determine if there is a "true" conflict, "false" conflict, or an absence of law. *Budget Rent-A-Car Sys. Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005). "A true conflict exists 'when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied,' and a false conflict exists when 'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law.'" *Id.* (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 & n.15 (3d Cir. 1991)).

Here, ERC alleges a pre-Acquisition implied contract between BTS and BM, which BL assumed from BM following the Acquisition in mid-2015. (FAC-¶48; SUMF-¶63.) Thus, the states with interests are (1) Pennsylvania, as the forum state, and (2) Texas, as the principal place of business of BTS, BM, and BL. (SUMF-¶6, 17, 167.) There is a material difference in the way Pennsylvania and Texas address the statute of frauds, and thus whether they would recognize an implied contract. Pennsylvania does not require parties to memorialize contracts that cannot be performed in one year. *See* 33 Pa.C.S. §§ 1, *et seq*. In Texas, however, an agreement "which is not to be performed within one year from the date of making the agreement" must be in writing and "signed by the person to be charged." Tex. Bus. & Com. Code § 26.01(a), (b)(6). Accordingly, the statute of frauds differs meaningfully. *See Gallagher v. Med. Rsch. Consultants, LLP*, 04-236, 2004 WL 2223312, at *5 (E.D. Pa. Oct. 1, 2004) (applying Texas law to breach of contract claim based on statute of frauds difference with Pennsylvania law).

This creates a "false" conflict, because only the interests of Texas are impaired if its statute of frauds is ignored. The Texas statute of frauds "prevent[s] fraud and perjury in certain types of transactions." *Id.*; *see also Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 2014 WL 1052515, at *6

18

(S.D. Tex. Mar. 18, 2014) (Texas statute of frauds "has the purpose of 'remov[ing] uncertainty, prevent[ing] fraudulent claims, and reduc[ing] litigation'") (quoting *Givens v. Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984)).

Courts have reasoned that the absence of a one-year statute of frauds provision in Pennsylvania indicates an interest in "enforce[ing] oral contracts" over "preventing fraud and perjury." *Gallagher*, 2004 WL 2223312, at *5. Here, because the party that would need to enforce the alleged implied contract, BTS, operated its business from Texas, Pennsylvania's interest is inapplicable. *See Inoff v. Craftex Mills, Inc.*, CIV. A. 06-3675, 2007 WL 4355385, at *6 (E.D. Pa. Dec. 11, 2007) (Pennsylvania had no interest in applying its statute of frauds because the person seeking to enforce the agreement was a resident of New York). Accordingly, the Court should apply "the law of the only interested jurisdiction"—Texas. *Budget*, 407 F.3d at 170.

Even if Pennsylvania had an interest in enforcing the alleged agreements on behalf of ERC, resulting in a "true" conflict, the Pennsylvania framework points to Texas law. When a case presents a true conflict, courts apply "the law of the state having the most significant contacts or relationships with the particular issue." *Id.* To determine the state with the most significant contacts, Pennsylvania courts apply the *Restatement (Second) of Conflicts of Law* § 188(2) (1971) to evaluate the "relevant contacts between each state, the parties, and the subject matter" and then the contacts "according to the policy oriented factors." *Gallagher*, 2004 WL 2223312, at *6. Here, while the affected companies were organized in Louisiana and ERC is in Pennsylvania, all contacts related to the alleged implied contract point to the application of Texas law because BTS, BM, and BL were all operating in Texas when they allegedly entered into, assumed, and performed on the alleged implied contract to satisfy the obligations of BTS under the RSA. (SUMF-¶1, 6, 17, 167.)

The policy factors also favor Texas. *Gallagher*, 2004 WL 2223312, at *7. Texas' interest

is express, while any Pennsylvania interest is inferred from legislative silence, and (1) all parties

to the alleged implied contract were in Texas and reasonably expected any contracts between them

to be governed by Texas law; (2) predictability and certainty are furthered where contracts are

governed by the state with the most interest, particularly when applying the majority view (here, a

statute of frauds provision regarding contracts of more than one year); and (3) the basic polices of

contract law are furthered by requiring written contracts.  *See id.*  Thus, Texas law governs all

issues related to the alleged implied contract.  *Id.*  at *3, 10 (applying Texas law to "disposition of

[plaintiff's] breach-of-contract claim" after choice of law analysis focusing on statute of frauds

differences).

### 2.  Any Implied Agreement Is Unenforceable Under The Statute Of Frauds.

Under Texas law, certain types of contracts are "not enforceable unless the promise or

agreement" is "in writing" and "signed by the person to be charged with the promise or

agreement…."  Tex. Bus. & Com. Code § 26.01(a).  One of such contract types is "an agreement

which is not to be performed within one year from the date of making the agreement." *Id.* §

26.01(a), (b)(6).  Here, ERC alleges a contract with a duration of "5 years and 2 months."  (SUMF-

¶62.)  Because the alleged agreement was for a term beyond one year, the statute of frauds required

a signed writing.  Tex. Bus. & Com. Code § 26.01(b)(5).  ERC admits, however, that the alleged

contract "was not a written agreement."  (SUMF-¶64.)

In addition, the Texas statute of frauds requires a written contract for "a promise by one

person to answer for the debt, default, or miscarriage of another person."  Tex. Bus. & Com. Code

§ 26.01(b)(2).[4]  Here, ERC contends that it "expected" that BL (post-Acquisition) or BM (pre-

---

[4]     Pennsylvania law also provides that "[n]o action shall be brought … to charge the defendant, upon any special promise, to answer for the debt or default of another" unless such promise is "in writing, and signed by the party to be charged therewith."  33 P.S. § 3.

Acquisition) "would answer for the debts of BTS" under the RSA by "ensur[ing] that BTS had the funds sufficient to satisfy that debt." (SUMF-¶79.) While such an arrangement would be tantamount to a parent guaranty, ERC admits it "asked for a parent guaranty to secure the full amount of the RSA" or a "letter of credit," but that "ultimately did not come to fruition." (SUMF-¶30, 34.) This provision of the statute of frauds is independently dispositive and precludes ERC from enforcing an unwritten implied contract to pay BTS's obligations.

Thus, summary judgment is appropriate. *E.g.*, *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 801 (Tex. App. 2005) (affirming summary judgment against plaintiff and applying statute of frauds to implied renewal contract that was not in writing and could not be performed within one year); *Collins v. Allied Pharm. Mgmt., Inc.*, 871 S.W.2d 929, 936 (Tex. App. 1994) ("Application of the statute of frauds to a contract vitiates a fraud claim based on the same facts").

### 3.   There Was No Implied Contract.[5]

Aside from application of the statute of frauds, Defendants are entitled to summary judgment because there was no implied contract as a matter of law. ERC contends there was a single implied contract between BTS and BM prior to the Acquisition, which was assumed by BL at the time of the Acquisition. (SUMF-¶63.) Accordingly, ERC's arguments depend upon the existence and validity of an implied contract between BTS and BM.[6]

<u>Mutual Assent.</u> Under Texas law, "[t]he elements of a contract, express or implied, are

---

[5]   Although Pennsylvania and Texas law diverge with respect to the statute of frauds, both states are in accord on general implied contract principles. *Univ. Atl. Sys., Inc. v. Honeywell Int'l, Inc.*, 388 F. Supp. 3d 417, 428 (E.D. Pa. 2019) (an implied contract arises when "the intention to [incur] obligation is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct").

[6]   Although ERC's interrogatory responses stated there were a "series of implied contracts," the subsequent and unequivocal testimony of ERC's 30(b)(6) deponent clarified that ERC alleges only one implied contract between BTS and BM that was assumed by BL. (SUMF-¶63.)

identical." *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App. 2009) (affirming summary judgment in favor of defendant on plaintiff's claim for breach of implied contract). "[T]he elements of either type of contract are (1) an offer, (2) acceptance, (3) a meeting of the minds, (4) each parties' consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Id.* at 476. "[T]he real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them." *Id.* at 476-77.

"In the case of an implied contract, mutual assent is inferred from the circumstances—a 'meeting of the minds' is inferred from and evidenced by the parties' <u>conduct and course of dealing</u>." *JTREO, Inc. v. Hightower & Assocs., Inc.*, 2020 WL 3468148, at *4 (Tex. App. June 18, 2020) (emphasis added) (granting summary judgment on implied contract because, despite plaintiff's expectations, "there is no evidence that [defendant] so agreed"); *Cao v. Glob. Motorcars of Houston, LLC*, 2014 WL 1338309, at *4 (Tex. App. Apr. 3, 2014) ("While mutual assent can be shown from the conduct of the parties, the conduct must be intentional and the actor must know or have reason to know that the other party will infer his assent from his conduct."). "The determination of whether there is a meeting of the minds must be based upon objective standards of what the parties said and did, not on their alleged subjective states of mind." *Harris Fiberglass Materials, Inc. v. Vought Aircraft Indus., Inc.*, 2007 WL 3317655, at *3 (Tex. App. Nov. 9, 2007) (summary judgment for defendant on implied contract claim).

Here, ERC contends there was an implied contract based on its own subjective "expectation given industry practice." (SUMF-¶66.) ERC cannot identify any circumstances surrounding any such "agreement" between BTS and BM. (SUMF-¶65.) Indeed, Julio Rios expressly disavowed the existence of a take-or-pay arrangement backstopping the RSA. (SUMF-¶84.) ERC's alleged "expectation" does not provide any "objective" evidence of a meeting of the minds between BTS

and BM.  *Harris Fiberglass, Inc.*, 2007 WL 3317655, at *3; *see also Jordan v. Sony BMG Music. Ent., Inc.*, 637 F. Supp. 2d 442, 453 (S.D. Tex. 2008) ("unsupported argument" characterizing communications between the parties insufficient to establish implied contract).

        Course of Dealing and Conduct.  ERC also contends there was an implied contract between BTS and BM based on a "course of dealing."  (SUMF-¶67.)  Course of dealing is conduct by the parties in dealings <u>prior to</u> the alleged implied contract.  *Harrison v. Williams Dental Grp., P.C.*, 140 S.W.3d 912, 916 (Tex. App. 2004) ("'[C]ourse of dealing' was '<u>previous conduct between the parties that indicates the parties' understanding of their contractual obligations</u>") (emphasis added); Tex. Bus. & Com. Code § 1.303(b) ("[C]ourse of dealing" is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").

        According to ERC, "the course of dealing between BM and BTS, during the pre-acquisition period, is evidenced by rate sheets and accounting records."  (SUMF-¶68.)  But the rate sheet post-dates the 2013 RSA, and neither the rate sheet nor the accounting records evidence conduct consistent with the alleged contract.  (SUMF-¶69-75.)  Indeed, the proposed rate sheet is dated January 2015.  (SUMF-¶69.)  The rate sheet (Exhibit 824) contains the following content:

**Intercompany fee schedule**

Bridger Transfer EPND

| Shipper Accounts | Bridger Transfer $/bbl | Bridger Marketing $/bbl | 1-Jan-15 |
|---|---|---|---|
| Bridger Marketing | freight* | freight + $0.50/bbl on deliveries | to Clearbrook only |
| Whiting | freight* | freight + $0.50/bbl on deliveries | to Clearbrook only |

| Rail Loading | | Third Party | BM Current | 1-Jan-15 |
|---|---|---|---|---|
| Berthold (loaded Volumes) | | $1.27 | $2.27 | $2.10 |
| Deficiency | | $1.00 | $2.00 | $1.00 |
| Over-committed vol. | | $0.25 | $0.50 | $0.25 |
| Eddystone | | $2.25 | $2.75 | $2.55 |
| Deficiency | | $1.75 | TBD | $1.75 |

(SUMF-¶69-71.)  In the "Deficiency" row at the bottom, "$1.75" is the per-barrel deficiency charge under the RSA, and "TBD" means "to be determined."  (SUMF-¶71.)  Thus, <u>prior to January 2015</u>, there was no intercompany charge from BTS to BM for deficiency payments, as the charge was "to be determined."  (SUMF-¶72.)  As a result, the rate sheet cannot show a meeting of the minds upon execution of the RSA <u>in 2013</u>.

Critically, ERC conceded, in an interrogatory response, that "contrary to Bridger, LLC's rate sheet policy, <u>the accounting records do not appear to indicate that [BM] provided funds to BTS to cover deficiency charges that BTS was required to pay Eddystone.</u>"  (SUMF-¶73 (emphasis added).)  ERC's corporate representative confirmed as much in her deposition.  (SUMF-¶73.)  Accordingly, the conduct of BM and BTS during the alleged implied contract is entirely inconsistent with the alleged implied contract.

Moreover, "a prior course of dealing, on its own, [i]s not evidence of mutual assent without evidence of prior assent to the <u>same terms</u>."  *MGR, Inc. v. Geico Cas. Co.*,  2019 WL 573968, at *3 (Tex. App. Feb. 13, 2019) ("[T]he fact that Miracle and Geico have a long-standing course of doing business, on its own, is not sufficient to raise a fact question as to the existence of an implied contract on the terms Miracle now asserts."); *E-Learning LLC v. AT&T Corp.*, 517 S.W.3d 849, 860 (Tex. App. 2017) (affirming summary judgment in defendant's favor on implied contract claim despite prior course of dealing between the parties).  Here, there is no evidence of any prior course of dealing in which BM implicitly agreed to backstop BTS's deficiency payments to any third party, or any other such prior course of dealing from which to infer a meeting of the minds.

<u>Essential Terms.</u>  Nor could there be a meeting of the minds between BTS and BM, because the alleged implied agreement fails for indefiniteness.  *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently

definite in its terms so that a court can understand what the promisor undertook").  An "essential" term is "one that the parties reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain.  Failure to fulfill such a promise, in other words, would <u>seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole</u>."  *Neeley v. Bankers Tr. Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985) (emphasis added).

According to ERC, it is industry standard for an agreement like the alleged implied contract to address a number of essential terms, including payment, volume commitment, duration, termination rights, deficiency payments, force majeure, assignability rights, limitations on liability, financial assurances, third-party beneficiaries, and remedies for default.  (SUMF-¶77.) Yet ERC concedes it has no evidence of a meeting of the minds between BTS and BM on any of force majure, limitation of liabilities, remedies for default, termination rights, assignability, or third party beneficiaries.  (SUMF-¶78.)

Summary judgment is warranted because ERC's theory that BM and BTS entered into an implied contract at the start of the RSA is unsupported by evidence and belied by the conduct of the parties to the alleged agreement.  *E-Learning*, 517 S.W.3d at 858 ("In the case of an implied contract, 'the element of mutual agreement' is 'inferred from the circumstances,'" and a "meeting of the minds is implied from and evidenced by the parties' conduct and course of dealing.")

### 4. BL Did Not Assume An Implied Contract.

Because there was no implied contract between BTS and BM, there was no implied contract for BL to "assume."  Beyond that, ERC also has no evidence that BL agreed to "assume" an implied contract, let alone that it agreed to release BM from any implied obligations.  ERC cannot identify who at BL agreed to the alleged assumption.  (SUMF-¶80.)  Nor is there evidence that BL received any consideration for that alleged assumption.  (SUMF-¶81.)

25

Nor do the facts show any assignment or assumption by BL of any implied contract with BTS. No such agreement is identified on the schedule of material contracts attached to the PSA for the Acquisition. (SUMF-¶¶82-83.) ERC's own accounting records show that BL made only two of eight payments directly to ERC during the post-acquisition period, with a single payment of $3,278.19 for deficiency charges in September 2015. (SUMF-¶75.) Yet, Bridger Rail Shipping—a different entity—made four separate payments to ERC in the post-Acquisition period, including three deficiency payments totaling more than $400,000. (SUMF-¶76.) Again, the conduct of the parties to the alleged implied contract does not support ERC's theory.

### D.     ERC's Fraudulent-Transfer Claims Fail (Counts II & III).

ERC's claims for intentional and constructive fraudulent transfers under PUFTA also fail as a matter of law on undisputed facts.[7] To succeed on its claims under PUFTA, ERC must prove, by a preponderance of the evidence, that BTS "transferred" an "asset," either: (1) with "actual intent to hinder, delay, or defraud any creditor of the debtor," *see* 12 Pa.C.S. § 5104(a) (intentional fraudulent transfer); or (2) without receiving a reasonably equivalent value in exchange, and that BTS was insolvent or became insolvent because of the transfer, *see* 12 Pa.C.S. § 5105 (constructive fraudulent transfer). PUFTA defines a "transfer," in pertinent part, as "[e]very mode, direct or indirect, ... of disposing of or parting with an asset or an interest in an asset." 12 Pa.C.S. § 5101(b). "Asset" is defined, in relevant part, as "property of a debtor," but the definition specifically excludes "property to the extent it is encumbered by a valid lien." *Id.*

---

[7]     All PUFTA citations are to the pre-amendment version of the statute. The post-amendment Uniform Voidable Transaction Act, if it applied here, calls for the application of the law of Texas, where BTS had its principal office at the time of the allegedly fraudulent transfers. *See* 12 Pa.C.S. § 5110. Like Pennsylvania, Texas has enacted the Uniform Fraudulent Transfer Act, which includes the same definitions of "asset" and "valid lien." *See* Tex. Bus. & Com. Code § 24.002.

## 1.     The 2016 Assignments Were Subject To A Valid Lien.

Summary judgment is appropriate with respect to the 2016 Assignments, because such assets were subject to BOA's valid lien and cannot serve as the basis of claims under PUFTA. ERC lost nothing as a result of the 2016 Assignments because those assets were encumbered by the lien and never available for ERC to collect.

It is undisputed that BTS entered a guaranty with non-party BOA, BTS granted a security interest in all of its personal property in connection with that guaranty, and BOA perfected its security interest by at least January 15, 2016–before the 2016 Assignments. (SUMF-¶¶133-38.)

PUFTA is clear on its face—the term "asset" expressly "does not include … property to the extent it is encumbered by a valid lien." 12 Pa.C.S. § 5101(b)(1).  Thus, property subject to a valid lien is not an "asset" subject to fraudulent transfer claims.

As a result, courts routinely grant summary judgment under PUFTA where the property allegedly transferred was subject to a valid lien. *See, e.g.*, *Mullins v. TestAmerica, Inc.* 564 F.3d 386, 414 n.20 (5th Cir. 2009) (judgment for defendant because challenged sale proceeds were encumbered by a valid lien, and thus were not "assets" under TUFTA); *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 262 (1st Cir. 1997) (judgment for defendants, despite evidence of fraudulent intent, because a valid security interest in all assets existed at the time of transfer and thus the property was not an "asset" subject to RIUFTA); *see also Hipple v. Hipple*, No. 12-1256, 2016 WL 320216, at *4, 11 (E.D. Pa. Jan. 27, 2016) (rejecting PUFTA claim because assets transferred were encumbered by valid lien, even though lien was granted years after debt was incurred, post-judgment, and shortly before judgment creditor exercised remedies); *Smith v. Marshview Fitness, LLC*, 212 A.3d 767, 774 (Conn. App. 2019) (summary judgment for defendant on CUFTA claim because assets were secured by a valid lien); *Hasso v. Hapke*, 227 Cal. App. 4th 107, 125-26 (Cal. App. 2014) (management fees were subject to valid lien and thus were not assets

under UFTA); *Epperson v. Enter. Express, Inc.*, 338 F. Supp. 2d 328, 341-42 (D. Conn. 2004) (valid lien precluded application of UFTA to challenged transfer); *Am. Fed. Bank v. W. Central Ag Servs.*, 2021 WL 1193948, at *7 (D. Minn. Mar. 30, 2021) (summary judgment because assets subject to valid lien); *Zurich Am. Ins. Co. v. MB Fin. Bank, N.A.*, 2020 WL 4913178 (Ill. App. Aug. 19, 2020) (summary judgment based on valid lien).[8]

As the comments to PUFTA make clear, "[i]f there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential transfer [for the benefit of a secured creditor] does not constitute a fraudulent conveyance." 12 Pa.C.S. § 5103 cmt. 1 (2017). The Utah Supreme Court aptly stated the rationale for excluding assets encumbered by a valid lien:

> The Act provides a remedy for creditors who are actually harmed when a debtor transfers property; it does not provide a remedy in cases of only theoretical harm....
>
> When such property is transferred, there is no harm done to either the creditor holding the lien—the secured creditor—or any other unsecured creditor of the debtor. The secured creditor is not harmed because it retains the right to proceed against the property by foreclosing its lien—regardless of whether the debtor currently holds the encumbered property. And any unsecured creditors are not harmed because they would never have been able to recover their debt by means of the encumbered property. Thus, excluding property to the extent that it is encumbered by a valid lien is consistent with the [UFTA's] general no-harm, no-foul operation.

*Rupp v. Moffo*, 358 P.3d 1060, 1064-65 (Utah 2015) (remanding for entry of summary judgment because valid lien existed and property was not an "asset" subject to UFTA).

### a. BOA's Lien Was Valid.

Because it is undisputed that the 2016 Assignments involved property subject to a valid lien, ERC cannot satisfy its burden to prove the existence of an "asset" transferred under PUFTA.

---

[8]       Because PUFTA is a uniform statute, where no Pennsylvania case law exists, Pennsylvania courts will look to other states that have enacted the UFTA. 1 Pa.C.S. § 1927 ("[s]tatutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them"); *Klein v. Weidner*, 729 F.3d 280, 294 (3d Cir. 2013) (looking to other states' law to interpret aspects of PUFTA).

*See Mullins*, 564 F.3d at 414 n.20 (finding burden unsatisfied); *A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*, 560 F. Supp. 705, 710 (E.D. Pa. 1983) (rejecting creditor's "vague assertions" about invalidity of mortgages); *Mehrtash v. Mehrtash*, 112 Cal.Rptr.2d 802, 806 (Ct. App. 2001) (treating creditor's failure to show ability to recover from mortgaged property as failure to prove essential element of claim).

PUFTA defines "lien" as "an interest in property to secure payment of a debt or performance of an obligation," which includes "a security interest created by agreement[.]" 12 Pa.C.S. § 5101(b). A "valid lien" is "[a] lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." *Id.* By definition, a perfected lien is a valid lien. *See* 13 Pa.C.S. § 9317(a)(2) (perfected security interest is senior to subsequent lien creditor); 42 Pa.C.S. § 8141 (recorded mortgage is senior to subsequent judgment lien). UCC Section 9-203(b) provides that a security interest is enforceable against the debtor and third parties if three requirements are met: (1) value has been given; (2) the debtor has rights in the collateral…; and (3) the debtor has authenticated a security agreement that provides a description of the collateral. 13 Pa.C.S. § 9203(b); La.R.S. § 10:9-203(b). BOA's lien meets all three criteria.

### i. BOA Gave Value In Exchange For A Blanket Lien On BTS's Assets.

First, BOA gave value to BTS in exchange for the lien. Under the UCC, "a person gives value for rights if the person acquires them (1) in return for a binding commitment to extend credit ... whether or not drawn upon; (2) as security for a preexisting claim; ... or (4) in return for any consideration sufficient to support a simple contract." 13 Pa.C.S. § 1204; La.R.S. § 10:1-204.

In connection with a $600 million secured credit facility, BOA required all Ferrellgas subsidiaries, including BTS, to execute a supplement to guaranty Ferrellgas' obligations to the secured creditors, and the collateral documents necessary to secure the subsidiaries' assets for the

benefit of those secured creditors. (SUMF-¶125-27.) To satisfy that obligation, BTS and other BL subsidiaries entered into a guaranty supplement with BOA on June 24, 2015. (SUMF-¶128.)

It is undisputed that, through no fault of BTS or Defendants, BOA failed to counter-sign the June 24, 2015 guaranty supplement. (SUMF-¶129.) This omission was discovered in early January 2016 in connection with FGP's decision to exercise an accordion feature to increase the facility from $600 million to $700 million—a financing decision FGP considered as early as November 2015. (SUMF-¶130-31.). FGP asked BOA to accept the June 24, 2015 guaranty supplement as-is, but BOA required that BTS and the other guarantors execute a new version to correct a reference in the initial guaranty supplement. (SUMF-¶132.) BTS and the other BL subsidiaries accommodated BOA's request and again signed a guaranty supplement and a grantor accession agreement, dated January 14, 2016, affirming the blanket security arrangement previously promised in mid-2015. (SUMF-¶124, 133-34.)

Consequently, in exchange for a security interest in BTS's assets, BOA satisfied all forms of value required to be provided under the UCC: (1) BOA entered a binding commitment to extend credit; (2) BTS gave the security for BOA's preexisting claim; and (3) the consideration provided by BOA was sufficient to support a simple contract. 13 Pa.C.S. § 1204; La.R.S. § 10:1-204.

ERC has argued that BTS received no benefit from executing its security agreement with BOA, but ERC has the test backwards. "Value has been given" in exchange for the security interest when the secured creditor (*i.e.*, BOA) gives consideration by executing a binding commitment to extend credit in exchange. *See, e.g.*, *In re Blatstein*, 226 B.R. 140, 153-54 (E.D. Pa. 1998) (explaining that, in considering whether "value has been given" sufficient to find a valid lien, "the issue was not whether the [debtor] received value, but rather whether [] the creditor claiming secured status[] gave consideration in return for [its] security."); *In re Reliable Mfg.*

*Corp.*, 703 F.2d 996, 1000 (7th Cir. 1983) ("A security interest given in consideration for the obligation of a third party clearly ... fulfills the requirements of the U.C.C.  It is enough, in fact, that there be detriment to the secured party even if there is no benefit to the owner of the assets subject to the security interest."); *In re Terminal Moving & Storage Co., Inc.*, 631 F.2d 547, 551 (8th Cir. 1980) (finding value was given where creditor "incurred a detriment to itself in extending credit in exchange for the pledge" of the company's assets, and the "fact that the benefit of this agreement accrued to Walker, the sole stockholder of [the company] and not the corporation itself does not detract from the fact that the secured party gave value for the security interest"); *Royce v. Michael R. Needle, P.C.*, 381 F. Supp. 3d 968, 979-80 (N.D. Ill. 2019) (value extended to a third party, or detriment to the secured party, satisfies requirement).

### ii.    BTS Had A Right To The Assets, And BOA Perfected The Lien.

The second and third requirements of Section 9-203 are also satisfied.  It is undisputed that BTS had rights in the collateral, and it authenticated a security agreement describing the collateral on January 14, 2016.  (SUMF-¶133-36.)  The lien was effective under the UCC that day.

The following day, on January 15, 2016, BOA perfected its security interest by filing a financing statement in Acadia Parish, Louisiana.  (SUMF-¶138.)  Accordingly, the lien became "valid" (i.e., enforceable against a subsequent lien creditor) under PUFTA on January 15, 2016.  The 2016 Assignments occurred after this date—thus, the property assigned was encumbered by the valid lien at the time and was not an "asset" subject to PUFTA.

BOA's lien extended to all of BTS's personal property, which means the lien attached not only to BTS's tangible personal property, but also to its accounts receivable, general intangibles, and payment intangibles.  (SUMF-¶136.)  The lien fully encumbered the property subject to the 2016 Assignments.  ERC's expert (Sherman) values the property assigned in January 2016 at $64

million and did not opine on the value of other property securing the BOA credit facility. (SUMF-¶141a.) At the time BOA obtained a valid lien on BTS's assets, BOA was owed approximately $311.6 million. (SUMF-¶139.) Consequently, ERC cannot satisfy its burden to show that the property involved in the 2016 Assignments was unencumbered by a valid lien and otherwise actionable under PUFTA. *In re Valley Bldg. & Const. Corp.*, 435 B.R. 276, 285, 287 (E.D. Pa. 2010) (party challenging transfer as intentionally or constructively fraudulent bears the burden of proof on all elements); *Fidelity Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 720 (E.D. Pa. 2007) (party challenging transfer must establish all elements by a preponderance of the evidence).

BOA's valid lien renders the 2016 Assignments incapable of supporting a fraudulent transfer claim, even if BTS acted with fraudulent intent (which it did not). When determining whether property is an "asset" that was "transferred" for purposes of PUFTA, "the actual intent of the defendants [is] immaterial as a matter of law." *Ed Peters Jewelry Co., Inc.,* 124 F.3d at 262 (sustaining judgment for defendants, notwithstanding evidence of fraudulent intent, because a valid security interest existed at the time of transfer and the property was not an "asset" subject to RIUFTA); *see also In re 1701 Com., LLC*, 511 B.R. 812, 826 (N.D. Tex. 2014) ("Without a transfer of an 'asset,' the parties' intent is irrelevant."). BOA's lien is dispositive and summary judgment should be granted in Defendants' favor on the fraudulent transfer claims.

### b.      Any Attempt To Invalidate The Lien Would Fail.

Any attempt to invalidate the lien would fail because (1) BOA is not a party to this lawsuit, (2) neither the guaranty nor the lien could be avoided regardless, and (3) an implied contract, if it existed, would have been subject to BOA's lien as well.

ERC does not allege that BOA's lien can be avoided under PUFTA. (FAC-¶¶76–103.) ERC cannot invalidate BOA's lien because BOA is not a party to this case. Under PUFTA, "[b]oth the debtor/transferor and the transferee are necessary parties to a fraudulent transfer action." *Univ.*

32

*Com. Consulting, Inc. v. Pitcairn Enter., Inc.*, 2005 WL 2077269, at \*15 (E.D. Pa. Aug. 26, 2005) (refusing to consider transfers made to transferees not joined as parties). "This requirement arises from the judicial recognition that the transferee 'has an interest in the subject matter of the suit, which should not be affected by a decree unless he has been given a right to be heard.'" *Id.* ERC cannot invalidate BOA's lien in a case in which BOA cannot defend itself.[9]

Even if BOA were a party to the suit, neither the lien, nor the guaranty it secures, could be avoided. The guaranty is not avoidable under PUFTA. As set forth below, there is no evidence to support an intentional fraudulent transfer because there is no evidence that BTS intended to hinder, delay, or defraud any creditor in connection with the Acquisition when it executed the guaranty. Nor does the guaranty give rise to a constructive fraudulent transfer claim. Sherman opines that BTS did not receive reasonably equivalent value for the lien, but he concedes that he did not analyze whether BTS derived value from the Acquisition. (SUMF-¶93, 137.) Consequently, Sherman does not account for the nearly $40 million in debt forgiveness BTS received in connection with the Acquisition, nor does Sherman attempt to quantify the indirect benefits BTS may have achieved. (SUMF-¶¶88-91.) Instead, Sherman merely asserts his subjective belief that BTS did not benefit from being a part of the Ferrellgas corporate family (SUMF-¶93). *See In re Vivaro*, 524 B.R. 536, 558 (Bankr. S.D.N.Y. 2015) (dismissing fraudulent transfer claim targeting guaranty executed by subsidiary because plaintiff failed to rule out receipt of any indirect benefit).

Sherman also failed to value the cost of BTS's guaranty by analyzing the right of contribution from co-guarantors. Such an error, standing alone, is fatal to ERC's assertion that

---

[9]     In 2019, ERC sued BOA separately, and that case is pending in the Southern District of New York. Even in the SDNY Case, ERC does not seek to avoid the guaranty or the lien; rather, ERC seeks to recover from BOA transfers allegedly made by the defendants there (not BTS) after mid-2016. (*See id.*, Dkt. 1-1, Complaint ¶¶80-103).

BTS did not receive reasonably equivalent value for the guaranty.  *See, e.g.*, *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) (party's failure to introduce evidence of the value of the rights to contribution defeated fraudulent transfer claim).

Because the guaranty is valid, BOA's security interest and lien cannot be avoided as fraudulent transfers.  ERC makes a great deal of the paperwork omission that resulted in BOA confirming and perfecting its security interest after BTS decided to transfer its assets.  But the paperwork delay does not give rise to a fraudulent transfer claim as to either BOA or Defendants.

As an initial matter, it is undisputed that BTS intended to grant both the security interest and lien earlier, in connection with the Acquisition and when BTS was solvent.  (SUMF-¶87, 128-29.)  Emails between Defendants in late 2015 and early 2016 establish that the delay in perfecting BOA's lien had nothing to do with ERC and instead resulted from a paperwork oversight. (SUMF-¶129-34.) Moreover, the undisputed evidence establishes that the timing of the discovery of the omission, and its correction, resulted from Ferrellgas' decision to exercise an accordion feature of its credit facility, again having nothing to do with ERC.  (SUMF-¶129-34.)

Regardless, because the lien and security interest were granted in connection with a valid preexisting debt, the lien itself is valid and cannot be avoided.  *See, e.g.*, *Hipple*, 2016 WL 320216, at *4, 11 (rejecting PUFTA claim because assets transferred were encumbered by valid lien, even though lien was granted years after debt was incurred, post-judgment, and shortly before judgment creditor exercised remedies); 12 Pa.C.S. § 5103 ("Value is given for a transfer or obligation if, in exchange for the transfer or obligation ... an antecedent debt is secured or satisfied[.]"); *see also Peoples-Pittsburgh Tr. Co. v. Holy Family Polish Nat'l Catholic Church*, 19 A.2d 360, 361 (Pa. 1941) ("A mortgage given to secure an existing indebtedness is based upon sufficient consideration and is valid as to other creditors of the mortgagor.") (applying PUFCA); *Vivaro*, 524 B.R. at 556

(explaining that payments made on account of an antecedent debt are presumed to be made "for value"). The lien secured BTS's guaranty, which had been in effect since June 2015.

Finally, ERC's claim that BTS fraudulently transferred assets "by allow[ing] its implied contract with Bridger Logistics to be abrogated without any compensation to BTS" fails for the same reason: BOA's valid lien. As discussed above, no implied contract existed. But even if the "implied contract" had existed, it would have been either a "payment intangible" or a "general intangible." 13 Pa.C.S. § 9102(a). BOA's lien applied to both. (SUMF-¶136.) The purported "implied contract," like the other property assigned in 2016, is not an "asset" under PUFTA and cannot support a fraudulent transfer claim.

## 2.    The 2015 Accounting Activities Were Not Fraudulent Transfers.

Unable to maintain fraudulent transfer claims based on the 2016 Assignments, ERC suggests that Ferrellgas paid $800 million in the Acquisition, intending to "strip" BTS of assets. Nothing in the record supports this assertion. ERC's theory presumes that Ferrellgas acquired BL anticipating a BTS default under the RSA and immediately set about making accounting changes to shield assets from ERC. The undisputed facts belie this narrative.

At the time, the COSA arrangement provided BL with its largest customer (the Monroe refinery) and one of its main sources of revenue. (SUMF-¶16.) It is undisputed that Monroe enjoyed a cost advantage for COSA-based Bakken crude through September 2015. (SUMF-¶174.) It is nonsensical (and myopic) for ERC to contend that Ferrellgas paid $800 million to acquire BL, despite anticipating that its largest and most lucrative arrangement would soon fall apart, and then immediately set about shielding assets from ERC because it anticipated a BTS default on the RSA.

Nevertheless, ERC wrongly alleges that forgiveness of certain BTS accounts receivable (the Write-Offs), and the adoption of cost-center accounting (Cost Center Recording), constituted impermissible transfers of BTS's assets. (FAC-¶56.) Sherman opines that the mid-2015 Write-

Offs total approximately $13.79 million.  (SUMF-¶94.)  Likewise, ERC wrongly alleges that Ferrellgas' post-Acquisition Cost Center Recording, which involved the creation of two new cost centers amounted to fraudulent transfers.  Neither of these 2015 Accounting Activities constituted an intentional or constructive fraudulent transfer.

### a.     The 2015 Accounting Activities Were Not Intentional Fraudulent Transfers.

There is no issue of material fact with respect to ERC's claim of intentional fraudulent transfer based on the Acquisition or the 2015 Accounting Activities, because there is no evidence that BTS acted "with intent to hinder, delay, or defraud other creditors." 12 Pa.C.S. § 5104(a).

The Write-Offs occurred because, in the PSA governing the Acquisition, the parties required the termination of all accounts receivable among the Jamex entities, on one hand, and the acquired BL entities, on the other.  (SUMF-¶95.)  Sherman acknowledged that most of the Write-Offs—roughly $7.3 million—were owed to BTS from entities that Ferrellgas did not acquire.  (SUMF-¶96.)  The remaining accounts receivable were BL's intercompany accounts.  (SUMF-¶98.)  The third-party valuation firm hired by Ferrellgas to value the acquired assets did not attribute <u>any</u> value to these intercompany accounts.  (SUMF-¶99, 103.)  As a result, Ferrellgas wrote off the remaining $6,483,541 in accounts receivable when integrating the Bridger entities into its corporate family, as permitted by purchase accounting principles, including ASC 805.  (SUMF-¶101-02, 105-06.)

Similarly, BTS adopted Cost Center Accounting in accordance with a recommendation from consulting firm Grant Thornton.  (SUMF-¶109.)  Grant Thornton recommended a modified financial reporting structure as part of BL's integration into the Ferrellgas corporate family.  (SUMF-¶114.)   Before the Acquisition, BTS recorded revenues in four sectors: pipeline management, rail throughput, stations throughput, and storage fees.  (SUMF-¶118.)  After the

Acquisition, to better track financial performance, Ferrellgas created new cost centers in its accounting system to track pipeline management and rail throughput revenue. (SUMF-¶122.) These cost centers were called "Bridger Pipeline Services" and "Bridger Rail Services." (SUMF-¶122.) The storage fees BTS recorded on its general ledger prior to the Acquisition did not belong to BTS, but rather to Bridger Storage. (SUMF-¶119.) After the Acquisition, those storage fees were recorded on the Bridger Storage general ledger. (SUMF-¶120.)[10] BTS continued to record its stations throughput revenue. (SUMF-¶121.)[11]

There was some confusion among Defendants' personnel when they first implemented the Cost Center Recording, and organizational charts circulated internally in June 2015 indicated that Bridger Pipeline Services and Bridger Rail Services would be separate legal entities. (SUMF-¶124.) All agree, however, that neither were legal entities—rather, they existed only as codes on Defendants' accounting system. (SUMF-¶124.) BL's Senior Counsel, Patrick Knapp, confirmed that Bridger Pipeline Services and Bridger Rail Services were merely names for "accounting entities." (SUMF-¶124.)

Nothing about the 2015 Accounting Activities suggests an intention to defraud creditors. The only alleged "badges of fraud" (FAC-¶92) are inapplicable. 12 Pa. C.S § 5104(b):

- The 2015 Accounting Activities were not a "transfer to an insider" and instead resulted from an arms-length Acquisition between unrelated entities Ferrellgas and Bridger, LLC (later renamed Jamex, LLC). (SUMF-¶7, 18, 10.) 12 Pa.C.S. § 5104 (b)(1). Ferrellgas paid more than $800 million in the Acquisition (SUMF-¶10). *In re Pinto Trucking Svc., Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988) (no insider status because "the instant transfer involved parties ... with whom the transfer was clearly negotiated at arms-length"). Neither of the 2015 Accounting Activities involved a transfer of any kind. Rather, the Write-Offs

---

[10]    Sherman testified that, despite being recorded on BTS's records for a period of time, these fees never belonged to BTS and at all times remained property of Bridger Storage—which further demonstrates that revenue recording in cost centers did not alter BTS's ownership of the revenue. (SUMF-¶119-20.)

[11]    ERC has not offered any explanation as to why Defendants would divert some, but not all, of BTS's revenue if they truly intended to "strip" BTS in mid-2015. (SUMF-¶121.)

involved BTS assigning no value to accounts receivable, consistent with a third-party valuation firm's recommendation and purchase accounting principles, and the Cost Center Recording involved recording revenue to certain accounting codes.

- The 2015 Accounting Activities were not concealed or hidden. 12 Pa.C.S. § 5104 (b)(3). ERC was aware that it received payments from accounts held by entities other than BTS after the Acquisition. (SUMF-¶75.)[12]

- The 2015 Accounting Activities did not constitute transfers, let alone transfers "of substantially all of BTS's assets." 12 Pa.C.S. § 5104 (b)(5). ERC admits that BTS continued to possess its fixed assets and the revenue-generating contracts, which Sherman valued at approximately $64 million. (SUMF-¶123.)

- Even if the 2015 Accounting Activities were transfers, BTS received reasonably equivalent value. 12 Pa.C.S. § 5104 (b)(8). The 2015 Accounting Activities were made in order to integrate BTS and the other Bridger entities into Ferrellgas' corporate family. As part of the Acquisition, Ferrellgas paid off $39.69 million in various BTS obligations. (SUMF-¶¶88-92.); 12 Pa.C.S. § 5103(a) (under PUFTA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation ... an antecedent debt is ... satisfied."). Nor has ERC satisfied its burden of demonstrating that BTS did not receive indirect benefits from the Acquisition. *See, e.g., Mellon Bank, N.A.,* 945 F.2d at 648 (finding party challenging transfer failed to value indirect benefits the subsidiary may have received from parent).

- The 2015 Accounting Activities did not render BTS insolvent. 12 Pa.C.S. § 5104 (b)(9).[13]

- There is no evidence that BTS was in litigation or threatened with litigation when adopting the 2015 Accounting Transfers. 12 Pa.C.S. § 5105(b)(4) (requiring that, "*before* the transfer was made ... the debtor had been sued or threatened with suit") (emphasis added); *Matter of Foxcroft Square Co.*, 184 B.R. 671, 675 (E.D. Pa. 1995) (finding no evidence suggesting that litigation was pending at time of alleged transfer, which was made six months before the debtor defaulted on its obligations).

Thus, the Court should grant summary judgment on the intentional fraudulent transfer claims to the extent they are based on the 2015 Accounting Activities. *See, e.g., Valley Bldg.*, 435

---

[12]     While ERC and Sherman make passing references to BTS' cash, Sherman acknowledges that Ferrellgas instituted a zero-balance cash management system for BTS shortly after the Acquisition, on August 27, 2015. (SUMF-¶122.) Sherman made clear that he does not rely on the cash management system to support his opinions on diversion. (*Id.*)

[13]     Defendants challenge Sherman's opinion on BTS's solvency in June 2015 in a contemporaneously-filed Daubert motion. As explained therein, Sherman's opinion that BTS became insolvent immediately upon the recording of a single dollar of profit in a cost center on June 24, 2015 lacks foundation and defies reason.

B.R. at 285-86 (finding no fraud despite existence of one badge of fraud); *In re Laramie Assocs., Ltd.*, 1997 WL 587288, at *6 (E.D. Pa. Sept. 8, 1997) (finding three badges of fraud insufficient).

> **b.     The Write-Offs Were Not Constructive Fraudulent Transfers.**

Nor were the Write-Offs constructive fraudulent transfers.  ERC cannot establish either element of such a claim because (1) BTS received reasonably equivalent value in the Acquisition; and (2) BTS was solvent at the time of the Acquisition and Write-Offs.  (SUMF-¶86-92.)  First, as to reasonable equivalent value, no issue of material fact exists because ERC did not produce evidence to dispute the third-party valuation firm's contemporaneous determination that the receivables lacked value.  (SUMF-¶103-04.) In the Third Circuit, there is a two-step process for evaluating "reasonably equivalent value."  *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 387 (E.D. Pa. 2013) (affirming dismissal of PUFTA claims after finding reasonably equivalent value).  The Court must first determine whether the debtor received "any value at all" from the challenged transaction.  *Id.*  If so, it must decide whether the value received was "roughly the value it gave."  *Id.* Here, BTS received value—Ferrellgas paid off around $39.69 million of BTS's debts as part of the Acquisition.  (SUMF-¶88-92.)     Given the third-party valuation firm's contemporaneous conclusion that the accounts receivable written off lacked <u>any</u> value, it follows that the nearly $40 million debt reduction BTS received in the Acquisition provided <u>at least</u> reasonably equivalent value "in exchange" for the Write-Offs in connection with the Acquisition.

Second, BTS remained solvent following the Write-Offs.  Both parties' experts valued BTS in excess of $200 million at the time of the Acquisition.  (SUMF-¶86-87.)  Moreover, Defendants' valuation expert, Manish Kumar, demonstrates that BTS was adequately capitalized at the time of the Acquisition and the associated Write-Offs, and Sherman does not contradict Kumar on that point.  (SUMF-¶87.)  Thus, the Write-Offs are not actionable.  *See Garden State Tanning, Inc. v. Mitchell Mfg. Grp., Inc.*, 55 F. Supp. 2d 337, 343 (E.D. Pa. 1999) (summary judgment for

defendants on fraudulent transfer claim because plaintiff provided no evidence that established insolvency at the time of the transfer).

> **c.** **The Cost Center Recording Was Not A Transfer At All.**

The Cost Center Recording also cannot give rise to a constructive fraudulent transfer claim because it did not involve a transfer at all.  Contrary to ERC's assertions, <u>recording revenue</u> to an internal cost center does not constitute an asset transfer under PUFTA.  Sherman concedes that "revenue" is not an "asset." (SUMF-¶123a.)  Moreover, BTS did not "dispose of" or "part with" revenue under PUFTA by recording it under a different accounting code.  *See* 12 Pa.C.S. § 5101(b).  ERC concedes that the revenue-generating contracts continued to reside with the same corporate entity, BTS, despite the use of Cost Center Recording.  (SUMF-¶123.)  Tellingly, Sherman cannot identify a different entity that "received" the transfer purportedly caused by Cost Center Recording, testifying:

> I think the diverted revenue stayed there.  Ultimately when it gets consolidated, it gets consolidated up the line and ends up in Logistics and then in Ferrellgas, <u>but I think the revenue stayed in the general ledger of those two accounts.</u>

(SUMF-¶123.)  Thus, the Cost Center Recording did not transfer any asset.

> **d.** **ERC Suffered No Harm From The 2015 Accounting Activities Because All Of BTS's Assets Were Subject To A Valid Lien.**

ERC's claims based on the 2015 Accounting Activities also fail because neither alleged transfer harmed ERC.  *See, e.g.*, *A/S Kreditt-Finans*, 560 F. Supp. At 711 (it is "axiomatic" that a creditor must "be injured by the conveyance it seeks to invalidate").

There is no evidence that any creditor, including ERC, was harmed by the Write-Offs or Cost Center Recording.  ERC's expert concedes that, because ERC received the payments to which it was entitled following the 2015 Accounting Activities, "as it relates to the payment[,] Eddystone wouldn't have been harmed" (SUMF-¶123b).  *A/S Kreditt-Finans*, 560 F. Supp. at 711.

Moreover, as set forth above, all of BTS's assets, including its accounts receivable and any proceeds from its assets, became subject to the valid lien held by BOA by January 2016, before JTS ceased paying on its contract with ERC.  As such, BOA would have had priority over ERC with respect to any assets allegedly diverted from BTS's accounts.  As explained, ERC has not attempted to satisfy its burden to show that the 2015 Accounting Activities constituted transfers or that those purported transfers had any value.  Nor has ERC demonstrated that the 2015 Accounting Activities caused the transfer of assets in excess of BOA's security interest, such that ERC had the ability to collect on those assets but for the 2015 Accounting Activities. *Am. Fed. Bank*, at *7 (in a hypothetical collection action, the secured creditor has priority over the unsecured creditor, and the unsecured creditor has no claim to the property subject to a lien).  Under PUFTA, ERC cannot "recover funds ... through a voidable transfer action even though those funds would otherwise be beyond its reach." *Id.* (rejecting this strained reading of the UFTA).

### 3. Summary Judgment Should Be Granted On The Real Estate Transfer.

ERC bears the burden to establish the value of any asset it claims was not subject to the lien.  The only such asset ERC has identified is a single piece of property—Swan Ranch—and ERC did not provide a fair market value for the property.  (SUMF-¶141b.)  Instead, Sherman refers only to the book value of $1,726,247. (SUMF-¶141b.) The book value of real estate does not establish its fair-market value. *See, e.g., In re Watt & Shand*, 452 Pa. 287, 296 (1973) ("[T]here is nearly complete agreement that book value does not accurately represent the fair value of the corporate assets.'"). ERC has no other evidence of value.  (SUMF-¶141b.)

Accordingly, ERC cannot satisfy its burden to establish the value of Swan Ranch, which limits ERC's potential recovery under PUFTA. 12 Pa.C.S. § 5108(b)(1) (limiting recovery to the lesser of the value of the asset transferred, or the amount necessary to satisfy the creditor's claim); *see In re Intelligent Direct Mktg.*, 518 B.R. 579, 593 (E.D. Cal. 2014) (court could not award

judgment under CUFTA because, "[e]ven though the Court finds there was a transfer and it is avoidable, there is no valuation evidence."); *Liberty Mut. Ins. Co. v. Horizon Bus Co.*, 2011 WL 1131098, at *8 (E.D.N.Y. Feb. 22, 2011) (under NYUFCA, "[w]here a plaintiff is given ample opportunity to provide evidence of its damages and fails to do so, no damages can be awarded."); *Carucci v. Regency Fin. Grp., LLC*, 2016 WL 3909570, at *6 (N.J. App. July 20, 2016) (plaintiff failed to establish entitlement to relief under NJUFTA where he offered no evidence regarding value of customer lists); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 278-79 (Bankr. W.D. Tex. 2009) ("Proof that assets were transferred and an assessment of their value are essential to sustaining a fraudulent conveyance action" under TUFTA).

### E.   ERC's Breach Of Fiduciary Duty Claim Fails (Count IV).

ERC alleges that BL—and its parent companies FG and FGP—owed fiduciary duties to ERC, in its capacity as a creditor while BTS was in a "zone of insolvency." (FAC-¶¶11, 99-103.) The only link between ERC and Defendants is that BL is the owner and sole member of BTS, which was ERC's counter-party under the RSA. (SUMF-¶167-73.) Because no manager was appointed at the time, BL was the BTS manager by default. La.R.S. § 12:1311; 15 Pa.C.S. § 8847. Count IV fails, because neither Louisiana nor Pennsylvania extend fiduciary duties to creditors.

#### 1.   Count IV Fails Under Louisiana Law.

##### a.   Louisiana Law Applies.

BTS is a member-managed Louisiana LLC. (SUMF-¶167-68.) As explained further below, Louisiana law bars ERC's fiduciary duty claim. Applying Pennsylvania's internal affairs doctrine as a choice-of-law rule, Defendants previously asked this Court to dismiss the claim under Louisiana law (*see* Dkt. 384, Opinion). *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 n.10 (3d Cir. 2005) ("[C]ourts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation."). The internal affairs doctrine is a "'principle of conflict of

laws ... designed to make sure that the law of only one state shall govern the corporation or other association.'" *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 78 (1987).

The Court has twice rejected the internal affairs doctrine as a choice-of-law rule in this case. (*See* Dkt. 275 at 1 n.1; Dkt. 421 at 5-8.)  If the internal affairs doctrine does not apply, then Pennsylvania's hybrid choice-of law analysis governs.  Because the Court has not undertaken the hybrid analysis, law of the case does not preclude such an analysis or applying Louisiana law as a result.  *See, e.g., Golden Horn Shipping Co., Ltd. v. Volans Shipping Co., Ltd*., 2017 WL 3535002, at *7 (S.D.N.Y. Aug. 16, 2017) (analyzing choice-of-law and declining to "apply the law of the case doctrine to an issue that the parties have not previously briefed and argued"); *Oetting v. Heffler Radetich & Saitta LLP*, 2017 WL 3453342, at *4 (E.D. Pa. Aug. 11, 2017) (rejecting law of the case as a bar to applying Pennsylvania's borrowing statute).

As explained above, the first step in Pennsylvania's "hybrid" approach is to determine whether there is a "true" conflict between the laws of the states.  *Melmark, Inc. v. Schutt by and through Schutt*, 206 A.3d 1096, 1104 (Pa. 2019).  Neither state recognizes the fiduciary duty to creditors that ERC asserts, but in Louisiana duties to third parties are expressly limited by its LLC Act, whereas Pennsylvania's LLC Act is silent on whether a third party may bring such claims. To the extent this is a conflict, the LLC Acts of both states point to Louisiana law.

In Pennsylvania, the general law applicable to associations (including foreign LLCs) states that "[t]he laws of the <u>jurisdiction of formation of a foreign association</u> govern[] ... [t]he liability that a person has as an interest holder or governor for a debt, obligation or other liability of the association."  15 Pa.C.S. § 402(a)(2) (emphasis added).  Section 402 thus directs the court to Louisiana law, because ERC seeks to impose liability on the sole member or "interest holder" of BTS to collect "debts, obligations or other liabilities" of BTS.  In addition, the Pennsylvania LLC

Act applies Pennsylvania law only to domestic LLCs, because it defines "limited liability company" as "[a]n association formed under this chapter or which becomes subject to this chapter" for reasons that do not apply here (e.g., by merger or statutory amendment). 15 Pa.C.S. § 8812(a) (definition) (emphasis added), § 8814 (governing law).

Under the Restatement, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." *Restatement (Second) of Conflict of Laws* § 6 (1971). Section 402 of the Pennsylvania LLC Act points to Louisiana, 15 Pa.C.S. § 402(a)(2), and Louisiana law provides that the personal liability of members is to be governed "solely and exclusively" by the Louisiana LLC Act, La.R.S. § 12:1320(A) ("Liability to third parties of members and managers"). The Louisiana LLC Act also provides that, "[w]henever a conflict arises between the law of this state and the laws of any other state with regard to the liability of members ... for the debts, obligations, and liabilities" of the LLC, "the laws of this state shall be deemed to govern in determining such liability." *Id.* § 12:1366 (emphasis added). This express legislative prescription underscores Louisiana's interest as the state of formation, an interest confirmed by Section 402 of the Pennsylvania LLC Act.

### b.     ERC's Fiduciary Duty Claim Fails Under Louisiana Law.

Count IV is not viable under Louisiana law. Under the Louisiana LLC Act, a member of a Louisiana LLC has fiduciary duties only to the "[LLC] and its members." La.R.S. § 12:1314(A)(1). The LLC Act states expressly that a member of an LLC "is not a proper party" to a claim against an LLC, "except when the object is to enforce [a member's] rights against or liability to the [LLC]." *Id.* § 12:1320(C) (emphasis added). It also states that the personal liability of Louisiana LLC members is to be determined "solely and exclusively" by the LLC Act, *id.* § 12:1320(A) (emphasis added), which does not purport to extend fiduciary duties to creditors.

Consequently, only BL owed fiduciary duties to BTS (as its sole member and manager),

and only BTS could sue for breach of such duties.  *Id.* § 12:1314.   Under the plain text of the statute, ERC cannot sue for breach of fiduciary duty, and its claim fails as a matter of law.

Confirming this conclusion, there is "[n]o controlling authority" extending a fiduciary duty to creditors of a Louisiana LLC.  *In re Lobell*, 390 B.R. 206, 216-17 (Bankr. M.D. La. 2008) (emphasis added).  *Lobell* is consistent with long-standing Louisiana precedent in the corporate context, establishing "beyond peradventure that Louisiana law does not give a creditor a direct cause of action against a director of an insolvent corporation for ... breach of fiduciary duty."  *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 239-40 (5th Cir. 1988); *McDonough Marine Serv. v. Doucet*, 694 So. 2d 305, 312 (La. Ct. App. 1996) (officers and directors of corporations owe no fiduciary duties "to persons or entities which contract with the corporation.").[14]

### 2.      The Fiduciary Duty Claim Also Fails Under Pennsylvania Law.

Even were Pennsylvania law to apply, the Pennsylvania LLC Act does not extend fiduciary duties to creditors, and there is no controlling Pennsylvania authority permitting creditors of an LLC to bring a claim for breach of fiduciary duty against an LLC's managing member.  Other jurisdictions, like Delaware, reject such claims based on similar statutes.

The Pennsylvania LLC Act provides that a managing member owes fiduciary duties "to the company" and "the other members"—with no mention of creditors.  15 Pa.C.S. § 8849.1. Indeed, Section 8849.1 falls under Subchapter D, which governs "Relations of Members to Each Other and to Limited Liability Company."  *Id.* §§ 8841-8850 (emphasis added).  Subchapter C, titled "Relations of Members and Managers to Persons Dealing with Limited Liability Company"

---

[14]      In *Lobell*, the court distinguished *3 Point Holdings, L.L.C. v. Gulf S. Sols., L.L.C.*, 2008 WL 695379 at *2 (E.D. La. Mar. 13, 2008), a non-controlling opinion granting an unopposed motion for summary judgment against pro se defendants that ERC has previously cited. (*E.g.*, Dkt. 39 at 46.)  In that case, the court mistakenly determined that defendants owed fiduciary duties to the creditors of a Lousiana LLC, based on a single citation to a case applying Texas law to a Texas LLC.  *See id.* (citing *Carriere v. Jobs.com Inc.*, 393 F.3d 508, 534 & n.24 (5th Cir. 2004)).

(*e.g.*, creditors) makes no mention of fiduciary duties. *Id.* §§ 8831-8835 (emphasis added). To the contrary, Section 8834(a) ("Liability of Members and Managers: General Rule") states:

> A debt, obligation or other liability of a limited liability company is <u>solely</u> the debt, obligation or other liability of the company. A member or manager is <u>not personally liable, directly or indirectly</u>, by way of contribution or otherwise, for a debt, obligation or other liability of the company solely by reason of being or acting as a member or manager.

*Id.* § 8834(a) (emphasis added). ERC's claim for breach of fiduciary duty against BL—the sole member of BTS—fails under Section 8843(a), because it ignores that any debts owed by BTS to ERC are "solely" the debts of BTS. (FAC-¶100.)

Some courts have invoked precedent that pre-dates the enactment of the Pennsylvania Business Corporation Law to find that controlling shareholders of a <u>corporation</u> (not an LLC) owe common law fiduciary duties to creditors. *See, e.g., In re Total Containment, Inc.*, No. 04–13144bf, 2008 WL 682455, at *9 n. 11 (Bankr. E. D. Pa. Mar. 5, 2008). Such cases arise from the common-law principle that "assets of a dissolved corporation constitute a trust fund for creditors and stockholders," and shareholders may not distribute such assets to themselves without becoming "personally liable, by reason of such breach of their trust, to a creditor whose right to priority could not be thus destroyed." *Heaney v. Riddle*, 23 A.2d 456 (Pa. 1942); *Robar Dev. Corp. v. Minutello*, 408 A.2d 851, 853 (Pa. Super. Ct. 1979) (same).

LLCs, however, are creatures of statute and, "unlike corporations, did not exist at common law." *CML V, LLC v. Bax*, 6 A.3d 238 (Del. Ch. 2010). Thus, courts in other jurisdictions have declined to extend liability to members of an insolvent LLC. In Delaware, for example, "the creditors of an <u>insolvent corporation</u> have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (emphasis added). Creditors of an <u>insolvent LLC</u>, however, may not bring fiduciary duty claims (even derivatively) against LLC

46

managers or members.  *CML*, 28 A.3d at 1046; 6 Del. C. §§ 18–1001, 18-1002.

Since the Delaware Supreme Court decided *CML*, other courts around the country have followed suit, rejecting fiduciary duty claims by creditors and declining to extend corporate common law to LLCs without statutory authorization.  *E.g.*, *Weinstein v. Colborne Foodbotics, LLC*, 302 P.3d 263, 269 (Colo. 2013) ("[A]bsent statutory authority, the manager of an insolvent LLC does not owe the LLC's creditors the same fiduciary duty that an insolvent corporation's directors owe the corporation's creditors."); *Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 804 (Wyo. 2019) ("Wyoming's LLC Act specifies that managers of a [LLC] owe duties of loyalty and care 'to the company,' and is silent as to any extension of fiduciary duties to creditors."); *Charles Schwab & Co. v. WS Wealth Mgmt., LLC*, 2016 WL 7033699, at *9-12 (E.D. Va. Dec. 2, 2016) (Virginia would decline to recognize a fiduciary duty claim by creditors of an insolvent LLC, given the "text" of the Virginia LLC statute).

As one such court explained, "[o]ur emphasis on the differences between corporations and LLCs, our apparent caution to extend corporate common law to LLCs, and the lack of statutory language extending fiduciary duties to creditors, all constrain us from imposing fiduciary duties on an LLC to its creditors."  *Mantle*, 437 P.3d at 804.  In *Hanaway v. Parkesburg Grp., LP*, 168 A.3d 146, 154-58 (Pa. 2017), the Pennsylvania Supreme Court applied similar logic when it declined to find an implied duty of good faith and fair dealing in limited partnership agreements beyond that prescribed by statute:  "[W]hen interpreting a statute we must listen attentively to what the statute says, but also to what it does not say," and "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include."  *Id.*

Any contention by ERC that the Court already decided otherwise should be rejected.  When the Court decided a motion to dismiss in which Rios and Gamboa (not Defendants) argued that

ERC had only derivative standing, the Court found that "[m]ultiple Pennsylvania federal and state courts have permitted creditors of insolvent <u>corporations</u> to assert fiduciary duty claims directly under Pennsylvania law." (Dkt. 368 at 8-9 (emphasis added).)  Defendants did not participate in that motion, and the Court has not previously decided whether the Pennsylvania LLC Act permits creditors of <u>LLCs</u> to sue a member for breach of fiduciary duty.  (*See also* Dkt. 60, Order (denying Defendants' motion to dismiss without discussion); Dkt. 275, Opinion (denying Rios and Gamboa motion to dismiss seeking to apply Louisiana law pursuant to the internal affairs doctrine); Dkt. 421, Opinion (declining to reconsider application of internal affairs doctrine).)[15]

### 3.   ERC's "Zone of Insolvency" Claim Fails Under Either State's Law.

ERC's fiduciary duty claim also fails to the extent ERC alleges that BL violated a duty to creditors allegedly owed while in the "zone of insolvency," as neither Louisiana nor Pennsylvania recognizes such a claim.  (*See* FAC-¶¶11, 99-103 (describing "zone of insolvency" theory underlying fiduciary duty claim).)  As explained above, both states' LLC Acts shield members from personal liability for the debts of an LLC.  La.R.S. § 12:1320(C); 15 Pa.C.S. § 8834(a). Neither statute changes the scope of any fiduciary duties of LLC members when an LLC is in the "zone of insolvency."  *See Lobell*, 390 B.R. at 216-17 (finding no fiduciary duty to LLC creditors under Louisiana law and stating that a "zone of insolvency" theory "claims too much").

Even when applying corporate common law, Courts now roundly reject "zone of insolvency" claims following the landmark decision in *Gheewalla*, in which Delaware's highest

---

[15]     The Court's previous citation to *Hipple*, 2016 WL 320216, at *12, should not resonate here. *Hipple* involved an LLC yet discusses Pennsylvania cases on fiduciary duties owed by principals of an insolvent <u>corporation</u> (*Heaney*, 23 A.2d 456 and *Robar*, 408 A.2d at 853).  This discussion is dicta because that court based its decision on plaintiff's failure to prove that defendant was an officer of an LLC.   Moreover, the cases cited in *Hipple* were decided decades before Pennsylvania's LLC Act was first adopted in 1994.  Obsolete dicta in *Hipple* offers no basis upon which to re-write Pennsylvania's LLC Act.

court rejected a claim that corporate fiduciaries owe duties to creditors when in the "zone of insolvency." *Gheewalla*, 930 A.2d at 99-101 (no "direct claim for breach of fiduciary duty to a creditor while [a corporation] was operating in the zone of insolvency"); *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015) ("[T]here is no legally recognized 'zone of insolvency' with implications for fiduciary duty claims"). Again, other jurisdictions are in accord. *E.g.*, *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 203 (S.D.N.Y. 2009) ("New York State's corporate directors do not owe a duty of care to a corporation's creditors when the corporation is arguably operating within the 'zone of insolvency.'"); *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 100, 101-03 (D. Conn. 2010) ("[T]he Court has little difficulty concluding that the [zone of insolvency] cause of action ... does not exist under Connecticut law."); *Sanford v. Waugh & Co.*, 328 S.W.3d 836, 846 (Tenn. 2010) (same).

### 4.   FG And FGP Are Not BTS Fiduciaries.

Finally, even if BL somehow violated fiduciary duties to ERC in its capacity as the sole member of BTS, there is no basis whatsoever to extend such duties to FG or FGP. BL is a subsidiary of FG, which is a subsidiary of FGP. (SUMF-¶¶4, 13.) Neither FG nor FGP was ever a member or manager of BTS. (SUMF-¶¶171-73.) In Count Four, ERC alleges only that FG and FGP were "controlling persons" of BTS when it "was in the zone of insolvency." (FAC-¶100.)

Whether applying Pennsylvania or Louisiana law, there is no statutory (or common law) basis to impose fiduciary duties on entities that were not managers or members of an LLC. To the contrary, "[i]t is a general principle of corporate law, deeply ingrained in our economic and legal systems, that a parent corporation ... is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61 (emphasis added). Consequently, a fiduciary duty "could not pass [from a subsidiary to a corporate parent] without piercing the legal veil that generally shields a parent corporation from the acts of its subsidiaries." *Garza v. Citigroup Inc.*, 724 F. App'x 95, 99 (3d Cir. 2018).

Put another way, a parent company that "controls" a subsidiary does not simply step into the shoes of the subsidiary to assume duties owed to third parties like ERC. For example, in *Kidd v. Symbion, Inc.*, 2011 WL 4020814, at *9 (E.D. La. Sept. 9, 2011), plaintiff was a member of an LLC and alleged breach of fiduciary duty against both the managing member and its corporate parent. The Court held that plaintiff could not sue the corporate parent, because "there is no fiduciary relationship" to plaintiff (absent veil-piercing). *Id.* (emphasis added).

ERC strains to the breaking point by suing BL, the sole member and manager of BTS, for breach of a non-existent fiduciary duty to creditors, and it claims too much by relying on a discredited "zone of insolvency" theory. Even if such a claim could be asserted against BL, ERC has made no effort to pierce the corporate veil between BL and FG (BL's direct parent) or FG and FGP (BL's indirect parent). If the Court does not enter judgment on the entire claim, there should be no question that FG and FGP are entitled to summary judgment in their favor on Count IV.[16]

Dated: September 28, 2021.

Respectfully submitted,

By: */s/ Lawrence G. Scarborough*

Richard E. Coe (I.D. No. 94539)
Victoria Foltz Cordova (I.D. No. 326433)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
richard.coe@faegredrinker.com
victoria.cordova@faegredrinker.com

---

[16] ERC also cannot prove that BL is an alter ego of BTS. Defendants, however, have elected not to move for summary judgment on this basis, both because their legal arguments dispose of the fiduciary duty claim against BL and because of the potential for factual disputes.

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
lawrence.scarborough@faegredrinker.com

Jacob A. Kramer (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1050 K Street NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 312-7400
Facsimile: (202) 312-7461
jake.kramer@faegredrinker.com
rachel.beck@faegredrinker.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas Partners, L.P., Ferrellgas L.P., Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC, Bridger Admin Services II LLC, Bridger Energy, LLC, Bridger Lake, LLC, Bridger Leasing, LLC, and Bridger Marine, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Lawrence G. Scarborough, hereby certify that, pursuant to the Court's Policy and Procedure II(B)(3), this Memorandum contains 17,248 words (excluding the caption, tables, signature block, and certificates).

*/s/ Lawrence G. Scarborough*

## <u>CERTIFICATE OF SERVICE</u>

I, Lawrence G. Scarborough, hereby certify that on September 28, 2021, a true and correct copy of the foregoing Memorandum in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the alternative, for Summary Judgment on all Counts in Plaintiff's First Amended Complaint was filed electronically via the Court's ECF filing system. This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

*/s/ Lawrence G. Scarborough*