## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : | |
| Plaintiff/Counter-defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| BRIDGER LOGISTICS, LLC, *et al.*, | : | No. 2:17-cv-00495-JDW |
| Defendants, | : | |
| | : | |
| BRIDGER LOGISTICS, LLC, *et al.*, | : | |
| Defendants/Counterclaimants. | : | |
| | : | |
| | : | |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and in accordance with Section II(B)(4) of the Court's Policies and Procedures, Defendants respectfully submit this statement of undisputed material facts in support of their motion for summary judgment.[1]

### The Parties and Related Entities

1.      At the time it filed this action, Plaintiff Eddystone Rail Company, LLC ("ERC") was a limited liability company organized under the laws of Delaware with its principal place of business in Eddystone, Pennsylvania. (Dkt. 77 (Counterclaims ¶ 3); Dkt. 133 (ERC Answer to Counterclaims ¶ 3).)

2.      ERC was a joint venture between Enbridge Rail (Philadelphia), LLC, a subsidiary of Enbridge, Inc. (collectively with other Enbridge entities, "Enbridge") and Canopy Prospecting,

---

[1]      The "Defendants" include Ferrellgas Partners, L.P.; Ferrellgas, L.P.; Bridger Logistics, LLC; Bridger Administrative Services II, LLC; Bridger Marine, LLC; Bridger Rail Shipping, LLC; Bridger Real Property, LLC; Bridger Storage, LLC; Bridger Swan Ranch, LLC; Bridger Terminals, LLC; Bridger Transportation, LLC; Bridger Energy, LLC; Bridger Leasing, LLC; Bridger Lake, LLC; J.J. Liberty, LLC; and J.J. Addison Partners, LLC.

Inc. ("Canopy"). (Dkt. 77 (Ferrellgas Counterclaims ¶ 3); Dkt. 133 (ERC Answer to Counterclaims ¶ 3); Ex. 1 (Paradis Tr. (11/30/18)) at 61:16-62:8 ("Q. Enbridge is the only owner of the Enbridge Rail (Philadelphia), LLC; right? ... A. I believe so."); Ex. 2 (Wilkins Tr. (10/26/18) at 6:3-10, 10:25-11:23, 21:8-17 (testifying he was "senior vice-president of business development" at Bridger Logistics in 2014 and worked within the Enbridge family of companies), 90:10-23 (testifying "Enbridge owned Enbridge Rail and it rolled up into Enbridge, Inc.").)

3.      Defendant Ferrellgas Partners, L.P. ("FGP") is a Delaware limited partnership with its corporate headquarters in the State of Kansas. (Dkt. 182 (FAC ¶ 14); Dkt. 192 (Ferrellgas Answer to FAC ¶ 14).)

4.      FGP is the controlling parent of defendant Ferrellgas, L.P. ("FG," collectively with FGP, "Ferrellgas"); FG is a Delaware limited partnership with its corporate headquarters in the State of Kansas. (Dkt. 182 (FAC ¶ 15); Dkt. 192 (Ferrellgas Answer to FAC ¶ 15); Dkt. 133 (ERC Answer to Amended Counterclaims ¶ 1); Ex. 3 (1/31/16 Ferrellgas 10-Q at BLFG_EDPA1604276 ("The operating partnership [defined as Ferrellgas, L.P.] is the only operating subsidiary of Ferrellgas Partners [defined as Ferrellgas Partners, L.P.]").)

5.      Non-party Ferrellgas, Inc. is the general partner of both FGP and FG. (Ex. 4 (11/5/18 Ruisinger Decl. ¶ 1); Ex. 3 (1/31/16 Ferrellgas 10-Q at BLFG_EDPA1604276 ("Ferrellgas, Inc. (the "general partner"), a wholly-owned subsidiary of Ferrell Companies, has retained a 1% general partner interest in Ferrellgas Partners [defined as Ferrellgas Partners, L.P.] and also holds an approximate 1% general partner interest in the operating partnership [defined as Ferrellgas, L.P.], representing an effective 2% general partner interest in Ferrellgas [defined as Ferrellgas Partners, L.P., collectively with Ferrellgas L.P.] on a combined basis. As general partner, it performs all management functions required by Ferrellgas.").)

6.      Defendant Bridger Logistics, LLC ("BL") is a limited liability company that was organized under the laws of Louisiana on June 2, 2011, with its principal place of business in the State of Texas. (Dkt. 193 (BL Answer to FAC ¶ 13); Ex. 5 (BL Articles of Organization at BLFG_EDPA0275702).)

7.      As of July 1, 2013, non-party Bridger, LLC ("Bridger") was BL's sole member and manager. (Ex. 6 (12/30/11 Notice of Change of Members and Membership Interests of BL, BLFG_EDPA0054889-90, 2/6/12 Notice of Change of Members and Membership Interests of BL, BLFG_EDPA0054891-92, 7/29/13 Notice of Change of Members and Managers of BL, BLFG_EDPA0054893-94, and 6/28/13 Certificate of Merger of Bridger Group, LLC with and into Bridger, LLC, BLFG_EDPA1630513-16).)

8.      Defendant Julio Rios was Bridger's President and Chief Executive Officer from July 1, 2013 until June 24, 2015. (Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274499); Ex. 8 (Rios Tr. at 30:24 – 31:23); Ex. 9 (ERC Supplemental Response to R/G Second Set of Interrogatories at 16 ("Prior to the Acquisition, Rios was also President and Chief Executive Officer of Bridger, LLC")); Ex 10 (7/1/13 Second Amended and Restated Limited Liability Company Agreement of Bridger, LLC at BLFG_EDPA1625670 (identifying officers)).)

9.      Defendant Jeremy Gamboa was Bridger's Executive Vice President and Chief Operating Officer from July 2013 until June 24, 2015. (Ex. 11 (Gamboa Tr. at 23:19-23); Ex. 9 (ERC Supplemental Response to R/G Second Set of Interrogatories at 16 ("Prior to the Acquisition, Gamboa was Executive Vice President and Chief Operating Officer of Bridger, LLC"); Ex 10 (7/1/13 Second Amended and Restated Limited Liability Company Agreement of Bridger, LLC at BLFG_EDPA1625670 (identifying officers)).)

10.     On June 24, 2015, FGP acquired BL and its subsidiaries from Bridger in an arms-length transaction for more than $800 million (the "Acquisition") pursuant to a May 29, 2015 Purchase and Sale Agreement By and Between Bridger, LLC, as Seller, and Ferrellgas Partners, L.P., as Purchaser (the "Ferrellgas PSA"). (Ex. 12 (Ferrellgas PSA at 1).)

11.     In connection with the Acquisition, Rios became employed by Ferrellgas, Inc., and served as the President and Chief Executive Officer of BL, as well as the Executive Vice President of Ferrellgas, Inc. (Ex. 13 (5/29/15 Rios Employment Agreement ¶ 3); Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274499).)

12.     In connection with the Acquisition, Gamboa became employed by Ferrellgas, Inc., and served as the Chief Operating Officer of BL, as well as the Senior Vice President of Ferrellgas, Inc. (Ex. 14 (5/29/15 Gamboa Employment Agreement ¶ 3); Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274499).)

13.     Following the Acquisition, BL became a subsidiary of FG. (Ex. 15 (10/1/20 ERC's Supplemental Responses and Objections to Defendants Rios and Gamboa's Fourth Set of Interrogatories at Supplemental Response 4, pg. 24 ("Through the Acquisition, Logistics became a wholly-owned subsidiary of Ferrellgas, L.P.").)

14.     Prior to the Acquisition, Bridger had two main divisions: (1) Bridger Marketing, LLC ("BM," f/k/a Bridger Trading, LLC), an oil marking company that, among other ventures, purchased crude oil from the Bakken region of North Dakota and then sold such crude to East Coast refineries; and (2) BL, an oil logistics and transportation company that, along with its subsidiaries, transported the crude from the Bakken to East Coast refineries. (Ex. 18 (12/23/16 Ballengee Decl., ¶¶ 3, 5, 32).)

15.     Non-party Bridger Transfer Services, LLC ("BTS") was a BL subsidiary that, prior to being acquired by FGP, had entered a 2013 Rail Facilities Services Agreement ("RSA") with ERC for the use of a transloading facility in Eddystone, Pennsylvania, which was designed to transload crude oil from rail cars onto barges on the Delaware River.  (Dkt. 182 (FAC ¶¶ 4, 41); Dkt. 193 (BL Answer to FAC ¶¶ 4, 41); Ex. 16 (RSA at 1); (Ex. 12 (PSA at Schedule 4.4, RG_EDPA0008562).)

16.     BL and BTS provided logistical services to support a 2014 Crude Oil Supply Agreement (the "COSA") in which BM agreed to supply Bakken crude from North Dakota to the Trainer Refinery located near Philadelphia, Pennsylvania.  (Dkt. 182 (FAC ¶¶ 40-41, 47); Dkt. 193 (BL Answer to FAC ¶¶ 40-41, 47); Ex. 17 (COSA, JTS-SMA_0002008-12).) At the time of the Acquisition, the COSA arrangement provided BL with its largest customer and was one of its main sources of revenue. (Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274544 ("[BL's] largest customer, owns a refinery in Trainer, Pennsylvania. Bridger has entered into an agreement with this customer under which Bridger will provide logistics services to transport a minimum of 65 MBbls/d of crude oil from the Bakken region in North Dakota to the Trainer refinery. This agreement terminates in 2019, and the minimum volume commitment is subject on a monthly basis to a minimum average delivery amount per month of 35 MBbls/d.  During the fiscal year ended July 31, 2015, approximately 50% of our crude oil logistics gross margin was generated from this customer."); Ex. 61 (11/5/18 Soiefer Decl. ¶¶ 11-12, 16-17 ("Ferrellgas believed the RSA was a valuable asset as part of Bridger Logistics' and its subsidiaries' overall logistical solution to provide crude oil to the Trainer Refinery.  Additionally, the Monroe TLA was a significant customer contract to Bridger Logistics at the time of the Ferrellgas Acquisition.").)

17.     At all times relevant to this action, BM was a Louisiana limited liability company, with its principal place of business in Texas. (Dkt. 70 (Third-Party Complaint ¶ 11); Dkt. 158 (Answer to Third-Party Complaint ¶ 11).)

18.     Through the Acquisition, Bridger sold BL to Ferrellgas while retaining BM; following the Acquisition, Bridger, LLC changed its name to Jamex, LLC, and BM changed its name to Jamex Marketing, LLC ("Jamex Marketing"). (Ex 18 (12/23/16 Ballengee Decl. ¶ 32).)

### The Eddystone Facility and Rail Facilities Services Agreement

19.     In early 2012, ERC's parent entities Enbridge and Canopy began developing and marketing a plan to convert a coal-fired power plant in Eddystone, Pennsylvania with existing infrastructure into a transloading facility (the "Eddystone Facility") that would load crude oil shipped by rail from North Dakota onto barges for delivery to East Coast refineries. (Ex. 19 (5/11/12 Rios email to Canopy regarding the Eddystone Facility, CANTP001646); Ex. 20 (11/26/12 Canopy email regarding and attaching press release concerning joint venture with Enbridge, Eddystone 0034339-41).)

20.     The Defendants first learned about the Eddystone Facility in February 2012. (Ex. 18 (Ballengee Decl. ¶ 6).)

21.     At that time, BTS and other BL subsidiaries had relationships with several Enbridge entities, including contracts to lease truck stations in North Dakota used for crude storage and transport, an agreement to use a transloading facility in Berthold, North Dakota, and an agreement for oil storage in Berthold, North Dakota, for which BL had provided the associated Enbridge entity a parental guaranty. (Ex. 21 (9/1/11 Beaver Lodge Lease, ERCEDPA00450648); Ex. 22 (11/1/11 Trenton Lease, ERCEDPA00002225); Ex. 23 (5/5/12 Berthold Rail Agreement, ERCEDPA00131622); Ex. 24 (7/12/12 Berthold Rail Phase I Agreement, ERCEDPA00411916);

Ex. 91 (6/1/12 Oil Storage Agreement, BLFG_EDPA0330536 ("In accordance with Exhibit "A,"
Customer [defined as Bridger Storage, LLC] shall cause its ultimate parent corporation, Bridger
[], to provide a parental guarantee in form and substance acceptable to Enbridge"),
BLFG_EDPA0330544 (9/7/12 Guarantee "by Bridger Logistics, LLC (the 'Grantor') to and in
favor of Enbridge Storage (North Dakota) L.L.C. (the 'Creditor').").)

22.     On or about February 13, 2013, BTS and ERC entered into the RSA. (Ex. 16 (RSA
at 18).)

23.     Enbridge had to approve ERC's execution of the RSA. (Ex. 25 (ERC Operating
Agreement, ERCEDPA00243083-107 ¶ 1 (defining "Company" as Eddystone Rail Company,
L.L.C. and "Operator" as Enbridge Rail (Philadelphia) L.L.C.), § 2.1(n)(ii) ("Operator shall ... (n)
in collaboration with the Facility Business Development Manager appointed pursuant to Section
3.4, undertake the commercial responsibilities of the Operator for Expansions approved by the
Management Committee and the maintenance of business through the Facilities, which include ...
(ii) developing the Rail Services Agreements (RSAs), Transportation Service Agreements (TSAs)
and all other commercial contracts for the Expansion"); Ex. 26 (Eddystone Rail Company, L.L.C.
Limited Liability Company Agreement (Ex. 426 to ERC 30(b)(6) Cohen Tr.) at § 5.1 (specifying
the rights and duties of ERC's Management Committee and identifying Enbridge employees as
comprising two of the four members of the Management Committee).)

24.     Enbridge was the entity that actually built the Eddystone Facility and operated it
until 2017, when Enbridge sold its interest to the other joint venturer, Canopy, a private company.
(Ex. 1 (Paradis Tr. (10.19.17) at 5:5-18 (testifying he has been employed by Enbridge for "[o]ver
31 years"), 11:21-12:4 (testifying "it was late 2014" when he "first [got] involved and [became]
responsible in some way for the Eddystone facility"), 17:17-19:18 (testifying Enbridge "put a

significant amount of capital into" building the Eddystone Facility and subsequently "sold this facility to -- to Canopy"), 392:8-12 (confirming he was "the lead from the Enbridge side negotiating the ultimate deal between Enbridge and Canopy that got consummated in October of 2017"), 394:2-395:4 (confirming the Redemption and Asset Transfer Agreement is dated October 19, 2017); 395:24-396:12 (testifying the Redemption and Asset Transfer Agreement gave Canopy the "rights to the Exelon lease at the Eddystone Rail facility"); Ex. 27 (Copy of Redemption and Asset Transfer Agreement (Ex. 78 to Paradis Dep., ERCEDPA00529409-37) (providing for the sale of Enbridge's interests in ERC to Canopy).)

25.     Under the RSA, BTS agreed to transload a minimum of 64,750 barrels per day ("bpd") through the Eddystone Facility for five years following an initial phase-in period, or to pay a "Deficiency Volume Charge" if it transloaded fewer than 64,750 bpd in a given month. (Ex. 16 (RSA §§ 1.1, 2.1, 4).)

26.     The RSA set the "Deficiency Volume Charge" at $1.75 per barrel not transloaded and made the charge subject to adjustment "by any increase in the United States department of Labor, Consumer Price Index." (Ex. 16 (RSA §§ 1.1, 5.1).)

27.     The RSA set the "Transloaded Volume Charge" at $2.25 per barrel, and similarly made this charge subject to adjustment "by any increase in the United States department of Labor, Consumer Price Index." (Ex. 16 (RSA §§ 1.1, 5.1).)

28.     The RSA provided that, whenever BTS paid a "Deficiency Volume Charge," it would receive "credits" that could be used to pay for the transloading of future barrels of oil. (Ex. 16 (RSA §§ 1.1, 4.2).)

29.    The credits could be used only to pay for barrels of crude over and above BTS's daily minimum volume commitment of 64,750 bpd, and the credits expired six months after they were earned. (Ex. 16 (RSA §§ 1.1, 4.2).)

30.    The RSA did not require that BTS supply a surety bond, parent guaranty, letter of credit, or any other form of collateral or financial assurance. (Ex. 16 (RSA § 11).)

31.    Instead, with respect to "financial assurances," the RSA gave ERC the right to request information that would enable ERC to determine BTS's "ability to pay the Charges and all other amounts that may reasonably become payable by [BTS] under this Agreement, the Terms and Conditions and/or the Terminal Rules."  (Ex. 16 (RSA § 11.1).)

32.    The RSA further gave ERC the right to request a letter of credit, guaranty, or "other enforceable collateral security," but only if (1) BTS failed to provide the requested information within five days, (2) ERC determined BTS "may not have the ability to pay," or (3) BTS's credit ratings fell beneath a certain threshold. (Ex. 16 (RSA § 11.1).)

33.    If BTS refused to provide the requested security, ERC's sole remedy under the RSA was to stop transloading crude presented by BTS. (Ex. 16 (RSA § 11.1).)

34.    ERC requested a parent guaranty, letter of credit and/or surety bond on several occasions.  (Ex. 28 (1/30/15 BTS-ERC emails discussing ERC's request for financial assurances, ERCEDPA00561613-18); Ex. 29 (2/24/15 ERC emails discussing requests to BTS for financial assurances and a surety bond, ERCEDPA00177802); Ex. 30 (6/1/15 BTS-ERC emails discussing ERC's request for a letter of credit, RG_EDPA0088782-85); Ex. 31 (June 2015 BTS-ERC emails discussing ERC's requests for credit assurances, ERCEDPA00541634-39); Ex. 32 6/17/15-7/1/15 BTS-ERC emails regarding ERC's request for a surety bond, RG_EDPA0007695-704); Ex. 18 (12/23/16 Ballenge Decl. ¶¶ 16, 29-31); Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 223:21-

224:5 ("A. We asked for a guaranty is my recollection, or my understanding, and it wasn't forthcoming. Q. … So Eddystone asked for a parent guaranty to secure the full amount of the RSA? … A. I think so. Or a letter of credit. And that ultimately didn't come to fruition.").

35.    On September 10, 2014, BL executed a short-term guaranty of certain limited obligations of BTS to ERC, which guaranty expired by its terms on September 30, 2014. (Ex. 34, (9/10/14 Guarantee, BTSEDDYSTONE0027989).)

36.    BTS provided no other guaranty, letter of credit, surety bond or other collateral security in connection with the RSA. (Ex. 16 (RSA § 11.1); Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 223:21-224:5 ("A. We [ERC] asked for a guaranty is my recollection, or my understanding, and it wasn't forthcoming. Q. … So Eddystone asked for a parent guaranty to secure the full amount of the RSA? … A. I think so. Or a letter of credit. And that ultimately didn't come to fruition.").)

37.    The RSA contains a choice-of-law provision, instructing that it "shall be governed and construed according to the laws of the State of New York, without regard to principles of conflict of laws that, if applied, might require the application of the laws of another jurisdiction." (Ex. 16 (RSA § 15.2).)

38.    The RSA further provides that BTS "shall not be entitled to assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed." (Ex. 16 (RSA § 8).)

39.    Exhibit A to the RSA reflects the "Terms and Conditions for the Use of the Eddystone Rail Facilities," which ERC could amend, supplement or restate so long as ERC provided BTS with 45 days' prior written notice. (Ex. 16 (RSA § 6.1, Ex. A).)

40.     Exhibit A contains the sole reference to the term "maritime" in the RSA. (Ex. 16 (RSA Ex. A at §§ 6, 12, 16).)

41.     Exhibit A to the RSA addresses dispute resolution and provides that "either Party may refer [any dispute, controversy or claim] to three (3) persons at New York" and that the "proceedings shall be conducted in accordance with the Rules of the Society of Maritime Arbitrators, Inc."  (Ex. 16 (RSA Ex. A § 16(b)).)

42.     BTS, defined as the "Customer," and ERC, defined as the "Owner," are the sole parties to the RSA. (Ex. 16 (RSA at 1).)

43.     The RSA defines the term "Affiliate" as "a Party, or any other Person directly or indirectly controlling, controlled by, or under common control with such Party," and further provides that "[e]ach of the members of the Owner shall be deemed to be Affiliates of Owner." (Ex. 16 (RSA § 1.1 at 1).)

44.     In defining the term "Operator," the RSA states "Owner shall, without limitation, have the right to perform any and all of Transloading Services (directly or through an Affiliate) and/or to replace the Operator from time to time."  (Ex. 16 (RSA § 1.1 at 4).)

45.     When it entered the RSA, ERC understood that BTS was a distinct legal entity and its sole counterparty with contractual obligations under the RSA. (Ex. 33 (ERC 30(B)(6) Depo. Tr. (Day 2: Cohen) at 282:17-24 ("Q. When it entered into the RSA, Eddystone was aware that BTS was a distinct legal entity, correct? A. Yes.") and 289:3-5 ("Q. BTS was the only entity with contractual liability, correct?  A. BTS was the obligor under the RSA, yeah."); Ex. 1 (Paradis Tr. at 183:3-19 ("Q.  In this case, the party that ERC looks to with respect to its rights and obligations under [the RSA] is [BTS]; correct? A. Yes.")); Ex. 2 (Wilkins Tr. at 111:21-117:6 ("Q. And Enbridge ultimately had to have been comfortable having [BTS] as opposed to BP as their counter-

party? A. Yeah, and by the time we signed the contract, they had already demonstrated the ability to do that with their Berthold business and they had regretted not taking more at Berthold. They were very capable guys and doing – I mean, by this time they were the up-and-coming oil company") and 123:4-124:17 ("Q. So in that lead-up period to 2012 when you were exploring the Eddystone Rail facility ... do you recall that there were a number of different leases that [BTS] took for Enbridge stations in North Dakota? A. Yea…. [T]hey had one lot at Stanley and then they took one at Berthold. And then as I put on Little Muddy and Reserve, Grenora, as we made room in all the spots, they wanted one. Great. Here's the contract. Got it back signed, and they went and built their stuff…. I mean, it was a good business partner. Q. And so do you recall which of the Bridger Group entities actually contracted for those various stations? A. Yeah, it was [BTS]. Q. And did you understand at the time why it was [BTS] as opposed to another entity that you were contracting with for those leases?  A.  Ma'am, I -- it's similarly to which company -- we'e spent a lot of time this morning talking about Enbridge and Enbridge, Inc., and all that. I mean, it was always Bridger; and it was, like, this is the company they want their business to be conducted with for this type of work. And it worked with us and my counsel said, "Great. Let's go with them." So we contracted between [BTS] and Enbridge Pipeline (North Dakota) or Enbridge Rail (North Dakota) and that's how we did it and it worked.")).)

46.     When it entered the RSA, ERC concluded that "BTS had strong financials."  (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 225:2-20).)

47.     At the time the parties entered the RSA, the Eddystone Facility was not operational. (Ex. 16 (RSA § 2.2).)

48.     By May 2014, construction of the Eddystone Facility was substantially complete, and the Eddystone Facility accepted its first train on May 3, 2014. (Ex. 35 (5/3/14 Nicely Email,

BLFG_EDPA0469085-86); Ex. 36 (Turnbull Tr. at 9:13-24, 29:11-30:11 (testifying he joined Enbridge as an employee in April 2013 and was "manager of the Eddystone Rail Company in Eddystone" where he "was responsible for the overall safe, environmentally sound, and efficient operation of the facility"), 75:1-76:7 ("Q. When did the facility become operational? A. Again, it was early May of 2014 when we received our first train.").)

49.     Shortly after operations began, BTS informed ERC that BTS had several complaints with respect to the Eddystone Facility's performance and capabilities. (Ex. 18 (Ballengee Decl. ¶¶ 28-30); Ex. 37 (Nicely Decl. ¶ 49).)

50.     Rather than terminating the RSA as a result of such problems, BTS attempted to negotiate a resolution with ERC. (Ex. 18 (Ballengee Decl. ¶¶ 28-30).)

51.     To that end, affiliates of BTS offered to buy the Eddystone Facility three times: (a) in 2013, when construction stalled, (b) in 2014, after operations began and BTS complained about the Eddystone Facility's performance and capabilities, and (c) in 2015, when the issues giving rise to BTS's complaints persisted. (Ex. 18 (Ballengee Decl. ¶¶ 16, 29-31).)

52.     BTS also tried to negotiate an amendment to the RSA that would address certain of its complaints. (Ex. 18 (Ballengee Decl. ¶¶ 28-29).)

53.     BTS eventually retained counsel in December 2014 to demand a formal dispute resolution meeting in accordance with the RSA. (Ex. 18 (Ballengee Decl. ¶ 30).)

54.     Negotiations to amend the RSA proceeded through the fall of 2015 but were ultimately unsuccessful. (Ex. 18 (Ballengee Decl. ¶ 31); Ex. 37 (Nicely Decl. ¶ 49).)

55.     Despite the identified problems with the Eddystone Facility's performance and capabilities, BTS paid ERC for all transloaded and deficiency volume charges that were due under the RSA during the time BTS was owned by Bridger Logistics. (Ex. 38 (ERC Response to Rios

and Gamboa's First Set of Interrogatories at 2-9); Ex. 39 (Sherman Tr. at 186:23-187:2 (Q: "Eddystone was paid every single month while Bridger Logistics Owned BTS, wasn't it?" A: "Yeah, I want to say except for a small piece, yes.").)

## The Monroe COSA

56.     On July 1, 2014, BM and Monroe Energy, LLC ("Monroe") entered into the COSA, pursuant to which BM agreed to deliver 1,950,000 barrels of crude per month (approximately 65,000 bpd) to Monroe's refinery in Trainer, Pennsylvania (the "Trainer Refinery"). (Ex. 17 (COSA, JTS-SMA_0002008); Ex. 40 (Ballengee Tr. 48:2-21 ("Q. Had they agreed that [Monroe] would take a minimum volume of 65,000 barrels per day? A. They did, yes.").)

57.     BM used BTS's capacity at the Eddystone Facility to unload crude oil delivered by trains onto barges, which then delivered the crude to the Trainer Refinery. (Ex. 40 (Ballengee Tr. 48:2-4 ("Q. So was Monroe your only customer out of Eddystone? A. Yes."); Ex. 17_ (COSA at JTS-SMA_0002017 (§ 2.8: "Refiner and Supplier agree that Supplier shall be the exclusive source of Crude Oil purchased or otherwise procured by Refinery that is unloaded at the Eddystone Facility" and "Refiner shall not during any period of exclusivity . . . purchase or otherwise procure Crude Oil that to Refiner's knowledge has been transshipped from the Eddystone Facility except through Supplier"), at JTS-SMA_0002049-50 (Schedule 4.2: describing crude oil transportation, including "rail car loading at origin, BNSF/CP freight, rail car utilization, Eddystone Facility throughput, barge from Eddystone Facility to the Refinery"), JTS-SMA_0002019 (§ 4.1: providing the "price for Crude Oil pursuant to this Agreement" is based on Schedule 4.1).)

58.     On May 26, 2015, BM and Monroe entered the Amended and Restated Crude Oil Supply Agreement ("Amended COSA"), pursuant to which BM agreed to continue delivering

1,950,000 barrels of crude per month (approximately 65,000 barrels per day) to Monroe. (Ex. 41 (Amended COSA).)

59.    Under the Amended COSA, the per-barrel price Monroe paid to BM was reduced by $0.25 per barrel, and Monroe was entitled to further reduce its payments to BM by any payments Monroe made to BL pursuant to a separate Transportation and Logistics Services Agreement that BL and Monroe entered on May 26, 2015 (the "Monroe TLA"). (Ex. 41 (Amended COSA at §§ 1.1, 4.1(c), 7.1).)

60.    Under the Monroe TLA, Monroe agreed to pay BL a per-barrel transportation fee and to reimburse BL for "railroad freight charges, fees and other costs" that BL incurred to transport crude from North Dakota to the Eddystone Facility; Monroe also agreed to pay deficiency charges, so long as BM delivered to Monroe an average of at least 35,000 bpd during the month. (Ex. 42 (Monroe TLA §§ 6.1-6.4).)

61.    On June 24, 2015, BM and BL entered into a separate Transportation and Logistics Agreement (the "Marketing TLA"), pursuant to which BM agreed that BL would be "the sole and exclusive provider of [logistics] Services with respect to any [of BM's] Marketing Arrangements for Crude Petroleum."  (Ex. 43 (Marketing TLA  § 2).)  If Monroe delivered fewer than 35,000 bpd during the month, BM was to pay deficiency charges to BL.  (*Id.* § 23.)

<u>The Alleged Implied Contracts</u>

62.    ERC contends that, prior to the Acquisition, BTS had an implied contract with BM that mirrored the terms of the RSA, with a duration of five years and two months.  (Ex. 33, (ERC 30(B)(6) Tr. (Day 2: Cohen) at 140:25-141:12 & 143:11-17 (volume commitment was "the same as what was in the RSA," or "65,000 barrels a day"), 144:3-9 ("payments would have had to follow

the same structure as the RSA"), 145:13-17 ("It would be for the same term as the RSA, so 5 years and 2 months, I think."), 151:15-152:11 (parties agreed on "price, the term, and the volume").)

63.     ERC contends that "the implied contract between BM and BTS was assumed by [BL] after the acquisition."  (Ex. 33 (ERC 30(b)(6) Tr. (Day 2 Cohen) at 232:9-16 ("Q. So the contention is then that, following the acquisition, Bridger Logistics assumed the same obligations [of the implied contract] that BM had during the pre-acquisition period? A. Yes.") and 126:22-127:12 ("A. I would say that the implied contract between BM and BTS was assumed by [BL] after the acquisition. … Q. But it's the same contract and just one party agreed to assume it? A. That is our allegation.").)

64.     The alleged implied contract between BM and BTS "was not a written agreement." (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 136:25-137:5 ("Q. [T]his implied contract that you alleged occurred is not a written agreement? … A. To my knowledge, it was not a written agreement."), 235:14-236:5 ("Q. And there's no written agreement upon which Eddystone relies to establish a implied contract in the post-acquisition period, correct? A. No written agreement").)

65.     ERC has not identified who allegedly agreed to the terms of the implied contract on behalf of BTS or BM. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 127:13-128:9 ("Q. Who negotiated the implied contract between BTS and BM on the BTS side? A. I don't know. Q. … [W]ho negotiated on the BM side? A. I don't know.").)

66.     ERC bases the existence of the alleged implied contract between BTS and BM on ERC's "expectation, given industry practice."  (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 250:21-252:3 ("A. [A]t the time that we entered the [RSA] with BTS, we had an expectation, given industry practice that BTS had a contract in place that – and BM had an agreement that would backstop BTS's obligations to Eddystone under the [RSA] … We didn't know at the time whether

it was written or not. We wouldn't have known. But we had an expectation because that's common practice in our industry that there was a backstop agreement. That was the expectation; that's the contention. … Q. So you didn't know, one way or the other, whether there was a backstop agreement?  A. No. We had the expectation because that's common practice.").)

67.     ERC also bases the existence of the alleged implied contract on an alleged "course of dealing" between BTS and BM. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 232:5-16 ("Q: Does Eddystone rely on the course of dealing between BM and BTS to ascertain the terms of the implied contract during the pre-acquisition period? A. That is the implied contract during the pre-acquisition period. Between BM and BTS. Q. Okay. So the contention is then that, following the acquisition, [BL] assumed the same obligations that BM had during the pre-acquisition period? A. Yes."); Ex. 44 (ERC Supp. Response to BLFG Second Interrogatories at 5-7).)

68.     ERC contends "the course of dealing between BM and BTS, during the pre-acquisition period, is evidenced by rate sheets and accounting records."  (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 252:4-13 ("Q. And the course of dealing between BM and BTS during the pre-acquisition period, is evidenced by rate sheets and accounting records, correct? A. In part, yes."); Ex. 15 (10/1/20 Plaintiff Eddystone Rail Company, LLC's Supplemental Responses and Objections to Defendants Rios and Gamboa's Fourth Set of Interrogatories at Supplemental Response 4, pg. 7-8 (referring to accounting records)); Ex. 44 (ERC Supp. Response to BLFG Second Interrogatories at 5-7 ("Bridger, LLC's corporate policy required affiliated-party transactions to be conducted at arms-length through written contracts…. In some instances, [BL] subsidiaries such as BTS had written contracts with Marketing. For example, BTS had written contracts with [BM] (then Bridger Trading) under which BTS provided crude injection station capacity to [BM].... In other instances, BTS and [BM] conducted business without written

17

agreements.  In situations where there was not a written agreement between BTS and [BM], Bridger, LLC's corporate policy required BTS to charge fees to [BM] based on intercompany fee schedules.").)

69.     The rate sheet ERC identifies was created, circulated and effective on or about January 2015, and contains the content reflected in the immediately following image.  (Ex. 45 (Kelly Tr. at 141:4-143:2); Ex. 46 (Kelly Dep. Ex. 823 (1/29/15 Email attaching rate sheet)); Ex. 47 (Kelly Dep. Ex. 824 (rate sheet)).)

**Intercompany fee schedule**

**Bridger Transfer EPND**

| Shipper Accounts | Bridger Transfer $/bbl | Bridger Marketing $/bbl | 1-Jan-15 |
|---|---|---|---|
| Bridger Marketing | freight* | freight + $0.50/bbl on deliveries | to Clearbrook only |
| Whiting | freight* | freight + $0.50/bbl on deliveries | to Clearbrook only |
| | | | |
| Rail Loading | Third Party | BM Current | 1-Jan-15 |
| Berthold (loaded Volumes) | $1.27 | $2.27 | $2.10 |
| Deficiency | $1.00 | $2.00 | $1.00 |
| Over-committed vol. | $0.25 | $0.50 | $0.25 |
| Eddystone | $2.25 | $2.75 | $2.55 |
| Deficiency | $1.75 | TBD | $1.75 |

70.     In the "Eddystone" row of the rate sheet, "$2.25" under "Third Party" is the amount BTS paid to ERC for each barrel transloaded through its facility under the RSA, and "$2.75" under "BM Current" is the intercompany charge from BTS to BM for each barrel.  (Ex. 45 (Kelly Tr. at 149:21-150:14); Ex. 47 (Kelly Dep. Ex. 824 (rate sheet)).

71.     In the bottom-most "Deficiency" row of the rate sheet, "$1.75" is the proposed per-barrel deficiency charge under the RSA starting in January 2015, and "TBD" means "to be determined."  (Ex. 45 (Kelly Tr. at 156:20-158:4); Ex. 47 (Kelly Dep. Ex. 824 (rate sheet)).)

72.     Prior to January 2015, there was no intercompany charge from BTS to BM for deficiency payments, and "the intention here going forward as part of our budgeting process was to reflect that third-party rate at $1.75 in the 2015 budget."  (Ex. 45 (Kelly Tr. at 156:20-158:4; Ex. 47 (Kelly Dep. Ex. 824 (rate sheet); Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 244:7-245:9

18

("Q. The intercompany fee is not determined, at least prior to January 1, 2015. Fair?  A. That's what it says.").)

73.    ERC concedes that Bridger's pre-Acquisition accounting records do not show BM ever providing funds to BTS to cover deficiency payments.  (Ex. 44 (ERC Supp. Response to BLFG Second Interrogatories at 6-7 ("[T]he accounting records do not appear to indicate that [Bridger] Marketing provided funds to BTS to cover deficiency charges that BTS was required to pay Eddystone")); Ex 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 241:12-245:9 ("Q. Isn't it the case that BM never actually transferred money to BTS to cover deficiency payments?  A. I think that's true.")).)

74.    ERC alleges that [BL's] post-Acquisition accounting records "show that amounts due to ERC under the RSA and the North Dakota rail loading contracts were paid directly to ERC by [BL] or [BL] subsidiaries other than BTS until the time that BTS was sold to [JTH]."  (Ex. 44 (ERC Supp. Response to BLFG Defendants Second Set of Interrogatories at 8-9).)

75.    ERC's own accounting records show that it received payments owed under the RSA from May 2014 through January 2016 as set forth in the sub-paragraphs that follow. (Ex. 84 (10/25/17 Sloniewsky Decl., Ex. 6 (chart of ERC's payment records for each monthly payment)); Ex. 49 (ERC Response to Rios and Gamboa's First Set of Interrogatories at 2-8).)

a.    "On May 22, 2014, Eddystone received a payment of $453,250.00, for deficiency charges due under the RSA for the month of April 2014. As best Eddystone can determine ... the payment was made by [BTS].

b.    On June 20, 2014, Eddystone received a payment of $1,607,731.00. Of that amount, $533,164 was owed for transloading charges and $1,074,556.50 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

c.   On July 21, 2014, Eddystone received a payment of $3,040,715.50. Of that amount, $1,882,532.25 was owed for transloading charges and $1,158,183.25 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

d.   On August 20, 2014, Eddystone received a payment of $3,954,313.50. Of that amount, $1,987,317 was owed for transloading charges and $1,966,996.50 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

e.   On September 19, 2014, Eddystone received a payment of $4,190,066.00. Of that amount, $3,048,203.25 was owed for transloading charges and $1,141,862.75 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

f.   On October 20, 2014, Eddystone received a payment of $3,996,218.00. Of that amount, $2,685,793.50 was owed for transloading charges and $1,310,424.50 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

g.   On November 20, 2014, Eddystone received a payment of $4,362,363.40. Of that amount, $3,823,541.51 was owed for transloading charges and $538,821.89 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

h.   On December 19, 2014, Eddystone received a payment of $4,145,126.20. Of that amount, $3,355,880.36 was owed for transloading charges, and $789,245.84 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

i.   On January 20, 2015, Eddystone received a payment of $3,895,568.78. Of that amount, $2,742,778.40 was owed for transloading charges and $1,152,790.38 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

j.   On February 20, 2015, Eddystone received a payment of $4,308,930.30. Of that amount, $2,583,092.62 was owed for transloading charges and $725,837.68 for deficiency

charges. As best Eddystone can determine ... the payment was made by BTS.

k. On March 20, 2015, Eddystone received a payment of $3,879,337.14. Of that amount, $3,179,642.11 was owed for transloading charges and $699,695.03 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

l. On April 20, 2015, Eddystone received a payment of $4,400,038.94. Of that amount, $3,993,081.44 was owed for transloading charges and $406,957.50 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

m. On May 20, 2015, Eddystone received a payment of $4,415,616.26. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment was made by BTS.

n. On June 19, 2015, Eddystone received a payment of $4,536,666.42. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment was made by BTS.

o. On July 20, 2015, Eddystone received a payment of $4,336,274.72. Of that amount, $4,216,048.74 was owed for transloading charges and $120,225.98 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

p. On August 20, 2015, Eddystone received a payment of $4,520,685.18. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment was made by Bridger Logistics, LLC.

q. On September 21, 2015, Eddystone received a payment of $4,803,869.19. Of that amount, $4,728,015.17 was owed for transloading charges and $3,278.19 for deficiency charges. As best Eddystone can determine ... the payment was made by Bridger Logistics, LLC.

r. On October 20, 2015, Eddystone received a payment of $4,377,174.70. Of that

21

amount, $4,155,343.65 was owed for transloading charges and $221,831.05 for deficiency charges. As best Eddystone can determine ...  the payment was made by Bridger Rail Shipping, LLC.

s.  On November 20, 2015, Eddystone received a payment of $4,607,109.67. Of that amount, $4,597,591.89 was owed for transloading charges and $9,517.78 for deficiency charges. As best Eddystone can determine ...  the payment was made by Bridger Rail Shipping, LLC.

t.  On December 21, 2015, Eddystone received a payment of $4,390,571.55. Of that amount, $4,215,629.45 was owed for transloading charges and $174,942 for deficiency charges. As best Eddystone can determine ...  the payment was made by Bridger Rail Shipping, LLC.

u.  On January 20, 2016, Eddystone received a payment of $4,595,859.48. The entire amount was owed for transloading charges. As best Eddystone can determine ...  the payment was made by Bridger Rail Shipping, LLC.

v.  On February 26, 2016, Eddystone received a payment of $3,954,543.58. The entire amount was owed for transloading charges. As best Eddystone can determine ...  the payment was made by Jamex Transfer Services, LLC ('JTS')."

76.    ERC does not allege that an implied contract existed between BTS and Bridger Rail Shipping, LLC ("BR"), or between BTS and any Jamex entities. (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 271:1-4) ("Q. All right. Eddystone does not allege an implied contract between Bridger Rail Shipping and BTS, right?   A. Right."), 274:4-8 ("Q. So the contention is that there was no impediment to [BL] assuming the contract, but Jamex did not assume the contract when it purchased BTS? A. Yea, I think that's fair.").)

77.    According to ERC, there are "standard terms that are industry practice" for a crude logistics contract to address, including payment, volume commitment, duration, termination rights,

deficiency payments, force majeure, assignability rights, limitations on liability, financial assurances, third-party beneficiaries, and remedies for default.  ERC has identified three material terms that it contends constituted the alleged implied contracts: (a) payment, (b) volume commitment, and (c) duration. (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 117:18-124:11 (acknowledging the several "standard terms that are industry practice," including "volume commitment," "length of the contract," "termination of rights," "amount of money that will be paid for use," "deficiency credits," "[w]hen the payment is due," "[a] force majeure clause," "[a]ssignability rights," "[l]imitations on liability," "financial assurances," "[g]overning law," and "remedies for default"), 140:25-141:12 & 143:11-17 (volume commitment was "the same as what was in the RSA," or "65,000 barrels a day"), 144:3-9 ("payments would have had to follow the same structure as the RSA"), 145:13-17 ("It would be for the same term as the RSA, so 5 years and 2 months, I think."), 151:15-152:11 (parties agreed on "price, the term, and the volume").)

78.      ERC does not contend that the implied contract with BM and BTS included agreement on terms as to force majeure, limitation of liabilities, remedies for default, termination rights, assignability, or third party beneficiaries. (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 150:9-159:14) ("Q. [W]hat agreement did [BTS and BM] reach about force majeure in connection with that implied contract? A. I have no idea. . . . I just don't know if there was a limitation on liability term.  I'm not alleging that there was.  And if there was, I don't have a comment what that provides. . . . So I don't know that there was a termination clause, but it wouldn't make sense. . . . Q. [W]hat agreements whoud lthey have reached about whether there were any intended third-party beneficiaries of this agreement? . . . A. I have the same response. It's not a necessary component to the implied contract between [BM] and BTS, so I don't have a comment on what that term may or may not include. If it's . . . even part of the contract.").)

79.     ERC's corporate representative initially conceded that it "expected" that BL (post-Acquisition) or BM (pre-Acquisition) "would answer for the debts of BTS under the RSA" by "ensur[ing] that BTS had the funds sufficient to satisfy that debt" to ERC, but she then attempted to retreat from that concession by using different words to say that ERC expected BL and BM to answer for the debts of BTS. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 219:9-18 ("Eddystone expected a back-to-back contract to secure payment under the RSA"), 220:11-17  ("Q. Okay. So essentially what Eddystone expected is that [BL] or BM would answer for the debts of BTS under the RSA. Fair?  A. BM, prior to the Ferrellgas acquisition; and Bridger Logistics after the Ferrellgas acquisition. Q. … The expectation at Eddystone was, prior to the Ferrellgas acquisition, BM would answer for the debts of BTS; and after the Ferrellgas acquisition, [BL] would answer for the debts of BTS. Do I have that correct?  A. Well, I don't think it's accurate to characterize that Eddystone's expectation was that BM or [BL] would answer for the debts of BTS. BTS was the obligor under the RSA. But that … there was an implied contract between BM and BTS, wherein BM would provide the revenues necessary for BTS to do that through its, you know -- basically through its agreement with Monroe for the volumes that are getting moved under that COSA. And so I wouldn't say that it's fair to characterize Eddystone's expectation that BM would answer for those debts, but that there was an ancillary implied contract that backstopped BTS's obligations under the RSA. Q. Okay. And by "backstop," you mean, to the extent BTS incurred a debt to Eddystone, in the pre-acquisition period, BM would ensure that BTS had the funds sufficient to satisfy that debt? A. … Ultimately, yes.).)

80.     ERC has identified no evidence indicating who at BL agreed to the assumption ERC contends occurred. (Ex. 33  (ERC 30(b)(6) Tr. (Day 2: Cohen) at 161:7 -162:8 ("Q. [W]ho were the people … that had the meetings of the minds by which this contract that [ ] supposedly

existed between [BM] and BTS was assumed by [BL]? Who were the people at BTS, Marketing, and Logistics that all had the meeting of the minds and agreed to that, this assumption? ... A. Well, it would have to have included Rios and Gamboa and the folks at [BL] and Ferrellgas. But I don't know who specifically had those conversations.")).)

81.    ERC has identified no evidence that BL received consideration for allegedly assuming the implied contract with BTS. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 264:12-19 ("Q. Do you know if any consideration was paid to [BL] for assuming [BM's] obligations? A. I don't. Q. Okay. Do you know if any consideration was paid to BM or BTS for [BL] to assume those obligations?  A. I don't.")).)

82.    The Ferrellgas PSA required that Bridger identify and schedule any material contracts, including those that may require expenditures of greater than $500,000 in a year. (Ex 12 (Ferrellgas PSA § 4.10, RG_EDPA0008404-05).)

83.    Neither Schedule 4.10(a) to the Ferrellgas PSA, nor any other section of the Ferrellgas PSA, makes any mention of an implied contract between BM and BTS that BL was to assume. (Ex 12 (Ferrellgas PSA, Schedule 4.10(a) at RG_EDPA0008560).)

84.    Rios testified that the relationship between Marketing and BTS was a "spot contract," pursuant to which BTS was paid for the use of BTS assets, and he disavowed the existence of a take-or-pay arrangement between BM and BTS. (Ex. 16 (Rios Tr. at 271:12-72 ("Q. What type of arrangement, if any, did [BL] have with BTS related to the Eddystone facility? A. So [BL] paid BTS when it used [BTS's] assets. So if you talk about the Eddystone asset, [BL] would pay a fee to [BTS]. ... Q. Would you characterize that arrangement between [BL] and BTS as a take-or-pay contract? A: No. Q. How would you characterize it? A. You know, it was a spot

contract that renewed every month. It was basically an evergreen contract.").)  There is no contrary testimony from any fact witness affiliated with BM or BL.

85.     The Defendants asserted the statute of frauds as an affirmative defense in their answers. (Dkt. 244 (BL Answer at 32); Dkt. 245 (Ferrellgas Answer at 29).)

## BTS 2015 Solvency and Debt Relief

86.     At the time of the Acquisition, BTS's assets were valued in excess of $200 million. (Ex. 48 (Sherman Rep. ¶¶ 154-55); Ex. 49 (Sherman Rebuttal Rep. ¶ 6); Ex. 50 (Kumar Rep. at 7, 30).)

87.     Defendants' expert Kumar analyzed BTS as of the time of the Acquisition and concluded BTS was solvent and adequately capitalized; Sherman does not contradict Kumar's opinion that BTS was adequately capitalized. (Ex. 50 (Kumar Rep. at 7 (Summary of Conclusions), 23-49 (Assets-to-Liabilities Test), 50-53 (Ability-to-Pay Debts Test), 54-59 (Capital Adequacy Test)); Ex. 49 (Sherman Rebuttal Rep. ¶¶ 6-7).)

88.     In connection with the Acquisition, Ferrellgas paid off $9,045,847.68 of debt BTS owed to Community Trust Bank, and Community Trust Bank issued a corresponding payoff letter dated June 22, 2015. (Ex. 51 (Jilla Tr. at 202:12-204:15); Ex. 52 (Jilla Dep. Ex. 862 (6/22/15 Community Trust Bank Pay-Off Letter BLFG_EDPA1709109)).)

89.     In connection with the Acquisition, Ferrellgas paid off $16,240,702.55 of debt that BTS owed to Texas Capital Bank, and Texas Capital Bank issued a corresponding payoff letter dated June 22, 2015. (Ex. 51 (Jilla Tr. 204:16-205:23); Ex. 53 (Jilla Dep. Ex. 863 (6/22/15 Texas Capital Bank Pay-Off Letter, BLFG_EDPA0171224).)

90.     In connection with the Acquisition, Ferrellgas paid off $4,411,716.21 of debt BTS owed to Wells Fargo Equipment Finance, Inc. ("Wells Fargo"), and Wells Fargo issued

corresponding payoff letters dated June 5, 2015. (Ex. 51 (Jilla Tr. at 205:24-208:1); Ex. 54 (Jilla Dep. Ex. 864 (6/5/15 Wells Fargo Pay-Off Letter for $ 3,007,808.21, BLFG_EDPA0176385); Ex. 55 (Jilla Dep. Ex. 865 (6/5/15 Wells Fargo Pay-Off Letter for $1,403,908)).)

91.     The funds from the purchase of BL by Ferrellgas also paid off approximately $10 million that BTS owed to EnLink NGL Marketing, LP. (Ex. 51 (Jilla Tr. at 208:2-10); Ex. 56 (6/24/15 EnLink Termination Agreement, BLFG_EDPA0176385).)

92.     Ferrellgas paid off approximately $39,698,266.44 in various BTS obligations at the time of the Acquisition; as a result, BTS derived value from the Acquisition. (*Infra* ¶¶ 88-91 (adding $9,045,847.68, $16,240,702.55, $4,411,716.21 and $10,000,000 results in $39,698,266.44); Ex. 39 (Sherman Tr. at 190:3-21 ("Q. Okay. So you say, 'From all the information available, BTS did not receive any benefit from Ferrellgas' Bank of America credit facility,' right? A. Yes. Q. Did you investigate whether BTS had debts that were paid off in connection with the acquisition by Ferrellgas? A. I know that Logistics had debts. I don't -- I can't tell you at the moment whether or what part of those were BTS" -- Q. Did you -- A. -- if anything. Q. Did you review Mr. Jilla's deposition transcript where he walked through various debts that were owed by BTS that were paid off in connection with the acquisition? A. I may have. I don't recall whether I reviewed that particular part of it or not.").)

93.     ERC's accounting and damages expert Sherman did not conduct any analysis of whether BTS derived value from the Acquisition, but he claims that "BTS did not benefit from being a part of the Ferrellgas corporate family." (Ex. 48 (Sherman Rep. ¶ 164); Ex. 39 (Sherman Tr. at 193:7-20 ("Q. Have you done any analysis to determine whether or not BTS obtained value from the Ferrellgas Logistics transaction? . . . A. No.").)

## The 2015 Accounting Activity: The Write-Offs

94.     Sherman opines that BTS wrote off approximately $13,798,002 in accounts receivable in connection with the Acquisition (the "Write-Offs"). (Ex. 49 (Sherman Rebuttal Rep. ¶¶ 21-23); Ex. 39 (Sherman Tr. at 159:4-25).)

95.     Section 6.12 of the Ferrellgas PSA required that "all intercompany accounts among [BL and the subsidiary companies that FGP acquired], on the one hand, and [Bridger and the subsidiary companies that FGP did not acquire], on the other hand, that then remain outstanding will be terminated, voided, canceled and discharged, except to the extent any such accounts would be taken into account in connection with the determination of Closing Date Net Working Capital." (Ex. 12 (PSA § 6.12); Ex. 57 (12/4/20 Polkowitz Rep. at 28); Ex. 58 (11/7/18 Polkowitz Decl. ¶ 16).)

96.     Of the $13,798,002 in Write-Offs, Sherman identifies $7,314,461 that was due to BTS from entities that FGP did not acquire. (Ex. 49 ((Sherman Rebuttal Rep. ¶ 23 (Table 1: BTS was owed a total of $16,193,249 by BM ($14,036,938), Bridger Midstream ($1,156,118) and Waskom Energy Mrkt & Trans LLC ($1,000,193), and BTS owed Bridger $5,546,950 and Bridger Admin Services, LLC $3,331,838); Ex. 12 (5/29/21 PSA at Schedule 4.4, RG_EDPA0008562 (listing subsidiaries acquired); *see also* Ex. 39 (Sherman Tr. at 163:9-164:11).)

97.     Section 6.12 of the Ferrellgas PSA required the $7,314,461 to be terminated, voided, canceled and/or discharged. (Ex. 12 (PSA § 6.12); Ex. 57 (12/4/20 Polkowitz Rep. at 28); Ex. 58 (11/7/18 Polkowitz Decl. ¶ 16).)

98.     The remaining $6,483,541 in Write-Offs that Sherman identifies were intercompany receivables between BTS and Bridger subsidiaries that FGP acquired pursuant to

the Ferrellgas PSA. (Ex. 49 (Sherman Rebuttal Rep. ¶ 23); Ex. 12 (5/29/21 PSA at Schedule 4.4 (listing subsidiaries acquired)).)

99.    Ferrellgas retained a third-party valuation firm, CBIZ Valuation Group, LLC ("CBIZ"), to "estimate the fair value of certain identifiable tangible and intangible assets (the "Subject Assets") of Bridger Logistics, LLC [ ], with respect to the acquisition of the Subject Assets (the "Transaction") by Ferrellgas Partners, L.P. … as of June 23, 2015 (the "Valuation Date")."  (Ex. 59 (CBIZ Valuation at BLFG_EDPA2449816); Ex. 4 (11/5/18 Ruisinger Decl. ¶ 3).)

100.    On August 17, 2015, CBIZ provided a final valuation analysis to FGP (the "CBIZ Valuation"). (Ex. 59 (CBIZ Valuation at BLFG_EDPA2449816).)

101.    The CBIZ Valuation was "conducted for financial reporting purposes to comply with the requirements of Accounting Standards Codification Topic 805, Business Combinations ("ASC 805" or the "Statement")."  (Ex. 59 (CBIZ Valuation at BLFG_EDPA2449816).)

102.    Ferrellgas used the CBIZ Valuation to assist it "in allocating the [Acquisition] purchase price among those assets [included in the Acquisition] and establishing appropriate asset values in the account systems used by Ferrellgas and the acquired Bridger [Logistics] companies." (Ex. 4 (11/5/18 Ruisinger Decl. ¶ 3).)

103.    The CBIZ Valuation "did not allocate any value to intercompany accounts receivable and accounts payable among [BL] and its acquired affiliates."  (Ex. 4 (11/5/18 Ruisinger Decl. ¶ 4); *see also* Ex. 59 (CBIZ Valuation (intercompany accounts receivable and accounts payable are not identified)).)

29

104.    ERC has no valuation or other evidence disputing CBIZ's determination not to assign value to intercompany accounts receivable and accounts payable among BL and its acquired affiliates.

105.    Ferrellgas wrote off the $6,483,541 in accounts receivable when integrating the Bridger Entities into its corporate family. (Ex. 4 (11/5/18 Ruisinger Decl. ¶¶ 3-5); Ex. 57 (Polkowitz Report at 27-28); *see infra* ¶¶ 94, 96-98 (subtracting $7,314,461 from $13,798,002 results in $6,483,541 in accounts receivable write offs).)

106.    That write-off was permitted by purchase accounting principles, including ASC Topic 805 and ACS Topic 820. (Ex. 4 (11/5/18 Ruisinger Decl. ¶¶ 3-5); Ex. 57 (Polkowitz Report at 27-28).)

### The 2015 Accounting Activity: Cost Center Recording

107.    Before the Acquisition, BL was comprised of four principal business sectors: (1) Truck Transportation, (2) Pipeline Terminals, (3) Pipelines, and (4) Rail. (Ex. 60 (5/12/15 Email attaching Bridger Management Report and PDF print-off of as-produced native excel sheet, BLFG_EDPA1880336-37).)

108.    Rather than breaking down costs, expenses, and financial performance on a subsidiary-by-subsidiary basis, the management reports BL used to run the business were broken down by sector. (Ex. 60 (5/12/15 Bridger Management Report, BLFG_EDPA1880333-37).)

109.    As part of its due diligence before acquiring BL, Ferrellgas retained consultants to assist it in assessing the opportunity, including Grant Thornton, LLP ("Grant Thornton") for accounting due diligence. (Ex. 61 (11/5/18 Soiefer Decl. ¶¶ 4-8).)

110.    Grant Thornton produced a "Financial, tax, and human resources due diligence report" dated May 21, 2015, also known as a Quality of Earnings Analysis ("QEA"). (Ex. 62 (QEA at BLFG_EDPA0299508).)

111.    The QEA stated that BL's "[h]istorical financial records do not track contract performance, but rather segments (e.g. Trucking, Rail) revenue and expenses." (Ex. 62 (QEA at BLFG_EDPA0299525).)

112.    The QEA also stated that "[t]he accounting systems were run on QuickBooks until October 2014, when the company migrated to Great Plains, with limited adaptation to the business." (Ex. 62 (QEA at BLFG_EDPA0299528).)

113.    The QEA also stated: "The Bridger business has been growing rapidly and the finance and accounting function has been a dynamic environment that has seen significant changes. In the last 12 to 20 months, the company has hired all of the existing accounting and finance personnel, with the CFO only being hired in May 2014." (Ex. 62 (QEA at BLFG_EDPA0299528).)

114.    Grant Thornton recommended that Ferrellgas "[d]evelop a clear and direct mapping between Management operating reports and the trial balance to ensure the analytics contained in the Management operating reports are based on accurate and reliable accounting data."  (Ex. 62 (QEA at BLFG_EDPA0299528).)

115.    Consistent with Grant Thornton's recommendation, when Ferrellgas acquired BL, it realigned BL's accounting around business sectors, also called "cost centers," to better reflect the reality of its operations, attributing costs and revenues associated to the specific business sectors to which they belonged. (Ex. 63 (9/15/15 Bridger Management Report, BLFG_EDPA0183830); Ex. 64 (11/6/18 Farmer Decl. ¶ 8) ("Ferrellgas also established cost

centers"); Ex. 65 (Farmer Tr. at 8:1-4; 13:12-15:2 (testifying he joined Ferrellgas in April 2014 and around August or September 2015 until January 2018 he became the assistant controller with "responsibilities [] to oversee the accounting for the Bridger segment of the company" as an "SEC reporting manager and directive account manager"), 17:2-8 (testifying he "assist[ed] with the accounting transition" following the acquisition of BL), 32:3-10 (identifying Great Plains as the accounting system for BL), 69:10-70:18 (testifying "202 was for the cost center for Bridger Transfer Services" to "make Great Plains entries to help facilitate the internal management reports"), 159:14-161:6 (testifying that in October 2015, "I was trying to gain understanding of the operations of the different cost centers" and shared the information with "people from the Ferrellgas integration team").)

116.    After the Acquisition, BL and its affiliates continued to maintain their accounting records in Great Plains. (Ex. 64 (11/6/18 Farmer Decl. ¶ 4); Ex. 48 (Sherman Rep. ¶ 54).)

117.    Because "Ferrellgas maintained its accounting records in a system known as PeopleSoft," the "[f]inancial information from [BL] and its affiliates in the Great Plains system was imported into the PeopleSoft system to produce Ferrellgas's publicly-reported accounting statements." (Ex. 64 (11/6/18 Farmer Decl. ¶¶ 6-7).)

118.    Before the Acquisition, BTS recorded revenues in four sectors: storage fees, stations throughput, pipeline management, and rail throughput. (Ex. 48 (Sherman Rep. ¶ 60).)

119.    The storage fees BTS recorded on its general ledger prior to the Acquisition did not belong to BTS, but rather to Bridger Storage, LLC. (Ex. 48 (Sherman Rep. ¶¶ 71-75); Ex. 39 (Sherman Tr. at 63:6-65:4).)

120.    After the Acquisition, those storage fees were recorded on Bridger Storage, LLC's general ledger. (Ex. 48 (Sherman Rep. ¶¶ 91-92); Ex 39 (Sherman Tr. at 63:6-65:4).)

121.    The stations throughput revenue was recorded on BTS's general ledger both before and after the Acquisition. (Ex. 48 (Sherman Rep. ¶ 90); Ex. 39 (Sherman Tr. at 108:6-12 ("Q. And do you have an understanding as to why Bridger Logistics or its representatives would go through the trouble of diverting pipeline management revenue away from BTS but would not divert the roughly ten times as much of station revenue away from BTS? A. No.")).)

122.    After the Acquisition, "[t]o assist management in analyzing cost and revenue by business sector, [BL] established company codes identified as Bridger Rail Services and Bridger Pipeline Services in the Great Plain system [and] Ferrellgas also established cost centers with the same names in the PeopleSoft system." Sherman acknowledges that, on or about August 27, 2015, Ferrellgas instituted a zero-balance cash management system for BTS, and he made clear that he does not rely on the cash management system to support his opinions on diversion.    (Ex. 64 (11/6/18 Farmer Decl. ¶ 8); Ex. 48 (Sherman Rep. ¶ 188 n. 250); Ex. 49 (Sherman Rebuttal Rep. ¶ 39.).)

123.    Following the 2015 Accounting Activities and before the Jamex Acquisition of BTS discussed below, BTS continued to possess its fixed assets and the revenue-generating contracts, which Sherman valued at approximately $64 million. (Ex. 48 (Sherman Rep. ¶¶ 57, 96-101, 107, 108, 112-114, 159, Table 13 (at page 50), Table 18 (at page 57); (Ex. 39 (Sherman Tr. at 76:14-21 ("Q. To which other entities did they in fact divert that July 2015 revenue? A. I didn't -- I don't think that I traced that that I can give you a specific entity or specific entity names. We know that the money -- the accounting transactions, pardon me, were put into Bridger Rail Services and Bridger Pipeline Services"), at 87:25-92:23 ("So there are, I don't know, 14 or 15 Bridger affiliates or former affiliates that are defendants here.  Can you tell me which of those defendants received the diverted revenue in July 2015? A: As I sit here, no. Q: If I looked in your report,

would I find the answer to that question? A: I don't remember – well, to your specific question, no. Q: And if I were to ask about August or September or October, we'd have the same answer, correct? A: That's correct. . . Q. Did you trace it from those accounts to an actual legal entity that's a defendant in this case, the next step? . . . A: I think the diverted revenue stayed there. Ultimately when it gets consolidated, it gets consolidated up the line and ends up in Logistics and then up the line in Ferrellgas, but I think the revenue stayed in the general ledger of those two accounts.").)

a.   The parties do not dispute that "revenue" is not an "asset." (Ex. 39 (Sherman Tr. at 68:25-69:3 ("Q. Okay. Is revenue an asset? A. From an accounting standpoint, no.").)

b.   Sherman acknowledges that, because ERC received the payments to which it was entitled following the 2015 Accounting Activities, "as it relates to the payment[,] Eddystone wouldn't have been harmed." (Ex. 39 (Sherman Tr. at 81:1-15 ("[Q.] Was Eddystone harmed in July 2015 when that revenue was recorded in that manner? A. Again, I look at the totality of the circumstances. So Eddystone -- in July of 2015 Eddystone ultimately received its money I believe from Logistics, and so Logistics at that point in time -- so Logistics and the group of people who were controlling all of this put -- puts the money -- I'm sorry -- puts the revenue someplace else. Logistics takes on the obligation of paying Eddystone and pays Eddystone, sort of steps into Eddystone's shoes in order to pay the obligation under the RSA. So at that point in time, as it relates to the payment Eddystone wouldn't have been harmed.").)

124.   While there was some initial confusion among the Defendants' personnel when Cost Center Recording was first implemented, causing organizational charts circulated internally in June 2015 to indicate that Bridger Pipeline Services and Bridger Rail Services were separate legal entities, neither Bridger Pipeline Services nor Bridger Rail Services were legal entities, they existed only as accounting entities, codes on the Defendants' accounting system. (Ex. 48 (Sherman

Rep. ¶¶ 156-60); Ex. 49 (Sherman Rebuttal Rep. ¶¶ 32-33); Ex. 57 (Polkowitz Rep. at 18-20, 58); Ex. 8 (Rios Tr. at 199:22-200:8); Ex. 64 (11/6/18 Farmer Decl. ¶¶ 9-10); Ex. 87 (Knapp Tr. at 30:13-31:10 ("[Q.] Was Bridger Rail Services, to your knowledge, an actual legal entity? A. No. It was an accounting entity, to the best of my recollection. Q. Okay. Do you know whether Bridger Pipeline Services, LLC was an actual legal entity? A. No. Again, it was an accounting entity, to the best of my recollection. Q. Okay. Below the rectangle that says, 'Bridger Rail Services' -- I should say within that rectangle there's a number, '(208).' What is that? A. To the best of my recollection, that's an accounting entity ID. Q. Moving over to Bridger Pipeline Services, in that rectangle there's a number, '(210).' Do you see that? A. I do. Q. What does that refer to? A. To the best of my recollection, it's an accounting entity ID.").)

## The BOA Lien

125.     At the time of the Acquisition, Ferrellgas had a $600 million secured credit facility with Bank of America and other lenders ("BOA"), for which BOA acted as an administrative agent, pursuant to a November 2, 2009 Credit Agreement (the "Credit Agreement"), along with amendments and supplements thereto. (Ex. 66 (11/2/09 Credit Agreement, at BLFG_EDPA2056725 (identifying "Other Lenders"), BLFG_EDPA2056861 (Schedule 2.01, identifying $400 million credit commitment)); Ex. 67 (10/21/13 Amendment No. 2 to Credit Agreement, Schedule 2.01, BLFG_EDPA2056482 (increasing to $500 million credit commitment); Ex. 68 (6/6/14 Commitment Increase Supplement, Supplement to Schedule 2.01, BLFG_EDPA2056536-63 ($100 million credit increase); Ex. 69 (11/2/09 Security Agreement, Ex. 48 (Sherman Rep. ¶ 164 (acknowledging $500 million secured credit facility, without accounting for the $100 million increase by the 6/6/14 Commitment Increase Supplement).)

126.     Pursuant to a November 2, 2009 Security Agreement, the lenders had a security interest in substantially all Ferrellgas assets. (Ex. 69(11/2/09 Security Agreement, BLFG_EDPA2056411).)

127.     The Credit Agreement required Ferrellgas to cause any new subsidiary to execute (1) a supplement to guaranty of Ferrellgas' obligations to the secured creditors, and (2) collateral documents securing the subsidiaries' assets for the benefit of those secured creditors. (Ex. 66 (11/2/09 Credit Agreement, § 6.12(b), BLFG_EDPA2056807); Ex. 48 (Sherman Rep. ¶ 164).)

128.     On June 24, 2015, BTS and the other Bridger Entities signed a guaranty supplement to comply with the Credit Agreement. (Ex. 70 (6/24/15 Email to BOA attaching guaranty supplement, BLFG_EDPA2324390-96); Ex. 48 (Sherman Rep. ¶ 164).)

129.     BOA failed to countersign, or failed to return, the June 24, 2015 guaranty supplement. (Ex. 48 (Sherman Rep. ¶ 164); Ex. 71 (1/8/16 Counsel email attaching guaranty supplement and requesting BOA countersigned copy, BLFG_EDPA2386465-70); Ex. 72 (1/8/16 – 1/20/16 Counsel email thread confirming BOA failed to countersign the June 24, 2015 guaranty supplement and that BOA required a new guaranty supplement, BLFG_EDPA2389098-102).)

130.     BOA's failure to countersign, or failure to return, the June 24, 2015 guaranty supplement was discovered when Ferrellgas exercised an accordion feature in its credit facility to increase the amount from $600 million to $700 million. (Ex. 73 (1/6/16 Email from BOA counsel requesting copies of the guaranty supplement in connection with transaction to increase the credit facility to $700, BLFG_EDPA2386439); Ex. 71  (1/8/16 Counsel email attaching guaranty supplement and requesting BOA countersigned copy, BLFG_EDPA2386465-70); Ex. 72 (1/8/16 – 1/20/16 Counsel email thread confirming BOA failed to countersign the June 24, 2015 guaranty supplement and that BOA required a new guaranty supplement, BLFG_EDPA2389098-102).)

131.     Ferrellgas had considered exercising the accordion feature to increase the facility from $600 million to $700 million as early as November 2015. (Ex. 74 (11/16/15 Email attaching Ferrell Energy Partners financial summary noting proposal to "exercise[] the accordion feature in [Ferrellgas'] existing facility which would increase [its] facility from $600 million to $700 million," BLFG_EDPA2256659).)

132.     On January 8, 2016, Ferrellgas asked BOA to accept the June 24, 2015 guaranty supplement, but BOA required that BTS and the Bridger Entities execute a new version to correct a reference in the June 25, 2015 guaranty supplement.  (Ex. 72 (1/8/16 – 1/20/16 Counsel email thread confirming BOA failed to countersign the June 24, 2015 guaranty supplement and that BOA required a new guaranty supplement, BLFG_EDPA2389098-102).)

133.     BTS and the other BL subsidiaries accommodated BOA's request and again signed a guaranty supplement with BOA, dated January 14, 2016. (Ex. 48 (Sherman Rep. ¶ 165); Ex. 72 (1/8/16 – 1/20/16 Counsel email thread regarding guaranty supplement, BLFG_EDPA2389098-102); Ex. 75 (1/14/16 Guaranty Supplement, BLFG_EDPA2056483-85).)

134.     BTS and the other BL subsidiaries also signed a grantor accession agreement with BOA, dated January 14, 2016, thereby becoming parties to the Security Agreement and granting "a security interest in all of [their] rights, title and interest in and to all of the Collateral of [BTS and the other Bridger Entities], whether now owned or hereafter acquired [ ], wherever located and whether now or hereafter existing or arising, including the property of such undersigned set forth on the attached supplemental schedules to the Schedules to the Security Agreement."  (Ex. 76 (1/14/16 Grantor Accession Agreement, BLFG_EDPA0045976-85); Ex 69 (11/2/09 Security Agreement at BLFG_EDPA2056417-18).)

135.   The Grantor Accession Agreement identifies the membership interests in BTS as Scheduled Collateral. (Ex. 76 (1/14/16 Grantor Accession Agreement at BLFG_EDPA0045984).)

136.   The Security Agreement identifies as collateral all accounts, all general intangibles, including all payment intangibles, all tangible property, and all investment property, among other items. (Ex. 69 (11/2/09 Security Agreement at BLFG_EDPA2056417-18).)

137.   ERC concedes that the BOA lien extends to all of BTS's personal property; ERC's expert Sherman opines, however, that BTS executed the guaranty "with no apparent reasonably equivalent value returned." (Ex. 48 (Sherman Rep. ¶¶ 164-165).)

138.   On January 15, 2016, BOA perfected its security interest in BTS's personal property by filing a UCC Financing Statement with the Clerk of Court of Acadia Parish, Louisiana that covered the following collateral: "ALL ASSETS OF [BTS] AND ALL PROCEEDS THEREOF, AND ALL RIGHTS AND PRIVILEGES WITH RESPECT THERETO (OTHER THAN "EXCLUDED COLLATERAL" AS DEFINED IN THE SECURITY AGREEMENT DATED NOVEMBER 2, 2009, AS AMENDED, BY DEBTOR AND CERTAIN OTHER GRANTORS PARTY THERETO IN FAVOR OF SECURED PARTY)."  (Ex. 77 (1/15/16 BOA UCC Filing, BLFG_EDPA2056997).)

139.   At the time it filed the UCC Financing Statement, BOA was owed approximately $311.6 million. (Ex. 3 (1/31/16 Ferrellgas 10-Q at BLFG_EDPA1604286 ("[A]s of January 31, 2016, Ferrellgas had total borrowings outstanding under its secured credit facility of $311.6 million").)

140.   On January 31, 2016, BTS assigned to its affiliates substantially all of its assets, excluding the RSA. (Ex. 78 (1/31/16 Assignment and Assumption Agreement between BTS and Bridger Terminals, LLC, JTS-SMA_0010861); Ex. 79 (1/31/16 Assignment and Assumption

Agreement between BTS and Bridger Swan Ranch, LLC, JAMEX-EDPA_00040507); Ex. 80 (1/31/16 General Warranty Deed by BTS and Bridger Real Property, LLC, BLFG_EDPA0044188).)

141.    The BOA lien encumbered all of the property subject to the 2016 Assignments, except for a piece of real property called Swan Ranch.  (Ex. 48 (Sherman Rep. ¶¶ 57, 96-101, 107, 108, 112114, Table 13 (at page 50), Table 18 (at page 57)); Ex. 39, Sherman Tr. at 194:4-19 ("Q. And you're not assigning a value to Bank of America's collateral, right? A. I'm not opining on Bank of America's collateral…. Q. Are you giving an opinion on the value of any of Bank of America's collateral? A. No.").)

     a.    Sherman values the property assigned in January 2016 at $64 million; he did not opine on the value of other property securing the BOA credit facility. (Ex. 48 (Sherman Rep. ¶¶ 57, 96-101, 107, 108, 112, 114, Table 13 (at page 50), Table 18 (at page 57)); Ex. 39 Sherman Tr. at 194:4-19 ("Q.  And you're not assigning a value to Bank of America's collateral, right? A. I'm not opining on Bank of America's collateral…. Q. Are you giving an opinion on the value of any of Bank of America's collateral? A. No.").)

     b.    Swan Ranch is the only asset ERC has identified as not subject to the BOA lien, but ERC does not provide a fair market value for the property; instead Sherman refers only to the book value of $1,726,247.  (Ex. __, 10/14/20 Sherman Rep. ¶ 108 (stating "BTS' ownership in the fifteen acres of land upon which the Swan Ranch terminal sat, which had been purchased for $1,726,247, was sold to another Ferrellgas entity"), ¶ 108 n.153 (admitting the $1,726,247 is a "[p]rice based on the journal entries to record the purchase of the land in BTS' general ledger"), at Table 18 (listing the Swan Ranch "Book Value" at "$1,726,247").)  ERC has offered no other evidence of the value of this real property.

**The Jamex Acquisition of BTS**

142.    In early 2016, Jamex affiliate Jamex Transfer Holdings, LLC ("JTH") acquired

BTS from BL and changed its name to Jamex Transfer Services, LLC ("JTS," collectively with

the other Jamex affiliates, "Jamex"). (Dkt. 182 (FAC ¶ 74); Dkt. 193 (BL Answer to FAC ¶ 74);

(Ex. 81 (BTS PSA, BLFG_EDPA0005497); (Ex. 92 (12/25/16 Notice of Name Changes, JAMEX-

EDPA_00011507-8).)

143.    Effective February 1, 2016, JTS was no longer affiliated with the Defendants. (Dkt.

182 (FAC ¶ 74); Dkt. 193 (BL Answer to FAC ¶ 74); (Ex. 81 (BTS PSA, BLFG_EDPA0005497);

(Ex. 92 (12/25/16 Notice of Name Changes, JAMEX-EDPA_00011507-8).)

144.    Under the BTS PSA, JTH expressly acquired the RSA, including all obligations to

pay for any barrels transloaded at the Eddystone Facility or to pay deficiency payments if

insufficient barrels were transloaded at the facility after February 1, 2016. (Ex. 81 (BTS PSA

§ 2.1(b), BLFG_EDPA0005503-4 ("At the Closing, Buyer will accept such assignment and

transfer of the Membership Interests from Seller on the terms and conditions set forth herein,

including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth

on Schedule 4.4 for periods on and after the Closing Date.")); Ex. 83 (BTS Assignment,

BLFG_EDPA0044192); Ex. 40 (Ballengee Dep at 259:6-8 ("So you took the entity with the [RSA]

agreement in the entity?  A. Yes, sir.").)

145.    JTH acquired JTS to establish privity with ERC "to get them to negotiate" as Jamex

was "still trying to figure out a way to keep the agreement" and continue moving crude through

the Eddystone Facility.  (Ex. 40 (Ballengee Tr. at 232:5-13 ("Q. What was -- what was your

intention with respect to the [RSA] after buying back BTS? A. Well, the hope was to get – to get

[ERC] to negotiate to come out to a lower rate, because at the time we were still – we were still

trying to figure out a way to keep the agreement, go on the TLA with [BL], and I felt like we had a better chance of negotiating with [ERC]"); Ex. _ (Jilla Tr. at 186:10-182:2 (Q. "Do you have an understanding about the reason that Jamex purchased BTS?" A. "Yes. . . . Eddystone had refused [to enter the Carlyle tripartite] . . . stating that they had no privity of contract with [ ] Jamex Marketing . . . we wanted to make sure that Jamex had privity of contract with [ ] Eddystone" . . . Q. "What was the plan upon establishing privity" A. "[N]egotiate directly with Eddystone . . . then get working capital in place so we could restart [shipping crude]"), at 188:16-189:7 (Q. "Did Jamex … negotiate with Eddystone in connection with … the [Carlyle] agreement?" A. "We had to work through Bridger Logistics because … we did not have any privity of contract." Q. "I meant after acquiring BTS." A. "[W]e had one meeting in the lawyer's office … we explained our position … and in a few days … this case went to arbitration … [going] the legal route versus a commercial route").)

146.    Under the BTS PSA, JTH assumed the liabilities under the RSA only for dates after February 1, 2016. (Ex. 81 (BTS PSA § 2.1(b), BLFG_EDPA0005503-4 ("At the Closing, Buyer will accept such assignment and transfer of the Membership Interests from Seller on the terms and conditions set forth herein, including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth on Schedule 4.4 for periods on and after the Closing Date.")),  § 1.1, BLFG_EDPA0005501 (defining "Retained Liabilities" as "any asset, Contract (including the [RSA] and the other Contracts set forth on Schedule 4.4), ... to the extent relating to any period before the Closing")).)

147.    Pursuant to the BTS PSA, BL paid JTH $4,447,677.96 "in satisfaction of all charges and sums actually due under invoices issued in the ordinary course of business pursuant to the [RSA] that are incurred during the period for the month of January 2016, as such sums and charges

become due and payable on or about February 20, 2016." (Ex. 81 (BTS PSA § 2.3(c), BLFG_EDPA0005504); Ex. 40 (Ballengee Tr. at 235:10-12 ("Q. When you took BTS, it came with about four and a half million dollars in cash, correct? A. Yes, sir.")).)

148.    On February 26, 2016, Jamex paid ERC $3,954,543.58 for volumes transloaded in January 2016; Jamex did not pay the January 2016 deficiency charges. (Ex. 40 (Ballengee Tr. at 235:10-12 ("Q. When you took BTS, it came with about four and a half million dollars in cash, correct? A. Yes, sir. Q. And the purpose of that cash was to pay Eddystone through the end of January '16? A. Yes, sir. There was -- there was an invoice pending for the January throughput plus some January deficiencies. Q. Okay. Did you pay that invoice? A. We paid the January actual throughput. We did not pay the deficiencies. Q. Did ... the entire amount of cash that was transferred go to [ERC] or did you keep some? A. No, we kept -- there was about 400,000 that stayed in JTS, that's now in [my lawyer's] account.")); Ex. 82 (6/14/16 Boaz Decl. ¶ 18).)

## The 2016 Arbitration

149.    After JTS ceased payments to ERC under the RSA, ERC initiated arbitration against Jamex, and Jamex responded with counterclaims.  (Dkt. 182 (FAC  ¶¶ 74, 75); Dkt. 193 (BL Answer to FAC  ¶¶ 74, 75); (Ex. 81 (BTS PSA, BLFG_EDPA0005497); (Ex. 92 (12/25/16 Notice of Name Changes, JAMEX-EDPA_00011507-8).)

150.    The arbitration resolved in January 2017 when the arbitration panel issued a stipulated award, which has not been confirmed, arising from a settlement agreement between and among "Jamex LLC, Jamex Marketing LLC, Jamex Administrative Services LLC, Jamex Unitholder LLC, Jamex Transfer Holdings LLC, James H. Ballengee, JBAH Holdings LLC, Ballengee Holdings LLC, and Ballengee Interests LLC;" JTS was also a "Party," but "solely for the purposes of Paragraphs 1, 4, 8, 11, and 13-22" (the "Arbitration Settlement"). (Ex. 85

(Settlement Agreement, ERCEDPA00000400); Ex. 86 (Stipulated Arbitration Award, JAMEX-EDPA_00013719); *Eddystone Rail Company, LLC v. Jamex Transfer Services, LLC*, No. 1:17-cv-01266-JMF-OTW, slip op. (S.D.N.Y. Jan. 11, 2019), ECF No. 71 (order staying action to confirm arbitration award).)

151.    Section 11 of the Arbitration Settlement, to which JTS was expressly included as a Party, provided that there was no "admission of liability by any Party, all such liability being expressly denied," and that "[n]either the Parties' consent to the terms of [the agreement], nor [the agreement] or the terms themselves, shall constitute an admission of legal responsibility, liability, or fault on the part of any Party." (Ex. 85 (Settlement Agreement, ERCEDPA00000401, 406-7).)

152.    The Arbitration Settlement identified the basis for the settlement as JTS's lack of "resources remaining to continu[e] litigating the Arbitration or satisfy any award in favor of ERC," and Jamex's owner, James H. Ballengee ("Ballengee"), testified that the stipulated arbitration award was not "on the merits."   (Ex. 85 (Settlement Agreement, ERCEDPA00000400); Ex. 40 (Ballengee Tr. at 256:7-15 ("Q. Now, related to that, Eddystone, in this lawsuit, has alleged that the arbitration award is on the merits. Is that your belief?  A. No. My belief was that I -- we settled that and in exchange for that -- you know, that entered/agreed upon judgment and the half million dollars, that I got releases for my entities. And, you know, that's – that's what – that's what I signed up for."), Ballengee Tr. at 255:10-256:6 ("[Counsel for ERC] made it very clear that -- that if they prevailed at arbitration, they were going to try to go all the way up to Jamex to Ballengee Interests and to me personally. So for $500,000, I got a release from everybody, and I didn't have, you know -- so I -- and at the time, you know, I had a lot of -- I had a lot of other issues to deal with. I was trying to negotiate the TLA with Ferrell. I was still negotiating with Monroe. So for half a million dollars to get out and to get releases for -- for myself and everybody up and down

the chain, I felt like that was a huge win, even though I felt like that we had -- you know, our claims had merit. I just didn't have the million dollars to spend to defend it.")).)

153.    Under the Settlement Agreement, the parties agreed to "submit to the Arbitration Panel a proposed arbitration award" that would "determine that JTS has breached the RSA and award damages in the amount of $139,050,406.77," but the "Jamex Parties" would make payments totaling only $450,000 to ERC. (Ex. 85 (Settlement Agreement, ERCEDPA00000401-2).)

154.    The Settlement Agreement further provided that, "[u]pon issuance of the Award ..., payment of the First and Second Payments, and completion of the Title Transfer, ERC, on behalf of itself and any past or present corporate parents, subsidiaries, affiliates ... (collectively with ERC, the 'ERC Releasors'), do hereby absolutely and unconditionally agree to release and discharge the Jamex Parties from each and every right, claim, demand, debt, liability, obligation, attorneys' fees, damages, costs, expenses, lawsuits, and cause of action whatsoever, or compensation of any kind, in law or equity, known or unknown, fixed or contingent, liquidated or unliquidated, foreseen or unforeseen, contemplated or uncontemplated, that the ERC Releasors have or may have against the Jamex Parties related to the Arbitration or any potential Affiliate Claims, other than the obligations contained in this Agreement…. ERC acknowledges and agrees that the release contained in this Paragraph is to be broadly construed to the fullest extent permitted by law. For the avoidance of doubt, ERC does not however remise, release, or discharge JTS from the Award or its obligations thereunder." (Ex. 85 (Settlement Agreement, ERCEDPA00000400).)

155.    The Defendants were not parties to the arbitration or the RSA; nevertheless, through this action, ERC seeks to recover from the Defendants on the basis of the arbitration settlement, demanding "all payments BTS owes to [ERC] under the RSA" and "all amounts awarded by the [] arbitration panel in the arbitration between [ERC] and [BTS]," together with interest.  (Dkt. 182

44

(FAC ¶¶ 75, 86, Prayer for Relief ¶¶ 1, 2; Ex. 85 (Settlement Agreement, ERCEDPA00000400); Ex. 16 (RSA at 1); Ex. 44 (ERC's Responses to BL/FG Defendants' Second Set of Interrogatories at 30 (Supplemental Response to Interrogatory No. 16) ( "Eddystone seeks all amounts owed under the RSA, which sums currently exceed $169 million in compensatory damages plus prejudgment interest and attorneys' fees" and referring to the "more complete analysis of all aspects of Eddystone's damages claim [that] will be set forth in the forthcoming expert reports and testimony of Eddystone expert Marc Sherman"); Ex. 48 (Sherman Rep. ¶¶ 208-213 (calculating alleged "Payments Owed to Eddystone Under the RSA," including interest, and alleging a total of "$173,020.238").)

## The Alter Ego Allegations

156.    ERC seeks to impose liability on FGP, FG, BL, and BR for a breach of the RSA, namely the failure to pay either the transloading charges or the deficiency fees from early 2016 to the end of the RSA. (Ex. 44 (ERC's Responses to Defendants BL/FG Defendant's Second Set of Interrogatories, Interrogatory No. 16 ("Defendants Bridger Logistics, LLC, Ferrellgas Partners, L.P., and Ferrellgas, L.P., Rios, Gamboa, and Bridger Rail Shipping, LLC, caused the damages by failing to make the payments they owed under the RSA as alter egos of BTS."); Ex. 38 (ERC's Responses to Rios/Gamboa First Set of Interrogatories (4/2/2018), Interrogatory No. 2 (detailing payments alleged outstanding payments due under the RSA).)

157.    ERC has not brought a claim for breach of the RSA in this case, but it asserts four sets of unpaid amounts under the RSA: (a) $44,399.67 charged to ERC on December 15, 2015 by Norfolk Southern for moving its locomotives in and out of the Eddystone facility; (b) $493,134.38 for deficiency charges incurred in the month of January 2016; (c) $3,338,639.50 for deficiency charges incurred in the month of February 2016; and (d) $143,816,593.05 for the "entire remaining

amount of deficiency charges" for the remaining term of the RSA.  (Ex. 38 (4/2/18 ERC's Responses to Rios/Gamboa First Set of Interrogatories, Interrogatory No. 2); (Dkt. 182 (FAC).)

158.   ERC's basis for assigning liability to FGP and FG (i.e., piercing the corporate veil of BL to reach FG and piercing the veil of FG to reach FGP) consists of generalized statements regarding "Ferrellgas" or "Defendants," and assertions that Rios, Gamboa, and other Ferrellgas employees undertook the actions related to BTS. (Ex. 44 (ERC Response to Rios/Gamboa Second ROGs, Interrogatory 8 at 9) ("Several Ferrellgas and Bridger employees and attorneys participated in the fraudulent transfers, including but not limited to, Rios, Gamboa, Todd Soiefer, Steve Wambold, Trent Hampton, Patrick Knapp, Andy Lehman, and John Goodgame. Ferrellgas and Logistics, through Rios and Gamboa, totally dominated, controlled and manipulated BTS starting no later than June 2015.").).

159.   The record reflects that Todd Soiefer was an employee of both BL and Ferrellgas, Inc., Steve Wambold was employed by Ferrellgas, Inc., Trent Hampton was employed by Ferrellgas, Inc., Patrick Knapp was an employee of both Ferrellgas, Inc. and BL, and Andy Lehman and John Goodgame were outside counsel to all Ferrellgas and Bridger entities. (Ex. _ (Ex. 61 (11/5/18 Soiefer Decl. ¶ 2 ("I was employed by Ferrellgas, Inc., the general partner of [Ferrellgas], as the Senior Vice President for Strategic Development from January 2014 to November 2016. Following the acquisition of [BL] and its then-affiliates by Ferrellgas on or about June 24, 2015 ... I also served as the Chief Financial Officer of [BL] from November 2015 to November 2016.")); Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274498 ("Mr. Wambold joined our general partner [defined as Ferrellgas, Inc.] as a General Manager in 1997, became Region Vice President in 2003, became Senior Vice President of Operations in 2005, became President and Chief Operating Officer in 2006 and became Chief Executive Officer and President

and was appointed to the board of directors in 2009."); Ex. 15 (10/1/20 Plaintiff Eddystone Rail Company, LLC's Supplemental Responses and Objections to Defendants Rios and Gamboa's Fourth Set of Interrogatories, Supplemental Response to Interrogatory No. 5 at 30 (conceding Trent Hampton was "Ferrellgas' counsel"); Ex. 87 (Knapp Tr. (8/18/20) at 10:20-11:8; 16:1-17:1) (confirming that "[a]fter the closing" of the Acquisition he was "employed by Ferrellgas, Inc.").)

160.    ERC does not contend that BTS was undercapitalized when it was formed. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 299:12-23).)

161.    ERC does not contend that BTS failed to observe corporate formalities. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 299:24-300:1 ("Q. Does Eddystone contend that BTS failed to observe corporate formality?  A. Not that I'm aware of").)

162.    ERC does not contend that BTS failed to pay dividends. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 299:24-300:3 ("Q. Okay. Does Eddystone contend ... That BTS failed to pay dividends?  A. Not that I'm aware of.").)

163.    ERC does not contend that BTS failed to maintain corporate records. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:4-6, 301:1-4) ("Q. Does Eddystone contend that BTS failed to maintain corporate records?  A. Not that I'm aware of.").)

164.    ERC does not contend that BTS had officers and directors that did not actually participate in the business. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:13-16) ("Q. Does Eddystone contend that BTS had officers or directors that did not actually participate in the business?  A. Oh, not that I'm aware of.").)

165.    ERC does not contend that BTS commingled corporate and shareholder funds. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:17-19 ("Q. Okay. Does Eddystone contend that BTS commingled corporate funds with shareholder funds? A. Not that I'm aware of.").)

166.     ERC does not contend that BTS failed to maintain separate bank accounts from other Bridger entities. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:20-25 ("Q. Does Eddystone contend that BTS failed to make separate bank accounts -- failed to maintain separate bank accounts? A. Separate bank accounts from what? Q. Other Bridger entities. A. I don't know that that's a contention.").)

### BTS Limited Liability Company Organization

167.     BTS was, at all times relevant to this action, a Louisiana limited liability company with its principal place of business in Texas. (Ex. 12 (PSA at Schedule 4.4, RG_EDPA0008562); Ex. 88 (BTS Articles of Organization, BLFG_EDPA0310345-48).)

168.     BTS's articles of organization specified that it would "be managed by one or more Managers." (Ex. 88 (BTS Articles of Organization, Article 5(A), BLFG_EDPA0310346).)

169.     BTS's articles of organization further provided that "[e]ach Manager is relieved of any personal liability to the fullest extent permitted by law, including, not by way of limitation, any liability for monetary damages for breach of any duty provided for in R.S. 12:1314." (Ex. 88 (BTS Articles of Organization, Article 8, BLFG_EDPA0310347).)

170.     As of July 1, 2013, BL was the sole member of BTS. (Ex. 88 (Notice of Change of Members of BTS, BLFG_EDPA0310351, Notice of Change of Members and Membership Interests of BTS,  BLFG_EDPA0310352, and Notice of Change of Members and Managers of BTS, BLFG_EDPA0310354).)

171.     As of July 1, 2013, Bridger, LLC was the sole manager of BTS. (Ex. 88 (Notice of Change of Members and Managers of BTS, BLFG_EDPA0310354).)

172.     On June 24, 2015, BTS filed amended and restated articles of organization with the Louisiana Secretary of State, which identified BL as the sole member of BTS and did not state

whether it was managed by its members or by managers. (Ex. 88 (BTS Amended and Restated Articles of Organization, BLFG_EDPA0310355-56).)

173.    At all times relevant to this action, BTS had no operating agreement. (Ex. 89 (8/12/20 Rios Decl. ¶ 4); Ex. 90 (8/12/20 Gamboa Decl. ¶ 4).)

## 2015 OIL MARKET CHANGES

174.    It is undisputed that, until September 2015, the cost to Monroe of COSA-based Bakken barrels was similar to, or lower than, the delivered cost of Bonny Light crude from West Africa. (Ex. 93 (O'Connor Rep. at 12-13 ("COSA-Based Bakken Barrels Were Advantageous for Monroe Versus Nigerian Imports Until at Least September 2015") and 16 ("Monroe Demonstrated on Multiple Occasions that the COSA-Sourced Bakken Crude was an Economic Benefit to the Refinery in 2015, Including After the COSA was Amended in June 2015")); Ex. 94 (Monroe 30(b)(6) (Hunter) Tr. at 110:24-111:13 ("Q. Now at some point in time, did Monroe become aware that Bridger was looking at a transaction where the logistics and marketing arms were going to be split? A. Yes. Q. And do you recall when Monroe became aware of that, approximately? A. Sometime in -- I mean, in early – I think it was spring of '15. Q. And by the spring of 2015 had there been any changes in the crude oil markets that made the pricing structure more or less favorable – [to Monroe?] A. No.").)

Dated: September 28, 2021.

Respectfully submitted,

By:  /s/ Lawrence G. Scarborough

Richard E. Coe (I.D. No. 94539)
Victoria Foltz Cordova (I.D. No. 326433)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757
richard.coe@faegredrinker.com
victoria.cordova@faegredrinker.com

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
lawrence.scarborough@faegredrinker.com

Jacob A. Kramer (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1050 K Street NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 312-7400
Facsimile: (202) 312-7461
jake.kramer@faegredrinker.com
rachel.beck@faegredrinker.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas
Partners, L.P., Ferrellgas L.P., Bridger Rail
Shipping, LLC, Bridger Real Property, LLC,
Bridger Storage, LLC, Bridger Swan Ranch, LLC,
Bridger Terminals, LLC, Bridger Transportation,
LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC,
Bridger Admin Services II LLC, Bridger Energy,
LLC, Bridger Lake, LLC, Bridger Leasing, LLC,
and Bridger Marine, LLC*

50

<u>**CERTIFICATE OF SERVICE**</u>

I, Lawrence G. Scarborough, hereby certify that on September 28, 2021, a true and correct copy of the foregoing Defendants' Statement of Undisputed Material Facts was filed electronically via the Court's ECF filing system. This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

*/s/ Lawrence G. Scarborough*