# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
EDDYSTONE RAIL COMPANY,        )
LLC,                           )
       Plaintiff/              )  NO.2:17-CV-00495-
       Counter-defendant,      )  RK
  v.                           )
JULIO RIOS, JEREMY GAMBOA,     )
BRIDGER LOGISTICS, LLC,        )
FERRELLGAS PARTNERS, L.P.,     )
FERRELLGAS, L.P., et al.,      )
       Defendants              )
BRIDGER LOGISTICS, LLC,        )
FERRELLGAS PARTNERS, L.P.,     )
and FERRELLGAS, L.P.,          )
       Defendants/
       Counterclaimants
```
_____

The videotaped and oral deposition of VINCENT ADRIAN PARADIS, in the above-styled suit, was taken pursuant to notice for discovery and/or evidentiary purposes, before Deanna DiPaolo, CSR(A), at the offices of Enbridge Inc., Calgary, Alberta, on November 30, 2018.

_____



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                         Page 5
 1            VIDEOGRAPHER:     Will the court
 2   reporter please swear in the witness.
 3            VINCENT ADRIAN PARADIS, duly sworn.
 4            EXAMINED BY MR. FIELDING:
 5       Q.   Good morning, Mr. Paradis, would you
 6   state your name for the record, please?
 7       A.   Vincent Adrian Paradis.
 8       Q.   Where do you presently reside?
 9       A.   In Calgary, Alberta.
10       Q.   What's your address?
11       A.   2606 - 7th Avenue NW, Calgary, Alberta.
12       Q.   Okay, what is your current job title at
13   Enbridge?
14       A.   Current job title is the director of
15   regional business development and M&A.
16       Q.   All right.  How long have you been at
17   Enbridge?
18       A.   Thirty-one years.
19       Q.   Long time.  What prior responsibilities
20   or jobs have you had at Enbridge besides your
21   current one?
22       A.   There's been plenty.
23       Q.   I imagine.
24       A.   Over 31 years.
25       Q.   I imagine.
```



MAGNA LEGAL SERVICES    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   just, you know, you were involved obviously in the
2   initial decision to invest in the Eddystone
3   facility, but then on an ongoing basis, it seems
4   like you continued to be involved in terms of
5   monitoring the performance of that particular
6   asset; is that right?
7           MR. AGUSTI:       Objection, assumes
8   facts not in evidence and misstates prior evidence.
9       A.  No, I wasn't responsible for the
10  original investment in Eddystone, either.
11      Q.  MR. FIELDING:  You weren't
12  involved -- you weren't involved in that original
13  investment --
14      A.  No, nothing to do with it at all.
15      Q.  -- analysis?  Who was the one at
16  Enbridge that took the lead and that was sort of
17  the equivalent of the business development guy that
18  took the lead on that deal in Enbridge?
19      A.  I believe it was Kevin Hatfield's group
20  that had that responsibility.
21      Q.  Okay, when did you first get involved
22  and become responsible in some way for the
23  Eddystone facility?
24      A.  I believe it was late 2014.
25      Q.  Okay, and that was part of -- part of



Page 12

1  your role when you were put in charge of monitoring
2  the financial performance of the rail assets; is
3  that correct?
4       A.   That's correct.
5       Q.   Okay, got it, all right.  What is your
6  opinion of the -- of Enbridge's -- with the benefit
7  of hindsight, Enbridge's investment in the
8  Eddystone facility?
9       A.   My opinion is at the time we made the
10 investment, it was the right thing to do.
11 Unfortunately, and it's still playing out today,
12 the market went sideways on us.  And at the
13 ultimate end of the day, with the benefit of
14 hindsight, it was good in the short-term but not a
15 good long-term investment.
16      Q.   Okay.  Is that the reason Enbridge got
17 out of the deal?
18           MR. AGUSTI:      Objection.
19      A.   Enbridge got out of the deal because it
20 wasn't any -- it wasn't -- it wasn't core to our
21 business anymore.  When we originally got into the
22 business, we thought it would be a good springboard
23 for other activities in the area, in the
24 Philadelphia area.
25      Q.   MR. FIELDING:   Right.



MAGNA LEGAL SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 17

1      Q.    MR. FIELDING:    Right, has that
2   happened with other projects, that same kind of
3   dynamic where Enbridge got into it and then
4   realized things have changed where, "We need to get
5   out rather than continue to play the long game"?
6      A.    I'm not sure that it would be the exact
7   same circumstance.
8      Q.    Mm-hmm.
9      A.    There's certainly other projects that we
10  invested in where we invested in companies.  As an
11  example, the Olympic Pipeline or the Frontier
12  Pipeline where we were not building, we bought in
13  as an investor or a partner, we bought in for
14  different reasons.  And whether they were
15  performing or not, I think they were performing, we
16  decided to exit those projects.
17     Q.    Okay, are you aware of other times, in
18  this instance, obviously Enbridge has divested
19  itself of this Eddystone facility now; correct?
20     A.    That's correct.
21     Q.    In fact, the only -- I mean though
22  Enbridge continues to be a 100 percent owner of
23  Eddystone Rail Company, ERC, the only -- the
24  only -- I mean the only existing asset, if you can
25  call it that, of ERC is this lawsuit; is that



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   right?
2        A.   That's correct.
3        Q.   Okay.  I mean isn't that the only reason
4   ERC continues to exist today is it's sold all of
5   its assets, it's no longer operating, it exists for
6   the sole and exclusive purpose of bringing this
7   lawsuit; right?
8        A.   I believe so.
9        Q.   Okay.  Are there any other instances
10  that you can think of where -- where Enbridge
11  invested in a project and then subsequently
12  divested itself of the project?  In fact, let me --
13  let me be more clear.  In this particular case,
14  Enbridge actually took a pretty significant hit
15  when it sold this facility to -- to Canopy, didn't
16  it?
17       A.   Yes, it did.
18       Q.   I mean Enbridge put $160 million in this
19  facility to build it; right?
20            MR. AGUSTI:       Objection.
21       A.   I'm not exactly sure what the final
22  number was, but we put a significant amount of
23  capital into the project.
24       Q.   MR. FIELDING:   And then it sold the
25  facility in effect for a net cash of about two and


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 19

```
 1   a half million dollars; right?
 2           MR. AGUSTI:       Objection, assumes
 3   facts not in evidence, misstates prior evidence.
 4       A.   I believe we have a deal in place with
 5   Canopy that would pay us close to $5 million at the
 6   end of the day.
 7       Q.   MR. FIELDING:   Right, but that $5
 8   million, but -- but part of that deal was that
 9   Canopy would keep two and a half million dollars of
10   cash that were Eddystone's accounts; right?
11       A.   That's correct, I believe so.
12       Q.   So it's a net two and a half million
13   dollar payment to Enbridge maybe at some point in
14   time 'cause it's paid out over time; right?
15       A.   That's correct.
16       Q.   Okay.  And that's the basic terms of the
17   deal, wasn't it?
18       A.   I believe so.
19       Q.   So has there been any other instances
20   where -- where Enbridge invested in a project,
21   market turned against them, and then it realized
22   "We've just got to divest ourselves of this and
23   take -- take the loss"?
24       A.   The one project that I am familiar with
25   or that I'm familiar with is the Sandpiper project
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

1  the LLC; right?
2           MR. AGUSTI:       Objection, assumes
3  facts not in evidence, lack of foundation.
4      A.   I don't know.
5      Q.   MR. FIELDING:   Well --
6      A.   I don't know how they set up the
7  special -- I know how we set up the special purpose
8  entity, i.e. the names.
9      Q.   Right.
10     A.   But I don't know behind the scenes what
11 they do in terms of their ownership structure.
12     Q.   Well, you understand that those special
13 purpose entities that are owned and operated,
14 they're wholly owned by Enbridge; right?
15          MR. AGUSTI:       Objection, asked --
16     Q.   MR. FIELDING:   For instance, the
17 entity here that signed the -- the entity, the
18 special purpose entity created for the purpose of
19 the Eddystone Rail Terminal, LLC, that Enbridge
20 entity was called Enbridge Rail (Philadelphia),
21 LLC; right?
22          MR. AGUSTI:       Objection, compound
23 question.
24     A.   I understand that Enbridge Rail
25 (Philadelphia), LLC, was set up for the purpose of



Page 62

```
 1   holding this investment.
 2       Q.   MR. FIELDING:   And that's a wholly
 3   owned subsidiary of Enbridge; right?
 4            MR. AGUSTI:     Objection.
 5       Q.   MR. FIELDING:   Enbridge is the only
 6   owner of Enbridge Rail (Philadelphia), LLC; right?
 7            MR. AGUSTI:     Objection, vague.
 8       A.   I believe so.
 9       Q.   MR. FIELDING:   And again, that
10   means in this particular instance, if a creditor
11   of -- if a creditor of ERC wasn't paid for some
12   reason, that -- Eddystone Rail Company's an LLC;
13   right?
14       A.   That's correct.
15       Q.   A limited liability company; right?
16       A.   That's right.
17       Q.   And the two shareholders of Eddystone
18   Rail, LLC, are Enbridge Rail (Philadelphia), LLC,
19   and Canopy Prospecting Inc.; correct?
20       A.   That's correct.
21       Q.   Okay.  And Enbridge Rail (Philadelphia),
22   LLC, is a special purpose entity that Enbridge
23   created to own its share of Eddystone Rail;
24   correct?
25       A.   Yeah, absolutely.
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 183

```
 1        Q.   Page 18?
 2        A.   I see that, yes.
 3        Q.   And the party to this agreement is BTS,
 4   Bridger Transfer Services; correct?
 5        A.   Yes, I see that, Bridger Transfer
 6   Services, LLC.
 7        Q.   It's not Bridger Logistics; correct?
 8        A.   That's correct.
 9        Q.   And again, you understood, I mean in
10   your experience when -- when you do these deals,
11   you understand the consequences associated with the
12   party that you actually contract with; right?
13        A.   Yes.
14        Q.   Because that party is the one that you
15   looked to with respect to your rights and
16   obligations; fair?
17             MR. AGUSTI:       Objection, asked and
18   answered.
19        A.   Yes.
20        Q.   MR. FIELDING:   In this case, the
21   party that ERC looks to with respect to its rights
22   and obligations under agreement is Bridger Transfer
23   Services; correct?
24        A.   Yes.
25        Q.   If -- if Eddystone Rail had wanted
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 392

1  they complained about our loading rates, as well,
2  which were above the contract, which met their
3  vessel that they brought in.
4           So with the benefit again of
5  hindsight, I believe they were complaining so that
6  they would have an excuse not to put up the
7  financial assurances.
8      Q.   MS. HARTLEY:   Were you the lead
9  from the Enbridge side negotiating the ultimate
10 deal between Enbridge and Canopy that got
11 consummated in October of 2017?
12     A.   Yes.
13     Q.   Who else from the Enbridge side was
14 involved in those negotiations?
15     A.   Myself, I believe Chris McGlincey was
16 also participant, Bryan Boaz.  I believe Morgan
17 Keith would have been involved, as well.
18     Q.   Now, once we get through this, I'm going
19 to walk through a time permitting some additional
20 efforts to sell the facility in prior years, but
21 fair to say that you'd gotten a number of offers
22 over the years to acquire the facility well over a
23 hundred million dollars?
24     A.   There were a number of offers, yes.
25     Q.   Up to I believe around $160 million or



```
 1        A.   No, I don't believe so.
 2             EXHIBIT 78 - Document entitled
 3             "Redemption and Asset Transfer
 4             Agreement by and among Canopy
 5             Prospecting, Eddystone Rail
 6             Company, Canopy Principals, and
 7             Enbridge US Inc."
 8        Q.   MS. HARTLEY:     Now, you have in
 9   front of you Exhibit 78?
10        A.   Mm-hmm.
11        Q.   Which is the Redemption and Asset
12   Transfer Agreement by and among Canopy Prospecting,
13   Eddystone Rail Company, Canopy Principals, and
14   Enbridge US Inc.?
15             MR. AGUSTI:      Counsel, are you
16   sure that's 78?
17             MS. HARTLEY:     Sorry?
18             MR. McGLINCEY:   This is 78, isn't
19   it?
20             MR. AGUSTI:      This is 78.
21        A.   I think so.
22             MS. HARTLEY:     Yes.
23             MR. AGUSTI:      No, I apologize.
24             MS. HARTLEY:     Perfect.
25             MR. AGUSTI:      I'm losing track.
```



```
 1        Q.   MS. HARTLEY:    Fair enough, it's
 2   late in the day.  And this is dated October 19th,
 3   2017; right?
 4        A.   Yes.
 5        Q.   And so had the default not happened in
 6   early 2016, had Jamex Transfer Services continued
 7   to pay, this redemption and asset transfer
 8   agreement would have occurred within the term of
 9   the rail services agreement; is that true?
10        A.   Well, if -- if it had occurred, it's
11   speculation.  If -- if they continued to pay, if
12   they hadn't defaulted, it could have been this --
13   it could have been a sales to Canopy or it could
14   have been a sale to somebody else or we could have
15   held the asset, it's difficult to say.
16        Q.   Let me -- let me be more clear on my
17   question, then.  The rail services agreement had a
18   term that extended till sometime in 2019; is that
19   correct?
20        A.   That's correct.
21        Q.   So October 19th, 2017, comes before the
22   middle of 2019?
23        A.   Yes, it does.
24        Q.   Perfect.  So as of the date of this
25   redemption and asset transfer agreement, Enbridge
```



1  now owns full rights in Eddystone Rail Company;
2  correct?
3       A.   I believe that's correct.
4       Q.   However, it has no right to use the
5  Eddystone Rail facility?
6       A.   That's correct, nor do we have any of
7  the obligations associated with the Eddystone Rail
8  facility.
9       Q.   Canopy has the rights to the Exelon
10 lease at the Eddystone Rail facility now, doesn't
11 it?
12      A.   That's correct.
13      Q.   Now, as of the date of this agreement,
14 had there been any discussion of holding out to try
15 and get a higher value for Enbridge's interest in
16 the Eddystone Rail Company?
17           MR. AGUSTI:       Objection.
18      A.   As of the date of this agreement or up
19 to the point of this agreement?
20      Q.   MS. HARTLEY:    Up to this point?
21      A.   Prior to reaching agreement with Canopy
22 on how the structure of the deal and the sale was
23 going to be and the agreement around price,
24 etcetera, I mean if that deal had fallen through,
25 we would have looked potentially to others or


MAGNA LEGAL SERVICES    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Certificate of Transcript
 2
 3   I, the undersigned, hereby certify that the
 4   foregoing pages 1 to 453 are a complete and
 5   accurate transcript of the proceedings taken down
 6   by me in shorthand and transcribed from my
 7   shorthand notes to the best of my skill and
 8   ability.
 9                  Dated at the City of Calgary,
10   Province of Alberta, this 3rd day of December,
11   2018.
12
13
14
15
16
17                       Deanna M. DiPaolo, CSR(A)
18                       Official Court Reporter
19
20
21
22
23
24
25
```



MAGNA LEGAL SERVICES    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY