# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC          *
 Plaintiff/Counter-Defendant
VS.                                  *  No. 2:17-cv-00495-RK
JULIO RIOS, JEREMY GAMBOA,
BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P.,
FERRELLGAS, L.P., BRIDGER REAL
STORAGE, LLC, BRIDGER SWAN
RANCH, LLC, BRIDGER TERMINALS,
LLC, J.J. LIBERTY, LLC, BRIDGER
ADMINISTRATIVE SERVICES II, LLC,
BRIDGER ENERGY, LLC, BRIDGER
LAKE, LLC, BRIDGER LEASING, LLC,
and BRIDGER MARINE, LLC,
 Defendants

BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P., and
FERRELLGAS, L.P.,
  Defendants/Counterclaims      *
*********************************************************
     VIDEO DEPOSITION OF KELLY STEVEN WILKINS
                  OCTOBER 26, 2018
                  VOLUME 1 OF 1
*********************************************************
   VIDEO DEPOSITION OF KELLY STEVEN WILKINS, produced
at the instance of Defendant, and duly sworn, was taken
in the above-styled and numbered cause on the 26th day
of October, 2018, from 9:16 a.m. until 6:07 p.m.,
before Carol S. Temperton, CSR, in and for the State of
Texas, reported by stenograph machine, at the offices
of Cokinos Young, Four Houston Center, 1221 Lamar
Street, 16th Floor, Houston, Harris County, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record.

TAXABLE COST: _____
PAID BY: _____
TBA NO.: _____
JOB NUMBER: _____



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

```
 1   Kelley from Lynn, Pinker, Cox & Hurst representing
 2   Julio Rios and Jeremy Gamboa.
 3                  KELLY STEVEN WILKINS,
 4   having been first duly sworn, testified on his oath as
 5   follows:
 6                       EXAMINATION
 7   BY MS. HARTLEY:
 8       Q    Great.  Thank you, Mr. Wilkins, for being here
 9   today.  Could you state your full name for the record?
10       A    My name is Kelly Steven Wilkins.
11       Q    I'm just going to go over some of the basics
12   of depositions here today so that hopefully we can all
13   be respectful and I won't talk over you and you won't
14   talk over me and the court reporter can get everything
15   down.
16       A    Okay.
17       Q    Have you had your deposition taken before?
18       A    I did in -- it was a criminal -- yes, I have.
19       Q    Okay.  So --
20       A    But not with television cameras.
21       Q    Fair enough.  So the videographer will have
22   the camera focused on you, but our hope is that we can
23   all talk slowly enough that the court reporter can get
24   down what we're saying and that we don't speak over
25   each other.  So please wait until I've asked my
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

```
 1      Q     Have you had any conversations with any
 2   individuals at Canopy about the issues in this
 3   litigation?
 4      A     No, I have not.
 5      Q     And how about with anybody at Bridger
 6   Logistics or Ferrellgas?
 7      A     Not Ferrellgas.  I have -- I've seen some
 8   folks who I used to work with at Bridger on occasion.
 9   We have not discussed the litigation.  They have been
10   social events, but I've seen them and shook hands, say,
11   "How are you doing?  What's life going on?"  And, "Oh,
12   my God, this case is going on.  Yeah, it sucks."  That
13   kind of stuff, so, I mean, that's about it.
14      Q     Okay.  Now, could you let us know your current
15   residence?
16      A     My current residence?
17      Q     Your current residence.
18      A     My current residence is 9 -- is in Spring,
19   Texas.  I can give you the address if you'd like.  It's
20   the same residence I've had since 2000.
21      Q     Would you mind just for the record?
22      A     No, 9035 Kilrenny Drive in Spring, Texas.
23      Q     Thank you.  Now, are you currently employed?
24      A     No.
25      Q     What was your last employment?
```



Page 11

```
 1      A     Ferrellgas in October of 2016.
 2      Q     Okay.  When did you begin work at Ferrellgas?
 3      A     I began work at Ferrellgas when it was -- they
 4   acquired Bridger Logistics.  I began work for Bridger
 5   Logistics in June of 2014.
 6      Q     Now, during your time at Ferrellgas, were you
 7   employed by Ferrellgas itself or by Bridger Logistics?
 8   Who was your actual employer?
 9      A     I always worked for Bridger Logistics.
10      Q     Okay.
11      A     I think.  Okay.  I mean, seriously, I stayed
12   with the Bridger Logistics company.  I mean, it was --
13   I worked for Julio Rios that entire time.
14      Q     And while you were with Bridger Logistics
15   before the Ferrellgas acquisition, were you similarly
16   employed by the Bridger Logistics entity?
17      A     Yeah.
18      Q     When did you start with Bridger Logistics?
19      A     June 15th of 2014.
20      Q     2014.  And what was your role at Bridger
21   Logistics?
22      A     I was a senior vice-president of business
23   development.
24      Q     And could you explain for us what that role
25   entailed?
```



MAGNA LEGAL SERVICES    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the name.
2         A    No, no.  It was one of a series of pipeline
3    expansions that Enbridge undertook from 2005 to
4    present, which increased the pipeline capacity from
5    80,000 barrels a day to 750,000 barrels a day.
6         Q    Okay.  And over time did your focus shift to
7    other business development projects?
8         A    I became -- my primary responsibilities were
9    supporting the organization operations and commercial
10   operations up in North Dakota.  Eventually I got
11   transferred up there and became full-time living up
12   there.
13        Q    And at the time that you left Enbridge and
14   went to work for Bridger Logistics, were you still
15   stationed out of North Dakota?
16        A    Well, I had a residence -- I always maintained
17   my residence in Houston.
18        Q    Okay.
19        A    And I had a three-year-old son when I got
20   transferred to North Dakota, and I kept -- my son has a
21   residence in North Dakota, which I used to live in.  I
22   have ten children.  And anyway, my transition from
23   North Dakota to Houston was -- was as -- I -- you know,
24   I quit my job in North Dakota, came back to Houston
25   basically.


HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Page 90

1     the interest in Eddystone Rail Company?
2          A     Well, this is the company we created and it's
3     identical to Enbridge Rail Berthold or North Dakota,
4     LLC.
5          Q     What do you mean that it's identical?
6          A     Well, I mean, that's kind of why we had it set
7     up that way, so we could have a Berthold Rail and an
8     Enbridge Rail.  We had multiple rail facilities.  They
9     could be lumped up.
10         Q     So Enbridge Rail (Philadelphia) was set up
11    solely for the purpose of holding the rail facility --
12         A     Yeah.
13         Q     -- Eddystone in Philadelphia?
14         A     That's my recollection.
15         Q     Okay.  Now, do you know who the owners of
16    Enbridge Rail (Philadelphia), LLC, were?  Was it a
17    wholly owned subsidiary of some other entity?
18         A     It would have been -- for Enbridge Rail?
19    Enbridge is -- Enbridge owned Enbridge Rail and it
20    rolled up into Enbridge, Inc., because we -- it didn't
21    roll up into Enbridge EEP, Energy Partners.  I know.  I
22    don't know how it -- I think that was your original
23    document how we got up the tree.
24         Q     Correct.  And do you recall any discussions
25    other than with counsel around the rationale for


HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Page 109

1   you became aware of?
2      A    I became aware of it later.  As they started
3   the refinery up, my understanding is that they had
4   nobody skilled in trading products, let alone selling
5   them.  So what they did was they worked a deal with
6   British Petroleum or BP to where they would give them
7   all their products and get jet fuel back in New York
8   and Los Angeles.  And that's the extent of my knowledge
9   of it, but I know that they had this relation -- this
10  supply agreement, exchange relationship.
11     Q    So I want to make sure I understand if BP had
12  anything to do with Eddystone and the --
13     A    Well --
14     Q    -- the companies that you were marketing for
15  the purposes of bringing crude into Eddystone?
16     A    Well, I mean, we talked to -- later when we
17  were marketing the project, we talked to BP
18  representatives and let them know what we were trying
19  to do.  They could certainly be a party to it and fold
20  that into whatever business they wanted to do.  We
21  never took them as exclusive.  We knew they had a
22  contract and they were a supplier and we certainly
23  wanted their business, and we didn't treat them any
24  differently from the others that we talked to.
25     Q    Did they ultimately make any commitment,


HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Page 111

```
 1              identification and is attached hereto.)
 2        Q    (BY MS. HARTLEY)  So when we get this document
 3   before you, I want you to help me understand or see if
 4   you have an understanding of what it is.  It's a
 5   document that's marked as Exhibit 14 with Bates number
 6   ERCEDPA 00015572.  And not concerned with the
 7   PowerPoint in the back.
 8              MR. AGUSTI:  Excuse me.  Do you have a
 9   third copy?
10              MS. ANDEMARIAM:  I think I handed you
11   three.
12              MR. AGUSTI:  Oh, I see.
13              MS. ANDEMARIAM:  Okay.
14        A    Okay.
15        Q    (BY MS. HARTLEY)  So I'm just focused on the
16   e-mail on the front.
17        A    Okay.
18        Q    But for purposes of completeness, we provide
19   you the attachments.
20        A    Okay.
21        Q    It's an e-mail from you to Kevin Hatfield and
22   Mike Moeller on June 5th, 2012, correct?
23        A    Yep.
24        Q    And I want to understand your recollection of
25   what was going on here.  You say, "BP just made the
```



MAGNA LEGAL SERVICES          HIGHLY CONFIDENTIAL -
                              ATTORNEYS' EYES ONLY

Page 112

```
 1    call on Eddystone."
 2         A     It's pretty abbreviated.
 3         Q     "They are evaluating which sites to use to
 4    feed Delta Trainer and after a 30-second chat said
 5    we're the ones they're going to go with."
 6         A     Well, again, I just got this from Rob
 7    Stevens.  He was my contact at BP, and he was the guy
 8    who did the one train a day at Berthold.  And look at
 9    the date on this, June 5th, 2012.  We're negotiating
10    the MOU for the first time, and you can see that this
11    presentation is very much North Dakota-based, right,
12    capacity and rates and all that.  And I'm still
13    selling, which I seem to round up and positively, and
14    I'm trying to sell to my boss the idea that, "Hey, I
15    just got off the phone with BP.  And guess what?  They
16    just got this Delta Trainer thing," which I probably
17    learned about.  "And I sent them my slides and we're
18    going to work on getting this thing done."  And they
19    mentioned working with Bridger Transfer Services, which
20    is our other Berthold Rail customer again, for at least
21    40 a day.  So guess what?  What I want to have happen,
22    North Dakota barrels going to Eddystone will work, and
23    here's one of -- two of my existing customers can work
24    out a deal where they can make that happen.  Let's
25    facilitate it.  That's what I was trying to say in my
```



MAGNA LEGAL SERVICES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

```
 1   enthusiasm and brevity.  Okay?  That -- I have no --
 2   and other than him mentioning that, hey, could we work
 3   with Bridger?  Great.  He could have worked with MVP or
 4   Mickey Mouse.  You know, it's the same thing.  It was
 5   just a rail customer to get to there.  And I liked it
 6   because it was a nice, tight package.
 7        Q    All right.
 8             MS. HARTLEY:  Could I have tab 15,
 9   please.
10        Q    (BY MS. HARTLEY)  So it sounds like you were
11   being enthusiastic, but did you ultimately get a
12   commitment of any sort from BP for the Eddystone Rail
13   facility?
14        A    No.
15        Q    Did you get any type of clarification on what
16   the possibility of a working relationship between BP
17   and Bridger Transfer Services --
18        A    Well, I thought they were backing them up.  I
19   mean, it's not an uncommon thing.
20        Q    What do you mean by backing them up?
21        A    Okay.  Imagine you have a Uber -- you're in
22   the Uber business, okay, and I'm a hotel and --
23        Q    Sorry.  Please go ahead.
24        A    No, you're fine.  And I just -- basically we
25   make an arrangement where you're going to always drive
```



Page 114

1  your Uber to my hotel.  Okay.  Great.  And I don't need
2  to be in the middle of that.  I own the hotel and you
3  and the guy with all the customers work something out.
4  I don't need to be a party to understand it.  I think
5  it's great that you guys are doing business together to
6  bring business to my business.  I mean, how do you do
7  that?  It's -- there's -- it happens all the time.
8  It's how most of the oil in volumes and gases are
9  trans -- are transacted in business.
10           (Exhibit Number 15 was marked for
11           identification and is attached hereto.)
12       Q   (BY MS. HARTLEY)  So if you could look at the
13  document that's been marked as Exhibit 15, hopefully
14  this will clarify why I'm questioning this.  So this is
15  a document that's Bates numbered ERCEDPA 00003025.
16       A   Okay.
17       Q   From you to Kevin Hatfield, amongst others,
18  regarding Eddystone Rail announcement.  Do you see
19  that?
20       A   Yeah, I do.
21       Q   Okay.  And if you would look at the first
22  paragraph, "We have very strong verbal commitments
23  supporting Eddystone.  BP has given the Bridger Group a
24  50-million-dollar line of credit to start buying crude
25  for Eddystone, and they wanted to fully subscribe the



1   Phase I capacity of 80,000 bpd" or barrels per day.
2       A    Uh-huh.
3       Q    Is that what you were talking about when you
4   said backing them up?
5       A    Yeah.  Basically, I mean, BP has got better
6   credit than those nations, right?  And so if you need
7   to go buy barrels and you don't have a lot of assets or
8   you don't have an extra $400 million in the bank to go
9   buy a barrel and sell it over the next two months, the
10  guy says, "I'll back your credit up with the bank so
11  you can buy the barrel and make your 15 or 20 cents a
12  barrel through the middle of it."  It's a standard
13  practice.  So they're backing them up with a credit or
14  buying the contract.  But basically BP -- and I'm
15  telling him that Bridger -- now, keep in mind, BP had
16  an exclusive supply arrangement at Trainer at the
17  time.  So now Bridger has got a way to feed half or up
18  to full capacity with BP.  Great.  Good.  And this is
19  good news.  Okay.  So, I mean, I -- why is there an
20  issue with this?
21      Q    Just wanted to make sure I understood when you
22  said backing up if this is what you were referring to.
23      A    It just meant that they had come to terms
24  somehow -- and it may not be permanent -- that BP would
25  buy the barrels from Bridger to feed Trainer.


MAGNA LEGAL SERVICES     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Now, at this point in time this is September
2    24th, 2012.
3    A    Yep.
4    Q    Had Bridger given any commitments to 80,000
5    barrels per day to Eddystone Rail Company or to you at
6    Enbridge?
7    A    Nothing binding.  It wouldn't be more than,
8    "Hey, I want to do it."
9    Q    And had they given you a, "Hey, I want to do
10   80,000 barrels per day" at that time?
11   A    If they didn't, I didn't believe it, ma'am.
12   Okay?  I mean, I was looking at them as just being a
13   middleman for BP.  And I would have been thinking, "I
14   want BP to sign my contract."  Okay?
15   Q    So why is it then that BP didn't sign a
16   contract?
17   A    Because they preferred to have Bridger supply
18   the barrels and do the rail contracts and all that
19   work.  So this way Bridger could do the work and give
20   them the oil and make a nickel and they get the oil.
21   Q    And Enbridge ultimately had to have been
22   comfortable having Bridger Transfer Services as opposed
23   to BP as their counter-party?
24   A    Yeah, and by the time we signed the contract,
25   they had already demonstrated the ability to do that



Page 117

1  with their Berthold business and they had regretted not
2  taking more at Berthold.  They were very capable guys
3  and doing -- I mean, by this time they were the
4  up-and-coming oil company.  It was like working with
5  Elon Musk.  Okay.  Great.  Let's go.  And they had the
6  support of BP with them.  Let's do it.
7      Q    All right.  And I apologize for jumping a
8  little bit around chronologically, but I want to talk
9  about the economics of the project --
10     A    Okay.
11     Q    -- and sort of what the expectations were
12 going into it.  So if you have in front of you a
13 document that will be marked as Exhibit 16, which is
14 from May -- mid-May of 2012 with Bates number ERCEDPA
15 00173151.
16          (Exhibit Number 16 was marked for
17           identification and is attached hereto.)
18     Q    (BY MS. HARTLEY)  And I'd like to focus on the
19 middle e-mail from you to Roland Walters and others
20 regarding questions regarding Eddystone Rail
21 opportunity.  Do you see that?
22     A    Okay.
23     Q    And so looking at your -- I'll give you a
24 moment to take a look at it.  I apologize.
25     A    Okay.  So your question is what?



MAGNA LEGAL SERVICES          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

```
 1   wouldn't you like them?  They were just a good customer
 2   and they were building their business.  And if you're
 3   selling assets, that's a good customer to find.
 4        Q    Sure.  So in that lead-up period to 2012 when
 5   you were exploring the Eddystone Rail facility, so
 6   before you started that process --
 7        A    Uh-huh.
 8        Q    -- do you recall that there were a number of
 9   different leases that Bridger Transfer Services took
10   for Enbridge stations in North Dakota?
11        A    Yeah.  They started out they had one lot at
12   Stanley and then they took one at Berthold.  And then
13   as I put on Little Muddy and Reserve, Grenora, as we
14   made room in all the spots, they wanted one.  Great.
15   Here's the contract.  Got it back signed, and they went
16   and built their stuff.  Operations people, got along
17   with them.  They were easy to work with, very
18   competent, very professional.  And when we did Berthold
19   Rail, not a lot of bitching and moaning.  They just did
20   their thing and got it done and then took care of it.
21   So, I mean, it was a good business partner.
22        Q    And so do you recall which of the Bridger
23   Group entities actually contracted for those various
24   stations?
25        A    Yeah, it was Bridger Transfer Service.
```



HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

Page 124

1  Q    And did you understand at the time why it was
2  Bridger Transfer Services as opposed to another entity
3  that you were contracting with for those leases?
4  A    Ma'am, I -- it's similarly to which company --
5  we've spent a lot of time this morning talking about
6  Enbridge and Enbridge, Inc., and all that.  I mean, it
7  was always Bridger; and it was, like, this is the
8  company they want their business to be conducted with
9  for this type of work.  And it worked with us and my
10 counsel said, "Great.  Let's go with them."  So we
11 contracted between Bridger Transfer Services and
12 Enbridge Pipeline (North Dakota) or Enbridge Rail
13 (North Dakota) and that's how we did it and it worked.
14 And as, you know, you go to find out, you know, that
15 was all their business.  You check around and other
16 people are doing the same thing.  So that was the
17 Bridger/Bridger.
18 Q    And so when you had the storage tank, for
19 example, you had an Enbridge storage entity that would
20 then contract with the Bridger storage entity?
21 A    I think that was with Transfer Services as
22 well.
23 Q    Okay.
24 A    And they took a -- they took a -- in fact,
25 they leased both of the tanks.



Page 312

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    EDDYSTONE RAIL COMPANY, LLC      *
 3    Plaintiff/Counter-Defendant
 4  VS.                              *  No. 2:17-cv-00495-RK
 5  JULIO RIOS, JEREMY GAMBOA,
    BRIDGER LOGISTICS, LLC,
 6  FERRELLGAS PARTNERS, L.P.,
    FERRELLGAS, L.P., BRIDGER REAL
 7  STORAGE, LLC, BRIDGER SWAN
    RANCH, LLC, BRIDGER TERMINALS,
 8  LLC, J.J. LIBERTY, LLC, BRIDGER
    ADMINISTRATIVE SERVICES II, LLC,
 9  BRIDGER ENERGY, LLC, BRIDGER
    LAKE, LLC, BRIDGER LEASING, LLC,
10  and BRIDGER MARINE, LLC,
     Defendants
11
    BRIDGER LOGISTICS, LLC,
12  FERRELLGAS PARTNERS, L.P., and
    FERRELLGAS, L.P.,
13    Defendants/Counterclaims       *
14                                   JOB NUMBER: _____
15              REPORTER'S CERTIFICATION
         VIDEO DEPOSITION OF KELLY STEVEN WILKINS
16                TAKEN OCTOBER 26, 2018
17      I, Carol S. Temperton, Certified Shorthand Reporter
    in and for the State of Texas, hereby certify to the
18  following:
         That the witness, KELLY STEVEN WILKINS, was duly
19  sworn by the officer and that the transcript of the
    oral deposition is a true record of the testimony given
20  by the witness;
         That the original deposition was delivered to
21  Ms. Sarah Hartley;
         That a copy of this certificate was served on all
22  parties and/or the witness shown herein on
    _____.
23      I further certify that pursuant to FRCP No.
    30(e)(2) that the signature of the deponent:
24     _XX_ was requested by the deponent or a party
    before the completion of the deposition and that the
25  signature is to be returned within 30 days from date of
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                          Page 313
 1    receipt of the transcript.  If returned, the attached
      Changes and Signature Page contains any changes and the
 2    reasons therefor;
            ____ was not requested by the deponent or a party
 3    before the completion of the deposition.
            I further certify that I am neither counsel for,
 4    related to, nor employed by any of the parties in the
      action in which this proceeding was taken, and further
 5    that I am not financially or otherwise interested in
      the outcome of the action.
 6
                             *******
 7
            Certified to by me this _____ day of _____,
 8    2018.
 9
10
11                              _____
                                Carol S. Temperton, CSR
12                              CSR Certificate Number: 3128
                                Expiration: December 31, 2018
13                              Firm Registration Number: 633
                                Magna Legal Services
14                              866-624-66221
                                www.MagnaLS.com
15
16
17
18
19
20
21
22
23
24
25
```



MAGNA LEGAL SERVICES    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY