# EXHIBIT 7

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended July 31, 2015

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from       to

Commission file numbers: 001-11331, 333-06693-02, 000-50182 and 000-50183

## Ferrellgas Partners, L.P.
## Ferrellgas Partners Finance Corp.
## Ferrellgas, L.P.
## Ferrellgas Finance Corp.

*(Exact name of registrants as specified in their charters)*

| | |
|---|---|
| Delaware | 43-1698480 |
| Delaware | 43-1742520 |
| Delaware | 43-1698481 |
| Delaware | 14-1866671 |
| *(States or other jurisdictions of incorporation or organization)* | *(I.R.S. Employer Identification Nos.)* |

| | |
|---|---|
| 7500 College Boulevard, | |
| Suite 1000, Overland Park, Kansas | 66210 |
| *(Address of principal executive office)* | *(Zip Code)* |

Registrants' telephone number, including area code:
(913) 661-1500

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Units of Ferrellgas Partners, L.P. | New York Stock Exchange |

Securities registered pursuant to section 12(g) of the Act:

**Limited Partner Interests of Ferrellgas, L.P.**
**Common Stock of Ferrellgas Partners Finance Corp.**
**Common Stock of Ferrellgas Finance Corp.**
(Title of class)

Indicate by check mark if the registrants are well-known seasoned issuers, as defined in Rule 405 of the Securities Act.

Ferrellgas Partners, L.P.: Yes ☒ No ☐

Ferrellgas Partners Finance Corp., Ferrellgas, L.P. and Ferrellgas Finance Corp.: Yes ☐  No ☒

Indicate by check mark if the registrants are not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrants (1) have filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrants were required to file such reports), and (2) have been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrants have submitted electronically and posted on their corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrants were required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrants' knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

BLFG_EDPA2274418

Table of Contents

Indicate by check mark whether the registrants are large accelerated filers, accelerated filers, non-accelerated filers, or smaller reporting companies. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Ferrellgas Partners, L.P.:

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
|---|---|---|---|
| | | (do not check if a smaller reporting company) | |

Ferrellgas Partners Finance Corp, Ferrellgas, L.P. and Ferrellgas Finance Corp.:

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ | Smaller reporting company ☐ |
|---|---|---|---|
| | | (do not check if a smaller reporting company) | |

Indicate by check mark whether the registrants are shell companies (as defined in Rule 12b-2 of the Exchange Act).

Ferrellgas Partners, L.P. and Ferrellgas, L.P. Yes ☐ No ☒

Ferrellgas Partners Finance Corp. and Ferrellgas Finance Corp. Yes ☒ No ☐

The aggregate market value as of January 31, 2015, of Ferrellgas Partners, L.P.'s common units held by nonaffiliates of Ferrellgas Partners, L.P., based on the reported closing price of such units on the New York Stock Exchange on such date, was approximately $1,364,265,558. There is no aggregate market value of the common equity of Ferrellgas Partners Finance Corp., Ferrellgas, L.P. and Ferrellgas Finance Corp. as their common equity is not sold or traded.

At September 1, 2015, the registrants had common units or shares of common stock outstanding as follows:

| | | |
|---|---|---|
| Ferrellgas Partners, L.P. | 100,376,789 | Common Units |
| Ferrellgas Partners Finance Corp. | 1,000 | Common Stock |
| Ferrellgas, L.P. | n/a | n/a |
| Ferrellgas Finance Corp. | 1,000 | Common Stock |

Documents Incorporated by Reference: None

EACH OF FERRELLGAS PARTNERS FINANCE CORP. AND FERRELLGAS FINANCE CORP. MEET THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(A) AND (B) OF FORM 10-K AND ARE THEREFORE, WITH RESPECT TO EACH SUCH REGISTRANT, FILING THIS FORM 10-K WITH THE REDUCED DISCLOSURE FORMAT.

BLFG_EDPA2274419

Table of Contents

**FERRELLGAS PARTNERS, L.P.**
**FERRELLGAS PARTNERS FINANCE CORP.**
**FERRELLGAS, L.P.**
**FERRELLGAS FINANCE CORP.**

**For the fiscal year ended July 31, 2015**
**FORM 10-K ANNUAL REPORT**

**Table of Contents**

| | | | Page |
|---|---|---|---|
| | | **PART I** | |
| ITEM | 1. | BUSINESS | 1 |
| ITEM | 1A. | RISK FACTORS | 14 |
| ITEM | 1B. | UNRESOLVED STAFF COMMENTS | 39 |
| ITEM | 2. | PROPERTIES | 39 |
| ITEM | 3. | LEGAL PROCEEDINGS | 41 |
| ITEM | 4. | MINE SAFETY DISCLOSURES | 42 |
| | | **PART II** | |
| ITEM | 5. | MARKET FOR REGISTRANTS' COMMON EQUITY, RELATED UNITHOLDER AND STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 42 |
| ITEM | 6. | SELECTED FINANCIAL DATA | 43 |
| ITEM | 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 46 |
| ITEM | 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 73 |
| ITEM | 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 74 |
| ITEM | 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 74 |
| ITEM | 9A. | CONTROLS AND PROCEDURES | 74 |
| ITEM | 9B. | OTHER INFORMATION | 77 |
| | | **PART III** | |
| ITEM | 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 77 |
| ITEM | 11. | EXECUTIVE COMPENSATION | 83 |
| ITEM | 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED UNITHOLDER MATTERS | 98 |
| ITEM | 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 100 |
| ITEM | 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 101 |
| | | **PART IV** | |
| ITEM | 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 102 |

BLFG_EDPA2274420

Table of Contents

# PART I

## Introductory Statement

In this Annual Report on Form 10-K, unless the context indicates otherwise:

- "us," "we," "our," "ours," "consolidated," or "Ferrellgas" are references exclusively to Ferrellgas Partners, L.P. together with its consolidated subsidiaries, including Ferrellgas Partners Finance Corp., Ferrellgas, L.P. and Ferrellgas Finance Corp., except when used in connection with "common units," in which case these terms refer to Ferrellgas Partners, L.P. without its consolidated subsidiaries;

- "Ferrellgas Partners" refers to Ferrellgas Partners, L.P. itself, without its consolidated subsidiaries;

- the "operating partnership" refers to Ferrellgas, L.P., together with its consolidated subsidiaries, including Ferrellgas Finance Corp.;

- our "general partner" refers to Ferrellgas, Inc.;

- "Ferrell Companies" refers to Ferrell Companies, Inc., the sole shareholder of our general partner;

- "unitholders" refers to holders of common units of Ferrellgas Partners;

- "retail sales" refers to Propane and other gas liquid sales: Retail — Sales to End Users or the volume of propane sold primarily to our residential, industrial/commercial and agricultural customers;

- "wholesale sales" refers to Propane and other gas liquid sales: Wholesale — Sales to Resellers or the volume of propane sold primarily to our portable tank exchange customers and bulk propane sold to wholesale customers;

- "other gas sales" refers to Propane and other gas liquid sales: Other Gas Sales or the volume of bulk propane sold to other third party propane distributors or marketers and the volume of refined fuel sold;

- "propane sales volume" refers to the volume of propane sold to our retail sales and wholesale sales customers;

- "water solutions revenues" refers to fees charged for the processing and disposal of salt water as well as the sale of skimming oil;

- "crude oil logistics revenues" refers to fees charged for crude oil transportation and logistics services on behalf of producers and end-users of crude oil;

- "crude oil purchases and sales" refers to crude oil purchased and sold in connection with crude oil transportation and logistics services on behalf of producers and end-users of crude oil;

- "crude oil hauled" refers to the crude oil volume in barrels transported through our operation of a fleet of trucks and tank trailers and rail cars;

- "salt water volume" refers to the number of barrels of salt water processed at our disposal sites;

- "skimming oil" refers to the oil collected from the process used at our salt water disposal wells through a combination of gravity and chemicals to separate crude oil that is dissolved in the salt water;

- "Notes" refers to the notes of the consolidated financial statements of Ferrellgas Partners or the operating partnership, as applicable; and

- "MBbls/d" refers to one thousand barrels per day.

**Forward-looking Statements**

Statements included in this report include forward-looking statements. These forward-looking statements are identified as any statement that does not relate strictly to historical or current facts. These statements often use words such as "anticipate," "believe," "intend," "plan," "projection," "forecast," "strategy," "position," "continue," "estimate," "expect," "may," "will," or the negative of those terms or other variations of them or comparable terminology. These statements often discuss plans,

1

Table of Contents

strategies, events or developments that we expect or anticipate will or may occur in the future and are based upon the beliefs and assumptions of our management and on the information currently available to them. In particular, statements, express or implied, concerning our future operating results or our ability to generate sales, income or cash flow are forward-looking statements.

Forward-looking statements are not guarantees of performance. You should not put undue reliance on any forward-looking statements. All forward-looking statements are subject to risks, uncertainties and assumptions that could cause our actual results to differ materially from those expressed in or implied by these forward-looking statements. Many of the factors that will affect our future results are beyond our ability to control or predict.

Some of our forward-looking statements include the following:

- that we will continue to have sufficient access to capital markets at yields acceptable to us to support our expected growth expenditures and refinancing of debt maturities;
- that Ferrellgas Partners and the operating partnership will continue to meet all of the quarterly financial tests required by the agreements governing their indebtedness; and
- that our future capital expenditures and working capital needs will be provided by a combination of cash generated from future operations, existing cash balances, the secured credit facility or the accounts receivable securitization facility.

When considering any forward-looking statement, you should also keep in mind the risk factors set forth in "Item 1A. Risk Factors." Any of these risks could impair our business, financial condition or results of operations. Any such impairment may affect our ability to make distributions to our unitholders or pay interest on the principal of any of our debt securities. In addition, the trading price, if any, of our securities could decline as a result of any such impairment.

Except for our ongoing obligations to disclose material information as required by federal securities laws, we undertake no obligation to update any forward-looking statements or risk factors after the date of this Annual Report on Form 10-K.

## ITEM 1.   BUSINESS.

### Overview

Ferrellgas Partners, L.P. is a growth-oriented publicly traded Delaware limited partnership formed in 1994 and is engaged in:

- the retail distribution of propane and related equipment sales, and
- midstream operations, which is comprised of the following:
  ◦ crude oil logistics segment, which began subsequent to an acquisition in June 2015, and
  ◦ water solutions segment, which began subsequent to an acquisition in May 2014.

Our common units are listed on the New York Stock Exchange under the ticker symbol "FGP," and our activities are primarily conducted through our operating partnership, Ferrellgas, L.P., a Delaware limited partnership. We are the sole limited partner of Ferrellgas, L.P. with an approximate 99% limited partner interest.

Ferrellgas Partners is a holding entity that conducts no operations and has two direct subsidiaries, Ferrellgas Partners Finance Corp. and the operating partnership. Ferrellgas Partners' only significant assets are its approximate 99% limited partnership interest in the operating partnership and its 100% equity interest in Ferrellgas Partners Finance Corp.

The operating partnership was formed on April 22, 1994, and accounts for substantially all of our consolidated assets, sales and operating earnings, except for interest expense related to the senior notes co-issued by Ferrellgas Partners and Ferrellgas Partners Finance Corp.

Our general partner performs all management functions for us and holds a 1% general partner interest in Ferrellgas Partners and an approximate 1% general partner interest in the operating partnership. The parent company of our general partner, Ferrell Companies, beneficially owns approximately 22.7% of our outstanding common units. Ferrell Companies is owned 100% by an employee stock ownership trust.

### Our Businesses

*Propane and related equipment sales*

2

Table of Contents

We are a leading distributor of propane and related equipment and supplies to customers in the United States. We believe that we are the second largest retail marketer of propane in the United States as measured by the volume of our retail sales in fiscal 2015 and a leading national provider of propane by portable tank exchange.

We serve residential, industrial/commercial, portable tank exchange, agricultural, wholesale and other customers in all 50 states, the District of Columbia and Puerto Rico. Our operations primarily include the distribution and sale of propane and related equipment and supplies with concentrations in the Midwest, Southeast, Southwest and Northwest regions of the United States. Sales from propane distribution are generated principally from transporting propane purchased from third parties to propane distribution locations and then to tanks on customers' premises or to portable propane tanks delivered to nationwide and local retailers. Sales from portable tank exchanges, nationally branded under the name Blue Rhino, are generated through a network of independent and partnership-owned distribution outlets. Our market areas for our residential and agricultural customers are generally rural while our market areas for our industrial/commercial and portable tank exchange customers are generally urban.

In the residential and industrial/commercial markets, propane is primarily used for space heating, water heating, cooking and other propane fueled appliances. In the portable tank exchange market, propane is used primarily for outdoor cooking using gas grills. In the agricultural market, propane is primarily used for crop drying, space heating, irrigation and weed control. In addition, propane is used for a variety of industrial applications, including as an engine fuel burned in the internal combustion engines of vehicles and forklifts and as a heating or energy source in manufacturing and drying processes.

A substantial majority of our gross margin from propane and other gas liquids sales is derived from the distribution and sale of propane and related risk management activities. Our gross margin from the retail distribution of propane is primarily based on the cents-per-gallon difference between the sales price we charge our customers and our costs to purchase and deliver propane to our propane distribution locations.

The distribution of propane to residential customers generally involves large numbers of small volume deliveries. Our retail deliveries of propane are typically transported from our retail propane distribution locations to our customers by our fleet of bulk delivery trucks, which are generally fitted with tanks ranging in size from 2,600 to 3,500 gallons. Propane storage tanks located on our customers' premises are then filled from these bulk delivery trucks. We also deliver propane to our industrial/commercial and portable tank exchange customers using our fleet of portable tank and portable tank exchange delivery trucks, truck tractors and portable tank exchange delivery trailers.

Our residential customers and portable tank exchange customers typically provide us a greater cents-per-gallon margin than our industrial/commercial, agricultural, wholesale and other customers. We track "Propane sales volumes," "Revenues – Propane and other gas liquids sales" and "Gross Margin – Propane and other gas liquids sales" by customer; however, we are not able to specifically allocate operating and other costs by customer in a manner that would determine their specific profitability with a high degree of accuracy. The wholesale propane price per gallon is subject to various market conditions, including inflation, and may fluctuate based on changes in demand, supply and other energy commodity prices, primarily crude oil and natural gas, as propane prices tend to correlate with the fluctuations of these underlying commodities.

As of July 31, 2015, approximately 52% of our residential customers rent their tanks from us. Our rental terms and the fire safety regulations in some states require rented bulk tanks to be filled only by the propane supplier owning the tank. The cost and inconvenience of switching bulk tanks helps minimize a customer's tendency to switch suppliers of propane on the basis of minor variations in price, helping us minimize customer loss.

In addition, we lease tanks to some of our independent distributors involved with our delivery of propane for portable tank exchanges. Our owned and independent distributors provide portable tank exchange customers with a national delivery presence that is generally not available from most of our competitors.

In our past three fiscal years, our total annual propane sales volumes in gallons were:

| Fiscal year ended | Propane sales volumes (in millions) |
|---|---|
| July 31, 2015 | 879 |
| July 31, 2014 | 947 |
| July 31, 2013 | 901 |

We utilize marketing programs targeting both new and existing customers by emphasizing:

- our efficiency in delivering propane to customers;

3

BLFG_EDPA2274423

Table of Contents

- our employee training and safety programs;
- our enhanced customer service, facilitated by our technology platform and our 24 hours a day, seven days a week emergency retail customer call support capabilities; and
- our national distributor network for our commercial and portable tank exchange customers.

Some of our propane distribution locations also conduct the retail sale of propane appliances and related parts and fittings, as well as other retail propane related services and consumer products. We also sell gas grills, grilling tools and accessories, patio heaters, fireplace and garden accessories, mosquito traps and other outdoor products through Blue Rhino Global Sourcing, Inc.

Our other activities in our propane and related equipment and supplies sales segment include the following:

- ⑩ the sale of refined fuels, and
- common carrier services

In fiscal 2015, no one customer accounted for 10% or more of our consolidated revenues.

*Effect of Weather and Seasonality*

Weather conditions have a significant impact on demand for propane for heating purposes during the months of November through March (the "winter heating season"). Accordingly, the volume of propane used by our customers for this purpose is directly affected by the severity of the winter weather in the regions we serve and can vary substantially from year to year. In any given region, sustained warmer-than-normal temperatures in the winter heating season will tend to result in reduced propane usage, while sustained colder-than-normal temperatures in the winter heating season will tend to result in greater usage. Although there is a strong correlation between weather and customer usage, general economic conditions in the United States and the wholesale price of propane can also significantly impact this correlation. Additionally, there is a natural time lag between the onset of cold weather and increased sales to customers. If the United States were to experience a cooling trend we could expect nationwide demand for propane for heating purposes to increase which could lead to greater sales, income and liquidity availability. Conversely, if the United States were to experience a warming trend, we could expect nationwide demand for propane for heating purposes to decrease which could lead to a reduction in our sales, income and liquidity availability.

The market for propane is seasonal because of increased demand during the winter heating season primarily for the purpose of providing heating in residential and commercial buildings. Consequently, sales and operating profits are concentrated in our second and third fiscal quarters, which are during the winter heating season. However, our propane by portable tank exchange business experiences higher volumes in the spring and summer, which include the majority of the grilling season. These volumes add to our operating profits during our first and fourth fiscal quarters due to those counter-seasonal business activities. These sales also provide us the ability to better utilize our seasonal resources at our propane distribution locations. Other factors affecting our results of operations include competitive conditions, volatility in energy commodity prices, demand for propane, timing of acquisitions and general economic conditions in the United States.

We use information on temperatures to understand how our results of operations are affected by temperatures that are warmer or colder than normal. We use the definition of "normal" temperatures based on information published by the National Oceanic and Atmospheric Administration ("NOAA"). Based on this information we calculate a ratio of actual heating degree days to normal heating degree days. Heating degree days are a general indicator of weather impacting propane usage.

We believe that our broad geographic distribution helps us reduce exposure to regional weather and economic patterns. During times of colder-than-normal winter weather, we have been able to take advantage of our large, efficient distribution network to avoid supply disruptions, thereby providing us a competitive advantage in the markets we serve.

*Risk Management Activities – Commodity Price Risk*

We employ risk management activities that attempt to mitigate price risks related to the purchase, storage, transport and sale of propane generally in the contract and spot markets from major domestic energy companies on a short-term basis. We attempt to mitigate these price risks through the use of financial derivative instruments and forward propane purchase and sales contracts. We enter into propane sales commitments with a portion of our customers that provide for a contracted price agreement for a specified period of time. These commitments can expose us to product price risk if not immediately hedged with an offsetting propane purchase commitment.

Our risk management strategy involves taking positions in the forward or financial markets that are equal and opposite to our positions in the physical products market in order to minimize the risk of financial loss from an adverse price change. This risk

4

Table of Contents

management strategy is successful when our gains or losses in the physical product markets are offset by our losses or gains in the forward or financial markets. Our propane related financial derivatives are designated as cash flow hedges.

Our risk management activities may include the use of financial derivative instruments including, but not limited to, swaps, options, and futures to seek protection from adverse price movements and to minimize potential losses. We enter into these financial derivative instruments directly with third parties in the over-the-counter market and with brokers who are clearing members with the New York Mercantile Exchange. We also enter into forward propane purchase and sales contracts with counterparties. These forward contracts qualify for the normal purchase normal sales exception within accounting principles generally accepted in the United States ("GAAP") and are therefore not recorded on our financial statements until settled.

Through our supply procurement activities, we purchase propane primarily from energy companies. Supplies of propane from these sources have traditionally been readily available, although no assurance can be given that they will be readily available in the future. We may purchase and store inventories of propane to avoid delivery interruptions during the periods of increased demand and to take advantage of favorable commodity prices. As a result of our ability to buy large volumes of propane and utilize our national distribution system, we believe we are in a position to achieve product cost savings and avoid shortages during periods of tight supply to an extent not generally available to other propane distributors. During fiscal 2015, seven suppliers accounted for approximately 64% of our total propane purchases. Because there are numerous alternative suppliers available, we do not believe it is reasonably possible that this supplier concentration could cause a near-term severe impact on our ability to procure propane, though propane prices could be affected. If supplies were interrupted or difficulties in obtaining alternative transportation were to arise, the cost of procuring replacement supplies may materially increase. These transactions are accounted for at cost in "Cost of product sold – propane and other gas liquids sales" in our consolidated statement of earnings.

A portion of our propane inventory is purchased under supply contracts that typically have a one-year term and a price that fluctuates based on spot market prices. In order to limit overall price risk, we will enter into fixed price over-the-counter propane forward and/or swap contracts that generally have terms of less than 36 months. We may also use options to hedge a portion of our forecasted purchases for up to 36 months in the future.

We also incur risks related to the price and availability of propane during periods of much colder-than-normal weather, temporary supply shortages concentrated in certain geographic regions and commodity price distortions between geographic regions. We attempt to mitigate these risks through our transportation activities by utilizing our transport truck and railroad tank car fleet to distribute propane between supply or storage locations and propane distribution locations. The propane we sell to our customers is generally transported from gas processing plants and refineries, pipeline terminals and storage facilities to propane distribution locations or storage facilities by our leased railroad tank cars, our owned or leased highway transport trucks, common carrier, or owner-operated transport trucks.

*Industry*

Natural gas liquids are derived from petroleum products and are sold in compressed or liquefied form. Propane, the predominant natural gas liquid, is typically extracted from natural gas or separated during crude oil refining. Although propane is gaseous at normal pressures, it is compressed into liquid form at relatively low pressures for storage and transportation. Propane is a clean-burning energy source, recognized for its transportability and ease of use relative to alternative forms of stand-alone energy sources.

Based upon industry publications propane accounts for approximately 3% to 4% of energy consumption in the United States, a level which has remained relatively constant for the past two decades. Propane competes primarily with natural gas, electricity and fuel oil as an energy source principally on the basis of price, availability and portability. Propane serves as an alternative to natural gas in rural and urban areas where natural gas is unavailable or portability of product is required. Propane is generally more expensive than natural gas on an equivalent British Thermal Unit ("BTU") basis in locations served by natural gas, although propane is often sold in such areas as a standby fuel for use during peak demands and during interruption in natural gas service. The expansion of natural gas into traditional propane markets has historically been inhibited by the capital costs required to expand distribution and pipeline systems. Although the extension of natural gas pipelines tends to displace propane distribution in the neighborhoods affected, we believe that new opportunities for propane sales arise as more geographically remote neighborhoods are developed.

Propane has historically been less expensive to use than electricity for space heating, water heating and cooking and competes effectively with electricity in the parts of the country where propane is less expensive than electricity on an equivalent BTU basis. Although propane is similar to fuel oil in application, market demand and price, propane and fuel oil have generally developed their own distinct geographic markets. Because residential furnaces and appliances that burn propane will not operate on fuel oil, a conversion from one fuel to the other requires the installation of new equipment. Residential propane customers will

5

Table of Contents

have an incentive to switch to fuel oil only if fuel oil becomes significantly less expensive than propane. Conversely, we may be unable to expand our retail customer base in areas where fuel oil is widely used, particularly the northeast United States, unless propane becomes significantly less expensive than fuel oil. However, many industrial customers who use propane as a heating fuel have the capacity to switch to other fuels, such as fuel oil, on the basis of availability or minor variations in price.

*Risk Management Activities – Transportation Fuel Price Risk*

We employ risk management activities that attempt to mitigate price risks related to the purchase of gasoline and diesel fuel for use in the transport of propane from retail fueling stations. We attempt to mitigate these price risks through the use of financial derivative instruments.

Our risk management strategy involves taking positions in the financial markets that are not more than the forecasted purchases of fuel for our internal use in the retail propane delivery fleet in order to minimize the risk of decreased earnings from an adverse price change. This risk management strategy locks in our purchase price and is successful when our gains or losses in the physical product markets are offset by our losses or gains in the financial markets. Our transport fuel financial derivatives are not designated as cash flow hedges.

*Competition*

In addition to competing with marketers of other fuels, we compete with other companies engaged in the propane distribution business. Competition within the propane distribution industry stems from two types of participants: the larger, multi-state marketers, including farmers' cooperatives, and the smaller, local independent marketers, including rural electric cooperatives. Based on our propane sales volumes in fiscal 2015, we believe that we are the second largest retail marketer of propane in the United States and a leading national provider of propane by portable tank exchange.

Most of our retail propane distribution locations compete with three or more marketers or distributors, primarily on the basis of reliability of service and responsiveness to customer needs, safety and price. Each retail distribution outlet operates in its own competitive environment because propane marketers typically reside in close proximity to their customers to lower the cost of providing service.

*Business Strategy*

Our business strategy for this segment is to:

- expand our operations through disciplined acquisitions and internal growth, as accretive opportunities become available;
- capitalize on our national presence and economies of scale; and
- maximize operating efficiencies through utilization of our technology platform.

Expand our operations through disciplined acquisitions and internal growth as accretive opportunities become available

We expect to continue the expansion of our propane customer base through both the acquisition of other propane distributors and through organic growth. We intend to concentrate on propane acquisition activities in geographical areas within or adjacent to our existing operating areas, and on a selected basis in areas that broaden our geographic coverage. We also intend to focus on acquisitions that can be efficiently combined with our existing propane operations to provide an attractive return on investment after taking into account the economies of scale and cost savings we anticipate will result from those combinations. Our goal is to improve the operations and profitability of our propane and related equipment sales segment by integrating best practices and leveraging our established national organization and technology platforms to help reduce costs and enhance customer service. We believe that our enhanced operational synergies, improved customer service and ability to better track the financial performance of acquired operations provide us a distinct competitive advantage and better analysis as we consider future acquisition opportunities.

We believe that we are positioned to successfully compete for growth opportunities within and outside of our existing operating regions. Our efforts will focus on adding density to our existing customer base, providing propane and complementary services to national accounts and providing other product offerings to existing customer relationships. This continued expansion will give us new growth opportunities by leveraging the capabilities of our operating platforms.

6

BLFG_EDPA2274426

Table of Contents

Capitalize on our national presence and economies of scale

We believe our national presence of 862 propane distribution locations in the United States as of July 31, 2015 gives us advantages over our smaller competitors. These advantages include economies of scale in areas such as:

- product procurement;
- transportation;
- fleet purchases;
- propane customer administration; and
- general administration.

We believe that our national presence allows us to be one of the few propane distributors that can competitively serve industrial/commercial and portable tank exchange customers on a nationwide basis, including the ability to serve such propane customers through leading home-improvement centers, mass merchants and hardware, grocery and convenience stores. In addition, we believe that our national presence provides us opportunities to make acquisitions of other propane distribution companies whose operations overlap with ours, providing economies of scale and significant cost savings in these markets.

We also believe that investments in technology similar to ours require both a large scale and a national presence, in order to generate sustainable operational savings to produce a sufficient return on investment. For these reasons, we believe our national presence and economies of scale provide us with an on-going competitive advantage.

Maximize operating efficiencies through utilization of our technology platform

We believe our significant investments in technology give us a competitive advantage to operate more efficiently and effectively at a lower cost compared to most of our competitors. We do not believe that many of our competitors will be able to justify similar investments in the near term. Our technology advantage has resulted from significant investments made in our retail propane distribution operating platform together with our state-of-the-art tank exchange operating platform.

Our technology platform allows us to efficiently route and schedule our customer deliveries, customer administration and operational workflow for the retail sale and delivery of bulk propane. Our service centers are staffed to provide oversight and management to multiple distribution locations, referred to as service units. We operate a retail distribution network, including portable tank exchange operations, using a structure of 51 service centers and 862 service units as of July 31, 2015. The service unit locations utilize hand-held computers and cellular or satellite technology to communicate with management personnel who are typically located at the associated service center. We believe this structure and our technology platform allow us to more efficiently route and schedule customer deliveries and significantly reduce the need for daily on-site management.

The efficiencies gained from operating our technology platform allow us to consolidate our management teams at fewer locations, quickly adjust the sales prices to our customers and manage our personnel and vehicle costs more effectively to meet customer demand.

Our customer support capabilities allow us to accept emergency customer calls 24 hours a day, seven days a week. These combined capabilities provide us cost savings while improving customer service by reducing customer inconvenience associated with multiple, unnecessary deliveries.

*Governmental Regulation - Environmental and Safety Matters*

Propane is not currently subject to any price or allocation regulation and has not been defined by any federal or state environmental law as an environmentally hazardous substance.

In connection with all acquisitions of propane distribution businesses that involve the purchase of real property, we conduct a due diligence investigation to attempt to determine whether any substance other than propane has been sold from, stored on or otherwise come into contact with any such real property prior to its purchase. At a minimum, due diligence includes questioning the sellers, obtaining representations and warranties concerning the sellers' compliance with environmental laws and visual inspections of the real property.

With respect to the sale and distribution of propane, we are subject to regulations promulgated by the Occupational Safety and Health Administration (OSHA) under its Hazard Communication Standard (HCS), which requires preparation and maintenance of material safety data sheets, hazard labeling on products, and other worker protections. In 2012, OSHA promulgated new hazard communications requirements designed to align US HCS standards with those of other countries under a

7

BLFG_EDPA2274427

Table of Contents

Globally Harmonized System ("GHS"). These hazard labeling and communication changes, which took effect in June 2015, required us and other propane manufacturers and distributors to revise and update our consumer and compliance materials.

With respect to the transportation of propane by truck, we are subject to regulations promulgated under the Federal Motor Carrier Safety Act. These regulations cover the transportation of flammable materials and are administered by the United States Department of Transportation ("DOT"). The National Fire Protection Association Pamphlet No. 58 establishes a national standard for the safe handling and storage of propane. Those rules and procedures have been adopted by us and serve as the industry standard by the states in which we operate.

We believe that we are in material compliance with all governmental regulations and industry standards applicable to environmental and safety matters.

***Midstream operations***

Crude oil logistics

Our midstream operations - crude oil logistics ("Bridger") segment, which we operate under the Bridger Logistics tradename provides domestic crude oil transportation and logistics services with an integrated portfolio of midstream assets connecting crude oil production in prolific basins in the U.S. to downstream markets. Bridger's truck, pipeline terminal, pipeline, rail and maritime assets form a comprehensive, fee-for-service business model, and substantially all of its cash flow is generated from fee-based commercial agreements.

Bridger's fee-based business model generates income by providing crude oil transportation and logistics services on behalf of producers and end-users of crude oil with end markets across North America including a presence in all major domestic crude oil basins. The first link in Bridger's integrated value chain is its truck transportation operations. Bridger is the largest for-hire crude oil carriers in the U.S. by fleet size and has a presence in most domestic crude producing regions. Bridger charges producers and first purchasers of crude oil fees per barrel to transport crude from the wellhead to takeaway outlets, which provide connectivity to end markets and generate additional fee-for-service income. Bridger also owns or controls a number of assets connecting trucked crude volumes to downstream takeaway infrastructure, including pipeline injection terminals, crude storage, rail loading and unloading facilities, new build railcars, maritime assets and pipelines. The majority of Bridger's cash flow is generated under contracts with average remaining terms of four years.

*Customers*

Bridger's customers include crude oil producers, refiners and marketers. Generally, Bridger seeks to enter into long-term contracts to provide logistics services; however, contracts for the transportation of crude oil by truck, tend to be terminable on 30 days' notice.

Bridger's largest customer, owns a refinery in Trainer, Pennsylvania. Bridger has entered into an agreement with this customer under which Bridger will provide logistics services to transport a minimum of 65 MBbls/d of crude oil from the Bakken region in North Dakota to the Trainer refinery. This agreement terminates in 2019, and the minimum volume commitment is subject on a monthly basis to a minimum average delivery amount per month of 35 MBbls/d. During the fiscal year ended July 31, 2015, approximately 50% of our crude oil logistics gross margin was generated from this customer.

A subsidiary of Bridger has also entered into a series of agreements with a subsidiary of a large oil producer in the Permian Basin, to provide truck oil transportation services on a "right of first call" basis within an area of mutual interest covering a significant portion of the Permian Basin in West Texas and New Mexico. This initial term of this agreement ends in 2019, then automatically extends for additional one (1) year periods during which time it may be terminated upon by six (6) months notice.

Bridger also entered into a ten-year transportation and logistics agreement with Jamex Marketing, LLC ("Jamex Marketing"), a company owned by James H. Ballengee, an owner of 9.5% of Ferrellgas Partners' outstanding common units. Under this agreement, Bridger will be the exclusive provider of crude oil logistics services to Jamex Marketing, and will also have the right of first offer with respect to any logistics services contracted by Jamex Marketing for any hydrocarbons.

A subsidiary of Bridger has also entered into a take-or-pay throughput agreement with an entity in connection with one of Bridger's Rockies pipeline terminals, pursuant to which Bridger provides dedicated storage and throughput services to this entity at that pipeline terminal. This agreement is scheduled to terminate in 2019, with automatic annual extensions unless a party gives notice 180 days prior to the renewal date.
.

8

BLFG_EDPA2274428

Table of Contents

*Competition*

Bridger faces significant competition, as many entities are engaged in the crude oil logistics business, some of which have greater financial resources than we do. Bridger's ability to compete could be harmed by factors that it cannot control, including:

- the perception that another company can provide better service;
- the availability of crude oil alternative supply points, or crude oil supply points located closer to the operations of its customers; and
- a decision by its competitors to develop acquire or construct crude oil midstream assets and provide gathering, transportation, terminalling or storage services in geographic areas, or to customers, served by Bridger's assets and services.

*Pricing Policy*

Bridger earns fee for-service income by charging producers and first purchasers of crude oil fees per barrel to transport crude from the wellhead to downstream takeaway outlets, which provide connectivity to end markets. Bridger also owns and/or controls a number of assets connecting trucked crude volumes to downstream takeaway infrastructure, including pipeline injection terminals, crude storage, rail loading and unloading facilities, new build railcars, maritime assets and pipelines.

*Business Strategy*

We believe Bridger's crude oil logistics operations will serve as a platform to further develop our midstream business. We continue to seek large-scale growth opportunities that leverage the existing asset base, are meaningful in scale and could provide us with the opportunity to deploy capital at attractive multiples to generate long-term growth.

*Governmental Regulation - Environmental and Safety Matters*

Bridger's crude oil logistics operations are subject to stringent federal, state and local laws and regulations relating to the discharge of materials into the environment or otherwise relating to protection of the environment. As with the midstream industry generally, compliance with current and anticipated environmental laws and regulations increases its overall cost of business, including its capital costs to construct, maintain and upgrade equipment and facilities. Failure to comply with these laws and regulations may result in the assessment of significant administrative, civil and criminal penalties, the imposition of investigatory and remedial liabilities, and even the issuance of injunctions that may restrict or prohibit some or all of its operations. We believe that Bridger's operations are in substantial compliance with applicable laws and regulations. However, environmental laws and regulations are subject to change, resulting in potentially more stringent requirements, and we cannot provide any assurance that the cost of compliance with current and future laws and regulations will not have a material adverse effect on the results of operations or earnings associated with the Bridger's business.

In December 2014, EPA proposed lowering the National Ambient Air Quality Standard ("NAAQS") from the current 75 parts per billion ("PPB") level to between 65 and 70 PPB using an 8-hour average. This change, if finalized in 2017 as currently scheduled, could significantly expand the number of areas and counties deemed to be in nonattainment with federal ozone standards, and could force states to impose additional emissions controls on oil, gas and other industrial sectors.

In May 2015, the DOT issued final rules for oil-by-rail transportation requiring that certain older tank cars be phased out of operation and that new tank cars comply with certain design requirements. All tank cars built after October 1, 2015 must meet these new standards. DOT-111 tank cars must be retrofitted or replaced within three years and CPC-1232 tank cars without insulating jackets must be retrofitted or replaced within five years. We estimate that it will cost approximately $30.0 million to bring Bridger's tank cars into compliance with the new standards. In May 2015, the U.S. Environmental Protection Agency also released final rules that could expand the boundaries of federal jurisdiction under the Clean Water Act, raising the potential for increased oversight of infrastructure development and, as discussed below, increased federal liability for accidental releases to the environment.

In August 2015, as part of the Administration's Climate Action Plan, EPA released a suite of proposed rules that, if finalized, would increase regulatory oversight of midstream oil and gas operations under the Clean Air Act. These included proposed methane New Source Performance Standards ("NSPS") at new and modified sources in the oil and gas industry, new draft Control Technique Guidelines for reducing volatile organic compound ("VOC") emissions from existing oil and gas sources in ozone nonattainment areas, and proposed clarifications to EPA's methodology for aggregating pollutant emissions from buildings,

9

Table of Contents

structures, facilities and installations within the oil and natural gas industry for the purpose of making major source determinations under the Clean Air Act.

<u>Water solutions</u>

Our midstream operations - water solutions ("Water solutions") segment generates revenues from treatment and disposal of salt water generated from crude oil production operations at our salt water disposal wells and from the sale of recovered crude oil from our skimming oil process. Our facilities are located near oil and gas production fields with high levels of crude oil and natural gas in the Eagle Ford Basin in Texas.

*Industry*

Salt water disposal wells are a critical component of the oil and natural gas well drilling industry. Oil and gas wells generate significant volumes of salt water known as "flowback" and "production" water. Flowback is a water based solution that flows back to the surface during and after the completion of the hydraulic fracturing ("fracking") process whereby large volumes of water, sand and chemicals are injected under high pressures into rock formations to stimulate production. Flowback contains clays, chemicals, dissolved metal ions, total dissolved solids and crude oil. Production water is salt water from underground formations that is brought to the surface during the normal course of oil or gas production. Because this water has been in contact with hydrocarbon-bearing formations, it contains some of the chemical characteristics of the formations and crude oil. In the oil and gas fields we service, these volumes of water are transported by truck away from the fields to salt water disposal wells where a combination of gravity and chemicals are used to separate crude oil that is dissolved in the salt water through a process known as "skimming oil". This skimming oil is then captured and sold before the salt water is injected into underground geologic formations using high-pressure pumps. Our revenue per barrel of salt water processed is derived from a blend of fees we charge our customers to dispose of salt water at our facilities and skimming oil sales.

*Customers*

Our water solutions operations customers consist primarily of salt water transportation companies and large exploration and production companies who conduct drilling operations near our facilities. During the fiscal year ended July 31, 2015, 28% of our water solutions gross margin was generated from a single customer.

*Competition*

We compete with other salt water disposal providers to the extent other providers have facilities geographically close to our facilities. Location is an important consideration for our customers, who seek to minimize the cost of transporting the salt water to disposal facilities. Our facilities are strategically located near areas of significant crude oil and natural gas production in the Eagle Ford Basin.

*Pricing Policy*

We generally charge customers a processing fee per barrel of wastewater processed. We also generate revenue from our skimming oil process, which we take into consideration in negotiating the processing fees with our customers. Skimming oil is sold to third party gatherers at spot prices pursuant to a contract.

*Business Strategy*

Our business strategy for this segment is to expand our operations and diversify our business through disciplined acquisitions and internal growth as accretive opportunities become available. We anticipate these growth opportunities will leverage our expertise in transportation, storage and terminaling of energy related products.

*Permits and Regulatory Compliance*

We operated nine salt water disposal facilities as of September 2, 2015 all in the Eagle Ford shale region of south Texas. Each of these facilities is permitted to inject non-hazardous oil and gas waste into an Underground Injection Control ("UIC") Class II disposal well. These wells have been drilled in certain acceptable geologic formations far below the base of underground sources of fresh water to a point that is safely separated by other substantial geological confining layers according to environmental laws that are administered under the auspices of the federal government or states with primacy. We are actively

10

Table of Contents

seeking UIC Class II disposal permits for additional facilities that we intend to develop and operate.

Because the major component of our business is the disposal of oil and gas field residual salt water in an environmentally sound manner, a significant amount of our capital expenditures in this segment are related, either directly or indirectly, to environmental protection measures, including compliance with federal, state and local provisions that regulate the placement of oilfield residual salt water into the environment. There are costs associated with siting, design, operations, monitoring, site maintenance, corrective actions, financial assurance, and facility closure and post-closure obligations.

In connection with our acquisition, development or expansion of a Class II injection facility or transfer station, we must often spend considerable time, effort and money to obtain or maintain required permits and approvals. There are no assurances that we will be able to obtain or maintain required governmental approvals. Once obtained, operating permits are subject to renewal, modification, suspension or revocation by the issuing agency. Compliance with current and any future regulatory requirements could require us to make significant capital and operating expenditures. However, most of these expenditures would impact the entire industry and, accordingly, would not be expected to place us at any competitive disadvantage.

*Governmental Regulation - Environmental and Safety Matters*

Like the customers we service, our water solutions business is subject to extensive, complex and evolving federal, state and local environmental, health, safety and transportation laws and regulations that can affect the cost, manner, feasibility or timing of doing business. These laws and regulations are administered by the United States Environmental Protection Agency ("EPA") and various other federal, state and local environmental, zoning, transportation, land use, health and safety agencies in the United States. The Railroad Commission of Texas ("RRCT") is the principal state agency that regulates our water solutions business in Texas.

Many of these agencies regularly examine and inspect our operations to monitor compliance with these laws and regulations and have the power to enforce compliance, obtain injunctions or impose civil or criminal penalties in case of violations. In recent years, the oil and gas industry that we serve has perceived an increase in both the amount of government regulation and the number of enforcement actions being brought by regulatory entities against operations in related industries. These increases in regulatory oversight can affect both the demand for our services and our ability to supplying services at an economically viable level.

The key United States federal environmental, safety and health statutes affecting our business are summarized below. While the EPA retains oversight authority, the state of Texas has primary authority to administer regulatory and enforcement programs under each of these statutes, their state analogues and other state laws. The RRCT has primary regulatory jurisdiction over the oil and natural gas industry and related industry sectors. Accordingly, the RRCT is the principal state regulator of our water solutions business. Meanwhile, the Texas Commission on Environmental Quality is the principal state environmental regulator for virtually every other industry in the state, including industries that may have an effect on our business.

The Safe Drinking Water Act ("SDWA") is the primary statute that governs injection wells. The SDWA requires the EPA to protect underground sources of drinking water ("USDW") from being endangered as a result of underground injection of fluids through a well. Injection through a well is defined as the subsurface emplacement of fluids through a bored, drilled, or driven well or through a dug well where the depth of the dug well is greater than the largest surface dimension; or a dug hole whose depth is greater than the largest surface dimension; or an improved sinkhole; or a subsurface distribution system. The EPA has promulgated standards by setting minimum requirements for injection wells, including Class II injection wells such as those owned and operated by us. The Underground Injection Control ("UIC") provisions of the SDWA and implementing regulations control the construction, operation, permitting, and closure of injection wells that place fluids underground for storage or disposal. All injection must be authorized under either general or specific permits. Injection well owners and operators may not site, construct, operate, maintain, convert, plug, abandon, or conduct any other injection activity that endangers USDWs.

The SDWA allows a state to obtain primacy from the EPA for oil and gas related injection wells, either by adopting the federal UIC requirements or, under some circumstances without adopting the complete set of applicable federal UIC regulations. The state must be able to demonstrate that its existing regulatory program is protecting USDWs in that state, even if the regulations may not be as stringent as federal rules. Presently, 34 states, including Texas, have primacy from EPA to regulate UIC wells, including Class II injection wells for the disposal of oil and gas produced and flowback water. Requirements in primacy states may differ from and be more stringent than federal requirements. While we currently operate UIC Class II wells only in the state of Texas, we continue to explore opportunities to develop new injection wells in other states. Some of those states may not have primacy under SDWA, in which case EPA directly enforces the federal requirements.

11

BLFG_EDPA2274431

Table of Contents

The Occupational Safety and Health Act of 1970, as amended, establishes certain employer responsibilities, including maintenance of a workplace free of recognized hazards likely to cause death or serious injury, compliance with standards promulgated by the Occupational Safety and Health Administration ("OSHA"), and various reporting and record keeping obligations, as well as disclosure and procedural requirements. Various standards for notices of hazards, safety in excavation and demolition work and the handling of asbestos, apply to our midstream operations.

The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), or the Superfund law, and comparable state laws impose liability, potentially without regard to fault or legality of the activity at the time, on certain parties that are considered to be potentially responsible for the release of a hazardous substance into the environment. These potentially responsible parties include the current owner or operator of the disposal site or sites where the release occurred, past owners or operators at the time disposal activities occurred at the site, and companies that disposed or arranged for the disposal of hazardous substances that have been released at the site.

Under CERCLA, these persons may be subject to joint and several liability for the costs of investigating and cleaning up hazardous substances that have been released into the environment, for damages to natural resources and for the costs of some health studies. In addition, neighboring landowners and other third parties may file claims under common law for personal injury and property damage allegedly caused by hazardous substances or other pollutants released into the environment.

The federal Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, regulates the management and disposal of solid and hazardous waste. Some wastes associated with the exploration and production of oil and natural gas are exempted from more stringent regulation as "hazardous wastes" under the subtitle C of RCRA in certain circumstances. Wastes that may fall under this exemption include drilling fluids, produced waters and other wastes associated with the exploration, development or production of oil and natural gas. However, these exempt wastes may still be regulated under other federal and state laws. Further, the exemption does not cover all materials that may be used at an oil and gas exploration, development or production site. In the ordinary course of our operations, we may generate other industrial wastes such as waste solvents and waste chemicals that may be regulated as hazardous waste under RCRA or considered hazardous substances under CERCLA. Compliance with RCRA and CERCLA imposes additional costs on our operations, and if these wastes are not properly disposed of in accordance with regulation, we may be subject to clean up orders, penalty actions or private lawsuits that may require us to expend additional resources.

**Financial Information about Segments**

For financial information regarding our reportable segments, please see Note P to Ferrellgas Partners' consolidated financial statements and Note O to the operating partnership's consolidated financial statements included in this annual report.

**Employees**

We have no employees and are managed by our general partner pursuant to our partnership agreement. At September 1, 2015, our general partner had 4,028 full-time employees.

Our general partner's employees consisted of individuals in the following areas:

| | |
|---|---:|
| Propane field operations | 3,365 |
| Water solutions field operations | 58 |
| Crude oil logistics field operations | 203 |
| Centralized corporate functions | 402 |
| Total | 4,028 |

Less than one percent of these employees are represented by an aggregate of five different local labor unions, which are all affiliated with the International Brotherhood of Teamsters. Our general partner has not experienced any significant work stoppages or other labor problems.

**Trademarks and Service Marks**

We market our goods and services under various trademarks and trade names, which we own or have a right to use. Those trademarks and trade names include marks or pending marks before the United States Patent and Trademark Office such as

12

BLFG_EDPA2274432

Table of Contents

Ferrellgas, Ferrell North America, and Ferrellmeter. Our general partner has an option to purchase for a nominal value the trade names "Ferrellgas" and "Ferrell North America" and the trademark "Ferrellmeter" that it contributed to us during 1994, if it is removed as our general partner other than "for cause." If our general partner ceases to serve as our general partner for any reason other than "for cause," it will have the option to purchase our other trade names and trademarks from us for fair market value.

We believe that the Blue Rhino mark and Blue Rhino's other trademarks, service marks and patents are an important part of our consistent growth in both tank exchange and outdoor living product categories. Included in the registered and pending trademarks and service marks are the designations Blue Rhino®, Blue Rhino & Design®, Rhino Design™, Grill Gas & Design®, A Better Way™, Spark Something Fun®, America's Choice for Grill Gas®, RhinoTUFF®, Tri-Safe®, Drop, Swap and Go™, Rhino Power™, Uniflame®, UniGrill®, Patriot®, Grill Aficionado®, Skeetervac®, Fine Tune®, Vac & Tac®, Wavedrawer®, It's Your Backyard. Enjoy It More With Skeetervac®, Less Biting Insects. More Backyard Fun®, DuraClay®, Endless Summer®, Endless Summer Comfort®, ChefMaster® and Mr. Bar-B-Q®. In addition, we have patents issued for a Method for Reconditioning a Propane Gas Tank and an Overflow Protection Valve Assembly, which expire in 2017 and 2018, respectively, as well as various other patents and patent applications pending. The protection afforded by our patents furthers our ability to cost-effectively service our customers and to maintain our competitive advantages. Our water solutions business operates primarily under the Sable Environmental trade name and our crude oil logistics business operates primarily under the Bridger Logistics trade name.

**Businesses of Other Subsidiaries**

Ferrellgas Partners Finance Corp. is a Delaware corporation formed in 1996 and is our wholly-owned subsidiary. Ferrellgas Partners Finance Corp. has nominal assets, no employees other than officers and does not conduct any operations, but serves as a co-issuer and co-obligor for debt securities of Ferrellgas Partners. Institutional investors that might otherwise be limited in their ability to invest in debt securities of Ferrellgas Partners because it is a partnership are potentially able to invest in debt securities of Ferrellgas Partners because Ferrellgas Partners Finance Corp. acts as a co-issuer and co-obligor. Because of its structure and pursuant to the reduced disclosure format, a discussion of the results of operations, liquidity and capital resources of Ferrellgas Partners Finance Corp. is not presented in this Annual Report on Form 10-K. See Note B – Contingencies and Commitments – to Ferrellgas Partners Finance Corp.'s financial statements for a discussion of the debt securities with respect to which Ferrellgas Partners Finance Corp. is serving as a co-issuer and co-obligor.

Ferrellgas Finance Corp. is a Delaware corporation formed in 2003 and is a wholly-owned subsidiary of the operating partnership. Ferrellgas Finance Corp. has nominal assets, no employees other than officers and does not conduct any operations, but serves as a co-issuer and co-obligor for debt securities of the operating partnership. Institutional investors that might otherwise be limited in their ability to invest in debt securities of the operating partnership because it is a partnership are potentially able to invest in debt securities of the operating partnership because Ferrellgas Finance Corp. acts as a co-issuer and co-obligor. Because of its structure and pursuant to the reduced disclosure format, a discussion of the results of operations, liquidity and capital resources of Ferrellgas Finance Corp. is not presented in this Annual Report on Form 10-K. See Note B – Contingencies and commitments – to Ferrellgas Finance Corp.'s financial statements for a discussion of the debt securities with respect to which Ferrellgas Finance Corp. is serving as a co-issuer and co-obligor.

We have agreements to transfer, on an ongoing basis, a portion of our trade accounts receivable through Ferrellgas Receivables, LLC ("Ferrellgas Receivables"), a wholly-owned subsidiary of the operating partnership that maintains an accounts receivable securitization facility. We retain servicing responsibilities for transferred accounts receivable but have no other continuing involvement with the transferred receivables. The accounts receivable securitization facility is more fully described in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financing Activities - Accounts receivable securitization" and in Note F – Accounts and notes receivable, net and accounts receivable securitization – to our consolidated financial statements provided herein.

We also sell gas grills, grilling tools and accessories, patio heaters, fireplace and garden accessories, mosquito traps and other outdoor products. These products are manufactured by independent third parties in Asia and are sold to mass market retailers in Asia or shipped to the United States, where they are sold under our various trade names. These products are sold through Blue Rhino Global Sourcing, Inc. a taxable corporation that is a wholly-owned subsidiary of the operating partnership. We operate our midstream operations - crude oil logistics operations under the wholly-owned subsidiary Bridger Logistics, LLC and our midstream operations - water solutions under the wholly-owned subsidiary Sable Environmental, LLC.

**Available Information**

We file annual, quarterly, and other reports and information with the Securities and Exchange Commission (the "SEC"). You may read and download our SEC filings over the Internet from several commercial document retrieval services as well as at the

13

BLFG_EDPA2274433

Table of Contents

SEC's website at www.sec.gov. You may also read and copy our SEC filings at the SEC's Public Reference Room located at 100 F Street, NE, Washington, DC 20549. Please call the SEC at 1-800-SEC-0330 for further information concerning the Public Reference Room and any applicable copy charges. Because our common units are traded on the New York Stock Exchange under the ticker symbol of "FGP," we also provide our SEC filings and particular other information to the New York Stock Exchange. You may obtain copies of these filings and such other information at the offices of the New York Stock Exchange located at 11 Wall Street, New York, New York 10005. In addition, our SEC filings are available on our website at www.ferrellgas.com at no cost as soon as reasonably practicable after our electronic filing or furnishing thereof with the SEC. Please note that any Internet addresses provided in this Annual Report on Form 10-K are for informational purposes only and are not intended to be hyperlinks. Accordingly, no information found and/or provided at such Internet addresses is intended or deemed to be incorporated by reference herein.

## ITEM 1A.   RISK FACTORS.

Risks Inherent in the Distribution of Propane

*Weather conditions may reduce the demand for propane; our financial condition is vulnerable to warm winters and poor weather in the grilling season.*

Weather conditions have a significant impact on the demand for propane for heating, agricultural, and recreational grilling purposes. Many of our customers rely heavily on propane as a heating fuel. Accordingly, our sales volumes of propane are highest during the five-month winter-heating season of November through March and are directly affected by the temperatures during these months. During fiscal 2015, approximately 55% of our propane sales volume was attributable to sales during the winter-heating season. Actual weather conditions can vary substantially from year to year, which may significantly affect our financial performance. Furthermore, variations in weather in one or more regions in which we operate can significantly affect our total propane sales volume and therefore our realized profits. A negative effect on our sales volume may in turn affect our financial position or results of operations. The agricultural demand for propane is also affected by weather, as dry or warm weather during the harvest season may reduce the demand for propane used in some crop drying applications.

Sales from portable tank exchanges experience higher volumes in the spring and summer, which includes the majority of the grilling season. Sustained periods of poor weather, particularly in the grilling season, can negatively affect our portable tank exchange revenues. In addition, poor weather may reduce consumers' propensity to purchase and use grills and other propane-fueled appliances thereby reducing demand for portable tank exchange as well as the demand for our outdoor products.

To the extent weather conditions are affected by climate change or demand is impacted by regulations associated with climate change, customers' energy use could increase or decrease depending on the duration and magnitude of the changes, leading either to increased investment or decreased revenues.

*Sudden and sharp propane wholesale price increases cannot be passed on to customers with contracted pricing arrangements and these contracted pricing arrangements will adversely affect our profit margins if they are not immediately hedged with an offsetting propane purchase commitment.*

Gross margin from the retail distribution of propane is primarily based on the cents-per-gallon difference between the sales price we charge our customers and our costs to purchase and deliver propane to our propane distribution locations. We enter into propane sales commitments with a portion of our customers that provide for a contracted price agreement for a specified period of time. The wholesale propane price per gallon is subject to various market conditions and may fluctuate based on changes in demand, supply and other energy commodity prices. Propane prices tend to correlate primarily with crude oil and natural gas prices. We employ risk management activities that attempt to mitigate risks related to the purchasing, storing, transporting, and selling of propane. However, sudden and sharp propane price increases cannot be passed on to customers with contracted pricing arrangements. Therefore, these commitments expose us to product price risk and reduced profit margins if those transactions are not immediately hedged with an offsetting propane purchase commitment.

*Sudden and sharp wholesale propane price decreases may result in customers not fulfilling their obligations under contracted pricing arrangements previously entered into with us. The decreased sales volumes of these higher sales price arrangements may adversely affect our profit margins.*

We may attempt to lock-in a gross margin per gallon on our contracted sales commitments by immediately hedging or entering into a fixed price propane purchase contract. If we were to experience sudden and sharp propane price decreases, our

14

Table of Contents

customers may not fulfill their obligation to purchase propane from us at their previously contracted price per gallon and we may not be able to sell the related hedged or fixed price propane at a profitable sales price per gallon in the current pricing environment.

*Our failure or our counterparties' failure to perform on obligations under commodity derivative and financial derivative contracts could materially affect our liquidity, cash flows and results of operations.*

Volatility in the oil and gas commodities sector for an extended period of time or intense volatility in the near term could impair us or our counterparties' ability to meet margin calls which could cause us or our counterparties to default on commodity and financial derivative contracts. This could have a material adverse effect on our liquidity or our ability to procure product or procure it at prices reasonable to us.

*Hurricanes and other natural disasters could have a material adverse effect on our business, financial condition and results of operations.*

Hurricanes and other natural disasters can potentially destroy thousands of propane business structures and homes and, if occurring in the Gulf Coast region of the United States, could disrupt the supply chain for oil and gas products. Disruptions in supply could have a material adverse effect on our business, financial condition, results of operations and cash flow. Damages and higher prices caused by hurricanes and other natural disasters could also have an adverse effect on our financial condition due to the impact on the financial condition of our customers.

To the extent weather conditions are affected by climate change in a manner that increases the frequency or magnitude of significant weather events and natural disasters, increased weather disruptions could also have adverse impact on our financial condition on both the supply and demand side.

*The propane distribution business is highly competitive, which may negatively affect our sales volumes and/or our results of operations.*

Our profitability is affected by the competition for customers among all of the participants in the propane distribution business. We compete with a number of large national and regional firms and several thousand small independent firms. Because of the relatively low barriers to entry into the propane market, there is the potential for small independent propane distributors, as well as other companies not previously engaged in propane distribution, to compete with us. Some rural electric cooperatives and fuel oil distributors have expanded their businesses to include propane distribution. As a result, we are subject to the risk of additional competition in the future. Some of our competitors may have greater financial resources or lower costs than we do. Should a competitor attempt to increase market share by reducing prices, our operating margins and customer base may be negatively impacted. Generally, warmer-than-normal weather and increasing fuel prices further intensifies competition.

*The propane distribution industry is a mature one, which may limit our growth.*

The propane distribution industry is a mature one. We foresee no growth or a small decline in total national demand for propane in the near future. Year-to-year industry volumes are primarily impacted by fluctuations in temperatures and economic conditions. Our ability to grow our sales volumes within the propane distribution industry is primarily dependent upon our ability to acquire other propane distributors, to integrate those acquisitions into our operations, and upon the success of our marketing efforts to acquire new customers. If we are unable to compete effectively in the propane distribution business, we may lose existing customers or fail to acquire new customers.

*The propane distribution business faces competition from other energy sources, which may reduce the existing demand for our propane.*

Propane competes with other sources of energy, some of which can be less costly for equivalent energy value. We compete for customers against suppliers of electricity, natural gas and fuel oil. The convenience and efficiency of electricity makes it an attractive energy source for consumers and developers of new homes. Electricity is a major competitor of propane, but propane has historically enjoyed a competitive price advantage over electricity. Except for some industrial and commercial applications, propane is generally not competitive with natural gas in areas where natural gas pipelines already exist, because such pipelines generally make it possible for the delivered cost of natural gas to be less expensive than the bulk delivery of propane. The expansion of natural gas into traditional propane markets has historically been inhibited by the capital cost required to expand distribution and pipeline systems, however, the gradual expansion of the nation's natural gas distribution systems has resulted in the availability of natural gas in areas that were previously dependent upon propane. As long as natural gas remains a less expensive energy source than propane, our business will lose customers in each region in which natural gas distribution systems

15

BLFG_EDPA2274435

Table of Contents

are expanded. The gradual expansion of the nation's natural gas distribution systems has resulted, and may continue to result, in the availability of natural gas in some areas that previously depended upon propane. Although propane is similar to fuel oil in some applications and market demand, propane and fuel oil compete to a lesser extent primarily because of the cost of converting from one to the other and due to the fact that both fuel oil and propane have generally developed their own distinct geographic markets.

In August 2015, the EPA announced its Clean Power Plan rule, which requires states to submit plans for the reduction of carbon emissions from power plants. The plan will have an impact on electric prices and is anticipated to result in a shift away from coal-based sources of energy to natural gas and renewables. While this may increase demand for natural gas, other regulations governing drilling for natural gas may make natural gas extraction more expensive, so the resulting impact on demand for propane may change as implementation of the Clean Power Act occurs. We cannot predict the effect that the development of alternative energy sources might have on our financial position or results of operations.

*Energy efficiency and technology advances may affect demand for propane; increases in propane prices may cause our residential customers to increase their conservation efforts.*

The national trend toward increased conservation and technological advances, including installation of improved insulation and the development of more efficient furnaces and other heating devices, has reduced the demand for propane in our industry. We cannot predict the effect of future conservation measures or the effect that any technological advances in heating, conservation, energy generation or other devices might have on our operations. As the price of propane increases, some of our customers will tend to increase their conservation efforts and thereby decrease their consumption of propane.

*Current economic and political conditions may harm the energy business disproportionately to other industries.*

Deteriorating regional and global economic conditions and the effects of ongoing military actions may cause significant disruptions to commerce throughout the world. If those disruptions occur in areas of the world which are tied to the energy industry, such as the Middle East, it is most likely that our industry will be either affected first or affected to a greater extent than other industries. These conditions or disruptions may:

- impair our ability to effectively market or acquire propane; or
- impair our ability to raise equity or debt capital for acquisitions, capital expenditures or ongoing operations.

*A significant increase in motor fuel prices may adversely affect our profits.*

Motor fuel is a significant operating expense for us in connection with the delivery of propane to our customers. Currently we have hedged approximately 75% of our anticipated annual motor fuel usage for fiscal years 2016 and 2017. There is no assurance that we will continue this hedge strategy in future years. The price and supply of motor fuel is unpredictable and fluctuates based on events we cannot control, such as geopolitical developments, supply and demand for oil, gas, and refined fuels, actions by oil and gas producers, actions by motor fuel refiners, war and unrest in oil producing countries and regions, regional production patterns and weather concerns. As a result, any increases in these prices in future years may adversely affect our profitability and competitiveness.

*The revenues received from our portable tank exchange are concentrated with a limited number of retailers under non-exclusive arrangements that may be terminated at will.*

The propane gallons sales that we generate from our delivery of propane by portable tank exchange are concentrated with a limited number of retailers. If one or more of these retailers were to materially reduce or terminate its business with us, the results from our delivery of propane from portable tank exchanges may decline. For fiscal 2015, four retailers represented approximately 60% of portable tank exchange net revenues. None of our significant retail accounts associated with portable tank exchanges are contractually bound to offer portable tank exchange service or products. Therefore, retailers can discontinue our delivery of propane to them by portable tank exchange service, or sales of our propane related products, at any time and accept a competitor's delivery of propane by portable tank exchange, or its related propane products or none at all. Continued relations with a retailer depend upon various factors, including price, customer service, consumer demand and competition. In addition, most of our significant retailers have multiple vendor policies and may seek to accept a competitor's delivery of propane by portable tank exchange, or accept products competitive with our propane related products, at new or existing locations of these significant retailers. If any significant retailer materially reduces, terminates or requires price reductions or other adverse modifications in our selling terms, our results from our delivery of propane from portable tank exchanges may decline.

16

BLFG_EDPA2274436

Table of Contents

*If the distribution locations that some of our national customers rely upon for the delivery of propane do not perform up to the expectations of these customers, if we encounter difficulties in managing the operations of these distribution locations or if we or these distribution locations are not able to manage growth effectively, our relationships with our national customers may be adversely impacted and our delivery of propane to our national customers may decline.*

We rely on independently-owned and company-owned distributors to deliver propane to our national customers. Accordingly, our success depends on our ability to maintain and manage distributor relationships and operations and on the distributors' ability to set up and adequately service accounts. National customers impose demanding service requirements on us, and we could experience a loss of consumer or customer goodwill if our distributors do not adhere to our quality control and service guidelines or fail to ensure the timely delivery of an adequate supply of propane to our national customers. The poor performance of a distribution location for a national customer could jeopardize our entire relationship with that national customer and cause our delivery of propane to that particular customer to decline.

*Potential retail partners may not be able to obtain necessary permits or may be substantially delayed in obtaining necessary permits, which may adversely impact our ability to increase our delivery of propane by portable tank exchange to new retail locations.*

Local ordinances, which vary from jurisdiction to jurisdiction, generally require retailers to obtain permits to store and sell propane tanks. These ordinances influence retailers' acceptance of propane by portable tank exchange, distribution methods, propane tank packaging and storage. The ability and time required to obtain permits varies by jurisdiction. Delays in obtaining permits have from time to time significantly delayed the installation of new retail locations. Some jurisdictions have refused to issue the necessary permits, which has prevented some installations. Some jurisdictions may also impose additional restrictions on our ability to market and our distributors' ability to transport propane tanks or otherwise maintain its portable tank exchange services.

*We depend on particular management information systems to effectively manage all aspects of our delivery of propane.*

We depend on our management information systems to process orders, manage inventory and accounts receivable collections, maintain distributor and customer information, maintain cost-efficient operations and assist in delivering propane on a timely basis. In addition, our staff of management information systems professionals relies heavily on the support of several key personnel and vendors. Any disruption in the operation of those management information systems, including a cyber-security breach or loss of employees knowledgeable about such systems, termination of our relationship with one or more of these key vendors or failure to continue to modify such systems effectively as our business expands could negatively affect our business.

*We are dependent on our principal suppliers, which increases the risks from an interruption in supply and transportation.*

Through our supply procurement activities, we purchased approximately 64% of our propane from seven suppliers during fiscal 2015. During extended periods of colder-than-normal weather, suppliers may temporarily run out of propane necessitating the transportation of propane by truck, rail car or other means from other areas. If supplies from these sources were interrupted or difficulties in alternative transportation were to arise, the cost of procuring replacement supplies and transporting those supplies from alternative locations might be materially higher and, at least on a short-term basis, our margins could be reduced.

Risks Inherent in our Midstream Operations - Crude Oil Logistics Business

*Changes in demand for and production of hydrocarbon products could have a material adverse effect on Logistics' results of operations and cash flows and our ability to make distributions or pay interest or principal on debt securities.*

In recent years, the price of crude oil has been volatile, and we expect this volatility to continue. Generally, the price of crude oil is subject to fluctuations in response to changes in supply, demand, market uncertainty and a variety of other uncontrollable factors, such as:

- the level of domestic production and consumer demand;
- the availability of imported oil and actions taken by foreign oil producing nations;
- the availability of alternative transportation systems with adequate capacity;
- the availability of competitive fuels;
- fluctuating demand for oil and other hydrocarbon products;
- the impact of conservation efforts;
- the level of excess production capacity;
- the cost of exploring for, producing and delivering oil and gas;

17

BLFG_EDPA2274437

Table of Contents

- weather conditions;
- political uncertainty and sociopolitical unrest;
- technological advances affecting energy consumption;
- governmental regulation and taxation; and
- prevailing economic conditions.

The crude oil currently transported by Bridger originates from existing domestic resource basins, which naturally deplete over time. To offset this natural decline, Bridger' assets will need access to production from newly discovered or newly developed properties. Many economic and business factors beyond our control can adversely affect the decision by producers to explore for and develop new reserves. These factors could include relatively low oil prices, cost and availability of equipment and labor, regulatory changes, capital budget limitations, the lack of available capital or the probability of success in finding hydrocarbons. A decrease in exploration and development activities in the regions where Bridger's assets are located could result in a decrease in volumes transported over time, which materially and adversely affect Bridger's results of operations and cash flows and accordingly, negatively impact our ability to make distributions or pay interest or principal on debt securities.

*Bridger may not be able to compete effectively in its logistics activities.*

Bridger faces competition in all aspects of its business and we can give no assurances that we and it will be able to compete effectively against its competitors. In general, competition comes from a wide variety of players in a wide variety of contexts, including new entrants and existing players and in connection with day-to-day business, expansion capital projects, acquisitions and joint venture activities. Some of Bridger's competitors have capital resources many times greater than ours and may contract to control greater supplies of crude oil.

*Bridger is subject to the risk of a capacity overbuild of midstream energy infrastructure in the areas where it operates.*

A significant driver of competition in some of the markets where Bridger operates (including, for example, the Eagle Ford, Permian Basin, and Rockies/Bakken areas) is the rapid development of new midstream energy infrastructure capacity driven by the combination of (i) significant increases in oil and gas production and development in the applicable production areas, both actual and anticipated, (ii) relatively low barriers to entry and (iii) generally widespread access to relatively low cost capital. Accordingly, Bridger is exposed to the risk that these areas become overbuilt and/or oversupplied, resulting in an excess of oil transportation, logistics and infrastructure capacity. Bridger is also exposed to the risk that expectations for oil and gas development in any particular area may not be realized or that too much logistics capacity is developed relative to the demand for services that ultimately materializes. In addition, as an established player in some markets, Bridger may also face competition from aggressive new entrants to the market that are willing to provide services at a discount in order to establish relationships and gain a foothold in the market.

*Rail and marine transportation of crude oil have inherent operating risks.*

Bridger's operations include transporting crude oil on rail cars or barges. Such cargo are at risk of being damaged or lost because of events such as derailment, marine disaster, inclement weather, mechanical failures, grounding or collision, fire, explosion, environmental accidents, terrorism and political instability. Such occurrences could result in death or injury to persons, loss of property or environmental damage, delays in the delivery of cargo, loss of revenues, termination of contracts, governmental fines, penalties or restrictions on conducting business, higher insurance rates and damage to its or our reputation and customer relationships generally. Any of these circumstances or events could increase Bridger's costs or lower its revenues.

*The minimum volume commitment under Bridger's largest revenue customer agreement depends on its customer maintaining a specified minimum volume.*

Bridger's largest customer contract is with a refinery pursuant to which it transports crude oil via rail and barge from the Bakken region to Pennsylvania. That agreement contains a minimum volume commitment and payment obligation from the refinery of 65 MBbls per day. However, that commitment would be suspended in the case of force majeure, and also would be suspended for any month in which Bridger delivers less than an average of 35 MBbls per day for such month to the Trainer refinery. If the refinery's demand for crude oil drops below that threshold for a material length of time, whether because of a force majeure event or otherwise, Bridger's cash flows would be adversely affected. Force majeure events include revolutions, wars, acts of enemies, embargoes, import or export restrictions, strikes, lockouts, fires, storms, floods, acts of God, explosions, mechanical or physical failures of our equipment or facilities of customers.

*Our business would be adversely affected if service on the railroads we use is interrupted.*

18

BLFG_EDPA2274438

Table of Contents

We do not own or operate the railroads on which the railcars we use are transported. Any disruptions in the operations of these railroads could adversely impact our ability to deliver product to our customers.

*Increased trucking and rail regulations may increase Bridger's costs or make it more difficult for it to attract or retain qualified drivers, which could negatively affect its results of operations.*

In connection with the trucking services Bridger provides, it operates as a motor carrier and, therefore, is subject to regulation by the Department of Transportation (the "DOT"), and by various state agencies. These regulatory authorities exercise broad powers, governing activities such as the authorization to engage in motor carrier operations and regulatory safety. The trucking industry is subject to possible regulatory and legislative changes that may affect the economics of the industry by requiring changes in operating practices or by changing the demand for common or contract carrier services or the cost of providing truckload services. These possible changes include increasingly stringent environmental regulations, changes in the regulations that govern the amount of time a driver may drive in any specific period, onboard black box recorder devices or limits on vehicle weight and size.

Similarly, Bridger's rail transportation services are subject to regulation by the DOT and other agencies. Recent derailments of trains carrying crude oil have brought increased attention by regulators to the transport of flammable materials by rail. In May 2015, the DOT issued final rules for oil-by-rail transportation requiring that certain older tank cars be phased out of operation and that new tank cars comply with certain design requirements. All tank cars built after October 1, 2015 must meet these new standards. DOT-111 tank cars must be retrofitted or replaced within three years and CPC-1232 tank cars without insulating jackets must be retrofitted or replaced within five years. Bridger estimates that it will cost approximately $30 million to bring its tank cars into compliance with the new standards. Failure to meet these compliance deadlines or other requirements could result in fines or other penalties, and could affect Bridger's costs or operations.

*Compliance with environmental, health and safety laws and regulations could result in costs.*

Bridger's crude oil logistics services are subject to stringent federal, state and local laws and regulations relating to the discharge of materials into the environment or otherwise relating to protection of the environment or human health and safety. Compliance with current and future environmental laws and regulations may increase its overall cost of business, including its capital costs to construct, maintain and upgrade equipment and facilities. Failure to comply with these laws and regulations may result in the assessment of significant administrative, civil and criminal penalties, the imposition of investigatory and remedial liabilities, and even the issuance of injunctions that may restrict or prohibit some or all of its operations. Furthermore, environmental laws and regulations are subject to change, resulting in potentially more stringent requirements, and we cannot provide any assurance that the cost of compliance with current and future laws and regulations will not have a material effect on the results of operations or earnings associated with Bridger's crude oil logistics business.

*Bridger's crude oil logistics operations are subject to all of the risks and operational hazards inherent in gathering, transporting and storing crude oil.*

Such risks include:

- mechanical or structural failures with respect to our assets, at our facilities or with respect to third-party assets or facilities on which our operations are dependent;
- damages to pipelines and facilities, related equipment and surrounding properties caused by earthquakes, floods, fires, severe weather, explosions and other natural disasters and acts of terrorism; and
- the inability of third-party facilities on which our operations are dependent, to complete capital projects and to restart timely refining operations following a shutdown.

*The fees charged to customers under Bridger's agreements for its logistics services may not escalate sufficiently to cover increases in costs and the agreements may be suspended in some circumstances, which would affect our profitability.*

Bridger's costs may increase at a rate greater than the rate that the fees that it charges to customers increase pursuant to their contracts with them. Additionally, some customers' obligations under their agreements may be permanently or temporarily reduced upon the occurrence of certain events, some of which are beyond Bridger's control, including force majeure events wherein the supply of crude oil, condensate, and/or natural gas liquids are curtailed or cut off. Force majeure events include revolutions, wars, acts of enemies, embargoes, import or export restrictions, strikes, lockouts, fires, storms, floods, acts of God, explosions, mechanical or physical failures of our equipment or facilities of customers. If the escalation of fees is insufficient to cover increased costs or if any customer suspends or terminates its contracts with Logistics, our profitability could be materially and adversely affected.

19

BLFG_EDPA2274439

Table of Contents

*As a result of the acquisition of Bridger, the scope and size of our operations and business has substantially changed. We cannot provide assurance that our expansion in size and into the midstream domestic crude oil transportation and Bridger industry will be successful.*

The acquisition of Bridger substantially expanded the scope and size of our business by adding substantial midstream crude oil assets and operations to our existing assets and operations. Prior to this acquisition, our operations consisted of propane and related equipment sales and the operation of salt water disposal wells. Bridger's operations focus on providing domestic crude oil transportation and logistics, which is a new line of business for us. Providing domestic crude oil transportation and logistics requires different operating strategies and managerial expertise than our current operations and are subject to additional or different regulatory requirements.

The anticipated future growth of our business will impose significant added responsibilities on management, including the need to identify, recruit, train and integrate additional employees. The rapid and significant growth may place strain on our administrative and operational infrastructure. Our senior management's attention may be diverted from the management of daily operations to the integration of the assets acquired in the Bridger acquisition. Our ability to manage our business and growth will require us to continue to improve our operational, financial and management controls, reporting systems and procedures. We may also encounter risks, costs and expenses associated with any undisclosed or other unanticipated liabilities, use more cash and other financial resources on integration and implementation activities than we expect. We may not be able to successfully integrate Bridger's operations into our existing operations, successfully manage this new line of business or realize the expected economic benefits of the Bridger acquisition, which may have a material adverse effect on our business, financial condition and results of operations, including our distributable cash flow.

Risks Inherent in Our Midstream Operations - Water Solutions Business

*Our revenues are highly dependent on the quantity of crude oil we collect from our skimming oil process and the market price we receive for the sale of this crude oil.*

A significant portion of our revenues comes from the sale of crude oil we separate from salt water in our skimming oil process. A significant decrease in the ratio of crude oil to salt water we process could significantly lower the quantity of crude oil we are able to collect from our skimming oil process. This ratio is, among other things, a function of water temperature. Generally, where water temperature is higher, crude oil content is lower. Thus, our skimming oil process yields more crude oil during the winter season than during the summer season. Additionally, crude oil content will decrease if, among other things, producers begin recovering higher levels of crude oil in the salt water stream prior to delivering such water to us for processing. A significant decrease in the market price for crude oil could lower the price we are able to charge for crude oil we have collected from our skimming oil process. Either of these effects could have a material adverse effect on our financial condition, results of operations and cash flows.

*We are subject to federal, state and local regulations regarding issues of health, safety, transportation, and protection of natural resources and the environment. Under these regulations, we may become liable for penalties, damages or costs of remediation. Any changes in laws and government regulations could increase our costs of doing business.*

Hydraulic fracturing is a commonly used process that involves using water, sand and certain chemicals to fracture the hydrocarbon-bearing rock formation to allow flow of hydrocarbons into the wellbore. Federal and state legislation and regulatory initiatives relating to hydraulic fracturing are expected to result in increased costs and additional operating restrictions for oil and gas explorers and producers. The adoption of any future federal or state laws or implementing regulations imposing reporting obligations on, or otherwise limiting, the hydraulic fracturing process would make it more difficult and more expensive to complete new wells in the unconventional shale resource formations and increase costs of compliance and doing business for oil and natural gas operators. As a result of such increased costs, the pace of oil and gas activity could be slowed, resulting in less need for water management solutions. These effects could have a material adverse effect on our financial condition, results of operations and cash flows.

On August 18, 2015, the EPA announced a proposed rule that would change the New Source Performance Standards under the Clean Air Act for the oil and gas industry in a way designed to curb methane emissions at natural gas well sites. This rule will

20

Table of Contents

increase the costs of hydraulic fracturing operations and may slow demand for our water solutions business. The regulation of hydraulic fracturing activity continues to be controversial, and changes to regulations will impact demand for our services.

Our water solutions operations are subject to other federal, state and local laws and regulations relating to protection of natural resources and the environment, health and safety, waste management, and transportation and disposal of produced-water and other materials. For example, our midstream operations water solutions segment includes disposal into injection wells that could pose some risks of environmental liability, including leakage from the wells to surface or subsurface soils, surface water or groundwater. Liability under these laws and regulations could result in cancellation of well operations, fines and penalties, expenditures for remediation, and liability for property damage, personal injuries and natural resource damage. Sanctions for noncompliance with applicable environmental laws and regulations also may include assessment of administrative, civil and criminal penalties, revocation of permits and issuance of orders to assess and clean up contamination.

In the course of our operations, some of our equipment may be exposed to naturally occurring radiation associated with oil and natural gas deposits, and this exposure may result in the generation of wastes containing technically enhanced, naturally occurring radioactive materials, or "TENORM." TENORM wastes exhibiting trace levels of naturally occurring radiation in excess of established standards are subject to special handling and disposal requirements, and any storage vessels, piping and work area affected by TENORM may be subject to remediation or restoration requirements. In addition, federal and state safety and health requirements impose limitations on worker exposure to TENORM, which requirements increase our costs. Because many of the properties presently or previously owned, operated or occupied by us have been used for oil and natural gas production operations for many years, it is possible that we may incur costs or liabilities associated with elevated levels of TENORM, particularly if TENORM requirements become more stringent over time.

Failure to comply with these laws and regulations could result in the assessment of administrative, civil or criminal penalties, imposition of assessment, cleanup, natural resource loss and site restoration costs and liens, revocation of permits, and, to a lesser extent, orders to limit or cease certain operations. In addition, certain environmental laws impose strict and/or joint and several liability, which could cause us to become liable for the conduct of others or for consequences of our own actions that were in compliance with all applicable laws at the time of those actions regardless of fault and irrespective of when the acts occurred. We may be required to make large expenditures to comply with environmental safety and other laws and regulations.

*Demand for our water solutions services is substantially dependent on the levels of expenditures and production by the oil and gas industry. A substantial or an extended decline in commodity prices could result in lower expenditures and production by the oil and gas industry, which could have a material adverse effect on our financial condition, results of operations and cash flows and our ability to make distributions or pay interest or principal on debt securities.*

A portion of the demand for our water solutions services depends substantially on the level of expenditures by the oil and gas industry for the exploration, development and production of oil and natural gas reserves. These expenditures are generally dependent on the industry's view of future oil and natural gas prices and are sensitive to the industry's view of future economic growth and the resulting impact on demand for oil and natural gas. Declines, as well as anticipated declines, in oil and gas prices could also result in project modifications, delays or cancellations, general business disruptions, and delays in, or nonpayment of, amounts that are owed to us. These effects could have a material adverse effect on our financial condition, results of operations and cash flows.

In recent years, the price of crude oil has been volatile, and we expect this volatility to continue. Generally, the price of crude oil is subject to fluctuations in response to changes in supply, demand, market uncertainty and a variety of other uncontrollable factors, such as:

- the level of domestic production and consumer demand;
- the availability of imported oil and actions taken by foreign oil producing nations;
- the availability of alternative transportation systems with adequate capacity;
- the availability of competitive fuels;
- fluctuating demand for oil and other hydrocarbon products;
- the impact of conservation efforts;
- the level of excess production capacity;
- the cost of exploring for, producing and delivering oil and gas;
- weather conditions;

BLFG_EDPA2274441

Table of Contents

- political uncertainty and sociopolitical unrest;
- technological advances affecting energy consumption;
- governmental regulation and taxation; and
- prevailing economic conditions.

The oil and gas industry has historically experienced, and is currently experiencing, periodic downturns. A continued or further downturn in the oil and gas industry could result in a reduction in demand for our water solutions services and could adversely affect our financial condition, results of operations and cash flows and, accordingly, negatively impact our ability to make distributions or pay interest or principal on debt securities.

The crude gathered and sold by water solutions originates from existing domestic resource basins, which naturally deplete over time. To offset this natural decline, water solutions' assets will need access to production from newly discovered or newly developed properties. Many economic and business factors beyond our control can adversely affect the decision by producers to explore for and develop new reserves.  These factors could include relatively low oil prices, cost and availability of equipment and labor, regulatory changes, capital budget limitations, the lack of available capital or the probability of success in finding hydrocarbons.  A decrease in exploration and development activities in the regions where water solutions' assets are located could result in a decrease in volumes transported over time, which materially and adversely affect water solutions' results of operations and cash flows and accordingly, negatively impact our ability to make distributions or pay interest or principal on debt securities.

*Competitors in the market place for water solutions services may hinder our ability to compete.*

We face competition in our water solutions business from several other water management companies, some of which are much larger enterprises than us. As a result, our ability to effectively enter into additional water solutions arrangements or acquire other operations could be hindered by competition.

*Some oil and gas producers have their own water solutions services, which could limit the demand for our services.*

Our water solutions business is predicated on providing salt water disposal solutions to oil and gas producers. Some of the larger oil and gas producers have their own salt water disposal solutions and some have even implemented their own injection well sites to dispose of the salt water produced from their own oil and gas drilling activities. With access to their own salt water disposal solutions, larger oil and gas producers could have less need for the salt water disposal solutions that we provide. A lower demand for our services could adversely affect our financial position, results of operations and cash flows.

*Advancements in water treatment technologies could render our disposal wells technologically obsolete which could adversely affect our business and results of operations.*

Evolving customer and regulatory demands could result in technological advancements in the treatment and recycling of salt water used in the hydraulic fracturing process. Such advancements could render our disposal wells obsolete.

*The availability of water is critical to our business and weather condition, natural disasters, droughts or other natural conditions could affect that availability and impose significant costs and losses on our business.*

Our ability to provide water solutions operations is subject to the availability of water, which is vulnerable to adverse weather conditions, including extended droughts and temperature extremes, which are quite common, in our operating regions, but difficult to predict. This risk is particularly true with respect to regions where oil and gas operations are significant. In extreme cases, entire operations may be unable to continue without substantial water reserves. These factors can increase costs, decrease revenues and lead to additional charges to earnings, which may have a material adverse effect on our financial position, results of operations and cash flows.

*Salt water injection wells potentially may create earthquakes.*

22

Table of Contents

There are current theories that hypothesize a causation link between minor seismic events and injection wells and there are various studies being conducted to determine possible man-made causes of recent seismic events. If it is determined that there is a link between injection wells and seismic events this could have an adverse impact on our financial position, results of operations and cash flows.

Recent published studies have purported to find a causal connection between the deep well injection of hydraulic fracturing wastewater and a sharp increase in seismic activity in Oklahoma and Texas since 2008. In Texas, where all of our water services facilities are located, one recently published study has suggested that gas fluid injection was the most likely cause of recent earthquakes in north Texas. These findings may trigger new legislation or regulations that would limit or ban the disposal of oil and gas production wastewater in deep injection wells. If such new laws or rules were adopted, our operations may be curtailed while alternative treatment and disposal methods are developed and approved. Increased seismic activity may galvanize public opposition to hydraulic fracturing, perhaps giving rise to local fracking bans or causing us to expend additional resources on public outreach. In addition, it may give rise to private tort suits from individuals who claim they are adversely by seismic activity, again requiring us to expend additional resources.

*Due to our lack of asset and geographic diversification, adverse developments in the areas in which we are located could adversely impact our financial condition, results of operations and cash flows and reduce our ability to make distributions to our unitholders.*

Our salt water disposal facilities are located exclusively in Texas. This concentration could disproportionately expose us to operational, economic and regulatory risk in this area. Additionally, our salt water disposal facilities consist of nine managed facilities. Any operational, economic or regulatory issues at a single facility could have a material adverse impact on us. Due to the lack of diversification in our assets and the location of our assets, adverse developments in the our markets, including, for example, transportation constraints, adverse regulatory developments, or other adverse events at one of our facilities, could have a significantly greater impact on our financial condition, results of operations and cash flows than if we were more diversified.

*A substantial portion of the revenues from our water solutions operations is concentrated with a single customer under a master service agreement that may be terminated at will.*

The salt water barrels we receive for disposal and from which our gross margin is generated is concentrated with a single customer. For fiscal 2015, 28% of our water disposal gross margin was generated from this customer in accordance with a master services agreement. Continued relations with this customer depends upon various factors, including price, customer service and competition. If this customer materially reduces, terminates or requires price reductions or other adverse modifications in our master service agreement terms, our results from midstream operations may decline.

Risks Inherent to Our Business Structure

*Our substantial debt and other financial obligations could impair our financial condition and our ability to fulfill our obligations.*

We have substantial indebtedness and other financial obligations. As of July 31, 2015:

- we had total indebtedness of approximately $1.95 billion;

- Ferrellgas Partners had partners' capital of approximately $207.7 million;

- we had availability under our credit facility of approximately $327.4 million; and

- we had aggregate future minimum rental commitments under non-cancelable operating leases of approximately $147.7 million; provided, however, if we elect to purchase the underlying assets at the end of the lease terms, such aggregate buyout would be $22.8 million.

We have long and short-term payment obligations with maturity dates ranging from fiscal 2016 to 2023 that bear interest at rates ranging from 6.5% to 9.5%. Borrowings from our secured credit facility classified as "Long-term debt" of $136.1 million currently bear an interest rate of 2.7%. As of July 31, 2015, the long-term obligations do not contain any sinking fund provisions but do require the following aggregate principal payments, without premium, during the following fiscal years:

- $3.6 million - 2016

23

BLFG_EDPA2274443

Table of Contents

- $3.2 million - 2017;

- $1.7 million - 2018;

- $1.2 million - 2019;

- $136.4 million - 2020; and

- $1,657.9 million - thereafter.

Our secured credit facility provides $600.0 million in revolving credit for loans and has a $200.0 million sublimit for letters of credit. The obligations under this credit facility are secured by substantially all assets of the operating partnership, the general partner and certain subsidiaries of the operating partnership but specifically excluding (a) assets that are subject to the operating partnership's accounts receivable securitization facility, (b) the general partner's equity interest in Ferrellgas Partners and (c) equity interest in certain unrestricted subsidiaries. Such obligations are also guaranteed by the general partner and certain subsidiaries of the operating partnership. The secured credit facility will mature in October 2018.

All of the indebtedness and other obligations described above are obligations of the operating partnership except for $182.0 million in aggregate principal value of senior notes due in 2020 issued by Ferrellgas Partners and Ferrellgas Partners Finance Corp.

Subject to the restrictions governing the operating partnership's indebtedness and other financial obligations and the indenture governing Ferrellgas Partners' and Ferrellgas Partners' Finance Corp.'s outstanding senior notes due 2020, we may incur significant additional indebtedness and other financial obligations, which may be secured and/or structurally senior to any debt securities we may issue.

Our substantial indebtedness and other financial obligations could have important consequences to our security holders. For example, it could:

- make it more difficult for us to satisfy our obligations with respect to our securities;

- impair our ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, general corporate purposes or other purposes;

- result in higher interest expense in the event of increases in interest rates since some of our debt is, and will continue to be, at variable rates of interest;

- impair our operating capacity and cash flows if we fail to comply with financial and restrictive covenants in our debt agreements and an event of default occurs as a result of that failure that is not cured (or waived);

- require us to dedicate a substantial portion of our cash flow to payments on our indebtedness and other financial obligations, thereby reducing the availability of our cash flow to fund distributions, working capital, capital expenditures and other general partnership requirements;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and

- place us at a competitive disadvantage compared to our competitors that have proportionately less debt.

*Disruptions in the capital and credit markets may adversely affect our business, including the availability and cost of debt and equity issuances for liquidity requirements, our ability to meet long-term commitments and our ability to hedge effectively; each could adversely affect our results of operations, cash flows and financial condition.*

We rely on our ability to access the capital and credit markets at rates and terms reasonable to us. A disruption in the capital and credit markets could impair our ability to access capital and credit markets at rates and terms reasonable to us. This could limit our ability to access capital or credit markets for working capital needs, risk management activities and long-term debt maturities, or could force us to access capital and credit markets at rates or terms normally considered to be unreasonable or force us to take other aggressive actions including the suspension of our quarterly distribution.

*Ferrellgas Partners or the operating partnership may be unable to refinance their indebtedness or pay that indebtedness if it becomes due earlier than scheduled.*

If Ferrellgas Partners or the operating partnership are unable to meet their debt service obligations or other financial obligations, they could be forced to:

- restructure or refinance their indebtedness;

24

BLFG_EDPA2274444

Table of Contents

- enter into other necessary financial transactions;
- reduce or suspend Ferrellgas Partners' distributions;
- seek additional equity capital; or
- sell their assets.

They may then be unable to obtain such financing or capital or sell their assets on satisfactory terms, if at all. Their failure to make payments, whether after acceleration of the due date of that indebtedness or otherwise, or our failure to refinance the indebtedness would impair their operating capacity and cash flows.

*Restrictive covenants in the agreements governing our indebtedness and other financial obligations may reduce our operating flexibility.*

The indenture governing the outstanding notes of Ferrellgas Partners and the agreements governing the operating partnership's indebtedness and other financial obligations contain, and any indenture that will govern debt securities issued by Ferrellgas Partners or the operating partnership may contain, various covenants that limit our ability and the ability of specified subsidiaries of ours to, among other things:

- incur additional indebtedness;

- make distributions to our unitholders;

- purchase or redeem our outstanding equity interests or subordinated debt;

- make specified investments;

- create or incur liens;

- sell assets;

- engage in specified transactions with affiliates;

- restrict the ability of our subsidiaries to make specified payments, loans, guarantees and transfers of assets or interests in assets;

- engage in sale-leaseback transactions;

- effect a merger or consolidation with or into other companies or a sale of all or substantially all of our properties or assets; and

- engage in other lines of business.

These restrictions could limit the ability of Ferrellgas Partners, the operating partnership and our other subsidiaries:

- to obtain future financings;

- to make needed capital expenditures;

- to withstand a future downturn in our business or the economy in general; or

- to conduct operations or otherwise take advantage of business opportunities that may arise.

Some of the agreements governing our indebtedness and other financial obligations also require the maintenance of specified financial ratios and the satisfaction of other financial conditions. Our ability to meet those financial ratios and conditions can be affected by unexpected downturns in business operations beyond our control, such as significantly warmer-than-normal weather, a volatile energy commodity cost environment or an economic downturn. Accordingly, we may be unable to meet these ratios and conditions. This failure could impair our operating capacity and cash flows and could restrict our ability to incur debt or to make cash distributions, even if sufficient funds were available.

Our breach of any of these covenants or the operating partnership's failure to meet any of these ratios or conditions could result in a default under the terms of the relevant indebtedness, which could cause such indebtedness or other financial obligations, and by reason of cross-default provisions, any of Ferrellgas Partners' or the operating partnership's other outstanding notes or future debt securities, to become immediately due and payable. If we were unable to repay those amounts, the lenders could initiate a bankruptcy proceeding or liquidation proceeding or proceed against the collateral, if any. If the lenders of the operating partnership's indebtedness or other financial obligations accelerate the repayment of borrowings or other amounts owed, we may not have sufficient assets to repay our indebtedness or other financial obligations, including our outstanding notes and any future debt securities.

25

BLFG_EDPA2274445

Table of Contents

*Our results of operations and our ability to make distributions or pay interest or principal on debt securities could be negatively impacted by price and inventory risk related to propane and management of these risks.*

The amount of gross profit we earn on the distribution of propane depends significantly on the excess of the sales price over our costs to purchase and distribute propane. Consequently, our profitability is sensitive to changes in energy prices, in particular, changes in wholesale propane prices. Propane is a commodity whose market price can fluctuate significantly based on changes in supply, changes in other energy prices or other market conditions. We have no control over these market conditions. In general, product supply contracts permit suppliers to charge posted prices plus transportation costs at the time of delivery or the current prices established at major delivery points. Any increase in the price of product could reduce our gross profit because we may not be able to immediately pass rapid increases in such costs, or costs to distribute product, on to our customers.

While we generally attempt to minimize our inventory risk by purchasing product on a short-term basis, we may purchase and store propane or other natural gas liquids depending on inventory and price outlooks. We may purchase large volumes of propane at the then current market price during periods of low demand and low prices, which generally occurs during the summer months. The market price for propane could fall below the price at which we made the purchases, which would adversely affect our profits or cause sales from that inventory to be unprofitable. A portion of our inventory is purchased under supply contracts that typically have a one-year term and at a price that fluctuates based on the prevailing market prices. Our contracts with our independent portable tank exchange distributors provide for a portion of our payment to the distributor to be based upon a price that fluctuates based on the prevailing propane market prices. To limit our overall price risk, we may purchase and store physical product and enter into fixed price over-the-counter energy commodity forward contracts, swaps and options that have terms of up to 36 months. This strategy may not be effective in limiting our price risk if, for example, weather conditions significantly reduce customer demand, or market or weather conditions prevent the delivery of physical product during periods of peak demand, resulting in excess physical product after the end of the winter heating season and the expiration of related forward or option contracts.

Some of our sales are pursuant to commitments at contracted price agreements. To manage these commitments, we may purchase and store physical product and/or enter into fixed price-over-the-counter energy commodity forward contracts, swaps and options. We may enter into these agreements at volume levels that we believe are necessary to mitigate the price risk related to our anticipated sales volumes under the commitments. If the price of propane declines and our customers purchase less propane than we have purchased from our suppliers, we could incur losses when we sell the excess volumes. If the price of propane increases and our customers purchase more propane than we have purchased from our suppliers, we could incur losses when we are required to purchase additional propane to fulfill our customers' orders. The risk management of our inventory and contracts for the future purchase of product could impair our profitability if the price of product changes in ways we do not anticipate.

The Board of Directors of our general partner has adopted a commodity risk management policy which places specified restrictions on all of our commodity risk management activities such as limits on the types of commodities, loss limits, time limits on contracts and limitations on our ability to enter into derivative contracts. The policy also requires the establishment of a risk management committee that includes senior executives. This committee is responsible for monitoring commodity risk management activities, establishing and maintaining timely reporting and establishing and monitoring specific limits on the various commodity risk management activities. These limits may be waived on a case-by-case basis by a majority vote of the risk management committee and/or Board of Directors, depending on the specific limit being waived. From time to time, for valid business reasons based on the facts and circumstances, authorization has been granted to allow specific commodity risk management positions to exceed established limits. If we sustain material losses from our risk management activities due to our failure to anticipate future events, a failure of the policy, incorrect waivers or otherwise, our ability to make distributions to our unitholders or pay interest or principal of any debt securities may be negatively impacted as a result of such loss.

*Our results of operations and our ability to make distributions or pay interest or principal on debt securities could be negatively impacted by risks related to our midstream operations and the management of these risks.*

The amount of operating income we earn from midstream operations depends significantly on the price and availability of crude oil. In recent years, the price of crude oil has been volatile, and we expect this volatility to continue. Generally, the price of crude oil is subject to fluctuations in response to changes in supply, demand, market uncertainty and a variety of other uncontrollable factors, such as: (i) the level of domestic production and consumer demand; (ii) the availability of imported oil and actions taken by foreign oil producing nations; (iii) the availability of alternative transportation systems with adequate capacity; (iv) the availability of competitive fuels; (v) fluctuating and seasonal demand for oil and other hydrocarbon products; (vi) the impact of conservation efforts; (vii) governmental regulation and taxation; and (viii) prevailing economic conditions. The crude oil currently transported by Bridger or gathered and sold by water solutions originate from existing domestic resource basins, which naturally deplete over time. To offset this natural decline, Bridger's and water solutions' assets will need access to production from newly discovered properties. Many economic and business factors beyond our control can adversely affect the

26

Table of Contents

decision by producers to explore for and develop new reserves. These factors could include relatively low oil prices, cost and availability of equipment and labor, regulatory changes, capital budget limitations, the lack of available capital or the probability of success in finding hydrocarbons. A decrease in exploration and development activities in the regions where Bridger's and water solutions' assets are located could result in a decrease in volumes transported over time, which materially and adversely affect Bridger's and water solutions' results of operations and cash flows.

*The availability of cash from our secured credit facility and accounts receivable securitization may be impacted by many factors beyond our control.*

We typically borrow on the operating partnership's secured credit facility or sell accounts receivable under its accounts receivable securitization facility to fund our working capital requirements. We may also borrow on these facilities to fund debt service payments, distributions to our unitholders, acquisition and capital expenditures. We purchase product from suppliers and make payments with terms that are typically within five to ten days of delivery. We believe that the availability of cash from the operating partnership's secured credit facility and the accounts receivable securitization facility will be sufficient to meet our future working capital, debt service, distributions to our unitholders, acquisitions, and capital expenditure needs. However, if we were to experience an unexpected significant increase in these requirements or have insufficient funds to fund distributions, our needs could exceed our immediately available resources. Events that could cause increases in these requirements include, but are not limited to the following:

- a significant increase in the wholesale cost of propane;
- a significant reduction in the production of crude oil;
- a significant delay in the collections of accounts receivable;
- increased volatility in energy commodity prices related to risk management activities;
- increased liquidity requirements imposed by insurance providers;
- a significant downgrade in our credit rating leading to decreased trade credit;
- a significant acquisition; or
- a large uninsured unfavorable lawsuit result or settlement.

As is typical in the propane industry, our retail customers do not pay upon receipt, but generally pay between 30 and 60 days after delivery. Our water solutions and crude oil logistics customers generally pay between 20 and 50 days after delivery or completion of service. During the winter heating season, we experience significant increases in accounts receivable and inventory levels and thus a significant decline in working capital availability. Although we have the ability to fund working capital with borrowings from the operating partnership's secured credit facility and sales of accounts receivable under its accounts receivable securitization facility, we cannot predict the effect that increases in propane prices and colder-than-normal winter weather may have on future working capital availability.

*We may not be successful in making acquisitions and any acquisitions we make may not result in our anticipated results; in either case, this failure would potentially limit our growth, limit our ability to compete and impair our results of operations.*

We have historically expanded our business through acquisitions. We regularly consider and evaluate opportunities to acquire propane distributors and oil and gas midstream operations. We may choose to finance these acquisitions through internal cash flow, external borrowings or the issuance of additional common units or other securities. We have substantial competition for acquisitions, and although we believe there are numerous potential large and small acquisition candidates in these industries, there can be no assurance that:

- we will be able to acquire any of these candidates on economically acceptable terms, which may include the assumption of known or unknown liabilities such as environmental liabilities and indemnity limitations;

- we will be able to successfully integrate acquired operations with any expected cost savings;

- any acquisitions made will not be dilutive to our earnings and distributions;

- we will not have unforeseen difficulties operating in new geographic areas or in new business segments;

- management's and employees' attention will not be diverted from other business concerns'

- we will not have customer or key employee loss from the acquired businesses;

- any additional equity we issue as consideration for an acquisition will not be dilutive to our unitholders; or

- any additional debt we incur to finance an acquisition will not affect the operating partnership's ability to make distributions to Ferrellgas Partners or service the operating partnership's existing debt.

27

BLFG_EDPA2274447

Table of Contents

*We are subject to operating and litigation risks, which may not be covered by insurance.*

Our propane and related equipment sales segment, and water solutions and crude oil midstream segments, are subject to all operating hazards and risks normally incidental to the handling, storing and delivering of combustible liquids such as propane and crude oil. These operations face an inherent risk of exposure to general liability claims in the event that the use of these facilities results in injury or destruction of property. As a result, we have been, and are likely to be, a defendant in various legal proceedings arising in the ordinary course of business. Our insurance policies do not cover all losses, costs or liabilities that we may experience, and insurance companies that currently insure companies in the energy industry may cease to do so or substantially increase premiums. We maintain insurance policies with insurers in such amounts and with such coverages and deductibles as we believe are reasonable and prudent. However, we cannot guarantee that such insurance will be adequate to protect us from all material expenses related to potential future claims for personal injury and property damage or that such levels of insurance will be available in the future at economical prices.

Risks Inherent to an Investment in Our Debt Securities

*Ferrellgas Partners and the operating partnership are required to distribute all of their available cash to their equity holders and Ferrellgas Partners and the operating partnership are not required to accumulate cash for the purpose of meeting their future obligations to holders of their debt securities, which may limit the cash available to service those debt securities.*

Subject to the limitations on restricted payments contained in the indenture that governs Ferrellgas Partners' outstanding notes, the instruments governing the outstanding indebtedness of the operating partnership and any applicable indenture that will govern any debt securities Ferrellgas Partners or the operating partnership may issue, the partnership agreements of both Ferrellgas Partners and the operating partnership require us to distribute all of our available cash each fiscal quarter to our limited partners and our general partner and do not require us to accumulate cash for the purpose of meeting obligations to holders of any debt securities of Ferrellgas Partners or the operating partnership. Available cash is generally all of our cash receipts, less cash disbursements and adjustments for net changes in reserves. As a result of these distribution requirements, we do not expect either Ferrellgas Partners or the operating partnership to accumulate significant amounts of cash. Depending on the timing and amount of our cash distributions and because we are not required to accumulate cash for the purpose of meeting obligations to holders of any debt securities of Ferrellgas Partners or the operating partnership, such distributions could significantly reduce the cash available to us in subsequent periods to make payments on any debt securities of Ferrellgas Partners or the operating partnership.

*Debt securities of Ferrellgas Partners will be structurally subordinated to all indebtedness and other liabilities of the operating partnership and its subsidiaries.*

Debt securities of Ferrellgas Partners will be effectively subordinated to all existing and future claims of creditors of the operating partnership and its subsidiaries, including:

- the lenders under the operating partnership's indebtedness;
- the claims of lessors under the operating partnership's operating leases;
- the claims of the lenders and their affiliates under the operating partnership's accounts receivable securitization facility;
- debt securities, including any subordinated debt securities, issued by the operating partnership; and
- all other possible future creditors of the operating partnership and its subsidiaries.

This subordination is due to these creditors' priority as to the assets of the operating partnership and its subsidiaries over Ferrellgas Partners' claims as an equity holder in the operating partnership and, thereby, indirectly, the claims of holders of Ferrellgas Partners' debt securities. As a result, upon any distribution to these creditors in a bankruptcy, liquidation or reorganization or similar proceeding relating to Ferrellgas Partners or its property, the operating partnership's creditors will be entitled to be paid in full before any payment may be made with respect to Ferrellgas Partners' debt securities. Thereafter, the holders of Ferrellgas Partners' debt securities will participate with its trade creditors and all other holders of its indebtedness in the assets remaining, if any. In any of these cases, Ferrellgas Partners may have insufficient funds to pay all of its creditors, and holders of its debt securities may therefore receive less, ratably, than creditors of the operating partnership and its subsidiaries. As of July 31, 2015, the operating partnership had approximately $1.77 billion of outstanding indebtedness and other liabilities to which any of the debt securities of Ferrellgas Partners will effectively rank junior.

*All payments on any subordinated debt securities that we may issue will be subordinated to the payments of any amounts due on any senior indebtedness that we may have issued or incurred.*

The right of the holders of subordinated debt securities to receive payment of any amounts due to them, whether interest, premium or principal, will be subordinated to the right of all of the holders of our senior indebtedness, as such term will be

28

BLFG_EDPA2274448

Table of Contents

defined in the applicable subordinated debt indenture, to receive payments of all amounts due to them. If an event of default on any of our senior indebtedness occurs, then until such event of default has been cured, we may be unable to make payments of any amounts due to the holders of our subordinated debt securities. Accordingly, in the event of insolvency, creditors who are holders of our senior indebtedness may recover more, ratably, than the holders of our subordinated debt securities.

*Debt securities of Ferrellgas Partners are expected to be non-recourse to the operating partnership, which will limit remedies of the holders of Ferrellgas Partners' debt securities.*

Ferrellgas Partners' obligations under any debt securities are expected to be non-recourse to the operating partnership. Therefore, if Ferrellgas Partners should fail to pay the interest or principal on the notes or breach any of its other obligations under its debt securities or any applicable indenture, holders of debt securities of Ferrellgas Partners will not be able to obtain any such payments or obtain any other remedy from the operating partnership or its subsidiaries. The operating partnership and its subsidiaries will not be liable for any of Ferrellgas Partners' obligations under its debt securities or the applicable indenture.

*Ferrellgas Partners or the operating partnership may be unable to repurchase debt securities upon a change of control; it may be difficult to determine if a change of control has occurred.*

Upon the occurrence of "change of control" events as may be described from time to time in our filings with the SEC and related to the issuance by Ferrellgas Partners or the operating partnership of debt securities, the applicable issuer or a third party may be required to make a change of control offer to repurchase those debt securities at a premium to their principal amount, plus accrued and unpaid interest. The applicable issuer may not have the financial resources to purchase its debt securities in that circumstance, particularly if a change of control event triggers a similar repurchase requirement for, or results in the acceleration of, other indebtedness. The indenture governing Ferrellgas Partners' outstanding notes contains such a repurchase requirement. Some of the agreements governing the operating partnership's indebtedness currently provide that specified change of control events will result in the acceleration of the indebtedness under those agreements. Future debt agreements of Ferrellgas Partners or the operating partnership may also contain similar provisions. The obligation to repay any accelerated indebtedness of the operating partnership will be structurally senior to Ferrellgas Partners' obligations to repurchase its debt securities upon a change of control. In addition, future debt agreements of Ferrellgas Partners or the operating partnership may contain other restrictions on the ability of Ferrellgas Partners or the operating partnership to repurchase its debt securities upon a change of control. These restrictions could prevent the applicable issuer from satisfying its obligations to purchase its debt securities unless it is able to refinance or obtain waivers under any indebtedness of Ferrellgas Partners or of the operating partnership containing these restrictions. The applicable issuer's failure to make or consummate a change of control repurchase offer or pay the change of control purchase price when due may give the trustee and the holders of the debt securities particular rights as may be described from time to time in our filings with the SEC.

In addition, one of the events that may constitute a change of control is a sale of all or substantially all of the applicable issuer's assets. The meaning of "substantially all" varies according to the facts and circumstances of the subject transaction and has no clearly established meaning under New York law, which is the law that will likely govern any indenture for the debt securities. This ambiguity as to when a sale of substantially all of the applicable issuer's assets has occurred may make it difficult for holders of debt securities to determine whether the applicable issuer has properly identified, or failed to identify, a change of control.

*There may be no active trading market for our debt securities, which may limit a holder's ability to sell our debt securities.*

We do not intend to list the debt securities we may issue from time to time on any securities exchange or to seek approval for quotations through any automated quotation system. An established market for the debt securities may not develop, or if one does develop, it may not be maintained. Although underwriters may advise us that they intend to make a market in the debt securities, they are not expected to be obligated to do so and may discontinue such market making activity at any time without notice. In addition, market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act. For these reasons, we cannot assure a debt holder that:

- a liquid market for the debt securities will develop;
- a debt holder will be able to sell its debt securities; or
- a debt holder will receive any specific price upon any sale of its debt securities.

If a public market for the debt securities did develop, the debt securities could trade at prices that may be higher or lower than their principal amount or purchase price, depending on many factors, including prevailing interest rates, the market for similar debt securities and our financial performance. Historically, the market for non-investment grade debt, such as our debt securities, has been subject to disruptions that have caused substantial fluctuations in the prices of these securities.

BLFG_EDPA2274449

Table of Contents

Risks Inherent to an Investment in Ferrellgas Partners' Equity

*Ferrellgas Partners may sell additional limited partner interests, diluting existing interests of unitholders.*

The partnership agreement of Ferrellgas Partners generally allows Ferrellgas Partners to issue additional limited partner interests and other equity securities. When Ferrellgas Partners issues additional equity securities, a unitholder's proportionate partnership interest will decrease. Such an issuance could negatively affect the amount of cash distributed to unitholders and the market price of common units. The issuance of additional common units will also diminish the relative voting strength of the previously outstanding common units.

*Cash distributions are not guaranteed and may fluctuate with our performance and other external factors.*

Although we are required to distribute all of our "available cash," we cannot guarantee the amounts of available cash that will be distributed to the holders of our equity securities. Available cash is generally all of our cash receipts, less cash disbursements and adjustments for net changes in reserves. The actual amounts of available cash will depend upon numerous factors, including:

- cash flow generated by operations;
- weather in our areas of operation;
- borrowing capacity under our secured credit facility;
- principal and interest payments made on our debt;
- the costs of acquisitions, including related debt service payments;
- restrictions contained in debt instruments;
- issuances of debt and equity securities;
- fluctuations in working capital;
- capital expenditures;
- adjustments in reserves made by our general partner in its discretion;
- prevailing economic conditions; and
- financial, business and other factors, a number of which will be beyond our control.

Cash distributions are dependent primarily on cash flow, including from reserves and, subject to limitations, working capital borrowings. Cash distributions are not dependent on profitability, which is affected by non-cash items. Therefore, cash distributions might be made during periods when we record losses and might not be made during periods when we record profits.

*Our general partner has broad discretion to determine the amount of "available cash" for distribution to holders of our equity securities through the establishment and maintenance of cash reserves, thereby potentially lessening and limiting the amount of "available cash" eligible for distribution.*

Our general partner determines the timing and amount of our distributions and has broad discretion in determining the amount of funds that will be recognized as "available cash." Part of this discretion comes from the ability of our general partner to establish and make additions to our reserves. Decisions as to amounts to be placed in or released from reserves have a direct impact on the amount of available cash for distributions because increases and decreases in reserves are taken into account in computing available cash. Funds within or added to our reserves are not considered to be "available cash" and are therefore not required to be distributed. Each fiscal quarter, our general partner may, in its reasonable discretion, determine the amounts to be placed in or released from reserves, subject to restrictions on the purposes of the reserves. Reserves may be made, increased or decreased for any proper purpose, including, but not limited to, reserves:

- to comply with the terms of any of our agreements or obligations, including the establishment of reserves to fund the payment of interest and principal in the future of any debt securities of Ferrellgas Partners or the operating partnership;

- to provide for level distributions of cash notwithstanding the seasonality of our business; and

- to provide for future capital expenditures and other payments deemed by our general partner to be necessary or advisable.

The decision by our general partner to establish, increase or decrease our reserves may limit the amount of cash available for distribution to holders of our equity securities. Holders of our equity securities will not receive payments required by such securities unless we are able to first satisfy our own obligations and the establishment of any reserves. See the first risk factor under "Risks Arising from Our Partnership Structure and Relationship with Our General Partner."

30

BLFG_EDPA2274450

Table of Contents

*The debt agreements of Ferrellgas Partners and the operating partnership may limit their ability to make distributions to holders of their equity securities.*

The debt agreements governing Ferrellgas Partners' and the operating partnership's outstanding indebtedness contain restrictive covenants that may limit or prohibit distributions to holders of their equity securities under various circumstances. Ferrellgas Partners' existing indenture generally prohibits it from:

•  making any distributions to unitholders if an event of default exists or would exist when such distribution is made;

•  distributing amounts in excess of 100% of available cash for the immediately preceding fiscal quarter if its consolidated fixed charge coverage ratio as defined in the indenture is less than 1.75 to 1.00;  or

•  distributing amounts in excess of $25.0 million less any restricted payments made for the prior sixteen fiscal quarters plus the aggregate cash contributions made to us during that period if its consolidated fixed charge coverage ratio as defined in the indenture is less than or equal to 1.75 to 1.00.

See the first risk factor under "Risks Arising from Our Partnership Structure and Relationship with Our General Partner" for a description of the restrictions on the operating partnership's ability to distribute cash to Ferrellgas Partners. Any indenture applicable to future issuances of debt securities by Ferrellgas Partners or the operating partnership may contain restrictions that are the same as or similar to those in their existing debt agreements.

*Persons owning 20% or more of Ferrellgas Partners' common units cannot vote. This limitation does not apply to common units owned by Ferrell Companies, our general partner and its affiliates.*

All common units held by a person that owns 20% or more of Ferrellgas Partners' common units cannot be voted. This provision may:

•  discourage a person or group from attempting to remove our general partner or otherwise change management; and
•  reduce the price at which our common units will trade under various circumstances.

This limitation does not apply to our general partner and its affiliates. Ferrell Companies, the parent of our general partner, beneficially owns all of the outstanding capital stock of our general partner in addition to approximately 22.7% of our common units.

Risks Arising from Our Partnership Structure and Relationship with Our General Partner

*Ferrellgas Partners is a holding entity and has no material operations or assets. Accordingly, Ferrellgas Partners is dependent on distributions from the operating partnership to service its obligations. These distributions are not guaranteed and may be restricted.*

Ferrellgas Partners is a holding entity for our subsidiaries, including the operating partnership. Ferrellgas Partners has no material operations and only limited assets. Ferrellgas Partners Finance Corp. is Ferrellgas Partners' wholly-owned finance subsidiary, serves as a co-obligor on any of its debt securities, conducts no business and has nominal assets. Accordingly, Ferrellgas Partners is dependent on cash distributions from the operating partnership and its subsidiaries to service obligations of Ferrellgas Partners. The operating partnership is required to distribute all of its available cash each fiscal quarter, less the amount of cash reserves that our general partner determines is necessary or appropriate in its reasonable discretion to provide for the proper conduct of our business, to provide funds for distributions over the next four fiscal quarters or to comply with applicable law or with any of our debt or other agreements. This discretion may limit the amount of available cash the operating partnership may distribute to Ferrellgas Partners each fiscal quarter. Holders of Ferrellgas Partners' securities will not receive payments required by those securities unless the operating partnership is able to make distributions to Ferrellgas Partners after the operating partnership first satisfies its obligations under the terms of its own borrowing arrangements and reserves any necessary amounts to meet its own financial obligations.

In addition, the various agreements governing the operating partnership's indebtedness and other financing transactions permit quarterly distributions only so long as each distribution does not exceed a specified amount, the operating partnership meets a specified financial ratio and no default exists or would result from such distribution. Those agreements include the indentures governing the operating partnership's existing notes, secured credit facility and an accounts receivable securitization facility. Each of these agreements contains various negative and affirmative covenants applicable to the operating partnership and some of these agreements require the operating partnership to maintain specified financial ratios. If the operating partnership

31

BLFG_EDPA2274451

Table of Contents

violates any of these covenants or requirements, a default may result and distributions would be limited. These covenants limit the operating partnership's ability to, among other things:

- incur additional indebtedness;
- engage in transactions with affiliates;
- create or incur liens;
- sell assets;
- make restricted payments, loans and investments;
- enter into business combinations and asset sale transactions; and
- engage in other lines of business.

*Unitholders have limits on their voting rights; our general partner manages and operates us, thereby generally precluding the participation of our unitholders in operational decisions.*

Our general partner manages and operates us. Unlike the holders of common stock in a corporation, unitholders have only limited voting rights on matters affecting our business. Amendments to the agreement of limited partnership of Ferrellgas Partners may be proposed only by or with the consent of our general partner. Proposed amendments must generally be approved by holders of at least a majority of our outstanding common units.

Unitholders will have no right to elect our general partner, or any directors of our general partner on an annual or other continuing basis, nor will any proxies be received for such voting. Our general partner may not be removed except pursuant to:

- the vote of the holders of at least 66 2/3% of the outstanding units entitled to vote thereon, which includes the common units owned by our general partner and its affiliates; and
- upon the election of a successor general partner by the vote of the holders of not less than a majority of the outstanding common units entitled to vote.

Because Ferrell Companies is the parent of our general partner and beneficially owns 22.7% of our outstanding common units, James H. Ballengee, owner of Jamex, LLC and Jamex Marketing, LLC, beneficially owns 9.5% of our outstanding common units, and James E. Ferrell, Chairman of the Board of Directors of our general partner, indirectly owns 4.7% of our outstanding common units, amendments to the agreement of limited partnership of Ferrellgas Partners or the removal of our general partner are unlikely if neither Ferrell Companies, Mr. Ballengee, nor Mr. Ferrell consent to such action.

*Our general partner has a limited call right with respect to the limited partner interests of Ferrellgas Partners.*

If at any time less than 20% of the then-issued and outstanding limited partner interests of any class of Ferrellgas Partners are held by persons other than our general partner and its affiliates, our general partner has the right, which it may assign to any of its affiliates or to us, to acquire all, but not less than all, of the remaining limited partner interests of such class held by such unaffiliated persons at a price generally equal to the then-current market price of limited partner interests of such class. As a consequence, a unitholder may be required to sell its common units at a time when the unitholder may not desire to sell them or at a price that is less than the price desired to be received upon such sale.

*Unitholders may not have limited liability in specified circumstances and may be liable for the return of distributions.*

The limitations on the liability of holders of limited partner interests for the obligations of a limited partnership have not been clearly established in some states. If it were determined that we had been conducting business in any state without compliance with the applicable limited partnership statute, or that the right, or the exercise of the right by the limited partners as a group, to:

- remove or replace our general partner;

- make specified amendments to our partnership agreements; or

- take other action pursuant to our partnership agreements that constitutes participation in the "control" of our business,

then the limited partners could be held liable in some circumstances for our obligations to the same extent as a general partner.

In addition, under some circumstances a unitholder may be liable to us for the amount of a distribution for a period of three years from the date of the distribution. Unitholders will not be liable for assessments in addition to their initial capital investment in our common units. Under Delaware law, we may not make a distribution to our unitholders if the distribution causes all our liabilities to exceed the fair value of our assets. Liabilities to partners on account of their partnership interests and liabilities for

32

Table of Contents

which recourse is limited to specific property are not counted for purposes of determining whether a distribution is permitted. Delaware law provides that a limited partner who receives such a distribution and knew at the time of the distribution that the distribution violated the Delaware law will be liable to the limited partnership for the distribution amount for three years from the distribution date. Under Delaware law, an assignee that becomes a substituted limited partner of a limited partnership is liable for the obligations of the assignor to make contributions to the partnership. However, such an assignee is not obligated for liabilities unknown to that assignee at the time such assignee became a limited partner if the liabilities could not be determined from the partnership agreements.

*Our general partner's liability to us and our unitholders may be limited.*

The partnership agreements of Ferrellgas Partners and the operating partnership contain language limiting the liability of our general partner to us and to our unitholders. For example, those partnership agreements provide that:

- the general partner does not breach any duty to us or our unitholders by borrowing funds or approving any borrowing; our general partner is protected even if the purpose or effect of the borrowing is to increase incentive distributions to our general partner;

- our general partner does not breach any duty to us or our unitholders by taking any actions consistent with the standards of reasonable discretion outlined in the definitions of available cash and cash from operations contained in our partnership agreements; and

- our general partner does not breach any standard of care or duty by resolving conflicts of interest unless our general partner acts in bad faith.

The modifications of state law standards of fiduciary duty contained in our partnership agreements may significantly limit the ability of unitholders to successfully challenge the actions of our general partner as being a breach of what would otherwise have been a fiduciary duty. These standards include the highest duties of good faith, fairness and loyalty to the limited partners. Such a duty of loyalty would generally prohibit a general partner of a Delaware limited partnership from taking any action or engaging in any transaction for which it has a conflict of interest. Under our partnership agreements, our general partner may exercise its broad discretion and authority in our management and the conduct of our operations as long as our general partner's actions are in our best interest.

*Our general partner and its affiliates may have conflicts with us.*

The directors and officers of our general partner and its affiliates have fiduciary duties to manage itself in a manner that is beneficial to its stockholder. At the same time, our general partner has fiduciary duties to manage us in a manner that is beneficial to us and our unitholders. Therefore, our general partner's duties to us may conflict with the duties of its officers and directors to its stockholder.

Matters in which, and reasons that, such conflicts of interest may arise include:

- decisions of our general partner with respect to the amount and timing of our cash expenditures, borrowings, acquisitions, issuances of additional securities and changes in reserves in any quarter may affect the amount of incentive distributions we are obligated to pay our general partner;

- borrowings do not constitute a breach of any duty owed by our general partner to our unitholders even if these borrowings have the purpose or effect of directly or indirectly enabling us to make distributions to the holder of our incentive distribution rights, currently our general partner;

- we do not have any employees and rely solely on employees of our general partner and its affiliates;

- under the terms of our partnership agreements, we must reimburse our general partner and its affiliates for costs incurred in managing and operating us, including costs incurred in rendering corporate staff and support services to us;

- our general partner is not restricted from causing us to pay it or its affiliates for any services rendered on terms that are fair and reasonable to us or causing us to enter into additional contractual arrangements with any of such entities;

- neither our partnership agreements nor any of the other agreements, contracts and arrangements between us, on the one hand, and our general partner and its affiliates, on the other, are or will be the result of arms-length negotiations;

- whenever possible, our general partner limits our liability under contractual arrangements to all or a portion of our assets, with the other party thereto having no recourse against our general partner or its assets;

- our partnership agreements permit our general partner to make these limitations even if we could have obtained more favorable terms if our general partner had not limited its liability;

33

BLFG_EDPA2274453

Table of Contents

- any agreements between us and our general partner or its affiliates will not grant to our unitholders, separate and apart from us, the right to enforce the obligations of our general partner or such affiliates in favor of us; therefore, our general partner will be primarily responsible for enforcing those obligations;

- our general partner may exercise its right to call for and purchase common units as provided in the partnership agreement of Ferrellgas Partners or assign that right to one of its affiliates or to us;

- our partnership agreements provide that it will not constitute a breach of our general partner's fiduciary duties to us for its affiliates to engage in activities of the type conducted by us, other than retail propane sales to end users in the continental United States in the manner engaged in by our general partner immediately prior to our initial public offering, even if these activities are in direct competition with us;

- our general partner and its affiliates have no obligation to present business opportunities to us;

- our general partner selects the attorneys, accountants and others who perform services for us, and these persons may also perform services for our general partner and its affiliates; however, our general partner is authorized to retain separate counsel for us or our unitholders, depending on the nature of the conflict that arises;

- James E. Ferrell is the Chairman of the Board of Directors of our general partner. Mr. Ferrell also owns other companies with whom we may, from time to time, conduct transactions within our ordinary course of business. Mr. Ferrell's ownership of these entities may conflict with his duties as a director of our general partner, including our relationship and conduct of business with any of Mr. Ferrell's companies; and

- James H. Ballengee is the owner of Jamex, LLC, Jamex Marketing, LLC and is the beneficial owner of 9.5% of our outstanding common units. Jamex Marketing, LLC conducts business directly with us in the normal course of business. Mr. Ballengee's ownership of our units may cause conflicts in our business dealings.

See "Conflicts of Interest" and "Fiduciary Responsibilities" below.

*Ferrell Companies may transfer the ownership of our general partner which could cause a change of our management and affect the decisions made by our general partner regarding resolutions of conflicts of interest.*

Ferrell Companies, the owner of our general partner, may transfer the capital stock of our general partner without the consent of our unitholders. In such an instance, our general partner will remain bound by our partnership agreements. If, however, through share ownership or otherwise, persons not now affiliated with our general partner were to acquire its general partner interest in us or effective control of our general partner, our management and resolutions of conflicts of interest, such as those described above, could change substantially.

*Our general partner may voluntarily withdraw or sell its general partner interest.*

Our general partner may withdraw as the general partner of Ferrellgas Partners and the operating partnership without the approval of our unitholders. Our general partner may also sell its general partner interest in Ferrellgas Partners and the operating partnership without the approval of our unitholders. Any such withdrawal or sale could have a material adverse effect on us and could substantially change the management and resolutions of conflicts of interest, as described above.

*Our general partner can protect itself against dilution.*

Whenever we issue equity securities to any person other than our general partner and its affiliates, our general partner has the right to purchase additional limited partner interests on the same terms. This allows our general partner to maintain its partnership interest in us. No other unitholder has a similar right. Therefore, only our general partner may protect itself against dilution caused by our issuance of additional equity securities.

Tax Risks

*The IRS could treat us as a corporation for tax purposes or changes in federal or state laws could subject us to entity-level taxation, which would substantially reduce the cash available for distribution to our unitholders.*

The anticipated after-tax economic benefit of an investment in us depends largely on our being treated as a partnership for federal income tax purposes. We believe that, under current law, we have been and will continue to be classified as a partnership for federal income tax purposes; however, we have not requested, and do not plan to request, a ruling from the IRS with respect to our treatment as a partnership for federal income tax purposes. One of the requirements for such classification is that at least 90% of our gross income for each taxable year has been and will be "qualifying income" within the meaning of Section 7704 of the

34

Table of Contents

Internal Revenue Code. Whether we will continue to be classified as a partnership in part depends on our ability to meet this qualifying income test in the future.

If we were classified as a corporation for federal income tax purposes, we would pay tax on our income at corporate rates, currently 35% at the federal level, and we would probably pay additional state income taxes as well. In addition, distributions would generally be taxable to the recipient as corporate dividends and no income, gains, losses or deductions would flow through to our unitholders. Because a tax would be imposed upon us as a corporation, the cash available for distribution to our unitholders would be substantially reduced. Therefore, treatment of us as a corporation would result in a material reduction in the anticipated cash flow and after-tax return to our unitholders and thus would likely result in a substantial reduction in the value of our common units.

A change in current law or a change in our business could cause us to be treated as a corporation for federal income tax purposes or otherwise subject us to entity-level taxation. Our partnership agreements provide that if a law is enacted or existing law is modified or interpreted in a manner that subjects us to taxation as a corporation or otherwise subjects us to entity-level taxation for federal, state or local income tax purposes, provisions of our partnership agreements will be subject to change. These changes would include a decrease in the minimum quarterly distribution and the target distribution levels to reflect the impact of such law on us.

*The tax treatment of publicly traded partnerships could be subject to potential legislative, judicial or administrative changes and differing interpretations, possibly on a retroactive basis.*

The present U.S. federal income tax treatment of publicly traded partnerships, including us, may be modified by administrative, legislative or judicial interpretation at any time. Any modification to the U.S. federal income tax laws and interpretations thereof may or may not be applied retroactively and could make it more difficult or impossible to meet the exception for us to be treated as a partnership for U.S. federal income tax purposes that is not taxable as a corporation, affect or cause us to change our business activities, affect the tax considerations of an investment in us and change the character or treatment of portions of our income.

On May 5, 2015, the U.S. Treasury Department and the IRS released proposed regulations (the "Proposed Regulations") regarding qualifying income under Section 7704(d)(1)(E) of the Code. The U.S. Treasury Department and the IRS have requested comments from industry participants regarding the standards set forth in the Proposed Regulations. The Proposed Regulations provide an exclusive list of industry-specific activities and certain limited support activities that generate qualifying income; however, the Proposed Regulations did not specifically address retail sales of propane. Although the Proposed Regulations adopt a narrow interpretation of the activities that generate qualifying income and did not specifically address retail sales of propane, we believe the income that we treat as qualifying income satisfies the requirements for qualifying income under the Proposed Regulations. However, the Proposed Regulations could be changed before they are finalized and could take a position that is contrary to our interpretation of Section 7704 of the Code. If the regulations in their final form were to treat any material portion of our income we treat as qualifying income as non-qualifying income, we anticipate being able to treat that income as qualifying income for ten years under special transition rules provided in the Proposed Regulations.

We are unable to predict whether any of these changes, or other proposals, will ultimately be enacted. Any such changes could cause a material reduction in our anticipated cash flows and could cause us to be treated as an association taxable as a corporation for U.S. federal income tax purposes subjecting us to the entity-level tax and adversely affecting the value of our common units.

*A successful IRS contest of the federal income tax positions we take may reduce the market value of our common units and the costs of any contest will be borne by us and therefore indirectly by our unitholders and our general partner.*

We have not requested, and do not plan to request, a ruling from the IRS with respect to our treatment as a partnership for federal income tax purposes. The IRS may adopt positions that differ from those expressed herein or from the positions we take. It may be necessary to resort to administrative or court proceedings in an effort to sustain some or all of the positions we take, and some or all of these positions ultimately may not be sustained. Any contest with the IRS may materially reduce the market value of our common units and the prices at which our common units trade. In addition, our costs of any contest with the IRS will be borne by us and therefore indirectly by our unitholders and our general partner.

*Unitholders may be required to pay taxes on income from us even if unitholders do not receive any cash distributions from us.*

A unitholder will be required to pay federal income taxes and, in some cases, state and local income taxes on its share of our taxable income, even if it does not receive cash distributions from us. A unitholder may not receive cash distributions equal to its

BLFG_EDPA2274455

Table of Contents

share of our taxable income or even the tax liability that results from that income. Further, a unitholder may incur a tax liability in excess of the amount of cash it receives upon the sale of its units.

*The ratio of taxable income to cash distributions could be higher or lower than our estimates, which could result in a material reduction of the market value of our common units.*

We estimate that a person who acquires common units in the 2015 calendar year and owns those common units through the record dates for all cash distributions payable for all periods within the 2015 calendar year will be allocated, on a cumulative basis, an amount of federal taxable income that will be less than 10% of the cumulative cash distributed to such person for those periods. The taxable income allocable to a unitholder for subsequent periods may constitute an increasing percentage of distributable cash. These estimates are based on several assumptions and estimates that are subject to factors beyond our control. Accordingly, the actual percentage of distributions that will constitute taxable income could be higher or lower and any differences could result in a material reduction in the market value of our common units.

*There are limits on the deductibility of losses.*

In the case of unitholders subject to the passive loss rules (generally, individuals, closely held corporations and regulated investment companies), any losses generated by us will only be available to offset our future income and cannot be used to offset income from other activities, including passive activities or investments. Unused losses may be deducted when the unitholder disposes of its entire investment in us in a fully taxable transaction with an unrelated party. A unitholder's share of our net passive income may be offset by unused losses carried over from prior years, but not by losses from other passive activities, including losses from other publicly-traded partnerships.

*Tax gain or loss on the disposition of our common units could be different than expected.*

If a unitholder sells their common units, the unitholder will recognize a gain or loss equal to the difference between the amount realized and its tax basis in those common units. Prior distributions in excess of the total net taxable income the unitholder was allocated for a common unit, which decreased its tax basis in that common unit, will, in effect, become taxable income to the unitholder if the common unit is sold at a price greater than its tax basis in that common unit, even if the price received is less than its original cost. A substantial portion of the amount realized, whether or not representing a gain, will likely be ordinary income to that unitholder. Should the IRS successfully contest some positions we take, a selling unitholder could recognize more gain on the sale of units than would be the case under those positions, without the benefit of decreased income in prior years. In addition, if a unitholder sells its units, the unitholder may incur a tax liability in excess of the amount of cash that unitholder receives from the sale.

*Tax-exempt entities, regulated investment companies, and foreign persons face unique tax issues from owning common units that may result in additional tax liability or reporting requirements for them.*

An investment in common units by tax-exempt entities, such as employee benefit plans, individual retirement accounts, regulated investment companies, generally known as mutual funds, and non-U.S. persons, raises issues unique to them. For example, virtually all of our income allocated to organizations exempt from federal income tax, including individual retirement accounts and other retirement plans, will be unrelated business taxable income and thus will be taxable to them. Net income from a "qualified publicly-traded partnership" is qualifying income for a regulated investment company, or mutual fund. However, no more than 25% of the value of a regulated investment company's total assets may be invested in the securities of one or more qualified publicly-traded partnerships. We expect to be treated as a qualified publicly-traded partnership. Distributions to non-U.S. persons will be reduced by withholding taxes, at the highest effective tax rate applicable to individuals, and non-U.S. persons will be required to file federal income tax returns and generally pay tax on their share of our taxable income.

*Certain information relating to a unitholder's investment may be subject to special IRS reporting requirements.*

Treasury regulations require taxpayers to report particular information on Form 8886 if they participate in a "reportable transaction." Unitholders may be required to file this form with the IRS. A transaction may be a reportable transaction based upon any of several factors. The IRS may impose significant penalties on a unitholder for failure to comply with these disclosure requirements. Disclosure and information maintenance obligations are also imposed on "material advisors" that organize, manage or sell interests in reportable transactions, which may require us or our material advisors to maintain and disclose to the IRS certain information relating to unitholders.

36

BLFG_EDPA2274456

Table of Contents

*An audit of us may result in an adjustment or an audit of a unitholder's own tax return.*

We may be audited by the IRS and tax adjustments could be made. The rights of a unitholder owning less than a 1% interest in us to participate in the income tax audit process are very limited. Further, any adjustments in our tax returns will lead to adjustments in the unitholders' tax returns and may lead to audits of unitholders' tax returns and adjustments of items unrelated to us. A unitholder will bear the cost of any expenses incurred in connection with an examination of its personal tax return.

*Reporting of partnership tax information is complicated and subject to audits; we cannot guarantee conformity to IRS requirements.*

We will furnish each unitholder with a Schedule K-1 that sets forth that unitholder's allocable share of income, gains, losses and deductions. In preparing these schedules, we will use various accounting and reporting conventions and adopt various depreciation and amortization methods. We cannot guarantee that these schedules will yield a result that conforms to statutory or regulatory requirements or to administrative pronouncements of the IRS. If any of the information on these schedules is successfully challenged by the IRS, the character and amount of items of income, gain, loss or deduction previously reported by unitholders might change, and unitholders might be required to adjust their tax liability for prior years and incur interest and penalties with respect to those adjustments.

*Unitholders may lose tax benefits as a result of nonconforming depreciation conventions.*

Because we cannot match transferors and transferees of common units, uniformity of the economic and tax characteristics of our common units to a purchaser of common units of the same class must be maintained. To maintain uniformity and for other reasons, we have adopted certain depreciation and amortization conventions which we believe conform to Treasury Regulations under 743(b) of the Internal Revenue Code. A successful IRS challenge to those positions could reduce the amount of tax benefits available to our unitholders. A successful challenge could also affect the timing of these tax benefits or the amount of gain from the sale of common units and could have a negative impact on the value of our common units or result in audit adjustments to a unitholder's tax returns.

*As a result of investing in our common units, a unitholder will likely be subject to state and local taxes and return filing requirements in jurisdictions where it does not live.*

In addition to federal income taxes, unitholders will likely be subject to other taxes, such as state and local taxes, unincorporated business taxes and estate, inheritance or intangible taxes that are imposed by the various jurisdictions in which we do business or own property. A unitholder will likely be required to file state and local income tax returns and pay state and local income taxes in some or all of the various jurisdictions in which we do business or own property and may be subject to penalties for failure to comply with those requirements. We currently conduct business in all 50 states, the District of Columbia and Puerto Rico. It is a unitholder's responsibility to file all required federal, state and local tax returns.

*States may subject partnerships to entity-level taxation in the future, thereby decreasing the amount of cash available to us for distributions and potentially causing a decrease in our distribution levels, including a decrease in the minimum quarterly distribution.*

Several states have enacted or are evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise or other forms of taxation. If additional states were to impose a tax upon us as an entity, the cash available for distribution to unitholders would be reduced. The partnership agreements of Ferrellgas Partners and the operating partnership each provide that if a law is enacted or existing law is modified or interpreted in a manner that subjects one or both partnerships to taxation as a corporation or otherwise subjects one or both partnerships to entity-level taxation for federal, state or local income tax purposes, provisions of one or both partnership agreements will be subject to change. These changes would include a decrease in the minimum quarterly distribution and the target distribution levels to reflect the impact of those taxes.

*Unitholders may have negative tax consequences if we default on our debt or sell assets.*

If we default on any of our debt, the lenders will have the right to sue us for non-payment. That action could cause an investment loss and negative tax consequences for our unitholders through the realization of taxable income by unitholders without a corresponding cash distribution. Likewise, if we were to dispose of assets and realize a taxable gain while there is substantial debt outstanding and proceeds of the sale were applied to the debt, our unitholders could have increased taxable income without a corresponding cash distribution.

BLFG_EDPA2274457

Table of Contents

*A unitholder whose common units are the subject of a securities loan (e.g., a loan to a "short seller" to cover a short sale of common units) may be considered as having disposed of those common units. If so, the unitholder would no longer be treated for tax purposes as a partner with respect to those common units during the period of the loan and may recognize gain or loss from the disposition.*

Because there are no specific rules governing the U.S. federal income tax consequences of loaning a partnership interest, a unitholder whose common units are the subject of a securities loan may be considered as having disposed of the loaned units. In that case, the unitholder may no longer be treated for tax purposes as a partner with respect to those common units during the period of the loan and the unitholder may recognize gain or loss from such disposition. Moreover, during the period of the loan, any of our income, gain, loss or deduction with respect to those common units may not be reportable by the unitholder and any cash distributions received by the unitholder as to those common units could be fully taxable as ordinary income. Unitholders desiring to assure their status as partners and avoid the risk of gain recognition from a loan to a short seller should modify any applicable brokerage account agreements to prohibit their brokers from borrowing their common units.

*The sale or exchange of 50% or more of our capital and profits interests within a twelve-month period will result in the termination of our partnership for federal income tax purposes.*

We will be considered to have constructively terminated as a partnership for federal income tax purposes if there is a sale or exchange within a twelve-month period of 50% or more of the total interests in our capital and profits. For purposes of determining whether the 50% threshold has been met, multiple sales of the same interest will be counted only once. Our termination would, among other things, result in the closing of our taxable year for all unitholders which could result in us filing two tax returns (and unitholders receiving two Schedule K-1s) for one calendar year. Our termination could also result in a deferral of depreciation deductions allowable in computing our taxable income. In the case of a unitholder reporting on a taxable year other than a calendar year, the closing of our taxable year may also result in more than twelve months of our taxable income or loss being includable in its taxable income for the year of termination. Our termination would not affect our classification as a partnership for federal income tax purposes, but instead, we would be treated as a new partnership for federal income tax purposes. If treated as a new partnership, we must make new tax elections and could be subject to penalties if we are unable to determine that a termination occurred. Pursuant to an IRS relief procedure, a publicly traded partnership that has technically terminated may request special relief which, if granted by the IRS, among other things, would permit the partnership to provide only a single Schedule K-1 to unitholders for the tax years in which the termination occurs.

## Conflicts of Interest

Conflicts of interest could arise as a result of the relationships between us, on the one hand, and our general partner and its affiliates, on the other. The directors and officers of our general partner have fiduciary duties to manage our general partner in a manner beneficial to its stockholder. At the same time, our general partner has fiduciary duties to manage us in a manner beneficial to us and our unitholders. The duties of our general partner to us and our unitholders, therefore, may conflict with the duties of the directors and officers of our general partner to its stockholder.

Matters in which, and reasons that, such conflicts of interest may arise include:

- decisions of our general partner with respect to the amount and timing of our cash expenditures, borrowings, acquisitions, issuances of additional securities and changes in reserves in any quarter may affect the amount of incentive distributions we are obligated to pay our general partner;

- borrowings do not constitute a breach of any duty owed by our general partner to our unitholders even if these borrowings have the purpose or effect of directly or indirectly enabling us to make distributions to the holder of our incentive distribution rights, currently our general partner;

- we do not have any employees and rely solely on employees of our general partner and its affiliates;

- under the terms of our partnership agreements, we must reimburse our general partner and its affiliates for costs incurred in managing and operating us, including costs incurred in rendering corporate staff and support services to us;

- our general partner is not restricted from causing us to pay it or its affiliates for any services rendered on terms that are fair and reasonable to us or causing us to enter into additional contractual arrangements with any of such entities;

- neither our partnership agreements nor any of the other agreements, contracts and arrangements between us, on the one hand, and our general partner and its affiliates, on the other, are or will be the result of arms-length negotiations;

- whenever possible, our general partner limits our liability under contractual arrangements to all or a portion of our assets, with the other party thereto having no recourse against our general partner or its assets;

38

Table of Contents

- our partnership agreements permit our general partner to make these limitations even if we could have obtained more favorable terms if our general partner had not limited its liability;

- any agreements between us and our general partner or its affiliates will not grant to our unitholders, separate and apart from us, the right to enforce the obligations of our general partner or such affiliates in favor of us; therefore, our general partner will be primarily responsible for enforcing those obligations;

- our general partner may exercise its right to call for and purchase common units as provided in the partnership agreement of Ferrellgas Partners or assign that right to one of its affiliates or to us;

- our partnership agreements provide that it will not constitute a breach of our general partner's fiduciary duties to us for its affiliates to engage in activities of the type conducted by us, other than retail propane sales to end users in the continental United States in the manner engaged in by our general partner immediately prior to our initial public offering, even if these activities are in direct competition with us;

- our general partner and its affiliates have no obligation to present business opportunities to us;

- our general partner selects the attorneys, accountants and others who perform services for us. These persons may also perform services for our general partner and its affiliates. Our general partner is authorized to retain separate counsel for us or our unitholders, depending on the nature of the conflict that arises;

- James E. Ferrell is the Chairman of the Board of Directors of our general partner. Mr. Ferrell also owns other companies with whom we may, from time to time, conduct transactions within our ordinary course of business. Mr. Ferrell's ownership of these entities may conflict with his duties as a director of our general partner, including our relationship and conduct of business with any of Mr. Ferrell's companies; and

- James H. Ballengee is the owner of Jamex, LLC, Jamex Marketing, LLC and is a beneficial owner of 9.5% of our outstanding common units. Jamex Marketing, LLC conducts business directly with us in the normal course of business. Mr. Ballengee's ownership of our units may cause conflicts in our business dealings.

**Fiduciary Responsibilities**

Unless otherwise provided for in a partnership agreement, Delaware law generally requires a general partner of a Delaware limited partnership to adhere to fiduciary duty standards under which it owes its limited partners the highest duties of good faith, fairness and loyalty and which generally prohibit the general partner from taking any action or engaging in any transaction as to which it has a conflict of interest. Our partnership agreements expressly permit our general partner to resolve conflicts of interest between itself or its affiliates, on the one hand, and us or our unitholders, on the other, and to consider, in resolving such conflicts of interest, the interests of other parties in addition to the interests of our unitholders. In addition, the partnership agreement of Ferrellgas Partners provides that a purchaser of common units is deemed to have consented to specified conflicts of interest and actions of our general partner and its affiliates that might otherwise be prohibited, including those described above, and to have agreed that such conflicts of interest and actions do not constitute a breach by our general partner of any duty stated or implied by law or equity. Our general partner will not be in breach of its obligations under our partnership agreements or its duties to us or our unitholders if the resolution of such conflict is fair and reasonable to us. Any resolution of a conflict approved by the audit committee of our general partner is conclusively deemed fair and reasonable to us. The latitude given in our partnership agreements to our general partner in resolving conflicts of interest may significantly limit the ability of a unitholder to challenge what might otherwise be a breach of fiduciary duty.

The partnership agreements of Ferrellgas Partners and the operating partnership expressly limit the liability of our general partner by providing that our general partner, its affiliates and their respective officers and directors will not be liable for monetary damages to us, our unitholders or assignees thereof for errors of judgment or for any acts or omissions if our general partner and such other persons acted in good faith. In addition, we are required to indemnify our general partner, its affiliates and their respective officers, directors, employees, agents and trustees to the fullest extent permitted by law against liabilities, costs and expenses incurred by our general partner or such other persons if our general partner or such persons acted in good faith and in a manner it or they reasonably believed to be in, or (in the case of a person other than our general partner) not opposed to, the best interests of us and, with respect to any criminal proceedings, had no reasonable cause to believe the conduct was unlawful.

**ITEM 1B.   UNRESOLVED STAFF COMMENTS.**

None.

**ITEM 2.   PROPERTIES.**

BLFG_EDPA2274459

Table of Contents

We own or lease the following transportation equipment at July 31, 2015 that is utilized primarily in the distribution of propane and related equipment sales operations:

|  | Owned | Leased | Total |
|---|---|---|---|
| Truck tractors | 69 | 78 | 147 |
| Propane transport trailers | 263 | — | 263 |
| Portable tank delivery trucks | 239 | 307 | 546 |
| Portable tank exchange delivery trailers | 214 | 137 | 351 |
| Bulk propane delivery trucks | 796 | 666 | 1,462 |
| Pickup and service trucks | 678 | 374 | 1,052 |
| Railroad tank cars | — | 93 | 93 |

The propane transport trailers have an average capacity of approximately 10,000 gallons. The bulk propane delivery trucks are generally fitted with tanks ranging in size from 2,600 to 3,500 gallons. Each railroad tank car has a capacity of approximately 30,000 gallons.

We typically manage our propane distribution locations using a structure where one location, referred to as a service center, is staffed to provide oversight and management to multiple distribution locations, referred to as service units. At July 31, 2015, our propane distribution locations were comprised of 51 service centers and 862 service units. The service unit locations utilize hand-held computers and cellular or satellite technology to communicate with management typically located in the associated service center. We believe this structure together with our technology platform allows us to more efficiently route and schedule customer deliveries and significantly reduces the need for daily on-site management.

We also distributed propane for portable tank exchanges from 22 independently-owned distributors at July 31, 2015.

We owned approximately 49.5 million gallons of propane storage capacity at our propane distribution locations at July 31, 2015. We owned our land and buildings in the local markets of approximately 61% of our operating locations and leased the remaining facilities on terms customary in the industry at July 31, 2015.

We owned approximately 0.9 million propane tanks at July 31, 2015, most of which are located on customer property and rented to those customers. We also owned approximately 3.9 million portable propane tanks at July 31, 2015, most of which are used by us to deliver propane to our portable tank exchange customers and to deliver propane to our industrial/commercial customers.

At July 31, 2015, we leased approximately 59.6 million gallons of propane storage capacity located at underground storage facilities and pipelines at various locations around the United States.

At July 31, 2015, we leased 73,988 square feet of office space at separate locations that comprise our corporate headquarters in the Kansas City metropolitan area.

At July 31, 2015, our crude oil logistics business owned asset base included 555 trucks and 634 specialized tractor-trailers, 19 pipeline injection terminals, approximately 38 MBbls/d of capacity on multiple crude oil pipelines, and 999 rail cars. At July 31, 2015, our crude oil logistics business also included 264 leased rail cars and rail loading and unloading terminals and had barge capacity to transport a minimum of 65 MBbls/d.

We operated nine salt water disposal sites for use in our water solutions operations at July 31, 2015. The location of the facilities and the permitted processing capacities at which the facilities operate are summarized below:

40

BLFG_EDPA2274460

Table of Contents

| Location name | Region | Permitted Capacity (barrels per day) |
|---|---|---|
| Gillet, Texas (A) | Eagle Ford shale | 25,000 |
| Engler, Texas (A) | Eagle Ford shale | 25,000 |
| Helena, Texas (A) | Eagle Ford shale | 25,000 |
| Kenedy, Texas (B) | Eagle Ford shale | 25,000 |
| Dilley, Texas (B) | Eagle Ford shale | 25,000 |
| Dietert, Texas (A) | Eagle Ford shale | 10,000 |
| Gerold, Texas (A) (C) | Eagle Ford shale | 25,000 |
| Mellenbruch, Texas (A) (C) | Eagle Ford shale | 20,000 |
| Hirsch, Texas (A) (D) | Eagle Ford shale | 20,000 |

(A)   These facilities are located on land we lease.
(B)   These facilities are located on land we own.
(C)   We purchased this facility effective September 2, 2014.
(D)   We purchased this facility effective April 1, 2015.

At July 31, 2015, we owned 45.6 acres of land in the Eagle Ford shale region of south Texas that house two of our salt water disposal sites and we leased 171.9 acres of land in the Eagle Ford shale region of south Texas that house seven of our salt water disposal sites.

We believe that we have satisfactory title to or valid rights to use all of our material properties. Although some of those properties may be subject to liabilities and leases, liens for taxes not yet currently due and payable and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with the continued use of such properties in our business. We believe that we have obtained, or are in the process of obtaining, all required material approvals. These approvals include authorizations, orders, licenses, permits, franchises, consents of, registrations, qualifications and filings with, the various state and local governmental and regulatory authorities which relate to our ownership of properties or to our operations.

## ITEM 3.   LEGAL PROCEEDINGS.

Our operations are subject to all operating hazards and risks normally incidental to handling, storing, transporting and otherwise providing for use by consumers of combustible liquids such as propane and crude oil. As a result, at any given time, we can be threatened with or named as a defendant in various lawsuits arising in the ordinary course of business. Other than as discussed below, we are not a party to any legal proceedings other than various claims and lawsuits arising in the ordinary course of business. It is not possible to determine the ultimate disposition of these matters; however, management is of the opinion that there are no known claims or contingent claims that are reasonably expected to have a material adverse effect on the consolidated financial condition, results of operations and cash flows.

The Federal Trade Commission ("FTC") initiated an investigation into certain practices related to the filling of portable propane cylinders. On March 27, 2014, the FTC filed an administrative complaint alleging that Ferrellgas and one of its competitors colluded in 2008 to persuade a customer to accept the cylinder fill reduction from 17 pounds to 15 pounds. The complaint did not seek monetary remedies. Ferrellgas reached a settlement with the FTC during the three months ended October 31, 2014 without any financial payment; the settlement has been approved by a vote of the Commission and became final after a public comment period.

We have also been named as a defendant, along with a competitor, in putative class action lawsuits filed in multiple jurisdictions. The complaints, filed on behalf of direct and indirect customers of our tank exchange business, reference the FTC complaint mentioned above. The lawsuits allege that we and a competitor coordinated in 2008 to reduce the fill level in barbeque cylinders and combined to persuade a common customer to accept that fill reduction, resulting in increased cylinder costs to retailers and end-user customers in violation of federal and certain state antitrust laws. The lawsuits seek treble damages, attorneys' fees, injunctive relief and costs on behalf of the putative class. These lawsuits have been consolidated into one case by a multidistrict litigation panel. We believe we have strong defenses to the claims and intend to vigorously defend against the consolidated case. We do not believe loss is probable or reasonably estimable at this time related to the putative class action lawsuit.

BLFG_EDPA2274461

Table of Contents

In addition, putative class action cases have been filed in California relating to residual propane remaining in the tank after use. We believe we have strong defenses to the claims and intend to vigorously defend against the consolidated case. We do not believe loss is probable or reasonably estimable at this time related to the putative class action lawsuit.

We were also named as a defendant in a putative class action lawsuit filed in the United States District Court in Kansas. The complaint was the subject of a motion to dismiss which was granted, in part, in August 2011. The surviving claims alleged breach of contract and breach of the implied duty of good faith and fair dealing, both of which allegedly arise from the existence of an oral contract for continuous propane service. We recently prevailed in a trial to determine whether the claims were required to be arbitrated, resulting in a dismissal of this case. There is no probable or reasonably estimable loss relating to this matter.

As of July 31, 2015, Bridger and Murex, LLC were arbitrating a dispute with respect to a sublease of approximately 220 rail cars by Bridger, which arbitration arose out of an action between Bridger and Murex in the 116th Judicial District Court of Dallas County, Texas, originally brought in April 2014. In August 2015, we settled all claims subject to such dispute, by paying $10.4 million to Murex in such settlement. The liability was considered in our acquisition method of accounting for Bridger.

## ITEM 4.   MINE SAFETY DISCLOSURES.

Not applicable.

## PART II

## ITEM 5.   MARKET FOR REGISTRANTS' COMMON EQUITY, RELATED UNITHOLDER AND STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

### Common Units of Ferrellgas Partners

Our common units represent limited partner interests in Ferrellgas Partners and are listed and traded on the New York Stock Exchange under the symbol "FGP." As of August 31, 2015, we had 606 common unitholders of record. The following table sets forth the high and low sales prices for our common units on the New York Stock Exchange and the cash distributions declared per common unit for our fiscal periods indicated.

|  | Common Unit Price Range | | Distributions |
|  | High | Low | Declared Per Unit |
| --- | --- | --- | --- |
| **2014 Fiscal Year** | | | |
| First Quarter | $ 23.42 | $ 21.70 | $ 0.50 |
| Second Quarter | 25.27 | 22.75 | 0.50 |
| Third Quarter | 25.63 | 21.84 | 0.50 |
| Fourth Quarter | 28.25 | 25.17 | 0.50 |
| | | | |
| **2015 Fiscal Year** | | | |
| First Quarter | $ 28.68 | $ 24.87 | $ 0.50 |
| Second Quarter | 28.45 | 21.98 | 0.50 |
| Third Quarter | 25.40 | 22.13 | 0.50 |
| Fourth Quarter | 24.82 | 20.00 | 0.50 |

We make quarterly cash distributions of our available cash. Available cash is defined in our partnership agreement as, generally, the sum of our consolidated cash receipts less consolidated cash disbursements and changes in cash reserves established by our general partner for future requirements. To the extent necessary and due to the seasonal nature of our operations, we will generally reserve a portion of the cash inflows from our second and third fiscal quarters for distributions during our first and fourth fiscal quarters. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity and Capital Resources" for a discussion of the financial tests and covenants which place limits on the amount of cash that we can use to pay distributions.

### Recent Sales of Unregistered Securities

On July 2, 2015, we issued 134,169 units to Propane Advantage, LLC in a private placement in connection with our acquisition of the assets of Propane Advantage, LLC. The units were issued in a transaction exempt from registration pursuant to Section 4(a)(2) of the Securities Act.

### Ferrellgas Partners Tax Matters

Ferrellgas Partners is a master limited partnership and thus not subject to federal income taxes. Instead, our common unitholders are required to report for income tax purposes their allocable share of our income, gains, losses, deductions and credits, regardless of whether we make distributions to our common unitholders. Accordingly, each common unitholder should consult its own tax advisor in analyzing the federal, state, and local tax consequences applicable to its ownership or disposition of our common units. Ferrellgas Partners reports its tax information on a calendar year basis, while financial reporting is based on a fiscal year ending July 31.

### Common Equity of Other Registrants

There is no established public trading market for the common equity of the operating partnership, Ferrellgas Partners Finance Corp. or Ferrellgas Finance Corp. Our general partner owns all of the general partner interest, and Ferrellgas Partners owns all of the limited partner interest, in the operating partnership.

BLFG_EDPA2274462

All of the common equity of Ferrellgas Partners Finance Corp. is held by Ferrellgas Partners and all of the common equity of Ferrellgas Finance Corp. is held by the operating partnership. There are no equity securities of the operating partnership, Ferrellgas Partners Finance Corp. or Ferrellgas Finance Corp. authorized for issuance under any equity compensation plan. During fiscal 2015, there were no issuances of securities of the operating partnership, Ferrellgas Partners Finance Corp. or Ferrellgas Finance Corp.

Neither Ferrellgas Partners Finance Corp. nor Ferrellgas Finance Corp. declared or paid any cash dividends on its common equity during fiscal 2015 or fiscal 2014. The operating partnership distributes cash to its partners at least four times per fiscal year, as well as any other time necessary (including in connection with acquisitions). See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity and Capital Resources – Financing Activities – Distributions" for a discussion of its distributions during fiscal 2015. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity and Capital Resources" for a discussion of the financial tests and covenants which place limits on the amount of cash that the operating partnership can use to pay distributions.

**Equity Compensation Plan Information**

See Item 12. "Security Ownership of Certain Beneficial Owners and Management and Related Unitholder Matters – Securities Authorized for Issuance Under Equity Compensation Plans."

BLFG_EDPA2274463

Table of Contents

**ITEM 6.    SELECTED FINANCIAL DATA.**

The following tables present selected consolidated historical financial and operating data for Ferrellgas Partners and the operating partnership.

| | Ferrellgas Partners, L.P. | | | | |
| | Year Ended July 31, | | | | |
| (in thousands, except per unit data) | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **Income statement data:** | | | | | |
| Total revenues | $ 2,024,390 | $ 2,405,860 | $ 1,975,467 | $ 2,339,092 | $ 2,423,215 |
| Interest expense | 100,396 | 86,502 | 89,145 | 93,254 | 101,885 |
| Net earnings (loss) attributable to Ferrellgas Partners, L.P. | 29,620 | 33,211 | 56,426 | (10,952) | (43,648) |
| Basic and diluted net earnings (loss) per common unitholders' interest | $ 0.35 | $ 0.41 | $ 0.71 | $ (0.14) | $ (0.60) |
| Cash distributions declared per common unit | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 |
| | | | | | |
| **Balance sheet data:** | | | | | |
| Working capital (1) | $ (44,371) | $ 9,891 | $ (21,305) | $ (50,875) | $ 28,712 |
| Total assets | 2,464,056 | 1,572,270 | 1,356,028 | 1,397,279 | 1,460,586 |
| Long-term debt | 1,804,392 | 1,292,214 | 1,106,940 | 1,059,085 | 1,050,920 |
| Partners' capital (deficit) | 207,709 | (111,646) | (86,627) | (27,526) | 88,317 |
| | | | | | |
| **Operating data (unaudited):** | | | | | |
| Propane sales volumes (gallons) | 878,846 | 946,570 | 901,370 | 878,130 | 899,683 |
| Salt water volume (barrels) | 17,035 | 2,500 | — | — | — |
| Crude oil hauled (barrels) | 10,447 | — | — | — | — |
| | | | | | |
| **Capital expenditures:** | | | | | |
| Maintenance | $ 19,449 | $ 18,138 | $ 15,248 | $ 15,864 | $ 15,330 |
| Growth | 50,388 | 32,843 | 25,916 | 32,865 | 34,699 |
| Acquisition | 901,612 | 169,430 | 31,919 | 14,034 | 12,587 |
| Total | $ 971,449 | $ 220,411 | $ 73,083 | $ 62,763 | $ 62,616 |
| | | | | | |
| **Supplemental data (unaudited):** | | | | | |
| Adjusted EBITDA (a) | $ 300,184 | $ 288,148 | $ 272,249 | $ 193,086 | $ 227,645 |
| | | | | | |
| **Reconciliation of Net Earnings (Loss) to EBITDA and Adjusted EBITDA and Distributable cash flow attributable to common unit holders:** | | | | | |
| Net earnings (loss) attributable to Ferrellgas Partners, L.P. | $ 29,620 | $ 33,211 | $ 56,426 | $ (10,952) | $ (43,648) |
| Income tax expense (benefit) | (315) | 2,516 | 1,855 | 1,128 | 1,241 |
| Interest expense | 100,396 | 86,502 | 89,145 | 93,254 | 101,885 |
| Depreciation and amortization expense | 98,579 | 84,202 | 83,344 | 83,841 | 82,486 |
| EBITDA | 228,280 | 206,431 | 230,770 | 167,271 | 141,964 |
| Loss on extinguishment of debt | — | 21,202 | — | — | 46,962 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 | 15,769 | 9,440 | 10,157 |

43

BLFG_EDPA2274464

Table of Contents

| | | | | | |
|---|---|---|---|---|---|
| Non-cash stock and unit-based compensation charge | 25,982 | 24,508 | 13,545 | 8,843 | 13,488 |
| Loss on disposal of assets and other | 7,099 | 6,486 | 10,421 | 6,035 | 3,633 |
| Other (income) expense, net | 350 | 479 | (565) | (506) | (567) |
| Severance charges | — | — | — | 1,055 | — |
| Change in fair value of contingent consideration | (6,300) | 5,000 | — | — | — |
| Litigation accrual and related legal fees associated with a class action lawsuit | 806 | 1,749 | 1,568 | 892 | 12,120 |
| Acquisitions and transition expenses | 16,373 | — | — | — | — |
| Unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments | 2,412 | — | — | — | — |
| Net earnings (loss) attributable to noncontrolling interest | 469 | 504 | 741 | 56 | (112) |
| Adjusted EBITDA (a) | 300,184 | 288,148 | 272,249 | 193,086 | 227,645 |
| Net cash interest (b) | (96,150) | (83,686) | (83,495) | (87,600) | (93,353) |
| Maintenance capital expenditures (c) | (19,612) | (17,673) | (15,070) | (16,044) | (15,437) |
| Cash paid for taxes | (712) | (816) | (550) | (764) | (591) |
| Proceeds from asset sales | 5,905 | 4,524 | 9,980 | 5,742 | 5,994 |
| Distributable cash flow attributable to equity investors (d) | 189,615 | 190,497 | 183,114 | 94,420 | 124,258 |
| Distributable cash flow attributable to general partner and non-controlling interest | (3,792) | (3,810) | (3,663) | (1,888) | (2,485) |
| Distributable cash flow attributable to common unit holders (e) | 185,823 | 186,687 | 179,451 | 92,532 | 121,773 |
| Less: Distributions paid to common unitholders | (165,433) | (159,316) | (158,087) | (154,955) | (143,551) |
| Distributable cash flow surplus/(shortage) | $ 20,390 | $ 27,371 | $ 21,364 | $ (62,423) | $ (21,778) |

(a) Adjusted EBITDA is calculated as earnings before income tax expense, interest expense, depreciation and amortization expense, loss on extinguishment of debt, non-cash employee stock ownership plan compensation charge, non-cash stock and unit-based compensation charge, loss on disposal of assets and other, other (income) expense, net, severance charges, change in fair value of contingent consideration, litigation accrual and related legal fees associated with a class action lawsuit, acquisition and transition expenses, unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments and net earnings (loss) attributable to non-controlling interest. Management believes the presentation of this measure is relevant and useful because it allows investors to view the partnership's performance in a manner similar to the method management uses, adjusted for items management believes makes it easier to compare its results with other companies that have different financing and capital structures. This method of calculating Adjusted EBITDA may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

(b) Net cash interest expense is the sum of interest expense less non-cash interest expense and other income (expense), net. This amount includes interest expense related to the accounts receivable securitization facility.

(c) Maintenance capital expenditures include capitalized expenditures for betterment and replacement of property, plant and equipment.

(d) Management considers distributable cash flow attributable to equity investors a meaningful non-GAAP measure of the partnership's ability to declare and pay quarterly distributions to equity investors. Distributable cash flow attributable to equity investors, as management defines it, may not be comparable to distributable cash flow attributable to equity investors or similarly titled measurements used by other corporations and partnerships. Items added into our calculation of distributable cash flow attributable to equity investors that will not occur on a continuing basis may have associated cash payments. Distributable cash flow attributable to equity investors may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

(e) Management considers distributable cash flow attributable to common unitholders a meaningful non-GAAP measure of the partnership's ability to declare and pay quarterly distributions to common unitholders. Distributable cash flow attributable to common unitholders, as management defines it, may not be comparable to distributable cash flow

44

BLFG_EDPA2274465

Table of Contents

attributable to common unitholders or similarly titled measurements used by other corporations and partnerships. Items added into our calculation of distributable cash flow attributable to common unitholders that will not occur on a continuing basis may have associated cash payments. Distributable cash flow attributable to common unitholders may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

(1) Working capital is the sum of current assets less current liabilities.

|  | Ferrellgas, L.P. | | | | |
|  | Year Ended July 31, | | | | |
|  | 2015 | 2014 | 2013 | 2012 | 2011 |
| **Income statement data:** | | | | | |
| Total revenues | $  2,024,390 | $  2,405,860 | $  1,975,467 | $  2,339,092 | $  2,423,215 |
| Interest expense | 84,227 | 70,332 | 72,974 | 77,127 | 80,074 |
| Net earnings (loss) | 46,427 | 49,907 | 73,375 | 5,589 | (11,062) |
| | | | | | |
| **Balance sheet data:** | | | | | |
| Working capital (1) | $  (41,986) | $  11,901 | $  (19,289) | $  (48,843) | $  30,738 |
| Total assets | 2,459,962 | 1,569,833 | 1,352,932 | 1,393,662 | 1,456,816 |
| Long-term debt | 1,622,392 | 1,110,214 | 924,940 | 877,085 | 868,920 |
| Partners' capital | 390,126 | 69,925 | 94,476 | 153,140 | 268,686 |
| | | | | | |
| **Operating data (unaudited):** | | | | | |
| Propane sales volumes (gallons) | 878,846 | 946,570 | 901,370 | 878,130 | 899,683 |
| Salt water volume (barrels) | 17,035 | 2,500 | — | — | — |
| Crude oil hauled (barrels) | 10,447 | | | | |
| | | | | | |
| **Capital expenditures:** | | | | | |
| Maintenance | $  19,449 | $  18,138 | $  15,248 | $  15,864 | $  15,330 |
| Growth | 50,388 | 32,843 | 25,916 | 32,865 | 34,699 |
| Acquisition | 901,612 | 169,430 | 31,919 | 14,034 | 12,587 |
| Total | $  971,449 | $  220,411 | $  73,083 | $  62,763 | $  62,616 |
| | | | | | |
| **Supplemental data (unaudited):** | | | | | |
| Adjusted EBITDA (a) | $  300,288 | $  288,125 | $  272,269 | $  193,436 | $  228,003 |
| | | | | | |
| **Reconciliation of Net Earnings (Loss) to EBITDA and Adjusted EBITDA :** | | | | | |
| Net earnings (loss) | $  46,427 | $  49,907 | $  73,375 | $  5,589 | $  (11,062) |
| Income tax expense (benefit) | (384) | 2,471 | 1,838 | 1,120 | 1,225 |
| Interest expense | 84,227 | 70,332 | 72,974 | 77,127 | 80,074 |
| Depreciation and amortization expense | 98,579 | 84,202 | 83,344 | 83,841 | 82,486 |
| EBITDA | 228,849 | 206,912 | 231,531 | 167,677 | 152,723 |
| Loss on extinguishment of debt | — | 21,202 | — | — | 36,449 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 | 15,769 | 9,440 | 10,157 |
| Non-cash stock and unit-based compensation charge | 25,982 | 24,508 | 13,545 | 8,843 | 13,488 |
| Loss on disposal of assets and other | 7,099 | 6,486 | 10,421 | 6,035 | 3,633 |
| Other (income) expense, net | 354 | 479 | (565) | (506) | (567) |
| Severance charges | — | — | — | 1,055 | |

45

BLFG_EDPA2274466

Table of Contents

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Change in fair value of contingent consideration | | (6,300) | | 5,000 | | — | | — | — |
| Litigation accrual and related legal fees associated with a class action lawsuit | | 806 | | 1,749 | | 1,568 | | 892 | 12,120 |
| Acquisition and transition expenses | $ | 16,373 | $ | — | $ | — | $ | — | $ | — |
| Unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments | $ | 2,412 | $ | — | $ | — | $ | — | $ | — |
| Adjusted EBITDA (a) | $ | 300,288 | $ | 288,125 | $ | 272,269 | $ | 193,436 | $ | 228,003 |

    (a) Adjusted EBITDA is calculated as earnings before income tax expense, interest expense, depreciation and amortization expense, loss on extinguishment of debt, non-cash employee stock ownership plan compensation charge, non-cash stock and unit-based compensation charge, loss on disposal of assets and other, other (income) expense, net, severance charges, change in fair value of contingent consideration and litigation accrual and related legal fees associated with a class action lawsuit, acquisition and transition expenses and unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments. Management believes the presentation of this measure is relevant and useful because it allows investors to view the partnership's performance in a manner similar to the method management uses, adjusted for items management believes makes it easier to compare its results with other companies that have different financing and capital structures. This method of calculating Adjusted EBITDA may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

(1) Working capital is the sum of current assets less current liabilities.

    Our capital expenditures fall generally into three categories:

- maintenance capital expenditures, which include capitalized expenditures for betterment and replacement of property, plant and equipment;
- growth capital expenditures, which include expenditures for purchases of both bulk and portable propane tanks and other equipment to facilitate expansion of our customer base and operating capacity; and
- acquisition capital expenditures, which include expenditures related to the acquisition of propane and related equipment sales operations and midstream operations; acquisition capital expenditures represent the total cost of acquisitions less working capital acquired.

<u>Factors that materially affect the comparability of the information reflected in selected financial data</u>

    During fiscal 2014, and 2011, the prepayment of outstanding principal amounts of fixed rate senior notes resulted in amounts recorded as "Loss on extinguishment of debt."

    During fiscal 2015, 2014, 2013, 2012 and 2011, a class action lawsuit resulted in a litigation accrual and related legal fees.

    During fiscal 2014, we acquired Sable Environmental and Sable SWD 2, LLC, a fluid logistics provider in the Eagle Ford shale region of south Texas for consideration of $126.1 million. See additional discussion about water solutions in Item 1 - Business. Midstream operations. Water solutions.

    During fiscal 2015, we acquired C&E Production, LLC ("C&E"), a fluid logistics provider in the Eagle Ford shale region of south Texas for consideration of $67.5 million. See additional discussion about water solutions in Item 1 - Business. Midstream operations. Water solutions.

    During fiscal 2015, we acquired Bridger, a provider of integrated crude oil midstream services for combined consideration of cash and common units in the amount of $822.5 million. See additional discussion about Bridger in Item 1 - Business. Midstream operations. Crude oil logistics.

**ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

    Our management's discussion and analysis of financial condition and results of operations relates to Ferrellgas Partners and the operating partnership.

BLFG_EDPA2274467

Table of Contents

Ferrellgas Partners Finance Corp. and Ferrellgas Finance Corp. have nominal assets, do not conduct any operations and have no employees other than officers. Ferrellgas Partners Finance Corp. serves as co-issuer and co-obligor for debt securities of Ferrellgas Partners and Ferrellgas Finance Corp. serves as co-issuer and co-obligor for debt securities of the operating partnership. Accordingly, and due to the reduced disclosure format, a discussion of the results of operations, liquidity and capital resources of Ferrellgas Partners Finance Corp. and Ferrellgas Finance Corp. is not presented in this section.

The following is a discussion of our historical financial condition and results of operations and should be read in conjunction with our historical consolidated financial statements and accompanying Notes thereto included elsewhere in this Annual Report on Form 10-K.

The discussions set forth in the "Results of Operations" and "Liquidity and Capital Resources" sections generally refer to Ferrellgas Partners and its consolidated subsidiaries. However, in these discussions there exist two material differences between Ferrellgas Partners and the operating partnership. Those two material differences are:

• because Ferrellgas Partners has outstanding $182.0 million in aggregate principal amount of 8.625% senior notes due fiscal 2020, the two partnerships incur different amounts of interest expense on their outstanding indebtedness; see the statements of earnings in their respective consolidated financial statements and Note H – Debt in the respective notes to their consolidated financial statements; and

• Ferrellgas Partners issued common units during fiscal years 2015 and 2014.

**Overview**

### *Strategic Diversification - Midstream Acquisitions*

On June 24, 2015, we acquired all of the outstanding membership interests of Bridger Logistics, LLC ("Bridger") for $562.5 million in cash, subject to certain post-closing adjustments for working capital, indebtedness and transaction expenses, and 11.2 million Ferrellgas Partners common units valued at $260.0 million. Bridger is a domestic crude oil transportation and logistics provider with an integrated portfolio of midstream assets, which connects crude oil production in prolific unconventional resource plays to downstream markets. Bridger's truck, pipeline terminal, pipeline, rail and maritime assets form a comprehensive, fee-for-service business model, and it is expected that substantially all of its cash flow will be generated from fee-based commercial agreements. With this acquisition we created a Midstream Operations - Crude Oil Logistics segment.

During September 2014, we acquired salt water disposal wells from C&E Production, LLC and its affiliates ("C&E sellers") based in Bryan, Texas for $67.5 million in cash. During May 2015, we purchased the assets of a salt water disposal well in Atascosa County, Texas for $5.8 million in cash. All of these acquired salt water disposal wells, together with our acquisition of Sable Environmental, LLC and Sable SWD 2, LLC in fiscal 2014, operate in the Eagle Ford shale region of South Texas and are included in our Midstream Operations - Water Solutions segment.

### *Propane and related equipment sales*

We are a leading distributor of propane and related equipment and supplies to customers in the United States as measured by the volume of our retail sales in fiscal 2015 and a leading national provider of propane by portable tank exchange. We serve residential, industrial/commercial, portable tank exchange, agricultural, wholesale and other customers in all 50 states, the District of Columbia and Puerto Rico. Our operations primarily include the distribution and sale of propane and related equipment and supplies with concentrations in the Midwest, Southeast, Southwest and Northwest regions of the United States.

We employ risk management activities that attempt to mitigate price risks related to the purchase, storage, transport and sale of propane generally in the contract and spot markets from major domestic energy companies on a short-term basis. We attempt to mitigate these price risks through the use of financial derivative instruments and forward propane purchase and sales contracts. We enter into propane sales commitments with a portion of our customers that provide for a contracted price agreement for a specified period of time. These commitments can expose us to product price risk if not immediately hedged with an offsetting propane purchase commitment.

Our open financial derivative purchase commitments are designated as hedges primarily for fiscal 2016 and 2017 sales commitments and, as of July 31, 2015, have experienced net mark to market losses of approximately $35.3 million. Because these financial derivative purchase commitments qualify for hedge accounting treatment, the resulting asset, liability and related mark to market gains or losses are recorded on the consolidated balance sheets as "Prepaid expenses and other current

47

BLFG_EDPA2274468

Table of Contents

assets," "Other assets, net," "Other current liabilities," "Other liabilities" and "Accumulated other comprehensive income (loss)," respectively, until settled. Upon settlement, realized gains or losses on these contracts will be reclassified to "Cost of product sold-propane and other gas liquid sales" in the consolidated statements of earnings as the underlying inventory is sold. These financial derivative purchase commitment net losses are expected to be offset by increased margins on propane sales commitments that qualify for the normal purchase normal sale exception. At July 31, 2015, we estimate 55% of currently open financial derivative purchase commitments, the related propane sales commitments and the resulting gross margin will be realized into earnings during the next twelve months.

Our open financial derivative fuel purchase commitments for fiscal 2016 and 2017 forecasted fuel usage by our propane related fleet are not designated as hedges, and as of July 31, 2015, have experienced net mark to market losses of approximately $2.4 million. Because these financial derivative purchase commitments do not qualify for hedge accounting treatment, the resulting liabilities and related mark to market losses are recorded on the consolidated balance sheets as "Other current liabilities" and "Other liabilities" and on the consolidated statement of earnings as "Operating expenses". These financial derivative fuel purchase commitment losses recognized currently on the statements of earnings are expected to be offset by future decreased fuel expense incurred by our fleet.

We also enter into interest rate derivative contracts, including swaps, to manage our exposure to interest rate risk associated with our fixed rate senior notes and our floating rate borrowings from both the secured credit facility and the accounts receivable securitization facility. Fluctuations in interest rates subject us to interest rate risk. Decreases in interest rates increase the fair value of our fixed rate debt, while increases in interest rates subject us to the risk of increased interest expense related to our variable rate borrowings.

*Midstream operations*

**Crude oil logistics**

The crude oil logistics segment generates income by providing crude oil transportation and logistics services on behalf of producers and end-users of crude oil. Bridger services include transportation through its operation of a fleet of 555 trucks, 634 tank trailers and 1,263 railcars primarily servicing Texas, Louisiana, North Dakota, Pennsylvania, Colorado and Wyoming; pipeline services in North Dakota, Montana, Wyoming, New Mexico, Mississippi, Oklahoma and Texas; and crude oil purchase and sale in connection with pipeline management services.

**Water solutions**

We currently own and operate nine salt water disposal wells in and around the Eagle Ford shale in south Texas. Salt water disposal wells are a critical component of the oil and natural gas well drilling industry. Oil and natural gas wells generate significant volumes of salt water. In the oil and gas fields Ferrellgas services, these volumes of water are transported by truck away from the fields to salt water disposal wells where a combination of gravity and chemicals are used to separate crude oil that is dissolved in the salt water through a process that results in the collection of "skimming oil". This skimming oil is then captured and sold before the salt water is injected into underground geologic formations using high-pressure pumps. Our revenue per barrel of salt water processed is derived from a blend of fees we charge our customers to dispose of salt water at our facilities and skimming oil sales. Our gross margin is highly dependent on crude oil production activity in the Eagle Ford shale and thus from the volume of salt water delivered to our wells for disposal. We hedge the price of crude oil sales from our a portion of our oil skimming activities, although we did not elect to qualify these transactions for hedge accounting.

*Overview of net earnings attributable to Ferrellgas Partners, L.P.*

"Net earnings attributable to Ferrellgas Partners, L.P." in fiscal 2015 was $29.6 million as compared to $33.2 million in fiscal 2014. This decrease was primarily due to:

- a $16.6 million decrease in gross margin in the propane and related equipment sales segment;
- a $14.4 million increase in "Depreciation and amortization expense";
- a $13.9 million increase in "Interest expense";
- a $12.1 million increase in "General and administrative expense";
- a $6.5 million increase in "Equipment lease expense";

BLFG_EDPA2274469

Table of Contents

partially offset by a

- a $21.2 million loss on extinguishment of debt that occurred in the prior year period;
- a $14.1 million decrease in "Operating expense";
- a $13.7 million increase in crude oil logistics gross margin; and
- an $11.4 million increase in water solutions gross margin.

We have completed our impairment test for the Retail operations, Products and Midstream operations - water solutions reporting units and believe that estimated fair values exceed the carrying values of our reporting units as of January 31, 2015. Goodwill associated with the Midstream operations - crude oil logistics reporting unit is a result of the acquisition of Bridger on June 24, 2015.

As a result of the significant drop in the price of crude oil and its impact on the results of Midstream operations - water solutions reporting unit during the second half of fiscal 2015, we considered whether the carrying value of this reporting unit no longer exceeded the fair value. Upon applying a fair-value-based test similar to the annual impairment test, we concluded that there was no impairment of the Midstream operations - water solutions reporting unit as of July 31, 2015. This test primarily consists of a discounted future cash flow model to predict fair value. The conclusion is based on the following critical assumptions: (1) the NYMEX West Texas Intermediate ("WTI") crude oil curve was used to predict future oil prices; (2) the oil skimming rate is expected to increase consistent with the projected increases in the NYMEX WTI crude oil curve consistent with past history; and (3) certain organic growth projects will increase the salt water volumes processed as new drilling activity increases associated with the projected NYMEX WTI crude oil curve. We believe that the results of this business are closely tied to the price of WTI crude oil and, therefore, if any of these assumptions are not sustained or are not sustained in a timely manner, the Midstream operations - water solutions reporting unit could incur material impairments.

**Forward-looking Statements**

Statements included in this report include forward-looking statements. These forward-looking statements are identified as any statement that does not relate strictly to historical or current facts. These statements often use words such as "anticipate," "believe," "intend," "plan," "projection," "forecast," "strategy," "position," "continue," "estimate," "expect," "may," "will," or the negative of those terms or other variations of them or comparable terminology. These statements often discuss plans, strategies, events or developments that we expect or anticipate will or may occur in the future and are based upon the beliefs and assumptions of our management and on the information currently available to them. In particular, statements, express or implied, concerning our future operating results or our ability to generate sales, income or cash flow are forward-looking statements.

Forward-looking statements are not guarantees of performance. You should not put undue reliance on any forward-looking statements. All forward-looking statements are subject to risks, uncertainties and assumptions that could cause our actual results to differ materially from those expressed in or implied by these forward-looking statements. Many of the factors that will affect our future results are beyond our ability to control or predict.

Some of our forward-looking statements include the following:

- that we will continue to have sufficient access to capital markets at yields acceptable to us to support our expected growth expenditures and refinancing of debt maturities;
- that Ferrellgas Partners and the operating partnership will continue to meet all of the quarterly financial tests required by the agreements governing their indebtedness; and
- that our future capital expenditures and working capital needs will be provided by a combination of cash generated from future operations, existing cash balances, the secured credit facility or the accounts receivable securitization facility.

When considering any forward-looking statement, you should also keep in mind the risk factors set forth in "Item 1A. Risk Factors." Any of these risks could impair our business, financial condition or results of operations. Any such impairment may affect our ability to make distributions to our unitholders or pay interest on the principal of any of our debt securities. In addition, the trading price, if any, of our securities could decline as a result of any such impairment.

Except for our ongoing obligations to disclose material information as required by federal securities laws, we undertake no obligation to update any forward-looking statements or risk factors after the date of this Annual Report on Form 10-K.

49

BLFG_EDPA2274470

Table of Contents

**Results of Operations**

Fiscal Year Ended July 31, 2015 compared to Fiscal Year Ended July 31, 2014

| *(amounts in thousands)* | | | | | Favorable (unfavorable) variance | |
|---|---|---|---|---|---|---|
| **Fiscal Year-Ended July 31,** | | **2015** | | **2014** | | |
| Propane sales volumes (gallons): | | | | | | |
| Retail – Sales to End Users | | 608,781 | | 651,358 | (42,577) | (7)% |
| Wholesale – Sales to Resellers | | 270,065 | | 295,212 | (25,147) | (9)% |
| | | 878,846 | | 946,570 | (67,724) | (7)% |
| Salt water volume (barrels) | | 17,035 | | 2,500 | 14,535 | NM |
| Crude oil hauled (barrels) | | 10,447 | | — | 10,447 | NM |
| | | | | | | |
| Revenues - | | | | | | |
| Propane and other gas liquids sales: | | | | | | |
| Retail – Sales to End Users | $ | 1,071,754 | $ | 1,392,526 | $ (320,772) | (23)% |
| Wholesale – Sales to Resellers | | 478,247 | | 619,710 | (141,463) | (23)% |
| Other Gas Sales (a) | | 107,015 | | 135,107 | (28,092) | (21)% |
| Other | | 260,185 | | 251,082 | 9,103 | 4 % |
| Propane and related equipment revenues | | 1,917,201 | | 2,398,425 | (481,224) | (20)% |
| Midstream operations - water solutions | | 25,677 | | 7,435 | 18,242 | NM |
| Midstream operations - crude oil logistics | | 81,512 | | — | 81,512 | NM |
| | $ | 2,024,390 | $ | 2,405,860 | $ (381,470) | (16)% |
| | | | | | | |
| Gross margin - | | | | | | |
| Propane and other gas liquids sales: (b) | | | | | | |
| Retail – Sales to End Users (a) | $ | 493,407 | $ | 497,508 | $ (4,101) | (1)% |
| Wholesale – Sales to Resellers (a) | | 186,385 | | 193,447 | (7,062) | (4)% |
| Other | | 89,488 | | 94,900 | (5,412) | (6)% |
| Propane and related equipment gross margin | $ | 769,280 | $ | 785,855 | $ (16,575) | (2)% |
| Midstream operations - water solutions (d) | | 16,862 | | 5,465 | 11,397 | NM |
| Midstream operations - crude oil logistics (d) | | 13,737 | | — | 13,737 | NM |
| | $ | 799,879 | $ | 791,320 | $ 8,559 | 1 % |
| | | | | | | |
| Operating income | $ | 130,520 | $ | 144,414 | $ (13,894) | (10)% |
| | | | | | | |
| Adjusted EBITDA - | | | | | | |
| Propane and related equipment | $ | 325,797 | $ | 331,292 | $ (5,495) | (2)% |
| Midstream operations - water solutions | | 5,536 | | 3,438 | 2,098 | NM |
| Midstream operations - crude oil logistics | | 8,583 | | — | 8,583 | NM |
| Corporate and other | | (39,732) | | (46,582) | 6,850 | (15)% |
| Adjusted EBITDA (c) | $ | 300,184 | $ | 288,148 | $ 12,036 | 4 % |
| | | | | | | |
| Interest expense | $ | 100,396 | $ | 86,502 | $ (13,894) | (16)% |
| Interest expense - operating partnership | | 84,227 | | 70,332 | (13,895) | (20)% |
| Loss on extinguishment of debt | | — | | 21,202 | 21,202 | NM |

NM - Not Meaningful

a)   Gross margin from Other Gas Sales is allocated to Gross margin Retail - Sales to End Users and Wholesale - Sales to Resellers based on the volumes of fixed-price sales commitments in each respective category.

50

BLFG_EDPA2274471

Table of Contents

b)  Gross margin from propane and other gas liquids sales represents "Revenues - propane and other gas liquids sales" less "Cost of product sold – propane and other gas liquids sales" and does not include depreciation and amortization.

c)  Adjusted EBITDA is calculated as net earnings attributable to Ferrellgas Partners, L.P., income tax expense, interest expense, depreciation and amortization expense, loss on extinguishment of debt, non-cash employee stock ownership plan compensation charge, non-cash stock and unit-based compensation charge, loss on disposal of assets, other expense, change in fair value of contingent consideration, litigation accrual and related legal fees associated with a class action lawsuit, unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments, acquisition and transition expenses and net earnings attributable to noncontrolling interest. Management believes the presentation of this measure is relevant and useful because it allows investors to view the partnership's performance in a manner similar to the method management uses, adjusted for items management believes makes it easier to compare its results with other companies that have different financing and capital structures. This method of calculating Adjusted EBITDA may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

d)  Gross margin from Midstream - water solutions and Midstream - crude oil logistics represents revenues less cost of sales and does not include depreciation and amortization.

The following table summarizes EBITDA, Adjusted EBITDA and distributable cash flow for the fiscal years ended July 31, 2015 and 2014, respectively:

*(amounts in thousands)*

| For the fiscal year ended July 31 | 2015 | 2014 |
|---|---|---|
| Net earnings attributable to Ferrellgas Partners, L.P. | $ 29,620 | $ 33,211 |
| Income tax expense (benefit) | (315) | 2,516 |
| Interest expense | 100,396 | 86,502 |
| Depreciation and amortization expense | 98,579 | 84,202 |
| EBITDA | 228,280 | 206,431 |
| Loss on extinguishment of debt | — | 21,202 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 |
| Non-cash stock-based compensation charge | 25,982 | 24,508 |
| Loss on disposal of assets | 7,099 | 6,486 |
| Other expense | 350 | 479 |
| Change in fair value of contingent consideration | (6,300) | 5,000 |
| Litigation accrual and related legal fees associated with a class action lawsuit | 806 | 1,749 |
| Unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments | 2,412 | — |
| Acquisition and transition expenses | 16,373 | — |
| Net earnings attributable to noncontrolling interest | 469 | 504 |
| Adjusted EBITDA | 300,184 | 288,148 |
| Net cash interest expense (a) | (96,150) | (83,686) |
| Maintenance capital expenditures (b) | (19,612) | (17,673) |
| Cash paid for taxes | (712) | (816) |
| Proceeds from asset sales | 5,905 | 4,524 |
| Distributable cash flow attributable to equity investors (c) | 189,615 | 190,497 |
| Distributable cash flow attributable to general partner and non-controlling interest | (3,792) | (3,810) |
| Distributable cash flow attributable to common unitholders (d) | 185,823 | 186,687 |
| Less: Distributions paid to common unitholders | (165,433) | (159,316) |
| Distributable cash flow surplus | $ 20,390 | $ 27,371 |

(a)  Net cash interest expense is the sum of interest expense less non-cash interest expense and other income (expense), net. This amount includes interest expense related to the accounts receivable securitization facility.

(b)  Maintenance capital expenditures include capitalized expenditures for betterment and replacement of property, plant and equipment.

BLFG_EDPA2274472

Table of Contents

(c) Management considers distributable cash flow attributable to equity investors a meaningful non-GAAP measure of the partnership's ability to declare and pay quarterly distributions to equity investors. Distributable cash flow attributable to equity investors, as management defines it, may not be comparable to distributable cash flow attributable to equity investors or similarly titled measurements used by other corporations and partnerships. Items added into our calculation of distributable cash flow attributable to equity investors that will not occur on a continuing basis may have associated cash payments. Distributable cash flow attributable to equity investors may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

(d) Management considers distributable cash flow attributable to common unitholders a meaningful non-GAAP measure of the partnership's ability to declare and pay quarterly distributions to common unitholders. Distributable cash flow attributable to common unitholders, as management defines it, may not be comparable to distributable cash flow attributable to common unitholders or similarly titled measurements used by other corporations and partnerships. Items added into our calculation of distributable cash flow attributable to common unitholders that will not occur on a continuing basis may have associated cash payments. Distributable cash flow attributable to common unitholders may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

**Propane and related equipment sales**

Propane sales volumes during fiscal 2015 decreased 7%, or 67.7 million gallons, from that of the prior year period due to 51.4 million of decreased gallon sales to retail customers and 25.1 million of decreased gallon sales to wholesale customers, partially offset by 8.8 million of acquisition related gallons.

Weather in the more highly concentrated geographic areas we serve for the twelve months ended July 31, 2015 was approximately 8% warmer than that of the prior year period and 4% warmer than normal. We believe retail and wholesale customer sales volume decreased due to warmer weather.

Our wholesale sales price per gallon correlates to the wholesale market price of propane. The wholesale market price at major supply points in Mt. Belvieu, Texas and Conway, Kansas, during fiscal 2015 averaged 43% and 49% less than the prior year period, respectively. The wholesale market price at Mt. Belvieu, Texas averaged $0.65 and $1.15 per gallon during fiscal 2015 and 2014, respectively, while the wholesale market price at Conway, Kansas averaged $0.62 and $1.22 per gallon during fiscal 2015 and 2014, respectively.

We believe the effect of this significant decrease in the average wholesale market price of propane resulted in an increase in our gross margin per gallon. During this period of significantly lower prices, we earned relatively greater gross margin per gallon as our ability to maintain sales price per gallon did not decline at the same rate as the corresponding decline in wholesale propane prices.

*Revenues*

Retail sales decreased $320.8 million compared to the prior year period. This decrease resulted primarily from a $229.7 million decrease in sales price per gallon and $111.0 million of decreased sales volumes, partially offset by $19.9 million increase resulting from gallons gained through acquisitions completed during the last twelve months, each as discussed above.

Wholesale sales decreased $141.5 million compared to the prior year period. This decrease resulted from $111.5 million of decreased sales price per gallon and $30.0 million of decreased sales volumes, both as discussed above.

Other gas sales decreased $28.1 million compared to the prior year period primarily due to $82.2 million of decreased sales price per gallon, partially offset by $54.1 million of increased sales volumes.

Other revenues increased $9.1 million compared to the prior period, primarily due to the increased sales of certain lower margin equipment sales.

*Gross margin - Propane and other gas liquids sales*

Gross margin decreased $11.2 million compared to the prior period. This decrease resulted primarily from a $47.2 million decrease in propane sales volumes, as discussed above, partially offset by a $25.5 million increase in gross margin per gallon and $10.5 million resulting from gallons gained through acquisitions completed during the last twelve months, as discussed above.

BLFG_EDPA2274473

Table of Contents

*Gross margin - Other*

Gross margin decreased $5.4 million primarily due to a $2.6 million decrease in miscellaneous fees billed to customers and $2.0 million decrease due to lower margin equipment sales.

*Adjusted EBITDA*

Adjusted EBITDA decreased $5.5 million primarily due to the $11.2 million of decreased "Gross margin – Propane and other gas liquid sales", as discussed above, a $7.4 million increase in lease expense and a $5.4 million decrease in Gross margin – Other, as discussed above, partially offset by a $18.4 million decrease in "Operating expense". "Equipment lease expense" increased $7.4 million primarily due to the replacement of older vehicles. "Operating expense" decreased due to a $10.4 million decrease in vehicle fuel and other vehicle costs, an $8.4 million decrease in personnel related costs, primarily due to reduced performance-based incentive expenses, and a $5.5 million decrease in general liability and workers compensation costs, partially offset by $4.9 million of expense related to gallons gained through acquisitions completed during the last twelve months.

## Midstream operations - Crude oil logistics

Our midstream operations - crude oil logistics began with our June 2015 acquisition of Bridger.

*Revenues*

Our midstream operations - crude oil logistics generated $81.5 million of crude oil transportation related revenues.

*Gross margin*

Our midstream operations - crude oil logistics generated $13.7 million of crude oil transportation related gross margin.

*Adjusted EBITDA*

Our midstream operations - crude oil logistics Adjusted EBITDA of $8.6 million during fiscal 2015 was due to the $13.7 million of gross margin discussed above, partially offset by $4.2 million of operating expenses.

## Midstream operations - Water solutions

Our midstream operations - water solutions began with our May 2014 acquisition of Sable, therefore, fiscal 2015 includes a full year of operations as compared to fiscal 2014, which included three months of operations.

*Revenues*

Our midstream operations - water solutions revenues increased $18.2 million primarily due to the timing of the Sable acquisition in fiscal 2014, as discussed above.

*Gross margin*

Our midstream operations - water solutions gross margin increased $11.4 million primarily due to the timing of the Sable acquisition in fiscal 2014, as discussed above.

*Adjusted EBITDA*

Our midstream operations - water solutions Adjusted EBITDA increased $2.1 million due to the $11.4 million of gross margin discussed above, partially offset by a $9.3 million increase in operating expenses. Operating expenses increased primarily due to the timing of the Sable acquisition in fiscal 2014, as discussed above.

## Corporate & other

The Adjusted EBITDA within "corporate and other" increased by $6.9 million primarily due to a decrease in "General and administrative expense" performance-based incentives.

BLFG_EDPA2274474

Table of Contents

**Consolidated**

*Operating income*

"Operating income" decreased $13.9 million compared to the prior year period primarily due to a $14.4 million increase in "Depreciation and amortization", a $12.1 million increase in "General and administrative expense" and a $6.5 million increase in "Equipment lease expense", as discussed above, partially offset by $14.1 million decrease in "Operating expense" and a $8.5 million increase in total gross margin, as discussed above.

"Depreciation and amortization" increased primarily due to depreciation and amortization related to the assets acquired for our Midstream operations. "General and administrative expense" increased primarily due to the expenditure of $16.4 million of acquisition and transition costs related to the Bridger Logistics Acquisition, partially offset by a $6.6 million decrease in performance-based incentive expenses. "Operating expense" within our Propane and related equipment sales segment decreased $16.0 million due to an $8.4 million decrease in personnel related costs, primarily due to reduced performance-based incentive expenses, an $8.0 million decrease in vehicle fuel and other vehicle costs and a $5.5 million decrease in general liability and workers compensation costs, partially offset by $4.9 million of expense related to gallons gained through acquisitions completed during the last twelve months. Operating expense within our Midstream operations segments increased $2.1 million compared to the prior year period, due to $9.3 million of increases related to the full year of Midstream operations - water solutions in fiscal 2015 and $4.2 million of increases related to the fiscal 2015 Bridger Logistics Acquisition, substantially offset by the $11.3 million decrease in the fair value of contingent consideration related to the Sable acquisition.

*Distributable cash flow to equity investors*

Distributable cash flow attributable to equity investors decreased slightly from $190.5 million in the prior year to $189.6 million in the current period primarily due to the $12.5 million increase in net cash interest expense, offset by the $12.0 million increase in Adjusted EBITDA, as discussed above.

*Interest expense - consolidated*

"Interest expense" increased $13.9 million primarily due to the issuance of new debt to fund acquisitions and growth capital expenditures.

*Interest expense - operating partnership*

"Interest expense" increased $13.9 million primarily due to the issuance of new debt to fund acquisitions and growth capital expenditures.

*Loss on extinguishment of debt*

During fiscal 2014, we redeemed the outstanding principal amount on our $300.0 million 9.125% fixed rate senior notes due October 1, 2017, incurring a loss on extinguishment of debt of $20.9 million. We incurred an additional $0.3 million loss on extinguishment of debt related to the write-off of capitalized financing costs as a result of amending our secured credit facility.

54

BLFG_EDPA2274475

Table of Contents

Fiscal Year Ended July 31, 2014 compared to Fiscal Year Ended July 31, 2013

| *(amounts in thousands)* **Fiscal Year-Ended July 31,** | | **2014** | | **2013** | | **Favorable (unfavorable) variance** | |
|---|---|---|---|---|---|---|---|
| Propane sales volumes (gallons): | | | | | | | |
| Retail – Sales to End Users | | 651,358 | | 637,923 | | 13,435 | 2 % |
| Wholesale – Sales to Resellers | | 295,212 | | 263,447 | | 31,765 | 12 % |
| | | 946,570 | | 901,370 | | 45,200 | 5 % |
| Salt water volume (barrels) | | 2,500 | | — | | 2,500 | NM |
| | | | | | | | |
| Revenues - | | | | | | | |
| Propane and other gas liquids sales: | | | | | | | |
| Retail – Sales to End Users | $ | 1,392,526 | $ | 1,127,748 | $ | 264,778 | 23 % |
| Wholesale – Sales to Resellers | | 619,710 | | 479,533 | | 140,177 | 29 % |
| Other Gas Sales (a) | | 135,107 | | 131,986 | | 3,121 | 2 % |
| Other | | 251,082 | | 236,200 | | 14,882 | 6 % |
| Propane and related equipment revenues | $ | 2,398,425 | $ | 1,975,467 | $ | 422,958 | 21 % |
| Midstream operations - water solutions | | 7,435 | | — | | 7,435 | NM |
| | $ | 2,405,860 | $ | 1,975,467 | $ | 430,393 | 22 % |
| | | | | | | | |
| Gross margin - | | | | | | | |
| Propane and other gas liquids sales: (b) | | | | | | | |
| Retail – Sales to End Users (a) | $ | 497,508 | $ | 476,040 | $ | 21,468 | 5 % |
| Wholesale – Sales to Resellers (a) | | 193,447 | | 170,966 | | 22,481 | 13 % |
| Other | | 94,900 | | 91,744 | | 3,156 | 3 % |
| Propane and related equipment gross margin | | 785,855 | | 738,750 | | 47,105 | 6 % |
| Midstream operations - water solutions (d) | | 5,465 | | — | | 5,465 | NM |
| | $ | 791,320 | $ | 738,750 | $ | 52,570 | 7 % |
| | | | | | | | |
| Operating income | | 144,414 | | 147,602 | | (3,188) | (2)% |
| | | | | | | | |
| Adjusted EBITDA - | | | | | | | |
| Propane and related equipment | $ | 331,292 | $ | 315,486 | $ | 15,806 | 5 % |
| Midstream operations - water solutions | | 3,438 | | — | | 3,438 | NM |
| Corporate and other | | (46,582) | | (43,237) | | (3,345) | 8 % |
| Adjusted EBITDA (c) | $ | 288,148 | $ | 272,249 | $ | 15,899 | 6 % |
| | | | | | | | |
| Interest expense | | 86,502 | | 89,145 | | 2,643 | 3 % |
| Interest expense - operating partnership | | 70,332 | | 72,974 | | 2,642 | 4 % |
| Loss on extinguishment of debt | | 21,202 | | — | | (21,202) | NM |

NM - Not Meaningful

a)   Gross margin from Other Gas Sales is allocated to Gross margin Retail - Sales to End Users and Wholesale - Sales to Resellers based on the volumes of fixed-price sales commitments in each respective category.

b)   Gross margin from propane and other gas liquids sales represents "Revenues - propane and other gas liquids sales" less "Cost of product sold - propane and other gas liquids sales" and does not include depreciation and amortization.

c)   Adjusted EBITDA is calculated as net earnings attributable to Ferrellgas Partners, L.P., income tax expense, interest expense, depreciation and amortization expense, loss on extinguishment of debt, non-cash employee stock ownership plan compensation charge, non-cash stock and unit-based compensation charge, loss on disposal of assets, other expense (income), net, litigation accrual and related legal fees associated with a class action lawsuit, change in fair value of

BLFG_EDPA2274476

Table of Contents

contingent consideration and net earnings attributable to noncontrolling interest. Management believes the presentation of this measure is relevant and useful because it allows investors to view the partnership's performance in a manner similar to the method management uses, adjusted for items management believes makes it easier to compare its results with other companies that have different financing and capital structures. This method of calculating Adjusted EBITDA may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

d) Gross margin from Midstream - water solutions represents revenues less cost of sales and does not include depreciation and amortization.

The following table summarizes EBITDA, Adjusted EBITDA and distributable cash flow for the fiscal year ended July 31, 2014 and 2013, respectively:

| (amounts in thousands) | 2014 | 2013 |
|---|---|---|
| Net earnings (loss) attributable to Ferrellgas Partners, L.P. | $ 33,211 | $ 56,426 |
| Income tax expense | 2,516 | 1,855 |
| Interest expense | 86,502 | 89,145 |
| Depreciation and amortization expense | 84,202 | 83,344 |
| EBITDA | 206,431 | 230,770 |
| Loss on extinguishment of debt | 21,202 | — |
| Non-cash employee stock ownership plan compensation charge | 21,789 | 15,769 |
| Non-cash stock and unit-based compensation charge | 24,508 | 13,545 |
| Loss on disposal of assets | 6,486 | 10,421 |
| Other expense (income), net | 479 | (565) |
| Change in fair value of contingent consideration | 5,000 | — |
| Litigation accrual and related legal fees associated with a class action lawsuit | 1,749 | 1,568 |
| Net earnings attributable to noncontrolling interest | 504 | 741 |
| Adjusted EBITDA | 288,148 | 272,249 |
| Net cash interest expense (a) | (83,686) | (83,495) |
| Maintenance capital expenditures (b) | (17,673) | (15,070) |
| Cash paid for taxes | (816) | (550) |
| Proceeds from asset sales | 4,524 | 9,980 |
| Distributable cash flow attributable to equity investors (c) | 190,497 | 183,114 |
| Distributable cash flow attributable to general partner and non-controlling interest | (3,810) | (3,662) |
| Distributable cash flow attributable to common unitholders (d) | 186,687 | 179,452 |
| Less: Distributions paid to common unitholders | (159,316) | (158,087) |
| Distributable cash flow surplus | $ 27,371 | $ 21,365 |

(a) Net cash interest expense is the sum of interest expense less non-cash interest expense and other income, net. This amount includes interest expense related to the accounts receivable securitization facility.

(b) Maintenance capital expenditures include capitalized expenditures for betterment and replacement of property, plant and equipment.

(c) Management considers distributable cash flow attributable to equity investors a meaningful non-GAAP measure of the partnership's ability to declare and pay quarterly distributions to equity investors. Distributable cash flow attributable to equity investors, as management defines it, may not be comparable to distributable cash flow attributable to equity investors or similarly titled measurements used by other corporations and partnerships. Items added into our calculation of distributable cash flow attributable to equity investors that will not occur on a continuing basis may have associated cash payments. Distributable cash flow attributable to equity investors may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

(d) Management considers distributable cash flow attributable to common unitholders a meaningful non-GAAP measure of the partnership's ability to declare and pay quarterly distributions to common unitholders. Distributable cash flow attributable to common unitholders, as management defines it, may not be comparable to distributable cash flow attributable to

BLFG_EDPA2274477

Table of Contents

common unitholders or similarly titled measurements used by other corporations and partnerships. Items added into our calculation of distributable cash flow attributable to common unitholders that will not occur on a continuing basis may have associated cash payments. Distributable cash flow attributable to common unitholders may not be consistent with that of other companies and should be viewed in conjunction with measurements that are computed in accordance with GAAP.

**Propane and related equipment sales**

Propane sales volumes during fiscal 2014 increased 5%, or 45.2 million gallons, from that of the prior year period due to 31.8 million of increased gallon sales to wholesale customers and 13.4 million of increased gallons to retail customers.

Weather in the more highly concentrated geographic areas we serve for the twelve months ended July 31, 2014 was approximately 9% colder than that of the prior year period and 4% colder than normal. We believe retail and wholesale customer sales volume increased due to colder weather and heavier than normal propane use for crop drying during an unusually wet harvest season.

Our sales price per gallon correlates to the wholesale market price of propane. The wholesale market price at the major supply points in Mt. Belvieu, Texas and Conway, Kansas during fiscal 2014 averaged 29% and 49% more than the prior year period, respectively. The wholesale market price at Mt. Belvieu, Texas averaged $1.15 and $0.89 per gallon during fiscal 2014 and 2013, respectively, while the wholesale market price at Conway, Kansas averaged $1.22 and $0.82 per gallon during fiscal 2014 and 2013, respectively.

The propane industry experienced significant logistical and infrastructure challenges caused by industry-wide storage and transportation issues during the winter heating season. As a result, wholesale propane prices rose to historic levels in certain geographic areas. Once these issues were resolved, the wholesale cost of propane decreased significantly and dramatically in these geographic locations. During February 2014, the wholesale cost of propane in Conway, Kansas decreased from $2.49 per gallon to $1.16 per gallon. During this period of rapidly decreasing wholesale propane prices our gross margin per gallon sold increased on certain contracted sales volumes to commercial customers.

*Revenues*

Retail sales increased $264.8 million compared to the prior year period. This increase resulted primarily from a $241.0 million increase in sales price per gallon and $23.8 million of increased sales volumes, both as discussed above.

Wholesale sales increased $140.2 million compared to the prior year period. This increase resulted primarily from $89.8 million of increased sales price per gallon and $50.4 million of increased sales volumes, both as discussed above.

Other gas sales increased $3.1 million compared to the prior year period primarily due to $34.4 million of increased sales price per gallon, offset by $31.3 million of decreased sales volumes.

*Gross margin - Propane and other gas liquids sales*

Gross margin increased $43.9 million primarily due to a $30.2 million increase in gallon sales and an $13.7 million increase in gross margin per gallon sold nationally, both as discussed above.

*Gross margin - Other*

Gross margin increased $3.2 million primarily due to $8.2 million of grilling tool and accessory sales gained through acquisitions, partially offset by a $2.2 million decrease in miscellaneous fees billed to customers and a $1.9 million decrease in materials and appliance sales.

*Adjusted EBITDA*

Adjusted EBITDA increased $15.9 million primarily due to the $43.9 million of increased "Gross margin - Propane and other gas liquid sales" and a $3.2 million increase in Gross margin - Other, both as discussed above, partially offset by a $29.8 million increase in "Operating expense". "Operating expense" increased $17.9 million due to variable delivery costs related to the increase in propane sales volume, as discussed above, and increased operating expenses of $8.1 million related to acquisitions of both grilling tool and accessory operations and propane operations.

BLFG_EDPA2274478

Table of Contents

**Midstream operations - Water solutions**

Our midstream operations - water solutions began with our May 2014 acquisition of Sable.

*Revenues*

Our midstream operations - water solutions generated $7.4 million of skimming oil and salt water disposal revenues.

*Gross margin*

Our midstream operations - water solutions generated $5.5 million of skimming oil and salt water disposal gross margin.

*Adjusted EBITDA*

Our midstream operations - water solutions Adjusted EBITDA of $3.4 million during fiscal 2014 was due to the $5.5 million of gross margin discussed above, partially offset by $2.1 million of operating expenses.

**Corporate & other**

The operating loss within "corporate and other" increased by $3.3 million primarily due to an increase of $3.1 million in "General and administrative expense". "General and administrative expense" increased primarily due to a $1.4 million increase in performance-based incentive expenses and $0.9 million in acquisition related costs.

**Consolidated**

*Operating income*

"Operating income" decreased $3.2 million compared to the prior year period primarily due to a $39.1 million increase in "Operating expense", a $12.0 million increase in "General and administrative expense" and a $6.0 million increase in "Non-cash employee stock ownership plan compensation charge", partially offset by $43.9 million of increased "Gross margin - Propane and other gas liquid sales", a $5.5 million increase in midstream operations - water solutions gross margin and a $3.2 million increase in Gross margin - Other, each as discussed above.

"Operating expense" increased $17.9 million primarily due to variable delivery costs related to the increase in propane sales volume, $8.1 million due to increased operating expenses related to both acquisitions of grilling tool and accessory operations and propane operations, $2.1 million of operating costs related to our midstream operations - water solutions, each as discussed above, and a $5.0 million change in the fair value of contingent consideration related to our midstream operations - water solutions. "General and administrative expense" increased primarily due to $8.0 million of increased non-cash stock based compensation charges, a $1.4 million increase in performance-based incentive expenses and $0.9 million in acquisition related costs.

"Non-cash employee stock ownership plan compensation charge" increased primarily due to the increase in per share value of Ferrell Companies shares allocated to employees during the current year period as compared to the prior year period.

*Distributable cash flow to equity investors*

Distributable cash flow attributable to equity investors increased from $183.1 million in the prior year to $190.5 million in the current period primarily due to the $15.9 million increase in Adjusted EBITDA in propane and related equipment sales as discussed above. This increase was partially offset by a $5.5 million decrease in proceeds from asset sales due to a one time sale of underutilized assets in the prior year period that was not repeated in the current year period and a $2.6 million increase due to the timing of maintenance capital expenditures.

*Interest expense - consolidated*

"Interest expense" decreased $2.6 million primarily due to a $1.9 million decrease due to the issuance of new senior debt at lower rates than the debt retired.

58

Table of Contents

*Interest expense - operating partnership*

"Interest expense" decreased $2.6 million primarily due to a $1.9 million decrease due to the issuance of new senior debt at lower rates than the debt retired.

*Loss on extinguishment of debt*

During fiscal 2014, we redeemed the outstanding principal amount on our $300.0 million 9.125% fixed rate senior notes due October 1, 2017, incurring a loss on extinguishment of debt of $20.9 million. We incurred an additional $0.3 million loss on extinguishment of debt related to the write-off of capitalized financing costs as a result of amending our secured credit facility.

## Liquidity and Capital Resources

### General

Our liquidity and capital resources enable us to fund our working capital requirements, letter of credit requirements, debt service payments, acquisition and capital expenditures and distributions to our unitholders. Our liquidity and capital resources may be affected by our ability to access the capital markets or by unforeseen demands on cash, or other events beyond our control.

During June 2015, we acquired Bridger, a provider of integrated crude oil midstream services based near Dallas, Texas. We paid $562.5 million in cash, subject to certain post-closing adjustments for working capital, indebtedness and transaction expenses, and 11.2 million Ferrellgas Partners common units. We funded the cash portion of this acquisition from the following transactions that also closed in June 2015: (a) the operating partnership's issuance of $500.0 million in aggregate principal amount of 6.75% senior notes due 2023 at an offering price equal to par for net proceeds of $491.3 million, and (b) our issuance of 6.3 million Ferrellgas Partners common units in a registered public offering, for net proceeds of approximately $141.1 million. We used the excess proceeds to pay down a portion of the outstanding borrowings under our secured credit facility.

During September 2014, we acquired two salt water disposal wells in the Eagle Ford shale region of south Texas from C&E sellers, based in Bryan, Texas. Consideration was paid in cash upon closing with funds borrowed from our secured credit facility. During September 2014, in a non-brokered registered direct offering, we issued to Ferrell Companies Inc. and the former equity holders of C&E sellers, an aggregate of 1.5 million Ferrellgas Partners common units for an aggregate purchase price of $42.0 million, which units are subject to certain transfer restrictions. We used these proceeds to pay down a portion of the borrowings under our secured credit facility used to fund the acquisition discussed above, as well as other propane and related equipment sales acquisitions completed during fiscal 2014.

### Distributable Cash Flow

A reconciliation of distributable cash flow to distributions paid for the year ended July 31, 2015 to the year ended July 31, 2014 is as follows (in thousands):

|  | Distributable Cash Flow to equity investors | Cash reserves approved by our General Partner | Cash distributions paid to equity investors | DCF ratio |
|---|---|---|---|---|
| Year ended July 31, 2015 | $ 189,615 | $ 20,646 | $ 168,969 | 1.12 |
| Year ended July 31, 2014 | 190,497 | 27,769 | 162,728 | 1.17 |
| Increase (decrease) | $ (882) | $ (7,123) | $ 6,241 | (0.05) |

For the year ended July 31, 2015 distributable cash flow decreased $0.9 million. Cash distributions paid increased $6.2 million primarily due to the issuance of 2.0 million common units during the fourth quarter of fiscal 2014 and 1.5 million common units during the first quarter of fiscal 2015, both in connection with acquisitions. These changes resulted in a decrease in our distribution coverage ratio to 1.12 for the year ended July 31, 2015 as compared to 1.17 for the year ended July 31, 2014. Cash reserves of $20.6 million and $27.8 million in fiscal 2015 and 2014, respectively, were established to meet future anticipated expenditures.

BLFG_EDPA2274480

Table of Contents

Subject to meeting the financial tests discussed below and also subject to the risk factors identified in "Item 1A. Risk Factors," we believe we will continue to have sufficient access to capital markets at yields acceptable to us to support our expected growth expenditures and refinancing of debt maturities. Our disciplined approach to fund necessary capital spending and other partnership needs, combined with sufficient trade credit to operate our business efficiently and available credit under our secured credit facility and our accounts receivable securitization facility should provide us the means to meet our anticipated liquidity and capital resource requirements.

During periods of high volatility, our risk management activities may expose us to the risk of counterparty margin calls in amounts greater than we have the capacity to fund. Likewise our counterparties may not be able to fulfill their margin calls from us or may default on the settlement of positions with us.

Our working capital requirements are subject to, among other things, the price of propane, delays in the collection of receivables, volatility in energy commodity prices, liquidity imposed by insurance providers, downgrades in our credit ratings, decreased trade credit, significant acquisitions, the weather, customer retention and purchasing patterns and other changes in the demand for propane and crude oil. Relatively colder weather or higher propane prices during the winter heating season are factors that could significantly increase our working capital requirements.

Our ability to satisfy our obligations is dependent upon our future performance, which will be subject to prevailing economic, financial, business and weather conditions and other factors, many of which are beyond our control. Due to the seasonality of the retail propane distribution business, a significant portion of our propane and related products cash flows from operations is generated during the winter heating season. Our midstream operations segments are not expected to experience seasonality. Our net cash provided by operating activities primarily reflects earnings from our business activities adjusted for depreciation and amortization and changes in our working capital accounts. Historically, we generate significantly lower net cash from operating activities in our first and fourth fiscal quarters as compared to the second and third fiscal quarters due to the seasonality of our propane and related equipment sales segment.

A quarterly distribution of $0.5125 was paid on September 14, 2015, to all common units that were outstanding on September 7, 2015. This represents the first increase to our quarterly distribution, after eighty-three consecutive quarterly distributions of $0.50 paid to our common unitholders dating back to October 1994.

Our secured credit facility, publicly-held debt and accounts receivable securitization facility contain several financial tests and covenants restricting our ability to pay distributions, incur debt and engage in certain other business transactions. In general, these tests are based on our debt-to-cash flow ratio and cash flow-to-interest expense ratio. We believe that the most restrictive of these tests are debt incurrence limitations under the terms of our secured credit and accounts receivable securitization facilities and limitations on the payment of distributions within our 8.625% senior notes due 2020.

As of July 31, 2015, we met all of our required quarterly financial tests and covenants. Based upon current estimates of our cash flow, we believe we will be able to continue to meet all of our required quarterly financial tests and covenants in fiscal 2016. However, we may not meet the applicable financial tests in future quarters if we were to experience:

- significantly warmer than normal temperatures during the winter heating season;
- a more volatile energy commodity cost environment;
- an unexpected downturn in business operations;
- a change in customer retention or purchasing patterns due to economic or other factors in the United States; or
- a material downturn in the credit and/or equity markets.

Failure to meet applicable financial tests could have a material effect on our operating capacity and cash flows and could restrict our ability to incur debt or to make cash distributions to our unitholders, even if sufficient funds were available. Depending on the circumstances, we may consider alternatives to permit the incurrence of debt or the continued payment of the quarterly cash distribution to our unitholders. No assurances can be given, however, that such alternatives can or will be implemented with respect to any given quarter.

We expect our future capital expenditures and working capital needs to be provided by a combination of cash generated from future operations, existing cash balances, the secured credit facility or the accounts receivable securitization facility. See additional information about the accounts receivable securitization facility in "Financing Activities – Accounts receivable securitization." In order to reduce existing indebtedness, fund future acquisitions and expansive capital projects, we may obtain funds from our facilities, issue additional debt to the extent permitted under existing financing arrangements or issue additional common units.

BLFG_EDPA2274481

Table of Contents

Toward this purpose, the following registration statements were effective upon filing or declared effective by the SEC:

- a shelf registration statement for the periodic sale of common units for general business purposes, which among other things, may include the following: repayment of outstanding indebtedness; the redemption of any senior notes or other securities (other than common units) previously issued; working capital; capital expenditures; acquisitions, or other general business purposes. As of August 31, 2015, Ferrellgas Partners has issued 6.3 million common units from this shelf registration statement; and
- an "acquisition" shelf registration statement for the periodic sale of up to $500.0 million in common units to fund acquisitions; as of August 31, 2015, Ferrellgas Partners had $500.0 million available under this shelf registration statement.

**Operating Activities**

Ferrellgas Partners

Fiscal 2015 v Fiscal 2014

Net cash provided by operating activities was $203.1 million for fiscal 2015, compared to net cash provided by operating activities of $125.7 million for fiscal 2014. This increase in cash provided by operating activities was primarily due to a $100.2 million decrease in working capital requirements which was partially offset by a $3.9 million decrease in cash flow from operations and a $18.9 million increase in other assets , net, used to fund margin deposits made toward price risk management activities.

The decrease in working capital requirements was primarily due to a $77.8 million decrease in inventory from the decrease in the wholesale price of propane as well as the timing of inventory purchases and a $46.3 million decrease in accounts receivable resulting primarily from the decrease in the wholesale price of propane as well as the timing of billing and collections on accounts receivable and a $12.7 million increase in accrued interest expense due to the timing of interest payments. These decreases in working capital requirements were partially offset by a $21.0 million increase in prepaid expenses and other current assets primarily due to margin deposits made toward price risk management activities and a $17.8 million decrease in accounts payable resulting primarily from the timing of purchases and disbursements.

The decrease in cash flow from operations is primarily due to a $13.9 million increase in "Interest Expense", $10.4 million of increased "General and Administrative expense", a $6.5 million increase in "Equipment lease expense", as discussed above, partially offset by a $14.7 million decrease in "Loss on extinguishment of debt", an $8.6 million increase in combined "Gross margin - Propane and other gas liquid sales", gross margin from our Midstream operations and "Gross margin - Other", as discussed above and $2.6 million of decreased "Operating expense", net of $11.3 million non-cash decrease in the fair value of contingent consideration.

Fiscal 2014 v Fiscal 2013

Net cash provided by operating activities was $125.7 million for fiscal 2014, compared to net cash provided by operating activities of $210.1 million for fiscal 2013. This decrease in cash provided by operating activities was primarily due to a $86.4 million increase in working capital requirements, partially offset by a $4.1 million improvement in cash flows from operations.

The increase in working capital requirements was due to a $42.2 million increase in accounts receivable resulting primarily from the increase in the wholesale market price of propane as well as the timing of billings and collections on accounts receivable, a $44.6 million increase in inventory from the increase in the wholesale market price of propane as well as the timing of inventory purchases, a $10.1 million increase in prepaid expenses and other current assets primarily due to the timing of deposits made toward the purchase of propane appliances and a $7.5 million decrease in accrued interest expense due to the timing of interest payments. These increases in working capital requirements were partially offset by a $15.8 million increase in accounts payable from the timing of purchases and disbursements.

The increase in cash flow from operations is primarily due to $43.9 million of increased "Gross margin - Propane and other gas liquid sales", $5.5 million of increased "Gross margin - midstream operations" and a $3.2 million increase in "Gross margin - Other", partially offset by a $31.1 million increase in operating expenses and $14.7 million of make whole and consent payments related to the early extinguishment of all of our $300.0 million 9.125% fixed rate senior notes due October 1, 2017, each as discussed above.

61

BLFG_EDPA2274482

Table of Contents

The operating partnership

Fiscal 2015 v Fiscal 2014

Net cash provided by operating activities was $216.5 million for fiscal 2015, compared to net cash provided by operating activities of $141.5 million for fiscal 2014. This increase in cash provided by operating activities was primarily due to a $97.7 million decrease in working capital requirements which was somewhat offset by a $3.7 million decrease in cash flow from operations and a $18.9 million increase in other assets, net, used to fund margin deposits made toward price risk management activities.

The decrease in working capital requirements was primarily due to a $77.8 million decrease in inventory from the decrease in the wholesale price of propane as well as the timing of inventory purchases and a $46.3 million decrease in accounts receivable resulting primarily from the decrease in the wholesale price of propane as well as the timing of billing and collections on accounts receivable and a $12.7 million increase in accrued interest expense due to the timing of interest payments. These decreases in working capital requirements were partially offset by a $21.0 million increase in prepaid expenses and other current assets primarily due to margin deposits made toward price risk management activities and a $17.8 million decrease in accounts payable resulting primarily from the timing of purchases and disbursements.

The decrease in cash flow from operations is primarily due to a $13.9 million increase in "Interest Expense", $10.4 million of increased "General and Administrative expense", a $6.5 million increase in "Equipment lease expense", as discussed above, partially offset by a $14.7 million decrease in "Loss on extinguishment of debt", an $8.6 million increase in combined "Gross margin - Propane and other gas liquid sales", gross margin from our Midstream operations and "Gross margin - Other", as discussed above and $2.6 million of decreased "Operating expense", exclusive of a $11.3 million non-cash decrease in the fair value of contingent consideration.

Fiscal 2014 v Fiscal 2013

Net cash provided by operating activities was $141.5 million for fiscal 2014, compared to net cash provided by operating activities of $225.9 million for fiscal 2013. This decrease in cash provided by operating activities was primarily due to a $86.4 million increase in working capital requirements, partially offset by a $4.1 million improvement in cash flows from operations.

The increase in working capital requirements was due to a $42.2 million increase in accounts receivable resulting primarily from the increase in the wholesale market price of propane as well as the timing of billings and collections on accounts receivable, a $44.6 million increase in inventory from the increase in the wholesale market price of propane as well as the timing of inventory purchases, a $10.1 million increase in prepaid expenses and other current assets primarily due to the timing of deposits made toward the purchase of propane appliances and a $7.5 million decrease in accrued interest expense due to the timing of interest payments. These increases in working capital requirements were partially offset by a $15.8 million increase in accounts payable from the timing of purchases and disbursements.

The increase in cash flow from operations is primarily due to $43.9 million of increased "Gross margin - Propane and other gas liquid sales", $5.5 million of increased "Gross margin - midstream operations" and a $3.2 million increase in "Gross margin - Other", partially offset by a $31.3 million increase in operating expenses and $14.7 million of make whole and consent payments related to the early extinguishment of all of our $300.0 million 9.125% fixed rate senior notes due October 1, 2017, each as discussed above.

**Investing Activities**

Capital Requirements

Our business requires continual investments to upgrade or enhance existing operations and to ensure compliance with safety and environmental regulations. Capital expenditures for our business consist primarily of:

- Maintenance capital expenditures. These capital expenditures include expenditures for betterment and replacement of property, plant and equipment rather than to generate incremental distributable cash flow. Examples of maintenance capital expenditures include a routine replacement of a worn-out asset or replacement of major vehicle components; and

- Growth capital expenditures. These expenditures are undertaken primarily to generate incremental distributable cash flow. Examples include expenditures for purchases of both bulk and portable propane tanks and other equipment to

BLFG_EDPA2274483

Table of Contents

facilitate expansion of our customer base and operating capacity.

Fiscal 2015 v Fiscal 2014

Net cash used in investing activities was $708.0 million for fiscal 2015, compared to net cash used in investing activities of $210.1 million for fiscal 2014. This increase in net cash used in investing activities is due to an increase of $479.4 million in "Business acquisitions, net of cash acquired" primarily due to the acquisition of Bridger and a $19.9 million increase in "Capital expenditures".

The increase in "Capital expenditures" is primarily due to the timing of $7.8 million in Propane and related equipment sales growth and maintenance capital expenditures and an increase of $11.7 million in Midstream operations growth capital expenditures related to improvements at existing salt water disposal facilities.

Due to the mature nature of our propane and related equipment sales operations segment, we have not incurred and do not anticipate significant fluctuations in maintenance capital expenditures. However, future fluctuations in growth capital expenditures could occur due to the opportunistic nature of these projects.

Due to the relatively new nature of our midstream operations segments, we may experience significant fluctuations in maintenance capital expenditures as our facilities age and future fluctuations in growth capital expenditures could occur due to the opportunistic nature of these projects.

Fiscal 2014 v Fiscal 2013

Net cash used in investing activities was $210.1 million for fiscal 2014, compared to net cash used in investing activities of $68.1 million for fiscal 2013. This increase in net cash used in investing activities is primarily due to an increase of $124.8 million in "Business acquisitions, net of cash acquired", a $11.7 million increase in "Capital expenditures" and a $5.5 million decrease in "Proceeds from sale of assets" resulting primarily from the one-time sale of underutilized assets during the prior year period that was not repeated during the current year period.

The increase in "Business acquisitions, net of cash acquired" relates primarily to $124.0 million for the Sable acquisition. The increase in "Capital expenditures" relates primarily to $6.0 million of increased cylinder purchases, $2.6 million due to the timing of maintenance capital expenditures and $1.7 million of midstream operations construction projects.

**Financing Activities**

Fiscal 2015 v Fiscal 2014

Net cash provided by financing activities was $504.3 million for fiscal 2015, compared to net cash provided in financing activities of $86.4 million for fiscal 2014. This increase in net cash provided by financing activities was primarily due to a $328.2 million increase in long-term borrowings due to the issuance of $500 million of 6.75% senior notes related to the Bridger Logistics Acquisition and a $131.0 million increase in the proceeds from equity offerings, which was primarily used to fund acquisitions during the period, partially offset by a $43.7 million decrease in net credit facility and accounts receivable short term borrowings.

Fiscal 2014 v Fiscal 2013

Net cash provided by financing activities was $86.4 million for fiscal 2014, compared to net cash used in financing activities of $143.8 million for fiscal 2013. This increase in net cash provided by financing activities was primarily due to net increase in long-term borrowings of $126.1 million, an increase in secured credit facility and accounts receivable securitization facility short-term borrowings of $66.1 million and $50.0 million of proceeds from issuance of common units. These increases in cash were used primarily to fund our $124.0 million acquisition of Sable and the $84.5 million decrease in cash flows from operating activities as discussed above. These increases were partially offset by an $11.5 million increase in "Cash paid for financing costs".

BLFG_EDPA2274484

Table of Contents

*Distributions*

Ferrellgas Partners paid a $0.50 per unit quarterly distribution on all common units, as well as the related general partner distributions, totaling $167.1 million during fiscal 2015 in connection with the distributions declared for the three months ended July 31, 2014, October 31, 2014, January 31, 2015 and April 30, 2015. During fiscal 2015, the operating partnership paid to its general partner $1.7 million in connection with the quarterly distributions and $4.3 million in connection with the acquisition of Bridger. The quarterly distribution of $0.5125 on all common units and the related general partner distribution for the three months ended July 31, 2015 of $52.0 million was paid on September 14, 2015 to holders of record on September 7, 2015.

Ferrellgas Partners paid a $0.50 per unit quarterly distribution on all common units, as well as the related general partner distributions, totaling $162.7 million during fiscal 2014 in connection with the distributions declared for the three months ended July 31, 2013, October 31, 2013, January 31, 2014 and April 30, 2014. During fiscal 2014, the operating partnership paid to its general partner $1.8 million in connection with the quarterly distributions.

*Secured credit facility*

During June 2015, we executed a fourth amendment to our secured credit facility to administer certain technical revisions in order to facilitate the Bridger Logistics Acquisition and related funding. This amendment did not change the terms or maturity date of the secured credit facility which remains at October 2018. During June 2014, we executed a third amendment to our secured credit facility to better facilitate our strategic focus on further business diversification. Immediately following the third amendment, we increased the size of this secured credit facility from $500.0 million to $600.0 million providing increased liquidity for future acquisitions. There was no change to the size of the letter of credit sublimit which remains at $200.0 million. The third amendment did not change the interest rate or the maturity date of the secured credit facility. Borrowings under this amended secured credit facility are available for working capital needs, capital expenditures and other general partnership purposes, including the refinancing of existing indebtedness. During October 2013, we executed the second amendment to our secured credit facility. The second amendment extended the maturity date to October 2018, increased the size of the secured credit facility from $400.0 million to $500.0 million with no change to the size of the letter of credit sublimit which remained at $200.0 million and decreased interest rates by 0.25%.

As of July 31, 2015, we had total borrowings outstanding under our secured credit facility of $211.4 million, of which $136.1 million was classified as long-term debt. Additionally, Ferrellgas had $327.4 million of available borrowing capacity under our secured credit facility as of July 31, 2015.

Borrowings outstanding at July 31, 2015 under the secured credit facility had a weighted average interest rate of 3.5%. All borrowings under the secured credit facility bear interest, at Ferrellgas' option, at a rate equal to either:

- for Base Rate Loans or Swing Line Loans, the Base Rate, which is defined as the higher of i) the federal funds rate plus 0.50%, ii) Bank of America's prime rate; or iii) the Eurodollar Rate plus 1.00%; plus a margin varying from 0.75% to 1.75%; or
- for Eurodollar Rate Loans, the Eurodollar Rate, which is defined as the LIBOR Rate plus a margin varying from 1.75% to 2.75%.

As of July 31, 2015, the federal funds rate and Bank of America's prime rate were 0.14% and 3.25%, respectively. As of July 31, 2015, the one-month and three-month Eurodollar Rates were 0.19% and 0.33%, respectively.

In addition, an annual commitment fee is payable at a per annum rate range from 0.35% to 0.50% times the actual daily amount by which the secured credit facility exceeds the sum of (i) the outstanding amount of revolving credit loans and (ii) the outstanding amount of letter of credit obligations.

The obligations under this secured credit credit facility are secured by substantially all assets of the operating partnership, the general partner and certain subsidiaries of the operating partnership but specifically excluding (a) assets that are subject to the operating partnership's accounts receivable securitization facility, (b) the general partner's equity interest in Ferrellgas Partners and (c) equity interest in certain unrestricted subsidiaries. Such obligations are also guaranteed by the general partner and certain subsidiaries of the operating partnership.

Letters of credit outstanding at July 31, 2015 totaled $61.2 million and were used primarily to secure insurance arrangements and to a lesser extent product purchases. At July 31, 2015, we had available letter of credit remaining capacity of $138.8 million.

BLFG_EDPA2274485

Table of Contents

All standby letter of credit commitments under our secured credit facility bear a per annum rate varying from 1.75% to 2.75% (as of July 31, 2015, the rate was 2.50%) times the daily maximum amount available to be drawn under such letter of credit. Letter of credit fees are computed on a quarterly basis in arrears.

*Accounts receivable securitization*

Ferrellgas Receivables is accounted for as a consolidated subsidiary. Expenses associated with accounts receivable securitization transactions are recorded in "Interest expense" in the consolidated statements of earnings. Additionally, borrowings and repayments associated with these transactions are recorded in "Cash flows from financing activities" in the consolidated statements of cash flows.

Cash flows from our accounts receivable securitization facility decreased $30.0 million. We reduced our net funding of $21.0 million from this facility during fiscal 2015 as compared to receiving net funding of $9.0 million from this facility in the prior year period.

Our strategy is to maximize liquidity by utilizing the accounts receivable securitization facility along with borrowings under the secured credit facility. See additional discussion about the secured credit facility in "Financing Activities – Secured credit facility." Our utilization of the accounts receivable securitization facility is limited by the amount of accounts receivable that we are permitted to securitize according to the facility agreement. The accounts receivable securitization facility has $225.0 million of capacity and matures on January 19, 2017. This agreement allows for proceeds of up to $225.0 million during the months of January, February, March and December, $175.0 million during the months of April and May and $145.0 million for all other months, depending on available undivided interests in our accounts receivable from certain customers. As of July 31, 2015, we had received cash proceeds of $70.0 million related to the securitization of our trade accounts receivable, with no remaining capacity to receive additional proceeds. As of July 31, 2015, the weighted average interest rate was 2.3%. As our trade accounts receivable increase during the winter heating season, the securitization facility permits us to receive greater proceeds as eligible trade accounts receivable increases, thereby providing additional cash for working capital needs.

*Common unit issuances*

During June 2015, we issued common units in two transactions related to the acquisition of Bridger: (a) we issued 6.325 million common units in a registered public offering, for net proceeds of approximately $141.1 million that was used to help fund the acquisition of Bridger, and (b) we issued 11.2 million common units directly to the sellers of Bridger in a private placement.

In connection with the issuance of 11.2 million common units to the sellers of Bridger, Ferrellgas Partners has agreed to provide such sellers registration rights with respect to the units issued to them. The sellers can request that Ferrellgas Partners file a registration statement with the SEC permitting the resale of common units held by the sellers. In addition, if Ferrellgas Partners were to file a new registration statement or prospectus supplement relating to its issuance of common units pursuant to an underwritten equity offering, then Ferrellgas Partners would be obligated to offer the sellers the opportunity to participate as selling unitholders in such underwritten equity offering, subject to certain customary exceptions.

During fiscal 2015, Ferrellgas Partners issued approximately 0.1 million common units for an aggregate purchase price of $3.0 million in connection with propane related acquisitions.

During September 2014, in a non-brokered registered direct offering, we issued to Ferrell Companies Inc. and the former equity holders of the C&E sellers, an aggregate of 1.5 million common units for an aggregate purchase price of $42.0 million, which units are subject to certain transfer restrictions. We used these proceeds to pay down a portion of the borrowings under our secured credit facility that funded the C&E acquisition and other propane and related equipment sales acquisitions completed during fiscal 2014.

During May 2014, subsequent to the Sable acquisition, Sable's ownership group purchased $50.0 million of common units in a non-brokered registered direct offering, which units are subject to certain transfer restrictions. We used these proceeds to pay down a portion of the borrowings under our secured credit facility that funded the Sable acquisition.

During fiscal 2015 and 2014, Ferrellgas Partners issued $0.1 million and $0.6 million of common units, respectively, pursuant to its unit option plan.

BLFG_EDPA2274486

Table of Contents

*Debt issuances and repayments*

During June 2015, we issued $500.0 million in aggregate principal amount of 6.75% senior notes due 2023 at an offering price equal to par for net proceeds of $491.3 million after deducting underwriters' fees. We used the net proceeds primarily to fund a portion of the purchase price for the acquisition of Bridger. We used the remaining funds to reduce borrowings on our secured credit facility.

During August 2014, the operating partnership completed an offer to exchange $475.0 million principal amount of its 6.75% senior notes due 2022, which were registered under the Securities Act of 1933, as amended, for a like principal amount of its outstanding and unregistered 6.75% senior notes due 2022, the principal amount of $325.0 million of which were issued on November 4, 2013, and the principal amount of $150.0 million of which were issued on June 13, 2014, each in a private placement.

During June 2014, we issued an additional $150.0 million in aggregate principal amount of 6.75% senior notes due 2022 at an offering price equal to 104% of par. We used the net proceeds for general corporate purposes, including to repay indebtedness under its secured credit facility and to pay related transaction fees and expenses.

During November 2013, we issued $325.0 million in aggregate principal amount of 6.75% senior notes due 2022 at an offering price equal to par. We received $319.3 million of net proceeds after deducting underwriters' fees. We applied the net proceeds to redeem all of our $300.0 million 9.125% fixed rate senior notes due October 1, 2017. We used the remaining proceeds to pay the related $14.7 million make whole and consent payments, $3.3 million in interest payments and to reduce outstanding indebtedness under the secured credit facility. This redemption also resulted in $6.0 million of non-cash write-offs of unamortized debt discount and related capitalized debt costs. The make whole and consent payments and the non-cash write-offs of unamortized debt discount and related capitalized debt costs are classified as loss on extinguishment of debt.

We believe that the liquidity available from our secured credit facility and the accounts receivable securitization facility will be sufficient to meet our capital expenditure, working capital and letter of credit requirements in fiscal 2016. See "Accounts Receivable Securitization" for discussion about our accounts receivable securitization facility. However, if we were to experience an unexpected significant increase in these requirements, our needs could exceed our immediately available resources. Events that could cause increases in these requirements include, but are not limited to the following:

- a significant increase in the wholesale cost of propane;
- a significant reduction in the production of crude oil;
- a significant delay in the collections of accounts receivable;
- increased volatility in energy commodity prices related to risk management activities;
- increased liquidity requirements imposed by insurance providers;
- a significant downgrade in our credit rating leading to decreased trade credit;
- a significant acquisition; or
- a large uninsured unfavorable lawsuit settlement.

If one or more of these or other events caused a significant use of available funding, we may consider alternatives to provide increased liquidity and capital funding. No assurances can be given, however, that such alternatives would be available, or, if available, could be implemented. See a discussion of related risk factors in the section in Item 1A. "Risk Factors."

The operating partnership

The financing activities discussed above also apply to the operating partnership except for cash flows related to common unit issuances and distributions and contributions received, as discussed below.

*Distributions*

The operating partnership paid cash distributions of $184.7 million and $178.4 million during fiscal 2015 and 2014, respectively. The operating partnership paid cash distributions of $52.5 million on September 14, 2015.

Cash distributions increased in fiscal 2015 as compared to fiscal 2014, due to the one-time distributions of $418.9 million and $4.3 million to Ferrellgas Partners and our general partner, respectively, in connection with the Bridger Logistics Acquisition.

66

BLFG_EDPA2274487

Table of Contents

*Cash contributions received by the operating partnership*

During June 2015, the operating partnership received a cash contribution of $8.4 million from its general partner in connection with Ferrellgas Partner's contribution of Bridger to the operating partnership.

During September 2014, the operating partnership received cash contributions of $42.2 million from Ferrellgas Partners pursuant to a registered direct offering as discussed above and a related $0.4 million from the general partner. The proceeds were used to pay down outstanding indebtedness under the secured credit facility that funded the C&E acquisition and other propane and related equipment sales acquisitions completed during fiscal 2014.

During fiscal 2014, the operating partnership received cash contributions of $51.1 and $0.5 million from Ferrellgas Partners and the general partner, respectively. The proceeds were used to reduce outstanding indebtedness under the secured credit facility that funded the Sable acquisition. During fiscal 2014, the operating partnership received asset contributions from Ferrellgas Partners of $1.5 million in connection with other propane and related equipment acquisitions. The general partner made cash contributions of $0.5 million and non-cash contributions of $0.5 million to the operating partnership to maintain its 1.0101% general partner interest in connection with these contributions from Ferrellgas Partners.

## Disclosures about Effects of Transactions with Related Parties

We have no employees and are managed and controlled by our general partner. Pursuant to our partnership agreement, our general partner is entitled to reimbursement for all direct and indirect expenses incurred or payments it makes on our behalf, and all other necessary or appropriate expenses allocable to us or otherwise reasonably incurred by our general partner in connection with operating our business. These reimbursable costs, which totaled $245.0 million for fiscal 2015, include operating expenses such as compensation and benefits paid to employees of our general partner who perform services on our behalf, as well as related general and administrative expenses and severance costs.

Related party common unitholder information consisted of the following:

| | Common unit ownership at July 31, 2015 | Distributions paid during the year ended (in thousands) July 31, 2015 | |
|---|---|---|---|
| Ferrell Companies (1) | 22,529,361 | $ | 45,059 |
| FCI Trading Corp. (2) | 195,686 | | 392 |
| Ferrell Propane, Inc. (3) | 51,204 | | 104 |
| James E. Ferrell (4) | 4,763,475 | | 8,717 |
| James H. Ballengee (5) | 9,542,895 | | — |

(1) Ferrell Companies is the sole shareholder of our general partner. During September 2014, we completed a non-brokered registered direct offering to Ferrell Companies of 1.1 million common units. Net proceeds of approximately $30.0 million were used to reduce outstanding indebtedness under our secured credit facility.
(2) FCI Trading Corp. is an affiliate of the general partner and is wholly-owned by Ferrell Companies.
(3) Ferrell Propane, Inc. is wholly-owned by our general partner.
(4) James E. Ferrell is the Chairman of the Board of Directors of our general partner. JEF Capital Management owns 4,758,859 of these common units and is wholly-owned by the James E. Ferrell Revocable Trust Two for which James E. Ferrell is the trustee and sole beneficiary. The remaining 4,616 common units are held by Ferrell Resources Holdings, Inc., which is wholly-owned by the James E. Ferrell Revocable Trust One, for which James E. Ferrell is the trustee and sole beneficiary.
(5) Jamex Marketing, LLC is the unitholder of record of these common units. Jamex, LLC is the majority member of Jamex Marketing, LLC. Ballengee Interests, LLC is the majority member of Jamex, LLC. James H. Ballengee is the manager of each of Jamex, LLC, Jamex Marketing, LLC and Ballengee Interests, LLC.

During fiscal 2015, Ferrellgas Partners and the operating partnership together paid the general partner distributions of $3.5 million.

In connection with the closing of the Bridger Logistics acquisition, we issued approximately 9.5 million common units to Bridger Marketing, LLC (now known as Jamex Marketing, LLC) and entered into a ten-year transportation and logistics agreement (the "TLA") with Jamex Marketing, LLC. As a result of that issuance, Jamex Marketing, LLC owns approximately 9.5% of our outstanding common units; however, neither Jamex Marketing, LLC nor any of its affiliates has any interest in our general partner or its board of directors or any control of our business or policies. Jamex Marketing, LLC, in connection with

67

BLFG_EDPA2274488

Table of Contents

the TLA, enters into transactions with the operating partnership and its subsidiaries. Bridger provides crude oil logistics services for Jamex Marketing, LLC, including the purchase, sale, transportation and storage of crude oil by truck, terminal and pipeline. During fiscal 2015, Ferrellgas' total revenues and cost of sales from these transactions were $9.4 million and $8.4 million, respectively. The amounts due from and to Jamex Marketing at July 31, 2015, were $4.8 million and $4.2 million, respectively.

On September 14, 2015, Ferrellgas Partners paid distributions to Ferrell Companies, FCI Trading Corp., Ferrell Propane, Inc., James E. Ferrell (indirectly), James H. Ballengee (indirectly), and the general partner of $11.5 million, $0.1 million, $26 thousand, $2.4 million, $4.9 million and $0.5 million, respectively.

**Contractual Obligations**

In the performance of our operations, we are bound by certain contractual obligations.

The following table summarizes our contractual obligations at July 31, 2015:

| (in thousands) | Payment or settlement due by fiscal year | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Thereafter** | **Total** |
| Long-term debt, including current portion (1) | $ 3,652 | $ 3,241 | $ 1,719 | $ 1,204 | $ 136,429 | $1,657,931 | $1,804,176 |
| Fixed rate interest obligations (2) | 114,760 | 114,010 | 114,010 | 114,010 | 114,010 | 181,844 | 752,644 |
| Operating lease obligations (3) | 39,999 | 31,497 | 25,599 | 20,084 | 14,402 | 16,078 | 147,659 |
| Operating lease buyouts (4) | 2,738 | 1,816 | 3,217 | 3,011 | 2,693 | 9,355 | 22,830 |
| Purchase obligations: (5) | 49,782 | — | — | — | — | — | 49,782 |
| Product purchase commitments: (6) | | | | | | | |
| Estimated payment obligations | 68,054 | 13,734 | 4,436 | — | — | — | 86,224 |
| Throughput fees (7) | 67,214 | 57,986 | 57,530 | 48,789 | 4,500 | 15,000 | 251,019 |
| Contingent consideration (8) | 100 | — | — | — | — | — | 100 |
| Total | $ 346,299 | $ 222,284 | $206,511 | $187,098 | $ 272,034 | $1,880,208 | $3,114,434 |
| Underlying product purchase volume commitments (in gallons) | 130,034 | 23,835 | 8,400 | — | — | — | 162,269 |

(1)  We have long and short-term payment obligations under agreements such as our senior notes and our secured credit facility. Amounts shown in the table represent our scheduled future maturities of long-term debt (including current maturities thereof) for the periods indicated. For additional information regarding our debt obligations, please see "Liquidity and Capital Resources – Financing Activities."

(2)  Fixed rate interest obligations represent the amount of interest due on fixed rate long-term debt, not including the effect of interest rate swaps. These amounts do not include interest on the long-term portion of our secured credit facility, a variable rate debt obligation. As of July 31, 2015, variable rate interest on our outstanding balance of long-term variable rate debt of $136.1 million would be $4.8 million on an annual basis, not including the effect of interest rate swaps. Actual variable rate interest amounts will differ due to changes in interest rates and actual seasonal borrowings under our secured credit facility.

(3)  We lease certain property, plant and equipment under noncancelable and cancelable operating leases. Amounts shown in the table represent minimum lease payment obligations under our third-party operating leases for the periods indicated.

(4)  Operating lease buyouts represent the maximum amount we would pay if we were to exercise our right to buyout the assets at the end of their lease term. Historically, we have been successful in renewing certain leases that are subject to buyouts. However, there is no assurance we will be successful in the future.

(5)  We define a purchase obligation as an agreement to purchase goods or services that is enforceable and legally binding (unconditional) on us that specifies all significant terms, including: fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and the approximate timing of the transactions.

(6)  We have long and short-term product purchase obligations for propane and energy commodities with third-party suppliers. These purchase obligations are entered into at either variable or fixed prices. The purchase prices that we are obligated to pay under variable price contracts approximate market prices at the time we take delivery of the volumes. Our estimated future variable price contract payment obligations are based on the July 31, 2015 market price of the applicable commodity applied to future volume commitments. Actual future payment obligations may vary depending on market prices at the

BLFG_EDPA2274489

Table of Contents

time of delivery. The purchase prices that we are obligated to pay under fixed price contracts are established at the inception of the contract. Our estimated future fixed price contract payment obligations are based on the contracted fixed price under each commodity contract. Quantities shown in the table represent our volume commitments and estimated payment obligations under these contracts for the periods indicated.

(7)   We have certain throughput fee arrangements with terminal owners at rail loading and offloading terminals and throughput storage arrangements with pipeline storage terminals. Amounts shown in the table represent minimum throughput fee payment obligations under these third-party agreements for the periods indicated.

(8)   We have a contingent consideration obligation for the Sable acquisition that is based upon our estimate of the amount and likelihood that certain targeted EBITDA metrics will be met and exceeded.

Other than contingent consideration, the components of other noncurrent liabilities included in our consolidated balance sheets principally consist of property and casualty liabilities and the fair value of derivatives in connection with our risk management activity. These liabilities are not included in the table above because they are estimates of future payments and not contractually fixed as to timing or amount.

<u>The operating partnership</u>

The contractual obligation table above also applies to the operating partnership, except for long-term debt, including current portion and fixed rate interest obligations, which are summarized in the table below:

| (in thousands) | Payment or settlement due by fiscal year | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2019 | 2020 | Thereafter | Total |
| Long-term debt, including current portion (1) | $ 3,652 | $ 3,241 | $ 1,719 | $ 1,204 | $ 136,429 | $ 1,475,931 | $ 1,622,176 |
| Fixed rate interest obligations (2) | $ 99,063 | $ 98,313 | $ 98,313 | $ 98,313 | $ 98,313 | $ 181,841 | $ 674,156 |

(1)   The operating partnership has long and short-term payment obligations under agreements such as the operating partnership's senior notes and secured credit facility. Amounts shown in the table represent the operating partnership's scheduled future maturities of long-term debt (including current maturities thereof) for the periods indicated. For additional information regarding the operating partnership's debt obligations, please see "Liquidity and Capital Resources – Financing Activities."

(2)   Fixed rate interest obligations represent the amount of interest due on fixed rate long-term debt, not including the effect of interest rate swaps. These amounts do not include interest on the long-term portion of our secured credit facility, a variable rate debt obligation. As of July 31, 2015, variable rate interest on our outstanding balance of long-term variable rate debt of $136.1 million would be $4.8 million on an annual basis, not including the effect of interest rate swaps. Actual variable rate interest amounts will differ due to changes in interest rates and actual seasonal borrowings under our secured credit facility.

Other than contingent consideration, the components of other noncurrent liabilities included in our consolidated balance sheets principally consist of property and casualty liabilities and the fair value of derivatives in connection with our risk management activity. These liabilities are not included in the table above because they are estimates of future payments and not contractually fixed as to timing or amount.

**Off-balance Sheet Financing Arrangements**

In this section we discuss our off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources. An off-balance sheet arrangement is any transaction, agreement or other contractual arrangement involving an unconsolidated entity under which a company has:

•   made guarantees;

•   an obligation under derivative instruments classified as equity; or

•   any obligation arising out of a material variable interest in an unconsolidated entity that provides financing, liquidity, market risk or credit risk support to the company, or that engages in leasing, hedging or research and development arrangements with the company.

Our off-balance sheet arrangements include the leasing of transportation equipment, property, plant and office equipment and letters of credit available under our secured credit facility.

BLFG_EDPA2274490

Table of Contents

The leasing of transportation equipment, property, plant and office equipment is accounted for as operating leases. We believe these arrangements are a cost-effective method for financing our equipment needs. These off-balance sheet arrangements enable us to lease equipment from third parties rather than, among other options, purchasing the equipment using on-balance sheet financing.

Most of the operating leases involving our transportation equipment contain residual value guarantees. These transportation equipment lease arrangements are scheduled to expire over the next seven years. Most of these arrangements provide that the fair value of the equipment will equal or exceed a guaranteed amount, or we will be required to pay the lessor the difference. Although the fair values at the end of the lease terms have historically exceeded these guaranteed amounts, the maximum potential amount of aggregate future payments we could be required to make under these leasing arrangements, assuming the equipment is worthless at the end of the lease term, was $7.0 million as of July 31, 2015. We do not know of any event, demand, commitment, trend or uncertainty that would result in a material change to these arrangements.

See discussion about our letters of credit available under our secured credit facility and the sale of accounts receivable to our accounts receivable securitization facility both in "Liquidity and Capital Resources."

## Adoption of New Accounting Standards

Below is a listing of a recently issued accounting pronouncement that we have not yet adopted as of July 31, 2015.

| Title of Guidance | Effective Date |
| --- | --- |
| Accounting Standard Update No. 2014-09 "*Revenue from Contracts with Customers*" | Fiscal years, and interim reporting periods within those years, beginning after December 15, 2017 |
| Accounting Standard Update No. 2014-08 "*Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity*" | Effective in the first quarter of 2015 for public companies with calendar year ends |
| Accounting Standard Update No. 2015-02, "*Consolidation: Amendments to the Consolidation Analysis*" | Fiscal years, and interim reporting periods within those years, beginning after December 15, 2015 |
| Accounting Standard Update No. 2015-03, "*Interest - Imputation of Interest*" | Fiscal years, and interim reporting periods within those years, beginning after December 15, 2015 |

## Critical Accounting Estimates

The preparation of financial statements in conformity with GAAP requires us to establish accounting policies and make estimates and assumptions that affect our reported amounts of assets and liabilities at the date of the consolidated financial statements. These financial statements include some estimates and assumptions that are based on informed judgments and estimates of management. We evaluate our policies and estimates on an on-going basis and discuss the development, selection and disclosure of critical accounting policies with the Audit Committee of the Board of Directors of our general partner. Predicting future events is inherently an imprecise activity and as such requires the use of judgment. Our consolidated financial statements may differ based upon different estimates and assumptions.

We discuss our significant accounting policies in Note B – Summary of significant accounting policies – to our consolidated financial statements. Our significant accounting policies are subject to judgments and uncertainties that affect the application of such policies. We believe these financial statements include the most likely outcomes with regard to amounts that are based on our judgment and estimates. Our financial position and results of operations may be materially different when reported under different conditions or when using different assumptions in the application of such policies. In the event estimates or assumptions prove to be different from the actual amounts, adjustments are made in subsequent periods to reflect more current information. We believe the following accounting policies are critical to the preparation of our consolidated financial statements due to the estimation process and business judgment involved in their application:

Depreciation of property, plant and equipment

We calculate depreciation on property, plant and equipment using the straight-line method based on the estimated useful lives of the assets ranging from two to 30 years. Changes in the estimated useful lives of our property, plant and equipment could have a material effect on our results of operations. The estimates of the assets' useful lives require our judgment

70

Table of Contents

regarding assumptions about the useful life of the assets being depreciated. When necessary, the depreciable lives are revised and the impact on depreciation is treated on a prospective basis. There were no such revisions to depreciable lives in fiscal 2015, 2014 or 2013.

Residual value of customer and storage tanks

We use an estimated residual value when calculating depreciation for our customer and bulk storage tanks. Customer and bulk storage tanks are classified as property, plant and equipment on our consolidated balance sheets. The depreciable basis of these tanks is calculated using the original cost less the residual value. Depreciation is calculated using straight-line method based on the tanks' estimated useful life of 30 years. Changes in the estimated residual value could have a material effect on our results of operations. The estimates of the tanks' residual value require our judgment of the value of the tanks at the end of their useful life or retirement. When necessary, the tanks' residual values are revised and the impact on depreciation is treated on a prospective basis. There were no such revisions to residual values in fiscal 2015, 2014 or 2013.

Valuation methods, amortization methods and estimated useful lives of intangible assets

The specific, identifiable intangible assets of a business enterprise depend largely upon the nature of its operations. Potential intangible assets include intellectual property such as trademarks and trade names, customer lists and relationships, and non-compete agreements, permits, favorable lease arrangements as well as other intangible assets. The approach to the valuation of each intangible asset will vary depending upon the nature of the asset, the business in which it is utilized, and the economic returns it is generating or is expected to generate. During fiscal 2015, 2014 or 2013, we did not find it necessary to adjust the valuation methods used for any acquired intangible assets.

Our recorded intangible assets primarily include the estimated value assigned to certain customer-related and contract-based assets representing the rights we own arising from the acquisition of propane distribution companies, midstream operations companies and related contractual agreements. A customer-related or contract-based intangible with a finite useful life is amortized over its estimated useful life, which is the period over which the asset is expected to contribute directly or indirectly to the future cash flows of the entity. We believe that trademarks and trade names have an indefinite useful life due to our intention to utilize all acquired trademarks and trade names. When necessary, the intangible assets' useful lives are revised and the impact on amortization will be reflected on a prospective basis. The determination of the fair market value of the intangible asset and the estimated useful life are based on an analysis of all pertinent factors including (1) the use of widely-accepted valuation approaches, the income approach or the cost approach, (2) the expected use of the asset by the entity, (3) the expected useful life of related assets, (4) any legal, regulatory or contractual provisions, including renewal or extension periods that would not cause substantial costs or modifications to existing agreements, (5) the effects of obsolescence, demand, competition, and other economic factors and (6) the level of maintenance required to obtain the expected future cash flows.

If the underlying assumption(s) governing the amortization of an intangible asset were later determined to have significantly changed (either favorably or unfavorably), then we may be required to adjust the amortization period of such asset to reflect any new estimate of its useful life. Such a change would increase or decrease the annual amortization charge associated with the asset at that time. During fiscal 2015, 2014 or 2013, we did not find it necessary to adjust the valuation method, estimated useful life or amortization period of any of our intangible assets.

Should any of the underlying assumptions indicate that the value of the intangible asset might be impaired, we may be required to reduce the carrying value and subsequent useful life of the asset. Any such write-down of the value and unfavorable change in the useful life (i.e., amortization period) of an intangible asset would increase operating costs and expenses at that time.

We did not recognize any impairment losses related to our intangible assets during fiscal 2015, 2014 or 2013. For additional information regarding our intangible assets, see Note B - Summary of significant accounting policies - and Note G - Goodwill and intangible assets, net - to our consolidated financial statements.

Accounting for risk management activities and derivative financial instruments

We enter into commodity forward, futures, swaps and options contracts involving propane, diesel, gasoline and related products to hedge exposures to price risk. These derivative contracts are reported in the consolidated balance sheets at fair value with changes in fair value recognized in cost of sales and operating expenses in the consolidated statements of earnings or in other comprehensive income in the consolidated statement of partners' capital. We utilize published settlement prices for exchange-traded contracts, quotes provided by brokers and estimates of market prices based on daily contract activity to estimate the fair value of these contracts. Changes in the methods used to determine the fair value of these contracts could have

BLFG_EDPA2274492

Table of Contents

a material effect on our consolidated balance sheets and consolidated statements of earnings. For further discussion of derivative commodity and interest rate contracts, see Item 7A. "Quantitative and Qualitative Disclosures about Market Risk," Note B – Summary of significant accounting policies, Note J – Fair value measurements and Note K – Derivative instruments and hedging activities – to our consolidated financial statements. We do not anticipate future changes in the methods used to determine the fair value of these derivative contracts.

Stock-based compensation

We utilize a binomial valuation tool to compute an estimated fair value of stock-based awards at each balance sheet date. This valuation tool requires a number of inputs, some of which require an estimate to be made by management. Significant estimates include our computation of volatility, the number of groups of employees, the expected term of awards and the forfeiture rate of awards.

- Our stock-based awards plans grant awards out of Ferrell Companies. Ferrell Companies is not a publicly-traded company and management does not believe it can be categorized within any certain industry group. As a result, our volatility computation is highly subjective. If a different volatility factor were used, it could significantly change the fair value assigned to stock-based awards at each balance sheet date.

- Management believes we have three groups of employees that participate in our stock-based compensation plans. If a determination were made that we have a different number of groups of employees, that determination could significantly change the expected term and forfeiture rate assigned to our stock and unit-based awards.

- Our method for computing the expected term of our stock-based awards utilizes a combination of historical exercise patterns and estimates made by management on grantee exercises patterns. This method could assign a term to our stock-based awards that is significantly different from their actual terms, which could result in a significant difference in the fair value assigned to the awards at each balance sheet date.

- Our method for computing the expected forfeiture rates of our stock-based awards utilizes a combination of historical forfeiture patterns and estimates made by management on forfeiture patterns. If actual forfeiture rates were to differ significantly from our estimates, it could result in significant differences between actual and reported compensation expense for our stock-based awards.

Litigation accruals and environmental liabilities

We are involved in litigation regarding pending claims and legal actions that arise in the normal course of business and may own sites at which hazardous substances may be present. In accordance with GAAP, we establish reserves for pending claims and legal actions or environmental remediation liabilities when it is probable that a liability exists and the amount or range of amounts can be reasonably estimated. Reasonable estimates involve management judgments based on a broad range of information and prior experience. These judgments are reviewed quarterly as more information is received and the amounts reserved are updated as necessary. Such estimated reserves may differ materially from the actual liability and such reserves may change materially as more information becomes available and estimated reserves are adjusted.

Goodwill impairment

We record goodwill as the excess of the cost of acquisitions over the fair value of the related net assets at the date of acquisition. Goodwill recorded is not deductible for income tax purposes. We have determined that we have five reporting units for goodwill impairment testing purposes. Four of these reporting units contain goodwill that are subject to at least an annual assessment for impairment by applying a fair-value-based test. Under this test, the carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units as of the date of the evaluation on a specific identification basis. To the extent a reporting unit's carrying value exceeds its fair value, an indication exists that the reporting unit's goodwill may be impaired and the second step of the impairment test must be performed. In the second step, the implied fair value of the goodwill is determined by allocating the fair value of all of its assets (recognized and unrecognized) and liabilities to its carrying amount. We completed the impairment test for the Retail operations, Products and Midstream operations - water solutions reporting units and believe that estimated fair values exceed the carrying values of its reporting units as of January 31, 2015. Goodwill associated with the Midstream operations - crude oil logistics reporting unit is a result of the acquisition of Bridger on June 24, 2015.

As a result of the significant drop in the price of crude oil and its impact on the results of Midstream operations - water solutions reporting unit during the second half of fiscal 2015, we considered whether the carrying value of this reporting unit no longer exceeded the fair value. Upon applying the fair-value-based test as described above for purposes of the annual

72

Table of Contents

impairment test, we concluded that there was no impairment of the Midstream operations - water solutions reporting unit as of July 31, 2015. As of July 31, 2015, we determined that this reporting unit had an estimated fair value in excess of its respective carrying value of approximately 10%.

This test primarily consists of a discounted future cash flow model to estimate fair value. The cash flow model includes the following critical assumptions: (1) the NYMEX West Texas Intermediate ("WTI") crude oil curve as of July 31, 2015 was used to predict future oil prices; (2) the oil skimming rate is expected to correlate to the NYMEX WTI crude oil curve consistent with our past history; (3) a terminal period growth rate equal to the expected rate of inflation; and (4) certain organic growth projects will increase the salt water volumes processed as a result of new drilling activity in the Eagle Ford shale region of Texas that we expect to occur as the price of WTI crude oil increases. We believe that the results of this business are closely tied to the price of WTI crude oil and, therefore, if any of these assumptions are not sustained or are not sustained in a timely manner, the Midstream operations - water solutions reporting unit could incur material impairments. In addition to these critical cash flow assumptions, a discount rate of 11.1% was applied to the projected cash flows. A 5% increase, resulting in a discount rate equal to 11.7%, could cause us to fail step one of the goodwill impairment test. If this reporting unit fails step one in the future, we would be required to perform step two of the goodwill impairment test. If we perform step two, up to $29.3 million of goodwill assigned to this reporting unit could be written off in the period that the impairment is triggered.

Judgments and assumptions are inherent in management's estimates used to determine the fair value of our reporting units and are consistent with what management believes would be utilized by the primary market participant. The use of alternate judgments and assumptions could result in the recognition of different levels of impairment charges in our financial statements.

**ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

We did not enter into any risk management trading activities during fiscal 2015. Our remaining market risk sensitive instruments and positions have been determined to be "other than trading."

*Commodity Price Risk Management*

Our risk management activities primarily attempt to mitigate price risks related to the purchase, storage, transport and sale of propane and crude oil generally in the contract and spot markets from major domestic energy companies on a short-term basis. We attempt to mitigate these price risks through the use of financial derivative instruments and forward propane purchase and sales contracts.

Our risk management strategy involves taking positions in the forward or financial markets that are equal and opposite to our positions in the physical products market in order to minimize the risk of financial loss from an adverse price change. This risk management strategy is successful when our gains or losses in the physical product markets are offset by our losses or gains in the forward or financial markets. Propane related financial derivatives are designated as cash flow hedges.

Our risk management activities include the use of financial derivative instruments including, but not limited to, price swaps, options, futures and basis swaps to seek protection from adverse price movements and to minimize potential losses. We enter into these financial derivative instruments directly with third parties in the over-the-counter market and with brokers who are clearing members with the New York Mercantile Exchange. We also enter into forward propane purchase and sales contracts with counterparties. These forward contracts qualify for the normal purchase normal sales exception within GAAP guidance and are therefore not recorded on our financial statements until settled.

*Transportation Fuel Price Risk*

Our risk management activities also attempt to mitigate price risks related to the purchase of gasoline and diesel fuel for use in the transport of propane from retail fueling stations. We attempt to mitigate these price risks through the use of financial derivative instruments.

Our risk management strategy involves taking positions in the financial markets that are not more than the forecasted purchases of fuel for our internal use in the retail and supply propane delivery fleet in order to minimize the risk of decreased earnings from an adverse price change. This risk management strategy locks in our purchase price and is successful when our gains or losses in the physical product markets are offset by our losses or gains in the financial markets. Our transport fuel financial derivatives are not designated as cash flow hedges.

*Risk Policy and Sensitivity Analysis*

BLFG_EDPA2274494

Table of Contents

Market risks associated with energy commodities are monitored daily by senior management for compliance with our commodity risk management policy. This policy includes an aggregate dollar loss limit and limits on the term of various contracts. We also utilize volume limits for various energy commodities and review our positions daily where we remain exposed to market risk, so as to manage exposures to changing market prices.

We have prepared a sensitivity analysis to estimate the exposure to market risk of our energy commodity positions. Forward contracts, futures, swaps and options outstanding as of July 31, 2015 and 2014, that were used in our risk management activities were analyzed assuming a hypothetical 10% adverse change in prices for the delivery month for all energy commodities. The potential loss in future earnings from these positions due to a 10% adverse movement in market prices of the underlying energy commodities was estimated at $11.3 million and $9.0 million as of July 31, 2015 and 2014, respectively. The preceding hypothetical analysis is limited because changes in prices may or may not equal 10%, thus actual results may differ. Our sensitivity analysis does not include the anticipated transactions associated with these hedging transactions, which we anticipate will be 100% effective for propane related hedges.

*Credit Risk*

We maintain credit policies with regard to our counterparties for propane procurement that we believe significantly minimize overall credit risk. These policies include an evaluation of counterparties' financial condition (including credit ratings), and entering into agreements with counterparties that govern credit guidelines.

These counterparties consist of major energy companies who are suppliers, wholesalers, retailers, end users and financial institutions. The overall impact due to certain changes in economic, regulatory and other events may impact our overall exposure to credit risk, either positively or negatively in that counterparties may be similarly impacted. Based on our policies, exposures, credit and other reserves, management does not anticipate a material adverse effect on financial position or results of operations as a result of counterparty performance.

*Interest Rate Risk*

At July 31, 2015, we had $281.4 million in variable rate secured credit facility and collateralized note payable borrowings. We also have an interest rate swap that hedges a portion of the interest rate risk associated with these variable rate borrowings, as discussed in the table below. Thus, assuming a one percent increase in our variable interest rate, our interest rate risk related to these borrowings would result in a loss in future earnings of $1.1 million for fiscal 2016. The preceding hypothetical analysis is limited because changes in interest rates may or may not equal one percent, thus actual results may differ. To the extent that we have debt with variable interest rates that is not hedged, our results of operations, cash flows and financial condition could be materially adversely affected by significant increases in interest rates.

We also manage a portion of our interest rate exposure associated with our fixed rate debt by utilizing an interest rate swap. A hypothetical one percent change in interest rates would result in a loss in future earnings of $1.4 million for fiscal 2016.

As discussed above, the following interest rate swaps are outstanding as of July 31, 2015, and are all designated as hedges for accounting purposes:

| Term | Notional Amount(s) (in thousands) | Type |
|---|---|---|
| May-21 | $140,000 | Pay a floating rate and receive a fixed rate of 6.50% |
| Aug-18 (1) | $175,000 and $100,000 | Forward starting to pay a fixed rate of 1.95% and receive a floating rate |

(1)  These forward starting swaps have an effective date of August 2015 and a term of three years.

## ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.

Our consolidated financial statements and the Independent Registered Public Accounting Firm's Reports thereon and the Supplementary Financial Information listed on the accompanying Index to Financial Statements and Financial Statement Schedules are hereby incorporated by reference. See Note Q – Quarterly data (unaudited) – to Ferrellgas Partners, L.P. and Subsidiaries consolidated financial statements and Note P - Quarterly data (unaudited) to Ferrellgas L.P. and Subsidiaries consolidated financial statements for Selected Quarterly Financial Data.

## ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

None

## ITEM 9A.   CONTROLS AND PROCEDURES.

An evaluation was performed by the management of Ferrellgas Partners, Ferrellgas Partners Finance Corp., Ferrellgas, L.P., and Ferrellgas Finance Corp., with the participation of the principal executive officer and principal financial officer of our general partner, of the effectiveness of our disclosure controls and procedures. Based on that evaluation, our management, including our principal executive officer and principal financial officer, concluded that our disclosure controls and procedures, as defined in Rules 13a-15(e) or 15d-15(e) under the Exchange Act, were effective.

BLFG_EDPA2274495

Table of Contents

The management of Ferrellgas Partners, Ferrellgas Partners Finance Corp., Ferrellgas, L.P., and Ferrellgas Finance Corp. does not expect that our disclosure controls and procedures will prevent all errors and all fraud. The design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Based on the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the above mentioned Partnerships and Corporations have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple errors or mistakes. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events. Therefore, a control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Our disclosure controls and procedures are designed to provide such reasonable assurances of achieving our desired control objectives, and the principal executive officer and principal financial officer of our general partner have concluded, as of July 31, 2015, that our disclosure controls and procedures are effective in achieving that level of reasonable assurance.

**Management's Report on Internal Control Over Financial Reporting**

The management of Ferrellgas Partners, Ferrellgas Partners Finance Corp., Ferrellgas, L.P. and Ferrellgas Finance Corp. is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the framework in 2013 *Internal Control – Integrated Framework*, our management concluded that our internal control over financial reporting was effective as of July 31, 2015.

On June 24, 2015 we acquired Bridger. We are in the process of integrating Bridger and we therefore excluded Bridger from our July 31, 2015 assessment of the effectiveness of internal control over financial reporting. The operations excluded from our evaluation represent 37.2% of our total assets at July 31, 2015, 4.0% of our total revenues for the year ended July 31, 2015. The impact of the acquisition of Bridger has not materially affected and is not expected to materially affect our internal control over financial reporting. As a result of these integration activities, certain controls will be evaluated and may be changed. We believe, however, that we will be able to maintain sufficient controls over the substantive results of our financial reporting throughout this integration process.

The effectiveness of our internal control over financial reporting for Ferrellgas Partners, as of July 31, 2015, has been audited by Grant Thornton LLP, an independent registered public accounting firm, as stated in their report which is included herein.

During the most recent fiscal quarter ended July 31, 2015, there have been no changes in our internal control over financial reporting (as defined in Rule 13a–15(f) or Rule 15d–15(f) of the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

BLFG_EDPA2274496

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Partners
Ferrellgas Partners, L.P.

We have audited the internal control over financial reporting of Ferrellgas Partners, L.P. ( a Delaware limited partnership) and subsidiaries (the "Partnership") as of July 31, 2015, based on criteria established in the 2013 Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Partnership's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting ("Management Report"). Our responsibility is to express an opinion on the Partnership's internal control over financial reporting based on our audit.

Our audit of, and opinion on, the Partnership's internal control over financial reporting does not include internal control over financial reporting of Bridger Logistics, LLC and its subsidiaries (collectively, "Bridger"), a wholly owned subsidiary, whose financial statements reflect total assets and revenues constituting 37.2 and 4 percent, respectively, of the related consolidated financial statement amounts as of and for the year ended July 31, 2015. As indicated in Management's Report, Bridger was acquired on June 24, 2015, and therefore, management's assertion on the effectiveness of the Partnership's internal control over financial reporting excluded internal control over financial reporting of Bridger.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Partnership maintained, in all material respects, effective internal control over financial reporting as of July 31, 2015, based on criteria established in the 2013 Internal Control-Integrated Framework issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements of the Partnership as of and for the year ended July 31, 2015, and our report dated September 29, 2015 expressed an unqualified opinion on those financial statements.

/s/ GRANT THORNTON LLP

Kansas City, Missouri
September 29, 2015

BLFG_EDPA2274497

Table of Contents

**ITEM 9B.   OTHER INFORMATION.**

None.

### PART III

**ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

**Directors and Executive Officers of our General Partner**

The following table sets forth certain information with respect to the directors and executive officers of our general partner as of September 29, 2015. Officers are appointed to their respective office or offices either annually or as needed. Directors are appointed to their respective office or offices annually.

| Name | Age | Director Since | Executive Officer Since | Position |
|------|-----|----------------|-------------------------|----------|
| Stephen L. Wambold | 47 | 2009 | 2005 | Chief Executive Officer and President, Director |
| Alan C. Heitmann | 57 | N/A | 2015 | Executive Vice President and Chief Financial Officer; Treasurer |
| Tod D. Brown | 52 | N/A | 2006 | Executive Vice President, Ferrellgas, Inc. and President, Blue Rhino |
| Boyd H. McGathey | 56 | N/A | 2013 | Executive Vice President and Chief Operating Officer |
| Thomas M. Van Buren | 42 | N/A | 2015 | Executive Vice President, Ferrell North America and Midstream |
| Julio E. Rios II | 44 | N/A | 2015 | Executive Vice President, Ferrellgas, Inc. and President and Chief Executive Officer, Bridger Logistics, LLC |
| Jeremy H. Gamboa | 39 | N/A | 2015 | Executive Vice President, Ferrellgas, Inc. and Chief Operating Officer, Bridger Logistics, LLC |
| James E. Ferrell | 75 | 1984 | N/A | Chairman of the Board of Directors |
| Pamela A. Breuckmann | 39 | 2013 | N/A | Director |
| Daniel G. Kaye | 61 | 2012 | N/A | Director |
| A. Andrew Levison | 59 | 1994 | N/A | Director |
| John R. Lowden | 58 | 2003 | N/A | Director |
| Michael F. Morrissey | 73 | 1999 | N/A | Director |
| David L. Starling | 66 | 2014 | N/A | Director |

*Stephen L. Wambold* – Mr. Wambold joined our general partner as a General Manager in 1997, became Region Vice President in 2003, became Senior Vice President of Operations in 2005, became President and Chief Operating Officer in 2006 and became Chief Executive Officer and President and was appointed to the board of directors in 2009. Mr. Wambold obtained his Bachelors degree from Purdue University.

BLFG_EDPA2274498

Table of Contents

Mr. Wambold's experience as a retail propane operations manager brings to the Board a unique and well-developed understanding of our industry and the opportunities within the industry to drive unitholder value. Mr. Wambold contributes to the Board his strategic vision for growth, brand building experience and a consumer focus. Mr. Wambold also adds strong leadership capabilities, operating expertise, business strategy expertise and strategic planning skills.

*Alan C. Heitmann* - Mr. Heitmann joined our general partner in 1995 as Assistant Controller. In 2001 he was promoted to Retail Controller then transitioned to Corporate Controller in 2005. In 2006 he was promoted to Vice President and Corporate Controller. In 2008 he transitioned to the Vice President Accounting and Finance position. In 2013, he became Senior Vice President Finance and Investor Relations. In January 2015 he was promoted and took his current role of Executive Vice President and Chief Financial Officer. Mr. Heitmann obtained his Bachelor of Science degree in Accounting from Rockhurst College.

*Tod D. Brown* – Mr. Brown joined our general partner as Senior Director of Sales, Blue Rhino in 2004, became Vice President of Sales, Blue Rhino in 2005, became Vice President, Blue Rhino in 2006, became Senior Vice President, Ferrellgas and President, Blue Rhino in 2008 and became Executive Vice President, Ferrellgas and President, Blue Rhino in 2012. Mr. Brown obtained his Bachelor of Arts degree from Ball State University.

*Boyd H. McGathey* - Mr. McGathey joined our general partner as Senior Vice President of Operations in 2011 and became Executive Vice President and Chief Operating Officer in 2013. Prior to that, Mr. McGathey served as the West Division President of Inergy, L.P. from January 2010 to March 2011 as well as Partner and Chief Operating Officer of Liberty Propane from March 2005 to December 2009. Mr. McGathey serves on the Board of Directors of International Young Gassers Association, Kansas City Metropolitan Crime Commission, Kansas City Crime Stoppers and Surviving Spouse and Family Endowment Fund.

*Thomas M. Van Buren* - Mr. Van Buren joined our general partner in 1999 as a part of Ferrell North America ("FNA"). He then served in various roles in transportation, supply and wholesale before becoming Director Midwest Supply, Wholesale and Rail in 2005, then Director of Supply, Wholesale and Pipeline Distribution in 2007, Vice President of Supply and Wholesale in 2008, and Senior Vice President of FNA in 2012. In 2015, Mr. Van Buren was promoted to Executive Vice President of FNA and Midstream where he is responsible for daily operations of FNA and our midstream operations - water solutions business. He also has oversight of the company's industry relations, working with state and national associations and currently serving as Chairman of the Propane Education Research Council and a member of the National Propane Gas Association's Executive Committee. Mr. Van Buren is also a member of the Board of Directors for Kansas City's Surviving Spouse and Family Endowment Fund. He received his Bachelor of Science in Chemical Engineering from Cornell University before serving as an officer in the United States Army, transitioning out as a Captain when he joined Ferrellgas.

*Julio E. Rios II* - Mr. Rios joined our general partner as Executive Vice President on June 24, 2015 and as President and Chief Executive Officer of Bridger Logistics, LLC. He was President, Chief Executive Officer and Director of Bridger, LLC from July 1, 2013 to June 23, 2015. Mr. Rios was President, Chief Executive Officer and Director of Southern Energy Transportation, Inc, from April 1, 2011 until it was merged into Bridger, LLC on July 1, 2013. Mr. Rios co-founded Bridger, LLC in October 2010 and was President and Chief Operating Officer of Bridger, LLC from October, 2010 to June 30, 2013. Prior to that, Mr. Rios practiced commercial law, concentrating on business transactions primarily in the oil and gas industry. He was formerly the Managing Partner of the Shreveport law firm of Shuey Smith from 2001 to 2010. He received both his Bachelor's degree and his Juris Doctorate from Louisiana State University in Baton Rouge.

*Jeremy H. Gamboa* - Mr. Gamboa joined our general partner in June 2015 as the Executive Vice President and Chief Operating Officer of Bridger Logistics and Senior Vice President at Ferrellgas Partners LP. Mr. Gamboa co-founded Bridger, LLC in 2010 and was Chief Marketing Officer from October 2010 to June 30, 2013. Prior to co-founding Bridger, Mr. Gamboa joined Taylor Companies, LLC in February 2004 where he served as Vice President of Business Development until August 2010. Prior to the six years Mr. Gamboa spent at Taylor, he spent four years in the crude oil marketing business with Rising Star Crude Company, LLC.

*James E. Ferrell* – Mr. Ferrell has been with Ferrell Companies or its predecessors and its affiliates in various executive capacities since 1965, including Chairman of the Board of Directors of Ferrellgas, Inc. Under his leadership, Ferrellgas has grown from a small, independently owned propane company to one of the nation's largest propane retailers. An active member of the retail propane industry, Mr. Ferrell is a past President of the World LP Gas Association and a former Chairman of the Propane Vehicle Council. Mr. Ferrell brings to the Board significant experience in the propane industry and valuable knowledge of the company's operating history.

*Pamela A. Breuckmann* - Ms. Breuckmann was elected to the Board of Directors in September 2013. Since 2011, Ms. Breuckmann has served as the President and since January 2015, Chief Executive Officer of Ferrell Capital, Inc. Prior to becoming President of Ferrell Capital, she served as the Chief Financial Officer of the organization from 2007 to 2011. In

78

Table of Contents

addition to her role at Ferrell Capital, she is the President and Chief Operating Officer of Samson Capital Management, LLC. This SEC registered investment advisory business specializes in managing Master Limited Partnership securities for investors.  The blend of Ms. Breuckmann's investment experience, accounting background and finance roles give her a unique perspective that serves the Board of Directors well. She began her career in 1998 as an auditor at Deloitte & Touche, LLP.  Ms. Breuckmann graduated from the University of Kansas with Bachelor of Science degrees in Business Administration and Accounting.  She also holds a Master of Accounting and Information Systems degree from the University of Kansas and has been a Certified Public Accountant since 2000.  Ms. Breuckmann currently serves on the board and the finance committee of a local not-for-profit, Women's Employment Network.

*Daniel G. Kaye* – Mr. Kaye joined the Board of Directors in August 2012, and since that date has served as Chairman of the Corporate Governance and Nominating Committee and a member of the Audit Committee. Mr. Kaye served as Senior Vice President and Chief Financial Officer for HealthEast Care System from January 2013 to May 2014 where he directed all financial and treasury matters for this billion dollar revenue hospital and clinic system based in St. Paul, Minnesota.  He is also the recently (2012) retired Ernst & Young Midwest Managing Partner of Assurance in Chicago, where he was responsible for more than 1,600 professionals in 10 offices serving 12 states. Mr. Kaye enjoyed a track record of increasing leadership and responsibilities over his 35-year career at Ernst & Young which included serving as the New England Area Managing Partner and an audit partner for 25 years. He recently became a member of the board of directors and audit committees of AXA Financial and two of its insurance subsidiaries, AXA Equitable Life Insurance Company and MONY Life Insurance Company of America, and has served on the board of directors of several not-for-profit organizations including the United Way of Metropolitan Chicago, the United Way of Massachusetts Bay, Catholic Charities, Junior Achievement and the The Greater Boston Chamber of Commerce. Mr. Kaye is a National Association of Corporate Directors (NACD) Board Leadership Fellow. He has been a Certified Public Accountant since 1978 with a Bachelor of Science degree in Accounting from the University of Wisconsin-Madison. Mr. Kaye brings to the Board significant leadership and financial experience with his many years as an audit partner of a major accounting firm. We consider Mr. Kaye to be a financial and accounting expert.

*A. Andrew Levison* – Mr. Levison has served on the Board of Directors since 1994 and is a member of the Board's Compensation and Corporate Governance and Nominating Committees. For the past five years Mr. Levison has served as the Managing Partner of Southfield Capital Advisors, LLC, a Greenwich, Connecticut-based, private merchant banking firm and serves on the Boards of Directors of Presidio Partners, LLC, and the Levison/Present Foundation at Mount Sinai Hospital in New York City. Mr. Levison obtained his Bachelor of Science degree in Finance from Babson College.

Mr. Levison founded Levison & Co., the predecessor of Southfield Capital Advisors, LLC, in 2002. Prior to that, Mr. Levison was the Head of Leveraged Finance at Donaldson, Lufkin & Jenrette ("DLJ"), where he oversaw banking and origination activities for all of DLJ's investment banking products for leveraged companies. In particular, Mr. Levison focused on high yield securities, leveraged bank loans, bridge loans and mezzanine/equity investments. Under Mr. Levison's leadership, DLJ became the number one ranked firm for high yield underwriting throughout the 1990's. While at DLJ, Mr. Levison also served as Co-Chairman of the Credit Committee and as a member of the Management Committee of the Investment Banking Division and the Banking Review Committee. Prior to joining DLJ, Mr. Levison was a Managing Director of the Leveraged Buyout Group at Drexel Burnham Lambert and a Vice-President of the Special Finance Group at Manufacturers Hanover Trust.

While serving on the Board of Directors of our general partner, Mr. Levison's firm DLJ acted as an underwriter with regard to the initial public offering in 1994 which coincided with the formation of our master limited partnership. Mr. Levison brings to the Board significant experience in capital markets, corporate finance and investment banking. We consider Mr. Levison to be a financial expert.

*John R. Lowden* – Mr. Lowden was appointed to the Board of Directors in 2003 and chairs the Board's Compensation Committee and serves on the Board's Audit Committee. Since 2001, Mr. Lowden has served as the President of NewCastle Partners, LLC, a Greenwich, Connecticut-based private investment firm. Mr. Lowden also serves as Chairman and CEO of World Dryer Corporation and Metpar Industries, Inc. and serves on the Board of Trustees of Wake Forest University. Mr. Lowden obtained his Master's degree in Business Administration and his Bachelor of Science degree in Business from Wake Forest University.

Mr. Lowden was a founding partner of NewCastle Partners, LLC in 2001. Prior to that, Mr. Lowden had served as a partner of The Jordan Company, a New York City-based private equity firm. Mr. Lowden was also an investment banker with Ferris & Company in Washington, DC. During his 30 years in private equity, Mr. Lowden has been a principal investor and participated in the acquisitions of over 40 manufacturing, retail and distribution businesses.

Mr. Lowden brings to the Board significant experience in capital markets, corporate finance and investment banking. We consider Mr. Lowden to be a financial expert.

BLFG_EDPA2274500

Table of Contents

*Michael F. Morrissey* – Mr. Morrissey has served on the Board of Directors since 1999 and chairs the Board's Audit Committee and serves on the Board's Compensation Committee. Mr. Morrissey has been selected as the presiding director for non-management executive sessions of the Board. Mr. Morrissey retired as the Managing Partner of Ernst & Young's Kansas City, Missouri office in 1999. For the past five years Mr. Morrissey has served as a board member on the boards of directors of various companies, and currently serves on the board of directors and its compensation committee and as audit committee Chairman of Waddell & Reed Financial, Inc. (since 2010), and the boards of several private companies and not-for-profit organizations.

Mr. Morrissey served as a partner of Ernst & Young for seventeen years. Prior to that, Mr. Morrissey worked for twelve years for two major accounting firms, one of which was Ernst & Young (for seven years). Mr. Morrissey has been a Certified Public Accountant since 1972. Mr. Morrissey brings to the Board substantial experience as the Chairman of the audit committees of public companies, many years of experience as an audit partner of a major accounting firm and extensive experience as a director of other large private and public companies. We consider Mr. Morrissey to be a financial and accounting expert. Mr. Morrissey has a high level of understanding of the Board's role and responsibilities based on his service on other company boards. Mr. Morrissey obtained his Bachelor of Business Administration degree in Accounting from the University of Notre Dame and obtained his Master of Business Administration degree in Finance from Temple University.

*David L. Starling*  - Mr. Starling was elected to the Board of Directors in February 2014 and serves on the Board's Corporate Governance and Nominating Committee. Mr. Starling has served as President and Chief Executive Officer of Kansas City Southern (KCS) since August 2010. Mr. Starling has been a director of KCS since May, 2010. He served as President and Chief Operating Officer of KCS from July 2008 through August 2010. Mr. Starling has also served as a Director, President and Chief Executive Officer of The Kansas City Southern Railway Company since July 2008. He has also served as Vice Chairman of the Board of Directors of Kansas City Southern de Mexico since September 2009. Mr. Starling has served as Vice Chairman of the Board of Directors of Panama Canal Railway Company and Panarail since July 2008. Prior to joining KCS, Mr. Starling served as President and Director General of Panama Canal Railway Company from 1999 through June 2008. Mr. Starling brings to the board substantial expertise in the North American rail industry and in intermodal and global shipping logistics. His experience in Latin America, North America and Asia has helped to expand KCS' marketing and growth opportunities and his 30 years of operating experience helped navigate the company through the economic downturn and established longterm, sustainable operating efficiencies.

**Corporate Governance**

The limited partnership agreements of Ferrellgas Partners and the operating partnership provide for each partnership to be governed by a general partner rather than a board of directors. Through these partnership agreements, Ferrellgas, Inc. acts as the general partner of both Ferrellgas Partners and the operating partnership and thereby manages and operates the activities of Ferrellgas Partners and the operating partnership. Ferrellgas, Inc. anticipates that its activities will be limited to the management and operation of the partnerships. Neither Ferrellgas Partners nor the operating partnership directly employs any of the persons responsible for the management or operations of the partnerships, rather, these individuals are employed by the general partner.

The Board of Directors of our general partner has adopted a set of Corporate Governance Guidelines for the Board and charters for its Audit Committee, Corporate Governance and Nominating Committee and Compensation Committee. A current copy of these Corporate Governance Guidelines and charters, each of which were adopted and approved by the entire Board, are available, free of charge, to our security holders and other interested parties on our website at www.ferrellgas.com (under the caption "Corporate Governance" within "Investor Information") and are also available in print to any unitholder or other interested parties who request it. Requests for print copies should be directed to:

Ferrellgas, Inc.
Attention: Investor Relations
7500 College Boulevard, Suite 1000
Overland Park, Kansas 66210
913-661-1533
investors@ferrellgas.com.

Please note that the information and materials found on our website, except for SEC filings expressly incorporated by reference into this report herein, are not part of this report and are not incorporated by reference into this report.

Additionally, the Board has affirmatively determined that Mr. Levison, Mr. Lowden, Mr. Morrissey, Mr. Kaye and Mr. Starling, who constitute a majority of its Directors, are "independent" as described by the New York Stock Exchange's ("NYSE") corporate governance rules. In conjunction with regular Board meetings, these five non-management directors also meet in a regularly scheduled executive session without members of management present. A non-management director presides over each executive session of non-management directors. Mr. Morrissey has been selected as the presiding director for non-

BLFG_EDPA2274501

Table of Contents

management executive sessions. If Mr. Morrissey is not present then the other non-management directors shall select the presiding director. Additional executive sessions may be scheduled by a majority of the non-management directors in consultation with the presiding director and the Chairman of the Board.

The NYSE requires the Chief Executive Officer of each listed company to submit a certification indicating that the company is not in violation of the Corporate Governance listing standards of the NYSE on an annual basis. The last CEO certification to the NYSE was submitted on October 9, 2014.

**Audit Committee**

The Board has a designated Audit Committee established in accordance with the Exchange Act comprised of Messrs. Morrissey, Lowden and Kaye. Mr. Morrissey is the Chairman of the Audit Committee. Mr. Morrissey and Mr. Kaye each have been determined by the board to be an "audit committee financial expert." The Audit Committee charter, as well as the rules of the NYSE and the SEC, requires that members of the Audit Committee satisfy "independence" requirements as set out by the NYSE. The Board has determined that all of the members of the Audit Committee are "independent" as described under the relevant standards.

The Audit Committee charter requires the Audit Committee to pre-approve all engagements with any independent registered public accounting firm, including all engagements regarding the audit of the financial statements of each of Ferrellgas Partners, Ferrellgas Partners Finance Corp., Ferrellgas, L.P., Ferrellgas Finance Corp. and all permissible non-audit engagements with the independent registered public accounting firm. The Audit Committee charter is available on the company's website.

**Limitation on Directors Participating on Audit Committees**

The Board has adopted a policy limiting the number of public-company audit committees its directors may serve on to three at any point in time. If a director desires to serve on more than three public-company audit committees, he or she must first obtain the written permission of the Board.

**Corporate Governance and Nominating Committee**

The Board has a designated Corporate Governance and Nominating Committee, comprised of Messrs. Kaye, Levison and Starling. Mr. Kaye is the Chairman of the Corporate Governance and Nominating Committee. The Corporate Governance and Nominating Committee charter requires that members of the Corporate Governance and Nominating Committee satisfy particular "independence" requirements. The Board has determined that all of the members of the Corporate Governance and Nominating Committee are "independent" as described under relevant standards. The Corporate Governance and Nominating Committee charter is available on the company's website.

**Compensation Committee**

The Board has a designated Compensation Committee, comprised of Messrs. Lowden, Morrissey and Levison. Mr. Lowden is the Chairman of the Compensation Committee. The Compensation Committee charter requires that members of the Compensation Committee satisfy particular "independence" requirements. The Board has determined that all of the members of the Compensation Committee are "independent" as described under relevant standards. The Compensation Committee has the authority to assist the Board of Directors in fulfilling its responsibility to effectively compensate the senior management of the general partner in a manner consistent with the growth strategy of the general partner. Toward that end, the Compensation Committee oversees the review process of all compensation, equity and benefit plans of Ferrellgas. In discharging this oversight role, the Compensation Committee has full power to consult with, retain and compensate independent legal, financial and/or other advisers as it deems necessary or appropriate. The Compensation Committee charter is available on the company's website.

**Disclosure about our Security Holders' and Interested Parties' Ability to Communicate with the Board of Directors of our General Partner**

The Board of Directors of our general partner has a process by which security holders and interested parties can communicate with it. Security holders and interested parties can send communications to the Board by contacting our Investor Relations department by mail, telephone or e-mail at:

Ferrellgas, Inc.
Attention: Investor Relations
7500 College Boulevard, Suite 1000

BLFG_EDPA2274502

Table of Contents

Overland Park, Kansas  66210
913-661-1533
investors@ferrellgas.com.

Any communications directed to the Board of Directors from employees or others that concern complaints regarding accounting, internal controls or auditing matters will be handled in accordance with procedures adopted by the Audit Committee. All other communications directed to the Board of Directors are initially reviewed by the Investor Relations Department. The Chairman of the Corporate Governance and Nominating Committee is advised promptly of any such communication that alleges misconduct on the part of management or raises legal, ethical or compliance concerns about the policies or practices of the general partner. On a periodic basis, the Chairman of the Corporate Governance and Nominating Committee receives updates on other communications that raise issues related to the affairs of the Partnership but do not fall into the two prior categories. The Chairman of the Corporate Governance and Nominating Committee determines which of these communications require further review. The Corporate Secretary maintains a log of all such communications that is available for review for one year upon request of any member of the Board. Typically, the general partner does not forward to the Board of Directors communications from unitholders or other parties which are of a personal nature or are not related to the duties and responsibilities of the Board, including junk mail, customer complaints, job inquiries, surveys and polls, and business solicitations.

**Code of Ethics for Principal Executive and Financial Officers and Code of Business Conduct and Ethics**

The Board has adopted a Code of Ethics for our general partner's principal executive officer, principal financial officer, principal accounting officer or those persons performing similar functions. Additionally, the Board has adopted a general Code of Business Conduct and Ethics for all of our general partner's directors, officers and employees. These codes, which were adopted and approved by the entire Board, are available to our security holders and other interested parties at no charge on our website at www.ferrellgas.com (under the caption "Corporate Governance" within "Investor Information") and are also available in print to any security holder or other interested parties who requests it. Requests for print copies should be directed to:

Ferrellgas, Inc.
Attention: Investor Relations
7500 College Boulevard, Suite 1000
Overland Park, Kansas 66210
913-661-1533
investors@ferrellgas.com.

Please note that the information and materials found on our website, except for SEC filings expressly incorporated by reference into this report herein, are not part of this report and are not incorporated by reference into this report.

We intend to disclose, within four business days, any amendment to the code of business conduct and the Code of Ethics on our website. Any waivers from the Code of Ethics will also be disclosed on our website.

**Compensation of our General Partner**

Our general partner receives no management fee or similar compensation in connection with its management of our business and receives no remuneration other than:

- distributions on its combined approximate 2% general partner interest in Ferrellgas Partners and the operating partnership; and
- reimbursement for:
  - all direct and indirect costs and expenses incurred on our behalf;
  - all selling, general and administrative expenses incurred by our general partner on our behalf; and
  - all other expenses necessary or appropriate to the conduct of our business and allocable to us.

The selling, general and administrative expenses reimbursed include specific employee benefits and incentive plans for the benefit of the executive officers and employees of our general partner.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires our general partner's officers and directors, and persons who beneficially own more than 10% of our common units, to file reports of beneficial ownership and changes in beneficial ownership of our common units with the SEC. These persons are also required by the rules and regulations promulgated by the SEC to furnish

BLFG_EDPA2274503

Table of Contents

our general partner with copies of all Section 16(a) forms filed by them. These forms include Forms 3, 4 and 5 and any amendments thereto.

To our knowledge, based solely on its review of the copies of such Section 16(a) forms received by our general partner and, to the extent applicable, written representations from certain reporting persons that no Annual Statement of Beneficial Ownership of Securities on Form 5 were required to be filed by those persons, our general partner believes that during fiscal 2015 all Section 16(a) filing requirements applicable to the officers, directors of our general partner and beneficial owners of more than 10% of our common units were met in a timely manner, except as noted below.

| Reportable Event | Name of Filer | Number of Transactions Reported Late | Average Delay (1) |
|---|---|---|---|
| Initial Statement of Beneficial Ownership | Thomas M. Van Buren | 1 | 6 days |
| Purchase of units | David L. Starling | 1 | 3 days |
| Initial Statement of Beneficial Ownership | Jeremy H. Gamboa | 1 | 4 days |

(1) Represents the average number of business days by which the filing deadlines were missed.

## ITEM 11.   EXECUTIVE COMPENSATION.

### Compensation Committee Report

As of September 23, 2015, the Compensation Committee has reviewed and discussed the following Compensation Discussion and Analysis with management. Based on its review and discussion with management, the compensation committee has determined that this Compensation Discussion and Analysis should be included in this report.

Submitted by:
    John R. Lowden
    A. Andrew Levison
    Michael F. Morrissey

### Compensation Committee Interlocks and Insider Participation

The Compensation Committee is comprised of Messrs. Lowden, Morrissey and Levison. None of the members were officers or employees of the general partner or any of its subsidiaries prior to or during fiscal 2015. None of the members has any relationship required to be disclosed under this caption under the rules of the SEC.

### Risks Related to Compensation Policies and Practices

Management conducted a risk assessment of our compensation policies and practices for fiscal 2015. Based on its evaluation, management does not believe that any such policies or practices create risks that are reasonably likely to have a material adverse effect on the Ferrellgas Partners.

### Compensation Discussion and Analysis

*Overview of Executive Officer Compensation*

Throughout this section, each person who served as the Principal Executive Officer ("PEO") during fiscal 2015, each person who served as the Principal Financial Officer ("PFO") during fiscal 2015, the three most highly compensated executive officers other than the PEO and PFO serving at July 31, 2015 and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer at July 31, 2015 are referred to as the Named Executive Officers ("NEOs"). We do not directly employ our NEOs. Rather, we are managed by our general partner who serves as the employer of our NEOs. We reimburse our general partner for all NEO compensation.

BLFG_EDPA2274504

**Named Executive Officers**

Stephen L. Wambold, Chief Executive Officer and President

Alan C. Heitmann, Executive Vice President and Chief Financial Officer

Tod D. Brown, Executive Vice President, Ferrellgas and President, Blue Rhino

Boyd H. McGathey, Executive Vice President and Chief Operating Officer

Thomas M. Van Buren, Executive Vice President, Ferrell North America and Midstream

J. Ryan VanWinkle, Former Executive Vice President and Chief Financial Officer (resigned effective February 10, 2015)

*Compensation Objectives*

We believe an effective executive compensation package should link total compensation to overall financial performance and to the achievement of both short and long term strategic, operational and financial goals. The elements of our compensation program are intended to provide a total reward package to our NEOs that (i) provides competitive compensation opportunities, (ii) recognizes and rewards individual contribution, (iii) attracts, motivates and retains highly-talented executives, and (iv) aligns executive performance toward the creation of sustained unitholder value rather than the achievement of short-term goals that might be inconsistent with the creation of long-term unitholder value.

*Role of Management, Compensation Consultant and Compensation Peer Group*

Stephen L. Wambold, with the assistance of our Chief Financial Officer ("CFO"), formulates preliminary compensation recommendations for all NEOs, including themselves. These recommendations are subject to review and approval by the Compensation Committee. To assist Stephen L. Wambold and the Compensation Committee, our CFO utilizes market compensation survey data provided by the consulting firm Mercer Human Resources Consulting ("Mercer"), which is used to create salary range benchmarks for each NEO's compensation. Mercer was engaged by the Compensation Committee, provided no significant other services for us and there were no conflicts of interest presented by the work performed. The compensation survey data provided by Mercer included data from the 16 peer group companies identified below.

We use a peer group of companies in setting compensation levels, determining awards under our option plans and setting director compensation levels. The companies included in this peer group are determined (with the assistance of Mercer) based on the following factors:

- companies in our industry or related industries (oil and gas, gas utilities, master limited partnerships);
- companies identified as our peer group of competitors;
- companies with similar total sales;
- companies with similar net income; and
- companies with similar market value.

For purposes of setting compensation for our fiscal year ended July 31, 2015, the companies included in our compensation peer group were as follows:

- Targa Resources Partners, L.P.
- Suburban Propane Partners, L.P.
- Enbridge Energy Partners, L.P.
- Laclede Group Inc.
- Genesis Energy, L.P.
- WGL Holdings Inc.
- UGI Corp.
- Star Gas Partners, L.P.
- Atmos Energy Corp., L.P.
- New Jersey Resources Corp.
- Regency Energy Partners, L.P.
- Amerigas Partners, L.P.
- Alliance Resource Partners, L.P.
- Copano Energy LLC
- Northern Tier Energy, L.P.

BLFG_EDPA2274505

Table of Contents

*Components of Named Executive Officer Compensation*

During fiscal 2015, elements of compensation for our NEOs consisted of the following:

- base salary;
- non-equity incentive plan;
- discretionary bonus;
- stock based option plans;
- employee stock ownership plan ("ESOP");
- deferred compensation plans; and
- employment and change-in-control agreements.

*Base Salary*

Stephen L. Wambold, with the assistance of our CFO, formulates preliminary base salary recommendations for all NEOs, including themselves. These recommendations are subject to review and approval by the Compensation Committee. To assist Stephen L. Wambold and the Compensation Committee, our CFO utilizes compensation survey data provided by Mercer to provide market data that is used to create benchmarks for each NEO's base salary. These benchmarks refer to the high and low end of the ranges provided by Mercer, rather than a specific point within the range. The following table identifies the low and high ends of the range included in the Mercer base salary market data for each of our NEOs:

| | Low Point | High Point |
|---|---|---|
| Chief Executive Officer | $ 431,000 | $ 736,000 |
| Chief Operating Officer | 362,000 | 512,000 |
| Chief Financial Officer | 287,000 | 369,000 |
| Top Division Executive | 303,000 | 363,000 |

Additionally, other factors such as performance and other executive responsibilities are taken into consideration when determining the base salaries of our NEOs.

The amount of salary paid to each NEO during fiscal year 2015 is displayed in the "Salary" column of the Summary Compensation Table.

| Named Executive Officer | 2015 Annual Base Salary (1) |
|---|---|
| Stephen L. Wambold | $ 700,000 |
| Alan C. Heitmann | 375,000 |
| Tod D. Brown | 400,000 |
| Boyd H. McGathey | 400,000 |
| Thomas M. Van Buren | 335,000 |

(1) 2015 Annual Base Salary as of July 31, 2015

*Non-Equity Incentive Plan*

The Board of Directors has approved each NEO's participation in the general partner's Corporate Incentive Plan ("CIP"). The purpose of this plan is to provide an incentive for NEOs to meet or exceed annual profitability targets that are consistent with the company's overall long term strategy to increase unitholder value. Our Board of Directors utilizes data from our compensation peer group to assist in assigning an appropriate incentive target for each NEO. The amount of the CIP payment made to each NEO for fiscal 2015 is displayed in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation Table.

This plan awards a cash payment to the NEO if incentive distributable cash flow ("incentive DCF") targets are achieved for the fiscal year. Incentive DCF has been selected in order to align performance measures for NEOs with how our investors evaluate our performance. Each NEO's incentive target is computed as a percentage of his annual base salary rate. Due to his decision to terminate his employment as Chief Financial Officer of our general partner in February 2015, J. Ryan VanWinkle was not eligible for participation in this plan. For fiscal 2015 the target percentage for each NEO was as follows:

85

BLFG_EDPA2274506

Table of Contents

| Named Executive Officer | % of Salary Incentive Target |
|---|---|
| Stephen L. Wambold | 100% |
| Alan C. Heitmann | 100% |
| Tod D. Brown | 100% |
| Boyd H. McGathey | 100% |
| Thomas M. Van Buren | 100% |

Awards under the plan are based on a calculation of incentive DCF as reconciled to "Net income attributable to Ferrellgas Partners, L.P." below. Total company actual incentive DCF as a percentage of total company target incentive DCF will result in incentive target potential payouts as provided in the table below. No payout is made if actual incentive DCF is less than 100% of targeted incentive DCF.

| Percent of Planned Incentive DCF Achieved | Incentive Target Potential |
|---|---|
| 100% | 100% |
| 105% | 125% |
| 110% and above | 150% |

For fiscal 2015, the percent of targeted total company incentive DCF achieved was less than 100%. Accordingly there were no payouts under the Non-Equity incentive plan for NEOs. The amount of corporate incentive plan payouts for Stephen L. Wambold, Boyd H. McGathey, Alan C. Heitmann, and Tod D. Brown are listed in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation Table. For Incentive Plan purposes, total company actual incentive DCF was computed as follows:

| | | (in thousands) |
|---|---|---|
| Net earnings attributable to Ferrellgas Partners, L.P. | $ | 29,620 |
| Add (subtract): | | |
| Income tax benefit | | (315) |
| Interest expense | | 100,396 |
| Depreciation and amortization expense | | 98,579 |
| Non-cash employee stock ownership plan compensation charge | | 24,713 |
| Non-cash stock-based compensation charge | | 25,982 |
| Loss on disposal of assets | | 7,099 |
| Other expense, net | | 350 |
| Change in fair value of contingent consideration | | (6,300) |
| Litigation accrual and related legal fees associated with a class action lawsuit | | 806 |
| Unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments | | 2,412 |
| Acquisition and transition expenses | | 16,373 |
| Net earnings attributable to noncontrolling interest | | 469 |
| Discretionary bonuses | | 250 |
| Midstream operations - crude oil logistics - adjusted EBITDA | | (8,583) |
| Midstream operations - crude oil logistics - maintenance capital expenditures | | 64 |
| Maintenance capital expenditures | | (19,612) |
| Incentive DCF | $ | 272,303 |

*Discretionary Bonus*

Stephen L. Wambold has the authority to recommend for Compensation Committee review and approval, discretionary cash bonuses to any NEO, including himself. These awards are designed to reward performance by a NEO that Stephen L. Wambold believes exceeded expectations in operational or strategic objectives during the last fiscal year. The amount of discretionary bonus paid to each NEO for fiscal 2015 is displayed in the "Bonus" column of the Summary Compensation Table.

86

BLFG_EDPA2274507

Table of Contents

Based on his work involving our recent diversification into midstream operations - crude oil logistics, the Compensation Committee decided to award the NEO's named below an additional discretionary bonus as follows:

| Named executive officer | Discretionary Bonus ($) |
|---|---|
| Alan C. Heitmann | 250,000 |

*Equity-based and Incentive Compensation Plans*

We have two equity-based incentive plans available for participation by our NEOs, the "Ferrell Companies Incentive Compensation Plan" ("ICP") and the "Ferrellgas Unit Option Plan." The amount of compensation cost related to these plans incurred for each NEO during fiscal 2015 is displayed in the "Option Awards" column of the Summary Compensation Table.

The "Ferrell Companies Incentive Compensation Plan" is an equity-based incentive plan available for participation by our NEOs.

The ICP was established by Ferrell Companies to allow upper-middle and senior level managers, including NEOs, and directors of our general partner to participate in the equity growth of Ferrell Companies. Pursuant to this ICP, eligible participants may be granted stock options to purchase shares of common stock of Ferrell Companies, stock appreciation rights ("SARs"), performance shares or other incentives payable in cash or in stock. Neither Ferrellgas Partners nor the operating partnership contributes, directly or indirectly, to the ICP. Options granted under the ICP vest ratably over periods ranging from zero to 12 years or 100% upon a change of control of Ferrell Companies, or upon the death, disability or retirement at the age of 65 of the participant. All awards expire either ten or 15 years from the date of issuance.

Options or SARs are granted under the ICP periodically throughout the year at strike prices equal to the most recently published semi-annual valuation by an independent third party valuation firm that is performed on Ferrell Companies, which is a privately held company, for the purposes of the Employee Stock Ownership Plan. All other terms of these awards granted to the NEOs, including the quantity awarded, vesting life and expiration date of awards are discretionary and must be approved by the ICP Option Committee, which includes Stephen L. Wambold and Alan C. Heitmann. Awards granted to NEOs must also be approved by the Compensation Committee. To assist the ICP Option Committee and the Compensation Committee in determining the quantity of awards to grant to a NEO, Alan C. Heitmann utilizes data from our compensation peer group to create recommended ranges of current year ICP award grants by executive position. Utilizing the peer group data, the Compensation Committee approved stock option awards under the ICP to NEOs in fiscal 2015 taking into account each NEO's responsibilities, performance and respective holdings of such ICP awards previously granted by the committee to ensure the appropriate level of equity as a component of the NEO's total compensation package.

Ferrellgas Unit Option Plan ("UOP") - The Second Amended and Restated Ferrellgas Unit Option Plan grants employees of our general partner unit options to purchase our common units. The purpose of the UOP is to encourage certain employees of our general partner to develop a proprietary interest in our growth and performance; to generate an increased incentive to contribute to our future success and prosperity, thereby enhancing our value for the benefit of our unitholders; and to enhance our ability to attract and retain key individuals who are essential to our progress, growth and profitability, by giving these individuals the opportunity to acquire our common units.

This plan is authorized to issue options in common units to employees of the general partner or its affiliates. The Board of Directors of the general partner in its sole discretion administers the authorization of grants and sets the unit option price and vesting terms. The options currently outstanding vest over a one to five year period and expire on the tenth anniversary date of the grant.

During fiscal 2015, no new awards were granted to any NEOs under the UOP.

*Employee Stock Ownership Plan ("ESOP")*

On July 17, 1998, pursuant to the Ferrell Companies, Inc. Employee Stock Ownership Plan ("ESOP"), an employee stock ownership trust purchased all of the outstanding common stock of Ferrell Companies. The purpose of the ESOP is to provide all employees of our general partner, including NEOs, an opportunity for ownership in Ferrell Companies, and indirectly, in us. Ferrell Companies makes contributions to the ESOP, which allows a portion of the shares of Ferrell Companies owned by the ESOP to be allocated to employees' accounts over time. The value of the shares allocated to each NEO for compensation related to fiscal 2015 is included in the "All Other Compensation" column of the Summary Compensation Table.

BLFG_EDPA2274508

Table of Contents

Twice per year and in accordance with the ESOP, each NEO's ESOP account receives an allocation of Ferrell Companies shares. This allocation, as determined by the ESOP, is based on the following: a) the percentage of the NEO's base salary, discretionary bonus, and corporate incentive plan payment made during the period, subject to certain limitations under Section 415 of the Internal Revenue Code, and b) shares owned from previous allocations. NEOs vest in their account balances as follows:

| Number of Completed Years of Service | Vested Percent |
|---|---|
| Less than 3 years | —% |
| 3 years | 20% |
| 4 years | 40% |
| 5 years | 60% |
| 6 years | 80% |
| 7 years or more | 100% |

NEOs are entitled to receive a distribution for the vested portion of their accounts at specified times in accordance with the ESOP for normal or late retirement, disability, death, resignation, or dismissal.

*Deferred Compensation Plans*

Two deferred compensation plans are available for participation by our NEOs, the "Defined Contribution Profit Sharing Plan," a tax-qualified retirement plan, and the "Supplemental Savings Plan," a nonqualified deferred compensation plan. The amount of company match related to these plans credited to each NEO's account during fiscal 2015 is included in the "All Other Compensation" column of the Summary Compensation Table.

*Defined Contribution Profit Sharing Plan ("401(k) Plan")* – The Ferrell Companies, Inc. Profit Sharing and 401(k) Investment Plan is a qualified defined contribution plan, which includes both employee contributions and employer matching contributions. All employees including NEOs, that are not part of a collective bargaining agreement, or any of its direct or indirect wholly-owned subsidiaries are eligible to participate in this plan. This plan has a 401(k) feature allowing all eligible employees to specify a portion of their pre-tax and/or after-tax compensation to be contributed to this plan. This plan provides for matching contributions under a cash or deferred arrangement based upon participant salaries and employee contributions to this plan.

Our contributions to the profit sharing portion of this plan are discretionary and no profit sharing contributions were made to this plan for fiscal 2015. However, this plan also provides for matching contributions under a cash or deferred arrangement based upon the participant salary and employee contributions to this plan. Due to Internal Revenue Code "Highly Compensated Employee" rules and regulations, NEOs may only contribute up to approximately 6% of their eligible compensation to this plan. We will provide a 50% matching contribution of the first 8% of all eligible contributions made to this plan and the Supplemental Savings Plan (see below) combined. Employee contributions are 100% vested, while the company's matching contribution vests ratably over the first five years of employment. Employee and our matching contributions can be directed, at the employee's option, to be invested in a number of investment options that are offered by this plan.

*Supplemental Savings Plan ("SSP")* – The Ferrell Companies, Inc. Supplemental Savings Plan was established October 1, 1994 in order to provide certain management or highly compensated employees with supplemental retirement income which is approximately equal in amount to the retirement income that such employees would have received under the terms of the 401(k) feature of the 401(k) Plan (see above) based on such members' deferral elections thereunder, but which could not be provided under the 401(k) feature of the 401(k) Plan due to the application of certain "Highly Compensated Employee" IRS rules and regulations.

This non-qualified plan is available to all employees who have been designated as "Highly Compensated" as defined in the Internal Revenue Code. NEOs are allowed to make, subject to Internal Revenue Code limitations, pre-tax contributions to the SSP of up to 25% of their eligible compensation. We provide a 50% matching contribution of the first 8% of all eligible contributions made to this plan and the 401(k) Plan (see above) combined. Employee contributions are 100% vested, while our matching contribution vests ratably over the first 5 years of employment. Employee and our matching contributions can be directed, at the employee's option, to be invested in a number of investment options that are offered by the SSP.

*Employment and Change-in-Control Agreements*

The independent members of the Board of Directors of our general partner have authorized the general partner to enter into Employment Agreements with each of our NEOs. The purpose for entering into these agreements is to (i) encourage and motivate NEOs to remain employed and focused on the business during a potential change in control, (ii) motivate NEOs to

BLFG_EDPA2274509

Table of Contents

make business decisions that are in the best interest of the company, (iii) ensure that NEOs conduct appropriate due diligence and effectively integrate companies in the event of an acquisition, and (iv) secure the long-term employment of the NEO. The initial term of these agreements ended on December 31, 2012 for Messrs. Wambold and Brown. The initial term of Mr. McGathey's agreement ends on December 31, 2016. The initial term of Mr. Heitmann's agreement ends on June 30, 2017. The initial term of Mr. Van Buren's agreement ends on May 28, 2017. Thereafter, each agreement automatically renews for successive 12-month periods, unless one party to the agreement provides notice of non-renewal to the other at least 180 days before the last day of then current agreement term.

Mr. VanWinkle's employment agreement terminated in connection with his resignation from the CFO position effective February 10, 2015. Mr. VanWinkle signed a release agreement under which he agreed to provide advisory services to us for a two-year period following his resignation from the CFO position and became eligible to receive benefits provided for under his release agreement during this period, including salary continuation and continued vesting in outstanding equity awards.

The specific terms of these agreements are described under "Other Potential Post-Employment Payments" below.

**Summary Compensation Table**

The following table sets forth the compensation for the last three fiscal years of our NEOs:

89

BLFG_EDPA2274510

Table of Contents

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Option Awards (1) ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation (2) ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Stephen L. Wambold | 2015 | 700,000 | — | 1,778,450 | — | 28,498 | 2,506,948 |
| Chief Executive Officer and President | 2014 | 700,000 | 300,000 | 1,998,240 | 875,000 | 27,989 | 3,901,229 |
| | 2013 | 700,000 | 175,000 | 334,433 | 700,000 | 41,082 | 1,950,515 |
| J. Ryan VanWinkle | 2015 | 212,603 | — | 729,226 | — | 432,482 | 1,374,311 |
| Former Executive Vice President and Chief Financial Officer; | 2014 | 400,000 | 250,000 | 1,279,741 | 500,000 | 49,439 | 2,479,180 |
| President, Midstream Operations; Treasurer (resigned February 10, 2015) | 2013 | 400,000 | 100,000 | 179,450 | 400,000 | 49,476 | 1,128,926 |
| Alan C. Heitmann | 2015 | 298,593 | 250,000 | 671,820 | — | 33,230 | 1,253,643 |
| Executive Vice President and Chief Financial Officer; Treasurer | | | | | | | |
| Tod D. Brown | 2015 | 400,000 | — | 936,929 | — | 51,548 | 1,388,477 |
| Executive Vice President, Ferrellgas and President, Blue Rhino | 2014 | 400,000 | 100,000 | 1,111,928 | 500,000 | 57,693 | 2,169,621 |
| | 2013 | 369,126 | 100,000 | 261,278 | 400,000 | 45,644 | 1,176,048 |
| Boyd H. McGathey | 2015 | 400,000 | — | 816,909 | — | 55,205 | 1,272,114 |
| Executive Vice President and Chief Operating Officer | 2014 | 400,000 | 100,000 | 580,850 | 500,000 | 49,120 | 1,629,970 |
| | 2013 | 357,308 | 100,000 | 1,117,184 | 400,000 | 32,103 | 2,006,595 |
| Thomas M. Van Buren | 2015 | 303,793 | — | 785,034 | — | 56,451 | 1,145,278 |
| Executive Vice President, Ferrell North America and Midstream | | | | | | | |

(1)  See Note B – Summary of significant accounting policies (16) Stock-based plans – to our consolidated financial statements for information concerning these awards. The value reported represents the aggregate grant date fair value computed in accordance with FASB ASC Topic 718.

(2)  All Other Compensation consisted of the following:

BLFG_EDPA2274511

Table of Contents

| Name | Year | ESOP Allocations ($) | 401(k) Plan Match ($) | SSP Match ($) | Other ($) | | Total All Other Compensation ($) |
|------|------|------|------|------|------|------|------|
| Stephen L. Wambold | 2015 | 16,890 | 6,702 | 4,906 | — | | 28,498 |
| | 2014 | 16,324 | 3,535 | 8,130 | | | 27,989 |
| | 2013 | 18,353 | 2,417 | 5,496 | 14,816 | (3) | 41,082 |
| J. Ryan VanWinkle | 2015 | 16,890 | 3,502 | 4,383 | 407,707 | (4) | 432,482 |
| | 2014 | 16,324 | 5,873 | 4,391 | 22,851 | (5) | 49,439 |
| | 2013 | 18,353 | 2,925 | 7,857 | 20,341 | (8) | 49,476 |
| Alan C. Heitmann | 2015 | 16,890 | 11,336 | 5,004 | — | | 33,230 |
| Tod D. Brown | 2015 | 16,890 | 9,115 | 2,945 | 22,598 | (6) | 51,548 |
| | 2014 | 16,324 | 8,692 | 3,977 | 28,700 | (7) | 57,693 |
| | 2013 | 18,353 | 6,547 | — | 20,744 | (9) | 45,644 |
| Boyd H. McGathey | 2015 | 16,890 | 6,532 | 4,906 | 26,877 | (11) | 55,205 |
| | 2014 | 16,324 | 3,643 | 8,130 | 21,023 | (10) | 49,120 |
| | 2013 | 18,353 | 12,250 | 1,500 | — | | 32,103 |
| Thomas M. Van Buren | 2015 | 16,890 | 6,261 | 5,164 | 28,136 | (12) | 56,451 |

(3) This amount primarily includes $10,500 for car allowance and $3,691 for payment of personal financial, tax or legal advice.

(4) This amount primarily includes $372,603 for advisory services, $12,000 for transition pay, $9,000 for car allowance, $8,086 for payment of personal financial, tax or legal advice, $3,873 for payment of medical benefits, $1,145 for personal use of company membership, and $1,000 for a service award.

(5) This amount includes $18,000 for car allowance, $3,859 for payment of personal financial, tax or legal advice and $992 for personal use of company membership.

(6) This amount includes $18,000 for car allowance, and $4,598 for payment of personal financial, tax or legal advice

(7) This amount includes $18,000 for car allowance, $7,517 for payment of personal financial, tax or legal advice and $3,183 for a service award.

(8) This amount primarily includes $18,000 for car allowance and $1,715 for payment of personal financial, tax or legal advice.

(9) This amount primarily includes $18,000 for car allowance and $2,183 for payment of personal financial, tax or legal advice.

(10) This amount primarily includes $18,000 for car allowance and $3,023 for payment of personal financial, tax or legal advice.

(11) This amount includes $18,000 for car allowance, $6,377 for payment of personal financial, tax or legal advice, and $2,500 for a service award.

(12) This amount primarily includes $22,472 for relocation costs and $5,204 for payment of personal financial, tax or legal advice.

**Grants of Plan-Based Awards**

The following table lists information on our general partner's NEOs grants of plan based awards during the fiscal year ended July 31, 2015:

BLFG_EDPA2274512

Table of Contents

| Name | | Grant Date | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Share) | Grant Date Fair Value of Award ($) |
|---|---|---|---|---|---|
| Stephen L. Wambold | (1) | 10/31/2014 | 446,250 | 31.65 | 392,700 |
| | (2) | 10/31/2014 | 132,884 | 31.65 | 252,480 |
| | (3) | 10/31/2014 | 284,649 | 31.65 | 697,390 |
| | (3) | 4/30/2015 | 1,114 | 31.15 | 3,286 |
| | (2) | 4/30/2015 | 59,254 | 31.15 | 138,062 |
| | (3) | 7/31/2015 | 104,075 | 31.15 | 294,532 |
| J. Ryan VanWinkle | (1) | 10/31/2014 | 337,500 | 31.65 | 297,000 |
| | (2) | 10/31/2014 | 83,052 | 31.65 | 157,799 |
| | (3) | 10/31/2014 | 112,011 | 31.65 | 274,427 |
| Alan C. Heitmann | (1) | 10/31/2014 | 101,500 | 31.65 | 89,320 |
| | (2) | 4/30/2015 | 250,000 | 31.15 | 582,500 |
| Tod D. Brown | (1) | 10/31/2014 | 280,000 | 31.65 | 246,400 |
| | (2) | 10/31/2014 | 71,292 | 31.65 | 135,455 |
| | (3) | 10/31/2014 | 138,360 | 31.65 | 338,982 |
| | (3) | 4/30/2015 | 4,440 | 31.15 | 13,098 |
| | (2) | 4/30/2015 | 24,465 | 31.15 | 57,003 |
| | (3) | 7/31/2015 | 38,760 | 31.15 | 109,691 |
| | (2) | 7/31/2015 | 16,500 | 31.15 | 36,300 |
| Boyd H. McGathey | (1) | 10/31/2014 | 125,000 | 31.65 | 110,000 |
| | (2) | 10/31/2014 | 82,500 | 31.65 | 156,750 |
| | (3) | 10/31/2014 | 10,000 | 31.65 | 24,500 |
| | (3) | 4/30/2015 | 30,000 | 31.15 | 88,500 |
| | (2) | 4/30/2015 | 109,725 | 31.15 | 255,659 |
| | (2) | 7/31/2015 | 82,500 | 31.15 | 181,500 |
| Thomas M. Van Buren | (1) | 10/31/2014 | 75,000 | 31.65 | 66,000 |
| | (3) | 10/31/2014 | 18,728 | 31.65 | 45,884 |
| | (3) | 10/31/2014 | 37,000 | 31.65 | 90,650 |
| | (2) | 4/30/2015 | 250,000 | 31.15 | 582,500 |

(1)  Grant vests immediately and expires in ten years.
(2)  Grant vests ratably over three years and expires in ten years.
(3)  Grant vests ratably over five years and expires in ten years.

During fiscal 2015 there were no options awarded to our NEOs under the Ferrellgas Unit Option Plan.

**Outstanding Equity Awards at Fiscal Year End**

The following table lists information concerning our NEOs' outstanding equity awards under the Ferrell Companies Incentive Compensation Plan as of July 31, 2015.

BLFG_EDPA2274513

Table of Contents

**Ferrell Companies Incentive Compensation Plan**
**Option Awards**

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|---|---|
| Stephen L. Wambold | — | 7,875 | (10) | 11.78 | 5/1/2019 |
| | — | 37,275 | (12) | 23.95 | 7/19/2021 |
| | — | 115,520 | (14) | 22.14 | 10/1/2021 |
| | — | 60,640 | (15) | 22.14 | 10/31/2021 |
| | — | 240 | (16) | 22.14 | 1/31/2022 |
| | — | 66,720 | (18) | 21.92 | 10/31/2022 |
| | — | 300 | (19) | 21.92 | 1/31/2023 |
| | — | 178,676 | (15) | 24.65 | 10/31/2023 |
| | — | 283,416 | (22) | 24.65 | 10/31/2023 |
| | — | 29,186 | (17) | 28.70 | 4/30/2024 |
| | — | 576 | (23) | 28.70 | 4/30/2024 |
| | 446,250 | — | (3) | 31.65 | 10/31/2024 |
| | — | 132,884 | (18) | 31.65 | 10/31/2024 |
| | — | 284,649 | (24) | 31.65 | 10/31/2024 |
| | — | 59,254 | (20) | 31.15 | 4/30/2025 |
| | — | 1,114 | (25) | 31.15 | 4/30/2025 |
| | — | 104,075 | (26) | 31.15 | 7/31/2025 |
| | | | | | |
| J. Ryan VanWinkle | 1,500 | — | (4) | 8.02 | 3/12/2018 |
| | — | 1,875 | (13) | 11.78 | 9/15/2019 |
| | 6,675 | — | (6) | 19.88 | 7/19/2020 |
| | 17,250 | 17,250 | (12) | 23.95 | 7/19/2021 |
| | — | 49,000 | (14) | 22.14 | 10/1/2021 |
| | — | 24,320 | (15) | 22.14 | 10/31/2021 |
| | 28,050 | — | (5) | 20.60 | 4/30/2022 |
| | 4,225 | 8,450 | (17) | 20.60 | 4/30/2022 |
| | — | 23,955 | (18) | 21.92 | 10/31/2022 |
| | — | 111,673 | (15) | 24.65 | 10/31/2023 |
| | — | 140,764 | (22) | 24.65 | 10/31/2023 |
| | 8,984 | 18,241 | (17) | 28.70 | 4/30/2024 |
| | 1,045 | 4,180 | (23) | 28.70 | 4/30/2024 |
| | 337,500 | — | (3) | 31.65 | 10/31/2024 |
| | — | 83,052 | (18) | 31.65 | 10/31/2024 |
| | — | 112,011 | (24) | 31.65 | 10/31/2024 |
| | | | | | |
| Alan C. Heitmann | 2,500 | — | (2) | 5.08 | 6/1/2016 |
| | 6,000 | — | (1) | 14.95 | 3/1/2019 |
| | 26,500 | — | (6) | 19.88 | 7/19/2020 |
| | 3,000 | 1,000 | (7) | 19.88 | 9/1/2020 |
| | 7,900 | 1,975 | (12) | 23.95 | 7/19/2021 |
| | 3,600 | 2,400 | (14) | 22.14 | 10/1/2021 |

93

BLFG_EDPA2274514

Table of Contents

| | | | | |
|---|---|---|---|---|
| | 8,175 | 5,450 (16) | 22.14 | 1/31/2022 |
| | 101,500 | — (3) | 31.65 | 10/31/2024 |
| | 250,000 | — (5) | 31.15 | 4/30/2025 |
| | | | | |
| Tod D. Brown | — | 38,760 (12) | 23.95 | 7/19/2021 |
| | — | 70,000 (14) | 22.14 | 10/1/2021 |
| | — | 25,280 (15) | 22.14 | 10/31/2021 |
| | — | 4,000 (17) | 20.60 | 4/30/2022 |
| | — | 24,600 (18) | 21.92 | 10/31/2022 |
| | — | 17,000 (11) | 22.36 | 7/12/2023 |
| | — | 73,693 (15) | 24.65 | 10/31/2023 |
| | — | 151,040 (22) | 24.65 | 10/31/2023 |
| | — | 12,050 (17) | 28.70 | 4/30/2024 |
| | — | 9,760 (23) | 28.70 | 4/30/2024 |
| | 280,000 | — (3) | 31.65 | 10/31/2024 |
| | — | 71,292 (18) | 31.65 | 10/31/2024 |
| | — | 138,360 (24) | 31.65 | 10/31/2024 |
| | — | 24,465 (20) | 31.15 | 4/30/2025 |
| | — | 4,440 (25) | 31.15 | 4/30/2025 |
| | — | 16,500 (21) | 31.15 | 7/31/2025 |
| | — | 38,760 (26) | 31.15 | 7/31/2025 |
| | | | | |
| Boyd H. McGathey | — | 25,000 (9) | 23.95 | 3/14/2021 |
| | — | 85,000 (8) | 21.92 | 2/27/2023 |
| | — | 85,000 (11) | 22.36 | 7/12/2023 |
| | — | 40,000 (22) | 24.65 | 10/31/2023 |
| | — | 55,275 (17) | 28.70 | 4/30/2024 |
| | — | 20,000 (23) | 28.70 | 4/30/2024 |
| | 125,000 | — (3) | 31.65 | 10/31/2024 |
| | — | 82,500 (18) | 31.65 | 10/31/2024 |
| | — | 10,000 (24) | 31.65 | 10/31/2024 |
| | — | 109,725 (20) | 31.15 | 4/30/2025 |
| | — | 30,000 (25) | 31.15 | 4/30/2025 |
| | — | 82,500 (21) | 31.15 | 7/31/2025 |
| | | | | |
| Thomas M. Van Buren | — | 1,000 (7) | 19.88 | 9/1/2020 |
| | — | 2,400 (14) | 22.14 | 10/1/2021 |
| | — | 10,240 (15) | 22.14 | 10/31/2021 |
| | — | 25,632 (22) | 24.65 | 10/31/2023 |
| | 75,000 | — (3) | 31.65 | 10/31/2024 |
| | — | 18,728 (24) | 31.65 | 10/31/2024 |
| | — | 37,000 (24) | 31.65 | 10/31/2024 |
| | 250,000 | — (5) | 31.15 | 4/30/2025 |

(1) These options were fully vested on 3/1/2013.
(2) These options were fully vested on 6/1/2013.
(3) These options were fully vested on 10/31/2014.
(4) These options were fully vested on 3/12/2015.
(5) These options were fully vested on 4/30/2015.
(6) These options were fully vested on 7/19/2015.

BLFG_EDPA2274515

Table of Contents

(7)  These options will be fully vested on 9/1/2015.
(8)  These options will be fully vested on 2/27/2016.
(9)  These options will be fully vested on 3/14/2016.
(10) These options will be fully vested on 5/1/2016.
(11) These options will be fully vested on 7/12/2016.
(12) These options will be fully vested on 7/19/2016.
(13) These options will be fully vested on 9/15/2016.
(14) These options will be fully vested on 10/1/2016.
(15) These options will be fully vested on 10/31/2016.
(16) These options will be fully vested on 1/31/2017.
(17) These options will be fully vested on 4/30/2017.
(18) These options will be fully vested on 10/31/2017.
(19) These options will be fully vested on 1/31/2018.
(20) These options will be fully vested on 4/30/2018.
(21) These options will be fully vested on 7/31/2018.
(22) These options will be fully vested on 10/31/2018.
(23) These options will be fully vested on 4/30/2019.
(24) These options will be fully vested on 10/31/2019.
(25) These options will be fully vested on 4/30/2020.
(26) These options will be fully vested on 7/31/2020.

**Ferrellgas Unit Option Plan**
**Option Awards**

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise price ($) | Option Expiration Date |
|---|---|---|---|---|
| Thomas M. Van Buren | 5,800 (1) | — | 15.70 | 2/3/2022 |

(1) These options were fully vested on 2/3/2013.

## Option Exercises

The following tables list information concerning our NEOs' equity awards that were exercised during the fiscal year ended July 31, 2015:

**Ferrell Companies Incentive Compensation Plan**
**Option Awards**

| Name | Number of Equity Based Awards Exercised (#) | Value Realized on Exercise ($) |
|---|---|---|
| Steven L. Wambold | 1,019,626 | 6,552,669 |
| J. Ryan VanWinkle | 532,563 | 2,671,604 |
| Alan C. Heitmann | 101,500 | 299,425 |
| Tod D. Brown | 573,817 | 3,266,286 |
| Boyd H. McGathey | 439,725 | 2,950,776 |
| Thomas M. Van Buren | 93,728 | 421,479 |

## Nonqualified Deferred Compensation

The following table lists information concerning our NEOs' nonqualified SSP account activity during the fiscal year ended July 31, 2015:

95

BLFG_EDPA2274516

Table of Contents

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY (1) ($) | Aggregate Earnings in Last FY ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE (2) ($) |
|---|---|---|---|---|---|
| Stephen L. Wambold | 36,346 | 4,906 | 26,626 | — | 473,798 |
| J. Ryan VanWinkle | 17,750 | 4,383 | 31,557 | — | 489,828 |
| Alan C. Heitmann | 123,501 | 5,004 | 22,341 | — | 419,267 |
| Tod D. Brown | 16,615 | 2,945 | 11,438 | — | 186,965 |
| Boyd H. McGathey | 93,231 | 4,906 | 12,668 | — | 210,102 |
| Thomas M. Van Buren | 12,488 | 5,164 | 6,069 | — | 84,348 |

(1)  Amounts are included in the Summary Compensation Table above.

(2)  The portion of this amount representing registrant contributions made in years prior was previously reported as compensation to the NEO in the Summary Compensation Table for previous years.

**Other Potential Post-Employment Payments**

In September 2013 James E. Ferrell retired from his role as Executive Chairman of our General Partner while retaining his role as Chairman of the Board of Directors. In connection with this retirement a one-time bonus payment of $1.1 million due to James E. Ferrell under the terms of his former employment agreement was paid during March 2015.

Our general partner has entered into an employment agreement with each of our NEOs. Pursuant to the terms of the employment agreements, if the NEO's employment is terminated for any reason, the NEO will be entitled to the following payments:

(i)      the NEO's earned but unpaid salary for the period ending on the NEO's termination date;

(ii)     the NEO's accrued but unpaid vacation pay for the period ending on the NEO's termination date;

(iii)      the NEO's unreimbursed business expenses; and

(iv)     any amounts payable to the NEO under the terms of any employee benefit plan.

Pursuant to the terms of the employment agreements, in the event of death, disability, a termination for cause, voluntary resignation or mutual agreement, neither the NEO nor any other person will have any right to payments or benefits other than those listed above for periods after the NEO's termination date.

Pursuant to the terms of the employment agreements, the term "Cause" means:

(i)    the willful and continued failure by the NEO to substantially perform his duties for Ferrellgas, Inc. (other than any such failure resulting from the NEO's being disabled) within a reasonable period of time after a written demand for substantial performance is delivered to the NEO by the Board of Ferrellgas, Inc., which demand specifically identifies the manner in which the Board of Ferrellgas, Inc. believes that the NEO has not substantially performed his duties;

(ii)   the willful engaging by the NEO in conduct which is demonstrably and materially injurious to Ferrellgas, Inc., monetarily or otherwise;

(iii)  the engaging by the NEO in egregious misconduct involving serious moral turpitude to the extent that, in the reasonable judgment of the Board of Ferrellgas, Inc., the NEO's credibility and reputation no longer conform to the standard of the Ferrellgas, Inc.'s executives; or

(iv)   the NEO's material breach of a material term of this Agreement.

Pursuant to the terms of the employment agreements, the term "Good Reason" means any of the following which occur after the effective date of the employment agreement without the consent of the NEO:

(i)    A reduction in excess of 10% in the NEO's salary or target incentive potential as in effect as of the effective date of the employment agreement, as the same may be modified from time to time in accordance with the employment agreement;

(ii)   A material diminution in the NEO's authority, duties or responsibilities as in effect as of the effective date of the employment agreement, as the same may be modified from time to time in accordance with the employment agreement;

96

Table of Contents

(iii) The relocation of the NEO's principal office location to a location which is more than 50 highway miles from the location of the NEO's principal office location as in effect on the effective date of the employment agreement (or such subsequent principal location agreed to by the NEO); or

(iv) Ferrellgas, Inc.'s material breach of any material term of the employment agreement.

Should a termination of employment occur resulting from a termination other than for Cause or from a termination for Good Reason, each of our NEOs will be entitled to:

(i)   a payment equal to two times the NEO's annual base salary in effect immediately prior to the termination date; this amount would be paid in substantially equal monthly installments over a two year timeframe beginning within five days following the termination date;

(ii)  a payment equal to two times the NEO's target bonus, at his target bonus rate in effect immediately prior to the termination date; this amount would be paid in substantially equal monthly installments over a two year timeframe beginning within five days following the termination date;

(iii) receive continuing group medical coverage for himself and his dependents for two years following the termination date; and

(iv)  a lump sum payment of $12,000 for professional outplacement services.

The value of the cash severance payments under the employment agreements for all of the NEOs, at July 31, 2015 would have been:

| NEO | Two times annual base salary ($) | Two times target bonus ($) |
|---|---|---|
| Stephen L. Wambold | 1,400,000 | 1,400,000 |
| Alan C. Heitmann | 750,000 | 750,000 |
| Tod D. Brown | 800,000 | 800,000 |
| Boyd H. McGathey | 800,000 | 800,000 |
| Thomas M. Van Buren | 670,000 | 670,000 |

Additionally, a change in control would cause each NEO's unvested SARs to become fully vested. At July 31, 2015, this would have resulted in a cash payment due to our NEOs as follows:

| NEO | SAR payout at July 31, 2015 upon a change in control ($) |
|---|---|
| Stephen L. Wambold | 6,149,480 |
| J. Ryan VanWinkle | 3,646,046 |
| Alan C. Heitmann | 903,726 |
| Tod D. Brown | 3,310,295 |
| Boyd H. McGathey | 2,406,399 |
| Thomas M. Van Buren | 427,722 |

**Compensation of Non-Employee Directors**

We believe the compensation package for the non-employee members of the Board of Directors of our general partner (the "Board") should compensate our non-employee directors in a manner that is competitive within the marketplace. Our compensation package includes a combination of annual director fees and SAR awards. Total compensation awarded to our non-employee directors varies depending upon their level of activity within the Board. Participation in and chairing of committees within the Board will increase the level of compensation paid to an individual Board member.

With the assistance of our CFO, Stephen L. Wambold formulates preliminary annual director fee and SAR awards recommendations for each Board member. These recommendations are subject to review and approval by the Compensation Committee. To assist Stephen L. Wambold and the Compensation Committee, our CFO utilizes publicly available board of director compensation data within our industry, as compiled by Mercer, to provide market data that is used to create benchmarks for each director's annual director fee and total compensation package.

SAR awards for non-employee members of the Board are determined utilizing competitive compensation data that is gathered on an annual basis. Annually we compare the compensation of our Board with the compensation levels and practices of companies that are of similar size and operate in similar industries. We utilize that data to analyze the compensation of our

97

Table of Contents

non-employee members of the Board and ensure that we are competitive in the marketplace for compensating our Board. SAR awards are one element of that compensation, and the actual awards that are granted are determined on a discretionary basis. All SAR awards granted to our non-employee directors have an exercise price equal to the most recently published semi-annual valuation that is performed on Ferrell Companies for the purposes of the ESOP.

The following table sets forth the compensation for the last completed fiscal year of our Board.

| Name | | Fees Paid in Cash ($) | Option Awards (6) ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| James E. Ferrell | (1) | 200,000 | — | 1,087,500 (5) | 1,287,500 |
| David L. Starling | (2) | 55,000 | 95,000 | — | 150,000 |
| A. Andrew Levison | (3) | 55,000 | 87,050 | — | 142,050 |
| John R. Lowden | (3) | 76,250 | 87,050 | — | 163,300 |
| Michael F. Morrissey | (4) | 72,500 | 105,150 | — | 177,650 |
| Pamela A. Breuckmann | (2) | 55,000 | 31,350 | — | 86,350 |
| Daniel G. Kaye | (2) | 66,250 | 51,132 | — | 117,382 |

(1) At July 31, 2015 this director had 613,620 SAR awards outstanding.

(2) At July 31, 2015 this director had 50,000 SAR awards outstanding.

(3) At July 31, 2015 this director had 95,000 SAR awards outstanding.

(4) At July 31, 2015, this director had 115,000 SAR awards outstanding.

(5) In September 2013 James E. Ferrell retired from his role as Executive Chairman of our General Partner while retaining his role as Chairman of the Board of Directors. In connection with this retirement a one-time bonus payment of $1.1 million due to James E. Ferrell under the terms of his former employment agreement was paid during March 2015.

(6) See Note B – Summary of significant accounting policies (16) Stock based plans – to our consolidated financial statements for information concerning these awards. The value reported represents the aggregate grant date fair value computed in accordance with FASB ASC Topic 718.

**ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIALOWNERS AND MANAGEMENT AND RELATED UNITHOLDER MATTERS.**

The following table sets forth certain information as of September 1, 2015, regarding the beneficial ownership of our common units by:

- persons that own more than 5% of our common units;
- persons that are directors, nominees or named executive officers of our general partner; and
- all directors and executive officers of our general partner as a group.

Other than those persons listed below, our general partner knows of no other person beneficially owning more than 5% of our common units.

**Ferrellgas Partners, L.P.**

BLFG_EDPA2274519

Table of Contents

| Title of class | Name and address of beneficial owner | Units beneficially owned | Percentage of class |
|---|---|---|---|
| Common units | Ferrell Companies, Inc. Employee Stock Ownership Trust<br>125 S. LaSalle Street, 17th floor<br>Chicago, IL 60603 | 22,776,251 | 22.7 |
| | James H. Ballengee<br>3838 Oak Lawn Avenue, Suite 1150<br>Dallas, TX 75219. | 9,542,895 | 9.5 |
| | J. Ryan VanWinkle<br>6095 Timberidge Drive<br>Parkville, MO 64152 | 52,000 | * |
| | James E. Ferrell<br>7500 College Blvd. Suite 1000<br>Overland Park, KS 66210 | 4,763,475 | 4.7 |
| | Stephen L. Wambold | 130,000 | * |
| | Alan C. Heitmann | 10,000 | * |
| | Tod D. Brown | 50,000 | * |
| | Thomas M. Van Buren | 11,000 | * |
| | Julio E. Rios II | 1,104,737 | 1.1 |
| | A. Andrew Levison | 21,800 | * |
| | Boyd H. McGathey | 28,000 | * |
| | John R. Lowden | 5,000 | * |
| | Michael F. Morrissey | 4,000 | * |
| | Pamela A. Breuckmann | 14,955 | * |
| | Daniel G. Kaye | 20,000 | * |
| | David L. Starling | 4,000 | * |
| | Jeremy H. Gamboa | 552,368 | * |
| | All Directors and Executive Officers as a Group | 6,719,335 | 6.7 |

\*      Less than one percent

Beneficial ownership for the purposes of the foregoing table is defined by Rule 13d-3 under the Exchange Act. Under that rule, a person is generally considered to be the beneficial owner of a security if he has or shares the power to vote or direct the voting thereof, and/or to dispose or direct the disposition thereof, or has the right to acquire either of those powers within 60 days. See the "Executive Compensation – Outstanding Equity Awards at Fiscal Year End – Ferrellgas Unit Option Plan" table above for the number of common units that could be acquired by each named executive officer through exercising common unit options.

All common stock of Ferrell Companies, Inc. ("FCI shares") held in the Ferrell Companies, Inc. Employee Stock Ownership Trust ("Trust") is ultimately voted by the appointed trustee. The current independent trustee of the Trust is GreatBanc Trust Company. Each participant in the Ferrell Companies, Inc. Employee Stock Ownership Plan ("ESOP") may be entitled to direct the Trustee as to the exercise of any voting rights attributable to FCI shares allocated to their ESOP account, but only to the extent required by Sections 401(a)(22) and 409(e)(3) of the Internal Revenue Code and the regulations thereunder (the "Code"). The ESOP plan administrator shall direct the Trustee how to vote both FCI shares not allocated to plan participants (i.e., held in a Trust suspense account) and any allocated FCI shares in the Trust as to which no voting instructions have been received from participants. In all cases, the Trustee may vote the shares as it determines is necessary to fulfill its fiduciary duties under ERISA.

As it relates to the Trust, the Code provides that an ESOP participant may be entitled to direct the Trustee as to the exercise of any voting rights attributable to FCI shares then allocated to their ESOP account with respect to any corporate matters which involves the voting of such shares with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as the Secretary may prescribe in regulations.

BLFG_EDPA2274520

Table of Contents

The common units owned by the Employee Stock Ownership Trust at September 1, 2015 includes 22,529,361 common units owned by Ferrell Companies which is 100% owned by the Employee Stock Ownership Trust, 195,686 common units owned by FCI Trading Corp., a wholly-owned subsidiary of Ferrell Companies and 51,204 common units owned by Ferrell Propane, Inc., a wholly-owned subsidiary of our general partner.

**Securities Authorized for Issuance under Equity Compensation Plans**

None.

**ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

**Related Party Transactions**

Our written Code of Business Conduct and Ethics applies to our directors, officers and employees. It deals with conflicts of interest, confidential information, use of company assets, business dealings, and other similar topics. The Code prohibits any transaction that raises questions of possible ethical or legal conflict between the interests of the company and an employee's personal interests.

The board of directors maintains policies that govern specific related party transactions. Each of these policies contain guidelines on what entities or natural persons are considered related parties or an affiliate and the related procedures that are to be followed if transactions occur with these parties. On a quarterly basis, or more frequently if required by the policies, management provides the board with a discussion of any related party or affiliate trading transactions. Annually, these policies are reviewed by the board's Corporate Governance and Nominating Committee and considered for approval by the board of directors.

Our directors and officers are required each year to respond to a detailed questionnaire. The questionnaire requires each director and officer to identify every non-Company organization of any type of which they or their family (as defined by the SEC) are a director, partner, member, trustee, officer, employee, representative, consultant or significant shareholder. The questionnaire also requires disclosure of any transaction, relationship or arrangement with the Company. The information obtained from these questionnaires is then evaluated to determine the nature and amount of any transactions or relationships. If significant, the results are provided to the Corporate Governance and Nominating Committee and Board for their use in determining director and officer independence and related party disclosure obligations.

We have no employees and are managed and controlled by our general partner. Pursuant to our partnership agreement, our general partner is entitled to reimbursement for all direct and indirect expenses incurred or payments it makes on our behalf, and all other necessary or appropriate expenses allocable to us or otherwise reasonably incurred by our general partner in connection with operating our business. These reimbursable costs, which totaled $245.0 million for fiscal 2015, include operating expenses such as compensation and benefits paid to employees of our general partner who perform services on our behalf, as well as related general and administrative expenses.

Related party common unitholder information consisted of the following:

|  | Common unit ownership at July 31, 2015 | Distributions paid during the year ended July 31, 2015 (in thousands) |
| --- | --- | --- |
| Ferrell Companies (1) | 22,529,361 $ | 45,059 |
| James E. Ferrell (2) | 4,763,475 | 8,717 |
| FCI Trading Corp. (3) | 195,686 | 392 |
| Ferrell Propane, Inc. (4) | 51,204 | 104 |
| James H. Ballengee (5) | 9,542,895 | — |

(1) Ferrell Companies is the sole shareholder of our general partner.
(2) James E. Ferrell is the Chairman of the Board of Directors of our general partner. JEF Capital Management owns 4,758,859 of these common units and is wholly-owned by the James E. Ferrell Revocable Trust Two for which James E. Ferrell is the trustee and sole beneficiary. The remaining 4,616 common units are held by Ferrell Resources Holdings, Inc.,

BLFG_EDPA2274521

Table of Contents

which is wholly-owned by the James E. Ferrell Revocable Trust One, for which James E. Ferrell is the trustee and sole beneficiary.
(3) FCI Trading Corp. is an affiliate of the general partner and is wholly-owned by Ferrell Companies.
(4) Ferrell Propane, Inc. is wholly-owned by our general partner.
(5) Jamex Marketing, LLC is the unitholder of record of these common units. Jamex, LLC is the majority member of Jamex Marketing, LLC. Ballengee Interests, LLC is the majority member of Jamex, LLC. James H. Ballengee is the manager of each of Jamex, LLC, Jamex Marketing, LLC and Ballengee Interests, LLC.

During fiscal 2015, Ferrellgas Partners and the operating partnership together paid the general partner regular quarterly distributions totaling $3.5 million.

During June 2015 one-time cash distributions of $418.9 million and $4.3 million was paid by the operating partnership to Ferrellgas Partners and the general partner, respectively, in connection with the acquisition of Bridger.

During June 2015, Ferrellgas Partners contributed $822.5 million of net assets of Bridger to the operating partnership. In connection with this contribution, the operating partnership received a cash contribution of $8.4 million from the general partner.

In connection with the closing of the Bridger Logistics acquisition, we issued approximately 9.5 million common units to Bridger Marketing, LLC (now known as Jamex Marketing, LLC) and entered into a ten-year transportation and logistics agreement (the "TLA") with Jamex Marketing, LLC. As a result of that issuance, Jamex Marketing, LLC owns approximately 9.5% of our outstanding common units; however, neither Jamex Marketing, LLC nor any of its affiliates has any interest in our general partner or its board of directors or any control of our business or policies. Jamex Marketing, LLC, in connection with the TLA, enters into transactions with the operating partnership and its subsidiaries. Bridger provides crude oil logistics services for Jamex Marketing, LLC, including the purchase, sale, transportation and storage of crude oil by truck, terminal and pipeline. During fiscal 2015, Ferrellgas' total revenues and cost of sales from these transactions were $9.4 million and $8.4 million, respectively. The amounts due from and to Jamex Marketing at July 31, 2015, were $4.8 million and $4.2 million, respectively.

On September 2, 2014, Ferrellgas Partners completed a non-brokered registered direct offering to Ferrell Companies of 1.1 million common units. In connection with this transaction, Ferrellgas, Inc. contributed $0.4 million to Ferrellgas, L.P. and $0.4 million to Ferrellgas Partners.

On September 14, 2015, Ferrellgas Partners paid distributions to Ferrell Companies, FCI Trading Corp., Ferrell Propane, Inc., James E. Ferrell (indirectly), James H. Ballengee (indirectly) and the general partner of $11.5 million, $0.1 million, $26 thousand, $2.4 million, $4.9 million and $0.5 million, respectively.

**Certain Business Relationships**

None.

**Indebtedness of Management**

None.

**Transactions with Promoters**

None.

**Director Independence**

The Board has affirmatively determined that Messrs. Levison, Lowden, Kaye, Starling and Morrissey, who constitute a majority of its Directors, are "independent" as described by the NYSE's corporate governance rules.

**ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES.**

The following table presents fees for professional services rendered by Grant Thornton LLP for the audit of the Company's annual financial statements for the years ended July 31, 2015 and July 31, 2014 and fees billed for other services rendered by Grant Thornton LLP for such years, unless otherwise noted:

| (in thousands) | 2015 | | 2014 | |
|---|---|---|---|---|
| Audit fees (1) | $ | 1,119 | $ | 955 |
| Audit-related fees (2) | | 403 | | 298 |
| Tax fees (3) | | — | | — |
| All other fees (4) | | 173 | | — |
| Total | $ | 1,695 | $ | 1,253 |

(1)   Audit fees consist of the aggregate fees billed for each of the last two fiscal years for professional services rendered by Grant Thornton LLP in connection with the audit of our annual financial statements and the review of financial statements included in our quarterly reports on Form 10-Q. In addition, these fees also covered those services that are normally provided by an accountant in connection with statutory and regulatory filings or engagements and services related to the audit of our internal controls over financial reporting, accounting consultations, consents, comfort letters and assistance with and review of documents filed with the SEC.

BLFG_EDPA2274522

(2)   Audit-related fees consist of the aggregate fees billed in each of the last two fiscal years for assurance and related services by Grant Thornton LLP that we believe are reasonably related to the performance of the audit or review of our financial statements and that would not normally be reported under Item 9(e)(1) of Schedule 14A. These services generally consisted of financial accounting and reporting consultations not classified as audit fees, due diligence related to mergers and acquisitions and audits of our benefit plans.

(3)   Tax fees consist of the aggregate fees billed in each of the last two fiscal years for professional services provided by Grant Thornton.

(4)   All other fees consist of the aggregate fees billed in each of the last two fiscal years for products and services provided by Grant Thornton, other than the services that would normally be reported in Items 9(e)(1) through 9(e)(3) of Schedule 14A.


The Audit Committee of our general partner reviewed and approved all audit and non-audit services provided to us by Grant Thornton LLP during fiscal 2015 and 2014, respectively, prior to the commencement of such services. See "Item 10. Directors and Executive Officers of the Registrants–Audit Committee" for a description of the Audit Committee's pre-approval policies and procedures related to the engagement by us of an independent registered public accounting firm.

BLFG_EDPA2274523

Table of Contents

**PART IV**

**ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

| **1.** | **Financial Statements.** |
|---|---|
| | See "Index to Financial Statements" set forth on page F-1. |
| **2.** | **Financial Statement Schedules.** |
| | See "Index to Financial Statement Schedules" set forth on page S-1. |
| **3.** | **Exhibits.** |
| | See "Index to Exhibits" set forth on page E-1. |

102

BLFG_EDPA2274524

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

FERRELLGAS PARTNERS, L.P.

By Ferrellgas, Inc. (General Partner)

| | | |
|---|---|---|
| Date: | September 29, 2015 | By | /s/ Stephen L. Wambold |
| | | | Stephen L. Wambold |
| | | | Chief Executive Officer and President |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ James E. Ferrell<br>James E. Ferrell | Chairman of the Board of Directors | 9/29/2015 |
| /s/ Pamela A. Breuckmann<br>Pamela A. Breuckmann | Director | 9/29/2015 |
| /s/ Daniel G. Kaye<br>Daniel G. Kaye | Director | 9/29/2015 |
| /s/ A. Andrew Levison<br>A. Andrew Levison | Director | 9/29/2015 |
| /s/ John R. Lowden<br>John R. Lowden | Director | 9/29/2015 |
| /s/ Michael F. Morrissey<br>Michael F. Morrissey | Director | 9/29/2015 |
| /s/ David L. Starling<br>David L. Starling | Director | 9/29/2015 |
| /s/ Stephen L. Wambold<br>Stephen L. Wambold | Chief Executive Officer and President (Principal Executive Officer) and Director | 9/29/2015 |
| /s/ Alan C. Heitmann<br>Alan C. Heitmann | Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) | 9/29/2015 |

103

BLFG_EDPA2274525

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

FERRELLGAS PARTNERS FINANCE CORP.

Date:          September 29, 2015          By          /s/ Stephen L. Wambold
                                                        Stephen L. Wambold
                                                        Chief Executive Officer and President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Stephen L. Wambold | Chief Executive Officer and President (Principal Executive Officer) and Director | 9/29/2015 |
| Stephen L. Wambold | | |
| /s/ Alan C. Heitmann | Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) | 9/29/2015 |
| Alan C. Heitmann | | |

**Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Act by Registrants Which Have Not Registered Securities Pursuant to Section 12 of the Act**

Ferrellgas Partners Finance Corp. has not registered securities pursuant to Section 12 of the Securities Act and files reports pursuant to Section 15(d) of the Securities Act. As of the date of filing of this Annual Report on Form 10-K, no annual report or proxy material has been sent to the holders of the securities of Ferrellgas Partners Finance Corp., however, a copy of this Annual Report will be furnished to the holders of the securities of Ferrellgas Partners Finance Corp. subsequent to the date of filing of this Annual Report.

BLFG_EDPA2274526

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

FERRELLGAS, L.P.

By Ferrellgas, Inc. (General Partner)

| | | | |
|---|---|---|---|
| Date: | September 29, 2015 | By | /s/ Stephen L. Wambold |
| | | | Stephen L. Wambold |
| | | | Chief Executive Officer and President |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ James E. Ferrell<br>James E. Ferrell | Chairman of the Board of Directors | 9/29/2015 |
| /s/ Pamela A. Breuckmann<br>Pamela A. Breuckmann | Director | 9/29/2015 |
| /s/ Daniel G. Kaye<br>Daniel G. Kaye | Director | 9/29/2015 |
| /s/ A. Andrew Levison<br>A. Andrew Levison | Director | 9/29/2015 |
| /s/ John R. Lowden<br>John R. Lowden | Director | 9/29/2015 |
| /s/ Michael F. Morrissey<br>Michael F. Morrissey | Director | 9/29/2015 |
| /s/ David L. Starling<br>David L. Starling | Director | 9/29/2015 |
| /s/ Stephen L. Wambold<br>Stephen L. Wambold | Chief Executive Officer and President (Principal Executive Officer) and Director | 9/29/2015 |
| /s/ Alan C. Heitmann<br>Alan C. Heitmann | Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) | 9/29/2015 |

105

BLFG_EDPA2274527

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

FERRELLGAS FINANCE CORP.

Date:          September 29, 2015                    By          /s/ Stephen L. Wambold
                                                                  Stephen L. Wambold
                                                                  Chief Executive Officer and President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Stephen L. Wambold<br>Stephen L. Wambold | Chief Executive Officer and President (Principal Executive Officer) and Director | 9/29/2015 |
| /s/ Alan C. Heitmann<br>Alan C. Heitmann | Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) | 9/29/2015 |

106

BLFG_EDPA2274528

Table of Contents

## INDEX TO FINANCIAL STATEMENTS

|  | **Page** |
|---|---|
| **Ferrellgas Partners, L.P. and Subsidiaries** | |
| Report of Independent Registered Public Accounting Firm - Grant Thornton LLP | F-2 |
| Consolidated Balance Sheets - July 31, 2015 and 2014 | F-3 |
| Consolidated Statements of Earnings - Years ended July 31, 2015, 2014 and 2013 | F-4 |
| Consolidated Statements of Comprehensive Income - Years ended July 31, 2015, 2014 and 2013 | F-5 |
| Consolidated Statements of Partners' Capital (Deficit) - Years ended July 31, 2015, 2014 and 2013 | F-6 |
| Consolidated Statements of Cash Flows - Years ended July 31, 2015, 2014 and 2013 | F-7 |
| Notes to Consolidated Financial Statements | F-8 |
| **Ferrellgas Partners Finance Corp.** | |
| Report of Independent Registered Public Accounting Firm - Grant Thornton LLP | F-38 |
| Balance Sheets - July 31, 2015 and 2014 | F-39 |
| Statements of Earnings - Years ended July 31, 2015, 2014 and 2013 | F-39 |
| Statements of Stockholder's Equity - Years ended July 31, 2015, 2014 and 2013 | F-40 |
| Statements of Cash Flows - Years ended July 31, 2015, 2014 and 2013 | F-40 |
| Notes to Financial Statements | F-41 |
| **Ferrellgas, L.P. and Subsidiaries** | |
| Report of Independent Registered Public Accounting Firm - Grant Thornton LLP | F-42 |
| Consolidated Balance Sheets - July 31, 2015 and 2014 | F-43 |
| Consolidated Statements of Earnings - Years ended July 31, 2015, 2014 and 2013 | F-44 |
| Consolidated Statements of Comprehensive Income - Years ended July 31, 2015, 2014 and 2013 | F-45 |
| Consolidated Statements of Partners' Capital - Years ended July 31, 2015, 2014 and 2013 | F-46 |
| Consolidated Statements of Cash Flows - Years ended July 31, 2015, 2014 and 2013 | F-47 |
| Notes to Consolidated Financial Statements | F-48 |
| **Ferrellgas Finance Corp.** | |
| Report of Independent Registered Public Accounting Firm - Grant Thornton LLP | F-76 |
| Balance Sheets - July 31, 2015 and 2014 | F-77 |
| Statements of Earnings – Year ended July 31, 2015, 2014 and 2013 | F-77 |
| Statements of Stockholder's Equity - Year ended July 31, 2015, 2014 and 2013 | F-78 |
| Statements of Cash Flows - Year ended July 31, 2015, 2014 and 2013 | F-78 |
| Notes to Financial Statements | F-79 |

BLFG_EDPA2274529

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Partners
Ferrellgas Partners, L.P.

We have audited the accompanying consolidated balance sheets of Ferrellgas Partners, L.P. and subsidiaries (the "Partnership") as of July 31, 2015 and 2014, and the related consolidated statements of earnings, comprehensive income, partners' capital (deficit), and cash flows for each of the three years in the period ended July 31, 2015. Our audits of the basic consolidated financial statements included the financial statement schedules listed in the index appearing on page S-1. These financial statements and financial statement schedules are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Ferrellgas Partners, L.P. and subsidiaries as of July 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three years in the period ended July 31, 2015 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Partnership's internal control over financial reporting as of July 31, 2015, based on criteria established in the 2013 Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated September 29, 2015 expressed an unqualified opinion.

/s/ GRANT THORNTON LLP

Kansas City, Missouri
September 29, 2015

BLFG_EDPA2274530

Table of Contents

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except unit data)**

| | July 31, | |
|---|---|---|
| **ASSETS** | **2015** | **2014** |
| **Current assets:** | | |
| Cash and cash equivalents | $ 7,652 | $ 8,289 |
| Accounts and notes receivable (including $123,791 and $159,003 of accounts receivable pledged as collateral at 2015 and 2014, respectively, and net of allowance for doubtful accounts of $4,816 and $4,756 at 2015 and 2014, respectively) | 196,918 | 178,602 |
| Inventories | 96,754 | 145,969 |
| Prepaid expenses and other current assets | 64,285 | 32,071 |
| **Total current assets** | 365,609 | 364,931 |
| | | |
| Property, plant and equipment, net | 965,217 | 611,787 |
| Goodwill | 478,747 | 273,210 |
| Intangible assets, net | 580,043 | 276,171 |
| Other assets, net | 74,440 | 46,171 |
| **Total assets** | $ 2,464,056 | $ 1,572,270 |
| | | |
| **LIABILITIES AND PARTNERS' CAPITAL (DEFICIT)** | | |
| | | |
| **Current liabilities:** | | |
| Accounts payable | $ 83,974 | $ 69,360 |
| Short-term borrowings | 75,319 | 69,519 |
| Collateralized note payable | 70,000 | 91,000 |
| Other current liabilities | 180,687 | 125,161 |
| **Total current liabilities** | 409,980 | 355,040 |
| | | |
| Long-term debt | 1,804,392 | 1,292,214 |
| Other liabilities | 41,975 | 36,662 |
| Contingencies and commitments (Note M) | | |
| | | |
| **Partners' capital (deficit):** | | |
| Common unitholders (100,376,789 and 81,228,237 units outstanding at 2015 and 2014, respectively) | 299,730 | (57,893) |
| General partner unitholder (1,013,907 and 820,487 units outstanding at 2015 and 2014, respectively) | (57,042) | (60,654) |
| Accumulated other comprehensive income (loss) | (38,934) | 6,181 |
| **Total Ferrellgas Partners, L.P. partners' capital (deficit)** | 203,754 | (112,366) |
| Noncontrolling interest | 3,955 | 720 |
| **Total partners' capital (deficit)** | 207,709 | (111,646) |
| **Total liabilities and partners' capital (deficit)** | $ 2,464,056 | $ 1,572,270 |

See notes to consolidated financial statements.

F-3

BLFG_EDPA2274531

Table of Contents

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF EARNINGS**
(in thousands, except per unit data)

| | For the year ended July 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| **Revenues:** | | | |
| Propane and other gas liquids sales | $ 1,657,016 | $ 2,147,343 | $ 1,739,267 |
| Midstream operations | 107,189 | 7,435 | — |
| Other | 260,185 | 251,082 | 236,200 |
| **Total revenues** | 2,024,390 | 2,405,860 | 1,975,467 |
| | | | |
| **Costs and expenses:** | | | |
| Cost of sales - propane and other gas liquids sales | 977,224 | 1,456,388 | 1,092,261 |
| Cost of sales - midstream operations | 76,590 | 1,970 | — |
| Cost of sales - other | 170,697 | 156,182 | 144,456 |
| Operating expense | 437,457 | 451,528 | 412,450 |
| Depreciation and amortization expense | 98,579 | 84,202 | 83,344 |
| General and administrative expense | 77,238 | 65,156 | 53,181 |
| Equipment lease expense | 24,273 | 17,745 | 15,983 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 | 15,769 |
| Loss on disposal of assets | 7,099 | 6,486 | 10,421 |
| | | | |
| **Operating income** | 130,520 | 144,414 | 147,602 |
| | | | |
| Interest expense | (100,396) | (86,502) | (89,145) |
| Loss on extinguishment of debt | — | (21,202) | — |
| Other income (expense), net | (350) | (479) | 565 |
| | | | |
| **Earnings before income taxes** | 29,774 | 36,231 | 59,022 |
| | | | |
| Income tax expense (benefit) | (315) | 2,516 | 1,855 |
| | | | |
| **Net earnings** | 30,089 | 33,715 | 57,167 |
| | | | |
| Net earnings attributable to noncontrolling interest | 469 | 504 | 741 |
| | | | |
| Net earnings attributable to Ferrellgas Partners, L.P. | 29,620 | 33,211 | 56,426 |
| | | | |
| Less: General partner's interest in net earnings | 296 | 332 | 564 |
| **Common unitholders' interest in net earnings** | $ 29,324 | $ 32,879 | $ 55,862 |
| | | | |
| **Basic and diluted net earnings per common unitholders' interest** | $ 0.35 | $ 0.41 | $ 0.71 |
| | | | |
| **Cash distributions declared per common unit** | $ 2.00 | $ 2.00 | $ 2.00 |

See notes to consolidated financial statements.

F-4

BLFG_EDPA2274532

Table of Contents

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Net earnings** | $ 30,089 | $ 33,715 | $ 57,167 |
| **Other comprehensive income (loss)** | | | |
| Change in value on risk management derivatives | (73,647) | 14,592 | 4,252 |
| Reclassification of gains and losses of derivatives to earnings | 28,258 | (10,175) | 10,613 |
| Foreign currency translation adjustment | (2) | (145) | (147) |
| Pension liability adjustment | (185) | 258 | 290 |
| **Other comprehensive income (loss)** | (45,576) | 4,530 | 15,008 |
| Comprehensive income (loss) | (15,487) | 38,245 | 72,175 |
| Less: comprehensive income attributable to noncontrolling interest | (8) | (550) | (893) |
| **Comprehensive income (loss) attributable to Ferrellgas Partners, LP** | $ (15,495) | $ 37,695 | $ 71,282 |

See notes to consolidated financial statements.

F-5

BLFG_EDPA2274533

Table of Contents

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF PARTNERS' CAPITAL (DEFICIT)**
**(in thousands)**

| | Number of units | | | | | Total Ferrellgas Partner, L.P. partners' capital (deficit) | Non-controlling interest | Total partners' capital (deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Common unitholders | General Partner unitholder | Common unitholders | General Partner unitholder | Accumulated other comprehensive income (loss) | | | |
| **Balance at July 31, 2012** | 79,006.6 | 798.0 | $ 43,701 | $ (59,630) | $ (13,159) | $ (29,088) | $ 1,562 | $ (27,526) |
| Contributions in connection with non-cash ESOP and stock and unit-based compensation charges | — | — | 28,728 | 291 | | 29,019 | 295 | 29,314 |
| Distributions | — | — | (158,086) | (1,596) | | (159,682) | (1,790) | (161,472) |
| Exercise of common unit options | 66.2 | 0.7 | 864 | 9 | | 873 | 9 | 882 |
| Net earnings | | | 55,862 | 564 | | 56,426 | 741 | 57,167 |
| Other comprehensive income | | | | | 14,856 | 14,856 | 152 | 15,008 |
| **Balance at July 31, 2013** | 79,072.8 | 798.7 | (28,931) | (60,362) | 1,697 | (87,596) | 969 | (86,627) |
| Contributions in connection with non-cash ESOP and stock and unit-based compensation charges | — | — | 45,370 | 459 | | 45,829 | 468 | 46,297 |
| Distributions | — | — | (159,316) | (1,609) | | (160,925) | (1,803) | (162,728) |
| Common units issued in connection with acquisitions | 62.6 | 0.6 | 1,500 | 15 | | 1,515 | 15 | 1,530 |
| Exercise of common unit options | 52.0 | 0.5 | 605 | 6 | | 611 | 6 | 617 |
| Common units issued in offering, net of issuance costs | 2,040.8 | 20.7 | 50,000 | 505 | | 50,505 | 515 | 51,020 |
| Net earnings | | | 32,879 | 332 | | 33,211 | 504 | 33,715 |
| Other comprehensive income | | | | | 4,484 | 4,484 | 46 | 4,530 |
| **Balance at July 31, 2014** | 81,228.2 | 820.5 | (57,893) | (60,654) | 6,181 | (112,366) | 720 | (111,646) |
| Contributions in connection with non-cash ESOP and stock and unit-based compensation charges | — | — | 49,681 | 502 | | 50,183 | 512 | 50,695 |
| Distributions | — | — | (165,433) | (1,672) | | (167,105) | (6,139) | (173,244) |
| Common units issued in connection with acquisitions | 11,334.2 | 114.5 | 262,952 | 2,656 | | 265,608 | 31 | 265,639 |
| Exercise of common unit options | 5.8 | 0.1 | 91 | 1 | | 92 | — | 92 |
| Common units issued in offering, net of issuance costs | 7,808.6 | 78.9 | 181,008 | 1,829 | | 182,837 | 8,823 | 191,660 |
| Net earnings | | | 29,324 | 296 | | 29,620 | 469 | 30,089 |
| Other comprehensive loss | | | | | (45,115) | (45,115) | (461) | (45,576) |
| **Balance at July 31, 2015** | 100,376.8 | 1,014.0 | $ 299,730 | $ (57,042) | $ (38,934) | $ 203,754 | $ 3,955 | $ 207,709 |

See notes to consolidated financial statements.

BLFG_EDPA2274534

Table of Contents

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Cash flows from operating activities:** | | | |
| Net earnings | $ 30,089 | $ 33,715 | $ 57,167 |
| Reconciliation of net earnings to net cash provided by operating activities: | | | |
| Depreciation and amortization expense | 98,579 | 84,202 | 83,344 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 | 15,769 |
| Non-cash stock and unit-based compensation charge | 25,982 | 24,508 | 13,545 |
| Loss on disposal of assets | 7,099 | 6,486 | 10,421 |
| Loss on extinguishment of debt | — | 6,526 | — |
| Change in fair value of contingent consideration | (6,300) | 5,000 | — |
| Provision for doubtful accounts | 3,419 | 3,419 | 2,066 |
| Deferred tax expense | 270 | 88 | 133 |
| Other | 3,361 | 5,372 | 4,520 |
| Changes in operating assets and liabilities, net of effects from business acquisitions: | | | |
| Accounts and notes receivable, net of securitization | (1,739) | (48,087) | (5,901) |
| Inventories | 49,050 | (28,738) | 15,869 |
| Prepaid expenses and other current assets | (24,956) | (3,960) | 6,157 |
| Accounts payable | (1,547) | 16,279 | 508 |
| Accrued interest expense | 5,099 | (7,613) | (150) |
| Other current liabilities | 10,754 | 8,579 | 6,369 |
| Other assets and liabilities | (20,801) | (1,896) | 303 |
| Net cash provided by operating activities | 203,072 | 125,669 | 210,120 |
| **Cash flows from investing activities:** | | | |
| Business acquisitions, net of cash acquired | (641,427) | (162,004) | (37,186) |
| Capital expenditures | (72,481) | (52,572) | (40,910) |
| Proceeds from sale of assets | 5,905 | 4,524 | 9,980 |
| Other | (14) | (23) | — |
| Net cash used in investing activities | (708,017) | (210,075) | (68,116) |
| **Cash flows from financing activities:** | | | |
| Distributions | (167,105) | (160,925) | (159,682) |
| Proceeds from increase in long-term debt | 628,134 | 750,351 | 58,356 |
| Payments on long-term debt | (119,457) | (569,841) | (3,912) |
| Net additions to (reductions in) short-term borrowings | 5,800 | 19,465 | (45,676) |
| Net additions to (reductions in) collateralized short-term borrowings | (21,000) | 9,000 | 8,000 |
| Cash paid for financing costs | (10,301) | (11,508) | — |
| Noncontrolling interest activity | 2,684 | (1,282) | (1,781) |
| Proceeds from exercise of common unit options | 91 | 605 | 864 |
| Proceeds from equity offering, net of issuance costs of $648, $0 and $0 for the years ended July 31, 2015, 2014 and 2013, respectively | 181,008 | 50,000 | — |
| Cash contribution from general partner in connection with common unit issuances | 4,456 | 511 | 9 |
| Net cash provided by (used in) financing activities | 504,310 | 86,376 | (143,822) |
| Effect of exchange rate changes on cash | (2) | (145) | (147) |
| Increase (decrease) in cash and cash equivalents | (637) | 1,825 | (1,965) |
| **Cash and cash equivalents - beginning of year** | 8,289 | 6,464 | 8,429 |
| **Cash and cash equivalents - end of year** | $ 7,652 | $ 8,289 | $ 6,464 |

See notes to consolidated financial statements.

BLFG_EDPA2274535

Table of Contents

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except per unit data, unless otherwise designated)**

**A.  Partnership organization and formation**

Ferrellgas Partners, L.P. ("Ferrellgas Partners") was formed on April 19, 1994, and is a publicly traded limited partnership, owning an approximate 99% limited partner interest in Ferrellgas, L.P. (the "operating partnership"). Ferrellgas Partners and the operating partnership, collectively referred to as "Ferrellgas," are both Delaware limited partnerships and are governed by their respective partnership agreements. Ferrellgas Partners was formed to acquire and hold a limited partner interest in the operating partnership. As of July 31, 2015, Ferrell Companies Inc. beneficially owns 22.8 million of Ferrellgas Partners' outstanding common units and also owns 100% of Ferrellgas, Inc. Ferrellgas, Inc. (the "general partner") retains a 1% general partner interest in Ferrellgas Partners and also holds an approximate 1% general partner interest in the operating partnership, representing an effective 2% general partner interest in Ferrellgas on a combined basis. As general partner, it performs all management functions required by Ferrellgas. Creditors of the operating partnership have no recourse with regards to Ferrellgas Partners.

Ferrellgas Partners is a holding entity that conducts no operations and has two subsidiaries, Ferrellgas Partners Finance Corp. and the operating partnership. Ferrellgas Partners owns a 100% equity interest in Ferrellgas Partners Finance Corp., whose only business activity is to act as the co-issuer and co-obligor of any debt issued by Ferrellgas Partners. The operating partnership is the only operating subsidiary of Ferrellgas Partners.

Ferrellgas is engaged in the following primary businesses:
- Propane and related equipment sales consists of the distribution of propane and related equipment and supplies. The propane distribution market is seasonal because propane is used primarily for heating in residential and commercial buildings. Ferrellgas serves residential, industrial/commercial, portable tank exchange, agricultural, wholesale and other customers in all 50 states, the District of Columbia, and Puerto Rico.
- Midstream operations consists of two reportable operating segments: crude oil logistics and water solutions. The crude oil logistics segment ("Bridger") generates income by providing crude oil transportation and logistics services on behalf of producers and end-users of crude oil. Bridger's services include transportation through its operation of a fleet of trucks and tank trailers and railcars primarily servicing Texas, Lousiana, North Dakota, Pennsylvania, Colorado and Wyoming; pipeline services in North Dakota, Montana, Wyoming, New Mexico, Mississippi, Oklahoma and Texas; and crude oil purchase and sale in connection with pipeline management services. The salt water disposal wells within the water solutions segment are located in the Eagle Ford shale region of south Texas and are a critical component of the oil and natural gas well drilling industry. Oil and natural gas wells generate significant volumes of salt water. In the oil and gas fields Ferrellgas services, these volumes of water are transported by truck away from the fields to salt water disposal wells where a combination of gravity and chemicals are used to separate crude oil from the salt water through a process that results in the collection of "skimming oil". This skimming oil is then captured and sold before the salt water is injected into underground geologic formations using high-pressure pumps.

**B.  Summary of significant accounting policies**

**(1)  Accounting estimates:** The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reported period. Actual results could differ from these estimates. Significant estimates impacting the consolidated financial statements include accruals that have been established for contingent liabilities, pending claims and legal actions arising in the normal course of business, useful lives of property, plant and equipment assets, residual values of tanks, capitalization of customer tank installation costs, amortization methods of intangible assets, valuation methods used to value sales returns and allowances, allowance for doubtful accounts, fair value of reporting units, assumptions used to value business combinations, fair values of derivative contracts and stock-based compensation calculations.

**(2)  Principles of consolidation:** The accompanying consolidated financial statements present the consolidated financial position, results of operations and cash flows of Ferrellgas Partners, its wholly-owned subsidiary, Ferrellgas Partners Finance Corp., and the operating partnership, its majority-owned subsidiary, after elimination of all intercompany accounts and transactions. The accounts of Ferrellgas Partners' majority-owned subsidiary are included based on the determination that the operating partnership is a variable interest entity for whom Ferrellgas Partners has no ability through voting rights or similar rights to make decisions and thus does not have the power to direct the activities of the operating partnership that most significantly impact economic performance. However, Ferrellgas Partners has the obligation to absorb the losses of and the right to receive benefits from the operating partnership that are significant to the operating partnership. Furthermore, assets and

F-8

BLFG_EDPA2274536

Table of Contents

liabilities of Ferrellgas Partners consist substantially of the operating partnership. The operating partnership includes the accounts of its wholly-owned subsidiaries. The general partner's approximate 1% general partner interest in the operating partnership is accounted for as a noncontrolling interest. The wholly-owned consolidated subsidiary of the operating partnership, Ferrellgas Receivables, LLC ("Ferrellgas Receivables"), is a special purpose entity that has agreements with the operating partnership to securitize, on an ongoing basis, a portion of its trade accounts receivable.

**(3)  Supplemental cash flow information:** For purposes of the consolidated statements of cash flows, Ferrellgas considers cash equivalents to include all highly liquid debt instruments purchased with an original maturity of three months or less. Certain cash flow and significant non-cash activities are presented below:

| | For the year ended July 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | **2014** | | **2013** | |
| CASH PAID FOR: | | | | | | |
| Interest | $ | 91,783 | $ | 90,820 | $ | 84,030 |
| Income taxes | $ | 712 | $ | 816 | $ | 550 |
| NON-CASH INVESTING AND FINANCING ACTIVITIES: | | | | | | |
| Issuance of common units in connection with acquisitions | $ | 262,952 | $ | 1,500 | $ | — |
| Liabilities incurred in connection with acquisitions | $ | 481 | $ | 4,312 | $ | 2,035 |
| Change in accruals for property, plant and equipment additions | $ | 498 | $ | 978 | $ | 533 |

**(4)  Fair value measurements:** Ferrellgas measures certain of its assets and liabilities at fair value, which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants – in either the principal market or the most advantageous market. The principal market is the market with the greatest level of activity and volume for the asset or liability.

The common framework for measuring fair value utilizes a three-level hierarchy to prioritize the inputs used in the valuation techniques to derive fair values. The basis for fair value measurements for each level within the hierarchy is described below with Level 1 having the highest priority and Level 3 having the lowest.

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Quoted prices in active markets for similar assets or liabilities; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs are observable in active markets.
- Level 3: Valuations derived from valuation techniques in which one or more significant inputs are unobservable.

**(5)  Accounts receivable securitization:** Through its wholly-owned and consolidated subsidiary Ferrellgas Receivables, Ferrellgas has agreements to securitize, on an ongoing basis, a portion of its trade accounts receivable.

**(6)  Inventories:** Inventories are stated at the lower of cost or market using weighted average cost and actual cost methods.

**(7)  Property, plant and equipment:** Property, plant and equipment are stated at cost less accumulated depreciation. Expenditures for maintenance and routine repairs are expensed as incurred. Ferrellgas capitalizes computer software, equipment replacement and betterment expenditures that upgrade, replace or completely rebuild major mechanical components and extend the original useful life of the equipment. Depreciation is calculated using the straight-line method based on the estimated useful lives of the assets ranging from two to 30 years. Ferrellgas, using its best estimates based on reasonable and supportable assumptions and projections, reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of its assets might not be recoverable. See Note E – Supplemental financial statement information – for further discussion of property, plant and equipment.

**(8)  Goodwill:** Ferrellgas records goodwill as the excess of the cost of acquisitions over the fair value of the related net assets at the date of acquisition. Goodwill recorded is not deductible for income tax purposes. Ferrellgas has determined that it has five reporting units for goodwill impairment testing purposes. Four of these reporting units contain goodwill that is subject to at least an annual assessment for impairment by applying a fair-value-based test. Under this test, the carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units as of the date of the evaluation on a specific identification basis. To the extent a reporting unit's carrying value exceeds its fair value, an indication exists that the reporting unit's goodwill may be impaired and the second step of the impairment test must be performed. In the second step, the implied fair value of the goodwill is determined by allocating the fair value of all of its assets (recognized and unrecognized) and liabilities to its carrying amount. Ferrellgas has completed the impairment test for the Retail operations, Products and Midstream operations - water solutions reporting units and believes that

F-9

BLFG_EDPA2274537

Table of Contents

estimated fair values exceed the carrying values of its reporting units as of January 31, 2015. Goodwill associated with the Midstream operations - crude oil logistics reporting unit is a result of the acquisition of Bridger on June 24, 2015.

As a result of the significant drop in the price of crude oil and its impact on the results of Midstream operations - water solutions reporting unit during the second half of fiscal 2015, Ferrellgas considered whether the carrying value of this reporting unit no longer exceeded the fair value. Upon applying the fair-value-based test as described above for purposes of the annual impairment test, Ferrellgas concluded that there was no impairment of the Midstream operations - water solutions reporting unit as of July 31, 2015.  As of July 31, 2015, Ferrellgas determined that this reporting unit had an estimated fair value in excess of its respective carrying value of approximately 10%.

This test primarily consists of a discounted future cash flow model to estimate fair value. The cash flow model includes the following critical assumptions: (1) the NYMEX West Texas Intermediate ("WTI") crude oil curve as of July 31, 2015 was used to predict future oil prices; (2) the oil skimming rate is expected to correlate to the NYMEX WTI crude oil curve consistent with Ferrellgas' past history; (3) a terminal period growth rate equal to the expected rate of inflation; and (4) certain organic growth projects will increase the salt water volumes processed as a result of new drilling activity in the Eagle Ford shale region of Texas that are expected to occur as the price of WTI crude oil increases. Ferrellgas believes that the results of this business are closely tied to the price of WTI crude oil and, therefore, if any of these assumptions are not sustained or are not sustained in a timely manner, the Midstream operations - water solutions reporting unit could incur material impairments. In addition to these critical cash flow assumptions, a discount rate of 11.1% was applied to the projected cash flows. A 5% increase, resulting in a discount rate equal to 11.7%, could cause Ferrellgas to fail step one of the goodwill impairment test. If this reporting unit fails step one in the future, we would be required to perform step two of the goodwill impairment test. If we perform step two, up to $29.3 million of goodwill assigned to this reporting unit could be written off in the period that the impairment is triggered.

Judgments and assumptions are inherent in management's estimates used to determine the fair value of Ferrellgas' reporting units and are consistent with what management believes would be utilized by primary market participants. The use of alternate judgments and assumptions could result in the recognition of different levels of impairment charges in the financial statements.

**(9)   Intangible assets:** Intangible assets with finite useful lives, consisting primarily of customer related assets, non-compete agreements, permits, favorable lease arrangements and patented technology, are stated at cost, net of accumulated amortization calculated using the straight-line method over periods ranging from two to 15 years. Trade names and trademarks have indefinite lives, are not amortized, and are stated at cost. Ferrellgas tests finite-lived intangible assets for impairment when events or changes in circumstances indicate that the carrying amount of these assets might not be recoverable. Ferrellgas tests indefinite-lived intangible assets for impairment annually on January 31 or more frequently if circumstances dictate. Ferrellgas has not recognized impairment losses as a result of these tests. When necessary, intangible assets' useful lives are revised and the impact on amortization reflected on a prospective basis. See Note G – Goodwill and intangible assets, net – for further discussion of intangible assets.

**(10)   Derivative instruments and hedging activities:**

*Commodity and Transportation Fuel Price Risk.*

Ferrellgas' overall objective for entering into commodity based derivative contracts, including commodity options and swaps, is to hedge a portion of its exposure to market fluctuations in propane, gasoline, diesel and crude oil prices.

Ferrellgas' risk management activities primarily attempt to mitigate price risks related to the purchase, storage, transport and sale of propane and crude oil generally in the contract and spot markets from major domestic energy companies on a short-term basis. Ferrellgas attempts to mitigate these price risks through the use of financial derivative instruments and forward propane purchase and sales contracts. Additionally, Ferrellgas risk management activities attempt to mitigate price risks related to the purchase of gasoline and diesel fuel for use in the transport of propane from retail fueling stations through the use of financial derivative instruments.

Ferrellgas' risk management strategy involves taking positions in the forward or financial markets that are equal and opposite to Ferrellgas' positions in the physical products market in order to minimize the risk of financial loss from an adverse price change. This risk management strategy is successful when Ferrellgas' gains or losses in the physical product markets are offset by its losses or gains in the forward or financial markets. The propane related financial derivatives are designated as cash flow hedges. The gasoline and diesel related financial derivatives are not formally designated and documented as a hedge of exposure to fluctuations in the market price of fuel.

Ferrellgas' risk management activities may include the use of financial derivative instruments including, but not limited to, swaps, options, and futures to seek protection from adverse price movements and to minimize potential losses. Ferrellgas enters into these financial derivative instruments directly with third parties in the over-the-counter market and with brokers who are

F-10

BLFG_EDPA2274538

Table of Contents

clearing members with the New York Mercantile Exchange. All of Ferrellgas' financial derivative instruments are reported on the consolidated balance sheets at fair value.

Ferrellgas also enters into forward propane purchase and sales contracts with counterparties. These forward contracts qualify for the normal purchase normal sales exception within GAAP guidance and are therefore not recorded on Ferrellgas' financial statements until settled.

On the date that derivative contracts are entered into, other than those designated as normal purchases or normal sales, Ferrellgas makes a determination as to whether the derivative instrument qualifies for designation as a hedge. These financial instruments are formally designated and documented as a hedge of a specific underlying exposure, as well as the risk management objectives and strategies for undertaking the hedge transaction. Because of the high degree of correlation between the hedging instrument and the underlying exposure being hedged, fluctuations in the value of the derivative instrument are generally offset by changes in the anticipated cash flows of the underlying exposure being hedged. Since the fair value of these derivatives fluctuates over their contractual lives, their fair value amounts should not be viewed in isolation, but rather in relation to the anticipated cash flows of the underlying hedged transaction and the overall reduction in Ferrellgas' risk relating to adverse fluctuations in propane prices. Ferrellgas formally assesses, both at inception and at least quarterly thereafter, whether the financial instruments that are used in hedging transactions are effective at offsetting changes in the anticipated cash flows of the related underlying exposures. Any ineffective portion of a financial instrument's change in fair value is recognized in "Cost of product sold - propane and other gas liquids sales" in the consolidated statements of earnings. Financial instruments formally designated and documented as a hedge of a specific underlying exposure are recorded gross at fair value as either "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities", or "Other liabilities" on the consolidated balance sheets with changes in fair value reported in other comprehensive income.

Financial instruments not formally designated and documented as a hedge of a specific underlying exposure are recorded at fair value as "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities", or "Other liabilities" on the consolidated balance sheets with changes in fair value reported in "Cost of sales - midstream operations" and "Operating expense" on the consolidated statements of earnings.

*Interest Rate Risk.*

Ferrellgas' overall objective for entering into interest rate derivative contracts, including swaps, is to manage its exposure to interest rate risk associated with its fixed rate senior notes and its floating rate borrowings from both the secured credit facility and the accounts receivable securitization facility. Fluctuations in interest rates subject Ferrellgas to interest rate risk. Decreases in interest rates increase the fair value of Ferrellgas' fixed rate debt, while increases in interest rates subject Ferrellgas to the risk of increased interest expense related to its variable rate borrowings.

Ferrellgas enters into fair value hedges to help reduce its fixed interest rate risk. Interest rate swaps are used to hedge the exposure to changes in the fair value of fixed rate debt due to changes in interest rates. Fixed rate debt that has been designated as being hedged is recorded at fair value while the fair value of interest rate derivatives that are considered fair value hedges are classified as "Prepaid expenses and other current assets", "Other assets, net", Other current liabilities" or as "Other liabilities" on the consolidated balance sheets. Changes in the fair value of fixed rate debt and any related fair value hedges are recognized as they occur in "Interest expense" on the consolidated statements of earnings.

Ferrellgas enters into cash flow hedges to help reduce its variable interest rate risk. Interest rate swaps are used to hedge the risk associated with rising interest rates and their effect on forecasted interest payments related to variable rate borrowings. These interest rate swaps are designated as cash flow hedges. Thus, the effective portions of changes in the fair value of the hedges are recorded in "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities" or as "Other liabilities" with an offsetting entry to "Other comprehensive income" at interim periods and are subsequently recognized as interest expense in the consolidated statement of earnings when the forecasted transaction impacts earnings. Changes in the fair value of any cash flow hedges that are considered ineffective are recognized as interest expense on the consolidated statement of earnings as they occur.

**(11) Revenue recognition:** Revenues from Ferrellgas' propane and related equipment sales segment are recognized at the time product is delivered with payments generally due 30 days after receipt. Amounts are considered past due after 30 days. Ferrellgas determines accounts receivable allowances based on management's assessment of the creditworthiness of the customers and other collection actions. Ferrellgas offers "even pay" billing programs that can create customer deposits or advances. Revenue is recognized from these customer deposits or advances to customers at the time product is delivered. Other revenues, which include revenue from the sale of propane appliances and equipment is recognized at the time of delivery or installation. Ferrellgas recognizes shipping and handling revenues and expenses for sales of propane, appliances and equipment at the time of delivery or installation. Shipping and handling revenues are included in the price of propane charged to

F-11

BLFG_EDPA2274539

Table of Contents

customers, and are classified as revenue. Revenues from annually billed, non-refundable propane tank rentals are recognized in "Revenues: other" on a straight-line basis over one year.

Revenues from Ferrellgas' midstream operations - crude oil logistics segment include crude oil sales, pipeline tariffs, trucking fees, rail throughput fees, pipeline management services, leasing, throughput, and storage; all items deemed as being associated with the transportation of crude oil. These revenues are recognized upon completion of the related service or delivery of product.

Revenues from Ferrellgas' midstream operations - water solutions segment are recognized when there is persuasive evidence that an arrangement exists, delivery has occurred or services have been rendered, the price is fixed or determinable and collectability is reasonably assured. Salt water disposal revenues are based on Ferrellgas' published or negotiated water disposal rates. Customers deliver salt water to be disposed to facilities and revenue is recognized when actual volumes of water are off-loaded at the facilities. Skimming oil disposal revenues are determined based on published rates subject to adjustments based on the quality of the oil sold and are recognized when actual volumes are delivered to the customer who determines the quality of the oil and collectability is reasonably assured. Amounts are considered past due after 30 days. Ferrellgas determines accounts receivable allowances based on management's assessment of the creditworthiness of the customers and other collection actions.

**(12)   Shipping and handling expenses:** Shipping and handling expenses related to delivery personnel, vehicle repair and maintenance and general liability expenses are classified within "Operating expense" in the consolidated statements of earnings. Depreciation expenses on delivery vehicles Ferrellgas owns are classified within "Depreciation and amortization expense." Delivery vehicles and distribution technology leased by Ferrellgas are classified within "Equipment lease expense."

See Note E – Supplemental financial statement information – for the financial statement presentation of shipping and handling expenses.

**(13)   Cost of sales:** "Cost of sales – propane and other gas liquids sales" includes all costs to acquire propane and other gas liquids, the costs of storing and transporting inventory prior to delivery to Ferrellgas' customers, the results from risk management activities to hedge related price risk and the costs of materials related to the refurbishment of Ferrellgas' portable propane tanks. "Cost of sales - midstream operations" includes all costs incurred to purchase and transport crude oil, including the costs of terminaling and transporting crude oil prior to delivery to customers and transportation cost related to the processing and disposal of salt water. "Cost of sales – other" primarily includes costs related to the sale of propane appliances and equipment.

**(14)   Operating expenses:** "Operating expense" primarily includes the personnel, vehicle, delivery, handling, plant, office, selling, marketing, credit and collections and other expenses related to the retail distribution of propane and related equipment and supplies. Within midstream operations, "Operating expense" includes plant, office, selling, marketing, credit and collections and other expense.

**(15)   General and administrative expenses:** "General and administrative expense" primarily includes personnel and incentive expense related to executives, and employees and other overhead expense related to centralized corporate functions.

**(16)   Stock-based plans:**

**Ferrell Companies, Inc. Incentive Compensation Plans ("ICPs")**

The ICPs are not Ferrellgas stock-compensation plans; however, in accordance with Ferrellgas' partnership agreements, all Ferrellgas employee-related costs incurred by Ferrell Companies are allocated to Ferrellgas. As a result, Ferrellgas incurs a non-cash compensation charge from Ferrell Companies. During the years ended July 31, 2015, 2014 and 2013, the portion of the total non-cash compensation charge relating to the ICPs was $25.6 million, $24.5 million and $13.5 million, respectively.

Ferrell Companies is authorized to issue up to 9.25 million stock appreciation rights ("SARs") that are based on shares of Ferrell Companies common stock. The SARs were established by Ferrell Companies to allow upper-middle and senior level managers as well as directors of the general partner to participate in the equity growth of Ferrell Companies. The SARs awards vest ratably over periods ranging from zero to 12 years or 100% upon a change of control of Ferrell Companies, or upon the death, disability or retirement at the age of 65 of the participant. All awards expire 10 or 15 years from the date of issuance. The fair value of each award is estimated on each balance sheet date using a binomial valuation model.

Effective July 31, 2015, Ferrell Companies is authorized to issue deferred appreciation right ("DARs") awards that are based on shares of Ferrell Companies common stock. The DAR awards were established by Ferrell Companies to allow upper-middle and senior level managers as well as directors of the general partner to participate in the equity growth of Ferrell Companies.

F-12

BLFG_EDPA2274540

Table of Contents

The DAR awards vest ratably over periods ranging from zero to 12 years or 100% upon a change of control of Ferrell Companies, or upon the death, disability or retirement at the age of 65 of the participant. All awards expire 10 or 15 years from the date of issuance. The fair value of each award is estimated on each balance sheet date using a binomial valuation model.

**(17) Income taxes:** Ferrellgas Partners is a publicly-traded master limited partnership with one subsidiary that is a taxable corporation. The operating partnership is a limited partnership with three subsidiaries that are taxable corporations. Partnerships are generally not subject to federal income tax, although publicly-traded partnerships are treated as corporations for federal income tax purposes and therefore subject to Federal income tax unless a qualifying income test is satisfied. If this qualifying income test is satisfied, the publicly-traded partnership will be treated as a partnership for Federal income tax purposes. Based on Ferrellgas' calculations, Ferrellgas Partners satisfies the qualifying income test. As a result, except for the taxable corporations, Ferrellgas Partners' earnings or losses for Federal income tax purposes are included in the tax returns of the individual partners, Ferrellgas Partners' unitholders. Accordingly, the accompanying consolidated financial statements of Ferrellgas Partners reflect federal income taxes related to the above mentioned taxable corporations and certain states that allow for income taxation of partnerships. Net earnings for financial statement purposes may differ significantly from taxable income reportable to Ferrellgas Partners unitholders as a result of differences between the tax basis and financial reporting basis of assets and liabilities, the taxable income allocation requirements under Ferrellgas Partners' partnership agreement and differences between Ferrellgas Partners financial reporting year end and its calendar tax year end.

Income tax expense consisted of the following:

|  | For the year ended July 31, | | | | | |
|  | 2015 | | 2014 | | 2013 | |
|---|---|---|---|---|---|---|
| Current expense (benefit) | $ | (585) | $ | 2,428 | $ | 1,722 |
| Deferred expense | | 270 | | 88 | | 133 |
| Income tax expense (benefit) | $ | (315) | $ | 2,516 | $ | 1,855 |

Deferred taxes consisted of the following:

|  | July 31, | | | |
|  | 2015 | | 2014 | |
|---|---|---|---|---|
| Deferred tax assets | $ | 724 | $ | 1,152 |
| Deferred tax liabilities | | (4,157) | | (4,313) |
| Net deferred tax liability | $ | (3,433) | $ | (3,161) |

**(18)   Sales taxes:** Ferrellgas accounts for the collection and remittance of sales tax on a net tax basis. As a result, these amounts are not reflected in the consolidated statements of earnings.

**(19)   Net earnings per common unitholders' interest:** Net earnings per common unitholders' interest is computed by dividing "Net earnings attributable to Ferrellgas Partners, L.P.," after deducting the general partner's 1% interest, by the weighted average number of outstanding common units and the dilutive effect, if any, of outstanding unit options. See Note O – Net earnings per common unitholders' interest – for further discussion about these calculations.

**(20) Loss contingencies:** In the normal course of business, Ferrellgas is involved in various claims and legal proceedings. Ferrellgas records a liability for such matters when it is probable that a loss has been incurred and the amounts can be reasonably estimated. When only a range of possible loss can be established, the most probable amount in the range is accrued. If no amount within this range is a better estimate than any other amount within the range, the minimum amount in the range is accrued. Legal costs associated with these loss contingencies are expensed as incurred.

**(21)   New accounting standards:**

**Financial Accounting Standards Board ("FASB") Accounting Standard Update ("ASU") No. 2011-08**
In September 2011, the FASB issued ASU 2011-08, which amends the existing guidance on goodwill impairment testing. Under the new guidance, entities testing goodwill for impairment have the option of performing a qualitative assessment before calculating the fair value of the reporting unit. If an entity determines, on the basis of qualitative factors, that the fair value of the reporting unit is more likely than not less than the carrying amount, the two-step impairment test would be required. This guidance is effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011. Ferrellgas' adoption of this guidance in fiscal 2013 did not have a significant impact on its financial position, results of operations or cash flows.

F-13

Table of Contents

**FASB Accounting Standard Update No. 2012-02**

In July 2012, the FASB issued ASU 2012-02, which amends the existing guidance on impairment testing of indefinite-lived intangible assets. Under the new guidance, entities testing indefinite-lived intangible assets for impairment have the option of performing a qualitative assessment before calculating the fair value of the asset. If an entity determines, on the basis of qualitative factors, that the fair value of the asset is more likely than not less than the carrying amount, the two-step impairment test would be required. This guidance is effective for annual and interim indefinite-lived intangible asset impairment tests performed for fiscal years beginning after September 15, 2012. Early adoption is permitted.  Ferrellgas' adoption of this guidance in fiscal 2013 did not have a significant impact on its financial position, results of operations or cash flows.

**FASB Accounting Standard Update No. 2014-09**

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers*. The issuance is part of a joint effort by the FASB and the International Accounting Standards Board (IASB) to enhance financial reporting by creating common revenue recognition guidance for U.S. GAAP and IFRS and, thereby, improving the consistency of requirements, comparability of practices and usefulness of disclosures. The new standard will supersede much of the existing authoritative literature for revenue recognition. The standard and related amendments will be effective for Ferrellgas for its annual reporting period beginning August 1, 2018, including interim periods within that reporting period. Early application is not permitted. Entities are allowed to transition to the new standard by either recasting prior periods or recognizing the cumulative effect. Ferrellgas is currently evaluating the newly issued guidance, including which transition approach will be applied and the estimated impact it will have on the consolidated financial statements.

**FASB Accounting Standard Update No. 2014-08**

In April 2014, the FASB issued ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity*, to change the criteria for determining which disposals can be presented as discontinued operations and enhanced the related disclosure requirements. ASU 2014-08 is effective for us on a prospective basis in Ferrellgas' first quarter of fiscal 2016 with early adoption permitted for disposals (or classifications as held for sale) that have not been reported in financial statements previously issued. Ferrellgas does not expect the adoption of ASU 2014-08 to have a material impact on the consolidated financial statements.

**FASB Accounting Standard Update No. 2015-02**

In February 2015, the FASB issued ASU 2015-02, *Consolidation: Amendments to the Consolidation Analysis*, which provides additional guidance on the consolidation of limited partnerships and on the evaluation of variable interest entities. This guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015. Early adoption is permitted. Ferrellgas is currently evaluating the impact of our pending adoption of ASU 2015-02 on the consolidated financial statements.

**FASB Accounting Standard Update No. 2015-03**

In April 2015, the FASB issued ASU 2015-03, *Interest - Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*, which requires that debt issuance costs be presented in the balance sheet as a direct deduction from the carrying value of the debt liability. ASU 2015-03 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015, with early adoption permitted, and retrospective application required. Ferrellgas is currently evaluating the impact of our pending adoption of ASU 2015-03 on the consolidated financial statements.


**C.   Business combinations**

Business combinations are accounted for under the acquisition method of accounting and the assets acquired and liabilities assumed are recorded at their estimated fair market values as of the acquisition dates. The results of operations are included in the consolidated statements of earnings from the date of acquisition. The pro forma effect of these transactions was not material to Ferrellgas' balance sheets or results of operations, except for Bridger as noted below.

*Propane and related equipment sales*

During July 2015, Ferrellgas acquired the assets of Propane Advantage, LLC, based in Utah, with an aggregate value of $7.7 million.

During fiscal 2014, Ferrellgas acquired seven propane distribution assets with an aggregate value of $38.7 million in the following transactions:

- KanGas, based in Kansas, acquired November 2013;
- Motor Propane, based in Wisconsin, acquired December 2013;
- Country Boys Propane, based in Georgia, acquired March 2014;

F-14

BLFG_EDPA2274542

Table of Contents

- Viking Propane, based in California, acquired May 2014;
- Kaw Valley Propane, based in Kansas, acquired June 2014;
- Wise Choice Propane, based in Ohio, acquired July 2014; and
- Sharp Propane, based in Texas, acquired July 2014.

During fiscal 2013, Ferrellgas acquired propane distribution and grilling tool assets with an aggregate value of $39.2 million in the following transactions:

- Capitol City Propane, based in California, acquired September 2012;
- Flores Gas, based in Texas, acquired October 2012;
- IGS Propane, based in Connecticut, acquired December 2012;
- Mr. Bar-B-Q, based in New York, acquired March 2013; and
- Western Petroleum, based in Utah, acquired April 2013.

The goodwill arising from the propane and related equipment sales acquisitions consists largely of the synergies and economies of scale expected from combining the operations of Ferrellgas and the acquired companies.

These acquisitions, were funded as follows on their dates of acquisition:

| | For the year ended July 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | | 2014 | | 2013 |
| Cash payments, net of cash acquired | $ | 4,250 | $ | 34,219 | $ | 37,186 |
| Issuance of liabilities and other costs and considerations | | 481 | | 2,942 | | 2,035 |
| Common units, net of issuance costs | | 3,000 | | 1,500 | | — |
| Aggregate fair value of transactions | $ | 7,731 | $ | 38,661 | $ | 39,221 |

The aggregate fair values, for the acquisitions in propane and related equipment sales reporting segment, were allocated as follows, including any adjustments identified during the measurement period:

| | For the year ended July 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | | 2014 | | 2013 |
| Working capital | $ | 233 | $ | (919) | $ | 7,302 |
| Customer tanks, buildings, land and other | | 236 | | 14,519 | | 5,155 |
| Goodwill | | — | | 2,922 | | 4,640 |
| Customer lists | | 6,569 | | 19,480 | | 12,211 |
| Non-compete agreements | | 693 | | 2,659 | | 944 |
| Other intangibles | | — | | — | | 5,678 |
| Trade names & trademarks | | — | | — | | 3,291 |
| Aggregate fair value of net assets acquired | $ | 7,731 | $ | 38,661 | $ | 39,221 |

*Midstream operations - Water solutions*

During fiscal 2015, Ferrellgas acquired salt water disposal assets with an aggregate value of $74.7 million in the following transactions, which includes $1.4 million paid in fiscal 2015 as a working capital and valuation adjustment for prior year acquisitions:

- C&E Production, LLC, based in Texas, acquired September 2014; and
- Segrest Saltwater Resources, based in Texas, acquired May 2015.

During fiscal 2014, Ferrellgas acquired salt water disposal assets with an aggregate value of $130.3 million relating to the midstream - water solutions segment. This included the acquisitions of Sable Environmental, LLC and Sable SWD 2, LLC ("Sable"), based in Corpus Christi, Texas and Dietert SWD, based in LaSalle County, Texas. The Sable acquisition was funded through borrowings from the secured credit facility, and subsequently Sable's ownership group purchased $50.0 million of Ferrellgas Partners common units. The excess of purchase consideration over net assets assumed was recorded as goodwill, which represents the strategic value assigned to Sable, including the knowledge and experience of the workforce in place.

BLFG_EDPA2274543

Table of Contents

These acquisitions were funded as follows on their dates of acquisition:

| | For the year ended July 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2015 | | 2014 | | 2013 | |
| Cash payments. net of cash acquired | $ | 74,677 | $ | 127,785 | $ | — |
| Issuance of liabilities and other costs and considerations | | — | | 2,555 | | — |
| Aggregate fair value of transactions | $ | 74,677 | $ | 130,340 | $ | — |

The aggregate fair values, for these acquisitions were allocated as follows:

| | For the year ended July 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2015 | | 2014 | | 2013 | |
| Working capital | $ | 1,155 | $ | 490 | $ | — |
| Customer tanks, buildings, land and other | | 1,704 | | 622 | | — |
| Salt water disposal wells | | 10,705 | | 24,288 | | — |
| Goodwill | | 12,359 | | 16,957 | | — |
| Customer relationships | | 38,846 | | 64,000 | | — |
| Non-compete agreements | | 3,639 | | 13,300 | | — |
| Permits and favorable lease arrangements | | 6,269 | | 10,683 | | — |
| Aggregate fair value of net assets acquired | $ | 74,677 | $ | 130,340 | $ | — |

The acquisition of Sable included contingent consideration which requires Ferrellgas to pay the former owners of Sable a multiple for earnings in excess of certain EBITDA targets for each of the first two years following the acquisition date. At the date of acquisition, the potential undiscounted amount of all future payments that Ferrellgas could be required to make under the contingent consideration arrangement was between $0 and $2.0 million based upon management's estimate of the likelihood that the target EBITDA metric will be met and exceeded and the amount by which it could be exceeded at the date of acquisition. See further discussion of the determination of the fair value of the contingent consideration at Note J - Fair Value Measurements.

*Midstream operations - Crude oil logistics solutions*

On June 24, 2015, Ferrellgas acquired Bridger and formed a new midstream operation - crude oil logistics segment based near Dallas, Texas. Ferrellgas paid $560.0 million of cash, net of cash acquired and issued $260.0 million of Ferrellgas Partners common units to the seller, along with $2.5 million of other seller costs and consideration for an aggregate value of $822.5 million. Ferrellgas has incurred and charged to operating expenses, net $16.4 million of costs during the year ended July 31, 2015, related to the acquisition and transition of Bridger.

Bridger's assets include rail cars, trucks, tank trailers, injection stations, a pipeline, and other assets. Bridger's operations provide crude oil transportation logistics on behalf of producers and end-users of crude oil on a fee-for-service basis, and purchases and sells crude oil in connection with other fee-for-service arrangements.

The excess of purchase consideration over net assets assumed was recorded as goodwill, which represents the strategic value assigned to Bridger, including the knowledge and experience of the workforce in place.

The aggregate fair value for the Bridger Logistics Acquisition in the midstream operations - crude oil logistics solutions segment was preliminarily allocated as follows:

BLFG_EDPA2274544

Table of Contents

|  | For the year ended July 31, |
|---|---|
|  | 2015 |
| Working capital | $ 1,783 |
| Transportation equipment | 293,491 |
| Injection stations and pipelines | 41,632 |
| Goodwill | 193,311 |
| Customer relationships | 261,811 |
| Non-compete agreements | 14,800 |
| Trade names & trademarks | 5,800 |
| Office equipment | 7,449 |
| Other | 2,375 |
| Aggregate fair value of net assets acquired | $ 822,452 |

The following amounts from this acquisition were included in the operating results for the year ending July 31, 2015:

|  | For the year ended July 31, |
|---|---|
|  | 2015 |
| Revenue | $ 81,512 |
| Operating income | 3,848 |

*Pro forma results of operations (unaudited)*

The following summarized unaudited pro forma consolidated statement of earnings information assumes that the acquisition of Bridger during fiscal 2015 occurred as of August 1, 2013. These unaudited pro forma results are for comparative purposes only and may not be indicative of the results that would have occurred had this acquisition been completed on August 1, 2013 or the results that would be attained in the future.

|  | For the year ended July 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Revenue | $ 2,319,927 | 2,583,680 |
| Net earnings (loss) | (11,834) | 4,388 |
| Net earnings (loss) per common unitholders' interest | $ (0.14) | $ 0.05 |

The unaudited pro forma consolidated data presented above has also been prepared as if the following transactions, which are described in Notes H and I to these consolidated financial statements, had been completed on August 1, 2013:

- the issuance of senior secured notes in June 2015;
- the sale of common units in June 2015 in a public offering; and
- the issuance of common units to the seller in June 2015.

The estimated fair values and useful lives of assets acquired during fiscal 2015 are based on a preliminary valuation and are subject to final valuation adjustments. Ferrellgas intends to continue its analysis of the net assets of these transactions to determine the final allocation of the total purchase price to the various assets and liabilities acquired. The estimated fair values and useful lives of assets acquired during fiscal 2014 and 2013 are based on internal valuations and included only minor adjustments during the 12 month period after the date of acquisition. Due to the immateriality of these adjustments, Ferrellgas did not retrospectively adjust the consolidated statements of operations for those measurement period adjustments.

**D.   Quarterly distributions of available cash**

Ferrellgas Partners makes quarterly cash distributions of all of its "available cash." Available cash is defined in the partnership agreement of Ferrellgas Partners as, generally, the sum of its consolidated cash receipts less consolidated cash disbursements and net changes in reserves established by the general partner for future requirements. Reserves are retained in order to provide

BLFG_EDPA2274545

Table of Contents

for the proper conduct of Ferrellgas Partners' business, or to provide funds for distributions with respect to any one or more of the next four fiscal quarters. Distributions are made within 45 days after the end of each fiscal quarter ending October, January, April and July to holders of record on the applicable record date.

Distributions by Ferrellgas Partners in an amount equal to 100% of its available cash, as defined in its partnership agreement, will be made to the common unitholders and the general partner. Additionally, the payment of incentive distributions to the holders of incentive distribution rights will be made to the extent that certain target levels of cash distributions are achieved.

**E.   Supplemental financial statement information**

Inventories consist of the following:

F-18

Table of Contents

| | | 2015 | | 2014 |
|---|---|---|---|---|
| Propane gas and related products | $ | 68,731 | $ | 121,111 |
| Appliances, parts and supplies | | 28,023 | | 24,858 |
| Inventories | $ | 96,754 | $ | 145,969 |

In addition to inventories on hand, Ferrellgas enters into contracts primarily to buy propane for supply procurement purposes. Most of these contracts have terms of less than one year and call for payment based on market prices at the date of delivery. All supply procurement fixed price contracts have terms of fewer than 36 months. As of July 31, 2015, Ferrellgas had committed, for supply procurement purposes, to take delivery of approximately 80.5 million gallons of propane at fixed prices.

Property, plant and equipment, net consist of the following:

| | Estimated useful lives | | 2015 | | 2014 |
|---|---|---|---|---|---|
| Land | Indefinite | $ | 34,389 | $ | 31,890 |
| Land improvements | 2-20 | | 13,249 | | 12,812 |
| Buildings and improvements | 20 | | 71,923 | | 68,492 |
| Vehicles, including transport trailers | 8-20 | | 228,646 | | 95,701 |
| Bulk equipment and district facilities | 5-30 | | 111,657 | | 109,739 |
| Tanks, cylinders and customer equipment | 2-30 | | 772,904 | | 772,402 |
| Salt water disposal wells and related equipment | 2-23 | | 38,460 | | 24,288 |
| Rail cars | 30 | | 150,235 | | — |
| Injection stations | 20 | | 37,619 | | — |
| Pipeline | 15 | | 4,074 | | — |
| Computer and office equipment | 2-5 | | 123,386 | | 116,265 |
| Construction in progress | n/a | | 16,841 | | 7,029 |
| | | | 1,603,383 | | 1,238,618 |
| Less: accumulated depreciation | | | 638,166 | | 626,831 |
| Property, plant and equipment, net | | $ | 965,217 | $ | 611,787 |

Depreciation expense totaled $61.3 million, $58.3 million and $59.3 million for fiscal 2015, 2014 and 2013, respectively.

Other current liabilities consist of the following:

| | | 2015 | | 2014 |
|---|---|---|---|---|
| Accrued interest | $ | 17,281 | $ | 12,182 |
| Accrued payroll | | 17,485 | | 37,120 |
| Customer deposits and advances | | 28,792 | | 25,412 |
| Price risk management liabilities | | 31,450 | | 83 |
| Other | | 85,679 | | 50,364 |
| Other current liabilities | $ | 180,687 | $ | 125,161 |

Shipping and handling expenses are classified in the following consolidated statements of earnings line items:

| | For the year ended July 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2015 | | 2014 | | 2013 |
| Operating expense | $ | 174,105 | $ | 190,999 | $ | 181,932 |
| Depreciation and amortization expense | | 5,127 | | 5,829 | | 5,744 |
| Equipment lease expense | | 22,667 | | 15,807 | | 14,028 |
| | $ | 201,899 | $ | 212,635 | $ | 201,704 |

**F.   Accounts and notes receivable, net and accounts receivable securitization**

Accounts and notes receivable, net consist of the following:

| | | 2015 | | 2014 |
|---|---|---|---|---|
| Accounts receivable pledged as collateral | $ | 123,791 | $ | 159,003 |
| Accounts receivable | | 77,636 | | 24,108 |
| Other | | 307 | | 247 |
| Less: Allowance for doubtful accounts | | (4,816) | | (4,756) |
| Accounts and notes receivable, net | $ | 196,918 | $ | 178,602 |

BLFG_EDPA2274547

Ferrellgas maintains an accounts receivable securitization facility with Wells Fargo Bank, N.A., Fifth Third Bank and SunTrust Bank. This accounts receivable securitization facility has up to $225.0 million of capacity and matures on January 19, 2017. As part of this facility, Ferrellgas, through Ferrellgas Receivables, securitizes a portion of its trade accounts receivable through a commercial paper conduit for proceeds of up to $225.0 million during the months of January, February, March and December, $175.0 million during the months of April and May and $145.0 million for all other months, depending on the availability of undivided interests in its accounts receivable from certain customers. At July 31, 2015, $123.8 million of trade accounts receivable were pledged as collateral against $70.0 million of collateralized notes payable due to the commercial paper conduit. At July 31, 2014, $159.0 million of trade accounts receivable were pledged as collateral against $91.0 million of collateralized notes payable due to the commercial paper conduit. These accounts receivable pledged as collateral are bankruptcy remote from Ferrellgas. Ferrellgas does not provide any guarantee or similar support to the collectability of these accounts receivable pledged as collateral.

Ferrellgas structured Ferrellgas Receivables in order to facilitate securitization transactions while complying with Ferrellgas' various debt covenants. If the covenants were compromised, funding from the facility could be restricted or suspended, or its costs could increase. As of July 31, 2015, Ferrellgas had received cash proceeds of $70.0 million from trade accounts receivables securitized, with no remaining capacity to receive additional proceeds. As of July 31, 2014, Ferrellgas had received cash proceeds of $91.0 million from trade accounts receivables securitized, with no remaining capacity to receive additional proceeds. Borrowings under the accounts receivable securitization facility had a weighted average interest rate of 2.3% and 2.1% as of July 31, 2015 and 2014, respectively.

**G.  Goodwill and intangible assets, net**

Goodwill and intangible assets, net consist of the following:

F-19

BLFG_EDPA2274548

Table of Contents

| | July 31, 2015 | | | July 31, 2014 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Goodwill, net | $ 478,747 | $ — | $ 478,747 | $ 273,210 | $ — | $ 273,210 |
| | | | | | | |
| Intangible assets, net | | | | | | |
| Amortized intangible assets | | | | | | |
| Customer related | $ 807,122 | $ (349,719) | $ 457,403 | $ 500,100 | $ (322,277) | $ 177,823 |
| Non-compete agreements | 53,711 | (18,730) | 34,981 | 63,933 | (43,120) | 20,813 |
| Permits and favorable lease arrangements | 16,952 | (1,173) | 15,779 | 10,683 | (119) | 10,564 |
| Other | 9,182 | (5,497) | 3,685 | 9,177 | (4,592) | 4,585 |
| | 886,967 | (375,119) | 511,848 | 583,893 | (370,108) | 213,785 |
| | | | | | | |
| Unamortized intangible assets | | | | | | |
| Trade names & trademarks | 68,195 | | 68,195 | 62,386 | | 62,386 |
| Total intangible assets, net | $ 955,162 | $ (375,119) | $ 580,043 | $ 646,279 | $ (370,108) | $ 276,171 |

Changes in the carrying amount of goodwill, by reportable segment, are as follows:

| | Propane and related equipment sales | Midstream operations - water solutions | Midstream operations - crude oil logistics | Total |
|---|---|---|---|---|
| **Balance July 31, 2013** | $ 253,362 | $ — | $ — | $ 253,362 |
| Acquisitions | 2,922 | 16,957 | — | 19,879 |
| Other | (31) | — | — | (31) |
| **Balance July 31, 2014** | 256,253 | 16,957 | — | 273,210 |
| Acquisitions | — | 12,359 | 193,311 | 205,670 |
| Other | (133) | — | — | (133) |
| **Balance July 31, 2015** | $ 256,120 | $ 29,316 | $ 193,311 | $ 478,747 |

Customer related intangible assets have estimated lives of 12 to 15 years, permits and favorable lease arrangements have estimated lives of 15 years while non-compete agreements and other intangible assets have estimated lives ranging from two to 10 years. Ferrellgas intends to utilize all acquired trademarks and trade names and does not believe there are any legal, regulatory, contractual, competitive, economical or other factors that would limit their useful lives. Therefore, trademarks and trade names have indefinite useful lives. Customer related intangibles, permits and favorable lease arrangements non-compete agreements and other intangibles carry a weighted average life of 11, 14, six years and five years, respectively.

Aggregate amortization expense related to intangible assets, net:

**For the year ended July 31,**

| | |
|---|---|
| 2015 | $ 34,585 |
| 2014 | 23,490 |
| 2013 | 21,725 |

Estimated amortization expense:

**For the year ended July 31,**

| | |
|---|---|
| 2016 | $ 61,788 |
| 2017 | 61,212 |
| 2018 | 57,546 |
| 2019 | 51,297 |
| 2020 | 45,588 |

BLFG_EDPA2274549

Table of Contents

**H.   Debt**

*Short-term borrowings*

Ferrellgas classified a portion of its secured credit facility borrowings as short-term because it was used to fund working capital needs that management had intended to pay down within the 12 month period following each balance sheet date. As of July 31, 2015 and 2014, $75.3 million and $69.5 million, respectively, were classified as short-term borrowings. For further discussion see the secured credit facility section below.

*Long-term debt*

Long-term debt consists of the following:

|  | 2015 | 2014 |
|---|---|---|
| **Senior notes** | | |
| Fixed rate, 6.50%, due 2021 (1) | $        500,000 | $        500,000 |
| Fixed rate, 6.75%, due 2023 (4) | 500,000 | — |
| Fixed rate, 6.75%, due 2022, net of unamortized premium of $4,906 and $5,863 at 2015 and 2014, respectively (3) | 479,906 | 480,863 |
| Fixed rate, 8.625%, due 2020 (2) | 182,000 | 182,000 |
| Fair value adjustments related to interest rate swaps | 876 | (2,534) |
| | | |
| **Secured credit facility** | | |
| Variable interest rate, expiring October 2018 (net of $75.3 million and $69.5 million classified as short-term borrowings at July 31, 2015 and 2014, respectively) | 136,081 | 123,781 |
| | | |
| **Notes payable** | | |
| 9.5% and 8.8% weighted average interest rate at July 31, 2015 and 2014, respectively, due 2015 to 2022, net of unamortized discount of $1,914 and $2,239 at July 31, 2015 and 2014, respectively | 9,181 | 11,727 |
| | 1,808,044 | 1,295,837 |
| Less: current portion, included in other current liabilities on the consolidated balance sheets | 3,652 | 3,623 |
| **Long-term debt** | $     1,804,392 | $     1,292,214 |

(1)   During November 2010, Ferrellgas issued $500.0 million in aggregate principal amount of 6.50% senior notes due 2021 at an offering price equal to par. These notes are general unsecured senior obligations of Ferrellgas and are effectively junior to all future senior secured indebtedness of Ferrellgas, to the extent of the value of the assets securing the debt, and are structurally subordinated to all existing and future indebtedness and obligations of the operating partnership. The senior notes bear interest from the date of issuance, payable semi-annually in arrears on May 1 and November 1 of each year. The outstanding principal amount is due on May 1, 2021. Ferrellgas would incur prepayment penalties if it were to repay the notes prior to 2019.

(2)   During April 2010, Ferrellgas issued $280.0 million of its fixed rate senior notes. The senior notes bear interest from the date of issuance, payable semi-annually in arrears on June 15 and December 15 of each year. Ferrellgas would incur prepayment penalties if it were to repay the notes prior to 2018. During March 2011, Ferrellgas redeemed $98.0 million of these fixed rate senior notes.

(3)   During November 2013, Ferrellgas issued $325.0 million in aggregate principal amount of 6.75% senior notes due 2022 at an offering price equal to par. Ferrellgas received $319.3 million of net proceeds after deducting underwriters' fees. Ferrellgas used the net proceeds to redeem all of its $300.0 million 9.125% fixed rate senior notes due October 1, 2017. Ferrellgas used the remaining proceeds to pay the related $14.7 million make whole and consent payments, $3.3 million in interest payments and to reduce outstanding indebtedness under the secured credit facility. This redemption also resulted in $6.0 million of non-cash write-offs of unamortized debt discount and related capitalized debt costs. The make whole and consent payments and the non-cash write-offs of unamortized debt discount and related capitalized debt costs are classified as loss on extinguishment of debt. During June 2014, Ferrellgas issued an additional $150.0 million in aggregate principal amount of 6.75% senior notes due 2022 at an offering price equal to 104% of par. Ferrellgas used the net proceeds for general corporate purposes, including to repay indebtedness under its secured credit facility and to pay related transaction fees and expenses.

F-21

Table of Contents

(4) During June 2015, Ferrellgas issued $500.0 million in aggregate principal amount of 6.75% senior notes due 2023 at an offering price equal to par. The senior notes bear interest from the date of issuance, payable semi-annually in arrears on June 15 and December 15 of each year. The outstanding principal amount is due on June 15, 2023. Ferrellgas would incur prepayment penalties if it were to repay the notes prior to 2021. Ferrellgas received $491.3 million of net proceeds after deducting underwriters' fees. Ferrellgas used the net proceeds to fund a portion of the cash portion of the consideration for the acquisition of the outstanding membership interests in Bridger Logistics, LLC and its subsidiaries with remaining amounts being used to repay outstanding borrowing under the secured credit facility after the closing of the acquisitions.

*Secured credit facility*

During October 2013, Ferrellgas executed a second amendment to its secured credit facility. This amendment extended the maturity date to October 2018, increased the size of the facility from $400.0 million to $500.0 million with no change to the size of the letter of credit sublimit which remains at $200.0 million and decreased interest rates by 0.25%. Ferrellgas incurred a loss on extinguishment of debt of $0.3 million related to the writeoff of capitalized financing costs.

During June 2014, Ferrellgas executed a third amendment to its secured credit facility to better facilitate its strategic focus on further business diversification. Immediately following the amendment, Ferrellgas increased the size of this facility from $500.0 million to $600.0 million with no change to the size of the letter of credit sublimit which remains at $200.0 million. This amendment did not change the interest rate or the maturity date of the secured credit facility which remains at October 2018. Borrowings under this amended facility are available for working capital needs, capital expenditures and other general partnership purposes, including the refinancing of existing indebtedness.

During June 2015, Ferrellgas executed a fourth amendment to its secured credit facility to administer certain technical revisions in order to facilitate the Bridger Logistics Acquisition and related funding. This amendment did not change the terms or maturity date of the secured credit facility.

The secured credit facility contains various affirmative and negative covenants and default provisions, as well as requirements with respect to the maintenance of specified financial ratios and limitations on the making of loans and investments.

As of July 31, 2015, Ferrellgas had total borrowings outstanding under its secured credit facility of $211.4 million, of which $136.1 million was classified as long-term debt. As of July 31, 2014, Ferrellgas had total borrowings outstanding under its secured credit facility of $193.3 million, of which $123.8 million was classified as long-term debt.

Borrowings outstanding at July 31, 2015 and 2014 under the secured credit facility had a weighted average interest rate of 3.5% and 3.4%, respectively. All borrowings under the secured credit facility bear interest, at Ferrellgas' option, at a rate equal to either:
- for Base Rate Loans or Swing Line Loans, the Base Rate, which is defined as the higher of i) the federal funds rate plus 0.50%, ii) Bank of America's prime rate; or iii) the Eurodollar Rate plus 1.00%; plus a margin varying from 0.75% to 1.75% (as of July 31, 2015 and 2014, the margin was 1.50% and 1.25%, respectively); or
- for Eurodollar Rate Loans, the Eurodollar Rate, which is defined as the LIBOR Rate plus a margin varying from 1.75% to 2.75% (as of July 31, 2015 and 2014, the margin was 2.50% and 2.25%, respectively).

As of July 31, 2015, the federal funds rate and Bank of America's prime rate were 0.14% and 3.25%, respectively. As of July 31, 2014, the federal funds rate and Bank of America's prime rate were 0.09% and 3.25%, respectively. As of July 31, 2015, the one-month and three-month Eurodollar Rates were 0.19% and 0.33%, respectively. As of July 31, 2014, the one-month and three-month Eurodollar Rates were 0.17% and 0.24%, respectively.

In addition, an annual commitment fee is payable at a per annum rate range from 0.35% to 0.50% times the actual daily amount by which the facility exceeds the sum of (i) the outstanding amount of revolving credit loans and (ii) the outstanding amount of letter of credit obligations.

The obligations under this credit facility are secured by substantially all assets of Ferrellgas, the general partner and certain subsidiaries of Ferrellgas but specifically excluding (a) assets that are subject to Ferrellgas' accounts receivable securitization facility, (b) the general partner's equity interest in Ferrellgas Partners and (c) equity interest in certain unrestricted subsidiaries. Such obligations are also guaranteed by the general partner and certain subsidiaries of Ferrellgas.

Letters of credit outstanding at July 31, 2015 totaled $61.2 million and were used primarily to secure insurance arrangements and to a lesser extent, commodity hedges and product purchases. Letters of credit outstanding at July 31, 2014 totaled $56.3 million and were used primarily to secure insurance arrangements and to a lesser extent, product purchases. At July 31, 2015, Ferrellgas had available letter of credit remaining capacity of $138.8 million. At July 31, 2014, Ferrellgas had available letter of

F-22

BLFG_EDPA2274551

Table of Contents

credit remaining capacity of $143.7 million. Ferrellgas incurred commitment fees of $1.5 million, $1.2 million and $0.9 million in fiscal 2015, 2014 and 2013, respectively.

*Interest rate swaps*

In May 2012, Ferrellgas entered into a $140.0 million interest rate swap agreement to hedge against changes in fair value on a portion of its $300.0 million 9.125% fixed rate senior notes due 2017. Ferrellgas received 9.125% and paid one-month LIBOR plus 7.96%, on the $140.0 million swapped. In October 2013, this interest rate swap was terminated. As a result, Ferrellgas discontinued hedge accounting treatment for this agreement at a cost of $0.2 million, which was classified as loss on extinguishment of debt when the related senior notes were redeemed as discussed above. Ferrellgas accounted for this agreement as a fair value hedge. In May 2012, Ferrellgas also entered into a $140.0 million interest rate swap agreement to hedge against changes in fair value on a portion of its $500.0 million 6.5% fixed rate senior notes due 2021. Ferrellgas receives 6.5% and pays a one-month LIBOR plus 4.715%, on the $140.0 million swapped. Ferrellgas also accounts for this agreement as a fair value hedge.

In May 2012, Ferrellgas entered into a forward interest rate swap agreement to hedge against variability in forecasted interest payments on Ferrellgas' secured credit facility and collateralized note payable borrowings under the accounts receivable securitization facility. From August 2015 through July 2017, Ferrellgas will pay 1.95% and receive variable payments based on one-month LIBOR for the notional amount of $175.0 million. From August 2017 through July 2018, Ferrellgas will pay 1.95% and receive variable payments based on one-month LIBOR for the notional amount of $100.0 million. Ferrellgas accounts for this agreement as a cash flow hedge.

*Covenants*

The senior notes and the credit facility agreement contain various restrictive covenants applicable to Ferrellgas and its subsidiaries, the most restrictive relating to additional indebtedness. The only restriction that prohibits Ferrellgas, L.P. from making cash distributions, advances or loans of the minimum quarterly distribution is if a default or event of default exists or would exist upon making such distribution, advances or loans, or if Ferrellgas L.P. fails to meet certain coverage tests. As of July 31, 2015, Ferrellgas L.P. is in compliance with all requirements, tests, limitations and covenants related to these debt agreements. At July 31, 2015, Ferrellgas L.P. has no restricted net assets. Other than the senior notes and the credit facility agreement, there are no other agreements which restrict Ferrellgas' subsidiaries ability to transfer funds to Ferrellgas in the form of cash dividends, loans or advances.

The scheduled annual principal payments on long-term debt are as follows:

| For the year ending July 31, | | Scheduled annual principal payments |
|---|---|---|
| 2016 | $ | 3,652 |
| 2017 | | 3,241 |
| 2018 | | 1,719 |
| 2019 | | 1,204 |
| 2020 | | 136,429 |
| Thereafter | | 1,657,931 |
| Total | $ | 1,804,176 |

**I. Partners' capital (deficit)**

As of July 31, 2015 and 2014, limited partner units were beneficially owned by the following:

| | 2015 | 2014 |
|---|---|---|
| Public common unitholders (1) | 63,294,168 | 55,153,208 |
| Ferrell Companies (2) | 22,529,361 | 21,469,664 |
| FCI Trading Corp. (3) | 195,686 | 195,686 |
| Ferrell Propane, Inc. (4) | 51,204 | 51,204 |
| James E. Ferrell (5) | 4,763,475 | 4,358,475 |
| James H. Ballengee (6) | 9,542,895 | — |

(1)  These common units are listed on the New York Stock Exchange under the symbol "FGP."

F-23

BLFG_EDPA2274552

Table of Contents

(2) Ferrell Companies is the owner of the general partner and a 22.4% direct owner of Ferrellgas Partner's common units and thus a related party. Ferrell Companies also beneficially owns 195,686 and 51,204 common units of Ferrellgas Partners held by FCI Trading Corp. ("FCI Trading") and Ferrell Propane, Inc. ("Ferrell Propane"), respectively, bringing Ferrell Companies' total beneficial ownership to 22.7%.
(3) FCI Trading is an affiliate of the general partner and thus a related party.
(4) Ferrell Propane is controlled by the general partner and thus a related party.
(5) James E. Ferrell is the Chairman of the Board of Directors of our general partner and a related party. JEF Capital Management owns 4,758,859 of these common units and is wholly-owned by the James E. Ferrell Revocable Trust Two for which James E. Ferrell is the trustee and sole beneficiary. The remaining 4,616 common units are held by Ferrell Resources Holdings, Inc., which is wholly-owned by the James E. Ferrell Revocable Trust One, for which James E. Ferrell is the trustee and sole beneficiary.
(6) Jamex Marketing, LLC is the unitholder of record of these common units. Jamex, LLC is the majority member of Jamex Marketing, LLC. Ballengee Interests, LLC is the majority member of Jamex, LLC. James H. Ballengee is the manager of each of Jamex, LLC, Jamex Marketing, LLC and Ballengee Interests, LLC. Jamex Marketing, LLC and Bridger regularly conduct business in their normal operations, and is a related party.

Together these limited partner units represent Ferrellgas Partner's limited partners' interest and an effective 98% economic interest in Ferrellgas Partners, exclusive of the general partners' incentive distribution rights. The general partner has an effective 2% interest in Ferrellgas Partners, excluding incentive distribution rights. Since ongoing distributions have not yet reached the levels required to commence payment of incentive distribution rights to the general partner, distributions to the partners from operations or interim capital transactions will generally be made in accordance with the above percentages. In liquidation, allocations and distributions will be made in accordance with each common unitholder's positive capital account.

The common units of Ferrellgas Partners represent limited partner interests in Ferrellgas Partners, which give the holders thereof the right to participate in distributions made by Ferrellgas Partners and to exercise the other rights or privileges available to such holders under the Fourth Amended and Restated Agreement of Limited Partnership of Ferrellgas Partners, L.P. dated February 18, 2003, as amended (the "Partnership Agreement"). Under the terms of the Partnership Agreement, holders of common units have limited voting rights on matters affecting the business of Ferrellgas Partners. Generally, persons owning 20% or more of Ferrellgas Partners' outstanding common units cannot vote; however, this limitation does not apply to those common units owned by the general partner or its "affiliates," as such term is defined in the Partnership Agreement.

Ferrellgas maintains shelf registration statements for the issuance of common units. The Partnership Agreement allows the general partner to issue an unlimited number of additional Ferrellgas general and limited partner interests of Ferrellgas Partners for such consideration and on such terms and conditions as shall be established by the general partner without the approval of any unitholders.

*Partnership distributions paid*

Ferrellgas Partners has paid the following distributions:

|  | For the year ended July 31, | | | | | |
|  | **2015** | | **2014** | | **2013** | |
|---|---|---|---|---|---|---|
| Public common unitholders | $ | 111,163 | $ | 107,164 | $ | 105,934 |
| Ferrell Companies | | 45,059 | | 42,939 | | 42,939 |
| FCI Trading Corp. | | 392 | | 392 | | 392 |
| Ferrell Propane, Inc. | | 104 | | 104 | | 104 |
| James E. Ferrell | | 8,717 | | 8,717 | | 8,717 |
| General partner | | 1,670 | | 1,609 | | 1,596 |
| | $ | 167,105 | $ | 160,925 | $ | 159,682 |

On August 20, 2015, Ferrellgas Partners declared a cash distribution of $0.5125 per common unit for the three months ended July 31, 2015, which was paid on September 14, 2015. Included in this cash distribution were the following amounts paid to related parties:

F-24

BLFG_EDPA2274553

Table of Contents

| | |
|---|---|
| Ferrell Companies | $ 11,546 |
| FCI Trading Corp. | 100 |
| Ferrell Propane, Inc. | 26 |
| James E. Ferrell | 2,441 |
| General partner | 520 |
| James H. Ballengee | 4,890 |

See additional discussions about transactions with related parties in Note L – Transactions with related parties.

*Common unit issuances*

During fiscal 2015, in a non-brokered registered direct offering, which units are subject to certain contractual transfer restrictions, Ferrellgas issued to Ferrell Companies, Inc. and the former owners of two salt water disposal wells from C&E Production, LLC ("C&E") and its affiliates an aggregate of 1.5 million common units for an aggregate purchase price of $42.0 million. Ferrellgas used these proceeds to pay down a portion of the borrowing under the secured credit facility used to fund the C&E salt water disposal wells acquisition as well as propane and related equipment sales acquisitions completed in fiscal 2014.

During fiscal 2015, Ferrellgas issued 6.3 million common units in a public offering valued at $139.1 million, after deducting for issuance costs. The net proceeds from this offering were used to partially fund the acquisition of Bridger.

During fiscal 2015, Ferrellgas issued 11.3 million common units valued at $260.0 million in connection with the acquisitions of Bridger and propane distribution assets.

During fiscal 2014, Ferrellgas Partners, entered into an agreement with the former owners of Sable relating to a non-brokered registered direct offering of 2.0 million common units. Net proceeds of $50.0 million were used to reduce outstanding indebtedness under Ferrellgas' secured credit facility initially used to fund the Sable acquisition.

During fiscal 2014 Ferrellgas issued 0.1 million common units valued at $1.5 million in connection with acquisitions of propane distribution assets.

*Accumulated Other Comprehensive Income (Loss) ("AOCI")*

See Note K – Derivative instruments and hedging activities – for details regarding changes in fair value on risk management financial derivatives recorded within AOCI for the years ended July 31, 2015 and 2014.

*General partner's commitment to maintain its capital account*

Ferrellgas' partnership agreements allows the general partner to have an option to maintain its effective 2% general partner interest concurrent with the issuance of other additional equity.

During fiscal 2015, the general partner made cash contributions of $13.3 million and non-cash contributions of $1.0 million to Ferrellgas to maintain its effective 2% general partner interest.

During fiscal 2014, the general partner made cash contributions of $1.1 million and non-cash contributions of $0.9 million to Ferrellgas to maintain its effective 2% general partner interest.

**J.   Fair value measurements**

*Derivative Financial Instruments*

The following table presents Ferrellgas' financial assets and financial liabilities that are measured at fair value on a recurring basis for each of the fair value hierarchy levels, including both current and noncurrent portions, as of July 31, 2015 and 2014:

| | Asset (Liability) | | | |
|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets and Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total |
| **July 31, 2015:** | | | | |
| Assets: | | | | |
| Derivative financial instruments: | | | | |
| Interest rate swap agreements | $ — | $ 1,828 | $ — | $ 1,828 |
| Commodity derivatives | $ — | $ 4,655 | $ — | $ 4,655 |
| Liabilities: | | | | |
| Derivative financial instruments: | | | | |
| Interest rate swap agreements | $ — | $ (4,748) | $ — | $ (4,748) |
| Commodity derivatives | $ — | $ (42,375) | $ — | $ (42,375) |
| Contingent consideration | $ — | $ — | $ (100) | $ (100) |

**July 31, 2014:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Assets: | | | | | | | | | |
| Derivative financial instruments: | | | | | | | | | |
| Interest rate swap agreements | $ | | — | $ | 2,101 | $ | | — | $ | 2,101 |
| Commodity derivatives | $ | | — | $ | 7,006 | $ | | — | $ | 7,006 |
| Liabilities: | | | | | | | | | |
| Derivative financial instruments: | | | | | | | | | |
| Interest rate swap agreements | $ | | — | $ | (5,075) | $ | | — | $ | (5,075) |
| Commodity derivatives | $ | | — | $ | (83) | $ | | — | $ | (83) |
| Contingent consideration | $ | | — | $ | — | $ | | (6,400) | $ | (6,400) |

The following is a reconciliation of the opening and closing balances for the liability measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the period ended July 31, 2014:

| | Contingent consideration liability |
|---|---|
| **Balance at July 31, 2014** | $ 6,400 |
| Estimated value at acquisition | — |
| Increase in fair value related to accretion | 400 |
| Change in fair value included in earnings | (6,700) |
| **Balance at July 31, 2015** | $ 100 |

*Quantitative Information about Level 3 Fair Value Measurements*

| | Fair value at July 31, 2015 | Valuation technique | | Unobservable input | Range | Weighted Average |
|---|---|---|---|---|---|---|
| Contingent consideration liability | $ 100 | Discounted cash flow | A. | Weighted average cost of capital (WACC) | N/A | 20% |
| | | | B. | Probability of forecast | 5% - 80% | N/A |

The valuation of the contingent consideration is based on unobservable inputs such as Ferrellgas' weighted average cost of capital and the likelihood of the acquired company meeting earnings thresholds. As of July 31, 2015, fluctuations in these inputs could have the following effect (in thousands):

F-25

BLFG_EDPA2274555

Table of Contents

|  | | Increase/(decrease) | | |
|---|---|---|---|---|
|  | 5% increase in WACC | 5% decrease in WACC | 10% increase in best earnings forecast probability | 10% decrease in best earnings forecast probability |
| Change in the fair value of contingent consideration | $              (10) | $                — | $              200 | $              (100) |

*Methodology*

The fair values of Ferrellgas' non-exchange traded commodity derivative contracts are based upon indicative price quotations available through brokers, industry price publications or recent market transactions and related market indicators. The fair values of interest rate swap contracts are based upon third-party quotes or indicative values based on recent market transactions.

The fair value of Ferrellgas' contingent consideration for the acquisition of Sable, is based upon Ferrellgas' estimate of the likelihood that the target EBITDA metric will be met and exceeded and the amount by which it could be exceeded then discounting that value at a risk- and inflation-adjusted rate. The inputs to this model are the likelihood of meeting and exceeding the target EBITDA metric and discount rate. Management and the sellers prepared an operating forecast based on Sable's operating capacities, historical performance, and projected oil and water volumes and set a target EBITDA metric. Management then assessed the likelihood of this target EBITDA metric being achieved and exceeded and assigned probabilities to various potential outcomes. To determine the appropriate discount rate, management used observable inputs such as inflation rates, short and long-term yields for U.S. government securities and Ferrellgas' nonperformance risk. Due to the significant unobservable inputs required in this measurement, management determined that the fair value measurement of the contingent consideration liability is level 3 in the fair value hierarchy.

*Other Financial Instruments*

The carrying amounts of other financial instruments included in current assets and current liabilities (except for current maturities of long-term debt) approximate their fair values because of their short-term nature. At July 31, 2015 and July 31, 2014, the estimated fair value of Ferrellgas' long-term debt instruments was $1,889.8 million and $1,408.2 million, respectively. Ferrellgas estimates the fair value of long-term debt based on quoted market prices. The fair value of Ferrellgas' consolidated debt obligations is a Level 2 valuation based on the observable inputs used for similar liabilities.

Ferrellgas has other financial instruments such as trade accounts receivable which could expose it to concentrations of credit risk. The credit risk from trade accounts receivable is limited because of a large customer base which extends across many different U.S. markets.

## K.  Derivative instruments and hedging activities

Ferrellgas is exposed to certain market risks related to its ongoing business operations. These risks include exposure to changing commodity prices as well as fluctuations in interest rates. Ferrellgas utilizes derivative instruments to manage its exposure to fluctuations in commodity prices. Of these, the propane commodity derivative instruments are designated as cash flow hedges. All other commodity derivative instruments do not qualify or are not designated as cash flow hedges, therefore, the change in their fair value are recorded currently in earnings. Ferrellgas also periodically utilizes derivative instruments to manage its exposure to fluctuations in interest rates, which is discussed in Note H - Debt. Additional information related to derivatives is provided in Note B – Summary of significant accounting policies.

*Derivative instruments and hedging activity*

During the year ended July 31, 2015, Ferrellgas recognized a $0.2 million loss related to hedge ineffectiveness. During the year ended July 31, 2014, Ferrellgas did not recognize any gain or loss in earnings related to hedge ineffectiveness and did not exclude any component of financial derivative contract gains or losses from the assessment of hedge effectiveness related to commodity cash flow hedges.

The following tables provide a summary of the fair value of derivatives within Ferrellgas' consolidated balance sheets as of July 31, 2015 and 2014:

F-26

BLFG_EDPA2274556

Table of Contents

| | July 31, 2015 | | | | |
|---|---|---|---|---|---|
| | **Asset Derivatives** | | | **Liability Derivatives** | |
| **Derivative Instrument** | **Location** | **Fair value** | | **Location** | **Fair value** |
| Derivatives designated as hedging instruments | | | | | |
| Commodity derivatives | Prepaid expenses and other current assets | $ 3,614 | | Other current liabilities | $ 27,929 |
| Commodity derivatives | Other assets, net | 1,041 | | Other liabilities | 12,034 |
| Interest rate swap agreements | Prepaid expenses and other current assets | 1,828 | | Other current liabilities | 2,241 |
| Interest rate swap agreements | Other assets, net | — | | Other liabilities | 2,507 |
| Derivatives not designated as hedging instruments | | | | | |
| Commodity derivatives | Prepaid expenses and other current assets | — | | Other current liabilities | 1,280 |
| Commodity derivatives | Other assets, net | — | | Other liabilities | 1,132 |
| | Total | $ 6,483 | | Total | $ 47,123 |

| | July 31, 2014 | | | | |
|---|---|---|---|---|---|
| | **Asset Derivatives** | | | **Liability Derivatives** | |
| **Derivative Instrument** | **Location** | **Fair value** | | **Location** | **Fair value** |
| Derivatives designated as hedging instruments | | | | | |
| Commodity derivatives | Prepaid expenses and other current assets | $ 5,301 | | Other current liabilities | $ 83 |
| Commodity derivatives | Other assets, net | 1,705 | | Other liabilities | — |
| Interest rate swap agreements | Prepaid expenses and other current assets | 2,101 | | Other current liabilities | — |
| Interest rate swap agreements | Other assets, net | — | | Other liabilities | 5,075 |
| | Total | $ 9,107 | | Total | $ 5,158 |

Ferrellgas' exchange traded commodity derivative contracts require cash margin deposit as collateral for contracts that are in a negative mark-to-market position. These cash margin deposits will be returned if mark-to-market conditions improve or will be applied against cash settlement when the contracts are settled. The following tables provide a summary of cash margin deposit balances as of July 31, 2015 and July 31, 2014, respectively:

F-27

BLFG_EDPA2274557

Table of Contents

| | | July 31, 2015 | | | |
|---|---|---|---|---|---|
| | **Assets** | | | **Liabilities** | |
| **Description** | **Location** | **Amount** | **Location** | **Amount** | |
| Margin Deposits | Prepaid expense and other current assets | $  18,009 | Other current liabilities | $  15 | |
| | Other assets, net | 11,786 | Other liabilities | — | |
| | | $  29,795 | | $  15 | |

| | | July 31, 2014 | | | |
|---|---|---|---|---|---|
| | **Assets** | | | **Liabilities** | |
| **Description** | **Location** | **Amount** | **Location** | **Amount** | |
| Margin Deposits | Prepaid expense and other current assets | $  156 | Other current liabilities | $  — | |
| | Other assets, net | 189 | Other liabilities | — | |
| | | $  345 | | $  — | |

The following table provides a summary of the effect on Ferrellgas' consolidated statements of comprehensive income for the years ended July 31, 2015 and 2014 due to derivatives designated as fair value hedging instruments:

| | | **Amount of Gain Recognized on Derivative** | | **Amount of Interest Expense Recognized on Fixed-Rated Debt (Related Hedged Item)** | |
|---|---|---|---|---|---|
| **Derivative Instrument** | **Location of Gain Recognized on Derivative** | **For the year ended July 31,** | | **For the year ended July 31,** | |
| | | **2015** | **2014** | **2015** | **2014** |
| Interest rate swap agreements | Interest expense | $  1,892 | $  2,520 | $  (9,100) | $  (11,985) |

The following tables provide a summary of the effect on Ferrellgas' consolidated statements of comprehensive income for the years ended July 31, 2015 and 2014 due to derivatives designated as cash flow hedging instruments:

| | | **For the year ended July 31, 2015** | | |
|---|---|---|---|---|
| **Derivative Instrument** | **Amount of Gain (Loss) Recognized in AOCI** | **Location of Gain (Loss) Reclassified from AOCI into Income** | **Amount of Gain (Loss) Reclassified from AOCI into Income** | |
| Commodity derivatives | $  (70,291) | Cost of product sold- propane and other gas liquids sales | $  (28,059) | |
| Interest rate swap agreements | (3,356) | Interest expense | (199) | |
| | $  (73,647) | | $  (28,258) | |

BLFG_EDPA2274558

Table of Contents

| | For the year ended July 31, 2014 | | |
|---|---|---|---|
| **Derivative Instrument** | **Amount of Gain (Loss) Recognized in AOCI** | **Location of Gain (Loss) Reclassified from AOCI into Income** | **Amount of Gain (Loss) Reclassified from AOCI into Income** |
| Commodity derivatives | $              15,473 | Cost of product sold- propane and other gas liquids sales | $              10,175 |
| Interest rate swap agreements | (881) | Interest expense | — |
| | $              14,592 | | $              10,175 |

The following table provides a summary of the effect on Ferrellgas' consolidated statements of comprehensive income for the year ended July 31, 2015 due to the change in fair value of derivatives not designated as hedging instruments:

| | For the year ended July 31, 2015 | |
|---|---|---|
| **Derivatives Not Designated as Hedging Instruments** | **Amount of Gain (Loss) Recognized in Income** | **Location of Gain (Loss) Reclassified in Income** |
| Commodity derivatives | $              (2,412) | Operating expense |

There was no effect on Ferrellgas' consolidated statements of comprehensive income for the year ended July 31, 2014 due to the change in fair value of derivatives not designated as hedging instruments.

The changes in derivatives included in accumulated other comprehensive income (loss) ("AOCI") for the years ended July 31, 2015, 2014 and 2013 were as follows:

| | For the year ended July 31, | | |
|---|---|---|---|
| **Gains and losses on derivatives included in AOCI** | **2015** | **2014** | **2013** |
| Beginning balance | $      6,483 | $      2,066 | $      (12,799) |
| Change in value on risk management commodity derivatives | (70,291) | 15,473 | 2,032 |
| Reclassification of gains and losses of commodity hedges to cost of product sold - propane and other gas liquids sales, net | 28,059 | (10,175) | 10,613 |
| Change in value on risk management interest rate derivatives | (3,356) | (881) | 2,220 |
| Reclassification of gains and losses on interest rate hedges to interest expense | 199 | — | — |
| Ending balance | $      (38,906) | $      6,483 | $      2,066 |

Ferrellgas expects to reclassify net losses of approximately $24.3 million to earnings during the next 12 months. These net losses are expected to be offset by increased margins on propane sales commitments Ferrellgas has with its customers that qualify for the normal purchase normal sales exception.

During the years ended July 31, 2015 and 2014, Ferrellgas had no reclassifications to earnings resulting from discontinuance of any cash flow hedges arising from the probability of the original forecasted transactions not occurring within the originally specified period of time defined within the hedging relationship.

As of July 31, 2015, Ferrellgas had financial derivative contracts covering 2.9 million barrels of propane that were entered into as cash flow hedges of forward and forecasted purchases of propane.

As of July 31, 2015, Ferrellgas, L.P. had financial derivative contracts covering 0.3 million barrels of diesel and 0.1 million barrels of unleaded gasoline related to fuel hedges in transportation of propane.

*Derivative Financial Instruments Credit Risk*

Ferrellgas is exposed to credit loss in the event of nonperformance by counterparties to derivative financial and commodity instruments. Ferrellgas' counterparties principally consist of major energy companies and major U.S. financial institutions. Ferrellgas maintains credit policies with regard to its counterparties that it believes reduces its overall credit risk. These policies include evaluating and monitoring its counterparties' financial condition, including their credit ratings, and entering into

F-29

BLFG_EDPA2274559

Table of Contents

agreements with counterparties that govern credit limits. Certain of these agreements call for the posting of collateral by the counterparty or by Ferrellgas in the forms of letters of credit, parental guarantees or cash. Although Ferrellgas has concentrations of credit risk associated with derivative financial instruments held by certain derivative financial instrument counterparties, the maximum amount of loss due to credit risk that, based upon the gross fair values of the derivative financial instruments, Ferrellgas would incur no loss if these counterparties that make up the concentration failed to perform according to the terms of their contracts at July 31, 2015.

Ferrellgas L.P. holds certain derivative contracts that have credit-risk-related contingent features which dictate credit limits based upon the Partnership's debt rating. As of July 31, 2015, a downgrade in the Partnership's debt rating could trigger a reduction in credit limit and would result in an additional collateral requirement of $0.4 million. There were $0.4 million of derivatives with credit-risk-related contingent features in a liability position on July 31, 2015 and Ferrellgas L.P. had posted no collateral in the normal course of business related to such derivatives.

**L.   Transactions with related parties**

Ferrellgas has no employees and is managed and controlled by its general partner. Pursuant to Ferrellgas' partnership agreements, the general partner is entitled to reimbursement for all direct and indirect expenses incurred or payments it makes on behalf of Ferrellgas and all other necessary or appropriate expenses allocable to Ferrellgas or otherwise reasonably incurred by its general partner in connection with operating Ferrellgas' business. These costs primarily include compensation and benefits paid to employees of the general partner who perform services on Ferrellgas' behalf and are reported in the consolidated statements of earnings as follows:

|  | For the year ended July 31, | | | | | |
|  | **2015** | | **2014** | | **2013** | |
| Operating expense | $ | 217,742 | $ | 216,657 | $ | 203,859 |
| General and administrative expense | $ | 27,278 | $ | 32,119 | $ | 30,053 |

In connection with the closing of the Bridger Logistics acquisition, Ferrellgas issued common units to Bridger Marketing, LLC (now known as Jamex Marketing, LLC) and entered into a ten-year transportation and logistics agreement (the "TLA") with Jamex Marketing, LLC. As a result of that issuance, Jamex Marketing, LLC owns 9.5% of Ferrellgas Partners' limited partners' interest. Jamex Marketing, LLC, in connection with the TLA, enters into transactions with the operating partnership and its subsidiaries. Bridger provides crude oil logistics services for Jamex Marketing, LLC, including the purchase, sale, transportation and storage of crude oil by truck, terminal and pipeline. During fiscal 2015, Ferrellgas' total revenues and cost of sales from these transactions were $9.4 million and $8.4 million, respectively. The amounts due from and due to Jamex Marketing, LLC at July 31, 2015, were $4.8 million and $4.2 million, respectively.

See additional discussions about transactions with the general partner and related parties in Note I – Partners' capital (deficit).

**M.   Contingencies and commitments**

*Litigation*

Ferrellgas' operations are subject to all operating hazards and risks normally incidental to handling, storing, transporting and otherwise providing for use by consumers of combustible liquids such as propane and crude oil. As a result, at any given time, Ferrellgas can be threatened with or named as a defendant in various lawsuits arising in the ordinary course of business. Other than as discussed below, Ferrellgas is not a party to any legal proceedings other than various claims and lawsuits arising in the ordinary course of business. It is not possible to determine the ultimate disposition of these matters; however, management is of the opinion that there are no known claims or contingent claims that are reasonably expected to have a material adverse effect on the consolidated financial condition, results of operations and cash flows of Ferrellgas.

The Federal Trade Commission ("FTC") initiated an investigation into certain practices related to the filling of portable propane cylinders. On March 27, 2014, the FTC filed an administrative complaint alleging that Ferrellgas and one of its competitors colluded in 2008 to persuade a customer to accept the cylinder fill reduction from 17 pounds to 15 pounds. The complaint did not seek monetary remedies. Ferrellgas reached a settlement with the FTC during the three months ended October 31, 2014 without any financial payment; the settlement has been approved by a vote of the Commission and became final after a public comment period.

BLFG_EDPA2274560

Table of Contents

Ferrellgas has also been named as a defendant, along with a competitor, in putative class action lawsuits filed in multiple jurisdictions. The complaints, filed on behalf of direct and indirect customers of Ferrellgas' tank exchange business, reference the FTC complaint mentioned above. The lawsuits allege that Ferrellgas and a competitor coordinated in 2008 to reduce the fill level in barbeque cylinders and combined to persuade a common customer to accept that fill reduction, resulting in increased cylinder costs to retailers and end-user customers in violation of federal and certain state antitrust laws.  The lawsuits seek treble damages, attorneys' fees, injunctive relief and costs on behalf of the putative class. These lawsuits have been consolidated into one case by a multidistrict litigation panel. Ferrellgas believes it has strong defenses to the claims and intends to vigorously defend against the consolidated case. Ferrellgas does not believe loss is probable or reasonably estimable at this time related to the putative class action lawsuit.

In addition, putative class action cases have been filed in California relating to residual propane remaining in the tank after use. Ferrellgas believes it has strong defenses to the claims and intends to vigorously defend against the consolidated case.  Ferrellgas does not believe loss is probable or reasonably estimable at this time related to the putative class action lawsuit.

Ferrellgas was named as a defendant in a putative class action lawsuit filed in the United States District Court in Kansas. The complaint was the subject of a motion to dismiss which was granted, in part, in August 2011. The surviving claims alleged breach of contract and breach of the implied duty of good faith and fair dealing, both of which allegedly arise from the existence of an oral contract for continuous propane service. Ferrellgas recently prevailed in a trial to determine whether the claims were required to be arbitrated, resulting in a dismissal of this case. There is no probable or reasonably estimable loss relating to this matter.

As of July 31, 2015, Bridger and Murex, LLC were arbitrating a dispute with respect to a sublease of approximately 220 rail cars by Bridger, which arbitration arose out of an action between Bridger and Murex in the 116th Judicial District Court of Dallas County, Texas, originally brought in April 2014. In August 2015, Ferrellgas and Murex settled all claims subject to such dispute, with Ferrellgas paying $10.4 million to Murex in such settlement. The liability was considered in Ferrellgas' acquisition method of accounting for Bridger.

*Long-term debt-related commitments*

Ferrellgas has long and short-term payment obligations under agreements such as senior notes and its secured credit facility. See Note H – Debt – for a description of these debt obligations and a schedule of future maturities.

*Operating lease commitments and buyouts*

Ferrellgas leases certain property, plant and equipment under non-cancelable and cancelable operating leases. Amounts shown in the table below represent minimum lease payment obligations under Ferrellgas' third-party operating leases with terms in excess of one year for the periods indicated. These arrangements include the leasing of transportation equipment, property, computer equipment and propane tanks. Ferrellgas accounts for these arrangements as operating leases.

Ferrellgas is required to recognize a liability for the fair value of guarantees. The only material guarantees Ferrellgas has are associated with residual value guarantees of operating leases. Most of the operating leases involving Ferrellgas' transportation equipment contain residual value guarantees. These transportation equipment lease arrangements are scheduled to expire over the next 7 fiscal years. Most of these arrangements provide that the fair value of the equipment will equal or exceed a guaranteed amount, or Ferrellgas will be required to pay the lessor the difference. The fair value of these residual value guarantees was $1.5 million as of July 31, 2015. Although the fair values of the underlying equipment at the end of the lease terms have historically exceeded these guaranteed amounts, the maximum potential amount of aggregate future payments Ferrellgas could be required to make under these leasing arrangements, assuming the equipment is worthless at the end of the lease term, was $7.0 million as of July 31, 2015. Ferrellgas does not know of any event, demand, commitment, trend or uncertainty that would result in a material change to these arrangements.

Operating lease buyouts represent the maximum amount Ferrellgas would pay if it were to exercise its right to buyout the assets at the end of their lease term.

The following table summarizes Ferrellgas' contractual operating lease commitments and buyout obligations as of July 31, 2015:

F-31

BLFG_EDPA2274561

Table of Contents

| | Future minimum rental and buyout amounts by fiscal year | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Thereafter** |
| Operating lease obligations | $ 39,999 | $ 31,497 | $ 25,599 | $ 20,084 | $ 14,402 | $ 16,078 |
| Operating lease buyouts | $ 2,738 | $ 1,816 | $ 3,217 | $ 3,011 | $ 2,693 | $ 9,355 |

Certain property and equipment is leased under non-cancelable operating leases, which require fixed monthly rental payments and which expire at various dates through 2026. Rental expense under these leases totaled $45.0 million, $35.6 million and $32.2 million for fiscal 2015, 2014 and 2013, respectively.

**N.   Employee benefits**

Ferrellgas has no employees and is managed and controlled by its general partner. Ferrellgas assumes all liabilities, which include specific liabilities related to the following employee benefit plans for the benefit of the officers and employees of the general partner.

Ferrell Companies makes contributions to the ESOT, which causes a portion of the shares of Ferrell Companies owned by the ESOT to be allocated to employees' accounts over time. The allocation of Ferrell Companies' shares to employee accounts causes a non-cash compensation charge to be incurred by Ferrellgas, equivalent to the fair value of such shares allocated. This non-cash compensation charge is reported separately in Ferrellgas' consolidated statements of earnings and thus excluded from operating and general and administrative expenses. The non-cash compensation charges were $24.7 million, $21.8 million and $15.8 million during fiscal 2015, 2014 and 2013, respectively. Ferrellgas is not obligated to fund or make contributions to the ESOT.

The general partner and its parent, Ferrell Companies, have a defined contribution profit-sharing plan which includes both profit sharing and matching contribution features. The plan covers substantially all full time employees. The plan, which qualifies under section 401(k) of the Internal Revenue Code, also provides for matching contributions under a cash or deferred arrangement based upon participant salaries and employee contributions to the plan. Matching contributions for fiscal 2015, 2014 and 2013 were $3.9 million, $3.6 million and $3.0 million, respectively.

The general partner has a defined benefit plan that provides participants who were covered under a previously terminated plan with a guaranteed retirement benefit at least equal to the benefit they would have received under the terminated plan. Until July 31, 1999, benefits under the terminated plan were determined by years of credited service and salary levels. As of July 31, 1999, years of credited service and salary levels were frozen. The general partner's funding policy for this plan is to contribute amounts deductible for Federal income tax purposes and invest the plan assets primarily in corporate stocks and bonds, U.S. Treasury bonds and short-term cash investments. During fiscal 2015, 2014 and 2013, other comprehensive income and other liabilities were adjusted by $(0.2) million, $0.3 million and $0.3 million, respectively.

**O.   Net earnings per common unitholders' interest**

Below is a calculation of the basic and diluted net earnings per common unitholders' interest in the consolidated statements of earnings for the periods indicated. In accordance with guidance issued by the FASB regarding participating securities and the two-class method, Ferrellgas calculates net earnings per common unitholders' interest for each period presented according to distributions declared and participation rights in undistributed earnings, as if all of the earnings or loss for the period had been distributed. Due to the seasonality of Ferrellgas' business, the dilutive effect of the two-class method typically impacts only the three months ending January 31. In periods with undistributed earnings above certain levels, the calculation according to the two-class method results in an increased allocation of undistributed earnings to the general partner and a dilution of the earnings to the limited partners as follows.

| | Ratio of total distributions payable to: | |
|---|---|---|
| **Quarterly distribution per common unit** | **Common unitholder** | **General partner** |
| $0.56 to $0.63 | 86.9% | 13.1% |
| $0.64 to $0.82 | 76.8% | 23.2% |
| $0.83 and above | 51.5% | 48.5% |

BLFG_EDPA2274562

Table of Contents

There was not a dilutive effect resulting from this guidance on basic and diluted net earnings per common unitholders' interest for fiscal 2015, 2014 and 2013.

In periods with net losses, the allocation of the net losses to the limited partners and the general partner will be determined based on the same allocation basis specified in the Ferrellgas Partners' partnership agreement that would apply to periods in which there were no undistributed earnings. Additionally, in periods with net losses, there are no dilutive securities.

| | For the year ended July 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| Common unitholders' interest in net earnings | $ 29,324 | $ 32,879 | $ 55,862 |
| Weighted average common units outstanding (in thousands) | 84,646.2 | 79,651.1 | 79,038.6 |
| Dilutive securities | 6.7 | 20.6 | 37.0 |
| Weighted average common units outstanding plus dilutive securities | 84,652.9 | 79,671.7 | 79,075.6 |
| Basic and diluted net earnings per common unitholders' interest | $ 0.35 | $ 0.41 | $ 0.71 |

**P.   Segment reporting**

Ferrellgas has two primary operations: propane and related equipment sales and midstream operations. These two operations result in three reportable operating segments: propane and related equipment sales, midstream operations - water solutions and midstream operations - crude oil logistics.

During June 2015, subsequent to an acquisition, Ferrellgas formed a new midstream operation - crude oil logistics segment. During May 2014, subsequent to an acquisition, Ferrellgas formed a new midstream operation - water solutions segment.

The chief operating decision maker evaluates the operating segments using an Adjusted EBITDA performance measure which is based on earnings before income tax expense, interest expense, depreciation and amortization expense, loss on extinguishment of debt, non-cash employee stock ownership plan compensation charge, non-cash stock-based compensation charge, loss on disposal of assets, other income (expense), net, change in fair value of contingent consideration, litigation accrual and related legal fees associated with a class action lawsuit, acquisition and transition expenses, unrealized (non-cash) gain on changes in fair value of derivatives not designated as hedging instruments and net earnings attributable to noncontrolling interests. This performance measure is not a GAAP measure, however the components are computed using amounts that are determined in accordance with GAAP. A reconciliation of this performance measure to net earnings attributable to Ferrellgas Partners L.P., which is its nearest comparable GAAP measure, is included in the tables below. In management's evaluation of performance, certain costs, such as compensation for administrative staff and executive management, are not allocated by segment and, accordingly, the following reportable segment results do not include such unallocated costs. The accounting policies of the operating segments are otherwise the same as those described in the summary of significant accounting policies in Note B.

Assets reported within a segment are those assets that can be identified to a segment and primarily consist of trade receivables, property, plant and equipment, inventories, identifiable intangible assets and goodwill. Cash, certain prepaid assets and other assets are not allocated to segments. Although Ferrellgas can and does identify long-lived assets such as property, plant and equipment and identifiable intangible assets to reportable segments, Ferrellgas does not allocate the related depreciation and amortization to the segment as management evaluates segment performance exclusive of these non-cash charges.

The propane and related equipment sales segment primarily includes the distribution and sale of propane and related equipment and supplies with concentrations in the Midwest, Southeast, Southwest and Northwest regions of the United States. Sales from propane distribution are generated principally from transporting propane purchased from third parties to propane distribution locations and then to tanks on customers' premises or to portable propane tanks delivered to nationwide and local retailers. Sales from portable tank exchanges, nationally branded under the name Blue Rhino, are generated through a network of independent and partnership-owned distribution outlets.

The midstream operations - crude oil logistics segment primarily includes a domestic crude oil transportation and logistics provider with an integrated portfolio of midstream assets. These assets connect crude oil production in prolific unconventional resource plays to downstream markets. Bridger's truck, pipeline terminal, pipeline, rail and maritime assets form a comprehensive, fee-for-service business model, and substantially all of its cash flow is expected to be generated from fee-based

F-33

Table of Contents

commercial agreements. Bridger's fee-based business model generates income by providing crude oil transportation and logistics services on behalf of producers and end users of crude oil.

The midstream operations - water solutions segment primarily includes salt water disposal wells that are a critical component of the oil and natural gas well drilling industry. Oil and gas wells generate significant volumes of salt water known as "flowback" and "production" water. Flowback is a water based solution that flows back to the surface during and after the completion of the hydraulic fracturing ("fracking") process whereby large volumes of water, sand and chemicals are injected under high pressures into rock formations to stimulate production. Production water is salt water from underground formations that are brought to the surface during the normal course of oil or gas production. In the oil and gas fields Ferrellgas services, these volumes of water are transported by truck away from the fields to salt water disposal wells where it is injected into underground geologic formations using high-pressure pumps. Revenue is derived from fees charged to customers to dispose of salt water at the disposal facilities and crude oil sales from the skimming oil process.

Prior to the Sable acquisition in May 2014, Ferrellgas managed and evaluated its operations as a single reportable segment. As the current three reportable segment structure is the result of both the Bridger Logistics Acquisition completed in June 2015 and the Sable acquisition completed during May 2014, comparative historical segment information for fiscal 2013 does not exist.

Following is a summary of segment information for the years ended July 31, 2015 and 2014.

| | Year Ended July 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water Solutions | Corporate and other | Total |
| Segment revenues | $  1,917,201 | $   81,512 | $   25,677 | $   — | $  2,024,390 |
| Direct costs (1) | 1,591,404 | 72,929 | 20,141 | 39,732 | 1,724,206 |
| Adjusted EBITDA | $   325,797 | $   8,583 | $   5,536 | $  (39,732) | $   300,184 |

| | Year Ended July 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water Solutions | Corporate and other | Total |
| Segment revenues | $  2,398,425 | $   — | $   7,435 | $   — | $  2,405,860 |
| Direct costs (1) | 2,067,133 | — | 3,997 | 46,582 | 2,117,712 |
| Adjusted EBITDA | $   331,292 | $   — | $   3,438 | $  (46,582) | $   288,148 |

(1) Direct costs are comprised of "cost of sales-propane and other gas liquids sales", "cost of sales-other", "cost of sales-midstream operations", "operating expense", "general and administrative expense", and "equipment lease expense" less "non-cash stock and unit-based compensation charge", "change in fair value of contingent consideration", "litigation accrual and related legal fees associated with a class action lawsuit", "acquisition and transition expenses" and "unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments".

F-34

BLFG_EDPA2274564

Table of Contents

Following is a reconciliation of Ferrellgas' total segment performance measure to consolidated net earnings:

| | Year Ended July 31, | | |
|---|---|---|---|
| | 2015 | | 2014 |
| Net earnings attributable to Ferrellgas Partners, L.P. | $ 29,620 | $ | 33,211 |
| Income tax expense (benefit) | (315) | | 2,516 |
| Interest expense | 100,396 | | 86,502 |
| Depreciation and amortization expense | 98,579 | | 84,202 |
| EBITDA | 228,280 | | 206,431 |
| Loss on extinguishment of debt | — | | 21,202 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | | 21,789 |
| Non-cash stock-based compensation charge | 25,982 | | 24,508 |
| Loss on disposal of assets | 7,099 | | 6,486 |
| Other expense, net | 350 | | 479 |
| Change in fair value of contingent consideration | (6,300) | | 5,000 |
| Litigation accrual and related legal fees associated with a class action lawsuit | 806 | | 1,749 |
| Acquisition and transition expenses | 16,373 | | — |
| Unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments | 2,412 | | — |
| Net earnings attributable to noncontrolling interest | 469 | | 504 |
| Adjusted EBITDA | $ 300,184 | $ | 288,148 |

Following are total assets by segment:

| | July 31, 2015 | | July 31, 2014 |
|---|---|---|---|
| **Assets** | | | |
| Propane and related equipment sales | $ 1,295,831 | $ | 1,400,603 |
| Midstream operations - crude oil logistics | 917,325 | | — |
| Midstream operations - water solutions | 205,358 | | 136,116 |
| Corporate and unallocated | 45,542 | | 35,551 |
| Total consolidated assets | $ 2,464,056 | $ | 1,572,270 |

Following are capital expenditures by segment (unaudited):

F-35

BLFG_EDPA2274565

Table of Contents

| | Year Ended July 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water solutions | Corporate and other | Total |
| Capital expenditures: | | | | | |
| Maintenance | $ 16,020 | $ — | $ 1,072 | $ 2,357 | $ 19,449 |
| Growth | 36,958 | 64 | 13,366 | — | 50,388 |
| Total | $ 52,978 | $ 64 | $ 14,438 | $ 2,357 | $ 69,837 |

| | Year Ended July 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water solutions | Corporate & other | Total |
| Capital expenditures: | | | | | |
| Maintenance | $ 14,682 | $ — | $ 181 | $ 3,275 | $ 18,138 |
| Growth | 30,501 | — | 1,715 | 627 | 32,843 |
| Total | $ 45,183 | $ — | $ 1,896 | $ 3,902 | $ 50,981 |

**Q.   Quarterly data (unaudited)**

The following summarized unaudited quarterly data includes all adjustments (consisting only of normal recurring adjustments, with the exception of those items indicated below), which Ferrellgas considers necessary for a fair presentation. Due to the seasonality of the propane distribution business, first and fourth quarter Revenues, gross margin from propane and other gas liquids sales, Net earnings attributable to Ferrellgas Partners and common unitholders' interest in net earnings are consistently less than the second and third quarter results. Other factors affecting the results of operations include competitive conditions, demand for product, timing of acquisitions, variations in the weather and fluctuations in propane prices. The sum of basic and diluted net earnings (loss) per common unitholders' interest by quarter may not equal the basic and diluted net earnings (loss) per common unitholders' interest for the year due to variations in the weighted average units outstanding used in computing such amounts.

BLFG_EDPA2274566

Table of Contents

| For the year ended July 31, 2015 | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|
| Revenues | $ 443,355 | $ 665,973 | $ 532,551 | $ 382,511 |
| Gross margin from propane and other gas liquids sales (a) | 129,547 | 230,175 | 191,983 | 128,087 |
| Gross margin from midstream operations (b) | 5,948 | 4,934 | 3,416 | 16,301 |
| Net earnings (loss) | (33,169) | 86,371 | 36,220 | (59,333) |
| Net earnings (loss) attributable to Ferrellgas Partners, L.P. | (32,875) | 85,458 | 35,812 | (58,775) |
| Common unitholders' interest in net earnings (loss) | (32,546) | 84,603 | 35,454 | (58,187) |
| | | | | |
| Basic and diluted net earnings (loss) per common unitholders' interest | $ (0.40) | $ 0.89 | $ 0.43 | $ (0.64) |

| For the year ended July 31, 2014 | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|
| Revenues | $ 415,030 | $ 869,683 | $ 722,117 | $ 399,030 |
| Gross margin from propane and other gas liquids sales (a) | 123,469 | 237,940 | 202,861 | 126,685 |
| Gross margin from midstream operations (b) | — | — | — | 5,465 |
| Net earnings (loss) | (25,057) | 61,123 | 45,890 | (48,241) |
| Net earnings (loss) attributable to Ferrellgas Partners, L.P. | (24,843) | 60,464 | 45,385 | (47,795) |
| Common unitholders' interest in net earnings (loss) | (24,595) | 59,860 | 44,931 | (47,317) |
| | | | | |
| Basic and diluted net earnings (loss) per common unitholders' interest | $ (0.31) | $ 0.72 | $ 0.57 | $ (0.58) |

(a)  Gross margin from "Propane and other gas liquids sales" represents "Revenues - propane and other gas liquids sales" less "Cost of sales – propane and other gas liquids sales."

(b)  Gross margin from "Midstream operations" represents "Revenues - midstream operations" less "Cost of sales - midstream operations."

**R.  Subsequent events**

Ferrellgas has evaluated events and transactions occurring after the balance sheet date through the date Ferrellgas' consolidated financial statements were issued and concluded that there were no events or transactions occurring during this period that required recognition or disclosure in its financial statements.

F-37

BLFG_EDPA2274567

Table of Contents

3

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors
Ferrellgas Partners Finance Corp.

We have audited the accompanying balance sheets of Ferrellgas Partners Finance Corp. (a Delaware corporation) (the "Company") as of July 31, 2015 and 2014, and the related statements of earnings, stockholders' equity, and cash flows for each of the three years in the period ended July 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ferrellgas Partners Finance Corp. as of July 31, 2015 and 2014, and the results of its operations and its cash flows for each of the three years in the period ended July 31, 2015 in conformity with accounting principles generally accepted in the United States of America.

/s/ GRANT THORNTON LLP

Kansas City, Missouri
September 29, 2015

F-38

BLFG_EDPA2274568

Table of Contents

**FERRELLGAS PARTNERS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas Partners, L.P.)**
**BALANCE SHEETS**

|  | July 31, | |
|---|---|---|
|  | **2015** | **2014** |
| **ASSETS** | | |
| Cash | $ 1,000 | $ 969 |
| **Total assets** | $ 1,000 | $ 969 |
|  | | |
| **Contingencies and commitments (Note B)** | | |
| **STOCKHOLDER'S EQUITY** | | |
| Common stock, $1.00 par value; 2,000 shares authorized; 1,000 shares issued and outstanding | $ 1,000 | $ 1,000 |
| Additional paid in capital | 17,485 | 15,106 |
| Accumulated deficit | (17,485) | (15,137) |
| **Total stockholder's equity** | $ 1,000 | $ 969 |

See notes to financial statements.

**FERRELLGAS PARTNERS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas Partners, L.P.)**
**STATEMENTS OF EARNINGS**

|  | For the year ended July 31, | | |
|---|---|---|---|
|  | **2015** | **2014** | **2013** |
| General and administrative expense | $ 2,348 | $ 2,149 | $ 2,038 |
| **Net loss** | $ (2,348) | $ (2,149) | $ (2,038) |

See notes to financial statements.

F-39

BLFG_EDPA2274569

Table of Contents

**FERRELLGAS PARTNERS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas Partners, L.P.)**
**STATEMENTS OF STOCKHOLDER'S EQUITY**

| | Common stock | | Additional paid in capital | Accumulated deficit | Total stockholder's equity |
|---|---|---|---|---|---|
| | Shares | Dollars | | | |
| **July 31, 2012** | 1,000 | 1,000 | 10,919 | (10,950) | 969 |
| Capital contribution | — | — | 2,038 | — | 2,038 |
| Net loss | — | — | — | (2,038) | (2,038) |
| **July 31, 2013** | 1,000 | 1,000 | 12,957 | (12,988) | 969 |
| Capital contribution | — | — | 2,149 | — | 2,149 |
| Net loss | — | — | — | (2,149) | (2,149) |
| **July 31, 2014** | 1,000 | $ 1,000 | $ 15,106 | $ (15,137) | $ 969 |
| Capital contribution | — | — | 2,379 | — | 2,379 |
| Net loss | — | — | — | (2,348) | (2,348) |
| **July 31, 2015** | 1,000 | $ 1,000 | $ 17,485 | $ (17,485) | $ 1,000 |

See notes to financial statements.

**FERRELLGAS PARTNERS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas Partners, L.P.)**
**STATEMENTS OF CASH FLOWS**

| | For the year ended July 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (2,348) | $ (2,149) | $ (2,038) |
| Cash used in operating activities | (2,348) | (2,149) | (2,038) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Capital contribution | 2,379 | 2,149 | 2,038 |
| Cash provided by financing activities | 2,379 | 2,149 | 2,038 |
| | | | |
| Change in cash | 31 | — | — |
| Cash - beginning of year | 969 | 969 | 969 |
| **Cash - end of year** | $ 1,000 | $ 969 | $ 969 |

See notes to financial statements.

F-40

BLFG_EDPA2274570

Table of Contents

**FERRELLGAS PARTNERS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas Partners, L.P.)**

**NOTES TO FINANCIAL STATEMENTS**

**A.   Formation**

Ferrellgas Partners Finance Corp. (the "Finance Corp."), a Delaware corporation, was formed on March 28, 1996 and is a wholly-owned subsidiary of Ferrellgas Partners, L.P. (the "Partnership").

The Partnership contributed $1,000 to the Finance Corp. on April 8, 1996 in exchange for 1,000 shares of common stock.

The Finance Corp. has nominal assets, does not conduct any operations and has no employees.

**B.   Contingencies and commitments**

The Finance Corp. serves as co-issuer and co-obligor for debt securities of the Partnership.

The senior unsecured notes contain various restrictive covenants applicable to the Partnership and its subsidiaries, the most restrictive relating to additional indebtedness. As of July 31, 2015, the Partnership is in compliance with all requirements, tests, limitations and covenants related to this debt agreement.

**C.   Income taxes**

Income taxes have been computed separately as the Finance Corp. files its own income tax return. Deferred income taxes are provided as a result of temporary differences between financial and tax reporting using the asset/liability method. Deferred income taxes are recognized for the tax consequences of temporary differences between the financial statement carrying amounts and tax basis of existing assets and liabilities.

Due to the inability of the Finance Corp. to utilize the deferred tax benefit of $6,588 associated with the net operating loss carryforward of $16,936, which expire at various dates through July 31, 2035, a valuation allowance has been provided on the full amount of the deferred tax asset. Accordingly, there is no net deferred tax benefit for fiscal 2015, 2014 or 2013, and there is no net deferred tax asset as of July 31, 2015 and 2014.

**D.   Subsequent events**

The Finance Corp. has evaluated events and transactions occurring after the balance sheet date through the date the Finance Corp.'s consolidated financial statements were issued, and concluded that there were no events or transactions occurring during this period that required recognition or disclosure in its financial statements.

F-41

BLFG_EDPA2274571

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**


Partners
Ferrellgas, L.P.

We have audited the accompanying consolidated balance sheets of Ferrellgas, L.P. and subsidiaries (the "Partnership") as of July 31 2015 and 2014, and the related consolidated statements of earnings, comprehensive income, partners' capital, and cash flows for each of the three years in the period ended July 31, 2015. Our audits of the basic consolidated financial statements included the financial statement schedules listed in the index appearing on page S-1. These financial statements and financial statement schedule are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Partnership's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Ferrellgas, L.P. and subsidiaries as of July 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three years in the period ended July 31, 2015 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ GRANT THORNTON LLP

Kansas City, Missouri
September 29, 2015

BLFG_EDPA2274572

Table of Contents

FERRELLGAS, L.P. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
(in thousands)

| | July 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 5,600 | $ 8,283 |
| Accounts and notes receivable (including $123,791 and $159,003 of accounts receivable pledged as collateral at 2015 and 2014, respectively, and net of allowance for doubtful accounts of $4,816 and $4,756 at 2015 and 2014, respectively) | 196,918 | 178,602 |
| Inventories | 96,754 | 145,969 |
| Prepaid expenses and other current assets | 64,211 | 32,079 |
| **Total current assets** | 363,483 | 364,933 |
| | | |
| Property, plant and equipment, net | 965,217 | 611,787 |
| Goodwill | 478,747 | 273,210 |
| Intangible assets, net | 580,043 | 276,171 |
| Other assets, net | 72,472 | 43,732 |
| **Total assets** | $ 2,459,962 | $ 1,569,833 |
| | | |
| **LIABILITIES AND PARTNERS' CAPITAL** | | |
| | | |
| **Current liabilities:** | | |
| Accounts payable | $ 83,974 | $ 69,360 |
| Short-term borrowings | 75,319 | 69,519 |
| Collateralized note payable | 70,000 | 91,000 |
| Other current liabilities | 176,176 | 123,153 |
| **Total current liabilities** | 405,469 | 353,032 |
| | | |
| Long-term debt | 1,622,392 | 1,110,214 |
| Other liabilities | 41,975 | 36,662 |
| Contingencies and commitments (Note M) | | |
| | | |
| **Partners' capital:** | | |
| Limited partner | 425,105 | 63,024 |
| General partner | 4,339 | 643 |
| Accumulated other comprehensive income (loss) | (39,318) | 6,258 |
| **Total partners' capital** | 390,126 | 69,925 |
| **Total liabilities and partners' capital** | $ 2,459,962 | $ 1,569,833 |

See notes to consolidated financial statements.

F-43

BLFG_EDPA2274573

Table of Contents

**FERRELLGAS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF EARNINGS**
**(in thousands)**

| | For the year ended July 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| **Revenues:** | | | |
| Propane and other gas liquids sales | $ 1,657,016 | $ 2,147,343 | $ 1,739,267 |
| Midstream operations | 107,189 | 7,435 | — |
| Other | 260,185 | 251,082 | 236,200 |
| **Total revenues** | 2,024,390 | 2,405,860 | 1,975,467 |
| | | | |
| **Costs and expenses:** | | | |
| Cost of sales - propane and other gas liquids sales | 977,224 | 1,456,388 | 1,092,261 |
| Cost of sales - midstream operations | 76,590 | 1,970 | — |
| Cost of sales - other | 170,697 | 156,182 | 144,456 |
| Operating expense | 437,353 | 451,551 | 412,430 |
| Depreciation and amortization expense | 98,579 | 84,202 | 83,344 |
| General and administrative expense | 77,238 | 65,156 | 53,181 |
| Equipment lease expense | 24,273 | 17,745 | 15,983 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 | 15,769 |
| Loss on disposal of assets | 7,099 | 6,486 | 10,421 |
| | | | |
| **Operating income** | 130,624 | 144,391 | 147,622 |
| | | | |
| Interest expense | (84,227) | (70,332) | (72,974) |
| Loss on extinguishment of debt | — | (21,202) | — |
| Other income (expense), net | (354) | (479) | 565 |
| | | | |
| **Earnings before income taxes** | 46,043 | 52,378 | 75,213 |
| | | | |
| Income tax expense (benefit) | (384) | 2,471 | 1,838 |
| | | | |
| **Net earnings** | $ 46,427 | $ 49,907 | $ 73,375 |

See notes to consolidated financial statements.

F-44

BLFG_EDPA2274574

Table of Contents

**FERRELLGAS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | For the year ended July 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| Net earnings | $ 46,427 | $ 49,907 | $ 73,375 |
| Other comprehensive income (loss) | | | |
| Change in value on risk management derivatives | (73,647) | 14,592 | 4,252 |
| Reclassification of gains and losses of derivatives to earnings | 28,258 | (10,175) | 10,613 |
| Foreign currency translation adjustment | (2) | (145) | (147) |
| Pension liability adjustment | (185) | 258 | 290 |
| Other comprehensive income (loss) | (45,576) | 4,530 | 15,008 |
| Comprehensive income | $ 851 | $ 54,437 | $ 88,383 |

See notes to consolidated financial statements.

F-45

BLFG_EDPA2274575

Table of Contents

**FERRELLGAS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF PARTNERS' CAPITAL**
**(in thousands)**

| | Limited partner | General partner | Accumulated other comprehensive income (loss) | Total partners' capital |
|---|---|---|---|---|
| **Balance at July 31, 2012** | $ 164,737 | $ 1,683 | $ (13,280) | $ 153,140 |
| | | | | |
| Contributions in connection with non-cash ESOP and stock and unit-based compensation charges | 29,019 | 295 | | 29,314 |
| Cash contributed by Ferrellgas Partners and general partner | 800 | 9 | | 809 |
| Distributions | (175,380) | (1,790) | | (177,170) |
| Net earnings | 72,634 | 741 | | 73,375 |
| Other comprehensive income | | | 15,008 | 15,008 |
| **Balance at July 31, 2013** | 91,810 | 938 | 1,728 | 94,476 |
| | | | | |
| Contributions in connection with non-cash ESOP and stock and unit-based compensation charges | 45,829 | 468 | | 46,297 |
| Contributions in connection with acquisitions | 1,500 | 15 | | 1,515 |
| Cash contributed by Ferrellgas Partners and general partner | 51,105 | 521 | | 51,626 |
| Distributions | (176,623) | (1,803) | | (178,426) |
| Net earnings | 49,403 | 504 | | 49,907 |
| Other comprehensive income | | | 4,530 | 4,530 |
| **Balance at July 31, 2014** | 63,024 | 643 | 6,258 | 69,925 |
| | | | | |
| Contributions in connection with non-cash ESOP and stock and unit-based compensation charges | 50,183 | 512 | | 50,695 |
| Contributions in connection with acquisitions | 825,452 | 8,423 | | 833,875 |
| Cash contributed by Ferrellgas Partners and general partner | 42,224 | 431 | | 42,655 |
| Distributions | (601,736) | (6,139) | | (607,875) |
| Net earnings | 45,958 | 469 | | 46,427 |
| Other comprehensive loss | | | (45,576) | (45,576) |
| **Balance at July 31, 2015** | $ 425,105 | $ 4,339 | $ (39,318) | $ 390,126 |

See notes to consolidated financial statements.

F-46

BLFG_EDPA2274576

Table of Contents

**FERRELLGAS, L.P. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Cash flows from operating activities:** | | | |
| Net earnings | $ 46,427 | $ 49,907 | $ 73,375 |
| Reconciliation of net earnings to net cash provided by operating activities: | | | |
| Depreciation and amortization expense | 98,579 | 84,202 | 83,344 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 | 15,769 |
| Non-cash stock and unit-based compensation charge | 25,982 | 24,508 | 13,545 |
| Loss on disposal of assets | 7,099 | 6,486 | 10,421 |
| Loss on extinguishment of debt | — | 6,526 | — |
| Change in fair value of contingent consideration | (6,300) | 5,000 | — |
| Provision for doubtful accounts | 3,419 | 3,419 | 2,066 |
| Deferred tax expense | 270 | 88 | 133 |
| Other | 2,921 | 4,898 | 4,067 |
| Changes in operating assets and liabilities, net of effects from business acquisitions: | | | |
| Accounts and notes receivable, net of securitization | (1,739) | (48,087) | (5,901) |
| Inventories | 49,050 | (28,738) | 15,869 |
| Prepaid expenses and other current assets | (24,934) | (3,994) | 6,143 |
| Accounts payable | (1,547) | 16,279 | 508 |
| Accrued interest expense | 5,099 | (7,611) | (151) |
| Other current liabilities | 8,250 | 8,674 | 6,454 |
| Other assets and liabilities | (20,801) | (1,896) | 303 |
| Net cash provided by operating activities | 216,488 | 141,450 | 225,945 |
| | | | |
| **Cash flows from investing activities:** | | | |
| Business acquisitions, net of cash acquired | (78,927) | (162,019) | (37,186) |
| Capital expenditures | (72,481) | (52,572) | (40,910) |
| Proceeds from sale of assets | 5,905 | 4,524 | 9,980 |
| Other | (14) | (23) | — |
| Net cash used in investing activities | (145,517) | (210,090) | (68,116) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Distributions | (607,875) | (178,426) | (177,170) |
| Contributions | 51,047 | 51,626 | 809 |
| Proceeds from increase in long-term debt | 628,134 | 750,351 | 58,356 |
| Payments on long-term debt | (119,457) | (569,841) | (3,912) |
| Net additions to (reductions in) short-term borrowings | 5,800 | 19,465 | (45,676) |
| Net additions to (reductions in) to collateralized short-term borrowings | (21,000) | 9,000 | 8,000 |
| Cash paid for financing costs | (10,301) | (11,414) | — |
| Net cash provided by (used in) financing activities | (73,652) | 70,761 | (159,593) |
| | | | |
| Effect of exchange rate changes on cash | (2) | (145) | (147) |
| | | | |
| Increase (decrease) in cash and cash equivalents | (2,683) | 1,976 | (1,911) |
| Cash and cash equivalents - beginning of year | 8,283 | 6,307 | 8,218 |
| **Cash and cash equivalents - end of year** | $ 5,600 | $ 8,283 | $ 6,307 |

See notes to consolidated financial statements.

BLFG_EDPA2274577

Table of Contents

**FERRELLGAS, L.P. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, unless otherwise designated)**

### A.   Partnership organization and formation

Ferrellgas, L.P. was formed on April 22, 1994, and is a Delaware limited partnership. Ferrellgas Partners, L.P. ("Ferrellgas Partners"), a publicly traded limited partnership, holds an approximate 99% limited partner interest in, and consolidates, Ferrellgas, L.P. Ferrellgas, Inc. (the "general partner"), a wholly-owned subsidiary of Ferrell Companies, Inc. ("Ferrell Companies"), holds an approximate 1% general partner interest in Ferrellgas, L.P. and performs all management functions required by Ferrellgas, L.P. Ferrellgas Partners and Ferrellgas, L.P. are governed by their respective partnership agreements. These agreements contain specific provisions for the allocation of net earnings and loss to each of the partners for purposes of maintaining the partner capital accounts.

Ferrellgas, L.P. owns a 100% equity interest in Ferrellgas Finance Corp., whose only business activity is to act as the co-issuer and co-obligor of any debt issued by Ferrellgas, L.P.

Ferrellgas, L.P. is engaged in the following primary businesses:
- Propane and related equipment sales consists of the distribution of propane and related equipment and supplies. The propane distribution market is seasonal because propane is used primarily for heating in residential and commercial buildings. Ferrellgas, L.P. serves residential, industrial/commercial, portable tank exchange, agricultural, wholesale and other customers in all 50 states, the District of Columbia, and Puerto Rico.
- Midstream operations consists of two reportable operating segments: crude oil logistics and water solutions. The crude oil logistics segment ("Bridger") generates income by providing crude oil transportation and logistics services on behalf of producers and end-users of crude oil. Bridger's services include transportation through its operation of a fleet of trucks and tank trailers and railcars primarily servicing Texas, Lousiana, North Dakota, Pennsylvania, Colorado and Wyoming; pipeline services in North Dakota, Montana, Wyoming, New Mexico, Mississippi, Oklahoma and Texas; and crude oil purchase and sale in connection with pipeline management services. The salt water disposal wells within the water solutions segment are located in the Eagle Ford shale region of south Texas and are a critical component of the oil and natural gas well drilling industry. Oil and natural gas wells generate significant volumes of salt water. In the oil and gas fields Ferrellgas, L.P. services, these volumes of water are transported by truck away from the fields to salt water disposal wells where a combination of gravity and chemicals are used to separate crude oil from the salt water through a process that results in the collection of "skimming oil". This skimming oil is then captured and sold before the salt water is injected into underground geologic formations using high-pressure pumps.

### B.   Summary of significant accounting policies

**(1)   Accounting estimates:** The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reported period. Actual results could differ from these estimates. Significant estimates impacting the consolidated financial statements include accruals that have been established for contingent liabilities, pending claims and legal actions arising in the normal course of business, useful lives of property, plant and equipment assets, residual values of tanks, capitalization of customer tank installation costs, amortization methods of intangible assets, valuation methods used to value sales returns and allowances, allowance for doubtful accounts, fair value of reporting units, assumptions used to value business combinations, fair values of derivative contracts and stock-based compensation calculations.

**(2)   Principles of consolidation:** The accompanying consolidated financial statements present the consolidated financial position, results of operations and cash flows of Ferrellgas, L.P. and its subsidiaries after elimination of all intercompany accounts and transactions. Ferrellgas, L.P. consolidates the following wholly-owned entities: Bridger Logistics, LLC, Sable Environmental, LLC, Sable SWD 2, LLC, Blue Rhino Global Sourcing, Inc., Blue Rhino Canada, Inc., Ferrellgas Real Estate, Inc., Ferrellgas Finance Corp. and Ferrellgas Receivables, LLC ("Ferrellgas Receivables"), a special purpose entity that has agreements with Ferrellgas, L.P. to securitize, on an ongoing basis, a portion of its trade accounts receivable.

**(3)   Supplemental cash flow information:** For purposes of the consolidated statements of cash flows, Ferrellgas, L.P. considers cash equivalents to include all highly liquid debt instruments purchased with an original maturity of three months or less. Certain cash flow and significant non-cash activities are presented below:

BLFG_EDPA2274578

Table of Contents

|  | For the year ended July 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2015** | | **2014** | | **2013** | |
| CASH PAID FOR: | | | | | | |
| Interest | $ | 76,085 | $ | 75,121 | $ | 68,334 |
| Income taxes | $ | 643 | $ | 771 | $ | 534 |
| NON-CASH INVESTING AND FINANCING ACTIVITIES: | | | | | | |
| Assets contributed from Ferrellgas Partners in connection with acquisitions | $ | 825,452 | $ | 1,500 | $ | — |
| Liabilities incurred in connection with acquisitions | $ | 481 | $ | 4,312 | $ | 2,035 |
| Change in accruals for property, plant and equipment additions | $ | 498 | $ | 978 | $ | 533 |

**(4)  Fair value measurements:** Ferrellgas, L.P. measures certain of its assets and liabilities at fair value, which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants – in either the principal market or the most advantageous market. The principal market is the market with the greatest level of activity and volume for the asset or liability.

The common framework for measuring fair value utilizes a three-level hierarchy to prioritize the inputs used in the valuation techniques to derive fair values. The basis for fair value measurements for each level within the hierarchy is described below with Level 1 having the highest priority and Level 3 having the lowest.

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Quoted prices in active markets for similar assets or liabilities; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs are observable in active markets.
- Level 3: Valuations derived from valuation techniques in which one or more significant inputs are unobservable.

**(5)  Accounts receivable securitization:** Through its wholly-owned and consolidated subsidiary Ferrellgas Receivables, Ferrellgas, L.P. has agreements to securitize, on an ongoing basis, a portion of its trade accounts receivable.

**(6)  Inventories:** Inventories are stated at the lower of cost or market using weighted average cost and actual cost methods.

**(7)  Property, plant and equipment:** Property, plant and equipment are stated at cost less accumulated depreciation. Expenditures for maintenance and routine repairs are expensed as incurred. Ferrellgas, L.P. capitalizes computer software, equipment replacement and betterment expenditures that upgrade, replace or completely rebuild major mechanical components and extend the original useful life of the equipment. Depreciation is calculated using the straight-line method based on the estimated useful lives of the assets ranging from two to 30 years. Ferrellgas, L.P., using its best estimates based on reasonable and supportable assumptions and projections, reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of its assets might not be recoverable. See Note E – Supplemental financial statement information – for further discussion of property, plant and equipment.

**(8)  Goodwill:** Ferrellgas, L.P. records goodwill as the excess of the cost of acquisitions over the fair value of the related net assets at the date of acquisition. Goodwill recorded is not deductible for income tax purposes. Ferrellgas, L.P. has determined that it has five reporting units for goodwill impairment testing purposes. Four of these reporting units contain goodwill that is subject to at least an annual assessment for impairment by applying a fair-value-based test. Under this test, the carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units as of the date of the evaluation on a specific identification basis. To the extent a reporting unit's carrying value exceeds its fair value, an indication exists that the reporting unit's goodwill may be impaired and the second step of the impairment test must be performed. In the second step, the implied fair value of the goodwill is determined by allocating the fair value of all of its assets (recognized and unrecognized) and liabilities to its carrying amount. Ferrellgas, L.P. has completed the impairment test for the Retail operations, Products and Midstream operations - water solutions reporting units and believes that estimated fair values exceed the carrying values of its reporting units as of January 31, 2015. Goodwill associated with the Midstream operations - crude oil logistics reporting unit is a result of the acquisition of Bridger on June 24, 2015.

As a result of the significant drop in the price of crude oil and its impact on the results of Midstream operations - water solutions reporting unit during the second half of fiscal 2015, Ferrellgas, L.P. considered whether the carrying value of this reporting unit no longer exceeded the fair value. Upon applying the fair-value-based test as described above for purposes of the annual impairment test, Ferrellgas, L.P. concluded that there was no impairment of the Midstream operations - water solutions reporting unit as of July 31, 2015.  As of July 31, 2015, Ferrellgas, L.P. determined that this reporting unit had an estimated fair value in excess of its respective carrying value of approximately 10%.

F-49

BLFG_EDPA2274579

Table of Contents

This test primarily consists of a discounted future cash flow model to estimate fair value. The cash flow model includes the following critical assumptions: (1) the NYMEX West Texas Intermediate ("WTI") crude oil curve as of July 31, 2015 was used to predict future oil prices; (2) the oil skimming rate is expected to correlate to the NYMEX WTI crude oil curve consistent with Ferrellgas, L.P.'s past history; (3) a terminal period growth rate equal to the expected rate of inflation; and (4) certain organic growth projects will increase the salt water volumes processed as a result of new drilling activity in the Eagle Ford shale region of Texas that are expected to occur as the price of WTI crude oil increases. Ferrellgas, L.P. believes that the results of this business are closely tied to the price of WTI crude oil and, therefore, if any of these assumptions are not sustained or are not sustained in a timely manner, the Midstream operations - water solutions reporting unit could incur material impairments. In addition to these critical cash flow assumptions, a discount rate of 11.1% was applied to the projected cash flows. A 5% increase, resulting in a discount rate equal to 11.7%, could cause Ferrellgas, L.P. to fail step one of the goodwill impairment test. If this reporting unit fails step one in the future, we would be required to perform step two of the goodwill impairment test. If we perform step two, up to $29.3 million of goodwill assigned to this reporting unit could be written off in the period that the impairment is triggered.

Judgments and assumptions are inherent in management's estimates used to determine the fair value of Ferrellgas, L.P.'s reporting units and are consistent with what management believes would be utilized by primary market participants. The use of alternate judgments and assumptions could result in the recognition of different levels of impairment charges in the financial statements.

**(9)  Intangible assets:** Intangible assets with finite useful lives, consisting primarily of customer related assets, non-compete agreements, permits, favorable lease arrangements and patented technology, are stated at cost, net of accumulated amortization calculated using the straight-line method over periods ranging from two to 15 years. Trade names and trademarks have indefinite lives, are not amortized, and are stated at cost. Ferrellgas, L.P. tests finite-lived intangible assets for impairment when events or changes in circumstances indicate that the carrying amount of these assets might not be recoverable. Ferrellgas, L.P. tests indefinite-lived intangible assets for impairment annually on January 31 or more frequently if circumstances dictate. Ferrellgas, L.P. has not recognized impairment losses as a result of these tests. When necessary, intangible assets' useful lives are revised and the impact on amortization reflected on a prospective basis. See Note G – Goodwill and intangible assets, net – for further discussion of intangible assets.

**(10)  Derivative instruments and hedging activities:**

*Commodity and Transportation Fuel Price Risk.*

Ferrellgas, L.P.'s overall objective for entering into commodity based derivative contracts, including commodity options and swaps, is to hedge a portion of its exposure to market fluctuations in propane, gasoline, diesel and crude oil prices.

Ferrellgas, L.P's risk management activities primarily attempt to mitigate price risks related to the purchase, storage, transport and sale of propane and crude oil generally in the contract and spot markets from major domestic energy companies on a short-term basis. Ferrellgas, L.P attempts to mitigate these price risks through the use of financial derivative instruments and forward propane purchase and sales contracts. Additionally, Ferrellgas, L.P.'s risk management activities attempt to mitigate price risks related to the purchase of gasoline and diesel fuel for use in the transport of propane from retail fueling stations through the use of financial derivative instruments.

Ferrellgas, L.P.'s risk management strategy involves taking positions in the forward or financial markets that are equal and opposite to Ferrellgas, L.P.'s positions in the physical products market in order to minimize the risk of financial loss from an adverse price change. This risk management strategy is successful when Ferrellgas, L.P.'s gains or losses in the physical product markets are offset by its losses or gains in the forward or financial markets. These financial derivatives are designated as cash flow hedges. The gasoline and diesel related financial derivatives are not formally designated and documented as a hedge of exposure to fluctuations in the market price of fuel.

Ferrellgas, L.P.'s risk management activities may include the use of financial derivative instruments including, but not limited to, swaps, options, and futures to seek protection from adverse price movements and to minimize potential losses. Ferrellgas, L.P. enters into these financial derivative instruments directly with third parties in the over-the-counter market and with brokers who are clearing members with the New York Mercantile Exchange. All of Ferrellgas, L.P.'s financial derivative instruments are reported on the consolidated balance sheets at fair value.

Ferrellgas, L.P. also enters into forward propane purchase and sales contracts with counterparties. These forward contracts qualify for the normal purchase normal sales exception within GAAP guidance and are therefore not recorded on Ferrellgas, L.P.'s financial statements until settled.

F-50

Table of Contents

On the date that derivative contracts are entered into, other than those designated as normal purchases or normal sales, Ferrellgas, L.P. makes a determination as to whether the derivative instrument qualifies for designation as a hedge. These financial instruments are formally designated and documented as a hedge of a specific underlying exposure, as well as the risk management objectives and strategies for undertaking the hedge transaction. Because of the high degree of correlation between the hedging instrument and the underlying exposure being hedged, fluctuations in the value of the derivative instrument are generally offset by changes in the anticipated cash flows of the underlying exposure being hedged. Since the fair value of these derivatives fluctuates over their contractual lives, their fair value amounts should not be viewed in isolation, but rather in relation to the anticipated cash flows of the underlying hedged transaction and the overall reduction in Ferrellgas, L.P.'s risk relating to adverse fluctuations in propane prices. Ferrellgas, L.P. formally assesses, both at inception and at least quarterly thereafter, whether the financial instruments that are used in hedging transactions are effective at offsetting changes in the anticipated cash flows of the related underlying exposures. Any ineffective portion of a financial instrument's change in fair value is recognized in "Cost of product sold - propane and other gas liquids sales" in the consolidated statements of earnings. Financial instruments formally designated and documented as a hedge of a specific underlying exposure are recorded gross at fair value as either "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities" or "Other liabilities" on the consolidated balance sheets with changes in fair value reported in other comprehensive income.

Financial instruments not formally designated and documented as a hedge of a specific underlying exposure are recorded at fair value as "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities", or "Other liabilities" on the consolidated balance sheets with changes in fair value reported in "Cost of sales - midstream operations" and "Operating expense" on the consolidated statements of earnings.

*Interest Rate Risk.*

Ferrellgas, L.P.'s overall objective for entering into interest rate derivative contracts, including swaps, is to manage its exposure to interest rate risk associated with its fixed rate senior notes and its floating rate borrowings from both the secured credit facility and the accounts receivable securitization facility. Fluctuations in interest rates subject Ferrellgas, L.P. to interest rate risk. Decreases in interest rates increase the fair value of Ferrellgas, L.P.'s fixed rate debt, while increases in interest rates subject Ferrellgas, L.P. to the risk of increased interest expense related to its variable rate borrowings.

Ferrellgas, L.P. enters into fair value hedges to help reduce its fixed interest rate risk. Interest rate swaps are used to hedge the exposure to changes in the fair value of fixed rate debt due to changes in interest rates. Fixed rate debt that has been designated as being hedged is recorded at fair value while the fair value of interest rate derivatives that are considered fair value hedges are classified as "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities" or as "Other liabilities" on the consolidated balance sheets. Changes in the fair value of fixed rate debt and any related fair value hedges are recognized as they occur in "Interest expense" on the consolidated statements of earnings.

Ferrellgas, L.P. enters into cash flow hedges to help reduce its variable interest rate risk. Interest rate swaps are used to hedge the risk associated with rising interest rates and their effect on forecasted interest payments related to variable rate borrowings. These interest rate swaps are designated as cash flow hedges. Thus, the effective portions of changes in the fair value of the hedges are recorded in "Prepaid expenses and other current assets", "Other assets, net", "Other current liabilities" or as "Other liabilities" with an offsetting entry to "Other comprehensive income" at interim periods and are subsequently recognized as interest expense in the consolidated statement of earnings when the forecasted transaction impacts earnings. Changes in the fair value of any cash flow hedges that are considered ineffective are recognized as interest expense on the consolidated statement of earnings as they occur.

**(11) Revenue recognition:** Revenues from Ferrellgas, L.P.'s propane and related equipment sales segment are recognized at the time product is delivered with payments generally due 30 days after receipt. Amounts are considered past due after 30 days. Ferrellgas, L.P. determines accounts receivable allowances based on management's assessment of the creditworthiness of the customers and other collection actions. Ferrellgas, L.P. offers "even pay" billing programs that can create customer deposits or advances. Revenue is recognized from these customer deposits or advances to customers at the time product is delivered. Other revenues, which include revenue from the sale of propane appliances and equipment is recognized at the time of delivery or installation. Ferrellgas, L.P. recognizes shipping and handling revenues and expenses for sales of propane, appliances and equipment at the time of delivery or installation. Shipping and handling revenues are included in the price of propane charged to customers, and are classified as revenue. Revenues from annually billed, non-refundable propane tank rentals are recognized in "Revenues: other" on a straight-line basis over one year.

Revenues from Ferrellgas, L.P.'s midstream operations - crude oil logistics segment include crude oil sales, pipeline tariffs, trucking fees, rail throughput fees, pipeline management services, leasing, throughput, and storage; all items deemed as being associated with the transportation of crude oil. These revenues are recognized upon completion of the related service or delivery of product.

F-51

BLFG_EDPA2274581

Table of Contents

Revenues from Ferrellgas, L.P.'s midstream operations - water solutions segment are recognized when there is persuasive evidence that an arrangement exists, delivery has occurred or services have been rendered, the price is fixed or determinable and collectability is reasonably assured. Salt water disposal revenues are based on Ferrellgas, L.P.'s published or negotiated water disposal rates. Customers deliver salt water to be disposed to facilities and revenue is recognized when actual volumes of water are off-loaded at the facilities. Skimming oil disposal revenues are determined based on published rates subject to adjustments based on the quality of the oil sold and are recognized when actual volumes are delivered to the customer who determines the quality of the oil and collectability is reasonably assured. Amounts are considered past due after 30 days. Ferrellgas, L.P. determines accounts receivable allowances based on management's assessment of the creditworthiness of the customers and other collection actions.

**(12)  Shipping and handling expenses:** Shipping and handling expenses related to delivery personnel, vehicle repair and maintenance and general liability expenses are classified within "Operating expense" in the consolidated statements of earnings. Depreciation expenses on delivery vehicles Ferrellgas, L.P. owns are classified within "Depreciation and amortization expense." Delivery vehicles and distribution technology leased by Ferrellgas, L.P. are classified within "Equipment lease expense."

See Note E – Supplemental financial statement information – for the financial statement presentation of shipping and handling expenses.

**(13)  Cost of sales:** "Cost of sales – propane and other gas liquids sales" includes all costs to acquire propane and other gas liquids, the costs of storing and transporting inventory prior to delivery to Ferrellgas, L.P.'s customers, the results from risk management activities to hedge related price risk and the costs of materials related to the refurbishment of Ferrellgas, L.P.'s portable propane tanks. "Cost of sales - midstream operations" includes all costs incurred to purchase and transport crude oil, including the costs of terminaling and transporting crude oil prior to delivery to customers and transportation cost related to the processing and disposal of salt water. "Cost of sales – other" primarily includes costs related to the sale of propane appliances and equipment.

**(14)  Operating expenses:** "Operating expense" primarily includes the personnel, vehicle, delivery, handling, plant, office, selling, marketing, credit and collections and other expenses related to the retail distribution of propane and related equipment and supplies. Within midstream operations, "Operating expense" includes plant, office, selling, marketing, credit and collections and other expense.

**(15) General and administrative expenses:** "General and administrative expense" primarily includes personnel and incentive expense related to executives, and employees and other overhead expense related to centralized corporate functions.

**(16)  Stock-based plans:**

**Ferrell Companies, Inc. Incentive Compensation Plans ("ICPs")**
The ICPs are not Ferrellgas, L.P. stock-compensation plans; however, in accordance with Ferrellgas, L.P.'s partnership agreements, all Ferrellgas, L.P. employee-related costs incurred by Ferrell Companies are allocated to Ferrellgas, L.P. As a result, Ferrellgas, L.P. incurs a non-cash compensation charge from Ferrell Companies. During the years ended July 31, 2015, 2014 and 2013, the portion of the total non-cash compensation charge relating to the ICPs was $25.6 million, $24.5 million and $13.5 million, respectively.

Ferrell Companies is authorized to issue up to 9.25 million stock appreciation rights ("SARs") that are based on shares of Ferrell Companies common stock. The SARs were established by Ferrell Companies to allow upper-middle and senior level managers as well as directors of the general partner to participate in the equity growth of Ferrell Companies. The SARs awards vest ratably over periods ranging from zero to 12 years or 100% upon a change of control of Ferrell Companies, or upon the death, disability or retirement at the age of 65 of the participant. All awards expire 10 or 15 years from the date of issuance. The fair value of each award is estimated on each balance sheet date using a binomial valuation model.

Effective July 31, 2015, Ferrell Companies is authorized to issue deferred appreciation right ("DARs") awards that are based on shares of Ferrell Companies common stock. The DAR awards were established by Ferrell Companies to allow upper-middle and senior level managers as well as directors of the general partner to participate in the equity growth of Ferrell Companies. The DAR awards vest ratably over periods ranging from zero to 12 years or 100% upon a change of control of Ferrell Companies, or upon the death, disability or retirement at the age of 65 of the participant. All awards expire 10 or 15 years from the date of issuance. The fair value of each award is estimated on each balance sheet date using a binomial valuation model.

**(17)   Income taxes:** Ferrellgas, L.P. is a limited partnership and owns three subsidiaries that are taxable corporations. As a result, except for the taxable corporations, Ferrellgas, L.P.'s earnings or losses for federal income tax purposes are included in the tax returns of the individual partners. Accordingly, the accompanying consolidated financial statements of Ferrellgas, L.P.

BLFG_EDPA2274582

Table of Contents

reflect federal income taxes related to the above mentioned taxable corporations and certain states that allow for income taxation of partnerships. Net earnings for financial statement purposes may differ significantly from taxable income reportable to partners as a result of differences between the tax basis and financial reporting basis of assets and liabilities, the taxable income allocation requirements under Ferrellgas, L.P.'s partnership agreement and differences between Ferrellgas, L.P.'s financial reporting year end and limited partners tax year end.

Income tax expense consisted of the following:

|  | For the year ended July 31, | | | | | |
|  | 2015 | | 2014 | | 2013 | |
|---|---|---|---|---|---|---|
| Current expense (benefit) | $ | (654) | $ | 2,383 | $ | 1,705 |
| Deferred expense |  | 270 |  | 88 |  | 133 |
| Income tax expense | $ | (384) | $ | 2,471 | $ | 1,838 |

Deferred taxes consisted of the following:

|  | July 31, | | | |
|  | 2015 | | 2014 | |
|---|---|---|---|---|
| Deferred tax assets | $ | 724 | $ | 1,152 |
| Deferred tax liabilities |  | (4,157) |  | (4,313) |
| Net deferred tax liability | $ | (3,433) | $ | (3,161) |

**(18)  Sales taxes:** Ferrellgas, L.P. accounts for the collection and remittance of sales tax on a net tax basis. As a result, these amounts are not reflected in the consolidated statements of earnings.

**(19)  Loss contingencies:** In the normal course of business, Ferrellgas, L.P. is involved in various claims and legal proceedings. Ferrellgas, L.P. records a liability for such matters when it is probable that a loss has been incurred and the amounts can be reasonably estimated. When only a range of possible loss can be established, the most probable amount in the range is accrued. If no amount within this range is a better estimate than any other amount within the range, the minimum amount in the range is accrued. Legal costs associated with these loss contingencies are expensed as incurred.

**(20)  New accounting standards:**

**Financial Accounting Standards Board ("FASB") Accounting Standard Update ("ASU") No. 2011-08**
In September 2011, the FASB issued ASU 2011-08, which amends the existing guidance on goodwill impairment testing. Under the new guidance, entities testing goodwill for impairment have the option of performing a qualitative assessment before calculating the fair value of the reporting unit. If an entity determines, on the basis of qualitative factors, that the fair value of the reporting unit is more likely than not less than the carrying amount, the two-step impairment test would be required. This guidance is effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011. Ferrellgas, L.P.'s adoption of this guidance in fiscal 2013 did not have a significant impact on its financial position, results of operations or cash flows.

**FASB Accounting Standard Update No. 2012-02**
In July 2012, the FASB issued ASU 2012-02, which amends the existing guidance on impairment testing of indefinite-lived intangible assets. Under the new guidance, entities testing indefinite-lived intangible assets for impairment have the option of performing a qualitative assessment before calculating the fair value of the asset. If an entity determines, on the basis of qualitative factors, that the fair value of the asset is more likely than not less than the carrying amount, the two-step impairment test would be required. This guidance is effective for annual and interim indefinite-lived intangible asset impairment tests performed for fiscal years beginning after September 15, 2012. Early adoption is permitted.  Ferrellgas, L.P.'s adoption of this guidance in fiscal 2013 did not have a significant impact on its financial position, results of operations or cash flows.

**FASB Accounting Standard Update No. 2014-09**
In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers*. The issuance is part of a joint effort by the FASB and the International Accounting Standards Board (IASB) to enhance financial reporting by creating common revenue recognition guidance for U.S. GAAP and IFRS and, thereby, improving the consistency of requirements, comparability of practices and usefulness of disclosures. The new standard will supersede much of the existing authoritative literature for revenue recognition. The standard and related amendments will be effective for Ferrellgas, L.P. for its annual reporting period beginning August 1, 2018, including interim periods within that reporting period. Early application is not permitted. Entities are allowed to transition to the new standard by either recasting prior periods or recognizing the cumulative effect. Ferrellgas, L.P.

BLFG_EDPA2274583

Table of Contents

is currently evaluating the newly issued guidance, including which transition approach will be applied and the estimated impact it will have on the consolidated financial statements.

**FASB Accounting Standard Update No. 2014-08**

In April 2014, the FASB issued ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity*, to change the criteria for determining which disposals can be presented as discontinued operations and enhanced the related disclosure requirements. ASU 2014-08 is effective for us on a prospective basis in Ferrellgas, L.P.'s first quarter of fiscal 2016 with early adoption permitted for disposals (or classifications as held for sale) that have not been reported in financial statements previously issued. Ferrellgas, L.P. does not expect the adoption of ASU 2014-08 to have a material impact on the consolidated financial statements.

**FASB Accounting Standard Update No. 2015-02**

In February 2015, the FASB issued ASU 2015-02, *Consolidation: Amendments to the Consolidation Analysis* which provides additional guidance on the consolidation of limited partnerships and on the evaluation of variable interest entities. This guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015. Early adoption is permitted. Ferrellgas, L.P. is currently evaluating the impact of our pending adoption of ASU 2015-02 on the consolidated financial statements.

**FASB Accounting Standard Update No. 2015-03**

In April 2015, the FASB issued ASU 2015-03, *Interest - Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*, which requires that debt issuance costs be presented in the balance sheet as a direct deduction from the carrying value of the debt liability. ASU 2015-03 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015, with early adoption permitted, and retrospective application required. Ferrellgas, L.P. is currently evaluating the impact of our pending adoption of ASU 2015-03 on the consolidated financial statements.

**C.   Business combinations**

Business combinations are accounted for under the acquisition method of accounting and the assets acquired and liabilities assumed are recorded at their estimated fair market values as of the acquisition dates. The results of operations are included in the consolidated statements of earnings from the date of acquisition. The pro forma effect of these transactions was not material to Ferrellgas, L.P.'s balance sheets or results of operations, except for Bridger as noted below.

*Propane and related equipment sales*

During July 2015, Ferrellgas, L.P. acquired the assets of Propane Advantage, LLC, based in Utah, with an aggregate value of $7.7 million.

During fiscal 2014, Ferrellgas, L.P. acquired seven propane distribution assets with an aggregate value of $38.7 million in the following transactions:

• KanGas, based in Kansas, acquired November 2013;
• Motor Propane, based in Wisconsin, acquired December 2013;
• Country Boys Propane, based in Georgia, acquired March 2014;
• Viking Propane, based in California, acquired May 2014;
• Kaw Valley Propane, based in Kansas, acquired June 2014;
• Wise Choice Propane, based in Ohio, acquired July 2014; and
• Sharp Propane, based in Texas, acquired July 2014.

During fiscal 2013, Ferrellgas, L.P. acquired propane distribution and grilling tool assets with an aggregate value of $39.2 million in the following transactions:

• Capitol City Propane, based in California, acquired September 2012;
• Flores Gas, based in Texas, acquired October 2012;
• IGS Propane, based in Connecticut, acquired December 2012;
• Mr. Bar-B-Q, based in New York, acquired March 2013; and
• Western Petroleum, based in Utah, acquired April 2013.

The goodwill arising from the propane and related equipment sales acquisitions consists largely of the synergies and economies of scale expected from combining the operations of Ferrellgas, L.P. and the acquired companies.

These acquisitions, were funded as follows on their dates of acquisition:

F-54

BLFG_EDPA2274584

Table of Contents

| | For the year ended July 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2015 | | 2014 | | 2013 |
| Cash payments, net of cash acquired | $ | 4,250 | $ | 34,219 | $ | 37,186 |
| Issuance of liabilities and other costs and considerations | | 481 | | 2,942 | | 2,035 |
| Common units, net of issuance costs | | 3,000 | | 1,500 | | — |
| Aggregate fair value of transactions | $ | 7,731 | $ | 38,661 | $ | 39,221 |

The aggregate fair values, for the acquisitions in propane and related equipment sales reporting segment, were allocated as follows, including any adjustments identified during the measurement period:

| | For the year ended July 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2015 | | 2014 | | 2013 |
| Working capital | | 233 | | (919) | | 7,302 |
| Customer tanks, buildings, land and other | | 236 | | 14,519 | | 5,155 |
| Goodwill | | — | | 2,922 | | 4,640 |
| Customer lists | | 6,569 | | 19,480 | | 12,211 |
| Non-compete agreements | | 693 | | 2,659 | | 944 |
| Other intangibles | | — | | — | | 5,678 |
| Trade names & trademarks | | — | | — | | 3,291 |
| Aggregate fair value of net assets acquired | $ | 7,731 | $ | 38,661 | $ | 39,221 |

*Midstream operations - Water solutions*

During fiscal 2015, Ferrellgas, L.P. acquired salt water disposal assets with an aggregate value of $74.7 million in the following transactions, which includes $1.4 million paid in fiscal 2015 as a working capital and valuation adjustment for prior year acquisitions:

•   C&E Production, LLC, based in Texas, acquired September 2014; and
•   Segrest Saltwater Resources, based in Texas, acquired May 2015.

During fiscal 2014, Ferrellgas, L.P. acquired salt water disposal assets with an aggregate value of $130.3 million relating to the midstream - water solutions segment. This included the acquisitions of Sable Environmental, LLC and Sable SWD 2, LLC ("Sable"), based in Corpus Christi, Texas and Dietert SWD, based in LaSalle County, Texas. The Sable acquisition was funded through borrowings from the secured credit facility, and subsequently Sable's ownership group purchased $50.0 million of Ferrellgas Partners common units. The excess of purchase consideration over net assets assumed was recorded as goodwill, which represents the strategic value assigned to Sable, including the knowledge and experience of the workforce in place.

These acquisitions were funded as follows on their dates of acquisition:

| | For the year ended July 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2015 | | 2014 | | 2013 |
| Cash payments, net of cash acquired | $ | 74,677 | $ | 127,785 | $ | — |
| Issuance of liabilities and other costs and considerations | | — | | 2,555 | | — |
| Aggregate fair value of transactions | $ | 74,677 | $ | 130,340 | $ | — |

The aggregate fair values, for these acquisitions were allocated as follows:

F-55

BLFG_EDPA2274585

Table of Contents

|  | For the year ended July 31, | | |
|---|---|---|---|
|  | **2015** | **2014** | **2013** |
| Working capital | 1,155 | 490 | — |
| Customer tanks, buildings, land and other | 1,704 | 622 | — |
| Salt water disposal wells | 10,705 | 24,288 | — |
| Goodwill | 12,359 | 16,957 | — |
| Customer relationships | 38,846 | 64,000 | — |
| Non-compete agreements | 3,639 | 13,300 | — |
| Permits and favorable lease arrangements | 6,269 | 10,683 | — |
| Aggregate fair value of net assets acquired | $ 74,677 | $ 130,340 | $ — |

The acquisition of Sable included contingent consideration which requires Ferrellgas, L.P. to pay the former owners of Sable a multiple for earnings in excess of certain EBITDA targets for each of the first two years following the acquisition date. At the date of acquisition, the potential undiscounted amount of all future payments that Ferrellgas, L.P. could be required to make under the contingent consideration arrangement was between $0 and $2.0 million based upon management's estimate of the likelihood that the target EBITDA metric will be met and exceeded and the amount by which it could be exceeded at the date of acquisition. See further discussion of the determination of the fair value of the contingent consideration at Note J - Fair Value Measurements.

*Midstream operations - Crude oil logistics solutions*

On June 24, 2015, Ferrellgas Partners acquired Bridger and formed a new midstream operation - crude oil logistics segment based near Dallas, Texas. Ferrellgas Partners paid $560.0 million of cash, net of cash acquired and issued $260.0 million of Ferrellgas Partners common units to the seller, along with $2.5 million of other seller costs and consideration for an aggregate value of $822.5 million. Ferrellgas Partners then contributed the Bridger assets and liabilities to Ferrellgas, L.P. Ferrellgas, L.P. has incurred and charged to operating expenses, net $16.4 million of costs during the year ended July 31, 2015, related to the acquisition and transition of Bridger.

Bridger's assets include rail cars, trucks, tank trailers, injection stations, a pipeline, and other assets. Bridger's operations provide crude oil transportation logistics on behalf of producers and end-users of crude oil on a fee-for-service basis, and purchases and sells crude oil in connection with other fee-for-service arrangements.

The excess of purchase consideration over net assets assumed was recorded as goodwill, which represents the strategic value assigned to Bridger, including the knowledge and experience of the workforce in place.

The aggregate fair value for the Bridger Logistics Acquisition in the midstream operations - crude oil logistics solutions segment was preliminarily allocated as follows:

|  | For the year ended July 31, |
|---|---|
|  | **2015** |
| Working capital | $ 1,783 |
| Transportation equipment | 293,491 |
| Injection stations and pipelines | 41,632 |
| Goodwill | 193,311 |
| Customer relationships | 261,811 |
| Non-compete agreements | 14,800 |
| Trade names & trademarks | 5,800 |
| Office equipment | 7,449 |
| Other | 2,375 |
| Aggregate fair value of net assets acquired | $ 822,452 |

The following amounts from this acquisition were included in the operating results for the year ending July 31, 2015:

F-56

BLFG_EDPA2274586

Table of Contents

|  | For the year ended July 31, |
|---|---|
|  | 2015 |
| Revenue | $ 81,512 |
| Operating income | 3,848 |

*Pro forma results of operations (unaudited)*

The following summarized unaudited pro forma consolidated statement of earnings information assumes that the acquisition of Bridger during fiscal 2015 occurred as of August 1, 2013. These unaudited pro forma results are for comparative purposes only and may not be indicative of the results that would have occurred had this acquisition been completed on August 1, 2013 or the results that would be attained in the future.

|  | For the year ended July 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Revenue | $ 2,319,927 | 2,583,680 |
| Net earnings | 4,504 | 20,580 |

The unaudited pro forma consolidated data presented above has also been prepared as if the issuance of senior secured notes in June 2015, which are described in Note H to these consolidated financial statements, had been completed on August 1, 2013.

The estimated fair values and useful lives of assets acquired during fiscal 2015 are based on a preliminary valuation and are subject to final valuation adjustments. Ferrellgas, L.P. intends to continue its analysis of the net assets of these transactions to determine the final allocation of the total purchase price to the various assets and liabilities acquired. The estimated fair values and useful lives of assets acquired during fiscal 2014 and 2013 are based on internal valuations and included only minor adjustments during the 12 month period after the date of acquisition. Due to the immateriality of these adjustments, Ferrellgas, L.P. did not retrospectively adjust the consolidated statements of operations for those measurement period adjustments.

**D.   Quarterly distributions of available cash**

Ferrellgas, L.P. makes quarterly cash distributions of all of its "available cash." Available cash is defined in the partnership agreement of Ferrellgas, L.P. as, generally, the sum of its consolidated cash receipts less consolidated cash disbursements and net changes in reserves established by the general partner for future requirements. Reserves are retained in order to provide for the proper conduct of Ferrellgas, L.P.'s business, or to provide funds for distributions with respect to any one or more of the next four fiscal quarters. Distributions are made within 45 days after the end of each fiscal quarter ending October, January, April, and July.

Distributions by Ferrellgas, L.P. in an amount equal to 100% of its available cash, as defined in its partnership agreement, will be made approximately 99% to Ferrellgas Partners and approximately 1% to the general partner.

**E.   Supplemental financial statement information**

Inventories consist of the following:

|  | 2015 | 2014 |
|---|---|---|
| Propane gas and related products | $ 68,731 | $ 121,111 |
| Appliances, parts and supplies | 28,023 | 24,858 |
| Inventories | $ 96,754 | $ 145,969 |

In addition to inventories on hand, Ferrellgas, L.P. enters into contracts primarily to buy propane for supply procurement purposes. Most of these contracts have terms of less than one year and call for payment based on market prices at the date of delivery. All supply procurement fixed price contracts have terms of fewer than 36 months. As of July 31, 2015, Ferrellgas, L.P. had committed, for supply procurement purposes, to take delivery of approximately 80.5 million gallons of propane at fixed prices.

Property, plant and equipment, net consist of the following:

F-57

Table of Contents

| | Estimated useful lives | 2015 | 2014 |
|---|---|---|---|
| Land | Indefinite | $ 34,389 | $ 31,890 |
| Land improvements | 2-20 | 13,249 | 12,812 |
| Buildings and improvements | 20 | 71,923 | 68,492 |
| Vehicles, including transport trailers | 8-20 | 228,646 | 95,701 |
| Bulk equipment and district facilities | 5-30 | 111,657 | 109,739 |
| Tanks, cylinders and customer equipment | 2-30 | 772,904 | 772,402 |
| Salt water disposal wells and related equipment | 2-23 | 38,460 | 24,288 |
| Rail cars | 30 | 150,235 | — |
| Injection stations | 20 | 37,619 | — |
| Pipeline | 15 | 4,074 | — |
| Computer and office equipment | 2-5 | 123,386 | 116,265 |
| Construction in progress | n/a | 16,841 | 7,029 |
| | | 1,603,383 | 1,238,618 |
| Less: accumulated depreciation | | 638,166 | 626,831 |
| Property, plant and equipment, net | | $ 965,217 | $ 611,787 |

Depreciation expense totaled $61.3 million, $58.3 million and $59.3 million for fiscal 2015, 2014 and 2013, respectively.

Other current liabilities consist of the following:

| | 2015 | 2014 |
|---|---|---|
| Accrued interest | $ 15,275 | $ 10,176 |
| Accrued payroll | 17,485 | 37,120 |
| Customer deposits and advances | 28,792 | 25,412 |
| Price risk management liabilities | 31,450 | 83 |
| Other | 83,174 | 50,362 |
| Other current liabilities | $ 176,176 | $ 123,153 |

Shipping and handling expenses are classified in the following consolidated statements of earnings line items:

| | For the year ended July 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Operating expense | $ 174,105 | $ 190,999 | $ 181,932 |
| Depreciation and amortization expense | 5,127 | 5,829 | 5,744 |
| Equipment lease expense | 22,667 | 15,807 | 14,028 |
| | $ 201,899 | $ 212,635 | $ 201,704 |

F.  **Accounts and notes receivable, net and accounts receivable securitization**

Accounts and notes receivable, net consist of the following:

| | 2015 | 2014 |
|---|---|---|
| Accounts receivable pledged as collateral | $ 123,791 | $ 159,003 |
| Accounts receivable | 77,636 | 24,108 |
| Other | 307 | 247 |
| Less: Allowance for doubtful accounts | (4,816) | (4,756) |
| Accounts and notes receivable, net | $ 196,918 | $ 178,602 |

Ferrellgas, L.P. maintains an accounts receivable securitization facility with Wells Fargo Bank, N.A., Fifth Third Bank and SunTrust Bank. This accounts receivable securitization facility has up to $225.0 million of capacity and matures on January 19, 2017. As part of this facility, Ferrellgas, L.P. through Ferrellgas Receivables, securitizes a portion of its trade accounts receivable through a commercial paper conduit for proceeds of up to $225.0 million during the months of January, February,

BLFG_EDPA2274588

Table of Contents

March and December, $175.0 million during the months of April and May and $145.0 million for all other months, depending on the availability of undivided interests in its accounts receivable from certain customers. At July 31, 2015, $123.8 million of trade accounts receivable were pledged as collateral against $70.0 million of collateralized notes payable due to the commercial paper conduit. At July 31, 2014, $159.0 million of trade accounts receivable were pledged as collateral against $91.0 million of collateralized notes payable due to the commercial paper conduit. These accounts receivable pledged as collateral are bankruptcy remote from Ferrellgas, L.P. Ferrellgas, L.P. does not provide any guarantee or similar support to the collectability of these accounts receivable pledged as collateral.

Ferrellgas, L.P. structured Ferrellgas Receivables in order to facilitate securitization transactions while complying with Ferrellgas, L.P.'s various debt covenants. If the covenants were compromised, funding from the facility could be restricted or suspended, or its costs could increase. As of July 31, 2015, Ferrellgas, L.P. had received cash proceeds of $70.0 million from trade accounts receivables securitized, with no remaining capacity to receive additional proceeds. As of July 31, 2014, Ferrellgas, L.P. had received cash proceeds of $91.0 million from trade accounts receivables securitized, with no remaining capacity to receive additional proceeds. Borrowings under the accounts receivable securitization facility had a weighted average interest rate of 2.3% and 2.1% as of July 31, 2015 and 2014, respectively.

**G.   Goodwill and intangible assets, net**

Goodwill and intangible assets, net consist of the following:

|  | July 31, 2015 | | | July 31, 2014 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Goodwill, net | $ 478,747 | $ — | $ 478,747 | $ 273,210 | $ — | $ 273,210 |
| | | | | | | |
| Intangible assets, net | | | | | | |
| Amortized intangible assets | | | | | | |
| Customer related | $ 807,122 | $ (349,719) | $ 457,403 | $ 500,100 | $ (322,277) | $ 177,823 |
| Non-compete agreements | 53,711 | (18,730) | 34,981 | 63,933 | (43,120) | 20,813 |
| Permits and favorable lease arrangements | 16,952 | (1,173) | 15,779 | 10,683 | (119) | 10,564 |
| Other | 9,182 | (5,497) | 3,685 | 9,177 | (4,592) | 4,585 |
| | 886,967 | (375,119) | 511,848 | 583,893 | (370,108) | 213,785 |
| | | | | | | |
| Unamortized intangible assets | | | | | | |
| Trade names & trademarks | 68,195 | | 68,195 | 62,386 | | 62,386 |
| Total intangible assets, net | $ 955,162 | $ (375,119) | $ 580,043 | $ 646,279 | $ (370,108) | $ 276,171 |

Changes in the carrying amount of goodwill, by reportable segment, are as follows:

|  | Propane and related equipment sales | Midstream operations - water solutions | Midstream operations - crude oil logistics | Total |
|---|---|---|---|---|
| **Balance July 31, 2013** | $ 253,362 | $ — | $ — | $ 253,362 |
| Acquisitions | 2,922 | 16,957 | — | 19,879 |
| Other | (31) | — | — | (31) |
| **Balance July 31, 2014** | 256,253 | 16,957 | — | 273,210 |
| Acquisitions | — | 12,359 | 193,311 | 205,670 |
| Other | (133) | — | — | (133) |
| **Balance July 31, 2015** | $ 256,120 | $ 29,316 | $ 193,311 | $ 478,747 |

Customer related intangible assets have estimated lives of 12 to 15 years, permits and favorable lease arrangements have estimated lives of 15 years while non-compete agreements and other intangible assets have estimated lives ranging from two to

F-59

BLFG_EDPA2274589

Table of Contents

10 years. Ferrellgas, L.P. intends to utilize all acquired trademarks and trade names and does not believe there are any legal, regulatory, contractual, competitive, economical or other factors that would limit their useful lives. Therefore, trademarks and trade names have indefinite useful lives. Customer related intangibles, permits and favorable lease arrangements, non-compete agreements and other intangibles carry a weighted average life of 11, 14, six years and five years, respectively.

Aggregate amortization expense related to intangible assets, net:

| For the year ended July 31, | | |
|---|---|---|
| 2015 | $ | 34,585 |
| 2014 | | 23,490 |
| 2013 | | 21,725 |

Estimated amortization expense:

| For the year ended July 31, | | |
|---|---|---|
| 2016 | $ | 61,788 |
| 2017 | | 61,212 |
| 2018 | | 57,546 |
| 2019 | | 51,297 |
| 2020 | | 45,588 |

## H.   Debt

*Short-term borrowings*

Ferrellgas, L.P. classified a portion of its secured credit facility borrowings as short-term because it was used to fund working capital needs that management had intended to pay down within the 12 month period following each balance sheet date. As of July 31, 2015 and 2014, $75.3 million and $69.5 million, respectively, were classified as short-term borrowings. For further discussion see the secured credit facility section below.

*Long-term debt*

Long-term debt consists of the following:

| | 2015 | 2014 |
|---|---|---|
| **Senior notes** | | |
| Fixed rate, 6.50%, due 2021 (1) | $       500,000 | $       500,000 |
| Fixed rate, 6.75%, due 2023 (3) | 500,000 | — |
| Fixed rate, 6.75%, due 2022, net of unamortized premium of $4,906 and $5,863 at 2015 and 2014, respectively (2) | 479,906 | 480,863 |
| Fair value adjustments related to interest rate swaps | 876 | (2,534) |
| | | |
| **Secured credit facility** | | |
| Variable interest rate, expiring October 2018 (net of $75.3 million and $69.5 million classified as short-term borrowings at July 31, 2015 and 2014, respectively) | 136,081 | 123,781 |
| | | |
| **Notes payable** | | |
| 9.5% and 8.8% weighted average interest rate at July 31, 2015 and 2014, respectively, due 2015 to 2022, net of unamortized discount of $1,914 and $2,239 at July 31, 2015 and 2014, respectively | 9,181 | 11,727 |
| | 1,626,044 | 1,113,837 |
| Less: current portion, included in other current liabilities on the consolidated balance sheets | 3,652 | 3,623 |
| Long-term debt | $   1,622,392 | $   1,110,214 |

(1)   During November 2010, Ferrellgas, L.P. issued $500.0 million in aggregate principal amount of new 6.50% senior notes due 2021 at an offering price equal to par. These notes are general unsecured senior obligations of Ferrellgas, L.P. and are effectively

F-60

BLFG_EDPA2274590

Table of Contents

junior to all future senior secured indebtedness of Ferrellgas, L.P., to the extent of the value of the assets securing the debt, and are structurally subordinated to all existing and future indebtedness and obligations of Ferrellgas, L.P. The senior notes bear interest from the date of issuance, payable semi-annually in arrears on May 1 and November 1 of each year. The outstanding principal amount is due on May 1, 2021. Ferrellgas, L.P. would incur prepayment penalties if it were to repay the notes prior to 2019.

(2) During November 2013, Ferrellgas, L.P. issued $325.0 million in aggregate principal amount of 6.75% senior notes due 2022 at an offering price equal to par. Ferrellgas, L.P. received $319.3 million of net proceeds after deducting underwriters' fees. Ferrellgas, L.P. used the net proceeds to redeem all of its $300.0 million 9.125% fixed rate senior notes due October 1, 2017. Ferrellgas, L.P. used the remaining proceeds to pay the related $14.7 million make whole and consent payments, $3.3 million in interest payments and to reduce outstanding indebtedness under the secured credit facility. This redemption also resulted in $6.0 million of non-cash write-offs of unamortized debt discount and related capitalized debt costs. The make whole and consent payments and the non-cash write-offs of unamortized debt discount and related capitalized debt costs are classified as loss on extinguishment of debt. During June 2014, Ferrellgas, L.P. issued an additional $150.0 million in aggregate principal amount of 6.75% senior notes due 2022 at an offering price equal to 104% of par. Ferrellgas, L.P. used the net proceeds for general corporate purposes, including to repay indebtedness under its secured credit facility and to pay related transaction fees and expenses.

(3) During June 2015, Ferrellgas, L.P. issued $500.0 million in aggregate principal amount of 6.75% senior notes due 2023 at an offering price equal to par. The senior notes bear interest from the date of issuance, payable semi-annually in arrears on June 15 and December 15 of each year. The outstanding principal amount is due on June 15, 2023. Ferrellgas, L.P. would incur prepayment penalties if it were to repay the notes prior to 2021. Ferrellgas, L.P. received $491.3 million of net proceeds after deducting underwriters' fees. Ferrellgas, L.P. used the net proceeds to fund a portion of the cash portion of the consideration for the acquisition of the outstanding membership interests in Bridger Logistics, LLC and its subsidiaries with remaining amounts being used to repay outstanding borrowing under the secured credit facility after the closing of the acquisitions.

*Secured credit facility*

During October 2013, Ferrellgas, L.P. executed a second amendment to its secured credit facility. This amendment extended the maturity date to October 2018, increased the size of the facility from $400.0 million to $500.0 million with no change to the size of the letter of credit sublimit which remains at $200.0 million and decreased interest rates by 0.25%. Ferrellgas, L.P. incurred a loss on extinguishment of debt of $0.3 million related to the writeoff of capitalized financing costs.

During June 2014, Ferrellgas, L.P. executed a third amendment to its secured credit facility to better facilitate its strategic focus on further business diversification. Immediately following the amendment, Ferrellgas, L.P. increased the size of this facility from $500.0 million to $600.0 million with no change to the size of the letter of credit sublimit which remains at $200.0 million. This amendment did not change the interest rate or the maturity date of the secured credit facility which remains at October 2018. Borrowings under this amended facility are available for working capital needs, capital expenditures and other general partnership purposes, including the refinancing of existing indebtedness.

During June 2015, Ferrellgas, L.P. executed a fourth amendment to its secured credit facility to administer certain technical revisions in order to facilitate the Bridger Logistics Acquisition and related funding. This amendment did not change the terms or maturity date of the secured credit facility.

The secured credit facility contains various affirmative and negative covenants and default provisions, as well as requirements with respect to the maintenance of specified financial ratios and limitations on the making of loans and investments.

As of July 31, 2015, Ferrellgas, L.P. had total borrowings outstanding under its secured credit facility of $211.4 million, of which $136.1 million was classified as long-term debt. As of July 31, 2014, Ferrellgas, L.P. had total borrowings outstanding under its secured credit facility of $193.3 million, of which $123.8 million was classified as long-term debt.

Borrowings outstanding at July 31, 2015 and 2014 under the secured credit facility had a weighted average interest rate of 3.5% and 3.4%, respectively. All borrowings under the secured credit facility bear interest, at Ferrellgas, L.P.'s option, at a rate equal to either:

• for Base Rate Loans or Swing Line Loans, the Base Rate, which is defined as the higher of i) the federal funds rate plus 0.50%, ii) Bank of America's prime rate; or iii) the Eurodollar Rate plus 1.00%; plus a margin varying from 0.75% to 1.75% (as of July 31, 2015 and 2014, the margin was 1.50% and 1.25%, respectively); or

• for Eurodollar Rate Loans, the Eurodollar Rate, which is defined as the LIBOR Rate plus a margin varying from 1.75% to 2.75% (as of July 31, 2015 and 2014, the margin was 2.50% and 2.25%, respectively).

F-61

BLFG_EDPA2274591

Table of Contents

As of July 31, 2015, the federal funds rate and Bank of America's prime rate were 0.14% and 3.25%, respectively. As of July 31, 2014, the federal funds rate and Bank of America's prime rate were 0.09% and 3.25%, respectively. As of July 31, 2015, the one-month and three-month Eurodollar Rates were 0.19% and 0.33%, respectively. As of July 31, 2014, the one-month and three-month Eurodollar Rates were 0.17% and 0.24%, respectively.

In addition, an annual commitment fee is payable at a per annum rate range from 0.35% to 0.50% times the actual daily amount by which the facility exceeds the sum of (i) the outstanding amount of revolving credit loans and (ii) the outstanding amount of letter of credit obligations.

The obligations under this credit facility are secured by substantially all assets of Ferrellgas, L.P., the general partner and certain subsidiaries of Ferrellgas, L.P. but specifically excluding (a) assets that are subject to Ferrellgas, L.P.'s accounts receivable securitization facility, (b) the general partner's equity interest in Ferrellgas Partners and (c) equity interest in certain unrestricted subsidiaries. Such obligations are also guaranteed by the general partner and certain subsidiaries of Ferrellgas, L.P.

Letters of credit outstanding at July 31, 2015 totaled $61.2 million and were used primarily to secure insurance arrangements and to a lesser extent, commodity hedges and product purchases. Letters of credit outstanding at July 31, 2014 totaled $56.3 million and were used primarily to secure insurance arrangements and to a lesser extent, product purchases. At July 31, 2015, Ferrellgas, L.P. had available letter of credit remaining capacity of $138.8 million. At July 31, 2014 Ferrellgas, L.P. had available letter of credit remaining capacity of $143.7 million. Ferrellgas, L.P. incurred commitment fees of $1.5 million, $1.2 million and $0.9 million in fiscal 2015, 2014 and 2013, respectively.

*Interest rate swaps*

In May 2012, Ferrellgas, L.P. entered into a $140.0 million interest rate swap agreement to hedge against changes in fair value on a portion of its $300.0 million 9.125% fixed rate senior notes due 2017. Ferrellgas, L.P. received 9.125% and paid one-month LIBOR plus 7.96%, on the $140.0 million swapped. In October 2013, this interest rate swap was terminated. As a result, the operating partnership discontinued hedge accounting treatment for this agreement at a cost of $0.2 million, which was classified as loss on extinguishment of debt when the related senior notes were redeemed as discussed above. The operating partnership accounted for this agreement as a fair value hedge. In May 2012, Ferrellgas, L.P. also entered into a $140.0 million interest rate swap agreement to hedge against changes in fair value on a portion of its $500.0 million 6.5% fixed rate senior notes due 2021. Ferrellgas, L.P. receives 6.5% and pays a one-month LIBOR plus 4.715%, on the $140.0 million swapped. The operating partnership accounts for this agreement as a fair value hedge.

In May 2012, Ferrellgas, L.P. entered into a forward interest rate swap agreement to hedge against variability in forecasted interest payments on Ferrellgas, L.P.'s secured credit facility and collateralized note payable borrowings under the accounts receivable securitization facility. From August 2015 through July 2017, Ferrellgas, L.P. will pay 1.95% and receive variable payments based on one-month LIBOR for the notional amount of $175.0 million. From August 2017 through July 2018, Ferrellgas, L.P. will pay 1.95% and receive variable payments based on one-month LIBOR for the notional amount of $100.0 million. Ferrellgas, L.P. accounts for this agreement as a cash flow hedge.

*Covenants*

The senior notes and the credit facility agreement contain various restrictive covenants applicable to Ferrellgas, L.P. and its subsidiaries, the most restrictive relating to additional indebtedness. The only restriction that prohibits Ferrellgas, L.P. from making cash distributions, advances or loans of the minimum quarterly distribution is if a default or event of default exists or would exist upon making such distribution, advances or loans, or if Ferrellgas, L.P. fails to meet certain coverage tests. As of July 31, 2015, Ferrellgas, L.P. is in compliance with all requirements, tests, limitations and covenants related to these debt agreements. At July 31, 2015, Ferrellgas, L.P. has no restricted net assets. Other than the senior notes and the credit facility agreement, there are no other agreements which restrict Ferrellgas, L.P.'s subsidiaries ability to transfer funds to Ferrellgas, L.P. in the form of cash dividends, loans or advances.

The scheduled annual principal payments on long-term debt are as follows:

F-62

Table of Contents

| For the year ending July 31, | Scheduled annual principal payments |
|---|---|
| 2016 | $ 3,652 |
| 2017 | 3,241 |
| 2018 | 1,719 |
| 2019 | 1,204 |
| 2020 | 136,429 |
| Thereafter | 1,475,931 |
| Total | $ 1,622,176 |

### I.  Partners' capital

*Bridger transaction and related distributions and contributions*

During June 2015, in connection with the Bridger Logistics Acquisition, Ferrellgas, L.P. entered into the following transactions with Ferrellgas Partners and the general partner:

- Distributed $418.9 million and $4.3 million in cash to Ferrellgas Partners and the general partner, respectively.
- Received an asset contribution of $822.5 million from Ferrellgas Partners.
- In connection with this non-cash contribution, Ferrellgas, L.P. received a cash contribution of $8.4 million from the general partner.

See Note C - Business combinations for details regarding the acquisition of Bridger.

*Partnership quarterly distributions paid*

Ferrellgas, L.P. has paid the following quarterly distributions.

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Ferrellgas Partners | $ 182,803 | $ 176,623 | $ 175,380 |
| General partner | 1,864 | 1,803 | 1,790 |

On August 20, 2015, Ferrellgas, L.P. declared distributions for the three months ended July 31, 2015 to Ferrellgas Partners and the general partner of $52.0 million and $0.5 million, respectively, which were paid on September 14, 2015.

*Other partnership contributions*

During fiscal 2015, Ferrellgas, L.P. received cash contributions of $42.2 million from Ferrellgas Partners. The proceeds were used to reduce outstanding indebtedness under Ferrellgas, L.P.'s secured credit facility.

During fiscal 2015 and 2014 Ferrellgas, L.P. received asset contributions of $3.0 million and $1.5 million from Ferrellgas Partners in connection with acquisitions of propane distribution assets.

See additional discussions about transactions with related parties in Note L – Transactions with related parties.

*Accumulated other comprehensive income (loss) ("AOCI")*

See Note K – Derivative instruments and hedging activities – for details regarding changes in fair value on risk management financial derivatives recorded within AOCI for the years ended July 31, 2015 and 2014.

*General partner's commitment to maintain its capital account*

Ferrellgas, L.P.'s partnership agreement allows the general partner to have an option to maintain its 1.0101% general partner interest concurrent with the issuance of other additional equity.

During fiscal 2015, the general partner made cash contributions of $0.4 million and non-cash contributions of $0.5 million to Ferrellgas, L.P. to maintain its 1.0101% general partner interest.

BLFG_EDPA2274593

Table of Contents

During fiscal 2014, the general partner made cash contributions of $0.5 million and non-cash contributions of $0.5 million to Ferrellgas, L.P. to maintain its 1.0101% general partner interest.

**J.   Fair value measurements**

*Derivative Financial Instruments*

The following table presents Ferrellgas, L.P.'s financial assets and financial liabilities that are measured at fair value on a recurring basis for each of the fair value hierarchy levels, including both current and noncurrent portions, as of July 31, 2015 and 2014:

| | Asset (Liability) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets and Liabilities (Level 1) | | Significant Other Observable Inputs (Level 2) | | Unobservable Inputs (Level 3) | | Total | |
| **July 31, 2015:** | | | | | | | | |
| Assets: | | | | | | | | |
| Derivative financial instruments: | | | | | | | | |
| Interest rate swap agreements | $ | — | $ | 1,828 | $ | — | $ | 1,828 |
| Commodity derivatives | $ | — | $ | 4,655 | $ | — | $ | 4,655 |
| Liabilities: | | | | | | | | |
| Derivative financial instruments: | | | | | | | | |
| Interest rate swap agreements | $ | — | $ | (4,748) | $ | — | $ | (4,748) |
| Commodity derivatives | $ | — | $ | (42,375) | $ | — | $ | (42,375) |
| Contingent consideration | $ | — | $ | — | $ | (100) | $ | (100) |
| | | | | | | | | |
| **July 31, 2014:** | | | | | | | | |
| Assets: | | | | | | | | |
| Derivative financial instruments: | | | | | | | | |
| Interest rate swap agreements | $ | — | $ | 2,101 | $ | — | $ | 2,101 |
| Commodity derivatives | $ | — | $ | 7,006 | $ | — | $ | 7,006 |
| Liabilities: | | | | | | | | |
| Derivative financial instruments: | | | | | | | | |
| Interest rate swap agreements | $ | — | $ | (5,075) | $ | — | $ | (5,075) |
| Commodity derivatives | $ | — | $ | (83) | $ | — | $ | (83) |
| Contingent consideration | $ | — | $ | — | $ | (6,400) | $ | (6,400) |

The following is a reconciliation of the opening and closing balances for the liability measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the period ended July 31, 2014:

| | Contingent consideration liability | |
|---|---|---|
| **Balance at July 31, 2014** | $ | 6,400 |
| Estimated value at acquisition | | — |
| Increase in fair value related to accretion | | 400 |
| Change in fair value included in earnings | | (6,700) |
| **Balance at July 31, 2015** | $ | 100 |

*Quantitative Information about Level 3 Fair Value Measurements*

F-64

BLFG_EDPA2274594

Table of Contents

| | Fair value at July 31, 2015 | Valuation technique | | Unobservable input | Range | Weighted Average |
|---|---|---|---|---|---|---|
| Contingent consideration liability | $        100 | Discounted cash flow | A. | Weighted average cost of capital (WACC) | N/A | 20% |
| | | | B. | Probability of forecast | 5% - 80% | N/A |

The valuation of the contingent consideration is based on unobservable inputs such as Ferrellgas, L.P.'s weighted average cost of capital and the likelihood of the acquired company meeting earnings thresholds. As of July 31, 2015, fluctuations in these inputs could have the following effect (in thousands):

| | Increase/(decrease) | | | |
|---|---|---|---|---|
| | 5% increase in WACC | 5% decrease in WACC | 10% increase in best earnings forecast probability | 10% decrease in best earnings forecast probability |
| Change in the fair value of contingent consideration | $        (10) | $        — | $        200 | $        (100) |

*Methodology*

The fair values of Ferrellgas, L.P.'s non-exchange traded commodity derivative contracts are based upon indicative price quotations available through brokers, industry price publications or recent market transactions and related market indicators. The fair values of interest rate swap contracts are based upon third-party quotes or indicative values based on recent market transactions.

The fair value of Ferrellgas, L.P.'s contingent consideration for the Sable acquisition is based upon Ferrellgas, L.P.'s estimate of the likelihood that the target EBITDA metric will be met and exceeded and the amount by which it could be exceeded then discounting that value at a risk- and inflation-adjusted rate. The inputs to this model are the likelihood of meeting and exceeding the target EBITDA metric and discount rate. Management and the sellers prepared an operating forecast based on Sable's operating capacities, historical performance, and projected oil and water volumes and set a target EBITDA metric. Management then assessed the likelihood of this target EBITDA metric being achieved and exceeded and assigned probabilities to various potential outcomes. To determine the appropriate discount rate, management used observable inputs such as inflation rates, short and long-term yields for U.S. government securities and our nonperformance risk. Due to the significant unobservable inputs required in this measurement, management determined that the fair value measurement of the contingent consideration liability is level 3 in the fair value hierarchy.

*Other Financial Instruments*

The carrying amounts of other financial instruments included in current assets and current liabilities (except for current maturities of long-term debt) approximate their fair values because of their short-term nature. At July 31, 2015 and July 31, 2014, the estimated fair value of Ferrellgas, L.P.'s long-term debt instruments was $1,700.5 million and $1,215.3 million, respectively. Ferrellgas, L.P. estimates the fair value of long-term debt based on quoted market prices. The fair value of our consolidated debt obligations is a Level 2 valuation based on the observable inputs used for similar liabilities.

Ferrellgas, L.P. has other financial instruments such as trade accounts receivable which could expose it to concentrations of credit risk. The credit risk from trade accounts receivable is limited because of a large customer base which extends across many different U.S. markets.

**K.   Derivative instruments and hedging activities**

Ferrellgas, L.P. is exposed to certain market risks related to its ongoing business operations. These risks include exposure to changing commodity prices as well as fluctuations in interest rates. Ferrellgas, L.P. utilizes derivative instruments to manage its exposure to fluctuations in commodity prices. Of these, the propane commodity derivative instruments are designated as cash flow hedges. All other commodity derivative instruments do not qualify or are not designated as cash flow hedges, therefore, the change in their fair value are recorded currently in earnings. Ferrellgas, L.P. also periodically utilizes derivative instruments to manage its exposure to fluctuations in interest rates, which is discussed in Note H - Debt. Additional information related to derivatives is provided in Note B – Summary of significant accounting policies.

BLFG_EDPA2274595

Table of Contents

*Derivative instruments and hedging activity*

During the year ended July 31, 2015, Ferrellgas, L.P. recognized a $0.2 million loss related to hedge ineffectiveness. During the year ended July 31, 2014, Ferrellgas, L.P. did not recognize any gain or loss in earnings related to hedge ineffectiveness and did not exclude any component of financial derivative contract gains or losses from the assessment of hedge effectiveness related to commodity cash flow hedges.

The following tables provide a summary of the fair value of derivatives within Ferrellgas, L.P.'s consolidated balance sheets as of July 31, 2015 and 2014:

| | July 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | |
| Derivative Instrument | Location | Fair value | Location | Fair value | |
| Derivatives designated as hedging instruments | | | | | |
| Commodity derivatives | Prepaid expenses and other current assets | $ 3,614 | Other current liabilities | $ 27,929 | |
| Commodity derivatives | Other assets, net | 1,041 | Other liabilities | 12,034 | |
| Interest rate swap agreements | Prepaid expenses and other current assets | 1,828 | Other current liabilities | 2,241 | |
| Interest rate swap agreements | Other assets, net | — | Other liabilities | 2,507 | |
| Derivatives not designated as hedging instruments | | | | | |
| Commodity derivatives | Prepaid expenses and other current assets | — | Other current liabilities | 1,280 | |
| Commodity derivatives | Other assets, net | — | Other liabilities | 1,132 | |
| | Total | $ 6,483 | Total | $ 47,123 | |

| | July 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | |
| Derivative Instrument | Location | Fair value | Location | Fair value | |
| Derivatives designated as hedging instruments | | | | | |
| Commodity derivatives | Prepaid expenses and other current assets | $ 5,301 | Other current liabilities | $ 83 | |
| Commodity derivatives | Other assets, net | 1,705 | Other liabilities | — | |
| Interest rate swap agreements | Prepaid expenses and other current assets | 2,101 | Other current liabilities | — | |
| Interest rate swap agreements | Other assets, net | — | Other liabilities | 5,075 | |
| | Total | $ 9,107 | Total | $ 5,158 | |

Ferrellgas, L.P.'s exchange traded commodity derivative contracts require cash margin deposit as collateral for contracts that are in a negative mark-to-market position. These cash margin deposits will be returned if mark-to-market conditions improve or will be applied against cash settlement when the contracts are settled. The following tables provide a summary of cash margin deposit balances as of July 31, 2015 and July 31, 2014, respectively:

BLFG_EDPA2274596

Table of Contents

| | | July 31, 2015 | | | |
|---|---|---|---|---|---|
| | **Assets** | | | **Liabilities** | |
| **Description** | **Location** | **Amount** | **Location** | **Amount** | |
| Margin Deposits | Prepaid expense and other current assets | $ 18,009 | Other current liabilities | $ | 15 |
| | Other assets, net | 11,786 | Other liabilities | | — |
| | | $ 29,795 | | $ | 15 |

| | | July 31, 2014 | | | |
|---|---|---|---|---|---|
| | **Assets** | | | **Liabilities** | |
| **Description** | **Location** | **Amount** | **Location** | **Amount** | |
| Margin Deposits | Prepaid expense and other current assets | $ 156 | Other current liabilities | $ | — |
| | Other assets, net | 189 | Other liabilities | | — |
| | | $ 345 | | $ | |

The following table provides a summary of the effect on Ferrellgas, L.P.'s consolidated statements of comprehensive income for the years ended July 31, 2015 and 2014 due to derivatives designated as fair value hedging instruments:

| | | Amount of Gain Recognized on Derivative | | Amount of Interest Expense Recognized on Fixed-Rated Debt (Related Hedged Item) | |
|---|---|---|---|---|---|
| **Derivative Instrument** | **Location of Gain Recognized on Derivative** | **For the year ended July 31,** | | **For the year ended July 31,** | |
| | | **2015** | **2014** | **2015** | **2014** |
| Interest rate swap agreements | Interest expense | $ 1,892 | $ 2,520 | $ (9,100) | $ (11,985) |

The following tables provide a summary of the effect on Ferrellgas, L.P.'s consolidated statements of comprehensive income for the years ended July 31, 2015 and 2014 due to derivatives designated as cash flow hedging instruments:

| | | For the year ended July 31, 2015 | | |
|---|---|---|---|---|
| **Derivative Instrument** | **Amount of Gain (Loss) Recognized in AOCI** | **Location of Gain (Loss) Reclassified from AOCI into Income** | **Amount of Gain (Loss) Reclassified from AOCI into Income** | |
| Commodity derivatives | $ (70,291) | Cost of product sold- propane and other gas liquids sales | $ (28,059) | |
| Interest rate swap agreements | (3,356) | Interest expense | (199) | |
| | $ (73,647) | | $ (28,258) | |

| | | For the year ended July 31, 2014 | | |
|---|---|---|---|---|
| **Derivative Instrument** | **Amount of Gain (Loss) Recognized in AOCI** | **Location of Gain (Loss) Reclassified from AOCI into Income** | **Amount of Gain (Loss) Reclassified from AOCI into Income** | |
| Commodity derivatives | $ 15,473 | Cost of product sold- propane and other gas liquids sales | $ 10,175 | |
| Interest rate swap agreements | (881) | Interest expense | — | |
| | $ 14,592 | | $ 10,175 | |

F-67

BLFG_EDPA2274597

Table of Contents

The following table provides a summary of the effect on Ferrellgas, L.P.'s consolidated statements of comprehensive income for the year ended July 31, 2015 due to the change in fair value of derivatives not designated as hedging instruments:

| Derivatives Not Designated as Hedging Instruments | For the year ended July 31, 2015 | |
| --- | --- | --- |
| | Amount of Gain (Loss) Recognized in Income | Location of Gain (Loss) Reclassified in Income |
| Commodity derivatives | $ (2,412) | Operating expense |

There was no effect on Ferrellgas, L.P.'s consolidated statements of comprehensive income for the year ended July 31, 2014 due to the change in fair value of derivatives not designated as hedging instruments.

The changes in derivatives included in accumulated other comprehensive income (loss) ("AOCI") for the years ended July 31, 2015, 2014 and 2013 were as follows:

| Gains and losses on derivatives included in AOCI | For the year ended July 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Beginning balance | $ 6,483 | $ 2,066 | $ (12,799) |
| Change in value on risk management commodity derivatives | (70,291) | 15,473 | 2,032 |
| Reclassification of gains and losses of commodity hedges to cost of product sold - propane and other gas liquids sales, net | 28,059 | (10,175) | 10,613 |
| Change in value on risk management interest rate derivatives | (3,356) | (881) | 2,220 |
| Reclassification of gains and losses on interest rate hedges to interest expense | 199 | — | — |
| Ending balance | $ (38,906) | $ 6,483 | $ 2,066 |

Ferrellgas, L.P. expects to reclassify net losses of approximately $24.3 million to earnings during the next 12 months. These net losses are expected to be offset by increased margins on propane sales commitments Ferrellgas, L.P. has with its customers that qualify for the normal purchase normal sales exception.

During the years ended July 31, 2015 and 2014, Ferrellgas, L.P. had no reclassifications to earnings resulting from discontinuance of any cash flow hedges arising from the probability of the original forecasted transactions not occurring within the originally specified period of time defined within the hedging relationship.

As of July 31, 2015, Ferrellgas, L.P. had financial derivative contracts covering 2.9 million barrels of propane that were entered into as cash flow hedges of forward and forecasted purchases of propane.

As of July 31, 2015, Ferrellgas, L.P. had financial derivative contracts covering 0.3 million barrels of diesel and 0.1 million barrels of unleaded gasoline related to fuel hedges in transportation of propane.

*Derivative Financial Instruments Credit Risk*

Ferrellgas, L.P. is exposed to credit loss in the event of nonperformance by counterparties to derivative financial and commodity instruments. Ferrellgas, L.P.'s counterparties principally consist of major energy companies and major U.S. financial institutions. Ferrellgas, L.P. maintains credit policies with regard to its counterparties that it believes reduces its overall credit risk. These policies include evaluating and monitoring its counterparties' financial condition, including their credit ratings, and entering into agreements with counterparties that govern credit limits. Certain of these agreements call for the posting of collateral by the counterparty or by Ferrellgas, L.P. in the forms of letters of credit, parental guarantees or cash. Although Ferrellgas, L.P. has concentrations of credit risk associated with derivative financial instruments held by certain derivative financial instrument counterparties, the maximum amount of loss due to credit risk that, based upon the gross fair values of the derivative financial instruments, Ferrellgas, L.P. would incur no loss if these counterparties that make up the concentration failed to perform according to the terms of their contracts at July 31, 2015.

Ferrellgas, L.P. holds certain derivative contracts that have credit-risk-related contingent features which dictate credit limits based upon the Partnership's debt rating. As of July 31, 2015, a downgrade in the Partnership's debt rating could trigger a reduction in credit limit and would result in an additional collateral requirement of $0.4 million. There were $0.4 million of derivatives with credit-risk-related contingent features in a liability position on July 31, 2015 and Ferrellgas, L.P. had posted no collateral in the normal course of business related to such derivatives.

F-68

BLFG_EDPA2274598

Table of Contents

**L.   Transactions with related parties**

Ferrellgas, L.P. has no employees and is managed and controlled by its general partner. Pursuant to Ferrellgas, L.P.'s partnership agreement, the general partner is entitled to reimbursement for all direct and indirect expenses incurred or payments it makes on behalf of Ferrellgas, L.P., and all other necessary or appropriate expenses allocable to Ferrellgas, L.P. or otherwise reasonably incurred by its general partner in connection with operating Ferrellgas, L.P.'s business. These costs primarily include compensation and benefits paid to employees of the general partner who perform services on Ferrellgas, L.P.'s behalf and are reported in the consolidated statements of earnings as follows:

| | For the year ended July 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | | 2014 | | 2013 |
| Operating expense | $ | 217,742 | $ | 216,657 | $ | 203,859 |
| | | | | | | |
| General and administrative expense | $ | 27,278 | $ | 32,119 | $ | 30,053 |

In connection with the closing of the Bridger Logistics acquisition, Ferrellgas Partners issued common units to Bridger Marketing, LLC (now known as Jamex Marketing, LLC) and entered into a ten-year transportation and logistics agreement (the "TLA") with Jamex Marketing, LLC. As a result of that issuance, Jamex Marketing, LLC owns 9.5% of our outstanding common units; however, neither Jamex Marketing, LLC nor any of its affiliates has any interest in our general partner or its board of directors or any control of our business or policies. Jamex Marketing, LLC, in connection with the TLA, enters into transactions with the operating partnership and its subsidiaries. Bridger provides crude oil logistics services for Jamex Marketing, LLC, including the purchase, sale, transportation and storage of crude oil by truck, terminal and pipeline. During fiscal 2015, Ferrellgas, L.P.'s total revenues and cost of sales from these transactions were $9.4 million and $8.4 million, respectively. The amounts due from and to Jamex Marketing at July 31, 2015, were $4.8 million and $4.2 million, respectively.

See additional discussions about transactions with the general partner and related parties in Note I – Partners' capital.


**M.   Contingencies and commitments**

*Litigation*

Ferrellgas, L.P.'s operations are subject to all operating hazards and risks normally incidental to handling, storing, transporting and otherwise providing for use by consumers of combustible liquids such as propane and crude oil. As a result, at any given time, Ferrellgas, L.P. can be threatened with or named as a defendant in various lawsuits arising in the ordinary course of business. Other than as discussed below, Ferrellgas, L.P. is not a party to any legal proceedings other than various claims and lawsuits arising in the ordinary course of business. It is not possible to determine the ultimate disposition of these matters; however, management is of the opinion that there are no known claims or contingent claims that are reasonably expected to have a material adverse effect on the consolidated financial condition, results of operations and cash flows of Ferrellgas, L.P..

The Federal Trade Commission ("FTC") initiated an investigation into certain practices related to the filling of portable propane cylinders. On March 27, 2014, the FTC filed an administrative complaint alleging that Ferrellgas, L.P. and one of its competitors colluded in 2008 to persuade a customer to accept the cylinder fill reduction from 17 pounds to 15 pounds. The complaint did not seek monetary remedies. Ferrellgas, L.P. reached a settlement with the FTC during the three months ended October 31, 2014 without any financial payment; the settlement has been approved by a vote of the Commission and became final after a public comment period.

Ferrellgas, L.P. has also been named as a defendant, along with a competitor, in putative class action lawsuits filed in multiple jurisdictions. The complaints, filed on behalf of direct and indirect customers of Ferrellgas, L.P.'s tank exchange business, reference the FTC complaint mentioned above. The lawsuits allege that Ferrellgas, L.P. and a competitor coordinated in 2008 to reduce the fill level in barbeque cylinders and combined to persuade a common customer to accept that fill reduction, resulting in increased cylinder costs to retailers and end-user customers in violation of federal and certain state antitrust laws. The lawsuits seek treble damages, attorneys' fees, injunctive relief and costs on behalf of the putative class. These lawsuits have been consolidated into one case by a multidistrict litigation panel. Ferrellgas, L.P. believes it has strong defenses to the claims and intends to vigorously defend against the consolidated case. Ferrellgas, L.P. does not believe loss is probable or reasonably estimable at this time related to the putative class action lawsuit.

F-69

BLFG_EDPA2274599

Table of Contents

In addition, putative class action cases have been filed in California relating to residual propane remaining in the tank after use. Ferrellgas, L.P. believes it has strong defenses to the claims and intends to vigorously defend against the consolidated case.  Ferrellgas, L.P. does not believe loss is probable or reasonably estimable at this time related to the putative class action lawsuit.

Ferrellgas, L.P. was named as a defendant in a putative class action lawsuit filed in the United States District Court in Kansas. The complaint was the subject of a motion to dismiss which was granted, in part, in August 2011. The surviving claims alleged breach of contract and breach of the implied duty of good faith and fair dealing, both of which allegedly arise from the existence of an oral contract for continuous propane service. Ferrellgas, L.P. recently prevailed in a trial to determine whether the claims were required to be arbitrated, resulting in a dismissal of this case. There is no probable or reasonably estimable loss relating to this matter.

As of July 31, 2015, Bridger and Murex, LLC were arbitrating a dispute with respect to a sublease of approximately 220 rail cars by Bridger, which arbitration arose out of an action between Bridger and Murex in the 116th Judicial District Court of Dallas County, Texas, originally brought in April 2014. In August 2015, Ferrellgas, L.P. and Murex settled all claims subject to such dispute, with Ferrellgas, L.P. paying $10.4 million to Murex in such settlement. The liability was considered in Ferrellgas, L.P.'s acquisition method of accounting for Bridger.

*Long-term debt-related commitments*

Ferrellgas, L.P. has long and short-term payment obligations under agreements such as senior notes and its credit facility. See Note H – Debt – for a description of these debt obligations and a schedule of future maturities.

*Operating lease commitments and buyouts*

Ferrellgas, L.P. leases certain property, plant and equipment under non-cancelable and cancelable operating leases. Amounts shown in the table below represent minimum lease payment obligations under Ferrellgas, L.P.'s third-party operating leases with terms in excess of one year for the periods indicated. These arrangements include the leasing of transportation equipment, property, computer equipment and propane tanks. Ferrellgas, L.P. accounts for these arrangements as operating leases.

Ferrellgas, L.P. is required to recognize a liability for the fair value of guarantees. The only material guarantees Ferrellgas, L.P. has are associated with residual value guarantees of operating leases. Most of the operating leases involving Ferrellgas, L.P.'s transportation equipment contain residual value guarantees. These transportation equipment lease arrangements are scheduled to expire over the next 7 fiscal years. Most of these arrangements provide that the fair value of the equipment will equal or exceed a guaranteed amount, or Ferrellgas, L.P. will be required to pay the lessor the difference. The fair value of these residual value guarantees was $1.5 million as of July 31, 2015. Although the fair values of the underlying equipment at the end of the lease terms have historically exceeded these guaranteed amounts, the maximum potential amount of aggregate future payments Ferrellgas, L.P. could be required to make under these leasing arrangements, assuming the equipment is worthless at the end of the lease term, was $7.0 million as of July 31, 2015. Ferrellgas, L.P. does not know of any event, demand, commitment, trend or uncertainty that would result in a material change to these arrangements.

Operating lease buyouts represent the maximum amount Ferrellgas, L.P. would pay if it were to exercise its right to buyout the assets at the end of their lease term.

The following table summarizes Ferrellgas, L.P.'s contractual operating lease commitments and buyout obligations as of July 31, 2015:

| | Future minimum rental and buyout amounts by fiscal year | | | | | | | | | | | |
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | Thereafter | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Operating lease obligations | $ | 39,999 | $ | 31,497 | $ | 25,599 | $ | 20,084 | $ | 14,402 | $ | 16,078 |
| | | | | | | | | | | | | |
| Operating lease buyouts | $ | 2,738 | $ | 1,816 | $ | 3,217 | $ | 3,011 | $ | 2,693 | $ | 9,355 |

Certain property and equipment is leased under non-cancelable operating leases, which require fixed monthly rental payments and which expire at various dates through 2026. Rental expense under these leases totaled $45.0 million, $35.6 million and $32.2 million for fiscal 2015, 2014 and 2013, respectively.

**N.  Employee benefits**

BLFG_EDPA2274600

Table of Contents

Ferrellgas, L.P. has no employees and is managed and controlled by its general partner. Ferrellgas, L.P. assumes all liabilities, which include specific liabilities related to the following employee benefit plans for the benefit of the officers and employees of the general partner.

Ferrell Companies makes contributions to the ESOT, which causes a portion of the shares of Ferrell Companies owned by the ESOT to be allocated to employees' accounts over time. The allocation of Ferrell Companies' shares to employee accounts causes a non-cash compensation charge to be incurred by Ferrellgas, L.P., equivalent to the fair value of such shares allocated. This non-cash compensation charge is reported separately in Ferrellgas, L.P.'s consolidated statements of earnings and thus excluded from operating and general and administrative expenses. The non-cash compensation charges were $24.7 million, $21.8 million and $15.8 million during fiscal 2015, 2014 and 2013, respectively. Ferrellgas, L.P. is not obligated to fund or make contributions to the ESOT.

The general partner and its parent, Ferrell Companies, have a defined contribution profit-sharing plan which includes both profit sharing and matching contribution features. The plan covers substantially all full time employees. The plan, which qualifies under section 401(k) of the Internal Revenue Code, also provides for matching contributions under a cash or deferred arrangement based upon participant salaries and employee contributions to the plan. Matching contributions for fiscal 2015, 2014 and 2013 were $3.9 million, $3.6 million and $3.0 million, respectively.

The general partner has a defined benefit plan that provides participants who were covered under a previously terminated plan with a guaranteed retirement benefit at least equal to the benefit they would have received under the terminated plan. Until July 31, 1999, benefits under the terminated plan were determined by years of credited service and salary levels. As of July 31, 1999, years of credited service and salary levels were frozen. The general partner's funding policy for this plan is to contribute amounts deductible for Federal income tax purposes and invest the plan assets primarily in corporate stocks and bonds, U.S. Treasury bonds and short-term cash investments. During fiscal 2015, 2014 and 2013, other comprehensive income and other liabilities were adjusted by $(0.2) million, $0.3 million and $0.3 million, respectively.

## O.  Segment reporting

Ferrellgas, L.P. has two primary operations: propane and related equipment sales and midstream operations. These two operations result in three reportable operating segments: propane and related equipment sales, midstream operations - water solutions and midstream operations - crude oil logistics.

During June 2015, subsequent to an acquisition, Ferrellgas, L.P. formed a new midstream operation - crude oil logistics segment. During May 2014, subsequent to an acquisition, Ferrellgas, L.P. formed a new midstream operation - water solutions segment.

The chief operating decision maker evaluates the operating segments using an Adjusted EBITDA performance measure which is based on earnings before income tax expense, interest expense, depreciation and amortization expense, loss on extinguishment of debt, non-cash employee stock ownership plan compensation charge, non-cash stock-based compensation charge, loss on disposal of assets, other income (expense), net, change in fair value of contingent consideration, litigation accrual and related legal fees associated with a class action lawsuit, acquisition and transition expenses and unrealized (non-cash) gain on changes in fair value of derivatives not designated as hedging instruments. This performance measure is not a GAAP measure, however, the components are computed using amounts that are determined in accordance with GAAP. A reconciliation of this performance measure to net earnings, which is its nearest comparable GAAP measure, is included in the tables below. In management's evaluation of performance, certain costs, such as compensation for administrative staff and executive management, are not allocated by segment and, accordingly, the following reportable segment results do not include such unallocated costs. The accounting policies of the operating segments are otherwise the same as those described in the summary of significant accounting policies in Note B.

Assets reported within a segment are those assets that can be identified to a segment and primarily consist of trade receivables, property, plant and equipment, inventories, identifiable intangible assets and goodwill. Cash, certain prepaid assets and other assets are not allocated to segments. Although Ferrellgas, L.P. can and does identify long-lived assets such as property, plant and equipment and identifiable intangible assets to reportable segments, Ferrellgas, L.P. does not allocate the related depreciation and amortization to the segment as management evaluates segment performance exclusive of these non-cash charges.

The propane and related equipment sales segment primarily includes the distribution and sale of propane and related equipment and supplies with concentrations in the Midwest, Southeast, Southwest and Northwest regions of the United States. Sales from propane distribution are generated principally from transporting propane purchased from third parties to propane distribution locations and then to tanks on customers' premises or to portable propane tanks delivered to nationwide and local retailers.

F-71

BLFG_EDPA2274601

Table of Contents

Sales from portable tank exchanges, nationally branded under the name Blue Rhino, are generated through a network of independent and partnership-owned distribution outlets.

The midstream operations - crude oil logistics segment primarily includes a domestic crude oil transportation and logistics provider with an integrated portfolio of midstream assets. These assets connect crude oil production in prolific unconventional resource plays to downstream markets. Bridger's truck, pipeline terminal, pipeline, rail and maritime assets form a comprehensive, fee-for-service business model, and substantially all of its cash flow is expected to be generated from fee-based commercial agreements. Bridger's fee-based business model generates income by providing crude oil transportation and logistics services on behalf of producers and end users of crude oil.

The midstream operations - water solutions segment primarily includes salt water disposal wells that are a critical component of the oil and natural gas well drilling industry. Oil and gas wells generate significant volumes of salt water known as "flowback" and "production" water. Flowback is a water based solution that flows back to the surface during and after the completion of the hydraulic fracturing ("fracking") process whereby large volumes of water, sand and chemicals are injected under high pressures into rock formations to stimulate production. Production water is salt water from underground formations that are brought to the surface during the normal course of oil or gas production. In the oil and gas fields Ferrellgas, L.P. services, these volumes of water are transported by truck away from the fields to salt water disposal wells where it is injected into underground geologic formations using high-pressure pumps. Revenue is derived from fees charged to customers to dispose of salt water at the disposal facilities and crude oil sales from the skimming oil process.

Prior to the Sable acquisition in May 2014, Ferrellgas, L.P. managed and evaluated its operations as a single reportable segment. As the current three reportable segment structure is the result of both the Bridger Logistics Acquisition completed in June 2015 and the Sable acquisition completed during May 2014, comparative historical segment information for fiscal 2013 does not exist.

Following is a summary of segment information for the years ended July 31, 2015 and 2014.

| | Year Ended July 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water Solutions | Corporate and other | Total |
| Segment revenues | $ 1,917,201 | $ 81,512 | $ 25,677 | $ — | $ 2,024,390 |
| Direct costs (1) | 1,591,300 | 72,929 | 20,141 | 39,732 | 1,724,102 |
| Adjusted EBITDA | $ 325,901 | $ 8,583 | $ 5,536 | $ (39,732) | $ 300,288 |

| | Year Ended July 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water Solutions | Corporate and other | Total |
| Segment revenues | $ 2,398,425 | $ — | $ 7,435 | $ — | $ 2,405,860 |
| Direct costs (1) | 2,067,156 | — | 3,997 | 46,582 | 2,117,735 |
| Adjusted EBITDA | $ 331,269 | $ — | $ 3,438 | $ (46,582) | $ 288,125 |

(1) Direct costs are comprised of "cost of sales-propane and other gas liquids sales", "cost of sales-other", "cost of sales-midstream operations", "operating expense", "general and administrative expense", and "equipment lease expense" less "non-cash stock and unit-based compensation charge", "change in fair value of contingent consideration", "litigation accrual and related legal fees associated with a class action lawsuit", "acquisition and transition expenses" and "unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments".

F-72

BLFG_EDPA2274602

Table of Contents

Following is a reconciliation of Ferrellgas, L.P.'s total segment performance measure to consolidated net earnings:

| | Year Ended July 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net earnings | $ 46,427 | $ 49,907 |
| Income tax expense (benefit) | (384) | 2,471 |
| Interest expense | 84,227 | 70,332 |
| Depreciation and amortization expense | 98,579 | 84,202 |
| EBITDA | 228,849 | 206,912 |
| Loss on extinguishment of debt | — | 21,202 |
| Non-cash employee stock ownership plan compensation charge | 24,713 | 21,789 |
| Non-cash stock and unit-based compensation charge | 25,982 | 24,508 |
| Loss on disposal of assets | 7,099 | 6,486 |
| Other expense, net | 354 | 479 |
| Change in fair value of contingent consideration | (6,300) | 5,000 |
| Litigation accrual and related legal fees associated with a class action lawsuit | 806 | 1,749 |
| Acquisition and transition expenses | 16,373 | — |
| Unrealized (non-cash) loss on changes in fair value of derivatives not designated as hedging instruments | 2,412 | — |
| Adjusted EBITDA | $ 300,288 | $ 288,125 |

Following are total assets by segment:

| | July 31, 2015 | July 31, 2014 |
| --- | --- | --- |
| **Assets** | | |
| Propane and related equipment sales | $ 1,291,737 | $ 1,400,603 |
| Midstream operations - crude oil logistics | 917,325 | — |
| Midstream operations - water solutions | 205,358 | 136,116 |
| Corporate and unallocated | 45,542 | 33,114 |
| Total consolidated assets | $ 2,459,962 | $ 1,569,833 |

F-73

BLFG_EDPA2274603

Table of Contents

Following are capital expenditures by segment (unaudited):

| | Year Ended July 31, 2015 | | | | |
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water solutions | Corporate and other | Total |
|---|---|---|---|---|---|
| **Capital expenditures:** | | | | | |
| Maintenance | $ 16,020 | $ — | $ 1,072 | $ 2,357 | $ 19,449 |
| Growth | 36,958 | 64 | 13,366 | — | 50,388 |
| Total | $ 52,978 | $ 64 | $ 14,438 | $ 2,357 | $ 69,837 |

| | Year Ended July 31, 2014 | | | | |
| | Propane and related equipment sales | Midstream operations - Crude oil logistics | Midstream operations - Water solutions | Corporate & other | Total |
|---|---|---|---|---|---|
| **Capital expenditures:** | | | | | |
| Maintenance | $ 14,682 | $ — | $ 181 | $ 3,275 | $ 18,138 |
| Growth | 30,501 | — | 1,715 | 627 | 32,843 |
| Total | $ 45,183 | $ — | $ 1,896 | $ 3,902 | $ 50,981 |

**P.   Quarterly data (unaudited)**

The following summarized unaudited quarterly data includes all adjustments (consisting only of normal recurring adjustments, with the exception of those items indicated below), which Ferrellgas, L.P. considers necessary for a fair presentation. Due to the seasonality of the propane distribution business, first and fourth quarter Revenues, gross margin from propane and other gas liquids sales and Net earnings are consistently less than the second and third quarter results. Other factors affecting the results of operations include competitive conditions, demand for product, timing of acquisitions, variations in the weather and fluctuations in propane prices.

| For the year ended July 31, 2015 | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|
| Revenues | $ 443,355 | $ 665,973 | $ 532,551 | $ 382,511 |
| Gross margin from propane and other gas liquids sales (a) | 129,547 | 230,175 | 191,983 | 128,087 |
| Gross margin from midstream operations (b) | $ 5,948 | $ 4,934 | $ 3,416 | $ 16,301 |
| Net earnings (loss) | $ (29,137) | $ 90,409 | $ 40,404 | $ (55,249) |

| For the year ended July 31, 2014 | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|
| Revenues | $ 415,030 | $ 869,683 | $ 722,117 | $ 399,030 |
| Gross margin from propane and other gas liquids sales (a) | 123,469 | 237,940 | 202,861 | 126,685 |
| Gross margin from midstream operations (b) | $ — | $ — | $ — | $ 5,465 |
| Net earnings (loss) | $ (21,138) | $ 65,171 | $ 50,053 | $ (44,179) |

(a) Gross margin from "Propane and other gas liquids sales" represents "Revenues - propane and other gas liquids sales" less "Cost of sales – propane and other gas liquids sales."

(b) Gross margin from "Midstream operations" represents "Revenues - midstream operations" less "Cost of sales - midstream operations."

**Q. Subsequent events**

F-74

Table of Contents

Ferrellgas, L.P. has evaluated events and transactions occurring after the balance sheet date through the date Ferrellgas, L.P.'s consolidated financial statements were issued and concluded that there were no events or transactions occurring during this period that required recognition or disclosure in its financial statements.

F-75

BLFG_EDPA2274605

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors
Ferrellgas Finance Corp.

We have audited the accompanying balance sheets of Ferrellgas Finance Corp. (a Delaware corporation) (the "Company") as of July 31, 2015 and 2014, and the related statements of earnings, stockholders' equity, and cash flows for each of the three years in the period ended July 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ferrellgas Finance Corp. as of July 31, 2015 and 2014, and the results of its operations and its cash flows for each of the three years in the period ended July 31, 2015 in conformity with accounting principles generally accepted in the United States of America.

/s/ GRANT THORNTON LLP

Kansas City, Missouri
September 29, 2015

BLFG_EDPA2274606

Table of Contents

**FERRELLGAS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas, L.P.)**
**BALANCE SHEETS**

| | July 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| **ASSETS** | | |
| Cash | $ 1,100 | $ 1,100 |
| **Total assets** | $ 1,100 | $ 1,100 |
| | | |
| **Contingencies and commitments (Note B)** | | |
| | | |
| **STOCKHOLDER'S EQUITY** | | |
| | | |
| Common stock, $1.00 par value; 2,000 shares authorized; 1,000 shares issued and outstanding | $ 1,000 | $ 1,000 |
| | | |
| Additional paid in capital | 53,267 | 49,159 |
| | | |
| Accumulated deficit | (53,167) | (49,059) |
| **Total stockholder's equity** | $ 1,100 | $ 1,100 |

See notes to financial statements.

**FERRELLGAS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas, L.P.)**
**STATEMENTS OF EARNINGS**

| | For the year ended July 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| General and administrative expense | $ 4,108 | $ 5,289 | $ 4,999 |
| | | | |
| **Net loss** | $ (4,108) | $ (5,289) | $ (4,999) |

See notes to financial statements.

F-77

BLFG_EDPA2274607

Table of Contents

**FERRELLGAS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas, L.P.)**
**STATEMENTS OF STOCKHOLDER'S EQUITY**

| | Common stock | | | Additional paid in capital | | Accumulated deficit | | Total stockholder's equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | | Dollars | | | | | |
| **July 31, 2012** | 1,000 | $ | 1,000 | $ | 38,871 | $ (38,771) | $ | 1,100 |
| Capital contribution | — | | — | | 4,999 | — | | 4,999 |
| Net loss | — | | — | | | (4,999) | | (4,999) |
| **July 31, 2013** | 1,000 | | 1,000 | | 43,870 | (43,770) | | 1,100 |
| Capital contribution | — | | — | | 5,289 | — | | 5,289 |
| Net loss | — | | — | | | (5,289) | | (5,289) |
| **July 31, 2014** | 1,000 | | 1,000 | | 49,159 | (49,059) | | 1,100 |
| Capital contribution | — | | — | | 4,108 | — | | 4,108 |
| Net loss | — | | — | | | (4,108) | | (4,108) |
| **July 31, 2015** | 1,000 | $ | 1,000 | $ | 53,267 | $ (53,167) | $ | 1,100 |

See notes to financial statements.

**FERRELLGAS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas, L.P.)**
**STATEMENTS OF CASH FLOWS**

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (4,108) | $ (5,289) | $ (4,999) |
| Cash used in operating activities | (4,108) | (5,289) | (4,999) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Capital contribution | 4,108 | 5,289 | 4,999 |
| Cash provided by financing activities | 4,108 | 5,289 | 4,999 |
| | | | |
| Change in cash | — | — | — |
| Cash - beginning of year | 1,100 | 1,100 | 1,100 |
| **Cash - end of year** | $ 1,100 | $ 1,100 | $ 1,100 |

F-78

BLFG_EDPA2274608

Table of Contents

**FERRELLGAS FINANCE CORP.**
**(a wholly-owned subsidiary of Ferrellgas, L.P.)**

**NOTES TO FINANCIAL STATEMENTS**

**A.   Formation**

Ferrellgas Finance Corp. (the "Finance Corp."), a Delaware corporation, was formed on January 16, 2003 and is a wholly-owned subsidiary of Ferrellgas, L.P. (the "Partnership").

The Partnership contributed $1,000 to the Finance Corp. on January 24, 2003 in exchange for 1,000 shares of common stock.

The Finance Corp. has nominal assets, does not conduct any operations and has no employees.

**B.   Contingencies and commitments**

The Finance Corp. serves as co-issuer and co-obligor for debt securities of the Partnership.

The senior notes agreements contain various restrictive covenants applicable to the Partnership and its subsidiaries, the most restrictive relating to additional indebtedness. As of July 31, 2015, the Partnership is in compliance with all requirements, tests, limitations and covenants related to these debt agreements.

**C.   Income taxes**

Income taxes have been computed separately as the Finance Corp. files its own income tax return. Deferred income taxes are provided as a result of temporary differences between financial and tax reporting using the asset/liability method. Deferred income taxes are recognized for the tax consequences of temporary differences between the financial statement carrying amounts and tax basis of existing assets and liabilities.

Due to the inability of the Finance Corp. to utilize the deferred tax benefit of $20,701 associated with the net operating loss carryforward of $53,217, which expires at various dates through July 31, 2035, a valuation allowance has been provided on the full amount of the deferred tax asset. Accordingly, there is no net deferred tax benefit for fiscal 2015, 2014 or 2013, and there is no net deferred tax asset as of July 31, 2015 and 2014.

**D.   Subsequent events**

The Finance Corp. has evaluated events and transactions occurring after the balance sheet date through the date the Finance Corp.'s consolidated financial statements were issued, and concluded that there were no events or transactions occurring during this period that required recognition or disclosure in its financial statements.

BLFG_EDPA2274609

Table of Contents

### INDEX TO FINANCIAL STATEMENT SCHEDULES

|  |  | **Page** |
|---|---|---|
| **Ferrellgas Partners, L.P. and Subsidiaries** |  |  |
| Schedule I | Parent Only Balance Sheets as of July 31, 2015 and 2014 and Statements of Earnings and Cash Flows for the years ended July 31, 2015, 2014 and 2013 | S-2 |
| Schedule II | Valuation and Qualifying Accounts for the years ended July 31, 2015, 2014 and 2013 | S-4 |
|  |  |  |
| **Ferrellgas, L.P. and Subsidiaries** |  |  |
| Schedule II | Valuation and Qualifying Accounts for the years ended July 31, 2015, 2014 and 2013 | S-5 |

S-1

BLFG_EDPA2274610

Table of Contents

Schedule 1

**FERRELLGAS PARTNERS, L.P.**
**PARENT ONLY**
**BALANCE SHEETS**
**(in thousands, except unit data)**

| | July 31, | |
|---|---|---|
| | **2015** | **2014** |
| **ASSETS** | | |
| Cash and cash equivalents | $ 2,052 | $ 6 |
| Prepaid expenses and other current assets | 74 | — |
| Investment in Ferrellgas, L.P. | 386,171 | 69,205 |
| Other assets, net | 1,968 | 2,439 |
| **Total assets** | $ 390,265 | $ 71,650 |
| | | |
| **LIABILITIES AND PARTNERS' CAPITAL (DEFICIT)** | | |
| Other current liabilities | $ 4,511 | $ 2,016 |
| Long-term debt | 182,000 | 182,000 |
| | | |
| **Partners' capital (deficit)** | | |
| Common unitholders (100,376,789 and 81,228,237 units outstanding at 2015 and 2014, respectively) | 299,730 | (57,893) |
| General partner (1,013,907 and 820,487 units outstanding at 2015 and 2014, respectively) | (57,042) | (60,654) |
| Accumulated other comprehensive income (loss) | (38,934) | 6,181 |
| **Total Ferrellgas Partners, L.P. partners' capital (deficit)** | 203,754 | (112,366) |
| **Total liabilities and partners' capital (deficit)** | $ 390,265 | $ 71,650 |

**FERRELLGAS PARTNERS, L.P.**
**PARENT ONLY**
**STATEMENTS OF EARNINGS**
**(in thousands)**

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Equity in earnings of Ferrellgas, L.P. | $ 45,958 | $ 49,403 | $ 72,634 |
| Operating expense | 104 | 23 | (20) |
| | | | |
| **Operating income** | 45,854 | 49,426 | 72,614 |
| | | | |
| Interest expense | (16,169) | (16,170) | (16,171) |
| Income tax expense | (69) | (45) | (17) |
| Other income | 4 | 0 | 0 |
| **Net earnings** | $ 29,620 | $ 33,211 | $ 56,426 |

S-2

BLFG_EDPA2274611

Table of Contents

**FERRELLGAS PARTNERS, L.P.**
**PARENT ONLY**
**STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | For the year ended July 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Cash flows from operating activities:** | | | |
| Net earnings attributable to Ferrellgas Partners, L.P. | $ 29,620 | $ 33,211 | $ 56,426 |
| Reconciliation of net earnings to net cash used in operating activities: | | | |
| Other | 2,922 | 426 | 383 |
| Equity in earnings of Ferrellgas, L.P. | (45,958) | (49,403) | (72,634) |
| Net cash used in operating activities | (13,416) | (15,766) | (15,825) |
| | | | |
| **Cash flows from investing activities:** | | | |
| Business acquisitions, net of cash acquired | (562,500) | — | — |
| Distributions received from Ferrellgas, L.P. | 601,736 | 176,623 | 175,380 |
| Cash contributed to Ferrellgas, L.P. | (42,224) | (51,105) | (800) |
| Net cash provided by (used in) investing activities | (2,988) | 125,518 | 174,580 |
| | | | |
| **Cash flows from financing activities:** | | | |
| Distributions paid to common and general partner unitholders | (167,105) | (160,925) | (159,682) |
| Cash paid for financing costs | — | (94) | — |
| Issuance of common units (net of issuance costs of $648, $0, and $0 for the years ended July 31, 2015, 2014, and 2013 | 181,008 | 50,000 | — |
| Proceeds from exercise of common unit options | 91 | 605 | 864 |
| Cash contribution from general partners in connection with common unit issuances | 4,456 | 511 | 9 |
| Net cash provided by (used in) financing activities | 18,450 | (109,903) | (158,809) |
| | | | |
| Increase (decrease) in cash and cash equivalents | 2,046 | (151) | (54) |
| Cash and cash equivalents - beginning of year | 6 | 157 | 211 |
| **Cash and cash equivalents - end of year** | $ 2,052 | $ 6 | $ 157 |

S-3

BLFG_EDPA2274612

Table of Contents

Schedule II

**FERRELLGAS PARTNERS, L.P. AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS**
**(in thousands)**

| Description | Balance at beginning of period | | Charged to cost and expenses | | Other | | | Balance at end of period |
|---|---|---|---|---|---|---|---|---|
| **Year ended July 31, 2015** | | | | | | | | |
| Allowance for doubtful accounts | $ | 4,756 | $ | 3,419 | $ | (3,359) | (1) | $ 4,816 |
| **Year ended July 31, 2014** | | | | | | | | |
| Allowance for doubtful accounts | $ | 3,607 | $ | 3,419 | $ | (2,270) | (1) | $ 4,756 |
| **Year ended July 31, 2013** | | | | | | | | |
| Allowance for doubtful accounts | $ | 3,812 | $ | 2,066 | $ | (2,271) | (1) | $ 3,607 |

(1)  Uncollectible accounts written off, net of recoveries.

S-4

BLFG_EDPA2274613

Table of Contents

Schedule II

**FERRELLGAS, L.P. AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS**
**(in thousands)**

| Description | Balance at beginning of period | | Charged to cost and expenses | | Other | | | Balance at end of period |
|---|---|---|---|---|---|---|---|---|
| **Year ended July 31, 2015** | | | | | | | | |
| Allowance for doubtful accounts | $ | 4,756 | $ | 3,419 | $ | (3,359) | (1) | $ | 4,816 |
| **Year ended July 31, 2014** | | | | | | | | |
| Allowance for doubtful accounts | $ | 3,607 | $ | 3,419 | $ | (2,270) | (1) | $ | 4,756 |
| **Year ended July 31, 2013** | | | | | | | | |
| Allowance for doubtful accounts | $ | 3,812 | $ | 2,066 | $ | (2,271) | (1) | $ | 3,607 |

(1)  Uncollectible accounts written off, net of recoveries.

S-5

BLFG_EDPA2274614

Table of Contents

The exhibits listed below are furnished as part of this Annual Report on Form 10-K. Exhibits required by Item 601 of Regulation S-K of the Securities Act, which are not listed, are not applicable.

| | Exhibit Number | Description |
|---|---|---|
| + | 2.1 | Purchase and Sale Agreement, dated May 29, 2015, by and between Ferrellgas Partners, L.P. and Bridger, L.L.C. Incorporated by reference to Exhibit 2.1 to our Current Report on Form 8-K filed June 1, 2015. |
| * | 3.1 | Certificate of Limited Partnership of Ferrellgas Partners, L.P. dated as of April 19, 1994. |
| * | 3.2 | Amendment to the Certificate of Limited Partnership of Ferrellgas Partners, L.P. dated as of April 21, 1994. |
| | 3.3 | Fourth Amended and Restated Agreement of Limited Partnership of Ferrellgas Partners, L.P. dated as of February 18, 2003. Incorporated by reference to Exhibit 3.1 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.4 | First Amendment to Fourth Amended and Restated Agreement of Limited Partnership of Ferrellgas Partners, L.P. dated as of March 8, 2005. Incorporated by reference to Exhibit 3.2 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.5 | Second Amendment to Fourth Amended and Restated Agreement of Limited Partnership of Ferrellgas Partners, L.P. dated as of June 29, 2005. Incorporated by reference to Exhibit 3.3 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.6 | Third Amendment to Fourth Amended and Restated Agreement of Limited Partnership of Ferrellgas Partners, L.P. dated as of October 11, 2006. Incorporated by reference to Exhibit 3.4 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.7 | Certificate of Incorporation of Ferrellgas Partners Finance Corp. filed with the Delaware Division of Corporations on March 28, 1996. Incorporated by reference to Exhibit 3.6 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.8 | Bylaws of Ferrellgas Partners Finance Corp. adopted as of April 1, 1996. Incorporated by reference to Exhibit 3.7 to our registration statement on Form S-3 filed March 6, 2009. |
| * | 3.9 | Certificate of Limited Partnership of Ferrellgas, L.P. dated as of April 22, 1994. |
| | 3.10 | Third Amended and Restated Agreement of Limited Partnership of Ferrellgas, L.P. dated as of April 7, 2004. Incorporated by reference to Exhibit 3.5 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.11 | Certificate of Incorporation of Ferrellgas Finance Corp. filed with the Delaware Division of Corporations on January 16, 2003. Incorporated by reference to Exhibit 3.8 to our registration statement on Form S-3 filed March 6, 2009. |
| | 3.12 | Bylaws of Ferrellgas Finance Corp. adopted as of January 16, 2003. Incorporated by reference to Exhibit 3.9 to our registration statement on Form S-3 filed March 6, 2009. |
| | 4.1 | Specimen Certificate evidencing Common Units representing Limited Partner Interests. Incorporated by reference to Exhibit A of Exhibit 3.1 to our registration statement on Form S-3 filed March 6, 2009. |
| | 4.2 | Indenture dated as of November 4, 2013 with form of Note attached, by and among Ferrellgas, L.P., Ferrellgas Finance Corp. and U.S. Bank National Association, as trustee, relating to $475 million aggregate amount of the Registrant's 6 3/4% Senior Notes due 2022. Incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K filed November 5, 2013. |
| | 4.3 | Indenture dated as of April 13, 2010, among Ferrellgas Partners, L.P., Ferrellgas Partners Finance Corp. and U.S. Bank National Association, as trustee, relating to $280 million aggregate amount of the Registrant's 8 5/8% Senior Notes due 2020. Incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K filed April 13, 2010. |
| | 4.4 | First Supplemental Indenture dated as of April 13, 2010, with form of Note attached, by and among Ferrellgas Partners, L.P., Ferrellgas Partners Finance Corp. and U.S. Bank National Association, as trustee, relating to $280 million aggregate amount of the Registrant's 8 5/8% Senior Notes due 2020. Incorporated by reference to Exhibit 4.2 to our Current Report on Form 8-K April 13, 2010. |
| | 4.5 | Indenture dated as of November 24, 2010, by and among Ferrellgas Partners, L.P., Ferrellgas Partners Finance Corp. and U.S. Bank National Association, as trustee, relating to $500 million aggregate amount of the Registrant's 6 1/2% Senior Notes due 2021. Incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K filed November 30, 2010. |
| | 4.6 | Registration Rights Agreement dated as of December 17, 1999, by and between Ferrellgas Partners, L.P. and Williams Natural Gas Liquids, Inc. Incorporated by reference to Exhibit 4.6 to our Annual Report on Form 10-K filed September 29, 2014. |
| | 4.7 | First Amendment to Registration Rights Agreement dated as of March 14, 2000, by and between Ferrellgas Partners, L.P. and Williams Natural Gas Liquids, Inc. Incorporated by reference to Exhibit 4.7 to our Annual Report on Form 10-K filed September 29, 2014. |
| | 4.8 | Second Amendment to Registration Rights Agreement dated as of April 6, 2001, by and between Ferrellgas Partners, L.P. and The Williams Companies, Inc. Incorporated by reference to Exhibit 4.8 to our Annual Report on Form 10-K filed September 29, 2014. |
| | 4.9 | Third Amendment to Registration Rights Agreement dated as of June 29, 2005, by and between Ferrellgas Partners, L.P. and JEF Capital Management, Inc. Incorporated by reference to Exhibit 4.13 to our Quarterly Report on Form 10-Q filed June 9, 2010. |
| | 4.10 | Indenture, dated June 8, 2015, by and among Ferrellgas, L.P., Ferrellgas, Finance Corp. the subsidiary guarantors party thereto, and U.S. Bank National Association, as trustee, relating to $500 million aggregate amount of the Registrant's 6 3/4% Senior Notes due 2023. Incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K filed June 8, 2015. |
| | 4.11 | Registration Rights Agreement, dated as of June 8, 2015, by and among Ferrellgas, L.P., Ferrellgas Finance Corp. and J.P. Morgan Securities L.L.C., as representative of the several initial purchasers. Incorporated by reference to Exhibit 4.2 to our Current Report on Form 8-K filed June 8, 2015 |
| | 4.12 | Registration Rights Agreement, dated as of June 24, 2015 among Ferrellgas Partners, L.P., Jamex Marketing, LLC, Rios Holdings, Inc. and Gamboa Enterprises, LLC. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed June 24, 2015. |
| | 10.1 | Credit Agreement dated as of November 2, 2009, among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto. Incorporated by reference to Exhibit 10.1 to our Annual Report on Form 10-K filed September 29, 2014. |
| | 10.2 | Amendment No. 1 to Credit Agreement dated as of September 23, 2011, by and among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto. Incorporated by reference to Exhibit 10.2 to our Annual Report on Form 10-K filed September 26, 2011. |

BLFG_EDPA2274615

E-1

BLFG_EDPA2274616

[Table of Contents](#)

| | | |
|---|---|---|
| | 10.3 | Amendment No. 2 to Credit Agreement dated as of October 21, 2013, by and among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed October 23, 2013. |
| | 10.4 | Amendment No. 3 to Credit Agreement dated as of June 6, 2014, by and among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed June 9, 2014. |
| | 10.5 | Amendment No. 4 to Credit Agreement and Amendment No. 2 to Security Agreement, dated as of May 29, 2015, by and among Ferrellgas, L.P. as the borrower, Ferrellgas, Inc. as the general partner of the borrower, Bank of America, N.A. as administrative agent, swing line lender and L/C issuer, and the lenders party hereto. Incorporated by reference to Exhibit 10.5 to our Current Report on Form 8-K filed June 9, 2015. |
| | 10.6 | Amended and Restated Receivable Sale Agreement dated as of January 19, 2012, between Ferrellgas, L.P. and Blue Rhino Global Sourcing, Inc., as originators, and Ferrellgas Receivables, LLC, as buyer. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed January 20, 2012. |
| | 10.7 | Receivables Purchase Agreement dated as of January 19, 2012, among Ferrellgas Receivables, LLC, as seller, Ferrellgas, L.P., as servicer, the purchasers from time to time party hereto, Fifth Third Bank and SunTrust Bank, as co-agents, and Wells Fargo Bank, N.A., as administrative agent. Incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K filed January 20, 2012. |
| | 10.8 | First Amendment to Receivables Purchase Agreement dated as of April 30, 2012, among Ferrellgas Receivables, LLC, as seller, Ferrellgas, L.P., as servicer, the purchasers from time to time party hereto, Fifth Third Bank and SunTrust Bank, as co-agents, and Wells Fargo Bank, N.A., as administrative agent. Incorporated by reference to Exhibit 10.5 to our Quarterly Report on Form 10-Q filed June 8, 2012. |
| # | 10.9 | Ferrell Companies, Inc. Supplemental Savings Plan, as amended and restated effective January 1, 2010. Incorporated by reference to Exhibit 10.14 to our Quarterly Report on Form 10-Q filed March 10, 2010. |
| # | 10.10 | Ferrell Companies, Inc. 1998 Incentive Compensation Plan, as amended and restated effective October 11, 2004. Incorporated by reference to Exhibit 10.9 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.11 | Amendment to Ferrell Companies, Inc. 1998 Incentive Compensation Plan, dated as of March 7, 2010. Incorporated by reference to Exhibit 10.7 to our Quarterly Report on Form 10-Q filed June 9, 2010. |
| # | 10.12 | Employment, Confidentiality, and Noncompete Agreement dated as of July 17, 1998 by and among Ferrell Companies, Inc. as the company, Ferrellgas, Inc. as the company, James E. Ferrell as the executive and LaSalle National Bank as trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust. Incorporated by reference to Exhibit 10.11 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.13 | Employment Agreement dated as of August 10, 2009 by and between Ferrellgas, Inc. as the company and Stephen L. Wambold as the executive. Incorporated by reference to Exhibit 10.13 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.14 | Employment Agreement dated as of August 10, 2009 by and between Ferrellgas, Inc. as the company and James R. VanWinkle as the executive. Incorporated by reference to Exhibit 10.14 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.15 | Employment Agreement dated as of August 10, 2009 by and between Ferrellgas, Inc. as the company and Tod Brown as the executive. Incorporated by reference to Exhibit 10.15 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.16 | Employment Agreement dated as of August 10, 2009 by and between Ferrellgas, Inc. as the company and George L. Koloroutis as the executive. Incorporated by reference to Exhibit 10.16 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.17 | Agreement and Release dated as of January 19, 2012 by and between Ferrellgas, Inc. as the company and George L. Koloroutis as the executive. Incorporated by reference to Exhibit 10.3 to our Current Report on Form 8-K filed January 20, 2012. Incorporated by reference to Exhibit 10.18 to our Annual Report on Form 10-K filed September 29, 2014. |
| # | 10.18 | Employment Agreement dated as of September 25, 2013 by and between Ferrell Companies, Inc. as the company and Boyd H. McGathey as the executive. Incorporated by reference to Exhibit 10.17 to our Annual Report on Form 10-K filed September 26, 2013. |
| | 10.19 | ISDA 2002 Master Agreement and Schedule to the 2002 ISDA Master Agreement both dated as of May 3, 2012 together with three Confirmation of Swap Transaction documents each dated as of May 8, 2012, all between SunTrust Bank and Ferrellgas, L.P. Incorporated by reference to Exhibit 10.17 to our Quarterly Report on Form 10-Q filed June 8, 2012. |
| # | 10.20 | Form of Director/Officer Indemnification Agreement, by and between Ferrellgas, Inc. and each director and executive officer. Incorporated by reference to Exhibit 10.16 to our Quarterly Report on Form 10-Q filed March 9, 2012. |
| | 10.21 | Membership interest purchase agreement dated May 1, 2014, among Ferrellgas, L.P. and the former members of Sable Environmental LLC and Sable SWD 2 LLC. Incorporated by reference to Exhibit 2.1 to our Current Report on Form 8-K filed May 1, 2014. |
| | 10.22 | Agreement and Release dated as of January 27, 2015 by and between Ferrellgas, Inc. as the company and J. Ryan VanWinkle as the executive. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed January 28, 2015. |
| *  # | 10.23 | Ferrell Companies, Inc. 2015 Deferred Appreciation Rights Plan, dated as of July 31, 2015. |
| | 10.24 | Employment agreement dated as of July 1, 2015 by and between Ferrellgas, Inc. as the company and Alan C. Heitmann as the executive. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed June 24, 2015. |
| * | 10.25 | Employment agreement dated as of May 29, 2015 by and between Ferrellgas, Inc. as the company and Julio E. Rios, IIas the executive. |
| * | 10.26 | Employment agreement dated as of May 29, 2015 by and between Ferrellgas, Inc. as the company and Jeremy H. Gamboa as the executive. |
| * | 10.27 | Employment agreement dated as of May 28, 2015 by and between Ferrellgas, Inc. as the company and Thomas M. Van Buren as the executive. |
| *  @ | 10.28 | Transportation Logistics Agreement, dated May 29, 2015, by and between Ferrellgas Partners, L.P. and Bridger, L.L.C. |
| * | 21.1 | List of subsidiaries |

BLFG_EDPA2274617

\*    23.1      Consent of Grant Thornton LLP, independent registered public accounting firm, for the certain use of its report appearing in the Annual Report on Form 10-K of Ferrellgas Partners, L.P. for the year ended July 31, 2015.

E-2

BLFG_EDPA2274618

Table of Contents

| | | |
|---|---|---|
| * | 31.1 | Certification of Ferrellgas Partners, L.P. pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act. |
| * | 31.2 | Certification of Ferrellgas Partners Finance Corp. pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act. |
| * | 31.3 | Certification of Ferrellgas, L.P. pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act. |
| * | 31.4 | Certification of Ferrellgas Finance Corp. pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act. |
| * | 32.1 | Certification of Ferrellgas Partners, L.P. pursuant to 18 U.S.C. Section 1350. |
| * | 32.2 | Certification of Ferrellgas Partners Finance Corp. pursuant to 18 U.S.C. Section 1350. |
| * | 32.3 | Certification of Ferrellgas, L.P. pursuant to 18 U.S.C. Section 1350. |
| * | 32.4 | Certification of Ferrellgas Finance Corp. pursuant to 18 U.S.C. Section 1350. |
| * | 101.INS | XBRL Instance Document. |
| * | 101.SCH | XBRL Taxonomy Extension Schema Document. |
| * | 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| * | 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| * | 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| * | 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |

| | |
|---|---|
| * | Filed or furnished as an exhibit to this Annual Report on Form 10-K |
| # | Management contracts or compensatory plans. |
| + | Exhibits and Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A list of these Exhibits and Schedules is included in the index of each Purchase and Sale Agreement. Ferrellgas agrees to furnish a supplemental copy of any such omitted Exhibit or Schedule to the SEC upon request. |
| @ | Confidential treatment has been requested with respect to certain portions of this exhibit. Omitted portions have been filed separately with the SEC. |

E-3

BLFG_EDPA2274619

# *Delaware*

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "FERRELLGAS PARTNERS , L .P . " AS RECEIVED AND FILED IN THI S OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED :

CERTIFICATE OF LIMITED PARTNERSHIP, FILED THE NINETEENTH DAY OF APRIL, A.D. 1994, AT 4 O'CLOCK P .M .

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "FERRELLGAS, L.P." TO "FERRELLGAS PARTNERS, L .P.", FILED THE TWENTY -FIRST DAY OF APRI L , A .D . 1994, AT 11: 30 O' CLOCK A .M .

AND I DO HEREBY FURTHER CERTI FY THAT THE AFORESAI D CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

AFORESAID LIM I TED PARTNERSHIP, "FERRELLGAS PARTNERS, L .P. " .

2395994   8100H



AUTHENTICA

Jeffrey W. Bullock, Secretary of State

*C TION : 2415077*

*150800331*

*You may veri f y thi s certi ficate onl ine at corp . delaware . gov/ authver . shtml*

*DATE : 05-28 -15*

BLFG_EDPA2274621

*CERTIFICATE OF LIMITED PARTNERSHIP*
OF
FERRELLGAS, L,P,

The undersigned represent that they have formed a limited partnership pursuant to 6 Del. C Sections 17-101 <u>et seq</u>. ('the Act") and that the undersigned have executed this Certificate in compliance with the requirements of the Act. The undersigned further state:

1. The name of the limited partnership is Ferrellgas, L.P. (the "Partnership").

2. The address of the registered office o f t h e Partnership in the State of Delaware and the name and address of the registered agent of the Partnership required t o be maintained by Section 17-104 of the Act at such address are as follows:

*Name and Address*

Registered Agent

The Corporation Trust Company Corporation
Trust Center
1209 Orange Street
Wilmington, New Castle County, Delaware
19801

*Address of Registered Office*

Corporation Trust Center 1209 Orange Street Wilmington,
New Castle County, Delaware 19801

3, The name and business address of the General Partner is as follows:

| General Partner | *Address* |
|---|---|
| Ferrellgas, Inc. | One Liberty Plaza |

Liberty,
Missouri 64068

BLFG_EDPA2274622

WHEREFORE, the undersigned have executed this Certificate as of the 18th day of April, 1994.

By: _____

Title: Chief Financial Officer

BLFG_EDPA2274623

**CONSENT TO USE OF NAME**

*Ferrellgas, Inc., a corporation organized under the laws of the State of Delaware, hereby consents to the organization of Ferrellgas, L.P. in the State of Delaware.*

IN WITNESS WHEREOF, the said Ferrellgas, Inc. has caused this consent to be executed by its Chief Financial Officer and attested by its assistant secretary, this 19th day of April, 1994.

FERRELLGAS, INC.

By: /s/ Danley K. Sheldon
Danley K. Sheldon
     Chief Financial Office

*Attest:*
/s/ Rhonda Smiley
     Rhonda Smiley
     Assistant Secretary

BLFG_EDPA2274624

CERTIFICATE OF LIMITED PARTNERSHIP
OF
FERRELLGAS, L.P.

The undersigned represent that they have formed a limited partnership pursuant to 6 Del. C Sections 17-101 et seq. ('the Act") and that the undersigned have executed this Certificate in compliance with the requirements of the Act. The undersigned further state:

1. The name of the limited partnership is Ferrellgas, L.P. (the "Partnership").

2. The address of the registered office of the Partnership in the State of Delaware and the name and address of the registered agent of the Partnership required to be maintained by Section 17-104 of the Act at such address are as follows:

   *Name and Address of*

   Registered Agent

   The Corporation Trust Company Corporation
   Trust Center
   1209 Orange Street
   Wilmington, New Castle County, Delaware
   19801

*Address of Registered Officer*

Corporation Trust Center 1209 Orange Street Wilmington,
New Castle County, Delaware 19801

3, The name and business address of the General Partner is as follows:

| General Partner | *Address* |
|---|---|
| Ferrellgas, Inc. | One Liberty Plaza |

Liberty,
Missouri 64068

BLFG_EDPA2274625

WHEREFORE, the undersigned have executed the Certificate as of the 18th day of April, 1994.

*GENERAL PARTNER:*

Ferrellgas, Inc.
By: /s/ Danley K. Sheldon
Danley K. Sheldon
Title: Chief Financial Officer

By: _____
Title: Chief Financial Officer

BLFG_EDPA2274626

## CONSENT TO USE OF NAME

*Ferrellgas, Inc., a corporation organized under the laws of the State of Delaware, hereby consents to the organization of Ferrellgas, L.P. in the State of Delaware.*

IN WITNESS WHEREOF, the said Ferrellgas, Inc. has caused this consent to be executed by its Chief Financial Officer and attested by its assistant secretary, this 19th day of April, 1994.

FERRELLGAS, INC.
By: /s/ Danley K. Sheldon
Danley K. Sheldon
Chief Financial Officer

*Attest:*
/s/ Rhonda Smiley
Rhonda Smiley
Assistant Secretary

BLFG_EDPA2274627

APR 21 '94 11:02

## CERTIFICATE OFAMENDMENT OF THE
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## FERRELLGAS, L.P.

Ferrellgas, L.P. (the "Limited Partnership"), a limited partnership organized and existing pursuant to 6 Del. C. Section 17-101 <u>et seq</u>. (the "Act"), does hereby certify that:

1.    The name of the Limited Partnership is Ferrellgas, L.P.

2.    The Certificate of Limited Partnership of the Limited Partnership is hereby amended pursuant to the Act by changing the name of the Limited Partnership to:

Ferrellgas Partners, L.P.

WHEREFORE, the undersigned has executed this Certificate as of the 21st day of April, 1994.

### GENERAL PARTNER:

Ferrellgas, Inc.
By: <u>/s/ Danley K. Sheldon</u>
Danley K. Sheldon
Chief Financial Officer

STATE OF DELAWARE SECRETARY OF STATE
DIVISION OF CORPORATIONS FILED 11:30 AM 04/21/1994
944069289 - 2395994

BLFG_EDPA2274628

APR 21 '94 11:02

# CERTIFICATE OF AMENDMENT OF THE
## CERTIFICATE OF LIMITED PARTNERSHIP
### OF
### FERRELLGAS, L.P.

Ferrellgas, L.P. (the "Limited Partnership"), a limited partnership organized and existing pursuant to 6 Del. C. Section 17-101 <u>et seq</u>. (the "Act"), does hereby certify that:

1. The name of the Limited Partnership is Ferrellgas, L.P.

2. The Certificate of Limited Partnership of the Limited Partnership is hereby amended pursuant to the Act by changing the name of the Limited Partnership to:

Ferrellgas Partners, L.P.

WHEREFORE, the undersigned has executed this Certificate as of the 21st day of April, 1994.

**GENERAL PARTNER:**
Ferrellgas, Inc.
By: /s/ Danley K. Sheldon
Danley K. Sheldon
Chief Financial Officer

STATE OF DELAWARE SECRETARY OF STATE
DIVISION OF CORPORATIONS FILED 11:30 AM 04/21/1994
944069289 - 2395994

BLFG_EDPA2274629

# *Delaware*

### *The First State*

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "FERRELLGAS PARTNERS , L .P . " AS RECEIVED AND FILED IN THIS OFFICE .*

*THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED :*

*CERTIFICATE OF LIMITED PARTNERSHIP, FILED THE NINETEENTH DAY OF APRIL, A.D. 1994, AT 4 O'CLOCK P .M .*

*CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "FERRELLGAS, L.P." TO "FERRELLGAS PARTNERS, L .P.", FILED THE TWENTY -FIRST DAY OF APRI L , A .D . 1994, AT 11: 30 O ' CLOCK A .M .*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIM I TED PARTNERSHIP, "FERRELLGAS PARTNERS, L .P. " .*

BLFG_EDPA2274630



*2395994   8100H*

*150800331*

**You may verify this certificate onl ine at corp.delaware.gov/ authver.shtml**

*DATE : 05-28 -15*

CERTIFICATE OF LIMITED PARTNERSHIP
OF
FERRELLGAS, L,P,

The undersigned represent that they have formed a limited partnership pursuant to 6 Del. C Sections 17-101 et seq. ('the Act") and that the undersigned have executed this Certificate in compliance with the requirements of the Act. The undersigned further state:

1. The name of the limited partnership is Ferrellgas, L.P. (the "Partnership").

2. The address of the registered office of the Partnership in the State of Delaware and the name and address of the registered agent of the Partnership required to be maintained by Section 17-104 of the Act at such address are as follows:

> Name and Address
> Registered Agent

The Corporation Trust Company Corporation
Trust Center
1209 Orange Street
Wilmington, New Castle County, Delaware
19801

Address of Registered Office

Corporation Trust Center 1209 Orange Street Wilmington,
New Castle County, Delaware 19801

3,   The name and business address of the General Partner is as follows:

> General Partner          Address

Ferrellgas, Inc.          One Liberty Plaza
                                              Liberty,
Missouri 64068

WHEREFORE, the undersigned have executed this Certificate as of the

BLFG_EDPA2274632

SENT BY:Xerox Te ecopier 7020 ; 4-19-94 ; 9:37AM

18th day of April, 1994.

**GENERAL PARTNER:**

Ferrellgas, Inc
By: /s/ Danley K. Sheldon
Title: Chief Financial Officer

ORGANIZATIONAL LIMITED PARTNER
By: /s/ Danley K. Sheldon
Danley K. Sheldon
     Chief Financial Office

BLFG_EDPA2274633

**CONSENT TO USE OF NAME**


Ferrellgas, Inc., a corporation organized under the laws o f the State of Delaware, hereby consents to the organization of Ferrellgas, L.P. in the State of Delaware.

IN WITNESS WHEREOF, the said Ferrellgas, Inc. has caused this consent to be executed by its Chief Financial Officer and attested by its assistant secretary, this 19th day of April, 1994.


FERRELLGAS, INC.

By: /s/ Danley K. Sheldon
Danley K. Sheldon
      Chief Financial Office


Attest:
/s/ Rhonda Smiley
      Rhonda Smiley
      Assistant Secretary

---

BLFG_EDPA2274634

SENT BY:Xerox Te ecopier 7020 ; 4-19-94 ; 9:37AM

.

CERTIFICATE OF LIMITED PARTNERSHIP
OF
FERRELLGAS, L.P.

The undersigned represent that they have formed a limited partnership pursuant to 6 Del. C Sections 17-101 et seq. ('the Act") and that the undersigned have executed this Certificate in compliance with the requirements of the Act. The undersigned further state:

1. The name of the limited partnership is Ferrellgas, L.P. (the "Partnership").

2. The address of the registered office of the Partnership in the State of Delaware and the name and address of the registered agent of the Partnership required to be maintained by Section 17-104 of the Act at such address are as follows:

Name and Address of

Registered Agent

The Corporation Trust Company Corporation
Trust Center
1209 Orange Street
Wilmington, New Castle County, Delaware
19801

Address of Registered Officer

Corporation Trust Center 1209 Orange Street Wilmington,
New Castle County, Delaware 19801

3, The name and business address of the General Partner is as follows:

| General Partner | Address |
|---|---|
| Ferrellgas, Inc. | One Liberty Plaza |

Liberty,

Missouri 64068

BLFG_EDPA2274635

WHEREFORE, the undersigned have executed the Certificate as of the 18th day of April, 1994.

GENERAL PARTNER:

Ferrellgas, Inc.
By: /s/ Danley K. Sheldon
Danley K. Sheldon
Title: Chief Financial Officer

ORGANIZATIONAL LIMITED PARTNER

By: /s/ Danley K. Sheldon
Danley K. Sheldon
Chief Financial Office

BLFG_EDPA2274636

SENT BY:Xerox To ecopier 7020 ; 4-19-94 ; 9:37AM

**CONSENT TO USE OF NAME**

Ferrellgas, Inc., a corporation organized under the laws of the State of Delaware, hereby consents to the organization of Ferrellgas, L.P. in the State of Delaware.

IN WITNESS WHEREOF, the said Ferrellgas, Inc. has caused this consent to be executed by its Chief Financial Officer and attested by its assistant secretary, this 19th day of April, 1994.

FERRELLGAS, INC.

By: /s/ Danley K. Sheldon

Danley K. Sheldon

Chief Financial Officer

Attest:

/s/ Rhonda Smiley

Rhonda Smiley

Assistant Secretary

BLFG_EDPA2274637

APR 21 '94 11:02

### CERTIFICATE OFAMENDMENT OF THE
### CERTIFICATE OF LIMITED PARTNERSHIP
### OF
### FERRELLGAS, L.P.

Ferrellgas, L.P. (the "Limited Partnership"), a limited partnership organized and existing pursuant to 6 Del. C. Section 17-101 <u>et seq</u>. (the "Act"), does hereby certify that:

1.  The name of the Limited Partnership is Ferrellgas, L.P.

2.  The Certificate of Limited Partnership of the Limited Partnership is hereby amended pursuant to the Act by changing the name of the Limited Partnership to:

Ferrellgas Partners, L.P.

WHEREFORE, the undersigned has executed this Certificate as of the 21st day of April, 1994.

### GENERAL PARTNER:

Ferrellgas, Inc.
By: <u>/s/ Danley K. Sheldon</u>
Danley K. Sheldon
Chief Financial Officer

STATE OF DELAWARE SECRETARY OF STATE

BLFG_EDPA2274638

DI VISI ON OF CORPORATI ONS FI LED 11 : 30 AM 04/21/1994

944069289 - 2395994

BLFG_EDPA2274639

APR 21 '94 11:02

## CERTIFICATE OF AMENDMENT OF THE
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## FERRELLGAS, L.P.

Ferrellgas, L.P. (the "Limited Partnership"), a limited partnership organized and existing pursuant to 6 Del. C. Section 17-101 <u>et seq</u>. (the "Act"), does hereby certify that:

1.   The name of the Limited Partnership is Ferrellgas, L.P.

2.   The Certificate of Limited Partnership of the Limited Partnership is hereby amended pursuant to the Act by changing the name of the Limited Partnership to:

Ferrellgas Partners, L.P.

WHEREFORE, the undersigned has executed this Certificate as of the 21st day of April, 1994.

**GENERAL PARTNER:**

Ferrellgas, Inc.

By: <u>/s/ Danley K. Sheldon</u>

Danley K. Sheldon

Chief Financial Officer

STATE OF DELAWARE SECRETARY OF STATE

DI VISI ON OF CORPORATI ONS FI LED 11 : 30 AM 04/21/1994

944069289 - 2395994

**BLFG_EDPA2274640**

# *Delaware*

### *The First State*

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "FERRELLGAS, L.P." AS RECEIVED AND FILED IN THIS OFFICE.*

*THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:*

*CERTIFICATE OF LIMITED PARTNERSHIP, FILED THE TWENTY-SECOND DAY OF APRIL, A.D. 1994, AT 2:30 O'CLOCK P.M.*

*CERTIFICATE OF MERGER, FILED THE TWENTY-SECOND DAY OF APRIL, A.D. 1996, AT 3:15 O'CLOCK P.M.*

*CERTIFICATE OF MERGER, FILED THE SEVENTEENTH DAY OF DECEMBER, A.D. 1999, AT 10:55 O'CLOCK A.M.*

*CERTIFICATE OF MERGER, FILED THE THIRTEENTH DAY OF DECEMBER, A.D. 2002, AT 4 O'CLOCK P.M.*

*CERTIFICATE OF MERGER, FILED THE TWENTIETH DAY OF APRIL, A.D. 2004, AT 2:49 O'CLOCK P.M.*



BLFG_EDPA2274641

*AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE TWENTY-FIRST DAY OF APRIL, A.D. 2004, AT 8 O'CLOCK A.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE*



*AFORESAID LIM I TED PARTNERSHIP , "FERRELLGAS, L .P. " .*



BLFG_EDPA2274643

APR 22 '94 13: 13 RR DONNELLEY HOUSTON   STATE OF DELAWARE   p 2

SECRETARY OF STATE   . DIVISION OF CORPORATIONS FILED 02,30 PM 04/22/1994

# CERTIFICATE OF LIMITED PARTNERSHIP 2397107

## OF

## FERRELLGAS, L.P.

The undersigned represent that they have formed a limited partnership pursuant to 6 Del. C. Section 17-101 et seq. (the "Act") and that the undersigned have executed this Certificate in compliance with the requirements of the Act. The undersigned further state: ·

1. The name of the limited partnership is Ferrellgas, L.P. (the "Partnership").

2. The address of the registered office of the Partnership in the State of Delaware and the name and address of the registered agent of the Partnership required to be maintained by Section 17-104 of the Act at such address are as follows:

Name and Address of

Registered Agent    Address of Registered Office

The Corporation Trust Company
Corporation Trust Center
1209 Orange Street Wilmington, New Castle
County, Delaware 19801

Corporation Trust Center 1209 Orange Street
Wilmington, New Castle County, Delaware 19801

3. The name and business address of the General Partner is as follows:

General Partner

Ferrellgas, Inc.

Address

One Liberty Plaza Liberty, Missouri 64068

WHEREFORE, the undersigned have executed this Certificate as of the 22 day of April, 1994.

### GENERAL PARTNER:

Ferrellgas, Inc., a Delaware corporation

By: /s/ Danley K. Sheldon
Danley K. Sheldon
Chief Financial Officer

BLFG_EDPA2274644

LIMITED PARTNER:

Ferrellgas Partners, L.P.,
       a Delaware limited partnership

By: Ferrellgas, Inc., as general partner

By: /s/Danley K. Sheldon
     Danley K. Sheldon
     Chief Financial Officer

BLFG_EDPA2274645

RP'< 22 '94 13: 13 RR DONNELLEY HOUSTON   P. 3

CONSENT TO USE OF NAME

Ferrellgas, Inc., a corporation organized under the laws of the State of Delaware, hereby consents to the organization of Ferrellgas, L.P. in the State of Delaware.

IN WITNESS WHEREOF, the said Ferrellgas, Inc. has caused this consent to be executed by its Chief Financial Officer and attested by its assistant secretary, this 22 day of April, 1994.

FERRELLGAS, INC.

By: /s/ Danley K. Sheldon

Danley K. Sheldon,

Chief Financial Officer

Attest:

/s/ Rhonda Smiley
     Rhonda Smiley,
Assistant Secretary

BLFG_EDPA2274646

..- A p r

.. ᴿ˙.... ...

*22.*

STATE OF DELAWARE SECRETARY OF STATE
DIVISION OF CORPORATIONS FILED 03, l5 PM 04/22/1996
9601 15773 - 2397107

* / -

CERTIFICATE OF MERGER OF

STEWART ROAD, L.P. INTO

FERRELLGAS, L.P.

To the Secretary of State State of Delaware

      Stewart Road, LP., a limited partnership organized under the Delaware Revised Uniform Limited Partnership Act (the "Act"), for the purpose of merging with other business entities pursuant to Section 17-211 of the Act, hereby certifies that:

      1.    The name and jurisdiction of organization of each domestic limited partnership or other business entity which is. a constituent entity are:

NAME   JURISDICTION

Stewart Road, L.P.   Delaware

              Ferrellgas, L.P.        Delaware

      2.    An agreement of merger has been approved and executed by each domestic limited partnership or other business entity which is a constituency entity.

      3.    The name of the surviving domestic limited partnership is Ferrellgas, L.P.

          4.    The merger shall be effective upon filing.

BLFG_EDPA2274647

5.   The agreement of merger is on file at the following place of business of the surviving domestic limited partnership:

Ferrellgas, L.P.

One Liberty Plaza Liberty, Missouri 64068

KCOI ZI 2715. 1

BLFG_EDPA2274648

No. 4216   P. 4/4  APR. 22. 1996

6.   A copy of the agreement of merger will be furnished by the surviving domestic limited partnership, on request and without cost, to any partner of any domestic limited partnership, or any person holding an interest in any other business entity which is a constituent entity.

Signed on April <u>22</u>, 1996.

FERRELLGAS, L.P.

By:   Ferrellgas, Inc.
            General Partner


By: <u>/s/ James M. Hake</u>
James M. Hake
            Vice: President - Acquisitions

**KCOI 2 127115.1**   2

BLFG_EDPA2274649

BLFG_EDPA2274650

## CERTIFICATE OF MERGER OF THERMOGAS L.L.C. WITH AND INTO
### FERRELLGAS, L.P.

The undersigned limited partnership formed and existing under and by virtue of the Delaware Revised Uniform Limited Partnership Act, 6 *Del.C.* § 17-101, *et seq.* (the "Act"),

DOES HEREBY CERTIFY:

FIRST: The name and jurisdiction of formation or organization of each of the constituent entities which is to merge are as follows:

| Name | Jurisdiction of Formation or Organization |
|------|-------------------------------------------|
| Thermogas L.L.C. | Delaware |
| Ferrellgas, L.P. | Delaware |

SECOND: An Agreement and Plan of Merger has been approved and executed in accordance with Section 17-211 of the Act and Section 18-209 of the Delaware Limited Liability Com pan y Act by Ferrellgas, L.P. and Thermogas L.L.C.

THIRD: The name of the surviving Delaware limited partnership is Ferrellgas, L.P.

FOURTH: The executed Agreement and Plan of Merger is on fi le at the principal place of business of the surviving limited partnership. The address of the principal place of business of the surviving limited partnership is One Liberty Plaza, Libe.rty, Missouri 64068.

FIFTH: A copy of the Agreement and Plan of Merger will be furnished by the surviving limited partnership, on request and without cost, to any partner of Ferrellgas, L.P or any former m ember of Thermogas L.L.C.

IN WITNESS WHEREOF, this Certificate of Merger has been executed as of this 17th day of December, 1999.

FERRELLGAS, LP.

By Ferrellgas , Inc., its general partner By:/s/ James A Hake

James A. Hake
Senior Vi ce President - Acquisitions

*STATE OF DELAWARE SECRETARY OF STATE*
*DIVISION OF CORPORATIONS FILED 10:55 AM 12/17/1999*

991545246 - 2397107

** TOTAL PAGE 02 **

BLFG_EDPA2274652

**CERTIFICATE
OF MERGER
OF PRO AM
DELAWARE,
LLC WITH
AND INTO
<u>FERRELLGAS.
L.P.</u>**

*STATE OF DELAWARE SECRETARY OF STATE
DIVISION OF CORPORATIONS FILED 04:00 PM 12/13/2002
020770158 - 2397107*

The undersigned limited partnership formed and existing under and by virtue of the Delaware Revised Uniform Limited Partnership Act, 6 Del.C § 17-101, et seq (the "Act").

DOES HEREBY CERTIFY:

FIRST: The name and jurisdiction of formation or organization of each of the constituent entities which is to merge are as follows:

| <u>Name</u> | <u>Jurisdiction of Formation or Organization</u> |
|---|---|
| Pro Am Delaware, | |
| LLC | Delaware Ferrellgas, |
| L.P | Delaware |

SECOND: An Agreement and Plan of Merger has been approved and executed in accordance with Section 17-211 of the Act and Section 18-209 of the Delaware Limited Liability Company Act by Ferrellgas, L.P. and Pro Am Delaware, LLC

THIRD: The name of the surviving Delaware limited partnership is Ferrellgas, L.P.

FOURTH: The executed Agreement and Plan of Merger is on file at the principal place of business of the surviving limited partnership. The address of the principal place of business of the surviving limited partnership is One Liberty Plaza, Liberty, Missouri 64068.

FIFTH: A copy of the Agreement and Plan of Merger will be furnished by the surviving limited partnership, on request and without cost, to any partner of Ferrellgas, L.P. or any former member of Pro Am Delaware, LLC

IN WITNESS WHEREOF, this Certificate of Merger has been executed as of this 16th day of December, 2002.

FERRELLGAS, L.P.

BLFG_EDPA2274653

By: Ferrellgas, Inc., its general partner

By: *I sl* <u>Kenneth A Heinz</u> Name: Kenneth A Heinz
     Title:  Vice President of Finance and Corporate Development

JC 46104. 1

BLFG_EDPA2274654

**CERTIFICATE OF MERGER**
**of**
**FERRELLGAS ESCROW LLC**
**and**
**BLUE RHINO LLC**
**with and into FERRELLGAS, L.P.**

State *of* Delaware *Secretary of* State *Division of Corporations*
*Delivered 02:49 PM 04/20/2004 FILED 02:49 PM 04/20/2004*
*SRV 040287813 - 2397107 FILE*

BLFG_EDPA2274655

Pursuant to § 17-211 of the Delaware Revised Uniform Limited Partnership Act and § 18-209 of the Delaware Limited Liability Company Act, the general partner of Ferrellgas, L.P., has executed the following Certificate of Merger for the purpose of merging Ferrellgas Escrow LLC and Blue Rhino LLC (together, the "Merging Entities"), with and into Ferrellgas, L.P, (the "Surviving Partnership"):

1.      The names and jurisdictions of formation of each of the constituent entities of the merger (the "Merger") are:

   (a)     Ferrellgas Escrow LLC, a Delaware limited liability company;

   (b)     Blue Rhino LLC, a Delaware limited liability company; and

   (c)   Ferrellgas, L.P., a Delaware limited partnership.

2.      An Agreement of Merger has been approved, adopted, certified, executed and acknowledged by the Surviving Partnership and the Merging Entities.

3.      The name of the Surviving Partnership is Ferrellgas, L.P.

4.      These mergers will become effective as of 8 a.m. Eastern Daylight Time on April 21, 2004.

5.      The Agreement of Merger is on file at the office of the Surviving Partnership. The address of the Surviving Partnership is One Liberty Plaza, Liberty, Missouri 64068.

6.      A copy of the Agreement of Merger will be furnished by the Surviving Partnership on request and without cost to any partner of the Surviving Partnership or any member of the Merging Entities.

IN WITNESS WHEREOF, Ferrellgas, L.P. has caused this Certificate of Merger to be signed by its general partner this 20th day of April, 2004.

Ferrellgas, Inc.

BLFG_EDPA2274656

By: <u>/s/ Kevin T. Kelly</u> Kevin T. Kelly
Senior Vice President and Chief Financial Officer

24518642.3 04236729

BLFG_EDPA2274657

**Exhibit 10.23**

**FERRELL COMPANIES, INC.**
**2015 DEFERRED APPRECIATION RIGHTS PLAN**

1.     **PURPOSE.** The purposes of the Ferrell Companies, Inc. 2015 Deferred Appreciation Rights Plan (the "Plan") are as follows:

(a)     to allow upper middle and senior level managers of Ferrellgas, Inc. ("FGI") to participate in the equity growth of Ferrell Companies, Inc. ("FCI") and, indirectly (through its "subsidiary" holding), in the equity growth of Ferrellgas Partners, L.P. (the "Partnership") and its subsidiaries (with FCI, FGI, the Partnership and its subsidiaries being collectively referred to herein as "Companies");

(b)     to generate an increased incentive to contribute to the Partnership's future success and prosperity and to focus on the value growth of FCI; and

(c)     to focus on profitable Partnership growth and acquisition activities that will enable increases in the value of all Partnership Units and to increase the equity value of FCI, through an increasing Partnership value, a maximization of Partnership distributions, a reduction of FCI debt, and an optimization of share value growth for the FCI shares held by FCI's employee stock ownership plan (its "ESOP").

Unless defined in the sentence or paragraph in which they are used, definitions used herein are set forth in Section 5.9 below.

2.     **ADMINISTRATION.**

2.1     **Administration by Committee.** The Plan shall be administered by a committee comprised of at least three members of the FCI's or FGI's Management Committee, and generally including the CEO and CFO of FGI, as well as the senior personnel manager of FGI (the "Committee").

2.2     **Authority.** Subject to the provisions and limitations of the Plan, the Committee shall have the authority to (a) conclusively interpret the provisions of the Plan, and prescribe, amend, and rescind rules and procedures relating to the Plan, (b) grant Deferred Appreciation Rights awards under the Plan, in such forms and amounts and subject to such terms and conditions as it deems appropriate, (c) modify the terms of, cancel and reissue, or repurchase outstanding Deferred Appreciation Rights awards, (d) suspend the operation of the Plan (or any portion thereof) pursuant to the provisions of Section 5.7 hereinbelow, and (e) make all other determinations and take all other actions as it deems necessary or desirable for the administration of the Plan. The determination of the Committee on matters within its authority shall be conclusive and binding on Companies

BLFG_EDPA2274658

and all other persons. The Committee shall comply with all applicable law in administering the Plan.

3.    **Participation.** Subject to the terms and conditions of the Plan, the Committee shall designate from time to time employees of Companies (including, without limitation, employees who are officers of any Companies entity, but not including employees of Partnership, if any) who shall receive awards under the Plan ("Participants").

4.    **DEFERRED APPRECIATION RIGHTS.**

4.1    **Grant of DARs.** Subject to the terms and conditions of the Plan, the Committee shall designate the employees to whom deferred appreciation rights ("DARs") are to be awarded under the Plan and shall determine the number and terms of the DARs to be awarded to each of them.

4.2    **Exercise of DARs.** DARs may be exercised upon such terms and conditions as the Committee, in its sole discretion, determines.

4.3    **Term of DARs.** The term of a DAR granted under the Plan shall be determined by the Committee in its sole discretion; provided, however, that such term shall not exceed ten years.

4.4    **Payment of DAR Amount.** Upon exercise of a DAR, a Participant shall be entitled to receive payment from Companies in an amount determined by multiplying:

(a)    The excess of the Fair Market Value of a share of Common Stock on the date of exercise over the "grant price" of the DAR; by

(b)    The number of shares with respect to which the DAR is exercised.

The payment to be made upon a DAR exercise shall be in cash.

5.    **GENERAL**

5.1    **Effective Date.** The Plan was adopted by the Board of Directors effective as of 7/31/2015.

5.2    **Duration.** The Plan shall remain in effect until all awards granted under the Plan have been satisfied by the payment of cash, or have been terminated in accordance with the terms of the Plan or the award agreement.

5.3    **Non-transferability of Awards.** No award granted under the Plan may be transferred, pledged, or assigned by the employee except by will or the laws of descent and distribution in the event of death, and FCI shall not be required to recognize any attempted assignment of such rights by any Participant. During a Participant's lifetime, awards may be exercised only by the Participant or by the Participant's guardian or legal representative. Notwithstanding the foregoing, at the discretion of the Committee, a grant of an award may (but need not) permit the transfer of the award by the Participant solely to members of the Participant's immediate family or trusts or family partnerships for the benefit of such persons, subject to such terms and conditions as may be established by the Committee.

5.4     **Compliance with Applicable Law and Withholding.**

    (a)     The award of any benefit under the Plan shall be made subject to such provisions as the Committee determines appropriate to comply with all applicable laws.

    (b)     The Companies' entities shall have the right to deduct from the cash proceeds payable upon exercise of a DAR any taxes required by law to be withheld.

5.5     **No Continued Employment.** Participation in the Plan will not affect any right any entity of Companies has to terminate the employment of a Participant or give any Participant the right to be retained in the employ of the Companies or any right or claim to any benefit under the Plan unless such right or claim has specifically accrued under the terms of any award under the Plan.

5.6     **Treatment as a Stockholder.** No award granted to a Participant under the Plan shall create any rights in such Participant as a stockholder of FCI.

5.7     **Amendment or Discontinuation of the Plan.** The Board of Directors may amend, suspend, or discontinue the Plan at any time; provided, however, that (a) the Committee may amend or suspend the Plan to avoid the occurrence of any of the events/circumstances described in Section 5.8 below; and (b) other than such an amendment or suspension by the Committee, no amendment, suspension or discontinuance shall adversely affect any outstanding award.

5.8     **Limitations on Applicability.** No Plan provision shall be applicable if its application would (a) cause a default under the terms of an extension of credit made to any Companies' entity, (b) have an effect on the ability of the Partnership to make any "Restricted Payment," or (c) cause a material change in FCI's Federal, state or local corporate or tax status. In addition to the powers reserved to the Committee in Section 2.2 above, the Committee shall have complete discretion to administer the Plan in such a way as will prevent the occurrence of any such default, inability to make a Restricted Payment or change in corporate tax status.

5.9     **Definitions.**

    **(a)     Fair Market Value.** Except as otherwise determined by the Committee, the "Fair Market Value" of a share of Common Stock as of any date shall equal the value of such a share most recently determined for the ESOP by its independent financial advisor to the ESOP (assuming no material change in such value since the date as of which such determination was made); provided, however, that the "Fair Market Value" of a share of Common Stock as of any July 31st or January 31st shall equal the value of such a share, *as of such date*, as determined by such independent financial advisor.

    **(b)     Restricted Payment.** The term "Restricted Payment" of the Partnership or its subsidiaries means, as applicable, a "Restricted Payment" as defined in the debt documents of either the Partnership or its subsidiaries.

BLFG_EDPA2274660

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement"), made and entered into this 29th day of May 2015, by and between Ferrellgas, Inc. (the "Company") and Julio E. Rios, II (the "Executive");

## WITNESSETH THAT:

WHEREAS, the Company and Bridger, LLC are entering into a Purchase and Sale Agreement whereby Company has agreed to purchase all of the membership interests of Bridger Logistics, LLC (the "Transaction"); and

WHEREAS, the Executive is the President and Chief Executive Officer of Bridger Logistics, LLC; and

WHEREAS, the Company wishes to continue to assure itself of the continuity of the Executive's services; and

WHEREAS, the Company and the Executive now desire to enter into this Agreement relating to the Executive's continued employment with the Company; and

WHEREAS, Executive will enter a noncompetition agreement contemporaneously herewith;

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein and in the noncompetition agreement, IT IS HEREBY AGREED by and between the parties as follows:

1. Certain Definitions. In addition to terms otherwise defined herein, the following capitalized terms used in this Agreement shall have the meanings specified:

(a) Board. The term "Board" means the Board of Directors of the Company.

(b) Cause. The term "Cause" means:

(i) the willful and continued failure by the Executive to substantially perform his duties for the Company (other than any such failure resulting from the Executive's being disabled) within a reasonable period of time after a written demand for substantial performance is delivered to the Executive by the Board, which demand specifically identifies the manner in which the Board believes that the Executive has not substantially performed his duties;

(ii) the willful engaging by the Executive in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise;

(iii) the engaging by the Executive in egregious misconduct involving serious moral turpitude to the extent that, in the reasonable judgment of the Board, the Executive's credibility and reputation no longer conform to the standard of the Company's executives; or

(iv) the Executive's material breach of a material term of this Agreement. For purposes of this Agreement, no act, or failure to act, on the Executive's part shall be deemed "willful" unless done, or omitted to be done, by the Executive not in good faith and without reasonable belief that the Executive's action or omission was in the best interest of the Company.

(c) Change in Control. The term "Change in Control" means the first to occur of any of the following that occurs after the Effective Date:

(i) any merger or consolidation of the Company in which the Company is not the survivor;

(ii) any sale of all or substantially all of the common stock of Ferrell Companies, Inc. by the Ferrell Companies, Inc. Employee Stock Ownership Trust;

(iii) a sale of all or substantially all of the common stock of the Company;

(iv) a replacement of the Company as the General Partner of Ferrellgas Partners, L.P.;

(v) a public sale of at least 51 percent of the equity of Ferrell Companies,

BLFG_EDPA2274661

Inc.; or

(vi) such other transaction designated as a Change in Control by the Board.

(d) Confidential Information. For purposes of this Agreement, the term "Confidential Information" shall include (i) all non-public information (including, without limitation, information regarding litigation and pending litigation) concerning the Company and the affiliates which is acquired by or disclosed to the Executive during the course of his employment with the Company and (ii) all non-public information concerning any other person or company that was shared with the Company or an affiliate of the Company that is subject to an agreement to maintain the confidentiality of such information.

(e) COBRA. The term "COBRA" means continuing group health coverage required by section 4980B of the Code or sections 601 et. seq. of the Employee Retirement Income Security Act of 1974, as amended.

(f) Code. The term "Code" means the Internal Revenue Code of 1986, as amended.

(g) Good Reason. The term "Good Reason" means any of the following which occur after the Effective Date without the consent of the Executive:

(a) A reduction in excess of 10% in the Executive's Salary (as defined in paragraph 4(a)) or target incentive potential as in effect as of the Effective Date, as the same may be modified from time to time in accordance with this Agreement;

(b) A material diminution in the Executive's authority, duties or responsibilities as in effect as of the Effective Date, as the same may be modified from time to time in accordance with this Agreement;

(c) The relocation of the Executive's principal office location to a location which is more than 50 highway miles from the location of the Executive's principal office location as in effect on the Effective Date (or such subsequent principal location agreed to by the Executive); or

(d) The Company's material breach of any material term of this Agreement, which, for the avoidance of doubt, will include any breach of Section 4(b) and 4(d).

Notwithstanding any other provision of this Agreement to the contrary, the Executive's Termination Date shall not be considered to be on account of Good Reason unless the Executive provides notice of the event or condition that the Executive believes to constitute Good Reason within 180 days after the date on which the event first occurs or the condition first exists, the Company does not cure such event or condition within 30 days following the date the Executive provides notice and the Executive resigns his employment with the Company and its affiliates for Good Reason within the Agreement Term.

(h) Termination Date. The term "Termination Date" with respect to the Executive means the date on which the Executive's employment with the Company and its affiliates terminates for any reason, including voluntary resignation. If the Executive becomes employed by the entity into which the Company is merged, or the purchaser of substantially all of the assets of the Company, or a successor to such entity or purchaser, the Executive's Termination Date shall not be treated as having occurred for purposes of this Agreement until such time as the Executive terminates employment with the successor and its affiliates (including, without limitation, the merged entity or purchaser). If the Executive is transferred to employment with an affiliate (including a successor to the Company, and regardless of whether before, on, or after a Change in Control), such transfer shall not constitute the Executive's Termination Date for purposes of this Agreement. To the extent that any payments or benefits under the Agreement are subject to section 409A of the Code and are paid or provided on account of the Executive's Termination Date, the determination as to whether the

Executive has had a Termination Date (or other termination of employment or separation from service) shall be made in accordance with section 409A of the Code and the guidance issued thereunder.

2. Agreement Term. Contingent upon the closing of the Transaction, and subject to the terms and conditions of this Agreement, the Company hereby agrees to employ the Executive during the Agreement Term (as defined below) and the Executive hereby agrees to remain in the employ of the Company and to provide services during the Agreement Term in accordance with this Agreement. Unless terminated sooner in accordance with this Agreement, the "Agreement Term" shall be the period beginning on the date of closing of the Transaction (the "Effective Date") and ending on the day before the third anniversary of the closing of the Transaction and, thereafter, the Agreement Term will be automatically extended for successive 12-month periods, unless one party to this Agreement provides notice of non-renewal to the other at least 180 days before the last day of then current Agreement Term. Notwithstanding the foregoing, if a Change in Control occurs during the Agreement Term (as it may be extended from time to time), the Agreement Term shall continue for a period of twenty-four calendar months beyond the calendar month in which such Change in Control occurs and, following an extension in accordance with this sentence, the Agreement Term shall expire without further action by any party. Notwithstanding the foregoing, in all cases, the Agreement Term shall terminate on the Executive's Termination Date. All of the obligations and covenants contained in this agreement are conditioned upon the closing of the Transaction by September 1, 2015.

3. Performance of Duties. The Executive shall serve as the President and Chief Executive Officer of Bridger Logistics, LLC and shall serve as the Executive Vice President of the Company, with such duties, power and authority as are associated with such positions. The Executive agrees that during the Agreement Term from and after the Effective Date, while the Executive is employed by the Company, the Executive will devote the Executive's full business time, energies and talents to serving the Company, at the direction of the Board. The Executive shall have such duties and responsibilities as may be assigned to the Executive from time to time by the Board, shall perform all duties assigned to the Executive faithfully and efficiently, subject to the direction of the Board, and shall have such authorities and powers as are inherent to the undertakings applicable to the Executive's position and necessary to carry out the responsibilities and duties required of the Executive hereunder. The Executive will perform the duties required by this Agreement at the Company's principal place of business unless the nature of such duties requires otherwise. Notwithstanding the foregoing, during the Agreement Term, the Executive may devote reasonable time to activities other than those required under this Agreement, including activities of a charitable, educational, religious or similar nature (including professional associations) to the extent such activities do not, in the reasonable judgment of the Board, inhibit, prohibit, interfere with or conflict with the Executive's duties under this Agreement or conflict in any material way with the business of the Company and its affiliates; provided, however, that the Executive shall not serve on the board of directors of any business (other than the Company or its affiliates) or hold any other position with any business without receiving the prior written consent of the Board.

4. Compensation. During the Agreement Term, while the Executive is employed by the Company, the Executive shall be compensated for the Executive's services as follows:

(a) The Executive shall receive, for each 12-consecutive month period beginning on the Effective Date and each anniversary thereof, a base annual salary ("Salary") at the rate of $500,000. The Salary shall be payable in accordance with the regular payroll practices of the Company. The Executive's rate of Salary shall be reviewed annually by the Board; provided that the Executive's rate of Salary will not be reduced.

(b) The Executive shall be eligible to participate in employee benefit

plans and programs maintained from time to time by the Company
for the benefit of similarly situated senior management employees,
subject to the terms and conditions of such plans. The Company is
developing a long-term equity-based incentive award program for
senior management employees to supplement its current stock
appreciate rights program, and Executive shall be granted an longterm
equity-based incentive award on terms and conditions
substantially similar to those provided to similarly situated senior
management employees. On each anniversary of the Effective Date,
if a long-term equity-based incentive award has not been made for
such year pursuant to this section, the Executive shall be entitled to
a cash payment of $1,000,000.

(c) The Executive shall be entitled to participate in the bonus plan based
upon total Company performance, with a target bonus set at the
discretion of the board of directors (the "Target Bonus") which shall
be commensurate with other executives at the same level.

(d) In addition, the Executive shall be entitled to bonuses based on the
financial results of the Company's subsidiary, Bridger Logistics, LLC
as set forth in the attached Exhibit A (the "Incentive Bonus") which,
subject to the provisions of Exhibit A and Section 5, shall be
contingent upon the continued employment of the Executive at the
end of the relevant one-year period on which the Incentive Bonus is
based.

(e) The Executive shall be reimbursed by the Company, on terms and
conditions that are substantially similar to those that apply to other
similarly situated senior management employees of the Company
and in accordance with the Company's expense reimbursement
policy, for reasonable out-of-pocket expenses for entertainment,
travel, meals, lodging and similar items which are consistent with the
Company's expense reimbursement policy and actually incurred by
the Executive in the promotion of the Company's business; provided,
however, that, the reimbursement of any such expenses that are
taxable to the Executive shall be made on or before the last day of
the year following the year in which the expense was incurred and
the amount of the expenses eligible for reimbursement during one
year will not affect the amount of expenses eligible for
reimbursement in any other year, and the right to reimbursement
shall not be subject to liquidation or exchange for any other benefit.

5. Rights and Payments Upon Termination. The Executive's right to
benefits and payments, if any, for periods after the Executive's Termination Date
shall be determined in accordance with this Section 5. Additionally, a signed
Agreement and Release will be required of the Executive before payments will be
made to the Executive under this agreement.

(a) Minimum Payments. If the Executive's Termination Date occurs
during the Agreement Term for any reason, the Executive shall be
entitled to the following payments, in addition to any payments or
benefits to which the Executive may be entitled under the following
provisions of this Section 5 (other than this paragraph 5(a)) or the
express terms of any employee benefit plan or as required by law:

(i) the Executive's earned but unpaid Salary for the period
ending on the Executive's Termination Date;

(ii) the Executive's accrued but unpaid vacation pay for the period
ending with the Executive's Termination Date, as determined
in accordance with the Company's policy as in effect from
time to time, and all other amounts earned and owed to the
Executive through and including the Termination Date;

(iii) the Executive's unreimbursed business expenses;

(iv) the Executive's earned but unpaid Target Bonus and Incentive
Bonus for any completed fiscal year or applicable bonus

BLFG_EDPA2274664

computation period; and

(v) any amounts payable to the Executive under the terms of any employee benefit plan.

Payments to be made to the Executive pursuant to subparagraphs 5(a)(i), (ii) and (iv) shall be made within 30 days after the Executive's Termination Date in a lump sum, payments to be made pursuant to subparagraph 5(a)(iii) shall be paid in accordance with paragraph 4(d) and amounts payable pursuant to subparagraph 5(a)(v) shall be paid in accordance with the terms of the applicable employee benefit plan. Except as may be otherwise expressly provided to the contrary in this Agreement or as otherwise provided by law, nothing in this Agreement shall be construed as requiring the Executive to be treated as employed by the Company following the Executive's Termination Date for purposes of any employee benefit plan or arrangement in which the Executive may participate at such time.

(b) Termination by the Company for Cause; Termination for Death or Disability. If the Executive's Termination Date occurs during the Agreement Term and is a result of (i) the Company's termination of the Executive's employment on account of Cause or for disability, or (ii) the Executive's death, then, except as described in paragraph 5(a) or as agreed in writing between the Executive and the Company, neither the Executive nor any other person shall have any right to payments or benefits under this Agreement (and the Company shall have no obligation to make any such payments or provide any such benefits) for periods after the Executive's Termination Date; *provided, however*, that in the event of a termination due to the Executive's death or disability and either (A) the Termination Date occurs prior to the first anniversary of the Closing Date or (B) the Termination Date occurs on or after the first anniversary of the Closing Date and the Bridger EBITDA has reached the threshold level in each of the prior post-Closing years (as defined in Exhibit A), then the Executive shall be entitled to a lump sum payment within 30 days after the Executive's Termination Date of the Incentive Bonus at 100% of the Maximum level set forth on Exhibit A for the year in which the Termination Date occurs, prorated based on the number of days worked during such year.

(c) Termination Other than for Cause; Termination for Good Reason. If the Executive's Termination Date occurs during the Agreement Term and is a result of the Executive's termination of employment (i) by the Company for any reason other than Cause (and is not on account of the Executive's death, disability, the Executive's voluntary resignation, or the mutual agreement of the parties or otherwise as pursuant to paragraph 5(d)), (ii) by the Executive for Good Reason, or (iii) as a result of the Company's notice of non-renewal of the Agreement Term pursuant to Section 2, then the Executive shall be entitled to the following payments and benefits:

(i) A payment equal to two times the Executive's Salary in effect immediately prior to the Termination Date without regard to any reduction thereof in contemplation of the Termination Date.

(ii) A payment equal to two times the Executive's Target Bonus, at his Target Bonus rate in effect immediately prior to the Termination Date without regard to any reduction thereof in contemplation of the Termination Date.

(iii) If either (A) the Termination Date occurs prior to the first anniversary of the Closing Date or (B) the Termination Date occurs on or after the first anniversary of the Closing Date and the Bridger EBITDA has reached the threshold level in each of the prior post-closing years (as defined in Exhibit A), then a

BLFG_EDPA2274665

payment equal to the Incentive Bonus for the year in which
the Termination Date occurs, as well as any Incentive Bonus
for a future year as set forth on Exhibit A, each at 100% of the
Maximum level set forth on Exhibit A.

(iv) For the two year period following the Termination Date, the
Executive shall be entitled to receive continuing group medical
coverage for himself and his dependents (on a non-taxable
basis, including if necessary, payment of any gross-up
payments necessary to result in net non-taxable benefits),
which coverage is not materially less favorable to the
Executive than the group medical coverage which was
provided to the Executive by the Company or its affiliates
immediately prior to the Termination Date. To the extent
applicable and to the extent permitted by law, any continuing
coverage provided to the Executive and/or his dependents
pursuant to this subparagraph (iii) shall be considered part of,
and not in addition to, any coverage required under COBRA.

(v) The Executive will be provided with a lump sum payment of
$12,000 for professional outplacement services.

Subject to the terms and conditions of this Agreement, payments
pursuant to subparagraphs (i) and (ii) next above shall be made in
substantially equal monthly installments beginning within five days
following the Termination Date. Payments to be made to the
Executive pursuant to subparagraphs (iii) and (v) next above shall be
made within 30 days after the Executive's Termination Date in a
lump sum. To the extent that the Company is required to make any
gross-up payments to the Executive in order to provide the benefits
described in subparagraph (iv) on a non-taxable basis, such
payments shall be made in the month that the Executive otherwise
has taxable income as a result of such benefits, but in no event later
than the end of the year in which the Executive pays the related
taxes.

(d) Termination for Voluntary Resignation, Mutual Agreement or Other
Reasons. If the Executive's Termination Date occurs during the
Agreement Term and is a result of the Executive's voluntary
resignation, the mutual agreement of the parties, or any reason other
than those specified in paragraphs 5(b) or (c) above, then, except as
described in paragraph 5(a) or as agreed in writing between the
Executive and the Company, the Executive shall have no right to
payments or benefits under this Agreement (and the Company shall
have no obligation to make any such payments or provide any such
benefits) for periods after the Executive's Termination Date.

6. Mitigation. The Executive shall not be required to mitigate the
amount of any payment provided for in this Agreement by seeking other
employment or otherwise. None of the Company or any of its affiliates shall be
entitled to set off against the amounts payable to the Executive under this
Agreement any amounts owed to the Company or any of its affiliates by the
Executive, any amounts earned by the Executive in other employment after his
Termination Date, or any amounts which might have been earned by the
Executive in other employment had he sought such other employment.

7. Confidentiality. Except as may be required by the lawful order of a
court or agency of competent jurisdiction, except as necessary to carry out his
duties to the Company and its affiliates, and except to the extent that the
Executive otherwise has express written authorization from the Company, the
Executive agrees to keep secret and confidential indefinitely, all Confidential
Information, and not to disclose the same, either directly or indirectly, to any other
person, firm, or business entity, or to use it in any way. The Executive shall,
during the continuance of the Executive's employment with the Company and its
affiliates, use the Executive's best endeavors to prevent the unauthorized

publication or misuse of any Confidential Information. To the extent that any court or agency seeks to have the Executive disclose Confidential Information, he shall promptly inform the Company, and he shall take reasonable steps to prevent disclosure of Confidential Information until the Company has been informed of such requested disclosure and the Company has an opportunity to respond to such court or agency. To the extent that the Executive obtains information on behalf of the Company or any of the affiliates that may be subject to attorney-client privilege as to the Company's attorneys, the Executive shall take reasonable steps to maintain the confidentiality of such information and to preserve such privilege. Nothing in the foregoing provisions of this Section 7 shall be construed so as to prevent the Executive from using, in connection with his employment for himself or an employer other than the Company or any of the affiliates, knowledge which was acquired by him during the course of his employment with the Company and the affiliates, and which is generally known to persons of his experience in other companies in the same industry.

8. Tax Payments. If:

(a) any payment or benefit to which the Executive is entitled from the Company, any affiliate, or trusts established by the Company or by any affiliate (the "Payments," which shall include, without limitation, the vesting of an option or other non-cash benefit or property) are subject to the tax imposed by section 4999 of the Code or any successor provision to that section; and

(b) reduction of the Payments to the amount necessary to avoid the application of such tax would result in the Executive retaining an amount that is greater than the amount he would retain if the Payments were made without such reduction but after the reduction for the amount of the tax imposed by section 4999 of the Code;

then the Payments shall be reduced to the extent required to avoid application of the tax imposed by section 4999 of the Code. The Executive shall be entitled to select the order in which payments are to be reduced in accordance with the preceding sentence. Determination of whether Payments would result in the application of the tax imposed by section 4999 of the Code , and the amount of reduction that is necessary so that no such tax would be applied, shall be made, at the Company's expense, by the independent accounting firm employed by the Company immediately prior to the occurrence of the Change in Control. Notwithstanding the foregoing, in no event shall the Executive be entitled to exercise any discretion with respect to the reduction of payments that are subject to section 409A of the Code and any such payments shall be reduced, if applicable, in the order in which they would otherwise be paid or provided (with the payments to be made first being reduced first) and cash payments shall be reduced prior to any non-cash payments or benefits.

9. Other Benefits. Except as may be otherwise specifically provided in an amendment of this Agreement adopted in accordance with Section 13, the Executive shall not be eligible to participate in or to receive any benefits pursuant to the terms of any severance pay or termination pay arrangement of the Company (or any affiliate of the Company), including any arrangement of the Company (or any affiliate of the Company) providing benefits upon involuntary termination of employment.

10. Withholding. All payments to the Executive under this Agreement will be subject to all applicable withholding of applicable taxes.

11. Assistance with Claims. The Executive agrees that, for the period beginning on the Effective Date, and continuing for a reasonable period after the Executive's Termination Date, the Executive will assist the Company and its affiliates in defense of any claims that may be made against the Company or its affiliates and will assist the Company and its affiliates in the prosecution of any claims that may be made by the Company or its affiliates, to the extent that such claims may relate to services performed by the Executive for the Company or its affiliates. The Executive agrees to promptly inform the Company if he becomes aware of any lawsuits involving such claims that may be filed against the Company

BLFG_EDPA2274667

or its affiliates. The Company agrees to provide legal counsel to the Executive in connection with such assistance (to the extent legally permitted), and to reimburse the Executive for all of his reasonable out-of-pocket expenses associated with such assistance, including travel expenses. For periods after the Executive's employment with the Company terminates, the Company agrees to provide reasonable compensation to the Executive for such assistance. The Executive also agrees to promptly inform the Company if he is asked to assist in any investigation of the Company or its affiliates (or their actions) that may relate to services performed by the Executive for the Company or its affiliates, regardless of whether a lawsuit has then been filed against the Company or its affiliates with respect to such investigation. Any compensation payable to the Executive pursuant to this Section 11 for services provided to the Company shall be paid within ten days after the Executive provides the applicable services. To the extent that any reimbursements to be provided pursuant to this Section 11 are taxable to the Executive, such reimbursements shall be paid to the Executive only if (a) the expenses are incurred and reimbursable pursuant to a reimbursement plan that provides an objectively determinable nondiscretionary definition of the expenses that are eligible for reimbursement and (b) the expenses are incurred within two years following the Termination Date. With respect to any expenses that are reimbursable pursuant to the preceding sentence, the amount of the expenses that are eligible for reimbursement during one calendar year may not affect the amount of reimbursements to be provided in any subsequent calendar year, the reimbursement of an eligible expense shall be made on or before the last day of the calendar year following the calendar year in which the expense was incurred, and the right to reimbursement of the expenses shall not be subject to liquidation or exchange for any other benefit.

12. Nonalienation. The interests of the Executive under this Agreement are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, or garnishment by creditors of the Executive or the Executive's beneficiary.

13. Amendment. This Agreement may be amended or canceled only by mutual agreement of the parties in writing without the consent of any other person. So long as the Executive lives, no person, other than the parties hereto, shall have any rights under or interest in this Agreement or the subject matter hereof.

14. Applicable Law. The provisions of this Agreement shall be construed in accordance with the laws of the State of Texas, without regard to the conflict of law provisions of any state.

15. Severability. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, and this Agreement will be construed as if such invalid or unenforceable provision were omitted (but only to the extent that such provision cannot be appropriately reformed or modified).

16. Obligation of Company. Except as otherwise specifically provided in this Agreement, nothing in this Agreement shall be construed to affect the Company's right to modify the Executive's position or duties, compensation, or other terms of employment, or to terminate the Executive's employment. Nothing in this Agreement shall be construed to require the Company or any other person to take steps or not take steps (including, without limitation, the giving or withholding of consents) that would result in a Change in Control.

17. Waiver of Breach. No waiver by any party hereto of a breach of any provision of this Agreement by any other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party of any similar or dissimilar provisions and conditions at the same or any prior or subsequent time. The failure of any party hereto to take any action by reason of such breach will not deprive such party of the right to take action at any time while such breach continues.

18. Successors, Assumption of Contract. This Agreement is personal to the Executive and may not be assigned by the Executive without the written

BLFG_EDPA2274668

consent of the Company. However, to the extent that rights or benefits under this Agreement otherwise survive the Executive's death, the Executive's heirs and estate shall succeed to such rights and benefits pursuant to the Executive's will or the laws of descent and distribution; provided that the Executive shall have the right at any time and from time to time, by notice delivered to the Company, to designate or to change the beneficiary or beneficiaries with respect to such benefits. This Agreement shall be binding upon and inure to the benefit of the Company and any successor of the Company, subject to the following:

(a) The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

(b) After a successor assumes this Agreement in accordance with this Section 18, only such successor shall be liable for amounts payable after such assumption, and no other companies (including, without limitation, the Company and any other predecessors) shall have liability for amounts payable after such assumption.

(c) If the successor is required to assume the obligations of this Agreement under subparagraph 18(a), the successor shall execute and deliver to the Executive a written acknowledgment of the assumption of the Agreement.

19. Notices. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid (provided that international mail shall be sent via overnight or two-day delivery), or sent by facsimile or prepaid overnight courier to the parties at the addresses set forth below. Such notices, demands, claims and other communications shall be deemed given:

(a) in the case of delivery by overnight service with guaranteed next day delivery, the next day or the day designated for delivery;

(b) in the case of certified or registered U.S. mail, five days after deposit in the U.S. mail; or

(c) in the case of facsimile, the date upon which the transmitting party received confirmation of receipt by facsimile, telephone or otherwise;

provided, however, that in no event shall any such communications be deemed to be given later than the date they are actually received. Communications that are to be delivered by the U.S. mail or by overnight service or two-day delivery service are to be delivered to the addresses set forth below:

to the Company:

Stephen L. Wambold

Chief Executive Officer

Ferrellgas
7500 College Blvd., Suite 1000
Overland Park, Kansas 66210

or to the Executive:

Julio E. Rios, II

5625 Netherland Court
Dallas, Texas 75229

Each party, by written notice furnished to the other party, may modify the applicable delivery address, except that notice of change of address shall be

BLFG_EDPA2274669

effective only upon receipt.

20. Arbitration of All Disputes. Any controversy or claim arising out of or relating to this Agreement (or the breach thereof) shall be settled by final, binding and non-appealable arbitration in Overland Park, Kansas by three arbitrators. Except as otherwise expressly provided in this Section 20, the arbitration shall be conducted in accordance with the rules of the American Arbitration Association (the "Association") then in effect. One of the arbitrators shall be appointed by the Company, one shall be appointed by the Executive, and the third shall be appointed by the first two arbitrators. If the first two arbitrators cannot agree on the third arbitrator within 30 days of the appointment of the second arbitrator, then the third arbitrator shall be appointed by the Association.

21. Survival of Agreement. Except as otherwise expressly provided in this Agreement, the rights and obligations of the parties to this Agreement shall survive the termination of the Executive's employment with the Company.

22. Entire Agreement. Except as otherwise provided herein, this Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior or contemporaneous agreements, if any, between the parties relating to the subject matter hereof; provided, however, that nothing in this Agreement shall be construed to limit any policy or agreement that is otherwise applicable relating to confidentiality, rights to inventions, copyrightable material, business and/or technical information, trade secrets, solicitation of employees, interference with relationships with other businesses, competition, and other similar policies or agreement for the protection of the business and operations of the Company and its affiliates.

23. Code Section 409A. Notwithstanding any other provision of this Agreement to the contrary, if any payment or benefit hereunder is subject to section 409A of the Code, if such payment or benefit is to be paid or provided on account of the Executive's separation from service (within the meaning of section 409A of the Code), and if such payment or benefit is required to be made or provided prior to the first day of the seventh month following the Employee's separation from service, and if the Executive is a specified employee (within the meaning of section 409A(a)(2)(B) of the Code), such payment or benefit shall be paid or provided on the later of (a) the first day of the seventh month following the Executive's separation from service or (b) the date on which such payment or benefit would otherwise be paid or provided pursuant to the terms of this Agreement.

24. Counterparts. This Agreement may be executed in two or more counterparts, any one of which shall be deemed the original without reference to the others.


# Exhibit A


The Incentive Bonus pool of the Executive shall be $20 million, divided equally among the first three one year periods beginning on the closing date (the "Closing Date") of the transaction between Company or its affiliate and Bridger, LLC for the purchase of the membership interests in Bridger Logistics, LLC. The award of an Incentive Bonus shall be based on the EBITDA of Bridger Logistics, LLC and any direct spin-off entities or businesses of Bridger Logistics (the "Bridger EBITDA"), computed in accordance with the accounting principles and elections utilized by Company and its affiliates, consistently applied. In the event of subsequent acquisitions or dispositions by Bridger Logistics of entities or substantially all of the assets of entities, the parties agree to negotiate in good faith regarding whether and to what extent the Bridger EBITDA incentive targets shall be adjusted to reflect such transactions.

Year 1 shall include the first one year period beginning on the Closing Date and ending the day before the first anniversary of the Closing Date. The maximum Incentive Bonus for that period shall be $6,666,667.

Year 2 shall include the second one year period beginning on the first anniversary

of the Closing Date and ending the day before the second anniversary of the
Closing Date. The maximum Incentive Bonus for that period shall be $6,666,667.
Year 3 shall include the third one year period beginning on the second anniversary
of the Closing Date and ending the day before the third anniversary of the Closing
Date. The maximum Incentive Bonus for that period shall be $6,666,667.
The Year 1 Incentive Bonus shall be paid as follows:

**Bridger EBITDA Percentage of Maximum Incentive Bonus**

$120 Million (threshold level) or more 50% $3,333,334
$125 Million or more 75% $5,000,000
$135 Million or more 100% $6,666,667

The Year 2 Incentive Bonus shall be paid as follows:

**Bridger EBITDA Percentage of Maximum Incentive Bonus**
$125 Million (threshold level) or more 50% $3,333,334
$135 Million or more 75% $5,000,000
$145 Million or more 100% $6,666,667

The Year 3 Incentive Bonus shall be paid as follows:

**Bridger EBITDA Percentage of Maximum Incentive Bonus**
$135 Million (threshold level) or more 50% $3,333,334
$145 Million or more 75% $5,000,000
$155 Million or more 100% $6,666,667

In the event that the Bridger EBITDA does not reach the threshold level for a year,
the payment of an Incentive Bonus is discretionary and shall be determined by the
Chief Executive Officer and the Board of Directors of Company.
In the event of the occurrence of a Change of Control while the Executive remains
employed and either (i) prior to the first anniversary of the Closing Date or (ii) on or
after the first anniversary of the Closing Date and the Bridger EBITDA has reached
the threshold level in each of the prior post-Closing years, then any unpaid Year 1
Incentive Bonus, Year 2 Incentive Bonus and Year 3 Incentive Bonus will be
accelerated and paid in full at 100% of Maximum on the date of the Change of
Control. Except as expressly provided in Section 5 or upon the occurrence of a
Change of Control, payment of the Incentive Bonus is at all times contingent upon
the continued employment of the Executive during and through the end of the oneyear
period upon which it is based. Payment will be made within 30 days following
the close of the relevant one-year period upon which the Incentive Bonus is based.
For purposes of this Exhibit A, Change of Control is defined as any transaction
that meets the definition of Change in Control in Section 1(c), as well as either a
sale all or substantially all of the membership interests or assets of Bridger
Logistics, LLC or the partnership interests or assets of Ferrellgas, L.P. to an
unrelated and unaffiliated entity or entities.

BLFG_EDPA2274671

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement"), made and entered into this 29th day of May, 2015, by and between Ferrellgas, Inc. (the "Company") and Jeremy H. Gamboa (the "Executive");

## WITNESSETH THAT:

WHEREAS, the Company and Bridger, LLC are entering into a Purchase and Sale Agreement whereby Company has agreed to purchase all of the membership interests of Bridger Logistics, LLC (the "Transaction"); and

WHEREAS, the Executive is the Chief Operating Officer of Bridger Logistics, LLC; and

WHEREAS, the Company wishes to continue to assure itself of the continuity of the Executive's services; and

WHEREAS, the Company and the Executive now desire to enter into this Agreement relating to the Executive's continued employment with the Company; and

WHEREAS, Executive will enter a noncompetition agreement contemporaneously herewith;

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein and in the noncompetition agreement, IT IS HEREBY AGREED by and between the parties as follows:

1. Certain Definitions. In addition to terms otherwise defined herein, the following capitalized terms used in this Agreement shall have the meanings specified:

(a) Board. The term "Board" means the Board of Directors of the Company.

(b) Cause. The term "Cause" means:

(i) the willful and continued failure by the Executive to substantially perform his duties for the Company (other than any such failure resulting from the Executive's being disabled) within a reasonable period of time after a written demand for substantial performance is delivered to the Executive by the Board, which demand specifically identifies the manner in which the Board believes that the Executive has not substantially performed his duties;

(ii) the willful engaging by the Executive in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise;

(iii) the engaging by the Executive in egregious misconduct involving serious moral turpitude to the extent that, in the reasonable judgment of the Board, the Executive's credibility and reputation no longer conform to the standard of the Company's executives; or

(iv) the Executive's material breach of a material term of this Agreement. For purposes of this Agreement, no act, or failure to act, on the Executive's part shall be deemed "willful" unless done, or omitted to be done, by the Executive not in good faith and without reasonable belief that the Executive's action or omission was in the best interest of the Company.

(c) Change in Control. The term "Change in Control" means the first to occur of any of the following that occurs after the Effective Date:

(i) any merger or consolidation of the Company in which the Company is not the survivor;

(ii) any sale of all or substantially all of the common stock of Ferrell Companies, Inc. by the Ferrell Companies, Inc. Employee Stock Ownership Trust;

(iii) a sale of all or substantially all of the common stock of the Company;

(iv) a replacement of the Company as the General Partner of Ferrellgas Partners, L.P.;

(v) a public sale of at least 51 percent of the equity of Ferrell Companies,

BLFG_EDPA2274672

Inc.; or

(vi) such other transaction designated as a Change in Control by the Board.

(d) Confidential Information. For purposes of this Agreement, the term "Confidential Information" shall include (i) all non-public information (including, without limitation, information regarding litigation and pending litigation) concerning the Company and the affiliates which is acquired by or disclosed to the Executive during the course of his employment with the Company and (ii) all non-public information concerning any other person or company that was shared with the Company or an affiliate of the Company that is subject to an agreement to maintain the confidentiality of such information.

(e) COBRA. The term "COBRA" means continuing group health coverage required by section 4980B of the Code or sections 601 et. seq. of the Employee Retirement Income Security Act of 1974, as amended.

(f) Code. The term "Code" means the Internal Revenue Code of 1986, as amended.

(g) Good Reason. The term "Good Reason" means any of the following which occur after the Effective Date without the consent of the Executive:

(a) A reduction in excess of 10% in the Executive's Salary (as defined in paragraph 4(a)) or target incentive potential as in effect as of the Effective Date, as the same may be modified from time to time in accordance with this Agreement;

(b) A material diminution in the Executive's authority, duties or responsibilities as in effect as of the Effective Date, as the same may be modified from time to time in accordance with this Agreement;

(c) The relocation of the Executive's principal office location to a location which is more than 50 highway miles from the location of the Executive's principal office location as in effect on the Effective Date (or such subsequent principal location agreed to by the Executive); or

(d) The Company's material breach of any material term of this Agreement, which, for the avoidance of doubt, will include any breach of Section 4(b) and 4(d).

Notwithstanding any other provision of this Agreement to the contrary, the Executive's Termination Date shall not be considered to be on account of Good Reason unless the Executive provides notice of the event or condition that the Executive believes to constitute Good Reason within 180 days after the date on which the event first occurs or the condition first exists, the Company does not cure such event or condition within 30 days following the date the Executive provides notice and the Executive resigns his employment with the Company and its affiliates for Good Reason within the Agreement Term.

(h) Termination Date. The term "Termination Date" with respect to the Executive means the date on which the Executive's employment with the Company and its affiliates terminates for any reason, including voluntary resignation. If the Executive becomes employed by the entity into which the Company is merged, or the purchaser of substantially all of the assets of the Company, or a successor to such entity or purchaser, the Executive's Termination Date shall not be treated as having occurred for purposes of this Agreement until such time as the Executive terminates employment with the successor and its affiliates (including, without limitation, the merged entity or purchaser). If the Executive is transferred to employment with an affiliate (including a successor to the Company, and regardless of whether before, on, or after a Change in Control), such transfer shall not constitute the Executive's Termination Date for purposes of this Agreement. To the extent that any payments or benefits under the Agreement are subject to section 409A of the Code and are paid or provided on account of the Executive's Termination Date, the determination as to whether the

Executive has had a Termination Date (or other termination of employment or separation from service) shall be made in accordance with section 409A of the Code and the guidance issued thereunder.

2. Agreement Term. Contingent upon the closing of the Transaction, and subject to the terms and conditions of this Agreement, the Company hereby agrees to employ the Executive during the Agreement Term (as defined below) and the Executive hereby agrees to remain in the employ of the Company and to provide services during the Agreement Term in accordance with this Agreement. Unless terminated sooner in accordance with this Agreement, the "Agreement Term" shall be the period beginning on the date of closing of the Transaction (the "Effective Date") and ending on the day before the third anniversary of the closing of the Transaction and, thereafter, the Agreement Term will be automatically extended for successive 12-month periods, unless one party to this Agreement provides notice of non-renewal to the other at least 180 days before the last day of then current Agreement Term. Notwithstanding the foregoing, if a Change in Control occurs during the Agreement Term (as it may be extended from time to time), the Agreement Term shall continue for a period of twenty-four calendar months beyond the calendar month in which such Change in Control occurs and, following an extension in accordance with this sentence, the Agreement Term shall expire without further action by any party. Notwithstanding the foregoing, in all cases, the Agreement Term shall terminate on the Executive's Termination Date. All of the obligations and covenants contained in this agreement are conditioned upon the closing of the Transaction by September 1, 2015.

3. Performance of Duties. The Executive shall serve as the Chief Operating Officer of Bridger Logistics, LLC and shall serve as the Senior Vice President of the Company, with such duties, power and authority as are associated with such positions. The Executive agrees that during the Agreement Term from and after the Effective Date, while the Executive is employed by the Company, the Executive will devote the Executive's full business time, energies and talents to serving the Company, at the direction of the Board. The Executive shall have such duties and responsibilities as may be assigned to the Executive from time to time by the Board, shall perform all duties assigned to the Executive faithfully and efficiently, subject to the direction of the Board, and shall have such authorities and powers as are inherent to the undertakings applicable to the Executive's position and necessary to carry out the responsibilities and duties required of the Executive hereunder. The Executive will perform the duties required by this Agreement at the Company's principal place of business unless the nature of such duties requires otherwise. Notwithstanding the foregoing, during the Agreement Term, the Executive may devote reasonable time to activities other than those required under this Agreement, including activities of a charitable, educational, religious or similar nature (including professional associations) to the extent such activities do not, in the reasonable judgment of the Board, inhibit, prohibit, interfere with or conflict with the Executive's duties under this Agreement or conflict in any material way with the business of the Company and its affiliates; provided, however, that the Executive shall not serve on the board of directors of any business (other than the Company or its affiliates) or hold any other position with any business without receiving the prior written consent of the Board.

4. Compensation. During the Agreement Term, while the Executive is employed by the Company, the Executive shall be compensated for the Executive's services as follows:

(a) The Executive shall receive, for each 12-consecutive month period beginning on the Effective Date and each anniversary thereof, a base annual salary ("Salary") at the rate of $400,000. The Salary shall be payable in accordance with the regular payroll practices of the Company. The Executive's rate of Salary shall be reviewed annually by the Board; provided that the Executive's rate of Salary will not be reduced.

(b) The Executive shall be eligible to participate in employee benefit

plans and programs maintained from time to time by the Company for the benefit of similarly situated senior management employees, subject to the terms and conditions of such plans. The Company is developing a long-term equity-based incentive award program for senior management employees to supplement its current stock appreciate rights program, and Executive shall be granted an longterm equity-based incentive award, on terms and conditions substantially similar to those provided to similarly situated senior management employees. On each anniversary of the Effective Date, if a long-term equity-based incentive award has not been made for such year pursuant to this section, the Executive shall be entitled to a cash payment of $1,000,000.

(c) The Executive shall be entitled to participate in the bonus plan based upon total Company performance, with a target bonus set at the discretion of the board of directors (the "Target Bonus") which shall be commensurate with other executives at the same level.

(d) In addition, the Executive shall be entitled to bonuses based on the financial results of the Company's subsidiary, Bridger Logistics, LLC as set forth in the attached Exhibit A (the "Incentive Bonus") which, subject to the provisions of Exhibit A and Section 5, shall be contingent upon the continued employment of the Executive at the end of the relevant one-year period on which the Incentive Bonus is based.

(e) The Executive shall be reimbursed by the Company, on terms and conditions that are substantially similar to those that apply to other similarly situated senior management employees of the Company and in accordance with the Company's expense reimbursement policy, for reasonable out-of-pocket expenses for entertainment, travel, meals, lodging and similar items which are consistent with the Company's expense reimbursement policy and actually incurred by the Executive in the promotion of the Company's business; provided, however, that, the reimbursement of any such expenses that are taxable to the Executive shall be made on or before the last day of the year following the year in which the expense was incurred and the amount of the expenses eligible for reimbursement during one year will not affect the amount of expenses eligible for reimbursement in any other year, and the right to reimbursement shall not be subject to liquidation or exchange for any other benefit.

5. Rights and Payments Upon Termination. The Executive's right to benefits and payments, if any, for periods after the Executive's Termination Date shall be determined in accordance with this Section 5. Additionally, a signed Agreement and Release will be required of the Executive before payments will be made to the Executive under this agreement.

(a) Minimum Payments. If the Executive's Termination Date occurs during the Agreement Term for any reason, the Executive shall be entitled to the following payments, in addition to any payments or benefits to which the Executive may be entitled under the following provisions of this Section 5 (other than this paragraph 5(a)) or the express terms of any employee benefit plan or as required by law:

(i) the Executive's earned but unpaid Salary for the period ending on the Executive's Termination Date;

(ii) the Executive's accrued but unpaid vacation pay for the period ending with the Executive's Termination Date, as determined in accordance with the Company's policy as in effect from time to time, and all other amounts earned and owed to the Executive through and including the Termination Date;

(iii) the Executive's unreimbursed business expenses;

(iv) the Executive's earned but unpaid Target Bonus and Incentive Bonus for any completed fiscal year or applicable bonus

computation period; and

(v) any amounts payable to the Executive under the terms of any employee benefit plan.

Payments to be made to the Executive pursuant to subparagraphs 5(a)(i), (ii) and (iv) shall be made within 30 days after the Executive's Termination Date in a lump sum, payments to be made pursuant to subparagraph 5(a)(iii) shall be paid in accordance with paragraph 4(d) and amounts payable pursuant to subparagraph 5(a)(v) shall be paid in accordance with the terms of the applicable employee benefit plan. Except as may be otherwise expressly provided to the contrary in this Agreement or as otherwise provided by law, nothing in this Agreement shall be construed as requiring the Executive to be treated as employed by the Company following the Executive's Termination Date for purposes of any employee benefit plan or arrangement in which the Executive may participate at such time.

(b) Termination by the Company for Cause; Termination for Death or Disability. If the Executive's Termination Date occurs during the Agreement Term and is a result of (i) the Company's termination of the Executive's employment on account of Cause or for disability, or (ii) the Executive's death, then, except as described in paragraph 5(a) or as agreed in writing between the Executive and the Company, neither the Executive nor any other person shall have any right to payments or benefits under this Agreement (and the Company shall have no obligation to make any such payments or provide any such benefits) for periods after the Executive's Termination Date; *provided, however*, that in the event of a termination due to the Executive's death or disability and either (A) the Termination Date occurs prior to the first anniversary of the Closing Date or (B) the Termination Date occurs on or after the first anniversary of the Closing Date and the Bridger EBITDA has reached the threshold level in each of the prior post-Closing years (as defined in Exhibit A), then the Executive shall be entitled to a lump sum payment within 30 days after the Executive's Termination Date of the Incentive Bonus at 100% of the Maximum level set forth on Exhibit A for the year in which the Termination Date occurs, prorated based on the number of days worked during such year.

(c) Termination Other than for Cause; Termination for Good Reason. If the Executive's Termination Date occurs during the Agreement Term and is a result of the Executive's termination of employment (i) by the Company for any reason other than Cause (and is not on account of the Executive's death, disability, the Executive's voluntary resignation, or the mutual agreement of the parties or otherwise as pursuant to paragraph 5(d)), (ii) by the Executive for Good Reason, or (iii) as a result of the Company's notice of non-renewal of the Agreement Term pursuant to Section 2, then the Executive shall be entitled to the following payments and benefits:

(i) A payment equal to two times the Executive's Salary in effect immediately prior to the Termination Date without regard to any reduction thereof in contemplation of the Termination Date.

(ii) A payment equal to two times the Executive's Target Bonus, at his Target Bonus rate in effect immediately prior to the Termination Date without regard to any reduction thereof in contemplation of the Termination Date.

(iii) If either (A) the Termination Date occurs prior to the first anniversary of the Closing Date or (B) the Termination Date occurs on or after the first anniversary of the Closing Date and the Bridger EBITDA has reached the threshold level in each of the prior post-closing years (as defined in Exhibit A), then a

payment equal to the Incentive Bonus for the year in which
the Termination Date occurs, as well as any Incentive Bonus
for a future year as set forth on Exhibit A, each at 100% of the
Maximum level set forth on Exhibit A.

(iv) For the two year period following the Termination Date, the
Executive shall be entitled to receive continuing group medical
coverage for himself and his dependents (on a non-taxable
basis, including if necessary, payment of any gross-up
payments necessary to result in net non-taxable benefits),
which coverage is not materially less favorable to the
Executive than the group medical coverage which was
provided to the Executive by the Company or its affiliates
immediately prior to the Termination Date. To the extent
applicable and to the extent permitted by law, any continuing
coverage provided to the Executive and/or his dependents
pursuant to this subparagraph (iii) shall be considered part of,
and not in addition to, any coverage required under COBRA.

(v) The Executive will be provided with a lump sum payment of
$12,000 for professional outplacement services.

Subject to the terms and conditions of this Agreement, payments
pursuant to subparagraphs (i) and (ii) next above shall be made in
substantially equal monthly installments beginning within five days
following the Termination Date. Payments to be made to the
Executive pursuant to subparagraphs (iii) and (v) next above shall be
made within 30 days after the Executive's Termination Date in a
lump sum. To the extent that the Company is required to make any
gross-up payments to the Executive in order to provide the benefits
described in subparagraph (iv) on a non-taxable basis, such
payments shall be made in the month that the Executive otherwise
has taxable income as a result of such benefits, but in no event later
than the end of the year in which the Executive pays the related
taxes.

(d) Termination for Voluntary Resignation, Mutual Agreement or Other
Reasons. If the Executive's Termination Date occurs during the
Agreement Term and is a result of the Executive's voluntary
resignation, the mutual agreement of the parties, or any reason other
than those specified in paragraphs 5(b) or (c) above, then, except as
described in paragraph 5(a) or as agreed in writing between the
Executive and the Company, the Executive shall have no right to
payments or benefits under this Agreement (and the Company shall
have no obligation to make any such payments or provide any such
benefits) for periods after the Executive's Termination Date.

6. Mitigation. The Executive shall not be required to mitigate the
amount of any payment provided for in this Agreement by seeking other
employment or otherwise. None of the Company or any of its affiliates shall be
entitled to set off against the amounts payable to the Executive under this
Agreement any amounts owed to the Company or any of its affiliates by the
Executive, any amounts earned by the Executive in other employment after his
Termination Date, or any amounts which might have been earned by the
Executive in other employment had he sought such other employment.

7. Confidentiality. Except as may be required by the lawful order of a
court or agency of competent jurisdiction, except as necessary to carry out his
duties to the Company and its affiliates, and except to the extent that the
Executive otherwise has express written authorization from the Company, the
Executive agrees to keep secret and confidential indefinitely, all Confidential
Information, and not to disclose the same, either directly or indirectly, to any other
person, firm, or business entity, or to use it in any way. The Executive shall,
during the continuance of the Executive's employment with the Company and its
affiliates, use the Executive's best endeavors to prevent the unauthorized

publication or misuse of any Confidential Information. To the extent that any court or agency seeks to have the Executive disclose Confidential Information, he shall promptly inform the Company, and he shall take reasonable steps to prevent disclosure of Confidential Information until the Company has been informed of such requested disclosure and the Company has an opportunity to respond to such court or agency. To the extent that the Executive obtains information on behalf of the Company or any of the affiliates that may be subject to attorney-client privilege as to the Company's attorneys, the Executive shall take reasonable steps to maintain the confidentiality of such information and to preserve such privilege. Nothing in the foregoing provisions of this Section 7 shall be construed so as to prevent the Executive from using, in connection with his employment for himself or an employer other than the Company or any of the affiliates, knowledge which was acquired by him during the course of his employment with the Company and the affiliates, and which is generally known to persons of his experience in other companies in the same industry.

8. Tax Payments. If:

(a) any payment or benefit to which the Executive is entitled from the Company, any affiliate, or trusts established by the Company or by any affiliate (the "Payments," which shall include, without limitation, the vesting of an option or other non-cash benefit or property) are subject to the tax imposed by section 4999 of the Code or any successor provision to that section; and

(b) reduction of the Payments to the amount necessary to avoid the application of such tax would result in the Executive retaining an amount that is greater than the amount he would retain if the Payments were made without such reduction but after the reduction for the amount of the tax imposed by section 4999 of the Code;

then the Payments shall be reduced to the extent required to avoid application of the tax imposed by section 4999 of the Code. The Executive shall be entitled to select the order in which payments are to be reduced in accordance with the preceding sentence. Determination of whether Payments would result in the application of the tax imposed by section 4999 of the Code , and the amount of reduction that is necessary so that no such tax would be applied, shall be made, at the Company's expense, by the independent accounting firm employed by the Company immediately prior to the occurrence of the Change in Control. Notwithstanding the foregoing, in no event shall the Executive be entitled to exercise any discretion with respect to the reduction of payments that are subject to section 409A of the Code and any such payments shall be reduced, if applicable, in the order in which they would otherwise be paid or provided (with the payments to be made first being reduced first) and cash payments shall be reduced prior to any non-cash payments or benefits.

9. Other Benefits. Except as may be otherwise specifically provided in an amendment of this Agreement adopted in accordance with Section 13, the Executive shall not be eligible to participate in or to receive any benefits pursuant to the terms of any severance pay or termination pay arrangement of the Company (or any affiliate of the Company), including any arrangement of the Company (or any affiliate of the Company) providing benefits upon involuntary termination of employment.

10. Withholding. All payments to the Executive under this Agreement will be subject to all applicable withholding of applicable taxes.

11. Assistance with Claims. The Executive agrees that, for the period beginning on the Effective Date, and continuing for a reasonable period after the Executive's Termination Date, the Executive will assist the Company and its affiliates in defense of any claims that may be made against the Company or its affiliates and will assist the Company and its affiliates in the prosecution of any claims that may be made by the Company or its affiliates, to the extent that such claims may relate to services performed by the Executive for the Company or its affiliates. The Executive agrees to promptly inform the Company if he becomes aware of any lawsuits involving such claims that may be filed against the Company

BLFG_EDPA2274678

or its affiliates. The Company agrees to provide legal counsel to the Executive in connection with such assistance (to the extent legally permitted), and to reimburse the Executive for all of his reasonable out-of-pocket expenses associated with such assistance, including travel expenses. For periods after the Executive's employment with the Company terminates, the Company agrees to provide reasonable compensation to the Executive for such assistance. The Executive also agrees to promptly inform the Company if he is asked to assist in any investigation of the Company or its affiliates (or their actions) that may relate to services performed by the Executive for the Company or its affiliates, regardless of whether a lawsuit has then been filed against the Company or its affiliates with respect to such investigation. Any compensation payable to the Executive pursuant to this Section 11 for services provided to the Company shall be paid within ten days after the Executive provides the applicable services. To the extent that any reimbursements to be provided pursuant to this Section 11 are taxable to the Executive, such reimbursements shall be paid to the Executive only if (a) the expenses are incurred and reimbursable pursuant to a reimbursement plan that provides an objectively determinable nondiscretionary definition of the expenses that are eligible for reimbursement and (b) the expenses are incurred within two years following the Termination Date. With respect to any expenses that are reimbursable pursuant to the preceding sentence, the amount of the expenses that are eligible for reimbursement during one calendar year may not affect the amount of reimbursements to be provided in any subsequent calendar year, the reimbursement of an eligible expense shall be made on or before the last day of the calendar year following the calendar year in which the expense was incurred, and the right to reimbursement of the expenses shall not be subject to liquidation or exchange for any other benefit.

12. Nonalienation. The interests of the Executive under this Agreement are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, or garnishment by creditors of the Executive or the Executive's beneficiary.

13. Amendment. This Agreement may be amended or canceled only by mutual agreement of the parties in writing without the consent of any other person. So long as the Executive lives, no person, other than the parties hereto, shall have any rights under or interest in this Agreement or the subject matter hereof.

14. Applicable Law. The provisions of this Agreement shall be construed in accordance with the laws of the State of Texas, without regard to the conflict of law provisions of any state.

15. Severability. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, and this Agreement will be construed as if such invalid or unenforceable provision were omitted (but only to the extent that such provision cannot be appropriately reformed or modified).

16. Obligation of Company. Except as otherwise specifically provided in this Agreement, nothing in this Agreement shall be construed to affect the Company's right to modify the Executive's position or duties, compensation, or other terms of employment, or to terminate the Executive's employment. Nothing in this Agreement shall be construed to require the Company or any other person to take steps or not take steps (including, without limitation, the giving or withholding of consents) that would result in a Change in Control.

17. Waiver of Breach. No waiver by any party hereto of a breach of any provision of this Agreement by any other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party of any similar or dissimilar provisions and conditions at the same or any prior or subsequent time. The failure of any party hereto to take any action by reason of such breach will not deprive such party of the right to take action at any time while such breach continues.

18. Successors, Assumption of Contract. This Agreement is personal to the Executive and may not be assigned by the Executive without the written

consent of the Company. However, to the extent that rights or benefits under this Agreement otherwise survive the Executive's death, the Executive's heirs and estate shall succeed to such rights and benefits pursuant to the Executive's will or the laws of descent and distribution; provided that the Executive shall have the right at any time and from time to time, by notice delivered to the Company, to designate or to change the beneficiary or beneficiaries with respect to such benefits. This Agreement shall be binding upon and inure to the benefit of the Company and any successor of the Company, subject to the following:

(a) The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

(b) After a successor assumes this Agreement in accordance with this Section 18, only such successor shall be liable for amounts payable after such assumption, and no other companies (including, without limitation, the Company and any other predecessors) shall have liability for amounts payable after such assumption.

(c) If the successor is required to assume the obligations of this Agreement under subparagraph 18(a), the successor shall execute and deliver to the Executive a written acknowledgment of the assumption of the Agreement.

19. Notices. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid (provided that international mail shall be sent via overnight or two-day delivery), or sent by facsimile or prepaid overnight courier to the parties at the addresses set forth below. Such notices, demands, claims and other communications shall be deemed given:

(a) in the case of delivery by overnight service with guaranteed next day delivery, the next day or the day designated for delivery;

(b) in the case of certified or registered U.S. mail, five days after deposit in the U.S. mail; or

(c) in the case of facsimile, the date upon which the transmitting party received confirmation of receipt by facsimile, telephone or otherwise;

provided, however, that in no event shall any such communications be deemed to be given later than the date they are actually received. Communications that are to be delivered by the U.S. mail or by overnight service or two-day delivery service are to be delivered to the addresses set forth below:

to the Company:

Stephen L. Wambold

Chief Executive Officer

Ferrellgas
7500 College Blvd., Suite 1000
Overland Park, Kansas 66210

or to the Executive:

Jeremy H. Gamboa

6837 Cliffbrook Drive
Dallas, TX 75254

Each party, by written notice furnished to the other party, may modify the applicable delivery address, except that notice of change of address shall be effective only upon receipt.

20. Arbitration of All Disputes. Any controversy or claim arising out of or relating to this Agreement (or the breach thereof) shall be settled by final, binding and non-appealable arbitration in Overland Park, Kansas by three arbitrators. Except as otherwise expressly provided in this Section 20, the arbitration shall be conducted in accordance with the rules of the American Arbitration Association (the "Association") then in effect. One of the arbitrators shall be appointed by the Company, one shall be appointed by the Executive, and the third shall be appointed by the first two arbitrators. If the first two arbitrators cannot agree on the third arbitrator within 30 days of the appointment of the second arbitrator, then the third arbitrator shall be appointed by the Association.

21. Survival of Agreement. Except as otherwise expressly provided in this Agreement, the rights and obligations of the parties to this Agreement shall survive the termination of the Executive's employment with the Company.

22. Entire Agreement. Except as otherwise provided herein, this Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior or contemporaneous agreements, if any, between the parties relating to the subject matter hereof; provided, however, that nothing in this Agreement shall be construed to limit any policy or agreement that is otherwise applicable relating to confidentiality, rights to inventions, copyrightable material, business and/or technical information, trade secrets, solicitation of employees, interference with relationships with other businesses, competition, and other similar policies or agreement for the protection of the business and operations of the Company and its affiliates.

23. Code Section 409A. Notwithstanding any other provision of this Agreement to the contrary, if any payment or benefit hereunder is subject to section 409A of the Code, if such payment or benefit is to be paid or provided on account of the Executive's separation from service (within the meaning of section 409A of the Code), and if such payment or benefit is required to be made or provided prior to the first day of the seventh month following the Employee's separation from service, and if the Executive is a specified employee (within the meaning of section 409A(a)(2)(B) of the Code), such payment or benefit shall be paid or provided on the later of (a) the first day of the seventh month following the Executive's separation from service or (b) the date on which such payment or benefit would otherwise be paid or provided pursuant to the terms of this Agreement.

24. Counterparts. This Agreement may be executed in two or more counterparts, any one of which shall be deemed the original without reference to the others.

# Exhibit A

The Incentive Bonus pool of the Executive shall be $10 million, divided equally among the first three one year periods beginning on the closing date (the "Closing Date") of the transaction between Company or its affiliate and Bridger, LLC for the purchase of the membership interests in Bridger Logistics, LLC. The award of an Incentive Bonus shall be based on the EBITDA of Bridger Logistics, LLC and any direct spin-off entities or businesses of Bridger Logistics (the "Bridger EBITDA"), computed in accordance with the accounting principles and elections utilized by Company and its affiliates, consistently applied. In the event of subsequent acquisitions or dispositions by Bridger Logistics of entities or substantially all of the assets of entities, the parties agree to negotiate in good faith regarding whether and to what extent the Bridger EBITDA incentive targets shall be adjusted to reflect such transactions.

Year 1 shall include the first one year period beginning on the Closing Date and ending the day before the first anniversary of the Closing Date. The maximum Incentive Bonus for that period shall be $3,333,333.

Year 2 shall include the second one year period beginning on the first anniversary of the Closing Date and ending the day before the second anniversary of the

Closing Date. The maximum Incentive Bonus for that period shall be $3,333,333.
Year 3 shall include the third one year period beginning on the second anniversary
of the Closing Date and ending the day before the third anniversary of the Closing
Date. The maximum Incentive Bonus for that period shall be $3,333,333.

The Year 1 Incentive Bonus shall be paid as follows:

**Bridger EBITDA Percentage of Maximum Incentive Bonus**

$120 Million (threshold level) or more 50% $1,666,667
$125 Million or more 75% $2,500,000
$135 Million or more 100% $3,333,333

The Year 2 Incentive Bonus shall be paid as follows:

**Bridger EBITDA Percentage of Maximum Incentive Bonus**

$125 Million (threshold level) or more 50% $1,666,667
$135 Million or more 75% $2,500,000
$145 Million or more 100% $3,333,333

The Year 3 Incentive Bonus shall be paid as follows:

**Bridger EBITDA Percentage of Maximum Incentive Bonus**

$135 Million (threshold level) or more 50% $1,666,667
$145 Million or more 75% $2,500,000
$155 Million or more 100% $3,333,333

In the event that the Bridger EBITDA does not reach the threshold level for a year,
the payment of an Incentive Bonus is discretionary and shall be determined by the
Chief Executive Officer and the Board of Directors of Company.
In the event of the occurrence of a Change of Control while the Executive remains
employed and either (i) prior to the first anniversary of the Closing Date or (ii) on or
after the first anniversary of the Closing Date and the Bridger EBITDA has reached
the threshold level in each of the prior post-Closing years, then any unpaid Year 1
Incentive Bonus, Year 2 Incentive Bonus and Year 3 Incentive Bonus will be
accelerated and paid in full at 100% of Maximum on the date of the Change of
Control. Except as expressly provided in Section 5 or upon the occurrence of a
Change of Control, payment of the Incentive Bonus is at all times contingent upon
the continued employment of the Executive during and through the end of the oneyear
period upon which it is based. Payment will be made within 30 days following
the close of the relevant one-year period upon which the Incentive Bonus is based.
For purposes of this Exhibit A, Change of Control is defined as any transaction
that meets the definition of Change in Control in Section 1(c), as well as either a
sale all or substantially all of the membership interests or assets of Bridger
Logistics, LLC or the partnership interests or assets of Ferrellgas, L.P. to an
unrelated and unaffiliated entity or entities.

BLFG_EDPA2274682

**EXECUTIVE EMPLOYMENT AGREEMENT**

THIS EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement"), made and entered into effective the 28th day of May, 2015 (the "Effective Date"), by and between Ferrellgas, Inc. (the "Company") and Thomas Van Buren (the "Executive");

<u>WITNESSETH THAT</u>:

WHEREAS, the Company wishes to continue to assure itself of the continuity of the Executive's services; and

WHEREAS, the Company and the Executive now desire to enter into this Agreement relating to the Executive's continued employment with the Company;

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein, IT IS HEREBY AGREED by and between the parties as follows:

1.      <u>Certain Definitions</u>. In addition to terms otherwise defined herein, the following capitalized terms used in this Agreement shall have the meanings specified:

(a)     <u>Board</u>. The term "Board" means the Board of Directors of the Company.

(b)     <u>Cause</u>. The term "Cause" means:

(i)     the willful and continued failure by the Executive to substantially perform his duties for the Company (other than any such failure resulting from the Executive's being disabled) within a reasonable period of time after a written demand for substantial performance is delivered to the Executive by the Board, which demand specifically identifies the manner in which the Board believes that the Executive has not substantially performed his duties;

(ii)    the willful engaging by the Executive in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise;

(iii)   the engaging by the Executive in egregious misconduct involving serious moral turpitude to the extent that, in the reasonable judgment of the Board, the Executive's credibility and reputation no longer conform to the standard of the Company's executives; or

(iv)    the Executive's material breach of a material term of this Agreement.

For purposes of this Agreement, no act, or failure to act, on the Executive's part shall be deemed "willful" unless done, or omitted to be done, by the Executive not in good faith and without reasonable belief that the Executive's action or omission was in the best interest of the Company.

(c)     <u>Change in Control</u>. The term "Change in Control" means the first to occur of any of the following that occurs after the Effective Date:

(i)     any merger or consolidation of the Company in which the Company is not the survivor;

(ii)    any sale of all or substantially all of the common stock of Ferrell Companies, Inc. by the Ferrell Companies, Inc. Employee Stock Ownership Trust;

(iii)   a sale of all or substantially all of the common stock of the Company;

(iv)    a replacement of the Company as the General Partner of Ferrellgas Partners, L.P.;

(v)     a public sale of at least 51 percent of the equity of Ferrell Companies, Inc.; or

(vi)    such other transaction designated as a Change in Control by the Board.

BLFG_EDPA2274683

(d)   Confidential Information. For purposes of this Agreement, the term "Confidential Information" shall include (i) all non-public information (including, without limitation, information regarding litigation and pending litigation) concerning the Company and the affiliates which is acquired by or disclosed to the Executive during the course of his employment with the Company and (ii) all non-public information concerning any other person or company that was shared with the Company or an affiliate of the Company that is subject to an agreement to maintain the confidentiality of such information.

(e)   COBRA. The term "COBRA" means continuing group health coverage required by section 4980B of the Code or sections 601 et. seq. of the Employee Retirement Income Security Act of 1974, as amended.

(f)   Code. The term "Code" means the Internal Revenue Code of 1986, as amended.

(g)   Good Reason. The term "Good Reason" means any of the following which occur after the Effective Date without the consent of the Executive:

(a)   A reduction in excess of 10% in the Executive's Salary (as defined in paragraph 4(a)) or target incentive potential as in effect as of the Effective Date, as the same may be modified from time to time in accordance with this Agreement;

(b)   A material diminution in the Executive's authority, duties or responsibilities as in effect as of the Effective Date, as the same may be modified from time to time in accordance with this Agreement;

(c)   The relocation of the Executive's principal office location to a location which is more than 50 highway miles from the location of the Executive's principal office location as in effect on the Effective Date (or such subsequent principal location agreed to by the Executive); or

(d)   The Company's material breach of any material term of this Agreement.

Notwithstanding any other provision of this Agreement to the contrary, the Executive's Termination Date shall not be considered to be on account of Good Reason unless the Executive provides notice of the event or condition that the Executive believes to constitute Good Reason within 180 days after the date on which the event first occurs or the condition first exists, the Company does not cure such event or condition within 30 days following the date the Executive provides notice and the Executive resigns his employment with the Company and its affiliates for Good Reason within the Agreement Term.

(h)   Termination Date. The term "Termination Date" with respect to the Executive means the date on which the Executive's employment with the Company and its affiliates terminates for any reason, including voluntary resignation. If the Executive becomes employed by the entity into which the Company is merged, or the purchaser of substantially all of the assets of the Company, or a successor to such entity or purchaser, the Executive's Termination Date shall not be treated as having occurred for purposes of this Agreement until such time as the Executive terminates employment with the successor and its affiliates (including, without limitation, the merged entity or purchaser). If the Executive is transferred to employment with an affiliate (including a successor to the Company, and regardless of whether before, on, or after a Change in Control), such transfer shall not constitute the Executive's Termination Date for purposes of this Agreement. To the extent that any payments or benefits under the Agreement are subject to section 409A of the Code and are paid or provided on account of the Executive's Termination Date, the determination as to whether the Executive has had a Termination Date (or other termination of employment or separation from service) shall be made in accordance with section 409A of the Code and the guidance issued thereunder.

   **2.**   Agreement Term. Subject to the terms and conditions of this Agreement, the Company hereby agrees to employ the Executive during the Agreement Term (as defined below) and the Executive hereby agrees to remain in the employ of the Company and to provide services during the Agreement Term in accordance with this Agreement.  Unless terminated sooner in accordance with this Agreement, the "Agreement Term" shall be for two (2) years beginning on the Effective Date, and the Agreement Term will be automatically extended for successive 12-month periods, unless one party to this Agreement provides notice of non-renewal to the other at least 180 days before the last day of then current Agreement Term. Notwithstanding the foregoing, if a Change in Control occurs during the Agreement Term (as it may be extended from time to time), the Agreement Term shall continue for a period of twenty-four calendar months beyond the calendar month in which such Change in Control occurs and, following an extension in accordance with this sentence, the Agreement Term shall expire without further action by any party. Notwithstanding the foregoing, in all cases, the Agreement Term shall terminate on the Executive's Termination Date.

   3.   Performance of Duties. The Executive agrees that during the Agreement Term from and after the Effective Date, while the Executive is employed by the Company, the Executive will devote the Executive's full business time,

BLFG_EDPA2274684

energies and talents to serving the Company, at the direction of the Board. The Executive shall have such duties and responsibilities as may be assigned to the Executive from time to time by the Board, shall perform all duties assigned to the Executive faithfully and efficiently, subject to the direction of the Board, and shall have such authorities and powers as are inherent to the undertakings applicable to the Executive's position and necessary to carry out the responsibilities and duties required of the Executive hereunder. The Executive will perform the duties required by this Agreement at the Company's principal place of business unless the nature of such duties requires otherwise. Notwithstanding the foregoing, during the Agreement Term, the Executive may devote reasonable time to activities other than those required under this Agreement, including activities of a charitable, educational, religious or similar nature (including professional associations) to the extent such activities do not, in the reasonable judgment of the Board, inhibit, prohibit, interfere with or conflict with the Executive's duties under this Agreement or conflict in any material way with the business of the Company and its affiliates; provided, however, that the Executive shall not serve on the board of directors of any business (other than the Company or its affiliates) or hold any other position with any business without receiving the prior written consent of the Board.

4.      <u>Compensation</u>. During the Agreement Term, while the Executive is employed by the Company, the Executive shall be compensated for the Executive's services as follows:

(a)      The Executive shall receive, for each 12-consecutive month period beginning on the Effective Date and each anniversary thereof, a base annual salary ("Salary") at the rate of $335,000. The Salary shall be payable in accordance with the regular payroll practices of the Company. The Executive's rate of Salary shall be reviewed annually by the Board; provided that the Executive's rate of Salary will not be reduced.

(b)      The Executive shall be eligible to participate in employee benefit plans and programs maintained from time to time by the Company for the benefit of similarly situated senior management employees, subject to the terms and conditions of such plans.

(c)      The Executive shall be entitled to bonuses from the Company as set forth in the attached Exhibit A.

(d)      The Executive shall be reimbursed by the Company, on terms and conditions that are substantially similar to those that apply to other similarly situated senior management employees of the Company and in accordance with the Company's expense reimbursement policy, for reasonable out-of-pocket expenses for entertainment, travel, meals, lodging and similar items which are consistent with the Company's expense reimbursement policy and actually incurred by the Executive in the promotion of the Company's business; provided, however, that, the reimbursement of any such expenses that are taxable to the Executive shall be made on or before the last day of the year following the year in which the expense was incurred and the amount of the expenses eligible for reimbursement during one year will not affect the amount of expenses eligible for reimbursement in any other year, and the right to reimbursement shall not be subject to liquidation or exchange for any other benefit.

5.      <u>Rights and Payments Upon Termination</u>. The Executive's right to benefits and payments, if any, for periods after the Executive's Termination Date shall be determined in accordance with this Section 5. Additionally, a signed Agreement and Release will be required of the Executive before payments will be made to the Executive under this agreement.

(a)      Minimum Payments. If the Executive's Termination Date occurs during the Agreement Term for any reason, the Executive shall be entitled to the following payments, in addition to any payments or benefits to which the Executive may be entitled under the following provisions of this Section 5 (other than this paragraph 5(a)) or the express terms of any employee benefit plan or as required by law:

(i)      the Executive's earned but unpaid Salary for the period ending on the Executive's Termination Date;

(i)      the Executive's accrued but unpaid vacation pay for the period ending with the Executive's Termination Date, as determined in accordance with the Company's policy as in effect from time to time, and all other amounts earned and owed to the Executive through and including the Termination Date;

(ii)      the Executive's unreimbursed business expenses; and

(iii)      any amounts payable to the Executive under the terms of any employee benefit plan.

Payments to be made to the Executive pursuant to subparagraphs 5(a)(i) and (ii) shall be made within 30 days after the Executive's Termination Date in a lump sum, payments to be made pursuant to subparagraph 5(a)(iii) shall be paid in accordance with paragraph 4(d) and amounts payable pursuant to subparagraph 5(a)(iv) shall be paid in accordance with the terms of the applicable employee benefit plan. Except as may be otherwise expressly provided to the contrary in this Agreement or as otherwise provided

BLFG_EDPA2274685

by law, nothing in this Agreement shall be construed as requiring the Executive to be treated as employed by the Company following the Executive's Termination Date for purposes of any employee benefit plan or arrangement in which the Executive may participate at such time.

(b)     Termination by the Company for Cause; Termination for Death or Disability.  If the Executive's Termination Date occurs during the Agreement Term and is a result of (i) the Company's termination of the Executive's employment on account of Cause or for disability, or (ii) the Executive's death, then, except as described in paragraph 5(a) or as agreed in writing between the Executive and the Company, neither the Executive nor any other person shall have any right to payments or benefits under this Agreement (and the Company shall have no obligation to make any such payments or provide any such benefits) for periods after the Executive's Termination Date.

(c)     Termination Other than for Cause; Termination for Good Reason. If the Executive's Termination Date occurs during the Agreement Term and is a result of the Executive's termination of employment (i) by the Company for any reason other than Cause (and is not on account of the Executive's death, disability, the Executive's voluntary resignation, or the mutual agreement of the parties or otherwise as pursuant to paragraph 5(d)), or (ii) by the Executive for Good Reason, the Executive shall be entitled to the following payments and benefits:

(i)     A payment equal to two times the Executive's Salary in effect immediately prior to the Termination Date without regard to any reduction thereof in contemplation of the Termination Date.

(ii)    A payment equal to two times the Executive's Target Bonus (as defined in Exhibit A), at his Target Bonus rate in effect immediately prior to the Termination Date without regard to any reduction thereof in contemplation of the Termination Date.

(iii)   For the two year period following the Termination Date, the Executive shall be entitled to receive continuing group medical coverage for himself and his dependents (on a non-taxable basis, including if necessary, payment of any gross-up payments necessary to result in net non-taxable benefits), which coverage is not materially less favorable to the Executive than the group medical coverage which was provided to the Executive by the Company or its affiliates immediately prior to the Termination Date. To the extent applicable and to the extent permitted by law, any continuing coverage provided to the Executive and/or his dependents pursuant to this subparagraph (iii) shall be considered part of, and not in addition to, any coverage required under COBRA.

(iv)    The Executive will be provided with a lump sum payment of $12,000 for professional outplacement services.

Notice by the Company that the term of this Agreement will not be renewed, and any subsequent termination of the Executive's employment at or after the end of the Agreement Term, will not result in the Executive being eligible for any payments or benefits contemplated by this paragraph 5(c). Subject to the terms and conditions of this Agreement, payments pursuant to subparagraphs (i) and (ii) next above shall be made in substantially equal monthly installments beginning within five days following the Termination Date. To the extent that the Company is required to make any gross-up payments to the Executive in order to provide the benefits described in subparagraph (iii) on a non-taxable basis, such payments shall be made in the month that the Executive otherwise has taxable income as a result of such benefits, but in no event later than the end of the year in which the Executive pays the related taxes.

(d)     Termination for Voluntary Resignation, Mutual Agreement or Other Reasons. If the Executive's Termination Date occurs during the Agreement Term and is a result of the Executive's voluntary resignation, the mutual agreement of the parties, or any reason other than those specified in paragraphs 5(b) or (c) above, then, except as described in paragraph 5(a) or as agreed in writing between the Executive and the Company, the Executive shall have no right to payments or benefits under this Agreement (and the Company shall have no obligation to make any such payments or provide any such benefits) for periods after the Executive's Termination Date.

6.      Mitigation. The Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise. None of the Company or any of its affiliates shall be entitled to set off against the amounts payable to the Executive under this Agreement any amounts owed to the Company or any of its affiliates by the Executive, any amounts earned by the Executive in other employment after his Termination Date, or any amounts which might have been earned by the Executive in other employment had he sought such other employment.

BLFG_EDPA2274686

7.     Confidentiality. Except as may be required by the lawful order of a court or agency of competent jurisdiction, except as necessary to carry out his duties to the Company and its affiliates, and except to the extent that the Executive otherwise has express written authorization from the Company, the Executive agrees to keep secret and confidential indefinitely, all Confidential Information, and not to disclose the same, either directly or indirectly, to any other person, firm, or business entity, or to use it in any way. The Executive shall, during the continuance of the Executive's employment with the Company and its affiliates, use the Executive's best endeavors to prevent the unauthorized publication or misuse of any Confidential Information. To the extent that any court or agency seeks to have the Executive disclose Confidential Information, he shall promptly inform the Company, and he shall take reasonable steps to prevent disclosure of Confidential Information until the Company has been informed of such requested disclosure and the Company has an opportunity to respond to such court or agency. To the extent that the Executive obtains information on behalf of the Company or any of the affiliates that may be subject to attorney-client privilege as to the Company's attorneys, the Executive shall take reasonable steps to maintain the confidentiality of such information and to preserve such privilege. Nothing in the foregoing provisions of this Section 7 shall be construed so as to prevent the Executive from using, in connection with his employment for himself or an employer other than the Company or any of the affiliates, knowledge which was acquired by him during the course of his employment with the Company and the affiliates, and which is generally known to persons of his experience in other companies in the same industry.

8.     Tax Payments. If:

(a)     any payment or benefit to which the Executive is entitled from the Company, any affiliate, or trusts established by the Company or by any affiliate (the "Payments," which shall include, without limitation, the vesting of an option or other non-cash benefit or property) are subject to the tax imposed by section 4999 of the Code or any successor provision to that section; and

(b)     reduction of the Payments to the amount necessary to avoid the application of such tax would result in the Executive retaining an amount that is greater than the amount he would retain if the Payments were made without such reduction but after the reduction for the amount of the tax imposed by section 4999 of the Code;

then the Payments shall be reduced to the extent required to avoid application of the tax imposed by section 4999 of the Code. The Executive shall be entitled to select the order in which payments are to be reduced in accordance with the preceding sentence. Determination of whether Payments would result in the application of the tax imposed by section 4999 of the Code , and the amount of reduction that is necessary so that no such tax would be applied, shall be made, at the Company's expense, by the independent accounting firm employed by the Company immediately prior to the occurrence of the Change in Control. Notwithstanding the foregoing, in no event shall the Executive be entitled to exercise any discretion with respect to the reduction of payments that are subject to section 409A of the Code and any such payments shall be reduced, if applicable, in the order in which they would otherwise be paid or provided (with the payments to be made first being reduced first) and cash payments shall be reduced prior to any non-cash payments or benefits.

9.     Other Benefits. Except as may be otherwise specifically provided in an amendment of this Agreement adopted in accordance with Section 13, the Executive shall not be eligible to participate in or to receive any benefits pursuant to the terms of any severance pay or termination pay arrangement of the Company (or any affiliate of the Company), including any arrangement of the Company (or any affiliate of the Company) providing benefits upon involuntary termination of employment.

10.     Withholding. All payments to the Executive under this Agreement will be subject to all applicable withholding of applicable taxes.

11.     Assistance with Claims. The Executive agrees that, for the period beginning on the Effective Date, and continuing for a reasonable period after the Executive's Termination Date, the Executive will assist the Company and its affiliates in defense of any claims that may be made against the Company or its affiliates and will assist the Company and its affiliates in the prosecution of any claims that may be made by the Company or its affiliates, to the extent that such claims may relate to services performed by the Executive for the Company or its affiliates. The Executive agrees to promptly inform the Company if he becomes aware of any lawsuits involving such claims that may be filed against the Company or its affiliates. The Company agrees to provide legal counsel to the Executive in connection with such assistance (to the extent legally permitted), and to reimburse the Executive for all of his reasonable out-of-pocket expenses associated with such assistance, including travel expenses. For periods after the Executive's employment with the Company terminates, the Company agrees to provide reasonable compensation to the Executive for such assistance. The Executive also agrees to promptly inform the Company if he is asked to assist in any investigation of the Company or its affiliates (or their actions) that may relate to services performed by the Executive for the Company or its affiliates, regardless of whether a lawsuit has then been filed against the Company or its affiliates with respect to such investigation. Any compensation payable to the Executive pursuant to this Section 11 for services provided to the Company shall be paid within ten days after the Executive provides the applicable services. To the extent that any reimbursements to be provided pursuant to this Section 11 are taxable to the Executive, such reimbursements shall be paid to the Executive only if (a) the expenses are incurred and reimbursable pursuant to a reimbursement plan that provides an objectively determinable nondiscretionary definition of the expenses that are eligible for reimbursement and (b) the expenses are incurred within two years following the Termination Date. With respect to any expenses that are reimbursable pursuant to the preceding sentence, the amount of the expenses that are eligible for reimbursement during one calendar year may not affect the amount of reimbursements to be provided in any subsequent calendar year, the reimbursement of an eligible expense shall be made on or before the last day of the calendar year following the calendar

BLFG_EDPA2274687

year in which the expense was incurred, and the right to reimbursement of the expenses shall not be subject to liquidation or exchange for any other benefit.

12.     Nonalienation. The interests of the Executive under this Agreement are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, or garnishment by creditors of the Executive or the Executive's beneficiary.

13.     Amendment. This Agreement may be amended or canceled only by mutual agreement of the parties in writing without the consent of any other person. So long as the Executive lives, no person, other than the parties hereto, shall have any rights under or interest in this Agreement or the subject matter hereof.

14.     Applicable Law. The provisions of this Agreement shall be construed in accordance with the laws of the State of Kansas, without regard to the conflict of law provisions of any state.

15.     Severability. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, and this Agreement will be construed as if such invalid or unenforceable provision were omitted (but only to the extent that such provision cannot be appropriately reformed or modified).

16.     Obligation of Company. Except as otherwise specifically provided in this Agreement, nothing in this Agreement shall be construed to affect the Company's right to modify the Executive's position or duties, compensation, or other terms of employment, or to terminate the Executive's employment. Nothing in this Agreement shall be construed to require the Company or any other person to take steps or not take steps (including, without limitation, the giving or withholding of consents) that would result in a Change in Control.

17.     Waiver of Breach. No waiver by any party hereto of a breach of any provision of this Agreement by any other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any subsequent breach by such other party of any similar or dissimilar provisions and conditions at the same or any prior or subsequent time. The failure of any party hereto to take any action by reason of such breach will not deprive such party of the right to take action at any time while such breach continues.

18.     Successors, Assumption of Contract. This Agreement is personal to the Executive and may not be assigned by the Executive without the written consent of the Company. However, to the extent that rights or benefits under this Agreement otherwise survive the Executive's death, the Executive's heirs and estate shall succeed to such rights and benefits pursuant to the Executive's will or the laws of descent and distribution; provided that the Executive shall have the right at any time and from time to time, by notice delivered to the Company, to designate or to change the beneficiary or beneficiaries with respect to such benefits. This Agreement shall be binding upon and inure to the benefit of the Company and any successor of the Company, subject to the following:

(a)     The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

(b)     After a successor assumes this Agreement in accordance with this Section 18, only such successor shall be liable for amounts payable after such assumption, and no other companies (including, without limitation, the Company and any other predecessors) shall have liability for amounts payable after such assumption.

(c)     If the successor is required to assume the obligations of this Agreement under subparagraph 18(a), the successor shall execute and deliver to the Executive a written acknowledgment of the assumption of the Agreement.

19.     Notices. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid (provided that international mail shall be sent via overnight or two-day delivery), or sent by facsimile or prepaid overnight courier to the parties at the addresses set forth below. Such notices, demands, claims and other communications shall be deemed given:

(a)     in the case of delivery by overnight service with guaranteed next day delivery, the next day or the day designated for delivery;

(b)     in the case of certified or registered U.S. mail, five days after deposit in the U.S. mail; or

(c)     in the case of facsimile, the date upon which the transmitting party received confirmation of receipt by facsimile, telephone or otherwise;

provided, however, that in no event shall any such communications be deemed to be given later than the date they are actually received. Communications that are to be delivered by the U.S. mail or by overnight service or two-day delivery service are to be delivered to the addresses set forth below:

BLFG_EDPA2274688

to the Company:

      Stephen L. Wambold
      Chief Executive Officer
      Ferrellgas
      7500 College Blvd., Suite 1000
      Overland Park, Kansas 66210

and to the Executive at his current address as reflected in his employment records.

Each party, by written notice furnished to the other party, may modify the applicable delivery address, except that notice of change of address shall be effective only upon receipt.

      20.     Arbitration of All Disputes. Any controversy or claim arising out of or relating to this Agreement (or the breach thereof) shall be settled by final, binding and non-appealable arbitration in Overland Park, Kansas by three arbitrators. Except as otherwise expressly provided in this Section 20, the arbitration shall be conducted in accordance with the rules of the American Arbitration Association (the "Association") then in effect. One of the arbitrators shall be appointed by the Company, one shall be appointed by the Executive, and the third shall be appointed by the first two arbitrators. If the first two arbitrators cannot agree on the third arbitrator within 30 days of the appointment of the second arbitrator, then the third arbitrator shall be appointed by the Association.

      21.     Survival of Agreement. Except as otherwise expressly provided in this Agreement, the rights and obligations of the parties to this Agreement shall survive the termination of the Executive's employment with the Company.

      22.     Entire Agreement. Except as otherwise provided herein, this Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior or contemporaneous agreements, if any, between the parties relating to the subject matter hereof; provided, however, that nothing in this Agreement shall be construed to limit any policy or agreement that is otherwise applicable relating to confidentiality, rights to inventions, copyrightable material, business and/or technical information, trade secrets, solicitation of employees, interference with relationships with other businesses, competition, and other similar policies or agreement for the protection of the business and operations of the Company and its affiliates.

      23.     Code Section 409A. Notwithstanding any other provision of this Agreement to the contrary, if any payment or benefit hereunder is subject to section 409A of the Code, if such payment or benefit is to be paid or provided on account of the Executive's separation from service (within the meaning of section 409A of the Code), and if such payment or benefit is required to be made or provided prior to the first day of the seventh month following the Employee's separation from service, and if the Executive is a specified employee (within the meaning of section 409A(a)(2)(B) of the Code), such payment or benefit shall be paid or provided on the later of (a) the first day of the seventh month following the Executive's separation from service or (b) the date on which such payment or benefit would otherwise be paid or provided pursuant to the terms of this Agreement.

      24.     Counterparts. This Agreement may be executed in two or more counterparts, any one of which shall be deemed the original without reference to the others.

      IN WITNESS THEREOF, the Executive has hereunto set his hand, and the Company has caused these presents to be executed in its name and on its behalf, all as of the Effective Date.

          /s/ Thomas M. Van Buren
                 EXECUTIVE
          FERRELLGAS, INC.


          _/s/ Stephen L.
          Wambold._____
          Its Chief Executive Officer
          Date

1

BLFG_EDPA2274689

Exhibit 10.28

## TRANSPORTATION AND LOGISTICS AGREEMENT

This Transportation and Logistics Agreement ("Agreement"), dated June 24, 2015, is made and entered into by and between Bridger Marketing, LLC (hereinafter designated as "Marketing") and Bridger Logistics, LLC (hereinafter designated as "Carrier"). Marketing and Carrier are sometimes referred to herein solely as a "Party," or collectively as the "Parties."

**WHEREAS**, Marketing requires transportation and logistics services for the movement of Crude Petroleum from one or more Receipt Point(s) to one or more Delivery Point(s) by truck transportation, pipeline terminals, pipelines, rail transportation and marine movements;

**WHEREAS**, Carrier (or its subsidiary or contractor) is engaged in the business of transporting Crude Petroleum and providing related logistics services and expertise with respect to such transportation; and

**WHEREAS**, certain capitalized terms used in this Agreement are defined in Section 24.

**NOW, THEREFORE**, Marketing desires to use Carrier's Services and expertise, and Carrier desires to provide such Services and expertise to Marketing, in each case subject to the following terms and conditions and (with respect to any specific Services) the applicable Statement of Work.

1. **TERM**

   The term of this Agreement shall become effective on the date hereof and terminate on the tenth (10th) anniversary hereof, unless otherwise expressly specified in this Agreement or terminated earlier by mutual written agreement between the Parties. Termination or expiration of this Agreement will not relieve any Party from any obligation accruing, or accrued, prior to the date of such termination, and notwithstanding any such termination or expiration each Party will continue to be bound by the provisions of this Agreement that reasonably require some action or forbearance after such termination or expiration, including those related to confidentiality, indemnities, addresses for giving notice, governing law and audit rights.

2. **EXCLUSIVITY; RIGHT OF FIRST OFFER**

   (a) For purposes of this Agreement, "Services" means any transportation and logistics services (including transportation and logistics services by truck, pipeline terminal, pipeline, rail and/or marine assets) for any Crude Petroleum with respect to any Marketing Arrangements. Services shall be deemed to include transportation and logistics services indirectly provided to Marketing in connection with exchange agreements or buy/sell transactions between Marketing and a third party in which Marketing sells Crude Petroleum to a third party and then purchases Crude Petroleum from the same third party, with the price differential reflecting the cost of transportation and logistics along the mode of transport between the sale and purchase. Notwithstanding the foregoing, any sales (including by means of an exchange) of Crude Petroleum by Marketing to third parties where the sale is for the sole purpose of marketing or credit, rather than for transportation of such Crude Petroleum, shall not be considered Services.

   (b) For purposes of this Agreement, "Marketing Arrangements" means any arrangement to which Marketing or any of its Affiliates is a party pursuant to which Crude Petroleum is marketed, traded or owned by Marketing or any of its Affiliates in the United States; provided that arrangements in which Crude Petroleum is owned by or sold to others and with respect to which Marketing has no right or ability to cause or permit Services to be rendered with respect thereto by Carrier shall not be deemed Marketing Arrangements.

(c) <u>Exclusivity Provision</u>. During the term of this Agreement, Marketing agrees that Carrier will be the sole and exclusive provider of Services with respect to any Marketing Arrangements for Crude Petroleum that Carrier then has sufficient and proper assets and personnel to perform such Services required to be provided hereunder.

(d) [***]

(e) <u>ROFO for Non-Offered Services</u>. If Carrier does not then have sufficient and proper assets and personnel to perform any particular Services, Marketing shall not engage or contract (or enter into any other arrangement or agreement) with any other Person to provide such Services with respect to any Marketing Arrangements without first strictly complying with this <u>Section 2(e)</u>.

    (i) Marketing shall provide to Carrier written notice (a "<u>ROFO Notice</u>") of such proposed new Marketing Arrangement and the proposed Services with respect thereto, which notice shall include a reasonably detailed description thereof, including the proposed commencement, term, price and volume for such proposed Services and specific information regarding the nature and quality of Crude Petroleum for which such proposed Services are contemplated and the region in which such Services are to be performed.

    (ii) If, within five (5) days following the date of its receipt of a ROFO Notice (the "<u>ROFO Discussion Period</u>"), Carrier delivers written notice (a "<u>ROFO Agreement Notice</u>") to Marketing that it will provide the Services proposed within the ROFO Notice, then the Parties will use commercially reasonable efforts to execute and deliver a Statement of Work covering such Services promptly but no event later than ten (10) days after the delivery of such notice to Marketing.

    (iii) If Carrier does not deliver a ROFO Agreement Notice to Marketing before the end of the ROFO Discussion Period, then Marketing shall be permitted, during the thirty (30) days immediately succeeding the ROFO Discussion Period, to enter into a written contract with a Person other than Carrier (a "<u>Substitute Provider</u>") of Services with respect to such new Marketing Arrangement; *provided*, *however*, that Marketing shall not enter into any arrangement or agreement with any Substitute Provider if such arrangement or agreement is on terms more favorable to the Substitute Provider than those set forth in the ROFO Notice. If Marketing enters into any arrangement or agreement with a Substitute Provider, Marketing shall disclose in writing to Carrier the identity of such Substitute Provider and provide Carrier such details of the arrangement or agreement as Carrier may reasonably request (it being agreed that any request relating to the price terms, volume terms, and duration of any arrangement or agreement are details that are reasonable for Carrier to request), all of which Carrier agrees to keep confidential using such confidentiality restrictions that are no less restrictive than those Carrier uses to protect its own confidential information.

    (iv) With respect to any ROFO Notice where Carrier has not delivered a ROFO Agreement Notice before the end of the ROFO Discussion Period, if Marketing does not enter into a written contract with a Substitute Provider for Services with respect to such new Marketing Arrangement within the thirty (30) day-period immediately succeeding the ROFO Discussion Period, then Carrier shall not engage or contract (or enter into any other arrangement or agreement) with any other Person to provide Services with respect to such New Marketing Arrangement without first strictly complying again with this <u>Section 2(e)</u>.

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

BLFG_EDPA2274691

3. **RECEIPT/DELIVERY OF CRUDE PETROLEUM**

With respect to any specific Services to be provided hereunder, Carrier's obligations hereunder shall be contingent upon the execution and delivery by both Parties of one or more Statements of Work

substantially in the form attached as <u>Exhibit A</u> (each, a "<u>Statement of Work</u>") specifying, among other things, each receipt point applicable to such Services (the "<u>Receipt Point(s)</u>"), each delivery point applicable to such Services (the "<u>Delivery Point(s)</u>"), the rate(s) applicable to such Services and the term therefor. Pursuant to the terms of each effective Statement of Work, Carrier shall, load, unload, handle and transport (including services by truck, pipeline terminals, pipelines, rail and marine transportation) Crude Petroleum from the applicable Receipt Point(s) to the applicable Delivery Point(s) as may be tendered for transportation by or on behalf of Marketing. Carrier shall provide (or shall cause to be provided) the proper and necessary equipment to perform Services under this Agreement and each applicable Statement of Work.

4. **FACILITY ACCESS**

In connection with Carrier (or its Affiliate or contractor) performing Services hereunder, Marketing shall provide Carrier (or its Affiliate or contractor) with any necessary access to facilities belonging to Marketing, its Affiliates and/or the facilities of third parties. Carrier shall cause its employees or agents to comply with all the terms, provisions, rules, regulations and instructions supplied by the owner or operator of any such facility in the loading, unloading or transportation of Crude Petroleum or its equipment. Each Party agrees that its agents and employees will comply with all known safety regulations of the other when such agents or employees are on the premises of the other in connection with the performance of this Agreement. Marketing shall have no liability or responsibility for delay, detention, or demurrage; *provided*, *however*, that if delay, detention, or demurrage is incurred at loading as a result of the acts or omissions of Marketing or its Affiliate, Marketing will pay Carrier the actual, out-of-pocket demurrage charges incurred by Carrier.

5. **PERMITS/COMPLIANCE WITH LAWS**

Carrier shall be responsible for securing, at Carrier's cost, any permits and operating authorities' consents necessary for the Services provided by or on behalf of Carrier hereunder. Each Party agrees to comply with all Applicable Laws. Each Party agrees that all financial settlements, billings and reports rendered to the other Party as provided for in this Agreement will, to the best of its knowledge, reflect properly the facts about all activities and transactions related to this Agreement.

6. **MEASUREMENT**

To the extent the services provided to Marketing hereunder involve the measurement of Crude Petroleum, Carrier warrants to Marketing that Carrier's activities related to the measurement of Crude Petroleum hereunder, whether involving measurements of Crude Petroleum purchased by Marketing at the "lease level" or otherwise, shall be conducted: (i) in a manner that results in accurate measurements; (ii) in accordance with applicable industry standards (including the then-current version of the Manual of Petroleum Measurement Standards as published by the American Petroleum Institute ("API")) or, to the extent Marketing notifies Carrier of same, in accordance with other standards specifically agreed to by Marketing and the lease operator or other seller of the Crude Petroleum in question; and (iii) in accordance with all applicable laws, regulations and other governmental requirements. Ticket, manifest, and invoice quantity shall be based on API tank gauging measurement procedures. Each Party, upon such Party's reasonable request, shall be entitled to review, audit or otherwise monitor the other Party's measurement activities hereunder and any documents relating thereto, and each Party agrees to reasonably cooperate with the requesting Party in the course of any such review, audit or monitoring.

BLFG_EDPA2274692

7. **TITLE/LOSSES**

Title to the Crude Petroleum tendered by or on behalf of Marketing to Carrier for Services will remain with Marketing at all times, subject to any lien created under Applicable Law. Carrier may, in its sole but reasonable discretion, reject any Crude Petroleum, when made available to Carrier for Services by or on behalf of Marketing, which may be involved in litigation, the title of which may be in dispute, or which may be encumbered by a lien or charge of any kind (except for customary encumbrances arising under a joint operating agreement or Applicable Law), and Carrier may require that Marketing either provide (i) satisfactory evidence of Marketing's good, marketable and unencumbered title (other than customary encumbrances arising under a joint operating agreement or Applicable Laws, or any lien created under any obligation of Marketing for borrowed money), or (ii) a reasonably satisfactory indemnity bond to protect Carrier. Crude Petroleum gains and losses resulting from Services will be allocated as Loss Allowance (defined below) in accordance with this Agreement.

8. **PAYMENT OBLIGATION**

<u>Exhibit B</u> sets forth the applicable rates that Marketing shall be charged for the Services provided by Carrier hereunder as of the date hereof, except to the extent set forth to the contrary in any applicable Statement of Work. Each month, Carrier shall deliver to Marketing, by email or facsimile, an invoice for the Services rendered during the previous month. Marketing shall pay each such invoice by the later of the 20th day of the applicable month or the 10th day following the date such invoice was delivered to Marketing. If the due date for payment falls on a Saturday or a New York bank holiday other than a Monday, payment shall be due on the immediately preceding New York banking day.  If the due date for payment falls on a Sunday or Monday New York bank holiday, payment shall be due on the next succeeding New York banking day.

9. **INSURANCE/TAXES**

Carrier shall maintain (or cause to be maintained) insurance as required by Applicable Law. During the term of this Agreement, any taxes assessed by any governmental authority upon or as a result of the ownership, loading, unloading, transportation or delivery of any of Marketing's Crude Petroleum or the Services provided by Carrier to Marketing hereunder, shall be borne and paid by Marketing, except to the extent any such taxes are required under applicable law to be paid by Carrier, in which case, such taxes shall be paid by Carrier and reimbursed by Marketing. The above notwithstanding, Carrier shall remain liable for and Marketing shall have no obligation to reimburse Carrier for (a) any taxes imposed on or calculated based upon net profits, gross or net income, profit margin or gross receipts of Carrier, (b) any taxes measured by capital value or net worth of Carrier, or (c) any ad valorem or personal property taxes on the equipment used by Carrier in performing the Services hereunder.

10. **RELATIONSHIP OF THE PARTIES**

In the performance of any Services hereunder, Carrier conclusively shall be deemed an independent contractor, with the right and authority to direct and control all work being performed by the employees, contractors, agents or representatives of Carrier. Carrier shall be permitted to engage owner-operators and subcontractors to perform all or a portion of the Services hereunder. Any such owner-operator and subcontractor shall for purposes of this Agreement be considered to be acting on behalf of and as an agent for Carrier at all times in connection with this Agreement. Carrier is responsible for ensuring all owner-operators and subcontractors are compliant with all terms and conditions of this Agreement. All costs incurred in Carrier's performance of the Agreement including payroll, fuel, tolls, and depreciation shall be borne by Carrier. Marketing shall provide coordinates of load origination and unload destination and Carrier shall determine routing and resulting transit

mileage. Marketing shall be responsible for all obligations and liabilities for the payment of all persons due any proceeds derived from Marketing's Crude Petroleum transported under this Agreement, including, without limitation, royalties, overriding royalties and similar interests.

11. **INDEMNIFICATION; LIMITATION OF LIABILITY**

(a) Except as otherwise expressly provided in this Agreement (including elsewhere in this <u>Section 11</u>), each Party (the "<u>Indemnifying Party</u>") will be responsible for, and will release, indemnify, defend, and hold harmless the other Party (the "<u>Indemnified Party</u>") and its Indemnified Group from and against any and all Losses based on the personal injury or death of any person or damage to property to the extent caused by or resulting from the negligence, gross negligence, or willful misconduct on the part of the Indemnifying Party, its employees, agents, or contractors in the performance of its obligations under this Agreement.

(b) **Notwithstanding anything to the contrary in this Agreement, each Party's liability for Losses hereunder is limited to direct, actual damages only, and no Party or its Group shall be liable to any Person for specific performance, consequential damages, indirect damages, incidental damages, exemplary damages, or special damages, loss of profits, loss of product or production, business interruptions, or punitive damages arising out of or resulting from this Agreement (including from the performance, suspension of performance, failure to perform, or termination of the services contemplated hereby), even if caused in whole or in part by the negligence, fault, or strict liability of a Party or its employees, agents, or contractors.** CARRIER SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED OR EXPRESS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(c) Notwithstanding anything in this Agreement to the contrary, Carrier in possession of Crude Petroleum shall not be liable for any loss thereof, damage thereto, or delay, in each case, caused by Force Majeure, any default of Marketing, or from any other cause not attributable to the negligence of Carrier.

(d) Any liability associated with contaminated, non-conforming or hazardous Crude Petroleum or disposal of any contaminated, non-conforming or hazardous Crude Petroleum shall be borne solely by Marketing. Carrier's acceptance of, or failure to reject, Crude Petroleum tendered for services at any Receipt Point shall not be deemed to be a waiver by Carrier of Marketing's obligations or liability regarding compliance with the provisions of this Agreement. If, upon investigation, Carrier determines that any Crude Petroleum delivered by or on behalf of Marketing does not conform to the requisite quality specifications, or if the Crude Petroleum delivered by or on behalf of Marketing contains contaminated or hazardous substances, which (in Carrier's opinion) may materially affect the quality of Crude Petroleum or Carrier's operations, Marketing will be liable for the cost of Carrier's investigation in addition to other remedies specified in this Agreement.

12. **FORCE MAJEURE**

(a) Neither Party shall be liable to the other Party for failure to perform any of its obligations under this Agreement, except the obligation to make monetary payments due hereunder or each Party's indemnification obligations as set forth in this Agreement, to the extent such performance is hindered, delayed, or prevented by Force Majeure. "<u>Force Majeure</u>" shall mean causes, conditions, events, or circumstances affecting either Party, either Party's facilities, upstream facilities or transporters, or downstream facilities or transporters, which are beyond the reasonable control of the Party claiming Force Majeure. Such causes, conditions, events, or circumstances shall include acts of God, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, storms, storm warnings, industrial or labor disturbances, acts of the public enemy, acts of terrorism, local or national disruptions to transportation networks or operations,

BLFG_EDPA2274694

sabotage, blockades, insurrections, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, fuel shortages, explosions, breakage or accidents to machinery or lines of pipe, hydrate obstruction or blockages of any kind of lines of pipe, adverse operating conditions on any Party's facilities or on any upstream or downstream facilities, repairs, improvements, replacement of or alterations to plants, lines of pipe or related facilities, inability of either Party to obtain necessary machinery, materials, permits, easements or rights-of-way on reasonable terms, freezing of a well or delivery facility, the act of any Governmental Authority prohibiting a Party from discharging its obligations under this Agreement or resulting in diminutions in service and conduct. Inability of a Party to be profitable or to secure funds, arrange bank loans or other financing, obtain credit or (other than for reasons of Force Majeure) have adequate capacity on downstream facilities or transporters shall not be regarded as an event of Force Majeure.

(b)  If by reason of Force Majeure either Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement, it is agreed that upon such Party giving notice in full particulars of such Force Majeure in writing or by other electronic means to the other Party within a reasonable time after the occurrence of the cause relied on, the Party giving such notice, so far as and to the extent that it is affected by such Force Majeure, will not be liable in damages during the continuance of any inability so caused, but for no longer period, and such cause will so far as possible be remedied with all reasonable dispatch.

(c)  A Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event, or circumstance of such Force Majeure, shall promptly give written notice to the other Party of the termination of such Force Majeure, and shall resume performance of any suspended obligation as soon as reasonably possible after termination of such Force Majeure. The foregoing sentence shall not require the settlement of strikes, lockouts, or other labor difficulty by the Party claiming Force Majeure.

13.  **NOTICE OF CLAIMS**

Except as may be otherwise expressly provided herein, as a condition precedent to recovery from Carrier for loss, damage, or delay to shipments, any claim must be filed in writing with Carrier within nine months after delivery of the Crude Petroleum, or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed (or, in each case, if longer, nine months after Marketing discovered, or after the exercise of reasonable diligence should have discovered, such loss, damage or delay); and any suit arising out of any such claim shall be instituted against Carrier within one year from the day when notice in writing is given by Carrier to the claimant that Carrier has disallowed the claim or any part or parts thereof specified in the notice. Where any claim is not filed or any suit is not instituted thereon in accordance with the foregoing provisions, Carrier shall not be liable therefor and such claim will not be paid.

14.  **RECORDS**

Each Party shall have the right, at its own expense, upon thirty (30) days written notice and during reasonable working hours to perform an audit of the other Party's books and records ("Audit") no more often than once in any calendar year. A Party performing an Audit shall have the right to obtain access to and copies of the relevant portion of such books and records which shall be considered Confidential Information hereunder and includes, but is not limited to, financial information, reports, charts, calculations, measurement data, allocation support, third party support, telephone recordings, and electronic communications of the other Party to the extent reasonably necessary and available to verify performance under the terms and conditions of this Agreement, including the accuracy of any statement, allocation, charge, payment calculation, or determination made pursuant to the

provisions contained in this Agreement for or during any calendar year within the thirty-six (36) month period preceding the calendar year in which the Audit occurs. For the avoidance of doubt, with respect to books and records related to Services Carrier provides to third parties to the extent required to be disclosed hereunder, Carrier shall only be required to provide Marketing with summary records that provide volume, rate and quality information relating to Services Carrier provides to such third parties to the extent that such information is required to determine compliance with this Agreement, but which exclude such third parties' names or other personal or confidential information. The Party subject to the Audit shall respond to all exceptions and claims of discrepancies within 90 days of receipt thereof. Except as otherwise provided in Section ý13, the accuracy of any statement, allocation, charge, payment calculation, or determination made pursuant to the provisions of this Agreement shall be conclusively presumed to be correct after the end of the thirty-six (36) month period next following the end of the calendar year in which the statement, allocation, charge, payment calculation, or determination was generated or prepared, if not challenged (claimed) in writing prior thereto. Except as otherwise provided in Section ý13, each Party agrees that all claims and rights to adjustments are irrevocably waived and released unless a claim is made in writing within the thirty-six (36) month period next following the end of the calendar year in which the statement, allocation, charge, payment calculation, or determination was generated or prepared, notwithstanding any longer period that may be permitted by any applicable statute of limitations or other applicable law.

15. **ENTIRE AGREEMENT**

This Agreement constitutes the complete and entire agreement between the Parties and incorporates all of their prior negotiations, discussions and understandings with respect to the subject matter herein. Although there may be other written contracts between the Parties, there are no private understandings or side agreements between the Parties relating to their respective rights and duties under this Agreement. This Agreement may be executed by the Parties in separate counterparts and all such counterparts shall together constitute one and the same instrument. In the event that any signature is delivered by e-mail or facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or the Party on whose behalf the signature is executed) the same with the same force and effect as if such e-mail or facsimile signature page were an original thereof.

16. **ASSIGNMENT**

This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Parties; provided that neither this Agreement, nor any interest therein, shall be assigned, transferred, or conveyed by Marketing or Carrier, in whole or in part, without the prior written consent of the other, which consent shall not be unreasonably withheld, conditioned or delayed, except that (a) Carrier may pledge or assign its rights and interests in this Agreement to any lender as security in connection with any financing transaction for the benefit of itself or any of its affiliates and (b) Carrier may assign its rights and interests in this Agreement to an Affiliate of Carrier. Any purported assignment in violation of the foregoing shall be null and void.

17. **RULES/CLASSIFICATIONS**

All Services provided hereunder shall be governed by and subject to Applicable Law. To the extent permitted by Applicable Law, in the event of a conflict between the terms, conditions and provision of any bill of lading or Applicable Law and this Agreement, the terms of this Agreement shall govern.

18. **CONFIDENTIALITY; RESTRICTIVE COVENANTS**

The Parties agree that any confidential, proprietary or non-public material information communicated to or received by a Party from the other Party in connection herewith is confidential (with respect to such receiving Party, "Confidential Information") and each receiving Party shall (i) hold such Confidential Information in confidence, exercising a degree of care not less than the care used by

BLFG_EDPA2274696

each respective Party to protect its own proprietary or confidential information, (ii) restrict disclosure of such Confidential Information solely to those of its and its affiliates' directors, officers, employees, contractors, legal advisors and consultants with a "need to know" and not to disclose it to any other Person, (iii) advise those Persons to whom such Confidential Information is disclosed of their confidentiality and use obligations hereunder, and (iv) use such Confidential Information for the sole purpose of meeting obligations contained herein; provided, however, that either Party or its affiliates may make any public disclosure that it believes in good faith is required by applicable law or any listing or trading agreement applicable to or concerning it or its affiliates or to any of their publicly traded securities. The Parties acknowledge that in the event of an unauthorized disclosure, the damages incurred by a Party due to the disclosure may be difficult to ascertain, and that such damaged Party may seek injunctive relief as well as monetary damages against a Party that breaches this Agreement and causes such damages. In the event of a conflict between this Agreement and the terms of any confidentiality agreement or other similar agreement between the Parties, the terms, conditions and provisions of this Agreement related to confidentiality or nondisclosure shall control. The provisions of this section shall survive the expiration or termination of this Agreement.

During the first four (4) years of the term of this Agreement, Marketing covenants and agrees that it shall not, directly or indirectly, whether through its respective Affiliates, representatives, agents or otherwise, provide any services to any Person in the United States that are or may be competitive with the services that Carrier provides or has provided to Marketing under this Agreement. Marketing agrees that the restrictions on its activities contemplated by the foregoing are reasonable in light of the commercial relationship Marketing has with Carrier, and Marketing's access to the Confidential Information of Carrier.

19. **CHOICE OF LAW; WAIVER OF JURY TRIAL**
This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas (without regard to any principles of conflicts of laws which would direct application of the substantive laws of another jurisdiction). In the event of a dispute over the meaning or application of this Agreement, it shall be construed fairly and reasonably and neither more strongly for nor against any Party.

TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

20. **ADDITIONAL TERMS**
No waiver by either party hereto of a breach of an obligation owed hereunder by the other party shall be construed as a waiver of any other breach, whether of the same or a different nature. Any provision hereof which is legally unenforceable shall be ineffective only to the extent of such unenforceability without thereby invalidating the remaining provisions hereof or affecting the validity of enforceability of this Agreement as a whole.

This Agreement shall not be modified or amended except by written instrument duly executed by officers or other duly authorized representatives of the respective parties. Any notice required under this Agreement must be in writing and shall be effective upon receipt or refusal of delivery service to the party's business address as set forth in this Agreement.

21. **REPRESENTATIONS AND WARRANTIES**

Marketing represents and warrants to Carrier as follows: (a) Marketing is duly organized, validly existing and in good standing under the Laws of the State of Louisiana; (b) the execution, delivery and performance of this Agreement and all documents required to be executed and delivered by Marketing in connection herewith, and the performance of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company or similar action on the part of Marketing; (c) this Agreement has been duly executed and delivered by or on behalf of Marketing (and all documents required hereunder to be executed and delivered by Marketing in connection herewith will be duly executed and delivered by Marketing) and this Agreement (assuming that this Agreement constitutes the legal, valid and binding obligation of Carrier) constitutes, and at the time of their execution such documents will constitute, the valid and binding obligations of Marketing, enforceable in accordance with their terms except as such enforceability may be limited by applicable bankruptcy or other similar laws affecting the rights and remedies of creditors generally, as well as by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); and (d) the execution, delivery and performance of this Agreement and all documents required to be executed and delivered by Marketing and the transactions contemplated herein and therein, will not (i) violate any provision of the organizational documents of Marketing, (ii) result in default (with due notice or lapse of time or both) or the creation of any lien, encumbrance or adverse claim or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, license or agreement to which Marketing is a party, (iii) violate any judgment, order, ruling or decree applicable to Marketing as a party in interest, or (iv) violate any laws applicable to Marketing.

Carrier represents and warrants to Marketing as follows: (a) Carrier is duly organized, validly existing and in good standing under the Laws of the State of Louisiana; (b) the execution, delivery and performance of this Agreement and all documents required to be executed and delivered by Seller in connection herewith, and the performance of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company or similar action on the part of Carrier; (c) this Agreement has been duly executed and delivered by or on behalf of Carrier (and all documents required hereunder to be executed and delivered by Carrier in connection herewith will be duly executed and delivered by Carrier) and this Agreement (assuming that this Agreement constitutes the legal, valid and binding obligation of Marketing) constitutes, and at the time of their execution such documents will constitute, the valid and binding obligations of Carrier, enforceable in accordance with their terms except as such enforceability may be limited by applicable bankruptcy or other similar laws affecting the rights and remedies of creditors generally, as well as by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); and (d) the execution, delivery and performance of this Agreement and all documents required to be executed and delivered by Carrier and the transactions contemplated herein and therein, will not (i) violate any provision of the organizational documents of Carrier, (ii) result in default (with due notice or lapse of time or both) or the creation of any lien, encumbrance or adverse claim or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, license or agreement to which Carrier is a party, (iii) violate any judgment, order, ruling or decree applicable to Carrier as a party in interest, or (iv) violate any laws applicable to Carrier.

BLFG_EDPA2274698

The representations and warranties in this Section 21 shall survive the execution, delivery, and performance of this Agreement.

22. **SEVERABILITY**

Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction applying such law, and this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision.

23. **CERTAIN ADDITIONAL OBLIGATIONS OF MARKETING**

[***]

[***]

Marketing acknowledges and agrees that the Monroe TLA contemplates certain obligations on behalf of Marketing in connection with the transactions contemplated therein. Accordingly, Marketing agrees to fulfil all obligations contemplated under the Monroe TLA that, pursuant to the terms thereof, are contemplated as obligations of Marketing.

Marketing agrees that it shall not, without Carrier's prior written consent thereto, amend or modify any term or condition of the COSA or take any action in connection with the COSA, in each case, the result of which could cause and adverse effect on Carrier.

24. **CERTAIN DEFINED TERMS**

The following terms shall have the following meanings in this Agreement:

"<u>Affiliate</u>" means, with respect to any relevant Person, any other Person controlling, controlled by, or under common control with, such relevant Person, where "control" (and its derivatives) means the ability, directly or indirectly, through one or more intermediaries, to direct or cause the direction of the management and policies of such relevant Person, whether through the ownership or control of voting securities or interest, by contract, or otherwise.

"<u>Applicable Law</u>" means the laws, rules, regulations, decrees, and orders of the United States of America and all other Governmental Authorities having jurisdiction, whether such Laws now exist or hereafter come into effect.

"<u>COSA</u>" means the Amended and Restated Crude Oil Supply Agreement entered into on May 26, 2015, by and between Bridger Marketing, LLC and Monroe Energy LLC.

"<u>Crude Petroleum</u>" means crude oil and condensate.

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

BLFG_EDPA2274699

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, and any entity or administrative authority, agency, court, tribunal, commission, board or bureau exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to any nation or government.

"<u>Indemnified Group</u>" means, with respect to any Party in its capacity as an Indemnified Party, its officers, directors, employees, agents, contractors, subcontractors, and other representatives

"<u>Loss</u>" means any loss, expense, liability, obligation, damage, demand, suit, sanction, claim, settlement, judgment, lien, civil fine, civil penalty, interest, or cost, of every kind and character (including reasonable fees and expenses of attorneys, technical experts, and expert witnesses reasonably incident to same).

"<u>Monroe TLA</u>" means that certain Transportation and Logistics Services Agreement made and entered into on May 26, 2015, by and between Bridger Logistics, LLC and Monroe.

"<u>Person</u>" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, agency, association, joint stock company, trust, organization, Governmental Authority, or other entity.

25. **INTERPRETATION**

The table of contents and headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof. When a reference is made in this Agreement to a Section, subsection, paragraph, clause, or Exhibit or, such reference shall be to a Section, subsection, paragraph or clause of, or an Exhibit to, this Agreement unless otherwise indicated. Whenever the word "include," "includes" or "including" is used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. All references to "$" or dollar amounts shall be to lawful currency of the United States of America. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to any Person are also to its permitted successors and assigns. Unless specifically provided for herein, the term "or" shall not be deemed to be exclusive. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". All references to the defined term "Hydrocarbons" shall mean Crude Petroleum, natural gas, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, condensate, products, liquids and other hydrocarbons.

The undersigned parties hereto hereby agree to the terms of this Transportation Logistics Agreement, effective as of the date first written above.

BRIDGER MARKETING, LLC                    BRIDGER LOGISTICS, LLC

By: Bridger, LLC, its Manager              By: Bridger, LLC, its Manager

By:      /s/ James H. Ballengee           By:      /s/ Julio E. Rios II
Name:    James H. Ballengee               Name:    Julio E. Rios II
Title:   Chief Executive Officer          Title:   Chief Executive Officer

BLFG_EDPA2274701

<u>**EXHIBIT A**</u>

**STATEMENT OF WORK**

This Statement of Work dated as of _____, _____ (the "***Statement of Work***"), is between Bridger Logistics, LLC ("***CARRIER***") and Bridger Marketing, LLC ("***MARKETING***"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Transportation and Logistics Agreement to provide Services (the "***TLA***"), dated as of May [__], 2015, between CARRIER and MARKETING.

This Statement of Work is hereby incorporated into and made part of the TLA.

Pursuant to the terms of the TLA, and for good and valuable consideration, the adequacy and receipt of which are hereby acknowledged by the parties hereto, the parties hereto agree as follows:

1.   **GENERAL TERMS**
    1.1.      This is a Statement of Work under the TLA and is subject to all of the terms of the TLA.  In the event of any conflict between the terms of this Statement of Work and any terms of the TLA, the TLA's terms shall control.  Notwithstanding the foregoing, if a provision of this Statement of Work specifically references a provision in the TLA and provides that the provision of this Statement of Work shall control in the event of a conflict, then such provision in this Statement of Work shall control with respect to the Services under this Statement of Work.
    1.2.      The term ("***Term***") of this Statement of Work shall commence on _____ (the "***Effective Date***") and shall expire upon the earlier of (i) _____ or (ii) _____. In addition, either CARRIER or MARKETING may terminate this Statement as Work as follows: _____.
    1.3.      This Statement of Work may be executed in any number of counterparts by the parties hereto and delivered in person or transmitted by facsimile, electronic communication in portable document format (.pdf), or similar transmission, each of which, when so executed and delivered, shall be deemed an original, but such counterparts shall together constitute but one and the same Statement of Work.

2.      **SERVICES PROVIDED**
    2.1.      Listed below are descriptions and/or specifications of the Services to be performed.
<u>**Summary of Services**</u>

| RECEIPT POINT(S) | | EST. BARRELS PER DAY | RATE ($/Barrel) | |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

        2.2.      Listed below is the name and address of an authorized representative for each of CARRIER and MARKETING.

CARRIER Authorized Representative        MARKETING Authorized Representative
Name:                                    Name:
Address:                                 Address:


Telephone:                               Telephone:
Fax:                                     Fax:

    2.3.      All Services performed pursuant to this Statement of Work shall be performed at the rates set forth above. In addition to the rates set forth above, additional charges may also apply with respect to the Services as specified in the Rate Schedule (as amended, supplemented or modified from time to time) which is included as Exhibit C to the TLA.

CARRIER shall be authorized to commence the Services described in this Statement of Work once this Statement of Work is signed and delivered by MARKETING and CARRIER.


    IN WITNESS WHEREOF, the parties have executed this Statement of Work as of _____, _____ by their duly authorized representatives.

**CARRIER**                              **MARKETING**
BRIDGER LOGISTICS, LLC                   BRIDGER MARKETING, LLC
  By:                            By:
  Name:                          Name:
  Title:                         Title:

BLFG_EDPA2274703

**Exhibit B**

**Rate Schedule**

($ per barrel)

1. Truck Transportation Rates
   a. North Dakota (attached)
   b. Louisiana / Texas (attached)
   c. DJ Basin (attached)

2. Pipeline Terminals
   a. North Dakota Pipeline System terminals
      i. [***]
      ii. [***]
   b. Karnack terminal
      i. [***]
   c. LaBarge terminal
      i. [***]
   d. Permian terminals
      i. [***]
      ii. [***]

3. Pipelines
   a. NDPL Pipeline Shipper Management
      i. [***]
      ii. [***]
   b. Platte Pipeline Shipper Management
      i. [***]
   c. Cline Shale Pipeline Shipper Management
      i. [***]
   d. Bridger Lake
      i. [***]

4. Rail Terminals
   a. North Dakota rail terminals
      i. Berthold Rail Terminal
         1. [***]
         2. [***]
         3. [***]
         4. [***]

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

BLFG_EDPA2274704

    ii. Van Hook Rail Terminal
       1.  [***]
       2.  [***]
       3.  [***]
       4.  [***]

    iii.    Pioneer Rail Terminal
       1.  [***]
       2.  [***]
       3.  [***]
       4.  [***]

\*   [***]

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

**Trucking Rates Prepared
Exclusively for
Bridger Marketing, LLC**

| **Region:** North Dakota |
| --- |
| **Effective Date:** OCTOBER 1, 2013* |
| *Rates are subject to change upon 30 days' notice* |

| Loaded Miles | | Rate |
| --- | --- | --- |
| 1 | 5 | [***] |
| 6 | 10 | [***] |
| 11 | 15 | [***] |
| 16 | 20 | [***] |
| 21 | 25 | [***] |
| 26 | 30 | [***] |
| 31 | 35 | [***] |
| 36 | 40 | [***] |
| 41 | 45 | [***] |
| 46 | 50 | [***] |
| 51 | 55 | [***] |
| 56 | 60 | [***] |
| 61 | 65 | [***] |
| 66 | 70 | [***] |
| 71 | 75 | [***] |
| 76 | 80 | [***] |
| 81 | 85 | [***] |
| 86 | 90 | [***] |
| 91 | 95 | [***] |
| 96 | 100 | [***] |
| 101 | 105 | [***] |
| 106 | 110 | [***] |
| 111 | 115 | [***] |
| 116 | 120 | [***] |
| 121 | 125 | [***] |
| 126 | 130 | [***] |
| 131 | 135 | [***] |
| 136 | 140 | [***] |
| 141 | 145 | [***] |
| 146 | 150 | [***] |

| Loaded Miles | | Rates |
| --- | --- | --- |
| 151 | 155 | [***] |
| 156 | 160 | [***] |
| 161 | 165 | [***] |
| 166 | 170 | [***] |
| 171 | 175 | [***] |
| 176 | 180 | [***] |
| 181 | 185 | [***] |
| 186 | 190 | [***] |
| 191 | 195 | [***] |
| 196 | 200 | [***] |
| 201 | 205 | [***] |
| 206 | 210 | [***] |
| 211 | 215 | [***] |
| 216 | 220 | [***] |
| 221 | 225 | [***] |
| 226 | 230 | [***] |
| 231 | 235 | [***] |
| 236 | 240 | [***] |
| 241 | 245 | [***] |
| 246 | 250 | [***] |
| 251 | 255 | [***] |
| 256 | 260 | [***] |
| 261 | 265 | [***] |
| 266 | 270 | [***] |
| 271 | 275 | [***] |
| 276 | 280 | [***] |
| 281 | 285 | [***] |
| 286 | 290 | [***] |
| 291 | 295 | [***] |
| 296 | 300 | [***] |

| Loaded Miles | | Rates |
| --- | --- | --- |
| 301 | 305 | [***] |
| 306 | 310 | [***] |
| 311 | 315 | [***] |
| 316 | 320 | [***] |
| 321 | 325 | [***] |
| 326 | 330 | [***] |
| 331 | 335 | [***] |
| 336 | 340 | [***] |
| 341 | 345 | [***] |
| 346 | 350 | [***] |
| 351 | 355 | [***] |
| 356 | 360 | [***] |
| 361 | 365 | [***] |
| 366 | 370 | [***] |
| 371 | 375 | [***] |
| 376 | 380 | [***] |
| 381 | 385 | [***] |
| 386 | 390 | [***] |
| 391 | 395 | [***] |
| 396 | 400 | [***] |
| 401 | 405 | [***] |
| 406 | 410 | [***] |
| 411 | 415 | [***] |
| 416 | 420 | [***] |
| 421 | 425 | [***] |
| 426 | 430 | [***] |
| 431 | 435 | [***] |
| 436 | 440 | [***] |
| 441 | 445 | [***] |
| 446 | 450 | [***] |

Above rates are based on retail diesel @$[***]/gallon - If retail diesel exceeds $[***]/gallon, see fuel surcharge calculation below

**Fuel Surcharge (FSC) Reimbursement = Gallons x FSC Reimbursement Rate**

Gallons = Loaded Miles x 2 / Fuel Mileage per Gallon (which is set at 3.0)

FSC Reimbursement Rate = [***]

**Wait Time = After first hour of Wait Time, $[***] per hour for each subsequent hour of Wait Time**

**Rejects = Upon submission of Carrier-numbered reject run ticket, $[***]**

**Splits Loads = $[***] per run that involves Split Loads (as defined in the ICOA)**

**Minimum Barrels = [***] netted barrels**

**Chain Up = $[***]**

_/s/ Jeremy H. Gamboa_        _10/1/13_
Jeremy H. Gamboa        Date
   EVP & COO

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

**CONFIDENTIAL**

# Trucking Rates Prepared Exclusively for Bridger Marketing, LLC

| | |
|---|---|
| **Region:** DJ Basin | |
| **Effective Date:** February 1, 2015* | |
| *Rates are subject to change upon 30 days' notice* | |

| Loaded Miles | | Rate |
|---|---|---|
| 1 | 5 | [***] |
| 6 | 10 | [***] |
| 11 | 15 | [***] |
| 16 | 20 | [***] |
| 21 | 25 | [***] |
| 26 | 30 | [***] |
| 31 | 35 | [***] |
| 36 | 40 | [***] |
| 41 | 45 | [***] |
| 46 | 50 | [***] |
| 51 | 55 | [***] |
| 56 | 60 | [***] |
| 61 | 65 | [***] |
| 66 | 70 | [***] |
| 71 | 75 | [***] |
| 76 | 80 | [***] |
| 81 | 85 | [***] |
| 86 | 90 | [***] |
| 91 | 95 | [***] |
| 96 | 100 | [***] |
| 101 | 105 | [***] |
| 106 | 110 | [***] |
| 111 | 115 | [***] |
| 116 | 120 | [***] |
| 121 | 125 | [***] |
| 126 | 130 | [***] |
| 131 | 135 | [***] |
| 136 | 140 | [***] |
| 141 | 145 | [***] |
| 146 | 150 | [***] |

| Loaded Miles | | Rates |
|---|---|---|
| 151 | 155 | [***] |
| 156 | 160 | [***] |
| 161 | 165 | [***] |
| 166 | 170 | [***] |
| 171 | 175 | [***] |
| 176 | 180 | [***] |
| 181 | 185 | [***] |
| 186 | 190 | [***] |
| 191 | 195 | [***] |
| 196 | 200 | [***] |
| 201 | 205 | [***] |
| 206 | 210 | [***] |
| 211 | 215 | [***] |
| 216 | 220 | [***] |
| 221 | 225 | [***] |
| 226 | 230 | [***] |
| 231 | 235 | [***] |
| 236 | 240 | [***] |
| 241 | 245 | [***] |
| 246 | 250 | [***] |
| 251 | 255 | [***] |
| 256 | 260 | [***] |
| 261 | 265 | [***] |
| 266 | 270 | [***] |
| 271 | 275 | [***] |
| 276 | 280 | [***] |
| 281 | 285 | [***] |
| 286 | 290 | [***] |
| 291 | 295 | [***] |
| 296 | 300 | [***] |

| Loaded Miles | | Rates |
|---|---|---|
| 301 | 305 | [***] |
| 306 | 310 | [***] |
| 311 | 315 | [***] |
| 316 | 320 | [***] |
| 321 | 325 | [***] |
| 326 | 330 | [***] |
| 331 | 335 | [***] |
| 336 | 340 | [***] |
| 341 | 345 | [***] |
| 346 | 350 | [***] |
| 351 | 355 | [***] |
| 356 | 360 | [***] |
| 361 | 365 | [***] |
| 366 | 370 | [***] |
| 371 | 375 | [***] |
| 376 | 380 | [***] |
| 381 | 385 | [***] |
| 386 | 390 | [***] |
| 391 | 395 | [***] |
| 396 | 400 | [***] |
| 401 | 405 | [***] |
| 406 | 410 | [***] |
| 411 | 415 | [***] |
| 416 | 420 | [***] |
| 421 | 425 | [***] |
| 426 | 430 | [***] |
| 431 | 435 | [***] |
| 436 | 440 | [***] |
| 441 | 445 | [***] |
| 446 | 450 | [***] |

Above rates are based on retail diesel @ $[***]/gallon - If retail diesel exceeds $[***]/gallon, see fuel surcharge calculation below

**Fuel Surcharge (FSC) Reimbursement** = Gallons x FSC Reimbursement Rate

Gallons = Loaded Miles x 2 / Fuel Mileage per Gallon (which is set as 3)

FSC Reimbursement Rate = [***]

**Wait Time** = After first hour of Wait Time, $[***] per hour for each subsequent hour of Wait Time

**Rejects** = Upon submission of Carrier-numbered reject run ticket, $[***]

**Splits Loads** = $[***] per run that involves Split Loads

**Minimum Barrels** = [***] netted barrels

**Chain Up** = $[***]

_/s/ Jeremy H. Gamboa_          _2/24/15_
Jeremy H. Gamboa                Date
   EVP & COO

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

**BLFG_EDPA2274709**

**Customer Rate Sheet**
**Bridger TX/LA Rates**

| Region: LA/TX/OK |
|---|
| Effective Date: October 1, 2013* |
| *Rates are subject to change upon 30 days' notice* |

| Loaded Miles | | Rate | | Loaded Miles | | Rates | | Loaded Miles | | Rates | | Loaded Miles | | Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5 | [***] | | 151 | 155 | [***] | | 301 | 305 | [***] | | 451 | 455 | [***] |
| 6 | 10 | [***] | | 156 | 160 | [***] | | 306 | 310 | [***] | | 456 | 460 | [***] |
| 11 | 15 | [***] | | 161 | 165 | [***] | | 311 | 315 | [***] | | 461 | 465 | [***] |
| 16 | 20 | [***] | | 166 | 170 | [***] | | 316 | 320 | [***] | | 466 | 470 | [***] |
| 21 | 25 | [***] | | 171 | 175 | [***] | | 321 | 325 | [***] | | 471 | 475 | [***] |
| 26 | 30 | [***] | | 176 | 180 | [***] | | 326 | 330 | [***] | | 476 | 480 | [***] |
| 31 | 35 | [***] | | 181 | 185 | [***] | | 331 | 335 | [***] | | 481 | 485 | [***] |
| 36 | 40 | [***] | | 186 | 190 | [***] | | 336 | 340 | [***] | | 486 | 490 | [***] |
| 41 | 45 | [***] | | 191 | 195 | [***] | | 341 | 345 | [***] | | 491 | 495 | [***] |
| 46 | 50 | [***] | | 196 | 200 | [***] | | 346 | 350 | [***] | | 496 | 500 | [***] |
| 51 | 55 | [***] | | 201 | 205 | [***] | | 351 | 355 | [***] | | 501 | 505 | [***] |
| 56 | 60 | [***] | | 206 | 210 | [***] | | 356 | 360 | [***] | | 506 | 510 | [***] |
| 61 | 65 | [***] | | 211 | 215 | [***] | | 361 | 365 | [***] | | 511 | 515 | [***] |
| 66 | 70 | [***] | | 216 | 220 | [***] | | 366 | 370 | [***] | | 516 | 520 | [***] |
| 71 | 75 | [***] | | 221 | 225 | [***] | | 371 | 375 | [***] | | 521 | 525 | [***] |
| 76 | 80 | [***] | | 226 | 230 | [***] | | 376 | 380 | [***] | | 526 | 530 | [***] |
| 81 | 85 | [***] | | 231 | 235 | [***] | | 381 | 385 | [***] | | 531 | 535 | [***] |
| 86 | 90 | [***] | | 236 | 240 | [***] | | 386 | 390 | [***] | | 536 | 540 | [***] |
| 91 | 95 | [***] | | 241 | 245 | [***] | | 391 | 395 | [***] | | 541 | 545 | [***] |
| 96 | 100 | [***] | | 246 | 250 | [***] | | 396 | 400 | [***] | | 546 | 550 | [***] |
| 101 | 105 | [***] | | 251 | 255 | [***] | | 401 | 405 | [***] | | 551 | 555 | [***] |
| 106 | 110 | [***] | | 256 | 260 | [***] | | 406 | 410 | [***] | | 556 | 560 | [***] |
| 111 | 115 | [***] | | 261 | 265 | [***] | | 411 | 415 | [***] | | 561 | 565 | [***] |
| 116 | 120 | [***] | | 266 | 270 | [***] | | 416 | 420 | [***] | | 566 | 570 | [***] |
| 121 | 125 | [***] | | 271 | 275 | [***] | | 421 | 425 | [***] | | 571 | 575 | [***] |
| 126 | 130 | [***] | | 276 | 280 | [***] | | 426 | 430 | [***] | | 576 | 580 | [***] |
| 131 | 135 | [***] | | 281 | 285 | [***] | | 431 | 435 | [***] | | 581 | 585 | [***] |
| 136 | 140 | [***] | | 286 | 290 | [***] | | 436 | 440 | [***] | | 586 | 590 | [***] |
| 141 | 145 | [***] | | 291 | 295 | [***] | | 441 | 445 | [***] | | 591 | 595 | [***] |
| 146 | 150 | [***] | | 296 | 300 | [***] | | 446 | 450 | [***] | | 596 | 600 | [***] |

**Fuel Surcharge (FSC) Reimbursement** = Gallons x FSC Reimbursement Rate

Gallons = Loaded Miles x 2 / Fuel Mileage per Gallon (which is 4.5)

FSC Reimbursement Rate = [***]

**Wait Time** = After first hour of Wait Time, $[***] per hour for each subsequent hour of Wait Time

**Rejects** = Upon submission of Carrier-numbered reject run ticket, $[***]

**Splits Loads** = $[***] per run that involves Split Loads

**Minimum Barrels** = [***]  netted barrels

BLFG_EDPA2274710

BLFG_EDPA2274711

Use for the following for Bridger Invoice:

| | |
|---|---|
| Whiting TX | TX Loads |
| Pioneer | Apace |
| Endeavor | Mewborne |
| Prism | Bridger Station |

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

BLFG_EDPA2274712

**EXHIBIT C**

**Certain Agreements**

[***]

Confidential information has been omitted and separately filed with the Securities and Exchange Commission. [***] indicates that confidential treatment has been requested with respect to this omitted information.

BLFG_EDPA2274713

EXHIBIT 21.1

SUBSIDIARIES OF
FERRELLGAS PARTNERS, L.P.

Ferrellgas, L.P., a Delaware limited partnership
Ferrellgas Partners Finance Corp., a Delaware Corporation

SUBSIDIARIES OF
FERRELLGAS, L.P.

Ferrellgas Receivables, LLC, a Delaware limited liability company
Ferrellgas Finance Corp., a Delaware Corporation
Blue Rhino Canada, Inc., a Delaware Corporation
Blue Rhino Global Sourcing, Inc., a Delaware Corporation
Uni Asia, Ltd, a Seychelles limited company
Sable Environmental, LLC, a Texas limited liability company
Bridger Logistics, LLC, a Texas limited liability company

BLFG_EDPA2274714

**EXHIBIT 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our reports dated September 29, 2015, with respect to the consolidated financial statements, schedules, and internal control over financial reporting included in the Annual Report of Ferrellgas Partners, L.P. on Form 10-K for the year ended July 31, 2015. We hereby consent to the incorporation by reference of said reports in the Registration Statements of Ferrellgas Partners, L.P. on Forms S-3 (File No. 333-121350, File No. 333-115765, and File No. 333-204620, Amendment No. 1 to File No. 333-130193 and File No. 333-134867), on Form S-4 (File No. 333-197308) and on Forms S-8 (Post-Effective Amendment No. 1 to File No. 333-84344 and File No. 333-87633).


/s/ GRANT THORNTON LLP


Kansas City, Missouri
September 29, 2015

EXHIBIT 31.1

**CERTIFICATIONS**
**FERRELLGAS PARTNERS, L.P.**

I, Stephen L. Wambold, certify that:

1.  I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas Partners, L.P. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President of
Ferrellgas, Inc., general partner of the Registrant

BLFG_EDPA2274716

**CERTIFICATIONS**
**FERRELLGAS PARTNERS, L.P.**

I, Alan C. Heitmann, certify that:

1.  I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas Partners, L.P. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Alan C. Heitmann
Alan C. Heitmann
Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) of Ferrellgas, Inc., general partner of the Registrant

BLFG_EDPA2274717

EXHIBIT 31.2

**CERTIFICATIONS**
**FERRELLGAS PARTNERS FINANCE CORP.**

I, Stephen L. Wambold, certify that:

1.  I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas Partners Finance Corp. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President

BLFG_EDPA2274718

**CERTIFICATIONS**
**FERRELLGAS PARTNERS FINANCE CORP.**

I, Alan C. Heitmann, certify that:

1.   I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas Partners Finance Corp. (the "Registrant");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.   The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.   The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Alan C. Heitmann
Alan C. Heitmann
Chief Financial Officer and Sole Director

EXHIBIT 31.3

**CERTIFICATIONS**
**FERRELLGAS, L.P.**

I, Stephen L. Wambold, certify that:

1.  I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas, L.P. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President of
Ferrellgas, Inc., general partner of the Registrant

**CERTIFICATIONS**
**FERRELLGAS, L.P.**

I, Alan C. Heitmann, certify that:

1.  I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas, L.P. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015
    /s/ Alan C. Heitmann

                    Alan C. Heitmann
                    Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial
                    and Accounting Officer) of Ferrellgas, Inc., general partner of the Registrant

EXHIBIT 31.4

**CERTIFICATIONS**
**FERRELLGAS FINANCE CORP.**

I, Stephen L. Wambold, certify that:

1.  I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas Finance Corp. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President

BLFG_EDPA2274722

**CERTIFICATIONS**
**FERRELLGAS FINANCE CORP.**

I, Alan C. Heitmann, certify that:

1.   I have reviewed this report on Form 10-K for the year ended July 31, 2015 of Ferrellgas Finance Corp. (the "Registrant");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.   The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c.   Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d.   Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5)   The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: September 29, 2015

/s/ Alan C. Heitmann
Alan C. Heitmann
Chief Financial Officer and Sole Director

BLFG_EDPA2274723

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. 1350,
AS ADOPTED PURSUANT TO
SECTION 906
OF THE
SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report on Form 10-K of Ferrellgas Partners, L.P. (the "Partnership") for the year ended July 31, 2015, as filed with the Securities and Exchange Commission (the "SEC") on the date hereof (the "Report"), the undersigned, in the capacity and on the date indicated below, hereby certify pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.   The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership at the dates and for the periods indicated within the Report.

The foregoing certification is made solely for purposes of 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and is subject to the "knowledge" and "willfulness" qualifications contained in 18 U.S.C. 1350(c).

This certification is being furnished to the SEC and is not to be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18. In addition, this certification is not to be incorporated by reference into any registration statement of the Partnership or other filing of the Partnership made pursuant to the Exchange Act or Securities Act of 1933, as amended, unless specifically identified as being incorporated therein by reference.

Dated:  September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President of Ferrellgas, Inc., the Partnership's general partner

/s/ Alan C. Heitmann
Alan C. Heitmann
Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) of Ferrellgas, Inc., the Partnership's general partner

**\*As required by 18 U.S.C. 1350, a signed original of this written statement has been provided to the Partnership.**

EXHIBIT 32.2

**CERTIFICATION PURSUANT TO
18 U.S.C. 1350,
AS ADOPTED PURSUANT TO
SECTION 906
OF THE
SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report on Form 10-K of Ferrellgas Partners Finance Corp. for the year ended July 31, 2015, as filed with the Securities and Exchange Commission (the "SEC") on the date hereof (the "Report"), the undersigned, in the capacity and on the date indicated below, hereby certify pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.   The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Ferrellgas Partners Finance Corp. at the dates and for the periods indicated within the Report.

The foregoing certification is made solely for purposes of 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and is subject to the "knowledge" and "willfulness" qualifications contained in 18 U.S.C. 1350(c).

This certification is being furnished to the SEC and is not to be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18. In addition, this certification is not to be incorporated by reference into any registration statement of Ferrellgas Partners Finance Corp. or other filing of Ferrellgas Partners Finance Corp. made pursuant to the Exchange Act or Securities Act of 1933, as amended, unless specifically identified as being incorporated therein by reference.

Dated:  September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President

/s/ Alan C. Heitmann
Alan C. Heitmann
Chief Financial Officer and Sole Director

**\*As required by 18 U.S.C. 1350, a signed original of this written statement has been provided to Ferrellgas Partners Finance Corp.**

BLFG_EDPA2274725

EXHIBIT 32.3

**CERTIFICATION PURSUANT TO
18 U.S.C. 1350,
AS ADOPTED PURSUANT TO
SECTION 906
OF THE
SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report on Form 10-K of Ferrellgas, L.P. (the "Partnership") for the year ended July 31, 2015, as filed with the Securities and Exchange Commission (the "SEC") on the date hereof (the "Report"), the undersigned, in the capacity and on the date indicated below, hereby certify pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership at the dates and for the periods indicated within the Report.

The foregoing certification is made solely for purposes of 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and is subject to the "knowledge" and "willfulness" qualifications contained in 18 U.S.C. 1350(c).

This certification is being furnished to the SEC and is not to be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18. In addition, this certification is not to be incorporated by reference into any registration statement of the Partnership or other filing of the Partnership made pursuant to the Exchange Act or Securities Act of 1933, as amended, unless specifically identified as being incorporated therein by reference.

Dated:  September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President of Ferrellgas, Inc., the Partnership's general partner

/s/ Alan C. Heitmann
Alan C. Heitmann
Executive Vice President and Chief Financial Officer; Treasurer (Principal Financial and Accounting Officer) of Ferrellgas, Inc., the Partnership's general partner

**\*As required by 18 U.S.C. 1350, a signed original of this written statement has been provided to the Partnership.**

EXHIBIT 32.4

**CERTIFICATION PURSUANT TO**
**18 U.S.C. 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906**
**OF THE**
**SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report on Form 10-K of Ferrellgas Finance Corp. for the year ended July 31, 2015, as filed with the Securities and Exchange Commission (the "SEC") on the date hereof (the "Report"), the undersigned, in the capacity and on the date indicated below, hereby certify pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.   The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Ferrellgas Finance Corp. at the dates and for the periods indicated within the Report.

The foregoing certification is made solely for purposes of 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and is subject to the "knowledge" and "willfulness" qualifications contained in 18 U.S.C. 1350(c).

This certification is being furnished to the SEC and is not to be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18. In addition, this certification is not to be incorporated by reference into any registration statement of Ferrellgas Finance Corp. or other filing of Ferrellgas Finance Corp. made pursuant to the Exchange Act or Securities Act of 1933, as amended, unless specifically identified as being incorporated therein by reference.

Dated:  September 29, 2015

/s/ Stephen L. Wambold
Stephen L. Wambold
Chief Executive Officer and President

/s/ Alan C. Heitmann
Alan C. Heitmann
Chief Financial Officer and Sole Director

**\*As required by 18 U.S.C. 1350, a signed original of this written statement has been provided to Ferrellgas Finance Corp.**

BLFG_EDPA2274727

BLFG_EDPA2274728