# EXHIBIT 8

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                        - - - - -
 4
      EDDYSTONE RAIL COMPANY,       )
 5    LLC                           )
                                    )
 6           Plaintiff              )  Civil Action No.
                                    )  17-CV-00495
 7           vs.                    )
                                    )
 8    BRIDGER LOGISTICS, LLC,       )
      JULIO RIOS, JEREMY GAMBOA,    )
 9    FERRELLGAS PARTNERS, L.P.,    )
      FERRELLGAS, L.P., BRIDGER     )
10    ADMINISTRATIVE SERVICES II,   )
      LLC, BRIDGER MARINE, LLC,     )
11    BRIDGER RAIL SHIPPING, LLC,   )
      BRIDGER REAL PROPERTY, LLC,   )
12    BRIDGER STORAGE, LLC,         )
      BRIDGER SWAN RANCH, LLC,      )
13    BRIDGER TERMINALS, LLC,       )
      BRIDGER TRANSPORTATION,       )
14    LLC, BRIDGER ENERGY, LLC,     )
      BRIDGER LEASING, LLC,         )
15    BRIDGER LAKE, LLC, J.J.       )
      LIBERTY, LLC, J.J. ADDISON    )
16    PARTNERS, LLC                 )
                                    )
17           Defendants             )
18
                     REMOTE VIDEOCONFERENCE
19
           VIDEO RECORDED DEPOSITION OF JULIO RIOS
20
             Thursday, October 1, 2020, 10:29 a.m.
21
22
23
24    Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA
25    Job Number: 4248155
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1        REMOTE VIDEOCONFERENCE
2        VIDEO RECORDED DEPOSITION OF JULIO RIOS,
3   a witness herein, called by the Plaintiff for
4   examination, taken pursuant to the Notice, by and
5   before Marjorie Peters, a Registered Merit Reporter,
6   Certified Realtime Reporter and Notary Public in and
7   for the Commonwealth of Pennsylvania, on Thursday,
8   October 1, 2020, at 10:29 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

```
 1                  MR. KRAMER:  This is Jake Kramer
 2     from Bryan Cave Leighton and Paisner.  With me is
 3     Sarah Hartley from my firm.  We're here on behalf of
 4     the corporate defendants, Bridger Logistics and its
 5     subsidiaries and Ferrellgas.
 6                  THE VIDEOGRAPHER:  Thank you.  Will
 7     the Court Reporter please swear in the witness.
 8                       JULIO RIOS,
 9     a witness, having been first duly sworn, was
10     examined and testified as follows:
11                       EXAMINATION
12     BY MR. AGUSTI:
13          Q.    May I proceed?
14                  COURT REPORTER:  Yes, sir.
15                  MR. AGUSTI:  Thank you.
16     BY MR. AGUSTI:
17          Q.    Mr. Rios, could you please state your
18     full name and address for the record, please.
19          A.    Julio Emerson Rios II, 5625 Netherland
20     Court, Dallas, Texas, 75229.
21          Q.    Mr. Rios, I understand you were a
22     practicing lawyer for about 11 years so I apologize
23     if this is something you already know, but I just
24     want to make sure that we're both working off the
25     same wavelength.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    So basically was your title chief
2    operating officer of Ballengee Interests LLC?
3    A.    It was.
4    Q.    You remained the chief operating officer
5    of Ballengee Interests LLC, then Bridger Group LLC,
6    and then ultimately Bridger LLC?
7    A.    I'm sorry.  Could you ask those
8    questions one at a time.
9    Q.    Sure.  You were chief operating officer
10   of Ballengee Interests LLC; correct?
11   A.    I was for a period of time.
12   Q.    Then you were chief operating officer of
13   Bridger Group LLC; correct?
14   A.    I was, for a period of time.
15   Q.    And then you were -- and then when
16   Bridger LLC was formed, you became the chief
17   operating officer of Bridger LLC?
18   A.    No.
19   Q.    Tell me what I have got wrong.
20   A.    When Bridger LLC --
21   Q.    What did you --
22   A.    -- was formed, Riverstone promoted me to
23   chief executive officer of Bridger LLC.
24   Q.    Great.  You remained the chief executive
25   officer of Bridger LLC from 2013 to 2015?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                   Page 31
1        A.    At some point in 2015 that ceased to
2    exist.  That ceased to be the case, yes.
3        Q.    That point in time was the point in time
4    when Ferrellgas acquired Bridger Logistics?
5        A.    That's right.  Bridger Logistics LLC.
6        Q.    Okay.  And as of July 1, 2015, you
7    became the president and chief executive officer of
8    Bridger Logistics; correct?
9        A.    I became the president and chief
10   executive officer of Bridger Logistics before July 1
11   of 2015.
12       Q.    Okay.  When was that?
13       A.    June 24th of 2015.
14       Q.    Okay.  Once you joined -- once the
15   merger was completed, you became an executive vice
16   president of Ferrellgas?
17       A.    I'm unfamiliar with what you mean by
18   merger.
19       Q.    When -- I'm sorry.  When there was an
20   acquisition by Ferrellgas of Bridger Logistics; from
21   that point, you became an executive vice president
22   of Ferrellgas?
23       A.    I did.
24       Q.    You're still an active member of the
25   Louisiana bar; correct, sir?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 199

1  question.  That's not what it says.
2       A.    Nobody -- nobody -- Vispi Jilla in that
3  sentence does not say he wants to do anything.
4       Q.    I haven't said -- I'm just -- at this
5  point, we are not -- I'm not asking, just to be
6  clear, whose idea this is.
7             I'm asking -- I'm pointing to the
8  fact that we have a sentence there that is calling
9  for payments to be synced up to Bridger Rail
10 Shipping; right?
11      A.    The sentence --
12            MR. KRAMER:  Object to form.
13      Q.    We all agree that that sentence, from
14 whatever source it came, that sentence is saying
15 that you are supposed to sync those up; correct?
16            MR. KRAMER:  Objection to form.
17      A.    It says to sync -- it says to sync up
18 the accounting records, we can assign the rail
19 load/unload agreements to Bridger Rail Shipping and
20 book these as part of Bridger Rail Shipping so the
21 accounting follows the management report.
22            When we -- when Evercore put the
23 packet together to sell the business to Ferrellgas,
24 our business was divided up into segments in the
25 investment banker report.  Trucking was a segment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 200

1   Rail was a segment.  Marine was a segment.  Pipeline
2   and pipeline terminals were segments.  Okay.
3                  And what Ferrellgas was attempting
4   to do, and we objected to them doing it, was to try
5   to place -- to combine all these juridical entities
6   into one juridical entity, so it would all roll up
7   to the segment that was presented to them in the
8   investment presentation.
9                  So for example, when we talk about
10  the trucking business, we've got two trucking
11  components, Bridger Transportation and Bridger
12  Leasing.  They're talking up here about forming some
13  parent company over on top of Bridger Transportation
14  and Bridger Leasing where everything will roll up to
15  that LLC, so they can just see the Bridger -- the
16  trucking segment by itself, and not have to look at
17  Bridger Transportation LLC and then have to look at
18  Bridger Leasing LLC.
19       Q.    Okay.  Did you -- so then you say what
20  you've said there before.
21       A.    Mm-hmm.
22       Q.    I'll be there to discuss and set them
23  straight; correct?
24       A.    That's right.
25       Q.    Okay.  And because Mr. Jilla is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 271

```
1      A.    It has.
2      Q.    Mr. Agusti asked you about some notes of
3    a call involving lawyers from Akin Gump in late
4    2015.  Do you recall that; it was Exhibit 1024?
5      A.    I do recall seeing some -- some notes.
6    1024?
7      Q.    Yes.
8      A.    Okay.
9      Q.    There was a reference in those notes to
10   a BL/BTS contract; do you recall that?
11     A.    I do.
12     Q.    Okay.  What type of arrangement, if any,
13   did Bridger Logistics have with BTS related to the
14   Eddystone facility?
15     A.    So Bridger Logistics paid BTS when it
16   used the Bridger Transfer Services assets.
17             So if you talk about the Eddystone
18   asset, Bridger Logistics would have used those
19   assets, it would pay a fee to Bridger Transfer
20   Services.
21             Same thing with the North Dakota
22   pipeline terminals.
23     Q.    Would you characterize that arrangement
24   between Bridger Logistics and BTS as a take-or-pay
25   contract?
```

Page 272

```
1      A.     No.
2      Q.     How would you characterize it?
3      A.     You know, it was a spot contract that
4   renewed every month.  It was basically an evergreen
5   contract.  To the extent that you use it, Bridger
6   Logistics pays for it.
7              MR. KRAMER:  Okay.  Those are all of
8   my questions.  Thank you again.
9              MR. AGUSTI:  I have one follow-up
10  question.
11                      RE-EXAMINATION
12  BY MR. AGUSTI:
13     Q.     Mr. Rios, you said that that contract
14  was a spot contract?
15     A.     Yeah.
16     Q.     In your view.
17              Are you aware of -- can you point to
18  any logistics company that would provide -- that
19  would enter into a long-term agreement leasing a
20  facility that has agreed to make it available on an
21  exclusive basis to someone on a spot contract?
22              Can you name any examples of that?
23     A.     You know, James Ballengee and his
24  companies did that all the time.
25     Q.     Can you name one example?
```

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

1          CERTIFICATE OF COURT REPORTER
2              I, Marjorie Peters, Fellow of the Academy of
3      Reporting, Registered Merit Reporter, Certified
4      Realtime Reporter, and Notary Public in the State of
5      Pennsylvania, before whom the foregoing deposition
6      was taken, do hereby certify that the witness was
7      placed under oath according to the law; that the
8      foregoing transcript is a true and correct record of
9      the testimony given; that said testimony was taken
10     by me stenographically and thereafter reduced to
11     typewriting under my direction and that I am neither
12     counsel for, related to, nor employed by any of the
13     parties to this case and have no interest, financial
14     or otherwise, in its outcome.
15              I further certify that signature was
16     not waived by the witness.
17              IN WITNESS WHEREOF, I have hereunto set my
18     hand this 12th day of October, 2020.
19
20
21     *[signature: Marjorie Peters]*
22
23     Marjorie Peters, FAPR, RMR, CRR
24     My Commission Expires:  July 13, 2024
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY