# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **EDDYSTONE RAIL COMPANY, LLC** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Civil Action No.  17-CV-00495** |
| **BRIDGER LOGISTICS, LLC, JULIO RIOS, JEREMY GAMBOA, FERRELLGAS PARTNERS, L.P., FERRELLGAS, L.P.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS RIOS AND GAMBOA'S SECOND SET OF INTERROGATORIES

Plaintiff Eddystone Rail Company, LLC ("Eddystone") pursuant to Federal Rule of Civil Procedure 33, and the Court's Order dated October 19, 2018 (Dkt. 238), hereby submits its Supplemental Responses and Objections to the Second Set of Interrogatories of Defendants Julio Rios and Jeremy Gamboa in the above-captioned action ("this Litigation").

Eddystone has not yet completed its investigation of the facts in this Litigation, its search for relevant documents, or its preparation for trial.  Vispi Jilla was deposed on September 29, 2020 and Julio Rios on October 1, 2020, but Eddystone has not yet been able to review the transcripts of their testimony.  In addition, the parties have not yet exchanged expert reports or taken expert discovery.  These responses and objections to the Interrogatories are based on

1

information now known to Eddystone, based on discovery obtained to date.  Eddystone reserves

the right to amend, modify, or supplement its responses as it learns of new information.

### GENERAL OBJECTIONS AND OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Eddystone objects to the Interrogatories insofar as they seek to impose on

Eddystone obligations that exceed or contradict those imposed by the Federal Rules of Civil

Procedure, and/or the Local Rules of the Eastern District of Pennsylvania.  Eddystone will

respond in accordance with the applicable rules.

2.      Eddystone objects to the Definition of "Identify" insofar as it requires Eddystone

to specify facts that are either already in the possession of Rios and Gamboa, or not relevant to

the claims and defenses in this Litigation.

3.      Eddystone objects to the Definition of "You" insofar as it includes both

Eddystone and "any of its affiliates."  Eddystone's affiliates include a large multinational

corporation, Enbridge, Inc., which has many business units other than the transloading facility in

Eddystone, Pennsylvania.  To the extent an Interrogatory seeks information about an Enbridge

entity, employee, or agent unrelated to the events underlying this litigation, Eddystone objects to

the request as irrelevant and disproportionate.

4.      Eddystone objects that the Instructions, including Instruction 10, require

Eddystone to state objections in a manner different from what is required in Rule 33.  Eddystone

will state its objections as required by Rule 33.

5.      Eddystone objects to Rios and Gamboa's purporting to characterize these

interrogatories as served on behalf of Rios alone.  By their express terms, the interrogatories seek

information on behalf of both Rios and Gamboa.  Eddystone will treat these interrogatories as

2

having been served on behalf of both Rios and Gamboa, including for purposes of the limits on

interrogatories under the Rules of Civil Procedure.

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 3:** Describe in detail the factual basis for your contentions regarding

Rios and Gamboa in connection with Count Two of your Complaint, identifying for each transfer

you contend to be fraudulent the following: (1) what was transferred; (2) the entity from which

the transfer was made; (3) the entity or individual to whom the transfer was made; (4) when the

transfer occurred; (5) the value (in dollars) of the thing transferred; (6) the benefit (in dollars)

received by: (a) Rios; and/or (b) Gamboa from the transfer; and (6) the method and manner of

calculating the: (a) value of the thing transferred; and (b) the benefits received by Rios and/or

Gamboa from the transfer.

**RESPONSE 3:**  Eddystone incorporates its General Objections and Objections to Definitions

and Instructions as if fully set forth herein.  In addition to those objections, Eddystone objects

that the information requested is within Defendants' knowledge.  Eddystone further objects that

this Interrogatory is premature, because Eddystone's investigation of the facts is ongoing.

Identification of each transfer at issue will be detailed in an expert report.  Accordingly,

Eddystone will update and supplement its response at the end of expert discovery, in accordance

with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 3:**  Without waiving and subject to its previously-asserted

objections, Eddystone supplements its response as follows:

Beginning on July 1, 2015, the effective date of Ferrellgas's acquisition of BTS (the

"Acquisition"), the Defendants diverted BTS's revenues and profits - earned on BTS's own

contracts - to other real and fictional entities – but ultimately to Defendants' own benefit.  BTS

3

continued to work its many contracts, including the Rail Facilities Services Agreement between Eddystone and BTS ("RSA"), but virtually all of the revenues on those contracts were transferred to other entities.

Upon taking control of Bridger Logistics and obtaining the logistics portions of the Monroe revenue stream, Ferrellgas continued to recognize that a substantial portion of the Monroe payments were rail throughput revenue ("Rail Throughput Revenue") attributable to the BTS loading and transloading capacity at New Town, ND, Van Hook, ND, Berthold, ND, and Eddystone. But Ferrellgas prevented BTS from being paid for that capacity. Instead, Ferrellgas internally transferred these loading and transloading assets and the associated portion of the Monroe revenue stream to other Bridger Logistics subsidiaries and stripped BTS of the payments for the services BTS was still providing. Ferrellgas did something similar with pipeline management revenue ("Pipeline Management Revenue") owed to BTS for pipeline-related services it provided.

To divert revenue from BTS to other Ferrellgas subsidiaries, Ferrellgas adopted a fictitious new internal accounting structure involving fictional accounting entities with the names "Bridger Rail Services" and "Bridger Pipeline Services," though no such subsidiaries ever actually existed. A document generated shortly after the Acquisition represented that BTS had or was about to assign its rail loading and unloading contracts at Berthold, New Town, Van Hook and Eddystone to a new subsidiary, Bridger Rail Services. Bridger Logistics Organizational Chart, BLFG_EDPA2425743. The document also showed that various pipeline management contracts would be assigned to another new subsidiary, Bridger Pipeline Services. But no such entities ever actually existed; they were fictional accounts on Ferrellgas's books.

In its post-acquisition internal emails and documents, Ferrellgas lists the New Town, Van Hook, Berthold, and Eddystone capacity as an asset of Bridger Rail Services although, of course, BTS remained the counterparty on all those contracts and retained the corresponding minimum volume commitment obligations.  September 18, 2015, Bridger Company Overview, BLFG_EDPA0187830-40.  Ferrellgas credited the Rail Throughput Revenue generated through those assets to the Bridger Rail Services account.  As an October 1, 2015 Bridger operations summary explained of Bridger Rail Services, "Rail throughput fees are captured here," including "load facilities at Berthold, New Town, and Vanhook," and "unload facilities at Eddystone." October 1, 2015 Farmer Email and Attachment, BLFG_EDPA0191424-26.  Ferrellgas's accounting records and internal emails demonstrates that BTS never saw any of the revenue credited to Bridger Rail Services.  Instead, the amounts in the Bridger Rail Services account were ultimately credited to another Bridger Logistics subsidiary called Bridger Rail Shipping, LLC.  November 3, 2015 Tibbetts Email, BLFG_EDPA0198350-52 ("Bridger Rail Services, LLC is not a legal entity and would roll up under Bridger Rail Shipping, LLC.").  This effectively transferred the Monroe Rail Throughput Revenue that BTS earned through its loading and transloading capacity from BTS to Bridger Rail Shipping.  Similarly, Pipeline Management Revenue was transferred from BTS to Bridger Pipeline Services, a fictitious entity.

In line with the foregoing, accounting records show that beginning July 2015, BTS stopped recording Rail Throughput Revenue altogether.  Also in July 2015, Rail Services began recording Rail Throughput Revenue for the first time.  Between July 2015 and December 2016, Rail Services recorded approximately $90 million in Rail Throughput Revenue from Jamex Marketing and Monroe.  *See* Accounting Records, BLFG_EDPA0046390-408.  Similarly, beginning in June 2015, the accounting records show that BTS ceased recording similar Pipeline

5

Management Revenue.  In June 2015, Pipeline Services began recording Pipeline Management Revenue for the first time.  Between June 2015 and December 2016, Bridger Pipeline Services recorded approximately $1 million in Pipeline Management Revenue. *See* Accounting Records, BLFG_EDPA0046390 - 408.  At the same time, BTS remained the obligor on the five-year stream of minimum volume payments due to Eddystone under the RSA.

Immediately upon the acquisition, Ferrellgas also stripped BTS of the majority of its other assets and income streams.  Upon acquiring Bridger Logistics, Ferrellgas promptly caused BTS and its affiliates to eliminate a substantial portion of their intercompany accounts payable and receivable, resulting in a net loss to BTS of several million dollars.   Ferrellgas also diverted BTS's pipeline and other rail throughput revenue to other Bridger entities, just as it had diverted the Monroe-related revenue.

After Ferrellgas's initial round of stripping, all that remained in BTS was the pipeline injection stations and associated revenue.  This revenue allowed the many employees still working at BTS projects to be paid.  As described in the October 1, 2015 operations summary, Bridger Transfer "owned pipeline terminals (around 20) where we make throughput fees on the volume injected . . . about 900k-$1m/month. No COS [cost of sales]."  October 1, 2015, Farmer Email and Attachment, BLFG_EDPA0191424-26.

In late 2015, Defendants decided they could not continue the Monroe shipments, so they proceeded to complete the stripping of BTS.  In December 2015 and January 2016, Defendants privately negotiated a "suspension" of delivery to Monroe to take effect on February 1, 2016. January 13, 2016 Adams Email and Attachments, BLFG_EDPA1752875-901.  Defendants then transferred BTS's remaining businesses and their assets to other Ferrellgas subsidiaries for no consideration.  January 31, 2016, BTS Assignments to Bridger Swan Ranch,

6

BLFG_EDPA0005462-77; January 31, 2016 BTS Assignments to Bridger Terminal,

BLFG_EDPA2405638-47; October 30, 2014 BTS-Shell Throughput Agreement (Amended),

BLFG_EDPA0012203-31;  January 31, 2016 Metzke Email and Attachments,

BLFG_EDPA2406910-21.  Defendants kept these transfers of BTS assets secret from

Eddystone.  On February 1, the last train arrived at Eddystone.  Thereafter, the assetless BTS

delivered no more crude to Eddystone and, of course, defaulted on all subsequent MVC

obligations under the RSA.

On February 22, 2016, Bridger Logistics sold BTS to Jamex Transfer Holdings, LLC, a

newly formed, assetless shell subsidiary of Jamex Marketing, for $10.  This was a strategic move

to put distance between the looters and the looted company and thus prepare a defense against a

possible suit by Eddystone.

Moreover, at the time it sold BTS to Jamex Transfer Holdings, Bridger Logistics

abrogated its implied agreement to fund BTS's remaining obligations under the RSA.  This was

yet another fraudulent transfer.  Bridger Marketing (later renamed Jamex Marketing) utilized the

Eddystone facility to transload crude destined for the end user, Monroe.  Prior to the Ferrellgas

acquisition, Bridger Marketing provided its affiliate BTS with the funds needed to satisfy BTS's

obligations to Eddystone under the RSA.  Marketing was able to fund BTS with payments it

received from Monroe under the COSA, which matched the transloading capacity Eddystone

provided to BTS under the RSA.  There was no written agreement between BTS and Bridger

Marketing but Eddystone's expert will testify that if BTS were dealing at arms-length with a

third-party supplier, it never would have agreed to a 5-year payment commitment under the RSA

without the third party's implied agreement to cover BTS's costs.  Indeed, BTS had written

contracts with Bridger Marketing for other types of services and all those contracts were

structured so that BTS would turn a profit.  James Ballengee Deposition, 27:18 – 35:14.  Thus, there was an implied agreement between BTS and Marketing that Marketing would cover BTS's payment obligations to Eddystone under the RSA (including deficiency payments) and provide enough funds for BTS to profit on the RSA.

Bridger Logistics assumed this implied agreement after it split off from Marketing and was sold to Ferrellgas.  A Bridger Logistics subsidiary that took BTS's revenues, Bridger Rail Shipping, paid Eddystone and other BTS creditors as long as it served Defendants' interests.  But once Defendants decided to jettison BTS, they stripped it of its remaining assets, sold it to Jamex for $10, and BTS promptly defaulted on the RSA.  Bridger Logistics thereby abrogated its implied agreement to fund BTS's payments under the RSA for the remainder of the 5-year term.  Through the abrogation of this implied obligation, Bridger Logistics fraudulently transferred approximately $169 million (plus prejudgment interest) it had promised to BTS to cover its payments to Eddystone under the RSA.

Defendants engaged in further fraudulent transfers when they forced BTS to sign a guaranty supplement and grantor accession agreement in favor of Ferrellgas' lenders, and to grant the lenders a blank lien on BTS's assets.  There was never a valid lien against BTS because it never received consideration for the lien.  When a corporate parent takes out a loan, it cannot cause its subsidiary to guarantee and secure, for no consideration, the parent's debt to its lender. The same fraudulent transfer rules apply.  "[A] transferor receives less than reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party . . . even when the third party is the parent company of the debtor."  *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 667 (N.D. Tex. 2011).  And if by granting the lien and

8

securing the parent's debt the subsidiary becomes insolvent, the lien constitutes a fraudulent transfer. *In re TOUSA, Inc.*, 680 F.3d 1298, 1303 (11th Cir. 2012).

Here, the blanket lien that Ferrellgas caused BTS to grant to Ferrellgas's banks constituted another fraudulent transfer. Affiliate guarantors do not receive fair consideration for guaranteeing the debts of affiliated entities if they don't receive loan proceeds or other benefit from the loan. *See, e.g.*, *U.S. v. Gleneagles Inv. Co., Inc.*, 565 F.Supp. 556, 576-577 (M.D. Pa. 1983). But BL/FG readily admits that BTS received no value from granting its lien in favor of Ferrellgas's lenders. Dkt. 266 (("ERC asserts (at 9) that BTS 'received no benefit from the loans to Ferrellgas.' But that is far from the point."). Assuming liability for Ferrellgas's bank debt rendered BTS balance-sheet insolvent: Ferrellgas caused BTS, a company Ferrellgas was in the process of stripping, to guaranty and secure a $311.6 million debt Ferrellgas had outstanding under its loan facility. January 31, 2016, Ferrellgas Form 10-Q, at 15. Thus, the lien that Ferrellgas claims encumbered BTS's assets was itself a fraudulent transfer and invalid, making BTS's assets available to satisfy its debt to Eddystone.

Finally, the sale of a denuded BTS to Jamex was itself a fraudulent transfer. By transferring BTS, the individuals and entities responsible for fraudulent conveying away BTS' assets sought to distance themselves from the victim of their looting. The sale was itself a transfer intended to "hinder, delay or defraud" Eddystone, and therefore was a fraudulent transfer. 12 Pa. C.S.§ 5104.

Further details regarding these fraudulent transfers can be found in deposition testimony and exhibits and in documents produced by Defendants and third parties during discovery. *See* Michael Farmer Deposition at 22:18 – 24:7, 112:8 – 155:6, 162:20 – 171:7, 174:22 – 175:16; Patrick Kelly Deposition at 34:15 – 39:25; Patrick Knapp Deposition at 26:14 – 63:11, 152:3 –

9

295:18; Jonna Seline Deposition at 74:20 – 102:10, 133:7 – 135:6, 136:22 – 137:2; Todd Soeifer

Deposition at 313:17 – 316:8, 316:15 – 320:13; April 9, 2012 Wilkins Email,

ERCEDPA00018685-86; March 5, 2014 Seline Email, BLFG_EDPA1972883-84; July 6, 2015

Seline Email, BLFG_EDPA1553368-70; July 21, 2015 Brown Email, BLFG_EDPA2394589-90;

July 21, 2015 Knapp Email and Attachment, BLFG_EDPA2394565-72; July 21, 2015 Knapp

Email and Attachment, BLFG_EDPA2394565-72; January 4, 2016 Knapp Email and

Attachment, BLFG_EDPA2390698-704; January 5, 2016 Knapp Email, BLFG_EDPA2390802-

05; January 6, 2016 Hampton Email, BLFG_EDPA2390821-24; January 6, 2016 Lehman Email

and Attachment, BLFG_EDPA2395617-33; January 6, 2016 Lehman Email,

BLFG_EDPA2395574-75; January 7, 2016 Lehman Email, BLFG_EDPA2395844-47; January

13, 2016 Knapp Email, BLFG_EDPA2391477-78; January 18, 2016 Knapp Email,

BLFG_EDPA2397118-20; January 18, 2016 at Knapp Email and Attachment,

BLFG_EDPA2391508-11; January 19, 2016 Hampton Email, BLFG_EDPA2397202-03;

January 19, 2016 NDPL Consent to Assignment, ERCEDPA00577329-331; January 20, 2016

Steede Email, ERCEDPA00577327-28; January 21, 2016 Knapp Email, BLFG_EDPA2391635-

36; January 22, 2016 Knapp Email and Attachment, BLFG_EDPA2398257-71; January 26, 2016

Knapp Email, BLFG_EDPA2399636-40; January 29, 2016 Lehman Email,

BLFG_EDPA2399770; January 30, 2016 Lehman Email, BLFG_EDPA2399828; January 31,

2016 BTS and Bridger Terminals Assignment and Assumption Agreement,

BLFG_EDPA0005478-87; February 2, 2016 Knapp Email, BLFG_EDPA2400715-20; February

3, 2016 Knapp Email, BLFG_EDPA2400895-99; February 5, 2016 Knapp Email,

BLFG_EDPA2393158-63; February 5, 2016 Lehman Email and Attachment,

BLFG_EDPA2264678-822; February 7, 2016 Knapp Email BLFG_EDPA2393569-71; February

10

9, 2016 Knapp Email, BLFG_EDPA2393875-76; February 9, 2016 Rios Email,

BLFG_EDPA2403142-44; February 19, 2016 Metzke Email, BLFG_EDPA2406869-74;

February 19, 2016 BTS Statement of Consideration, BLFG_EDPA2406916-17; February 19,

2016 Metzke Email, BLFG_EDPA2406910-15; February 19, 2016 Metzke Email and

Attachment, BLFG_EDPA2406910-21; February 19, 2016 Swan Ranch General Warranty Deed,

BLFG_EDPA0044188-91; February 22, 2016, Angell Email BLFG_EDPA2268983-2269105;

February 22, 2016, Terminal Logistics Services Agreement, BLFG_EDPA2269114-31; March

14, 2016 Knapp Email, BLFG_EDPA2409381-83; March 30, 2016 Knapp Email,

BLFG_EDPA2409609-11; October 2, 2017 Farmer Email, BLFG_EDPA0271621-22; Dkt. 266-

3, Farmer Decl.; Bridger Logistics Organizational Chart, BLFG_EDPA2425743; Bridger

Logistics Organizational Chart, BLFG_EDPA2381104; Excel Spreadsheet,

BLFG_EDPA0046391; Excel Spreadsheet, BLFG_EDPA0045989.

Moreover, the expert report of Eddystone's forensic accounting expert, Marc Sherman,

will detail the specific transferors, transferees, timing, and amounts of the fraudulent transfers at

issue. Eddystone's economic and industry custom and practice expert, Neil Earnest, will provide

relevant testimony too, including testimony regarding the implied contracts at issue.

Eddystone contends that Rios benefitted from the foregoing transfers because the

transfers were in the financial interest of, and benefitted, Bridger Logistics and Ferrellgas. Mr.

Rios owned 1,104,737 units of Ferrellgas, and also had performance-based financial incentives

in his employment agreement with Ferrellgas. Rios' Employment Agreement,

BLFG_EDPA1696669. Because the fraudulent transfers benefitted Bridger Logistics and

Ferrellgas, Mr. Rios benefitted through increased value of his Ferrellgas units and EBITDA

under his employment agreement. Rios himself stated that on October 12, 2015 that "Bridger is

11

my company and my responsibility and I need to have all the gaps closed with confidence, it doesn't matter that I only own 1 % of FGP, **every dollar that I make or save finds its way into my and the other shareholder's pockets** and right now I think there is a lot of fat." October 12, 2015 Rios Email, RG EDPA0118803-07 (emphasis added).

Eddystone contends that Gamboa benefitted from the foregoing transfers because the transfers were in the financial interest of, and benefitted, Bridger Logistics and Ferrellgas. Mr. Gamboa owned 552,368 units of Ferrellgas, and also had performance-based financial incentives in his employment agreement with Ferrellgas. Gamboa's Employment Agreement, BLFG_EDPA1696692. Because the fraudulent transfers benefitted Bridger Logistics and Ferrellgas, Mr. Gamboa benefitted through increased value of his Ferrellgas units and EBITDA under his employment agreement.

Further information responsive to this Interrogatory is referenced in Eddystone's Supplemental Response to Interrogatory no. 6 in the present Rios and Gamboa Second Set of Interrogatories.

\* \* \* \* \* \* \*

The foregoing supplemental response is based on discovery obtained through September 28, 2020. Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery. Eddystone further states that the parties have produced an enormous volume of documents in this litigation. Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence. However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory. Eddystone reserves its right to rely on other documents and

evidence at trial, including other documents produced in the litigation, documents filed with the

Court, discovery responses of the parties, documents listed on any party's exhibit list, and

witnesses listed on any party's witness list.

**INTERROGATORY NO. 4:** Describe in detail the factual basis for your contentions regarding

Rios and Gamboa in connection with Count Three of your Complaint, identifying for each

transfer you contend to be fraudulent the following: (1) what was transferred; (2) the entity from

which the transfer was made; (3) the entity or individual too whom the transfer was made; (4)

when the transfer occurred; (5) the value (in dollars) of the thing transferred; (6) the benefit (in

dollars) received by: (a) Rios; and/or (b) Gamboa from the transfer; and (6) the method and

manner of calculating the: (a) value of the thing transferred; and (b) the benefits received by Rios

and/or Gamboa from the transfer.

**RESPONSE 4:**  Eddystone incorporates its General Objections and Objections to Definitions

and Instructions as if fully set forth herein.  In addition to those objections, Eddystone objects

that the information requested is within Defendants' knowledge.  Eddystone further objects that

this Interrogatory is premature, because Eddystone's investigation of the facts is ongoing.

Identification of each transfer at issue will be detailed in an expert report.  Accordingly,

Eddystone will update and supplement its response at the end of expert discovery, in accordance

with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 4:**  Without waiving and subject to its previously-asserted

objections, Eddystone incorporates its supplemental response to Interrogatory No. 3.  Eddystone

states that the transfers described in the supplemental response rendered BTS insolvent, or were

made a time when BTS was insolvent.

The solvency of BTS is a subject of expert testimony that will be addressed more fully by Eddystone expert Marc Sherman.  Nonetheless, based on the information currently known to it, Eddystone states that at a minimum BTS became cash-flow insolvent when Ferrellgas began diverting revenues away from it following Ferrellgas' acquisition of Bridger Logistics.

* * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery. Eddystone further states that the parties have produced an enormous volume of documents in this litigation.  Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

**INTERROGATORY NO. 6:** Describe in detail the factual bases of your allegation in paragraph 29 that "[t]he course of dealing among the Bridger entities shows that they either operated with one another without regard to corporate entities," identifying each and every practice by Rios or Gamboa that forms the basis of that allegation.

**RESPONSE 6:**  Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein.  In addition to those objections, Eddystone objects

14

that the Interrogatory is overly burdensome insofar as it asks Eddystone to describe in detail each and every practice by Rios and Gamboa over a three-year period that forms the basis of its allegation in paragraph 29, particularly given that those practices are best known to Rios and Gamboa.  Eddystone further objects that the Interrogatory is premature, because Eddystone's investigation of the facts is ongoing.

Subject to and without waiving any of its objections, Eddystone states that, among other things, Rios and Gamboa caused the Bridger entities to enter into business arrangements with one another without written contracts, to incur debts to one another, and to forgive those debts for no consideration whenever convenient for the Bridger entities' owners and in the operation of their business treated their entities as an undifferentiated whole.  Eddystone will update and supplement its response at the end of fact discovery, in accordance with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 6:**  Without waiving and subject to its previously-asserted objections, Eddystone supplements its response as follows:

Pre-Acquisition Period

Prior to Ferrellgas's acquisition of Bridger Logistics on June 24, 2015 ("Acquisition"), Bridger, LLC operated its marketing and logistics business as a single, coordinated enterprise. Bridger Marketing, LLC ("Marketing") was a wholly-owned subsidiary of Bridger, LLC and handled the marketing side of the business (i.e., buying and selling crude).  Bridger Logistics, LLC ("Logistics") was also a wholly-owned subsidiary of Bridger, LLC.  Logistics was a holding company and 100% equity owner of several operating subsidiaries, including Bridger Transfer Services, LLC ("BTS").  Through these subsidiaries, Logistics handled the logistics side of the Bridger business (i.e., facilitating the shipment of crude).  James Ballengee Deposition at 22:8-25.

Bridger Logistics was the sole member and 100% equity owner of BTS at all relevant times after July 1, 2013.  Notices of Change of Members of BTS, BLFG_EDPA0310351-56; Bridger Consolidated Financial Statements, ERCEDPA00176402-26.

Defendants Julio Rios ("Rios") and Jeremy Gamboa ("Gamboa") "ran the Logistics side of Bridger" and in June 2015 "took the Logistics business to Ferrellgas."  James Ballengee Deposition at 23:15-19.  Prior to the Acquisition, Rios was also President and Chief Executive Officer of Bridger, LLC.  Confidential Credit Presentation, ERCEDPA00176427-442.  Prior to the Acquisition, Gamboa was Executive Vice President and Chief Operating Officer of Bridger, LLC.  *Id.*  Gamboa was "responsible for all operations in business development" and those responsibilities "covered both Bridger, LLC, and subsidiaries . . . ," such as subsidiary BTS.  Jeremy Gamboa Deposition at 24:12-:24.

A substantial portion of Logistics' business involved providing logistics services to Marketing through Logistics' operating subsidiaries.  "[M]arketing, as the purchaser and seller of the crude, utilized some of the services of Bridger Logistics subsidiaries to physically move the crude . . . ."  Patrick Kelly Deposition at 24:22-25:1.  Eddystone alleges that this business was conducted without regard to corporate entities, or, in the alternative, through a series of implied contracts.  Bridger, LLC's corporate policy required affiliated-party transactions to be conducted at arms-length through written contracts.  April 8, 2015 Kelly Email and Bridger LLC & Subsidiaries Risk Management Policy, RG_EDPA0083763-73; James Ballengee Deposition at 25:11-27:17.  In some instances, Logistics subsidiaries such as BTS had written contracts with Marketing.  For example, BTS had written contracts with Marketing (then Bridger Trading) under which BTS provided crude injection station capacity to Marketing.  February 1, 2013

16

Terminal Throughput Agreement, BLFG_EDPA0159157-64; January 4, 2012 Terminal

Throughput Agreement, BLFG-JMX_EDPA0002213-22.

In other instances, BTS and Marketing conducted business without written agreements.

In situations where there was not a written agreement between BTS and Marketing, Bridger,

LLC's corporate policy required BTS to charge fees to Marketing based on intercompany fee

schedules.  Patrick Kelly Deposition at 141:18-145:19, 152:21-155:20; January 29, 2015 Kelly

Email and Attachment, RG_EDPA0231492-95.  These "transfer prices" were purportedly based

on market data involving analogous third-party transactions.  Patrick Kelly Deposition at 150:15-

151:15.

The former Chief Financial Officer of Bridger, LLC, Patrick Kelly, testified that BTS

supported Marketing's crude oil supply agreement with Monroe Energy, LLC ("COSA")

through an unwritten, implied contract related to the Eddystone transloading facility in

Eddystone, PA ("Facility").  BTS had acquired rail transloading capacity at the Facility through

a Rail Terminal Facilities Agreement ("RSA") between Eddystone Rail Company, LLC ("ERC"

or "Eddystone") and BTS.  Bridger, LLC's intercompany rate sheets specified that ERC charged

BTS a transloading fee of $2.25/bbl and a deficiency charge of $1.75/bbl.  January 29, 2015

Kelly Email and Attachment, RG_EDPA0231492-95 (Exs. 823 and 824); Patrick Kelly

Deposition at 145:24-150:14.  They further stated that BTS should charge Marketing $2.75/bbl

to transload crude at Eddystone.  January 29, 2015 Kelly Email and Attachment,

RG_EDPA0231492-95 (Exs. 823 and 824).  The sheets further listed a deficiency fee to be

charged to Marketing.  Initially, this fee was "to be determined" but by January 2015, the fee

was set at $1.75/bbl, which matched the deficiency charge assessed to BTS under the RSA.  *Id.*

Moreover, the rate sheets show that the transloading fee charged to Marketing was reduced to

$2.55/bbl starting in January 2015.  *Id.*  Finally, the rate sheets also contained information regarding rates that BTS charged Marketing for using certain upstream rail loading facilities in North Dakota.

Bridger, LLC's accounting records show that Marketing funded BTS's bank account so that BTS could pay monthly transloading charges to Eddystone under the RSA.  *See* Accounting Records BLFG_EDPA0046411 and RG_EDPA0231495, Invoice, JAMEX_EDPA00049108.  The accounting records also show that BTS charged and Marketing paid for Eddystone transloading services in the amounts stated in the rate sheets.  *See* Accounting Records BLFG_EDPA0046411 and RG_EDPA0231495, Invoice, JAMEX_EDPA00049108.  Accounting records similarly show Marketing funding BTS at the rates set forth in the rate sheets so that BTS could pay loading charges in North Dakota.  BLFG_EDPA2361875, RG_EDPA0231495, BLFG_EDPA2360447, BLFG_EDPA2361325, BLFG_EDPA2110853.  However, contrary to Bridger, LLC's rate sheet policy, the accounting records do not appear to indicate that Marketing provided funds to BTS to cover deficiency charges that BTS was required to pay Eddystone, even though Marketing had an implied obligation to make such payments.

Post-Acquisition Period

Through the Acquisition, Logistics became a wholly-owned subsidiary of Ferrellgas, L.P., but Logistics' operating subsidiaries, including BTS, remained wholly-owned subsidiaries of Logistics.  July 21, 2015 Knapp Email and Organization Chart, BLFG_EDPA2394565-72.  After the Acquisition, Marketing became a separate business and was renamed Jamex Marketing, LLC ("Jamex Marketing").  James Ballengee Deposition at 18.

Ferrellgas, Inc. supplied BTS with employees for BTS' operations.  July 21, 2015 Knapp Email and Organization Chart, BLFG_EDPA2394565-72, -69.  Rios and Gamboa were CEO and

18

COO of Logistics, respectively, at this time.  October 12, 2015 Rios Email, RG_EDPA0118803-07; March 3, 2017 Gamboa Declaration.  Rios also became Executive Vice Presidents of Ferrellgas Partners, L.P., and Gamboa became Senior Vice-President and later Executive Vice-President of the same.  October 12, 2015 Rios Email, RG EDPA0118803-07; March 3, 2017 Gamboa Declaration.  Evidencing his belief that he ran Bridger, Rios stated on October 12, 2015 that "yes you are right my role it is strategic, but I have to get the house in order at the same time.  **Bridger is my company and my responsibility** . . . ."  October 12, 2015 Rios Email, RG EDPA0118803-07 (emphasis added).

Logistics and its subsidiaries continued to conduct a substantial amount of business with Marketing (renamed Jamex Marketing).  For example, BTS continued to support the crude oil supply arrangement between Jamex and Monroe.  The COSA, however, was split into three agreements:  (1) an Amended COSA between Monroe and Marketing, dated May 26, 2015 ("Amended COSA"); (2) a Transportation and Logistics Services Agreement between Monroe and Logistics, dated May 26, 2015 ("Monroe TLA"); and a Transportation and Logistics Agreement between Logistics and Marketing, dated June 24 2015 ("Marketing TLA").  *See* MONROE 0000104-205, and BLFG_EDPA0019650-72.

As required by the original COSA, under the new arrangement Jamex Marketing continued to be obligated to supply and Monroe obligated to purchase at least 1,950,000 bbls per month (or approximately 65 kb/d) of Bakken crude oil, although the price paid by Monroe for the Bakken crude oil was reduced by $0.25/barrel.  Amended COSA, ¶2.1(b) and ¶4.1(c), MONROE 0000104-205, -164, -169.  This equates to a cost reduction of approximately $5.9 million per year, to the benefit of Monroe. The second major modification to the original contract was that Monroe was entitled to reduce its payments to Jamex Marketing for all

payments made by Monroe to Bridger Logistics for transportation services rendered.  *Id.* at

Amended COSA, ¶7.1, MONROE 0000104-205, -171.

Moreover, whereas, under the COSA, Marketing allocated a portion of Monroe's

payments to Logistics' subsidiaries, now Monroe paid Logistics directly for logistics services

pursuant to the Monroe TLA.  Monroe TLA, ¶ 7.2, MONROE 0000104-205, -112.  And under

the Marketing TLA, Marketing was obligated to make deficiency payments to Logistics if

Marketing did not ship an average of at least 35,000 bbls/day to Monroe.  Marketing TLA, ¶ 23,

BLFG_EDPA0019650-72, -62.

After the restructuring of the COSA and Acquisition, Marketing's obligations under its

implied contracts with BTS were assumed by Logistics.  This is reflected in Logistics' post-

acquisition accounting records.  Those records show that amounts due to ERC under the RSA

and the North Dakota rail loading contracts were paid directly to ERC by Logistics or Logistics

subsidiaries other than BTS until the time that BTS was sold to Jamex Transfer Holdings, LLC.

April 2, 2018 Eddystone Responses And Objections to Rios And Gamboa's First Set Of

Interrogatories at 6-8.  In failing to continue making payments to ERC through the remainder of

the RSA term, Logistics abrogated its implied contract with BTS, resulting in at least $169

million in damages to Eddystone, plus prejudgment interest.  Moreover, Defendants' revenue

and asset stripping scheme stripped BTS' entire business, resulting in an  intentional fraudulent

transfer of at least $200 million from BTS to Logistics.

Several Ferrellgas and Bridger employees and attorneys participated in the fraudulent

transfers, including but not limited to, Rios, Gamboa, Todd Soiefer, Steve Wambold, Trent

Hampton, Patrick Knapp, Andy Lehman and John Goodgame.  Ferrellgas and Logistics, through

Rios and Gamboa, totally dominated, controlled and manipulated BTS starting no later than June

2015.  The fraudulent transfers described in Supplemental Response 3 (fraudulent transfers of BTS revenues and assets, abrogation of Logistics' implied agreement with BTS, and the sale of a denuded BTS for $10), were done to benefit Ferrellgas, Logistics, Rios and Gamboa and to erect a liability shield against ERC's inevitable claims for breach of the RSA.  The specific benefits to Rios and Gamboa are referenced in Eddystone's supplemental response to Interrogatory 3 to Rios and Gamboa's Second Set of Interrogatories, above.

Starting in July 2015, rail throughput revenue ("Rail Throughput Revenue") that at one time had flowed from Marketing to BTS, and should have been paid by Bridger Logistics to BTS, started being redirected to two non-existent Bridger entities, Bridger Rail Services, LLC ("Rail Services") and Bridger Pipeline Services, LLC ("Pipeline Services").  Farmer Deposition at 117:7-12 (Rail Services does not exist); 154:20-155:6 (Pipeline Services does not exist).  As noted above, BTS at this time had rail throughput agreements involving rail terminals at Berthold, Dakota Plains/New Town, and Van Hook, as well as access to the Eddystone facility under RSA.  Under those agreements, BTS supported the Monroe shipping arrangement by providing Jamex Marketing with access to the rail terminals and to Eddystone's transfer facility.

It appears that in June 2015, Bridger and Ferrellgas officers falsely created the impression that the RSA and those three other contracts were being assigned to the fake entities, Rail Services and Pipeline Services, and that the latter would be allocated Rail Throughput Revenue for use of the four facilities.  In a June 12, 2015 email to Rios, Gamboa, and others in Bridger management, Ferrellgas and Logistics executive Vispi Jilla sent a chart ("Rail Shipping Chart") to Rios and others suggesting that some of the profits from BTS loading and unloading agreements should actually be allocated to Bridger Rail Shipping, LLC, a real limited liability company and Logistics subsidiary.  June 12, 2015 Jilla Email and Attachment,

21

BLFG_EDPA2394354-57.  Rios responded that he would attend a meeting with other officers and Logistics accountants on June 15 to discuss the issue, noting that "I will be there to discuss and get them straight".  June 12, 2015 Rios Email, BLFG_EDPA2394358-60.  On the morning of June 18, 2015, Jilla sent the Rail Shipping Chart to Rios' secretary, Michelle DeWaal.  June 19, 2015 Jilla Email and Attachment, BLFG_EDPA0735007-08.  After discussing the chart with Rios and Gamboa, on June 19, 2015, Jilla circulated a revised chart ("Rail Services Chart") showing that the Rail Throughput Revenue would flow to the non-existent Rail Services, and pipeline management revenue would flow to the non-existent Pipeline Services, not BTS.  June 19, 2015 Jilla Email and Chart, BLFG_EDPA 2381102-04.

Bridger's accountants were unaware at the time of this reallocation that Rail Services and Pipeline Services did not actually exist.  Jonna Seline, who helped direct the accountants, testified that she did not know until the day before her deposition that the four rail loading/unloading agreements had not in fact been assigned.  Jonna Seline Testimony at 80:17-81:5.  She also testified that it was BTS, and not Rail Services, that performed under the contracts and earned the Rail Throughput Revenue, but that BTS did not record such revenue.  Id. at 97:11-21, 100:14-21.  Similarly, Ferrellgas' Assistant Controller, accountant Michael Farmer, testified that he had believed that Rail Services was a legal entity until this litigation.  Farmer Deposition at 117:7-12.  Farmer agreed that, because Rail Services was not a legal entity, it could not have earned revenue.  Farmer Deposition at 128:14-19.  Rios', Gamboa's and Jilla's deception of BLFG accountants is also reflected in BLFG management reports prepared after the Acquisition.  Those reports refer to Rail Services and Pipeline Services as limited liability companies, apparently because the accounting staff who prepared the reports believed them to be

22

real companies. All the while, however, Rios and Gamboa knew they were not real companies but were instead vehicles they used to fraudulently transfer revenue from BTS.

In line with the foregoing, accounting records show that beginning July 2015, BTS stopped recording Rail Throughput Revenue altogether. Also in July 2015, Rail Services began recording Rail Throughput Revenue for the first time. Between July 2015 and December 2016, Rail Services recorded approximately $90 million in Rail Throughput Revenue from Jamex Marketing and Monroe. *See* Accounting Records, BLFG_EDPA0046390-408. Similarly, beginning in June 2015, the accounting records show that BTS ceased recording similar pipeline management revenue ("Pipeline Management Revenue"). In June 2015, Pipeline Services began recording Pipeline Management Revenue for the first time. Between June 2015 and December 2016, Bridger Pipeline Services recorded approximately $1 million in Pipeline Management Revenue. *See* Accounting Records, BLFG_EDPA0046390 - 408.

Even as BTS lost access to the Rail Throughput Revenue and Pipeline Management Revenue, it continued to receive a small amount of so-called stations throughput revenue ("Stations Throughput Fees"). Such revenue represented revenue earned by BTS from owning and operating pipeline terminals (i.e., injection stations) across the Rockies, Bakken, Gulf Coast and Permian Basin. Bridger Summary Confidential Information Memorandum, BLFG_EDPA0140545-595 at 570. BTS sold its capacity at its injection stations to Marketing and third-party customers.

Even before Ferrellgas purchased Bridger Logistics, Bridger Marketing (later Jamex Marketing) was hemorrhaging cash in connection with the Amended COSA and Marketing TLA due to the unfavorable spread between the West Texas Intermediate crude ("WTI") price and the Brent crude price. The WTI price is a surrogate for Bakken crude which is sourced from North

Dakota and which Bridger shipped by rail to Eddystone for transloading and delivery to Monroe. The Brent price is a surrogate for the price of West African crude ("WAF"), a type of crude that Monroe could use as a substitute for Bakken.  Beginning in 2014 and continuing forward, the spread between WTI and Brent had become "much narrower".  James Ballengee Deposition at 62-63.  When the spread was narrow, Bridger Marketing suffered "substantial losses".  *Id.* at 63. In July 2015, Jamex Marketing lost $7.5 million, over $6 million in August, and about $7.3 million in September 2015.  *Id.* at 117-119.  These losses were caused by a continuing narrowing of the Brent-WTI spread.  *Id.* at 119.   The spreads continued to narrow in October and November 2015, and the losses continued to mount in those months.  *Id.* at 119.

Bridger Logistics and Ferrellgas were aware throughout the period leading up to and after the Acquisition that Bridger Marketing (Jamex Marketing after the Acquisition) was losing money.  In May 2015, Ferrellgas received a report from Grant Thornton noting Bridger Marketing's losses.  May 21, 2015 Grant Thornton Report, BLFG_EDPA0299508-78.  After the Acquisition, in late August 2015, Soiefer sent an email to Rios stating that he had spoken with Jamex Marketing's James Ballengee, who had asked for Soiefer's help in getting additional financing.  August 29, 2015 Soiefer Email, RG_EDPA0053060.  Soiefer noted that Jamex Marketing was losing $3-$4 million per month at the time.  *Id.*    Additionally, it appears based on handwritten notes of Rios, that Rios had a meeting in October 12, 2025 with Soiefer, Gamboa, and others regarding Monroe, and the spread between Brent and WTI prices – the source for Jamex Marketing's consistent losses.  Rios Handwritten Notes, RG_EDPA0279213, -36-37; James Ballengee Deposition at 130-31.

By late fall 2015, Bridger and Ferrellgas understood that Jamex Marketing was in deep trouble.  Gamboa noted in an email to Rios and Soiefer that "If we do nothing: Benefits Monroe

[i.e., Monroe is benefitted]; Jamex bankrupt in 12-18 months depending on spreads and FGP stock; Bridger has $70 million ebitda and $41.5 million obligation to ERC".  December 8, 2015 Gamboa Email, BLFG_EDPA2259244-51.  Gamboa also stated that revising the Monroe/Jamex Marketing/Bridger arrangement would enable "us to get some back from [Eddystone] once we threaten or actually stop shipping" through Eddystone.  *Id.*

Because of its losses, in June 2015, Bridger Marketing was already talking to Monroe about revising the Amended COSA, as the contract was unprofitable for it.  James Ballengee Testimony at 123.  One of the possible options was to convert the Amended COSA to a 100% cost plus contract.  *Id.* at 124-25.  Sometime in October 2015, the focus changed and Monroe and Jamex Marketing began discussing substituting WAF crude for Bakken crude, a step that would have rendered continued use of the Eddystone facility unnecessary.  *Id.* at 121, 130-31. At his deposition, Ballengee testified that in October-November 2015, Jamex Marketing began discussing with Monroe the possibility of replacing the Bakken crude under the Amended COSA with WAF crude.  *Id.* at 121.  During this time, Ballengee made a number of presentations to Monroe.  *Id.* at 121.  It was the case if the Amended COSA was not amended, Jamex Marketing would go bankrupt in 12-18 months, and Ballengee conveyed this to Monroe.  *Id.* at 122.

In connection with the proposed changes to the parties' relationship, Rios, Soiefer, Gamboa, and Ferrellgas' counsel, Trent Hampton, participated in communications in late September 2015 regarding the possibility of "**getting out of the contract**" with Eddystone. 20150922 Hampton Email; 20150922 Soiefer Email (emphasis added).  By December, Bridger and Ferrellgas officials began contemplating intentionally defaulting on the RSA and thinking of ways to strip BTS of its remaining assets.  On December 3, 2015, Soiefer stated "We may seek to **terminate the [Eddystone] deal** . . . ."  December 4, 2015 Hampton Email,

BLFG_EDPA2410300-01 (emphasis added).  On December 15, 2015, after learning that there was no guaranty running to Eddystone, Rios sent an email to Hampton (cc Jeremy Gamboa and Todd Soiefer on all emails) asking "what are your thoughts around **Bridger Transfer Services (BTS) defaulting under the Eddystone contract**.  BTS owns the Cheyenne terminal that Shell through puts at and all the pipeline injection terminals.  Do our banks have liens on these assets, in addition to our subsidiaries' receivables and accounts.  If so, this would be a good way to **restructure BTS and divest ourselves of Eddystone**. . . ."  December 15, 2015 Rios Email, BLFG_EDPA2390133-39 (emphasis added).  He also said at this time "**Time to go nuclear** as long as we have another option to offload elsewhere." *Id.*  Ferrellgas executive Todd Soiefer understood this to mean that Rios wanted to "go nuclear" on Eddystone.   Todd Soiefer Deposition at 291:6-294:2.

On December 16, Rios told Gamboa and Ferrellgas Senior Vice-President, Legal and Risk Management Trent Hampton, among others, "**I am looking to stop paying [Eddystone] in February**, but we need an analysis of this ASAP.  Please let me know what I can do to help.  We should also engage restructuring counsel for this subsidiary, so that we know what we are getting into."  December 16, 2015 Hampton Email, BLFG_EDPA2390288-96; December 16, 2015 Heitmann Email, BLFG_EDPA2394776 (emphasis added).  Two days later, Rios sent an email to John Goodgame of Akin Gump (cc Todd Soiefer) stating "**John: We could sell Bridger Transfer Services to Jamex and let them deal with Eddystone**".  December 18, 2015 Rios Email, BLFG_EDPA2390409 (emphasis added)  He then follows up by asking Goodgame if he is available for a quick call.  After the call, Rios tells Hampton that Goodgame "and his able team at Akin Gump are going to look into the restructuring, **including but not limited to selling BTS to Jamex**, which sounds like a good alternative".  December 18, 2015 Hampton Email,

BLFG_EDPA2390342-43; December 18, 2015 Hampton Email, BLFG_EDPA2390344-45 (emphasis added).

At the time that Defendants were considering and later implementing their plan to strip BTS, they were aware that they were engaging in fraudulent transfers.  On December 21, 2015, Rios recorded in his meeting with Akin Gump that they advised him of the risk of fraudulent transfer, and that doing the transactions was "**not without risk**."  September 28, 2015 to December 21, 2015, Rios's Handwritten notes, RG_EDPA0279213 (emphasis added).  On January 5, 2016, Bridger inhouse counsel Knapp wrote to Hampton, "Trent, **since we're already playing in the UFTA/UFCA sandbox**, what are your thoughts on contributing all assets of Bridger Logistics to Newco (less BTS) and selling it to Jamex?"  January 5, 2016, Knapp Email, BLFG_EDPA2390802 (emphasis added).  "UFTA/UFCA" refers to Uniform Fraudulent Transfer Act/Uniform Fraudulent Conveyance Act.  On January 27, 2016, Knapp wrote to Rios, Gamboa, Hampton, and Soiefer "There's no law that requires us to inform Enbridge of a change in ownership **other than those we've covered (UFTA/UFCA)**."  January 27, 2016, Knapp Email, BLFG_EDPA2399663 (emphasis added).

At the time it was planning to sell a denuded BTS to Jamex, Bridger engaged in discussions with Monroe and Jamex Marketing to suspend the parties' existing arrangement.  On December 18, 2015, the parties circulated a term sheet under which all shipments of crude through Eddystone would be suspended.  December 19, 2015 Rios Email and Attachment, BLFG_EDPA2394788-92.  On December 22, 2015, the term sheet was amended to also provide that BTS would be stripped of all assets other than the RSA and then sold to Jamex.  January 4, 2016 Hampton Email and Attachment, BLFG_EDPA2394924-27.  Ultimately, the parties entered into three letter agreements dated January 13, 2016 whereby the Monroe shipping

arrangement was suspended and the Amended COSA, Logistics TLA and Monroe TLA were amended.  January 13, 2016 Adams Email and Attachments, BLFG_EDPA1752875-901.  Rios signed these agreements on behalf of Bridger Logistics.

In order get the benefit of a suspension of agreements that were causing it massive losses, Jamex Marketing promised to buy BTS from Bridger Logistics.  The sale price was for a cash consideration of $10.00, and was supposed to occur on or soon after February 1, 2016.  January 13, 2016 Adams Email and Letter Agreements, BLFG_EDPA1752875-900; James Ballengee Deposition at 172.  The parties also stipulated in the letter agreements that "BTS, at the time of its sale to Jamex, includes no assets or liabilities other than its rights and obligations under the Eddystone Contract." January 13, 2016 Adams Email and Letter Agreement, BLFG_EDPA1752875-900.  The letter agreements further included an amendment eliminating references to Eddystone from the parties' prior agreements and stating that, if and when deliveries resumed, for any crude supplied to Trainer without using the Eddystone facility, Monroe would get a $.50/barrel discount.  *Id.*  Through these actions and others, it became clear that, should shipments of crude to Monroe resume, those shipments would not go through Eddystone.

Consistent with the foregoing, after signing the letter agreements BTS began transferring additional assets to Bridger Logistics subsidiaries without receiving any consideration in return. Logistics in-house counsel Patrick Knapp summarized the stripping plan in an email circulated on the day the suspension letter agreements were signed.  January 13, 2016 Knapp Email, BLFG_EDPA2391477-48.

On or about January 31, 2016, BTS assigned substantially all of its remaining assets – worth tens of millions of dollars – to Bridger Swan Ranch, LLC and Bridger Terminals LLC.

The assignment agreements are signed by Rios on behalf of BTS and both Bridger Terminals
LLC and Bridger Swan Ranch, LLC.  January 31, 2016, BTS Assignments to Bridger Swan
Ranch, BLFG_EDPA0005462-77; January 31, 2016 BTS Assignments to Bridger Terminal,
BLFG_EDPA2405638-47; October 30, 2014 BTS-Shell Throughput Agreement (Amended),
BLFG_EDPA0012203-31.  By assigning these assets, BTS was also deprived of millions of
dollars in revenue that it would have otherwise received.  Under a General Warranty Deed dated
January 31, 2016, BTS also transferred ownership in the fifteen acres of land upon which the
Swan Ranch terminal sat, which had been purchased for $1,726,247 (per journal entries), to
another Ferrellgas owned entity, Bridger Real Property, for $10.  January 31, 2016 Metzke Email
and Attachments, BLFG_EDPA2406910-21.  On January 21, 2016, when told that BTS' balance
in Bridger Transfer Services's bank account was at zero, Bridger in-house counsel Patrick Knapp
was asked "Should we expect an incoming wire to this account, then?"  January 21, 2016, Knapp
Email, BLFG_EDPA2410413.  Knapp replied "No, keep it at zero."  *Id.*  That same day, Knapp
wrote to Hampton and Lehman: "**[T]o better protect against UFTA/UFCA**, I included limited
waivers of the non-compete contained in the Ferrellgas/Bridger-PSA and the exclusivity clause
in the Bridger-Jamex TLA.  Really, really limited.  **It will help create a fact dispute** if we can
waive the PSA around and say that we intended Jamex to continue operating at Eddystone."
January 21, 2016, Knapp Email, BLFG_EDPA2391635 (emphasis added).

On February 22, 2016, Mr. Rios, on behalf of BTS, Logistics and Ferrellgas, signed a
"Purchase and Sale Agreement" (the "BTS PSA") for the sale of BTS to Jamex Transfer
Holdings, for ten dollars, effective February 1, 2016.  The parties stipulated that BTS "has no
assets other than the Eddystone Agreement".  On October 2, 2017, Farmer, Ferrellgas' Assistant
Controller who was responsible for overseeing the accounting for the Logistics entities,  stated in

29

16990423 4

an email that BTS had been "'sold' to Jamex **to strategically deal with an Enbridge contract** . . . ."  October 2, 2017 Farmer Email and Attachment, BLFG_EDPA0271621-24 (emphasis added).

Further information responsive to this Interrogatory is referenced in Eddystone's Supplemental Response to Interrogatory no. 4 in the present Rios and Gamboa Second Set of Interrogatories.

* * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery. Eddystone further states that the parties have produced an enormous volume of documents in this litigation.  Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.


**INTERROGATORY NO. 7:** Describe in detail the factual bases of your allegation in paragraph 29 that "[t]he course of dealing among the Bridger entities shows that they either operated . . . through a series of implied contracts," identifying each and every such "implied contract" and the factual basis for your belief in the existence of such contract.

**RESPONSE 7:**  Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein.  In addition to those objections, Eddystone objects that the Interrogatory misstates Eddystone's allegation in paragraph 29.  Eddystone has alleged that, since the Bridger entities entered into business arrangements with one another without express contracts, that there were implied contracts governing the terms of those arrangements, including for the use of BTS's transloading, loading, pipeline, and injection capacity to supply Monroe, and that if no implied contracts existed the entities were alter egos of one another. Eddystone further objects that the Interrogatory is premature, because Eddystone's investigation of the facts is ongoing.  Eddystone will update and supplement its response at the end of fact discovery, in accordance with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 7:**  Without waiving and subject to its previously-asserted objections, Eddystone supplements its response as follows:

BTS had an implied contract with Bridger Marketing before the sale of Bridger Logistics to Ferrellgas (the "Acquisition"), and an implied contract with Bridger Logistics after the Acquisition.  The implied contracts required BTS to make available to Bridger Marketing and Bridger Logistics certain crude-oil transportation equipment and assets to which BTS had access, including access to throughput assets at Eddystone, Pennsylvania and at Berthold, Van Hook, and New Town, North Dakota.  In exchange, Bridger Marketing and Bridger Logistics agreed to pay an amount sufficient for BTS to cover its payment obligations under its contracts and earn a profit.  Evidence supporting the existence and terms the foregoing implied contracts is referenced in the supplemental responses to Interrogatories nos. 4 and 6 in Rios and Gamboa's Second Set of Interrogatories, above.   Further support for the foregoing will be provided by Eddystone's industry custom and practice expert, Neil Earnest, who will supply relevant testimony on this

point and will identify additional facts and documents evidencing the existence and terms of the contracts.

* * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery. Eddystone further states that the parties have produced an enormous volume of documents in this litigation.  Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

**INTERROGATORY NO. 8:** Set forth every representation made by Rios or Gamboa related to this action that you allege was false, misleading, or constitutes a misrepresentation or fraud. Include for each: (1) the person who made the misrepresentation, and (2) the person to whom the misrepresentation was made. If the representation was oral, identify the date – at least the month and year – that the representation was made.  If the representation was not oral, identify the document or communication in which the representation was made by stating: (1) the author of the document or communication; (2) the recipient of the document or communication; (3) the

32

date of the document or communication; and (4) the bates label of the produced document or communication.

**RESPONSE 8:**  Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein.  In addition to those objections, Eddystone objects that the Interrogatory is overly burdensome insofar as it asks Eddystone to identify each and every false or misleading statement made by Rios or Gamboa over more than three years. Eddystone's investigation of the facts is ongoing and it does not know every statement Rios or Gamboa made that was false.  This information is best known to Rios and Gamboa.  Eddystone further objects to the Interrogatory as requiring an unnecessary effort, because Eddystone has not, as yet, alleged fraudulent misrepresentation as a cause of action.  There is no need for Eddystone to compile every false statement that Rios and Gamboa have made into an interrogatory response, and doing so would be grossly overburdensome.  Eddystone will not respond to this Interrogatory.

**SUPPLEMENTAL RESPONSE 8:**  Without waiving and subject to its previously-asserted objections, Eddystone supplements its response as follows:

As described in the other Responses to these Interrogatories, Rios and Gamboa, together with other Defendants, improperly denuded BTS of assets and revenues without consideration, so as to render it judgment-proof and unable to pay its obligations to Eddystone under the RSA. There is no evidence that this scheme was ever disclosed to Eddystone, or that Eddystone knew about it before it was effectuated.  Eddystone reasonably and properly could have assumed, and did assume, that BTS was being operated in compliance with all relevant applicable laws, including laws against fraudulent transfer, laws forbidding use of legal entities as alter egos of

33

other parties, and laws imposing fiduciary obligations on the management and owners of legal entities.

In addition, Rios, Gamboa, Kelly, and others at Bridger and Ferrellgas repeatedly implied to Eddystone, and one of its parents, Enbridge, that Bridger was willing to provide Eddystone a letter of credit or other financial assurances as required under the RSA. *See* December 16, 2014 Chesnutt Email, BLFG_EDPA0620608-11. In fact, however, Rios and others at Bridger made it clear in internal discussions that they had no intention of providing the assurances, and sought to postpone providing such indefinitely. For instance, after Eddystone renewed its request for assurances in October 2015, Bridger in-house attorney told Rios that "Im [sic] happy to keep **stiff-arming**" Eddystone. October 30, 2015 Rios Email, BLFG_EDPA2443117-18 (emphasis added). Mr. Rios gave a one word reply in approval, referring to the famous football award: "**Hiesman**". *Id.* (emphasis added). Similarly, in December 2015, Bridger's Trent Hampton described in an email to Rios, Gamboa, and Soiefer Bridger's general policy for dealing with Eddystone requests for assurances. Hampton noted that "**Bridger stiff-armed them [Eddystone] pre-Ferrellgas and that continues today**." December 11, 2015 Rios Email, BLFG_EDPA2394752-54 (emphasis added).

Rios, Gamboa, and other Bridger Logistics and Ferrellgas officers also participated in efforts to mislead Enbridge in early 2016 with respect to truck station leases that BTS had with Enbridge. It was crucial to Bridger Logistics that it be able to maintain access to those leases after BTS was sold to Jamex Marketing. Initially, in mid-January 2016 Bridger Logistics asked for Enbridge's permission to assign BTS' interest in the leases, misleadingly stating that Bridger Logistics was merely "re-arranging some of our assets into a new . . . affiliate," and not mentioning the forthcoming sale of BTS. February 3, 2016 Knapp Email,

BLFG_EDPA2400895-99.  When Enbridge nonetheless refused to permit assignment due to Bridger's persistent refusal to provide financial assurances, Bridger Logistics adopted "Plan B", purportedly conveying BTS' interests anyway through a "services agreement".  January 27, 2016 Knapp Email, BLFG_EDPA2399663;  February 3, 2016 Knapp Email, BLFG_EDPA2400895; February 5, 2016 Knapp Email, BLFG_EDPA2393158; February 5, 2016 Lehman Email, BLFG_EDPA2264678; February 22, 2016, Terminal Logistics Services Agreement, BLFG_EDPA2269114-31; February 9, 2016 Rios Email, BLFG_EDPA2403142.

* * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery. Eddystone further states that the parties have produced an enormous volume of documents in this litigation.  Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

**INTERROGATORY NO. 9:** Describe in detail the "implied contract" that the Complaint alleges exists between BTS and Bridger Logistics, identifying (1) the date on which the "implied contract" was entered into by BTS and Bridger Logistics; (2) the term of the "implied contract"

35

*i.e.* its temporal duration; (3) the consideration provided by BTS as part of this "implied contract;" (4) the consideration provided by Bridger Logistics as part of this "implied contract;" (5) each of BTS' specific rights and obligations under this "implied contract"; (6) each of Bridger Logistics' specific rights and obligations under this "implied contract"; (7) whether BTS had the right under the "implied contract" to terminate and, if so, on what terms or conditions; and (8) whether Bridger Logistics had the right under the "implied contract" to terminate and, if so, on what terms or conditions.

**RESPONSE 9:**  Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein.  In addition, Eddystone objects that this interrogatory mischaracterizes the allegations of the Complaint because the contention of an implied contract between BTS and Bridger Logistics is one Eddystone pled in the alternative.  Eddystone further objects that the Interrogatory is premature, because Eddystone's investigation of the facts is ongoing.

Subject to and without waiving any of its objections, Eddystone states that the term of the implied contract between BTS and Bridger Logistics was five years and two months.  The implied contract required BTS to make available to Bridger Logistics the throughput capacity that BTS secured at Eddystone, Pennsylvania and at Berthold, Van Hook, and New Town, North Dakota.  In exchange, Bridger Logistics promised to pay an amount sufficient for BTS to cover its payment obligations under its throughput contracts and earn a profit.  The remaining contract terms will be detailed in an expert report.  Accordingly, Eddystone will update and supplement its response at the end of expert discovery, in accordance with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 9:**  Without waiving and subject to its previously-asserted objections, Eddystone responds as follows:

16990423 4

BTS had an implied contract with Bridger Logistics after the Acquisition.  The implied contract required BTS to make available to Bridger Logistics certain crude-oil transportation equipment and assets to which BTS had access, including access to throughput assets at Eddystone, Pennsylvania and at Berthold, Van Hook, and New Town, North Dakota.  In exchange, Bridger Logistics agreed to pay an amount sufficient for BTS to cover its payment obligations under its contracts and earn a profit.  Evidence supporting the existence and terms the foregoing implied contract is referenced in the supplemental responses to Interrogatories nos. 4 and 6 in Rios and Gamboa's Second Set of Interrogatories, above.   Further support for the foregoing will be provided by Eddystone's industry custom and practice expert, Neil Earnest, who will supply relevant testimony on this point and will identify additional facts and documents evidencing the existence and terms of the contracts.

                                            * * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery.  Eddystone further states that the parties have produced an enormous volume of documents in this litigation.  Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

16990423 4

Dated: October 1, 2020                      Respectfully submitted,


                                            /s/ Filiberto Agusti
                                            Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                            Terence M. Grugan (I.D. No. 307211)
                                            BALLARD SPAHR LLP
                                            1735 Market Street, 51st Floor
                                            Philadelphia, PA 19103-7599
                                            Telephone: (215) 665-8500
                                            Facsimile: (215) 864-8999
                                            hockeimerh@ballardspahr.com
                                            grugant@ballardspahr.com


                                            Filiberto Agusti (*pro hac vice*)
                                            Steven J. Barber (*pro hac vice*)
                                            Andrew J. Sloniewsky (*pro hac vice*)
                                            STEPTOE & JOHNSON LLP
                                            1330 Connecticut Avenue, NW
                                            Washington, DC 20036
                                            Telephone: (202) 429-3000
                                            Facsimile: (202) 429-3902
                                            fagusti@steptoe.com
                                            sbarber@steptoe.com
                                            asloniewsky@steptoe.com

                                            *Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I have this October 1, 2020 sent a copy of the foregoing Plaintiff Eddystone Supplemental Responses and Objections to **DEFENDANTS JULIO RIOS AND JEREMY GAMBOA'S SECOND SET OF INTERROGATORIES** to counsel for all parties of record via email.

Dated October 1, 2020                    /s/ Andrew J. Sloniewsky
                                         Andrew J. Sloniewsky

16990423 4