# EXHIBIT 10

EXECUTION VERSION

## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### BRIDGER, LLC

### a Delaware Limited Liability Company

### Dated as of July 1, 2013

Limited Liability Company interests in Bridger, LLC, a Delaware limited liability company, have not been registered with or qualified by the Securities and Exchange Commission or any securities regulatory authority of any state. The interests are being sold in reliance upon exemptions from such registration or qualification requirements. The interests cannot be sold, transferred, assigned or otherwise disposed of except in compliance with the restrictions on transferability contained in the Second Amended and Restated Limited Liability Company Agreement of Bridger, LLC, as such may be amended or restated from time to time, and applicable federal and state securities laws.

NY\5767490

**BLFG_EDPA1625692**

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS ..................................................................................................1

    1.01    Certain Definitions ........................................................................................1
    1.02    Construction ...............................................................................................14

ARTICLE II. ORGANIZATION ...........................................................................................15

    2.01    Organization ...............................................................................................15
    2.02    Name. ........................................................................................................15
    2.03    Registered Office; Registered Agent ...........................................................15
    2.04    Principal Office ..........................................................................................15
    2.05    Purpose; Powers .........................................................................................15
    2.06    Fiscal Year .................................................................................................16
    2.07    Foreign Qualification Governmental Filings ................................................16
    2.08    Term .........................................................................................................16

ARTICLE III. MEMBERS; DISPOSITIONS OF INTERESTS ...............................................16

    3.01    Members ....................................................................................................16
    3.02    Restrictions on the Transfer of an Interest ..................................................16
    3.03    Additional Members ...................................................................................20
    3.04    Representations and Warranties ...................................................................20
    3.05    Liability to Third Parties .............................................................................22
    3.06    Drag Along Rights ......................................................................................22
    3.07    Drag-Along Notice .....................................................................................23
    3.08    Tag-Along Notice .......................................................................................23
    3.09    Tag-Along Rights .......................................................................................24
    3.10    Non-Accredited Investors ...........................................................................25
    3.11    Members Have No Agency Authority ...........................................................26
    3.12    Withdrawal ................................................................................................26

ARTICLE IV. CAPITAL CONTRIBUTIONS; CLASSES OF EQUITY ...................................26

    4.01    Capital Contributions ..................................................................................26
    4.02    Capital Commitments ..................................................................................26
    4.03    Rights to Terminate Capital Contributions ...................................................27
    4.04    Capital Contributions by New Members .......................................................27
    4.05    Interest on and Return of Capital Contributions; Deficit Capital Accounts .........28
    4.06    Withdrawal of Capital. ................................................................................28
    4.07    Capital Accounts ........................................................................................28
    4.08    Failure to Make Capital Contributions by Class B Members ..........................28
    4.09    Failure to Make Capital Contributions by Class A Members ..........................28
    4.10    Interests ....................................................................................................29
    4.11    Special Class A Capital Contribution ..........................................................29

 **BLFG_EDPA1625693**

ARTICLE V. DISTRIBUTIONS AND ALLOCATIONS ................................................30

    5.01    Distributions....................................................................................30
    5.02    Tax Distributions ...........................................................................32
    5.03    Allocations .....................................................................................33
    5.04    Withholding ...................................................................................37

ARTICLE VI. MANAGEMENT ................................................................................38

    6.01    Management....................................................................................38
    6.02    Board of Managers.........................................................................38
    6.03    Transactions with Affiliates ..........................................................41
    6.04    Officers. .........................................................................................42
    6.05    Duties; Indemnification; Limitation of Liability ..........................43
    6.06    Managers' and Officers' Insurance...............................................45
    6.07    Liability of Indemnitees ................................................................45
    6.08    Other Activities .............................................................................45
    6.09    Annual Monitoring Fee ..................................................................46

ARTICLE VII. RIGHTS OF MEMBERS; CONFIDENTIALITY ...................................46

    7.01    Access to Information ....................................................................46
    7.02    Audits.............................................................................................46
    7.03    Confidentiality ...............................................................................46
    7.04    Non-Disparagement .......................................................................47
    7.05    Class C Units .................................................................................48
    7.06    Class B Repurchase Rights ............................................................51

ARTICLE VIII. TAXES ..........................................................................................53

    8.01    Tax Returns ....................................................................................53
    8.02    Tax Elections .................................................................................53
    8.03    Tax Matters Partner........................................................................53

ARTICLE IX. BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS ...................54

    9.01    Maintenance of Books and Records ..............................................54
    9.02    Reports...........................................................................................54
    9.03    Tax Information ..............................................................................54
    9.04    Bank Accounts ...............................................................................54

ARTICLE X. DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION ........54

    10.01    Dissolution ...................................................................................55
    10.02    Liquidation and Termination ........................................................55
    10.03    Cancellation of Filing ...................................................................56
    10.04    Qualified Public Offering .............................................................56

NY\5767490

ARTICLE XI. GENERAL PROVISIONS ..................................................................................57

    11.01  Offset..................................................................................................................57
    11.02  Expenses ............................................................................................................57
    11.03  Notices ...............................................................................................................57
    11.04  Entire Agreement; Supersedure ........................................................................58
    11.05  Effect of Waiver or Consent .............................................................................58
    11.06  Amendment or Modification..............................................................................58
    11.07  Binding Effect....................................................................................................59
    11.08  Governing Law; Severability.............................................................................59
    11.09  Jurisdiction and Venue ......................................................................................59
    11.10  Waiver of Jury Trial..........................................................................................59
    11.11  Further Assurances.............................................................................................59
    11.12  Title to Company Property.................................................................................60
    11.13  Third-Party Beneficiaries..................................................................................60
    11.14  Waiver of Certain Rights...................................................................................60
    11.15  Counterparts ......................................................................................................60

Exhibit A – Members, Capital Contributions, and Units

Exhibit B – Adoption Agreement

Exhibit C – Consent of Spouse

Exhibit D – Registration Rights

Exhibit E – Officers

NY\5767490

 BLFG_EDPA1625695

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**BRIDGER, LLC**

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "<u>Agreement</u>") of BRIDGER, LLC, a Delaware limited liability company (the "<u>Company</u>"), is made and entered into by and among Riverstone V Bridger Holdings, L.P., a Delaware limited partnership ("<u>Riverstone</u>") and the other Members party hereto, effective as of July 1, 2013 (the "<u>Effective Date</u>"). Capitalized terms used herein without definition have the meanings set forth in <u>Section 1.01</u>.

WHEREAS, Bridger, LLC, a Louisiana limited liability company ("<u>Bridger LA</u>"), was organized under Louisiana law on July 19, 2011;

WHEREAS, on July 1, 2013, Bridger LA effected a merger with and into the Company and in connection therewith, the Company adopted the First Amended and Restated Limited Liability Company Agreement of Bridger, LLC; and

WHEREAS, the members of the Company desire to further amend and restate the limited liability company agreement of the Company to, among other things, reflect the addition of one new Member of the Company and to reflect the relative ownership and other rights and obligations of the Members;

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**
**DEFINITIONS**

**1.01    Certain Definitions**. As used in this Agreement, the following terms have the following meanings:

"<u>Act</u>" means the Delaware Limited Liability Company Act, 6 Del.C. §18-101, <u>et</u>. <u>seq</u>., and any successor to such statute, as amended, supplemented or restated from time to time.

"<u>Adjusted Capital Account</u>" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    add to such Capital Account any amounts which such Member is obligated to restore pursuant to this Agreement or is deemed to be obligated to restore to the Company pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    subtract from such Capital Account such Member's share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

1

**CONFIDENTIAL**                                                                                    **BLFG_EDPA1625696**

"Affiliate" means, with respect to any Person, any other Person Controlling, Controlled by, or under common Control with such first Person.  Any Riverstone Sponsor or any portfolio company of any Riverstone Sponsor will not be an Affiliate for purposes of this Agreement.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Amended Drag-Along Notice" has the meaning set forth in Section 3.07.

"Amended Tag-Along Notice" has the meaning set forth in Section 3.08.

"Annual Monitoring Fee" means an annual monitoring fee equal to $500,000 paid pursuant to a services agreement. In accordance with the services agreement, the Annual Monitoring Fee will be paid on a quarterly basis, in advance, in four equal installments of $125,000, without the need for any request or invoice, and the initial installment of the Annual Monitoring Fee shall be paid on the first day of the next fiscal quarter immediately following the Effective Date.  For the avoidance of doubt, the Annual Monitoring Fee is not a distribution subject to Section 5.01(a) nor incorporated in any calculation of Preferred Return.

"Assigning Member" has the meaning set forth in Section 3.02(c).

"Assumed Tax Rate" means, with respect to each Member and for a taxable year, the highest marginal income tax rate, taking into account federal, state and local income taxes (including the tax under Section 1411 of the Code), which the Board of Managers estimates is applicable to such Member (or beneficial owner of a Member if the Member is a flow-through entity for federal income tax purposes, provided that in the case of the Riverstone Entities, such rate will be 45% or, if applicable (with such applicability to be determined by the Board of Managers), such higher rate is the greater of the highest marginal income tax rate that is applicable to individual residents of New York, New York or U.S. corporations doing business in New York, New York), as a result of the income, gain, loss and deductions allocated to such member under this Agreement for U.S. federal income tax purposes in such taxable year, utilizing the rates for ordinary income or capital gain applicable based on the character of the Company's income and gain.

"Available Cash" means the gross cash proceeds from the Company's operations (including sales and dispositions of property whether or not in the ordinary course of business) and any net cash proceeds from any refinancing of debt or new debt issuance, less amounts used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, future acquisitions and investments and contingencies, all as reasonably determined by the Board of Managers.

"Award Agreement" means a written agreement between the Company and a Member pursuant to which awards of Units are issued under the Initial Incentive Plan or a Subsequent Incentive Plan.

"Board of Managers" means the Board of Managers that manages and controls the Company as set forth in Article VI.

NY\5767490

CONFIDENTIAL                                                                   BLFG_EDPA1625697

"Business Day" means any day other than a Saturday, Sunday or legal holiday on which banks in New York, New York are authorized or obligated by law to close.

"Capital" means the amount of cash and the net fair market value, as determined by the Board of Managers at the time of contribution, of any property contributed to the Company by the Members pursuant to the terms of this Agreement.

"Capital Account" means the Capital Account maintained for each Member on the Company's books and records in accordance with the following provisions:

(a)      To each Member's Capital Account there will be added (i) the amount of cash and the Gross Asset Value of any other asset contributed by such Member to the Company pursuant to Article IV hereof, (ii) such Member's allocable share of Profits, any items in the nature of income or gain that are specially allocated to such Member pursuant to Sections 5.03(a) and (b) hereof or other provisions of this Agreement, and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b)      From each Member's Capital Account there will be subtracted (i) the amount of cash and the Gross Asset Value of any other Company assets distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's allocable share of Losses, any other items in the nature of expenses or losses that are specially allocated to such Member pursuant to Section 5.03(a) and (b) or other provisions of this Agreement, and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)      In the event any Interest is Transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(d)      Determination of the amount of any liability for purposes of subparagraphs (a) and (b) above will take into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

(e)      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and will be interpreted and applied in a manner consistent with such Treasury Regulations.   In the event that the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article X hereof upon the dissolution of the Company.

"Capital Contribution" means any amount of Capital contributed to the Company by a Member pursuant to the terms of this Agreement.  Any reference to the Capital Contributions of a Member will include the Capital Contributions made by a predecessor holder of the Interest of such Member.

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625698

"Cash Contributions" has the meaning set forth in Section 4.02(a).

"Cause," with respect to any Class B Employee or Class C Member, has the meaning set forth in such Member's Employment Agreement; provided, that if such Employment Agreement contains no definition of such term, or if such Member is not party to an Employment Agreement, then Cause shall mean: (i) any material breach by such Member of this Agreement, the Company's risk management policy, the Company's code of conduct, the Member's Employment Agreement or any other material agreement between such Member and the Company or its Affiliates, including, without limitation, the breach of any representation, warranty or covenant made under this Agreement or such Employment Agreement or other material agreement by the Member, (ii) the commission of an act of gross negligence, willful misconduct, breach of fiduciary duty, fraud, theft or embezzlement on the part of the Member, (iii) the conviction or indictment under any federal, state or local law or regulation applicable to the business of the Company and its subsidiaries on the part of the Member that adversely affects the Company and its subsidiaries; (iv) conviction of the Member, or plea of nolo contendere by the Member, to a felony or crime involving moral turpitude or (v) the Member's willful failure or refusal to perform the Member's lawful obligations pursuant to this Agreement, such Member's Employment Agreement (if applicable) or any other material agreement entered into between the Member and the Company or its Affiliates.

"Certificate" has the meaning set forth in Section 2.01.

"Class A Capital Commitment" shall mean, in addition to the amount of the Capital Contribution of the Class A Members on the Effective Date, an amount equal to the sum of (i) the aggregate Capital Contributions made by the Class A Members so that the Class A 58% Level is first achieved, plus (ii) $60,071,429.

"Class A 58% Level" shall mean that the issued and outstanding Class A Units represent 58% of the aggregated number of the issued and outstanding Class A Units and Class B Units.

"Class A Manager" has the meaning set forth in Section 6.02(a).

"Class A Member" means any Member owning Class A Units and identified on Exhibit A, as such may be amended from time to time by the Board of Managers.

"Class A Units" means the Class A Units issued to Class A Members pursuant to Section 4.01 and any other Units issued after the date hereof and designated by the Board of Managers as Class A Units.

"Class B Distribution Percentage" means, with respect to the Class B Members, the ratio as of the applicable date of the Capital Contribution of all Class B Members with respect to then outstanding Class B Units to the aggregate Capital Contributions of all Members with respect to then outstanding Class A Units and Class B Units. The Class B Distribution Percentage as of the Effective Date is set forth on Exhibit A. The Class B Distribution Percentage, as adjusted from time to time, will be maintained with the books and records of the Company.

"Class B Equity Advance" means a payment made pursuant to an Employment Agreement of a Key Employee upon termination of employment pursuant to the applicable

4

CONFIDENTIAL

Employment Agreement that is an advance on the Transfer and distributions of such Key Employee's Controlled Class B Units.  Upon payment of a Class B Equity Advance, the Company shall have a lien on such Member's Controlled Class B Units until the Class B Equity Advance is repaid or distributions under Section 5.01 offset such amount.

"Class B Employee" means any Class B Member that is employed by the Company or any of its subsidiaries.

"Class B Manager" has the meaning set forth in Section 6.02(a).

"Class B Member" means any Member owning Class B Units and identified on Exhibit A, as such may be amended from time to time by the Board of Managers.

"Class B Member Repurchase Right" has the meaning set forth in Section 7.06(d).

"Class B Permitted Transfer" means a Transfer of up to 10% in the aggregate of the number of Class B Units as of the Effective Date or if such Class B Member is not a Member on the Effective Date, then the number of Class B Units upon initial issuance, to another Class B Member on such terms and conditions as such Class B Members agree upon.

"Class B Repurchase Notice" has the meaning set forth in Section 7.06(a).

"Class B Repurchase Right" has the meaning set forth in Section 7.06(a).

"Class B Special Distribution" means the special distribution made solely to the Class B Members on the Effective Date.

"Class B Units" means the Class B Units issued to Class B Members pursuant to Section 4.01 and any other Units issued after the date hereof and designated by the Board of Managers as Class B Units.

"Class C Catch Up Amount" shall mean that amount necessary to cause the aggregate distributions received by the Class C Members pursuant to Sections 5.01(a)(iv)(A) and (B) to be equal to 20% of the sum of such amount and the aggregate distributions received by the Class A Members in excess of the amount of their Unreturned Contribution Account and Preferred Return.

"Class C Initial Sharing Ratio" means fifteen percent (15%) subject to (i) decrease in the event of repurchases of Class C Units pursuant to Section 7.05 in an amount equal to the Class Sharing Percentage repurchased on such dates and (ii) increase in the event of issuances of Class C Units pursuant to Section 4.09; provided, however, that in no event shall the Class C Initial Sharing Ratio exceed fifteen percent (15%).

"Class C Member" means any Member holding Class C Units and identified on Exhibit A, as such may be amended from time to time by the Board of Managers.

"Class C Purchase Price" has the meaning set forth in Section 7.05(g)(i).

5

CONFIDENTIAL

BLFG_EDPA1625700

"Class C Repurchase Notice" has the meaning set forth in Section 7.05(g).

"Class C Repurchase Right" has the meaning set forth in Section 7.05(g).

"Class C Second Sharing Ratio" means twenty percent (20%) subject to (i) decrease in the event of repurchases of Class C Units pursuant to Section 7.05 in an amount equal to the Class Sharing Percentage repurchased on such dates and (ii) increase in the event of issuances of Class C Units pursuant to Section 4.09; provided, however, that in no event shall the Class C Second Sharing Ratio exceed twenty percent (20%).

"Class C Units" means the Class C Units issued to Class C Members as of the Effective Date and any other Units issued after the date hereof and designated by the Board of Managers as Class C Units.

"Class Sharing Percentage" means, with respect to any Member as to a particular class of Units held by such Member, a fraction (expressed as a percentage), the numerator of which is the total number of Units of such class held by such Member and the denominator of which is the total number of Units of such class held by all Members.

"Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Company" has the meaning set forth in the introductory paragraph hereof.

"Company Minimum Gain" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d)(1) for the phrase "partnership minimum gain."

"Control", "Controlled by" or "under common Control" (or variations thereof) means the possession, directly or indirectly, through one or more intermediaries, of the following:  (i) in the case of a corporation, more than 50% of the voting power of the outstanding voting securities thereof; (ii) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); (iii) in the case of a trust or estate, more than 50% of the beneficial interest therein; (iv) in the case of any other Entity, more than 50% of the economic or beneficial interest therein; or (v) in the case of any Entity, the power or authority, through ownership of voting securities, by contract or otherwise, to direct the management, activities or policies of the Entity.

"Controlled Class B Units" means the Class B Units held by a Key Employee or any Controlled Member of such Key Employee.

"Controlled Member" means, with respect to James Ballengee, Ballengee Interests, LLC, with respect to Julio Rios, Rios Holdings, Inc., and with respect to Jeremy Gamboa, Gamboa Enterprises, LLC.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the

6

CONFIDENTIAL

BLFG_EDPA1625701

beginning of such Fiscal Year or other period, Depreciation will be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis.   Notwithstanding the foregoing, if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Drag-Along Notice" has the meaning set forth in Section 3.07(a).

"Drag-Along Transferee" has the meaning set forth in Section 3.06(a).

"Effective Date" has the meaning set forth in the introductory paragraph hereof.

"Employment Agreement" means, as of any time, with respect to any Class B Member or Class C Member, the then-current employment, consulting or other service agreement, if any, entered into between such Member and the Company.

"Entity" means any corporation, limited liability company, general partnership, limited partnership, venture, trust, business trust, unincorporated association, estate or other entity.

"Equity Securities" means (i) any Interest, (ii) any security convertible, with or without consideration, into any Interest (including any option to purchase such a convertible security), (iii) any security carrying any warrant or right to subscribe to or purchase any Interest and (iv) any such warrant or right.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Executive Class B Units" means Class B Units issued after the Effective Date to new executive officers that enter into an Employment Agreement with the Company that are issued at Fair Market Value on such date of issuance.

"Exit Sale" has the meaning set forth in Section 3.06(a).

"Fair Market Value" of any Units means, at any time, expressed in U.S. dollars, the amount of cash proceeds which the owner of such Units would receive if all of the assets of the Company and its Subsidiaries were sold on such date, any Profits and Losses of the Company (including any Profits and Losses that would have been realized from such sale) were allocated in accordance with Section 5.03 and the Company and its Subsidiaries were dissolved and its assets distributed in accordance with Section 5.01, taking into account for such purposes publicly available information about similarly situated companies.  In determining "Fair Market Value," the fair market value of the business of the Company shall be determined on a full enterprise (*i.e.*, fully consolidated, including direct and indirect Subsidiaries of the Company) and going concern basis, but without giving effect to any discount for a minority interest or lack of liquidity of Units.

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625702

"Family Member" means, with respect to any Member that is an individual, a spouse, lineal ancestor, lineal descendant, legally adopted child, brother or sister of such Member, or a lineal descendant or legally adopted child of a brother or sister of such Member.

"Fiscal Year" has the meaning set forth in Section 2.06.

"Forced Contribution" has the meaning set forth in Section 4.11(a).

"Good Reason," with respect to any Class B Employee or Class C Member has the meaning set forth in such Member's Employment Agreement; provided, that if such Employment Agreement contains no definition of such term, or if such Member is not party to an Employment Agreement, then Good Reason shall mean: (i) a material breach by the Company of any of its covenants or obligations under this Agreement or the Member's Employment Agreement or any other material agreement between the Employee and the Company or its Affiliates; (ii) a material reduction by the Company in the Member's duties or responsibilities; (iii) a material reduction in the Member's base salary, other than a reduction that is generally applicable to all similarly situated employees or service providers; or (iv) the involuntary relocation of the geographic location of the Member's principal place of employment or service by more than 50 miles from the location of the Member's prior principal place of employment or service, except in each case in connection with a Liquidity Event (provided that for purposes of clause (i) of the definition of Liquidity Event, there must be a transfer of at least 75% of the Class A Units).  Notwithstanding the foregoing, any assertion of the Member of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (A) the condition described in subsections (i)-(iv) giving rise to the Member's termination of employment or service must have arisen without the Member's consent; (B) the Member must provide written notice to the Board of Managers of such condition within thirty (30) days of the initial existence of the condition; (C) the condition specified in such notice must remain uncorrected for thirty (30) days after receipt of such notice by the Board of Managers; and (D) the date of the Member's termination of employment or service must occur within ninety (90) days after the initial existence of the condition specified in such notice.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company is the gross fair market value of such asset, as determined by the Board of Managers in reasonable good faith using such reasonable method of valuation as it may adopt.

(b)     The Gross Asset Value of all Company assets immediately prior to the occurrence of any event described in subparagraphs (i) through (iv) below may be adjusted to equal their respective gross fair market values, as determined by the Board of Managers using such reasonable method of valuation as it may adopt in good faith, as of the following times:

(i)     the acquisition of an additional Interest in the Company by a new or existing Member in exchange for more than a *de minimis* Capital Contribution

8

CONFIDENTIAL

BLFG_EDPA1625703

(other than Capital Contributions made by the Members pursuant to <u>Section 4.02(b)</u>), if the Board of Managers reasonably determines in good faith that such adjustment is necessary or appropriate to reflect the relative Interests of the Members in the Company;

(ii)   the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for an Interest in the Company, if the Board of Managers reasonably determines in good faith that such adjustment is necessary or appropriate to reflect the relative Interests of the Members in the Company;

(iii)   the liquidation or dissolution of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(iv)   the grant of an Interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in his capacity as a Member, or by a new Member acting his capacity as a Member or in anticipation of becoming a Member of the Company, if the Board of Managers reasonably determines in good faith that such adjustment is necessary or appropriate to reflect the relative Interests of the Members in the Company;

(v)   the issuance by the Company of a "noncompensatory option" within the meaning of Sections 1.721-2(f) and 1.721-3(b)(2) of the Treasury Regulations which is not treated as a partnership interest pursuant to Section 1.761-3(a) of the Treasury Regulations; and

(vi)   at such other times as the Board of Managers reasonably determines in good faith is necessary or appropriate to comply with Treasury Regulation Section 1.704-1(b) and 1.704-2;

provided, if any noncompensatory options are outstanding upon the occurrence of an event described in this paragraph (b)(i) through (b)(iv), the Company shall adjust the Gross Asset Values of its assets in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(f)(1) and 1.704-1(b)(2)(iv)(h)(2).

(c)   The Gross Asset Value of any Company asset distributed to a Member is the gross fair market value of such asset (taking Section 7701(g) of the Code into account) on the date of distribution as determined by the Board of Managers in good faith using such reasonable method of valuation as it may adopt.

(d)   The Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), except that Gross Asset Values will not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to

9

CONFIDENTIAL                                     BLFG_EDPA1625704

subparagraph (b) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

(e)     Gross Asset Value shall be adjusted by Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Implied Sale Price" means the product of the price per Class B Unit to be sold under Section 3.02(c)(ii) and the total number of Class B Units held by the applicable Key Employee immediately prior to the commencement of the applicable Class B Equity Advance.

"Indemnitee" has the meaning set forth in Section 6.05(a).

"Initial Incentive Plan" means distributions on Class C Units and any additional classes of units that are intended to constitute "profits interests" based upon the Class A Capital Commitment.

"Interest" means the limited liability company interest of a Member in the Company at any particular time.

"Interest Rate" means a rate per annum equal to the lesser of (a) varying rate per annum that is equal to the interest rate publicly quoted by JPMorgan Chase Bank (or its successor) from time to time as its prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate, compounded annually, and (b) the maximum rate permitted by applicable law.

"Key Employees" means James Ballengee, Julio Rios and Jeremy Gamboa.

"Liquidation Event" has the meaning set forth in Section 10.01.

"Liquidity Event" means (i) the consummation of a transaction resulting in the Riverstone Entities and their Affiliates receiving consideration in exchange for all or substantially all of their Class A Units that is not in connection with a public offering of the securities of the Company or its successor in which the Riverstone Entities or their Affiliates retain Control of the public entity or the general partner of the public entity or its functional equivalent, (ii) the sale of all or substantially all of the assets of the Company by asset sale, merger, consolidation or similar transaction, or (iii) an Exit Sale.  Notwithstanding the foregoing, the transfer of Class A Units into a separate vehicle or the restructuring of the Company for the purpose of effecting a public offering of the securities of the Company or its successor or any restructuring whereby Riverstone continues to Control the Company shall not itself be considered a Liquidity Event.

"Manager" means any member of the Board of Managers.

"Member" means any Person executing this Agreement as a Member, but does not include any Person who has ceased to hold any Interests in the Company.

"Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Minimum Gain that would result if such Member Nonrecourse Debt were

NY\5767490

CONFIDENTIAL                                                                                     BLFG_EDPA1625705

treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i) with respect to "partner minimum gain."

"Member Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4) for the phrase "partner nonrecourse debt."

"Member Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i) for the phrase "partner nonrecourse deductions."

"Newco" has the meaning set forth in Section 10.04(b).

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2).

"Objection Notice" has the meaning set forth in Section 7.05(g)(ii).

"Offered Units" has the meaning set forth in Section 3.02(c).

"Officer" means any Person designated as an officer of the Company pursuant to Section 6.04.

"Original Issue Price" means with respect to Class A Units, $100 per Unit, and with respect to Class B Units, $100 per Unit.

"Percentage Interest" means the ratio of the number of Class A Units and Class B Units held by a Member relative to the aggregate number of issued and outstanding Class A Units and Class B Units at any applicable time, which shall be adjusted for repurchases by the Company. Each Member's initial Percentage Interest is set forth opposite such Member's name on Exhibit A. The Percentage Interests of the Members, as adjusted from time to time, will be maintained with the books and records of the Company.

"Performance Vesting Criteria" means the attainment by the Company of at least ninety percent (90%) of the following levels of performance: (i) the amount of the Company's earnings before income taxes, interest, depreciation and amortization, and (ii) the free cash flow generated from ordinary course sale of goods and provision of services by the Company, in each case as set forth in the annual budget and performance targets approved by the Board of Managers, for each Fiscal Year for which the Performance Vesting Criteria is considered.

"Person" means any individual or Entity.

"Post-Admission Class C Members" has the meaning set forth in Section 5.01(d).

"Pre-Admission Class C Aggregate Value" has the meaning set forth in Section 5.01(d).

"Pre-Admission Class C Member Value" has the meaning set forth in Section 5.01(d).

11

CONFIDENTIAL                                                                                    BLFG_EDPA1625706

"Pre-Admission Class C Members" has the meaning set forth in Section 5.01(d).

"Preferred Return" means, for each Class A Member, a return accruing on the balance of such Member's Unreturned Contribution Account that constitutes a return of 8.0% per annum, compounded annually, on such Member's Unreturned Contribution Account. The Preferred Return will begin to accrue on the balances in such Member's Unreturned Contribution Account from the later of the Effective Date and the date such Member's Capital Contributions are made in accordance with Article IV until they are distributed to such Member in accordance with Section 5.01(a)(i).

"Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

    (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of Profits and Losses will increase the amount of such income and/or decrease the amount of such loss;

    (b)    Any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of Profits and Losses, will decrease the amount of such income and/or increase the amount of such loss;

    (c)    Gain or loss resulting from any disposition of Company assets where such gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the Company assets disposed of, notwithstanding that the adjusted tax basis of such Company assets differs from its Gross Asset Value;

    (d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such income or loss, Depreciation will be taken into account for such Fiscal Year or other period;

    (e)    To the extent an adjustment to the adjusted tax basis of any asset included in Company assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and will be taken into account for the purposes of computing Profits or Losses;

    (f)    If the Gross Asset Value of any Company asset is adjusted in accordance with subparagraph (b) or subparagraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment will be taken into account in the taxable year of

NY\5767490

BLFG_EDPA1625707

such adjustment as gain or loss from the disposition of such asset for purposes of computing Profits or Losses; and

(g)    Notwithstanding any other provision of this definition of  Profits and Losses, any items that are specially allocated pursuant to Sections 5.03(a) and (b) hereof will not be taken into account in computing Profits or Losses.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 5.03(a) and (b) hereof will be determined by applying rules analogous to those set forth in this definition of Profits and  Losses.

"Proposed Regulations" has the meaning set forth in Section 5.03(d)(iv).

"Publicly Offered Securities" has the meaning set forth in Section 10.04(a).

"Purchase Agreement" means the Purchase Agreement, dated July 1, 2013, by and between Ballengee Interests, LLC, Gamboa Enterprises, LLC, Rios Holdings, Inc., Bridger, LLC and Riverstone V Bridger Holdings, L.P.

 "Purchase Price" has the meaning set forth in Section 7.06(b).

"Qualified Public Offering" has the meaning set forth in Section 10.04(a).

"Qualified Termination" means the termination of the employment with the Company or any of its Subsidiaries of a Class B Member or Class C Member (i) by the Company for Cause or (ii) by such Class B Member or Class C Member without Good Reason.

"Registration Rights" means the registration rights set forth on Exhibit D.

"Regulatory Allocations" has the meaning set forth in Section 5.03(b)(viii).

"Repurchased Units" has the meaning set forth in Section 7.06(a).

"Remaining Repurchased Units" has the meaning set forth in Section 7.06(d).

"Right to Compete" has the meaning set forth in Section 6.08.

"Riverstone" has the meaning set forth in the introductory paragraph hereof.

"Riverstone Entities" means, collectively, (i) Riverstone, (ii) any Affiliate of Riverstone (not including, for such purposes, portfolio companies of Riverstone or its Affiliates), (iii) any Riverstone Sponsor, but only so long as all co-managers, if applicable, of such investment fund are Affiliates of Riverstone Holdings LLC, and (iv) any co-investor of any of the foregoing where the Riverstone Sponsor retains direct or indirect control over voting and disposition of the Interest.

"Riverstone Sponsor" means any investment fund sponsored and managed or co-managed by Riverstone Holdings LLC, or an Affiliate.

"Secretary of State" means the Secretary of State of the State of Delaware.

NY\5767490

CONFIDENTIAL                                                                                    BLFG_EDPA1625708

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiaries" of the Company means, collectively, each entity (i) of which the Company (either alone or through or together with one or more other Subsidiaries) owns, directly or indirectly, more than 50% of the capital stock or other equity securities of such entity, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of, or otherwise Control the business and affairs of, such entity or (ii) the operations of which are consolidated with the Company for financial reporting purposes.

"Subsequent Incentive Plan" means distributions on any class of units that is intended to constitute "profits interests" after the exhaustion of the Class A Capital Commitment.

"Tag-Along Notice" has the meaning set forth in Section 3.08.

"Tag-Along Rights" has the meaning set forth in Section 3.09(a).

"Tag-Along Transfer" has the meaning set forth in Section 3.08.

"Tag-Along Transferee" has the meaning set forth in Section 3.08.

"Terminated Member" has the meaning set forth in Section 7.05(g).

"Transfer" means a, direct or indirect, disposition, sale, assignment, transfer or exchange, including without limitation, (i) the Transfer of sole control of voting and dispositive power by a Controlled Member or (ii) the Transfer of beneficial ownership (on a look-through basis) by any Key Employee.

"Transfer Notice" has the meaning set forth in Section 3.02(c).

"Treasury Regulations" means temporary and final Treasury Regulations promulgated under the Code, as such definitions may be amended from time to time.

"Units" means the units representing limited liability company interests in the Company and includes the Class A Units, the Class B Units, the Class C Units and any other class of Units of the Company issued after the date hereof and designated by the Board of Managers.

"Unreturned Class B Equity Advance" means any portion of the Class B Equity Advance that has not been returned to the Company under Section 3.02(c)(ii) or otherwise as of the applicable time.

"Unreturned Contribution Account" means, for each Member, an account maintained for such Member equal, at any time, to (i) the cumulative Capital Contributions of such Member contributed under Article IV, less (ii) the cumulative distributions to such Member under Section 5.01(a) up to the amount of such Member's cumulative Capital Contributions referred to in clause (i) above.

**1.02   Construction**. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  All references to Articles and Sections

CONFIDENTIAL

BLFG_EDPA1625709

refer to articles and sections of this Agreement, and all references to Exhibits and Schedules are to exhibits and schedules attached hereto, each of which is made a part hereof for all purposes. Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.  All accounting terms used herein and not otherwise defined herein will have the meanings accorded them in accordance with U.S. generally accepted accounting principles and, except as expressly provided herein, all accounting determinations will be made in accordance with such accounting principles in effect from time to time. "Including" means "including without limitation."

**ARTICLE II.**
**ORGANIZATION**

**2.01    Organization**.  The Company was organized as a Delaware limited liability company by the filing of the Certificate of Formation of the Company (the "Certificate") in the office of the Secretary of State pursuant to the Act on June 25, 2013. The Limited Liability Company Agreement of the Company adopted by the initial member of the Company as of June 28, 2013, and amended and restated on July 1, 2013, is further amended and restated in its entirety by this Agreement. Except as provided herein, the rights, duties and liabilities of each Member shall be as provided in the Act.

**2.02    Name.**  The name of the Company is "Bridger, LLC".  Company business will be conducted in such name or such other names that comply with applicable law as the Board of Managers may select from time to time.

**2.03    Registered Office; Registered Agent**.  The registered office of the Company in the State of Delaware will be the initial registered office designated in the Certificate or such other office (which need not be a place of business of the Company) as the Board of Managers may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Delaware will be the initial registered agent designated in the Certificate, or such other Person or Persons as the Board of Managers may designate from time to time in the manner provided by law.

**2.04    Principal Office**.  The principal office of the Company will be at 15510 Wright Brothers Drive, Addison, Texas 75001 or such other location as the Board of Managers may designate from time to time, which need not be in the State of Delaware.  The Company may have such other offices as the Board of Managers may determine appropriate.

**2.05    Purpose; Powers**.  The Company is organized for the purposes of engaging in any business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient in furtherance of or otherwise relating to the foregoing purposes as determined by the Board of Managers in its discretion.  The Company will have all powers permitted to be exercised by a limited liability company organized in the State of Delaware.

15

CONFIDENTIAL                                                                       BLFG_EDPA1625710

**2.06    Fiscal Year**.  The fiscal year of the Company (the "Fiscal Year") for financial statement and federal income tax purposes will end on December 31st unless otherwise determined by the Board of Managers or required under the Code.

**2.07    Foreign Qualification Governmental Filings**.    Prior to the Company's conducting business in any jurisdiction other than the State of Delaware, the Board of Managers will cause the Company to comply, to the extent procedures are available, with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction. Each Officer is authorized, on behalf of the Company, to execute, acknowledge, swear to and deliver all certificates and other instruments as may be necessary or appropriate in connection with such qualifications.  Further, each Member will execute, acknowledge, swear to and deliver all certificates and other instruments that are necessary or appropriate to qualify, or, as appropriate, to continue or terminate such qualification of, the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**2.08    Term**.  The Company commenced on the date the Certificate was filed with the Secretary of State, and will continue in existence until terminated pursuant to this Agreement.

**ARTICLE III.**
**MEMBERS; DISPOSITIONS OF INTERESTS**

**3.01    Members**.  As of the Effective Date, the Class A Members, the Class B Members and the Class C Members are the sole Members of the Company.  The names, addresses, Capital Contributions, Capital Account and number of Units of the Members are set forth on Exhibit A attached hereto and incorporated herein. The Board of Managers is hereby authorized to complete or amend Exhibit A to reflect the admission of additional Members, the change of address of a Member, the Capital Contribution of a Member, the number and classes of Units of a Member, and other information called for by Exhibit A, and to correct or amend Exhibit A or cause such Exhibit to be corrected or amended, all in accordance with the provisions of this Agreement. Such completion, correction or amendment may be made from time to time as and when the Board of Managers considers it appropriate. Such revised Exhibit A will be maintained in the books and records of the Company.

**3.02    Restrictions on the Transfer of an Interest**.

(a)    General.  For a period of four (4) years following the date hereof, no Class B Member or Class C Member may Transfer any Units or assign all or any portion of its rights or obligations hereunder without the prior written approval of the Board of Managers, except for the following:

(i)    any Transfer of Units to a Family Member pursuant to Section 3.02(b),

(ii)    to a Drag-Along Transferee pursuant to Sections 3.06 and 3.07,

(iii)    to a Tag-Along Transferee pursuant to Sections 3.08 and 3.09,

(iv)    a Class B Permitted Transfer,

16

CONFIDENTIAL

BLFG_EDPA1625711

(v)     a Transfer that complies with Section 3.02(c)(ii), or

(vi)     Transfers of Units to the Company specifically contemplated by this Agreement.

No Class B Member or Class C Member may pledge or grant a security interest in or lien or other encumbrance on any Units at any time without the prior written approval of the Board of Managers other than a pledge (or any foreclosure in connection therewith) of Class B Units by a Class B Member to another Class B Member to secure a loan the proceeds of which are used to fund the Class B Member's Capital Contributions when due.

(b)     Transfers to Family Members and for Estate Planning Purposes. Notwithstanding Section 3.02(a), any Class B Member or Class C Member that is an individual may upon notice to the Board of Managers, without the need for consent by the Board of Managers, Transfer by way of gift all or any portion of its Units to a trust or other entity whose sole and exclusive beneficiaries are such Member and/or Family Members of such Member; provided that such transferring Member maintains sole control over the voting and disposition of such Units.

(c)     Transfer of Class B Units.

(i)     Right of First Refusal. Subject to Sections 3.02(a), 3.02(c)(ii) and 3.02(d), in the event that any Class B Member (an "Assigning Member") receives a *bona fide*, offer from any third party or any existing Class B Member to Transfer (other than in connection with Sections 3.02(b) or 3.06 or following a Qualified Public Offering) to such party all or any portion of its Class B Units, such Assigning Member will give the Company, the Class A Members and the other Class B Members written notice of its intention, describing the Units to be Transferred (the "Offered Units"), the purchase price or consideration sought for such Offered Units and other material terms and conditions of the Transfer such Assigning Member proposes to make (a "Transfer Notice"). Each other Class B Member will have fifteen (15) days from the giving of such notice to specify, by delivery of a written notice to the Company and the Assigning Member, the amount of such Offered Units that such Class B Member desires to purchase, and setting forth such Class B Member's agreement to purchase such Offered Units for the price specified in the Transfer Notice. Any Class B Member that has not notified the Company and the Assigning Member in writing of the amount of Offered Units such Class B Member desires to purchase within such fifteen (15) day period shall be deemed to have elected not to exercise its right to purchase all or any portion of such Offered Units hereunder. If the Class B Members in the aggregate elect to purchase more Units than are available, the Company will allocate the available Offered Units amongst such Class B Members in proportion to the amount of such Offered Units requested to be purchased by each such Class B Member. If the Class B Members propose to acquire none or less than all of the available Offered Units pursuant to this Section 3.02(c)(i) then, with the approval of the Board of Managers, remaining Offered Units not proposed to be acquired by the Class B Members may be purchased by (i) the Company, or (ii) if and to the extent not purchased by the Company, the Class A Members. If the Class B Members propose to acquire none or less than all of the available Offered Units, and neither the Class A Members nor the

17

CONFIDENTIAL

BLFG_EDPA1625712

Company propose to acquire the remainder of the Offered Units, then none of the Class A Members, the Class B Members or the Company shall have any right to purchase any of the Offered Units pursuant to this Section 3.02(c)(i) and the Assigning Member will have ninety (90) days (subject to any extension necessary to pursue any required regulatory approvals or clearances) thereafter to Transfer all of the Offered Units (i) at a purchase price no less than the purchase price specified in the Transfer Notice and (ii) upon general terms and conditions no more favorable to the purchasers thereof than as specified in the Transfer Notice. To the extent the Assigning Member has not entered into a binding agreement to sell, subject to the consent of the Board of Managers and any necessary regulatory or other approval, such Offered Units within ninety (90) days (subject to any extension necessary to pursue any required regulatory approvals or clearances) of providing the Transfer Notice, such Assigning Member may not thereafter Transfer any Units without first offering such Units to the other Class B Members, the Class A Members and the Company in the manner provided in this Section 3.02(c).

(ii)     Transfer by Key Employees Upon Payment of Class B Equity Advance. In the event that the Company's employment of a Key Employee ceases and a Class B Equity Advance is owed to such Key Employee pursuant to the terms of his Employment Agreement, for a period of three (3) months following the date of such termination, the Company, or its nominee or assignee, shall have the option to make an offer to purchase for cash such Member's Controlled Class B Units, which offer may be payable ratably over a twelve (12) month time period. If the Company, or its nominee or assignee, does not elect to make an offer prior to the expiration of such three (3) month time period, the Key Employee shall have the option to Transfer all of such Controlled Class B Units to a third party or other Class B Member at any price and upon any terms (for a period of six (6) months following the earlier of (A) three (3) months from the termination date and (B) notice by the Company that it does not elect to make an offer), provided that (A) if the proposed price is less than the amount of the Class B Equity Advance made to such Member as of the date of the Transfer, then the Company shall have the right of first refusal to acquire such Controlled Class B Units as set forth in Section 3.02(c)(i) and (B) if the proposed price is equal to or greater than the Class B Equity Advance made to such Member as of the date of Transfer, then the amount of the Class B Equity Advance paid to such Member as of the date of Transfer (less any distribution offsets under Section 5.01 of this Agreement) shall be repaid to the Company and the remaining amount of the Class B Equity Advance shall no longer be payable by the Company. If the Company, or its nominee or assignee, elects to make an offer to purchase such Member's Controlled Class B Units, such offer must remain open for a six (6) month period and during such period, the Member may sell his Controlled Class B Units to a third party or other Class B Member at a purchase price no less than the purchase price offered by the Company, or its nominee or assignee, provided that the amount of the Class B Equity Advance paid to such Member as of the date of Transfer (less any distribution offsets under Section 5.01 of this Agreement) shall be repaid to the Company and the remaining amount of the Class B Equity Advance shall no longer be payable by the Company. If such Controlled Class B Units are not sold within such time period, as applicable, the Key Employee may Transfer all or part of such Controlled Class B Units to a third party or other Class B Member at any price for all, or any Implied

CONFIDENTIAL

BLFG_EDPA1625713

Sale Price for part, in each case equal to or greater than the Class B Equity Advance paid or payable to such Key Employee, provided that:

(1) if the sale is for all such Controlled Class B Units, then the amount of the Class B Equity Advance paid to such Key Employee as of the date of Transfer shall be repaid to the Company and the remaining amount of the Class B Equity Advance shall no longer be payable by the Company; and

(2) if the sale is for part of such Controlled Class B Units, then (A) if such proceeds are sufficient to repay the amount of the Class B Equity Advance, then the amount of the Class B Equity Advance made as of such date shall be repaid to the Company and the remaining amount of the Class B Equity Advance shall no longer be payable by the Company or (B) if such proceeds are insufficient to repay the amount of the Class B Equity Advance made as of such date, then the full amount of the proceeds shall be repaid to the Company and the remaining amount of the Class B Equity Advance shall continue to be payable ratably by the Company, subject to a lien on the remaining Controlled Class B Units of such Class B Member.

(d)    <u>Conditions to Transfer</u>.   Notwithstanding any other provision of this Agreement, no Transfer may be effected by any Member unless:  (i) such Transfer is in compliance with the Securities Act and all applicable state securities laws, and, if requested by the Board of Managers, such transferring Member has delivered an opinion of such Member's counsel to the Company, in form and substance reasonably satisfactory to the Company, to the effect that such Transfer is either exempt from the requirements of the Securities Act and the applicable securities laws of any state or that such registration requirements have been complied with, (ii) such Transfer would not cause the Company to be treated as an association or "publicly traded partnership" taxable as a corporation and would not make the Company ineligible for one or more "safe harbors" set forth in Section 7704 of the Code and the regulations promulgated thereunder, (iii) all necessary regulatory and other approvals are obtained and (iv) such Transfer is otherwise in compliance with the terms and conditions of this Agreement.  As a further condition to being admitted as a Member of the Company, any Person receiving a Transfer of any Units in accordance with the terms set forth above must agree to be bound by the terms of this Agreement by executing and delivering an agreement in the form of <u>Exhibit B</u> hereof.  The Board of Managers will determine in its reasonable discretion whether the foregoing conditions have been satisfied and may, in its sole discretion, determine to waive any such conditions.  Any attempted Transfer by a Person of any Units other than in accordance with this <u>Section 3.02(d)</u>, including a Transfer by a Class B Member that has received a Class B Equity Advance and such amount is not repaid to the Company at the time of Transfer, is void and will not be recognized by the Company.

(e)    <u>Spouses</u>.

(i)    As a condition to remaining a Member, each Member that is an individual and is or becomes married will cause his or her spouse to execute an agreement in the form of <u>Exhibit C</u> hereof.  If an existing Member fails to have his or her spouse execute such agreement, until such time as such agreement is duly executed, such Member will lose all of his or her rights hereunder except for the economic rights

19

CONFIDENTIAL                                                      BLFG_EDPA1625714

associated with his or her Units, and the remaining Members of the class or classes of Units held by such Member will thereafter have all voting rights with respect to such Member's Units allocated to them in accordance with their respective Class Sharing Percentages.

(ii)     In the event of a property settlement or separation agreement between a Member and his or her spouse, such Member will use his or her best efforts to assign to his or her spouse only the right to share in profits and losses, to receive distributions, and to receive allocations of income, gain, loss, deduction or credit or similar items to which such Member was entitled, with respect to his or her Units to the extent Transferred to his or her spouse.

(iii)     If a spouse or former spouse of a Member acquires any Units as a result of any property settlement or separation agreement, such spouse or former spouse hereby grants, as evidenced by Exhibit C, an irrevocable power of attorney (which will be coupled with an interest) to the original Member who held such Units to vote or to give or withhold such approval as such original Member will himself or herself vote or approve with respect to such matter and without the necessity of the taking of any action by any such spouse or former spouse. Such power of attorney will not be affected by the subsequent disability or incapacity of the spouse or former spouse granting such power of attorney. Furthermore, such spouse or former spouse agrees that the Company will have the option at any time to purchase all, but not less than all, of such Units for a purchase price equal to the Fair Market Value of such Units.

(f)     Notice.  Without limiting any of the foregoing restrictions set forth in this Section 3.02, each Member shall promptly provide notice to the Company of any loan, voting trust, stockholder agreement, proxy or other agreement, arrangement or understanding entered into by such Member and relating to the Company, any Interests, any Capital Contributions or any of such Member's rights or obligations under this Agreement.

3.03    **Additional Members**.  Subject to Article IV, upon the approval of the Board of Managers pursuant to Section 6.04(b), additional Persons may be admitted to the Company as Members and Units may be created and issued to such Persons as determined by the Board of Managers on such terms and conditions as the Board of Managers may determine at the time of admission.  The terms of admission may provide for the creation of different classes or series of Units having different rights, powers and duties. As a condition to being admitted as a Member of the Company, any Person must agree to be bound by the terms of this Agreement by executing and delivering an agreement in the form of Exhibit B hereof, and must make the representations and warranties set forth in Section 3.04 as of the date of such Person's admission to the Company.  Any Person acquiring Class B Units from a Class B Member that has received a Class B Equity Advance shall not be admitted as a Member unless such Transfer complies with the applicable provisions of Section 3.02(c)(ii).

3.04    **Representations and Warranties**.  Each Member hereby represents and warrants to the Company and each other Member that:

20

CONFIDENTIAL                                                      BLFG_EDPA1625715

(a)     such Member has full power and authority to enter into this Agreement and to perform its obligations hereunder;

(b)     the execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which such Member is a party or by which it is or its assets are bound;

(c)     except as set forth in this Agreement and except for the Transfer or assignment of any interests or obligations hereunder in accordance with the terms of this Agreement, such Member has not entered into, and is not otherwise bound by, any voting trust, stockholder agreement, proxy or other agreement, arrangement or understanding relating to the Company, any Interests or any of such Member's rights or obligations under this Agreement;

(d)     all property contributed to the Company by such Member, and any property thereafter to be contributed to the Company by such Member, has been or will be duly and lawfully acquired and will be contributed to the Company without any liens or encumbrances;

(e)     such Member is and will be acquiring its interest in the Company for investment purposes only for his or its own account and not with a view to the distribution, reoffer, resale, or other disposition not in compliance with the Securities Act and applicable state securities laws;

(f)     such Member alone or together with his or its representatives, possesses such expertise, knowledge, and sophistication in financial and business matters generally, and in the type of transactions in which the Company proposes to engage in particular, that such Member is capable of evaluating the merits and economic risks of acquiring and holding an Interest, and that such Member is able to bear all such economic risks now and in the future;

(g)     such Member has had access to all of the information with respect to his or its Interest that such Member deems necessary to make a complete evaluation thereof;

(h)     such Member's decision to acquire an Interest for investment has been based solely upon the evaluation made by such Member;

(i)     such Member is aware that he or it must bear the economic risk of such Member's investment in the Company for an indefinite period of time because Interests have not been registered under the Securities Act or under the securities laws of any state, and, therefore, such Interests cannot be sold unless they are subsequently registered under the Securities Act and any applicable state securities laws or an exemption from registration is available;

(j)     such Member is aware that only the Company can take action to register Interests in the Company and that the Company is under no such obligation and does not propose or intend to attempt to do so other than pursuant to the terms of this Agreement;

(k)     such Member is aware that this Agreement provides restrictions on the ability of a Member to Transfer Interests, and such Member will not seek to effect any Transfer other than in accordance with such restrictions; and

NY\5767490

CONFIDENTIAL                                                                                          BLFG_EDPA1625716

(l)     such Member is, and at such time that it makes any additional Capital Contributions to the Company, will be, an "accredited investor" within the meaning of Rule 501 under the Securities Act.

**3.05     Liability to Third Parties**.  No Member, Manager or Officer will have any personal liability for any obligations or liabilities of the Company, whether such liabilities arise in contract, tort or otherwise, except to the extent that any such liabilities or obligations are set forth in the Purchase Agreement or otherwise expressly assumed in writing by such Member, Manager or Officer.  Nothing in this Section 3.05 comprises or will be construed as an agreement by the Company to indemnify or hold harmless any Member, Manager or Officer.

**3.06     Drag Along Rights**.

(a)     If, following the earlier of (i) date that is two (2) years from the date hereof or (ii) in connection with a transaction in which Class B Members receive proceeds at least equal to the amount of their Unreturned Contribution Account, the Class A Members elect to Transfer to any Person or Persons, other than to any Affiliate of any Class A Member (collectively, a "Drag-Along Transferee"), in a bona fide arms'-length transaction or series of related transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise) a 75% of the outstanding Class A Units (an "Exit Sale" for the purposes of this Section 3.06), then the Class A Members may, subject to the other provisions of this Section 3.06, require all of the other Members to sell or transfer all, but not less than all, on a pro rata basis, of the Units held by such Member, for the aggregate consideration and on the terms set forth in this Section 3.06 and to take all actions reasonably required, necessary or desirable in connection with, the Exit Sale.

(i)     Class B Units.  Subject to Section 3.06(b), each other holder of the Class B Units shall transfer all of its Class B Units on the same terms and conditions applicable to, and for the same type of consideration payable to, the Class A Members, at the price calculated in accordance with Section 3.06(a)(iii).

(ii)     Class C Units.  Subject to Section 3.06(b), each holder of the Class C Units shall transfer all of its Class C Units on the same terms and conditions applicable to, and for the same type of consideration payable to, the Class A Members at the price calculated in accordance with Section 3.06(a)(iii).

(iii)     Consideration.  The purchase price payable to each holder of Class A Units, Class B Units and Class C Units with respect to such Units will be determined by applying the aggregate price to be paid by such Drag Along Transferee in such Exit Sale as if such amount were distributed to the holders of the Units in accordance with Section 5.01(a) hereof.

(b)     Terms of Sale.  In connection with an Exit Sale, each Member shall execute such documents, and make such representations, warranties, covenants and indemnities, as are executed and made by the Class A Members; provided, without the written consent of a Drag-Along Transferee, such Drag-Along Transferee shall not be obligated with respect to (1) any representation or warranty other than (x) a representation and warranty that relates solely to

NY\5767490

CONFIDENTIAL                                                                BLFG_EDPA1625717

such Drag-Along Transferee's title to its Interests, and its authority and capacity to execute and deliver the subject purchase and sale agreement or (y) a representation and warranty made by the Company that relates to the Company and its operations (but only to the extent of an indemnity obligation related to such representation and warranty that complies with <u>clause (2)</u> of this <u>Section 3.06(b)</u> and is the same as the indemnity obligation of the Class A Members), or (2) any indemnity obligation beyond a pro rata portion or in excess of the gross proceeds received by a Drag-Along Transferee (in each case, based on the value of consideration received by such Drag-Along Transferee in the Exit Sale) of the indemnity obligations which obligate the Class A Members and all Drag-Along Transferees and then, such indemnity obligations shall be several, and not joint or joint and several, or (3) except as provided in an Employment Agreement, any other continuing obligation on such Drag-Along Transferee in favor of any other person following the Exit Sale of such Drag-Along Transferee's Interests (other than obligations relating to representations and warranties that relate solely to such Drag-Along Transferee and not to any other Member or the indemnification obligation provided for in <u>clause (2)</u> of this <u>Section 3.06(b)</u>).  If the consummation of the Exit Sale does not occur within one hundred eighty (180) days from the date of the Drag-Along Notice, the Drag-Along Transferee shall be obligated to provide another Drag-Along Notice if the proposed transaction is contemplated to occur.  The Drag-Along Transferee shall provide the Class B Members and Class C Members with reasonably prompt notice if any proposed Exit Sale is terminated.

       **3.07**    **Drag-Along Notice**.

       (a)    The rights set forth in <u>Section 3.06</u> shall be exercised by the Class A Members giving written notice (the "<u>Drag-Along Notice</u>") to each other Member, at least twenty (20) Business Days prior to the date on which the Class A Members expect to consummate the Exit Sale.  In the event that the terms and/or conditions set forth in the Drag-Along Notice are thereafter amended in any respect, the Class A Members shall give written notice (an "<u>Amended Drag-Along Notice</u>") of the amended terms and conditions of the proposed Transfer to each other Member.  Each Drag-Along Notice and Amended Drag-Along Notice shall set forth: (i) the name and address of the Drag-Along Transferee, (ii) the proposed amount and form of consideration and terms and conditions of payment offered by the Drag-Along Transferee, and (iii) all other material terms of the proposed transaction, including without limitation the expected closing date of the transaction.

       (b)    The Company shall pay the reasonable expenses of the Company and the Members incurred in connection with any unconsummated Exit Sale, to the extent such expenses are incurred for the benefit of, and prior to such incurrence are consented to by, all Members.

       (c)    No Member shall be obligated to consummate an Exit Sale contemplated by the Drag-Along Notice unless the Class A Members consummate the Exit Sale with respect to all (but not less than all) of their Units on the terms and conditions contemplated by the Drag-Along Notice and/or Amended Drag-Along Notice, as applicable.

       **3.08**    **Tag-Along Notice**.  Except following a Qualified Public Offering or a Transfer pursuant to <u>Section 3.06</u>, if the Class A Members propose a Transfer to any Person or Persons, other than to an Affiliate of such Class A Member (collectively, a "<u>Tag-Along Transferee</u>"), in a bona fide arms–length transaction or series of related transactions at least twenty-five percent

NY\5767490

BLFG_EDPA1625718

(25%) of the outstanding Class A Units, then such Class A Member shall be required to give written notice (a "Tag-Along Notice") to each Class B Member (and each Class C Member to the extent of such Member's vested Class C Units after the fourth anniversary of the Effective Date) (a "Tag-Along Transfer"), setting forth in reasonable detail the terms and conditions of such proposed Transfer, including the name and address of the transferee, the proposed amount and form of consideration, terms and conditions of payment and a summary of any other material terms pertaining to the Transfer, including without limitation the expected closing date of the transaction.  In the event that the terms and/or conditions set forth in the Tag-Along Notice are thereafter amended in any respect, such Class A Member shall give written notice (an "Amended Tag-Along Notice") of the amended terms and conditions of the proposed Transfer to each Class B Member.

**3.09    Tag-Along Rights**.

(a)      Each Class B Member (and each Class C Member to the extent of such Member's vested Class C Units after the fourth anniversary of the Effective Date) shall have the right, upon written notice to the applicable Class A Member, exercisable within twenty (20) days after receipt of the Tag-Along Notice, or, if later, within ten (10) days after receipt of the most recent Amended Tag-Along Notice, to participate in the proposed Tag-Along Transfer by the applicable Class A Member to the Tag-Along Transferee on the terms and conditions set forth in such Tag-Along Notice or the most recent Amended Tag-Along Notice, as the case may be (such participation rights being hereinafter referred to as "Tag-Along Rights"), and any such transaction shall be consummated on such terms.  Any Class B Member (and Class C Member, if applicable) that has not notified the Class A Member of its intent to exercise Tag-Along Rights within twenty (20) days of receipt of a Tag-Along Notice (or, if applicable, within ten (10) days of receipt of an Amended Tag-Along Notice) shall be deemed to have elected not to exercise such Tag-Along Rights with respect to the Transfer contemplated by such Notice.

(b)      Class B Units and Class C Units.  In the case of a Tag-Along Transfer, each Class B Member (and Class C Member, if applicable) may participate with respect to a number of Class B Units (or vested Class C Units if applicable) owned by such Member in an amount equal to the product obtained by multiplying (i) the aggregate number of Class B Units (and vested Class C Units if applicable) owned by such Member immediately prior to such Transfer by (ii) a fraction, the numerator of which is equal to the aggregate number of Class A Units proposed to be Transferred by such Class A Member and the denominator of which is the aggregate number of Class A Units owned by such Class A Member immediately prior to the Transfer.  Each Class B Member (and Class C Member, if applicable) shall transfer all of its Class B Units and Class C Units, as applicable, to be transferred on the same terms and conditions applicable to, and for the same type of consideration payable to, the Class A Members, at the price calculated in accordance with Section 3.09(c).

(c)      Consideration.  The aggregate purchase price payable for the Class B Units (and vested Class C Units if applicable) purchased by a Tag-Along Transferee will be allocated among the holders of such Class B Units (and vested Class C Units if applicable) based upon the relative values of the Class B Units (and vested Class C Units if applicable) held by each such holder assuming that 100% of the aggregate equity value of the Company implied by the purchase price payable by the Tag-Along Transferee were distributed to the holders of the

24

CONFIDENTIAL                                                                      BLFG_EDPA1625719

Class A Units, Class B Units and vested Class C Units in accordance with <u>Section 5.01(a)</u> hereof.

(d)     <u>Terms of Sale</u>.  In connection with a Tag-Along Transfer, each Tag-Along Transferee shall execute such documents, and make such representations, warranties, covenants and indemnities, as are executed and made by the Class A Members; <u>provided</u>, without the written consent of a Tag-Along Transferee, such Tag-Along Transferee shall not be obligated with respect to (1) any representation or warranty other than (x) a representation and warranty that relates solely to such Tag-Along Transferee's title to its Interests, and its authority and capacity to execute and deliver the subject purchase and sale agreement or (y) a representation and warranty made by the Company that relates to the Company and its operations (but only to the extent of an indemnity obligation related to such representation and warranty that complies with <u>clause (2)</u> of this <u>Section 3.09(d)</u> and is the same as the indemnity obligation of the Class A Members), or (2) any indemnity obligation beyond a pro rata portion or in excess of the gross proceeds received by a Tag-Along Transferee (in each case, based on the value of consideration received by such Tag-Along Transferee in the Tag-Along Transfer) of the indemnity obligations which obligate the Class A Members and all Tag-Along Transferees and then, such indemnity obligations shall be several, and not joint or joint and several, or (3) except as provided in an Employment Agreement, any other continuing obligation on such Tag-Along Transferee in favor of any other person following the Tag-Along Transfer of such Tag-Along Transferee's Interests (other than obligations relating to representations and warranties that relate solely to such Tag-Along Transferee and not to any other Member or the indemnification obligation provided for in <u>clause (2)</u> of this <u>Section 3.09(d)</u>).  If the consummation of the Tag-Along Transfer does not occur within ninety (90) days from the date of the Tag-Along Notice, the Tag-Along Transferee shall be obligated to provide another Tag-Along Notice if the proposed transaction is contemplated to occur.  The Tag-Along Transferee shall provide the Class B Members (and Class C Members, if applicable) with reasonably prompt notice if any proposed Tag-Along Transfer is terminated.

(e)     <u>Compliance</u>. Except as permitted by <u>Section 3.02(a)</u>, no Class A Member shall consummate any Transfer (or deemed Transfer) of Units without compliance with <u>Section 3.08</u> and this <u>Section 3.09</u>, and the Company shall not recognize or give effect to any purported Transfer of Units not made in compliance with <u>Section 3.08</u> and this <u>Section 3.09</u>.

**3.10     Non-Accredited Investors**.  If any Transfer described in <u>Section 3.06</u> or <u>Section 3.09</u> involves the issuance of any stock or other equity consideration in a transaction not involving a public offering and any Member otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D of the Securities Act), then the Class A Members, at their election, may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to otherwise be cashed out (by redemption or otherwise) by the Company or any other Member immediately prior to the consummation of such transaction and/or (iii) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company, with the intent being that such Member that is not an accredited investor receive substantially the same value that such Member would have otherwise received had such Member been an accredited investor.  Except as provided herein, no Member shall have the right to withdraw, resign or retire from the Company as a Member.

25

NY\5767490

BLFG_EDPA1625720

**3.11   Members Have No Agency Authority**.  Except as expressly provided in this Agreement, no Member (in its capacity as a member of the Company) shall have any agency authority on behalf of the Company.

**3.12   Withdrawal**.  Except as provided herein, no Member shall have the right to withdraw, resign or retire from the Company as a Member.

## ARTICLE IV.
## CAPITAL CONTRIBUTIONS; CLASSES OF EQUITY

**4.01   Capital Contributions**.  Immediately prior to the Capital Contribution of the Class A Members, the outstanding equity of the Company shall be converted into Class B Units as set forth on Exhibit A. As of the Effective Date, each Member listed on Exhibit A has made a Capital Contribution in the aggregate amount set forth opposite such Member's respective name under the caption "Initial Capital Contribution" on Exhibit A.

**4.02   Capital Commitments**

(a)   Commitments.  Each Member agrees to make Capital Contributions to the Company in cash (the "Cash Contributions") from time to time until December 31, 2017, in accordance with the terms of this Agreement, in an aggregate amount not to exceed the commitment of such Member set forth opposite such Member's name on Exhibit A under the caption Post Closing Commitment (each, a "Commitment"), which for the Class A Member shall be the Class A Capital Commitment, provided, however, that the Class B Members shall not make Capital Contributions until the Class A 58% Level is first achieved or exceeded. In addition to the rights of the Class A Members under Section 4.03, the obligations of the Members under Section 4.02(a) shall terminate in the event of a Liquidity Event, Qualified Public Offering or bankruptcy of the Company.

(b)   Capital Contributions.  Subject to Section 4.02(a), the Members will make Cash Contributions to the Company on a pro rata basis in accordance with such Members' Percentage Interests, at such times and in such amounts as may be determined by the Board of Managers in its sole discretion. In exchange for any Cash Contribution, the Company shall issue a number of Class A Units to each Class A Member, or a number of Class B Units to each Class B Member, as applicable, in each case equal to the amount of the Cash Contribution of such Member divided by the Original Issue Price of such Class A Units or Class B Units.  For the avoidance of doubt, Class C Units shall not be issued in exchange for Cash Contributions.

(c)   Capital Call Notice.  Unless waived by a contributing Member, any Cash Contribution will be requested in a capital call issued by the Board upon at least 21 days' written notice to such Member.  For all purposes under this Agreement, any Cash Contributions will be deemed to have been made on the later of (i) the date such Cash Contribution is required to be made pursuant to this Section 4.02(c) and (ii) the date on which such Cash Contribution is actually made.

(d)   Commitment Limit and Increase.  No Member will be required to make Capital Contributions in excess of its Commitment (or to increase its Commitment) without the consent of such Member.  If additional equity capital is desired by the Company other than (i)

26

CONFIDENTIAL

BLFG_EDPA1625721

Executive Class B Units or (ii) the issuance of the Class A Units and Class B Units contemplated hereby, the Board of Managers must offer both Class A Members and Class B Members the opportunity, upon 21 days' written notice, to increase their Commitments on a pro rata basis in accordance with their existing Percentage Interests prior to soliciting third party interest. The Board will amend Exhibit A to reflect any changes in Commitments and Percentage Interests resulting from any acceptance of additional Commitments hereunder.

**4.03   Rights to Terminate Capital Contributions.**

(a)   Key Man Event.   Notwithstanding anything in this Article IV to the contrary, (a) in the event that any of James Ballengee, Julio Rios and Jeremy Gamboa (i) is terminated by the Company or its Subsidiaries for Cause or (ii) voluntarily terminates employment with the Company or its Subsidiaries without Good Reason, the Class A Members will have the right to terminate any remaining Class A Capital Commitment. If the Class A Members elect to terminate the remaining Class A Capital Commitment, then the Class B Members are likewise permitted to terminate their obligations to make further Capital Contributions pursuant to Section 4.02. If a Key Employee is terminated by the Company or its Subsidiaries and Cause does not exist or voluntarily terminates employment with the Company or its Subsidiaries with Good Reason, such individual may elect to terminate his remaining Commitment and a Controlled Member of such Key Employee may elect to terminate such Controlled Member's remaining Commitment.

(b)   Death of Key Employee.   Notwithstanding anything in this Article IV to the contrary, in the event of the death of a Key Employee, such deceased Member's estate or Controlled Member, as applicable, each shall have a one time option, exercisable upon written notice to the Company within 90 days of such Member's death, whether or not to elect to continue to make all or part of the Capital Contributions that the deceased Member or his Controlled Member, as applicable, would have otherwise been obligated to make under this Agreement. If such deceased Member's estate or Controlled Member, as applicable, elects to continue such Capital Contributions, the estate or Controlled Member, as applicable, shall have a period of 21 days from such election to fund any Capital Contributions it would have otherwise been required to make pursuant to any capital call notice funded by the other Members during the 90-day period following the death of the deceased Member. If such deceased Member's estate or Controlled Member elects not to continue such Capital Contributions within the 90-day period, the deceased Member's or his Controlled Member, as applicable, remaining unpaid Commitment Amount shall be automatically reduced to zero and such deceased Member's estate or Controlled Member, as applicable, shall have no further obligations to make any Capital Contributions and shall not be considered a Defaulting Member for the failure to make any Capital Contributions. The failure by such deceased Member's estate or Controlled Member, as applicable, to give timely notice of its election described in this Section 4.03(a) shall be deemed an election not to continue to make the Capital Contributions that the deceased Member or his Controlled Member, as applicable, would have otherwise been obligated to make under this Agreement.

**4.04   Capital Contributions by New Members.**   New Members will make any Capital Contribution required by the Board of Managers pursuant to Section 3.03.

NY\5767490

CONFIDENTIAL                                                                                      BLFG_EDPA1625722

**4.05    Interest on and Return of Capital Contributions; Deficit Capital Accounts**. Except as provided in this Agreement, a Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  Any unpaid Capital Contribution is not a liability of the Company or of the other Members.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return the other Members' Capital Contributions.  Except as otherwise specifically provided in this Agreement, no Member shall be required to make any payment or contribution to the Company or any other Person in respect of any deficit balance in such Member's Capital Account.

**4.06    Withdrawal of Capital.**  No Member has the right to withdraw any part of its Capital Contribution from the Company or, except as provided in this Agreement, receive the return of any part of its Interest in the Company prior to its liquidation and termination pursuant to Article X hereof.

**4.07    Capital Accounts**.  The Company will maintain for each Member owning any Units a separate Capital Account with respect to such Units in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv) and as set forth in this Agreement.  The Capital Account of each Member as of the Effective Date is set forth on Exhibit A.

**4.08    Failure to Make Capital Contributions by Class B Members**.

(a)    General.  If any Class B Member fails to make Capital Contributions in an aggregate amount of 80% of such Member's aggregate Commitment as set forth on Exhibit A on the Effective Date under the caption "Post-Closing Commitment" when due under Section 4.02 prior to December 31, 2017, then the Company will promptly provide written notice of such failure to such Member.  If such Member fails to make such Capital Contribution within fifteen (15) Business Days after receipt of such notice, then the Board of Managers may, in its sole discretion, designate such Member a "Defaulting Member" and the provisions of this Section 4.08 will apply.  The Company will provide written notice of any such designation to each other Member.  For the avoidance of doubt, a Class B Member may elect not to fund up to 20% of such Commitment at any time without being designated a Defaulting Member or otherwise being subject to the provisions of this Section 4.08.

(b)    Remedy.  Provided that the Class A Members have funded or are ready to fund their Commitment under Section 4.02, the Board of Managers may, in its sole discretion, subject to Section 6.03, provide the option to the Class A Members who are not Defaulting Members (exercisable in their sole discretion and *pro rata* in accordance with their respective Class Sharing Percentages) or their nominee or assignee to fund the Commitment that is due from the Defaulting Member in return for additional Class A Units, at a price per Class A Unit issued at 75% of the Original Issue Price of the Class A Units.

**4.09    Failure to Make Capital Contributions by Class A Members**.  If any Class A Member fails to make a Capital Contribution when due prior to December 31, 2017, then the Company will promptly provide written notice of such failure to such Member.  If such Class A Member fails to make such Capital Contribution within fifteen (15) Business Days after receipt of such notice, then the non-defaulting Class A Members shall have the option to fund such

28

CONFIDENTIAL                                                                 BLFG_EDPA1625723

amount for additional Class A Units, at a price per Class A Unit issued at 100% of the Original Issue Price of the Class A Units.  If the non-defaulting Class A Members do not elect to fund the full amount in default, the Class B Members who are not then Defaulting Members shall have the option (pro rata in accordance with their respective Class Sharing Percentages) to fund such amount in return for Class A Units at a price per Unit issued at 100% of the Original Issue Price of the Class A Units.

4.10    **Interests**.

(a)    Each Member's interest in the Company will be represented by its Capital Account and by Units issued by the Company to such Member.  The initial classes of Units are Class A Units, Class B Units and Class C Units.  Class A Units, Class B Units and Class C Units have been issued by the Company upon the Effective Date and additional Class A Units, Class B Units and Class C Units may be issued at such additional times and from time to time as may be determined by the Board of Managers pursuant to Section 6.04(b).

(b)    The Class C Units are issued in consideration of services rendered and to be rendered by the holders for the benefit of the Company in their capacities as Members of the Company or employees of the Company.  The Class C Units are intended to constitute "profits interests" as that term is used in Revenue Procedures 93-27 and 2001-43 or, to the extent Revenue Procedures 93-27 and 2001-43 are superseded by the proposed regulations under IRS Notice 2005-43, then to the extent such regulations are applicable, if at all, to the Class C Units.  Within thirty (30) days following the receipt of any Class C Unit, each Class C Member will file with the Internal Revenue Service an election authorized by Section 73(b) of the Code with respect to such Class C Unit and will deliver to the Company a copy of such election promptly after its filing.

(c)    Subject to Section 4.02(d), the Company may issue additional Equity Securities for any Company purpose at any time and from time to time to such Persons for such consideration and on such terms and conditions as the Board of Managers shall determine, all without the approval of any Member.

4.11    **Special Class A Capital Contribution**.

(a)    Until the earlier of (i) eighteen (18) months from the date hereof or (ii) the Class A 58% Level is first achieved, the Class A Members shall have the right, which may be exercised multiple times, to require (x) that the Company allow the Class A Members to make Capital Contributions to the Company in exchange for additional Class A Units (the "Forced Contribution") at a price per Unit equal to the Original Issue Price for the Class A Units and (y) for the Company to utilize the proceeds from the Forced Contribution to purchase from the Class B Members, and for the Class B Members to sell to the Company, free and clear or all liens and restrictions, at a price per Unit equal to the Original Issue Price for the Class B Units, that number of Class B Units equal to the amount of the proceeds of the Forced Contribution *divided by* the price per Unit equal to the Original Issue Price for the Class B Units; *provided*, that the Class A Members shall not be permitted to exercise the right to make a Forced Contribution in such an amount so that immediately following the purchase of the Class B Units pursuant to the preceding clause (y), the Class A 58% Level would be exceeded.  Upon compliance by each

29

CONFIDENTIAL                                                                              BLFG_EDPA1625724

Class B Member with Section 4.11(c), the Company shall promptly pay the applicable portion of the purchase price payable to such Class B Member by wire transfer of immediately available funds to an account designated to the Company by such Class B Member.

(b)     The Class A Members shall exercise their right to make the Forced Contribution by providing written notice to the Company and the Class B Members.

(c)     Each Class B Member shall participate in the sale of its Class B Units (other than Executive Class B Units) to the Company pro rata based upon the relative number of Class B Units held by such Class B Member relative to the total number of Class B Units held by all Class B Members.  The purchase of the Class B Units contemplated by Section 4.11(a) shall take place on a date specified by the Class A Members. In connection with such sale of Class B Units to the Company, each Class B Member shall (i) execute such instruments of transfer reasonably requested by the Company to evidence such Transfer and (ii) on behalf of itself (and not the other Class B Members selling Class B Units), make the following representations and warranties to the Company:

(i)     it has the right, power and authority, and has taken all actions necessary, to consummate the Transfer of the applicable Class B Units to the Company, free and clear of all liens and restrictions;

(ii)     its obligations under this Section 4.11 are enforceable against such Class B Member in accordance with their respective terms;

(iii)     it has sole legal and beneficial title to the Class B Units being transferred to the Company free and clear or all liens and restrictions other than those restrictions set forth in this Agreement;

(iv)     the instruments of transfer contemplated by this Section 4.11 have been duly and validly authorized, executed and delivered by such Class B Member, and no other authorization, execution or delivery is required to validly transfer the applicable Class B Units to the Company, free and clear of all liens and restrictions;

(v)     the consummation of the transactions contemplated by this Section 4.11 will not (or with the giving of notice or lapse of time would not) (x) result in a breach of any provision of its constitutional or organizational documents; (y) result in a breach of, or constitute a default under, any instrument to which it is a party or by which it is bound; or (z) result in a breach of any order, judgment or decree of any court or governmental agency to which it is a party or by which it is bound or any contractual commitment to which it is bound.

## ARTICLE V.
## DISTRIBUTIONS AND ALLOCATIONS

**5.01   Distributions**.

(a)     Except for the Class B Special Distribution, Available Cash will be distributed to the Members at such times as may be determined by the Board of Managers, in

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625725

accordance with the provisions of this Section 5.01; provided, however, that distributions shall be made under this Section 5.01 during a taxable year only if and to the extent that the Board of Managers reasonably determines that, after making such distributions, the Company will have remaining Available Cash in an amount sufficient to pay all projected tax distributions for such taxable year under Section 5.02.  Available Cash will be distributed during the time period of the Initial Incentive Plan as follows:

> (i)      *first*, to the Class A Members, in proportion to, and to the extent of, each Class A Member's Unreturned Contribution Account;

> (ii)     *second*, to the Class A Members (*pro rata* in accordance with their respective Class Sharing Percentages) until the holders of Class A Units receive the Preferred Return;

> (iii)    *third*, 100% to the Class B Members (*pro rata* in accordance with their respective Class Sharing Percentages and, as offset for any applicable Class B Member by any then Unreturned Class B Equity Advance of such Member) until the holders of Class B Units receive an amount equal to the Class B Distribution Percentage of the cumulative aggregate amount distributed pursuant to Sections 5.01(a)(i), (ii) and (iii); and

> (iv)     *fourth*, to the Class B Members (*pro rata* in accordance with their respective Class Sharing Percentages and, as offset for any applicable Class B Member by any then Unreturned Class B Equity Advance of such Member) in accordance with the Class B Distribution Percentage, and the remainder to Class A Members (*pro rata* in accordance with their respective Class Sharing Percentages) and Class C Members, subject to Section 7.05(f), (*pro rata* in accordance with their respective Class Sharing Percentages) as follows:

>> (A)     to the Class C Members in an amount equal to the Class C Initial Sharing Ratio and the remainder to the Class A Members until the Class A members have received aggregate distributions in an amount equal to three (3) times their aggregate Capital Contributions;

>> (B)     thereafter, 100% to the Class C Members until Class C Members have received aggregate distributions in an amount equal to the Class C Catch Up Amount; and

>> (C)     thereafter, to the Class C Members in an amount equal to the Class C Second Sharing Ratio and the remainder to the Class A Members.

(b)     Any distributions pursuant to this Section 5.01 made in error or in violation of the Act will, upon demand by the Board of Managers, be returned to the Company.

(c)     The value of any property other than cash or Publicly Offered Securities distributed pursuant to this Section 5.01 will be determined by the Board of Managers in its good faith discretion using any reasonable valuation method it may adopt.

31

CONFIDENTIAL                                                                                    BLFG_EDPA1625726

(d)     Notwithstanding the provisions set forth in Section 5.01(a), in the event any Class C Units are issued after the Effective Date and at a time when the Pre-Admission Class C Aggregate Value exceeds $0 (the existing Class C Members at such time, the "Pre-Admission Class C Members" and the Members receiving newly issued Class C Units at such time, the "Post-Admission Class C Members"), the following rules shall govern the manner in which the amount to be distributed to the Class C Members pursuant to Section 5.01(a) is distributed among such Class C Members.  The Board of Managers shall make a determination of the amount that would be distributed to each Pre-Admission Class C Member in respect of its Class C Units on the date immediately prior to such admission based upon a valuation of the Company's net assets and liabilities by the Board of Managers in its good faith discretion using any reasonable method it may adopt (the amount with respect to each Class C Member, the "Pre-Admission Class C Member Value" and the aggregate amount with respect to all Class C Members, the "Pre-Admission Class C Aggregate Value").  Distributions to the Class C Members pursuant to Section 5.01(a) will be made (i) first to the Pre-Admission Class C Members pro rata in accordance with each Pre-Admission Class C Member's Pre-Admission Class C Member Value until each Pre-Admission Class C Member has received an amount under Section 5.01(a) equal to its Pre-Admission Class C Member Value, and (ii) thereafter, to the Class C Members pro rata in accordance with their respective Class Sharing Percentage.

(e)     In the event of an adoption of a Subsequent Incentive Plan or increase in the Class A Members' Capital Contribution above the Class A Capital Commitment, this Section 5.01 shall be amended accordingly; provided however, that in no event shall such Subsequent Incentive Plan adversely affect distribution rights on the Class B Units.

5.02   **Tax Distributions**.  Notwithstanding the provisions of Section 5.01, to the extent of Available Cash, the Company shall distribute to each Member at least ten (10) days before each estimated tax payment due date (April 15, June 15, September 15 and December 15) with respect to each taxable year, an amount equal to the excess, if any, of (i) the product of (A) the Company's estimate of such Member's allocable share of the Company's estimated taxable income (taking into account all items of income, gain, loss and deduction), as determined for U.S. federal income tax purposes for such taxable period and all prior taxable periods of such taxable year, multiplied by (B) the Assumed Tax Rate with respect to such Member over (ii) the aggregate amount previously distributed to such Member pursuant to Section 5.01(a)(iv) and this Section 5.02 with respect to such taxable year.  Furthermore, the Company shall distribute to each Member, to the extent of Available Cash, not later than each April 1st, any additional amount that would have been distributed as part of the last estimated tax payment with respect to the preceding taxable year had such payment been based on such Member's actual allocable share of the Company's taxable income as determined for U.S. federal income tax purposes for such taxable year rather than an estimate thereof.

If the amount of Available Cash is not sufficient to make the foregoing payments in full, the amount that is available will be distributed in the same proportion as the distribution would be made if the full amount were available. Distributions made pursuant to this Section 5.02 will be treated as advances of distributions (including liquidating distributions) to be made under Section 5.01(a)(iv) of this Agreement and will be credited against and will reduce future distributions to be made to each Member under Section 5.01(a)(iv) of this Agreement. Notwithstanding the foregoing and for the avoidance of doubt, the Members agree that the

32

CONFIDENTIAL                                                                                    BLFG_EDPA1625727

Company shall not be required to make distributions to a Member pursuant to this Section 5.02 to the extent that such Member realizes income in connection with the issuance of Class C Units to such Member, the forfeiture of Class C Units by such Member or another Member or the repurchase of Units from such Member or another Member and that only income, gain, loss and deduction realized after the Effective Date will be taken into account for purposes of determining the amount each Member is to receive under this Section 5.02.

**5.03    Allocations**.

(a)    Profits and Losses.

(i)    Profits and Losses will be determined and allocated with respect to each Fiscal Year of the Company as of the end of such Fiscal Year, at such times as the Company assets are revalued in accordance with the definition of Gross Asset Value and at such other times as determined appropriate by the Board of Managers.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Profits or Losses will be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profits or Losses.  Subject to the other provisions of this Article V, for purposes of adjusting the Capital Accounts of the Members, the Profits and Losses for any Fiscal Year or other period will be allocated among the Members in a manner such that the Adjusted Capital Account of each Member, immediately after making such allocation is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the asset securing such liability), all unvested Class C Units were vested and the net assets of the Company were distributed in accordance with Section 10.02(c)(iii).

(ii)    Notwithstanding Section 5.03(a)(i), but subject to Section 5.03(b), Profits and Losses, and to the extent necessary, individual items of income, gain, loss or deduction of the Company, arising in the year in which a Liquidation Event occurs will be allocated such that, to the extent possible, the balance in each Member's Adjusted Capital Account is equal to the amount that each such Member is entitled to receive under Section 10.02(c)(iii).

(b)    Regulatory Allocations.    Notwithstanding the foregoing provisions of Section 5.03(a), the following special allocations will be made in the following order of priority:

(i)    Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a Company taxable year, then each Member will be allocated items of Company income and gain for such taxable year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  This Section 5.03(b)(i) is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and will be interpreted consistently therewith.

NY\5767490

CONFIDENTIAL                                                                                    BLFG_EDPA1625728

(ii)     Member Minimum Gain Chargeback.  If there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), will be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in a manner consistent with the provisions of Treasury Regulations Section 1.704-2(g)(2).   This Section 5.03(b)(ii) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(i)(4) and will be interpreted consistently therewith.

(iii)     Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain will be allocated to all such Members (in proportion to the amounts of their respective deficit Adjusted Capital Accounts) in an amount and manner sufficient to eliminate the deficit balance in the Adjusted Capital Account of such Member as quickly as possible, provided that an allocation pursuant to this Section 5.03(b)(iii) shall be made if and only to the extent that such Member would have an Adjusted Capital Account deficit after all other allocations provided for in this Article V have been tentatively made as if this Section 5.03(b)(iii) were not in this Agreement.   It is intended that this Section 5.03(b)(iii) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(iv)     Limitation on Allocation of Net Loss.  If the allocation of Losses to a Member as provided in Section 5.03(a) hereof would create or increase an Adjusted Capital Account deficit, there will be allocated to such Member only that amount of Losses as will not create or increase an Adjusted Capital Account deficit.  The Losses that would, absent the application of the preceding sentence, otherwise be allocated to such Member will be allocated to the other Members in accordance with their relative proportion of Units, subject to the limitations of this Section 5.03(b)(iv).

(v)     Certain Additional Adjustments.  To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss will be specially allocated to the Members in accordance with their Interests in the Company in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625729

(vi)    Nonrecourse Deductions.  The Nonrecourse Deductions for each taxable year of the Company will be allocated to the Class A Members and the Class B Members in accordance with their respective Percentage Interest.

(vii)    Member Nonrecourse Deductions.  The Member Nonrecourse Deductions will be allocated each year to the Member that bears the economic risk of loss (within the meaning of Treasury Regulations Section 1.752-2) for the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.

(viii)    Certain Corrective Allocations.  If, as a result of an exercise of a noncompensatory option to acquire an interest in the Company, a Capital Account reallocation is required under Treasury Regulation Section 1.704-1(b)(2)(iv)(s)(3), the Company shall make corrective allocations pursuant to Treasury Regulation Section 1.704-1(b)(4)(x).

(ix)    Construction of Allocation Provisions.  The allocations set forth in Sections 5.03(b)(i) through (vii) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2(i) and will be interpreted in a manner consistent therewith.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations that are made be offset either with other Regulatory Allocations or with special allocations pursuant to this Section 5.03(b)(ix).  Therefore, notwithstanding any other provisions of subsections (a) and (b) or this Section 5.03 (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Adjusted Capital Account balance is, to the extent possible, equal to the Adjusted Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.03(a).

(c)    Tax Allocations.

(i)    Except as provided herein, for federal income tax purposes, each Company item of income, gain, loss, deduction and credit will be allocated between the Members as its correlative item of "book" income, gain, loss, deduction or credit is allocated pursuant to this Article V and each tax credit shall be allocated to the Members in the same manner as the receipt or expenditures giving rise to such credit is allocated under this Article V.

(ii)    Tax items with respect to Company assets that are contributed to the Company with a Gross Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution will be allocated between the Members for income tax purposes pursuant to Treasury Regulations promulgated under Code Section 704(c) so as to take into account such variation.  The Company will account for such variation under the "remedial allocation method," as described in Treasury Regulations Section 1.704-3(d).  If the Gross Asset Value of any Company asset is adjusted pursuant to the definition of "Gross Asset Value" herein, subsequent allocations of income, gain, loss, deduction and credit with respect to such

35

CONFIDENTIAL                                                                BLFG_EDPA1625730

Company asset will take account of any variation between the adjusted basis of such Company asset for federal income tax purposes and its Gross Asset Value in a manner consistent with Code Section 704(c) and the Treasury Regulations promulgated thereunder under the "remedial allocation method," as described in Treasury Regulations Section 1.704-3(d).  Allocations pursuant to this Section 5.03(c) are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of net Profits, net Losses and any other items or distributions pursuant to any provision of this Agreement.

      (d)    <u>Other Provisions</u>.

      (i)    For any Fiscal Year or other period during which any part of an Interest in the Company is transferred between the Members or to another person, the portion of the Profits, Losses and other items of income, gain, loss, deduction and credit that are allocable with respect to such part of an Interest in the Company will be apportioned between the transferor and the transferee under any method allowed pursuant to Section 706 of the Code and the applicable Treasury Regulations as determined by the Board of Managers.

      (ii)    In the event that the Code or any Treasury Regulations require allocations of items of income, gain, loss, deduction or credit different from those set forth in this <u>Article V</u>, the Board of Managers is hereby authorized to make new allocations in reliance on the Code and such Regulations, and no such new allocation will give rise to any claim or cause of action by any Member.

      (iii)    For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Profits will be deemed to equal such Member's Percentage Interest.

      (iv)    To the extent the current law is unclear, the Company may consider the proposed Treasury Regulations that were issued on May 24, 2005 regarding the issuance of partnership equity for services (including Prop. Treas. Reg. §§1.83-3, 1.83-6, 1.704-1, 1.706-3, 1.721-1 and 1.761-1), as such regulations may be subsequently amended (the "<u>Proposed Regulations</u>"), with respect to matters that arise with respect to the issuance or forfeiture of Class C Units issued for services rendered or to be rendered to or for the benefit of the Company, until final Treasury Regulations regarding these matters are issued.  Following the promulgation, if any, of final regulations and associated guidance by the Treasury Department and IRS regarding the tax consequences associated with the issuance or transfer of partnership interests in exchange for the performance of services, the Company and each Member shall make the safe harbor election contemplated by proposed Section 1.83-3(l) of the Treasury Regulations and by the revenue procedure contemplated by IRS Notice 2005-43 (or the corresponding provisions of any such final Treasury Regulations or associated guidance) in connection with the issuance or transfer by the Company of any Class C Unit issued as of the Effective Date for the performance of services if the Board of Managers determines that making such election will not have an adverse effect on the Class A Members or the

36

 BLFG_EDPA1625731

Class B Members.  The Board of Managers is hereby authorized without the consent of any other Member to amend this Agreement to provide that (i) the Company is authorized and directed to elect the safe harbor for Class C Units issued as of the Effective Date, (ii) the Company and each of its Members (including any person to whom a partnership interest is transferred in connection with the performance of services) will comply with all requirements of the safe harbor with respect to all Interests issued as of the Effective Date transferred in connection with the performance of services while such election remains in effect and (iii) the Company and each of its Members will take all actions reasonably necessary, including providing the Company with any required information, to permit the Company to comply with the requirements set forth or referred to in the applicable Regulations for such election to be effective.

(v)     The Company agrees that it will not treat amounts with respect to distributions that a Class A Member is entitled to receive under Section 5.01(a)(ii), or a corresponding amount that a Class B Member is entitled to receive under Section 5.01(a)(iii), as a "guaranteed payment" except to the extent that the Class A Member receives cash distributions pursuant to Section 5.01(a)(ii), or the Class B Member receives a corresponding amount pursuant to Section 5.01(a)(iii), in excess of the Profit allocated to such Member with respect to its right to receive such amounts.

(e)     Valuation; Revaluation.  Valuations will be made by the Board of Managers or by independent third parties appointed by the Board of Managers and deemed qualified by the Board of Managers to render an opinion as to the value of the Company's assets, using such methods and considering such information relating to the investments, assets and liabilities of the Company as the Board of Managers or independent third party, as the case may be, may determine in the reasonable discretion of the Board of Managers.

**5.04    Withholding**.  The Company may withhold distributions or portions thereof if it is required to do so by any applicable rule, regulation, or law, and each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local or foreign taxes that the Board of Managers determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  Any amounts withheld pursuant to this Section 5.04 will be treated as having been distributed to such Member.  To the extent that the cumulative amount of such withholding for any period exceeds the distributions to which such Member is entitled for such period, the amount of such excess will be considered a loan from the Company to such Member, with interest accruing at the Interest Rate or the amount of such excess will be promptly paid to the Company by the Member on whose behalf such withholding is required to be made. Any income from any deemed loan will not be allocated to or distributed to the Member requiring such loan.  Such loan may, at the option of the Board of Managers, be satisfied out of distributions to which such Member would otherwise be subsequently entitled. Each Member hereby agrees to indemnify and hold harmless the Company, the other Members and the Board of Managers from and against any liability (including, without limitation, any liability for taxes, penalties, additions to tax or interest) with respect to income attributable to or distributions or other payments to such Member.

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625732

# ARTICLE VI.
# MANAGEMENT

**6.01    Management**.  Except as otherwise provided in this Agreement or by applicable law, the power and authority to manage, direct and control the Company will be vested in the Board of Managers.  The Board of Managers will have full, complete and exclusive authority to manage, direct and control the business, affairs and properties of the Company, and to perform any and all other acts or activities customary or incident to the management of the Company's activities.  Unless explicitly provided otherwise in this Agreement, the Board of Managers shall have the power, right and authority on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts which the Board of Managers, in its sole discretion, may deem necessary or desirable.  Unless expressly authorized to do so by the provisions hereof or by action of the Board of Managers, no Member may claim or exercise any authority to act, or to enter into any contract or agreement, on behalf of the Company.

**6.02    Board of Managers**.

(a)    Composition.  There will be seven (5) members of the Board of Managers. Managers need not be Members of the Company.  Two (2) Managers shall be appointed by the Class A Members (the "Class A Managers") and three (3) Managers shall be appointed by the Class B Members (the "Class B Managers"). As of the Effective Date, initial Class A Managers are Baran Tekkora and Andrew W. Ward and the initial Class B Managers are James Ballengee, Julio E. Rios, II and Jeremy H. Gamboa.  Subject to Section 6.02(f) below, each Manager will hold office until his or her successor is appointed.

(b)    Without limiting the general authority of the Board of Managers, and notwithstanding any other provision of this Agreement to the contrary other than Section 6.02(c), the Company shall not be permitted to take (directly or through any Subsidiary), and shall have no authority to take or cause to be taken, any of the following actions without the affirmative approval or vote of a majority of the votes cast by Managers present at any meeting at which a quorum is present (which shall include the approval of at least one (1) Class A Manager appointed by Riverstone), unless such items were included in or covered by an existing budget or business plan that has been previously approved by the Board of Managers:

(i)    adopt, modify or amend any operating expense budget or capital expenditure budget for the Company;

(ii)    adopt, modify or amend any business plan for the Company;

(iii)    subject to Section 11.06(b), amend or modify this Agreement or any of the rights or preferences with respect to any Equity Security;

(iv)    make any change to the size or composition of the Company's Board of Managers;

(v)    elect or remove any officers of the Company, subject to the terms of their respective Employment Agreements;

38

CONFIDENTIAL                                                                                    BLFG_EDPA1625733

(vi)    obligate or cause the Company to repurchase or issue any Equity Security or admit any new Member;

(vii)    obligate or cause the Company to make any acquisition, divestiture or disposition of assets (whether singly or in a series of related transactions) or any capital expenditure exceeding $2,000,000 per transaction or $8,000,000 in the aggregate during any Fiscal Year;

(viii)    except for marketing agreements which shall be governed by the risk management policy, obligate or cause the Company to enter into any contract or amend, modify or terminate any such contract exceeding $3,000,000 per contract or $15,000,000 in the aggregate during any Fiscal Year;

(ix)    obligate or cause the Company to enter into, amend or modify any credit facility or assume, guarantee or incur any indebtedness for borrowed money, including without limitation, any off-balance sheet indebtedness, other than any indebtedness arising from trade payables incurred in the ordinary course of business;

(x)    obligate or cause the Company to become a party to any merger, interest exchange or consolidation with or into another Person;

(xi)    obligate or cause the Company to wind up or liquidate, including pursuant to Section 10.01(a);

(xii)    obligate or cause the Company to enter into, terminate, modify or amend any employment, severance or consulting agreement with any executive officer;

(xiii)    increase or establish any form of compensation or benefits payable or to become payable to any employees, officers, directors or contractors of the Company or any of its subsidiaries;

(xiv)    issue a capital call or otherwise request or require a Cash Contribution of any Member;

(xv)    issue any additional class or series of Equity Securities;

(xvi)    registering any Equity Securities (or equity securities of a Subsidiary or entity that prior to the consummation of such offering was a Subsidiary) under the Securities Act in connection with, or consummating, any public offering of any such Equity Security (or equity securities of a Subsidiary or entity that prior to the consummation of such offering was a Subsidiary);

(xvii)    obligate or cause the Company to enter into, amend or modify any hedging, forward sales, futures or other financial contract, except as otherwise set forth in the risk management policy adopted by the Company;

(xviii)    retain or terminate accounting advisors;

NY\5767490

CONFIDENTIAL    BLFG_EDPA1625734

(xix)   (A) commence litigation against any party or (B) settle any pending litigation unless, in each case, for an amount less than $250,000 per claim or $1,000,000 in the aggregate for any Fiscal Year; provided that no such settlement shall contain any restrictions on the Company's operations;

(xx)   make an election for the Company to be treated as a corporation for U.S. federal income tax purposes; or

(xxi)   make any distributions pursuant to Section 5.01.

(c)   In addition to the approval necessary under Section 6.02(b), each of the following actions shall also require the affirmative approval of at least one (1) Class B Manager:

(i)   a material change in the scope or conduct of business of the Company as conducted at the Effective Time;

(ii)   a merger, consolidation, liquidation or sale of all or substantially all of the assets of the Company unless (x) the date of such transaction is at least two (2) years from the date hereof or (y) the Class B Members receive proceeds at least equal to the amount of their Unreturned Contribution Amount;

(iii)   registering any Equity Securities (or equity securities of a subsidiary or entity that prior to the consummation of such offering was a subsidiary) under the Securities Act in connection with, or consummating, any public offering of any such Equity Security within one year form the date hereof; and

(iv)   prior to the Class A Units representing a majority of the Percentage Interest of the Company, the actions contained in subsections (iv), (vii), (viii), (xiii),(xvii), (xviii), (xix) and (xx) of Section 6.02(b).

(d)   Meetings; Quorum.  Regular meetings of the Board of Managers may be held at such place or places (which need not be in the State of Delaware) and at such times as may be determined from time to time by the Board of Managers.  Special meetings of the Board of Managers may be called by any Manager on at least twenty-four (24) hours' notice (which notice may be in writing or by any oral or telephonic means which conveys actual notice) to each other Manager.  At every meeting of the Board of Managers, the presence (in person, by telephone or by proxy, which proxy must be revocable at any time) of a majority of the total number of Managers will be necessary to constitute a quorum; provided that the attendance of at least one (1) Class B Manager shall be required to constitute a quorum; provided, further, that the presence of such Class B Manager shall not be required to constitute a quorum if (x) a meeting has been adjourned for at least one (1) day due to a failure of such Class B Manager to be present, and (y) at the reconvened meeting (held at least one (1) day after the previously adjourned meeting) the absence of such Class B Manager is the cause of the failure to constitute a quorum. Meetings may be held in person, by telephone, or any other means by which the Managers can hear each other.  Any Manager attending or participating in a meeting of the Board of Managers will be deemed to have waived any notice requirement unless his presence at such meeting was for the sole purpose of objecting to the failure of notice.

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625735

(e)     <u>Written Consent in Lieu of Meeting</u>.  Any action permitted or required by applicable law or this Agreement to be taken at a meeting of the Board of Managers may be taken without a meeting if a unanimous consent in writing, setting forth the action to be taken, is signed by all of the Managers.  Such consent will have the same force and effect as an affirmative vote at a duly constituted meeting which is cast by those Managers who have signed the consent, and the execution of such consent will constitute attendance or presence in person at a meeting of the Board of Managers.

(f)     <u>Decisions Made by Vote</u>.  Each Class A Manager shall have two (2) votes and each Class B Manager shall have one (1) vote at any meeting of the Board of Managers, which, in accordance with the appointments made in <u>Section 6.02(a)</u>, <u>provided</u>, that any Class A Manager may act as proxy for any or all other Class A Managers, and any Class B Manager may act as a proxy for any or all other Class B Managers.  Except as otherwise set forth herein, the affirmative vote of a majority of the votes cast by Managers present at any meeting at which a quorum is present will be necessary for the adoption of any resolution, the making of any decision, the delegation of any authority, or the taking of any action by the Company.

(g)     <u>Vacancies</u>.  Subject to <u>Section 6.02(a)</u>, vacancies in the Board of Managers occurring for any reason will be filled by the Member(s) that appointed such Manager.  A Manager appointed to fill any vacancy will hold office until his successor has been appointed.

(h)     <u>Removal and Resignation</u>.  Any of the Class A Managers may be removed, with or without cause, at any time, by Riverstone, and any of the Class B Managers may be removed, with or without cause, at any time, by the Class B Members.  Any Manager may resign at any time, such resignation to be made in writing and to take effect immediately on such later date as may be specified therein without acceptance.

(i)     <u>Committees</u>.  The Board of Managers may appoint an executive committee or any other committee or committees for any purpose or purposes to the extent permitted by law, which committee or committees will have such powers as specified in the resolution of appointment.

(j)     <u>Reimbursement and Remuneration</u>.  Managers will not be compensated for acting in such capacity, but will be entitled to reimbursement for reasonable out-of-pocket expenses incurred in furtherance of the business or management of the Company.  Distributions received by the Members pursuant to <u>Articles 5</u> and <u>10</u> are not, and will not be deemed to be, remuneration within the meaning of this <u>Section 6.02(j)</u>.

(k)     <u>Capital Call Following Distribution</u>. The Board shall not issue any capital call for a period of six (6) months following the date of any distribution (other than a tax distribution pursuant to <u>Section 5.02</u>) for so long as any Member has a Commitment pursuant to <u>Section 4.02(a)</u> outstanding, unless such capital call is funded in its entirety by recipients of such distribution in an amount up to but not exceeding the amount of such distribution (without credit towards reducing such Member's Commitments) and thereafter pro-rata in accordance with the Members' respective Percentage Interests.

**6.03    Transactions with Affiliates**.

NY\5767490

 BLFG_EDPA1625736

(a)     Notwithstanding any other provision of this Agreement to the contrary, the Company may not enter into any contract or agreement (including employment, consulting or service agreements), or amend or alter the terms of, or terminate or enforce any rights or obligations with respect to, any such contract or agreement, with any Member and/or any of its Affiliates or any officer, director, stockholder or Family Member of any Member or an Affiliate of a Member for the rendering of services without approval of the Board of Managers (provided that if the Member who is or whose Affiliate or Family Member is proposed to be party to such transaction is also a Manager, such Manager or Managers shall be recused from, and shall not participate in, any vote or approval of such transaction).

(b)     No such contract or agreement shall be void or voidable solely for such reason and no Person having an interest in any such transaction shall have any liability to the Company or any Member solely by virtue of such relationship or conflict, if the material facts as to the relationship and transaction are disclosed or are known to the Board of Managers and, if required, the transaction is approved by the Board of Managers (provided that if the Member who is or whose Affiliate or Family Member is proposed to be party to such transaction is also a Manager, such Manager or Managers shall be recused from, and shall not participate in, any vote or approval of such transaction).

(c)     Neither this Agreement (including the issuance of Units hereunder) nor the Purchase Agreement, or the amendment or alteration of the terms hereof or thereof, or termination or enforcement any rights or obligations with respect hereto or thereto, shall be deemed to be an affiliate transaction to which this Section 6.03 applies.

**6.04    Officers.**

(a)     The Board of Managers may, from time to time, designate one or more Persons to be Officers of the Company, with such titles as the Board of Managers may assign to such Persons.  No Officer need be a Member or a resident of the State of Delaware.  Officers so designated will have such authority and perform such duties as the Board of Managers may, from time to time, delegate to them and, unless otherwise specified by the Board of Managers, will have the authority and responsibilities generally held by officers of a Delaware corporation holding the same titles.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the Officers and agents of the Company will be fixed from time to time by the Board of Managers.  Any Officer may resign as such at any time.  Such resignation will be made in writing and will take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board of Managers. Any Officer may be removed as such, either with or without Cause, by the Board of Managers, in its sole discretion.  Any vacancy occurring in any office of the Company may be filled by the Board of Managers.  The determination as to whether or not Cause exists for termination of the employment of any Officer or other employee will be made by the Board of Managers, acting in good faith, and shall be memorialized in a written resolution duly adopted by the Board of Managers (provided that if such Officer or employee is also a Manager, such Manager shall be recused from, and shall not participate in, any such vote or approval).  The Officers of the Company, and their respective titles, as of the Effective Date, are set forth on Exhibit E hereto.

NY\5767490

CONFIDENTIAL                                                                    BLFG_EDPA1625737

(b)      Notwithstanding any duty otherwise existing at law or in equity, Managers may act in the best interests of, or at the direction of, the Members appointing them. In the absence of bad faith by the Board of Managers, the resolution, action or terms so made, taken or provided by the Board of Managers will not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty stated or implied by law or equity.  A Class A Manager, in performing his obligations under this Agreement, shall be entitled to act or omit to act at the direction of the Riverstone Entities, considering only such factors, including the separate interest of the Riverstone Entities (which interest may differ from, and be given priority over, the interests of the Company or any other Member), as such Class A Manager or the Riverstone Entities chooses to consider, and any action of a Class A Manager or failure to act, taken or omitted in reliance on this Section 6.04(b) shall not constitute a breach of any duty (including any fiduciary duty) on the part of any such Class A Manager or Riverstone Entity to the Company or any other Member or Manager. To the fullest extent permitted by applicable law, (i) the parties hereby waive and disclaim the requirements of any fiduciary duty, including the duty of loyalty, existing at law or in equity in connection with the management of the affairs of the Company by the Class A Managers and the Riverstone Entities, except as expressly set forth in this Agreement, and (ii) to the extent that the provisions of this Agreement modify or eliminate any other duties and liabilities of any Class A Manager or Riverstone Entity otherwise existing at law or in equity, such provisions are agreed by the Members to modify or eliminate to that extent such other duties and liabilities of such Class A Manager or Riverstone Entity.

(c)      The Board of Managers and each Officer may rely and will be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it or him or her to be genuine and to have been signed or presented by the proper party or parties.

(d)      The Board of Managers and each Officer may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it or him or her, and any act taken or omitted to be taken in reliance upon the opinion (including an opinion of counsel) of such Persons as to matters that such Board of Managers or Officer reasonably believes to be within such Person's professional or expert competence will be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

**6.05    Duties; Indemnification; Limitation of Liability**.

(a)      Except as limited by applicable law and subject to the provisions of this Section 6.05, each Manager, Member and Officer of the Company (each an "Indemnitee") will not be liable for, and will be indemnified and held harmless by the Company against, any and all losses, liabilities and reasonable expenses, including attorneys' fees, arising from proceedings in which such Indemnitee may be involved, as a party or otherwise, by reason of its being a Manager, Member or Officer of the Company, or by reason of its involvement in the management of the affairs of the Company, whether or not it continues to be such at the time any such loss, liability or expense is paid or incurred.  Notwithstanding the foregoing, no Indemnitee will be held harmless or indemnified under this Section 6.05 in respect of any indemnification obligation or other liability of such Indemnitee under the Purchase Agreement or if there has

43

CONFIDENTIAL

BLFG_EDPA1625738

been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter for which the Indemnitee is seeking indemnification pursuant to this Section 6.05, the Indemnitee engaged in fraud, intentional misconduct, knowing and willful breach of Indemnitee's obligations under this Agreement, bad faith or, in the case of a criminal matter, the Indemnitee had no reasonable cause to believe that the Indemnitee's conduct was lawful.

(b)     The rights of indemnification provided in this Section 6.05 are in addition to any rights to which an Indemnitee may otherwise be entitled by contract or as a matter of law. The Company hereby acknowledges and agrees that the Company shall be the indemnitor of first resort with respect to any Company indemnity obligation under this Section 6.05.  Without limiting the foregoing, an Indemnitee will be entitled to indemnification by the Company against reasonable expenses (as incurred), including attorneys' fees, incurred by the Indemnitee in connection with the defense of any action to which the Indemnitee may be made a party (without regard to the success of such defense), to the fullest extent permitted under the provisions of the Act or any other applicable statute.

(c)     Reasonable expenses incurred by an Indemnitee in defending any proceeding will be paid by the Company in advance of the final disposition of the proceeding, upon receipt of a written undertaking by or on behalf of such Indemnitee to repay such amount if such Indemnitee is determined pursuant to this Section 6.05 or adjudicated to be ineligible for indemnification, which undertaking will be an unlimited general obligation and subject to disgorgement from the Indemnitee but need not be secured unless so determined by the Board of Managers.

(d)     The indemnification provided by this Section 6.05 shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, pursuant to any vote of the Members or the Board of Managers, as a matter of law or otherwise, both as to actions in the Indemnitee's capacity as an Indemnitee and as to actions in any other capacity, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

(e)     For purposes of this Section 6.05, the Company shall be deemed to have requested an Indemnitee to serve as fiduciary of an employee benefit plan whenever the performance by it of its duties to the Company also imposes duties on, or otherwise involves services by, it to the plan or participants or beneficiaries of the plan; excise taxes assessed on an Indemnitee with respect to an employee benefit plan pursuant to applicable law shall constitute "fines" within the meaning of Section 6.05(a); and action taken or omitted by it with respect to an employee benefit plan in the performance of its duties for a purpose reasonably believed by it to be in the interest of the participants and beneficiaries of the plan shall be deemed to be for a purpose which is in, or not opposed to, the best interests of the Company.

(f)     An Indemnitee shall not be denied indemnification in whole or in part under this Section 6.05 because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

44

CONFIDENTIAL                                                                       BLFG_EDPA1625739

(g)     No amendment, modification or repeal of this Section 6.05 or any provision hereof shall in any manner terminate, reduce or impair the right of any past, present or future Indemnitee to be indemnified by the Company, nor the obligation of the Company to indemnify any such Indemnitee under and in accordance with the provisions of this Section 6.05 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

(h)     The indemnification provided by this Section 6.05 will inure to the benefit of the heirs successors, assigns and administrators and personal representatives of each Indemnitee, and shall not be deemed to create any rights for the benefit of any other Persons.

(i)     Any indemnification pursuant to this Section 6.05 will be made only out of the assets of the Company and will in no event cause any Member to incur any personal liability nor shall it result in any liability of the Members to any third party.

**6.06    Managers' and Officers' Insurance.**  The Company will purchase and maintain manager and officer liability insurance, on terms and in an amount approved by the Board of Managers, on behalf of any Person who is or was a Manager, Member or Officer of the Company against any liability asserted against him or incurred by him in any capacity identified in Section 6.05 or arising out of his status as an Indemnitee, whether or not the Company would have the power to indemnify him against that liability under Section 6.05.

**6.07    Liability of Indemnitees**.

(a)     Notwithstanding anything to the contrary set forth in this Agreement, no Indemnitee shall be liable for monetary damages to the Company, the Members, the Assignees or any other Persons who have acquired an Interest, for losses sustained or liabilities incurred as a result of any act or omission if such Indemnitee acted in good faith.

(b)     The Board of Managers may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the Board of Managers shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Board of Managers in good faith.

(c)     Any amendment, modification or repeal of this Section 6.07 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the liability of the Indemnitees as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

**6.08    Other Activities**.  Subject to Section 7.03 and any other agreement between a Class A Member and the Company or its Affiliates, each Class A Member, its Affiliates and any Class A Manager may engage or invest in, and devote its and their time to, any other business venture or activity of any nature and description, whether or not such activities are considered competitive with the Company or its business (the "Right to Compete"), and neither the Company nor any Member will have any right by virtue of this Agreement or the relationship

NY\5767490

BLFG_EDPA1625740

created hereby in or to such other venture or activity of any Class A Member (or to the income or proceeds derived therefrom), and the pursuit of such other venture or activity will not be deemed wrongful or improper. The Right to Compete of each Class A Member and its Affiliates does not require notice to, approval from, or other sharing with, any of the other Members or the Company. The legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines will not be applied to any such competitive venture or activity of a Class A Member or its Affiliates or any Class A Manager (but, for the avoidance of doubt, will be applied in respect of other Members and Managers of the Company). No Class A Member or its Affiliates will have any obligation to the Company or its other Members with respect to any opportunity to expand the Company's business, whether geographically, or otherwise. Notwithstanding the foregoing, no Class A Member or its Affiliates shall engage in such other activities solely as a result of using confidential or proprietary information provided by the Partnership to such Class A Member.

**6.09    Annual Monitoring Fee**.  The Company shall pay pursuant to the services agreement to REP Management Company V, LLC (or its designee) the Annual Monitoring Fee so long as Riverstone owns fifty percent (50%) or more of the Class A Units.

## ARTICLE VII.
## RIGHTS OF MEMBERS; CONFIDENTIALITY

**7.01    Access to Information**.  In addition to the other rights specifically set forth in this Agreement, each Class A Member and each Class B Member will have access to all information to which a Member is entitled to have access pursuant to the Act, including the timely receipt of the following reports: (i) audited annual financial statements; and (ii) unaudited quarterly financial statements. Class C Members have no right to information, other than (i) information relating solely to such Class C Member's ownership of its Class C Units and its Cash Contributions, and (ii) such other information that a majority of the Board of Managers determines, in their sole discretion, should be provided to any Class C Member.

**7.02    Audits**.  No Member will have the right to conduct, or cause to be conducted, an audit of the books and records of the Company.

**7.03    Confidentiality**.  Each Member agrees that the provisions of this Agreement, all understandings, agreements and other arrangements between and among the Members, and all other non-public information received from or otherwise relating to the Company or its business will be confidential, and will not be disclosed or otherwise released to any other Person (other than another party hereto), and no Class B Member shall use any such information in connection with any business venture or opportunity or trading activity, without the prior written consent of a majority of the Board of Managers, <u>provided</u>, however, that such restrictions shall not apply to (a) information that is or becomes available to the public generally without breach of this <u>Section 7.03</u>; (b) disclosures required to be made by applicable laws and regulations or stock exchange requirements or requirements of the Financial Industry Regulatory Authority; (c) disclosures required to be made pursuant to an order, subpoena or other legal process; (d) disclosures to officers, directors or Affiliates of such Member (and the officers and directors of such Affiliates), to auditors, counsel, and other professional advisors to or potential financing sources of such Persons or the Company and to Persons who are direct or indirect beneficial owners of Interests

NY\5767490

CONFIDENTIAL                                                                 BLFG_EDPA1625741

and their representatives (provided, however, that such Persons have been informed of the confidential nature of the information, and, in any event, the Member disclosing such information shall be liable for any failure by such Persons to abide by the provisions of this Section 7.03); (e) disclosures in connection with any litigation or dispute among the Members and/or the Company; or (f) disclosures made by a Member acting in accordance with this Section 7.03; provided, further, that any disclosure pursuant to clause (b), (c), (d), (e) or (f) of this sentence shall be made only subject to such procedures as the Member making such disclosure determines in good faith are reasonable and appropriate in the circumstances, taking into account the need to maintain the confidentiality of such information and the availability, if any, of procedures under laws, regulations, orders, subpoenas or other legal processes.  Each Member shall notify each other Member, as applicable, immediately upon becoming aware of any order, subpoena, or other legal process providing for the disclosure or production of information subject to the provisions of the immediately preceding sentence and, to the extent not prohibited by applicable law, immediately shall supply each other Member with a copy of any such order, subpoena, or other legal process.  In addition, to the extent not prohibited by applicable law, (i) each Member shall notify each other Member prior to disclosing or producing any information subject to the provisions of the two immediately preceding sentences and (ii) shall permit each other Member to seek a protective order protecting the confidentiality of such information.  The obligations of a Member pursuant to this Section 7.03 shall continue following the time such Person ceases to be a Member, but thereafter such Person shall not have the right to enforce the provisions of this Agreement.  Each Member acknowledges that disclosure of information in violation of the provisions of this Section 7.03 may cause irreparable injury to the Company and the Members for which monetary damages are inadequate, difficult to compute, or both. Accordingly, each Member agrees that its obligations under this Section 7.03 may be enforced by specific performance and that breaches or prospective breaches of this Section 7.03 may be enjoined.   The Company acknowledges that Riverstone employees and advisors serve as directors of portfolio companies of investment funds managed by Riverstone, and such portfolio companies and Riverstone Entities will not be deemed to have received information about "business opportunities" or "corporate opportunities" solely due to the dual role of any such employee or advisor so long as the employee or advisor does not provide any information about such "business opportunities" or "corporate opportunities to the other directors or officers or employees of such portfolio companies or Riverstone Entities.

      **7.04   Non-Disparagement**.   Each Member agrees that, in communications with Persons other than the Members and the Company (and their respective Affiliates, employees, members and partners or employees of Affiliates of Members or the Company), it shall not disparage in any way the Company, and each other Member (and their Affiliates, members and partners).  Under no circumstances shall any Member, in communications with Persons other than the Members and the Company or any of its Subsidiaries (and their respective Affiliates, employees, members and partners or employees of Affiliates of Members or the Company), criticize or disparage any business practice, policy, statement, valuation or report that is made, conducted or published by the Company or any of its Subsidiaries or any other Member (and their Affiliates, members and partners).  Notwithstanding the foregoing, this Section 7.04 shall not be construed to prohibit or restrain any criticism or other statements made in communications exclusively between or among any of the Members, the Company, their Affiliates, members, partners, or their respective employees, to the extent such communications or statements are made in the ordinary course of  business.  The obligations of each Member under this Section

CONFIDENTIAL

7.04 shall continue after the date such Person ceases to be a Member, but thereafter such Person shall not have the right to enforce the provisions of this Agreement. Each Member acknowledges that any violation of this Section 7.04 may cause irreparable injury to the Members and the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, each Member agrees that this Section 7.04 may be enforced by specific performance, and that breaches or prospective breaches of this Section 7.04 may be enjoined.

**7.05    Class C Units**.

(a)    General.  The Company may issue Class C Units pursuant to an Award Agreement to employees and other service providers to the Company and its Subsidiaries from time to time upon approval of the Board of Managers.  The Board of Managers shall maintain on a confidential basis the terms of the issuance of the Class C Units and the identities of the Class C Members. The terms of this Section 7.05 in respect of any Class C Member will be subject to the provisions of any Employment Agreement or Award Agreement to which such Class C Member is subject.  All permitted transferees of any Class C Member will be subject to this Section 7.05 regardless of whether any such permitted transferee is an employee of the Company (i.e., if the employment of the Class C Member who Transferred Class C Units to such permitted transferees is terminated by the Company, this Section 7.05 will apply to such Class C Units regardless of their ownership).

(b)    Time Vesting.  Subject to the provisions of any Employment Agreement or Award Agreement to which such Class C Member is subject, twelve and one half percent (12.5%) of the Class C Units initially issued to each Class C Member shall vest on each anniversary of the date on which Class C Units are issued, subject to the Class C Member's continued employment or service with the Company or its Affiliates on the applicable vesting date, such that a maximum of fifty percent (50%) of such Class C Units will vest after the period of forty-eight (48) months from the date of issue.

(c)    Performance Vesting. Subject to the provisions of any Employment Agreement or Award Agreement to which such Class C Member is subject, twelve and one half percent (12.5%) of the Class C Units initially issued to each Class C Member shall vest as of the end of each Fiscal Year, beginning with the full Fiscal Year after issuance, if the Performance Vesting Criteria are satisfied for such Fiscal Year, such that a maximum of fifty percent (50%) of such Class C Units will vest after the Performance Vesting Criteria have been satisfied for four (4) full Fiscal Years. The determination of whether the Performance Vesting Criteria have been satisfied shall be made by the Board of Managers promptly upon receipt and review of the audit for such Fiscal Year. In the event that the Performance Vesting Criteria is not met in any Fiscal Year, but if by aggregating the following Fiscal Year with such non-satisfied Fiscal Year the Performance Vesting Criteria is satisfied for both years, there will be a one year look back and the Performance Vesting Criteria for both years shall be deemed to be satisfied. In the event there are Fiscal Years in which the Performance Vesting Criteria are not satisfied and a Liquidity Event occurs which results in the Class A Members receiving both (i) three (3) times their aggregate Capital Contribution, and (ii) a thirty percent (30%) internal rate of return on their aggregate Capital Contribution, then all fifty percent (50%) of the Class C Units subject to the Performance Vesting Criteria shall vest to the extent both clause (i) and clause (ii) remain satisfied. For the avoidance of doubt, a Class C Member shall only be eligible for vesting if the

48

CONFIDENTIAL                                                                                  BLFG_EDPA1625743

Class C Member is then employed by the Company. In no event shall any excess amounts be deemed to carry forward for future years.

(d)     Accelerated Vesting. Notwithstanding the vesting schedule set forth in Sections 8.05(b) and 8.05(c) above or in any Employment Agreement or Award Agreement to which such Class C Member is subject, (i) all unvested Class C Units shall fully vest immediately prior to a Liquidity Event, and (ii) if the Company's employment of a Class C Member is terminated by the Company without Cause or by such Class C Member for Good Reason following a Qualified Public Offering, the unvested Class C Units held by such Class C Member will immediately vest upon such termination.

(e)     Forfeiture.  Except as provided in Section 7.05(d) or in any Employment Agreement or Award Agreement to which such Class C Member is subject, unvested Class C Units will be immediately forfeited without consideration upon termination of such Class C Member's employment or service with the Company and its Affiliates for any reason.  If the Company's employment or engagement of a Class C Member is terminated by the Company for Cause, all of such Class C Member's vested and unvested Class C Units will be immediately forfeited without consideration.

(f)     Distributions.  Prior to the earlier of (x) the exhaustion of the Commitment of the Class A Members as set forth on Exhibit A on the Effective Date and (y) December 31, 2017, all distributions with respect to the Class C Units under Section 5.01 shall be held in escrow by the Company for the benefit of the holder of such Class C Units, and the holder of such Class C Units will be considered the owner of such amounts for income tax purposes.  After the occurrence of such date in the previous sentence, all distributable amounts relating to vested Class C Units shall be disbursed to the holder of such Class C Units. After the remaining Class C Units which relate to such distributions become vested, such amounts shall be disbursed to the holder of such Class C Units.  In the event that any of such Class C Units remain unvested upon the holder thereof ceasing to be an employee, consultant or other service provider to the Company, such amounts attributable to such unvested Class C Units, if any, shall be forfeited accordingly and distributed in accordance with the terms of Section 5.01.  Nothing in this paragraph shall prevent any holder of Class C Units from receiving cash distributions in accordance with Section 5.02 regardless of whether such Class C Units are fully vested.

(g)     Repurchase Right.  In the event that the Company's employment or engagement of any Class C Member is terminated for any reason (including as a result of the death, disability or resignation of such Member or the termination of such Member's employment or engagement without Cause and whether or not as a result of a Qualified Termination) (such Member, a "Terminated Member"), for a period of six (6) months following the date of such termination of employment or engagement (which six (6) month period shall be extended to the extent the repurchase is prohibited by the Company's credit facilities), the Company, or its nominee or assignee, shall have the option to purchase, and cause such Terminated Member (and any transferees thereof) to sell, all of the vested Class C Units held by such Terminated Member (and any transferees thereof) (the "Class C Repurchase Right").  The Company may, in its sole discretion, assign its rights under this Section 7.05 with respect to the repurchase of a Terminated Member's Units to a party who has the financial ability to pay the full purchase price in cash for such Units as provided herein.  The Repurchase Right shall be

49

CONFIDENTIAL                                                                      BLFG_EDPA1625744

exercised by written notice (the "Class C Repurchase Notice") to such Terminated Member given in accordance with Section 11.03 of this Agreement.

(i)     The purchase price payable for any Class C Units purchased upon exercise of the Class C Repurchase Right (the "Class C Purchase Price") shall be the Fair Market Value of such Class C Units on the date the Class C Repurchase Notice is delivered, as determined in good faith by the Board of Managers of the Company; *provided, however*, that any Terminated Member who holds more than 15% of the outstanding Class C Units shall be entitled to seek appraisal of his or her Class C Units in accordance with the provisions set forth in subparagraph (ii) below.

(ii)    If any Terminated Member who holds more than 15% of the outstanding Class C Units disagrees with the determination by the Board of Managers of the Fair Market Value of the Class C Units subject to a Class C Repurchase Right and provides written notice thereof to the Company (the "Objection Notice") within twenty (20) days following receipt of written notice of such determination in writing, such Terminated Member and the Board of Managers shall seek to resolve the dispute within 20 Business Days.  In the event that no resolution is reached within such 20 Business Days, the Fair Market Value of such Units shall be determined by appraisal as provided below:

(A)     The selling Member and the Company shall select a mutually acceptable appraiser to determine the Fair Market Value of the Units pursuant to subparagraph (i) above, and the fees and expenses of such appraiser shall be borne 50% by the selling Member and 50% by the Company.

(B)     If the parties are unable to agree on an appraiser within ten (10) days following receipt of the Objection Notice, the selling Member and the Company shall each select an appraiser to determine the Fair Market Value of the applicable Units, and the fees and expenses of each appraiser shall be borne by the party that selected such appraiser.  If the determinations of Fair Market Value by each appraiser pursuant to this subsection (B) are within 10% of each other, then the Fair Market Value shall be the mathematical average of the two appraisals, and such determination shall be final and binding upon the Members and the Company.

(C)     If the calculations of Fair Market Value by each appraiser pursuant to subsection (B) above vary by more than 10% of each other, then both of the appraisers designated by the selling Member and the Company shall meet and agree upon a third appraiser within ten (10) days following the delivery of the last of the appraisals pursuant to subsection (B) above.  If such appraisers cannot agree upon a third appraiser within the ten (10) day period, either the selling Member or the Company may petition any United States federal district court in the State of Delaware to appoint such appraiser.  The appraiser appointed pursuant to this subsection (C) shall determine the Fair Market Value of the applicable Units.  The Fair Market Value of the applicable Units shall be the mathematical average of the two closest appraisals prepared pursuant to

50

CONFIDENTIAL

BLFG_EDPA1625745

subsection (B) above and this subsection (C), and such determination shall be final and binding upon the Members and the Company.  The Company and the selling Member shall each pay 50% of the fees and expenses of the appraiser appointed pursuant to this subsection (C).

(D)     Each appraiser shall have access to the books, records, assets and properties of the Company as it may reasonably request for the purpose of appraising the value of the Units.  The Members and the Company shall take such actions as are reasonable to grant such access.

(E)     Each appraiser appointed hereunder shall be a national or international investment banking or valuation firm actively involved in the business of valuing and appraising companies in the natural gas compression business for no less than the five (5) year period immediately preceding the date of appointment.

(F)     Each appraiser shall have access to the books, records, assets and properties of the Company as it may reasonably request for the purpose of appraising the value of the Units.  The Members and the Company shall take such actions as are reasonable to grant such access.

(iii)     The purchase of the Terminated Member's Class C Units pursuant to the exercise of the Class C Repurchase Right shall take place on a date specified by the Company, but in no event later than 30 days following the determination of the Fair Market Value of the Class C Units in accordance with Section 7.05(g)(i).  On such date, (i) the Terminated Member shall Transfer the Class C Units to the Company and shall execute any instruments reasonably requested by the Company to evidence such Transfer and (ii) the Company shall pay to the Terminated Member his or her respective purchase price, which shall be payable in cash or by bank or cashier's check.

**7.06    Class B Repurchase Rights**.

(a)     In the event of a Qualified Termination of any Class B Employee, for a period of six (6) months following the date of such termination of employment or engagement (which six (6) month period shall automatically be extended to the extent and for so long as the repurchase is prohibited by the Company's credit facilities), the Company, or its nominee or assignee, shall have the option to purchase, and cause such Member (and any transferees thereof) to sell, all or any portion of the Class B Units (the "Repurchased Units") held by such Member (and any transferees thereof) (the "Class B Repurchase Right").  The Company may, in its sole discretion, assign its rights under this Section 7.06 with respect to the repurchase of the Repurchased Units to a party who has the financial ability to pay the full purchase price in cash for such Repurchased Units as provided herein.  The Class B Repurchase Right shall be exercised by written notice (the "Class B Repurchase Notice") to such Member given in accordance with Section 11.03 of this Agreement.

(b)     The purchase price payable by the Company (or its nominee or assignee) for the Class B Units purchased upon exercise of the Class B Repurchase Right shall be the Fair

51

CONFIDENTIAL                                                                                                    BLFG_EDPA1625746

Market Value of such Class B Units on the date the Class B Repurchase Notice is delivered as determined in good faith by the Board of Managers of the Company (the "Purchase Price"); provided, however, that any Class B Employee who holds more than 15% of the outstanding Class B Units shall be entitled to seek appraisal of his or her Class B Units in accordance with the provisions set forth in Section 7.05(g)(ii).

(c)    The purchase of a terminated Class B Employee's Class B Units pursuant to the exercise of the Class B Repurchase Right shall take place on a date specified by the Company, but in no event later than 30 days following the determination of the Fair Market Value of such Class B Units in accordance with Section 7.06(b). On such date, (i) the terminated Class B Employee shall Transfer the Class B Units to the Company and shall execute any instruments reasonably requested by the Company to evidence such Transfer and (ii) the Company shall pay to the terminated Class B Employee his or her respective purchase price, which shall be payable in cash or by bank or cashier's check.

(d)    If the Company acquires none or less than all of the Repurchased Units, then (i) the Company shall notify each Class B Member (other than the Class B Employee whose employment has been terminated) of the total number of Repurchased Units and the number of Repurchased Units that were not acquired by the Company (the "Remaining Repurchased Units") and (ii) each Class B Member (other than the Class B Employee whose employment has been terminated), or its nominee or assignee, for a period of fifteen (15) days following the date of such notice (which fifteen (15) day period shall automatically be extended to the extent and for so long as the repurchase is prohibited by the Company's credit facilities), shall have the option to purchase, and cause such terminated Member (and any transferees thereof) to sell, all or any portion of the Remaining Repurchased Units (and any transferees thereof) (the "Class B Member Repurchase Right"). The Class B Member Repurchase Right shall be exercised by written notice to the Company and the Member whose employment has been terminated given in accordance with Section 11.03 of this Agreement and shall state the amount of the Remaining Repurchased Units such Class B Member desires to purchase. Any Class B Member that has not notified the Company and the terminated Member in writing of the amount of Remaining Repurchased Units such Class B Member desires to purchase within such fifteen (15) day period shall be deemed to have elected not to exercise its right to purchase all or any portion of such Remaining Repurchased Units hereunder. If the Class B Members in the aggregate elect to purchase more Units than are available, the Company will allocate the available Remaining Repurchased Units among such Class B Members in proportion to the amount of such Remaining Repurchased Units requested to be purchased by each such Class B Member. The purchase price payable by each Class B Member (or its nominee or assignee) for the Remaining Repurchased Units purchased upon exercise of the Class B Member Repurchase Right shall be value determined in accordance with Section 7.06(b). The purchase of any Remaining Repurchased Units shall take place on a date specified by the Company, but in no event later than 30 days following the expiration of the fifteen (15) day period during which the Class B Members may exercise their Class B Member Repurchase Right. On such date, (i) the terminated Class B Member shall Transfer the number of Remaining Repurchased Units to each Class B Member that elected to purchase such Remaining Repurchased Units as determined in accordance with the provisions of this Section 7.06(d) and shall execute any instruments reasonably requested by the Company or the Class B Members to evidence such Transfer and (ii) the Class B Members exercising their Class B Member Repurchase Right shall pay to the

52

terminated Class B Member his or her respective purchase price, which shall be payable in cash or by bank or cashier's check.

# ARTICLE VIII.
## TAXES

**8.01   Tax Returns**.  The Board of Managers will cause to be prepared and filed all necessary federal, state and local income tax returns for the Company, including making the elections described in <u>Section 8.02</u>.  Each Member will furnish to the Board of Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.  The Board of Managers will prepare or cause to be prepared all federal, state and local tax returns on a timely basis and will furnish to each Member copies of all income tax returns that are actually filed promptly after their filing.

**8.02   Tax Elections**.  The Company will make the following elections (to the extent not previously made and currently effective) in the appropriate manner:

       (a)   to adopt the calendar year as the Company's Fiscal Year;

       (b)   to adopt the accrual method of accounting;

       (c)   if a distribution of Company property as described in Section 734 of the Code occurs or if a transfer of an Interest as described in Section 743 of the Code occurs, on request by notice from the transferring Member (if a transfer) or any Member (if a distribution), to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties;

       (d)   to elect to amortize the start-up expenses of the Company under Section 195 of the Code ratably over a period of one hundred eighty (180) months as permitted by Section 709(b) of the Code; and

       (e)   any other election the Board of Managers may deem appropriate and in the best interests of the Members.

It is the intent of the Members that the Company be treated as a partnership for federal income tax purposes and, to the extent permitted by applicable law, for state and local franchise and income tax purposes.

**8.03   Tax Matters Partner**.  The Board of Managers will select a "tax matters partner" within the meaning of Code Section 6231(a)(7), subject to replacement from time to time by the Board of Managers.  The initial "tax matters partner" of the Company shall be Riverstone.  The Company will reimburse the "tax matters partner" for all costs and expenses incurred by the "tax matters partner" in connection with it serving as "tax matters partner" with respect to the Company.  The "tax matters partner" will take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code.  The "tax matters partner" will inform each other Class A Member and Class B Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625748

giving notice thereof reasonably promptly after becoming aware thereof and, within a reasonable time, will forward to each other Member copies of all significant written communications it may receive in that capacity. The "tax matters partner" may take any action contemplated by Sections 6222 through 6231 of the Code with the consent of the Board of Managers. The "tax matters partner" shall not take any action left to the determination of an individual Member under Sections 6222 through 6231 of the Code.

## ARTICLE IX.
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

**9.01   Maintenance of Books and Records**.  The books of account for the Company and other records of the Company will be located at the principal office of the Company or such other place as the Board of Managers may deem appropriate, and will be maintained on an accrual basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members will be maintained in accordance with Section 4.07 and the other terms of this Agreement.

**9.02   Reports**.  The Company will cause to be prepared or delivered such reports as the Board of Managers may require, including the reports described in Section 7.01.  The Company will bear the costs of such reports.

**9.03   Tax Information**.  Within 120 days after the end of the Company's tax year (or as soon as practicable thereafter) the Board of Managers will prepare and send, or cause to be prepared and sent, to each Person that was a Member at any time during such year copies of such information as may be required for applicable income tax reporting purposes arising solely by reason of the Company's activities, and such other information as a Member may reasonably request for the purpose of applying for refunds of withholding taxes.  At least twenty (20) days prior to filing any income tax return of the Company, the Company shall provide a draft copy of such tax return to Riverstone and the Class B Members for their review and comment and, before filing such return, the Company shall make all reasonable changes requested by such Members.  The Company shall also (i) cause an estimated Internal Revenue Service Schedule K-1 or any successor form to be prepared and delivered to Riverstone and each Class B Member for each Fiscal Year by December 1st of each such Fiscal Year including an estimate of state and local apportionment information, (ii) a draft Internal Revenue Service Schedule K-1 or any successor form to be prepared and delivered to each Member by each Fiscal Year within sixty (60) days after the end of such Fiscal Year and (ii) provide any other information a Member reasonably requests for purposes of complying with applicable tax reporting requirements that arise as a result of it being a Member in the Company.

**9.04   Bank Accounts**.  The Board of Managers will cause the Company to establish and maintain one or more separate bank or investment accounts for Company funds in the Company name with such financial institutions and firms as the Board of Managers may select and with such signatories thereon as the Board of Managers may designate.

## ARTICLE X.
## DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

NY\5767490

CONFIDENTIAL   BLFG_EDPA1625749

**10.01   Dissolution**.   The Company will dissolve and its affairs will be wound up upon the first to occur of any of the following (each, a "Liquidation Event"):

(a)    the consent of a majority of the Board of Managers to such dissolution;

(b)    the occurrence of any other event causing dissolution of the Company under the Act; or

(c)    the sale of all or substantially all of the assets of the Company

provided, however, that, upon dissolution pursuant to clause (b) of this Section 10.01, any or all of the remaining Members may elect to continue the business of the Company within ninety (90) days of the occurrence of the event causing such dissolution.   The death, resignation, bankruptcy, insolvency or expulsion of any Member will not dissolve the Company.

**10.02   Liquidation and Termination**.   On dissolution of the Company, the Board of Managers may appoint one or more other Persons as liquidator(s).   The liquidator will proceed diligently to wind up the affairs of the Company and make final distributions as provided herein. The costs of liquidation will be borne as a Company expense.   Until final distribution, the liquidator will continue to operate the Company properties with all of the power and authority of the Managers.   The steps to be accomplished by the liquidator are as follows:

(a)    as promptly as possible after dissolution and again after final liquidation, the liquidator will cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b)    the liquidator will pay from Company funds all of the debts and liabilities of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision therefor (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c)    the Company will dispose of all remaining assets as follows:

(i)    the liquidator may sell any or all Company property, and any resulting gain or loss from each sale will be computed and allocated to the Members pursuant to Section 5.03;

(ii)    with respect to all Company property that has not been sold, the fair market value of that property will be determined and the Capital Accounts of the Members will be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable Transfer of that property for the fair market value of that property on the date of distribution; and

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625750

(iii)   thereafter, Company property shall be distributed among the Members in accordance with <u>Section 5.01</u>.  All distributions made pursuant to this <u>Section 10.02(c)(iii)</u> will be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, within ninety (90) days after the date of such liquidation).

(d)   All distributions in kind to the Members will be made subject to the liability of each distributee for its allocable share of costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities will be allocated to the distributee pursuant to this <u>Section 10.02</u>.

**10.03   Cancellation of Filing**.  On completion of the distribution of Company assets as provided herein, the Company will be terminated, and the Board of Managers (or such other Person or Persons as may be required) will cause the cancellation of the Certificate and any other filings made as provided in <u>Section 2.07</u> and will take such other actions as may be necessary to terminate the Company.

**10.04   Qualified Public Offering**.

(a)   Immediately prior to the effective date of the registration statement with respect to the first firm commitment underwritten offering of equity securities by the Company (or a successor thereto) or one of the Company's Affiliates ("<u>Publicly Offered Securities</u>", such offering, a "<u>Qualified Public Offering</u>"), all of the Class A Units, Class B Units and Class C Units will be converted into securities of any new entity formed for the purpose of owning the securities in the issuer of the Publicly Offered Securities, with the approval of the Board of Managers or, with respect to Class C Units, such adjustments may be made to the terms of <u>Section 5.01</u>, as are determined to be equitable by the Board of Managers, in its discretion, in connection with any equity incentive plan, program or arrangement that may be adopted or implemented for employees of the Company, its successor or their subsidiaries at the time of the Qualified Public Offering.  If converted, each Member's Units will be converted into that amount of equity securities which such Member would have received if the Company (or a successor thereto) had been liquidated following the sale of all of its assets to the Person making the public offering in return for the assumption of all of the Company's debts and the equity securities of the Person making the public offering to be outstanding after the public offering (other than the equity securities being sold to the public for the Person by the underwriters) (assuming for this purpose that liquidating distributions were made in accordance with <u>Section 5.01</u>); <u>provided</u>, however, that:

(i)   any unvested Class C Units under <u>Section 7.05</u> will be converted into restricted equity securities and will be subject to the same forfeiture and resale obligations that govern the Class C Units under this Agreement;

(ii)   if the Company issues more than one class of securities into which the Class A Units, Class B Units and Class C Units are to be converted, each Member will receive a share of each such class of Company equity securities in proportion to its share of deemed liquidating distributions described above; and

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625751

(iii)     if the Company or its successor or Company Affiliate completes a Qualified Public Offering other than in the form of a corporation, the Class A Units and the Class B Units will be converted into the securities of the public entity and its general partner or functional equivalent in the same proportion as the Class A Units and Class B Units are converted into securities of the public entity and its general partner or functional equivalent.

The market value of the equity securities being distributed will be deemed to be the price at which the Publicly Offered Securities were initially sold by the underwriters.

(b)     The terms of the Qualified Public Offering and of the Publicly Offered Securities and the board of directors (or similar managing body) and the officers of the Person making the Qualified Public Offering will be determined by the Board of Managers. Any conversion effected pursuant to this Section 10.04 that, when considered together with the Qualified Public Offering, will result in the Company being classified as a corporation for U.S. Federal income tax purposes ("Newco") will be effected in a manner that qualifies as a tax-free contribution of all Interests (or assets of the Company) to Newco in a transaction described in Section 351 of the Code, unless the Company is characterized as a partnership for U.S. Federal income tax purposes pursuant to Section 7704(c) of the Code or unless the Board of Managers otherwise determines that a conversion will not be effected in this manner.

## ARTICLE XI.
## GENERAL PROVISIONS

**11.01  Offset**.  Whenever the Company is to pay any sum to any Member, any amounts such Member owes the Company may be deducted from that sum before payment; provided, that the provisions of this Section 11.01, do not apply with respect to tax distributions under Section 5.02 for any Key Employee that has a Class B Equity Advance then outstanding.

**11.02  Expenses**.  Class A Members and Class B Members shall each be responsible for their respective expenses incurred in connection with the negotiation of this Agreement, including due diligence expenses, attorney's fees and other professional expenses.  After the Effective Date, the Company shall pay the Class A Members' reasonable out-of-pocket expenses, including legal fees, associated with monitoring their ongoing investment in the Company, including, but not limited to, any legal fees incurred in connection with a significant refinancing (including subsequent equity rounds), a reorganization or restructuring, a significant acquisition, or an exit by merger, sale, public offering or other such event of the Company.

**11.03  Notices**.  All notices, requests or consents provided for or permitted to be given under this Agreement will be in writing and will be given either by depositing such writing in the United States mail, addressed to the recipient, postage paid and certified with return receipt requested, or by depositing such writing with a reputable overnight courier for next day delivery, or by delivering such writing to the recipient in person, by courier or by facsimile transmission. A notice, request or consent given under this Agreement will be effective on receipt by the Person to receive it.  All notices, requests and consents to be sent to a Member will be sent to or made at the addresses given for that Member on the list attached hereto as Exhibit A or such other address as that Member may specify by notice to the other Members.  Any notice, request

NY\5767490

CONFIDENTIAL

BLFG_EDPA1625752

or consent to the Company will be sent to the principal office of the Company as set forth in Section 2.04.

**11.04   Entire Agreement; Supersedure**.  This Agreement (together with the Exhibits thereof) constitutes the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written. Notwithstanding any other provision of this Agreement, the Company may enter into agreements or other writings with any Member in respect of the Units of such Member, and the rights of the Company and obligations of such Member set forth in any such agreement or writing may establish rights in favor of the Company or limit the rights of such Member notwithstanding any other provision of this Agreement.

**11.05   Effect of Waiver or Consent**.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company will not constitute a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Unless otherwise provided herein, failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long such failure continues, will not constitute a waiver by that Person of its rights with respect to that default until the applicable limitations period has expired.

**11.06   Amendment or Modification**.

(a)      Except as otherwise provided herein, this Agreement may be amended or modified from time to time only by a written instrument that is adopted by the Board of Managers; provided, however, that, in no event shall this Agreement be amended, supplemented, or otherwise modified:  (i) to require any Member to make any additional Capital Contribution to the Company without that Member's prior written consent; (ii) in a manner that would materially adversely affect the rights attributable to the Class B Units in relation to the effect such amendment would have on the rights attributable to the Class A Units, without the prior written consent of the holders of a majority of the outstanding Class B Units; or (iii) in a manner that would materially adversely affect the rights attributable to the Class C Units in relation to the effect such amendment would have on the rights attributable to the Class A Units or Class B Units, without the prior written consent of the holders of a majority of the outstanding Class C Units.

(b)      Notwithstanding the proviso in Section 11.06(a), no consent of any Member will be required for the Board of Managers to make an amendment to Exhibit A in accordance with Section 3.01, or to make an amendment to this Agreement (i) to issue additional Units, to authorize and issue new classes or series of Units, or any other Equity Security, in each case, pursuant to the terms of this Agreement, including any Units with a liquidation preference on parity with or senior to the Class A Units, (ii) to admit additional Members in connection with any issuance of Units to such Persons pursuant to the terms of this Agreement, (iii) necessitated by a merger agreement or similar document provided that all consideration from such transaction is allocated among the Members as provided in this Agreement and any Equity Securities issued in such transaction are issued in accordance with the terms of this Agreement, (iv) necessary or advisable to reflect, account for and deal with appropriately the formation by the Company of, or

NY\5767490

CONFIDENTIAL                                                                                      BLFG_EDPA1625753

investment by the Company in, any Entity, (v) necessary or advisable to prevent the Company, any Member or any Manager from being subjected to the Investment Company Act of 1940 or the Investment Advisers Act of 1940, as amended, (vi) necessary or advisable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state agency or judicial authority or contained in any federal or state statute, or (vii) necessary or advisable to qualify or continue the qualification of the Company as a limited liability company under the laws of any state or to ensure that the Company will not be treated as an association taxable as a corporation or otherwise taxed as an entity for federal income tax purposes.

**11.07  Binding Effect**.   Subject to the restrictions on Transfer set forth in this Agreement, this Agreement will be binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**11.08  Governing Law; Severability**.   This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.  If any provision of this Agreement or its application to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby, and such provision will be enforced to the greatest extent permitted by law.

**11.09  Jurisdiction and Venue**.  IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, EACH OF THE PARTIES HERETO CONSENTS TO THE JURISDICTION AND VENUE OF ANY FEDERAL OR STATE COURT LOCATED WITHIN THE STATE OF DELAWARE, WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON HIM, CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY FIRST CLASS REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, DIRECTED TO HIM AT THE ADDRESS SPECIFIED PURSUANT TO SECTION 11.03, AGREES THAT SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT THEREOF, AND WAIVES ANY OBJECTION TO JURISDICTION OR VENUE OF, AND WAIVES ANY MOTION TO TRANSFER VENUE FROM, ANY OF THE AFORESAID COURTS.

**11.10  Waiver of Jury Trial**.  THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH.

**11.11  Further Assurances**.  In connection with this Agreement and the transactions contemplated thereby, each Member will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.  The Class A Member acknowledges that certain Class B Members or their Affiliates have made personal guarantees for the benefit of the Company and its Subsidiaries.  The Class A Members, without the obligation to expend capital or make a Capital Contribution, agree to cooperate with the

59

CONFIDENTIAL                                                          BLFG_EDPA1625754

Company and the Class B Members to have such guarantees removed in their entirety or be replaced, as soon as reasonably practicable following the Effective Date, by the guarantee of the Company or a Subsidiary.  In any event and without diminishing the agreement of the Class A Members in the immediately preceding sentence, the Company agrees to have such guarantees removed in their entirety or be replaced by the guarantee of the Company or a Subsidiary prior to a Liquidity Event or Qualified Public Offering.

**11.12   Title to Company Property**.  All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company, and no Member, individually, shall have any ownership of such property.  The Company shall hold all of its property in its own name.

**11.13   Third-Party Beneficiaries**.  Except as set forth in Sections 6.05, 6.06 and 6.07, this Agreement is solely for the benefit of the parties hereto and their respective successors and permitted assigns and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim of liability or reimbursement, cause of action or other right.

**11.14   Waiver of Certain Rights**.  To the maximum extent permitted by applicable law, each Member irrevocably waives any right it might have to maintain any action for dissolution of the Company, or to maintain any action for partition of the property of the Company.

**11.15   Counterparts**.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts will be construed together and constitute the same instrument.

*[Signature pages follow.]*

NY\5767490

CONFIDENTIAL                                        BLFG_EDPA1625755

IN WITNESS THEREOF, the undersigned have executed this Agreement effective as of the Effective Date.

<u>CLASS A MEMBERS:</u>

**RIVERSTONE V BRIDGER HOLDINGS, L.P.**

By:   RIVERSTONE ENERGY PARTNERS V, L.P., its general partner

By:   RIVERSTONE ENERGY GP V, LLC, its general partner

By: _____

Name:  Andrew W. Ward
Title:   Authorized Person

[Signature Page to Second Amended and Restated LLC Agreement]

CONFIDENTIAL

BLFG_EDPA1625756

CLASS B MEMBERS:

BALLENGEE INTERESTS, LLC

By: _____
Name: Julio E. Rios, II
Title: Manager

RIOS HOLDINGS, INC.

By: _____
Name: Julio E. Rios II
Title: President and CEO

GAMBOA ENTERPRISES, LLC

By: _____
Name: Julio E. Rios II
Title: Manager

[Signature Page to Second Amended and Restated LLC Agreement]

BLFG_EDPA1625757

**Exhibit A**

**Members, Capital Contributions, Capital Accounts and Units**

| Name and Address | Initial Capital Contribution | Post-Closing Commitment | Additional Capital Contributions | Total Capital Contributions | Capital Account as of the Effective Date | Class A Units | Class B Units | Percentage Interest |
|---|---|---|---|---|---|---|---|---|
| *Riverstone V Bridger Holdings, L.P. c/o Riverstone Holdings LLC 712 Fifth Avenue, 51st Floor New York, N.Y. 10019* | $103,000,000.00 | The Class A Capital Commitment | — | $103,000,000 | $103,000,000 | 1,030,000 | — | 41.1791% |
| *Ballengee Interests, LLC 15510 Wright Brothers Drive Addison, TX 75001 Attention: James Ballengee* | $102,988,971.10 | $30,450,000 | — | $102,988,971.10 | $102,988,971.10 | — | 1,029,890 | 41.1747% |
| *Rios Holdings, Inc. 15510 Wright Brothers Drive Addison, TX 75001 Attention: Julio E. Rios, II* | $29,425,420.31 | $8,700,000 | — | $29,425,420.31 | $29,425,420.31 | — | 294,254 | 11.7642% |
| *Gamboa Enterprises, LLC 15510 Wright Brothers Drive Addison, TX 75001 Attention: Jeremy H. Gamboa* | $14,712,710.16 | $4,350,000 | — | $14,712,710.16 | $14,712,710.16 | — | 147,127 | 5.8821% |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

A-1

CONFIDENTIAL

BLFG_EDPA1625758

**Exhibit B**

**Adoption Agreement**

This Adoption Agreement is executed by the undersigned pursuant to the Second Amended and Restated Limited Liability Company Agreement of Bridger, LLC (the "Company"), dated as of July 1, 2013, as amended from time to time, a copy of which is attached hereto and is incorporated herein by reference (the "Agreement").  By the execution of this Adoption Agreement the undersigned agrees as follows:

1.      Acknowledgment.  The undersigned acknowledges that he/she/it is acquiring a limited liability company interest in the Company as a Class A Member/Class B Member/Class C Member, subject to the terms and conditions of the Agreement (including the Exhibits thereto), as amended from time to time.  Capitalized terms used herein without definition are defined in the Agreement and are used herein with the same meanings set forth therein.

2.      Agreement.  The undersigned hereby joins in, and agrees to be bound by, and subject to, the Agreement (including the Exhibits thereto), as amended from time to time, with the same force and effect as if it were originally a party thereto.

3.      Representations and Warranties.

(a)      The limited liability company interests will be acquired in a transaction pursuant to Rule 506 of Regulation D of the Securities Act of 1933, as amended (the "Act") and have the status of securities acquired in a transaction under Section 4(2) of the Act.  The limited liability company interests have not been registered under the Act and cannot be resold without registration under the Act or an exemption therefrom.

(b)      The undersigned is not an underwriter within the meaning of Section 2(11) of the Act.  Pursuant to Section 2(11) of the Act, the term "underwriter" means "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission."

4.      Notice.  Any notice required or permitted by the Agreement shall be given to the undersigned at the address listed below, which address shall be included in Exhibit A to the Agreement as if originally provided therein.

[Name of Transferee]

By:    _____
Name:_____
Title:_____
Address:_____

B-1

CONFIDENTIAL

BLFG_EDPA1625759

**Exhibit C**

**Consent of Spouse**

I, the undersigned, the spouse of _____, a Member of Bridger, LLC (the "Company") named in the Amended and Restated Limited Liability Company Agreement of the Company (the "Agreement") acknowledge that I have read the Agreement and that I understand its contents. I hereby consent to and approve of the provisions of the Agreement, as it may be amended from time to time in accordance with its terms, and agree that the Units held by my spouse and my interest in such Units are subject to such provisions. I agree that I will take no action at any time to hinder the operations of the Company.

Dated: _____, 20___

_____
Name:_____
Address:_____

C-1

CONFIDENTIAL                                      BLFG_EDPA1625760

**Exhibit D**

**Registration Rights**

Capitalized terms not defined in this Exhibit D shall have the meanings set forth in the Agreement. As used in this Exhibit D, the following terms have the following meanings:

"Commission" means the Securities and Exchange Commission.

"Holder" means any Person that was a member of Newco immediately prior to a Qualified Public Offering owning Registrable Securities indirectly through, and in proportion to its holding in, Newco that have not been sold to the public.

"Newco Percentage Interest" means a fraction, the numerator of which is the number of equity securities in Newco held by a Holder at a given time following conversion of its Units into equity securities of Newco in accordance with Section 11.04 of this Agreement, and the denominator of which is the total number of outstanding equity securities at such time in Newco.

"Registrable Securities" means securities of the Public Entity owned by a Holder indirectly through, and in proportion to its holding in, Newco and that are the same class as the Publicly Offered Securities.

"Registration Expenses" means, except for Selling Expenses, all expenses incurred by the Public Entity in effecting any registration pursuant to this Agreement, including all registration, qualification and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Public Entity, blue sky fees and expenses, the expense of any special audits incident to or required by any such registration and the reasonable fees and disbursements of one special legal counsel to represent all of the Holders together.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Selling Expenses" means all underwriting discounts and selling commissions applicable to the securities registered by the Holders.

Unless the context otherwise requires, all references to Sections in this Exhibit E refer to Sections of this Exhibit E.

Section 1.            *Demand Registration Rights*

(a)     *General.*  If the Company or successor entity (such successor entity for purposes of this Exhibit E, the *"Public Entity"*) shall receive from any Class A Member or Class B Member, at any time after six (6) months after the Public Entity has closed a Qualified Public Offering, a written request that the Public Entity file a registration statement (including a shelf registration statement pursuant to Rule 415) with respect to any of such Member's Registrable Securities (the sender(s) of such request or any similar request pursuant to Sections 1 to 13 shall be known as the "Initiating Holder(s)"), then the Public Entity shall, within thirty (30) days of the receipt

D-1

CONFIDENTIAL                                                                                        BLFG_EDPA1625761

thereof, give written notice of such request to all Holders, and subject to the limitations of this Section 1, use its reasonable best efforts to effect, as soon as practicable, the registration under the Securities Act of all Registrable Securities that the Holders request to be registered within twenty (20) days after delivery of the Company's notice. The Public Entity shall not be obligated to take any action to effect any such registration:

(i)      at the request of any Class A Member, after it has effected five (5) such registrations at the request of such Class A Member pursuant to this Section 1, and such registrations have been declared or ordered effective; or at the request of any Class B Member, after it has effected five (5) such registrations at the request of such Class B Member pursuant to this Section 1, and such registrations have been declared or ordered effective;

(ii)     during the period starting with the date sixty (60) days prior to its good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a Public Entity-initiated  registration (other than a registration relating solely to the sale of securities to employees of the Public Entity pursuant to a stock option, stock purchase or similar plan), provided that the Public Entity is actively employing in good faith all reasonable efforts to cause such registration statement to become effective;

(iii)    where the anticipated offering price, net of any underwriting discounts or commissions, is equal to or less than twenty-five million dollars ($25,000,000);

(iv)    if the Public Entity shall furnish to such Holders a certificate signed by the President of the Public Entity stating that in the good faith judgment of the board of directors or general partner (as applicable) of the Public Entity it would be seriously detrimental to the Public Entity and its equity holders for such registration statement to be filed at the time filing would be required and it is therefore essential to defer the filing of such registration statement, the Public Entity shall have the right to defer such filing for a period of not more than one hundred twenty (120) days after receipt of the request of the Holders, provided that the Public Entity shall not defer its obligation in this manner more than once in any twelve (12) month period; or

(v)     in any particular jurisdiction in which the Public Entity would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance.

(b)     *Underwriting.*   The Public Entity (together with all Holders proposing to distribute their securities through such underwriting) shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Initiating Holders and reasonably acceptable to the Company. Notwithstanding any other provision of this Section 1, if the underwriter advises the Initiating Holders in writing that marketing factors require a limitation of the number of Registrable Securities to be underwritten, the Initiating Holders shall so advise all Holders of Registrable Securities that would otherwise be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the registration and underwriting shall be allocated (i) if the Initiating Holders are Class A Members, first among all Holders that are Class A Members in proportion, as nearly as practicable, to the respective amounts of Registrable Securities held by such Holders at the time

D-2

CONFIDENTIAL                                                                                          BLFG_EDPA1625762

of filing of the registration statement and then to the Holders that are Class B Members or (ii) if the Initiating Holders are Class B Members, first among all Holders that are Class B Members in proportion, as nearly as practicable, to the respective amounts of Registrable Securities held by such Holders at the time of filing of the registration statement and then to the Holders that are Class A Members. If any Holder of Registrable Securities disapproves of the terms of the underwriting, such Person may elect to withdraw therefrom by written notice to the Public Entity, the managing underwriter and the Initiating Holders. The Registrable Securities so excluded or withdrawn shall not be transferred in a public distribution prior to one hundred eighty (180) days after the effective date of such registration. If by the withdrawal of such Registrable Securities a greater number of Registrable Securities held by other Holders may be included in such registration (up to the maximum of any limitation imposed by the underwriters), then the Public Entity shall offer to all Holders who have included Registrable Securities in the registration the right to include additional Registrable Securities in the same proportion used in determining the underwriter limitation in this Section 1(b). If the underwriter has not limited the number of Registrable Securities to be underwritten, the Public Entity may include securities for its own account if the underwriter so agrees and if the number of Registrable Securities which would otherwise have been included in such registration and underwriting will not thereby be limited.

Section 2.       *Piggyback Registrations*

(a)      *General.*       If, at any time or from time to time, beginning with the Public Entity's Qualified Public Offering, the Public Entity shall determine to register any of its securities for its own account in connection with an underwritten offering of its securities to the general public for cash on a form which would permit the registration of Registrable Securities (including but not limited to the Public Entity's Qualified Public Offering), the Public Entity will:

(i)      promptly give to each Holder written notice thereof; and

(ii)      include in such registration and in the underwriting involved therein, all the Registrable Securities specified in a written request or requests, made within twenty (20) days after mailing or personal delivery of such written notice from the Public Entity, by any Holders, except as set forth in Section 2(b);

provided, however, that the Public Entity may withdraw any registration statement at any time before it becomes effective, or postpone or terminate the offering of securities, without obligation or liability to any Holder.

(b)      *Underwriting.*  The right of any Holder to registration pursuant to this Section 2 shall be conditioned upon such Holder's participation in the underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their Registrable Securities through such underwriting shall (together with the Public Entity) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Public Entity. Notwithstanding any other provision of this Section 2, if the underwriter determines that

D-3

CONFIDENTIAL                                                           BLFG_EDPA1625763

marketing factors require a limitation of the number of Registrable Securities to be underwritten, the Public Entity shall so advise all Holders whose securities would otherwise be registered and underwritten pursuant hereto, and the number of Registrable Securities that may be included in the registration and underwriting shall be allocated in proportion, as nearly as practicable, to the respective amounts of Registrable Securities entitled to inclusion in such registration held by such Holders at the time of filing the registration statement. If any Holder disapproves of the terms of any such underwriting, the Holder may elect to withdraw therefrom by written notice to the Public Entity and the underwriter. Any Registrable Securities so excluded or withdrawn shall not be transferred in a public distribution prior to one hundred eighty (180) days after the effective date of such registration statement.  If by the withdrawal of such Registrable Securities a greater number of Registrable Securities held by other Holders may be included in such registration (up to the maximum of any limitation imposed by the underwriters), then the Public Entity shall offer to all Holders who have included Registrable Securities in the registration the right to include additional Registrable Securities in the same proportion used in determining the underwriter limitation in this Section 2(b).

Section 3.      *Registration Expenses*

All Registration Expenses incurred in connection with any registration, filing, qualification or compliance pursuant to Sections 1 and 2 shall be borne by the Public Entity.  All Selling Expenses relating to securities registered by the Holders shall be borne by the holders of such securities pro rata on the basis of the number of Registrable Securities so registered; provided, however, that the Public Entity shall not be required to pay for expenses of any registration proceeding commenced pursuant to Sections 1 or 2, the request of which has been subsequently withdrawn by the Initiating Holders unless the withdrawal is based upon (a) material adverse information concerning the Public Entity of which the Initiating Holders were not aware at the time of such request or (b) a material adverse change in the financial markets that has occurred since the registration request.

Section 4.      *Further Obligations of the Public Entity*

Whenever required under Sections 1 or 2 to effect the registration of any Registrable Securities, the Public Entity shall, as expeditiously as reasonably possible:

(a)      Prepare and file with the Commission a registration statement with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for up to ninety (90) days for a non-shelf registration statement or until the Holder or Holders have completed the distribution described in the registration statement, whichever first occurs, and with respect to a shelf registration statement, keep such shelf registration statement effective with the Commission until all Registrable Securities covered by such shelf registration statement have been distributed as set forth therein.

(b)      Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as

D-4

CONFIDENTIAL                                                                                    BLFG_EDPA1625764

may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(c)     In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering.  Each Holder participating in such underwriting shall also enter into and perform his or its obligations under such agreement.

(d)     Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

Section 5.     *Further Information Furnished by Holders*

It shall be a condition precedent to the obligations of the Public Entity to take any action pursuant to Sections 1 through 4 that the Holders shall furnish to the Public Entity such information regarding themselves, the Registrable Securities held by them, and the intended method of disposition of such securities as shall be required to effect the registration of their Registrable Securities.

Section 6.     *Indemnification*

In the event any Registrable Securities are included in a registration statement under Sections 1 or 2:

(a)     To the extent permitted by law, the Public Entity will indemnify and hold harmless each Holder, each of the officers, directors, equityholders and agents of each Holder, any underwriter (as defined in the Securities Act) for such Holder and each Person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or Exchange Act, against any losses, claims, damages or liabilities (joint or several) to which they may became subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (collectively a "Violation"): any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto or any free writing prospectus, "road show" presentation or other document incident to the registration or qualification of the Registrable Securities; the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or any violation or alleged violation by the Public Entity of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law; and the Public Entity will reimburse each such Holder, officer, director, equityholder or agent, underwriter or controlling Person for any legal or other expenses reasonably incurred by them in

D-5

| HN\814267.5||
NY\5767490.17

connection with investigating or defending any such loss, claim, damage, liability, or action; provided, however, that the indemnity agreement contained in this Section 6(a) shall not apply to any loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder or underwriter.

(b)     To the extent permitted by law, each Holder will, if Registrable Securities held by such Person are included in the securities as to which such registration, qualification or compliance is being effected, indemnify and hold harmless the Public Entity, each of its directors and officers, each legal counsel and independent accountant of the Public Entity, each Person, if any, who controls the Public Entity within the meaning of the Securities Act, each underwriter (within the meaning of the Securities Act) of the Public Entity's securities covered by such a registration statement, any Person who controls such underwriter, and any other Holder selling securities in such registration statement and each of its directors, officers, equityholders or agents or any Person who controls such Holder, against any losses, claims, damages, or liabilities (joint or several) to which the Public Entity or any such underwriter, other Holder, director, officer, equityholder or agent or controlling Person may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such registration, and each such Holder will reimburse any legal or other expenses reasonably incurred by the Public Entity or any such underwriter, other Holder officer, director, equityholder or agent or controlling Person in connection with investigating or defending any such loss, claim, damage, liability, or action; provided, however, that the indemnity agreement contained in this Section 6(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and provided, that in no event shall any indemnity under this Section 6(b) exceed the net proceeds from the offering received by such Holder.

(c)     Promptly after receipt by an indemnified party under this Section 6 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 6, notify the indemnifying party in writing of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure of any indemnified party to notify an indemnifying party within a reasonable time of the commencement of any such action, if prejudicial to its ability to defend such action, shall relieve such indemnifying party of liability to the indemnified party under this Section 6 only to the extent that such failure to give notice shall materially prejudice the indemnifying party in the defense of any such claim or any such litigation, but the omission so to notify the indemnifying

D-6

CONFIDENTIAL                                                     BLFG_EDPA1625766

party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 6.

(d)     If the indemnification provided for in this Section 6 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any losses, claims, damages or liabilities referred to herein, the indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall to the extent permitted by applicable law contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the Violation(s) that resulted in such loss, claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; provided, that in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by such Holder.

(e)     The obligations of the Public Entity and the Holders under this Section 6 shall survive completion of any offering of Registrable Securities in a registration statement.

Section 7.     *Rule 144 Reporting*

With a view to making available to the Holders the benefits of Rule 144 promulgated under the Securities Act ("Rule 144") and any other rule or regulation of the Commission that may at any time permit a Holder to sell securities of the Public Entity to the public without registration or pursuant to a registration on Form S-3, the Public Entity agrees to use commercially reasonable efforts to:

(a)     make and keep public information available as those terms are understood and defined in Rule 144, at all times after the effective date of the first registration statement filed by the Public Entity for the offering of its securities to the general public;

(b)     file with the Commission in a timely manner all reports and other documents required of the Public Entity under the Securities Act and the Exchange Act; and

(c)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request, a written statement by the Public Entity that it has complied with the reporting requirements of Rule 144, the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), a copy of the most recent annual or quarterly report of the Public Entity and such other reports and documents so filed by the Public Entity and such other information as may be reasonably requested in availing any Holder of any rule or regulation of the Commission which permits the selling of any such securities without registration or pursuant to such form.

D-7

CONFIDENTIAL

BLFG_EDPA1625767

Section 8.    *Assignment of Rights*

For so long as this Agreement is in effect, the rights to cause the Public Entity to register Registrable Securities pursuant to Sections 1 or 2 may only be assigned without the prior consent of the Board of Managers if such assignment is in conjunction with a valid Transfer of Units which does not require the prior consent of the Board of Managers under this Agreement. If this Agreement is no longer in effect, a Holder may assign its rights hereunder without the Public Entity's consent to an assignee of Registrable Securities which (i) is a Family Member or trust for the benefit of one or more of such Persons and/or the Holder, (ii) is a legatee, executor or other fiduciary pursuant to a last will and testament of the Holder or pursuant to the terms of my trust which take effect upon the death of the Holder. Furthermore, any Holder may assign his rights hereunder without the Public Entity's prior written consent to any party; provided, that such assignment occurs in connection with the transfer of all, but not less than all, of such Registrable Securities in a single transaction (to the extent such transfer is otherwise permissible). Any assignment pursuant to this Section 8 shall be conditioned upon prior written notice to the Company or the Public Entity identifying the name and address of the assignee and any other material information as to the identity of such assignee as may be reasonably requested.

Section 9.    *Amendment of Registration Rights*

Any provision of Sections 1 through 13 may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of (a) the Company or the Public Entity and (b) the Holders of at least sixty-six and two-thirds percent (66⅔%) of the Registrable Securities or securities convertible into Registrable Securities (including Units). Any amendment or waiver effected in accordance with this Section 9 shall be binding upon each Holder, the Company and the Public Entity.

Section 10.    *Delay of Registration*

(a)    Following the second anniversary of a Qualified Public Offering, a Holder's registration rights and obligations will expire if all Registrable Securities held by and issuable to such Holder may be sold under Rule 144 during any ninety (90) day period.

(b) No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of Sections 1 through 13.

(c)    Following the fifth anniversary of a Qualified Public Offering, all Holders registration rights and obligations under this Exhibit D will terminate.

Section 11.    *Limitations on Subsequent Registration Rights*

| HN\814267.5||
NY\5767490.17

CONFIDENTIAL                                                                 BLFG_EDPA1625768

From and after the Effective Date, the Company or the Public Entity may, without the prior written consent of the Holders, enter into any agreement with any holder or prospective holder of any securities of the Company or the Public Entity which provides such holder or prospective holder of securities of the Company or the Public Entity comparable, but not materially more favorable, registration rights to those granted to the Holders hereby.

Section 12.      *"Market Stand-off" Agreement*

Each Holder hereby agrees that it will not, to the extent requested by the Public Entity and an underwriter of securities of the Public Entity, sell or otherwise transfer or dispose of any Registrable Securities, except securities included in such registration, during the one hundred eighty (180)-day period following the effective date of a registration statement of the Public Entity or the date of the final prospectus thereto, as applicable, filed under the Securities Act; provided, however, that all other Persons with registration rights (whether or not pursuant to this Agreement) enter into similar agreements.  In order to enforce the foregoing covenant, the Public Entity may impose stop-transfer instructions with respect to the Registrable Securities of each Holder (and the units or securities of every other Person subject to the foregoing restriction) until the end of such one hundred eighty (180)-day period. In addition, if (1) during the last seventeen (17) days of the applicable restricted period set forth above the Company issues an earnings release or material news or a material event relating to the Company occurs or (2) prior to the expiration of the applicable restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of such restricted period, unless otherwise waived by the applicable managing underwriters in their sole discretion, then the foregoing restrictions shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event, unless the Company then has actively traded securities, as defined in Rule 101(c)(1) of Regulation M of the Exchange Act.

| HN\814267.5||
NY\5767490.17

CONFIDENTIAL

BLFG_EDPA1625769

**Exhibit E**

**Officers**

| Officer | Position |
|---|---|
| Julio E. Rios, II | President, Chief Executive Officer |
| Jeremy H. Gamboa | Execuve Vice President, Chief Operating Officer |
| Troy S. Lee | Senior Vice President, General Counsel, Secretary |

E-1

NY\5767490