**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 17-cv-00495-RK |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P. | ) | |
| | ) | |
| Defendants/Counterclaimants. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................

ARGUMENT ................................................................................ 5

    I.    THIS ACTION ARISES OUT OF THE BREACH OF A MARITIME CONTRACT & THUS FALLS WITHIN FEDERAL ADMIRALTY JURISDICTION ........................................................................... 5

        A.    The Court's Prior Finding of Jurisdiction Should Not Be Reopened ........ 5

        B.    This Action Arises Out of a Maritime Contract ................................ 6

        C.    Admiralty Jurisdiction Applies to a Suit for Breach of a Maritime Contract Against an Alter Ego No Less Than to a Suit Against the Nominal Contracting Party .................................................................. 7

        D.    Defendants' Other Jurisdictional Arguments Are Meritless .................... 10

    II.    DEFENDANTS OPERATED AS BTS' ALTER EGOS ....................................... 11

        A.    Eddystone Is Entitled to Summary Judgment on Its Alter Ego Claim ..... 11

        B.    Defendants' Request for Summary Judgment on the Alter Ego Claim Should Be Denied ............................................................... 20

    III.    DEFENDANTS' FRAUDULENT TRANSFERS REDUCED BTS' VALUE FROM BETWEEN $200-325 MILLION TO A MERE $10 ............................... 24

        A.    Eddystone Is Entitled to Summary Judgment on Its Fraudulent Transfer Claim as a Matter of Law .................................................... 24

        B.    Defendants' Request for Summary Judgment on the Fraudulent Transfer Claim Should Be Denied ...................................................... 33

        C.    Defendants' Implied Contract Arguments Are Both Irrelevant and Wrong ................................................................................ 44

    IV.    DEFENDANTS BREACHED THE FIDUCIARY DUTIES THEY OWED EDDYSTONE .......................................................................... 47

        A.    Eddystone Is Entitled to Summary Judgment on Breach of Fiduciary Duty ................................................................................ 47

        B.    The Court Should Deny Defendant's Motion for Summary Judgment on Breach of Fiduciary Duty .................................................... 50

CONCLUSION ................................................................................ 54

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3 Point Holdings, LLC v. Gulf South Solutions, LLC*,
   No. 06-10902, 2008 WL 695379 (M.D. La. Mar. 13, 2008) ...................................................53

*Abraham v. Lake Forest, Inc.*,
   377 So.2d 465 (La. App. 1979)..........................................................................................53

*Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co.*,
   752 F.2d 71 (3d Cir. 1985)................................................................................................51

*Ameriserv Fin. Bank v. Commercebank, N.A.*,
   No. CIV. A. 07-1159, 2009 WL 890583 (W.D. Pa. Mar. 26, 2009) .........................25, 29, 33

*Ariate Compania Naviera v. Commonwealth Tankship Owners*,
   310 F. Supp. 416 (S.D.N.Y. 1970).......................................................................................9

*Berg Chilling Sys. v. Hull Corp.*,
   435 F.3d 455 (3d Cir. 2006)...............................................................................................51

*Cantiere DiPortovenere Piesse S.p.A. v. Kerwin*,
   739 F. Supp. 231 (E.D. Pa. 1990) .......................................................................................21

*Cardiello v. Arbogast*,
   533 F. App'x 150 (3d Cir. 2013) .........................................................................................38

*Carroll v. Stettler*,
   941 F. Supp. 2d 572 (E.D. Pa. 2013) ..................................................................................25

*Clevo Co. v. Hecny Transp.*,
   715 F.3d 1189 (9th Cir. 2013) ......................................................................................46, 47

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures*,
   851 F. Supp. 2d 504 (S.D.N.Y. 2012)...................................................................................8

*Collet v. Am. Nat'l Stores*,
   708 S.W.2d 273 (Mo. App. 1986) .......................................................................................22

*Cooper v. Loper*,
   923 F.2d 1045 (3d Cir. 1991)...............................................................................................6

*In re Covenant Partners*,
   L.P., No. AP 16-226, 2017 WL 838637 (Bankr. E.D. Pa. Mar. 2, 2017).........................53, 54

*In re Diloreto*,
  No. 04-CV-1326, 2006 WL 2974156 (E.D. Pa. Oct. 13, 2006) ...........................................20

*Eclipse Liquidity, Inc. v. Geden Holdings Ltd.*,
  No. 20-1847, 2020 WL 3574540 (E.D. Pa. July 1, 2020) ........................................................8

*Elbeco Inc. v. Estrella de Plato, Corp.*,
  989 F. Supp. 669, 679 (E.D. Pa. 1997) ...................................................................................51

*Fid. Bond & Mortg. Co. v. Brand*,
  371 B.R. 708 (E.D. Pa. 2007) ..................................................................................................32

*Floyd v. Lykes Bros. S.S. Co.*,
  844 F.2d 1044 (3d Cir. 1988)...................................................................................................11

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*,
  380 F.3d 849 (5th Cir. 2004) ...................................................................................................22

*In re G-I Holdings, Inc.*,
  313 B.R. 612 (Bankr. D.N.J. 2004) ........................................................................................28

*Golden Horn Shipping Co. v. Volans Shipping Co.*,
  14-CV-2168 (JPO), 2017 WL 3535002 (S.D.N.Y. Aug. 16, 2017) .......................................49

*Ex parte Gordon*,
  104 U.S. 515 (1881)...................................................................................................................6

*Hammersmith v. TIG Ins. Co.*,
  480 F.3d 220 (3d Cir. 2007).....................................................................................................51

*Heaney v. Riddle*,
  23 A.2d 456 (Pa. Sup. Ct. 1942)..............................................................................................32

*Hooper v. Maruka Machinery*,
  525 So.2d 1113 (La. App. 1988)..............................................................................................53

*Hornyak v. Sell*,
  629 A.2d 138 (Pa. Super. 1993)...............................................................................................46

*Image Masters, Inc. v. Chase Home Fin.*,
  489 B.R. 375 (E.D. Pa. 2013), and (2).....................................................................................27

*In re Jolly's Inc.*,
  188 B.R. 832 (Bankr. D. Minn. 1995) .....................................................................................36

*Klein v. Weidner*,
  729 F.3d 280 (3d Cir. 2013).....................................................................................................25

iii

*Knapp v. Schaeffler Grp. USA Inc.*,
  No. 3:21-CV-05035-MDH, 2021 WL 2482410 (W.D. Mo. June 17, 2021) ..........................22

*Kossick v. United Fruit Co.*,
  365 U.S. 731 (1961).........................................................................................................46

*Landmark Cmty. Bank, N.A. v. Klingelhutz*,
  874 N.W.2d 446 (Minn. App. 2016).................................................................................40

*In re Main, Inc.*,
  239 B.R. 281 (Bankr. E.D. Pa. 1999) ..............................................................................50

*Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*,
  689 F. Supp. 1340 (S.D.N.Y. 1988)....................................................................................8

*In re Marquis Products, Inc.*,
  150 B.R. 487 (Bankr. D. Me. 1993)..................................................................................36

*In re Maxus Energy Corp.*,
  No. AP 18-50489-CSS, 2019 WL 4343722 (D. Del. Sept. 12, 2019) ...................................21

*In re Moll Indus., Inc.*,
  454 B.R. 574 (Bankr. D. Del. 2011) .................................................................................23

*Moore-McCormack Lines, Inc. v. Int'l Terminal Operating Co.*,
  619 F. Supp. 1406 (S.D.N.Y. 1985)..................................................................................11

*Mullins v. TestAmerica, Inc.*,
  564 F.3d 386 (5th Cir. 2009) (applying Texas UFTA)........................................................34

*Nat'l Loan Investors, L.P. v. World Prop., L.L.C.*,
  830 A.2d 1178 (Conn. App. 2003) ...............................................................................41, 42

*Nat'l Marine Serv., Inc. v. C.J. Thibodeaux & Co.*,
  380 F. Supp. 1076 (S.D. Tex. 1973) ..................................................................................8

*Navarette v. Silversea Cruises Ltd.*,
  620 F. App'x 793 (11th Cir. 2015) ..........................................................................47, 48, 49

*Ne. Marine Terminal Co. v. Caputo*,
  432 U.S. 249 (1977)..........................................................................................................6

*New Orleans Stevedoring Co. v. United States*,
  439 F.2d 89 (2d Cir. 1971)...............................................................................................11

*Nielsen v. Logs Unlimited, Inc.*,
  839 N.W.2d 378 (S.D. 2013) ...........................................................................................41

*Norfolk S. Ry. Co. v. Kirby*,
  543 U.S. 14 (2004)........................................................................................6, 7, 11

*NYKCool A.B. v. Pac. Int'l Servs., Inc.*,
  No. 12 CIV. 5754, 2013 WL 1274561 (S.D.N.Y. Mar. 29, 2013) ...........................................12

*Oetting v. Heffler, Radetich & Saitta, LLP*,
  No. 11-4757, 2017 WL 3453342 (S.D.N.Y. Aug. 11, 2017)..................................................49

*Ogea v. Merritt*,
  130 So.3d 888 (La. 2013) ....................................................................................53

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*,
  648 F.3d 258 (5th Cir. 2011) .................................................................................46

*Peacock v. Thomas*,
  516 U.S. 349 (1996)...........................................................................................21

*Peters v. Lifeline Sys. Co.*,
  No. 4:08CV1862 RWS, 2009 WL 3335098 (E.D. Mo. Oct. 15, 2009)....................................22

*Philadelphia Entertainment & Development Partners LP v. Department of Revenue*,
  860 F. App'x 25 (3d Cir. 2021) .............................................................................38

*Pink Goose (Cayman) Ltd. v. Sunway Traders LLC*,
  No. 08cv2351 (HB), 2008 WL 4619880 (S.D.N.Y. Oct. 17, 2008) ......................................8, 9

*Ragan v. Tri-Cty. Excavating, Inc.*,
  62 F.3d 501 (3d Cir. 1995)..........................................................................13, 15, 16

*Sabine Towing & Transp. v. Merit Ventures*,
  575 F. Supp. 1442 (E.D. Tex. 1983) ........................................................................9

*In re Shuey*,
  606 B.R. 760 (N.D. Ill. Bankr. 2019) .....................................................................39

*Siematic Mobelwerke GmbH v. Siematic Corp.*,
  643 F. Supp. 2d 675 (E.D. Pa. 2009) .....................................................................39

*In re Solomon*,
  299 B.R. 626 (10th Cir. B.A.P. 2003) .....................................................................35

*Sugartown Worldwide LLC v. Shanks*,
  No. 14-5063, 2015 WL 1312572 (E. D. Pa. Mar. 24, 2015) .................................................53

*Swift & Co. Packers v. Compania Colombiana del Caribe*,
  339 U.S. 683 (1950)........................................................................................7, 9

*Taylor v. Stanley Co. of Am.*,
  158 A. 157 (Pa. 1932) ........................................................................................47

*Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*,
  80 S.W.3d 601 (Tex. App. 2002) ......................................................................34

*In re TOUSA, Inc.*,
  680 F.3d 1298 (11th Cir. 2012) ........................................................................35

*Trustees of Nat. Elevator Indus. Pension v. Lutyk*,
  140 F. Supp. 2d 447 (E.D. Pa. 2001), *aff'd sub nom. Lutyk*, 332 F.3d 188 ............12

*United States v. Golden Acres, Inc.*,
  702 F. Supp. 1097 (D. Del. 1988), *aff'd sub nom. Golden Acres, Inc. v. Sutton
  Place Corp.*, 879 F.2d 857 (3d Cir. 1989) ........................................................12, 20

*United States v. Kindred Healthcare, Inc.*,
  469 F. Supp. 3d 431 (E.D. Pa. 2020) ................................................................12

*United States v. Pisani*,
  646 F.2d 83 (3d Cir. 1981) ................................................................12, 17, 20

*United States v. Thomas*,
  515 F. Supp. 1351 (W.D. Tex. 1981) ................................................................12

*United States v. Wexler*,
  31 F.3d 117 (3d Cir. 1994) ..................................................................................6

*Universal Computer Consulting, Inc. v. Pitcairn Enter., Inc.*,
  No. 03-2398, 2005 WL 2077269 (E.D. Pa. Aug. 26, 2005) ..............................37

*Vitol v. Primerose Shipping*,
  708 F.3d 527 (4th Cir. 2013) ..............................................................................7

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998) ................................................................................5

*Weber v. U.S. Sterling Sec.*,
  924 A.2d 816 (2007) ........................................................................................53

**Statutes**

15 Pa. Cons. Stat. Ann. § 8834(a) ..........................................................................52

1 Pa. Cons. Stat. § 1921(a) ................................................................................34, 38

12 Pa. Cons. Stat. § 5101(b) ..............................................................................34, 37

12 Pa. Cons. Stat. § 5101 cmt. (2) ....................................................................38, 39, 40

12 Pa. Cons. Stat. § 5102(b) ................................................................................27, 43, 44

12 Pa. Cons. Stat. § 5104(a)(1) ...........................................................................................24

12 Pa. Cons. Stat. §§ 5104(a)(1), 5107(a)(1), 5108(d) .......................................................25

12 Pa. Cons. Stat. § 5104(a)(2) ...........................................................................................32

12 Pa. Cons. Stat. § 5104(b)(1) ...........................................................................................29

12 Pa. Cons. Stat. § 5104(b)(2) ...........................................................................................29

12 Pa. Cons. Stat. § 5104(b)(3) ...........................................................................................29

12 Pa. Cons. Stat. § 5104(b)(5) ...........................................................................................27

12 Pa. Cons. Stat. § 5104(b)(9) ...........................................................................................27

12 Pa. Cons. Stat. § 5105 ...............................................................................................32, 36

13 Pa. Cons. Stat. § 9203(b) ...............................................................................................36

15 Pa. Cons. Stat. § 402(a)(2) .............................................................................................52

5 U.S.C. § 548 .....................................................................................................................17

J.B. Heaton, Solvency Tests, 62 Bus. Law. 983, 988–95 (2007) ..................................18, 19

La. R.S. §§ 12:1314(B) .......................................................................................................53

La. R.S. §§ 12:1314(C) .......................................................................................................53

**Other Authorities**

PWC, "Financial Instruments Under IFRS: A Guide Through the Maze," page 36,
        https://www.pwc.com/gx/en/ifrs-
        reporting/pdf/financial_instruments_guide_maze.pdf ...........................................43

U.S. Const. Art. III, § 2 .........................................................................................................5

**Glossary[1]**

| Acronym/Names | Description |
|---|---|
| Ballengee | James Ballengee, Executive Vice President and Chief Commercial Officer of Bridger, LLC |
| BTS | Bridger Transfer Services, LLC, subsidiary of Bridger Logistics and then Ferrellgas, previously worth between $202.5 and $324.9 million and sold for $10. |
| COSA | Crude Oil Supply Agreement.  The COSA was entered between Bridger Marketing and Monroe Energy, LLC |
| EBITDA | Earnings Before Interest, Taxes, Depreciation and Amortization |
| Eddystone Facility | The transloading facility built by Eddystone, pursuant to the Rail Services Agreement, on the Delaware River to transload crude oil from trains arriving from the Bakken region, in North Dakota, to barges bound for East Coast refineries.  The cost of building this transloading facility was about $172 million. |
| FAC | First Amended Complaint, filed by Eddystone in this case (Dkt. 182). |
| FG | Ferrellgas, L.P., a named defendant.  In June 2015, FG acquired Bridger Logistics LLC, along with BTS. |
| FG Acquisition | In June 2015, Ferrellgas Partners acquired Bridger's logistics business by buying Bridger Logistics and its operating subsidiaries, including BTS, for $837.5 million.  BTS was valued between $202.5 and $324.9 million at the time. |
| Gamboa | Jeremy Gamboa, the CEO and COO of Logistics.  Gamboa was a named defendant in this case. |
| Hampton | Trent Hampton was the Senior Vice President, Legal and Risk Management, of FG |
| Herrold | Jack Herrold was the Senior Vice President, Finance & Investor Relations, of FG |

---

[1] Although not required, this Glossary is included for the Court's convenience.  It contains acronyms, terms, and names that appear throughout this brief.

| | |
|---|---|
| Jamex Transfer Holdings, LLC | Jamex Transfer Holdings was an assetless subsidiary of Jamex LLC created for the purpose of purchasing BTS, at a contract price of ten dollars ($10). |
| Knapp | Patrick Knapp, Senior Counsel for Bridger Logistics and an employee of Ferrellgas, Inc. |
| Logistics | Bridger Logistics LLC, parent of non-party BTS |
| Marketing | Until June 2015, Bridger Marketing, a subsidiary of Bridger LLC, was run by James Ballengee.  Marketing purchased and sold crude oil and liquid petroleum gas and exchanged crude oil barrels under buy/sell arrangements.  After the FG Acquisition, FG left Marketing with Bridger LLC, but acquired the name "Bridger."  Marketing was renamed "Jamex Marketing" and its parent, "Jamex LLC." |
| Monroe | Monroe Energy, LLC, operator of a refinery on the Delaware River in Trainer, PA.  Monroe refines crude oil into refined products including jet fuel for Monroe's parent company, Delta Airlines. |
| Rios | Julio Rios was a former practicing lawyer.  He was also Executive Vice President of FG and a named defendant in this case. |
| RSA | Rail Services Agreement, entered into between plaintiff Eddystone and non-party Bridger Transfer Services, LLC. |
| SOF | Eddystone's Statement of Undisputed Facts, filed contemporaneously with this brief. |
| Soiefer | Todd Soiefer was the Senior Vice President for Strategic Development for FG as well as the Chief Financial Officer of Logistics. |
| Warmbold | Stephen L. Wambold was the Chief Executive Officer and President of FG Partners, LP and FG, LP.  He was also the General Partner of FG, Inc. |

## INTRODUCTION

This is a relatively simple case:  Defendants have a subsidiary which entered into a long-term maritime contract with plaintiff.  When the market shifted, Defendants stood to lose more than $140 million dollars.  Rather than honor the contract, Defendants transferred the subsidiary's assets to other entities that they owned and controlled.  SOF-¶¶89-121, 177-89.  As if looting the subsidiary were not enough to frustrate the contractual obligations, Defendants then transferred the subsidiary to an assetless entity of a third party for $10.  SOF-¶¶214-16. Defendants' expert agrees that seven months earlier when Defendants acquired the subsidiary, it had been worth between $202 and $325 million.  SOF-¶53.  This lawsuit concerns plaintiff's effort to hold the defendants liable for their own actions in causing the subsidiary to default on the multimillion-dollar contract.

The details of this scheme are drawn from defendants' own internal documents.  In early 2013, Eddystone entered into a rail services agreement ("RSA") with non-party Bridger Transfer Services, LLC ("BTS").  SOF-¶12.  Eddystone agreed to build and operate a facility ("Eddystone facility") on the Delaware River to transload crude oil from trains arriving from the Bakken region, in North Dakota, to barges bound for East Coast refineries.  SOF-¶¶13-15.  BTS agreed that for a five-year period, it would guarantee a monthly minimum volume commitment of crude oil deliveries through the facility (64,750 barrels of crude oil per day) or else pay a deficiency charge for shortfalls.  SOF-¶7.  Among other terms, the RSA required submission of disputes to the Society of Maritime Arbitrators for resolution.  Dkt. 491-27.

From March 2013 to April 2014, Eddystone built the promised transloading facility at a cost of about $172 million.  SOF-¶14.  Thereafter, Eddystone transloaded every trainload of crude oil that BTS delivered to the facility.  All of the crude oil leaving the Eddystone facility went on barges downstream to the Monroe oil refinery in Trainer, Pennsylvania.  SOF-¶¶22-25.

A BTS affiliate (Marketing) had an obligation to supply crude oil to Monroe Energy LLC. *Id.* This supply contract matched the same flow terms (roughly 65,000 barrels per day) and duration term (five years) as provided in the RSA. SOF-¶84.

In June 2015, Defendant Ferrellgas, L.P. ("FG") acquired BTS' parent, Bridger Logistics LLC, along with BTS. SOF-¶52. At the time of the acquisition, BTS was an active operating company with $104 million in revenue, $44 million in profits, and a net book worth of $38 million. SOF-¶50. FG valued BTS, by itself, at between $202.5 million and $324.9 million. SOF-¶210. Experts from both sides agree that BTS was worth in this range at acquisition. *Id.*

By early 2015, the price of crude oil dropped dramatically. For BTS's crude-marketing former affiliate Bridger Marketing, the continued rail delivery of Bakken crude to Philadelphia became uneconomic and, if crude prices and the Monroe contract remained unchanged, Marketing would eventually fail. SOF-¶¶128, 132. While this drop in prices did not immediately affect BTS' profitability, if Marketing collapsed and stopped delivering crude to Monroe, BTS still had an obligation under the RSA to pay for transloading. SOF-¶84. The parties that controlled BTS—the named Defendants—decided they wanted the option of evading BTS' remaining $140+ million contractual obligation to Eddystone if prices did not change or if Marketing could not renegotiate its Monroe contract. SOF ¶173; *see also* Ex. 21 of Marc Sherman Report (showing the actual deficiency payments still owed under the RSA to be $145.9 million, not including interest and present value calculations).

As the initial step, while Marketing was trying to renegotiate the Monroe contract, Defendants diverted BTS' revenues and profits from contract rights to other FG subsidiaries. SOF-¶¶89-116. To accomplish this, Defendants told their accountants they had created entities named "Bridger Rail Services, LLC" and "Bridger Pipeline Services, LLC"—although no such

subsidiaries ever actually existed—and assigned BTS' contracts to these fake entities.  SOF-¶¶91-107.  The accountants then credited these fictional entities with the revenues from BTS contracts, thereby transferring BTS' contractual revenues to them.  *Id.*  FG's accounting records and internal emails confirmed that BTS never saw any of the millions in revenue credited to "Bridger Rail Services" or "Bridger Pipeline Services."  SOF-¶¶91, 98, 100.  This diversion of revenue left BTS cash-flow insolvent, unable to pay its debts as they became due.  SOF-¶¶111-16.  Instead, other FG entities paid BTS' bills.  SOF-¶110.

By December 2015, prices had not materially changed and it was clear that Monroe would not agree to a contract modification that would make delivery of Bakken crude oil economic for Marketing.  SOF-¶133.  So, Defendants secretly negotiated a "suspension" of the Monroe agreement.  SOF-¶142.  This eliminated the contractual obligations owed by Marketing to supply crude oil to Monroe.  SOF-¶146.  By January 31, 2016, FG had completed the transfer of BTS' remaining assets to other FG subsidiaries.  SOF-¶¶177-89.  All of these transfers were concealed from Eddystone.  SOF-¶¶190-203.

Defendants not only left BTS without assets; it created new obligations for BTS.  On January 14, 2016, having put in place their plans to strip BTS' assets, Defendants caused BTS to grant a lien securing a $311.6 million debt to Bank of America for FG.  SOF-¶¶185-87.  The lien was itself part and parcel of Defendants' fraudulent scheme; a December 2015 email shows an FG executive emailing his outside counsel:  "Do our banks have liens on these [BTS] assets … If so, it would be a good way to restructure BTS and divest ourselves of Eddystone."  SOF-¶152.  (This same FG executive was also a former practicing lawyer whose last case was the unsuccessful defense of a client's fraudulent transfer scheme.)  Consistent with the quoted email, Defendants now contend that the lien shields the pilfered BTS assets from BTS' creditor

Eddystone.  Not so.  Because the creation of the lien was itself a fraudulent transfer, the lien is invalid and cannot impede Eddystone's fraudulent transfer claims.  In any event, even if the lien were valid, the encumbrance it placed on BTS' assets was too limited to shield the transfer of those assets from judicial scrutiny.

On February 1, 2016, the last BTS train left Eddystone.  SOF-¶218.  On February 22, 2016, FG sold BTS to a newly-formed, assetless affiliate of Marketing for $10.  SOF-¶218.  The sale documents represented that BTS had "no assets other than the Eddystone Agreement and the other Contracts" on which BTS still owed money.  SOF-¶215.  Thus, Defendants had pillaged all of BTS' remaining assets and sold BTS' shell for a total of $10.  SOF-¶¶209-11.  Once judgment-proof and distanced from Defendants, BTS defaulted on the contract with Eddystone.  SOF-¶¶218-22.

Unaware of Defendants' maneuverings, Eddystone initially sought relief under the RSA in a maritime arbitration against BTS.  SOF-¶223.  The arbitration discovery began to show the general parameters of the looting scheme including asset transfers.  After the arbitration's conclusion, Eddystone sued in this Court the persons and entities that had rendered BTS insolvent.  The operative complaint asserts four counts:  alter ego based on a maritime contract (Count I); fraudulent transfer based on actual intent (Count II) and based on constructive intent (Count III); and breach of fiduciary duty (Count IV).  Dkt. 182.  In discovery, FG refused to produce accounting records, and Eddystone filed motions to compel.  Dkt. 73, 183.  Eddystone learned about the diversion of revenues only after Judge Kelly directed FG to allow Eddystone's forensic accountants on site.  Dkt. 215.

Also during discovery, Eddystone found documentary evidence of fraudulent intent, and this Court ordered production of certain attorney/client documents, including email chains

entitled "Eddystone Restructuring."   Dkt. 59.   Defendants sought mandamus from the Third Circuit, claiming lack of jurisdiction and the lack of evidence for the crime/fraud exception.   The Court denied the writ.

**ARGUMENT**

## I.    THIS ACTION FALLS WITHIN FEDERAL ADMIRALTY JURISDICTION

"The [federal] judicial Power shall extend … to all Cases of admiralty and maritime Jurisdiction."   U.S. Const. Art. III, § 2.   Five years ago, Eddystone properly invoked that power by seeking recovery for breach of a maritime contract from Defendants under a theory (alter ego) that is an established part of admiralty law.   When Defendants first raised their jurisdictional challenge in January 2019, Judge Kelly rightly rejected it in a thorough 19-page opinion.   *See* Dkt. 308.   Defendants sought mandamus, which the Third Circuit denied after briefing.   See Appeal No. 19-2678, Order at 1 (3d Cir. Sept. 27, 2019).   This Court has no reason to disturb Judge Kelly's ruling, which is the law of the case and was entirely correct.

### A.    The Court's Prior Finding of Jurisdiction Should Not Be Reopened

Defendants concede that this Court has already found jurisdiction because Eddystone's Count I (Alter Ego) arises out of a maritime contract.   Dkt. 495-1 at 2; Dkt. 308 at 19 (Judge Kelly's Memorandum).   Apparently believing Judge Kelly's retirement entitles them to reopen rulings they do not like, Defendants purport to "renew their motion."   Dkt. 495-1 at 2.   They ignore the law-of-the-case doctrine—a doctrine of which Defendants are well aware, because Judge DuBois already explicitly applied it in rejecting another attempt to reopen Judge Kelly's rulings.   Dkt. 421 at 5-8.

"Under the law of the case doctrine, once an issue has been decided, parties may not relitigate that issue in the same case."   *Waldorf v. Shuta*, 142 F.3d 601, 616 n.4 (3d Cir. 1998). "The exceptions to the law of the case doctrine are narrow" (Dkt. 421 at 5), and none apply here.

5

While claiming to "renew their motion … on the basis of a factual record demonstrating a lack of jurisdiction" (Dkt. 495-1 at 2), Defendants do not seriously suggest that their argument turns on any new fact that has become available since Judge Kelly denied their Rule 12(b)(1) motion.  As such, the law-of-the-case doctrine forecloses that argument unless "reconsideration of [the] prior decision[] is necessary to prevent clear error or manifest injustice."  Dkt. 421 at 5.  This formulation is practically identical to the mandamus standard under which the Third Circuit considered and rejected Defendants' challenge to Judge Kelly's jurisdictional ruling.  *E.g.*, *United States v. Wexler*, 31 F.3d 117, 128 (3d Cir. 1994) ("the petitioner must prove that the district court committed a clear abuse of discretion or a clear error of law").  In any event, Judge Kelly's jurisdictional ruling was entirely proper for the following reasons.

### B.      This Action Arises Out of a Maritime Contract

"Admiralty jurisdiction extends to maritime contracts."  *Ex parte Gordon*, 104 U.S. 515, 516 (1881); *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22-23 (2004).  There is no longer an issue that this case involves a maritime contract.  While Defendants initially argued to Judge Kelly that the RSA is not a maritime agreement, they abandoned that argument when they sought mandamus from the Third Circuit and do not renew it here.  Judge Kelly explained that "the RSA's direct connection with the traditional maritime activity of loading a barge makes it akin to a stevedoring contract."  Dkt. 308 at 12; *see also Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 254 n.4 (1977).  "A 'stevedoring contract is a maritime contract' and a federal district court has jurisdiction over a claim for breach of such a contract under Section 1333."  *Cooper v. Loper*, 923 F.2d 1045, 1048 (3d Cir. 1991) (quoting *A&G Stevedores v. Elleman Lines*, 369 U.S. 355, 359 (1962)).

Judge Kelly was right.  As the Supreme Court has clarified, whether a contract is maritime or not "'depends upon … the nature and character of the contract,' and the true

criterion is whether it has 'reference to maritime service or maritime transactions.'" *Norfolk S.*, 543 U.S. at 24.  Like a traditional stevedoring contract, the RSA is a maritime contract because "the primary objective of the agreement was to transload the oil onto barges for the express purpose of the barges travelling down river to deliver the oil to refineries on the Delaware River."  Dkt. 308 at 13.

     **C.**     **Admiralty Jurisdiction Applies to a Suit for Breach of a Maritime Contract Against an Alter Ego**

Defendants' argument here appears to be that this is not an admiralty case because Eddystone seeks recovery for BTS' breach of a maritime contract *from Defendants* rather than suing BTS for that breach directly.  Dkt. 495-1 at 3-6.  This argument—which was also made, without success, to Judge Kelly and the Third Circuit—fails.  *See also* Dkt. 308 at 15-19 (Judge Kelly's analysis rejecting the argument).  Defendants argue that "alter ego" (also called veil piercing) is not an "independent cause of action."  *See* Dkt. 495-1 at 3-4.  But Eddystone plainly does have a claim against a subsidiary entity (BTS) for breach of a maritime contract (the RSA), a quintessential admiralty jurisdiction case.  The only question, then, is whether the case somehow loses its "salty flavor" (*Norfolk S.*, 543 U.S. at 22) because Eddystone is seeking to recover for the breach of the maritime contract from Defendants under an alter ego theory rather than from BTS directly.

The answer is no.  "[A] claim arising upon a [maritime] contract" is "obviously within admiralty jurisdiction."  *Swift & Co. Packers v. Compania Colombiana del Caribe*, 339 U.S. 683, 691 (1950).  And "[t]he jurisdiction of a court of admiralty to determine the question of alter ego is undoubted."  *Id.* at 689 n.4; *Vitol v. Primerose Shipping*, 708 F.3d 527, 538 (4th Cir. 2013) ("It is well established that an admiralty court can review questions of … alter ego.").  Therefore, as then-District Judge Sullivan explained, where the contract "at the heart of the

dispute was a maritime contract," "[t]he fact that Plaintiff[] asserted claims against [Defendant] as an alter ego of [the counterparty on the contract] does nothing to undermine that fact or vitiate the Court's maritime jurisdiction." *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures*, 851 F. Supp. 2d 504, 508 (S.D.N.Y. 2012). In short, "alter-ego theories of liability are prima facie admiralty claims so long as the underlying claim arose in admiralty." *Pink Goose (Cayman) Ltd. v. Sunway Traders LLC*, No. 08cv2351 (HB), 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008); *see also, e.g.*, *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F. Supp. 1340, 1347-48 (S.D.N.Y. 1988); *Nat'l Marine Serv., Inc. v. C.J. Thibodeaux & Co.*, 380 F. Supp. 1076, 1080 (S.D. Tex. 1973).

Defendants appear to suggest that Eddystone is not seeking to recover on a maritime contract: "Because Eddystone does not assert a maritime cause of action as a basis for veil-piercing, it has failed in its burden to establish a basis for subject matter jurisdiction." Dkt. 495-1 at 4; *see id.* at 24 ("no underlying admiralty claim here"). The premise of the argument is false: Eddystone *does* assert an underlying maritime cause of action—the breach of a maritime contract—as the basis for veil piercing.[2] As Judge Kelly made clear, "Eddystone's First Amended Complaint alleges that certain Defendants, as alter egos of BTS, *are liable for the breach of BTS' obligations under a maritime contract (the RSA)*. … Eddystone seeks to impose liability and collect damages on this basis." Dkt. 308 at 8 (emphasis added). Rejecting the very argument that Defendants now seek to resurrect, Judge Kelly went on to hold:

> Regarding Count I – Alter Ego, it is clear that Eddystone asserts that certain Defendants … can be held liable for the damages arising from BTS' breach of the RSA by virtue of the fact that they are BTS' alter egos …. Eddystone has

---

[2] *Eclipse Liquidity, Inc. v. Geden Holdings Ltd.* is inapposite: It held that the contract at issue (for purchase of a boat) was not a maritime contract and therefore the guarantee of that obligation is also not maritime in nature." No. 20-1847, 2020 WL 3574540, at *3-4 (E.D. Pa. July 1, 2020). Here, by contrast, the "underlying contract" plainly *was* "maritime in nature."

> predicated this lawsuit on a breach of the RSA since it will need to establish that BTS breached its maritime contract with Eddystone, and that the aforementioned Defendants are liable for that breach as alter egos of BTS.

*Id.* at 16 (alter ego claim "is essentially a 'contractual claim,' albeit against BTS' alter egos").

Defendants themselves admit, in the first sentence of their Introduction, that "[t]his dispute centers on the RSA." Dkt. 495-1 at 1. And an examination of the operative First Amended Complaint confirms Judge Kelly's observation that "Eddystone has predicated this lawsuit on a breach of the RSA" and that maritime contract "lies at the heart of Eddystone's Alter Ego claim, which is essentially a 'contractual claim'" against the alter egos. Dkt. 308 at 16. The Complaint begins: "This is an action for money damages … *arising from a maritime contract*." Dkt. 182 (First Amended Complaint at ¶ 1.) It alleges that "BTS … defaulted on its payments to Eddystone" and that, "[b]y dominating BTS as their alter ego, Defendants are liable for the debts BTS owes to ERC." *Id.* (FAC ¶¶ 8-9.) The Complaint's jurisdiction section states that "Eddystone seeks to enforce payment of a debt arising under a maritime contract." *Id.* (FAC ¶ 31.) The alter ego count (Count I) states that "Eddystone is entitled to an order from this Court piercing the corporate veil of BTS and holding each Defendant liable for the debts BTS owes to Eddystone." *Id.* (FAC ¶ 86.) And the Prayer for Relief requests "[a]n award of all payments BTS owes to Eddystone under the RSA." *Id.* (FAC pp. 27-28.)

In short, Eddystone is pursuing "a claim arising upon a [maritime] contract," which is "obviously within admiralty jurisdiction." *Swift & Co.*, 339 U.S. at 691; *Sabine Towing & Transp. v. Merit Ventures*, 575 F. Supp. 1442, 1443-44, 1446 (E.D. Tex. 1983) (admiralty court finding parent company liable as alter ego for absent subsidiary's breach of maritime contract); *Ariate Compania Naviera v. Commonwealth Tankship Owners*, 310 F. Supp. 416, 418 (S.D.N.Y. 1970) ("[t]he cause of action was … essentially one for breach of a maritime contract").

Eddystone's claim arises out of the maritime RSA just as much as a conventional breach-of-contract claim against BTS itself would.  Defendants cite no contrary authority.

### D.     Defendants' Other Jurisdictional Arguments Are Meritless

Defendants say, incorrectly, that "there is no underlying admiralty claim here" because Eddystone "seeks to recover … based on a stipulated arbitration award with JTS that has not been confirmed."  Dkt. 495-1 at 6.  Eddystone can and will establish liability without reference to any arbitration award, simply by proving in this action (1) that BTS breached the RSA and (2) that Defendants are liable for the breach as BTS' alter egos.

Defendants take issue with Judge Kelly's use of the term "quasi-contract" in holding that "admiralty jurisdiction exists over Eddystone's quasi-contractual claim for alter ego premised on a breach of contract because it directly arises out of a maritime contract, the RSA."  Dkt. 308 at 17.  It appears, however, that Judge Kelly simply used the term "quasi-contract" in recognition of the fact that Eddystone seeks to hold Defendants liable under the RSA even though they were not literally parties to that contract—as noted above, Eddystone asks the Court to award damages *as if* Defendants were signatories to the RSA.   That is precisely the approach that Eddystone briefed, though without using the term "quasi-contract."   And while Defendants apparently assign a narrower and more technical meaning to that term, Judge Kelly's usage was perfectly natural: "The term 'quasi contracts' may with propriety be applied to all noncontractual obligations which are treated, for the purpose of affording a remedy, as if they were contracts." Black's Law Dictionary ("quasi-contract") (11th ed. 2019) (quoting Frederic Campbell Woodward, The Law of Quasi Contracts § 1 (1913)).

Finally, Defendants assert that "the deficiency fees Eddystone seeks to recover are not a maritime debt" because "[t]here is nothing maritime about Eddystone's claim for more than $140 million in unpaid deficiency fees for not using a facility."  Dkt. 495-1 at 6.  But the question is

not whether the "deficiency payments" that BTS owed under the RSA are maritime in the abstract, but rather whether the RSA was a maritime contract—which Defendants do not and cannot successfully challenge.  The Supreme Court has made clear that an action for breach of a maritime contract is an admiralty action, regardless of whether the particular breach at issue seems like a maritime breach—after all, the contract dispute in *Norfolk Southern* arose out of an "inland" "train wreck."  543 U.S. at 18.  The Court held the dispute was maritime because the contract as a whole was a maritime contract.  *Id.* at 29 (federal admiralty law governs the interpretation of contracts that "cover both sea and land carriers"); *see also New Orleans Stevedoring Co. v. United States*, 439 F.2d 89, 90-92 (2d Cir. 1971) (suit under stevedoring contract "to recover overhead costs incurred as a result of a decline in the volume of shipping" held to be maritime); *Moore-McCormack Lines, Inc. v. Int'l Terminal Operating Co.*, 619 F. Supp. 1406, 1409 (S.D.N.Y. 1985) (breach of stevedoring contract was maritime regardless of whether the losses occurred after goods had been loaded or unloaded from ship, because "the jurisdictional inquiry begins and ends with the subject matter of the contract").  The nonbinding cases that Defendants cite do not suggest otherwise—they address whether various contracts are maritime or not, but none says that some suits arising out of a maritime contract are not maritime because of the specifics of the breach or of the remedy sought.  In sum, Judge Kelly correctly held that this is a maritime case.

## II.     DEFENDANTS OPERATED AS BTS' ALTER EGOS

### A.     Eddystone Is Entitled to Summary Judgment on Its Alter Ego Claim

Eddystone is entitled to summary judgment on its alter ego claim (Count I) because the undisputed facts show that Defendants abused the corporate form.  *See Floyd v. Lykes Bros. S.S. Co.*, 844 F.2d 1044, 1047 (3d Cir. 1988) (liability of an alter ego in admiralty is determined under federal common law).  Defendants are the alter ego of BTS, and the underlying wrong is

BTS' undisputed breach of the RSA.  SOF-¶218.  In *United States v. Pisani*, 646 F.2d 83 (3d Cir. 1981), the Court articulated the factors to be considered for piercing the corporate veil in the absence of fraud.   The *Pisani* factors include:   (1) siphoning subsidiary funds, (2) the subsidiary's insolvency, (3) using the subsidiary as a facade for the parent, (4) gross undercapitalization, (5) lack of corporate formalities, (6) not paying dividends, (7), nominal officers or directors, and (8) lack of corporate records.  *Trustees of Nat. Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 457 (E.D. Pa. 2001), *aff'd sub nom. Lutyk*, 332 F.3d 188 (quoting *Pisani*, 646 F.2d at 88).  Strong evidence supporting just one or two factors can be sufficient to establish alter ego liability.  *E.g.*, *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 455 (E.D. Pa. 2020) ("undercapitalization and siphoning of funds" were sufficient).

While the undisputed facts satisfy other *Pisani* factors, two factors—alone, but especially combined—require granting summary judgment against Defendants for alter ego liability:  (1) Defendants siphoned BTS' assets to render it judgment proof and (2) Defendants stripped BTS of its remaining assets after rendering it insolvent.  *See United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1106 (D. Del. 1988), *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989) (applying federal standards and granting summary judgment because "defendants were siphoning funds out of the corporation at regular intervals").

### 1.     Defendants Siphoned *All* of BTS' Assets to Render it Judgment Proof

"A classic example of a 'fraud or wrong'" that establishes alter ego liability "is the stripping of the assets of the dominated corporation for the purposes of rendering it judgment proof."  *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, No. 12 CIV. 5754, 2013 WL 1274561, at *11 (S.D.N.Y. Mar. 29, 2013); *Pisani*, 646 F.2d at 88.  In fact, dissipation of a subsidiary's corporate assets in this manner to benefit a sole shareholder has been held sufficient evidence upon which to grant summary judgment in favor of the plaintiff.  *E.g.*, *United States v. Thomas*, 515 F. Supp.

1351, 1357 (W.D. Tex. 1981).   Conduct proving this factor includes acts by the parent corporation that financially cripple the subsidiary.  *Ragan v. Tri-Cty. Excavating, Inc.*, 62 F.3d 501, 507 (3d Cir. 1995).

In this case, the siphoning is remarkably manifest and undisputed.  Defendants took a company—valued by their own expert at between $202.5 and $324.9 million (SOF-¶210)—transferred all of its assets and eliminated all of BTS' accounts receivable between December 2015-February 2016.  SOF-¶¶210.  This conduct, by itself, makes Defendants' abuse of BTS' separate corporate identity clear.  But it is Defendants' own communications in the fall and early winter of 2015-2016, that put in stark relief their stratagem and end game:  dismantling BTS so as to evade its contract obligations to Eddystone.

Defendants' decision to strip and sell BTS was the culmination of a series of options that Defendants considered, each of which involved sacrificing BTS for the good of FG.  In the June of 2015 and August forward, the declining difference in price (or "spread") between Bakken and the Brent-priced North Atlantic-borne crudes narrowed to the point where it was no longer profitable for Marketing to transload Bakken crude.  SOF-¶123.  As a result, Marketing—renamed Jamex Marketing after FG acquired Bridger's Logistics companies from Bridger LLC—still obligated to deliver Bakken crude to Monroe/Delta under the Amended COSA, was losing millions of dollars every month.  *Id.* (without amending its contract with Monroe, Jamex would go bankrupt); SOF-¶128 ("If we do nothing … Jamex bankrupt in 12-18 months depending on spreads and FGP stock").

Jamex Marketing's insolvency and the resulting end of Monroe shipments would terminate the flow of payments to BTS.  But it would not alter BTS' obligation to pay the Eddystone Deficiency Volume Charges ($1.75 for each barrel it did not deliver) under the

RSA—approximately $3.5 million per month—without any revenue from Monroe or Jamex Marketing.   SOF-¶149.   REDACTED

REDACTED

To stop its losses stemming from the narrow Bakken-Brent spread, Marketing had sought to convert its COSA with Monroe/Delta into a cost-plus contract.   Marketing had been negotiating with Monroe to convert the Amended COSA into a cost-plus contract that would permit continued supply from the Bakken.   Those negotiation efforts, however, came to a screeching halt on November 16, 2015.   At that time, Monroe came back with a price tag that was not acceptable—$275 million for the switch.   SOF-¶133.   Marketing's Ballengee colorfully ended those efforts, saying "F- them."   SOF-¶133.   Thus, as of November 16, 2015, Marketing's contract negotiation with Monroe was over because any amended COSA would not be a cost-plus deal.

Defendants then moved to an alternative plan—eliminate the Eddystone obligation. Ballengee wrote Defendants that the companies considered substituting West African crude for Bakken.   SOF-¶139.   REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Emails discussing the West African strategy on December 8, 2015, between Soiefer, Gamboa, and Rios make clear that they realized the potential hit that FG consolidated earnings would take should Marketing fail.   SOF-¶130.   BTS's Earnings Before Interest, Taxes,

Depreciation and Amortization (EBITDA) would roll up to FG's consolidated financials.  In the messages, the FG executives do a rough calculation based on 20-month estimate they have received on the timing of Marketing's then-impending insolvency, counting the remaining months of BTS' obligations under the RSA and multiplying by the $3.5 million per month Deficiency Volume Charge that BTS would owe Eddystone.  SOF-¶130.  Gamboa wrote his colleagues:

> If we do nothing:  Benefits Monroe
>
> Jamex bankrupt in 12-18 months depending on spreads and FGP stock
>
> Bridger has $70mm ebitda []hole and $41.5MM annual obligation to ERC
>
> Lets be firm but commercial for our sake, no one else's

*Id.*  Rios agreed and Soiefer said, "Yes Bridger EBITDA goes to zero.  Let's avoid that." *Id.*

REDACTED

REDACTED

Of course, having BTS default on the RSA would have resulted in significant losses to FG—over $70 million in earnings under Gamboa's rough calculations, which assumed that Marketing would last to the more optimistic end of 12 to 18 months.  Thus, the specifics of the scheme to transfer all of BTS' assets and accounts receivable began to form.  REDACTED

REDACTED

And, indeed, they succeeded.  When BTS defaulted on its obligations under the RSA, it did not have a penny to contribute towards Eddystone's arbitration damages award.  This extraordinary record of siphoning conduct, by itself, is sufficient to support summary judgment for alter ego liability.

> 2.    **Defendants Stripped Its Remaining Assets After Rendering BTS Insolvent**

The second *Pisani* factor is insolvency.  A company is insolvent either when it is unable to pay its debts in the regular course of business (the "cash flow" or "ability to pay" test) or when

the fair value of its liabilities exceeds the fair value of its assets (the "balance sheet test").  *See* J.B. Heaton, Solvency Tests, 62 Bus. Law. 983, 988–95 (2007).

Prior to June 24, 2015, BTS' businesses were valued by both sides' experts at between $202.5 and $325 million.  SOF-¶210.  Starting in June 2015, Defendants rendered BTS **cash-flow insolvent** when they transferred BTS' earned profits and cash to other FG entities, such that BTS was unable to fulfill its obligations under the RSA.  The facts are undisputed.  When FG acquired Logistics group of companies on June 24, 2015, it wrote off BTS' net positive accounts receivable from other entities for no compensation.  SOF-¶¶117-21.  Then, as BTS continued to provide the loading and transloading capacity in support of the Monroe arrangement and other projects, it redirected the associated revenue to "Bridger Rail Services."  And FG re-directed BTS's remaining pipeline management revenue to "Bridger Pipeline Services."  SOF-¶96.  BTS received *nothing* while its FG affiliates reaped the benefit of millions in revenues that BTS had rightfully earned.  The credits to the fake entities remained in the Logistics bank account for general FG corporate purposes.  REDACTED

It is undisputed that at the time of those transfers BTS remained obligated under the RSA to Eddystone and that BTS had insufficient revenue with which to pay Eddystone.  At the time Defendants' diversions began, BTS' payment owed to Eddystone for July 2015 activity would have been expected to be approximately $4.5 million.  SOF-¶32.  Even if there had been no shipments through Eddystone, the fixed, Minimum Volume Commitment payment for the month was approximately $3.5 million.  SOF-¶112.  Without BTS receiving its rail throughput and

18

pipeline management revenues for July, which Defendants diverted, BTS would have been expected to receive only approximately $945,000 in revenues.  SOF-¶114.  And BTS would have had to pay roughly $770,000 of that revenue in fixed expenses (not including rail throughput and pipeline management expense).  SOF-¶113.  The remaining revenues would have been grossly insufficient to make either the anticipated $4.5 million payment or even the minimum $3.5 million Minimum Volume Commitment payment BTS owed Eddystone.  SOF-¶115.  And, in fact, there is no dispute that BTS failed to make those payments; instead, FG affiliates made all post-acquisition payments to Eddystone after July 20, 2015.  SOF-¶116.

After rendering BTS cash-flow insolvent, Defendants stripped its remaining assets and rendered it **balance-sheet insolvent**. ███████████████ REDACTED ███████████████ ████████████████████████████████████████████ Defendants transferred the rest of BTS's client contracts, real estate, equipment, and any other assets (including revenue-generating assets) to FG entities, and cancelled receivables that other entities owed to BTS.  *Id.*  By Defendants' design, BTS' sole remaining "asset" was the Eddystone RSA. *Id.*  As a result, when FG sold BTS to Jamex Transfer Holdings, LLC (an assetless and newly formed Marketing affiliate) in February 2016, BTS was penniless and still owed Eddystone over $140 million to be paid over the next three years and four months.  SOF-¶¶209-11; Ex. 21 of Marc Sherman Report (showing actual deficiency payments owed under the RSA to be $145.9 million, not including interest and present value calculations).

The incontrovertible facts are thus that (1) Defendants rendered BTS cash-flow insolvent in the latter half of 2015 and (2) then rendered BTS balance-sheet insolvent at the start of 2016. These facts demand alter ego liability.

      **3.**     **Defendants' Conduct Demonstrates Sufficient Injustice to Grant Summary Judgment on Alter Ego Liability**

Although these facts are sufficient to warrant piercing the corporate veil, plaintiff independently establishes that a monumental injustice would result from failing to impose liability on the Defendants. *See Pisani*, 646 F.2d at 88. Indeed, Defendants' siphoning of BTS assets after rendering it insolvent demonstrates more than sufficient injustice to support summary judgment against Defendants on alter ego. Defendants treated BTS as if it existed for their benefit, parceling its revenues and businesses out to their other subsidiaries and reducing a corporation once worth between $203-325 million to a shell that they sold for a paltry ten dollars ($10). Now, they seek to rely on the very entity they abused and ignored to shield themselves from liability to its creditors. *See Golden Acres, Inc.*, 702 F. Supp. at 1106. Defendants cannot be allowed to sacrifice BTS to avoid fulfilling its contractual commitments under the RSA. This is exactly the sort of evasion of legal obligations that alter ego is designed to prevent. *See In re Diloreto*, No. 04-CV-1326, 2006 WL 2974156, at *3 (E.D. Pa. Oct. 13, 2006). Eddystone is entitled to summary judgment on Count I.

      **B.**     **The Court Should Deny Defendants' Request for Summary Judgment on Alter Ego**

Defendants do not seek summary judgment on Eddystone's claims that Logistics and Bridger Rail Shipping are liable as BTS' alter egos. Dkt. 495-1 at 14 n.3. These intermediate entities have long since had their assets sold and are empty shells. Defendants raise three challenges to Eddystone's alter ego claims against the other corporate defendants. None is availing.

      **1.**     **Eddystone Has a Cognizable Claim for Imposing Alter Ego Liability**

Defendants urge that alter ego cannot be asserted absent an underlying tort or contract claim. *Id.* at 9-11. However, as this Court specifically concluded, Eddystone's alter ego claim is

itself a quasi-contractual claim based on *Defendants'* breach of the RSA: "There is no doubt that **the alleged breach of the RSA is at the center of Eddystone's Alter Ego claim** since it alleges that certain **Defendants engineered BTS' breach of the RSA** and **seeks damages that clearly arose as a result of the breach**."   Dkt. 308 at 17 (emphasis added).   "When coupled with allegations of another wrong, such as breach of fiduciary duty or a fraudulent conveyance, alter ego can constitute an independent claim."   *In re Maxus Energy Corp.*, No. AP 18-50489-CSS, 2019 WL 4343722, at *5 (D. Del. Sept. 12, 2019); *cf. Cantiere DiPortovenere Piesse S.p.A. v. Kerwin*, 739 F. Supp. 231, 236 (E.D. Pa. 1990).[3]   Similar to the plaintiff in *In re Maxus Energy Corp.*, Defendants stripped BTS of its assets and left the corporation without the ability to fulfill its obligations under the RSA either by using the transloading capacity or making the agreed deficiency payments.   SOF-¶¶89-116.

Defendants next assert that Eddystone "seeks to collect from the Alter Ego Defendants on the basis of" its settlement agreement with Jamex.   Dkt. 495-1 at 10.   But Eddystone did not bring an action to enforce an arbitration award.   Eddystone is prepared to prove the RSA breach and damages without the arbitration award.   In fact, Eddystone has submitted undisputed evidence that BTS breached the RSA.   SOF-¶218.   Eddystone is also prepared to show at trial the significant damages that it suffered as a result of the breach.   Thus, defendants' alter ego liability does not depend upon the arbitration award.

### 2.    Defendants Are Liable for BTS' Breach of the RSA

Next, Defendants seek to hide behind their own malfeasance to avoid alter ego liability. They assert that they cannot be held liable because they sold BTS to an assetless affiliate of Marketing immediately prior to its breach of the RSA.   Dkt. 495-1 at 11-12.   This argument is

---

[3] The primary case Defendants rely on, *Peacock v. Thomas*, 516 U.S. 349 (1996) (Dkt. 495-1 at 9), examines whether an independent claim for alter ego liability is permissible under ERISA.   It is a matter of statutory interpretation and not a statement of federal common law.

too cute by half.  It was Defendants' conduct *while BTS was under Defendants' control* that caused the breach.  Defendants raised this same argument in their motion to dismiss (Dkt. 35-1 at 13-14), and Judge Kelly rejected it.  Dkt. 59 at 12.

Alter ego liability permits a court to ignore the legal fiction of the corporation to reach the party who exercised control over the subsidiary and caused the subsidiary either to breach its contractual obligations or commit a tort.  *See Collet v. Am. Nat'l Stores*, 708 S.W.2d 273 (Mo. App. 1986).  As Defendants' cited cases make clear, the temporal limitation is *not* in relation to when the *consequences* occur, but when the *wrongdoing* occurs.  *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 862 (5th Cir. 2004); *Knapp v. Schaeffler Grp. USA Inc.*, No. 3:21-CV-05035-MDH, 2021 WL 2482410, at *2 (W.D. Mo. June 17, 2021) (relevant time frame is when "the complained of conduct occurred"); *Peters v. Lifeline Sys. Co.*, No. 4:08CV1862 RWS, 2009 WL 3335098, at *1 (E.D. Mo. Oct. 15, 2009) (same).

Here, there is no question that Defendants were in control when the BTS was stripped of its assets.  REDACTED

Such a sham sale does not cut off alter ego liability.  Defendants are liable as BTS' alter egos.

### 3.      Both FG Partners and FG Acted as Alter Egos of BTS

Defendants assert that there is no evidence that FG or FG Partners acted as alter egos of BTS.  Dkt. 495-1 at 14-15.  Defendants further urge that for FG Partners to be held liable as an alter ego it must have acted as an alter ego not only for BTS, but also for FG and Logistics.  *Id.*

at 14.  But Eddystone need not prove that FG Partners acted as alter ego to FG or that FG acted as alter ego to Logistics.  Eddystone need only demonstrate that those entities acted as alter egos to BTS.  *See In re Moll Indus., Inc.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011) ("[I]t is not necessary for the Committee to make allegations sufficient to pierce every layer of the corporate structure between Moll and HCMLP.  There is no indication in the two-part test that it may only be applied to a direct relationship such as a parent and subsidiary.").  On that issue, there is no doubt.

FG was run by Stephen L. Wambold, who was the Chief Executive Officer and President of FG Partners, LP and FG, LP.  He was also the General Partner of FG, Inc.  SOF-¶66.  REDACTED █████████████████████████████████████████  Todd Soiefer was the Senior Vice President for Strategic Development for FG as well as the Chief Financial Officer of Logistics.  SOF-¶68.  Jack Herrold was the Senior Vice President, Finance & Investor Relations, of FG.  SOF-¶70.  In June 2015—when FG acquired Logistics—Rios and Gamboa were Executive Vice Presidents of FG and CEO and COO of Logistics, respectively.  SOF-¶62.

The record indisputably shows that each of these FG/FG Partners executives was intimately involved in the strip-and-sell operation every step of the way.  And when decisions were made, these executives were the ones calling the shots.  They initiated and approved the decisions to divert BTS' receivables, assign BTS' assets, and sell BTS as an empty shell for $10:





In short, there is no dispute that FG Partners and FG executives developed, approved, and executed the plan to strip and sell BTS to avoid its obligations under the RSA. Their motion for summary judgment on Count I should be denied.

## III.   DEFENDANTS' FRAUDULENT TRANSFERS REDUCED BTS' VALUE FROM BETWEEN $200-325 MILLION TO A MERE $10

### A.   Eddystone Is Entitled to Summary Judgment on Fraudulent Transfer

Eddystone is entitled to summary judgment on the fraudulent transfer claims as well. Creditors may obtain voidance of a transfer under PUFTA in two ways, by demonstrating either actual or constructive fraud. A transfer is fraudulent if made "with actual intent to hinder, delay *or* defraud any creditor of the debtor." 12 Pa. Cons. Stat. § 5104(a)(1) (emphasis added); Uniform Law Cmt. 10. The statute requires courts to infer actual intent from factors—known as the "badges of fraud". *Id.* cmt. 6. Here, Defendants' internal documents overwhelmingly show that they made the transfers with actual intent to "hinder, delay or defraud" a creditor, Eddystone. A more clear-cut example of actual intent can hardly be imagined. Nearly every badge of fraud identified by courts is present in this case. Eddystone is entitled to summary judgment on its claim for actual intent (Count II). At a minimum, the undisputed facts show constructive intent. Even in the absence of the compelling basis for inferring actual intent, summary judgment should be granted to plaintiff for constructive intent (Count III).

### 1.       Defendants' Transfers Should Be Voided Due to Actual Intent to Hinder, Delay, or Defraud

Under PUFTA, creditors may obtain voidance of a transfer or obligation made to another party if they can show: (1) the plaintiffs are "creditors" as defined by the statute; (2) the transfers were made with intent to "hinder, delay, or defraud" creditors; and (3) there are no viable defenses.  12 Pa. Cons. Stat. §§ 5104(a)(1), 5107(a)(1), 5108(d); *see also Carroll v. Stettler*, 941 F. Supp. 2d 572, 578 (E.D. Pa. 2013); *Ameriserv Fin. Bank v. Commercebank, N.A.*, No. CIV. A. 07-1159, 2009 WL 890583, at *4 (W.D. Pa. Mar. 26, 2009) (granting summary judgment for actual intent).  Judge Kelly looked at the badges of fraud and made findings based on a more limited factual record.  Dkt. 332 at 9-10 (setting forth the law); *id.* at 10-14 (setting forth his analysis).

As for the first element under PUFTA, there is no debate that Eddystone was BTS' creditor.  SOF-¶¶17-19.  As for the second element, the badges of fraud overwhelmingly show Defendants intended to "hinder, delay or defraud" Eddystone.  *Klein v. Weidner*, 729 F.3d 280, 284 (3d Cir. 2013) (affirming the grant of summary judgment after an analysis and application of the badges of fraud to the undisputed facts).  As demonstrated above, evading Eddystone and the RSA was the sole reason for dismembering BTS in January 2016.  Undisputed evidence shows that (1) BTS received zero value for the transfers of many millions of dollars in assets; (2) the transfers were of substantially all BTS' assets, leaving behind only $10 of value; (3) the transfers rendered BTS insolvent; (4) the transfers were to insiders, FG subsidiaries in which the parties controlling the transfers had an interest; (5) the transfers allowed Defendants to retain control over the transferred assets; (6) the transfers were concealed from Eddystone; and (7) the transfers were made in anticipation of litigation once BTS defaulted on the RSA.

### a.    Defendants' Transfers Depleted All of BTS' Assets

Defendants' transfers, beginning in June 2015 and continuing through January 2016, stripped BTS completely.  Prior to January 2016, BTS had "Rail Throughput," providing capacity (often called "throughput") rail services, comprised of rail terminal loading capacity at stations in Berthold, New Town, and Van Hook, ND, and rail unloading capacity in Eddystone, PA.  SOF-¶26.  BTS provided this capacity to load and transload crude oil.  BTS was paid millions of dollars in return.   SOF-¶¶27-29.   BTS also controlled "Pipeline Stations Throughput," comprised of nineteen terminals and fuel injection stations connected to pipeline, trucks, and rail, at which crude oil brought by trucks from the field were injected into the pipeline systems.  SOF-¶30.  BTS charged fees for the use of those injection stations and earned millions of dollars of pipeline management revenue from its capacity on those lines.  SOF-¶¶30-32.  In addition to its Rail Throughput and Pipeline Stations Throughput, BTS earned "Pipeline Management" revenue, providing throughput capacity for crude oil on various pipelines that BTS leased on Enbridge Energy Partners, LLC's North Dakota pipeline and Spectra Energy Corp.'s Platte pipeline, and selling that capacity to crude oil marketers, including Bridger Marketing.  SOF-¶33.  A significant portion of BTS' receivables were intercompany receivables owed from other Bridger entities that, as of May 31, 2015 (prior to the FG Acquisition), totaled approximately $34.7 million.  SOF-¶35.  Bridger's year-end 2014 financial statements show that BTS had approximately $104 million of revenue and $44 million of cross profit.  SOF-¶50.

FG's expert, Manish Kumar, valued BTS at the time of the FG Acquisition between $202.5 million and $324.9 million.  SOF-¶53.    REDACTED

REDACTED

_____. Defendants transferred "substantially all [of BTS'] assets" to their own subsidiaries, leaving BTS insolvent.   12 Pa. Cons. Stat. § 5104(b)(5).

### b.    BTS Did Not Receive Any Value for Defendants' Transfers

BTS received *nothing*—let alone "reasonably equivalent value"—in exchange for the transfer of all its valuable assets.  Determining whether reasonably equivalent value was received in this Circuit requires two steps:  (1) the Court must determine whether the debtor received "any value at all" from the challenged transaction, *see Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 387 (E.D. Pa. 2013), and (2) if the Court finds the debtor received at least some value, it must then decide whether the value received was "roughly the value it gave," *id.* (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212–13 (3d Cir. 2006)).  Defendants fail both prongs.

Discovery has not uncovered *any* value given to BTS in exchange for Defendants' raid on its assets.  The transfers were utterly one-sided.  The transfers were planned and executed without any counsel or other party to represent BTS and left BTS with nothing.  SOF-¶181-82.

### c.    Defendants' Transfers Rendered BTS Insolvent

BTS "was insolvent or became insolvent shortly after the [Defendants'] transfer[s] w[ere] made."   12 Pa. Cons. Stat. § 5104(b)(9).   For purposes of actual intent, PUFTA defines insolvency as when "the sum of the debtor's debts is greater than the sum of the debtor's assets." *Id.* § 5102(a).  "A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent."  *Id.* § 5102(b).  There is no dispute that Defendants took a business worth hundreds of millions of dollars and, in less than eight months, transferred away every single asset reducing it to a $10 company with a $140-plus million debt.

Defendants transferred BTS' earned revenues to other FG entities, such that BTS was unable to make payments under the RSA starting in June 2015. *See* Section II.A.2. As noted, affiliates made the actual payments. While Defendants advance fanciful theories about a "cost accounting" practice not backed by a single scrap of contemporaneous paper in FG's accounting department, there is no dispute that BTS revenues were never credited to it.　REDACTED

████████████████████████████████████████████████████　When FG sold BTS in February 2016, BTS still owed Eddystone over $140 million in periodic payments over the next three years and four months. *See* Ex. 21 of Sherman Report (showing actual deficiency payments owed to Eddystone to be $145.9 million, not including interest and present value calculations). At that time, the net balance in BTS' intercompany accounts receivable account was approximately $8.2 million. SOF-¶184. These receivables were not satisfied before BTS was sold to Jamex Transfer Holdings for $10 on February 22, 2016. SOF-¶185. With no assets, no satisfaction of remaining accounts receivable, and sold for $10 to distance BTS from the FG affiliates that had been receiving its former revenue streams, "the sum of [BTS'] debts [wa]s greater than the sum of the debtor's assets." *Id.* § 5102(a). BTS was insolvent shortly after and as a direct result of Defendants' fraudulent transfers.

### d. Defendants Transferred BTS' Assets to Insider Subsidiaries and, Thus, Retained Control of the Transferred Assets

Defendants transferred BTS' valuable assets to their own insider subsidiaries, which allowed them to retain control over BTS' transferred assets. Transferring assets to a direct or even indirect subsidiary is sufficient to demonstrate the badges of fraud for insider transfers and retention of control. *E.g.*, *In re G-I Holdings, Inc.*, 313 B.R. 612, 641–43 (Bankr. D.N.J. 2004) (allegations that assets were transferred to an indirect subsidiary were sufficient to prove a claim for actual and constructive fraud). This is exactly what Defendants did here.

Defendants structured the June 2015 to January 2016 transfers to retain control over BTS' valuable assets.  Each transfer was to an insider Defendant subsidiary:  Bridger Rail Services, Bridger Rail Shipping, Bridger Real Property, Bridger Terminals, Bridger Swan Ranch, and the other transferees were all affiliates of BTS that FG and Logistics wholly owned.  12 Pa. Cons. Stat. § 5104(b)(1).  Control over the transferees allowed Defendants to "retain[] possession or control of the property transferred after the transfer."   12 Pa. Cons. Stat. § 5104(b)(2).

REDACTED

. Thus, Defendants retained the value of the transferred assets and control over those assets.

### e.    Defendants Deliberately Concealed Their Transfers

Defendants were hollowing out BTS in a manner invisible to Eddystone.  Defendants thus actively concealed these transfers from BTS' principal creditor, Eddystone.  12 Pa. C.S. § 5104(b)(3).  Defendants' actual intent is "self-evident" from their use of fictitious accounting entities to conceal the transfers, even from FG's own accountants.  *E.g.*, *Ameriserv Fin. Bank*, 2009 WL 890583, at *4 (granting summary judgment for actual fraudulent transfer in part because money was transferred to an account for a fictitious entity).  The June 2015 shifting of revenue from BTS purportedly due to contract assignments never made to non-existent LLCs—resulting in Logistics having more money in its accounts—led FG's own accountants to not credit BTS for its revenues.

The record has ample additional evidence of concealment.  Defendants gave Eddystone no notice that they had stripped BTS of all of its assets.  After Defendants deprived BTS of its rail throughput revenue, it lacked the cash flow to cover its payments to Eddystone.  This drastic

change in BTS' ability to fulfill the RSA would have alerted Eddystone to Defendants' under-the-table transfers.  Defendants directed BTS' affiliates to step in and make those payments on BTS' behalf, concealing BTS' engineered insolvency from Eddystone until after BTS was made judgment proof.  SOF-¶¶110, 116.

The last BTS train left Eddystone Facility on or before February 1, 2016.  (SOF-¶218, citing Ballengee Dep. at 172:11-16.)  BTS, now a hollowed shell owning only the Eddystone contract, was transferred to the new shell affiliate of Marketing effective that same day (SOF-¶214)—also the same day the Defendants had agreed with Monroe that oil shipments would stop, thereby effectively ending operations at the Eddystone Facility.  SOF-¶219.

Defendants ensured that Eddystone was kept in the dark with respect to each of these transactions.  The concealment continued until Eddystone initiated the litigation.  Eddystone learned about the asset transfers in 2016 in the arbitration after obtaining enforcement of an arbitration subpoena.  Eddystone did not learn about the diversion of revenues until after Judge Kelly forced Defendants to show Eddystone the accounting documents.  Dkt. 107, 215.  In discovery, FG inexplicably refused to produce accounting records, and Eddystone was forced to file a motion to compel.  Dkt. 73, 183.  Judge Kelly then compelled FG to allow plaintiff's forensic accountants on site.  Dkt. 215 (Oct. 11, 2018 Order).

> **f.    Defendants Transferred BTS' Assets to Avoid Judgment in Anticipated Litigation with Eddystone**



Emails between Soiefer, Rios, Gamboa, Hampton, and Ballengee make clear that the purpose of the BTS restructuring was to "make more money"

via "a lower cost arrangement," "cancel" the RSA, and make "Eddystone [] pound sand." SOF-¶144. The undisputed goals for transferring BTS' assets and selling BTS for $10 were to render BTS judgment proof and to distance Defendants from the engineered BTS default on the RSA.



### g.     Defendants Did Not Make Transfers in Good Faith

Defendants have the burden of proving that BTS' assets were transferred in good faith and for a "reasonably equivalent" value.   12 Pa. Con. Stat. § 5108; *id.*, Committee Cmt. 1. Defendants "*cannot*" meet that burden because—as discussed *supra*—they can offer "no evidence that anything of value was exchanged for the assets transferred here."   *Clinton Plumbing,* 2011 WL 6088611, at *7 (without proof that reasonably equivalent value was exchanged for the transferred assets, the defendant's "good faith does not provide a basis for avoiding liability").

### 2.     Defendants' Transfers Should Be Voided for Constructive Fraudulent Transfers

The facts of this case present a classic case of actual intent. At a minimum, there can be no question that the undisputed facts surrounding the transfers show constructive intent. "The distribution of a corporation's assets, leaving it incapable of discharging its debts, is fraudulent in the eyes of the law." *Heaney v. Riddle*, 23 A.2d 456, 459 (Pa. Sup. Ct. 1942) (quoting *Bankers Tr. Co. v. Hale & Kilburn Corp.*, 84 F.2d 401, 405 (2d Cir. 1936)). Under PUFTA, a transfer is voidable if the debtor did not "receiv[e] a reasonably equivalent value in exchange for the transfer" and either "(i) was engaged ... in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 12 Pa. Cons. Stat. § 5104(a)(2). The unreasonably small assets test set forth in § 5104(a)(2)(i) means "a financial condition short of insolvency." *Fid. Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 722 (E.D. Pa. 2007) (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992)). A transfer is also voidable "as to a creditor whose claim arose before the transfer "if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 12 Pa. Cons. Stat. § 5105.

It is undisputed that:

➤ Starting in June 2015, Defendants transferred BTS' earned profits and cash to other FG entities leaving BTS with insufficient funds to perform under the RSA—rendering it cash-flow insolvent.

➤ In January 2016, Defendants made BTS gift its remaining assets to other FG entities—rendering it balance-sheet insolvent.

➤ None of these funds or other assets were ever returned.

➤ BTS did not receive any consideration in exchange for these valuable assets.

*See* Section II.A.2; III.A.1.b.  When FG sold BTS to Jamex Transfer Holdings, in February 2016, BTS was penniless by design. ▓▓▓▓▓▓▓▓▓▓ REDACTED ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓  Of course, because Defendants arranged for the Monroe contract to be performed without using the Eddystone Facility, the RSA was actually a substantial liability rather than an asset—a liability that due to Defendants' transfers BTS had no ability to meet.  SOF-¶¶174-75.

Under these facts, Eddystone is entitled to summary judgment on its constructive fraudulent transfer claim as a matter of law.  Defendants' transferred BTS' assets for no value and left BTS insolvent, with unreasonably small assets either to conduct its business with Eddystone or to pay the debts Defendants knew BTS would incur under the RSA.

### B.    The Court Should Deny Defendants' Request for Summary Judgment on the Fraudulent Transfer Claims

#### 1.    The BTS Property Was Not Encumbered by a Valid Lien

Defendants cannot dispute the evidence surrounding the fraudulent transfers because it comes from their own internal documents.  Defendants instead contend that they have a "lien" defense.  Specifically, they contend that their transfers of BTS property from January 15, 2016, forward are immune from judicial scrutiny because the property was subject to a "valid lien" held by BOA and therefore did not constitute "assets" protected by PUFTA.  Dkt. 495-1 at 26-35.  (Defendants do *not* contend that any such valid lien argument applies to transfers made before that date.  *Id.* at 27, 31.)  Under the plain text of PUFTA, Defendants' argument about the subsequent transfers fails for at least two independently sufficient reasons.  *First*, the lien was not *valid* at all, because the creation of the lien was itself a fraudulent transfer.  *Second*, even if the lien was valid, it did not encumber the BTS assets to any meaningful extent—rather, the

value of the guaranty secured by the lien was tiny compared to the value of the assets that Defendants fraudulently transferred.

a.       The BTS Property Was Not Subject to a "Valid Lien"

The statutory text makes clear that only a *valid* lien on property can remove that property from PUFTA's definition of "Asset." Needless to say, the Court should construe PUFTA "to give effect to all its provisions," including that crucial word "valid." 1 Pa. Stat. § 1921(a); *see also* Scalia & Garner, Reading Law § 26 (2012) (in interpreting a statute, "every word … is to be given effect"). PUFTA defines the term "Valid lien" to mean "[a] lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." 12 Pa. Cons. Stat. § 5101(b). Here, the supposed lien was not valid under this definition because BTS' purported grant of the lien to BOA was itself avoidable as a fraudulent transfer.

PUFTA contemplates that the creation of a lien can constitute a fraudulent transfer: It defines "[t]ransfer" to include the "creation of a lien or other encumbrance." *Id.* A lien that itself constitutes a fraudulent transfer is not a "valid lien." PUFTA's express definition confirms this: If the grant of a lien is a fraudulent transfer, then that lien is avoidable under PUFTA and would not be "effective against the holder of a judicial lien subsequently obtained." *Id.* Case law likewise confirms that, "if the circumstances surrounding the lien's creation are themselves part of the alleged fraudulent transfer," then the lienor "does not hold a 'valid lien' exempt from the definition of an 'asset.'" *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 417 (5th Cir. 2009) (applying Texas UFTA); *see also Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 608-09 (Tex. App. 2002) ("If Westchase ultimately prevails at trial on the merits of its UFTA claims, TEN's security interest, as part of the fraudulent transfer of assets, will be voidable.").

Just as the other transfers of BTS property made in January 2016 were fraudulent, the purported creation of a lien at that time was itself an avoidable fraudulent transfer. The undisputed facts show that Defendants were acting with "actual intent to hinder, delay or defraud" Eddystone when they caused BTS to purportedly grant the lien on January 14, 2016.

REDACTED

REDACTED

REDACTED At his deposition, Rios, a former practicing lawyer, admitted to having represented a company that was found to have fraudulently transferred assets to evade a judgment (the court there ultimately revoked those transfers). SOF-¶63-65. And BTS had, in fact, not granted a lien and had no obligation to do so at the time of Rios' email to Hampton. The date on which the lien was granted—January 14—was the day immediately *after* the date of the agreement that stripped BTS of its assets. In short, the timing of the transactions and the documentary evidence leave no doubt that Defendants viewed the "valid lien" defense as a component in their scheme to defraud Eddystone.

Nor did BTS receive "reasonably equivalent value" in exchange for the purported lien. BTS itself was under no pre-existing obligation to grant a lien to the lender. And it was particularly not required to grant the lien after FG had agreed to strip BTS of its remaining assets—the facts are undisputed that after the January 13 agreement to strip and sell BTS, FG gave no value to BTS, much less value "reasonably equivalent" to the value of all of its assets. FG simply used its power over BTS to compel security for guaranty for the equity holders. *E.g.*, *In re TOUSA, Inc.*, 680 F.3d 1298, 1310-13 (11th Cir. 2012) (affirming conclusion that subsidiaries did not receive reasonably equivalent value for liens they conveyed); *In re Solomon*,

299 B.R. 626, 637 (10th Cir. B.A.P. 2003) (finding that debtors did not receive reasonably equivalent value when they granted a lien to secure a preexisting guaranty of a loan to another entity); *In re Jolly's Inc.*, 188 B.R. 832, 845-46 (Bankr. D. Minn. 1995) (rejecting argument that subsidiary received reasonably equivalent value where it granted lien on its assets to third party that had extended credit to related corporate entity); *In re Marquis Products, Inc.*, 150 B.R. 487, 495 (Bankr. D. Me. 1993) (avoiding mortgage conveyed by subsidiary to secure line of credit to its parent because subsidiary "received no direct benefit in exchange for the mortgage and, therefore, no consideration that could amount to reasonably equivalent value").

Defendants offer a slew of faulty counterarguments. They argue at length that BOA "gave value to BTS in exchange for the lien" and assert that "Eddystone has argued that BTS received no benefit from executing its security agreement with BOA, but Eddystone has the test backwards." Dkt. 495-1 at 29-30. Eddystone does not have the test backwards; Defendants are applying the wrong test. The relevant test is PUFTA's test for a fraudulent transfer, which, as Defendants admit, asks whether the transferor (here, BTS) made the transfer (here, the January 14 grant of the lien) "without receiving a reasonably equivalent value in exchange." *Id.* at 44; *see* 12 Pa. Cons. Stat. § 5105. Defendants apparently recognize that they cannot possibly tell the Court that BTS—which Defendants were actively scuttling into an empty shell in January 2016—received any value (much less reasonably equivalent value) in exchange for the lien as required by PUFTA. So Defendants focus instead on arguing that BOA gave value in exchange for the lien. Dkt. 495-1 at 47; *see* 13 Pa. Cons. Stat. § 9203(b). But that is the UCC's test for whether BOA perfected the lien. *See id.* (describing requirements for "a security interest [to be] enforceable against the debtor and third parties"). Defendants' problem is not that BOA failed to *perfect* the lien under *the UCC*, but rather that the purported *creation* of the lien was invalid from

the start because it was a fraudulent transfer *to FG under PUFTA*.  UCC Section 9203 does not speak to that, and its three-factor test is simply inapposite.  In short, the issue here is not whether the lien satisfied the UCC, but whether the FG-controlled BTS grant of it for the benefit of FG creates PUFTA liability for *FG*.

Defendants next contend that Eddystone "cannot invalidate BOA's lien because BOA is not a party to this case."  Dkt. 495-1 at 32.  But Eddystone is not literally seeking to *invalidate* the supposed lien for UCC purposes—it is not asking the Court to enter an order avoiding the lien and annihilating BOA's supposed security interest in the BTS assets.  Rather, Eddystone is contending that the lien is *invalid* as a shield for Defendants to protect them from liability for BTS' transfers of *other* assets *to Defendants*.  If Eddystone were seeking a judgment that would be binding against BOA and would affect its rights, then of course BOA would be a necessary party to this action.  That is why the court in *Universal Computer Consulting, Inc. v. Pitcairn Enter., Inc.* refused to consider fraudulent transfer claims against transferees that were not parties to the case.  No. 03-2398, 2005 WL 2077269, at *15 (E.D. Pa. Aug. 26, 2005).  But the relief actually sought here—avoidance of the transfers *to Defendants*—would not affect any interest of BOA's or otherwise result in a decree binding upon that entity.

        **b.**        **Even If There Was a "Valid Lien," the BTS Property Was Not "Encumbered" By That Lien to Any Meaningful Extent**

Even if there was a valid lien, Defendants' argument would still fail as a matter of law because property is excluded from PUFTA's definition of "Asset" only "*to the extent it is encumbered* by a valid lien."  12 Pa. Cons. Stat. § 5101(b) (emphasis added).  Here, even if there was a valid lien securing a guaranty on the BOA line of credit to FG, the BTS property was not encumbered by that lien to any meaningful extent, both because there was no possibility that FG would default on it and thereby trigger the guaranty and because the line of credit was vastly

over-secured.  Because the property was not wholly encumbered by a valid lien, the transfers of the property necessarily constituted transfers of "assets" under PUFTA which deprived Eddystone of the opportunity to recover and should be avoided as fraudulent.

Again, the Court should construe PUFTA "to give effect to all its provisions."  1 Pa. Cons. Stat. § 1921(a).  The relevant language here is "to the extent it is encumbered."  A Comment to PUFTA explains in detail what this language means and how it should be applied:

> Property encumbered by a valid lien is excluded from the definition of "asset" only "to the extent" the property is so encumbered.  For example, in the case of property encumbered by a lien securing a contingent obligation, such as a guaranty, in general it would be appropriate to value the obligation by discounting its face amount to reflect the probability that the guaranty will ever be called upon.  Likewise, if an obligation is secured by a lien on several items of property and only one such item is disposed of, it may be appropriate to allocate the obligation among the items of property subject to the lien for the purpose of determining the "extent" to which the item disposed of is encumbered for purposes of this definition.

12 Pa. Cons. Stat. § 5101 cmt. (2).  These principles are directly applicable here.[4]

Here, the plain text of the statute ("to the extent it is encumbered"), as elucidated by the Comment, provides two further grounds to reject Defendants' "valid lien" defense.  *First*, there was no real probability that the BTS guaranty would actually be called upon, meaning that the lien securing that contingent obligation imposed no encumbrance on the BTS property.  *Second*, the BTS property was only a small portion of the total property subject to liens securing the BOA line of credit, and allocating the obligation among all such property leaves only an inconsequential encumbrance on the BTS property.

---

[4] The Third Circuit has consulted the Comments when construing PUFTA.  *E.g.*, *Philadelphia Entertainment & Development Partners LP v. Department of Revenue*, 860 F. App'x 25, 30 & n.6 (3d Cir. 2021); *Cardiello v. Arbogast*, 533 F. App'x 150, 156 (3d Cir. 2013).

### (1) Because there was no chance that the BTS guaranty would be called upon, the lien securing that guaranty imposed no encumbrance on the BTS property

In addressing how to evaluate "the extent" to which property "is encumbered by a valid lien," the Comment explains that, "in the case of property encumbered by a lien securing a contingent obligation, such as a guaranty, in general it would be appropriate to value the obligation by discounting its face amount to reflect the probability that the guaranty will ever be called upon."  12 Pa. Cons. Stat. § 5101 cmt. (2).  A guaranty is a "contingent" obligation because, by contrast to a typical debtor, a guarantor will never pay a penny unless the entity that owes the underlying debt covered by the guaranty defaults on that debt.  *E.g.*, *In re Shuey*, 606 B.R. 760, 768 (N.D. Ill. Bankr. 2019).  The guarantor effectively provides the creditor with insurance against the debtor's default, and, as with any insurance contract, the guaranty should generally be valued "by discounting its face amount to reflect the probability that the guaranty will ever be called upon."  12 Pa. Cons. Stat. § 5101 cmt. (2); *see also, e.g.*, *Siematic Mobelwerke GmbH v. Siematic Corp.*, 643 F. Supp. 2d 675, 691 (E.D. Pa. 2009) ("Thus, where the lien is a contingent obligation, such as a guaranty, the obligation is valued in light of the probability that the guaranty will ever be called upon.").

Here, FG never defaulted on the BOA line of credit and there is no evidence that there was any probability that it would do so.  There was therefore never any probability that the BTS guaranty would be called upon, and so the lien did not materially encumber BTS' assets.  In January 2016, FG owed $311 million on the line of credit, while its corporate family had around $2.5 *billion* in assets.  SOF-¶187.  As Marc Sherman explained:

> Given Ferrellgas' current assets at those times as compared to its short term debt balance, the likelihood of Ferrellgas defaulting on the secured credit facility and requiring access to BTS' assets would have been highly improbable.  Therefore, even if it were to be determined that valid liens stemming from a guaranty existed against BTS' assets, the likelihood that BTS' assets were at risk was nominal.

SOF-¶187.  Discovery has uncovered no reason to believe at the time of the transfer in January 2016 that there was any probability that FG would default on the line of credit.  Defendants do not suggest otherwise.  Discounting the face value of the guaranty by the zero percent probability that it would ever be called upon results in a $0 valuation for the guaranty and, thus, a $0 encumbrance for the lien.  *See Landmark Cmty. Bank, N.A. v. Klingelhutz*, 874 N.W.2d 446, 451 (Minn. App. 2016) ("The record shows that at the time of the transfer, there was no claim of default upon the principal mortgage or guaranty mortgage.  Hence, … the amount of debt secured by the guaranty mortgage was zero.").  In short, even if the BTS guaranty was secured by a valid lien, that lien imposed no encumbrance on the BTS property because there was no meaningful probability that the guaranty would be called upon.

At a minimum, this "discounting" point precludes summary judgment for Defendants (who never address the point at all).  In light of the foregoing, Defendants plainly cannot show that FG was indisputably so likely to default that the BTS assets were fully encumbered.

> **(2)   Allocation of the value of the line of credit among all assets securing guaranties on it also shows that the BTS property was not encumbered by any lien to any meaningful extent**

Even setting aside the "discounting" sentence of the Comment, the Comment's "allocation" sentence makes clear that any lien imposed no meaningful encumbrance on the BTS property.  That sentence states that "if an obligation is secured by a lien on several items of property and only one such item is disposed of, it may be appropriate to allocate the obligation among the items of property subject to the lien for the purpose of determining the 'extent' to which the item disposed of is encumbered for purposes of this definition."  12 Pa. Cons. Stat. § 5101 Comment (2).

40

The line of credit—valued at $311 million—was covered by around *2.5 billion* in assets. SOF-¶187.  Allocating the obligations among the items of property subject to liens results in an encumbrance of under 12.5% of value on any given item of property (311 million is 12.44% of 2.5 billion).  As noted, this would have discounted by the unlikelihood of a call on the guarantee. But even without the discounting, more than 87% of the value of the transferred BTS property was *not* encumbered by the supposed lien.  That value therefore falls within PUFTA's definition of an "Asset" whose fraudulent transfer can and should be avoided.  *See Nielsen v. Logs Unlimited, Inc.*, 839 N.W.2d 378, 384 (S.D. 2013) (where fair market value of property exceeded value of lien, transfer was of an "asset" within the meaning of South Dakota's UFTA statute and therefore constituted a fraudulent transfer); *Nat'l Loan Investors, L.P. v. World Prop., L.L.C.*, 830 A.2d 1178, 1183 (Conn. App. 2003) (property was an "asset" to the extent that the value of the property exceeded the valid lien).

Defendants assert that "[t]he lien fully encumbered" the BTS property and that Eddystone cannot show otherwise because Sherman "did not opine on the value of other property securing the BOA credit facility."  Dkt. 495-1 at 31-32.  Expert testimony was not required, however, to show that the total assets subject to liens securing guaranties of the line of credit vastly exceeded the value of FG's debt.  In short, the supposed lien was neither valid nor large enough to shield Defendants' fraudulent transfers from judicial scrutiny.

## 2. Defendants' Accounting Gimmickry Cannot Shield Them from Liability for Fraudulent Transfers

Defendants deem "nonsensical" the notion that, in June 2015, FG purchased Logistics, whose largest subsidiary was BTS (valued between $202.5 and $324.9 million), SOF-¶210, and immediately "ma[de] accounting changes to shield assets from" Eddystone.  Dkt. 495-1 at 35. Defendants insist that FG would not have purchased Logistics if it anticipated that the Monroe

arrangement would fall apart. *Id.*  But the record shows that FG was acutely aware of the substantial risk that BTS would end up as Eddystone's debtor and thus had ample incentive to protect itself from potential losses under the RSA by moving value out of BTS.

In May 2015, before the Acquisition, consultants warned FG that losses at Bridger Marketing would affect Logistics.  SOF-¶125.  The consultant noted that "Bridger Marketing incurred significant losses in 2014 of over $10 million … [If losses continue,] it is difficult to see how Bridger Logistics will not be impacted." *Id.*  The Bakken-Brent spread had already narrowed to the point that Marketing was taking losses on the Monroe contract—the oil being transloaded through the Eddystone Facility via BTS' contract with Eddystone.  If Marketing collapsed, BTS would have no use for the capacity at the Eddystone Facility, which carried a significant deficiency fee for every month in which BTS did not meet its minimum volume requirement.  In short, Defendants knew that BTS would likely end up owing Eddystone under the RSA and acted to strip its assets.

Defendants next assert their decision to strip $13.8 million of BTS' accounts receivable as part of the FG Acquisition was either required under the Acquisition purchase agreement or meaningless based on a valuation report prepared by third-party, which Defendants claim "did not attribute <u>any</u> value to these intercompany accounts." Dkt. 495-1 at 36.  But, at his deposition, the expert Defendants rely upon for this *opinion* stated that neither the purchase agreement nor the CBIZ report justified or required the cancellation of the accounts receivable.  SOF-¶121.  Moreover, there is a simple explanation why Defendants' third-party valuation firm did not identify or attribute any value to BTS' accounts receivable:  the firm was hired to do a

valuation of *tangible* and *intangible* assets, not *financial* assets like accounts receivable.[5]  Dkt. 495-63 at 2.  The firm did not evaluate financial assets and, therefore, did not evaluate BTS' accounts receivable.

Defendants assert that "*BTS* adopted Cost Center Accounting" based on a recommendation from FG's consultant.  Dkt. 495-1 at 36 (emphasis added).  But *BTS* did not adopt anything.   ████████████ REDACTED ████████████

████████████████████████████████████████  Dkt. 217-1, Ex. 12.  And Defendants have no evidence that they implemented a cost center accounting system. In June 2015, Jilla forwarded the chart showing assignments to the fake entities to a finance employee (Seline) and instructed her to use them for billing.  SOF-¶96.  Seline testified that she did not know that the entities were fake until her deposition preparation in this case.  SOF-¶105. The accounting records are clear that Defendants diverted BTS' revenues and profits away from BTS to other FG entities.

Regardless, the undisputed fact is, wherever Defendants diverted BTS' revenues in 2015, BTS *never got those funds back*.  FG's accounting records and internal emails confirm that BTS never saw any of the millions in revenue that was earned by BTS contracts but credited to "Bridger Rail Services" and "Bridger Pipeline Services."  *E.g.*, Dkt. 217-2 ¶ 14; Dkt. 266-5 ¶ 28.

Defendants contest that stripping BTS of these assets left it insolvent, but ignore that under 12 Pa. C. S. § 5102(b), Eddystone is entitled to a presumption of insolvency because—as Defendants themselves point out—BTS was "generally not paying [its] debts as they become

---

[5] A "financial asset" includes any asset that is a contractual right to receive cash or assets—*known as accounts receivable*.  *See* PWC, "Financial Instruments Under IFRS: A Guide Through the Maze," page 36, https://www.pwc.com/gx/en/ifrs-reporting/pdf/financial_instruments_guide_maze.pdf, accessed Oct. 15, 2021.

due." Nor was BTS capable of doing so after Defendants commandeered its cash flow. SOF-¶¶89-116.

Defendants contend that stripping these assets was permissible because "BTS received reasonably equivalent value." Dkt. 495-1 at 38-40. Defendants claim that as part of the FG Acquisition, Defendants paid off $39.69 million in BTS obligations. *Id.* But Eddystone's expert was able to trace the money Defendants reference, and he concluded that the $39.69 million was part of the FG Acquisition purchase price rather than consideration for transfers of assets. SOF-¶58.

### 3. The Real Estate Assets Defendants Transferred Are Valued to Determine Damages, Not Liability

Defendants argue Eddystone cannot establish the value of Swan Ranch transloading facility and, therefore, summary judgment must be granted. Dkt. 495-1 at 41-42. This is a throw-away argument. PUFTA does not require a plaintiff to establish the value of each and every asset that was fraudulently transferred; it merely limits recovery to the amount transferred. In any event, BTS' assets are worth much more together than they are in pieces. Thus, the individual value of the Swan Ranch property is largely irrelevant to the fraudulent transfer analysis.

### C. Defendants' Implied Contract Arguments Are Both Irrelevant and Wrong

Defendants devote a significant portion of their brief to attempting to disprove the existence of what they call an "implied contract." Dkt. 495-1 at 17-26.[6] There is no dispute that BTS earned revenue to pay its obligations under the maritime contract with Eddystone from the proceeds of a contract between BTS and Marketing (and later, with Logistics). Specifically,

---

[6] Eddystone disagrees with Defendants' legal characterization of the contract at issue as "an implied contract." The oral agreement was memorialized in intercompany rate sheets. Nevertheless, Eddystone assumes defendants' characterization solely for purposes of this summary judgment opposition.

BTS entered into a take-or-pay contract with Marketing that matched the terms in the RSA. SFO-¶¶39-45.  Marketing received the benefit of capacity at the Eddystone facility, and BTS received in return payments from Marketing to cover the expenses due to Eddystone, plus some profit.  SOF-¶48.  The payments owed to BTS were reflected on an intercompany rate sheet (Exs. 832-824).  As Eddystone's expert explained, the custom and practice in the oil logistics industry is that no logistics company in BTS's position would have agreed to the RSA with Eddystone without revenue to fund the obligations.  SOF-¶45.  He also noted that in all similar contracts between Marketing and BTS, Bridger itself followed that industry practice.  SOF-¶46.  As Eddystone will show at trial, Defendants' failure to allow performance under the "implied contract" after BTS was sold to Jamex Transfer Holdings is both a fraudulent transfer to Logistics (an effective diversion of BTS's future revenue stream) and a breach of fiduciary duty to Eddystone by failing to preserve assets for BTS's creditors.

The "implied contract" theory is not a necessary element to Eddystone's claims for fraudulent transfer or breach of fiduciary duty.  Disregard of the "implied contract," however, would be the transfer of another asset, enhancing Eddystone's damages.  Since Defendants seek summary judgment on the claims—and not the scope of the damages—their arguments about the contracts implied by law are premature and irrelevant.

Nevertheless, because Defendants have thrown a spotlight on this issue, Eddystone briefly explains here that Defendants' arguments are wrong or, at a minimum, raise disputed factual issues.  For starters, Defendants try to get out from under the obligations in the "implied contract" by saying that the contract was not in writing and thus is barred by the Texas statute of frauds one-year rule—despite the fact that the agreement was recorded on an inter-company rate sheet (Exs. 832-824).  But Texas substantive law does not govern here.  Because this is a

contract backstopping the federal maritime contract, federal common law governs.  At a minimum, Pennsylvania law applies because Pennsylvania has significant and overwhelming interests in the resolution of this matter.  *See* Section IV.B, *infra*.  Under either federal common law or Pennsylvania, there is no one year requirement.  *See Kossick v. United Fruit Co.*, 365 U.S. 731, 734-41 (1961); *Hornyak v. Sell*, 629 A.2d 138, 141 (Pa. Super. 1993).  There is no statute of frauds problem here.

Next, Defendants contend that there was no meeting of the minds.  Dkt. 495-1 at 22.  But, as defendants acknowledge, Rios admitted that a "spot" contract existed between BTS and Marketing.  *See id.*; *see also* SOF-¶86.  Rios disputed the terms of the contract, injecting at most a factual question.  The terms can be derived from the rate sheets and, as Eddystone's expert explained, from the parties' prior course of dealing, and industry practice (SOF-¶¶45-46).  *E.g.*, *One Beacon Ins. Co. v. Crowley Marine Servs., Inc*., 648 F.3d 258, 265 (5th Cir. 2011) ("Where parties share a history of business dealings …, such familiar provisions … are binding where they are accepted without objection.'").  Contrary to defendants' argument, a contract can be proven from the parties' performance even if some of the performance occurs after the date of contract formation.  *See Clevo Co. v. Hecny Transp.,* 715 F.3d 1189, 1194 (9th Cir. 2013).

Defendants contend that the contractual terms were indefinite.  Dkt. 495-1 at 24.  However, a reasonable factfinder could disagree based on industry practice and defendants' own prior practice in written agreements.  A reasonable factfinder could conclude that BTS and Marketing had agreed on a transloading fee, deficiency payment, volume commitment, and duration of their contract.  *See* SOF-¶¶45-49.  These terms allowed BTS and Marketing to identify a breach (i.e., non-payment of a charge) and remedy (*i.e.*, money damages).  A maritime

contract needs only the terms required to establish breach and provide a remedy. *Hecny*, 715 F.3d at 1194. None of the terms that Defendants identify as being "indefinite" are at issue here.

Finally, Defendants challenge Eddystone's novation theory that one of the original contracting parties (BTS Marketing) was substituted out for another party (BTS Logistics). Dkt. 495-1 at 25. The elements of novation are: "[t]he displacement and extinction of the prior contract, the substitution of a new contract, a sufficient consideration therefor, and the consent of the parties thereto." *Taylor v. Stanley Co. of Am.*, 158 A. 157, 158 (Pa. 1932); *Navarette v. Silversea Cruises Ltd.*, 620 F. App'x 793, 797 (11th Cir. 2015) (for maritime contracts, law of forum governs novation terms). Each element is established here. It is undisputed that Logistics and one of its wholly-owned subsidiaries, Bridger Rail Shipping, LLC, paid all BTS invoices under the RSA prior to Logistics' sale of BTS to Jamex Transfer Holdings. SOF-¶110. Logistics directed its subsidiary (Bridger Rail Shipping) to make these payments. *Id.*; SOF-¶116. The evidence also shows that Logistics needed the Eddystone transloading facility to perform its own contractual obligations with Monroe and that Marketing's obligations under the "implied contract" were effectively extinguished at the time FG acquired Logistics. *Id.* While Defendants may dispute these novation facts, such factual dispute cannot be resolved on summary judgment.

## IV.   DEFENDANTS BREACHED FIDUCIARY DUTIES OWED TO EDDYSTONE

### A.   Eddystone Is Entitled to Summary Judgment on Breach of Fiduciary Duty

#### 1.   This Court's Prior Rulings Are Law of the Case

Defendants' scam was further aggravated by two factors: (1) defendants were fiduciaries to the BTS creditor they robbed and (2) defendants—who were supposed to protect BTS' creditors' interests—transferred BTS' assets to themselves. This Court's prior rulings establish that Pennsylvania law governs the breach of fiduciary duty claim and that defendants owed a

fiduciary duty to Eddystone when BTS became insolvent.  *See* Dkt. 59 at 12; Dkt. 60 at 1-2; Dkt. 275 at 1-2 & nn.1-2; Dkt. 368 at 6-7, 10.  These rulings are law of the case.

Lacking any meaningful defense on the merits of count IV, Defendants seek to relitigate the Court's prior rulings on the basic legal framework.  For the *fifth* time in five years, Defendants ask the Court to hold that Eddystone's fiduciary duty claim is governed by Louisiana law.  *See* Dkt. 495-1 at 60-62.  When rejecting the fourth such attempt in 2020, Judge DuBois laid out the relevant procedural history.  *See* Dkt. 421 at 3-4.  Judge DuBois recounted that Judge Kelly squarely held in 2018 that "'Pennsylvania law, not Louisiana law, applies' to this claim" and then ruled in 2019 that "'this basic argument has already been raised—and rejected.'"  *Id.* (quoting Dkt. 275 at 2 n.2 & Dkt. 368 at 6-7).  Judge DuBois then laid out the law-of-the-case doctrine and held that none of the three narrow exceptions applied.  *Id.* at 5-7.  He also analyzed the issue himself—and concluded that Judge Kelly's "decisions correctly stated the law."  *Id.* at *4.  Judge DuBois further held in an earlier ruling that "plaintiff has stated a claim for breach of fiduciary duty."  Dkt. 368 at 7.

This fifth time around, defendants do not even argue that they can satisfy any of the narrow exceptions to the law-of-the-case doctrine.  *See* Dkt. 495-1 at 60-62.  Instead, they urge that the doctrine does not apply because they now seek to advance a new *argument* for applying Louisiana law: While their prior attempts were based on the internal affairs choice-of-law doctrine, they now seek to apply "Pennsylvania's hybrid choice-of-law analysis."  *Id.* at 61.

Defendants' attempt to circumvent the law of the case fails.  As Judge DuBois explained, "[u]nder the law of the case doctrine, once *an issue* has been decided, parties may not relitigate that issue in the same case."  Dkt. 421 at 5 (emphasis added) (quoting *Waldorf*, 142 F.3d at 616 n.4).  The "issue" here is which state's substantive law governs Eddystone's fiduciary duty

claim—Pennsylvania's or Louisiana's?  This Court has held—repeatedly—that "'Pennsylvania law, not Louisiana law, applies' to this claim." *Id.* (quoting Dkt. 275 at 2 n.2).  Since that issue has been decided, the law-of-the-case doctrine says that "parties may not relitigate that issue in the same case," as defendants seek to do here. *Id.* (quoting *Waldorf*, 142 F.3d at 616 n.4).  It is immaterial that defendants seek to relitigate the issue by advancing a new *argument*; the doctrine bars relitigation regardless of whether the party retreads its prior argument or cooks up a new one.  Indeed, the doctrine would count for little if it ceased to apply whenever a party came up with a new argument.  If defendants wanted to argue the "hybrid approach," they could and should have advanced it as an alternative argument the first time around.[7]  Pennsylvania substantive law governs here.

### 2.    Defendants Breached Fiduciary Duties Owed to Eddystone

Judge DuBois established the governing substantive standard under Pennsylvania law. Once defendants' transfer of BTS' revenue rendered BTS insolvent, Defendants owed Eddystone fiduciary duties.  Dkt. 368 at 7.  "Importantly, when a corporation is insolvent, corporate directors and officers owe a fiduciary duty to the creditors of the corporation." *Id.* at 8 (collecting cases).  "This fiduciary relationship with creditors applies in the context of insolvent limited liability companies, such as BTS, as well." *Id.* (citation omitted).  Judge DuBois also concluded that, once proven, Defendants' fraudulent transfers of BTS assets constitute a breach of fiduciary duty that directly injured Eddystone by "facilitat[ing] BTS's breach of the RSA." *Id*. at 8-9.

---

[7] Defendants' two cited cases do not help them.  Those cases merely show that courts may decline to apply law of the case "to an issue that the parties have not previously briefed and argued in full," *Golden Horn Shipping Co. v. Volans Shipping Co.*, 14-CV-2168 (JPO), 2017 WL 3535002, at *7 (S.D.N.Y. Aug. 16, 2017), and that law of the case "only applies to issues that were 'actually decided by the court,'" *Oetting v. Heffler, Radetich & Saitta, LLP*, No. 11-4757, 2017 WL 3453342, at *4 (S.D.N.Y. Aug. 11, 2017).  Here, the issue has been previously briefed, argued at length, and actually decided on multiple occasions.

Here, Defendants owed fiduciary duties to Eddystone. *See In re Main, Inc*., 239 B.R. 281, 291 (Bankr. E.D. Pa. 1999) (explaining that the fiduciary duty includes both a duty of care that protects against negligence and a duty of loyalty that protects against intentional harm and self-dealing). It is undisputed that Defendants were well aware of BTS' minimum volume commitment under the RSA—indeed, it was the anticipated $70 million "EBITDA hole" that the RSA created which triggered the final "Eddystone restructuring." It is similarly undisputed that they knew that their actions would—and were indeed carefully calculated to—render BTS unable to fulfill that obligation and to manufacture defenses to the anticipated litigation against the asset transferees. *See* Sections II.A.1-2, *supra*.

The undisputed facts also show that Defendants breached their fiduciary duty to Eddystone. After Defendants removed every single thing of value from BTS and arranged for the Monroe contract to be performed without using the Eddystone Facility (*see* Section III.A.2, *supra*), BTS could neither meet the minimum volume requirement nor pay the deficiency charges it owed. Defendants left Eddystone with no income for the Eddystone Facility and no ability to recover its losses from BTS. Defendants engineered the entire scheme for their own benefit—in Gamboa's words, approved by Soifer and Rios, "for our sake, no one else's"—and at the expense of Eddystone. SOF-¶130. Defendants are thus liable for the resulting damages. Eddystone is entitled to summary judgment on Count IV.

**B.    The Court Should Deny Defendant's Motion for Summary Judgment on Breach of Fiduciary Duty**

Defendants argue that the breach of fiduciary duty claim (Count IV) is not legally viable. They contend that this claim should be governed by Louisiana law because BTS was formed in Louisiana and that Louisiana law does not recognize a fiduciary duty to creditors even if the entity is insolvent. Dkt. 495-1 at 42-45. They contend that the same result would be dictated if

Pennsylvania law were applied.  *Id.* at 45-49.  These arguments—which attempt to relitigate long-settled legal matters—fail for several reasons.

*First*, these arguments are barred by law of the case.  As explained above, this Court has held–on multiple occasions–that Pennsylvania law governs the fiduciary claim.  Dkt. 59 at 12; Dkt. 275 at 1-2 & nn.1-2; Dkt. 368 at 6-7, 10.  It has rejected three times arguments that Eddystone's fiduciary duty claim should fail because it is governed by Louisiana law.  Dkt. 59 at 12; Dkt. 275 at 1-2 & nn.1-2; Dkt. 421 at 7-8.  And this Court has twice held that Eddystone's claim for breach of fiduciary duty is legally viable under Pennsylvania law.  Dkt. 59 at 12; Dkt. 60 at 1-2; Dkt. 368 at 7-10.  Judge DuBois cemented in these rulings by denying, on law of the case grounds, an earlier motion for summary judgment on Count IV.  Dkt. 421 at 5-8.  This alone defeats the current motion for summary judgment on Count IV.

*Second*, the Court's prior choice-of-law rulings are correct.  "A district court's choice-of-law decision is governed by the choice-of-law rules of the forum state."  *Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co*., 752 F.2d 71, 74 (3d Cir. 1985).  Even assuming there is an actual conflict between the substantive laws of each state—as defendants suggest—Pennsylvania clearly has a "greater interest" than Louisiana in the resolution of this dispute.  *See Hammersmith v. TIG Ins. Co*., 480 F.3d 220, 231 (3d Cir. 2007).  Pennsylvania is the locus of Plaintiff's transloading business at issue in this litigation and the target of defendants' scheme to victimize Eddystone.  *E.g., Elbeco Inc. v. Estrella de Plato, Corp*., 989 F. Supp. 669, 679 (E.D. Pa. 1997) ("Pennsylvania has a strong interest in protecting its residents and in having the responsible defendants accountable for their actions in Pennsylvania.").  By contrast, there is no connection with Louisiana other than that it is place of incorporation of non-party BTS.  *See Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 467-68 (3d Cir. 2006).

Defendants ignore the overwhelming contacts with Pennsylvania in favor of a flawed interpretation of 15 Pa. Cons. Stat. § 402(a)(2).  They contend that Pennsylvania law "points to Louisiana" because Pennsylvania provides that the substantive law of the foreign association's state of formation will govern "[t]he liability that a person has as an interest holder or governor for a debt, obligation or other liability of the association."  Dkt. 495-1 at 43 (quoting 15 Pa. C.S. § 402(a)(2)).  But, as Judge DuBois explained, the "BL/FG defendants cite no authority supporting their interpretation of 15 Pa. Cons. Stat. § 402(a)(2)."  Dkt. 421 n.2.  Defendants are being sued in Count IV for their own misconduct, not for the debt of the LLC.  Thus, Section 402(a)(2) is not relevant here.

*Third*, the Court correctly rejected defendants' legal challenges to Eddystone's fiduciary duty claim under Pennsylvania law.  As Judge DuBois explained, "multiple Pennsylvania federal and state courts have permitted creditors of insolvent corporations to assert fiduciary duty claims directly under Pennsylvania law."  *Id*. at 9 (collecting cases).  Defendants seek to shield themselves from liability by drawing a distinction between an LLC and a corporation.  *See* Dkt. 495-1 at 45-47.  They cite no Pennsylvania cases supporting this distinction.  They instead try to draw an inference from 15 Pa. Cons. Stat. Ann. § 8834(a).  *See* Dkt. 495-1 at 46.  But the statute's plain language reveals the legislature's true intent:  to shield managers from personal liability for a company debt or liability "solely by reason of being or acting as a member or manger."  15 Pa. Cons. Stat. Ann. § 8834(a).  The committee comments explain that this "shield is … irrelevant to claims seeking to hold a member or member directly liable on account of the member's or manager's own conduct."  Committee Comments to Subsection a (2016).  Here, Count IV seeks to hold defendants liable for actions taken in their own self-interest—and not "solely by reason of being or acting as a member or manager."  As Judge DuBois recognized,

"this Court applied Pennsylvania law to a creditor's fiduciary duty claim against an individual who allegedly 'transferred assets' from a Delaware LLC to himself." Dkt. 421 at 7 (citing *Hipple v. Hipple*, No. 12-1256, 2016 WL 320216, at *11-12 (E.D. Pa. Jan. 27, 2016)); *see also Sugartown Worldwide LLC v. Shanks*, No. 14-5063, 2015 WL 1312572, at *12 (E. D. Pa. Mar. 24, 2015); *Weber v. U.S. Sterling Sec.,* 924 A.2d 816, 824–25 (2007) (same analysis under Delaware LLC Act).

Even if Louisiana substantive law applied to Count IV, the result would be the same. *See* Dkt. 495-1 at 44-45 (defendants' contention that Count IV fails under Louisiana law). Louisiana courts have historically recognized that directors, officers, and agents who engage in self-dealing expose themselves to a direct fiduciary duty claim from the creditors. *See Hooper v. Maruka Machinery*, 525 So.2d 1113, 1117 (La. App. 1988); *Abraham v. Lake Forest, Inc.*, 377 So.2d 465, 471 (La. App. 1979); *see also 3 Point Holdings, LLC v. Gulf South Solutions, LLC*, No. 06-10902, 2008 WL 695379, at *2 (M.D. La. Mar. 13, 2008). Contrary to Defendants' argument (Dkt. 495-1 at 48), "LLCs are not different from corporations in any sense that would justify a different approach to such questions of personal liability." *Ogea v. Merritt*, 130 So.3d 888, 901 (La. 2013). The Louisiana LLC statute does not preclude liability to creditors for a breach of fiduciary duty. *See also* La. R.S. §§ 12:1314(B); La. R.S. §§ 12:1314(C).

*Finally*, Defendants argue that the FG entities (FG and FGP) were not managers or members of BTS and thus cannot be liable for breach of fiduciary duty. *See* Dkt. 495-1 at 49-50. But these FG entities are liable as the controlling entities of BTS' sole member. Control persons of a fiduciary are liable when they cause that fiduciary to breach its duties. *See In re Covenant Partners*, L.P., No. AP 16-226, 2017 WL 838637, at *3 (Bankr. E.D. Pa. Mar. 2, 2017). There, the control persons of a limited partnership's general partner were held liable for the general

partner's breach of its fiduciary duties because the breach resulted from their exercise of control, just as FG—a principal beneficiary of Logistics' fiduciary breaches—caused Logistics to breach its fiduciary duties to BTS.  The court held that, "[a]s the individuals who control the general partner of the limited partnership which is the general partner of the Debtor, [Defendants] owed fiduciary duties to the Debtor's limited partners."  *Id.*  Similarly, the FG entities, which control the managing member of BTS, owe fiduciary duties to BTS's creditors.  Accordingly, Defendants' motion for summary judgment on Count IV should be denied.

## CONCLUSION

Eddystone's motion for summary judgment should be granted.  Defendants' motion for summary judgment should be denied.

Dated:  October 29, 2021                    Respectfully submitted,


                                            /s/ Filiberto Agusti
                                            Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                            BALLARD SPAHR LLP
                                            1735 Market Street, 51st Floor
                                            Philadelphia, PA 19103-7599
                                            Telephone: (215) 665-8500
                                            Facsimile: (215) 864-8999
                                            hockeimerh@ballardspahr.com

                                            Filiberto Agusti (*pro hac vice*)
                                            Steven Barber (*pro hac vice*)
                                            Andrew J. Sloniewsky (*pro hac vice*)
                                            STEPTOE & JOHNSON LLP
                                            1330 Connecticut Avenue, NW
                                            Washington, DC 20036
                                            Telephone: (202) 429-3000
                                            Facsimile: (202) 429-3902
                                            fagusti@steptoe.com

                                            *Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF WORD COUNT

Pursuant to the Court's Order dated September 22, 2021 (Dkt. 487), the foregoing combined brief is 17,486 words (less than the 17,500 set in the Court's order), excluding the cover page, the table of contents, the glossary, the signature block, and the certificates of word count/service.

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed via the Court's ECF system on October 29, 2021, thereby serving all counsel of record.

/s/ Filiberto Agusti
Filiberto Agusti

1