**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDDYSTONE RAIL COMPANY, LLC,

        Plaintiff/Counter-Defendant,

      v.

BRIDGER LOGISTICS, LLC, JULIO RIOS,
JEREMY GAMBOA, FERRELLGAS
PARTNERS, L.P., and FERRELLGAS L.P.
*et al.*

        Defendants.

BRIDGER LOGISTICS, LLC,
FERRELLGAS PARTNERS, L.P., and
FERRELLGAS, L.P.

        Defendants/Counterclaimants

No. 17-cv-00495

**PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S RESPONSES TO
DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and in accordance with Section II(B)(4) of

the Court's Policies and Procedures, Plaintiff Eddystone Rail Company, LLC ("Eddystone")

respectfully submits these responses to Defendants' Statement of Undisputed Material Facts, Dkt.

495-4.

**Preliminary Statement**

Eddystone's responses below are made solely for purposes of resolving Defendants'

Motion to Dismiss, or in the Alternative, for Summary Judgment, Dkt. 495 (the "Motion").  The

responses are limited to Defendants' fact assertions in their Statement of Undisputed Material

Facts, Dkt. 495-4, and do not extend to statements that Defendants reference in the Statement in

support of those assertions.  Additionally, by responding to those statements, Eddystone does not

waive the right to object that those statements, even if accurate, are not relevant or otherwise

inadmissible.

## **General Objections**

A.  Eddystone objects to the extent that Defendants fail to cite evidence in support of their Statements of Undisputed Facts, including where the purported evidence cited by Defendants does not support a Statement and/or where the only cited evidence is to a self-serving, conclusory, or unsubstantiated assertion made in an affidavit.

B.  Eddystone objects to the extent Defendants cite to purported evidence as support for their Statements that is inadmissible at trial.

C.  Eddystone objects to the extent the purported documentary evidence cited by Defendants as support for their Statements has not been authenticated by the author of the document or a witness with personal knowledge of its preparation and contents.

D.  Eddystone objects to the extent the purported documentary evidence cited by Defendants as support for their Statements contain hearsay statement(s) that are being offered by Defendants for the truth of the matter asserted.

E.  Eddystone objects to Defendants' Statements to the extent they are misleading, distorted, and taken out of context in light of the full record.

F.  Where Defendants' Statements selectively quote a document, Eddystone respectfully refers the Court to the entire exhibit.

G.  Eddystone objects to Defendants' Statements to the extent they are irrelevant and immaterial to the disposition of the pending Motions.

H.  Eddystone objects to any Statement that purports to state a legal conclusion or resolve a legal issue on which a ruling from the Court is required.

### The Parties and Related Entities

1.  At the time it filed this action, Plaintiff Eddystone Rail Company, LLC ("ERC") was a limited liability company organized under the laws of Delaware with its principal place of business in Eddystone, Pennsylvania. (Dkt. 77 (Counterclaims ¶ 3); Dkt. 133 (ERC Answer to Counterclaims ¶ 3).).

**Response No. 1:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

2.  ERC was a joint venture between Enbridge Rail (Philadelphia), LLC, a subsidiary of Enbridge, Inc. (collectively with other Enbridge entities, "Enbridge") and Canopy Prospecting, Inc. ("Canopy"). (Dkt. 77 (Ferrellgas Counterclaims ¶ 3); Dkt. 133 (ERC Answer to Counterclaims ¶ 3); Ex. 1 (Paradis Tr. (11/30/18) at 61:16-62:8 ("Q. Enbridge is the only owner of the Enbridge Rail (Philadelphia), LLC; right? ... A. I believe so."); Ex. 2 (Wilkins Tr. (10/26/18) at 6:3-10, 10:25-11:23, 21:8-17 (testifying he was "senior vice-president of business development" at Bridger Logistics in 2014 and worked within the Enbridge family of companies), 90:10-23 (testifying "Enbridge owned Enbridge Rail and it rolled up into Enbridge, Inc.").)

**Response No. 2:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant

to any issue raised in this motion.

3.  Defendant Ferrellgas Partners, L.P. ("FGP") is a Delaware limited partnership with its corporate headquarters in the State of Kansas. (Dkt. 182 (FAC ¶ 14); Dkt. 192 (Ferrellgas Answer to FAC ¶ 14).)

**Response No. 3:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

4.  FGP is the controlling parent of defendant Ferrellgas, L.P. ("FG," collectively with FGP, "Ferrellgas"); FG is a Delaware limited partnership with its corporate headquarters in the State of Kansas. (Dkt. 182 (FAC ¶ 15); Dkt. 192 (Ferrellgas Answer to FAC ¶ 15); Dkt. 133 (ERC Answer to Amended Counterclaims ¶ 1); Ex. 3 (1/31/16 Ferrellgas 10-Q at BLFG_EDPA1604276 ("The operating partnership [defined as Ferrellgas, L.P.] is the only operating subsidiary of Ferrellgas Partners [defined as Ferrellgas Partners, L.P.]").)

**Response No. 4:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

5.  Non-party Ferrellgas, Inc. is the general partner of both FGP and FG. (Ex. 4 (11/5/18

Ruisinger Decl. ¶ 1); Ex. 3 (1/31/16 Ferrellgas 10-Q at BLFG_EDPA1604276 ("Ferrellgas, Inc. (the "general partner"), a wholly-owned subsidiary of Ferrell Companies, has retained a 1% general partner interest in Ferrellgas Partners [defined as Ferrellgas Partners, L.P.] and also holds an approximate 1% general partner interest in the operating partnership [defined as Ferrellgas, L.P.], representing an effective 2% general partner interest in Ferrellgas [defined as Ferrellgas Partners, L.P., collectively with Ferrellgas L.P.] on a combined basis. As general partner, it performs all management functions required by Ferrellgas.").)

**Response No. 5:**     For purposes of the Motion only, Eddystone does not dispute

Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial

and irrelevant to any issue raised in this motion.

6.   Defendant Bridger Logistics, LLC ("BL") is a limited liability company that was organized under the laws of Louisiana on June 2, 2011, with its principal place of business in the State of Texas. (Dkt. 193 (BL Answer to FAC ¶ 13); Ex. 5 (BL Articles of Organization at BLFG_EDPA0275702).)

**Response No. 6:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

7.   As of July 1, 2013, non-party Bridger, LLC ("Bridger") was BL's sole member and manager. (Ex. 6 (12/30/11 Notice of Change of Members and Membership Interests of BL, BLFG_EDPA0054889-90, 2/6/12 Notice of Change of Members and Membership Interests of BL, BLFG_EDPA0054891-92, 7/29/13 Notice of Change of Members and Managers of BL, BLFG_EDPA0054893-94, and 6/28/13 Certificate of Merger of Bridger Group, LLC with and into Bridger, LLC, BLFG_EDPA1630513-16).)

**Response No. 7:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant

to any issue raised in this motion.

8.   Defendant Julio Rios was Bridger's President and Chief Executive Officer from July 1, 2013 until June 24, 2015. (Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274499); Ex. 8 (Rios Tr. at 30:24 – 31:23); Ex. 9 (ERC Supplemental Response to R/G Second Set of Interrogatories at 16 ("Prior to the Acquisition, Rios was also President and Chief Executive Officer of Bridger, LLC")); Ex 10 (7/1/13 Second Amended and Restated Limited Liability Company Agreement of Bridger, LLC at BLFG_EDPA1625670 (identifying officers)).)

**Response No. 8:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

9.  Defendant Jeremy Gamboa was Bridger's Executive Vice President and Chief Operating Officer from July 2013 until June 24, 2015. (Ex. 11 (Gamboa Tr. at 23:19-23); Ex. 9 (ERC Supplemental Response to R/G Second Set of Interrogatories at 16 ("Prior to the Acquisition, Gamboa was Executive Vice President and Chief Operating Officer of Bridger, LLC"); Ex 10 (7/1/13 Second Amended and Restated Limited Liability Company Agreement of Bridger, LLC at BLFG_EDPA1625670 (identifying officers)).)

**Response No. 9:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

10. On June 24, 2015, FGP acquired BL and its subsidiaries from Bridger in an arms-length transaction for more than $800 million (the "Acquisition") pursuant to a May 29, 2015 Purchase and Sale Agreement By and Between Bridger, LLC, as Seller, and Ferrellgas Partners, L.P., as Purchaser (the "Ferrellgas PSA"). (Ex. 12 (Ferrellgas PSA at 1).)

**Response No. 10:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

11. In connection with the Acquisition, Rios became employed by Ferrellgas, Inc., and served as the President and Chief Executive Officer of BL, as well as the Executive Vice President of Ferrellgas, Inc. (Ex. 13 (5/29/15 Rios Employment Agreement ¶ 3); Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274499).)

**Response No. 11:**      Undisputed, except that Rios also served as Executive Vice-President of

Ferrellgas Partners, LP.  ERC-2028, 10/12/15 Rios Email, RG_EDPA0118803-07, at -03.

12. In connection with the Acquisition, Gamboa became employed by Ferrellgas, Inc.,and served as the Chief Operating Officer of BL, as well as the Senior Vice President of Ferrellgas,Inc. (Ex. 14 (5/29/15 Gamboa Employment Agreement ¶ 3); Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274499).)

**Response No. 12:**      Undisputed, except that Gamboa also served as Executive Vice-President

of Ferrellgas Partners, LP.  ERC-380, 12/24/15 Giannini Email, BTSEDDYSTONE0027138-39,

at -38.

13. Following the Acquisition, BL became a subsidiary of FG. (Ex. 15 (10/1/20 ERC's Supplemental Responses and Objections to Defendants Rios and Gamboa's Fourth Set of Interrogatories at Supplemental Response 4, pg. 24 ("Through the Acquisition, Logistics became a wholly-owned subsidiary of Ferrellgas, L.P.").)

**Response No. 13:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

14. Prior to the Acquisition, Bridger had two main divisions: (1) Bridger Marketing, LLC ("BM," f/k/a Bridger Trading, LLC), an oil marking company that, among other ventures, purchased crude oil from the Bakken region of North Dakota and then sold such crude to East Coast refineries; and (2) BL, an oil logistics and transportation company that, along with its subsidiaries, transported the crude from the Bakken to East Coast refineries. (Ex. 18 (12/23/16 Ballengee Decl., ¶¶ 3, 5, 32).)

**Response No. 14:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

15. Non-party Bridger Transfer Services, LLC ("BTS") was a BL subsidiary that, prior to being acquired by FGP, had entered a 2013 Rail Facilities Services Agreement ("RSA") with ERC for the use of a transloading facility in Eddystone, Pennsylvania, which was designed to transload crude oil from rail cars onto barges on the Delaware River. (Dkt. 182 (FAC ¶¶ 4, 41); Dkt. 193 (BL Answer to FAC ¶¶ 4, 41); Ex. 16 (RSA at 1); (Ex. 12 (PSA at Schedule 4.4, RG_EDPA0008562).)

**Response No. 15:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

16. BL and BTS provided logistical services to support a 2014 Crude Oil Supply Agreement (the "COSA") in which BM agreed to supply Bakken crude from North Dakota to theTrainer Refinery located near Philadelphia, Pennsylvania.  (Dkt. 182 (FAC ¶¶ 40-41, 47); Dkt. 193(BL Answer to FAC ¶¶ 40-41, 47); Ex. 17 (COSA, JTS-SMA_0002008-12).) At the time of the Acquisition, the COSA arrangement provided BL with its largest customer and was one of its main sources of revenue. (Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274544 ("[BL's] largest customer, owns a refinery in Trainer, Pennsylvania. Bridger has entered into an agreement with this customer under which Bridger will provide logistics services to transport a minimum of 65 MBbls/d of crude oil from the Bakken region in North Dakota to the Trainer refinery. This agreement terminates in 2019, and the minimum volume commitment is subject on a monthly basis to a minimum average delivery amount per month of 35 MBbls/d. During the fiscal year ended July 31, 2015, approximately 50% of our crude oil logistics gross margin was generated from this customer."); Ex. 61 (11/5/18 Soiefer Decl. ¶¶ 11-12, 16-17 ("Ferrellgas believed the RSA was a valuable asset as part of Bridger Logistics' and its subsidiaries' overall logistical solution to provide crude oil to the Trainer Refinery. Additionally, the Monroe TLA was a significant customer contract to Bridger Logistics at the time of the Ferrellgas Acquisition.").)

**Response No. 16:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

17. At all times relevant to this action, BM was a Louisiana limited liability company, with its principal place of business in Texas. (Dkt. 70 (Third-Party Complaint ¶ 11); Dkt. 158 (Answer to Third-Party Complaint ¶ 11).)

**Response No. 17:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.

18. Through the Acquisition, Bridger sold BL to Ferrellgas while retaining BM; following the Acquisition, Bridger, LLC changed its name to Jamex, LLC, and BM changed its name to Jamex Marketing, LLC ("Jamex Marketing"). (Ex 18 (12/23/16 Ballengee Decl. ¶ 32).)

**Response No. 18:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.

### The Eddystone Facility and Rail Facilities Services Agreement

19. In early 2012, ERC's parent entities Enbridge and Canopy began developing and marketing a plan to convert a coal-fired power plant in Eddystone, Pennsylvania with existing infrastructure into a transloading facility (the "Eddystone Facility") that would load crude oil shipped by rail from North Dakota onto barges for delivery to East Coast refineries. (Ex. 19 (5/11/12 Rios email to Canopy regarding the Eddystone Facility, CANTP001646); Ex. 20 (11/26/12 Canopy email regarding and attaching press release concerning joint venture with Enbridge, Eddystone 0034339-41).)

**Response No. 19:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.

20. The Defendants first learned about the Eddystone Facility in February 2012. (Ex. 18 (Ballengee Decl. ¶ 6).)

**Response No. 20:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.

21. At that time, BTS and other BL subsidiaries had relationships with several Enbridge entities, including contracts to lease truck stations in North Dakota used for crude storage and transport, an agreement to use a transloading facility in Berthold, North Dakota, and an agreement for oil storage in Berthold, North Dakota, for which BL had provided the associated Enbridge

entity a parental guaranty. (Ex. 21 (9/1/11 Beaver Lodge Lease, ERCEDPA00450648); Ex. 22
(11/1/11 Trenton Lease, ERCEDPA00002225); Ex. 23 (5/5/12 Berthold Rail Agreement,
ERCEDPA00131622); Ex. 24 (7/12/12 Berthold Rail Phase I Agreement, ERCEDPA00411916);
Ex. 91 (6/1/12 Oil Storage Agreement, BLFG_EDPA0330536 ("In accordance with Exhibit "A,"
Customer [defined as Bridger Storage, LLC] shall cause its ultimate parent corporation, Bridger
[], to provide a parental guarantee in form and substance acceptable to Enbridge"),
BLFG_EDPA0330544 (9/7/12 Guarantee "by Bridger Logistics, LLC (the 'Grantor') to and in
favor of Enbridge Storage (North Dakota) L.L.C. (the 'Creditor').").)

**Response No. 21:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

22. On or about February 13, 2013, BTS and ERC entered into the RSA. (Ex. 16 (RSA

at 18).)

**Response No. 22:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

23. Enbridge had to approve ERC's execution of the RSA. (Ex. 25 (ERC Operating
Agreement, ERCEDPA00243083-107 ¶ 1 (defining "Company" as Eddystone Rail Company,
L.L.C. and "Operator" as Enbridge Rail (Philadelphia) L.L.C.), § 2.1(n)(ii) ("Operator shall ... (n)
in collaboration with the Facility Business Development Manager appointed pursuant to Section
3.4, undertake the commercial responsibilities of the Operator for Expansions approved by the
Management Committee and the maintenance of business through the Facilities, which include ...
(ii) developing the Rail Services Agreements (RSAs), Transportation Service Agreements (TSAs)
and all other commercial contracts for the Expansion"); Ex. 26 (Eddystone Rail Company, L.L.C.
Limited Liability Company Agreement (Ex. 426 to ERC 30(b)(6) Cohen Tr.) at § 5.1 (specifying
the rights and duties of ERC's Management Committee and identifying Enbridge employees as
comprising two of the four members of the Management Committee).)

**Response No. 23:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant

to any issue raised in this motion.

24. Enbridge was the entity that actually built the Eddystone Facility and operated it until
2017, when Enbridge sold its interest to the other joint venturer, Canopy, a private company.(Ex.
1 (Paradis Tr. (10.19.17) at 5:5-18 (testifying he has been employed by Enbridge for "[o]ver 31
years"), 11:21-12:4 (testifying "it was late 2014" when he "first [got] involved and [became]
responsible in some way for the Eddystone facility"), 17:17-19:18 (testifying Enbridge "put a
significant amount of capital into" building the Eddystone Facility and subsequently "sold this
facility to -- to Canopy"), 392:8-12 (confirming he was "the lead from the Enbridge side

negotiating the ultimate deal between Enbridge and Canopy that got consummated in October of 2017"), 394:2-395:4 (confirming the Redemption and Asset Transfer Agreement is dated October 19, 2017); 395:24-396:12 (testifying the Redemption and Asset Transfer Agreement gave Canopy the "rights to the Exelon lease at the Eddystone Rail facility"); Ex. 27 (Copy of Redemption and Asset Transfer Agreement (Ex. 78 to Paradis Dep., ERCEDPA00529409-37) (providing for the sale of Enbridge's interests in ERC to Canopy).)

**Response No. 24:**     Disputed.  Eddystone built the transloading facility, but it hired an

Enbridge affiliate to do the construction work.  ERC-2116, 11/12/12 Construction Agreement,

BLFG_EDPA0058396-417.  Additionally, Eddystone retained an Enbridge affiliate to perform

operations at the facility.  ERC-2115, 11/21/12 Operating Agreement, BLFG_EDPA0057445-69.

Further, Eddystone objects that this statement is misleading and, in any event, immaterial and

irrelevant to any issue raised in this motion.  Eddystone also objects to the extent this statement

relies on hearsay or other inadmissible evidence.

25. Under the RSA, BTS agreed to transload a minimum of 64,750 barrels per day ("bpd") through the Eddystone Facility for five years following an initial phase-in period, or to pay a "Deficiency Volume Charge" if it transloaded fewer than 64,750 bpd in a given month. (Ex.16 (RSA §§ 1.1, 2.1, 4).)

**Response No. 25:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

26. The RSA set the "Deficiency Volume Charge" at $1.75 per barrel not transloaded and made the charge subject to adjustment "by any increase in the United States department of Labor, Consumer Price Index." (Ex. 16 (RSA §§ 1.1, 5.1).)

**Response No. 26:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph but objects that the description of the adjustment provision in Rail

Services Agreement ("RSA"), § 5.1, is incomplete.

27. The RSA set the "Transloaded Volume Charge" at $2.25 per barrel, and similarly made this charge subject to adjustment "by any increase in the United States department of Labor, Consumer Price Index." (Ex. 16 (RSA §§ 1.1, 5.1).)

**Response No. 27:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph but objects that the description of the adjustment provision in Rail

Services Agreement ("RSA"), § 5.1, is incomplete.

28. The RSA provided that, whenever BTS paid a "Deficiency Volume Charge," it would receive "credits" that could be used to pay for the transloading of future barrels of oil. (Ex.16 (RSA §§ 1.1, 4.2).)

**Response No. 28:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

29. The credits could be used only to pay for barrels of crude over and above BTS's daily minimum volume commitment of 64,750 bpd, and the credits expired six months after they were earned. (Ex. 16 (RSA §§ 1.1, 4.2).)

**Response No. 29:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

30. The RSA did not require that BTS supply a surety bond, parent guaranty, letter of credit, or any other form of collateral or financial assurance. (Ex. 16 (RSA § 11).)

**Response No. 30:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, but object that the statement is misleading in that, as set forth in ¶¶

31 and 32, below, under certain circumstances Eddystone was entitled to demand a surety bond,

parent guaranty, letter of credit, or other form of collateral or financial assurances.  Eddystone

further objects to the extent this statement is incomplete and respectfully refers the Court to the

entire referenced Exhibit 16.

31. Instead, with respect to "financial assurances," the RSA gave ERC the right to request information that would enable ERC to determine BTS's "ability to pay the Charges and all other amounts that may reasonably become payable by [BTS] under this Agreement, the Terms and Conditions and/or the Terminal Rules." (Ex. 16 (RSA § 11.1).)

**Response No. 31:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, but object that the statement is misleading in that, as set forth in ¶ 32, below, under certain circumstances Eddystone was entitled to demand a surety bond, parent guaranty, letter of credit, or other form of collateral or financial assurances.  Eddystone further objects to the extent this statement is incomplete and respectfully refers the Court to the entire referenced Exhibit 16.

32. The RSA further gave ERC the right to request a letter of credit, guaranty, or "other enforceable collateral security," but only if (1) BTS failed to provide the requested information within five days, (2) ERC determined BTS "may not have the ability to pay," or (3) BTS's credit ratings fell beneath a certain threshold. (Ex. 16 (RSA § 11.1).)

**Response No. 32:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and respectfully refers the Court to the entire referenced Exhibit 16.

33. If BTS refused to provide the requested security, ERC's sole remedy under the RSA was to stop transloading crude presented by BTS. (Ex. 16 (RSA § 11.1).)

**Response No. 33:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and respectfully refers the Court to the entire referenced Exhibit 16.

34. ERC requested a parent guaranty, letter of credit and/or surety bond on several occasions. (Ex. 28 (1/30/15 BTS-ERC emails discussing ERC's request for financial assurances, ERCEDPA00561613-18); Ex. 29 (2/24/15 ERC emails discussing requests to BTS for financial assurances and a surety bond, ERCEDPA00177802); Ex. 30 (6/1/15 BTS-ERC emails discussing ERC's request for a letter of credit, RG_EDPA0088782-85); Ex. 31 (June 2015 BTS-ERC emails discussing ERC's requests for credit assurances, ERCEDPA00541634-39); Ex. 32 6/17/15-7/1/15 BTS-ERC emails regarding ERC's request for a surety bond, RG_EDPA0007695-704); Ex. 18 (12/23/16 Ballengee Decl. ¶¶ 16, 29-31); Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 223:21-224:5 ("A. We asked for a guaranty is my recollection, or my understanding, and it wasn't forthcoming. Q. … So Eddystone asked for a parent guaranty to secure the full amount of the RSA? … A. I think so. Or a letter of credit. And that ultimately didn't come to fruition.").

**Response No. 34:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph, but object that they are misleading to the extent that Eddystone

denies that it sought assurances on "several occasions", and notes the record citations describe only a few instances in early 2015 and mid-2015 in which Eddystone requested assurances. Eddystone further objects to the extent these contentions rely on hearsay or other inadmissible evidence.

35. On September 10, 2014, BL executed a short-term guaranty of certain limited obligations of BTS to ERC, which guaranty expired by its terms on September 30, 2014. (Ex. 34,(9/10/14 Guarantee, BTSEDDYSTONE0027989).)

**Response No. 35:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and respectfully refers the Court to the entire referenced Exhibit 34.

36. BTS provided no other guaranty, letter of credit, surety bond or other collateral security in connection with the RSA. (Ex. 16 (RSA § 11.1); Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 223:21-224:5 ("A. We [ERC] asked for a guaranty is my recollection, or my understanding, and it wasn't forthcoming. Q. … So Eddystone asked for a parent guaranty to secure the full amount of the RSA? … A. I think so. Or a letter of credit. And that ultimately didn't come to fruition.").)

**Response No. 36:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.  Eddystone further objects to the extent that this statement is based on hearsay or other inadmissible evidence.

37. The RSA contains a choice-of-law provision, instructing that it "shall be governed and construed according to the laws of the State of New York, without regard to principles of conflict of laws that, if applied, might require the application of the laws of another jurisdiction."(Ex. 16 (RSA § 15.2).)

**Response No. 37:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and respectfully refers the Court to the entire referenced Exhibit 16.

38. The RSA further provides that BTS "shall not be entitled to assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed." (Ex. 16 (RSA § 8).)

**Response No. 38:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, but objects that this statement is misleading to the extent that the

RSA, § 8, specifically identifies, without limitation, circumstances in which a refusal to permit

assignment shall not be considered unreasonable.  Eddystone further objects to the extent this

statement is incomplete and respectfully refers the Court to the entire referenced Exhibit 16.

39. Exhibit A to the RSA reflects the "Terms and Conditions for the Use of the Eddystone Rail Facilities," which ERC could amend, supplement or restate so long as ERC provided BTS with 45 days' prior written notice. (Ex. 16 (RSA § 6.1, Ex. A).)

**Response No. 39:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

40. Exhibit A contains the sole reference to the term "maritime" in the RSA. (Ex. 16 (RSA Ex. A at §§ 6, 12, 16).)

**Response No. 40:**      Disputed.  Section 1.1 of the RSA defines the phrase "Applicable Laws"

as "all maritime and other laws . . . ."  Eddystone objects that this statement is misleading and, in

any event, immaterial and irrelevant to any issue raised in this motion.  The Court has already

determined that the RSA is a maritime contract and that determination is law of the case and,

therefore, not at issue.

41. Exhibit A to the RSA addresses dispute resolution and provides that "either Party may refer [any dispute, controversy or claim] to three (3) persons at New York" and that the "proceedings shall be conducted in accordance with the Rules of the Society of Maritime Arbitrators, Inc." (Ex. 16 (RSA Ex. A § 16(b)).)

**Response No. 41:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, but object that it is misleading to the extent that RSA Ex. A, § 16

contains additional rules and limitations governing arbitrations beyond those described in this

paragraph.  Eddystone further objects to the extent this statement is incomplete and respectfully

refers the Court to the entire referenced Exhibit 16.

42.  BTS, defined as the "Customer," and ERC, defined as the "Owner," are the sole parties to the RSA. (Ex. 16 (RSA at 1).)

**Response No. 42:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

43. The RSA defines the term "Affiliate" as "a Party, or any other Person directly or indirectly controlling, controlled by, or under common control with such Party," and further provides that "[e]ach of the members of the Owner shall be deemed to be Affiliates of Owner." (Ex. 16 (RSA § 1.1 at 1).)

**Response No. 43:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

44. In defining the term "Operator," the RSA states "Owner shall, without limitation, have the right to perform any and all of Transloading Services (directly or through an Affiliate) and/or to replace the Operator from time to time." (Ex. 16 (RSA § 1.1 at 4).)

**Response No. 44:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement is incomplete and

respectfully refers the Court to the entire referenced Exhibit 16.

45. When it entered the RSA, ERC understood that BTS was a distinct legal entity and its sole counterparty with contractual obligations under the RSA. (Ex. 33 (ERC 30(B)(6) Depo. Tr. (Day 2: Cohen) at 282:17-24 ("Q. When it entered into the RSA, Eddystone was aware that BTS was a distinct legal entity, correct? A. Yes.") and 289:3-5 ("Q. BTS was the only entity with contractual liability, correct? A. BTS was the obligor under the RSA, yeah."); Ex. 1 (Paradis Tr. at 183:3-19 ("Q. In this case, the party that ERC looks to with respect to its rights and obligations under [the RSA] is [BTS]; correct? A. Yes.")); Ex. 2 (Wilkins Tr. at 111:21-117:6 ("Q. And Enbridge ultimately had to have been comfortable having [BTS] as opposed to BP as their counter-party? A. Yeah, and by the time we signed the contract, they had already demonstrated the ability to do that with their Berthold business and they had regretted not taking more at Berthold. They were very capable guys and doing – I mean, by this time they were the up-and-coming oil company") and 123:4-124:17 ("Q. So in that lead-up period to 2012 when you were exploring the Eddystone Rail facility ... do you recall that there were a number of different leases that [BTS]

took for Enbridge stations in North Dakota? A. Yea…. [T]hey had one lot at Stanley and then they took one at Berthold. And then as I put on Little Muddy and Reserve, Grenora, as we made room in all the spots, they wanted one. Great. Here's the contract. Got it back signed, and they went and built their stuff…. I mean, it was a good business partner. Q. And so do you recall which of the Bridger Group entities actually contracted for those various stations? A. Yeah, it was [BTS]. Q. And did you understand at the time why it was [BTS] as opposed to another entity that you were contracting with for those leases? A. Ma'am, I -- it's similarly to which company -- we'e spent a lot of time this morning talking about Enbridge and Enbridge, Inc., and all that. I mean, it was always Bridger; and it was, like, this is the company they want their business to be conducted with for this type of work. And it worked with us and my counsel said, "Great. Let's go with them." So we contracted between [BTS] and Enbridge Pipeline (North Dakota) or Enbridge Rail (North Dakota) and that's how we did it and it worked."))

**Response No. 45:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is misleading and, in any event, immaterial and irrelevant to any issue raised in this motion.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

46. When it entered the RSA, ERC concluded that "BTS had strong financials." (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 225:2-20).)

**Response No. 46:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.

47. At the time the parties entered the RSA, the Eddystone Facility was not operational.(Ex. 16 (RSA § 2.2).)

**Response No. 47:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.

48. By May 2014, construction of the Eddystone Facility was substantially complete,and the Eddystone Facility accepted its first train on May 3, 2014. (Ex. 35 (5/3/14 Nicely Email,BLFG_EDPA0469085-86); Ex. 36 (Turnbull Tr. at 9:13-24, 29:11-30:11 (testifying he joined Enbridge as an employee in April 2013 and was "manager of the Eddystone Rail Company in Eddystone" where he "was responsible for the overall safe, environmentally sound, and efficient operation of the facility"), 75:1-76:7 ("Q. When did the facility become operational? A. Again, itwas early May of 2014 when we received our first train.").)

**Response No. 48:**     Disputed.  The Eddystone facility became operational on April 17, 2014.

9/28/21 Eddystone Statement of Uncontested Facts, Dkt. 491-2, ¶ 52. For purposes of the Motion

only, Eddystone does not dispute the contention in this paragraph that the first train was received

on May 3, 2014.  Eddystone objects to the extent this statement relies on hearsay or inadmissible

evidence.

49. Shortly after operations began, BTS informed ERC that BTS had several complaints with
respect to the Eddystone Facility's performance and capabilities. (Ex. 18 (Ballengee Decl. ¶¶ 28-
30); Ex. 37 (Nicely Decl. ¶ 49).)

**Response No. 49:**      Disputed.  The BTS "complaints" were pretextual and did not refer to any

significant problems with the facility.  9/28/21 Eddystone Statement of Uncontested Facts, Dkt.

491-2, ¶¶ 56, 58 (noting that even Defendants' expert agreed the facility could meet the

minimum volume commitment set forth in the RSA).  Eddystone objects that this statement is

misleading and, in any event, immaterial and irrelevant to any issue raised in this motion.

Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

50. Rather than terminating the RSA as a result of such problems, BTS attempted to
negotiate a resolution with ERC. (Ex. 18 (Ballengee Decl. ¶¶ 28-30).)

**Response No. 50:**      Disputed.  There were no significant problems with the facility and there

were no grounds for termination.  9/28/21 Eddystone Statement of Uncontested Facts, Dkt. 491-

2, ¶¶ 56, 58 (noting that even Defendants' expert agreed the facility could meet the minimum

volume commitment set forth in the RSA).  Eddystone objects that this statement is misleading

and, in any event, immaterial and irrelevant to any issue raised in this motion.  Eddystone further

objects to the extent this statement relies on hearsay or inadmissible evidence.

51. To that end, affiliates of BTS offered to buy the Eddystone Facility three times: (a) in
2013, when construction stalled, (b) in 2014, after operations began and BTS complained about
the Eddystone Facility's performance and capabilities, and (c) in 2015, when the issues giving rise
to BTS's complaints persisted. (Ex. 18 (Ballengee Decl. ¶¶ 16, 29-31).)

**Response No. 51:**      Disputed.  There was no contractual in-service date and construction did

not "stall."  9/28/21 Eddystone Statement of Uncontested Facts, Dkt. 491-2, ¶¶ 38, 66-75.  The

BTS "issues" were pretextual and did not refer to any significant problems with the facility.

9/28/21 Eddystone Statement of Uncontested Facts, Dkt. 491-2, ¶¶ 56, 58 (noting that even

Defendants' expert agreed the facility could meet the minimum volume commitment set forth in

the RSA).  Moreover, the source relied on for this paragraph does not clearly state that an effort

was made to purchase the facility in 2013.  Ex. 18 (Ballengee Decl. ¶ 16).  For purposes of the

Motion only, Eddystone does not dispute Defendants' contention in this paragraph that

discussions to purchase the facility occurred in 2014 and 2015.  Eddystone objects that this

statement is misleading and, in any event, immaterial and irrelevant to any issue raised in this

motion.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible

evidence.

52. BTS also tried to negotiate an amendment to the RSA that would address certain of its
complaints. (Ex. 18 (Ballengee Decl. ¶¶ 28-29).)

**Response No. 52:**     Disputed.  The BTS "issues" were pretextual and did not refer to any

significant problems with the facility.  9/28/21 Eddystone Statement of Uncontested Facts, Dkt.

491-2, ¶¶ 56, 58 (noting that even Defendants' expert agreed the facility could meet the

minimum volume commitment set forth in the RSA).  Eddystone objects that this statement is

misleading and, in any event, immaterial and irrelevant to any issue raised in this motion.

Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

53. BTS eventually retained counsel in December 2014 to demand a formal dispute
resolution meeting in accordance with the RSA. (Ex. 18 (Ballengee Decl. ¶ 30).)

**Response No. 53:**     Disputed.  The source relied upon by Defendants (Ex. 18 (Ballengee Decl.

¶ 30) does not support the contention that BTS "retained counsel in December 2014."  For

purposes of the Motion only, Eddystone does not dispute Defendants' contention in this

paragraph that counsel for BTS sent a December 2014 letter to Eddystone asking for a formal

meeting under the terms of the RSA.  Eddystone objects that this statement is misleading and, in any event, immaterial and irrelevant to any issue raised in this motion.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

54. Negotiations to amend the RSA proceeded through the fall of 2015 but were ultimately unsuccessful. (Ex. 18 (Ballengee Decl. ¶ 31); Ex. 37 (Nicely Decl. ¶ 49).)

**Response No. 54:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is misleading and, in any event, immaterial and irrelevant to any issue raised in this motion.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

55. Despite the identified problems with the Eddystone Facility's performance and capabilities, BTS paid ERC for all transloaded and deficiency volume charges that were due under the RSA during the time BTS was owned by Bridger Logistics. (Ex. 38 (ERC Response to Rios and Gamboa's First Set of Interrogatories at 2-9); Ex. 39 (Sherman Tr. at 186:23-187:2 (Q: "Eddystone was paid every single month while Bridger Logistics Owned BTS, wasn't it?" A: "Yeah, I want to say except for a small piece, yes.").)

**Response No. 55:**     Disputed.  There were no significant problems with the Eddystone facility. 9/28/21 Eddystone Statement of Uncontested Facts, Dkt. 491-2, ¶¶ 56, 58 (noting that even Defendants' expert agreed the facility could meet the minimum volume commitment set forth in the RSA).  Moreover, other than a single payment in July 2015, after the June 24, 2015 acquisition of Bridger Logistics, LLC ("Bridger Logistics") all payments owed to Eddystone under the RSA were made by Bridger Logistics or a subsidiary, Bridger Rail Shipping, LLC. ERC-1205, Sherman Expert Report at ¶¶ 130-32.  Eddystone objects that this statement is misleading and, in any event, immaterial and irrelevant to any issue raised in this motion. Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

**The Monroe COSA**

56. On July 1, 2014, BM and Monroe Energy, LLC ("Monroe") entered into the COSA, pursuant to which BM agreed to deliver 1,950,000 barrels of crude per month (approximately

65,000 bpd) to Monroe's refinery in Trainer, Pennsylvania (the "Trainer Refinery"). (Ex. 17 (COSA, JTS-SMA_0002008); Ex. 40 (Ballengee Tr. 48:2-21 ("Q. Had they agreed that [Monroe] would take a minimum volume of 65,000 barrels per day? A. They did, yes.").)

**Response No. 56:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

57. BM used BTS's capacity at the Eddystone Facility to unload crude oil delivered by trains onto barges, which then delivered the crude to the Trainer Refinery. (Ex. 40 (Ballengee Tr.48:2-4 ("Q. So was Monroe your only customer out of Eddystone? A. Yes."); Ex. 17_ (COSA at JTS-SMA_0002017 (§ 2.8: "Refiner and Supplier agree that Supplier shall be the exclusive source of Crude Oil purchased or otherwise procured by Refinery that is unloaded at the Eddystone Facility" and "Refiner shall not during any period of exclusivity . . . purchase or otherwise procure Crude Oil that to Refiner's knowledge has been transshipped from the Eddystone Facility except through Supplier"), at JTS-SMA_0002049-50 (Schedule 4.2: describing crude oil transportation, including "rail car loading at origin, BNSF/CP freight, rail car utilization, Eddystone Facility throughput, barge from Eddystone Facility to the Refinery"), JTS-SMA_0002019 (§ 4.1: providing the "price for Crude Oil pursuant to this Agreement" is based on Schedule 4.1).)

**Response No. 57:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

58. On May 26, 2015, BM and Monroe entered the Amended and Restated Crude Oil Supply Agreement ("Amended COSA"), pursuant to which BM agreed to continue delivering 1,950,000 barrels of crude per month (approximately 65,000 barrels per day) to Monroe. (Ex. 41 (Amended COSA).)

**Response No. 58:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

59. Under the Amended COSA, the per-barrel price Monroe paid to BM was reduced by $0.25 per barrel, and Monroe was entitled to further reduce its payments to BM by any payments Monroe made to BL pursuant to a separate Transportation and Logistics Services Agreement that BL and Monroe entered on May 26, 2015 (the "Monroe TLA"). (Ex. 41 (AmendedCOSA at §§ 1.1, 4.1(c), 7.1).)

**Response No. 59:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

60. Under the Monroe TLA, Monroe agreed to pay BL a per-barrel transportation fee and to reimburse BL for "railroad freight charges, fees and other costs" that BL incurred to transport crude from North Dakota to the Eddystone Facility; Monroe also agreed to pay deficiency charges, so long as BM delivered to Monroe an average of at least 35,000 bpd during the month. (Ex. 42 (Monroe TLA §§ 6.1-6.4).)

**Response No. 60:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

61. On June 24, 2015, BM and BL entered into a separate Transportation and Logistics Agreement (the "Marketing TLA"), pursuant to which BM agreed that BL would be "the sole and exclusive provider of [logistics] Services with respect to any [of BM's] Marketing Arrangements for Crude Petroleum." (Ex. 43 (Marketing TLA § 2).) If Monroe delivered fewer than 35,000 bpd during the month, BM was to pay deficiency charges to BL. (*Id.* § 23.)

**Response No. 61:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

### The Alleged Implied Contracts

62. ERC contends that, prior to the Acquisition, BTS had an implied contract with BT that mirrored the terms of the RSA, with a duration of five years and two months. (Ex. 33, (ERC 30(B)(6) Tr. (Day 2: Cohen) at 140:25-141:12 & 143:11-17 (volume commitment was "the same as what was in the RSA," or "65,000 barrels a day"), 144:3-9 ("payments would have had to follow the same structure as the RSA"), 145:13-17 ("It would be for the same term as the RSA, so 5 years and 2 months, I think."), 151:15-152:11 (parties agreed on "price, the term, and the volume").)

**Response No. 62:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph regarding the BTS-Bridger Marketing contract.  Eddystone objects

that this statement is misleading and misconstrues Eddystone's contentions with respect to the

contract BTS had with BM.  Eddystone further objects to the extent this statement relies on

hearsay or inadmissible evidence.

63. ERC contends that "the implied contract between BM and BTS was assumed by [BL] after the acquisition." (Ex. 33 (ERC 30(b)(6) Tr. (Day 2 Cohen) at 232:9-16 ("Q. So the contention is then that, following the acquisition, Bridger Logistics assumed the same obligations [of the implied contract] that BM had during the pre-acquisition period? A. Yes.") and 126:22-127:12 ("A. I would say that the implied contract between BM and BTS was assumed by [BL] after the acquisition. … Q. But it's the same contract and just one party agreed to assume it? A. That is our allegation.").)

**Response No. 63:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph regarding the BTS-Bridger Marketing contract.  Eddystone objects

that this statement is misleading and misconstrues Eddystone's contentions with respect to the

contract BTS had with BM.  Eddystone further objects to the extent this statement relies on

hearsay or inadmissible evidence.

64. The alleged implied contract between BM and BTS "was not a written agreement."(Ex. 33
(ERC 30(b)(6) Tr. (Day 2: Cohen) at 136:25-137:5 ("Q. [T]his implied contract that you alleged
occurred is not a written agreement? … A. To my knowledge, it was not a written agreement."),
235:14-236:5 ("Q. And there's no written agreement upon which Eddystone relies to establish a
implied contract in the post-acquisition period, correct? A. No written agreement").)

**Response No. 64:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph regarding the BTS-Bridger Marketing contract.  Eddystone objects

that this statement is misleading and misconstrues Eddystone's contentions with respect to the

contract between BTS and BM.  Eddystone further objects to the extent this statement relies on

hearsay or inadmissible evidence.

65. ERC has not identified who allegedly agreed to the terms of the implied contract on
behalf of BTS or BM. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 127:13-128:9 ("Q. Who
negotiated the implied contract between BTS and BM on the BTS side? A. I don't know. Q. …
[W]ho negotiated on the BM side? A. I don't know.").)

**Response No. 65:**      Disputed.  While Eddystone is not aware of the identity of specific

individuals involved, Bridger, LLC Chief Financial Officer Patrick Kelly testified that the rates

BTS charged affiliates "would come down to, frankly, an internal discussion among the team

leads in the respective departments, and they would resolve any issues and differences they had

and agree to a number . . . . I believe this email exchange [attaching rate sheets] is Vispi Jilla's

efforts and my efforts to document what we understand to be the agreements among the different

groups inside the organization . . . ."  ERC-2076, Kelly Tr.  151:18-152:4.  Eddystone objects

that this statement is misleading and, in any event, immaterial and irrelevant to any issue raised

in this motion.  Eddystone further objects to the extent this statement relies on hearsay or
inadmissible evidence.

66. ERC bases the existence of the alleged implied contract between BTS and BM on ERC's
"expectation, given industry practice." (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 250:21-
252:3 ("A. [A]t the time that we entered the [RSA] with BTS, we had an expectation, given
industry practice that BTS had a contract in place that – and BM had an agreement that would
backstop BTS's obligations to Eddystone under the [RSA] … We didn't know at the time whether
it was written or not. We wouldn't have known. But we had an expectation because that's common
practice in our industry that there was a backstop agreement. That was the expectation; that's the
contention. … Q. So you didn't know, one way or the other, whether there was a backstop
agreement?  A. No. We had the expectation because that's common practice.").)

**Response No. 66:**      Disputed.  Eddystone bases the existence of the BTS-Bridger Marketing

contract on not just industry practice, but also course of dealing between BTS and Bridger

Marketing, the existence of negotiated written rate sheets identifying the rates BTS was to charge

Bridger Marketing, Bridger LLC's corporate practices, and common sense (no logistics company

in BTS' position would have agreed to undertake a multimillion take-or-pay obligations like the

RSA without having a commitment to receive revenue to fund the obligations).  Eddystone Rule

56 Statement of Uncontested Facts in Support of Its Summary Judgment, filed this date ("SOF"),

¶¶ 35-49.  Eddystone objects that this statement is misleading and misconstrues Eddystone's

contentions with respect to the contract between BTS and BM.  Eddystone further objects to the

extent this statement relies on hearsay or inadmissible evidence.

67. ERC also bases the existence of the alleged implied contract on an alleged "course of
dealing" between BTS and BM. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 232:5-16 ("Q:
Does Eddystone rely on the course of dealing between BM and BTS to ascertain the terms of the
implied contract during the pre-acquisition period? A. That is the implied contract during the pre-
acquisition period. Between BM and BTS. Q. Okay. So the contention is then that, following the
acquisition, [BL] assumed the same obligations that BM had during the pre-acquisition period? A.
Yes."); Ex. 44 (ERC Supp. Response to BLFG Second Interrogatories at 5-7).)

**Response No. 67:**      Disputed.  Eddystone bases the existence of the BTS-Bridger Marketing

contract on not just a course of dealing between BTS and Bridger Marketing (which would

include, but not be limited to, the existence of negotiated written rate sheets identifying the rates

BTS was to charge Bridger Marketing), but also industry practice, Bridger LLC's corporate

practices, and common sense (no logistics company in BTS' position would have agreed to

undertake a multimillion take-or-pay obligations like the RSA without having a commitment to

receive revenue to fund the obligations).  SOF ¶¶ 35-49.  Eddystone objects that this statement is

misleading and misconstrues Eddystone's contentions with respect to the contract between BTS

and BM.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible

evidence.

68. ERC contends "the course of dealing between BM and BTS, during the pre- acquisition period, is evidenced by rate sheets and accounting records." (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 252:4-13 ("Q. And the course of dealing between BM and BTS during the pre-acquisition period, is evidenced by rate sheets and accounting records, correct? A. In part, yes."); Ex. 15 (10/1/20 Plaintiff Eddystone Rail Company, LLC's Supplemental Responses and Objections to Defendants Rios and Gamboa's Fourth Set of Interrogatories at Supplemental Response 4, pg. 7-8 (referring to accounting records)); Ex. 44 (ERC Supp. Response to BLFG Second Interrogatories at 5-7 ("Bridger, LLC's corporate policy required affiliated-party transactions to be conducted at arms-length through written contracts…. In some instances, [BL] subsidiaries such as BTS had written contracts with Marketing. For example, BTS had written contracts with [BM] (then Bridger Trading) under which BTS provided crude injection station capacity to [BM].... In other instances, BTS and [BM] conducted business without written agreements. In situations where there was not a written agreement between BTS and [BM], Bridger, LLC's corporate policy required BTS to charge fees to [BM] based on intercompany fee schedules.").)

**Response No. 68:**      Disputed.  The course of dealing evidence includes not just the existence

of negotiated written rate sheets identifying rates BTS was to charge Bridger Marketing, but also

the fact that Bridger Marketing had made payment in accordance with those rates.  SOF ¶¶ 35-

45, 48.  Eddystone objects that this statement is misleading and misconstrues Eddystone's

contentions with respect to the contract between BTS and BM.  Eddystone further objects to the

extent this statement relies on hearsay or inadmissible evidence.

69. The rate sheet ERC identifies was created, circulated and effective on or about January 2015, and contains the content reflected in the immediately following image. (Ex. 45 (Kelly Tr.

at 141:4-143:2); Ex. 46 (Kelly Dep. Ex. 823 (1/29/15 Email attaching rate sheet)); Ex. 47 (Kelly Dep. Ex. 824 (rate sheet)).)

**Intercompany fee schedule**

Bridger Transfer EPND

| | Bridger Transfer | Bridger Marketing | |
|---|---|---|---|
| **Shipper Accounts** | $/bbl | $/bbl | **1-Jan-15** |
| Bridger Marketing | freight* | freight + $0.50/bbl on deliveries | to Clearbrook only |
| Whiting | freight* | freight + $0.50/bbl on deliveries | to Clearbrook only |
| **Rail Loading** | **Third Party** | **BM Current** | **1-Jan-15** |
| Berthold (loaded Volumes) | $1.27 | $2.27 | $2.10 |
| Deficiency | $1.00 | $2.00 | $1.00 |
| Over-committed vol. | $0.25 | $0.50 | $0.25 |
| Eddystone | $2.25 | $2.75 | $2.55 |
| Deficiency | $1.75 | TBD | $1.75 |

**Response No. 69:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph, but notes that the image included depicts only a portion of the entire document, Ex. 47 (Kelly Dep. Ex. 824 (rate sheet)).  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

70. In the "Eddystone" row of the rate sheet, "$2.25" under "Third Party" is the amount BTS paid to ERC for each barrel transloaded through its facility under the RSA, and "$2.75" under "BM Current" is the intercompany charge from BTS to BM for each barrel. (Ex. 45 (Kelly Tr. at 149:21-150:14); Ex. 47 (Kelly Dep. Ex. 824 (rate sheet).)

**Response No. 70:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

71. In the bottom-most "Deficiency" row of the rate sheet, "$1.75" is the proposed per-barrel deficiency charge under the RSA starting in January 2015, and "TBD" means "to be determined." (Ex. 45 (Kelly Tr. at 156:20-158:4); Ex. 47 (Kelly Dep. Ex. 824 (rate sheet).)

**Response No. 71:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph, but notes that the "TBD" entry appears under a column titled "BM [Bridger Marketing] Current", *i.e.*, before January 2015.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

72. Prior to January 2015, there was no intercompany charge from BTS to BM for deficiency payments, and "the intention here going forward as part of our budgeting process was to reflect that third-party rate at $1.75 in the 2015 budget." (Ex. 45 (Kelly Tr. at 156:20-158:4; Ex. 47 (Kelly Dep. Ex. 824 (rate sheet); Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 244:7-245:9 ("Q. The intercompany fee is not determined, at least prior to January 1, 2015. Fair? A. That'swhat it says.").)

**Response No. 72:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

73. ERC concedes that Bridger's <u>pre-Acquisition</u> accounting records do not show BM ever providing funds to BTS to cover deficiency payments. (Ex. 44 (ERC Supp. Response to BLFG Second Interrogatories at 6-7 ("[T]he accounting records do not appear to indicate that [Bridger] Marketing provided funds to BTS to cover deficiency charges that BTS was required topay Eddystone")); Ex 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 241:12-245:9 ("Q. Isn't it the casethat BM never actually transferred money to BTS to cover deficiency payments? A. I think that's true.")).)

**Response No. 73:**     Disputed.  Before the Ferrellgas acquisition, BTS charged a rate for

transloaded crude barrels (at first $2.75/barrel, and then $2.55/barrel beginning in January 2015)

that was higher than the rate it was charged by Eddystone under the RSA.  ERC-823, 1/29/15

Kelly Email, RG_EDPA0231492-94; ERC-824, 1/29/15 Schedule Attached to ERC-823,

RG_EDPA0231495.  Using the profits it earned, BTS was able to and did pay Eddystone

amounts owed under the RSA from BTS' own funds up until the date of the Ferrellgas

acquisition.  ERC-1205, 10/14/20 Sherman Rep. at ¶ 143.  Eddystone objects that this statement

is misleading and misconstrues Eddystone's contentions with respect to the contract between

BTS and BM.  Eddystone further objects to the extent this statement relies on hearsay or

inadmissible evidence.

74. ERC alleges that [BL's] <u>post-Acquisition</u> accounting records "show that amounts due to ERC under the RSA and the North Dakota rail loading contracts were paid directly to ERC by [BL] or [BL] subsidiaries other than BTS until the time that BTS was sold to [JTH]." (Ex. 44 (ERC Supp. Response to BLFG Defendants Second Set of Interrogatories at 8-9).)

**Response No. 74:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

75. ERC's own accounting records show that it received payments owed under the RSA from May 2014 through January 2016 as set forth in the sub-paragraphs that follow. (Ex. 84 (10/25/17 Sloniewsky Decl., Ex. 6 (chart of ERC's payment records for each monthly payment));Ex. 49 (ERC Response to Rios and Gamboa's First Set of Interrogatories at 2-8).) [sic – should be Ex. 38]

a. "On May 22, 2014, Eddystone received a payment of $453,250.00, for deficiency charges due under the RSA for the month of April 2014. As best Eddystone can determine ... the payment was made by [BTS].

b. On June 20, 2014, Eddystone received a payment of $1,607,731.00. Of that amount, $533,164 was owed for transloading charges and $1,074,556.50 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

c. On July 21, 2014, Eddystone received a payment of $3,040,715.50. Of that amount, $1,882,532.25 was owed for transloading charges and $1,158,183.25 for deficiency charges. As best Eddystone can determine ...  the payment was made by BTS.

d. On August 20, 2014, Eddystone received a payment of $3,954,313.50. Of that amount, $1,987,317 was owed for transloading charges and $1,966,996.50 for deficiency charges.As best Eddystone can determine ...  the payment was made by BTS.

e. On September 19, 2014, Eddystone received a payment of $4,190,066.00. Of that amount, $3,048,203.25 was owed for transloading charges and $1,141,862.75 for deficiency charges. As best Eddystone can determine ...  the payment was made by BTS.

f. On October 20, 2014, Eddystone received a payment of $3,996,218.00. Of that amount, $2,685,793.50 was owed for transloading charges and $1,310,424.50 for deficiency charges. As best Eddystone can determine ...  the payment was made by BTS.

g. On November 20, 2014, Eddystone received a payment of $4,362,363.40. Of that amount, $3,823,541.51 was owed for transloading charges and $538,821.89 for deficiency charges. As best Eddystone can determine ...  the payment was made by BTS.

h. On December 19, 2014, Eddystone received a payment of $4,145,126.20. Of that

26

amount, $3,355,880.36 was owed for transloading charges, and $789,245.84 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

i.    On January 20, 2015, Eddystone received a payment of $3,895,568.78. Of that amount, $2,742,778.40 was owed for transloading charges and $1,152,790.38 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

j.    On February 20, 2015, Eddystone received a payment of $4,308,930.30. Of that amount, $2,583,092.62 was owed for transloading charges and $725,837.68 for deficiencycharges. As best Eddystone can determine ... the payment was made by BTS.

k.    On March 20, 2015, Eddystone received a payment of $3,879,337.14. Of that amount, $3,179,642.11 was owed for transloading charges and $699,695.03 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

l.    On April 20, 2015, Eddystone received a payment of $4,400,038.94. Of that amount, $3,993,081.44 was owed for transloading charges and $406,957.50 for deficiency charges. As best Eddystone can determine ... the payment was made by BTS.

m.    On May 20, 2015, Eddystone received a payment of $4,415,616.26. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment wasmade by BTS.

n.    On June 19, 2015, Eddystone received a payment of $4,536,666.42. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment wasmade by BTS.

o.    On July 20, 2015, Eddystone received a payment of $4,336,274.72. Of that amount, $4,216,048.74 was owed for transloading charges and $120,225.98 for deficiency charges. As bestEddystone can determine ... the payment was made by BTS.

p.    On August 20, 2015, Eddystone received a payment of $4,520,685.18. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment wasmade by Bridger Logistics, LLC.

q.    On September 21, 2015, Eddystone received a payment of $4,803,869.19. Of that amount, $4,728,015.17 was owed for transloading charges and $3,278.19 for deficiency charges. As best Eddystone can determine ... the payment was made by Bridger Logistics, LLC.

r.    On October 20, 2015, Eddystone received a payment of $4,377,174.70. Of that

amount, $4,155,343.65 was owed for transloading charges and $221,831.05 for deficiency charges. As best Eddystone can determine ... the payment was made by Bridger Rail Shipping, LLC.

s.     On November 20, 2015, Eddystone received a payment of $4,607,109.67. Of that amount, $4,597,591.89 was owed for transloading charges and $9,517.78 for deficiency charges. As best Eddystone can determine ...  the payment was made by Bridger Rail Shipping, LLC.

t.     On December 21, 2015, Eddystone received a payment of $4,390,571.55. Of that amount, $4,215,629.45 was owed for transloading charges and $174,942 for deficiency charges. As best Eddystone can determine ...  the payment was made by Bridger Rail Shipping, LLC.

u.     On January 20, 2016, Eddystone received a payment of $4,595,859.48. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment wasmade by Bridger Rail Shipping, LLC.

v.     On February 26, 2016, Eddystone received a payment of $3,954,543.58. The entire amount was owed for transloading charges. As best Eddystone can determine ... the payment wasmade by Jamex Transfer Services, LLC ('JTS')."

**Response No. 75:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph, but notes the reference to Ex. 49 should be Ex. 38.  Eddystone objects to the extent this statement lacks foundation and/or relies on hearsay or inadmissible evidence.

76. ERC does not allege that an implied contract existed between BTS and Bridger Rail Shipping, LLC ("BR"), or between BTS and any Jamex entities. (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 271:1-4) ("Q. All right. Eddystone does not allege an implied contract between Bridger Rail Shipping and BTS, right? A. Right."), 274:4-8 ("Q. So the contention is that there was no impediment to [BL] assuming the contract, but Jamex did not assume the contract when itpurchased BTS? A. Yea, I think that's fair.").)

**Response No. 76:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

77. According to ERC, there are "standard terms that are industry practice" for a crude logistics contract to address, including payment, volume commitment, duration, termination rights, deficiency payments, force majeure, assignability rights, limitations on liability, financial assurances, third-party beneficiaries, and remedies for default. ERC has identified three material

terms that it contends constituted the alleged implied contracts: (a) payment, (b) volume commitment, and (c) duration. (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 117:18-124:11 (acknowledging the several "standard terms that are industry practice," including "volume commitment," "length of the contract," "termination of rights," "amount of money that will be paid for use," "deficiency credits," "[w]hen the payment is due," "[a] force majeure clause," "[a]ssignability rights," "[l]imitations on liability," "financial assurances," "[g]overning law," and "remedies for default"), 140:25-141:12 & 143:11-17 (volume commitment was "the same as what was in the RSA," or "65,000 barrels a day"), 144:3-9 ("payments would have had to follow the same structure as the RSA"), 145:13-17 ("It would be for the same term as the RSA, so 5 years and 2 months, I think."), 151:15-152:11 (parties agreed on "price, the term, and the volume").)

**Response No. 77:**     Disputed.  Eddystone denies that it has asserted all of the listed contract

provisions are mandatory in crude logistics contracts.  In this regard, Eddystone further notes as

follows:  First, Ms. Cohen appeared as an Eddystone designee in response to a Rios and Gamboa

30(b)(6) notice.  ERC-1036, 11/11/20 Rios and Gamboa 30(b)(6) Notice.  The Notice did not ask

for testimony regarding Eddystone's views with respect to standard crude logistics contracts.  *Id.*

Although Ms. Cohen is an Enbridge in-house counsel, her testimony on this subject was not

given as Eddystone's 30(b)(6) designee.  Second, Ms. Cohen nowhere testified that particular

contract terms *must* appear in crude logistics contracts.  Instead, as a fact witness, she merely

testified either that certain terms appear in the RSA, or that in her experience some terms are

sometimes or usually found in such contracts.  Ex. 33, Cohen Dep. at 119:1-10 (volume

commitment was in the RSA); 119:22-120:2, 120:10-15, 121:1-8 (deficiency payment,

assignability of rights, and financial assurances provisions "can be" in such contracts); 119:11-

21, 120:7-9, 121:9-11 (contract term, termination, payment, force majeure, and governing law

provisions are "common" or "typical", or "often" included).  Third, Ms. Cohen testified that, in

her view, "price, the term, and the volume are really what's . . . key here", indicating that those

were the terms that were necessary to be included.  Ex. 33, Cohen Dep. at 152:7-8.  Eddystone

objects that this statement is misleading and misconstrues evidence in the record.  Eddystone

further objects to the extent this statement relies on hearsay or inadmissible evidence.

29

78. ERC does not contend that the implied contract with BM and BTS included agreement on terms as to force majeure, limitation of liabilities, remedies for default, termination rights, assignability, or third party beneficiaries. (Ex. 33 (ERC 30(B)(6) Tr. (Day 2: Cohen) at 150:9-159:14) ("Q. [W]hat agreement did [BTS and BM] reach about force majeure in connection with that implied contract? A. I have no idea. . . . I just don't know if there was a limitation on liability term. I'm not alleging that there was. And if there was, I don't have a comment what that provides. . . . So I don't know that there was a termination clause, but it wouldn't make sense. . . . Q. [W]hat agreements would they have reached about whether there were any intended third-party beneficiaries of this agreement? . . . A. I have the same response. It's not a necessary component to the implied contract between [BM] and BTS, so I don't have a comment on what that term may or may not include. If it's even part of the contract.").

**Response No. 78:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph regarding the BTS-Bridger Marketing contract.  Eddystone objects

that this statement is misleading and, in any event, immaterial and irrelevant to any issue raised

in this motion.  Eddystone further objects to the extent this statement relies on hearsay or

inadmissible evidence.

79. ERC's corporate representative initially conceded that it "expected" that BL (post-Acquisition) or BM (pre-Acquisition) "would answer for the debts of BTS under the RSA" by "ensur[ing] that BTS had the funds sufficient to satisfy that debt" to ERC, but she then attempted to retreat from that concession by using different words to say that ERC expected BL and BM to answer for the debts of BTS. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 219:9-18 ("Eddystone expected a back-to-back contract to secure payment under the RSA"), 220:11-17 ("Q. Okay. So essentially what Eddystone expected is that [BL] or BM would answer for the debts of BTS under the RSA. Fair? A. BM, prior to the Ferrellgas acquisition; and Bridger Logistics after the Ferrellgas acquisition. Q. ... The expectation at Eddystone was, prior to the Ferrellgas acquisition, BM would answer for the debts of BTS; and after the Ferrellgas acquisition, [BL] would answer for the debts of BTS. Do I have that correct? A. Well, I don't think it's accurate to characterize that Eddystone's expectation was that BM or [BL] would answer for the debts of BTS. BTS was the obligor under the RSA. But that … there was an implied contract between BM and BTS, wherein BM would provide the revenues necessary for BTS to do that through its, you know -- basically through its agreement with Monroe for the volumes that are getting moved under that COSA. And so I wouldn't say that it's fair to characterize Eddystone's expectation that BM would answer for those debts, but that there was an ancillary implied contract that backstopped BTS's obligations under the RSA. Q. Okay. And by "backstop," you mean, to the extent BTS incurred a debt to Eddystone, in the pre-acquisition period, BM would ensure that BTS had the funds sufficient to satisfy that debt? A. … Ultimately, yes.).)

**Response No. 79:**     Disputed.  Defendants are incorrect in suggesting that Cohen changed

positions at her deposition.  When Rios and Gamboa's counsel first asked her whether Bridger

Marketing or Bridger Logistics would "answer for" BTS, he did not define what he meant by

that phrase – a formal independent obligation owed directly to Eddystone, *i.e.*, a guaranty, or

rather, an obligation to ensure that BTS could pay its bills.  When asked a second and third time,

Cohen  clarified that she meant a commitment by Bridger Marketing and Bridger Logistics to

ensure that BTS could pay its bills.  ERC-2121, Cohen Dep. at 220:19-221:16, 275:12-21.

Eddystone objects that this statement is misleading and misconstrues Ms. Cohen's testimony.  In

any event, the statement is immaterial and irrelevant to any issue raised in this motion.

Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

    80. ERC has identified no evidence indicating who at BL agreed to the assumption ERC
contends occurred. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 161:7 -162:8 ("Q. [W]ho were
the people … that had the meetings of the minds by which this contract that [ ] supposedly
existed between [BM] and BTS was assumed by [BL]? Who were the people at BTS, Marketing,
and Logistics that all had the meeting of the minds and agreed to that, this assumption? ... A. Well,
it would have to have included Rios and Gamboa and the folks at [BL] and Ferrellgas. But I don't
know who specifically had those conversations.")).)

**Response No. 80:**     Disputed.  As noted in the language quoted, Cohen specified that the

people who agreed to the assumption of the contract would have included at least Rios and

Gamboa.  Eddystone objects that this statement is misleading and, in any event, immaterial and

irrelevant to any issue raised in this motion.  Eddystone further objects to the extent this

statement relies on hearsay or inadmissible evidence.

    81. ERC has identified no evidence that BL received consideration for allegedly assuming
the implied contract with BTS. (Ex. 33 (ERC 30(b)(6) Tr. (Day 2: Cohen) at 264:12-19("Q. Do
you know if any consideration was paid to [BL] for assuming [BM's] obligations? A. I don't. Q.
Okay. Do you know if any consideration was paid to BM or BTS for [BL] to assume those
obligations?  A. I don't.")).)

**Response No. 81:**     Disputed.  The deposition questions cited ask what consideration Bridger

Logistics was "paid" to assume the obligation to BTS.  They do not ask about non-monetary

consideration, which is what Bridger Logistics received, namely, the ability to serve Monroe and

Jamex Marketing through use of BTS' right to access transloading services at the Eddystone

facility.  *See* ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 85-87 (Eddystone continued to be paid

under the RSA after the Ferrellgas acquisition).  Eddystone objects that this statement is

misleading and misconstrues the record evidence.  Eddystone further objects to the extent this

statement relies on hearsay or inadmissible evidence.

82. The Ferrellgas PSA required that Bridger identify and schedule any material contracts, including those that may require expenditures of greater than $500,000 in a year. (Ex 12 (Ferrellgas PSA § 4.10, RG_EDPA0008404-05).)

**Response No. 82:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

83. Neither Schedule 4.10(a) to the Ferrellgas PSA, nor any other section of the Ferrellgas PSA, makes any mention of an implied contract between BM and BTS that BL was to assume. (Ex 12 (Ferrellgas PSA, Schedule 4.10(a) at RG_EDPA0008560).)

**Response No. 83:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph regarding references to the BTS-Bridger Marketing contract.

Eddystone objects that this statement is misleading and, in any event, immaterial and irrelevant

to any issue raised in this motion.  Eddystone further objects to the extent this statement relies on

hearsay or inadmissible evidence.

84. Rios testified that the relationship between Marketing and BTS was a "spot contract," pursuant to which BTS was paid for the use of BTS assets, and he disavowed the existence of a take-or-pay arrangement between BM and BTS. (Ex. 16 (Rios Tr. at 271:12-72 ("Q.What type of arrangement, if any, did [BL] have with BTS related to the Eddystone facility? A. So [BL] paid BTS when it used [BTS's] assets. So if you talk about the Eddystone asset, [BL] would pay a fee to [BTS]. … Q. Would you characterize that arrangement between [BL] and BTSas a take-or-pay contract? A: No. Q. How would you characterize it? A. You know, it was a spot contract that renewed every month. It was basically an evergreen contract.").)  There is no contrarytestimony from any fact witness affiliated with BM or BL.

**Response No. 84:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in the first sentence of this paragraph.

The second sentence in this paragraph is disputed.  Patrick Kelly was the Chief Financial Officer and Executive Vice President at Bridger LLC from May 2014 to June 2015.  ERC-X, Kelly Dep. at 22:2-12,  Mr. Kelly testified that in situations where there was not a written agreement between BTS and Bridger Marketing (e.g., under the Eddystone transloading arrangement), Bridger's corporate policy required BTS to charge fees to Bridger Marketing based on intercompany fee schedules.  ERC-2076, Kelly Dep. at 133:7-134:10, 134:12-24, 141:18-145:19, 152:21-155:20; ERC-823, 1/29/15 Kelly Email, RG_EDPA0231492-94; ERC-824, 1/29/15 Schedule Attached to ERC-823,  RG_EDPA0231495.  These "transfer pric[es]" and inter-affiliate agreements were based on market data involving, among other things, analogous third-party transactions.  ERC-2076, Kelly Dep. at 135:3-136:22, 145:20-152:15; ERC-823, 1/29/15 Kelly Email, RG_EDPA0231492-94, at -92.

Bridger's intercompany rate sheets specified that Eddystone charged BTS a transloading fee of $2.25/bbl and a deficiency charge of $1.75/bbl.  ERC-823, 1/29/15 Kelly Email, RG_EDPA0231492-94; ERC-824, 1/29/15 Schedule Attached to ERC-823, RG_EDPA0231495; ERC-2076, Kelly Dep. at 145:24-150:18.

They further stated that BTS should charge Marketing $2.75/bbl to transload crude at Eddystone, which would cover BTS's transloading costs and provide for a profit margin.  ERC-823, 1/29/15 Kelly Email, RG_EDPA0231492-94; ERC-824, 1/29/15 Schedule Attached to ERC-823,  RG_EDPA0231495.  The rate sheets show that the transloading fee charged to Marketing was reduced to $2.55/bbl starting in January 2015.  ERC-824, 1/29/15 Schedule Attached to ERC-823,  RG_EDPA0231495.  Finally, the rate sheets also contained information regarding rates that BTS charged Bridger Marketing for using certain upstream rail loading facilities in North Dakota.  *Id.*

The sheets also listed a deficiency fee to be charged to Bridger Marketing. Initially, this fee was "to be determined" but by January 2015, the fee was set at $1.75/bbl, which matched the deficiency charge assessed to BTS under the RSA. ERC-824, 1/29/15 Schedule Attached to ERC-823, RG_EDPA0231495. Bridger's accounting records show that Bridger Marketing made the payments required under the rate sheets to BTS for use of the Facility but did not separately provide BTS funds to make the deficiency payments under the RSA. ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 120-22. But before the Ferrellgas acquisition, BTS charged a rate for transloaded crude barrels (at first $2.75/barrel, and then $2.55/barrel beginning in January 2015) that was higher than the rate it was charged by Eddystone under the RSA. ERC-823, 1/29/15 Kelly Email, RG_EDPA0231492-94; ERC-824, 1/29/15 Schedule Attached to ERC-823, RG_EDPA0231495. Using the profits it earned, BTS was able to and did pay Eddystone amounts owed under the RSA from BTS' own funds up until the date of the Ferrellgas acquisition. ERC-1205, 10/14/20 Sherman Rep. at ¶ 143.

Eddystone objects that this statement is misleading. Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

85. The Defendants asserted the statute of frauds as an affirmative defense in their answers. (Dkt. 244 (BL Answer at 32); Dkt. 245 (Ferrellgas Answer at 29).)

**Response No. 85:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.

### BTS 2015 Solvency and Debt Relief

86. At the time of the Acquisition, BTS's assets were valued in excess of $200 million.(Ex. 48 (Sherman Rep. ¶¶ 154-55); Ex. 49 (Sherman Rebuttal Rep. ¶ 6); Ex. 50 (Kumar Rep. at 7,30).)

**Response No. 86:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph. Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

87. Defendants' expert Kumar analyzed BTS as of the time of the Acquisition and concluded BTS was solvent and adequately capitalized; Sherman does not contradict Kumar's opinion that BTS was adequately capitalized. (Ex. 50 (Kumar Rep. at 7 (Summary of Conclusions),23-49 (Assets-to-Liabilities Test), 50-53 (Ability-to-Pay Debts Test), 54-59 (Capital Adequacy Test)); Ex. 49 (Sherman Rebuttal Rep. ¶¶ 6-7).)

**Response No. 87:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, but notes that Kumar's analysis is performed as of June 24, 2015,

immediately prior to the Ferrellgas acquisition.  Ex. 49 (Sherman Rebuttal Rep. ¶ 6) (Kumar's

valuation was "prior to the sale of Logistics and its subsidiaries").  Eddystone objects to the

extent this statement relies on hearsay or inadmissible evidence.

88. In connection with the Acquisition, Ferrellgas paid off $9,045,847.68 of debt BTSowed to Community Trust Bank, and Community Trust Bank issued a corresponding payoff letterdated June 22, 2015. (Ex. 51 (Jilla Tr. at 202:12-204:15); Ex. 52 (Jilla Dep. Ex. 862 (6/22/15 Community Trust Bank Pay-Off Letter BLFG_EDPA1709109)).)

**Response No. 88:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, as the debt

was paid off as part of the FG Acquisition purchase price.  SOF ¶58.  Eddystone further objects

to the extent this statement relies on hearsay or inadmissible evidence.

89. In connection with the Acquisition, Ferrellgas paid off $16,240,702.55 of debt thatBTS owed to Texas Capital Bank, and Texas Capital Bank issued a corresponding payoff letter dated June 22, 2015. (Ex. 51 (Jilla Tr. 204:16-205:23); Ex. 53 (Jilla Dep. Ex. 863 (6/22/15 Texas Capital Bank Pay-Off Letter, BLFG_EDPA0171224).)

**Response No. 89:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, as the debt

was paid off as part of the FG Acquisition purchase price.  SOF-¶58.  Eddystone further objects

to the extent this statement relies on hearsay or inadmissible evidence.

90. In connection with the Acquisition, Ferrellgas paid off $4,411,716.21 of debt BTSowed to Wells Fargo Equipment Finance, Inc. ("Wells Fargo"), and Wells Fargo issued

corresponding payoff letters dated June 5, 2015. (Ex. 51 (Jilla Tr. at 205:24-208:1); Ex. 54 (Jilla Dep. Ex. 864 (6/5/15 Wells Fargo Pay-Off Letter for $ 3,007,808.21, BLFG_EDPA0176385); Ex. 55 (Jilla Dep. Ex. 865 (6/5/15 Wells Fargo Pay-Off Letter for $1,403,908)).)

**Response No. 90:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, as the debt

was paid off as part of the FG Acquisition purchase price.  SOF-¶58.  Eddystone further objects

to the extent this statement relies on hearsay or inadmissible evidence.

91. The funds from the purchase of BL by Ferrellgas also paid off approximately $10 million that BTS owed to EnLink NGL Marketing, LP. (Ex. 51 (Jilla Tr. at 208:2-10); Ex. 56 (6/24/15 EnLink Termination Agreement, BLFG_EDPA0176385).)

**Response No. 91:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, as the debt

was paid off as part of the FG Acquisition purchase price.  SOF-¶58.  Eddystone further objects

to the extent this statement relies on hearsay or inadmissible evidence.

92. Ferrellgas paid off approximately $39,698,266.44 in various BTS obligations at thetime of the Acquisition; as a result, BTS derived value from the Acquisition. (*Infra* ¶¶ 88-91 (adding $9,045,847.68, $16,240,702.55, $4,411,716.21 and $10,000,000 results in $39,698,266.44); Ex. 39 (Sherman Tr. at 190:3-21 ("Q. Okay. So you say, 'From all the information available, BTS did not receive any benefit from Ferrellgas' Bank of America credit facility,' right? A. Yes. Q. Did you investigate whether BTS had debts that were paid off in connection with the acquisition by Ferrellgas? A. I know that Logistics had debts. I don't -- I can't tell you at the moment whether or what part of those were BTS'' -- Q. Did you -- A. -- if anything.  Q. Did you review Mr. Jilla's deposition transcript where he walked through various debts that were owed by BTS that were paid off in connection with the acquisition? A. I may have. I don't recall whether I reviewed that particular part of it or not.").)

**Response No. 92:**      Disputed.  First, the question of whether BTS derived value from the

Ferrellgas acquisition is not relevant to any issue in this case; the acquisition was completed

without BTS giving any consideration.   Second, as Eddystone's forensic accounting expert,

Marc Sherman, explained, in the eight months after the Ferrellgas acquisition, BTS – an entity

that Defendants' own expert, Manish Kumar, had valued at between $202.5 million and $324.9

million immediately before the transaction – was stripped of all of its assets and sold for $10. ERC-1209, Kumar Report at 30, 47; ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 76-117, 164 ("BTS did not benefit from being part of the Ferrellgas corporate family . . . ."). The Ferrellgas acquisition did not benefit BTS, it destroyed BTS. Third, to the extent that Defendants are seeking to assert that the Ferrellgas acquisition necessitated BTS' issuance of a lien in favor of banks led by Bank of America ("BOA"): (a) that lien was issued in January 2016, seven months *after* the acquisition, (b) no money from the BOA loan ever made its way to BTS' coffers, and (c) the BOA loan proceeds were not used for the Ferrellgas acquisition, and therefore, were not use to pay down BTS' debt. ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 164, 166-171. Eddystone objects that this statement is misleading, as the debt was paid off as part of the FG Acquisition purchase price. SOF-¶58. Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

93.     ERC's accounting and damages expert Sherman did not conduct any analysis of whether BTS derived value from the Acquisition, but he claims that "BTS did not benefit from being a part of the Ferrellgas corporate family." (Ex. 48 (Sherman Rep. ¶ 164); Ex. 39 (Sherman Tr. at 193:7-20 ("Q. Have you done any analysis to determine whether or not BTS obtained value  from the Ferrellgas Logistics transaction? . . . A. No.").)

**Response No. 93:**     Disputed. First, on its face, the question of whether BTS derived value from the Ferrellgas acquisition is not relevant to this litigation; the transaction was completed without BTS giving any consideration. Second, the cited deposition testimony constitutes one instance in which Sherman said he did not "analyze" whether BTS "obtained value" from Ferrellgas Partners' acquisition of Bridger Logistics. But Sherman's reports speak for themselves. In the eight months after the Ferrellgas acquisition, BTS – an entity that Defendants' own expert, Manish Kumar, had valued at between $202.5 million and $324.9 million immediately before the transaction – was stripped of all of its assets and sold for $10.

ERC-1209, Kumar Report at 30, 47; ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 76-117, 164

("BTS did not benefit from being part of the Ferrellgas corporate family . . . ."). The Ferrellgas

acquisition did not benefit BTS, it destroyed BTS. Eddystone objects that this statement is

misleading and directly controverted by the record. Eddystone further objects to the extent this

statement relies on hearsay or inadmissible evidence.

### The 2015 Accounting Activity: The Write-Offs

94. Sherman opines that BTS wrote off approximately $13,798,002 in accounts receivable in connection with the Acquisition (the "Write-Offs"). (Ex. 49 (Sherman Rebuttal Rep. ¶¶ 21-23); Ex. 39 (Sherman Tr. at 159:4-25).)

**Response No. 94:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

95. Section 6.12 of the Ferrellgas PSA required that "all intercompany accounts among[BL and the subsidiary companies that FGP acquired], on the one hand, and [Bridger and the subsidiary companies that FGP did not acquire], on the other hand, that then remain outstanding will be terminated, voided, canceled and discharged, except to the extent any such accounts would be taken into account in connection with the determination of Closing Date Net Working Capital." (Ex. 12 (PSA § 6.12); Ex. 57 (12/4/20 Polkowitz Rep. at 28); Ex. 58 (11/7/18 Polkowitz Decl. ¶ 16).)

**Response No. 95:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph but notes that write-off was not justified by any legal authority and

that it benefitted Ferrellgas Partners, LP, which otherwise would have paid more as part of the

Ferrellgas acquisition, and objects to Defendants' reliance on the intended testimony of

Polkowitz, which should be excluded for the reasons set forth in Eddystone's Motion to Preclude

the Testimony of Defendants' Expert Gary Polkowitz. ERC-2114, Sherman Dep. at 162:1-

163:8. Eddystone objects that this statement is misleading. Eddystone further objects to the

extent that statement relies on hearsay or inadmissible evidence.

96. Of the $13,798,002 in Write-Offs, Sherman identifies $7,314,461 that was due to BTS from entities that FGP did not acquire. (Ex. 49 ((Sherman Rebuttal Rep. ¶ 23 (Table 1: BTSwas

owed a total of $16,193,249 by BM ($14,036,938), Bridger Midstream ($1,156,118) and Waskom Energy Mrkt & Trans LLC ($1,000,193), and BTS owed Bridger $5,546,950 and Bridger Admin Services, LLC $3,331,838); Ex. 12 (5/29/21 PSA at Schedule 4.4, RG_EDPA0008562 (listing subsidiaries acquired); *see also* Ex. 39 (Sherman Tr. at 163:9-164:11).)

**Response No. 96:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

97. Section 6.12 of the Ferrellgas PSA required the $7,314,461 to be terminated, voided, canceled and/or discharged. (Ex. 12 (PSA § 6.12); Ex. 57 (12/4/20 Polkowitz Rep. at 28);Ex. 58 (11/7/18 Polkowitz Decl. ¶ 16).)

**Response No. 97:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

98. The remaining $6,483,541 in Write-Offs that Sherman identifies were intercompany receivables between BTS and Bridger subsidiaries that FGP acquired pursuant to the Ferrellgas PSA. (Ex. 49 (Sherman Rebuttal Rep. ¶ 23); Ex. 12 (5/29/21 PSA at Schedule 4.4 (listing subsidiaries acquired)).)

**Response No. 98:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

99. Ferrellgas retained a third-party valuation firm, CBIZ Valuation Group, LLC ("CBIZ"), to "estimate the fair value of certain identifiable tangible and intangible assets (the "Subject Assets") of Bridger Logistics, LLC [ ], with respect to the acquisition of the Subject Assets (the "Transaction") by Ferrellgas Partners, L.P. … as of June 23, 2015 (the "Valuation Date")." (Ex. 59 (CBIZ Valuation at BLFG_EDPA2449816); Ex. 4 (11/5/18 Ruisinger Decl. ¶ 3).)

**Response No. 99:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

100.     On August 17, 2015, CBIZ provided a final valuation analysis to FGP (the "CBIZ Valuation"). (Ex. 59 (CBIZ Valuation at BLFG_EDPA2449816).)

**Response No. 100:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

101.     The CBIZ Valuation was "conducted for financial reporting purposes to comply with the requirements of Accounting Standards Codification Topic 805, Business Combinations ("ASC 805" or the "Statement")."  (Ex. 59 (CBIZ Valuation at BLFG_EDPA2449816).)

**Response No. 101:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

102.     Ferrellgas used the CBIZ Valuation to assist it "in allocating the [Acquisition] purchase price among those assets [included in the Acquisition] and establishing appropriate asset values in the account systems used by Ferrellgas and the acquired Bridger [Logistics] companies." (Ex. 4 (11/5/18 Ruisinger Decl. ¶ 3).)

**Response No. 102:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

103.     The CBIZ Valuation "did not allocate any value to intercompany accounts receivable and accounts payable among [BL] and its acquired affiliates."  (Ex. 4 (11/5/18 Ruisinger Decl. ¶ 4); *see also* Ex. 59 (CBIZ Valuation (intercompany accounts receivable and accounts payable are not identified)).)

**Response No. 103:**     Disputed.  This paragraph implies that CBIZ considered the intercompany

accounts receivable and payable and concluded that they had no value.  That is incorrect.  The

CBIZ Valuation does not reference intercompany receivables or payables.  ERC-2094, Polkowitz

Dep. at 106:17-20.  It valued "tangible assets" and "intangible assets", but intercompany

accounts do not fall into those categories unless over a year old.  ERC-2094, Polkowitz Dep. at

119:18-123:7.  As Defendants' expert, Gary Polkowitz, admits, the CBIZ Valuation does not

justify a write-off of intercompany receivables.  ERC-2094, Polkowitz Dep. at 106:25-109:7; *see*

*also* 123:8-21 (he does not opine that the valuation justifies writing off receivables).  Eddystone

objects that this statement is misleading, distorted, and taken out of context in light of the full

record.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible

evidence.

104.     ERC has no valuation or other evidence disputing CBIZ's determination not to assign value to intercompany accounts receivable and accounts payable among BL and its acquired affiliates.

**Response No. 104:**     Disputed.  As noted in response to the para. 103, above, CBIZ did not

"determine" that the intercompany accounts receivable and accounts payable had no value.

Rather, CBIZ did not conduct an analysis of those accounts at all.  Moreover, it is not true that

Eddystone possesses no evidence finding that the intercompany receivables had value.  Sherman

provided reports and testimony noting that he valued BTS' intercompany accounts receivables at

their stated value in Bridger's accounting, pointing out that such receivables were not written off

and were routinely paid, thus evidencing that they were collectible.  ERC-2114, Sherman Dep.

at 70:17-71:9; ERC-1205, 10/14/20 Sherman Report at ¶¶ 113-17; ERC-1206, 1/29/21 Sherman

Resp. Rep. at ¶¶ 21-23 (increasing valuation of receivables based on Polkowitz report).  Sherman

also noted that BTS was obviously harmed by the elimination of the receivables owed it by those

Bridger entities that Ferrellgas did not purchase.  ERC-2114, Sherman Dep. at 162:1-163:8;

164:12-165:9.  Eddystone objects that this statement is misleading, distorted, and taken out of

context in light of the full record.  Eddystone further objects to the extent this statement relies on

hearsay or inadmissible evidence.

105.     Ferrellgas wrote off the $6,483,541 in accounts receivable when integrating the Bridger Entities into its corporate family. (Ex. 4 (11/5/18 Ruisinger Decl. ¶¶ 3-5); Ex. 57 (Polkowitz Report at 27-28); *see infra* ¶¶ 94, 96-98 (subtracting $7,314,461 from $13,798,002 results in $6,483,541 in accounts receivable write offs).)

**Response No. 105:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

106.     That write-off was permitted by purchase accounting principles, including ASC
Topic 805 and ACS Topic 820. (Ex. 4 (11/5/18 Ruisinger Decl. ¶¶ 3-5); Ex. 57 (Polkowitz Report
at 27-28).)

**Response No. 106:**     Disputed.  As testified to by Defendants' expert, Gary Polkowitz, purchase

accounting principles do not require or justify the write-off of accounts receivable.  ERC-2094,

Polkowitz Dep. at 102:23-103:8 ("In ASC 805, there is nothing specific that refers to elimination

or the write-off of intercompanies"), 105:25-106:5 (ASC 820 "doesn't refer specifically to the

write-off of any intercompany receivables").  Eddystone objects that this statement is misleading,

distorted, and taken out of context in light of the full record.  Eddystone further objects to the

extent this statement relies on hearsay or inadmissible evidence.  Eddystone also objects to the

extent this statement relies on improper expert opinion, which lacks sufficient data and

reliability.

### The 2015 Accounting Activity: Cost Center Recording

107.     Before the Acquisition, BL was comprised of four principal business sectors: (1)
Truck Transportation, (2) Pipeline Terminals, (3) Pipelines, and (4) Rail. (Ex. 60 (5/12/15 Email
attaching Bridger Management Report and PDF print-off of as-produced native excel sheet,
BLFG_EDPA1880336-37).)

**Response No. 107:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

108.     Rather than breaking down costs, expenses, and financial performance on a
subsidiary-by-subsidiary basis, the management reports BL used to run the business were broken
down by sector. (Ex. 60 (5/12/15 Bridger Management Report, BLFG_EDPA1880333-37).)

**Response No. 108:**     Undisputed that, before the Ferrellgas Acquisition, management reports

included information provided by sector, but disputed to the extent the assertion is made that no

information was provided on a subsidiary-by-subsidiary basis.  For instance, a page from the

very management report cited includes subsidiary-by-subsidiary information.  (Ex. 60 (5/12/15

Bridger Management Report, BLFG_EDPA1880333-37, at -37)).  Eddystone objects to the

extent this statement relies on hearsay or inadmissible evidence.

109.      As part of its due diligence before acquiring BL, Ferrellgas retained consultants to assist it in assessing the opportunity, including Grant Thornton, LLP ("Grant Thornton") for accounting due diligence. (Ex. 61 (11/5/18 Soiefer Decl. ¶¶ 4-8).)

**Response No. 109:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

110.      Grant Thornton produced a "Financial, tax, and human resources due diligence report" dated May 21, 2015, also known as a Quality of Earnings Analysis ("QEA"). (Ex. 62 (QEA at BLFG_EDPA0299508).)

**Response No. 110:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

111.      The QEA stated that BL's "[h]istorical financial records do not track contract performance, but rather segments (e.g. Trucking, Rail) revenue and expenses." (Ex. 62 (QEA at BLFG_EDPA0299525).)

**Response No. 111:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

112.      The QEA also stated that "[t]he accounting systems were run on QuickBooks until October 2014, when the company migrated to Great Plains, with limited adaptation to the business." (Ex. 62 (QEA at BLFG_EDPA0299528).)

**Response No. 112:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

113.      The QEA also stated: "The Bridger business has been growing rapidly and the finance and accounting function has been a dynamic environment that has seen significant

changes. In the last 12 to 20 months, the company has hired all of the existing accounting and finance personnel, with the CFO only being hired in May 2014." (Ex. 62 (QEA at BLFG_EDPA0299528).)

**Response No. 113:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

114.     Grant Thornton recommended that Ferrellgas "[d]evelop a clear and direct mapping between Management operating reports and the trial balance to ensure the analytics contained in the Management operating reports are based on accurate and reliable accounting data." (Ex. 62 (QEA at BLFG_EDPA0299528).)

**Response No. 114:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

115.     Consistent with Grant Thornton's recommendation, when Ferrellgas acquired BL, it realigned BL's accounting around business sectors, also called "cost centers," to better reflect the reality of its operations, attributing costs and revenues associated to the specific business sectors to which they belonged. (Ex. 63 (9/15/15 Bridger Management Report, BLFG_EDPA0183830); Ex. 64 (11/6/18 Farmer Decl. ¶ 8) ("Ferrellgas also established cost centers"); Ex. 65 (Farmer Tr. at 8:1-4; 13:12-15:2 (testifying he joined Ferrellgas in April 2014 and around August or September 2015 until January 2018 he became the assistant controller with "responsibilities [] to oversee the accounting for the Bridger segment of the company" as an "SEC reporting manager and directive account manager"), 17:2-8 (testifying he "assist[ed] with the accounting transition" following the acquisition of BL), 32:3-10 (identifying Great Plains as the accounting system for BL), 69:10-70:18 (testifying "202 was for the cost center for Bridger Transfer Services" to "make Great Plains entries to help facilitate the internal management reports"), 159:14-161:6 (testifying that in October 2015, "I was trying to gain understanding of the operations of the different cost centers" and shared the information with "people from the Ferrellgas integration team")).)

**Response No. 115:**     Disputed.  Eddystone disputes this paragraph to the extent it is intended to

suggest that Bridger Rail Services and Bridger Pipeline Services were cost centers for BTS.  *See*

*infra* Eddystone's response to para. 122.  Eddystone also disputes the contention that entity code

202 was a cost center established after the Ferrellgas Acquisition.  ERC-1208, 12/4/20 Polkowitz

Report at 19; ERC-2079, Seline Dep. 99:11-101:2.  Eddystone further disputes this paragraph on

the grounds that it is based on inadmissible hearsay of Michael Farmer.  Eddystone objects that

this statement is misleading, distorted, and taken out of context in light of the full record.

Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

116.      After the Acquisition, BL and its affiliates continued to maintain their accounting
records in Great Plains. (Ex. 64 (11/6/18 Farmer Decl. ¶ 4); Ex. 48 (Sherman Rep. ¶ 54).)

**Response No. 116:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, except to the extent it is based on inadmissible hearsay of Michael

Farmer.  Eddystone objects that this statement is misleading, distorted, and taken out of context

in light of the full record.  Eddystone further objects to the extent this statement relies on hearsay

or inadmissible evidence.

117.      Because "Ferrellgas maintained its accounting records in a system known as
PeopleSoft," the "[f]inancial information from [BL] and its affiliates in the Great Plains system
was imported into the PeopleSoft system to produce Ferrellgas's publicly-reported accounting
statements." (Ex. 64 (11/6/18 Farmer Decl. ¶¶ 6-7).)

**Response No. 117:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, except to the extent Defendants intend to suggest that after the FG

acquisition Bridger Logistics and its acquired subsidiaries no longer used the Great Plains

system.  *See* ERC-1208, Polkowitz Expert Report at 19.  Eddystone objects to the extent this

statement relies on hearsay or inadmissible evidence.

118.      Before the Acquisition, BTS recorded revenues in four sectors: storage fees,
stations throughput, pipeline management, and rail throughput. (Ex. 48 (Sherman Rep. ¶ 60).)

**Response No. 118:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, except to the extent Defendants intend to suggest that after the FG

acquisition Bridger Logistics and its acquired subsidiaries no longer used the Great Plains

system.  See ERC-1208, Polkowitz Expert Report at 19.

119.      The storage fees BTS recorded on its general ledger prior to the Acquisition did not

belong to BTS, but rather to Bridger Storage, LLC. (Ex. 48 (Sherman Rep. ¶¶ 71-75); Ex. 39 (Sherman Tr. at 63:6-65:4).)

**Response No. 119:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

120.     After the Acquisition, those storage fees were recorded on Bridger Storage, LLC's general ledger. (Ex. 48 (Sherman Rep. ¶¶ 91-92); Ex 39 (Sherman Tr. at 63:6-65:4).)

**Response No. 120:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

121.     The stations throughput revenue was recorded on BTS's general ledger both before and after the Acquisition. (Ex. 48 (Sherman Rep. ¶ 90); Ex. 39 (Sherman Tr. at 108:6-12 ("Q. And do you have an understanding as to why Bridger Logistics or its representatives would go through the trouble of diverting pipeline management revenue away from BTS but would not divert the roughly ten times as much of station revenue away from BTS? A. No.")).)

**Response No. 121:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

122.     After the Acquisition, "[t]o assist management in analyzing cost and revenue by business sector, [BL] established company codes identified as Bridger Rail Services and Bridger Pipeline Services in the Great Plain system [and] Ferrellgas also established cost centers with the same names in the PeopleSoft system."  Sherman acknowledges that, on or about August 27, 2015, Ferrellgas instituted a zero-balance cash management system for BTS, and he made clear that he does not rely on the cash management system to support his opinions on diversion. (Ex. 64 (11/6/18 Farmer Decl. ¶ 8); Ex. 48 (Sherman Rep. ¶ 188 n. 250); Ex. 49 (Sherman Rebuttal Rep. ¶ 39.).)

**Response No. 122:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in the second sentence of this paragraph.

Eddystone disputes the first sentence.  The evidence is overwhelming that accountants

and executives at Bridger Logistics did not view Bridger Rail Services and Bridger Pipeline

Services as cost centers or that those accounts were established to "assist management in

analyzing cost and revenue by business sector".  Rather, the accountants viewed those accounts

as real entities that had assumed BTS' contracts, and hence they thought that Bridger Rail

Shipping and Bridger Pipeline Shipping – not BTS – owned the revenues and expenses recorded in those accounts.

For instance, on June 19, 2015, Bridger's Vispi Jilla sent an email to Bridger accounting executive Joanna Seline (nee Huneryager).  ERC-731, 6/19/15 Jilla Email and Chart, BLFG_EDPA2381102-4.  Seline, a financial analyst, was the manager respondsible for reviewing accounting output.  ERC-2079, Seline Dep. 18:13-20, 21:4-22.  Jilla's email attached an organization chart prepared with the assistance of, among others, Defendants Julio Rios and Jeremy Gamboa.  accounting staff.  ERC-731, 6/19/15 Jilla Email and Chart, BLFG_EDPA2381102-4, -02.  The chart depicts BRS and BPS as legal entities, not cost centers, and indicates that BTS' contracts were being assigned to BRS.  ERC-731, 6/19/15 Jilla Email and Chart, BLFG_EDPA2381102-4, -04.

Similarly, after the Ferrellgas acquisition, management reports were generated at Bridger Logistics to show the financial performance of the company and its subsidiaries.  *See* ERC-751, 10/8/15 Farmer Email and Attached Report, BLFG_EDPA0304634-54.  Those reports were distributed to Bridger Logistics and Ferrellgas management, and identified BRS and BPS as legal entities.  ERC-751, 10/8/15 Farmer Email and Attached Report, BLFG_EDPA0304634-54, at -648, -651 (referring to BRS and BPS as limited liability companies).

Deposition testimony confirms that Bridger Logistics accounting staff did not view BRS and BPS as BTS revenue/cost centers.  Michael Farmer was the "principal accountant" overseeing Bridger Logistics and its subsidiaries starting in September 2015.  ERC-2080, Farmer Dep. at 168:13-22.  Mr. Farmer testified that he only learned that BRS and BPS were not legal entities sometime after the present litigation began in February 2017 – more than 12 months after BTS was sold to Jamex, and more than 17 months after the Ferrellgas acquisition.  ERC-2080, Farmer

Dep. at 153:22-154:13, 154:22-155:2.

Similar testimony was provided by Bridger's Jonna Seline.  Seline prepared accounting records for management, and hence should have had detailed knowledge of Bridger Logistics' revenue/cost centers.  Yet, she testified that she believed in 2015 and 2016 that BRS and BPS were independent legal entities.  ERC-2094, Polkowitz Dep. at 85:14-86:9; ERC-2079, Seline Dep at 84:18-86:10, 95:18-25.  In fact, Seline did not learn the truth – namely, that BRS and BPS were not real entities – until the day before her July 2020 deposition.  ERC-2079, Seline Dep. at 95:18-25.

The relevant accounting records also do not suggest that Bridger believed revenues and costs recorded at BRS and BPS actually belonged to BTS.  Although Mr. Polkowitz states briefly in his report that he concluded that BRS and BPS were BTS revenue/cost centers based on his review of those accounting records, Polkowitz Report at 19, he does not point to any particular accounting entries in support of this conclusion.

Moreover, Eddystone's accounting expert, Marc Sherman, confirms that there is nothing in the accounting records to suggest that the revenues and expenses in Bridger Rail Services and Bridger Pipeline Services actually belonged to BTS.

> If they were treated as cost centers, they would have been rolled up into BTS, and those assets that were generated from the activity in those two and the cash and the revenues and profits, they would have been in BTS available for the satisfaction of its obligations.  Because if something is a cost center, it is merely a subcategory of the company itself, and at the end of the day, whatever happens in that subcategory belongs to and is retained in that company.  And the fact, that at the end of the day, nothing ever comes back to BTS or that subcategory doesn't roll up into BTS.

ERC-2114, Sherman Dep. at 111:9-112:22

And Defendants' own expert, Polkowitz (whose testimony is inadmissible in any event), could not say whether Bridger Rail Services and Bridger Pipeline Services were utilized as

revenue/cost centers for BTS.  At his deposition, he admitted that he did not know whether they were used as revenue/cost centers to better understand BTS' performance.  ERC-2094, Polkowitz Dep. at 77:18-78:16.  Though he had read Seline's deposition before drafting his report, Polkowitz could also not explain why she believed in 2015 and 2016 that Bridger Rail Services and Bridger Pipeline Services were legal entities, rather than BTS revenue/cost centers.  ERC-2094, Polkowitz Dep. at 85:22-86:9.

Eddystone further disputes the first sentence of this paragraph because it relies on the inadmissible hearsay of Michael Farmer.  The Farmer Declaration states that it is Farmer's "understanding" that "management directed the accounting department" to record BTS rail transactions activity to the BRS company code, and BTS pipeline transactions activity to the BPS company code.  ERC-1217, 11/6/18 Farmer Decl. ¶¶ 9-10.  "Management" purportedly did this "[t]o assist . . . [it] in analyzing costs and revenue by business sector" in order "to better align the Bridger Logistics structure with the company's management reports."  *Id.* at ¶¶ 8-10.

At his deposition, however, Farmer demonstrated that he had no personal knowledge to support these assertions.  He could not provide background information regarding the conclusions he reached in the Farmer Declaration.  He testified at his deposition that he does not know who in "management directed the accounting department" to use BRS and BPS as revenue/cost centers.  ERC-2080, Farmer Dep. at 149:17-150:7.  He himself was not one of the individuals receiving such direction.  *Id.*  Farmer further testified that when he signed the Farmer Declaration in November 2018 he was no longer working for Ferrellgas, *id.* at 146:10-17, and that he never discussed it with anyone at Ferrellgas or Bridger.  *Id.* at 149:2-5.  In fact, when preparing the declaration Farmer spoke only with lawyers for Defendants.  *Id.* at 148:11-22.

Additional evidence for the conclusion that Bridger Rail Services and Bridger Pipeline

Services were not cost centers is set forth in Eddystone's Memorandum in Support of its Motion to Preclude the Testimony of Defendant/Counterclaimants' Expert Gary Polkowitz, filed this same date.   Eddystone objects that the second statement is misleading, distorted, and taken out of context in light of the full record.   Eddystone further objects to the extent the second statement relies on hearsay or inadmissible evidence.

123.      Following the 2015 Accounting Activities and before the Jamex Acquisition of BTS discussed below, BTS continued to possess its fixed assets and the revenue-generating contracts, which Sherman valued at approximately $64 million. (Ex. 48 (Sherman Rep. ¶¶ 57, 96-101, 107, 108, 112-114, 159, Table 13 (at page 50), Table 18 (at page 57); (Ex. 39 (Sherman Tr. at 76:14-21 ("Q. To which other entities did they in fact divert that July 2015 revenue? A. I didn't-- I don't think that I traced that that I can give you a specific entity or specific entity names. We know that the money -- the accounting transactions, pardon me, were put into Bridger Rail Servicesand Bridger Pipeline Services"), at 87:25-92:23 ("So there are, I don't know, 14 or 15 Bridger affiliates or former affiliates that are defendants here. Can you tell me which of those defendantsreceived the diverted revenue in July 2015? A: As I sit here, no. Q: If I looked in your report, would I find the answer to that question? A: I don't remember – well, to your specific question, no. Q: And if I were to ask about August or September or October, we'd have the same answer, correct? A: That's correct. . . Q. Did you trace it from those accounts to an actual legal entity that'sa defendant in this case, the next step? . . . A: I think the diverted revenue stayed there.  Ultimatelywhen it gets consolidated, it gets consolidated up the line and ends up in Logistics and then up theline in Ferrellgas, but I think the revenue stayed in the general ledger of those two accounts.").)

a.      The parties do not dispute that "revenue" is not an "asset." (Ex. 39 (Sherman Tr. at68:25-69:3 ("Q. Okay. Is revenue an asset? A. From an accounting standpoint, no.").)

b.      Sherman acknowledges that, because ERC received the payments to which it was entitled following the 2015 Accounting Activities, "as it relates to the payment[,] Eddystone wouldn't have been harmed." (Ex. 39 (Sherman Tr. at 81:1-15 ("[Q.] Was Eddystone harmed in July 2015 when that revenue was recorded in that manner? A. Again, I look at the totality of the circumstances. So Eddystone -- in July of 2015 Eddystone ultimately received its money I believefrom Logistics, and so Logistics at that point in time -- so Logistics and the group of people who were controlling all of this put -- puts the money -- I'm sorry -- puts the revenue someplace else. Logistics takes on the obligation of paying Eddystone and pays Eddystone, sort of steps into Eddystone's shoes in order to pay the obligation under the RSA. So at that point in time, as it relatesto the payment Eddystone wouldn't have been harmed.").)

**Response No. 123:**      First sentence: Disputed.  As explained at length in Sherman's report, the

rail throughput and pipeline revenues to which BTS was entitled began to be diverted

immediately after the Ferrellgas acquisition.  ERC-1205, Sherman Rep. at ¶¶ 76-89.  Some of

this diverted revenue is attributable to the BTS-Bridger Logistics contract under which BTS

provided Bridger Logistics with services at the Eddystone facility.  *See*, SOF ¶¶ 26-49, 85-87

(identifying evidence for the BTS-Bridger Logistics contract).  BTS cannot be said to have

"possessed" contracts, the revenue for which was diverted to other entities without consideration.

Section a.: Eddystone interprets this sentence as addressing definitions of "revenue" and "assets"

in the technical accounting sense.   Based on that understanding, and for purposes of the Motion

only, Eddystone does not dispute Defendants' contentions in section a. of this paragraph.

Section b.:  Disputed.  This sentence suggests that Eddystone was not harmed by transfers of

assets from BTS because Eddystone received RSA payments through February 2016.  In fact, the

transformation of BTS into an assetless shell did harm Eddystone, and that harm became

actualized when BTS claimed an inability to pay remaining amounts owed to Eddystone after

February 2016.  ERC-1206, 1/29/21 Sherman Resp. Rep. at ¶¶ 6-7 (BTS worth $200-$300

million before the Ferrellgas acquisition); ERC-1205, 10/14/20 Sherman Rep. at ¶ 114 (at time

of sale to Jamex, BTS had no assets); SOF ¶ 220 (BTS pleads poverty as the basis for refusing to

make further payments after being sold to Jamex).

Eddystone objects that these statements are misleading, distorted, and taken out of context in

light of the full record.  Eddystone further objects to the extent these statements rely on hearsay

or inadmissible evidence.

124.        While there was some initial confusion among the Defendants' personnel when
Cost Center Recording was first implemented, causing organizational charts circulated internally
in June 2015 to indicate that Bridger Pipeline Services and Bridger Rail Services were separate
legal entities, neither Bridger Pipeline Services nor Bridger Rail Services were legal entities,
theyexisted only as accounting entities, codes on the Defendants' accounting system. (Ex. 48
(Sherman Rep. ¶¶ 156-60); Ex. 49 (Sherman Rebuttal Rep. ¶¶ 32-33); Ex. 57 (Polkowitz Rep. at
18-20, 58);Ex. 8 (Rios Tr. at 199:22-200:8); Ex. 64 (11/6/18 Farmer Decl. ¶¶ 9-10); Ex. 87
(Knapp Tr. at 30:13-31:10 ("[Q.] Was Bridger Rail Services, to your knowledge, an actual legal

entity? A. No. It was an accounting entity, to the best of my recollection. Q. Okay. Do you know whether BridgerPipeline Services, LLC was an actual legal entity? A. No. Again, it was an accounting entity, to the best of my recollection. Q. Okay. Below the rectangle that says, 'Bridger Rail Services' -- I should say within that rectangle there's a number, '(208).' What is that? A. To the best of my recollection, that's an accounting entity ID. Q. Moving over to Bridger Pipeline Services, in that rectangle there's a number, '(210).' Do you see that? A. I do. Q. What does that refer to? A. To the best of my recollection, it's an accounting entity ID.").)

**Response No. 124:**    Eddystone does not dispute Defendants' contention that Bridger Rail Services and Bridger Pipeline Services were not legal entities, but Eddystone disputes the assertion that there was only "initial confusion" about this fact.  Based on the facts cited above in response to para. 122, the evidence is overwhelming that Defendants' accountants and executives believed even after BTS was sold in February 2016 that Bridger Rail Services and Bridger Pipeline Services were real legal entities.  Because they were believed to be real legal entities to whom BTS' contracts had been transferred, the accountants would have believed it was proper to record revenue to them that was previously recorded at BTS.  SOF ¶ 109 (revenues earned and expenses incurred under a contract would belong to the company that enters into the contract, or is the assignee of the contract).  Eddystone further objects to this paragraph to the extent it is based on the inadmissible hearsay of Michael Farmer and the intended testimony of Polkowitz, which is inadmissible for the reasons set forth in Eddystone's Motion to Preclude the Testimony of Defendants' Expert Gary Polkowitz.

### The BOA Lien

125.    At the time of the Acquisition, Ferrellgas had a $600 million secured credit facility with Bank of America and other lenders ("BOA"), for which BOA acted as an administrative agent, pursuant to a November 2, 2009 Credit Agreement (the "Credit Agreement"), along with amendments and supplements thereto. (Ex. 66 (11/2/09 Credit Agreement, at BLFG_EDPA2056725 (identifying "Other Lenders"), BLFG_EDPA2056861 (Schedule 2.01, identifying $400 million credit commitment)); Ex. 67 (10/21/13 Amendment No. 2 to Credit Agreement, Schedule 2.01, BLFG_EDPA2056482 (increasing to $500 million credit commitment); Ex. 68 (6/6/14 Commitment Increase Supplement, Supplement to Schedule 2.01, BLFG_EDPA2056536-63 ($100 million credit increase); Ex. 69 (11/2/09 Security Agreement, Ex. 48 (Sherman Rep. ¶ 164 (acknowledging $500 million secured credit facility, without accounting

for the $100 million increase by the 6/6/14 Commitment Increase Supplement).)

**Response No. 125:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading and/or implies

the BOA financing was used to finance the FG Acquisition, which it was not.  SOF-¶59.

Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

126.    Pursuant to a November 2, 2009 Security Agreement, the lenders had a security
interest in substantially all Ferrellgas assets. (Ex. 69(11/2/09 Security Agreement,
BLFG_EDPA2056411).)

**Response No. 126:**   Eddystone interprets this sentence as referring to a security interest in

Ferrellgas assets as of November 2, 2009.  Based on this understanding, and for purposes of the

Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone

objects to the extent this statement relies on hearsay or inadmissible evidence.

127.    The Credit Agreement required Ferrellgas to cause any new subsidiary to execute
(1) a supplement to guaranty of Ferrellgas' obligations to the secured creditors, and (2) collateral
documents securing the subsidiaries' assets for the benefit of those secured creditors. (Ex. 66
(11/2/09 Credit Agreement, § 6.12(b), BLFG_EDPA2056807); Ex. 48 (Sherman Rep. ¶ 164).)

**Response No. 127:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, distorted,

and/or taken out of context in light of the full record.  Eddystone further objects to the extent this

statement relies on hearsay or inadmissible evidence.

128.    On June 24, 2015, BTS and the other Bridger Entities signed a guaranty supplement
to comply with the Credit Agreement. (Ex. 70 (6/24/15 Email to BOA attaching guaranty
supplement, BLFG_EDPA2324390-96); Ex. 48 (Sherman Rep. ¶ 164).)

**Response No. 128:**   For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is taken out of context in

light of the full record.  Eddystone further objects to the extent this statement relies on hearsay or

inadmissible evidence.

129.     BOA failed to countersign, or failed to return, the June 24, 2015 guaranty supplement. (Ex. 48 (Sherman Rep. ¶ 164); Ex. 71 (1/8/16 Counsel email attaching guaranty supplement and requesting BOA countersigned copy, BLFG_EDPA2386465-70); Ex. 72 (1/8/16-1/20/16 Counsel email thread confirming BOA failed to countersign the June 24, 2015 guarantysupplement and that BOA required a new guaranty supplement, BLFG_EDPA2389098-102).)

**Response No. 129:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

130.     BOA's failure to countersign, or failure to return, the June 24, 2015 guaranty supplement was discovered when Ferrellgas exercised an accordion feature in its credit facility to increase the amount from $600 million to $700 million. (Ex. 73 (1/6/16 Email from BOA counsel requesting copies of the guaranty supplement in connection with transaction to increase the creditfacility to $700, BLFG_EDPA2386439); Ex. 71 (1/8/16 Counsel email attaching guaranty supplement and requesting BOA countersigned copy, BLFG_EDPA2386465-70); Ex. 72 (1/8/16-1/20/16 Counsel email thread confirming BOA failed to countersign the June 24, 2015 guarantysupplement and that BOA required a new guaranty supplement, BLFG_EDPA2389098-102).)

**Response No. 130:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

131.     Ferrellgas had considered exercising the accordion feature to increase the facility from $600 million to $700 million as early as November 2015. (Ex. 74 (11/16/15 Email attachingFerrell Energy Partners financial summary noting proposal to "exercise[] the accordion feature in[Ferrellgas'] existing facility which would increase [its] facility from $600 million to $700 million," BLFG_EDPA2256659).)

**Response No. 131:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

132.     On January 8, 2016, Ferrellgas asked BOA to accept the June 24, 2015 guaranty supplement, but BOA required that BTS and the Bridger Entities execute a new version to correct a reference in the June 25, 2015 guaranty supplement. (Ex. 72 (1/8/16 – 1/20/16 Counsel email thread confirming BOA failed to countersign the June 24, 2015 guaranty supplement and that BOA required a new guaranty supplement, BLFG_EDPA2389098-102).)

**Response No. 132:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

133.    BTS and the other BL subsidiaries accommodated BOA's request and again signed
a guaranty supplement with BOA, dated January 14, 2016. (Ex. 48 (Sherman Rep. ¶ 165); Ex. 72
(1/8/16 – 1/20/16 Counsel email thread regarding guaranty supplement, BLFG_EDPA2389098-
102); Ex. 75 (1/14/16 Guaranty Supplement, BLFG_EDPA2056483-85).)

**Response No. 133:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

134.    BTS and the other BL subsidiaries also signed a grantor accession agreement with
BOA, dated January 14, 2016, thereby becoming parties to the Security Agreement and granting
"a security interest in all of [their] rights, title and interest in and to all of the Collateral of [BTS
and the other Bridger Entities], whether now owned or hereafter acquired [ ], wherever located and
whether now or hereafter existing or arising, including the property of such undersigned set forth
on the attached supplemental schedules to the Schedules to the Security Agreement." (Ex. 76
(1/14/16 Grantor Accession Agreement, BLFG_EDPA0045976-85); Ex 69 (11/2/09 Security
Agreement at BLFG_EDPA2056417-18).)

**Response No. 134:**    Disputed.  The lien that that BTS purportedly granted in its assets (a) was

itself a fraudulent transfer and hence ineffective, (b) even if it was valid, did not encumber BTS'

assets to any meaningful extent.  Eddystone Memorandum In Support Of Plaintiff's Motion For

Summary Judgment And In Opposition To Defendants' Motion For Summary Judgment, filed

this same date, at 34-42; ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 164-71 (BTS derived no

benefit from the lien).  Additionally, Bridger Storage, LLC and Bridger Rail Shipping, LLC

apparently did not sign the grantor accession agreement.  Ex. 76 (1/14/16 Grantor Accession

Agreement, BLFG_EDPA0045976-85, -982).  Eddystone objects that this statement is

misleading, distorted, and taken out of context in light of the full record.  Eddystone further

objects to the extent this statement relies on hearsay or inadmissible evidence.

135.     The Grantor Accession Agreement identifies the membership interests in BTS as Scheduled Collateral. (Ex. 76 (1/14/16 Grantor Accession Agreement at BLFG_EDPA0045984).)

**Response No. 135:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

136.     The Security Agreement identifies as collateral all accounts, all general intangibles, including all payment intangibles, all tangible property, and all investment property, among other items. (Ex. 69 (11/2/09 Security Agreement at BLFG_EDPA2056417-18).)

**Response No. 136:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or inadmissible evidence.

137.     ERC concedes that the BOA lien extends to all of BTS's personal property; ERC's expert Sherman opines, however, that BTS executed the guaranty "with no apparent reasonably equivalent value returned." (Ex. 48 (Sherman Rep. ¶¶ 164-165).)

**Response No. 137:**     For purposes of the Motion only, Eddystone does not dispute Defendants' contention in this paragraph that Sherman opined that BTS executed the guaranty without receiving reasonably equivalent value.  Eddystone does dispute Defendants' contention that the lien extends to all of BTS' personal property.  The lien that that BTS purportedly granted in its assets (a) was itself a fraudulent transfer and hence ineffective, (b) even if it was valid, did not encumber BTS' assets to any meaningful extent.  Eddystone Memorandum In Support Of Plaintiff's Motion For Summary Judgment And In Opposition To Defendants' Motion For Summary Judgment, filed this same date, at 34-42; ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 164-71 (BTS derived no benefit from the lien).  Additionally, even if the lien were valid, the only assets encumbered are those specified in the Security Agreement, many of which are admittedly categories of personal property.  Ex. 69 (11/2/09 Security Agreement at BLFG_EDPA2056417-18, -417-18).  Eddystone objects that this statement is misleading, distorted, and taken out of

context in light of the full record.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

138.      On January 15, 2016, BOA perfected its security interest in BTS's personal property by filing a UCC Financing Statement with the Clerk of Court of Acadia Parish, Louisiana that covered the following collateral: "ALL ASSETS OF [BTS] AND ALL PROCEEDS THEREOF, AND ALL RIGHTS AND PRIVILEGES WITH RESPECT THERETO (OTHER THAN "EXCLUDED COLLATERAL" AS DEFINED IN THE SECURITY AGREEMENT DATED NOVEMBER 2, 2009, AS AMENDED, BY DEBTOR AND CERTAIN OTHER GRANTORS PARTY THERETO IN FAVOR OF SECURED PARTY)." (Ex. 77 (1/15/16 BOA UCC Filing, BLFG_EDPA2056997).)

**Response No. 138:**      Disputed.  The lien that that BTS purportedly granted in its assets (a) was itself a fraudulent transfer and hence ineffective, (b) even if it was valid, did not encumber BTS' assets to any meaningful extent.  Eddystone Memorandum In Support Of Plaintiff's Motion For Summary Judgment And In Opposition To Defendants' Motion For Summary Judgment, filed this same date, at 34-42; ERC-1205, 10/14/20 Sherman Rep. at ¶¶ 164-71 (BTS derived no benefit from the lien).  Eddystone objects that this statement is misleading, distorted, and taken out of context in light of the full record.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

139.      At the time it filed the UCC Financing Statement, BOA was owed approximately $311.6 million. (Ex. 3 (1/31/16 Ferrellgas 10-Q at BLFG_EDPA1604286 ("[A]s of January 31, 2016, Ferrellgas had total borrowings outstanding under its secured credit facility of $311.6 million").)

**Response No. 139:**      For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.

140.      On January 31, 2016, BTS assigned to its affiliates substantially all of its assets, excluding the RSA. (Ex. 78 (1/31/16 Assignment and Assumption Agreement between BTS and Bridger Terminals, LLC, JTS-SMA_0010861); Ex. 79 (1/31/16 Assignment and Assumption Agreement between BTS and Bridger Swan Ranch, LLC, JAMEX-EDPA_00040507); Ex. 80 (1/31/16 General Warranty Deed by BTS and Bridger Real Property, LLC, BLFG_EDPA0044188).)

**Response No. 140:**      Eddystone interprets this paragraph as addressing assets that BTS had on

January 31, 2016.  Subject to this understanding, Eddystone disputes this paragraph because BTS

net intercompany accounts receivables totaling approximately $8.2 million on or about February

1, 2016 were simply eliminated, and were not "assigned" to BTS affiliates.  ERC-1205, 10/14/20

Sherman Report at ¶¶ 112-14.  Eddystone objects that this statement is misleading, distorted, and

taken out of context in light of the full record.  Eddystone further objects to the extent this

statement relies on hearsay or inadmissible evidence.

141.      The BOA lien encumbered all of the property subject to the 2016 Assignments,
except for a piece of real property called Swan Ranch.  (Ex. 48 (Sherman Rep. ¶¶ 57, 96-101, 107,
108, 112114, Table 13 (at page 50), Table 18 (at page 57)); Ex. 39, Sherman Tr. at 194:4-19 ("Q.
And you're not assigning a value to Bank of America's collateral, right? A. I'm not opining on
Bank of America's collateral…. Q. Are you giving an opinion on the value of any of Bank of
America's collateral? A. No.").)

     a.      Sherman values the property assigned in January 2016 at $64 million; he
did not opine on the value of other property securing the BOA credit facility. (Ex. 48 (Sherman
Rep. ¶¶ 57, 96-101, 107, 108, 112, 114, Table 13 (at page 50), Table 18 (at page 57)); Ex. 39
Sherman Tr.at 194:4-19 ("Q. And you're not assigning a value to Bank of America's collateral,
right? A. I'mnot opining on Bank of America's collateral…. Q. Are you giving an opinion on the
value of anyof Bank of America's collateral? A. No.").)

     b.      Swan Ranch is the only asset ERC has identified as not subject to the
BOA lien, but ERC does not provide a fair market value for the property; instead Sherman refers
only to thebook value of $1,726,247. (Ex._, 10/14/20 Sherman Rep. ¶ 108 (stating "BTS'
ownership in thefifteen acres of land upon which the Swan Ranch terminal sat, which had
been purchased  for $1,726,247, was sold to another Ferrellgas entity"), ¶ 108 n.153 (admitting
the $1,726,247 is a "[p]rice based on the journal entries to record the purchase of the land in
BTS' general ledger"), at Table 18 (listing the Swan Ranch "Book Value" at "$1,726,247").)
ERC has offered no other evidence of the value of this real property.

**Response No. 141:**      First sentence:  Disputed.  The lien that that BTS purportedly granted in its

assets (a) was itself a fraudulent transfer and hence ineffective, (b) even if it was valid, did not

encumber BTS' assets to any meaningful extent.  Eddystone Memorandum In Support Of

Plaintiff's Motion For Summary Judgment And In Opposition To Defendants' Motion For

Summary Judgment, filed this same date, at 34-42; ERC-1205, 10/14/20 Sherman Rep. at ¶¶

164-71 (BTS derived no benefit from the lien).  Eddystone further notes that in fiscal year 2018,

Ferrellgas Partners, LP sold off all of its Midstream (i.e., logistics) operations, including Swan Ranch Terminal, for $119 million.  ERC-2123, 7/31/18 Ferrellgas 10-K (excerpt), at 2.

Section a.: Disputed.  It is not clear from this paragraph what assets are the subject of the statement that "Sherman values the property assigned in January 2016 at $64 million". Eddystone admits that Sherman found (i) stations throughput revenue diverted to Bridger Terminals up to August 31, 2018 totaled approximately $3 million, (ii) stations throughput revenue diverted to Swan Ranch up to August 31, 2018 totaled approximately $20 million, and (iii) BTS fixed assets diverted (comprising Swan Ranch real property and Bridger Terminals and Swan Ranch injection stations) totaled approximately $40.2 million.  ERC-1205, 10/14/20 Sherman Report at 47, 50, and 57 (Tables 11, 13, and 18).  Eddystone disputes that Sherman found that BTS as whole was worth $64 million in January 2016, notes that none of Defendants' citations quote him as saying that, and further notes that the stations throughput figures are cutoff at August 31, 2018.

Section b.: Disputed. The book value of the Swan Ranch land was at least equal to the fair market value.  Eddystone Opposition To Defendants' Motion To Preclude The Testimony Of Plaintiff's Expert Marc Sherman, filed this date, section III.C.

Eddystone objects that these statements are misleading, distorted, and taken out of context in light of the full record.  Eddystone further objects to the extent these statements rely on hearsay or inadmissible evidence.

## The Jamex Acquisition of BTS

142.    In early 2016, Jamex affiliate Jamex Transfer Holdings, LLC ("JTH") acquired BTS from BL and changed its name to Jamex Transfer Services, LLC ("JTS," collectively with the other Jamex affiliates, "Jamex").  (Dkt. 182 (FAC ¶ 74); Dkt. 193 (BL Answer to FAC ¶ 74); (Ex. 81 (BTS PSA, BLFG_EDPA0005497); (Ex. 92 (12/25/16 Notice of Name Changes, JAMEX-EDPA_00011507-8).)

**Response No. 142:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

143.     Effective February 1, 2016, JTS was no longer affiliated with the Defendants.
(Dkt. 182 (FAC ¶ 74); Dkt. 193 (BL Answer to FAC ¶ 74); (Ex. 81 (BTS PSA,
BLFG_EDPA0005497);  (Ex. 92 (12/25/16 Notice of Name Changes, JAMEX-
EDPA_00011507-8).)

**Response No. 143:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

144.     Under the BTS PSA, JTH expressly acquired the RSA, including all obligations to
pay for any barrels transloaded at the Eddystone Facility or to pay deficiency payments if
insufficient barrels were transloaded at the facility after February 1, 2016. (Ex. 81 (BTS PSA
§ 2.1(b), BLFG_EDPA0005503-4 ("At the Closing, Buyer will accept such assignment and
transfer of the Membership Interests from Seller on the terms and conditions set forth herein,
including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth
on Schedule 4.4 for periods on and after the Closing Date.")); Ex. 83 (BTS Assignment,
BLFG_EDPA0044192); Ex. 40 (Ballengee Dep at 259:6-8 ("So you took the entity with the [RSA]
agreement in the entity? A. Yes, sir.").)

**Response No. 144:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

145.     JTH acquired JTS to establish privity with ERC "to get them to negotiate" as Jamex
was "still trying to figure out a way to keep the agreement" and continue moving crude through
the Eddystone Facility. (Ex. 40 (Ballengee Tr. at 232:5-13 ("Q. What was -- what was your
intention with respect to the [RSA] after buying back BTS? A. Well, the hope was to get – to get
[ERC] to negotiate to come out to a lower rate, because at the time we were still – we were still
trying to figure out a way to keep the agreement, go on the TLA with [BL], and I felt like we had
a better chance of negotiating with [ERC]"); Ex. _ (Jilla Tr. at 186:10-182:2 (Q. "Do you have an
understanding about the reason that Jamex purchased BTS?" A. "Yes     Eddystone had refused
[to enter the Carlyle tripartite] . . . stating that they had no privity of contract with [ ] Jamex
Marketing . . . we wanted to make sure that Jamex had privity of contract with [ ] Eddystone" . .
.Q. "What was the plan upon establishing privity" A. "[N]egotiate directly with Eddystone then
get working capital in place so we could restart [shipping crude]"), at 188:16-189:7 (Q. "Did Jamex
… negotiate with Eddystone in connection with … the [Carlyle] agreement?" A. "We had to work

through Bridger Logistics because … we did not have any privity of contract." Q. "I meant after acquiring BTS." A. "[W]e had one meeting in the lawyer's office … we explained our position … and in a few days … this case went to arbitration … [going] the legal route versus a commercial route").)

**Response No. 145:**     Disputed.  Several facts contradict the claim that Jamex Transfer Holdings, LLC ("JTH") acquired Jamex Transfer Services, LLC ("JTS") "to facilitate negotiations with Eddystone so that JTS could 'continue moving crude through the Eddystone facility.'"

First, JTH acquired JTS (formerly BTS) from Bridger Logistics in a contract signed on February 22, 2016.  ERC-389, 2/22/16 Jamex Transfer – Bridger Logistics Purchase Agreement, BLFG_EDPA0005496-555; ERC-390, 1/28/16 CT Service Email to Adams and Formation Documents, JAMEX-EDPA_00040062-66, at -66.  At that time, Bridger Logistics and JTH knew that no crude was going to be shipped through Eddystone because on January 13, 2016, Bridger Logistics, Jamex Marketing, and Monroe had executed three letter agreements that suspended certain obligations, including the obligation of Jamex Marketing to deliver crude oil to Monroe. ERC-382, 1/13/16 Adams Email and Letter Agreements, BLFG_EDPA1752875-901, at -892. The suspension agreements further included an amendment eliminating references to Eddystone from the parties' prior agreements and stating that, if and when deliveries resumed, for any crude supplied to Trainer without using the Facility, Monroe would get a $.50/barrel discount.   ERC-382, 1/13/16 Adams Email and Letter Agreements, BLFG_EDPA1752875-901, at -893 (oil shipped without using the Facility would entitle Monroe to $.50/barrel discount), -899 (deleting references to the Facility from the Bridger Logistics-Monroe TLA).  Jamex Marketing did not buy BTS/JTS to move crude, because the only customer that used the Eddystone facility – Monroe – was no longer receiving shipments from Jamex Marketing.

Second, Defendants cite to the need to negotiate with Eddystone regarding a tripartite

agreement that Carlyle Commodity Management, LLC ("Carlyle") insisted upon as part of a the reason to sell BTS/JTS to JTH.  But, in the very first communication to Eddystone after the sale, Jamex Markting did not ask Eddystone to reconsider entering into that agreement, and indeed, did not even mention Carlyle.   ERC-399, 2/25/16 Ballengee Email and Letter, JTS-SMA_0003770-72.   Instead, Jamex Marketing announced that it complained about alleged shortcomings at the Eddystone facility.  *Id.*  Had negotiation of the tripartite agreement been important to it, Jamex Marketing would not have been completely silent about that issue when announcing to Eddystone that it had purchased BTS.

Third, and consistently with the foregoing, by the time JTS bought BTS on February 22, 2016, Carlyle had given up on the proposed financing deal for which the tripartite agreement was required.   Dkt. 491-73, 1/25/21 Declaration of David E. Johnson at ¶13 (noting that Carlyle concluded in December 2015 the proposed intermediation contract was unattractive, and that Carlyle had made the strategic decision to stop entering deals like the one proposed by Jamex Marketing).  Accordingly, the need to facilitate negotiations with Carlyle was not a reason for Jamex Marketing to buy BTS/JTS.

Eddystone objects that this statement is misleading, distorted, and taken out of context in light of the full record.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

146.       Under the BTS PSA, JTH assumed the liabilities under the RSA only for dates after February 1, 2016. (Ex. 81 (BTS PSA § 2.1(b), BLFG_EDPA0005503-4 ("At the Closing, Buyer will accept such assignment and transfer of the Membership Interests from Seller on the terms and conditions set forth herein, including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth on Schedule 4.4 for periods on and after the Closing Date.")), § 1.1, BLFG_EDPA0005501 (defining "Retained Liabilities" as "any asset, Contract (including the [RSA] and the other Contracts set forth on Schedule 4.4), ... to the extent relating to any period before the Closing")).)

**Response No. 146:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph regarding the language in the BTS purchase and sale agreement.

Eddystone denies that this agreement – to which Eddystone was not a party – can limit

Eddystone's legal rights in this matter.  Eddystone objects to the extend that this statement is

misleading, distorted, and/or taken out of context in light of the full record.  Eddystone further

objects to the extent this statement relies on hearsay or inadmissible evidence.

147.      Pursuant to the BTS PSA, BL paid JTH $4,447,677.96 "in satisfaction of all charges
and sums actually due under invoices issued in the ordinary course of business pursuant to the
[RSA] that are incurred during the period for the month of January 2016, as such sums and charges
become due and payable on or about February 20, 2016." (Ex. 81 (BTS PSA § 2.3(c),
BLFG_EDPA0005504); Ex. 40 (Ballengee Tr. at 235:10-12 ("Q. When you took BTS, it came
with about four and a half million dollars in cash, correct? A. Yes, sir.")).)

**Response No. 147:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

148.      On February 26, 2016, Jamex paid ERC $3,954,543.58 for volumes transloaded in
January 2016; Jamex did not pay the January 2016 deficiency charges. (Ex. 40 (Ballengee Tr. at
235:10-12 ("Q. When you took BTS, it came with about four and a half million dollars in cash,
correct? A. Yes, sir. Q. And the purpose of that cash was to pay Eddystone through the end of
January '16? A. Yes, sir. There was -- there was an invoice pending for the January throughput
plus some January deficiencies. Q. Okay. Did you pay that invoice? A. We paid the January actual
throughput. We did not pay the deficiencies. Q. Did ... the entire amount of cash that was
transferred go to [ERC] or did you keep some? A. No, we kept -- there was about 400,000 that
stayed in JTS, that's now in [my lawyer's] account.")); Ex. 82 (6/14/16 Boaz Decl. ¶ 18).)

**Response No. 148:**      For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent that this statement is misleading,

distorted, and/or taken out of context in light of the full record.  Eddystone further objects to the

extent this statement relies on hearsay or inadmissible evidence.

## The 2016 Arbitration

149.      After JTS ceased payments to ERC under the RSA, ERC initiated arbitration
against Jamex, and Jamex responded with counterclaims. (Dkt. 182 (FAC ¶¶ 74, 75); Dkt. 193
(BL Answer to FAC ¶¶ 74, 75); (Ex. 81 (BTS PSA, BLFG_EDPA0005497); (Ex. 92 (12/25/16

Notice of Name Changes, JAMEX-EDPA_00011507-8).)

**Response No. 149:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, distorted, and

taken out of context in light of the full record.  JTS was asset-less and never had the ability to

pay Eddystone.  Defendants knew that they were selling BTS to a newly-formed, asset-less

affiliate of Jamex Marketing, without any assets beyond the liability under the RSA.  SOF-

¶¶163-78.  Eddystone further objects to the extent this statement relies on hearsay or

inadmissible evidence.

150.     The arbitration resolved in January 2017 when the arbitration panel issued a
stipulated award, which has not been confirmed, arising from a settlement agreement between and
among "Jamex LLC, Jamex Marketing LLC, Jamex Administrative Services LLC, Jamex
Unitholder LLC, Jamex Transfer Holdings LLC, James H. Ballengee, JBAH Holdings LLC,
Ballengee Holdings LLC, and Ballengee Interests LLC;" JTS was also a "Party," but "solely for
the purposes of Paragraphs 1, 4, 8, 11, and 13-22" (the "Arbitration Settlement"). (Ex. 85
(Settlement Agreement, ERCEDPA00000400); Ex. 86 (Stipulated Arbitration Award, JAMEX-
EDPA_00013719); *Eddystone Rail Company, LLC v. Jamex Transfer Services, LLC*, No. 1:17-cv-
01266-JMF-OTW, slip op. (S.D.N.Y. Jan. 11, 2019), ECF No. 71 (order staying action to confirm
arbitration award).)

**Response No. 150:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

151.     Section 11 of the Arbitration Settlement, to which JTS was expressly included as a
Party, provided that there was no "admission of liability by any Party, all such liability being
expressly denied," and that "[n]either the Parties' consent to the terms of [the agreement], nor [the
agreement] or the terms themselves, shall constitute an admission of legal responsibility, liability,
or fault on the part of any Party." (Ex. 85 (Settlement Agreement, ERCEDPA00000401, 406-7).)

**Response No. 151:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent this statement relies on hearsay or

inadmissible evidence.

152.     The Arbitration Settlement identified the basis for the settlement as JTS's lack of

"resources remaining to continu[e] litigating the Arbitration or satisfy any award in favor of ERC," and Jamex's owner, James H. Ballengee ("Ballengee"), testified that the stipulated arbitration award was not "on the merits." (Ex. 85 (Settlement Agreement, ERCEDPA00000400); Ex. 40 (Ballengee Tr. at 256:7-15 ("Q. Now, related to that, Eddystone, in this lawsuit, has alleged that the arbitration award is on the merits. Is that your belief?  A. No. My belief was that I -- we settled that and in exchange for that -- you know, that entered/agreed upon judgment and the half million dollars, that I got releases for my entities. And, you know, that's – that's what – that's what I signed up for."), Ballengee Tr. at 255:10-256:6 ("[Counsel for ERC] made it very clear that -- that if they prevailed at arbitration, they were going to try to go all the way up to Jamex to Ballengee Interests and to me personally. So for $500,000, I got a release from everybody, and I didn't have, you know -- so I -- and at the time, you know, I had a lot of -- I had a lot of other issues to deal with. I was trying to negotiate the TLA with Ferrell. I was still negotiating with Monroe. So for half a million dollars to get out and to get releases for -- for myself and everybody up and down the chain, I felt like that was a huge win, even though I felt like that we had -- you know, our claims had merit. I just didn't have the million dollars to spend to defend it.")).)

**Response No. 152:**     Disputed.  The settlement agreement states as follows regarding reasons

for settlement:

JTS does not have sufficient resources remaining to continue litigating the Arbitration or to satisfy any award in favor of ERC and the Jamex Parties desire to avoid the uncertainty, burden, and expense of any future litigation or claims that ERC may seek to bring against them arising out of or related in any way to the subject matter of the Arbitration, including but not limited to piercing the veil, alter ego, fraudulent transfer, conspiracy, derivative liability, liability as a shareholder or member, liability as director or manager or officer, liability as a vice principal, or any other claim that a Jamex Party is liable for any amounts awarded in the Arbitration or otherwise related to the RSA, the Eddystone rail facility, or the shipment or failure to ship oil through the Eddystone rail facility (the "Affiliate Claims " ).

Ex. 85 (Settlement Agreement, ERCEDPA00000400, -400-01).  Eddystone objects that this statement is misleading, distorted, and taken out of context in light of the full record.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

153.     Under the Settlement Agreement, the parties agreed to "submit to the Arbitration Panel a proposed arbitration award" that would "determine that JTS has breached the RSA and award damages in the amount of $139,050,406.77," but the "Jamex Parties" would make payments totaling only $450,000 to ERC. (Ex. 85 (Settlement Agreement, ERCEDPA00000401-2).)

**Response No. 153:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

154.     The Settlement Agreement further provided that, "[u]pon issuance of the Award ..., payment of the First and Second Payments, and completion of the Title Transfer, ERC, on behalf of itself and any past or present corporate parents, subsidiaries, affiliates ... (collectively with ERC,

the 'ERC Releasors'), do hereby absolutely and unconditionally agree to release and discharge the Jamex Parties from each and every right, claim, demand, debt, liability, obligation, attorneys' fees, damages, costs, expenses, lawsuits, and cause of action whatsoever, or compensation of any kind, in law or equity, known or unknown, fixed or contingent, liquidated or unliquidated, foreseen or unforeseen, contemplated or uncontemplated, that the ERC Releasors have or may have against the Jamex Parties related to the Arbitration or any potential Affiliate Claims, other than the obligations contained in this Agreement…. ERC acknowledges and agrees that the release contained in this Paragraph is to be broadly construed to the fullest extent permitted by law. For the avoidance of doubt, ERC does not however remise, release, or discharge JTS from the Award or its obligations thereunder." (Ex. 85 (Settlement Agreement, ERCEDPA00000400).)

**Response No. 154:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

155.    The Defendants were not parties to the arbitration or the RSA; nevertheless, through this action, ERC seeks to recover from the Defendants on the basis of the arbitration settlement, demanding "all payments BTS owes to [ERC] under the RSA" and "all amounts awarded by the [] arbitration panel in the arbitration between [ERC] and [BTS]," together with interest.  (Dkt. 182(FAC ¶¶ 75, 86, Prayer for Relief ¶¶ 1, 2; Ex. 85 (Settlement Agreement, ERCEDPA00000400); Ex. 16 (RSA at 1); Ex. 44 (ERC's Responses to BL/FG Defendants' Second Set of Interrogatoriesat 30 (Supplemental Response to Interrogatory No. 16) ( "Eddystone seeks all amounts owed underthe RSA, which sums currently exceed $169 million in compensatory damages plus prejudgmentinterest and attorneys' fees" and referring to the "more complete analysis of all aspects of Eddystone's damages claim [that] will be set forth in the forthcoming expert reports and testimonyof Eddystone expert Marc Sherman"); Ex. 48 (Sherman Rep. ¶¶ 208-213 (calculating alleged "Payments Owed to Eddystone Under the RSA," including interest, and alleging a total of "$173,020.238").)

**Response No. 155:**    Disputed.  Eddystone can and will establish liability without reference to

any arbitration award, and did not bring an action to enforce an arbitration award—the

arbitration award is merely proof that (1) BTS breached the RSA and (2) Eddystone suffered

damages as a result.  Eddystone specifically seeks to hold Defendants "liable for the debts BTS

owes to Eddystone."  FAC ¶ 86.  Eddystone's prayer for relief seeks:  (1) "all payments BTS

owes Eddystone under the RSA," (2) "[a]ll expectation damages available to a party injured by

breach of contract . . . ," (3) voidance of all fraudulent transfers, (4) damages in the amount of

the transfers, (5) "minimum volume payments owed under the RSA," and (5) punitive damages.

*Id.* at 27-28. And Eddystone has submitted undisputed evidence that BTS breached the RSA.

SOF-¶218. Eddystone objects that this statement is misleading, distorted, and taken out of

context in light of the full record.  Eddystone further objects to the extent this statement relies on

hearsay or inadmissible evidence.

### The Alter Ego Allegations

156.    ERC seeks to impose liability on FGP, FG, BL, and BR for a breach of the RSA,
namely the failure to pay either the transloading charges or the deficiency fees from early 2016 to
the end of the RSA. (Ex. 44 (ERC's Responses to Defendants BL/FG Defendant's Second Set of
Interrogatories, Interrogatory No. 16 ("Defendants Bridger Logistics, LLC, Ferrellgas Partners,
L.P., and Ferrellgas, L.P., Rios, Gamboa, and Bridger Rail Shipping, LLC, caused the damages by
failing to make the payments they owed under the RSA as alter egos of BTS."); Ex. 38 (ERC's
Responses to Rios/Gamboa First Set of Interrogatories (4/2/2018), Interrogatory No. 2 (detailing
payments alleged outstanding payments due under the RSA).)

**Response No. 156:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

157.    ERC has not brought a claim for breach of the RSA in this case, but it asserts four
sets of unpaid amounts under the RSA: (a) $44,399.67 charged to ERC on December 15, 2015
byNorfolk Southern for moving its locomotives in and out of the Eddystone facility; (b)
$493,134.38 for deficiency charges incurred in the month of January 2016; (c) $3,338,639.50 for
deficiency charges incurred in the month of February 2016; and (d) $143,816,593.05 for the "entire
remaining amount of deficiency charges" for the remaining term of the RSA. (Ex. 38 (4/2/18
ERC's Responses to Rios/Gamboa First Set of Interrogatories, Interrogatory No. 2); (Dkt. 182
(FAC).)

**Response No. 157:**    Disputed.  With respect to the assertion that Eddystone has not brought

contract breach claim, the Court has specifically concluded that Eddystone's alter ego claim is

itself a quasi-contractual claim based on Defendants' breach of the RSA.  Dkt. 308 at 17.  "When

coupled with allegations of another wrong, such as breach of fiduciary duty or a fraudulent

conveyance, alter ego can constitute an independent claim."  *In re Maxus Energy Corp.*, No. AP

18-50489-CSS, 2019 WL 4343722, at *5 (D. Del. Sept. 12, 2019); *cf. Cantiere DiPortovenere*

*Piesse S.p.A. v. Kerwin*, 739 F. Supp. 231, 236 (E.D. Pa. 1990). Similar to the plaintiff in *In re*

*Maxus Energy Corp.*, Defendants stripped BTS of its assets and left the corporation without the

ability to fulfill its obligations under the RSA either by using the transloading capacity or making the agreed deficiency payments.  SOF-¶¶89-116.

Disputed also with respect to the amounts owed under RSA.  Since the interrogatory response cited by Defendants, the parties have engaged in extensive expert discovery, including with respect to damages.   Eddystone's accounting expert, Marc Sherman, has identified the following amounts contractually owed under the RSA, not including contractual interest: (a) $293,134  for deficiency charges incurred in the month of January 2016; (b) $3,338,639.50 for deficiency charges incurred in the month of February 2016; and (c) $142,275,629 for the term of the RSA after February 2016.  ERC-1205, 10/14/20 Sherman Rep. at Ex. 21.  Eddystone objects that this statement is misleading, distorted, and taken out of context in light of the full record. Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

158.    ERC's basis for assigning liability to FGP and FG (i.e., piercing the corporate veil of BL to reach FG and piercing the veil of FG to reach FGP) consists of generalized statements regarding "Ferrellgas" or "Defendants," and assertions that Rios, Gamboa, and other Ferrellgas employees undertook the actions related to BTS. (Ex. 44 (ERC Response to Rios/Gamboa Second ROGs, Interrogatory 8 at 9) ("Several Ferrellgas and Bridger employees and attorneys participated in the fraudulent transfers, including but not limited to, Rios, Gamboa, Todd Soiefer, Steve Wambold, Trent Hampton, Patrick Knapp, Andy Lehman, and John Goodgame. Ferrellgas and Logistics, through Rios and Gamboa, totally dominated, controlled and manipulated BTS starting no later than June 2015.").)

**Response No. 158:**    Disputed.  Eddystone has identified numerous specific acts and communications engaged in by Rios, Gamboa, Soiefer, and others on behalf of Defendants to strip BTS of its assets and then sell it as an empty husk.  These  communications and acts relate to, among other things, the diversion of revenues; financial conditions that required Defendants to end the RSA; a potential bankruptcy of Eddystone; and formulation of the plan to strip and sell BTS.  SOF ¶¶ 3-5, 7, 94-95, 102, 125-130, 136-148, 150-165, 168-174, 176, 178-185, 191-202, 204-209, 212-215.  Eddystone objects that this statement is misleading, distorted, and taken

out of context in light of the full record.  Eddystone further objects to the extent this statement

relies on hearsay or inadmissible evidence.

159.        The record reflects that Todd Soiefer was an employee of both BL and Ferrellgas,
Inc., Steve Wambold was employed by Ferrellgas, Inc., Trent Hampton was employed by
Ferrellgas, Inc., Patrick Knapp was an employee of both Ferrellgas, Inc. and BL, and Andy
Lehman and John Goodgame were outside counsel to all Ferrellgas and Bridger entities. (Ex. _
(Ex. 61 (11/5/18 Soiefer Decl. ¶ 2 ("I was employed by Ferrellgas, Inc., the general partner of
[Ferrellgas], as the Senior Vice President for Strategic Development from January 2014 to
November 2016. Following the acquisition of [BL] and its then-affiliates by Ferrellgas on or about
June 24, 2015 ... I also served as the Chief Financial Officer of [BL] from November 2015 to
November 2016.")); Ex. 7 (7/31/15 Ferrellgas 10-K at BLFG_EDPA2274498 ("Mr. Wambold
joined our general partner [defined as Ferrellgas, Inc.] as a General Manager in 1997, became
Region Vice President in 2003, became Senior Vice President of Operations in 2005, became
President and Chief Operating Officer in 2006 and became Chief Executive Officer and President
and was appointed to the board of directors in 2009."); Ex. 15 (10/1/20 Plaintiff Eddystone Rail
Company, LLC's Supplemental Responses and Objections to Defendants Rios and Gamboa's
Fourth Set of Interrogatories, Supplemental Response to Interrogatory No. 5 at 30 (conceding
Trent Hampton was "Ferrellgas' counsel"); Ex. 87 (Knapp Tr. (8/18/20) at 10:20-11:8; 16:1-17:1)
(confirming that "[a]fter the closing" of the Acquisition he was "employed by Ferrellgas, Inc.").)

**Response No. 159:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph, except that it notes that ███████REDACTED███████

████████████████████████████████████████████████

███████████████████████    Additionally, Eddystone notes that Ferrellgas,

Inc., which purportedly employed Soiefer, Wambold, and Knapp, was the general partner of both

Ferrellgas Partners and Ferrellgas LP, and had management control over those entities.  *Id.* at ¶ 4.

Ferrellgas, Inc. also held all employees of Ferrellgas Partners, Ferrellgas LP, Bridger Logistics,

LLC ("Bridger Logistics"), and Bridger Logistics' subsidiaries.  *Id.* at ¶ 60.  Eddystone objects

that this statement is misleading, distorted, and taken out of context in light of the full record.

Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

160.        ERC does not contend that BTS was undercapitalized when it was formed. (Ex. 33
(ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 299:12-23).)

**Response No. 160:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

161.     ERC does not contend that BTS failed to observe corporate formalities. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 299:24-300:1 ("Q. Does Eddystone contend that BTS failed to observe corporate formality? A. Not that I'm aware of").)

**Response No. 161:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

162.     ERC does not contend that BTS failed to pay dividends. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 299:24-300:3 ("Q. Okay. Does Eddystone contend ... That BTS failed to pay dividends?  A. Not that I'm aware of.").)

**Response No. 162:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

163.     ERC does not contend that BTS failed to maintain corporate records. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:4-6, 301:1-4) ("Q. Does Eddystone contend that BTS failed to maintain corporate records?  A. Not that I'm aware of.").)

**Response No. 163:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is misleading, distorted, and

taken out of context in light of the full record.  Defendants are well aware that LLCs do not have

the same corporate record keeping requirements of other business organizations.  Eddystone

further objects to the extent this statement relies on hearsay or inadmissible evidence.

164.     ERC does not contend that BTS had officers and directors that did not actually participate in the business. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:13-16) ("Q. Does Eddystone contend that BTS had officers or directors that did not actually participate in the business? A. Oh, not that I'm aware of.").)

**Response No. 164:**     For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects to the extent that this statement is misleading,

distorted, and/or taken out of context in light of the full record.  Eddystone further objects to the

extent this statement relies on hearsay or inadmissible evidence.

165.     ERC does not contend that BTS commingled corporate and shareholder funds. (Ex.

33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:17-19 ("Q. Okay. Does Eddystone contend that BTS commingled corporate funds with shareholder funds? A. Not that I'm aware of.").)

**Response No. 165:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone notes that when Defendants removed revenues and

assets from BTS they did not continue to permit it access to such.

166.     ERC does not contend that BTS failed to maintain separate bank accounts from other Bridger entities. (Ex. 33 (ERC 30(B)(6) Depo. Tr. at (Day 2: Cohen) at 300:20-25 ("Q. Does Eddystone contend that BTS failed to make separate bank accounts -- failed to maintain separate bank accounts? A. Separate bank accounts from what? Q. Other Bridger entities. A. I don't know that that's a contention.").)

**Response No. 166:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.

### BTS Limited Liability Company Organization

167.     BTS was, at all times relevant to this action, a Louisiana limited liability company with its principal place of business in Texas. (Ex. 12 (PSA at Schedule 4.4, RG_EDPA0008562); Ex. 88  (BTS Articles of Organization, BLFG_EDPA0310345-48).)

**Response No. 167:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant

to any issue raised in this motion.

168.     BTS's articles of organization specified that it would "be managed by one or more Managers." (Ex. 88 (BTS Articles of Organization, Article 5(A), BLFG_EDPA0310346).)

**Response No. 168:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant

to any issue raised in this motion.

169.     BTS's articles of organization further provided that "[e]ach Manager is relieved of any personal liability to the fullest extent permitted by law, including, not by way of limitation, any liability for monetary damages for breach of any duty provided for in R.S. 12:1314." (Ex. 88 (BTS Articles of Organization, Article 8, BLFG_EDPA0310347).)

**Response No. 169:**    For purposes of the Motion only, Eddystone does not dispute Defendants'

contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.

170.    As of July 1, 2013, BL was the sole member of BTS. (Ex. 88 (Notice of Change of Members of BTS, BLFG_EDPA0310351, Notice of Change of Members and Membership Interests of BTS, BLFG_EDPA0310352, and Notice of Change of Members and Managers of BTS, BLFG_EDPA0310354).)

**Response No. 170:**    For purposes of the Motion only, Eddystone does not dispute that Bridger Logistics, LLC became the sole member of BTS on July 1, 2013.

171.    As of July 1, 2013, Bridger, LLC was the sole manager of BTS. (Ex. 88 (Notice of Change of Members and Managers of BTS, BLFG_EDPA0310354).)

**Response No. 171:**    For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.

172.    On June 24, 2015, BTS filed amended and restated articles of organization with the Louisiana Secretary of State, which identified BL as the sole member of BTS and did not state whether it was managed by its members or by managers. (Ex. 88 (BTS Amended and Restated Articles of Organization, BLFG_EDPA0310355-56).)

**Response No. 172:**    For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.

173.    At all times relevant to this action, BTS had no operating agreement. (Ex. 89 (8/12/20 Rios Decl. ¶ 4); Ex. 90 (8/12/20 Gamboa Decl. ¶ 4).)

**Response No. 173:**    For purposes of the Motion only, Eddystone does not dispute Defendants' contentions in this paragraph.  Eddystone objects that this statement is immaterial and irrelevant to any issue raised in this motion.  Eddystone further objects to the extent this statement relies on hearsay or inadmissible evidence.

## 2015 OIL MARKET CHANGES

174.    It is undisputed that, until September 2015, the cost to Monroe of COSA-based Bakken barrels was similar to, or lower than, the delivered cost of Bonny Light crude from West Africa. (Ex. 93 (O'Connor Rep. at 12-13 ("COSA-Based Bakken Barrels Were Advantageous

forMonroe Versus Nigerian Imports Until at Least September 2015") and 16 ("Monroe
Demonstratedon Multiple Occasions that the COSA-Sourced Bakken Crude was an Economic
Benefit to the Refinery in 2015, Including After the COSA was Amended in June 2015")); Ex.
94 (Monroe 30(b)(6) (Hunter) Tr. at 110:24-111:13 ("Q. Now at some point in time, did Monroe
become awarethat Bridger was looking at a transaction where the logistics and marketing arms
were going to besplit? A. Yes. Q. And do you recall when Monroe became aware of that,
approximately? A. Sometime in -- I mean, in early – I think it was spring of '15. Q. And by the
spring of 2015 had there been any changes in the crude oil markets that made the pricing
structure more or less favorable – [to Monroe?] A. No.").)

**Response No. 174:**   Disputed.  Eddystone's expert, Neil Earnest, concluded that if one takes in

to consideration, not just prices, but also the so-called comparative "refining value" of Bakken

crude versus West African "Bonny Light" crude, Monroe would have preferred to obtain the

latter in May and June 2015.  ERC-2112, Earnest Second Report at ¶¶ 2.4-2.9.  Eddystone

further objects to the extent this statement relies on hearsay or inadmissible evidence.


Dated: October 29, 2021.                       Attorneys for Plaintiff/Counterdefendant Eddystone
                                               Rail Company, LLC


                                               /s/ Filiberto Agusti
                                               Henry E. Hockeimer, Jr. (PA #86768)
                                               Terence M. Grugan (PA #307211)
                                               BALLARD SPAHR LLP
                                               1735 Market Street, 51st Floor
                                               Philadelphia, PA 19103-7599
                                               Telephone: (215) 665-8500
                                               Facsimile: (215) 864-8999
                                               hockeimerh@ballardspahr.com
                                               grugant@ballardspahr.com

                                               Filiberto Agusti (pro hac vice)
                                               Steven Barber (pro hac vice)
                                               Andrew J. Sloniewsky (pro hac vice)
                                               STEPTOE & JOHNSON LLP
                                               1330 Connecticut Avenue, NW
                                               Washington, DC 20036
                                               Telephone: (202) 429-3000
                                               Facsimile: (202) 429-3902
                                               fagusti@steptoe.com
                                               sbarber@steptoe.com

asloniewsky@steptoe.com

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on October 29, 2021, a true and correctcopy of the foregoing was filed electronicallyvia the Court's ECF filing system.

*<u>/s/ Andrew Sloniewsky</u>*