## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | : | |
|     Plaintiff/Counter-defendant, | : | No. 2:17-cv-00495-JDW |
| | : | |
|   v. | : | THIS DOCUMENT CONTAINS |
| | : | CONFIDENTIAL |
| BRIDGER LOGISTICS, LLC, *et al.*, | : | INFORMATION THAT IS |
|     Defendants, | : | SUBJECT TO THE COURT'S |
| | : | PROTECTIVE ORDER IN THIS |
| BRIDGER LOGISTICS, LLC, *et al.*, | : | ACTION AND IS HEREBY |
|     Defendants/Counterclaimants. | : | FILED UNDER SEAL |
| | : | |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON ALL COUNTS OF PLAINTIFF'S FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

TABLE OF ABBREVIATIONS ..................................................................... xii

I.   INTRODUCTION ............................................................................... 1

II.  ARGUMENT ........................................................................................ 3

    A.   The Court Lacks Subject Matter Jurisdiction ........................................... 3

        1.   Law Of The Case Is No Bar ........................................................ 3

        2.   Subject Matter Jurisdiction Is Lacking ......................................... 4

    B.   ERC's Alter Ego Claim Fails (Count I) ..................................................... 6

        1.   Defendants' Motion For Summary Judgment Should Be Granted ................................................................................... 6

            a.   Alter Ego Is Not A Cognizable Claim .............................. 6

            b.   Defendants Are Not Liable For Any Breach Of The RSA ....................................................................... 7

            c.   Neither FGP Nor FG Is An Alter Ego Of BTS ................. 8

        2.   ERC's Cross-Motion On Alter Ego Should Be Denied ............... 9

            a.   Defendants Did Not Siphon BTS Assets ......................... 9

            b.   Defendants Are Not Alter Egos Based On Insolvency ..................................................................... 12

    C.   There Is No Gap-Filling Implied Contract ............................................... 13

        1.   Texas Law Applies .................................................................... 13

        2.   The Statute Of Frauds Invalidates Any Implied Agreement ................................................................................. 14

        3.   There Was No Implied Agreement Between BM And BTS ........................................................................................... 15

i

                                                                                   **Page**

4.      BL Did Not Assume An Implied Contract Via
        Novation .............................................................   16

D.  The Fraudulent-Transfer Claims Fail (Counts II & III) .........................   17

    1.      ERC Cannot Meet Its Burden To Overcome BOA's
            Valid Lien .......................................................   17

            a.      The Lien Is Valid And Cannot Be Avoided ....................   17

            b.      The Lien Encumbered The Assets At Issue ....................   18

    2.      The 2015 Accounting Activities Are Not Actionable .................   19

    3.      The Real Estate Transfer Is Not Actionable .................................   22

    4.      ERC Is Not Entitled To Summary Judgment On
            Intentional Fraud .............................................................   22

    5.      ERC Is Not Entitled To Summary Judgment On
            Constructive Fraud .............................................................   25

E.  ERC's Breach Of Fiduciary Duty Claim Fails (Count IV) ....................   26

    1.      Law Of The Case Does Not Apply .............................................   26

    2.      Count IV Fails Under Louisiana Law .............................................   28

    3.      Count IV Also Fails Under Pennsylvania Law ...........................   30

    4.      FG And FGP Are Not BTS Fiduciaries ......................................   31

    5.      Factual Disputes Preclude Summary Judgment For
            ERC .............................................................................   32

# TABLE OF AUTHORITIES

**Cases:**                                                                                 **Page(s)**

*A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama,*
    560 F. Supp. 705 (E.D. Pa. 1983) ....................................................................... 17

*Abraham v. Lake Forest, Inc.,*
    377 So. 2d 465 (La. App. 1979) ........................................................................... 30

*Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co.,*
    752 F.2d 71 (3d Cir. 1985) ................................................................................... 29

*Ameriserv Fin. Bank v. Commercebank, N.A.,*
    2009 WL 890583 (W.D. Pa. Mar. 26, 2009) ....................................................... 25

*Anderson v. Perez,*
    No. 14-cv-6747, 2015 WL 5013704 (E.D. Pa. 2015) ........................................... 15

*Ariate Compania Naviera, S.A. v. Commonwealth Tankship Owners, Ltd.,*
    310 F. Supp. 416 (S.D.N.Y. 1970) ...................................................................... 5

*Atlanta Shipping Corp., Inc. v. Chem. Bank,*
    818 F.2d 240 (2d Cir. 1987) ................................................................................. 4

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.,*
    247 F.3d 79 (3d Cir. 2001) ................................................................................... 30

*Cal Dive Offshore Contractors, Inc. v. M/V SAMPSON,*
    245 F. Supp. 3d 473 (S.D.N.Y. 2017) ................................................................. 14

*Cantiere DiPortovenere Piesse S.p.A. v. Kerwin,*
    739 F. Supp. 231 (E.D. Pa. 1990) ....................................................................... 6

*Carnegie Tech, LLC v. Triller, Inc.,*
    2021 WL 2322934 (W.D. Tex. June 7, 2021) ...................................................... 16

*Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio,*
    2011 WL 6088611 (E.D. Pa. Dec. 7, 2011) ........................................................ 25

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures,*
    851 F. Supp. 2d 504 (S.D.N.Y. 2012) ................................................................. 5

*CML V, LLC v. Bax,*
    28 A.3d 1037 (Del. 2011) ..................................................................................... 31

**Page(s)**

*Collet v. Am. Nat'l Stores,*
   708 S.W.2d 273 (Mo. App. 1986) .......................................................................... 8

*Connors v. Peles,*
   724 F. Supp. 1538 (W.D. Pa. 1989) ................................................................ 10, 11

*Cooper v. Loper,*
   923 F.2d 1045 (3d Cir. 1991) ............................................................................... 4

*Council Tree Communc'ns, Inc. v. F.C.C.,*
   503 F.3d 284 (3d Cir. 2007) ................................................................................ 3

*Disilverio v. Serv. Master Pro.,*
   2007 WL 1029759 (W.D. Pa. Mar. 31, 2007) ..................................................... 14

*Eclipse Liquidity, Inc. v. Geden Holdings, Ltd.,*
   No. 20-1847, 2020 WL 3574530 (E.D. Pa. July 1, 2020) ................................... **5**

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,*
   124 F.3d 252 (1st Cir. 1997) .............................................................................. 22

*Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.,*
   346 F.3d 552 (5th Cir. 2003) ............................................................................. 14

*Elbeco Inc. v. Estrella de Plato, Corp.,*
   989 F. Supp. 669 (E.D. Pa. 1997) ..................................................................... 29

*Ex parte Gordon,*
   104 U.S. 515 (1881) ............................................................................................ 6

*Fednav, Ltd. v. Isoramar, S.A.,*
   925 F.2d 599 (2d Cir. 1991) .............................................................................. 14

*Fidelity Bond & Mortg. Co. v. Brand,*
   371 B.R. 708 (E.D. Pa. 2007) ........................................................................... 26

*Flourine On Call, Ltd. v. Flourogas Ltd.,*
   380 F.3d 849 (5th Cir. 2004) ........................................................................... 7-8

*Fouad v. Milton Hershey Sch. & Sch. Trust,*
   2020 WL 5775018 (M.D. Pa. Sept. 28, 2020) ..................................................... 3

*Fulcrum Cent.. v. AutoTester, Inc.,*
   102 S.W.3d 274 (Tex. App. 2003) ..................................................................... 16

iv

**Page(s)**

*Futura Dev. of P.R., Inc. v. Estado Libre Asociado de P.R.*,
    144 F.3d 7 (1st Cir. 1998) ...................................................................... 7

*Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.*,
    2017 WL 3535002 (S.D.N.Y. Aug. 16, 2017) ........................................ 27

*Hammersmith v. TIG Ins. Co.*,
    480 F.3d 220 (3d Cir. 2007) .................................................................. 29

*Hanaway v. Parkesburg Grp., L.P.*,
    168 A.3d 146 (Pa. 2017) ........................................................................ 31

*Hipple v. Hipple*,
    No. 12-1256, 2016 WL 3202216 (E.D. Pa. Jan. 27, 2016) .................... 31

*Hooper v. Maruka Machinery Corp. of Am.*,
    525 So. 2d 1113 (La. App. 1988) ........................................................ 29-30

*Image Masters, Inc. v. Chase Home Fin.*,
    489 B.R. 375 (E.D. Pa. 2013) ................................................................ 24

*In re Bridger Logistics, LLC*,
    No. 19-2678, Dkt. 3013359757 (3d Cir. Sept. 27, 2019) ...................... 3

*In re Covenant Partners, LP*,
    2017 WL 838637 (Bankr. E.D. Pa. Mar. 2, 2017) ................................ 32

*In re Diloreto*,
    04-CV-1326, 2006 WL 2974156 (E.D. Pa. Oct. 13, 2006) .................... 13

*In re Fair Fin. Co.*,
    13 F. 4th 547 (6th Cir. 2021) ................................................................ 17

*In re Gulf Fleet Holdings, Inc.*,
    491 B.R. 747 (Bankr. W.D. La. 2013) .................................................. 8

*In re Jolly's Inc.*,
    188 B.R. 832 (Bankr. D. Minn. 1995) .................................................. 18

*In re Lobell*,
    390 B.R. 206 (Bankr. M.D. La. 2008) .................................................. 29

*In re Main, Inc.*,
    239 B.R. 281 (Bankr. E.D. Pa. 1999) .................................................... 31

**Page(s)**

*In re Marquis Prods., Inc.*,
150 B.R. 487(Bankr. D. Me. 1993) .......................................................................... 18

*In re Matter of Foxcroft Square Co.*,
184 B.R. 671 (E.D. Pa. 1995) .................................................................................. 25

*In re Maxus Energy Corp.*,
2019 WL 4343722 (D. Del. Sept. 12, 2019) ............................................................ 6

*In re Moll Indus., Inc.*,
454 B.R. 574 (Bankr. D. Del. 2011) ........................................................................ 8

*In re Opus East*,
698 F. App'x 711 (3d Cir. 2017) ............................................................................. 12

*In re Pinto Trucking Serv., Inc.*,
93 B.R. 379 (Bankr. E.D. Pa. 1988) ....................................................................... 24

*In re Polichuk*,
506 B.R. 405 (Bankr. E.D. Pa. 2014) ...................................................................... 23

*In re Shuey*,
606 B.R. 760 (N.D. Ill. Bankr. 2019) ...................................................................... 19

*In re SMTC Mfg. of Texas*,
421 B.R. 251 (Bankr. W.D. Tex. 2009) ................................................................... 22

*In re Solomon*,
299 B.R. 626 (10th Cir. B.A.P. 2003) ..................................................................... 18

*In re Teleglobe Commc'ns Corp.*,
392 B.R. 561 (Bankr. D. Del. 2008) ....................................................................... 12

*In re TOUSA, Inc.*,
680 F.3d 1298 (11th Cir. 2012) .............................................................................. 18

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) ...................................................................................... 8

*In re Valley Bldg. & Construction Corp.*,
435 B.R. 276 (E.D. Pa. 2010) ................................................................................. 25

**Page(s)**

*Interstate Power Sys., Inc. v. Drake Water Techs., LLC*,
  2009 WL 10665417 (D. Wyo. July 10, 2009) ....................................... 8

*Krueger Assocs., Inc. v. Am. Dist. Telegraph Co. of Pa.*,
  247 F.3d 61 (3d Cir. 2001) .................................................. 27

*Krys v. Aaron*,
  106 F. Supp. 3d 472 (D.N.J. 2015) ......................................... 27

*Landmark Cmty. Bank, N.A. v. Klingelhutz*,
  874 N.W.2d 446 (Minn. Ct. App. 2016) ................................... 19

*Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*,
  689 F. Supp. 1340 (S.D.N.Y. 1988) .......................................... 5

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
  945 F.2d 635 (3d Cir. 1991) ............................................ 22, 24

*Melmark, Inc. v. Schutt by and through Schutt*,
  206 A.3d 1096 (Pa. 2019) .............................................. 28, 29

*Mercy Health Sys. of Se. Pa. v. Metro. Partners Realty LLC*,
  No. 02-1015, 2002 WL 1774060 (E.D. Pa. July 29, 2002)....................... 3

*Moore-McCormack Lines, Inc. v. Int'l Terminal Operating Co., Inc.*,
  619 F. Supp. 1406 (S.D.N.Y. 1985) .......................................... 6

*Mullins v. TestAmerica, Inc.*,
  564 F.3d 386 (5th Cir. 2009) .......................................... 10, 17

*Nat'l Loan Investors, L.P. v. World Props., L.L.C.*,
  830 A.2d 1178 (Conn. App. 2003) .......................................... 19

*Nat'l Marine Serv., Inc. v. C.J. Thibodeaux & Co.*,
  380 F. Supp. 1076 (S.D. Tex. 1973) ........................................ 5-6

*Ne. Marine Terminal Co. v. Caputo*,
  432 U.S. 249 (1977) ....................................................... 6

*New Orleans Stevedoring Co. v. United States*,
  439 F.2d 89 (5th Cir. 1971) ............................................... 6

*Nielsen v. Logs Unlimited, Inc.*,
  839 N.W.2d 378 (S.D. 2013) .............................................. 19

**Page(s)**

*Norfolk S. Ry. Co. v. Kirby*,
    543 U.S. 14 (2004) ..................................................................... 6

*NYKCool A.B. v. P. Intern. Servs., Inc.*,
    2013 WL 1274561 (S.D.N.Y. Mar. 29, 2013) ...................... 9

*Oetting v. Heffler, Radetich & Saitta, LLP*,
    No. 11-4757, 2017 WL 3453342 (E.D. Pa. Aug. 11, 2017) .................. 26, 27

*Pac. Emp. Ins. Co. v. Glob. Reinsurance Corp. of Am.*,
    693 F.3d 417 (3d Cir. 2012) ................................................... 31

*Parker Hannifin Corp. v. N. Sound Properties*,
    2013 WL 1932109 (S.D.N.Y. May 8, 2013) ......................... 13

*Parks v. Woodbridge Golf Club, Inc.*,
    CV 11-0562, 2017 WL 1133949 (E.D. Pa. Mar. 27, 2017) .................. 13

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ............................................................... 4, 7

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) ................................................... 9

*Pink Goose (Cayman) Ltd. v. Sunway Traders LLC*,
    2008 WL 4619880 (S.D.N.Y. Oct. 17, 2008) ...................... 5

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
    123 F.3d 111 (3d Cir. 1997) ................................................... 3, 26

*Ragan v. Tri-County Excavating, Inc.*,
    62 F.3d 501 (3d Cir. 1995) ..................................................... 9

*Randle v. Sanders*,
    2016 WL 7321298 (Tex. App. Dec. 14, 2016) ...................... 16

*Royal Indem. Co. v. Security Guards, Inc.*,
    255 F. Supp. 2d 497 (E.D. Pa. 2003) ................................... 32

*Sabine Towing & Trans. Co., Inc. v. Merit Ventures, Inc.*,
    575 F. Supp. 1442 (E.D. Tex. 1983) ..................................... 5

*Shaw v. AAA Engr. & Drafting Inc.*,
    138 F. App'x 62 (10th Cir. 2005) .......................................... 7

**Page(s)**

*Siematic Mobelwerke GmbH v. Siematic Corp.*,
   643 F. Supp. 2d 675 (E.D. Pa. 2009) .................................................................. 19

*Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.*,
   609 F.3d 223 (3d Cir. 2010) ............................................................................... 29

*Speeney v. Rutgers*,
   369 F. App'x 357 (3d Cir. 2010) ....................................................................... 26

*Speeney v. Rutgers*,
   675 F. App'x 149 (3d Cir. 2016) ....................................................................... 27

*Sugartown Worldwide LLC v. Shanks*,
   No. 14-5063, 2015 WL 1312572 (E.D. Pa. Mar. 24, 2015) .............................. 31

*Swift & Co. Packers v. Compania Columbiana del Caribe*,
   339 U.S. 684 (1950) ..................................................................................... 4, 5

*Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*,
   80 S.W.3d 601 (Tex. App. 2002) ...................................................................... 18

*Tenet Health Sys. Hosp. Dallas, Inc. v. N. Tx. Hosp. Pbysicians Gp., P.A.*,
   438 S.W.3d 190 (Tex. App. 2014) ..................................................................... 16

*Teva Pharm. Indus., Ltd. v. United Healthcare Servs., Inc.*,
   341 F. Supp. 3d 475 (E.D. Pa. 2018) ............................................................... 14

*T.R. v. Sch. Dist. of Phila.*,
   458 F. Supp. 3d 274 (E.D. Pa. 2020) ................................................................. 7

*Transcontinental Refrigerated Lines v. New Prime, Inc.*,
   2016 WL 69581 (M.D. Pa. Jan. 6, 2016) .......................................................... 23

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
   903 F.3d 333 (3d Cir. 2018) ............................................................................... 9

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ............................................................................................. 8

*United States. v. Golden Acres, Inc.*,
   702 F. Supp. 1097 (D. Del. 1988) ................................................................. 9, 13

*United States v. Kindred Healthcare, Inc.*,
   469 F. Supp. 3d 431 (E.D. Pa. 2020) ................................................................. 9

ix

Page(s)

*United States v. Pisani*,
646 F.2d 83 (3d Cir. 1981) ................................................................ 9

*United States v. Thomas*,
515 F. Supp. 1351 (W.D. Tex. 1981) .................................................. 9

*Vitol v. Primerose Shipping*,
708 F.3d 527 (4th Cir. 2013) ............................................................. 5

*Weber v. U.S. Sterling Sec.*,
924 A.2d 816 (Conn. 2007) .............................................................. 30

*Wiest v. Tyco Elecs. Corp.*,
812 F.3d 319 (3d Cir. 2016) ........................................................ 1, 28

*Wolters v. Lakey*,
456 B.R. 687 (D. Kan. 2011) ........................................................... 11

**Statutes and Rules:**

**Federal**

Fed. R. Civ. P. 30(b)(6) .................................................................... 16

**Louisiana**

La.R.S. §12:1314(B) ......................................................................... 29

La.R.S. § 12:1320(A) ....................................................................... 29

La.R.S. § 12:1320(C) ....................................................................... 29

La.R.S. § 12:1366 ............................................................................. 29

**Pennsylvania**

33 P.S. § 3 (2021) ............................................................................. 15

12 Pa.C.S. § 5101 ............................................................................. 17

12 Pa.C.S. § 5103 ............................................................................. 22

12 Pa.C.S. § 5103(a) ........................................................................ 22

**Page(s)**

12 Pa.C.S. § 5104(b)(1) ........................................................ 24

12 Pa.C.S. § 5104(b)(4) ........................................................ 25

12 Pa.C.S. § 5105 ................................................................. 25

15 Pa.C.S. § 402(a) .............................................................. 27

15 Pa.C.S. § 402(a)(2) .......................................................... 28, 29

15 Pa.C.S. § 8812(a) ............................................................ 29

15 Pa.C.S. § 8814 ................................................................ 30

15 Pa.C.S. § 8831 ................................................................ 30

15 Pa.C.S. § 8832 ................................................................ 30

15 Pa.C.S. § 8833 ................................................................ 30

15 Pa.C.S. § 8834 ................................................................ 30

15 Pa.C.S. § 8834(a) ............................................................ 30

15 Pa.C.S. § 8835 ................................................................ 30

15 Pa.C.S. § 8849.1(c) .......................................................... 32

15 Pa.C.S. § 8849.1(f) .......................................................... 32

15 Pa.C.S. § 8849.1(g) .......................................................... 32

**Texas**

Tex. Bus. & Com. Code § 26.01(a) ........................................ 15

Tex. Bus. & Com. Code § 26.01(b)(2) .................................... 15

**Other Authorities:**

*Restatement (Second) Conflict of Laws* § 6 (1971) ................... 28

# TABLE OF ABBREVIATIONS

8-Hour Loading Window .............. Time period under RSA for train and barge loading/unloading

Acquisition............................................. Ferrellgas purchase of BL and subsidiaries in June 2015

bbl.................................................................................................................Barrel of oil

BL..........................................................................................................Bridger Logistics, LLC

BNSF....................................................................................................... BNSF Railway

bpd...................................................................................................... Barrels per day

BTS ..........................................................................................Bridger Transfer Services, LLC

Carlyle ...............................................................................Carlyle Commodities, Inc.

CLMs...................................................................................Car Location Messages

CM-RSOF............................................................Defendants' Response to ERC's SOF

COSA ............................................................................... Crude Oil Supply Agreement

CP...................................................................................... Canadian Pacific Railroad

CSX ....................................................................................CSX Transportation

CT Meters............................................................................Custody transfer meters

Defendants ........................................................................................FGP, FG, BL

DR-SUMF ......................................................... Defendants' Reply to ERC RSUMF

ERC ....................................................................................Eddystone Rail Company, LLC

Facility................................................................ERC's transloading facility in Eddystone, PA

Ferrellgas ..................................................................................... FG and FGP

FG......................................................................................................Ferrellgas, L.P.

FGP ..................................................................... Ferrellgas Partners, L.P.

Granite Pinnacle............................Rock outcropping in the river approach channel to the Facility

Jamex.................................................................................JM, JTH, and JTS

JM..........................................................................Jamex Marketing, LLC

JTH.............................................................Jamex Transfer Holdings, LLC

JTS ..............................................................Jamex Transfer Services LLC

MCV........................................Minimum Contract Volume of 65,000 bpd set forth in the COSA

MLC ....................................................................... Merrill Lynch Commodities, Inc.

MLC Acknowledgment.........................Agreement among MLC, BTS, and ERC regarding crude

MLC Intermediation Agreement ........................Intermediation agreement between JM and MLC

Monroe ..................................................................... Monroe Energy, LLC

Motion ..........................................................Defendants' Opening Brief (Dkt. 495-1)

MVC.......................................Monthly Volume Commitment of 64,750 bpd set forth in the RSA

NS.........................................................................Norfolk Southern

Opposition .................. ERC's Opposition and Cross Motion for Summary Judgment (Dkt 512-1)

PCP........................................................................... Petrochem Producer

Reply ...............................................................................This brief

RSA ............................................................... 2013 Rail Facilities Services Agreement

ERC RSUMF .............................................. ERC's Response to Defendants' SUMF (Dkt. 509-3)

SEPTA........................................................Southeastern Pennsylvania Transportation Authority

SEPTA Window............... 12:00 am-4:00 am window in which trains could arrive/depart Facility

SOF .........................ERC Cross Motion for Summary Judgment Statement of Facts (Dkt. 512-2)

SUMF.................................... Defendants' Statement of Undisputed Material Facts (Dkt. 495-4)

Tripartite Agreement....................................Proposed agreement among Carlyle, BTS, and ERC

## I.     INTRODUCTION.

ERC repeats the same sensational but fictional narrative in each of its filings.  ERC—as the Plaintiff—now has the burden to support its narrative with actual facts—it is time to "put up or shut up."  *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016) (affirming summary judgment).  Instead of "putting up" actual evidence derived from years of discovery, including thousands of documents (and even privileged documents from the time of the alleged wrongdoing), ERC repeats its fictional narrative.  But summary judgment must account for the facts as they are—not as ERC would have them.  Here, ERC fails to support numerous "undisputed facts" with any citations, contends that disputed facts are "undisputed," and ignores applicable law, choosing instead to repeat the same mistruths alleged in its First Amended Complaint, which are disproven by the factual record.

First, ERC offers an illogical narrative (at 1-4) that Ferrellgas paid more than $800 million for BL in mid-2015 and then proceeded to loot the enterprise because it knew a principal asset— the RSA with ERC—would crash and burn immediately and permanently, destroying the entire value of the Acquisition.  Instead, the evidence establishes that Ferrellgas invested $800 million to acquire BL and BTS fully expecting to profit from their existing operations, including from the RSA.  (CM-RSOF-¶123.)

Second, says ERC, beginning literally the day after the transaction closed, Ferrellgas unleashed a plan to avoid liability for deficiency charges under the RSA, which may or may not have accrued based on unpredictable crude oil spreads years into the future, by "stripping and selling" BTS assets.  To the contrary, however, as part of the Acquisition and to ameliorate any losses sustained by JM due to narrowing spreads, the parties endowed JM with $250 million in initial capitalization.  When spreads continued to deteriorate beyond September 2015 to the point where it became more economical for Monroe to source crude from Africa, Jamex and Monroe

elected to suspend their arrangements for a three-month period beginning in early 2016. As a result, BL/BTS and ERC were left with nothing to transload. Thus, BL agreed to modify arrangements with Jamex and Monroe to maintain the relationship for a coterminous 3-month period. (CM-RSOF -¶¶123, 171.)

Third, says ERC, Ferrellgas orchestrated a multi-party conspiracy to deprive ERC of any RSA proceeds. In truth, in this same period during which ERC concedes (at 4) that JM "was trying to renegotiate the Monroe contract," it was ERC's refusal to consider the Tripartite Agreement—based on ERC's lack of privity—that spawned the sale of BTS to Jamex to establish that missing privity. Even with privity, however, ERC declined to adjust in any way. (DR-SUMF-¶145.)

Monroe ultimately ameliorated the impact of the late 2015 market changes by sourcing crude from Africa. For Jamex, BL, and Ferrellgas, however, the results were near catastrophic. For Ferrellgas, the fallout necessitated a complete recapitalization, including a pre-packaged FGP Chapter 11 bankruptcy. (CM-RSOF-¶58.) Despite the economic carnage suffered by Defendants, ERC continues its "strip and sell" incantation to insist it is entitled to the RSA's full benefits, which were to be achieved over a period extending years into the future, based on a muddled arbitration settlement with Jamex, now stayed by another federal court, and brought here in the form of a collection action. Even then, ERC's false narrative depends on the transmutation of a credit facility—entered into years earlier and encumbering all Ferrellgas assets (including the assets at issue here)—into another feature of its "strip and sell" diatribe. (DR-SUMF-¶¶125-41.)

Defendants' briefs and accompanying factual statements undo ERC's narrative and reveal the factual voids in ERC's ability to prove essential aspects of its claims. Judgment in Defendants' favor is warranted. At a minimum, a trial is required as to any surviving ERC claims.

## II.    ARGUMENT.

### A.    The Court Lacks Subject Matter Jurisdiction.

#### 1.    Law Of The Case Is No Bar.

The principles underpinning subject matter jurisdiction make clear that the discretionary law-of-the-case doctrine does not bar this Court from assessing jurisdiction now.  A federal court has the "'ultimate responsibility … at all levels … to reach the correct judgment under law" and "nowhere is it greater and more unflagging than in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority.'"  *Council Tree Commc'ns, Inc. v. F.C.C.*, 503 F.3d 284, 292 (3d Cir. 2007).  Thus, a federal court has "an ongoing obligation to consider its jurisdiction over an action."  *Mercy Health Sys. of Se. Pa. v. Metro. Partners Realty LLC*, No. 02-1015, 2002 WL 1774060, at *1 (E.D. Pa. July 29, 2002).

Courts in the Third Circuit have repeatedly concluded that law of the case does not bar revisiting subject matter jurisdiction, without applying any exceptions.  *E.g.*, *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (reconsidering Article III standing because "federal courts' unyielding obligation to uphold statutory and constitutional limitations on jurisdiction should not bend to less important prudential notions of comity and finality"); *Council Tree*, 503 F.3d at 292 (law-of-the-case doctrine did not preclude revisiting subject matter jurisdiction); *Fouad v. Milton Hershey Sch. & Sch. Trust*, 2020 WL 5775018 (M.D. Pa. Sept. 28, 2020), at *4 (same).[1]

---

[1]    ERC overstates the impact of the Third Circuit's one-line order that Defendants' "Petition for Writ of Mandamus is denied."  *In re Bridger Logistics, LLC*, No. 19-2678, Dkt. 3013359757 (3d Cir. Sept. 27, 2019).  In opposing mandamus, ERC argued that jurisdiction would be reviewable at the end of the case on appeal.  (Dkt. 313347821, ERC Opp. at 27.)  The Third Circuit's order could signal no more than its agreement with ERC on that point.

3

## 2.    Subject Matter Jurisdiction Is Lacking.

ERC does not contend (at 7-11) that its request for an equitable alter ego remedy is an admiralty claim, and it has no response to the cases (Motion at 3-4) demonstrating that there must be an underlying admiralty case to support jurisdiction. *E.g.*, *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (alter ego claim does not independently support jurisdiction); *Swift & Co. Packers v. Compania Columbiana del Caribe*, 339 U.S. 684, 690 (1950) (admiralty court will "not enforce an independent equitable claim merely because it pertains to maritime property"); *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987) (no admiralty jurisdiction over derivative claim without primary admiralty claim). Instead, ERC cites (at 7-11) cases involving underlying maritime claims, and no case establishing that an unpleaded claim against a non-party (breach by JTS) can manufacture admiralty jurisdiction.

Perhaps not surprisingly, ERC advances a different argument at this stage. Originally, ERC predicated its entitlement to seek relief on the arbitration award against JTS. (Dkt. 294 at 28.) The record, however, shows that the unconfirmed "award" is little more than a stipulated <u>amount</u>, because the underlying agreement disclaims any JTS liability. (DR-SUMF-¶¶150-53.) Thus, ERC now argues (at 10) that it "will establish liability without reference to any arbitration award."

But ERC has not asserted an underlying maritime claim, none of ERC's cases suggest that any claim for relief touching on a maritime contract is a cause of action in admiralty, and courts reject ERC's contention. *E.g.*, *Swift*, 339 U.S. at 692 (insufficient for an equitable claim to "pertain[] to maritime property"); *Cooper v. Loper*, 923 F.2d 1045, 1048 (3d Cir. 1991) ("Whether a particular claim is an admiralty claim … depends solely on the nature of the claim.").

Moreover, ERC fails to distinguish the cases (Motion at 6) establishing that a purely financial obligation is not a maritime obligation, and it altogether ignores the Supreme Court's recognition (in the same footnote from *Swift* cited by ERC) that there can be no alter ego liability

where there is a temporal disconnect between the alleged alter egos. *Swift*, 339 U.S. at 689 n.4 (no alter ego where company came into existence after alleged breach).[2] Yet the principal "damages" ERC seeks are <u>deficiency charges</u> (a financial obligation) JTS allegedly owes for not using the Facility <u>after Defendants sold BTS</u> (after Jamex gained control of JTS).  (DR-SUMF-¶55 (ERC received all payments owed pre-sale); DR-SUMF-¶157 (damages alleged).)

The alter ego cases ERC cites (at 7-9) fall into one of two inapplicable categories.  First, there is an underlying maritime case, and an alter ego defendant is responsible for breach.  *See Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F. Supp. 1340, 1343, 1347-48 (S.D.N.Y. 1988) (in "admiralty action arising out of a contract of charter party," alleged alter ego not dismissed due to allegations of "domination"); *Sabine Towing & Trans. Co., Inc. v. Merit Ventures, Inc.*, 575 F. Supp. 1442, 1443-45 (E.D. Tex. 1983) (in "admiralty suit to recover for the breach of certain maritime charter agreements," underlying liability accrued when the defendant owned alter ego); *Ariate Compania Naviera, S.A. v. Commonwealth Tankship Owners, Ltd.*, 310 F. Supp. 416, 420 (S.D.N.Y. 1970) (alter ego defendant caused corporate defendant to breach charter party).  Second, there is an underlying maritime case and defendant both controlled its alleged alter ego and engineered a default on a judgment.  *See Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures*, 851 F. Supp. 2d 504, 508 (S.D.N.Y. 2012) (alleged alter ego caused dissolution after award entered); *Pink Goose (Cayman) Ltd. v. Sunway Traders LLC*, 2008 WL 4619880, *2 (S.D.N.Y. Oct. 17, 2008) (same); *Vitol v. Primerose Shipping*, 708 F.3d 527, 538, 544-45 (4th Cir. 2013) (recognizing jurisdiction to enforce foreign admiralty judgment but rejecting alter ego theory); *Nat'l Marine Serv., Inc. v. C.J. Thibodeaux & Co.*, 380 F. Supp. 1076,

---

[2]     The only case ERC attempts to distinguish (at 8 n.2) is *Eclipse Liquidity, Inc. v. Geden Holdings, Ltd.*, No. 20-1847, 2020 WL 3574530, at *3-4 (E.D. Pa. July 1, 2020), but its attempt to conflate "contract" and "obligation" is unavailing.

1080 (S.D. Tex. 1973) (post-judgment suit against party allegedly causing default).  Here, there is no underlying maritime case, Jamex caused JTS to breach, and there was no judgment when Defendants owned BTS.[3]

ERC's remaining cases (at 11) involve underlying maritime claims, rendering them inapposite.  *See Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 271 (1977) (construing Longshoremen's and Harbor Workers' Compensation Act); *Ex parte Gordon*, 104 U.S. 515, 516 (1881) (collision between vessels); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22-23, 29 (2004) (enforcing maritime contract); *New Orleans Stevedoring Co. v. United States*, 439 F.2d 89, 90-92 (5th Cir. 1971) (government estopped to deny admiralty jurisdiction); *Moore-McCormack Lines, Inc. v. Int'l Terminal Operating Co., Inc.*, 619 F. Supp. 1406, 1411 (S.D.N.Y. 1985) (stevedoring and terminal agreement).  Accordingly, ERC's claims belong in the stayed action in Delaware County, if they belong in court at all.

## B.    ERC's Alter Ego Claim Fails (Count I).

### 1.    Defendants' Motion For Summary Judgment Should Be Granted.

#### a.    Alter Ego Is Not A Cognizable Claim.

There are numerous fatal flaws in ERC's alter ego "claim."  ERC now admits (at 20-21) it needs to attach its alter ego theory to an underlying claim.  *See In re Maxus Energy Corp.*, 2019 WL 4343722, at *5 (D. Del. Sept. 12, 2019) ("[A]lter ego requires 'allegations of another wrong….'"); *Cantiere DiPortovenere Piesse S.p.A. v. Kerwin*, 739 F. Supp. 231, 236 (E.D. Pa. 1990) (alter ego claim based on judgment against subsidiary) (both cited by ERC at 21).

Consequently, ERC shifts gears, asserting (at 21) that its alter ego "claim" is not based on its collusive settlement with Jamex, and it is instead "prepared to prove the RSA breach and

---

[3]    Defendants have not "abandoned" their contention that the RSA is not a maritime contract, as ERC argues (at 6).  Defendants simply do not advance the argument due to factual disputes.

damages without the arbitration award." Yet ERC has no breach of contract claim. (*See* Dkt. 182, FAC; Dkt. 308 at 17 (Judge Kelly recognizing ERC's "inability to assert a breach of contract claim").) Nor could ERC bring such a claim in this case, because JTS is not a defendant and the RSA requires arbitration. (DR-SUMF-¶41.) Nor does the evidence ERC cites (at 21) establish breach. (CM-RSOF-¶218 ("The last BTS train left [ERC] on or before February 1, 2016.").) Accordingly, as explained in the Motion (at 9-11), ERC's alter ego "claim" is untethered to any cause of action. *See*, *e.g.*, *Peacock*, 516 U.S. at 354 (no jurisdiction over alter ego "claim").

ERC ignores most of Defendants' cases, attempting to distinguish only *Peacock* (at 21 n.3), because it relates to ERISA. *Peacock* is not so limited and is consistently applied to foreclose stand-alone alter ego "claims." *E.g.*, *Futura Dev. of P.R., Inc. v. Estado Libre Asociado de P.R.*, 144 F.3d 7, 10 (1st Cir. 1998) (no jurisdiction under *Peacock* for alter ego claim based on prior judgment); *Shaw v. AAA Engr. & Drafting Inc.*, 138 F. App'x 62, 69 (10th Cir. 2005) (same).

### b.    Defendants Are Not Liable For Any Breach Of The RSA.

ERC's argument (at 21-22) that its alter ego "claim" is proper despite the sale of BTS to Jamex fails. Contrary to ERC's argument (at 22), Judge Kelly's one-paragraph denial of Defendants' motion to dismiss in no way means that ERC has satisfied its summary judgment burden. *T.R. v. Sch. Dist. of Phila.*, 458 F. Supp. 3d 274, 291 (E.D. Pa. 2020) (court not precluded "from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations.").

Moreover, ERC conflates (at 22) the timing of the alleged alter ego conduct (before the sale) with the timing of the alleged breach (after Jamex purchased BTS and renamed it JTS). (*See* CM-RSOF-¶¶134-36, 154-56, 160-63, 218-20.) As explained in the Motion (at 11-12), Defendants' conduct before the sale does not make Defendants liable for any post-sale breach of the RSA by JTS. *See*, *e.g.*, *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861–62 (5th

Cir. 2004) ("It is illogical … to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred."); *cf. Collet v. Am. Nat'l Stores*, 708 S.W.2d 273, 285-86 (Mo. App. 1986) (cited by ERC at 22) (finding liability post-sale when prior-parent retained control of company).

ERC also has not brought a claim for any damages allegedly incurred prior to the BTS sale. (*See* Motion at 12-13; DR-SUMF-¶157; CM-RSOF-¶218).  Nor could it bring one in this Court, because the RSA requires arbitration.  (DR-SUMF-¶41.)

### c.   Neither FGP Nor FG Is An Alter Ego Of BTS.

ERC argues (at 23) that it need not show alter ego liability at each level of the corporate structure, but it fails to address cases Defendants cited (at 14).  *E.g.*, *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 790 n.10 (Bankr. W.D. La. 2013) ("[I]f a plaintiff seeks to establish liability for all members of a corporate group, it must 'establish alter ego liability with respect to each one of the entities.'"); *In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017) (same).  Instead, ERC relies exclusively on *In re Moll Indus., Inc.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011), which required veil-piercing evidence specific to each alleged alter ego.  ERC does not—and cannot—identify any conduct specific to FG or FGP.

Instead, ERC identifies (at 23) individuals affiliated with Ferrellgas and alleges conduct related to BTS assets.  But ERC offers no evidence that these individuals were officers of FG or FGP, as opposed to non-party Ferrellgas, Inc.  (DR-SUMF-¶¶11-12, 158; CM-RSOF-¶¶62, 66-70); *Interstate Power Sys., Inc. v. Drake Water Techs., LLC*, 2009 WL 10665417, at *9 (D. Wyo. July 10, 2009) ("[M]erely signing emails as a representative of two companies hardly meets the steep standard for piercing the veil.").  As explained in the Motion (at 15), ERC also fails to demonstrate that these individuals were acting on behalf of FGP or FG.  (DR-SUMF-¶158); *see, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 69-70 ("[I]t cannot be enough to establish liability …

that dual officers and directors made policy decisions and supervised activities.").

## 2.      ERC's Cross-Motion On Alter Ego Should Be Denied.

ERC's arguments for summary judgment in its favor (at 11-19) consist of unsubstantiated rhetoric and unsupported inferences.  ERC has the burden to prove that BTS was "little more than a legal fiction," which "is <u>notoriously difficult</u> for plaintiffs to meet."  *Pearson v. Component Tech. Corp.*, 247 F. Supp. 471, 485 (3d Cir. 2001) (affirming decision not to pierce veil) (emphasis added).

ERC contends (at 12-13) that one or two factors are enough to establish alter ego liability at the summary judgment stage, but its own cases belie its argument.  *See United States. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104-06 (D. Del. 1988) (six factors); *United States v. Thomas*, 515 F. Supp. 1351, 1357 (W.D. Tex. 1981) (four factors); *Ragan v. Tri-County Excavating, Inc.*, 62 F.3d 501, 507 (3d Cir. 1995) (five factors); *NYKCool A.B. v. P. Intern. Serv., Inc.*, 2013 WL 1274561, at *9 (S.D.N.Y. Mar. 29, 2013) (eight factors under NY test); *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (five factors); *see also United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 455 (E.D. Pa. 2020) (deciding motion to dismiss).

ERC's reliance on just two factors (alleged siphoning and insolvency) unsupported by evidence does not satisfy its "notoriously difficult burden."  *Pearson*, 247 F.3d at 485.  Instead, no single factor is dispositive, and the totality of the circumstances must be considered.  *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018).

## a.      Defendants Did Not Siphon BTS Assets.

ERC argues (at 13) that BTS was valued at $202.5-$324.9 million, and Defendants "transferred all of its assets and eliminated all of BTS' accounts receivables between December 2015-February 2016."  ERC relies on two documents to support this assertion: (1) the expert report of Defendants' valuation expert, Manish Kumar (ERC-1209) and (2) 2013 financial information for BL and its subsidiaries (ERC-2045).  (CM-RSOF-¶210.)  Kumar's valuation does not

demonstrate siphoning, and 2013 financials provide no information as to alleged actions taken in 2015 and 2016.

Nor did siphoning occur.  As explained in the Motion (at 36-42), the 2015 Accounting Activities did not defraud creditors, BTS received reasonably equivalent value, and BTS was solvent in 2015. (CM-RSOF-¶179; DR-SUMF-¶¶87, 92, 94-124.)  Moreover, all assets transferred from BTS in 2016 were encumbered by BOA's lien and, accordingly, such transfers cannot constitute siphoning.  (DR-SUMF-¶¶140-141); *Connors v. Peles*, 724 F. Supp. 1538, 1568 (W.D. Pa. 1989) ("The repayment of legitimate loan obligations by a corporation, to its shareholders, does not, by itself, establish siphoning of funds."); *Mullins v. TestAmerica, Inc.* 564 F.3d 386, 414 n.20 (5th Cir. 2009) (defense judgment because sale proceeds were encumbered by valid lien).

ERC parades (at 13-17) communications among individuals affiliated with Ferrellgas to suggest malintent.  These communications show only that Defendants evaluated the impact of changing market conditions.  When the RSA was executed in 2013, Bakken crude was far less expensive than African crude, and the "spread" between the two prices was favorable.  (CM-RSOF-¶15.)  When acquiring BL and BTS in 2015, Defendants knew that the spread had narrowed and JM would lose money until the spread improved.  (CM-RSOF-¶¶123, 125.)  Consequently, Defendants planned for the possibility of continued JM losses by ensuring that JM was capitalized with $250 million in assets to provide a "cushion to absorb any losses that might occur through the remainder of the COSA's contract term."  (*Id.*)  It was not until later, in September 2015, that the spread narrowed such that African crude became more economical for Monroe (taking shipping costs into account).  (CM-RSOF-¶¶16, 123; DR-SUMF-¶174.)

Defendants continued to evaluate the narrowing spread's impact, including the impact on JM, and their options with respect to BTS.  (CM-RSOF-¶¶122-69.)  ████████████



. (*E.g.*, CM-RSOF-¶¶132-35, 137-39.)  It was during this review that Defendants acknowledged: "[W]e aren't driving here, Monroe is.  Just trying to make the best of it.  If we do nothing:  Benefits Monroe[.]  Jamex bankrupt in 12-18 months depending on spreads and FGP stock[.]  Bridger has $70mm ebitda []hole and $41.5MM annual obligation to ERC[.]"  (CM-RSOF-¶128.)  Unsurprisingly, Defendants protected their interests during such negotiations. (CM-RSOF-¶¶128, 130 ("Lets be firm but commercial for our sake, no one else's.".)

(CM-RSOF-¶¶154-55, 158-59.)  There is nothing nefarious about evaluating potential avenues to address changing market conditions.[4]

" but evaluating potential legal risk does not establish siphoning.  Nor does the transfer of encumbered assets.  *E.g.*, *Connors*, 724 F. Supp. at 1568 ("repayment of legitimate loan obligations" not siphoning); *Wolters v. Lakey*, 456 B.R. 687, 699 (D. Kan. 2011) (reducing valid loans from shareholder not siphoning).

The facts do not support ERC's narrative that Defendants sold BTS as part of a long-

---

[4]      JM also negotiated with Monroe to convert the COSA to a cost-plus contract, culminating in Ballengee's "F- them" statement.  (CM-RSOF-¶133.)  Ballengee was not affiliated with Defendants at the time. (CM-RSOF-¶¶54-56.)

running conspiracy to injure ERC. Instead, after evaluating the situation, BL determined the best course was to assign the BTS assets encumbered by a valid lien (avoiding a default on the BOA credit facility) and sell BTS to allow JM to negotiate directly with ERC. (CM-RSOF-¶173; DR-SUMF-¶¶140-41, 145.) The undisputed evidence shows that JM purchased BTS—with the RSA— to overcome the lack of privity ERC cited when it refused to consider the industry-standard Tripartite Agreement "in any form." (CM-RSOF-¶126; DR-SUMF-¶145.) With financing, JM could have continued selling oil to Monroe, with smaller monthly losses than deficiency charges for non-performance. (CM-RSOF-¶123, 126.)

**b.   Defendants Are Not Alter Egos Based On Insolvency.**

Nor has ERC met its burden based on the insolvency factor. As explained (Motion at 36-40), the 2015 Write-Offs were (1) related to receivables terminated in accordance with the PSA and (2) permitted by purchase accounting principles, including ASC 805. (DR-SUMF-¶¶94-106; CM-RSOF-¶¶117-121.) As also explained, "Bridger Rail Services" and "Bridger Pipeline Services" were not legal entities (a fact ERC now concedes), but rather were accounting cost centers, which means all BTS revenue and costs "stayed" with BTS. (DR-SUMF-¶¶107-124; CM-RSOF-¶¶89-116.)

ERC again fails to acknowledge that the Acquisition was structured to provide Jamex with $250 million in assets to cover any losses under the COSA. (CM-RSOF-¶123,125.) When Defendants sold BTS to JTH seven months later, JM warranted that it had $124 million in assets, including tens of millions in liquid assets. (CM-RSOF-¶ 214.) JTS's new parent had sufficient assets to satisfy RSA obligations, which ERC's expert failed to consider in opining on insolvency. (*Id.*); *In re Opus East*, 698 F. App'x 711, 717 (3d Cir. 2017) (access to insider credit supported conclusion that debtor was solvent); *In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 602 (Bankr. D. Del. 2008) (expert opinion on subsidiary insolvency improperly omitted funding from parent).

12

Even if BTS were balance-sheet insolvent in February 2016, "insolvency alone does not mean that the [Defendants] became the alter ego[s] of" BTS. *Parks v. Woodbridge Golf Club, Inc.*, CV 11-0562, 2017 WL 1133949, at *3 (E.D. Pa. Mar. 27, 2017); *Parker Hannifin Corp. v. N. Sound Properties*, 2013 WL 1932109, at *13 (S.D.N.Y. May 8, 2013) ("[U]ndercapitalization would be insufficient to pierce the corporate veil ... otherwise every insolvent subsidiary would have its veil pierced.").

ERC argues that there is "injustice," but its own cases (at 20) found significant factors demonstrating an alter ego relationship, together with injustice. *See*, *e.g.*, *Golden Acres*, 702 F. Supp. at 1097 (six factors); *In re Diloreto*, 04-CV-1326, 2006 WL 2974156, at *4 (E.D. Pa. Oct. 13, 2006) (reciting numerous examples of treating company assets as personal).

### C.    There Is No Gap-Filling Implied Contract.

To avoid summary judgment on its "implied contract" theory, ERC again radically changes position.  ERC repeatedly suggests (at 44-47) that <u>Defendants</u> coined the "implied contract" phrase.  In truth, ERC references an "implied contract" <u>15 times in the operative Complaint</u>.  (*See* Dkt. 182, FAC-¶¶10, 44, 48, 49, 71, 79, 82, 89, 90, 92.b, 95, 102, 103.)  ERC also relies (at 46) on its expert, Neil Earnest, to establish the implied contract's terms, <u>despite withdrawing Earnest's opinions about those terms</u>.  (CM-RSOF-¶49; Dkt. 511, Earnest Opp. at 1 ("[ERC] does not oppose these limited challenges," including "opinions going to the ultimate issues" expressed "in Sections 6.8 [and] 14.3 of the Report"); Dkt. 494-1, 10/14/20 Earnest Report ¶¶6.8 & 14.3 (opinions on alleged implied contract terms).)  ERC also contends (at 45) that Defendants' Motion is "premature and irrelevant," but Rule 56(a) authorizes summary judgment on "part" of a "claim," and the implied contract theory is a part of Counts II, III, and IV.  (FAC-¶¶89-90, 92, 95, 102.)

### 1.    Texas Law Applies.

In response to Defendants' detailed choice-of-law analysis in the Motion (at 17-20), which

favors Texas law, ERC asserts in conclusory fashion (at 45-46) that "federal common law governs" because the "implied contract" backstops a "federal maritime contract" or, alternatively, that "Pennsylvania law applies."   "The Court is not required to consider arguments consisting of nothing more than a conclusory assertion and not developed through proper briefing."   *E.g.*, *Disilverio v. Serv. Master Pro.,* 2007 WL 1029759, at *4 (W.D. Pa. Mar. 31, 2007).

Moreover, there is no basis to apply federal common law to an alleged agreement by companies headquartered in Texas to "backstop" the RSA.  The RSA specifies that it is governed by New York law, which was applied in the arbitration involving ERC and Jamex.  (DR-SUMF-¶37.)  Nor is the implied contract a maritime agreement.  *E.g.*, *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 566 (5th Cir. 2003) (bond to reimburse cruise deposits not maritime because it "does not relate to the carriage of passengers; it merely makes good on the owners' financial obligations by reimbursing the passengers if the cruise is not performed"); *Fednav, Ltd. v. Isoramar*, S.A., 925 F.2d 599, 601-02 (2d Cir. 1991) ("[M]erely agreeing as surety 'to pay damages for another's breach of a maritime charter is not' a maritime contract."); *Cal Dive Offshore Contractors, Inc. v. M/V SAMPSON*, 245 F. Supp. 3d 473, 486 (S.D.N.Y. 2017) ("[C]ovenant to pay [] damages … neither involves maritime service nor maritime transactions").

Nor does Pennsylvania law govern.  ERC apparently relies (at 46) on its argument that Pennsylvania law applies to its <u>fiduciary duty claim</u> (at 50-52), but "Pennsylvania follows the well-established principle that choice of law is 'issue-specific, [meaning] different states' laws may apply to different issues in a single case, a principle known as 'depecage.'"   *Teva Pharm. Indus., Ltd. v. United Healthcare Servs., Inc.,* 341 F. Supp. 3d 475, 506 n.2 (E.D. Pa. 2018) (applying different state laws to different issues).

### 2.    The Statute Of Frauds Invalidates Any Implied Agreement.

The statute of frauds vitiates ERC's "implied contract" theory.  ERC's sole argument (at

45) is that the one-year provision in the Texas statute of frauds does not apply because "the agreement was recorded on an inter-company rate sheet." But the rate sheet is plainly not a written contract (DR-SUMF-¶64), nor is it "signed by the person to be charged with the promise," Tex. Bus. & Com. Code § 26.01(a).

ERC does not address the suretyship provision applicable in Texas and Pennsylvania. *Id.* § 26.01(b)(2); 33 P.S. § 3 (2021). Thus, ERC has "waived or abandoned" any argument that it does not apply. *Anderson v. Perez*, No. 14-cv-6747, 2015 WL 5013704, at *4 (E.D. Pa. 2015) ("Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned.").

### 3.     There Was No Implied Agreement Between BM And BTS.

Amazingly, ERC contends (at 44) that "there is no dispute" that BTS paid ERC from the "proceeds of a contract between BTS and Marketing (and later, Logistics)" (at 44). Defendants obviously dispute the existence of any such agreement. (*See* DR-SUMF-¶¶62-85; CM-RSOF-¶¶36-49, 85-87.)

Mutual Assent. ERC argues (at 46) that there is a factual question as to mutual assent, because "Rios admitted that a 'spot' contract existed" and merely "disputed the terms of the contract." But Rios testified that "Bridger Logistics paid BTS when it used the [BTS] assets," with no mention of deficiency charges, and he expressly disavowed the existence of a take-or-pay contract between BL and BTS. (DR-SUMF-¶84 (emphasis added).) As explained (Motion at 21-25), neither Rios's testimony nor the rate sheet establish assent.

Course of Dealing and Conduct. Despite the authorities cited (Motion at 23-24), ERC does not respond to the point that BM never funded deficiency charges for BTS, nor does it identify any prior course of dealing between BM and BTS on the same terms as the alleged implied contract. (CM-RSOF-¶¶45-46.) Industry custom or practice testimony from Earnest cannot establish an

implied agreement, because "usage or custom cannot create or bring a contract into being where without it no contract exists." *Randle v. Sanders*, 2016 WL 7321298, at *4 (Tex. App. Dec. 14, 2016). ERC and Earnest also fail to identify any industry custom or practice pre-dating the implied contract "so general and universal that the parties to a contract are charged with knowledge of its existence." *Id.*

Essential Terms. ERC does not address its own Rule 30(b)(6) testimony on essential terms. Other than relying on Earnest's withdrawn opinions (CM-RSOF-¶49), ERC offers no evidence of agreement on transloading fees, deficiency charges, volumes, or duration.

### 4.    BL Did Not Assume An Implied Contract Via Novation.

Contradicting its interrogatory responses and Rule 30(b)(6) testimony, ERC for the first time contends (at 47) that it relies on a "novation theory."   (DR-SUMF-¶63.)

ERC presumes novation of an implied contract, but "[t]he parties must have clearly intended a novation and a novation is never presumed." *Tenet Health Sys. Hosp. Dallas, Inc. v. N. Tx. Hosp. Physicians Grp., P.A.*, 438 S.W.3d 190, 200 (Tex. App. 2014) (emphasis added) (no novation based on summary judgment evidence); *Carnegie Tech., LLC v. Triller, Inc.*, 2021 WL 2322934, at *11 (W.D. Tex. June 7, 2021) (no novation because claimant "has not carried its burden to prove that the parties had a meeting of the minds as to the intent to discharge and release Triller of all contractual obligations").

ERC also cannot meet its burden to establish the essential elements of novation, which are "(1) the validity of a previous obligation; (2) an agreement among all parties to accept a new contract; (3) the extinguishment of the previous obligation; and (4) the validity of the new agreement." *Fulcrum Cent. v. AutoTester, Inc.*, 102 S.W.3d 274, 277 (Tex. App. 2003) (rejecting novation theory at summary judgment). There was no "previous" implied obligation. (DR-SUMF-¶63.) Nor is there evidence of agreement among BM, BTS, and BL "to accept a new contract" as

16

a part of the heavily negotiated and documented Acquisition, extinguishing any BM obligations. (*Id.*)  Paragraphs 110 and 116 of ERC's SOF are the only two paragraphs ERC cites (at 47) as factual support, but both refer to Sherman's report on BTS cash flow and insolvency, which cannot support a novation theory.  (CM-RSOF-¶¶110,116.)  Finally, even if there were an "implied contract" with BL, it would fail under the statute of frauds.

### D.   The Fraudulent-Transfer Claims Fail (Counts II & III).

#### 1.   ERC Cannot Meet Its Burden To Overcome BOA's Valid Lien.

Despite ERC's argument (at 33), BOA's valid lien is not a "defense" to a fraudulent transfer claim.  Instead, ERC has the burden, which it cannot meet, to establish the existence of an "asset," which requires the absence of a "valid lien" on the property transferred.  *See Mullins*, 564 F.3d at 414 n.20 (finding burden unsatisfied); *A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*, 560 F. Supp. 705, 710 (E.D. Pa. 1983) (rejecting creditor's "vague assertions" about invalidity of mortgages).

#### a.   The Lien Is Valid And Cannot Be Avoided.

Contrary to ERC's fiction that the lien was granted to injure ERC (at 35), BTS agreed to provide the lien in a June 24, 2015 guaranty supplement.  (Motion at 29-31; DR-SUMF-¶128.)

ERC's concession (at 36-37) that BOA's lien was valid and perfected under the UCC is dispositive under PUFTA.  *See* 12 Pa. §5101 (defining "asset" to exclude property "encumbered by valid lien" and "valid lien" as "a lien effective against the holder of a judicial lien subsequently obtained"); *In re Fair Fin. Co.*, 13 F. 4th 547, 554, 557 (6th Cir. 2021) (affirming summary judgment: the "UCC … determines whether a creditor has a 'valid lien' under OUFTA").

ERC attempts to avoid the import of this law by calling the lien itself (at 37) a "fraudulent transfer to <u>FG</u>." Tacitly conceding that ERC is not entitled to any relief that affects BOA (the lienholder), ERC contends (also at 37) that it does not seek to affect BOA's rights, but rather seeks

"avoidance of the transfers <u>to Defendants</u>."  ERC provides no legal or factual authority to carry its burden to prove this point, as none exists.  The lien was granted to BOA, not Defendants. (DR-SUMF-¶134.)  The lien secured BTS's guaranty to BOA, and BTS received value under PUFTA because it received debt relief in connection with the guaranty.  (DR-SUMF-¶¶92, 127-34); 12 Pa.C.S. § 5103 (value given if antecedent debt secured).

Any attempt to avoid BOA's lien as a fraudulent transfer fails without BOA's participation in the case.  By characterizing the lien as a transfer to <u>Defendants</u>, ERC improperly seeks to prioritize its unsecured debt above BOA's secured debt—turning the law of secured transactions on its head.  BOA determined it needed BTS's assets as collateral, and avoiding a lien without the lender's participation deprives it of the opportunity to defend its bargained-for collateral.

ERC cites (at 34-36) no case in which a court avoids a lien granted to a non-party.  *See In re TOUSA, Inc.*, 680 F.3d 1298, 1310-13 (11th Cir. 2012) (adversary proceeding <u>against lenders</u> to avoid lien); *In re Solomon*, 299 B.R. 626, 637 (10th Cir. B.A.P. 2003) (fraudulent transfer counterclaims by trustee <u>against lender</u>); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 608-09 (Tex. App. 2002) (attacking transfer of security interest <u>from lender</u>); *In re Jolly's Inc.*, 188 B.R. 832, 835 (Bankr. D. Minn. 1995) (challenging security interest granted <u>to defendant-creditor</u>); *In re Marquis Prods., Inc.*, 150 B.R. 487, 495 (Bankr. D. Me. 1993) (adversary proceeding against <u>secured creditor</u>).

### b.    The Lien Encumbered The Assets At Issue.

ERC also argues (at 37-38) that BOA was over-secured, citing Ferrellgas' total assets from its SEC filing.  (CM-RSOF-¶187.)  ERC's expert did not opine on the value of BOA's collateral. (DR-SUMF-¶141.)  ERC also ignores other debts.  By January 2016, FGP owed $311 million to BOA, plus debt under a separate accounts receivable securitization facility.  (CM-RSOF-¶187.) At the time, Ferrellgas (and subsidiaries) had $425.7 million in current assets, approximately $190

million of which were collateral under the securitization facility, leaving just $235 million in current assets to secure the $311 million debt to BOA. (*Id.*)  *Cf. Nielson v. Logs Unlimited, Inc.*, 839 N.W.2d 378, 384 (S.D. 2013) (secured loans encumbered "much less than the fair market value of the transferred property"); *Nat'l Loan Investors, L.P. v. World Props.*, L.L.C., 830 A.2d 1178, 1183 (Conn. App. 2003) ($5.2 million lien insufficient to encumber property worth $14.5 million) (both cited by ERC at 41).  ERC cites no evidence (at 40-41) to dispute that all BTS assets (except Swan Ranch) were encumbered by BOA's lien.

ERC wrongly contends (at 39) that the guaranty was contingent, as "there is no evidence that there was any probability" of default.  Yet ERC cites numerous emails discussing the possibility that increasing market volatility would require a BTS bankruptcy, which ERC acknowledges would have been a default under the BOA credit facility.  (CM-RSOF-¶155.)  And FG was ultimately forced to effectuate a pre-packaged bankruptcy based on its debt load, including debt incurred in connection with the Acquisition.  (CM-RSOF-¶58.)

The facts here do not resemble any case on which ERC relies (at 39).  *See In re Shuey*, 606 B.R. 760, 768 (N.D. Ill. Bankr. 2019) (father's personal guaranty of ex-daughter-in-law's student loan was contingent liability); *Siematic Mobelwerke GmbH v. Siematic Corp.*, 643 F. Supp. 2d 675, 691 (E.D. Pa. 2009) (fact dispute about whether liens were contingent where lienholders failed to prevent transfer of allegedly encumbered property); *Landmark Comty. Bank, N.A. v. Klingelhutz*, 874 N.W.2d 446, 450-51 (Minn. Ct. App. 2016) (considering individual's guaranty without discussing available security).

## 2.   The 2015 Accounting Activities Are Not Actionable.

Faced with undisputed facts establishing that Defendants had no intent to defraud ERC by engaging in the 2015 Accounting Activities (*i.e.*, the Write-Offs and Cost Centers), ERC resorts to fiction.  ERC argues for the first time (at 42) that Defendants instituted accounting changes after

the Acquisition to defraud ERC, because a consulting firm warned during due diligence that BM lost $10 million in 2014. ERC again conveniently ignores that, following the due diligence report, Defendants capitalized JM with $250 million in assets. (CM-RSOF-¶125.) ERC also tries to link JM's losses in 2014 to narrowing of the spread, but it is undisputed that the spread did not consistently eliminate the COSA-based Bakken crude cost advantage until September 2015—three months after the 2015 Accounting Activities. (DR-SUMF-¶174; CM-RSOF-¶123.)

ERC's attack on the Write-Offs (at 42) fares no better. ERC does not dispute that the arms-length PSA required Defendants to write off $7.3 million in receivables from a third party, more than half of the amount in dispute. (DR-SUMF-¶97.) The remaining $6.5 million in intercompany receivables were written off consistent with the PSA and the CBIZ report. ERC's only response (at 42) is to say that Defendants' accounting expert, Gary Polkowitz, did not opine that the PSA or the CBIZ report "justified or required" the cancellation of account receivables. Polkowitz opined that the $6.5 million write-off was "consistent" with the PSA and the CBIZ report. (DR-SUMF-¶103; CM-RSOF-¶121.)

ERC ignores extensive evidence when it argues (at 28) that there is not a "single scrap" of paper demonstrating Defendants' use of Cost Centers and (at 43) that Defendants "have no evidence that they implemented" Cost Centers, including:

- BL's pre- and post-Acquisition accounting verifies that Defendants implemented a recommendation from Grant Thornton to use cost centers to better track revenue and costs by segment following the Acquisition. (DR-SUMF-¶115.)

- Ferrellgas' Corporate Controller during the Acquisition, William Ruisinger, was involved "with the establishment of company codes and cost centers … identified as Bridger Rail Services and Bridger Pipeline Services." (DR-SUMF-¶122 (emphasis added).)

- Vispi Jilla, responsible for transitioning Bridger's finance and accounting post-Acquisition, testified that BPS and BRS were cost centers. (*Id.*)

- Evidence from the integration of Ferrellgas and Bridger accounting systems plainly identifies each internal "Cost Center" (*Id.*):



- BL's Senior Counsel, Patrick Knapp, testified that Bridger Pipeline Services and Bridger Rail Services were "accounting entities."  (*Id.*)

- A July 2015 email, ignored by ERC, shows Knapp addressing internal confusion about the cost centers: ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████      (*Id.*)

ERC also contends (at 43) that "BTS never saw any of the millions in revenue" BTS earned. This too is incorrect.  Approximately $27,295,269 of this revenue went to ERC on BTS' behalf. (DR-SUMF-¶75.)  ERC's expert conceded that he did not identify any legal entity that received the BTS revenue allegedly "transferred."  (DR-SUMF-¶122; CM-RSOF-¶123.)

ERC asserts (at 43) that it is entitled to a presumption of insolvency because BTS did not pay its debts as they came due.  There is no dispute, however, that ERC received every payment to which it was entitled while Defendants owned BTS.  (DR-SUMF-¶75.)  ERC ignores that, beginning in August 2015, BTS was part of a consolidated cash management system—BTS cash went into the system, and its debts were paid out of the system.  (DR-SUMF-¶122.)  ERC's accounting expert, Marc Sherman, concedes that he does not rely on cash management to opine

on revenue diversion.  (*Id.*)

Finally, ERC asserts (at 44)—with no legal support—that BTS did not receive reasonably equivalent value for the 2015 Accounting Activities, because the $39.69 million in debt relief for BTS was "part of the FG Acquisition purchase price rather than consideration for transfers of assets."  But the 2015 Accounting Activities were implemented in connection with the Acquisition (DR-SUMF-¶¶94-124), and, under PUFTA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation … an antecedent debt is … satisfied."  12 Pa.C.S. § 5103(a); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) (the "touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred").

### 3.	The Real Estate Transfer Is Not Actionable.

ERC attempts (at 44) to wish away its burden in connection with the Swan Ranch property by asserting its value relates to damages, not liability.  As a matter of law, however, "[p]roof that assets were transferred and an assessment of their value are essential to sustaining a fraudulent conveyance action."  *In re SMTC Mfg. of Texas*, 421 B.R. 251, 278-79 (Bankr. W.D. Tex. 2009) (applying TUFTA).  ERC has not met its burden.

### 4.	ERC Is Not Entitled To Summary Judgment On Intentional Fraud.

The Court should reject ERC's unsubstantiated rhetoric and request (at 24-33) for summary judgment on its intentional fraudulent transfer claims.

First, BOA's valid lien is dispositive and requires summary judgment in Defendants' favor. ERC ignores caselaw cited in the Motion (at 32) establishing that, when a valid lien exists, "the actual intent of the defendants [is] immaterial as a matter of law."  *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 262 (1st Cir. 1997); *see also* 12 Pa.C.S. § 5103 cmt. 1 (PUFTA "clarifies that a preferential transfer [benefiting a secured creditor], as such, by an

22

insolvent is not fraudulent under this chapter, regardless of whether the transferee is an insider or has knowledge of the debtor's financial condition").

Second, as explained above and in the Motion (at 36-38), no genuine issues of material fact exist as to Defendants' intent with respect to the 2015 Accounting Activities.

Third, even if the BOA lien were not dispositive (and it is), under "PUFTA, the determination of whether a transfer was made with fraudulent intent is a question of fact that is rarely susceptible to resolution at the summary judgment stage." *In re Polichuk*, 506 B.R. 405, 418 (Bankr. E.D. Pa. 2014) (denying summary judgment).

ERC wrongly suggests (at 25) that Judge Kelly made findings applicable here, but (1) there were no "findings" on intent, and (2) ERC's burden to obtain summary judgment is much higher than it was to obtain discovery. *See* Dkt. 332 at 4-6 (ERC burden was to show "reasonable basis to suspect" fraud), 10-14 (finding that ERC satisfied standard); *Transcontinental Refrigerated Lines v. New Prime, Inc.*, 2016 WL 69581, at *4 (M.D. Pa. Jan. 6, 2016) (rejecting plaintiff's "reliance on the crime-fraud opinion as abdication of its summary judgment obligations").

ERC contends (at 25) that "evading [ERC] and the RSA was the sole reason for dismembering BTS in January 2016." Not so. Jamex wanted BTS (and the RSA) to establish privity with ERC, to negotiate to resume operations. (CM-RSOF-¶173; DR-SUMF-¶145.) BTS assigned its assets subject to the BOA lien to avoid defaulting on the BOA credit facility. (CM-RSOF-¶155.)

Fourth, ERC incorrectly asserts (at 25-31) that "undisputed evidence" establishes seven badges of fraud, but the evidence ERC cites is very much in dispute:

Depletion of Assets. ERC's argument (at 26) that the 2015 Accounting Activities and the 2016 Assignments "depleted all of BTS's assets" is riddled with inaccuracies. ERC's expert

acknowledged the 2015 Accounting Activities did not affect ERC (DR-SUMF-¶123), and the assets assigned in 2016 were never available to ERC due to BOA's lien. ERC contends (at 26) that BTS was deprived of "$34.7 million" in receivables from other Bridger entities, but ERC's expert later revised that figure to $13.8 million (CM-RSOF-¶35; DR-SUMF-¶94)—and ERC concedes that $7,314,461 of that amount had to be written off in the Acquisition (DR-SUMF-¶97).

Reasonably Equivalent Value. ERC argues (at 27) that discovery "has not uncovered any value given to BTS[.]" As ERC's case establishes, however, the "proper focus" is on "the specific transaction sought to be avoided, not the transfer's collateral effects on the welfare of a debtor's business." *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 390 (E.D. Pa. 2013) (affirming dismissal of PUFTA claims). ERC ignores that BTS received $39.69 million in debt forgiveness in the Acquisition, which spurred both the 2015 Accounting Activities and the guaranty giving rise to the BOA lien. (CM-RSOF-¶179; DR-SUMF-¶¶92, 94-124.) ERC's expert failed to acknowledge or quantify the indirect benefits BTS received (CM-RSOF-¶179). *Mellon Bank*, 945 F.2d at 648 (claimant failed to value indirect benefits subsidiary received from parent).

Insolvency. ERC asserts (at 28) that BTS was insolvent in June 2015 and January 2016. But BTS's debts were paid before the sale to Jamex, defeating any presumption of cash-flow insolvency in June 2015. (CM-RSOF-¶116.) BTS was not "forced" to "gift" its assets—BTS assigned encumbered assets to avoid a default under the BOA credit facility. (CM-RSOF-¶155.)

Transfers to Insiders/Retention of Control. As explained (Motion at 37), the 2015 Accounting Activities were neither designed to permit Defendants to "retain control" over BTS's assets nor a "transfer to an insider" (CM-RSOF-¶35; DR-SUMF-¶¶7, 18, 10.) 12 Pa.C.S. § 5104(b)(1); *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988) (no insider status because transfer "clearly negotiated at arms-length").

Concealment.  Defendants concealed nothing; ERC was aware it received payments from entities other than BTS.  (CM-RSOF-¶110; DR-SUMF-¶75.)  ERC is dead wrong to assert that Defendants "secretly agreed" with Monroe to cease oil shipments.  ERC's SOF indicates that Jamex and Monroe agreed to suspend operations at the Facility.  (CM-RSOF-¶219.)  No facts here resemble those in *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 WL 890583, at *2-4 (W.D. Pa. Mar. 26, 2009), where the debtor funneled illicit funds through an account with a fictitious name in response to litigation.

Anticipated Litigation.  Despite its argument (at 30-31), ERC cannot show that "before the transfer was made … the debtor had been sued or threatened with suit."  12 Pa.C.S. § 5104(b)(4) (emphasis added); *In re Matter of Foxcroft Square Co.*, 184 B.R. 671, 675 (E.D. Pa. 1995) (no evidence that litigation was pending at time of transfer, prior to default).  Nor was the goal to "render BTS judgment-proof."  (CM-RSOF-¶173; DR-SUMF-¶145.)

"Good Faith" Defense.  At minimum, there is a fact dispute about whether BTS received reasonably equivalent value for any transfer, and ERC's cited case is not on point.  *See Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, 2011 WL 6088611, at *7 (E.D. Pa. Dec. 7, 2011) (debtor's spouse could not establish she accepted funds in good faith after debtor pled guilty to theft and "admitted that he intended to defraud Plaintiffs, his creditors," by transferring assets).

### 5.    ERC Is Not Entitled To Summary Judgment On Constructive Fraud.

ERC's claim for constructive fraud also fails as a matter of law due to BOA's valid lien. Even if it did not, ERC is not entitled to summary judgment.

ERC has the burden to prove BTS made transfers without receiving reasonably equivalent value and that BTS was insolvent at the time or became insolvent as a result.  12 Pa.C.S. § 5105; *In re Valley Bldg. & Construction Corp.,* 435 B.R. 276, 285, 287 (E.D. Pa. 2010) (plaintiff has burden).  As with intentional fraud, factual issues preclude summary judgment.  ERC repeats the

facts supporting its intentional-fraud claim (at 32), arguing that it is "undisputed" that (1) BTS was cash-flow insolvent as of June 2015, (2) BTS "gifted" its assets to Defendants in January 2016, (3) such assets were not returned; and (4) BTS did not receive "consideration." As explained above, however, all but the third point are disputed. (CM-RSOF-¶¶116, 155, 179; DR-SUMF-¶¶92, 94-124.)

ERC contends (at 32-33) that BTS operated with unreasonably small assets, but the case on which ERC relies undercuts its position. *Fidelity Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 722 (E.D. Pa. 2007) (plaintiff failed to satisfy "unreasonably small assets" test by proving "transfer rendered the debtor unable 'to generate sufficient profits to sustain operations.'"). As explained in *Daubert* briefing regarding Sherman, ERC lacks any expert opinion on this issue. ERC admits (at 33) that the RSA was an asset that gave JTS transloading capacity at the Facility, which JTS in turn could lease to a crude oil marketer (e.g., JM) to turn a profit.

### E.    ERC's Breach Of Fiduciary Duty Claim Fails (Count IV).

In the Motion (at 48-49), Defendants established that the "zone of insolvency" theory upon which ERC relies is not viable under corporate law, let alone with respect to LLCs. ERC offers no response, instead seeking refuge in "law of the case."

#### 1.    Law Of The Case Does Not Apply.

Law of the case is a judicial construct that "directs [a court's] exercise of discretion." *Pub. Int.*, 123 F.3d at 116. It does not apply unless the parties had a "full and fair opportunity to litigate" an issue, *Speeney v. Rutgers*, 369 F. App'x 357, 360 (3d Cir. 2010), and the issue was "actually decided," *Oetting v. Heffler, Radetich & Saitta, LLP*, No. 11-4757. 2017 WL 3453342, at *4 (E.D. Pa. Aug. 11, 2017).

While the Court has rejected the internal affairs doctrine as a choice-of-law rule, it has not undertaken any further choice-of-law analysis. (*See* Dkt. 275 at 1-2 & n.1-2 (denying 12(b)(6)

motion based on internal affairs doctrine without further choice-of-law analysis); Dkt. 421 (denying summary judgment based on internal affairs doctrine without further choice-of-law analysis).)  For example, none of the earlier opinions addressed 15 Pa.C.S. § 402(a).[5]

Courts in similar circumstances conclude that law of the case does not preclude revisiting choice of law.  *See Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.*, 2017 WL 3535002, at *6-7 (S.D.N.Y. Aug. 16, 2017) (applying one state's law in an early decision and later revisiting the issue to address the factors underpinning the analysis); *Oetting*, 2017 WL 3453342, at *2 (concluding, on remand, that prior court's choice-of-law conclusion did not preclude further analysis); *Krys v. Aaron*, 106 F. Supp. 3d 472, 480 (D.N.J. 2015) (law-of-the-case  doctrine did not preclude choice-of-law analysis on second motion to dismiss, where court did not "actually and fully" analyze the issue previously).

More generally, the fact that Judge DuBois previously denied summary judgment on Count IV does not bar Defendants' current motion.  *Krueger Assocs., Inc. v. Am. Dist. Telegraph Co. of Pa.*, 247 F.3d 61, 65-66 (3d Cir. 2001) ("Under the law of the case doctrine the district court's denial of ADT's initial summary judgment motion did not create any bar to the court's later reconsideration of the renewed motion."); *Speeney v. Rutgers*, 673 F. App'x 149, 152 n. 2 (3d Cir. 2016) ("A prior denial of summary judgment should not be viewed as law of the case.").

Similarly, law of the case does not mean that the standard governing ERC's claim under Pennsylvania law was decided previously.  In denying the individual defendants' motion to dismiss for lack of standing, Judge DuBois <u>assumed</u> that duties of corporate officers and directors of an insolvent corporation also apply to LLC members, but he did not engage in any analysis of

---

[5]     Other opinions ERC cites (Dkt. 59 & 368) did not address choice of law and merely denied motions to dismiss Count IV.

Pennsylvania law.  (Dkt. 368 at 8.)  Nor did Defendants brief that issue, as they were not parties

to that motion.  Judge DuBois also did not conclude, as ERC erroneously asserts (at 49), that the

alleged fraudulent transfers "constitute a breach of fiduciary duty."  Rather, he denied a motion to

dismiss, which does not bind this Court at summary judgment.  *Wiest*, 812 F.3d at 330.

### 2. Count IV Fails Under Louisiana Law.

As Defendants explained (at 42-44), Pennsylvania's hybrid choice-of-law analysis points

to Louisiana, because ERC seeks to hold BL liable for "a debt, obligation, or other liability" of

BTS (a Louisiana LLC) as the sole "interest holder" of BTS.  15 Pa.C.S. § 402(a)(2) ("The laws

of the jurisdiction of formation of a foreign association govern[] … [t]he liability that a person has

as an interest holder or governor for a debt, obligation or other liability of the association.").[6]

ERC's argument (at 52) that "Defendants are being sued … for their own misconduct, <u>not</u>

<u>for the debt of the LLC</u>" is sophistry.  (emphasis added).  ERC seeks deficiency charges under the

RSA, and it alleges in Count IV that Defendants had "a duty to manage BTS in a manner calculated

to maximize creditors' recovery of BTS' debts to creditors."  (Dkt. 182, FAC ¶100.)

Section 402(a)(2) also establishes that Louisiana has a greater interest, because "[a] court,

subject to constitutional restrictions, will follow a statutory directive of its own state on choice of

law."  *Restatement (Second) Conflict of Laws* § 6 (1971).  Yet, ERC argues (at 51) that

Pennsylvania "clearly" has a greater interest, because it is "the locus of Plaintiff's transloading

business."  "Pennsylvania, like a majority of other states, has abandoned" the "*lex loci delicti*, or

'place of injury,' rule."  *Melmark, Inc. v. Schutt by and through Schutt*, 206 A.3d 1096, 1107 (Pa.

---

[6]     ERC cites a footnote (at 52) in which the Court (1) declined to consider the import of
Section 402(a)(2) after it was raised in a reply brief as the parties briefed the internal affairs
doctrine and (2) noted that Defendants "cite no authority supporting their interpretation."  (Dkt.
421 n.2.)  In these circumstances, the import of Section 402 was not fully and fairly litigated.

2019).  ERC cites *Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F. Supp. 669, 679 (E.D. Pa. 1997) (at 51), to argue otherwise, but that case involved venue, not choice of law.[7]

Instead, applying "the overriding consideration," Louisiana "has 'a priority of interest in the application of its rule of law' so as to vindicate the policy interest underlying that law." *Melmark*, 206 A.3d at 1107.  Section 402(a)(2) points to Louisiana, and the Pennsylvania LLC Act applies only to LLCs "formed under this chapter."  15 Pa.C.S. § 8812(a).  In Louisiana, the personal liability of LLC managers is governed "solely and exclusively" by the Louisiana LLC Act, La.R.S. § 12:1320(A), and Louisiana law "shall be deemed to govern" whenever there is a conflict of law regarding "the liability of members … for the debts, obligations, and liabilities" of a Louisiana LLC, *id.* § 12:1366.

On the merits, the Louisiana LLC Act creates no fiduciary duties to creditors and states expressly that a member "is not a proper party" to a claim against an LLC, "except when the object is to enforce [a member's] rights against or liability to the [LLC]."  *Id.* § 12:1320(C).  ERC largely ignores these points (at 53) and relies on a provision establishing a gross negligence standard to hold a manager "personally liable <u>to the [LLC] or the members thereof</u>."  *Id.* § 12:1314(B) (emphasis added).  Here, ERC sues on its own account.

ERC does not address *In re Lobell*, 390 B.R. 206, 216-17 (Bankr. M.D. La. 2008), which explains that there is "[n]o controlling authority extending a fiduciary duty to creditors of a Louisiana LLC."  Nor does ERC cite (at 53) any such "controlling authority."  *See Hooper v.*

---

[7]        ERC also cites (at 51) *Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co.*, 752 F.2d 71, 74 (3d Cir. 1985), and *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007).  The place of the alleged injury was not dispositive in either case.  In *Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.*, 609 F.3d 223, 237 (3d Cir. 2010), the court found that "the panel in *American Contract Bridge League* was mistaken if it predicted that the Pennsylvania Supreme Court … would apply the of the law of the state where the tort occurred and the tort lawsuit was filed instead of the law of the state with the most significant contacts with the contract of insurance."

*Maruka Machinery Corp. of Am.*, 525 So.2d 1113, 1117 (La. App. 1988) (addressing writ of

sequestration); *Abraham v. Lake Forest, Inc.*, 377 So. 2d 465, 471 (La. App. 1979) (applying now-

repealed La.R.S. 12:93D).  ERC's failure to address the authorities Defendants cite and inability

to provide any supporting authority confirms that Claim IV fails under Louisiana law.

### 3.        Count IV Also Fails Under Pennsylvania Law.

The Pennsylvania LLC Act applies only to LLCs "formed under this chapter," 15 Pa.C.S.

§ 8814; states that "[a] debt, obligation or other liability of a [LLC] is <u>solely</u> the debt, obligation

or other liability of the company," *id.* § 8834(a) (emphasis added); and does not expressly establish

fiduciary duties to creditors, *id.* §§ 8831-8835.

ERC relies (at 52) on the comments to Section 8834(a), but the comments merely state that

an LLC manager may be "directly liable" when the manager "personally guarantees a[n LLC]

debt," "purports to bind [the LLC] while lacking any agency power to do so," "defames a third

party," or "commits malpractice."  15 Pa.C.S. § 8834, cmt.  In all such situations, the manager

assumes an independent duty to a third party (either via contract or a duty of care imposed by

common or statutory law).[8]  Here, ERC's argument is circular because it presupposes a fiduciary

duty to creditors.  Because Count IV is a tort claim, ERC must first establish that BL owed a

fiduciary duty to ERC as a creditor of BTS.  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,

247 F.3d 79, 105 (3d Cir. 2001) (fiduciary duty claims arise from "the larger social policies

embodied in the law of torts").

As explained (Motion at 45-48), the Pennsylvania LLC Act does not create such a duty, no

Pennsylvania court has permitted an LLC creditor to bring fiduciary duty claims against a member

---

[8]        ERC also cites (at 53) *Weber v. U.S. Sterling Sec.*, 924 A.2d 816, 824-25 (Conn. 2007). Like the examples in the comments to Section 8834(a), the members of the LLC in *Weber* were charged with violating independent duties established by the Telephone Consumer Protection Act.

or manager of an LLC, and courts in other jurisdictions reject such claims.  The only Pennsylvania

case suggesting that <u>LLC</u> managers owe fiduciary duties to creditors is *Hipple v. Hipple*, No. 12-

1256, 2016 WL 3202216, at *11-12 (E.D. Pa. Jan. 27, 2016).  ERC ignores that *Hipple* cites only

corporate cases, and its discussion of fiduciary duties is dicta.  (Motion at 48 n.15.)[9]

"In the absence of a controlling opinion from a state's highest court on an issue of state

law," federal courts sitting in diversity "typically predict how that court would decide the issue."

*Pac. Emp. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 433 (3d Cir. 2012).  ERC

effectively asks the Court to predict that the Pennsylvania Supreme Court would find that BTS is

subject to the Pennsylvania LLC Act (which by its terms does not apply to foreign LLCs) and that

the Act extends fiduciary duties to creditors (without statutory language or supporting case law)

based on corporate common law (which other states have declined to apply to LLCs) when an LLC

is in the "zone of insolvency" (bucking a nationwide trend rejecting such claims even in the

corporate context).  *See CML V, LLC v. Bax*, 28 A.3d 1037, 1046 (Del. 2011) (creditors of insolvent

LLC may not bring fiduciary duty claims against LLC managers or members).  ERC ignores that

"it is not for the courts to add, by interpretation to a statute, a requirement which the legislature

did not see fit to include."  *Hanaway v. Parkesburg Grp., LP*, 168 A.3d 146, 154 (Pa. 2017).  ERC

asks too much, offering little more than "law of the case" as support.

### 4.    FG And FGP Are Not BTS Fiduciaries.

At minimum, FG and FGP are entitled to summary judgment in their favor on Count IV.

As explained (Motion at 49-50), neither was a member or manager of BTS.  In response (at 53-

54), ERC relies on a single, unpublished opinion addressing fiduciary duties owed under Delaware

---

[9]      The other cases ERC cites (at 49, 53) involve <u>corporations</u>.  *See In re Main, Inc.*, 239 B.R.
281, 291 (Bankr. E.D. Pa. 1999) (describing duties of corporate directors); *Sugartown Worldwide
LLC v. Shanks*, No. 14-5063, 2015 WL 1312572, at *12 (E.D. Pa. Mar. 24, 2015) (same).

law by individuals who controlled the general partner of the general partner of a Delaware limited partnership. *See In re Covenant Partners, LP*, 2017 WL 838637, at *3 (Bankr. E.D. Pa. Mar. 2, 2017). ERC's response is so off base as to amount to capitulation.

### 5. Factual Disputes Preclude Summary Judgment For ERC.

Even if ERC could overcome such legal obstacles (and it cannot), there is a question of fact about whether BL's conduct (or the conduct of FG or FGP) amounts to a breach of any fiduciary duty owed to BTS creditors. Because it does not establish such duties, the Pennsylvania LLC Act provides no guidance on the applicable standard.

At a minimum, ERC must prove that BL acted with "gross negligence" (duty of care), 15 Pa.C.S. § 8849.1(c), or that the challenged conduct was neither "fair" nor "authorize[d]" by BL as the sole member (duty of loyalty), *id.* § 8849.1(f)-(g). These are fact questions. *E.g.*, *Royal Indem. Co. v. Security Guards, Inc.*, 255 F. Supp. 2d 497, 506 (E.D. Pa. 2003) (denying summary judgment because "the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact") (quoting *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164-65 (Pa. 1997).) "The court may decide the issue as a matter of law <u>only</u> when 'the conduct in question <u>falls short of gross negligence</u>, the case is entirely free from doubt, and <u>no reasonable jury could find gross negligence</u>." *Id.* (emphasis added). If that were not dispositive, myriad other fact disputes preclude summary judgment for ERC (*e.g.*, regarding the 2015 Accounting Activities (DR-SUMF-¶¶94-124) and the 2016 Assignments (*id.* ¶¶125-48)).

Accordingly, ERC's motion should be denied, and Defendants are entitled to summary judgment on Count IV.

Dated:  December 3, 2021.

Respectfully submitted,

By:  */s/ Lawrence G. Scarborough*

Richard E. Coe (I.D. No. 94539)
Elizabeth M. Casey (I.D. No. 325696)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
richard.coe@faegredrinker.com
elizabeth.casey@faegredrinker.com

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
lawrence.scarborough@faegredrinker.com

Jacob A. Kramer (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1050 K Street NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 312-7400
Facsimile: (202) 312-7461
jake.kramer@faegredrinker.com
rachel.beck@faegredrinker.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas Partners, L.P., Ferrellgas L.P., Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC, Bridger Admin Services II LLC, Bridger Energy, LLC, Bridger Lake, LLC, Bridger Leasing, LLC, and Bridger Marine, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Lawrence G. Scarborough, hereby certify that, pursuant to the Court's Policy and Procedure II(B)(3), Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Reply in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment on All Counts of Plaintiff's First Amended Complaint contains 10,481 words (excluding the caption, tables, signature block, and certificates).

*/s/ Lawrence G. Scarborough*

## CERTIFICATE OF SERVICE

I, Lawrence G. Scarborough, hereby certify that, on December 3, 2021, a true and correct copy of the foregoing Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Reply in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment on All Counts of Plaintiff's First Amended Complaint was filed electronically via the Court's ECF filing system.  This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

*/s/ Lawrence G. Scarborough*