**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDYSTONE RAIL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 17-cv-00495-RK |
| | ) | |
| BRIDGER LOGISTICS, LLC, JULIO RIOS, | ) | |
| JEREMY GAMBOA, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS L.P. *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BRIDGER LOGISTICS, LLC, FERRELLGAS | ) | |
| PARTNERS, L.P., and FERRELLGAS, L.P. | ) | |
| | ) | |
| Defendants/Counterclaimants. | ) | |
| _____ | ) | |

**REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.      This action falls within the federal admiralty jurisdiction ................................... 3

        A.      The Court's prior finding of jurisdiction should not be reopened ........................ 3

        B.      Defendants' attack on this Court's prior decision fails........................................ 4

II.     Eddystone is entitled to summary judgment on alter ego liability....................... 5

        A.      Undisputed evidence shows siphoning and insolvency ......................................... 5

        B.      Defendants' attempts to spin the narrative are irrelevant ...................................... 7

III.    Eddystone is entitled to summary judgment on the fraudulent transfer claims................. 9

        A.      Constructive fraudulent transfer ........................................................................ 9

        B.      Intentional fraudulent transfer ......................................................................... 10

        C.      The BTS property was not encumbered by a valid lien........................................ 12

                1.      The BTS property was not subject to a "valid lien" ............................... 12

                2.      Even if there was a "valid lien," the BTS property was not "encumbered" by that lien to any meaningful extent......................................................... 14

                        a.      There was no chance that the BTS guaranty would be called upon............................................................................................... 14

                        b.      Because the line of credit was oversecured, the BTS property was not encumbered to any meaningful extent........................... 15

IV.     Eddystone is entitled to summary judgment on its breach of fiduciary duty claim.......... 15

CONCLUSION....................................................................................................................... 17

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameriserv Fin. Bank v. Commercebank, N.A.,*
No. 07-1159, 2009 WL 890583 (W.D. Pa. Mar. 26, 2009) .....................................................11

*Christianson v. Colt Indus.,*
486 U.S. 800 (1988)...................................................................................................................4

*Council Tree Communications. v. FCC,*
503 F.3d 284 (3d Cir. 2007).......................................................................................................3

*In re Ferrellgas Partners, L.P.,*
No. 21-10021 (Bankr. D. Del. Jan. 11, 2021) ...........................................................................14

*Fouad v. Milton Hershey School,*
2020 WL 5775018 (M.D. Pa. 2020) ..........................................................................................3

*Fraternal Order of Police, Lodge 1 v. City of Camden,*
842 F.3d 231 (3d Cir. 2016).....................................................................................................12

*Ex parte Gordon,*
104 U.S. 515 (1881)...................................................................................................................4

*Judson Atkinson Candies v. Latini-Hohberger Dhimantec,*
529 F.3d 371 (7th Cir. 2008) .....................................................................................................7

*Klein v. Weidner,*
729 F.3d 280, 284 (3d Cir. 2013) ............................................................................................10

*Mellon Bank, N.A. v. Metro Communications,*
945 F.2d 635 (3d Cir. 1991).....................................................................................................10

*Mercy Health System v. Metropolitan Partners Realty*
2002 WL 1774060 (E.D. Pa. 2002) ...........................................................................................3

*Mullins v. Test America, Inc.,*
564 F.3d 386 (5th Cir. 2009) ...................................................................................................13

*NYKCool A.B. v. Pac. Int'l Servs.,*
2013 WL 1274561 (S.D.N.Y. Mar. 29, 2013) .......................................................................5, 6

*In re Opus E. LLC,*
698 F. App'x 711 (3d Cir. 2017) ...............................................................................................8

*Patel v. Texas Tech Univ.*,
    941 F.3d 743 (5th Cir. 2019) ............................................................................12

*Peacock v. Thomas*,
    516 U.S. 349 (1996)...........................................................................................4

*Public Interest Research Group v. Magnesium Electron*,
    123 F.3d 111 (3d Cir. 1997)..............................................................................3

*Swift & Co. Packers v. Compania Colombiana del Caribe*,
    339 U.S. 683 (1950)...........................................................................................4

*In re Teleglobe Commc'ns Corp.*,
    392 B.R. 561 (Bankr. D. Del. 2008) ..................................................................8

*In re Tronox Inc.*,
    855 F.3d 84 (2d Cir. 2017)................................................................................9

*Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
    332 F.3d 188 (3d Cir. 2003)..............................................................................7

*United States v. Kindred Healthcare*,
    469 F. Supp. 3d 431 (E.D. Pa. 2020) ................................................................5

*United States v. Pisani*,
    646 F.2d 83 (3d Cir. 1981)........................................................................5, 6, 7

*Wachovia Securities v. Banco Panamericano*,
    674 F.3d 743 (7th Cir. 2012) .............................................................................7

**Statutes**

12 Pa. Cons. Stat. § 5101(b) ..................................................................................2, 7, 13

12 Pa. Cons. Stat. § 5101 Comment (2)........................................................................15

12 Pa. Cons. Stat. §§ 5104(a)(1), 5107(a)(1), 5108(d) ................................................10

12 Pa. Cons. Stat. § 5104(a)(2)......................................................................................9

15 Pa. Cons. Stat § 8849.1(a) ......................................................................................16

15 Pa. Cons. Stat. § 8849.1(c)......................................................................................16

## Glossary[*]

| Acronym/Name | Description |
|---|---|
| BPS | Bridger Pipeline Services, LLC |
| BRS | Bridger Rail Services, LLC |
| BTS | Bridger Transfer Services, LLC |
| EBITDA | Earnings Before Interest, Taxes, Depreciation and Amortization |
| FG | Ferrellgas, L.P., a named defendant.  In June 2015, FG acquired Bridger Logistics LLC, along with BTS. |
| FGP | Ferrellgas Partners, L.P., a named defendant |
| FG Acquisition | In June 2015, Ferrellgas Partners acquired Bridger's logistics business by buying Bridger Logistics and its operating subsidiaries, including BTS, for $837.5 million.  BTS was valued between $202.5 and $324.9 million at the time. |
| Gamboa | Jeremy Gamboa, the CEO and COO of Logistics.  Gamboa was a named defendant in this case. (Dkt. 530.) |
| Jamex Transfer Holdings, LLC | Jamex Transfer Holdings was an assetless subsidiary of Jamex LLC created for the purpose of purchasing BTS, at a contract price of ten dollars ($10). |
| Knapp | Patrick Knapp, Senior Counsel for Bridger Logistics and an employee of Ferrellgas, Inc. |
| Logistics | Bridger Logistics LLC, parent of non-party BTS |
| Marketing | Until June 2015, Bridger Marketing, a subsidiary of Bridger LLC, was run by James Ballengee.  After the FG Acquisition, FG left Marketing with Bridger LLC, but acquired the name "Bridger." Marketing was renamed "Jamex Marketing" and its parent, "Jamex LLC." |
| Monroe | Monroe Energy, LLC, operator of a refinery on the Delaware River in Trainer, PA.  Monroe refines crude oil into refined products |

---

[*] Although not required, this Glossary is included for the Court's convenience.  It contains acronyms, terms, and names that appear throughout this brief.

| | | including jet fuel for Monroe's parent company, Delta Airlines. |
|---|---|---|
| | Rios | Julio Rios was a former practicing lawyer.  He was also Executive Vice President of FG and a named defendant in this case.  (Dkt. 530.) |
| | RSA | Rail Services Agreement, entered into between plaintiff Eddystone and non-party Bridger Transfer Services, LLC. |
| | SOF | Statement of Undisputed Facts submitted by Eddystone (Dkt. 512-2). |

## INTRODUCTION

After hundreds of pages of briefs and fact statements, Defendants leave undisputed two critical facts:

- At the time of the FG acquisition in June 2015, BTS was worth well over $200 million;

- Eight months later, in February 2016, BTS was sold for $10.  (Dkt. 512-1 at 2, 4).

This is an astounding siphoning of value.  And the reduction in value left BTS' largest creditor—Eddystone—without recourse against BTS.  These core facts, and the events surrounding them, establish liability on all counts against Defendants.

Defendants seek to put their own spin on the events, claiming it is illogical for FG to have paid $800 million for the Bridger entities "if a principal asset"—the Eddystone contract—would immediately "crash and burn."  Dkt. 528 at 1.  But FG recognized a potential for profit if the spread on crude oil moved in the right direction.  This case arises from Defendants' unlawful acts to stick Eddystone with the risk that the spread would move in the wrong direction, as in fact it did. ███████  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

Defendants engage in an elaborate shell game in an effort to avoid liability.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Defendants also argue that the stripping is immune from any judicial scrutiny because the assets were supposedly encumbered by a "valid lien" in favor of lenders led by Bank of America (together, BOA)—even

though the assets were not transferred to BOA, but to other entities Defendants wholly owned.

████████████████████████████████████████████████████████

██████████████████████████████████████████████ And

even if the lien was valid, the assets were not encumbered to any meaningful extent. The BOA

lien was greatly oversecured—a $311 million debt compared with $2.5 billion of assets of FG

entities. Dkt. 528 at 19. Further, there was no probability that BOA would seek to call upon the

BTS assets.

To be clear, the Court can grant summary judgment without ever reaching the "lien

defense." Defendants' lien defense—derived from a statute—is not a defense to the common

law claims for alter ego and breach of fiduciary duty. 12 Pa. Cons. Stat. §5101(b). And because

Judges Kelly and DuBois rejected Defendants' legal challenges to the breach of fiduciary duty

claim, liability on that claim is straightforward. Even as to the fraudulent transfer claims, the

lien defense does not apply to fraudulent transfers before January 15, 2016, when Defendants

claim the lien was perfected. In all events, there is no merit to the lien defense and thus

Defendants are liable as to all transfers. Because the undisputed facts show liability, the Court

should move to a trial on damages.[1]

---

[1] On December 3, 2021, Defendants filed a 215-page response to Eddystone's statement of facts (SOF), along with a 160-page reply in support of their statement of facts. Dkts. 528-3, 528-4. These documents are replete with legal arguments, unreasonable interpretations of Eddystone's allegations, and extensive elaborations on collateral facts. As such, they violate this Court's internal guidelines and Third Circuit precedent. Eddystone will not make matters worse by responding with a separate pleading and instead will limit its discussion to the few facts material to disposition of this motion.

ARGUMENT

**I.     This action falls within the federal admiralty jurisdiction**

**A.     The Court's prior finding of jurisdiction should not be reopened**

Defendants wrongly argue that rulings on jurisdiction are not law of the case and may be freely opened at any time (here, upon case assignment to a new judge).  *See* Dkt. 528 at 3. Defendants cite *Public Interest Research Group v. Magnesium Electron,* 123 F.3d 111 (3d Cir. 1997), but that case stands for the proposition that the doctrine applies to jurisdictional issues, subject to a limited exception of extraordinary circumstances being present to warrant reconsideration.  *Id*. at 117-18 ("courts may reconsider issues that impinge on their jurisdictional powers … *when extraordinary circumstances warrant such reconsideration*" (emphasis added)). In contrast to *Public Interest*, Defendants do not argue that there has been an intervening factual finding by this Court, a change in the facts or law, or any other "extraordinary circumstance."

Defendants' other cited cases are inapposite.  *Council Tree Communications. v. FCC* cites *Magnesium Elektron* and "hold[s] that the law of the case doctrine does not bar a merits panel from revisiting a motions panel's assumption of subject matter jurisdiction."  503 F.3d 284, 292 (3d Cir. 2007).  That holding is irrelevant here—and it would not have been necessary if there were a general rule that the doctrine never applies to jurisdiction.  *Fouad v. Milton Hershey School* notes that a court should reconsider an earlier jurisdictional ruling if it was "clearly erroneous."  2020 WL 5775018, at *4 (M.D. Pa. 2020).  Defendants do not argue that Judge Kelly's ruling was clearly erroneous.  Finally, *Mercy Health System v. Metropolitan Partners Realt*y does not concern the law-of-the-case doctrine or the reconsideration of an earlier ruling finding jurisdiction.  2002 WL 1774060 (E.D. Pa. 2002).

This case has been pending for nearly five years, and this Court long ago held that it belongs in federal court.  "Perpetual litigation of any issue—jurisdictional or nonjurisdictional—

3

delays, and therefore threatens to deny, justice." *Christianson v. Colt Indus.*, 486 U.S. 800, 816 n.5 (1988).

**B.      Defendants' attack on this Court's prior decision fails**

Judge Kelly rightly found jurisdiction. Dkt. 512-1 at 6-11. This is an action for breach of a maritime contract against Defendants who are liable for the breach as alter egos of BTS, the contract counterparty. "Admiralty jurisdiction extends to maritime contracts." *Ex parte Gordon*, 104 U.S. 515, 516 (1881). And the fact that Eddystone seeks to recover not from BTS itself but from Defendants as its alter egos does not deprive the Court of jurisdiction. "The jurisdiction of a court of admiralty to determine the question of alter ego is undoubted." *Swift & Co. Packers v. Compania Colombiana*, 339 U.S. 683, 689 n.4 (1950).

That disposes of Defendants' challenge to jurisdiction. Indeed, Defendants themselves urge that a case arises under federal law if "a right … created by the … laws of the United States [is] an element, and an essential one, of the plaintiff's cause of action." Dkt. 495-1 at 3 (quoting *Gully v. First National Bank*, 299 U.S. 109, 113 (1936)). Here, the breach of a maritime contract is clearly within the admiralty jurisdiction and is an essential element of Eddystone's alter ego claim. This distinguishes Defendant's lead citation, *Peacock v. Thomas*, 516 U.S. 349 (1996). The plaintiff there merely sought to enforce a preexisting ERISA judgment against the defendant's alleged alter ego. *Id*. at 351-52. An underlying ERISA violation was not an element of his claim, because it had already been established in a separate lawsuit. *Id.* There was no federal-question jurisdiction over his "naked" alter ego claim. *Id.* at 353-54.

Defendants note that, in some cases where a court of admiralty rules on an alter ego theory, the actual contract counterparty is also a defendant in the case (not true here). But that is beside the point. The point is that a suit to recover for breach of a maritime contract is an admiralty case, regardless of whether the plaintiff seeks that recovery from the counterparty, its

4

alter ego, or both.  It is not as if the courts in the cases with claims against both counterparty and alter ego suggested that they were exercising admiralty jurisdiction over the former but only supplemental or pendent jurisdiction over the latter, or that jurisdiction over the latter in any way depended on the presence of the former.  Eddystone's claim arises out of the maritime RSA just as much as a conventional breach-of-contract claim against BTS itself would and it equally falls within the admiralty jurisdiction.  Dkt. 512-1 at 7-10 (citing cases).  Defendants offer no authority and no argument to the contrary.

## II.     Eddystone is entitled to summary judgment on alter ego liability

All parties agree that the veil piercing test set forth in *United States v. Pisani*, 646 F.2d 83 (3d Cir. 1981), governs here.  As Judge DuBois recently explained, strong evidence supporting just one or two *Pisani* factors can be sufficient to establish alter ego liability.  *E.g., United States v. Kindred Healthcare,* 469 F. Supp. 3d 431, 455 (E.D. Pa. 2020) ("undercapitalization and siphoning of funds" sufficient to allege alter ego liability).  Defendants emphasize that some courts have also considered other *Pisani* factors (Dkt. 528 at 9), but this is beside the point.  Siphoning money from an insolvent subsidiary is quintessential conduct that establishes alter ego liability.  *See NYKCool A.B. v. Pac. Int'l Servs*., 2013 WL 1274561, at *11 (S.D.N.Y. Mar. 29, 2013) (collecting cases); *Pisani*, 646 F.2d at 88.  Eddystone has set forth uncontradicted evidence supporting two *Pisani* factors—siphoning and insolvency—and that same evidence supports other *Pisani* factors.

### A.     Undisputed evidence shows siphoning and insolvency

Eddystone established that Defendants siphoned BTS funds and assets.  Dkt. 512-1 at 12-17.  While Defendants "reconstruct" records to suggest siphoning of revenues did not begin until February 2016, their contemporaneous records show:  (1) Defendants' eliminated BTS' accounts receivable in June 2015 and again in February 2016, (2) transferred BTS' revenues and assets to

fictional FG entities, and (3) transferred BTS' remaining assets to FG subsidiaries. *Id*. at 13-17, 25-27. Defendants admit that the transferred revenues/assets were never returned to BTS. Dkt. 528 at 26.

As a result of the siphoning, BTS became insolvent. In 2015, when revenues were siphoned, BTS was unable to meet its obligations under the RSA and its debts were being paid by other FG subsidiaries. Dkt. 512-1 at 17-19. Defendants say that those funds, while in the hands of other FG entities with no credit to BTS, somehow still belonged to BTS. Dkt. 528 at 12. (Eddystone has argued that this unsubstantiated "reconstruction" is inadmissible. Dkt. 507.) But it is undisputed that BTS never saw those funds again, so there can be no question that FG's actions ultimately did render BTS cash flow insolvent by early 2016 at the latest. SOF-¶209 (January 2016, BTS account "sits at $0"). It is also undisputed that after Defendants transferred BTS' remaining assets in 2016, those assets were likewise never returned. Dkt. 528 at 25-26. BTS was left without a penny to its name and was sold for $10. SOF-¶¶180-89, 209-11. Thus, even if—as Defendants suggest—the siphoning and insolvency did not occur until just before the February 2016 sale, Defendants are still liable as alter egos. *See Pisani*, 646 F.2d at 88 (piercing veil where the "reduction of the corporation's indebtedness … from approximately $184,00 in 1967 to $0 in 1969 indicates that [sole owner] siphoned corporate funds").

All told, Defendants unquestionably rendered BTS both cash-flow and balance sheet insolvent, completely unable to pay its creditor Eddystone and judgment-proof to any Eddystone effort to enforce its contract rights. Dkt. 512-1 at 13-17. ██ ███████████████ ██████████████████████████████████████. Defendants also make a perfunctory reference to their lien defense in their alter ego response (Dkt 528 at 10), but this

defense is derived from a statute and is not applicable to a common law alter ego claim.  12 Pa. Cons. Stat. §5101(b).

Defendants do not deny that Eddystone has established the requisite injustice under these undisputed facts, but urge that other "significant factors demonstrating an alter ego relationship" are necessary in addition to injustice.  Dkt. 528 at 13.  To the extent any other factors are necessary—they are not—the same evidence shows the undercapitalization *Pisani* factor.  For example, BTS was so depleted of funds that it relied on other subsidiaries to pay its debts.  *E.g., Judson Atkinson Candies v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 379 (7th Cir. 2008) (company is undercapitalized when it has "so little money that it could not and did not actually operate its nominal business as its own").  █████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████.  *See Wachovia Securities v. Banco Panamericano*, 674 F.3d 743, 755 (7th Cir. 2012) (affirming district court's finding that officers and directors were nonfunctioning where key decisions were effectively controlled by a dominant shareholder).  Thus, to the extent that some combination of the *Pisani* factors is required, Eddystone has easily made that showing here.

**B.      Defendants' attempts to spin the narrative are irrelevant**

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Defendants' accounting records and other internal documents contain all the critical facts.  To the extent that Defendants contend proof of "malintent" or fraud is required (Dkt. 528 at 10),

they are wrong.  *See Trs. of the Nat'l Elevator v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (court

"does not require proof of actual fraud as a prerequisite for piercing the corporate veil").



. In any event, the purchaser's reasons for buying BTS

are irrelevant.  Eddystone's alter ego claim goes to the actions taken by FG in relation to its

subsidiaries.

Defendants do not dispute that Jamex Transfer Holdings—which purchased BTS for

$10—had no assets.  SOF-¶214.  Defendants emphasize that the corporate parent of Jamex

Transfer Holdings had substantial assets (Dkt. 528 at 12), but this is meaningless because the

parent specifically denied any intention of meeting BTS' RSA obligations.  Dkt. 97 at 25.

Defendants' cases are thus inapposite because they indicate only that if a parent company

actually provides funding, such funding could be considered.  *See In re Teleglobe Commc'ns*,

392 B.R. 561, 602–03 (Bankr. D. Del. 2008) (wrong to exclude from the cash flow test the

funding support "actually given by" parent); *In re Opus E. LLC*, 698 F. App'x 711, 717 (3d Cir.

2017).



███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████.

Eddystone already demonstrated that Defendants' other arguments are flawed, both legally and factually.  Dkt. 512-1 at 20-21 (explaining that a separate breach of contract claim is not required where, as here, the breach is an element of the alter ego claim); *id.* at 21-22 (explaining that the sale of BTS is irrelevant to liability because the malfeasance occurred while BTS was under Defendants' control).  In their opposition, Defendants ignore these obvious problems and repeat the same deficient arguments.  *See* Dkt. 528 at 6-8.  Eddystone is entitled to summary judgment on the alter ego claim (Count I).

### III.    Eddystone is entitled to summary judgment on the fraudulent transfer claims

#### A.    Constructive fraudulent transfer

Defendants' own brief confirms that this Court can simply enter a liability judgment on Count III.  Constructive fraudulent transfer under PUFTA requires only that the debtor (1) did not receive "reasonably equivalent value" for the transfer and (2) either had unreasonably small assets for its business or transaction or would incur debts beyond the debtor's ability to pay when they came due.  12 Pa. Cons. Stat. §5104(a)(2); *see* Dkt. 528 at 25.  The legal test is easily met here.  Defendants transferred millions away from BTS, and BTS did not receive reasonably equivalent value in return.  (SOF-¶¶91, 99-100, 180-85).  When BTS was sold for $10 in February 2016, neither BTS nor the buyer had anything of value, let alone enough to run BTS' business or pay its debts (SOF-¶¶110-13, 171-72, 180-85).

Defendants say the Purchase and Sales Agreement required that they write off BTS' accounts receivables.  Dkt. 528 at 20.  This is not correct.  SOF-¶¶120-21.  But even if it were,

this does not change that BTS received nothing for these write-offs.  SOF-¶¶119.  Defendants urge that they did not take BTS' revenue, but simply pooled it into "cost centers."  Dkt. 528 at 20.  Whatever Defendants want to call it, BTS' revenues were credited to two purported LLCs and never credited or "rolled-up" to BTS and there is no fact evidence that BTS had access to the BRS/BPS accounts.  SOF-¶¶89-92, 96-109.  Defendants then hedge that "$27,295,269 of this revenue went to Eddystone on BTS' behalf."  Dkt. 528 at 21.  But that money did not come out of BTS' revenue—either from BTS directly or indirectly via the fictional entities of BRS and BPS.  That money came from Bridger Logistics and its subsidiary Bridger Rail Shipping, LLC. SOF-¶110.

Defendants argue that the FG Acquisition created an "antecedent debt" that BTS satisfied through its later transfers.  Dkt. 528 at 22.  But the supposed debt was not documented anywhere in the acquisition purchase agreement.  In fact, there is no record support for the notion that BTS owed any debt to Defendants.  Defendants' rely on *Mellon Bank v. Metro Communications,* 945 F.2d 635, 647 (3d Cir. 1991), which states that "reasonably equivalent value has been received" when the debtor's "realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction …." *Id.*  Here, BTS gave up far more in value than it received.  BTS had a going concern value between $202.5 and $324.9 million as of June 23, 2015.  SOF-¶53.  After Defendants transferred away BTS' assets, BTS was worth $10.  SOF-¶172.  Defendants exsanguinated BTS.

### B.    Intentional fraudulent transfer

On the intentional fraudulent transfer claim (Count III), the parties agree that a creditor such as Eddystone may obtain voidance of transfers made with intent to "hinder, delay, or defraud" creditors and there are no viable defenses.  12 Pa. Cons. Stat. §§ 5104(a)(1), 5107(a)(1), 5108(d); *Klein v. Weidner*, 729 F.3d 280, 284 (3d Cir. 2013) (affirming summary judgment).

Defendants do not deny that BTS was depleted of all assets. They suggest, however, that BTS received debt forgiveness and other "indirect benefits" from FG. Dkt. 528 at 24. But BTS went from a going concern valued between $202.5 and $324.9 million (net of debt) to an empty shell worth $10 as a direct result of the transfers. Defendants assert BTS' debts were paid before its sale to Jamex. *Id*. at 24. But Defendants' subsidiaries—not BTS—paid BTS' debts as BTS did not have sufficient funds to cover them. SOF-¶¶110-13.

Defendants contend that "BTS assigned" its assets "to avoid a default under the BOA credit facility." Dkt. 528 at 24. But, as Defendants admitted in prior briefing, FG caused BTS to transfer its assets. *See* Defs' Opp. to C-F Mot., Dkt. 266, at 23 ("Ferrellgas transferred assets from BTS …."). As noted below, in the absence of FG's transfers, there was no evidence of an imminent BTS default. Moreover, BTS had no independent obligations to BOA. BTS' only obligation was to pay *if* the guarantee was called, which it never was. *See* Dkt. 266-1, Ex. 41 at 5; *see id*., Ex. 42 at 84.

Defendants claim the transfers "were not designed to permit Defendants to 'retain control' over BTS's assets nor a 'transfer to an insider.'" Dkt. 528 at 24. But Defendants did, in fact, retain control over BTS' funds and assets, which were transferred to FG affiliates and never returned to BTS. Defendants do not dispute that BTS' funds were credited to other subsidiaries and that BTS did not have those funds when it was sold to Jamex Transfer Holdings. Dkt. 512-1 at 2-4. And Defendants affirmatively admit that the assets transferred in January 2016 were never returned to BTS. *Id*. at 26. *Ameriserv Fin. Bank v. Commercebank, N.A*., 2009 WL 890583, at *4 (W.D. Pa. Mar. 26, 2009) is on point. Both here and in *Ameriserv*, the defendants funneled money through fictitious entities' accounts.

Defendants claim in their response to Eddystone's statement of facts that the Court should not consider expert opinions in an "unsworn expert report." *E.g.*, Dkt. 528-3 at ¶ 89-91, 101, 110-13. However, hearsay may be considered on summary judgment where, as here, the witness is able to testify at trial. *Fraternal Order of Police v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016); *Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019) (trial court erred in refusing to consider unsworn expert reports on summary judgment). In any event, these experts have fulfilled any technical requirement by submitting sworn declarations that they stand behind the opinions in their reports. *See* ERC-2134 (Sherman); ERC-2135 (Earnest).[2]

### C.     The BTS property was not encumbered by a valid lien

Defendants seek to insulate their fraudulent transfers from judicial scrutiny by relying on a lien protecting the interests of Bank of America. That lien does not protect Defendants. In the first place, as Eddystone pointed out in its initial memorandum, that lien was not perfected until January 15, 2016. It has no relevance to claims for fraudulent transfers made before that date. Dkt. 495-1 at 27, 31-32. Defendants do not disagree. Thus, Defendants have no defense for transfers prior to January 15, 2016.

### 1.     The BTS property was not subject to a "valid lien"

Even as to later transfers, Defendants' lien argument fails, because BTS's purported grant of the lien was itself a fraudulent transfer. It was a constructive fraudulent transfer because it was a part of the transaction that left BTS insolvent without giving BTS reasonably equivalent value. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[2] Eddystone notes that its SOF references ERC-650 and ERC-769 but those exhibits were inadvertently omitted. Both exhibits are now attached.

███████████████████.  ████████████.  The lien therefore was not "valid" under PUFTA.

Defendants say that BOA's perfection of the lien under the UCC is "dispositive [of whether it was a 'valid lien'] under PUFTA." Dkt. 528 at 17. This ignores the law of fraudulent transfer. The ordinary meaning of the key statutory term "valid," common sense, and Eddystone's cited cases (Dkt. 512-1 at 34-36) all confirm that a lien that itself constitutes a fraudulent transfer is not "valid" under PUFTA. "[I]f the circumstances surrounding the lien's creation are themselves part of the alleged fraudulent transfer," then the lien is not "valid." *Mullins v. Test America, Inc*., 564 F.3d 386, 417 (5th Cir. 2009). PUFTA expressly defines "Transfer" to "include[]" the "creation of a lien or other encumbrance," which makes clear that the Legislature contemplated that the grant of a lien could be a fraudulent transfer. 12 Pa. Cons. Stat. §5101(b).

Defendants dispute that the grant of the lien was a fraudulent transfer of value to FG. Dkt. 528 at 17-18. But the grant of a lien to fulfill FG's obligation to BOA was plainly a transfer for FG's benefit. *See* 12 Pa. Cons. Stat. §5101(b) ("Transfer" includes "indirect" dispositions of property). And it plainly did not benefit BTS, which was being dismembered and had nothing to gain. Because the transfer was fraudulent, the lien is invalid to shield Defendants' stripping of BTS's assets. Indeed, if a corporate parent could immunize its stripping of a subsidiary's assets by first causing the subsidiary to grant a lien securing a guaranty of an obligation of the parent, then there would be no limit to corporate parents' ability to get away with fraudulent transfers— and PUFTA would be largely nullified. Unsurprisingly, Defendants offer no case law and no argument to support that absurd conclusion.

**2.** **Even if there was a "valid lien," the BTS property was not "encumbered" by that lien to any meaningful extent**

    **a.** **There was no chance that the BTS guaranty would be called upon**

The "extent" to which property "is encumbered by a valid lien" securing a guaranty depends on the probability that the guaranty would be called upon. *See* Dkt. 512-1 at 38-40. Defendants argue that there was a possibility that BTS would be forced into bankruptcy, which would be an event of default under the BOA credit facility. Dkt. 528 at 19. But BTS' insolvency was attributable entirely to Defendants' stripping of its assets. There is no evidence that, without that wrongful asset-stripping, BTS lacked sufficient value to cover losses in "12 to 18 months" on the RSA and maintain its solvency. *Compare* SOF-¶130 ($70 million EBITDA hole), *with* SOF-¶210 (BTS valued between $202.5 million and $324.9 million).

Defendants observe that FG ultimately went into bankruptcy. Dkt. 528 at 19. But that bankruptcy occurred some five years after the events at issue here. *See In re Ferrellgas Partners, L.P.*, No. 21-10021 (Bankr. D. Del. Jan. 11, 2021). And the bankruptcy filing makes clear that the bankruptcy did not involve any call on any line-of-credit guaranties. *See id.,* Dkt. 3 at 11-14 (explaining the reasons for the bankruptcy). Nor did any secured lender lose money. *Id.* Dkt. 203-1 at 21 (discussing treatment of secured claims). Anyway, the BOA line of credit had been paid off and terminated more than two-and-a-half years earlier, in May 2018. *See* ERC-2137*,* Ferrellgas Partner, L.P. Form 8K dated May 4, 2018, at 4 (explaining replacement of secured credit facility). There was no risk of BOA losing a penny or taking any action to call a guaranty in connection with the bankruptcy. In short, the record provides zero basis to find a probability that the BTS guaranty would be called upon.

> **b.** **Because the line of credit was oversecured, the BTS property was not encumbered to any meaningful extent**

Even if the lien were valid, the Court should "allocate the [value of the BOA line of credit] among the items of property subject to [liens securing it] for the purpose of determining the 'extent' to which the [BTS property] disposed of [was] encumbered for purposes of" PUFTA.  12 Pa. Cons. Stat. § 5101 Comment (2); *see* Dkt. 512-1 at 40-41.  Defendants agree that FG owed BOA $311 million.  Dkt. 528 at 19.  That obligation must therefore be allocated among all assets securing guaranties thereon—which were valued at some $2.5 billion, resulting in an encumbrance of less than 12.5%.  Dkt. 512-1 at 41.  Defendants respond that FG had other debts and that its "current assets" were lower than its $2.5 billion in total assets.  Dkt. 528 at 18-19.  These points are irrelevant.  Comment (2) calls for allocation of the value of the obligation secured by the supposed "valid lien" among all items of property subject to that lien; it does not consider other debts, and it looks to all assets, not just those that Defendants classify as "current" assets.  Defendants do not dispute that FG's obligation was worth some $311 million and was oversecured by liens on some $2.5 billion in assets.  So even if Defendants could avail themselves of a valid lien defense, they could only shield some 12.5% of the value of the BTS assets fraudulently transferred in 2016.

## IV.   Eddystone is entitled to summary judgment on its breach of fiduciary duty claim

Eddystone is entitled to summary judgment on the breach of fiduciary duty claim (Count IV) because the Court decided the controlling legal test and defendants raise no material facts.  This Court has already held—on several occasions—that Pennsylvania law applies to Count IV of the complaint and that Eddystone may sue for a breach under Pennsylvania law.  Dkt. 512-1 at 47-51.  Defendants argue that in reaching its prior ruling on choice-of-law, the Court did not consider their § 402(a) argument.  Dkt. 528 at 26-28.  To the contrary, the Court considered the

argument but rejected it because Defendants "cite no authority supporting their interpretation" of § 402(a).  Dkt. 421 n.2.  In any event, the law of the case doctrine bars relitigation of the same issue regardless of whether the party retreads its prior argument or cooks up a new one.  Dkt. 512-1 at 48-40.

Defendants argue that Pennsylvania law does not permit a creditor to sue directly for breach of fiduciary duty.  Dkt. 528 at 30-31.  Judge DuBois rejected this very argument.  Dkts. 421, 368, 275.  "[M]ultiple Pennsylvania federal and state courts have permitted creditors of insolvent corporations to assert fiduciary duty claims directly under Pennsylvania law."  Dkt. 421 at 9 (collecting cases); *id.* at 7 (courts also applied "Pennsylvania law to a creditor's fiduciary duty claim against an individual who allegedly 'transferred assets' from a Delaware LLC to himself"); *see also* Dkt. 368 at 7-9.

Significantly, Judge DuBois indicated that, once proven, Defendants' transfers of BTS assets for inadequate consideration would constitute a breach of fiduciary duty owed to Eddystone.  Dkt. 421 at 8-9.  The undisputed facts show that the asset transfers were for inadequate consideration and they occurred while BTS was in Defendants' control.  Dkt. 512-1 at 2-4.

Defendants' opposition brief includes a section that "factual disputes preclude summary judgment for ERC" on the breach of fiduciary duty claim.  Dkt. 528 at 32.  This argument is premised on the wrong legal standard.  Defendants reason that, because Pennsylvania law "does not establish such duties" owed to creditors, this Court should look to 15 Pa. Cons. Stat. §8849.1(c).  But their premise is wrong:  as Judge DuBois found, Pennsylvania law *does* establish fiduciary duties owed to creditors.  Dkt. 421 at 7-9.  Moreover, Section 8849.1(c) is not

applicable here because that section addresses a duty of care owed to the company and other LLC members.  15 Pa. Cons. Stat §8849.1(a).

Finally, Defendants repeat their argument that the FG entities were not managers or members of BTS and thus are not fiduciaries to BTS.  Dkt. 528 at 31.  But control persons of a fiduciary are liable when they cause that fiduciary to breach its duties.  Dkt. 512-1 at 53, citing *Covenant Partners*, 2017 WL 838637 at *3.  Defendants are liable as the controlling entities of BTS' sole member, Bridger Logistics.  Dkt. 512-1 at 53-54.

CONCLUSION

The Court should grant summary judgment for Eddystone on liability and set a trial on damages.

Dated:  December 23, 2021                    Respectfully submitted,

/s/ Filiberto Agusti
Henry E. Hockeimer, Jr. (I.D. No. 86768)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Steven Barber (*pro hac vice*)
Andrew J. Sloniewsky (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

## CERTIFICATE OF WORD COUNT

Pursuant to the Court's Order dated September 22, 2021 (Dkt. 487), the foregoing reply is 5246 words (less than the 5250 set in the Court's order), excluding the cover page, the table of contents, the glossary, the signature block, and the certificates of word count/service.

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed via the Court's ECF system on December 23, 2021, thereby serving all counsel of record.

/s/ Filiberto Agusti
Filiberto Agusti