# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**EDDYSTONE RAIL COMPANY, LLC,**

*Plaintiff,*

v.

**BRIDGER LOGISTICS, LLC, et al.,**

*Defendants.*

Case No. 5:17-cv-00495-JDW

## ORDER

AND NOW, this 21st day of March, 2022, upon consideration of BL/FG Defendants' Motion To Dismiss For Lack Of Subject Matter Jurisdiction Or, In The Alternative, For Summary Judgment On All Counts Of Plaintiff's First Amended Complaint (ECF No. 495), Eddystone Rail Company's Motion For Summary Judgment On Amended Counterclaims (ECF No. 491), and Plaintiff Eddystone Rail Company, LLC's Motion To Preclude The Testimony Of Defendants/Counterclaim Plaintiffs' Expert James Heller (ECF No. 489), the Court notes as follows.

## I.    ADMIRALTY JURISDICTION

1.    The BL/FG Defendants' effort to "renew" their jurisdictional argument is actually a request for reconsideration, and the Court considers it under that standard.

2.    Once the Court has decided an issue, parties generally may not relitigate that issue in the same case. See Schneyder v. Smith, 709 F. Supp.2d 368, 383 (E.D. Pa.

2010). "The exceptions to the law of the case doctrine are narrow, reserved for instances where there has been an intervening change in the law, where new evidence has become available, or where reconsideration is necessary to prevent clear error or a manifest injustice." Id.

3.      The BL/FG Defendants claim that their jurisdictional motion rests on facts developed in discovery, but they do not cite any fact that they learned in discovery. They would therefore have to show that the Court clearly erred for it to reconsider on this basis. They cannot meet that high standard.

4.      The Rail Services Agreement's ("RSA") direct connection to the traditional maritime activity of loading a barge makes it akin to a stevedoring contract, and a stevedoring contract is a maritime contract. See Cooper v. Loper, 923 F.2d 1045, 1048 (3d Cir. 1991). Thus, Eddystone's claim is for breach of a maritime contract.

5.      The BL/FG Defendants' argument about the nature of Eddystone's claim is wrong. Eddystone might have labeled its claim "Alter Ego," but the label doesn't matter. In substance, the claim is one for breach of the RSA—a maritime contract—and an effort to use the alter ego doctrine to hold liable Defendants who were not parties to the RSA. The BL/FG Defendants' refusal to read the claim that way is not reasonable.

## II.    LEGAL STANDARD

6.      Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Scott v. Harris, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

7.      The filing of cross-motions does not change this analysis. See Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." Id. at 560 (quotation omitted).

## III.   CLAIMS THAT WILL PROCEED TO TRIAL

### A.      Complaint Count I - Alter Ego

8.      As noted, Eddystone's claim is one seeking to impose liability based on a breach of the RSA. The Court has held that before. (See ECF No. 308 at 8.) So there's no

merit to the BL/FG Defendants' argument that an "alter ego" claim is not cognizable. █

████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Assuming Eddystone can establish a

breach of the RSA, alter ego is a viable way to impose liability on the BL/FG Defendants.

9.    In <u>United States v. Pisani</u>, 646 F.2d 83 (3d Cir. 1981), the court articulated

the factors to be considered for piercing the corporate veil in the absence of fraud. The

<u>Pisani</u> factors include: (a) siphoning subsidiary funds; (b) the subsidiary's insolvency, (c)

using the subsidiary as a facade for the parent; (d) gross undercapitalization; (e) lack of

corporate formalities; (f) not paying dividends; (g) nominal officers or director;, and (h)

lack of corporate records. <u>See</u> <u>Trustees of Nat. Elevator Indus. Pension v. Lutyk</u>, 140 F.

Supp.2d 447, 457 (E.D. Pa. 2001). Strong evidence supporting just one or two factors can

establish alter ego liability. <u>See</u> <u>United States v. Kindred Healthcare, Inc.</u>, 469 F. Supp.3d

431, 455 (E.D. Pa. 2020).

10.    Eddystone has evidence suggesting that the BF/FG Defendants siphoned

funds. In internal emails, its executives █████████████████████████████████████

███████████████████████████████████████████████████████████ (ECF

No. 520-73.) Julio Rios also told outside counsel ███████████████████████████

███████████████████████████████████ (ECF No. 534-1.)

11.    Eddystone also has evidence suggesting that BTS became insolvent. BTS

had a value of over $200 million in 2015, but it had $0 in its account in January 2016.

Maybe that was because the BL/FG Defendants were engaged in cash sweeps, as they say, but maybe it was because BTS was insolvent. Viewed in the light most favorable to Eddystone, the evidence suggests the latter.

12.     Regarding the BL/FG Defendants' contention that alter ego must be established at each organizational level, Bridger's in-house counsel testified that "any conveyance of real property was subjected to higher level approval." (ECF No. 539-6 at 301:2-302:18.) ███████████████████████████████████████████████████

████████████████████ (ECF No. 520-5.)

13.     Finally, the same alleged siphoning of funds and internal emails that create a genuine dispute as to alter ego also create a genuine dispute on the underlying breach of the RSA.

14.     While all of this evidence gives Eddystone a basis to proceed on its alter-ego claim, none of it is so conclusive as to warrant summary judgment in Eddystone's favor. The BL/FG Defendants' papers make clear that there are innocuous ways to view the evidence. This claim must proceed to trial.

**B.     Eddystone Count II – Intentional Fraudulent Transfer**

15.     Under the Pennsylvania Uniform Fraudulent Transfer Act, a creditor may avoid transfers made with intent to "hinder, delay, or defraud" creditors if there are no viable defenses. See 12 Pa. Cons. Stat. §§ 5104(a)(1), 5107(a)(1), 5108(d); Klein v. Weidner, 729 F.3d 280, 284 (3d Cir. 2013.) The PUFTA defines a "transfer" as "[e]very

mode, direct or indirect ... of disposing of or parting with an asset or an interest in an asset ... includ[ing] ... creation of a lien or other encumbrance." 12 Pa. Cons. Stat. § 5101(b). The PUFTA defines "assets" as "property of a debtor" but excludes "property to the extent it is encumbered by a valid lien." Id.

16.    Because individuals rarely admit intent, PUFTA allows courts to infer intent from 11 factors known as "badges of fraud." In re Carbone, 615 B.R. 76, 80 (Bankr. E.D. Pa. 2020) (citations omitted). These badges of fraud are as follows:

(a)    the transfer was to an insider;

(b)    the debtor retained possession or control of the property transferred after the transfer;

(c)    the transfer or obligation was not disclosed and/or otherwise concealed;

(d)    the debtor had been sued or threatened with a suit before the transfer was made or the obligation incurred;

(e)    the transfer was of substantially all the debtor's assets;

(f)    the debtor absconded;

(g)    the debtor removed or concealed assets;

(h)    the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j)    the transfer occurred shortly before or after a substantial debt was incurred; and

(k)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. Cons. Stat. §§ 5104(a)(1). No particular badge is necessary, nor is any combination

sufficient; finding intent is always fact specific. Id. "[T]he determination of whether a

transfer was made with fraudulent intent is a question of fact that is rarely susceptible to

resolution at the summary judgment stage." In re Polichuk, 506 B.R. 405, 418 (Bankr. E.D.

Pa. 2014)

      17.    At least some of Eddystone's evidence speaks to the BL/FG Defendants'

intent. BL's attorney wrote:



      18.    In addition to the specific evidence of intent, there are genuine disputes

on multiple badges of fraud. For example, the Parties agree that all of the transferees

were affiliates of Bridger Transfer Services ("BTS") that FG and Bridger Logistics owned,

but they dispute whether the transaction was at arm's-length and thus not to an insider.

Also, the Parties agree Jamex and Monroe agreed to suspend operations at the Facility

but dispute whether that suspension amounted to a concealed removal of assets. The

evidence could support either side's version of events.

      19.    Regarding the BL/FG Defendants' lien defense, under the PUFTA, the

creation of a lien is a type of transfer, and a fraudulent transfer may be avoided. It

therefore stands to reason that if a party created a lien to defraud a third party, it would constitute a fraudulent transfer and not be a valid lien.

20.     BTS granted the lien to Bank of America on January 14, 2015. The day prior, Jamex Marketing agreed to buy BTS from Bridger Logistics for ten dollars, and agreed that, "BTS, at the time of its sale to Jamex, [would] include[] no assets or liabilities other than its rights and obligations under the Eddystone contract." (ECF No. 508-2 at 6.) Just four weeks earlier, Mr. Rios emailed outside counsel and asked, ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████     (ECF No. 520-30 at 2, 4.) The timing calls into question whether BTS granted the lien with intent to hinder, delay, or defraud Eddystone.

21.     The BL/FG Defendants contend that BTS agreed to grant BOA a lien six months earlier, but the evidence does not support them. Alan Heitmann sent an email to Bank of America on June 24, 2015, that attached a guaranty supplement. But contrary to the BL/FG Defendants' characterization, this is not evidence BTS and BOA entered into a guaranty supplement on that date. There is no record BOA ever countersigned, responded, or otherwise acknowledged its receipt. Nor is there any record of BOA acknowledging BTS's desire to grant the lien until January 6, 2016 – the week prior to doing so. That said, Mr. Heitmann's email provides a justification for the granting the

lien other than an intent to defraud Eddystone. It therefore creates a factual dispute that also precludes a grant of summary judgment to Eddystone on the lien defense.

22.     The Court makes no judgment as to whether BOA maintains a security interest in BTS assets. This is not an action seeking voidance of BOA's lien, but of BTS's transfer of property to the BL/FG Defendants. Thus, if at trial the Court determines the lien is not valid under the PUFTA, that only means the lien is not a viable defense to Eddystone's fraudulent transfer claims. BOA's rights would be unaffected.

23.     Finally, because the Court has determined there is a genuine dispute regarding the validity of the BOA lien, the Court does not reach the question of whether the lien encumbered the BTS property for purposes of PUFTA. Nor does the Court reach the question of whether there was an implied contract, which would be one form of fraudulent transfer, but not the only type. This claim is therefore not appropriate for summary judgment resolution.

### C.     Complaint Count III – Constructive Fraudulent Transfer

24.     Constructive fraudulent transfer under PUFTA requires the debtor (a) did not receive "reasonably equivalent value" for the transfer and (b) either (i) had unreasonably small assets for its business or transaction or (ii) would incur debts beyond the debtor's ability to pay when they came due. See 12 Pa. Cons. Stat. §5104(a)(2).

25.     Eddystone relies on the expert testimony of Marc Sherman to create fact issues regarding BTS's insolvency, asset transfers, and value of consideration. Without

his testimony, Eddystone's claim fails. The BL/FG Defendants' motion for summary judgment rests on their <u>Daubert</u> motion challenging Mr. Sherman's opinion on these issues. But the Court has denied that motion and will accept Mr. Sherman's testimony. Accordingly, this claim should proceed to trial, and the BL/FG Defendants concede as much.

### D.     Complaint Count IV - Breach Of Fiduciary Duties Of Care And Loyalty

26.     The BL/FG Defendants ask the Court to decide the issue of whether Pennsylvania or Louisiana law governs this claim, even though, on four prior occasions, the Court has held that Pennsylvania law applies. This time, they reframe the issue as one that decides not which law to apply, but which choice-of-law rule applies and point to cases that have not applied law of the case in some circumstances. (ECF No. 495-1 at 43.) In this case, though, they have briefed which law should apply several times, and each time the Court has held that Pennsylvania law applies. Their desire to advance a new argument does not provide them an opportunity to relitigate the issue. And they have not explained how the Court made a clear error or how manifest injustice would result from applying Pennsylvania law.

27.     The Pennsylvania Supreme Court has not decided whether an insolvent corporation owes a duty to the creditors of the corporation. "In the absence of a controlling opinion from a state's highest court on an issue of state law," federal courts sitting in diversity "predict how that court would decide the issue." <u>Pac. Emp. Ins. Co. v.</u>

Glob. Reinsurance Corp. of Am., 693 F.3d 417, 433 (3d Cir. 2012). Other courts have predicted that Pennsylvania would impose such a duty, and this Court finds their reasoning persuasive (if not controlling in the case of the Third Circuit's prediction). When a corporation is insolvent, corporate directors and officers owe a fiduciary duty to the creditors of the corporation. See, e.g. In re Lemington Home for Aged, 659 F.3d 282, 290 (3d Cir. 2011); Travelers Cas. & Sur. Co. v. Irex Corp., No. 02-CV-2142, 2002 WL 32351176, at *3 (E.D. Pa. May 31, 2002). This fiduciary relationship applies to insolvent limited liability companies like BTS. See Hipple v. Hipple, No. CV 12-1256, 2016 WL 320216, at *12 (E.D. Pa. Jan. 27, 2016). Control persons of a fiduciary may be liable when they cause that fiduciary to breach its duties. See In re Covenant Partners, L.P., No. AP 16-226, 2017 WL 838637, at *3 (Bankr. E.D. Pa. Mar. 2, 2017); Com., ex rel. Corbett v. Citizens All. for Better Neighborhoods, Inc., 983 A.2d 1274, 1281 (Pa. Commw. Ct. 2009).

28.     There is a dispute about whether the FG entities dominated the affairs of BL to the extent they could be considered control persons. Even if the Court could determine the FG entities were control persons of BTS at the time of the asset transfers, whether the transfers were for inadequate consideration, and thus a breach of their fiduciary duty, is also disputed. These issues require a trial.

###     E.     Counterclaim IV – Breach of Contract – Custody Transfer Meters

29.     The BL/FG Defendants assert this and several other Counterclaims conditionally upon a finding of alter ego liability, as Federal Rule of Civil Procedure 18(b)

permits them to do. But Eddystone contends that they cannot assert the claims because, if the Court finds the BL/FG Defendants to be the alter egos of BTS, that finding necessarily implies they acted with fraudulent intent, and those with unclean hands cannot benefit from the exercise of the Court's equitable powers. That argument goes too far, though, at this last this stage of the case. A finding of alter ego liability "does not require proof of actual fraud as a prerequisite for piercing the corporate veil." Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003). It is not yet clear whether the BL/FG Defendants acted with the fraudulent intent or whether there might be some other basis to pierce the veil. At a minimum, if a non-fraudulent basis exists, then the unclean hands doctrine might not apply.

30.     The RSA elects New York law to govern, and Pennsylvania honors such provisions. See Kramont Operating P'ship., L.P., v. Levy, No. 07-1430, 2008 WL 2405724, at *5 (E.D. Pa. June 12, 2008).

31.     The RSA provides that ""all custodial cargo transfer operations at the Eddystone Rail Facilities will be performed solely by custody transfer meter and not by hand innage and/or ullage measurements of shore tanks and/or barges." (ECF 507-4 at 23.) Emails between Joe Natale and Steve Turnbull show that BTS waived the initial installation of those meters, but there remains a genuine dispute as to the term and scope of that waiver. Given that dispute, there remains a possibility that, at some point, Eddystone's failure to install the meters violated the RSA.

32.     Eddystone cannot use Section 12.1 of the RSA to avoid liability. That provision provides, "Owner shall not be liable to Customer for any delay, damage, loss or consequential loss resulting from any cause while Owner is in possession or control of Customer's Crude Petroleum." But the breach did not occur when Eddystone transferred the oil; it occurred when Eddystone failed to install the CT meters. Because that failure did not occur while Eddystone had BTS's oil, Section 12.1 does not apply.

## IV.     CLAIMS ON WHICH SUMMARY JUDGMENT IS GRANTED

### A.     Counterclaim I - Tortious Interference With Contract

33.     The parties agree that Pennsylvania law governs this claim. Under Pennsylvania law, the elements of tortious interference with contract are "(1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct." Empire Trucking Co. v. Reading Anthracite Coal Co., 71 A.3d 923, 933 (Pa. Super. 2013) (citations omitted).

34.     The BTS PSA is a contract between Bridger Logistics, and Jamex.

35.     Although the BL/FG Defendants' assert that "there is ample evidence from which the factfinder can determine that [Eddystone] intended to interfere" (ECF No. 509 at 43), they do not cite any such evidence. The single email that the BL/FG Defendants cite concerning the parties' negotiations about indemnification does not demonstrate

collusion; even read in the light most favorable to the BL/FG Defendants, it reveals nothing more than arms'-length negotiations about indemnity.

36.     Even if the BL/FG Defendants could show Eddystone intended to interfere with the BTS PSA, their claim would still fail because they have not shown that Eddystone's conduct was improper. They fall back on conclusory language that Eddystone "engaged in deceitful conduct ... to concoct a conclusive settlement" to assert that Eddystone's conduct was improper. (Id. at 45.) But the only fact supporting that argument is the amount of the settlement award, and the reduction in liability that Jamex received as a result. The BL/FG Defendants provide no evidence that the settlement was not an arm's-length agreement. Even when viewed in the light most favorable to the BL/FG Defendants, the Court cannot conclude that Eddystone's conduct was improper just because it entered into a settlement agreement that included terms favorable to Jamex.

37.     Finally, although the BL/FG Defendants repeat the mantra that the settlement agreement caused Jamex to breach its indemnity agreement, nothing in the record supports that causal relationship. It is not obvious from the settlement agreement itself, and the Court cannot make a logical leap without some evidence to support it.

## B.     Counterclaim II - Fraudulent Inducement

38.     New York law governs the RSA. Under New York law, fraudulent inducement requires a plaintiff to show a party (i) made a "material false representation," (ii) "intended to defraud," (iii) that plaintiff "reasonably relied upon," and (iv) "suffered damage as a

result." <u>Baker-Rhett v. Aspiro AB</u>, 324 F. Supp.3d 407, 418–19 (S.D.N.Y. 2018) (citing <u>Wall v. CSX Transp., Inc.</u>, 471 F.3d 410, 415–16 (2d Cir. 2006)).

39.     The BL/FG Defendants' claims about the four-hour window fail because they rest on publicly-available information that Eddystone had no duty to disclose.

        a.     The BL/FG Defendants' claim about the SEPTA Window does not rely on a material false representation, but on a material omission. Under New York law, in the context of a business transaction, a duty to disclose arises when (1) one party possesses superior knowledge, (2) not readily available to the other, (3) and knows that the other is acting on the basis of mistaken knowledge. <u>See TVT Recs. v. Island Def Jam Music Grp.</u>, 412 F.3d 82, 91 (2d Cir. 2005).

        b.     The BL/FG Defendants' claim fails on the second element. The SEPTA Window, a restriction on a segment of track approximately six miles outside of the Eddystone facility, is publicly available information that a public authority imposed. At the time the Parties entered the RSA, that Window had existed for over 25 years. Anyone performing diligence on the rail lines approaching the Eddystone Facility would be aware of its existence, and the BL/FG Defendants provide no reason why BTS, a sophisticated logistics company engaged in cross-country transportation of oil, did not know about it.

40.     The BL/FG Defendants' claims about the granite pinnacle fail for two reasons: many of Eddystone's representations were not false; and Eddystone corrected any that were so that the BL/FG Defendants' reliance on them was unreasonable.

a.      Eddystone's representation in a slide presentation to BTS on February 3, 2013, that referenced "existing marine facilities with 34 feet of authorized depth at berths" (ECF No. 509-5 at 17) was not false. Eddystone offers evidence that "authorized depth is the maximum depth that you're allowed to dredge to, according to the Army Corps of Engineers." (ECF No. 526-4, 7:17-7:20.) The BL/FG Defendants have no contrary evidence disputing this definition or any evidence disputing that Eddystone had 34 feet of authorized depth at berths. Thus, the statement was not false, even viewing the evidence in the light most favorable to the BL/FG Defendants.

b.      On November 20, 2013, Eddystone told BTS that it would "have 31' draft." (ECF No. 491-6 at 2.) Assuming that statement was one of fact, and not just a future projection, it might have led BTS to rely on it. But on December 19, 2013, Eddystone notified BTS that there might be "some high spots of ledge rock that cannot be removed." (ECF No. 491-10 at 3.) Four days later BTS acknowledged this fact in an internal email, "[d]raft issue- Single pinnacle mid-channel (~27-8" max draft, vs. >= 31' planned)." (ECF No. 491-11 at 2.) At that point, BTS could not rely on representations about 31 feet of channel depth; it knew better. But the conduct giving rise to the claim—chartering the Petrochem Producer in January 2014—came later. At that point, if BTS was relying on Eddystone's representation about 31 feet, its reliance was unreasonable.

41.    The BL/FG Defendants cannot rely on Eddystone's promises about installation of custody transfer meters to support their fraudulent inducement claim.

Although Eddystone made representations about the installation of custody transfer meters, BTS waived its right to insist that Eddystone install them at the outset, and the parties agree that Eddystone eventually installed them. After the waiver, Eddystone responded to at least twelve emails between August 2014 and September 2015 asking about the installation or operational status of the custody transfer meters. Nothing in Eddystone's responses was false; they just show that BTS was unhappy with the pace of installation. Also, no evidence suggests that Eddystone intended to defraud BTS. The BL/FG Defendants' have not raised a triable issue of fact on this claim.

### C.    Counterclaim III - Negligent Misrepresentation

42.    To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012) (citing Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir.2000)).

43.    "A special relationship may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" Mandarin

Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 180 (2011). An "arm's length transaction" between "sophisticated parties ... [ordinarily] precludes a finding of a special relationship" Basis Pac-Rim Opportunity Fund (Master) v. TCW Asset Mgt. Co., 124 A.D.3d 538, 539 (1st Dep't 2015), and "alleged reliance on [a] defendant's superior knowledge and expertise in connection with its [business] ignores the reality that  ... parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities [] do not give rise to fiduciary duties." Sebastian Holdings, Inc. v. Deutsche Bank AG, 78 A.D.3d 446, 447, 912 N.Y.S.2d 13 (1st Dep't 2010). Summary judgment on the negligent misrepresentation claim is appropriate where no triable issue of fact as to the "special relationship" element exists. See St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd., 976 F. Supp. 198, 204 (S.D.N.Y. 1996) (citations omitted).

44.     Eddystone did not have unique or specialized expertise. It just had more information than BTS about operational aspects of Eddystone's facility. That happens in many (if not most) business transactions, and it does not give rise to a special relationship.

45.     The cases on which the BL/FG Defendants rely are distinguishable. In Vanderbilt Minerals, LLC v. Sub-Technical, Inc., 2019 WL 4964466, at *7 (N.D.N.Y. Oct. 8, 2019), the court found specialized knowledge where the defendant acknowledged that individuals who work in the mining business are often unfamiliar with the process of polyurethane grouting, but that the defendant's principals had over seventy years of polyurethane grouting experience. In Polycast Tech. Corp. v. Uniroyal, Inc., 792 F. Supp.

244, 269 (S.D.N.Y. 1992), the defendant vouched for the accuracy of its earnings statements, even assuring the plaintiff that higher projections were more accurate than newer, lower projections. In both cases, the defendant had unique knowledge that its counterparty could not hope to acquire. The BL/FG Defendants do not offer any such evidence about Eddystone. Its principals did not have long experience in a highly specialized field, nor did they vouch for information uniquely in its possession.

46.     Finally, in <u>Morris v. Flaig</u>, 2005 WL 8157008, at *7-8 (E.D.N.Y. July 29, 2005), the court did not apply the "special relationship" test for negligent misrepresentation; it relied on a landlord-tenant doctrine about morals and good conscience that does not apply in sophisticated business transactions.

47.     Because the BL/FG Defendants have not established a genuine dispute of material fact as to the existence of a "special relationship," the Court will grant summary judgment on those claims. Even if the BL/FG Defendants could establish a special relationship, their claims based on the SEPTA Window and the granite pinnacle would fail for the same reason that their fraudulent inducement claims on those issues fail.

**D.     Counterclaim IV – Breach Of Contract – 8-Hour Window**

48.     The RSA does not obligate Eddystone to provide an 8-hour loading window. Even if it did, the BL/FG Defendants point to no facts that suggest Eddystone was responsible for the SEPTA Window's restrictions.

49.     First, what the BL/FG Defendants refer to as the "8-hour loading window," the RSA defines as the "Permitted Train Arrival Period." Per the RSA, Eddystone had to provide a Permitted Train Arrival Period – an 8-hour window in which "[BTS] shall cause … Trains to be delivered to the Eddystone Rail Facilities." (ECF No. 505-7 at 22.) The BL/FG Defendants have submitted no evidence that Eddystone did not provide an 8-hour window during which BTS could deliver trains to the Eddystone facility. Rather, they assert "the SEPTA Window … allowed only four hours for trains to access the Facility" and "in breach of the RSA, Eddystone never resolved the SEPTA Window." But nothing in the RSA assigned to Eddystone the obligation to reconcile restrictions that a public authority placed on a section of track six miles outside of the facility. The RSA required Eddystone to make its facility available for arrivals, not to resolve every dispatch-related problem along the route (even parts of the route close to the facility).

50.     The BL/FG Defendants' additional arguments on this claim are immaterial. They note "due diligence into rail access to a facility is critical before opening a terminal" (ECF No. 509 at 26), but the best they can show is that BTS failed to conduct due diligence before contracting with a rail terminal. And while there may be a genuine dispute as to whether the Amtrak route was a viable alternative to the SEPTA route, that too is not a material factual dispute because it does not bear on whether Eddystone provided an 8-hour window for BTS's trains to arrive at the Eddystone facility.

E.      **Counterclaim V - Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

51.     New York law implies a covenant of good faith and fair dealing in every contract. See 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (quote omitted). "While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. (quote omitted). "In some cases, the covenant may even require affirmative steps to cooperate in achieving the contract's objective." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir.2007) (quotes omitted). Finally, the "implied covenant ... does not require the promisor to take actions contrary to his own economic interest." Bank of New York v. Sasson, 786 F. Supp. 349, 354 (S.D.N.Y. 1992).

52.     Unlike BTS's financing agreement with Merrill Lynch, the Carlyle Tripartite Agreement includes no statement that crude oil in Eddystone's possession was "subject to the rights of the Facility under the [RSA]" or that the agreement did not replace "replace[] or supersede[]" Eddystone's rights "in the [RSA]." This difference in the agreements subjected Eddystone to the risk that the Carlyle Tripartite Agreement would have subordinated Eddystone's rights in the crude in its possession. Because the implied

covenant of good faith and fair dealing did not require Eddystone to act against its economic interests, Eddystone did not violate the covenant by refusing to sign.

53.     The BL/FG Defendants attempt to survive summary judgment by disputing Eddystone's interpretation of the Carlyle Tripartite Agreement. Their proposed expert, a lawyer and businessman in the commodities trading and financing industry, interprets the Carlyle Tripartite Agreement as one that would not have subordinated Eddystone's lien in the crude oil it possessed. It is not clear that an expert should opine on this issue of contract interpretation. But even if the Court accepts his interpretation, his opinion is beside the point. To establish a lack of good faith, and accordingly a violation of the covenant, the BL/FG Defendants must demonstrate more than that their interpretation of the Carlyle Tripartite Agreement is correct. They have to go a step further and show that it is the **only** possible reading. If Eddystone could reasonably have read the agreement as subordinating its rights, then it had no obligation to agree.

54.     The BL/FG Defendants have no evidence that goes that far. In fact, the plain language of the Carlyle Tripartite Agreement, which references "storage" fees and does not include a specific carveout for Eddystone's rights under the RSA, makes Eddystone's reading reasonable. Because Eddystone could reasonably interpret the Carlyle Tripartite Agreement as harmful to its own interests, the duty of good faith and fair dealing did not obligate Eddystone to sign it.

55.     Although the BL/FG Defendants hint at the idea that Eddystone should have negotiated with Carlyle, they cite no case holding that the breach of duty of good faith and fair dealing imposes such a requirement. Even if it did, there is no evidence that Carlyle would have agreed to revised terms, so the BL/FG Defendants cannot show that Eddystone's supposed failure to negotiate caused the agreement to fall through.

**F.      Counterclaim VI - Rescission**

56.     Under New York law, a plaintiff may obtain rescission—in lieu of actual damages—when a breach of contract is either "material and willful" or "so substantial and fundamental" that it "strongly tend[s] to defeat" the purpose of the contract. See Graham v. James, 144 F.3d 229, 237 (2d Cir. 1998). Because it is an equitable remedy, rescission is available only if damages would not be a "complete and adequate" remedy and "the status quo may be substantially restored" by equitable relief. Rudman v. Cowles Commc'ns, Inc., 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 43, 280 N.E.2d 867, 874 (1972) (emphasis omitted). Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 227 (2d Cir. 2017)

57.     The Court confines its discussion to Eddystone's failure to install custody transfer meters because that is the only breach of contract counterclaim to survive summary judgment. The BL/FG Defendants do not address how Eddystone's failure to install custody transfer meters is a "material and willful" breach, nor how their absence is so substantial that it strongly tends to defeat the purpose of the RSA.

58.     In fact, they contend that "the Facility's capability to transload sufficient oil is the basic assumption on which the contract is made," but provide no evidence that custody transfer meters substantially impact the Facility's capability to transload oil. Therefore, because it is undisputed that Eddystone's failure to install custody transfer meters did not defeat the purpose of the RSA, rescission is unavailable.

## V.     JAMES HELLER OPINIONS

59.     The BL/FG Defendants designated James Heller as an expert on the operational impact of the SEPTA Window and the Granite Pinnacle. Mr. Heller's opinion is moot because the Court is granting summary judgment on those claims.

For the foregoing reasons, it is **ORDERED** as follows:

1.     Eddystone Rail Company's Motion For Summary Judgment On Amended Counterclaims (ECF No. 491) is **GRANTED IN PART AND DENIED IN PART**, as follows;

       a.     Summary Judgment is **DENIED** with respect to the breach of contract stemming from the custody transfer meters alleged in Counterclaim IV;

       b.     Summary Judgment is **GRANTED** in favor of Eddystone and against the BL/FG Defendants on Counterclaims I-III, V, and VI;

2.     The BL/FG Defendants' Motion To Dismiss For Lack Of Subject Matter Jurisdiction Or, In The Alternative, For Summary Judgment On All Counts Of Plaintiff's First Amended Complaint (ECF No. 495) is **DENIED**;

3.      Eddystone Rail Company, LLC's Motion For Summary Judgment (ECF No. 512) is **DENIED**; and

4.      Eddystone's      Motion      To      Preclude      The      Testimony      Of Defendants/Counterclaim Plaintiffs' Expert James Heller (ECF No. 489) is **DENIED** as **MOOT**.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
Hon. Joshua D. Wolson
United States District Judge