# Exhibit E

# EXHIBIT 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **EDDYSTONE RAIL COMPANY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 17–cv–00495** |
| | ) | |
| **BRIDGER LOGISTICS, LLC, JULIO RIOS,** | ) | |
| **JEREMY GAMBOA, FERRELLGAS** | ) | |
| **PARTNERS, L.P., and FERRELLGAS L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF EDDYSTONE RAIL COMPANY, LLC'S SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANTS RIOS AND GAMBOA'S FOURTH SET OF
INTERROGATORIES**

Plaintiff Eddystone Rail Company, LLC ("Eddystone") pursuant to Federal Rule of Civil

Procedure 33, and the Court's Order dated October 19, 2018 (Dkt. 238), hereby submits its

Supplemental Responses and Objections to the Fourth Set of Interrogatories of Defendants Julio

Rios ("Rios") and Jeremy Gamboa ("Gamboa") in the above-captioned action ("this

Litigation").

Eddystone has not yet completed its investigation of the facts in this Litigation, its search

for relevant documents, or its preparation for trial. Vispi Jilla was deposed on September 29,

2020 and Julio Rios on October 1, 2020, but Eddystone has not yet been able to review the

transcripts of their testimony. In addition, the parties have not yet exchanged expert reports or

taken expert discovery. These responses and objections to the Interrogatories are based on

information now known to Eddystone, based on discovery obtained to date. Eddystone reserves

1

the right to amend, modify, or supplement its responses as it learns of new information.

## GENERAL OBJECTIONS
## AND OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Eddystone objects to the Interrogatories insofar as they seek to impose on Eddystone obligations that exceed or contradict those imposed by the Federal Rules of Evidence, the Federal Rules of Civil Procedure, and/or the Local Rules of the Eastern District of Pennsylvania. Eddystone will respond in accordance with the applicable rules.

2.     Eddystone objects to the Definition of "Identify" insofar as it requires Eddystone to specify facts that are either already in the possession of Rios and Gamboa, or are not relevant to the claims and defenses in this Litigation.

3.     Eddystone objects to the Definition of "You" insofar as it includes Eddystone and "any of its affiliates." Eddystone's affiliates include a large multinational corporation, Enbridge, Inc., which has many business units other than the transloading facility in Eddystone, Pennsylvania. To the extent an Interrogatory seeks information about an Enbridge entity, employee, or agent unrelated to the events underlying this litigation, Eddystone objects to the request as irrelevant and disproportionate.

4.     Eddystone objects to the Definition of "Communication insofar as it includes any "exchange or transmission of words, ideas, data, or information …" including "evidencing verbal communication." Eddystone will respond to the Interrogatories based on information that is reasonably accessible. However, Eddystone will not undertake the overly burdensome task of interrogating all of its personnel about every verbal conversation over the past five years that might be responsive to the Interrogatories.

5.     Eddystone objects that the Instructions, including Instruction 10, require Eddystone to state objections in a manner different from what is required in Rule 33.

2

Eddystone will state its objections as required by Rule 33.

6.      Eddystone objects to Rios and Gamboa's purporting to characterize these interrogatories as served on behalf of Gamboa alone. By their express terms, the interrogatories seek information on behalf of both Rios and Gamboa. Eddystone will treat these interrogatories as having been served on behalf of both Rios and Gamboa, including for the purposes of the limits on interrogatories under the Rules of Civil Procedure.

### SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 3:** State the precise date you allege BTS became insolvent, and identify the solvency test you are using to measure BTS' solvency as of that date (*e.g.*, the "balance sheet test;" the "cash flow test;" or the "adequate capital test").

**RESPONSE 3:** Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein. Eddystone also objects that this is a contention interrogatory regarding material within Defendant's knowledge. Eddystone further objects that this Interrogatory is premature, because Eddystone's investigation and analysis of the facts is ongoing, and Eddystone reserves the right to update and supplement its response. Accordingly, Eddystone will update and supplement its response at the end of expert discovery, in accordance with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 3:**  Without waiving and subject to its previously-asserted objections, Eddystone supplements its response as follows:

The solvency of BTS is a subject of expert testimony that will be addressed more fully by Eddystone expert Marc Sherman.  Nonetheless, based on the information currently known to it, Eddystone states that at a minimum BTS became cash-flow insolvent very shortly after Ferrellgas began diverting revenues away from it following Ferrellgas' acquisition Bridger

Logistics.

\* \* \* \* \* \* \*

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery.  Eddystone further states that the parties have produced an enormous volume of documents in this litigation. Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

**INTERROGATORY NO. 4:** In connection with Count I of your Complaint, to the extent you claim that Rios "completely dominated BTS in all aspects of its business," identify (1) each action taken by Rios to "dominate" BTS; (2) the date on which such action occurred; and (3) the bates-label of all documents produced reflecting the same.

**RESPONSE 4:** Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein. Eddystone also objects to this Interrogatory in that the request for "each action taken by Rios to 'dominate' BTS" and "the bates-label of all documents produced reflecting the same" exceeds the proper scope of an interrogatory and is unreasonably burdensome. Eddystone is not required to describe in detail each and every action and document

4

over a three-year period that relates to the manner in which Defendants were operating BTS. In addition to these objections, Eddystone objects that the information requested is within Defendants' knowledge. Eddystone further objects that this Interrogatory is premature, because Eddystone's investigation of the facts is ongoing, and Eddystone reserves the right to update and supplement its response. Accordingly, Eddystone will update and supplement its response at the end of expert discovery, in accordance with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 4:**  Without waiving and subject to its previously-asserted objections, Eddystone supplements its response as follows:

In his role as a senior executive of Bridger, LLC, Bridger Logistics, LLC, and Ferrellgas, Rios was able to completely dominate BTS.  Rios's and the other Defendants' total domination, control, and manipulation of BTS is evidenced by the fact that, without providing BTS reasonable compensation in return, they deprived it of revenues and assets after Ferrellgas purchased Bridger Logistics in June 2015. Rios played a significant role in this stripping of BTS as well as in BTS' subsequent sale, which was undertaken to shield Rios and other Defendants from liability.

Additional facts supporting the conclusion that Rios completely dominated BTS are as follows:

Pre-Acquisition Period

Prior to Ferrellgas's acquisition of Bridger Logistics on June 24, 2015 ("Acquisition"), Bridger, LLC operated its marketing and logistics business as a single, coordinated enterprise. Bridger Marketing, LLC ("Marketing") was a wholly-owned subsidiary of Bridger, LLC and handled the marketing side of the business (i.e., buying and selling crude).  Bridger Logistics, LLC ("Logistics") was also a wholly-owned subsidiary of Bridger, LLC.  Logistics was a holding company and 100% equity owner of several operating subsidiaries, including Bridger Transfer Services, LLC ("BTS").  Through these subsidiaries, Logistics handled the logistics side of the Bridger business (i.e., facilitating the shipment of crude).  James Ballengee Deposition at 22:8-25.

5

Bridger Logistics was the sole member and 100% equity owner of BTS at all relevant times after July 1, 2013.  Notices of Change of Members of BTS, BLFG_EDPA0310351-56; Bridger Consolidated Financial Statements, ERCEDPA00176402-26.  Rios and Gamboa "ran the Logistics side of Bridger" and in June 2015 "took the Logistics business to Ferrellgas."  James Ballengee Deposition at 23:15-19.  Prior to the Acquisition, Rios was also President and Chief Executive Officer of Bridger, LLC.  Confidential Credit Presentation, ERCEDPA00176427-442.

A substantial portion of Logistics' business involved providing logistics services to Marketing through Logistics' operating subsidiaries.  "[M]arketing, as the purchaser and seller of the crude, utilized some of the services of Bridger Logistics subsidiaries to physically move the crude . . . ."  Patrick Kelly Deposition at 24:22-25:1.  Eddystone alleges that this business was conducted without regard to corporate entities, or, in the alternative, through a series of implied contracts.  Bridger, LLC's corporate policy required affiliated-party transactions to be conducted at arms-length through written contracts.  April 8, 2015 Kelly Email and Bridger LLC & Subsidiaries Risk Management Policy, RG_EDPA0083763-73; James Ballengee Deposition at 25:11-27:17.  In some instances, Logistics subsidiaries such as BTS had written contracts with Marketing.  For example, BTS had written contracts with Marketing (then Bridger Trading) under which BTS provided crude injection station capacity to Marketing.  February 1, 2013 Terminal Throughput Agreement, BLFG_EDPA0159157-64; January 4, 2012 Terminal Throughput Agreement, BLFG-JMX_EDPA0002213-22.

In other instances, BTS and Marketing conducted business without written agreements.  In situations where there was not a written agreement between BTS and Marketing, Bridger, LLC's corporate policy required BTS to charge fees to Marketing based on intercompany fee schedules.  Patrick Kelly Deposition at 141:18-145:19, 152:21-155:20; January 29, 2015 Kelly Email and

6

Attachment, RG_EDPA0231492-95.  These "transfer prices" were purportedly based on market

data involving analogous third-party transactions.  Patrick Kelly Deposition at 150:15-151:15.

The former Chief Financial Officer of Bridger, LLC, Patrick Kelly, testified that BTS

supported Marketing's crude oil supply agreement with Monroe Energy, LLC ("COSA") through

an unwritten, implied contract related to the Eddystone transloading facility in Eddystone, PA

("Facility").  BTS had acquired rail transloading capacity at the Facility through a Rail Terminal

Facilities Agreement ("RSA") between Eddystone Rail Company, LLC ("ERC" or "Eddystone")

and BTS.  Bridger, LLC's intercompany rate sheets specified that ERC charged BTS a transloading

fee of $2.25/bbl and a deficiency charge of $1.75/bbl.  January 29, 2015 Kelly Email and

Attachment, RG_EDPA0231492-95 (Exs. 823 and 824); Patrick Kelly Deposition at 145:24-

150:14.  They further stated that BTS should charge Marketing $2.75/bbl to transload crude at

Eddystone.  January 29, 2015 Kelly Email and Attachment, RG_EDPA0231492-95 (Exs. 823 and

824).  The sheets further listed a deficiency fee to be charged to Marketing.  Initially, this fee was

"to be determined" but by January 2015, the fee was set at $1.75/bbl, which matched the deficiency

charge assessed to BTS under the RSA.  *Id.*  Moreover, the rate sheets show that the transloading

fee charged to Marketing was reduced to $2.55/bbl starting in January 2015.  *Id.*  Finally, the rate

sheets also contained information regarding rates that BTS charged Marketing for using certain

upstream rail loading facilities in North Dakota.

Bridger, LLC's accounting records show that Marketing funded BTS's bank account so that

BTS could pay monthly transloading charges to Eddystone under the RSA.  *See* Accounting

Records BLFG_EDPA0046411 and RG_EDPA0231495, Invoice, JAMEX_EDPA00049108.  The

accounting records also show that BTS charged and Marketing paid for Eddystone transloading

services in the amounts stated in the rate sheets.  *See* Accounting Records BLFG_EDPA0046411

and RG_EDPA0231495, Invoice, JAMEX_EDPA00049108.  Accounting records similarly show Marketing funding BTS at the rates set forth in the rate sheets so that BTS could pay loading charges in North Dakota.  BLFG_EDPA2361875, RG_EDPA0231495, BLFG_EDPA2360447, BLFG_EDPA2361325, BLFG_EDPA2110853.  However, contrary to Bridger, LLC's rate sheet policy, the accounting records do not appear to indicate that Marketing provided funds to BTS to cover deficiency charges that BTS was required to pay Eddystone, even though Marketing had an implied obligation to make such payments.

<u>Post-Acquisition Period</u>

Through the Acquisition, Logistics became a wholly-owned subsidiary of Ferrellgas, L.P., but Logistics' operating subsidiaries, including BTS, remained wholly-owned subsidiaries of Logistics.  July 21, 2015 Knapp Email and Organization Chart, BLFG_EDPA2394565-72.  After the Acquisition, Marketing became a separate business and was renamed Jamex Marketing, LLC ("Jamex Marketing").  James Ballengee Deposition at 18.

Ferrellgas, Inc. supplied BTS with employees for BTS' operations.  July 21, 2015 Knapp Email and Organization Chart, BLFG_EDPA2394565-72, -69.  Rios and Gamboa were CEO and COO of Logistics, respectively, at this time.  October 12, 2015 Rios Email, RG_EDPA0118803-07; March 3, 2017 Gamboa Declaration.  Rios also became Executive Vice Presidents of Ferrellgas Partners, L.P., and Gamboa became Senior Vice-President and later Executive Vice-President of the same.  October 12, 2015 Rios Email, RG EDPA0118803-07; March 3, 2017 Gamboa Declaration.  Evidencing his belief that he ran Bridger, Rios stated on October 12, 2015 that "yes you are right my role it is strategic, but I have to get the house in order at the same time.  **Bridger is my company and my responsibility** . . . ."  October 12, 2015 Rios Email, RG EDPA0118803-07 (emphasis added).

8

Logistics and its subsidiaries continued to conduct a substantial amount of business with Marketing (renamed Jamex Marketing). For example, BTS continued to support the crude oil supply arrangement between Jamex and Monroe. The COSA, however, was split into three agreements: (1) an Amended COSA between Monroe and Marketing, dated May 26, 2015 ("Amended COSA"); (2) a Transportation and Logistics Services Agreement between Monroe and Logistics, dated May 26, 2015 ("Monroe TLA"); and a Transportation and Logistics Agreement between Logistics and Marketing, dated June 24 2015 ("Marketing TLA"). *See* MONROE 0000104-205, and BLFG_EDPA0019650-72.

As required by the original COSA, under the new arrangement Jamex Marketing continued to be obligated to supply and Monroe obligated to purchase at least 1,950,000 bbls per month (or approximately 65 kb/d) of Bakken crude oil, although the price paid by Monroe for the Bakken crude oil was reduced by $0.25/barrel. Amended COSA, ¶2.1(b) and ¶4.1(c), MONROE 0000104-205, -164, -169. This equates to a cost reduction of approximately $5.9 million per year, to the benefit of Monroe. The second major modification to the original contract was that Monroe was entitled to reduce its payments to Jamex Marketing for all payments made by Monroe to Bridger Logistics for transportation services rendered. *Id.* at   Amended COSA, ¶7.1, MONROE 0000104-205, -171.

Moreover, whereas, under the COSA, Marketing allocated a portion of Monroe's payments to Logistics' subsidiaries, now Monroe paid Logistics directly for logistics services pursuant to the Monroe TLA. Monroe TLA, ¶ 7.2, MONROE 0000104-205, -112. And under the Marketing TLA, Marketing was obligated to make deficiency payments to Logistics if Marketing did not ship an average of at least 35,000 bbls/day to Monroe. Marketing TLA, ¶ 23, BLFG_EDPA0019650-72, -62.

After the restructuring of the COSA and Acquisition, Marketing's obligations under its implied contracts with BTS were assumed by Logistics.  This is reflected in Logistics' post-acquisition accounting records.  Those records show that amounts due to ERC under the RSA and the North Dakota rail loading contracts were paid directly to ERC by Logistics or Logistics subsidiaries other than BTS until the time that BTS was sold to Jamex Transfer Holdings, LLC.  April 2, 2018 Eddystone Responses And Objections to Rios And Gamboa's First Set Of Interrogatories at 6-8.  In failing to continue making payments to ERC through the remainder of the RSA term, Logistics abrogated its implied contract with BTS, resulting in at least $169 million in damages to Eddystone, plus prejudgment interest.  Moreover, Defendants' revenue and asset stripping scheme stripped BTS' entire business, resulting in an  intentional fraudulent transfer of at least $200 million from BTS to Logistics.

Several Ferrellgas and Bridger employees and attorneys participated in the fraudulent transfers, including but not limited to, Rios, Gamboa, Todd Soiefer, Steve Wambold, Trent Hampton, Patrick Knapp, Andy Lehman and John Goodgame.  Ferrellgas and Logistics, through Rios and Gamboa, totally dominated, controlled and manipulated BTS starting no later than June 2015.  The fraudulent transfers described in Supplemental Response 3 (fraudulent transfers of BTS revenues and assets, abrogation of Logistics' implied agreement with BTS, and the sale of a denuded BTS for $10), were done to benefit Ferrellgas, Logistics, Rios and Gamboa and to erect a liability shield against ERC's inevitable claims for breach of the RSA.  The specific benefits to Rios and Gamboa are detailed in Eddystone's supplemental response to Interrogatory 3 to Rios and Gamboa's Second Set of Interrogatories.

Starting in July 2015, rail throughput revenue ("Rail Throughput Revenue") that at one time had flowed from Marketing to BTS, and should have been paid by Bridger Logistics to BTS,

started being redirected to two non-existent Bridger entities, Bridger Rail Services, LLC ("Rail Services") and Bridger Pipeline Services, LLC ("Pipeline Services").  Farmer Deposition at 117:7-12 (Rail Services does not exist); 154:20-155:6 (Pipeline Services does not exist).  As noted above, BTS at this time had rail throughput agreements involving rail terminals at Berthold, Dakota Plains/New Town, and Van Hook, as well as access to the Eddystone facility under RSA.  Under those agreements, BTS supported the Monroe shipping arrangement by providing Jamex Marketing with access to the rail terminals and to Eddystone's transfer facility.

It appears that in June 2015, Bridger and Ferrellgas officers falsely created the impression that the RSA and those three other contracts were being assigned to the fake entities, Rail Services and Pipeline Services, and that the latter would be allocated Rail Throughput Revenue for use of the four facilities. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  On the morning of June 18, 2015, Jilla sent the Rail Shipping Chart to Rios' secretary, Michelle DeWaal.  June 19, 2015 Jilla Email and Attachment, BLFG_EDPA0735007-08.  After discussing the chart with Rios and Gamboa, on June 19, 2015, Jilla circulated a revised chart ("Rail Services Chart") showing that the Rail Throughput Revenue would flow to the non-existent Rail Services, and pipeline management revenue would flow to the

non-existent Pipeline Services, not BTS.  June 19, 2015 Jilla Email and Chart, BLFG_EDPA
2381102-04.

Bridger's accountants were unaware at the time of this reallocation that Rail Services and
Pipeline Services did not actually exist.  Jonna Seline, who helped direct the accountants, testified
that she did not know until the day before her deposition that the four rail loading/unloading
agreements had not in fact been assigned.  Jonna Seline Testimony at 80:17-81:5.  She also
testified that it was BTS, and not Rail Services, that performed under the contracts and earned the
Rail Throughput Revenue, but that BTS did not record such revenue.  Id. at 97:11-21, 100:14-21.
Similarly, Ferrellgas' Assistant Controller, accountant Michael Farmer, testified that he had
believed that Rail Services was a legal entity until this litigation.  Farmer Deposition at 117:7-12.
Farmer agreed that, because Rail Services was not a legal entity, it could not have earned revenue.
Farmer Deposition at 128:14-19.  Rios', Gamboa's and Jilla's deception of BLFG accountants is
also reflected in BLFG management reports prepared after the Acquisition.  Those reports refer to
Rail Services and Pipeline Services as limited liability companies, apparently because the
accounting staff who prepared the reports believed them to be real companies.  All the while,
however, Rios and Gamboa knew they were not real companies but were instead vehicles they used
to fraudulently transfer revenue from BTS.

In line with the foregoing, accounting records show that beginning July 2015, BTS stopped
recording Rail Throughput Revenue altogether.  Also in July 2015, Rail Services began recording
Rail Throughput Revenue for the first time.  Between July 2015 and December 2016, Rail Services
recorded approximately $90 million in Rail Throughput Revenue from Jamex Marketing and
Monroe.  *See* Accounting Records, BLFG_EDPA0046390-408.  Similarly, beginning in June 2015,
the accounting records show that BTS ceased recording similar pipeline management revenue

("Pipeline Management Revenue"). In June 2015, Pipeline Services began recording Pipeline

Management Revenue for the first time.  Between June 2015 and December 2016, Bridger Pipeline

Services recorded approximately $1 million in Pipeline Management Revenue. *See* Accounting

Records, BLFG_EDPA0046390 - 408.

Even as BTS lost access to the Rail Throughput Revenue and Pipeline Management

Revenue, it continued to receive a small amount of so-called stations throughput revenue ("Stations

Throughput Fees").  Such revenue represented revenue earned by BTS from owning and operating

pipeline terminals (i.e., injection stations) across the Rockies, Bakken, Gulf Coast and Permian

Basin.  Bridger Summary Confidential Information Memorandum, BLFG_EDPA0140545-595 at

570.  BTS sold its capacity at its injection stations to Marketing and third-party customers.

Even before Ferrellgas purchased Bridger Logistics, Bridger Marketing (later Jamex

Marketing) was hemorrhaging cash in connection with the Amended COSA and Marketing TLA

due to the unfavorable spread between the West Texas Intermediate crude ("WTI") price and the

Brent crude price.  The WTI price is a surrogate for Bakken crude which is sourced from North

Dakota and which Bridger shipped by rail to Eddystone for transloading and delivery to Monroe.

The Brent price is a surrogate for the price of West African crude ("WAF"), a type of crude that

Monroe could use as a substitute for Bakken.  Beginning in 2014 and continuing forward, the

spread between WTI and Brent had become "much narrower".  James Ballengee Deposition at 62-

63.  When the spread was narrow, Bridger Marketing suffered "substantial losses".  *Id.* at 63. In

July 2015, Jamex Marketing lost $7.5 million, over $6 million in August, and about $7.3 million in

September 2015.  *Id.* at 117-119.  These losses were caused by a continuing narrowing of the

Brent-WTI spread.  *Id.* at 119.   The spreads continued to narrow in October and November 2015,

and the losses continued to mount in those months.  *Id.* at 119.

Bridger Logistics and Ferrellgas were aware throughout the period leading up to and after the Acquisition that Bridger Marketing (Jamex Marketing after the Acquisition) was losing money. In May 2015, Ferrellgas received a report from Grant Thornton noting Bridger Marketing's losses. May 21, 2015 Grant Thornton Report, BLFG_EDPA0299508-78.  After the Acquisition, in late August 2015, Soiefer sent an email to Rios stating that he had spoken with Jamex Marketing's James Ballengee, who had asked for Soiefer's help in getting additional financing.  August 29, 2015 Soiefer Email, RG_EDPA0053060.  Soiefer noted that Jamex Marketing was losing $3-$4 million per month at the time.  *Id.*   Additionally, it appears based on handwritten notes of Rios, that Rios had a meeting in October 12, 2025 with Soiefer, Gamboa, and others regarding Monroe, and the spread between Brent and WTI prices – the source for Jamex Marketing's consistent losses. Rios Handwritten Notes, RG_EDPA0279213, -36-37; James Ballengee Deposition at 130-31.

By late fall 2015, Bridger and Ferrellgas understood that Jamex Marketing was in deep trouble.  Gamboa noted in an email to Rios and Soiefer that "If we do nothing: Benefits Monroe [i.e., Monroe is benefitted]; Jamex bankrupt in 12-18 months depending on spreads and FGP stock; Bridger has $70 million ebitda and $41.5 million obligation to ERC".  December 8, 2015 Gamboa Email, BLFG_EDPA2259244-51.  Gamboa also stated that revising the Monroe/Jamex Marketing/Bridger arrangement would enable "us to get some back from [Eddystone] once we threaten or actually stop shipping" through Eddystone.  *Id.*

Because of its losses, in June 2015, Bridger Marketing was already talking to Monroe about revising the Amended COSA, as the contract was unprofitable for it.  James Ballengee Testimony at 123.  One of the possible options was to convert the Amended COSA to a 100% cost plus contract.  *Id.* at 124-25.  Sometime in October 2015, the focus changed and Monroe and Jamex Marketing began discussing substituting WAF crude for Bakken crude, a step that would have

rendered continued use of the Eddystone facility unnecessary.  *Id.* at 121, 130-31.  At his

deposition, Ballengee testified that in October-November 2015, Jamex Marketing began discussing

with Monroe the possibility of replacing the Bakken crude under the Amended COSA with WAF

crude.  *Id.* at 121.  During this time, Ballengee made a number of presentations to Monroe.  *Id.* at

121.  It was the case if the Amended COSA was not amended, Jamex Marketing would go

bankrupt in 12-18 months, and Ballengee conveyed this to Monroe.  *Id.* at 122.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  20150922 Soiefer Email (emphasis added).  By December, Bridger and

Ferrellgas officials began contemplating intentionally defaulting on the RSA and thinking of ways

to strip BTS of its remaining assets.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  Todd Soiefer Deposition at 291:6-294:2.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████

    At the time that Defendants were considering and later implementing their plan to strip

BTS, they were aware that they were engaging in fraudulent transfers. ████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████

At the time it was planning to sell a denuded BTS to Jamex, Bridger engaged in discussions with Monroe and Jamex Marketing to suspend the parties' existing arrangement.  On December 18, 2015, the parties circulated a term sheet under which all shipments of crude through Eddystone would be suspended.  December 19, 2015 Rios Email and Attachment, BLFG_EDPA2394788-92. On December 22, 2015, the term sheet was amended to also provide that BTS would be stripped of all assets other than the RSA and then sold to Jamex.  January 4, 2016 Hampton Email and Attachment, BLFG_EDPA2394924-27.  Ultimately, the parties entered into three letter agreements dated January 13, 2016 whereby the Monroe shipping arrangement was suspended and the Amended COSA, Logistics TLA and Monroe TLA were amended.  January 13, 2016 Adams Email and Attachments, BLFG_EDPA1752875-901.  Rios signed these agreements on behalf of Bridger Logistics.

In order get the benefit of a suspension of agreements that were causing it massive losses, Jamex Marketing promised to buy BTS from Bridger Logistics.  The sale price was for a cash consideration of $10.00, and was supposed to occur on or soon after February 1, 2016.  January 13, 2016 Adams Email and Letter Agreements, BLFG_EDPA1752875-900; James Ballengee Deposition at 172.  The parties also stipulated in the letter agreements that "BTS, at the time of its sale to Jamex, includes no assets or liabilities other than its rights and obligations under the Eddystone Contract." January 13, 2016 Adams Email and Letter Agreement, BLFG_EDPA1752875-900.  The letter agreements further included an amendment eliminating

17

references to Eddystone from the parties' prior agreements and stating that, if and when deliveries resumed, for any crude supplied to Trainer without using the Eddystone facility, Monroe would get a $.50/barrel discount.  *Id.*  Through these actions and others, it became clear that, should shipments of crude to Monroe resume, those shipments would not go through Eddystone.

Consistent with the foregoing, after signing the letter agreements BTS began transferring additional assets to Bridger Logistics subsidiaries without receiving any consideration in return.

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

On or about January 31, 2016, BTS assigned substantially all of its remaining assets – worth tens of millions of dollars – to Bridger Swan Ranch, LLC and Bridger Terminals LLC.  The assignment agreements are signed by Rios on behalf of BTS and both Bridger Terminals LLC and Bridger Swan Ranch, LLC.  January 31, 2016, BTS Assignments to Bridger Swan Ranch, BLFG_EDPA0005462-77; January 31, 2016 BTS Assignments to Bridger Terminal, BLFG_EDPA2405638-47; October 30, 2014 BTS-Shell Throughput Agreement (Amended), BLFG_EDPA0012203-31.  By assigning these assets, BTS was also deprived of millions of dollars in revenue that it would have otherwise received.  Under a General Warranty Deed dated January 31, 2016, BTS also transferred ownership in the fifteen acres of land upon which the Swan Ranch terminal sat, which had been purchased for $1,726,247 (per journal entries), to another Ferrellgas owned entity, Bridger Real Property, for $10.  January 31, 2016 Metzke Email and Attachments, BLFG_EDPA2406910-21.  ██████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████

On February 22, 2016, Mr. Rios, on behalf of BTS, Logistics and Ferrellgas, signed a "Purchase and Sale Agreement" (the "BTS PSA") for the sale of BTS to Jamex Transfer Holdings, for ten dollars, effective February 1, 2016.  The parties stipulated that BTS "has no assets other than the Eddystone Agreement".  On October 2, 2017, Farmer, Ferrellgas' Assistant Controller who was responsible for overseeing the accounting for the Logistics entities,  stated in an email that BTS had been "'sold' to Jamex **to strategically deal with an Enbridge contract** . . . ."  October 2, 2017 Farmer Email and Attachment, BLFG_EDPA0271621-24 (emphasis added).

Further information responsive to this Interrogatory is referenced in Eddystone's Supplemental Response to Interrogatory no. 4 in the Rios and Gamboa's Second Set of Interrogatories.

* * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery.  Eddystone further states that the parties have produced an enormous volume of documents in this litigation. Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all

testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

**INTERROGATORY NO. 5:** In connection with Count I of your Complaint, to the extent you claim that Gamboa "completely dominated BTS in all aspects of its business," identify (1) each action taken by Gamboa to "dominate" BTS; (2) the date on which such action occurred; and (3) the bates-label of all documents produced reflecting the same.

**RESPONSE 5:** Eddystone incorporates its General Objections and Objections to Definitions and Instructions as if fully set forth herein. Eddystone also objects to this Interrogatory in that the request for "each action taken by Gamboa to 'dominate' BTS" and "the bates-label of all documents produced reflecting the same" exceeds the proper scope of an interrogatory and is unreasonably burdensome. Eddystone is not required to describe in detail each and every action and document over a three-year period that relates to the manner in which Defendants were operating BTS. In addition to these objections, Eddystone objects that the information requested is within Defendants' knowledge. Eddystone further objects that this Interrogatory is premature, because Eddystone's investigation of the facts is ongoing, and Eddystone reserves the right to update and supplement its response. Accordingly, Eddystone will update and supplement its response at the end of expert discovery, in accordance with Rule 33(a)(2).

**SUPPLEMENTAL RESPONSE 5:**  Without waiving and subject to its previously-asserted objections, Eddystone supplements its response as follows:

In his role as a senior executive of Bridger, LLC, Bridger Logistics, LLC, and Ferrellgas, Gamboa was able to completely dominate BTS. Gamboa's and the other Defendants' total domination, control, and manipulation of BTS is evidenced by the fact that, without providing BTS reasonable compensation in return, they deprived it of revenues and assets after Ferrellgas purchased Bridger Logistics in June 2015. Gamboa played a significant role in this stripping of BTS as well as in BTS' subsequent sale, which was undertaken to shield Gamboa and other Defendants from liability.

Additional facts supporting the conclusion that Gamboa completely dominated BTS are as follows:

Pre-Acquisition Period

Prior to Ferrellgas's acquisition of Bridger Logistics on June 24, 2015 ("Acquisition"), Bridger, LLC operated its marketing and logistics business as a single, coordinated enterprise. Bridger Marketing, LLC ("Marketing") was a wholly-owned subsidiary of Bridger, LLC and handled the marketing side of the business (i.e., buying and selling crude). Bridger Logistics, LLC ("Logistics") was also a wholly-owned subsidiary of Bridger, LLC. Logistics was a holding company and 100% equity owner of several operating subsidiaries, including Bridger Transfer Services, LLC ("BTS"). Through these subsidiaries, Logistics handled the logistics side of the Bridger business (i.e., facilitating the shipment of crude). James Ballengee Deposition at 22:8-25.

Bridger Logistics was the sole member and 100% equity owner of BTS at all relevant times after July 1, 2013. Notices of Change of Members of BTS, BLFG_EDPA0310351-56; Bridger Consolidated Financial Statements, ERCEDPA00176402-26.

Rios and Gamboa "ran the Logistics side of Bridger" and in June 2015 "took the Logistics business to Ferrellgas." James Ballengee Deposition at 23:15-19. Prior to the Acquisition, Gamboa was Executive Vice President and Chief Operating Officer of Bridger, LLC. *Id.* Gamboa was "responsible for all operations in business development" and those responsibilities "covered both

Bridger, LLC, and subsidiaries . . . ," such as subsidiary BTS.  Jeremy Gamboa Deposition at 24:12-:24.

A substantial portion of Logistics' business involved providing logistics services to Marketing through Logistics' operating subsidiaries.  "[M]arketing, as the purchaser and seller of the crude, utilized some of the services of Bridger Logistics subsidiaries to physically move the crude . . . ."  Patrick Kelly Deposition at 24:22-25:1.  Eddystone alleges that this business was conducted without regard to corporate entities, or, in the alternative, through a series of implied contracts.  Bridger, LLC's corporate policy required affiliated-party transactions to be conducted at arms-length through written contracts.  April 8, 2015 Kelly Email and Bridger LLC & Subsidiaries Risk Management Policy, RG_EDPA0083763-73; James Ballengee Deposition at 25:11-27:17.  In some instances, Logistics subsidiaries such as BTS had written contracts with Marketing.  For example, BTS had written contracts with Marketing (then Bridger Trading) under which BTS provided crude injection station capacity to Marketing.  February 1, 2013 Terminal Throughput Agreement, BLFG_EDPA0159157-64; January 4, 2012 Terminal Throughput Agreement, BLFG-JMX_EDPA0002213-22.

In other instances, BTS and Marketing conducted business without written agreements.  In situations where there was not a written agreement between BTS and Marketing, Bridger, LLC's corporate policy required BTS to charge fees to Marketing based on intercompany fee schedules.  Patrick Kelly Deposition at 141:18-145:19, 152:21-155:20; January 29, 2015 Kelly Email and Attachment, RG_EDPA0231492-95.  These "transfer prices" were purportedly based on market data involving analogous third-party transactions.  Patrick Kelly Deposition at 150:15-151:15.

The former Chief Financial Officer of Bridger, LLC, Patrick Kelly, testified that BTS supported Marketing's crude oil supply agreement with Monroe Energy, LLC ("COSA") through

an unwritten, implied contract related to the Eddystone transloading facility in Eddystone, PA ("Facility").  BTS had acquired rail transloading capacity at the Facility through a Rail Terminal Facilities Agreement ("RSA") between Eddystone Rail Company, LLC ("ERC" or "Eddystone") and BTS.  Bridger, LLC's intercompany rate sheets specified that ERC charged BTS a transloading fee of $2.25/bbl and a deficiency charge of $1.75/bbl.  January 29, 2015 Kelly Email and Attachment, RG_EDPA0231492-95 (Exs. 823 and 824); Patrick Kelly Deposition at 145:24-150:14.  They further stated that BTS should charge Marketing $2.75/bbl to transload crude at Eddystone.  January 29, 2015 Kelly Email and Attachment, RG_EDPA0231492-95 (Exs. 823 and 824).  The sheets further listed a deficiency fee to be charged to Marketing.  Initially, this fee was "to be determined" but by January 2015, the fee was set at $1.75/bbl, which matched the deficiency charge assessed to BTS under the RSA.  *Id.*  Moreover, the rate sheets show that the transloading fee charged to Marketing was reduced to $2.55/bbl starting in January 2015.  *Id.*  Finally, the rate sheets also contained information regarding rates that BTS charged Marketing for using certain upstream rail loading facilities in North Dakota.

Bridger, LLC's accounting records show that Marketing funded BTS's bank account so that BTS could pay monthly transloading charges to Eddystone under the RSA.  *See* Accounting Records BLFG_EDPA0046411 and RG_EDPA0231495, Invoice, JAMEX_EDPA00049108.  The accounting records also show that BTS charged and Marketing paid for Eddystone transloading services in the amounts stated in the rate sheets.  *See* Accounting Records BLFG_EDPA0046411 and RG_EDPA0231495, Invoice, JAMEX_EDPA00049108.  Accounting records similarly show Marketing funding BTS at the rates set forth in the rate sheets so that BTS could pay loading charges in North Dakota.  BLFG_EDPA2361875, RG_EDPA0231495, BLFG_EDPA2360447, BLFG_EDPA2361325, BLFG_EDPA2110853.  However, contrary to Bridger, LLC's rate sheet

policy, the accounting records do not appear to indicate that Marketing provided funds to BTS to cover deficiency charges that BTS was required to pay Eddystone, even though Marketing had an implied obligation to make such payments.

Post-Acquisition Period

Through the Acquisition, Logistics became a wholly-owned subsidiary of Ferrellgas, L.P., but Logistics' operating subsidiaries, including BTS, remained wholly-owned subsidiaries of Logistics.  July 21, 2015 Knapp Email and Organization Chart, BLFG_EDPA2394565-72.  After the Acquisition, Marketing became a separate business and was renamed Jamex Marketing, LLC ("Jamex Marketing").  James Ballengee Deposition at 18.

Ferrellgas, Inc. supplied BTS with employees for BTS' operations.  July 21, 2015 Knapp Email and Organization Chart, BLFG_EDPA2394565-72, -69.  Gamboa was COO of Logistics at this time.  October 12, 2015 Rios Email, RG_EDPA0118803-07; March 3, 2017 Gamboa Declaration.  Gamboa became Senior Vice-President and later Executive Vice-President of the same.  October 12, 2015 Rios Email, RG EDPA0118803-07; March 3, 2017 Gamboa Declaration.

Logistics and its subsidiaries continued to conduct a substantial amount of business with Marketing (renamed Jamex Marketing).  For example, BTS continued to support the crude oil supply arrangement between Jamex and Monroe.  The COSA, however, was split into three agreements:  (1) an Amended COSA between Monroe and Marketing, dated May 26, 2015 ("Amended COSA"); (2) a Transportation and Logistics Services Agreement between Monroe and Logistics, dated May 26, 2015 ("Monroe TLA"); and a Transportation and Logistics Agreement between Logistics and Marketing, dated June 24 2015 ("Marketing TLA").  *See* MONROE 0000104-205, and BLFG_EDPA0019650-72.

As required by the original COSA, under the new arrangement Jamex Marketing continued to be obligated to supply and Monroe obligated to purchase at least 1,950,000 bbls per month (or approximately 65 kb/d) of Bakken crude oil, although the price paid by Monroe for the Bakken crude oil was reduced by $0.25/barrel.  Amended COSA, ¶2.1(b) and ¶4.1(c), MONROE 0000104-205, -164, -169.  This equates to a cost reduction of approximately $5.9 million per year, to the benefit of Monroe. The second major modification to the original contract was that Monroe was entitled to reduce its payments to Jamex Marketing for all payments made by Monroe to Bridger Logistics for transportation services rendered.  *Id.* at   Amended COSA, ¶7.1, MONROE 0000104-205, -171.

Moreover, whereas, under the COSA, Marketing allocated a portion of Monroe's payments to Logistics' subsidiaries, now Monroe paid Logistics directly for logistics services pursuant to the Monroe TLA.  Monroe TLA, ¶ 7.2, MONROE 0000104-205, -112.  And under the Marketing TLA, Marketing was obligated to make deficiency payments to Logistics if Marketing did not ship an average of at least 35,000 bbls/day to Monroe.  Marketing TLA, ¶ 23, BLFG_EDPA0019650-72, -62.

After the restructuring of the COSA and Acquisition, Marketing's obligations under its implied contracts with BTS were assumed by Logistics.  This is reflected in Logistics' post-acquisition accounting records.  Those records show that amounts due to ERC under the RSA and the North Dakota rail loading contracts were paid directly to ERC by Logistics or Logistics subsidiaries other than BTS until the time that BTS was sold to Jamex Transfer Holdings, LLC.  April 2, 2018 Eddystone Responses And Objections to Rios And Gamboa's First Set Of Interrogatories at 6-8.  In failing to continue making payments to ERC through the remainder of the RSA term, Logistics abrogated its implied contract with BTS, resulting in at least $169 million in

damages to Eddystone, plus prejudgment interest.  Moreover, Defendants' revenue and asset

stripping scheme stripped BTS' entire business, resulting in an  intentional fraudulent transfer of at

least $200 million from BTS to Logistics.

Several Ferrellgas and Bridger employees and attorneys participated in the fraudulent

transfers, including but not limited to Gamboa, Rios, Todd Soiefer, Steve Wambold, Trent

Hampton, Patrick Knapp, Andy Lehman and John Goodgame.  Ferrellgas and Logistics, through

Rios and Gamboa, totally dominated, controlled and manipulated BTS starting no later than June

2015.  The fraudulent transfers described in Supplemental Response 3 (fraudulent transfers of BTS

revenues and assets, abrogation of Logistics' implied agreement with BTS, and the sale of a

denuded BTS for $10), were done to benefit Ferrellgas, Logistics, Rios and Gamboa and to erect a

liability shield against ERC's inevitable claims for breach of the RSA.  The specific benefits to

Gamboa are detailed in Eddystone's supplemental response to Interrogatory 3 to the Rios and

Gamboa Second Set of Interrogatories.

Starting in July 2015, rail throughput revenue ("Rail Throughput Revenue") that at one time

had flowed from Marketing to BTS, and should have been paid by Bridger Logistics to BTS,

started being redirected to two non-existent Bridger entities, Bridger Rail Services, LLC ("Rail

Services") and Bridger Pipeline Services, LLC ("Pipeline Services").  Farmer Deposition at 117:7-

12 (Rail Services does not exist); 154:20-155:6 (Pipeline Services does not exist).  As noted above,

BTS at this time had rail throughput agreements involving rail terminals at Berthold, Dakota

Plains/New Town, and Van Hook, as well as access to the Eddystone facility under RSA.  Under

those agreements, BTS supported the Monroe shipping arrangement by providing Jamex Marketing

with access to the rail terminals and to Eddystone's transfer facility.

It appears that in June 2015, Bridger and Ferrellgas officers falsely created the impression that the RSA and those three other contracts were being assigned to the fake entities, Rail Services and Pipeline Services, and that the latter would be allocated Rail Throughput Revenue for use of the four facilities. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ On the morning of June 18, 2015, Jilla sent the Rail Shipping Chart to Rios' secretary, Michelle DeWaal.  June 19, 2015 Jilla Email and Attachment, BLFG_EDPA0735007-08.  After discussing the chart with Gamboa and Rios, on June 19, 2015, Jilla circulated a revised chart ("Rail Services Chart") showing that the Rail Throughput Revenue would flow to the non-existent Rail Services, and pipeline management revenue would flow to the non-existent Pipeline Services, not BTS.  June 19, 2015 Jilla Email and Chart, BLFG_EDPA 2381102-04.

Bridger's accountants were unaware at the time of this reallocation that Rail Services and Pipeline Services did not actually exist.  Jonna Seline, who helped direct the accountants, testified that she did not know until the day before her deposition that the four rail loading/unloading agreements had not in fact been assigned.  Jonna Seline Testimony at 80:17-81:5.  She also testified that it was BTS, and not Rail Services, that performed under the contracts and earned the Rail Throughput Revenue, but that BTS did not record such revenue.  Id. at 97:11-21, 100:14-21.

Similarly, Ferrellgas' Assistant Controller, accountant Michael Farmer, testified that he had believed that Rail Services was a legal entity until this litigation.  Farmer Deposition at 117:7-12.  Farmer agreed that, because Rail Services was not a legal entity, it could not have earned revenue.  Farmer Deposition at 128:14-19.  Gamboa's, Rios', and Jilla's deception of BLFG accountants is also reflected in BLFG management reports prepared after the Acquisition.  Those reports refer to Rail Services and Pipeline Services as limited liability companies, apparently because the accounting staff who prepared the reports believed them to be real companies.  All the while, however, Gamboa and Rios knew they were not real companies but were instead vehicles they used to fraudulently transfer revenue from BTS.

In line with the foregoing, accounting records show that beginning July 2015, BTS stopped recording Rail Throughput Revenue altogether.  Also in July 2015, Rail Services began recording Rail Throughput Revenue for the first time.  Between July 2015 and December 2016, Rail Services recorded approximately $90 million in Rail Throughput Revenue from Jamex Marketing and Monroe.  *See* Accounting Records, BLFG_EDPA0046390-408.  Similarly, beginning in June 2015, the accounting records show that BTS ceased recording similar pipeline management revenue ("Pipeline Management Revenue"). In June 2015, Pipeline Services began recording Pipeline Management Revenue for the first time.  Between June 2015 and December 2016, Bridger Pipeline Services recorded approximately $1 million in Pipeline Management Revenue. *See* Accounting Records, BLFG_EDPA0046390 - 408.

Even as BTS lost access to the Rail Throughput Revenue and Pipeline Management Revenue, it continued to receive a small amount of so-called stations throughput revenue ("Stations Throughput Fees").  Such revenue represented revenue earned by BTS from owning and operating pipeline terminals (i.e., injection stations) across the Rockies, Bakken, Gulf Coast and Permian

28

Basin.  Bridger Summary Confidential Information Memorandum, BLFG_EDPA0140545-595 at

570.  BTS sold its capacity at its injection stations to Marketing and third-party customers.

Even before Ferrellgas purchased Bridger Logistics, Bridger Marketing (later Jamex

Marketing) was hemorrhaging cash in connection with the Amended COSA and Marketing TLA

due to the unfavorable spread between the West Texas Intermediate crude ("WTI") price and the

Brent crude price.  The WTI price is a surrogate for Bakken crude which is sourced from North

Dakota and which Bridger shipped by rail to Eddystone for transloading and delivery to Monroe.

The Brent price is a surrogate for the price of West African crude ("WAF"), a type of crude that

Monroe could use as a substitute for Bakken.  Beginning in 2014 and continuing forward, the

spread between WTI and Brent had become "much narrower".  James Ballengee Deposition at 62-

63.  When the spread was narrow, Bridger Marketing suffered "substantial losses".  *Id.* at 63.  In

July 2015, Jamex Marketing lost $7.5 million, over $6 million in August, and about $7.3 million in

September 2015.  *Id.* at 117-119.  These losses were caused by a continuing narrowing of the

Brent-WTI spread.  *Id.* at 119.   The spreads continued to narrow in October and November 2015,

and the losses continued to mount in those months.  *Id.* at 119.

Bridger Logistics and Ferrellgas were aware throughout the period leading up to and after

the Acquisition that Bridger Marketing (Jamex Marketing after the Acquisition) was losing money.

In May 2015, Ferrellgas received a report from Grant Thornton noting Bridger Marketing's losses.

May 21, 2015 Grant Thornton Report, BLFG_EDPA0299508-78.  After the Acquisition, in late

August 2015, Soiefer sent an email to Rios stating that he had spoken with Jamex Marketing's

James Ballengee, who had asked for Soiefer's help in getting additional financing.  August 29,

2015 Soiefer Email, RG_EDPA0053060.  Soiefer noted that Jamex Marketing was losing $3-$4

million per month at the time.  *Id.*   Additionally, it appears based on handwritten notes of Rios,

29

that Rios had a meeting in October 12, 2025 with Soiefer, Gamboa, and others regarding Monroe, and the spread between Brent and WTI prices – the source for Jamex Marketing's consistent losses. Rios Handwritten Notes, RG_EDPA0279213, -36-37; James Ballengee Deposition at 130-31.

By late fall 2015, Bridger and Ferrellgas understood that Jamex Marketing was in deep trouble.  Gamboa noted in an email to Rios and Soiefer that "If we do nothing: Benefits Monroe [i.e., Monroe is benefitted]; Jamex bankrupt in 12-18 months depending on spreads and FGP stock; Bridger has $70 million ebitda and $41.5 million obligation to ERC".  December 8, 2015 Gamboa Email, BLFG_EDPA2259244-51.  Gamboa also stated that revising the Monroe/Jamex Marketing/Bridger arrangement would enable "us to get some back from [Eddystone] once we threaten or actually stop shipping" through Eddystone.  *Id.*

Because of its losses, in June 2015, Bridger Marketing was already talking to Monroe about revising the Amended COSA, as the contract was unprofitable for it.  James Ballengee Testimony at 123.  One of the possible options was to convert the Amended COSA to a 100% cost plus contract.  *Id.* at 124-25.  Sometime in October 2015, the focus changed and Monroe and Jamex Marketing began discussing substituting WAF crude for Bakken crude, a step that would have rendered continued use of the Eddystone facility unnecessary.  *Id.* at 121, 130-31.  At his deposition, Ballengee testified that in October-November 2015, Jamex Marketing began discussing with Monroe the possibility of replacing the Bakken crude under the Amended COSA with WAF crude.  *Id.* at 121.  During this time, Ballengee made a number of presentations to Monroe.  *Id.* at 121.  It was the case if the Amended COSA was not amended, Jamex Marketing would go bankrupt in 12-18 months, and Ballengee conveyed this to Monroe.  *Id.* at 122.

███████████████████████████████████████████████████████████████

███████████; 20150922 Soiefer Email (emphasis added).  By December, Bridger and Ferrellgas officials began contemplating intentionally defaulting on the RSA and thinking of ways to strip BTS of its remaining assets.  ████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████ Todd Soiefer Deposition at 291:6-294:2.

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████l,

31

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

At the time that Defendants were considering and later implementing their plan to strip BTS, they were aware that they were engaging in fraudulent transfers.  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

At the time it was planning to sell a denuded BTS to Jamex, Bridger engaged in discussions with Monroe and Jamex Marketing to suspend the parties' existing arrangement.  On December 18, 2015, the parties circulated a term sheet under which all shipments of crude through Eddystone would be suspended.  December 19, 2015 Rios Email and Attachment, BLFG_EDPA2394788-92.

On December 22, 2015, the term sheet was amended to also provide that BTS would be stripped of all assets other than the RSA and then sold to Jamex.  January 4, 2016 Hampton Email and Attachment, BLFG_EDPA2394924-27.  Ultimately, the parties entered into three letter agreements dated January 13, 2016 whereby the Monroe shipping arrangement was suspended and the Amended COSA, Logistics TLA and Monroe TLA were amended.  January 13, 2016 Adams Email and Attachments, BLFG_EDPA1752875-901.  Rios signed these agreements on behalf of Bridger Logistics.

In order get the benefit of a suspension of agreements that were causing it massive losses, Jamex Marketing promised to buy BTS from Bridger Logistics.  The sale price was for a cash consideration of $10.00, and was supposed to occur on or soon after February 1, 2016.  January 13, 2016 Adams Email and Letter Agreements, BLFG_EDPA1752875-900; James Ballengee Deposition at 172.  The parties also stipulated in the letter agreements that "BTS, at the time of its sale to Jamex, includes no assets or liabilities other than its rights and obligations under the Eddystone Contract." January 13, 2016 Adams Email and Letter Agreement, BLFG_EDPA1752875-900.  The letter agreements further included an amendment eliminating references to Eddystone from the parties' prior agreements and stating that, if and when deliveries resumed, for any crude supplied to Trainer without using the Eddystone facility, Monroe would get a $.50/barrel discount.  *Id.*  Through these actions and others, it became clear that, should shipments of crude to Monroe resume, those shipments would not go through Eddystone.

Consistent with the foregoing, after signing the letter agreements BTS began transferring additional assets to Bridger Logistics subsidiaries without receiving any consideration in return.

██████████████████████████████████████████████

███████████████.

     On or about January 31, 2016, BTS assigned substantially all of its remaining assets – worth tens of millions of dollars – to Bridger Swan Ranch, LLC and Bridger Terminals LLC.  The assignment agreements are signed by Rios on behalf of BTS and both Bridger Terminals LLC and Bridger Swan Ranch, LLC.  January 31, 2016, BTS Assignments to Bridger Swan Ranch, BLFG_EDPA0005462-77; January 31, 2016 BTS Assignments to Bridger Terminal, BLFG_EDPA2405638-47; October 30, 2014 BTS-Shell Throughput Agreement (Amended), BLFG_EDPA0012203-31.  By assigning these assets, BTS was also deprived of millions of dollars in revenue that it would have otherwise received.  Under a General Warranty Deed dated January 31, 2016, BTS also transferred ownership in the fifteen acres of land upon which the Swan Ranch terminal sat, which had been purchased for $1,726,247 (per journal entries), to another Ferrellgas owned entity, Bridger Real Property, for $10.  January 31, 2016 Metzke Email and Attachments, BLFG_EDPA2406910-21.  ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

On February 22, 2016, Mr. Rios, on behalf of BTS, Logistics and Ferrellgas, signed a "Purchase and Sale Agreement" (the "BTS PSA") for the sale of BTS to Jamex Transfer Holdings, for ten dollars, effective February 1, 2016.  The parties stipulated that BTS "has no assets other than the Eddystone Agreement".  On October 2, 2017, Farmer, Ferrellgas' Assistant Controller who was responsible for overseeing the accounting for the Logistics entities,  stated in an email that BTS had been "'sold' to Jamex **to strategically deal with an Enbridge contract** . . . ."  October 2, 2017 Farmer Email and Attachment, BLFG_EDPA0271621-24 (emphasis added).

Further information responsive to this Interrogatory is referenced in Eddystone's Supplemental Response to Interrogatory no. 4 in the present Rios and Gamboa Second Set of Interrogatories.

* * * * * * *

The foregoing supplemental response is based on discovery obtained through September 28, 2020.  Eddystone reserves its right to rely on additional evidence obtained in the September 29 deposition of Vispi Jilla, October 1 deposition of Julio Rios, and in expert discovery.  Eddystone further states that the parties have produced an enormous volume of documents in this litigation. Eddystone has made a good faith effort to provide a detailed supplemental response based on the available evidence.  However, the supplemental response is not and cannot be a recitation of all testimony and each and every fact, document, and other type of evidence that is responsive to this interrogatory.  Eddystone reserves its right to rely on other documents and evidence at trial, including other documents produced in the litigation, documents filed with the Court, discovery responses of the parties, documents listed on any party's exhibit list, and witnesses listed on any party's witness list.

Dated:  October 1, 2020

Respectfully Submitted,


/s/ Filiberto Agusti
Henry E. Hockeimer, Jr. (I.D. No. 86768)
Terence M. Grugan (I.D. No. 307211)
BALLARD SPAHR LLP
1735 Market Street, 51st
Floor Philadelphia, PA 19103-
7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
hockeimerh@ballardspahr.com
grugant@ballardspahr.com

Filiberto Agusti (*pro hac vice*)
Steven J. Barber (*pro hac vice*)
Andrew J. Sloniewsky (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
fagusti@steptoe.com
sbarber@steptoe.com
asloniewsky@steptoe.com

*Counsel for Eddystone Rail Company, LLC*

36

**CERTIFICATE OF SERVICE**

I hereby certify that I have this October 1, 2020 sent a copy of the foregoing Plaintiff Eddystone Supplemental Responses and Objections to **DEFENDANTS JULIO RIOS AND JEREMY GAMBOA'S FOURTH SET OF INTERROGATORIES** to counsel for all parties of record via email.

Dated October 1, 2020                          /s/ Andrew J. Sloniewsky
                                                            Andrew J. Sloniewsky