# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC,
      Plaintiff,

    v.

BRIDGER LOGISTICS, LLC, *et al.*,
      Defendants.

:
:
:
:
:
:
:
:
:

No. 2:17-cv-00495-JDW

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

Page

PROPOSED FINDINGS OF FACT ............................................................................................ 1

I.    PARTIES, RELEVANT NON-PARTIES, AND WITNESSES. ........................... 2

    A.    Parties. ............................................................................................... 2

    B.    Key Non-Parties. ................................................................................ 5

    C.    Eddystone Fact Witnesses. ................................................................ 9

          Brian Boaz. ........................................................................................ 9

          Mary Cohen. ...................................................................................... 10

          Thomas Fridel. ................................................................................... 10

          John "Jack" Galloway. ...................................................................... 10

          Erik Johnson. ..................................................................................... 10

          Vincent Paradis. ................................................................................ 11

          Kelly Wilkins. ................................................................................... 11

          Robert Yaremko. ............................................................................... 11

    D.    Bridger, LLC/Bridger Logistics Fact Witnesses. ...................................... 12

          James Ballengee. ............................................................................... 12

          Jeremy Gamboa. ............................................................................... 12

          Vispi Jilla. ......................................................................................... 13

          Patrick Kelly. .................................................................................... 14

          Patrick Knapp. ................................................................................... 15

          Giuseppe "Joe" Natale. ..................................................................... 16

          Dion Nicely. ...................................................................................... 16

          Julio Rios. ......................................................................................... 16

          Jonna Seline. ..................................................................................... 17

    E.    Ferrellgas Fact Witnesses. ................................................................ 18

          Michael Farmer. ............................................................................... 18

          Trent Hampton. ................................................................................. 18

          Alan Heitmann. ................................................................................. 19

          Todd Soiefer. .................................................................................... 19

          Steven Wambold. ............................................................................. 19

    F.    Remaining Fact Witnesses. ............................................................... 20

i

John Hunter. .............................................................................................. 20

David Johnson. ......................................................................................... 20

Robin Miles. .............................................................................................. 20

G.    Eddystone's Experts. ................................................................................ 21

H.    Defendants' Experts. ............................................................................... 22

II.    CRUDE OIL AND LOGISTICS MARKETS. ...................................................... 23

A.    Crude Oil Market. .................................................................................... 23

B.    Crude Oil Logistics. ................................................................................ 24

III.    NONPARTY BRIDGER, LLC PRE-ACQUISITION. ....................................... 26

A.    Bridger, LLC Ownership. ........................................................................ 26

B.    Bridger Logistics Organizational Structure. ............................................ 27

C.    Relationship Between Bridger, LLC And Enbridge Pre-Acquisition.
.................................................................................................................. 29

D.    The Eddystone Rail Facilities Services Agreement. ................................ 31

General Terms. .......................................................................................... 32

Volume And Payment Terms. .................................................................... 33

Measuring Transloaded Crude. ................................................................. 35

Financial Assurances Under The RSA. ..................................................... 36

There Is No Parent Guaranty Covering BTS' Obligations Under The
RSA. .......................................................................................................... 38

Bridger Marketing Did Not Agree To Backstop The RSA ....................... 39

E.    The Monroe COSA. ................................................................................. 41

F.    Bridger Accounting/Financial Position Pre-Acquisition. ........................ 44

IV.    EDDYSTONE. ......................................................................................................... 46

A.    Eddystone Was A Joint Venture Between Enbridge And Canopy. .......... 46

B.    Cost Overruns Plagued The Facility's Construction. ............................... 47

C.    Operational Challenges And Issues Plagued The Facility As Well. ......... 48

SEPTA Window .......................................................................................... 50

Lack Of Custody Transfer Meters. ............................................................ 53

Granite Pinnacle. ....................................................................................... 60

D.    Pre-Acquisition Offers From Bridger To Purchase The Eddystone
Facility. ..................................................................................................... 62

E.    Pre-Acquisition Negotiations Regarding The RSA Amendments
And Their Relationship To Financial Assurances. ................................... 68

V.      FERRELLGAS, INC., FERRELLGAS PARTNERS, AND FERRELLGAS LP. ............................................................................................... 72

    A.      Corporate Organization. .......................................................... 72

    B.      Ferrellgas LP Funded Its Operations Through A Credit Facility. ............ 73

    C.      Ferrellgas Tracked EBITDA Using Cost Centers. ...................................... 77

    D.      Ferrellgas Financial Reporting/Audit Structure. ....................................... 78

    E.      The Ferrellgas Diversification Strategy. ..................................................... 79

VI.     DUE DILIGENCE FOR THE POTENTIAL ACQUISITION. ............................ 81

    A.      Bridger Logistics Is Identified As An Opportunity. .................................. 81

    B.      Ferrellgas Explores The Potential Acquisition And Conducts Due Diligence. ............................................................................................... 82

        Ferrellgas Hired Household Names To Vet The Bridger Logistics Acquisition. ............................................................................................ 82

        Bridger Logistics Financials Are Presented By Segment By Bridger And Evercore. ........................................................................................ 82

        Ferrellgas Sends Binding Letter Of Intent And Meets Bridger Logistics Executives. ........................................................................... 85

        Investment Bank Simmons Prepares Presentations Regarding Bridger Logistics For Ferrellgas And Its Board Of Directors. ............................. 86

        Ferrellgas Evaluated The Bridger Logistics Acquisition By Sector And Overall Performance, Not By Legal Entity. ...................................... 87

        Ferrellgas Anticipated That Bridger Logistics Would Have A Long-Term Relationship With Monroe. ............................................................ 87

    C.      Due Diligence Surfaced Several Issues, Which The Parties Addressed. .............................................................................................. 91

        Jamex Marketing Capitalization. .................................................................. 91

        Monroe Contract Bifurcation. ...................................................................... 95

        Bridger Management Retention. .................................................................... 101

        Grant Thornton Commentary On Bridger, LLC Accounting. ................. 102

    D.      Ferrellgas Obtains Approval From The ESOP Trustee. ......................... 109

VII.    THE ACQUISITION. ...................................................................................... 110

    A.      The Ferrellgas Partners/Bridger, LLC Purchase And Sale Agreement. ............................................................................................. 110

    B.      Consistent With Its Diversification Strategy, Ferrellgas Expected Bridger Logistics To Propel Its Overall Growth. .................................... 113

C.  Ferrellgas Partners Pays Off $286 Million In Bridger Logistics Indebtedness, Including $40 Million Relating To BTS. ........................ 114

D.  Treatment Of Bridger Logistics Accounts Receivable. ........................... 115

E.  Bridger Logistics Executes A Guaranty Supplement In Compliance With The Bank Of America Credit Facility............................................ 117

F.  Bridger Logistics And Its Subsidiaries Guarantee Senior Notes. ........... 121

G.  CBIZ Establishes The Book Value Of Bridger Logistics. ...................... 121

VIII.  BRIDGER   LOGISTICS   POST-ACQUISITION   OPERATIONAL STRUCTURE. ........................................................................................... 122

A.  Rios And Gamboa Continued To Manage Bridger Logistics' Day-To-Day Operations.................................................................................. 122

B.  The Credit Facility Provided Bridger Logistics With Working Capital. .................................................................................................. 124

C.  Accounting Transition. .......................................................................... 127

D.  Operating/Management Reports. ............................................................ 128

IX.  BRIDGER LOGISTICS POST-ACQUISITION ACTIVITIES........................ 129

A.  Bridger Logistics Immediately Sets Out To Negotiate A Longer-Term Contract With Monroe. .................................................................. 129

B.  Bridger Logistics Resumes Negotiations To Purchase Eddystone. ........ 130

C.  Dakota Plains Negotiates An Eddystone Purchase And Threatens To Lock Bridger Out If Successful. ............................................................. 131

D.  The Bakken/Brent Spread Narrows. ...................................................... 132

E.  In  October,  Rios  And  Soiefer  Resume  Discussions  With Enbridge/Eddystone.............................................................................. 136

X.  FERRELLGAS EXPLORES INCREASING ITS CREDIT FACILITY AND   UNCOVERS   AND   THEN   CORRECTS   PAPERWORK OMISSIONS IN THE PROCESS OF CLOSING THE CREDIT FACILITY UPSIZING. ................................................................................................ 138

A.  2015 Efforts To Increase Credit Facility. .............................................. 138

B.  A Paperwork Omission Is Discovered Related To The Acquisition. ..... 140

C.  Bank of America Perfects Its Lien........................................................... 142

XI.  THE JAMEX FINANCING ARRANGEMENT FOUNDERS........................... 145

A.  Jamex Marketing Funded Its Purchases Of Crude Oil Through An Intermediation Agreement. .................................................................... 145

B.  Jamex Marketing Approaches Ferrellgas For Intermediation After Jamex Refuses To Pay BAML A Fee To Continue Its Existing Arrangement. ........................................................................................ 147

C.     Eddystone Tanks The Replacement Carlyle Intermediation Agreement. .............................................................................. 148

D.     Bridger Logistics And Ferrellgas Attempt To Accommodate Jamex Where Possible .......................................................................... 154

XII.   MONROE/JAMEX/BRIDGER LOGISTICS CONFRONT WORSENING ECONOMIC CONDITIONS. ................................................................. 154

A.     Monroe And Jamex Sought A Solution For Their Respective Financial Challenges. .................................................................... 154

B.     Meanwhile, Rios Continued His Pursuit Of Concessions From Eddystone. ......................................................................................... 157

C.     Jamex Proposes Suspending Shipments And Buying BTS To Establish Privity. .................................................................................. 163

D.     Monroe, Jamex, And Bridger Logistics Agree To Suspend Shipments. ......................................................................................... 165

E.     Prior To Any Contemplated BTS Sale, Bridger Logistics Confirms Jamex's Ability To Continue To Pay Eddystone. ................................... 171

F.     Knapp Plays Minor Role In Documenting The Sale Of BTS. ................ 173

G.     BTS Complies With The Bank Of America Credit Facility By Assigning Liened Assets To Affiliates Also Subject To Bank Of America's Lien Requirements. .............................................................. 176

H.     Facts Relating To BTS Financial Condition As Of January 31, 2016. .............................................................................................. 177

I.     BTS Is Sold To Jamex. ........................................................................ 179

XIII.  EDDYSTONE REFUSES TO NEGOTIATE WITH JAMEX. ......................... 183

XIV.  BRIDGER LOGISTICS AND FERRELLGAS PROCEED, BELIEVING THAT JTS WILL CONTINUE TO PERFORM UNDER THE RSA. ............... 184

A.     Ferrellgas Was Singularly Focused On Long-Term Growth Of The Monroe Relationship. .................................................................... 184

B.     Ferrellgas And Bridger Logistics Monitor Jamex Financials. ................ 185

C.     Monroe Seeks To Resume Shipments; Bridger Logistics Readies The Crude-By-Rail Pipeline. ................................................................ 186

XV.   JAMEX RENEGES ON ITS COMMITMENTS. ............................................ 186

A.     Jamex Declines To Nominate Any Barrels. .......................................... 186

B.     Ferrellgas And Bridger Logistics Press Jamex To Perform As It Promised. ............................................................................................ 187

C.     With Jamex Owing Bridger Logistics Millions, Bridger Logistics Terminates The Marketing TLA. ........................................................... 189

D.      In May/June 2016, Ferrellgas/Bridger Logistics Learn That Eddystone Had Commenced An Arbitration Against Jamex And JTS. ........................................................................... 189

XVI.    THE AFTERMATH. ...................................................................... 189

A.      Bridger Logistics And Assets Are Valued At Pennies On The Dollar. .......................................................................... 189

B.      Ferrellgas Takes A Massive Impairment And Sustains Other Casualties. ................................................................... 190

XVII.   EDDYSTONE ENTERS INTO AN ARBITRATION SETTLEMENT WITH JAMEX AND TRIES TO CONFIRM THE AWARD........................... 192

A.      Eddystone And Jamex Settle The Arbitration. ....................... 192

B.      Eddystone Seeks To Confirm Its Stipulated Arbitration Award In The Southern District Of New York; Confirmation Is Stayed. .............. 195

XVIII.  ENBRIDGE TURNS AWAY NEW BUSINESS AT EDDYSTONE. .............. 195

XIX.    ENBRIDGE SELLS ITS STAKE IN EDDYSTONE TO CANOPY BUT RETAINS RIGHTS TO RECOVERY IN THIS LITIGATION; CANOPY RESUMES SHIPMENTS AT THE FACILITY................................................. 197

XX.     FACTS RELATED TO THIS LITIGATION.................................... 198

PROPOSED CONCLUSIONS OF LAW .............................................. 200

I.      COUNT ONE: ALTER EGO. ........................................................ 201

A.      Applicable Law. ............................................................. 203

B.      Eddystone Did Not Prove A Breach Of The RSA That Can Support Liability Against Defendants. ............................................. 207

BTS Did Not Breach the RSA Before The Sale To Jamex..................... 207

Defendants Are Not Responsible For Any Liability Incurred By JTS. .. 209

C.      None of the Alter Ego Defendants Was An Alter Egos Of BTS. ........... 220

Applicable Law. ................................................................. 221

Bridger Rail Shipping ........................................................... 223

Bridger Logistics.................................................................. 224

Ferrellgas LP And Ferrellgas Partners .................................... 225

D.      Eddystone Has Not Demonstrated An Injustice That Warrants Piercing The BTS Corporate Veil......................................... 231

II.     COUNTS TWO AND THREE: INTENTIONAL FRAUDULENT TRANSFER AND CONSTRUCTIVE FRAUDULENT TRANSFER under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"). ...................... 233

A.     Applicable Law. ............................................................. 233

B.     Eddystone's Allegations. ............................................... 237

June 24, 2015 Intercompany Receivables ("2015 Intercompany Receivables"). ............................................................ 237

BTS Revenue Recorded Using Great Plains Company Codes 208 and 210 ("Accounting Code Changes"). ........................................ 237

2016 Alleged Transfers. ........................................................ 237

Implied Contract Claim. ....................................................... 238

C.     BTS Was Solvent On June 24, 2015, And Eddystone Did Not Establish Insolvency Thereafter. ...................................... 239

BTS Was Solvent On June 24, 2015. .................................... 241

Eddystone Did Not Establish BTS Was Insolvent in Early 2016. ........ 248

D.     2015 Intercompany Receivables Do Not Support A PUFTA Claim. ..... 253

Jamex Receivables. ............................................................. 254

Affiliate Receivables. ......................................................... 255

E.     The Accounting Code Changes Do Not Support PUFTA Claims. ......... 256

F.     The 2016 Alleged Transfers Do Not Support Eddystone's PUFTA Claims. ......................................................................... 262

The 2016 Alleged Transfers Involved Property Subject To A Valid Lien. .......................................................................... 262

The Bank Of America Lien Is Not Voidable Under PUFTA. ................ 266

Eddystone Failed To Undermine The 2015 Guaranty Supplement. ....... 270

Eddystone Failed To Establish That The Property Involved In The 2016 Alleged Transfers Was Not Encumbered By The Lien. ................ 274

Even Without The Lien, Eddystone Failed To Establish The 2016 Alleged Transfers Were Voidable Under PUFTA. ................................. 276

Eddystone Overstates The Value Of Property Subject To The 2016 Alleged Transfers. ............................................................. 278

G.     There Is No Implied Contract, Much Less A PUFTA Claim Based On One. ....................................................................... 280

III.     COUNT FOUR: BREACH OF FIDUCIARY DUTY. ....................... 284

A.     No Fiduciary Duty Was Owed To Eddystone Under Pennsylvania Law. .......................................................................... 287

B.     The Result Is The Same Under Louisiana And Delaware Law. ............. 291

C.     Eddystone Did Not Prove A Breach Of A Duty Of Loyalty Or Care. ...................................................................... 293

The Sale Of BTS To Jamex Left Eddystone In No Worse Position. ....... 293

Bridger Logistics Did Not Intend For BTS To Fail. .............................. 296

D.    Ferrellgas Partners, L.P. And Ferrellgas L.P. Were Neither Fiduciaries Nor Control Persons of BTS. ................................................. 299

IV.    AFFIRMATIVE DEFENSES. ......................................................... 302

A.    Unclean Hands. ..................................................................... 302

B.    Failure To Mitigate. ............................................................... 303

C.    Duplicative Recovery, Proportionate Responsibility, And Unjust Enrichment. ........................................................................... 304

D.    Preclusion Of Claims And Exclusive Remedy. ...................................... 305

V.    CONTINGENT COUNTERCLAIM IV: BREACH OF CONTRACT REGARDING CUSTODY TRANSFER METERS. ........................................... 306

A.    Defendants May Bring A Contingent Counterclaim. ............................ 306

B.    Eddystone Breached The RSA By Failing To Install Functional CT Meters. ................................................................................. 307

C.    BTS Suffered Monetary Damages As A Result Of Eddystone's Breach. ................................................................................. 310

VI.    PLAINTIFF'S BREACH OF CONTRACT DAMAGES ARE GROSSLY OVERSTATED. ............................................................................. 311

B.    Applicable Law. .................................................................... 311

C.    Damages From JTS' Alleged Breach Do Not Exceed $53.6 Million. ................................................................................. 312

D.    Plaintiff's Damages Expert Seeks A Windfall For Eddystone. ............. 314

VII.    PREJUDGMENT INTEREST SHOULD NOT BE AWARDED. .................... 318

VIII.    EDDYSTONE IS NOT ENTITLED TO PUNITIVE DAMAGES. ................... 323

IX.    THERE IS NO SUBJECT MATTER JURISDICTION OVER THIS CASE. ................................................................................. 324

# TABLE OF AUTHORITIES

**Cases:**                                                                        **Page(s)**

*82-90 Broadway Realty Corp. v. N.Y. Supermarket, Inc.*,
154 A.D.3d 797 (N.Y. App. Div. 2017) ................................................... 274

*Abdallah v. Abdallah*,
359 F.2d 170 (3d Cir. 1966) ................................................... 216, 217
305

*Action Mfg. Co. v. Simon Wrecking Co.*,
375 F. Supp. 2d 411 (E.D. Pa. 2005) ................................................... 230, 302

*Advantage Sky Shipping LLC v. ICON Equip. and Corp. Infrastructure
Fund Fourteen Liquidating Tr.*,
427 F. Supp. 3d 501 (S.D.N.Y. 2019) ................................................... 328

*Ambromovage v. United Mine Workers of America*,
726 F.2d 972 (3d Cir. 1984) ................................................... 323

*Am. Enka Co. v. Wicaco Mach. Corp.*,
686 F.2d 1050 (3d Cir. 1982) ................................................... 319

*Am. Fed. Bank v. W. Cen. Ag Servs.*,
530 F. Supp. 3d 780 (D. Minn. 2021) ................................................... 235

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ................................................... 324-325

*Arimilli v. Rezendes*,
CV-21-00345-PHX-GMS, 2022 WL 1664278 (D. Ariz. May 25, 2022) ................ 202

*Arizona v. California*,
460 U.S. 605 (1983) ................................................... 334

*Arrowhead Conveyor Corp. v. Giuseppe's Finer Foods, Inc.*,
Nos. 309 and 351 WDA 2019, 2020 WL 1460815
(Pa. Super. Ct. Mar.24, 2020) ................................................... 206

*Ashland Mgt. v. Janien*,
624 N.E.2d 1007 (N.Y. 1993) ................................................... 318

*A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*,
560 F. Supp. 705 (E.D. Pa. 1983) ................................................... 265

                                                                                    **Page(s)**

*Assoc. of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*,
    553 N.W.2d 446 (Minn. Ct. App. 1996) ....................................    294

*Atlanta Shipping Corp. v. Chemical Bank*,
    818 F.2d 240 (2d Cir. 1987) ...............................................    328, 331

*Baldi v. Samuel Son & Co., Ltd.*,
    548 F.3d 579 (7th Cir. 2008) ..............................................    246

*Banjo Buddies, Inc. v. Renosky*,
    399 F.3d 168 (3d Cir. 2005) ...............................................    291

*Bank of Am., N.A. v. Knight*,
    875 F. Supp. 2d 837 (N.D. Ill. 2012),
    *aff'd*, 725 F.3d 815 (7th Cir. 2013) .......................................    202

*Berkshire Fashions, Inc. v. M.V. Hakusan II*,
    954 F.2d 874 (3d Cir. 1992) ...............................................    333

*Betancourt v. Wilson*,
    409 F. Supp. 598 (D.P.R. 1975) ..........................................    216, 217

*Bethel v. McAllister Bros., Inc.*,
    81 F.3d 376 (3d Cir. 1996) ................................................    331

*Blue Whale Corp. v. Grand China Ship. Dev. Co., Ltd.*,
    722 F.3d 488 (2d Cir. 2013) ...............................................    203

*Bridger Logistics, LLC v. Eddystone Rail Company, LLC*,
    No. CV-2019-000646 (Del. Cnty. Ct. Com. Pl.) ....................    334

*Brownback v. King*,
    141 S. Ct. 740 (U.S. 2001) .................................................    216

*Brown Bros. Elec. Contractors. v. Beam Constr. Corp.*,
    41 N.Y.2d 397 (N.Y. App. Div. 1977) ................................    273-274

*Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs.*,
    692 N.E.2d 551 (N.Y. 1998) ..............................................    311, 317

*Budget Rent-A-Car Sys. Inc. v. Chappell*,
    407 F.3d 166 (3d Cir. 2005),
    *cert. denied*, 546 U.S. 978 (2005) ....................................    280

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   40 F.3d 622 (3d Cir. 1994),
   *aff'd in part*, 514 U.S. 1126 (1996) ........................................................ 204

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   216 F.3d 338 (3d Cir. 2000) ..................................................................... 206

*Calvert v. Huckins*,
   875 F. Supp. 674 (E.D. Cal. 1995) ...................................................... 231, 30

*Carnegie Tech, LLC v. Triller, Inc.*,
   2021 WL 2322934 (W.D. Tex. June 7, 2021),
   *aff'd*, 39 F.4th 288 (5th Cir. 2022) ......................................................... 284

*Carucci v. Regency Fin. Grp., LLC*,
   A-5497-13T1, 2016 WL 3909570 (N.J. App. July 20, 2016) .................... 280

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   No. 00 C 2447, 2003 WL 21542491 (N.D. Ill. July 3, 2003) ............... 231, 302

*Ceres Terminals, Inc. v. Industrial Comm'n of Illinois*,
   53 F.3d 183 (7th Cir. 1995) ...................................................................... 333

*Chappelow v. Savastano*,
   758 N.Y.S.2d 782 (Sup. Ct. 2003) ............................................................ 213

*Chin v. Chrysler LLC*,
   538 F.3d 272 (3d Cir. 2008) ..................................................................... 286

*Chrysler Credit Corp. v. Whitney Nat'l Bank*,
   824 F. Supp. 605 (E.D. La. 1993) ...................................................... 285, 286

*Cinerama, Inc. v. Sweet Music, S.A.*,
   355 F. Supp. 1113 (S.D.N.Y. 1972) .......................................................... 272

*City of Hoboken v. Chevron Corp.*,
   45 F.4th 699 (3d Cir. 2022) ...................................................................... 333

*Clientron Corp. v. Devon IT, Inc.*,
   894 F.3d 568 (3d Cir. 2018) ...................................................................... 201

*CML V, LLC v. Bax*,
   6 A.3d 238 (Del. Ch. 2010),
   *aff'd*, 28 A.3d 1037 (Del. 2011) .............................................................. 292

*Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP,*
  262 F. Supp. 3d 118 (E.D. Pa. 2017) ........................................................ 322-323

*Commonwealth v. Conklin,*
  897 A.2d 1168 (Pa. 2006) ........................................................ 289

*Commonwealth v. Johnson,*
  26 A.3d 1078 (Pa. 2011) ........................................................ 288

*Commonwealth by Shapiro v. Golden Gate Nat'l Sr. Care LLC,*
  194 A.3d 1010 (Pa. 2018) ........................................................ 201, 326

*Commonwealth ex rel. Corbett v. Citizens Alliance for Better Neighborhoods, Inc.,*
  938 A.2d 1274 (Pa. Commw. Ct. 2009) ........................................................ 301

*Council of Alternative Political Parties v. Hooks,*
  179 F.3d 64 (3d Cir.1999) ........................................................ 334

*Council Tree Comm'ns, Inc. v. F.C.C.,*
  53 F.3d 284 (3d Cir. 2007) ........................................................ 332

*Craig v. Lake Asbestos of Quebec, Ltd.,*
  843 F.2d 145 (3d Cir. 1988) ........................................................ 217

*Crosse v. BCBSD, Inc.,*
  836 A.2d 492 (Del. 2003) ........................................................ 205

*Culbreath v. Amosa (Pty) Ltd.,*
  898 F.2d 13 (3d Cir. 1990) ........................................................ 206

*Curlett v. Madison Indus. Servs. Team, Ltd.,*
  863 F. Supp. 2d 357 (D. Del. 2012) ........................................................ 228

*D'Adamo v. Erie Ins. Exch.,*
  4 A.3d 1090 (Pa. Super. Ct. 2010) ........................................................ 304

*Danise v. Saxon Mortg. Servs Inc.,*
  738 F. App'x 47 (3d Cir. 2018) ........................................................ 217

*Daughtry v. Jenny G. LLC,*
  703 Fed. App'x 883 (11th Cir. 2017) ........................................................ 204

*Daval 37 Associates LLC v. Namdar,*
  No. 157359/14, 2015 WL 1504863 (N.Y. Sup. Ct. Apr. 2, 2015) ........................................................ 272

*Dennis' Nat. Mini-Meals, Inc. v. 91 Fifth Ave. Corp.*,
  172 A.D.2d 331 (N.Y. App. Div. 1991) ....................................... 208

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011) ..................................................... 207

*Difiore v. CSL Behring, U.S., LLC*,
  CIVIL ACTION No. 13-5027, 2015 WL 5316479 (E.D. Pa. Sep. 11, 2015) .......... 222

*Doehler Die Casting Co. v. Holmes*,
  52 N.Y.S.2d 321 (Sup. Ct. N.Y. Cnty. 1944) ............................... 272

*Dominion Dev. Grp., LLC v. Beverlein*,
  774 F. App'x 757 (3d. Cir. 2019) .......................................... 331

*East Coast Tender Serv., Inc. v. Robert T. Winzinger, Inc.*,
  759 F.2d 280 (3d Cir. 1985) ............................................... 321

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co.*,
  124 F.3d 252 (1st Cir. 1997),
  *aff'd*, 215 F.3d 182 (2000) ........................................... 234, 265

*Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*,
  346 F.3d 552 (5th Cir. 2003) .............................................. 328

*Eli Lilly Do Brasil Ltda v. Federal Express Corp.*,
  502 F.3d 78 (2d Cir. 2007) ................................................ 206

*Epperson v. Enter. Express, Inc.*,
  338 F. Supp. 2d 328 (D. Conn. 2004) ...................................... 235

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*,
  804 F.2d 787 (2d Cir. 1986) ............................................... 312

*Evcco Leasing Corp. v. Ace Trucking Co.*,
  828 F.2d 188 (3d Cir. 1987) ............................................... 216

*Fednay, Ltd. v. Isoramar, S.A.*,
  925 F.2d 599 (2d Cir. 1991) ............................................... 328

*Fidelity Bond & Mortgage Co. v. Brand*,
  371 B.R. 708 (E.D. Pa. 2007) .......................................... 235, 265

*Fineman v. Armstrong World Indus., Inc.*,
 980 F.2d 171 (3d Cir. 1992),
 *cert. denied*, 507 U.S. 921 (1993) ............................................................ 216

*Finkelman v. Nat'l Football League*,
 810 F.3d 187 (3d Cir. 2016) ...................................................................... 332

*Fletcher v. Atex, Inc.*,
 68 F.3d 1451 (2d Cir. 1995) ...................................................................... 230

*Floyd v. Lykes Bros. S.S. Co.*,
 844 F.2d 1044 (3d Cir. 1988) .................................................................... 204

*Flourine On Call, Ltd. v. Flourogas Ltd.*,
 380 F.3d 849 (5th Cir. 2004) ..................................................................... 218

*Garza v. Citigroup Inc.*,
 724 F. App'x 95 (3d Cir. 2018),
 *cert. denied*, 138 S. Ct. 2625 (U.S. 2018) ............................................... 226, 292
 299

*Great Lakes Insurance Se. v. Raiders Retreat Realty Co., LLC*,
 47 F.4th 225 (3d Cir. 2022),
 *cert. granted*, 2023 WL 2357327 (Mar. 6, 2023) ...................................... 203

*Gully v. First Nat'l Bank*,
 299 U.S. 109 (1936) ................................................................................... 333

*Haines v. Kibblehouse, Inc. v. Balfour Beatty Constr., Inc.*,
 553 F. App'x 246 (3d Cir. 2014) ............................................................... 217

*Hampshire Props. v. BTA Bldg. & Dev., Inc.*,
 996 N.Y.S.2d 129 (N.Y. App. Div. 2014) ................................................. 207

*Hasso v. Hapke*,
 227 Cal. App. 4th 107 (2014) .................................................................... 234

*Heckler v. Turner*,
 470 U.S. 184 (1985) ................................................................................... 290

*Henderson ex rel. Henderson v. Shinseki*,
 562 U.S. 428 (2011) ................................................................................... 325

*Hipple v. Hipple*,
   Civil Action No.12-1256, 2016 WL 320216 (E.D. Pa. Jan. 27, 2016) .................... 234
   274-275

*Image Masters, Inc. v. Chase Home Fin.*,
   489 B.R. 375 (E.D. Pa. 2013) ................................................................... 269

*Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*,
   CIVIL ACTION No. 16-1343, 2017 WL 2840352 (E.D. Pa. June 30, 2017) ......... 318-319
   321, 323

*In Matter of Complaint of Tug Beverly, Inc.*,
   Civ. A. No. 92-0099, 1994 WL 194891 (E.D. Pa. May 13, 1994) ......................... 320-321

*Inoff v. Craftex Mills, Inc.*,
   CIV. A. 06-3675, 2007 WL 4355385 (E.D. Pa. Dec. 11, 2007) ............................. 280-281

*In re 3dfx Interactive, Inc.*,
   389 B.R. 842 (Bankr. N.D. Cal. 2008) ....................................................... 261

*In re 1701 Com., LLC*,
   511 B.R. 812 (N.D. Tex. 2014) ................................................................ 265

*In re Blair*,
   588 B.R. 605 (Bankr. D. Colo. 2018) ....................................................... 252-253

*In re Blatstein*,
   226 B.R. 140 (Bankr. E.D. Pa. 1998),
   *aff'd sub nom In re Main, Inc.*, 1999 WL 689715 (E.D. Pa. Sept. 3, 1999 ............. 263, 264
   265

*In re Carbone*,
   615 B.R. 76 (Bankr. E.D. Pa. 2020) ....................................................... 236

*In re City of New York*,
   824 N.Y.S.2d 768 (N.Y. Super Ct. 2006) ................................................. 317

*In re Cox Motor Express of Greensboro, Inc.*,
   2016 WL 4259801 (M.D.N.C. Aug. 9, 2016) .............................................. 261, 278

*In re EBC I, Inc.*,
   380 B.R. 348 (Bankr. D. Del. 2008),
   *aff'd*, 382 F. App'x 135 (3d Cir. 2010) .................................................. 259, 278

*In re Fair Finance Co.*,
  13 F.4th 547 (6th Cir. 2021) ......................................................... 234, 263

*In re Fid. Bond & Mortg. Co.*,
  340 B.R. 266 (Bankr. E.D. Pa. 2006) ............................................. 252

*In re Gen. Trading, Inc.*,
  87 B.R. 216 (Bankr. S.D. Fla. 1988) ............................................. 253

*In re GTI Capital Holdings, LLC*,
  373 B.R. 671 (Bankr. D. Ariz. 2007) ............................................ 270

*In re Hechinger Inv. Co. of Del., Inc.*,
  278 F. App'x 125 (3d Cir. 2008) .................................................. 259

*In re Hillsborough Holdings Corp.*,
  166 B.R. 461 (Bankr. M.D. Fla.),
  *aff'd*, 176 B.R. 223 (M.D. Fla. 1994) ......................................... 230, 243

*In re Intelligent Direct Mktg.*,
  518 B.R. 579 (E.D. Cal. 2014) ..................................................... 280

*In re Investigating Grand Jury of Philadelphia County*,
  593 A.2d 402 (Pa. 1991) ............................................................ 334

*In re Lamar Haddox Contractor, Inc.*,
  278 F. App'x 125 (3d Cir. 2008) .................................................. 259

*In re Lemington Home for Aged*,
  659 F.3d 282 (3d Cir. 2011) ....................................................... 289, 290

*In re Lobell*,
  390 B.R. 206 (Bankr. M.D. La. 2008) .......................................... 291

*In re Lockwood Auto Group, Inc.*,
  450 B.R. 557 (Bankr. W.D. Pa. 2011) .......................................... 236, 256
                                                                                  268

*In re Lyondell Chem. Co.*,
  567 B.R. 55 (Bankr. S.D.N.Y. 2017),
  *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) ........................................... 240, 251

*In re M. Fabrikant & Sons, Inc.*,
  394 B.R. 721 (Bankr. S.D.N.Y. 2008) .......................................... 257

*In re Moll Indus., Inc.*,
  454 B.R. 574 (Bankr. D. Del. 2011) ....................................... 228

*In re Opus East, LLC*,
  698 F. App'x 711 (3d Cir. 2017) ....................................... *passim*

*In re Petters Co., Inc.*,
  557 B.R. 711 (Bankr. D. Minn. 2016) ....................................... 257

*In re Reliable Mfg. Corp.*,
  703 F.2d 996 (7th Cir. 1983) ....................................... 264

*In re SMTC Mfg. of Texas*,
  421 B.R. 251 (Bankr. W.D. Tex. 2009) ....................................... 243, 280

*In re SemCrude, L.P.*,
  648 F. App'x 205 (3d Cir. 2016) ....................................... 250

*In re SMTC Mfg. of Tex.*,
  421 B.R. 251 (Bankr. W.D. Tex. 2009) ....................................... 243

*In re Teleglobe Comm'ns Corp.*,
  392 B.R. 561 (Bankr. D. Del. 2008) ....................................... 244, 250

*In re Terminal Moving & Storage Co., Inc.*,
  631 F.2d 547 (8th Cir. 1980) ....................................... 264

*In re Tronox Inc.*,
  855 F.3d 84 (2d Cir. 2017) ....................................... 226

*In re Tutu Wells Contamination Litig.*,
  909 F. Supp. 1005 (D.V.I. 1995) ....................................... 206

*In re Valley Bldg. & Const. Corp.*,
  435 B.R. 276 (E.D. Pa. 2010) ....................................... 265

*In re Visteon Corp.*,
  579 F. App'x 121 (3d Cir. 2014) ....................................... 213

*In re Waterford Wedgwood USA*,
  500 B.R. 371 (Bankr. S.D.N.Y. 2013) ....................................... 269, 270

*In re Zambrano Corp.*,
  478 B.R. 670 (Bankr. W.D. Pa. 2012) ....................................... 268

*ITP, Inc. v. OCI Co.*,
   865 F. Supp. 2d 672 (E.D. Pa. 2012) ........................................................ 201

*JA Apparel Corp. v. Abboud*,
   682 F. Supp. 2d 294 (S.D.N.Y. 2010) ..................................... 208, 209
   233

*J.H. Grp., LLC v. Royal Rolling Chairs, LLC*,
   523 F. App'x 922 (3d Cir. 2013) ........................................................ 217

*Johnson v. Lansdale Borough*,
   146 A.3d 696 (Pa. 2016) ........................................................ 288

*Joy Vending Co. v. S. & A. Luncheonette & Rest., Inc.*,
   180 N.Y.S.2d 194 (1958) ........................................................ 312, 318

*JTREO, Inc. v. Hightower & Assocs., Inc.*,
   2020 WL 3468148 (Tex. App. June 18, 2020) ........................................................ 281

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
   529 F.3d 371 (7th Cir. 2008) ........................................................ 230

*Kaplan v. First Options of Chicago, Inc.*,
   19 F.3d 1503 (3d Cir. 1994),
   *aff'd*, 514 U.S. 938 (1995) ........................................................ 221

*Karson v. Arnow*,
   224 N.Y.S.2d 891 (1962) ........................................................ 266

*Kerrigan v. Otsuka Am. Pharm.*,
   560 F. App'x 162 (3d Cir. 2014) ........................................................ 287

*Kidd v. Symbion, Inc.*,
   No. 10-3361, 2011 WL 4020814 (E.D. La. Sept. 9, 2011) ..................................... 299, 300

*Klein v. Widner*,
   729 F.3d 280 (3d Cir. 2013) ........................................................ 236, 263

*Lehman Bros. Holdings, Inc. v. Matt*,
   34 A.D.3d 290 (N.Y. App. Div. 2006) ........................................................ 274

*Levy v. Sterling Holding Co., LLC*,
   544 F.3d 493 (3d Cir. 2008) ........................................................ 290

*Liberty Mut. Ins. Co. v. Horizon Bus. Co.,*
 No. CV 10-0449, 2011 WL 1131098 (E.D.N.Y. Feb. 22, 2011) ............................ 280

*Lightfoot v. U.S.,*
 564 F.3d 625 (3d Cir. 2009) ................................. 324

*Linde v. Linde,*
 220 A.3d 1119 (Pa. Super. Ct. 2022) ........................ 322

*Lomas v. Kravitz,*
 130 A.3d 107 (Pa. Super. Ct. 2015) ......................... 324

*La. World Exposition v. Fed. Ins. Co.,*
 858 F.2d 233 (5th Cir. 1988) ................................ 292

*Lusk v. Foxmeyer Health Corp.,*
 129 F.3d 773 (5th Cir. 1997) ................................ 228

*Lyon v. Lyon,*
 619 N.Y.S.2d 300 (1994) .................................... 266

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC,*
 220 F. Supp. 3d 450 (S.D.N.Y. 2016) ........................ 209

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,*
 739 F. Supp. 2d 100 (D. Conn. 2010) ........................ 292

*Mathes Brierre Architects v. Karlton/ISG Enter., LLC,*
 311 So. 3d 532 (La. Ct. App. 2020) ......................... 325

*Matter of S. Home and Ranch Supply, Inc.,*
 561 B.R. 810 (N.D. Ga. 2016) ........................... 270, 278

*McDonough Marine Serv. v. Doucet,*
 694 So. 2d 305 (La. Ct. App. 1996) ......................... 292

*Mehrtash v. Mehrtash,*
 112 Cal. Rptr. 2d 802 (Ct. App. 2001) .................. 235, 265

*Mellon Bank, N.A. v. Metro Commc'ns., Inc.,*
 945 F.2d 636 (3d Cir. 1991) ........................... 239, 246
 269, 271

*Metro. Steel Indus., Inc. v. FDIC,*
  68 A.D.2d 935 (2d Dept. 1979) ............................................................ 213, 306

*Meyer v. Bayles,*
  Civil Action No. 12-0043, 2012 WL 2522896 (W.D. La. May 31, 2012) .............. 202

*Meyer-Chatfield v. Century Bus. Servicing, Inc.,*
  732 F. Supp. 2d 514 (E.D. Pa. 2010) ...................................................... 304

*Mitchell v. CJKant Resource Group, LLC,*
  5:21-CV-2465, 2021 WL 5980049 (E.D. Pa. Dec. 17, 2021) ................................ 201, 202
                                                                                      325

*Monsanto Co. v. Rohm & Haas Co.,*
  456 F.2d 592 (3d Cir.1972),
  *cert. denied,* 407 U.S. 934 (1972) ......................................................... 303

*Montana-Dakota Utilities Company v. Northwestern Public Service Company,*
  341 U.S. 246 (1951) ......................................................................... 326

*Montrose Med. Grp. v. Bulgar,*
  243 F.3d 773 (3d Cir. 2001) ............................................................... 305-306

*Moody v. Sec. Pac. Bus. Credit, Inc.,*
  971 F.2d 1056 (3d Cir. 1992) .............................................................. 240, 251

*MRL Dev. I, LLC v. Whitecap Inv. Corp.,*
  823 F.3d 195 (3d Cir. 2016) ............................................................... 232

*Mullins v. TestAmerica, Inc.,*
  564 F.3d 386 (5th Cir. 2009) .............................................................. 234, 265

*Nadler v. Warner Co.,*
  184 A. 3 (Pa. 1936) ......................................................................... 334

*Nassau Chapter, Civ. Serv. Emp. Ass'n v. Bd. of Ed., Union Free
  Dist No. 3, Town of Hempstead,*
  310 N.Y.S.2d 381 (N.Y. App. Div. 1970) ................................................... 209, 233

*Nedd v. United Mine Workers of Am.,*
  488 F. Supp. 1208 (M.D. Pa. 1980),
  *aff'd sub nom. Ambromorage v. United Mine Workers of Am.,*
  726 F.2d 972 (3d Cir. 1984) ............................................................... 319

*Nederland Shipping Corp. v. United States,*
    18 F.4th 115 (3d Cir. 2021) .......................................... 328

*Newcrete Prods. v. City of Wilkes-Barre,*
    37 A.3d 7 (Pa. Commw. Ct. 2012) ............................... 219

*N.L.R.B. v. Scott Printing Corp.,*
    612 F.2d 783 (3d Cir. 1979) ........................................ 217

*Oato v. Xoxe,*
    276 A.2d 212 (Pa. Super. Ct. 2022) ............................. 322

*Ortiz v. Jordan,*
    562 U.S. 180 (2011) ..................................................... 333

*Osborne v. Univ. of Del.,*
    815 F. App'x 682 (3d Cir. 2020) ................................. 333

*Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC,*
    40 F. Supp. 3d 437 (E.D. Pa. 2014) ............................ 223

*Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.,*
    992 F.3d 893 (9th Cir. 2021) ...................................... 204

*Packard v. Provident Nat'l Bank,*
    994 F.2d 1039 (3d Cir. 1993) .................................... 332

*Peacock v. Thomas,*
    516 U.S. 349 (1996) ............................................ 201, 202
    325, 326

*Pearson v. Component Tech. Corp.,*
    247 F.3d 471 (3d Cir. 2001),
    *cert. denied,* 534 U.S. 950 (2001) ......................... 221, 302

*Peltz v. Hatten,*
    279 B.R. 710 (D. Del. 2002),
    *aff'd sub nom. In re USN Commc'ns, Inc.,*
    60 F. App'x 401 (3d Cir. 2003) .............................. 251-252

*Phillips v. Cricket Lighters,*
    883 A.2d 439 (Pa. 2005) ..................................... 323, 324

*Pittsburgh Live, Inc. v. Servov,*
   615 A.2d 438 (Pa. Super. Ct. 1992) ........................................................ 324

*Plotkin v. Joekel,*
   304 S.W.3d 455 (Tex. App. 2009) ........................................................ 381

*Prusky v. Reliastar Life Ins. Co.,*
   474 F. Supp. 2d 703 (E.D. Pa.),
   *aff'd*, 532 F.3d 252 (3d Cir. 2007) ........................................................ 303, 304

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Electron, Inc.,*
   123 F.3d 111 (3d Cir. 1997) ........................................................ 332

*Purnell v. Radnor Township School Dist.,*
   2022 WL 2757412 (E.D. Pa. July 14, 2022) ........................................................ 314

*Quadrant Structured Prods. Co. v. Vertin,*
   115 A.3d 535 (Del. Ch. 2015) ........................................................ 292

*R & I Elecs., Inc. v. Neuman,*
   66 A.D.2d 836 (N.Y. App. Div. 1978) ........................................................ 316

*Rapisardi v. Estate of Lange,*
   No. 22-1323, 2022 WL 4533851 (3d Cir. Sept. 28, 2022) ........................................................ 333

*RBATHTDSR, LLC v. Project 64 LLC,*
   Civil Action No. 19-1280-RGA, 2020 WL 2748027 (D. Del. May 27, 2020) ......... 202

*Red Ball Interior Demolition Corp. v. Palmadessa,*
   173 F.3d 481 (2d Cir. 1999) ........................................................ 213

*Resolution Tr. Corp. v. Farmer,*
   Civ. A. 92-3310, 1994 WL 317458 (E.D. Pa. June 24, 1994) ........................................................ 223

*Royce v. Michael R. Needle, P.C.,*
   381 F. Supp. 3d 968 (N.D. Ill. 2019) ........................................................ 264

*RSL Commc'ns PLC v. Bildirici,*
   649 F. Supp. 2d 184 (S.D.N.Y. 2009),
   *cert. denied*, 565 U.S. 816 (2011) ........................................................ 292

*Rupp v. Moffo,*
   358 P.3d 1060 (Utah 2015) ........................................................ 263

*S. Nicolia & Sons Realty Corp. v. AJA Concrete Ready Mix, Inc.*,
No. 001794/08, 2011 WL 499204 (N.Y. App. Div. Jan. 25, 2011) ........................ 316

*Saint-Jean v. Palisades Interstate Park Comm'n*,
49 F.4th 830 (3d Cir. 2022) .................................................................... 334

*St. Paul Fire and Marine Ins. Co. v. Board of Com'rs of Port of New Orleans*,
418 F. App'x 305 (5th Cir. 2011) ............................................................. 203

*Savage, Sharkey, Reiser & Szulborski Eye Care Consultants, P.C. v. Tanner*,
848 A.2d 150 (Pa. Super Ct. 2004) .......................................................... 303

*Schall v. Ronak Foods*,
Case No. 19-cv-01463-JDN, 2019 WL 4034765 (E.D. Pa. Aug. 27, 2019) ............ 322

*Sears, Roebuck & Co. v. Sears, plc*,
744 F. Supp. 1297 (D. Del. 1990) ............................................................ 303

*Shaw v. Rapone*,
585 F. Supp. 89 (E.D. Pa. 1984) ............................................................. 273

*Simmons v. Luba Workers' Comp.*,
206 So. 3d 397 (La. Ct. App. 2016) .......................................................... 205

*Simon v. Electrospace Corp.*,
28 N.Y.2d 136, 320 N.Y.S.2d 225 (1971) .................................................. 315

*Smith v. Marshview Fitness, LLC*,
212 A.3d 767 (Conn. App. 2019) ............................................................. 234

*Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*,
283 F.R.D. 142 (S.D.N.Y. 2012) ............................................................. 226

*Sovereign Bank v. REMI Cap. Inc.*,
49 F.4th 360 (3d Cir. 2022) .................................................................... 214

*Spence v. ESAB Grp., Inc.*,
623 F.3d 212 (3d Cir. 2010) .................................................................... 290

*Stonehill Cap. Mgmt., LLC v. Bank of the W.*,
28 N.Y.3d 439 (N.Y. app. Div. 2016) ....................................................... 273

*Stout Street Funding, LLC v. Johnson*,
Civil Action No. 10-5634, 2014 WL 5591043 (E.D. Pa. Nov. 4, 2014) ................ 322, 323

*Sugartown Worldwide, LLC v. Shanks*,
CIVIL ACTION NO. 14-5063, 2016 WL 7203513 (E.D. Pa. April 7, 2016) .......... 319

*Sun Ship, Inc. v. Matson Navigation Co.*,
785 F.2d 59 (3d Cir. 1986) ..................... 322, 323

*Swift and Co. Packers v. Compania Colombiana del Caribe SA*,
339 U.S. 684 (1950) ..................... 329

*Taaffe v. Life Ins. Co. of N. Am.*,
769 F. Supp. 2d 530 (S.D.N.Y. 2011) ..................... 310

*Tatonka Cap. Corp. v. Connelly*,
Civil Action No. 16-cv-01141-MSK-NYW, 2019 WL 5535226
(D. Colo. Oct. 25, 2019),
*aff'd*, 839 F. App'x 206 (10th Cir. 2020) ..................... 272

*Teachers Ins. & Annuity Ass'n of America v. Ormesa Geothermal*,
791 F. Supp. 401 (S.D.N.Y. 1991) ..................... 314

*Tekman v. Berkowitz*,
639 F. App'x 801 (3d Cir. 2016) ..................... 286

*Tenet Health Sys. Hosp. Dallas, Inc. v. N. Tx. Hosp. Physicians Grp., P.A.*,
438 S.W.3d 190 (Tex. App. 2014) ..................... 284

*Thales Alenia Space France v. Thermo Funding Co., LLC*,
No. 13-cv-712 SAS, 2014 WL 3887711 (S.D.N.Y. Aug. 7, 2014) ..................... 213

*Thomas v. Duralite Co., Inc.*,
524 F.2d 577 (3d Cir. 1975) ..................... 319

*TKS Realty, LLC v. 391 Broadway LLC*,
192 A.D.3d 572, 146 N.Y.S.3d 15 (2021) ..................... 317

*Town of Haynesville, Inc. v. Entergy Corp.*,
956 So. 2d 192 (La. App. 2d Cir. 2007) ..................... 205

*Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*,
609 F.3d 143 (3d Cir. 2010) ..................... 333

*Trinity Indus. Inc. v. Greenlease Holding Co.*,
903 F.3d 333 (3d Cir. 2018) ..................... *passim*

*Trs. of Nat'l Elevator Indus. Pension v. Lutyk,*
   332 F.3d 188 (3d Cir. 2003) ................................................................ 224, 225
   307

*United States v. Bestfoods,*
   524 U.S. 51 (1998) ............................................................................ 202, 221
   227, 228

*United States v. Exec. Health Res., Inc.,*
   196 F. Supp. 3d 477 (E.D. Pa. 2016) ................................................. 221, 222
   231

*United States v. Von Neumann,*
   474 U.S. 242 (1986) ........................................................................... 306

*United States ex rel. Greenfield v. Medco Health Sols., Inc.,*
   880 F.3d 89 (3d Cir. 2018) ................................................................ 290

*United States Fid. & Guar. Co. v. United Penn Bank,*
   524 A.2d 958 (Pa. Super. Ct. 1987) ................................................... 294

*Univ. Atl. Sys., Inc. v. Honeywell Int'l, Inc.,*
   388 F. Supp. 3d 417 (E.D. Pa. 2019) ................................................. 281

*U.S.I. Properties Corp. v. M.D. Constr. Co.,*
   230 F.3d 489 (1st Cir. 2000) .............................................................. 331

*VA C 12266 Jefferson, LLC v. Mattress Warehouse Inc.,*
   4:14CV34, 2014 WL 5311453 (E.D. Va. Oct.16, 2014) ...................... 202

*Viener v. Jacobs,*
   834 A.2d 546 (Pa. Super Ct. 2003),
   *cert. denied,* 543 U.S. 1146 (2005) .................................................... 302

*Vill. of Ilion v. Cnty of Herkimer,*
   18 N.E.3d 359 (N.Y. 2014) ................................................................ 314

*Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood,*
   752 A.2d 1175 (Del. Ch. 1999) .......................................................... 205

*Wechsler v. Hunt Health Sys., Ltd.,*
   330 F. Supp. 2d 383 (S.D.N.Y. 2004) ................................................ 307, 311

*Wenske v. Blue Bell Creameries, Inc.*,
  C.A. No. 2017-0699-JRS, 2018 WL 3337531 (Del. Ch. July 6, 2018) .................... 205

*Williamson v. Strickland & Smith, Inc.*,
  587 S.E.2d 876 (Ga. Ct. App. 2003) ........................................................ 312, 318

*Yenchi v. Ameriprise Fin., Inc.*,
  161 A.3d 811 (Pa. 2017) ........................................................................ 285

*Zamora v. Bodden*,
  395 F. App'x 118 (5th Cir. 2010) ............................................................ 329

*Zavecz v. Yield Dynamics, Inc.*,
  179 F. App'x 116 (3d Cir. 2006) ............................................................. 286

*Zurich Am. Ins. Co. v. MB Fin. Bank, N.A.*,
  2020 WL 4913178 (Ill. App. Aug. 19, 2020) ............................................. 235

## Constitution, Statutes and Rules:

U.S. Const. art. III, § 2 ............................................................................ 332

28 U.S.C. § 1333 ..................................................................................... 332

28 U.S.C. § 1961(a) ................................................................................. 322

6 Del. C. § 18-1001 ................................................................................. 292

6 Del. C. § 18-1002 ................................................................................. 292

La. R.S. § 10:1-204 ................................................................................. 264

La. R.S. § 10:9-203(b) ............................................................................ 263

La. R.S. § 12:1366(A) ............................................................................. 291

La. R.S. § 12:1314(A)(1) ......................................................................... 291

La. R.S. § 12-1320(A) ............................................................................. 291

La. R.S. § 12-1320(C) ............................................................................. 291

N.Y. C.P.L.R. § 5004(a) .......................................................................... 310

1 Pa. C.S. § 1927 ................................................................ 262

1 Pa. C.S. § 1939 ................................................................ 241, 242
289

12 Pa. C.S. § 5101 .............................................................. *passim*

12 Pa. C.S. § 5101(a) .......................................................... 284

12 Pa. C.S. § 5101(b) .......................................................... 234, 263

12 Pa. C.S. § 5102 .............................................................. 239, 241

12 Pa. C.S. § 5102(a) .......................................................... 239, 241
248

12 Pa. C.S. § 5102(b) .......................................................... 241, 252

12 Pa. C.S. § 5103 .............................................................. 262, 269

12 Pa. C.S.§ 5104 .............................................................. 242

12 Pa. C.S. § 5104(a) .......................................................... 233

12 Pa. C.S. § 5104(a)(1) ...................................................... *passim*

12 Pa. C.S. § 5104(a)(2) ...................................................... 270

12 Pa. C.S. § 5104(a)(2)(i)-(ii) ............................................. *passim*

12 Pa. C.S. § 5104(b)(9) ...................................................... 239

12 Pa. C.S. § 5104(c) .......................................................... 233, 246
265, 266

12 Pa. C.S. § 5105 .............................................................. 233, 237
270

12 Pa. C.S. § 5105(a) .......................................................... 239

12 Pa. C.S. § 5105(b) .......................................................... 236

12 Pa. C.S. § 5106(4) .......................................................... 284

|  | Page(s) |
|---|---|
| 12 Pa. C.S. § 5106(5)(i)-(ii) | 272 |
| 12 Pa. C.S. § 5108(b)(1) | 280 |
| 12 Pa. C.S. § 5110 | 233-234 |
| 13 Pa. C.S. § 1204 | 264 |
| 13 Pa. C.S. § 9203(b) | 263 |
| 13 Pa. C.S. 9317(a)(2) | 263 |
| 15 Pa. C.S. § 402(a)(1) | 286, 291 |
| 15 Pa. C.S. § 402(a)(2) | 291 |
| 15 Pa. C.S. § 512(a) | 288 |
| 15 Pa. C.S. § 1712(a) | 288 |
| 15 Pa. C.S. § 1717 | 288, 289 |
| 15 Pa. C.S. § 2543(a) | 299 |
| 15 Pa. C.S. § 8812(a) | 286, 291 |
| 15 Pa. C.S. § 8814 | 286, 291 |
| 15 Pa. C.S. § 8831 | 288 |
| 15 Pa. C.S. § 8832 | 288 |
| 15 Pa. C.S. § 8833 | 288 |
| 15 Pa. C.S. § 8834 | 288 |
| 15 Pa. C.S. § 8834(a) | 288 |
| 15 Pa. C.S. § 8835 | 288 |
| 15 Pa. C.S. § 8849.1 | 287 |
| 15 Pa. C.S. § 8849.2 | 287 |

15 Pa. C.S. § 8881 ................................................................... 287

15 Pa. C.S. § 8881(a)-(b) ...................................................... 287

15 Pa. C.S. § 8882(a) ............................................................ 287

15 Pa. C.S. § 8943(b)(1) ....................................................... 288

42 Pa. C.S. § 8141 ................................................................. 263

Tex. Bus. & Com. Code § 24.002 ......................................... 234

Tex. Bus. & Com. Code § 26.01(a) ....................................... 283

Tex. Bus. & Com. Code § 26.01(b)(2) .................................. 283

Fed. R. Civ. P. 8(d)(2) .......................................................... 306

Fed. R. Civ. P. 8(d)(3) .......................................................... 306

Fed. R. Civ. P. 12(h)(3) ........................................................ 324, 331

Fed. R. Civ. P. 13(a)(1)(A) .................................................... 306

Fed. R. Civ. P. 18(b) ............................................................. 306

## Other Authorities:

AICPA Forensic Valuation Service Practice Aid, *Discount Rates, Risk and Uncertainty in Economic Damages Calculations (2012)* at 35 ......................... 313

AICPA Forensic Valuation Services Practice Aid, *Calculating Lost Profits (2019)* at 60 ...................................................... 313

AICPA Practice Aid 06-4 on Lost Profits, *Calculating Lost Profits (2019)* at 36 ............................................................... 313

11 *Corbin on Contracts* § 55.3 (2022) ................................. 311

11 *Corbin on Contracts* § 55.11 (2022) ............................... 316

1 Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.85 (2016) ............. 233

Roger Grabowski, Carla Nunes & James P. Harrington,
*2016 Valuation Handbook Guide to Cost of Capital* at 2-11 (2016) ........................ 313

Jeffrey H. Kinrich & Everett P. Harry III,
*Lost Profits, Damages, Principles, Methods and Applications* at 495 (2017) .......... 313, 314

15 *Mertens Law of Fed. Income Tax'n* § 59:21 (2021) ............................................... 259

28A N.Y. Prac. *Contract Law* § 22:15 (2022) ............................................................ 316

*Restatement (Second) of Conflicts* § 307 (1971) ....................................................... 206

Roman L. Weil, *Litigation Services Handbook: The Role of the
Financial Expert* at.5-10 (6th ed. 2017) ..................................................................... 313

*Williston on Contracts* § 64:3 (4th ed. 2022) ............................................................. 316

In accordance with paragraph 3 of the Court's Order dated February 16, 2023 (Dkt. 720), Defendants propose the following Findings of Facts ("FOF") and Conclusions of Law ("COL"). To the extent that any Findings of Fact are deemed to be Conclusions of Law, they should be incorporated into the Conclusions of Law that follow.[1]

## PROPOSED FINDINGS OF FACT

Defendants' factual submission proceeds in a series of subject matter sections, as follows:

1.     An introduction to the parties, non-parties and witnesses (FOF ¶¶ 1-86);

2.     Introductions to the crude oil and crude oil logistics markets (FOF ¶¶ 87-102);

3.     Introductions to Bridger LLC, Bridger Logistics, Eddystone (including co-owners Canopy and Enbridge) and Monroe Energy, and the relationships among those parties, all before Bridger, LLC was introduced to Ferrellgas (FOF ¶¶ 103-286);

4.     Introductions to the pertinent Ferrellgas entities, including the post-2012 diversification strategy, the identification of Bridger Logistics as an acquisition target, and the due diligence process and undertakings that preceded the transaction (FOF ¶¶ 287-452);

5 .     An overview of the acquisition mechanics, including the deal documents and the elimination of Bridger Logistics debt, the financing undertaken by Ferrellgas to accomplish the acquisition, and compliance efforts in connection with existing Ferrellgas working capital arrangements (FOF ¶¶ 453-510);

6.     The post-acquisition operational environment, including the management of Bridger Logistics, the on-going relationship with Eddystone, the Ferrellgas steps to increase the size of its working capital credit facility, and the unforeseen liquidity challenges experienced by

---

[1] In accordance with the Court's February 16, 2023 Order, Defendants are "fil[ing] under seal, or in redacted form, any sealed exhibit or any sealed portion of the trial transcript," including excerpts from such sealed exhibits and testimony, without filing a separate motion to seal.  Dkt. 720  ¶ 5.

Jamex when its intermediation financing arrangement wound down and Eddystone declined to facilitate a replacement arrangement negotiated with Carlyle (FOF ¶¶ 511-637);

7. The confluence of events leading to the 2016 suspension arrangement engineered by Jamex and Monroe, followed by the sale of BTS to Jamex and ending with Jamex's unforeseen refusal to resume crude shipments at Monroe's request, including frantic efforts by Bridger Logistics and Ferrellgas to preserve the overall arrangement (FOF ¶¶ 638-777);

8. And, finally, the financial and personal defeats suffered by Bridger Logistics, Ferrellgas, and their leaders, the settlement orchestrated in the arbitration Eddystone commenced against Jamex as a springboard to this case, and the decision by Enbridge to discard the Eddystone facility and seek to recoup its investment exclusively from these Defendants (FOF ¶¶ 778-827).

## I. PARTIES, RELEVANT NON-PARTIES, AND WITNESSES.

### A. Parties.

1. At the time it brought this action, Eddystone Rail Company, LLC ("Eddystone" or "ERC") was a limited liability company ("LLC") organized under the laws of Delaware with its principal place of business in Eddystone, Pennsylvania. Dkt. 732 (Joint Stipulation of Facts) ¶ 5. Eddystone was a party to the Rail Facilities Services Agreement ("RSA") with non-party Bridger Transfer Services, LLC ("BTS"). *See* Trial Ex. 90-A.

2. Eddystone's principal asset, and the asset at issue in this litigation, was a rail-to-barge transloading facility (the "Eddystone Facility") located in Eddystone, Pennsylvania. E. Johnson, 12/13/22 Tr. 138:10-12.

3. Eddystone was a joint venture between nonparty Enbridge Rail (Philadelphia), LLC ("Enbridge Rail," 75% owner), and nonparty Canopy Prospecting, Inc. ("Canopy," 25% owner).

Dkt. 732 ¶ 3; *see also* Paradis, 9/19/22 Tr. 143:14-17; Galloway, Dep. Tr. 43:21-44:4.[2]

4.      The Eddystone joint venture was governed by two management representatives from each of Enbridge Rail and Canopy (the "Eddystone Management Committee"). Dkt. 732 ¶ 4; Paradis, 9/19/22 Tr. 177:4-9.

5.      From January 1, 2015 through December 31, 2018, Ferrellgas Partners, L.P. ("Ferrellgas Partners"), and Ferrellgas, L.P. ("Ferrellgas LP") were Delaware limited partnerships with their headquarters in Kansas. Dkt. 732 ¶ 6.

6.      From 2014 through 2016, Ferrellgas Partners was a publicly traded limited partnership that owned an approximate 99% partnership interest in Ferrellgas LP. During that period, Ferrellgas Partners was the holding company, and Ferrellgas LP was the operating company. Dkt. 732 ¶ 7; Trial Ex. 1399-A.5. As the holding company, Ferrellgas Partners conducts no operations. Trial Ex. 1399-A.5. Ferrellgas LP accounts for substantially all of the Ferrellgas consolidated assets, sales, and operating earnings. *Id.*

7.      On June 24, 2015, Ferrellgas Partners acquired Bridger Logistics and certain of its subsidiaries from Bridger, LLC, pursuant to a May 29, 2015 Purchase and Sale Agreement by and between Bridger, LLC, as seller, and Ferrellgas Partners, as purchaser (the "Acquisition"). Dkt. 732 ¶ 10; Trial Ex. 2705. "Acquired Subsidiaries" is a defined term in the Purchase and Sale Agreement, and includes Bridger Transportation, LLC; Bridger Leasing, LLC; Bridger Transfer Services, LLC; Bridger Storage, LLC; Bridger Rail Shipping, LLC; Bridger Marine, LLC; Bridger Shipper, LLC; Bridger Lake, LLC; Bridger Administrative Services II, LLC; Bridger Real Property, LLC; J.J. Addison Partners, LLC; J.J. Karnack Partners, LLC; and J.J. Liberty, LLC.

---

[2] All citations to trial testimony use the following convention: [Witness], [date] Tr. [page/line range]. All citations to deposition designations use the following convention: [Witness], Dep. Tr. [page/line range].

Dkt. 732 ¶ 10; Trial Ex. 2705 (the "Ferrellgas PSA").

8.      From June 24, 2015 to December 31, 2016, Bridger Logistics, LLC ("Bridger Logistics") was a Louisiana limited liability company with its principal place of business in Texas. Dkt. 732 ¶ 12; Trial Ex. 105.  After the Acquisition, Bridger Logistics was a subsidiary of the operating company, Ferrellgas LP.  *See* Trial Ex. 1399-A.5.

9.      From June 24, 2015 through February 1, 2016, the other Defendants in this action had the following organizational underpinnings:

      a.      Bridger Administrative Services II, LLC, a Delaware limited liability company;

      b.      Bridger Marine, LLC, a Delaware limited liability company;

      c.      Bridger Rail Shipping, LLC, a Louisiana limited liability company;

      d.      Bridger Real Property, LLC, a Delaware limited liability company;

      e.      Bridger Storage, LLC, a Louisiana limited liability company;

      f.      Bridger Transportation, LLC, a Louisiana limited liability company;

      g.      Bridger Energy, LLC, a Delaware limited liability company;

      h.      Bridger Leasing, LLC, a Louisiana limited liability company;

      i.      Bridger Lake, LLC, a Delaware limited liability company;

      j.      J.J. Liberty, LLC, a Texas limited liability company; and

      k.      J.J. Addison Partners, LLC, a Texas limited liability company.

Dkt. 732 ¶ 15.

10.      Bridger Terminals, LLC ("Bridger Terminals"), a Delaware limited liability company, was formed as a wholly-owned subsidiary of Bridger Logistics on January 7, 2016.  Dkt. 732 ¶ 16; Trial Ex. 1857.

11.     Bridger Swan Ranch, LLC ("Bridger Swan Ranch"), a Delaware limited liability company, was formed as a wholly-owned subsidiary of Bridger Logistics on January 11, 2016. Dkt. 732 ¶ 17; Trial Ex. 1856.

**B.     Key Non-Parties.**

12.     Nonparty Ferrellgas, Inc. is a Delaware corporation.  *See* Trial Exs. 1567-F, 1851.10.  From 2014 to 2016, Ferrellgas, Inc., held a 1% general partner interest in Ferrellgas Partners and an approximate 1% general partner interest in Ferrellgas LP.  Dkt. 732 ¶ 8.  As general partner, Ferrellgas, Inc., performed all management functions required by Ferrellgas Partners and Ferrellgas LP.  *Id.*  As part of those management functions, Ferrellgas, Inc. employed all of the employees within the broader organization.  Wambold, 12/8/22 Tr. 169:12-20; *see also* Trial Ex. 678 (Gamboa Employment Agreement with Ferrellgas, Inc.); Trial Ex. 673-B (Rios Employment Agreement with Ferrellgas, Inc.); Knapp, Dep. Tr. 16:21-17:1 ("Q. After the closing, I take it you were employed by Ferrellgas, Inc.; is that correct?  A. Correct."); Rios, 9/22/22 Tr. 61:3-12 ("Was it your understanding that the employees of Ferrellgas are employed by Ferrellgas Inc.?  A. That is my understanding.").

13.     Nonparty Bridger, LLC, was created from Bridger Group, LLC, on June 28, 2013. Dkt. 732 ¶ 9; *see* Ballengee, 9/20/22 Tr. 11:22-12:13; Trial Exs. 171.4, 167-A.19.  From July 1, 2013 through June 24, 2015, Bridger, LLC, was a Delaware limited liability company with its principal office in Texas.  Dkt. 732 ¶ 9; *see* Trial Ex. 167-A.19.

14.     Before the Acquisition, Bridger, LLC owned Bridger Logistics and nonparty Bridger Marketing, LLC ("Bridger Marketing"), which was formerly known as Bridger Trading, LLC.  Dkt. 732 ¶ 13; Ballengee, 9/20/22 Tr. 15:5-10, 28:4-6.

15.     Troy Lee served as general counsel for Bridger, LLC and Bridger Logistics until the Acquisition.  *See* Rios, 9/21/22 Tr. 66:21-24; Gamboa, 12/7/22 Tr. 106:20-107:1; Hampton,

12/14/22 Tr. 108:15-109:3. Lee served as counsel to Bridger Logistics for a short time after the Acquisition as "a transition to get us up to speed from a legal standpoint." Hampton, 12/14/22 Tr. 108:15-109:3.

16. Bridger Marketing was the contractual counter-party to nonparty Monroe Energy, LLC ("Monroe") under the July 1, 2014 Crude Oil Supply Agreement ("COSA") and May 26, 2015 Amended and Restated Crude Oil Supply Agreement ("Amended COSA"). Dkt. 732 ¶¶ 49, 55; Trial Exs. 1733 (COSA), 1736 (Amended COSA).

17. As of July 1, 2013, nonparty Riverstone V Bridger Holdings, L.P. ("Riverstone")—an entity associated with Riverstone Holdings LLC, a private equity firm—owned 41.1791% of Bridger, LLC. *See* Dkt. 732 ¶ 9; Ballengee, 9/20/22 Tr. 13:17-14:10; Rios, 9/22/22 Tr. 122:13-21; Trial Ex. 167-A.67.

18. Ferrellgas did not acquire Bridger, LLC or Bridger Marketing, LLC. Dkt. 732 ¶ 58; Trial Ex. 2705 (Purchase and Sale Agreement); Ballengee, 9/20/22 Tr. 60:22-61:16. After the Acquisition, Ballengee became the sole owner of Bridger, LLC, which continued to own Bridger Marketing. Ballengee, 9/20/22 Tr. 15:5-15, 84:12-18; 87:2-4.

19. After the Acquisition, Bridger, LLC changed its name to Jamex, LLC ("Jamex"). Dkt. 732 ¶ 11; Ballengee, 9/20/22 Tr. 84:16-23. At the same time, Bridger Marketing became Jamex Marketing, LLC ("Jamex Marketing"). Ballengee, 9/20/22 Tr. 15:5-10, 86:17-19.

20. Nonparty Bridger Transfer Services, LLC ("BTS") was a Louisiana limited liability company, organized on June 1, 2011. Dkt. 732 ¶ 14; Trial Ex. 1538-A. As of July 1, 2013, and through February 1, 2016, the sole member of BTS was Bridger Logistics. Dkt. 732 ¶ 14; Trial Ex. 1538-A. BTS was acquired as a Bridger Logistics subsidiary in the June 24, 2015 Acquisition by Ferrellgas. *See* Findings of Fact ("FOF") ¶ 7 (identifying Acquisition). BTS was Eddystone's

contractual counterparty under the RSA.  Trial Ex. 90-A.  At all relevant times, BTS had no employees.  Trial Ex. 1439-H.15 (§ 4.9). [3]

21.     Nonparty Jamex Transfer Holdings, LLC ("JTH"), is a Texas limited liability company with its principal offices in Carrollton, Texas.  Trial Ex. 1439-H.15 at 2.  JTH acquired BTS pursuant to a Purchase and Sale Agreement by and between Bridger Logistics, LLC , as Seller, and Jamex Transfer Holdings, LLC, as Buyer, dated February 22, 2016.  *Id.* at 1.  At that time, BTS was renamed Jamex Transfer Services ("JTS").  Trial Ex. 1445-A; Ballengee, 9/20/22 Tr. 136:22-24.  JTH was a wholly owned subsidiary of Jamex Marketing.  Trial Ex. 1433-A.1.

22.     Nonparty Enbridge Rail, LLC, a Delaware limited liability company, is a subsidiary of Enbridge, Inc. (collectively with other Enbridge entities, "Enbridge").  Dkt. 732 ¶ 2.  Enbridge Rail was set up solely for the purpose of holding the Eddystone facility in Pennsylvania and any expansions.  Wilkins, Dep. Tr. 90:10-14, 93:17-22.

23.     Nonparty Canopy is a Pennsylvania corporation.  Dkt. 732 ¶ 2.

24.     Nonparty Monroe, a Delaware limited liability company, is the operator of a refinery on the Delaware River in Trainer, Pennsylvania, which refines crude oil into refined products, including jet fuel for Monroe's parent company, Delta Airlines.  Dkt. 732 ¶ 18; Ballengee, 9/20/22 Tr. 46:20-24; Rios, 9/22/22 Tr. 30:6-12.  Monroe was the contractual partner with Jamex Marketing (f/k/a Bridger Marketing) under the COSA and Amended COSA.  *See* Dkt. 732 ¶¶ 49, 55; Trial Exs. 1733 (COSA), 1736 (Amended COSA).

25.     Senior executives at Monroe include Jeff Warmann, the Chief Executive Officer ("CEO") (Monroe 30(b)(6) (Hunter), Dep. Tr. 12:15-16; *see also* Wambold, 12/9/22 Tr. 74:12-14) and Graeme Burnett, the Chairman of the Board of Monroe and the Senior Vice President of Fuel

---

[3] Trial Exhibit 1439-H is the same exhibit as 1433-E.

for Delta Airlines. *See* Monroe 30(b)(6) (Hunter), Dep. Tr. 13:4-8.

26.    At the time of the Acquisition, Ferrellgas had a $600 million secured credit facility with nonparty Bank of America, N.A. ("Bank of America"), and a syndicate of other lenders, for which Bank of America acted as administrative agent, pursuant to a November 2, 2009 Credit Agreement (Trial Ex. 1851), along with related amendments and supplements. *See* Trial Ex. 1851.4 (identifying "Other Lenders"); Heitmann, 2/14/23 Tr. 96:16-20.

27.    Nonparty Bracewell LLP ("Bracewell") served as usual outside counsel to Ferrellgas in connection with issues related to the credit facility, including an expansion of the credit facility that closed in early 2016. Heitmann, 2/14/23 Tr. 54:15-18; Miles, 12/13/22 Tr. 8:24-9:1. Bracewell was not retained to perform work in connection with the Acquisition, even to the extent it affected the credit agreement. Miles, 12/12/22 Tr. 197:24-198:5.

28.    Nonparty Thompson & Knight LLP ("Thompson & Knight") was Bank of America's outside counsel in connection with the credit facility. Miles, 12/12/22 Tr. 235:5-7.

29.    Ferrellgas retained nonparty Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as outside counsel to provide legal advice in connection with the Acquisition and subsequent legal issues involving Bridger Logistics. Wambold, 12/9/22 Tr. 14:4-7; Miles, 12/13/22 Tr. 7:10-15; Hampton, 12/14/22 Tr. 102:4-7; Soiefer, 12/5/22 Tr. 155:2-12.

30.    During the relevant time period, nonparty Grant Thornton LLP ("Grant Thornton") served as Ferrellgas's independent auditor. Heitmann, 2/14/23 Tr. 14:8-13, 45:24-46:6. Ferrellgas also retained Grant Thornton to perform financial due diligence and prepare a quality-of-earnings analysis in connection with the Acquisition. *See id.* 13:14-16, 141:16-18; Wambold, 12/9/22 Tr. 14:4-6; Soiefer, 12/6/22 Tr. 55:8-11; Kelly, 2/13/23 Tr. 8:19-22.

31.    In 2012-2013, Bridger, LLC retained nonparty investment bank Simmons &

Company International ("Simmons") to serve as its investment bank in a process that resulted in Riverstone's investment in Bridger, LLC. Rios, 9/23/22 Tr. 116:17-117:3. In early 2015, Ferrellgas retained Simmons to make introductions to facilitate Ferrellgas's exploration of growth initiatives into areas other than propane. Soiefer, 12/5/22 Tr. 66:22-67:13; Soiefer, 12/6/22 Tr. 53:15-21. Ferrellgas also retained Simmons to advise in connection with the Acquisition. *See* Wambold, 12/9/22 Tr. 14:7-8; Heitmann, 2/14/23 Tr. 13:7-14; Soiefer, 12/6/22 Tr. 55:15-17.

32. Ferrellgas retained nonparty JPMorgan Chase & Co. ("JPMC") to advise on financing for the Acquisition, including an approximately $500 million senior note offering. *See* Trial Ex. 652-A.5; Wambold, 12/9/22 Tr. 14:8-9; Heitmann, 2/14/23 Tr. 14:2-4, 36:11-15; Soiefer, 12/6/22 Tr. 55:15.

33. Nonparty investment bank Evercore Group L.L.C. ("Evercore") advised Bridger, LLC in connection with the Acquisition. *See* Ballengee, 9/20/22 Tr. 166:14-16; Soiefer, 12/6/22 Tr. 59:2-4; Rios, 9/21/22 Tr. 44:23-45:10; Rios, 9/23/22 Tr. 82:6-12; Wambold, 12/8/22 Tr. 190:18-22; Trial Ex. 687.5.

34. Nonparty GreatBanc Trust Company ("GreatBanc") was the trustee of the ESOP. Heitmann, 2/14/23 Tr. 33:3-4.

35. Nonparty Stout Risius Ross, LLC ("SRR") was a global investment bank and advisory firm specializing in corporate finance that advised GreatBanc in connection with its evaluation of the Acquisition. Wambold, 12/9/22 Tr. 16:7-18; Heitmann, 2/14/23 Tr. 37:17-21.

### C. Eddystone Fact Witnesses.

#### *Brian Boaz.*

36. Bryan Boaz served as the Manager of Rail Logistics for Enbridge from November 2012 through March 2014, Manager of Rail Operational Risk and Management for Enbridge from March 2014 through August 2014, and Manager of Asset Performance and Enterprise Risk for

9

Enbridge from August 2014 through November 2016.  Dkt. 732 ¶ 20; Boaz, Dep. Tr. 20:21-24, 23:19-22, 26:18-27:9; Trial Ex. 2379.   In August 2014, Boaz became the President of the Eddystone Management Committee.  Dkt. 732 ¶ 20; Boaz, Dep. Tr. 7:10-21.  Boaz's testimony was submitted via designation in both his individual capacity and as a corporate representative.  *See* Dkt. 732 ¶ 21; Boaz, Dep. Tr. 7:11-17; Eddystone 30(b)(6) (Boaz), Dep. Tr. 17:23-18:1.

### Mary Cohen.

37.     At the time of her deposition, Mary Cohen was Senior Legal Counsel in the U.S. Liquid Pipelines group at Enbridge and had been employed by Enbridge as legal counsel for eight years.  Dkt. 732 ¶ 22; Eddystone 30(b)(6) (Cohen), Dep. Tr. 8:8-14.

### Thomas Fridel.

38.     Thomas Fridel was Director of Rail Operations at Enbridge from March 2012 through August 2015.  Dkt. 732 ¶ 23; Fridel, Dep. Tr. 25:3-5, 26:11-18, 30:9-11.  During his time at Enbridge, Fridel served on the Eddystone Management Committee.  Fridel Dep. Tr. 28:12-16; Wilkins Dep. Tr. 95:23-96:5.   In October 2015, Fridel became Vice President of Operations at Eddystone, employed by Canopy.  Dkt. 732 ¶ 23; Fridel, Dep. Tr. 29:8-13, 367:15-19, 369:15-18. Fridel's testimony was submitted through deposition designation.  *See* Fridel, Dep. Tr. 10:21-23.

### John "Jack" Galloway.

39.     John "Jack" Galloway was the Canopy President and CEO during the relevant time period.  Dkt. 732 ¶ 24; Galloway, Dep. Tr. 24:16-25:16.  He was also a principal owner of Canopy at the time.  Dkt. 732 ¶ 24; Galloway, Dep. Tr. 26:5-8.  Galloway was also on the Eddystone Management Committee, which made "major decisions" related to the facility.  Galloway, Dep. Tr. 51:17-52:15. Galloway's  testimony was submitted through deposition designation.  *See id.*

### Erik Johnson.

40.     Erik Johnson was the Canopy Vice President and General Manager from 2012

through at least 2016. Dkt. 732 ¶ 27; E. Johnson, 12/13/22 Tr. 75:10-16; Trial Ex. 50-A. In that role, Johnson was responsible for running the day-to-day operations of Canopy. E. Johnson, 12/13/22 Tr. 75:17-19. Johnson is also a shareholder of Canopy. *Id.* at 75:20-21. He was also on the Eddystone Management Committee. *Id.* at 78:18-23.

### *Vincent Paradis.*

41.     Vincent Paradis is Vice President of U.S. Business Development for the Liquid Pipelines business unit at Enbridge. Dkt. 732 ¶ 30. He became involved in the Eddystone project in June 2014. *Id.* The chair of the Eddystone Management Committee reported to Paradis beginning in June 2014. Paradis, 9/19/22 Tr. 144:1-5. During that time, Paradis had other business development and mergers and acquisition responsibilities at Enbridge. *Id.* 144:14-20.

### *Kelly Wilkins.*

42.     Kelly Wilkins was employed by Enbridge from December 2006 until he joined Bridger Logistics in June 2014. Dkt. 732 ¶ 32; Wilkins Dep. Tr. 13:9-15:15. At Enbridge, he served as the business development project coordinator for the Eddystone rail project until Eddystone was formed. Dkt. 732 ¶ 32; Wilkins Dep. Tr. 13:9-15:15. Wilkins subsequently served as an Enbridge representative on the Eddystone Management Committee. Dkt. 732 ¶ 32; Wilkins, Dep. Tr. 14:2-18. When he joined Bridger Logistics, Wilkins served as the Senior Vice President of Business Development for Bridger Logistics from June 2014 through October 2016. Dkt. 732 ¶ 32; Wilkins Dep. Tr. 10:25-11:23, 12:20-23.

### *Robert Yaremko.*

43.     At the time of his deposition, Robert Yaremko was Director of the liquids pipeline accounting function at Enbridge and had held that position for three years. Dkt. 732 ¶ 33; Eddystone 30(b)(6) (Yaremko), Dep. Tr. 11:2-7.

44.     Boaz, Cohen, and Yaremko testified as Eddystone's corporate representatives. Dkt.

732 ¶ 21; Eddystone 30(b)(6) (Boaz), Dep. Tr. 17:23-18:1; Eddystone 30(b)(6) (Cohen), Dep. Tr. 9:20-24; Eddystone 30(b)(6) (Yaremko), Dep. Tr. 10:14-16.

### D. Bridger, LLC/Bridger Logistics Fact Witnesses.

#### *James Ballengee.*

45.     Prior to the Acquisition, James Ballengee held the following titles: Executive Vice President and Chief Commercial Officer of Bridger, LLC, Executive Vice President of Bridger Marketing, and Manager of Bridger Logistics.  Dkt. 732 ¶ 19; Ballengee, 9/20/22 Tr. 15:1-4, 15:18-19, 15:23-16:3.

46.     Ballengee graduated from Louisiana State University with a degree in accounting. Ballengee, 9/20/22 Tr. 157:18-22.  He passed the Certified Public Accountancy ("CPA") exam and previously held a CPA license.  *Id.* at 157:23-25.  From 1997 to 2010, Ballengee was affiliated with a company called Taylor Gas.  *Id.* at 158:7-10.  In 2010, Ballengee founded Bridger Group, LLC.  *Id.* at 158:22-24.  Prior to the Acquisition, Ballengee managed Bridger Marketing and was familiar with its financial performance and significant contracts.  *Id.* at 34:21-24, 35:23-25.

47.     After the Acquisition, Ballengee indirectly owned 100% of Bridger, LLC, renamed Jamex, LLC.  Ballengee, 9/20/22 Tr. 80:12-18, 84:16-23, 86:17-23, 87:2-8; Trial Ex. 1576-B.2 (Side Letter Agreement); Trial Ex. 748.1 (Redemption Agreement).  Jamex, LLC owned 100% of Jamex Marketing (f/k/a Bridger Marketing).  Ballengee, 9/20/22 Tr. 84:16-23, 86:17-23, 87:2-8.

#### *Jeremy Gamboa.*

48.     Prior to the Acquisition, Jeremy Gamboa served as Executive Vice President and Chief Operating Officer ("COO") of Bridger, LLC and its subsidiaries.  *See* Trial Exs. 589-A.9, 167-A.67; Gamboa, 12/6/22 Tr. 244:9-23; Gamboa, 12/7/22 Tr. 56:22-57:18; Ballengee, 9/20/22 Tr. 13:24-14:5.

49.     From 2000 to 2004, Gamboa worked for Rising Star Crude Company as a crude

marketer, where he purchased crude oil from a producer, sold it to either an end user or another crude oil marketer, and solicited transportation to move the crude oil. Gamboa, 12/7/22 Tr. 50:4-20, 51:9-10, 51:21-24. In 2004, Gamboa became the general manager at Taylor Gas, where he worked with Ballengee. *Id.* at 51:21-52:9. Ultimately, he was responsible for all operations at Taylor Gas, including settlements and reconciliations of crude oil movement. *Id.* at 52:10-54:11. From 2010 to 2013, Gamboa became the Chief Marketing Officer for Bridger Group, LLC, which ultimately became Bridger, LLC. *Id.* at 55:18-25. In July 2013, Gamboa became the COO of Bridger, LLC. *Id.* at 56:1-18.

50. As the COO of Bridger, LLC, Gamboa was responsible for the operations of Bridger, LLC and all of its subsidiaries, including the logistics of transporting crude oil from North Dakota to Monroe. Gamboa, 12/7/22 Tr. 57:13-18, 61:19-22. At the time of the Acquisition, Gamboa supervised more than 100 employees, including experts on terminal management such as Giuseppe "Joe" Natale and Dion Nicely. *Id.* at 59:19-60:3, 60:11-20. Gamboa also supervised the employees in charge of planning and scheduling railcars, vessels, and barges. *Id.* at 62:2-16.

51. After the Acquisition, Gamboa was the COO of Bridger Logistics. Gamboa, 12/6/22 Tr. 247:2-5; Soiefer, 12/6/22 Tr. 115:14-16. Initially, Gamboa held a Ferrellgas, Inc. title of Senior Vice President, later holding the title Executive Vice President. Gamboa, 12/6/22 Tr. 246:24–247:9; Wambold, 12/8/22 Tr. 169:12-20, 198:1-23; Trial Ex. 678 (Gamboa Employment Agreement with Ferrellgas, Inc.); Rios, 9/21/22 Tr. 58:13-21. As Chief Operating Officer of Bridger Logistics, Gamboa was responsible for all operations of Bridger Logistics and its subsidiaries. Gamboa, 12/6/22 Tr. 244:15-17, 12/7/22 Tr. 57:13-18.

### *Vispi Jilla.*

52. Vispi Jilla served as Senior Vice President of Finance and Treasurer of Bridger, LLC from January 2014 through the Acquisition. Jilla, 12/12/22 Tr. 9:16-21. He received an

undergraduate degree in commerce and accounting in 1991 from the University of Bombay in Bombay, India. *Id.* at 6:18-25. Jilla received a Master of Business Administration from Texas A & M in 1998. *Id.* at 7:9-15. He holds a chartered accountant's license from India and an inactive CPA license in the U.S. *Id.* at 7:16-20.

53.     After finishing college, Jilla worked for A.F. Ferguson & Company, an accounting firm, and Reliance Capital in India. Jilla, 12/12/22 Tr. 7:21-8:2. After immigrating to the U.S. in 1995, Jilla worked at Mirchandani & Company, a small accounting company in the tri-state area. *Id.* at 8:3-8. After completing his MBA, Jilla worked at KPMG in the Transaction Services Group and its successor consulting firm KPMG Consulting/BearingPoint from 1998 through 2006. *Id.* at 8:12-22, 7:12-15. He then worked for Mesirow Financial, a restructuring firm, and AlixPartners, another restructuring firm, before starting in the oil and gas industry at Alon USA in 2010. *Id.* at 8:23-9:11. After Alon, Jilla was recruited to work at Bridger, LLC as the Senior Vice President and Treasurer, the position he held through the Acquisition. *Id.* at 9:12-21.

54.     From the Acquisition through October 2015, Jilla was Bridger Logistics' Chief Financial Officer ("CFO") (after Patrick Kelly departed) and also was the CFO of Jamex Marketing under a shared services agreement. Jilla, 12/12/22 Tr. 10:2-12. Jilla continued to work for Jamex as the CFO until April 2018. *Id.* at 10:2-11:8; Ballengee, 9/20/22 Tr. 87:21-22.

        *Patrick Kelly.*

55.     Patrick Kelly served as the Executive Vice President and CFO for Bridger, LLC from May 2014 through July 2015, departing around a month after the Acquisition. Kelly, 2/13/23 Tr. 7:8-18. Prior to his employment by Bridger, LLC, Kelly worked in finance in the energy industry for decades at companies including Amoco, Amoco BP, Elevance Renewable Sciences, and Gavilon Energy. Kelly, 2/13/23 Tr. 9:21-12:22. With respect to the Acquisition, Kelly was involved with searching for a potential acquirer, working with the investment bank, and, after

narrowing to Ferrellgas, working through all of the Bridger financial statements with counterparties at Ferrellgas, and working with Grant Thornton regarding the quality of earnings report. *Id.* at 8:11-9:2.

### *Patrick Knapp.*

56.     Patrick Knapp graduated from Southern Methodist University law school in 2010. Knapp, Dep. Tr. 13:14-17. After law school, he joined Toeppich & Associates, a boutique energy law firm in Houston, as an associate where he worked from April 2011 to November 2014. *Id.* at 15:8-22; Trial Ex. 2367. After he left Toeppich, he worked as counsel for Bridger Logistics from December 2014 through August 2018. Knapp Dep. Tr. 15:8-22; Trial Ex. 2367. At Bridger Logistics, Knapp focused on compliance and managed regulatory functions with respect to Bridger Logistics' trucking and rail fleets. Knapp, Dep. Tr. 23:5-22.

57.     Before the Acquisition, Knapp reported to Troy Lee, General Counsel for Bridger, LLC. *Id.* at 17:5-8; Rios, 9/21/22 Tr. 61:12-24; Rios, 9/22/22 Tr. 119:17-120:2.

58.     After the Acquisition, Knapp's responsibilities "were largely relating to the commercial aspects of the business," including "negotiation of contracts with customers" and "input on the trucking program." Knapp Dep. Tr. 24:6-19 (describing his responsibilities as "back office concerns."). Knapp took direction from several people, including Rios, Gamboa, Hampton, and "operational heads of business." *Id.* at 146:8-19. Hampton described Knapp's role as "that of a junior counsel, to draft documents and contracts, negotiate fine points and legal contracts but not to execute the strategy selected by others." Hampton, 12/14/22 Tr. 111:6-14; *see also* Rios, 9/22/22 Tr. 119:17-120:2 ("basically pushed paper for Trent [Hampton]."). Knapp was not involved in overall decision-making regarding Bridger Logistics. *See* Hampton, 12/14/22 Tr. 168:19-22; Rios, 9/22/22 Tr. 119:7-120:2. He was far from a "key executive." Hampton, 12/14/22

Tr. 110:25-111:14; Rios, 9/22/23 Tr. 120:6-17. And the President and CEO of Ferrellgas, Inc., Steven Wambold, never met Knapp. Wambold, 12/9/22 Tr. 65:3-14.

### Giuseppe "Joe" Natale.

59. Giuseppe "Joe" Natale worked for Bridger, LLC as Vice President of Operations and Terminals from July 2013 until March 2014. Dkt. 732 ¶ 28; Natale, 2/13/23 Tr. 88:10-15, 89:11-22. From 2001 until his employment with Bridger, LLC, Natale worked in the oil and gas industry in terminals, including for Motiva Enterprises (joint venture between Saudi Aramco and Shell) and U.S. Development Group. Natale, 2/13/23 Tr. 84:1-88:6. After his employment with Bridger, LLC ended in March 2014, Natale continued to work in the oil and gas industry for United Energy Trading, Blackline Partners, and Knight Chemstar. *Id.* at 89:23-91:8.

### Dion Nicely.

60. Dion Nicely was employed by Bridger from April 2014 through June 2016. Dkt. 732 ¶ 29; Nicely, Dep. Tr. 23:16-22, 24:17-25:3. During that time, he served as the Chief of Staff for approximately five months and then served as Vice President, Rail and Marine. Dkt. 732 ¶ 29; Nicely Dep. Tr. 23:16-22, 24:17-25:3. As Vice President, Rail and Marine Nicely was responsible for "all commercial aspects and logistics of the railroads, basically from origin in North Dakota to destination in Eddystone." Nicely, Dep. Tr. 25:4-12.

### Julio Rios.

61. Prior to the Acquisition, Julio Rios served as President and CEO of Bridger, LLC. Trial Ex. 589-A.9; Rios, 9/21/22 Tr. 13:5-14:1. Rios graduated from Louisiana State University in 1993 with a degree in microbiology. Rios, 9/21/22 Tr. 9:21-10:1. He obtained a law degree from Louisiana State University. *Id.* at 10:2-7. After law school, he joined a private practice and practiced in commercial litigation and commercial transactions. *Id.* at 10:8-14. In October 2010, Rios joined Ballengee Interests LLC, which was an umbrella company for several different

subsidiaries owned by Ballengee.  *Id.* at 12:9-24.  In July 2013, Rios became the President and CEO of Bridger, LLC.  *Id.* at 12:25-13:7.

62.     After the Acquisition, Rios was the President and CEO of Bridger Logistics.  Rios, 9/21/22 Tr. 33:19-34:3; Wambold, 12/8/22 Tr. 169:12-20, 197:23-25.  He also held a Ferrellgas, Inc. title of Executive Vice President.  Rios, 9/21/22 Tr. 6:20-21, 32:20-23, 33:19-23, 58:7-12; Wambold, 12/8/22 Tr. 169:12-20, 197:23-198:14; Trial Ex. 673-B (employment agreement). After the Acquisition, Rios continued to manage Bridger Logistics.  Rios, 9/23/22 Tr. 89:1-12; Wambold, 12/9/22 Tr. 6:7-11 ("Now, from your perspective, did Bridger operate as a standalone subsidiary of Ferrellgas? A. Yes. Q. Who ran the Bridger business?  A. Julio Rios."); Hampton, 12/14/22 Tr. 129:4-6; Soiefer, 12/6/22 Tr. 115:7-10; *see* Trial Ex. 759.

> *Jonna Seline.*

63.     Prior to the Acquisition, Jonna Seline (née Jonna Huneryager) was a financial analyst for Bridger, LLC from September 2013 through August 2014.  Seline, Dep. Tr. 14:23-15:18; 18:7-20; Rios, 9/23/22 Tr. 126:24-127:5.  From August 2014 through the Acquisition, Seline was the Manager of Financial Planning and Analysis for Bridger, LLC.  Seline, Dep. Tr. 17:19-18:20.  After the Acquisition, Seline continued to be employed by Bridger Logistics through March 2017.  *Id.* at 18:21-19:11.  At Bridger Logistics, Seline focused on organic growth opportunities, assisted Vispi Jilla with "general finance-related items," and assisted the operations team with modeling economic efficiencies of various contracts.  *Id.* 20:16-21:10.  She was not a Bridger financial executive (Jilla, 12/12/22 Tr. 26:17-21), was not an accountant (Seline, Dep. Tr. 21:11-16; Rios, 9/23/22 Tr. 126:24-127:5), and "never had access to the accounting software" Seline, Dep. Tr. 21:11-16) ("I can't enter a debit or credit for the life of me."); *see also* Seline, Dep. Tr. 53:8:11 (testifying that she never had any reason to review general ledgers).

### E. Ferrellgas Fact Witnesses.

#### *Michael Farmer.*

64. Michael Farmer worked for Ferrellgas, Inc. as an SEC Reporting Manager and Directive Account Manager from April 2014 through August 2015, then as an Assistant Controller from August 2015 to January 2018. Farmer Dep. Tr. 13:12-17, 14:11-15:2. Farmer had no knowledge of Bridger Logistics' accounting practices prior to the Acquisition, including the way it booked revenue or maintained its general ledger. *Id.* at 21:15-22:8, 23:18-24:7. After the Acquisition, Farmer worked with Bridger Logistics to ensure that Ferrellgas had what it needed for its consolidated reporting and helped Bridger Logistics become more efficient and work towards "getting [Bridger] from private company standards to public company standards." *Id.* at 21:5-14, 24:9-21. Farmer "wasn't very familiar with the legal structure of Bridger." *Id.* at 48:4-8.

#### *Trent Hampton.*

65. Trent Hampton was Senior Vice President of Legal and Risk Management and Corporate Secretary at Ferrellgas, Inc. during the 2015-2016 time period. Hampton, 12/14/22 Tr. 94:20-22, 97:5–8; Wambold, 12/8/22 Tr. 169:12-20; Rios, 9/21/22 Tr. 60:7-10. Hampton functioned as Ferrellgas's general counsel and attended Ferrellgas board meetings as corporate secretary. Hampton, 12/14/22 Tr. 97:9-15, 123:13-18; Wambold, 12/9/22 Tr. 178:24-179:9; Soiefer, 12/5/22 Tr. 153:23-154:9.

66. Hampton was not involved in Bridger Logistics' operations or decision-making regarding operations. Hampton, 12/14/22 Tr. 129:7-12. Nor was he involved in "complying with the requirements of the credit facility." *Id.* at 123:10-12; Heitmann, 2/14/23 Tr. 103:15-19 (CC). Instead, Hampton was occasionally asked by Heitmann or Miles to supply governance documents related to the credit facility tasks. Hampton, 12/14/22 Tr.125:11-126:19.

*Alan Heitmann.*

67.     Alan Heitmann was the CFO of Ferrellgas, Inc. from 2015 until his retirement in January 2018.  *See* Heitmann, 2/14/23 Tr. 127:22-24; Wambold, 12/8/22 Tr. 169:12-20; Rios, 9/21/22 Tr. 59:21-60:1.  Heitmann joined Ferrellgas, Inc. in 1995 as Assistant Controller and worked his way up to CFO.  Heitmann, 2/14/23 Tr. 9:16-24.  As CFO, Heitmann was responsible for all accounting, finance, and industrial relations (*id.* at 11:22-25) and had primary responsibility for handling the credit facility (*id.* at 54:11-14; Hampton, 12/14/22 Tr. 122:7-10).  Heitmann was Miles' primary contact at Ferrellgas during the 2015-2016 period.  Miles, 12/12/22 Tr. 180:23-25.

*Todd Soiefer.*

68.     Todd Soiefer was hired in January 2014 as the Senior Vice President of Strategic Development of Ferrellgas, Inc.  Dkt. 732 ¶ 31; Soiefer, 12/5/22 Tr. 61:4-7; Wambold, 12/8/22 Tr. 173:16-174:10.  His duties included identifying potential acquisition opportunities as part of a diversification strategy.  Dkt. 732 ¶ 31; Soiefer, 12/6/22 Tr. 47:7-11; Wambold, 12/8/22 Tr. 173:16-174:10.  In November 2015, Soiefer also became the CFO of Bridger Logistics.  *See* Dkt. 732 ¶ 31; Soiefer, 12/5/22 Tr. 61:8-16.  In his role as Senior Vice President of Ferrellgas, Soiefer reported to Wambold and kept him updated about "major" events.  Soiefer, 12/5/22 Tr. 90:9-16; Rios, 9/22/22 Tr. 32:25-33:20.  In his role as CFO of Bridger Logistics, Soiefer reported to Rios.  Rios, 9/22/22 Tr. 33:13-16.

69.     Soiefer's responsibilities in the CFO role included work "on the capital markets and M&A and just as a general executive leader."  Soiefer, 12/5/22 Tr. 167:11-18.  In addition, while he helped drive Bridger Logistics towards its financial goals, he was not involved in finance or accounting details at Bridger Logistics.  *Id.* at 167:19-168:5.

*Steven Wambold.*

70.     Steven Wambold was the President and CEO of Ferrellgas, Inc. during the relevant

period. Wambold, 12/8/22 Tr. 164:7-11, 169:12-20; Rios, 9/21/22 Tr. 59:14-20; Soiefer, 12/5/22 Tr. 62:5-12.   As CEO, Wambold had "responsibility for a lot of the outward-facing responsibilities," including "forming the strategy, interacting with the board and . . . taking a greater role with the investment community."  Wambold, 12/8/22 Tr. 167:22-168:4.

### F. Remaining Fact Witnesses.

#### *John Hunter.*

71.    John Hunter was Managing Director of Fuel for Delta from April 1, 2013 until October 1, 2015 and served as Vice President of Fuel Supply and Trading from October 1, 2015 through at least February 12, 2019.  Dkt. 732 ¶ 25; Monroe 30(b)(6) (Hunter) Dep. Tr. 14:4-16:4. Through a Services Agreement, Hunter provided services to Monroe.  Dkt. 732 ¶ 25; Monroe 30(b)(6) (Hunter) Dep. Tr. 14:20-16:4.

72.    In his role as Vice President of Fuel Supply and Trading at Monroe, Hunter "make[s] all of the commercial decisions around the [Trainer Refinery]" including "all the purchasing of feedstocks, crude oil, other feedstocks, as well as the sales of products that the crude oil makes, government compliance and logistics around the asset."  Monroe 30(b)(6) (Hunter) Dep. Tr. 14:4-19.  While at Delta/Monroe, Hunter was responsible for the procurement of crude or feedstock for the Trainer Facility.  *Id.* at 16:5-10.  He testified as Monroe's corporate representative.  Dkt. 732 ¶ 25; Monroe 30(b)(6) (Hunter) Dep. Tr. 10:23-11:6.  Hunter's testimony was submitted through deposition designations.  *See* Monroe 30(b)(6) (Hunter) Dep. Tr. 9:6-14.

#### *David Johnson.*

73.    David Johnson was a Vice President, Principal, and Managing Director of the Carlyle Group LP from 2010 to 2017.  Dkt. 732 ¶ 26; D. Johnson, 2/15/23 Tr. 6:10-7:1.

#### *Robin Miles.*

74.    Robin Miles is a partner at Bracewell and served as outside legal counsel to

Ferrellgas LP and Ferrellgas Partners, among other related entities, in connection with finance matters from approximately the mid-1990's through at least the time of trial. Miles, 12/12/22 Tr. 177:12-20, 178:12-21; Trial Ex. 1851.1, 29. At Bracewell, Miles specializes in energy finance work. Miles, 12/12/22 Tr. 178:20-21. Specifically, he represents either financial institutions or companies in connection with "raising money to invest in different kinds of energy businesses." *Id.* at 178:22-179:2. He did not work closely with Hampton. *Id.* at 181:1-11. Miles did not assist with the Acquisition. *Id.* at 197:24-198:5.

### G. Eddystone's Experts.

75. David Baker is an expert Eddystone offered, and the Court received, in the customs and practices of managers of financially distressed companies. Dkt. 732 ¶ 34; *See* Baker, 2/16/23 Tr. 33:2-14. Baker's written direct testimony appears at Trial Exhibit 3013.

76. Captain John Roy Dudley is an expert Eddystone offered, and the Court received, in marine, petroleum, terminal, and vessel operations. Dkt. 732 ¶ 35; Dudley, 02/15/23 Tr. 224:11-19 . Dudley's written direct testimony appears at Trial Exhibit 3012.

77. Neil Earnest is an expert Eddystone offered, and the Court received, in the field of crude oil market economics. Dkt. 732 ¶ 36; Earnest, 12/7/22 Tr. 172:10-177:13. Earnest's written direct testimony appears at Trial Exhibit 3001.

78. William Rennicke is an expert Eddystone offered, and the Court received, in rail logistics and operations. Dkt. 732 ¶ 37; Rennicke, 02/15/23 Tr. 149:15-150:16. Rennicke's written direct testimony appears at Trial Exhibit 3011.

79. Marc Sherman is an expert Eddystone offered, and the Court received, in the fields of forensic accounting, financial investigations, valuation, and damages. Dkt. 732 ¶ 38; 12/7/22 Tr. 251:2-16. Sherman's written direct and rebuttal testimony appears at Trial Exhibit 3002 and Trial Exhibit 3014.

### H. Defendants' Experts.

80.     Erica Bramer is an expert Defendants offered, and the Court received, in the area of damages.  Dkt. 732 ¶ 39; Bramer, 12/16/22 Tr. 10:11-11:11.  Bramer is often designated as an expert witness in matters of financial analysis, valuation, and economic damages, including in the energy industry.  Trial Ex. 3008 (Bramer Decl.) ¶ 2, 4.  She holds an MBA from the Wharton School and an MA from the University of Pennsylvania.  *Id.* ¶ 3.  Bramer's written direct testimony appears at Trial Exhibit 3008.

81.     Howard Brownstein is an expert Defendants offered, and the Court received, in turnaround management and the corporate governance of distressed companies.  Dkt. 732 ¶ 40; Brownstein, 2/13/23 Tr. 125:25-126:8.  Brownstein has been a turnaround and crisis management professional for more than 30 years.  Trial Ex. 3009 (Brownstein Decl.) ¶ 2.  Brownstein's written direct testimony appears at Trial Exhibit 3009.

82.     Dr. Glenn George is an expert Defendants offered, and the Court received, in the field of damages related to the energy industry.  Dkt. 732 ¶ 41; George, 12/14/22 Tr. 8:16-25.  Dr. George holds a master's degree in business administration from Cornell University and a Ph.D in public policy, with a focus on energy economics, from Harvard University.  Trial Ex. 3004 (George Decl.) ¶ 3.  After earning his Ph.D., Dr. George worked continuously for 27 years as an economic consultant, advisor, and expert in the energy and transportation sectors, with an ongoing focus on oil and natural gas.  *Id.* ¶ 4. Dr. George's written direct testimony appears at Trial Exhibit 3004.

83.     Manish Kumar is an expert Defendants offered, and the Court received, in the field of valuation.  Dkt. 732 ¶ 42; Kumar, 12/14/22 Tr. 59:7-11.  Kumar specializes in conducting valuation, solvency, and related analyses and is a Certified Valuation Analyst and Certified Fraud Examiner.  Trial Ex. 3006 (Kumar Decl.) ¶ 3, 6.  Kumar's written direct testimony appears at Trial Exhibit 3006.

84.     Jeffrey Mayer is an expert Defendants offered, and the Court received, in financing arrangements in the energy industry.  Dkt. 732 ¶ 43; Mayer, 2/13/23 Tr. 192:10-18.  Mayer has more than 40 years of experience in the energy industry with specific experience in commodities trading, pricing, financing and delivery of energy products.  Trial Ex. 3010 (Mayer Decl.) ¶ 3.  Mayer's written direct testimony appears at Trial Exhibit 3010.

85.     Thomas O'Connor is an expert Defendants offered, and the Court received, in the energy industry, including crude oil markets and pricing and refinery optimization.  Dkt. 732 ¶ 44; O'Connor, 12/14/22 Tr. 28:20-29:3.  O'Connor has almost 50 years of experience in the energy industry, including 30 years in downstream markets optimizing refinery margins, crude slates and logistics.  Trial Ex. 3005 (O'Connor Decl.) ¶ 3.  O'Connor's written direct testimony appears at Trial Exhibit 3005.

86.     Gary Polkowitz is an expert Defendants offered, and the Court received, in the field of accounting.  Dkt. 732 ¶ 45; Polkowitz, 12/13/22 Tr. 168:23-169:3.  Polkowitz has been a Certified Public Accountant since 1993 and he serves as an accounting and financial professional for distressed companies.  Trial Ex. 3003 (Polkowitz Decl.) ¶ 3.  Polkowitz's written direct testimony appears at Trial Exhibit 3003.

## II.     CRUDE OIL AND LOGISTICS MARKETS.

87.     Because much of this litigation centers on whether and to what extent the crude oil market affected Defendants' and third parties' decision-making, this section provides an overview of the crude oil and logistics markets to aid in later discussion.

### A.     Crude Oil Market.

88.     "Brent" is an international crude pricing benchmark.  Monroe 30(b)(6) (Hunter), Dep. Tr. 17:12-13.

89.     Brent Intercontinental European Exchange ("Brent ICE") is a "market[] where

people are buying and selling futures[.]" Monroe 30(b)(6) (Hunter), Dep. Tr. 17:12-18; O'Connor, 12/14/22 Tr. 30:15-17. Brent ICE pricing factors into the COSA pricing structure, as described below. Trial Ex. 1733; O'Connor, 12/14/22 Tr. 30:23-24.

90. The Dated Brent price of crude is the price for physical cargoes of Brent crude oil with specific load dates in the United Kingdom. Trial Ex. 3005 (O'Connor Decl.) ¶ 23; O'Connor, 12/14/22 Tr. 30:11-14. It is used as a basis for the pricing of many crudes in the Atlantic Basin, including Nigerian crudes. *Id.*

91. West Texas Intermediate ("WTI") is a benchmark for domestic crude pricing. *Id.* at 17:22-18:1; D. Johnson, 2/15/23 Tr. 68:2-3, 9-12. Bakken crude trades at a differential to WTI. Monroe 30(b)(6) (Hunter), Dep. Tr. 77:18-19; Rios, 9/23/20 Tr. 141:9-13 ("Bakken crude is priced on a plus or minus index. It's based plus or minus of the WTI index.").

92. Because of high per-barrel transportation and infrastructure costs, Bakken crude at the railhead in North Dakota needs to be priced at a steep discount to crude oil in the Atlantic Basin, which is primarily priced at a differential to the Dated Brent price. Trial Ex. 3005 (O'Connor Decl.) ¶ 23.

93. The price spread between Bakken railhead and Dated Brent prices (the "Bakken/Brent spread") is a key indicator of economics of crude by rail to the East Coast. Trial Ex. 3005 (O'Connor Decl.) ¶ 23; Paradis, 9/19/22 Tr. 175:2-16.

94. The Brent price is the benchmark that Monroe used when it bought crude oil on the spot market; regardless of the price paid, Monroe would convert to a differential to Brent. Monroe 30(b)(6) (Hunter), Dep. Tr. 250:2-8 ("Because we are an East Coast refinery, which is an Atlantic basin refinery, we consider ourselves to be a Brent based refinery versus a WTI.").

**B. Crude Oil Logistics.**

95. Different crude supply options have different crude oil logistics costs for East Coast

refiners.  Trial Ex. 3005 (O'Connor Decl.) ¶ 33.

96.     Crude oil logistics involves transporting crude oil from an oil producer to an end user; in the context of this case, the crude oil logistics chain is from North Dakota to the Monroe refinery.  Rios, 9/21/22 Tr. 31:1-4, 55:1-3; Trial Ex. 601 ("Bridger provides logistics services across the energy value chain, including trucking, terminalling, pipeline, rail and maritime divisions, connecting producers to end markets."); Gamboa, 12/6/22 Tr. 242:17-243:1; Ballengee, 9/20/22 Tr. 18:13-15; Trial Ex. 687.5; Trial Ex. 652-A.8, 49.

97.     The initial step in transporting crude oil from one place to another is purchasing crude from an oil producer.  *See* Trial Ex. 3010 (Mayer Decl.) ¶ 12(a).

98.     Purchasers (also called crude oil marketers) sometimes use "intermediation agreements" to finance the purchase of crude oil from producers.  Trial Ex. 3010 (Mayer Decl.) ¶ 12(c).  Under such agreements, a bank or financing entity substitutes its credit for that of its client by purchasing crude from an oil producer, and it retains an ownership interest in the oil until it is delivered and sold to an end user.  *Id.* ¶ 12(i).  On arrival, the financing entity sells the crude oil to the end user, retains the amount used to purchase the crude oil plus a fee for its services, and the remaining profit goes to the purchaser/marketer client.  *Id.*

99.     Where there are no pipelines between the producer and end user—or gaps between pipelines—railcars, trucks, or barges can be used to move crude oil.  Rios, 9/22/22 Tr. 62:21-63:6.

100.    Crude oil that is being transported via truck or railcar can be injected into pipelines at injection stations.  *See* Rios, 9/21/22 Tr. 18:21–19:8, 20:6–19.  At an injection station, crude oil enters storage tanks through "LACT units," which include custody transfer meters.  *Id.*  Property owners often lease land to logistics companies to house injection stations and other equipment in what are known as "throughput contracts."  *See id.* at 18:14–20.

101.     Additionally, logistics chains use "rail facility loading and unloading" or "transloading facilities" to move crude between railcars, tanks, and barges.  Rios, 9/21/22 Tr. 22:10–23:14.  The cost to acquire crude from the Bakken region varies between wellhead or railhead location in North Dakota.  Trial Ex. 3005 (O'Connor Decl.) ¶ 33.  Refiners that do not have direct rail access may require marine transloading and, as a result, sustain additional costs for marine logistics.  *Id.*

102.     During the relevant period, to transfer crude from the Bakken to a barge for delivery to Monroe, it had to be transloaded from railcars to river barges.  Ballengee, 9/20/22 Tr. 49:7-10. Between 2014 and 2016, that transloading took place at the Eddystone Facility.  *Id.* at 49:11-13.

## III.     NONPARTY BRIDGER, LLC PRE-ACQUISITION.

### A.     Bridger, LLC Ownership.

103.     At the time of Bridger Group, LLC's formation in 2010, Ballengee held 100% of the stock of Bridger Group, LLC.  Ballengee, 9/20/22 Tr. 158:22-24.

104.     Gamboa and Rios joined Ballengee at Bridger Group, LLC and became part owners in the company.  Ballengee, 9/20/22 Tr. 158:25-159:2.  At that point, Rios held 20% ownership and Gamboa held 10% ownership in Bridger Group, LLC.  *Id.* at 159:3-6.

105.     On June 28, 2013, Bridger, LLC was formed as a result of a merger with Bridger Group, LLC.  Dkt. 732 ¶ 9; Ballengee, 9/20/22 Tr. 11:22-12:13, Trial Exs. 171.4, 167-A.19.  From July 1, 2013 through June 24, 2015, Bridger, LLC was a Delaware limited liability company with its principal office in Texas.  Dkt. 732 ¶ 9; Trial Ex. 167-A.19.

106.     On July 1, 2013, nonparty private equity firm Riverstone invested in Bridger, LLC. Dkt. 732 ¶ 9; Trial Ex. 167-A; Rios, 9/22/22 Tr. 122:1-12.  Riverstone initially purchased a 41.1791% ownership stake in Bridger, LLC.  Dkt. 732 ¶ 9; Ballengee, 9/20/22 Tr. 13:17-14:10; Trial Ex. 167-A.67.  As of July 1, 2013, non-party Ballengee Interests, LLC owned 41.1747% of

Bridger, LLC; non-party Rios Holdings, Inc. owned 11.7642% of Bridger, LLC; and non-party Gamboa Enterprises, LLC owned the remaining 5.8821% of Bridger, LLC. Dkt. 732 ¶ 9; Ballengee, 9/20/22 Tr. 13:17-14:10; Trial Ex. 167-A.67. Riverstone's capital commitment was $300 million. Rios, 9/22/22 Tr. 122:19-123:1. After injecting additional capital into Bridger, LLC Riverstone acquired a greater equity interest. Rios, 9/22/22 Tr. 122:19-123:1. Riverstone's equity interest in Bridger, LLC eventually increased to around 51-52%. Rios, 9/22/22 Tr. 122:19-123:1.

107. Prior to the Acquisition, Bridger, LLC was managed by a Board of Managers consisting of Ballengee, Rios, Gamboa, and two Riverstone members. Ballengee, 9/20/22 Tr. 14:12-16; Rios, 9/22/22 Tr. 123:2-17. Riverstone held four votes and a voting majority with respect to the Board of Bridger, LLC. Rios, 9/22/22 Tr. 123:2-17; Trial Ex. 167-A.45.

108. Pre-Acquisition, holding company Bridger, LLC owned Bridger Logistics and nonparty Bridger Marketing. Dkt. 732 ¶¶ 13, 46; Ballengee, 9/20/22 Tr. 15:5-10.

109. During this time, Bridger Marketing purchased and sold crude oil, while Bridger Logistics and its subsidiaries provided transportation and logistics services for crude oil delivery. Dkt. 732 ¶ 46; Ballengee, 9/20/22 Tr at 17:16-18:18.

**B.      Bridger Logistics Organizational Structure.**

110. Bridger Logistics is organized under the laws of Louisiana and remained a Louisiana LLC throughout its existence. Dkt. 732 ¶ 12; Trial Ex. 105 (Certified Record of Corporate Filings); Rios, 9/22/22 Tr. 124:11-16. It had its principal place of business in Texas. Dkt. 732 ¶ 12; Trial Ex. 105.

111. Bridger Logistics was a holding company and owned various logistics companies, including Defendants Bridger Leasing, LLC, Bridger Transportation, LLC, Bridger Rail Shipping, LLC, Bridger Storage, LLC, Bridger Lake, LLC, Bridger Marine, LLC, and nonparties BTS and Bridger Shipper, LLC. Ballengee, 9/20/22 Tr. 16:4-11; *see* Trial Exs. 687.6-7; Trial Ex. 2705.56,

174 (Acquisition PSA).

112. Defendant Bridger Rail Shipping, LLC owned, leased, and held railcars out for use by shippers of crude oil. Rios, 9/21/22 Tr. 26:19-27:2.

113. Defendant Bridger Marine, LLC facilitated the barges for the shipment of crude oil to Monroe. Rios, 9/21/22 Tr. 27:6-9.

114. Bridger Storage, LLC leased large tanks for storage of crude oil that were held out for lease to other crude oil marketers or producers. Rios, 9/21/22 Tr. 28:19-23.

115. Bridger Transportation, LLC ("Bridger Transportation") operated a trucking business that transported crude oil by truck. Rios, 9/21/22 Tr. 27:19-22. Bridger Transportation operated in 14 states throughout the country. *Id.* at 27:19-25.

116. Bridger Leasing, LLC owned almost 700 trucks and trailers that were used by the owner/operators of Bridger Transportation. Rios, 9/21/22 Tr. 28:2-7.

117. BTS was comprised of three distinct business segments—pipeline terminals (i.e., injection stations or "stations throughput"), pipeline, and rail loading and unloading (also called rail services). Jilla, 12/12/22 Tr. 14:18-25; Rios, 9/21/22 Tr. 21:16-24, 22:6-16, 23:18-24:8; Sherman, 12/8/2022 Tr. 15:4-16:9.

118. First, BTS provided "pipeline management services," which consisted of leasing pipeline capacity from Enbridge and selling it to Bridger Marketing. Rios, 9/21/22 Tr. 21:10-24, 23:18-24:8; Trial Ex. 601.30; *see also, e.g.*, Trial Ex. 3002 (Sherman Aff.) ¶ 15.

119. Second, BTS earned pipeline terminal (or "stations throughput") revenue through its ownership of 19 stations where crude was injected into pipelines ("19 Injection Stations"). Rios, 9/21/22 Tr. 17:18-20, 24:12-22. BTS sold capacity at the 19 Injection Stations to third parties and Bridger Marketing. *Id.* at 24:12-22.

120.    Third, BTS also earned "rail throughput revenue" by performing rail loading and unloading services, which consisted of loading crude from railcars to tanks and from tanks to barges, including in connection with the Eddystone facility.  Rios, 9/21/22 Tr. 22:6-16, 25:16-22; Gamboa, 12/6/22 Tr. 245:2-6.  Berthold, Newton, Van Hook, and Eddystone are all rail facility loading and unloading terminals.  Rios, 9/21/22 Tr. 22:17-23:17; Trial Ex. 652.A-51; Trial Ex. 601.36.  The Eddystone Facility is also sometimes referred to as a transloading facility, which is short for "transfer and loading."  Rios, 9/21/22 Tr. 23:12-14.

121.    By April 2015, the Bridger Logistics subsidiaries had assets and operations in the Bakken, the Rockies, the Permian Basin, Eagle Ford, Texas, the Gulf Coast, and on the East Coast.  Trial Ex. 601.12 (Evercore CIM showing Bridger Logistics Asset Map and listing total assets).  As of April 2015, Bridger Logistics—through its subsidiaries—had assets in 14 states and owned hundreds of trucks, 19 pipeline terminals, hundreds of thousands of barrels per day in pipeline, rail transloading, and barge capacity, and millions of barrels worth of storage capacity.  *Id.*; Gamboa, 12/7/22 Tr. 119:10-120:15.

**C.    Relationship Between Bridger, LLC And Enbridge Pre-Acquisition.**

122.    Enbridge and Bridger subsidiaries engaged in a number of business dealings that predated the RSA.  *E.g.*, Rios, 9/22/22 Tr. 138:9-144:17, 148:14-149:17; Trial Exs. 39-B, 39-C , 62, 91-A.  Through those business dealings, Enbridge became familiar with the financials of Bridger and its subsidiaries, such as Bridger Logistics and BTS.  Rios, 9/22/22 Tr. 138:9-144:17, 148:14-149:17; Trial Exs. 33, 33-A, 33-B.

123.    Over the course of Paradis' Enbridge tenure, Enbridge was a party to hundreds of logistics contracts with shippers.  Paradis, 9/19/22 Tr. 146:13-20, 178:7-14.  Enbridge's general practice is to carefully negotiate the entirety of their agreements, including any financial assurances provisions.  *Id.* at 183:6-12.  When doing so, Enbridge individually evaluates each

project and the risks associated with each project on a standalone basis. *Id.* at 178:15-25. The risks evaluated include the credit risk of the contractual counterparty. *Id.* at 179:1-4. Although every deal is different, Enbridge's logistics contracts usually have conditions that address financial assurances. *Id.* at 179:10-13.

124. Enbridge carefully negotiates the type of financial assurances, the conditions and circumstances under which it will seek financial assurances, and Enbridge's remedies if the counterparty fails to provide any required financial assurances. Paradis, 9/19/22 Tr. 182:16-183:5.

125. Enbridge had a pre-existing relationship with Bridger and BTS prior to entering into the RSA in 2013. Eddystone 30(b)(6), Boaz, Dep. Tr. 41:8-14. In fact, by that time, Enbridge had entered into numerous contracts with Bridger entities, including BTS. *See* Trial Exs. 8 (September 1, 2011 agreement between Enbridge Pipelines (North Dakota) LLC and BTS), 11 (October 1, 2011 agreement between Enbridge Pipelines (North Dakota) LLC and BTS), 12 (November 1, 2011 agreement between Enbridge Pipelines (North Dakota) LLC and BTS related to the Trenton Station), 13 (November 1, 2011 agreement between Enbridge Pipelines (North Dakota) LLC and BTS related to the Alexander Station), 2679 (November 22, 2012 agreement between Enbridge Pipelines (North Dakota) LLC and BTS related to the Little Muddy Station), 2680 (November 22, 2012 agreement between Enbridge Pipelines (North Dakota) LLC and BTS related to the Grenora Station); 41-D (May 8, 2012 agreement between Enbridge Pipelines (North Dakota) LP and BTS related to the Berthold Rail Facility); 52-A (June 1, 2012 agreement between Enbridge Pipelines (North Dakota) LLC and Bridger Storage for Berthold West Tank Farm).

126. On August 16, 2012, Bridger sent Enbridge its 2011 and 2012 consolidated financial information for Bridger Group's logistics and "Oil and Gas Trading Services" segments, the latter of which included Bridger Marketing. Trial Exs. 33, 33-A, 33-B; see also Rios, 9/22/22

Tr. 141:2-144:14 (identifying Trial Exs. 33-A and 33-B as the financials attached to an email sent from Orlando Sala of Bridger to Keith Chesnutt of Enbridge).

127.    To help eliminate or reduce risk, the parties often negotiated credit enhancements as part of their dealings, and Enbridge sometimes requested parent guaranties from Bridger Logistics, such as when an Enbridge subsidiary contracted with a Bridger subsidiary. *See* Paradis, 9/19/22 Tr. 178:7-181:5.

128.    On at least three occasions, Enbridge sought, and Bridger Logistics provided, a parent guarantee related to the dealings between Bridger entities and Enbridge. Rios, 9/22/22 Tr. 149:6-14, 166:1-167:8, 168:5-19; Trial Ex. 39-B (September 7, 2012 Guarantee by Bridger Logistics in favor of Enbridge Pipelines (North Dakota) LLC in consideration of the dealings between Enbridge Pipelines (North Dakota) LLC and BTS), 39-C (September 7, 2012 Guarantee by Bridger Logistics in favor of Enbridge Pipelines (North Dakota) LLC in consideration of the dealings between Enbridge Pipelines (North Dakota) LLC and Bridger Storage, LLC), 367 (September 10, 2014 Guarantee by Bridger Logistics in favor of Eddystone, which terminated September 30, 2014); *see also* Trial Exs. 34, 34-A (communications from Enbridge to Rios referring to a parent guaranty and including a draft parent guaranty).

129.    For example, on May 8, 2012, Enbridge Rail (North Dakota) LLC and BTS entered into the Berthold Rail Loading Agreement, which included a parent guaranty from Bridger Logistics, LLC. Trial Exs. 39-B, 41-D; Rios, 9/22/22 Tr. 148:14-149:17.

130.    Likewise, the Berthold Oil Storage Agreement between Enbridge Storage (North Dakota) LLC and Bridger Storage LLC dated June 1, 2012, included a guaranty from Bridger Logistics. Rios, 9/22/22 Tr. 148:14-149:17; Trial Exs. 39-C , 62, 91-A.

**D.    The Eddystone Rail Facilities Services Agreement.**

131.    On or about February 13, 2013, BTS and Eddystone entered into the RSA. Dkt.

732 ¶ 47; Trial Ex. 90-A.

132.     At the time of those dealings, and at the time the RSA was executed, substantially all of Bridger's assets—and the assets of its subsidiaries, including BTS—were subject to valid liens.  Rios, 9/23/22 Tr. 67:23–69:10; Trial Exs. 787, 2697.174-84.

133.     BTS, defined as the "Customer," and Eddystone, defined as the "Owner," are the sole parties to the RSA.  Trial Ex. 90-A.1.

134.     When it entered into the RSA, Eddystone understood that BTS was a distinct legal entity and its sole counterparty under the RSA.  Eddystone 30(b)(6) (Cohen), Dep. Tr. 282:17-20 ("Q. When it entered into the RSA, Eddystone was aware that BTS was a distinct legal entity, correct? A. Yes."), 289:3-5 ("Q. Okay.  BTS was the only entity with contractual liability, correct? A.  BTS was the obligor under the RSA, yeah."); Wilkins, Dep. Tr. 116:21-117:6 ("Q. And Enbridge ultimately had to have been comfortable having Bridger Transfer Services as opposed to BP as their counter-party? A. Yeah, and by the time we signed the contract, they had already demonstrated the ability to do that with their Berthold business and they had regretted not taking more at Berthold. They were very capable guys and doing – I mean, by this time they were the up-and-coming oil company.  It was like working with Elon Musk.  Okay.  Great.  Let's go.  And they had the support of BP with them.  Let's do it.").

135.     The RSA had a term of "a period of five (5) years two (2) months from the Operational Date."  Trial Ex. 90-A.6 (§ 2.1).  At the time the parties entered into the RSA, the Eddystone Facility was not operational.  *Id.*  The Eddystone Facility accepted its first train in May 2014 (the "Operational Date").  Dkt. 732 ¶ 48.

          *General Terms.*

136.     The RSA provides that it "shall be governed and construed according to the laws of the State of New York, without regard to principles of conflict of laws that, if applied, might

require the application of the laws of another jurisdiction."  Trial Ex. 90-A.15 (§ 15.2).

137.    With respect to assignment, the RSA provides as follows:

[BTS] shall not be entitled to assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed. Without limitation, Owner shall be deemed reasonable in refusing its consent to a proposed assignment if the proposed assignee or transferee is not financially capable of performing Customer's obligations under this Agreement (and an assignee or transferee shall, without limitation, be deemed not financially capable of performing Customer's obligations hereunder if such assignee or transferee does not satisfy the requirements of Section 11 hereof).

Trial Ex. 90-A.11 (§ 8).

138.    Section 15.3 of the RSA provides: "No Third Party Rights. It is expressly understood that the provisions of this Agreement do not impart enforceable rights in anyone who is not a Party or a successor or permitted assign of a Party hereto." Trial Ex. 90-A.16 (§ 15.3).

139.    The RSA contains an integration provision.  Trial Ex. 90-A.16 (§ 15.4).

140.    The RSA does not restrict either party from a change of control or ownership.  *See* Trial Ex. 90-A.

141.    RSA Exhibit A, Section 16 addresses dispute resolution and provides that "either Party may refer [any dispute, controversy or claim] to three (3) persons at New York" and that the "proceedings shall be conducted in accordance with the Rules of the Society of Maritime Arbitrators, Inc." Trial Ex. 90-A.36 (Ex. A § 16(b)).  Arbitration is the "exclusive remedy" for all disputes not resolved pursuant to negotiation.  *Id.* § 16(b)(iv).

*Volume And Payment Terms.*

142.    The RSA included a "Volume Commitment" defined as seven trains per week with a minimum capacity of 65,000 barrels per train.  Trial Ex. 90-A.5 (§ 1.1) (definition of "Volume Commitment").    After a two-month ramp-up period, the parties anticipating transloading approximately 64,750 bpd through the Eddystone Facility.  *Id.*

143.    The 64,750 bpd transloading volume anticipated in the RSA paralleled the 65,000 bpd that Bridger Marketing committed to sell to Monroe under the COSA.  *Compare* Trial Ex. 90-A.5 (§ 1.1), *with* Trial Ex. 1733.7 (§ 2.1); Ballengee, 9/20/22 Tr. 58:14-21.

144.    The term "Transloaded Volumes" is defined as "volumes of Customer's Crude Petroleum for which Transloading Services are provided. The delivery ticket provided by Owner at the custody transfer meters into the Barges and/or, if applicable, the Pipeline Distribution Systems shall provide the conclusive measurement of the volume of such Crude Petroleum that is binding on both Parties. . . ."  Trial Ex. 90-A.5.

145.    The RSA set the "Transloaded Volume Charge" at $2.25 per barrel, subject to adjustment "by any increase in the United States department of Labor, Consumer Price Index."  Trial Ex. 90-A.5, 8 (§§ 1.1, 5.1).

146.    If BTS transloaded fewer than 64,750 bpd in a given month, it agreed to pay a "Deficiency Volume Charge with respect to the shortfall in accordance with Section 4.1(b)."  Trial Ex. 90-A.7 (§§ 4.1, 4.2).  "Deficiency Volume Charge" is defined as "$1.75 per Barrel, subject to adjustment" in accordance with "any increase in the United States Department of Labor, Consumer Price Index."  Trial Ex. 90-A.3, 8 (§§ 1.1, 5.1).

147.    For each barrel for which BTS paid the Deficiency Volume Charge, BTS received a one barrel credit which it could apply "towards the Transloaded Volume Charge payable by Customer for Transloaded Volumes in excess of Customer's Monthly Volume Commitment during the six (6) Months following the expiration of the applicable Month during which the deficiency occurred" ("Deficiency Credits").  Trial Ex. 90-A.7-8 (§ 4.2).

148.    Transloaded Volume Charges and Deficiency Volume Charges are together defined as "Charges" under the RSA.  Trial Ex. 90-A.2 (§ 1.1).

149.     If, in any month, Eddystone was unable to accept all or part of BTS' Monthly Volume Commitment for any reason other than an event of force majeure, BTS was not obligated to pay the Deficiency Volume Charge for that month.  Trial Ex. 90-A.8 (§ 4.4).

150.     The RSA instructs that Eddystone will send BTS an invoice "each Month for all Charges payable by Customer . . .and other amounts payable by Customer . . . for the immediately preceding Month."  Trial Ex. 90-A.9 (§ 5.3).

151.     BTS was required to pay the invoiced amount "on the 20th of the Month immediately following the Month for which Charges are payable or ten (10) days after invoicing whichever is later."  Failure to do so would result in "a late fee at an annual interest rate equivalent to one hundred twenty-five percent (125%) of the prime rate of interest charged by Citibank N.A."  Trial Ex. 90-A.9 (§ 5.3).  As explained below, the 20th of the month is the traditional day for payment settlements in the crude oil industry.

152.     The RSA does not contain an accelerated damages provision.  *See* Trial Ex. 90-A.

153.     Each month, Eddystone sent BTS an invoice for transloading and deficiency charges.  Gamboa, 12/6/22 Tr. 248:6-8.  Those invoices identified the volume of throughput that Eddystone credited to BTS, the amount of any shortfall, and the amount that Eddystone charged BTS for those transloaded and shortfall volumes.  *Id.* at 248:9-16.

### *Measuring Transloaded Crude.*

154.     The RSA provides as follows with respect to crude measurements:

(a) Crude Petroleum received from Customer at the Eddystone Rail Facilities and loaded into Customer's Barges will be evidenced by a ticket, showing the quantity received and loaded, offload date, railcar number, transloader number, weight in kilograms, temperature, density, sulphur, bottom solids and water, railcar waybill number, seal numbers, net Barrels, gross Barrels and any data essential to the determination of quantity. Unless otherwise agreed by Owner and Customer, such tickets shall be signed by a representative of Owner or Operator, and shall constitute final evidence of the Crude Petroleum received by Owner and the Crude Petroleum loaded into Barges for Customer.

(b) Customer acknowledges that, since Crude Petroleum may be unloaded from Trains into the store tank(s) at the Eddystone Rail Facilities at the same time as Crude Petroleum from such shore tank(s) is being loaded into barges, such shore tanks may not remain in a static condition for loading into barges. Accordingly, as specified in the definition of Transloaded Volumes, all custodial cargo transfer operations at the Eddystone Rail Facilities will be performed solely by custody transfer meter and not by hand innage and/or ullage measurements of shore tanks and/or barges.

Trial Ex. 90-A.22 (§ 3).

*Financial Assurances Under The RSA.*

155.    The RSA did not require BTS to supply a surety bond, parent guaranty, letter of credit, or any other form of collateral/financial assurance at inception. Trial Ex. 90-A.11-13 (§11).

156.    Instead, with respect to "financial assurances," the RSA provides that:

At Owner's request, Customer shall from time to time provide information to Owner that will enable Owner to determine Customer's ability to pay the Charges and all other amounts that may reasonably become payable by Customer under this Agreement, the Terms and Conditions and/or the Terminal Rules (collectively, the "Customer Costs").

Trial Ex. 90-A.11-12 (§ 11.1).

157.    If (1) BTS failed "to provide the requested information to Owner within five (5) days of Owner's written request, (2) Owner's review of the requested information reveals that Customer may not have the ability to pay all Customer Costs, or (3) at any time on or after the Effective Date, Customer has a Debt credit rating that is less than BBB- from Standard & Poor's or Baa3 from Moody's" or BTS did not have a debt rating from either of those two ratings organizations, the RSA then gave Eddystone the right to request:

(a) a letter of credit in favor of Owner in an amount sufficient to ensure payment of all Customer Costs payable during the forthcoming twelve (12) months (or, prior to the Operational Date, during the twelve (12) months commencing on the Operational Date), in a form, substance and from an institution reasonably acceptable to Owner, provided that such letter of credit shall, without limitation, allow Owner to demand full or partial payment thereunder in the event (i) of a breach by Customer of this Agreement, the Terms and Conditions or the Terminal Rules, (ii) Owner experiences losses or is entitled to damages in connection with or

arising out of the Agreement, the Terms and Conditions or the Terminal Rules or the termination or rejection of the Agreement, or (iii) Customer does not deliver to Owner a new letter of credit or extension satisfying the requirements of this clause at least forty-five days ( 45) prior to the expiration of such letter of credit;

(b) a guaranty in an amount sufficient to ensure payment of all Customer Costs, in form and substance reasonably acceptable to Owner, and which is from a third party reasonably acceptable to Owner (i) that has a Debt rating from Standard & Poor's and Moody's that is not less than the Minimum Rating or (ii) whose Debt is not credit rated by Standard & Poor's or Moody's, hut that otherwise satisfies Owner that it has the ability to satisfy all of Hs obligations under such guaranty (and if clause (ii) applies, at Owner's request, Customer shall cause such guarantor to provide to Owner from time to time such financial information as will enable Owner to determine guarantor's ability to satisfy all of its obligations under such guaranty); or

(c) such other enforceable collateral security as shall be reasonably acceptable to Owner, in form and substance acceptable to Owner.

Trial Ex. 90-A.11-12 (§ 11.1).

158.    If BTS refused to provide the requested security, Eddystone's sole remedy under the RSA was to stop transloading crude shipments at the facility.  Trial Ex. 90-A.12 (§ 11.1) ([I]n each case, Owner shall not be obligated to receive Crude Petroleum for Transloading Services.");  Paradis, 9/19/22 Tr. 193:9-19 ("Q. That was the only remedy you had in the contract, correct, you could stop accepting the oil and provide transloading services to BTS, correct? A: As I understand it, within the contract that was our remedy, we could stop receiving crude oil.").  Eddystone elected not to pursue that sole remedy.  *See* Paradis, 9/19/22 Tr. 199:14-22 ("It was a business decision to keep the facility up and running and to keep receiving their crude oil.  They had continued to make all their payments up to that point in time."); *see also* Trial Ex. 1438.

159.    Paradis testified that he was familiar with different Enbridge contracts that had other remedies available including requiring full payment if financials assurances were not provided.  Paradis, 9/19/22 Tr. 195:6-21.

160.    When it entered the RSA, Eddystone took on a risk that BTS would be unable to

pay.  Eddystone 30(b)(6) (Cohen), Dep. Tr. 224:18-25.

<u>*There Is No Parent Guaranty Covering BTS' Obligations Under The RSA.*</u>

161.    In this lawsuit, Eddystone seeks to collect damages from the parents and affiliates of BTS despite its failure to obtain a parent guaranty when it entered into the RSA.  Eddystone understood that it was contracting directly and exclusively with BTS under the RSA—not with Bridger, Bridger Logistics, Bridger Marketing, or any other entity.  *See* FOF ¶ 134.

162.    Eddystone, specifically Enbridge's credit department, considered requesting a parent guaranty, but it decided to move forward with the RSA without a parent guaranty. Eddystone 30(b)(6) (Boaz), Dep. Tr. 47:25-48:12 (testifying that before the RSA was finalized, Eddystone consulted the Enbridge credit department); *id.* at 48:16-25 ("Q. Okay. But Eddystone decided to proceed without a parental guarantee, correct? A. They did which was common place for the energy industry to basically enter into the contract, but you would receive a financial guarantee before you initiated service. Q. I see. And did Eddystone receive any kind of financial guarantee before it initiated service in this case?  A. No."); *see also* ERC 30(b)(6) (Boaz), Dep. Tr. 81:10-84:18, 85:12-87:1 (Enbridge credit department took lead on financial assurances and credit enhancements and recommended securing a parent guaranty from Bridger Logistics).

163.    The Berthold guaranties served as the model for the Enbridge employees who negotiated the terms of the RSA on behalf of Eddystone.  *See* Trial Ex. 62.  On August 22, 2012, Enbridge employee Keith Chesnutt wrote as follows: "Bridger – Since Bridger is a private company Credit scored the financials of the parent Bridger Group LLC which rated a B.  It was determined that we would need at least $3mm in credit assurance to cover exposure from both the storage and rail projects.  I spoke with Bridger COO Julio Rios who is willing to issue a $5mm [parent guaranty] to cover Bridger Tran[s]fer and Bridger Storage.  Credit will go forward with negotiating the [parent guaranty] with Bridger."  Trial Ex. 35.

164.     On January 30, 2013, Wilkins asked Chesnutt: "Keith: We're close to signing up Bridger for Eddystone – Will you (or Calgary) be signing off on their Credit and Will they need to provide the Parent Guarantee like they did for the Berthold Tanks?"  Trial Ex. 62.  In response, Chesnutt stated: "I would do the credit signoff since we negotiated the language and yes they would have to provide [parent guaranty]."  Referring to the Berthold guaranties, Wilkins replied: "Please amend the attached Guarantee that we received/used for the Berthold Tanks – Will you need a Letter of Credit too?"  *Id.*; Wilkins, Dep. Tr. 159:24-161:3; *see also* Trial Exs. 39-C, 62, 91-A.  In other words, the Enbridge credit department, which handled the negotiation of the credit enhancement provisions of the RSA, had a very recent contract that included a detailed parent guaranty that Enbridge wanted to modify for inclusion in the RSA.  Eddystone 30(b)(6) (Boaz), Dep. Tr. 47:25-48:25; *see also id.* at 81:10-84:18, 85:12-87:1; Wilkins, Dep. Tr. 159:24-161:3.

165.     Sometime between January 30, 2013 and the signing of the RSA on February 13, 2013, however, Enbridge and Eddystone agreed to enter into the RSA with BTS without a parent guaranty.  Eddystone 30(b)(6) (Boaz), Dep. Tr. 48:16-25; Rios, 9/22/22 Tr. 165:13-17; Trial Ex. 90-A.  Indeed, even in the first draft of the RSA, which Eddystone prepared, no parent guaranty was included. Eddystone 30(b)(6) (Boaz), Dep. Tr. 53:24-55:10.

166.     Nor did BTS obtain a parent guaranty from Eddystone.  *See* Trial Ex. 90-A.

*Bridger Marketing Did Not Agree To Backstop The RSA.*

167.     Lacking a parent guaranty, Eddystone has alleged the existence of an implied contract between BTS and Bridger Marketing to backstop the RSA in the pre-Acquisition period. But there were no agreements between Bridger Marketing and BTS in which Bridger Marketing agreed to pay deficiency charges owned by BTS to Eddystone.  Ballengee, 9/20/22 Tr. 159:21-160:2 ("Q. To your knowledge, were there any agreements in which Bridger Marketing agreed to pay deficiency charges owed by BTS to Eddystone under the RSA?  A.  Not to my knowledge, no,

there was not.  Q. If there were such an agreement, would you have needed to approve it?  A. Yes."); Kelly, 2/13/23 Tr. 34:6-8 ("Q. Did BTS enter into any kind of take-or-pay agreement with Bridger Marketing to backstop the RSA?  A. No, it did not."); Trial Ex. 2705.190 (Ferrellgas PSA listing intercompany agreements between BTS and Bridger Marketing; no agreement to backstop the RSA disclosed), Ballengee, 9/20/22 Tr. 164:11-18 ("Q. Are you aware of any deal documentation evidencing the existence of an agreement between Bridger Marketing and BTS to backstop deficiency charges under the RSA?  A.  No, sir, I'm not."); *see also* Trial Ex. 568.5 (requiring documentation of deals between Bridger, LLC subsidiaries).  And, Bridger Marketing never actually paid money to BTS to cover deficiency payments owed to Eddystone.  Ballengee, 9/20/22 Tr. 31:13-32:23, 40:22-25, 42:23-44:8, 159:17-161:6; Eddystone 30(b)(6) (Cohen) Dep. Tr. 241:12-245:9 ("[Q: I]sn't it the case that Bridger Marketing never actually transferred money to BTS to cover deficiency payments? A. I think that's true.").

168.    At trial, Eddystone suggested that Plaintiff's Summary Exhibit 94 provided circumstantial evidence of the existence of an implied contract because Plaintiff's Summary Exhibit 94 shows a series of deposits from Bridger Marketing to BTS that exceeded BTS' obligations to Eddystone.  Pl. Summ. Ex. 94; Trial Ex. 3002 (Sherman Aff.) ¶ 28.

169.    Ballengee explained that the records displayed on Plaintiff's Summary Exhibit 94 appeared to be bank deposits or transfers back and forth between Bridger Marketing and BTS on or around the 20th of the month.  Ballengee, 9/20/22 Tr. 161:7-17.  According to Ballengee, it was the practice of the Bridger subsidiaries to transfer funds as an intercompany transfer depending on which entity had funds and which entity needed money.  *Id.* at 162:12-23.  In the period from May 2014 through June 2015, BTS provided other services to Bridger Marketing that were not tied to Eddystone.  *Id.* at 162:12-23.  The funds transferred to BTS were to cover all services provided by

BTS, which all settled on the 20th of each month. *Id.* at 43:18-25. As Ballengee testified: "When Bridger Transfer needed funds, if Marketing had funds, they were to be transferred in as a[n] inter-company receivable or a loan or – that's all." *Id.* at 161:1-6.

E. **The Monroe COSA.**

170.    Nonparty Monroe operates a refinery in Trainer, Pennsylvania, which refines crude oil into other products, including jet fuel for Monroe's parent company, Delta Airlines. Dkt. 732 ¶ 18; Trial Ex. 1736.5; Monroe 30(b)(6) (Hunter), 24:2-16; Ballengee, 9/20/22 Tr. 46:20-24; Rios, 9/22/22 Tr. 30:6-12. Monroe's refinery became operational in approximately September 2012 and could refine 210,000 barrels a day. Monroe 30(b)(6) (Hunter), Dep. Tr. 22:7-23:13.

171.    The Monroe refinery required light, sweet crude oil like Bakken because of limitations related to sulfur capacity. Monroe 30(b)(6) (Hunter), Dep. Tr. 26:2-8 Rios, 9/22/22 Tr. 155:13-15; Monroe 30(b)(6) (Hunter), Dep. Tr. 286:2-4, 286:9-19. Monroe was able to buy disadvantaged foreign crudes to blend with the Bakken crude to lower the overall cost and generate a higher relative refining margin. Monroe 30(b)(6) (Hunter), Dep. Tr. 286:2-19.

172.    When it became operational in September 2012, Monroe sourced crude under a long-term supply agreement with British Petroleum ("BP"), under which BP supplied a minimum of 70% and a maximum of 100% of the refinery's needs. Monroe 30(b)(6) (Hunter), Dep. Tr. 23:14-24:1. But Monroe was unhappy with the costs of BP crude. *Id.* at 24:17-25:13. To that end, Monroe sought to procure crude from the Bakken because it was cheaper than foreign crude oil. *Id.* at 32:3-9. Monroe did not have the right to source crude oil due under the BP contract, so it needed to find a source to deliver crude. *Id.* at 40:13-19.

173.    Canopy's Erik Johnson and Jack Galloway alerted Monroe of the opportunity to use the Eddystone Facility even before 2012 when Monroe acquired the Trainer facility. Monroe 30(b)(6) (Hunter), Dep. Tr. 28:10-23. Monroe hoped that it could utilize the Eddystone Facility

to "get a cheaper feedstock for the refinery;" it was not initially interested in a joint venture or partnership relating to the Eddystone Facility. *Id.* at 29:14-21, 31:7-15.

174.     After Enbridge facilitated an introduction in November 2012, Monroe began discussions with Bridger Marketing about obtaining crude through the Eddystone Facility in summer 2013. Monroe 30(b)(6) (Hunter), Dep. Tr. 50:8-51:10, 66:10-19. Monroe was hoping to negotiate a "supply deal of crude oil at a good price." *Id.* at 66:20-23. Monroe was considering long-term contracts as well as spot contracts. *Id.* at 66:24-67:1.

175.     By July 2013, Monroe was interested in a firm commitment from Bridger Marketing to supply crude. Monroe 30(b)(6) (Hunter), Dep. Tr. 72:17-20. At this time, Monroe expected that, by year end, the markets would change such that it "would make economic sense" to source barrels from the Bakken. *Id.* at 72:3-16.

176.     But Monroe was not willing to enter into a deal with Bridger Marketing before the Eddystone Facility was in service because Monroe needed a crude supply commitment to avoid the "huge economic impact" of cutting refinery throughput. Monroe 30(b)(6) (Hunter), Dep. Tr. 67:5-68:9. At the outset, Bridger Marketing was "hoping to get a commitment that was back-to-back to their commitment that they had made through the Eddystone Rail Facility" for 65,000 barrels a day. *Id.* at 68:22-69:13. Monroe could accept up to 80,000 barrels a day. *Id.* at 69:14-17.

177.     By May 2014, the Eddystone Facility was operational. Dkt. 732 ¶ 48; Monroe 30(b)(6) (Hunter), Dep. Tr. 91:15-21. At that time, Monroe sourced Bakken crude through facilities other than the Eddystone Facility, using mostly spot contracts. Monroe 30(b)(6) (Hunter), Dep. Tr. 94:1-11. During that time, Monroe was evaluating Bridger Marketing and other companies for a structured long-term deal to source Bakken crude. *Id.* at 94:12-18.

178.     Ultimately, in July 2014, Monroe and Bridger Marketing entered into the COSA. Trial Ex. 1733; Dkt. 732 ¶ 49.  The COSA had a 5-year term.  Trial Ex. 1733.20 (Article 11.1).

179.     Under the COSA, Monroe made payments to Bridger Marketing for supplying Bakken crude oil.  Trial Ex. 1733.5.

180.     Article 2.1(b) of the COSA required Bridger Marketing to sell and deliver to Monroe 1,950,000 barrels of Bakken crude oil per month (approximately 65,000 bpd).  Trial Ex. 1733.7; Ballengee, 9/20/22 Tr. 58:17-19.

181.     Section 4.1, addressing Pricing, lays out the method by which the price of crude oil to be delivered to Monroe was determined.  Trial Ex. 1733.12.

182.     As Ballengee explained at trial, Section 4.1(a), relating to the "Brent Volumes," is an indexed-based pricing formula used to price 50% of the crude delivered to Monroe based on the ICE Brent benchmark price minus the Brent Differential.  Ballengee, 9/20/22 Tr. 50:5-15; *see also* Monroe 30(b)(6) (Hunter), Dep. Tr. 98:11-99:13.  Ballengee testified that, under this indexed-based pricing formula, if the differential between the Brent price and the price paid in the Bakken was large enough to exceed the cost of transportation, Bridger Marketing would make money. Ballengee, 9/20/22 Tr. 51:21-25; Hunter, Dep. Tr. 98:11–99:13.  This differential is referred to as the spread.  Ballengee, 9/20/22 Tr. 51:21-52:3.

183.     Section 4.1(b), relating to the "Cost-Based Volumes" is a cost-plus pricing formula used for the other 50% of the crude delivered to Monroe.  Ballengee, 9/20/22 Tr. 52:4-10.  This price was based on a weighted average price to acquire oil at the wellhead plus the weighted average of transportation and logistics fees.  *Id.* at 52:8-15; Trial Ex. 1733.1.

184.     The COSA was a significant contract for Bridger Marketing.  Ballengee, 9/20/22 Tr. 36:10-12. As the person in charge of Bridger Marketing, Ballengee was ultimately responsible

for Bridger Marketing's performance under the COSA. *Id.* at 36:13-16.

**F.    Bridger Accounting/Financial Position Pre-Acquisition.**

185.    In November 2012, Bridger, LLC retained investment bank Simmons to represent it in connection with obtaining investments. Rios, 9/23/22 Tr. 116:17-117:3. This process culminated in Riverstone's investment in Bridger, LLC. *See* FOF ¶¶ 17, 106; Rios, 9/23/22 Tr. 116:22-117:3. As part of that process in 2012, Simmons created a spreadsheet that presented Bridger, LLC's business by sectors: trucking, stations, rail, pipeline, and marketing. Trial Ex. 49-B; Rios, 9/23/22 Tr. 117:7-19. The spreadsheet did not segregate financial performance by legal entity. Trial Ex. 49-B; Rios, 9/23/22 Tr. 117:16-19. BTS' financial information was split among its three business segments. Trial Ex. 49-B; Rios, 9/23/22 Tr. 117:20-118:15. Rios explained at trial that Simmons felt a presentation based on segments "told a better story" to potential investors. Trial Ex. 49-B; Rios, 9/23/22 Tr. 118:20-119:2.

186.    Jilla testified that, when he joined Bridger, LLC in January 2014, the company used Quickbooks as its accounting software. Jilla, 12/12/22 Tr. 9:10-18, 11:9-15. Quickbooks was "rudimentary accounting system for smaller businesses" that Bridger, LLC had outgrown at that point in time. *Id.* at 11:16-22. Quickbooks was a "very manual" software with a lot of spreadsheets that complicated Bridger, LLC's ability to achieve a consolidated view of its financials without having to engage in a number of manual tasks. *Id.* at 12:6-13.

187.    Bridger, LLC closed its books every month, meaning the prior month's transactions were recorded and then used to create a set of financial statements for management to review. Jilla, 12/12/22 Tr. 12:14-13:10. Former Bridger, LLC CFO Kelly testified that, in May 2014, it took Bridger, LLC 90 days to close its monthly books. Kelly, 2/13/23 Tr. 7:9-11, 7:19-8:10. These monthly accounting records fed into management reports. Jilla, 12/12/22 Tr. 13:11-13.

188.    Jilla became familiar with Bridger, LLC's management reports when he joined

Bridger, LLC in January 2014. Jilla, 12/12/22 Tr. 9:10-18, 13:15-24. Jilla described these reports as "how the management, the owners, and officers of the company reviewed the health and performance of the business[.]" *Id.* at 13:19-24. Jilla explained that creating the management reports was a "very manual process" that required pulling information from the underlying financial system and the settlement system, including settlements of invoices and metrics. *Id.* at 13:25-14:5, 15:15-16:6. Gamboa testified that generating the management reports required inputs from various sources, including manual inputs. Gamboa, 12/7/22 Tr. 107:21-108:11. The Bridger, LLC management reports presented performance by segment, which did not match up to legal entities on a one-to-one basis. Jilla, 12/12/22 Tr. 14:11-17; Gamboa, 12/7/22 Tr. 107:21-108:3.

189.    In the fourth quarter of 2014, Bridger, LLC transitioned its accounting system from Quickbooks to Microsoft Great Plains. Jilla, 12/12/22 Tr. 11:23-12:5. At that time, the accounting activity for all three BTS segments (rail services, pipeline services, and pipeline management), as well as the accounting activity of BTS affiliate Bridger Storage, LLC, was recorded in Great Plains under "company code" 202, which was labeled "Bridger Transfer Services, LLC." *Id.* at 89:20-23; Sherman 12/8/22 Tr. 13:22-15:10, 20:12-21:4.

190.    Despite the software transition to Great Plains, generating the management reports continued to require significant manual processing. Jilla, 12/12/22 Tr. 14:6-10. The Great Plains accounting system permitted assigning company codes, which Jilla described as "a unique identifier that identifies the entity or cost center." *Id.* at 15:1-7. It is typical for accounting systems to require assigning different numeric codes to categories of revenue, expenses, and other accounting activity. Trial Ex. 3003 (Polkowitz Decl.) ¶ 10. Jilla testified that the process to set up a new legal entity in Great Plains was the same as setting up a cost center and the software permitted a user to enter a name using free-form text. Jilla, 12/12/22 Tr. 31:16-32:1.

191.     Bridger, LLC and Bridger Logistics did not have a working capital facility prior to the Acquisition.  Jilla, 12/12/22 Tr. 57:21-58:1; Rios, 9/23/22 Tr. 133:24-134:4.  In addition, Bridger, LLC maintained separate bank accounts for each legal entity.  Rios, 9/23/22 Tr. 131:4-8; Gamboa, 12/7/22 Tr. 103:23-104:2.  Cash would move between Bridger subsidiaries based on the needs of the individual subsidiary and were recorded as intercompany accounts receivable.  Ballengee, 9/20/22 Tr. 162:12-23; *see also id.* at 161:4-6 ("When Bridger Transfer needed funds, if marketing had funds, they were to be transferred in as a inter-company receivable or a loan or – that's all.").    To track intercompany charges, Bridger, LLC used due to/due from  accounting entries.  Jilla, 12/12/22 Tr. 35:19-22.

## IV.    EDDYSTONE.

### A.     Eddystone Was A Joint Venture Between Enbridge And Canopy.

192.     Eddystone divided roles and responsibilities in the joint venture between Enbridge Rail (Philadelphia), LLC (75% owner), and Canopy (25% owner).  Canopy's role was to engage in government relations and business development work in connection with the Eddystone project.  E. Johnson, 12/13/22 Tr. 79:9-13.  Enbridge's role was to build, fund, and operate the Eddystone Facility.  Paradis, 9/19/22 Tr. 147:7-13; E. Johnson, 12/13/22 Tr. 79:5-8.

193.     Enbridge provided 100% of the funding for the construction of the Eddystone Facility.  E. Johnson, 12/13/22 Tr. 79:14-17.  Canopy was ultimately responsible for 25% of those construction costs, which Canopy funded through a loan from Enbridge.  *Id.* at 79:18-22; Galloway Dep. Tr. 121:6-24.

194.     Paradis was responsible for overseeing the financial performance of Enbridge's investment in Eddystone.  Paradis, 9/19/22 Tr. 177:4-9.

195.     The Eddystone Management Committee, comprised of two management representatives from each of Enbridge Rail and Canopy, governed the joint venture.  *See* FOF ¶ 4;

Dkt. 732 ¶ 4; Paradis, 9/19/22 Tr. 177:4-9. The Enbridge Rail representative reported to Vincent Paradis and chaired the Management Committee. FOF ¶ 41; Dkt. 732 ¶ 4; Paradis, 9/19/22 Tr. 177:4-9. Galloway and Erik Johnson represented Canopy on the Management Committee. E. Johnson, 12/13/22 Tr. 78:18-23; Galloway, Dep. Tr. 53:4-8; *see also* FOF ¶¶ 39; 40. At various times, Wilkins, Fridel, and Boaz represented Enbridge on the Management Committee. Wilkins, Dep. Tr. 95:23-96:5; Eddystone 30(b)(6), Boaz, Dep. Tr. 56:9-57:2; FOF ¶¶ 36, 38, 42.

196. The Eddystone Management Committee met regularly and recorded its meetings in minutes. E. Johnson, 12/13/22 Tr. 94:20-95:3; *see, e.g.*, Trial Ex. 1609-L.

**B. Cost Overruns Plagued The Facility's Construction.**

197. The original conceptual budget for building the Eddystone Facility was $30-35 million; the first approved budget was around $67 million. E. Johnson, 12/13/22 Tr. 80:10-22.

198. During the course of construction, "there was a significant cost overrun." Paradis, 9/19/22 Tr. 152:4-6; E. Johnson, 12/13/22 Tr. 80:23-81:1. In 2013, the budget increased to $80 million, and it subsequently increased to $121 million and then to $155 million. E. Johnson, 12/13/22 Tr. 81:12-25. Ultimately, the total cost of construction for the Eddystone Facility was in the range of $172 to $185 million. *Id.* at 82:21-24 ("My belief is that all the costs included, the cost of the project was approximately $185 million."); Trial Ex. 1612.2 (Dec. 22, 2016 letter from Galloway to Paradis stating that "ERC's construction budget sanctioned by the ERC Management Committee spiraled out of control from $67 million ultimately to $172 million."); Paradis, 9/19/22 Tr. 208:24-209:2; Galloway, Dep. Tr. 120:15-121:4.

199. At trial, Erik Johnson testified that, at a cost of $155 million, Enbridge did not believe the project was viable. E. Johnson, 12/13/22 Tr. 82:13-20. The project was severely over budget, the cost was "concerning" to Canopy, and Enbridge was "looking for ways to cost it down." *Id.* at 82:1-20.

200.     On September 16, 2013, Lee Golden, Vice President of Major Projects at Enbridge, sent an email to Kevin Hatfield (Enbridge) and others proposing to reduce the total project cost for the Eddystone Facility by about $42 million, bringing project costs to a range between $100 to $115 million. Trial Ex. 134.3.  On September 17, 2013, Hatfield responded, forecasting that "[a]t $110-$115MM I can't believe that the project has a financial hope of being any type of significant positive return."  Trial Ex. 134.2; Eddystone 30(b)(6) (Boaz), Dep Tr. 186:1-6.

201.     In an August 22, 2014 email to Kelly, Rios, Gamboa, Ballengee and others, Wilkins (by then employed by Bridger, LLC) expressed his belief, based on his knowledge as a previous Enbridge employee, that "Enbridge had a number of internal issues with Eddystone, and the Rail Competes With Pipeline mentality that permeated the Senior Executives and their drones in Calgary."  Trial Ex. 354.2.  Wilkins expressed his conviction that "a large part of the Major Projects debacle in executing the construction of the site was due to these Palace Eunuchs trying to kill the Project after the Board had approved the Project and Bridger had fully subscribed the capacity."  *Id.*  Wilkins explained that he was referring, in part, to an Enbridge decision to assign a construction management team unfamiliar with rail that had significant overruns on another project, were located in Edmonton, Canada, and "had a very strong Canadian perspective, mainline Enbridge, and they weren't used to common carrier laws of the United States, et cetera."  Wilkins, Dep. Tr. 56:4-57:6.

### C.     Operational Challenges And Issues Plagued The Facility As Well.

202.     The parties dispute whether the Eddystone Facility posed any operational challenges that impacted BTS' ability to transload a sufficient volume of crude oil to satisfy Monroe's requirements, benefit from contractually negotiated deficiency credits, and to make a profit. *Compare* Agusti Opening Statement, 9/19/22 Tr. 68:14-18 (Eddystone Facility was "just a swell Facility") *with* Scarborough Opening Statement, 9/19/22 Tr. 109:23-110:19 (operational

difficulties impacted BTS ability to use deficiency credits under the RSA).  The evidence adduced at trial supports Defendants' position.

203.    On February 3, 2013, more than a year before the first train arrived at the Eddystone Facility, Wilkins (then employed by Enbridge) sent to Rios, Ballengee, and others a presentation designed for potential shippers of crude.  Trial Exs. 67, 67-A; FOF ¶¶ 42, 135. The presentation described the Eddystone Facility as a "state of the art, high speed crude oil unloading facility and transloading terminal and distribution facilities centering in Eddystone, PA."  Trial Ex. 67-A.3. The presentation advertised that the facility would receive, unload, and have 120-car-trains ready for departure within 12 hours.  Trial Ex. 67-A.17.  The presentation also stated that the facility's berth in river would have 34 feet of authorized depth.  Trial Ex. 67-A.13.

204.    As constructed, however, the Eddystone Facility had certain operational challenges and issues that constrained BTS' ability to transload volumes of crude from its inception.  Gamboa, 12/7/22 Tr. 5:10-24; Ballengee, 9/20/22 Tr. 235:6-236:1 (describing facility challenges at the Eddystone Facility); Rios, 9/21/22 Tr. 8:3-15; Monroe 30(b)(6) (Hunter), Dep. Tr. 196:5-197:20 (describing defects with the facility that caused Monroe to reject ownership interest in the facility); *see also* Trial Ex. 416.  The primary issues raised at trial were (1) a 20-hour rail access restriction imposed by the Southeastern Pennsylvania Transportation Authority ("SEPTA"), also called the "SEPTA window"; (2) the lack of functional CT meters; and (3) a granite pinnacle in the middle of the Delaware river that restricted barge access to the Eddystone Facility outside of high-slack tide.  Ballengee, 9/20/22 Tr. 235:6-236:1; Rios, 9/21/22 Tr. 8:3-15; Trial Ex. 416 (10/9/14 email from Kelly Wilkins outlining a list of issues "that have materially adversely impacted Bridger at Eddystone"); *see also* Wilkins, Dep. Tr. 168:24-169:9, 169:13-172:25, 174:10-23, 175:9-177:11; Trial Ex. 453 (Dec. 3-4 emails between Wilkins and Kelly).

205.    The SEPTA window refers to a restriction imposed by SEPTA on freight trains that are 92 cars or longer, which were not permitted to traverse a 3.4 mile stretch of track necessary to reach the Eddystone Facility except during a four-hour period between 12:00 am and 4:00 am.  E. Johnson, 12/13/22 Tr. 109:22-110:11; Trial Ex. 307.37.

206.    Enbridge did not become aware of the SEPTA window until three weeks before the Eddystone Facility opened.  Trial Ex. 307.37; *see* Eddystone 30(b)(6) (Boaz), Dep. Tr. 87:21-24.

207.    Bridger began raising concerns about the four-hour restriction imposed by the SEPTA window almost immediately after the facility started receiving trains.  E. Johnson, 12/13/22 Tr. 111:15-19.  Although the SEPTA window was "open" from 12:00 am to 4:00 am, Bridger was subject to additional restrictions within the SEPTA window.  Gamboa, 12/7/22 Tr. 99:1-4.  The SEPTA window was not limited to train traffic going to and from the Eddystone Facility; other entities also moved restricted trains during the SEPTA window.  *Id.* at 99:5-19 ("[T]here was other traffic – during that window as well.  Monroe, who we delivered to, also receives rail shipments.  That's how they move the propane out of the facility.").  In addition, it took time for the incoming train to get on the track to come into the Eddystone Facility and for the outgoing train to exit the facility.  *Id.*  Approximately two hours of lead time was necessary to get a train released by Eddystone out through the SEPTA window.  *Id.* at 100:13-20.

208.    Due to the SEPTA window, if a train did not depart the facility by 4:00 a.m., trains could stack up.  Gamboa, 12/7/22 Tr. 100:13-22; Rios, 9/22/22 Tr. 161:1-162:11 ("That four hour window got missed a lot.  So what had happened?  That second train had to wait a whole other cycle for it to get in.").  Nicely testified that the "inability to get out of the terminal on a 24/7 basis" due to the SEPTA window caused rail turn times to increase and resulted in lost time.  Nicely, Dep. Tr. 293:1-22; Fridel, Dep. Tr. 241:1-17 (SEPTA window had to be lifted to turn more than

one train a day).

209.    Recognizing the SEPTA window's negative impact on BTS, on October 20, 2014, Rios emailed Erik Johnson and Galloway asking for their advice as to whom he should contact about expanding the SEPTA window beyond the 4-hour restriction.  Trial Ex. 426.2; Rios, 9/23/22 Tr. 36:19-22.  Rios emphasized that he wanted "to bring in our Government Relations department to start laying the groundwork for a meeting with me personally."  Trial Ex. 426.2.  Galloway responded on October 23, 2013, telling Rios that he should not get involved with SEPTA.  Trial Ex. 426.1 ("At this time, it would not be helpful for you to undertake direct communication with the various SEPTA Board members who are appointed by the various county and city governments, as well as the Pennsylvania legislature and the Governor."); Galloway, Dep. Tr. 253:13-15 (admitting that he discouraged Bridger from any direct communication with SEPTA); *see also* Nicely, Dep. Tr. 307:4-308:7 (recalling Galloway stating Canopy was working with the "local community, Conrail SEPTA to work on a solution" and that it was best "for Bridger not to be involved").

210.    The SEPTA window also made it difficult for BTS to use any deficiency credits. Fridel, Dep. Tr. 248:5-12 ("Q.  So the presence of the SEPTA window and the lack of a second vessel . . . both contributed to Bridger's inability to make up the deficiency credits?  A.  Correct."); Trial Ex. 426.2 ( "[W]ith respect to expanding the window I need your support at the ERC level in extending the usage of the deficiency credits to a time period when we can actually bring in more than one train a day so that Bridger can make up the through-put that we have already paid for.  The current 4 hour window makes the usage of deficiency credits impossible." (email from Rios to E. Johnson, Galloway)); Rios, 9/23/22 Tr. 38:20-40:19.

211.    Although Eddystone offered an expert witness on rail logistics who opined that the

SEPTA window was "a good thing" for the Eddystone Facility and BTS (Rennicke, 2/15/23 Tr. 168:22-169:3), contemporaneous evidence from Eddystone's own witnesses suggests otherwise. In an internal Enbridge presentation prepared by Boaz, Boaz acknowledged that the SEPTA window "decreased the throughput of the" Eddystone Facility, and the "Enbridge Project Team should have checked with all railroads directly (including SEPTA and Amtrak) involved in primary and optional routes to discuss Windows (when trains can operate) . . . Capacity restrictions." Trial Ex. 307.37-38. In a March 28, 2014 email, Erik Johnson of Canopy recounted that "we are encountering difficulties with SEPTA that will make our Phase I operation, which is one unit train a day or up to 85,000 barrels a day, difficult." Trial Ex. 260.

212.    Eddystone's rail logistics expert similarly testified that there were two fully operational routes into and out of the Eddystone Facility (Rennicke, 2/15/23 Tr. 192:16-193:2), but his view was again undermined by contemporaneous evidence, including communications from employees of the railroads. Rennicke, 2/15/23 Tr. 201:19-202:23, 194:4-195:18.

213.    In addition, Rennicke appeared to be biased based on longstanding relationships with Enbridge and Eddystone's counsel, most of which he purportedly could not recall until confronted with his deposition testimony at trial. Rennicke, 2/15/23 Tr. 154:6-159:7.

214.    The SEPTA window was never resolved during the time that Bridger used the Eddystone Facility. Rios, 9/23/22 Tr. 37:13-15; *see also* Rios, 9/22/22 Tr. 160:20-162:11 (expectation of turning trains around in 12 hours never met); Trial Ex. 67-A.17; Monroe 30(b)(6) (Hunter), Dep. Tr. 100:10-17 (describing "constant" conversations with Bridger Logistics about problems related to SEPTA). Canopy's Galloway testified that Eddystone could have fixed the problems with the window for $5-6 million. Galloway, Dep. Tr. 148:22-149:11.

215. The RSA required Eddystone to install custody transfer ("CT") meters between the storage tanks and the barge. *See* Trial Ex. 90-A.22, Terms & Conditions, § 3; FOF ¶ 154; Gamboa, 12/7/22 Tr. 6:11-15; Natale, 2/13/23 Tr. 97:12-17.

216. A custody transfer meter ("CT meter") measures the quantity and quality of oil that passes through it as oil is transferred from one custodian to another. Gamboa, 12/7/22 Tr. 6:5-7, 68:6-69:2; Natale, 2/13/23 Tr. 97:18-25; *see also* Fridel, Dep. Tr. 67:7-16. A CT meter then generates a ticket identifying the volume, temperature, and quality of the crude as well as basic company, customer, and facility location information. Natale, 2/13/23 Tr. 97:18-25; Gamboa, 12/7/22 Tr. 69:14-23.

217. Although required by the RSA, Eddystone did not provide a CT meter to measure the oil being transferred at the transfer point from the Eddystone Facility tank to the barge. E. Johnson, 12/13/2022 Tr. 125:2-14 (CT meters were never commissioned); *see also* Gamboa, 12/7/22 Tr. 77:19-21, 83:17-20; Rios, 9/23/22 Tr. 41:18-22; Ballengee, 9/20/22 Tr. 235:6-236:1.

218. Eddystone contends that, after the RSA was signed, BTS agreed by email that there would be no CT meters at the facility and, instead, third-party inspectors would measure the crude oil by hand gauging. E. Johnson, 12/13/2022 Tr. 123:3-12.

219. Rather than installing CT meters by the operational date, Eddystone proposed installing the "CT meters post facility start-up." Trial Ex. 156.2 (10/15/2013 email from Turnbull to Natale and Randy Morgan of Bridger). Eddystone further proposed that, "during this interim period w/o the meters, volumes loaded to barges would be based upon an agreed upon 3rd party inspection company gauging the vessels innage / ullage for custody transfer." *Id.* Eddystone represented that "[u]nder this arrangement, ERC would be responsible for the service fees charged by the inspection company," and it acknowledged that third-party hand gauging "does not meet

the language of the agreement between ERC & Bridger (specifying CT meter solely), and would require your approval to do so." *Id.*; Natale, 2/13/23 Tr. 99:8-104:12.

220.    Hand gauging involves manually measuring (or gauging) the oil at different strike points in a storage tank. *Id.* at 100:22-101:22; *see also, e.g.*, Trial Ex. 440-B.2 (invoice from Inspectorate identifying a charge for "Barge Inspection" and "Lab Analysis"). "Innage" and "ullage" are various techniques of gauging, with innage measuring from the top of the oil to the bottom of the tank and ullage measuring from the top of the oil to the top of the tank. Natale, 2/13/23 Tr. 101:8-22. Hand gauging is less accurate than using CT meters to measure volumes of crude. *Id.* at 101:23-25 ("Q. All right. As between CT meters and hand gauging are there any benefits to using a CT meter? A. It's more exact.")

221.    On October 16, 2013, Natale responded to Eddystone and agreed that measurement could be taken by a third-party inspection company during the interim period between facility start-up and installation of the CT meters. Trial Ex. 156.1 ("We are fine with a 3rd party nominated for marine movement as a source of documentation for inventory reconciliation between ERC and Bridger, as outlined in your note below."). Prior to sending the October 16, 2013 response, Natale spoke to Gamboa about this decision, and Gamboa authorized him to send the email. Natale, 2/13/23 Tr. 103:25-104:7. Natale did not expect the substitution of hand gauging to be permanent, but Bridger was willing to temporarily use a method other than a CT meter because the construction was behind schedule and it wanted to get the terminal up and running. *Id.* at 103:19-24; Gamboa, 12/7/22 Tr. 11:12-19 (explaining that he approved delaying the installation of the CT meters and agreed "to allow the facility to begin operations without a meter" because "[i]t was already six months behind.").

222.     Testimony from Eddystone's corporate representative confirms that hand gauging was to be an interim accommodation for delays in installing the CT meters.  Eddystone 30(b)(6) (Boaz), Dep. Tr. 291:24-292:10.  In other words, CT meters were not installed for reasons other than an agreement to permanently forego them.  *Id.*  The interim period for which Natale agreed to use third-party gauging in lieu of CT meters, was expected to last "no more than a couple of months."   Natale, 2/13/23 Tr. 100:19-21; Trial Exs. 156, 435.   Eddystone's corporate representative testified that Eddystone understood from Natale's email that hand gauging was to be used only "until the custody transfer meters could be . . . put on line and . . . tested and placed into service."  Eddystone 30(b)(6) (Boaz), Dep. Tr. 288:20-289:10; *see also id.* at 291:15-17 ("Q. Is it your understanding that the word interim means temporary?  A. Yes."); *see also* E. Johnson, 12/13/2022 Tr. 124:22-125:1 ("Q. And the use of something other than a custody transfer meter was only during this interim period between startup and installation, as Mr. Turnbull described it, correct?  A. It was.").

223.     There is no evidence that BTS agreed to dispense with CT meters as a contractual requirement.  Only Gamboa and Rios had the authority to decide on behalf of BTS whether to waive Eddystone's obligations under the RSA.  Gamboa, 12/7/22 Tr. 83:8-11.  Gamboa never authorized Natale to waive, and BTS never agreed to waive, the RSA's requirement of CT meters.  Gamboa, 12/7/22 Tr. 83:12-16; Turnbull, Dep. Tr. 277:10-17, 278:17-24 ("Q. To your understanding, did BTS and ERC ever amend the RSA to excuse ERC's performance of providing the custody transfer meters? A. To my understanding, no.").

224.     Eddystone elicited testimony regarding an email from Natale in which he asked: "Why would we be putting a custody transfer meter to the doc?  3rd party mediators will be nominated for all transfers between Bridger and our customers.  I think we stay away from t his."

Trial Ex. 155.  As Natale and Gamboa both testified, however, Natale's questions related to the settlement of sales with their customer, Monroe (for which CT meters at the Eddystone dock would not be helpful), not the reconciliation of volumes in and out of the facility.  Gamboa, 12/7/22 Tr. 81:20-83:7; Natale, 2/13/23 Tr. 108:15-109:3.  Gamboa testified that he disagreed with Natale's recommendation to "stay away" from CT meters "at the dock.  Gamboa, 12/7/22 Tr. 9:6-11 ("Q. You did not disagree with Mr. Natale's comments or recommendations, correct?  A.  I did.")

225.     Gamboa never authorized Natale to waive and BTS never meant to waive the contractually required CT meter installation at the barge.  Gamboa, 12/7/22 Tr. 83:12-16; Turnbull, Dep. Tr. 277:10-17, 278:17-24 ("Q. To your understanding, did BTS and ERC ever amend the RSA to excuse ERC's performance of providing the custody transfer meters?   A. To my understanding, no."); Natale, 2/13/23 Tr. 104:8-12, 109:4-16, 104:3-7 (recounting that Gamboa authorized Natale to send the email).

226.     From May 2014 through January 2016, CT meters were never installed at the Eddystone Facility.  Gamboa, 12/7/22 Tr. 83:17-20.

227.      The RSA did not expressly require the use of CT meters to measure crude at the transfer point from the trains into the facility storage tanks.  Gamboa, 12/7/22 Tr. 6:19-22.  CT meters are, however, standard at oil transloading facilities, particularly "state of the art" facilities (as Eddystone was represented to be).  Natale, 2/13/23 Tr. 98:12-18, 103:1-3, 120:24-121:4 ("Q. It was your experience that CT meters were the general practice?  A.  CT meters are the preferred mans of custody transfer."); Gamboa, 12/7/22 Tr. 79:20-80:1.

228.     The Eddystone Facility did not contain a CT meter between the arriving train and the tank to measure the oil offloaded from the train.  Gamboa, 12/7/22 Tr. 70:2-5.  To measure the oil offloaded, Eddystone proposed a scale to weigh the incoming railcars.  *Id.* at 70:6-15.  But the

scale was too short to accommodate all of the wheels on a railcar, rendering its measurement of crude quantity inaccurate. *Id.* at 70:6-15; Natale, 2/13/23 Tr. 107:9-12 ("[Q.] Without CT meters to measure the oil coming into the Eddystone facility, was there any way to reconcile the volumes going in and out? A. Not that I recall.").

229.    Instead of CT meters, Eddystone used hand gauging throughout the entire period in which BTS used the Eddystone Facility. Gamboa, 12/7/22 Tr. 83:21-23.

230.    At the inception of the COSA and the RSA, Bridger anticipated sending delivered trains to the Eddystone Facility as part of its plan to satisfy its volume commitments. Gamboa, 12/7/22 Tr. 71:11-17. A delivered train is a full crude oil train that a marketing company purchases from a third party. *Id.* at 70:19-71:1. The third party owns or leases the train and handles all of the logistics. *Id.* at 70:19-71:1. Title to the crude transfers when the oil is offloaded from the delivered train. *Id.* at 71:2-4. The purchase price of a delivered train is based on the value of oil offloaded. *Id.* at 71:5-7.

231.    The use of scales and hand gauging to measure crude at the offload train-side point, rather than industry-standard CT meters, negatively impacted the ability to bring delivered trains into the facility to meet BTS volume commitments. Gamboa, 12/7/22 Tr. 71:25-73:14.

232.    The facility's measurement failings also resulted in railcars returning to North Dakota full of, or partially full of, crude oil. Gamboa, 12/7/22 Tr. 73:15-74:7.

233.    Without CT meters, Gamboa, Rios, and Natale all testified that Eddystone had failed to construct a state-of-the-art facility. Gamboa, 12/7/22 Tr. 79:20-80:1; Rios, 9/22/22 Tr. 158:1-159:15; Natale, 2/13/23 Tr. 103:1-3.

234.    Bridger received and paid 50% of the invoices submitted by the third-party inspection companies for third-party inspectors to hand gauge the barge and measure the volume

and quality of the crude.  *See* Trial Exs. 438, 440-A, 440-B, 463-B, 482-A, 506-A, 544-A, 545-A, 587-A, 726-A, 862-E, 862-F, 885-A, 981-A, 1050-A, 1059-A, 1113-A, 1248-E.

235.     Defendants' expert, Dr. George, calculated the damages suffered by BTS as a result of Eddystone's failure to install CT meters between the facility storage tank and the barge as the amount of the "'real-world' cost to retain third-party inspectors to measure volume of oil transfers, which costs would not have been incurred in a 'but-for' world in which [Eddystone] had installed CT meters."  Trial Ex. 3004.4 (George Decl.) ¶ 14.

236.     Dr. George first took a set of 213 invoices and added together the charges that related to the manual measurement of the volumes of crude at the barge side of the Eddystone Facility.  George, 12/14/22 Tr. 10:12-23.  The total amount of the invoices paid by Bridger was $124,706.50.  Trial Ex. 3004.4 ¶ 16; Trial Exs. 438, 440-A, 440-B, 463-B, 482-A, 506 A, 544-A, 545-A, 587-A, 726-A, 862-E, 862-F, 885-A, 981-A, 1050-A, 1059-A, 1113-A, 1248-E.

237.     Dr. George subsequently calculated the net present value ("NPV") of the costs. Trial Ex. 3004.4 (George Decl.) ¶ 15; George, 12/14/22 Tr. 11:3-14 ("[B]ecause a dollar today is worth more than a dollar tomorrow, taking into account the time value of money is critically important in calculating damages.").

238.     Dr. George discounted the amounts shown on the invoices to NPV using each individual invoice's actual inspection date, or the date on which the inspection cost was actually incurred or accrued.  Trial Ex. 3004.5 (George Decl.) ¶ 19.  If only a month, and not an actual inspection date, appears on the invoice, Dr. George assumed the charge accrued on the 15th of that month.  *Id.* at n.5.  The discount rate used within Dr. George's calculations is the weighted average cost of capital ("WACC") for Bridger Logistics.  George, 12/14/22 Tr. 11:15-17; Trial Ex. 3004.4 (George Decl.) ¶ 15.  Dr. George explained: "[T]he charges which occurred over roughly a 14-

month period of time in this case needed to be, as we just discussed, discounted back to the valuation date. That's done using a weighted average cost of capital for a particular company at a particular point in time." George, 12/14/22 Tr. 11:18-24. Based on an April 17, 2014 date of injury (the date the facility was alleged to have been operational and therefore the date of the first act alleged to have given rise to liability), Dr. George calculated Bridger Logistics' WACC to be 14.5%. Trial Ex. 3004.4-5 (George Decl.) ¶ 17.

239. Dr. George calculated the total discounted NPV of the invoices as of April 17, 2014 to be $105,676.92. Trial Ex. 3004.5 (George Decl.) ¶ 21; George, 12/14/22 Tr. 12:4-10.

240. Dr. George also calculated prejudgment interest from April 17, 2014 through the end of 2022. Trial Ex. 3004.5-6 (George Decl.) ¶ 22. In doing so, Dr. George used the New York State statutory rate of 9% simple interest per annum. *Id.* The total interest through December 31, 2022 is $82,862.29, and interest has continued to accrue at a rate of $26.06 per day. *Id.*

241. During the trial, Dr. George provided to the Court a working spreadsheet version of the model used to calculate damages (attached to his Declaration in pdf form, see Trial Ex. 3004.8-13) that can be adjusted. George, 12/14/22 Tr. 15:7-10.

242. According to Dr. George, based on a valuation date of April 17, 2014 and using individual invoice data, the total amount of damages suffered by BTS because of Eddystone's failure to install and commission CT meters, including statutory prejudgment interest through December 31, 2022 was $188,539.21. Trial Ex. 3004.6 ¶ 23.

243. Using Dr. George's spreadsheet, as of the date of this filing, April 28, 2023, the 118th day of 2023, an additional $3,075.08 in interest has accrued. *See* Trial Ex. 3004.8-13. The total amount of damages, including statutory prejudgment interest through the date of this filing is $191,614.29. *See id.*

*Granite Pinnacle.*

244. Compounding logistical issues at the Eddystone Facility was the presence of a large granite pinnacle in the channel that limited the depth of the channel to 27 feet, 8 inches. Ballengee, 9/20/22 Tr. 235:6-236:1; Rios, 9/22/22 Tr. 160:10-19; Fridel, Dep. Tr. 296:22-297:2; E. Johnson, 12/13/22 Tr. 120:15-17; Dudley, 2/15/23 Tr. 266:19-23. The pinnacle spread across almost half the width of the channel. Dudley, 2/15/23 Tr. 266:11-18; *see also* Fridel, Dep. Tr. 249:13-18.

245. The existence of the granite pinnacle is not disputed. Instead, Eddystone offered expert testimony to support its view that it was Bridger's decision to charter a particular barge, which it says created logistical issues for Bridger, and not the granite pinnacle itself. *See generally* Trial Ex. 3012 (Dudley Decl.).

246. Bridger Trading, LLC entered into a Charter Party Agreement with U.S. Shipping for a barge known as the Petrochem Producer. Trial Exhibit 2671-A. Eddystone had approval or rejection authority over any vessel chosen by Bridger. Dudley, 2/15/23 290:7-10.

247. Under the RSA, Eddystone was required to provide BTS an eight-hour window for barge arrival. Boaz, Dep. Tr. 39:2-5. But because the channel depth was only 27 feet, 8 inches, the barge could sail only twice a day, at high tide, when loaded to full capacity. Gamboa 12/7/22 Tr. 101:14-18; E. Johnson. 12/13/2022 Tr. 121:8-14; Nicely, Dep. Tr. 86:7-10: Fridel, Dep. Tr. 256:12-257:11.

248. The pinnacle impacted the volumes transloaded at the Eddystone Facility because it created time constraints on when BTS could load the barge to full capacity. Gamboa, 12/7/22 Tr. 101:1-13 ("It created a bottleneck similar to the SEPTA window and that here was time – time constraints on when we could – could load and load the barge to full capacity."); Ballengee, 9/20/23 Tr. 279:16-19 ("Q. And what precisely is your complaint about the pinnacle? A. Because of that, we could not fully load the ship that we leased."). Moreover, to traverse the pinnacle at

any tide, the Petrochem Producer would have needed to shortload by 23,000 barrels. Eddystone 30(b)(6) (Boaz), Dep. Tr. 198:17-199:1 ("Q. All right. There is a reference here to a 20,000 – approximately 23,000 barrel penalty. Do you understand what that means? A. I believe what he is referring to is that the, uh, PetroChem Producer would not be able to load 23,000 barrels."); Nicely, Dep. Tr. 72:23-73:7.

249. The pinnacle also impacted Bridger's ability to manage dock congestion at the Monroe facility. Gamboa, 12/7/22 Tr. 101:22-102:3. Though there were times when the Monroe dock was empty and available, the Petrochem Producer could not get to that dock because the barge had to wait for high tide to depart the Eddystone Facility. *Id.* at 102:4-9.

250. In May 2014, U.S. Shipping, the owner of the Petrochem Producer, imposed an additional slack tide requirement on the barge. Nicely, Dep. Tr. 105:17-22, 106:6-9. Slack tide occurs between the flood and ebb tide when water is not moving. *Id.* at 101:12-21. There are two high and two low slack tides each day. *Id.* at 101:22-24.

251. Nicely testified that he understood that the slack tide restriction "was temporary, based on the channel getting dredged." Nicely, Dep. Tr. 106:6-14. The slack tide requirement dictated that the Petrochem Producer could berth and unberth at the Eddystone Facility at slack tide only. Dudley, 2/15/2023 Tr. 233:20-22.

252. Nicely also testified that that the slack tide restriction was directly related to the pinnacle and that, absent the pinnacle, the Petrochem Producer would not have needed to sail at slack tide. Nicely, Dep. Tr. 277:3-278:5. Although Eddystone's expert, Dudley, testified that the slack tide restriction was a maneuvering issue based on the narrowness of the channel and was not caused by the pinnacle (Dudley, 2/15/2023 Tr. 265:20-25), contemporaneous documents and fact witness testimony that he failed to consider undercut his opinion. *See* Dudley, 2/15/23 Tr. 280:7-

10 (admitting Dudley did not consider Nicely's testimony), Dudley, 2/15/23 Tr. 271:16-273:4 (acknowledging he did not consider February 2014 emails recognizing that dredging would widen the channel by removing the pinnacle); Dudley, 2/15/23 Tr. 274:8-275:10).

253.     Dudley also testified that the pinnacle did not act as a constraint on either transit between the Eddystone Facility and the Monroe dock or Bridger's ability to meet its MVC. Dudley, 2/15/23 Tr. 265:6-11.  Dudley's own testimony, however, confirms that the pinnacle constrained the Petrochem Producer's ability to depart fully loaded.  Dudley, 2/15/2023 Tr. 266:5-10 ("Q.  But a Petrochem Producer with a full load could only depart Eddystone at high slack tide, right?  A.  That's correct.  Q.  It couldn't' depart at low slack tide, correct?  A.  With a full load, it could not depart at low slack."), 268:6-10 ("Q.  Okay.  And if the Petrochem Producer wanted to depart at any stage of the tide, such as low water, it would have to cut some of its cargo out of the vessel, right?  A.  It would have to sail light, yes."); *see also* Nicely, Dep. Tr. 102:11-20 (for the barge "to leave fully loaded, it would have to leave at slack high tide").

**D.     Pre-Acquisition Offers From Bridger To Purchase The Eddystone Facility.**

254.     At trial, Eddystone argued that efforts by some Defendants to purchase the Eddystone Facility post-Acquisition were just a "safeguard" in a "rather urgent effort" to handle risks posed by Jamex Marketing.  Agusti Opening Statement, 9/19/22 Tr. 67:24-69:8.  Defendants contend that Bridger attempted to purchase the Eddystone Facility as early as 2013 due to the desire to complete construction at a quicker pace and, later, to remedy the operational issues. Scarborough Opening Statement, 9/19/22 Tr. 110:20-111:13.

255.     Bridger sought to purchase the Eddystone Facility before it was operational because Bridger believed it could do a better job completing its construction.  Ballengee, 9/20/22 Tr. 230:8-21.  The acquisition also made financial sense for Bridger.  *Id.* at 230:14-21 ("[W]e'd rather own the asset than pay somebody else to use theirs").

256.     Bridger made its first offer to purchase in July 2013.  Trial Ex. 102-A (July 16, 2013 letter from Rios to Enbridge expressing an interest in discussing "Bridger purchasing from Enbridge both the rail loading facility in Berthold, North Dakota and the rail unloading facility in Eddystone, Philadelphia"); Ballengee, 9/20/22 Tr. 230:1-4.  From September 30 to October 31, 2013, Enbridge and Bridger exchanged edits to a draft purchase and sale agreement, but they never reached an agreement.  Trial Exs. 147, 147-A, 166, 166-A, 166-B; Rios, 9/23/22 Tr. 23:17-21.

257.     Nevertheless, prior to the Acquisition, Bridger made several other offers to buy the Eddystone Facility.  Trial Exs. 102-A, 317-A, 479, 479-A, 2661-A; Paradis, 9/19/22 Tr. 154:1-9; Ballengee, 9/20/22 Tr. 230:1-4, 231:17-19; 233:13-16; E. Johnson 12/13/22 Tr. 104:2-16.

258.     On July 10, 2014, Bridger sent another letter to Enbridge offering to buy the Eddystone Facility.  Trial Exs. 317-A; 318-A; Ballengee, 9/20/22 Tr. 231:17-21; Paradis, 9/19/22 Tr. 205:1-206:4.  Rios attached to the July 10, 2014 letter an unsigned check for $128 million made out to the Eddystone Rail Company, LLC.  Trial Ex. 317-A.4.  In the letter, Rios represented that he was authorized by Bridger's board to sign the check, subject to the execution of definitive documentation.  Trial Ex. 317-A.2.  The check was sent to "emphasize [Bridger] was prepared to close the transaction."  Kelly, 2/13/23 Tr. 18:20-19:10; *see also* Rios, 9/23/22 Tr. ("I expected it to elicit an appropriate response that would get the right people coming back to me to get serious about discussing the purchase of this facility."); Wilkins, Dep. Tr. 253:22-254:7 ("Julio said, 'I want to buy – I want to buy the Eddystone Rail from Bridger or Enbridge.'  I said, 'Well, good. Well, send them a check; maybe they'll cash it.  Maybe they might sell it.'").

259.     Enbridge declined the $128 million offer.  Ballengee, 9/20/22 Tr. 232:1-7. Testimony at trial established that Enbridge wanted to recoup the total construction costs of the Eddystone Facility (later determined to be $172 to $185 million) in connection with a sale.  Paradis,

9/19/22 Tr. 208:16-23 ("I have recall having a conversation internally with Al [Monaco, President, Enbridge, Inc.] and others . . . around trying to seek at least our construction costs and what we put into the facility."); *see also* Trial Ex. 318-A (identifying Al Monaco).

260. Contemporaneous emails support Bridger's commitment to acquiring the Eddystone Facility at this time. In August 2014, Bridger engaged in discussions with Societe Generale, or SocGen, about raising debt financing for the acquisition of the Eddystone Facility. Kelly, 2/13/23 Tr. 16:17-17:1; Trial Ex. 351. In an August 2014 email to SocGen, Bridger CFO Kelly highlighted the "East Coast acquisition details," referring to the Eddystone Facility. Trial Ex. 351.1; Kelly, 2/13/23 Tr. 17:9-10. Kelly's August 2014 email anticipated that the deal would close and fund sometime between the end of September and the middle of October 2014. Trial Ex. 351.2; Kelly, 2/13/23 Tr. 17:23-18:2.

261. In addition to SocGen, Bridger spoke to several other investors about raising debt financing for the facility acquisition. Kelly, 2/13/23 Tr. 18:3-6. In Kelly's view, Bridger was "very close" to acquiring the facility in 2014. Kelly, 2/13/23 Tr. 18:20-24 ("Q. Okay. In your view having participated in these talks, how close was Bridger to acquiring the facility in 2014? A. We were very close. We wanted to acquire the facility to be clear."). Rios shared Kelly's belief that Bridger be able to buy the facility. Rios, 9/23/22 Tr. 34:7-9 ("Q. So at this point, were you optimistic that Bridger would be able to buy the facility? A. Yes."); *see also* Monroe 30(b)(6) (Hunter), Dep. Tr. 110:12-23, 115:9-24 (describing Monroe's belief that Bridger, LLC was serious about purchasing the facility).

262. Defendants offered evidence at trial that Bridger's attempts to acquire the facility and its decision not to provide financial assurances requested by Eddystone were interrelated.

263. In September 2014, Bridger Logistics gave Eddystone a temporary parent guaranty

with a limitation of liability up to $8 million and a 20-day term that expired on September 30, 2014. Trial Ex. 367; Rios, 9/22/22 Tr. 166:1-167:8, 168:5-19 ("Q. What is the term of the guarantee? A. The term was until September 30th, 2014. Q. And I believe the date at the top of the guarantee is September 10, 2014, correct? A. That's right. Q. So this is in place for 20 days? A. Yes. Q. And as far as you know, this is the only parent guarantee given by Bridger Logistics in connection with the RSA? That's correct."). No other guaranty was given. Rios, 9/22/22 Tr. 166:1-167:8, 168:5-19.

264.    Enbridge Senior Credit Advisor Richard Fernandez contacted Bridger at the end of September 2014 informing it to be ready to post the required letter of credit ("LC") if "things don't play out as Bridger plans." Trial Ex. 385.2. Rios responded internally that "Bridger will not be posting an LC to Enbridge at Eddystone. . . . Discussions continue on the acquisition front and he simply needs to stay out of the way." *Id.* at 1. There was a cost to provide a letter of credit and Bridger was not willing to incur that cost while it was negotiating for the purchase of the facility. Rios, 9/23/22 Tr. 33:16-34:6 ("We were going to buy the facility. Why would we incur a cost for a facility that we were going to own?").

265.    In September 2014, Bridger increased its offer to $160 million. Ballengee, 9/20/22 Tr. 232:8-10; Paradis, 9/19/22 Tr. 208:8-15. At that point, Bridger and Enbridge had a deal in principle for $160 million based on what Enbridge understood the cost of the facility to be at the time. Paradis, 9/19/22 Tr. 209:7-210:12. Because the cost of the facility was closer to $172 million, however, Enbridge rejected Bridger's $160 million offer and countered at $172 million. Paradis, 9/19/22 Tr. 209:7-210:12. ("So right around the same time our estimates came in, and I think the project went from a hundred and some odd 60 million or whatever, the number was over 170 or right around 170. So I believe we went back to Bridger with that number. And they told

us no, they were not prepared to go to that."); Ballengee, 9/20/22 Tr. 232:8-12; Trial Ex. 375-A.2 (September 19, 2014 internal Bridger presentation comments that "[a]s of late July, the budget had expanded to approximately $160 million, forming the basis of Enbridge's ask of $160mm for exclusivity. Enbridge's full cost of completion of the Eddystone Facility is now expected to be $172 million. . . . Enbridge has revised the terms of the transaction it is willing to accept in an effort to recoup the increased construction costs"); *see also* Rios, 9/23/22 Tr. 30:25-32:2 (explaining Trial Ex. 375-A.2). Bridger did not agree to pay $172 million at that time but, while the parties were negotiating the potential purchase of the facility in September 2014, Enbridge held off on its requests for financial assurances. Paradis, 9/19/22 Tr. 209:7-210:12; Rios, 9/23/22 Tr. 35:9-11; 30(b)(6) (Boaz), Dep. 145:12-18. Canopy pushed Enbridge to obtain assurances throughout this period, but Enbridge was not interested. Galloway, Dep. Tr. 164:11-170:4.

266. From December 7, 2014 through January 5, 2015, Rios and Morgan Keith at Enbridge exchanged a series of emails on the subject of acquiring the Eddystone Facility. *See* Trial Ex. 477. On January 7, 2015, Bridger again sent a letter to Enbridge seeking to acquire the Eddystone Facility, this time for $175 million. Trial Ex. 479-A.1; Ballengee, 9/20/22 Tr. 233:13-234:6; Rios, 9/23/22 Tr. 49:21-50:1. Bridger also offered to assume the cost to complete construction of the facility. Trial Ex. 479-A.1; Rios, 9/23/22 Tr. 50:2-4. Although the letter is dated January 7, 2014, the cover email (Trial Ex. 479) is dated January 7, 2015, and Ballengee testified that he believed the letter's 2014 date to be an error. Ballengee, 9/20/22 Tr. 232:19-25.

267. On February 12, 2015, Paradis wrote to Troy Lee, then general counsel at Bridger, LLC, to follow up "on the status of your review of the Eddystone PSA and when we can expect to see a mark-up." Trial Ex. 510.2; Paradis, 9/19/22 Tr. 211:5-11. Although Paradis could not specifically remember Bridger's $175 million offer, he confirmed that '[i]f we had actually

engaged in discussion and had marked up a PSA, a purchase and sale agreement, then, yes, we would have been interested." Paradis, 9/19/22 Tr. 211:23-212:5.

268.    Ultimately, Enbridge rejected Bridger's $175 million offer to purchase the Eddystone Facility as well. Ballengee, 9/20/22 Tr. 234:7-8; Rios, 9/23/22 Tr. 50:5-6.

269.    For several reasons, Bridger continued its efforts to buy the Eddystone Facility after the facility began receiving crude in May 2014. *See* FOF ¶ 135. First, Bridger wanted to address the facility defects that could be addressed, which had an impact on operations. Gamboa, 12/7/22 Tr. 118:19-119:3 (referencing the CT meters and the pinnacle); Ballengee, 9/20/22 Tr. 234:23-236:25 (specifying the pinnacle, CT meters, pipe size/speed of loading, and the SEPTA window).

270.    Second, based on its experience operating terminals all around the U.S., Bridger believed it could operate the Eddystone Facility more efficiently. Gamboa, 12/7/22 Tr. 119:4-120:15 (describing experience with construction and operation of Swan Ranch terminal, nine pipeline terminals in the Bakken, four pipeline terminals in the Rockies, four pipeline terminals in Permian, and two pipeline terminals in the Gulf Coast); Ballengee, 9/20/22 Tr. 234:23-235:5.

271.    Finally, the financial considerations surrounding Bridger's ability to convert an expense into EBITDA was attractive, inasmuch as Bridger measured its business on that basis for internal purposes and for any potential valuation in a sale, as was done in connection with the Acquisition. Gamboa, 12/7/22 Tr. 120:16-22; Ballengee, 9/20/22 Tr. 234:9-15 ("Essentially what we would be doing is paying ourselves and we'd create additional EBITDA for Bridger.").

272.    In response to the question of whether Bridger made several offers to buy the Eddystone Facility, Erik Johnson replied that he did not "know if there were offers in retrospect, but they made several inquiries to purchase the Eddystone Facility." E. Johnson, 12/13/22 Tr. 104:2-6. In light of the extensive testimonial and contemporaneous documentary evidence to the

contrary, the suggestion by Erik Johnson that the offers by Bridger to purchase the Eddystone Facility were not genuine offers is not credible.

### E. Pre-Acquisition Negotiations Regarding The RSA Amendments And Their Relationship To Financial Assurances.

273. Under the RSA, BTS had six months to use any Deficiency Credits it accrued while transloading crude through the facility. Trial Ex. 90-A.3, 7, §§ 1.1, 4.1, 4.2; *see* FOF ¶ 146-147.

274. On December 17, 2014, counsel for BTS sent to Eddystone, Enbridge, and Canopy a letter listing examples of the facility defects and detailing the extent to which they had frustrated the purpose of the RSA. Trial Ex. 468.2-3 (Lynn letter); *see also* FOF ¶¶ 197-253. Those facility deficiencies included the "[f]ailure to timely complete construction of Phase I." Trial Ex. 468.2. In particular, by December 2014, a full seven months after the first trains began delivering crude to the facility, Eddystone had still not installed custody transfer meters. *Id.* at 2. The December 17, 2014 deficiency letter also emphasized that the "unloading capacity of one unit train per day (80,000 b/d) in Phase 1 is frustrated by the 4-hour SEPTA window." *Id.* ("This sort of restriction was simply not contemplated by the Parties prior to or contemporaneous with the Agreement's execution, and severely restricts Bridger's ability to meet its take-or-pay requirements under the Agreement. It also effectively prevents Bridger from being able to apply its deficiency credits under the Agreement."). The letter also identifies the "[o]utgoing cargo barge loading of just 27 feet of depth, not 34 feet of depth," as initially promised. *Id.* This "rendered [the barge] unusable except for a very short window at high tide." *Id.*

275. The facility defects described above affected BTS' ability to use the deficiency credits. Rios, 9/23/2022 Tr. 38:20-40:19 (explaining at length how the "four-hour SEPTA window is a huge problem for using deficiency credits" and how the inability to bring in delivered trains due to the lack of custody transfer meters prevented BTS "from getting customers to come to our

facility"); Trial Ex. 260; Gamboa, 12/7/2022 Tr. 85:11-18 (testifying that he expected to be able to deliver more than 65,000 barrels a day, but was not able to realize that expectation); Fridel, Dep. Tr. 248:1-12 ("Q. So the presence of the SEPTA window and the lack of a second vessel . . . both contributed to Bridger's inability to make up the deficiency credits? A. Correct.").

276. Although BTS believed these failures afforded it a "clear legal right to rescind" the RSA, its "preference [was] for the parties to renegotiate the terms of the [RSA]." Trial Ex. 468.3.

277. In January 2015, representatives from BTS and Eddystone met in Philadelphia to discuss the substance of the BTS complaints. Paradis, 9/19/2022 Tr. 168:5-18; Rios, 9/23/22 Tr. 201: 8-18 (recalling a Philadelphia airport meeting with Enridge representatives after BTS counsel sent the deficiency letter). At that meeting, BTS sought an extension of the six-month limit on using deficiency credits accrued under the RSA. Paradis, 9/19/2022 Tr. 168:5-18 ("They were seeking an extension of their makeup rights."). BTS also proposed deferring deficiency payments until the SEPTA window constraint was resolved, that Eddystone credit BTS for all prior deficiency payments, and that Bridger have exclusive access to Eddystone until a reliable system for measurement and testing was implemented. Trial Ex. 484.2.

278. BTS and Eddystone engaged in negotiations to amend the RSA through email, the January in-person meeting in Philadelphia, and by exchanging draft amendments. *See, e.g.*, Trial Exs. 484, 486, 486-A (January 22, 2015 email from Bridger's general counsel to Galloway, Boaz, E. Johnson, Paradis, and others with a draft amendment to the RSA attached), 517 (February 24, 2015 email from Paradis stating that an amendment would be sent to Bridger that week), 676 (June 1, 2015 email from Boaz to Rios and others regarding an RSA amendment and Eddystone's request for financial assurances).

279. Based on its review of BTS financial statements, Enbridge had no concern about

BTS' ability to pay and never had any conversations with BTS about payment. Paradis, 9/19/2022 Tr. 158:16-21; 204:14-22; *see also id.* at 204:23-25 (testifying that, from the date trains were first brought into the Eddystone Facility, BTS never missed a payment).

280. Nevertheless, in October 2014, Eddystone sought financial assurances from BTS. Kelly, 2/13/2023 Tr. 69:18-24; Paradis, 9/19/2022 Tr. 158:8-12. Eddystone reiterated its request in December 2014. Kelly, 2/13/2023 Tr. 70:8-12. At the time, Bridger was focused on acquiring the Eddystone Facility, and BTS and Eddystone were negotiating amendments to the RSA. *Id.*; Trial Exs. 468, 484. As these discussions continued, Eddystone periodically reiterated its request for financial assurances. *See, e.g.*, Trial Ex. 676.4 (June 1, 2015 email from Boaz to Rios and others requesting a letter of credit and referencing a May 17 email to the same effect); Kelly, 2/13/2023 Tr. 72:4-11 (observing that Enbridge never completely ceased reiterating its request for BTS to provide financial assurances).

281. Eddystone understood the BTS position that the facility was defective and it would not provide financial assurances until Enbridge agreed to RSA amendments that ameliorated the BTS concerns about the facility. Paradis, 9/19/2022 Tr. 198:3-14; Trial Ex. 517 ("We have been working with Bridger to post the required financial assurances for several months (they have proposed a surety bond and credit has accepted this form) – but they are not willing to post it until we – Eddystone Rail Co – work through some amending language on their rail services agreement which has been outstanding since last year."); *see also* Kelly, 2/13/2023 Tr. 72:4-11 ("This is a very good example of the higher priority items that we were attempting to resolve with the Eddystone Facility. Letters of credit was not high on the list of issues to be resolved."); *id.* at 22:4-23:5 (testifying that BTS did not post a bond that was being discussed internally in March 2015, *see* Trial Ex. 531, because BTS "continued to have operational issues" and "[t]he operational

issues getting sorted was the highest priority.").

282.     Conversely, Eddystone's position was that it would not execute an amendment providing a longer period within which to use deficiency credits until Eddystone received financial assurances.  Paradis, 9/19/2022 Tr. 196:14-21 ("I know we said we were not going to execute [the RSA amendment] until we received the financial assurances."); Trial Ex. 676.1 (June 1, 2015 email from Boaz to Rios advising that "[w]e are more than willing to finalize the amendment with you which will include the $1.56 million credit and extension of startup deficiency credits.  We can execute the amendment just as soon as the LC is in place."); Rios, 9/23/2022 Tr. 51:9-52:8 (testifying regarding Trial Ex. 676 and negotiations in June 2015 regarding the letter of credit and amendment to the RSA explaining that this proposed amendment included a $1.56 million credit for "deficiency credits that we could not otherwise use" and an additional extension of startup deficiency credits for those not included in the $1.56 million credit).

283.     The parties' positions created a standoff.  Boaz and Paradis both agreed, however, that the amendments to the RSA would cost Eddystone little to nothing.  Trial Ex. 517 (email from Paradis commenting that Canopy "had been unwilling to compromise on the proposed amendments which we believe will not cost the Eddystone JV anything now or in the future"); ERC 30(b0(6), Boaz, Dep. Tr. 153:5-14 ("I thought my view was that it would be minimal cost to the – to the joint venture, but it, uh, it wasn't – it wasn't millions upon millions of dollars.").

284.     Due in part to this standoff, the RSA was never amended.  Paradis, 9/19/2022 Tr. 198:20-24 ("[Q.] BTS and Eddystone were not able to agree on the language of an amendment to the RSA that was acceptable to both parties, correct?  A. My recollection is we had . . . almost reached agreement.  But it never was finalized."); Rios, 9/23/2022 Tr. 52:5-6.

285.    Although Bridger Logistics preferred that the parties renegotiate the terms of the RSA, when negotiations with Eddystone stalled, Bridger Logistics considered bringing a lawsuit against Eddystone due to the facility defects.  Gamboa, 12/7/22 Tr. 128:12-14; Trial Ex. 468.

286.    Bridger Logistics believed that Eddystone had defaulted on its obligations under the RSA, which cut off BTS' obligation to pay.  Rios, 9/23/22 Tr. 152:4-12; Trial Exs. 1118, 1127.

## V.    FERRELLGAS, INC., FERRELLGAS PARTNERS, AND FERRELLGAS LP.

### A.    Corporate Organization.

287.    From 2014 to 2016, nonparty Ferrellgas, Inc., had a 1% general partner interest in Ferrellgas Partners and an approximate 1% general partner interest in Ferrellgas LP.  As the general partner, Ferrellgas, Inc. performed all management functions for Ferrellgas Partners and Ferrellgas LP and employed all Ferrellgas employees.  Dkt. 732 ¶ 8; FOF ¶ 12.

288.    Ferrellgas, Inc., was owned by Ferrellgas Companies, Inc., which was owned by the public and an employee stock ownership program ("ESOP"), which ESOP had a 40% ownership interest in the organization.  *See* Wambold, 12/8/22 Tr. 169:21-170:16.

289.    All Ferrellgas employees owned part of the ESOP and received ESOP units on an annual basis based on tenure and pay.  Wambold, 12/8/22 Tr. 170:8-16.

290.    Ferrellgas Partners was the publicly traded entity within the Ferrellgas organization, starting in 1994.  Wambold, 12/8/22 170:20-22 (FGP was the ticker of the publicly traded Ferrellgas entity).

291.    From 1994—when Ferrellgas Partners went public—to 2015, Ferrellgas Partners paid annual distributions to the public, as well as equivalent distributions to the ESOP after it was formed.  Wambold, 12/8/22 Tr. 171:1-14.  The distributions were important to Ferrellgas; Wambold described them as the "lifeblood of the enterprise" and the "lifeblood of the value of the ESOP."  *Id.* at 171:15-19.  Prior to the Acquisition, Ferrellgas paid a $2 distribution per unit each year and

never missed a distribution. *Id.* at 171:9-19; Wambold, 12/9/22 Tr. 25:7-24.

292.    Ferrellgas Partners was a Master Limited Partnership ("MLP"). *See* Wambold, 12/8/22 Tr. 176:8-11.  An MLP is an entity for which a high percentage of revenue derives from the ground and which carries certain tax advantages for the assets that qualify as "MLP-able." *Id.* at 176:8-23.  Acquisition of significant assets that are not "MLP-able" may jeopardize MLP status and tax advantages. *Id.*

**B.    Ferrellgas LP Funded Its Operations Through A Credit Facility.**

293.    Ferrellgas LP had relied on a credit facility for funding "as long as [CFO Heitmann] could remember."  Heitmann, 2/14/23 Tr. 53:18-54:2.  Ferrellgas CFO Heitmann testified that the credit facility was "the lifeblood of our organization" and funded both working capital and capital expenditures in the form of smaller acquisitions. *Id.*

294.    In 2009, Ferrellgas LP obtained a credit facility through Bank of America, as the administrative agent on behalf of a number of lenders.  Miles, 12/12/22 Tr. 195:22-196:3; Trial Ex. 1851.  The credit facility was established through a November 2, 2009 Credit Agreement (the "Credit Agreement"). *Id.*; Miles, 12/12/22 Tr. 184:3-23.

295.    ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████. *See* Heitmann, 2/14/23 Tr. 59:5-7 (CC).  The lenders had a security interest in substantially all of Ferrellgas' personal property except for accounts receivable. *Id.* at 117:5-11; Miles, 12/12/22 Tr. 189:21-25.  Accounts receivable were collateralized under a separate credit facility that is not at issue in this litigation.  Miles, 12/12/22 Tr. 182:10-16; Heitmann, 117:4-11.

296.    The Credit Agreement imposed numerous obligations on Ferrellgas Partners, including restrictions on the debt that Ferrellgas could onboard (Trial Ex. 1851.89 (§ 7.02) (Indebtedness)), how Ferrellgas could dispose of assets (*Id.* at 93 (§ 7.02 Dispositions)), and what

changes to accounting policies or reporting practices Ferrellgas could make (*Id.* at 97 (§ 7.13 Accounting Changes)). In addition, the Credit Agreement required Ferrellgas to deposit funds in bank accounts ultimately controlled by Bank of America. *Id.* at 98 (§ 7.19 Deposit Accounts); Miles, 12/12/22 Tr. 187:19-24.

297. The Credit Agreement defines "Restricted Subsidiaries" as all Ferrellgas Partners subsidiaries other than certain "Unrestricted Subsidiaries," none of which are involved in this litigation. *See* Miles, 12/12/22 Tr. 192:20-22, 188:17-19, 189:4-7; Trial Ex. 1851.34 (definition of Restricted Subsidiaries); *id.* at 38 (definition of Unrestricted Subsidiaries). Thus, all of the subsidiaries involved in this case were Restricted Subsidiaries.

298. By virtue of the Credit Agreement, Restricted Subsidiaries had access to the credit facility without restrictions on intercompany transactions. Miles, 12/12/22 Tr. 192:24-193:8, 194:15-21 (comparing treatment of Restricted Subsidiaries to Unrestricted Subsidiaries).

299. The Credit Agreement defines "Borrower" as Ferrellgas LP and "General Partner" as Ferrellgas Partners. Trial Ex. 1851.10. "Guarantors" includes the Borrower (Ferrellgas LP), the General Partner (Ferrellgas Partners), and the Restricted Subsidiaries. *Id.* at 25 (definition of Guarantors). "Loan Parties" includes all of the Guarantors. *Id.* at 29.

300. Section 6.12(a) of the Credit Agreement required the Loan Parties (i.e., Ferrellgas LP, Ferrellgas Partners, and the Restricted Subsidiaries) to "[d]eliver . . . deeds of trust, mortgages, chattel mortgages, security agreements, financing statements and other Collateral Documents . . . for the purpose of granting, confirming, and perfecting first and prior liens or security interests (subject to Permitted Liens) in any real or personal property now owned or hereafter acquired by any Loan Party[.]" Trial Ex. 1851.85 (§ 6.12(a) Loan Parties); *id.* at 15 (a lien is to be created in favor of Bank of America). To that end, the Credit Agreement required that the Loan Parties

execute certain collateral documents in favor of Bank of America.  *Id.* at 85 (§ 6.12(a)); *id.* at 15 (defining "Collateral Documents").

301.    The principal document that the Loan Parties had to execute in connection with section 6.12(a) of the Credit Agreement was the security agreement, which covered all personal property.  Trial Ex. 1851.85 (§ 6.12(a)), *id.* at 15 (defining "Collateral Documents"); Miles, 12/12/22 Tr. 189:21-25.  A security agreement that was substantially the same as the form attached to the Credit Agreement was executed when the credit facility was established in 2009 (as supplemented or amended, "Security Agreement").  Miles, 12/12/22 Tr. 195:22-25; *see also* Trial Ex. 1851.186-228 (form of security agreement).

302.    The Credit Agreement also required the Guarantors to execute a guaranty in favor of Bank of America, a form of which is provided by the Credit Agreement.  Trial Ex. 1851.25 (definition of Guaranty); *id.* at 172-85 (form of guaranty attached to the Credit Agreement).  A guaranty that was substantially the same as the form provided by the Credit Agreement was executed when the credit facility was established in 2009 by the Guarantors at that time (as supplemented or amended, "Guaranty").  Miles, 12/12/22 Tr. 196:4-14.

303.    Section 6.12(b) of the Credit Agreement addressed the applicable requirements for when a Loan Party formed or acquired a new subsidiary, requiring any new Restricted Subsidiary to execute: (1) a supplement to the Guaranty within 10 business days (§ 6.12(b)(i)) and (2) collateral documents granting a security interest in the new subsidiary's assets as promptly as practicable (§ 6.12(b)(ii)).  Trial Ex. 1851.86.

304.    By executing a guaranty supplement, the new subsidiary joined the Guaranty in accordance with to § 6.12(b)(i).  Trial Ex. 1851.178 (describing effect of guaranty supplement); *id.* at 183-85 (form of guaranty supplement).

305. The second required document was the grantor accession agreement, by which a new subsidiary became a party to the Security Agreement in accordance with to § 6.12(b)(ii). Trial Ex. 1851.35 (definition of "Security Agreement Supplement" in Credit Agreement); *id.* at 192 (definition of "Security Agreement Supplement" in form security agreement); *id.* at 219-22 (form of grantor accession agreement).

306. The Credit Agreement was amended from time to time. Amendment No. 3, dated June 6, 2014, amended the Credit Agreement to provide that the Loan Parties could not dispose of property, whether by sale or otherwise, unless (1) no default existed at the time of the disposition; (2) the disposition included 100% of the equity interests of a Restricted Subsidiary; and (3) if the fair market value of the assets subject to disposition exceeded $25,000,000, then at least 75% of the consideration received for it by the Loan Parties had to be in cash. Trial Ex. 1850.12 (§ 7.05(k)).

307. ██████████████████████████████████████████████████████████
████████████████████████████████████ Heitmann, 2/14/23 Tr. 73:16-19 (CC); Miles, 12/12/22 Tr. 182:17-22; Soiefer, 12/6/22 Tr. 191:5-14.

308. As a result, it was critical for Ferrellgas to remain in compliance with the terms of the credit facility. *See* Heitmann, 2/14/23 Tr. 357:1-4; *id.* at 232:13-25 (CC). In the event of default, Bank of America's remedies included declining to lend, accelerating repayment, and foreclosing on its collateral. Trial Ex. 1851.101 (remedies in event of default); Miles, 12/12/22 Tr. 198:24-199:5, 198:18-23. A default under the Credit Agreement triggered defaults under other Ferrellgas debt instruments pursuant to cross-default provisions. Heitmann, 2/14/23 79:3-8.

██████████████████████████████████████████████████████████
████████████ Heitmann, 2/14/23 Tr. 73:13-19 (CC); *see also* Miles, 12/12/22 Tr. 182:17-22.

309. Certain events would constitute defaults under the Credit Agreement. Trial Ex. 1851.98. In particular, the institution of bankruptcy by a Loan Party would constitute an "immediate definitive default" under the Credit Agreement. *Id.* at 98 (§ 8.01(f) Events of Default); Miles, 12/22/22 Tr. 224:4-6; Trial Ex. 1153; Trial Ex. 1851.98 (Article VIII of the Credit Agreement (Events of Default)).

310. Heitmann and Bracewell were responsible for overseeing Ferrellgas' compliance with the credit facility. Heitmann, 2/14/23 Tr. 53:14-55:12; Miles, 12/12/22 Tr. 180:23-181:11; Hampton, 12/14/22 Tr. 122:7-15. By his own admission, Hampton did not have the time or expertise to deal with the credit facility. *Id.* at 122:11-123:12.

## C. Ferrellgas Tracked EBITDA Using Cost Centers.

311. The propane side of the Ferrellgas business tracked EBITDA using cost centers. Wambold, 12/9/22 Tr. 39:17-19; Heitmann, 2/14/23 Tr. 42:7-22. Ferrellgas had used cost centers since at least 1997, when Ferrellgas CEO Wambold started working at the company. Wambold, 12/9/22 Tr. 39:22-25; Wambold, 12/8/22 Tr. 164:7-167:1 (Wambold's background at Ferrellgas).

312. Cost centers are a tool for senior management to gain an understanding of their business. Heitmann, 2/14/23 Tr. 42:8-14. Cost center accounting is a mechanism that companies use to track specific categories, or segments, of revenues, expenses, and other accounting activity associated with their businesses to better understand and manage aspects of their business lines. Trial Ex. 3003 (Polkowitz Decl.) ¶ 29. Cost center accounting is particularly common among companies with common ownership so that management can see how various segments perform, as opposed to looking at performance by individual legal entity. *Id.* ¶ 29; Trial Ex. 3014 (Sherman Rebuttal Decl.) ¶ 15 (acknowledging that Ferrellgas reports financials by segment, not legal entity); Sherman, 12/7/22 Tr. 272:25-274:8 (acknowledging that cost-center accounting is both common and appropriate).

313. Polkowitz further explained that generally accepted accounting principles ("GAAP") do not require accountants to track accounting activity by legal subsidiary and, in fact, public companies are often required to provide financial reporting by operating segments rather than by legal entity. Trial Ex. 3003 ¶ 30 (citing ASC 280-10).

314. Heitmann explained that, at Ferrellgas, cost centers allowed separate financials showing budget and profitability to be created for individual service units that could be aggregated by area and region. Heitmann, 2/14/23 Tr. 42:8-43:6. The cost center reporting structure was helpful to Wambold from a management perspective because it allowed him to identify the business, area, or location that he wanted to analyze. Wambold, 12/9/22 Tr. 40:5-12.

**D.    Ferrellgas Financial Reporting/Audit Structure.**

315. As a publicly traded company, Ferrellgas Partners had public reporting obligations to the Securities and Exchange Commission ("SEC"). Heitmann, 2/14/23 Tr. 44:2-11.

316. Ferrellgas also had an internal audit department with a director and seven or eight employees. Heitmann, 2/14/23 Tr. 44:19-45:2. The audit department was responsible for ensuring that the company complied with Sarbanes-Oxley controls and also performed random audits of the several hundred Ferrellgas service units. *Id.* at 45:3-7. The audit department did not report to the CFO or CEO; instead, the audit department reported to the audit committee chair. *Id.* at 45:8-12. The audit committee chair sat on the Ferrellgas board of directors. *Id.* at 45:11-21.

317. In addition to the internal audit department, Grant Thornton performed external formal audits on Ferrellgas each year. Heitmann, 2/14/23 Tr. 45:22-46:6. Grant Thornton also reviewed the Ferrellgas quarterly results. *Id.* For the quarterly reviews and the annual audit, Grant Thornton would send a team to the Ferrellgas offices in Liberty, Kansas. *Id.* at 46:1-13.

318. Heitmann testified that, during the time he was CFO (2015-2018), no internal or external auditing entity raised any concerns with the use of cost center accounting. Heitmann,

2/14/23 Tr. 46:14-18.

E.    **The Ferrellgas Diversification Strategy.**

319.    At the time of the Acquisition, Ferrellgas had a diversification strategy in place, the impetus for which was a particularly challenging year in 2012 caused by unseasonal high temperatures. Wambold, 12/8/22 Tr. 174:25-175:14; Wambold, 12/9/22 Tr. 23:2-12; Heitmann, 2/14/23 Tr. 12:6-17; Trial Ex. 688-A.3. At the time, the propane market was flat to declining, reducing industry growth prospects. Wambold, 12/9/22 Tr. 32:23-24, 34:5-12; Soiefer, 12/6/22 Tr. 47:15-48:23.

320.    Following fiscal year 2012, the Ferrellgas Board of Directors launched a strategy to diversify the company's revenue streams to a "roughly 70/30 split – 70 percent propane, 30 percent non-propane." Wambold, 12/8/22 Tr. 174:22-175:14, 179:15-24; Wambold, 12/9/22 Tr. 23:2-12; Hampton, 12/14/22 Tr. 99:17-100:3; Heitmann, 2/14/23 Tr. 12:6-17; Trial Ex. 688-A.3.

321.    To that end, Ferrellgas sought a transaction that was sufficiently large to offset the conditions that motivated diversification (i.e., weather dependency) but valued at a price that Ferrellgas could afford. Wambold, 12/8/22 Tr. 175:23-176:7; *see also* Soiefer, 12/6/22 Tr. 49:18-50:6. Ferrellgas sought a company with "MLP-able" revenues that benefited from favorable tax treatment available to MLPs and would not place the Ferrellgas MLP status at risk. Wambold, 12/8/22 Tr. 175:23-176:16.

322.    It was also important to Ferrellgas to identify an acquisition target removed from high commodity risk to offset the degree of volatility from propane's seasonal and commodity prices. Soiefer, 12/5/22 Tr. 98:4-99:12 (Bridger Logistics was attractive because it had contract-based revenues that "could perform against different cycles and different commodity prices").

323.    While Ferrellgas had made close to 200 acquisitions prior to 2014, Ferrellgas did not have extensive experience with larger acquisitions outside of propane. *See* Soiefer, 12/6/22

49:2-14; Hampton, 12/14/22 Tr. 100:18-24; Wambold, 12/8/22 Tr. 187:6-14.

324.    In January 2014, after initially unsuccessful efforts to diversify, Ferrellgas hired Soiefer as a business development executive to help Ferrellgas diversify through compatible large acquisitions.  Wambold, 12/8/22 Tr. 177:21-178:12, 173:16-174:4; Soiefer, 12/5/22 Tr. 61:4-7 (establishing start date); Soiefer, 12/6/22 Tr. 47:7-11.

325.    Soiefer undertook to identify sectors that could be a good fit based on offerings, growth profiles, end markets, and valuation.  Soiefer, 12/6/22 Tr. 49:15-50:13.  He presented a few sectors, largely focused on logistics, to Ferrellgas leadership and the Board of Directors.  *Id.* at 49:15-50:25.  Based on those discussions with leadership and the Board of Directors, Soiefer identified about 100 potential targets in his first year with Ferrellgas.  Soiefer, 12/6/22 Tr. 51:3-16; *see* Wambold, 12/8/22 Tr. 178:13-15.

326.    In May 2014, the Ferrellgas Board of Directors approved an opportunity identified by Soiefer: acquiring a saltwater disposal well business in the Eagle Ford shale region in Texas called Sable Environmental ("Sable").  Wambold, 12/8/22 Tr. 178:16-179:4; Trial Ex. 688-A.3.

327.    Following the Sable acquisition, Ferrellgas made a few other acquisitions in the environmental services and water disposal space in 2014.  Soiefer, 12/6/22 Tr. 51:20-52:2.  The environmental services and water disposal acquisitions did not achieve the Ferrellgas diversification strategy because the deals were not large enough to achieve the 70/30 split between propane and non-propane EBITDA.  Wambold, 12/8/22 Tr.179:5-24; *see also id.* at 181:13-182:3.

328.    In addition, shortly after the Sable deal closed, the former Sable ownership group and employees departed, which caused significant business issues because Ferrellgas lacked expertise in Sable's business.  Wambold, 12/8/22 Tr. 182:21-183:3.  Based on this experience, Ferrellgas learned that it needed dedicated leadership that knew how to run any business Ferrellgas

acquired that operated in industries or sectors other than propane.  *Id.* at 52:24-53:6; Wambold, 12/8/22 Tr. 182:21-183:3 ("We didn't know what the hell we were doing with that business. We needed the leadership team to run it.").

## VI.   DUE DILIGENCE FOR THE POTENTIAL ACQUISITION.

### A.   Bridger Logistics Is Identified As An Opportunity.

329.   In early 2015, Ferrellgas engaged investment bank Simmons—the same investment bank that assisted Bridger, LLC with the Riverstone investment—to assist in a "renewed effort" to bring about a more substantial acquisition.  Soiefer, 12/6/22 Tr. 53:7-54:1; Trial Exs. 739, 739-C.  One of the companies identified was Bridger Logistics.  Soiefer, 12/5/22 Tr. 66:22-67:3.

330.   Soiefer and Rios first met in New York City in March 2015.  Soiefer, 12/5/22 Tr. 67:4-8; Rios, 9/21/22 Tr. 34:10-36:20.  Soiefer described the first meeting as an "informal" meeting where Rios "gave an overview of the business, told us about some of the customers they had, the type of business that they were in and some of the exciting growth that they were achieving."  Soiefer, 12/5/22 Tr. 67:9-18.  Rios testified that he got the opportunity to tell the "Bridger story," a "bootstrap business-type story" where "we started with nothing and built a business in a very short period of time through a lot of hard work."  Rios, 9/21/22 Tr. 36:21-37:4. The next day, Soiefer met with Riverstone to discuss Bridger Logistics and other companies in Riverstone's portfolio.  Soiefer, 12/5/22 Tr. 54:2-17, 67:19-22, 68:15-21.

331.   Soiefer understood at the time that, with the "advent of significant shale oil drilling in various parts of the country[,] . . . there was a very significant demand for crude logistics." Soiefer, 12/6/22 Tr. 54:2-17.  Bridger Logistics was also very attractive because "a significant portion of the business was [of a] high-quality contracted nature."  *Id.* at 54:18-55:2.  In other words, Ferrellgas executives understood that Bridger Logistics had steady contract-based revenue that would not be influenced by fluctuations in commodity prices.  Wambold, 12/9/22 Tr. 130:15-

131:1; Soiefer, 12/6/22 Tr. 54:18-55:2; Soiefer, 12/5/22 Tr. 98:4-24. Bridger Logistics also was "MLP-able." Wambold, 12/9/22 Tr. 22:22-24:9.

332. On April 7, 2015, Wambold sent an email to Soiefer, Ferrellgas COO Boyd McGathey, and Blue Rhino CEO Tod Brown describing the potential opportunity with Bridger Logistics. Trial Ex. 566; Wambold 12/8/22 Tr. 180:12-181:6. In the email, Wambold stated that Soiefer "landed the big one today," referring to Bridger Logistics. Trial Ex. 566.1; Wambold, 12/8/22 Tr. 181:7-20. Wambold testified that he was "very excited" about the potential acquisition of Bridger Logistics because it was an acquisition "big enough to move the needle on the diversification strategy;" initial reports were that Bridger Logistics had $100 million in EBITDA to the Ferrellgas EBITDA of $300 million, "effectively check[ing] our 70/30 box." Wambold, 12/8/22 Tr. 181:13-182:3; *see also id.* at 174:11-18.

333. Wambold testified to a desire to move quickly to negotiate with Bridger, LLC because he understood that Bridger was going to "hit[] the open market for sale," increasing the price of the business. Wambold, 12/8/22 Tr. 183:4-15; *see also* Trial Ex. 566.1.

**B. Ferrellgas Explores The Potential Acquisition And Conducts Due Diligence.**

*Ferrellgas Hired Household Names To Vet The Bridger Logistics Acquisition.*

334. Ferrellgas hired numerous advisors to assess the Acquisition: (1) Simmons to provide investment banking and advisory services; (2) Grant Thornton to provide accounting diligence and quality of earnings analysis; (3) Akin Gump as legal counsel; (4) JPMorgan Chase to advise on financing; and (5) Burns & McDonnell for environmental due diligence. FOF ¶¶ 29-32; Wambold, 12/9/22 Tr. 14:4-8; Heitmann, 2/13/23 Tr. 13:7-16; Soiefer, 12/6/22 Tr. 55:8-19.

*Bridger Logistics Financials Are Presented By Segment By Bridger And Evercore.*

335. On April 8, 2015, Rios sent Evercore (Bridger's investment bank) materials about Bridger, LLC that Simmons had prepared in 2013. Trial Exs. 571, 581, 584; Rios, 9/23/22 Tr.

119:7-120:2. In his email, Rios wrote Evercore that Rios could be in the office all day to "knock the Ferrellgas [confidential information memorandum ("CIM")] out." Trial Ex. 571; Rios, 9/23/22 Tr. 121:13-23. Rios testified that he was referring to the CIM that Evercore was to prepare for the Acquisition. *Id.* at 121:21-23.

336. Rios attached the financial spreadsheet that Simmons had prepared in 2013. Trial Ex. 584; Rios, 9/23/22 Tr. 120:17-24. That spreadsheet presented Bridger, LLC's financials by segment and included aspects of the BTS business (and the business of other subsidiaries) on the rail tab and the stations tab. Trial Ex. 571; Rios, 9/23/22 Tr. 121:24-122:18. [4]

337. Rios also attached a "Descriptive Memorandum Regarding Bridger" that was prepared by Simmons in 2013. Trial Ex. 581; Rios, 9/23/22 Tr. 120:14-16. The memorandum presented the Bridger, LLC business by segments (truck transportation, pipeline injection stations, rail, pipeline, and marketing), not by legal entity. Trial Ex. 581.4; Rios, 9/23/22 Tr. 122:19-123:5.

338. Ultimately, Evercore created its own version of a CIM (the "Evercore CIM"). Trial Ex. 601.3, 601.7; *see* Rios, 9/23/22 Tr. 123:18125:1. That CIM was provided to Ferrellgas on or about April 11, 2015. *See* Trial Exs. 589, 589-A; Soiefer 12/6/22 Tr. 60:19-61:25.

339. Like the previous presentation deck that Simmons had prepared in 2013, the Evercore CIM presented Bridger Logistics' financials by service offering. Trial Ex. 589-A.7; Soiefer, 12/6/22 Tr. 121:23-25; Heitmann, 12/14/22 Tr. 18:11-17 ("Q. Did this CIM inform your understanding of the Bridger's business and its constituent parts? A. It did.").

340. The CIM identifies the Eddystone Facility as part of Bridger Logistics' rail service offering. Trial Ex. 589.A.7 (listing "80.0 MBpd of unloading capacity in Eddystone, PA" under

---

[4] Witnesses refer to the offerings of the Bridger Logistics enterprise as "service offerings," "lines of service," "segments," and "sectors." The Findings of Fact use such words interchangeably.

"Rail"); Soiefer, 12/6/22 Tr. 121:18-122:4.

341.    The Evercore CIM identifies Bridger Logistics' organizational structure as follows (Trial Ex. 689-A.8):



342.    As reflected in the chart above, BTS does not appear under either the rail or the pipeline segments in the Evercore CIM, but instead appears under "Pipeline Terminal."  Trial Ex. 589-A.8; *see also* Soiefer, 12/6/22 Tr. 122:5-16; Heitmann, 2/14/23 Tr. 19:3-12.

343.    Evercore also created a management presentation regarding Bridger Logistics for use during an April 2015 meeting in Dallas between and among Ferrellgas and Bridger Logistics executives.  *See* Trial Ex. 699-B; Soiefer, 12/6/22 Tr. 124:3-17.  That management presentation also presented Bridger Logistics' financials by service offering and identified the Eddystone Facility as part of the rail service offering.  Trial Ex. 699-B.5, 14; Soiefer, 12/6/22 Tr. 125:1-19; *see* Wambold, 12/9/22 Tr. 12:1-10, Hampton, 12/14/22 Tr. 113:10-15.

344.    On May 13, 2015, Kelly emailed Heitmann and Herrold an email titled "Updated Management Report – March 2015."  Trial Ex. 646.  The document attached was titled "Bridger Management Report – March 2015 – 5.13.15 v2.xlsx."  Trial Exs. 646, 646-A.  The first tab of the

March 2015 management report presented financial performance by segment (trucking, rail, pipeline terminals, pipeline, and maritime) on a quarterly and annual basis. Trial Ex. 646-A; Rios, 9/23/22 Tr. 127:6-25. The management report did not contain a financial report broken down by legal entity. Trial Ex. 646-A; Rios, 9/23/22 Tr. 127:22-128:2.

<em>Ferrellgas Sends Binding Letter Of Intent And Meets Bridger Logistics Executives.</em>

345. After evaluating Bridger Logistics materials and other initial information with its advisors, on April 17, 2015 Ferrellgas sent Bridger a non-binding letter of intent. *See* Trial Exs. 596, 596-A; Soiefer, 12/6/22 Tr. 62:6-18; Wambold, 12/8/22 Tr. 184:17-185:22.

346. The letter of intent stated that Ferrellgas had "assigned a preliminary enterprise value of $825 - $900 million for Bridger [Logistics] on a cash-free / debt-free basis," which was calculated by applying a seven-and-a-half times multiple (7.5x) to what it understands Bridger's current run-rate EBITDA to be ($110 - $120 million)." Trial Ex. 596-A.2. Ballengee testified that the Bridger Logistics EBITDA was in the range of $110 to $120 million per year. Ballengee, 9/20/22 Tr. 165:13-166:7.

347. On April 23, 2015, a meeting between Ferrellgas and Bridger management took place in Dallas. *See* Trial Ex. 608-A; Wambold, 12/8/22 Tr. 188:1-189:1; Hampton, 12/14/22 Tr. 106:12-23; Rios, 9/21/22 Tr. 45:1-22. The meeting served as an opportunity for executives from both companies to meet and assess the viability of working together long term. Wambold, 12/8/22 Tr. 189:2-15; Soiefer, 12/6/22 Tr. 62:24-63:19, 64:2-65:1; Hampton, 12/14/22 Tr. 106:24-107:5; Rios, 9/21/22 Tr. 48:1-8. There was no discussion about the legal entities that comprised Bridger Logistics. Hampton, 12/14/22 Tr. 111:20-24.

348. Bridger Logistics executed the letter of intent. Wambold, 12/8/22 Tr. 187:15-17.

*Investment Bank Simmons Prepares Presentations Regarding Bridger Logistics For Ferrellgas And Its Board Of Directors.*

349. In April 2015, Simmons prepared an initial presentation for Ferrellgas that reviewed the materials that Evercore provided and included additional analysis and evaluation. *See* Trial Exs. 593, 593-A; Soiefer, 12/5/22 Tr. 74:10-25; Soiefer, 12/6/22 Tr. 68:5-17.

350. The April 2015 Simmons report presented Bridger Logistics financials by service offering. Trial Ex. 593-A.6; Soiefer, 12/6/22 Tr. 123:3-10.

351. In May 2015, Simmons prepared another presentation for the Ferrellgas Board of Directors which tracked Bridger Logistics financials by service offering. *See* Trial Ex. 652-A.8; Soiefer, 12/6/22 Tr. 125:20-126:17, Heitmann, 2/14/23 Tr. 21:2-11.

352. The May 2015 Simmons presentation includes a slide titled "EBITDA Bridge – Q1 Actual Run-Rate to 2015P Base Case." Trial Ex. 652-A.11. The slide reflects an increase of $9 million in EBITDA between Bridger Logistics' Q1 2015 financials and the 2015 projected base case EBITDA for the rail segment based in part on "Eddystone volumes reaching 65 MBbls/d." Trial Ex. 652-A.11.

353. In the May 2015 presentation, Simmons included a slide titled "Base Case Bridger Financials." Trial Ex. 652-A.82. The page reflected historical and projected financials, including next 12 months' (NTM) financials for Bridger Logistics. *Id.*; Soiefer, 12/6/22 Tr. 126:6-13. The "Base Case Bridger Financials" page presented gross margin, opex, and EBITDA by service offering as well. Trial Ex. 652-A.82; Soiefer, 12/6/22 Tr. 126:14-17.

354. Eddystone's accounting expert, Marc Sherman, calculated the value of BTS pre-Acquisition by adding together the EBITDA of the three BTS business segments from the Simmons report, which reported EBITDA by segment, not legal subsidiary. Sherman, 12/8/22 Tr. 16:11-19:15 (citing Trial Ex. 652-A); *see also* Pl. Summ. Ex. 79.

355.    Ferrellgas executives did not focus on BTS pre-Acquisition and could not identify BTS' assets; instead, they reviewed the overall performance and outlook for Bridger Logistics or its business segments.  Hampton, 12/14/22 Tr. 111:20-24, 112:24-113:5; *see* Soiefer, 12/5/22 Tr. 69:19-24, 76:19-25; Heitmann, 2/14/23 Tr. 18:18-19:2, 23:15-17, 31:17-21; Trial Ex. 631.

356.    Throughout due diligence, Bridger Logistics financials were presented by business segment, not legal subsidiary.  *See* Heitmann, 2/14/23 Tr. 19:17-21:11; Trial Ex. 652-A.8; Heitmann, 2/14/23, Tr. 33:7-34:9 (discussing pre-acquisition management reports); Trial Ex. 646-A; Hampton, 12/14/22 Tr. 112:24-113:5; Trial Ex. 699-B.5; Soiefer, 12/6/22 Tr. 121:21-25; Trial Ex. 589-A.7; Soiefer, 12/6/22 Tr. 123:8-10; Trial Ex. 593-A.6.

357.    Soiefer, Wambold, and Hampton each testified that they did not recall ever seeing Bridger Logistics financial performance tracked by legal entity.  Soiefer, 12/6/22 Tr. 123:11-15, 130:18-131:1 ("Through the sale process, through our due diligence, everything was reported to us on service offering."); Wambold, 12/9/22 Tr. 12:21-13:14; Hampton, 12/14/22 Tr. 113:16-21.

358.    Although Heitmann reviewed Bridger, LLC's audited consolidated financials for 2014, he did so to try to understand if expenses were recorded under Bridger Marketing that rightfully belonged to Bridger Logistics, and to determine the overhead associated with Bridger Logistics.  Heitmann, 2/14/23 Tr. 24:3-26:16.  Heitmann did not focus any particular subsidiaries other than Bridger Marketing and Bridger Logistics.  *Id.* at 25:12-18, 144:11-16, 144:24-3.

*Ferrellgas Anticipated That Bridger Logistics Would Have A Long-Term Relationship With Monroe.*

359.    Much of Ferrellgas' due diligence efforts focused on the potential to grow Bridger Logistics' relationship with Monroe and to evaluate any barriers in the way of that future growth.

360.    On May 13, 2015, Rios and Gamboa took Soiefer and others from Ferrellgas on a

tour of the Eddystone Facility.  Trial Ex. 647; Soiefer, 12/6/22 Tr. 82:4-83:5; Rios, 9/21/22 Tr. 48:19-50:19.  Ferrellgas executives left that visit with an understanding that, if the Monroe COSA was not renewed, there were other refineries near the Eddystone Facility that would be potential customers.  Soiefer, 12/6/22 Tr. 83:6-84:18; Trial Ex. 647.1.  Soiefer and other Ferrellgas executives were aware that there were only four years left on the Monroe COSA, "[s]o we needed to either replace that contract with some other business or extend it as part of our strategy[.]" Soiefer, 12/6/22 Tr. 84:19-85:16.

361.    Around the time of that visit, Ferrellgas executives learned that there was a possibility of constructing a pipeline from the Eddystone Facility to Monroe's refinery.  *See* Trial Ex. 647.1; Soiefer, 12/6/22 Tr. 85:17-86:23.  Soiefer explained that the pipeline proposal was "something we spent a decent amount of time on both initially and then down the road" and the pipeline would "gain efficiencies" that would rid the need to transport crude oil by barge.  *Id.* Soiefer testified that pipeline would have required a significant investment, "but it would have been very worthwhile because it would then further tie us in with Monroe."  *Id.* at 86:24-87:8.

362.    During due diligence, Ferrellgas Partners used a tracker to surface questions to Bridger, LLC and account for the responses received.  Soiefer, 12/6/22 Tr. 99:4-100:16; *see also* Trial Ex. 699-A.  Many of the questions surfaced by Ferrellgas focused on Monroe, including what other options Monroe had to source crude oil for its refinery and the possibility of expanding the existing relationship with Monroe.  Trial Ex. 699-A; Soiefer, 12/6/22 Tr. 105:7-110:10.

363.    In response to Ferrellgas Partners' question about other options Monroe had to source crude for the refinery, Bridger, LLC responded that switching costs were higher for refiners and that, if Monroe found a new source for crude oil, it was likely to eliminate imported crude oil rather than Bakken crude.  Trial Ex. 699-A; Soiefer, 12/6/22 Tr. 105:7-107:4.

364. With respect to the "Rail" topic, Ferrellgas Partners requested the following: "5 Year lease at 80k bpd Eddystone Facility. Possible purchase. What would cost be? How much more money would Bridger make by buying Eddystone Facility? Expansion opportunities." Trial Ex. 699-A (row 17). Soiefer explained that, during due diligence, he understood that acquiring the Eddystone Facility could be "a follow-on investment and acquisition as part of a vertical integration strategy." Soiefer, 12/6/22 Tr. 107:22-108:6.

365. Under the "Customers" topic, Ferrellgas Partners asked the following: "Delta drives about half of the EBITDA. What other options do they have when terms are up for renewal? How much of Delta's need is Bridger supplying?" Trial Ex. 699-A (row 66). Soiefer testified that Ferrellgas Partners was interested in both the risk that Monroe would not renew its contract and also wanted to understand Bridger Logistics' role within the Delta supply stack so they could understand how important Bridger Logistics was to Monroe. Soiefer, 12/6/22 Tr. 108:20-109:10. In response to this inquiry, Bridger, LLC provided the following information:

> Bridger is within delivery distance of 1.3 MMBpd of crude consumption. Today Bridger supply is approximately a third of Delta's needs. Delta's publicly-stated intent is to increase domestically-sourced crude. They have approached Bridger to increase supply and discussions are underway. Other third party refiners have approached Bridger as well, interested in long term logistics arrangements. Delta's options for domestic crude come through the Eddystone Facility, which Management has plans to purchase and build pipelines to the Delta Trainer facility in order to move more than 65 MBpd. Delta's appetite is 130 MBpd, which could all be fed through the Eddystone Facility.

Trial Ex. 699-A (row 66, column G); *see* Soiefer, 12/6/22 Tr. 109:11-23.

366. Based on the information Soiefer learned during due diligence, he testified that Bridger Logistics and Ferrellgas viewed the continued use of the Eddystone Facility in connection with servicing Monroe as "really important." Soiefer, 12/6/22 Tr. 109:24-110:4. He explained that the Eddystone Facility "was a key part of the largest contract of the company that we were buying, and it also was an opportunity to potentially further invest and increase volume which

would increase revenue and get closer to that largest customer." *Id.* at 110:5-13.

367. Other contemporaneous documents support Soiefer's view that Ferrellgas perceived the Eddystone Facility to be a key part of its Monroe growth strategy at the time of the Acquisition. In a May 2015 Simmons presentation prepared for the Ferrellgas board of directors, Simmons highlighted additional large-scale capital opportunities that would emerge as part of the Acquisition. *See, e.g.*, Trial Ex. 652-A.53.

368. The first growth opportunity identified was acquiring Eddystone. Trial Ex. 652-A.53. Soiefer explained that they had some early indications of what that acquisition could cost based on what Eddystone was receiving in revenue, and Bridger, LLC provided some estimates of operating expenses and profitability. Soiefer, 12/6/22 Tr. 111:7-24. Based on the initial information supplied by Bridger, LLC, Soiefer believed they could acquire Eddystone for $150-200 million, and Simmons calculated the potential profit associated with acquiring Eddystone as $35 million. Soiefer, *Id.*; Trial Ex. 652-A.53.

369. The second growth opportunity identified was acquiring the land underneath the Eddystone Facility, which was owned by Exelon. Trial Ex. 652-A.53; Soiefer, 12/6/22 Tr. 112:4-22. Soiefer testified that this growth opportunity was part of the vertical integration strategy. *Id.*

370. The third growth opportunity identified was constructing a pipeline from the Eddystone Facility to Monroe's refinery. Trial Ex. 652-A.53; Soiefer, 12/6/22 Tr. 112:23-113:4.

371. Soiefer testified that all of these growth opportunities that Simmons highlighted reflected plans for long-term growth involving the use of the Eddystone Facility. Soiefer, 12/6/22 Tr. 113:9-23 ("Q. At this point did you consider terminating the relationship with Eddystone? A. Absolutely not. We were looking to spend another couple hundred million dollars to further bolster this relationship with Monroe and to own this piece of infrastructure.").

**C.  Due Diligence Surfaced Several Issues, Which The Parties Addressed.**

*Jamex Marketing Capitalization.*

372.  Much of the testimony at trial centered on Bridger/Jamex Marketing's financial position and whether, at the time of the Acquisition, the Defendants believed that Jamex would fail.  *See* Agusti Opening Statement, 9/19/22 Tr. 61:16-70:25 (setting out Eddystone's theory of the case).  Because this issue is central to Eddystone's case, the Court visits what Jamex's reported regarding its financial condition at several points throughout these Findings of Fact.

373.  As part of its opening, Eddystone cited to an April 2015 presentation wherein Simmons identified Bridger Marketing as a risk factor.  *See* Agusti Opening Statement, 9/19/22 Tr. 61:16-25.  In that presentation, Simmons provided an "initial analysis" of Bridger Logistics for Ferrellgas Partners.  Trial Ex. 593-A.4.  The presentation contained an overview of Bridger Logistics' segments, assets, opex, and other financial data.  *See generally id.*; *see also* Soiefer, 12/5/22 Tr. 74:18-25.  The presentation also highlighted four potential risk factors, including the long-term viability of Bridger Marketing, for further due diligence.  Trial Ex. 593-A.31.

374.  Soiefer testified that "a significant amount of thought and work went into mitigating that risk factor" following the April 2015 Simmons presentation.  Soiefer, 12/6/22 Tr. 68:5-69:10; Wambold, 12/9/22 Tr. 7:20-8:6 (The capitalization of Jamex "was an important item for [Ferrellgas].");  *see also* Soiefer, 12/6/22 75:21-76:10 ("[S]ignificant efforts were gone to to [*sic*] make sure that the capitalization and the outlook for Jamex would be strong.").

375.  In May 2015, Grant Thornton provided Ferrellgas with a financial due diligence/quality of earnings report ("QoE Report") that identified Bridger Marketing as the primary contractual counterparty for Bridger Logistics, accounting for 60 percent of forecasted EBITDA.  *See* Trial Ex. 657-B.12; Soiefer, 12/6/22 Tr. 70:11-17.  Grant Thornton also flagged that Bridger Marketing lost $10 million in 2014.  Trial Ex. 657-B.12.  Grant Thornton

recommended "that buyer gain a better understanding of how Bridger Marketing is to operate on a go forward basis." *Id.*

376. Bridger Marketing's recent losses were addressed in connection with the Acquisition. Bridger, LLC management agreed to inject capital into Bridger Marketing at the time of the Acquisition in an amount sufficient to cushion against losses for the life of the COSA. *See* Jilla, 12/12/22 Tr. 61:22-62:6 ("[T]hose funds were to backstop any potential losses we would have under the crude oil supply agreement with Delta and Jamex."); *see also* FOF ¶¶ 380-389.

377. Around that time, the Bridger, LLC board considered a number of options to address Bridger Marketing's losses under the COSA. Gamboa, 12/7/22 Tr. 112:15-22. The first option the board explored was possibility of having a third party assume Bridger Marketing's obligations under the COSA. *Id.* at 112:15-113:4. Bridger approached two trading companies—Betel and Shell Trading—both of which made offers to assume the COSA in exchange for either $120 million or $150 million. *Id.* at 113:2-22.

378. The board declined the Betel and Shell Trading offers, but the offers factored into the value of the assets used to capitalize Jamex Marketing. Gamboa, 12/7/22 Tr. 114:12-25.

379. Based on "prior experience under the COSA, projections from multiple sources, external materials and analysis using conservative projections," Bridger, LLC management recommended capitalizing Jamex Marketing with $180 million. Trial Ex. 687.30; Ballengee, 9/20/22 Tr. 167:15-169:9; Rios, 9/23/22 Tr. 106:15-17. Riverstone, however, decided to take the highest offer ($150 million) and add $100 million, and ultimately the board agreed to be conservative and inject $250 million into Jamex Marketing at the time the Acquisition closed. Gamboa, 12/7/22 Tr. 114:17-115:4; Rios, 9/23/22 Tr. 106:1-20; *see also* Trial Exs. 687.30, 668.

380. The decision to capitalize Jamex Marketing was memorialized in a side letter

agreement dated May 29, 2015 between and among Bridger, LLC, Riverstone, Ballengee, Rios, Gamboa, and various entities with ownership interests in Bridger, LLC (the "Bridger Side Letter Agreement"). *See* Trial Ex. 1576-B; Ballengee, 9/20/22 Tr. 79:19-80:4. The Bridger Side Letter Agreement required "$220 million of FGP common units . . . and $30 million in cash (collectively, the "Marketing Reserve") [to] be contributed by Bridger LLC to Bridger Marketing on the Closing Date," subject to various terms. Trial Ex. 1576-B.2.

381. Those terms included: (1) requiring the Marketing Reserve to be deposited into a segregated account and used solely to support the Amended COSA and the Marketing business; (2) permitting Jamex Marketing to pledge Ferrellgas Partners units for loans to support the Amended COSA; (3) permitting Jamex Marketing to use distributions on the units to support its business in the ordinary course; (4) permitting Jamex Marketing to sell its units when certain lock-ups expired, but requiring the proceeds to be deposited in the segregated account; (5) permitting Jamex Marketing to use cash and units to support its business other than the Amended COSA, but only to the extent that losses on the Monroe Agreement were less than $5 million per month. *See* Trial Ex. 1576-B.2; Ballengee, 9/20/22 Tr. 80:20-81:15, 82:16-83:4.

382. The same terms are included in a June 24, 2015 Redemption Agreement between Bridger, LLC and its members ("Redemption Agreement"). Trial Ex. 748.5; *see* Ballengee, 9/20/22 Tr. 170:2-173:19; Rios, 9/23/22 Tr. 108:25-109:4 ("Q. What was the purpose of requiring that the Marketing Reserve be placed in a segregated account? A. "These were the guardrails that we wanted to put in place to make sure that the money stayed where it was supposed to be.").

383. That Redemption Agreement allowed Bridger LLC to redeem units owned by members in connection with the Acquisition, subject to certain conditions, including that Marketing could not liquidate any of the units during the first three months. Trial Ex. 748.2;

Ballengee, 9/20/22 Tr. 199:15-21; Rios, 9/23/22 Tr. 107:11-17.

384.    After the first three months, Marketing could liquidate 25 percent of the units every 3 months until getting full access 18 months after closing.  Ballengee, 9/20/22 Tr. 172:4-10; Jilla, 12/12/22 Tr. 62:23-63:2 ("Q. Were there any restrictions placed on the use of those assets used to capitalize Jamex?  A. The assets were supposed to – some of the stock was restricted stock, so the united were restricted, so they vested in certain tranches.").  To the extent those units were sold, the proceeds had to go into the segregated account.  Ballengee, 9/20/22 Tr. 172:11-13; Jilla, 12/12/22 Tr. 61:21-63:25.

385.    The full value of the $250 million Marketing Reserve was restricted for use related to the COSA and Marketing's performance under the COSA and was intended to carry through the end of the term of the contract.  Ballengee, 9/20/22 Tr. 173:20-25; *see also* Jilla, 12/12/22 Tr. 62:7-11 ("Q. What did you understand the purpose of that capitalization to be?  A. So those funds were to backstop any potential losses we would have under the crude oil supply agreement with Delta and Jamex."); Rios, 9/23/22 Tr. 109:13-15 ("FGP common units were designed to backstop the Monroe Agreement so they are there to solely be used for that agreement.").

386.    When the Acquisition closed, Jamex Marketing received $30 million in cash and approximately $220 million in Ferrellgas units (generating around $20 million in annual dividends). Trial Ex. 748; Ballengee, 9/20/22 Tr. 171:5-17; Rios, 9/23/22 Tr. 103:12-15, 110:11-16; Jilla, 12/12/22 Tr. 61:22-62:22; *see also* Trial Exhibit 781 ("[W]e have intentionally overcapitalized Bridger Marketing with $250 million of cash and zero debt.").  There was a true-up of shares to equal $220 million at the closing.  Ballengee, 9/20/22 Tr. 305:8-306:15.

387.    At the time, Ballengee viewed the $250 million as sufficient capitalization, particularly with current spreads, the dividends from Ferrellgas units, and some "cushion" to arrive

at a "safe number." Ballengee, 9/20/22 Tr. 168:10-169:4. Ballengee did not expect that Jamex Marketing would continue to lose money on a monthly basis, and there were times prior to July 2019 when the spread improved to the point where the COSA would have been profitable for Jamex Marketing. Ballengee, 9/20/22 Tr. 169:5-13.

388. Rios and Gamboa testified that they viewed the amount of capitalization as more than was necessary. Gamboa, 12/7/22 Tr. 115:5-10; Rios, 9/23/22 Tr. 103:4-11.

389. Ferrellgas executives understood that Bridger Marketing losses were addressed by capitalizing Bridger Marketing as part of the Acquisition. *See, e.g.*, Soiefer, 12/6/22 Tr. 71:8-11; Wambold, 12/9/22 Tr. 8:24-25.

390. Although Ferrellgas had no visibility into Jamex Marketing's financials at the time, Ferrellgas executives believed Jamex Marketing was adequately capitalized, and that the capitalization would be sufficient to see Jamex Marketing through the remaining term of the 5-year COSA. Wambold, 12/9/22 Tr. 8:20-23 ("[M]y recollection is that that was . . . a very comfortable number that would withstand several highs and lows in the commodity market."); Soiefer, 12/5/22 Tr. 139:17-21, 161:14-162:16; Soiefer, 12/6/22 Tr. 199:3-200:11. Soiefer testified that, to his knowledge, the $250 million initial capitalization was not all Jamex had with which to pay its operating expenses. Soiefer, 12/6/22 Tr. 76:11-77:13; *see also* Gamboa, 12/7/22 Tr. 115:5-10; Ballengee, 9/20/22 Tr. 174:1-13 (describing Jamex's other business dealings).

391. Indeed, at the time of the Acquisition, Jamex Marketing also had $43 million in its account at Morgan Stanley. Kelly, 2/13/22 Tr. 42:22-24, Tr. 43:5-8, 45:2-46:3; Trial Ex. 781, Trial Ex. 781-A; Trial Ex. 785 (referring to "290 million of liquid or near-liquid assets").

*Monroe Contract Bifurcation.*

392. In due diligence, Ferrellgas learned that Bridger Logistics did not have a direct contractual relationship with Monroe. Soiefer, 12/6/22 Tr. 78:11-23. While not involved in the

negotiations, Ferrellgas executives supported efforts by Bridger Logistics to obtain a contract with Monroe because Ferrellgas "was merging into a new space that it didn't historically operate in, [so] having some marquis customers would be a great kind of resume and reference for them to continue to expand and grow its business and get other customers as well." *Id.* at 78:11-79:15.

393.    While previously Monroe had one contract directly with Bridger Marketing (the COSA), that contract was bifurcated so that each of Jamex Marketing and Bridger Logistics had a contract with Monroe. Soiefer, 12/5/22 Tr. 103:25-107:19; Ballengee, 9/20/22 Tr. 61:11-62:10.

394.    On May 26, 2015, Bridger Logistics and Monroe entered into a Transportation and Logistics Services Agreement ("Monroe TLA"). *See* Dkt. 732 ¶ 54; Trial Ex. 1736.

395.    The Monroe TLA defined Bridger Logistics' services to include receiving and loading crude oil onto railcars at the "Loading Points" in North Dakota, transporting those railcars to the "Eddystone Rail Facilities," transloading the crude oil from railcars to vessels, transporting and delivering the crude oil to the "Delivery Point," and measuring crude oil in accordance with the Monroe TLA. Trial Ex. 1736.7 (§ 3.1); *id.* at 1736.27 (Exhibit B).

396.    The Monroe TLA defined "Eddystone Rail Facilities" to mean "Eddystone Rail Company, LLC's crude oil petroleum transloading facilities located in Eddystone, Pennsylvania, or its replacement(s) subject to the mutual agreement" of Bridger Logistics and Monroe. Trial Ex. 1736.26 (Exhibit B).

397.    Ballengee testified on direct that Schedule 4.1 of the COSA and the TLA did not permit transloading anywhere other than at the Eddystone Facility. Ballengee, 9/20/22 Tr. 54:17-55:16. On cross-examination, however, Ballengee clarified that in conjunction with the definition of "Eddystone Facility," the Monroe TLA allowed for transloading through any facility as long as the location was agreed upon with Monroe. *Id.* at 155:15-156:2 ("At any time we could have gone

back to Monroe and asked for a different location, but it would have had to be agreed to them outside of this contract.").

398. The Monroe TLA defined the "Delivery Point" for crude oil as (1) the dock of the Monroe refinery; (2) any pipeline completed as contemplated by Section 2.3(a) of the COSA; or (3) any location mutually agreed upon with a corresponding transportation and logistics fee adjustment. Trial Ex. 1736.24 (Exhibit A).

399. The Monroe TLA provided that Monroe would pay Bridger Logistics $7.60 per barrel of crude oil delivered after June 24, 2015 until August 31, 2015, and then $7.30 per barrel after September 1, 2015. Trial Ex. 1736.8 (§ 6.1). Monroe also agreed to reimburse Bridger Logistics for all railroad freight charges, fees, and other costs incurred in transporting the crude oil from the Bakken to the Eddystone Facility. *Id.* (§ 6.2).

400. The Monroe TLA contained the following minimum volume commitment: Monroe agreed to pay for a minimum of 65,000 bpd in a given month (the "Minimum Volume"). Trial Ex. 1736.8 (§ 6.4). If Bridger Logistics delivered less than the Minimum Volume, Monroe would pay Bridger Logistics the deficiency volume of barrels multiplied by the per-barrel fee ($7.60 if prior to September 1, 2015; $7.30 if September 1, 2015 or later). *Id.* If Bridger Logistics delivered fewer than 35,000 bpd, however, Monroe was not required to make any deficiency payments. *Id.*

401. Section 7.2 of the Monroe TLA required Monroe to pay Bridger Logistics via an electronic funds transfer to Bridger Logistics' bank account at Business First Bank. Trial Ex. 1736.9 (§ 7.2); *id.* at 18 (§ 18.3(c)).

402. Section 7.6 of the Monroe TLA required Monroe to deliver a parental guarantee from Delta Air Lines, Inc. for up to $90 million. Trial Ex. 1736.9 (§ 7.6); *id.* at 47 (Exhibit F to the Monroe TLA).

403. The Monroe TLA terminated on the earliest of (1) June 30, 2019; (2) the date on which the COSA was terminated; or (3) the date on which either party terminated the Monroe TLA in accordance with its terms. Trial Ex. 1736.14 (§ 16.1).

404. Also on May 26, 2015, Bridger Marketing and Monroe entered into the Amended COSA. See Dkt. 732 ¶ 56; Trial Ex. 1736.59.

405. The Amended COSA was effective for the remainder of the COSA's five-year term. Trial Ex. 1736.74 (§ 11.1(a)); Ballengee, 9/20/22 Tr. 64:20-65:4.

406. Consistent with Bridger Logistics' plans for long-term growth with Monroe following the Acquisition, Section 2.3(a) of the Amended COSA defined the "Delivery Point" as (1) Monroe's dock, (2) "any pipeline completed as contemplated in Section 2.3(b) subject to" a price adjustment, or (3) any other location mutually agreed upon with an adjustment to the transportation and logistics fee. Trial Ex. 1736.62-63.

407. Section 2.3(b) of the Amended COSA stated, "[p]romptly after the date hereof, the Parties may, but shall not be required to, work jointly on the possible construction of a pipeline connection between the Eddystone Facility and the [Monroe] Refinery[.]" Trial Ex. 1736.62.

408. Other sections similarly contemplated long-term growth and expansion of delivered volumes to Monroe. Section 2.5(a) of the Amended COSA provided that Bridger Marketing was required to offer marketed crude oil volumes in excess of its delivery requirement to Monroe before offering those volumes to another customer. Trial Ex. 1736.63 (§ 2.5(a)). Section 2.5(a) contained a carve-out with respect to "Eddystone Expansion Volumes," which are addressed in Section 2.5(b). *Id.*. Section 2.5(b) provided that if the capacity of the Eddystone Facility was ever increased and Bridger Marketing was able to deliver additional volumes, it was required to offer those additional volumes to Monroe. *Id.* at 64 (§ 2.5(b)).

409.    The Amended COSA reduced Monroe's price per barrel by $0.25, but the Amended COSA continued to apply the same two pricing formulas as the COSA. Trial Ex. 1736.66 (§ 4.1); Ballengee, 9/20/22 Tr. 65:2-12.

410.    Under the Amended COSA, instead of paying Bridger Marketing directly as it had under the COSA, Monroe received a credit for amounts it paid to Bridger Logistics pursuant to the Monroe TLA.  Trial Ex. 1736.68 (§ 7.1); Ballengee, 9/20/22 Tr. 67:15-68:10.  The Amended COSA specified the following transportation and logistics fees (*id.* at 96 (Schedule 4.1)):

| Location of Crude Acquisition | Price Per Barrel | Transportation Services |
|---|---|---|
| Acquisition at loading terminal | $15.25 | Railcar loading at origin, rail freight, railcar utilization, Eddystone Facility throughput, barge from Eddystone to Monroe Refinery, management fees, and other related costs of delivery ("Schedule 1 services") |
| Acquisition on pipelines with delivery to loading rail terminal | $15.25 + actual pipeline charges | Schedule 1 Services plus pipeline transportation |
| Acquisition by truck with delivery to loading rail terminal | $18.50 | Schedule 1 services plus trucking from point of acquisition to origin rail terminal |
| Acquisitions by truck with delivery to truck injection station and pipeline delivery to rail terminal | $18.90 + actual pipeline charges | Schedule 1 services plus trucking from point of acquisition to injection station and pipeline transportation from injection station to rail terminal |
| Acquisition at Eddystone Facility | $4.00 | Eddystone Facility throughput, barge from Eddystone Facility to Delivery Point, management fee, and other related costs of delivery. |

411.    Section 7.7 of the Amended COSA required a parent guarantee from Delta Air

Lines that was sufficient to ensure payment for three months of monthly contract volume, unless Bridger Marketing and Monroe were able to enter into intermediation agreements with a term of at least one year.  Trial Ex. 1736.69 (§ 7.7).

412.    On June 24, 2015 Bridger Logistics and Bridger Marketing signed the Transportation and Logistics Agreement ("Marketing TLA"). Dkt. 732 ¶ 57; Trial Ex. 1040-C.

413.    Under the Marketing TLA, Bridger Marketing contracted to use Bridger Logistics' services for a term of 10 years.  Trial Ex. 1040-C.1 (§ 1).

414.    The Marketing TLA defines "Services" to mean "transportation and logistics services (including transportation and logistics services by truck, pipeline terminal, pipeline, rail, and/or marine assets)" for any crude oil procured by Bridger Marketing for any end customer, not just Monroe.  Trial Ex. 1040-C.1 (§ 2(a)). Bridger Marketing agreed that Bridger Logistics would serve as its exclusive provider of services to the extent that Bridger Logistics had sufficient assets and personnel to perform the services.  Trial Ex. 1040-C.2 (§ 2(c)).

415.    Section 18 of the Marketing TLA provides that, "[d]uring the first four (4) years of the term of this Agreement, Marketing covenants and agrees that it shall not, directly or indirectly . . . provide any services to any Person in the United States that are or may be competitive with the services that [Bridger Logistics and its subsidiaries] provides or has provided to Marketing" under the Marketing TLA.  Trial Ex. 1040-C.10 (§ 19).

416.    Section 23 of the Marketing TLA provides that, if "[d]uring any month of the Monroe TLA, [] Marketing is not ready, willing and able to tender at least 35,000 Barrels of Crude Oil (as defined in the Monroe TLA) per day under the terms of the Monroe TLA for deliveries thereunder," Jamex Marketing must pay Bridger Logistics an amount "equal to the difference between the payment" Bridger Logistics would have received from Monroe for the period if 65,000

bpd had been delivered.  Trial Ex. 1040.C.13 (§ 23).

417.    Section 23 of the Marketing TLA states: "Marketing agrees that it shall not, without [Bridger Logistics'] prior written consent thereto, amend or modify any term or condition of the COSA or take any action in connection with the COSA, in each case, the result of which could cause an[] adverse effect on [Bridger Logistics]."  Trial Ex. 1040.C.13 (§ 23).

418.    Exhibit B of the Marketing TLA is a rate schedule based on dollars per barrel.  Trial Ex. 1040-C.21.  Exhibit B does not identify any rates related to the Eddystone Facility.  *Id.*

419.    As a result of the Monroe contract bifurcation, Jamex Marketing remained an important counterparty for Bridger Logistics, but it accounted for just 13 percent of Bridger Logistics' EBITDA rather than the 60 percent originally forecast in the QoE Report.  Trial Ex. 652-A.35 ("13% of NTM EBITDA is exposed to Bridger Marketing"); Soiefer, 12/5/22 Tr. 101:6-105:14 (Jamex Marketing accounted for around 10 percent of Bridger Logistics EBITDA).

### *Bridger Management Retention.*

420.    Ferrellgas executives did not have experience managing a midstream logistics business.  Wambold, 12/9/22 Tr. 9:1-8; Soiefer, 12/6/22 Tr. 80:15-25, Hampton, 12/14/22 Tr. 108:15-22.  For this reason, they deemed it critical to retain senior Bridger Logistics management in connection with the Acquisition.  Soiefer, 12/6/22 Tr. 80:4-8, Wambold, 12/8/22 Tr. 182:12-183:3, 191:5-11; Hampton, 12/14/22 Tr. 108:15-22; Rios, 9/23/22 Tr. 84:1-7; Trial Ex. 596-A.2 (Ferrellgas' proposal to acquire Bridger Logistics stated that the "current Bridger management leadership" was "critical to the long-term success" of the transaction).

421.    During the due diligence period, Soiefer and other Ferrellgas executives perceived Rios to be a leader who was interested in continuing Bridger Logistics' high-growth business.  Trial Ex. 647.1-2; Soiefer, 12/6/22 Tr. 87:13-88:2.  Ferrellgas was "particularly focused on" retaining Rios and Gamboa "from a leadership and operations perspective."  Soiefer, 12/6/22 Tr.

80:9-14, 81:25-82:3.

422.    Retaining Rios and Gamboa was also "important for continuity within the entire organization." Soiefer, 12/6/22 Tr. 81:1-7.  Through the Sable acquisition, Soiefer learned "that you can't buy a business unless you have a dedicated team that you trust that will fit in with you to run that business."  Soiefer, 12/6/22 Tr. 52:24-53:6; *see also* Wambold, 12/8/22 Tr. 182:18-183:3; Trial Ex. 566.

423.    Ultimately, Ferrellgas, Inc. entered into employment agreements with Rios and Gamboa that contained multi-year performance goals.  *See* Trial Exs. 673-B.16-17, 678.17-18; Hampton, 12/14/22 Tr. 109:23-110:3 ("The incentives in their employment agreements were based primarily on the earnings from Bridger.").  Both employment agreements contained lucrative financial incentives, including bonus eligibility based upon the EBITDA achieved by Bridger Logistics.  Gamboa, 12/7/22 Tr. 116:25-117:18; *see also* Trial Exs. 673-B.16-17, 678.17-18; Soiefer, 12/6/22 Tr. 81:8-16, 89:22-90:1 ("[Rios] was also very financially aligned with us and incentivized to perform not just the business that we had but to grow it.").  Specifically, the employment agreements established a bonus pool of up to $10 million (Gamboa) or $20 million (Rios), divided equally among the first three years after the Acquisition.  Trial Exs. 678.17, 673-B.16.  As Bridger Logistics' EBITDA increased, so did Rios and Gamboa's bonus.  Trial Exs. 673-B.16-17, 678.17-18.  The EBITDA threshold to earn a bonus increased each year, from $120 million in year one to $135 million in year three.  Trial Exs. 678.17, 673-B.16.

*Grant Thornton Commentary On Bridger, LLC Accounting.*

424.    The Grant Thornton QoE report indicated that Bridger, LLC's "[h]istorical financial records do not track contract performance, but rather segments (e.g., Trucking, Rail) revenue and expenses.  Therefore, supporting information to substantiate or corroborate key assumptions or forecast amounts was not available and we were unable to fully [corroborate] key

management assumptions." Trial Ex. 657-B.18.

425. In the "Key findings – financial" section, the Grant Thornton QoE report commented that one issue encountered during due diligence was "[q]uality of management information and governance structure." Trial Ex. 657-B.21. The report explained: "[t]he Bridger business has been growing rapidly and the finance and accounting function has been a dynamic environment that has seen significant changes. In the last 12 to 20 months, the company has hired all of the existing accounting and finance personnel, with the CFO only being hired in May 2014. The accounting systems were run on Quickbooks until October 2014, when the company migrated to Great Plains, with limited adaptation to the business." Trial Ex. 657-B.21.

426. The QoE report recommended that Ferrellgas establish "clear and direct mapping" between the accounting records and management reports that presented performance by segment:

> Given the above, overall accounting and management performance reports rely upon compilation through excel and other analysis that was prepared by the accounting staff and in many instances by outside advisors. As such, data quality appears to be less than optimal. We noted that supporting information provided often does not corroborate or reconcile consistently with the financial statement account balances. Based on documents provided in the transaction datasite, as well as observations made during the course of our diligence, we recommend the following for improvement to the financial reporting procedures and controls structure:
>
> --Define a precise review process surrounding manual and year end adjusting journal entries to avoid ledger reconciliation issues.
>
> --Develop a clear and direct mapping between the Management operating reports and the trial balance to ensure the analytics contained in the Management operating reports are based on accurate and reliable accounting data.

Trial Ex. 657-B.21; *see also* Soiefer, 12/6/22 Tr. 128:3-129:5 (Great Plains was an off-the-shelf Microsoft system with limited adaptation to the business); Heitmann, 12/14/22 Tr. 39:14-19 (Heitmann's takeaway was that "there needed to be stronger internal controls over the financial reporting and we needed to ensure that we had information available for all the periods").

427.     To address the issues, Heitmann and Herrold spoke with individuals at Bridger Logistics regarding Grant Thornton's recommendations.  Heitmann, 2/14/23 Tr. 41:11-18; Jilla, 12/12/22 Tr. 16:24-17:2, 20:11-21:2; Trial Ex. 706.1.  Jilla testified that he recalled learning from Herrold "that the Bridger Logistics management report . . . wasn't simplified in terms of, you know, creation.  It was a lot of manual work to create the report which we talked about on this call."  Jilla, 12/12/22 Tr. 17:3-8; *see also* Trial Ex. 706.1.  After these conversations, Jilla worked to implement Grant Thornton's recommendation.  Jilla, 12/12/22 Tr. 17:3-8.

428.     Initially, Jilla proposed creating new legal entities to address the accounting structure issues.  Jilla, 12/12/22 Tr. 19:10-13, 21:21-25.  That proposal was not implemented because Rios and Gamboa did not want to create new legal entities.  Jilla, 12/12/22 Tr. 19:14-20.

429.     Jilla's initial proposal contemplated assigning the BTS rail load/unload agreements to Bridger Rail Shipping so that all financials for the rail segment appeared under Bridger Rail Shipping "to streamline and simplify the reporting."  Trial Ex. 706; Jilla, 12/12/22 Tr. 22:1-23:1.  No such assignment occurred because the Bridger Logistics management team "wasn't interested in either moving anything or assigning anything."  Jilla, 12/12/22 Tr. 23:2-10.

430.     Much of the testimony at trial centered around versions of Jilla's initial proposal that showed the creation of new legal entities Bridger Rail Services, LLC and Bridger Pipeline Services, LLC and proposed assignment of contracts from BTS to those entities.  Trial Exs. 718, 718-A, 723, 723-A; Jilla, 12/12/22 Tr. 23:11-30:11.  All witnesses involved in these initial discussions testified that the proposal was never implemented.  Jilla, 12/12/22 Tr. 28:13-19, 29:15-30:3; Gamboa, 12/6/22 Tr. 267:1-268:1; Rios, 9/21/22 Tr. 75:14-22.  Bridger LLC's counsel described the chart in an internal email as "grossly incorrect," as it pertained to the legal structure of the company.  Trial Ex. 821.

431.    Contemporaneous documents corroborate this testimony. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Trial Ex. 732 (QPO); Heitmann, 2/14/23 Tr. 60:5-22 (CC).

432.    ████████████████████████████████████████████

██████████████████████████████████. Trial Exs. 732 & 732-A (QPO);

Heitmann, 2/14/23 Tr. 60:23-61:9 (CC). ████████████████████████████

████████████ Trial Exs. 732-A, 732-B, 732-C (QPO); Heitmann, 2/14/23 Tr. 61:7-24 (CC).

433.    ████████████████████████████████████████████

████████████████. Trial Ex. 732-A.1 (QPO); Heitmann, 2/14/23 Tr. 61:25-62:4

(CC). ████████████████████████████████████████████████

██████ Trial Ex. 732-A.1 (QPO). ████████████████████████████████

████████████████████████████ Heitmann, 2/14/23 Tr. 63:10-13 (CC).

434.    ████████████████████████████████████████████

████████████████████. Trial Ex. 732 (QPO). ████████████████████

████████████████████████████████████ Heitmann, 2/14/23

Tr. 64:7-12 (CC). ████████████████████████████████████████

████████████████████ Heitmann, 2/14/23 Tr. 64:13-17 (CC).

435.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████. Trial Ex. 736.1 (QPO); Heitmann, 2/14/23

Tr. 64:25-65:18 (CC). 

Trial Ex. 736.1 (QPO); Heitmann, 2/14/23 Tr. 65:19-66:2 (CC).

436.

Trial Ex. 736.1 (QPO); Heitmann, 2/14/23 Tr. 66:3-8 (CC).

Trial Ex. 736.1 (QPO); Heitmann, 2/14/23 Tr. 66:9-13 (CC).

Trial Ex. 736.1 (QPO); Heitmann, 2/14/23 Tr. 66:14-18 (CC).

437.    Miles testified that he was not surprised that there was a discrepancy between the accounting and legal structures. Miles, 12/12/22 Tr. 203:2-5. He testified that it is "common to have the books set up differently than the actual legal entities within a company. So you will have cost centers and profit centers that are along business lines and not the actual legal entities and how they're organized within the company." Miles, 12/12/22 Tr. 203:2-12. Miles was aware that Ferrellgas employed cost centers in its accounting, which he described as "a part of the business that the company sets up to keep track of the profitability of that part of the business." Miles, 12/12/22 Tr. 203:18-204:2.

438.    . Heitmann, 2/14/23 Tr. 67:10-13 (CC).

439.    Instead of creating new legal entities as initially proposed, Bridger Logistics transitioned to cost center accounting. Jilla, 12/12/22 Tr. 16:24-19:9; Polkowitz, 12/13/22 Tr.

171:10-17. According to Jilla, this streamlined the process of creating management reports. Jilla, 12/12/22 Tr. 17:13-18:25, 33:19-24. Jilla also testified that the move to cost center accounting did not in any way relate to Eddystone. Jilla, 12/12/22 Tr. 19:1-9. As part of the transition to cost center accounting, BTS was assigned three company codes in Great Plains: 202, 208, and 210. Jilla, 12/12/22 Tr. 34:3-21. "Bridger Transfer Services, LLC" was used as the name for company code 202, while company 208 was called "Bridger Rail Services, LLC" and company code 210 was called "Bridger Pipeline Services, LLC." Jilla, 12/12/22 Tr. 34:3-21.

440. It is undisputed that neither Bridger Rail Services nor Bridger Pipeline Services was a legal entity. Trial Ex. 821 

*see also* Heitmann, 2/14/23 Tr. 66:19-67:1 (CC), 69:17-20

Trial Ex. 3002.27 (Sherman Aff.) ¶ 47.

441. After the Acquisition, Bridger Logistics continued to record accounting activity related to the BTS pipeline segment using company code 202. Trial Ex. 3003 (Polkowitz Decl.) ¶¶ 15, 28. But Bridger Logistics recorded accounting activity related to the BTS rail services using company code 208. *See* Jilla, 12/12/22 Tr. 34:6-8; Trial Ex. 3003 (Polkowitz Decl.) ¶¶ 15, 26; Sherman, 12/8/22 Tr. 27:17-25. And Bridger Logistics recorded accounting activity related to the BTS pipeline management segment using company code 210. Jilla, 12/12/22 Tr. 34:9-11; Trial Ex. 3003 (Polkowitz Decl.) ¶ 15, 27; Sherman, 12/8/22 Tr. 27:7-16.

442. Jilla testified that, to identify revenues and costs attributable to BTS, "you add up 208, 202, and 210 . . . then you get back to the entity called BTS." Jilla, 12/12/22 Tr. 34:12-21; Polkowitz, 12/13/22 Tr. 172:7-14. Great Plains had the ability to run reports that would add up these cost centers to generate a report for a legal entity. Jilla, 12/12/22 Tr. 18:20-22. Accounting

expert Polkowitz likewise confirmed that Great Plains does not contain a mechanism by which company codes "roll up" automatically—instead, accountants generate a report using the appropriate company codes in Great Plains and/or cost centers in PeopleSoft. Polkowitz, 12/13/22 Tr. 210:23-211:6. Despite the use of cost centers, all BTS revenue was attributed to BTS in the general ledger via the three company codes (202, 208, and 210). Jilla, 12/12/22 Tr. 35:7-13.

443. Importantly, company codes 208 and 210 were not the only cost centers created at this time. There were company codes created for Bridger Management and Bridger Trucking Services in Great Plains as well. Trial Ex. 3003 (Polkowitz Decl.) ¶ 15; Polkowitz, 12/13/22 Tr. 173:15-20. Both Bridger Management and Bridger Trucking Services were identified in Great Plains as LLCs, but neither was a legal entity. Polkowitz, 12/13/22 Tr. 173:21-174:1. Additionally, a company code was created for legal entity Bridger Storage, which had previously recorded its accounting activity under the BTS company code. Sherman, 12/8/22 Tr. 20:12-24:4.

444. Ferrellgas used a Microsoft accounting system called PeopleSoft. Heitmann, 2/14/23 Tr. 43:15-22, 84:11-23; Trial Ex. 3003 (Polkowitz Decl.) ¶ 9; Sherman, 12/8/22 Tr. 6:1-12. Ferrellgas created corresponding codes in PeopleSoft for the cost centers in Bridger Logistics' Great Plains accounting system. Trial Ex. 3003 (Polkowitz Decl.) ¶ 13. In PeopleSoft, company codes are called "cost centers." Trial Ex. 3003 (Polkowitz Decl.) ¶¶ 10, 15; Polkowitz, 12/13/22 Tr. 173:11-14; Sherman, 12/8/22 Tr. 7:17-24 (not remembering, but not disagreeing). In PeopleSoft, the BTS cost center codes were 4161 (Bridger Rail Services), 4170 (Bridger Pipeline Services), and 4175 (Bridger Transfer Services); Trial Ex. 3003 (Polkowitz Decl.) ¶ 13.

445. Jilla explained that creating new Great Plains company codes, and PeopleSoft cost centers, for each business segment addressed Grant Thornton's concerns regarding internal mapping and reduced the amount of manual labor required to generate management reports post-

Acquisition. Jilla, 12/12/22 Tr. 15:1-18:25, 30:12-35:13, 104:22-108:24; *see also* Farmer, Dep. Tr. 149:9-150:19 (management directed accounting to use the three codes to better align Bridger Logistics accounting structure with management reports); Trial Ex. 3003 (Polkowitz Decl.) ¶ 24.

446.　Both sides' accounting experts agree that cost-center accounting is common and appropriate.  Sherman, 12/7/22 Tr. 271:19-272:4, 272:23-24; Trial Ex. 3003 (Polkowitz) ¶ 30.

**D.　Ferrellgas Obtains Approval From The ESOP Trustee.**

447.　The ESOP had a third-party trustee, GrantBanc, that represented the employees' interests.  Wambold, 12/9/22 Tr. 14:15-21; Heitmann, 2/14/23 Tr. 33:3-4.  Every large Ferrellgas transaction or other meaningful event had to be approved by the ESOP trustee, including the Acquisition.  Wambold, 12/9/22 Tr. 14:22-15:4.

448.　GreatBanc engaged investment bank Stout Risius Ross ("SRR") to help it evaluate the Acquisition.  *See* Wambold, 12/9/22 Tr. 16:19-25; Heitmann, 2/14/23 Tr. 37:17-21.

449.　As part of GreatBanc's evaluation, it met with and received information from Simmons regarding the proposed acquisition.  *See* Trial Ex. 653.　In addition, in May 2015, representatives from GreatBanc visited Texas to meet with representatives from Bridger as part of GreatBanc's evaluation of the acquisition.  *See* Trial Ex. 646.1; Heitmann, 2/14/23 Tr. 32:22-33:6.

450.　On May 20, 2015, SRR requested additional information on the proposed transaction from Simmons and asked whether Simmons could "shed some additional light" on whether the Monroe contract would be extended "beyond the five-year term given the intertwined operations of Bridger and Monroe."  Trial Ex. 653; Heitmann, 2/14/23 Tr. 35:6-21.

451.　On May 29, 2015, GreatBanc informed Wambold that it approved the Acquisition. Wambold, 12/9/22 Tr. 15:10-13, 16:7-18; Trial Ex. 671.2.  Because the ESOP trustee had declined to approve opportunities in the past that it deemed to be not in the best interest of Ferrellgas employees, Wambold was "incredibly excited" that the ESOP trustee had approved the Acquisition

of Bridger Logistics. *Id.* at 17:4-9. Later that day, Wambold emailed the Ferrellgas Board of Directors to apprise its members of the news. *Id.* at 17:10-14; Trial Ex. 671.1-2.

452. The Ferrellgas Board of Directors had to, and did, approve the Acquisition. Soiefer, 12/6/22 Tr. 115:4-6; Heitmann, 2/14/23 Tr. 140:12-15.

## VII.    THE ACQUISITION.

### A.    The Ferrellgas Partners/Bridger, LLC Purchase And Sale Agreement.

453. On May 29, 2015, Bridger, LLC, as Seller, and Ferrellgas Partners, as Buyer, entered into the Ferrellgas PSA. Trial Ex. 2705. ███████████████████████████████

████████████████████████████████████████ Heitmann, 2/14/23 Tr. 65:24-66:2 (Latham was Bridger's law firm) (CC); Wambold, 12/9/22 Tr. 14:4-7; Miles, 12/13/22 Tr. 7:10-15; Hampton, 12/14/22 Tr. 102:4-7.

454. Pursuant to the Ferrellgas PSA, Ferrellgas Partners acquired all membership interests of Bridger Logistics (defined as the "Acquired Company") and the Acquired Subsidiaries. Trial Ex. 2705.7; 2705.13-14 (§ 4.4 identifying schedule of Acquired Subsidiaries); 2705.174 (Schedule 4.4).

455. Section 2.2 of the Ferrellgas PSA provided that the Purchase Price was equal to "(i) $562,500,000 [in cash], *plus* (ii) the Aggregate Adjustment as finally determined pursuant to and at the time provided" under Section 2.4, "*minus* (iii) the Seller Portion [of the representation and warranty insurance premium amount], *plus* (iv) 11,200,000 LP Units. Trial Ex. 2705.8.

456. Because Ferrellgas Partners did not acquire Bridger Marketing, the Ferrellgas PSA set forth procedures for a post-closing working capital adjustment. The Ferrellgas PSA defined "Aggregate Adjustment" to mean the positive or negative sum of (1) the amount calculated by subtracting $2,300,000 (the Target Net Working Capital) from the Closing Date Net Working Capital, (2) the Company Indebtedness immediately prior to closing, and (3) accrued but unpaid

110

transaction expenses. Trial Ex. 2705.56, 2705.65. "Closing Date Net Working Capital" was defined to mean the total current assets of Bridger Logistics minus its total current liabilities as of the Closing Date, as determined by Schedule 2.3. *Id.* at 2705.57. Finally, "Company Indebtedness" meant all indebtedness of Bridger Logistics and the Acquired Subsidiaries as of the Closing Date, including prepayment penalties. *Id.* at 2705.58.

457. To determine the Aggregate Adjustment to the Purchase Price, Seller Bridger, LLC was required to prepare a closing statement that contained its good-faith estimate of the Aggregate Adjustment (also called Schedule 2.3). Trial Ex. 2705.8 (§ 2.3), 2705.60 (Estimated Aggregate Adjustment definition), 2705.164 (Schedule 2.3). Within 60 days after the Acquisition closed, Purchaser Ferrellgas Partners was required to deliver to Seller Bridger, LLC, a closing statement setting forth Ferrellgas Partners' good-faith calculation of the Aggregate Adjustment. *Id.* at 2705.8-9 (§ 2.4(a)). If they agreed on the Aggregate Adjustment, Ferrellgas Partners and Bridger, LLC were required to adjust the purchase price based on a formula set forth in Section 2.4(b). *Id.* at 2705.9 (§ 2.4(b)). If they disagreed on the Aggregate Adjustment, Ferrellgas Partners and Bridger, LLC were required to either resolve the dispute within 30 days or submit the dispute to accounting firm PricewaterhouseCoopers LLP, which would determine the final Aggregate Adjustment. *Id.* at 2705.9-10 (§ 2.4(c)).

458. Schedule 2.3 to the Ferrellgas PSA identified the Parties' Target Working Capital ($9,309,816) and Estimated Indebtedness prior to closing ($286,805,428.16). Trial Ex. 2705.165. Footnote 3a of Schedule 2.3 stated: "Recurring intercompany billings between Bridger Marketing and Bridger Logistics for June are projected to amount to $14.3mm. The pre-close portion of these balances will be paid by Bridger Marketing to Bridger Logistics on July 20, 2015." *Id.* at 2705.166.

459. Section 6.12 of the Ferrellgas PSA required that "all intercompany accounts among

111

[Bridger Logistics and the Acquired Subsidiaries], on the one hand, and [Bridger, LLC and the subsidiary companies that Ferrellgas Partners did not acquire], on the other hand, that then remain outstanding will be terminated, voided, canceled and discharged, except to the extent any such accounts would be taken into account in connection with the determination of Closing Date Net Working Capital." *Id.* at 2705.37.

460.    Relevant to Eddystone's implied contract theory, § 4.10 of the Ferrellgas PSA required Bridger, LLC to disclose "a complete and accurate list of all of the following Contracts to which the Acquired Company or any Acquired Subsidiary is a party (the "***Company Contracts***") or by which any of them is otherwise bound: . . . (vi) any Contract that the Acquired Company reasonably expects will require expenditures or generate revenues in the 12-month period ending after the Closing Date in excess of $500,000; *provided, however*, that the listing of an agreement on Schedule 4.10(a)(vi) is not a representation or warranty that the agreement will generate such revenues in such period in excess of $500,000;" "(viii) any Contract (other than employment contracts and compensatory arrangements) with any Affiliate of the Seller (other than Contracts with another member of the Company Group) or any current or former officer, director, or stockholder of the Seller or any of its Affiliates;" and "(xiii) any Contract obligating the Acquired Company or any Acquired Subsidiary to provide or obtain products or services for a period of more than 30 days or requiring the Acquired Company or any Acquired Subsidiary to purchase or sell a stated portion of requirements or outputs[.]" Trial Ex. 2705.16-17.

461.    Schedule 4.10(a)(vi)(21) identifies the "Eddystone Rail Facilities Services Agreement, dated February 14, 2013, by and between Bridger Transfer [Services] and Eddystone Rail Company, LLC." *Id.* at 2705.188. Schedule 4.10(a)(vi) does not identify any contracts between BTS and Bridger Marketing. *Id.* at 2705.187-90.

462.     Schedule 4.10(a)(viii) identifies a number of contracts between BTS and Bridger Marketing, none of which is identified as related to the transloading capacity BTS leased at the Eddystone Facility.  *Id.* at 2705.190-91.

463.     Schedule 4.10(xiii) does not identify any contracts between BTS and Bridger Marketing.  *Id.* at 2705.192.

**B.     Consistent With Its Diversification Strategy, Ferrellgas Expected Bridger Logistics To Propel Its Overall Growth.**

464.     On June 1, 2015, Ferrellgas announced the Acquisition of Bridger Logistics. Wambold, 12/9/22 Tr. 21:23-25; Trial Ex. 688-A.1.  As part of that announcement, Wambold stated that he expected Bridger Logistics be a large step forward in Ferrellgas' plans to diversify its business.  Wambold, 12/9/22 Tr. 24:8-13; Trial Ex. 688-A.3.  Wambold also announced that the Board of Directors approved an increase in its distributions for the first time in the company's history.  Wambold, 12/9/22 Tr. 25:7-24; Trial Ex. 688-A.6.  Wambold described himself as being "damn proud" to announce that first distribution increase.  Wambold, 12/9/22 Tr. 25:21-24.

465.     On the same day, Wambold received an alert from UBS that the Acquisition marked a major step in Ferrellgas' strategy to diversify its assets and predicted that the Acquisition would be accretive for Ferrellgas and would drive additional growth.  Trial Ex. 683.3; Wambold, 12/9/22 Tr. 19:4-20:5, 20:15-21: 5.  In internal emails, Wambold, Rios, Soiefer, and former Ferrellgas COO Boyd McGathey expressed unvarnished enthusiasm about growth prospects in light of the Acquisition.  Trial Ex. 683.1-2; Wambold, 12/9/22 Tr. 20:15-21:5.

466.     Ultimately, Wambold expected Bridger Logistics to be a transforming acquisition for the company that would check the strategic boxes that Ferrellgas had identified at the inception of its diversification strategy.  Wambold, 12/9/22 Tr. 17:20-18:4, 21:2-3; Wambold, 12/8/22 Tr. 181:13-18; Trial Ex. 566.

**C.** **Ferrellgas Partners Pays Off $286 Million In Bridger Logistics Indebtedness, Including $40 Million Relating To BTS.**

467.    In connection with the Acquisition, Ferrellgas Partners paid off Bridger Logistics' existing debt in the amount of $286.8 million.   Trial Ex. 3006.8 (Kumar Decl.) ¶ 21; Jilla, 12/12/2022 Tr. 37:19-38:8 (testifying that Ferrellgas Partners paid most lenders directly).

468.    At the time of the Acquisition, several creditors held liens or mortgages on BTS assets.  Trial Ex. 2697.171-184; Rios, 9/23/22 Tr. 74:5-8.

469.    Community Trust Bank held a lien on all BTS accounts.  Rios, 9/23/22 Tr. 70:2-20; Trial Ex. 2697.171.

470.    Wells Fargo Equipment Finance held a lien on BTS LACT units and carbon steel tanks.  Rios, 9/23/22 Tr. 71:4-22, 73:5-74:4; Trial Ex. 2697.178, 2697.183.

471.    Texas Capital Bank held a lien on all accounts  and other assets of BTS arising out of or relating to BTS' Throughput Agreement at the Swan Ranch Terminal. Rios, 9/23/22 Tr. 71:23-73:4; Trial Ex. 2697.182.

472.    Texas Capital Bank also held a mortgage on the BTS Swan Ranch property.  Rios, 9/23/22 Tr. 74:9-18, 75:2-22; Trial Ex. 787.4-5.

473.    Ferrellgas Partners paid off BTS debts owed to Community Trust Bank in the amount of $9,045,847, and Community Trust Bank discharged its lien against BTS accounts.  Trial Ex. 762-C.5 (Community Trust Bank payoff letter); Jilla 12/12/22 Tr. 38:10-39:22; Rios, 9/23/22 Tr. 70:12-71:3.

474.    Ferrellgas Partners also paid off the BTS debts owed to Wells Fargo Finance in the amounts of $3,007,808.21 and $1,403,908.61, and Wells Fargo Finance discharged its liens against BTS equipment.  Trial Exs. 728-D (Wells Fargo Equipment Finance payoff statement), 728-H; Jilla, 12/12/22 Tr. 40:22-41:2, 41:9- 42:12; Rios, 9/23/22 Tr. 71:4-22, 73:5-74:4.

475.     Ferrellgas Partners also paid off the BTS debts owed to Texas Capital Bank in the amount of $16,240,702, and Texas Capital Bank discharged its lien on BTS assets.  Trial Ex. 829 (Texas Capital Bank payoff letter); Jilla, 12/12/22 Tr. 39:23-40:17; Rios, 9/23/22 Tr. 71:23-73:4.

476.     Ferrellgas Partners also paid off debt secured by two Texas Capital Bank mortgages totaling $20 million on BTS' Swan Ranch property.  Rios, 9/23/22 Tr. 75:2-22; Trial Ex. 787.4-5.

477.     Ferrellgas Partners also paid $9,600,000 to terminate a take-or-pay agreement BTS had with a transloading facility in Geismar, Louisiana.  Trial Ex. 2705.166 (Ferrellgas PSA, Schedule 2.3); Jilla, 12/12/22 Tr. 42:15-43:15.

478.     In total, BTS debts and liabilities totaling $39.2 million were paid off in connection with the Acquisition.  Trial Ex. 3006.8-9 (Kumar Decl.) ¶ 22.

479.     Bridger Logistics and Ferrellgas executives also acknowledged a number of synergies in the form of operational cost savings that accrued in Bridger Logistics' favor as a result of the Acquisition.  *See* Gamboa, 12/7/22 Tr. 106:2-107:1; Wambold, 12/8/22 Tr. 191:19-192:10, Wambold, 12/9/22 Tr. 43:11-44:1; Hampton, 12/14/22 Tr. 114:8-20; *see also* Trial Ex. 777.

**D.     Treatment Of Bridger Logistics Accounts Receivable.**

480.     At the time of the Acquisition, Bridger, LLC's accounting records reflected accounts receivable between Bridger Logistics and entities that were subsequently affiliated with Jamex Marketing.  Jilla, 12/12/22 Tr. 35:15-36:4.  Consistent with the Ferrellgas PSA, Jilla testified that these accounts receivable were addressed in two ways: (1) there was a working capital adjustment as part of the PSA, and (2) there was a due to/due from between Bridger Logistics and Bridger Marketing/Jamex Marketing at closing.  Jilla, 12/12/22 Tr. 36:5-15.  The working capital calculation was an arms-length negotiation, while the due to/due from was a "true up" based on actual volumes shipped and sold.  *Id.* at 36:16-20; Heitmann, 2/14/23 Tr. 49:11-21.

481.     Heitmann confirmed that the working capital adjustment accounted for the accounts

receivable owed by Jamex to Bridger Logistics.  Heitmann, 2/14/23 Tr. 49:22-25.  On June 24, 2015, Bridger, LLC and Ferrellgas Partners agreed to amend and supplement the PSA to address working capital.  Heitmann, 2/14/23 Tr. 51:18-52:11; ; Trial Ex. 756.1.  In particular, they executed a letter amendment that replaced the Target Net Working Capital number of $2,300,000 with $9,309,816, and provided that Bridger Marketing would pay an invoice for services rendered between June 1, 2015 through June 23, 2015.  Trial Ex. 756.1.  The letter appended Schedule 2.3, which identified Target Net Working Capital as $9,309,816 and Estimated Indebtedness as $286,805,428.  Trial Ex. 756.7.  Footnote (3a) to Schedule 2.3 continued to state that the pre-close portion of the intercompany balances between Bridger Marketing and Bridger Logistics "will be paid by Bridger Marketing to Bridger Logistics on July 20, 2015."  Trial Ex. 756.8.

482.  Prior to the Acquisition, Bridger, LLC's accounting records also reflected accounts receivable owed among and between Bridger Logistics and its subsidiaries that Ferrellgas Partners had agreed to acquire.  Jilla, 12/12/22 Tr. 36:23-37:1.  Jilla and others at Bridger, LLC and Bridger Logistics "decided that, since, you know, one, we had not done a good job reconciling the intercompany charges within the Logistics entities over time, and since they didn't honestly matter, we basically zeroed them all out before the [Acquisition] took place."  Jilla, 12/12/22 Tr. 37:2-7. Jilla explained that these accounts receivable were cleared prior to the Acquisition for "pre[-]transaction cleanup," "because we were selling . . . Bridger Logistics to Ferrellgas, and we wanted a clean set of books to send them."  Jilla, 12/12/22 Tr. 37:8-18; *see also* Heitmann, 2/14/23 Tr. 46:19-48:4; Kelly, 2/13/23 Tr. 34:9-39:21 (Kelly was familiar with intercompany write-offs in other deals).  Ferrellgas did not instruct Bridger Logistics to remove intercompany accounts receivable from its books.  Heitmann, 2/14/23 Tr. 48:5-8.

**Bridger Logistics Executes A Guaranty Supplement In Compliance With The Bank Of America Credit Facility.**

483.     After the Acquisition, Bridger Logistics and its subsidiaries became "Restricted Subsidiaries" under the Credit Agreement. Trial Ex. 1851.34 (defining "Restricted Subsidiary" to mean "any newly acquired or formed Subsidiary of the Borrower after" November 2, 2009).

484.     Under the Credit Agreement and Security Agreement, all Restricted Subsidiaries were required to guarantee the credit facility and grant Bank of America a security interest in their assets.  Trial Ex. 1851.70 (§ 4.01(a)(i), (iii), (iv)), 1851.85-86 (§ 6.12); 1851.186-228 (form of Security Agreement); Miles, 12/12/22 Tr. 197:7-16, 213:25-214:12 (BTS would be required to guarantee the credit facility and grant a security interest in its assets like all other Restricted Subsidiaries); Heitmann, 2/14/22 Tr. 57:10-18.

485.     In return, each Restricted Subsidiary, including Bridger Logistics and the Acquired Subsidiaries, gained access to the credit facility.  Miles, 12/12/22 Tr. 219:15-220:10.

486.     At the time of the Acquisition, Heitmann had primary responsibility for Ferrellgas compliance with the credit facility.  Heitmann, 2/14/23 Tr. 54:11-14. Although Miles was Ferrellgas outside counsel for issues related to the credit facility, Akin Gump assumed responsibility for issues related to the credit facility in connection with the Acquisition.  Heitmann, 2/14/23 Tr. 54:15-55:2, 55:8-12.

487.     On May 29, 2015, William Morris (Akin Gump) emailed Heitmann and others and attached a draft amendment to the Credit Agreement.  Trial Exs. 672, 672-A; Heitmann, 2/14/23 Tr. 55:13-56:3.  The amendment revised the definition of Permitted Unsecured Debt so that Ferrellgas could assume the debt necessary to fund the Acquisition.  Trial Ex. 672-A.7; Heitmann, 2/14/23 Tr. 56:16-23.  Heitmann explained at trial that the amendment was necessary because the Credit Agreement contained covenants and requirements regarding leverage ratios, so Ferrellgas

needed Bank of America's approval to assume additional debt.  Heitmann, 2/14/23 Tr. 56:24-57:9.

488. ████████████████████████████████████████████████████████

Trial Ex. 729 (QPO). ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Trial

Ex. 729 (QPO); Heitmann, 2/14/23 Tr. 58:16-59:1 (CC).

489. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Heitmann,

2/14/23 Tr. 59:2-7 (CC).

490. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███  Trial Ex. 753 (QPO); Heitmann 2/14/23 Tr. 70:9-21 (CC). █████████

███████  Heitmann, 2/14/23 Tr. 70:22-24 (CC).

491.     That same day, Heitmann transmitted an executed guaranty supplement ("June 2015 Guaranty Supplement") on behalf of the Bridger entities to Priscilla Baker at Bank of America.  Trial Ex. 754-R, 754-A; Heitmann, 2/14/23 Tr. 74:21-75:4, 76:2-10. Heitmann testified that Baker was the administrative agent for Bank of America and was his primary contact for sending documents back and forth at that time.  Heitmann, 2/14/23 Tr. 76:7-10.

492.     The June 2015 Guaranty Supplement is dated June 24, 2015, and Heitmann executed the document on behalf of all of the acquired Bridger entities, including BTS.  Trial Ex. 754-A.2, 754-A.5; Heitmann, 2/14/23 Tr. 77:13-15.

493.     The June 2015 Guaranty Supplement states that it "is delivered pursuant to that

certain Guaranty, dated as of November 2, 2009 (as it may be amended, supplemented, or otherwise modified, the "Guaranty"," and incorporates the definitions.  Trial Ex. 754-A.2.

494.    Section 1(a) of the June 2015 Guaranty Supplement states that each signatory "agrees that this Supplement may be attached to the Guaranty and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Guaranty and the Loan Documents and agrees to be bound by all of the terms thereof[.]"  Trial Ex. 754-A.2.

495.    Section 1(d) of the June 2015 Guaranty Supplement states that each signatory "agrees to absolutely and unconditionally guarantee, as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all Guaranteed Obligations as provided by Section 1 of the Guaranty."  Trial Ex. 754-A.2.

496.    Section 2 of the June 2015 Guaranty Supplement states that each signatory "agrees from time to time, upon request of the Administrative Agent, to take such additional actions and to execute and deliver such additional documents and instruments as the Administrative Agent may request to effect the transactions contemplated by, and to carry out the intent of, this Supplement."  Trial Ex. 754-A.2.

497.    Finally, the June 2015 Guaranty Supplement has a New York choice-of-law provision.  Trial Ex. 754-A.2.

498.    At the time he executed the June 2015 Guaranty Supplement, Heitmann's intent was to obligate those subsidiaries to pledge their assets in favor of the credit facility, and he believed the Guaranty Supplement did just that.  Heitmann, 2/14/23 Tr. 77:16-19.  Heitmann testified that he was the signatory because, "[a]s CFO, I'm responsible for all the Ferrellgas-owned subs."  Heitmann, 2/14/23 Tr. 77:9-12.

499. On July 7, 2015, Chase Armbrust of Akin Gump emailed to Heitmann and others a grantor accession agreement for execution by Bridger Logistics and its subsidiaries. Trial Ex. 774 (QPO); Miles, 12/12/22 Tr. 204:8-205:8.

500.  Heitmann, 2/14/23 Tr. 71:12-19 (CC).

501. On July 27, 2015, William Morris of Akin Gump emailed Heitmann and others, copying Miles, regarding the grantor accession agreement. Trial Ex. 830 (QPO). Trial Ex. 830.1 (QPO).

. Trial Ex. 830.1 (QPO).

Ex. 830.1 (QPO).

502. Heitmann, 2/14/23 Tr. 72:19-22 (CC).

Heitmann, 2/14/23 Tr. 73:2-9 (CC).

Heitmann, 2/14/23 Tr. 72:23-24 (CC).

503. If Ferrellgas failed to comply with the requirements under the credit facility in connection with the Acquisition, that failure was an event of default under the Credit Agreement.

Miles, 12/12/22 Tr. 198:18-23. ███████████████████████████████████████

████████████████████████████████████████████████ Heitmann, 2/14/23

Tr. 73:10-14 (CC). In the event of a default, Bank of America could accelerate the outstanding

borrowings, stop lending, and foreclose upon its collateral to repay the loan. Miles, 12/12/22 Tr.

198:24-199:5. ████████████████████████████████████████████████████

████████████████████████████████████ Heitmann, 2/14/23 Tr. 73:10-19 (CC).

504.    Around the time the Acquisition closed, Ferrellgas Partners and its subsidiaries

owed Bank of America approximately $211.4 million, and it could not afford to repay that debt at

that time. Trial Ex. 1567.F.68; Heitmann, 2/14/23 Tr. 78:16-79:2.

505.    In the event Ferrellgas Partners or its subsidiaries defaulted under the Bank of

America credit facility, defaults under other debt instruments would be triggered. Heitmann,

2/14/23 Tr. 79:3-8. As of July 2015, Ferrellgas Partners and its subsidiaries owed $1.95 billion

under its debt instruments, including the Bank of America credit facility and the senior notes it

issued in connection with the Acquisition. Trial Ex. 1567.F.26; Heitmann, 2/14/23 Tr. 79:9-80:3.

**F.    Bridger Logistics And Its Subsidiaries Guarantee Senior Notes.**

506.    Eddystone was not the only unsecured creditor of BTS. To finance the Acquisition,

Ferrellgas issued $500 million worth of unsecured senior notes in the debt capital markets. Miles,

12/12/22 Tr. 208:4-12. Bridger Logistics and its subsidiaries, including BTS, executed a first

supplemental indenture on June 24, 2015 that guaranteed the indentures related to the senior debt.

Trial Ex. 1314-A; Miles, 12/12/22 Tr. 208:20-23, 210:16-211:5.

**G.    CBIZ Establishes The Book Value Of Bridger Logistics.**

507.    In connection with the Acquisition, CBIZ conducted a valuation analysis to

estimate the value of identifiable tangible and intangible assets of Bridger Logistics as of June 23,

2015 ("June 2015 CBIZ Report"). Trial Ex. 961-A.3.

508. The June 2015 CBIZ Report states that the purpose of the CBIZ valuation analysis was "for financial reporting purposes to comply with the requirements of Accounting Standards Codification Topic 805, *Business Combinations*[.]" Trial Ex. 961-A.3 (emphasis in original). The June 2015 CBIZ Report assigned a value of $346.5 million to Bridger Logistics' tangible assets and a value of $299.2 million to Bridger Logistics' intangible assets. Trial Ex. 961-A.40.

509. The June 2015 CBIZ Report valued the pipeline and terminal assets at $39.76 million. Trial Ex. 961-A.47. Heitmann testified that this valuation supplied the book value for those assets as of June 23, 2015. Heitmann, 2/14/23 Tr. 113:22-114:4. Heitmann testified that Ferrellgas used the numbers from the June 2015 CBIZ Report in its SEC filings into 2016 because the SEC provided a 12-month window in which to make adjustments to such values. Heitmann, 2/14/23 Tr. 114:5-14. There was no contrary evidence on this point.

510. "Book value" is an accounting term that represents the sum of the asset accounts, net of depreciation and amortization, as shown on a balance sheet. Trial Ex. 3006.18 (Kumar Decl.) ¶ 43. Book value does not equate to the fair market value of an asset, which is determined by estimating what a company's assets would garner if sold in a prudent manner in market conditions at the time of the transfer. *Id*. In assessing fair market value, an analyst must consider the (1) general economic outlook; (2) particular outlook for the industry in which the company operates; and (3) market price of companies in the industry or similar lines of business. *Id.* ¶ 44.

## VIII. BRIDGER LOGISTICS POST-ACQUISITION OPERATIONAL STRUCTURE.

### A. Rios And Gamboa Continued To Manage Bridger Logistics' Day-To-Day Operations.

511. After the Acquisition closed, Rios and Gamboa continued to manage day-to-day operations of Bridger Logistics and its subsidiaries, including BTS. In fact, Eddystone's corporate representative testified repeatedly that Rios and Gamboa—not Ferrellgas LP or Ferrellgas

Partners—had "total control" of BTS at all relevant times. Eddystone 30(b)(6) (Cohen), Dep. Tr. 68:23-69:13, 89:16-90:17; Eddystone 30(b)(6) (Boaz), Dep. Tr. 256:1-6 (admitting that Eddystone understood that Rios and Gamboa "were the decision makers" on "anything related to BTS"). By way of example, Eddystone's corporate representative testified that Rios and Gamboa "directed" alleged efforts to divert revenue from BTS and render it insolvent. *Id.* 79:24-81:9 ("Q. Did [Rios and Gamboa] direct those efforts? A. That's our contention.").

512.    In an email to various individuals at Bridger Logistics on June 25, 2015—the day after the Acquisition closed—Rios wrote: "No one at Ferrellgas has the authority to make any changes [to Bridger Logistics' operations] unless I agree to them. This was the deal that Steve Wambold and I made. Bridger [Logistics] will run as an autonomous subsidiary of Ferrellgas, and as such the business will run like it has in the past until I approve a recommendation for something different." Trial Ex. 759.2; Rios, 9/23/22 Tr. 89:1-15.

513.    Wambold had the same view. *See* Trial Exs. 652-A.5, 761-A.5, 627.1-2 (May 4, 2015 email from Wambold to board members stating that the "goal is to have a smooth transition and initially leave Bridger operating as a stand-alone subsidiary of Ferrellgas reporting directly to myself"); *see also* Wambold, 12/8/22 Tr. 194:10-17.

514.    At the time Soiefer became CFO of Bridger Logistics, Rios and Gamboa continued to lead the operations of Bridger Logistics and its subsidiaries. Soiefer, 12/6/22 Tr. 118:21-119:2. At the time, Bridger Logistics' principal goal was to achieve $100 million in EBITDA and to find new growth opportunities. *Id.* at119:3-20.

515.    Ferrellgas executives were aware of how Bridger Logistics performed only "at a divisional level." Soiefer, 12/6/22 Tr. 120:3-17.

516.    At no point did Wambold believe that he had operational control of Bridger

Logistics or BTS.  Wambold, 12/9/22 Tr. 6:7-11; Wambold, 12/8/22 Tr. 193:16-194:17; Soiefer, 12/6/22 Tr. 120:22-121:2.

**B.  The Credit Facility Provided Bridger Logistics With Working Capital.**

517.  Prior to the Acquisition, Bridger Logistics leadership was aware that Ferrellgas Partners utilized a cash management system as part of its credit facility.  Trial Ex. 717; Jilla, 12/12/22 Tr. 44:13-21.  On June 17, 2015, Jilla wrote the following in an email to Bridger LLC leadership: "[I]n short order, FGP wants to move all Logistics bank accounts to JP Morgan, and Logistics will need to transition the driver information and other ACH information to that account." Trial Ex. 717.4.  Gamboa responded and inquired whether Bridger Logistics' accounts would be "tied to FGP revolver and the accounts get swept every night?"  Trial Ex. 717.2. Recognizing the benefits, Gamboa then commented, "[i]t could save a lot of money on interest annually."  Trial Ex. 717.1; Gamboa, 12/7/22 Tr. 104:11-105:6.  Jilla responded: "Yes once all logistics accounts are moved to one combined account at JPM, FGP will link to their revolver and sweep it to a clearing account so there will not be spare cash sitting around."  Trial Ex. 717.1.

518.  Bridger Logistics leadership was also aware that Ferrellgas Partners had "an all[-]assets pledge to their working capital."  Jilla, 12/12/22 Tr. 44:17-21.

519.  After the Acquisition closed, all working capital for Bridger Logistics "was basically coming in from the Ferrellgas revolver." Jilla, 12/12/22 Tr. 44:22-45:4. The money from the credit facility funded Bridger Logistics' operations and operating costs; when customers would pay Bridger Logistics' subsidiaries, Bridger Logistics would sweep the money back to the Ferrellgas account.  *Id.*

520.  Jilla and Gamboa testified that BTS used the credit facility to obtain working capital and to manage cash flow.  Jilla, 12/12/22 Tr. 45:11-19; Gamboa, 105:22-106:1.  Jilla explained the process through which Bridger Logistics would request funding from the credit facility for its

subsidiaries' expenses. Jilla, 12/12/22 Tr. 45:20-46:7. That process consisted of Bridger Logistics providing a cash forecast to the Ferrellgas treasury department that estimated Bridger Logistics' sources and uses of funds over a certain amount of time and requested a borrowing of cash to fund the operations of its subsidiaries. Jilla, 12/12/22 Tr. 46:13-47:19; Trial Exs. 843, 851, 851-A, 852, 852-A, 892, 892-A, 912, 912-A, 920, 920-A; Heitmann, 2/14/23 Tr. 87:18-88:5.

521.    Bridger Logistics' cash forecast identified wires in from Ferrellgas via the credit facility and wires out to Ferrellgas to pay back Bridger Logistics' borrowings from the credit facility. Trial Ex. 851-A; Jilla, 12/12/22 Tr. 49:18-50:16. The cash forecast did not differentiate between Bridger subsidiaries, and none of the costs or revenues are linked to the responsible subsidiaries. *See, e.g.* Trial Ex. 852-A; Heitmann, 2/14/23 Tr. 91:3-5. Eddystone is identified on the cash forecast under a heading titled "Bridger Logistics costs." Trial Ex. 852-A; Heitmann, 2/14/23 Tr. 90:3-91:5.

522.    For example, the cash forecasts reflect that, on or about June 26, 2015, Bridger Logistics and its subsidiaries requested, and were provided, $10 million in cash from Ferrellgas to fund its operations. Trial Ex. 851-A; Jilla, 12/12/22 Tr. 51:6-14. On or about July 31, 2015, Bridger Logistics and its subsidiaries requested, and were provided, $3.5 million from Ferrellgas. Trial Ex. 851-A; Jilla, 12/12/22 Tr. 52:4-8. On or about August 7, 2015, Bridger Logistics and its subsidiaries requested and received $12 million from Ferrellgas. Trial Exs. 851-A, 852, 852-A, 856; Jilla, 12/12/22 Tr. 52:24-53:4; Heitmann, 2/14/23 Tr. 89:10-90:2, 92:3-24.

523.    When the Ferrellgas treasury department received a request for funds or a cash forecast from Bridger Logistics, the treasury department would wire funds to Bridger Logistics' bank account. Heitmann, 2/14/23 Tr. 87:18-88:5. When Bridger Logistics needed to repay funds, Jilla and David Stark (Bridger Logistics) would manually wire the funds back to Ferrellgas based

on Bridger Logistics' cash forecast.  Trial Exs. 937, 940; Jilla, 12/12/22 Tr. 61:5-13.

524.    In the period from the Acquisition date to August 4, Ferrellgas Partners advanced Bridger Logistics $33 million in cash, and Bridger Logistics repaid $23 million of that amount. Heitmann, 2/14/23 Tr. 91:6-14; Trial Ex. 852-A.

525.    Bridger Logistics and its subsidiaries benefitted from the Ferrellgas credit facility because it provided access to working capital that Bridger Logistics did not have prior to the Acquisition. Jilla, 12/12/22 Tr. 57:21-58:13.

526.    After the Acquisition, Bridger Logistics and its subsidiaries continued to maintain their bank accounts in Louisiana. Jilla, 12/12/22 Tr. 60:25-61:4.  It is undisputed that Bridger Logistics implemented a zero-balance cash management system on August 27, 2017, which involved cash sweeps of all affiliates to keep borrowing costs low.  Sherman, 12/7/22 Tr. 313:13-314:7; Jilla, 12/12/22 Tr. 43:16-45:12 (explaining zero-balance cash management involves keeping cash at main pledged account level and not with subsidiary's individual bank account); Heitmann, 2/14/23 Tr. 86:7-88:21 (Bridger Logistics companies incorporated into zero-balance cash management system to reduce overall borrowing costs).

527.    As part of the cash management system, affiliates of BTS paid Eddystone's invoices each month.  *See* Trial Ex. 3003.12 (Polkowitz Decl.) ¶ 32.

528.    Sherman acknowledged that it is both common and appropriate for affiliate companies to make payments on behalf of one another, so long as an intercompany receivable is recorded; and there is nothing improper about affiliated companies utilizing a combined cash management system, like Defendants.  Sherman, 12/7/22 Tr. 306:22-310:14, 312:5-315:25

529.    Both sides' experts agree that intercompany receivables were recorded by Bridger Logistics post-Acquisition to account for payments due to BTS and payments made on behalf of

BTS by its affiliates under Great Plains company codes 202, 208, and 210. Defendants' accounting expert Gary Polkowitz set forth examples in the record showing that Bridger Logistics recorded intercompany receivables with respect to money earned by BTS, and payments made to Eddystone by BTS affiliates, in the three company codes utilized to track the BTS business segments. Trial Ex. 3003.12 (Polkowitz Decl.) ¶¶ 32, 34. Sherman likewise acknowledged that Bridger Logistics recorded intercompany receivables reflecting amounts due and from BTS in those same three company codes. Sherman, 12/8/22 Tr. 44:10-45:24.

530. Heitmann testified that he was not aware of any instance where Ferrellgas refused to provide a Bridger entity the cash requested. Heitmann, 2/14/23 Tr. 88:18-21.

### C. Accounting Transition.

531. After the Acquisition, Bridger Logistics was initially responsible for its own accounting. Heitmann, 2/14/23 Tr. 81:9-13. As part of that responsibility, Bridger Logistics handled its own day-to-day banking operations. Heitmann, 2/14/23 Tr. 83:4-7.

532. In July 2015, Rios asked to transition Bridger Logistics' accounting to Ferrellgas. Trial Ex. 793; Heitmann, 2/14/23 Tr. 81:14-82:19. In particular, Rios wanted to transition trucking settlements, accounts payable, accounts receivable, and treasury functions to the Ferrellgas headquarters. Trial Ex. 793.1; Heitmann, 2/14/23 Tr. 82:20-24. Treasury was responsible for the flow of cash. Heitmann, 2/14/23 Tr. 82:25-83:3.

533. The accounting transition from Bridger Logistics to Ferrellgas headquarters occurred by November 2015. Heitmann, 2/14/23 Tr. 83:17-23.

534. To obtain Bridger Logistics accounting records in the time period between the Acquisition and November 2015, Ferrellgas relied on Jilla at Bridger Logistics to provide outputs from the Great Plains accounting system, which Ferrellgas would then upload into its own PeopleSoft accounting system. Heitmann, 2/14/23 Tr. 85:3-24; Trial Exs. 960, 960-A, 960-B.

### D.    Operating/Management Reports.

535.    In the period immediately following the Acquisition, an operating report was generated that identified Bridger Rail Services and Bridger Pipeline Services as LLCs. *See, e.g.*, Trial Ex. 996-A.

536.    Soiefer testified that he recalled a period of time following the Acquisition where there were reports generated "that were really hard to make sense of compared to the way" they understood Bridger Logistics' operations from the Acquisition. Soiefer, 12/5/22 Tr. 170:8-24.

537.    After Soiefer received the initial operating reports, he requested that the reports be revised to better reflect Bridger Logistics' operations. Soiefer, 12/5/22 Tr. 180:11-22. Soiefer's focus was on EBITDA and whether Bridger Logistics was on track to achieve the expected EBITDA projected at the time of the Acquisition. Soiefer, 12/5/22 Tr. 181:14-182:3.

538.    Soiefer wanted to review Bridger Logistics' financial performance by service offering. Soiefer, 12/6/22 Tr. 130:1-17. He testified that it would not have been helpful for him to review financial performance by legal entity because that is not how he understood Bridger Logistics' business from due diligence and the Acquisition. Soiefer, 12/6/22 Tr. 130:18-131:9. He wanted financial reporting that was in line with the way he understood Bridger Logistics' business. Soiefer, 12/6/22 Tr. 131:2-9.

539.    When Soiefer assumed the CFO role at Bridger Logistics, he transitioned the internal financial reporting "to match up perfectly" with how he understood Bridger Logistics' segments. Soiefer, 12/5/22 Tr. 170:8-24. Soiefer identified Bridger Logistics' management report as the report he received in November 2015. Soiefer, 12/5/22 Tr. 174:13-19; Soiefer, 12/6/22 Tr. 133:14-134:15; Trial Exs. 1404-R, 1404-A.

540.    Soiefer relied on management reports to tell him how the business is performing and why, based on "key performance indicators" or KPIs. Soiefer, 12/6/22 Tr. 129:6-130:13. One

example of a KPI is a margin-per-barrel calculation. Soiefer, 12/6/22 Tr. 130:1-9.

541. The November 2015 management report contained a summary of different service offerings with a comparison of performance versus the budget. Trial Ex. 1404-A; Soiefer, 12/6/22 Tr. 134:1-15. That report also presented KPIs within each service offering. Trial Ex. 1404-A; Soiefer, 12/6/22 Tr. 134:11-15. The rail service offering was broken down into sub-categories of rail service, rail shipping, and storage, with further subcategorization within each of those three sub-categories. Trial Ex. 1404-A; Soiefer, 12/6/22 Tr. 135:4-19. Soiefer explained that it was useful to see this level of detail for the rail services sub-category because he could see the different components that drove the revenue and profit. Soiefer, 12/6/22 Tr. 135:20-136:9.

542. Soiefer did not have an understanding as to the revenues or costs generated at the subsidiary level. Soiefer, 12/5/22 Tr. 168:1-18. He testified that "in my time at that company and my current company, we always looked at financials either by segment or service offering but not specific legal entities. Legal entity financials was [sic] something that maybe accounting or legal would handle but that wasn't something I was focused on." Soiefer, 12/5/22 Tr. 181:14-22.

543. Similarly, Wambold evaluated Bridger Logistics revenue by segment because he was used to cost center reporting at Ferrellgas. *See* Wambold, 12/9/22 Tr. 39:17-40:21.

## IX. BRIDGER LOGISTICS POST-ACQUISITION ACTIVITIES.

### A. Bridger Logistics Immediately Sets Out To Negotiate A Longer-Term Contract With Monroe.

544. After the Acquisition closed and consistent with the information learned in due diligence about expansion opportunities connected to Monroe, Bridger Logistics and Ferrellgas continued to explore the viability of acquiring the Eddystone Facility as part of a broader effort to extend Bridger Logistics' relationship with Monroe. Soiefer, 12/5/22 Tr. 131:25-132:23; Soiefer, 12/6/22 Tr. 142:2-144:4; Wambold, 12/9/22 Tr. 46:5-47:11; Rios, 9/23/22 Tr. 58:9-59:4; *see also*

Trial Ex. 875-A.2 (joint venture proposal "seeks to extend and broaden the relationship between Bridger Logistics and Monroe").

545. In particular, Bridger Logistics and Ferrellgas explored entering into a joint venture with Monroe. Soiefer, 12/6/22 Tr. 113:9-12. The Monroe joint venture contemplated a multi-prong approach to long-term growth that included purchasing the Eddystone Facility, building a pipeline to Monroe, and extending the term of the Monroe TLA. Trial Exs. 777, 875, 875-A.2, Rios, 9/23/22 Tr. 60:7-11; Soiefer, 12/5/22 Tr. 131:4-9; Wambold, 12/9/22 Tr. 46:5-22. Ferrellgas hoped that the Monroe joint venture would lock Monroe into its contract with Bridger Logistics, which was set to end in 2019, for an additional four years. Wambold, 12/9/22 Tr. 46:23-47:4, 47:12-48:3. Efforts to negotiate the joint venture began as early as July 2015, and were "in progress" as late as November 2015. Trial Exs. 777, 875, 875-A, 998, 1061-A.44 (November 2015 materials for a Ferrellgas board meeting included the "Eddystone Pipeline" and Monroe joint venture under "Live Organic Growth Projects"); Rios, 9/23/22 Tr. 67:4-6, 65:5-67:11; Soiefer, 12/6/22 Tr. 156:8-157:18; Wambold, 12/9/22 Tr. 56:3-58:1.

546. Voluminous evidence in the record supports Defendants' position that they were focused on extending the Monroe TLA throughout fall 2015. Trial Exs. 876 ("I'd like nothing more than to start off our year extending this contract"), 890 (extending the Monroe contract would be an "outstanding message" to the market), 902, Wambold, 12/9/22 Tr. 47:18-48:4, 49:4-17, 51:15-19, 52:12-25. Further, Wambold expected that Soiefer would succeed in negotiating an extension with Monroe. Wambold, 12/9/22 Tr. 54:20-23.

**B.    Bridger Logistics Resumes Negotiations To Purchase Eddystone.**

547. On July 22, 2015, an internal Enbridge memo expressed that Enbridge was working to divest Eddystone and wanted to keep the existing operations and rail activities intact to support a sale of the asset. Trial Ex. 799-A.1. The memo also stated that efforts to obtain financial

assurances from Bridger Logistics would "increase the value of the Eddystone facility in a sale event," but acknowledged that it "will likely take several months [to obtain financial assurances] as Ferrellgas operationally adapts to its recent acquisition." *Id.* at 799-A.1-2.

548.    On August 27, 2015, Rios introduced Paradis to Soiefer by email to return to discussions about acquiring the Eddystone Facility. Paradis, 9/19/22 Tr. 221:16-222:20; Trial Ex. 1008.2. In his email, Rios referenced the earlier discussions about acquiring the Eddystone Facility that occurred in June 2015. Rios, 9/23/22 Tr. 57:9-16; Trial Ex. 1008.2. In those earlier discussions, Rios indicated to Paradis that he could not discuss acquiring the facility but would revert to Paradis in about a month. Rios, 9/23/22 Tr. 57:9-16. Rios explained that he paused discussions with Paradis due to the Acquisition. Rios, 9/23/22 Tr. 57:17-19.

549.    On August 31, 2015, Paradis responded that Enbridge would reach out to Soiefer when Enbridge was ready to re-engage. Paradis, 9/19/22 Tr. 222:21-223:19; Trial Ex. 1008.1. Paradis also indicated that Enbridge was "swamped" at that time but expected to be able to connect in October 2015. Paradis, 9/19/22 Tr. 223:9-14; Trial Ex. 1008.1.

C.    **Dakota Plains Negotiates An Eddystone Purchase And Threatens To Lock Bridger Out If Successful.**

550.    In September 2015, Paradis received an offer from Dakota Plains to purchase the Eddystone Facility. Trial Ex. 963; Paradis, 9/19/22 Tr. 154:10-17, 215:14-216:8. Dakota Plains was a small company that owned a rail facility in Van Hook, North Dakota. Paradis, 9/19/22 Tr. 155:20-22. Enbridge was interested in the offer. *See* Paradis, 9/19/22 Tr. 211:18-212:5.

551.    Around the same time, Dakota Plains approached Ferrellgas and Bridger Logistics, asking them to finance Dakota Plains' acquisition of the Eddystone Facility. Trial Exs. 933, 933-A, 969, 969-A; Soiefer, 12/6/22 Tr. 166:1-170:2; Rios, 9/23/22 Tr. 59:5-18. On September 17, 2015, Soiefer forwarded Wambold an email from Dakota Plains from the previous day with a draft

purchase and sale agreement between Enbridge and Dakota Plains. Trial Ex. 933.1; Soiefer, 12/6/22 Tr. 167:17-168:1. In the email, Dakota Plains indicated that it was finalizing the purchase schedules and was exploring a transition services agreement (presumably for the benefit of BTS). Trial Ex. 933.1, 933-A; Soiefer, 12/6/22 Tr. 167:17-168:1.

552. Following his email, Soiefer attended a meeting with Dakota Plains, where Dakota Plains proposed partnering with Ferrellgas in a new entity that would buy Enbridge's shares in Eddystone, with Ferrellgas raising the money for the project. Soiefer, 12/6/22 Tr. 169:17-170:2; *see also* Trial Ex. 933.1 (referencing upcoming meeting at BakerHostetler's offices). Dakota Plains indicated to Soiefer that, if Ferrellgas did not help finance Dakota Plains' acquisition of the Eddystone Facility as contemplated, Dakota Plains would proceed with the acquisition and deny Bridger Logistics access to the Eddystone Facility. Soiefer, 12/6/22 Tr. 168:17-170:2. Soiefer testified that such an outcome was not acceptable because it would jeopardize the entire relationship with Monroe. *Id.* at 169:8-13.

553. Up to early October, Ferrellgas and Bridger Logistics continued to try to work with Dakota Plains and SunTrust, the investment bank working on the deal with Dakota Plains. Soiefer, 12/6/22 Tr. 170:12-171:3; Trial Ex. 990. On October 9, 2015, Peter Panos at SunTrust emailed Soiefer that Canopy was "the issue" and was not willing to transact. Trial Ex. 1005.2; Soiefer, 12/6/22 Tr. 172:10-22. The Dakota Plains deal did not go forward. *Id.* at 172:23-173:3.

554. On October 20, 2015, Paradis stated in an internal email to Enbridge's asset performance group that negotiations with Dakota Plains concluded unsuccessfully because Dakota Plains was unable to secure financing for the negotiated $150 million sale price. Trial Ex. 1013; Paradis, 9/19/22 Tr. 156:19-23, 220:12-221:15.

**D.    The Bakken/Brent Spread Narrows.**

555. Much of the testimony at trial concerned the "spread" between Bakken and Brent

and, in particular, when the spread between Bakken and Brent narrowed to the point where the economics of the COSA were negatively impacted. *See* Agusti Opening Statement, 9/19/22 Tr. 58:17-59:3 (tying Bakken/Brent spread to theory that Jamex Marketing was a risk to Defendants).

556. The price spread between Bakken railhead and Dated Brent prices is a key indicator of economics of crude by rail to the East Coast. Trial Ex. 3005.5 (O'Connor Decl.) ¶ 23; Paradis, 9/19/22 Tr. 175:2-16.

557. According to Defendants' energy industry expert, O'Connor, because of high per-barrel transportation and infrastructure costs, Bakken crude at the railhead in North Dakota needs to be priced at a steep discount to crude oil in the Atlantic Basin, which is primarily priced at a differential to the Dated Brent price. Trial Ex. 3005.5 (O'Connor Decl.) ¶ 23. The Dated Brent price of crude is used as a basis for the pricing of many crude oils in the Atlantic Basin, including Nigerian crude oils. Trial Ex. 3005.5 (O'Connor Decl.) ¶ 23.

558. It is undisputed that, in the summer of 2015, after the Acquisition, Jamex Marketing reported that it continued to lose money on the COSA. *See* Ballengee, 9/20/22 Tr. 87:9-12; Gamboa, 12/6/22 Tr. 285:6-9.

559. Specifically, in July, August, and September of 2015, Jamex Marketing lost $6-$7 million per month. Ballengee, 9/20/22 Tr. 87:13-15; Trial Ex. 922 (describing the loss on the COSA in August 2015 to be $6.1 million compared to a $7.6 million loss in July 2015); Jilla, 12/12/22 Tr. 116:12-117:12 (acknowledging Jamex losses of $7.6 million in July 2015 and $6.1 million in August 2015; *see also* Ballengee, 9/20/22 Tr. 81:21-24 (estimating Marketing's losses in May 2015 and June 2015 to be between $5-$10 million per month).

560. The record does not support Eddystone's view that the spread was already uneconomical in summer 2015, however. Defendants' energy expert O'Connor testified credibly

that, in May and June 2015, market conditions were such that COSA-based Bakken crude was advantageous for the Monroe refinery as compared to other crude options. Trial Ex. 3005.2 (O'Connor Decl.) ¶ 8. It was not until September 2015 when the spread narrowed to the point that some East Coast refiners began reducing Bakken rail purchases and instead shifted to imported Nigerian crudes. *See* Trial Ex. 3005.3 (O'Connor Decl.) ¶ 10, 15, 30. The delivered cost of foreign crude did not become favorable versus sourcing Bakken under the COSA until October 2015. Dkt. 732 ¶ 39; Trial Ex. 3005 (O'Connor Decl.) ¶ 38.

561. Monroe's 30(b)(6) representative, John Hunter, also testified that the advantage from the Monroe perspective began to shift in the second half of 2015. Monroe 30(b)(6) (Hunter), Dep. Tr. 118:13-20; 143:18-144:5.

562. Even with a narrowed spread, the cost-plus pricing term of the COSA pricing structure acted as an offset. Monroe 30(b)(6) (Hunter), Dep. Tr. 107:20-108:15.

563. O'Connor's opinion that the spread did not begin to narrow until the fall of 2015 is also supported by Defendants' Summary Exhibit 67, which plots the difference between the estimated price of Bakken crude oil delivered under the COSA versus the estimated price of imported Nigerian crude oil delivered to Monroe on a monthly basis. Trial Ex. 3005.12 (O'Connor Decl.) ¶ 37; Defendants' Summary Ex. 67.[5] As the relative cost spread narrowed, and then shifted in favor of Nigerian crude, Monroe increased the volumes of imported Nigerian crudes, but continued to accept COSA-based Bakken crudes through the fourth quarter of 2015. Trial Ex. 3005.12-13 (O'Connor Decl.) ¶¶ 38, 40; Defendants' Summary Ex. 68; Monroe 30(b)(6) (Hunter), Dep. Tr. 118:21-119:9.

---

[5] When the yellow bars in Defendants' Summary Exhibit 67 are below the line, Monroe was receiving a significant advantage from COSA pricing. O'Connor, 12/14/22 Tr. 41:21-42:21.

564.     There is testimony that at least some Jamex Marketing losses after the Acquisition were attributable to Jamex Marketing's failure to purchase hedges.  In particular, Rios testified that Ballengee could have entered into hedges that would permit him to cabin the Jamex Marketing losses to $5 million per month.  Rios, 9/23/22 Tr. 113:8-11.  For reasons unknown, Ballengee did not enter into hedges following the Acquisition.  *Id.* at 113:12-13.

565.     In fall 2015, in response to the changing spreads, Bridger Logistics explored a number of options, including the possibility of transloading at another facility such as a facility owned by Philadelphia Energy Solutions ("PES").  Soiefer, 12/5/22 Tr. 144:5-21; Soiefer, 12/6/22 Tr. 179:13-182:8; Gamboa, 12/7/22 Tr. 121:5-122:14; *see also* Trial Exs. 944, 946, 1002, 1006.  The PES facility was larger than the Eddystone Facility and was potentially up for sale.  Soiefer, 12/6/22 Tr. 180:2-181:3.

566.     On October 11, 2015, Soiefer circulated a list of "alternatives with respect to Monroe."  Trial Ex. 1002.  Soiefer testified that by referring to "alternatives with respect to Monroe," he was referring to the "different levers" that would be available as they "were exploring a very choppy market."  Soiefer, 12/6/22 Tr. 184:14-20; see also Wambold, 12/9/22 Tr. 163:17-20 ("My very quick read on this is that Todd is just doing what we were trying to do from the beginning, which is extend the contract with Delta.  That's my quick read – and sharing all kinds of other ideas.").  Soiefer did not generate each idea personally; rather, he compiled different ideas raised during multiple brainstorming sessions.  Id. at 184:21-12.  Soiefer's list included 14 ideas, including buying Monroe.  Trial Ex. 1002; Soiefer, 12/6/22 Tr. 187:25-188:15.

567.     Soiefer asked Hampton to evaluate whether BTS could terminate the RSA early to obtain a cost savings at PES.  Trial Ex. 946.  Soiefer testified that he asked Hampton to explore whether the contract permitted early termination, giving the example of a 30-day notice of

termination. Soiefer, 12/6/22 Tr. 181:8-21, 182:9-183:7; *see also* Soiefer, 12/5/22 Tr. 144:5-145:22. In connection with his request for an evaluation by Hampton, Soiefer transmitted the Lynn Tillotson letter that documented the facility defects. Trial Ex. 468; Soiefer, 12/6/22 Tr. 183:15-25; Hampton, 12/14/22 Tr. 136:5-17. Soiefer testified that he later learned that the RSA did not permit early termination. Soiefer, 12/5/22 Tr. 158:6-13, 165:22-167:7.

568. Around this time, Soiefer generated a list of various options with respect to challenges Bridger Logistics was facing in connection with the narrowing spreads. Trial Ex. 1002; Soiefer, 12/5/22 Tr. 151:21-152:11, 163:24-164:18; Soiefer, 12/6/22 Tr. 185:13-188:16. Although one of the options raised the specter of terminating the RSA, others contemplated continued use of the Eddystone Facility. Trial Ex. 1002; Soiefer, 12/6/22 Tr. 185:13-188:16. The list was intended to be "exhaustive" and included the possibility of Bridger Logistics buying Monroe. Trial Ex. 1002; Soiefer, 12/6/22 Tr. 187:25-188:15.

**E.     In October, Rios And Soiefer Resume Discussions With Enbridge/Eddystone.**

569. Meanwhile, undeterred by the spread, Defendants continued their attempts to buy the facility. On October 1, 2015, Rios emailed Paradis and Boaz and inquired as to when Enbridge would be ready to engage again regarding the purchase of Eddystone. Trial Ex. 978.

570. On October 13, 2015, Soiefer reached out to Paradis, copying Rios, to follow up on potentially acquiring the Eddystone Facility. Paradis, 9/19/22 Tr. 225:10-17; Trial Ex. 1008.1. At that time, Bridger Logistics remained interested in acquiring the Eddystone Facility. Soiefer, 12/6/22 Tr. 176:18-22; Rios, 9/23/22 Tr. 58:6-8; Trial Ex. 1008.1. According to Soiefer, Ferrellgas and Bridger Logistics made no more progress after this email. Soiefer, 12/6/22 Tr. 177:7-12.

571. That outreach followed and continued alongside Bridger Logistics' effort to negotiate to amend the RSA. On July 20, 2015, and again on August 12, 2015, Troy Lee asked Boaz for an update on the RSA amendment. Trial Ex. 1021.4-5. On August 28, 2015, Lee advised

Boaz that he was leaving Bridger Logistics and others would work on the amendment going forward. Trial Ex. 1021.3.

572. On October 1, 2015, Rios requested an update on the RSA amendment and wrote: "It has been 10 months since we sent you the letter from our counsel[, Lynn Tillotson,] on the facility's deficiencies. I would like to have this wrapped ASAP or we will just push it back to the lawyers to handle." Trial Exs. 978, 989.3. On October 7, having heard nothing from Eddystone, Rios followed up again and asked for "commercial accord" as to the RSA. Trial Ex. 989.3.

573. Boaz responded that day and attached the most recent version of the proposed amendment to the RSA, indicating that Eddystone would execute it when a surety bond was in place. Trial Exs. 987, 987-A, 989.2. Boaz also acknowledged that there had been a delay in sharing the proposed amendment. Trial Ex. 987.1.

574. Subsequently, Knapp corresponded with Enbridge about the RSA amendment. Hampton, 12/14/22 Tr. 132:6-133:15; Knapp, Dep. Tr. 102:5-14 (recalling seeking an amendment to address "ongoing efficiencies of the terminal").

575. Meanwhile, as Bridger Logistics renewed attempts to acquire the Eddystone Facility, it decided internally to "shelve" a potentially costly response to Eddystone's requests for financial assurances until it had "more clarity on the future of Eddystone." Trial Ex. 1021 (October 26-27, 2015 emails comparing the cost of a letter of credit vs. a bond should Bridger Logistics buy Eddystone). Accordingly, when Boaz pressed Knapp for an update on the letter of credit, Knapp relayed internally that he would "keep stiff-arming Boaz," while noting that a letter of credit would "save up to $200,000 if we buy Eddystone" whereas "[p]osting bond is a cheaper long-term arrangement if we dont [sic]." *Id.* Trial Ex. 1025 (October 30, 2015 emails); Knapp, Dep. Tr. 108:9-16 ("Q. And you meant, by 'stiff-arming,' that you're happy to keep refusing Mr. Boaz's

requests for a letter of credit; right?  A.  No. I believe you have to look at the context with my prior E-mail, and the internal discussions reflected that the future of Eddystone was unclear.  I think that's all my stiff-arm reference is calling back to in context.").

576.    BTS and Eddystone almost reached agreement on the RSA amendment, but the amendment was never finalized.  Paradis, 9/19/22 Tr. 198:20-24.

## X.    FERRELLGAS EXPLORES INCREASING ITS CREDIT FACILITY AND UNCOVERS AND THEN CORRECTS PAPERWORK OMISSIONS IN THE PROCESS OF CLOSING THE CREDIT FACILITY UPSIZING.

### A.    2015 Efforts To Increase Credit Facility.

577.    In July 2015, Heitmann engaged in initial discussions with Bank of America regarding increasing the size of the credit facility.  Trial Exs. 819, 819-A; Heitmann, 2/14/23 Tr. 92:25-93:10; Miles, 12/12/22 Tr. 226:23-227:7.  Heitmann was focused on increasing the credit facility to ensure there was sufficient working capital available, but also to fund additional growth.  Heitmann, 2/14/23 Tr. 92:25-93:10; *see also* Trial Ex. 819-A (July 2015 Bank of America presentation regarding increase).

578.    Throughout fall 2015, Heitmann kept the Ferrellgas Board of Directors apprised of his progress on this initiative.  Heitmann, 2/14/23 Tr. 95:19-22; *see also* Trial Ex. 887-A.5 ("We are investigating the possibility of amending and upsizing our credit facility, to provide borrowing capacity for further midstream growth").

579.    Bracewell attorneys Robin Miles and Jeris Brunette assisted Heitmann in upsizing the credit facility.  Heitmann, 2/14/23 Tr. 93:22-25 ("We would use Robin to help draft whatever documents needed to be drafted to help us with this endeavor."); Heitmann, 2/14/23 Tr. 98:15-20 (CC); Miles, 12/12/22 Tr. 184:16-20.

580.    Thompson Knight attorneys Shad Sumrow and Michael Lii were outside counsel to Bank of America with respect to the credit facility.  Miles, 12/12/22 Tr. 235:5-10; 236:23.

581.     ████████████████████████████████████████████

████████████████. Trial Exhibit 1176 (QPO); Heitmann, 12/14/23 Tr. 98:25-17 (CC). ████

████████████████████████████████████ *Id.*; Heitmann, 2/14/23 Tr. 99:18-23 (CC).

████████████████████████████████████████████████████

████████████████████████ Heitmann, 2/14/23 Tr. 99:24-100:1 (CC); Trial Ex. 887-A.5;

Heitmann, 2/14/23 Tr. 97:2-5.  Miles testified that he did not recall any urgency from Heitmann to

close on the accordion increase.  Miles, 12/12/22 Tr. 234:3-5.

582.     Throughout this time period, Ferrellgas and Bridger Logistics executives believed

there were liens on the assets of Bridger Logistics and its subsidiaries.  *See* Soiefer, 12/5/22 Tr.

224:16-19; Heitmann, 2/14/23 Tr. 234:22-235:4 (CC); Hampton, 12/14/22 Tr. 200:1-206:11 (CC).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Trial Ex. 1131 (QPO).████████████████████████████████████

████████████████████████████████████████████████████

████████████ Trial Ex. 1131 (QPO); Heitmann, 2/14/22 Tr. 167:13-168:21 (CC).

583.     The following day, Hampton reported separately to Rios and Soiefer that there were

liens on BTS assets.  Trial Ex. 1134 (QPO); *see* Soiefer, 12/6/22 Tr. 191:5-193:14, 230:7-231:1;

Soiefer, 12/5/22 Tr. 224:4-6; Rios, 9/22/22 Tr. 72:13-15.

584.     ████████████████████████████████████████████

████████████ Trial Ex. 1176.1-2 (QPO); Heitmann, 2/14/23 Tr. 100:10-12 (CC). ████

████████████████████████████████████████████████████

████████████████████████████████████ Trial Ex. 1176 (QPO); Heitmann,

2/14/23 Tr. 100:23-101:4 (CC). ████████████████████████████████

██████████. *See* Trial Ex. 1227 (QPO); *see also* Trial Ex. 1227-A (QPO); Heitmann, 2/14/23 Tr. 101:10-19 (CC), Miles, 12/12/22 Tr. 233:7-16.

**B.     A Paperwork Omission Is Discovered Related To The Acquisition.**

585.    Miles contacted Bank of America outside counsel Thompson & Knight shortly after receiving Heitmann's request to upsize the credit facility.  Miles, 12/12/22 Tr. 235:11-13.   On January 6, Thompson & Knight requested certain documentation, including copies of the guaranty supplements and grantor accession agreements for the Bridger entities.  Trial Ex. 1188; Miles, 12/12/22 Tr. 238:4-11. Thompson & Knight also requested a certificate that no default existed as of the time of the credit facility upsizing, which was a condition of closing.  Miles, 12/12/22 Tr. 237:19-23; Trial Ex. 1851.61-62 § 2.14(a) (stating that no default was a condition of upsizing the credit facility); Miles, 12/12/22 Tr. 237:19-23.

586.    On January 8, 2016, Brunette sent Thompson & Knight a copy of the June 2015 Guaranty Supplement.  Trial Exs. 1209, 1210.  Brunette explained that Bracewell did not have a counter-signed version and requested that Thompson & Knight return a countersigned copy.  Trial Ex. 1209.  Miles testified that he first received an executed copy of the June 2015 Guaranty Supplement around the time of that email. Miles, 12/12/22 Tr. 239:10-12. Miles believed the June 2015 Guaranty Supplement to be applicable and in place at this time.  Miles, 12/13/22 Tr. 70:13-72:24.  No one ever told Miles that the June 2015 Guaranty Supplement was not applicable and in place.  *See* Miles, 12/13/2022 Tr. 71:16:-21.  He also testified that he understood the guaranty to be a "one-way instrument" that "only needs to be signed by the guarantors to be enforceable." Miles, 12/12/22 Tr. 239:17-19.

587.    Lii responded to Brunette's email the same day and requested a grantor accession agreement for the new guarantors (i.e., the acquired Bridger entities).  Trial Ex. 1212; Miles, 12/12/22 Tr. 240:23-241:2.  Bracewell tried to locate the Bridger Logistics subsidiaries' grantor

accession agreement, but learned that they had not executed one. Miles, 12/12/22 Tr. 241:3-11.
Miles testified that this was the first time he learned that Bridger Logistics and its subsidiaries had
not previously executed the grantor accession agreement. Miles, 12/12/22 Tr. 241:8-11.

588. 

Heitmann, 2/14/23 Tr. 102:18-103:1 (CC); Trial Ex. 1214 (QPO).

Heitmann, 2/14/23 Tr. 103:2-8 (CC).

Hampton, 12/14/22 Tr. 200:1-206:11 (CC).

Heitmann, 2/14/23 Tr. 234:22-235:4 (CC).

589.

Miles, 12/12/22 Tr. 241:12-20 (CC).

, 2/14/23 Tr. 72:19-72:14, 73:10-19 (CC)

, 12/12/22 Tr. 198:18-
23 ("If you breach a covenant, another credit agreement, it becomes an event of default under the
credit agreement."). Heitmann understood that a default under the Credit Agreement would also
trigger defaults of other Ferrellgas debt instruments. Heitmann, 2/14/23 Tr. 79:3-8, 104:7-10 (CC).

590. In connection with the credit facility upsizing, Bank of America required Ferrellgas
to complete a certificate of no default. Trial Ex. 1188; Miles, 12/12/22 Tr. 237:15-25. Miles
testified that he advised Ferrellgas not to complete that certificate while the grantor accession

agreement was outstanding.  Miles, 12/12/22 Tr. 241:21-25.

591.  ██████████████████████████████████████████

████████████.  Trial Exs. 1224 & 1224-A (QPO).  ██████████████

████████████████████████████████████████████████.

Trial Ex. 1226 (QPO) ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  Heitmann, 2/14/23 Tr. 104:23-11 (CC); Miles, 12/12/22 Tr. 243:6-244:7.

████████████████████████████████████████████████████

████████████  Heitmann, 2/14/23 Tr. 105:10-11 (CC).

592.  Brunette sent the execution version of the grantor accession agreement to Ferrellgas

on January 12, 2016.  Trial Ex. 1247-R; Miles, 12/12/22 Tr. 245:16-246:7; Heitmann, 2/14/23 Tr.

105:24-106:2 (CC).  ████████████████████████████████████████

████████████████.  *Id.* at 106:3-5 (CC).  Miles testified that no one at Ferrellgas expressed

any urgency to sign the grantor accession agreement.  Miles, 12/12/22 Tr. 244:15-18, 246:8-14.

C.  **Bank of America Perfects Its Lien.**

593.  ██████████████████████████████████████████

████████████████████████████████████████████████  Heitmann,

2/14/23 Tr. 106:6-11 (CC); *see also* Trial Ex. 1260; Miles, 12/12/22 Tr. 252:1-9.

594.  On January 13, 2016, Bracewell emailed Thompson & Knight a suite of executed

documents to be held in escrow until the credit upsizing was closed the following day, including

(1) a grantor accession agreement executed by the Bridger Logistics subsidiaries and (2) a

certificate of no default under the Credit Agreement, both dated January 14, 2016.  Miles, 12/12/22

Tr. 248:20-249:8, 249:15-18, 252:1-2; Trial Exs. 1257, 1259 ¶ 2 (certificate of no default) & 1260

(executed grantor accession agreement).

595.    The grantor accession agreement applied to a number of entities other than BTS and is executed on behalf of: Bridger Marine, Bridger Energy, Bridger Lake, Bridger Administrative Services II, Bridger Real Property, J.J. Addison Partners, J.J. Karnack Partners, J.J. Liberty, Bridger Logistics, Bridger Transportation, Bridger Leasing, Bridger Storage, and Bridger Rail Shipping.  Trial Exs. 1260.8, 2636.8.

596.    Section 1 of the grantor accession agreement granted to Bank of America "a security interest in all of its right, title and interest in and to all of the Collateral of such Additional Grantor, whether now owned or hereafter acquired by it[.]"  Trial Exs. 1260.1, 2636.1.  In addition to pledging all assets of the guarantors, Bridger Logistics' bank account was disclosed as a deposit account subject to Bank of America's security interest.  Trial Exs. 1260.9, 2636.9.

597.    Subsequently, the grantor accession agreement was countersigned by Bank of America.  Miles, 12/13/22 Tr. 59:16-60:7; Trial Ex. 2636.7. Miles testified that, at this point, he was not concerned about whether Ferrellgas had complied with the requirements of the credit facility.  Miles, 12/12/22 Tr. 251:11-17.

598.    After Ferrellgas delivered its closing documents to Bank of America, Thompson & Knight requested an updated form of the guaranty supplement that referenced an amendment to the original guaranty.  Trial Ex. 1277-R.3; Miles, 12/12/22 Tr. 253:23-254:14.  Thompson & Knight stated that re-executing the guaranty supplement was not required as a condition of closing the expansion of the credit facility, and the slightly revised guaranty supplement did not in fact hold up the closing.  Miles, 12/13/22 Tr. 70:13-72:24; *see also* Trial Ex. 1277-R.2.  Ferrellgas agreed to sign the updated supplement, though Miles did not think it necessary because "the amendment and restatement is an amendment to the original guaranty, not a new guaranty."  Trial

Ex. 1277-R.1 ("We'll sign this to keep things tidy, but the reference in the supplement that was signed is the correct guaranty—the amendment and restatement is an amendment to the original guaranty, not a new guaranty."); Miles, 12/12/22 Tr. 254:15-18; *see also* Trial Ex. 1339. Ferrellgas executed an updated guaranty supplement dated January 14, 2016. Trial Ex. 1339.

599. At the time these documents were executed, Miles did not know about the potential sale of BTS. Miles, 12/12/22 Tr. 252:15-23, 258:10-12. Heitmann testified that he could not recall when he learned that Bridger Logistics intended to sell one of its subsidiaries, but he does not recall having concerns about Bridger Logistics at the time because Bridger Logistics had been performing as anticipated at the time of the Acquisition. Heitmann, 2/14/23 Tr. 106:21-107:2. Miles testified that at no point in 2015 or 2016 did he believe that the efforts he undertook in connection with Bank of America were intended to keep assets away from Eddystone. Miles, 12/12/22 Tr. 266:10-15. The Court finds this testimony credible.

600. The Credit Agreement permitted Bank of America to file UCC statements to perfect its security interest in the assets of Restricted Subsidiaries. *See, e.g.*, Trial Ex. 1851.70 § 4.01(a)(iii)(B) (requiring Bank of America's receipt of financing statements in "form appropriate for filing" prior to the initial credit extension under the facility). After Bracewell transmitted an executed guaranty supplement and grantor accession agreement for an acquired entity to Bank of America, Bracewell typically had no further involvement with perfecting the lien, which was handled by Bank of America and its counsel. Miles, 12/12/22 Tr. 257:8-13; *see also* Miles, 12/12/22 Tr. 255:21-23; Trial Ex. 1350 (Thompson & Knight provided January 15, 2016 UCC search and UCC-1 relating to BTS to Bracewell upon request); Trial Ex. 1351 (the attached UCC search); Trial Ex. 1352 the attached UCC-1).

601. On January 15, 2016, Bank of America filed the UCC-1s in connection with the

assets of Bridger Logistics and its subsidiaries, including BTS.  Trial Exs. 1260, 1351, 1352, 1861; Miles, 12/12/22 Tr. 257:8-21.

602.    Thirty minutes after Bracewell sent the executed grantor accession agreement to Bank of America (Trial Ex. 1247), counsel for Bridger Logistics, Knapp, emailed Akin Gump, Hampton, and Bracewell regarding compliance with the credit facility in connection with the sale of BTS.  Trial Ex. 1269.  Miles testified that he did not have any communication with Knapp prior to receiving this email, and he had no expectation at the time that he would receive Knapp's email. Miles, 12/13/22 Tr. 48:17-21, 49:4-8 (CC).  Prior to January 2016, Miles had not interacted with Knapp or Soiefer, and Miles has never spoken to Rios.  Miles, 12/13/22 Tr. 12:3-20.

603.    The Court finds credible Miles' and Heitmann's testimony regarding the upsizing of the credit facility and the execution of the grantor accession agreement.  In light of the evidence adduced at trial, the Court concludes that the execution of the grantor accession agreement and Bank of America's perfection of its lien did not relate to Eddystone.

## XI.    THE JAMEX FINANCING ARRANGEMENT FOUNDERS.

### A.    Jamex Marketing Funded Its Purchases Of Crude Oil Through An Intermediation Agreement.

604.    An intermediation agreement is a financing structure used in the oil and gas industry to provide credit support for marketing companies that purchase crude.  Jilla, 12/12/22 Tr. 64:16-65:1.  Bridger Marketing (and later Jamex Marketing) required intermediation financing to support the COSA, because the company lacked cash or credit sufficient to fund the purchase of oil under the COSA.  *Id.* at 65:13-66:5; Ballengee, 9/20/22 Tr. 177:24-178:11.

605.    Defendants' energy finance expert Jeffrey Mayer explained that oil marketing companies typically require financing agreements of this kind as a result of their tight margins and limited balance sheets.  Trial Ex. 3010.13-14 (Mayer Decl.) ¶¶ 14 & 19.e ("Today, I do not know

of a single energy marketing company in the U.S. or Canada that does not rely on such an intermediation or asset-based receivable financing solution, with the possible exception of some unregulated marketing affiliates of utility companies with large balance sheets.").

606. Prior to the Acquisition, Bridger Marketing arranged for "open credit" with Bakken producers for up to 25,000 bpd, but not for the entire 65,000 bpd anticipated by the COSA. In this context, "open credit" means that producers provided barrels on credit, yet they were not paid until the 20th day of the following month, which is the customary settlement date in the industry. Ballengee, 9/20/22 Tr. 178:3-11; Trial Ex. 3010, Mayer Declaration ¶ 13.a ("[I]n the crude oil, distillates and natural gas industries sellers typically demand payment by the 20th day of the month following delivery."); Jilla, 12/12/22 Tr. 13:2-10 (same). And because of the industry's settlement date on the 20th day of the month, there is frequent mismatch in the due dates of payments to suppliers and from the end user. *See* Mayer Decl. ¶ 18(a).

607. For the remaining barrels, Bridger Marketing initially relied on Merrill Lynch Commodities, a subsidiary of Bank of America ("BAML") to provide intermediation financing. Jilla, 12/12/22 Tr. 65:13-66:5; Ballengee, 9/20/22 Tr. 176:23-177:2, 180:19-181:17; Trial Ex. 263-C, Trial Ex. 263-D, & Trial Ex. 263-G, BAML Intermediation Agreements.

608. At the point of purchase, BAML would step into the shoes of Bridger/Jamex Marketing and use BAML's balance sheet and "A-rated credit" to buy Bakken crude. *See* Jilla, 12/12/22 Tr. 65:13-66:18; Ballengee, 9/20/22 Tr. 177:3-16. At the point of sale, BAML would sell the oil directly to Monroe and collect the proceeds, minus a $.25 per barrel fee. Jilla, 12/12/22 Tr. 65:13-66:18; Ballengee, 9/20/22 Tr. 177:3-23.

609. Mayer further testified that, because the intermediary providing financing (e.g., BAML) is exposed to the risk of its client not paying for the commodity purchased on its behalf,

the intermediary typically seeks an acknowledgement by any third parties that take possession of the commodity that the intermediary is the beneficial owner and may seize the commodity at any time to satisfy its client's obligations in the event of a default. Trial Ex. 3010 (Mayer Decl.) at 9.

610. Here, BAML had a lien on the oil as it was transported from North Dakota to Monroe. Ballengee 9/20/22 Tr. 179:10-13, 180:8-18. To facilitate the BAML financing agreement, Eddystone executed an agreement on June 18, 2014 to acknowledge BAML's lien rights in the oil in transit and permit BAML to "to take the oil that was in the tank at Eddystone" after making "any unpaid payments to Eddystone before they could get the oil out." *Id.* at 183:2-184:20; Trial Ex. 304-A (Eddystone BAML Acknowledgment); Jilla, 12/12/22 Tr. 68-3-22:2. Eddystone had no concerns with this acknowledgment. Eddystone 30(b)(6) (Boaz), Tr. 226:8-13.

**B.** **Jamex Marketing Approaches Ferrellgas For Intermediation After Jamex Refuses To Pay BAML A Fee To Continue Its Existing Arrangement.**

611. Shortly after the Acquisition, Ballengee contacted Soiefer at Ferrellgas to discuss what he perceived to be liquidity issues experienced by Jamex Marketing. Soiefer, 12/5/22 Tr. 195:16-25; Trial Ex. 900; Hampton, 12/14/22 Tr. 133:22-134:11.

612. Soiefer testified that he was unsure if Jamex Marketing was "really having [liquidity] issues" given its recent significant capitalization, but Soiefer said he tried to be a good partner. Soiefer, 12/5/22 Tr. 197:19-25 ("We were just trying to be good partners and then also act in a way that was prudent for ourselves. We didn't know if he was really having these problems, but we took him seriously and we acted to try to help him[.]").

613. Over the course of the fall of 2015, Ferrellgas considered many options, including providing short-term financing solutions such as intermediation or a credit sleeve to Jamex Marketing. Soiefer, 12/5/22 Tr. 195:21-196:14 ("[W]e explored a number of different options to help Jamex. Like we talked about the intermediation or a credit sleeve."); Gamboa, 12/6/22 Tr.

164:24-165:4 ("[W]e received a bunch of requests for liquidity, credit sleeves, different other ideas. We've evaluated those."); *id.* at 165:5-11 ("[T]he way this was being communicated to me was not something I was used to. It was in fragments and very challenging to understand."). Ultimately, Ferrellgas could not agree to be the financer for the purchase of crude oil due to its capital structure. Soiefer, 12/5/22 Tr. 140:21-141:19; Wambold, 12/9/22 Tr. 58:13-60:24.

614. As it turned out, the Jamex search for financing assistance was spawned by its own, self-induced decision to let its BAML financing arrangement expire. Specifically, at the time of the Acquisition, BAML took the position that there had been a change in control and demanded additional consideration to continue the intermediation agreement with Jamex Marketing. Jilla, 12/12/22 Tr. 121:7-19. After Ballengee made a decision on behalf of Jamex to discontinue and wind down the arrangement to avoid paying additional fees totaling around $15 million, the BAML intermediation agreement ended in November 2015. Ballengee, 9/20/22 Tr. 185:15-189:9 ("Q. Did you make a decision not to continue the intermediation agreement with Merrill Lynch? A. Yes I did. Q. What were your reasons? A. They asked for additional fees of about $15 million in exchange for giving our permissions for changing the change in control provisions."); Trial Ex. 2675 (BAML Wind-Down Agreement); Trial Ex. 950-A (Amendment to BAML Wind-Down Agreement). This wind-down coincided with a narrowing of the Brent/Bakken spread.

## C. Eddystone Tanks The Replacement Carlyle Intermediation Agreement.

615. Jamex's decision to allow the BAML intermediation agreement to expire had a number of consequences that ultimately resulted in Ballengee's decision to acquire BTS in early 2016. Despite Ballengee's falling out with BAML, in mid-2015, Jamex Marketing needed financing to continue to supply crude under the COSA. Ballengee, 9/20/22 Tr. 189:23-190:8. Jamex Marketing arranged for a 60-day stopgap intermediation financing from Macquarie, but it needed long-term intermediation financing to continue supplying oil to Monroe, and it spoke with

a number of potential financiers before entering into a term sheet with Carlyle.  Ballengee, 9/20/22 Tr. 189:23-190:22; Jilla, 12/12/22 Tr. 70:13-23, 76:6-10, 84:13-23.

616.    Specifically, Jamex Marketing explored obtaining a new intermediation financing arrangement from two providers, including a subsidiary of the Carlyle Group; at the same time, Jamex Marketing pursued traditional working capital financing (e.g., financing secured by receivables or inventory) from a number of financial institutions.  Jilla, 12/12/22 Tr. 170:1-171:9.

617.    In the latter half of 2015, Jamex negotiated to enter into an intermediation finance agreement with Carlyle Commodity Management, LLC ("CCM"), a subsidiary of the Carlyle Group (together with CCM, "Carlyle").  Ballengee, 9/20/22 Tr. 190:20-22.

618.    For reasons explained below, Defendants contend that Eddystone torpedoed Jamex's new intermediation financing agreement with Carlyle by declining to execute an acknowledgment like the one Eddystone had provided for BAML citing a lack of privity with Jamex, which caused Ballengee to purchase BTS in an effort to establish privity to facilitate negotiations with Eddystone.  Eddystone does not dispute that Eddystone refused to consent to the intermediation agreement; instead, Eddystone elicited testimony from a Carlyle witness (David Johnson) that the Carlyle agreement was doomed for reasons other than Eddystone's refusal.  For the reasons that follow, the Court finds that the evidence better supports Defendants' view.

619.    Prior to a September 2015 meeting, during which Carlyle's investment committee reviewed the transaction with Jamex Marketing, the investment team working on the transaction circulated a memorandum outlining a proposed intermediation agreement with Jamex Marketing (the "IC Memorandum").  D. Johnson, Tr. 2/15/23 12:14-13:3, 14:10-13; Trial Exs. 2580, 2582.

620.    The proposed intermediation agreement with Jamex involved Carlyle "intermediating crude purchases with credit support and capital, taking title to oil as it is

transported to the refinery, hedging the oil, and taking assignment of the receivables from Monroe." Trial Ex. 2582.2 (IC Memorandum).

621. The proposed intermediation agreement contained a number of terms that were favorable to Carlyle.

622. First, Carlyle did not propose to intermediate (i.e., finance) all of the 65,000 bpd that Jamex planned to purchase in North Dakota for sale to Monroe. Instead, Carlyle was to intermediate only around 40,000 of the 65,000 bpd, while Jamex Marketing would procure the remaining 25,000 bpd on open credit without credit support from Carlyle. Trial Ex. 2582.3-4; D. Johnson, 2/15/23 Tr. 26:17-22; *see* Jilla, 12/12/22 Tr. 154:17-155:18 ("Delta was buying and Jamex was selling about 65,000 barrels a day, which is about 2 million barrels a month. And the intermediation, we would only be purchasing barrels that we didn't have open line credit on, so where we were required to post. And I believe we had somewhere between 15 -- at least 15 or as high as like 25,000 barrels a day that we worked on open lines.").

623. Second, Carlyle's monthly outlay to intermediate 40,000 bpd was expected to be approximately $80 million. Trial Ex. 2582.2-3; D. Johnson, 2/15/23 Tr. 59:8-21. To create a "cushion" (i.e., adequate security to ensure repayment of Carlyle's capital outlay for around 60 percent of the barrels purchased in North Dakota), Jamex's "right, title and interest to *all receivables* from Monroe" would be assigned to Carlyle, even though Carlyle would not finance the purchase of 100% of the barrels sold to Monroe. Trial Ex. 2593.3 (Term Sheet (emphasis added)). In other words, Jamex Marketing's assignment of receivables in favor of Carlyle was for the entire 65,000 bpd, including receivables from the 25,000 bpd of open credit barrels that Carlyle would not intermediate. D. Johnson, 2/15/23 Tr. 77:25-78:25; Jilla, 12/12/22 Tr. 154:17-155:18. The value of the receivables was expected to be in the range of $100-150 million per month, which

greatly exceeds the $80 million monthly outlay. Trial Ex. 2582.1-2; D. Johnson, 2/15/23 Tr. 80:17-81:20; *see also* Jilla, 12/12/22 Tr. 154:12-155:18 ("When you asked me how the intermediation would have worked, Carlyle would be buying [40,000 bpd] and reselling [65,000 bpd]. So they would collect monies so their credit risk would be nonexistent.").

624.    Third, other terms of the proposed intermediation agreement worked to protect Carlyle: (1) to ensure Carlyle was paid first, receivables from Monroe would be "deposited directly into a bank account designated and controlled by CCM," and Carlyle would deduct the amounts it paid to finance barrels, plus its fees, before distributing the balance of the receivables to Jamex, Trial Ex. 2593.4; D. Johnson, 2/15/23 Tr. 97:9-14; (2) to protect against risk of default by Monroe, Monroe's payment of receivables was backed by a parent guaranty from Delta Airlines, which would be assigned to Carlyle, Trial Ex. 2593.3-4; (3) to protect against both a Monroe default and a failure by Delta to honor its guaranty, in the event of an inability to collect the receivables from Monroe or Delta Airlines, Jamex Marketing would be responsible for paying 10 percent of the receivables, and the other 90 percent would be insured by a third party, *id.* at 2593.4; and (4) if Jamex Marketing were to default on its agreement with Carlyle, Bridger Logistics would still be obligated to transport to Monroe any crude that had already been financed by Carlyle, as Bridger Logistics was being "paid directly by Monroe for their services," Trial Ex. 2582.7.

625.    On October 7, 2015, Jamex and Carlyle executed a term sheet. Trial Ex. 2593; D. Johnson, 2/15/23 Tr. 94:11-22. The term sheet reflects the same economics described in the IC Memorandum. For example, the term sheet states that "[t]he parties expect that payment for purchases from CCM will be made through the assignment of receivables" from Monroe, with Jamex to "assign its right, title, and interest to all receivables from Monroe Energy" to Carlyle. Trial Ex. 2593.3; D. Johnson, 2/15/23 Tr. 100:24-102:3.

626. By November 2015, Jilla had been informed that Carlyle had completed due diligence, and the transaction had already been approved by Carlyle investment committee. Jilla, 12/12/22 Tr. 149:20-150:15.

627. David Johnson's contrary testimony is not credible. Although he was offered as a witness to explain the reasons why Carlyle would not agree to the intermediation arrangement, Johnson demonstrated a clear lack of understanding regarding the economics of the proposed agreement. *See, e.g.*, D. Johnson, 2/15/23 Tr. 64:11-19, 67:12-15 (not aware of when settlements occur in the crude industry); *id.* at 64:20-25, 65:17-19, 76:14-23 (not aware of details regarding open credit barrels and acknowledging that he did not account for those details in preparing his trial declaration); *id.* at 51:2-52:16, 86:13-16, 105:7-12 (first identifying lack of sufficient cushion as the reason Carlyle would not consider the financing arrangement, then later agreeing the terms provided a cushion). Contemporaneous emails from members of Carlyle's investment team do not raise any of the concerns Johnson identified at trial, and Johnson agreed that he had limited visibility into Carlyle's negotiations with Jamex Marketing. Trial Ex. 979; *e.g.*, D. Johnson, 2/15/23 Tr. 53:4-16, 67:5-11 ("[T]hose conversations are actions that would have been at the investment team level, not at the investment committee level."), 93:19-94:5 ("[A]s the investment committee . . . you're not involved in the day-to-day.")

628. Moreover, after testifying that he had no interest in this litigation, Johnson admitted that he and his company tried to acquire Ferrellgas in 2019 when the company was in financial distress and while this litigation was pending. D. Johnson, 2/15/23 Tr. 31:1-14.

629. Just as the BAML intermediation agreement provided BAML with a lien on the oil, Carlyle would have had a property interest in the oil as it was being transported from North Dakota to Monroe. Trial Ex. 2593.2; Ballengee, 9/20/22 Tr. 179:10-13, 180:8-18; Trial Ex. 2582.7; D.

Johnson, 2/15/23 Tr. 54:19-55:11.

630.    To satisfy that requirement, Jamex Marketing once again needed an acknowledgment from Eddystone (and all other terminals in the logistics chain) of Carlyle's security interests in the oil, in the form of a "tripartite agreement." Ballengee, 9/20/22 Tr. 190:23-191:10; Jilla, 2/12/22 Tr. 78:3-17. Eddystone refused, however, effectively putting an end to the Carlyle transaction. Ballengee, 9/20/22 Tr. 191:11-22; Jilla, 2/12/22 Tr. 78:18-20; Trial Ex. 1065.

631.    In particular, on November 23, 2015, Bryan Boaz of Eddystone declined an invitation from Bridger Logistics to review a draft tripartite agreement designed to acknowledge Carlyle's title to crude in transit as part of an intermediation finance agreement with Jamex:

> We at Enbridge/ Eddystone Rail Company (ERC) reviewed the agreements per your request. Our agreements are with Bridger Transfer Services, LLC only. Enbridge and ERC does not have current working relationships with the other counterparties listed in the agreements. We decline to execute these agreements in any form as there is too many liabilities that would exist per the agreement and the lien rights.

Trial Ex. 1065; Eddystone 30(b)(6) (Boaz), Dep. Tr. 231:23-232:18, 233:12-234:20; Knapp, Dep. Tr. 325:14-20; *see also* Mayer, 2/13/23 Tr. at 203:21-24.

632.    In contrast, other terminals owned by Dakota Plains and Plains All American provided comments on the draft tripartite agreement to address matters of individual interest to them. Jilla, 2/12/22 Tr. 81:15-84-6; Trial Ex. 1096 & 1096-B (Dakota Plains); Trial Ex. 1086 & 1086-B (Plains All American).

633.    As a result of the first reason given in Boaz's email, Ballengee believed that Eddystone refused to negotiate a tripartite agreement because Jamex Marketing and Carlyle had no privity or direct relationship with Eddystone. Ballengee, 9/20/22 Tr. 191:23-192:24. As explained further below, Ballengee later proposed to acquire BTS to establish privity.

634.    Erik Johnson, who represented Canopy as a member of the Eddystone Management

Committee, stated that it felt like a "kick in the gut" when he learned of Eddystone's refusal to negotiate the tripartite agreement, long after the fact.  E. Johnson, 12/13/22 Tr. at 98:4-22.

635.    Overall, the Court finds that Eddystone's refusal to negotiate, or even discuss, the draft tripartite agreement derailed the negotiations between Jamex and Carlyle and played a material role in Ballengee's decision to acquire BTS, as further explained below.

**D.    Bridger Logistics And Ferrellgas Attempt To Accommodate Jamex Where Possible.**

636.    In November 2015, while Jamex was still working with Carlyle on an intermediation agreement, Ferrellgas bought back 2,385,724 Ferrellgas Partner units from Jamex Marketing for approximately $45 million in cash, in an effort to assist with reported liquidity issues.  Trial Exs. 1037, 1039, 1046; Ballengee, 9/20/22 Tr. 199:22-201:24; Rios, 9/23/22 Tr. 145:19-146:2; Gamboa, 12/6/22 Tr. 162:2-9; Jilla, 12/12/22 Tr. 63:6-12; Wambold, 12/9/22 Tr. 61:8-24; Hampton, 12/14/22 Tr. 134:15-25; Heitmann, 2/14/23 Tr. 246:24-247:2 (CC).   The Ferrellgas Board approved the transaction.  Wambold, 12/9/22 Tr. 62:13-15.

637.    Ferrellgas and Bridger Logistics believed this influx of $45 million in cash to Jamex Marketing would solve any liquidity issues.   Wambold, 12/9/22 Tr. 61:19-24 ("James was complaining about liquidity issues and, obviously, this was going to be something that would be helpful to him, and I think, you know, my position at this time was if it's helpful to him, keeps the trains rolling, keeps Delta happy, then we're going to do it."); Gamboa, 12/6/22 Tr. 164:22-165:11 ("Then we gave $46 million of liquidity which we thought would clear up the liquidity issue.").

**XII.    MONROE/JAMEX/BRIDGER LOGISTICS CONFRONT WORSENING ECONOMIC CONDITIONS.**

**A.    Monroe And Jamex Sought A Solution For Their Respective Financial Challenges.**

638.    On a parallel track, beginning in August 2015, Jamex Marketing initiated efforts to renegotiate the COSA with Monroe to curb its losses while continuing to deliver crude.  Monroe

30(b)(6) (Hunter), Dep. Tr. 120:25-121:4, 136:20-137:20; Ballengee, 9/20/22 Tr. 195:14-19. Jamex Marketing's chief aim was to change the COSA's pricing structure to be based entirely on the cost-plus formula, which would reduce its exposure to market variability. Ballengee, 9/20/22 Tr. 89:21-90:4.

639.    In connection with these negotiations, Ballengee reported to Monroe that Jamex Marketing had only $150 million to support the COSA and was losing approximately $10 million a month due to then-existing market conditions. Monroe 30(b)(6) (Hunter), Dep. Tr. 119:20-120:22, 122:6-15. Monroe considered auditing the cost-plus aspect of the COSA but it nevertheless entertained Ballengee's proposal. Monroe 30(b)(6) (Hunter), Dep. Tr. 121:5-17, 121:21-122:5.

640.    On August 31, 2015, Monroe drafted a term sheet of potential amendments to the COSA, which included changing the pricing structure to be based entirely on a cost-plus formula, with Jamex Marketing receiving an $8 million dollar annual fee for serving as Monroe's procurement agent. Trial Exs. 906, 906-B; Ballengee, 9/20/22 Tr. 90:5-92:1. The term sheet also called for a "negotiated cash sum payment" from Jamex Marketing to Monroe as compensation for the value of the existing COSA. Trial Ex. 906-B; Ballengee, 9/20/22 Tr. 92:2-21; Monroe 30(b)(6) (Hunter), Dep. Tr. 126:13–127:9. Ballengee was willing to make a cash payment to renegotiate the COSA. Ballengee, 9/20/22 Tr. 92:12-17.

641.    Negotiations proceeded in fits and starts throughout fall 2015. On October 5, 2015, Jamex provided a revised term sheet to Monroe. Trial Exs. 982, 982-A, 982-B; Ballengee, 9/20/22 Tr. 93:3-21. The term sheet included the same 100 percent cost-based pricing and $8 million fee, as well as a $75 million upfront payment from Jamex Marketing to Monroe. Trial Ex. 982-B; Ballengee, 9/20/22 Tr. 93:22-95:1.

642.    Monroe responded by phone to Jamex's offer on November 19, 2015, proposing an

upfront payment of $275 million.  Trial Ex. 1056.2; Ballengee, 9/20/22 Tr. 95:2-96:11.

643.  To put it mildly, Ballengee was "frustrated" with Monroe's offer.  Ballengee, 9/20/22 Tr. 96:15-20.  He responded to Jilla's email as follows: "Let's just kill all the talks and get the attorneys involved," followed by multiple expletives.  Trial Ex. 1056.1; Ballengee, 9/20/22 Tr. 96:21-97:13.  Ballengee explained at trial that he was frustrated and did not have $275 million at that point in time.  Ballengee, 9/20/22 Tr. 97:14-98:2.

644.  Despite Ballengee's email, the negotiations with Monroe continued and Ballengee never got "the attorneys involved."  Ballengee, 9/20/22 Tr. 196:22-197:5.  Ballengee testified that his email statement was not related to communications with Eddystone.  *Id.* at 197:9-12.  He also testified that Bridger Logistics was not involved in these discussions.  *Id.* at 197:13-15.

645.  Ultimately, Jamex and Monroe did not successfully renegotiate the COSA to proceed on a cost-plus basis because they could not settle on a fee that Jamex was willing to pay.  Ballengee, 9/20/22 Tr. 99:6-13, 197:6-8; Monroe 30(b)(6) (Hunter), Dep. Tr. 144:13-15.

646.  On November 25, 2015—about a week after renegotiation talks with Monroe fell through and just two weeks after Ferrellgas provided Jamex Marketing with $45 million in cash for certain shares—Ballengee presented Bridger Logistics with an offer to take over the COSA from Jamex.  Trial Ex. 1073; Ballengee, 9/20/22 Tr. 202:12–203:19; Soiefer, 12/6/22 Tr. 163:4-10.  Ballengee sought to keep $75 million in exchange for assigning the COSA, citing the need to "keep funds aside for taxes from the [Acquisition]."  Trial Ex. 1073.1-2; *see also* Ballengee, 9/20/22 Tr. 203:7-17.  Soiefer was "surprised" to receive the proposal after the recent Ferrellgas share repurchase, and nothing came of the proposal.  Soiefer, 12/6/22 Tr. 163:11-24, 164:15-17.

647.  In early December 2015, Ballengee had a meeting with Monroe to discuss ways to restructure the COSA.  Ballengee, 9/20/22 Tr. 203:20-25.  On December 2, 2015, Ballengee

contacted Soiefer to discuss a Jamex proposal to Monroe to substitute West African crude for Bakken under the COSA. Trial Ex. 1085.2. After Soiefer added Rios and Gamboa to the email chain, Rios responded by stating that it was important to have Monroe as a counterparty, and he raised concerns with the Jamex proposal. *Id.* at 1085.1; Ballengee, 9/20/22 Tr. 206:10-207:3.

**B.      Meanwhile, Rios Continued His Pursuit Of Concessions From Eddystone.**

648.     In December 2015, a number of events occurred in close proximity: (1) Congress lifted a ban on U.S. crude exports, causing an increase in the price of domestic crude; (2) the value of the Ferrellgas units that capitalized Jamex Marketing declined; (3) Jamex Marketing continued to report issues with liquidity; and (4) Jamex Marketing no longer had an intermediation finance agreement in place. Rios, 9/23/22 Tr. 140:25-142:6.

649.     Because these developments threatened the viability of the Amended COSA between Jamex and Monroe, Rios surfaced various ideas related to the RSA, as well as Ballengee's complaints about the Eddystone Facility and pressure by Ballengee to resolve the operational issues as well. Rios, 9/23/22 Tr. 151:21-152:16; *see also* Rios, 9/22/22 Tr. 64:1-13; Hampton, 12/14/22 Tr. 131:9-18, 142:22-143:7. Rios testified that his initial objective was "to bring a resolution to the deficiencies." Rios, 9/23/22 Tr. 150:2-25; *see also* Rios, 9/22/23 Tr. 68:25-69:5 ("Right now I'm gathering information, not on one linear line of what I'm going to do.").

650.     On December 3, 2015, Hampton forwarded Soiefer an email from Knapp regarding an amendment to the RSA. Trial Ex. 1093.1-2; Soiefer, 12/5/22 Tr. 209:4-210:1. Soiefer responded: "Not sure we should go down this path. We may seek to terminate the deal instead." Trial Ex. 1093.1. At trial, Soiefer explained that he was at the time exploring whether there was a termination provision in the RSA that would allow BTS to exit the deal. Soiefer, 12/5/22 Tr. 210:8-13. Ultimately, BTS did not seek to terminate the RSA because it was a critical component of the Monroe revenue stream. Hampton, 12/14/22 Tr. 144:9-13.

651.     On December 8, 2015, Gamboa predicted that "if we do nothing," Jamex could be bankrupt in 12 to 18 months.  Gamboa, 12/6/22 Tr. 296:19-24; Trial Ex. 1099.2.  If Jamex went bankrupt, Bridger Logistics' EBITDA associated with the arrangement to supply Monroe would go to zero.  Gamboa, 12/6/22 Tr. 296:25-297:3; Trial Ex. 1099.2.  Gamboa predicted that, if Jamex went bankrupt, Bridger would have a $70 million EBITDA hole, which was an estimate of the annual EBITDA generated by Bridger Logistics' transportation agreements related to Monroe.  Gamboa, 12/6/22 Tr. 297:6-15.  Earlier on the same day, Gamboa stated that he did not have any ideas to fill the EBITDA gap "if we do nothing."  Gamboa, 12/6/22 Tr. 297:16-23; Trial Ex. 1099.3.  By "we," Gamboa meant Bridger Logistics, Jamex, and Monroe.  Gamboa, 12/7/22 Tr. 139:20-25.

652.     As explained below, Bridger Logistics, Monroe, and Jamex did not "do nothing"— they took action by suspending the Amended COSA for three months.  Gamboa, 12/7/22 Tr. 142:2-7.  At the time the suspension agreements were entered, Gamboa believed that Jamex would be able to avoid bankruptcy because it was sufficiently capitalized.  *Id.* at 142:8-11.

653.     No one at Jamex had suggested bankruptcy to Gamboa prior to his December 8, 2015 emails.  Gamboa, 12/7/22 Tr. 140:18-20.  Gamboa did not think that Jamex would actually go bankrupt in 12 to 18 months; he merely pointed out that it was a possibility under the circumstances, depending on spreads and FGP unit values.  *Id.* at 140:1-14; Trial Ex. 1099.2.  The spreads ultimately improved.  Gamboa, 12/7/22 Tr. 140:15-17.

654.     In the same December 8, 2015 email chain, Gamboa stated that "[w]e also have an opportunity to get some back from ERC once we threaten" to stop shipping.  Trial Ex. 1099.4.  He testified that he was not proposing to stop paying Eddystone, but instead stating that he expected Eddystone to be motivated to negotiate if it was receiving a $1.75/barrel deficiency charge instead

of the $2.25/barrel transloading fee because the difference accounted for most of Eddystone's margin. Gamboa, 12/7/22 Tr. 137:12-25.

655. On December 10, 2015, Jilla (now CFO at Jamex) reported to Soiefer that Jamex Marketing was facing a margin call on its Morgan Stanley margin loan on Ferrellgas units based on the unit price drop. Trial Ex. 1104.2-3. Soiefer responded that a loan from Ferrellgas "seems like a long putt, but he asked whether Jamex Marketing was interested in selling a small number of units up to $50 million in value. Trial Ex. 1104.2. Soiefer testified that Ferrellgas was unable to offer Jamex a margin loan due to its debt covenants. Soiefer, 12/5/22 Tr. 210:14-212:11

656. On December 11, 2015, Ballengee emailed Soiefer regarding a meeting he had with Monroe. Trial Ex. 1110.2. He wrote that Monroe "wanted half the quality differential" between West African crude and Bakken as part of the proposal, then commented: "need you guys around that 9.3 million number or tell Eddystone to pound sand." *Id.* Ballengee testified that he was referencing a reduced monthly payment from Jamex Marketing to Bridger Logistics under the Marketing TLA. Ballengee, 9/20/22 Tr. 204:19-205:2. Soiefer responded that he needed to "run the numbers but open to working with you on a solution that works for everyone." Trial Ex. 1110.1. Ballengee testified that, at this point, all parties needed to make concessions to keep the Amended COSA and the RSA alive, and every party agreed to make some concessions—except Eddystone. Ballengee, 9/20/22 Tr. 205:8-16.

657. Although Eddystone suggested that Soiefer acted in his capacity as a Ferrellgas executive, Soiefer rebuffed that assertion at trial, testifying that he was the CFO of Bridger Logistics at the time, and that Jamex's contract was with Bridger Logistics, not Ferrellgas. Soiefer, 12/5/22 Tr. 216:19-221:10.

658. Soiefer testified that he recalled Gamboa had discussions with Eddystone around

this time, but he was unable to obtain any concessions from Eddystone.  Soiefer, 12/15/22 Tr. 214:22-215:13.  He also testified that it had become apparent that Eddystone was "not operating at the current market rate" because "[t]he market had shifted."  *Id.* at 215:17-24.

659.    Ballengee testified that, after he spoke with Bridger Logistics in early December, he continued to negotiate with Monroe on his own.  Ballengee, 9/20/22 Tr. 207:17-19.   On December 15, 2015, Ballengee sent a proposed term sheet to Monroe related to substituting West African crude; that proposal was subject to the caveat that Jamex would need approval from Bridger Logistics.   Trial Ex. 1119; Ballengee, 9/20/22 Tr. 207:20-23.   No one from Bridger Logistics or Ferrellgas was copied on the exchange.  *Id.*

660.    On December 15, 2015, Rios emailed Hampton asking his thoughts around BTS "defaulting under the Eddystone contract."  *See* Trial Ex. 1118.2; Hampton, 12/14/22 Tr. 145:21-146:5.  Hampton responded that default "may be a viable option."  Trial Ex. 1118.1; Hampton, 12/14/22 Tr. 146:6-11.  Hampton testified that he meant "we should review our agreement with Monroe on whether it required the Eddystone Facility to be used, and just generally agreeing that we need to look at all of our options to address these issues."  Hampton, 12/14/22 Tr. 146:12-22.

661.    That same day, Rios emailed Soiefer, Hampton, and Gamboa saying, "[r]emember that the Eddystone Facility is deficient in several aspects and a payment default by us is not without cause."  Trial Ex. 1122; Rios, 9/22/22 Tr. 64:1-13.  Rios testified that the parties had tried to negotiate an amendment to the RSA in an attempt to address the facility defects.  Rios, 9/22/22 Tr. 64:15-19.  Rios felt that "the concessions that Eddystone was making were not fulsome."  *Id.* at 64:24-65:2. Hampton responded to Rios, referencing the fact that an amendment to the Eddystone agreement might foreclose concern about some of the facility defects.  Hampton, 12/14/22 Tr. 150:22-151:4; *see also id.* at 151:5-17 ("The goal was to find some way to operationally and

finically deliver the Monroe product and maintain that revenue stream."); Trial Ex. 1122.

662. In the same emails, Rios asked: "Does our agreement with Delta reference the use of Eddystone? In other words is Eddystone required?" Trial Ex. 1122.3. He also instructed Gamboa to "please advise of other rail offloading options," stated that it was "over one year since we gave them notice [of the deficiencies] with no resolution," and opined that it was "[t]ime to go nuclear as long as we have another option to offload elsewhere." *Id.* Rios testified that he asked about "other rail offloading options" because "[t]he price for all rail offloading options had significantly declined, and there was some open space on the coast." *Id.*; Rios, 9/22/22 Tr. 67:18-68:15. He explained, "if we could find somewhere else to offload on the Delaware river that is $0.50 or less, we are no worse off, because we still have to pay Eddystone our $1.75. We pay 50 cents and it's going to cause them a severe amount of pain at Eddystone." *Id.* When asked about all of his "follow ups" in this email thread, Rios explained he was "putting together a strategy of what we are going to do," by "gathering information" and assessing "options." *Id.* at 68:16-69:11. Hampton testified that he understood Rios' "go nuclear" email to  mean that he was growing impatient with Eddystone and the facility defects. Hampton, 12/14/22 Tr. 152:7-153:2.

663. On December 16, Rios emailed Hampton, Soiefer, and Gamboa, saying, "I am looking to stop paying in February, but we need an analysis of this ASAP." Trial Ex. 1127.1. In the same email, Rios mentioned engaging restructuring counsel. *Id.* Hampton testified that, in response, he reached out to the "treasury team, [Al Heitmann], and Jack Herrold about the assets in BTS and whether there were liens on those assets," and he "agreed with [Rios] that we could hire outside counsel to help us with this." Hampton, 12/14/22 Tr. 154:4-10; Trial Ex. 1127.

664. Hampton later retained Akin Gump to advise on the viability of various options with respect to BTS. Trial Ex. 1135; Hampton, 12/14/22 Tr. 157:14-23, 159:2-14; Rios, 9/22/23

Tr. 72:20-73:1 ("The plan at this point was to get advice. We were still gathering options."). Hampton testified that he asked Rios about his preference for outside counsel because "he had worked with outside attorneys, and after our discussion on the insurance, I wanted to make sure I deferred to his preference." Hampton, 12/14/22 Tr. 158:23-159:1.

665.    Also on December 16, 

Trial Ex. 1131.2 (QPO).

Hampton, 12/14/22 Tr. 156:18-23 (CC).

. *Id.* at 156:24-157:2 (CC); *see also* Trial Ex. 1131 (QPO).

666.    Hampton and Rios both testified that a default under the RSA was ruled out as an option. Hampton, 12/14/22 Tr. 144:9-13, 148:5-11; Rios, 9/23/22 Tr. 152:13-19.

667.    Rios also considered putting BTS into bankruptcy to "have a bankruptcy judge in there to make [Eddystone] come to a reasonable resolution on the deficiencies that we had not been able to fix." Rios, 9/23/22 Tr. 150:6-151:10, Soiefer, 12/5/22 Tr. 229:22-25. Soiefer reacted negatively to the idea. Soiefer, 12/5/22 Tr. 230:1-5 ("I remember we looked at it, and I remember that it was not a good option.").

668.    On December 18, Robin Miles emailed Heitmann and outlined the repercussions of a hypothetical bankruptcy by a subsidiary. Trial Ex. 1156; Miles, 12/12/22 Tr. 222:21-223:4., 224:11-17. Miles explained that "[a]ny subsidiary bankruptcy would cause an immediate event of default and acceleration of the Credit Agreement and Receivables Purchase Agreement," as well as "an event of default under all of the Indentures." Trial Ex. 1156. He also added that "there's

often a domino effect on other material agreements." *Id; see also* Miles, 12/12/22 Tr. 223:15-21 ("My gut reaction, sounds like a really bad idea . . . because a bankruptcy subsidiary can have lots of negative effects on credit facilities as well as other material contracts.").

669. Miles testified that, at the time, he was unaware of any particular subsidiary that was at issue. Miles, 12/12/22 Tr. 223:5-7. Heitmann testified that any subsidiary bankruptcy would cause "an immediate event of default" as well as cross-defaults with other agreements. Heitmann, 2/14/23 Tr. 223:9-21. If that happened, all of Ferrellgas' outstanding debt— approximately $2 billion—would become due. *Id.* at 223:22-224:2.

670. Heitmann forwarded Miles' analysis to Jack Herrold, saying "You're missing all the fun. Julio and Todd want to INTENTIONALLY drive Bridger Transfer Services into Bankruptcy." Trial Ex. 1156. Herrold responded: "Ac Ferrell is rolling over in his grave. Wtf have we gotten ourselves into." *Id.* Heitmann took Herrold's response to indicate "there is no way we are going to allow any subsidiary to file for bankruptcy because it would – it would be the end game; since all debt would become due and payable." Heitmann, 2/14/23 Tr. 224:14-19.

671. Around this time, Rios learned that placing a subsidiary in bankruptcy was not an option. Rios, 9/23/22 Tr. 151:11-15 ("I was told that they could not put a Ferrellgas subsidiary in bankruptcy because it would result in the breach of our loan covenants, and therefore a default under our credit facility."); *see also* Hampton, 12/14/22 Tr. 211:25-212:5 ("We also had agreements with our creditors that I think would have – we might have violated some covenants with our creditors to have [put BTS into bankruptcy.]").

C. **Jamex Proposes Suspending Shipments And Buying BTS To Establish Privity.**

672. On December 18, 2015, Ballengee proposed to Monroe that they suspend deliveries under the COSA to allow Jamex to limit its losses and collect some fees from Monroe without having to deliver crude oil. Ballengee, 9/20/22 Tr. 208:3-14; Trial Exs. 1147, 1147-A. Ballengee

did not believe that the suspension would be permanent.  Ballengee, 9/20/22 Tr. 208:15-17.

673.    At the time Ballengee sent Jamex's proposed term sheet to Monroe (Trial Ex. 1147-A), Bridger Logistics had not agreed to the proposal.  Ballengee, 9/20/22 Tr. 209:1-7.

674.    On December 19, 2015, Ballengee and Rios met for lunch and discussed the proposed term sheet.  Ballengee, 9/20/22 Tr. 209:8-22.  Soiefer did not attend the lunch.  Soiefer, 12/6/22 Tr. 197:16-198:13.  At that lunch, Ballengee proposed to Rios that Jamex could buy BTS.  Ballengee, 9/20/22 Tr. 209:11-22; Rios, 9/23/22 Tr. 152:23-153:17.  Ballengee testified that it was his idea to purchase BTS.  *Id.*

675.    Ballengee testified that he proposed purchasing BTS because, "if [Jamex] owned BTS, we would be able to get the intermediation agreement.  If we were now the customer, we could get Eddystone to sign the collateral agreement for intermediation."  Ballengee, 9/20/22 Tr. 218:21-219:12; *see also id.* at 260:18–22 (confirming that one reason for the purchase of BTS was "to have an entity that [Ballengee] controlled being privity with Eddystone"); Rios, 9/23/22 Tr. 168:9-169:4.  Ballengee testified that he was also motivated to purchase BTS because he "had the obligation" to BTS so he "had the most motivation to try to get Eddystone to the table and try to get a better deal, because at the end of the day, Marketing was paying the bill."  Ballengee, 9/20/22 Tr. 218:21-219:21.  The Jamex witnesses (Ballengee and Jilla) testified that owning BTS would both establish the privity Jamex needed with Eddystone for purposes of the intermediation agreement and would increase Jamex's ability to address the operational defects at the Eddystone Facility.  Ballengee, 9/20/22 Tr. 260:12-261:1; Jilla, 12/12/22 Tr. 84:12-85:17.

676.    From Gamboa's perspective, Ballengee could address the facility issues in ways that Bridger Logistics could not, and Ballengee had more flexibility in negotiations. Gamboa, 12/7/22 Tr. 142:25-143:11, 143:22-144:2.

677.     When asked what value BTS had to Jamex, Ballengee explained: "[I]f I could negotiate a better deal and get through there, and then I could also ship other barrels to there other than to Delta if they ever got the expansion done.  That gave me the flexibility – I would not have to go through Bridger to use that asset."  Ballengee, 9/20/22 Tr. 219:17-25.

### D.     Monroe, Jamex, And Bridger Logistics Agree To Suspend Shipments.

678.     On Saturday, December 19, 2015—the same day as Ballengee's lunch with Rios— Ballengee emailed Rios and proposed an initial arrangement whereby Jamex would pay Bridger Logistics $11 million during the suspension, which would drop to $10 million once the Van Hook agreement ended.  Trial Ex. 1158.2.  Ballengee's proposal required that Bridger Logistics provide Jamex with "full use of the railcars, van hook [sic] and Bridger [Logistics] personnel to manage our logistics."  *Id.*  Ballengee reported that he needed to "give Monroe a firm answer Tuesday at the latest."  *Id.*

679.     Hunter of Monroe testified that Bridger Logistics was not involved in the negotiations to suspend deliveries of crude oil.  Monroe 30(b)(6) (Hunter), Dep. Tr. 152:14-24.

680.     Akin Gump was involved in advising on the viability of the sale of BTS to Jamex Marketing.  Soiefer, 12/5/22 Tr. 156:12-14; *see also* Rios, 9/23/22 Tr. 159:3-18.  Hampton's involvement included providing information on behalf of his internal client, Bridger Logistics (parent company of BTS).  Hampton, 12/12/22 Tr. 127:18-22.  On approximately December 21, 2015, Rios attended a conference call with Soiefer and Hampton, as well as John Goodgame and Chuck Gibbs from Akin Gump.  Rios, 9/22/22 Tr. 81:11-82:9, 83:16-20; Trial Ex. 1871-B.  Chuck Gibbs was a bankruptcy attorney at Akin Gump.  Rios, 9/22/22 Tr. 83:22-24.

681.     Rios took notes, which he testified were "scratch" that he wrote down from the call. Rios, 9/23/22 Tr. 156:16-22.  Rios' notes include a note referencing "SR," "BTS," and "Other." Trial Ex. 1871-B.2.  Rios testified these notes referred to transferring the assets of BTS, such as

Swan Ranch and pipeline injection terminals, to other Bridger Logistics subsidiaries. Trial Ex. 1871-B.2; Rios, 9/22/22 Tr. 83:25-84:16. Rios' notes also stated "Arms Length transaction," which Rios testified "means that any transaction of any assets needs to be arms length for fair value consideration, for it not to be a fraudulent conveyance." Trial Ex. 1871-B.1; Rios 9/22/22 Tr. 84:17-85:1. Rios explained that, after this call with Akin Gump, he did not believe that transferring assets subject to a lien could amount to a fraudulent transfer and that he understood, and discussed during the call, that all of the assets of BTS were subject to a lien as of December 2015. Rios, 9/23/22 Tr. 158:8-14, 159:7-9. He also testified that, after the meeting with attorneys from Akin Gump he did not believe that Bridger Logistics was about to engage in fraudulent transfers. *Id.* at 158:24-159:2.

682. Rios testified that he "certainly [did] not" believe that Akin Gump would have let Bridger Logistics participate in a transaction if it was an intentional fraudulent transfer. Rios, 9/23/22 Tr. 159:3-6. He testified that he did not have further conversations with Akin Gump and that no one at Akin Gump ever told him that the proposed transaction was a fraudulent transfer. *Id.* at 159:10-16 ("Q: Am I correct that Akin Gump never told you that it believed a proposed transaction was a fraudulent transfer? A: You are correct, they never said that."). Other witnesses also testified that no one at Akin Gump told them that the proposed transaction would be a fraudulent transfer. *See* Soiefer, 12/6/22 Tr. 205:4-10 (CC); Hampton, 12/14/22 Tr. 167:14-16, 209:4-8 (Q: Are you aware of any legal advice that you received not to proceed with the sale of BTS to Jamex? A: We did not receive advice not to proceed.").

683. Rios's notes further state "Not w/o Risk" with the phrase "BTS B.R." immediately below. Trial Ex. 1871-B. Rios testified that the phrase "Not w/o Risk" did not refer to the transfer of BTS assets, but instead meant "that bankruptcies are not without risk. File bankruptcy, and you

lose control." Rios, 9/22/22 Tr. 85:5-22. He further explained that the Akin attorneys explained that "[f]iling bankruptcy is not without risk. But you can still get used later on no matter if you do it right." *Id.* at 86:5-10. When pressed regarding another notation to "§ 548," Rios again explained that "this was Chuck Gibbs giving essentially a bankruptcy treatise." *Id.* at 108:2-10. Indeed, the phrase "BTS B.R." appears below the phrase "Not w/o Risk," and refers to the potential for BTS to file bankruptcy. Trial Ex. 1871-B.1; Rios, 9/23/22 Tr. 156:23-157:4.

684. On January 5, 2016, Jilla emailed Soiefer and reported that Jamex Marketing was finalizing "the current structure with Monroe and Bridger Logistics under which no barrels will be delivered to Monroe under the COSA." Trial Ex. 1182; Soiefer, 12/6/22 Tr. 196:2-13. Jilla acknowledged that Jamex Marketing would be making direct payments to Bridger Logistics under the suspension proposed and requested that Ferrellgas lift the unit lock-up restrictions so that Jamex Marketing could monetize its units. Trial Ex. 1182.

685. On January 13, 2016, Ballengee forwarded an email update from Jamex counsel Grant Adams advising that Jamex was waiting on the revised letter agreement from Monroe. Trial Ex. 1253.1-2. Soiefer inquired, "[w]here did you shake out on the 50 cent fee?" Trial Ex. 1253.1. Ballengee responded: "Still haven't seen language. I told hunter if I got a release from ERC and we went through another location I would give him the fee. Can't if [I'm] still on the hook for the 1.75 at eddystone." *Id.* (emphasis added).

686. On January 13, 2016, Jamex, Monroe, and Bridger Logistics executed a series of letter agreements amending and supplementing the Amended COSA, Monroe TLA, and Marketing TLA. Trial Exs. 1276-A, 1276-B (Amended COSA Letter Agreement), 1276-C.

687. The letter agreement amending and supplementing the Amended COSA ("Monroe-Jamex Letter Agreement") had a term that commenced on February 1, 2016 and expired on April

30, 2016.  Trial Ex. 1276.B.2 (Section VI).

688.　　The Monroe-Jamex Letter Agreement suspended Jamex's procurement and delivery of crude oil to Monroe, as well as Monroe's requirement to accept any deliveries while the COSA Letter Agreement was in effect.  Trial Ex. 1276-B.1 (Section I.B)

689.　　Under the Monroe-Jamex Letter Agreement, Monroe would pay Jamex $58,500 per day (approximately $1,755,000 per month) for the term of the suspension.  Trial Ex. 1276-B.2 (Section II).  Jamex assigned its right to that payment to Bridger Logistics.  *Id.*

690.　　The Monroe-Jamex Letter Agreement removed Jamex's obligation to offer Monroe additional volumes of crude oil it procured as required under Section 2.5 of the Amended COSA. Trial Ex. 1276-B.2 (Section IV).  In other words, Jamex was able to procure and supply crude oil to parties other than Monroe without first obtaining Monroe's permission.  *Id.*

691.　　The Monroe-Jamex Letter Agreement contained a post-term ramp-up provision that required delivery of 40,000 bpd in the first month following the suspension.  Trial Ex. 1256-A.2 (Section III).  Hunter of Monroe testified that this provision was included "[b]ecause we anticipated restarting to take deliveries in the future."  Monroe 30(b)(6) (Hunter), Dep. Tr. 156:25-157:5. He also testified that Monroe eventually did desire more shipments of Bakken crude in 2016, at the end of the initial suspension period, based on the price and quality of oil.  Monroe 30(b)(6) (Hunter), Dep. 223:1-15.  After the one-month ramp-up period, the requirements reverted to the original volume commitment in the Amended COSA.  Trial Ex. 1256-A.2 (Section III).

692.　　Section V of the Monroe-Jamex Letter Agreement provided that the price for crude oil delivered pursuant to the Amended COSA would decrease by $.50 per barrel if the crude oil was delivered outside of the Eddystone Facility.  Trial Ex. 1276-B.2.

693.　　The following individuals executed the Monroe-Jamex Letter Agreement: Jilla as

CFO of Jamex (Trial Ex. 1276-B.4), Jeffrey Warmann as CEO & President of Monroe (*id.* at 1276-B.5), and Rios as the President and CEO of Bridger Logistics (*id*. at 1276-B.6).

694.   The letter agreement amending the Marketing TLA ("Jamex-Bridger Letter Agreement") had a term equal to the term of the Monroe-Jamex Letter Agreement.  Trial Exs. 1276-A.2-3 (Jamex-Bridger Letter Agreement, Section V); 1276.B.2 (Section VI).

695.   Section I of the Jamex-Bridger Letter Agreement suspended Bridger Logistics' provision of services under the TLA except as requested by Jamex in writing.  Trial Ex. 1276-A.1.

696.   Section II of the Jamex-Bridger Letter Agreement required Jamex to pay Bridger Logistics $11,550,000 for the first two months of the term and $10,850,000 for each month thereafter.  Trial Ex. 1276-A.1-2.  The reduction in payment amount coincided with the end of Bridger Logistics' Van Hook obligation.  Ballengee, 9/20/22 Tr. 129:6-9.

697.   The monthly amount Jamex owed Bridger Logistics would be reduced by (1) any amounts Monroe paid Bridger Logistics under Section II of the Monroe-Jamex Letter Agreement, (2) third-party revenues that Bridger Logistics received for use of the barge or CPC-1232 railcars during the suspension, and (3) $3,400,000 per month in deficiency payments owed to Eddystone.  Trial Ex. 1276-A.2.  Jamex also agreed to reimburse Bridger Logistics for any out-of-pocket costs for loading, unloading, freight, or other expenses incurred in connection with services performed for Jamex.  Trial Ex. 1276-A.2.  The combination of a payment reduction based on amounts Monroe paid Bridger Logistics directly and the amount of deficiency fees owed to Eddystone amounted to a monthly reduction of approximately $5.1 million.  Ballengee, 9/20/22 Tr. 133:4-20.

698.   Bridger Logistics agreed to maintain a fleet of 800 railcars that would be available to Jamex at Jamex's request.  Trial Ex. 1276-A.2.  Jamex was responsible for the costs of storing the railcars.  *Id.*

699. Section III of the Jamex-Bridger Letter Agreement required Jamex to provide a provisional statement of cash, cash equivalents, Ferrellgas Partners units, and outstanding obligations on Schedule I. Trial Ex. 1276-A.2 (Section III).

700. Schedule I disclosed that, as of January 12, 2016, Jamex had a total of $124 million in net assets: $52 million in cash and equivalents, $38 million in unrestricted Ferrellgas Partners units, and $77 million in restricted Ferrellgas Partners units, minus $43 million owed to Morgan Stanley on the margin loan. Trial Ex. 1276-A.15; Ballengee, 9/20/22 Tr. 210:16-211:18.

701. Section IV of the Jamex-Bridger Letter Agreement required Jamex to provide Bridger Logistics with (1) monthly good faith estimates of its consolidated financial condition; (2) monthly internally certified unaudited financial statements; and (3) annual audited financial statements. Trial Ex. 1276-A.2. Jamex's obligation to provide annual audited financial statements survived termination. Trial Ex. 1276-A.2-3 (Section V).

702. Section VI of the Jamex-Bridger Letter Agreement provided that, on some date after February 1, 2016, Bridger Logistics would sell its equity interest in BTS to Jamex or an affiliate of Jamex. Trial Ex. 1276-A.3. As consideration for that sale, Bridger Logistics agreed to the terms of both the Jamex-Bridger Letter Agreement and the Monroe-Jamex Letter Agreement. *Id.* Bridger Logistics and Jamex agreed that BTS would be sold with no assets or liabilities other than "its rights and obligations under" the RSA. *Id.*

703. Rios executed the Jamex-Bridger Letter Agreement in his capacity as President and CEO of Bridger Logistics. Trial Ex. 1276-A.5. Jilla executed the Jamex-Bridger Letter Agreement in his capacity as CFO of Jamex. Trial Ex. 1276-A.6.

704. The letter agreement amending the Monroe TLA ("Monroe-Bridger Letter Agreement") eliminated the defined term "Eddystone Rail Facilities" from the Monroe TLA and

replaced it with references to "Delivery Point(s)," which was already a defined term in the TLA. Trial Ex. 1276-C.1-2. Ballengee testified that this revision "gave us more flexibility. We never intended not to use Eddystone or I did not." Ballengee, 9/20/22 Tr. 127:6-10.

705. Rios signed the Monroe-Bridger Letter Agreement in his capacity as President and CEO of Bridger Logistics. Trial Ex. 1276-C.3. Monroe CEO and President Jeffrey Warmann executed the document on behalf of Monroe. *Id.* at 1276-C.4.

706. All parties involved with the January 13 letter agreements believed that the suspension would last three months, at which point shipments of crude oil would resume. Ballengee, 9/20/22 Tr. 217:19-25, 220:1-8; Monroe 30(b)(6) (Hunter) Dep. Tr. 151:8-152:4; Rios, 9/23/22 Tr. 169:6-14; Soiefer, 12/6/22 Tr. 197:4-7; Gamboa, 12/7/22 Tr. 142:5-14; Hampton, 12/14/22 Tr. 162:24-163:6.

707. The individuals involved in negotiating the January 13 letter agreements on behalf of Bridger Logistics testified that they believed there were liens on BTS assets after Hampton's email indicating that liens were in place in December 2015. Soiefer, 12/5/22 Tr. 224:4-23; Rios, 9/23/22 Tr. 158:8-14; Hampton, 12/14/22 Tr. 200:1-10, 205:19-25, 252:23-253:9.

### E. Prior To Any Contemplated BTS Sale, Bridger Logistics Confirms Jamex's Ability To Continue To Pay Eddystone.

708. Bridger Logistics previously received Jamex financial disclosures in connection with the Jamex-Bridger Letter Agreement, and Section IV of the Jamex-Bridger Letter Agreement required Jamex to continue to provide monthly financial disclosures to Bridger Logistics. Trial Ex. 1276-A.2 (Section IV); Ballengee, 9/20/22 Tr. 210:16-211:6.

709. On January 25, 2016, Jamex emailed information regarding Jamex's financial condition to Bridger Logistics. Trial Exs. 1337 & 1337-A; Ballengee, 9/20/22 Tr. 211:19-213:22. Jamex's unaudited balance sheet showed that Jamex had total assets of $263.4 million, liabilities

of $103.6 million, and members' equity of $159.8 million as of December 31, 2015. Trial Ex. 1337-A.2; Ballengee, 9/20/22 Tr. 212:25-213:12. The balance sheet also showed that Jamex received $3.7 million in distributions from Ferrellgas units in the fourth quarter of 2015. Trial Ex. 1337-A.2; Ballengee, 9/20/22 Tr. 213:19-22.

710. Based on these disclosures, Bridger Logistics counsel and executives were satisfied that Jamex had sufficient capital on hand to assume the payment obligations under the RSA. Soiefer, 12/6/22 Tr. 199:15-200:7 (commenting that the Jamex financials showed "tremendous capitalization"); Hampton, 12/14/22 Tr. 169:17-171:18. No one at Bridger Logistics or Ferrellgas raised concerns about Jamex's ability to perform after reviewing Jamex's financials. Hampton, 12/14/22 Tr. 171:14-18.

711. Witnesses from both Jamex and Bridger Logistics testified that Jamex intended to continue operating during the suspension period and had access to Bridger Logistics' logistical assets to generate additional revenues for Jamex. Ballengee, 9/20/22 Tr. 215:15-219:25; Jilla, 12/12/22 Tr. 87:24-88:16; Soiefer, 12/6/22 Tr. 196:3-197:3; Trial Ex. 1182; Trial Ex. 1276-A.2 (Section II); *see also* Monroe 30(b)(6) Hunter, Dep. Tr. 218:1-21 (testifying that Rios and Gamboa never gave Monroe the impression that Bridger Logistics intended to cause BTS to breach the RSA). During that period, Jamex had a relatively large contract with Whiting Petroleum under which Jamex would buy from Whiting Petroleum and sell to Shell. Jilla, 12/12/22 Tr. 88:3-8. That contract generated between $600,000 and $700,000 per month. *Id.* at 88:9-12. When Jilla left Jamex in April 2018, Jamex was still operating and had employees. *Id.* at 88:13-16.

712. Ballengee testified that, at the time Jamex acquired BTS, Jamex Marketing had assets that would have been used to carry on under the Amended COSA, including satisfying payments owed to Eddystone under the RSA. Ballengee, 9/20/22 Tr. 218:6-20; Soiefer, 12/6/22

Tr. 38:25-40:16, 41:11-17.  Ballengee also testified that Jamex was not on the verge of bankruptcy in December 2015.  Ballengee, 9/20/22 Tr. 210:13-15.

713.    Ballengee also testified that, at the time he acquired BTS, he intended to throughput barrels at the Eddystone Facility once the three-month suspension ended.  Ballengee, 9/20/22 Tr. 218:1-5 ("Q: When the COSA picked back up again, did you intend to use the assets of Jamex Marketing to fund any obligations that JTS had to Eddystone?  A: I planned on buying barrels and putting them through there and paying the fee, yes.").

714.    Jamex's audited financials for the year ending December 31, 2015 corroborated Jamex's unaudited statements. Trial Ex. 1581-B.  The audited financials showed total current assets of $253 million, total assets of $277 million, total current liabilities of $108 million, and members' equity of $168 million.  Ballengee, 9/20/22 Tr. 215:15-23; Trial Ex. 1581-B.7.

**F.      Knapp Plays Minor Role In Documenting The Sale Of BTS.**

715.    Throughout this case, Eddystone has relied heavily on statements made by Knapp leading up to the transaction between Bridger Logistics and Jamex to try to prove that assets were transferred from BTS with fraudulent intent.  In truth, Knapp was a "junior" member of the team and his role at Bridger Logistics was minor.  Hampton, 12/14/22 Tr. 110:9-13, 111:6-14; Soiefer, 12/5/22 Tr. 189:15-23 (describing Knapp as a "young junior attorney at the company"); Gamboa, 12/7/22 Tr. 147:21-148:4 (describing Knapp as a "junior level" lawyer); *see also* Wambold, 12/9/22 Tr. 65:3-14 (Wambold did not recall ever having a conversation with Knapp).

716.    His job was to implement strategy decisions made by others by drafting documents and contracts and negotiating the fine points as required within Bridger Logistics' business.  Hampton, 12/14/22 Tr. 111:6-14; *see* Rios, 9/22/22 Tr. 119:17-120:2.  Hampton (the functioning general counsel of Ferrellgas) believed that Knapp was helpful as a team member for larger transactions.  Hampton, 12/14/22 Tr. 225:25-226:2.  But Hampton did not have Knapp

involved in strategic or operational decision-making for Bridger Logistics or Ferrellgas. Hampton, 12/14/22 Tr. 111:6-9, 111:15-19.

717.    Knapp was not involved in any decision-making about how to address the situation facing Bridger Logistics in December 2015 or January 2016, and he was not on the team working on restarting the logistics chain in preparation for the end of the suspension period. Gamboa, 12/7/22 Tr. 148:5-9; Rios, 9/22/22 Tr. 119:17-120:2; Hampton, 12/14/22 Tr. 168:19-22.

718.    Hampton testified he was focused on Ferrellgas issues around the time that Jamex sought to purchase BTS, so he relied primarily on Akin Gump, and Akin Gump worked with Knapp to handle the paperwork for the sale of BTS. Hampton, 12/14/22 Tr. 228:16-25, 229:13-17, 230:2-7. Hampton was clear that Akin Gump had the lead on the transaction and that Bridger Logistics relied on Akin Gump for advice about the uniform fraudulent transfer act—not Knapp. Hampton, 12/14/22 Tr. 224:5-11 ("Well, our point team was at Akin. Pat was helping effectuate the transactions they were working on."), 228:21-25, 229:23-230:1.

719.    As an example, on January 19, 2016, at Knapp's instruction, Wilkins emailed Enbridge North Dakota and informed Enbridge that Bridger Logistics was "in the process of re-arranging some of our assets into a new wholly owned affiliated: Bridger Terminals, LLC[.]" Trial Ex. 2628. Wilkins requested approval to assign certain BTS assets to Bridger Terminals. *Id.*

720.    Because Knapp was out of the loop on the bigger picture decisions concerning the future of Bridger Logistics and BTS, and because Akin Gump led the transaction with Jamex as well as any risks associated with it, Hampton was dismissive of Knapp's comments related to fraudulent transfer laws. Hampton, 12/14/22 Tr. 168:15-18; Knapp, Dep. Tr. 182:17-20, 183:7-184:15 (acknowledging Hampton's response to his "UFTA/UFCA sandbox" email was "clearly a senior-level lawyer shooting down a mid-level lawyer"). Instead, Hampton was confident that

there was no risk of fraudulent transfer laws being implicated based on advice from Akin Gump, which was hired "to reduce or eliminate that risk," that he received during the December 21, 2015 call with Akin Gump that Knapp did not attend. Hampton, 12/14/22 Tr. 209:15-18, 257:4-9; Knapp, Dep. Tr. 312:2-14 (confirming that he was not party to calls with Akin Gump about risks associated with fraudulent transfer laws).

721. Nevertheless, Eddystone relies heavily on a January 21, 2016 email from Knapp to Hampton and Lehman attaching three documents concerning the sale of BTS: a draft purchase and sale agreement between Bridger Logistics and Jamex, an assignment of BTS member interests from Bridger Logistics to Jamex, and a member and manager resignation of Bridger Logistics, LLC. Knapp, Dep. Tr. 253:1-11; Hampton, 12/14/22 Tr. 227:23-228:9; Trial Ex. 1306.1-2. In the email, Knapp asked Hampton and Lehman to review the indemnities in the PSA and stated that "to better protect against UFTA/UFCA," he included limited waivers of the non-compete in the Ferrellgas-Bridger PSA and the exclusivity clause in the Bridger-Jamex TLA, which would "help create a fact dispute if we can waive the PSA around and say that we intended Jamex to continue operating at Eddystone." Knapp Dep. Tr. 253:12-254:10; Trial Ex. 1306. Knapp testified that the reference to the UFTA/UFCA was to protect against a potential claim by Jamex against Bridger Logistics. Knapp Dep. Tr. 255:10-14. In particular, Knapp was addressing a concern within Bridger Logistics that Jamex would "twist the fact pattern to manipulate or somehow negotiate their way out of obligations that they owed to us," especially in connection with its reserve of Ferrellgas units. Knapp Dep. Tr. 256:3-11. As a result, he made sure that Bridger Logistics' intent in selling BTS and allowing Jamex to continue operating the company was sufficiently documented, which was his primary role, such that Bridger Logistics could point to the documentation later should the need arise. Knapp Dep. Tr. 254:15-255:14.

722.     Emails from a junior lawyer, primarily about documentation necessary to avoid a perceived risk of potential litigation from Jamex, do not establish that Bridger Logistics—or any of the other Defendants—orchestrated fraudulent transfers.

G.     **BTS Complies With The Bank Of America Credit Facility By Assigning Liened Assets To Affiliates Also Subject To Bank Of America's Lien Requirements.**

723.     As discussed above, the Credit Agreement placed limitations on how a Restricted Subsidiary could engage in a disposition of its assets, and a disposition that violated these limitations constituted a default under the Credit Agreement.  Trial Ex. 1851.98 (failure to comply with any covenant in Article VII was an event of default); Trial Ex. 1851.93 (Credit Agreement § 7.05); Miles, 12/12/22 Tr. 186:11-20.

724.     The Credit Agreement permitted Restricted Subsidiaries to assign assets to other Restricted Subsidiaries without restrictions, however.  Trial Ex. 1850.11-13 (amended version of § 7.05); Miles, 12/12/22 Tr. 262:2-11 (noting amendment).

725.     The Credit Agreement permitted selling the equity interests in a Restricted Subsidiary as long as (1) no default existed at the time of the sale, (2) the sale involved 100% of the equity interests in the Restricted Subsidiary, and (3) the fair market value of the assets subject to the disposition was below $25 million. Trial Ex. 1850.12-13.

726.     If the third condition was not satisfied, further requirements applied, including that at least 75% of the consideration received by Ferrellgas LP or the Restricted Subsidiary had to be in cash.  Trial Ex. 1850.13.

727.     On January 25, 2016, Bracewell supplied Thompson & Knight with an executed grantor accession agreement and guaranty supplement for Bridger Swan Ranch and Bridger Terminals and draft UCC-1 filings for those entities in compliance with the Credit Agreement.  Trial Exs. 1335.2, 1324, 1328.  Bracewell also explained that BTS would be sold to a third party

"in a transaction permitted under Section 7.05(k) of the Credit Agreement." Trial Ex. 1335.2.

728. Bank of America perfected its lien on all assets of Bridger Swan Ranch and Bridger Terminals on January 28, 2016. Trial Exs. 2730, 2731.

729. On January 31, 2016, BTS assigned 19 injection stations and associated customer contracts to Bridger Terminals and Bridger Swan Ranch. Trial Exs. 1433-J & 1433-D.

730. Numerous witnesses involved with the sale of BTS to Jamex testified that BTS assigned its assets to affiliates prior to the sale because the assets were subject to Bank of America's lien. Hampton, 12/14/22 Tr. 255:11-18; Soiefer, 12/5/22 Tr. 240:21-241:8; Knapp Dep. Tr. 210:1-7, 211:5-8.

**H.  Facts Relating To BTS Financial Condition As Of January 31, 2016.**

731. Defendants' accounting expert Polkowitz recreated BTS' balance sheet and trailing twelve-month financial statements as of January 31, 2016. Trial Ex. 3003 (Polkowitz) ¶¶ 18; Def. Sum. Ex. 2. Following the Acquisition, BTS did not have a standalone balance sheet or income statement, which was not unusual given that Ferrellgas reported its financials as part of the midstream segment in connection with its SEC filings. Heitmann, 2/14/23 Tr. 44:12-18, 214:17-217:1; Polkowitz, 12/13/22 Tr. 170:15-21.

732. Polkowitz explained that, between the Acquisition and January 31, 2016, BTS generated $16.356 million in net profits. Defs. Summ. Ex. 2; Trial Ex. 3003 (Polkowitz) ¶ 37; Polkowitz, 12/13/22 Tr. 176:6-177:5. There is no evidence in the record regarding whether these net profits were actually collected. Polkowitz, 12/13/22 Tr. 177:6-12; Sherman, 12/8/22 Tr. 59:25-60:20 (acknowledging he did not investigate whether BTS revenues were collected).

733. BTS' Balance Sheet as of January 31, 2016 reflects the following: (1) receivables of approximately $29.6 million (trade account and intercompany receivables); (2) The 19 Injection Stations' 2015 book value of approximately $40 million ("Land" and "Pipeline Terminals"); (3)

"Intangible Assets," net of amortization of approximately $114.269 million; and (4) remaining assets of approximately $1.87 million after depreciation (the sum of prepaid expenses, other current assets, vehicles, furniture and equipment, construction in progress minus accumulated depreciation). Def. Summ. Ex. 2. The net profits of $16.356 million is calculated by taking revenue minus expenses, and the revenue figure would include the trade account and intercompany receivables reflected in the balance sheet.

734. The intangible asset value reflected on Polkowitz's balance sheet is a portion of the approximately $300 million in "intangible assets" that CBIZ allocated to Bridger Logistics when evaluating the purchase price of more than $800 million as of June 24, 2015. Trial Ex. 3003 (Polkowitz Decl.) ¶ 21 (stating he used June 2015 CBIZ Report to allocate intangible assets); *see also* Trial Ex. 961-A.40 (June 2015 CBIZ Report showing intangible assets of $299.2 million of a total $822.452 million purchase price).

735. In short, the balance sheet reflects that as of January 31, 2016, BTS' tangible assets other than the RSA were: (1) $16.356M in net profits (to the extent they were actually collected as cash); (2) 19 Injection Stations and associated customer contracts; and (3) potentially other additional, and unspecified, assets that have a book value of $1.87 million. Def. Summ. Ex. 2. Eddystone did not provide a fair market valuation of BTS' assets and debts as of early 2016 or at any other point in time in the record. Sherman, 12/8/22 Tr. 71:10-15 (Sherman did not do an independent valuation as of January 2016).

736. Sherman suggested at trial that approximately $47.2 million in profits were diverted. That $47.2 million includes $32 million in revenue recorded as purportedly earned by BTS from Jamex Marketing, approximately $26 million of which was purportedly earned by BTS in 2016 after BTS was sold to Jamex. Pl. Summ. Exs. 84, 86. Sherman admittedly never

investigated, however, whether any of this revenue was ever collected as cash by any party. Sherman, 12/8/22 Tr. 59:25-60:20. As a result, the Court does not credit Sherman's calculation.

737. As of January 31, 2016, Ferrellgas owed Bank of America $311.6 million. Trial Ex. 1468-A.17. Heitmann testified that, if Ferrellgas were to default on the Bank of America credit facility, it would not be able to repay the amount due and cross-defaults would be a much bigger issue. Heitmann, 2/14/23 Tr. 77:20-80:13; 115:24-117:4. Heitmann likewise testified that approximately $190.1 million in accounts receivable were carved out from Bank of America's collateral package, making it more likely Bank of America would look to the collateral of its subsidiaries. Heitmann, 2/14/23 Tr. 115:11-117:24. Eddystone did not offer any evidence of the value of the collateral that supported the Bank of America credit facility, and its expert failed to offer any opinion on that value. Sherman, 12/8/22 Tr. 85:7-88:18.

**I.      BTS Is Sold To Jamex.**

738. On February 22, 2016, Jamex affiliate JTH entered into a Purchase and Sale Agreement ("BTS PSA") with Bridger Logistics, by which JTH acquired 100% of the membership interests in BTS. Dkt. 732 ¶ 69; Trial Ex. 1439-H. At that time, Jamex changed BTS' name to JTS. Trial Ex. 1445-A; Ballengee, 9/20/22 Tr. 136:19-24.

739. Effective February 1, 2016, JTS was no longer affiliated with Defendants. Trial Ex. 1439-H.8; Ballengee, 9/20/22 Tr. 137:21-24.

740. As consideration for the sale, JTH paid Bridger Logistics $10 as monetary consideration, and Bridger Logistics paid JTH $4,447,677.96 "in satisfaction of all charges and sums actually due under invoices issued in the ordinary course of business pursuant to the [RSA] that are incurred during the period for the month of January 2016, as such sums and charges become due and payable on or about February 20, 2016." Trial Ex. 1439-H.9 (§ 2.3(a), (c)); Ballengee, 9/20/22 Tr. 138:22-25; Hampton, 12/14/22 Tr. 165:23-166:2. Although Bridger

Logistics accepted, as a "Retained Liability," any liability to Eddystone under the RSA that arose after the closing of the BTS PSA but related to the pre-closing period, Bridger Logistics did not retain any liability with respect to those payments for the month of January 2016, other than if Bridger Logistics failed to pay the $4.5 million payment. Trial Ex. 1439-H.6 (definition of "Retained Liabilities"), 1439-H.9 (§ 2.3(c)). Bridger Logistics also agreed to execute a release whereby Jamex released claims against Bridger Logistics. Trial Ex. 1439-H.9 (§ 2.3(b)). Finally, Bridger Logistics agreed to consent to Jamex's use of JTS (which would have otherwise violated the non-compete contained in the Marketing TLA), but only for purposes of the services provided under the RSA. Trial Ex. 1439-H.9-10 (§ 2.3(d)).

741. Because the Ferrellgas PSA and letter agreement between Ferrellgas and Ballengee also contained a non-compete, Ferrellgas Partners similarly agreed to lift its non-compete to permit Jamex to use JTS to provide services under the RSA. Trial Ex. 1439-H.10 (§ 2.3(e)).

742. In exchange, JTH agreed to assume "[l]iabilities under the [RSA] and the Contracts set forth on Schedule 4.4 for periods on and after" February 1, 2016. Trial Ex. 1439-H.8-9 (§ 2.1(b)). JTH also agreed not to amend, modify, or extend the RSA without express prior written consent from Bridger Logistics. Trial Ex. 1439-H.10-11 (§ 2.3(f)).

743. For its part, Jamex Marketing entered into a Release and Guarantee Agreement with Bridger Logistics, whereby it released certain claims against Bridger Logistics and guaranteed "the full and timely payment and prompt and complete performance of [JTH's] obligations and liabilities" under the BTS PSA, including its obligation to assume liabilities under the RSA. Trial Ex. 1439-H.9 (§ 2.3(b)); Trial Ex. 1434-H.3 (§ 4(a)). Ballengee testified on direct that neither Jamex nor JTH was responsible for paying deficiency fees on behalf of JTS (Ballengee, 9/20/22 Tr. 138:11-18), but when presented with the Release and Guarantee Agreement (Trial Ex. 1434-

H.3), he testified that he was "incorrect" and confirmed that Jamex Marketing guaranteed JTH obligations under the BTS PSA. Ballengee, 9/20/22 Tr. 245:17-246:22. Thus, through guarantees, Jamex Marketing was ultimately responsible for payments to Eddystone under the RSA.

744. At trial, Eddystone suggested that Jamex purchased BTS without any corresponding business records. *See, e.g.*, Ballengee, 9/20/22 Tr. 145:24-146:15. The BTS PSA does not support that unsubstantiated suggestion. The BTS PSA required Bridger Logistics to identify all insurance policies in place for JTS and represent and warrant that the policies remained in force and were sufficient under applicable law and under JTS' contracts. Trial Ex. 1439-H.13 (§ 3.7). The BTS PSA also stated that, prior to the date of the BTS PSA, Bridger Logistics "made available to [JTH]" a true and correct copy of each of the insurance policies identified on Schedule 3.7. *Id.*; *see also* Trial Ex. 1439-H.56-57 (Schedule 3.7 identifying seven insurance policies in place)). Similarly, the BTS PSA contained a number of representations and warranties from Bridger Logistics with respect to JTS taxes, including that Bridger Logistics "delivered or otherwise made available" to JTH copies of all JTS tax returns and related documents from January 1, 2012 to February 1, 2016. Trial Ex. 1439-H.15-16 (§ 4.10).

745. The BTS PSA also required Bridger Logistics to disclose all of the JTS liabilities and obligations on Schedule 4.6. Trial Ex. 1439-H.13-14 (§ 4.6); *see also* Trial Ex. 1439-H.60 (Schedule 4.6). Schedule 4.6 disclosed (1) a letter from Boaz on January 25, 2015 regarding the status of credit assurances under the RSA, and (2) claims and losses relating to a lightning strike and fire at a Mississippi tank battery and injection station on July 19, 2015. Trial Ex. 1439-H.60 (Schedule 4.6). Other than the items disclosed on Schedule 4.6 and the contracts identified on Schedule 4.4 (including the amounts payable under the RSA), Bridger Logistics represented and warranted that JTS had no other liabilities and obligations. Trial Ex. 1439-H.13-14 (§ 4.6).

746.     Ferrellgas and Bridger Logistics expected JTS to continue to perform under the RSA after the sale.  Soiefer, 12/6/22 Tr. 207:20-22 ("Q. What did you believe Mr. Ballengee would do at the completion of the sale process of BTS to Jamex? A. Utilize the facility in some way."); Rios, 9/23/22 Tr. 153:18-25 (Q. Now, when you were talking about this with Mr. Ballengee, did you expect that Jamex or Monroe would cease performing under the amended COSA for all time? A. Not in the lease. [sic] Q. Did you expect Mr. Ballengee to cause BTS once it became part of his family of companies to stop paying Eddystone for the remainder of the RSA? A. No, not at all."); *id.* at 138:20-23, 176:12-15, 177:4-12; Hampton, 12/14/22 Tr. 167:7-13 ("Q. Around this time, did anyone tell you that Jamex intended to default under the RSA? A. No.  Q. Sitting there at the time, did you have any reason to believe that Jamex would default under the RSA?  A. No."); *id.* at 171:15-18.  For his part, Ballengee testified that he "planned on buying barrels and putting them through [Eddystone] and paying the fee."  Ballengee, 9/20/22 Tr. 217:19-218:5.

747.     Returning to Carlyle, Ballengee and Jilla both testified that Jamex acquired JTS to establish privity with ERC to enable negotiations as Jamex was still trying to figure out a way to keep the agreement and keep moving crude through Eddystone, including by negotiating with ERC to obtain an executed copy of the tripartite agreement for Carlyle.  Ballengee, 9/20/22 Tr. 218:21-219:25, 260:18-261:1; Jilla, 12/12/22 Tr. 85:5-17 ("The plan, as I recollect, was to make sure that we could negotiate directly with Eddystone to work through, one, some of the operational issues that the terminal had since inception, as well as obviously work on a new working capital facility or intermediation financing so we wouldn't have the same problem the next time around."); Hampton, 12/14/22 Tr. 161:4-14, 166:15:167:6; Rios, 9/23/22 Tr. 154:1-12, 168:5-169:4.

748.     As a result of the sale of BTS to JTH, Bridger Logistics fell short of its $120 million EBITDA target, costing Rios and Gamboa their lucrative bonuses.  Rios, 9/23/22 Tr. 138:1-19.

## XIII.  EDDYSTONE REFUSES TO NEGOTIATE WITH JAMEX.

749.    After the sale of BTS, having reached an agreement with Monroe and Bridger Logistics on the suspension agreements and having purchased BTS, Ballengee turned his attention to Eddystone.  On February 23, 2016, JTH (via letter from Ballengee) informed Eddystone that as of February 1, 2016, JTH was the new owner of BTS, which JTH had renamed to JTS.  Trial Exs. 1446, 1446-A.  As planned, this was the start of Jamex attempts to negotiate with Eddystone.

750.    On February 25, 2016, Ballengee sent a follow-up letter to Eddystone raising the facility defects that dated "back to the fall of 2013, which are the basis of an ongoing significant dispute between Owner and Customer."  Trial Exs. 1454-A.1, 1453-B.1.  The February 25 letter requested "that the failings of the facility that have had a devastating impact on the operations and profitability of [JTS] be corrected."  Trial Exs. 1454-A.2, 1453-B.2.  Ballengee requested a meeting to resolve the dispute.  Trial Exs. 1454-A.2, 1543-B.2.  He believed he could negotiate those issues more effectively than the prior owner, Bridger Logistics.  Ballengee, 9/20/22 Tr. 249:4-7.

751.    On February 26, 2016, Jamex Marketing paid ERC $3,954,543.58 for volumes transloaded in January 2016.  Jamex Marketing did not pay the January 2016 deficiency charges.  Ballengee, 9/20/22 Tr. 142:4-12.

752.    This was the first time Eddystone had not been paid in full.  From May 2014 through January 2016, Eddystone received all payments due to it under the RSA.  Dkt. 732 ¶ 71; Paradis, 9/19/2022 Tr. 200:9-19 (testifying that "BTS had continued to make all of their payments up to [February 2016]"), , 164:5-9 ("Until [February 22, 2016,] Bridger had continued to make all of its payments."); *see also* Sherman, 12/7/22 Tr. 306:22-310:14; Baker, 2/16/2023 Tr. 56:12-15.

753.    Ballengee's letters and JTS' short payment having captured Eddystone's attention, Eddystone and its representatives met with Ballengee and Jilla on March 29, 2016, in Dallas, Texas. Ballengee, 9/20/22 Tr. 249:14-250:2.

754. Boaz, then Enbridge's Manager of Asset Performance and Enterprise Risk (and later its corporate representative), admitted that, even before the meeting, Eddystone was intent on filing an arbitration against JTS to obtain a judgment against the company for deficiency charges that JTS did not pay. Eddystone 30(b)(6) (Boaz), Dep. Tr. 246:24-247:3.

755. Eddystone brought its lead trial counsel, Fil Agusti, to the meeting. Ballengee, 9/20/22 Tr. 250:9-13; Boaz, Dep. Tr. 198:1-4. Ballengee testified that it was clear at the meeting that Eddystone was "going to pursue [its] arbitration options under the [RSA] and sue me." Ballengee, 9/20/22 Tr. 250:14-18. Boaz admitted that Eddystone "quickly dismissed" the issues related to facility defects. Boaz, Dep. Tr. 198:12-21.

756. Eddystone submitted its arbitration demand to JTS in April 2016 before any further negotiations took place. Paradis, 9/19/22 Tr. 253:20-254:4; Ballengee, 9/20/22 Tr. 250:19-21; Boaz, Dep. Tr. 199:9-13.

## XIV. BRIDGER LOGISTICS AND FERRELLGAS PROCEED, BELIEVING THAT JTS WILL CONTINUE TO PERFORM UNDER THE RSA.

### A. Ferrellgas Was Singularly Focused On Long-Term Growth Of The Monroe Relationship.

757. In the meantime, Ferrellgas remained interested in extending its arrangements with Jamex Marketing and Monroe under the Amended COSA, which was the main source of EBITDA for its new logistics division. On January 20, 2016, Wambold emailed Rios stating that renewing or extending the Monroe contract was Wambold's number one priority. Wambold, 12/9/22 Tr. 68:3-7; Trial Ex. 1304.1. On the same day, Rios responded that he was continuing to work on renewing or extending the Monroe contract, and that opportunities other than Monroe should also be pursued. Wambold, 12/9/22 Tr. 68:8-18; Trial Ex. 1304.1.

758. Also on January 20, 2016, Ferrellgas Chairman Jim Ferrell emailed Wambold asking him to extend or renew the Monroe contract. Wambold, 12/9/22 Tr. 70:16-22. Wambold

responded that Ferrellgas had agreed to suspend deliveries as part of a side deal with Delta to help facilitate the longer-term discussion about extending the contract. Wambold, 12/9/22 Tr. 70:23-71:6. Wambold thought that suspending deliveries would show that Ferrellgas was willing to accommodate Delta. Wambold, 12/9/22 Tr. 71:7-11.

759. Wambold was aware that the sale of BTS occurred, but he was not involved in the decision to sell BTS. Wambold, 12/9/22 Tr. 64:2-65:14. Soiefer kept Wambold apprised of details about that transaction, but Wambold did not need to approve the transaction nor take any other action with respect to that transaction. *Id.* at 65:15-67:6.

**B.  Ferrellgas And Bridger Logistics Monitor Jamex Financials.**

760. After the sale of BTS on February 22, 2016, Jamex continued to share its financials. On February 25, 2016, Jamex emailed updated financial information to Bridger Logistics. Ballengee, 9/20/22 Tr. 213:23-215:14; Trial Exs. 1452 & 1452-A. Jamex's unaudited balance sheet as of January 31, 2016 showed that Jamex had total assets of $221 million, liabilities of $88.2 million, and members' equity of $132.6 million. Trial Ex. 1452-A; Ballengee, 9/20/22 Tr. 214:22-215:6; Soiefer, 12/6/22 Tr. 37:21-38:11. The balance sheet also reflected that Jamex received $10.2 million from Ferrellgas distributions in the fourth quarter of 2015 and from unit sales in the first quarter of 2016. Trial Ex. 1452-A.1; Ballengee, 9/20/22 Tr. 215:7-13. The projected summary showed $112.5 million in "Total Cash & Marketable Securities (net)" as well as projected liquidity of $21 million. Trial Ex. 1452-B; Soiefer, 12/6/22 Tr. 38:12-39:2, 200:9-13.

761. At the time, Jamex's financials appeared strong enough to meet its obligations under the COSA through the end of the contract in July 2019. Trial Exhibit 1513.2 ("We learned at that time that he had enough reserves to see us through the end of our contract (July 2019) at current economics"); Wambold, 12/9/22 Tr. 206:17–209:5.

### C. Monroe Seeks To Resume Shipments; Bridger Logistics Readies The Crude-By-Rail Pipeline.

762. In March 2016, Monroe informed Jamex it wanted to resume shipments under the Amended COSA, starting in May 2016. *See* Trial Ex. 1490; Trial Ex. 1490-C; Soiefer, 12/6/22 Tr. 207:23-208:12; Hampton, 12/14/22 Tr. 173:10-14, Ballengee, 9/20/22 Tr. 220:1-8; Monroe 30(b)(6) (Hunter), Dep Tr. 171:11-13; Rios, 9/23/22 Tr. 169:11-14; Gamboa, 12/7/22 Tr. 144:10-16. Because of the beneficial properties of Bakken crude, and despite the price to acquire foreign or domestic crude being roughly equal, Monroe sought to restart deliveries of Bakken crude in May 2016, following the three-month suspension. Monroe 30(b)(6) (Hunter), Dep. Tr. 222:11-22.

763. Rios responded, "Let's get a plan together to turn our logistics network back on." Trial Ex. 1491. Hampton took Rios' statement to mean they "were resuming the Logistics support of sale of crude oil from Jamex to Monroe." Hampton, 12/14/22 Tr. 173:20-22. Rios and Gamboa both testified that Bridger Logistics was ready and willing to turn the logistics network back on. Rios, 9/23/22 Tr. 171:19-21, Gamboa, 12/7/22 Tr. 145:11-21, 148:10-14; *see also* Trial Ex. 1493.

764. Wambold, Soiefer, and Hampton all testified that they understood Bridger Logistics was contemplating resuming logistical support of the sale of crude oil from Jamex to Monroe at that time. *See* Wambold, 12/9/22 Tr. 72:23-73:14; Soiefer, 12/6/22 Tr. 209:1-5; Hampton, 12/14/22 Tr. 173:20-22; *see also* Trial Ex. 1491.

## XV. JAMEX RENEGES ON ITS COMMITMENTS.

### A. Jamex Declines To Nominate Any Barrels.

765. On March 29, 2016, Ballengee met with Monroe "to discuss the respective positions of the parties and the status of the discussions held to resolve the dispute so far." Trial Ex. 1453-B; Ballengee, 9/20/22 Tr. 249:14-250:2. Ballengee testified that by "the dispute" he was referring to the operational issues at the Eddystone Facility. Ballengee, 9/20/22 Tr. 248:23-249:3.

It was "very clear" to Ballengee that Eddystone planned to pursue arbitration. *Id.* at 250:14-18.

766.    In response to Monroe's request to resume shipments, Rios contacted Ballengee and Jilla. *See* Trial Exs. 1495, 1495-B. Rios and Gamboa both testified that they needed input from Jamex in order to resume shipments to Monroe. Rios, 9/23/22 Tr. 174:11-175:9, Gamboa, 12/7/22 Tr. 147:1-20 ("So they needed to tell us how much oil and where and when.").

767.    On April 4, 2016, Jamex nominated zero barrels for May 2016. Wambold, 12/9/22 Tr. 80:12-13; Hampton, 12/14/22 Tr. 173:23-174:3; Ballengee, 9/20/22 Tr. 224:19-25; Rios, 9/23/22 Tr. 175:10-12; Trial Ex. 1508-A. Wambold recalls being "pretty nervous about this," and that he "didn't understand exactly what was going on, but . . . knew this couldn't be a great thing." Wambold, 12/9/22 Tr. 81:9-13. Soiefer testified that he "pretty quickly realized that this was a very bad situation." Soiefer, 12/6/22 Tr. 210:10-13. Hampton testified that they "were all surprised" when Jamex declined to nominate any barrels. Hampton, 12/14/22 Tr. 177:12-15.

768.    Monroe then informed Jamex it considered Jamex to be in breach of the Amended COSA. Trial Ex. 1509-A; Hunter Dep. Tr. 172:12-173:23. In response, Jamex sent a letter stating that Monroe was in breach. Trial Ex. 1524-A. Hampton testified that his reaction to that letter was "[d]isappointment that we had not resolved this." Hampton, 12/14/22 Tr. 174:21-175:1.

**B.    Ferrellgas And Bridger Logistics Press Jamex To Perform As It Promised.**

769.    Wambold testified that he contacted Ballengee "pretty quickly" and "told him to nominate some barrels and get back to work." Wambold, 12/9/22 Tr. 98:4-10; *see also* Trial Ex. 1527.2 ("I think Jamex has to nominate the full contract barrels for June."); Ballengee, 9/20/22 Tr. 225:1-6. Soiefer also took steps to address the issue. Soiefer, 12/6/22 Tr. 210:14-21, 211:11-20. Hampton testified that Bridger Logistics and Ferrellgas attempted to communicate with both Jamex and Monroe regarding the situation. Hampton, 12/14/22 Tr. 175:25-176:17 ("This dispute affected our revenues and we were trying to figure out a resolution among the parties.").

770.    Despite Ferrellgas urging it to do so, Jamex did not nominate any barrels for June 2016; instead, Jamex declared the COSA terminated.  Ballengee, 9/20/22 Tr. 225:25-226:19; Trial Ex. 1529-A.  Wambold testified that upon seeing that letter he was "nearing the side of helpless."  Wambold, 12/9/22 Tr. 100:18-22.

771.    Monroe responded with a May 9, 2016 letter demanding immediate payment of $166,725,000 in liquidated damages "as a result of Jamex's repudiation of the COSA."  Trial Ex. 1535.  Wambold testified that he was horrified and continued his efforts to try to drive a solution for all parties involved.  Wambold, 12/9/22 Tr. 103:4-15.

772.    Ferrellgas and Bridger Logistics considered many options to keep the COSA in effect, including stepping into Jamex's shoes to perform or contracting directly with Monroe.  Wambold, 12/9/22 Tr. 97:1-8, 101:24-102:12 (CC); Trial Exs. 1533 (QPO), 1522; Hampton, 12/14/22 Tr. 177:4-9, Monroe 30(b)(6) (Hunter), Dep. Tr. 183:25-184:19; Trial Ex. 1513.  Wambold testified that Ferrellgas was "doing everything possibly we could to try to keep the business alive, every possible thing that we could."  Wambold, 12/9/22 Tr. 105:25-106:3.  Indeed, as of April 2016, Jamex owed Bridger Logistics $19.4 million.  Heitmann, 2/14/23 Tr. 111:24-17, 249:3-13 (CC); Trial Ex. 1567-B.25 ("The amounts due from and due to Jamex Marketing, LLC at April 30, 2016, were $19.4 million and $0.8 million, respectively."); Trial Ex. 1548.

773.    Ferrellgas and Bridger Logistics discussed the Jamex/Monroe dispute during a May 23, 2016 Ferrellgas board meeting.  *See* Trial Ex. 1541-A ("Since these events tensions between Jamex and Monroe have increased significantly and Ferrellgas has become intimately involved."); Hampton, 12/14/22 Tr. 178:1-16; Wambold, 12/9/22 Tr. 104:5-12.

774.    After the May 2016 board meeting, Wambold tried to negotiate a deal between Monroe and Jamex. Wambold, 12/9/22 Tr. 107:1-4; Trial Ex. 1548.  Wambold testified that

Ferrellgas and Bridger Logistics were in negotiations with Jamex and "were still trying to pull him in and satisfy whatever it was that he needed to keep operating." Wambold, 12/9/22 Tr. 108:24-109:4.

### C. With Jamex Owing Bridger Logistics Millions, Bridger Logistics Terminates The Marketing TLA.

775. As of April 2016, Jamex owed Bridger Logistics $19.4 million. Heitmann, 2/14/23 Tr. 110:24-111:17, 249:3-13 (CC); Trial Ex. 1567-B.25 ("The amounts due from and due to Jamex Marketing, LLC at April 30, 2016, were $19.4 million and $0.8 million. . ."); Trial Ex. 1548.

776. It is undisputed that Bridger Logistics ultimately terminated the Marketing TLA with Jamex Marketing based on its inability to collect from Jamex Marketing in September 2016. Sherman, 12/8/22 Tr. 58:15-59:22. At the time, Jamex Marketing owed Bridger Logistics $49.5 million. Trial Ex. 2419.19-20.

### D. In May/June 2016, Ferrellgas/Bridger Logistics Learn That Eddystone Had Commenced An Arbitration Against Jamex And JTS.

777. At the time of the May 23, 2016 board meeting, Ferrellgas and Bridger Logistics had not learned that Eddystone had commenced an arbitration against Jamex and JTS. Wambold, 12/9/22 Tr. 106:16-21. After the meeting, however, Ferrellgas and Bridger Logistics learned through their attorneys that there was an arbitration between Jamex and Eddystone related to the RSA payments. Hampton, 12/14/22 Tr. 180:21-181:5.

## XVI. THE AFTERMATH.

### A. Bridger Logistics And Assets Are Valued At Pennies On The Dollar.

778. Heitmann testified that CBIZ performed an impairment valuation of Bridger Logistics as of July 2016. Heitmann, 2/14/23 Tr. 117:25-118:2; Trial Ex. 1791. Because the Monroe contract was no longer in force, Ferrellgas and Bridger Logistics concluded that they had an indication of impairment, prompting the new valuation. Heitmann, 2/14/23 Tr. 118:3-7.

779. CBIZ used two different forecasts to calculate Bridger Logistics' updated value. Heitmann, 2/14/23 Tr. 119:15-21; Trial Ex. 1791.35. One estimated Bridger Logistics' assets to be worth $44 million, the other estimated the assets to be worth $203 million. Heitmann, 2/14/23 Tr. 119:15-21; Trial Ex. 1791.35.

780. At the time of the Acquisition in June 2015, CBIZ valued Bridger Logistics' assets at $822,000,452. Heitmann, 2/14/23 Tr. 119:22-25; Trial Ex. 1791.

**B.      Ferrellgas Takes A Massive Impairment And Sustains Other Casualties.**

781. Based on the CBIZ valuation, Ferrellgas reported a $628 million impairment in its July 31, 2016 SEC filing—essentially writing down the value of Bridger Logistics from $822 million to $194 million. *See* Trial Ex. 2495 (Ferrellgas 10-K for the year ending July 31, 2016); Trial Ex. 1791 (CBIZ valuation); Heitmann, 2/14/23 Tr. 121:4-7, 121:24-123:3. The impairment included a reduction in value for the Injection Stations that are the subject of Eddystone's fraudulent transfer claim from $41.6 million to $14.8 million. Trial Ex. 2495.147; Kumar, 12/14/22 Tr. 70:15-71:1 (explaining that Ferrellgas was reporting the value of the injection stations in 2015 as $41.6 million but on "July 31, 2016 this number ha[d] declined . . . to about $14.8 million"). When asked about the impact of the Bridger Logistics purchase, Heitmann testified "It was devastating. You know, paying $822 million for an asset and roughly a year later having to write it down by 628 million was -- it was devastating." Heitmann, 2/14/23 Tr. 122:23-123:3.

782. By September 2016, Wambold was forced to recommend that Ferrellgas cut its distributions to "try to find a way to rebound." Wambold, 12/9/22 Tr. 117:6-118:2. At the time, Jim Ferrell commented in an email to Wambold that the situation was a "massive train wreck" and looked like a "nuclear bomb went off." Trial Ex. 1571.1. Wambold responded: "Yes, I would agree that this is a terrible outcome, unexpected and terribly disappointing. The loss of the Monroe Deal-despite our very best efforts-is a crushing blow and the primary driver behind my request to

the board to consider a distribution reduction."  Trial Ex. 1571.4.

783.   At the end of his testimony, Wambold described the impact of what happened at the company in the final six months of his tenure as CEO of Ferrellgas: "This was – this was – to be in this position so soon after this deal was done was exactly – as I put it in writing, it was shocking, it was disappointing, it was terrifying. You know, so yeah, it was a terrible, terrible time."  Wambold, 12/9/22 Tr. 115:7-13.

784.   He continued: "The distribution cut is one thing to the public markets, right?  I mean, you make a decision to buy a share of stock and when you buy that share of stock, you accept that things go can go bad.  There's a risk.  The most heartbreaking thing of all here is my employees, who many don't have a retirement savings, are about to get hammered and potentially three-quarters of their retirement savings which were tied up inside of the ESOP are about to go down the drain. So that's why we fought so hard all the way to the end, because at the end, that's primarily who we were concerned with."  Wambold, 12/9/22 Tr. 120:16-121:10.

785.   At the board meeting, Wambold, along with the rest of management, was asked to step out of the room.   Wambold, 12/9/22 Tr. 121:19-24.   Wambold then resigned, having concluded that the Board of Directors had lost confidence in him.  Wambold, 12/9/22 Tr. 122:4-7.

786.   Gamboa and Rios also lost their jobs as a result of the failed Acquisition.  Gamboa, 12/7/22 Tr. 149:3-150:4; Rios, 9/23/22 Tr. 137:23-138:11.

787.   Ultimately, Ferrellgas Partners filed a bankruptcy petition in the United States Bankruptcy Court for the District of Delaware on January 11, 2021.  Dkt. 425.

## XVII. EDDYSTONE ENTERS INTO AN ARBITRATION SETTLEMENT WITH JAMEX AND TRIES TO CONFIRM THE AWARD.

### A. Eddystone And Jamex Settle The Arbitration.

788.    In January 2017, the arbitration between JTS and Eddystone was resolved through a settlement agreement between and among "Jamex LLC, Jamex Marketing LLC, Jamex Administrative Services LLC, Jamex Unitholder LLC, Jamex Transfer Holdings LLC, James H. Ballengee, JBAH Holdings LLC, Ballengee Holdings LLC, and Ballengee Interests LLC" (the "Arbitration Settlement").  Dkt. 732 ¶ 112; Trial Ex. 1618; *see also* Paradis, 9/19/22 Tr. 254:5-7.

789.    JTS was a "Party" to the Arbitration Settlement but "solely for the purposes of Paragraphs 1, 4, 8, 11, and 13-22."  Trial Ex. 1618.1; *see also* Ballengee, 9/20/22 Tr. 252:3-12. JTS was warranted to be a Party "correctly described and named," with "power, authority, and legal right" to enter into and perform the obligations of the Agreement.  Trial Ex. 1618.8-9 (¶ 13.)

790.    The recitals stated that ERC and JTS were parties to the arbitration and that the Parties desired to "settle and resolve all claims and disputes between them relating in any way to the Arbitration or any potential Affiliate Claims, all related claims and controversies that were or could have been brought in any pending or resolved litigation and all current, future, known, or unknown claims or disputes between the Parties related in any way to the Arbitration or potential Affiliate Claims, without any admission of liability, all such liability being expressly denied." Trial Ex. 1618.2, Recitals.  "Affiliate Claims" was defined as "any future litigation or claims that ERC may seek to bring against them arising out of or related in any way to the subject matter of the Arbitration, including but not limited to piercing the veil, alter ego, fraudulent transfer, conspiracy, derivative liability, liability as a shareholder or member, liability as director or manager or officer, liability as a vice principal, or any other claim that a Jamex Party is liable for any amounts awarded in the Arbitration or otherwise related to the RSA, the Eddystone rail facility,

or the shipment or failure to ship oil through the Eddystone rail facility." *Id.*

791. The merits of the underlying claims were never fully arbitrated. *See* Dkt. 732 ¶ 112 ("On January 5, 2017, Jamex Transfer Services, LLC and Eddystone settled the arbitration without either party admitting legal responsibility, liability or fault."); *see also* Trial Ex. 2726.2-3 (explaining that Eddystone presented its case-in-chief before the arbitration panel and then parties agreed to a recess until February 2017 to conduct additional discovery, ultimately reaching a settlement in principle in December 2016).

792. Paragraph 11 of the Arbitration Settlement, which applied to JTS as well as the Jamex Parties, provided that there was no "admission of liability by any Party, all such liability being expressly denied," and that "[n]either the Parties' consent to the terms of [the agreement], nor [the agreement] or the terms themselves, shall constitute an admission of legal responsibility, liability, or fault on the part of any Party." Trial Ex. 1618.7-8 (¶ 11); *see also* Ballengee, 9/20/22 Tr. 252:13-253:2. Accordingly, as part of the Arbitration Settlement, JTS did not admit any legal responsibility, liability, or fault. *See* Ballengee, 9/20/22 Tr. 253:3-6 ("Q. Did you understand JTS to have admitted legal responsibility, liability or fault in this settlement agreement? A. I understood that we didn't admit that."); *see also* Dkt. 732 ¶ 112.

793. Nevertheless, the parties also agreed to "submit to the Arbitration Panel a proposed arbitration award" that would "determine that JTS has breached the RSA and award damages in the amount of $139,050,406.77," although the "Jamex Parties" would make cash payments totaling only $450,000 to ERC. Trial Ex. 1618.2-3 (¶¶ 1-2); *see* Ballengee, 9/20/22 Tr. 253:10-254:20; Paradis, 9/19/22 Tr. 254:5-11; *see also* Trial Ex. 2725 (Pet. To Confirm Arbitration Award, Dkt. No. 1, *Eddystone Rail Company v. Jamex Transfer Services, LLC*, Case No. 1:17-cv-01266-JMF-OTW (S.D.N.Y.)) (petitioning the court to confirm the arbitration award of $139,050,406.77).

794.     Although JTS denied liability, paragraph 5 of the Arbitration Settlement released the Jamex Parties from the Award but did not release or discharge JTS, both through the definition of a "Party" and by stating expressly that "ERC does not however remise, release, or discharge JTS from the Award or its obligation thereunder."  Trial Ex. 1618.4-5 (¶ 5).

795.     Paragraph 12 stated that the Settlement is a "full and complete settlement between them as to the matters being released, and that none of the Parties has any obligation to make any payment or to do any act other than as set forth herein."  Trial Ex. 1618.8 (¶ 12).

796.     Paragraph 17 provided that the Arbitration Settlement is the "entire understanding and agreement between the Parties concerning the subject matter hereof and supersedes and replaces any and all prior negotiations and agreements, written or oral."  Trial Ex. 1618.10 (¶ 17).

797.     The Arbitration Settlement is governed by New York law.  Trial Ex. 1618.10 (¶ 16).

798.     Despite JTS denying liability, the stipulated arbitration award provided that JTS "has materially breached and anticipatorily repudiated the" RSA, that JTS "owes $139,050,406.77 in damages to Eddystone Rail Company, LLC," and that the "defenses and counterclaims asserted by [JTS] in the arbitration are without merit."  Trial Ex. 1618.15-16 (Exhibit 1, Proposed Arbitration Award, ¶¶ 1, 2, 4).

799.     The Jamex Parties made an initial payment of $250,000 to ERC five days after executing the Arbitration Settlement.  *See* Trial Ex. 1618.2-3 (¶ 2); Ballengee, 9/20/22 Tr. 253:18-254:20.  The Jamex Parties agreed to make a subsequent payment of $200,000 to ERC no later than six months after the Arbitration Settlement was executed.  Trial Ex. 1618.2-3 (¶ 2); Ballengee, 9/20/22 Tr. 254:3-11.  When crafting its settlement with the Jamex Parties, including the payment amount, Eddystone relied on unaudited financial statements.  30(b)(6) (Boaz), Tr. 250:4-17.

800.     As part of the Settlement, Eddystone took possession of the oil in the storage tank

at the facility.  Trial Ex. 1618.3 (¶ 3); Ballengee, 9/20/22 Tr. 254:12-20.  There were approximately 28,000 barrels of oil left at the facility at that point.  Trial Ex. 3008 (Bramer Decl.) ¶ 14, 17 n.10.

801.   Although Defendants were not a party to the Arbitration Settlement, ERC commenced this action in February 2017, which seeks "all payments BTS owes to [ERC] under the RSA" and "all amounts awarded by the [] arbitration panel in the arbitration between [ERC] and [BTS]," together with interest.  Dkt. 182 (FAC) ¶¶ 75, 86, Prayer for Relief ¶¶ 1-2.

**B.      Eddystone Seeks To Confirm Its Stipulated Arbitration Award In The Southern District Of New York; Confirmation Is Stayed.**

802.   Also in February 2017, Eddystone moved to confirm its stipulated arbitration award in the Southern District of New York.  Trial Ex. 2625.  Defendants moved to intervene, arguing that the arbitration award was the product of collusion between Jamex and Eddystone.  Trial Ex. 2726.5. Although Judge William H. Pauley denied Defendants' motion to intervene, Judge Pauley stayed the confirmation proceedings:

> Bridger has not yet demonstrated a substantial interest in the arbitration.  But as a practical matter, it is troubling to the Court that an Arbitration Award obtained through a settlement between Eddystone and Jamex—an entity with no assets— could summarily be converted into a $139 million judgment.  And even more concerning is that this judgment could then be used against a party that never had the opportunity to challenge the process by which the Arbitration Award was obtained.

Trial Ex. 2727.8.

## XVIII. ENBRIDGE TURNS AWAY NEW BUSINESS AT EDDYSTONE.

803.   JTS did not have the exclusive right to use the Eddystone Facility, and Eddystone had the ability to offer other shippers transloading capacity.  Paradis, 9/19/22 Tr. 202:16-203:2.

804.   To that end, Enbridge and Canopy had discussions about finding other uses for the Eddystone Facility.   Paradis, 9/19/22 Tr. 240:10-14; E. Johnson, 12/13/22 Tr. 129:25-130:4, 130:22-131:1, 133:22-25.  But Enbridge and Canopy disagreed about whether and how the facility

should be used.  Paradis, 9/19/22 Tr. 240:23-241:5.  Canopy wanted to keep the facility open and continue to market it.  Paradis, 9/19/22 Tr. 240:23-241:5; Trial Ex. 1644.  Enbridge was paying all of the operating costs at that time and wanted to shut the facility down.  Paradis, 9/19/22 Tr. 240:23-241:5.  Paradis testified that in early 2016, Eddystone was not "part of [Enbridge's] core business."  Paradis, 9/19/22 Tr. 241:6-10.

805.    Canopy nonetheless tried to bring new customers to the facility.  E. Johnson, 12/13/22 Tr. 129:2-5.  As Erik Johnson testified, Eddystone was Canopy's only asset at the time and Canopy's sole concern was keeping the facility from shutting down.  E. Johnson, 12/13/22 Tr. 138:3-11.  In Canopy's view, "[t]he best way to mitigate Canopy's damages and keep some glimmer of hope of the facility operational was to try anything but to shut it down."  E. Johnson, 12/13/22 Tr. 129137:22-138:2.

806.    Accordingly, Canopy found some potential customers.  E. Johnson, 12/13/22 Tr. 133:24-25.  It pursued Watco as a strategic partner, *id.* at 134:22-25, had interest from a company named Brasken, and was in "advancing discussions with Delta to resume crude flows to ERC a number of times in 2016" among others.  *See* Trial Ex. 1644 ("outlining a number of opportunities for ERC and the potential cash flow that they may generate"); E. Johnson, 12/13/22 Tr. 135:10-136:17, 137:19-21.  With respect to the interest from Delta and Monroe, Erik Johnson testified that discussions were shut down twice during 2016 because Enbridge's issuance of a subpoena and aggressive pursuit of litigation related to it.  E. Johnson, 12/13/22 Tr. 136:18-137:13.

807.    From February 2016 to October 2017, no additional customers transloaded through the Eddystone Facility.  E. Johnson, 12/13/22 Tr. 128:20-129:1; Paradis, 9/19/22 Tr. 241:17-20.

808.    With regard to the potential business opportunities, Canopy characterized Enbridge's actions as a "go-away sign" that "made it difficult to get business in."  E. Johnson,

12/13/22 Tr. 130:15-21. Enbridge believed that the best way to proceed was to "mothball the facility," which means decommissioning the facility or putting it in preservation status." E. Johnson, 12/13/22 Tr. 131:2-17. Johnson explained that "Enbridge had a big company approach. They could make – they could afford to mothball the facility and move on with their many other opportunities." E. Johnson, 12/13/22 Tr. 138:3-9.

809.    Ultimately, the Eddystone Facility was not mothballed. E. Johnson, 12/13/22 Tr. 132:2-3. Instead, Eddystone maintained sufficient personnel, although somewhat reduced, to operate the facility. E. Johnson, 12/13/22 Tr. 132:4-10. Eddystone also kept current on all but one of the insurance programs on the facility, which was transferred to inactive status. E. Johnson, 12/13/22 Tr. 133:1-8.

810.    In other words, Eddystone paid the required insurance and maintained sufficient staff to operate so Eddystone could receive customers, yet it brought in no new customers.

## XIX.    ENBRIDGE SELLS ITS STAKE IN EDDYSTONE TO CANOPY BUT RETAINS RIGHTS TO RECOVERY IN THIS LITIGATION; CANOPY RESUMES SHIPMENTS AT THE FACILITY.

811.    Enbridge finally agreed to sell its interests in the facility in 2017, which Canopy as its counterparty. As leverage in negotiations with Canopy, Enbridge threatened to drive Eddystone into bankruptcy. Galloway, Dep. Tr. 484:21-485:7.

812.    On October 19, 2017, Canopy, Eddystone, the Canopy principals, and Enbridge (U.S.) Inc. entered into a Redemption and Asset Transfer Agreement related to the Eddystone Facility. E. Johnson, 12/13/22 Tr. 140:12-14; Trial Ex. 1786. As a result of that agreement, Canopy became the sole owner of the Eddystone Facility. E. Johnson, 12/13/22 Tr. 141:25-142:4. In exchange, Enbridge forgave its $39 million loan to Canopy. E. Johnson, 12/13/22 Tr. 142:5-22; 143:9-14. Enbridge also agreed to indemnify Canopy and pay Canopy's legal expenses. E. Johnson, 12/13/22 Tr. 142:23-143:4. Canopy agreed to pay Enbridge $5 million, provided a

release to Enbridge, and assigned its rights to any recovery in this litigation to Enbridge. E. Johnson, 12/13/22 Tr. 143:9-20. As of the date of trial, Enbridge owned 100 percent of Eddystone, Eddystone has no revenue-generating or operating assets, and Eddystone exists solely to pursue this lawsuit. Paradis, 239:12-21.

813. In August 2018, the Eddystone Facility once again began receiving trains of crude oil, which were moved onto barges and sent to the Monroe refinery. E. Johnson, 139:15-140:1; Trial Ex. 2455. Monroe also entered into a direct crude supply deal with Eddystone for approximately 20,000 barrels in January 2018. Monroe 30(b)(6) (Hunter), Dep. Tr. 205:24-206:7.

## XX. FACTS RELATED TO THIS LITIGATION.

814. By that time, Eddystone had already initiated this action by filing its initial complaint in February 2017. Since then, the following facts have been established by the testimony of Eddystone's corporate representative or by an absence of evidence in the record.

815. There is no allegation or evidence that BTS was undercapitalized when it was formed. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 299:12–23.

816. There is no allegation or evidence that Bridger Logistics or Bridger Rail Services neglected corporate formalities with regard to BTS. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 299:24–300:1.

817. There is no allegation or evidence that the Ferrellgas entities neglected corporate formalities with regard to BTS. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 299:24–300:1.

818. There is no allegation or evidence that BTS failed to pay dividends. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:2–3.

819. There is no allegation or evidence that BTS failed to maintain proper, individual corporate records. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:4–6.

820. There is no allegation or evidence that BTS employed nonfunctioning officers or

directors that did not participate in BTS' business. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:13-16.

821.     There is no allegation or evidence that Bridger Logistics or Bridger Rail Services comingled funds with BTS. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:17–19.

822.     There is no allegation or evidence that the Ferrellgas entities comingled funds with BTS. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:17–19.

823.     There is no allegation or evidence that BTS failed to maintain separate bank accounts from Bridger Logistics or Bridger Rail Services. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:20–25.

824.     There is no allegation or evidence that BTS failed to maintain separate bank accounts from Ferrellgas. *See* Eddystone 30(b)(6) (Cohen), Dep. Tr. 300:20–25.

825.     The Bridger entities maintained corporate separateness between each subsidiary and its parent. *See* Rios, 9/23/22 Tr. 128:3–134:4 (discussing the steps taken by Bridger to maintain separateness in its subsidiaries' bank accounts and asset classifications).

826.     There is no evidence relating to Bridger Energy, LLC.

827.     There is no evidence that any Ferrellgas executive approved, directed, or actively participated in the affairs of BTS.

# PROPOSED CONCLUSIONS OF LAW

Defendants' legal submission also proceeds in a series of subject matter sections, as follows:

1. A discussion of alter ego, which is a remedy and not a claim, and the inapplicability of the doctrine based on the facts adduced at trial (COL ¶¶ 1-124);

2. The fraudulent transfer claims, both intentional and constructive, including the details demonstrating the absence of any "siphoning" or "diversion," while also proving that the perfected Bank of America lien was not itself a fraud and showing that Eddystone's valuation of transferred BTS assets is legally insufficient in any event (COL ¶¶ 125-268);

3. The fiduciary duty claim, built on a supposed duty transferred from members to creditors that was recently declared to be non-existent in Pennsylvania, that is not recognized in other states of any pertinence and, in any case, where Defendants sought to preserve, rather than destroy, the parties' economic opportunities, including for Eddystone (COL ¶¶ 269-359);

4. Defendants' affirmative defenses, also established based on the same factual record, the existence of which defeats aspects of Eddystone's claims in this case (COL ¶¶ 360-76);

5. Only in the event of an alter ego finding, the economic harm stemming from Eddystone's failure to install CT meters, as required by the RSA (COL ¶¶ 377-96);

6. The absence of a legal basis for the enormous damage numbers Eddystone claims based on a non-existent breach of contract claim arising from a breach of the RSA by JTS, not BTS, and the commensurate absence of any reason to award pre-judgment interest in this case, let alone any basis on which to award punitive damages (COL ¶¶ 397-431);

7. And, finally, based on a full record, the reasons why admiralty jurisdiction, the ostensible basis for federal court jurisdiction, is lacking in this case (COL ¶¶ 423-71).

# I.    COUNT ONE: ALTER EGO.

8.    Count One is a claim for "Alter Ego" liability.  Dkt. 182 ¶¶ 76-86.

9.    Eddystone argues that four different entities (Bridger Logistics, Bridger Rail Shipping, Ferrellgas LP, and Ferrellgas Partners, collectively the "Alter Ego Defendants") were alter egos of BTS, based principally on the allegations that they "completely dominated BTS in all aspects of its business" and ultimately transferred assets from BTS and sold the company to Jamex. Dkt. 182 ¶ 77.  From that, Eddystone claims the Alter Ego Defendants are liable "for the debts BTS owes to Eddystone."  *Id.* ¶ 86.

10.    Alter ego is not an independent cause of action; it is an equitable remedy.  *Peacock v. Thomas*, 516 U.S. 349, 354 (1996); *ITP, Inc. v. OCI Co.*, 865 F. Supp. 2d 672, 684 (E.D. Pa. 2012) ("[A]n attempt to pierce the corporate veil is not itself a cause of action, but rather a means of imposing liability on an underlying cause of action, such as a tort or breach of contract."); *Mitchell v. CJKant Res. Grp., LLC*, No. 21-cv-2465, 2021 WL 5980049, at *4 (E.D. Pa. Dec. 17, 2021) ("[T]he alter ego theory is just that—a theory used to impose liability onto a defendant once an actual cause of action has been proven, such as a breach of contract claim, and after the necessary factors for piercing the corporate veil have been met."); *Commonwealth by Shapiro v. Golden Gate Nat'l Sr. Care LLC*, 194 A.3d 1010, 1035 (Pa. 2018) (same).

11.    Stated differently, alter ego allows a court to consider and impose derivative liability ***only after*** a party has alleged and proven a predicate cause of action.  Without an underlying cause of action creating liability, evidence of abuse of the corporate form is wholly immaterial.  *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 576 (3d Cir. 2018) (veil piercing is "an equitable remedy whereby a court disregards the 'existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'" (quoting *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999))); *Mitchell,* 2021 WL

5980049, at *4 ("[T]he alter ego theory is just that—a theory used to impose liability onto a defendant once an actual cause of action has been proven, such as a breach of contract claim, and after the necessary factors for piercing the corporate veil have been met."); *see also United States v. Bestfoods*, 524 U.S. 51, 68 (1998) (questions about "relationship between" a parent and a subsidiary go to "indirect liability").

12.     Eddystone did not plead an underlying cause of action here—i.e., it did not allege an independent cause of action for which it seeks to hold the Alter Ego Defendants liable.  That alone is dispositive.  *See, e.g.*, *Peacock*, 516 U.S. at 354 (no jurisdiction over alter ego "claim" because there was no underlying cause of action); *RBATHTDSR, LLC v. Project 64 LLC*, Civil Action No. 19-1280-RGA, 2020 WL 2748027, at *6 (D. Del. May 27, 2020) (dismissing alter ego claim premised on a tort claim that was not asserted); *Meyer v. Bayles*, Civil Action No. 12–0043, 2012 WL 2522896, at *4 (W.D. La. May 31, 2012) ("[I]f a complaint attempts only to state a veil piercing claim, and not an underlying cause of action, it must be dismissed."); *Bank of Am., N.A. v. Knight*, 875 F. Supp. 2d 837, 854 (N.D. Ill. 2012), *aff'd*, 725 F.3d 815 (7th Cir. 2013) (dismissing alter ego "claim" when underlying claims were dismissed); *Arimilli v. Rezendes*, No. CV-21-00345-PHX-GMS, 2022 WL 1664278, at *7 (D. Ariz. May 25, 2022) ("An alter ego claim 'is not itself a cause of action,' but rather a tool by which to ascribe liability to an individual or entity for the actions of a separate corporate entity. . . . As Plaintiff has not asserted claims against any corporate entities, her claim for alter ego does not state a claim for relief."); *VA C 12266 Jefferson, LLC v. Mattress Warehouse Inc.*, Civil No. 14cv34, 2014 WL 5311453, at *4 (E.D. Va. Oct. 16, 2014) ("Since Plaintiffs' breach of contract claim is dismissed, its alter ego claim has no cause of action on which to rest."); *Mitchell*, 2021 WL 5980049, at *7 ("[S]ince Pennsylvania's highest

court has determined that alter ego and veil-piercing claims are not independent causes of action, the Court dismisses [the] Alter Ego Claim with prejudice.").

13. Should the Court rule, as it did on summary judgment (Dkt. 557 ¶ 8), that the standalone alter ego count is a claim for breach of the RSA, Eddystone was required to prove (1) that it could enforce the RSA against these Defendants, (2) a breach of contract that supports liability against the Alter Ego Defendants in the first place, and (3) that each of these Defendants should be held liable through the doctrine of alter ego/veil piercing.

14. As Eddystone failed to prove each of these steps, Count One fails.

**A. Applicable Law.**

15. Eddystone seeks to enforce the RSA, which contains a choice-of-law provision stating that the agreement is governed by New York law. FOF ¶ 136 (quoting Trial Ex. 90-A, RSA § 15.2 ("This Agreement shall be governed and construed according to the laws of the State of New York, without regard to principles of conflict of laws that, if applied might require the application of the laws of another jurisdiction")). As the Third Circuit recently explained, in admiralty, contractual choice-of-law provisions are typically enforced, unless there is either an established federal rule or enforcement would be "unreasonable or unjust." *Great Lakes Ins. Se. v. Raiders Retreat Realty Co., LLC*, 47 F.4th 225, 229-230 (3d Cir. 2022), *cert. granted*, 2023 WL 2357327 (Mar. 6, 2023); *St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of Port of New Orleans*, 418 F. App'x 305, 309 (5th Cir. 2011).

16. As for the alter ego allegations, the Third Circuit Court of Appeals has not decided the issue, but other federal courts sitting in admiralty have applied federal common law to evaluate veil piercing theories. *See, e.g.*, *Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.*, 722 F.3d 488, 497 (2d Cir. 2013) ("When the choice is between state law and federal common law, the federal interest in maintaining uniformity in the quintessentially federal realm of admiralty

supersedes any competing interest in applying state law"); *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) ("Sitting in admiralty, we apply the federal common law in examining corporate identity."); *Daughtry v. Jenny G. LLC*, 703 F. App'x 883, 886 (11th Cir. 2017) ("To determine whether to disregard the corporate form in an admiralty case, we apply federal common law."). To the extent there is variance in courts' articulation of the federal common law of alter ego, courts ultimately follow the law of their own circuits. *See*, *e.g.*, *Pac. Gulf Shipping*, 992 F.3d at 899 (applying Ninth Circuit articulation of law).

17. In turn, when applying federal common law, the Court may borrow from state law. *Floyd v. Lykes Bros. S.S. Co.*, 844 F.2d 1044, 1047 (3d Cir. 1988) ("State law may supplement maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with maritime law."); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 40 F.3d 622, 627 (3d Cir. 1994), *aff'd in part*, 514 U.S. 1126 (1996) ("Whether a state law may provide a rule of decision in an admiralty case depends on whether the state rule 'conflicts' with the substantive principles of federal admiralty law.").

18. Accordingly, the alter ego analysis must be consistent with Third Circuit law and may take into account the interests of the pertinent states—here, Louisiana, Delaware, and Pennsylvania.

19. Though there are differences in the articulation of the factors, the laws of the three pertinent states all require a showing that the parent/shareholder and the company/subsidiary fail to maintain separate corporate structure such that they become indistinguishable to the point that, in fairness, they should be treated as a single entity.

20. Under the Louisiana law, the state of formation for BTS and Bridger Logistics (*see* FOF ¶ 20), the veil is pierced when "the shareholder fails to properly conduct the corporation's

business as a separate entity, and the shareholder and the corporation become indistinguishable such that, in reality, the corporation is the alter ego of its shareholder." *See, e.g.*, *Simmons v. LUBA Workers' Comp.*, 206 So. 3d 397, 402 (La. Ct. App. 2016); *see also Town of Haynesville, Inc. v. Entergy Corp.*, 956 So. 2d 192, 198 (La. App. 2d Cir. 2007) ("An alter ego analysis involves the consideration of five factors: (1) commingling of corporate and shareholder funds (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization (4) failure to maintain separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings."); *id.* at 197 ("[C]ontrol alone is not sufficient to warrant a piercing of the corporate veil. The determination of whether the corporate veil has been pierced and the corporation is merely the 'alter ego' of the shareholder is made by considering the totality of the circumstances.").

21.     To pierce the corporate veil under Delaware law, the state of formation for Ferrellgas LP and Ferrellgas Partners (*see* FOF ¶ 5), the parent must have "exclusive domination and control" such that the controlled entity "no longer ha[s] legal or independent significance of [its] own" and is essentially a "sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999); *Wenske v. Blue Bell Creameries, Inc.*, C.A. No. 2017-0699-JRS, 2018 WL 3337531, at *15 (Del. Ch. July 6, 2018) (dismissing veil-piercing claim that failed to allege facts supporting inference that corporation "exists solely as a vehicle for fraud"); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("[T]he plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors.").

22.     Under the laws of Pennsylvania, the location of the Eddystone Facility, veil piercing requires a showing that "the controlling corporation wholly ignored the separate status of

the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." *Trinity Indus. Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365-368 (3d Cir. 2018) (applying federal and Pennsylvania law and rejecting theory under both); *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 14 (3d Cir. 1990); *Arrowhead Conveyor Corp. v. Giuseppe's Finer Foods, Inc.*, Nos. 309 and 351 WDA 2019, 2020 WL 1460815, at *10 (Pa. Super. Ct. Mar. 24, 2020) ("[T]here is a strong presumption in Pennsylvania against piercing the corporate veil. . . . Our courts consider the following factors when determining whether to pierce the corporate veil: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs, and (4) use of the corporate form to perpetrate a fraud.").

23.     To the extent these jurisdictions' laws diverge, federal choice-of-law principles guide the analysis. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000). The federal common law looks to the *Restatement (Second) of Conflict of Laws* when conducting a choice-of-law analysis and the general rule is "to apply the law of the jurisdiction having the greatest interest in the litigation." *Eli Lilly Do Brasil, Ltda v. Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007).

24.     The basic principles to determine a jurisdiction's interest are stated in Section 6 of the *Restatement (Second) of Conflict of Laws*, but courts will generally follow the more specific provision of the *Restatement*, which is Section 307 here. *See In re Tutu Wells Contamination Litig.*, 909 F. Supp. 1005, 1009 (D.V.I. 1995). Section 307 states that the existence and extent of a shareholder or member's liability to an entity is determined by the state in which the entity was formed. *Restatement (Second) of Conflict of Laws* § 307 (1971).

25.     Accordingly, to the extent the Court supplements federal common law with state law, because BTS is a Louisiana company, the Court looks most directly to Louisiana law.

**B.    Eddystone Did Not Prove A Breach Of The RSA That Can Support Liability Against Defendants.**

*BTS Did Not Breach the RSA Before The Sale To Jamex*

26.    The elements of a breach of contract claim under New York law are well established: to prevail, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract with the defendant, (2) performance of the plaintiff's obligations under the contract, (3) breach of the contract by the defendant, and (4) damages to the plaintiff caused by that defendant's breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (applying New York law); *Hampshire Props. v. BTA Bldg. & Dev., Inc.*, 996 N.Y.S.2d 129, 130 (N.Y. App. Div. 2014).

27.    Here, Eddystone has not brought a breach of contract claim. *See* Dkt. 182.

28.    Rather, Eddystone represented that, as part of its Alter Ego Claim, it would "prove [an] RSA breach and damages" without reference to the Jamex arbitration award. Dkt. 512-1 (Pl.'s MSJ Br.) at 21. Eddystone made this statement in response to Defendants' arguments that (1) alter ego cannot be asserted absent an underlying tort or contract claim and (2) Eddystone sought to collect on the basis of its settlement agreement with Jamex, which expressly disclaims liability as to JTS. *Id.* at 20; Dkt. 495-1 at 10; Dkt. 495-4 (Defs.' MSJ Statement of Facts ¶ 151).

29.    Eddystone's breach of contract allegations are limited to the failure to pay under the RSA. Dkt. 512-1 at 20-22 (describing breach of contract allegations on which alter ego claim is based); ; *see also* Trial Ex. 3002 (Sherman Aff.) ¶ 115 (Sherman, 12/8/22 Tr. 95:9-18 (damages calculation is based on payments due under the RSA's full term). It has not identified a breach of contract related to the any failure to provide financial assurances. *See id.*; Dkt. 182.

30.    With respect to obligations under the RSA, BTS was the only entity that executed the RSA (FOF ¶ 133), there are no third-party beneficiaries under the RSA (FOF ¶ 134), and none

of the Alter Ego Defendants (or any other parties, for that matter) guaranteed BTS' performance (FOF ¶¶ 155, 165). While Bridger Logistics executed a 20-day guarantee in September 2014 (more than a after the RSA was signed), that guarantee contained a limitation of liability and expired that same month. (FOF ¶ 263).

31. BTS performed its obligations under the RSA through the time it was sold to Jamex, after which the company was renamed James Transfer Services or "JTS." FOF ¶ 749. Every payment owed to Eddystone by **BTS** under the RSA prior to the sale was made before Bridger Logistics sold its interest in the company to Jamex; BTS was current on its payments at the time of the sale. FOF ¶ 752; *see also* Dkt. 182 ¶ 86 & Prayer for Relief (seeking only monies for debts owed after the sale to Jamex).

32. Eddystone did not plead that the decision to transfer the BTS assets to other subsidiaries and then sell the company to Jamex directly breached any term of the RSA. Nor could it because, even though the RSA contains an anti-assignment provision, it does not contain a change-of-control provision. FOF ¶¶ 137-38.

33. Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accordance with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing." *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 302 (S.D.N.Y. 2010) (citations omitted).

34. New York distinguishes "assignment" from "change-in-control" and provides that a limitation on the former does not bar a change-of-control of an entity through the purchase or transfer of shares in the entity. *See Dennis' Nat. Mini-Meals, Inc. v. 91 Fifth Ave. Corp.*, 172 A.D.2d 331, 334 (N.Y. App. Div. 1991) (corporation's "transfer of all of its stock to a third party does not constitute a breach of a nonassignment provision" of an agreement to which it is a party).

35.     Courts will not read a change-of-control provision into a contract when a sophisticated party like Eddystone could have negotiated for such a provision but failed to do so. *See MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 456 (S.D.N.Y. 2016) ("The parties that negotiated Section 13(e) did not use any language that would require consent based on an upstream change of control. Courts routinely refuse to find a change of control provision in contracts that do not use the phrase 'change of control.'"); *JA Apparel*, 682 F. Supp. 2d at 302 (observing that New York law is particularly reluctant to insert into arms-length contracts provisions or obligations that sophisticated parties could have included on their own); *Nassau Chapter, Civ. Serv. Emp. Ass'n v. Bd. of Ed., Union Free Sch. Dist. No. 3, Town of Hempstead*, 310 N.Y.S.2d 381, 383 (N.Y. App. Div. 1970) ("It is not for the Court to enlarge the contract by inserting provisions which the parties could have negotiated and agreed upon but did not[.]").

36.     It follows that nothing in the RSA prevented Bridger Logistics from transferring BTS assets and then selling BTS to Jamex, an entity that had an interest in the success of the Eddystone contract. *See* FOF ¶¶ 672-77.

37.     Accordingly, the Court concludes that BTS did not breach the RSA while it was a Bridger Logistics subsidiary.

### *Defendants Are Not Responsible For Any Liability Incurred By JTS.*

38.     Unable to show that **BTS** breached the RSA, Eddystone seeks damages for debts that **JTS** allegedly owed to Eddystone after **JTS** ceased performance under the RSA. *See* Dkt. 182 ¶ 86 & Prayer for Relief.

39.     Eddystone's expert Sherman calculates Eddystone's alleged damages as the deficiency charges for periods January 2016 through June 2019, which Sherman totals to $145,907,403.00. Trial Ex. 3002 (Sherman Aff.) ¶ 115 ("[T]he amount of payments owed to

Eddystone under the RSA, before any late fees set forth in the RSA or pr-judgment interest, total $145,907,403, as shown on PSX 104."); *id.* at 3002.77 (PSX 104, showing alleged deficiency charges by month).

40.　　As an initial matter, and perhaps most fundamentally, Eddystone has never—in this case or in the arbitration—proven that JTS breached the RSA, i.e., that it was required to perform but failed to do so.  That is fatal.

41.　　The deficiency charges identified did not become due and owing until ***after*** Jamex purchased BTS.  The deficiency charges allegedly due for the month of February 2016 to the end of the RSA's term were undisputedly incurred after BTS was sold to Jamex and liabilities for the RSA transferred to Jamex.  *See* FOF ¶ 742 (BTS PSA § 2.1(b) provides that JTH assumed all "[l]iabilities under the [RSA] and the Contracts set forth on Schedule 4.4 for periods on and after" February 1, 2016 (Trial Ex. 1439-H.8-.9)).

42.　　The deficiency charges for throughput in January 2016, though incurred prior to the sale of BTS to Jamex, did not become due and owing until February 2016, after the sale.  *See* FOF ¶¶ 149-51 (Section 5.3 of the RSA (Trial Ex. 90-A.9) provides that Eddystone will send BTS an invoice "each Month for all Charges payable by Customer . . .and other amounts payable by Customer . . . for the immediately preceding Month" and that BTS was required to pay the invoiced amount "on the 20th of the Month immediately following the Month for which Charges are payable or ten (10) days after invoicing whichever is later.").

43.　　In connection with the BTS sale, Bridger Logistics provided $4,447,677.96 to JTS to cover these (and other) amounts "in satisfaction of all charges and sums actually due under invoices issues in the ordinary course of business pursuant to the [RSA] that are incurred during the period of the month of January 2016."  *See* FOF ¶¶ 740-41 (explaining that the BTS PSA §

2.3(c) (Trial Ex. 1439-H.8) ensures that Eddystone was paid by JTS for any deficiency payments incurred in January 2016 and § 2.1(b) & Ex. B § 4 agree that JTS would be responsible for future amounts due to Eddystone, guaranteed by Jamex Marketing, the ultimate parent). On February 26, 2016, Jamex paid ERC $3,954,543.58 for volumes transloaded in January 2016, but did not pay the January 2016 deficiency charges, instead sending a letter to Eddystone regarding the facility deficiencies. *See* FOF ¶¶ 749-52 (Trial Ex. 1454-A). The RSA expressly provides that JTS could withhold deficiency payments for any month where Eddystone was unable to accept all or part of the Monthly Volume Commitment. *See* FOF ¶¶ 147-49 (Trial Ex. 90-A.2 (§ 4.4)). Eddystone has not proven that JTS operated outside the confines of its rights under the RSA by withholding deficiency fees for January 2016 and raising the facility defects as the reason.

44.     Rather than negotiate with Ballengee, Eddystone elected to commence arbitration against JTS, JTH, and Jamex (among other parties). FOF ¶ 753-56. The merits of the arbitration were never resolved and instead the parties entered into a settlement agreement in which no party admitted liability, while also stipulating to a $139 million arbitration award in favor of Eddystone for breach of the RSA. FOF ¶¶ 788-94.

45.     There are multiple doctrines that preclude what Eddystone seeks to do here—manipulate pleaded facts to its advantage in two different fora in an effort to capitalize on the same alleged injury against different entities under conflicting theories.

46.     First, the Arbitration Settlement extinguished the very obligation on which Eddystone purports to base its alter ego "claim." FOF ¶¶ 789, 793-94 (Trial Ex. 1618 (the Arbitration Settlement)).

47.     The Arbitration Settlement, governed by New York law, was between "Jamex LLC, Jamex Marketing LLC, Jamex Administrative Services LLC, Jamex Unitholder LLC, Jamex

Transfer Holdings LLC, James H. Ballengee, JBAH Holdings LLC, Ballengee Holdings LLC, and Ballengee Interests LLC." FOF ¶¶ 790, 797. Though JTS was identified as "a Party solely for the purposes of Paragraphs 1, 4, 8, 11, and 13-22 herein.," it was warranted to be a Party "correctly described and named," with "power, authority, and legal right" to enter into and perform the obligations of the Arbitration Settlement. FOF ¶ 789.

48.     Despite the limitation on JTS' participation in the Arbitration Settlement, the recitals specify that JTS is a party in the arbitration, and that it seeks to settle all claims and disputes between it and Eddystone "relating in any way to the Arbitration" and "all related claims and controversies that were or could have been brought in any pending or resolved litigation and all current, future, known, or unknown claims or disputes between the parties . . . without any admission of liability, all such liability being expressly denied." FOF ¶ 790. Paragraph 11 further provides that there was no "admission of liability by any Party, all such liability being expressly denied," and that "[n]either the Parties' consent to the terms of [the agreement], nor [the agreement] or the terms themselves, shall constitute an admission of legal responsibility, liability, or fault on the part of any Party." FOF ¶ 792.

49.     The only carve out in the general release by Eddystone related to JTS, stating "ERC does not however remise, release, or discharge JTS from the Award or its obligation thereunder." FOF ¶ 794.

50.     Paragraph 12 specifies that the Arbitration Settlement is a "full and complete settlement between them as to the matters being released, and that none of the Parties has any obligation to make any payment or to do any act other than as set forth herein." FOF ¶ 795. Paragraph 17 further specifies that the Arbitration Settlement is the "entire understanding and agreement between the Parties concerning the subject matter hereof and supersedes and replaces

any and all prior negotiations and agreements, written or oral." FOF ¶ 796. Both oil and money was transferred to Eddystone in the settlement. FOF ¶¶ 798-800.

51.     In accordance with the Arbitration Settlement, and despite disclaiming any admission of liability, the parties agreed to an award that stated that "Jamex Transfer Services, LLC has materially breached and anticipatorily repudiated the Eddystone Rail Facilities Services Agreement;" that it is "liable . . . for general damages resulting therefrom" and that "Jamex Transfer Services, LLC owes $139,050,406.77 in damages to Eddystone." FOF ¶ 798.

52.     The effect of those provisions is clear:  Eddystone arbitrated its claims for monies allegedly owed under the RSA from February 2016 through the contract term against JTS, the party with the power and obligation to perform as of February 1, 2016, and JTS entered into a valid and binding settlement agreement to resolve payment of those obligations. *In re Visteon Corp.*, 579 F. App'x 121, 129 (3d Cir. 2014) ("Settlement agreements are considered binding contracts and are governed by the ordinary principles of contract law."); *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) ("[S]ettlement agreements are contracts and must therefore be construed according to general principles of contract law").

53.     Here, the Arbitration Settlement supersedes the RSA. *See* FOF ¶ 796 (Arbitration Settlement states that it is the "entire understanding" between the parties that "supersedes and replaces any and all prior negotiations and agreements, written or oral" between the parties"); *Metro. Steel Indus., Inc. v. Fid. & Deposit Co. of Md.,* 68 A.D.2d 935, 935 (2d Dept. 1979) (finding that settlement agreement "discharged the earlier obligation and became substituted therefor"); *Chappelow v. Savastano*, 758 N.Y.S.2d 782, 786 (Sup. Ct. 2003) (general releases and intent to supersede in later agreement extinguished claim for breach); *Thales Alenia Space France v. Thermo Funding Co., LLC*, No. 13-cv-712 SAS, 2014 WL 3887711, at *2 (S.D.N.Y. Aug. 7, 2014)

("Article 14 of the Settlement Agreement extinguishes the prior Reimbursement Agreement. The clause reads: 'This Agreement constitutes the entire agreement between the Parties and supersedes all prior understandings, commitments and representations between the Parties.'").

54.     Although there has not yet been a final judgment confirming the arbitration award, its effect would be the same.  *See Sovereign Bank v. REMI Cap. Inc.*, 49 F.4th 360, 368 (3d Cir. 2022) (even aside from the doctrine of substituted contract, earlier contract claims and interest rates "were not extinguished solely by entry of a judgment in this case.  Rather the parties agreed to a settlement which they recorded in a judicial decree," "constrain[ing] [the Court] to interpret the subsequent agreement by the parties within the confines of its text," an analysis closer to "the contractual principle of merger than merger-by-judgment.").

55.     To the extent Eddystone attempted to retain its claims against JTS under the RSA notwithstanding the Arbitration Settlement by not providing a release to JTS in the settlement or stating that no party admits liability (FOF ¶ 792), its attempt is in contradiction to the Arbitration Settlement itself.  The Arbitration Settlement expressly provides that the Jamex Parties desired to settle the claims against them "arising out of or related in any way to the subject matter of the Arbitration, including . . . any other claim that a Jamex Party is liable for any amounts awarded in the Arbitration or otherwise related to the RSA, the Eddystone rail facility, or the shipment or failure to ship oil through the Eddystone Rail facility ('Affiliate Claims')" and that the Parties desired to "forever settle and resolve all claims or disputes between them relating in any way to the Arbitration or any potential Affiliate Claims, all other related claims and controversies that were or could have been brought in any pending or resolved litigation, and all current, future, known, or unknown claims or disputes between the Parties related in any way to the Arbitration."

FOF ¶ 790.  Paragraph 12 further stated that the Arbitration Settlement was "represents a full and complete settlement between them as to the matters being release."  FOF ¶ 795.

56.     The stipulated award stated that JTS has "materially breached and anticipatorily repudiated the Eddystone Rail Facilities Services Agreement" and that JTS "owes $139,050,406.77 in damages to Eddystone Rail Company, LLC."  FOF ¶ 796.  Eddystone sought to confirm the award in the Southern District of New York.  FOF ¶ 802.

57.     These statements and actions clearly indicate an intent to settle all claims under the RSA through the Arbitration Settlement and proceed with the Arbitration Settlement and the attendant agreed-to Award.

58.     Indeed, it would be unjust and unreasonable to permit Eddystone to agree to settle all claim and enjoy the benefits of an admission of liability by JTS and award of $139 million in damages in the Stipulated Award (that Eddystone sought to confirm) while also retaining its rights under the RSA as to JTS.

59.     Accordingly, the relief requested by Eddystone in this action—all amounts "in the arbitration between Eddystone and BTS" and for payments owing under the RSA and released in the Settlement Agreement, as well as for "expectation damages" under the RSA—are not recoverable in this action.

60.     Absent some contractual or statutory right (such as to a guaranty, contribution, or indemnification), the stipulations and undertakings of the settlement are binding on all parties to the settlement agreement, including Eddystone and, under the above principles, preclude transferring that liability to Defendants here.  Eddystone has neither pled nor proven those rights against Bridger Logistics.  As stated below, a failure to establish a breach at the BTS level necessarily precludes any attempt to pierce a veil upward from that level.  See COL ¶¶ 100-101.

61.     Second, the most basic jurisprudential principles preclude a plaintiff with a single alleged injury from a single course of conduct from multiplying its remedies by multiplying its legal theories.  *See, e.g.*, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir. 1992)*, cert. denied,* 507 U.S. 921 (1993) (directing district court to require election of remedies).

62.     Election of remedies prevents a party from "occupy[ing] inconsistent positions in relation to the facts which form the basis of his respective remedies." *Abdallah v. Abdallah*, 359 F.2d 170, 174 (3d Cir. 1966).  "The so-called 'inconsistency of remedies' is not an inconsistency between the remedies themselves . . . but it means that a certain state of facts relied upon as the basis of a certain remedy is inconsistent with and repugnant to another certain state of facts relied upon as the basis of another remedy." *Id.* at 174-75; *see also Evcco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 195 (3d Cir. 1987) (observing that election is "a choice of one of two inconsistent rights, even though there is no intent to relinquish the other right.").  In other words, "one cannot pursue a second remedy . . . if the claim is based upon inconsistent facts which would involve the contradiction of the grounds on which the party proceeded before." *Betancourt v. Wilson*, 409 F. Supp. 598, 599 (D.P.R. 1975) (citing *Abdallah*, 359 F.2d 170) (barring claim under doctrine of election of remedies when plaintiff alleged varying facts in two actions).  *Cf. Brownback v. King*, 141 S. Ct. 740, 751 (U.S. 2021) (dismissal of Federal Tort Claims Act claims against the United States barred *Bivens* action against the officers under a statutory judgment bar, which is based on claim preclusion doctrine).

63.     But that is precisely what Eddystone attempts here—in the arbitration, Eddystone based its claim upon the fact that any obligations under the RSA from February 2016 through the contract term belonged to **JTS;** now, in this action, Eddystone asserts that those same obligations

under the RSA from February 2016 through the contract term belonged to **BTS** and can somehow be transferred upwards to former parents, grandparents, and great-grandparents of BTS.

64.     In other words, the position that Eddystone adopts here is "irreconcilably inconsistent" with the position it took in, and took in resolving, the arbitration.  As such, Eddystone is precluded from asserting a contrary position and seeking recovery from the Alter Ego Defendants on a contrary set of facts to those asserted in the arbitration.  *See Abdallah*, 359 F.2d at 174; *Betancourt*, 409 F. Supp. at 599; *see also J.H. Grp., LLC v. Royal Rolling Chairs, LLC*, 523 F. App'x 922, 923-24 (3d Cir. 2013) (inconsistencies between bankruptcy petition and complaint warranted application of judicial estoppel and dismissal); *Haines & Kibblehouse, Inc. v. Balfour Beatty Constr., Inc.*, 553 F. App'x 246, 251 (3d Cir. 2014) (applying judicial estoppel where a party argued on the one hand it could not refile its complaint but after a lengthy mediation process refiled claims in state court); *Danise v. Saxon Mortg. Servs Inc.*, 738 F. App'x 47, 50 (3d Cir. 2018) (applying judicial estoppel against a debtor who brought a cause of action based on events before she filed for bankruptcy).

65.     Finally, Eddystone provided no evidence that any of the Alter Ego Defendants owned or controlled JTS at the time when JTS ceased performance.

66.     Where there has been a change in control, the "crucial element in a decision to apply the alter ego doctrine …is a finding that the older company continued to maintain a substantial degree of control over the business claimed to have been sold to the new entity." *N.L.R.B. v. Scott Printing Corp.*, 612 F.2d 783, 786 (3d Cir. 1979); *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988) ("The control which a parent must exercise over a subsidiary so as to warrant piercing the veil between them is more than 'mere majority or complete stock control;' instead it is "complete domination, not only of finances but of policy and business

practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own") (quoting 1 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 43.10 (1983)); *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861-62 (5th Cir. 2004) ("It is illogical, for example, to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred.").

67.     Here, it is undisputed that the sale of BTS severed any connection between JTS and Bridger Logistics or any of its parents or affiliated companies, and the decision to withhold deficiency payments under the RSA (though disputed as to whether Eddystone breached first), was made by JTS.  Thus, veil-piercing through JTS would not lead to any of the Alter Ego Defendants.

68.     That is consistent with the principle underlying veil-piercing; the "purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that party from using another corporation to shield itself from liability." *In re Opus East, LLC*, 698 F. App'x 711 (3d Cir. 2017) (quoting *Official Comm. of Unsecured Creditors v Morgan Stanley & Co., Inc.*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002)).

69.     The sequence of events here demonstrates that what Eddystone has characterized as a **B**TS obligation would, to the extent it were an obligation, be a **J**TS obligation; and, indeed, that is how Eddystone proceeded by filing suit against JTS in the arbitration.  In fact, Eddystone's request for relief asks that the Court here to simply assign to Bridger Logistics and all other Defendants the stipulated amounts at issue in the arbitration to which Defendants were not parties.

70.     But none of the Alter Ego Defendants had any ownership interest in JTS (let alone control of the company) after the February 2016 sale.  Rather, the company was owned, ultimately, by Jamex and James Ballengee.  *See* FOF ¶¶ 675, 738-42.

71. Put differently, at the time the alleged liability accrued, the Alter Ego Defendants had no control over whether JTS delivered crude oil to the Eddystone Facility or made deficiency payments to Eddystone. They cannot be held liable as alter egos if JTS failed to do so.

72. No Bridger or Ferrellgas entity could have been the alter ego of JTS or Jamex as a matter of law—alter ego liability can only attach to entities or individuals with an equity interest in the allegedly breaching entity. *See Newcrete Prods. v. City of Wilkes-Barre*, 37 A.3d 7, 14 (Pa. Commw. Ct. 2012) (observing that "piercing the corporate veil is a means of assessing liability for the acts of a corporation against an equity holder in the corporation").

73. Tellingly, Eddystone's sole contention is that the Alter Ego Defendants were alter egos of BTS; Eddystone neither alleged nor offered any evidence that Defendants were alter egos of JTS or Jamex. Nor could they, given the ownership structure of JTS and Jamex. Similarly, Eddystone did not allege or prove that the Alter Ego Defendants are responsible under third party beneficiary or privity theories, and, as stated above, the RSA forecloses such avenues in any event. FOF ¶ 138 (Trial Ex. 90-A.16 (§ 15.3)).

74. It appears that, instead of a traditional veil piercing analysis, in which the corporate form is alleged to have been ignored for a fraudulent purpose, Eddystone wishes to impose liabilities on BTS' parent (and its parent, and so on), for failing to control BTS indefinitely and to cause any successor to comply with the obligations that Bridger Logistics complied with when it owned BTS. That is both factually inconsistent with the circumstances of the sale—i.e., that Jamex approached Bridger Logistics (FOF ¶ 675) and that Bridger Logistics had improved the financial condition of BTS and provided financial support to Jamex (FOF ¶ 386)—and legally inconsistent with the right of any entity to alienate its property unless a contract provides otherwise; as stated above, the RSA does not include any such restriction (FOF ¶ 140).

75. For example, as part of the deal with Jamex (as discussed above), Jamex assumed liabilities under the RSA for dates after February 1, 2016. FOF ¶¶ 738-42. To ensure such payments, Jamex was provided with $4,447,677.96 to make all RSA payments, including deficiency payments, through the date of the transaction, after which time Jamex was obligated to make such payments. FOF ¶ 743.

76. Bridger Logistics also accepted, as a "Retained Liability," any liability to Eddystone under the RSA that arose after the closing of the BTS PSA but related to the pre-closing period. FOF ¶ 740. That is, with one important exception; Bridger Logistics' payment of $4.5 million to JTH was "in satisfaction of all charges and sums actually due under invoices issued in the ordinary course of business pursuant to the" RSA for the month of January 2016. FOF ¶ 740. Bridger Logistics did not retain any liability with respect to those payments other than if Bridger Logistics failed to pay the $4.5 million payment (and it did not). *Id.*

77. JTS' ultimate parent, Jamex Marketing, also guaranteed Jamex's obligations, including to Eddystone. FOF ¶ 740.

78. And, the BTS PSA removed contractual restrictions that existed on Jamex Marketing's ability to utilize the Eddystone Facility. FOF ¶ 741.

79. Because alter ego is an equitable remedy, and not a cause of action, it cannot be used to impose an affirmative obligation that the law or contract does not impose.

80. At bottom, there was no breach of the RSA for which the Alter Ego Defendants can be held liable—BTS did not breach the contract when it was a Bridger Logistics subsidiary and there is no basis to hold the Alter Ego Defendants responsible for any liability that accrued after the sale of BTS to Jamex.

### C. None of the Alter Ego Defendants Was An Alter Egos Of BTS.

81. Absent an underlying cause of action, there is no need to analyze alter ego.

82.     Even if that were not the case and the Court were able to look at allegations devoid of any legal predicate, however, Eddystone has not adduced clear and convincing evidence to demonstrate abuse of BTS' corporate form for a fraudulent purpose.

*Applicable Law.*

83.     A core tenet of corporate and commercial law presumes the legitimacy of the corporate form. *Bestfoods*, 524 U.S. at 61 ("It is a general principle of corporate law 'deeply ingrained in our economic and legal systems' that a 'parent corporation' . . . is not liable for the acts of its subsidiaries."); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001), *cert. denied,* 534 U.S. 950 (2001) ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent.").

84.     Courts in the Third Circuit pierce the veil between corporate entities only in exceptional circumstances when a parent "'so dominated the subsidiary that it had no separate existence' or to 'prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime.'" *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 515 (E.D. Pa. 2016) (applying federal common law and dismissing alter ego claim) (quoting *Pearson*, 247 F. 3d at 484 ). A party seeking to pierce the corporate veil must "essentially demonstrate that in all aspects of business, the two corporations actually functioned as a single entity and should be treated as such." *Pearson,* 247 F.3d at 484.

85.     The test is an "inquiry" into whether the [controlled] corporation is little more than a legal fiction. Such a burden is notoriously difficult for plaintiffs to meet." *Pearson,* 247 F.3d at 485. Eddystone was required to meet its burden by ***clear and convincing evidence***. *See Trinity Indus.*, 903 F.3d at 365 (finding no basis to pierce veil); *see also Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994), *aff'd*, 514 U.S. 938 (1995) (finding no basis to pierce veil).

86.     In the Third Circuit, courts applying federal common law evaluate multiple factors to determine whether to pierce the corporate veil:  (1) gross undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of subsidiary entity, (5) siphoning of funds from the subsidiary by the parent, (6) nonfunctioning of officers and directors, (7) absence of corporate records, and (8) "whether the corporation is merely a façade for the operations of the dominant stockholder." *See Trinity Indus.*, 903 F.3d at 365 (quoting *Pearson*, 247 F.3d at 484-85).  "Additionally, the situation 'must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness.'" *Exec. Health Res.*, 196 F. Supp. 3d at 515 (dismissing claims against corporate parents for failure to establish basis for veil-piercing).

87.     No single factor is dispositive; the Court looks to the totality of the circumstances. *See Trinity*, 903 F.3d at 365.

88.     Eddystone has admitted that a number of these factors are not present here. Specifically, Eddystone's corporate representative, Mary Cohen, testified that Eddystone does not base its alter ego assertions on any failure to observe corporate formalities, undercapitalization at formation, nonpayment of dividends, nonfunctioning officers and directors, or the absence of corporate records.  FOF ¶¶ 814-27.  Indeed, on summary judgment, Eddystone argued only that two factors—siphoning and insolvency—were met.  Dkt. 512 at 12.

89.     Cohen's testimony is admissible against Eddystone and the absence of such factors weighs against piercing BTS' corporate veil against any Alter Ego Defendant.  *See Difiore v. CSL Behring, U.S., LLC*, CIVIL ACTION No. 13-5027, 2015 WL 5316479, at *2 (E.D. Pa. Sep. 11, 2015) ("A corporation is 'bound' by a 30(b)(6) deponent's testimony concerning factual matters," even though such testimony may not be considered a " 'judicial admission absolutely binding" on

the corporation"); *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 451 (E.D. Pa. 2014); *Resolution Tr. Corp. v. Farmer*, Civ. A. No. 92-3310, 1994 WL 317458, at *1 (E.D. Pa. June 24, 1994) ("The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation.").

90. For the sake of completeness, however, Eddystone has not presented clear and convincing evidence of ***any*** factor with respect to ***any*** Alter Ego Defendant.

### *Bridger Rail Shipping*

91. Bridger Rail Shipping is not the alter ego of BTS.

92. Bridger Rail Shipping was a Bridger Logistics subsidiary that held railcars out for use by shippers of crude oil. FOF ¶ 112.

93. After the June 2015 Acquisition, Bridger Rail Shipping, like BTS, became a member of the Ferrellgas corporate family. FOF ¶ 7. There are numerous corporate entities in the Ferrellgas corporate hierarchy, all of which are separate and distinct. Ferrell Companies is the 100% owner of Ferrellgas, Inc., which holds a 1% general partner interest in Ferrellgas Partners, a publicly traded master limited partnership, and an approximate 1% general partner interest in Ferrellgas Partners' subsidiary, Ferrellgas LP. FOF ¶ 12. After the Acquisition, as the operating partnership, Ferrellgas LP became the corporate parent of Bridger Logistics, which was the parent of both Bridger Rail Shipping and BTS (along with other special purpose entities). FOF ¶ 454.

94. To put it more simply, Bridger Rail Shipping was a sister entity of BTS. There were no allegations that Bridger Rail Shipping did—or even could—abuse BTS' corporate form.

95. Rather, Eddystone contends only that funds were paid to Eddystone for obligations through Bridger Rail Shipping, instead of BTS. Put another way, Eddystone's only contention as to Bridger Rail Shipping is that it ***satisfied*** obligations to Eddystone on behalf of BTS. There is nothing "nefarious" about that contention, which, standing alone, does not establish the control

223

and domination that are the hallmarks of alter ego liability.  *See Trinity*, 903 F.3d at 365 (describing the totality of the circumstances test); *id.* at 368 ("The record is devoid of evidence that Ampco misused separate corporate entities for some nefarious purpose.").  Eddystone elicited no other facts at trial that would support a finding of alter ego liability with respect to Bridger Rail Shipping.

96.     Judgment in favor of Bridger Rail Shipping is warranted.

*Bridger Logistics.*

97.     Eddystone did not prove by clear and convincing evidence that Bridger Logistics, BTS' immediate corporate parent, was its alter ego.

98.     <u>Siphoning and Insolvency</u>.  In essence, Eddystone claims that BTS was rendered insolvent because the Alter Ego Defendants siphoned BTS' assets.  The evidence supports neither siphoning nor insolvency, however, as addressed more fully below in Section II.  Indeed, to the extent Eddystone relies on transfers of other BTS assets in January 2016, as explained below (COL ¶¶ 208-56), such assets were subject to a valid lien.

99.     <u>Corporate Façade</u>.  Eddystone has adduced no evidence that BTS was merely a façade for Bridger Logistics.  Rather, the evidence confirms that Eddystone knew, when entering into the RSA, that BTS was a separate, standalone subsidiary and that other related Bridger entities would not and did not guarantee BTS' obligations.  FOF ¶¶ 155, 165.

100.     <u>Gross Undercapitalization</u>.  Eddystone contends that BTS was undercapitalized due to asset transfers that began in June 2015, but gross undercapitalization is considered **at the time an entity was formed**.  A "corporation that was adequately capitalized when formed, but which subsequently suffers financial reverses is not undercapitalized." *Trs. of Nat'l Elevator Indus. Pension v. Lutyk*, 332 F.3d 188, 196-97 (3d Cir. 2003) (holding that district court's finding of gross undercapitalization was clearly erroneous) (quoting Fletcher, § 41.33).  This is because "[c]ompanies commonly become insolvent, then bankrupt; piercing the corporate veil is an

exception reserved for extreme situations, rather than the rule." *Id.* at 197. "[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *Id.*

101.    Eddystone has adduced no evidence that BTS was grossly undercapitalized at the time it was formed.  FOF ¶ 815.

102.    Corporate Formalities. Eddystone has not elicited evidence that Bridger Logistics and BTS failed to observe corporate formalities.  To the contrary, the record shows that Bridger judiciously maintained corporate separateness between each subsidiary and its parent. *See, e.g.*, FOF ¶ 825.  Moreover, even though Eddystone neglected to negotiate a parent guaranty here other than a limited, 20-day guarantee from Bridger Logistics (FOF ¶¶ 161-66), BTS' corporate parents routinely executed such instruments in other transactions—including transactions involving Enbridge—to separately secure BTS' obligations (FOF ¶¶ 128-30).

103.    Nonpayment of Dividends. There is no evidence in the record related to nonpayment of dividends by BTS.  FOF ¶ 818.

104.    Nonfunctioning Officers and Directors.  Eddystone did not adduce any evidence related to nonfunctioning directors or officers of BTS.  FOF ¶ 820.

105.    Corporate Books and Records.  There is no evidence that BTS neglected to maintain separate corporate books and records.   FOF ¶ 825.

106.    For these reasons, and those set forth above, there is no basis to pierce the corporate veil from BTS to Bridger Logistics.

*Ferrellgas LP And Ferrellgas Partners*

107.    As an initial matter, many courts have found that, where alter ego theories are directed at multiple levels of a corporation organization, sequential veil piercing is required—i.e.,

alter ego liability must be established for each relationship at each level (from BTS to Bridger Logistics and then from Bridger Logistics to each level of the Ferrellgas entities). As the Third Circuit explained in considering an attempt to transfer fiduciary duty through an alter ego analysis, a failure to establish first-level liability precludes imputation upward: "then *a fortiori* there is no such duty that can be imputed to Citigroup as Banamex's alleged corporate parent." *Garza v. Citigroup Inc.*, 724 F. App'x 95, 99 (3d Cir. 2018), *cert. denied*, 138 S. Ct. 2625 (U.S. 2018); *see also, e.g.*, *Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142, 151 (S.D.N.Y. 2012) (citing *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 514 (Bankr. N.D. Tex. 2009) ("[T]the Delaware two-pronged test must be applied to, and satisfied at, each level or layer of ownership applicable within the multifaceted entity structure.")); *In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017) (two more levels of veil piercing needed to reach former parent and ultimate parent).

108. Consequently, Eddystone's failure to pierce the corporate veil from BTS to Bridger Logistics is dispositive and the Court need not continue climbing the corporate ladder from Bridger Logistics to the Ferrellgas entities.

109. Assuming that were not the case, however, Eddystone elicited no material evidence that ***either*** Ferrellgas Partners or Ferrellgas LP acted as an alter ego of Bridger Logistics. There is no evidence that Bridger Logistics was undercapitalized, failed to observe corporate formalities, unreasonably failed to pay dividends, had been insolvent, had funds siphoned from it by either Ferrellgas Partners or Ferrellgas LP, had nonfunctioning officers and directors, failed to keep adequate corporate records, or had merely been a façade for the operations of Ferrellgas LP. *See Trinity*, 903 F.3d at 365.

110. Similarly, Eddystone elicited no evidence that Ferrellgas Partners ever acted as the alter ego of its direct subsidiary, Ferrellgas LP. There is no evidence that Ferrellgas LP was ever

undercapitalized, failed to observe corporate formalities, unreasonably failed to pay dividends, had been insolvent, had funds siphoned from it by Ferrellgas Partners, had nonfunctioning officers and directors, failed to keep adequate corporate records, or had merely been a façade for the operations of Ferrellgas Partners. *See Trinity*, 903 F.3d at 365.

111. To the contrary, the evidence demonstrates that Rios, Gamboa, and Soiefer served as Bridger Logistics officers and that Bridger Logistics entered into arm's-length contracts with third parties, including Jamex Marketing and Monroe, which entitled it to payment for the logistics services provided. FOF ¶¶ 12, 412-19.

112. Moreover, as to Ferrellgas Partners and Ferrellgas LP, Eddystone did not elicit evidence that any of the actions complained of were undertaken by Rios or Gamboa in their capacity as officers or employees of Ferrellgas Partners or Ferrellgas LP, as opposed to in their capacity as officers of Bridger Logistics. In fact, neither Rios nor Gamboa was employed by Ferrellgas Partners or Ferrellgas LP—their employment contracts were with non-party Ferrellgas, Inc., and they held corporate positions only at that company and Bridger Logistics. FOF ¶ 12.

113. Additionally, while Eddystone attempted to adduce evidence that Soiefer was acting in his capacity as a Ferrellgas executive at the time he discussed a number of options with respect to BTS in December 2015 (when he also served as Bridger Logistics' CFO), Soiefer rejected that view. FOF ¶ 657.

114. Generalized contentions that "Rios, Gamboa, and other Ferrellgas employees" made decisions relating to BTS (even if they were proven, and they were not) are not enough. *Bestfoods*, 524 U.S. at 69 (quoting *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988))*, cert. denied,* 488 U.S. 852 (1988) (court erred in its "automatic attribution of the actions of dual officers and directors to the corporate parent").

115. "[I]t cannot be enough to establish liability . . . that dual officers and directors made policy decisions and supervised activities." *Bestfoods*, 524 U.S. at 69-70; *see also Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997) (describing "well established principle that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership" and requiring plaintiffs to establish that the dual officers were "acting in their capacity as officers of [the subsidiary]"). "[C]lose relationships, even to the point where the subsidiary's management is run by the parent's employees, are not sufficient to hold the parent liable for the subsidiary's actions unless the 'subsidiary is in fact a mere instrumentality or alter ego of its parent.'" *Curlett v. Madison Indus. Servs. Team, Ltd.*, 863 F. Supp. 2d 357, 363 (D. Del. 2012) (dismissing alter ego).

116. Eddystone did not pierce the corporate veil at every requisite step here.

117. Even if the Court assessed whether Eddystone could in fact jump from a great-grandparent or grandparent entity to BTS, Eddystone was still required, at a minimum, to adduce evidence showing that Ferrellgas Partners or Ferrellgas LP actually reached down to BTS and abused its corporate form. *See In re Moll Indus., Inc.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011) (requiring veil piercing evidence as to each defendant). It did not do so.

118. As discussed above, there is no evidence that BTS was undercapitalized, failed to observe corporate formalities, unreasonably failed to pay dividends, had funds siphoned from it by Ferrellgas Partners or Ferrellgas LP, had nonfunctioning officers and directors, failed to keep adequate corporate records, or had been "a façade for the operations of" Ferrellgas Partners or Ferrellgas LP. In addition, Eddystone failed to establish that BTS was insolvent. COL ¶¶ 145-82.

119. The most Eddystone can show is that certain Ferrellgas executives and employees **knew about** or **were aware of** certain accounting changes and were kept in the loop regarding the decision to sell BTS to Jamex. *See* FOF ¶¶ 430-31, 759.

120. No witness testified and no document demonstrates that any Ferrellgas executive approved, directed, or actively participated in the affairs of BTS. Rather, Wambold testified that, while he was kept in the loop about the decision to sell BTS to Jamex, he was not actively involved in the sale, did not approve the sale, and did not have an understanding as to what assets were even included in the sale. FOF ¶ 759. Far from demonstrating that either Ferrellgas entity controlled BTS, that evidence only shows typical corporate oversight of subsidiaries in a large corporate family and responsible stewardship. To the extent Hampton was involved in evaluating and providing information for the sale of BTS, he testified that he would act on behalf of his internal client, here, Bridger Logistics, as the parent of BTS. FOF ¶ 680.

121. To be sure, Eddystone's expert, David Baker, opined that **all** Defendants "transferr[ed] BTS assets at less than adequate consideration," "siphon[ed] BTS cash away from BTS," and "grant[ed] a lien on all BTS assets," all of which was "outside business custom and practice." Trial Ex. 3013 (Baker Decl.) ¶ 11; *see also id.* ¶ 12 ("**Defendants'** departure from custom and practice is not excused or justified by their consideration of alternatives to siphoning BTS of its cash and other assets that Ferrellgas executives declined to authorize based on the potential harm to Ferrellgas.") (emphasis added); *id.* ¶ 13 ("[A] blanket lien in favor of Defendants' lender would not justify Defendants' overt departures from accepted custom and practice.").

122. But he also testified that he did not conduct a defendant-by-defendant analysis when preparing his report. Baker, 2/16/23 Tr. 46:1-47:25 (Q: "Is it your opinion that all 18 defendants [in this case] engaged in this conduct described in paragraph 11?" A: "That was not

part of my schedule to look at individual defendants.").)  In other words, he did not actually assess whether Ferrellgas Partners or Ferrellgas LP was involved in (let alone controlled) the alleged misconduct.  Nor did he cite evidence to support his conclusions.

123. To the contrary, Eddystone testified repeatedly at its 30(b)(6) deposition that Rios and Gamboa—not Ferrellgas LP or Ferrellgas Partners—had "total control" of BTS at all relevant times.  FOF ¶ 509.  As just one example, Eddystone testified that Rios and Gamboa "directed" alleged efforts to divert revenue from BTS and render it insolvent.  FOF ¶ 511 (Eddystone 30(b)(6) (Cohen), Dep. Tr. 79:24-81:9 ("Q. Did [Rios and Gamboa] direct those efforts?  A. That's our contention.").  Tellingly, Eddystone did **not** testify that Ferrellgas LP or Ferrellgas Partners controlled or dominated BTS or any other subsidiary.

124. Further, any reliance on the BTS cash management system or cost center accounting—i.e., Bridger Rail Services and Bridger Pipeline Services—to prove alter ego lacks legal support.

125. "Courts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 380 (7th Cir. 2008) (same); *see also In re Hillsborough Holdings Corp.*, 166 B.R. 461, 471 (Bankr. M.D. Fla.), *aff'd,* 176 B.R. 223 (M.D. Fla. 1994) ("It has been widely recognized in the corporate world that there is nothing inherently wrong in a parent managing all the cash generated by the subsidiaries through a cash management system.").

126. The same is true for other shared services*. See Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 423 (E.D. Pa. 2005) (finding that although two related entities "share[d] services, such as human resources and information technology services, and office space and

infrastructure, [one] reimburse[d] [the other] for these services and the office space . . . indicat[ing] that [they] are maintaining their corporate separateness and observing corporate formalities."); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, No. 00 C 2447, 2003 WL 21542491, at *5 (N.D. Ill. July 3, 2003) ("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family. Such shared functions are insufficient to pierce the corporate veil."); *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995) (finding that the fact that, *inter alia*, the parent and the subsidiary shared counsel was not sufficient to confer alter ego status). In other words, the mere fact that Trent Hampton advised both the Bridger entities and the Ferrellgas entities does not provide clear and convincing evidence of veil piercing.

127.    At bottom, there can be no real question that none of the four Defendants sued in Count One was an alter ego of BTS .

**D.    Eddystone Has Not Demonstrated An Injustice That Warrants Piercing The BTS Corporate Veil.**

128.    The Court must also find "an element of injustice or fundamental unfairness" that is remedied by piercing the veil between a parent and its subsidiary. *Exec. Health Res.*, 196 F. Supp. 3d at 515. Far from clearing that hurdle, Eddystone did the opposite and in fact asks the Court to ***create*** (not remedy) a patently unfair result.

129.    For one thing, Eddystone's alter ego theory attempts to rewrite the RSA to include a parent guaranty that Eddystone chose to forgo at the time it negotiated the contract.

130.    Eddystone was a sophisticated party, a majority-owned subsidiary within the extensive Enbridge group of companies, with counsel and advisors steeped in commodities knowledge and experience. *See* FOF ¶¶ 128-30. To mitigate the risk inherent in the crude oil market, Eddystone contracted for the right to request certain financial assurances, forms of

collateral, and limited guarantees in the event that certain conditions were met regarding BTS' financial stability.  FOF ¶¶ 279-80.

131.    Eddystone understood that it was contracting directly and exclusively with non-party BTS under the RSA—not with Bridger, Bridger Logistics, Bridger Marketing, or any other entity—but it did not obtain any parent or affiliate guarantee at the time of contracting by which it could eliminate the risk involved in entering a five-year contract with BTS, even though the Enbridge credit department specifically recommended obtaining such a guarantee and Enbridge had actually secured similar guarantees from Bridger in other deals.  FOF ¶¶ 128-30, 161-66. Moreover, the RSA expressly disclaims any third-party rights.  FOF ¶ 128.

132.    As such, Eddystone accepted the risk that commodity market conditions might change and the impact of such a change on BTS' future performance under the contract—presumably satisfied by the opportunities the deal presented and the other negotiated financial assurances—but in full knowledge of the fact that its ability to recover for any future failure to perform was limited to the assets held by BTS and BTS alone, substantially all of which were subject to a lien securing the BTS assets.  FOF ¶132.

133.    BTS did not obtain a parent guaranty either and was similarly limited in its ability to recover for Eddystone's failure to perform.  In other words, the parties agreed to a symmetrical risk-sharing scheme—each kept the risk of breach at level of the two contracting parties.

134.    Eddystone cannot now argue that its contract choices are "inequitable" and "unjust."  As the Third Circuit emphasizes, "public policy first favors upholding the corporate form"—unless there was fraud or a mere corporate façade. *Trinity*, 903 F.3d at 368; *cf., MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 206-207 (3d. Cir. 2016) (refusing to impute additional terms to a contract and rejecting tort claims under (there, Virgin Islands) gist-of-the-action

doctrine). To permit Eddystone to secure through litigation the parent guaranty and change-of-control provision for which it did not bargain is neither fair under the equitable principles of veil piercing nor correct under the law. *See JA Apparel*, 682 F. Supp. 2d at 302; *Nassau Chapter*, 310 N.Y.S.2d at 383; 1 Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.85 (2016) ("[A]bsent very compelling equitable considerations, courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established.").

135. For Eddystone to secure damages from a group of entities that are not its contractual counterparties and that did not own or control JTS when it ceased performance would be unjust and inequitable. There is no basis in fact, law, or equity to employ an alter ego equitable remedy in this case. Count One therefore fails.

## II. COUNTS TWO AND THREE: INTENTIONAL FRAUDULENT TRANSFER AND CONSTRUCTIVE FRAUDULENT TRANSFER UNDER THE PENNSYLVANIA UNIFORM FRAUDULENT TRANSFER ACT ("PUFTA").

### A. Applicable Law.

136. To succeed on its claims under PUFTA, Eddystone must prove, by a preponderance of the evidence, that BTS "transferred" an "asset," either (1) with "actual intent to hinder, delay, or defraud any creditor of the debtor," *see* 12 Pa. C.S. § 5104(a) (intentional fraudulent transfer); or (2) without receiving a reasonably equivalent value in exchange, and that BTS was insolvent or became insolvent because of the transfer. *See* 12 Pa. C.S. § 5105 (constructive fraudulent transfer); *see also id.* § 5104 (a)(2)(i)-(ii) and § 5104(c) ("A creditor making a claim for relief under subsection (a) has the burden of proving the elements of the claim for relief by a preponderance of the evidence."); *id.* § 5105 (burden of proof on Eddystone as present creditor).[6]

---

[6] All PUFTA citations are to the pre-amendment version of the statute. The post-amendment Uniform Voidable Transaction Act, if it applied here, calls for the application of the law of Texas, where BTS had its principal office at the time of the allegedly fraudulent transfers. *See* 12 Pa. C.S.

137.    PUFTA defines a "transfer," in pertinent part, as "[e]very mode, direct or indirect, . . . of disposing of or parting with an asset or an interest in an asset."  12 Pa. C.S. § 5101(b).

138.    PUFTA defines "asset" as "property of the debtor" that is not "encumbered by a valid lien."  12 Pa. C.S. § 5101(b).

139.    The term "valid lien" is "a lien effective against the holder of a judicial lien subsequently obtained."  12 Pa. C.S. § 5101(b).

140.    Under PUFTA, there is no transfer subject to avoidance where the asset transferred is encumbered by a valid lien. 12 Pa. C.S. § 5101(b); *see, e.g.*, *In re Fair Finance Co.*, 13 F.4th 547, 554-57 (6th Cir. 2021) (proceeds paid to lender under revolver agreement were not "assets" because the proceeds were encumbered by a valid lien);  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 n.20 (5th Cir. 2009) (judgment for defendant because challenged sale proceeds were encumbered by a valid lien, and thus were not "assets" under TUFTA); *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co.*, 124 F.3d 252, 262 (1st Cir. 1997), *aff'd,* 215 F.3d 182 (2000) (judgment for defendants on the fraudulent transfer claims, despite evidence of fraudulent intent, because a valid security interest in all assets existed at the time of transfer and thus the property was not an "asset" subject to RIUFTA); *see also Hipple v. Hipple*, Civil Action No. 12-1256, 2016 WL 320216, at *4, 11 (E.D. Pa. Jan. 27, 2016) (rejecting PUFTA claim because assets transferred were encumbered by valid lien, even though lien was granted years after debt was incurred, post-judgment, and shortly before judgment creditor exercised remedies); *Smith v. Marshview Fitness, LLC*, 212 A.3d 767, 774 (Conn. App. 2019) (summary judgment for defendant on CUFTA claim because assets were secured by a valid lien); *Hasso v. Hapke*, 227 Cal. App. 4th 107, 125-26 (2014)

---

§ 5110. Like Pennsylvania, Texas has enacted the Uniform Fraudulent Transfer Act, which includes the same definitions of "asset" and "valid lien." *See* Tex. Bus. & Com. Code § 24.002.

(management fees were subject to valid lien and thus were not assets under UFTA); *Epperson v. Enter. Express, Inc.*, 338 F.Supp.2d 328, 341-42 (D. Conn. 2004) (valid lien precluded application of UFTA to challenged transfer); *Am. Fed. Bank v. W. Cen. Ag Servs.*, 530 F. Supp. 3d 780, 788 (D. Minn. 2021) (summary judgment because assets subject to valid lien); *Zurich Am. Ins. Co. v. MB Fin. Bank, N.A.*, 2020 WL 4913178 (Ill. App. Aug. 19, 2020) (summary judgment based on valid lien); *Mehrtash v. Mehrtash*, 112 Cal. Rptr. 2d 802, 806 (Ct. App. 2001) (treating creditor's failure to show ability to recover from mortgaged property as failure to prove essential element).

141.    Accordingly, to establish either an intentional or a constructive fraudulent transfer under PUFTA, Eddystone bears the burden of proof to establish that BTS disposed of some property that was not encumbered by a valid lien. *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 720 (E.D. Pa. 2007) (plaintiff has the burden on all fraudulent transfer claim elements).

142.    Assuming Eddystone identifies transferred property that was not encumbered by a valid lien, to establish an intentional fraudulent transfer, Eddystone must then prove, by a preponderance of evidence, that BTS made the transfer "with actual intent to hinder, delay or defraud any creditor of BTS."  12 Pa. C.S.§ 5104(a)(1).

143.    In determining actual intent, the Court may consider, among other factors, whether (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transfer after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;  (10) the transfer occurred shortly before or

shortly after a substantial debt was incurred; and (11) the debtor transferred essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 12 Pa. C.S. § 5105(b). Courts refer to these 11 factors as "badges of fraud." *See, e.g.*, *In re Carbone*, 615 B.R. 76, 82-83 (Bankr. E.D. Pa. 2020).

144. The presence of badges of fraud does not end the inquiry—the Court must make a factual determination as to whether the debtor acted with fraudulent intent based on the evidence presented at trial. *See, e.g., Klein v. Weidner*, 729 F.3d 280, 284 (3d Cir. 2013) (holding that the court "should take into account all relevant circumstances" in determining whether there exists an intentional fraudulent transfer); *Carbone*, 615 B.R. at 80-81 ("whatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient . . . the presence of badges of fraud permits but does not compel a finding of actual intent") (quoting 5 *Collier on Bankruptcy* ¶ 548.04[1][b][ii]); *In re Lockwood Auto Grp., Inc.*, 450 B.R. 557, 571 (Bankr. W.D. Pa. 2011) (denying fraudulent transfer claim due to legitimate tax-related reason for the transaction).

145. To establish a constructive fraudulent transfer, in addition to demonstrating the absence of a valid lien, Eddystone must prove, by a preponderance of the evidence, that BTS made a transfer or incurred an obligation without receiving reasonably equivalent value in exchange, and, at the time, BTS: (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that BTS would incur, debts beyond BTS' ability to pay as they became due. 12 Pa. C.S. § 5104(a)(2)(i)-(ii) (present and future creditor standard). A transfer also may be avoided as a constructive fraudulent transfer if Eddystone can establish that it was a BTS creditor at the time the transfer was made and BTS (1) made the transfer or incurred the obligation without receiving reasonably

equivalent value in exchange for the transfer; and (2) BTS was insolvent or became insolvent as a result of the transfer.  12 Pa. C.S. § 5105 (present creditor standard).

### B.    Eddystone's Allegations.

146.    Eddystone alleges that several actions by Bridger Logistics and its affiliates amounted to constructive or intentional fraudulent transfers that should be voided and are subject to recovery under PUFTA, as follows.

*June 24, 2015 Intercompany Receivables ("2015 Intercompany Receivables").*

147.    Eddystone alleges that, at the time of the Acquisition, BTS was owed net intercompany accounts receivable from Jamex-affiliated entities not acquired by Ferrellgas Partners and from other Acquired Subsidiaries.  Eddystone alleges that these 2015 Intercompany Receivables were written off, and that the write-off constituted a voidable transfer under PUFTA.

*BTS Revenue Recorded Using Great Plains Company Codes 208 and 210 ("Accounting Code Changes").*

148.    Eddystone alleges that the creation of new Great Plains company codes and PeopleSoft cost centers for the three BTS business segments at the time of the Acquisition diverted profits away from BTS and rendered BTS insolvent as of the date of the Acquisition.  FOF ¶¶ 189-191, 439-446 (describing pre- and post-acquisition accounting of three distinct BTS business segments—rail services, pipeline services, and pipeline management); *see also* Trial Ex. 3002 (Sherman Aff.) ¶¶ 51-62, 87, 96-98 (opining that Accounting Code Changes diverted revenue).

*2016 Alleged Transfers.*

149.    On January 31, 2016, BTS assigned 19 injection stations and associated customer contracts (the "19 Injection Stations") to Bridger Terminals, LLC and Bridger Swan Ranch, LLC. FOF ¶ 729.  On February 1, 2016, Bridger Logistics sold its membership interests in BTS to JTH. FOF ¶¶ 738-39.  When Bridger Logistics sold its membership interests in BTS to JTH, BTS did

not take with it $16.356 million in net profits that BTS had made after being acquired by Ferrellgas (the "Retained Earnings," and together with the 19 Injection Stations, the "2016 Alleged Transfers"). FOF ¶ 732. The Retained Earnings necessarily include Eddystone's separate allegation that BTS improperly wrote off $8.158M in intercompany receivables in 2016. Trial Ex. 3003 (Polkowitz Decl.) ¶ 37. Accordingly, the Court will consider Eddystone's allegations related to the 2016 intercompany receivables as part of its analysis of the Retained Earnings. Trial Ex. 3003 (Polkowitz Decl.) ¶ 37.

### *Implied Contract Claim.*

150. Eddystone further alleges that an unwritten, "implied" contract existed between Bridger Marketing and BTS pre-Acquisition that "backstopped" BTS' obligations under the RSA, that Bridger Logistics assumed that same implied contract from Bridger Marketing at the time of the Acquisition, and finally that the implied contract was then abrogated without any compensation to BTS when Bridger Logistics sold its membership interests in BTS to JTH on February 1, 2016, which abrogation constituted both a constructive and intentional fraudulent transfer. *See* FAC, Dkt. 182 at ¶ 95, ¶¶ 89-98; *see also* Eddystone 30(b)(6) (Cohen) Dep. Tr. 143:11-17, 144:3-9, 145:13-17, 250:21-252:3 (describing the implied contract as Eddystone's expectation, when entering the RSA in 2013, that an implied contract existed between Bridger Marketing and BTS that contained all the material terms and commitments of the RSA, effectively obligating Bridger Marketing to backstop the RSA). Eddystone further alleges that the abrogation of BTS' purported payment rights constituted a breach of fiduciary duty. *See* FAC, Dkt. 182 at ¶ 102. It is unclear to what extent Eddystone continues to rely on this theory. *See, e.g.,* Agusti, 9/19/22 Tr. 54:3-89:16 (Eddystone opening statement omitted implied contract). It is addressed here for completeness.

151. At trial, Eddystone did not establish the elements for either an intentional or a constructive fraudulent transfer with respect to any of these activities.

### C. BTS Was Solvent On June 24, 2015, And Eddystone Did Not Establish Insolvency Thereafter.

152.     Solvency is an important inquiry under PUFTA.  Plaintiffs able to demonstrate by a preponderance of evidence that a debtor is insolvent satisfy one of the necessary elements for a constructive fraudulent transfer claim and a critical badge of fraud in support of an intentional fraudulent transfer claim.  12 Pa. C.S. §§ 5105(a), 5104(b)(9), 5104(a)(2)(i)-(ii).

153.     There are three tests under which insolvency may be shown: (1) the balance-sheet test, (2) the cash-flow test, and (3) the inadequate capital test.  *Opus East*, 698 F. App'x  at 715 (finding trustee did not prove insolvency).

154.     PUFTA states that a debtor is "insolvent if, at fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."  12 Pa. C.S. § 5102(a).  This test is commonly known as the balance-sheet test.  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 636, 648-50 (3d Cir. 1991) (burden to prove insolvency unsatisfied); *Opus East*, 698 F. App'x at 715 (same).[7]  "'Fair valuation' is determined by valuing the debtor's assets on either a going concern or liquidation basis; the latter is only appropriate where bankruptcy is 'clearly imminent' and the 'business is on its deathbed.'"  *Opus East*, 698 F. App'x at 715 (citation omitted).  To evaluate going concern value, one must assess an asset's market value analyzed in a realistic framework that accounts for the "amounts [of cash] that can be realized in a reasonable time assuming a willing seller and a willing buyer."  *Id.*

155.     The cash-flow test examines whether a debtor intended to incur, or reasonably believed it would incur, debts beyond its ability to pay. The cash-flow test mimics the language in

---

[7] Although both of these cases evaluate insolvency under the Bankruptcy Code, the comments to PUFTA make clear that the definition of "insolvent" under PUFTA "is derived from the definition of 'insolvent' in § 101(32)(A) of the Bankruptcy Code."  12 Pa. C.S. § 5102 cmt. 1.

12 Pa. C.S. § 5104(a)(2)(ii), which provides that a creditor can prove a constructive fraudulent transfer claim by showing lack of reasonably equivalent value in exchange for the transfer and that the debtor expected to incur debts beyond its ability to pay. 12 Pa. C.S. § 5104(a)(2)(ii). The cash-flow test is "forward-looking" and assesses the debtor's reasonable prediction about its ability to repay a debt as it is incurred. *Opus East*, 698 F. App'x at 715. When evaluating cash-flow insolvency, the Court may consider "whether the debtor was 'able to pay, intended to pay, and was paying its debts as they came due.'" *Id.*

156. The "inadequate capital" test focuses on whether, at the time of the transaction in question, it was reasonably foreseeable that the debtor's assets would be insufficient. *Opus East*, 698 F. App'x at 715; *see Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992) (emphasizing focus on reasonable foreseeability under PUFTA's predecessor statute because "businesses fail for all sorts of reasons, and [] fraudulent conveyance laws are not a panacea for all such failures"); *In re Lyondell Chem. Co.*, 567 B.R. 55, 110 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) ("[A] central consideration when determining whether a transaction leaves a company with unreasonably small capital is 'whether the parties' projections' used in facilitating the transaction were 'reasonable.'"). The inadequate capital test mimics the language of 12 Pa. C.S. § 5104(a)(2)(i), which allows a creditor to establish a constructive fraudulent transfer if it can establish lack of reasonably equivalent value and that a debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." 12 Pa. C.S. § 5104(a)(2)(i),

157. Separately from the three solvency tests, PUFTA creates a rebuttable presumption of insolvency when a debtor "is generally not paying the debtor's debts as they become due other

than as the result of a bona fide dispute." 12 Pa. C.S. § 5102(b). PUFTA provides the following guidance as to this presumption:

> In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and the due dates of the indebtedness. The court should also take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments.

12 Pa. C.S. § 5102 cmt. 2; 1 Pa. C.S. § 1939 (comments to a statute may be consulted in construction or application of the original provisions of the statute).

158.    Eddystone failed to establish by a preponderance of evidence that, at any point in time, BTS was insolvent, had reason to believe it would be unable to pay debts as they became due, or was engaged in business for which its remaining assets were unreasonably small.

### *BTS Was Solvent On June 24, 2015.*

159.    Defendants' solvency expert Manish Kumar testified that he applied the balance sheet, cash-flow, and inadequate capital tests, and he concluded BTS was solvent on the date of the Acquisition (June 24, 2015) under each of the three tests. Trial Ex. 3006 (Kumar Decl.) ¶ 8.

160.    Eddystone's solvency expert, Marc Sherman, conceded that, when Ferrellgas acquired Bridger Logistics on June 24, 2015, BTS was "balance sheet solvent," such that Eddystone did not meet the insolvency standard set forth in 12 Pa. C.S. § 5102(a) as of that date. Sherman, 12/7/22 Tr. 305:22-306:1 (agreeing to balance sheet solvency), 304:7-12 (agreeing that balance sheet solvency means that the fair value of assets exceed debt).

161.    Instead, Sherman opined that BTS became insolvent under the cash flow test on the date of the Acquisition. Sherman, 12/7/22 Tr. 303:17-25, 305:22-306:1.

162.    And, having concluded that BTS was cash flow insolvent, Sherman did not offer a separate opinion regarding the inadequate capital test. *Id.*

163. The Court concludes that BTS was solvent under each of the three solvency tests on June 24, 2015, including the cash-flow test. When determining whether, on June 24, 2015, BTS could expect to be able to pay debts as they became due, Kumar appropriately considered BTS' projections, the portion of the Bank of America debt that should be allocated to BTS, and BTS' post-Acquisition use of a Bridger Logistics' cash management system. Tr. 3006 (Kumar Decl.) ¶¶ 25-29; *Opus East*, 698 F. App'x at 715 (cash-flow insolvency accounts for "whether the debtor was 'able to pay, intended to pay, and . . . was paying its debts as they came due").

164. Sherman's opinion that BTS was rendered immediately "cash flow insolvent" by the Acquisition is not supported by the evidence. Sherman, 12/7/22 Tr. 303:17-25, 305:22-306:1. Eddystone did not identify any BTS debt that went unpaid from July 2015 through February 1, 2016, while BTS was owned by Bridger Logistics. Sherman, 12/7/22 Tr. 306:22-310:14; *see also, e.g.*, 12 Pa. C.S. § 5104, cmt. 4 (determining whether a debtor is generally not paying his debts as they become due "[calls] for inquiry mainly to the extent to which the debtor is now actually paying debts presently due."); 1 Pa. C.S. § 1939 (comments to a statute may be consulted in construction or application of the original provisions of the statute).

165. Nor is there any evidence that BTS could not reasonably expect to pay its debts as of June 24, 2015. It is undisputed that Bridger Logistics implemented a zero-balance cash management system on August 27, 2015, which involved cash sweeps of all affiliates to keep borrowing costs low. FOF ¶¶ 517-19; *see also* Sherman, 12/7/22 Tr. 313:18-314:7. The zero-balance cash management system renders irrelevant Mr. Sherman's observations about the cash amount held on a day-to-day basis in the designated BTS bank account after August 27, 2015. *Compare* FOF ¶ 526 (Jilla, 12/12/22 Tr. 43:16-47:7 (explaining zero-balance cash management involves keeping cash at main pledged account level and not with subsidiary's individual bank

account)), *id.* (Heitmann, 2/14/23 Tr. at 86:7-88:21 (Bridger Logistics companies incorporated into zero-balance cash management system to reduce overall borrowing costs)), *with* Trial Ex. 3002 (Sherman Aff.) ¶ 97 (pointing to amounts in BTS Bank account after August 25, 2015 through February 1, 2016), Sherman, 12/7/2022 Tr. 310:15-315:25 (zero balance cash management system implemented on August 27, 2015).

166. As Sherman conceded at trial, a company can be solvent without either cash or a bank account, and there is nothing improper about affiliated companies utilizing a combined cash management system, such as the one utilized by Defendants. Sherman, 12/7/22 Tr. 312:5-315:25; *see, e.g.*, *In re SMTC Mfg. of Tex.*, 421 B.R. 251, 318 (Bankr. W.D. Tex. 2009) (debtor was not left with unreasonably small capital and did not intend to incur debts beyond its ability to pay where cash management system was used pursuant to a loan facility and nearly all debts were paid except certain tax payments, a few small unsecured claims, and future payments due); *Hillsborough Holdings Corp.*, 166 B.R. 461 at 471 (there is "nothing inherently wrong in a parent managing all the cash generated by the subsidiaries through a cash management system").

167. Sherman's suggestion that BTS was cash-flow insolvent because affiliates made payments to Eddystone on behalf of BTS between August 2015 and February 2016 is undermined by his own testimony. Specifically, Sherman acknowledged that it is both common and appropriate for affiliate companies to make payments on behalf of one another so long as an intercompany receivable is recorded. Sherman, 12/7/22 Tr. 306:22-310:14.

168. Both sides' experts agree that Bridger Logistics recorded intercompany receivables. FOF ¶ 529. Defendants' accounting expert, Gary Polkowitz, set forth examples in the record showing that Bridger Logistics recorded intercompany receivables with respect to money earned by BTS, and payments made to Eddystone by BTS affiliates, in the three company codes utilized

to track the BTS business segments post-Acquisition. *Id.* Sherman likewise acknowledged that Bridger Logistics recorded intercompany receivables reflecting amounts due to and from BTS in those same three company codes. *Id.*

169. Executives of Bridger Logistics and Ferrellgas testified that Bridger Logistics would routinely request funds from the credit facility to cover expenses of its subsidiaries, and no witness was aware of any instance where any Bridger entity failed to receive the cash it requested. *See, e.g.*, FOF ¶¶ 519-30. Accordingly, as a matter of law, Eddystone did not establish cash-flow insolvency. *See Opus East*, 698 F. App'x at 717 (affirming conclusion that company was cash-flow solvent due to "continued access to insider credit when forecasting [the debtor's] ability to pay debts") (citing *In re Teleglobe Comm'ns Corp.*, 392 B.R. 561 (Bankr. D. Del. 2008)); *see also Teleglobe*, 392 B.R. at 603 (cash-flow test "looks at the circumstances as they appeared to the debtor," and concluding expert should have considered support from parent company when evaluating cash-flow solvency).

170. Eddystone's allegation of insolvency based on a "pre-acquisition plan to transfer BTS' revenue away from BTS," based on the Accounting Code Changes, likewise has no support in the record. Trial Ex. 3002 (Sherman Aff.) ¶ 46.

171. It is undisputed that BTS had three distinct business segments and that, after the Acquisition, Bridger Logistics recorded the BTS accounting activity, both revenue and expenses, under three different accounting codes in both Great Plains and People Soft. FOF ¶¶ 441-42, 529.

172. Polkowitz explained that the creation of these BTS accounting codes is consistent with a change from accounting by legal subsidiary to cost-center accounting. Polkowitz, 12/13/2022 Tr. at 171:10-172:6. Multiple fact witnesses testified that is exactly what occurred, as Ferrellgas had historically utilized cost centers. FOF ¶¶ 314, 437, 439, 543. At the outset, it is

important to highlight that both sides' accounting experts agree that cost-center accounting is both common and appropriate. FOF ¶ 446 (citing Sherman, 12/7/22 Tr. 272:25-274:8; Trial Ex. 3003 (Polkowitz Decl.) ¶ 30). Polkowitz further explained that generally accepted accounting principles ("GAAP") do not require accountants to track accounting activity by legal subsidiary and, in fact, public companies are often required to provide financial reporting by operating segments rather than by legal entity. Trial Ex. 3003 (Polkowitz Decl.) ¶ 30 (citing ASC 280-10). Polkowitz testified that the accounting change was consistent with Grant Thornton's QoE Report, which highlighted accounting issues encountered with Bridger Logistics' books during the due diligence process. Trial Ex. 3003 (Polkowitz Decl.) ¶ 24; FOF ¶¶ 424-26. Jilla explained that the creation of the accounting codes streamlined Bridger Logistics' ability to generate routine management reports because, even before the Acquisition, management reviewed Bridger Logistics' performance by segment as opposed to by legal entity. FOF ¶ 439. There is no evidence in the record of Ferrellgas' external auditors, its audit committee, its internal audit department, or of anyone other than Eddystone raising concerns about Bridger Logistics' accounting practices post-Acquisition. FOF ¶ 318.

173. Eddystone's primary complaint seems to be that two of the BTS accounting codes utilized post-Acquisition were named in the accounting software as "Bridger Pipeline Services, LLC" and "Bridger Rail Services, LLC" instead of "BTS." Sherman, 12/7/22 Tr. 259:3-261:10. Sherman noted that some emails around the time of the Acquisition contemplated establishing new entities. Sherman, 12/7/22 Tr. 259:3-261:10. Defendants acknowledge as much. FOF ¶ 430. But it is undisputed that no such entities were formed, and that no legal entity called "Bridger Pipeline Services, LLC" or "Bridger Rail Services, LLC" exists. Trial Ex. 3003 (Sherman Aff.) ¶ 47. Accordingly, no legal entity "received" these purported transfers, nor was there any assignment or

legal transfer of any BTS property in connection with the Acquisition. Sherman, 12/7/22 Tr. 259:3-261:10. Moreover, other company codes and cost centers unrelated to BTS were created around the time of the Acquisition, which also have "LLC" after their names, confirming that this was not specific to BTS, or otherwise indicative of an intent to divert BTS revenue. FOF ¶ 443.

174. Sherman's assertion in his rebuttal declaration that neither the accounting standards nor the Grant Thornton report required separate company codes to be established for each of the three distinct BTS business segments misses the point. Trial Ex. 3014 (Sherman Rebuttal Aff.) ¶¶ 14-23. Defendants do not need to show that the creation of new company codes were required; Plaintiff bears the burden to establish that the creation of those codes rendered BTS insolvent or evidences an intent to render BTS insolvent. 12 Pa. C.S. § 5104(c). Here, where the record contains ample evidence and testimony that the creation of new company codes was motivated by sound accounting practices and had nothing to do with Eddystone, Eddystone has failed to satisfy its burden. *See, e.g.*, *Mellon Bank*, 945 F.2d at 648-50 (burden to prove insolvency unsatisfied); *Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 583 (7th Cir. 2008) ("radically unconvincing" expert opinion insufficient to prove insolvency).

175. Eddystone alleges that Defendants' pre-Acquisition "plan" to "divert revenue" from BTS is further evidenced by Trial Exhibit 723-A, a June 19, 2015 email between Bridger, LLC employees attaching an organizational chart that describes "Bridger Pipeline, LLC and "Bridger Rail Services, LLC" as new legal entities and that shows an assignment of BTS contracts to those new legal entities to be acquired. Trial Ex. 3002 (Sherman Aff.) ¶ 46 (citing Trial Exs. 723 & 723-A). According to Eddystone and its expert, this email means both that Defendants lied to their own accountants and also that the new cost centers "rolled up" to Bridger Logistics instead of BTS. Trial Ex. 3002 (Sherman Aff.) ¶¶ 52, 58 (citing Trial Exs. 723, 723-A). In

contemporaneous internal emails, however, Bridger, LLC's counsel described the organizational chart as "grossly incorrect." FOF ¶ 430; Sherman, 12/8/22 Tr. 34:1-36:20. And, in yet another contemporaneous internal email, ███████████████████████████████████████████ ███████████████████████████████████████████████████. *See* Trial Ex. 732. ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ FOF ¶¶ 431-36 (QPO).

176.    Even absent the contemporaneous emails and associated witness testimony, Trial Exhibits 723 and 723-A do not show any intent to render BTS insolvent. If new entities had been created, and the organizational chart attached to the June 19, 2015 email had been implemented, BTS would still have been solvent. The organizational chart contemplates BTS' contractual obligations to Eddystone and others, *i.e.*, BTS' costs, associated with two of its business segments, as well as revenue, being assigned to Bridger Rail Services and Bridger Pipeline Services. Trial Ex. 723-A. The remaining business segment in BTS, as reflected in Trial Exhibit 723-A, is what Sherman called "Stations Throughput" (also known as pipeline terminals). According to Sherman, the Stations Throughput segment, standing alone, generated revenue and had no affiliated costs. *Compare* Trial Ex. 723-A, *with* Trial Ex. 3002 (Sherman Aff.) ¶ 22 (no cost of sales incurred for Station Throughput) and ¶ 63 (post-acquisition Station Throughput profit was $7.426 million). In light of these undisputed facts, neither Sherman nor Eddystone has shown that, had BTS been left only with Station Throughput revenue and costs, as contemplated by Trial Exhibits 723 and 723-A (which it was not), it would have been insolvent. Trial Exhibit 723-A does not indicate any intent to render BTS insolvent.

177. ███████████████████████████████████████████████████

███████████████████████████████████ the argument that the new company codes rolled up to Bridger Logistics, not BTS, does not support Eddystone's allegation of insolvency. Polkowitz explained Great Plains does not contain a mechanism in which company codes "roll up" automatically. FOF ¶ 442. Instead, an accountant generates a report using the appropriate company codes in Great Plains and/or cost centers in PeopleSoft for the specific report being generated. *Id.* All of Bridger Logistics' subsidiaries' accounting activity ultimately "rolled up" to, and was publicly reported as, Ferrellgas' midstream segment. Trial Exs. 2495, 1791 (SEC filings). As Jilla explained, to the extent Bridger Logistics ever needed to look at the accounting activity of the legal subsidiary BTS standing alone, it could simply generate reports that combined the accounting activity from the three company codes containing the three distinct BTS business segments. FOF ¶ 442. But there is no evidence that, before this lawsuit, anyone had a need to, or did, generate reports to review Bridger Logistics' accounting activity by legal subsidiary post-Acquisition. FOF ¶ 731 (Polkowitz, 12/13/22 Tr. 170:15-170:21 (stating it was common for subsidiary not to maintain standalone balance sheet)).

178. Ultimately, Eddystone did not meet its burden to establish that BTS was "cash flow insolvent" or that anyone had reason to think, as of June 24, 2015, that BTS would be unable to pay debts as they became due.

*Eddystone Did Not Establish BTS Was Insolvent in Early 2016.*

179. Although Sherman summarily opines that BTS was balance-sheet insolvent as of February 2016 (Trial Ex. 3002 ¶ 98), Eddystone offered no evidence that the fair market value of BTS' debts exceeded its assets in early 2016. Nor did Eddystone provide a fair market valuation of BTS' assets and debts as of that date or at any other point in time. Sherman, 12/8/22 Tr. 71:10-16 (Sherman did not do an independent valuation as of January 2016).

180.     Similarly, Eddystone did not offer evidence that BTS would not be able to pay its debts as they became due in early 2016. 12 Pa. C.S. § 5102(a). When Bridger Logistics transferred its membership interest in BTS to Jamex, it also provided $4.4 million to pay Eddystone amounts due on February 20, 2016. FOF ¶ 740; Ballengee, 9/20/22 Tr. 137:9-138:25; Trial Ex. 1439-H.

181.     Prior to and after the sale of BTS, Jamex provided Bridger Logistics with financial statements reflecting that it had significant capital it could infuse into BTS, renamed JTS, to allow JTS to make further payments to Eddystone. FOF ¶¶ 709-11, 714, 719, 760-61. Multiple witnesses testified they expected Jamex to pay the amount due in February, to continue to make deficiency payments under the RSA, and to resume transloading through the Eddystone Facility when the three-month period of the suspension agreements expired. FOF ¶ 746. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Trial Ex. 1306.

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████. FOF ¶ 721. But ultimately, Jamex Marketing guaranteed BTS' performance (renamed JTS after the acquisition) under the RSA (FOF ¶ 743), and Jamex negotiated a discount of its own payments to Bridger Logistics under the Marketing TLA to reflect the payments owed to BTS and Eddystone. FOF ¶ 697.

182.     No evidence at trial established that, when Bridger Logistics sold its membership interests to Jamex, BTS would be incapable of accessing credit or funds needed to pay amounts

due in the under the RSA in the future.  *Opus East LLC*, 698 F. App'x at 715 (affirming conclusion that company was cash-flow solvent due to "continued access to insider credit when forecasting [the debtor's] ability to pay debts") (citing *Teleglobe Commc'ns. Corp.*, 392 B.R. 561); *see also Teleglobe*, 392 B.R. at 603 (cash-flow test "looks at the circumstances as they appeared to the debtor," and concluding expert should have considered support from parent company when evaluating cash-flow solvency).  Thus, Eddystone did not establish that BTS was cash-flow insolvent as of January 2016.

183.    Eddystone likewise did not establish by a preponderance of evidence that BTS had unreasonably small assets as of February 2016.  Sherman did not conduct any analysis of the value of the RSA if shipments of crude oil had resumed as expected, nor did he assess whether BTS was able to access credit from an insider or otherwise.  *See In re SemCrude L.P.*, 648 F. App'x 205, 210 (3d Cir. 2016) (explaining that access to credit must be considered and cautioning that the inadequate capital test should not be "biased by hindsight").

184.    Crude oil shipments did not ultimately resume, but the inadequate capital test evaluates what was known at the time based on "reasonable foreseeability."  *SemCrude*, 648 F. App'x at 210.  The facts available in the record indicate that the RSA was profitable assuming that BTS could throughput 65,000 barrels per day: the 2015 Simmons report credited the RSA with generating an increase of $9 million in EBITDA between Bridger Logistics' Q1 2015 financials and the 2015 projected base case EBITDA.  FOF ¶ 352.  Importantly, Soiefer, Gamboa, Heitmann, Wambold and others credibly testified that they expected crude oil operations to resume after the three-month suspension and that they intended to continue to use the Eddystone Facility, which would result in JTS receiving $2.55 per barrel for every barrel throughput once the suspension ended.  FOF ¶ 746.  JTS also was unencumbered by operational expenses.  Gamboa, 12/7/22 Tr.

145:25-146:2 ("Q. Did Jamex need any logistics assets of its own to perform under the COSA? A. No, sir."). In other words, the monthly payments JTS stood to receive well exceeded the payments it owed to Eddystone as of February 1, 2016. ($2.55 per barrel > $2.25 per barrel (Tr. Ex. 90-A; RSA Transloading Fee)).

185. Additionally, prior to the sale of BTS, Bridger Logistics requested and received financials from Jamex demonstrating that Jamex could support BTS and pay Eddystone through the suspension period. FOF ¶¶ 709-11, 714, 719. "[A] central consideration when determining whether a transaction leaves a company with unreasonably small capital is 'whether the parties' projections' used in facilitating the transaction were 'reasonable.'" *In re Lyondell Chem. Co.*, 567 B.R. 55, 110 (Bankr. S.D.N.Y. 2017). At the time Bridger Logistics agreed to sell BTS to Jamex, Jamex reported net assets of $124 million. FOF ¶ 700. Jamex was also a going concern; in connection with the suspension agreements, Jamex negotiated the right to continue to use Bridger Logistics' transportation assets through the suspension period, ostensibly to continue its profit-generating operations. FOF ¶ 698.

186. In this context, it was not "reasonably foreseeable" that Ballengee would subsequently: (1) fail to pay Eddystone despite receiving the full payment due to Eddystone from Bridger Logistics, (2) terminate the Monroe TLA, and (3) default under the Marketing TLA. Contemporaneous emails reflect the shock and dismay of Bridger Logistics and Ferrellgas executives upon learning, several months after the fact, that Ballengee declined to pay the deficiency fee due in February and that Eddystone had responded by commencing arbitration against Jamex. FOF ¶¶ 757-774; *see also Moody,* 971 F.2d at 1073 (emphasizing focus on reasonable foreseeability under PUFTA's predecessor statute because "businesses fail for all sorts of reasons, and [] fraudulent conveyance laws are not a panacea for all such failures"); *Peltz v.*

*Hatten*, 279 B.R. 710, 746 (D. Del. 2002), *aff'd sub nom.*, *In re USN Commc'ns, Inc.*, 60 F. App'x

401 (3d Cir. 2003) (unexpected dry-up of capital markets relevant to capitalization analysis); *In re*

*Fid. Bond & Mortg. Co.*, 340 B.R. 266, 297 (Bankr. E.D. Pa. 2006) (unplanned financial events

and unpredictable market events did not cause debtor to have unreasonably small assets because

intervening events were not reasonably foreseeable). Eddystone did not satisfy its burden to

establish that such an outcome was reasonably foreseeable as of February 1, 2016.

187. Eddystone did not establish BTS was insolvent at any point in time while owned

by the Defendants. Additionally, the JTS decision to pay only approximately $4 million of the

$4.4 million due in February 2016 (FOF ¶ 751) does not entitle Eddystone to a rebuttable

presumption of insolvency with respect to JTS as of that date. A presumption of insolvency arises

under PUFTA when there is proof that a debtor "is generally not paying the debtor's debts as they

become due other than as the result of a bona fide dispute." 12 Pa. C.S. § 5102(b). The evidentiary

record establishes that Ballengee, as the new owner of JTS, elected not to pay a portion of the

amount due to Eddystone as a result of a bona fide dispute to encourage Eddystone to negotiate

with him about the facility defects and the intermediation agreement, and as authorized in the RSA.

FOF ¶¶ 750-51; 12 Pa. C.S. § 5102 cmt. 2 ("A presumption of insolvency does not arise from

nonpayment of a debt as to which there is a genuine bona fide dispute, even though the debt is a

substantial part of the debtor's indebtedness) (citing 11 U.S.C. § 303(h)(1)); 12 Pa. C.S. § 5102

cmt. 2 ("In determining whether a debtor is paying its debts generally as they become due, the

court should look at more than the amount and due dates of indebtedness" including "the number

of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment,

and the existence of bona fide disputes or other special circumstances alleged to constitute an

explanation for the stoppage of payments."); *see also In re Blair*, 588 B.R. 605, 624 n.10 (Bankr.

D. Colo. 2018) (applying CUFTA and explaining that "[d]ebts in bona fide dispute are not deemed to be 'due' under the 'generally paying his debts as they became due' framework"); *In re Gen. Trading, Inc.*, 87 B.R. 216, 220 (Bankr. S.D. Fla. 1988) (excluding bona fide dispute from analysis of whether debtor was generally paying its debts as they came due under 11 U.S.C. § 303(h)(1)).

188.    JTS declined to pay the deficiency fee in connection with a bona fide dispute between JTS and Eddystone.  Instead of paying $400,000 in deficiency fees, JTS, now under the control of Jamex and Ballengee, paid Eddystone $4 million for the volume transloaded and sent a letter on February 25, 2016 raising the issue of the still-festering facility defects, which impacted Eddystone's ability to perform under the RSA.  FOF ¶¶ 750-51.  The RSA gave JTS the right to withhold deficiency payments in the event Eddystone could not accept JTS' volume commitment. FOF ¶ 149 (Trial Ex. 90-A (RSA) at § 4.4 (right to refuse to pay deficiency fees if facility unable to accept volume commitment)).  JTS' February 25 letter referenced the "ongoing significant dispute" over the facility defects and requested "that the failings of the facility that have had a devastating impact on the operations and profitability of [JTS] be corrected."  FOF ¶ 750.  In response, Eddystone elected to file arbitration against JTS and Jamex for the amounts due under the remainder of the RSA's five-year term. FOF ¶¶ 755-56.

189.    Eddystone did not establish that BTS was insolvent at any point in time, including when Bridger Logistics sold its membership interests in BTS to Jamex on February 1, 2016.

**D.    2015 Intercompany Receivables Do Not Support A PUFTA Claim.**

190.    Eddystone also did not establish a claim under PUFTA §§ 5104(a)(1), 5104(a)(2), or 5105 with respect to the 2015 Intercompany Receivables. Trial Ex. 3002 (Sherman Aff.) ¶ 44 & 45.  First, at the time the Intercompany Receivables were allegedly written off, BTS assets were subject to a perfected lien filed by Community Trust Bank on all of its accounts.  FOF ¶ 179. Eddystone did not challenge the validity of that lien or otherwise offer evidence that it did not

encumber BTS' 2015 Intercompany Receivables. Accordingly, there was no "transfer" under PUFTA with respect to the 2015 Intercompany Receivables. 12 Pa. C.S. § 5101 (definition of "asset" excludes property encumbered by lien.)

191. Even absent a lien encumbering the 2015 Intercompany Receivables, the write-offs of those receivables are not voidable under PUFTA because there was no intent to hinder, delay or defraud creditors and BTS received reasonably equivalent value. Pa. C.S. § 5104(a)(1). The 2015 Intercompany Receivables fall into two categories: (1) those between BTS and Jamex ("Jamex Receivables"); and (2) those between BTS and other affiliates acquired by Ferrellgas ("Affiliate Receivables"). The Court will address each in turn.

*Jamex Receivables.*

192. Eddystone failed to prove that the Jamex Receivables were written off (rather than handled separately as part of an arms-length working capital adjustment) and, even if it had, evidence presented at trial established appropriate reasons for any such write-offs. Trial Ex. 3002 (Sherman Aff.) ¶ 44.)[8] The Ferrellgas PSA contained several provisions that effectively required the pre-Acquisition portion of the Jamex Receivables to be resolved in connection with an arms-length working capital calculation between Bridger, LLC and Ferrellgas Partners; any Jamex Receivables remaining after the working capital calculation were required to be written off for all Acquired Subsidiaries. FOF ¶¶ 459, 480.

193. In particular, Section 6.12 of the Ferrellgas PSA required that "all intercompany accounts among [the Acquired Subsidiaries], on the one hand, and [Bridger, LLC and the

---

[8] Bridger Marketing, Bridger Midstream, Waskom Energy Mrkt & Trans LLC, Bridger Admin Services, LLC, and Bridger, LLC are all deemed to be Jamex affiliates, as they are not included in the Ferrellgas PSA definition of Acquired Subsidiaries. FOF ¶ 454. There is evidence in the record that Bridger Midstream was wound down prior to the Acquisition. Trial Ex. 657-B.55.

subsidiary companies that Ferrellgas Partners did not acquire], on the other hand, that then remain outstanding will be terminated, voided, canceled and discharged, except to the extent any such accounts would be taken into account in connection with the determination of Closing Date Net Working Capital." Trial Ex. 2705.37.

194. The Ferrellgas PSA was negotiated at arm's length. Sherman, 12/7/22 Tr. 294:20-295:4; FOF ¶¶ 329-390. Uncontroverted evidence establishes that Ferrellgas Partners and Bridger Logistics complied with the terms of the arms-length Ferrellgas PSA by engaging in working capital negotiations with Jamex post-closing and resolving outstanding Jamex Receivables. FOF ¶¶ 456-458. Sherman testified he was not aware of any reason for the write-off of Jamex Receivables other than compliance with the Ferrellgas PSA. Sherman, 12/7/22 Tr. 298:9-12.

### *Affiliate Receivables.*

195. Evidence presented at trial also established appropriate reasons for writing off the remaining $6.5 million in Affiliate Receivables at the time of the Acquisition. Trial Ex. 3002 (Sherman Aff.) ¶ 44.

196. Jilla, Kelly, and Heitmann, all of whom have served as CFOs, testified that it is a common practice to write off intercompany receivables of acquired affiliate companies so that the financial performance could be tracked by a new owner without the complicating factor of pre-acquisition intercompany receivables. FOF ¶ 482. Sherman likewise conceded he was aware of no reason the Affiliate Receivables were written off other than a straightforward application of purchase accounting principles. Sherman, 12/7/22 Tr. 301:7-22.

197. Eddystone has not established an intentional fraudulent transfer under 12 Pa. C.S. § 5104(a)(1) in light of these legitimate reasons supporting the decision to write off the 2015 Intercompany Receivables, and the absence of evidence that the decision was made to "hinder,

delay or defraud BTS' creditors." *See, e.g., Lockwood Auto Grp., Inc.*, 450 B.R. at 571 (denying fraudulent transfer claim given legitimate reason).

198.     Nor can Eddystone establish a constructive fraudulent transfer.  As set forth above, Eddystone did not establish that BTS was either insolvent at the time of the Acquisition or had any reason to believe it would be unable to pay its debts as they became due.  Eddystone did not meet the elements of constructive fraudulent transfer under either PUFTA Section 5104(a)(2) or 5105.

### E.     The Accounting Code Changes Do Not Support PUFTA Claims.

199.     As set forth in section II.C above, Eddystone's allegations that Bridger Logistics created new company codes in the Great Plains accounting software as part of a plan to "divert profits" from BTS is not supported by the evidence.  Nor does the creation of the company codes support Eddystone's PUFTA claims.

200.     Sherman contends that approximately $47.2 million in profit was diverted to fictious entities "Bridger Rail Services" and "Bridger Pipeline Services."  Sherman, 12/8/22 Tr. 46:8-56:25.  But "Bridger Rail Services, LLC" and "Bridger Pipeline Services, LLC" were simply the names of accounting codes in accounting software; they were not legal entities and therefore could not receive transfers of BTS property.  FOF ¶¶ 430, 439-40.  Eddystone did not meet its burden to show that recording BTS' accounting activity—including BTS' expenses and liabilities—associated with the three distinct BTS business segments utilizing three different company codes caused BTS to dispose of or part with the associated assets.  Accordingly, Eddystone did not satisfy its obligation to show any transfer occurred that could be voided under PUFTA.  12 Pa. C.S. § 5101 (defining "transfer" as disposing of or parting with an asset or an interest in an asset).

201.     Sherman's assertion that, through use of the company codes, or otherwise, tens of millions in "net profits" were diverted from BTS to other Bridger Logistics' subsidiaries is

likewise not supported by the record. As Sherman acknowledged, revenue itself is not an asset, nor is profit. Sherman, 12/8/22 Tr. 58:6-58:11. Revenue is recorded when it is earned, before cash is actually collected. Sherman, 12/8/22 Tr. 57:17-58:5.

202. Nor could Sherman identify which entity received the allegedly diverted revenue, instead testifying that he "assum[ed] it would be one of the other Logistics subsidiaries or Logistics itself." Sherman, 12/8/22 Tr. 39:17-40:4. This level of transferee proof does not satisfy pleading standards, much less the burden Eddystone carries at trial. *See, e.g.*, *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (dismissing fraudulent transfer claims based on "net transfers in the amount of $175.3 million" to affiliates for failing to "identify any specific transfer, transferor, transferee, or date of transfer"); *see also, e.g.*, *In re Petters Co.*, 557 B.R. 711, 725 (Bankr. D. Minn. 2016) (dismissing fraudulent transfer claim for failing "to properly identify a Defendant recipient of the transfers").

203. Additionally, Sherman's calculation of approximately $47.2 million in profit he alleges was diverted includes approximately $32 million in revenue recorded as purportedly earned by BTS from Jamex Marketing, approximately $26 million of which was purportedly earned by BTS in 2016 after BTS was sold to Jamex. Pl. Summ. Exs. 84, 86. Sherman admittedly never investigated whether this revenue purportedly earned by BTS and "diverted" to other Bridger Logistics entities was ever collected as cash by any party. Sherman, 12/8/22 Tr. 59:25-60:20.

204. It is undisputed that Bridger Logistics ultimately terminated the Marketing TLA with Jamex Marketing based on its inability to collect from Jamex Marketing in September 2016. Sherman, 12/8/22 Tr. 58:15-59:22. At the time, Jamex Marketing owed Bridger Logistics $49.5 million. Trial Ex. 2419.19-20. Nevertheless, Sherman opines that Bridger Logistics somehow diverted to itself tens of millions due from Jamex to BTS in 2016.

205. Sherman's purported "net profits" also include revenues earned by 19 Injection Stations. Yet Sherman separately valued the 19 Injection Stations and agreed that a valuation of an asset necessarily includes the revenue the asset is expected to generate. Sherman, 12/8/22 Tr. 69:18-22. Consequently, assuming Eddystone were entitled to damages associated with the 19 Injection Stations, it would not be entitled to the net profits as well because such relief would result in a double recovery. Double counting is not the only problem. Sherman's "net profits" purportedly diverted from BTS even includes revenue earned from contracts to which BTS was never a party. Sherman, 12/8/22 Tr. 66:25-67:15.

206. The suggestion that BTS earned tens of millions in profits diverted to Bridger Logistics after the Acquisition is not supported. Sherman's opinion cannot be reconciled with the fact that, by July 2016, a year after the acquisition, CBIZ valued Bridger Logistics between $44 million and $203 million. FOF ¶ 779. Based on that impairment valuation, Ferrellgas reported that the value of the entire Bridger Logistics acquisition had decreased approximately $630 million to less than a quarter of what Ferrellgas, LP had paid for it the year before. FOF ¶ 781.

207. On rebuttal, Sherman contends that the January 31, 2016 Balance Sheet (Def. Summ. Ex. 2) created by Polkowitz shows tens of millions transferred from BTS when it was sold on February 1, 2016. Polkowitz is an expert in accounting, not valuation. Polkowitz, 12/23/22 Tr. 168:23. Polkowitz combined the three accounting codes in Great Plains and Peoplesoft, applying GAAP to reflect accounting books and records specific to BTS as of January 31, 2016. Polkowitz, 12/23/22 Tr. 172:7-14. At trial, Polkowitz explained that BTS' accounting records reflected $16.356 million in Retained Earnings from the time of the Acquisition through January 31, 2016, in contrast to Sherman's claim that tens of millions in net profits were diverted from BTS to Bridger Logistics. Polkowitz 12/23/22 Tr. 176:13-23.

208.     According to Sherman, the BTS balance sheet that Polkowitz recreated shows that BTS had assets of approximately $186 million the day before it was sold to Jamex.  Trial Ex. 3014 (Sherman Rebuttal Aff.) ¶¶ 28-33.  Sherman states "under [GAAP], the fair value of those assets would likely be more than the $186 million but could not be less."  Trial Ex. 3002, Trial Ex. 3014 (Sherman Rebuttal Aff.) ¶ 32.  But Polkowitz did not purport to conduct any valuation of BTS, and the authors of PUFTA made clear that accounting values on a company's balance sheet are not appropriate for use as the value of property for purposes of PUFTA.  As the comments to PUFTA state: "Financial accounting standards may permit or require fair value measurement of an asset or a debt. The fair value of an asset or a debt for financial accounting purposes may be based on standards that are not appropriate for use in [PUFTA.]"  12 Pa. C.S. § 5101 cmt. 1; *see also, e.g., In re Hechinger Inv. Co. of Del., Inc.*, 278 F. App'x 125, 129 (3d Cir. 2008) ("It is certainly true that there can be a substantial disconnect between book value and fair market value[.]") (citing *JPMorgan Chase & Co. v. Comm'r of Internal Rev.*, 458 F.3d 564, 569 (7th Cir. 2006) ( "fair value" under GAAP is not the same as "fair market value" for purposes of the tax code)); *In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121-22 (5th Cir. 1994) (remanding for judgment in favor of transferee after finding that book value was insufficient to establish fair valuation); *In re EBC I, Inc.*, 380 B.R. 348, 358 (Bankr. D. Del. 2008), *aff'd,* 382 F. App'x 135 (3d Cir. 2010) (explaining that "GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company"); 15 *Mertens Law of Fed. Income Tax'n* § 59:21 (2021) ("Book values are based on cost and may have no relation to fair market value.").

209.     The reason that book values reflected on a company's balance sheet are not appropriate for purposes of PUFTA is made plain by a close look at BTS' recreated balance sheet, which is the following:

| BTS Balance Sheet as of January 31, 2016 | |
|---|---|
| *($ in 000s)* | **1/31/2016** |
| **Assets** | |
| Cash | - |
| Trade accounts receivable | 13,128 |
| Intercompany receivables | 16,535 |
| Prepaid expenses | 1,510 |
| Other current assets | 227 |
| **Total Current Assets** | **31,400** |
| Land | 1,726 |
| Pipeline terminals | 38,562 |
| Vehicles | 30 |
| Furniture and equipment | 158 |
| Construction in progress | 1,185 |
| Accumulated depreciation | (1,233) |
| Intangible assets, net of amortization | 114,269 |
| **Total Other Assets** | **154,698** |
| **Total Assets** | **186,098** |

Def. Sum. Ex. 2. The BTS Balance Sheet as of January 31, 2016 reflects: (1) receivables of approximately $29.6 million (trade account and intercompany receivables); (2) the 19 Injection Stations' book value of approximately $40 million ("Land" and "Pipeline Terminals"); (3) "Intangible Assets," net of amortization, of approximately $114.269 million, and (4) remaining assets of approximately $1.87 million after depreciation (the sum of prepaid expenses, other current assets, vehicles, furniture and equipment, construction in progress minus accumulated depreciation). Def. Summ. Ex. 2.

210.     Beyond the $16.356 million in Retained Earnings and 19 Injection Stations subject to a valid lien that are addressed below, Polkowitz's balance sheet does not suggest and cannot support an argument that BTS had any other assets transferred from it. As he explained, and as Sherman acknowledged in a different context, the trade account and intercompany "receivables" reflected on a balance sheet are necessarily incorporated into BTS' retained earnings. Trial Ex.

3003 (Polkowitz Decl.) ¶ 37; Sherman, 12/7/22 Tr. 284:6-284:8 ("So when I say the revenue was diverted, if I said that those intercompany receivables were also diverted, I'd be duplicative.").[9]

211.    Similarly, utilizing a book value for the 19 Injection Stations, which was established on June 24, 2015, is inappropriate on February 1, 2016 given the dramatic changes in the crude oil market between those two dates, as articulated by Defendants' valuation expert Kumar and described further below.  *See* COL ¶ 255-256.

212.    Most importantly, there is no evidence in the record that the remaining $114 million of "intangible assets" consist of property that was, or could be, transferred from BTS.  The intangible asset value reflected on Polkowitz's balance sheet is simply a portion of the approximately $300 million in "intangible assets" that CBIZ allocated to Bridger Logistics when evaluating the purchase price of more than $800 million in June 24, 2016.  Trial Ex. 3003 (Polkowitz Decl.) ¶ 21 (stating he used June 2015 CBIZ Report to allocate intangible assets); *see also* Trial Ex. 961-A.40 (June 2015 CBIZ Report showing intangible assets of $299.2 million of a total $822.452 million purchase price).  Other courts have found that the value assigned to intangible assets as part of the acquisition of a business—as happened here in the June 2015 CBIZ Report—is not an "asset" subject to a fraudulent transfer under the UFTA.  *See In re 3dfx Interactive, Inc.*, 389 B.R. 842, 881-82 (Bankr. N.D. Cal. 2008) (finding that trustee's theory that goodwill was fraudulently transferred "misunderstands the relevant accounting concepts"); *see also In re Cox Motor Express of Greensboro, Inc.*, 2016 WL 4259801, at *11 (M.D.N.C. Aug. 9, 2016) ("Although balance sheets, even prepared under [GAAP] may be relevant, they are not determinative of a fair valuation of the debtor's assets and other evidence is often required.").

_____

[9] While potentially counterintuitive to non-accountants, the reason for this is that when revenue is earned, a receivable is also recorded by double-entry book-keeping – counting both the revenue and the receivable would consist of double-counting.

213.    The only "intangible asset" belonging to BTS identified by Sherman on rebuttal were "Customer Relationships," but—as Sherman acknowledged at trial—BTS' most profitable customer relationship was with Jamex Marketing.  Trial Ex. 3002 (Sherman Aff.) ¶¶ 15, 17, 20 (Jamex Marketing was BTS' sole customer in the pipeline management and rail services segments, and a major customer in the stations throughput segment); *see also* Pl. Summ. Exs. 84, 86 (revenue by customer).  JTS retained that relationship after Jamex acquired it.

214.    In sum, Eddystone did not satisfy any element of PUFTA with respect to the Accounting Code Changes because there is no evidence that Defendants transferred any asset from BTS through the use of new accounting codes, that they created the new accounting codes "to hinder, delay and defraud creditors," or that that BTS was insolvent or could not pay debts when the new accounting codes were implemented.  As a result, Eddystone failed to prove a constructive or intentional fraudulent transfer claim under PUFTA based on the Accounting Code Changes.

**F.    The 2016 Alleged Transfers Do Not Support Eddystone's PUFTA Claims.**

215.    Eddystone did not establish that the 2016 Alleged Transfers are subject to PUFTA because the property assigned from BTS was encumbered by a valid lien at the time of the transfer.

216.    Even absent a valid lien, Eddystone did not satisfy the elements necessary to prove a constructive or intentional fraudulent transfer.

*The 2016 Alleged Transfers Involved Property Subject To A Valid Lien.*

217.    "If there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential transfer [for the benefit of a secured creditor] does not constitute a fraudulent conveyance."  12 Pa. C.S. § 5103 cmt. 1 (2017); *see also* 1 Pa. C.S. § 1927 ("[s]tatutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them").

218.    The Utah Supreme Court aptly stated the rationale for excluding assets encumbered by a valid lien under the UFTA:

> The Act provides a remedy for creditors who are actually harmed when a debtor transfers property; it does not provide a remedy in cases of only theoretical harm…. When such property is transferred, there is no harm done to either the creditor holding the lien—the secured creditor—or any other unsecured creditor of the debtor. The secured creditor is not harmed because it retains the right to proceed against the property by foreclosing its lien—regardless of whether the debtor currently holds the encumbered property. And any unsecured creditors are not harmed because they would never have been able to recover their debt by means of the encumbered property. Thus, excluding property to the extent that it is encumbered by a valid lien is consistent with the [UFTA's] general no-harm, no foul operation.

*Rupp v. Moffo*, 358 P.3d 1060, 1064-65 (Utah 2015) (remanding for entry of summary judgment because valid lien existed and property was not an "asset" subject to UFTA); *Klein*, 729 F.3d at 294 (looking to other states' law to interpret PUFTA).

219.    A "valid lien" is a lien that has been perfected, and that is not otherwise void or voidable. 12 Pa. C.S. § 5101(b) (a valid lien is one that is "effective against the holder of a judicial lien subsequently obtained"); 13 Pa. C.S. § 9317(a)(2) (perfected security interest is senior to subsequent lien creditor); 42 Pa. C.S. § 8141 (recorded mortgage is senior to subsequent judgment lien); *Fair Finance*, 13 F.4th at 553-54 (explaining that the "valid lien" aspect of UFTA considers whether the lien is effective against a later judicial lien under the UCC).

220.    Section 9-203(b) of the UCC provides that a security interest attaches (i.e., is enforceable against the debtor and third parties) if three requirements are met: (1) value has been given; (2) the debtor has rights in the collateral; and (3) the debtor has authenticated a security agreement that provides a description of the collateral. 13 Pa. C.S. § 9203(b); La. R.S. § 10:9-203(b); *see also In re Blatstein*, 226 B.R. 140, 151 (Bankr. E.D. Pa. 1998)*, aff'd sub nom In re Main, Inc.,* 1999 WL 689715 (E.D. Pa. Sept. 3, 1999) (finding lien was valid under PUFTA).

221.    Bank of America's lien satisfies all three requirements.  First, Bank of America gave value to BTS in exchange for the lien.  Under the UCC, "a person gives value for rights if the person acquires them (1) in return for a binding commitment to extend credit . . . whether or not drawn upon; (2) as security for a preexisting claim;. . . or (4) in return for any consideration sufficient to support a simple contract." 13 Pa. C.S. § 1204; La. R.S. § 10:1-204.  Under the Credit Agreement, Bank of America entered into a binding commitment to extend credit to Ferrellgas Partners and its Restricted Subsidiaries, including BTS. Trial Ex. 1851.  By January 2016, BTS had access to, and had drawn upon, that credit and gave Bank of America security for its preexisting claim.   FOF ¶¶ 517-530; Trial Ex. 2636.  *See, e.g.*, *Blatstein*, 226 B.R.at 151, 153-54 (explaining that, in considering whether "value has been given" sufficient to find a valid lien, "the issue was not whether the [debtor] received value, but rather whether [] the creditor claiming secured status[] gave consideration in return for [its] security."); *In re Reliable Mfg. Corp.*, 703 F.2d 996, 1000 (7th Cir. 1983) ("A security interest given in consideration for the obligation of a third party clearly . . . . fulfills the requirements of the UCC.  It is enough, in fact, that there be detriment to the secured party even if there is no benefit to the owner of the assets subject to the security interest."); *In re Terminal Moving & Storage Co., Inc.*, 631 F.2d 547, 551 (8th Cir. 1980) (finding value was given where creditor "incurred a detriment to itself in extending credit in exchange for the pledge" of the company's assets, and the "fact that the benefit of this agreement accrued to Walker, the sole stockholder of [the company] and not the corporation itself does not detract from the fact that the secured party gave value for the security interest"); *Royce v. Michael R. Needle, P.C.*, 381 F. Supp. 3d 968, 979-80 (N.D. Ill. 2019) (value extended to a third party, or detriment to the secured party, satisfies requirement).

222.    Second, there is no dispute that BTS had rights in the collateral.

223. Third, BTS executed the grantor accession agreement that provided a description of the collateral on January 14, 2016, and Bank of America perfected its lien on BTS' assets on January 15, 2016. Trial Exs. 2636, 1351, 1352, 1861; *see also Blatstein*, 226 B.R. at 151 (finding lien was perfected by filed UCC statement).

224. The 2016 Alleged Transfers occurred after Bank of America perfected its lien, and the property assigned from BTS to other Bridger Logistics subsidiaries was subject to the lien. 12 Pa. C.S. § 5106(4) (no transfer before debtor acquires rights in asset transferred); FOF ¶¶ 723-738.

225. Because the 2016 Alleged Transfers involved assets subject to a perfected lien, Eddystone must establish by a preponderance of evidence that either the lien itself is voidable under PUFTA or that it does not reach the assets at issue. *See, e.g., Ed Peters Jewelry Co., Inc.*, 124 F.3d at 262 (sustaining judgment for defendants on fraudulent transfer claims, notwithstanding evidence of fraudulent intent, because a valid security interest existed at the time of transfer and the property was not an "asset" subject to RIUFTA); *see also In re 1701 Com., LLC*, 511 B.R. 812, 826 (N.D. Tex. 2014) ("Without a transfer of an 'asset,' the parties' intent is irrelevant.").

226. Eddystone did not satisfy that burden. 12 Pa. C.S. § 5104(c) (burden of proof); *In re Valley Bldg. & Const. Corp.*, 435 B.R. 276, 285, 287 (E.D. Pa. 2010) (party challenging transfer as intentionally or constructively fraudulent bears the burden of proof on all elements); *Fid. Bond & Mortg. Co.,* 371 B.R. at 720 (party challenging transfer must establish all elements by a preponderance of the evidence); *Mullins*, 564 F.3d at 414 n.20 (finding burden unsatisfied in face of valid lien); *A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*, 560 F. Supp. 705, 709-10 (E.D. Pa. 1983) (rejecting creditor's "vague assertions" about invalidity of mortgages); *Mehrtash*, 112 Cal. Rptr. 2d at 806 (treating creditor's failure to show ability to recover from mortgaged property as failure to prove essential element of claim).

*The Bank Of America Lien Is Not Voidable Under PUFTA.*

227. Eddystone bears the burden to show that the "creation of a lien" is itself voidable as a fraudulent or constructive transfer under PUFTA, and Eddystone has failed to satisfy that burden. 12 Pa. C.S. § 5104(c) (establishing burden).

228. <u>Intentional Fraudulent Transfer.</u> Eddystone did not satisfy its burden to establish the lien is voidable as an intentional fraudulent transfer. 12 Pa. C.S. § 5104(c).

229. BTS executed the June 2015 Guaranty Supplement guaranteeing the Bank of America credit facility on June 24, 2015. FOF ¶ 492. Section 6.12 of that same credit facility required Ferrellgas-acquired subsidiaries, like BTS, not only to guarantee the credit facility, but also to provide Bank of America with a lien on BTS' assets. FOF ¶ 303 (citing Trial Ex. 1851.86). In executing the June 2015 Guaranty Supplement, BTS, like all Bridger Logistics' subsidiaries, "agree[d] to be bound" by all terms of the Guaranty and the Loan Documents between Ferrellgas and Bank of America. FOF ¶ 494 (citing Trial Ex. 754-A.2 at ¶ 1(a)). BTS further promised to "take such additional actions and to execute and deliver such additional documents and instruments . . . to carry out the intent of the [Guaranty Supplement.]" *Id.*

230. Accordingly, when BTS executed the June 2015 Guaranty Supplement, it obligated itself to give Bank of America a lien on its assets as of that date, an obligation it satisfied in January when it discovered that a single remaining document had not been completed in June 2015. *See, e.g., Lyon v. Lyon*, 619 N.Y.S.2d 300, 301 (1994) (enforcing the party's "agree[ment] to cooperate in signing whatever deeds and covenants may be necessary" to allow development of a parcel and the party's agreement to sign "whatever necessary documents there are" to convert the parcel into a specific type of plot); *Karson v. Arnow*, 224 N.Y.S.2d 891, 897 (1962) (holding that an agreement to execute or formalize effectuating documents is binding as long as the parties do not contemplate further negotiations).

231.     No badge of fraud is present with respect to BTS' issuance of the lien: (1) Bank of America is not an insider; (2) BTS did not retain the security interest that it gave to Bank of America by virtue of the lien; (3) the lien was publicly disclosed in the UCC statement perfecting it; (4) BTS had not been threatened with suit; (5) the lien gave Bank of America an interest in BTS' assets but did not constitute a transfer of all of BTS' assets; (6) BTS did not abscond; (7) BTS did not remove or conceal the lien; (8) BTS received reasonably equivalent value because it satisfied its pre-existing contractual obligation; (9) BTS was not insolvent (see COL ¶¶ 152-82); (10) BTS did not incur a substantial debt shortly before or after issuing the lien; and (11) the lien was not a transfer of assets essential to BTS' business —it was a grant of a security interest in those assets.   Accordingly, Eddystone did not establish the lien as voidable as an intentional fraudulent transfer under 12 Pa. C.S. § 5104(a)(1).

232.     To support its claim of fraudulent intent in the creation of the lien, Eddystone points to emails among Gamboa, Rios, Hampton and Soiefer in December 2015 in which Rios inquired into whether the banks had liens on BTS' assets.   FOF ¶ 582.   But, in that same email chain, Hampton reports, consistent with BTS' intent when executing the Guaranty Supplement, that there already was a lien on all BTS assets.   FOF ¶ 582.   ████████████████████████████

████████████████████████████████████████████

████████ FOF ¶ 582 .   ████████████████████████████████

████████████████████████████████████████████

████████ FOF ¶ 582.

233.     Eddystone also highlighted that Rios entered into a letter agreement on behalf of Bridger Logistics to sell BTS to Jamex on January 13, 2016, and Heitmann executed the grantor accession agreement on behalf of all Bridger Logistics subsidiaries, including BTS, on January 14,

2016. Contemporaneous documents and witness testimony established this timing to have been coincidental. The evidentiary record reflects that Ferrellgas engaged in efforts to upsize its credit facility as early as February 2015, and those efforts led to Bank of America discovering that the contractually required grantor accession agreement from Bridger Logistics and its subsidiaries, including BTS, remained outstanding. FOF ¶¶ 577-603. Miles remedied the issue in a matter of days in connection with closing on the increased credit facility. FOF ¶¶ 577-603.

234. Both Ferrellgas CFO Heitmann, and outside counsel Miles, credibly explained that the intent in executing the grantor accession agreement on behalf of BTS on January 14, 2016 and creating the lien in favor of Bank of America was to ensure there was no default under the Bank of America credit facility as part of an effort to increase the borrowing limit. No connection has been established between the execution of the grantor accession agreement and any BTS creditor or the 2016 Alleged Transfers. Contemporaneous emails in January 2016 support Miles and Heitmann's testimony and reflect that the execution of the grantor accession agreement was unrelated to the contemplated transfers from BTS. FOF ¶¶ 577-603.

235. In the face of such evidence, Eddystone did not meet its burden to establish the lien is voidable as an intentional fraudulent transfer under PUFTA 12 Pa. C.S. § 5104(a)(1). *See, e.g.*, *Lockwood Auto Grp.*, 450 B.R. at 571 (transfer not fraudulent because evidence at trial showed tax-related reason for transaction, which was a legitimate purpose); *In re Zambrano Corp.*, 478 B.R. 670, 689 (Bankr. W.D. Pa. 2012) (no actual intent because company had a history of making intercompany loans and debtor had reasonable expectation of value accruing from transfer).

236. <u>Constructive Fraudulent Transfer.</u> Nor did Eddystone satisfy its burden on any element required to establish the lien as voidable as a constructive fraudulent transfer.

237.     As previously detailed, Eddystone did not establish that BTS was insolvent at any point in time, let alone on January 14, 2016.  COL ¶¶ 152-82.

238.     Nor did Eddystone prove that BTS received less than reasonably equivalent value in exchange for the lien it granted Bank of America.  In the Third Circuit, the procedure for evaluating "reasonably equivalent value" proceeds in two steps. *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 387 (E.D. Pa. 2013) (affirming dismissal of PUFTA claims after finding reasonably equivalent value exchanged).  First, the Court determines whether the debtor received "any value at all" from the challenged transaction.  *Id.*  Second, if the Court finds that a debtor received at least some value, it decides whether the value received was "roughly the value it gave." *Id.* This analysis requires a review of the totality of the circumstances, including "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and transferee' and (3) the transferee's good faith." *Id.*

239.     The lien in favor of Bank of America secured BTS' antecedent debt in connection with the June 2015 Guaranty Supplement which, by definition under PUFTA, means that BTS received value for the debt. 12 Pa. C.S. § 5103 ("Value is given for a transfer . . .if . . . an antecedent debt is secured."); *see, e.g.*, *In re Waterford Wedgwood USA*, 500 B.R. 371, 379, 381 (Bankr S.D.N.Y.2013) ("A guaranty is an antecedent debt, and thus courts recognize that payment on account of a pre-existing guaranty constitutes value." (quotations and citations omitted)). Accordingly, the inquiry becomes whether BTS received reasonably equivalent value.

240.     Eddystone did not satisfy its burden to show that the value BTS received for the lien was less than reasonably equivalent value.  *See, e.g.*, *Mellon Bank,* 945 F.2d at 638 (bankruptcy trustee failed to prove lack of reasonably equivalent value because ability to obtain credit and synergy from combination had value).  In January 2016, the Ferrellgas entities, including

BTS, owed Bank of America more than $311 million on its secured credit facility. FOF ¶¶ 737. Eddystone did not offer any evidence regarding the value of the lien, BTS' guarantee, the overall collateral securing the Bank of America facility, or the amount BTS had drawn on the facility to fund cash flow needs until that point. Sherman, 12/8/22 Tr. 86:5-8, 88:19-90:14, 90:17-94:11; *see also, e.g.*, *Matter of S. Home and Ranch Supply, Inc.*, 561 B.R. 810, 816-17 (N.D. Ga. 2016) (trustee failed to meet burden on lack of reasonably equivalent value based on book values).

241. Moreover, BTS had a contractual obligation to issue the lien by virtue of the 2015 Guaranty Supplement and risked legal action by Bank of America if it breached that obligation. *See, e.g., In re GTI Cap. Holdings, LLC*, 373 B.R. 671, 681 (Bankr. D. Ariz. 2007) (rejecting fraudulent transfer to lien perfected months after loan executed in part because loan transfer would not have occurred if Debtor did not promise collateral, and had Debtor refused to perfect the security interest, the secured creditor would have likely sued debtor.) There is no dispute that BTS and Bank of America had an arms-length relationship, and Miles and Heitmann's testimony established that they acted in good faith when executing the Grantor Accession Agreement, in connection with the credit facility expansion, in order to clean up an aspect of the documentation around the Acquisition. *Waterford Wedgwood USA*, 500 B.R. at 379 (fraudulent transfer law elevates substance over form when addressing steps of transaction).

242. In light of the foregoing, the lien did not constitute a constructive fraudulent transfer under 12 Pa. C.S. § 5104(a)(2) or § 5105 and cannot be voided as such.

### *Eddystone Failed To Undermine The 2015 Guaranty Supplement.*

243. Eddystone also attempts to undermine the Guaranty Supplement, likely recognizing that antecedent debt created by the June 2015 Guaranty Supplement negates any attempt to void under PUFTA the valid lien securing it. But contrary to Eddystone's suggestions, the June 2015

Guaranty Supplement (1) is not a voidable obligation under PUFTA; (2) did not require a countersignature to be effective; and (3) was binding on BTS when executed on June 24, 2015.

244. First, the June 2015 Guaranty Supplement is not a voidable obligation under PUFTA and there is simply no evidence to support either a constructive or intentional fraudulent transfer. As set forth above (COL ¶¶ 152-82), BTS was solvent when it executed the June 2015 Guaranty Supplement. BTS also received extensive value in exchange for executing the June 2015 Guaranty Supplement in the form of approximately $40 million in debt relief, synergies resulting from the Acquisition, and access to the credit facility, which BTS then utilized to fund its cash-flow needs. FOF ¶¶ 473-77. Sherman's opinion that BTS received no benefit from the credit facility (Trial Exs. 3002 (Sherman Aff.), 109) is not credible in light of the uncontroverted documentary evidence and testimony. *Mellon Bank*, 945 F.2d at 646-47 (bankruptcy court's rejection of benefits from access to line of credit was "flawed" because "[t]he ability to borrow money has considerable value in the commercial world"); *see also Mellon Bank*, 945 F.2d at 638 (bankruptcy trustee failed to prove lack of reasonably equivalent value because ability to obtain credit and synergy from combination had value). There is likewise no evidence that any Defendant intended to "hinder, delay, or defraud" any creditor of BTS when Ferrellgas, LP paid more than $800 million to purchase Bridger Logistics and its subsidiaries in an arms-length transaction, and paid BTS' outstanding debts in the process.

245. Second, Eddystone's questions at trial highlighted that Bank of America did not countersign the June 2015 Guaranty Supplement when it was sent to Bank of America in June 2015. Heitmann, 2/14/23 Tr. at 192:21-193:9. But the June 2015 Guaranty Supplement was still binding on BTS as of the date BTS executed it regardless of any countersignature. By its own terms, the June 2015 Guaranty Supplement became effective when it was sent. In the document

itself, BTS agreed that "by the execution and delivery [of the June 2015 Guaranty Supplement], the undersigned becomes a Guarantor under the Guarantee and agrees to be bound by all of the terms thereof." Trial Ex. 754-A.2 (emphasis added). Moreover, the June 2015 Guaranty Supplement is governed by New York law, which does not require a bank to notice its acceptance for it to be effective. *See* Trial Ex. 754-A.2; *Cinerama, Inc. v. Sweet Music, S. A.*, 355 F. Supp. 1113, 1120 (S.D.N.Y. 1972) (stating the general rule that, unless notice of acceptance is required by the terms of a guarantee, the making of the loan constitutes acceptance by the bank of the guarantor's offer of surety.); *Doehler Die Casting Co. v. Holme*s, 52 N.Y.S.2d 321, 322 (Sup. Ct. N.Y. Cnty. 1944) ("The defense that plaintiff did not give defendant notice of the acceptance of the guarantee is equally bad. Where credit is advanced on the strength of a guarantee, no notice of acceptance is necessary."); *Daval 37 Assocs. LLC v. Namdar*, No. 157359/14, 2015 WL 1504863 (N.Y. Sup. Ct. Apr. 2, 2015) (argument that guarantee signed by one of the parties was unenforceable because there was no proof of delivery lacked merit); *Tatonka Cap. Corp. v. Connelly*, Civil Action No. 16-cv-01141-MSK-NYW, 2019 WL 5535226, at *2 (D. Colo. Oct. 25, 2019), *aff'd,* 839 F. App'x 206 (10th Cir. 2020) (rejecting argument that guarantee was unenforceable because it was not countersigned) (drawing from Colorado contract law).

246.    Eddystone is thus incorrect as a matter of law in suggesting that BTS did not become obligated on the June 2015 Guaranty Supplement, or as a guarantor of the credit facility, until the parties corrected the documentation issue and Bank of America countersigned in January 2016. Under PUFTA, an obligation is made when "a record signed by the obligor is delivered to or for the benefit of the obligee." 12 Pa. C.S. § 5106(5)(i)-(ii). It is undisputed that BTS executed the June 2015 Guaranty Supplement and that it was delivered to Bank of America. Tr. Ex. 754, 754-A; Heitmann, 2/14/23 Tr. 77:5-8.

247. Third, in addition to pointing to the lack of Bank of America's signature, ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ Miles, 12/13/22 Tr. 40:9-45:9 (CC). As the Court stated in response to Defendants' objection at the time, there is no evidence in the record that the relevant guaranty was "superseded." J. Wolson, 12/13/22 Tr. 40:9-45:9.[10]

248. Regardless of the guaranty referenced in the June 2015 Guaranty Supplement, the uncontroverted testimony and documentary evidence is that, on June 24, 2015, BTS intended to pledge its assets to, and create a lien in favor of, Bank of America. Heitmann, 2/14/23 Tr. at 77:1-77:19; Trial Exs. 1851.85 (Section 6.12(b)), 754-R, 754-A; Heitmann, 2/14/23 Tr. 77:1-77:19. (stating he intended to obligate the Bridger Logistics subsidiaries, including BTS, to pledge their assets in favor of the Bank of America credit facility and he understood that is what the June 2015 Guaranty Supplement accomplished); *see, e.g.*, *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448-449 (N.Y. App. Div. 2016) (In determining whether the parties intended to enter a contract, and the nature of the contract's material terms, [courts] look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.); *Brown*

---

[10] Earlier in the trial, the Court instructed counsel not to "read documents into the record and then ask if they refresh [the witness's] recollection. Show [the witness] a document. The document itself can either refresh his recollection, or it doesn't. We can't be reading stuff into the record and then ask." Court, 9/20/22 Tr. 274:7-15. Despite this admonition, Eddystone's counsel improperly read a portion of an inadmissible document into the record in an attempt to improperly refresh Miles and elicit a legal conclusion. To consider that testimony as substantive evidence of a legal conclusion without access to the actual substantive evidence—the contract itself—would improperly prejudice the Defendants. *See Shaw v. Rapone*, 585 F. Supp. 89, 90 (E.D. Pa. 1984) (allowing the substantive use of deposition testimony used to refresh a witness's recollection would be "a 'subterfuge to improperly suggest' the desired testimony," citing *United States v. Riccardi*, 174 F.2d 883, 889 (3d Cir. 1949) and the Third Circuit in *United States v. Booz*, 451 F.2d 719, 725 (3d Cir. 1971), and confirming that the rule "in cases of refreshed recollection is that the writing may not be admitted into evidence or its contents even seen by the jury").

*Bros. Elec. Contractors v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (N.Y. App. Div. 1977) ("[D]isproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.").

249.    Moreover, under New York law, a typographical error in a guaranty does not defeat the guaranty's enforceability. *See 82-90 Broadway Realty Corp. v. N.Y. Supermarket, Inc.*, 154 A.D.3d 797, 799 (N.Y. App. Div. 2017) (finding error in date did not preclude the court from carrying out the intentions of the parties by enforcing guaranty); *Lehman Bros. Holdings, Inc. v. Matt*, 34 A.D.3d 290, 291 (N.Y. App. Div. 2006) (finding reference to nonexistent section in loan agreement was a scrivener's error that did not affect enforceability). "In the absence of a claim for reformation, courts may as a matter of interpretation carry out the intentions of the parties by transposing, rejecting, or supplying words to make the meaning of the contract more clear." *82-90 Broadway*, 154 A.D.3d at 799. To the extent the Guaranty supplement referred to the incorrect versions of the guaranty, it appears to be nothing more than scrivener's error; to accept Eddystone's view would be to construe the June 2015 Guaranty Supplement as meaningless. But New York law does not allow for such an outcome based only on scrivener's error. *See Lehman Bros.*, 34 A.D.3d at 291 ("Whenever possible, a court will not construe a guaranty in such a way as to render it meaningless[.]").

### *Eddystone Failed To Establish That The Property Involved In The 2016 Alleged Transfers Was Not Encumbered By The Lien.*

250.    Because the lien is not voidable under PUFTA and it was perfected by Bank of America on January 15, 2016, it is a valid lien encumbering the 19 Injection Stations and Retained Earnings, such that the 2016 Alleged Transfers cannot support any claim under PUFTA. *See* 12 Pa. C.S. § 5101 (defining asset as excluding property subject to valid lien); *see also, e.g., Hipple,*

2016 WL 320216, *10 ("Under PUFTA, there is no transfer subject to avoidance where the asset transferred is encumbered by a valid lien."). Eddystone's suggestion that, even if valid, the lien did not "encumber" BTS assets because of the purported unlikelihood that Bank of America would call on BTS' assets to collect (Trial Ex. 3002 (Sherman Aff.) ¶ 103) is unsupported by the record, and Eddystone did not satisfy its burden.

251. Sherman opines that "the likelihood Ferrellgas would default on its credit facility or require access to BTS' assets in the event of default is highly improbable." Trial Ex. 3002 (Sherman Aff.) ¶ 103. But Sherman did not purport to value the other collateral supporting the Bank of America credit facility. FOF ¶ 737. In support of his conclusion, Sherman merely lists, without analysis, the Ferrellgas publicly reported total assets, short-term debt, and current assets and states, again without support, "only $12 million [of Ferrellgas' current assets] belonged to BTS." Trial Ex. 3002 (Sherman Aff.) ¶ 102. Sherman ignores, however, that those same public filings also reflected $492 million in current liabilities, which exceeded the current assets of $426 million called out by Sherman. Trial Ex. 1468-A at 5. Sherman also fails to acknowledge that the same filing states that Ferrellgas owed Bank of America $311.6 million as of January 31, 2016. Trial Ex. 1468-A.17.

252. By contrast, Heitmann testified that, if Ferrellgas were to default on the Bank of America credit facility, it would not be able to repay the amount due and cross-defaults would be a much bigger issue. FOF ¶ 737. Heitmann likewise testified that approximately $190.1 million in accounts receivable were carved out from Bank of America's collateral package, making it more likely Bank of America would look to the collateral of its subsidiaries. FOF ¶ 737. The record also supports that the Bridger Logistics acquisition and subsequent market fallout so destabilized

Ferrellgas that its assets plunged in value and it was forced into bankruptcy, rendering any concern about default quite real.  FOF ¶ 787.

253.    Accordingly, Bank of America's lien encumbered the 19 Injection Stations and the Retained Earnings at the time of the 2016 Alleged Transfers.[11]

### *Even Without The Lien, Eddystone Failed To Establish The 2016 Alleged Transfers Were Voidable Under PUFTA.*

254.    Even absent the Bank of America lien, Eddystone failed to meet its burden to show the 2016 Alleged Transfers were voidable under PUFTA.

255.    Setting aside the valid lien, Eddystone did not establish that the 2016 Alleged Transfers were made to "hinder, delay or defraud" Eddystone. 12 Pa. C.S. § 5104(a)(1). The contemporaneous evidence supports Defendants' position that the 2016 Alleged Transfers were necessary to comply with the Credit Agreement.  Bank of America's Credit Agreement allowed Restricted Subsidiaries to dispose of assets to: (1) other affiliated entities (§ 7.05(a)) and/or (2) others by selling the 100% equity interest in a subsidiary, provided the fair market value of the equity was less than $25,000,000. FOF ¶¶ 725.

256.    BTS complied with Section 7.05 of the credit facility by transferring BTS property subject to Bank of America's lien to affiliated entities before Bridger Logistics conveyed its 100 percent equity interest in BTS to a third party, Jamex.  Trial Ex. 1851.93 at § 7.05(d).  Multiple witnesses independently testified that the 2016 Alleged Transfers were made to comply with the Bank of America Credit Agreement.  FOF ¶ 730. Bridger Terminals and Bridger Swan Ranch were

---

[11] Bank of America did not perfect a lien on the real property underlying the Swan Ranch Terminal, which Plaintiff's expert valued at approximately $1.726 million.  Tr. Ex. 3002 (Sherman Aff.) ¶ 88.  It was transferred to Bridger Real Property, LLC.  Trial Ex. 1417.  It is unclear whether, at the time of the transfer, Defendants understood that Bank of America did not have a perfected lien on that single property.

required to execute a guaranty and Grantor Accession Agreement in favor of Bank of America before receiving any assets from BTS.  FOF ¶ 727.  In connection with Bridger Logistics' sale of its 100 percent equity interest in BTS, Bank of America agreed to terminate its lien on BTS' assets. Trial Exs. 1335, 1324, 1328, 1551.

257.     Nor was the transfer of Bridger Logistics' membership interests in BTS done with intent to "hinder, delay or defraud" Eddystone's right to collect payments under the RSA. Eddystone refused to engage with Jamex in connection with the Carlyle intermediation agreement, stating that Eddystone lacked privity with Jamex; Eddystone also refused to engage meaningfully with BTS regarding the both the operational issues and the threat Jamex's liquidity issues posed to the relationship with Monroe, which was critical to both Bridger Logistics and Eddystone. FOF ¶¶ 749-56.  Transferring the membership interests in BTS and the RSA to Jamex without BTS' other property allowed Ballengee to negotiate directly to obtain consent needed to finalize the Carlyle intermediation agreement and address the economics of the RSA and the various facility defects, all of which would protect payments under both the RSA and the COSA.  FOF ¶¶ 747, 749-56.  Ballengee's decision to terminate the Amended COSA and the RSA was not reasonably foreseeable, nor would it make sense for Defendants to intend for that to occur.  Ballengee's decision destroyed $628.8 million of value of Ferrellgas' more than $800 million purchase.  Trial Ex. 2495.14.  In addition, Rios and Gamboa failed to achieve their EBITDA-based bonus targets and ultimately lost their jobs, as did Wambold. FOF ¶¶ 748, 785-86.

258.     In the face of such evidence, Eddystone did not support its narrative that Defendants made the 2016 Alleged Transfers, and transferred membership interests in BTS, intending to hinder, delay and defraud Eddystone by leaving BTS judgment proof so that its new owners could breach the RSA.  There is overwhelming evidence to the contrary.

259. For these reasons, even in the absence of a valid lien, the 2016 Alleged Transfers do not amount to a constructive fraudulent transfer.

### *Eddystone Overstates The Value Of Property Subject To The 2016 Alleged Transfers.*

260. The transfer of the 19 Injection Stations does not support a claim under PUFTA because those stations were subject to Bank of America's valid lien and Eddystone failed to satisfy its burden on the other elements of a PUFTA claim. But even if the transfer of the 19 Injection Stations could be voided under PUFTA, Sherman's use of the approximately $40 million book value, established on June 24, 2015, overstates the value of the 19 Injection Stations as of February 1, 2016. Sherman, 12/8/22 Tr. 72:23-73:1 (book values established at time of Acquisition). Again, the authors of PUFTA made clear that accounting book values should not be used for purposes of PUFTA. 12. Pa. C.S. § 5101 cmt. 1 ("Financial accounting standards may permit or require fair value measurement of an asset or a debt. The fair value of an asset or a debt for financial accounting purposes may be based on standards that are not appropriate for use in [PUFTA]"); *see also In re EBC I, Inc.*, 380 B.R. 348, 358 (Bankr. D. Del. 2008) (explaining that "GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company"); *see Matter of S. Home and Ranch Supply,* 561 B.R. at 816-17 (rejecting Trustee's use of book values on balance sheet because they were seven months old and there had been precipitous downturn in industry); *Cox Motor Express of Greensboro,* 2016 WL 4259801, at *11 ("Although balance sheets, even prepared under [GAAP] may be relevant, they are not determinative of a fair valuation of the debtor's assets and other evidence is often required.")

261. Nevertheless, Sherman did no independent valuation of the 19 Injection Stations as of January 31, 2016, but instead used the book values as a "rough proxy." Sherman, 12/8/2022 Tr. 73:3-73:13. Sherman claimed that utilizing the book values was appropriate because,

278

according to him, Ferrellgas performed a valuation of the 19 Injection Stations when it reported the book value of those Injection Stations in its January 31, 2016 10-Q. Trial Ex. 3002 (Sherman Aff.) at ¶ 36 (citing 1468-A); Sherman 12/8/22 Tr. 73:3-73:6, 74:8-74:19. But the Ferrellgas January 31, 2016 10-Q does not indicate that Ferrellgas performed another fair market valuation of the 19 Injection Stations. Rather, it shows how the June 24, 2015 purchase price was allocated among Bridger Logistics' various assets and states that it is reporting the value of the assets at "acquisition date fair values. . . . and [that the values] are subject to change." Trial Ex. 1468-A.2.

262.     Here, there is significant evidence that the fair market value of the Injection Stations declined between the Acquisition and January 31, 2016. As Defendants' valuation expert, Kumar, explained, significant changes to the market occurred between June 24, 2015 and February 1, 2016. Trial Ex. 3006 (Kumar Decl.) at ¶¶ 46-49. Among other things, Bakken crude oil prices dropped from nearly $60/barrel to $24.30/barrel and the spread between Bakken crude and Brent crude narrowed. Trial Ex. 3006 (Kumar Decl.) at ¶ 47. In December 2015, the US lifted a 40-year ban on crude oil export and OPEC elected to continue its normal oil production schedule, despite a surplus of global supply. Trial Ex. 3006 (Kumar Decl.) at ¶ 48. In January 2016, the US and the European Union lifted sanctions against Iran, allowing the country to produce and export more oil. Trial Ex. 3006 (Kumar Decl.) at ¶ 48.

263.     As a result of these developments, market capitalization for companies deemed comparable to BTS declined significantly and companies in the midstream businesses attempting to sell their business found limited interest. Trial Ex. 3006 (Kumar Decl.) at ¶ 49. These changes, which occurred before January 31, 2016, ultimately led CBIZ to reduce its valuation of all Bridger Logistics' Injection Stations to approximately $19.4 million as of July 31, 2016 and for Bridger Logistics to take an impairment on the stations, reducing their value from $41.6 million to $14.8

million. Trial Ex. 1791, CBIZ Accounting Standards Codification Topic 350 Impairment Analysis of Bridger Logistics, LLC, as of July 31, 2016, Exhibit B 6. Accordingly, Eddystone has not met its burden to show that the value of the 19 Injection Stations was anywhere near $40 million when the 2016 Alleged Transfers occurred. 12 Pa. C.S. § 5108(b)(1) (limiting recovery to the lesser of the value of the asset transferred, or the amount necessary to satisfy the creditor's claim); *see In re Intelligent Direct Mktg.*, 518 B.R. 579, 593 (E.D. Cal. 2014) (court could not award judgment under CUFTA because, "[e]ven though the Court finds there was a transfer and it is avoidable, there is no valuation evidence"); *Liberty Mut. Ins. Co. v. Horizon Bus Co.*, No. CV 10-0449, 2011 WL 1131098, at *8 (E.D.N.Y. Feb. 22, 2011) (under NYUFCA, "[w]here a plaintiff is given ample opportunity to provide evidence of its damages and fails to do so, no damages can be awarded."); *Carucci v. Regency Fin. Grp., LLC*, A-5497-13T1, 2016 WL 3909570, at *6 (N.J. App. July 20, 2016) (plaintiff failed to establish entitlement to relief under NJUFTA where he offered no evidence regarding value of customer lists); *SMTC Mfg. of Texas*, 421 B.R. at 278-79 ("Proof that assets were transferred and an assessment of their value are essential to sustaining a fraudulent conveyance action" under TUFTA).

## G. There Is No Implied Contract, Much Less A PUFTA Claim Based On One.

264. As a threshold issue, the Court finds that Texas law governs the existence of any implied contract in this case. BTS, Bridger Logistics, and Bridger Marketing were all based in Texas at all relevant times, and the Court should apply the law of the "only interested jurisdiction." *Budget Rent-A-Car Sys. Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005), *cert. denied*, 546 U.S. 978 (2005). Texas is the "state having the most significant contacts or relationships with the particular issue." *Id.* While there is no material difference between general implied contract principles under Pennsylvania and Texas law, there is a difference in the application of the statute of frauds, which should be governed by Texas law. *See also Inoff v. Craftex Mills, Inc.*, CIV. A.

06-3675, 2007 WL 4355385, at *6 (E.D. Pa. Dec. 11, 2007) (Pennsylvania had no interest in applying its statute of frauds because person seeking to enforce contract was New York resident).

265.     Eddystone's allegations regarding the existence of an implied contract are without merit for several reasons.

266.     First, there was no unwritten implied contract between Bridger Marketing and BTS that "backstopped" the RSA.  In general, an implied contract arises when "the intention to [incur an] obligation is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct."  *Univ. Atl. Sys., Inc. v. Honeywell Int'l, Inc.*, 388 F. Supp. 3d 417, 428 (E.D. Pa. 2019); *JTREO, Inc. v. Hightower & Assocs., Inc.*, 2020 WL 3468148, at *4 (Tex. App. June 18, 2020) ("In the case of an implied contract, mutual assent is inferred from the circumstances—a 'meeting of the minds' is inferred from and evidenced by the parties' conduct and course of dealing."); *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex App. 2009) (elements of contracts are: (1) offer; (2) acceptance; (3) meeting of the minds; (4) each parties' consent to terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding).

267.     At trial, Eddystone offered no evidence of such an agreement between Bridger Marketing and BTS and thus did not prove the existence of any such contract.

268.      To the contrary, the witnesses with knowledge of the contracts between Bridger Marketing and BTS disclaimed the existence of an implied contract between those entities to backstop the RSA and fund deficiency payments owed to Eddystone.  FOF ¶¶ 167-69.  Instead, those witnesses testified that Bridger Marketing paid BTS a fee for each barrel transloaded at Eddystone, in the amount of the per-barrel transloading fee paid by BTS to Eddystone plus a premium. *Id.*

269.     To prove its case, Eddystone points to two pieces of evidence: (1) a draft intercompany rate sheet circulated between Bridger, LLC entities, and (2) Plaintiff's Summary Exhibit 94, which Eddystone asserts shows that Bridger Marketing deposited more money into BTS' bank account than the cost of the transloading services actually provided. Neither of these documents proves that an implied contract existed between Bridger Marketing and BTS.

270.     First, contrary to the contentions of Eddystone's 30(b)(6) witness, a pre-Acquisition intercompany rate sheet circulated between Bridger LLC entities does not indicate that there was an unwritten implied contract between Bridger Marketing and BTS that contained a five-year term and minimum volume commitment similar to the RSA. *See* Eddystone 30(b)6) (Cohen) Dep. Tr. 234:12-237:20 (citing Trial Ex. 500 and deposition testimony from Patrick Kelly); *see also* Eddystone 30(b)(6) (Cohen) Dep. Tr. 143:11-21, 145:13-17, 250:21-252:3 (testimony about the purported terms of the implied contract between Bridger Marketing and BTS). The rate sheet did not even define a set rate for deficiency, which was marked with a "TBD"—an undefined rate does not indicate that Bridger Marketing had a "course of dealing" with BTS requiring it to pay specific amounts due to Eddystone for the entire term of the RSA. Eddystone 30(b)6) (Cohen) Dep. Tr. 135:25-137:5, 236:22-237:20, 238:24-240:4, 252:4-22; Kelly, 2/13/23 Tr. 32:15-19.

271.     Moreover, the draft rate sheet expressly identifies certain intercompany take-or-pay agreements between Bridger entities, but it does not identify a take-or-pay arrangement related to the RSA. Trial Ex. 500; *see also* Kelly, 2/13/23 Tr. 34:6-8 ("Q. Did BTS enter into any kind of take-or-pay agreement with Bridger Marketing to backstop the RSA? A. No, it did not.").

272.     Second, Bridger Marketing never actually paid money to BTS to cover deficiency payments owed to Eddystone. FOF ¶ 168. No witness substantiated Eddystone's view that Plaintiff's Summary Exhibit 94 established otherwise. FOF ¶¶ 168-69.

273. Pre-Acquisition, Bridger, LLC recorded intercompany receivables due to BTS for the use of capacity at the Eddystone Facility. Trial Ex. 3003 (Sherman Aff.) at ¶ 26 ("Each month when earned, BTS recorded in its accounting records this Monroe related revenue along with a corresponding entry to an intercompany account receivable due from [Bridger] Marketing."). Nothing in the records supports the allegation that Bridger Marketing entered into a contract with BTS that included a five-year term, minimum volume commitment, or the many other various terms set forth in the RSA.

274. The law does not support Eddystone's attempt to imply such a contract. Texas law requires any contract mirroring BTS' five-year commitment under the RSA to be in writing to be enforceable. Tex. Bus. & Com. Code § 26.01(a), 26.01(b)(2). Eddystone produced no written contract between Bridger Marketing and BTS and has previously conceded none exists. Eddystone 30(b)(6) (Cohen) Dep. Tr. 136:25-137:5. Accordingly, under Texas law, there was no enforceable five-year contract between Bridger Marketing and BTS.

275. Third, even if the pre-Acquisition rate sheet somehow created a contract between Bridger Marketing and BTS that obligated Bridger Marketing to backstop the RSA's minimum volume commitment for the entire term, there is no evidence that Bridger Logistics assumed it.

276. To the contrary, the Ferrellgas PSA required Bridger, LLC to identify and schedule any material contracts, including those that may require expenditures of greater than $500,000 in a year, as well as intercompany contracts between BTS and other Bridger-affiliated companies— yet those schedules did not identify any contract between either Bridger Logistics or Bridger Marketing and BTS related to the RSA or the Eddystone Facility. FOF ¶¶ 460-63. If Bridger Logistics intended to take Bridger Marketing's place in a five-year minimum volume commitment implied contract with BTS, that assumption needed to be express because "novation is never

presumed." *Tenet Health Sys. Hosp. Dallas, Inc. v. N. Tx. Hosp. Physicians Grp., P.A.*, 438 S.W.3d 190, 200 (Tex. App. 2014); *Carnegie Tech., LLC v. Triller, Inc.*, 2021 WL 2322934, at *11 (W.D. Tex. June 7, 2021), *aff'd*, 39 F.4th 288 (5th Cir. 2022) (plaintiff failed to carry "burden to prove that the parties had a meeting of the minds.").

277.    All witnesses with knowledge of these disclosure obligations testified there was no agreement disclosed that backstopped the RSA.   FOF ¶¶ 167; Ballengee, 9/20/22 Tr. 175:18-176:22 ("Q: Could you review that list [of disclosed contracts] and let me know if you see a disclosure that Bridger Logistics had assumed some kind of agreement, backstop, [to the] RSA, on behalf of BTS? A: There's not one."); Kelly, 2/13/23 Tr. 34:6-38:22 ("Q: Okay. Does this schedule identify any agreement for marketing or logistics to backstop the RSA?  A: It does not.").

278.    Because there was no five-year implied contract that required Bridger Logistics to pay deficiency fees to BTS, it did not have any right to payments from Bridger Logistics to "abrogate" after February 1, 2016, and there is no basis for a PUFTA claim.  12 Pa. C.S. § 5106 (4) (A transfer is not made until the debtor has acquired rights in the asset transferred); *id.* § 5101(a) (defining "asset" as "property of the debtor").

279.    The Court finds in favor of Defendants on Counts Two and Three.

## III.    COUNT FOUR: BREACH OF FIDUCIARY DUTY.

280.    In Count Four, Eddystone brings a direct claim against Ferrellgas LP, Ferrellgas Partners, and Bridger Logistics (the "Fiduciary Duty Defendants") for breach of the fiduciary duties of loyalty and care allegedly owed to Eddystone in its capacity as a creditor of BTS.  Dkt. 182 ¶¶ 4, 99-103.

281.    Eddystone bases its breach of fiduciary duty claim on a "zone of insolvency" theory, arguing that, once BTS supposedly entered into the "zone of insolvency" on an unspecified

date, the fiduciary duties of BTS and its "controlling persons" (which Eddystone says include the Fiduciary Duty Defendants) shifted to Eddystone.  Dkt. 182 ¶¶ 99-103.

282.    Eddystone alleges the Fiduciary Duty Defendants breached those supposed duties by causing BTS to transfer its assets for allegedly inadequate consideration.  Dkt. 182 ¶¶ 100-103.

283.    On summary judgment, the Court held that Pennsylvania law governs Count Four; BTS and Bridger Logistics are Louisiana limited liability companies ("LLCs"), and Ferrellgas LP and Ferrellgas Partners are organized under the laws of Delaware.  Dkt. 557 ¶ 26.  As shown below, Eddystone's fiduciary duty claim fails as a matter of law, because Pennsylvania and Louisiana, as well as Delaware for that matter, concur that Eddystone is owed no duty as a creditor and, as a factual matter, because Eddystone failed to prove its claim against **any** Defendant by a preponderance of the evidence at trial, even assuming the existence of a duty.

284.    The failure to demonstrate that Bridger Logistics breached its fiduciary duty means that there cannot have been a breach of fiduciary duty at any subsequent level.  *See Garza,* 724 F. App'x at 99  (affirming grant of judgment on the pleadings because, "if [plaintiff] is not owed a fiduciary duty by Banamex, then *a fortiori* there is no such duty that can be imputed to Citigroup as Banamex's alleged corporate parent.").

285.    In general, a fiduciary duty is the highest duty implied by law and can either be created by statute or imposed "where the attendant conditions make it certain that a fiduciary relationship exists."  *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 820 (Pa. 2017) (internal citations and quotations omitted) (imposing duty is appropriate only where "attendant conditions make it certain that a fiduciary relationship exists"); *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 605, 607 (E.D. La. 1993) (citing *Black's Law Dictionary* 625 (6th Ed.1990)) (same).

286.     Entities with a purely commercial relationship—like BTS and Eddystone—typically owe no fiduciary duties to one another.  *See, e.g.*, *Tekman v. Berkowitz*, 639 F. App'x 801, 806 (3d Cir. 2016) (distinguishing between "surrendering control of one's affairs to a fiduciary" and "entering into an arms[-]length commercial agreement, however important its performance may be to the success of one's business") (quoting *eToll, Inc. v. Elias/Savion Adv., Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002)); *Chrysler Credit Corp.*, 824 F. Supp. at 607 (same).

287.     Eddystone has not pleaded or proven any sort of special or confidential relationship that would give rise to a duty here; rather, Eddystone relies on state statutes and inferences from corporate law as its sole source of the alleged fiduciary duty to creditors.  *See* Dkt. 182 ¶¶ 99-103.

288.     If there were a conflict between the pertinent state laws, Pennsylvania law would govern the choice of law analysis in this forum.  *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008).  Pennsylvania employs depecage (i.e., allowing different states' laws to apply to different issues in the same case), and the Third Circuit does the same when it applies Pennsylvania choice-of-law rules.  *See*, *e.g.*, *Zavecz v. Yield Dynamics, Inc*., 179 F. App'x 116, 120 (3d Cir. 2006).

289.     Pennsylvania law dictates that the law of Louisiana governs the existence and extent of the fiduciary duties alleged here.  *See* 15 Pa. C.S. § 402(a)(2) ("The laws of the jurisdiction of formation of a foreign association govern . . . the liability . . . for a debt, obligation or other liability of the association."); *see* 15 Pa. C.S. § 402(a)(1) (internal affairs doctrine).  Pennsylvania disclaims any intent to regulate foreign LLCs.  15 Pa. C.S. § 8812(a); 15 Pa. C.S. § 8814.

290.     But because it is now apparent that there is no conflict, and any perceived conflict is a false conflict, this Court can apply the laws of Pennsylvania and Louisiana interchangeably.

*See Kerrigan v. Otsuka Am. Pharm.*, 560 F. App'x 162, 167 (3d Cir. 2014) (looking to both Pennsylvania and New Jersey law for defamation).

291.    As explained below, neither Pennsylvania nor Louisiana law extends fiduciary duties to the creditors of an LLC as a result of its insolvency.

### A.    No Fiduciary Duty Was Owed To Eddystone Under Pennsylvania Law.

292.    Pennsylvania law is expressed in the Pennsylvania Uniform Limited Liability Act ("LLC Act") and clearly defines the classes of stakeholders who (1) are owed duties of care and/or loyalty by the company; and (2) may sue for a breach of those duties.  *See* 15 Pa. C.S. §§ 8849.1, 8849.2, 8881, 8882, 8883.  A company's **creditors** do not fall within either class.

293.    Under the current Pennsylvania LLC Act, a member of a member-managed LLC like BTS "owes to **the company** and, subject to section 8881(b) (relating to direct action by member), **the other members** the fiduciary duties of loyalty and care . . . ." 15 Pa. C.S. § 8849.1 (emphasis added); *see also id.* § 8849.2 (managers of manager-managed LLCs likewise owe to the **company** and **its members** the duties of loyalty and care).

294.    In turn, if a manager is alleged to have breached its fiduciary duty to the company or a member of the LLC, the statute gives the member two options.  Under Section 8881, the member may bring a direct action against another member, a manager, or the LLC if it can "plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company."  15 Pa. C.S. § 8881(a)-(b).  Under Section 8882, a manager or member may maintain a derivative action to enforce the rights of the LLC on its behalf.  *Id.* § 8882(a).

295.    In contrast, the statutory subchapter entitled "Relations of Members and Managers **to Persons Dealing with Limited Liability Company**" (e.g., creditors and other third parties)

includes no mention of fiduciary duties. *Id.* §§ 8831-8835 (emphasis added). To the contrary, Section 8834(a) of that subchapter states as follows:

> A debt, obligation or other liability of a limited liability company is solely the debt, obligation or other liability of the company. A member or manager is ***not personally liable, directly or indirectly***, by way of contribution or otherwise, for a debt, obligation or other liability of the company solely by reason of being or acting as a member or manager.

*Id.* § 8834(a) (emphasis added).

296.    Pennsylvania courts have not engrafted onto these statutory provisions a fiduciary duty to creditors of an insolvent LLC; nor are there foreign tribunals applying Pennsylvania law that read these provisions as imposing on LLC members or managers a fiduciary duty to creditors like Eddystone. *See, e.g.*, Dkt. 495-1 at 45-46.

297.    Given that LLCs are entirely creatures of statute, there is neither statutory nor judicial authority for imposing a fiduciary duty owed to creditors, and Eddystone's claim fails. *See Johnson v. Lansdale Borough*, 146 A.3d 696, 711 (Pa. 2016) ("[W]hen interpreting a statute [courts] must listen attentively to what the statute says, but also to what it does not say."); *Commonwealth v. Johnson*, 26 A.3d 1078, 1090 (Pa. 2011) ("[I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.").

298.    The analogous provisions of the Pennsylvania Business Corporation Law (the "BCL") reinforce that conclusion, and a recent statutory clarification makes clear that Eddystone is not owed any fiduciary duties as a creditor.

299.    Under Pennsylvania law, corporate directors and officers owe a fiduciary duty to the corporation. 15 Pa. C.S. §§ 512(a), 1712(a). Before this year, BCL Section 1717, which was expressly incorporated into the 1994 LLC Act, stated that this duty "may not be enforced directly by a shareholder or by another person or group." *See* former 15 Pa. C.S. § 1717 (1990); *see also* former 15 Pa. C.S. § 8943(b)(1) (2017) (incorporating former Section 1717).

300.    In 2011, under the prior formulation of Section 1717, the Third Circuit predicted that, notwithstanding the statutory language, the corporate duties that a director or officer owes to a corporation under the Business Corporation Law would extend to "the creditors of an insolvent entity."  *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).

301.    At summary judgment, this Court read *Lemington Home* as strong evidence that the Pennsylvania Supreme Court would impose on managers of insolvent LLCs the same fiduciary duties to creditors that *Lemington Home* imposed on the directors of insolvent corporations.  Dkt. 557 at 11.

302.    In November 2022, however, Pennsylvania updated its BCL, effective as of January 2, 2023.  Relevant here, Section 1717 has been amended to clarify that duties of directors run **solely** to the business corporation and **not to any creditor**.  In particular, the statute now states that fiduciary duties "may **not** be enforced directly by a shareholder **or creditor** or by any other person or group."  15 Pa. C.S. § 1717 (emphasis added).

303.    The plain language of the statute explicitly precludes a direct suit for breach of fiduciary duty by a creditor.  *See Commonwealth v. Conklin*, 897 A.2d 1168, 1175 (Pa. 2006) ("The statute's plain language generally provides the best indication of legislative intent.").

304.    The Introductory Note to the 2022 Amendment Committee Comments states that the Committee Comments are intended to form part of the legislative history of the sections of Title 15 being amended and are citable as such under 1 Pa. C.S. § 1939.  *See* Dkt. 711-1 at 4, 2022 Amendments to the Pennsylvania Consolidated Statutes with Committee Comments.

305.    The comment explains that the amendment to Section 1717 **merely clarifies** what the law has been **since 1990**.  2022 Amended Committee Comment, 15 Pa. C.S. § 1717.  Dkt. 711-1 at 205-06. Importantly, it states that the clarification of the statute was to correct mistaken

predictions in federal court decisions, specifically *Lemington Home*, that "directors of an insolvent Pennsylvania corporation owe a fiduciary duty directly to creditors." *Id.* Indeed, the Committee Comment characterizes the amended language as an express "reject[ion] of the contrary language in *Lemington Home*." *Id.*

306. The statute need not be expressly "retroactive" to apply here. *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 95 (3d Cir. 2018); *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 506 (3d Cir. 2008) ("[W]here a new rule constitutes a clarification— rather than a substantive change—of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does ***not*** have an impermissible retroactive effect." (emphasis in original)); *see also Heckler v. Turner*, 470 U.S. 184, 211 (1985) (statement that legislation was intended to clarify current law left no doubt about prospective interpretation of statute and "carries in addition considerable retrospective weight").

307. It is beyond cavil that when the Third Circuit predicts how Pennsylvania might construe the law, it is at all times "mindful" that its "duty is to apply state law . . . irrespective of what [it] regard[s] as its merits [and] not impose [its] own view of what state law should be, nor 'expand state law in ways not foreshadowed by state precedent.'" *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 217 (3d Cir. 2010).

308. In light of these amendments, *Lemington Home* is no longer an accurate predictor of whether the Pennsylvania Supreme Court would read Pennsylvania law to impose on managers of insolvent LLCs a fiduciary obligation to the company's creditors.

309. Instead, the clarified language of Section 1717, and its associated commentary, make clear that the managers of insolvent LLCs owe no fiduciary duty to the company's creditors, even when the company becomes insolvent, and such creditors have no basis on which to sue.

310.     For these reasons, Count Four fails as a matter of law under Pennsylvania law.

**B.     The Result Is The Same Under Louisiana And Delaware Law.**

311.     Louisiana law is also relevant here because BTS was a member-managed Louisiana LLC with a single member—Bridger Logistics—that was another Louisiana LLC.  Dkt. 732 ¶ 14; *see* 15 Pa. C.S. § 402(a).

312.     The Pennsylvania Uniform Limited Liability Act provides: "The laws of the jurisdiction of formation of a foreign association govern . . . [t]he internal affairs of the association."  15 Pa. C.S. § 402(a)(1); *see also id.* § 402(a)(2) ("The laws of the jurisdiction of formation of a foreign association govern . . . the liability . . . for a debt, obligation or other liability of the association."); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 n.10 (3d Cir. 2005) ("[C]ourts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation.").  Moreover, Pennsylvania specifically disclaims any intent to regulate foreign LLCs.  15 Pa. C.S. § 8812(a); 15 Pa. C.S. § 8814.  The Louisiana Limited Liability Act likewise provides that the laws of Louisiana govern the "liability of members . . . for the debts, obligations, and liabilities" of the limited liability company, which would include any obligations that BTS had to creditors.  *See* La. R.S. § 12:1366(A).

313.     Under the Louisiana LLC Act, a member of a Louisiana LLC has fiduciary duties only to the "[LLC] and its members." La. R.S. § 12:1314(A)(1).  The statute provides that a member of an LLC "is not a proper party to a claim against an LLC, except when the object is to enforce [a member's] rights against or liability to the [LLC]."  *Id.* § 12:1320(C); *see also id.* § 12:1320(A) (personal liability of Louisiana LLC members is to be determined "solely and exclusively" by the LLC Act, which does not purport to extend fiduciary duties to creditors).

314.     In line with the statute, there is "[n]o controlling authority" extending a fiduciary duty to creditors of a Louisiana LLC.  *In re Lobell*, 390 B.R. 206, 216-17 (Bankr. M.D. La. 2008).

315.    Moreover, courts addressing **corporate** fiduciary duties have emphatically established "beyond peradventure that Louisiana law does not give a creditor a direct cause of action against a director of an insolvent corporation for . . . breach of fiduciary duty." *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 239-40 (5th Cir. 1988); *McDonough Marine Serv. v. Doucet*, 694 So. 2d 305, 312 (La. Ct. App. 1996) (officers and directors of corporations owe no fiduciary duties "to persons or entities which contract with the corporation.").

316.    As stated above, if the first-level defendant does not owe a fiduciary duty, neither does any other level in the corporate hierarchy. *Garza*, 724 F. App'x at 99.  The lack of a duty owed by BTS and Bridger Logistics to Eddystone therefore is dispositive as to Ferrellgas LP and Ferrellgas Partners, obviating the need to consider Delaware law governing those entities.

317.    Even if that were not the case, Ferrellgas LP and Ferrellgas Partners are both Delaware limited partnerships, and Delaware law is in accord with Pennsylvania and Louisiana. *CML V, LLC v. Bax*, 6 A.3d 238, 241 (Del. Ch. 2010), *aff'd*, 28 A.3d 1037, 1046 (Del. 2011); 6 Del. C. §§ 18–1001, 18-1002.

318.    Thus, neither Louisiana nor Delaware law could salvage Eddystone's fiduciary duty claim, as both are consistent with Pennsylvania law in precluding such a claim by a creditor.[12]

---

[12] Because the law is clear in the pertinent states that insolvent companies do not owe duties to creditors, it follows that those jurisdictions do not extend duties to creditors when a company is merely in the "zone of insolvency," a theory Eddystone previously advanced. *See Lobell*, 390 B.R. at 216-17 (finding no fiduciary duty to LLC creditors under Louisiana law and stating that a "zone of insolvency" theory "claims too much").  Moreover, courts roundly reject "zone of insolvency" claims. *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015) ("[T]here is no legally recognized 'zone of insolvency' with implications for fiduciary duty claims"); *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 203 (S.D.N.Y. 2009), *cert. denied,* 565 U.S. 816 (2011) ("New York State's corporate directors do not owe a duty of care to a corporation's creditors when the corporation is arguably operating within the 'zone of insolvency.'"); *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 100, 101-03 (D. Conn. 2010) ("[T]he Court has little difficulty concluding that the [zone of insolvency] cause of action . . .does not exist under Connecticut law.").

### C. Eddystone Did Not Prove A Breach Of A Duty Of Loyalty Or Care.

319.    As a factual matter, even if Eddystone were owed a duty, it did not prove that supposed duty was breached.

320.    As explained above, the Pennsylvania and Louisiana LLC Acts both prescribe duties to the LLC and other members—but not to creditors—and both contain provisions designed to insulate a managing member like Bridger Logistics from liability.

321.    Because neither statute establishes duties to creditors, neither statute provides an applicable standard to assess whether Bridger Logistics (or Ferrellgas LP and Ferrellgas Partners, for that matter) breached any duty owed to Eddystone.  If any additional support were required for the Court to find no duty to creditors, the absence of a workable governing standard in both potentially appliable LLC Acts makes clear that neither legislature intended to write a fiduciary duty claim to creditors into their statutes.

322.    In any event, Eddystone has not proven that conduct by Bridger Logistics left Eddystone in a less favorable position when it sold BTS to Jamex.

#### *The Sale Of BTS To Jamex Left Eddystone In No Worse Position.*

323.    Under Eddystone's theory, Bridger Logistics (and as pleaded, Ferrellgas LP and Ferrellgas Partners) had "fiduciary duties" to creditors upon BTS entering the so-called "zone of insolvency"—which would extend to **all** BTS creditors, not just Eddystone.  Whether Bridger Logistics breached its alleged duties cannot be analyzed in a room occupied by Eddystone alone.

324.    BTS had other creditors, including (and most notably) secured creditors such as Bank of America.  *See* FOF ¶¶ 294-310, 600.  Secured creditors are entitled to preferential treatment under the law of secured transactions.  Trial Ex. 3009 (Brownstein Decl.) ¶ 15 ("[A]ny claim that ERC could have had to the BTS assets—as an unsecured creditor—would have been secondary, at best, to any claims of secured lienholders."); *see, e.g.*, *United States Fid. & Guar.*

*Co. v. United Penn Bank*, 524 A.2d 958, 960 (Pa. Super. 1987) ("Thus, a creditor with a perfected security interest in collateral has, under the [UCC], an interest therein which is superior to that of unsecured creditors."); *Assoc. of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 451 (Minn. Ct. App. 1996) (reversing fiduciary duty judgment because payments to secured creditors "did not create a preference or constitute a breach of fiduciary duty to the unsecured creditors").

325.     During trial, the evidence established that, as the market for Bakken crude began to change, Bridger Logistics considered many options to move forward, including:

      a.      Purchasing the Eddystone Facility to enhance the Monroe relationship and directly correct problems with the facility (FOF ¶¶ 254-72 (explaining offers to purchase the Eddystone facility post-Acquisition);

      b.      Filing a lawsuit against Eddystone because the operational defects had become untenable (FOF ¶¶ 274-75; *see also* FOF ¶¶ 221-73);

      c.      Putting BTS into bankruptcy, including to facilitate restructuring the RSA (FOF ¶¶ 663-69);

      d.      Stopping payments to Eddystone based on the operational issues with the facility (FOF ¶ 567); and

      e.      Renegotiating the RSA (FOF ¶ 276).

326.     Bridger Logistics did not ultimately undertake any of these options, including those that might have injured Eddystone (e.g., stopping payments under the RSA).

327.     Rather, after retaining restructuring counsel, Bridger Logistics elected to sell BTS to Jamex, which renamed the company JTS, to facilitate efforts by Jamex and Ballengee to

negotiate with Eddystone directly, obtain financing from Carlyle, and resume shipments under the Amended COSA. *See* FOF ¶¶ 672-77.

328.    Before taking this approach, however, Rios sought a report on all BTS assets and confirmed that, to the best of Defendants' knowledge at the time, all BTS assets were subject to credit facility–related security arrangements and could not be sold or transferred, except to other Ferrellgas subsidiaries in accordance with the Credit Agreement. *See* FOF ¶¶ 582-83.

329.    By the decisions and course of action ultimately followed, the rights of BTS' creditors were protected in accordance with the rights and priorities afforded their respective positions, which, as previously stated, is not only permitted under the law but required by it.

330.    Bank of America, for example, was protected by keeping the BTS assets securing the Credit Agreement within an entity that had also pledged its assets as security.

331.    Importantly, Eddystone was left in no worse position after the sale than it was before. Eddystone contracted directly and exclusively with BTS under the RSA—not with Bridger, Bridger Logistics, Bridger Marketing, or any other entity. FOF ¶ 161.

332.    The financial assurances provisions in the RSA limited ERC's remedies to a facility lock-out or arbitration if BTS did not provide such assurances. As a result, ERC's recourse was effectively limited to refusing BTS usage of the Facility. Paradis, 9/19/22, Tr. 199:14–200:8.

333.    While negotiating the RSA, Enbridge recommended obtaining a parent guaranty, but Eddystone ultimately failed to negotiate one, so the parties assumed the inherent risks and entered into the RSA with no on-going parent guaranty. FOF ¶¶ 161-66.

334.    All told, in negotiating the RSA, Eddystone understood that it was contracting exclusively with BTS and that at the time Eddystone entered into the agreement no other entity in

the Bridger group of companies had agreed to provide a parent guaranty of BTS' overall obligations for the term of the RSA. *See id.*

335. With no parent guaranty and with the BTS assets securing the credit facility, Eddystone would not have been entitled to the assets that were being held within BTS.

### *Bridger Logistics Did Not Intend For BTS To Fail.*

336. Though Eddystone contends that the transfers and subsequent sale were done so that JTS could immediately fail, the evidence is to the contrary, and it has failed in this proof.

337. For one thing, Ballengee testified that **he** (not Bridger Logistics, Rios, or Gamboa) proposed the sale of BTS so that he could obtain privity with Eddystone and negotiate to secure financing for Jamex. *See* FOF ¶¶ 672-77.

338. As explained, as the 2014 BAML intermediation agreement that Jamex relied on for financing was winding down, Jamex obtained a commitment from Carlyle to finance its crude purchases. FOF ¶¶ 615-17. Not surprisingly, Carlyle required all entities along the supply chain (including Eddystone and BTS) to execute an industry-standard acknowledgment of Carlyle's property interest in the crude it financed. FOF ¶¶ 630-31. Eddystone refused, however, stating that "ERC does not have current working relationships with the counterparties," ostensibly because it lacked privity with Jamex. FOF ¶ 631.

339. Purchasing BTS gave Jamex the privity Eddystone required to negotiate to secure that financing. FOF ¶ 631.

340. The decision to sell BTS was made to ensure the future health of the relationship with Monroe and Jamex when the economics became more viable.

341. Success would have inured to the benefit of Eddystone as well, as shipments under the Amended COSA would have resumed. Gamboa and Ballengee both testified, for example, that Ballengee was in a superior position to negotiate with Eddystone. FOF ¶¶ 672-77.

342.    Both Ballengee and Jilla testified that owning BTS would establish the privity Jamex needed with Eddystone for purposes of the intermediation agreement and would increase Jamex's ability to address the facility defects at the Eddystone Facility.  FOF ¶ 675.

343.    Moreover, a number of steps were taken to try to ensure that JTS fulfilled its obligations to Eddystone under the RSA following the sale to Jamex.

344.    In June 2015, Bridger Marketing was losing money on the COSA.  FOF ¶ 638.  As a result, the Bridger Board was considering ways to address the losses, including by having third parties like Betel or Shell assume Bridger Marketing's obligations under the agreement.  FOF ¶ 377.  In fact, those parties made offers from $120 million to $150 million, which, if accepted, would have one of them take the contract from Bridger Marketing.  FOF ¶ 378.

345.    Ultimately, the Bridger Board decided against paying any third parties to take the contract and instead opted to pursue the 2015 Ferrellgas deal and Jamex spin-off.  *See* FOF ¶¶ 378-80.  As part of that spin-off, the parties to the transaction affirmatively decided to overcapitalize Jamex with $250 million—an extremely conservative $100 million more than what Betel and Shell decided would be sufficient for them to take on the COSA—to ensure that Jamex would be able to fulfill its obligations under the contract.  FOF ¶¶ 377-79.

346.    For its part, Jamex made repeated attempts to find a solution that would have allowed all parties to continue to perform under the various agreements, including the RSA, despite deteriorating market conditions. *See, e.g.*, FOF ¶¶ 615-635.

347.    Finally, in February 2016, Jamex acquired BTS—renaming it JTS—with the goal of negotiating with Eddystone in the same manner it had negotiated successfully with Monroe and Bridger Logistics to temporarily suspend the COSA.  *See* FOF ¶¶ 672-77.

348. As part of the BTS Purchase and Sale Agreement ("PSA"), Bridger Logistics attempted to ensure that Jamex was able to fulfill its obligations to Eddystone.

349. Significantly, as part of the deal, Jamex assumed liabilities under the RSA for dates after February 1, 2016. FOF ¶ 740. To ensure such payments, Jamex was provided with $4,447,677.96 to make all RSA deficiency payments through the date of the transaction, after which time Jamex was obligated to make such payments. *Id.*

350. Bridger Logistics also voluntarily accepted, as a "retained liability," any liability to Eddystone under the RSA that arose after the closing of the BTS PSA but related to the pre-closing period. FOF ¶ 740.

351. As described above, Bridger Logistics required financials from Jamex Marketing as a condition of the sale of BTS. FOF ¶¶ 708-09. Those financials reflected, as of December 31, 2015, prior to the sale of BTS, total assets of $263.4 million, liabilities of $103.6 million, and members' equity of $159.8 million. FOF ¶ 709. As of January 31, 2016, Jamex Marketing financials showed total assets of $221 million, liabilities of $88.2 million, and member's equity of $132.6 million. FOF ¶ 760. Those numbers were confirmed by Jamex Marketing's audited financials for 2015, which showed total current assets of $253 million, total assets of $277 million, total current liabilities of $108 million, and members' equity of $168 million. FOF ¶ 714.

352. And, JTS' ultimate parent, Jamex Marketing—which was capitalized with $250 million and provided the financial statements as part of the sale—guaranteed JTS' obligations, including to Eddystone. FOF ¶¶ 333, 739.

353. To the extent Eddystone claims Bridger Logistics violated any supposed duty to Eddystone by "allow[ing]" the abrogation of the alleged "implied contract," that theory fails for the reasons set forth above. *See* COL ¶¶ 257-72.

354. At bottom, even assuming some sort of duty to creditors (which, as a matter of law, does not exist), Eddystone has not shown what that duty was or that conformance with the duty would have resulted in assets becoming available to Eddystone, as opposed to secured creditors.

355. For these reasons, Count Four fails on the evidence as well.

**D. Ferrellgas Partners, L.P. And Ferrellgas L.P. Were Neither Fiduciaries Nor Control Persons of BTS.**

356. Again, the Third Circuit has held that, if the first-level defendant does not owe a fiduciary duty, neither does any other defendant at a higher level in the corporate hierarchy. *Garza*, 724 F. App'x at 99 (fiduciary duty "could not pass [from a subsidiary to a corporate parent] without piercing the legal veil that generally shields a parent corporation from the acts of its subsidiaries).

357. Consequently, Eddystone's failure to prove liability as to Bridger Logistics is dispositive as to Ferrellgas LP and Ferrellgas Partners as well. Even if that were not the case and Bridger Logistics breached a fiduciary duty actually owed to Eddystone, there is no basis in law or fact to extend liability to Ferrellgas LP or Ferrellgas Partners.

358. Eddystone alleged in the First Amended Complaint that Ferrellgas LP and Ferrellgas Partners (along with Bridger Logistics, Rios, and Gamboa) were liable as "controlling persons" of BTS when it was "in the zone of insolvency." Dkt. 182 ¶ 100.

359. The only "controlling person" definition in Pennsylvania is with regard to registered corporations, which BTS is not. In that plainly inapplicable context, a controlling person is defined as one who has voting power over at least 20 percent of the votes in a registered corporation. *See* 15 Pa. C.S. § 2543(a).

360. Louisiana does not apply any version of a "control person" test to impose extra-statutory duties on parents of subsidiary fiduciaries, in the LLC setting or otherwise. *See Kidd v. Symbion, Inc.*, No. 10-3361, 2011 WL 4020814, at *9-10 (E.D. La. Sept. 9, 2011).

361. To the contrary, courts applying Louisiana law have explained that parent companies are not liable for the acts of their subsidiaries. *See Kidd*, 2011 WL 4020814, at *9-10 (citing *Bestfoods*, 524 U.S. at 68). In *Kidd*, the court observed that "Plaintiff [cannot], absent piercing the corporate veil, pursue his breach of fiduciary duty claim against Symbion [the ultimate corporate parent of and indirect investor in the LLC] because there is no fiduciary relationship between Plaintiff [an investing member of the LLC] and Symbion." *Id.*

362. All told, Eddystone adduced evidence that does no more than outline the kind of typical oversight that one might expect a parent to exercise over its subsidiary.

363. Eddystone's fiduciary duty expert, David M. Baker, concluded that **all** Defendants (without any attempt at differentiation) "transferr[ed] BTS assets at less than adequate consideration," "siphon[ed] BTS cash away from BTS," and "grant[ed] a lien on all BTS assets," all of which was "outside business custom and practice." Trial Ex. 3013 (Baker Decl.) ¶ 11; *see also id.* ¶ 12 ("**Defendants'** departure from custom and practice is not excused or justified by their consideration of alternatives to siphoning BTS of its cash and other assets that Ferrellgas executives declined to authorize based on the potential harm to Ferrellgas.") (emphasis added); *id.* ¶ 13 ("[T]he existence of a blanket lien in favor of **Defendants'** lender would not justify **Defendants'** overt departures from accepted custom and practice.").)

364. Critically, though, Baker testified that he did **not** conduct a defendant-by-defendant analysis when preparing his report. Baker, 2/16/23 Tr. 46:1-47:25 ("That was not part of my schedule to look at individual defendants.").

365. As a result, the opinion that all Defendants, including Ferrellgas LP and Ferrellgas Partners, were actively involved in the misconduct alleged in Count Four, was not based on facts; Baker did not actually **consider** whether Ferrellgas LP and Ferrellgas Partners were involved in

those decisions, let alone whether that involvement rose to the level of active control or domination. Nor did he cite any evidence that Ferrellgas LP or Ferrellgas Partners "transferr[ed] BTS assets at less than adequate consideration," "siphon[ed] BTS cash away from BTS," or "grant[ed] a lien on all BTS assets.".

366. To the contrary, Eddystone testified repeatedly at its 30(b)(6) deposition that Rios and Gamboa—not Ferrellgas LP or Ferrellgas Partners—had "total control" of BTS at all relevant times. By way of example, Eddystone testified that Rios and Gamboa "directed" alleged efforts to divert revenue from BTS. Eddystone 30(b)(6) (Cohen), Dep. Tr. 79:24-81:9 ("Q. Did [Rios and Gamboa] direct those efforts? A. That's our contention.").

367. The most that Eddystone has shown is that individual Ferrellgas executives were **aware** of various accounting changes and **kept in the loop** regarding the decision to sell BTS to Jamex—not that Ferrellgas LP and Ferrellgas Partners directed, controlled, or even approved the transactions. *See, e.g.*, FOF ¶ 430; *see also, e.g.*, FOF ¶¶ 758-59 (Wambold, 12/9/22 Tr. 64:2-65:14 (explaining that he was aware of the transaction but not involved in the decision to sell); *id.* 65:15-67:6 (testifying that Soiefer kept him up-to-date with weekly details about the transaction, none of the updates required his approval and he did not take any actions).

368. That is not enough to impose liability on Ferrellgas LP or Ferrellgas Partners. Rather, these activities typify standard parent-subsidiary interactions, and they do not reflect daily, operational control of BTS that would be the *sine qua non* of a controlling relationship. *See, e.g.*, *Commonwealth ex rel. Corbett v. Citizens Alliance for Better Neighborhoods, Inc.*, 983 A.2d 1274, 1280-1281 (Pa. Commw. Ct. 2009) (de facto control "requires 'a strong showing that the [control person] assumed actual, participatory, total control of the [controlled corporation]. Merely taking an active part in the management of the [controlled] corporation does not automatically constitute

control.'" (quoting *Nat'l Westminster Bank USA v. Cent. Healthcare*, 885 F. Supp. 601, 603 (S.D.N.Y.1995)).

369.　Eddystone disparages the corporate structure used to share services like legal counsel and a cash management system, but such pooling of resources is both common and lawful. *See Action Mfg. Co.*, 375 F. Supp. 2d at 423 (finding that although two related entities "share[d] services, such as human resources and information technology services, and office space and infrastructure, [one] reimburse[d] [the other] for these services and the office space . . . indicat[ing] that [they] are maintaining their corporate separateness and observing corporate formalities."); *Catalina Mktg.*, 2003 WL 21542491, at *5　("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family. Such shared functions are insufficient to pierce the corporate veil."); *Calvert*, 875 F. Supp. at 678 (parent and the subsidiary sharing counsel was not sufficient to confer alter ego status).

370.　At bottom, even if Bridger Logistics owed Eddystone a duty (and it did not as a matter of law), and Bridger Logistics breached that duty (it did not as a factual matter), Eddystone cannot extend liability to Ferrellgas LP and Ferrellgas Partners.

## IV.　AFFIRMATIVE DEFENSES.

### A.　Unclean Hands.

371.　Eddystone's claims are barred, in part, by the doctrine of unclean hands (or *in pari delicto*), based on Eddystone's inequitable conduct with respect to the matters alleged.

372.　ERC's alter ego veil-piercing theory and breach of fiduciary duty claim each sound in equity. *See, e.g., Pearson,* 247 F.3d at 484　(veil-piercing is a "tool of equity"); *Viener v. Jacobs*, 834 A.2d 546, 554 (Pa. Super Ct. 2003), *cert denied*, 543 U.S. 1146 (2005) ("A claim of breach of fiduciary duty sounds in equity."). Equity requires that "its suitors . . . shall have acted fairly

and without fraud or deceit as to the controversy in issue." *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir. 1972), *cert denied*, 407 U.S. 934 (1972).

373.     Under Pennsylvania law, "the doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy at issue." *Savage, Sharkey, Reiser & Szulborski Eye Care Consultants, P.C. v. Tanner*, 848 A.2d 150, 157-58 (Pa. Super Ct. 2004); *see also Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1309 (D. Del. 1990) (under federal common law, "[w]hen presented with a claim of unclean hands, the court is primarily concerned with protecting its own integrity, and not in abetting the inequitable conduct of a plaintiff with respect to the matter in litigation").

374.     The evidence set forth above shows that Eddystone failed to act fairly or without deceit.   In particular, Eddystone (1) failed to disclose facility defects, including the granite pinnacle, before BTS executed the RSA (FOF ¶¶ 269, 274, 285-86, 750); (2) entered into a problematic arbitration settlement with JTS, in which JTS simultaneously denied liability and stipulated to an arbitration award establishing liability and damages (FOF ¶¶ 756, 788-801); and (3) refused to consider an industry-standard tripartite agreement to facilitate the Carlyle intermediation agreement Jamex Marketing needed to continue servicing the Amended COSA, apparently based on pretextual reasons.  (FOF ¶¶ 614-35, 747).

375.     Because Eddystone has unclean hands, the Court will not exercise its equitable powers to provide relief to Eddystone.

**B.     Failure To Mitigate.**

376.     Eddystone's damages must be decreased in proportion to its failure to mitigate, reduce, or otherwise avoid its damages.  *See Prusky v. ReliaStar Life Ins. Co.*, 474 F. Supp. 2d 703, 709 (E.D. Pa.), *aff'd,* 532 F.3d 252 (3d Cir. 2007) ("[Plaintiffs] are not entitled to recover damages that they could have avoided without undue risk, burden or humiliation.").

377.     The evidence shows that Eddystone could have offered, but chose not to offer, other shippers capacity at the facility.  FOF ¶ 803.  In fact, Canopy made attempts to use the facility, but it was met with resistance from Enbridge.  *See* E. Johnson, 12/13/22 Tr. 129:25-130:4 (Enbridge was "not open to new business"); *see also id.* at 133:22-25 ("We were working very hard to find new customers."); Paradis, 9/19/22 Tr. 240:23-241:5; Trial Ex. 1644 ("outlining a number of opportunities for ERC and the potential cash flow that they may generate").  Indeed, Erik Johnson of Canopy made the following statement in a contemporaneous email:  "Despite ERC's having the 'go away' sign effectively out front for some time, we have been able to generate significant customer interest in a number of opportunities."  Trial Ex. 1644.

378.     Despite Canopy's efforts, however, the Eddystone facility sat idle and went unused after JTS made its last payment in February 2016 until Canopy acquired the facility in October 2017.  FOF ¶ 807.

379.     Thus, Eddystone's damages should be reduced to reflect the revenue it could have generated from use of the Eddystone facility.  *See Prusky*, 474 F. Supp. 2d at 709.  At a minimum, Eddystone's refusal to entertain Canopy's proposals to put the facility into use are another example of its inequitable conduct and reinforce the conclusion that Eddystone should not recover damages for the period following the October 2017 sale of the facility to Canopy.

## C.     Duplicative Recovery, Proportionate Responsibility, And Unjust Enrichment.

380.     In addition, Eddystone seeks overlapping or duplicative recovery, and the Court will not award damages that result in a windfall to Eddystone.  *See Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 524 n.3 (E.D. Pa. 2010) ("The same damages, even if caused by breaches of separate duties and obligations, cannot be recovered twice."); *D'Adamo v. Erie Ins. Exch.*, 4 A.3d 1090, 1096 (Pa. Super. Ct. 2010) ("An injured party cannot recover twice for the same injury.  This rule applies equally to situations where the injured party legally has

another claim for the same loss; the purpose of this rule of damages in any context is to avoid unjust enrichment.") (internal citation omitted).

381.    In the arbitration settlement, Jamex agreed to pay Eddystone $450,000 and to assign to Eddystone ownership of oil left in storage at the facility.  FOF ¶¶ 369, 793, 799-800, 813.  Jamex met its obligations under the Settlement Agreement.  Ballengee, 9/20/22 Tr. 253:18-254:20.

382.    There were approximately 28,000 barrels of oil in storage at Eddystone at the time of the JTS arbitration settlement.  Trial Ex. 3008 (Bramer Decl.) ¶ 14.  The oil assigned to Eddystone was worth at least $1,605,800 (*id.* ¶ 15), based on a conservative calculation of the 14-day average spot price (i.e., applying the $53.75/bbl average price for Nigerian Bonny Light to the 28,000 bbls, rather than the $59.79/bbl average price for delivered Bakken crude).  *Id.* ¶ 17 n.10.

383.    This reduction is already factored into the alternative damage calculations prepared by Bramer.  *Id.* ¶¶ 14-15.  It is not, however, factored into any of Sherman's calculations.  *See* Trial Ex. 3002 (Sherman Aff.) ¶ 114 (accounting only for $200,000 cash payment from Jamex).

384.    To avoid duplicative recovery, damages should not be awarded in this case without an offset to account for the $450,000 Jamex paid to Eddystone under the Settlement Agreement, as well as the assignment to Eddystone of oil in storage worth at least $1,605,800, for a cumulative total offset of $2,055,800.

### D.    Preclusion Of Claims And Exclusive Remedy.

385.    Eddystone's claims are precluded by the fact that it has already litigated in arbitration.  *See* COL ¶ 50-53.  Eddystone contradicts the arbitration and Arbitration Settlement by suggesting that Defendants are liable for breach of the RSA.

386.    Election of remedies is "an application of the law of estoppel" and prevents Eddystone from "occupy[ing] inconsistent positions in relation to the facts which form the basis of [its] respective remedies."  *Abdallah*, 359 F.2d at 174; *see also Montrose Med. Grp. v. Bulgar*,

243 F.3d 773, 779 (3d Cir. 2001) ("[J]udicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency.").

387.    Eddystone is seeking damages for debts JTS owed to Eddystone after JTS ceased performing under the RSA.  Dkt. 182 ¶ 86 & Prayer for Relief.  After JTS elected not to pay a portion of amounts related to the January 2016 deficiency fees owed under the RSA, Eddystone filed arbitration against JTS and Jamex.  FOF ¶¶ 754-56.  Rather than resolve the dispute on the merits, the parties entered into a settlement agreement (Trial Ex. 1618), under which neither party admitted liability.  FOF ¶¶ 788, 791-92, 793.  The Arbitration Settlement "supersedes and replaces any and all prior negotiations and agreements, written or oral."  Trial Ex. 1618; FOF ¶ 796; COL ¶ 46.  As explained above, the Arbitration Settlement extinguishes the obligations under the RSA, which means that Eddystone cannot now bring claims seeking to collect debts owed under the RSA.  COL ¶ 46; *Metro. Steel Indus., Inc. v. FDIC*, 68 A.D. 935 (2d Dept. 1979) (finding that settlement agreement "discharged the earlier obligation and became substituted therefor" and recovery was limited to amount owing under the settlement agreement).

## V.    CONTINGENT COUNTERCLAIM IV: BREACH OF CONTRACT REGARDING CUSTOM TRANSFER METERS.

### A.    Defendants May Bring A Contingent Counterclaim.

388.    Federal Rules of Civil Procedure 8(d)(2), (3) and 18(b) permit Defendants to assert contingent counterclaims.  *See also United States v. Von Neumann*, 474 U.S. 242, 246-47 n.6 (1986) (acknowledging assertion of contingent counterclaims).  In fact, if alter ego liability is imposed pursuant to Count One of Eddystone's claims, Defendants *must* assert the counterclaims "aris[ing] out of the transaction or occurrence that is the subject matter" of ERC's claims—here, that includes counterclaims arising from the RSA.  Fed. R. Civ. P. 13(a)(1)(A) (addressing counterclaims).

389. Eddystone argued in its Motion for Summary Judgment on Defendants' Counterclaims that Defendants did not have standing to pursue conditional counterclaims because Defendants were not parties to the RSA, upon which the counterclaims are based, and because, in Eddystone's view, a finding of alter ego liability necessarily implies that Defendants acted with fraudulent intent. *See* Dkt. 491-1 at 13-16.

390. Relying on Federal Rule 18(b) and the Third Circuit's conclusion that a finding of alter ego liability "does not require proof of actual fraud as a prerequisite for piercing the corporate veil," *Lutyk*, 332 F.3d at 194, the Court concluded that Defendants could assert counterclaims conditionally upon a finding of alter ego liability. Dkt. 557 ¶ 29; Fed. R. Civ. P. 18(b).

391. Thus, Defendants have standing to bring Counterclaim IV, contingent upon a finding of alter ego liability. *See Lutyk*, 332 F.3d at 194.

**B.      Eddystone Breached The RSA By Failing To Install Functional CT Meters.**

392. In Counterclaim IV, Defendants contend that Eddystone breached the RSA before BTS was sold to Jamex, based on Eddystone's failure to install and commission CT meters at the Eddystone Facility. Dkt. 78 ¶¶ 167-171.

393. As the Court held on summary judgment, under the RSA's choice of law provision, New York law applies to Defendants' breach of contract counterclaim stemming from the failure to install CT meters. *See* Dkt. 557 ¶ 30 ("The RSA elects New York law to govern, and Pennsylvania honors such provisions." (citing *Kramont Operating P'ship., L.P. v. Levy*, No. 07-1430, 2008 WL 2405724, at *5 (E.D. Pa. June 12, 2008).")); *see also* FOF ¶ 136.

394. Under New York law, the elements of a breach of contract claim are: "(1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 404 (S.D.N.Y. 2004) (finding breach).

395.    As to the first and second elements, it is undisputed that the RSA is the written, valid contract upon which the counterclaim is based and that BTS performed under the RSA.  *See* Dkt. 732 ¶ 47 (identifying RSA (Trial Ex. 90-A) between BTS and Eddystone); FOF ¶¶ 158, 752 (Paradis, 9/19/2022 Tr. 200:9-19 (testifying that "BTS had continued to make all of their payments up to [February 2016]")).

396.    The RSA required Eddystone to install and use CT meters to measure the dock-to-barge transfer of crude oil.  FOF ¶¶ 154, 215 (Trial Ex. 90-A.1, 5 (stating in the definition of "Transloaded Volumes," that the "delivery ticket provided by Owner at the custody transfer meters … shall provide the conclusive measurement of the volume of such Crude Petroleum that is binding on both Parties"); Trial Ex 90-A.22, Terms & Conditions, § 3 ("[A]ll custodial cargo transfer operations at the Eddystone Rail Facilities will be performed solely by custody transfer meter and not by hand innage and/or ullage measurements of shore tanks and/or barges.")).

397.    It is undisputed that Eddystone failed to install functional CT meters from the tank to the barge during the time that BTS was transloading crude at the facility.  FOF ¶¶ 217, 229.

398.    Eddystone contends that BTS agreed by email, after the RSA was signed, that there would not be custody transfer meters at the facility.  *See* FOF ¶ 221.  Specifically, Eddystone contends that BTS agreed to use third-party inspectors to measure the crude oil by hand gauging.  *See id.*  The sole evidence of such an agreement is an email exchange among Natale and Turnbull in October 2013.  *See* FOF ¶¶ 218-225.  The relevant email exchange, however, only confirms that BTS agreed to use something other than a CT meter ***during an interim period*** following the startup of the facility.  *See* FOF ¶¶ 219, 221-225 (Trial Exs. 156, 435 (in which Natale agreed to "3rd party nominated for marine movements as a source of documentation for inventory reconciliation

between ERC and Bridger, ***as outlined in your note below,***" referring to Turnbull's proposal that a third-party use hand gauging ("***during this interim period w/o the meters***")).

399.   This agreement to use third-party hand gauging as a temporary measure was made to expedite the opening of the facility. *See* FOF ¶ 221 (Trial Exs. 156.2, 435.2 (in which Turnbull states that the option of installing CT meters post facility start-up was an "effort[] to move up the in-service-date of the facility as much as possible")). As Gamboa testified, the construction of the facility was already six months behind schedule, and he was not opposed to allowing the facility to ***begin*** operations without a meter. *Id.* The interim period cited in Turnbull's email, and during which Natale agreed to use third-party inspectors in lieu of CT meters, was expected to last "no more than a couple of months." FOF ¶¶ 219, 221.

400.   The parties never agreed, however, to forgo custody meters for the duration of the RSA. FOF ¶¶ 221-225. Indeed, the individuals who authored the emails that make up the supposed amendment to the RSA, Turnbull and Natale, as well as the individual who authorized Natale to draft the email, Gamboa, all testified that BTS did not agree to use third-party inspectors for the duration of the RSA or to excuse Eddystone's performance of providing the custody transfer meters. FOF ¶ 225 (Turnbull, Dep. Tr. 277:10-17 ("Q. Do you recall any correspondence from BTS agreeing to use third-party inspectors for the life of the RSA in lieu of custody transfer meters? A. I don't recollect that, no."), 278:17-24 ("Q. To your understanding, did BTS and ERC ever amend the RSA to excuse ERC's performance of providing the custody transfer meters? A. To my understanding, no."); Gamboa, 12/7/22 Tr. 83:12-16 ("Q. Did you ever agree to waive that requirement? A. No."); Natale, 2/13/23 Tr. 104:8-12 ("[D]id you or anyone at Bridger, to your knowledge, agree to permanently substitute hand gauging for CT meter at the Eddystone Facility? A. Not to my knowledge."), 109:4-16 ("Q. Did Mr. Gamboa or Mr. Rios or Mr. Ballengee ever

authorize you to make a deal foregoing a CT meter at the facility permanently? A. No."), and 104:3-7 (recounting that Gamboa authorized Natale to send the email)).

401.    Because Eddystone failed to install functional CT meters as required by the RSA, a requirement never excused or waived by BTS, Eddystone breached the RSA.

### C.    BTS Suffered Monetary Damages As A Result Of Eddystone's Breach.

402.    Because Eddystone failed to install CT meters at the facility, BTS incurred the expenses associated with retaining third-party inspectors to measure oil transfers that it otherwise would not have incurred.  *See* FOF ¶ 234.

403.    Dr. George was Defendants' expert on the damages associated with Contingent Counterclaim IV.  FOF ¶ 82.

404.    He calculated damages by looking at the value of the business in the but-for world with CT meters and calculating the difference between that world and the value of the business in the real world without CT meters.  FOF ¶ 235 (George, 12/14/2022 Tr. 9:17¬25).  Dr. George applied this methodology in calculating the damages BTS sustained due to Eddystone's failure to install CT meters at the Eddystone Facility.  *Id.* (George, 12/14/22 Tr. 9:17-25; Trial Ex. 3004.3-4).

405.    During the time that BTS was transloading crude through the Eddystone Facility, Bridger entities received and paid invoices for third-party inspectors to hand gauge the barge and measure the volume and quality of the crude.  FOF ¶ 234.

406.    Dr. George calculated the total amount of damages sustained by BTS due to Eddystone's failure to install CT meters to be $105,676.92.  FOF ¶¶ 235-239.  Prejudgment interest is calculated under the New York statutory rate of 9% simple interest per annum.  N.Y. C.P.L.R. § 5004(a); *Taaffe v. Life Ins. Co. of N. Am.*, 769 F. Supp. 2d 530, 538 (S.D.N.Y. 2011).  As of the date of this filing (April 28, 2023), the total prejudgment interest accrued is $85,937.37, and such interest continues to accrue at a rate of $26.06 per day.  FOF ¶¶ 240, 243.

407.    Because (1) the RSA existed, (2) BTS made all payments required under the RSA during the time it transloaded crude through the facility, (3) Eddystone breached the RSA by failing to install CT meters at the facility, and (4) BTS suffered damages as a result of Eddystone's breach, Defendants' Counterclaim IV, as to the CT meters, succeeds on the merits. *See Wechsler*, 330 F. Supp. 2d at 404. Judgment should be entered against Eddystone in the amount of $105,676.92 plus prejudgment interest, in the event that any of Bridger Logistics, Ferrellgas LP, or Ferrellgas Partners is liable to Eddystone for any amount based on an appropriate alter ego finding.

## VI.    PLAINTIFF'S BREACH OF CONTRACT DAMAGES ARE GROSSLY OVERSTATED.

408.    As set forth in Section I, Eddystone failed to establish any entity breached the RSA, and even if nonparty JTS breached the RSA, there is no basis to hold any Defendant liable, much less each and every Defendant. Even so, it is worth stating that Eddystone grossly overstates the amount of damage it suffered. Defense Expert Erica Bramer correctly determined the damages Eddystone suffered if JTS is considered to have breached the RSA in February 2016—$53.6 million. Trial Ex. 3008.6; Trial Ex. 3008 ¶ 37.

### B.    Applicable Law.

409.    Breach of contract damages should not put a litigant in a better position than it would have occupied had the other party not breached. *See, e.g.*, 11 *Corbin on Contracts* § 55.3 (2022) ("In determining the amount of this compensation as the 'damages' to be awarded, the aim in view is to put the injured party in as good a position as that party would have been in if performance had been rendered as promised. . . . [I]t is a basic tenet of contract law that the aggrieved party will not be placed in a better position than it would have occupied had the contract been fully performed."); *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs.*, 692 N.E.2d 551, 553 (N.Y. 1998) ("Damages are intended to return the parties to the point at which the breach

arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed."); *see also, e.g.*, *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 796 (2d Cir. 1986) (reversing an award of prejudgment interest calculated from the date of anticipatory repudiation because it would afford "the plaintiff a windfall").

### C.    Damages From JTS' Alleged Breach Do Not Exceed $53.6 Million.

410.    Assuming JTS breached the RSA on February 20, 2016, Bramer's damages analysis would put Eddystone in the same position absent that breach. Bramer assumed that JTS would have paid deficiency fees only for the duration of the RSA and while Eddystone still owned the facility. Applying those assumptions, Bramer first calculated the revenues Eddystone would have received, and the costs Eddystone would have avoided as of the presumed February 2016 breach. In reviewing Eddystone's prospective revenues and avoided costs, Bramer recognized that Eddystone transferred the facility in October 2017 (FOF ¶ 807) and could no longer perform under the RSA. Tr. Ex. 3008 ¶ 11.a.

411.    Moreover, the lack of data about the Facility's revenues and expenses after October 2017 makes any damages calculation that includes subsequent time periods inaccurate and erroneous. Tr. Ex. 3008 ¶ 11.a. *Joy Vending Co. v. S. & A. Luncheonette & Rest., Inc.*, 180 N.Y.S. 2d 194, 196 (1958) (denying damages because plaintiff failed to offer evidence of cost data necessary to calculate lost profits); *Williamson v. Strickland & Smith, Inc.*, 587 S.E.2d 876, 879-80 (Ga. Ct. App. 2003) (denying damages because plaintiff failed to offer evidence of revenues and costs during the relevant time period).

412.    Bramer calculated Eddystone was due $72 million in deficiency revenue between February 2016 and October 2017. Tr. Ex. 3008 ¶ 19. To calculate the costs avoided during the same time, Bramer utilized Eddystone's average costs during 2015, when it was actively transloading crude ($1.92 million per month) and subtracted out the variable costs associated with

the transloading ($0.73 million per month). Tr. Ex. 3008 ¶ 25; Bramer, 12/16/22 Tr. 14:2-15:8. The resulting number showed the costs Eddystone would have incurred had it stood ready to receive shipments between February 2016 and October 2017 ($1.19 million per month average). Tr. Ex. 3008 ¶ 25; Bramer, 12/16/22 Tr. 15:11-24. Because Eddystone idled the Facility in February 2016 (FOF ¶ 807), it avoided some of these costs, which Bramer than calculated by subtracting Eddystone's actual costs after February 2016 ($0.8 million per month average) from the costs it would have incurred had it been ready to receive oil ($1.19 million per month average), resulting in a savings of approximately $ 0.39 million per month.  Tr. Ex. 3008 ¶ 25; Bramer, 12/16/22 Tr. 14:2-15:24.  She ultimately calculated that, between February 2016 and October 2017, Eddystone saved $8.3M.  Tr. Ex. 3008 ¶ 28.  Accordingly, Bramer calculated that Eddystone could anticipate profits of no more than approximately $63.67M ($72M-$8.3M) in February 2016, when the purported breach allegedly occurred. Tr. Ex. 3008 ¶  37.

413.    Recognizing that Eddystone faced operational and financial risks as of February 2016, Bramer then applied a discount rate.

414.    Various treatises establish that discounting damages to the date of the alleged breach "properly accounts for risk." Trial Ex. 3008 ¶ 29; Jeffrey H. Kinrich & Everett P. Harry III, *Lost Profits, Damages, Principles, Methods and Applications* at 495 (2017); Roman L. Weil, *Litigation Services Handbook: The Role of the Financial Expert* at 5-10 (6th ed. 2017); Roger Grabowski, Carla Nunes & James P. Harrington, *2016 Valuation Handbook Guide to Cost of Capital* at 2-11 (2016); AICPA Practice Aid 06-4 on Lost Profits, *Calculating Lost Profits (2019* at 36; AICPA Forensic Valuation Services Practice Aid*, Discount Rates, Risk and Uncertainty in Economic Damages Calculations (2012)* at 35; AICPA Forensic Valuation Services Practice Aid*, Calculating Lost Profits (2019)* at 60.

415.     Case law also dictates that a discount rate should be applied to damages calculations to properly account for risk. *Purnell v. Radnor Township Sch. Dist.*, 2022 WL 2757412, at *3 (E.D. Pa. July 14, 2022) (Wolson, J.) (holding that, because the plaintiff would have received money over time, "the Court must discount it to present value to avoid giving [plaintiff] a windfall"); *Vill. of Ilion v. Cnty of Herkimer*, 18 N.E.3d 359, 361 (N.Y. 2014) ("Generally, discounting future damages to their value at some point in the past is appropriate because it takes into account the time value of money."); *Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, 791 F. Supp. 401, 415 (S.D.N.Y. 1991) ("Under New York law, a party injured by breach of contract should be placed in the same economic position as it would have been in had the contract been performed. [The plaintiff] is thus entitled to damages equal to the discounted present value of the [money that the plaintiff] would be expected to lose as a result of the breach.").

416.     Bramer utilized the Capital Asset Pricing Model ("CAPM"), which seeks to determine an entity's cost of capital and apply that cost of capital as the discount rate. Trial Ex. 3008 ¶ 32; Jeffrey H. Kinrich & Everett P. Harry III, *Lost Profits, Damages, Principles, Methods and Applications* at 495 (2017). Using the CAPM, Eddystone's cost of capital at the time of the breach was 21.5%. Trial Ex. 3008 (Bramer Decl.) ¶ 32. Bramer's calculation is detailed in Trial Exhibit 3008, paragraphs 32 through 40.

417.     After application of the discount rate, Eddystone's damages from any JTS breach of contract were no more than $53.6 million.

### D.     Plaintiff's Damages Expert Seeks A Windfall For Eddystone.

418.     By contrast, Plaintiff's expert Marc Sherman provided 16 different sets of damages calculations resulting from JTS' purported breach of the RSA, ranging from $165.6 million to $318.8 million, all of which would put Eddystone in a much better position than it would have been in had JTS made the deficiency payments. JTS. Trial Ex. 3002.55-3002.59 (Sherman Aff.).

314

419. Sherman readily admitted at trial that 8 of the 16 damages sets he offered would put Eddystone in a better financial position than if JTS had actually performed under the contract. Sherman, 12/8/22 Tr. 106:10-21. This is because 8 of the 16 assume that all amounts due under the RSA for its complete term (between February 2016 and June 2019) were "accelerated" and assumed to be due and payable as of February 2016. Trial Ex. 3002 (Sherman Aff.) ¶ 120. Some of these damages numbers "accelerated" to February 2016 included late fees on payments not due until years after February 2016. *Id.* ¶ 120.1. Sherman also failed to provide a discount rate of any kind for these 8 "accelerated damages" calculations, despite admitting that a lump-sum payment in February 2016 would have put Eddystone in a better position than if it had received monthly payments over the life of the RSA (February 2016 to June 2019). Sherman, 12/8/22 Tr. 98:3-17.

420. Sherman's opinion that applying a discount rate would be improper because the profits at issue were "past profits" and not future profits, is unsupported by any authority and is otherwise unpersuasive. Sherman, 12/8/22 Tr. 151:24-152:6. In February 2016, when Sherman concluded damages were due, the profits were all future profits. *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (N.Y. 1971) ("[T]he proper measure of damages for breach of contract is determined by the loss sustained or the gain prevented at the time and place of the breach.")

421. Sherman both failed to apply a discount rate to the lump sum he determined was due on February 15, 2016 and he then improperly applied prejudgment interest to that lump sum beginning in February 2016. Ex. 3008 (Bramer Decl.) ¶ 44; Trial Ex. 3002 (Sherman Aff.) ¶ 118.

422. The remaining 8 "non-accelerated" damages numbers offered by Sherman would also place Eddystone in a better position than it would have been in had JTS performed under the RSA. Four of the 8 "non-accelerated damages" fail to subtract the costs Eddystone avoided as a result of JTS' purported breach. Trial Ex. 3008 (Bramer Decl.) ¶ 48; Trial Ex. 3002 (Sherman Aff.)

¶¶ 120-121. Under governing New York law, non-breaching parties' avoided costs should be deducted from anticipated revenues to avoid windfalls to plaintiffs. *See, e.g.*, *Williston on Contracts* § 64:3 (4th ed. 2022) ("[I]n order to avoid overcompensating the promisee, any savings realized by the plaintiff as a result of the defendant's breach, such as any costs that are avoided by the plaintiff not having to perform the balance of his or her own obligations under the contract, must be deducted from the recovery."); 11 *Corbin on Contracts* § 55.11 (2022) ("For breach of contract, the law of damages seeks to place the aggrieved party in the same economic position the aggrieved party would have attained if the contract had been performed. This involves an award of both the losses caused and gains prevented by the defendant's breach, in excess of savings made possible." ); *R & I Elecs., Inc. v. Neuman*, 66 A.D.2d 836, 837 (N.Y. App. Div. 1978) ("Direct costs are to be deducted from the contract price and are determined by what the plaintiff would have to pay if the contract had not been breached."); *S. Nicolia & Sons Realty Corp. v. AJA Concrete Ready Mix, Inc.*, No. 001794/08, 2011 WL 499204, at *6 (N.Y. App. Div. Jan. 25, 2011) (dismissing claim because claimant submitted evidence of gross revenues but not costs). The Court would provide Eddystone a windfall if it awarded such damages, as they would exceed Eddystone's actual losses under any recognized measure. Trial Ex. 3008 ¶ 48.

423.    Of the four remaining damage calculations that are both "non-accelerated" and do purport to subtract costs that Eddystone avoided, two apply late fee interest and prejudgment interest under the RSA. Trial Ex. 3008 ¶ 45. Applying two interest rates, both of which are intended to account for the time-value of money, results in double-counting interest and inflated damages. 28A N.Y. Prac. *Contract Law* § 22:15 (2022) ("When sophisticated parties agree upon a default rate of interest, the court will not disturb that bargain absent persuasive evidence of overreaching. A party cannot, however, have a duplicate recovery by receiving both contractual and statutory

interest on money that was owed but not timely paid." (citing *TIG Ins. Co. v. Newmont Mining Corp.*, 2005 WL 2446234 (S.D.N.Y. Oct. 4, 2005)). Eight of Sherman's damages calculations contain such double counting (four with accelerated late fee interest and four with non-accelerated late fee interest). Trial Ex. 3002 ¶¶ 120.1, 121.3; Trial Ex. 3008.28-29 (demonstrating how, because of Sherman's double counting, a deficiency payment from August 2018 of $3.67 million more than doubles).

424.    Another flaw with Sherman's late fee interest calculations, as he admitted, is that he compounded the interest calculations without any basis in the contract. Sherman, 12/08/22 Tr. 100:15-21; *TKS Realty, LLC v. 391 Broadway LLC*, 192 A.D.3d 572, 573, (N.Y. App. Div. 2021) (party "is not entitled to interest on a compounded basis because the agreement did not so explicitly provide"); *In re City of New York*, 824 N.Y.S.2d 768, 768 (N.Y. Super. Ct. 2006) ("As a general rule, agreements to pay compound interest have not found favor with the courts. It is established law that in the absence of an express agreement for either compound interest or interest on interest, or statutory authority, such interest is not recoverable." (quotations and citations omitted)).

425.    Finally, in a but-for world in which JTS had performed on the RSA, it would have made monthly deficiency payments over the remaining term, with no late fees. Trial Ex. 3008.27 (Bramer Decl.). So Sherman's addition of late fees would make Eddystone better off than if JTS had performed. *See Brushton-Moira Cent. Sch. Dist.*, 692 N.E.2d at 521 ("Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed.").

426.    Only two of the sixteen damages numbers offered by Sherman purportedly: (1) do not involve an accelerated non-discounted lump payment; (2) subtract Eddystone avoided costs; and (3) do not apply two interest rates over the same time period. But these two damages numbers

overstate damages because Sherman incorrectly estimates the costs Eddystone avoided and fails to recognize that Eddystone sold the facility in October 2017.  Sherman incorrectly estimates the costs that Eddystone avoided because he equates costs Eddystone avoided with costs Eddystone actually incurred in 2016, without explanation.  Trial Ex. 3008 (Bramer Decl.) ¶ 50.  Moreover, the remaining two damages calculations, like all of Sherman's calculations, assume Eddystone was entitled to damages through the end of the RSA, which means that they fail to account for the lack of data related to the facility's revenues and costs after the October 2017 sale of the facility to Canopy as well as the resumption of deliveries at the facility in 2018, which obviously offset Eddystone's losses. Trial Ex. 3008 (Bramer Decl.) ¶ 42; Trial Ex. 3002 (Sherman Aff.) ¶ 110.

427.    Without that data, Eddystone did not prove its alleged damages with reasonable certainty. *Ashland Mgt. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993) ("A party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty."); *Joy Vending Co.*, 180 N.Y.S. 2d at 196 (denying damages because plaintiff failed to offer evidence of cost data necessary to calculate lost profits); *Williamson*, 587 S.E.2d at 879-80 (denying damages because plaintiff failed to offer evidence of revenues and costs during the relevant time period).

428.    Bramer's damages number of $53.6 million is a much more credible estimate of damages that Eddystone suffered because of JTS' alleged breach of the RSA. Trial Ex. 3008.  But ultimately, Eddystone failed to establish that any Defendant can be held liable for that breach or even that any breach occurred.

## VII.    PREJUDGMENT INTEREST SHOULD NOT BE AWARDED.

429.    The Court has discretion in this case to award prejudgment interest (or "delay damages," as they are sometimes referred to as under Pennsylvania law). *Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, CIVIL ACTION No. 16-1343, 2017 WL

2840352, at *13 (E.D. Pa. June 30, 2017) (court has discretion to award delay damages in PUFTA claims); *Am. Enka Co. v. Wicaco Mach. Corp.*, 686 F.2d 1050, 1057 (3d Cir. 1982) (court has discretion to award delay damages in tort claims); *Nedd v. United Mine Workers of Am.*, 488 F. Supp. 1208, 1219 (M.D. Pa. 1980)*, aff'd sub nom Ambromorage v. United Mine Workers of Am.*, 726 F.2d 972 (3d Cir. 1984) (court has discretion to award prejudgment interest for claims brought under federal law)*.* "Interest is not to be recovered merely as compensation for money withheld but, rather, in response to considerations of fairness.  It should not be imposed when its exaction would be inequitable." *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 589 (3rd Cir.1975).

430.    In exercising its discretion, the Court considers "(1) the plaintiff's diligence in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether the award would be compensatory; and (4) whether countervailing equitable considerations militate against an award of pre-judgment interest." *Impala*, 2017 WL 2840352, at *13*.* (citing *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 540 (3d Cir. 1983)); *Sugartown Worldwide, LLC v. Shanks*, CIVIL ACTION NO. 14-5063, 2016 WL 7203513, at *2 (E.D. Pa. April 7, 2016) (same); *Nedd*, 488 F. Supp. at 1219 (applying the *Feather* factors to determine if prejudgment interest should be awarded for a claim brought under federal law).  "The burden is on [the plaintiff] to show these factors entitle it to prejudgment interest." *Sugartown*, 2016 WL 7203513, at *2.

431.    Because there are countervailing equitable considerations that militate against an award of prejudgment interest, which would not be compensatory after Eddystone sold the facility, the Court declines to award prejudgment interest on Eddystone's claims.

432.    Countervailing equitable considerations militate against an award of prejudgment interest.  Eddystone refused to consider a proposed tripartite agreement necessary for an intermediation financing deal with Carlyle—despite the tripartite agreement being materially the

same as the prior deal that Eddystone had in place with BAML and Jamex. FOF ¶¶ 615-635. Eddystone refused for pretextual reasons, knowing full well how crucial Jamex's access to intermediation finance was to its ability to supply oil to the facility and continue its relationship with Monroe. *Id.* It is inequitable for Eddystone to complain about the entire relationship between Monroe, Eddystone, Jamex, and Bridger Logistics dissolving when Eddystone played a central role in the dissolution.

433.    What is worse, when Jamex obtained ownership of BTS (then JTS), and thus the formal relationship with Eddystone, Eddystone still refused to work with Jamex/JTS to continue shipments to Monroe. FOF ¶¶ 754-56, 765-68. Instead, Eddystone quickly decided to file for arbitration against JTS; filed for arbitration against JTS; obtained a stipulated arbitration award of approximately $139 million, of which Jamex entities were responsible for paying only $450,000, despite JTS disclaiming liability in the underlying settlement agreement; and then filed the instant case seeking all amounts awarded by the panel in the arbitration from the Defendants, which were not party to the arbitration. FOF ¶¶ 754-56, 788-801.

434.    Meanwhile, within a year of purchasing Bridger Logistics, Ferrellgas lost nearly $628 million of its $822 million investment. FOF ¶ 781. For example, the Injection Stations that are the subject of Eddystone's fraudulent transfer claim reduced in value from $41.6 million to $14.8 million. Trial Ex. 2495.147. The significant losses suffered by Ferrellgas in relation to Bridger Logistics and its subsidiaries eventually led Ferrellgas to file for bankruptcy in 2021. Miles, 12/12/2022 Tr. 180:5-9. Therefore, it would be inequitable to require the Defendants to pay prejudgment interest on the PUFTA claims or the breach of fiduciary duty claims.

435.    An award of prejudgment interest past October 2017 would not be compensatory. *See In Matter of Complaint of Tug Beverly, Inc.*, Civ. A. No. 92-0099, 1994 WL 194891, at *1

(E.D. Pa. May 13, 1994) ("Prejudgment interest is intended to reimburse the claimant for the loss of use of its investment."). Eddystone sold the facility to Canopy in October 2017, which means it was no longer entitled to profits generated by the facility through the RSA or any other agreement. FOF ¶ 807. Prejudgment interest should not apply after October 2017 when Eddystone no longer had a right to use the facility. Moreover, shipments at the facility resumed in August 2018. Assuming Eddystone could claim any potential profits generated by the facility after October 2017 (which it cannot), Eddystone cannot claim prejudgment interest for a period in which the facility was transloading oil. *See East Coast Tender Serv., Inc. v. Robert T. Winzinger, Inc.*, 759 F.2d 280, 284 (3d Cir. 1985) (excluding from calculation time period when plaintiff was receiving services "because to permit prejudgment interest for that period would result in an inequitable double recovery").

436. If Eddystone were entitled to damages based on fraudulent transfers or constructive fraudulent transfers under PUFTA (it is not) and the Court decided to exercise its discretion to award prejudgment (it will not), then the Court would apply 6% simple interest from the date that Eddystone filed the Complaint in this case, February 2, 2017, to the date of the judgment.[13] *See Impala*, 2017 WL 2840352, at *16 (holding that prejudgment interest for claims under PUFTA brought in federal court begins to accrue when the complaint is filed and that the proper rate is the 6% statutory interest rate under 41 P.S. § 202).

437. If Eddystone were entitled to damages based on its breach of fiduciary duty claim under Pennsylvania law (it is not) and the Court decided to exercise its discretion to award prejudgment interest (it will not), then the Court would apply the 6% simple interest rate under

---

[13] Plaintiff admits that the 6% statutory interest under Pennsylvania law is simple interest, not compound interest. Trial Ex. 3002.91 (Sherman calculating damages based on "6% Simple Interest based on Pennsylvania pre-judgment interest rate.")

Pennsylvania law from the date of the breach of the fiduciary duty to the date of the judgment. *Qato v. Xoxe*, 276 A.3d 212, at \*9 (Pa. Super. Ct. 2022) (holding that in breach of fiduciary duty claims, "The general rule is that the prevailing litigant is entitled only to interest as of the date of the verdict"); *Linde v. Linde*, 220 A.3d 1119, 1150 (Pa. Super. Ct. 2022) (applying prejudgment interest from the date of the breach of the fiduciary duty); *Stout Street Funding, LLC v. Johnson*, Civil Action No. 10-5634, 2014 WL 5591043, at \*4 (E.D. Pa. Nov. 4, 2014) (applying 6% interest rate under 41 P.S. § 202 to Pennsylvania common law prejudgment interest award); *Schall v. Ronak Foods*, Case No. 19-cv-01463-JDN, 2019 WL 4034765, at \*4 (E.D. Pa. Aug. 27, 2019) (Wolson, J.) (same).

438.    If Eddystone were entitled to damages based on its alter ego claims based on federal common law (it is not) and the Court decided to exercise its discretion to award prejudgment interest (it will not), then the Court would apply the weekly average 1-year constant maturity Treasury yield rate from the week before the alleged breach on February 20, 2016, which was 0.522%, from February 20, 2016, to the date judgment is entered. *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986) (holding that in cases brought under federal law the court has discretion to determine the appropriate rate of interest and in "exercising that discretion . . . the court may be guided by the rate set out in 28 U.S.C. § 1961[.]"); 28 U.S.C. § 1961(a) ("Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."); *see also Comcast Cable Commc'ns, LLC v. Sprint Commc'ns*

*Co., LP*, 262 F.Supp.3d 118, 150 (E.D. Pa. 2017) (holding that the appropriate prejudgment interest rate "is the T-Bill rate for the week preceding February 17, 2006," when the claim accrued).[14]

439.     Eddystone argues that New York's prejudgment interest rate should apply. Eddystone has no basis for the argument, and case law dictates that New York's prejudgment interest laws do not apply to Eddystone's claim under PUFTA or its claim for breach of fiduciary duty under Pennsylvania law.  *See Impala*, 2017 WL 2840352, at *16 (applying Pennsylvania's prejudgment interest rate to claim under PUFTA); *Stout Street Funding*, 2014 WL 5591043, at *4 (applying Pennsylvania's prejudgment interest rate to tort claims, including breach of fiduciary duty claim, brought in federal court).  Further, when claims are brought under federal law, such as Eddystone's veil-piercing claim that it bases on federal common law, federal law determines the applicable prejudgment interest rate.  *See Sun Ship*, 785 F.2d at 63 (applying federal prejudgment interest law to a claim brought under federal law and rejecting the argument that state law applies); *Ambromovage v. United Mine Workers of America,* 726 F.2d 972, 981 (3d Cir. 1984) ("In connection with the federal claims, damages questions are governed by federal law[.]")

## VIII.   EDDYSTONE IS NOT ENTITLED TO PUNITIVE DAMAGES.

440.     Eddystone seeks punitive damages in connection with its PUFTA claims and its breach of fiduciary duty claims.  Dkt. 182, Prayer for Relief.

441.     Under Pennsylvania law, "punitive damages are an extreme remedy available in only the most exceptional matters." *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005) (quotations omitted).  "Punitive damages may be appropriately awarded only when the plaintiff

---

[14]     The historical data for the treasury yield can be downloaded here: https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H.15. The Defendants calculated the average rate by summing the rates from the week prior to February 20, 2016 (February 12 through February 19) and dividing the values by the number of days (five).

has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Id.* (quotations omitted). "To justify the award of punitive damages, there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others." *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438, 442 (Pa. Super. Ct. 1992). "[W]hen fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without more." *Id.*

442. Eddystone has failed to prove that it is entitled to punitive damages. In fact, Eddystone has failed to prove that any of the Defendants are liable under PUFTA or Pennsylvania fiduciary duty law. But certainly, Eddystone has not proved any action by any defendant, much less all of the Defendants, that rises to the level of "malice, vindictiveness and a wholly wanton disregard of the rights of others." *Pittsburgh Live*, 615 A.2d at 442; *see also Lomas v. Kravitz*, 130 A.3d 107, 129 (Pa. Super. Ct. 2015) (affirming an award of punitive damages where the defendant received an adverse arbitration award in 1996 and then immediately began "a steady and persistent campaign to avoid paying" the plaintiff that "continued for nearly 20 years and has involved not only fraudulent transfers of assets above, but years of incessant use and abuse of [Pennsylvania's] civil litigation processes," which included a multitude of frivolous filings and motions).

## IX. THERE IS NO SUBJECT MATTER JURISDICTION OVER THIS CASE.

443. The burden to establish subject matter jurisdiction is upon Eddystone as the plaintiff. *Lightfoot v. U.S.*, 564 F.3d 625, 627 (3d Cir. 2009) (Plaintiff "bears the burden of demonstrating subject matter jurisdiction.").

444. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Objections to subject-matter jurisdiction may be raised at any time, including "after trial and the entry of judgment." *Arbaugh v. Y&H*

*Corp.*, 546 U.S. 500, 500 (2006); *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011) ("Objections to subject-matter jurisdiction, however, may be raised at any time. Thus, a party, after losing at trial, may move to dismiss the case because the trial court lacked subject-matter jurisdiction.").

445.    Here, Eddystone relies solely on admiralty jurisdiction to establish federal jurisdiction over this case.  First Am. Compl., Dkt. 182 ¶ 31 ("This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) (maritime jurisdiction).").  Eddystone then asks the Court to exercise supplemental jurisdiction over the acknowledged state-law claims.  *Id.*  ("This Court also has jurisdiction under 28 U.S.C. § 1367(a) (supplemental jurisdiction).").

446.    As the parties are not diverse, and there is no federal question at issue, neither diversity nor federal question jurisdiction is present. Dkt. 182 ¶¶ 12, 14, 15, 18, 19, 21, 23, 24, 27, 28 (pleading Delaware entities); *id.*, Counts Two, Three (pleading Pennsylvania statutory violations); Count Four (breach of fiduciary duty).

447.    And, while Count One of the First Amended Complaint is for "alter ego," that is not a cause of action but an equitable remedy.  *Peacock*, 516 U.S. at 354 (veil-piercing "does not state a cause of action under ERISA and cannot independently support federal jurisdiction"); *Mitchell,* 2021 WL 5980049, at *4 ("[T]he alter ego theory is just that—a theory used to impose liability onto a defendant once an actual cause of action has been proven, such as a breach of contract claim, and after the necessary factors for piercing the corporate veil have been met."); *Mathes Brierre Architects v. Karlton/ISG Enter., LLC*, 311 So. 3d 532, 542 n.10 (La. Ct. App. 2020) ("'[p]iercing the corporate veil is not itself an independent [ ] cause of action, but rather is a means of imposing liability on an underlying cause of action'") (quoting *Peacock*, 516 U.S. at 354)); *Commonwealth by Shapiro*, 194 A.3d at 1035 (same).

448.     Without jurisdiction over the case in the first instance, this Court cannot provide the remedy which Eddystone seeks.  *See Montana-Dakota Utilities Company v. Northwestern Public Service Company*, 341 U.S. 246, 249 (1951) ("The Judicial Code, in vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions."); *Peacock*, 516 U.S. at 354 ("Because [plaintiff] alleged no 'underlying' violation of any provision of ERISA or an ERISA plan, neither ERISA's jurisdictional provision, 29 U.S.C. § 1132(e)(1), nor 28 U.S.C. § 1331 supplied the District Court with subject-matter jurisdiction over this suit.").

449.     Here, the sole basis for admiralty jurisdiction asserted by Eddystone is that it "seeks to enforce payment of a debt arising under a maritime contract."  Dkt. 182 ¶ 31.

450.     The contract that Eddystone seeks to enforce is the RSA, but none of the Defendants is a signatory to the RSA, and the RSA expressly disclaims any third-party rights.  Dkt. 182, Prayer for Relief  ("Eddystone respectfully requests . . . an award of all payments BTS owes Eddystone under the RSA" and compensatory damages "in the amount of the foregone minimum volume payments owed under the RSA"); FOF ¶¶ 134 (Eddystone understood that BTS was a distinct legal entity and its sole counterparty under the RSA), 138 (Section 15.3 of the RSA disclaims third-party rights); *see also id.* ¶¶ 164-66 (internal Enbridge discussions about parental guaranty prior to signing RSA).  Said differently, Eddystone seeks to enforce a contract obligation without privity.

451.     In keeping with the lack of privity, no count in the First Amended Complaint is for breach of contract, and Eddystone has never moved to amend its complaint further to assert one.

452.     The alleged debt to which Eddystone refers in Paragraph 31 of the First Amended Complaint is comprised of deficiency payments that were incurred by JTS, formerly BTS, after

JTS was acquired by Jamex. *See* Dkt. 182 ¶ 31; FOF ¶ 793; *see also* Trial Ex. 3002.51-53 (Sherman Aff.).

453.     Neither BTS nor JTS is a defendant in this action.

454.     Moreover, Eddystone brought an arbitration action against JTS and Ballengee to enforce the RSA and recover the deficiency payments it said it was owed. Dkt. 182 ¶ 75; Dkt. 732 ¶ 72; FOF ¶¶ 788-801.

455.     The defendants in the arbitration are not defendants in this action. *Compare* Dkt. 182 ¶ 75 (First Amended Complaint) with FOF ¶ 788 (listing parties to Jamex-Eddystone Arbitration Settlement).

456.     Neither Bridger Logistics, Ferrellgas Partners, nor Ferrellgas, LP is a corporate parent or affiliate of Jamex or JTS. FOF ¶¶ 5-6 (Ferrellgas entities), 7-11 (Bridger Logistics entities and their acquisition by Ferrellgas Partners), 21, 738-39.

457.     The arbitration was resolved when Eddystone entered into a voluntary settlement with Jamex, in which no party admitted liability, including JTS. Dkt. 732 ¶ 73; FOF ¶ 792 (quoting Trial Ex. 1618 ¶ 11).

458.     As part of the settlement, the parties to the arbitration stipulated to a sum they determined to be deficiency payments under the RSA, *see* FOF ¶ 793, and Eddystone is seeking to have that judgment entered in the Southern District of New York, FOF ¶ 802.

459.     In its request for relief in this case, Eddystone expressly asked for the amounts agreed to be owing under the RSA in connection with the arbitration settlement. Dkt. 182, Prayer for Relief ("award of all payments BTS owes to Eddystone under the RSA"; "award . . . of all amounts awarded by the SMA panel in the arbitration between Eddystone and BTS"; "All

expectation damages available to a party injured by breach of contract at common law and by statute . . . .").

460.    Because Eddystone does not have a contract with Defendants that would obligate them to "step into the shoes" of the obligor and continue to perform under the RSA—and does not even have a contract with Defendants that contained a promise to pay damages—the RSA is too far removed to impose admiralty jurisdiction on these Defendants. *See Atlanta Shipping Corp., Inc. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir. 1987) ("Atlanta is not pursuing a 'derivative issue in a litigation clearly maritime' nor is equitable relief sought 'in the course of admiralty's exercise of its jurisdiction over a matter exclusively maritime.'"); *Nederland Shipping Corp. v. United States*, 18 F.4th 115, 126 (3d Cir. 2021) (distinguishing between sureties and guarantees that cannot support admiralty jurisdiction and an agreement to "pay money and perform other undertakings in order to obtain a departure clearance so the Reefer could leave port and continue its maritime trade"); *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 566 (5th Cir. 2003) (bond to reimburse deposits for a cruise that does not occur "does not relate to the carriage of passengers; it merely makes good on the owners' financial obligations by reimbursing the passengers if the cruise is not performed."); *Fednav, Ltd. v. Isoramar, S.A.*, 925 F.2d 599, 601-602 (2d Cir. 1991) (contribution agreement is not maritime based on the established principles that an agreement to satisfy an obligation from a maritime contract or tort is not an admiralty claim; nor is breach of a settlement; and, where the defendant was not a party to a settlement, the agreement is "collateral" and "cannot serve as the basis for initiating an independent action in admiralty for specific performance."); *Advantage Sky Shipping LLC v. ICON Equip. and Corp. Infrastructure Fund Fourteen Liquidating Tr.*, 427 F. Supp. 3d 501, 503 (S.D.N.Y. 2019) ("Although the South African litigation between Plaintiffs and the Trust's subsidiaries may well

involve maritime claims, those claims are not at issue here; instead, Plaintiffs seek to secure the Trust's performance of the Letter of Undertaking in which the Trust agreed to guarantee its subsidiaries' potential liability in the South African litigation.").

461. Without a maritime cause of action, there is no basis for subject matter jurisdiction over this case. *See Swift and Co. Packers v. Compania Colombiana del Caribe SA*, 339 U.S. 684, 691 (1950) (fraudulent transfer may be pursued only if the litigation is "clearly maritime."); *Zamora v. Bodden*, 395 F. App'x 118, 119 (5th Cir. 2010) (affirming dismissal of an attempt to "collect an award on an alter-ego theory rendered in a prior admiralty case" because there were no independent grounds for federal jurisdiction).

462. Because there was no privity between Defendants and Eddystone via the RSA, and because there was no privity between Defendants and the entity alleged to have incurred the putative "debt," Defendants challenged subject matter jurisdiction at the outset of the case, but the Court held that "Eddystone's inability to assert a breach of contract claim under the facts before us does not automatically foreclose its quasi-contractual claim from admiralty jurisdiction. In fact, we find that admiralty jurisdiction exists over Eddystone's quasi-contractual claim for alter ego premised on a breach of contract because it directly arises out of a maritime contract, the RSA." Dkt. 308 at 17.

463. The Court further found that it could exercise supplemental jurisdiction over the breach of fiduciary duty and fraudulent transfer claims. Dkt. 308 at 19.

464. Now, after Eddystone has had the opportunity to present its case in full, it is apparent that there is no contractual predicate for an admiralty case against these Defendants: (1) neither a contract nor a quasi-contract cause of action has been pleaded (Dkt. 182); and (2) in any

event, the chronology and the requisite privity are not present to impose in admiralty an arbitration award upon Defendants on the basis of the RSA. *See* COL ¶¶ 257-72, 449.

465. Defendants are not signatories to or third-party beneficiaries of the RSA. FOF ¶ 133. Nor did any Defendant guarantee performance of the RSA. FOF ¶¶ 162-66. As just explained, Eddystone has not pleaded a breach of the RSA against Defendants; in fact, Eddystone has not even attempted to set forth a breach of contract cause of action.

466. The damages that Eddystone seeks to recover in its Prayer for Relief are an "award . . . of all amounts awarded by the SMA panel in the arbitration between Eddystone and BTS." Dkt. 182, Prayer for relief. Those obligations, if any, belong to an entity that had ceased to be associated with any Defendant to this action. *See* FOF ¶¶ 738-39, 751-52.

467. Indeed, the monies that Eddystone seeks to recover from Defendants are not based on any Defendant's operation of the BTS business. *See* FOF ¶¶ 738-39, 751-52.

468. BTS' sole member was Bridger Logistics, *see* FOF ¶ 457, and it not only assured that all payments BTS owed to Eddystone were made for the entire time during which BTS was its subsidiary (*id.* ¶¶ 750-51), it sold BTS as a debt-free entity (*id.* ¶¶ 745), even though BTS was a debt-burdened entity when Ferrellgas acquired Bridger Logistics in 2015. *See* FOF ¶¶ 467-79.

469. Although the Court initially found admiralty jurisdiction predicated on an unpleaded quasi-contract claim, Eddystone has failed to establish any basis for an obligation to be imposed on Defendants for payment under the RSA. Prior to trial, Eddystone had suggested that there was an implied contract between Bridger Logistics and BTS, but it adduced little evidence in support of this theory at trial and has given the Court no basis to consider there to be a separate, implied, admiralty agreement enforceable by Eddystone. *See* FOF ¶¶ 167-69 (Bridger Marketing did not agree to backstop the RSA); COL ¶¶ 257-72.

470. The law requires a direct admiralty cause of action to seek an equitable remedy in admiralty. *See Atlanta Shipping*, 818 F.2d at 248 ("Having never invoked the jurisdiction of an admiralty court over any primary admiralty claim, Atlanta cannot now invoke admiralty jurisdiction against a third party over the derivative claim of an alleged fraudulent transfer.")

471. Moreover, without jurisdiction over any admiralty cause of action, there is no basis for the exercise of supplemental jurisdiction. Fed. R. Civ. P. 12(h)(3). Although the Court of Appeals has not addressed the issue directly, it has questioned whether supplemental jurisdiction would apply even if there were admiralty jurisdiction. *See Bethel v. McAllister Bros., Inc.*, 81 F.3d 376, 379 n.4 (3d Cir. 1996) ("While the complaint recites that the court could exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the defamation claim because it had federal question jurisdiction under 28 U.S.C. § 1331, and admiralty and maritime jurisdiction under 28 U.S.C. § 1333, this assertion is questionable.").

472. Nor can Eddystone piggyback on its action against JTS to "enforce" a settlement against a non-party to the arbitration, because Eddystone's suit here "raise[s] an independent controversy with a new party, attempting to shift liability." *U.S.I. Properties Corp. v. M.D. Constr. Co.*, 230 F.3d 489 (1st Cir. 2000). Indeed, even if this Court had entered the settlement, it would not have jurisdiction to "enforce" the settlement against a non-party to the arbitration. *Dominion Dev. Grp., LLC v. Beverlein*, 774 F. App'x 757, 759 (3d Cir. 2019) (no jurisdiction where dismissal order did not make the terms of settlement a part of the order).

473. Accordingly, there is no admiralty jurisdiction, and dismissal is warranted.

474. The law of the case doctrine does not limit the Court's decision-making in this regard for at least eight independent reasons. First, Federal Rule of Civil Procedure 12(h)(3) is

unambiguous:  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

475.    Second, and relatedly, the Court of Appeals has recognized that the federal courts' "obligation to assure [themselves] that [they] have subject matter jurisdiction over a claim is antecedent to [their] power to reach the merits of that claim." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (examination of subject matter jurisdiction is a "bedrock obligation").  Indeed, "the ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law. Though that obligation may be tempered at times by concerns of finality and judicial economy, nowhere is it greater and more unflagging than in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority." *Council Tree Commc'ns, Inc. v. F.C.C.*, 503 F.3d 284, 292 (3d Cir. 2007) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003)).  The obligation is ever-present and ongoing.  *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1049 (3d Cir. 1993).  As such, the Court of Appeals has repeatedly found that law of the case does not bar revisiting subject matter jurisdiction, without applying any exceptions to the doctrine.  *E.g.*, *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (reconsidering Article III standing because "federal courts' unyielding obligation to uphold statutory and constitutional limitations on jurisdiction should not bend to less important prudential notions of comity and finality"); *Council Tree*, 503 F.3d at 292 (law of the case did not preclude revisiting subject matter jurisdiction).

476.    Third, the Constitution and the Congress restrict admiralty jurisdiction to causes of action arising at admiralty.  *See* United States Constitution, Art. III, § 2 ("The judicial power shall extend . . . to all Cases of admiralty and maritime Jurisdiction"); 28 U.S.C. § 1333 ("The district

courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.").  The power of a federal court to adjudicate state law questions is limited, and state law claims presumptively belong in state court.  *Rapisardi v. Estate of Lange*, No. 22-1323, 2022 WL 4533851, at *1 (3d Cir. Sept. 28, 2022); *see also City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 712 (3d Cir. 2022) (rejecting as "too far away" from the claimed federal nexus of exploration and production a complaint challenging alleged harms from oil companies' sales. For a "case [to] arise[] 'under the Constitution or laws of the United States'" "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.");  *Gully v. First Nat'l Bank,* 299 U.S. 109, 113 (1936); *Ceres Terminals, Inc. v. Industrial Comm'n of Illinois*, 53 F.3d 183, 186 (7th Cir. 1995) (dismissing a claim that there was admiralty jurisdiction to address a maritime workers' compensation claim).

477.   Fourth, the record is now complete and matters at different procedural postures are assessed based on the record at the time.  The Court of Appeals has previously found that factual development may be necessary to determine whether admiralty jurisdiction exists.  *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 886 (3d Cir. 1992) (remanding because intent of the parties to a contract was unclear).

478.   Fifth, in general, a party cannot appeal an order denying summary judgment when there is a subsequent trial on the merits and instead must rely on the trial record to establish its points.  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011); *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 167 n.32 (3d Cir. 2010).  While some courts have made an exception for a ruling of law at summary judgment, the Third Circuit has not done so.  *Osborne v. Univ. of Del.*, 815 F. App'x 682, 684 n.1 (3d Cir. 2020).

479.     Sixth, the costs of an improper jurisdictional decision have been impermissibly high, such that even if this Court were to consider this a request for "reconsideration," manifest injustice exists here. *See Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999) (citing *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998)). The Court (1) denied Defendants a jury trial that would otherwise have been available (Dkt. 328); (2) denied the state courts the ability to rule on questions of state law; and (3) ordered production of attorney-client documents by applying a lower burden of proof on Plaintiffs than would have been required under Pennsylvania law, finding only a "reasonable basis to suspect" there was fraud furthered by legal advice, instead of requiring the party seeking to pierce the privilege to satisfy the Court that "the evidence proposed to establish the fact is sufficient to go to the jury for the purpose." *Nadler v. Warner Co.*, 184 A. 3 (Pa. 1936); *In re Investigating Grand Jury of Philadelphia County*, 593 A.2d 402, 442–443 (Pa. 1991) (where "two conclusions conceivably may be drawn from that same evidence" cannot satisfy the burden of proof for "prima facie evidence that the communications were mad in the course of the commission of a proposed crime or fraud.").

480.     Seventh, there is an adequate state court forum for the state court claims—two of which are pending in a Pennsylvania Court of Common Pleas and asserted under Pennsylvania statutes. *See Bridger Logistics, LLC v. Eddystone Rail Company, LLC*, No. CV-2019-000646 (Del. Cnty. Ct. Com. Pl.).

481.     Eighth, subject matter jurisdiction is essential to the Court's authority, while law of the case is a discretionary case management tool. *Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, [but] it does not limit the tribunal's power."); *Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 836 (3d Cir. 2022) ("Law of the case may counsel against, but does not prevent, a district court from reconsidering its prior rulings.").

Dated: April 28, 2023 Respectfully submitted,

By: /s/ Lawrence G. Scarborough

Richard E. Coe (I.D. No. 94539)
Elizabeth M. Casey (I.D. No. 325696)
Henry M. Grabbe (I.D. No. 328928)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757
richard.coe@faegredrinker.com
elizabeth.casey@faegredrinker.com
henry.grabbe@faegredrinker.com

Lawrence G. Scarborough (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
lawrence.scarborough@faegredrinker.com

Jacob A. Kramer (Admitted *Pro Hac Vice*)
Jessica R. Maziarz (Admitted *Pro Hac Vice*)
Rachel A. Beck (Admitted *Pro Hac Vice*)
Kathryn E. Bettini (Admitted *Pro Hac Vice*)
Ashlee A. Paxton-Turner (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1050 K Street NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 312-7400
Facsimile: (202) 312-7461
jake.kramer@faegredrinker.com
jessica.maziarz@faegredrinker.com
rachel.beck@faegredrinker.com
kathryn.bettini@faegredrinker.com
ashlee.paxton-turner@faegredrinker.com

Desmonne A. Bennett (Admitted *Pro Hac Vice*)
Jesse L. Marks (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone:  (303) 607-3500
Facsimile:  (303) 607-3600

335

desmonne.bennett@faegredrinker.com
jesse.marks@faegredrinker.com

Jane E. Maschka (Admitted *Pro Hac Vice*)
Josh Peterson (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center, 90 South 7th Street
Minneapolis, Minnesota 55402
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
jane.maschka@faegredrinker.com
josh.peterson@faegredrinker.com

Maria S. Downham (Admitted *Pro Hac Vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
maria.downham@faegredrinker.com

*Attorneys for Bridger Logistics, LLC, Ferrellgas Partners, L.P., Ferrellgas L.P., Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, J.J. Addison Partners, LLC, J.J. Liberty, LLC, Bridger Admin Services II LLC, Bridger Energy, LLC, Bridger Lake, LLC, Bridger Leasing, LLC, and Bridger Marine, LLC*

## CERTIFICATE OF SERVICE

I, Lawrence G. Scarborough, hereby certify that, on April 28, 2023, a true and correct copy of the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law was filed electronically via the Court's ECF filing system.  This document is available for viewing and downloading from the ECF system and electronic notification has been sent to all counsel of record.

*/s/ Lawrence G. Scarborough*