## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDDYSTONE RAIL COMPANY, LLC,

*Plaintiff,*

v.

BRIDGER LOGISTICS, LLC, et al.,

*Defendants.*

Case No. 2:17-cv-00495-JDW

<u>REDACTED VERSION</u>

## <u>MEMORANDUM</u>

When the Defendants in this case sold Bridger Transfer Services, LLC ("BTS"), they thought they were being "smooth like butter," but they were more like "criminal[s] undercover."[1] When they structured their sale of BTS, they no doubt thought, "We Are Bulletproof."[2] It turns out, though, that they were making "Bad Decisions."[3] And now it is time for them to "Make It Right."[4] And so, pursuant to Federal Rule of Civil Procedure 52(a), I make the following findings of fact and conclusions of law and determine that Eddystone Rail Company, LLC is entitled to damages from Ferrellgas Partners, L.P., Bridger Logistics, LLC, Bridger Energy, LLC, and Bridger Transportation, LLC, due to a series of fraudulent transfers connected to the sale of BTS.

---

[1]     BTS, *Butter* (Big Hit-Sony Music 2021).
[2]     BTS, *We Are Bulletproof: The Eternal* (Big Hit-Sony Music 2020).
[3]     Benny Blanco, BTS & Snoop Dogg, *Bad Decisions* (Interscope-Universal Music Group 2022).
[4]     BTS, *Make It Right* (Big Hit-Sony Music 2019).

## I.   FINDINGS OF FACT[5]

### A.   The Parties

1.   This case centers around a series of events that led to the breach of a rail services agreement between two companies involved in the midstream segment of the oil and gas industry, which provides transportation between the upstream segment (*i.e.,* oil producers and exploration companies) and the downstream segment (*i.e.,* refineries and end markets and end users).

2.   I adopt the Parties' Joint Stipulation Of Facts. (ECF No. 732.) Rather than repeat all those facts, I incorporate them by reference.

3.   Eddystone Rail Company, LLC ("Eddystone") was a joint venture between Enbridge Rail (Philadelphia), LLC and Canopy Prospecting, Inc. ("Canopy"), neither of which is a party.

---

[5]   Defendants' Proposed Findings Of Fact appear at pages 1 thru 199 of ECF No. 737 ("DFOF"), while their Proposed Conclusions Of Law appear at pages 200 thru 334 of ECF No. 737 ("DCOL").   Throughout this Memorandum, "Defendants" refers to Ferrellgas Partners, L.P. ("Ferrellgas Partners"), Ferrellgas L.P. ("Ferrellgas L.P."), Bridger Logistics, LLC, Bridger Administrative Services II, LLC, Bridger Marine, LLC, Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Storage, LLC, Bridger Swan Ranch, LLC, Bridger Terminals, LLC, Bridger Transportation, LLC, Bridger Leasing, LLC, Bridger Energy, LLC, Bridger Lake, LLC, J.J. Liberty, LLC, J.J. Addison Partners, LLC.   In turn, "Ferrellgas Defendants" refers to Ferrellgas Partners and Ferrellgas L.P.

Eddystone's Proposed Findings Of Fact appear at ECF No. 736 ("PFOF"), and its Proposed Conclusions Of Law appear at ECF No. 736-1 ("PCOL").

In reaching these findings of fact, I focused on the portions of the record that the Parties cited in their respective proposed findings of fact. In other words, I did not mine the entire record (which "consists of 19 trial days ..., 939 admitted exhibits, and the testimony of 26 live witnesses and 11 additional witnesses by deposition" (ECF No. 733)) to resolve every possible factual dispute.

4.      Eddystone built a rail-to-barge facility in Eddystone, Pennsylvania, to provide transloading services for its customer BTS. Eddystone would unload crude petroleum from trains and then load the petroleum onto barges, pipelines, or other facilities for transporting and/or storing the petroleum.

5.      Bridger, LLC ("Bridger") owned Bridger Marketing, LLC, and Bridger Logistics, LLC. Bridger Logistics was a holding company that owned various subsidiaries, including BTS. Julio Rios and Jeremy Gamboa ran Bridger Logistics, and James Ballengee ran Bridger Marketing.

6.      Bridger Marketing was engaged in the purchase and sale of crude oil, while Bridger Logistics and its subsidiaries (including BTS) provided transportation and logistics services for crude oil delivery. The subsidiaries transported crude oil from the wellhead to refiners and other points in between.

7.      Ferrellgas, Inc. ("Ferrellgas") is in the propane business. At all relevant times, Ferrellgas held a general partner interest in both Ferrellgas Partners and Ferrellgas, L.P. and performed all management functions for the two entities. Ferrellgas Partners was the holding company and owned a 99% partnership interest in Ferrellgas L.P.—the operating company.

**B.      The COSA**

8.      In July 2014, Bridger Marketing entered into a Crude Oil Supply Agreement ("COSA") with Monroe Energy, LLC. Pursuant to the COSA, Bridger Marketing procured

and delivered crude oil to Monroe's refinery in Trainer, Pennsylvania. The COSA required that Bridger Marketing obtain crude from the Bakken oil fields in North Dakota and transload the oil at the Eddystone facility. (Ex. 1733, Schedule 4.1.[6])

9.      Bridger Marketing did not operate its own transportation or transloading facilities, so it relied on Bridger Logistics and its subsidiaries to deliver the oil to Monroe. Bridger Marketing would purchase crude oil, and then it would pay BTS to use BTS's capacity at various rail unloading terminals in North Dakota and its capacity at the Eddystone facility.

10.      The COSA's volume commitment and duration required Bridger Marketing to sell and deliver 1,950,000 barrels per month (or 65,000 barrels per day) for a term of five years. (*See* Ex. 1733, Art. 2.1(b), 11.1(a).) If Bridger Marketing failed to deliver 90% of the Minimum Volume Commitment ("MVC") in a quarter, or 95% in a year, then it had to make deficiency payments to Monroe. (*See id.* at Art. 2.1(e)(i)-(ii).

11.      The COSA had a split-price formula: Bridger Marketing delivered half of the oil on a Brent-indexed basis and the other half of the oil on a cost-plus basis. (*See id.* at Art. 4.1(a)-(b).)

12.      Under the Brent-indexed half of the formula, Monroe paid Bridger Marketing the Intercontinental Exchange Brent price ("ICE Brent") minus the "Brent

---

[6]      All citations to "Ex." refer to exhibits admitted during trial.

Differential," which was $2.50 per barrel for the first 18 months of the term and increased thereafter. (*See id.* at Art. 4.1(a), Schedule 1.1 at 1, 4.)

13.     Under the cost-plus half of the formula, Monroe paid Bridger Marketing the cost Bridger Marketing had paid to acquire the oil in North Dakota, plus transportation and logistics fees to cover the costs Bridger Marketing incurred to transport the oil to Monroe's refinery. (*See id.* at Art. 4.1(b), Schedule 4.1.)

14.     Most months, the cost-plus half of the formula was not profitable for Bridger Marketing. As a result, Bridger Marketing made money under the COSA only when there was a large enough differential between the Brent price and the price paid in the Bakken. The differential between the two is "the spread." When the spread was narrow, the COSA was not profitable for Bridger Marketing.

15.     By late 2014, the Brent-Bakken spread narrowed from highs in 2012 and 2013. As a result, Bridger Marketing incurred COSA-related losses of $18.4 million in the third and fourth quarters of 2014; it lost $9.5 million in the first quarter of 2015; it lost $6-7 million in each of the months of July, August, and September 2015; and it continued to suffer millions of dollars in losses on the COSA for the rest of 2015. (Ex. 657 at 12, Exs. 922, 922-A; Tr. 9/20/22 87:9 – 89:9.[7])

---

[7]     All citations to "Tr." refer to the trial transcript.

### C.     The RSA

16.     On February 13, 2013, BTS entered into a Rail Facilities Services Agreement ("RSA") with Eddystone. Pursuant to the RSA, BTS was responsible for getting rail cars filled with crude petroleum to the Eddystone facility. (*See* Ex. 90-A, Exhibit A at § 5(a).) In other words, BTS provided transportation and logistics services for delivering petroleum for its customers.

17.     Bridger Marketing was the only customer BTS ever had for capacity at Eddystone. Thus, Bridger Marketing—rather than BTS—controlled how many barrels went through the Eddystone facility. This occurred on a month-to-month basis; Bridger Marketing would nominate volumes for the following month. Bridger Marketing paid BTS $2.75 per barrel for throughput at Eddystone.

18.     The term of the RSA was five years and two months from the Operational Date, meaning the date that the Eddystone facility was operable. Because the first train arrived in May 2014, the RSA was scheduled to run through June 2019.

19.     As part of the RSA, BTS agreed to deliver a minimum "Monthly Volume Commitment" of approximately 65,000 barrels of crude petroleum per day for each day of the month. (*See* Ex. 90-A at § 1.1.) BTS's volume commitments mirrored Bridger Marketing's commitments under the COSA.

20.     In exchange for Eddystone's provision of transloading services at the facility, BTS paid Eddystone a "Transloaded Volume Charge" of $2.25 per barrel. (*See id.*) In

months when BTS did not meet its Monthly Volume Commitment, BTS was obligated to pay a "Deficiency Volume Charge" of $1.75 for every barrel of shortfall. (*See id.*) This sort of "take-or-pay" arrangement is standard practice in the midstream segment of the oil and gas industry. (Tr. 9/19/22 173:13-18.) As is typical in take-or-pay contracts, BTS (the customer) assumed the commodity risk, including the risk of loss from fluctuating oil prices. (*Id.* at 138:8-15.)

21.     The RSA required that "all custodial cargo transfer operations at the Eddystone Rail Facilities [would] be performed solely by custody transfer meter and not be hand innage and/or ullage measurements of shore tanks and/or barges." (Ex. 90-A at Ex. A at ¶ 3(b).)

22.     Each month, Eddystone sent BTS an invoice for transloading and deficiency charges. Those invoices identified the volume of throughput that Eddystone credited to BTS, the amount of any shortfall, and the amount that Eddystone charged BTS for those transloaded and shortfall volumes.

23.     While Bridger Marketing suffered significant COSA-related losses, the Bridger Logistics group of companies became the "largest for-hire provider of crude hauling services in North America," with an aggregate EBITDA of $121.9 million. (Ex. 593 at 6.)

24.     In 2014, Bridger Logistics generated $65,852,709 in operating income and $302,853,917 in operating revenue. BTS generated $104,442,305 (or 35%) of that

operating revenue. After expenses, BTS's operating income for 2014 totaled $37,977,128, which was approximately 58% of Bridger Logistics' total operating income for the year. Meanwhile, Bridger Marketing lost approximately $24.7 million in operating income in 2014.

25.     BTS's COSA-related income remained steady because Bridger Marketing always transferred enough cash to BTS to cover the transloading and deficiency charges that BTS incurred under the RSA. (Tr. 9/20/22 at 41:15 – 44:8.) Under the RSA, BTS owed Eddystone $2.25 for each transloaded barrel of crude, but Bridger Marketing paid BTS $2.75 per barrel (and later, $2.55 per barrel) for transloading services, giving BTS a margin of $0.50 per barrel (and later, $0.30 per barrel).

26.     Aside from providing rail loading, unloading, and transloading services to Bridger Marketing in connection with the COSA, BTS also received stations throughput fees revenue from other customers. (Ex. 3002 at ¶¶ 20-23.)

### D.     Issues At The Eddystone Facility

27.     Almost immediately, there were certain issues that impeded BTS's operations at the Eddystone facility. First, the owner of the train tracks, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), restricted larger freight trains from traversing a portion of the track necessary to reach the Eddystone facility. (Ex. 307 at 37.) Specifically, trains with more than 92 cars could only access that portion of track between 12:00 a.m. and 4:00 a.m. (the "SEPTA window"). This applied to all trains on the track – not

just BTS's. (*Id.*) In general, the trains transporting crude oil to Eddystone had 110 to 120 cars, making them subject to SEPTA's restriction. If a train did not leave the facility by 4:00 a.m., then it would have to wait until the next day to leave, and other trains would stack up behind it until they could get into the facility. This restriction caused BTS to lose time and prevented BTS from bringing more than one train into the facility each day.

28.     On February 10, 2014—about a year after entering the RSA with BTS—Eddystone learned about the SEPTA window. (Eddystone 30(b)(6) Dep. Tr. at 37:3-12, 87:21 – 88:10; *see* also Johnson Dep. Tr. at 110:2-12.) By that point, however, the facility was just a few months from opening. Eddystone did not share that information with BTS at that time, but once the facility started receiving trains, Bridger started to complain that the SEPTA window was impeding BTS's operations. (Johnson Dep. Tr. at 111:16-20.) Mr. Gamboa wrote to Enbridge as early as May 29, 2014, complaining about the delays stemming from the SEPTA window. (Ex. 295 at 2.)

29.     Second, Eddystone had not installed custody transfer meters ("CT meters") at its facility. CT meters measure oil at transfer points, and they measure volume, quality, and temperature. When a train arrived at the Eddystone facility, oil was pumped off the train and into a storage tank. Then, it was pumped from the tank into a barge. Without CT meters at the facility, Eddystone used hand gauging to measure the amount of crude that arrived in the railcars during the entire period BTS used the facility for transloading. (Tr. 12/7/22 at 83:17-23.)

9

30.     BTS never relieved Eddystone of its contractual obligation to install CT meters at the facility. (Tr. 12/7/22 at 83:8-16.) Instead, BTS agreed to permit the facility to go into operation without CT meters because the opening of the facility had been delayed, and it did not want to delay things further. (*Id.* at 11:9-19.)

31.     According to Mr. Gamboa, the lack of a CT meter at the off-load transfer point at Eddystone impacted BTS's operations and finances. For instance, some of the railcars would not be unloaded completely and would be sent back to their origin with oil still inside them. In addition, the lack of an accurate measurement via CT meters "cause[d] significant financial issues for the company" and impacted BTS's ability to meet its Monthly Volume Commitment under the RSA. (*Id.* at 70:16 – 72:19.)

32.     Third, there was a large column of granite known as a "pinnacle" in the Delaware River that impacted barges' access to the Eddystone facility. Prior to entering the RSA with BTS, Eddystone represented that it had existing marine facilities with 34 feet of "authorized depth" at the berths. (Ex. 67-A at 13.) However, due to the presence of the granite pinnacle, the "actual depth" near the Eddystone facility was only 27 feet, 8 inches. (Tr. 9/20/22 at 235:7-12; Tr. 9/22/22 at 160:17-19.) This meant that, when loaded to full capacity, the barge that Bridger Trading chartered to transport crude from the Eddystone the facility could only sail twice a day, during high tide. As a result, there were times when the dock sat empty because the barge had to wait until high tide to come in. There were

also times when a customer's dock was open, but the barge could not leave Eddystone until high tide.

33.     Eddystone knew there was some impediment in the Delaware River as of June 2013. Indeed, on June 2, 2013, Steve Turnbull, the Senior Manager at the Eddystone facility, wrote to Bridger Trading and disclosed that "the most current draft mapping of the channel to our dock revealed that there are some 'high spots' in the channel that will likely prohibit the [desired barge] from being brought in." (Ex. 2706 at 3.) Mr. Turnbull advised that Eddystone planned to dredge the channel later in the year to address the issue. By the end of 2013 or early 2014, Eddystone learned that the high spot was a granite pinnacle in the channel. (Tr. 12/13/22 at 119:25 – 120:10.)

34.     When BTS entered the RSA, it expected to be able to bring trains and barges in and out of the facility 24 hours a day. However, that was not possible given the different operational issues, which constrained BTS's ability to meet its minimum volume commitment each month. As a result, BTS sent letters to Eddystone complaining about the facility defects and attempted to renegotiate the terms of the RSA at different times during 2014 and 2015. (*See, e.g.,* Exs. 468, 484, 486, 486-A, 517, 676; *see also* Ex. 1453-B (recounting that "[t]he issues [had] been the subject of correspondence between the Parties" in late 2014 an early 2015.) BTS and Eddystone never resolved these issues or amended the RSA.

E.    **Ferrellgas's Acquisition Of Bridger**

35.    Following a challenging fiscal year 2012, Ferrellgas launched a strategy to diversify the company's revenue streams to a "roughly 70/30 split – 70 percent propane, 30 percent non-propane." (Tr. 12/8/22 at 179:22-23.) As part of that strategy, in 2014, the company hired Todd Soiefer as its Vice President of Business Development to find "big deals" to help diversify the company. (*Id.* at 173:19 – 174:7.)

36.    In April 2015, Mr. Soiefer introduced Ferrellgas to Bridger Logistics. A deal with Bridger was exactly what Ferrellgas had been searching for as part of its diversification strategy. (Tr. 12/8/22 at 181:13-20.) The Ferrellgas team was "very excited" about a potential deal with Bridger and started doing its diligence before having a signed letter of intent. (*Id.* at 181:17-18, 186:10-20.") In fact, even prior to having an LOI in place, Ferrellgas spend more on diligence than it ever had on a prior deal. (*Id.* at 187:3-5.)

37.    In the LOI, Ferrellgas valued Bridger Logistics at $825–$900 million, based on Bridger Logistics' run-rate EBITDA of $100–$120 million.

38.    After touring the Eddystone facility in May 2015, an Executive Vice President at Ferrellgas, Tod Brown, reported that BTS's segment of the business generated more than 50% of Bridger Logistics' total EBITDA. He and other Ferrellgas executives, like Mr. Soiefer, also understood that the COSA with Monroe "was absolutely a significant part of the business," (Tr. 12/6/22 at 84:9) and they were aware that they would need to extend the COSA or replace Monroe with another customer to keep that business line going. (Ex.

647; Tr. 12/6/22 at 83:10 – 85:16.) BTS's use of the Eddystone facility was "really important" and "critical" to its contractual relationship with Monroe. (Tr. 12/6/22 at 110:4, 110:11), and Ferrellgas executives were focused on understanding how they could invest in the facility and increase revenue. (*Id.* at 108:20 – 110:13.)

39. Ferrellgas hired Simmons & Company International ("Simmons") to provide investment banking and advisory services during the diligence period. (*Id.* at 55:8-17.) Simmons identified "large-scale capital opportunities" for additional growth, including acquiring the Eddystone facility, purchasing the land on which the Eddystone facility sat, and building a pipeline from Eddystone to Monroe's refinery. (Ex. 652-A at 52.) Though significant, such an investment "would have been very worthwhile because it would then further tie [Ferrellgas] in with Monroe." (Tr. 12/6/22 at 87:3-8.) In fact, Ferrellgas was "looking to spend another couple hundred million dollars to further bolster this relationship with Monroe ...." (*Id.* at 113:15-17.)

40. At the same time Ferrellgas was in the process of purchasing Bridger Logistics, Bridger Marketing had been losing money on the COSA with Monroe. Simmons identified the long-term viability of Bridger Marketing's business as a potential risk factor associated with acquiring Bridger Logistics because a significant portion of Bridger Logistics' cash flow was "predicated" on the viability of Bridger Marketing's business. (Ex. 593-A at 30.) That was because Bridger Marketing was BTS's sole customer, and BTS

generated a significant amount of Bridger Logistics' overall revenue. Thus, any problems for Bridger Marketing could spell trouble for Bridger Logistics.

41.     This information from Simmons prompted Ferrellgas to perform further diligence as to Bridger Marketing. According to Mr. Soiefer, "a significant amount of thought and work went into mitigating" the risk associated with Bridger Marketing, and "significant efforts were gone to make sure that the capitalization and the outlook for [Bridger Marketing] would be strong." (Tr. 12/6/22 at 69:8-10, 76:8-10.) As part of the mitigation efforts, Bridger's board decided to inject $250 million into Bridger Marketing when the transaction closed. (Ex. 687 at 24; Tr. 9/23/22 at 103:4-11; Tr. 167:12 – 169:4.) Ferrellgas was on-board with this capitalization of Bridger Marketing. (*See* Tr. 12/6/22 at 71:8 – 72:5; 12/9/22 at 7:20 – 8:25.) Again, helping Bridger Marketing helped Bridger Logistics.

42.     Pursuant to the Bridger Side Letter Agreement dated May 29, 2015, Bridger agreed to contribute $220 million worth of Ferrellgas Partners common units and $30 million in cash to Bridger Marketing on the day that the Ferrellgas acquisition of Bridger Logistics closed, subject to certain conditions. (Ex. 1576-B at ¶ 4.) Those funds were meant to carry Bridger Marketing through the end of the COSA and "backstop any potential losses" that it might incur because of the COSA. (Tr. 9/20/22 at 168:10 – 169:4, 173:23-25; Tr. 12/12/22 at 62:7-11.)

43.     Aside from diversifying its portfolio, Ferrellgas wanted to acquire Bridger Logistics to gain access to Monroe. Delta Airlines is Monroe's parent company, and having a "household name" like Delta as a customer was important to Ferrellgas. (Tr. 12/5/22 at 204:18 – 205:11.) Ferrellgas also hoped that replacing Bridger Marketing as the counterparty to Bridger Logistics' contracts and substituting a household name like Delta would be appealing to investors.

44.     To that end, the relevant parties worked together to replace the COSA between Bridger Marketing and Monroe with three interrelated agreements leading up to Ferrellgas's acquisition of Bridger Logistics. First, Bridger Marketing and Monroe entered into an Amended And Restated Crude Oil Supply Agreement on May 26, 2015 (the "Amended COSA"). (Ex. 1736.55.) Second, Bridger Logistics and Monroe entered into a Transportation And Logistics Services Agreement the same day (the "Monroe TLA"). (Ex. 1736.1.) The Monroe TLA and the Amended COSA took effect once Ferrellgas Partners acquired Bridger Logistics, and both agreements were scheduled to terminate at the end of June 2019, like the RSA between BTS and Eddystone. Third, Bridger Logistics and Bridger Marketing entered into a Transportation And Logistics Agreement (the "Marketing TLA"). (Ex. 1040-C.)

45.     Pursuant to the Monroe TLA, Monroe took on the obligation to pay Bridger Logistics for the transportation of crude oil from North Dakota to Monroe's refinery. Bridger Logistics would "perform, or cause its carriers and contractors," like BTS, to

perform these services. (Ex. 1736.7 at § 3.1.) Monroe reimbursed all rail charges for trains that terminated at Eddystone and paid an additional charge of $7.30 per barrel starting in September 2015 to Bridger Logistics. (Ex. 1736.8 at §§ 6.1, 6.2.) The Monroe TLA had the same minimum volume commitment of 65,000 barrels per day as the RSA. (*Id.* at § 6.4.) If Bridger Logistics shipped between 35,000 and 65,000 barrels per day, Monroe owed Bridger Logistics a deficiency payment of $7.30 per barrel of shortfall. If Bridger Logistics delivered less than 35,000 barrels, no deficiency payment was due.

46.     However, under the Marketing TLA, Bridger Marketing had to pay Bridger Logistics a deficiency charge if it failed to tender less than 35,000 barrels of crude each day. (Ex. 1040-C at § 23.) The deficiency charge was the difference between the amount that Monroe would have paid had it received 65,000 barrels and the amount Monroe actually paid to Bridger Logistics. (*Id.*)

47.     In turn, the Amended COSA permitted Monroe to deduct the payments it made to Bridger Logistics for transporting the crude from the payments it owed to Bridger Marketing for acquiring the crude. (Ex. 1736.68 at § 7.1.) Thus, in practical terms, Bridger Marketing covered the transportation fee that Monroe owed to Bridger Logistics, regardless of how many barrels Bridger Logistics delivered. So, while Monroe took over responsibility for paying for transportation expenses, Bridger Marketing continued to fund those expenses, given the structure of the agreements. At this point in time, Bridger

Marketing had been losing money under the COSA, and it would continue to lose money under the Amended COSA as well, unless and until the spread widened.

48.     Given the take-or-pay nature of the arrangement, Bridger Logistics was entitled to the whole transportation fee for the minimum volume each month.

49.     On June 24, 2015, Ferrellgas Partners acquired all membership interests of Bridger Logistics and other subsidiaries from Bridger (the "Acquisition") for $837.5 million, pursuant to a Purchase And Sale Agreement By And Between Bridger, LLC, As Seller, And Ferrellgas Partners, L.P., As Purchaser dated May 29, 2015 (the "Bridger PSA"). Ferrellgas Partners acquired Bridger Logistics, BTS, Bridger Transportation, LLC, Bridger Leasing, LLC, Bridger Transfer Services, LLC, Bridger Storage, LLC, Bridger Rail Shipping, LLC, Bridger Marine, LLC, Bridger Shipper, LLC, Bridger Lake, LLC, Bridger Administrative Services II, LLC, Bridger Real Property, LLC, J.J. Addison Partners, LLC, J.J. Karnack Partners, LLC, and J.J. Liberty, LLC (collectively the "Bridger Entities").

50.     Prior to the Acquisition, the Bridger Entities owed intercompany charges and receivables within the Bridger corporate family. Those companies' accounting records reflected those obligations. As of June 23, 2015—the day before the Acquisition closed— the following Bridger Entities owed intercompany charges to BTS: (a) Bridger Leasing owed $2,635,942; (b) Bridger Transportation owed $2,544,381; (c) JJ Liberty owed $858,315; (d) Bridger Rail Shipping owed $496,685; (e) Bridger Admin Services II owed $175,000; (f) J.J. Addison Partners owed $94,218; (g) Bridger Real Property owed $3,000;

and (h) Bridger Logistics owed $80,000.[8] (PSX 107; Ex. 3002 at ¶ 44.[9]) According to BTS's accounting records, none of these entities paid these balances.

51.     Because Bridger Logistics "had not done a good job reconciling the intercompany charges within the Logistics entities over time," it "basically zeroed them all out before the [Acquisition] took place" and gave Ferrellgas "a clean set of books." (Tr. 12/12/22 at 37:2-12.) That included the roughly $400,000 that BTS owed to Bridger Lake at the time. (*See* PSX 107.) Thus, each Bridger Entity's intercompany receivables were wiped away, not just BTS's. Vispi Jilla, who was Bridger's Treasurer and Senior Vice President of Finance at the time, testified that this process had nothing to do with Eddystone, and I find his unrebutted testimony to be credible. (Tr. 12/12/22 at 37:13-18.)

52.     Ferrellgas Partners did not purchase Bridger or Bridger Marketing. After the Acquisition, Bridger changed its name to Jamex, LLC, and Bridger Marketing changed its name to Jamex Marketing, LLC. Jamex continued to own Jamex Marketing.

53.     When Ferrellgas Partners purchased Bridger Logistics, it used proceeds from the sale to pay Bridger Logistics' and its subsidiaries' debts. At the time, BTS owed about $29.6 million to various lenders and/or creditors including Wells Fargo, Community Trust

---

[8]     The evidence also showed that other companies—*i.e.* Bridger Marketing, Bridger Midstream, and Waskom Energy Mrkt & Trans LLC—owed intercompany receivables to BTS leading up to the Acquisition. (*See* PSX 107.) However, none of those entities is named as a defendant in this matter, and Eddystone is not seeking to recover those amounts from them. Thus, I do not include them in my analysis of Eddystone's claims.

[9]     All citations to "PSX" refer to Plaintiff's Summary Exhibits.

Bank, Texas Capital Bank, and Crosstex NGL Marketing, L.P. (Ex. 3006 at ¶ 21.) In total, Ferrellgas Partners paid off about $39.2 million in BTS's debts to various creditors at the time it acquired the Bridger Entities. (Exs. 728-D, 728-H, 762-C, 829, 3006 at ¶ 22; Tr. 12/12/22 at 37:19 – 43:15.)

54.     At the time of the Acquisition, Ferrellgas L.P. had a $600 million secured credit facility with Bank of America, N.A. ("BOA") and other lenders, for which Bank of America acted as administrative agent, pursuant to a Credit Agreement dated November 2, 2009, between Ferrellgas L.P., Ferrellgas, and the various lenders (the "Credit Agreement"). The credit facility was Ferrellgas L.P.'s "primary source of funding" and "the lifeblood of [the] organization." (Tr. 2/14/23 at 53:22, 73:19.)

55.     In exchange for access to credit, the Credit Agreement required Ferrellgas L.P. and its subsidiaries to guarantee the credit facility and secure that guarantee with collateral. (Ex. 1851 at Art. 4.01(a), 6.12(a).) In addition, any time that Ferrellgas L.P. or Ferrellgas (*i.e.,* "Loan Parties" in the Credit Agreement) formed or acquired a new direct or indirect subsidiary, Ferrellgas L.P. had to "cause such Subsidiary" to execute and deliver to BOA a guaranty supplement and any collateral documents needed to secure the guaranty. (*Id.* at 6.12(b).)

56.     Thus, when Ferrellgas acquired the Bridger Entities as subsidiaries via the Acquisition, the Credit Agreement required Ferrellgas L.P. to cause all those subsidiaries

to execute a guaranty supplement and the collateral documentation necessary to secure that guaranty, like a lien.

57.    During the Acquisition, the Akin Gump law firm dealt with Ferrellgas L.P.'s obligations under the Credit Agreement with BOA. ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████ (Ex. 729).

58.    On June 24, 2015 (the day the Acquisition closed), Ferrellgas's CFO, Alan Heitmann, sent an executed guaranty supplement on behalf of the Bridger Entities (including BTS) to BOA (the "2015 Guaranty Supplement"). (Ex. 754-A.) In his cover letter, Mr. Heitmann indicated he would send an executed Grantor Accession Agreement at a later date.

59.    On July 7, 2015, another attorney from Akin Gump sent a draft grantor accession agreement for execution, "whereby [Ferrellgas Partners'] newly acquired Bridger subsidiaries will join the Credit Agreement's Security Agreement." (Ex. 774.) ████████

███████████████████████████████████

████████████████████████████████ (Ex. 830.) Indeed, neither Mr. Heitmann nor anyone else at Ferrellgas or the Bridger Entities

executed and delivered the grantor accession agreement on behalf of the Bridger Entities around this time, in July 2015.

60.     Ferrellgas L.P.'s failure to adhere to the affirmative covenants in Art. 6.12 of the Credit Agreement could have constituted an event of default under the agreement. (*See* Ex. 1851 at Art. 8.01(c).) Ferrellgas Partners's and Ferrellgas L.P.'s longtime outside counsel, Robin Miles from Bracewell LLP, understood that if Ferrellgas L.P. breached a covenant in the Credit Agreement, then that would constitute an event of default under the agreement. (Tr. 12/12/22 at 198:21-23.) And a default under the Credit Agreement would trigger defaults under other Ferrellgas debt instruments. (Tr. 2/14/23 at 79:3-8.) As of January 31, 2016, Ferrellgas L.P. owed BOA about $311.6 million on its line of credit and had secured its obligations under the credit facility with "substantially all" of its assets. (Ex. 1545.68.) As Mr. Heitmann put it, defaulting under the Credit Agreement "would be catastrophic" for Ferrellgas L.P. because it would jeopardize the company's "primary source of funding." (Tr. 2/14/23 at 73:13-19.)

61.     After the Acquisition, the BOA line of credit provided the necessary working capital for the Bridger Entities. (Tr. 12/12/22 at 171:10-14.) In fact, Ferrellgas utilized a zero-balance cash management system which required that none of its subsidiaries kept cash in their own accounts. (*Id.* at 44:17 – 45:4.) Thus, whenever Bridger Entities received cash from their customers, that money would be swept into a Ferrellgas account, and Ferrellgas would use its line of credit to fund the Bridger Entities' operations. (*Id.*)

### F.     Post-Acquisition Management And Accounting

62.     Following the Acquisition, Mr. Rios and Mr. Gamboa signed employment agreements with Ferrellgas and continued to run Bridger Logistics-with Mr. Rios maintaining his role as Bridger Logistics' President and CEO and Mr. Gamboa continuing as the company's COO. Mr. Rios also became an Executive Vice President of Ferrellgas, and Mr. Gamboa became a Senior Vice President. Mr. Rios's and Mr. Gamboa's respective employment agreements provided significant financial incentives for the first three years following the Acquisition, based on Bridger Logistics' EBITDA. For example, if Bridger Logistics achieved an EBITDA of $120 million in the first year, then Mr. Rios would earn a bonus of $3,333,334, and Mr. Gamboa would earn a bonus of $1,666,667. These potential bonuses increased if the EBITDA was higher.

63.     Before the Acquisition, Bridger used Quickbooks and then Microsoft Great Plains software for its accounting system. Each legal entity under the Bridger umbrella had a unique company code in Great Plains, and accounting reports were broken down by entity. Pre-Acquisition, Bridger booked all the revenue that BTS earned-whether from rail throughput services, station throughput services, or pipeline management-under the accounting code assigned to BTS, which was company code 202. Management reports, however, showed performance by each type of business segment (i.e. truck, rail, pipeline, etc.), rather than the individual entities.

64.     Leading up to the Acquisition, Ferrellgas hired Grant Thornton LLP to perform financial due diligence and prepare a quality-of-earnings ("QoE") analysis. As part of its work, Grant Thornton issued a financial, tax, and human resource due diligence report to Ferrellgas in advance of the Acquisition (the "Grant Thornton Report").

65.     The Grant Thornton Report flagged an issue regarding the "[q]uality of management information and governance structure," and reported that for a variety of reasons, the data quality of the accounting and management performance reports was "less than optimal." (Ex. 657-B at 21.) To improve the financial reporting procedures and controls, Grant Thornton recommended that Ferrellgas L.P. "[d]evelop a clear and direct mapping between the Management operating reports and the trial balance to ensure the analytics contained in the Management operating reports are based on accurate and reliable accounting data." (*Id.*)

66.     During the run-up to the closing of the Acquisition, Ferrellgas's Senior Vice President of Finance, Jack Herrold, discussed Grant Thornton's recommendations with Mr. Jilla. Following the Acquisition, Mr. Jilla served as Bridger Logistics' CFO through October 2015. According to Mr. Jilla, Ferrellgas L.P. wanted to reorganize Bridger Logistics' accounting records to match how the various business segments appeared in the management report.

67.     To do this, Mr. Jilla suggested creating new entities so that the accounting records would match the various segments in the management reports. From his

23

perspective, creating new legal entities and corresponding codes in the accounting software would help "streamline and simplify" the management reporting process by cutting down on manual inputs from various sources. (Tr. 12/12/22 at 22:12 - 23:1.)

68.     To this end, Mr. Jilla drafted a proposed organizational chart which depicted new entities that would be created, including an entity called "Bridger Pipeline, LLC." (Ex. 706-A.) His chart proposed that Bridger assign rail agreements to Bridger Rail Shipping, LLC, and pipeline agreements to Bridger Pipeline, LLC. A few days later, in a similar proposal, Mr. Jilla suggested creating a new entity called "Bridger Rail Services, LLC" and assigning an agreement with BTS to this new entity. (Exs. 723, 723-A.)

69.     Mr. Rios and Mr. Gamboa rejected Mr. Jilla's proposals, and Bridger Logistics did not create any new legal entities to address Grant Thornton's recommendation. (Tr. 12/12/22 at 19:10-20, 21:21-25, 25:6-10, 28:13-19, 29:25 - 30:3; Ex. 821.) Nor did Bridger Logistics assign any agreements as Mr. Jilla proposed. (Tr. 12/12/22 at 23:2-10, 25:11-13; Tr. 9/21/22 at 75:14-22.) In short, Bridger Logistics never formed an entity called Bridger Rail Services or Bridger Pipeline Services.[10]

70.     Ferrellgas had a long-standing history of using cost center accounting for its propane business. Companies use "cost centers" "to track specific categories, or segments, of revenues, expenses, and other accounting activity, associated with their

---

[10]     To the extent that Eddystone suggests that those entities exist, its failure to provide any evidence from any state agency documenting the existence of those entities undermines its contention.

businesses ...." (Ex. 3003 at  29.) Cost center accounting "is a common form of accounting, especially among companies with common ownership, so that management can see how various segments are performing, as opposed to looking at performance by individual legal entity." (*Id.*) Given Ferrellgas's size, the cost center accounting method was "pretty important" for its CEO, Steve Wambold, because it was an efficient way for him to analyze performance in a particular business, geographic region, or business unit.

71.     Following the Acquisition, Bridger Logistics attempted to implement Grant Thornton's recommendation to reconcile the accounting and management reports by utilizing cost centers in the accounting system. As part of this process, Bridger Logistics created unique company codes and assigned them to various legal entities and/or business segments. Company code "202" continued to refer to BTS. Bridger Logistics created company code "208" to refer to a "Bridger Rail Services" cost center (the "BRS Cost Center"), and it created company code "210" to refer to a "Bridger Pipeline Services" cost center ("BPS Cost Center"). However, all three codes related to BTS's business.

72.     BTS earned three different types of revenue during the relevant time period:

- "Stations Throughput Revenue" came from owning and operating the 19 crude oil injection stations at various pipeline terminals in different parts of the country;

- "Rail Throughput Revenue" came from leasing rail terminal capacity at various rail loading terminals and then selling that capacity to Jamex Marketing and by leasing rail-to-barge transloading capacity at the Eddystone facility to sell to Jamex Marketing; and

- "Pipeline Management Revenue" came from leasing pipeline capacity from Enbridge Pipelines and selling capacity to Jamex Marketing.

73.     Following the Acquisition, Bridger Logistics continued to record BTS's Stations Throughput Revenue and associated expenses under company code 202, meaning BTS. (Ex. 3003 at 28.) However, it started recording BTS's Rail Throughput Revenue and associated expenses under the BRS Cost Center. (Ex. 3003 at 26; Tr. 12/8/22 at 27:18 - 28:1.) And it started recording BTS's Pipeline Management Revenue and associated expenses under the BPS Cost Center. (Ex. 3003 at 27; Tr. 12/8/22 at 27:8-17.)

74.     To identify the total revenues and expenses attributable to BTS and its contracts—rather than individual segments of BTS's business—management or an accountant would have to sum all three cost centers (i.e., 202, 208, and 210).[11]  (Tr. 12/12/22 at 34:12-21.) Thus, anyone who wanted to see a full picture of BTS's accounting could run a report for company codes 202, 208, and 210.[12]

75.     Even though BTS had the contract with Eddystone, BTS was not a party to the Monroe TLA. Instead, Bridger Logistics was the counterparty and contracted to "perform, or cause its carriers and contractors" to transport crude oil from North Dakota to Monroe's refinery via the Eddystone facility. (Ex. 1736.7 at § 3.1.) Monroe paid for barrels transloaded at Eddystone and was also responsible for certain deficiency charges. But

---

[11]     Ferrellgas used a different accounting system called "PeopleSoft." Following the Acquisition, Bridger Logistics eventually started using PeopleSoft as well and used different company codes for BTS, the BRS Cost Center, and the BPS Cost Center within that system. (*See* DSX 26.) Again, to see a complete picture of BTS's revenues and expenses, one would need to combine the three different cost centers from PeopleSoft.
[12]     Eddystone's and Defendants' experts calculated BTS's revenues and expenses as part of their respective damages opinions. (Ex. 3003 at ¶¶ 34-35; Tr. 12/8/22 at 47:6 – 48:4.)

Bridger Logistics did not have the contractual right to transload at the Eddystone facility-that right belonged to BTS under the RSA. Yet, Monroe paid Bridger Logistics for these services and deposited payments under the Monroe TLA into Bridger Logistics' bank account-not BTS's. (Ex. 3002 at 69.)

76.     Mr. Rios testified that there was an agreement between Bridger Logistics and BTS for Bridger Logistics to make "monthly payments ... to BTS when it use[d] their facility." (Tr. 9/22/22 at 109:4-6.) However, there is no written agreement to that effect, and Eddystone did not present any contemporaneous documentary evidence depicting these alleged payments from Bridger Logistics to BTS. At most, as set forth below, there is evidence that Bridger Logistics paid BTS's monthly charges to Eddystone. I find Mr. Rios's testimony on this issue not to be credible.

77.     Between July 2015 and March 2016, Monroe deposited about $196 million into Bridger Logistics' bank account. (*See* PSX 97.) This amount included transloading fees at Eddystone and other fees related to the various services along the way that were necessary to transport crude from the oil wellhead to Monroe's refinery. For example, Monroe paid for the barge service to get crude from Eddystone to the refinery, and Bridger Logistics would record those fees as intercompany receivables owed to Bridger Marine-the entity responsible for that service. Likewise, Monroe paid for rail service, and Bridger Logistics recorded those revenues as intercompany receivables owed to Bridger Rail Shipping.

78.     However, when it came to BTS, Bridger Logistics did not record the transloading revenues as a receivable owed to BTS. (Tr. 12/7/22 at 275:22 - 276:7.) Instead, it recorded the revenue as a receivable under the BRS Cost Center. Defendants' expert, Gary Polkowitz, confirmed this flow of funds. (Ex. 3003 at 32-33.)

79.     In addition, Bridger Logistics did not attribute all BTS's expenses to BTS. For example, Bridger Logistics paid from its own bank account the monthly fees that BTS owed to Eddystone under the RSA and then deducted those payments from the intercompany receivables that it owed to the BRS Cost Center. (Ex. 3002 at 72.) On other occasions, another Bridger Entity-Bridger Rail Shipping-paid BTS's monthly obligations to Eddystone. (*Id.*) However, Bridger Logistics did not record these expenses under BTS.

80.     According to Eddystone's expert, Marc Sherman, between the Acquisition and December 31, 2015,[13] BTS diverted $312,399 in gross profits to the BPS Cost Center and diverted $18,367,667 in gross profits to the BRS Cost Center. (Ex. 3002 at pp. 29, 31.) In addition, he opined that during the same period, BTS recorded $6,420,111 in gross profits from stations throughput fees. (*Id.* at 33.) While Mr. Sherman accounted for "cost of sales" from these three revenue streams, he did not subtract other expenses. Indeed, his report refers only to "gross profits." Thus, it is not clear how much net profit was diverted to Bridger Logistics via the two cost centers. Mr. Polkowitz did not opine as to

---

[13]     I did not consider Mr. Sherman's figures which included alleged diverted profits through the end of 2016 because Bridger Logistics sold BTS to Jamex Transfer Holdings as of February 1, 2016.

this issue, either. Instead, he recreated BTS's balance sheet (as it would have looked as of January 31, 2016) and determined that BTS had retained earnings of $16.356 million as of that date.

81.     If this revenue belonged BTS, then the corresponding intercompany receivables logged under the BRS Cost Center and the BPS Cost Center should have been transferred to BTS's accounting records when Bridger Logistics later sold BTS to a Jamex affiliate. Similarly, Bridger Logistics should have made some provision for the retained earnings, as well as any remaining cash owed to BTS to be transferred from Bridger Logistics' bank account into BTS's bank account. However, none of these things happened. Instead, Bridger Logistics sold BTS without any cash or receivables. Thus, I conclude that the post-Acquisition deposits of cash into Bridger Logistics' bank account and the intercompany receivables logged under the BRS and BPS Cost Centers were transfers of BTS's property to Bridger Logistics.

### G.     Worsening Economic Conditions

82.     At the time of the Acquisition, the spread between Bakken and Brent crude oil prices had narrowed from negative $30 per barrel in November of 2013 to just negative $5 by June of 2015. This narrowing trend continued throughout the fourth quarter of 2015. As in 2014, Bridger Marketing—renamed Jamex Marketing—suffered large losses under the Amended COSA after the Acquisition.

83.     During this time, it became clear that the injection of $250 million into Jamex Marketing at the time of the Acquisition was not sufficient, and Jamex Marketing's working capital was drying up. As a result, Jamex Marketing was having difficulty purchasing crude and meeting its contractual obligations under the Amended COSA.

84.     Before the Acquisition, Bridger Marketing relied on an intermediation agreement with Merrill Lynch Commodities, a subsidiary of Bank of America ("BAML"), to purchase between 40,000 and 50,000 barrels of crude oil for Monroe. "In an intermediation agreement, a financing entity [(like BAML)] substitutes its credit for that of a client's [(i.e. Bridger Marketing)] weaker credit and buys or sells the commodity from a supplier or to an end user [(like Monroe)]." (Ex. 3010 at ¶ 12(h)(i).) Commodity marketers without adequate cash or credit use this type of third-party financing to make necessary purchases. The intermediation agreement between BAML and Jamex Marketing terminated on November 30, 2015.

85.     Jamex Marketing's liquidity problems posed a risk for BTS, and so for Bridger Logistics, because Jamex Marketing was BTS's customer. The revenue stream that came to Bridger Logistics depended on Jamex Marketing's ability to continue supplying crude to Monroe. Indeed, the Grant Thornton Report from May 2015 noted that if Jamex Marketing (at the time, Bridger Marketing) "continue[d] to incur losses or the cost of mitigating the related commodity risk exceeds marketing profits, it is difficult to see how Bridger Logistics will not be impacted." (Ex. 657-B at 12.)

86.     Following the Acquisition, Ferrellgas and Bridger Logistics continued to float various ideas to get Jamex Marketing through the fall of 2015. (Exs. 899, 1002; Tr. 12/5/22 at 143:8-17.) One of the ideas was terminating the Eddystone contract.

87.     As early as September 22, 2015, Mr. Soiefer emailed Mr. Rios and Mr. Gamboa suggesting that Bridger Logistics explore transloading at a facility other than Eddystone in order "to service [M]onroe at a cheaper cost." (Ex. 944.) To do this, the team would need to "find a way to cancel [E]ddystone." (*Id.*) To that end, Mr. Soiefer reached out to Ferrellgas's general counsel, Trent Hampton, and asked him to investigate whether BTS could "terminate [the] [E]ddystone rail agreement early[.]" (Ex. 946.) Mr. Rios understood that Mr. Hampton would be "analyzing getting out of the contract" and sent him materials he believed could be helpful in that regard. (Ex. 948 at 1.) In another email from October 11, 2015, Mr. Soiefer repeated the same idea of utilizing a different transloading facility and "terminating" the contract with Eddystone. (Ex. 1002 at 2.)

88.     A few days later, Mr. Soiefer asked Mr. Hampton if he had time to talk "regarding alternatives on Eddystone." (Ex. 1006.) When the two men spoke, Mr. Hampton advised Mr. Soiefer that the RSA did not contain a termination provision. (Tr. 12/5/22 at 166:25 – 167:6.)

89.     Before the Acquisition, Mr. Ballengee had been trying to negotiate with Monroe to amend the COSA to mitigate Jamex Marketing's losses. Mr. Ballengee wanted to revise the COSA's pricing structure to be based on a cost-plus formula (as opposed to

the split-price formula) to reduce Jamex Marketing's exposure to market variability. These negotiations continued throughout the fall of 2015. At that point, Jamex Marketing was losing millions of dollars each month.

90.    Mr. Ballengee was willing to make a cash payment to Monroe to renegotiate the Amended COSA. To that end, on October 5, 2015, Jamex Marketing offered Monroe an up-front payment of $75 million to restructure the Amended COSA to a cost-plus agreement. On November 19, 2015, Monroe responded by phone and advised Mr. Jilla (who had become Jamex Marketing's CFO) that it wanted $275 million to let Jamex Marketing out of its current obligations under the Amended COSA.

91.    Monroe's $275 million proposal was a non-starter for Jamex Marketing, which did not have adequate funds to cover it. The parties never renegotiated the Amended COSA to be a 100% cost-plus agreement because Jamex Marketing could not afford to meet Monroe's demand.

92.    In the meantime, Jamex Marketing's intermediation agreement with BAML was scheduled to end on November 30, 2015. Mr. Jilla knew it "was very critical for [Jamex Marketing] to have ... working capital," and he reached out to various companies for financing options. (Tr. 12/12/22 at 70:13-25.) Jamex Marketing was able to arrange for a 60-day stop-gap intermediation agreement with Macquarie Commodities, but it still needed long-term financing so that it could continue to supply crude oil to Monroe. At

some earlier time, Mr. Soiefer floated the idea of having Ferrellgas provide intermediation, but that did not happen. (Ex. 899.)

93.     As part of the efforts to get a replacement intermediation agreement in place, Jamex Marketing entered a term sheet with Carlyle Commodity Management LLC ("Carlyle"). (Ex. 2593; Tr. 9/20/22 at 190:20-22.) Before moving forward, however, Carlyle required Jamex Marketing to obtain acknowledgments from all the terminal owners that Carlyle would hold title to the crude in transit, as the intermediary. To that end, in November 2015, Carlyle sent draft tripartite agreements for the various terminals in the logistics chain to execute.

94.     Two of the terminal owners—Enbridge Rail (North Dakota), LP and Eddystone—declined to sign the draft agreement "in any form" because "there [were] too many liabilities that would exist per the agreement and the lien rights." (Ex. 1065.) In its email rejecting the draft tripartite agreement between Eddystone, BTS, and Carlyle Global Market Strategies Commodities Funding 2015-1, Ltd. ("Carlyle Global"), Eddystone also indicated that it did not have a current working relationship with the "other counterpart[y]" to the agreement. (*Id.*) There is no evidence that Jamex Marketing had any further negotiations with Eddystone as to the tripartite agreement after receiving this email.

95.     Two other terminal owners—Dakota Plains and Plains All American— provided comments and edits to the draft tripartite agreements to Jamex Marketing.

However, there is no evidence that further negotiations took place, and neither company signed its respective tripartite agreement. Thus, Jamex Marketing was still without a replacement funding source so that it could purchase crude for Monroe.

### H.    The Three-Month Suspension Of Oil Deliveries

96.    By December 2015, there was still no plan in place to rescue Jamex Marketing. If Jamex Marketing ran out of money, then a significant portion of Bridger Logistics' revenue stream would disappear. In the meantime, BTS still owed monthly deficiency payments to Eddystone under the RSA.

97.    On December 8, 2015, Mr. Gamboa, writing to Mr. Rios and Mr. Soiefer, summed-up Bridger Logistics' current situation: "If we do nothing: Benefits Monroe[;] Jamex bankrupt in 12-18 months depending on spreads and FGP stock[;] Bridger has $70mm ebitda whole [sic] and $41.5MM annual obligation to ERC[.]" (Ex. 1099 at 2.) He recommended that they "be firm but commercial for our sake, no one else's." (*Id.*) Mr. Rios agreed that they should be commercial for Ferrellgas's sake. (Tr. 9/22/22 at 46:3-21.) And Mr. Soiefer—who had brought the Bridger deal to Ferrellgas just six months prior— agreed that if they did nothing, then "Bridger EBITDA goes to zero. Let's avoid that." (Ex. 1099 at 1.)

98.    Preserving Bridger Logistics' EBITDA was critical for Bridger Logistics and Ferrellgas, but it was also important for the individuals running the company. As set forth above, Mr. Rios's and Mr. Gamboa's bonuses depended on Bridger Logistics' EBITDA, so

they had personal incentives to do whatever they could to preserve as much as they could. Likewise, Mr. Soiefer had had conversations with Mr. Wambold about replacing Mr. Heitmann as Ferrellgas's CFO at some point. (Tr. 12/5/22 at 95:8-16, 97:17-20.) Certainly, any decrease in Bridger Logistics' EBITDA, much less going to "zero," would not bode well for a future promotion.

99.    At this point, it was clear that preserving Bridger Logistics' EBITDA was the company's top priority. And it was important to retain Monroe (i.e. Delta) as a customer. (Ex. 1085 at 1.)

100.    To continue under the Amended COSA amidst worsening economic conditions, Mr. Ballengee proposed substituting barrels of West African crude ("WAF") for the crude that Jamex Marketing had been procuring from the Bakken. This made sense because the narrowing spread had made the cost-plus portion of the Amended COSA less favorable for Monroe, and sourcing crude from the Bakken became less appealing than acquiring crude from West Africa or other international sources. In fact, after meeting with Mr. Jilla, Mr. Gamboa relayed to Messrs. Rios and Soiefer that Monroe did not want domestic barrels at the time and was willing to negotiate over a WAF substitution.

101.    The Bridger Logistics team was on-board with the WAF substitution plan because they thought it might help Jamex Marketing to continue performing under the Amended COSA and thereby prevent the Monroe revenue stream from drying up. (*See*, *e.g.,* Exs. 1099, 1104 at 2; Tr. 9/20/22 at 102:20-21.)

102.    While the substitution with WAF would help Jamex Marketing continue under the Amended COSA, the WAF would arrive at Monroe via tanker, meaning that the plan to deliver WAF instead of crude from the Bakken would not require use of the Eddystone facility or the services that Bridger Logistics provided under the TLA.

103.    To maintain EBITDA while Bridger Logistics' transportation services were not used, the parties discussed an arrangement whereby Monroe would pay Bridger Logistics a reduced monthly TLA fee. In addition, Jamex Marketing would pay a reduced deficiency payment to Bridger Logistics.

104.    On December 11, 2015, Mr. Ballengee met with Monroe to discuss the WAF proposal. Ultimately, Monroe rejected Jamex Marketing's proposal to substitute WAF under the Amended COSA. However, Monroe counter-proposed that Jamex Marketing suspend deliveries under the Amended COSA for three-months. This would permit Jamex Marketing to stop providing Bakken crude to Monroe at a loss. Thus, the parties re-directed their efforts to work on a deal to suspend the Amended COSA.

105.    The proposed suspension was a temporary one, meant to last until April 30, 2016, and automatically renew for an additional 3-month period unless terminated on 30 days' notice. During the suspension period, Jamex Marketing would not need to deliver the minimum volume of barrels under the Amended COSA, and Monroe would not be obligated to purchase any. The proposed suspension also contemplated changes to the Monroe TLA with Bridger Logistics, and Jamex Marketing would need to pay Bridger

Logistics to obtain its consent to the proposal.  Jamex Marketing circulated a non-binding term sheet on December 18, 2015, and Mr. Rios passed it along to Mr. Hampton, Mr. Soiefer, and Ferrellgas's outside counsel, John Goodgame of Akin Gump. (Ex. 1158.)

## I.   Bridger Logistics And Ferrellgas Devise A Plan To Escape From Obligations To Eddystone

106.    Regardless of whether Jamex Marketing delivered WAF to Monroe or no barrels at all, BTS would continue to owe monthly deficiency payments to Eddystone under the RSA. Thus, Bridger Logistics needed to address this issue to preserve as much EBITDA as it could.

107.    Mr. Rios took the lead on finding a solution other than termination of the RSA (which Mr. Hampton advised was not an option). To that end, on December 11, 2015, Mr. Rios sent an email to Mr. Hampton (copying Messrs. Gamboa and Soiefer), with the subject line "Eddystone restructuring." (Ex. 1134.) He inquired into which Bridger Logistics entity was the counterparty to the RSA and asked whether any other entity (like Ferrellgas L.P.) had guaranteed BTS's performance. Mr. Hampton confirmed that BTS was the party to the RSA and that there was no current parent guarantee in place.

108.    Four days later, with this information in hand, Mr. Rios proposed defaulting under the RSA and advised the group that they needed "to seriously look" at a BTS default—*i.e.*, stopping payment—as an option. (*Id.* at 3; Tr. 9/23/22 at 152:1-3.) At some point, however, either Mr. Soiefer or Mr. Hampton advised Mr. Rios that a default was not

a viable option because Ferrellgas did not want to start litigation. (Tr. 9/23/22 at 152:13-22.) Thus, BTS did not pursue this option while under the ownership of Bridger Logistics.

109.    At some point, Mr. Rios raised with Mr. Soifer the idea of putting BTS into Chapter 11 bankruptcy, but Mr. Soiefer told him that putting a Ferrellgas subsidiary into bankruptcy would constitute a default under the credit facility. Because the credit facility "was the entire ball of wax," initiating a bankruptcy and causing a default was not a viable option. (*Id.* at 151:18-20.)

110.    Mr. Rios also asked whether any banks had liens on BTS's assets or Bridger Logistics' subsidiaries' receivables and accounts, noting that if such liens existed, it "would be a good way to restructure BTS and divest ourselves of Eddystone." (Ex. 1134 at 3.) At this point in time, Mr. Rios knew that transfers of assets subject to valid liens would not constitute fraudulent transfers. (Tr. 9/22/22 at 62:24 – 63:2.)

111.    On December 16, 2015, Mr. Rios emailed the group again and made clear that he was "looking to stop paying [Eddystone] in February" and recommended that they hire restructuring counsel for BTS. (Ex. 1134 at 1.)

112.    ███████████████████████████████████████

█████████████████████████████████████████████

██████████████████ (Ex. 1131 at 2.) ██████████████

█████████████████████████████████████████████

███████████████████████████████████████ Mr. Hampton

relayed that information to the group. (Ex. 1134.) This turned out to be incorrect, but none of the individuals on the email thread knew it at the time.

113.    On December 19, 2015, Mr. Rios met with Mr. Ballengee, who offered to purchase BTS from Bridger Logistics. (Tr. 9/23/22 at 153:5-17.) This was not the first time that Mr. Ballengee made this proposal. In fact, Mr. Rios had raised the notion of selling BTS to Jamex Marketing in an email to Mr. Hampton the day prior. (Ex. 1148.)

114.    In making this proposal, Mr. Ballengee reasoned that selling BTS to Jamex Marketing would enable Jamex Marketing to "do what Ferrellgas [wouldn't] let Bridger Logistics do," including sue Eddystone, put BTS into bankruptcy, or stop payment. (Tr. 9/23/22 at 154:1-7.)[14]  In other words, selling BTS to Jamex Marketing would give BTS multiple avenues to delay or evade its payment obligations to Eddystone.

115.    This proposal would benefit both Bridger Logistics and Jamex Marketing. It would permit Bridger Logistics to preserve EBITDA by ridding itself of a "$41.5MM annual obligation to [Eddystone.]" (Ex. 1099 at 2.) And it gave Jamex Marketing much-needed leverage. Mr. Ballengee thought that if Jamex Marketing owned BTS and became Eddystone's customer, then he could persuade Eddystone to consent to the intermediation with Carlyle Global and get the financing that Jamex Marketing needed to

---

[14]    What Mr. Ballengee said to Mr. Rios is not hearsay because I am relying on it for its effect on Mr. Rios, rather than its truth.

survive. He thought he might be able to accomplish that once he was in a position to threaten a lawsuit, bankruptcy, or withholding of payment.

116.    On December 21, 2015, Messrs. Hampton, Rios, and Soiefer spoke with Mr. Goodgame and Chuck Gibbs from Akin Gump about how to proceed with BTS. Bridger Logistics had enlisted the firm to investigate restructuring BTS, including a possible sale to Jamex Marketing.

117.    During the call, Mr. Gibbs "did all the talking." (Tr. 9/22/22 at 85:13 – 86:16.) Part of the discussion concerned Section 548 of the Bankruptcy Code—which governs fraudulent transfers—and the parties on the call discussed the potential transfer of BTS's assets. (Tr. 9/22/22 at 85:23-25, 107:17 – 108:10.) Mr. Rios's handwritten notes from the meeting twice refer to Section 548, and he transcribed the standards for both an intentional and constructive fraudulent conveyance under that provision. (Ex. 1871-B.) His notes also reflect that any transfer must be an arms-length transaction, and any judgment would be the value of the transferred asset. Mr. Rios also noted Mr. Gibbs's advice that the transfer of BTS's assets would not be without risk. At the time of this phone call, Messrs. Hampton, Rios, and Soiefer were operating under the mistaken belief that BOA held a lien on BTS's assets. (Ex. 1134; Tr. 9/23/22 at 159:7-9.) Thus, Mr. Rios continued to

believe that any transfer of BTS's assets would not constitute a fraudulent transfer. (Tr. 9/22/22 at 62:24 – 63:2; Tr. 9/23/22 at 158:9-14.)[15]

118.    At the time of the conference call, Bridger Logistics had been discussing a potential transfer of BTS's assets and a possible BTS bankruptcy. (Tr. 9/22/22 at 86:1-4; Tr. 12/14/22 at 207:6-19.) The record is not clear as to when BTS was planning on filing for bankruptcy, but the record is clear that BTS could not file bankruptcy while it was a Bridger Logistics subsidiary because that would likely constitute a default under Ferrellgas L.P.'s Credit Agreement with BOA. (*See, e.g.,* Ex. 1156.) Indeed, according to Mr. Heitmann, there was "no way" that Ferrellgas would allow a subsidiary to file for bankruptcy because "it would be the end game … all the debt would become due and payable." (Tr. 2/14/23 at 224 at 17-20.)

119.    Because a default "would be catastrophic" for Ferrellgas (and Bridger Logistics by extension) (*id.* at 73:13-19), it is not likely that the parties on the call were discussing putting BTS into bankruptcy while Bridger Logistics continued to own it. For example, when Mr. Rios first suggested that the team "restructure BTS" (Ex. 1118 at 2), Mr. Hampton did not interpret the term "restructure" to refer to bankruptcy because the Credit Agreement with BOA "would not permit [Ferrellgas] to put a subsidiary into bankruptcy." (Tr. 12/14/22 at 147:3-21.) Given the stakes if Ferrellgas or one of its

---

[15]    Mr. Rios tried to dismiss Mr. Gibbs's discussion as "like a law school professor" giving "a treatise on bankruptcy law." (Tr. 9/22/22 at 85:13 – 86:16.) I find that testimony not to be credible.

subsidiaries were to default under the Credit Agreement, I find Mr. Hampton's testimony on this point to be credible.

120. It is more likely that the parties were discussing the implications of Jamex Marketing putting BTS into bankruptcy after acquiring it, a strategy consistent with Mr. Ballengee's assertion that Jamex Marketing could "do what Ferrellgas [wouldn't] let Bridger Logistics do"—like put BTS into bankruptcy. (Tr. 9/23/22 at 154:1-7.)

121. Following the conference call with Akin Gump, Mr. Rios asked Messrs. Hampton and Goodgame about amending the draft term sheet that Jamex Marketing had circulated on December 18, 2015, regarding a potential suspension agreement. (Ex. 1160 at 3.) According to Mr. Hampton, the plan was "to get [BTS] to Jamex so that [Jamex] could deal with the Eddystone issue." (Tr. 12/14/22 at 207:18-19.) To that end, the Bridger Logistics/Ferrellgas team proposed two changes to the draft term sheet to deal with the Eddystone issue.

122. First, Bridger Logistics would consent to the proposed suspension of the Amended COSA if the Monroe TLA was amended to permit Bridger Logistics to provide services to Monroe without having to transload barrels at the Eddystone facility once shipments resumed.[16] While the initial term sheet just amended the definition of

---

[16] Mr. Rios had inquired as to whether Bridger Logistics's agreement with Monroe required them to use the Eddystone facility and asked Mr. Gamboa to advise if there were options for offloading elsewhere. (Ex. 1134 at 3.) Mr. Hampton advised that the parties could use a facility other than Eddystone if they could get Monroe's consent. (*Id.* at 2.)

"services" in the Monroe TLA to accomplish this goal (Ex. 1158-B at § 2), Mr. Goodgame recommended that "the TLA itself … be amended (not just the definition of Services) to allow delivery of barrels to delivery points other than the Eddystone terminal." (Ex. 1160 at 1.)

123.    Second, as part of dealing with the Eddystone issue, "Bridger Logistics would assign ownership of [BTS] to Jamex" and "[a]t the time of such assignment, BTS would own no material assets other than the Eddystone contract…." (Ex. 1160 at 1.) Mr. Hampton circulated a revised term sheet incorporating both provisions. (Exs. 1167, 1167-A.)

124.    The next day, Mr. Rios wrote to Mr. Goodgame and instructed him to "go ahead and start BTS assignment of assets." (Ex. 1169.) He sent this email because following the call with Akin Gump the day before, "[t]his was the path that Ferrellgas had said we want to go down this path and now it's time to prepare assignments." (Tr. 9/23/22 at 161:13-16.)

125.    To preserve as much EBITDA as possible, Ferrellgas and Bridger Logistics needed to rid themselves of BTS, which owed monthly deficiency payments to Eddystone, regardless of whether BTS transloaded barrels at the facility. They settled on a plan to sell BTS to an affiliate of Jamex and let Jamex "deal with the Eddystone issue." (Tr. 12/14/22 at 207:19.) As part of that plan, they approved a transaction that was designed to render BTS assetless, leaving only the liability of the RSA. (*See, e.g.,* Exs. 1269, 1276-A at § VI.) Once sold to Jamex Marketing, BTS would continue to owe monthly deficiency payments

to Eddystone but would have no assets to provide services and generate income. In addition, Mr. Ballengee had told Mr. Rios that once he purchased BTS, he would be free to sue Eddystone, put BTS into bankruptcy, or stop payments under the RSA altogether. All of this demonstrates that BTS intended to hinder and delay Eddystone.

**J.     Bridger Logistics And Ferrellgas Make Sure That BOA Has A Lien On BTS's Assets**

126.     While Bridger Logistics and Ferrellgas were effectuating their plan to rid themselves of BTS's monthly obligation to Eddystone, Ferrellgas L.P. had been working on expanding its credit facility (or revolver) with BOA. The efforts to increase the revolver had been in the works since July 2015, at least.

127.     Ferrellgas L.P. relied on its longtime outside counsel, Mr. Miles, to assist with these efforts. Thompson & Knight LLP represented BOA.

128.     The Ferrellgas board discussed expanding the credit facility from $600 million to $700 million at a board meeting on November 24, 2015. Mr. Heitmann reported that the board was in "universal agreement" when he mentioned an upsizing during that meeting. (Ex. 1176 at 3.)

129.     On December 16, 2015—five days before Messrs. Hampton, Rios, and Soiefer discussed selling BTS with Akin Gump—Mr. Heitmann asked Mr. Miles to prepare draft resolutions for Ferrellgas's board to approve the upsizing of the credit facility. The upsizing (or the accordion) was scheduled to close on January 15, 2016.

130.    Ferrellgas and BOA exchanged a series of emails and documents in advance of the closing. On January 6, 2016, Shad Sumrow, a partner at Thompson & Knight, emailed Mr. Miles and his colleague, Jeris Brunette, asking for various documents that BOA needed to complete the accordion, including a certificate of no default from Ferrellgas. Mr. Sumrow also inquired as to whether guaranty supplements and security agreement supplements had been prepared for the Bridger Entities, including BTS, noting that BOA did not have copies of either document in its records. (Ex. 1188.)

131.    On January 8, 2016, Ms. Brunette sent the 2015 Guaranty Supplement to BOA's legal team, noting that Ferrellgas did not have a countersigned copy. (Ex. 1209.) A few hours later, BOA's Counsel asked if there was a grantor accession agreement for the Bridger Entities or whether the BOA team should prepare one. (Ex. 1212.)

132.    Once BOA asked for the grantor accession agreement, Mr. Miles tried to track down a copy but discovered that it didn't exist.  (Tr. 12/12/22 at 240:23 – 241:7.) This was the first time Mr. Miles learned that Ferrellgas had not provided a grantor accession agreement on behalf of the Bridger Entities following the Acquisition, and he was worried that too much time had passed without a signed agreement in place. Mr. Miles believed that Ferrellgas needed "to take care of this fast" and advised the company not to sign a certificate of no default while the grantor accession agreement was outstanding. (*Id.* at 241:13, 21-25.)

133.   ██████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ (Ex. 1224 at 1.) ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ (Tr. 2/14/23 at 103:2-8, 104:7-10.) BOA did not seize upon this technical default,

and the lack of a signed grantor accession agreement on behalf of the Bridger Entities did

not prevent Ferrellgas L.P. from expanding its credit facility with BOA.

134.   Mr. Hampton did not play a major role in Ferrellgas's efforts to upsize the

credit facility.[17] ██████████████████████████████████████████

████████████████████████████████████████ [18] █████████████████

---

[17]   Mr. Hampton testified to that effect at trial (Tr. 12/14/22 at 125:11-15), and the
evidence in the record supports that testimony, as Mr. Hampton does not appear on most
of the emails related to the upsizing. However, Mr. Hampton was copied on some of the
email traffic, ████████████████████████████████████████████████
████████████████ (Id. at 206:9-11.) I find that testimony credible as well, given Mr.
Hampton's role as general counsel for Ferrellgas and because Ferrellgas had hired outside
counsel to handle the transaction.
[18]   ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

135.   At BOA's request, the parties moved up the accordion closing date to January 14, 2016 (Ex. 1226), and Mr. Heitmann executed a grantor accession agreement on behalf of all the Bridger Entities the day prior (the "Grantor Accession Agreement"). (Exs. 1257, 1260.) He also signed a Closing Certificate indicating that no default existed under the Credit Agreement. (Ex. 1259.)

136.   The day before the accordion closed, BOA's Counsel requested that Ferrellgas re-execute the 2015 Guaranty Supplement that BOA had not countersigned. (Ex. 1277 at 3.) Ferrellgas's Counsel requested that BOA excuse Ferrellgas from re-executing the supplement, but BOA refused. Ultimately, Ferrellgas agreed to sign a revised guaranty supplement "to keep things tidy," and BOA agreed that it wouldn't require it as a condition to closing, as long as Ferrellgas could finalize the document "quickly thereafter." (*Id.* at 1, 2.)



137.    Mr. Heitmann signed the revised guaranty supplement dated January 14, 2016 (the "2016 Guaranty Supplement") on behalf of all the Bridger Entities—not just BTS. (Ex. 1339.) Mr. Heitmann does not appear to have been involved in the effort to have Bridger Logistics sell its interest in BTS to Jamex Marketing at the time he executed this document or the Grantor Accession Agreement.[19]

138.    However, Mr. Hampton—Ferrellgas's general counsel—was very involved and, as such, was well-aware that having a lien on BTS's assets was a critical part of the plan to assign BTS's assets prior to the sale to avoid a fraudulent transfer claim. Again, Akin Gump's guidance regarding the assignments was premised on a belief that BTS's assets were subject to a lien. Thus, to proceed, Bridger Logistics needed a lien on BTS's assets, and Ferrellgas's execution of the 2016 Guaranty Supplement and Grantor Accession Agreement came just in time.

139.    On January 15, 2016, with the 2016 Guaranty Supplement and Grantor Accession Agreement in hand, BOA filed a UCC-1 statement imposing a lien on nearly all BTS's assets. (Ex. 1352.) However, BOA "did not perfect a lien on the real property underlying the Swan Ranch Terminal" in Laramie County, Wyoming. (DCOL ¶ 253 n.11.)

---

[19]    Mr. Heitmann testified that he did not remember if he knew, and I find his lack of memory credible. (Tr. 2/14/23 at 106:18-24.)   In addition, my review of the relevant documents and email traffic related to the sale does not include Mr. Heitmann, which leads me to conclude that he was not involved.

### K.     BTS Transfers Its Assets To Other Entities

140.     At the same time Mr. Heitmann was working with Mr. Miles and the rest of the Bracewell team to expand Ferrellgas L.P.'s credit facility, Bridger Logistics was moving ahead with the plan to sell BTS.

141.     On January 13, 2016, Jamex Marketing, Monroe, and Bridger Logistics executed a series of letter agreements that amended and supplemented the Amended COSA, the Monroe TLA, and the Marketing TLA.

142.     First, Monroe and Jamex Marketing agreed to amend the Amended COSA (the "Monroe-Jamex Letter Agreement"). (Ex. 1276-B.) The Monroe-Jamex Letter Agreement suspended Jamex's procurement and delivery of crude oil to Monroe, as well as Monroe's requirement to accept any deliveries of crude while the agreement was in effect. (*Id.* at § I.B.) The term of the agreement (and the accompanying suspension of crude deliveries) was three months—from February 1, 2016, to April 30, 2016—with an automatic three-month renewal absent termination. (*Id.* at § VI.)

143.     Second, Bridger Logistics and Monroe agreed to amend the Monroe TLA (the "Bridger-Monroe TLA Amendment"). (Ex. 1276-C.) The Bridger-Monroe TLA Amendment eliminated the defined term "Eddystone Rail Facilities" from the Monroe TLA. (*Id.* at § IV.) This meant that if deliveries to Monroe resumed, Bridger Logistics would no longer have to transload crude at the Eddystone facility. Like the Monroe-Jamex Letter Agreement, the Bridger-Monroe TLA Amendment was scheduled to begin as of February

1, 2016, but it did not have an end date. (*Id.* at § V.) In other words, this change was permanent.

144.    Third, Bridger Logistics and Jamex Marketing agreed to amend the Marketing TLA (the "Bridger-Jamex TLA Amendment"). (Ex. 1276-A.) The Bridger-Jamex TLA Amendment suspended Bridger Logistics' provision of services under the Marketing TLA (except as requested by Jamex) for the same three-month period set forth in the Monroe-Jamex Letter Agreement. (*Id.* at § I.) It also permitted Bridger Logistics to provide its services at a facility other than the one at Eddystone.

145.    In addition, the Bridger-Jamex TLA Amendment provided that on or after February 1, 2016, Bridger Logistics would sell all its equity interest in BTS to Jamex Marketing or one of its affiliates. (*Id.* at § VI.) The parties agreed that Bridger Logistics would sell BTS for $10, and that at the time of the sale, BTS would have "no assets or liabilities other than its rights and obligations under the Eddystone Contract[.]" (*Id.*)

146.    The Bridger-Jamex TLA Amendment provided that Jamex Marketing's monthly obligation to Bridger Logistics would be "reduced by the amount of and to the extent of … deficiency payments under [the RSA] …." (*Id.* at § II.) However, the agreement did not contain an express provision that required Jamex Marketing or its affiliate to cover those monthly deficiency payments. (*See generally id.*; *see also* Tr. 9/20/22 at 132:19-22.) In addition, in the draft "Release Agreement" attached as Exhibit A to the Bridger-Jamex TLA Amendment, there was no provision by which Jamex Marketing guaranteed BTS's

monthly payments to Eddystone. (*See generally* Ex. 1276-A at Ex. A.) Thus, as of January 13, 2016—when the parties executed the Bridger-Jamex TLA Amendment—there was no reason to believe that Jamex Marketing or its affiliate would cover the deficiency payments owed to Eddystone upon acquiring BTS.

147.    The same day that Jamex Marketing, Monroe, and Bridger Logistics executed this series of letter agreements, Bridger Logistics' in-house counsel, Patrick Knapp, emailed Mr. Hampton and attorneys at Bracewell regarding the sale of BTS to Jamex. (Ex. 1267.) He explained that as part of the plan to sell BTS to Jamex without any assets, BTS would transfer its Swan Ranch assets to Bridger Swan Ranch, LLC, and all its other assets to Bridger Terminals, LLC—two newly-formed entities. Mr. Knapp also explained that BTS would "not be capitalized with any cash at the time of the sale." (*Id.*) Indeed, just ten days later, Mr. Knapp reported to Mr. Hampton and attorneys at Bracewell that there was no money in BTS's bank account. (Ex. 1315.)

148.    The sale to Jamex Marketing was originally scheduled for February 1, 2016. However, Bridger Logistics had to push back the closing due to delays in assigning BTS's assets to other entities. (Exs. 1276-A, 1373.)

149.    The first assignments started on January 31, 2016. That day, pursuant to an Assignment And Assumption Agreement between BTS and Bridger Swan Ranch (the "Swan Ranch A&A"), BTS assigned various agreements, equipment, personal property, and

governmental regulatory permits, exemptions, and licenses related to the Swan Ranch injection stations to Bridger Swan Ranch. (Ex. 1433-D.)

150.   The physical assets included "[c]rude oil trucking injection stations and storage terminals" and "[c]rude oil transmission pipeline and associated equipment and fixtures" that were located on the Swan Ranch Rail Park in Laramie County, Wyoming. (*Id.* at Ex. B.)

151.   One of the assigned contracts was BTS's throughput agreement with Shell Trading (US) Company ("Shell"). (*Id.* at Ex. A.) BTS assigned all its "right, title, and interest" in these assets, as well as "any and all past, present, and future rights, obligations, accounts payable, and accounts receivable incidental and ancillary thereto." (*Id.* at ¶ 1.)

152.   Bridger Swan Ranch did not pay any monetary consideration to BTS in exchange for the assignment of these assets. (*See id*.; *see also* Ex. 1344 at 1.)

153.   In addition, pursuant to an Assignment And Assumption Agreement between BTS and Bridger Terminals (the "Terminals A&A"), BTS assigned various agreements, equipment, personal property, and governmental regulatory permits, exemptions, and licenses related to the remaining injection stations to Bridger Terminals. (Ex. 1433-J.) For example, BTS transferred all of its "equipment, fixtures, supplies, raw materials, commodities, line fill, tank bottoms, motor vehicles, tools, and personal property of every kind and nature," other than the assets located in the Swan Ranch Rail Park. (*Id.* at Ex. B.)

154.    Pursuant to the Terminals A&A, BTS assigned eight of its supplier, service, and customer agreements to Bridger Terminals, including the Crude Oil Services Agreement between BTS and Dakota Petroleum Transportation Solutions, LLC ("Dakota Petroleum"). (*Id.* at Ex. A.)

155.    BTS assigned its "right, title, and interest" in these assets, as well as "any and all past, present, and future rights, obligations, accounts payable, and accounts receivable incidental and ancillary thereto." (*Id.* at ¶ 1.) Bridger Terminals did not pay any monetary consideration to BTS in exchange for the assignment of these assets. (*See id.*; *see also* Ex. 1344 at 1.)

156.    After BTS executed the Swan Ranch A&A and the Terminals A&A, the associated stations throughput revenue and cash went to Bridger Swan Ranch and Bridger Terminals, respectively. For example, as of March 31, 2016, Bridger Swan Ranch started recording stations throughput fees derived from the throughput agreement with Shell that BTS assigned to Bridger Swan Ranch. (Ex. 3002 at ¶ 81.) From then until August 31, 2018, Bridger Swan Ranch recorded $20,020,074 in stations throughput revenue. (*Id.*) In addition, between February 29, 2016, and August 31, 2018, Bridger Terminals recorded stations throughput revenue of $2,976,682. (*Id.* at ¶ 77.)

157.    BTS also executed a General Warranty Deed by which it transferred the land on which the Swan Ranch truck stations sat to another Bridger entity—Bridger Real Property, LLC. (Ex. 1421-B.) As of January 31, 2016, Bridger Logistics' internal accounting

records attributed a book value of $1,726,000 to the real property at the Swan Ranch Terminal. (DSX 2.[20]) Likewise, Eddystone's expert valued the property at $1,726,247 based on the price that BTS had paid for it. (Ex. 3002 at § 88.) However, BTS sold "all right, title and interest" in 15.01 acres of land in Laramie County, Wyoming, to Bridger Real Property for $10. (*Id.* at 1, Ex. A.) It is not clear whether Bridger Real Property paid that amount.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ (Ex. 1421 at 1.) Though the deed was not signed until February 19, 2016, it was effective as of January 31, 2016. (Ex. 1421-B at 1, 3.)

158.    BTS did not own the land on which a series of North Dakota injection stations sat that injected crude oil into Enbridge Pipelines (North Dakota) LLC's ("Enbridge Pipelines") North Dakota Pipeline, so BTS leased the land from Enbridge Pipelines, the landowner. (*See, e.g.,* Tr. 9/21/22 at 18:14-17.) BTS was a party to nine different Truck Station Lease Agreements with Enbridge Pipelines. (Exs. 1381-A thru 1381-I.) Those leases prohibited BTS from subleasing the land or assigning its rights under the leases without Enbridge Pipelines' consent. (*See, e.g.,* Ex. 1381-A at ¶ 12.) This meant that BTS would need Enbridge Pipelines' consent to assign its lease rights to Bridger Terminals.

159.    On January 19, 2016, Kelly Wilkins from Bridger Logistics reached out to his contacts at Enbridge Pipelines and asked for Enbridge Pipelines' consent to permit BTS to

---

[20]    All citations to "DSX" refer to Defendants' Summary Exhibits.

assign the leases to Bridger Terminals. (Ex. 1375 at 4.) Enbridge Pipelines was responsive at first, but communications stalled. As a result, Bridger Logistics changed course and pivoted to what Mr. Knapp described as "Plan B." (*Id.* at 1.)

160.    By February 3, 2016, Bridger Logistics had devised a potential workaround that would let BTS transfer its lease rights to Bridger Terminals without Enbridge Pipelines' consent. Pursuant to this "Plan B," BTS would "'lease' the truck stations to Bridger Terminals ... under a services-colored agreement" rather than a true sublease or assignment. (Ex. 1375 at 1.)

161.    Five days later, Mr. Knapp reported that Enbridge Pipelines wanted a parent guarantee on BTS in exchange for its consent to permit BTS to assign the truck stations to Bridger Terminals.[21]  (Ex. 1389 at 2.) That was a non-starter for Bridger Logistics, as it was in the process of selling its interest in BTS to Jamex Marketing. Thus, the Bridger Logistics team pushed ahead with Plan B, and Mr. Rios directed Mr. Hampton to "hammer [it] to conclusion." (*Id.* at 1.)

162.    Because a Jamex Marketing affiliate was in the process of acquiring BTS, Bridger Logistics would need that counterparty to agree to Plan B. By the time of closing, Jamex Transfer Holdings, LLC—the actual buyer—agreed to such an arrangement.

---

[21]    What Enbridge Pipelines conveyed to Mr. Knapp is not hearsay because I am relying on it for its effect on Bridger Logistics, rather than its truth.

163.    Thus, on February 22, 2016, BTS and Bridger Terminals entered into a Terminal Logistics Services Agreement by which BTS granted Bridger Terminals access to the land on which the truck stations sat and granted Bridger Terminals use of the stations. (Ex. 1433-H at ¶ 3.) BTS also agreed to provide trucking terminal logistics services at the stations for Bridger Terminals. In exchange, Bridger Terminals would pay BTS a fee that was equal to the rent that BTS paid Enbridge Pipelines pursuant to the various Truck Station Lease Agreements. The Terminal Logistics Services Agreement prohibited BTS from charging any additional markup, increase, or appreciation above and beyond what it owed to Enbridge Pipelines, making the arrangement a wash for BTS. BTS did not receive any monetary consideration from Bridger Terminals for what was—for all practical purposes—an assignment of its lease rights. Mr. Rios signed the Terminal Logistics Services Agreement on behalf of Bridger Terminals, and Mr. Ballengee signed on behalf of BTS.

164.    BTS also had various license and truck connection agreements with Centurion Pipeline LP ("Centurion"). BTS did not assign these contracts to Bridger Swan Ranch or Bridger Terminals via the Swan Ranch A&A or the Terminals A&A. However, in the BTS PSA, the parties agreed that those contracts would be assigned to Bridger Terminals once Bridger Logistics obtained Centurion's consent. (Ex. 1433-E at Art. 6.4.) Jamex Transfer Holdings agreed that it would cause BTS to transfer "all pecuniary rights" under the Centurion contracts to Bridger Terminals until the assignments were complete.

(*Id.*) Thus, in March 2016, Bridger Logistics started crediting Bridger Terminals with revenue and cash flowing from the Centurion contracts. (*See* Ex. 1832.) Centurion did not provide its consent to the assignment until November 2016, but that did not prevent Bridger Terminals from reaping the pecuniary benefits from the contracts many months prior.

165.    Aside from the formal assignments of certain property and contract rights, BTS also transferred other assets on or before the sale to Jamex Transfer Holdings. For example, BTS assigned its rights under a Rail Terminal Services Agreement with Van Hook Crude Terminal LLC to Bridger Terminals. The contract with Van Hook is not listed as one of the assigned contracts in the Terminals A&A, nor is there a carve-out for it in the BTS PSA. However, after selling BTS, Bridger Logistics started crediting revenue from this contract to Bridger Terminals. (*See* Ex. 1832.) Thus, for all practical purposes, BTS assigned its rights under that contract to Bridger Terminals.

166.    BTS assigned its contract rights under various terminal throughput agreements with Jamex Marketing. Indeed, as of March 1, 2016, Bridger Terminals—rather than BTS—started invoicing Jamex Marketing for services related to these agreements. (*See* PSX 92; Ex. 3002 at ¶ 94.)

167.    By the time Bridger Logistics sold BTS, BTS had no remaining cash or accounts receivable. On January 22, 2016, just before the effective date of the sale to Jamex Transfer Holdings, Mr. Knapp reported to Mr. Hampton, that "the BTS bank account

sits at $0." (Ex. 1315.) I find that Mr. Knapp sent this email in connection with the sale of BTS to Jamex. At the time, Mr. Hampton was the Senior Vice President of Legal and Risk Management for Ferrellgas and served as the company's general counsel. (Tr. 12/14/22 at 97:6-16.) BTS routinely had little to no money in its bank account due to Ferrellgas's zero-balance cash management system, but that meant that there was no need for Bridger Logistics' attorney to report that fact to Ferrellgas's top counsel. Instead, I find that Mr. Knapp sent this email to Mr. Hampton to confirm that BTS had transferred its remaining cash to another entity in advance of the sale to Jamex Transfer Holdings. Indeed, Mr. Knapp sent this email along with attachments that became schedules to the Swan Ranch A&A and the Terminals A&A. (*Compare* Exs. 1315-C thru 1315-F, *with* Exs. 1433-D at Schedules 1-2, 1433-J at Schedule 1.) This fact buttresses my conclusion that Mr. Knapp sent this email to confirm that BTS had transferred its residual cash to some other entity.

168.    It is not clear which entity received the cash or how much it received. BTS did not have any retained earnings when Jamex Transfer Holdings purchased it. Thus, I conclude that these retained earnings stayed within the Bridger Logistics corporate family.[22]

---

[22]    Defendants contend that BTS had retained earnings of $16.356M as of January 31, 2016, which reflects BTS's net profit from the Acquisition until the sale to Jamex Transfer Holdings. (Ex. 3003 at ¶ 37.) But, as Defendants' Counsel acknowledged, there is no corresponding accounting record that demonstrates what happened to these retained earnings when Bridger Logistics sold BTS. (*See* Tr. 08/10/23 at 98:13-24.)

169.    At the time of the sale to Jamex Transfer Holdings, BTS owed Eddystone fees under the RSA for January 2016. However, as part of the BTS PSA, Bridger Logistics agreed to pay $4,447,677.96 to Jamex Transfer Holdings "for the benefit of [BTS]" to cover the January invoice. (Ex. 1433-E at Art. 2.3(c).) Again, BTS should have had its own funds to cover the invoice, but it did not because Bridger Logistics held all the funds, treating BTS as a cost center even though BTS was a separate legal entity.

170.    BTS eliminated its accounts receivable before the sale to Jamex Transfer Holdings. As of February 1, 2016, Bridger Energy owed BTS $610,347, and Bridger Transportation owed BTS $953,176. (PSX 72; Ex. 3002 at ¶ 91.) Likewise, BTS's records showed that it was entitled to "intercompany" receivables from the BRS and BPS Cost Centers, as well as another cost center, Bridger Management. (*Id.*) However, BTS eliminated those accounts receivable before the sale. This comported with Bridger Logistics' representation in the BTS PSA that BTS had "no accounts payable or accounts receivable." (Ex. 1433-E at Art. 4.6.)

171.    Once the bulk of assignments was complete, the next step was to remove the lien over BTS's assets. In advance of the sale, an attorney from Bracewell emailed BOA's outside counsel and requested (on behalf of Ferrellgas L.P.) that BOA release BTS from its guarantee and release the lien on BTS's assets, just ten days after the lien had been filed. (Ex. 1335 at 2.) For BOA to release the lien, Ferrellgas L.P. would need to certify that the fair market value of the sale did not exceed $25,000,000. Mr. Knapp confirmed

that "[p]roceeds of the sale remain de minimus, and the FMV of the BTS member interests should be zero (or less) given the Eddystone Agreement and the pass-through nature of any truck station arrangement." (Ex. 1373.)

172.    On February 15, 2016, BOA released BTS from its obligations under the 2016 Guaranty Supplement and the Grantor Accession Agreement. BOA also released the lien over BTS's personal property.

**L.    BTS's Enterprise Value As Of January 31, 2016**

173.    As set forth above, Ferrellgas retained Simmons to help it come up with a valuation of Bridger Logistics prior to the Acquisition. Simmons suggested a valuation of $900 million. (Ex. 593-A.)

174.    In the letter of interest to purchase Bridger Logistics, Mr. Soiefer represented that Ferrellgas, L.P. had assigned a preliminary enterprise value of $825 million-$900 million to Bridger Logistics. (Ex. 596-A.) Ferrellgas, L.P. arrived at this valuation by applying a 7.5x multiple to Bridger Logistics' $100 million -$120 million EBITDA. (*Id.*)

175.    In May 2015, after conducting further diligence, Simmons provided a final enterprise valuation for Bridger Logistics, in a range of $775 million-$1.05 billion and suggested a purchase price of $825 million. (Ex. 652-A.) At trial, Mr. Soiefer testified that Ferrellgas and its various outside advisors, like Simmons, did "a lot of work" to come up with the valuation for Bridger Logistics. (Tr. 12/05/22 at 94:15-24.)

176.    As part of these efforts, Simmons projected that BTS would recognize $38,856,000 in total 2015P EBITDA and $45,159,000 in total NTM EBITDA. (*See* Exs. 652-A at 81, 3002 at ¶¶ 38-39; PSX 79.) Those figures approximate 36% and 35% of Bridger Logistics' unadjusted EBITDA for the same periods, respectively.

177.    In the Ferrellgas Defendants' 10-Q statement filed with the Securities and Exchange Commission for the period ending as of January 31, 2016, the Ferrellgas Defendants reported that "the continued and prolonged decline in the price of crude oil" constituted a "triggering event" that required an update to the goodwill impairment assessment as of October 31, 2015. (Ex. 1545 at 14.) As a result, the Ferrellgas Defendants conducted a goodwill impairment test, and they "determined that the estimated fair values of each reporting unit tested exceeded its respective carrying value, thus no impairments were recorded during the three months ended January 31, 2016." (*Id.* at 15.)

178.    At the time they submitted their 10-Q to the SEC, the Ferrellgas Defendants were aware of the crude oil market conditions and had determined that those conditions had not impacted Bridger Logistics' value. I rely on their representations in the 10-Q to conclude that BTS's value did not change between the Acquisition and the sale to Jamex Transfer Holdings.[23]

---

[23]      *See, e.g.*, *Boyce v. Soundview Tech. Grp.*, 464 F.3d 376, 386-87 (2d Cir. 2006) (determining that SEC filing "contained primary evidence that the fact finder could have utilized in determining the Company's stock value"); *In re Hechinger Inv. Co. of Delaware*, 147 F. App'x 248, 252 (3d Cir. 2005) (affirming district court's determination of fair value

179.    In short, there is no evidence in the record demonstrating that BTS's value declined between the Acquisition and the sale to Jamex Transfer Holdings. On the contrary, the evidence suggests that the value remained the same.

180.    Thus, even if Eddystone's expert did not expressly account for the continued decline in the price of crude oil when he was calculating BTS's value as of January 31, 2016, the Ferrellgas Defendants did, and they determined there was no material change.

181.    The experts who testified in this case reached generally consistent conclusions about BTS's value at the time of the Acquisition.

---

where company "found the valuation sufficiently reliable to submit it to the United States Securities and Exchange Commission for use in public filings").

Defendants try to minimize the importance of their 10-Q by pointing to the Ferrellgas Defendants' representation in the 10-Q that they were still "in the process of identifying and determining the fair values of the assets acquired and liabilities assumed" as part of the Acquisition. (Ex. 1545 at 12.) Their disclaimer that their estimates of fair value "remain[ed] subject to change" reflected the fact that as part of the information-gathering process, the Ferrellgas Defendants might obtain new information that could impact their initial assessment of the fair value of the assets "as of the acquisition date, "June 24, 2015. (*Id.*)

As Eddystone's expert, Mr. Sherman, pointed out, this comports with the accounting standard known as ASC 805, Business Combination, which gives companies a "Measurement Period" of one year to "adjust the provisional [original] amounts recognized at the acquisition date to reflect new information obtained about facts and circumstances that existed as of the acquisition date that, if known, would have affected the measurement of the amounts recognized as of that date." (Ex. 3014 at ¶ 57 (quoting ASC 805-10-25-13).) In other words, the Measurement Period gave the Ferrellgas Defendants additional time to adjust their *initial* valuation of the assets as of June 24, 2015, and their invocation of this accounting standard has nothing to do with whether market events *after* the date of the Acquisition caused a decrease in their value.

182.    Eddystone's expert, Mr. Sherman, opined that BTS had a value between $266,793,420 and $315,244,197. When calculating BTS's 2015P EBITDA and NTM EBITDA, Mr. Sherman allocated $9 million of Bridger Logistics' general and administrative expenses ("G&A") to BTS based on its pro-rata EBITDA share. As a result, Mr. Sherman arrived at $35,752,456 for 2015P EBITDA and $42,032,560 for NTM EBITDA for BTS. With those figures as a basis, Mr. Sherman applied the 7.5x multiple that Ferrellgas, L.P. used to calculate the valuation set forth in its letter of interest. Mr. Sherman also applied what he referred to as "Ferrellgas' implied multiples" based on the final purchase price, of 8.6x for 2015P EBITDA and 6.9x for NTM EBITDA. Applying those multiples led to a value of BTS between $290,024,661 and $305,923,122. Mr. Sherman made a third valuation by using Bridger, LLC's audited financial statements from 2014 and applying the same three multiples to reach a value for BTS ranging from $274,620,000 to $342,280,000.

183.    Defendants' expert, Manish Kumar, also calculated BTS's value at the time of the Acquisition based on three different methods. First, utilizing the Income Approach, Mr. Kumar opined that BTS was worth between $202.5 million and $267.5 million. Second, under the Comparable Public Company Method, and applying three different multiples of 7.6x, 8.3x, and 9.2x, Mr. Kumar determined that BTS was worth between $250.7 million and $303 million. Third, Mr. Kumar employed the Comparable Transaction Method and applied multiples of 6.4x, 8.6x, and 9.9x, calculating BTS's value to be between $210.9 million and $324.9 million. To reach his final opinion as to valuation, Mr. Kumar weighed

the three different methods and opined that BTS's fair market value at the time of the Acquisition was somewhere between $216.6 million and $290.8 million.

184.    Based on these analyses, I find that BTS's value at the time of the Acquisition was approximately $300 million.

**M.    Bridger Logistics Sells Its Interest In BTS To Jamex Transfer Holdings**

185.    Though Ferrellgas had enlisted Akin Gump to assist with the BTS "restructuring," Mr. Knapp helped draft the purchase and sale agreement by which Bridger Logistics would sell its interest in BTS to Jamex Transfer Holdings. On January 21, 2016, he sent draft agreements for Mr. Hampton and Akin Gump's review, noting that he included "[r]eally, really limited" "waivers of the non-compete contained in the Ferrellgas/Bridger-PSA and the exclusivity clause in the Bridger-Jamex TLA" in order "to better protect against UFTA/UFCA[.]" (Ex. 1306 at 1.)

186.    Mr. Knapp was referring to the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act. According to Mr. Knapp, he wanted there to be contemporaneous documentation evidencing Bridger Logistics' intent that Jamex Marketing would continue to operate at the Eddystone facility, and he believed the limited waivers would be evidence of that intent and potentially "create a fact dispute" in future litigation. (Knapp Dep. Tr. at 254:11-18, 256:17 – 259:8; Ex. 1306 at 1.)

187.    On January 27, 2016, Jamex Marketing created Jamex Transfer Holdings to purchase BTS's stock. (Ex. 1356; Tr. 9/20/22 at 135:22 – 136:21.) Jamex Marketing owned Jamex Transfer Holdings. Jamex Transfer Holdings did not have any holdings at that time.

188.    On February 22, 2016, Bridger Logistics and Jamex Transfer Holdings entered into a Purchase And Sale Agreement (the "BTS PSA"), by which Bridger Logistics sold all its membership interests in BTS to Jamex Transfer Holdings for $10.00. (Ex. 1433-E at Art. 2.3(a).) Ferrellgas Partners consented to and joined in the BTS PSA. (*Id.* at 35.) In addition, the BTS PSA contained the "[r]eally, really limited" waivers of certain non-compete agreements that Mr. Knapp had drafted. (Ex. 1306; Ex. 1433-E at Art. 2.3(d)–(e).)

189.    At the time of the sale—consistent with the terms set forth in the Bridger-Jamex TLA Amendment—BTS had "no assets other than the Eddystone Agreement ...." (Ex. 1433-E at Art. 4.11.) However, the buyer—Jamex Transfer Holdings—agreed to "accept such assignment and transfer of the Membership Interests from [Bridger Logistics] on the terms and conditions set forth [in the BTS PSA], including the assumption of Liabilities under the Eddystone Agreement ... for periods on and after the Closing Date." (*Id.* at Art. 2.1(b).)

190.    In addition, the draft "Release Agreement" that had been attached the Bridger-Jamex TLA Amendment was re-drafted as a "Release And Guarantee Agreement" between Bridger Logistics and Jamex Marketing. (*Compare* Ex. 1276-A at Ex. A *with* Ex. 1434-H (emphasis added).) Now, pursuant to that agreement, Jamex Marketing

"absolutely, unconditionally, and irrevocably guarantee[d] each and every representation, warranty, covenant, agreement and other obligation of [Jamex Transfer Holdings], and the full and timely payment and prompt and complete performance of [Jamex Transfer Holding's] obligations and liabilities under the [BTS PSA] ...." (Ex. 1434-H at § 4(a).) Jamex Marketing also acknowledged that it made the guarantee "to induce Bridger to enter into" the BTS PSA. (*Id.*) Thus, Jamex Marketing guaranteed Jamex Transfer Holding's obligations under the BTS PSA, which included James Transfer Holding's obligation to assume liabilities under the RSA after February 1, 2016.[24]

191.    The BTS PSA was effective as of February 1, 2016. (Ex. 1433-E at Art. 2.1(a).) At the same time Bridger Logistics and Jamex Transfer Holdings executed the BTS PSA, BTS signed its respective Assignment And Assumption Agreements with Bridger Swan Ranch and Bridger Terminals, though both of those agreements were effective as of January 31, 2016. (Exs. 1433, 1433-D, 1433-J.)  BTS and Bridger Terminals also executed the Terminal Logistics Services Agreement, which gave Bridger Terminals access to the land that BTS rented from Enbridge Pipelines. In addition, BTS changed its name to Jamex Transfer Services, LLC ("JTS"), effective as of February 1, 2016.

---

[24]    Mr. Ballengee testified to the contrary. (Tr. 9/20/22 at 132:23 – 133:3; *Id.* at 244:22 – 246:22.) But the document says what it says, and Mr. Ballengee's mistaken belief that Jamex Marketing did not guarantee JTS's obligations under the RSA is not evidence to the contrary.

### N.    BTS/JTS Stops Paying Its Obligations Under The RSA

192.    On February 23, 2016, the day after the sale, Mr. Ballengee provided notice to Eddystone that BTS had changed its named to JTS and that JTS had a new owner. (Exs. 1445, 1445-A.)

193.    Two days later, Mr. Ballengee attempted to start direct negotiations with Eddystone, as he had been planning. To that end, he sent a letter to Eddystone, referencing past disputes that BTS had with Eddystone over alleged deficiencies at the facility and requested a meeting to resolve the ongoing issues. (Ex. 1453-B.)

194.    In the meantime, BTS[25] used a portion of the funds that Bridger Logistics had included as part of the sale and paid Eddystone's charges for the volumes that it had transloaded at the facility in January 2016. (Tr. 9/20/22 at 142:7-9.) However, it did not pay any of the deficiency charges for that month. (*Id.* at 142:10-12.) In fact, once Jamex Transfer Holdings acquired BTS, BTS never paid Eddystone any deficiency charges incurred after January 2016. (*Id.* at 143:16-20.)

195.    On March 29, 2016, representatives for BTS and Jamex Marketing, including Mr. Ballengee, met with representatives from Eddystone in Dallas, Texas. During that meeting, the Jamex group told Eddystone that "they did not have any assets, they did not

---

[25]    By this point in time, BTS had changed its name to JTS. However, I continue using "BTS" throughout for the sake of consistency and to avoid additional confusion.

have any cash, and they could not make their payments" under the RSA. (Tr. 9/19/22 at 170:12-15.)

196.    The same day that Jamex and Eddystone were meeting, Monroe advised Mr. Jilla that Monroe was terminating the Monroe-Jamex Letter Agreement as of April 30, 2016. (Exs. 1490, 1490-C.) This meant that the three-month suspension would come to an end, and Jamex would have to resume performing under the Amended COSA and start delivering 40,000 barrels of crude to Monroe starting on May 1, 2016.

197.    On March 31, 2016, Eddystone sent Mr. Ballengee a "Notice of Default" under the RSA due to BTS's failure to pay deficiency payments due for February 2016 that totaled $3,338,639.50. (Ex. 1501-A at 1.) The letter noted BTS's failure to pay deficiency charges for January 2016 as well.

198.    On April 4, 2016, Mr. Ballengee wrote to Monroe and advised that Jamex Marketing would not be delivering any barrels of crude to Monroe for the month of May. (Exs. 1508, 1508-A.) In other words, Jamex Marketing would not be resuming its obligations under the Amended COSA. About a month later, Jamex Marketing declared that it was terminating the Amended COSA altogether. (Exs. 1529, 1529-A.)

### O.    Operations At The Eddystone Facility Following BTS's Default

199.    After BTS stopped bringing trains to the Eddystone facility, the parties to the Eddystone venture—Enbridge and Canopy—disagreed about whether and how the facility should be used going forward. On the one hand, Enbridge was paying all the

facility's operating costs and wanted to shut the facility down. Enbridge had other assets as part of its business, while the Eddystone facility was Canopy's only asset.

200.    Bryan Boaz, Enbridge's Manager of Asset Performance and Enterprise Risk, attempted to solicit new business for the facility. He started by reaching out to companies that also shipped crude oil by rail, including British Petroleum, ConocoPhillips, Phillips 66, and SAT Oil. (Boaz Dep. Tr. at 221:17-23.) In addition, Eddystone also "advanc[ed] discussions with [Monroe] to resume crude flows to ERC a number of times in 2016." (Ex. 1644 at 1.) The discussions with Monroe stalled due to litigation.

201.    Canopy also sought other opportunities for the facility and proposed alternative uses for the facility, including storing railcars at the facility and transloading other materials such as natural gas liquids, condensate, soda ash, leachate, and ethanol glycol. (Ex. 1644 at 1; Tr. 12/13/22 at 134:2-5; Boaz Dep. Tr. 222:8-17, 223:2-4.) Enbridge rejected these options for various business reasons, including the overall size of the opportunity, safety concerns, and the need to invest in additional equipment. In short, Enbridge preferred to wait for an opportunity that "was going to make enough money to make it worthwhile to keep … the facility under operations" or leave room to resume full operations if the market for crude oil improved. (Boaz Dep. Tr. 224:11-16.)

202.    While Enbridge waited for the right opportunity, Eddystone reduced operations but maintained enough personnel to keep oil in the facility. (Tr. 12/13/22 at 132:5-8.) Canopy acquired the Eddystone facility in October 2017. (*Id.* at 138:14-17.) By

August 2018, the facility started receiving trains of crude oil again. (Tr. 12/13/22 at 132:5-8, 138:14-17, 139:16-19.)

### P.    Procedural History

203.    On April 19, 2016, Eddystone filed an arbitration proceeding against BTS in front of the Society of Maritime Arbitrators to recover the amounts due under the RSA. During discovery, Eddystone learned that Bridger Logistics had sold its interest in BTS for $10 and that BTS did not come with any business records when Jamex Transfer Holdings took ownership of it.

204.    On January 5, 2017, Eddystone entered into a Confidential Release And Settlement Agreement with Mr. Ballengee, Jamex, Jamex Marketing, Jamex Transfer Holdings, Jamex Administrative Services LLC, Jamex Unitholder LLC, JBAH Holdings LLC, Ballengee Holdings LLC, and Ballengee Interests LLC (the "Arbitration Settlement Agreement"). (Ex. 1618.) BTS is a party to some, but not all, sections of the Arbitration Settlement Agreement. As part of the settlement, the parties agreed that Eddystone would be entitled to an arbitration award determining that BTS breached the RSA and that Eddystone is entitled to damages of $139,050,406.77. Jamex Transfer Holdings also provided $450,000 and 28,000 barrels of crude oil to Eddystone.

205.    On January 24, 2017, a panel of arbitrators issued an award reflecting the parties' agreement. *See Eddystone Rail Company, LLC v. Jamex Transfer Services, LLC*, Case No. 1:17-cv-01266-JMF, Dkt. No. 5-3 (S.D.N.Y.). Less than a month later, Eddystone filed a

petition to confirm the arbitration award in the United States District Court for the Southern District of New York. To date, the district court has not confirmed that award.

206.    Eddystone filed this action on February 2, 2017. On March 26, 2019, Judge Kelly issued a Memorandum concluding that this case arises under the Court's admiralty jurisdiction. (ECF No. 308.) On June 28, 2019, Judge Kelly issued a Memorandum concluding that Defendants had to produce several documents over which they asserted attorney-client privilege because the crime-fraud exception applied. (ECF No. 332.)

207.    When Judge Kelly retired, the case was assigned to Judge DuBois. When Judge DuBois retired, it was assigned to me. I conducted a bench trial from September 19-September 23, 2022, December 6-December 19, 2022, and February 13-16, 2023. I received post-trial briefing and held closing arguments on August 10, 2023.

## II.    CONCLUSIONS OF LAW

### A.    Subject Matter Jurisdiction

208.    Defendants have not identified any extraordinary circumstances that warrant departure from Judge Kelly's and my prior determinations that the Court has original jurisdiction pursuant to 28 U.S.C. § 1333(1) because Eddystone's alter ego claim is based upon an alleged breach of the RSA, which is a maritime contract. (*See* ECF Nos. 308, 557.)

209.    Certainly, federal courts must "ensure that they do not exceed the scope of their jurisdiction[.]" *Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 132 (3d Cir. 2019) (quotation

omitted). However, that does not mean that judges must grant reconsideration any time a litigant raises a jurisdictional challenge. Instead, "courts may reconsider issues that impinge on their jurisdictional powers … when extraordinary circumstances warrant such reconsideration." Pub. *Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 118 (3d Cir. 1997) (emphasis added). Like any other motion for reconsideration, extraordinary circumstances exist when: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Id.* at 117.

210.    Defendants do not identify an intervening change in controlling law or any new evidence that would warrant reconsideration of Judge Kelly's and my rulings that the RSA is a maritime contract that confers admiralty jurisdiction on the Court. Instead, they rehash arguments they have made before (or assert arguments that they could have made before) and contend that a "manifest injustice exists here." (ECF No. DCOL ¶ 479.) But "manifest injustice" is not talismanic language, and it is much more than mere disagreement or dislike of a judge's prior decision. *See Purnell v. Radnor Twp. Sch. Dist.*, No. 19-cv-612, 2022 WL 2757412, at *1 (E.D. Pa. July 14, 2022). "[T]o satisfy this standard, a party seeking reconsideration 'must establish an error … that is direct, obvious, [ ] observable and apparent to the point of being indisputable.' That is, 'the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it.'" *Id.* (quotations omitted).

211.     Defendants do not identify an open and obvious error that needs correcting. Instead, they complain that the prior decisions as to subject matter jurisdiction operated to deprive them of a jury trial, denied state courts the ability to rule on questions of state law, and caused Judge DuBois to compel the production of attorney-client communications under a lesser standard than what Pennsylvania law would have required. But these alleged horribles are not themselves errors of fact or law; they are the result of prior decisions with which Defendants disagree. In short, these are not the type of extraordinary circumstances that warrant reconsideration.

   **B.     Eddystone Count One – Alter Ego Liability**

212.     Eddystone is not entitled to judgment on its alter ego claim against the Ferrellgas Defendants, Bridger Logistics, or Bridger Rail Shipping because none of those Defendants owned BTS or exercised control over it at the time BTS breached the RSA.

213.     The Parties agree that federal common law applies to claims over which Judge Kelly and I have determined admiralty law governs, including Eddystone's alter ego theory of liability. (*See* PCOL ¶ 14-15; DCOL ¶ 16.) "State and federal alter ego tests are essentially the same." *Century Hotels v. United States*, 952 F.2d 107, 110 n.4 (5th Cir. 1992). Regardless of the forum, "[t]he alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (citation omitted); *see also Dole Food Co.*

*v. Patrickson*, 538 U.S. 468, 475 (2003) ("The doctrine of piercing the corporate veil, however, is the rare exception[.]")

214.   The corporate form and other types of business entities "allow shareholders to invest without incurring personal liability for the acts of the corporation." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001). However, when shareholders or related entities abuse the corporate form, such that the company's acts can be attributed to its owner or affiliates, courts may "employ the 'tool of equity' known as veil-piercing" to disregard the corporate entity and impose alter ego liability on its owners or affiliates. *Id.* In other words, the doctrine seeks to impose liability on the puppeteer pulling the strings, rather than the puppet itself.

215.   The Parties agree that "[t]o pierce the corporate veil a parent corporation had to completely control its subsidiary at the time the complained of conduct occurred." *Peters v. Lifeline Sys. Co.*, No. 08-cv-1862, 2009 WL 3335098, at *1 (E.D. Mo. Oct. 15, 2009); *see also Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861–62 (5th Cir. 2004) ("It is illogical … to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred.").

216.   For purposes of applying alter ego liability and piercing the corporate veil, the complained-of conduct must be the conduct for which the plaintiff is attempting to hold the corporate parent liable. The entire purpose of the doctrine is to hold responsible those who caused the company to engage in the challenged conduct, recognizing that

the company had no real agency of its own and acted as a mere pawn of its owner(s) or a related entity. Thus, "a 'plaintiff seeking to pierce the corporate veil must demonstrate that a court in equity should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff.'" *City of Almaty v. Ablyazov*, 278 F. Supp.3d 776, 799 (S.D.N.Y. 2017) (quotation omitted) (emphasis added); *see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 28 (2d Cir. 1993) (analyzing alter ego factors "at the time of the breach"); *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985) (explaining that there must be "complete domination" with "respect to the transaction attacked" to impose alter ego liability) (original emphasis) (quotation omitted). For example, in Pisani, the Third Circuit imposed alter ego liability for Medicare overpayments on an individual physician who was a nursing home's "president, registered agent, and sole stockholder of the corporation during the [nursing home's] participation in the Medicare program." *United States v. Pisani*, 646 F.2d 83, 85 (3d Cir. 1981) (emphasis added).

217.   In this case, the "transaction at issue" is BTS's alleged breach of the RSA by failing to make deficiency payments to Eddystone after the sale to Jamex Transfer Holdings. The claim that Eddystone describes as "alter ego" is really a claim for breach of the RSA, and Eddystone seeks to invoke the alter ego doctrine to expand liability beyond

its contractual counterparty. Under New York law,[26] which governs the RSA, the elements of breach of contract are: (a) a contract existed; (b) plaintiff performed under the contract; (c) defendant breached; and (d) the breach caused harm. *See 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) (citations omitted). Eddystone's claim only exists because BTS didn't pay Eddystone. That non-payment under the RSA is the relevant breach (even if other conduct led to BTS's inability to pay) and the lack of payment is the harm that Eddystone suffered. Thus, the elements of the claim make clear that the non-payment is the conduct relevant to the alter ego analysis.

218.    While Eddystone argues that Defendants' alleged "siphon and sell" scheme led to BTS's inability to pay Eddystone, the siphon-and-sell conduct does not form the basis of Eddystone's breach of contract claim. The same is true of Eddystone's latest suggestion that BTS breached the RSA prior to the sale to Jamex Transfer Holdings by violating Sections 8 and 14 of the RSA (a claim that Eddystone first advanced during closing arguments).[27]  Again, neither of those alleged breaches is the transaction for which I must evaluate the Ferrellgas Defendants', Bridger Logistics', or Bridger Rail Shipping's level of control. Instead, my focus must be on the complained-of conduct which forms

---

[26]    The elements for a breach of contract claim under federal common law are similar. *See United States ex rel. Morsell v. NortonLifeLock, Inc.*, 651 F. Supp. 3d 95, 116 (D.D.C. 2023) (quotation omitted).

[27]    Sections 8 and 14 of the RSA prohibited BTS from assigning its rights and obligations under the RSA without Eddystone's consent and required all parties to comply with applicable laws, respectively. (*See* Ex. 90-A at §§ 8, 14.1.)

the basis of Eddystone's breach of contract claim, and that's the failure to make deficiency payments under the RSA.

219.    *Lacey Marketplace Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd.*, No. 13-cv-383, 2015 WL 403165, at *11 (W.D. Wash. Jan. 28, 2015), *aff'd in part*, 720 F. App'x 828 (9th Cir. 2017) is instructive. Like Eddystone here, the plaintiff in *Lacey* alleged that the corporate parent engaged in a "strip and strand" scheme, leaving the subsidiary liable for five commercial leases but with no assets. Then, the corporate parent sold the subsidiary to another company for $1, leaving it to default on the lease payments. The court in *Lacey* refused to extend the alter ego doctrine to hold the former corporate owner liable for the acts of a non-subsidiary, rejecting the plaintiff's argument that the former corporate parent should be held liable for breach of contract as an alter ego because its "previous disregard for [the] corporate form [was] the but-for cause of [the subsidiary's] subsequent default[.]" *Lacey*, 2015 WL 403165 at *11. Given the exceptional nature of the alter ego doctrine, I find *Lacey* persuasive, and Eddystone's cases do not convince me to expand the doctrine in this instance, where there is no evidence that any Defendant owned or controlled BTS after Bridger Logistics sold it to Jamex Transfer Holdings.

220.    The facts of this case do not come close to establishing the "overwhelming control" that existed in *Collet v. Am. Nat. Stores, Inc.*, 708 S.W.2d 273, 285 (Mo. Ct. App. 1986). In that case, following a sham sale of the debtor corporation that was not at arms-length, the former corporate parent's actual day-to-day control over the debtor company

did not change, and the former parent continued to control and dominate "the overall management" of the debtor's business, eventually dismantling it. *Id.* at 286. By contrast, there is no similar evidence that Bridger Logistics, Bridger Rail Shipping, or the Ferrellgas Defendants exercised continued control or domination over BTS after its sale to Jamex.

221.   At most, Eddystone points to the limited waiver of non-compete agreements in the BTS PSA and argues that it permitted Bridger Logistics and the Ferrellgas Defendants to prevent BTS from offering its services to other customers. But even if this were true, there is no evidence in the record that these Defendants exercised this right and that doing so led BTS to default under the RSA. Instead, BTS made a choice to stop paying, and Eddystone has not demonstrated that any of the Defendants compelled BTS to make that choice or otherwise came anywhere close to exerting the level of control that was present in Collet at the time of the default. Defendants might not have been surprised by the outcome, but they didn't compel it.

222.   Likewise, *In re Maxus Energy Corp.*, 641 B.R. 467 (Bankr. D. Del. 2022), offers little support for Eddystone's position. Unlike this case, the liquidating trust in that case based its alter ego claims upon alleged fraudulent transfers that harmed the company over many years, as opposed to a breach of contract. The bankruptcy court denied summary judgment, reasoning that the scope of the corporate parent's and grandparent's control and resulting harm to the estate would be left for a jury to resolve. Thus, *Maxus* stands for the unremarkable proposition that a corporate parent or grandparent may be

held liable as an alter ego for conduct of a subsidiary that it directed when it exercised control over the subsidiary. Perhaps if Eddystone's alter ego claim were based upon the fraudulent transfers, then its reliance on *Maxus* would make more sense, but its alter ego claim is based on the alleged breach of the RSA, and that conduct occurred after Bridger Logistics sold BTS to Jamex Transfer Holdings.

223.    Absent any evidence that any Defendant owned or controlled BTS at the time that BTS stopped paying under the RSA, Eddystone cannot hold Defendants liable for that breach as an alter ego of BTS, and I will enter judgment in favor of Defendants on this claim.

### C.    Bridger Logistics/Ferrellgas Counterclaim IV—Breach Of Contract Relating To Custody Transfer Meters

224.    Before turning to Eddystone's remaining claims, I will dispose of Defendants' breach of contract counterclaim, which was contingent upon a finding of alter ego liability. (*See* DCOL ¶ 388.) Having determined that Eddystone cannot hold Defendants liable as alter egos of BTS, I will dismiss as moot Defendants' counterclaim based on Eddystone's alleged breach of the RSA by failing to install and commission CT meters at the Eddystone facility.

### D.    Eddystone Count Four—Breach Of Fiduciary Duties Of Care And Loyalty

225.    Pennsylvania law governs Eddystone's breach of fiduciary duty claim. At least five times in this case, either I or another judge on this Court have reached that conclusion. At this point in the proceedings, Defendants acknowledge that "it is now

apparent that there is no conflict, and any perceived conflict is a false conflict[.]" (DCOL ¶ 290.) Thus, I need not "engage in a choice of law analysis, and may refer to the states' laws interchangeably." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 (3d Cir. 2007). I will therefore continue to apply Pennsylvania law.

226.    Eddystone is not entitled to judgment on its breach of fiduciary duty claim because managers of insolvent limited liability companies do not owe fiduciary duties to creditors under Pennsylvania law.

227.    On three prior occasions, Judge Kelly, Judge DuBois, and I ruled that Eddystone could assert a breach of fiduciary duty claim against Defendants based on a theory that managers of limited liability companies owe fiduciary duties to creditors once the company becomes insolvent. Those rulings are the law of the case. *See Magnesium Elektron*, 123 F.3d at 116 (3d Cir. 1997) ("The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation."). However, "the law of the case doctrine does not limit the power of trial judges to reconsider their prior decisions[.]" *Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016) (quotation omitted). Such reconsideration is warranted in extraordinary circumstances, such as "when the court has a clear conviction of error[.]" *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 247 (3d Cir. 2020), *cert. granted, judgment vacated on other grounds sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (U.S. 2022)

(quotation omitted). Upon further research and reflection, I am convinced that it would be a clear error of law to permit Eddystone to pursue its breach of fiduciary duty claim.[28]

228. In Pennsylvania, "limited liability companies are creatures of statute[.]" *Retina Assocs. of Greater Philadelphia, Ltd. v. Retinovitreous Assocs., Ltd.*, 176 A.3d 263, 271 (Pa. Super. Ct. 2017). "'[W]hen interpreting a statute we must listen attentively to what the statute says, but also to what it does not say.' In other words, 'it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.'" *Hanaway v. Parkesburg Grp., LP*, 168 A.3d 146, 154 (Pa. 2017). For example, in *Hanaway*, the Pennsylvania Supreme Court refused to impose a duty of good faith and fair dealing upon a general partner of a limited partnership because Pennsylvania's Revised Uniform Limited Partnership Act ("PRULPA") (which governed limited partnerships and limited partnership agreements at the relevant time) did not provide for such a duty. *See id.* at 156.

---

[28]    Mindful that the law of the case doctrine is meant to promote judicial economy and avoid unfair prejudice, *see McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 273 (3d Cir. 2017), I asked the Parties for supplemental briefing on this issue, to ensure that Eddystone will not be prejudiced by any reliance on prior rulings that I now believe were made in error. *See Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). In addition to asking for supplemental briefing on the substantive issue, I also asked the Parties to address whether the cases I identified "should cause me to reconsider my conclusion that members or managers or an insolvent LLC owe a fiduciary duty to the company's creditors." (ECF No. 743 at 2.) In its supplemental brief, Eddystone did not argue that it would suffer prejudice if I reconsider the prior decisions.

229.     Following *Hanaway's* guidance (in the context of a dispute involving a limited liability company), the Superior Court of Pennsylvania reasoned that an LLC's "members are subject to only those duties that are authorized by statute." *Retina Assocs.*, 176 A.3d at 271. These cases make clear that I must look to the relevant statutory text to determine whether members or managers of insolvent LLCs owe fiduciary duties to creditors.

230.     In this instance, there are two statutes that might apply: (a) Pennsylvania's Limited Liability Company Act of 1994, as amended in 2001 (which was repealed in 2016) (the "1994 Act"), or (b) Pennsylvania's Uniform Limited Liability Company Act of 2016 (the "2016 Act"). The alleged breaches of fiduciary duties occurred in the second half of 2015 and early 2016, long before the 2016 Act took effect on April 1, 2017, and there is a "presumption that statutes do not apply retroactively absent strong evidence that the legislature so intended." *Johnson v. Phelan Hallinan & Schmieg, LLP*, 235 A.3d 1092, 1098 (Pa. 2020); *see also* 1 Pa. C.S.A. § 1926. However, the 2016 Act purports to govern "all limited liability companies" after the effective date. 15 Pa. C.S.A. § 8811(c). Whether this provision constitutes "strong evidence" that the General Assembly intended the 2016 Act to apply retroactively is of no moment because the outcome is the same under either version of the statute: neither the 1994 Act nor the 2016 Act imposes a fiduciary duty to creditors on managers or members of insolvent LLCs.

231.     The 1994 Act set forth the duties of managers and members of LLCs. Where, as here, "the certificate of organization provides that the company shall be managed by one or more managers[,]" Sections 1711 through 1717 of Pennsylvania's Business Corporation Law (the "PBCL") apply to representatives of the company. *See* 15 Pa. C.S.A. § 8943(b)(1) (the 1994 Act). References to "directors" and "shareholders" in the PBCL refer to "managers" and "members," respectively. *Id.*

232.     In turn, the prior version of the PBCL provided that "[a] director of a business corporation shall stand in a fiduciary relation to the corporation ...." 15 Pa. C.S.A. § 1712(a) (the 1990 PBCL) (emphasis added). The limitation-on-standing provision also made clear that these duties were "solely to the business corporation ...." 15 Pa. C.S.A. § 1717 (the 1990 PBCL). The amended version of the PBCL does not create any fiduciary duties to creditors. *See* 15 Pa. C.S.A. § 1712(a). In fact, as amended, Section 1717 makes clear that "[t]he duty of ... individual directors under section 1712 ... is solely to the business corporation and not to any ... creditor ...." 15 Pa. C.S.A. § 1717.

233.     Neither these provisions nor any of the other provisions that the 1994 Act incorporated by reference create a fiduciary duty to creditors. Pursuant to the reasoning of *Hanaway* and *Retina Assocs.*, no such duty exists under the 1994 Act, and I cannot add a requirement to the statute that the General Assembly did not see fit to include.

234.    Eddystone seeks to avoid this outcome by pointing to the Committee Comments to Section 8943 of the 1994 Act, which express an intent "that the courts will

83

fashion rules in appropriate circumstances by analogy to principles of corporate or partnership law[,]" like 15 Pa. C.S.A. § 110.[29]  15 Pa. C.S.A. § 8943, Committee Comment 2001 (the 1994 Act). But that Comment refers to Subsection (b)(2), which addresses the duties of members who are not also managers of the company. That provision and the accompanying Comment has no application in this case because Bridger Logistics was both a member and a manager of BTS. In situations where an LLC's member is also a manager, a court need not resort to gap-filling to determine that member's fiduciary duties because the 1994 Act incorporated the duties set forth in the PBCL. *See* 15 Pa. C.S.A. § 8943(b)(1) (the 1994 Act). And none of those provisions created a fiduciary duty to creditors.

235.   Similarly, the 2016 Act does not create fiduciary duties for members or managers of insolvent LLCs. Under the current version of the statute, "[a] member of a member-managed limited liability company owes to the company and ... the other members the duties of loyalty and care ...." 15 Pa. C.S.A. § 8849.1(a). Managers of manager-managed LLCs owe the same duties to the company and its members. *See* 15 Pa. C.S.A. § 8849.2(a). The 2016 Act does not include any provision that imposes on an insolvent LLC's members or managers a fiduciary duty to creditors; nor does it direct

---

[29]    Section 110 of the Associations Code provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity, including, but not limited to, the law relating to principal and agent, estoppel, waiver, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause, shall supplement its provisions."  15 Pa. C.S.A. § 110.

courts to look to the PBCL or common law for additional duties. Absent an express statutory duty, I cannot impose one. *See Hanaway*, 168 A.3d at 154.

236.    This analysis compels me to reconsider the prior rulings in this case that held that Eddystone could maintain a claim against Defendants for a breach of a fiduciary duty owed to creditors.

237.    The initial decision came in the context of Defendants' motion to dismiss for failure to state a claim. "After carefully considering all of the arguments, and accepting all of the factual allegations in the Complaint as true," Judge Kelly determined that Eddystone's Complaint alleged a colorable claim against Defendants for breach of fiduciary duties of care and loyalty to creditors. (ECF No. 59 at 12.) To the extent he considered whether Eddystone's breach of fiduciary duty claim was viable under Pennsylvania law, Judge Kelly did not have the benefit of either *Hanaway* or *Retina Assocs.*, as those decisions issued after he ruled. Those intervening cases warrant reconsideration of his initial decision.

238.    Judge Dubois also ruled that Eddystone's breach of fiduciary duty claim could proceed when he ruled on former Defendants Julio Rios and Jeremy Gamboa's Motion to Dismiss Pursuant to Rule 12(b)(1) for Lack of Standing (the "Standing Memo"). (*See* ECF No. 368.) The Standing Memo warrants reconsideration on this issue for the following reasons.

239.    First, and foremost, the Standing Memo does not grapple with the statutory text. In fact, the Standing Memo does not cite the 1994 Act or the 2016 Act. But as the Superior Court noted, "[b]ecause limited liability companies are creatures of statute, their members are subject to only those duties that are authorized by statute." *Retina Assocs.*, 176 A.3d at 271.

240.    Second, the Standing Memo cites just one case for the proposition that a fiduciary duty to creditors applies in the context of insolvent limited liability companies: *Hipple v. Hipple*, No. 12-cv-1256, 2016 WL 320216 (E.D. Pa. Jan. 27, 2016). *Hipple* is problematic for a few reasons. Primarily, *Hipple* does not reach an express holding that such a duty exists. Instead, the case cites a host of cases applying the duty in the context of insolvent corporations and assumes without deciding that the same rule should apply to insolvent LLCs. In fact, the decision does not suggest that the existence of such a duty was in dispute. In addition, *Hipple* is not a state court decision, nor does it cite a single Pennsylvania state court decision that holds that members or managers of insolvent LLCs owe fiduciary duties to creditors. Eddystone has never cited a single Pennsylvania state court decision that reaches that holding, and I have not found one.

241.    By the time I confronted this issue at summary judgment, two prior judges had determined that Eddystone could proceed with its breach of fiduciary duty claim. Though Defendants cited to *Hanaway*, neither Party cited to *Retina Assocs.*, which extended *Hanaway's* logic to LLCs. My reliance on *Hipple* was misplaced. Likewise, the

Third Circuit's decision in *In re Lemington Home for Aged*, 659 F.3d 282 (3d Cir. 2011), has

little bearing on Eddystone's breach of fiduciary duty claim. *Lemington* involved fiduciary

duties of directors and officers of a corporation and recognized that common law, rather

than the plain language of the PBCL itself, extended those duties to the corporation's

creditors. *See Lemington*, 659 F.3d at 290 (citing *Citicorp Venture Cap., Ltd. v. Comm. of*

*Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir. 1998)).

242. "Only the written word is the law[.]" *Bostock v. Clayton Cty., Georgia*, 590

U.S. 644, 653 (2020). "If judges could add to, remodel, update, or detract from old

statutory terms inspired only by extratextual sources and our own imaginations, we would

risk amending statutes outside the legislative process reserved for the people's

representatives." *Id.* at 654. Whether the 1994 Act or the 2016 Act applies to Eddystone's

claim, I am bound by the statutory language, regardless of whether other federal judges

might have extended a fiduciary duty to creditors of an LLC. *See McGirt v. Okla.*, 140 S. Ct.

2452, 2568 (2020) (explaining that a court may not "favor contemporaneous or later

practices instead of the laws" the legislature passed). Neither the statutory language of

the 1994 Act nor the 2016 Act imposes a fiduciary duty to creditors on managers or

members of insolvent LLCs, so I must depart from my colleagues' and my prior decisions

that permitted Eddystone to proceed with its breach of fiduciary claim. Defendants are

entitled to judgment on this claim as a matter of law.

### E. Eddystone Counts Two & Three – Fraudulent Transfers

243.    Under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"),[30] a creditor may avoid intentional or constructive fraudulent transfers. A "transfer" is "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset[.]" 12 Pa. C.S.A. § 5101(b). An "asset" is "property of a debtor" but excludes "property to the extent it is encumbered by a valid lien[.]" *Id.*

244.    Under PUFTA, a debtor makes an intentional fraudulent transfer if the debtor makes the transfer "with actual intent to hinder, delay or defraud" the debtor's creditor(s). 12 Pa. C.S.A. § 5104(a)(1). Occasionally, a plaintiff will offer direct evidence of that intent. *See In re Carbone*, 615 B.R. 76, 80 (Bankr. E.D. Pa. 2020) ("Since 'individuals are rarely willing to admit intent, actual fraud is rarely proven by direct evidence.'") (quotation omitted). But in the absence of direct evidence, I can look to circumstantial evidence, including 11 factors known as "badges of fraud," to determine whether BTS intended to hinder, delay, or defraud Eddystone when it granted the lien to BOA. *See id.*

245.    The badges of fraud include, but are not limited to, considerations of whether:

> (1) the transfer or obligation was to an insider;

---

[30]    The Parties agree that the version of the statute that was in effect before the 2017 amendments governs Eddystone's claims.  Accordingly, all citations to PUFTA refer to the prior version of the statute.

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Pa. C.S.A. § 5104(b).

246. These indicators of fraud "are reviewed qualitatively rather than quantitatively." *Knoll v. Uku*, 154 A.3d 329, 333 (Pa. Super. Ct. 2017) (citation omitted). No badge is necessary, nor is any combination sufficient. *See Carbone*, 615 B.R. at 80-81 (quotation omitted). In addition, "[t]he plain language of § 5104(b) clearly provides that other factors, beyond those listed, can be considered in determining whether a transfer was made with actual intent to defraud. Therefore, even in the absence of any of the

enumerated badges, a court can find actual fraud." *In re C.F. Foods, L.P.*, 280 B.R. 103, 109 (Bankr. E.D. Pa. 2002).

247.    There are three ways for creditors to avoid a constructive fraudulent transfer under PUFTA. A creditor could avoid a transfer "if the debtor made the transfer … without receiving a reasonably equivalent value in exchange for the transfer … and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer …." 12 Pa. C.S.A. § 5105. "A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." 12 Pa. C.S.A. § 5102(a). There is also a presumption that a debtor is insolvent if the debtor is "generally not paying [its] debts as they become due …." 12 Pa. C.S.A. § 5102(b).

248.    A creditor could also avoid a transfer for which the debtor did not receive "reasonably equivalent value" in two other instances, where the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets would be unreasonably small, or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay when they came due. *See* 12 Pa. C.S.A. § 5104(a)(2)(i)-(ii). These three vehicles are referred to as the balance sheet test, the unreasonably small assets test,[31] and the cash flow test, respectively.

---

[31]    Eddystone does not rely on the unreasonably small assets test.  (*See* ECF No. 741 at 18.)

### 1. Validity of the BOA Lien

249. Because BOA held a lien on BTS's assets, I must first determine if that lien is valid. A "valid lien" is one "that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." 12 Pa. C.S.A. § 5101(b).

250. Under PUFTA, the "creation of a lien or other encumbrance" can constitute a transfer. *Id.* If a court were to determine that the creation of the lien itself was a fraudulent transfer, then the lien would not be valid.

251. "Fraudulent transfer law focuses on the intent of the debtor[,]" but in a case like this, which "involves numerous entities, it is important to identify precisely whose intent is relevant to the consideration of fraudulent intent." *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015) (original emphasis). BTS is the debtor, and BTS granted the lien that Eddystone seeks to avoid as fraudulent, so the relevant intent is BTS's. However, the Credit Agreement required Ferrellgas L.P. to cause BTS to guaranty Ferrellgas L.P.'s debt under the Credit Agreement and secure that guaranty with a lien. (Ex. 1851 at Art. 6.12(b).) In turn, Ferrellgas L.P.'s general partner, Ferrellgas, performed all management functions for Ferrellgas L.P. (ECF No. 732 ¶ 8.) Thus, BTS's intent in granting the lien was that of Ferrellgas L.P. and Ferrellgas.

252. As with most claims of intentional fraudulent conduct, there is no direct evidence that BTS granted the lien to BOA with actual intent to hinder, delay, or defraud Eddystone.

253.    Because Eddystone challenges the lien as a fraudulent transfer, and BTS granted the lien to benefit related third parties (*i.e.*, Ferrellgas and Ferrellgas L.P.), "the frame of reference is somewhat different from that usually associated with the statutory badges. However, where [as here] the transfer is effected by a person in common control of both, this only requires a readjustment of the analysis; it does not make the badges of fraud inapplicable." *In re Polaroid Corp.*, 472 B.R. 22, 56 (Bankr. D. Minn. 2012). BTS's grant of a lien to BOA implicates three badges of fraud.

254.    For the first badge of fraud, I can consider whether BTS granted the lien to benefit insiders. *See Ritchie*, 779 F.3d at 864. PUFTA does not define the term "insider," but the Comments suggest that courts should interpret the term "in a common-sense way[.]" 12 Pa. C.S.A. § 5101, cmt. 12. At the time of PUFTA's enactment, Webster's Ninth New Collegiate Dictionary defined an insider as "one (as an officer or director or a holder of 10 percent or more of an equity security) who is in a position to have special knowledge of the affairs of or to influence the decisions of a company." Webster's Ninth New Collegiate Dictionary, 625 (1988). From a commonsense perspective, BTS's owner and operator was a company insider. Thus, Ferrellgas and Ferrellgas L.P. were both BTS insiders because they owned and/or controlled BTS's operation. There is also no question that Ferrellgas and Ferrellgas L.P. caused BTS to grant a lien to BOA to comply with Ferrellgas L.P.'s obligations under the Credit Agreement. As Mr. Rios put it, that credit facility was "the entire ball of wax." (Tr. 9/23/22 at 151:19.) Without it, Ferrellgas L.P. could not operate.

255.   The fourth badge of fraud is also satisfied. As set forth above, before BTS made the alleged transfers, Messrs. Hampton, Rios, and Soiefer had a call with attorneys from Akin Gump to discuss the implications of Jamex Marketing putting BTS into bankruptcy after acquiring it. And the participants on the call thought that they could insulate BTS from fraudulent transfer liability because they believed there was a lien on BTS's assets at the time. Thus, while there was a legitimate business reason to put a lien on BTS's assets, doing so would also give BTS a defense in a potential bankruptcy.

256.   The ninth badge of fraud is satisfied as well. As set forth above, "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." 12 Pa. C.S.A. § 5102(a). By January 13, 2016, the day that Mr. Heitmann signed the Grantor Accession Agreement, the Ferrellgas Defendants and Bridger Logistics knew that they would cause BTS to assign all its assets to other Bridger entities in the near future so that Bridger Logistics could sell an assetless BTS. At that point, BTS would retain only the liability of the RSA, rendering its debts greater than its assets. As a result, BTS "became insolvent shortly after" granting the lien. 12 Pa. C.S.A. § 5104(b)(9).

257.   The remaining badges of fraud are not satisfied, however.

258.   The second badge is not satisfied because BTS did not retain the same property that it had before the lien. Before it granted the lien, BTS had unfettered right and title to its assets. The lien encumbered those assets, so BTS's title to them was no longer free and clear. It is, of course, true that BTS still had control over the assets, but

not in the same way that it did before. Also, BTS's continued control over the assets is consistent with an asset subject to a lien. If a debtor's retention of control were enough, then this badge would favor a finding of fraudulent conveyance in every lien case.

259.    As to the third badge, while BTS did not disclose the lien to Eddystone, BOA gave notice to the public regarding the lien's existence when it filed the UCC-1 statement on January 15, 2016. There is also no evidence of concealment.

260.    The fifth badge is not satisfied because BTS did not transfer all or substantially all its assets. It subjected them to a lien, but (as explained in more detail below) the likelihood of that lien being called against all its assets was infinitesimal.

261.    The six and seventh badges are also not satisfied because BTS did not abscond, nor did BTS remove or conceal assets. To the extent the lien gave BTS a possible fraudulent conveyance defense, I have already taken that fact into account.

262.    BTS received reasonably equivalent value in exchange for granting the lien to BOA, such that the eighth badge of fraud is not implicated. Determining whether BTS received reasonably equivalent value for the lien it granted to BOA involves a two-step inquiry. *See In re Island View Crossing II, L.P.*, 604 B.R. 181, 196 (Bankr. E.D. Pa. 2019). First, I must assess whether BTS received value in exchange for the lien. That value may be a direct or indirect benefit to BTS. *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991). Once value has been established, I must determine whether that value was reasonably equivalent to the value of the lien. The full analysis is a "fact-

intensive" inquiry. *Matter of Evergreen Helicopters Int'l Inc.*, 50 F.4th 547, 555 (5th Cir. 2022) (quotation omitted).

263.    Under PUFTA, "value is given for a transfer" if "an antecedent debt is secured or satisfied" in exchange for the transfer.  12 Pa. C.S.A. § 5103(a). In a "typical" antecedent debt case, the debtor receives the loan proceeds, and "the value the debtor receives is the proceeds of the loan itself[.]" *In re Solomon*, 299 B.R. 626, 637 (B.A.P. 10th Cir. 2003) (quotation omitted). But this is not a typical antecedent debt case because BOA did not extend a line of credit, or loan any funds, to BTS. Thus, the "typical" antecedent debt cases on which Defendants rely on have little relevance. *See*, *e.g., In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371 (Bankr. S.D.N.Y. 2013); *In re GTI Cap. Holdings, LLC*, 373 B.R. 671 (Bankr. D. Ariz. 2007).

264.    BTS received value from Ferrellgas L.P. when Ferrellgas L.P. extinguished $39.2 million of BTS's debts as part of the Acquisition. Indeed, "[a] debtor may also receive 'reasonably equivalent value' when the debtor's payment of a third-party's debt reduces the debtor's liabilities." *In re IFS Fin. Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009), *aff'd*, No. 09-cv-3059, 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd*, 803 F.3d 195 (5th Cir. 2015), and *subsequently aff'd*, 669 F.3d 255 (5th Cir. 2012).

265.    At the time of the Acquisition, when it wiped-out $39.2 million of BTS's debt, Ferrellgas L.P. required all of the newly acquired subsidiaries, including BTS, to execute a guaranty supplement and a grantor accession agreement in order to comply with

Ferrellgas L.P.'s obligations under the Credit Agreement with BOA. Whether the 2015 Guaranty Supplement or the 2016 Guaranty Supplement was effective does not matter, because BTS's obligation to guarantee Ferrellgas L.P.'s debt arose at the time Ferrellgas Partners acquired BTS, making BTS a subsidiary of Ferrellgas. In other words, at the time of the Acquisition, Ferrellgas L.P. intended to cause the Bridger Entities to execute the necessary documents to secure its credit facility with BOA, and the Bridger Entities believed (mistakenly) that they had done so. Thus, BTS's grant of a lien to BOA was a result of the Acquisition, which included $39.2 million of value to BTS in the form of debt relief.

266.    While Eddystone's expert did not opine as to the value of the lien itself, he did calculate BTS's "enterprise value" based (in part) on the value of its assets, nearly all of which were subject to the lien. But the value of a lien is not necessarily the same as the value of the asset(s) it encumbers. The comments to PUFTA provide some guidance as to how to value the lien itself.[32]  "[I]n the case of property encumbered by a lien securing a contingent obligation, such as a guaranty, in general it would be appropriate to value the obligation by discounting its face amount to reflect the probability that the guaranty will

---

[32]    Both Parties rely on various comments to PUFTA in their respective submissions. Pennsylvania law permits courts to consult comments by the committee that drafted the statute "in the … application of the original provisions of the statute if such comments … were published or otherwise generally available prior to the consideration of the statute by the General Assembly[.]" 1 Pa. C.S.A. § 1939. Thus, I may consult the committee comments, where they explain that "[t]his chapter, and the comments to this chapter, were drafted by a committee" and their "comments are part of the legislative history of this chapter under 1 Pa.C.S. § 1939 (relating to use of comments and reports)."  12 Pa. C.S.A. § 5101, cmt. 1.

ever be called upon." 12 Pa. C.S.A. § 5101, cmt. 2. In the lead case on this issue, Judge Posner explained that "a contingent liability is not certain—and often is highly unlikely— ever to become an actual liability." *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). As a result, in order to determine the value of that liability, "it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Id.*

267.    As Defendants point out, the issue in *Xonics* and most of the cases that follow it was determining balance-sheet insolvency. *See*, *e.g., In re Trans World Airlines*, Inc., 134 F.3d 188, 197 (3d Cir. 1998) ("[I]t is proper to consider contingent liabilities when evaluating the insolvency of a corporation ...."). However, the underlying issue is the same here; I must determine the value of a contingent liability. Thus, the fact that these cases apply a discount to contingent liabilities in an insolvency analysis is a distinction without a difference.

268.    To determine whether BOA might have sought to recover on the lien, I must look at the circumstances as they appeared to BTS at the time it granted the lien to BOA and whether, considering those circumstances, it was reasonable to think that BOA would call in the guaranty while it held a lien over BTS's assets. *See In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) ("[A] court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable."); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 290 (Bankr. W.D. Tex. 2009) ("[T]he

determination of whether to discount a debt because of the likelihood of payment should be made from the perspective of the Debtor, operating as it was at the time of the transfers.") (citing *In re Trans World Airlines, Inc.*, 134 F.3d 188, 194, 196-97 (3d Cir. 1998)).

269.   At the time that BTS granted a lien to BOA, there was no chance that BOA was going to call the guaranty. During the expansion of the credit facility, BOA's outside counsel became aware that none of the Bridger Entities, including BTS, had signed a grantor accession agreement, but BOA did not seize upon this technical default. Instead, its counsel volunteered to draft the necessary paperwork, and the parties worked together to get the documents signed so that the accordion could close. Thus, during a period when Ferrellgas L.P. may have been in technical default of the Credit Agreement by not having its subsidiaries sign a grantor accession agreement, BOA was in the process of extending an additional $100 million line of credit to Ferrellgas L.P. Indeed, Mr. Heitmann signed the Grantor Accession Agreement on January 13, 2016, and the accordion closed the next day.

270.   ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ (Tr. 2/14/23 at 104:10.) Indeed, there is no evidence in the record that BTS believed that BOA was going to declare a default and call in the guaranty. On the contrary, the evidence demonstrates that despite this technical default, BOA

nevertheless extended an additional $100 million of credit to Ferrellgas L.P., indicating that it had no intention of calling the guaranty. Thus, even if BTS believed that BOA would call the guaranty, such a belief would have been unreasonable.

271.    Finally, Defendants' own expert acknowledged the contingent nature of the lien and the guaranty it secured. When Mr. Polkowtiz recreated BTS's balance sheet, he did not list the lien or the guaranty as a liability. That's logical; "[o]ften [contingent liabilities] are not listed at all, when they are remote ...." *Xonics*, 841 F.2d at 200.

272.    Having determined that there was no chance that BOA would call the guaranty when BTS granted a lien to BOA, I conclude that the lien had no real value. This means that BTS did not grant the lien for less than reasonably equivalent value. On the contrary, BTS received $39.2 million in debt relief at the time of the Acquisition, and by the time it granted a lien to BOA, that lien was essentially worthless, given the unique facts of this case. Even if, as Eddystone contends, BTS did not receive any value in exchange for granting a lien to BOA, the result is the same because the lien had no value either. This is not to say that every lien or guaranty is worthless under PUFTA. Instead, this outcome reflects the fact-intensive nature of the reasonably equivalent value analysis and how value is determined on a case-by-case basis.

273.    Finally, neither the tenth nor the eleventh badge is satisfied. BTS did not grant the lien shortly before or after incurring a substantial debt, and the grant of the lien did not include the transfer of any assets to BOA or another lienor. Again, to the extent

the lien gave potential cover to BTS for the transfer of assets to other Bridger entities, I have already considered that in my analysis.

274.    The badges of fraud analysis does not end the story. Although only three badges support a conclusion of an intentional fraudulent conveyance, each of them points strongly in that direction. And it's not just a counting exercise. Also, other circumstantial evidence supports an inference of BTS's intent to hinder or delay Eddystone by granting a lien to BOA.

275.    By the time BTS granted the lien, Mr. Rios had been thinking of ways to deal with the so-called "Eddystone issue," and he noted that if there were liens on BTS's assets, that "would be a good way to restructure BTS and divest ourselves of Eddystone." (Ex. 1134.) On December 21, 2015, he and Messrs. Hampton and Soiefer had consulted Akin Gump about the plan to transfer BTS's assets, and everyone on that call was under the mistaken belief that BTS had granted a lien to BOA. Accordingly, while Akin Gump advised that the proposal to assign-away BTS's assets was not without risk (*see* Ex. 1871-B), no one believed that a court would void the transfers as fraudulent because the assets were subject to a lien. As a result, the presence of a lien on BTS's assets was a critical piece of the Ferrellgas Defendants' and Bridger Logistics' plan to render BTS assetless and sell it to a Jamex affiliate, putting all BTS's assets outside Eddystone's reach.

276.    A few weeks later, during the credit expansion, it came to light that none of the Bridger Entities had granted a lien to BOA. The fact that Ferrellgas and Ferrellgas L.P.

wanted all the subsidiaries (including BTS) to grant a lien to BOA to comply with their obligations under the Credit Agreement and avoid any disruption to the accordion does not nullify their separate intent to insure themselves against a fraudulent conveyance claim arising from the sale of BTS.

277.   Indeed, in a PUFTA case, the inquiry "is whether [debtor] intended to hinder or delay a creditor. If he did, he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." In re Blatstein, 192 F.3d 88, 97 (3d Cir. 1999) (quoting *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986)); *See also In re TransCare Corp.*, No. 20-cv-6274, 2021 WL 4459733, at *18 (S.D.N.Y. Sept. 29, 2021), *aff'd*, No. 21-cv-2547, 2023 WL 5523719 (2d Cir. Aug. 28, 2023) (corporate owner's benign reason for making transfers did not "preclude the finding that she nevertheless intended also to hinder or delay [the debtor's] other creditors").

278.   By arguing that the intent to hinder or delay must have been BTS's only intent, Defendants ask me to insert words into the statute. But courts may not "add to, remodel, update, or detract from" statutory terms. *Bostock*, 590 U.S. at 654. Pennsylvania courts also observe this limit. *See Hanaway* 168 A.3d at 154 ("[I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.") (quotation omitted).

279.   As written, the statute requires Eddystone to establish that BTS granted the lien "with actual intent" to hinder or delay a creditor. 12 Pa. C.S.A. 5104(a)(1). Had the

General Assembly intended for the objective to hinder or delay creditors to be the debtor's sole motivation, it could have drafted the statute to refer to "the" actual intent or "lone" or "sole" intent. But it didn't, and it's not my place to insert into the statute modifiers that the legislature didn't use. Because BTS granted a lien with actual intent to hinder or delay its creditor, Eddystone, the lien is an intentional fraudulent transfer and, therefore, does not prevent Eddystone from pursuing its fraudulent transfer claims against Defendants.

280.    I conclude that this evidence, coupled with the evidence about the first, fourth, and ninth badges of fraud, is enough to render BTS's agreement to subject its assets to the BOA lien an intentional fraudulent transfer. The lien is therefore no impediment to Eddystone's fraudulent transfer claims.[33]

### 2.    Challenged transfers

281.    Aside from the lien, Eddystone contends that BTS violated PUFTA by making the following fraudulent transfers:

- Transfers that occurred in 2015 (the "2015 Transfers"):

    o Elimination of BTS's intercompany receivables at the time of Acquisition; and

    o Diversion of rail throughput and pipeline management accounts receivable and cash to the BRS Cost Center, the BPS Cost Center, and/or to Bridger Logistics as of June 24, 2015;

---

[33]    Because I conclude that the lien is an intentional fraudulent transfer, I do not have to decide if it is a constructive fraudulent conveyance. It likely is not, because BTS received reasonably equivalent value for it.

- Transfers that occurred in 2016:

  o Assignment via the Terminals A&A of the Crude Oil Services Agreement between BTS and Dakota Petroleum and the Rail Terminal Services Agreement between BTS and Van Hook to Bridger Terminals;

  o Assignment via the Terminals A&A of BTS's physical assets outside the boundaries of Swan Ranch Rail Park (including crude oil injection equipment), various permits, exemptions, licenses, and several supplier, service, and customer agreements to Bridger Terminals;

  o Diversion of stations throughput cash and accounts receivable to Bridger Terminals from February 29, 2016, through August 31, 2018;

  o Assignment via the Swan Ranch A&A of the Throughput Agreement with Shell to Bridger Swan Ranch;

  o Assignment via the Swan Ranch A&A of BTS's physical assets inside the boundaries of the Swan Ranch Rail Park (including crude oil injection stations and storage terminals and oil transmission pipeline and associated equipment and fixtures), various permits, exemptions, licenses, and certain service and customer agreements to Bridger Swan Ranch;

  o Diversion of stations throughput cash and accounts receivable to Bridger Swan Ranch from March 31, 2016, through August 31, 2018;

  o Sale via a General Warranty Deed of the real property on which the Swan Ranch truck stations sat to Bridger Real Property;

  o Assignment to Bridger Terminals of BTS's rights pursuant to various truck station connection agreements with Centurion;

  o Assignment of various terminal throughput agreements between BTS and Jamex Marketing to Bridger Terminals;

  o Assignment of various truck station lease agreements with Enbridge Pipelines to Bridger Terminals by giving Bridger Terminals access to the land on which the truck stations sat via the Terminal Logistics Services Agreement;

- Termination of an implied contract between Bridger Logistics and BTS;

- Diversion of BTS's residual cash to before sale to Jamex Transfer Holdings; and

- Elimination of BTS's accounts receivable prior to sale to Jamex Transfer Holdings.

282.    Eddystone contends that each alleged transfer is both a constructive and intentional fraudulent transfer under PUFTA.

### a.    The 2015 Transfers

#### (i)    Elimination of BTS intercompany accounts receivable

##### (a)    Constructive fraudulent transfer

283.    Eddystone can establish a constructive fraudulent transfer under PUFTA by proving that: (a) BTS made the transfer without receiving reasonably equivalent value in exchange; and (b) BTS was insolvent at that time or became insolvent as a result of the transfer. *See* 12 Pa. C.S.A. § 5105. Eddystone relies on the cash flow test to establish BTS's insolvency.

284.    Eddystone also relies on Section 5104(a)(2) to establish its constructive fraudulent transfer claims, even though the First Amended Complaint asserts those claims under 12 Pa. C.S.A. § 5105 only. (*See* ECF No. 182 at § 97.) However, I find that the Parties tried Eddystone's constructive fraudulent transfer claims under 12 Pa. C.S.A. 5104(a)(2) by implied consent. Indeed, Eddystone cited to Section 5104(a)(2) in its Memorandum In Support Of Plaintiff's Motion For Summary Judgment And In Opposition To Defendants'

Motion For Summary Judgment (ECF No. 520 at 32), and Defendants did not object to Eddystone's assertion of that claim. (*See* ECF No. 528.) Likewise, Defendants did not file a motion in limine on this issue; nor did they argue in their proposed conclusions of law or response brief that it would be improper for me to consider this claim. Therefore, I treat Eddystone's claims under Section 5104(a)(2) as if raised in the Amended Complaint and evaluate whether the challenged transactions constitute constructive fraudulent transfers under that statute. *See* Fed. R. Civ. P. 15(b)(2).

285.   Unlike a Section 5105 claim, Eddystone need not establish that BTS was insolvent at the time of the challenged transfers to prevail under Section 5104(a)(2)(ii). Instead, it must show that BTS made the transfer without receiving reasonably equivalent value and "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 12 Pa. C.S.A. § 5104(a)(2)(ii) (emphasis added). "This 'forward looking' test requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred." *In re Opus E. LLC*, 698 F. App'x 711, 715 (3d Cir. 2017) (citation omitted).

286.   Eddystone's constructive fraudulent transfer claim as to the alleged elimination of BTS's intercompany accounts receivable at the time of Acquisition fails under both Section 5104 and Section 5105 because BTS had no reason to believe that it would incur debts beyond its ability to pay as they came due and was not cash flow insolvent at the time of challenged transfer.

287.    Eddystone bases this claim on its theory that following the Acquisition, BTS attributed rail throughput and pipeline management revenues to the BRS and the BPS Cost Centers, respectively, leaving BTS without sufficient cash to pay its bills as they became due. But Eddystone is wrong.

288.    Even if BTS diverted this money to one of the cost centers or to Bridger Logistics, BTS nevertheless remained able to pay its bills as they became due. From the time of the Acquisition until the sale to Jamex Transfer Holdings, either Bridger Logistics or Bridger Rail Shipping paid BTS's monthly bills to Eddystone, and I can consider this fact in determining whether BTS was cash flow insolvent. *See In re Opus E., LLC*, 528 B.R. 30, 55–56 (Bankr. D. Del. 2015), *aff'd* No. 09-cv-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017); *In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 601-04 (Bankr. D. Del. 2008).

289.    Eddystone's cases do not persuade me otherwise. First, as Defendants point out, in most of the cases on which Eddystone relies, the courts were considering whether the debtors were insolvent under the balance sheet test, not whether they were cash flow insolvent. Second, in those cases, the debtors could only pay their bills after receiving loans from their corporate parents or affiliates, leaving them in a worse financial position. In contrast, Bridger Logistics (or another Bridger entity) actually paid BTS's bills to Eddystone. There is no evidence that Bridger Logistics treated those payments as a loan. Nor is there evidence that Bridger Logistics charged BTS interest or otherwise required

BTS to reimburse it for the payments to Eddystone. Thus, even under Eddystone's revenue/cash-diversion theory, BTS was cash flow solvent because it could rely on these funds to ensure that it would be able to pay Eddystone when the RSA payments were due.

290.    Likewise, because it could rely on these payments by Bridger Logistics, BTS had no reason to believe that it would incur debts beyond its ability to pay. Finally, this transaction occurred as part of the Acquisition, at the same time Ferrellgas L.P. eliminated $39.2 million of BTS's debts. Where BTS wrote-off about $7 million intercompany receivables, it received sufficient value.

291.    As a result, Eddystone cannot prevail on its constructive fraudulent transfer claims as to the elimination of its intercompany receivables during the Acquisition under Section 5104 or Section 5105.

### (b)    Intentional fraudulent transfer

292.    Like the grant of the lien, there is no direct evidence that BTS eliminated its intercompany receivables at the time of the Acquisition with actual intent to hinder, delay, or defraud Eddystone. Thus, I turn to the badges of fraud.

293.    As an initial matter, I note that Eddystone did not provide an analysis as to the badges of fraud with respect to this specific transfer. This may amount to waiver. However, even if Eddystone did not waive this argument, the badges of fraud do not suggest that BTS acted with the requisite intent.

294.    At the time of the Acquisition, BTS eliminated millions of dollars of various intercompany receivables owed from Bridger Leasing, Bridger Transportation, J.J. Liberty, Bridger Rail Shipping, Bridger Admin Services II, J.J. Addison Partners, Bridger Real Property, and Bridger Logistics. Prior to the Acquisition, all these companies were part of the Bridger corporate family, and following the Acquisition, they each became part of the Ferrellgas corporate family. Thus, I am satisfied that each entity is an "insider" under PUFTA, satisfying the first badge of fraud.

295.    The third badge of fraud is satisfied because BTS did not disclose these transactions to Eddystone. However, in the absence of active concealment, this badge is not compelling evidence of fraud.

296.    Likewise, none of the other badges of fraud suggests that the elimination of these receivables was designed to hinder or delay Eddystone: no one had threatened BTS with suit before BTS eliminated the receivables; the approximately $7 million in receivables was not substantially all of BTS's assets; BTS did not abscond; BTS was not insolvent, nor did it become insolvent shortly after eliminating the receivables; BTS did not eliminate the receivables shortly before or after incurring a substantial debt; and it did not transfer the essential assets of its business to a lienor who transferred the assets to a BTS insider. In addition, BTS received more than reasonably equivalent value in exchange for eliminating these intercompany receivables. Indeed, this transaction occurred as part of the Acquisition, at the same time Ferrellgas L.P. eliminated $39.2 million of BTS's debts.

297.    On the contrary, the evidence demonstrates that BTS eliminated these intercompany receivables as a matter of convenience to clean-up the books prior to the Acquisition. (Tr. 12/12/22 at 36:23 – 37:18). Indeed, Mr. Jilla testified that he cancelled all the intercompany receivables owed to various Bridger Entities—not just BTS. Thus, these write-offs are not intentional fraudulent transfers.

### (ii)    Diversion of BTS rail throughput and pipeline management revenue

#### (a)    Constructive fraudulent transfer

298.    Eddystone's constructive fraudulent transfer claims as to the alleged diversion of rail throughput and pipeline management revenue to the two cost centers fails for the same reason as its claims regarding the elimination of BTS's intercompany accounts receivable at the time of Acquisition. Namely, these claims fail under both Section 5104 and Section 5105 because Eddystone was not cash flow insolvent at the time of challenged transfers, nor did it have a reason to believe that it would be unable to pay its debts as they came due.

#### (b)    Intentional fraudulent transfer

299.    The mere fact that Bridger Logistics started utilizing cost centers after the Acquisition—on its own—does not mean that BTS transferred revenues and associated cash. BTS could not have transferred accounts receivable or associated cash to the BRS or BPS Cost Centers because they were tools used for management and accounting purposes. There is no dispute that neither "Bridger Rail Services" nor "Bridger Pipeline

Services" was an actual legal entity, and neither cost center had its own bank account. Thus, there was no way for BTS to "transfer" any of its assets to either one. However, the same is not true with respect to Bridger Logistics.

300.    After the Acquisition, Bridger Logistics started treating BTS as if it were a cost center as well. As Defendants' expert explained, companies utilize cost center accounting so that management can view performance by different business segments, rather than by individual legal entity. (*See* Ex. 3003 at ¶ 29.) But unlike the BRS and BPS Cost Centers, BTS wasn't just a segment of Bridger Logistics' business—it was a separate entity. Bridger Logistics disregarded this distinction. When Mr. Rios started exploring how to get out from under the RSA, he was not sure which legal entity was Eddystone's counterparty. (*See* Ex. 1134.) Plainly, BTS's status as a standalone entity did not matter much to Bridger Logistics. Instead, Bridger Logistics treated BTS's revenues and expenses as an extension of its own. For example, once Bridger Logistics sold BTS to Jamex Transfer Holdings, BTS did not have any cash or accounts receivable, even though the evidence established that BTS should have had both. Indeed, even Defendants' own expert determined that BTS had $16.356 million of retained earnings as of January 31, 2016, yet Defendants have no explanation as to why those earnings did not follow BTS when it was sold. This reflects Bridger Logistics' view that those assets belonged to it, not BTS.

301.    In short, the combination of the zero-balance cash management system, cost center accounting, and disregard of BTS as an actual entity effectively transferred

BTS's accounts receivable and associated funds to Bridger Logistics during the period between the Acquisition and the sale to Jamex Transfer Holdings. Thus, when BTS recorded revenue and expenses across three different cost centers, it transferred the associated assets to Bridger Logistics. Whether that disposition of property constitutes an intentional fraudulent transfer turns on the badges of fraud.

302.    The first badge is satisfied because BTS's transfers of the accounts receivable and associated funds related to its Rail Throughput and Pipeline Management Revenue to Bridger Logistics—its corporate parent—was a transfer to an insider.

303.    The second badge is not satisfied because BTS did not retain control of these assets. Instead, Bridger Logistics did and exercised control over them without regard for BTS.

304.    The third badge is not implicated because BTS did not "conceal" this from anyone. In fact, Eddystone could see that monthly payments were coming from either Bridger Logistics or Bridger Rail Shipping.

305.    The fourth badge is not satisfied because BTS was not threatened with a lawsuit or sued before it made these transfers.

306.    The fifth badge is satisfied because, while BTS still retained the various assets and contractual rights that enabled it to generate revenues, that fact meant little where Bridger Logistics controlled the associated receivables.

307.    The sixth badge of fraud is not satisfied because BTS did not abscond.

308.    The seventh badge has not been met. While the combination of the zero-balance cash management system and cost center accounting method obscured true ownership of the assets, those assets could all be traced back to BTS by looking at a combination of the 202, 208, and 210 cost center codes (or the respective cost center codes in PeopleSoft).

309.    The eighth badge is met because BTS did not receive anything from Bridger Logistics in exchange for these transfers.

310.    The ninth badge is not satisfied because BTS was not cash flow insolvent at the time, and these transfers started at the time of the Acquisition, many months before BTS became balance sheet insolvent.

311.    The tenth badge of fraud could be implicated because BTS executed the 2015 Guaranty Supplement right after the Acquisition, around the same time these transfers started. However, even if the 2015 Guaranty Supplement was legally effective (which is not certain), Bridger Logistics executed it as well. This fact nullifies any inference of fraud, as both the transferor and transferee subjected themselves to the same debt.

312.    The eleventh badge of fraud is not met because BTS did not transfer its assets to a lienor who then transferred them to an insider.

313.    On the whole, three badges of fraud are satisfied with respect to the transfers of Rail Throughput and Pipeline Management Revenue to Bridger Logistics via the BRS and BPS Cost Centers, and the other eight badges do not suggest fraud. It's not

a counting game. But the three badges aren't enough to show fraud, either. The three implicated badges all point to Bridger Logistics' disregard of BTS as an individual, legal entity, but they do not demonstrate Bridger Logistics' intent to evade BTS's obligations to Eddystone. Bridger Logistics continued making monthly payments to Eddystone during this same time. Thus, these transfers do not constitute intentional fraudulent transfers under PUFTA.

### b.  The 2016 Transfers

#### (i)  Termination of implied contract

314.  To establish either a constructive or intentional fraudulent transfer, Eddystone must demonstrate that "the debtor made the transfer." 12 Pa. C.S.A. § 5104(a); 5105 (emphasis added). BTS, Eddystone's counterparty to the RSA, is the debtor. However, Eddystone contends that the Ferrellgas Defendants and/or Bridger Logistics made a fraudulent transfer by "unilaterally terminat[ing] BTS' implied contract with Bridger Logistics under which Bridger Logistics ... paid the transloading and deficiency charges BTS incurred under the RSA." (PFOF ¶ 997.)

315.  Eddystone failed to establish that an implied contract existed between Bridger Logistics and BTS. There is no evidence to support Mr. Rios's testimony that Bridger Logistics agreed to make monthly payments to BTS when Bridger Logistics used the Eddystone facility, and I have found Mr. Rios's testimony not to be credible. Instead, the evidence shows that Monroe wired its monthly TLA fees into a Bridger Logistics bank

account and then Bridger Logistics used the proceeds to pay BTS's monthly obligation to Eddystone. This is not evidence that Bridger Logistics agreed to pay BTS's bills, and there is certainly no evidence of the alleged term of any such implied contract. While Eddystone argues that the term was meant to last through the end of RSA, there is no evidence to support that argument, only Eddystone's wishful thinking. In fact, Eddystone's implied contract theory is inconsistent with its theory of the case—i.e. that Bridger Logistics disregarded BTS as a separate corporate entity and used its assets to serve Bridger Logistics' interests. That theory has support in the record; the implied contract does not.

316.    Even assuming the existence of an implied contract between BTS and Bridger Logistics, it is not enough to demonstrate that a non-debtor transferred assets away from the debtor. Instead, the plain language of the statute makes clear that Eddystone must prove that BTS made the alleged transfer. Certainly, a release can be a transfer under PUFTA, and transfers can be involuntary. *See* 12 Pa. C.S.A. § 5101(b). But a release includes "actions by a debtor to separate himself from assets which otherwise might be used to pay creditors." *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 791 (Del. Ch. 1992) (emphasis added).

317.    BTS did not grant a release to Bridger Logistics. When I asked Eddystone's counsel what evidence supported this claim, he acknowledged that "there was never a release in a traditional sense or in the PUFTA sense of a determination [sic] by BTS." (Tr. 8/10/23 at 120:25 – 121:2.) Instead, "[t]here was a unilateral termination by [Bridger]

Logistics." (*Id.* at 121:2-3.)[34]   In other words, BTS—the debtor—did not make the challenged transfer.

318.    Though Bridger Logistics terminated a "stream of payments" to Eddystone when it stopped paying BTS's bills (*Id.* at 121:11-12), PUFTA is not meant to turn creditors into third party beneficiaries. It is meant to prevent debtors like BTS from moving assets beyond the reach of their creditors, and there is no evidence that BTS did so by releasing Bridger Logistics from some implied contractual obligation. Thus, this is not a fraudulent transfer under PUFTA.

### (ii)    Remaining transfers—intentional fraudulent transfer

319.    As BTS's owners, Bridger Logistics and Ferrellgas agreed to cause BTS to make those transfers. Thus, I attribute their intent to BTS. *See Ritchie*, 779 F.3d at 862.

320.    Eddystone presented direct and circumstantial evidence that demonstrates that BTS intended to hinder or delay Eddystone by making the remaining 2016 transfers (*i.e.*, those other than the termination of the implied contract) (the "2016 Transfers") in violation of PUFTA.

### (a)    Direct evidence of intent

321.    The changing market dynamics after the Acquisition made the Amended COSA and the RSA a losing proposition for Jamex Marketing and thereby posed a

---

[34]    Eddystone's Proposed Findings Of Fact and Proposed Conclusions Of Law are replete with similar language. (*See* PFOF ¶¶ 568, 582, 997-999, 1007; PCOL ¶¶ 54, 88, 141, 152, 166.)

significant risk to Bridger Logistics. The ideas that Bridger Logistics and Ferrellgas explored, including terminating the RSA, defaulting under the RSA, and having BTS declare bankruptcy, demonstrate their intent to avoid the obligations that the RSA imposed.

322.    Many of the key players, including Mr. Rios and Mr. Hampton, acted in a way that sheds light on Bridger Logistics' and Ferrellgas's intent to avoid the economic consequences of the RSA by depriving BTS of the means and will to pay Eddystone.

323.    Mr. Rios floated the idea of putting BTS into bankruptcy or having BTS default under the RSA; he wondered whether Monroe required BTS to use the Eddystone facility; he directed Mr. Gamboa to explore offloading at locations other than the Eddystone facility; and he endorsed to Mr. Hampton and Mr. Soifer the idea of selling BTS.

324.    Mr. Rios asked Mr. Hampton whether any banks had liens on BTS's assets, noting that if that were the case, it "would be a good way to restructure BTS and divest ourselves of Eddystone" and made clear that he wanted BTS to "stop paying" Eddystone starting in February 2016. (Ex. 1134.)

325.    ████████████████████████████████████████
████████████████████████████████ (Ex. 1131.)

326.    Mr. Rios met with Mr. Ballengee, who proposed that if Bridger Logistics sold BTS to Jamex, then Jamex could "do what Ferrellgas [wouldn't] let Bridger Logistics do,"

including sue Eddystone, put BTS into bankruptcy, or stop payment. (Tr. 9/23/22 at 154:1-7.)

327.     Mr. Rios and Mr. Hampton participated in a conference call with Akin Gump lawyers to discuss BTS, and the discussion included intentional and constructive fraudulent conveyances under 11 U.S.C. § 548 and the "potential of transferring BTS or selling the BTS entity to Jamex." (Tr. 12/14/22 207:10-12.)

328.     Mr. Rios directed Akin Gump lawyers to "go ahead and start BTS assignment of assets" (Ex. 1169) because Bridger Logistics and Ferrellgas's plan by late December 2015 was to "get [BTS] to Jamex so that [Jamex] could deal with the Eddystone issue." (Tr. 12/14/22 at 207:18-19.)

**(b)     Badges of fraud**

329.     In addition to direct evidence of intent, my assessment of the badges of fraud reinforces my conclusion that BTS acted with actual intent to hinder and delay Eddystone from collecting deficiency payments under the RSA.

330.     The first badge of fraud supports a finding of an intentional fraudulent conveyance because each of the remaining 2016 Transfers was made to an insider. Bridger Logistics, Bridger Swan Ranch, Bridger Terminals, Bridger Real Property, Bridger Energy, and Bridger Transportation were all corporate relatives of BTS, and each of them received one or more transfers. Thus, these recipients are "insiders." Defendants do not argue otherwise.

331.    On its own, a transfer to an affiliated company is not sufficient to establish fraud. *See In re Forks Specialty Metals Inc.*, No. AP 19-28, 2023 WL 3239468, at *21 (Bankr. E.D. Pa. Apr. 30, 2023); 12 Pa. C.S.A. § 5104, cmt. 5. But a transfer to an insider "warrants close scrutiny of other circumstances, including the nature and extent of the consideration exchanged." *Id.* (citation omitted).

332.    Although BTS did not retain possession or control of its assets after the challenged transfers, Ferrellgas, the Ferrellgas Defendants, and Bridger Logistics did. In fact, that was the entire point of the transfers. The 2016 Transfers put BTS's assets out of Eddystone's reach, but because BTS transferred those assets to Bridger Logistics' subsidiaries, Ferrellgas, the Ferrellgas Defendants, and Bridger Logistics continued to reap the benefits of continued possession and control of them. Thus, the second badge of fraud is satisfied.

333.    The challenged transfers also implicate the fourth badge. As set forth above, before BTS made the alleged transfers, Messrs. Hampton, Rios, and Soiefer had a conference call with attorneys from Akin Gump to discuss the implications of Jamex Marketing putting BTS into bankruptcy after acquiring it. Thus, at the time it made the transfers, BTS had reason to think that a future bankruptcy was a possibility.

334.    The fifth and seventh badges of fraud are satisfied and provide compelling evidence of intent. BTS rid itself of all its assets through the series of transfers that started in January 2016, removing them from Eddystone's reach. *See, e.g., Klein v. Weidner*, No.

08-cv-3798, 2010 WL 27910, at *2 (E.D. Pa. Jan. 6, 2010), *aff'd*, 729 F.3d 280 (3d Cir. 2013).

Thus, by the time Bridger Logistics sold its interest in BTS to Jamex Transfer Holdings, BTS

had no assets whatsoever, and its creditors (read: Eddystone) were stranded. And that was

the point.

335.    The eighth badge of fraud is satisfied because Eddystone has demonstrated

that BTS did not receive reasonably equivalent value for any of the 2016 Transfers.

Defendants do not meaningfully dispute this. Instead, they argue over the value of the

assets, contending that the value of BTS's 19 injection stations decreased in value from

$41.6 million to $14.8 million between the time of the Acquisition and July 31, 2016.

According to Defendants, the injection stations were worth somewhere between these

two amounts when BTS transferred them to Bridger Terminals and Bridger Swan Ranch.

Because BTS assigned those assets without receiving anything in exchange for them, it

did not receive reasonably equivalent value, regardless of what the assets were worth.

336.    BTS did not receive reasonably equivalent value when it sold the real

property at the Swan Ranch Terminal to Bridger Real Property for $10. Defendants'

internal accounting records attributed a book value of $1,726,000 to the real property at

the Swan Ranch Terminal as of January 31, 2016. (*See* DSX 2; Ex. 3003.) Eddystone's expert

valued the property at $1,726,247 based on the previous purchase price. (Ex. 3002 at §

88.) Regardless of whether the property's fair market value was greater or less than that

amount, the sale of 15.01 acres of land for $10 was not for reasonably equivalent value, and Defendants do not argue to the contrary.

337.    BTS also did not receive reasonably equivalent value for any of the assignments it made as part of the 2016 Transfers. In fact, it received nothing in exchange for any of them. The same is true with respect to the elimination of BTS's intercompany accounts receivable in January of 2016.

338.    The ninth badge of fraud is satisfied as well. Bridger Logistics caused BTS to assign all its assets to other Bridger entities on January 31, 2016, so that Bridger Logistics could sell an assetless BTS to Jamex Transfer Holdings effective the next day. At that point, BTS retained only the liability of the RSA. As a result, BTS "became insolvent shortly after" making the challenged transfers. 12 Pa. C.S.A. § 5104(b)(9).

339.    Even if I credit Defendant's expert's opinion that BTS had $16.356 million in retained earnings as of January 31, 2016, that alleged asset is far less than the amounts BTS owed to Eddystone at that time. Defendants' expert's most conservative calculation of the but-for monthly revenue that Eddystone would have received from BTS after February 2016 is $72 million. Because BTS's debt to Eddystone exceeded BTS's assets, BTS was balance sheet insolvent as of January 31, 2016.

340.    The remaining badges of fraud have not been met.

341.    As to the third badge of fraud, there is no dispute that neither BTS nor any Defendant disclosed the 2016 Transfers to Eddystone. However, there is no evidence that

BTS concealed these transactions from Eddystone, either. What Bridger Logistics referred to as "Plan B"—BTS's lease of truck stations to Bridger Terminals to avoid the "no sublease" and "no assignment" provisions in BTS's leases with Enbridge Pipelines—is not evidence of concealment.

342.    First, Eddystone admits that Enbridge Pipelines is "unrelated to Eddystone," so any deception of Enbridge Pipelines has little relevance to whether BTS concealed its plans from Eddystone. Second, even if there was some connection or affiliation between the two entities, Bridger Logistics disclosed its intentions to Enbridge Pipelines when it sought its consent to assign BTS's lease rights to Bridger Terminals. The fact that Bridger Logistics devised an end-run around the consent requirement does not constitute concealment, even if it does demonstrate brass-knuckle tactics. Thus, the third badge of fraud is not satisfied.

343.    The sixth badge is not satisfied because BTS did not abscond, and Eddystone concedes as much.

344.    The tenth badge of fraud is not met because BTS did not incur a substantial debt shortly before or after the 2016 Transfers. At that time, BTS owed Eddystone monthly deficiency charges pursuant to the RSA, and that liability remained, regardless of whether BTS defaulted on the RSA when it stopped paying the monthly charges after January 2016. *See*, e.g., Bank of Joliet v. Firstar Bank Milwaukee, N.A.A., No. 96-cv-1145, 1997 WL 619875,

at *16 (N.D. Ill. Sept. 30, 1997) (drawing distinction between defaulting on a prior liability and incurring a new debt).

345.  On its face, the eleventh badge does not apply either. There is no dispute that BTS did not transfer any assets to BOA or any other lienor. In addition, I am not convinced that the grant of the lien to BOA was a sham transaction. Instead, as set forth above, Ferrellgas and the Ferrellgas Defendants had valid reasons for causing Bridger Logistics and its subsidiaries to grant liens to BOA. The fact that they also stood to benefit from imposition of the lien (because it permitted BTS to engage in the 2016 Transfers with a potential valid lien defense) does not mean that they "manipulated" the lien's creation. Thus, this badge of fraud is not met.

346.  Collectively, the direct evidence of fraudulent intent coupled with my analysis of the badges of fraud leads me to conclude that the 2016 Transfers (other than the termination of the implied contract), were intentional fraudulent transfers under PUFTA.

### (iii)  Remaining transfers—constructive fraudulent transfer

347.  The 2016 Transfers are constructive fraudulent transfers under Section 5105 because, as set forth above: (a) BTS made the transfers without receiving reasonably equivalent value in exchange, and (b) the transfers rendered BTS insolvent.

348.  The 2016 Transfers are constructive fraudulent transfers under Section 5104(a)(2)(ii) as well. Once Bridger Logistics entered the Bridger-Jamex TLA Amendment

with Jamex Marketing on January 13, 2016, it was clear that BTS would no longer be able to pay its debts to Eddystone as they became due. Indeed, that agreement provided that at the time of the sale (which was set for February 1, 2016), BTS would not have any "assets or liabilities other than its rights and obligations under the Eddystone Contract ...." (Ex. 1276-A at § VI.) In other words, BTS would have no money and no means of performing services to generate funds.

349.    In addition, at that point, BTS had no reason to expect that Jamex Marketing would cover BTS's obligations to Eddystone. As set forth above, neither the Bridger-Jamex TLA Amendment nor the attendant Release Agreement provided that Jamex Marketing or a Jamex affiliate would guarantee BTS's monthly payments to Eddystone. (*See* generally 1276-A, 1276-A at Ex. A.) While Jamex Marketing eventually guaranteed that obligation when the parties executed the BTS PSA and the related Release And Guarantee Agreement on February 22, 2016, Jamex Marketing made that guarantee after BTS had already assigned-away its assets.

350.    In addition, Mr. Ballengee believed that he could convince Eddystone to renegotiate the RSA or agree to an intermediation agreement with Carlyle Global if he threatened a lawsuit or withheld payment. In fact, that was why he proposed buying BTS from Bridger Logistics in the first place. Given all this, BTS could have no reasonable belief that at the time it made the challenged transfers, Jamex Marketing intended to cover the monthly deficiency payments going forward.

351.    As a result, the 2016 Transfers are constructive fraudulent transfers under Section 5104(a)(2)(ii) because BTS (a) made the transfers without receiving reasonably equivalent value in exchange and (b) believed or reasonably should have believed that it would not be able to make the deficiency payments to Eddystone going forward.

### 3.    Liable entities

352.    Having determined that BTS engaged in intentional and constructive fraudulent transfers, the next question is which Defendants are liable for those transfers.

353.    In its Amended Complaint, Eddystone asserted Counts II and III against the Ferrellgas Defendants, Bridger Logistics, Bridger Administrative Services II, Bridger Marine, Bridger Rail Shipping, Bridger Real Property, Bridger Storage, Bridger Swan Ranch, Bridger Terminals, Bridger Transportation, Bridger Energy, Bridger Leasing, Bridger Lake, J.J. Liberty, and J.J. Addison Partners.

354.    Once a creditor establishes a fraudulent transfer under PUFTA, "judgment may be entered against ... the first transferee of the asset or the person for whose benefit the transfer was made[.]" 12 Pa. C.S.A. § 5108(b)(1). Eddystone seeks to impose liability on beneficiaries and first transferees.

### a.    Beneficiaries

355.    By its plain terms, PUFTA permits the imposition of liability on entities other than the initial recipient of the transferred asset. "Indeed, courts have consistently held that the 'entity for whose benefit the transfer was made' is distinct from a transferee,

immediate or otherwise." *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp.2d 106, 121 (E.D. Pa. 2011) (citations omitted). An entity may benefit from a transfer if it owned the transferee. *See Sugartown Worldwide LLC v. Shanks*, No. 14-cv-5063, 2015 WL 1312572, at *11 (E.D. Pa. Mar. 24, 2015); *Carroll v. Stettler*, No. 10-cv-2262, 2013 WL 2370566, at *4 (E.D. Pa. May 31, 2013).

356.    The evidence presented at trial demonstrates that the Ferrellgas Defendants and Bridger Logistics caused BTS to make the alleged transfers to benefit Bridger Logistics and Ferrellgas Partners. By December 2015, Bridger Logistics was feeling squeezed by Jamex Marketing's financial troubles and BTS's monthly obligation to Eddystone. Though the decisionmakers floated a variety of ideas to deal with this problem, their objective was clear: preserve as much of Bridger Logistics' EBITDA as possible. This was meant to benefit Bridger Logistics itself, as well its corporate parent and grandparent—Ferrellgas Partners and Ferrellgas. In early December when Messrs. Rios, Gamboa, and Soiefer were discussing the need to avoid a $70 million EBITDA hole, Mr. Rios agreed that the team needed to be "firm but commercial" for Ferrellgas's sake. (Ex. 1099; Tr. 9/22/22 at 46:3-21.) These three men also had strong personal reasons to maximize Bridger Logistics' EBITDA.

357.    In the end, Bridger Logistics and the Ferrellgas Defendants (which Ferrellgas managed) agreed to strip BTS of all of its assets, give those assets to their wholly-owned subsidiaries, leave BTS with the liability of the RSA, and then rid themselves of the

"Eddystone issue" by selling BTS to Jamex Transfer Holdings. The benefit to Bridger Logistics and Ferrellgas Partners was twofold: (a) they rid themselves of the RSA, which had become economically undesirable; and (b) they retained BTS's money-making assets. Thus, Eddystone can hold Bridger Logistics and Ferrellgas Partners liable for the fraudulent transfers under Section 5108(b)(1).

358.    However, the same is not true with respect to Ferrellgas L.P., because there is no evidence that BTS made the transfer for Ferrellgas L.P.'s benefit. Unlike Ferrellgas Partners, Ferrellgas L.P. did not own BTS or any of the transferee entities. In addition, it does not matter whether Ferrellgas L.P. might have benefitted from BTS's execution of the 2015 or 2016 Guaranty Supplement or the Grantor Accession Agreement because the statute directs me to consider whether BTS made the challenged transfers for the purpose of benefitting Ferrellgas L.P. Neither the Guaranty Supplement nor the Grantor Accession Agreement is a challenged transfer. Instead, the transfers at issue are the 2016 Transfers. And absent evidence that BTS made those transfers to benefit Ferrellgas L.P., Eddystone cannot hold Ferrellgas L.P. liable under PUFTA.

359.    Defendants do not mount a meaningful defense on this issue. (*See* ECF No. 739 at 31.) They do not dispute that BTS made the transfers to benefit Bridger Logistics and Ferrellgas Partners. Instead, they dispute the extent of those benefits. But that is not the statute's focus. All that matters is whether the transfers were made to benefit these Defendants, and the evidence makes clear that they were.

**b.      Transferees**

360.    PUFTA also imposes liability on the initial recipient of a fraudulently transferred asset. During closing arguments, counsel for Eddystone clarified that Eddystone is seeking to hold liable as first transferees only those Defendants for whom BTS eliminated accounts receivable. (*See* Tr. 08/10/23 at 143:8 – 145:10; *see also* PFOF ¶ 16.) As part of that clarification, counsel confirmed that Eddystone is "not claiming" as to Bridger Terminals and Bridger Swan Ranch. (Tr. 08/10/23 at 144:22 – 145:4; *see also id.* at 143:25 – 144:1 ("We are not claiming separately for Bridger Terminals.").) Thus, I will enter judgment in favor of Bridger Terminals and Bridger Swan Ranch on Eddystone's fraudulent transfer claims in Counts Two and Three. In addition, I will enter judgment in favor of Bridger Marine, Bridger Storage, and Bridger Lake because there is no evidence that BTS eliminated accounts receivable due from these entities.[35]

361.    I will also enter judgment in favor of Bridger Administrative Services II, Bridger Rail Shipping, Bridger Real Property, Bridger Leasing, J.J. Liberty, and J.J. Addison Partners because I have determined that the elimination of BTS's intercompany receivables at the time of the Acquisition was not a fraudulent transfer.

362.    However, BTS made fraudulent transfers when it eliminated accounts receivable in advance of the sale to Jamex Transfer Holdings. As of February 1, 2016,

---

[35]     On the contrary, the evidence demonstrates that *BTS* owed these three Defendants money as of February 1, 2016. (*See* PSX 72; Ex. 3002 at ¶ 91.)

Bridger Energy owed $610,347 to BTS, and Bridger Transportation owed $953,176 to BTS. BTS eliminated both receivables before the sale, thereby releasing those two Defendants from these debts and permitting them to exert their dominion and control over the funds. Thus, Bridger Energy and Bridger Transportation are liable as first transferees under PUFTA. *See* 12 Pa. C.S.A. § 5108, cmt. 2 (noting that Section 5108(b) "is derived from § 550(a) and § 550(b) of the Bankruptcy Code"); *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (explaining that "the minimum requirement of status as a 'transferee' [under § 550] is dominion over the money or other asset, the right to put the money to one's own purposes").

### F.    Defendants' Affirmative Defenses

#### 1.    Unclean hands

363.    Neither Eddystone nor Defendants addressed whether beneficiaries or transferees may assert unclean hands to defend against PUFTA claims. Though I have not found a Pennsylvania case on-point, I note that "Texas courts have applied the doctrine of unclean hands to prevent recovery under [the Texas Uniform Fraudulent Transfer Act]." *GE Cap. Com., Inc. v. Worthington Nat. Bank*, No. 3:09-cv-572, 2011 WL 5025153, at *4 (N.D. Tex. Oct. 20, 2011) (citations omitted). Like this case, *GE Cap.* involved an "anomalous" situation in which a "transferee asserted an unclean hands defense against a creditor who was seeking to avoid a transaction between the debtor/transferor and the transferee." *Id.* Because the plaintiff sought the equitable remedy of avoidance of a

transfer, and because the Texas statute provided that "principles of law and equity" supplemented its provisions, the district court determined that defendants could rely on the doctrine of unclean hands to defend against fraudulent transfer claims.

364.    Like the Texas statute, PUFTA also has a supplemental provisions section that provides that "[u]nless displaced by the provisions of this chapter, the principles of law and equity" apply. 12 Pa. C.S.A. § 5110. In addition, Section 5107 permits creditors to obtain "any other relief the circumstances may require[,]" "[s]ubject to applicable principles of equity …." 12 Pa. C.S.A. § 5107(a)(3)(iii). The Third Circuit has explained that this provision could be read to require "that any relief granted must comply with the rules and procedures implicated by the specific kind of relief at issue. For example, a creditor seeking an injunction would be required to meet the otherwise generally applicable requirements for this form of equitable relief (e.g., not have 'unclean hands')[.]" *Klein v. Weidner*, 729 F.3d 280, 291 (3d Cir. 2013).

365.    Given all this, I predict that Pennsylvania law would permit defendants to assert unclean hands as a defense under PUFTA. Defendants may rely on this defense because Eddystone seeks the equitable remedy of avoiding the various challenged transfers and seeks pre-judgment interest. *See Chestnut St. Consol., LLC v. Dawara*, 619 F. Supp.3d 489, 517 (E.D. Pa.), *judgment entered*, 619 F. Supp.3d 521 (E.D. Pa. 2022) (award of prejudgment interest in a PUFTA case is an equitable remedy).

366.    "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy at issue." *In re Adoption of S.A.J.*, 838 A.2d 616, 625 (2003) (quotation omitted). The defense "applies when the party seeking relief is guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999) (emphasis added); *See also Stauffer v. Stauffer*, 351 A.2d 236, 244 (Pa. 1976) (unclean hands applies only where the alleged inequitable conduct "is directly connected with the matter in controversy") (citation omitted) (emphasis added).

367.    Defendants' unclean hands defense fails because they have failed to demonstrate that Eddystone's alleged misdeeds connect directly to the 2016 Transfers.

368.    Eddystone does not have unclean hands due to its "fail[ure] to disclose facility defects ... before BTS executed the RSA ...." (DCOL ¶ 374 (emphasis added).) Those issues—i.e. the SEPTA window, the lack of CT meters, and the granite pinnacle—did not come to light until months after the parties executed the RSA. In addition, there's no evidence linking an alleged failure to disclose the facility defects to the fraudulent transfers at issue. Likewise, there is no direct connection between Eddystone's fraudulent transfer claims and its decision to enter into the Arbitration Settlement Agreement with

Jamex, Jamex Marketing, and other Jamex affiliates, nearly a year after BTS made the fraudulent transfers.

369.    Finally, even if Eddystone's execution of a tripartite agreement to facilitate intermediation with Carlyle Global would have solved Bridger Logistics' and the Ferrellgas Defendants' economic concerns by providing a source of funding for Jamex Marketing to acquire crude, Eddystone's refusal to enter into such an agreement did not permit BTS to resort to the fraudulent transfers at issue. Instead, it had to pay its creditor. And, in any event, Defendants have not shown that Eddystone's refusal to consent to the intermediation agreement rises to the level of fraud, unconscionable conduct, or bad faith. Indeed, neither Dakota Plains nor Plains All American signed-off on their respective draft tripartite agreements. Instead, Eddystone identified a basis for concern and was under no obligation to sign.

### 2.    Claim preclusion and exclusive remedy

370.    Contrary to Defendants' position, Eddystone's election of remedies in the arbitration proceeding against BTS does not preclude it from asserting its claims here.

371.    A type of estoppel, the doctrine of election of remedies prohibits a litigant from "occupy[ing] inconsistent positions in relation to the facts which form the basis of his respective remedies[.]" *Abdallah v. Abdallah*, 359 F.2d 170, 174 (3d Cir. 1966) (emphasis added). Courts are not concerned with inconsistency between different remedies because it is often the case that the same set of facts can serve as the basis for several alternative

remedies. *See id*. Instead, the doctrine prohibits a litigant from relying on a certain set of facts to support a remedy and then later relying on inconsistent facts as the basis for another remedy. *See id*. at 174-75.

372.    In asserting its claim in this case, Eddystone has not relied on facts that are inconsistent with or repugnant to the facts on which it relied on in the arbitration proceedings against BTS. There is no dispute that BTS and JTS are the same entity. Nevertheless, Defendants contend that election of remedies precludes Eddystone from asserting its claims that BTS owed it obligations under the RSA because Eddystone asserted in the arbitration that JTS owed those obligations. This argument has no merit and treads dangerously close to bad faith. Likewise, there is nothing factually inconsistent about Eddystone seeking to hold Ferrellgas Partners liable as a transferee under PUFTA. This claim is based on the same fact that BTS owed a debt to Eddystone.

### G.    Damages

373.    PUFTA permits Eddystone to "recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less." 12 Pa. C.S.A. § 5108(b).

### 1.    Claims against Bridger Energy and Bridger Transportation

374.    Eddystone seeks judgment against Bridger Energy and Bridger Transportation due to the elimination of BTS's accounts receivable prior to the sale to Jamex Transfer Holdings. At the time of the transfers, these accounts receivable were

worth $610,347 and $953,176, respectively—far less than the amount necessary to satisfy Eddystone's claim against BTS for unpaid sums under the RSA.

375.   Eddystone is entitled to prejudgment interest on these amounts as well. "[C]ourts in this circuit have authorized the award of pre-judgment interest in cases arising under the [PUFTA]." *Chestnut*, 619 F. Supp.3d at 517 (collecting cases). In determining whether prejudgment interest is warranted, courts in this circuit consider the four Feather factors, including: "(1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable considerations militate against a surcharge." *Id.* (citing *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 540 (3d Cir. 1983)).

376.   Consideration of these factors leads me to conclude that Eddystone is entitled to prejudgment interest on its PUFTA claims against Bridger Energy and Bridger Transportation. Eddystone was diligent in prosecuting this action and brought its claim against these Defendants less than a year after discovering that BTS had made the challenged transfers. These Defendants owed these amounts to BTS at the time of the transfers, yet BTS eliminated those debts so that it would not have any assets at the time of the sale to Jamex Transfer Holdings, and they were unjustly enriched by not having to pay them. An award of interest on these claims would compensate Eddystone for a small

portion of the time and expense of litigating this matter for the past seven years, and I see no countervailing equitable considerations that militate against such an award.

377.    "Under Pennsylvania law, unless otherwise specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of six percent per year." *Id.* at 517-18 (citing 41 P. S. § 202). I calculate prejudgment interest as of the date the transfers took place—January 31, 2016. *See, e.g., Chestnut*, 619 F. Supp.3d at 518. Thus, Eddystone is entitled to prejudgment interest in on its claim against Bridger Energy in the amount of $305,783, for a total judgment of $916,130. In addition, Eddystone is entitled to prejudgment interest on its claim against Bridger Transportation in the amount of $477,541, for a total judgment of $1,430,717.

### 2.    Claims against Bridger Logistics and the Ferrellgas Defendants

#### a.    Value of the transferred assets

378.    Eddystone's expert did not opine as to the value of each of the other assets that BTS transferred. Instead, he calculated the "going concern" or "enterprise" value of BTS's assets at the time of the transfers. "Going-concern value is defined as '[t]he value of a commercial enterprise's assets ... as an active business with future earning power[.]'" *In re TransCare Corp.*, 81 F.4th 37, 52 (2d Cir. 2023) (quotation omitted).

379.    While I have not found a Pennsylvania decision applying this theory of valuation in a fraudulent transfer context, that fact does not render this method inappropriate. "'[T]he law does not command mathematical preciseness from the

evidence in finding damages.' Instead, all that is required is that 'sufficient facts … be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture.'" *Scully v. US WATS, Inc.*, 238 F.3d 497, 515 (3d Cir. 2001) (quotation omitted). Utilizing the going concern value of BTS's assets, in the aggregate, allows me to arrive at an intelligent estimate of the value of those assets because BTS transferred all its assets, leaving it with nothing of value.

380.    Like BTS, the debtor in TransCare transferred all the assets it used to operate three of its lines of business, including personal property and relevant contracts. Because it transferred those assets to a newly formed company with the intent that the new company would continue operating the three lines of business, the bankruptcy court relied on the going concern value of the business lines to determine the value of the transferred collateral. *See In re Transcare Corp.*, No. 16-10407, 2020 WL 8021060, at *24 (Bankr. S.D.N.Y. July 6, 2020), adopted as modified, No. 20-cv-6274, 2021 WL 4459733 (S.D.N.Y. Sept. 29, 2021), aff'd, 81 F.4th 37 (2d Cir. 2023).

381.    The same valuation method is appropriate in this case because where BTS transferred all the assets it used to operate its business—personal property, real property, contracts, and accounts receivable. Without those assets, BTS no longer had a business to operate, and Bridger Logistics intended that its subsidiaries would continue to operate different aspects of BTS's business going forward. Thus, it is appropriate to value those

assets based on BTS's going concern value. *See In re Heller Ehrman LLP*, No. 08-32514, 2014 WL 323068, at *8 (Bankr. N.D. Cal. Jan. 28, 2014).

382.    Under PUFTA, if a court bases its judgment on the value of the transferred asset, then it must measure value at "the time of the transfer." 12 Pa. C.S.A. § 5108(c). Mr. Sherman opined that BTS's transferred assets were worth between $266.8 million and $315.2 million at the time of the transfers. It was appropriate to calculate these figures based on the price that Ferrellgas Partners paid to acquire Bridger Logistics because there was no material change in value as of January 31, 2016. And Mr. Kumar agrees with Mr. Sherman's valuation, having found BTS's value to be somewhere between $202.5 million and $324.9 million.

383.    Finally, whether the value of BTS's transferred assets declined after the challenged transfers is of no moment because value must be measured as of "the time of the transfer." 12 Pa. C.S.A. § 5108(c).

**b.    Amount necessary to satisfy Eddystone's claim**

384.    Eddystone cannot recover the value of the transferred assets if that amount exceeds the amount necessary to satisfy Eddystone's claim against BTS. *See* 12 Pa. C.S.A. § 5108(b). Under PUFTA, a "claim" is "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 12 Pa. C.S.A. § 5101.

Eddystone's claim against BTS is its right to payment under the RSA, and there is no dispute that New York law governs the RSA.

385. Defendants are wrong that the Arbitration Settlement Agreement extinguished BTS's obligations under the RSA. This argument begins and ends with the relevant release provision. That provision grants a release only to the "Jamex Parties"—i.e., Jamex LLC, Jamex Marketing LLC, Jamex Administrative Services LLC, Jamex Unitholder LLC, Jamex Transfer Holdings LLC, James H. Ballengee, JBAH Holdings LLC, Ballengee Holdings LLC, and Ballengee Interests LLC. (*See* Ex. 1618 at ¶ 5.)  BTS—i.e., Jamex Transfer Services, LLC—is not defined as a Jamex Party, so a release as to the Jamex Parties has no bearing on Eddystone's claims against BTS. In addition, the release clarifies that, "[f]or the avoidance of doubt, ERC does not however remise, release, or discharge [BTS] from the Award or its obligations thereunder." (*Id.*) BTS is also not a Party to Paragraph 12 of the Arbitration Settlement Agreement. (*See Id.* at 1 ("[BTS] is a Party solely for the purposes of Paragraphs 1, 4, 8, 11, and 13-22 herein.").) Thus, Paragraph 12's recitation that the "Agreement represents a full and complete settlement" between Eddystone and the Jamex Parties "as to the matters being released" does not extinguish Eddystone's claims against BTS.

386. The tougher question is whether Eddystone's "claim" against BTS is the full amount due under the RSA as of February 2016 or the unconfirmed arbitration award from January 2017. However, because none of the Parties has argued that Eddystone's

claim against BTS should be grounded in the unconfirmed arbitration award, I need not resolve that question.

387.   Turning to Eddystone's claim against BTS based on a breach of the RSA, I reject Defendant's attempt to cut off Eddystone's damages prior to the RSA's termination. Under the RSA, BTS

> expressly agreed that, except as expressly provided in Sections 4.4 [Limited Capacity], 7.2 [Impact of Eddystone Force Majeure on Monthly Deficiency Payments], and 7.3 [Termination Based on Eddystone Force Majeure], *no cause or event whatsoever*, including an event of Force Majeure affecting the performance of [BTS's] obligations hereunder will permit or provide a basis for [BTS] to terminate this Agreement or excuse or suspend [BTS's] obligation to perform its obligations under this Agreement, including its obligations under Section 4.1 hereof[.]

(Ex. 90-A at § 7.4 (emphasis added).) In other words, according to the RSA's plain language, neither the sale of the Eddystone facility in October 2017 nor the resumption of transloading crude oil in August 2018 is a basis to excuse BTS from its obligations to make monthly deficiency payments to Eddystone for the life the RSA.

388.   This provision of the RSA is consistent with New York law. Where, as here, a party to the contract repudiates that contract before the time for performance, "the party harmed by the repudiation must make a choice either to pursue damages for the breach or to proceed as if the contract is valid." *Princes Point LLC v. Muss Dev. L.L.C.*, 87 N.E.3d 121, 124 (N.Y. 2017). Electing to treat the repudiation as a breach and seek damages for breach of contract terminates the contractual relation between the parties. *See Lucente v.*

*Int'l Bus. Machines Corp.*, 146 F. Supp.2d 298, 315 (S.D.N.Y. 2001). As a result, the injured party "need not ... tender performance nor prove its ability to perform the contract in the future." *Am. List Corp. v. U.S. News & World Rep., Inc.*, 549 N.E.2d 1161, 1165 (N.Y. 1989) (citations omitted).

389.    In a case involving both a take-or-pay contract and an anticipatory breach by the buyer, the Supreme Court of Oklahoma reasoned that the seller's "measure of damages is unaffected by the seller's future inability to deliver gas. If the seller is capable of performance on the date of the breach, the damages recoverable will not be diminished." *Roye Realty & Developing, Inc. v. Arkla, Inc.*, 863 P.2d 1150, 1160 (Okla. 1993). Because Oklahoma law regarding anticipatory breach is similar to that of New York, I find *Roye* persuasive on this issue. Thus, I conclude that BTS's anticipatory breach of the RSA relieved Eddystone of its obligation of future performance. Therefore, Eddystone's alleged inability to perform under the RSA has no bearing on the damages that it may recover. As a result, neither the alleged sale of the facility in October 2017 nor the resumption of transloading services in August 2018 provides a basis for reducing Eddystone's damages under the RSA.

390.    The Parties started their damages calculations by determining the total amount of deficiency payments due to Eddystone following BTS's repudiation, and my damages analysis begins there as well. Eddystone is entitled to deficiency payments through the termination of the RSA at the end of June 2019. Mr. Sherman's calculations

are a better starting point than Defendants' expert's, Erica Bramer. Mr. Sherman started with the actual amount that Eddystone was charging BTS for deficiency payments at the time of the alleged breach—$1.78 per barrel—as opposed to Ms. Bramer, who started her analysis using the unadjusted $1.75 per barrel figure. Mr. Sherman also explained his method for calculating the various Consumer Protection Index ("CPI") adjustment factors that he used in his analysis, whereas Ms. Bramer did not. Utilizing Mr. Sherman's figures, (Ex. 3002 at ¶ 115), BTS's remaining liability under the RSA was $146,107,401 as of February 2016.[36]

391.    The next question is whether this amount is subject to any further reductions or discounting. The Parties agree that the RSA was a take-or-pay contract, but they dispute whether that contract structure impacts the scope of Eddystone's damages. The Parties have not identified a New York case that answers this precise question, and I have not found one either. However, my review of cases from other jurisdictions and consideration of overarching principles of New York contract law leads to me to conclude that Eddystone's damages under the RSA are subject to certain reductions and discounts.

392.    Eddystone asserts an anticipatory breach/repudiation theory, and that theory treats BTS's repudiation of the RSA as a total breach as of February 2016 and permits Eddystone to "recover the present value of its damages from the repudiating

---

[36]    My calculation differs from Mr. Sherman's because I have not deducted $200,000 from the first deficiency payment balance.  I account for that payment to Eddystone later in my analysis.

party's breach of the total contract." *Am. List Corp.*, 549 N.E.2d at 1165 (citing *Long Island R. Co. v. Northville Indus. Corp.*, 362 N.E.2d 558, 566 (N.Y. 1977)) (emphasis added). "[U]nder the ancient and hoary rule, damages for breach of contract are measured as of the date of the breach." *Lucente*, 146 F. Supp.2d at 304; *see also J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc.*, 299 N.E.2d 243, 244 (N.Y. 1973) ("The general rule is that damages for breach of contract are computed at the time of breach."). As of the date of the breach, Eddystone was entitled to the remaining payments under the RSA that were not yet due. *See Princes Point*, 87 N.E.3d at 125. But a dollar in 2016 was worth more than a dollar in 2019. To avoid giving Eddystone a windfall, I must discount those payments to their present value as of February 2016. *See Long Island R. Co.*, 362 N.E.2d at 566.

393.    Eddystone's reliance on *Prenalta* and its progeny is misplaced. First, it is not at all clear that the court considered (or had a reason to consider) whether it was proper to discount the defendant's obligation to pay deficiency amounts due under a take-or-pay contract. The opinion is silent as to that issue. Second, because the plaintiff in *Prenalta* did "not claim repudiation of the contracts," there was no need to discount future payments to present value as of the time of the defendant's breach. *See Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 687 n.14 (10th Cir. 1991). None of the decisions on which Eddystone relies is from New York or applies New York law. To the extent that those cases stand for the proposition that a plaintiff's damages under a take-or-pay

contract may never be reduced or discounted, they conflict with New York's law regarding damages for repudiated contracts. As such, I do not follow them.

394.    Likewise, the *Roye* case does not assist Defendants on this issue. In that case, the court disagreed with *Prenalta* and held that the "pay" obligation of a take-or-pay contract is not determinative of the measure of damages for anticipatory repudiation of the contract. *See Roye*, 863 P.2d at 1158. But the court also determined that Oklahoma's Uniform Commercial Code set forth a "specific statutory measure of damages for anticipatory repudiation of the take-or-pay obligation"—the difference between the market price at the time when the aggrieved party learned of the repudiation and the unpaid contract price. *Id.* at 1159. There is no similar statutory provision that applies in this case, so *Roye* has little bearing on my analysis.

395.    In short, I am not convinced that either side has it quite right. Instead, I am guided by the New York Court of Appeals' decision in *Am. List Corp*. In that case, like this one, the defendant agreed to pay a specific amount over the course of many years, and the defendant repudiated the contract before it ended. The Court of Appeals determined that the proper measure of damages was "the total due plaintiff under the contract, taking into account the costs reasonably saved by plaintiff as a result of the breach and subtracting the amount already paid by defendant" and discounting to present value any amounts due in the future. *Am. List Corp., Inc.*, 549 N.E.2d at 1165. However, because the doctrine of anticipatory breach applied, it was improper to discount the plaintiff's

damages based on a risk that the plaintiff would be unable to perform the contract in the future.

396.     As of February 2016, Eddystone was entitled to the full amount of remaining deficiency payments due under the RSA, discounted to present value. However, none of the Parties' expert opinions is helpful in this regard. Eddystone's expert did not opine as to the present value of Eddystone's damages as of February 2016. And Defendants' expert's discount factor of 21.5% percent was based on various risks that Eddystone would be unable to perform its own obligations under the RSA—considerations that are improper in the anticipatory breach context. Ms. Bramer's discount factor also considered various market risks, but a take-or-pay contract allocates those risks on the front end, so they cannot factor into the damages analysis on the back end. Thus, I will not discount Eddystone's damages by additional risk factors.

397.     Instead, to determine the present value of the remaining deficiency payments as of February 2016, I will consider the risk of non-payment as the discount rate. To do this, I have considered Ferrellgas Partners' debt rate, because Ferrellgas Partners is liable under PUFTA. Relying on the Ferrellgas Defendants' 2016 10-K form (Ex. 2495 at F-24, F-26), I have determined the weighted average of Ferrellgas Partners' debt rate to be 6.43%, utilizing the following inputs:[37]

---

[37]     The full calculation is:
$(0.2547 \times 6.5 + 0.2547 \times 6.75 + 0.2441 \times 6.75 + 0.0927 \times 8.625 + 0.1493 \times 3.7 + 0.0043 \times 11.8) / (0.2547 + 0.2547 + 0.2441 + 0.0927 + 0.1493 + 0.0043) = 6.42642278$

| Interest Rate | 2016 Debt | Weight |
|---|---|---|
| 6.5% | $500,000 | $500,000 ÷ $1,962,601 |
| 6.75% | $500,000 | $500,000 ÷ $1,962,601 |
| 6.75% | $479,008 | $479,008 ÷ $1,962,601 |
| 8.625% | $182,000 | $182,000 ÷ $1,962,601 |
| 3.7% | $293,109 | $293,109 ÷ $1,962,601 |
| 11.8% | $8,484 | $8,484 ÷ $1,962,601 |

398.    As a sanity check, I also reviewed the Ferrellgas Defendants' 2017 10-K form, which is publicly available. In that filing, the Ferrellgas Defendants represented that in January 2017, "Ferrellgas issued and sold, in a private placement offering with registration rights, $175.0 million in aggregate principal amount of additional 8.625% unsecured senior notes ...." SEC Form 10-K, 2017 at F-24.[38] Because there is not a large discrepancy between these two figures, I conclude that my calculation of the weighted average is a fair number to use to determine Ferrellgas Partners' debt rate as of February 2016.

399.    Applying a discount rate of 6.43% to each monthly deficiency payment for February 2016 through June 2019 renders the present value of those remaining RSA

---

[38]    *Available at*
https://www.annualreports.com/HostedData/AnnualReportArchive/f/NYSE_FGP_2017.pdf

payments to be $130,715,994, as of February 2016.[39] This is how much the remaining payments were worth at that time. Together with the unpaid deficiency charges for the month of January 2016 ($493,134), the total amount owed to Eddystone as of February 2016 was $131,209,128.

400.    Aside from calculating the present value of BTS's obligations to Eddystone as of February 2016, I must also deduct any amounts that BTS paid toward that obligation, as well as any costs that Eddystone saved from BTS's repudiation. In 2017, Eddystone received $450,000 and 28,000 barrels of crude oil from Jamex Transfer Holdings as part of the Settlement. Ms. Bramer determined those barrels to be worth $1,605,800, and Eddystone did not offer any contrary evidence. Therefore, I will deduct these two amounts from Eddystone's damages, to reach an amount of $129,153,328 due under the RSA ($131,209,128 - $450,000 - $1,605,800 = $129,153,328).

401.    In terms of avoided costs, I decline to rely on Eddystone's calculations because Mr. Sherman did not calculate what costs Eddystone avoided after BTS's repudiation of the RSA. Instead, he provided a total of all the costs that Eddystone continued to incur after that time. Ms. Bramer, on the other hand, relied on Eddystone's 2015 cost data to calculate the difference between the operating costs Eddystone would

---

[39]    I used the following formula to calculate the present value (PV) of each remaining deficiency payment: PV = future value (FV) / (1+.0643)year. For example, for the period of February 2016, the FV was $3,338,640 (i.e. the deficiency payment due in March), and the year was 0.0833 (i.e. 1 month). That leads to a present value of $3,321,347. I repeated this analysis for each of the remaining deficiency payments.

have incurred if it had remained ready to receive crude deliveries and the operating costs it actually incurred after it idled the facility. Then, Eddystone was able to avoid all costs after selling the facility to Canopy. As a result, Eddystone avoided $32,228,405 in costs, so I will reduce Eddystone's damages further to $96,924,923 ($129,153,328 - $32,228,405 = $96,924,923).

402.    Eddystone contends that it is entitled to late fees under the RSA as part of its damages, but it's wrong. When BTS breached the RSA by failing to pay the deficiency payments for January 2016—and Eddystone treated that breach as a repudiation of the entire contract—that repudiation terminated the RSA, including the provision providing for late fees. Once BTS repudiated the RSA, BTS was liable for a total breach of the contract and was no longer required to make monthly deficiency payments—it was liable for the full remainder as of February 2016. Rather than treat BTS's breach as a repudiation, Eddystone could have continued to proceed as if the contract was valid and seek damages after the RSA ended, but it didn't. *See Princes Point*, 87 N.E.3d at 124. That choice eliminates Eddystone's claim for nearly all the monthly late fees it seeks, save for the late fee that was already due at the time BTS repudiated the RSA. However, Eddystone did not provide a calculation for the total late fees owed for the first unpaid invoice only,[40] so I do not have a proper figure to apply.

---

[40]    The RSA permits Eddystone to "assess a late fee at an annual interest rate equivalent to one hundred twenty-five percent (125%) of the prime rate of interest

403.     The final piece of Eddystone's claim for damages because of BTS's breach of the RSA is pre-judgment interest. Again, New York law governs. While Eddystone's alter ego breach of contract claim against the Ferrellgas Defendants and Bridger Logistics arose under federal common law, its claim against BTS for breach of contract arises under New York law. Again, under PUFTA, a "claim" is a right to payment, and it does not matter whether Eddystone's right to payment under the RSA is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 12 Pa. C.S.A. § 5101. So, the "claim" is the breach of contract claim grounded in New York law.

404.     Under New York law, Eddystone is entitled to prejudgment interest on its breach of contract claim against BTS. *See Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (noting that an award of prejudgment interest would have been "mandatory" for a breach of contract claim under New York law); N.Y. C.P.L.R. 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract[.]") (emphasis added). Indeed, Defendants concede that "prejudgment interest is recoverable as a matter of right for breach of contract[.]" (ECF No. 739 at 37.)

---

charged by Citibank N.A. of New York, New York (or its successor) on ninety (90) day loans to substantial and responsible commercial borrowers as of the due date." (Ex. 90-A at § 5.3.)  Eddystone did not introduce any of this information into evidence, so I cannot make the calculation based on the record before me.

405.     Therefore, Eddystone is entitled to prejudgment interest at the rate of 9% per year from February 20, 2016, when BTS repudiated the contract and owed the full amount of remaining deficiency payments under the RSA. *See* N.Y. C.P.L.R. 5001(b) ("Interest shall be computed from the earliest ascertainable date the cause of action existed[.]"); N.Y. C.P.L.R. 5004(a) ("Interest shall be at the rate of nine per centum per annum[.]"). Thus, Eddystone is entitled to $72,402,917 in prejudgment interest.

406.     All told, the amount necessary to satisfy Eddystone's claim against BTS would be $169,327,840 ($96,924,923 + $72,402,917 = $169,327,840). Because this amount is less than any of the experts' calculations as to BTS's enterprise value, I will enter judgment against Ferrellgas Partners and Bridger Logistics in this amount. *See* 12 Pa. C.S.A. § 5108(b).

### 3.     Punitive damages

407.     The Third Circuit has "predict[ed] that the Pennsylvania Supreme Court would conclude that punitive damages are available under the PUFTA," even though there's no express statutory authorization for such damages. *Klein*, 729 F.3d at 288. Absent any contrary authority from the Pennsylvania Supreme Court, I must assume that such damages are available. In this case, however, punitive damages are not appropriate.

408.     By their nature, all fraudulent transfer cases involve bad conduct. But bad conduct is not enough to justify punitive damages. Instead, Eddystone must point to outrageous conduct. *See id.* at 291. "[T]here must be acts of malice, vindictiveness and a

wholly wanton disregard of the rights of others." *Chestnut*, 619 F. Supp.3d at 516 (quotation omitted). In *Klein*, for example, the debtor had harassed his ex-wife (his creditor) and "made deeply disturbing threats against her attorneys" in connection with the fraudulent transfers. *Klein*, 729 F.3d at 293. The Court explained that the debtor's use of "unlawful and threatening means to impede the judicial process" exemplified "the very kind of outrageous and intolerable behavior that punitive damages are designed to punish and deter." *Id.*

409.   The facts of Klein were extreme, and Defendants' conduct does not come anywhere close to the level of outrageousness needed to justify a punitive damages award. There is no evidence that any Defendant acted out of malice or vindictiveness. Instead, the decision to transfer BTS's assets to other Bridger Entities and sell BTS to Jamex Transfer Holdings seems to have been a strategic business decision that ran afoul of PUFTA. Ferrellgas and Bridger Logistics sought advice of counsel before proceeding with this plan, and it appears that the various decisionmakers believed that a valid lien was in place when they received that advice, and that the lien would insulate BTS from any fraudulent transfer claims. Their consultation with attorneys does not demonstrate a reckless disregard for Eddystone's rights, and the decision to go forward with the transfers and the sale to Jamex Transfer Holdings in the face of some risk is not outrageous. While Eddystone may be outraged, the law requires more.

410.    There is no evidence in the record to support an award of punitive damages against Bridger Energy or Bridger Transportation.

### 4.    Mitigation

411.    Eddystone failed to demonstrate that a non-breaching party to a take-or-pay contract is not obligated to mitigate its damages under New York law. Neither case it cited applied New York law, which governs the RSA, and I have already determined that New York law would permit reducing or discounting damages where the breaching party repudiated a take-or-pay contract.

412.    That said, I will not reduce Eddystone's damages further because Defendants did not establish that Eddystone failed to take reasonable efforts to mitigate its losses. Instead, the evidence revealed that shortly after BTS's breach of the RSA, Eddystone's joint venturers explored alternate opportunities for the facility. However, given the difference in their respective holdings, Enbridge and Canopy did not agree as to the best approach. While Enbridge wanted to shutter the facility, Canopy wanted to explore smaller and/or non-crude opportunities to avoid a complete closure. While Enbridge prevented Canopy from pursuing those opportunities for various business reasons, it did not shut down the facility completely.

413.    Ultimately, Eddystone transferred ownership of the facility to Canopy in October 2017, which allowed it to avoid all costs thereafter. (*See* Ex. 3008 at ¶ 23.) The fact that Eddystone did not pursue alternate uses for the facility between February 2016 and

the sale to Canopy does not mean that it failed to mitigate. In addition, it is noteworthy that once Canopy took full ownership of the facility, it did not start regular transloading services until August 2018. This fact belies Defendants' argument that Eddystone ignored a host of available opportunities.

414.     In addition, even if Eddystone did fail to mitigate its damages by looking for an alternate shipper to take capacity at the facility, Defendants have not met their burden to demonstrate a proportionate reduction in Eddystone's damages. *See Whittemore v. Yeo*, 112 A.D.3d 475, 476 (N.Y. App. Div. 2013) (defendant had burden to "demonstrate plaintiff's failure to mitigate, including the extent to which damages allegedly could have been litigated"); *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 262 (Pa. 2012) ("[T]he burden is on the breaching party to show how losses could have been avoided."). While Defendants argue that "Eddystone's damages should be reduced to reflect the revenue it could have generated from use of the Eddystone facility," (DCOL ¶ 379), they have not demonstrated the amount of revenue Eddystone could have generated. (*See* Ex. 3008 at ¶ 14 ("The damages numbers do not account for the offsetting impact of opportunities to mitigate that were available to Eddystone, but that it did not pursue.").) Thus, there is no basis to reduce Eddystone's damages based on an alleged failure to mitigate.

## III.    CONCLUSION

415.    Eddystone has not met its burden to impose alter ego liability on Ferrellgas Defendants, Bridger Logistics, or Bridger Rail Shipping, so I will enter judgment against Eddystone on that claim. Because Defendants' counterclaim for breach of contract related to CT meters was contingent on a finding of alter ego, I dismiss that counterclaim as moot.

416.    Eddystone cannot prevail on its breach of fiduciary duty claim as a matter of law, so I will enter judgment against Eddystone on that claim as well.

417.    As set forth above, Eddystone has not established its PUFTA claims against Ferrellgas L.P., Bridger Administrative Services II, Bridger Marine, Bridger Rail Shipping, Bridger Real Property, Bridger Storage, Bridger Swan Ranch, Bridger Terminals, Bridger Leasing, Bridger Lake, J.J. Liberty, or J.J. Addison Partners, so I will enter judgment against Eddystone as to those Defendants.

418.    However, Eddystone has proven violations of PUFTA and is entitled to $169,327,840 in damages from Bridger Logistics and Ferrellgas Partners on those claims. Eddystone is also entitled to $916,130 from Bridger Energy and $1,430,717 from Bridger Transportation.

419.    An appropriate Order follows awarding those damages.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
_____
Hon. Joshua D. Wolson
United States District Judge

June 7, 2024